UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PRESENT: The Honorable **ROBERT J. BRYAN**, United States District Judge

Jean Adamson                                    Julaine V. Ryen
Courtroom Deputy                              Court Reporter
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Civil Minutes

DATE:      SEPTEMBER 3, 1996          CASE NUMBER: C94-5238RJB

SPENCER v. KLAUSER

ATTORNEY FOR PLAINTIFF(S)          ATTORNEY FOR DEFENDANT(S)
Peter Camiel                                    John Samson/Donna Mullen

PROCEEDING: EVIDENTIARY HEATING RE: HABEAS PETITIONI -- Day 1.

Petitioner's exhibits 1-17, 22-25 and 28,29 are ADMITTED BY STIPULATION

Respondent's exhibit A-1 thru A-13 ADMITTED BY STIPULATAION

Argument re: admission of exhbits 18, 19, 20, 21, 26,27; all admitted with

limitations stated by court.

Witnesses excluded;

10:00 Opening Statements

Petitioner calls Sharon Krause; James Davidson; Karen Klein; Clyde Raymond

Spencer (court advises re: right to testify)

Court to resume 1:30 9/4/96

Recess 4:30

DEPOSITION OF SHARON KRAUSE;

DEPOSITION OF KEVIN B. McGOVERN, Ph.D. in Lieu of Live Testimony

EXHIBIT    A

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PRESENT: The Honorable **ROBERT J. BRYAN,** United States District Judge

Jean Adamson                                          Julaine V. Ryen
Courtroom Deputy                                      Court Reporter
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Civil Minutes

DATE:      SEPTEMBER 4, 1996            CASE NUMBER: C94-5238RJB

SPENCER v. KLAUSER

ATTORNEY FOR PLAINTIFF(S)            ATTORNEY FOR DEFENDANT(S)
Peter Camiel                          John Samson/Donna Mullen

PROCEEDING: EVIDENTIARY HEATING RE: HABEAS PETITIONI -- Day 2.

1:30 Clyde Raymond Spencer resumes stand; Dr. Lawrence Halpern;

Dr. Manuel Galaviz;

Recess 4:30

DEPOSITION OF DR. LAWRENCE HALPERN;

DEPOSITION OF SHIRLEY JEAN SPENCER. in Lieu of Live Testimony

6

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

PRESENT: The Honorable **ROBERT J. BRYAN,** United States District Judge

Jean Adamson                                                  Julaine V. Ryen
Courtroom Deputy                                                Court Reporter
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### Civil Minutes

DATE:      SEPTEMBER 5, 1996          CASE NUMBER: C94-5238RJB

### SPENCER v. KLAUSER

ATTORNEY FOR PLAINTIFF(S)          ATTORNEY FOR DEFENDANT(S
Peter Camiel                                John Samson/Donna Mullen

PROCEEDING: <u>EVIDENTIARY HEATING RE: HABEAS PETITIONI -- Day 3.</u>

9:30 Petitioner calls Dr. Kathryn Magee (by phone)

Respondent calls Dr. Henry H. Dixon;

Petitioner calls James Peters, AUSA Idaho,;

Respondent calls Judge James Rulli; 3:50 pltf rests;

Recess 4:00



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PRESENT: The Honorable **ROBERT J. BRYAN,** United States District Judge

Jean Adamson                                                    Julaine V. Ryen
Courtroom Deputy                                               Court Reporter
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

<u>Civil Minutes</u>

DATE:        SEPTEMBER 6, 1996              CASE NUMBER: C94-5238RJB

<u>SPENCER v. KLAUSER</u>

ATTORNEY FOR PLAINTIFF(S)              ATTORNEY FOR DEFENDANT(S
Peter Camiel/Peter Mair                      John Samson/Donna Mullen

PROCEEDING: <u>EVIDENTIARY HEARING RE: HABEAS PETITIONI -- Day 3.</u>

1:00 Respondent call Rebecca Tritt Weister, M.D.;

2:40 Respondent rests;   Closing Arguments

For the reasons stated orally, on the record, the court makes a PARTIAL
FINDING and further RESERVES FINAL RULING and will issue a written order
or render an oral decision as soon as possible.

Recess 4:30



1

1          UNITED STATES DISTRICT COURT
2          WESTERN DISTRICT OF WASHINGTON
                   AT TACOMA

3
CLYDE RAYMOND SPENCER,          )     Docket No. C94-5238RJB
4                               )
                Petitioner,     )     Tacoma, Washington
5                               )     September 3, 1996
          v.                    )     9:30 a.m.
6                               )
JOSEPH KLAUSER, Warden,         )
7  Idaho State Institution;     )
CHRISTINE GREGOIRE, Attorney    )
8  General, State of Washington. )
                                )
9               Respondents.    )
   _____)

10

11                     VOLUME I
                  TRANSCRIPT OF TRIAL
12        BEFORE THE HONORABLE ROBERT J. BRYAN
              UNITED STATES DISTRICT JUDGE.

