1  finish all of our witnesses today except for one, Dr. Rebecca

2  Wiester, who is an expert in sexual abuse cases.  She is not

3  available today because she has testimony in another court, I

4  believe in state courts.  She would be available tomorrow

5  afternoon.  She would also be available on Wednesday the 18th or

6  Friday, September 20th.

7           THE COURT:  Tomorrow afternoon.

8           MR. SAMSON:  Very good, Your Honor.

9      Your Honor, then we would be calling Dr. Henry Dixon.

10     HENRY H. DIXON, RESPONDENTS' WITNESS, SWORN OR AFFIRMED

11          THE COURT:  I have read Exhibit 7, counsel, Dr. Dixon's

12 report to Mr. Rulli back in '85, which is in evidence.

13                    DIRECT EXAMINATION

14 BY MR. SAMSON:

15 Q.  Good morning, Dr. Dixon.

16 A.  Good morning.

17 Q.  My name is John Samson.  I'm an assistant attorney general.

18     Doctor, what is your current occupation?

19     Before you start that, let me ask you to state your name for

20 the record.

21 A.  All right.  My name is Henry Hadley Dixon, D-i-x-o-n, Jr.

22 Q.  And what is your current occupation?

23 A.  I'm a physician, licensed to practice medicine in the state

24 of Oregon.

25 Q.  And are you board certified?

40

**EXHIBIT** B-3

1   A.   Yes.

2   Q.   In what field are you certified?

3   A.   Psychiatry and neurology.

4   Q.   And that is with the American Board of Psychiatry and

5   Neurology?

6   A.   That is correct.

7   Q.   In your practice, has that included any work in forensic

8   psychiatry?

9   A.   About a quarter of my practice has been so-called forensic

10  psychiatry.

11  Q.   What is forensic psychiatry?

12  A.   It's psychiatry as it applies to the law and legal

13  questions.

14  Q.   How long have you been practicing as a psychiatrist?

15  A.   Well, since 1956.

16  Q.   And have you been recognized with any awards for your work

17  in psychiatry?

18  A.   I am a life fellow of the American Psychiatric Association.

19  Q.   And do you have any publications in the area of psychiatry?

20  A.   I do.

21  Q.   About how many do you have?

22  A.   Twenty, maybe twenty-two or something.

23  Q.   Doctor, have you conducted competency evaluations to

24  determine whether or not a defendant is competent to stand trial

25  or to plead guilty?

1  A.  Yes.  Many times.

2  Q.  Can you estimate how many times?

3  A.  The last time I estimated, it was, I think, 2,000.

4  Q.  And have you testified in court before regarding a

5  defendant's mental competency?

6  A.  Many times.

7  Q.  And your testimony, has that just been in the state of

8  Oregon?

9  A.  No.

10  Q.  What other states have you testified in?

11  A.  California, Texas, many times in Washington state.

12  Q.  Doctor, would the fact that a person has a major mental

13  illness, would that necessarily render that person mentally

14  incompetent to stand trial?

15  A.  No.

16  Q.  So the fact that a person may be psychotic or delusional,

17  that in itself would not necessarily render that person

18  incompetent?

19  A.  That is correct.

20  Q.  Do you remember examining Mr. Spencer back in 1985?

21  A.  That's difficult.  I've had a deposition and reviews and had

22  it brought to my attention.  This took place in 1985, and while

23  I have -- I think I now have some vague memories, but I think

24  they're primarily prompted by the written materials that I

25  submitted at that time.

302

1  Q.   That would have been the letter that you wrote to Mr. Rulli,

2  the defense attorney?

3  A.   Yes.

4  Q.   And that letter was contemporaneous with your examinations

5  of Mr. Spencer?

6  A.   Approximately.

7  Q.   Approximately a week after your last examination?

8  A.   I could -- that's my recollection.  I could refer to the

9  letter, but that's my usual speed.

10  Q.   Doctor, if you would, there is a blue notebook in front of

11  you.  Can you turn to the back of that notebook where it

12  indicates Exhibit No. 7.  It would be Respondents' A-7.

13  A.   I'm there, yes.

14  Q.   Is that a copy of your letter?

15  A.   It appears to be, yes.

16  Q.   The last time you saw Mr. Spencer was on May 14, 1985, is

17  that correct?

18  A.   I would have to rely on the letter, what it says, but that's

19  my recollection.

20  Q.   And does the letter, on the first page of Exhibit A-7, does

21  it also indicate that the first time you saw Mr. Spencer was on

22  April 25th, 1985?

23  A.   That's what it says, yes.

24  Q.   I would like to ask you a few questions regarding the

25  examinations of Mr. Spencer you had, and if at any time you need

1  to refresh your recollection by referring to this letter, please

2  let us know.

3      When you were requested to examine Mr. Spencer, you did not

4  conduct a formal competency evaluation, is that correct?

5  A.  No, not really.  I interviewed him primarily with

6  introducing him to the idea that I had been employed to conduct

7  certain evaluations beyond those of Dr. McGovern.

8  Q.  Did you at any time during the first examination attempt to

9  inquire into Mr. Spencer's current mental status?

10 A.  I just have to infer from the tone of my letter, I guess,

11 that I had established that he wanted these procedures and that

12 he was competent to help make that decision.

13 Q.  Did you, during your first meeting, attempt to develop his

14 understanding, whether he understood the charges against him?

15 A.  I think I did, yes.  The letter so indicates.

16 Q.  And did you determine whether or not Mr. Spencer had some

17 understanding of the charges?

18 A.  I expressed the idea in my letter that I felt that he had,

19 yes.

20 Q.  And did Mr. Spencer provide you with any information

21 regarding the allegation?

22 A.  It appears that he did from the letter.  I don't recall this

23 specifically.  I'm just referring to my letter at that time.

24 Q.  Referring to your letter, Exhibit No. 7.  On the third full

25 paragraph on the first page, the second to the last sentence, it

1  states:  "This narrative appeared sequential."  What does that

2  mean?

3  A.   That means that his recollection, as he expressed, of the

4  events went from A to B to C and appeared logical and coherent

5  and that sort of thing.

6  Q.   It didn't appear to have any gaps?

7  A.   No.  Not that I mentioned in the letter.

8  Q.   And it wasn't contradictory to itself?

9  A.   Apparently not.

10  Q.   Did it appear that Mr. Spencer was hallucinating at all?

11  A.   No.

12  Q.   Did it appear that he was incoherent?

13  A.   No.

14  Q.   Did it appear that he was confused?

15  A.   No.

16  Q.   If he had appeared that way, would you have noted it in this

17  report?

18  A.   I would have always noted that, I believe.

19  Q.   If Mr. Spencer had difficulties in discussing the

20  allegations with you at any time, would you have noted that in

21  the report?

22  A.   I believe I did in some way indicate that he gave the

23  sequential -- in that paragraph, for example -- he gave a

24  sequential verbal account.  As to whether that was the whole

25  picture, I have no way of telling.

1   Q.   Did you determine whether or not Mr. Spencer had a severe

2   mental disturbance?

3   A.   I did not diagnose a severe mental disturbance.

4   Q.   What would that cover?  What type of illness would a severe

5   mental disturbance cover?

6   A.   Well, schizophrenic illness or manic depressive or bipolar

7   illness or what we call an organic brain syndrome where there's

8   clear cognitive and perceptual disturbances.  An active

9   depression of a severe nature, that sort of thing.

10  Q.   And you did not detect any of those during your examination?

11  A.   No.

12  Q.   If you believed Mr. Spencer was incompetent or if you had

13  any doubt as to his competency, would you have conducted a

14  hypnosis test?

15  A.   Well, I would have to have a guardian established to make

16  that.  This is a procedure that is akin to an anesthetic or a

17  surgical procedure and you have to have some kind of

18  permission.

19  Q.   So the fact that you did not seek out that permission, would

20  that further indicate to you that you believed he was competent

21  at the time?

22  A.   If I had felt that he was incompetent, I would have insisted

23  on that.

24  Q.   If you had observed anything that would cause you some

25  concern as to Mr. Spencer's competency, would you have brought

1   that to the attention of his attorney?

