1   up and saying that these reports go to this count or these

2   reports might help as to this other count.   These cases were

3   clearly intertwined.   The credibility of the children was

4   intertwined and it was a domino effect.   If you could start by

5   attacking Kathryn Spencer's credibility, you could then go on to

6   attack the credibility of the others.

7        With regard to the competency issue, this wasn't like a Rule

8   11 plea in federal court where the judges always ask, have you

9   taken any -- consumed any alcohol or medication in the last 24

10  hours?   The judges ask that regardless of the demeanor of the

11  defendant, and I think there's a good reason for that question.

12  This case helps to demonstrate that reason.

13       With regard to Mr. Rulli's testimony, he testified he didn't

14  remember whether he was ever aware of all of these problems

15  we've described that Mr. Spencer was having in terms of the

16  medication and the depression.   By the time of the sentencing,

17  one week later, we know that's one week later than the sodium

18  amytal interview and we know it's one more week that could go by

19  to allow for the further withdrawal from the Xanax.

20       Those are the only additional points I have.   Again, I would

21  ask the court to grant the writ.

22            THE COURT:   Thank you.

23       Well, I can resolve some of the issues in this matter this

24  afternoon and want to do that.   There is one issue I think I

25  cannot resolve today.

95

EXHIBIT ___C___

1    I should point out to Mr. Spencer that there are some things

2  here that I must make factual findings on, and that is done by

3  considering the evidence and lack of evidence and determining,

4  based on that evidence and lack of evidence, what is more

5  probably true than not true.  In every case someone has the

6  burden of proof.  In this case you have the burden of proof, as

7  the petitioner, to prove by a preponderance of the evidence,

8  that is by what is more probably true than not true, each of the

9  essential elements of the two claims that are before the court.

10 When you have the burden of proof, to put that in a simple

11 analysis, it means that if the evidence is equally balanced, you

12 lose the point.  The one that has the burden loses the point if

13 the evidence is equal.

14    It's important, also, to note -- well, I might say about

15 that, Mr. Spencer, that there is no magic to that.  I'm just a

16 man, as you are just a man, that you get information in, you

17 analyze it the best you can, and you come to a conclusion.

18 There is no magic to that.  I don't have a lie detector here in

19 my mind, but nevertheless, I'm expected to judge the credibility

20 of witnesses, among other things that I have to do to decide

21 what is more probably true.

22    It's also important to note in this entire proceeding that

23 this is an evidentiary hearing on a petition for a writ of

24 habeas corpus.  It's very difficult for people to understand

25 that the guilt or innocence of the petitioner is not in issue

96

1   here.  The question is one of whether federal constitutional

2   rights were violated.  If there was a violation, that calls for

3   an issuance of the writ.  The fact of guilt, if you are guilty

4   of the crimes charged, doesn't make any difference.  The

5   opposite is true, likewise.  This is not, in other words, a

6   situation where I should make a judgment based on my view of

7   whether you are guilty or not guilty.  That's not part of the

8   mix.  The question is one of whether your conviction was

9   obtained by the state while providing you with all of the

10  constitutional rights to which you are entitled.

11      We have two issues here.  Let me first address the

12  competence issue.

13      It is clear that in the months and weeks and then days

14  leading up to the plea that Mr. Spencer issued, or entered, that

15  he was suffering from a depressive illness, and it is clear that

16  he was being treated for that illness and his emotional state

17  over that period of time, right up to and including the time of

18  his plea.  Whether that depressive illness was episodic or

19  chronic is something that is not real clear to me, partly

20  because we don't have any information about what happened to

21  that depressive illness after the plea was entered.  The medical

22  information sort of stops at the entry of a plea.  But

23  nevertheless, regardless of what type of a depressive illness it

24  was, there was a substantial depressive illness and symptoms of

25  it that were recognized by physicians and lay people alike.

1      Added to that, it is clear that there was the veritable

2  cocktail of drugs that provided for that condition, and, I guess

3  I want to say, the diagnosable mental illness of a depression

4  that is diagnosable and identifiable under the DSM-IV that the

5  professionals use, but there was also, besides that, I think, a

6  fairly severe emotional upset at the time over what was going on

7  that is a little separate from a mental illness.  But anyone who

8  is in this kind of a situation is going to have some emotional

9  upset, whether it lapses into a mental illness or not, and

10  certainly that was part of what was going on here.

11      The drugs taken, prescribed and taken, are in the record.  I

12  need not repeat all of that.  It is clear that the treatment for

13  the depression didn't work and the drugs were changed by the

14  physician.  It's clear that based on the way the drugs were

15  provided and, I assume, consumed by Mr. Spencer that there was a

16  substantial risk of side effects, and a risk of side effects

17  that could rise to the level of making him not competent to

18  enter a plea.

19      The situation was compounded, perhaps, by the sodium amytal

20  interview a few days before the plea, which also could have had

21  the effect of adding to his mental state and could have had the

22  effect of making him not competent to enter a plea.  So he had a

23  lot of mental and emotional problems going into the day of his

24  plea.  Now, the real question here, however, is whether he was

25  competent on that day.  We have a lot of clues, and let me talk

1   about the drug experts last.

2        We have lay testimony that he was tearful and upset, and so

3   forth, in his jail cell.  We have the testimony of physicians

4   that dealt with him, Dr. Dixon and others that were prescribing

5   medication leading up to that, all of whom testified that he

6   appeared to be competent in the legal sense.

7        We have the testimony of Mr. Rulli, Mr. Peters, and

8   indirectly by the plea colloquy of Judge Lodge, none of whom saw

9   any obvious signs of mental illness rising to the level of

10  incompetent.  One would, of course, expect that there would be

11  some overt symptoms that someone would have noticed at that

12  point had Mr. Spencer in fact not been competent to enter a

13  plea.

14       We have the testimony of Dr. Halpern, which is very

15  interesting.  He's a very bright guy and very able and very

16  knowledgeable in regard to medication.  Toward the end of his

17  testimony he indicated his conclusion was that probably Mr.

18  Spencer was not competent at the time that he entered his plea

19  based on his depression and the drugs given to him.  On further

20  questioning, however, and partly in response to my questions, he

21  indicated that the level of competence was partly -- if I can

22  paraphrase; I think this is accurate -- would partly be

23  determined by the quality of his answers to questions at the

24  time of the plea colloquy.  After I asked him a number of

25  questions about those exchanges in the plea colloquy, he

1    indicated that Mr. Spencer was functioning, but the question was

2    at what level.

3        Dr. Logan came to somewhat a similar conclusion.  At page 35

4    of his deposition, he indicated that simply the taking of the

5    drug doesn't infer that a person necessarily suffers from the

6    side effects; that the side effects described by Dr. Halpern and

7    by Dr. Logan, in other words, are things that might happen, but

8    don't necessarily happen in every case.  And he followed up by

9    saying the best way to evaluate would be from a psychiatric or

10   psychological evaluation of the person at the time in question.

11   The time in question, of course, is at the time of his plea.

12   The most current medical person who dealt with him at or about

13   that time is Dr. Dixon, who came to the conclusion, as testified

14   here today, that he didn't notice anything that would indicate a

15   lack of competence.

