1

1   IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

2   IN AND FOR THE COUNTY OF CLARK

3   _____

4   STATE OF WASHINGTON,            )
                                    )
5             Plaintiff,            )
                                    )
6        vs.                        )  Case No. 85-1-00007-2
                                    )
7   CLYDE RAY SPENCER,              )  Appeals No. 37229-1-II
                                    )
8             Defendant.            )
                                    )
9   _____

10
                    HEARING
11

12  _____

13              JULY 10, 2009

14

15          BEFORE THE HONORABLE

16              ROBERT LEWIS

17

18

19

20

21

22  TRANSCRIBED BY:   Patricia Diane Fontana, CSR NO. 3107

23                    Reed Jackson Watkins

24                    Court-Certified Transcription

25                    206.624.3005

EXHIBIT   G

147

DIRECT/TETZ
59

1        Do you swear or affirm that any testimony you
2   give in this hearing will be the truth, the whole
3   truth, and nothing but the truth so help you?
4        THE WITNESS:  Yes.
5        THE COURT:  Now please be seated.
6        Now that you're seated, please state your name
7   in full, then spell your last name for the court's
8   record.
9        THE WITNESS:  Kathryn Elizabeth Tetz, T-E-T-Z.
10       THE COURT:  Go ahead, Counsel.
11       MR. CAMIEL:  Thank you.
12
13              KATHRYN ELIZABETH TETZ,
14           having been first duly sworn,
15        was examined and testified as follows:
16
17                 DIRECT EXAMINATION
18  BY MR. CAMIEL:
19  Q.   Ma'am, were you born Kathryn Spencer?
20  A.   Yes.
21  Q.   And Tetz is your married name?
22  A.   Yes.
23  Q.   How old are you?
24  A.   Thirty.
25  Q.   And your date of birth?

DIRECT/TETZ

60

| | | |
|---|---|---|
| 1 | A. | 1/13/79. |
| 2 | Q. | Where do you live? |
| 3 | A. | Roseville, California. |
| 4 | Q. | And are you married? |
| 5 | A. | Yes. |
| 6 | Q. | And your husband's name? |
| 7 | A. | Mike. |
| 8 | Q. | Is he here today? |
| 9 | A. | He is. Over there. |
| 10 | Q. | And do you have any children? |
| 11 | A. | Yes. |
| 12 | Q. | How old? |
| 13 | A. | I have a nine-year-old stepdaughter, a |
| 14 | two-and-a-half daughter of my own, and one on the way. | |
| 15 | Q. | One on the way. |
| 16 | | What's your relationship to Clyde Spencer? |
| 17 | A. | He's my father. |
| 18 | Q. | And your relationship to Matt Spencer? |
| 19 | A. | He's my brother. |
| 20 | Q. | And do you also have a stepbrother Matt |
| 21 | Hansen? | |
| 22 | A. | Yes. |
| 23 | Q. | Are you employed? |
| 24 | A. | Um-hmm. |
| 25 | Q. | Where do you work? |

149

DIRECT/TETZ

61

```
 1    A.    I'm a health care recruiter.  I own my own
 2  business.
 3    Q.    And how much education have you had?
 4    A.    Two years of college.  I have an A.A.
 5    Q.    In 1984 how old were you?
 6    A.    Let's see.  Was I five?
 7    Q.    Where were you living at that time?
 8    A.    I believe we were in Southern California.
 9    Q.    Live with your mother?
10    A.    Yes.
11    Q.    Were you mother and your father divorced?
12    A.    Yes.  Actually, no.  I was in Northern
13  California by that point because they were divorced.
14    Q.    In the Sacramento area?
15    A.    Um-hmm.
16          THE COURT:  Sorry, you can't use "um-hmm" and
17  "hmm-um."
18          THE WITNESS:  Okay.
19          THE COURT:  So was the answer "yes" or "no"?
20          THE WITNESS:  "Yes."
21          THE COURT:  Go ahead.
22    Q.    (By Mr. Camiel:)  And where was your father
23  living after your parents divorced?
24    A.    I believe he was in Vancouver.
25    Q.    Did you come up here to visit?
```

