EXHIBIT 1

6

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

In re the Personal Restraint of

CLYDE R. SPENCER,

                   Petitioner.

NO. 84137-3

RULING DENYING REVIEW

       The State seeks discretionary review of a published Court of Appeals decision granting Clyde Spencer's personal restraint petition and remanding to the trial court to allow Spencer to withdraw his *Alford*[1] plea to multiple sex offenses allegedly committed against his son, daughter, and stepson more than 25 years ago. RAP 16.14(c); RAP 13.5A(a)(1).

       Mr. Spencer was a Vancouver city police officer. In the fall of 1984 he was investigated for allegedly sexually abusing his five-year-old daughter, K.S., and his eight-year-old son, M.S. Mr. Spencer's daughter initially indicated that she was abused by multiple persons, including her mother (Mr. Spencer's former wife), but the investigation focused on Mr. Spencer. The children were interviewed multiple times by Clark County Sheriff's Detective Sharon Krause. K.S. indicated to Krause that her

---

[1] In an *Alford* plea, the defendant does not admit guilt but concedes that the state's evidence is strong and most likely will result in conviction. *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

PLAINTIFF'S EXHIBIT

father had abused her. In contrast, M.S. denied his father had abused him, and he adhered to that denial for months.

The Clark County Sheriff's Office submitted its investigation report on K.S. to the King County Prosecutor's Office for an independent evaluation. In November 1984 King County Senior Deputy Prosecutor Rebecca Roe, known for her expertise in prosecuting child sex abuse cases, opined that the case was unwinnable because significant inconsistencies in K.S.'s version of events indicated an inability to distinguish fact from fantasy. In December 1984 a deputy prosecutor conducted a videotaped interview of K.S., assisted by Ms. Krause and K.S.'s mother, but the tape was not disclosed until October 2009. Notwithstanding Ms. Roe's assessment, the State charged Mr. Spencer in January 1985 with first degree statutory rape and indecent liberties committed against K.S.

Meanwhile, Mr. Spencer's then-current wife, Shirley Spencer, entered into a sexual relationship with the lead detective investigating the case. That detective supervised Ms. Krause, whom he notified of the relationship. While the charges were pending against him, Mr. Spencer stayed in a motel. Ms. Spencer dropped off her son, M.H., to spend the night with Mr. Spencer. Afterward, Ms. Spencer alleged that her son reported being abused by his stepfather while at the motel. Detective Krause interviewed M.H., who related that Mr. Spencer engaged in sexual intercourse with him, including penetrating the boy's rectum with his penis. The allegation resulted in the State adding three counts of first degree statutory rape committed against M.H.

As noted above, Mr. Spencer's son M.S. originally denied being abused. But after persistent interviewing by Ms. Krause, including an alleged threat to make the boy undergo a polygraph examination, M.S. reported that his father had abused him. Medical examinations of K.S. and M.H. disclosed no physical evidence of

molestation despite their reports of repeated anal and vaginal intercourse. The State did not disclose those reports.

Ultimately, the State charged Mr. Spencer with 16 counts: 10 counts of first degree statutory rape and six counts of complicity to first degree statutory rape. The complicity counts were based on allegations that Mr. Spencer forced the children to engage in sexual intercourse with each other. One or more of the children purportedly alleged that Mr. Spencer took photographs of the sexual activity, but the State found no such evidence.

In May 1985 Mr. Spencer, who was heavily medicated at the time for depression, entered an *Alford* plea to 11 counts: seven counts of first degree statutory rape (two involving K.S., two involving M.S., and three involving M.H.) and four counts of complicity to first degree statutory rape (one involving K.S. and M.S., two involving M.S. and M.H., and one involving K.S. and M.H.). The trial court imposed two consecutive life sentences on the first two statutory rape charges (one involving K.S., the other involving M.S.) and 171-month sentences on each of the remaining nine counts, to run concurrently with each other but consecutive to the life sentences.

Mr. Spencer collaterally challenged his judgment and sentence without success. He had partial success in 1995 when the United States Court of Appeals for the Ninth Circuit remanded his case to the United States District Court for the Western District of Washington for an evidentiary hearing on various issues, including Mr. Spencer's competency at the time of his plea and the State's nondisclosure of medical reports. *See Spencer v. Klauser*, 70 F.3d 1280, 1995 WL 710610 (9th Cir.) (unpublished). But after the evidentiary hearing, the district court denied habeas relief. and the Ninth Circuit affirmed, reasoning that the medical reports would not have caused Mr. Spencer to choose a trial over pleading guilty. *See Spencer v. Klauser*, 129 F.3d 127, 1997 WL 686029, at *1 (9th Cir.) (unpublished).

Mr. Spencer sought a commutation from then-Governor Gary Locke. M.S. signed a letter urging the governor to deny commutation. In 2004, apparently after Mr. Spencer finished his 171-month sentence and had started serving his first life sentence, Governor Locke conditionally commuted his sentence. The governor specifically made note of the withheld medical reports, the lack of alleged photographic evidence, Ms. Krause's questionable interview techniques and the children's inconsistent stories, and the affair between Ms. Spencer and the lead detective. The commutation required Mr. Spencer to complete three years of community supervision, which he accomplished.

A newspaper reporter investigating the case contacted M.S. The reporter facilitated M.S.'s contact with Mr. Spencer for the first time since the convictions. Meanwhile, K.S. took an interest in the case and contacted her brother, and she later met with Mr. Spencer for the first time in more than two decades. In 2006 M.S. sent a letter to Governor Christine Gregoire urging her to grant Mr. Spencer a full pardon. M.S. asserted in the letter that relentless interviews by law enforcement officers, including Ms. Krause, browbeat him into falsely accusing his father of abusing him.

In December 2007 Mr. Spencer filed the current personal restraint petition in Division Two of the Court of Appeals, seeking to have his convictions vacated or to hold a reference hearing. The petition was supported by the sworn declarations of M.S. and K.S. M.S. asserted that his father had never molested him and that he had never seen his father molest K.S. or M.H. K.S. claimed that she had no memory of being molested by her father and no recollection of any sexual activity involving M.S. or M.H. K.S. further asserted that if she had been sexually abused as described in police reports (repeated vaginal and anal intercourse), she would remember it.

The Court of Appeals ordered the trial court to conduct a reference hearing limited to determining whether M.S.'s and K.S.'s testimony at the hearing would be

10

consistent with their declarations. M.S. and K.S. testified at the reference hearing and were subjected to an extensive cross-examination by the State. Regarding the letter addressed to the governor, M.S. claimed it was actually written by their mother and that they merely signed it. K.S. recalled her mother asking M.S. to sign the letter. The trial court entered written findings that the testimony was factually consistent with the written declarations. The Court of Appeals then issued a published decision holding that the factual basis for Mr. Spencer's *Alford* plea was so undermined as to justify withdrawal of the plea. *See In re Pers. Restraint of Spencer*, 152 Wn. App. 698, 715, 218 P.3d 924 (2009). The State moved for reconsideration, introducing new evidence, including a transcript of a recent interview with M.H. in which he agreed with abuse allegations read to him by a deputy prosecutor. The State also submitted the previously undisclosed 1984 interview video, which had been in Ms. Krause's personal possession since that time.[2] The court denied reconsideration. The State now seeks this court's discretionary review.

To obtain this court's review, the State must demonstrate that the Court of Appeals decision conflicts with a decision of this court or another Court of Appeals decision, or that it is raising a significant constitutional question or an issue of substantial public interest. RAP 13.4(b). The State fails to address these criteria, much less shows that any of them applies.

A defendant may withdraw an *Alford* plea for manifest injustice when newly discovered evidence, viewed in balance with the record, changes the factual basis for the plea. *In re Per. Restraint of Ice*, 138 Wn. App. 745, 748, 158 P.3d 1228 (2007), *review denied*, 163 Wn.2d 1008 (2008). The Court of Appeals held that M.S.'s and K.S.'s recantations, viewed in light of the record, undermined the factual basis for Mr. Spencer's *Alford* plea sufficiently to justify withdrawal. I agree. Eight of

---

[2] Ms. Krause claimed she stumbled upon the recording while cleaning out her garage.

the 11 charges were based on statements extracted from K.S. and M.S. in a highly questionable interview method. Both have recanted, albeit M.S. with greater force than his sister. The recantations are plausible when viewed in light of the interview method, the failure to disclose the medical report of K.S. (which showed no physical evidence of sexual abuse), and the absence of evidence to corroborate the children's allegations that Mr. Spencer photographed the abuse. And the undisputed fact that Ms. Spencer engaged in sexual relations with the lead detective casts a shadow over the entire case.

