1
2
3
4
5
6
7

THE HONORABLE BENJAMIN SETTLE

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| CLYDE RAY SPENCER , MATTHEW RAY SPENCER, and KATHRYN E. TETZ, <br><br> Plaintiffs, <br><br> v. <br><br> FORMER DEPUTY PROSECUTING ATTORNEY FOR CLARK COUNTY JAMES M. PETERS, DETECTIVE SHARON KRAUSE, SERGEANT MICHAEL DAVIDSON, CLARK COUNTY PROSECUTOR'S OFFICE, CLARK COUNTY SHERIFF'S OFFICE, THE COUNTY OF CLARK and JOHN DOES ONE THROUGH TEN, <br><br> Defendants. | NO.  C11 5424 BHS <br><br> **DECLARATION OF GUY BOGDANOVICH IN SUPPORT OF MOTION FOR FED.R.CIV.P. 35 EXAMINATION** <br><br> **NOTE ON MOTION CALENDAR: Friday, November 30, 2012** |

PURSUANT TO 28 U.S.C. § 1746, Guy Bogdanovich declares as follows:

1. I am competent to testify in all respects, and make this declaration from personal knowledge.  I am the attorney of record for defendant Sharon Krause in the above-entitled action.

2. Attached hereto as **Exhibit A** are true and correct copies of the title and signature pages to Plaintiffs' Response to Defendant Davidson's Discovery Requests, and the pages containing Interrogatory No. 4 and plaintiff's answer thereto.

*LAW, LYMAN, DANIEL, KAMERRER & BOGDANOVICH, P.S.* ATTORNEYS AT LAW 2674 RW JOHNSON BLVD SW, TUMWATER, WA 98512 PO BOX 11880, OLYMPIA, WA 98508-1880 (360) 754-3480  FAX: (360) 357-3511

3. Attached hereto as **Exhibit B** are true and correct copies of Plaintiffs' Disclosure Pursuant to Fed. R. Civ. P. 26(a)(2) and the October 4, 2012 letter report of Ruth Boutin Kuncel, Ph.D.

4. Attached hereto as **Exhibit C** are true and correct copies of the first two pages to Defendant Michael Davidson's Disclosure of Rebuttal Expert Testimony, and the 11/05/2012 letter report of Ronald M. Klein, Ph.D. referenced in the Davidson Disclosure, with a true and correct copy of Dr. Klein's referenced Curriculum Vitae. Defendants Krause and Peters also relied upon Dr. Klein as a rebuttal expert witness in their disclosures.

5. Attached hereto as **Exhibit D** are true and correct copies of my November 7, 2012 letter to Daniel Davies and Kathleen Zellner regarding a requested Fed.R.Civ.P. 35 examination of plaintiff, and Ms. Zellner's November 8, 2012 letter to me in response.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 15th day of November, 2012 at Tumwater, Washington.


*/s/ Guy Bogdanovich*
_____
Guy Bogdanovich

DECLARATION OF GUY BOGDANOVICH IN
SUPPORT OF MOTION FOR FED.R.CIV.P. 35
EXAMINATION - 2
Cause No: C11-5424 BHS

*LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
2674 RW JOHNSON BLVD SW, TUMWATER, WA 98512
PO BOX 11880, OLYMPIA, WA 98508-1880
(360) 754-3480  FAX: (360) 357-3511

LLDKB 2012 NOV 8 AM 9:54

Honorable Judge Benjamin Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY )
SPENCER, and KATHRYN E. TETZ,  )        No. C11-5424BHS
                               )
            Plaintiffs,        )        PLAINTIFFS' RESPONSE TO
                               )        DEFENDANT DAVIDSON'S
      v.                       )        DISCOVERY REQUESTS
                               )
FORMER DEPUTY PROSECUTING      )
ATTORNEY FOR CLARK COUNTY JAMES )
M. PETERS, DETECTIVE SHARON KRAUSE,)
SERGEANT MICHAEL DAVIDSON, CLARK )
COUNTY PROSECUTOR'S OFFICE, CLARK )
COUNTY SHERIFF'S OFFICE, THE COUNTY)
OF CLARK and JOHN DOES ONE THROUGH)
TEN,                           )
                               )
            Defendants.        )
_____)

NOW COME PLAINTIFF, Clyde Ray Spencer, by and through his attorneys, Kathleen

T. Zellner & Associates, P.C., and for his answers to Defendant Davidson's written discovery

requests states as follows:

## INTERROGATORIES

1.     Please identify by name, address and telephone number each person, other than

health care providers, you believe has knowledge regarding the facts and circumstances

surrounding the happening of the incidents referred to in the Complaint, including, but not

PLAINTIFFS' RESPONSE TO DEFENDANT DAVIDSON'S
DISCOVERY REQUESTS (C11-5424BHS) — 1

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

EXHIBIT A

Without waiving and subject to the foregoing objection, Plaintiff answers that he was treated by various physicians both during and after the incidents described in the complaint:

Oregon Health Sciences University, 3181 S.W. Sam Jackson Park Road, Portland, OR 97239.  Phone – (503) 494-8311

See documents bates stamped Spencer000001-005616, produced herewith.  (Upon information and belief, defendants are in possession of the video of the interview conducted by Defendant Peters on December 11, 1984.  A copy of the video will be produced upon specific request).

Plaintiff was also treated by various health care providers at the Clark County Jail following his arrest.  See documents bates stamped Spencer000001-005616.

VA Puget Sound Health Care System, 1660 S. Columbian Way, Seattle, WA  98108-1597.  Phone - (206) 762-1010.  See VA Puget Sound records produced herewith, Spencer005932.

VA Greater Los Angeles Health Care System, 11301 Wilshire Blvd., Los Angeles, CA 90073.  Phone – (310) 478-3711.  See VA Los Angeles records produced herewith, Spencer005932.

4.     Are you claiming any past, present or future physical, mental or emotional injuries or disabilities due to the incident?  If so, please:

     (a)     Describe your understanding of each injury or disability;

     (b)     State those from which you have recovered and the approximate date of your recovery;

     (c)     For all continuing complaints, state whether the complaint is subsiding, remaining the same or becoming worse, and state the frequency and duration of the complaint.

PLAINTIFFS' RESPONSE TO DEFENDANT DAVIDSON'S
DISCOVERY REQUESTS (C11-5424BHS) — 3

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630 955 1212 main · 630 955 1111 fax

**ANSWER:**   Plaintiff objects to this Interrogatory on the basis it calls for a narrative response and is better posed upon oral deposition. Without waiving and subject to the foregoing objection, Plaintiff states yes. Refer to Plaintiff's complaint for allegations regarding damages. Refer to the report of Dr. Kuncel. Also, refer to the medical records in possession of the Defendants and produced by Plaintiff in response to Interrogatory No. 3.

Answering further, as a result of his incarceration Plaintiff was subjected to physical fights with other inmates that resulted in injury. Plaintiff endured and continues to endure severe stress as a result of his prosecution and incarceration, which has and may continue to contribute to a premature decline in his overall physical health.

Answering further, Plaintiff suffered and continues to suffer severe emotional distress and mental anguish as a result of the actions of the Defendants. Plaintiff lived in constant fear that he would be killed while an inmate. Plaintiff suffers from post-traumatic stress disorder; severe anxiety and depression; feelings of hopelessness and anger; difficulties with concentration; sleeplessness and nightmares; and side effects of medications he is on to manage these problems.

Answering further, Plaintiff states that he has suffered and continues to suffer from damage to the relationships with his wife, children, siblings and friends; a loss of a meaningful career; and damage to his reputation.

5.     Please provide an itemized list of all medical and health care costs and expenses claimed in this lawsuit to the present.

**ANSWER:**   See response to Interrogatory No. 3.

6.     Do you attribute any past or future loss of income to the incident? If so, then provide the following:

PLAINTIFFS' RESPONSE TO DEFENDANT DAVIDSON'S
DISCOVERY REQUESTS (C11-5424BHS) — 4

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

1

**RESPONSE:**        Plaintiff objects to this request to the extent it seeks information

2   protected by attorney-client privilege.  Without waiving and subject to the foregoing objection,

3   see documents bates stamped Spencer000001-005616 and Spencer005931-005932, produced

4   herewith.

5

6                                         Respectfully submitted,

7

8                                          /s/  Kathleen T. Zellner

9                                         Kathleen T. Zellner & Associates, P.C.
                                          Admitted *pro hac vice*

10                                        1901 Butterfield Road
                                          Suite 650

11                                        Downers Grove, Illinois  60515
                                          Phone:  (630) 955-1212

12                                        Fax:  (630) 955-1111
                                          kathleen.zellner@gmial.com

13                                        Attorney for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFFS' RESPONSE TO DEFENDANT DAVIDSON'S
DISCOVERY REQUESTS (C11-5424BHS) ---- 10

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

## VERIFICATION

STATE OF CALIFORNIA          )
                            )
COUNTY OF LOS ANGELES        )

Clyde Ray Spencer, begin first duly sworn on oath deposes and says that he is the Plaintiff herein and that he has read the within and foregoing Answers to Defendant Davidson's Discovery Requests, knows the contents thereof, and believes the same to be true.

_Clyde Ray Spencer_
Clyde Ray Spencer

SUBSCRIBED AND SWORN to before me this 9 day of November, 2012.

_Hong ha Seoh_
Notary Public

```
IN SEOUK HONG
Commission # 1832694
Notary Public - California
Los Angeles County
My Comm. Expires Feb 18, 2013
```

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515

1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10  CLYDE RAY SPENCER, MATTHEW RAY      )
    SPENCER, and KATHRYN E. TETZ,          )    No. C11-5424BHS
                                           )
11                     Plaintiffs,         )    PLAINTIFFS' DISCLOSURE
                                           )    PURSUANT TO FED. R. CIV. P.
12          v.                             )    26(a)(2)
                                           )
13  FORMER DEPUTY PROSECUTING            )
    ATTORNEY FOR CLARK COUNTY JAMES    )
14  M. PETERS, DETECTIVE SHARON KRAUSE,)
    SERGEANT MICHAEL DAVIDSON, CLARK  )
15  COUNTY PROSECUTOR'S OFFICE, CLARK  )
    COUNTY SHERIFF'S OFFICE, THE COUNTY)
16  OF CLARK and JOHN DOES ONE THROUGH)
    TEN,                                   )
17                                         )
                       Defendants.         )
18  _____)

19      NOW COME PLAINTIFFS, Clyde Ray Spencer, Matthew Ray Spencer and Kathryn E.

20  Tetz, by and through their attorneys, Kathleen T. Zellner & Associates, P.C., and for their

21  disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2), state as follows:

22      Plaintiffs reserve the right to supplement and/or amend this disclosure as more

23  information becomes available through the course of discovery.

24      a.    **William Bernet, M.D.**
              209 Oxford House
25            Nashville, TN 37232

26      Dr. Bernet is board certified in psychiatry, child psychiatry and forensic psychiatry.

27  Dr. Bernet is offered as an expert in child forensic interviews. Dr. Bernet will testify to the

PLAINTIFFS' DISCLOSURE PURSUANT TO FRCP 26(a)(2)
(C11-5424BHS) — 1
DWT 20493737v1 0094078-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

EXHIBIT B

1   opinions and bases for his opinions as set forth in his report. A copy of Dr. Bernet's report,

2   curriculum vitae, fee schedule, and list of cases in which he has testified as an expert at trial or

3   by deposition in the past four years is attached as Exhibit A.

4         b.    **David C. Raskin, Ph.D.**
                59975 Eider Avenue
5               Homer, Alaska  99603

6         Dr. Raskin has received his doctorate in psychology and is a certified polygraph

7   examiner. Dr. Raskin is offered as an expert in polygraph techniques and procedures.

8   Dr. Raskin will testify to the opinions and bases for his opinions as set forth in his report. A

9   copy of Dr. Raskin's report and curriculum vitae is attached as Exhibit B. A fee schedule and

10  updated list of cases in which he has testified as an expert at trial or by deposition in the past

11  four years will be provided upon receipt by Plaintiffs' counsel.

12        c.    **Dr. Ruth Boutin Kuncel, Ph.D.**
                911 North Elm Street, Suite 320
13              Hinsdale, Illinois  60521

14        Dr. Kuncel is a licensed clinical psychologist. Dr. Kuncel is offered as an expert in

15  support of Mr. Spencer's claims of damages. Dr. Kuncel will testify to the opinions and bases

16  for her opinions as set forth in her report. A copy of Dr. Kuncel's report, curriculum vitae, fee

17  schedule, and list of cases in which he has testified as an expert at trial or by deposition in the

18  past four years is attached as Exhibit C.

19

20                        Respectfully submitted,

21

22                         /s/ Kathleen T. Zellner
                           Kathleen T. Zellner
23

24

25

26

27

PLAINTIFFS' DISCLOSURE PURSUANT TO FRCP 26(a)(2)
(C11-5424BHS) — 2
DWT 20493737v1 0094078-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

# Ruth Boutin Kuncel, Ph.D.

License Clinical Psychologist

911 North Elm Street, Suite 320
Hinsdale, IL 60521

Telephone: (630) 325-4310
Facsimile: (630) 617-5751

October 4, 2012

> RE: Clyde Ray Spencer, Matthew Ray Spencer, and Kathryn
> Spencer v. Former Deputy Prosecuting Attorney for Clark County
> James M. Peters et. al., United States District Court Western
> District of Washington at Tacoma

To Whom It May Concern:

I was asked by Attorney Kathleen Zellner to review records in the above captioned case and to
speak to Dr. Clyde Ray Spencer, Ph.D. (DOB: 1/9/48) ("Ray") concerning the impact of the
events in this case upon his life.

I have reviewed the following records:

The Complaint filed in federal court

Dr. Spencer's Medical/Mental Health Records from Oregon Health Sciences University
(Dates of admission – 11/15/84-12/7/84; 2/3/85-2/4/85), from Clark County Jail (March-
April 1985), from the State of Washington Department of Correction, and from the State
of Idaho Department of Correction

Mental health and other reports prepared by Dr. Henry Dixon, M.D. (1985); Dr. Lawrence
Halpern, Ph.D. (1986); Dr. Carla van Dam, Ph.D. (1998); Dr. Kevin McGovern, Ph.D.
(with test data) (1985); Dr. Iris Rucker, Ph.D. (2001); Mr. Robert Hirsch, MSW, LCSW
(2005); and, Ms. Martha Peterson, SVAMC, ARNP (2005).

A DVD OF the 20/20 television program concerning this case (11/5/10)

Washington State Appellate Court opinion granting personal restraint petition based on
recantations and numerous irregularities

Washington State Supreme Court opinion regarding denial of State's motion for
discretionary review based on recantations, irregularities and failure to disclose video of
Kathryn Spencer interview (7/12/10)

> Letters complimenting/commending the conduct of Dr. Spencer when he was a police officer and a customs patrol officer
>
> Letter congratulating Dr. Spencer for being selected as the Mather Air Force Base Airman of the Month (1970)
>
> Pictures of Dr. Spencer in uniform, including several pictures in which he is receiving awards
>
> Article concerning a case in which Dr. Spencer was stabbed while working as a police officer

I spoke by telephone to Dr. Clyde Ray Spencer for thirty minutes on 9/17/12, for 2 ½ hours on 9/19/12, for 15 minutes on 9/29/12, and for 1 hour and forty minutes on 10/1/12. I spoke with Ms. Norma Spencer, Dr. Spencer's wife for thirty-five minutes on 9/30/12 and for forty minutes on 10/1/12. I also communicated with Attorneys Kathleen Zellner and Nicolas Curran concerning this case.