13

14  APPEARANCES:

15  For the Petitioner:        PETER A. CAMIEL
                               Mair, Abercrombie, Camiel &
16                               Rummonds
                               710 Cherry Street
17                             Seattle, Washington  98104

18  For the Respondents:       JOHN J. SAMSON
                               DONNA H. MULLEN
19                             Assistant Attorneys General
                               Post Office Box 40116
20                             Olympia, Washington  98504-0116

21
    Court Reporter:            Julaine V. Ryen
22                             Post Office Box 885
                               Tacoma, Washington 98401-0885
23                             (206) 593-6591

24

25  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.

ORIGINAL 97

172

1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
2                AT TACOMA

FILED
RECEIVED
LODGED
JAN 16 1997
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                          DEPUTY

3
CLYDE RAYMOND SPENCER,            )      Docket No. C95-5238RJB
4                                 )
           Petitioner,            )
5                                 )      Tacoma, Washington
     v.                           )      September 4, 1996
6                                 )      1:30 p.m.
                                  )
JOSEPH KLAUSER, Warden,           )
7 Idaho State Institution;        )
CHRISTINE GREGOIRE, Attorney      )
8 General, State of Washington.   )
                                  )
9          Respondent.            )
   _____)

10

11                      VOLUME II
                   TRANSCRIPT OF TRIAL
12        BEFORE THE HONORABLE ROBERT J. BRYAN
             UNITED STATES DISTRICT JUDGE.

13

14 APPEARANCES:

15 For the Petitioner:          PETER A. CAMIEL
                                Mair, Camiel & Kovach, P.S.
16                              710 Cherry Street
                                Seattle, Washington  98104
17
   For the Respondents:         JOHN J. SAMSON
18                              DONNA H. MULLEN
                                Assistant Attorneys General
19                              Post Office Box 40116
                                Olympia, Washington  98504-0116
20

21
   Court Reporter:              Julaine V. Ryen
22                              Post Office Box 885
                                Tacoma, Washington 98401-0885
23                              (206) 593-6591

24
   Proceedings recorded by mechanical stenography, transcript
25 produced by Reporter on computer.

ORIGINAL

10

281

FILED
RECEIVED
LODGED

JAN 16 1997

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, AT TACOMA
DEPUTY

1          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
2                 AT TACOMA

3

CLYDE RAYMOND SPENCER,          )      Docket No. C94-5298RJB
4                               )
            Petitioner,         )      Tacoma, Washington
5                               )      September 5, 1996
        v.                      )      9:30 a.m.
6                               )
JOSEPH KLAUSER, Warden,         )
7  Idaho State Institution;     )
   CHRISTINE GREGOIRE, Attorney  )
8  General, State of Washington. )
                                )
9            Respondent.        )
   _____)

10

11                      VOLUME III
                  TRANSCRIPT OF TRIAL
12          BEFORE THE HONORABLE ROBERT J. BRYAN
               UNITED STATES DISTRICT JUDGE.

13

14  APPEARANCES:

15  For the Petitioner:        PETER A. CAMIEL
                               Mair, Camiel & Kovach, P.S.
16                             710 Cherry Street
                               Seattle, Washington  98104
17

18  For the Respondents:       JOHN J. SAMSON
                               DONNA H. MULLEN
19                             Assistant Attorneys General
                               Post Office Box 40116
20                             Olympia, Washington  98504-0116

21

    Court Reporter:            Julaine V. Ryen
22                             Post Office Box 885
                               Tacoma, Washington 98401-0885
23                             (206) 593-6591

24

    Proceedings recorded by mechanical stenography, transcript
25  produced by Reporter on computer.

ORIGINAL 99

11

RECEIVED LODGED

JAN 16 1997

WESTERN CLERK U.S. DISTRICT COURT
DISTRICT OF WASHINGTON AT TACOMA
DEPUTY

1                 UNITED STATES DISTRICT COURT

            WESTERN DISTRICT OF WASHINGTON

2                       AT TACOMA

3

4   CLYDE RAYMOND SPENCER,       )     Docket No. C94-5238RJB

                        )

5            Petitioner,    )     Tacoma, Washington

                        )     September 6, 1996

6         v.              )     1:00  p.m.

                        )

7   JOSEPH KLAUSER, Warden,     )

    Idaho State Institution;    )

8   CHRISTINE GREGOIRE, Attorney  )

    General, State of Washington. )

                        )

9          Respondent.    )

  _____)

10

11                      VOLUME IV

               TRANSCRIPT OF TRIAL

12       BEFORE THE HONORABLE ROBERT J. BRYAN

          UNITED STATES DISTRICT JUDGE.

13

14   APPEARANCES:

15   For the Petitioner:        PETER A. CAMIEL

                      PETER MAIR

16                     Mair, Camiel & Kovach, P.S.

                    710 Cherry Street

17                     Seattle, Washington  98104

18   For the Respondents:       JOHN J. SAMSON

                      DONNA H. MULLEN

19                     Assistant Attorneys General

                    Post Office Box 40116

20                     Olympia, Washington  98504-0116

21

  Court Reporter:           Julaine V. Ryen

22                     Post Office Box 885

                    Tacoma, Washington 98401-0885

23                     (206) 593-6591

24

25   Proceedings recorded by mechanical stenography, transcript

  produced by Reporter on computer.

ORIGINAL

12

268

1  his motivation for giving those kinds of responses.  I just

2  don't know.