2   A.   Yes.

3   Q.   Doctor, I would like to ask you about a couple medications.

4   The drug Elavil, are you familiar with that?

5   A.   I have never taken it, but I'm very familiar with it.

6   Q.   What is Elavil?

7   A.   Elavil is one of the older, that is to say early '60s,

8   tricyclic antidepressant medications.  It's often used for

9   depression and frequently used for chronic pain, and it's quite

10  sedative so it's often prescribed at nighttime.

11  Q.   If Mr. Spencer was taken Elavil at the time that he entered

12  his guilty plea, would the drug Elavil necessarily render Mr.

13  Spencer incompetent?

14  A.   No.

15  Q.   Can you give an opinion as to whether -- what its effect on

16  his competency would be?

17  A.   I have not experienced -- except in massive overdoses, I

18  have not experienced competency issues relative to tricyclics,

19  including amitriptyline or Elavil.

20  Q.   So unless Mr. Spencer had been given an overdose of the

21  drug, it would not have affected his competency?

22  A.   In my opinion, no.

23  Q.   Are you familiar with the drug Xanax?

24  A.   I am, yes.

25  Q.   And what kind of drug is that?

47

1   A.   Well, it's classed as a minor tranquilizer.  It's

2   benzodiazepine -- b-e-n-z-o-d-i-a-z-u-p-i-n-e -- and it's akin

3   to Valium, which is perhaps better known.  It is really listed

4   as what we call an anxiolytic, that is it reduces anxiety.

5   Q.   And would that drug Xanax necessarily render Mr. Spencer

6   incompetent to plead guilty?

7   A.   Not in my opinion.

8   Q.   And if Mr. Spencer -- or let me ask first:

9        Are you familiar with the drug Sinequan?

10  A.   I am, yes.

11  Q.   And is that also an antidepressant?

12  A.   It is, yes.

13  Q.   If Mr. Spencer had taken Sinequan six weeks before his

14  guilty plea, that is the last time he took Sinequan, would that

15  have affected his competency to plead guilty?

16  A.   I neglected to look up the half-life of Sinequan, but most

17  of the antidepressants in that class have a half-life of about

18  14 hours, and which is why they are often prescribed twice a

19  day, to include -- to maintain better blood levels.  If it were

20  several weeks earlier that he ingested it, it would have almost

21  or completely disappeared from his system by the time his

22  competency was coming in question.

23  Q.   I understand that these drugs have possible side effects

24  that may occur.  Is that correct?

25  A.   Yes, indeed.

1  Q.  Would a person who takes Elavil necessarily suffer all the

2  side effects that could possibly occur?

3  A.  It would never be used if all the side effects -- I don't

4  mean to be frivolous -- but I have never experienced a patient

5  responding with all the side effects that are seen with the

6  drug.

7  Q.  So if a person takes Elavil -- would every person who takes

8  Elavil suffer hallucinations?

9  A.  No.

10  Q.  Returning to Exhibit A-7.  On the second page, and then over

11  to the third page of your letter before us.  You conducted a

12  sodium amytal test of Mr. Spencer?

13  A.  I did, yes.

14  Q.  What is sodium amytal?

15  A.  Sodium amytal is a barbiturate.  It's really amobarbital,

16  which can be mixed into a solution and injected intravenously,

17  that is in a vein.  The usual dosage that is needed to produce

18  sleep or a twilight condition, that is a sleepy, almost

19  hypnotic-like state -- it's given continuously.  From five to

20  seven hundred milligrams is the usual dosage.

21  Q.  How many sodium amytal tests have you performed throughout

22  your career?

23  A.  I really -- I noticed that I think I said 150 earlier.

24  About that amount.

25  Q.  If you had observed anything on Mr. Spencer that would cause

1   you to have some doubt regarding his competency, would you have

2   conducted a sodium amytal test?

3   A.   I might have.

4   Q.   Would you have first obtained a guardianship?

5   A.   If he was incompetent, yes.

6   Q.   How long would sodium amytal affect a person?

7   A.   Well, sodium amytal given intravenously is a different case

8   than given orally because it metabolizes very rapidly.   As a

9   matter of fact, you give it continuously during the amytal

10  interview, trying to maintain the state that I described

11  earlier, a sleepy, semi-aware, anti-twilight, hypnotic state.

12  And it's metabolizing out all the time so you have to add more.

13  Most people come into an interview without having had breakfast,

14  and within 30 to 40 minutes after the interview they will be

15  eating breakfast and able to ambulate.   So it's very rapid in

16  its metabolism.

17  Q.   And clarify, was the sodium amytal that was given to Mr.

18  Spencer, was that through an injection or was that orally?

19  A.   It was through an injection.

20  Q.   And you stated that a person would be ambulatory in how many

21  hours, would you estimate?

22  A.   How many hours?   Thirty to forty minutes.

23  Q.   What does ambulatory mean?

24  A.   Can stand and walk around alone without assistance.

25  Q.   Would sodium amytal affect a person's competency two days

1  after it had been administered?

2  A.  I can't imagine such a circumstance.

3  Q.  A person wouldn't have to be led around on a string for four

4  days after receiving sodium amytal?

5  A.  Not due to the drug, unless there was some -- if, for

6  example, they had severe kidney disease and they don't

7  metabolize the drug out, they could stay drunk on it, you know,

8  intoxicated.  Ordinarily with functioning kidneys, and so forth,

9  30 to 40 minutes they can ambulate and go where they wish.

10  Q.  Did you see Mr. Spencer after you had administered the

11  sodium amytal test and performed the test?

12  A.  It is and has been my custom to remain with them until

13  they're fully conscious, or at least ambulating with the help of

14  a nurse or some aid.

15  Q.  If you could, look on Exhibit A-7, on the third page, the

16  last full paragraph.

17      You state, "He," and I assume that means Mr. Spencer, is

18  that correct?  In the second sentence of the last full

19  paragraph.  "He expressed curiosity."

20  A.  The second sentence?

21  Q.  Of the last full paragraph on page 3.

22  A.  Okay.

23  Q.  "He expressed curiosity as to the results of these studies."

24  Would "he" refer to Mr. Spencer?

25  A.  Yes.

1   Q.   And the expression of curiosity, that was after the sodium

2   amytal test and the hypnosis test that you had previously

3   referred to in this letter?

4   A.   I'm not sure about what the question is.

5   Q.   Okay.   Doctor, this letter is sequential.   It discusses your

6   first examination through to your fourth examination, is that

7   correct?

8   A.   I probably admit that.

9   Q.   And then the last paragraph discusses Mr. Spencer expressing

10  curiosity.

11  A.   Yes.

12  Q.   Would his expression of curiosity as to the results of these

13  studies have occurred after you had completed the sodium amytal

14  test?

15  A.   Yes.

16  Q.   And that same sentence states that Mr. Spencer "verbalized

17  disappointment that no further understanding seemed to be cast

18  upon the validity of the charges brought against him."   Would

19  that verbalization of disappointment also have occurred after

20  these tests?

21  A.   That's my best recollection, yes.

22  Q.   If during the guilty plea hearing on May 16th, 1985, the

23  judge had asked Mr. Spencer if he had two years of college

24  education, and Mr. Spencer corrected the judge and said, "I have

25  four years of college education," would that indicate that Mr.

1  Spencer was competent at that time?

2  A.  I don't think it would bear very much on his competency.

3  Q.  Would it indicate that Mr. Spencer was able to understand

4  the judge's question, if Mr. Spencer corrected the judge as to

5  the number of years Mr. Spencer had been in college?

6  A.  It would be one of the elements, in my opinion, of

7  reflecting competency.

8  Q.  And if the judge had commented that he was not ready to

9  sentence Mr. Spencer because he had to decide whether to impose

10  a sentence of 20 years or a sentence of life imprisonment, and

11  the judge made a comment, "There's a lot of difference between

12  20 years and life," at which time Mr. Spencer responded, "Yes,

13  sir, there is," would that indicate that Mr. Spencer had some

14  understanding of the consequences that he was facing?

15  A.  As you relate that question, it appears that the answer is

16  responsive, which is one of the elements of competency.