16       Perhaps this plea colloquy is the best evidence we have of

17   what effect those drugs and the depression had on Mr. Spencer,

18   and that plea colloquy clearly indicates rational responses, not

19   just yes and no, but appropriate responses to questions that

20   indicated they thought the process was working.

21       When you put all of this together, it seems to me that Mr.

22   Spencer was legally competent to enter a plea at the time that

23   he did so.  I think, to put it in more legal language, that the

24   evidence is that he had a rational, as well as a factual,

25   understanding of the proceeding and the sufficient ability to

100

1  consult with counsel with a reasonable degree of rational

2  understanding.  His mental illness and the drugs he ingested did

3  not substantially impair his ability to make a reasoned choice

4  among the alternatives presented or to understand the nature and

5  consequences of his actions.  He understood the nature of the

6  charges, the consequences of his plea, and he was able to assist

7  in his own defense.  He evidenced at that time coherence and

8  rationality and a lack of psychosis.  He did not exhibit unusual

9  behavior, and I think that he was legally competent and not

10  entitled to relief on that basis.

11      Mr. Spencer testifies here that he doesn't remember

12  anything.  He doesn't remember a lot of things in this case, he

13  tells us, and, you know, I don't have a direct answer for that,

14  but certainly it is to his advantage not to remember, or to

15  choose not to remember those events.  I'm not satisfied that I

16  really believe that he doesn't remember the entry of the plea.

17      Now, so far as the Brady issues are concerned, there are two

18  prongs of this.  Of course, one is the first question, whether

19  the medical report or reports should have been turned over; and

20  second is the question of the effect of failure to turn those

21  over.  I want to address the first question tonight.

22      Based on everything I've read in this file, I am afraid that

23  I've come to the conclusion that Mr. Davidson, formerly of the

24  Clark County Sheriff's Office, I guess -- or was that the

25  Vancouver police?  The sheriff's office, I believe -- that he's

1   just not very credible, and I don't particularly believe what he

2   has told us.  Ms. Krause doesn't recall this.  Shirley Spencer,

3   in her affidavit, had a very vague recollection -- well, Shirley

4   Spencer didn't recall the part about the lad's medical report,

5   Exhibit 2.  And Ms. Spencer, in regard to that, had some very

6   vague and unconvincing testimony about that medical report.

7        It's hard in considering Exhibit 2 to reconstruct what

8   happened and what are the probabilities about that report.  I

9   sometimes have to look inward and see what I really think, and I

10  guess what I think about that is that I think that the sheriff's

11  office was aware that Matthew Hansen had been to a doctor for

12  this exam.  I think he went as a result of the recommendation of

13  Detective Krause.  I'm not at all sure, however, that the

14  sheriff's department had a report to hand over at that time.  I

15  don't know at this point where this report came from or whether

16  they had it.  I guess the evidence on that subject is

17  sufficiently cloudy, so my conclusion is that probably that

18  report was not in the hands of the sheriff's office or the

19  prosecution prior to the plea.

20       Clearly, however, Exhibit 1 was in the hands of the

21  sheriff's office.  Clearly, they had an obligation, based on the

22  omnibus order, to hand that document over to the defense, and

23  they had that obligation -- if I can find the right exhibit;

24  Exhibit 32 -- they had that obligation clearly on the 25th of

25  January of 1985 and thereafter.

1      The circuit spoke to that, and let me see if I can find

2  this -- oh.

3      The circuit said, in referring to medical reports, "If they

4  did exist, we see little excuse for the prosecutor's failure to

5  make them available to Spencer's attorney."

6      In support of the prosecutor, it appears to me from the

7  evidence here it wasn't his fault.  It was the sheriff's

8  department's fault.  I see little excuse for the sheriff's

9  department's failure to make the report on Kathryn Spencer

10 available to the prosecutor, and therefore to Mr. Spencer and

11 his attorney.  I'm satisfied that if they had gone to the

12 prosecutor, they would have gone to Mr. Rulli.

13     I guess violation of an omnibus application is not a federal

14 constitutional violation, but certainly that adds to the

15 conclusion that that information should have been turned over.

16 It was at least potentially exculpatory, and that brings me to

17 the next question that I'm going to have to take some time to

18 resolve here.  Let me refer to the law that I've got to deal

19 with here.

20     Evidence, of course, that is favorable to the accused and

21 material to either guilt or punishment should be handed over

22 under Brady v. Maryland and the other cases, but that does not

23 end the inquiry because, as the cases say, in the context of the

24 guilty plea -- referring now to Sanchez that has been cited by

25 counsel -- evidence is material "if there is a reasonable

1    probability that but for the failure to disclose the <u>Brady</u>

2    material, the defendant would have refused to plead and would

3    have gone to trial."  A reasonable probability is a probability

4    sufficient to undermine confidence in the outcome.

5         We have a lot of evidence in this case, and I guess that's

6    where we spent most of the time the last few days, in trying to

7    determine just what use that report would have been put to by

8    defense counsel and whether in fact it was material under those

9    definitions.  For it to be a constitutional violation under the

10   <u>Brady</u> cases, it isn't just a question of whether it should have

11   been turned over, but also would it have made any difference?

12   It is that latter question, the materiality of this report, that

13   I must consider.  I am afraid I can't resolve that today.  I

14   just need to look at some of these things a little further.

15        The circuit also spoke of a synergistic effect between the

16   situation with Mr. Spencer at the time of the plea and the

17   effect of failure to deliver these medical reports.

18        Based on the general rules I have just stated, this means to

19   me that in looking at the materiality question, I have to look

20   at it in terms of everything that was going on at the time.  You

21   know, this is not an easy task, but whether what would have

22   happened at that time, twelve years ago or so, has to do with

23   Mr. Spencer's state of mind, his relationship with his attorney,

24   the evidence available that people were aware of, evidence

25   available that no one was aware of, or at least the defense was

 1   not aware of at that time.  Just how far I have to go into that

 2   investigation and determination of what would have happened if

 3   this had been turned over, I'm not really sure either, and

 4   counsel have taken a different view of that, Mr. Camiel

 5   indicating that his view was that the inquiry should end with

 6   the finding that it had some potentially exculpatory value, and

 7   Mr. Samson suggesting that the court should determine what --

 8   should go further into what the investigation of that material

 9   might have triggered would actually have turned up.  I view that

10   as two quite different views of the task before the court, and I

11   need to look at that to be sure I know what my task is, and then

12   to make that determination of whether that information was

13   material.

14       I'm sorry I can't finish this today, but I've got to do my

15   homework before I can.  I'm going to be gone, as counsel knows,

16   next week.  I don't keep things cooking very long, and I would

17   certainly hope to have a ruling the following week.  I may make

18   it by conference call or may choose to write on the issue,

19   depending on how it looks to me after I finish my work.

20       I have nothing else under advisement, you will be pleased to

21   know, and so this is on top of my pile.  Unfortunately, I've got

22   to start a criminal case.  I would rather not start another case

23   when I have something like this to do, but I've got to start a

24   criminal case on the 16th, and that could delay work on this to

25   some extent.  But I will do my best, Mr. Spencer, to get the

105

527

1    answer to this out as soon as I can.

2         THE DEFENDANT:  Thank you, Your Honor.

3       (Recessed at 4:25 p.m.)