DIRECT/TETZ

1  A.    During the summer, yes.

2  Q.    When -- from, say, 1984, when is the next time
3 after that that you would have seen your father?

4  A.    I didn't see him -- I guess I would have seen
5 him in 2007.

6  Q.    Between '84 and 2007 you didn't see your
7 father at all?

8  A.    No.

9  Q.    Did you have any contact with him at all?

10  A.    No.

11  Q.    Any letters back and forth?

12  A.    I believe he may have written letters. But as
13 far as I know, I didn't write anything back.

14  Q.    Did you see the letters that he wrote?

15  A.    I don't remember if I saw them or just knew
16 that we had gotten them.

17  Q.    Do you know if he over the years sent gifts?

18  A.    He did.

19  Q.    Did you ever get to see those gifts?

20  A.    We did. But we sent them to the Children's
21 Receiving Home.

22  Q.    And who -- at whose request or direction was
23 that done?

24  A.    My mom's.

25  Q.    Did your mother try to prevent contact between

DIRECT/TETZ

63

1 you and your father?

2  A.  Yes.

3  Q.  How did she do that?

4  A.  We just couldn't respond to the presents that
5 were sent or any letters or any correspondence at all.

6  Q.  You say "we." Who are you talking about?

7  A.  My brother and I.

8  Q.  Your brother Matt?

9  A.  Um-hmm.

10  Q.  "Yes"?

11  A.  "Yes." Sorry.

12  Q.  I've handed you what's been marked as
13 Exhibit 1 for purposes of this hearing. Take a look at
14 both pages, and I want to ask you if you recognize this
15 document.

16  A.  Yes.

17  Q.  What is it?

18  A.  The declaration that I gave stating that I
19 never had any recollection of any of this happening.

20  Q.  And looking at the second page, is that your
21 signature?

22  A.  Yes.

23  Q.  And did you sign this under oath?

24  A.  Yes.

25  Q.  Did you read it carefully before you

DIRECT/TETZ

64

1 signed it?

2   A.   Yes.

3   Q.   During the times when you were a child and you
4 would come up to visit with your father up here to
5 Vancouver, or any other time, do you have any
6 recollection of your father having sexually abused you
7 in any way?

8   A.   No.

9   Q.   Do you have any recollection of observing your
10 father have any sexual contact with either your brother
11 Matt or your stepbrother Matt Hansen?

12   A.   No.

13   Q.   Do you have any recollection of being
14 contacted by a detective at some point when you were a
15 young child?

16   A.   Yes.

17   Q.   What do you remember about that?

18   A.   I vaguely remember being taken to -- I don't
19 know if it was a motel -- being given ice cream and
20 given dolls and kind of being asked if he had done
21 certain things to me. And I don't remember exactly how
22 I was asked, but I remember pictures were shown to me,
23 dolls were shown to me, and there was usually a reward
24 at the end of it.

25   Q.   What kind of a reward?

DIRECT/TETZ

65

1   A.   Ice cream usually.

2   Q.   Now, do you recall how many times you were --
3 you had police officers or detectives talk to you?

4   A.   No.

5   Q.   And at some point did you -- as you were
6 growing up, did you find out your father was in prison?

7   A.   Yes.

8   Q.   Do you remember how young you were when you
9 learned he was in prison?

10  A.   It was pretty soon after I think it had
11 happened.  I don't remember the exact date, but I think
12 everything had happened -- what? -- when I was five,
13 and it wasn't too long after that.

14  Q.   Okay.  Over the years as a child, did you ever
15 talk to your brother Matt about whether or not your
16 father had sexually molested you or him or your
17 stepbrother?

18  A.   Yes, basically just telling him I'd never
19 remembered anything like that happening.

20  Q.   Okay.  And did your brother Matt ever tell you
21 whether he had been molested or had any memory of being
22 molested by your father?