The sudden appearance of an interview videotape after nearly 25 years further undermines the reliability of the State's prosecution of Mr. Spencer. The notion that the State would simply lose track of and forget about a videotape in which a prosecutor interviews a complaining witness is difficult to fathom. As the Court of Appeals properly observed in its order denying reconsideration, the tape (which I have viewed) undercuts the State's theory of the case, since it confirms the unreliable child interview techniques the State employed at that time and indicates a potential disclosure violation that may be sufficient on its own to justify collateral relief.

The State complains that the Court of Appeals improperly weighed witness credibility. But the State itself urged the Court of Appeals to hold that the recantations lacked credibility. The Court of Appeals merely directed the trial court to determine whether M.S.'s and K.S.'s testimony was consistent with their declarations. The trial court found the testimony to be consistent, and the record amply supports those findings. The Court of Appeals properly relied on the trial court's findings in determining in light of the record properly before it whether the new evidence undermined Mr. Spencer's *Alford* plea so as to justify collateral relief.

The State relies heavily on M.H.'s "statement" (presented for the first time in its motion for reconsideration) that the rape allegations pertaining to him were

true.[3] Given that not all of the complaining witnesses recanted, the Court of Appeals properly limited Mr. Spencer's remedy to withdrawal of the plea, rather than outright reversal of the convictions. *See State v. Macon*, 128 Wn.2d 784, 804, 911 P.2d 1004 (1996) (reversal required where recanted evidence was sole basis for conviction). In any event, M.S. unequivocally stated that he did not see his father engage in any abuse involving M.H. And K.S. stated that she could not recall seeing any such abuse and that she would have remembered it if she had. Moreover, the previously undisclosed medical report regarding M.H. showed no signs of physical abuse even though he was examined not long after Mr. Spencer allegedly anally raped him.[4] Furthermore, M.H. made his disclosures to Ms. Krause, who seemingly employed the same questionable techniques she applied when interviewing M.S. and K.S. And M.H.'s mother was then having an affair with Ms. Krause's supervisor. Although M.H.'s unrecanted allegations alone may form a factual basis for supporting an *Alford* plea on the statutory rape charges pertaining solely to him, the record clearly indicates that Mr. Spencer pleaded to all charges as part of a package deal. He is therefore allowed to withdraw his plea on all counts. *See State v. Weyrich*, 163 Wn.2d 554, 556 n.2, 182 P.3d 965 (2008).

The motion for discretionary review is denied.

_____
COMMISSIONER

July 12, 2010

---

[3] M.H.'s "statement" is the transcript of an interview in which he indicates agreement with portions of the plea hearing transcript read to him by a deputy prosecutor.
[4] As noted above, the federal court denied habeas relief on the basis of the undisclosed medical reports, but that was before M.S. and K.S. came forward with their recantations and before disclosure of the video recording of the 1984 interview.

13

# EXHIBIT 2

1          IN THE UNITED STATES DISTRICT COURT

2          IN THE WESTERN DISTRICT OF WASHINGTON

3                      AT TACOMA

4     _____

5     CLYDE RAYMOND SPENCER,              )
                                          )
6                      Petitioner,        )
                                          )
7          vs.                            )   No. C94-5238RJB
                                          )
8     JOSEPH KLAUSER, Warden, Idaho       )
      State Institution; CHRISTINE        )
9     GREGOIRE, Attorney General,         )
      State of Washington,                )
10                                        )
                                          )
11                     Respondents.       )
      _____)

12

13    _____

14            DEPOSITION UPON ORAL EXAMINATION

15                         OF

16                  SHARON A. KRAUSE

17    _____

18

19    DATE TAKEN:   May 22, 1996

20

21    TIME:   10:30 a.m.

22    PLACE:   Hall of Justice
                Longview, Washington
23

24

25
                         SUZAN R. WELLS
                     Archer Associates, Inc.
                        P. O. Box 1092
15                 Longview, Washington   98632
                        (360) 423-2195

PLAINTIFF'S
EXHIBIT
2

A    Yes.  I'm sure it was.

Q    What was significant about that?  Why was that a
     problem?

A    Well, I think that's a big problem.  We weren't looking
     at one.  There could have been others.  The other thing
     that concerned me personally was that I remember him
     saying some of the other men had guns on their ankles.

Q    You were concerned that these other potential suspects
     might be police officers?

A    Absolutely.

Q    Was there an investigation that followed up on that?

A    There was.  And I remember Jim Holtz and I discussing
     that.

Q    Jim Holtz was with the Vancouver Police Department?

A    Was the detective who was doing it.  Other than that, I
     can't really tell you.  We were never able to identify,
     you know, if there was, who they were.

Q    Now, during the period of time of the Spencer
     investigation, did you become aware that your
     supervisor, Mike Davidson, began having a romantic
     relationship with Shirley Spencer?

                    MR. SAMSON:  I'll object on the
     grounds of relevancy.  This claim was addressed by the
     ninth circuit and was rejected by the ninth circuit so I
     don't think the issue is really relevant anymore to this

16

                    Sharon A. Krause

                                              38

```
 1           action.  But you can answer if you want.
 2   Q     (By Mr. Camiel:)  You can answer.
 3   A     I was aware of it, yes.  So was everybody else.
 4   Q     Was that ongoing while you were conducting your
 5           investigation?
 6   A     My memory of that, that was way on into the
 7           investigation that I became aware of that.  And I don't
 8           -- I don't remember if it -- You know, it's been so
 9           long.  My recollection of that is that when I became
10           aware of that, it was long after I had interviewed
11           Little Matt.  And I don't remember if it was before he
12           pled or after, to be honest with you.  But at some point
13           I became -- but it was --
14   Q     At the point where you learned about it, you've
15           indicated that it was long after you'd interviewed
16           Little Matt.
17   A     It seems to me.  That's what I think it was.  That's my
18           memory.
19   Q     I wanted to identify "Little Matt" as Matt Hansen.
20   A     Correct.
21   Q     Matt Hansen is the Matt that lived up here in the state
22           of Washington?
23   A     Right.  His mother is Shirley Spencer.
24   Q     When you learned that your supervisor, Michael Davidson,
25           was involved with Shirley Spencer, at the point where
```

17

Sharon A. Krause

1        you learned that, was it your understanding that their

2        relationship had been going on for a period of time?

3                         MR. SAMSON:   I'll object.

4        Irrelevant.   But you can answer.

5                         THE WITNESS:   What I remember is --

6        At the point I was told about it, my impression was it

7        hadn't been going on very long.   I didn't ever get the

8        impression that this was a thing that had been going on

9        for years, if that's what you're wondering.   At some

10       point I became aware that they were seeing each other,

11       but I didn't get the impression that it was a long --

12       they'd been seeing each other for a long time.

13   Q   (By Mr. Camiel:)   Did it -- Was it your impression

14       they'd been seeing each other for several weeks or a

15       matter of months?

16   A   I can't really say.   I would say weeks maybe at the time

17       I became aware.   Well, it was enough that he felt like

18       he needed to tell me, I guess.

19   Q   You learned about it from Sergeant Davidson?

20   A   Yes.

21   Q   Did the fact that Sergeant Davidson was in a

22       relationship with Shirley Spencer affect the way you

23       handled the Spencer investigation?

24   A   Absolutely not.

25   Q   Did you continue to have your reports reviewed by

18

Sharon A. Krause

1      Sergeant Davidson?

2  A  I don't know that he was actively reviewing my reports.

3      Again, a lot of times it's just verbal what's going on.

4      You sit down and talk about it.  I don't know that he

5      was reviewing my reports, to be honest.  There's a good

6      possibility he wasn't.

7  Q  But he was obviously aware that you were the lead

8      detective in the Spencer case?

9  A  Surely.

10  Q  And that one of the victims was Shirley Spencer's son?

11  A  That's correct.

12  Q  And he felt the need to advise you that he was in a

13      relationship with Shirley Spencer?