In speaking with Dr. Ray Spencer and Ms. Norma Spencer, I reviewed my credentials, role, the likely distribution of information, their right not to answer my questions, plus the potential limits of confidentiality. They said that they understood and agreed. I first outline the chronology of events and their impact on Dr. Spencer based upon my understanding of the background records and of the allegations made by Dr. Spencer. Next is a summary of my understanding of the allegations offered by Ms. Norma Spencer. I then offer an overview summarizing my current opinions of the various ways these events have affected Dr. Spencer based upon the above information.

## CHRONOLOGY OF EVENTS BASED UPON BACKGROUND RECORDS AND THE INTERVIEWS WITH DR. RAY SPENCER

In the summer of 1984, Dr. Spencer was a decorated police officer who had been employed for some five years by the Police Department of Vancouver, Washington. He had previously served honorably as a Staff Sergeant E-5 in the Air Force as an air traffic controller, worked as an undercover agent on domestic flights for the United States Department of Treasury, worked as a supervisory customs patrol officer (almost 99% under cover), received Marine training, conducted federal narcotics investigations, and worked in United States Customs as a Sky Marshall. His career was on the rise; he was testing for chief of police in a smaller department at that time. He had been married to "Shirley" for approximately a year and was exercising his six week summer visitation with his children, eight-year-old Matt and five-year-old Kathryn from a previous marriage (1971-78) to "DeAnne." Based upon Shirley's reported assertions in 8/84 that Kathryn had told her about instances of possible sexual abuse, Dr. Spencer reported the matter to appropriate authorities as was his legal and ethical duty. Dr. Spencer soon became the sole focus of the investigation of the alleged abuse of his children Matt and Kathryn.

Meantime, a number of events were taking place of which Dr. Spencer was unaware:

----His children were repeatedly questioned about alleged sexual abuse, but Dr. Spencer was not informed of the scope or frequency of this questioning. (Indeed, he had been in prison for five or six years when, through an investigator, he started hearing about the extent of the questioning; he knew that his son offered allegations after eight months but hadn't known about the pressure the boy was under during those eight months.)

----He discovered 25 years later that there was a videotape of an interview with his daughter.

----A medical examination of his daughter (8/30/84) proved negative but it was ten years before he knew for sure that such an examination had been conducted and before he gained access to the report.

----Not until a month after he went to prison did he learn that it was reportedly all over town that his wife was sleeping with a detective investigating this case and that Ray had been set up. Dr. Spencer did not know at that time of the apparent motives and strategies of individuals involved in his case.

Given what Dr. Spencer knew at the time, his children were accusing him of rape; he was facing felony charges; he was on administrative leave; the Vancouver Police Department planned to terminate him from his job; and his relationship with his wife, which was already problematic, was deteriorating. His relationship with his children, his career, his livelihood, his freedom, and his future were all on the line. Dr. Spencer watched his life gradually disintegrate, with each call, each allegation, each harassing interview representing a new source of anguish and fear. In the absence of the above information, he didn't understand what was happening. In 9/84, he was administered two polygraph exams; after the first exam, he was falsely told that he had failed; a second exam was administered presumably with the intent of eliciting a confession. He said it was like watching his body spiral out of control. It was like he had stepped outside of his body and was watching his whole being go downhill with no power to stop it. With pending felony charges of a most heinous kind, his personal and professional life deteriorating, Dr. Spencer contemplated suicide. He'd handled dozens of suicides during his career and had never understood why anyone would commit suicide until he reached that point himself. He looked at a 357 magnum and thought that shooting himself was better than trying to deal with this crisis, that it was better than trying to go on. He picked up the phone and called the crisis line; he scared the guy who answered the phone.

Dr. Spencer was admitted to the Oregon Health Center 11/18-12/7 of 1984, diagnosed with Major Depression and placed on anti-depressants for five months. On 1/2/85 he was charged with statutory rape of his daughter, having been terminated from his job the day prior to his arrest. After the arrest and, released on personal recognizance, he separated from his wife and was returned to the Oregon Health Center (2/3/85-2/4/85) for additional psychiatric treatment. After release from psychiatric care, he moved into a motel.

While at the motel, reportedly, his wife Shirley informed him on 2/16/85 that his stepson wanted to spend the night with him. Since Dr. Spencer wasn't guilty of abuse and had regularly dropped this child off for preschool, it never occurred to him that it was a setup. On 2/28/85, he was

arrested for allegedly abusing his stepson and was charged with three additional counts of statutory rape. He was repeatedly questioned and harassed by several detectives. Dr. Spencer was not informed for another ten years about the negative medical examination (3/6/85) on his stepson. Dr. Spencer's psychiatric condition further deteriorated while he was held in the Clark County Jail. He was heavily medicated with Sinequan, Xanax, Darvocet and Elavil. His mental stability was extremely shaky. He may not have been faithful in his first marriage (although he was in his second marriage), but his ethics and integrity as a police officer were totally different. If these allegations were true and he couldn't remember anything about these allegations, then he must be seriously mentally ill and he shouldn't be out on the streets. He wondered if he was losing his mind.

In approximately late March, 1985, a detective reported that Dr. Spencer's son had also implicated him. Dr. Spencer had no knowledge of the number of interviews or the form the questioning that preceded Matt's allegations. At the time, for Dr. Spencer, it was the final straw. He and Matt were so close; therefore, if Matt would say something like that, it must be true. Dr. Spencer figured that if he were doing these things and didn't remember, he shouldn't be walking the streets and risk getting someone else hurt. He has morals and he was seriously questioning his sanity, in itself a very frightening experience. Most people find it hard to imagine that they'd ever consider suicide as an option or fear for their own sanity, but that is naive, unless they have been in that position. By the time Dr. Spencer found out what had led Matt to these allegations, Dr. Spencer was in prison. As the events had unfolded, the whole thing seemed so outlandish that it didn't occur to him at that time that someone could be making this up.

At no time during any of this process has he thought of his children in a negative light. They were just babies. During this stretch he was just aware that he was missing out on their lives. He was wondering where they were. Were they safe? Did they ever think of their dad? He loved them and missed them. Meantime he was being harassed during almost daily interviews by detective(s), in spite of his request for an attorney and having informed them repeatedly that he didn't want to talk to them. He was told that his wife used to love him but she didn't any more. The harassment was so intense and so extensive that he filed a complaint and, finally, jail officials ordered the detective to leave and not return.

## TAKING A PLEA

The case was set for trial on 5/20/85. After further interrogations of Kathryn and Matthew, new complaints were filed. Ignorant of the negative medical reports, the inappropriate interrogation tactics used on the children, and the motives of the adults involved, Dr. Spencer continued to question his sanity. Trying to understand what was happening, Dr. Spencer underwent deep hypnosis and was administered a "truth serum," on 5/14/ 85.

Meantime, he was having problems with his attorney. Initially Dr. Spencer retained an attorney and gave him a $2500 retainer. The attorney advised him to throw himself on the mercy of court. When the retainer ran out, the attorney tried to withdraw, but the judge appointed him to continue until the case was resolved. Upset with the appointment, the attorney did essentially nothing after the money ran out. He didn't interview anyone. No character witnesses were lined up. He was forced to talk to Dr.

Spencer's children but delayed doing even that until a couple of weeks before trial. He didn't put together a defense. When later he was asked to produce documents, he delayed and then claimed there had been a fire.

Further, Dr. Spencer's case was heard in front of a judge who, in his opinion, also had an agenda. As an officer, Dr. Spencer had stopped a girl who was racing her car and almost ran him into the river. Recognizing her name and realizing that she was the daughter of a judge he knew, Dr. Spencer let her go and called the judge at home as a courtesy to warn him of his daughter's behavior. The judge was reportedly angry that his daughter had been stopped and an altercation followed.

An *Alford* plea was entered under which Dr. Spencer did not admit guilt but stipulated that a conviction would result. On 5/23/85, that judge handed Dr. Spencer the harshest sentence that could be handed out, 214 years to be served consecutively. A typical sentence for first degree murder is less than that. If innocent, why did he take a plea? He was mentally questioning his sanity, making it extremely difficult to make rational decisions. He wasn't really clear what the concept of an open plea meant. He was on a number of medications that interfered with his thinking. He lacked information about the events unfolding with his children, their mother, and the detectives. He didn't want to go to trial because he didn't think he would get a fair trial. He was not willing to confess to something he didn't do. His attorney had done essentially nothing in his defense. He was facing a judge with whom he'd had an altercation. He was told that a jury would find him guilty. He was confused about his legal options. He was under incredible pressure. In retrospect, if he'd had his wits about him, he would have gone into court and filed for a different attorney, but he also had no money. His wife had cashed his retirement check, leaving him penniless to mount a defense. The jigsaw puzzle didn't fall into place until much later; it wasn't until he was in prison, for instance, that he found out that his wife was sleeping with the lead detective on this case who had moved into Dr. Spencer's home shortly after he went to prison.

Dr. Spencer would remain incarcerated for almost twenty years, until Dec 29, 2004, spending 13 months in maximum security before he was transferred to Idaho (returning to Washington for two to three months in maximum security every two years for parole hearings) and then moved to Twin Springs, WA. He remained on parole for an additional three years and then continued to have to deal with the constraints imposed upon a registered sex offender.

## MAXIMUM SECURITY

Dr. Spencer clearly remembers his first day in prison. The guard had his hand on Dr. Spencer's elbow and could feel him shaking. The guard told him that because he was an officer, he wouldn't live six months. Dr. Spencer ran into this guard 17 years later, and the guard wanted to know how he did it, how he managed to stay alive all of those years. Dr. Spencer doesn't know.

When he first arrived in prison, they had no idea what to do with him because he was a police officer and he likely wouldn't survive long if left in the general population. He was placed in maximum security, solitary isolation. He was in an 8'x11' room with no TV, no radio, and a skinny window. The lights

were on twenty-four hours a day. He would pace for hours. This was the area of the prison that housed inmates who were behavioral problems, who were psychotic, who were crying or angry or trying to kill themselves. Even when not directly involved, in that kind of environment the adrenaline rushes, the stress skyrockets when one sees and hears all sorts of upsetting and violent things. If a guy in another cell wouldn't come out, they would gas him and the gas would circulate through the system leaving Dr. Spencer gasping for air, his eyes watering. He did pushups. He saw no one but the guards. When he was let out, they would cuff him and put him in ankle chains and lead him into a concrete enclosure with nothing there. He would walk in circles.

Twenty-four hours a day, he listened to screaming, to arguments, while on total lock down. His thought was, "I will die in here." He would look out at barbed wire and wonder what his children were doing. Were they OK? Did they ever think of him? He had to get it into his head that he'd die in there, that he'd likely be killed or eventually die of old age because they'd never let him out. The sound of prison bars closing has always stuck in his mind. If his identity as an officer had not become known after thirteen months, they might have kept him there indefinitely.

Typically when in maximum security, you are allowed to work your way through the system. So, after a month and half, ordinarily you are moved to the other end of the unit where you can begin to accumulate some privileges, like a radio. He was in maximum security for over a year, the longest time in that environment of all the inmates who had been housed there on the Intensive Management Unit, especially at the maximum end of the unit. They didn't know what to do with him, and they were not in much of a hurry to find an out-of-state placement where he could be released into the general population. He would lie there in his cell, waiting for somebody to say he was a cop. It was a huge culture shock. Even as a police officer, he'd had little professional contact with jails. He'd take a prisoner to booking and then leave, so he lacked even that little advantage that such professional knowledge would have given him. Further, he was on medications that were keeping him from thinking clearly. To survive, he needed all of his street knowledge and he needed to get off the psychotropic medications.

In an effort to put closure on his life, he wrote to Norma Kohlscheen in 1985, a nurse he'd met in Guam. She was the best thing that had ever happened to him, but he didn't expect her to write back. She did write back to him and came to see him. They talked on a speaker phone and viewed each other through glass. They would married in 1987 and waited another eighteen years (6/05) to spend a night together.

One of the most traumatizing events was when, during his incarceration, his identity as an officer became known. His worst nightmare had come true. One day two guards came to his cell and told him about the circumstances behind his whole situation; the word had gotten around that he had been set up, and so these guards went to the FBI. The FBI was not discreet. The captain wanted Dr. Spencer to tell him who the guards were. Dr. Spencer refused. Later a sergeant came and wanted to know who the guards were and warned that they'd beat him down if he didn't tell. Again he didn't tell to protect the guards from retaliation. What were the prison personnel going to do to him? He had been sentenced to 214 years in prison. They took him back to his cell. Dr. Spencer used to spend night after night listening to what was going on, fearing word would get around that he was a cop. That night he heard it; pretty soon all of the convicts were rattling their cages, "Kill the cop." Until that time, no significant efforts had been made to find other housing arrangements for Dr. Spencer, even though he'd been kept in maximum security for an inordinate amount of time. However, once his identity became known, he

became a liability, so arrangements were made to transfer him to Idaho. Apparently the captain made negative statements about Dr. Spencer to individuals in the Idaho penal system, making incarceration in Idaho even more difficult for Dr. Spencer than it might have been otherwise.

# MOVE TO IDAHO AND THEN TO TWIN RIVERS, WA

When Dr. Spencer was moved to Idaho, he was placed in the general population. His sanity likely depended upon getting out of the isolation of maximum security, but the move put him at risk from other inmates and posed multiple other adjustment problems.

The first six months in Idaho were especially hard. He was fresh meat; they tried to see if he'd fight. He was in a physical fight almost every week. Even if he took a beating, he needed to convey to the other inmates that they should be concerned that he might come back for them, that he was still a threat. You try to hurt others when fighting, to give them second thoughts about revenge. There are no rules governing a prison fight. If you get into a confrontation, you need to beat the individual down as far as you can so he won't come back for you. The rules of normal society don't apply. For twenty years, he couldn't have a friend or develop a friendship; it was too dangerous. He became a loner. Because he was a police officer and, in addition, because he was charged with raping children, he had to be especially careful. Convicts recognize a story that doesn't ring true.

Dr. Spencer said that he won't minimize the amount of fear he felt; he was afraid every single day he spent there. Inside a prison, there is an extremely violent world. They don't place much value on life. A warden said that he thought that Dr. Spencer was cool controlling his temper and said he was an angry man and that unless he dealt with it, he wouldn't be able to deal with society. When he walked in the yard, he needed never to make eye contact. He needed to show no emotion and to associate with no one. A guy said to him that he wasn't right (in the head) and that when he found out what Dr. Spencer's problem was, he'd kill him. It took time for Dr. Spencer to mold himself into a different personality. People put you down in prison.

Dr. Spencer had to create a cover story that he told to other inmates about why he was jailed in order to keep himself safe. He got quizzed about it. He drew upon his own history so that his story would ring true. His story was that he drew a murder charge. He had been an air traffic controller when Reagan was president and got fired when the controllers went on strike. He was making good money, didn't want to give up his lifestyle, hooked up with others smuggling narcotics, got busted on a boat, and during the shootout a cop was killed. In the commission of a felony somebody died. It would have been a mistake to say something simple like he'd been a burglar; other inmates would have asked to see the paperwork. There was always the possibility that someone would ask him to see his paperwork but no one ever did. In prison, inmates are attuned to things that get changed in people's stories. He never said he was innocent under his cover story. They beat you down if there is no paperwork or they come looking for sex. Dr. Spencer tried to carry himself well, but he is not a big man.