3          THE COURT:  Other questions of the doctor?

4          MS. MULLEN:  No further questions, Your Honor.

5          MR. CAMIEL:  No, Your Honor.

6          THE COURT:  Thank you, Doctor.

7          THE WITNESS:  Thank you.

8          THE COURT:  You may be excused.

9      (Witness excused.)

10         MR. CAMIEL:  We have another witness ready.

11     MANUEL R. GALAVIZ, PETITIONER'S WITNESS, SWORN OR AFFIRMED

12                      DIRECT EXAMINATION

13 BY MR. CAMIEL:

14 Q.  Could you please state your name and spell your last name.

15 A.  Manual Raymond Galaviz.  G-a-l-a-v-i-z.

16 Q.  And it's Dr. Galaviz?

17 A.  Yes.

18 Q.  Doctor, what's your professional address?

19 A.  My professional address, 123 -- 12607 Southeast Mill Plain

20 Boulevard.

21 Q.  What's the nature of your employment?

22 A.  I'm a family physician.

23 Q.  Doctor, where did you attend medical school?

24 A.  University of California, Davis.

25 Q.  And what year did you finish up medical school?

EXHIBIT  B-1    13

269

1  A.    1980.   June 1980.

2  Q.    And then where did you go for your residency?

3  A.    I did my residency at Group Health Cooperative of Puget

4  Sound up in Seattle.

5  Q.    What years did you serve your residency?

6  A.    From 1980 to 1983.

7  Q.    Was there a particular focus of your residency?

8  A.    It was a family practice residency, so it was pretty

9  general.

10 Q.    And what year did you actually begin, become licensed to

11 practice medicine?

12 A.    In 1983.

13 Q.    And where did you begin your practice?

14 A.    I started at -- with Kaiser Permanente in Vancouver,

15 Washington.

16 Q.    And are you still with Kaiser Permanente in Vancouver?

17 A.    Yes, I am.

18 Q.    And what is your specialty, if you have one?

19 A.    I specialize in family practice.

20 Q.    All right.

21        Doctor, as a part of your medical training going through

22 medical school or during your residency, did you have occasion

23 to receive training regarding diagnosing child abuse?

24 A.    Not specifically.  It was just mainly general pediatrics.

25 Q.    And in terms of your medical training, did you receive

14

270

1  training regarding diagnosing and treating injuries such as

2  bruises?

3  A.   Yes.

4  Q.   Lacerations?

5  A.   Yes.

6  Q.   Tears in the tissue?

7  A.   Yes.

8  Q.   Doctor, I would like you to turn your attention to 1985, if

9  you would, please.   In the blue notebook in front of you, if you

10  could turn to tab number 2, which is Exhibit No. 2.

11      Do you recognize what the documents are under tab No. 2?

12  A.   These are my progress notes from a visit March 6th, 1985.

13  Q.   Who is your patient?

14  A.   Matthew Hansen.

15  Q.   Have you been recently asked to review these notes?

16  A.   Yes, I have.

17  Q.   How was it that Matthew Hansen became your patient on

18  March 6th, 1985?

19  A.   I believe they called for an appointment and happened to be

20  on my schedule, like many other patients.

21  Q.   Do you know whether or not Matthew Hansen was referred to

22  you by another physician?

23  A.   I do not.

24  Q.   Do you have a recollection of your meeting with Mr. Hansen,

25  Matthew Hansen?

271

1   A.   As far as a photographic appearance, no.  Not specifically.

2   Q.   Apart from the -- independent of the medical record, which

3   is Exhibit No. 2, do you remember the occasion that you met with

4   Matthew Hansen?

5   A.   Vaguely.

6   Q.   Do you remember why it was that he had -- he or his parent

7   had made an appointment to meet with you?

8   A.   Can I refer to my progress notes?

9   Q.   Yes.

10  A.   Well, it was specifically to look for any physical evidence

11  of injury.

12  Q.   All right.  Matthew Hansen, I take it, wasn't a regular

13  patient of yours?

14  A.   Not that I recall at this time.  I have thousands of

15  patients.

16  Q.   You don't recall that you had ever seen him before this

17  time?

18  A.   Not that I recall now.

19  Q.   You indicated that the purpose for the appointment was to

20  look for evidence of injury.  Were you given a suspected cause

21  as to why there might be some injury to look for?

22  A.   I was given the information that Matthew had been sexually

23  abused.

24  Q.   And were you given information as to the type of sexual

25  abuse that was being alleged?

272

1  A.   The information I got was that he was sexually abused anally

2  and orally.

3  Q.   Did you receive information that he had been -- that the

4  sexual abuse had occurred by an adult male, his stepfather?

5  A.   Yes.

6  Q.   Do you recall what type of examination you did when Matt

7  Hansen came in to your office?

8  A.   I initially did a questioning about general information,

9  and proceeded to an exam from the head, neck, down to the

10  muscular-skeletal system.

11  Q.   Do you recall when Matt Hansen came in, was he accompanied

12  by his mother?

13  A.   Yes, she was, I believe, according to my note.

14  Q.   Do you recall her being present during your examination of

15  her son?