17        MR. SAMSON:  Thank you very much, Doctor.  I have

18  nothing further.

19                    CROSS-EXAMINATION

20  BY MR. CAMIEL:

21  Q.  Good morning, Dr. Dixon.

22  A.  Good morning.

23  Q.  Doctor, I believe you indicated at the beginning of your

24  testimony that your actual independent recollection of your

25  contact with Mr. Spencer was vague.

53

404

DIRECT EXAMINATION

BY MR. SAMSON:

Q.   Good afternoon, Judge Rulli.   Could you please state your full name for the record.

A.   James E. Rulli.

Q.   What is your current occupation?

A.   I am currently a superior court judge in Clark County, Washington.

Q.   How long have you been a judge?

A.   Since July 19th.

Q.   Congratulations.

A.   Thank you.

Q.   Judge Rulli -- if I may address you by that --

A.   That's fine.

Q.   -- title.   What did you do before you became a judge?

A.   I was in private practice for approximately 20 years.

Q.   And what type of practice?

A.   My practice was criminal law, family law, personal injury work.

Q.   And in 1985, what percentage of your practice would have been criminal law?

A.   More than 50 percent of my practice was criminal law in 1985.

Q.   In 1985, were you one of the few attorneys qualified to handle class A felonies in Clark County?

54

**EXHIBIT** B -4

1  A.  Yes, I was.

2  Q.  And in 1985, were you familiar with the legal standard for

3  mental competency to stand trial?

4  A.  Yes, I was.

5  Q.  Approximately how many months did you have contact with Mr.

6  Spencer in 1985?

7  A.  Approximately six months, I believe.

8  Q.  During your representation, you had had personal contact

9  with him during over that six months?

10  A.  Yes, I did.

11  Q.  Would you have discussed during that time the charges

12  against Mr. Spencer?

13  A.  Yes, I would have.

14  Q.  And would you have discussed the possible consequences of a

15  conviction on those charges?

16  A.  Yes, I would have.

17  Q.  And would you have discussed possible defenses with Mr.

18  Spencer?

19  A.  Yes, I would have.

20  Q.  Do you recall if at any time during your representation of

21  Mr. Spencer you had any reason to question his competency to

22  stand trial?

23  A.  No, I did not.

24  Q.  If you had such a question, would you have raised that to

25  the court?

1  A.   Yes.

2  Q.   I would like to ask you briefly about the victims in this

3  case.  Do you remember interviewing the children back in 1985?

4  A.   No, I do not at this time.

5  Q.   During your deposition a couple months ago, were you shown

6  some documents?

7  A.   Yes.

8  Q.   And did those documents refresh your recollection regarding

9  whether or not you had interviewed the children?

10  A.   I don't recall, Mr. Samson.

11        MR. SAMSON:   Your Honor, if I may approach.

12  Q.   (By Mr. Samson)  Judge Rulli, I'm showing you a copy of your

13  deposition.  If you could turn to page 27, please.

14     I take it you don't remember making any determinations then

15  whether you had considered the credibility of the victims.  You

16  don't recall that at this point?

17  A.   That's correct, and that's reflected in my deposition at

18  line 14.

19     "Question:  Do you remember talking to the victims?

20     "Answer:  No, I don't."

21  Q.   On line 19, on that same page, did you also then say that

22  based upon interviews with the victims at that time, they

23  appeared credible?

24  A.   Yes, I did.

25  Q.   Do you remember if during the guilty plea hearing you had

1  indicated to the judge whether or not you believed the children

2  were credible?

3  A.  I don't have any recollection of that, Mr. Samson.  I

4  haven't reviewed the transcript of the guilty plea hearing.

5  Q.  Whose decision would it have been for Mr. Spencer to plead

6  guilty?

7  A.  It would have been his decision.

8  Q.  And before he entered a guilty plea, would you have

9  discussed that decision with him?

10  A.  Yes, I would have.

11  Q.  Would you have attempted to force him in any way to plead

12  guilty?

13  A.  No, I would not.

14  Q.  If he had desired to go to trial, would you have in fact

15  gone to trial?

16  A.  Yes, I would have.

17        MR. SAMSON:  That is all I have, Your Honor.

18    Thank you very much.

19                    CROSS-EXAMINATION

20  BY MR. CAMIEL:

21  Q.  Good afternoon, Judge Rulli.

22  A.  Hello.

23  Q.  I'm Peter Camiel, and I'm representing Mr. Spencer.

24    Do you have an independent recollection of your various

25  meetings with Mr. Spencer during the time period that you were

415

1   an admission that the allegations might be true?

2   A.   If the defendant made an admission, would I consider that

3   factor?

4   Q.   Yes.

5   A.   Yes.

6   Q.   And would that factor have carried some weight if the

7   defendant told police that the allegations may be true?

8   A.   Yes.

9           MR. SAMSON:   That is all I have.   Thank you.

10          THE COURT:   Anything further, Mr. Camiel?

11          MR. CAMIEL:   No, Your Honor.

12          THE COURT:   Just a second, Judge Rulli.   Let me take a

13  look at a couple of things here and see if I have any other

14  questions.

15                   E X A M I N A T I O N

16  BY THE COURT:

17  Q.   Judge Rulli, I have a couple of questions, and I don't know

18  if you can reconstruct some of what went on back there or not.

19      As the trial date neared, was Mr. Spencer pretty upset about

20  his situation and this whole thing when you would talk to him?

21  A.   Visibly upset, Your Honor?

22  Q.   Yes.

23  A.   I couldn't tell you at this point in time how he felt.

24  Q.   Do you recall him crying, for example, or --

25  A.   I don't recall that.

1  Q.  He was obviously in a tough situation.

2  A.  Yes, he was.

3  Q.  And is your recollection that he acted appropriately, as far

4  as you could see, considering the situation he was in?  I mean

5  what you would expect of a criminal defendant in that situation

6  with his background.

7  A.  Yes, I thought so.

8  Q.  If you had had this report, Exhibit 1, regarding Kathryn

9  Spencer, obviously it would have led to more study on your part,

10  more investigation.  Are you able to say now what use you would

11  have put that information to in terms of trial or advice

12  regarding plea?

13  A.  Well, I think that that information, Your Honor, would have

14  been one factor we would have considered in the totality of all

15  the charges.  We had multiple victims with several counts of

16  different allegations that were raised, so it was one factor in

17  the total picture.  As far as having that evidence at trial, we

18  would have used it to rebut the testimony of Kathryn that these

19  events happened.

20  Q.  Do you recall what you expected her testimony would be

21  regarding penetration, vaginal penetration?

22  A.  No, I do not recall.

23  Q.  We have three victims here, multiple counts.  If this

24  information had led you to conclude that you might successfully

25  attack Kathryn's testimony at trial because of inconsistent

1  evidence and her statement, are you able to tell me whether you

2  think that would have had any effect on the cases of the other

3  children, where the other children were victims?

4  A.  Well, if I would have been able to successfully attack

5  Kathryn's testimony, I would have only gotten to the source of

6  the inconsistency, and if that led to someone else coaching the

7  children to testify in this manner, then, of course, I would

8  have investigated that in regards to the other two victims.

9  Q.  At the time you got up to this plea, was this sort of an

10  "all or nothing" thing as far as the government or the

11  prosecution was concerned?

12  A.  Yes, it was, Your Honor.

13  Q.  You couldn't say, well, I'm -- well, okay.

14  A.  Some of the counts were dismissed at that time, but because

15  of the sentencing range on, I believe, Counts I and II with the

16  20 to life, it was an all or nothing.

17  Q.  Were you satisfied when the plea was entered that you had

18  gotten all out of the prosecution that you were going to get out

19  of him in terms of a plea bargain?

20  A.  Yes, sir.  Mr. Peters and I had tried other cases in the

21  past, Your Honor, so we were -- we weren't friends at the time,

22  let's put it that way.

23  Q.  Do you think that was part of his --

24  A.  Part of his responsibility and part was mine.  We were both

25  advocates.  Mr. Peters was a good attorney for the state, and I

1    thought I was for the clients I represented, also.