4

5                C E R T I F I C A T E

6

7     I certify that the foregoing is a correct transcript from

8 the record of proceedings in the above-entitled matter.

9

10

11

12     _____       <u>January 15, 1997</u>
      JULAINE V. RYEN                    Date

13

14

15

16

17

18

19

20

21

22

23

24

25



ENTERED
ON DOCKET

SEP 27 1996

By Deputy

FILED ____ LODGED
____ RECEIVED

SEP 25 1996

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAYMOND SPENCER,

     Petitioner,

     v.

JOSEPH KLAUSER, Warden, Idaho State
Institution,

     Respondent.

Case No. C94-5238RJB

ORDER INCLUDING
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

THIS MATTER comes before the court on consideration of Mr. Spencer's Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* by a Person in State Custody. The court has considered the motion, documents filed in support and in opposition, the evidence presented at the evidentiary hearing, and the file herein.

<u>Statement of Facts</u>

On December 23, 1994, the court denied petitioner's motion on the merits without an evidentiary hearing. Docket #23. The Ninth Circuit Court of Appeals reversed in part and remanded for an evidentiary hearing to determine: (1) whether Mr. Spencer was competent to enter a guilty plea, and (2) whether the childrens' medical reports were "material," under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Sanchez v. United States*, 50 F.3d 1448, 1454 (9th Cir. 1995)? Docket #33.

ORDER INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW - Page 1

EXHIBIT ___D___ 107

1    On remand, the court held an evidentiary hearing, and at the conclusion of the hearing, the

2    court orally ruled and found that Mr. Spencer was competent to enter a guilty plea, and that the state

3    was not obliged to disclose Matthew Hansen's medical report because the state never possessed or

4    controlled this report.  The court found that the Clark County Sheriff's Office had Kathryn Spencer's

5    medical report, and that as of January 25, 1985, the sheriff's office had an obligation, based on the

6    omnibus order, which was entered as a result of Mr. Spencer's counsel's request for discovery, to

7    make the report available to Mr. Spencer's attorney. The court found that the sheriff's office did not

8    make the report available to the prosecutor and did not make the report available to Mr. Spencer's

9    attorney.

10    The court reserved the issues of whether Kathryn Spencer's medical report was material, or

11    whether the state violated Mr. Spencer's due process rights when the medical report was not

12    disclosed to Mr. Spencer before his guilty plea.

13    On May 16, 1985, Mr. Spencer pled guilty to seven counts of Statutory Rape in the First

14    Degree and four counts of Complicity to Statutory Rape in the First Degree.  Docket # 50, Ex. E.

15    The charges did not specify vaginal penetration, *id.*, and vaginal penetration is not a necessary

16    element for any of the charges. *See* Wash. Rev. Code §§ 9A.44.010(1), 9A.44.070 (1979) (amended

17    1986) (repealed by Laws 1988, ch. 145, § 24, eff. July 1, 1988).  Mr. Spencer did not admit to

18    vaginal penetration of Kathryn Spencer.  Docket #50, Ex. E, page 10-15 (Rep. Tr. of Change of Plea

19    dated May 16, 1985).

20    On August 30, 1984, Dr. Magee prepared a medical report on Kathryn Spencer, who was

21    then five years old.  Docket #50, Ex. D.  Dr. Magee examined Kathryn Spencer, and on her report

22    wrote: "Pelvic" and underneath that notation, Dr. Magee listed "no erythema," "hymen intact," "no

23    lacerations," and "no swelling." *Id.* Next to a line typed "FINDINGS" Dr. Magee wrote: "Pelvic

24    within normal limits." *Id.* Kathryn Spencer's medical report does not specifically describe the quality

25    of Kathryn's hymen, the report does not indicate that an internal vaginal examination was performed

26    and does not contain any information on the condition of the insides of Kathryn's vagina, and the

27    report does not describe the condition of Kathryn's mouth, anus, or rectum.  Docket #50, Ex. D

28    ORDER INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW - Page 2

1    Kathryn Spencer's pre-trial statements and demonstrations with "anatomically correct" dolls

2  may be interpreted to indicate full vaginal penetration.  However, because of the nature of Kathryn

3  Spencer's statements and demonstrations, it is unlikely, or highly questionable, that she was

4  describing full vaginal penetration.  If, at trial, Kathryn Spencer had described full vaginal penetration

5  the defense might have used the medical report to attack her credibility.

6    Even if Kathryn Spencer did describe full vaginal penetration, and even if the defense

7  successfully attacked her credibility on this issue because of the medical report, the report would not

8  negate the acts of abuse charged.  The evidence known to Mr. Spencer at the time of his guilty plea

9  was overwhelming and was corroborated by other child victims.  That evidence described substantial

10  acts of sex abuse as charged.  Finally, the absence of physical symptoms does not conclusively

11  indicate a lack of full vaginal penetration and is not exculpatory as to Mr. Spencer's guilt of those

12  crimes to which he plead guilty.

13                                    Discussion

14    The prosecution must disclose only evidence that is both favorable to the accused and

15  "material either to guilt or to punishment."  *United States v. Bagley*, 473 U.S. 667, 674 (1985) (citing

16  *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  In the context of a guilty plea, evidence is material if

17  "there is a reasonable probability that but for the failure to disclose the *Brady* material, the defendant

18  would have refused to plead and would have gone to trial."  *Sanchez v. United States*, 50 F.3d 1448,

19  1454 (9th Cir. 1995).  The test for whether the defendant would have chosen to go to trial if he had

20  received the *Brady* material is an objective one that centers on the "likely persuasiveness of the

21  withheld information."  *Id.* at 1454.

22    Applying the objective *Sanchez* test to Mr. Spencer's guilty plea, the questions are whether

23  Kathryn Spencer's medical report was likely to persuade the trier of fact that Mr. Spencer was not

24  guilty of the crimes charged, and, if so, whether the report was sufficiently persuasive that Mr.

25  Spencer would have refused to plead and would have gone to trial?

26    Mr. Spencer plead guilty to seven counts of Statutory Rape in the First Degree and four

27  counts of Complicity to Statutory Rape in the First Degree.  Docket # 50, Ex. E.  The charges did not

28  ORDER INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW - Page 3

1  specify vaginal penetration, and Mr. Spencer did not admit to vaginal penetration of Kathryn Spencer,

2  *id* at page 10-15 (Rep. Tr. of Change of Plea dated May 16, 1985).  Vaginal penetration is not a

3  required element of Statutory Rape in the First Degree.  *See* Wash. Rev. Code §§ 9A.44.010(1),

4  9A.44.070 (1979) (amended 1986) (repealed by Laws 1988, ch. 145, § 24, eff. July 1, 1988).

5      The only value that Kathryn Spencer's medical report might have had would be to attack

6  Kathryn Spencer's credibility at trial.  However, Kathryn Spencer's credibility regarding whether Mr.

7  Spencer fully penetrated her vagina was not at issue when Mr. Spencer entered his guilty plea.  The

8  information known to Mr. Spencer at the time of his guilty plea was overwhelming and corroborated

9  by other witnesses that there were substantial acts of sex abuse as charged.  Because of the nature of

10  Kathryn Spencer's known statements, it is unlikely, or highly questionable, that she was describing

11  full vaginal penetration.