23  A.   He said he hadn't.

24  Q.   Do you remember how young he was when he was
25 saying that?

DIRECT/TETZ
66

1   A.   No.

2   Q.   Was it while you were both still living at
3 home with your mother?

4   A.   Yes.

5   Q.   Did your mother have a response at all to your
6 indication that you had no memory of being molested by
7 your father?

8   A.   Yes. She had kept a journal of things that
9 she's -- the way she said we were acting or ways that
10 she thought were out of character, and that she
11 believed it had happened.

12   Q.   Okay. Did she indicate to you whether -- why
13 you couldn't remember it?

14   A.   No.

15   Q.   Her belief why you couldn't remember it?

16   A.   No.

17   Q.   At some point in time did you learn more of
18 the details of the alleged molestation that your father
19 supposedly committed?

20   A.   Yes.

21   Q.   How did that happen?

22   A.   Well, I have always had a doubt that something
23 wasn't right, and I could never remember anything
24 happening. I think when he got out of prison it kind
25 of came to the forefront of my mind even more so, that

DIRECT/TETZ

67

1  I felt I needed to do some further investigating.

2              I had talked with my brother; I knew he was
3  already in contact with him. I had started e-mailing
4  back and forth with my dad. I hadn't called him yet,
5  and then I called him later.

6              And then I had got in contact with you. I got
7  a copy of the police report and of the medical exams.
8  And after I saw really the details of what the
9  allegations were, I knew even more so that if that
10 would have happened, I would have remembered that.

11   Q.    If what would have happened?

12   A.    If the allegations that they had against him,
13 the things that they -- that it had said he had done to
14 me repeatedly -- I know that I would have remembered
15 something that graphic, something that violent.

16   Q.    In addition to not having a recollection of
17 anything happening to you, do you have any recollection
18 of anything of a sexual nature happening between your
19 father and either of your siblings, your brother Matt
20 or your stepbrother?

21   A.    No.

22   Q.    Do you have any recollection of any sexual
23 contact between your siblings, your brother Matt or
24 your stepbrother, and yourself?

25   A.    No.

DIRECT/TETZ

72

1 or having contact with your father?

2  A.  Yes.

3  Q.  And what was her reaction to that?

4  A.  She was supportive. She said that she did
5 what she felt she needed to do at that time as a
6 mother, and now that we were both grown she just wants
7 us to be happy and healthy; and if we want him in our
8 lives, then it's our decision at this point to make.

9  Q.  Okay. Was that a different reaction than her
10 reaction toward your father when you were younger?

11  A.  Yes.

12  Q.  In what way?

13  A.  Now I just think it's a different situation
14 because we're not children, so she's not as protective
15 as she was then because she doesn't need to be now that
16 we're grown. So she realizes that we're at a point
17 where we make the decisions now, not her, and she
18 respects that.

19  Q.  You've mentioned that one of the things that
20 you took a look at was -- were some of the police
21 reports in this case.

22      And were those reports that contained
23 statements that you allegedly made to the detective?

24  A.  Yes.

25  Q.  Describing acts of abuse by your father

157

DIRECT/TETZ

73

1 toward you?

2   A.   Yes.

3   Q.   Or toward your siblings?

4   A.   Yes.

5   Q.   Do you remember making those statements to the
6 detective?

7   A.   No.

8   Q.   Can you say as you sit here right now that you
9 did or didn't make those statements?

10  A.   No. All I can say is I don't remember.

11  Q.   And you also don't remember any acts of abuse
12 by your father?

13  A.   No.

14  Q.   Why is it -- now, in your declaration you
15 indicate that "it's my belief that if I'd been sexually
16 abused in the manner described in the police reports
17 alleged against my father, I would have a memory of
18 this having occurred."

19       Why would you think you'd remember that? You
20 were only five.

21  A.   Because it's very graphic and very violent.
22 And I believe as a five-year-old, and having a
23 five-year-old at one point, that you would remember
24 something so graphic. I don't think that you could go
25 on living a normal life after something like that.