14  A  That's correct.

15  Q  Did you become aware at any point in time as to whether

16      or not Sergeant Davidson had been having contact with

17      Ray Spencer while Ray was in the jail?

18                MR. SAMSON:  Objection.  Irrelevant.

19  Q  (By Mr. Camiel:)  You can answer.

20  A  I don't recall that.  I don't recall being aware of that.

21  Q  At any point in time did you become aware that Sergeant

22      Davidson had been going to the jail and talking to Ray

23      Spencer?

24                MR. SAMSON:  Objection.  Irrelevant.

25                THE WITNESS:  No.  I don't remember

19

EXHIBIT 3

20

# United States District Court
## Western District of Washington

CLYDE RAYMOND SPENCER )   Case No.
)   C94–5238 RJB
Petitioner, )
)
vs. )
)
JOSEPH KLAUSER, Warder, Idaho State )
Institution, )
)
Respondent. )

## DEPOSITION OF JAMES MATTHEW PETERS

### July 30, 1996

Reported by:
Jodi C. Williams



THE COURT REPORTERS

TUCKER

AND ASSOCIATES

208-345-3704 • 1-800-424-2354
Fax 208-345-3713
605 WEST FORT STREET
P.O. BOX 1625 • BOISE, ID 83701
Home Page: http://www.webfactor.com/tucker/
E-Mail: tucker@rmci.net

ORIGINAL



PLAINTIFF'S
EXHIBIT
3

21

**DEPOSITION OF JAMES MATTHEW PETERS,** taken at the instance of the petitioner, at the United States Attorney's Office, 877 West Main Street, First Interstate Center, Suite 201, in the City of Boise, State of Idaho, commencing at 9:30 a.m., on Tuesday, July 30, 1996, before Jodi C. Willilams, Court Reporter and a Notary Public in and for the State of Idaho, pursuant to notice, and in accordance with the Federal Rules of Civil Procedure.

# APPEARANCES

For Petitioner

MAIR CAMIEL & KOVACH, P.S.
by PETER A. CAMIEL
710 Cherry Street
Seattle, Washington 98104

For Respondent

UNITED STATES ATTORNEY'S OFFICE
CORRECTIONS DIVISION
by DONNA MULLEN
Assistant Attorney General
Post Office Box 40116
2411 Chandler Court
Olympia, Washington 98504-0116

22

12

1          A.    Because of the sensitive nature of the

2    case as the consequence of Mr. Spencer's position

3    in the police department.

4          At the time, I was responsible for

5    reviewing and making final decisions in all child

6    sexual abuse and rape cases.  And in the Clark

7    County prosecutor's office and in the routine

8    average case, that was not a problem.

9          Sensitive cases or cases that were close

10   calls, I would review it and refer the case to Art

11   Curtis, who was the elected prosecutor.      . . .

12         And in my view, that case, as initially

13   presented, was not provable.  But I didn't want to

14   make that call myself because Mr. Spencer was a

15   policeman.  And I didn't want to be accused of

16   favoritism or have someone suspect that he got

17   better treatment because he was a police officer.

18         And so we referred it to an outside

19   agency who didn't know Mr. Spencer.  I knew

20   Mr. Spencer.  But someone who was completely

21   independent and asked them make an independent

22   judgment.

23         Q.    Do you know what materials were forwarded

24   to the King County prosecuting attorney?

25         A.    I assume everything we had.

23

13

1    Q.    What was the result of the King County

2    prosecutor's review of the case?

3    A.    Now, you have to understand that the case

4    was reviewed only when we had one victim, a female,

5    five-year-old victim.

6    Q.    Yes.

7    A.    The status of the case changed later when

8    two other children came forward with allegations.

9         But at the time, they concurred with me

10   that the case wasn't provable.  And we declined it

11   as a result of that.

12   Q.    Why did you believe the case wasn't

13   provable?

14   A.    I don't remember the specifics.  That's

15   12 years ago.  I don't remember the specifics of

16   why not.

17        But at the time and to this day, I go

18   through a three-step analysis with every criminal

19   case.  And that is, first, to determine whether it

20   appears that a crime was committed.  And, secondly,

21   whether I can prove it beyond a reasonable doubt.

22   And, third, whether there is some reasonable way

23   short of bringing the power of the government down

24   on somebody to resolve the matter, such as pretrial

25   diversion or civil compromise or something short of

28

1          I remember one dramatically.  It was a

2    doctor from Kaiser who had taken a photograph of a

3    gaping rectum of a girl who was about eight who had

4    been subjected to chronic penetration with a

5    foreign object by her mother and brother.  And I

6    remember that one clearly because the photo was so

7    dramatic.

8          No others immediately jump out.

9        Q.   Focussing your attention on the Spencer

10   case, do you recall the types of allegations that

11   the female victim, Kathryn Spencer, was making?

12      A.   No.

13      Q.   Do you recall the types of sexual abuse

14   that she was alleging?

15      A.   No.

16      Q.   Were you ever involved in an interview

17   with her?

18      A.   I believe I was in the presence of a

19   defense attorney in Sacramento.

20      Q.   You indicated earlier that when the only

21   victim was Kathryn Spencer, upon your initial

22   review of the case, you believed the case wasn't

23   provable.  Do you recall why you thought that?

24      A.   No.  Probably the absence of

25   corroboration or -- I just don't remember.  If I

25

31

1      Q.   DeAnne?

2      A.   I met them both.

3      Q.   It was DeAnne?

4      A.   Yes.

5      Q.   Did you ever interview Matt Hansen?

6      A.   I don't think so.  It was never my

7 practice, nor is it my practice now, to get

8 involved in interviews with child molesting victims

9 unless I'm certain the case is going to go to

10 trial.  I think they have to tell their story to

11 too many grown-ups that they don't know without

12 having to meet another grown-up and tell the ugly

13 details to them.

14          So I don't have any memory of doing that,

15 and it wouldn't have been my practice to do that.

16          Now, if I had, there would be detailed

17 notes because I always took notes.  And there would

18 be notes in the file.  So I'm not saying I didn't,

19 but I don't think I did.

20          That case was heading toward trial.  But

21 I usually didn't get involved with actually

22 preparing the child for trial until a couple of

23 weeks before when I was sure it was going to go.

24          I might have met them.  And, in fact, my

25 practice would have been to meet the child, take

EXHIBIT 4

330

1      JAMES M. PETERS, PETITIONER'S WITNESS, SWORN OR AFFIRMED

2                        DIRECT EXAMINATION

3   BY MR. CAMIEL:

4   Q.   Would you state your full name and spell your last name,

5   please.

6   A.   My name is James Matthew Peters.  P-e-t-e-r-s.

7   Q.   And your professional address?

8   A.   Box 32, Boise, Idaho.

9   Q.   Mr. Peters, how are you currently employed?

10  A.   I'm an assistant United States attorney in the District of

11  Idaho.

12  Q.   Were you previously employed as a deputy prosecuting

13  attorney in Clark County?

14  A.   Yes, I was.

15  Q.   And were you the primary deputy prosecuting attorney in the

16  case involving Mr. Spencer?

17  A.   That's true.

18  Q.   Mr. Peters, do you recall when charges were initially filed

19  against Mr. Spencer?

20  A.   No, I do not.

21  Q.   Do you recall the fact that there was more than one

22  information filed against Mr. Spencer?

23  A.   Yes.

24  Q.   It was amended on occasion.

25  A.   I do recall that.

28



332

1   the request of the attorney general for an item.  So if that's

2   review, then, yes.

3   Q.  All right.  And was the item that you were looking for the

4   medical examination report pertaining to Kathryn Spencer?

5   A.  That's right.

6   Q.  Do you recall now whether or not back when you were handling

7   the Spencer case you were aware of the fact that Kathryn Spencer

8   had been seen by a physician down in California for a sexual

9   abuse examination?

10  A.  I do not recall that.

11  Q.  You don't recall whether you knew that at the time?

12  A.  I don't believe I -- I don't have any recollection that she

13  had seen a physician, but I don't have many recollections about

14  this case because it was so long ago and there have been so many

15  cases since then.

16  Q.  When you went to review the Clark County Prosecutor's file

17  to see if there was this medical examination report within the

18  Clark County Prosecutor file, had you at that point in time

19  received a copy of the report so that you knew what to look for?