When you are in prison, you need to learn about the culture. It is so hard to stay off the radar. In the chow hall when he was first placed in the general population in Idaho, he did not know where to sit; it was territorial; if you sit in the wrong seat, it will cause a fight. It took so long to learn the convict code. Don't see and don't tell anything. Don't involve yourself. He had to

reinvent who he was. If they had known he was allegedly a child molester, they would have wiped feces on his door handles and defecated on his blankets.

Since being in prison is one of a cop's worst nightmares, and since cops typically don't make it, it was especially difficult. Dr. Spencer said he couldn't explain just how much he needed to be attuned to the environment to make it in jail. It was especially hard for him because he didn't fit in. His upbringing was different. Many of these inmates had been in and out of jail their whole lives. The state had reared them. Dr. Spencer was, for instance, college educated; he was accused of using big words to put others down. He had to learn to speak all over again to fit in. There were words that he used that had special meaning in jail that got him into trouble with other inmates. It is hard to describe, but it is a subculture. Each prison is a different subculture. To keep safe you need to affiliate with a group when in prison. In Idaho he affiliated with the native Americans Indians; when transferred back to WA, there was a different mix of ethnic groups. The dialect in each prison is different. In each prison he had to learn things all over so that he wouldn't bring attention to himself.

How things work in jail is so convoluted and far out. He has almost ceased to try to explain. The shade would come down; everybody says he's innocent when he is in jail. He didn't sleep well; he'd look out at 2 a.m. at barbed wire---Did his children ever think of him? Were they OK? Did he cross their minds? His nightmares were so vivid that he could literally feel the pain. He'd have a nightmare in which he was shot four times and felt each bullet. What is it going to take to kill you? Now he doesn't want to sleep because of the terrifying dreams. He told himself that he would die there. They would kill him. He knew it would happen, but he decided that he would not go down easily. He had to keep physically fit to keep people off him. He walked in the main yard for hours. He was scared to death but he didn't show it. Dr. Spencer was, for instance, fearful of encountering those he had arrested and sent to prison. He didn't in fact encounter in jail someone whom he had arrested but he did encounter people he thought he knew and who knew he had been a police officer. Dr. Spencer thought, "If this guy remembers me, I'm dead." Life in prison was just existing. In prison, you get down to the animal level. There are alpha males and it goes down from there. If you show fear, they smell it out and take advantage of it. You have to fight if confronted or end up somebody's punk. He was in dozens of physical battles. If you get hurt in a fight in jail, you come up with an excuse; you can't tell anyone that your missing teeth were knocked out in a fight or they'll get you; you say you got bumped and the teeth broke off. When in jail, nothing happens quickly; it is hard to get medical treatment. He's suffered chest and head injuries. He lost a tooth in a fight; when he got out of prison, he was not in the best of health. Generally the cops who run the prison don't care. It is just more paperwork for them if someone complains. So, if there is some viable excuse to justify injuries, they don't care. You are on your own in that environment. If you don't fight, others have to know that you have the heart to fight. If you prove yourself, it helps. Disrespecting is a big term in prison. Real prisoners walk and look at the ground; if you look in someone's face, it is taken as a challenge.

In jail, there was nothing there he wanted or of which he was proud. Not wanting the years in prison to be a total waste, he enrolled in a college program and eventually earned a Ph.D. in clinical psychology. He wanted to be able to say that he had accomplished something. He went to the warden who said that if it had been anybody else, the warden wouldn't have allowed it. Dr. Spencer tried very hard to make the best of his circumstances.

Every two years he was sent back to Washington for two or three months for a parole hearing; they put him back in maximum security while he was there. Then he was shipped back to Idaho. Two guards transport him from Idaho back and forth, but their boss had spoken to one of the detectives and there were behind the scenes maneuvering to keep him incarcerated.

He was subjected also to repeated psychological/psychiatric evaluations typically related to requests for parole. They were stressful, knowing that so much depended upon them but knowing that typically they were conducted by individuals who assumed he was guilty and interpreted the data accordingly. The day before the one extensive testing, he was housed in a room with a hole in the floor and he slept on the concrete floor. Then he was placed in a room with Plexiglas where they administered tests. That first day there was an inmate a couple of cells down who would bite himself anywhere he could reach. Personnel would come in, restrain him, sew him up, and bring him back. That was the environment in which he was given tests; thinking and having hope was difficult. Some evaluators said he was in denial. Some reports were written by individuals with inadequate skills who weren't going to write the truth or interpret the data to proper standards. Nothing he had to say would make any difference.

Every time he returned for a parole hearing, he'd have a spark of hope, especially if there was new evidence. It was a real rollercoaster; he was back in maximum security while he was there where they'd slam the door and the screams would go through his brain like a needle. The recommendation to the parole board was always negative.

Repeatedly, both during the earlier interrogations by the detectives and after his incarceration, he was pressured to admit his guilt, obtain sex offender treatment, demonstrate that he was "cured" and then use his confession and treatment as a basis for obtaining parole. Dr. Spencer's view was that essentially everything had been taken away from him. They would tell him when to eat, when to go to bed, but they couldn't take away his integrity. If you give it up, shame on you. If he'd played their games, maybe he would have been released sooner. Dr. Spencer swore that he would never give it up. He refused to relinquish his integrity, even though it may have cost him additional years in prison.

Meantime, while he was in Washington for parole hearings, all of his personal property in Idaho was first placed in storage and then mailed out; repeatedly he lost everything, all of his personal possessions, such as his TV (He lost three TVs at $500 apiece.), and he'd have to start over. He would stuff it down deep and deal with it; that was all he could try to do. By 2001, he had disappeared from the Idaho prison and then showed up again repeatedly; it was getting more dangerous because other inmates thought he was out snitching, so Dr. Spencer told a counselor that he couldn't go back there. They switched him to Twin Rivers in Washington, figuring he'd been incarcerated long enough out-of-state that people wouldn't remember him there in Washington.

Dr. Spencer saw all kinds of awful things in prison. He saw people hang themselves. On guy jumped off a second tier tied to bed sheets, but the rope of sheets he made was too long and he landed breaking of his both legs. Dr. Spencer was wondering what/when such awful things would happen to him.

Dr. Spencer also suffered mistreatment by some of the guards. There was a dividing line; some knew he'd gotten the short end of the stuck; some considered him a dirty cop. He was threatened. One officer destroyed his cell while he was out of it and when he came back told him that if he was smart he wouldn't say anything about it. The guards knew he was a cop; records were available for them to read. He lived with the constant threat that one of them would tell inmates that he was a cop. Dr. Spencer sat down with the warden and talked to him about it.

If one of the guards came back and said he'd been with the FBI, he was in big trouble. The warden said that he couldn't close the files. The best he could do was put a cover letter on his file saying that none of it was to be discussed in the prison yard. One guard offered help saying that if this place goes off, he'd get Dr. Spencer out the front gate. One young guard liked him and liked to talk to him; Dr. Spencer told this young guard that every time the guard talked to him, it put heat on him. Dr. Spencer told this young guard that in a different environment, maybe they would have been drinking buddies, but in this situation, being friendly with Dr. Spencer could get Dr. Spencer killed. He couldn't have a friend. There was no place for him to let his hair down.

Dr. Spencer had no idea if his children knew he was alive or what they had been told about him. He used to fantasize on Father's Day that he'd get a card. They'd call out inmate's names; he allowed himself to believe that they'd call his name but they never did.

The jail food in Idaho was soy, not meat. One time they had donations from the military of processed meat. The veins in the beef looked like worms and it smelled rancid; they ate it three times a day. The assumption was he'd have money and could buy a few items like a can of chili, but he had no money; his ex-wife had taken it all. He couldn't buy a bar of soap. Later Norma sent him some money. He had no choice about food; he could eat what they offered or not. They served lots of liver; if he didn't like it, he could go hungry. He had to become innovative to keep his sanity.

In his thousands of miles of walking, sometimes he'd see an inmate go home. He'd see people he knew released. It was so hard, because he knew that he would never take that walk. He didn't deserve this; it would never end; he'd never walk down that road.

The clothes were jump suits that they changed once a week. The clothes were tossed into the cell, whether they fit or not. The underwear had no elastic; the T shirts had holes. Cells might have blood on them. The water was green and tasted funny but it was all they had to drink. He got a shower every three days if he was quick about it. He had to respond immediately to the call or it would be too late for the shower; he'd stay awake when it was close to morning so as not to miss the shower. It was all he had; the only break in the monotony was to take a shower.

## SUPERVISION – THREE YEARS ON PAROLE

When Dr. Spencer was finally let out in 12/04 after the governor conditionally commuted his sentence, he was placed on parole for three years. It is not as though he'd gained his freedom and life returned to normal. There were problems associated with the media coverage, restrictions on his movements, housing restrictions, lack of help in readjusting to society, employment problems, difficulties coping with out-of-date information concerning how to function in society, and ongoing legal battles.

It hit the news that he was about to be released. The inmates wanted to talk and throw him off the third tier. There was a big controversy about the governor releasing him and the press made much of where he would be living. Although his sentence had been commuted, he wasn't free.

Case 3:11-cv-05424-BHS   Document 103   Filed 11/15/12   Page 20 of 56

His punishment had been more severe than anyone else from the state for these types of crimes.

Further, he had to wear an ankle bracelet, observe a 10 p.m. curfew, and undergo monthly polygraph tests. He couldn't leave the state and had to register as a sex offender. He was treated like a predator who might re-offend. There were constant problems. A police officer would run a check on him, not an uncommon occurrence with civilians (e.g., a card left at his door), and he'd be called to come in and explain to his parole officer what had happened. When they police came around, they were often three deep, badges showing, saying that they couldn't trust him with one officer at a time. Once he returned to the motel and there were three or four cop cars there. The adrenaline rush was sky high. Were they there for him? No, it was an awful neighborhood, but he wasn't used to that. Was the roof falling in again? He had little trust in society. Further, he wasn't supposed to have contact with minors, but a 17-year-old son of a man showed up unexpectedly at a gathering, so he flunked the polygraph and had to explain that. He went to a market and a little boy in a basket said "Hi." Dr. Spencer said nothing and the father got angry, assuming that Dr. Spencer thought he was too good to say hello to the man's kid.

It was hard just to find a place to live as a registered sex offender. He managed to find a place in a rundown hotel in a neighborhood full of hookers and drug addicts with a room only somewhat bigger than a cell. He was there for five months because parole hadn't told him he could move. He couldn't move to California to join his wife, because California wouldn't take him; his case was high profile and he was a registered sex offender.

He spent months trying to find a job. The government offered him no counseling, no assistance finding employment. Finally he found a job in a factory doing commercial painting. They found out that he was a convicted felon and fired him. He took a position with the IRS, telling them up front about the commutation and that he could show that he had had nothing on his record in the last ten years. However, when he had been transferred to Idaho, an error was made and thus his records incorrectly indicated convictions in Idaho. The records were run through the FBI and the matter was taken up with a senator, the state of Washington, and the attorney general in an effort to get the matter straight, but it was too late; the IRS thought he had lied and fired him.

Even though he had a Ph.D. in clinical psychology, he couldn't get an internship or a license as a clinical psychologist.

When he was first put on parole, he had been out of society for twenty years. It wasn't obvious to him how to work his way back into society. One day he was in chains and the next day he was walking the street for the first time in twenty years. It was very stressful. He had learned how to live in prison, but for instance, the first day in Seattle he went downtown, someone nodded at him on the street and he'd back up against a wall. The guy was just trying to be jovial, but that wasn't the meaning of his behavior in a prison culture. Or, as another example, when he finally managed to get a car, he drove to go fishing. He was contacted by parole. Why did the fish and game people run your license? They were just doing their job and checking out cars in the area, but every time his license was run, heart beating, he was called in by parole.

Further, his information about society was twenty years out of date. He was at the motel and he couldn't find a telephone booth. He didn't know that telephone booths had almost disappeared. He hadn't driven a car in twenty years; freeways were new to him and he found them terrifying. He flew into Los Angeles and rented a car. How do you know which way is north and which way is south? He was given a transfer on a bus and thought it was a receipt, throwing it away. He felt so stupid and self-conscious when he found out what is was. He was trying to fit in and didn't know the rules. He felt like the biggest dummy with everybody looking around at him. He couldn't get a self-service gas pump to work and had to get a guy to show him how to pump gas. He had no idea how to use a GPS. He had never been on the internet. Norma bought him a laptop; when he went to prison, computers were as big as a room. He had no idea how to go online and apply for a job. He had no idea how to use a modern library. He experienced general paranoia. He could only stand society for short periods of time because of the sensory overload. He was used to a few items available at the store in the prison. There were billions of things to buy in the supermarket. It was overwhelming.

Because his parole kept him in Washington and his wife was holding two good jobs in California, they had to juggle with the management of two households. He also had tax problems as a result. He and his wife filed a joint return but they were assessed a penalty. His wife had filed a California income tax return and hadn't included his income because he didn't live in the state. They had to hire an attorney to straighten out the matter.

Typical of the type of chronic legal battles he has had to wage, he went to court about eliminating the need to register as a sex offender. The vote had been unanimous to give him a full pardon but individuals in the case had connections, and the governor denied the request. He had to go to court to get the listing as a sex offender off his record. It was finally overturned in 2008-09. Since then he's had ongoing trouble, for instance, with fliers sent out with his name on them. Various lists haven't been cleaned up. Now he has a state guard card with certification and hopes it has all been cleaned up. He had to go to court in Idaho too, involving a Senator in Washington dealing with the State of Idaho, to get the matter off his record. It took 18-20 months after it was overturned to get all of the charges dropped.

## CURRENT STATUS

Now that Dr. Spencer is off parole, it is not as though all is well.

Dr. Spencer is now a patient at the VA where he carries a diagnosis of Post Traumatic Stress Disorder. He continues, for instance, to suffer from severe, terrifying nightmares; he isn't just talking about bad dreams. He will, for instance, dream that he is confronting someone and he can literally feel the knife go in. A couple of months ago he dreamt that someone kept shooting him in the chest saying, "What is it going to take to kill you?" He's on Klonopin (100 mg., once a night), Hydroxyzine (50 mg. at bedtime) to help him sleep and to help control nightmares. He's had a heart attack. An artery was totally blocked, one that often kills and is nicknamed "the widow maker." He walked into an emergency room and fell to his knees. The sweat was pouring off him. He has a stent in his heart and is being treated for high cholesterol; he takes aspirin twice a day.

Dr. Spencer thinks he has current memory, attention, concentration problems that have been brought on by three major sources---delving into this topic reactivates old traumas; nightmares interrupt his sleep, leaving him fatigued; medication for nightmares help with the nightmares but have side effects impacting has attention, concentration, and memory.

It was obvious that my telephone interviews were stressful for him. He commented that he needed to just get through what he needed to get through in this matter.

Concerning employment, Dr. Spencer managed to do some drug/alcohol counseling and court order family assessments in Washington but, after he moved to California to be with his wife Norma, he has never quite been able to get things going professionally. The most productive part of his life was spent behind prison walls. He's now 64 years old with health that is problematic. Police work was the love of his life, but he has no hope of returning to police work. He tried to get back on with sheriff's department, but then they asked for a list of his employers. They are not going to hire him; cops can be narrow-minded. He has to accept that he will never be in law enforcement again. That is hard to accept. He has been forced to take a job far below where he might have been. He gets up at 4 a.m., working security at a high rise. Even here, things keep coming up; he may lose this job too. He has the chronic problem of dealing with background checks, rules. He never knows.