16  A.   I believe so.

17  Q.   Do you recall any conversations with Matt Hansen's mother,

18  Shirley Spencer, regarding how it was that she got to you?

19  A.   According to my notes, Matthew had been in counseling and

20  the counselor had learned that Matthew had described anal and

21  oral sexual manipulation.

22  Q.   Do you recall whether or not Matthew Hansen's mother

23  indicated whether or not she had been in touch with police

24  officers or whether police were involved in the investigation of

25  alleged abuse of Matt?

273

1   A.   I do not recall that.

2   Q.   You indicated you conducted an examination.   You started

3   from the head and worked your way down?

4   A.   Yes.

5   Q.   Where did the examination take place?

6   A.   In my office there in Vancouver.

7   Q.   You indicated you started with the head and you worked your

8   way down.   At some point, did your examination include a genital

9   and anal examination?

10  A.   Yes, it did.   An external genital and anal exam.

11  Q.   Why were you conducting a genital and anal examination?

12  A.   For -- well, in a normal five-year pediatric exam, that's

13  part of the exam, but in this case also looking for external

14  injury, trauma.

15  Q.   What kinds of external injury or trauma were you looking

16  for?

17  A.   Anything out of the ordinary.

18  Q.   Were you looking for things such as bruises?

19  A.   Yes, if they were present.

20  Q.   Or redness?

21  A.   Yes, if it was present.

22  Q.   Or swelling?

23  A.   Yes.

24  Q.   Lacerations?

25          THE COURT:   Counsel, you're going at this as though it

18

274

1   wasn't 4:31.  I assume that Dr. Galaviz would like to get back

2   to Vancouver tonight, if you can finish in four, five minutes.

3           MR. CAMIEL:  I will do the best I can, Your Honor.

4           THE COURT:  I can tell you what he's going to say.  I'm

5   not sure why we are going through all this.  He did a physical

6   exam and it came up negative.

7       Right?

8           THE WITNESS:  Yes.

9           THE COURT:  What else do you have to add?

10  Q.  (By Mr. Camiel)  Doctor, when you conducted the anal

11  examination, how did you do that?

12  A.  I simply looked externally.

13  Q.  How was Matthew positioned?

14  A.  I don't recall exactly.  I generally try to make it as least

15  traumatic to the patient as possible because that's very

16  embarrassing to them, and I simply generally look when they are

17  standing.

18  Q.  Is it possible you had Matthew on your lap or over your knee

19  when you conducted that exam?

20  A.  No.

21  Q.  Had you conducted exams where there had been allegations of

22  child sexual abuse before this exam that you conducted?

23  A.  Since I'm not -- that's not my area, and generally it's an

24  office exam, I can't recall.  Maybe a handful in my five years

25  of being a physician.

1    Q.   You submitted an affidavit for the attorney general.   Do you

2    recall your affidavit that you submitted?

3    A.   Yes, I do.

4    Q.   Do you recall indicating to the attorney general that you

5    had -- you had been minimally exposed to child abuse cases?

6    A.   Yes.

7    Q.   When Shirley Spencer came in and explained to you what the

8    allegations were involving Matt, did you feel the need to refer

9    him to another physician to conduct the exam, or did you feel

10   that you would be able to conduct the exam and determine whether

11   or not there were any present injuries that might have been

12   caused by the alleged sexual abuse?

13   A.   The reason for the visit that day was to simply look to see

14   if there was any obvious physical injury to this child.

15   Q.   Did you see anything that even appeared to be suspicious as

16   having been caused by child abuse, sexual abuse?

17   A.   I recall, according to my note, that he was just -- kind of

18   kept to himself and was quiet, but as far as physical, visual,

19   other evidence, I didn't recall any.

20   Q.   Do you believe that if you had -- if there had been physical

21   injury present in Matt's genital or anal area that you would

22   have been able to observe that at the time you conducted the

23   exam?

24   A.   Again, I'm not an expert in this, but I -- if it was there

25   obvious, I would have picked it up.   Externally.

276

1    Q.   After the exam was conducted, do you recall whether or not

2    you were ever contacted by any detectives or police officers

3    concerning your examination of Matt?

4    A.   I don't believe so.

5    Q.   Did you make a report, as is required by statute, concerning

6    suspected child abuse to anyone?

7    A.   I don't recall.

8    Q.   Were you familiar at that time with a statutory requirement

9    that you report suspected child abuse?

10   A.   Yes.  But I think I was in the intermediate.  I wasn't

11   the -- from my recollection, I wasn't -- this was already in the

12   process.  It wasn't new.

13   Q.   So it was your understanding that it had already been

14   reported?

15   A.   The fact that the patient had been with a counselor told me

16   that this was kind of an ongoing thing, part of an ongoing

17   process.

18   Q.   Did you have any understanding as to whether the police or

19   law enforcement had been notified?

20   A.   I believe so.

21   Q.   You believe you understood that they had been notified?

22   A.   Yes.  As far as having been with a counselor, I believe they

23   somehow were involved.  If that was -- that was part of their

24   job.

25   Q.   Did you refer Matt Hansen to anyone else for any additional

21

1   or follow-up examination?

2   A.   According to my exam and my plan, I did not have that in my

3   plan.