2            THE COURT:  Okay.  I guess I have no other questions.

3       Do you have further questions of Mr. Rulli?

4            MR. SAMSON:  I have no questions, Your Honor.

5            THE COURT:  Mr. Camiel?

6            MR. CAMIEL:  I have no other questions.

7            THE COURT:  Okay.  Have you got opposition down there?

8            THE WITNESS:  No, sir.  All seven positions are

9    unopposed.

10           THE COURT:  Is that right?  I was not aware of that.  I

11   was aware of your appointment through the judicial clipping

12   services that we do get from the state, or at least I get them

13   -- maybe because I'm a retired state judge, I don't know.  So

14   congratulations.  I hope you have as happy a time being a judge

15   as I have over the last coming on 30 years now.

16           THE WITNESS:  Well, I hope so.  Thank you.

17           THE COURT:  Okay.

18       (Witness excused.)

19           MR. SAMSON:  Your Honor, we have no further witnesses

20   for today.  We have one remaining witness we would call

21                   tomorrow, and that's Dr. Wiester.

22           MR. CAMIEL:  Your Honor, I wanted to offer as

23   Petitioner's Exhibit No. 32 the omnibus application that we --

24           THE COURT:  The original, or copy of the original?

25           MR. CAMIEL:  A copy of the original.  I don't think

1       AFTERNOON SESSION

2    (Defendant present.)

3         THE COURT:  Counsel, I have to recess at 1:30 for a,

4    hopefully, very brief conference call, but we will proceed with

5    the time we have here.

6    Since we met yesterday, I have read the deposition of Dr.

7    Logan, so I think now I have read all of the depositions offered

8    and the exhibits that have been admitted.

9    And this is your next witness, I take it?

10         MR. SAMSON:  Yes, Your Honor.  The respondent will call

11   Dr. Rebecca Wiester.

12   REBECCA T. WIESTER, RESPONDENTS' WITNESS, SWORN OR AFFIRMED

13         THE COURT:  Thank you.  Please be seated here.

14                    DIRECT EXAMINATION

15   BY MR. SAMSON:

16   Q.  Good afternoon.  Could you please state your full name for

17   the record.

18   A.  My name is Rebecca Tritt Wiester.

19   Q.  And you are a medical doctor?

20   A.  Yes.

21         THE COURT:  Excuse me.  Spell your last name for us,

22   please.

23         THE WITNESS:  W-i-e-s-t-e-r.

24         THE COURT:  W-i --

25         THE WITNESS:  e-s --

62

EXHIBIT  B-5

1    THE COURT:   -- e-s-t-e-r.

2    THE WITNESS:  Yes.

3    THE COURT:  Wiester.

4    THE WITNESS:  Wiester.

5    (Reporter asks witness to spell her middle name.)

6    THE WITNESS:  T-r-i-t-t.

7    THE COURT:  Pardon?

8    THE WITNESS:  Tritt.  My middle name.

9    THE COURT:  Oh.

10   Q.   (By Mr. Samson)   Dr. Wiester, are you licensed to practice

11   in the State of Washington?

12   A.   Yes, I am.

13   Q.   Do you have a specialty as a physician?

14   A.   I'm a pediatrician, and also a consulting physician for the

15   King County Sexual Assault Research Center.

16   Q.   So would you say that you had a specialty as a pediatrician?

17   A.   Yes.

18   Q.   And what would that be?

19   A.   Pediatrics, and then with sexual assault, child sexual

20   assault.

21   Q.   Would you briefly tell us or summarize your education for

22   us.

23   A.   I graduated from the University of Cincinnati in -- let's

24   see -- 1975, and went to the University of Cincinnati Medical

25   School, from which I graduated in 1979, and then did a year of

1   family practice internship at the University of Cincinnati and

2   then a full three-year pediatric residency at Cincinnati

3   Children's Hospital, finishing in 1980.  And then have been -- I

4   was in private practice in Cincinnati, and then after moving

5   here approximately 11 years ago, have worked for the

6   Seattle-King County Department of Public Health as a staff

7   pediatrician and chief of physician services and have been the

8   consulting physician for the King County Sexual Assault Research

9   Center as well as for Harborview Sexual Assault Center since for

10  the past, oh, seven years.

11  Q.  And where do you currently work?

12  A.  I currently work for the Seattle-King County Department of

13  Public Health, and also occasionally at Harborview Sexual

14  Assault Center.

15  Q.  Do you work at the Federal Way Sexual Assault Center?

16  A.  Yes, I do.

17  Q.  In that employment, what type of examinations do you

18  perform?

19  A.  As a physician for the Health Department, I do basic

20  pediatrics, and then I also run the medical examinations for the

21  Sexual Assault Center.

22  Q.  Do you examine alleged victims of sexual abuse?

23  A.  Yes, I do.

24  Q.  And that would include children and adults, or just

25  children?

1  A.   Children up until about 18.

2  Q.   And do you have any specialized training that you have

3  received in the area of examining children who are alleged

4  victims of sexual abuse?

5  A.   Yes, I do.   In 1987, the first training that I attended was

6  through the Harborview Sexual Assault Center, and it was

7  didactic training as well as in-clinic training, some time spent

8  seeing patients and learning to use the colposcope.   I then took

9  the Harborview sexual assault training for physicians in 1989,

10 and which is also another two or three day training with

11 in-clinic training as well.   And then shortly thereafter, I was

12 asked to be the consulting physician and run and set up the

13 Federal Way Clinic for the King County Sexual Assault Research

14 Center, which I have managed and run since that time.   I have

15 taken numerous continuing medical education courses as well as

16 run and partaken of the Northwest Colposcopy conferences which

17 happen several times a year since that time.   I have been the

18 consulting physician as well as attending physician at the

19 Harborview Sexual Assault Center on occasion, and certainly have

20 read multiple journal articles and done teaching, as well, in

21 the Harborview Sexual Assault Center sexual training since

22 1989.   I have been a part of that teaching program.

23 Q.   So you train other physicians on how to conduct sexual

24 assault examinations?

25 A.   Right.

428

1   Q.   Can you approximate how many examinations of children who

2   are alleged victims of sexual assault you have done during the

3   course of your career?

4   A.   Well, over the course of my career, there are many kids I've

5   seen in basic pediatric clinic or at Harborview, but the main

6   part of the kids that I see are the children scheduled into my

7   clinic in Federal Way, and that's, I would say, approximately

8   150 children a year, and so it ends up being probably over a

9   thousand children just in that clinic.

10  Q.   Just in the Federal Way clinic?

11  A.   Right.   Right.

12  Q.   Have you testified in court before?

13  A.   Yes, I have.

14  Q.   Approximately how many times?

15  A.   I don't know exactly how many times.   For my clinic, it

16  seems to be about three or four times a year, maybe.

17  Q.   And is there a specific type of case that you testify in?

18  A.   They're all cases related to the allegations of child sexual

19  abuse.

20  Q.   There's criminal cases, though?

21  A.   Right.   They are criminal cases and a couple of domestic --

22  or civil cases.

23  Q.   You testify for the prosecution or for the defense?

24  A.   I've only been asked by the prosecution.

25  Q.   You haven't been asked by the defense?

429

1    A.   No.

2    Q.   If you were asked, would you testify for the defense?

3    A.   Yes.

4    Q.   Explain briefly the difference between the physician who is

5    a pediatric and one who is a family practitioner.

6    A.   Well, a physician who is a family practitioner has done his

7    or her residency in family practice.   Family practice

8    encompasses a large area of medical care, including obstetrics

9    and adult care and elderly care, as well as pediatric care.   So

10   the amount of time spent doing pediatric examinations is

11   significantly smaller than the time spent doing pediatric

12   residency where the entire -- all the time is spent doing

13   pediatric examinations and evaluations.

14   Q.   I would like to ask you what you have reviewed in

15   preparation for your opinion today.   Have you reviewed various

16   police reports, utility reports?

17        MR. MAIR:   Excuse me, Your Honor.   Is counsel done with

18   his qualifications as an expert witness?

19        MR. SAMSON:   Yes, Your Honor.   Unless the court needs

20   me to further develop this matter, I believe I am.