12      Even if Kathryn Spencer did describe full vaginal penetration, and even if the defense

13  successfully attacked her credibility on this issue because of the medical report, the report would not

14  negate the other acts of abuse charged.  Finally, the absence of physical symptoms does not

15  conclusively indicate a lack of full vaginal penetration and is certainly inconclusive as to Mr.

16  Spencer's guilt of those crimes that he plead guilty to.

17      All things considered, it is probable that if Mr. Spencer had Kathryn Spencer's medical report,

18  it would not have been sufficiently exculpatory or persuasive to cause him to refuse to plead guilty

19  and to go to trial:  Kathryn Spencer's medical report was not likely to persuade the trier of fact that

20  Mr. Spencer was not guilty of the crimes charged.

21                          Conclusions of Law

22      Based on *Bagley*, the objective test from *Sanchez*, and the facts above, Kathryn Spencer's

23  medical report was not material, and Mr. Spencer's due process rights were not violated when the

24  state failed to disclose the report.

25

26

27

28  ORDER INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW - Page 4

110

1

2                                            Order

3          For the foregoing reasons, it is now

4          **ORDERED** that the Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* by Person

5   in State Custody is **DENIED**.

6          The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel of

7   record and to any party appearing *pro se* at said party's last known address.

8

9          DATED this ___25___ day of _____Sept_____, 19_96_

10

11

12          _____

13          Robert J. Bryan
            United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   ORDER INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW - Page 5

                                            111

AO 450 (Rev. 5/85) (Mod. 10/93)  Judgment in a Civil Case o

FILED

RECEIVED

LODGED

SEP 26 1996

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                    DEPUTY

ENTERED
ON DOCKET

SEP 27 1996

By Deputy

# United States District Court

## WESTERN DISTRICT OF WASHINGTON

CLYDE RAYMOND SPENCER,

v.

JOSEPH KLAUSER, Warden, Idaho
State Istitution,

JUDGMENT IN A CIVIL CASE

CASE NUMBER: C94-5238RJB

[ √ ]   **Decision by Court.**  This action came under consideration before the Court.  The issues have been considered and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

ORDERED thast the Petition Under 28 U.S.C. §2254 for Writ of *Habeas Corpus* by Person in State Custody is **DENIED.**

Date   _Sept 26, 1996_

_____
BRUCE RIFKIN
*Clerk*

_____
*(By) Deputy Clerk*

CERTIFIED TRUE COPY
ATTEST: WILLIAM M. McCOOL
Clerk, U.S. District Court
Western District of Washington
By _____
Deputy Clerk

1

1     IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

2          IN AND FOR THE COUNTY OF CLARK

3    _____

4    STATE OF WASHINGTON,            )
                                     )
5               Plaintiff,           )
                                     )
6          vs.                       )  Case No. 85-1-00007-2
                                     )
7    CLYDE RAY SPENCER,              )  Appeals No. 37229-1-II
                                     )
8               Defendant.           )
                                     )
9    _____

10                        HEARING

11   _____

12

13                    JULY 10, 2009

14

15              BEFORE THE HONORABLE

16                  ROBERT LEWIS

17

18

19

20

21

22   TRANSCRIBED BY:   Patricia Diane Fontana, CSR NO. 3107

23                     Reed Jackson Watkins

24                     Court-Certified Transcription

25                     206.624.3005



EXHIBIT   F
113

2

```
 1                    A P P E A R A N C E S

 2

 3 For the Plaintiff:      KIM FARR

 4                         Clark County Deputy Prosecutor

 5                         1013 Franklin Street

 6                         PO Box 5000

 7                         Vancouver, Washington 98666

 8

 9

10

11

12 For the Defendant:     PETER A. CAMIEL

13                        Mair & Camiel, P.S.

14                        710 Cherry Street

15                        Seattle, Washington 98104

16

17

18

19

20

21

22

23

24

25
```

114

3

1            E X A M I N A T I O N   I N D E X

2

3 MATTHEW RAY SPENCER

4 Direct Examination by Mr. Camiel.....................6

5 Cross-Examination by Mr. Farr......................23

6 Redirect Examination Mr. Camiel....................51

7 Recross-Examination Mr. Farr.......................56

8

9 KATHRYN ELIZABETH TETZ

10 Direct Examination by Mr. Camiel...................59

11 Cross-Examination by Mr. Farr......................74

12 Redirect Examination by Mr. Camiel.................83

13 Recross-Examination by Mr. Farr....................86

14

15

16            E X H I B I T   I N D E X

17

18 NUMBER                    DESCRIPTION              PAGE

19 Defendant's No. 1  Declaration of Kathryn E.

20                    Spencer Tetz.....................5

21 Defendant's No. 2  Declaration of Matthew Ray

22                    Spencer..........................5

23 Plaintiff's No. 3  Letter to Governor Locke from

24                    Matthew Ray Spencer.............42

25

115

4

1                          -000-

2

3          THE BAILIFF:  ...please.  The court is now in

4 session.  The Honorable Robert Lewis presiding.

5          THE COURT:  Thank you.  Please be seated.

6          The State of Washington v. Clyde Spencer,

7 85-1-0000-7-2, is on today for a reference hearing.

8          Are the parties ready to proceed?

9          MR. FARR:  The State's ready, Your Honor.

10          MR. CAMIEL:  Peter Camiel for Mr. Spencer.

11 We're ready.

12          THE COURT:  All right.  I've had the

13 opportunity to review the court of appeals' order and

14 its clarifying order and reviewed the memorandum

15 submitted by both counsel.  And I think what I need to

16 have is the affidavits that were presented to the court

17 of appeal marked as exhibits.

18          And have they been?

19          THE CLERK:  Yes.

20          THE COURT:  Okay.  And are there one for each

21 person?

22          MR. CAMIEL:  Yes.

23          THE COURT:  Okay.  If you want to hand them up.

24          Mr. Farr, do you have any objection to 1 or 2

25 being admitted for purposes of this hearing?

5

1          MR. FARR:  Not for purposes of this hearing.

2          THE COURT:  Okay.  One and 2 are admitted

3 then.

4          (Defendant's Exhibit Nos. 1 and 2 are

5          admitted into evidence.)

6          THE COURT:  All right.  Call your first

7 witness.

8          MR. CAMIEL:  Thank you, Your Honor.  The first

9 witness will be Matt Spencer.  I've got him out in the

10 hallway.

11         THE COURT:  All right.

12         MR. FARR:  The State would be asking that the

13 witnesses be excluded from each other.  I assume they

14 are.

15         MR. CAMIEL:  They are.  And we have no

16 objection.

17         MR. FARR:  Okay.

18         THE COURT:  That's fine.  That will be granted.

19         Come forward, please.  Raise your right hand.

20         Do you swear or affirm that any testimony you

21 give in this hearing will be the truth, the whole

22 truth, and nothing but the truth so help you?

23         THE WITNESS:  I do.

24         THE COURT:  Please be seated here then.

25         And now that you're seated, please state your

DIRECT/SPENCER

6

1 name in full, then spell your last name for the court's

2 record.