CROSS/TETZ

74

```
1            MR. CAMIEL:  I have nothing further.
2            THE COURT:  Cross-examination?
3
4                    CROSS-EXAMINATION
5  BY MR. FARR:
6    Q.    Your last name is Tess?
7    A.    Tetz.
8    Q.    T-E-S-S?
9    A.    T-E-T-Z.
10   Q.    T-E-T-Z.  I'm sorry.  Thank you.
11   A.    Um-hmm.
12   Q.    Ms. Tetz, did you receive therapy or
13 counseling after the allegations were made?
14   A.    Yes.
15   Q.    And how long did that counseling go on?
16   A.    A few years.  I don't remember how many years.
17   Q.    Do you remember how old you were when you
18 stopped?
19   A.    I don't.
20   Q.    Did you ever indicate to the therapist that
21 this acts never occurred?
22   A.    I don't remember.
23   Q.    When defense counsel -- I'm sorry.  Strike
24 that.
25          When your father was attempting to contact you
```

159

CROSS/TETZ

75

1 by sending you letters in the mail, that was in
2 violation of the no-contact order, wasn't it?
3   A.   I don't know that.
4   Q.   But you're aware that there was an order
5 placed against your father that he was not to have any
6 contact with you?
7   A.   No.
8   Q.   Did you ever talk to the attorney about
9 lifting any no-contact order?
10   A.   I don't remember.
11   Q.   All right. Do you know why your mother was
12 attempting to prevent contact between your father and
13 you -- I'm sorry, strike that -- attempting to -- do
14 you know why your mother was not allowing you to
15 contact your father during the time period you were
16 living at home?
17   A.   Yes. She didn't feel it was safe because she
18 does believe it happened.
19   Q.   Okay. You indicate that, in your Exhibit 1,
20 your declaration, that you began having contact with
21 your father in August of '07?
22   A.   Um-hmm.
23   Q.   Is that correct?
24   A.   Um-hmm. Yes.
25   Q.   And the declaration entered by you is in

```
 1  September of '07; is that correct?
 2  A.    Yes, I believe so.
 3  Q.    So the declaration actually came after you had
 4  met with your father?
 5  A.    After I had talked with him.
 6  Q.    Talked to your father.
 7  A.    Yeah.
 8  Q.    I'm sorry.
 9  A.    Right.
10  Q.    All right. And your brother Matt Spencer had
11  been talking to you for how long concerning the issue
12  of whether or not the events occurred?
13  A.    Since we were younger and both still living at
14  home.
15  Q.    How old do you think you were when he began to
16  express his doubts as to whether this occurred?
17  A.    I don't know.
18  Q.    Your brother apparently left home at 18?
19  A.    I believe so.
20  Q.    And has indicated that he had some problems
21  with methamphetamine use --
22  A.    Yes.
23  Q.    -- in his early years?
24        Were you aware your father was in prison?
25  A.    Yes.
```

CROSS/TETZ

77

1  Q.    You indicated that you became aware of that
2  fairly soon after the event?
3  A.    Um-hmm. Yes.
4  Q.    Did you feel badly that your father was in
5  prison?
6  A.    Not at that time. I mean, I don't know that I
7  really understood what was going on at five and six,
8  so...
9  Q.    When did you feel -- begin to feel -- badly
10 that your father was in prison?
11 A.    When I got older and I realized that I never
12 had any recollection of any of this and I started to
13 feel like there was something wrong, this hadn't
14 happened.
15 Q.    So what age were you at at that point?
16 A.    High school, so --
17 Q.    Did you express --
18 A.    -- 16, 17.
19 Q.    -- that to anybody?
20 A.    My brother and I.
21 Q.    Just Matt --
22 A.    And my mom.
23 Q.    -- Spencer?
24 A.    My brother and my mom.
25 Q.    Did you ever have contact with your