20  A.  No.

21  Q.  If you could turn to Exhibit 1 in the notebook.

22      That's the medical examination report I've asked you about.

23  Have you seen this report recently?

24  A.  Yes.

25  Q.  When you reviewed the prosecutor's file in the last several

29

1   weeks or few months, did you see this report anywhere in the
2   prosecutor's file?
3   A.   No, it wasn't there.
4   Q.   Did you review the Clark County Sheriff's office files while
5   you were at the -- about the time you were in the prosecutor's
6   files?
7   A.   Yes, sir, I did.
8   Q.   And did you find this report in the sheriff's office files?
9   A.   Yes.
10  Q.   If you could turn to Exhibit No. 12 in the book.
11      Did you find attached to the medical report, Exhibit No. 12,
12  Sharon Krause's utility report?
13  A.   I don't recall.  I wasn't looking for a utility report.
14  Q.   Turn your attention back to late 1984 and 1985 at the Clark
15  County Prosecutor's office.  I want to ask you about how
16  discovery was handled in criminal cases.  Once charges were
17  filed against an individual and a person was arraigned, what was
18  the practice at that time with regard to discovery?
19  A.   We had an open file system at that time.  Defense attorneys
20  came in, and in lieu of making a formal discovery motion to the
21  court, they signed a waiver form where they agreed not to copy
22  or otherwise disseminate any of the information that they
23  received from us.  It was voluntary discovery, and if they would
24  agree to do that, and to my knowledge they always did, we just
25  gave them complete open access, and as a consequence, they got
30

339

1          MR. CAMIEL:  I don't have that.  I don't know if the

2     attorney general has it.

3          MR. SAMSON:  We will attempt to find it, Your Honor.

4          THE COURT:  If you have it, I would like to see it, and

5     maybe Mr. Peters would.

6     Q.  (By Mr. Camiel)  Mr. Peters, during the pendency of the

7     Spencer case, did you involve yourself in the interviews of any

8     of the three victims?

9     A.   I recall being present at interviews of two of the children

10    in Sacramento, California.  Those were the defense attorney's

11    interviews.  As to whether I interviewed the Hansen boy, I don't

12    have independent recollection.  If I had, I would have taken

13    notes, and those notes would be in the file.

14        I specifically recall going to Sacramento because that's the

15    only time I ever did that in the eleven years I was in the

16    prosecutor's office, and so that stands out in my mind.

17    Q.  All right.

18         MR. CAMIEL:  Your Honor, the attorney general's office

19    has found what appears to be a copy of the omnibus application

20    that was entered in court and signed by the judge.  I haven't

21    marked it as an exhibit yet, but I would like to do that after

22    we make copies of it.

23         THE COURT:  You don't mind if I look at this?

24         MR. CAMIEL:  Not at all.

25         MR. SAMSON:  We would have no objection to its

31

EXHIBIT 5

UTILITY REPORT

| EMÉNTAL RPT. | ☐ CONTINUATION OF: | | TYPED BY: S. Krause |
| --- | --- | --- | --- |
| | ☐ Incident Rpt.   ☐ Supplemental Rpt. | | PROCESSED BY: |
| CLASSIFICATION (INCLUDE R.C.W NO.) | | | DATA ENTRY BY: |

CLASSIFICATION (INCLUDE R.C.W NO.)
ecent Liberties/Statutory Rape 1st Degree

| [ OF INCIDENT | DATE OF INCIDENT | PRESENT DATE |
| --- | --- | --- |
| 81 N.E. Lucia Falls Rd., Yacolt, Wash. | Summer of 1984 | 10-12-84 |

IONAL PERSONS INFO – ATTACH ADDITIONAL INCIDENT REPORTS. DETAIL ADDI-
L PERSON INFORMATION NOT COVERED IN BOXES
IONAL SUSPECT INFO – ATTACH ADDITIONAL INCIDENT REPORTS. DETAIL ADDI-
L SUSPECT INFORMATION NOT COVERED IN BOXES
ED PERSONS – (VICTIMS, WITNESSES, OFFICERS, SUSPECTS) – DETAIL INJURIES, MEDICAL
, DISPOSITION
IONAL PROPERTY – ATTACH UTILITY/PROPERTY REPORT. DETAIL INFORMATION NOT
DED IN BOXED PROPERTY SECTION

5. PHYSICAL EVIDENCE – DETAIL WHAT AND WHERE FOUND, BY WHOM, AND DISPOSITION
6. VEHICLES – SUSPECT VEHICLE INFORMATION IN SAME ORDER AS VEHICLE SECTION. ADDI-
   TIONAL VEHICLE INFORMATION NOT INCLUDED IN BOXES
7. PARENT, GUARDIAN'S NAME, ADDRESS, PHONE NUMBER OF JUVENILE IN DETENTION
   INDICATE IF CONTACTED AND IF INCIDENT ADJUSTED
8. LIST DOCUMENTS ATTACHED – (ANY FORM  MEDICAL RELEASE, WAIVERS, ETC.)
9. RECONSTRUCT INCIDENT AND DESCRIBE INVESTIGATION
10. SYNOPSIS FOR PROSECUTOR ON CLEARED CRIMES AND CUSTODIES.

NO. ARE LISTED IN ORDER OF STEP 1 TO 10. IF STEP IS UNNECESSARY, OMIT.

| CODE | PERSONS CODE | NAME OF VICTIM · OTHER  LAST, FIRST, MIDDLE |
| --- | --- | --- |
| | | SPENCER, Kathryn           Dob: 01-13-79 |
| | | |
| V1 | | Copies of  Therapeutic/Diagnostic Procedures Report forwarded |
| | | to  this department by University of California Davis Medical Cent. |
| | | Sacramento, California reference: an examination conducted on |
| | | Kathryn Spencer regarding sexual abuse allegations involving |
| | | Kathryn and her natural father, Clyde Ray Spencer. |

CASE NO. 84-8506

| ☐ CPS   ☐ JOH | ☐ CMHP   ☐ PAT   ☐ ARREST | ☐ DSHS   ☐ SIU   ☐ EXCEPTIONAL | ☐ PATROL   XX DETECTIVE   ☐ UNFOUNDED | REPORTING OFFICER: Sharon A. Krause  K/43 Detectives | DIST. |
| --- | --- | --- | --- | --- | --- |
| . DIST. | | | | REVIEWED BY: | DAT |

33

PLAINTIFF'S EXHIBIT
S
tabbies

USE PATIENT PLATE

UNIVERSITY OF CALIFORNIA DAVIS
MEDICAL CENTER
SACRAMENTO

762/PED ACC

**THERAPEUTIC/DIAGNOSTIC PROCEDURES REPORT**

```
032 084 97 17 4 3R
SPENCER, KATHRYN E.
F C1 13 7C  EXP 10 84
```

08 30 84

All cases of Suspected Child Abuse Neglect are to be reported by telephone and in writing (by submitting this form) to the designated agencies (C and D below) within 36 hours. (Penal Code Section 11161.5 and 11161.7)

## GENERAL INFORMATION

**Patient's Name** Spencer Kathryn

**Unit#**

| Address | City | State | Phone |
|---|---|---|---|
| 3930 Berbera | Sacramento | CA | 482-6057 |

| Age | Birthdate | Race | Sex | Date, Time of Examination | Place of Examination |
|---|---|---|---|---|---|
| S | 1-13-79 | C | F | 8-30-84  Poss Acute | 1:30 |

**Reporting Party's Name** Kathryn Eells-Magee, M.D.  **UCD Department** Family Practice  **Phone** 453-3630

### FAMILY—Parents:

| Name (Last, First, Middle) | Birthdate | Sex | Race | Name (Last, First, Middle) | Birthdate | Sex | Race |
|---|---|---|---|---|---|---|---|
| Spencer DeAnne | | F | C | Clyde Ray Spencer | | M | C |

| Address | Address |
|---|---|
| 3930 Bechria | Vancouver |

| Home Phone | Business Phone | Home Phone | Business Phone |
|---|---|---|---|
| ( ) | ( ) | ( ) | ( ) |

### Siblings:

| Name | Birthdate | Sex | Race | Name | Birthdate | Sex | Race |
|---|---|---|---|---|---|---|---|
| 1. Matthew | 8yr. | M | C | 4. | | | |
| 2. | | | | 5. | | | |
| 3. | | | | 6. | | | |

Child's Family/Home Environment—Include risk factors in parent and/or child. Specify who is/are caretaker(s).

Katie lives with mother and sibling. Parents divorced. Father
has visitation for six weeks in summer, week at Easter,
and two at Christmas every other year.

Previous reports of abuse of child or in family?  ☐ Yes  ☒ No  If yes, describe when, who involved, etc.

| Print Last Name | Signature | Date of Report |
|---|---|---|
| Eells-Magee | Y. Eells-Magee | 8/30/84 |

032 084 97 17 4 3R    762/PED ACC

SPETTER, CATHRYN E.
F .1 13 7C  EXP 10 84
4 PG 482 C957 ....