Dr. Spencer is trying to move ahead. He doesn't know how many more years he has to live. His wife works two jobs; they are struggling financially to keep their heads above water. They are not young; opportunities aren't there. One of the pleasures in life is having the ability to accomplish things; one way of assessing your worth is by your accomplishments. At 36 his accomplishments went down the tubes.

His anger over the injustices committed against him is greater because he was a police officer. In spite of all the corruption that has emerged in this case, he has never put aside his pride in being an officer. He still has that. There is an emptiness inside him when he sees a police officer on the street who is out of shape. Dr. Spencer thinks, "That man was hired to be a police officer, but they won't hire me to be a police officer." He still has the desire to take on the challenges of the profession. It is important to understand that if you are a cop and really like being a cop, you will go to great lengths to remain a cop until they throw you out the door. To be a cop, you have to have the right mind set. He had always wanted and had high paced jobs, adventurous jobs with an adrenaline rush---Air traffic controller, sky marshal, police officer. Dr. Spencer still wants to go back. Prison was harder for him because of his desire for the fast paced life of a cop; he's not the "sit in the corner" type. This whole way of life is gone.

Dr. Spencer has also tried to get a license to carry a concealed weapon for his own safety, but it is taking forever to get the record cleared. He's been trying for several years. One of the individuals involved in this case has made threats and doesn't seem too stable. Dr. Spencer worked with Mexican cartels. Individuals may attempt to retaliate. He's fighting politics and is conducting an appeal to a civilian board. He has fought for years to clear his records.

He and his wife Norma have only been together for two years. When he and Norma married, they were young enough to have a child, but it never happened. No conjugal visits were allowed. She is the love of his life. It would have been nice to have a baby with her.

His new relationship with his children is a source of great joy, but they all missed out on so much and they all were damaged by all that has happened, such as the separation, the harassment, the misleading information, and the confusion. They are working at rebuilding their relationship.

So much has changed socially since he first went to prison that he is still stressed, not knowing how to behave. For instance, if he were single, he wouldn't know how to approach women; they are more assertive than they were in the mid 1980s. He has no clue about these matters. He simply tries to be very soft and polite. He doesn't venture out. He's winging it.

Dr. Spencer also finds ordinary day-to-day events difficult. For instance, it is very disturbing to watch movies involving prisons. When, at first, he was in isolation, guards would get bored and at 2-3 a.m., they would open the doors a few inches and then slam them. He has flashbacks to these experiences with prison doors. When he watches on TV, he hears the doors and it starts the process; he knows that the nightmares are coming that night.

Dr. Spencer noted, finally, that there will always be those out there who want to retaliate; there will be those who have residual doubt. He is never going to convince everyone of the truth; some will always think he beat the rap, so dealing with the matter never goes away. How do you take 23 years of his life and have the gall to say that he somehow beat the rap?

## IMPACT OF EVENTS FROM THE POINT OF VIEW OF RAY SPENCER's WIFE, MS. NORMA SPENCER

When Norma Spencer ["Norma"] first met Dr. Spencer (when he was 21 years old and in the military; she was 25 years old), he was quite driven. Dr. Spencer always wanted to make something of himself and have a big impact, in addition to being a police officer. His father had left him when he was young, and it was always on his mind that he wanted to be a good father to his children. She and Dr. Spencer were going to get married when they were young. He was the love of her life. At their age, though, there were other things to do. She knew she was still naïve. She vowed that if she ever had a chance to marry him later, then she would.

She cried for two weeks when she got his letter from prison; he didn't tell her in his first letter what charges had been made against him; when she found out, she knew something was desperately wrong. He was a lady's man; these charges didn't make any sense. She had seen him around children; there was nothing abnormal about him. He loved well-endowed women, not little girls. She couldn't figure out how all of these charges came about; it was unbelievable; she knew that something was wrong.

Her first visit with him when he was in solitary was heart breaking. Visitation was sterile, through a glass with a microphone. He had been there 8-9 months. He was losing weight. Everyone had deserted him; she would be the only person to visit him for 20 years, except for three visits during that period from his sisters. He was on so many medications that he was not thinking clearly. He was scared to death. He was in solitary for 13 months and was getting paranoid. She knew that if he didn't have more human contact that he would have a psychotic break. He needed to get out of there, so she worked to get him moved.

Then he was transferred to Idaho and had to maintain a story about drug dealing. He faced up to a lot of physical threats and fights. People were cramped together in the visiting room, so they couldn't talk about much. It was pretty dark for many years.

They married in 1987. Every six to eight weeks, she'd go to prison to see him and wait outside for the visit, sometimes in subzero weather. She had a cushion to sit on while they talked; inmates had no cushions; there were no conjugal visits until he was released. At the end of the visit there was a three second kiss. They lived on memories.

Ray didn't want to frighten her with the things he had to do to stay alive. He feared for his life but held it inside. She knows this man. He has a set of principles. Life isn't fair but this was the life that he was dealt. Rather than lean on you, he tries to protect you. He'd send his paycheck home to her when he was making 19 cents an hour. He's a very proud man. He managed to maintain dignity in prison.

Meantime, she hid the truth about his incarceration from her family, telling them he was a fisherman in Alaska. She is a private person, and if the charges became known, people would be in their business and the stigma would impact their lives if he ever got out. Meantime, she was, and still is, supporting her brother who is a Vietnam veteran who sustained a bad head injury.

Her husband is an amazing guy. He was so alone. To see a man who was so proud and so in love with his job be reduced to this position as the result of whatever was going on was heart-breaking. They couldn't figure it out. She isn't sure how much she's spent on attorney's fees defending him; she does remember that the attorney's bill one month was $49,000. Through twenty years, they've gone up and down with attorneys. Then she saw the negative medical exams in light of the charges. Norma is an emergency room nurse. She has seen the genitals of abused children in an emergency room many times. In the medical exams, there was no trace of trauma and there should have been if he'd done what he was accused of doing. You can't have this type of alleged trauma to a child and have negative exams. So, she got an attorney involved again; something was not right.

When he was released from prison on parole, she had just gotten back from a visit two days before and couldn't get time off from work. They put him up in an awful motel. He was on three years of supervision and couldn't leave the state. She visited him every six to eight weeks. She couldn't move from California to Washington because she was working two jobs and making good money. They needed the money for attorneys, so she couldn't afford to move and start over. His case was too high profile for them to transfer him to California. After the three years on parole, he remained in Washington because he had a job up there, but then the IRS fired him. Then he got a job involving physical labor in crane construction but that was causing him problems physically. Finally he came to her just two years ago in February, 2010, twenty-five years after their marriage.

Norma watched Ray's son Matt tormented by what had happened. His daughter Kathryn struggled to sort things out and came to see her dad when he suffered a heart attack in 2008. For Dr. Spencer, having his children back in life was one of his biggest moments.

# OVERVIEW – SUMMARY OF TRAUMAS – DR. CLYDE RAY SPENCER

Dr. Ray Spencer's arrest, incarceration, and subsequent parole would have been difficult for anyone, but they were especially traumatic for Ray Spencer because of his family background and psychological makeup. His father was an alcoholic who beat his mother and left the family when Ray was 9 years old, never to return. As a fatherless child at age nine and thus acutely aware of the losses associated with his father's absence, Dr. Spencer was particularly concerned about being a good parent to his own children. His mother, who struggled all of her life, died suddenly when he was 17 years old; he was on his own his last year of high school and the school knew it; he had to sign his own permission forms. Ray sat by her grave many a night in high school and cried. Given his mother's struggles to rear him and her fears that he might turn out like his brother who was repeatedly in and out of prison, living a moral, exemplary, industrious life was particularly important to Ray in her memory. The charges of sexually abusing his children, singularly abhorrent crimes, were particularly odious to him in light of both his focus on being a good father and his desire to lead a moral, industrious life as a tribute to his mother, a life that would have made her proud. He was devastated when he went to prison. In the back of his head, he was glad that his mother was not alive to see him imprisoned. In a strange way he had let her down. Further, he was conflicted; what if he had committed these monstrous crimes and didn't know it?

By personality style, Dr. Spencer was also something of a risk taker, enjoying careers as an air traffic controller, sky marshal, and police officer; he was an especially poor fit for the monotony and solitude of a prison cell.

The traumas he has suffered touch upon virtually every aspect of his life and have often been magnified by their impact because of his upbringing and personality style.

**Enduring the Stress of Constant Danger and Awareness that his Life was at Stake—A Chronic State of Hypervigilance:** When Dr. Spencer first arrived in Idaho, he was in a physical fight nearly every week, as the other inmates tested him out. He had to prove that there were easier people for the other inmates to pick on than Dr. Spencer. He could never let his guard down. He had to be careful not to use cop terminology such as "dirt bag." Inmates were quick to interpret words as statements of disrespect. He had to think about every word that came out of his mouth. He had to tell his story exactly the same way every time or they'd get his number. His industrious style was redirected at the very basic process of just staying alive.

Most of us have felt the rush of fear when unexpectedly startled on a dark street or when touched unexpectedly from behind. Dr. Spencer, as he described it, spent much of his adult life in a very violent environment, in a constant state of alert, where life is not valued and many of the ordinary rules of society don't apply. As a police officer whose career focused upon justice, he was particularly vulnerable to life threatening retaliations while incarcerated, especially given the nature of his alleged crime which is more repugnant than murder. Thus, more than most inmates,

he was vulnerable to attacks and vindictive behavior by both inmates and guards. Dr. Spencer had good reason to fear for his life, day after day. His PTSD and vivid nightmares attest to the trauma he experienced.

**Damage to his Mental Health - Psychological Trauma:** As described in various psychological reports, the intense stress he was under lead to severe anxiety, hopelessness, hand wringing, pacing, anger, a sense of being overwhelmed by the situation, difficulties with attention/concentration, sleep and eating problems, lack of pleasure and tearfulness—for years. During the period when he was being accused and he wondered if he had forgotten, he feared that he was losing his mind, in itself a terrifying experience. He was stressed to the point of contemplating suicide, a state that he had previously found unimaginable. Dr. Spencer still suffers from Post Traumatic Stress Disorder and is under psychiatric care for his condition —He described horrific nightmares and fitful sleep. Fears are easily aroused. He startles easily and he suffers from attention/concentration/memory problems seemingly related to the arousal, the loss of sleep, and the side effects of medications.

**Damage to his Physical Health— Physical Trauma:** He dealt with injuries from numerous fights in prison where he could then not let it be known that he had been injured. Through most of his life he had to make do with the limited quality and delays associated with medical care available to inmates. He was subjected to chronic stress which typically contributes to health problems. Chronic stress may be related to the serious heart attack he suffered several years ago. At 64, he is not a young man; much of the productive part of his life is behind him.

**Damage to his Relationship with his Children:** Given his deep-seated desire to be a good father, it was especially difficult for him not to see his children from 1984 when Matthew was eight and Kathryn was five until 2006 when he saw Matt and a year later when he again saw Kathryn. Through most of this period, he received no letters or reports about the children. He didn't know how they were doing in school. Indeed, his daughter almost died in a car accident when she was 16 and he didn't know about it. Via an organization that sent presents in behalf of inmates, he tried to have presents sent to his children for Christmas and birthdays, but a minister told him that his ex-wife would not accept these presents for the children. He did not have the opportunity to participate in their development, share the joys of loving and being loved, or take pride in their achievements. There was no baseball in the backyard, no fishing trips, no father/daughter dances, and no opportunity to walk his daughter down the aisle at her wedding. Before Dr. Spencer had managed to get back in touch with his children, his sister sent him a videotape of her wedding; he said that watching it was unbelievably traumatic. Dr. Spencer was on parole when she married and it was all he could do to keep himself from jumping parole so he could just stand outside the church and catch a glimpse of her on her wedding day. He will never get back that part of his life. He was left instead to deal with the anguish of being accused, the confusion over the allegations and apparent rejection, the concerns about what they'd been told about him, and the fears about the impact of these events upon their development. In reestablishing a relationship with them, he has had to overcome the great fears that were implanted in them, fears that he would, for instance, come back and kill them. It takes time to reestablish relationships when they have few common memories, are now all adults, and have all been psychologically damaged by the years of confusion and repetition of

untruths that they have all endured. While he in no way holds them to blame (As he noted, they were just babies.), he has also had to deal with their tremendous sense of guilt over what happened.

**Added Distress in His Relationship with the Children's Mother:** A man's relationship with his ex-wife and mother of his children can be inherently difficult. The idea that he was a womanizer who liked big busted women doesn't fit with the idea that he would turn to a five year old for sex, however. He feels she couldn't put her anger about other women aside to look at him objectively. However, his arrest and incarceration apparently provided her with an opportunity to paint him in a negative light and to encourage fear of him. She reportedly worked to keep him incarcerated. At the same time, he respects his children's attachment to their mother and thinks she did a good job rearing them. He tries to step lightly. He thinks the children would have been better off with him in the picture. The events leading to his incarceration have certainly made this relationship more complex and psychologically stressful.

**Deprivation of the Opportunities to Enjoy his Marriage to Norma:** Married in 1987, Ray and Norma have only had the last two years together. He and Norma aren't young anymore. The need for adjustments in a marriage is inevitable; they are easier when you are young, before long-term patterns have been established. For instance, Norma has lived alone all of this time and is used to making her own decisions. She's done nothing but work, change her clothes, and go to bed. Meantime, in prison he had limited space and everything had its place. They have had their stresses adjusting to each other's habits. After two years, many of their possessions are still in boxes. He's also still hyper-sensitive. If she gets off work early, she shouldn't just walk into the house. He needs to know that she is coming; in prison his head was always on a swivel watching everybody. It was part of surviving. He also is very sensitive to having a light on when he sleeps. He is still in a state of chronic vigilance; for instance, they were in the parking garage underneath the building and he was on hyper-alert sensing that something was wrong. He looked over and realized that an attendant had parked a car and had forgotten to close the door. Even little things will set him off.

**Lack of Physical Contact:** Human beings have a normal desire to touch and be touched. Dr. Spencer had no opportunity to touch or hold his children, receive the hug of a relative or the pat on the back from a friend, or to pursue the normal physical affection of adulthood and marriage. Indeed, for twenty-five years, he exchanged no more than three second kisses with his wife Norma.

**Disruption of Relationship with Siblings:** His situation has caused complications in his relationship with his siblings. Dr. Spencer had two full sisters, two half-sisters, and a half-brother. For historical family reasons, some of the contact in these relationships was erratic. One sister was in a quandary when she found out about his situation and talked to a minister. She decided to let sleeping dogs lie, although she eventually contacted him. On sister knew he'd moved to Washington and put something on the computer. His first wife saw it and contacted

his sister to tell her what he'd purportedly done. Dr. Spencer's circumstances added to the difficulties of maintaining family ties.

**Disruption of Relationship with Friends:** Except for his wife Norma, Dr. Spencer's only three visits during more than twenty years of incarceration were three visits from sisters. People aren't as likely to say, "Ya, this is my friend" when talking about a man incarcerated for allegedly raping his young children---It is easier to be the friend of a convicted murderer. When Dr. Spencer went to jail, except for his immediate family, he essentially disappeared. Some friends/acquaintances wanted nothing to do with him. He was so embarrassed that he cut off his friendship with some others. His old narcotics partner never wavered. In jail, you don't dare have friends; it is too dangerous. You have acquaintances.