4   Q.   If you had seen something that you were not certain about

5   based on your level of experience, would you have referred him

6   to another physician who had more experience?

7   A.   I think my job was just strictly to look for physical

8   evidence of injury, and so since I did not find any obvious

9   external evidence, at that point then I didn't pursue it any

10  further.

11          MR. CAMIEL:   Thank you.   That's all I have.

12                      CROSS-EXAMINATION

13  BY MR. SAMSON:

14  Q.   Dr. Calaviz, I just have some short questions.

15       First, you're not an expert in the area of child abuse?

16  A.   No, I'm not.

17  Q.   You've only been minimally exposed to that?

18  A.   That's correct.

19  Q.   And at the time, you had only been a practicing doctor who

20  had finished residency for about a year and a half?

21  A.   That's correct.

22          THE COURT:   So far I already heard those three

23  answers.

24          MR. SAMSON:   Yes, Your Honor.

25  Q.   (By Mr. Samson)   Doctor, you testified that if there had --

1      THE COURT:  I heard what he testified about.  What's
2  the question?

3      MR. SAMSON:  Your Honor, I'm going to get to it.

4      THE COURT:  Don't repeat his testimony.  Just ask the
5  question.

6      MR. SAMSON:  Yes, Your Honor, but I believe --
7  Q.  (By Mr. Samson)  You said there were no physical injuries
8  observable at the time.  Could those physical injuries have
9  healed before you did the exam?
10 A.  Yes.  And -- yes, any injury could have healed.  My
11 information was it was three weeks prior to that.
12 Q.  And did you previously say in an affidavit, "I believe that
13 any lacerations or swelling that may have been present directly
14 after the alleged abuse would have healed prior to my
15 examination"?
16 A.  That's correct.
17 Q.  And if there were internal injury or trauma, you would not
18 have been able to have observed that?
19 A.  Not with my exam.
20 Q.  And the main concern of this exam was to make sure the child
21 was presently okay, the child was not injured?
22 A.  That was my understanding of the exam.
23 Q.  So if the child was injured, something could have been done
24 to heal the child?
25 A.  That's correct.

282

1     (Defendant present.)

2                              MORNING SESSION.

3          THE COURT:  I understand we have Dr. Magee on the

4     phone.

5          THE CLERK:  Yes.

6          THE COURT:  Is this your next witness?

7          MR. CAMIEL:  Yes.

8          THE COURT:  Dr. Magee, can you hear me all right?

9          DR. MAGEE:  Can you speak a little louder?

10         THE COURT:  Yes, I can.  I can speak as loud as you

11    want.

12         DR. MAGEE:  Okay.  That's fine.

13         THE COURT:  We are in court.  I'm Judge Bryan.  Mr.

14    Camiel is here representing Mr. Spencer, and Mr. Samson and Ms.

15    Mullen are here representing the state.

16      You're a witness called by Mr. Camiel, and the first --

17    first, it's my understanding here that we have all stipulated

18    that your testimony could be taken by telephone conference

19    call.  You should understand that the rules are the same as if

20    you were actually present here in court.

21      Do you understand that?

22         DR. MAGEE:  Yes.

23         THE COURT:  The first thing I must do is to put you

24    under oath.

25         KATHRYN MAGEE, PLAINTIFF'S WITNESS, SWORN OR AFFIRMED

24

EXHIBIT  B-2

1    THE COURT:  All right.  Mr. Camiel, you may examine.

2    Counsel, if you need to get closer to hear, feel free to

3    move around as you might need to.  I think it's coming through

4    all right soundwise, but if you need to get closer, do so.

5    MR. CAMIEL:  Your Honor, before actually beginning my

6    questioning, I have an additional exhibit that is stipulated to,

7    which is an affidavit of Dr. Magee which I expect she will have

8    in front of her.

9    THE COURT:  All right.  And this is what number?

10   Exhibit 31.

11   You have no objection?

12   MR. SAMSON:  No objection, Your Honor.

13   THE COURT:  31 may be admitted.

14   (Exhibit No. 31 was admitted.)

15   THE COURT:  Is this my copy?

16   MR. CAMIEL:  It is, Your Honor.

17                  DIRECT EXAMINATION

18   BY MR. CAMIEL:

19   Q.  Good morning, Dr. Magee.  This is Peter Camiel speaking.

20   A.  Good morning.

21   Q.  We have talked before a couple times, haven't we?

22   A.  I can barely hear you, Mr. Camiel.  Can you come closer.

23   Q.  I will.

24   Doctor, you're speaking to us today from what location?

25   THE COURT:  Louder.

25

1  Q.  (By Mr. Camiel)  Doctor, where are you speaking to us from?

2  A.  Tuba City Indian Medical Center in Tuba City, Arizona.

3  Q.  What is your position with that medical center?

4     Doctor --

5         THE COURT:  Can you hear, Doctor?

6         THE WITNESS:  Did he ask me something else?

7         THE COURT:  We will try again here.

8  Q.  (By Mr. Camiel)  Doctor, what is your position at the Tuba

9  City Medical Center?

10  A.  I'm the medical director of the outpatient department.

11         THE COURT:  Excuse me.  We don't have her name on the

12  record.