21        MR. MAIR:   And is he proffering her as an expert in

22   this specific area?

23        MR. SAMSON:   Yes, Your Honor, I am.

24        MR. MAIR:   Could he share with us that specific area.

25        MR. SAMSON:   Very good, Your Honor.

67

1       Your Honor, I will be offering Dr. Wiester as an expert to

2   give an opinion in the area of the examination of children who

3   are alleged victims of sexual abuse, both molestation and

4   penetration by penile penetration or by foreign objects, as well

5   as any alleged sexual contact between the mouth and genitals.   I

6   will be offering Dr. Wiester to give opinions on both

7   examinations in general and the specific examinations that were

8   conducted in this case.

9       MR. MAIR:   May I briefly voir dire on qualifications?

10       THE COURT:   Sure.

11                      VOIR DIRE EXAMINATION

12  BY MR. MAIR:

13  Q.   Doctor, I believe in response to counsel's question about

14  specialties, you said you had a specialty in pediatrics and

15  then sexual assault?

16  A.   Right.   Now, sexual assault is not a board certified

17  specialty like pediatrics is.

18  Q.   Right.   So you're board certified in pediatrics?

19  A.   Right.

20  Q.   And there is no such specialty in medicine as of today?

21  A.   There is no nationally recognized certification process at

22  this time for people who do these kinds of exams, you're right.

23  Q.   Okay.

24       Secondly, you mentioned articles.   Have you published

25  articles in this field?

1  A.  No.  I'm a clinician.  I don't do research and publish

2  articles.

3  Q.  Have you participated in any studies that resulted in

4  articles?

5  A.  No, I haven't.

6         MR. MAIR:  Thank you.  I have nothing further.

7              DIRECT EXAMINATION (Continuing)

8  BY MR. SAMSON:

9  Q.  Dr. Wiester, in the cases that you have testified in in the

10  past, have you testified as an expert?

11  A.  Yes.

12  Q.  You've been found to be a qualified expert by the court?

13  A.  Yes.

14  Q.  Doctor, I would like to ask you now about the various

15  materials you have reviewed in preparation for today.

16         THE COURT:  I'm not sure that's correct.  Judges

17  typically don't find, unless they do it orally in findings and

18  conclusions of a case, find the people to be experts.  They find

19  that they are qualified to render opinions.  That's a nicety

20  that is lost on most judges and lawyers, but I'm not going to

21  find at this point that she's an expert, only that she's

22  qualified to render an opinion.  I might find her qualified and

23  at the end not agree with anything she says and say she wasn't

24  so expert after all.

25         Not likely, Doctor.

1          MR. SAMSON:  Very good, Your Honor.

2    Q.  (By Mr. Samson)   Doctor, if I can ask you about what you

3    have reviewed.  Have you reviewed various police reports and

4    utility reports?

5    A.  Yes, I have.

6    Q.  Have you reviewed a summary of the charges that were alleged

7    in this case?

8    A.  Yes, I have.

9    Q.  Have you reviewed the medical reports of Kathryn Spencer and

10   Matt Hansen?

11   A.  Yes, I have.

12   Q.  If you can open that blue notebook that is in front of you,

13   and turn to the very first exhibit, Petitioner's Exhibit No. 1.

14   A.   Okay.

15   Q.  Is that the medical report of Kathryn Spencer that you

16   reviewed?

17   A.  Yes, it is.

18   Q.  And could you look at what's been marked as Petitioner's

19   Exhibit 2.

20   A.  Yes.

21   Q.  I'm sorry, is that the medical report of Matt Hansen that

22   you reviewed?

23   A.  This is a part of it, yes.

24   Q.  You reviewed additional reports regarding Matt Hansen?

25   A.  Yes.  There was a full medical record from Kaiser Permanente

1   Medical Care Program that was much more extensive.   It

2   basically, aside from this part, was basic common pediatric care

3   visits.

4   Q.   That ranged over a period of years?

5   A.   Yes.

6   Q.   Doctor, did you review affidavits from a Dr. Magee and Dr.

7   Galaviz?

8   A.   Yes, I did.

9   Q.   I would like, if we may, for you to describe the anatomy of

10  a female genitalia.   And I notice that you have drawn a diagram,

11  and I would like to go over that diagram with you --

12  A.   Okay.

13  Q.   -- if I may.

14       Basically, can you tell us generally what the female

15  genitalia is?

16  A.   Well, the female genitalia generally refers to any part of

17  the female body that has reproductive capacity, external and

18  internal genitalia included.   What I'm going to -- what I will

19  demonstrate there is just the evaluation of the anal genitalia

20  area, which includes the anus as well.

21  Q.   Would a pelvic examination, would that normally cover the

22  anus?

23  A.   It depends.   A pelvic examination, by definition that is

24  commonly used, refers to usually an examination of a post-

25  pubertal child or adult female because a pelvic examination

1  implies that there was examination of the anatomy or the organs

2  that are within the pelvis.  So an external genital examination

3  is usually what we do in children who are prepubertal.  In other

4  words, kids who aren't teenagers yet, we don't put things into

5  their vagina to look at or, you know, put the finger into the

6  vagina to examine the ovaries and uterus or the bladder, which

7  is what a pelvic examination by common terminology is.  A

8  genital, inner genital examination is generally what we call an

9  examination of the private parts of the child.

10  Q.  So you would not anticipate that a pelvic examination of a

11  prepubertal female would include the anus?

12  A.  Not necessarily.  That's usually called, in pediatric

13  practice, an anal examination.

14  Q.  Doctor, with the court's permission I would like you to

15  approach the diagram that you have just drawn.

16        THE COURT:  Sure.

17    Let's move right along with this.  This is not like new, you

18  know.  I've had classes in anatomy, and so forth, and so let's

19  move quickly through what you need to do.

20    I want to point out to you that the time you use with this

21  witness is coming out of your argument at the other end of the

22  case, so let's move right along.

23        MR. SAMSON:  Very good, Your Honor.

24  Q.  (By Mr. Samson)  Doctor, perhaps I can just have you point

25  out a couple structures very quickly.

435

1   A.   Okay.

2   Q.   If you could, point out where the hymen would be.

3   A.   Okay.

4        Well, just quickly, what I'm going -- the reason that I put

5   these two things here is because of the positions that we use

6   for evaluating the genitals of children in females.   This

7   (indicating) is called the standard; this is (indicating) called

8   the supine frog leg position because they're lying on their back

9   with their feet out to the side like this (indicating) and the

10  labia, or the lips, which is what you see when you change a

11  diaper, are pulled to the side so you can see the internal

12  structures which are not visible unless do you that.

13  Q.   So the labia is external?

14  A.   Yes, these are external genital structures.   The labia

15  majora.

16  Q.   What would be the next internal -- or the next structure in

17  line?

18  A.   The next structure in line going into the body would be the

19  labia minora, the clitoris, and the clitoral hood.   And the

20  posterior, it's called the posterior fourchette.

21  Q.   What would be the next structure?

22  A.   The next structure in line then is the clitoris, and the

23  beginning of what's called the posterior fascia, which is like a

24  bulb going back towards the hymen.

25  Q.   And -- I'm sorry?

73

1  A.   Then the next structure going back into that is the plane

2  that holds the hymenal tissue, the hymenal opening or orifice

3  and the urethra, which is underneath the bladder.

4  Q.   Thank you, Doctor, you may have a seat again.

5       Doctor, could you clarify, is the hymen a sheath that

6  covers --

7  A.   No.

8  Q.   -- the inside of the vagina?

9  A.   No.  Normally what the hymen is, is a membrane with an

10  opening in it.  Normally children are born with an opening in

11  the hymen, and it covers a part of the opening of the vagina.

12  Q.   And are all hymens the same?

13  A.   No, they are not.

14  Q.   How could they be different?

15  A.   In prepubertal children, children before reaching the age of

16  adolescence, there are about three or four different kinds of

17  hymen tissue, or hymen shapes.  One is what I have shown there,

18  which is called a posterior rim or crescentic, it's like a

19  crescent hymen where most of the tissue is posteriorly.  Another

20  kind is what is called a circumferential where the opening is

21  circular and there's more tissue towards the front of the body.