3        THE WITNESS:  My name is Matthew Ray Spencer,

4 S-P-E-N-C-E-R.

5        THE COURT:  Go ahead, Counsel.

6        MR. CAMIEL:  Thank you, Your Honor.

7

8             MATTHEW RAY SPENCER,

9        having been first duly sworn,

10       was examined and testified as follows:

11

12             DIRECT EXAMINATION

13 BY MR. CAMIEL:

14   Q.   Mr. Spencer, how old are you?

15   A.   I'm 33 years old.  I'll be 34 this year.

16   Q.   Where do you presently live?

17   A.   I live in Sacramento, California.

18   Q.   And how much of your life have you lived down

19 there?

20   A.   Pretty much all of it.  About over 20 years.

21 About 25 years I'd say.

22   Q.   Are you single or married?

23   A.   I'm single.

24   Q.   And who's your father?

25   A.   My father is Ray Spencer.

118

DIRECT/SPENCER

7

1    Q.    The gentleman seated next to me?

2    A.    Yes, sir.

3    Q.    And who's your mother?

4    A.    My mother is DeAnne Spencer.

5    Q.    Do you have any brothers or sisters?

6    A.    I have a sister, Kathryn.

7    Q.    And is she here today?

8    A.    She is here.

9    Q.    Where does she live?

10   A.    She lives in Roseville, California.

11   Q.    Near Sacramento?

12   A.    Near -- right.

13   Q.    And in terms of ages, are you older or younger?

14   A.    I'm older.

15   Q.    In 1984/1985, where were you living during

16   that time period?

17   A.    Between the two I lived in Sacramento and

18   lived up here with my father.

19   Q.    Were your parents still married or not?

20   A.    They'd been divorced.

21   Q.    And did you come up here to visit with your

22   father?

23   A.    Correct.

24   Q.    Did you also have a stepbrother?

25   A.    Yes.

DIRECT/SPENCER

8

1    Q.    What's his name?

2    A.    Matthew Hansen.

3    Q.    And in terms of age, what was his age compared

4 to yours?

5    A.    Much younger.  And I believe he's younger than

6 my sister as well.

7    Q.    What do you do for a living, Matt?

8    A.    I am a manual transmission mechanic.

9    Q.    And where do you work?

10    A.    I work for a business called Clutch Mart.

11    Q.    And where is that located?

12    A.    It's in Sacramento.

13    Q.    And what's the extent of your education?

14    A.    I've got two years completed in a community

15 college and just automotive experience.

16         MR. CAMIEL:  Do you have the exhibits?

17         THE COURT:  Did you want the exhibit back?

18         MR. CAMIEL:  I can -- I can use -- I have

19 other copies.

20         THE COURT:  I believe you attached a copy to

21 one of the memos that you'd sent in.  Okay.  There's

22 Exhibit 1 (inaudible).

23         MR. CAMIEL:  I just wanted to see which one

24 was marked which.

25    Q.    (By Mr. Camiel:)  Mr. Spencer, I'm going to

DIRECT/SPENCER

9

1 hand you what's been marked for purposes of this

2 hearing as Exhibit No. 2.

3         MR. CAMIEL:  Counsel.

4         MR. FARR:  I appreciate it.  Thank you.

5         THE WITNESS:  Thank you.

6    Q.    (By Mr. Camiel:)  I want you to take a little

7 bit and take a look at that and I want to ask you

8 whether you recognize that document.

9    A.    Yes, I do.

10   Q.    What is it?

11   A.    This is my declaration.

12   Q.    And looking at the last page, page 5, at the

13 bottom of the page is that your signature or a copy of

14 your signature?

15   A.    Yes, sir, it is.

16   Q.    Did you sign this under oath?

17   A.    I signed this -- yes.

18   Q.    I want to go back now to times when you'd come

19 up to visit your father in the mid 1980s.

20         During the times that you would come up to

21 visit with your father, was there ever an occasion

22 where your father sexually molested you in any way?

23   A.    There was never an occasion.

24   Q.    Was there ever an occasion where you observed

25 your father to engage in any sexual contact with your

121

DIRECT/SPENCER

10

1  sister Kathryn?

2     A.     Never at all.

3     Q.     Ever an occasion where you observed your

4  father engage in any sexual contact with your

5  stepbrother Matt Hansen?

6     A.     I've never seen my father abuse anybody.

7     Q.     Do you recall in the mid 1980s a police

8  officer or detective coming to see you in California?

9     A.     I recall two.

10     Q.     Do you remember who the first one was that

11  came to see you?

12     A.     The first one I believe was from Sacramento.

13     Q.     Do you remember about how old you were at the

14  time?

15     A.     I believe I was around seven or eight.

16     Q.     And when the policeman came to visit you, do

17  you recall what the policeman asked you about?

18     A.     I believe it was -- well, it was continuously

19  the same question, if my father had molested me and my

20  sister and my stepbrother.

21     Q.     Sticking with the first police officer that

22  you recall coming to see you, was that police officer,

23  do you remember, a male or female?

24     A.     I believe he was male.

25     Q.     And do you recall the responses you gave to

DIRECT/SPENCER

1 the police officer's questions about whether or not

2 your father had molested you?

3    A.    I do recall those statements.

4    Q.    What did you say?

5    A.    All my statements in Sacramento were

6 continuously "no."

7    Q.    "No," that he had not molested you?

8    A.    That he had never touched me or my family.

9    Q.    Do you recall at some point in time another

10 police officer coming to visit you in California?

11    A.    I do.

12    Q.    Do you remember who that police officer was?

13    A.    I believe that was Sharon Krause.

14    Q.    Do you know where she was from?

15    A.    She was from Vancouver Police Department.

16    Q.    When she came to visit you, what happened?

17    A.    She questioned us several times, and towards

18 the latter questioning became, it seemed -- she took us

19 to her hotel room to question.

20    Q.    And when you say "us," who are you talking

21 about?

22    A.    Me and my sister Katy, Kathryn.

23    Q.    Did she take the two of you together or

24 individually?

25    A.    We were always questioned individually.

123

DIRECT/SPENCER

1  Q.  Was the detective by herself or with anyone

2 else?

3  A.  By herself.

4  Q.  What did the detective ask you about?

5  A.  It was questioning upon if my father had ever

6 molested me.

7  Q.  Did the detective provide you with any

8 information about your father?

9  A.  Never.

10  Q.  Okay.  Did the detective indicate to you

11 anything about whether your father had done anything to

12 your sister or your stepbrother?

13  A.  Yes.

14  Q.  What did the detective indicate?

15  A.  She indicated that they had been molested and

16 was assuring me that I had been molested too.

17  Q.  And do you recall what you told the detective

18 in response to her inquiries to you?

19  A.  All my responses in Sacramento were

20 continuously no, nothing had happened.

21  Q.  Why were you telling her that nothing

22 happened?

23  A.  Because nothing had happened.

24  Q.  Okay.  Did there come a point in time where

25 you met with the detective again somewhere other than

DIRECT/SPENCER

1  Sacramento?

2  A.    Yes, sir.

3  Q.    Where did that take place?

4  A.    Vancouver.

5  Q.    What happened there?

6  A.    I had been questioned.  My sister and I were

7  flown up here and questioned in separate rooms again

8  for several hours, and I made a decision that was

9  wrong.

10  Q.    Well, what were you questioned about when the

11  detective brought you up here?