CROSS/TETZ
                                                                    80

1  penetration with a five-year-old would show up. Those
2  were the two main things that I do not believe on a
3  five-year-old you would not see if that happened.
4      Q.   On what do you base that conclusion?
5      A.   Because a five-year-old is tiny, for one; you
6  can't -- you would physically harm a child doing that
7  at that age.
8      Q.   Now, there's no indication that you saw a
9  medical examination immediately after these acts
10 occurred?
11     A.   No.
12     Q.   It was months if -- months after it occurred?
13     A.   That I saw the medical report?
14     Q.   Yes. No. That you had the medical
15 examination.
16     A.   I don't remember -- I don't know when it was.
17     Q.   You don't recall?
18     A.   No.
19     Q.   Are you basing your conclusion that these acts
20 did not occur because of your belief that such acts
21 would cause medical damage that was observable on your
22 body?
23     A.   No. That -- that just added to it. I'm
24 basing what I'm saying on the fact that if something
25 like this were to have happened to me, I know I would

163

1 remember it.

2   Q.   All right. Let me ask you about that.

3       Why do you think -- why do you think that it
4 would be impossible for you to forget this?

5   A.   I don't know how to give you that answer other
6 than it's just what I feel in my heart of hearts, that
7 I would know.

8   Q.   Do you have any literature or scientific basis
9 or medical or psychological basis to conclude that the
10 absence of remembering something means it did not
11 occur?

12   A.   No.

13   Q.   Are you basing your determination that this
14 did not occur upon the fact that you have no memory of
15 it?

16   A.   I'm basing it, yes, that I believe I would
17 have a memory if this did happen.

18   Q.   Now, I notice the language in your
19 declaration, Exhibit 1, No. 9, is very carefully
20 drafted, specifically, "Because I have no memory
21 whatsoever of being sexually abused by my father, I am
22 concerned that I was never abused and my father was
23 wrongfully convicted."

24       Do you recall the contact in this testimony --
25 sorry -- the statements you made to Detective Krause?

CROSS/TETZ

82

1   A.   Do I remember saying that?

2   Q.   Yes.

3   A.   Yes.

4   Q.   Do you remember saying those things to
5   Detective Krause?

6        MR. CAMIEL:  I'm sorry.  I would object.  What
7   things to Detective Krause?

8        MR. FARR:  I'm sorry.  The statements of the
9   sexual abuse.

10       THE WITNESS:  Are you -- wait.  Are you saying
11  to him?  No.  You're saying to Krause?

12       MR. FARR:  Let me rephrase.

13       THE WITNESS:  Okay.

14       THE COURT:  Why don't we all reset?

15       MR. FARR:  Yes, let's reset.

16       THE WITNESS:  Hold on.

17       MR. FARR:  I had two ideas running together.

18  Q.   (By Mr. Farr:)  So do you remember, in reading
19  Detective Krause' report, making those statements?

20  A.   No.

21  Q.   Does that mean since you don't recall it, that
22  you did not make those statements to Detective Krause?

23  A.   It means I don't remember.

24  Q.   Okay.  Does the fact that you don't remember
25  the abuse by your father mean that the abuse did

165

CROSS/TETZ - REDIRECT/TETZ

83.

1 not occur?

2   A.   No. It means I don't remember.

3       MR. FARR: Okay. That's all I have to ask.
4 Thank you very much.

5       THE COURT: Redirect?

6

7             REDIRECT EXAMINATION
8 BY MR. CAMIEL:

9   Q.   I want to ask you -- you were asked some
10 questions about your stepbrother Matt Hansen.

11      He lived up here in the state of Washington;
12 is that right?

13   A.   Yes.

14   Q.   And your father was married to his mother at
15 the time that you had come up to visit?

16   A.   Yes.

17   Q.   How many times did you see him, do you think?

18   A.   I don't know. I don't remember.

19   Q.   Handful?

20   A.   Maybe. Not very much.

21   Q.   Is it fair to say you had very, very little
22 contact with him when you were a child?

23   A.   Yes.

24   Q.   And after your father went off to prison, you
25 never had any contact with Matt Hansen again?

166