**UNIVERSITY OF CALIFORNIA DAVIS
MEDICAL CENTER
SACRAMENTO**

08 30 84

**THERAPEUTIC/DIAGNOSTIC
PROCEDURES REPORT**

.PHYSICAL EXAMINATION    13: 23

Patient's General Appearance:

White female child occurring in her
mother's lap.

Ht _110.5_ cm _15th_ %ile
Wt _17.0_ kg _15th_ %ile
Hc _____ cm _____ %ile

Locate and describe in detail *any* injuries or findings related to maltreatment. Indicate location of lesions/findings; shade for bruises or burns. Beside each injury indicated note *color, size, pattern, texture*, and *sensation*. Note if *recognizable imprint* or bruise goes *around curve*.



4 erythema-
bug bites

A pelvic examination should not be performed unless the parent, guardian or minor consent *or* unless necessary as part of treatment. See Department of Health Regulations Title 22, Division 2, Victims of Sexual Assault.

loic
o erythema
hymen intact
o lacerations.
o swelling



FINDINGS: Pelvic within normal limits.

Fundoscopic Examination—☐ Normal  ☐ Abnormal  ☒ Not done
Development Assessment—☒ Normal  ☐ Questionable  ☐ Abnormal,  by ☐ DDST  ☐ Estimate  ☐ Other
Behavioral Assessment—☐ Normal during visit  ☒ Abnormal during visit (Specify) _refused to speak, screan_
                                                                                                                _through exam_
X-ray bone survey—☐ Normal  ☒ Not done  ☐ Abnormal (findings) _____
Hemostasis tests performed—☐ PT  ☐ PTT  ☐ Platelets  ☒ None  ☐ Other _____ Results _____
Cultures for gonorrhea performed—☒ genitalia  ☒ throat  ☒ anus.  VDRL—☐ Done  ☒ Not done
Menarche age _____  Periods regular?  ☐ Yes  ☐ No  L.M.P. _____
Pregnancy test—☐ Positive  ☐ Negative  ☒ Not performed

Signature                        Print Last Name              Date of Report
_Peitra-Marce_            _Eells-Magee_                _8/30/84_

032 084 97 17 4 3R · 762/PED ACC

SPENCER, KATHRYN E.                    08 30 04

F C1 13 7C EXP 10 84

4 PG 482 E057

**UNIVERSITY OF CALIFORNIA DAVIS**
**MEDICAL CENTER**
**SACRAMENTO**

**THERAPEUTIC/DIAGNOSTIC**
**PROCEDURES REPORT**

MALTREATMENT HISTORY: 13:23

Give history of event(s) including time, date, place, perpetrator, circumstance, people present, etc. Underline name of person giving each version, e.g., Father said . . . Child said . . . Officer said . . .

Mother said

Children were visiting father for 2 weeks during summer. Returned to mother on 8-26. Step father reported to Vancouver police that the father had molested. Report was based on Renae's. Katie had made to step mother on 8-24-84. Katie refused to talk or answer questions during exam. She has refused to talk with mother regarding report.      M Spencer.

**Diagnostic Conclusion(s):**

Child's story consistent with history of molestation. No physical findings.

**MANAGEMENT**

1. Reported to: Officer _____ ID No. _____ Department _____ Phone _____

Pat Floyd        Storill           446-5191

Dependent Intake or CPS Worker _____ Department _____ Phone _____

366-2386

2. Medical Follow-up: Date _____ Time _____
☑ Scan F/U Clinic   ☐ P.M.D. (Name) 9·29-84 ·
☐ UCD Clinic (Name) _____      ☐ Other _____
☐ None (Why not?) _____

3. Mental Health Follow-up: Date _____ Time _____
☑ Referred to Victim Witness
☐ None _____

4. Disposition:
Police Hold?  ☐ Yes  ☑ No
☐ Receiving Home  ☐ Foster home  ☐ Relative's home  ☑ Parent's home  ☐ Other
☐ Hospitalized

5. Other Treatment:

| Print Last Name | Signature | Date of Report |
|---|---|---|
| Eells-Magee | K. Eells-Magee | 8/30/84 |

SUSPECTED CHILD ABUSE

EXHIBIT 6

37

IN THE UNITED STATES DISTRICT COURT

IN THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

CLYDE RAYMOND SPENCER,  )
                        )
          Petitioner,   )
                        )
    vs.                 )   No. C94-5238RJB
                        )
JOSEPH KLAUSER, Warden, Idaho )
State Institution; CHRISTINE  )
GREGOIRE, Attorney General,   )
State of Washington,          )
                        )
          Respondents.  )

COPY

DEPOSITION UPON ORAL EXAMINATION

OF

SHARON A. KRAUSE

DATE TAKEN:  May 22, 1996

TIME:  10:30 a.m.

PLACE:  Hall of Justice
        Longview, Washington

SUZAN R. WELLS
Archer Associates, Inc.
P. O. Box 1092
Longview, Washington  98632
(360) 423-2195

PLAINTIFF'S EXHIBIT
6

EXHIBIT 7

1        magnifying during an exam of a child, anal or

2        vaginally.  It's my understanding that if there are

3        lesions or there's been tearing and healing, it may be

4        detected with a colposcope and it wouldn't by the naked

5        eye.

6  Q   Have you been involved in cases before where the

7        prosecution has presented photographs that were taken

8        with colposcopic exam?

9  A   Well, I'm usually excluded from the courtroom when

10       that's going on, but I'm sure -- I know there's been

11       cases I've been involved in where that was utilized by

12       the physicians.

13  Q   Have you reviewed with physicians as a part of some of

14       your investigations photographs depicting physical

15       evidence of sex abuse through colposcopic exam?

16  A   I don't know that I've ever sat down with a physician

17       and done that.  But I've seen photographs in training.

18  Q   Now, the report Exhibit No. 1 that you have in front of

19       you, do you know whether or not this report was ever

20       forwarded to the Clark County prosecutor's office?

21  A   Like I explained, I'm told it wasn't in their file.  If

22       they have all the other reports, I can't imagine them

23       not having this one.  Also, based on Jim Peters and

24       knowing him and knowing how meticulous he is and knowing

25       historically what I would do, there is no doubt in my

40

1    mind if they didn't have a copy, he was aware of it when

2    I got it.  We talked.

3         If CAIC -- If I have a prosecutor on a case, he may

4    not have the whole case file or I may still have some

5    reports I haven't shipped up to him, but there would be

6    no doubt in my -- 99 percent sure that he had this

7    information.  I can't imagine him not having the report

8    if he had all the rest of the reports.  And I'm told

9    that it was in Vancouver Police internal investigation

10   file that they did.  So why would I send it to him and

11   not the prosecutor?  That doesn't make sense.

12   Q   Do you know how it was that Vancouver Police Department

13       received your reports, your investigative reports in the

14       Spencer case?

15   A   Not really.  I don't remember -- I know that they were

16       doing an investigation.  My mind just went blank.  Jim

17       Holtz with Vancouver Police worked on it.  I spoke to

18       him.  I think he may have done some interviews.  It

19       seems like there were other people.  I don't remember if

20       they got them from the prosecutor or they got them from

21       me or they got them from records.  I don't know.

22   Q   Now, you indicated that you spoke I guess recently with

23       Kim Farr, deputy prosecuting attorney.  And as I

24       understand it, Kim Farr indicated that a review had been

25       done of the prosecutor's files and they didn't have the

Sharon A. Krause

EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT TACOMA

```
CLYDE RAYMOND SPENCER,          )
                                )
          Petitioner,           )
                                )
     v.                         )   No.  C94-5238 RJB
                                )
JOSEPH KLAUSER, Warden, Idaho   )
State Institution; CHRISTINE    )
GREGOIRE, Attorney General,     )
State of Washington,            )
                                )
          Respondents.          )
                                )
```

DEPOSITION OF MICHAEL DAVIDSON

---

A P P E A R A N C E S

FOR THE PETITIONER:   Peter Camiel
     Attorney at Law
     Mair, Camiel, & Kovach
     710 Cherry Street
     Seattle, WA 98104
     (206) 624-1551

FOR THE RESPONDENTS:   John L. Samson
     Attorney at Law
     Assistant Attorney General
     P.O. Box 40116
     Olympia, WA 98504
     (360) 586-1445

Reported by: Kathleen Greene

* * * * * * * * * *

---

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT TACOMA

```
CLYDE RAYMOND SPENCER,          )
                                )
          Petitioner,           )
                                )
     v.                         )   No.  C94-5238 RJB
                                )
JOSEPH KLAUSER, Warden, Idaho   )
State Institution; CHRISTINE    )
GREGOIRE, Attorney General,     )
State of Washington,            )
                                )
          Respondents.          )
                                )
```

DEPOSITION OF MICHAEL DAVIDSON

Taken on behalf of Petitioner

July 25, 1996

* * * *

BE IT REMEMBERED THAT, pursuant to Washington Rules of Civil Procedure, the deposition of Michael Davidson was taken before Kathleen L. Greene, on July 25, 1996, commencing at the hour of 10:00 a.m., the proceedings being reported at Attorney General's Office, 500 W 8th Street, Suite 110, Vancouver, Washington.