**Loss of Meaningful Career, Sense of a Wasted Life, Loss of the Opportunity to Contribute to Society:** Dr. Spencer was an industrious man who loved his career as a police officer and to whom it was especially important to make something of his life, in part because of his promise to his mother. He apparently was good at his job. Typically one of life's greatest pleasures is to find work you love, that exercises your talents, and that gives your life meaning. He lost all of these at age 36 and, in spite of repeated efforts, has concluded that he will never have an opportunity to return to law enforcement.

**Damage to his Reputation; Having Others not Believe Him:** Most of us care about what others think of us. It is especially importance to someone whose goal is to live a moral life as a police officer. The charges created an acute sense of embarrassment. Dr. Spencer spent much of his life surrounded by guards, mental health professionals, etc. who thought he was a pedophile and a liar, the type of man who would brutally rape his children.

Dr. Spencer was also upset that people would think that because he was a womanizer as a young man, that he'd abuse kids. To explain, Norma was his first and only true love. When he got out of the service at 21, he more or less picked up where he was at age 17 but now all of his friends were married and he thought he was supposed to be married too. He married his first wife on the rebound. He went into the relationship for all of the wrong reasons. He was guilty of infidelity in his first marriage and offers no excuses for his behavior, but he wasn't going home drunk or beating his wife. By way of explanation though, at the time in his work he was flying all over the world with stewardesses. After he married, his wife quit trying to appeal to him; she liked to wear a frumpy housecoat and curlers. Someone once mistook her for his mother. However, as a young man he was a womanizer who liked big busted women. When he was in high school and working in a supermarket, he dated older women who came into the market. Being a womanizer when you are young and liking big busted women is a far cry from initiating sex with a five year old. Pedophiles are usually immature and uncomfortable initiating sex with individuals their own age, so they turn to young children. There are no excuses for his infidelity, but an unwillingness to approach adult women was never his problem. His taste did not run to five-year-olds. He has been quite hurt by the idea that his indiscretions as a young man, which he readily admits, could be used to suggest that he would molest his children.

**Having to Live a False Life:** In order to survive, he had to become someone else---creating a false history, a false language, hiding his career as an officer, and withholding/suppressing other aspects of the persona. He was forced to pretend to be exactly the type of person he didn't want to be.

**Loss of Financial Security:** ---He reported that he lost $50,000 plus his house where his signature was forged, the money put in a joint account, removed, and used to purchase another house then occupied by his ex-wife and a detective in this case. ---He estimates a loss of $3.5-4 million dollars in income if he had stayed an officer, likely much more if he had had an opportunity to advance in his career. Having not worked most of his life and having put so much money into attorney fees, he doesn't have the cushion for old age that others who had not been incarcerated might have.

**Loss of Keepsakes and Personal Possessions.** Allegedly, his ex-wife took his personal items, keeping some (including items awarded to Dr. Spencer by the court), giving some away, and throwing the rest into the front yard. He was deprived of baby pictures, certificates from college and work, pictures of his parents and sibs, pictures down to grade school, personal letters, gifts from Norma. He was left with nothing, no cash to pay for a defense and no monies to ease the monotony of prison through purchases of small items at the prison store. His sister hooked up with his ex-wife and vicariously sent him pictures of his children in 2000, his first information and only keepsake that came to him regarding his children after some fifteen years.

**Loss of Opportunity to Participate in Significant Events:** Dr. Spencer did not have the opportunity to tend his daughter's wedding, for instance. He missed the funerals of two sisters, an uncle, several aunts, and a couple of friends. There are other parties, ceremonies, outings, and other events that he would have found meaningful and/or enjoyed if he had had an opportunity to attend.

**Loss of the Simple Pleasures and Control of the Details of a Normal Life:** He has slept on a concrete floor with a hole in it rather than a comfortable bed. He drank only bad tasting water rather than having a beer or iced tea with dinner. He was locked for months in a room without the ability even to listen to a radio. He couldn't turn off the lights when he wanted to go to sleep. He couldn't make sure he had elastic in his underwear to make him more comfortable. There was no control over when he took a shower and no say over what he ate and when he ate it.

**Loss of Opportunity to Pursue his Interests:** Dr. Spencer was an outdoors guy. He enjoyed

adventurous activities like hunting, fishing, camping, and riding motorcycles. He had to manage by living vicariously through adventure books.

**Boredom, Lack of Stimulation, Isolation:** Most of us get quite bored and frustrated with a six hour delay at an airport or a two hour wait for a doctor who is running late. Dr. Spencer spent some thirteen months alone without appreciable entertainment or human contact in maximum security and another eighteen years in prison, much of it locked in a small, barren cell.

**Being Manipulated by Others in the System:** From the time Dr. Spencer first came under suspicion in this case, he's had to deal with the consequences of inappropriate interrogation tactics, false allegations, threats, misrepresentations by those in pursuit of their self-interests, hidden reports and tapes, the confiscation of his personal wealth, and purging of records from the system. He knows anger is there. He tries to keep it in check because if he lets himself become consumed with this anger he will never function again. He tries not to go down that road. He would like to see them say that they are sorry and have a taste of what he has experienced.

**Residual Impact on his Current Life:** It can be tempting to think that because Dr. Spencer has been released that all is well. Dr. Spencer still suffers from PTSD, poor sleep, severe nightmares and the impact of medication to control these symptoms. His wife has to warn him that she's coming home earlier because he is easily startled. He threw up reviewing the mental health evaluations in his case. In interviewing Ray Spencer, it was obvious, even on the telephone, that the process of me questioning him about their experiences was, in itself, a significant source of stress. The resurrection of memories related to much of his life is in itself severely disturbing. His physical health is problematic. He is in financial distress. His career opportunities are very limited. He still finds himself out of touch with the changes in society and is embarrassed by or reactive to them. He continues to deal with the legal and paperwork implications of his incarceration. He is just now trying to work through the marital adjustment issues that would normally have been addressed shortly after marriage. He has been hurt and damaged in so many ways, but he has his children now and his wife, and he is trying to make the best of the time in his life still available to him.

Respectfully submitted,

Ruth Boutin Kuncel, Ph.D.

Ruth Boutin Kuncel, Ph.D.
Licensed Clinical Psychologist

Honorable Benjamin H. Settle

1

2

3

4

5

6

7

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

8

9
CLYDE RAY SPENCER, MATTHEW RAY
SPENCER, and KATHRYN E. TETZ,

10

11                             Plaintiffs,

12                 v.

13
FORMER DEPUTY PROSECUTING
ATTORNEY FOR CLARK COUNTY

14
JAMES M. PETERS, DETECTIVE
SHARON KRAUSE, SERGEANT

15
MICHAEL DAVIDSON, CLARK COUNTY
PROSECUTOR'S OFFICE, CLARK

16
COUNTY SHERIFF'S OFFICE, THE
COUNTY OF CLARK, SHIRLEY

17
SPENCER, and JOHN DOES ONE
THROUGH TEN,

18
                          Defendants.

19

NO. C11-5424 BHS

DEFENDANT MICHAEL
DAVIDSON'S DISCLOSURE OF
REBUTTAL EXPERT
TESTIMONY

20       Defendant Michael Davidson hereby discloses the following rebuttal expert witnesses

21 and testimony pursuant to Federal Rule of Civil Procedure ("FRCP") 26(a)(2):

22            1.     **Ronald Klein**, Ph.D.
                     10 North Post St.
23                   Suite 216
                     Spokane, WA  99201-0705
24

25 Dr. Klein's report setting forth his opinions is attached hereto as Exhibit 1, along with

26 supporting material referenced in his report.  His CV is attached as Exhibit 2, and his

FREIMUND JACKSON TARDIF & BENEDICT GARRATT, PLLC
711 Capitol Way S., Suite 602
Olympia, WA  98501
Telephone: (360) 534-9960
Facsimile: (360) 534-9959

**EXHIBIT C**

1   identification of fees and prior testimony are attached as Exhibit 3.  Dr. Klein will provide

2   testimony via declaration or affidavit in support of a motion to exclude the testimony of Dr.

3   Kuncel.  Dr. Klein may also provide testimony at trial regarding the psychological or

4   emotional damage, if any, sustained by plaintiff Clyde Ray Spencer and regarding his

5   examination of plaintiff Clyde Ray Spencer, to be arranged by agreement of counsel subject to

6
7   the provisions of FRCP 35(b) or by motion, and the results of that examination.

8

9       2.   **Phillip Esplin**, Ed.D.,
            7131 E. Buena Terra Way
10           Scottsdale AZ 85253

11      In addition to offering his own opinions as previously disclosed, Dr. Esplin will rebut

12  opinions expressed by plaintiff's experts, including Dr. William Bernet's opinions. Dr. Esplin

13
14  will testify that fairness requires defendants' conduct to be measured by the standards

15  generally accepted among field investigators during the time the investigation at issue

16  occurred, that the standard of care for child sex abuse investigators, such as existed during the

17  relevant time period of August 1984 to May 1985, was not breached by defendants, and that

18  reasonable investigators in 1984-1985 could not have known that the investigative techniques

19  used by defendants were so coercive and abusive that they would yield false information.

20      Defendant Davidson also discloses the rebuttal experts identified by co-defendants

21
22  Sharon Krause and James Peters, including the report and rebuttal opinions of **Rebecca Roe**,

23  and incorporates herein those co-defendants' rebuttal expert disclosures as if fully set forth.

24  Defendant Davidson reserves the right to supplement or amend this disclosure as more

25  information becomes available through discovery and further investigation.

26

DEFENDANT DAVIDSON'S DISCLOSURE OF
REBUTTAL EXPERT TESTIMONY
No. C11-5424-BHS          - 2 -

FREIMUND JACKSON TARDIF & BENEDICT GARRATT, PLLC
711 Capitol Way S., Suite 602
Olympia, WA 98501
Telephone: (360) 534-9960
Facsimile: (360) 534-9959

# Ronald M. Klein, Ph.D.

Behavioral Medicine Service
10 North Post Street, Suite 216
Spokane, WA 99201   (509) 838-1285
ronklein@ronkleinphd.com

11/05/2012

Bernard Veljacic, Attorney
Clark County Prosecutor's Office
PO Box 5000
Vancouver WA 98666-5000

Re:     Dr. Kuncel's 10/04/2012 report on Clyde Ray Spencer

Dear Mr. Veljacic:

At your request I reviewed the forensic report prepared by Ruth Kuncel, Ph.D. regarding Mr.
Spencer who is currently a plaintiff in a legal action. You asked me to state my opinions about
that report from the standpoint of the practice of writing and submitting forensic reports to be
used for legal purposes, something which I have done for the past 30 years. To assist this
process, I have attached the Specialty Guidelines for Forensic Psychology and the Ethical Code
for Psychologists, both from the American Psychological Association (APA). These
foundational documents, the product of considerable professional effort from a large number
of expert psychologists, were duly presented to the governing board of APA and adopted by the
organization. I invite you and others involved in this case to review the material in depth. To
summarize, forensic reports are written from an objective viewpoint (not an advocacy
viewpoint), seeks out objective data, utilizes multiple data points (from records, interview, and
psychological testing), compiles that data to arrive at opinions supported by that data, and
expresses those opinions (orally and/or in writing) to answer questions posed by the attorneys in
any given case. My overall opinion is that Dr. Kuncel failed to follow these basic standards; the
remainder of this report will detail the bases for my opinions, using page numbers corresponding
to the pages of Dr. Kuncel's 10/04/2012 report to allow the reader to more easily attach my
critiques to specific entries in her report. However, I will begin with some overarching concerns.

Critique of Dr. Kuncel's report on Clyde Ray Spencer begins with the basics. She apparently
never met Mr. Spencer and conducted the entire evaluation by a series of long distance telephone
conversations. Her contact with him consisted of 4 phone conversations (totaling approximately
5 hours total). I am not aware of any factors that would have prevented one party to travel to the
location of the other party (or meet each other halfway) to conduct the evaluation in the usual
face to face manner. This is particularly important in a case with such complexity and detail.
Obviously, the data lost without observation of non-verbal behavior (especially with the
extraordinary statements Spencer made) is considerable.

Kuncel report of Spencer
11/05/2012
Dr. Klein

Dr. Kuncel lists several records she reviewed in preparing her report but then makes zero references to any information in any report. Therefore one can not determine whether any of the information in the records conflicts with or confirms Spencer's statements and allegations, whether the records provide a different but still plausible version of events from Spencer's statements, and simply what material of significance is contained in any records. Furthermore there was no stated request for further records, even though the need for more records is clear after reading Dr. Kuncel's report. She makes reference to several psychological evaluations performed in conjunction with periodic parole board review but presents not a word from any of those reports. Failure to include previously obtained psychological information is obviously below standards; even if the forensic reviewer ends up disputing previously obtained information from other psychologists, one has to begin that process by stating the previous findings and why those may have been considered unreliable or inaccurate.

Dr. Kuncel did no psychological testing whatsoever. This is an important type of data that balances out historical records and face to face interview; testing adds the element of the person's relative standing to the general population on a number of psychological variables and often to specific subpopulations meaningfully related to this specific individual. In Spencer's situation specifically, test findings currently could have been compared with findings obtained in the several previous evaluations. Validity scales on tests are especially useful in a situation such as this where considerable secondary gain is potentially available. Thus of the three usual and customary sources of information in a forensic report: records, interview, and testing, there are serious problems in all three areas in Dr. Kuncel's report.

Dr. Kuncel did not indicate when she was simply quoting Spencer or identifying certain phrasing as his phrasing rather than her own formulation. Accordingly I am taking what she has written as her statements and her formulation. Furthermore, if Dr. Kuncel's comments throughout the whole report are actually Spencer's statements without clear attribution, it puts Dr. Kuncel as essentially Spencer's mouthpiece, which is not the role of the forensic evaluator. The forensic evaluator is required to approach each case from a neutral objective standpoint and collect sufficient data to answer the questions posed by counsel, regardless of whether the answers are advantageous or non-advantageous to counsel's argument. The forensic evaluator certainly elicits information from the individual but is not simply a stenographer. Meaningful opinions are constructed upon analyzing all relevant information and making judgments about validity and consistency of information.

After the introductory comments in her report, she begins her findings on page 2 ("Chronology of Events..." etc.) by making several statements about Spencer's law enforcement and military background, with adjectives like "decorated" and "honorably." However, the case is not about his vocational accomplishments or his performance in his occupations. The case is about whether there were psychological damages suffered as a consequence of his incarceration, with

2

Kuncel report of Spencer
11/05/2012
Dr. Klein

special attention to the recanting of testimony that originally formed part of the basis of his incarceration. By beginning her report in this manner, she strays far from objective ground and appears to be defending a client (i.e. serving as an advocate) rather than objectively addressing the issues and obtaining information that would accomplish that task.

p. 2 "Based upon [first wife] Shirley's reported assertions in 8/84 that [5 year old daughter] Kathryn had told her about instances of possible sexual abuse, Dr. Spencer reported the matter to appropriate authorities as was his legal and ethical duty. Dr. Spencer soon became the sole focus of the investigation of the alleged abuse of his children Matt and Kathryn." Dr. Kuncel fails to establish whom Kathryn was originally accusing (was it Spencer?), on what basis did Spencer have a legal and ethical duty to report Kathryn's allegations of abuse to authorities, and on what basis (on what evidence) did Spencer become the sole focus of the investigation.

p. 3 "Spencer was not informed of the scope or frequency" of questioning of his children. If Spencer was the focus of an investigation, why would he have been informed of the scope or frequency of questioning of potential witnesses, even if they were his children. Dr. Kuncel goes on to cite the "pressure" the boy (son) was under but gives no basis for this assumption that carries with it an implied bias against the legal investigative process; one person's "pressure" is another person's careful and deliberate investigation. This translates to favoring the plaintiff and being biased against the defendant in the current action.

p.3 "it was reportedly all over town that his wife was sleeping with a detective investigating this case and Ray had been set up." All over town is vague and unverifiable; and appears to be giving immediate credibility to inappropriate gossip. No basis was given for accusation of marital infidelity. A forensic report should not be a vehicle for spreading gossip; if accusations are made, there should be a foundation for the bases of these statements and some comment about how much weight she assigned to these and why.