13     Will you give us your name, Doctor.

14         THE WITNESS:  Kathryn, K-a-t-h-r-y-n, Magee, M-a-g-e-e,

15  M.D.

16  Q.  Doctor, could you tell us about your college education and

17  medical training.

18  A.  Sure.  I attended the University of California at Berkeley

19  for my undergraduate, and I graduated there in 1975 with a

20  degree in biological sciences.  And then I attended the

21  University of Rochester School of Medicine in Rochester, New

22  York, and graduated there in 1979.

23     No, I'm sorry.  I've got those dates wrong.  I finished

24  college in '79.  I finished medical school in '83.

25  Q.  Following the completion in medical school, Doctor, where

26

1  did you serve your residency?

2  A.  At the University of California Davis in the medical center

3  in Sacramento.

4  Q.  Doctor, as a part of your residency rotation, did you work

5  conducting child sex abuse examinations at the University of

6  California Davis Medical Center in Sacramento?

7  A.  Yes.  It was part of the pediatric clinic rotation that we

8  would do these kind of exams.

9  Q.  What is your current specialty or areas in specialty?

10  A.  I trained and board certified in family medicine.

11  Q.  And you also practice in the area of pediatrics?

12  A.  I do some pediatrics as well.  I mean, family medicine

13  incorporates actually obstetrics, pediatrics, and adult

14  medicine.

15  Q.  Doctor, when you were working at the University of

16  California Davis Medical Center conducting child abuse

17  examinations, was that -- were those type of examinations

18  routinely conducted by residents?

19  A.  Yes.  Always.

20  Q.  Was there a supervising physician that you worked under?

21  A.  There was -- well, there were attending physicians

22  available, but they did not routinely do the exam or take part

23  in it at all.

24  Q.  Did you receive, prior to going to work at the University of

25  California Davis, training with regard to child sexual abuse?

1  A.  Well, we had had brief lectures probably in both medical

2  school and residency with slides and things like that regarding

3  child abuse exams.

4  Q.  And did that training, did that training include information

5  regarding diagnosing child sex abuse?

6  A.  Yes.

7  Q.  Did the training include information concerning the conduct

8  of sexual abuse examinations?

9  A.  I'm sorry?

10  Q.  Did the training include information regarding how to

11  conduct child sex abuse examinations?

12  A.  Yes, although it wasn't extensive training.  It was -- but

13  it went over the general portions of the exam, yes.

14  Q.  You indicated that the training consisted of both lectures

15  and slide presentations.

16  A.  Yes.

17  Q.  Who were the lectures conducted by?

18  A.  Usually pediatric attending physicians.

19  Q.  And were these individuals people who had some expertise in

20  the area of child sexual abuse?

21  A.  Yeah.  I can't say that I can actually remember any of them,

22  but I -- yeah, most of them would have some expertise in child

23  abuse.  They usually were both -- I mean, they were not just

24  sexual abuse.  They were child abuse and sexual abuse lectures.

25  Q.  These slide presentations that you received, what were the

28

1  general nature of those?

2  A.  Well, they would have slides of children with various

3  injuries, and cigarette burns, bruising.  Also some slides of

4  the pelvic area.

5  Q.  And were those slides examples of children that had in fact

6  been sexually abused?

7  A.  Yes.

8  Q.  Were those slides used to demonstrate abnormalities that

9  might be found during a child sexual abuse examination?

10 A.  Yes.

11 Q.  Doctor, prior to actually beginning to conduct on your own

12 child sexual abuse examinations, was there a period of time

13 where you observed these being done by other individuals?

14 A.  I believe that as an intern, which is the first year

15 residency, that I would have observed a couple of these exams.

16 But I -- I can't say for certain.

17 Q.  Doctor, do you have now any independent recollection of your

18 examination of Kathryn Spencer?

19 A.  None.

20 Q.  Do you have in front of you today the medical records that

21 pertain to Kathryn Spencer?

22 A.  Yes.

23 Q.  We're going to be referring to those as Exhibit No. 1 here

24 in court.

25      Doctor, apart from being able to look at the record and

29

1  being able to see what the record says, do you recall Kathryn

2  Spencer actually coming to the clinic with her mother?

3  A.   No.

4  Q.   Does the record in front of you, does that consist of three

5  pages?

6  A.   Yes.

7  Q.   Doctor, I would like to start out with regard to the record

8  by asking you if you can identify, going page by page, the

9  information that you actually placed on the record?

10  A.   Okay.  On page 1, it's my handwriting -- the only place my

11  handwriting appears is under "Reporting Party's Name" and "UCD

12  Department" and "Phone," which is, I guess, the fourth line.

13  Q.   Do you know who would have filled out the rest of the

14  report?

15  A.   A social worker.

16  Q.   All right.  And then going on to page 2.

17  A.   Actually on page 1, also, my handwriting is at the very

18  bottom, "Print Last Name," "Signature," and "Date of Report."

19       On page 2, all of it is my handwriting.

20       And on page 3, the top part is not mine.  My handwriting is

21  -- appears in the middle of the page under "Diagnostic

22  conclusion(s)," two lines, and then again at the bottom of the

23  page with my name and signature.

24  Q.   On page 3, in the top portion of that page under the section

25  that is labeled "Maltreatment History," would that also have

1  been filled out by the social worker?