22  Another kind is redundant, which mainly means extra tissue is

23  there and it's sort of folded.  There's still an opening in the

24  middle, but it looks more like a folded-up sleeve.  And then

25  there are others which are less common which are called

437

1   fibrillated, where they are redundant but it has fingers of

2   tissue that extend out.

3   Q.   Could you tell us what a colposcope is?

4   A.   A colposcope is basically an operating microscope that is on

5   a stand, that stands usually about four feet tall.   It can be

6   moved up and down and back and forth.   It has a fiberoptic light

7   source, and in our case, we use a photocolposcope which has a 35

8   millimeter connected to the microscope to photograph the images

9   seen through the microscope.

10   Q.   What is your understanding of the legal definition of

11   penetration for a rape case in the State of Washington?

12   A.   My understanding of legal penetration is that it is

13   penetration of a child's genitalia, either labia majora or anus,

14   however slight.

15   Q.   Does the hymen itself need to be penetrated?

16   A.   No, it doesn't.

17   Q.   Briefly tell us, if you could, what you normally do when you

18   conduct an examination of a child who's alleged to be a victim

19   of sexual abuse.

20   A.   What we normally -- do you want it from the beginning of

21   when we hear of the child or from the time we're in the

22   examining room?

23   Q.   Briefly, what happens when you first hear from the child?

24   A.   In our situation, when we first hear from a child, the child

25   comes to the sexual assault resource center.   That's where all

75

1  the calls from child protective services, law enforcement,

2  parents, everyone else comes to there.  The legal advocate then

3  does triage of family, figuring out whether or not the child

4  needs a medical examination, needs a check by the regular

5  physician, or there's other referrals to be made.  The children

6  that we have decided need a medical evaluation for possible

7  sexual abuse are scheduled into my clinic.  When they come to my

8  clinic on a certain day, they come with a parent, and the legal

9  advocate is there.  At the point when they come, they've already

10 received a lot of information about the examination.

11 Q.  What --

12 A.  At that point --

13 Q.  I'm sorry.

14 A.  -- I interview the parent alone, the child alone, and then

15 we do the examination in the exam room with usually a parent

16 present, myself, and my nurse.

17 Q.  How long does the actual examination take?

18 A.  The physical examination?

19 Q.  Yes.

20 A.  It takes usually 30 minutes.  It can take up to 45 minutes.

21 That's an average for us.

22 Q.  You have two positions that you noted, the supine frog leg

23 and the prone knee-chest position.  Are there any other

24 positions you use?

25 A.  There's another position that we use routinely.  It's the

76

1    knee-chest position where the child is still on her back but the

2    knees are put together and they are held to her chest, and

3    that's for an examination of the anus.

4    Q.   Is that the recommended method for performing an anal exam?

5    A.   Yes.

6    Q.   And are these other two methods the recommended method for a

7    vaginal exam?

8    A.   Yes.

9    Q.   Why do you use those positions?

10   A.   The purpose of the first position is to evaluate the

11   external genitalia, including the labia majora, everything you

12   can see on the outside.   It is also extremely important for

13   looking at the posterior fossa, which is that bulb part that

14   goes back in towards the hymen.   It's a very good way to see the

15   posterior fourchette, which is the connection of the two labia

16   majora.   It also gives you visual examination of the clitoris

17   and clitoral hood and labia minora.   It also gives you one way

18   of looking at the hymen, which can have very, either folding

19   tissue or tissue that falls in different positions.   It's

20   actually comfortable for children, which is another reason that

21   we use it, and it allows them to see you while you are examining

22   them.

23       The reason for doing -- did you want to know about the

24   knee-chest position?

25   Q.   If you could, briefly.

1    A.   Well, the reason for that position is that you can see

2    basically the hymen tissue much more adequately.   The effective

3    grabbing of the abdominal wall, pulling down towards the table,

4    it pulls the tissue down and stretches out the posterior hymen

5    so you can see that much more adequately.   That is a position

6    which is much more difficult for children to tense muscles.

7    They don't tend to tense their muscles as much.   Where even in

8    the position of supine frog-leg, on their back, if they are

9    uncomfortable or have to go to the bathroom, or whatever, don't

10   want to be there, tensing those muscles, you very rarely can see

11   the hymenal opening.   In this position they tend to be more

12   relaxed and it stretches the tissue out so you can better

13   evaluate the hymenal tissue.

14   Q.   Doctor, you mentioned that the child can tense so you can't

15   necessarily see the hymen.   Let's assume the child was in the

16   mother's lap and cowering in the mother's lap during the

17   examination.   Would that affect the ability to see the hymen?

18   A.   Significantly.

19   Q.   Why would that be?

20   A.   Well, for several reasons.  First of all, a child in the

21   mother's lap -- and we examine some children in their mother's

22   lap but they are sitting on the table and we have a specific way

23   of positioning them so that we get the same effect.  If you do

24   not do that -- and it takes some work in training of the parents

25   -- you can't expose, you can't get the legs open and relaxed so

1   that you can move the lips or the labia out enough because you

2   don't just have to push them this way (indicating), you actually

3   need to pull a little bit and down so that you expose all the

4   tissue.  If you are unable to do that, just positionwise, you

5   very often won't see any hymenal opening at all because of the

6   closeness of the tissue.

7        Another reason is that a child who is cowering or screaming

8   or unhappy and not willing to be there will tense up and will

9   tighten their muscles.  I mean, some kids will push their knees

10  together.  Other kids will just tense up even if their knees are

11  apart.  That clenching of the pelvic muscles can close all of

12  that anatomy.  You can't get a child to relax.  So even though

13  the hymen itself doesn't have muscles in it, all the muscles

14  around it can close.

15  Q.  Doctor, do you use just one of these positions or do you use

16  them in combination?

17  A.  No.  It is standard and routine to use them in combination,

18  and it is rare that we do not use all of them.

19  Q.  What would you do if the child that you were about to

20  examine was screaming?

21  A.  I don't examine screaming children.  If there is a life

22  threatening emergency, significant vaginal bleeding and the

23  source needs to be evaluated on an emergency basis, those

24  children can be sedated or anesthestized for evaluation.  Other

25  than that I do not examine screaming children.

442

1  Q.  After you have done your examination, what type of

2  information do you rely on when you form your opinion?

3  A.  After my examination, I rely on the information taken from

4  the child, sometimes the information taken from the parents or

5  the other referring people that brought the child to me, and to

6  the information in review of the colposcopic slides, as well as

7  any laboratory data that has been accumulated.

8  Q.  If you could refer to Exhibit No. 1, in the very front.  On

9  page number 2.  It references the term "hymen intact."

10     In your opinion, if this had been, in quotes, an extremely

11  rushed exam lasting maybe 15 to 30 minutes and the doctor

12  performing the exam is a novice, not very experienced in the

13  exam, and the child is in the mother's lap during the exam and

14  the child is screaming and cowering, would the physician likely

15  be able to see the hymen?

16  A.  It's unlikely.

17  Q.  Could the physician have mistaken something else for the

18  hymen?

19  A.  I have seen that happen, yes.

20  Q.  Let's assume that the physician actually saw the hymen and

21  was looking at the hymen and not something else, and all these

22  conditions were present:  The child was cowering and screaming

23  on the mother's lap and it was a rushed exam.  Could the

24  physician necessarily see everything, or is it possible that the

25  physician might have missed something?

1  A.  I think it's very -- I think it's very possible that

2  something could be missed.

3         THE COURT:  Excuse me, counsel.  I've got to get this

4  conference call.  I hope it will be five minutes or less.

5     (Court recessed for a conference call.)

6         THE COURT:  I'm sorry, it took a little longer than I

7  thought, as discussions with lawyers often take longer than you

8  think they are going to.

9         MR. SAMSON:  Thank you, Your Honor.

10 Q.  (By Mr. Samson)  Doctor, the information you had just been

11 talking about regarding the type of examination you performed

12 and whether an examination may hinder the ability to see the

13 hymen, is that based just on your own experience?