12  A.    We were questioned again of that if we were

13  molested or not.

14  Q.    Did the detective tell you anything about your

15  sister or stepbrother?

16  A.    She had told me that my sister and my

17  stepbrother had been molested by my father.

18  Q.    When you had been telling the detective that

19  you had not been molested, did the detective seem to

20  accept your answer?

21  A.    She never accepted a "no" answer.

22  Q.    And how do you know that?

23  A.    Because it wasn't until I said "yes" is when

24  the questioning stopped.

25  Q.    When you said "yes," what did you tell the

125

DIRECT/SPENCER

15

1 detective?

2   A.   I told her that he had molested me and my

3 sister and my stepbrother and that there had been more

4 than one individual involved and...

5   Q.   Why would you say that?

6   A.   I wanted it to end.

7   Q.   What did you want to end?

8   A.   I wanted the questioning -- I wasn't

9 understanding.  I came to a conclusion that my sister

10 and my stepbrother must have been molested and so I

11 must have been as well.

12   Q.   Why did you come to a conclusion that your

13 sister and stepbrother had been molested?

14   A.   You hear it enough times, it...

15   Q.   Who were you hearing it from?

16   A.   From Sharon Krause.

17   Q.   Did your sister ever tell you that she was

18 molested by your father?

19   A.   Never.

20   Q.   Did your stepbrother ever tell you that he was

21 molested by your father?

22   A.   Never.

23   Q.   Did you ever see your father engage in any

24 sexual conduct toward your sister or your stepbrother?

25   A.   Not one time.

DIRECT/SPENCER

1   Q.   So you told the detective that other people
2 were involved?

3   A.   Correct.

4   Q.   And was that true?

5   A.   No.

6   Q.   Did you provide the detective with details
7 about what you claimed your father did to you?

8   A.   Yes, I did.

9   Q.   Were any of those details true?

10   A.   No.

11   Q.   Okay.  Did your mother say anything to you
12 about whether or not your father had molested you or
13 your siblings?

14   A.   Yes.  My mother told me that my sister had
15 been molested and that I must have been molested as
16 well.

17   Q.   Did you find out -- now, there was no trial,
18 was there?

19   A.   No.

20   Q.   Okay.  After telling the detective that you
21 had been molested, did the questioning stop?

22   A.   Indeed it did.

23   Q.   And did you end up going back home to
24 Sacramento?

25   A.   Yes.

DIRECT/SPENCER

18

1    Q.    Over the years did you ever hear about whether

2  any investigators or lawyers on behalf of your father

3  tried to contact you?

4    A.    Yes, sir.

5    Q.    What did you hear?

6    A.    I was being contacted by you and an

7  investigator.

8    Q.    Did you ever talk to me?

9    A.    No, sir.

10   Q.    Did you ever talk to an investigator?

11   A.    No, sir.

12   Q.    Why not?

13   A.    I don't know.  I wasn't -- I was still

14 confused.  It took me many years to come to this -- to

15 this, you know -- to the thoughts to making it right.

16 It took me many, many years.  And I needed to do it on

17 my own.

18   Q.    Did there come a point in time when you were

19 contacted by a newspaper reporter?

20   A.    Yes, sir.

21   Q.    Do you remember how long ago that was?

22   A.    I believe that was I'd say four or five years

23 ago.

24   Q.    Do you remember who the reporter was?

25   A.    Ken Olsen.

128

DIRECT/SPENCER

19

1    Q.    Where did he contact you?

2    A.    From the Columbian up here.

3    Q.    Where were you when you were contacted?

4    A.    In Sacramento.

5    Q.    What did he tell you or ask you?

6    A.    He wanted to get my statements on what had

7 happened.

8    Q.    What did you tell him?

9    A.    I didn't really tell him much.

10   Q.    Okay.  Did you ask about your father?

11   A.    Yes, I did.

12   Q.    Okay.  Did -- at that point in time do you

13 know whether your father was still in prison or not?

14   A.    At that time I believe he was out.

15   Q.    How did you learn that he was out of prison?

16   A.    I was informed by my mother.

17   Q.    Did you make any attempt to contact your

18 father?

19   A.    I did, yes.

20   Q.    How did you do that?

21   A.    I attempted through Ken Olsen and wasn't

22 successful there, so I made my own attempt and

23 contacted him via through you and made it happen.

24   Q.    Okay.  So you initiated the contact?

25   A.    Correct.

DIRECT/SPENCER

20

1    Q.    Okay.  And when you had contact with your

2  father, did you talk to him about the charges?

3    A.    We did.  We did.

4    Q.    What did you tell him?

5    A.    I told him I knew in my heart he didn't do it.

6    Q.    What did he tell you?

7    A.    He told me that he had ruined the relationship

8  with my mother and he had -- you know, he had other

9  downfalls, but none of them were molesting children.

10   Q.    At some point in time did you come up to

11 Seattle and meet with me?

12   A.    Yes, sir.

13   Q.    And when you and I met and talked, was your

14 father present?

15   A.    No.

16   Q.    What did we talk about?

17   A.    We talked about making this right and me

18 recanting my statements.

19   Q.    Did you -- were you asked to review or take a

20 look at anything?

21   A.    There was not much to review.

22   Q.    Did you look at any police reports?

23   A.    Nope.

24   Q.    I want to talk to you about this document,

25 Exhibit No. 2, that you have in front of you, okay?

130

1   Q.   Now, you didn't sign this declaration until

2  February of 2006.

3         Why didn't you come forward sooner?

4   A.   Like I said, I needed to come to my own

5  conclusions.  I needed to find a way to make it right.

6   Q.   Did you -- did you know how to come forward or

7  who to come forward to?

8   A.   I did not know.

9         MR. CAMIEL:  I don't have any other questions.

10         THE COURT:  Cross-examination?

11         MR. FARR:  Thank you, Your Honor.

12

13                     CROSS-EXAMINATION

14  BY MR. FARR:

15   Q.   Mr. Spencer, you say you're 33 presently and

16  unmarried?

17   A.   Correct.

18   Q.   Have you undergone counseling as a result of

19  this action?

20   A.   Indeed I have.

21   Q.   When did you undergo counseling?

22   A.   I had -- under Victim Witness I was counseled

23  until 18.

24   Q.   During that counseling session did you ever

25  indicate that none of this occurred?

1    A.    Once again, yes.

2    Q.    You were interviewed by your father's attorney

3 Mr. Jim Rulli, weren't you?

4    A.    I believe so.

5    Q.    Down in Sacramento?

6    A.    I believe so.

7    Q.    And you told Attorney Rulli that, in fact, you

8 had been abused?

9    A.    I told everybody when I was nine that I had

10 been abused.

11    Q.    You told Detective Krause that you'd been

12 abused by your father?

13    A.    Indeed.  After I was up here.

14    Q.    And the defense attorney for your father?

15    A.    I told everybody.

16    Q.    Did you feel -- I'm sorry.  Let me rephrase

17 that.

18          You were aware then, before you turned 18 or

19 19, that your father was sent to prison for life; is

20 that correct?

21    A.    Correct.

22    Q.    How did you feel about being responsible for

23 sending your prison -- dad to prison for life?