43.

FREE WORD INDEXING WITH EVERY TRANSCRI[PT]

---

I N D E X

| EXAMINATION BY | PAGE |
| --- | --- |
| Mr. Camiel | 7 |
| Mr. Samson | 40 |
| Mr. Camiel | 41 |

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| 01 | Report dated 10-12-84 | 14 |
| 02 | Index dated 8-30-84 | 27 |
| 03 | Index dated 11-8-84 | 28 |
| 04 | Office Correspondence dated 9-12-84 | 31 |
| 05 | Report dated 3-6-85 | 35 |
| 06 | Affidavit of James Matthew Peters | 39 |

PLAINTIFF'S EXHIBIT 8

Page 20

1  allegation was that an adult male had penile vaginal
2  intercourse with a five-year-old child, in your experience
3  would you expect there to be any medical findings by a
4  doctor?
5          MR. SAMSON: Same objection as before, to
6  the extent it calls for a medical conclusion.
7      A. I would have to -- and we would have normally relied
8  on a doctor's opinion because we couldn't make an objective
9  call on that.
10     Q. Let me change the question a little bit. Based on
11  your experience, if there was an allegation that an adult
12  male had penile vaginal intercourse with a five-year-old
13  child, would the fact that there was an examination conducted
14  and the doctor found no physical evidence, would that be
15  significant to a defendant, based on your experience?
16     A. That's really a difficult hypothetical because we're
17  presupposing that we know the degree of penetration that was
18  made. There's a lot of factors that are involved in that.
19  Penetration can be very, very slight. There might not be
20  evidence, but yet it still could have happened.
21     Q. Understanding that it still could have happened,
22  despite the fact that there's no physical evidence, if a
23  doctor conducts an examination where those are the
24  allegations, do you believe that a defendant would consider
25  it significant if the doctor found nothing abnormal?

Page 21

1          MR. SAMSON: I would object on the grounds
2  that it calls for speculation as to what a defendant would
3  believe. And I would object to the extent it calls for a
4  legal conclusion as to what is material.
5      A. I would have to say the same thing as I did before,
6  again, I can't make that determination because there may be a
7  number of factors that are involved here, besides just the
8  physical evidence.
9      Q. I take it, in your experience as a police officer,
10  you understand what the term discovery means in a criminal
11  case?
12     A. I believe so, yes.
13     Q. And you understand that the prosecuting attorney has
14  discovery obligations?
15     A. Yes.
16     Q. That is, the prosecutor has certain obligations to
17  disclose certain information to the defendant's attorney?
18     A. Yes.
19     Q. And do you understand that one of the prosecutor's
20  obligations is to disclose exculpatory information to the
21  defense attorney?
22     A. I believe I understand that, yes.
23     Q. In your opinion, would a prosecutor be required to
24  disclose this report to a defendant's attorney?
25  44       MR. SAMSON: I would object to the extent

Page 22

1  that it calls for a legal conclusion.
2      A. I would have to rely on the prosecutor's opinion for
3  that, as well, because I don't know whether these would,
4  necessarily, fall within the guidelines of discovery.
5      Q. You think it would be proper for the sheriff's
6  department not to forward this report to the prosecutor?
7      A. The only way that I can see us not forwarding this
8  to the prosecutor would be if the prosecutor didn't feel it
9  was material or if the investigator felt that there was
10  nothing of significance to the prosecutor.
11     Q. How would the prosecutor know whether it was
12  material or not unless they saw the report?
13     A. Conversation with the investigator.
14     Q. In your experience with the Clark County Sheriff's
15  Office, have there been situations where you have had
16  discussions with the deputy prosecutor about a report, and
17  the prosecutor has indicated that you don't need to forward
18  that report to them?
19     A. I certainly can't off the top of my head, although I
20  can think of certain instances where I've done specific
21  things like that. An examination on things that bore out no
22  significant information, they didn't want to see the report.
23     Q. Okay. Can you recall any case where there was a
24  medical examination concerning an alleged sex-crime victim
25  where a prosecutor has indicated they didn't ever want to see

Page 23

1  the report?
2      A. Certainly not that I can recall.
3      Q. You've already referenced two interviews, or
4  attempted interviews, you've had with Ray Spencer. Did you
5  also have contact with Mr. Spencer after he was incarcerated
6  at the Clark County Jail?
7      A. Not to my recollection, no, sir.
8      Q. Do you recall whether you went up to the Clark
9  County Jail, ever, after Mr. Spencer was incarcerated, to
10  visit him?
11     A. No.
12     Q. When you indicate no, are you indicating that you
13  didn't go up there or that you don't recall?
14     A. I'm indicating that I didn't go up there.
15     Q. Did you ever tell anyone that you went up to the
16  Clark County Jail and visited with Ray Spencer?
17         MR. SAMSON: I'm going to object,
18  Peter, unless you can show how this is relevant to the issues
19  currently before the District Court. I don't believe it's
20  relevant. The Ninth Circuit has affirmed the denial of a
21  claim regarding force of plea and the alleged visits of
22  Sergeant Davidson at the Clark County Jail. And I don't
23  believe that it's relevant. So unless you can tie it to the
24  issues, I would object on the grounds of relevancy.
25         MR. CAMIEL: For the record, one of Mr.

# EXHIBIT 9

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT

STATUTORY RAPE IN THE FIRST DEGREE, RCW 9A.44.070
LOCATION OF INCIDENT:
DATE OF INCIDENT:

| | | |
|---|---|---|
| DATE & TIME: | 10-18-84 | 2030 hours |
| LOCATION: | Holiday Inn, Room #135 | |
| | 5321 Date Street | |
| | Sacramento, California 95841-2597 | |
| INCIDENT: | Interview with Victim | |
| VICTIM: | SPENCER, Kathryn E. | dob: 01-13-79 |
| | aka: Katie | |
| | aka: Kathy | |
| | 3930 Becerra Way | |
| | Sacramento, California 95821 | phone: (916) 482-6057 |
| SUSPECT: | SPENCER, Clyde Ray | dob: 01-09-48 |
| | aka: Ray SPENCER | |
| | 17681 NE Lucia Falls Road | |
| | Yacolt, Washington | phone: 687-1407 |
| | Work phone: (206) 696-8292 | |



CCSO Case #84-8506, S.A.Krause, K-34



page 1 of 12

46

remember anything her daddy said when that was happening and Katie stated, "I don't remember." I asked her if she was standing up or what when it happened and Katie stated, "No, I was laying on my back." I asked her if she could show me what happened with the dolls and at that time Katie picked up the anatomically correct child female doll and placed it on the pillow face up. I asked Katie, "Where were you?" and Katie picked up the female doll, hit the male doll and stated to me, "Put him right there," pointed to the pillow with the child female doll and stated, "I'll show you." I picked up the male doll and asked Katie, "How should he be laying?" and Katie stated, "My dad was laying on his back. Put him on his back." When I had placed the male doll face up on the pillow Katie immediately put the female doll on to of the male doll. Again, I observed her being careful to line the vaginal area of the female doll up with the penis of the male doll. I asked Katie, "Did Big Matt and Little Matt see that?" and again Katie pointed towards the headboard behind us and stated, "No, they were over there and Dad and me were laying on the blanket." I asked Katie, "What did your daddy have on when that happened?" and Katie stated, "Noth--ing." I asked her what she had on and Katie stated, "Noth--ing." Katie then stated, "Ick!" I indicated to Katie that she had told me she had on her nightgown and panties, and Katie stated, "Not when he did that." I asked her if she could remember how her clothes got off and at that time she pointed to her chest with her finger. Katie then stated, "My daddy made me do that." I asked her what her daddy made her do and Katie stated, "He makes me take my clothes off."