Spencer had reportedly cheated on first wife so therefore knew from personal experience that even people who generally do the right thing can in certain circumstances do the wrong thing. Plus he would have been sufficiently street smart to know that such behavior on his part might stimulate the recipient (his ex-wife) to retaliate against him in some way.

p. 3 "each harassing interview representing a new source of anguish and fear" inappropriately characterizes investigative interviews as harassment without establishing any basis for doing so. Therefore we can not tell from Dr. Kuncel's description if any alleged anguish or fear was a reasonable emotional reaction to a thorough and proper investigation or instead was an emotional reaction to a botched and improper abuse of police powers. Also on p. 3 regarding the first polygraph exam "he was falsely told that he had failed." No basis is given for what is essentially an accusation by Dr. Kuncel of wrongdoing on the part of law enforcement. Making unsupported

3

Kuncel report of Spencer
11/05/2012
Dr. Klein

accusations has no place in a forensic evaluation. Also on p. 3 "watching his whole being go downhill" language is vague and unprofessional. Further on p. 3, when he called the crisis line "he scared the guy who answered the phone": What actually was said; and what actions were taken? We are not told facts; we are given hints of emotion that are apparently supposed to convey some meaning but do not.

p.3  on 01/02/1985 he was charged with statutory rape of his daughter. Then in next paragraph "Since Dr. Spencer wasn't guilty of abuse and had regularly dropped this child off for preschool, it never occurred to him that it was a setup." Having said he was charged and offering no information about charges dropped or dismissed, there is no basis for Dr. Kuncel to say he wasn't guilty of abuse. There was no basis for Dr. Kuncel to weigh in on any judicial decision other than to simply report or refer to an actual decision handed down by the Court. She gives no indication that the Court had determined Spencer not guilty. Furthermore it seems highly unlikely that an experienced police officer would be so totally naïve about how "set ups" work. Spencer is then said to be arrested for "allegedly abusing his stepson"; does Dr. Kuncel have any basis to declare that arrest was improper or unjustified?

p.4  a "negative medical examination" of his stepson does not mean that the child was not sexually abused. It only speaks to the issue of actual rape; there are of course several types of sexual abuse that would not result in a "positive" medical examination. "If these allegations were true and he couldn't remember anything about these allegations, then he must be seriously mentally ill and he shouldn't be out on the streets." This statement is very puzzling. Is Dr. Kuncel saying this or is Spencer saying this? Is Dr. Dr. Kuncel proclaiming him to be mentally ill? Is Dr. Dr. Kuncel claiming to know whether Spencer really did or did not remember "anything" about these allegations? Is Dr. Kuncel simply acting as stenographer, writing down everything Spencer is saying without making it clear she is quoting him and without making it clear whether there is a basis to assign meaningful weight to Spencer's statements?

Further on p. 4  "if [son] Matt would say something like that [allegations of abuse], it must be true." It is highly unlikely that an experienced law enforcement officer would be unaware that an individual, a child (even his son) is capable of saying something that wasn't true for a variety of reasons in a variety of situations. Spencer reportedly claimed that he feared for his sanity; Dr. Kuncel should have been able to identify (and state) that neither having a difference of opinion nor being unable to remember an event are signs of insanity and do not lead to insanity. Rather these are rather commonplace events. If anything, his linking possible insanity with such commonplace events would introduce the possibility of gross exaggeration of psychological problems, which would then lead a skilled forensic evaluator to further explore that possibility, both with interview techniques and with psychological tests.

4

Kuncel report of Spencer
11/05/2012
Dr. Klein

Still on p. 4 referring to the children "They were just babies." Obviously they were not "babies"; they apparently were interviewed and provided information which presumably led to the arrest of Spencer. It is not clear why Dr. Kuncel would make such an odd statement. Another odd statement was that after filing a complaint, Spencer was successful in persuading "jail officials" to order the detective (investigating the criminal matter by interviewing Spencer in prison) to leave the prison facility and not return. The likelihood of this actually occurring seems extremely low such that Dr. Kuncel should have obtained clear and convincing information to give this any weight: i.e. the form and content of the complaint, what it was based on, to whom it was filed, who made the determination and on what basis. Without that, it appears on the surface to not be true, and would lead a forensic evaluator to interview further to determine why Spencer would have said that and whether there is gross exaggeration in Spencer's presentation. Dr. Kuncel refers to "the inappropriate interrogation tactics used on the children" as though this were a statement of fact, agreed to by all. However Dr. Kuncel gives no indication or verification that the investigation of the children was improper in any way and it goes against standards to take a stance so obviously aligned with one of the parties, especially with no actual evidence to support it. Her actions give the impression of being biased in favor of Spencer, whether or not that is her attempt.

Still on p. 4 Dr. Kuncel states that on 05/14/1985, Spencer "underwent deep hypnosis and was administered a "truth serum." Seriously. Given that the US Supreme Court ruled back in 1963 that information gained through such techniques as the administration of sodium pentothal or similar chemical was inadmissible, it is unlikely that Spencer underwent that procedure. The forensic examiner again would obtain verification that these measures were used on Spencer rather than embarrass herself by simply going along with whatever Spencer is telling her. The forensic examiner is required to exercise judgment, recognize that plaintiffs may make self-serving statements in a context where secondary gain is possible, may exaggerate, and therefore verification processes are required. Even a simple reference to the records (author/date/content) would be helpful in this regard. Dr. Kuncel doesn't make a single reference to anything in the records despite a series of rather outlandish claims by Spencer.

Still on p. 4 Spencer's attorney "advised him to throw himself on the mercy of the court." With the possible exception of 1930s era Warner Brothers crime movies (e.g. James Cagney, Edward G. Robinson, etc.) nobody talks like this. Therefore when a forensic evaluator hears a comment using such stilted or unlikely phrasing, the likelihood of an exaggerated or distorted piece of information is increased and the aforementioned process for trying to determine validity must be activated. Dr. Kuncel gives no indication that this was done or even considered. There is simply an ongoing unquestioning acceptance of everything Spencer is saying, no matter how unlikely it may be. This pattern continues at the bottom of page 4 and onto page 5 with a description of how incompetent the previous attorney was, even to the point of that attorney supposedly claiming there had been a fire (and therefore destruction of records?).

5

Kuncel report of Spencer
11/05/2012
Dr. Klein

On p. 5, the verbal report of incompetence is extended even to the previous judge in this matter who was said to have had "an agenda" because of an issue between Spencer and the judge's daughter. Basically Spencer is accusing the judge both of bias, and of incompetence (by not recusing himself, if the claims were true), and by simply accepting uncritically with what is being said and not voicing even basic cautions, Dr. Kuncel is joining in with these accusations. Not only does this fail to follow professional standards, it fails to follow common sense and judgment. There are two additional factors; one is that these allegations by Spencer and echoed by Dr. Kuncel are so outlandish that it should have triggered at least some response from Dr. Kuncel that the allegations may not be genuine. The other is to point out that the potential function of these possibly non-genuine allegations is to absolve Spencer of any responsibility for what has transpired, and instead to distribute blame to others (who are not presently in a position to defend themselves). This extends to his explanation to Dr. Kuncel that he entered an Alford plea because he was: a) not fully sane, and b) was taking (unspecified) medications that "interfered with his thinking." The key problem here is not Spencer's allegations: he is free to allege whatever he pleases. The key is Dr. Kuncel uncritically accepting each of these allegations without exploring them, analyzing them, and making some statement about why they should or should not be given weight in the formulation of her opinions. The "He didn't want to go to trial because he didn't think he would get a fair trial" comment begs at least for an explanation as to why he thought that, whether he had a rational thought process to analyze that, whether he could viably explain his thought process to Dr. Kuncel. One of the basic points of any psychological evaluation is to analyze the thought process of the person being evaluated.

Also on p. 5 "His wife had cashed his retirement check, leaving him penniless to mount a defense." Again there is absolutely no explanation as to how it would come to pass that his entire retirement funds would be contained in one check, how it would come to pass that his wife could cash Spencer's check, and how it would come to pass that he was otherwise "penniless" (a term I have not seen since reading the novels of Charles Dickens many years ago).

p. 7 Dr. Kuncel appears to be unilaterally stating that physical assault in incarceration is not governed by any rules/laws or any other form of institutional control. Thus after echoing previous statements suggesting Spencer's attorney was incompetent and that the presiding judge was incompetent, Dr. Kuncel finishes the trifecta by implying that the warden/prison system is also incompetent. As a forensic evaluator, Dr. Kuncel has an obligation to not make such extreme statements unless reasonable evidence exists and unless she clearly lists what that evidence is. Otherwise she is unprofessionally defaming these basic elements of the criminal justice system. The discussion about "inmates would have asked to see the paperwork" (referring to the charges resulting in his incarceration) appears simply bizarre.

6

Kuncel report of Spencer
11/05/2012
Dr. Klein

p.8   Referring to many of the other inmates, Dr. Kuncel wrote: "the state had reared them." This is an odd statement applied to a large heterogeneous mass of humans, seemingly pejorative and prejudicial. This seems to fall below professional standards, plus there is no clear purpose in including the statement in the first place. Also on p. 8 there are unexplained inconsistencies: first we are told Spencer was so frightened that he would be beaten or killed in jail that he could hardly maintain the basic ability to function; then we are told that while in prison he enrolled in a college program and earned a Ph.D. in clinical psychology. No explanation is given as to how these two factors could co-exist. On a more detailed note, there is no explanation as to how he could have specifically earned a Ph.D. in clinical psychology since that degree typically requires the student to complete a one year internship working in the field (which Spencer could not have done due to his incarceration) and to complete a research dissertation (which also seems unlikely given Spencer's circumstances). Again it is incumbent upon Dr. Kuncel to explain how these could all co-exist and/or to have explored these topics sufficiently with Spencer rather than simply accepting each statement without some level of challenge.

p. 9   Spencer attended a parole hearing every two years but over the course of two decades he was repeatedly denied. Dr. Kuncel should have requested copies of Parole Board decisions and included aspects of those decisions in the report to more fully understand Spencer and to introduce a source of information other than Spencer's own statements to her over the phone. Apparently the parole hearings included information from psychological evaluations, making it virtually mandatory that Dr. Kuncel obtain those documents and compare/contrast that information with the information Dr. Kuncel herself was obtaining. There is no reason to fail to obtain this information and to fail to include that data in Dr. Kuncel's report. Interestingly Dr. Kuncel uses the term " He was *subjected* also to repeated psychological/psychiatric evaluations typically related to requests for parole." Subjected? Is that supposed to imply that undergoing a psychological evaluation is a form of punishment? Was it not a routine request by a parole board to more fully understand the current status of the person requesting parole? Would Dr. Kuncel say that Spencer was *subjected* to the evaluation that she performed? Was the evaluation that she performed some sort of punitive event? Dr. Kuncel, referring to the reports, unbelievably wrote: "Some reports were written by individuals with inadequate skills who weren't going to write the truth or interpret the data to proper standards." Following such an extreme, accusatory statement, I would have expected a competent forensic evaluator to identify the basis of concluding the persons writing the reports had inadequate skills, weren't going to write "the truth" (a high standard indeed!) and weren't going to interpret the data to proper standards. There is no problem with evaluators making strong statements in reports, so long as the bases for such powerful statements are clearly stated in a way that allows them to be evaluated. Dr. Kuncel gives us none of that and thus falls below standards once again.

p. 11   Dr. Kuncel describes the restrictions that accompanied the parole Spencer was finally granted (ankle bracelet, curfew, travel restrictions, etc.) but characterized all this as "He was

7

Kuncel report of Spencer
11/05/2012
Dr. Klein

treated like a predator who might re-offend" rather than noting the State had an interest in (and obligation to) keeping the public secure. As it was with the original attorney, judge, and warden, all being accused of various types of incompetence, so too on p. 11 do we read about the IRS firing Spencer because criminal records were mishandled by an unspecified person or agency ("an error was made"). At no time does Dr. Kuncel appear to grapple with the commonality of all these statements: that Spencer is never responsible for what has happened to him; the blame is to be distributed among everybody else.

p. 12 "He hadn't driven a car in twenty years; freeways were new to him and he found them terrifying." The interstate highway system was built in the 1950s. They were well in place prior to Spencer's incarceration. This is not a major point but only adds to the non-credible information Spencer is providing and Dr. Kuncel apparently accepting without question, challenge, or even attempts to clarify for the sake of consistency.

On p. 16 Dr. Dr. Kuncel's opinions finally begin. "What if he had committed these monstrous crimes [sexual abuse of his own children] and didn't know it?" No basis is given for any amnesia, alteration of mental status, or any other reason why he wouldn't have known what actions he did or didn't commit. Dr. Kuncel's obligation is to either present information, if it exists, bolstering Spencer's statement; or to identify that there is no known basis for his statements, leading one to diminish the amount of weight to be attributed to Spencer's long list of verbal statements. Dr. Kuncel does write at some length about stresses that exist inside prisons; such stresses are well known, though there is no mandate (to the best of my knowledge) to make prisons a stress-free environment.

p. 17 Statements are made about Spencer not receiving letters or information about his children. Exactly whose fault is that? Was he denied mail by prison authorities (if so, for what reason) or were no letters sent to him? The point is that Dr. Kuncel has the responsibility to explore and get clarity on such issues before throwing them into the report. Dr. Kuncel does appear to have taken the stance that when the children (now grown) recanted their earlier testimony, it meant sexual abuse never happened. That is not a foregone conclusion. Recanting of testimony essentially means that the person giving testimony either lied originally, or lied when they recanted, since both statements can not be true. If Dr. Kuncel has some reason for her beliefs, those should be stated clearly in a forensic report. Instead Dr. Kuncel launches into an emotional discussion about Spencer missing out on "the joys of loving and being loved" and implies this was caused by the criminal justice system rather than by the sworn testimony of those same family members leading to his being found guilty. Dr. Kuncel wrote in general terms about the difficulties re-establishing relationships after being incarcerated for so long but doesn't describe any actual attempts to do so. This is a common problem throughout the report: making general statements about how difficult or negative something is but putting forward no actual behavioral data as to what Spencer actually did or didn't do in response to the challenges he faced. Forensic

8

Kuncel report of Spencer
11/05/2012
Dr. Klein

reports have to describe actual behaviors along with some statements about whether those were adaptive or maladaptive, with data to support the characterizations.

p. 18  Spencer's violation of his marital vows is skipped over rather briefly (it receives considerably fewer words that the description of food in prison) despite the fact that it is an example of boundary violation; childhood sexual abuse is also an example of boundary violation. Dr. Kuncel makes the statement that a "womanizer who liked big busted women" is incompatible with someone turning "to a five year old for sex." I would challenge Dr. Kuncel to demonstrate that persons who sexually abuse children never or rarely have sex with adults; to the best of my knowledge, no such data exist. Besides, "turning to a five year old for sex" improperly states the nature of that activity which is sexual assault and power based rather than the mutual exchange of sexual activity that goes on between adults. The later discussion on p. 19 with Dr. Kuncel essentially absolving Spencer of any wrong doing in his two failed marriages, not holding him accountable for apparently multiple boundary violations during those marriages, and then actually blaming his two wives for the problems is beyond any reasonable approach to a forensic report; Dr. Kuncel appears to have abandoned any point of objectivity and is instead putting forth a case as an advocate would.

p. 19  Dr. Kuncel wrote that Spencer was denied friendships. But there was nothing said that indicated that Spencer was denied visitors for 20 years. Regardless of the charges on which he was convicted by virtue of the testimony in his case, I saw nothing in Dr. Kuncel's report that visits from friends were denied or even discouraged.

p. 20-21  Dr. Kuncel describes the already understood restrictions of prison life: that if you are in prison, you don't get to attend family events, don't get to engage in outdoor recreation, don't have stimulating activities, etc. This is one of the main points of incarceration: being denied such opportunities as part of your punishment and also keeping the community safer. My understanding is Spencer was only in such a situation because he was found guilty of criminal acts. This long string of descriptions of the hardships of prison life is more properly the province of plaintiff's counsel, not a forensic evaluator.