2  A.  Yes, although I wrote in here, "Mother said," at the very

3  top.  But the rest of it is filled out by the social worker.

4  Q.  Doctor, did you have a general routine that you followed

5  when you conducted these examinations?

6  A.  Yes.  Basically, it would consist of asking sort of brief

7  questions of the child, although the social worker normally

8  would see them first and have a history; and followed by an exam

9  that basically followed the second page of the medical records;

10  and then the social worker would take care of follow-up and any

11  further counseling, appointments.

12  Q.  Doctor, if I could have you turn to the second page, then,

13  of the examination, or report.

14  A.  Okay.

15  Q.  What, based on your review of that report, does that tell us

16  with regard to what you did concerning your examination of

17  Kathryn Spencer and what your observations were?

18  A.  Well, the first observation was that the child was cowering

19  in her mother's lap, which encompassed the general appearance.

20  And then she was measured as far as her height and weight

21  compared to percentiles for her age for that.

22  Q.  Doctor, if I could stop you for one moment on that, on that

23  point.  Does this child appear to be a particularly small child?

24  A.  She's still within normal limits.

25  Q.  You've got --

1   A.   She's actually a little thin for her height, but she's

2   completely within normal limits.   It's only when you fall off of

3   the growth curve completely that it's considered abnormal.

4   Q.   All right.

5   A.   Which means you're below the zero percentile.

6   Q.   All right.   If you could continue please.   Thank you.

7          THE COURT:   Give her a question.

8   Q.   (By Mr. Camiel)  Doctor, after noting the height and weight,

9   what else did you do in terms of your examination?

10   A.   Well, based on this record, as I said, I don't recall.   It

11   looks like I did sort of a general overview of looking at her

12   skin and muscular-skeletal system and noted some bug bites on

13   her, and then it looks like I did a general external pelvic

14   exam, noting that there was no redness, that the hymen appeared

15   intact, and that there were no lacerations externally and no

16   swelling noted.

17   Q.   Doctor, as a general practice, how would you conduct the

18   pelvic examination, the external pelvic examination you

19   described?

20   A.   On a child this age, usually what we would do is have her --

21   well, we would probably try and have her lay on the table, but

22   if that was too traumatic, we would have her just lay back in

23   her mother's lap and go into what we call a frog position, where

24   she sort of bends her knees and then just spreads her legs

25   apart.

291

1  Q.  And in conducting this kind of an examination, do you use

2  any instruments or devices?

3  A.  There were no instruments used in this exam.  If her hymen

4  had been ruptured, we may have used a speculum to view inside.

5  It does look like I did some cultures, you know, to check her

6  for -- I think it's both genitalia and anus cultures were done.

7  Q.  Do you know whether or not you conducted a rectal or anal

8  examination of this child?

9  A.  I cannot tell from my note whether I did anything more than

10  culture her anus.  I have nothing written down about it, so I

11  just -- as I don't remember the case, I can't say.

12  Q.  So it's possible that you did, but it's just as likely that

13  you didn't?

14  A.  Yeah.  I mean, my guess is usually what we did is we just

15  looked at the outside and did not actually do a digital exam

16  just because it was so traumatic.

17  Q.  And in looking at the outside, what kinds of things would

18  you be looking for?

19  A.  Lacerations, bruising, swelling.

20  Q.  And I take it if you noted any such things, those would

21  appear in your report?

22  A.  I would imagine so, but I cannot say for certain that I

23  looked since it's not noted one way or the other on the report.

24  Q.  How do you go about taking a culture from the anus?

25  A.  Normally I would basically spread the buttocks apart and

33

1   slip the swab in.  So I can only imagine that I at least saw it

2   grossly.

3   Q.  All right.

4   A.  But I did not note it on my record.

5   Q.  Doctor, was the facility that you were working at, the

6   University of California Davis in Sacramento, was that a

7   facility that regularly received referrals from law enforcement

8   to conduct these kinds of examinations?

9   A.  Frequently.

10  Q.  Were kids coming in every day for these kinds of exams?

11  A.  Most every day.

12  Q.  And during the period of time that you had your rotation in

13  this area, do you know how many examinations you conducted of

14  this type?

15  A.  I don't know exactly.  I could probably guess that I

16  conducted maybe 15 or 20.

17  Q.  Doctor, on the third page of the report, you've indicated

18  that you added some language at the top of the page, the words

19  "Mother said"?

20  A.  Uh-huh.  Yes.

21  Q.  Can you --

22  A.  From what I can tell from this record, the child actually

23  did not say anything.

24  Q.  In the middle of the page, you have, under the diagnostic

25  conclusion section, the statement, "Child's story consistent

1  with history of molestation."  Was that something that was

2  written by the social worker?

3  A.  No, I wrote that.

4  Q.  Okay.

5  A.  But in reality it is in error.  It should have said,

6  "Mother's version of child's story consistent with history of

7  molestation."

8  Q.  Below that you have the phrase, "No physical findings."

9  Does that refer back to page 2 with regard to the "pelvic within

10 normal limits" and the other notes that you have?

11 A.  Yes.  I did not find any evidence of either sexual abuse or

12 physical abuse.