14 A.  No.  That's -- it's based on well-respected studies of

15 multiple clinicians who are responsible for research and review

16 of the literature and the state of the art at this point.

17 Q.  Doctor, can you have slight penetration, penetration of the

18 labia majora, without having any physical injury?

19 A.  Yes.

20 Q.  Would that include having no lacerations?

21 A.  Yes.

22 Q.  No swelling?

23 A.  Yes.

24 Q.  Is it possible to have full penetration, actually through

25 the hymen, without causing damage to the hymen?

444

1  A.  It is possible.  It depends on the kind of hymen, and also

2  the time of evaluation since the penetration.

3  Q.  Have you had any cases where you have either heard about

4  that occurring or actually seen that in an examination?

5  A.  I've had many cases I have heard about, and I have seen it

6  myself, as well.

7  Q.  If a child describes that the penetration caused pain,

8  discomfort, and bleeding, could you still expect to see a normal

9  hymen?

10  A.  You can, yes.

11  Q.  Why would that be?

12  A.  Well, first of all, pain experienced by a child does not

13  correlate necessarily at all with hymenal penetration.  Pain

14  described by children, which is commonly described in child

15  sexual assault, does not correlate in studies or clinically with

16  lacerations to the hymen on injuries to the hymen.  Very often

17  the pain that is complained about we think may be due to

18  pressure around the genitalia.  You can tell by doing

19  examinations on children that if you touch the hymenal tissue

20  with a Q-tip that's covered with cotton ever so slightly, they

21  will tell you, "You poked me.  That hurts," and your exam is

22  over.  So that tissue is very sensitive.  Any pressure to it is

23  painful.  Any pressure to areas in the genitals, any other

24  rubbing or touching can be painful.

25      The issue of discomfort or crying, children who are examined

1   and are not even touched but are sitting on their mother's lap

2   very often will complain of discomfort and cry, which is not

3   related to any touching at all.

4       And the issue of blood, it has been shown in a recent

5   article that children who have history of blood appearing at the

6   time of the molestation have an increased incidence of having

7   findings.  But there is also, you know, another large group of

8   children who have no findings.  So blood is positively

9   associated with that.  But that's all.

10  Q.  You just mentioned that in instances a person would take a

11  Q-tip, do a swab and touch the hymen, and the child talks about

12  having pain.

13  A.  Yes.

14  Q.  Would that necessarily be some type of visible injury to the

15  hymen?

16  A.  No.

17  Q.  What about anal penetration where the child describes pain,

18  would you expect to see physical injury there?

19  A.  In actual -- in the research that's been done, and years of

20  clinical research, and also in my experience, anal findings are

21  extremely rare, even when you know there's a history of anal

22  penetrative trauma, even repeated anal penetrative trauma.  It's

23  extremely rare in all the studies that have been done.  The

24  reason for that is the anus is a part of the body that is meant

25  for distensibility.  It has tissue that is much more forgiving,

1   and the healing of the anus is remarkable.  So you almost never

2   see anal scarring or abnormalities of the anus.  And that's

3   proven in all the studies, as well.

4   Q.  What if the child was saying that it hurt so bad it made

5   them cry, would that cause you to believe that there would be

6   more likelihood of injury?

7   A.  No.

8   Q.  What about multiple penetration by more than one person,

9   would that increase the likelihood of injury?

10  A.  It could.  You would think that with the increased numbers

11  of times that there would be an increased incidence of injury.

12  What we see actually, though, in studies and clinically is that

13  you almost never see anal scarring or anal findings.

14  Occasionally they are seen acutely as an anus that cannot

15  contract as sitting open.  Occasionally you can see it as

16  swelling, certainly redness and swelling, very acutely, which

17  resolves very quickly.  And rarely as anal scar.

18  Q.  How about a vaginal penetration, multiple penetration by

19  men?

20  A.  Well, if you are referring to true actual penile penetration

21  of the vagina through the hymen, that we're saying, we're

22  talking about, once again it depends upon the kind of hymen, it

23  depends upon the kind of damage that is done.  It depends on the

24  time since those events happened that the child is seen, and it

25  depends upon certainly the degree of penetration.

84

1  Q.  What if you don't know the actual degree of penetration, all

2  you know is there is an allegation that multiple men have

3  penetrated the vagina, or there was vaginal penetration, even if

4  slight penetration.

5  A.  Okay.  Well, what -- there can be a range of findings,

6  anywhere -- and this is, once again, this is affected by many

7  things.  If you are assuming you have done an adequate

8  examination and you are really seeing what you are seeing, the

9  range of findings can be anywhere from normal to diagnostic or

10  abnormal.  And that is because of the fact that if you're

11  putting something through a hymen and you have a hymen that is

12  distensible, in other words it is stretchable or elastic, which

13  has been shown in studies and we have seen operating room

14  evaluations of hymens that is quite remarkable of prepubertal

15  children, certainly you can have initial stretching out and

16  probably -- and then those can return to normal.  And there can

17  be swelling, which will also return to normal.  There can be

18  lacerations, certainly, some of which will not return to normal

19  but will heal over time, and with good examination techniques,

20  sometimes these can be seen months or years later.  Very often

21  the edges -- if you were to transect the hymen, just make a

22  slice through it, and you would have pointed edges initially of

23  where the cut was, it was cut like this (indicating) and cut

24  apart, over time those edges heal and round about so they look

25  much more like smooth curves.  What you can sometimes see,

1   however, is the absence of hymen in that area, if you are able

2   to do a very good examination.   There are cases, however, and

3   this is once again standard and been proven in many studies,

4   that there are children followed from the emergency room who

5   have had clear and simple hymenal transsections who had --

6   basically, they are unfindable later on.   This is months later.

7   Q.   Let's assume that there were five men who penetrated, but

8   the penetration was only slight of the vagina, or --

9   A.   The hymen.

10  Q.   -- of vaginal intercourse.   Would there be more of a

11  likelihood of finding injury because there were five as opposed

12  to just one person who had slight penetration?

13  A.   Well, if the penetration is slight, then it once again

14  depends upon the hymen type and it depends on the time since

15  this happened of healing.   You know, most of the kids that we

16  see have not been abused one time.   The majority of children in

17  the studies that we see have been -- it's been a multiple event

18  problem, not just one time.   So these are the kids that we're

19  talking about in the studies, not children who had a one-time

20  encounter, and those are the kids that we see.

21  Q.   And the kids that you see that had multiple abuse, it's not

22  uncommon not to find injury?

23  A.   Exactly.

24  Q.   Based on your training, your experience, articles that you

25  have read, would you expect that a five-year-old girl would be

1    able to describe the actual penetration in a reliable way?

2    A.   Based on literature and my experience, children who are five

3    do not understand the concept necessarily of penetration nor in

4    or out.   They do not have -- and actually, most of us in this

5    field don't think that kids much under ten, eleven, or twelve

6    understand the concept of what is in or out of their body.   They

7    understand pain, they understand pressure, and if shown

8    something, they might say, I think that's what happened.   Most

9    of those children don't even know there's another opening down

10   there.   They know they pee in that place and they poop in the

11   other place, but they don't necessarily even know there's a

12   place for anything to go there.   So the idea that they would

13   understand whether something was in or out -- I mean, most of us

14   who examine kids don't ask, you know, did it go inside, because

15   it doesn't correlate with what you find.   And their findings

16   plus their understanding of it is very -- no one believes that

17   most children understand that.

18   Q.   So if the child said it goes in all the way, would that be a

19   reliable factor to determine whether or not there was full

20   penetration?

21   A.   No, I wouldn't rely on that.

22   Q.   What if a four or five-year-old boy who was watching a man

23   have intercourse, vaginal intercourse with a little girl, and

24   the little boy said it goes in all the way, would you rely on

25   that?

87

1    A.   I think that a little boy who was watching that would not

2    necessarily have the anatomic understanding of what was

3    happening with the little girl unless he himself had had -- you

4    know, possibly if he, himself, had had something go into him,

5    but it's a different part of the anatomy.   And I don't think

6    that children, even in visualizing adult sexual activity, unless

7    it is incredibly graphic and shown immediately to the child,

8    understand what is going where.   And that's -- that's my feeling

9    of how they understand things.