24    A.    How did I feel about that?  It wrecked 20

25 years of my life.  It was not easy growing up without a

132

CROSS/SPENCER

1          THE WITNESS:  I didn't -- at the time, no, I

2 didn't feel bad that he went to prison.

3          Once I realized what happened, yeah.

4     Q.    (By Mr. Farr:)  What do you mean "what

5 happened"?

6     A.    That nothing had happened and he had done time

7 for nothing.

8     Q.    You considered -- because you've talked a

9 great deal about the healing effects of recant -- the

10 recantation.

11          Does it -- it must have been very painful to

12 you, then, to believe that you were the one

13 responsible, along with your brothers and sisters, to

14 send your father to prison?

15    A.    Indeed it was.

16    Q.    Your testimony is that during the time that

17 you were growing up, before any contact was made with

18 your father's attorney or his investigators, that they

19 had been attempting to contact you?

20    A.    Correct.

21    Q.    How often would you say they had been

22 attempting to contact you?

23    A.    His lawyer had attempted to contact me a

24 couple times via through my mother.  And when I turned

25 18, he attempted to in person contact me.

CROSS/SPENCER

34

1    Q.    So how old were you when you had first contact

2 with the investigator or the defense attorney for your

3 father?

4    A.    Okay.  I was eight years old.

5    Q.    Well, let me rephrase that then.

6          How many times -- when was the first time you

7 made contact with the defense counsel or the

8 investigator for defense counsel?

9    A.    It's the same question.  When I was eight

10 years old.

11   Q.    Let me re -- I'll -- is this man the defense

12 counsel for your father when you were eight?

13   A.    I don't believe so.

14   Q.    All right.  So how -- when was the first time

15 you had made any after the age of 18?  Because, if I

16 understand your testimony correctly, you made no

17 contact before the age of 18.

18   A.    Correct.

19   Q.    How old were you after the age of 18 before

20 you made any contact with the defense counsel, any

21 defense counsel for your father, after the age of 18,

22 or investigator?

23   A.    Let's see.  I believe I was 28, so six years

24 ago, five years ago.  It was after he had been out.

25   Q.    After he had been out?

134

CROSS/SPENCER

37

1   A.   At the airport.

2   Q.   How long did you have contact with him the

3 first time?

4   A.   What do you mean "the first time"?  We're

5 still having contact, from there to here.

6   Q.   After the attorney had lifted the no-contact

7 order, how long was it then before you made contact

8 with your father?

9   A.   Immediately.

10   Q.   Like a day?

11   A.   As soon as I got the word.  As soon as the

12 paperwork was signed down here, I signed it, sent it

13 back, and we became in contact.

14   Q.   And how did you arrange this contact?  Where

15 were you supposed to meet and how --

16   A.   E-mail, first via e-mail, and then I'd made

17 arrangements to come up here and see him.

18   Q.   Now, when you first met the defense attorney

19 before you met your father, had you indicated to him

20 that you were recanting your original testimony?

21   A.   When I came up here, that was what my first

22 intent was.

23   Q.   Let me --

24   A.   So he knew.

25   Q.   Let me rephrase the question then.

135

CROSS/SPENCER

38

1        When you met with him to lift the no-contact

2  order, did you indicate to him that this events, these

3  events, that you had sworn, that you had agreed to or

4  talked to to all of these individuals in 1985, did you

5  tell him they were not true?

6    A.    Not that moment.

7    Q.    Was it after your father and you had met that

8  you first informed the defense attorney that this

9  contact -- that these allegations were not true, the

10  allegations of sexual abuse?

11   A.    I had contacted -- before I flew up here for

12  the first time, Peter and I had been in contact and he

13  knew what I was doing when I was coming up here for the

14  first time.  It wasn't that my father had coerced me to

15  say that I'm going to reverse this.  I make my own

16  decisions.

17   Q.    But if I understand your testimony, you did

18  not tell your father's attorney that you -- that these

19  events did not occur until after you had met your

20  father; is that correct?

21   A.    Once again, correct.

22   Q.    All right.  Now, when you met your father the

23  first time, you indicated it was at an airport?

24   A.    Yeah.

25   Q.    You said you'd been communicating by internet

136

CROSS/SPENCER

1 e-mail?

2    A.    Right.

3    Q.    And then you met him at the airport.

4    A.    Right.

5    Q.    Which airport?.

6    A.    Sea-Tac.

7    Q.    And did you go with him from Sea-Tac or did

8 you just meet him in a meeting room or how was that

9 contact?

10    A.    No.  He picked me up.

11    Q.    He picked you up at Sea-Tac?

12    A.    Correct.

13    Q.    You flew in to Sea-Tac?

14    A.    Correct.

15    Q.    And then he met you at Sea-Tac and picked you

16 up?

17    A.    Um-hmm.

18    Q.    And what did you do?

19    A.    We went back and we talked.

20    Q.    Where did you go?

21    A.    To his apartment.

22    Q.    To his place?

23    A.    Yeah.

24    Q.    Were there any other adults present?

25    A.    No.

137

CROSS/SPENCER

1    Q.    And during the time -- so that we're talking

2  about what year, approximately?

3    A.    2000 -- I don't know.  It was 2002?  '3?  I

4  don't remember what year exactly it was.

5    Q.    Well, was it after he got out of jail?

6    A.    Of course.  How would he pick me up?

7    Q.    All right.  So it would have had to have been

8  after the governor's commutation of his sentence; isn't

9  that correct?

10    A.    I believe so, yes.  Yes.

11    Q.    All right.  Now, the governor was Governor

12  Locke at the time; wasn't that correct?

13    A.    Correct.

14    Q.    The governor was, you were aware, debating the

15  commutation of your father.  You were aware of that,

16  weren't you?

17    A.    The debating of my --

18    Q.    He was debating in his own cabinet whether or

19  not he should commute your father's sentence?

20    A.    Yes, I knew that.

21    Q.    You were made aware of that?

22    A.    Yes.

23    Q.    How were you made aware of that?

24    A.    Through Peter.

25    Q.    So did you write any letters to the governor

138

CROSS/SPENCER

1 or to anybody concerning your father's innocence or

2 guilt at the time the governor was considering whether

3 or not to commute your father's sentence?

4    A.    I wrote this letter and I've been in court I

5 don't know how many times now.

6    Q.    The letter you wrote is the letter dated

7 March 2nd, 2003?

8    A.    I believe so.  Where's this letter?

9    Q.    I'm going to show you what's marked as State's

10 identification No. 3 -- for identification No. 3.  This

11 letter.

12    A.    Yes, I wrote this.

13    Q.    And what date is on that letter?

14    A.    Where's the date?

15    Q.    That right there.

16    A.    Oh.  March 2nd, 2003.

17    Q.    Okay.  And you wrote this letter?

18    A.    Yeah.

19        MR. CAMIEL:  I would ask the witness to look

20 at the letter again.

21        THE COURT:  Has he looked at it long enough

22 for you, Counsel, or did you want some more?

23        MR. CAMIEL:  No.  I want to make sure that he

24 recognizes it.

25        THE WITNESS:  I recognize this letter.

139

CROSS/SPENCER

42

1          MR. FARR:  Okay.  The State moves for the

2  admission of this letter.

3          THE COURT:  Exhibit number?

4          MR. FARR:  Three.

5          THE COURT:  Three's admitted.

6          (Plaintiff's Exhibit No. 3 is admitted

7          into evidence.)