I stated to Katie, "What happened after your clothes were off?" and Katie stated, "That's when my daddy's wiener sticks up." I asked her what happened then and Katie stated, "Well, he hurt me then." I asked her if she could show me how he hurt her and Katie stated, "I can show you what hurt me." I asked her if she could do that with the dolls and Katie at that time picked up the child female doll and inserted the penis of the male doll into the vaginal opening of the child female doll that she had indicated was her. I asked Katie if she could remember if her daddy had said anything when that happened, advising her that it was really important to remember what he

EXHIBIT 10

first thing he did was walk into the house and as soon as he saw the guns were gone from the cabinet he was screaming over and over about his 'fucking guns' and that he wanted them." Shirley SPENCER stated to me, "He was saying all kids of things in front of Little Matt and I just couldn't understand what he was doing."

Prior to terminating my interview with Shirley SPENCER on 02-27-85 I made arrangements for her to bring her son to the Clark County Sheriff's Office on the morning of the 28th for the purpose of my interviewing Matt regarding the concerns that he had been sexually involved with his step-father, Ray SPENCER.

DATE & TIME:         02-28-85                           0930 hours
INCIDENT:            Interview with Matt HANSEN

With the permission of Shirley SPENCER the interview with Matt was done in an interview room located in the Detective Unit of the Clark County Sheriff's Office with only Matt and I present.

During the initial part of my conversation with Matt we talked about general topics. We talked about Matt's school and what he did in school; we talked about things he liked to do and at one point Matt and I practiced writing his name, my name and his mother's name. I indicated to Matt that I was a policeman and at one point I told him that I was a policeman because I liked to help people; however, sometimes we needed people to help us and a lot of times people who helped me were children. I told Matt that I wanted to talk to him because maybe he would be able to help me, too.

Matt appeared to be very verbal and there was no question that he was understanding what I was talking to him about. I indicated to Matt that sometimes I talked to children whose private parts had been touched by someone. I asked Matt if he knew what private parts were and shook his head, indicating that he did. I asked him if his nose would be a private part and he shook his, smiled and indicated that it wouldn't be. I asked Matt if his elbow would be a private part; he indicated it wouldn't. I asked him if his knee would be a private part; he indicated that it wouldn't. I asked him if his bottom

CCSO Case #84-8506, S.A.KRAUSE, K-43

49

PLAINTIFF'S
EXHIBIT
10

page 14 of 22

sorry that it hurt him, and at that time Matt stated to me, "And he hurt my bottom, too." I asked Matt who hurt is bottom and he stated, "My dad, Ray SPENCER. He puts his finger in my hole." I asked him where he was when that happened and Matt stated, "We were in the living room and in the shower, and in my mom's room." I asked Matt where his mother was when that happened and Matt stated to me, "Mostly when he does things my mom is at work."

I asked Matt if anything else happened to his body that he wanted to talk about so it would not be "bugging him" and Matt stated to me, "Well, he does something else to me." I asked Matt if he could tell me what the something else was and Matt stated, "He puts his pee-pee in my bottom and that really hurts and that makes me really cry." I asked Matt where he was when that happened and Matt stated, "In the shower." I asked him where the shower was and Matt stated, "At my house and it happens upstairs, too." I asked Matt who was upstairs when that happened and Matt stated, "Just me and my dad, and my mom was at work when it happened." I asked Matt what happened upstairs and Matt stated, "That's when he hurts my bottom side with his pee-pee, and he made me touch his bottom side, and he made me touch his pee-pee, too." I asked Matt what he had on when that happened and Matt stated, "I never have nothing on because he makes me take my clothes off."

I asked Matt if he ever saw anything come out of his daddy's pee-pee and Matt stated, "Yes, pee." I asked Matt if his daddy's pee looked like his pee and Matt stated, "No." I asked Matt what color his daddy's pee was and Matt stated, "It's white." I asked Matt where his daddy's pee goes when it comes out and Matt stated, "His pee goes in the toilet." I asked Matt if the pee ever went any place besides the toilet and at that time Matt stated, "Sometimes it gets on the floor and sometimes it gets on my hand and I have to wipe my bottom off with a paper towel when he gets it on my bottom."

I asked Matt if anything ever happened with his body anyplace besides at his house. Matt shook his head, indicating that it had. I asked Matt if he could tell me where something else happened and Matt stated, "At the motel." I asked him who was at the motel and Matt stated, "Just me and my dad 'cause my mom wasn't there." I asked him if he could tell me about what happened at the motel and Matt stated, "Well, he touched my pee-pee in the bathroom and then he put his pee-pee in my bottom." I asked Matt where he was

when his daddy put his pee-pee in Matt's bottom and Matt stated, "Well, I had to sleep with him and he kissed my bottom and he kissed my pee-pee, too."

At that time I indicated to Matt that I had dolls that had pee-pees and asked Matt if I got the dolls if he could show me about what happened with his daddy. Matt indicated that he could and at that time I got the anatomically correct dolls, which include one adult male doll, one adult female doll and one child female doll. I held up the male doll and asked who that was and Matt stated, "That's me." Matt then looked at the other two dolls and stated, "Those are girls so this is my dad (he held up the male doll again." I asked Matt if he could tell me with the dolls what happened in the bathtub and at that time Matt sat the male doll upright and indicated that that doll was "going to be him." Matt then picked up the adult female doll and sat it facing the male doll and stated, "This will have to be my dad because I don't want to be this one." Matt then bent the head of the male doll down to the genital area of the female doll and stated, "This is what he did." I asked Matt what part of him touched his daddy in the tub and Matt stated, "That's when I had to put my mouth on this." At that time Matt pointed to the penis on the male doll and then as he lifted the penis up in an erect position, Matt stated to me, "But his pee-pee sticks up like this and that make it hurt my mouth." I asked Matt what his daddy called a pee-pee and Matt stated, "I think he might call it a wiener."

I asked Matt if his daddy ever said any bad words when he was around him and Matt stated, "He says mostly mean, bad words." I asked him if he could remember any of the words and after Matt thought for a few minutes he advised me that "he forgot."

I asked Matt if he could show me what else happened with his daddy and at that time Matt indicated to me that the chair in the interview room was going to be "the bed." Matt placed the male anatomically correct doll on the chair, face up with the legs hanging over the edge. Matt then picked up the female doll and placed the head of the female doll on the penis of the male doll. I asked Matt who the female doll was and he stated, "This is gonna be my dad again, and this is me (pointing to the male doll)." I asked Matt what his dad was doing and Matt stated, "This is when he was kissing my pee-pee." I asked Matt where the bed was and Matt stated, "At the motel." I asked Matt if anything else happened at the motel and at that time Matt placed the hand of the

female doll on the penis of the male doll and stated, "He touched this with his hand, too." I pointed to the penis on the male doll and asked Matt, "Now, what do you call this?" Matt stated, "I call that my pee-pee."

I stated to Matt, "Now, what happened to your pee-pee at the motel?" Matt stated, "He touched my pee-pee with his hand and his mouth at the motel." I asked Matt if anything else happened at the motel and Matt stated to me, "He hurt my bottom there, too, with his pee-pee." I asked Matt if he could show me how that happened and at that time I observed Matt turn the male doll over, placing it face down with the legs still extending over the edge of the chair, and Matt placed the female doll lying on top of the male doll. Matt stated to me, as he pointed with his finger to the buttocks of the male doll, "He puts his pee-pee in this hole."

At that time I asked Matt if he ever saw his daddy touch any other children's body and Matt stated, "He touched my best friend's body." I asked Matt who his best were and Matt stated, "They're Big Matt and Kathryn."

I asked Matt where Kathryn was when that happened and Matt stated, "On my dad's bed." I asked him who else was there and Matt stated, "My dad was there and that's when he did it to her, and Kathryn cried, too." I asked Matt if he could remember where his mom was when that happened and Matt stated, "My mom was at work." I asked Matt if he could show me what happened to Kathryn and at that time he picked up the female doll and I observed him carefully placing the penis of the male doll in the vaginal opening of the female doll and at that time Matt stated, "You have to put this all the way in and that's what he did to Kathryn." I asked Matt if anything else happened to Kathryn and Matt turned the female doll over and placed the penis on the buttocks of the female doll and stated, "And his pee-pee was like this in her bottom and that hurts her too, and she cries just like me when it hurts." I asked Matt where that happened and Matt stated, "In my house." I asked Matt how many times he saw that happen to Kathryn and Matt stated, "It happened lots of times."