In summary, Dr. Kuncel falls far short of the established guidelines on how to conduct a forensic evaluation and compose a written report of that evaluation. Please feel free to contact me if further information is required.


Ronald M. Klein, Ph.D.
Behavioral Medicine Service

9

## CURRICULUM VITAE

I.   Name: **Ronald M. Klein**

Professional Address:
10 North Post St.
Suite 216
Spokane, WA  99201-0705
509-838-1285        Fax: 509-344-1011
ronklein@ronkleinphd.com

II.   **EDUCATION**

B.A.  (1972) Boston University: Psychology
Ph.D. (1978) Washington University (St. Louis); Clinical Psychology

Scholastic Awards and Honors

1972-1973  National Defense Education Act Title IV Fellowship
1973-1974  National Institute of Mental Health Fellowship
1975-1976  Washington University Tuition Scholarship
1975-1977  Washington University Graduate Research assistantship

III. **PROFESSIONAL EXPERIENCE**

July 2003- Present
Full time private practice encompassing psychotherapy, assessment, neuropsychological assessment, and forensic consultation.

Continuing as Eastern Washington University, Department of Physical Therapy, Guest Faculty

Medical Expert (Psychology) for Social Security Administration, Office of Disability and Adjudication Review: assist Administrative Law Judges to interpret psychological records to determine level of psychological impairment and vocational strengths/weaknesses (September 2001-May 2012)

Neuropsychological Consultant for Group Health Cooperative (2007-2009)

November 1998- June 2003
Part-time private practice including psychotherapy, assessment, neuropsychological assessment, and forensic consultation.

Sacred Heart Medical Center, Psychological Consultant to Inland Northwest Thoracic Organ Transplant Program, Kidney Transplant Program, and Kidney Dialysis Center. Direct assessment, treatment and consultation with adults and adolescents in these patient treatment programs. Staff training and consultation to the Renal Service Line.

Continuing as Eastern Washington University, Guest Faculty, Physical Therapy

**September 1982 - October 1998**

Sacred Heart Medical Center, Director, Behavioral Medicine Service; Direct assessment, treatment and consultation with adults and adolescents.Supervision of psychological and organizational aspect of several patient treatment programs, including Inland Northwest Thoracic Organ Transplant Program, Kidney Transplant Program, and general Behavioral Medicine Service (psychological aspects of medical disease and disability). Clinical Director of Pain Rehabilitation Clinic (1982-1994). Part-time private practice.

Eastern Washington University, Guest Faculty, Physical Therapy and Guest Faculty, Psychology: Lectures, supervision of graduate students, teaching Psychological Aspects of Physical Therapy.

Washington State University, Adjunct Assistant Professor, Department of Psychology plus Intercollegiate Center for Nursing Education: Supervision of graduate student practicum and research.

Spokane Mental Health Center, Adjunct Staff Psychologist for American Psychological Association approved Predoctoral Psychology Internship Program.

**October 1980 - July 1982**

University of Washington Burn Center: Consultant, clinical intervention, staff training, and psychosocial research activities.

**July 1977 - July 1982**

University of Washington Medical School, Assistant Professor, Department of Rehabilitation Medicine: Assessment and psychological intervention of physically disabled patients and their families. Teaching of medical and allied health personnel regarding application of behavioral methods to comprehensive rehabilitation programs. Research on behavioral measurement of disability.

**October 1977 - September 1980**

United States Public Health Service Hospital, Seattle, Washington. Consultant: Staff consultation and clinical assessment to Department of Rehabilitation Medicine and Cardiac Rehabilitation Program. Case consultation to Medicine, Neurology, and Primary Care Services.

September 1975 - June 1977
>Washington University of St. Louis, Research Associate, under supervision of Anthony Schuham, Ph.D. Conducted research studies on grant from National Institute of Alcoholism and Alcohol Abuse.

January 1976 - May 1976
>St. Louis State Hospital, Heroin Detoxification Unit. Consultant: Conducted staff interviews, systematically observed group process at staff meetings, issued report with recommendations to reduce staff dissension and ineffective ward procedures.

September 1974 - August 1975
>Jewish Hospital of St. Louis, Psychology Intern (APA approved internship): Individual and group psychotherapy in outpatient and inpatient psychiatric units, and a medical rehabilitation unit. Some experience in family therapy and behavior modification.

October 1974 - August 1975
>Narcotics Service Council (NASCO West), Consultant: Group psychotherapy with parents of adolescent drug abusers.

June 1968 - August 1972
>Massachusetts General Hospital, Child Development Laboratory, Psychological Technician for C. Keith Conners, Ph.D.: Psychological testing of hyperkinetic children with learning disabilities; assisted in research on analysis of reading dysfunctions and on pharmacological treatment of Attention Deficit Disorder with Hyperactivity (ADHD).

IV. **PROFESSIONAL LICENSES AND CERTIFICATES**

National Register of Health Service Providers in Psychology, Washington, D.C., 1983 - Present, Registrant # 31244

State of Washington Division of Professional Licensing (Psychology), 1979 - Present. License # 636.

Certificate of Training, Missouri State Alcoholism Training and Information Program; Missouri Department of Mental Health and Washington University Social Science Institute, 1976.

V. **PROFESSIONAL ORGANIZATIONS**

American Psychological Association
>Division of Health Psychology
>Division of Neuropsychology
>Division of Law and Psychology

Washington State Psychological Association

## VI.   RESEARCH PUBLICATIONS

Klein, R.M. and Charlton, J.E.: Behavioral observation and analysis of pain behavior in severely burned patients. PAIN 9:27-40, 1980.

Klein, R.M. and Fowler, R.S.: The use of a minicalculator timer as a pressure relief training device. Archives of Physical Medicine and Rehabilitation, 62:500-501, 1981.

Klein, R.M.: Adaptive behaviors in severely burned patients undergoing debridement procedures. Western Psychological Association, Annual Proceedings, 1980 (abstract).

Klein, R.M. and Charlton, J.E.: Analysis of pain behavior in severely burned patients. American Burn Association, Twelfth Annual Proceedings, 1980 (abstracts).

Klein, R.M. and Bell, B.: Self-care skills: Behavioral measurement with the Klein-Bell ADL scale. Archives of Physical Medicine and Rehabilitation, 63:335-338, 1982.

Klein, R.M.: Behavior and chronic pain. In Manual of Physical Medicine and Rehabilitation, Gary A. Okamoto, Editor. W.B. Saunders Co., Philadelphia, 1984.

King, N.J. and Klein, R.M.: Developing cooperative patient behavior in the dental setting. Journal of the Canadian Dental Association, 2:151-154, 1985.

King, N.J. and Klein, R.M.: Sexual counseling with spinal cord injured persons. Australian Family Physician, 14:47-51, 1985.

Thomas, S.A.; Remenyi, A.G.; Leonard, R.; King, N.J.; and Klein, R.M.: Psychological services in rehabilitation. Australian Psychologist, 20:43-50, 1986.

## VII.   RESEARCH AND CLINICAL PRESENTATIONS

Schuham, A.; Steinglass, P.; Klein, R.M.; Wolin, S.; and Guerin, P.: The alcoholic family; new research findings and their clinical implications. Annual meeting of the American Orthopsychiatric Association, New York, April, 1979.

Charlton, J.E.; Burns, M.; Heimbach, D.M.; Chapman, C.R.; Klein, R.M.; and Freund, P.: Factors affecting pain complaints in patients with burns. Annual meeting of the American Pain Society, San Diego, September, 1979.

Klein, R.M. and Charlton, J.E.: The use of behavioral observation to analyze pain behavior in burn patients. Annual meeting of the American Pain Society, San Diego, September, 1979.

4

Klein, R.M. and Charlton, J.E.: Analysis of pain behavior in severely burned patients. Annual meeting of the American Burn Association, San Antonio, March, 1980.

Klein, R.M.: Adaptive behaviors in severely burned patients. Annual meeting of the Western Psychological Association, Honolulu, May, 1980.

Klein, R.M. and Bell, B.: Research application for Occupational Therapy: An update of the Klein-Bell ADL Scale. Annual meeting of the Washington State Occupational Therapy Association, Seattle, October, 1980.

Bell, B. and Klein, R.M.: Objective measurement of activities of daily living. The Klein-Bell ADL Scale. Annual meeting of the American Occupational Therapy Association, San Antonio, March, 1981.

Klein, R.M.: Staff reactions to behaviors of burn patients. Annual meeting of the American Psychological Association, Los Angeles, August, 1981.

Charlton, J.E.; Klein, R.M.; Gagliardi, G.; Barsa, J.; and Heimbach, D.M.: Assessment of pain and pain relief in patients with burns. Third World Congress on Pain of the International Association for the Study of Pain, Edinburgh, Scotland, September, 1981.

Klein, R.M.; Johnson, C.; and Sandel, E.: Controlling pain during exercise. Annual meeting of the American Burn Association, Boston, May, 1982.

Klein, R.M.: Anoxic encephalopathy in burn patients due to smoke inhalation. Annual meeting of the American Psychological Association, Washington, D.C., August, 1982.

Klein, R.M.; Clode, J.; and Hammond, S.: Psychology and Medicine: Role of the psychologist in a general medicine setting. Semi-annual meeting of the Washington State Psychological Association, Pasco, May, 1983.

Klein, R.M.: Health-enhancing variables in the treatment of severe burn injuries. Washington State Psychological Associations, Chapter I meeting, Spokane, May, 1983.

Klein, R.M.: Chronic pain management. Conjoint Conferences: Sacred Heart Medical Center, University of Washington Medical Education Committee and Pfizer Laboratories, Spokane, April 1984, February, 1987, April 1989.

Boltwood, M.; Klein, R.M.; and Marvin, J.: A computerized psychosocial data base: Clinical and research applications. Annual meeting of the American Burn Associations, San Francisco, April, 1984.

Klein, R.M.: Psychology in the general hospital: Translating from the laboratory to the bedside. Psychology Day, Eastern Washington University, Department of Psychology, Cheney, May, 1984.

Klein, R.M.: Communicating code status to patients and families. Conjoint conference: Sacred Heart Medical Center, Spokane, May, 1984.

Klein, R.M.: Issues facing the brain injured. Governor's Committee on Employment of the Handicapped, and State of Washington Division of Vocational Rehabilitation, Spokane, June, 1984.

Klein, R.M.; Weisbrod, K.; and Young, J.: Assessing a patient's decisional capacity. Part of a workshop entitled Challenging Choices: Continuing care and difficult decisions. Sacred Heart Medical Center, Spokane, May 1985.

Klein, R.M.: Psychological issues in heart transplantation. Sacred Heart Medical Center, Spokane, January, 1986.

Klein, R.M.: Resolving group conflict: A nursing management forum. Sacred Heart Medical Center, Spokane, March, 1986.

Klein, R.M.: Cognitive retraining: Who? What? When? Where? Why? Current perspectives in Cognitive Rehabilitation. Sacred Heart Medical Center, Spokane, April, 1986.

Klein, R.M.: Health psychology: The new frontier. Annual Psychology Colloquium, Department of Psychology, Eastern Washington University, Cheney, May, 1986.

Klein, R.M.: Why do they behave that way? Ethical Series on the treatment of neurologically impaired patients. Sacred Heart Medical Center, May, 1986.

Klein, R.M.: Complicating factors in the rehabilitation of the injured worker. International Rehabilitation Associates, Spokane, June, 1986.

Klein, R.M.: Cognitive-emotional factors to consider in treating the neurologically compromised patient. Eastern Washington University, Department of Physical Therapy, Spokane, October 1986. Repeated annually.

Klein, R.M.: Cognitive Retraining - Bridging the gap. Washington State Speech and Hearing Association, Annual Meeting, Spokane, October, 1986.

Klein, R.M.: Enhancing Physical Therapy with chronic pain patients using behavioral techniques. Eastern Washington University, Department of Physical Therapy, Spokane, February, 1986. Repeated annually till 1994.

6

Klein, R.M.: Understanding the chronic pain claim. Spokane Association of Insurance Adjusters. Coeur d'Alene, October, 1987.

Klein, R.M.: Rehabilitation of the chronic pain patient. Annual meeting of the Idaho State Industrial Commission, Boise, November, 1987.

Klein, R.M.: Treatment of chronic pain in a family medicine context. Family Medicine Resident Training Program, Spokane, January, 1988.

Klein, R.M.: Stress Management - self-modification. Home Economics Association, District 81 School District, Spokane, February, 1988.

Klein, R.M.: Responding to the chronic pain claim. Washington State Department of Labor & Industries, Claims Division, Olympia, June, 1989.

Klein, R.M.: Depression as a secondary disability. National Rehabilitation Association, Eastern Washington Chapter, Spokane, July, 1989.

Klein, R.M. and Mays, P.D.: Current techniques in pain management. KREM-2 (CBS affiliate), Live call-in TV, Spokane, September, 1989.

Klein, R.M.: When pain is the problem, what is the answer? Idaho State Industrial Commission, Regional Meeting, Post Falls, September, 1989.

Klein, R.M.: Neuropsychological Testing. Medical Rehabilitation Consultants, Spokane, November, 1989.

Klein, R.M.: Psychological issues in heart transplantation. Inland Northwest Thoracic Organ Transplantation Program, Introductory Seminar, Spokane, January, 1990.

Klein, R.M.: What is a Pain Clinic? Washington Self-Insured Association, annual meeting, Spokane, February, 1990.

Klein, R.M.: Chronic pain management. Conjoint Conferences: Sacred Heart Medical Center, Spokane, April, 1990.

Klein, R.M.; Taylor, L.; and Maloney, T.: Comprehensive treatment of the trauma patient. Sacred Heart Medical Center Department of Physical Medicine and Rehabilitation Grand Rounds, Spokane, September, 1990.

Klein, R.M.: Teamwork in Health Care. Sacred Heart Medical Center Excellence in Service seminars, Spokane, January, 1991.

Klein, R.M.: Key issues in traumatic brain injury. Spokane County Bar Association, Spokane, February, 1991.

7

Klein, R.M.: Role of psychology in the medical center: making behavioral medicine work. Community Mental Health Center Proseminar Series, Spokane, February, 1991.

Klein, R.M.: Coping with stress: case in point - the Persian Gulf war. Spokane County Council on Aging, March, 1991.