13 Q.  Doctor, based on your experience having conducted, you

14 believe, perhaps 15 or 20 of these examinations and the training

15 that you received, if Kathryn Spencer, who was five years old,

16 had been fully penetrated vaginally by an adult male, by an

17 adult male penis, would you have expected that there would be

18 some observable trauma to the child?

19 A.  Well, I would imagine if she was fully penetrated that her

20 hymen would have appeared abnormal.  However, she could have

21 been partially penetrated, and if enough time had elapsed, there

22 would be no physical findings.

23 Q.  If this child had been penetrated by as many as four adult

24 males on multiple occasions, in your opinion, would that have

25 made it even more likely that there would have been some

1   observable trauma?

2   A.   I would think it would make it more likely, yes.

3   Q.   Doctor, when you conducted these examinations, did you have

4   references available to consult if you saw something that

5   appeared abnormal or unusual?

6   A.   Yeah.  There were reference books available in the clinic.

7   Q.   Were there also physicians, attending physicians you could

8   have consulted with if you had seen something that you had

9   questions about?

10  A.   Yes.  I believe this was conducted during the day, so there

11  would have been attending physicians available.

12  Q.   Were there ever occasions where you did consult with an

13  attending physician regarding something you had a question about

14  in one of these kinds of exams?

15  A.   I don't recall consulting.  But, you know, this was a long

16  time ago.  I may have consulted regularly and not remember.

17  Q.   Okay.

18       MR. CAMIEL:  Doctor, those are all the questions I have

19  for you.  Thank you.

20     Mr. Samson or cocounsel will have some questions for you.

21                  CROSS-EXAMINATION

22  BY MR. SAMSON:

23  Q.   Doctor Magee, my name is John Samson.  Can you hear me?

24  A.   Yes.

25  Q.   I just have a couple of quick questions.

36

1      You stated that the number of people penetrating the child

2  may make it more likely to have trauma.  Would that depend again

3  on the degree and force of penetration?

4  A.  Absolutely.

5  Q.  So if none of them did more than partial penetration, you

6  would not likely find evidence of trauma?

7  A.  It's certainly possible you would find no abnormalities.

8  Q.  And these exams were extremely rushed?

9  A.  They were rushed.  We often actually had three or four kids

10  at a time waiting.

11  Q.  And you would not actually have a lot of time to consult

12  with an attending physician during these exams?

13  A.  Not routinely, no.

14  Q.  I would like to direct you to your notations regarding the

15  child's behavior.  You stated the child was cowering in the

16  mother's lap during the exam.  Would you consider that normal or

17  abnormal behavior?

18  A.  For a five year old, I would consider that abnormal, and

19  particularly with a female physician.  Most of them do not

20  cower.  Most of them are very interactive.

21  Q.  And the fact that the child was refusing to speak and

22  screaming through the exam, would that be abnormal?

23  A.  I would consider that abnormal behavior.

24  Q.  There was a question of how you typically conducted these

25  exams, and sometimes you would have them on a table and

296

1   sometimes in the mother's lap.  Because you note that the child

2   was cowering in the mother's lap during the examination, would

3   that indicate that the child remained in the mother's lap the

4   whole time?

5   A.   I cannot say for certain, but I would say it was more likely

6   we would do it that way.

7   Q.   Now, I believe you also testified that you were looking for

8   physical injuries that may have occurred during penetration.

9   Again, the "may have occurred" means they may or may not have,

10  is that correct?

11  A.   Yes.

12  Q.   And if any lacerations or swelling or erythema or bruises

13  occurred, they could have healed by the time you actually

14  examined the child?

15  A.   Correct.

16  Q.   And in the absence of --

17  A.   I'm sorry.  It would depend on how far back she had been

18  abused.  But in general, bruising will resolve in a week or two

19  and edema or swelling in only a few days.

20  Q.   And the fact that this may have been at least four days and

21  possibly as many as a week or two, that would indicate that

22  these injuries might have healed if they did -- if they had been

23  present at one time?

24  A.   Yes.

25  Q.   And does the absence of trauma rule out penetration?

38

1   A.   No.

2             MR. SAMSON:   Thank you very much, Doctor.   That's all I

3   have.

4             THE COURT:   Mr. Camiel.

5                    REDIRECT EXAMINATION

6   BY MR. CAMIEL:

7   Q.   Doctor, this Peter Camiel again.

8        You indicated you would expect bruising to still be present

9   for a week or two after the abuse?

10  A.   That is an area that doesn't get a lot of bruising.   It gets

11  more swelling and erythema.

12  Q.   Okay.

13  A.   Bruising on the body, the rest of the body, tends to take a

14  week to ten days to resolve.

15  Q.   Doctor, I take it from your earlier testimony you actually

16  don't know how long you took with Kathryn Spencer?

17  A.   No, I have no idea.

18  Q.   And you don't know whether you examined her on an examining

19  table or in her mother's lap?

20  A.   No, I don't recall.

21            MR. CAMIEL:   Thank you.   I don't have any other

22  questions.

23            MR. SAMSON:   No questions, Your Honor.

24            THE COURT:   Thank you, Dr. Magee.

25            THE WITNESS:   Yes.