10   Q.   And that feeling is based on your experience?

11   A.   My experience and my training and the literature.

12   Q.   If you could refer again to Exhibit No. 1.   On page 2, and

13   the term "hymen intact."   Would that be an appropriate term for

14   this type of a report?

15   A.   No.   Not in my judgment.

16   Q.   Why not?

17   A.   Well, first of all, it does not give any information about

18   what kind of a hymen the child had, which is extremely

19   important.   It doesn't give any information about any of the

20   other anatomical structures in the area.   It doesn't tell me

21   about any of the other structures that can be injured with child

22   sexual abuse.   It doesn't say what "intact" means.   It doesn't

23   tell me where the tissue was or where it wasn't.   There's not

24   enough description to tell me what that means, and I've had kids

25   referred to me who have, quote, intact hymens and they have

1    either very abnormal examinations or they have what we call

2    labial fuse, which is where the labia majora, the lips that

3    cover the hymen and all those internal structures are fussed

4    together, where you can't even open them to see where the hymen

5    is.  So "hymen intact" means to me very little, and we try to

6    discourage that use in this day and age.

7              THE COURT:  Excuse me.  Wouldn't you take that to mean

8    in this report that the examiner looked and didn't notice

9    anything on gross examination?

10             THE WITNESS:  Right.  I would assume that's what she

11   meant.  But I think that my experience has been that with this

12   small amount of information, there was nothing obvious, but I'm

13   not sure what was seen.  And my experience has been that that

14   one word --

15             THE COURT:  In other words, she didn't see anything,

16   but it doesn't mean there wasn't anything there to see?

17             THE WITNESS:  Right.  You're right.

18   Q.  (By Mr. Samson)  Doctor, could it also mean that she did not

19   actually see the hymen?

20   A.  It can, yes.

21   Q.  Under the conditions of this exam where it was a rushed

22   exam, the child was cowering on the mother's lap and screaming

23   because of the tenseness of the muscles and the position of the

24   examination, it's possible the doctor was thinking she was

25   looking at the hymen and she wasn't?

1        MR. MAIR:  Your Honor, I object to the form of this

2   question.

3        THE COURT:  Sustained.

4   Q.  (By Mr. Samson)  Doctor, I would like you to assume -- or

5   actually -- I would like you to assume that this exam was

6   extremely rushed, according to the doctor who performed it.  I

7   would like you to assume that the exam lasted approximately 15

8   to 30 minutes.  I would like you to assume that the child was

9   examined in the mother's lap when the child was cowering and

10  screaming.  And I would like you to assume that the physician

11  performing this examination was inexperienced, had done

12  approximately 15 to 20 type exams during her residency, and she

13  was still a resident.

14        MR. MAIR:  Your Honor, I object to the hypothetical as

15  being incomplete and not in concord with what I understand the

16  testimony of the physician to have been.  My understanding is

17  she testified it was 15 to 30 minutes, her examinations in

18  general.  She has no memory of this specific examination; she

19  couldn't tell whether it was 15, 20, 25, or 30.  That at times

20  it was rushed because the clinic was crowded.  She has no memory

21  of the conditions at that time.  That she was at a hospital

22  where these cases were referred and had supervisors available.

23  She has no memory of whether the entire examination took place

24  with the child in the mother's lap or not.  And these are not

25  present in this hypothetical.  I object.

1          THE COURT:  What are you going to ask the witness?

2          MR. SAMSON:  Your Honor, I'm going to ask whether under

3     those assumptions that I have given, whether it's possible that

4     the doctor did not actually see the hymen when she thought she

5     was looking at it.

6          MR. MAIR:  Asked and answered, Your Honor.

7          THE COURT:  Sustained.

8  Q.   (By Mr. Samson)  Dr. Wiester, would the fact that there was

9  no colposcope used in this examination, would that affect the

10 physician's ability to observe injury that may have been there?

11 A.   It can, yes.

12 Q.   Why is that?

13 A.   Certainly using the colposcope, you have access to very good

14 illumination and magnification as well as documentation of what

15 you have seen.  One of the studies that was done by one of the

16 people outstanding in this field looked at whether or not using

17 a colposcope actually affected whether or not there were more

18 findings noted, and initially his feeling was -- this is David

19 Muram in Tennessee -- and his feeling was that if you use the

20 colposcope, you may not see more findings than if you don't use

21 the colposcope.  But what he found, actually, was that that's

22 true, but you have to be an extremely experienced examiner

23 before you can find the same number of findings.  In other

24 words, if you were an extremely experienced examiner, you can

25 find as many findings without the colposcope as you find with

1   the colposcope.  But if you're not an experienced examiner, then

2   the colposcope may help you, but you may not recognize what you

3   are seeing when you see it even with a colposcope.  But what

4   happens with a colposcope is that you document what you see if

5   you're not an experienced examiner so that someone who is more

6   experienced may evaluate what you saw.

7   Q.  So could a doctor who's inexperienced look and not see any

8   injury and show that slide from the colposcope to an experienced

9   doctor and that experienced doctor would see something?

10  A.  Yes.

11  Q.  The report on page 2 of Exhibit 1, it also talks about no

12  lacerations, no swelling, and no erythema.  Would the fact that

13  this exam took place at least four days, and as many as a few

14  weeks, after the last incident of abuse have an effect on

15  whether or not these injuries would be seen?

16  A.  Certainly.  You would not see erythema or swelling that long

17  after, even usually most of those acute findings are gone within

18  48 hours, at most 72 hours.  The lacerations, it's different,

19  however.

20  Q.  Would the fact that there's no colposcopic examination

21  explain why the doctor may not have seen lacerations, assuming

22  there were such there?

23  A.  That's possible, yes.

24          THE COURT:  Do you have to sedate a child to do that

25  kind of an exam?

92

1          THE WITNESS:  A screaming child?

2          THE COURT:  A five year old.

3          THE WITNESS:  No.  We don't sedate five year olds

4    generally.  As a matter of fact, we have never sedated a five

5    year old.  Usually the only children that we need to sedate are

6    two and three.  But a five year old is a larger weight for

7    sedation, and so you can -- there are rapid acting sedatives you

8    can use in hospital settings that were not available at this

9    time.  But screaming children, even in this day and age, are not

10   submitted to exams now.

11         THE COURT:  When you use a colposcope on a child this

12   age, do you get them to cooperate?

13         THE WITNESS:  I sure do.  A hundred percent.

14   Q.  (By Mr. Samson)  In your experience, have you ever seen

15   exams that have been performed by an inexperienced physician who

16   were subsequently performed by an experienced physician, in the

17   area of child sexual reviews, where the first physician did not

18   see any signs of penetration or injury and yet the second, more

19   experienced physician did see such things?

20   A.  Yes.

21   Q.  In your opinion, Doctor, based on all your experience and

22   training and the articles you have reviewed, would Exhibit No. 1

23   disprove penetration?

24   A.  No.

25   Q.  Referring you to Exhibit No. 2.  You have also looked at

1  this exam fully before?

2  A.  Yes.

3  Q.  In your experience, in your training and your education,

4  would this report disprove penetration?

5  A.  No.

6          MR. SAMSON:  Thank you, Doctor.  That's all I have.

7                       CROSS-EXAMINATION

8  BY MR. MAIR:

9  Q.  Good afternoon.

10  A.  Hi.

11          MR. MAIR:  Your Honor, I would seek to publish Dr.

12  Wiester's deposition at this time.

13          THE COURT:  It may be ordered opened and published.

14  Q.  (By Mr. Mair)  Doctor, as I understand it, you were first

15  consulted by the assistant attorney general, Mr. Samson,

16  concerning your opinions in this case and he provided you with

17  certain materials that you reviewed.

18  A.  Right.

19  Q.  And then you drafted an affidavit, or he did, and you signed

20  it, concerning your opinions.

21  A.  Right.

22  Q.  Is that correct?

23  A.  Right.

24  Q.  And then you were deposed by my partner on July 24th, 1996?

25  A.  Yes.

94