8     Q.   (By Mr. Farr:)  So when is your birthday,

9  Mr. Spencer?

10    A.   11/28/75.

11    Q.   So in 2003 how old would you have been?

12    A.   Over eighteen, I believe.

13    Q.   Twenty-six?

14    A.   Correct.

15    Q.   And in the letter to the governor, which is

16  dated March of '03, when you age 26, you pled with the

17  governor not to release him; isn't that correct?

18    A.   I did.

19    Q.   And you indicated that to release him would to

20  allow him back out onto the street to continue abusing

21  other children; isn't that correct?

22    A.   Correct.

23    Q.   This was after your meth period?

24    A.   Correct.  And so was this.

25    Q.   That was '06, the letter you've got in your

140

CROSS/SPENCER

43

1  hand, isn't it?

2     A.    Yes.

3     Q.    And it was after you had met your father,

4  wasn't it?

5     A.    The reason I came up here was to write this

6  letter.  It's not after I left --

7           THE COURT:  Are we referring to a letter

8  that's not marked as an exhibit?

9           MR. FARR:  I'm sorry, Your Honor.

10          THE WITNESS:  This is --

11          MR. CAMIEL:  He's referring to the

12  declaration.

13          THE COURT:  Oh.

14          THE WITNESS:  This is the first declaration.

15          THE COURT:  Oh, all right.  So Exhibit 2 then.

16          THE WITNESS:  Yes, sir.

17          MR. FARR:  All right.  Thank you, Your Honor.

18    Q.    (By Mr. Farr:)  That was done after you met

19  your father; isn't that correct?

20    A.    Yeah.

21          MR. CAMIEL:  I'm sorry, Counselor.  Are you

22  talking about the declaration?

23          MR. FARR:  The Exhibit No. 3.

24          I'm sorry.  Strike that.

25    Q.    (By Mr. Farr:)  Exhibit No. 2, your written

CROSS/SPENCER

44

1  declaration --

2      A.     Correct.

3      Q.     -- the one we're talking about (inaudible)?

4      A.     Yes, sir.

5      Q.     Now, besides that time you met your father in

6  Sea-Tac and met him and went to his apartment alone,

7  just you and he, how long -- did you stay there?

8      A.     Yeah.

9      Q.     How long did you stay there?

10     A.     Two days.

11     Q.     Just you and he?

12     A.     Yeah.

13     Q.     Did he talk to you about the prison time he

14  had served?

15     A.     We had spoken a bit.

16     Q.     And you already had guilt about sending your

17  father to prison.

18            Did that make it worse?

19     A.     Indeed it is.

20     Q.     So you -- how many times -- or I'm sorry.

21  Strike that.

22            When was the next time you met your father

23  after that two-day?

24     A.     I believe I came up here and we went fishing.

25     Q.     And how long after that two-day visit?

142

CROSS/SPENCER

1  meet with your father?

2     A.     I've been an mechanic for 11 years.

3     Q.     So I assume you were a mechanic during that

4  time period?

5     A.     (No audible response.)

6            THE COURT:  You have to answer out loud.

7            THE WITNESS:  Yes, sir.

8     Q.     (By Mr. Farr:)  And did you pay for your

9  flight up here to see your father?

10    A.     I believe it was -- yeah.  Or no.  He paid for

11  it.  He paid for it.

12    Q.     Did you pay for coming up during the fishing

13  trip?

14    A.     I have -- he's paid for it.

15    Q.     How many times have you met your father since

16  that fishing trip?

17    A.     I'd say about three or four times.  Maybe more

18  than that.

19    Q.     Was it always up here in Washington state?

20    A.     No.

21    Q.     Did he ever come down to Sacramento?

22    A.     Sure has.

23    Q.     On the trips to Washington state did you ever

24  pay to come up here to see him?

25    A.     No.

REDIRECT/SPENCER

1       MR. FARR:  All right.  That's all I have to
2 ask you.

3       THE COURT:  Redirect?

4       MR. CAMIEL:  Yes.  Thank you.

5

6            REDIRECT EXAMINATION

7 BY MR. CAMIEL:

8   Q.   Mr. Spencer, there are two documents in front
9 of you, and I want to (inaudible) both of them here.
10 One's a letter and one's a declaration.

11       Do you still have both of them in front of
12 you?

13   A.   I just have the declaration.

14   Q.   I'll get another copy of the letter, which is
15 Exhibit 3.

16       Now, the declaration, this document, that's a
17 document that was prepared when you came up and saw me?

18   A.   Correct.

19   Q.   This letter, who actually typed up that
20 letter?

21   A.   My mother typed this up.

22   Q.   And who put the information in the letter?

23   A.   She did.

24   Q.   Why did you sign it?

25   A.   I believe at the time that's what I needed

144

REDIRECT/SPENCER

1 to do.

2    Q.    Did your mother -- over the years did your

3 mother say negative things about your father?

4    A.    Indeed.

5    Q.    And did she repeatedly attempt to convince you

6 that you had in fact been abused?

7    A.    She did.

8    Q.    And that your sister had been abused?

9    A.    Correct.

10    Q.    And that your stepbrother had been abused?

11    A.    Correct.

12    Q.    And did she tell you that you were blocking

13 out the abuse to yourself?

14    A.    Indeed, yes.

15    Q.    And is she the one who had you go to

16 counseling?

17    A.    Correct.

18    Q.    Did she have any role in preventing you from

19 talking to the defense investigator or the defense

20 attorney who tried to contact you?

21    A.    She did.

22    Q.    Did she, in fact, contact the police when

23 there were attempts to contact you?

24    A.    She did, yes.

25    Q.    And did she tell you that she didn't want you

145

Governor Gary Locke
Office of the Governor
PO Box 40002
Olympia, WA 98504-0002
March 2, 2003

Re: Inmate Clyde R. Spencer #910743

Dear Governor Locke,

My name is Matt Spencer. I am the son of inmate Clyde R. Spencer. I received information that my father has requested clemency. It is difficult to put into words the emotions that I have experienced since hearing this news. I have experienced a certain amount of security since his incarceration. The thought that he may be released has set me on edge. Will I have to spend the rest of my life looking over my shoulder? My childhood was spent in baseball parks and therapy offices. Baseball parks thanks to my mom, therapy offices thanks to my father. The nightmares have gone but the emotional terror he and his friends subjected me and my sister to, surfaces with thoughts of him. He even hired investigators to hunt me down when I was 19 years old. They waited outside my house at 5:00am one morning to try and confront me. I was enraged but able to scare them off with a baseball bat. My mother hired an attorney to serve them with papers to leave us alone. To this day he has not admitted his crimes, nor has he received any rehabilitation. His inability to take responsibility for his actions is what concerns me the most. I know he has received several degrees while in prison (something I have never been able to afford). I also know he has been a model prisoner. That does not surprise me. There are no children in prison. Perhaps if he admitted and began rehabilitation I would feel differently but he has not. I am afraid not only for myself, my sister and my mom but also for any children he may come in contact with. It is my hope you will deny his request.

Respectfully Yours,

Matt Spencer
C/O  7622 Lakewood Park Drive
Sacramento, CA 95828

146