I asked Matt if he ever saw his daddy do anything to anyone besides Kathryn and him and he stated, "My dad puts his finger in Big Matt's bottom, just like he does to me." I asked Matt where he was when that happened and Matt stated, "At my house." I asked him if he ever saw anything

CCSO Case #84-8506, S.A.KRAUSE, K-43

else happen to Big Matt and Matt stated to me, "My daddy puts his pee-pee in Big Matt's bottom and that hurts Big Matt and he cried, too."

Matt then began talking with me again about having to touch his father's penis and I asked Matt if his father asked him to touch it in any special way. Matt stated to me, "He just tells me to move my hand and I had to."

I asked Matt if his daddy ever said anything about telling and Matt stated, "He said if I told he would do it again."

At that time I indicated to Matt that I wanted to try to figure out when things were happening so I would know for sure and asked Matt if he could tell me again the last time something happened with his daddy. Matt thought for several minutes and then stated, "Oh, yah, at the motel, I think." (During my interview with Shirley SPENCER she indicated that the last time Matt was alone with Ray SPENCER was on the evening of February 16th when Matt spent the night with Ray at the Salmon Creek Motel.) I drew on a sheet of paper a sun and below that drew three stick figures, indicating to Matt that that was the summer time when Kathryn and Big Matt visited him, and on the other end of the paper I drew a square with windows, stating, "This is a motel." I said to Matt, "This is the summer time when Kathryn and Big Matt visited you," pointing to the area around the stick figures. I asked Matt, "Did it happen after the motel?" and Matt stated no, that it hadn't. I pointed to the area where the stick figures were and stated to Matt, "This is the summer time when Big Matt and Kathryn were visiting you. Did something happen then?" Matt stated, "Yah, that's when he was doing it to Big Matt and Kathryn and me." I asked Matt where he was when that happened when Kathryn and Big Matt were visiting and Matt stated, "The same thing, mostly in my mom's bedroom when she was at work." I asked Matt what he had on and he indicated again that both he and his father were naked. I told Matt to think about what had happened during the summertime when Kathryn and Big Matt were visiting and asked him if he could tell me what happened with his daddy. Matt stated to me, "Just the same things. He puts his pee-pee in my bottom and he makes me kiss his pee-pee and he kissed my pee-pee." I asked Matt if the "bubble thing in the bathtub" happened when Big Matt and Kathryn were visiting and after thinking for several minutes Matt stated, "No, cause they

went home." I asked him if that was after the motel thing and Matt stated, "No, that was before."

In my discussion with Shirley SPENCER she indicated that the time that Matt appeared to be so frightened of the bubble bath was after Kathryn and Big Matt had returned to their mother's in Sacramento.

I pointed to the drawing again and stated to Matt, "This is before Big Matt and Kathryn came to visit you," pointing to an area in front of the three stick figures and then asked Matt, "Did anything ever happen to you before Kathryn and Big Matt came to visit?" Matt shook his head and stated, "He did it then, too." I asked him where he was when that happened and Matt stated, "At my house." Matt then took my pencil and drew on the paper towards the bottom of the page. I asked Matt what he was drawing and Matt stated, "This is God and my daddy doesn't love God cause that's why he does that to us."

At that time Matt indicated that he was tired and "he didn't want to talk about it anymore cause he was tired." I advised Matt that I was also tired and asked him if maybe we could talk some other day about what else he remembered. Matt indicated that he would come back to talk to me; however, he "sort of forgot what else happened, now."

At that time the conversation with Matt was terminated, and after I spoke with Matt I spoke with Shirley SPENCER alone while Matt colored. During that conversation I advised Shirley SPENCER of the specifics regarding what her son had told me. After we talked and Shirley SPENCER was able to compose herself, she and I went into the room and in Matt's presence I indicated to him that I had told his mother everything we talked about and that I wanted to make sure that I didn't forget anything. In Matt's presence I repeated in front of his mother the specifics regarding what he said had occurred.

This investigation is pending.

EXHIBIT 11

423

1                  UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

                       AT TACOMA

3

4  CLYDE RAYMOND SPENCER,      )     Docket No. C94-5238RJB

                               )

5          Petitioner,    )     Tacoma, Washington

                               )     September 6, 1996

6         v.             )     1:00  p.m.

                               )

7  JOSEPH KLAUSER, Warden,    )

    Idaho State Institution;   )

8  CHRISTINE GREGOIRE, Attorney  )

    General, State of Washington.  )

9                       )

             Respondent.    )

10  _____)

11                      VOLUME IV

12               TRANSCRIPT OF TRIAL

         BEFORE THE HONORABLE ROBERT J. BRYAN

13           UNITED STATES DISTRICT JUDGE.

14  APPEARANCES:

15  For the Petitioner:        PETER A. CAMIEL

                          PETER MAIR

16                       Mair, Camiel & Kovach, P.S.

                          710 Cherry Street

17                     Seattle, Washington  98104

18  For the Respondents:       JOHN J. SAMSON

                          DONNA H. MULLEN

19                     Assistant Attorneys General

                          Post Office Box 40116

20                     Olympia, Washington  98504-0116

21

22  Court Reporter:           Julaine V. Ryen

                          Post Office Box 885

23                     Tacoma, Washington 98401-0885

                          (206) 593-6591

24

    Proceedings recorded by mechanical stenography, transcript

25  produced by Reporter on computer.

56

PLAINTIFF'S
EXHIBIT
11

522

1  consult with counsel with a reasonable degree of rational

2  understanding. His mental illness and the drugs he ingested did

3  not substantially impair his ability to make a reasoned choice

4  among the alternatives presented or to understand the nature and

5  consequences of his actions. He understood the nature of the

6  charges, the consequences of his plea, and he was able to assist

7  in his own defense. He evidenced at that time coherence and

8  rationality and a lack of psychosis. He did not exhibit unusual

9  behavior, and I think that he was legally competent and not

10 entitled to relief on that basis.

11    Mr. Spencer testifies here that he doesn't remember

12 anything. He doesn't remember a lot of things in this case, he

13 tells us, and, you know, I don't have a direct answer for that,

14 but certainly it is to his advantage not to remember, or to

15 choose not to remember those events. I'm not satisfied that I

16 really believe that he doesn't remember the entry of the plea.

17    Now, so far as the Brady issues are concerned, there are two

18 prongs of this. Of course, one is the first question, whether

19 the medical report or reports should have been turned over; and

20 second is the question of the effect of failure to turn those

21 over. I want to address the first question tonight.

22    Based on everything I've read in this file, I am afraid that

23 I've come to the conclusion that Mr. Davidson, formerly of the

24 Clark County Sheriff's Office, I guess -- or was that the

25 Vancouver police? The sheriff's office, I believe -- that he's

57

1  just not very credible, and I don't particularly believe what he
2  has told us.  Ms. Krause doesn't recall this.  Shirley Spencer,
3  in her affidavit, had a very vague recollection -- well, Shirley
4  Spencer didn't recall the part about the lad's medical report,
5  Exhibit 2.  And Ms. Spencer, in regard to that, had some very
6  vague and unconvincing testimony about that medical report.

7      It's hard in considering Exhibit 2 to reconstruct what
8  happened and what are the probabilities about that report.  I
9  sometimes have to look inward and see what I really think, and I
10  guess what I think about that is that I think that the sheriff's
11  office was aware that Matthew Hansen had been to a doctor for
12  this exam.  I think he went as a result of the recommendation of
13  Detective Krause.  I'm not at all sure, however, that the
14  sheriff's department had a report to hand over at that time.  I
15  don't know at this point where this report came from or whether
16  they had it.  I guess the evidence on that subject is
17  sufficiently cloudy, so my conclusion is that probably that
18  report was not in the hands of the sheriff's office or the
19  prosecution prior to the plea.

20      Clearly, however, Exhibit 1 was in the hands of the
21  sheriff's office.  Clearly, they had an obligation, based on the
22  omnibus order, to hand that document over to the defense, and
23  they had that obligation -- if I can find the right exhibit;
24  Exhibit 32 -- they had that obligation clearly on the 25th of
25  January of 1985 and thereafter.

58