Klein, R.M.: Multidisciplinary factors in the management of the chronic pain patient. Intercollegiate Center for Nursing Education, Spokane, March, 1991.

Klein, R.M.: Update on Inland Northwest Thoracic Organ Transplant Program. KZZU Radio Interview, Spokane, March, 1991.

Klein, R.M.: Hiring Team Players. Sacred Heart Medical Center. Excellence In Service seminars, July, 1991.

Klein, R.M.: Transference/Countertransference. Neurological Intensive Care Unit Nursing Staff, Sacred Heart Medical Center, October, 1991.

Klein, R.M.: Holiday Stress. Spokane Chapter of the American Heart Association, December, 1991.

Klein, R.M.: Approaching the Chronic Pain Patient. Spokane Orthopedic Study Group, February, 1992.

Klein, R.M.: Coping with manipulative drug seeking patients. Surgical Unit Nursing Staff and Social Service Staff, Sacred Heart Medical Center, March, 1992.

Klein, R.M.: Effect of Chronic Disease on Children. Holy Family Hospital, Well Spouse Group, Spokane, March, 1992.

Calhoun, R.; Watkins, P.L.; Serwat, M.; and Klein, R.M.: Hostility among chronic pain patients: Impediment to success in a rehabilitation program. Society of Behavioral Medicine, Annual Meeting, New York, March, 1992

Klein, R.M.; Dang, J.; Tyrie, M.; and Wood, V.: Adjustment after spinal cord injury. Sacred Heart Department of Physical Medicine and Rehabilitation, Grand Rounds, Spokane, April, 1992.

Klein, R.M.; and Blakely, J.: The role of functional neuropsychological assessment in the care of the elderly. Sacred Heart Medical Center, Department of Psychiatry, Grand Rounds, Spokane, May, 1992.

Klein, R.M.: Interviewing the physically disabled job applicant: Impact of the Americans With Disabilities Act. Sacred Heart Medical Center, Spokane, May, 1992.

8

Klein, R.M.:  Marketing and maintaining hospital-based psychological services:  Customer satisfaction and a smile.  Washington State Psychological  Association, Seattle, October, 1992.

Klein, R.M.:  Psychological pitfalls in rehabilitating the injured worker.  Washington State Self-Insured Association, Spokane, November, 1992.

Klein, R.M.:  Stress Management Skills for chronic care nurses.  Association of Nephrology Nursing, Spokane, March, 1993.

Klein, R.M.:  Effect of organ transplantation on the families of recipients.  Transplant Recipients Support Group, Spokane, March, 1993.

Klein, R.M.:  Interviewing disabled job applicants:  Preserving dignity and meeting the challenges of the Americans With Disabilities Act.  Rockwood Clinic, Spokane, March 1993.

Klein, R.M.:  Managing chronic pain in family practice medicine.  Family Practice Residency Training Program, (University of Washington affiliated) Spokane, April, 1993.

Klein, R.M.:  The ultimate act of giving:  Psychological aspects of organ transplantation.  Washington State Psychological Association, Chapter 1, Spokane, May, 1993.

Klein, R.M.:  Handling the angry patient.  Sacred Heart Medical Center, Kidney Center, August, 1993.

Klein, R.M.; Joseph S.; and Hester, P.:  Lung Transplantation and quality of life.  Sacred Heart Rehabilitation Center, Grand Rounds, September, 1993.

Klein, R.M.:  Behavior Medicine:  Psychology's Frontier.  Gonzaga University Counseling Program, Spokane, October, 1993.

Klein, R.M.:  Format and structure of brain injury rehabilitation programs.  Medical Rehab Consultants, Spokane, October, 1993.

Klein, R.M.:  Psychology goes to the hospital:  Behavior Medicine in today's health care climate.  Spokane Community Mental Health Center, Psychology Internship Training Program, October, 1993.

Klein, R.M. and Kerr, R.:  Treatment of Unsuccessful Suicide Patients in the Emergency Room.  Sacred Heart Medical Center Ethics Conference.  Spokane, December, 1993.

Klein, R.M.:  Managing explosive families in the Intensive Care Unit.  Sacred Heart Medical Center, Spokane, February, 1994.

Klein, R.M.: Self-Care for Oncology Nursing: Taking care of us so we can take care of them. Rockwood Clinic, Spokane, February, 1994.

Watkins, P.L., White, M. and Klein, R.M.: Quality of Life after Lung Transplantation. Presented at Society of Behavioral Medicine annual meeting (poster session), Boston, April, 1994.

Klein, R.M.: Effect of health care reform on daily nursing practice: New applications for stress management. Rockwood Clinic, Spokane, April, 1994.

Klein, R.M.: A Matter of Life and Death: Multiple Roles of Psychologists in Organ Transplant Programs. Invited Address to Washington State Psychological Association, annual meeting, Spokane, April, 1994.

Klein, R.M.: Behavioral Medicine as a career path. Washington State University Department of Psychology, Pullman, April, 1994.

Klein, R.M.: Effective counseling techniques with organ transplant recipients and their families. Pacific Northwest Kidney Center Social Work Association. Spokane, May 1994.

Klein, R.M.: Body image and psychological complications in organ transplant patients. Regional meeting, UNOS (United Network for Organ Sharing), Coeur d'Alene Resort, Coeur d'Alene, ID, June, 1994.

Klein, R.M.: "The Bad Guys: PTSD, Antisocial Personality Disorder, and Malingering." Washington Self-Insured Association, Spokane, June, 1994.

Klein, R.M.: Psychological aspects of trauma. Seminar for ICU/Trauma Care Nurses (Mike Day, RN Coordinator), Sacred Heart Medical Center, Spokane, December, 1994.

Klein, R.M.: The Effect of Health Care Reform on the Practice of Clinical Psychology. Invited address, Washington State University Department of Psychology Colloquium, Pullman, April 1995.

Klein, R.M.: PTSD, Antisocial personality disorder, and malingering. Lorman Education Seminars of Wisconsin, Ridpath Hotel, Spokane, June 1995.

Klein, R.M.: Intrastaff conflict, Northpointe Dialysis Center, Spokane, June 1995.

Klein, R.M.: Psychological management of pain in the Post Anesthesia Care Unit, Cavanaugh's Inn at the Park, Spokane, October 1995.

Klein, R.M.: Pleasing the customer Proseminar, Psychology Internship Training Program, Spokane Mental Health Center, February, 1996

Klein, R.M.: (Repeat of) PTSD, Antisocial personality disorder, and malingering. Lorman Education Seminars of Wisconsin, Ridpath Hotel, Spokane, June, 1996.

Klein, R.M.: Assessment of the geriatric patient. Visiting Nurse Association, Sacred Heart Medical Center, Spokane, November, 1996.

Klein, R.M.: (Repeat of) Psychological aspects of trauma. Seminar for ICU/Trauma Care Nurses (Mike Day, RN Coordinator), Sacred Heart Medical Center, Spokane, December, 1996.

Klein, R.M.: Stress management for the air ambulance health care professional. NorthWest Medstar, Sacred Heart Medical Center, Spokane, February, 1997. (repeated April 1997).

Klein, R.M.: Grief counseling, Rockwood Clinic Laboratories, Spokane, March, 1997.

Klein, R.M.: Depression post transplantation, Northwest Speakers Bureau on Organ & Tissue Transplantation, Sacred Heart Medical Center, Spokane, March, 1997.

Mays, M. and Klein, R.M.: Understanding personality disorders. Spokane County Bar Association, Spokane, October, 1997.

Klein, R.M.: Consultation re psychological aspects of medical/surgical patients. Proseminar, Psychology Internship Training Program, Spokane Mental Health Center, November, 1997.

Klein, R.M.: Pain management in primary care. Family Medicine Spokane, Residency Program, Spokane, February 1998.

Klein, R.M.: Moral Challenges of Alzheimer's Disease, Panelist at Spokane Chapter Alzheimer's Association Conference, Providence Auditorium, Spokane, March 1998.

Klein, R.M.: New techniques for coping with chronic illness. American Nephrology Nurses Association, Inland Northwest Chapter, Intercollegiate Center for Nursing Education, Spokane, April 1998.

Klein, R.M.: Chronic pain management. University of Washington Physician's Assistant Training Program (Medex), Spokane, June, 1998. (Repeated June 1999, June, 2000, May 2001)

Klein, R.M.: Maximizing the value of a neuropsychological exam. Washington State Trial Lawyers Association, Legal Education Seminars, Seattle, May, 1999.

11

Klein, R.M.: Neuropsychological assessment. University of Washington Medical School, Dept. of Psychiatry Residency Program, Spokane Rotation, December, 1999.

Klein, R.M. and Mays, M.: How to approach personality disordered clients. Spokane County Bar Association, Spokane, February, 2000.

Klein, R.M.: Psychological Evaluations and Post Traumatic Treatment of Industrial Injuries. Western Association of Workers Compensation Boards and Commissions, Coeur d'Alene, ID, July 2000.

Klein, R.M. and Mays, M.: Practical considerations with personality disordered clients. Spokane County Bar Association, Spokane, December, 2000.

Klein, R.M.: Providing Feedback on MMPI-2 to Patients. Psychology Internship Training Program, Spokane Mental Health Center, March, 2001.

Klein, R.M.: Barriers To Healing: Bringing Tough Work Comp Cases To Closure. Lorman Education Seminars of Wisconsin, Doubletree Hotel, Spokane Valley, June 2001.

Klein, R.M.: The Transplant Patient in Developmental Crisis. United Network for Organ Sharing, Region VI Multidisciplinary Forum, West Coast River Inn, Spokane, April 2002

Klein, R.M.: Law and Psychology: Dynamic Tensions. Washington State Trial Lawyers Association, Spokane Chapter, Inn at the Park, Spokane, September 2006.

Klein, R.M.: Consultation in Multidisciplinary Settings. Eastern Washington University, Dept. of Psychology, Spokane, October 2006. (Repeated October 2007)

Klein, R.M.: Key Issues in Psychotherapy. University of Washington, Dept. of Psychiatry and Behavioral Sciences, Residency Seminar, Spokane, November 2006. (Repeated January 2007).

Klein, R.M.: Client Counseling Competition, Judge. Gonzaga University School of Law, Spokane, November 2006.

Klein, R.M.: Looking Sharp: Psychology Communicates With the Legal System. Washington State Psychological Association, Chapter 1, Spokane, March 2007.

Klein, R.M.: Responding to Psychological Crises: In Your Patients and In Yourselves. Eastern Washington University Department of Physical Therapy, Spokane, April 2007.

Klein, R.M.: Surviving Depositions. Washington State Psychological Association, Chapter 1, Spokane, September 2007.

Klein, R.M.: Consultation in Multidisciplinary Settings. (repeat) Eastern Washington University, Dept. of Psychology, Spokane, October 2007.

Klein, R.M.: Current Update on Neuropsychology. Washington Defense Trial Lawyers Association and Idaho Association of Defense Counsel, Coeur d'Alene, November 2007.

Klein, R.M.: The Bad Guys: Post Traumatic Stress Disorder, Antisocial Personality Disorder, and Malingering. Lorman Business Seminars, Coeur d'Alene, October 2008

Klein, R.M.: Skills Needed by Chronic Dystonia Patients. Washington State Dystonia Association, Eastern Washington Chapter, Spokane, March 2009.

Klein, R.M.: Required Skill Sets to Succeed as a Chronic Disease Patient. Parkinson's Disease Resource Center, Pacific Northwest Region, Spokane, June 2009.

Klein, R.M.: Preparing Your Mental Health Treating Expert for Trial. Idaho Trial Lawyers Association, Coeur d'Alene, September 2009

Klein, R.M.: Managing Stress in the Real Life World of Legal Practice. Spokane County Bar Association, Ethics CLE presentation, December 2011.

Klein, R.M.: Law Student Path To Stress Management. Gonzaga University Law School, Student Bar Association, Spokane, March 2012.

Klein, R.M.: Role of Experts in Litigation. University of Idaho Law School, Trial Advocacy course, Moscow, ID, October 2012.

GUY BOGDANOVICH*
DON G. DANIEL
JOHN E. JUSTICE*
W. DALE KAMERRER
DONALD L. LAW
ELIZABETH A. MCINTYRE*
JEFFREY S. MYERS
JULIE L. KAMERRER

JOCELYN LYMAN, *of counsel*
*Admitted in WA & OR*

### *LAW, LYMAN, DANIEL,*
### *KAMERRER & BOGDANOVICH, P.S.*

*ATTORNEYS AT LAW*

*(360) 754-3480   FAX (360) 357-3511*

*Mailing Address:*
*P.O. BOX 11880*
*OLYMPIA, WA 98508*

*Street Address:*
*2674 RW JOHNSON BLVD SW*
*TUMWATER, WA 98512*

November 7, 2012

**Via Electronic and U.S. Mail**

Daniel Davies
Davis Wright Tremaine LLP
1201 Third Avenue, Ste. 2200
Seattle, WA 98101-3045

Kathleen Zellner
Douglas Johnson
Esplanade IV
1901 Butterfield Road, Ste 650
Downers Grove, IL 60515

> **Re:   *Spencer, et al. v. Peters, et al.***
> **USDC WD TAC 11-5424 BHS**

Dear Counsel:

    Enclosed is Defendant Sharon Krause's Disclosure of Rebuttal Expert Witness Testimony, a copy of which was also electronically mailed to you today.  Please note that we are requesting an examination of Clyde Ray Spencer by Dr. Klein.  The examination, including provision of an MMPI, would last approximately six and one-half hours.  Dr. Klein is currently available to conduct the exam and testing on Tuesday, November 20th at 9 a.m. or on Wednesday, November 28th at 9 a.m.  It would be held at Dr. Klein's office in Spokane.  Please let us know as soon as possible whether either of these dates will work, or whether you have any questions.

Yours,

LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.

Guy Bogdanovich

GB:al
Enclosure
cc/enc:    Jeff Freimund
       Patricia Fetterly / Daniel Judge

**EXHIBIT D**



KATHLEEN T. ZELLNER & ASSOCIATES, P.C.
ATTORNEYS AT LAW
Esplanade IV
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515

KATHLEEN T. ZELLNER
DOUGLAS H. JOHNSON
NICHOLAS M. CURRAN
FRANK A. RICHTER

SCOTT T. PANEK
OFFICE MANAGER

Telephone: (630) 955-1212
Facsimile: (630) 955-1111
kathleen.zellner@gmail.com

November 8, 2012

**Sent via email**

Mr. Guy Bogdanovich
Law, Lyman, Daniel,
Kamerrer & Bogdanovich, P.S.
P.O. Box 11880
Olympia, Washington 98508

      Re:    *Spencer v. Peters et al.*

Dear Counsel,

      I am in receipt of your request for an examination of my client. First, neither Mr. Spencer nor I am available on the dates you suggested. Furthermore, we do not agree to your proposed examination of Mr. Spencer and administration of the MMPI, as you have failed to show good cause for why Mr. Spencer should be subjected to such an examination. As you are aware, Mr. Spencer has been subjected to extensive psychological testing in connection with his hearings before the Indeterminate Sentence Review Board. As recently as 2001 Mr. Spencer was administered a battery of psychological tests, including the MMPI-2, WAIS-III, the Personality Assessment Inventory and the Interpersonal Behavior Survey, among others. The Attorney General would have been provided copies of this report, which is included in our document production to you. Thus, I will not permit you to subject Mr. Spencer to additional testing absent a court order.

                                        Sincerely,

                                        Kathleen T. Zellner

cc:    Counsel of record