# Investigation and Prosecution of Child Abuse

American Prosecutors Research Institute
National Center for Prosecution of Child Abuse

1033 N. Fairfax Street, Suite 200
Alexandria, Virginia 22314
(703) 739-0321

EXHIBIT ___4___

24

© 1987 by the American Prosecutors Research Institute. Second printing 1989

American Prosecutors Research Institute, 1033 N. Fairfax Street, Suite 200, Alexandria, Virginia 22314. All rights reserved. No part of this document may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying or recording by any information storage and retrieval system, without permission in writing from the publisher.

Printed in the United States of America

The National Center for Prosecution of Child Abuse is a program of the American Prosecutors Research Institute, a nonprofit research and technical assistance affiliate of the National District Attorneys Association. This document was prepared under Cooperative Agreement Number 86-JN-CX-K001 from the Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice. Points of view or opinions in this document are those of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice.

Edited by
Patricia A. Toth, J.D.

and

Michael P. Whalen, J.D.

*Authors*

Lucy Berliner, M.S.W.
Harborview Medical Center
Seattle, Washington

Nancy Borko
Assistant District Attorney
Bronx, New York

Charles W. Campbell, Jr.
Deputy District Attorney
Ventura, California

Robert E. Cramer, Jr.
District Attorney
Huntsville, Alabama

Ross Eatman, J.D.
Philadelphia, Pennsylvania

Harry M. Elias
Deputy District Attorney
San Diego, California

Bruce Gardner
Assistant District Attorney
Huntsville, Alabama

Anne Hyland
Assistant County Attorney
St. Paul, Minnesota

Karen Kimbrell
Assistant District Attorney
Huntsville, Alabama

Rebecca Roe
Senior Deputy Prosecuting Attorney
Seattle, Washington

Karen Steinhauser
Chief Deputy District Attorney
Denver, Colorado

Patricia A. Toth
Center Director
Alexandria, Virginia

Susan Tuggle
Assistant District Attorney
Huntsville, Alabama

Beth Wanger
Center Staff Attorney
Alexandria, Virginia

Michael P. Whalen
Center Senior Attorney
Alexandria, Virginia

Associate Editor: Janet L. Dinsmore

# *American Prosecutors Research Institute*

Honorable Fred L. Foreman
Chairman
Waukegan, Illinois

Jack E. Yelverton
President, ex officio
Alexandria, Virginia

James C. Shine
Executive Vice President, ex officio
Alexandria, Virginia

Board of Directors

Honorable Thomas J. Charron
Marietta, Georgia

Honorable Norman K. Maleng
Seattle, Washington

Honorable Richard M. Daley
Chicago, Illinois

Honorable Edwin L. Miller, Jr.
San Diego, California

Honorable Arthur C. Eads
Belton, Texas

Joseph A. Morris, Esq.
Chicago, Illinois

Honorable Newman Flanagan
Boston, Massachusetts

Donald T. Santarelli, Esq.
Washington, D.C.

Honorable Stephen Goldsmith
Indianapolis, Indiana

Mr. E. Pete Adams, ex officio
Baton Rouge, Louisiana

Mr. Robert W. Johnson, Sr., Esq.
Anoka, Minnesota

Dean John Jay Douglass, ex officio
Houston, Texas

Honorable Thomas L. Johnson
Minneapolis, Minnesota

Honorable Lynn C. Slaby, ex officio
Akron, Ohio

# *National Center for Prosecution of Child Abuse Staff Members*

Monica J. Benton
Senior Attorney

Gail Cooper
Secretary

Cabell C. Cropper
Management and Administration Director
APRI

Janet L. Dinsmore
Communications Director

D. Jean Holt
Research Associate

Elizabeth T. Hinton
Data Base Manager

James M. Peters
Senior Attorney

Joy C. Repella
Staff Attorney

Kathleen K. Scutt
Administrative Assistant

James C. Shine
Executive Vice President
APRI

Patricia A. Toth
Director

Beth R. Wanger
Staff Attorney

28

29

CONTENTS

# Contents

Page

*Acknowledgments*.................................................................xiii

*Preface*.................................................................................xv

*Introduction* ......................................................................xvii

*Editor's Note*.....................................................................xix

CHAPTER I: *The Victim*

A. **OVERVIEW OF VICTIMS AND VICTIMIZATION** ................ I-1
   1. **Victims** ............................................................................ I-1
      *a. CHARACTERISTICS AND IMPACTS OF VICTIMIZATION* ........ I-1
      *b. THE NEED FOR SENSITIVITY* ............................................. I-2
         *(1) General Principles* ........................................................ I-2
         *(2) Ethnic and Cultural Diversity* ....................................... I-2
   2. **Offenders** ......................................................................... I-3

B. **VULNERABILITY OF CHILDREN** ........................................ I-4
   1. **Children are Easily Influenced by Adults** ......................... I-4
   2. **Children are Naturally Trusting and Curious** ................... I-4
   3. **Attention and Affection Fulfillment** .................................. I-4
   4. **Adolescent Defiance and Peer Pressure** ............................ I-4
   5. **Children with Disabilities** ............................................... I-5

C. **INDICATORS OF ABUSE** ..................................................... I-5
   1. **Indicators of Sexual Abuse** .............................................. I-5
      *a. AGE-INAPPROPRIATE KNOWLEDGE OF SEXUAL BEHAVIOR* ... I-6
      *b. PERSISTENT INAPPROPRIATE SEXUAL PLAY AND AGGRESSIVE*
      *SEXUAL BEHAVIOR* ............................................................ I-6
      *c. BECOMING MANIPULATIVE OR OVERLY SEDUCTIVE OR SEXUAL* I-6
   2. **Indicators of Physical Abuse** ........................................... I-6
      *a. SOFT TISSUE INJURIES* ..................................................... I-6
      *b. INTERNAL INJURIES* ......................................................... I-7
      *c. HEAD INJURIES* ............................................................... I-7
      *d. BROKEN BONES/SKELETAL INJURIES* ................................ I-7
      *e. BURNS* ............................................................................ I-8
      *f. CARETAKER'S ACTIONS OR EXPLANATIONS* ..................... I-8
   3. **Behavioral Indicators Common to Both Sexual and Physical Child Abuse Victims** .... I-8
      *a. SUBMISSIVENESS* ............................................................ I-8
      *b. AGGRESSIVE ACTING OUT/INCORRIGIBILITY* ................... I-9
      *c. SCHOOL-RELATED BEHAVIOR* ......................................... I-9
      *d. UNWARRANTED FEARS AND SELF-DESTRUCTIVENESS* ........ I-9
      *e. SLEEP DISTURBANCES AND REGRESSIVE BEHAVIOR* ......... I-9
      *f. SEVERE DEPRESSION, SUICIDAL FEELINGS* ..................... I-9
      *g. SUDDEN CHANGES IN APPETITE, MOODS OR GROOMING HABITS* ... I-10

D. **CHILD DEVELOPMENT FACTORS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-10
   1. Infants and Toddlers/Pre-Verbal Stage . . . . . . . . . . . . . . . . . . . . . . . . . . I-10
   2. Preschoolers (3–5 Years of Age) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-10
   3. First through Fifth Graders (6–10 Years of Age) . . . . . . . . . . . . . . . . . . I-11
   4. Puberty/Fifth through Seventh Graders (10–13 Years of Age) . . . . . . . . . I-11
   5. Adolescents/Eighth through Twelfth Graders (13–17 Years of Age) . . . . . . . I-12

E. **REPORTING ABUSE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-12
   1. Reliability of Abuse Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-12
   2. Children's Memory and Suggestibility . . . . . . . . . . . . . . . . . . . . . . . . . . I-13
   3. Delayed Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-14
   4. Recanting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-14
   5. Expectations of Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-14

F. **SPECIAL CHALLENGES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-14
   1. Perceptions of the Criminal Justice System . . . . . . . . . . . . . . . . . . . . . . I-14
   2. Personal Demands on Prosecutors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-15
      a. *TIME* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-15
      b. *EMOTIONAL DRAIN* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-15
      c. *RISING NUMBERS AND PUBLIC EXPECTATIONS* . . . . . . . . . . . . . . I-16

*Reference List* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I-17

CHAPTER II: *Investigation*

A. **INTERVIEWING THE CHILD VICTIM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-2
   1. Preparing for the Interview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-3
   2. Interview Location and Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . II-3
   3. Who Should Be Present at the Interview . . . . . . . . . . . . . . . . . . . . . . . . . II-5
   4. Recording Information From the Interview . . . . . . . . . . . . . . . . . . . . . . . II-6
   5. Conducting the Interview: General Principles and Building Rapport . . . . . . II-7
   6. Eliciting Facts About the Abuse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-8
      a. *FINDING OUT WHAT HAPPENED* . . . . . . . . . . . . . . . . . . . . . . . . . II-10
        *(1) Sample Questions in Sexual Abuse Allegations* . . . . . . . . . . . . . . II-10
        *(2) Physical Abuse Allegations/Sample Questions* . . . . . . . . . . . . . . . II-11
        *(3) Child's Fears/Reasons for Secrecy* . . . . . . . . . . . . . . . . . . . . . . . II-12
      b. *FINDING OUT WHO WAS INVOLVED* . . . . . . . . . . . . . . . . . . . . . . . II-13
      c. *FINDING OUT WHEN AND HOW OFTEN IT HAPPENED* . . . . . . . . . . II-13
      d. *FINDING OUT WHERE IT TOOK PLACE* . . . . . . . . . . . . . . . . . . . . . II-14
   7. Special Techniques . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-14
      a. *RELUCTANT OR RECANTING VICTIMS* . . . . . . . . . . . . . . . . . . . . . II-14
        *(1) Sensitivity to Child's Emotions* . . . . . . . . . . . . . . . . . . . . . . . . . II-14
        *(2) Special Strategies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-15
      b. *USE OF DOLLS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-16
      c. *USE OF DRAWINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-17
      d. *TEENAGERS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-18
   8. Ending the Interview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-19
   9. Assessing Validity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-20
      a. *ELIMINATION OF OTHER EXPLANATIONS* . . . . . . . . . . . . . . . . . . II-20
      b. *DETAIL* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-20
      c. *WORDS USED* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-21
      d. *CONSISTENCY AND VARIATION* . . . . . . . . . . . . . . . . . . . . . . . . . . II-21
      e. *CHILD'S MANNER AND EMOTIONAL RESPONSE* . . . . . . . . . . . . . II-22
      f. *CONTENT OF STATEMENT* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II-22
      g. *EXISTENCE OF POTENTIAL MOTIVE TO FABRICATE* . . . . . . . . . . II-23

**B. INTERVIEWING OTHER WITNESSES** ......................................... II-24
  **1. In General** ................................................................ II-24
    *a. BENEFITS OF EARLY INTERVIEWS BY INVESTIGATOR* ................ II-24
    *b. CONDUCT OF INTERVIEWS AND CONTENT OF REPORTS* ............... II-24
  **2. Interview of Complainant and Others to Whom Victim Made Statements** ........ II-25
  **3. Interview of Victim's Parents or Caretakers** ........................... II-26
  **4. Interview of Suspect's Spouse** ...................................... II-26
  **5. Interviewing Other Members of the Victim's Family** ................... II-27
  **6. Additional Witnesses** ............................................... II-28
    *a. OTHER CHILDREN ACCESSIBLE TO SUSPECT* ...................... II-28
    *b. OTHERS IN REGULAR CONTACT WITH VICTIM OR SUSPECT* ......... II-28

**C. INTERVIEW OF THE SUSPECT** ............................................ II-28
  **1. Who Should Conduct the Interview** ................................... II-29
  **2. When to Conduct the Interview** ..................................... II-29
  **3. Purpose and Benefits of the Interview** .............................. II-29
  **4. Beginning the Interview** ............................................ II-29
  **5. Verifying Information Given by the Victim** .......................... II-30
  **6. Common Reactions and Explanations of the Suspect** .................. II-30
    *a. DENIALS AND EXCUSES* ..................................... II-30
    *b. MINIMIZATION* ............................................ II-30
    *c. BLAMING THE VICTIM* ...................................... II-31
  **7. Deciding Whether to Arrest** ........................................ II-31

**D. PHYSICAL EVIDENCE AND SEARCH WARRANTS** ............................ II-31
  **1. Types of Physical Evidence** ........................................ II-32
    *a. FROM THE VICTIM* ......................................... II-32
    *b. FROM THE SUSPECT* ........................................ II-32
  **2. Use of Search Warrants** ............................................ II-32
    *a. WHAT TO DO* .............................................. II-33
    *b. WHAT TO LOOK FOR* ........................................ II-33

**E. MEDICAL EXAMINATIONS IN SEXUAL ABUSE CASES** ...................... II-34
  **1. Reasons for Medical Examination** ................................... II-34
  **2. Who Should do Medical Examinations** ................................ II-34
  **3. Development of Protocols** .......................................... II-35
  **4. Procedure and Components of the Examination** ....................... II-35
    *a. OBTAINING CONSENT* ....................................... II-35
    *b. EXAMINER'S APPROACH AND THE MEDICAL INTERVIEW* ........... II-36
    *c. EXAMINATION TECHNIQUES AND EVIDENCE COLLECTION* ......... II-37
      *(1) Evidence of Injury* ................................... II-37
        *(a) Vaginal Findings* ............................... II-38
        *(b) Anal Findings* .................................. II-38
        *(c) Use of the Colposcope* .......................... II-39
        *(d) Toluidine Blue Dye* ............................. II-39
      *(2) Sexually Transmitted Diseases* ......................... II-39
      *(3) Collection of Evidence When Recent Assault* ............. II-41
        *(a) Wood's Lamp* ................................... II-41
        *(b) Clothing* ...................................... II-42
        *(c) Fingernail Scrapings and Foreign Material Collection* ... II-42
        *(d) Bite Marks* .................................... II-42
        *(e) Hair Samples* .................................. II-43
        *(f) Collection of Samples to Detect Sexual Contact* .... II-43
          *(i) Presence of Sperm—Wet Mount and Permanent Smears* ...... II-43
          *(ii) Acid Phosphatase* ........................ II-44
          *(iii) P 30 (Semen Glycoprotein of Prostatic Origin)* ...... II-44

33

*(g) Genetic Markers in Bodily Fluids* ........................................ II-44
*(h) Additional Tests as Needed* ........................................ II-45
*(4) Evidence Collection Procedures and Use of "Rape Kits"* .................. II-45

F. ADDITIONAL INVESTIGATIVE TECHNIQUES ........................... II-46
   1. Forensic Analysis ........................................ II-46
   2. Polygraphs and PSEs ........................................ II-46
   3. Hypnosis ........................................ II-47

G. CASES INVOLVING MASS VICTIMIZATION ........................... II-47
   1. Investigation ........................................ II-47
   2. Interviewing Large Numbers of Children ........................ II-48
   3. Interviewing Employees of the School or Center ................. II-49
   4. Investigative Grand Jury ........................................ II-49
   5. Pre-Trial Case Management ........................................ II-50

H. CHILD HOMICIDE AND PHYSICAL ABUSE CASES ...................... II-50

I. INVESTIGATIVE CHECKLISTS ........................................ II-51

*Attachments:*
*Criminal Child Abuse Investigative Checklist* .......................... II-53
*Sample Form Used for Medical Examinations in Sexual Assault (Texas)* ....... II-67
*Sample Diagram* ........................................ II-71
*Definitions of Selected Medical Terms Relevant to Sexual Abuse* ........... II-73
*Bruise Characteristics* ........................................ II-75
*Reference List* ........................................ II-77


CHAPTER III: *Charging, Plea Negotiations and Disposition*

A. INTRODUCTION ........................................ III-1
   1. Establishment of Policies and Standards ......................... III-1
   2. Involvement of Victims, Their Families and Others ............... III-2

B. THE CHARGING DETERMINATION ........................... III-2
   1. Who Should Make Filing Decisions ................................ III-2
      *a. NEED FOR CONSULTATION* ................................ III-2
      *b. VERTICAL PROSECUTION* ................................ III-3
      *c. HANDLING SENSITIVE CASES* ............................. III-3
   2. Whether to File Criminal Charges ................................ III-3
      *a. SUSPECT'S FACTUAL GUILT* .............................. III-3
      *b. LEGAL SUFFICIENCY OF EVIDENCE* ....................... III-4
      *c. LIKELIHOOD OF CONVICTION* ............................ III-4
   3. What to Charge ........................................ III-4
      *a. APPROPRIATE CRIME* ................................ III-4
      *b. TIME PERIOD* ........................................ III-5
         *(1) Statutes of Limitation* ........................... III-5
         *(2) Specificity* ........................................ III-6
      *c. NUMBER OF COUNTS* ................................ III-6
         *(1) Multiple Victims* ................................ III-7
         *(2) Multiple Acts With a Single Victim* .................. III-7
   4. When to Charge ........................................ III-7
   5. Charging Method ........................................ III-8

C. DECLINING PROSECUTION ........................................ III-8

**D. PLEA NEGOTIATION** .................................................. III-9
  1. **Approach** ...................................................... III-9
    *a. BENEFITS OF EARLY GUILTY PLEAS* ...................... III-9
    *b. USE OF SENTENCE RECOMMENDATION AS NEGOTIATING TOOL* .......... III-10
  2. **Factors to Consider in Plea Negotiations** ................... III-10
    *a. ACCURATE REFLECTION OF SERIOUSNESS OF CRIME AND OFFENDER* ..... III-11
      *(1) Severity of the Crime* ............................. III-11
      *(2) Dangerousness of the Offender* ..................... III-11
    *b. VICTIM'S WISHES AND WELL-BEING* ..................... III-12
    *c. REASONS FOR ALTERING CHARGES* ...................... III-13

**E. SENTENCING** ....................................................... III-14
  1. **Components of Sentence Recommendations** ................... III-14
    *a. JAIL TIME/PRISON RECOMMENDATIONS* ................. III-14
    *b. THE TREATMENT ISSUE* ............................... III-15
      *(1) Content of Evaluations* ........................... III-15
        *(a) Accurate Description of the Offense* .......... III-15
        *(b) Description of the Defendant's History* ........ III-16
        *(c) Description of Tests Given and Their Results* .......... III-16
        *(d) Conclusions and Recommendations* .............. III-16
      *(2) Background of Treatment Provider* ................. III-16
    *c. OTHER CONDITIONS OF SENTENCE* .................... III-17
  2. **Involvement of Others in the Sentencing Process** ........... III-17
  3. **Countering Common Defense Arguments** ................... III-17
  4. **Release Pending Appeal** ................................... III-18

*Reference List* ....................................................... III-21

**CHAPTER IV:** *Pre-Trial Motions*

**A. INTRODUCTION** ................................................... IV-1

**B. DISCOVERY** ....................................................... IV-1
  1. **Protecting Privacy of Victims** .............................. IV-1
    *a. ADDRESSES AND TELEPHONE NUMBERS* ............... IV-1
    *b. ENLISTING POLICE COOPERATION* ..................... IV-2
    *c. PROSECUTORIAL PROCEDURES* ......................... IV-3
  2. **Defense Discovery Motions** ................................. IV-3
    *a. GENERAL CONSIDERATIONS* ........................... IV-3
    *b. PSYCHOLOGICAL/PSYCHIATRIC RECORDS* .............. IV-4
      *(1) Existence of Privileges* ........................... IV-4
      *(2) Defense Assertion of Confrontation Rights* .......... IV-4
      *(3) Requests for* In Camera *Review* ................. IV-4
      *(4) When to Disclose* ................................. IV-5
    *c. SCHOOL RECORDS* ................................... IV-5
    *d. JUVENILE RECORDS* ................................. IV-6
    *e. MOTIONS FOR PSYCHIATRIC/PSYCHOLOGICAL EXAMINATION*
      *OF THE VICTIM* ....................................... IV-6
  3. **Prosecution Discovery Motions** ............................. IV-7
    *a. MOTIONS FOR PHYSICAL EVIDENCE* ................... IV-7
    *b. ACQUISITION OF ARREST/BOOKING INFORMATION* .......... IV-7
    *c. MOTIONS FOR DISCLOSURE OF WITNESSES AND OTHER INFORMATION* ..... IV-8
    *d. MOTIONS TO DEPOSE DEFENSE WITNESSES* .............. IV-8

C. **ADDITIONAL DEFENSE PRE-TRIAL MOTIONS** .......................... IV-8
  1. Motions for Specificity, More Definite Statement of Charges, or Requests for a Bill
    of Particulars ...................................................................... IV-8
    a. DIFFICULTY OF SPECIFYING EXACT DATES ........................... IV-8
    b. ISSUES AND APPROACHES ............................................. IV-9
      (1) Continuous Course of Conduct ...................................... IV-9
      (2) Election of Act or Unanimity Instruction ............................ IV-9
      (3) Impact of Alibi Defense ............................................. IV-9
    c. PROSECUTOR'S APPROACH ............................................ IV-10
  2. Continuance Motions ............................................................. IV-10
    a. DISADVANTAGES OF CONTINUANCES ................................. IV-10
    b. OPPOSING AND AVOIDING CONTINUANCES ........................... IV-10
  3. Severance Motions ................................................................ IV-12
    a. MULTIPLE DEFENDANTS .............................................. IV-12
    b. MULTIPLE OFFENSES INVOLVING DIFFERENT VICTIMS ................. IV-12
    c. MULTIPLE OFFENSES INVOLVING SAME VICTIM ....................... IV-13

D. **MOTIONS REGARDING SIMILAR TRANSACTIONS** ...................... IV-14
  1. Prior Bad Acts Involving Same Victim ........................................... IV-14
    a. SEXUAL MISCONDUCT ................................................ IV-14
    b. PHYSICAL ABUSE .................................................... IV-15
  2. Prior Bad Acts Involving Different Victims ...................................... IV-15

E. **ADDITIONAL PROSECUTION PRE-TRIAL MOTIONS** ................... IV-15
  1. Motions *In Limine* .............................................................. IV-16
  2. Motions for Special Courtroom Configurations or Seating Arrangements ......... IV-16
    a. ADJUSTMENTS TO ACCOMMODATE CHILDREN ........................ IV-16
    b. PRO SE *DEFENDANTS* ............................................... IV-17
  3. Motions to Exclude Witnesses .................................................... IV-17
  4. Motions to Close Courtrooms ..................................................... IV-17
  5. Motions to Restrict Media Access or Seal Records ............................... IV-18
  6. Motions for Special Procedures or Aids .......................................... IV-19
  7. Motions Regarding Pre-Trial Release of Defendants .............................. IV-20
    a. CONSIDERATIONS .................................................... IV-20
    b. NO-CONTACT ORDERS ............................................... IV-20
      (1) Prohibiting Contact with Victim ..................................... IV-20
      (2) Prohibiting Contact with Other Children .............................. IV-21
    c. COMPLIANCE WITH THERAPY AS A CONDITION ....................... IV-21
    d. MOTIONS TO REVOKE PRE-TRIAL RELEASE ........................... IV-21

F. **CONCLUSION** ..................................................................... IV-21

Attachments:
  **Sample 1:** MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION TO COMPEL PSYCHOLOGICAL EVALUATION AND DISCLOSURE
OF PRIVATE RECORDS ............................................................. IV-25
  **Sample 2:** BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR
PSYCHOLOGICAL EVALUATION OF MINOR CHILD VICTIM ...................... IV-29
  **Sample 3:** MOTION, AFFIDAVIT AND ORDER DIRECTING THE TAKING
OF _____ SAMPLES .............................................................. IV-31
  **Sample 4:** STATE'S RESPONSE TO DEFENDANT'S MOTION TO ELECT ............ IV-33
  **Sample 5:** PEOPLE'S MEMORANDUM BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS AND SUPPRESS ............................................. IV-37
  **Sample 6:** MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION
TO EXCLUDE COLLATERAL CRIMES EVIDENCE .................................. IV-47
  **Sample 7:** PEOPLE'S OPPOSITION TO DEFENDANT'S MOTION FOR ADMISSION
OF VICTIM'S PRIOR HISTORY PURSUANT TO SECTION 18-3-407 .................. IV-51

36

*Sample 8:* MOTION TO ALLOW THE VICTIM TO BE EXAMINED WHILE SEATED
IN FRONT OF THE JURY BOX ............................................................. IV-55
*Sample 9:* MOTION TO RESTRICT COVERAGE BY ELECTRONIC MEDIA AND
STILL PHOTOGRAPHY ......................................................................... IV-57
*Sample 10:* MOTION TO CLEAR THE COURTROOM ........................... IV-59
*Sample 11:* MOTION FOR PROTECTIVE ORDER SEALING DISCOVERY ........... IV-61
*Sample 12:* MOTION TO ALLOW USE OF ANATOMICALLY CORRECT DOLLS
DURING THE VICTIM'S TESTIMONY ..................................................... IV-63
*Reference List* .................................................................................. IV-65

## CHAPTER V: *Trial*

**A. JURY SELECTION** ........................................................................ V-1
  **1. General Strategy** ...................................................................... V-1
  **2. Approach** ................................................................................. V-1
  **3. Procedure and Mechanics** ......................................................... V-3
    *a. INDIVIDUAL QUESTIONING BY COUNSEL* ........................ V-3
    *b. COURT-CONDUCTED VOIR DIRE* ........................................ V-4
    *c. JUROR QUESTIONNAIRES* ................................................... V-4
  **4. Juror Considerations in Child Abuse Cases** ............................... V-5
  **5. Nonverbal Communication** ....................................................... V-6
  **6. Subject Areas for Questioning** ................................................. V-6
    *a. JOBS* ................................................................................. V-6
    *b. RESIDENCE* ....................................................................... V-7
    *c. LEISURE TIME* ................................................................... V-7
    *d. RELATIONSHIPS WITH CHILDREN* ..................................... V-7
    *e. JURORS' ABILITY TO ASSESS THE CREDIBILITY OF WITNESSES* ........... V-8
    *f. THE MEDIA* ........................................................................ V-9
    *g. STEREOTYPES AND BIASES* ............................................... V-9
    *h. "EDUCATING" THE JURY* ................................................... V-9

**B. OPENING STATEMENT** ............................................................... V-11
  **1. Purpose and Importance of Opening** ........................................ V-11
  **2. Goals** ..................................................................................... V-11
  **3. Content and Organization** ....................................................... V-13

**C. STATE'S CASE** ........................................................................... V-14
  **1. Child Victim's Testimony** ........................................................ V-14
    *a. ORDER OF WITNESSES* ....................................................... V-14
    *b. PREPARATION FOR TESTIMONY* ......................................... V-15
      *(1) Courtroom Visit* ............................................................ V-15
      *(2) Preparation for Cross-Examination* ............................... V-15
    *c. IN THE COURTROOM FOR TRIAL* ...................................... V-16
    *d. COMPETENCY* .................................................................... V-17
      *(1) Necessity for Competency Hearings* ............................... V-17
      *(2) Conduct of Competency Hearings* ................................. V-20
        *(a) Timing* .................................................................... V-20
        *(b) Who Should Question the Child* ............................... V-21
        *(c) Type of Questions/Sample Questions* ........................ V-21
    *e. DIRECT EXAMINATION OF THE CHILD VICTIM* .................. V-22
    *f. CROSS-EXAMINATION OF THE CHILD VICTIM* .................... V-23
    *g. STRATEGIES WHEN THE CHILD FREEZES* ......................... V-24
  **2. Hearsay Evidence** ................................................................... V-24
    *a. NON-HEARSAY/VERBAL ACTS* .......................................... V-24
    *b. HUE AND CRY/OUTCRY/FRESH COMPLAINT* ..................... V-25

37

  *c. RES GESTAE/EXCITED UTTERANCE/SPONTANEOUS EXCLAMATION* ......... V-25
  *d. STATEMENT OF TREATING PHYSICIAN* .......................................... V-26
  *e. CHILD HEARSAY STATUTES AND RESIDUAL HEARSAY RULES* .............. V-26
 3. Medical Evidence in Sexual Abuse Cases ...................................... V-27
  *a. EVIDENCE PATHOGNOMONIC FOR SEXUAL ABUSE* ........................ V-27
   *(1) Acid Phosphatase/Sperm/Semen* ........................................ V-27
   *(2) Sexually Transmitted Diseases* .......................................... V-28
   *(3) Genital Injuries* ......................................................... V-29
  *b. MEDICAL EVIDENCE THAT IS NON-SPECIFIC TO SEXUAL ASSAULT* ........ V-30
   *(1) Redness* ................................................................ V-30
   *(2) Dilated Hymenal Opening* ............................................... V-30
   *(3) Encopresis* ............................................................. V-30
   *(4) Anal Fissures* .......................................................... V-30
  *c. LACK OF MEDICAL FINDINGS IN SEXUAL ABUSE CASES* .................. V-30
  *d. SAMPLE QUESTIONS* ...................................................... V-31
 4. Scientific Evidence in Sexual Abuse Cases ................................... V-33
  *a. SEMINAL FLUID TYPING* .................................................. V-33
  *b. HAIR EVIDENCE* .......................................................... V-33
 5. Expert Psychological Testimony ............................................. V-34
  *a. OVERVIEW* ............................................................... V-34
  *b. USE OF EXPERTS BY THE PROSECUTOR* ................................... V-34
   *(1) Factors to Consider Before Deciding to Use Mental Health Experts* ........... V-35
    *(a) Drawbacks* ...................................................... V-35
    *(b) Weighing the Need for Expert Testimony* ............................ V-36
   *(2) Legal Relevancy of Psychological or Behavioral Expert Testimony* ........... V-37
    *(a) Disapproval of Offender ''Profile'' Evidence* ......................... V-37
    *(b) Disapproval of Opinion Evidence About Credibility of Individual Children* .. V-38
    *(c) Disapproval of Opinion Evidence About Credibility of Children Generally* ... V-38
    *(d) Cases Allowing Opinion Testimony on Children's Credibility* .............. V-39
    *(e) Expert Testimony About Child Development, Dynamics and Characteristics* .. V-39
   *(3) Choosing An Expert* ..................................................... V-41
   *(4) Using and Preparing the Expert* .......................................... V-42
   *(5) Areas of Psychological or Behavioral Testimony* .......................... V-43
    *(a) Child Development* ................................................ V-43
    *(b) Post-Traumatic Stress Disorder* .................................... V-45
    *(c) Child Sexual Abuse Syndrome* ..................................... V-45
   *(6) Sample Questions* ....................................................... V-46
 6. Other Potential State's Witnesses ........................................... V-48
  *a. SCHOOL TEACHERS* ....................................................... V-48
  *b. DAYCARE PROVIDER* ...................................................... V-48
  *c. CPS WORKER* ............................................................. V-48
  *d. POLICE OFFICERS* ........................................................ V-49
  *e. OTHER CORROBORATING WITNESSES AND EVIDENCE* ..................... V-49
 7. Physical Abuse—Special Considerations ..................................... V-51
  *a. ORDER OF WITNESSES* .................................................... V-51
  *b. MEDICAL EVIDENCE* ...................................................... V-52
   *(1) General Considerations for Using Expert Medical Testimony* ............... V-52
   *(2) Battered Child Syndrome* ................................................ V-53
   *(3) Munchausen Syndrome by Proxy* ......................................... V-54

**D. THE DEFENSE CASE** ........................................................... V-55
 1. Cross-Examination of the Defendant ......................................... V-55
 2. Cross-Examination of the Defendant's Character Witness(es) .................... V-56
 3. Cross-Examination of Defense Witnesses Who Attack Your Victim ............... V-57

38

4. Dealing With Defense Experts ............................... V-57
   a. PREPARATION ...................................... V-57
      (1) Investigate Background ......................... V-57
      (2) Consult With Others and Review Transcripts .......... V-58
      (3) Pre-Trial Interview or Deposition ................ V-58
      (4) Assess Judicial Reaction ....................... V-59
   b. CHALLENGING ADMISSIBILITY OF THE TESTIMONY ........... V-59
   c. CROSS-EXAMINATION ................................. V-60

E. CLOSING ARGUMENTS ..................................... V-61
   1. Overview ........................................... V-61
      a. PURPOSE AND IMPORTANCE OF CLOSING ................. V-61
      b. LIMITS ON CLOSING ............................... V-61
   2. Organization ....................................... V-61
      a. PREPARATION ..................................... V-61
      b. LOGICAL STRUCTURE ............................... V-62
      c. NATURE OF CHILD ABUSE CASES ...................... V-62
      d. DELIVERY ........................................ V-62
   3. Content ............................................ V-63
      a. BEGINNING ....................................... V-63
      b. FACTS OF THE CASE, JURY INSTRUCTIONS, ELEMENTS OF CRIME ........ V-63
      c. ARGUE STRENGTHS ................................. V-64
      d. COMMON SENSE .................................... V-64
      e. CREDIBILITY ..................................... V-64
      f. CORROBORATION ................................... V-64
      g. CONFESSIONS, ADMISSIONS AND STATEMENTS OF THE DEFENDANT ....... V-65
      h. ACKNOWLEDGE WEAKNESSES ........................... V-65
      i. RESPONDING TO DEFENSE ARGUMENTS .................. V-65

Attachments:
   Sample 1: Juror Questionnaire Used in Federal Rules Jurisdictions ............... V-71
   Sample 2: Prosecution Questionnaire Used in California ...................... V-75
   Sample 3: Partial Trial Transcript—Direct and Cross-Examination of Criminalist
   Regarding Secretor Typing ........................................ V-83
   Sample 4: Partial Trial Transcript—Direct and Cross-Examination of Criminalist
   Regarding Hair Evidence .......................................... V-91
   Sample 5: Partial Trial Transcript—Direct Examination of Social Worker Testifying
   As An Expert ..................................................... V-111
   Sample 6: Partial Trial Transcript—Direct and Cross-Examination of
   Medical Examiner Regarding Autopsy and Opinion as to Cause of Death in Child
   Homicide Case ................................................... V-119
   Sample 7: Partial Trial Transcript—Beginning of Direct Examination of Surgeon
   Regarding Immersion Burns in Child Physical Abuse Case ..................... V-143
   Sample 8: Partial Trial Transcript—Direct and Cross-Examination of Consulting
   Pathologist Regarding Opinion as to Cause of Death in Child Homicide Case ........... V-157
   Sample 9: Transcript of Offer of Proof and Court Ruling Regarding Defense Expert
   Presented to Testify About Interrogation Process Used With Children and Reliability
   of Children's Statements .......................................... V-177
   Sample 10: Closing Argument in Child Sexual Abuse Case ..................... V-215
   Sample 11: Pointers for Expert Witnesses ............................... V-225
   Reference List .................................................. V-229

39

CHAPTER VI: *Special Considerations*

A. VIDEOTAPE AND CLOSED-CIRCUIT TELEVISION PROCEDURES ....... VI-1
    1. Introduction ................................................... VI-1
    2. Statutory Schemes ............................................. VI-1
        a. *VIDEOTAPED INTERVIEW STATUTES* ........................... VI-1
        b. *VIDEOTAPED TESTIMONY* .................................... VI-2
        c. *CLOSED-CIRCUIT TELEVISION TESTIMONY* .................... VI-3
    3. Potential Advantages of Videotaping and Closed-Circuit Television ............... VI-6
        a. *VIDEOTAPED INTERVIEWS OR STATEMENTS* ..................... VI-6
        b. *VIDEOTAPED TESTIMONY* .................................... VI-6
        c. *CLOSED-CIRCUIT TESTIMONY* ................................ VI-7
    4. Inherent Risks ................................................ VI-7
        a. *VIDEOTAPED INTERVIEWS* ................................... VI-7
        b. *VIDEOTAPED AND CLOSED-CIRCUIT TELEVISION TESTIMONY* ............. VI-8
    5. Legal Issues .................................................. VI-9
        a. *CONFRONTATION CLAUSE* .................................... VI-9
            (1) *Unavailability of the Child* ........................ VI-9
            (2) *Indicia of Reliability of Statements* .............. VI-10
            (3) *"Face-to-Face" Confrontation* ..................... VI-11
        b. *NECESSITY FOR SPECIAL PROCEDURES* ...................... VI-11
            (1) *Case by Case Assessment* ........................... VI-11
            (2) *Method of Proof and Need for Expert Testimony* .......... VI-13
        c. *OTHER ISSUES* .......................................... VI-14
    6. Practical Issues ............................................. VI-14
        a. *VIDEOTAPING INTERVIEWS OR STATEMENTS* .................. VI-14
            (1) *When to Videotape* ................................. VI-14
            (2) *Who Conducts the Interview* ....................... VI-15
            (3) *Long-Term Access and Ownership of Videotapes* ......... VI-15
            (4) *Monitor Results* .................................. VI-15
            (5) *Establish Protocols* .............................. VI-15
        b. *VIDEOTAPED AND LIVE CLOSED-CIRCUIT TESTIMONY* ............ VI-15
    7. Conclusion ................................................... VI-16

*Reference List* ................................................... VI-17

CHAPTER VII: *Developing a Coordinated System*

A. INTRODUCTION ................................................... VII-1

B. PROSECUTOR'S ROLE .............................................. VII-2

C. REVIEWING CURRENT PRACTICES IN YOUR JURISDICTION .......... VII-2
    1. Law Enforcement .............................................. VII-3
    2. Child Protective Services .................................... VII-3
    3. Medical Community ............................................ VII-4
    4. Victim Advocates and Guardians *Ad Litem* ................... VII-4
    5. The Courts ................................................... VII-4
    6. Other Alliances .............................................. VII-5
        a. *ADMINISTRATIVE AGENCIES* ................................ VII-5
        b. *CITIZEN AND SPECIAL INTEREST GROUPS* .................... VII-5
        c. *OUTSIDE EXPERTS* ....................................... VII-5

40

D. **IMPLEMENTING A COORDINATED SYSTEM** ...................... VII-6
  1. **Multidisciplinary Team Review** ........................... VII-6
    *a. BENEFITS* ........................................ VII-6
    *b. ORGANIZING THE TEAM* ............................ VII-7
    *c. DOCUMENTATION* ................................. VII-7
  2. **Sample Coordinated Approaches** ...................... VII-8
    *a. CAMBRIDGE, MASSACHUSETTS* ..................... VII-8
    *b. HUNTSVILLE, ALABAMA* .......................... VII-9
    *c. WHEATON, ILLINOIS* ............................ VII-10
    *d. SAN DIEGO, CALIFORNIA* ........................ VII-10

E. CONCLUSION ......................................... VII-11

*Reference List* ...................................... VII-13

APPENDICES:

Appendix A: *Select Articles* ......................... A-1

  1. Berliner & Barbieri, *The Testimony of the Child Victim of Sexual Assault*, 40 J. Soc. Issues 125 (1984). ........................................ A-3
  2. Dykes, *The Whiplash Shaken Infant Syndrome: What Has Been Learned?*, 10 Child Abuse & Neglect 211 (1986). .............................. A-9
  3. Kempe, Silverman, Steele, Droegemeuller & Silver, *The Battered-Child Syndrome*, 251 J. Am. Med. A. 3288 (June 1984). ......................... A-17
  4. Roe, *Expert Testimony in Child Sexual Abuse Cases*, 40 U. Miami L. Rev. 97 (1985). ........................................... A-25
  5. Summit, *Child Sexual Abuse Accommodation Syndrome*, 7 Child Abuse & Neglect 177 (1983). ......................................... A-33

Appendix B: *Select Community Efforts* ................ B-1

SAN DIEGO, CALIFORNIA ................................. B-1
SAN ANTONIO, TEXAS .................................... B-2
ORLANDO, FLORIDA ...................................... B-2
WHEATON, ILLINOIS ..................................... B-3
BIRMINGHAM, ALABAMA ................................... B-4
VENTURA, CALIFORNIA ................................... B-5
DENVER, COLORADO ...................................... B-6
HONOLULU, HAWAII ...................................... B-6
SYRACUSE, NEW YORK .................................... B-7
NORFOLK, VIRGINIA ..................................... B-8
HUNTSVILLE, ALABAMA ................................... B-8
GRANTS PASS, OREGON ................................... B-9
GRIFFIN, GEORGIA ...................................... B-10

Appendix C: *Legislative Protections for Children in Criminal Child Abuse Proceedings* .......................................... C-1

# Tables

|  |  | Page |
|---|---|---|
| TABLE IV-1 | Protecting Privacy of Child Victims ...................... | IV-2 |
| TABLE IV-2 | Speedy Disposition/Policy Against Continuances ........... | IV-11 |
| TABLE IV-3 | Closing the Courtroom ................................ | IV-18 |
| TABLE IV-4 | Anatomical Dolls .................................... | IV-19 |
| TABLE V-1 | Support Persons .................................... | V-16 |
| TABLE V-2 | Competency ....................................... | V-18 |
| TABLE V-3 | Special Hearsay Exceptions ........................... | V-28 |
| TABLE VI-1 | Videotaped Interviews or Statements ..................... | VI-2 |
| TABLE VI-2 | Videotaped Testimony Statutes .......................... | VI-4 |
| TABLE VI-3 | Live Closed-Circuit Television Testimony Statutes .......... | VI-5 |
| TABLE VI-4 | Constitutionality of Videotaping and Closed-Circuit Procedures ......................................... | VI-12 |

42

# *Acknowledgments*

A project the magnitude of this manual requires the dedication and commitment of numerous people in a variety of capacities. We feel fortunate to have had the support of many exceptional people during all phases of the project from writing portions of the manual to editing and typing countless drafts.

The core of the manual was produced by a group of talented and dedicated people from around the country who gave generously of their time, knowledge and experience. The practicality of this manual is due in large measure to their contributions. We owe a profound debt of gratitude to the following people who wrote manuscripts which are the foundation of this manual: Lucy Berliner, M.S.W., Harborview Medical Center, Seattle, Washington; Nancy Borko, Assistant District Attorney, Bronx, New York; Charles W. Campbell, Jr., Deputy District Attorney, Ventura, California; Robert E. Cramer, Jr., District Attorney, Huntsville, Alabama, and members of his staff—Assistant District Attorneys, Bruce A. Gardner, Karen Kimbrell, and Susan Tuggle; Ross Eatman, J.D., Philadelphia, Pennsylvania; Harry M. Elias, Deputy District Attorney, San Diego, California; Anne Hyland, Assistant County Attorney, St. Paul, Minnesota; Rebecca Roe, Senior Deputy Prosecuting Attorney, Seattle, Washington; and Karen Steinhauser, Chief Deputy District Attorney, Denver, Colorado.

Michael C. Redman, Executive Secretary, Washington Association of Prosecuting Attorneys, has been a staunch supporter and singular resource during the life of this project. The benefit of his counsel and knowledge was invaluable.

Howard Davidson, Esq., director of the American Bar Association's National Legal Resource Center for Child Advocacy and Protection, has been a welcome source of support and provided careful and critical review of the final drafts.

James P. Manak, editor of The Prosecutor, contributed valuable feedback which resulted in a number of improvements to our final product.

The continued support and enthusiasm of Ben Shapiro, Project Monitor, Office of Juvenile Justice and Delinquency Prevention, has been much valued.

The current and past members of the Assistant Prosecutor Section of the National Center's Advisory Board also gave generously of their time and energy. These prosecutors sacrificed weekends to participate in sometimes grueling sessions reviewing manuscripts. We benefited greatly from their collective experience and hope that in return they benefited from the intellectually stimulating interaction with their peers.

Other skilled individuals provided materials incorporated in the manual and gave constructive, detailed comments: Craig deArmond, State's Attorney, Danville, Illinois; Jim Peters, Deputy Prosecuting Attorney, Vancouver, Washington; prosecutors and others in Snohomish County, Everett, Washington, including Seth Dawson, Prosecuting Attorney, Joan Cavagnaro, Deputy Prosecuting Attorney, Craig Donaldson, Director, Snohomish County Pre-Prosecution Diversion Unit, Kay Field, Deputy Prosecuting Attorney, and Bill France, M.S.W., Director, Prosecutor's Office Special Child Abuse Project; and Carol Sopkovitch, Assistant Prosecuting Attorney, Trumbull County, Warren, Ohio. We are deeply indebted to them for their contributions.

During the months we worked on this project, we were privileged to meet and speak with numerous individuals at conferences who contributed valuable ideas and insights which we have incorporated into the manual. At the risk of overlooking others, we would like to express special thanks to members of the Oregon District Attorneys Association; Ethel Amacher, M.S.W., Nashville, Tennessee; Carolyn Levitt, M.D., St. Paul, Minnesota; Kee MacFarlane, Director, and Ian Russ, Research Associate, Children's Institute International, Los Angeles, California.

This manual literally could not have been produced without the assistance and support of the staff of the National Center and the National District Attorneys Association and its Executive Director, Jack E. Yelverton. The members of this staff devoted monumental amounts of time and effort to this task. Although all have our sincerest gratitude, special

43

appreciation is due Beth Wanger, Staff Attorney, without whom this manual would not be as comprehensive and up to date. She spent innumerable hours researching case law, collecting state statutes, revising and adding to manuscripts and checking references. Janet L. Dinsmore's editorial talent and substantive expertise in child abuse and juvenile justice issues increased the clarity and usefulness of the contents immeasurably. Cabell Cropper took care of the multitude of practical details involved in publishing a resource of such enormous scope and content: He literally did everything, from requesting and sifting through bids for production tasks to typing, editing, and proofreading. Jean Holt spent tedious hours carefully proofreading galleys and page proofs. Kathie Scutt and Gail Cooper patiently typed, retyped and typed again the manuscripts and final copy without losing their senses of humor or their willingness to put in that extra effort to get the job done. Research Assistant Debra Butensky also spent considerable time in law libraries summarizing journal articles and locating cases and statutes.

Finally, without James Shine, the first Director of the National Center and Executive Vice President of APRI, this manual would not exist. It was he who first conceptualized the project, found the resources to make it a reality, and persevered through the all too often painstaking process of seeing that it was completed. We are deeply indebted to him for the opportunity to make what we feel is a significant contribution to the nation's prosecutors. Through the Center and this manual, we have tried to create the kind of comprehensive resource we wish had existed when we were prosecuting child abuse cases. Because of the energy and commitment of all those who contributed to this project, the response of the nation's prosecutors to abused children will be forever changed to better protect and support child victims and hold offenders accountable for their crimes.

Patricia A. Toth
former Senior Deputy Prosecuting Attorney
Snohomish County, Washington

Michael P. Whalen
former Deputy State's Attorney
Prince George's County, Maryland

September, 1987

# *Preface*

   With the publication of this manual, America's prosecutors will have available to them the most complete and up-to-date compilation of information concerning the investigation and prosecution of child abuse cases. It is designed to serve as a practical guide for prosecutors in their efforts to prosecute these cases. Its contents represent a distillation of experiences and techniques employed by some of the most skilled prosecutors in the nation in the area of child abuse.

   As comprehensive as it may be, the manual cannot be considered a panacea. Child abuse is a highly complex area. It is one requiring tenacity, perseverance, sensitivity, courage and commitment. Foremost it requires creativity. I challenge you to attempt innovative approaches. Learn from what your colleagues have tried. Child abuse prosecution in many respects remains an uncharted area. Hopefully, this manual will serve you well as a fundamental tool. I encourage you to go beyond it and forge new inroads.

   The National District Attorneys Association through the National Center for the Prosecution of Child Abuse is dedicated to enhancing and strengthening the response of America's prosecutors to this national tragedy. Make use of the resources available through the National Center to share your experience and knowledge.

<div style="margin-left:40%">

Richard J. Arcara
President
National District Attorneys Association

Chairman, Board of Directors
American Prosecutors Research Institute

District Attorney
Erie County
Buffalo, New York

September, 1987

</div>

46

# *Introduction*

In May, 1985, the American Prosecutors Research Institute sponsored a Child Abuse Symposium for the members of the National District Attorneys Association to examine the issue of child abuse and prosecutors' responses to these troubling and complicated cases. It was clear to the participants in this Symposium that prosecutors must take the lead in developing innovative techniques for investigating and prosecuting child abuse. To be successful in protecting children from further trauma and at the same time hold offenders accountable for their crimes, prosecutors must bring the resources of their communities and the expertise of the law enforcement, social services, mental health and medical professions to bear in this complex area.

As a result of this Symposium, the Metropolitan Prosecutors Committee of the National District Attorneys Association proposed the establishment of a National Center for the Prosecution of Child Abuse to the Board of Directors of the National District Attorneys Association. Funding was sought and in November, 1985, the Department of Justice's Office of Juvenile Justice and Delinquency Prevention awarded a grant to the American Prosecutors Research Institute to establish the National Center. The mission of the Center has been and will continue to be to promote the prosecution and conviction of child abusers while advocating aggressively on behalf of child victims. To accomplish its mission the Center is dedicated to giving prosecutors the tools they need to prepare and present strong cases using the technology and resources of all professions charged with responding to reports of child abuse. This manual is a major effort to meet the needs of prosecutors in this area.

The information in the manual reflects the knowledge and experience of some of the finest prosecutors in the country. Prosecutors who deal with these cases on a daily basis have been involved in determining the contents of the manual, writing material to be included in the manual and reviewing its contents prior to publication. The process began with a meeting of 15 prosecutors in April, 1986, to develop an outline and identify key issues to be covered in the manual. A core group of prosecutors submitted manuscripts which formed the basis of individual chapters. The group of assistant prosecutors was reconvened in October, 1986, to review manuscripts and make recommendations concerning revisions and additions. The Center's then Sr. Attorneys, Patricia A. Toth and Michael P. Whalen, supplemented the material and wrote additional portions of the manual. Final drafts were reviewed by the prosecutors who had originally submitted manuscripts. The result is this publication, the first comprehensive national manual concerning techniques and strategies for investigating and prosecuting child abuse written by and for prosecutors.

The manual is not intended to be static or unchanging. We are already in the process of identifying additional areas to be covered and will issue supplements covering special issues or new developments. The contents of the manual will be revised as case law and the legal environment change. You, the prosecutor who confronts these cases daily, are the Center's best source of information about what the manual should include. I urge you to let us know your ideas and suggestions and to submit material you think should be included.

The manual makes clear that successful prosecution requires the coordination of all agencies and individuals involved in responding to child abuse. This coordination is often not easy; however, many prosecutors around the country have experimented with and implemented approaches to achieve this objective. To assist other communities develop a multi-disciplinary approach to child abuse, the Center will prepare written materials and provide assistance based on a distillation of approaches employed by other communities. Again, you can assist us by giving us the benefit of your experience and advice.

I would be remiss if I did not express my appreciation and admiration for the dedication and support the members of the Assistant Prosecutor Section of the Center's Advisory Board have given this project, particularly those prosecutors who wrote portions of the manuscript. In addition, the Center is fortunate to have had two exceptionally talented and knowledgeable prosecutors, Patricia A. Toth and Michael P. Whalen, as principal editors and con-

tributing authors of this manual. The amount of time and energy they have devoted to this project is incalculable.

The National District Attorneys Association and the American Prosecutors Research Institute are grateful for the support of the Office of Juvenile Justice and Delinquency Prevention. Terry Donahue was readily available in the early planning for the Center with constructive encouragement and helpful advice. We are especially grateful to OJJDP Administrators, Alfred Regnery and Verne Speirs for their decisions to make support for the Center a reality. Finally, the support of the entire Office of Juvenile Justice and Delinquency Prevention has been personified on an almost daily basis by Ben Shapiro, the Center's Project Monitor, who has been a steadfast friend and professional colleague.

This publication is a major step in improving the country's response to child abuse, but much remains to be done. With the involvement of people who are concerned about this problem and who are willing to contribute their expertise to finding solutions, the National Center for the Prosecution of Child Abuse will continue to be the vehicle for implementing change to protect children and hold abusers accountable for their actions.

James C. Shine
Executive Vice President
American Prosecutors Research Institute
Alexandria, Virginia

September, 1987

CHAPTER I

# *The Victim*

Child abuse is uniquely difficult to prosecute. No other type of case presents such consistently complex psychological and social dynamics. No other type of case so often requires the prosecutor to go to trial with a child as his or her most crucial witness. The pressure on victims is also uniquely painful. In the vast majority of cases the offenders are trusted family members and relatives. Frequently, revelation of the crime results in the child or offender being removed from the home leaving families disrupted (sometimes permanently) and often chaotic throughout the adjudicative process. And unlike victims of most other crimes, child victims of abuse are frequently castigated as villains by family members and friends.

The controversy surrounding children as witnesses in the criminal justice system runs the gamut from arguments that children live in a fantasy world and cannot be believed, to assertions that children never lie. Obviously, neither assumption is correct. Experience and research have shown that children are no more or less reliable as witnesses than adults. They are witnesses whose testimony must be evaluated in light of their specific developmental capacity. Their age, their ability to articulate, and their limited life experiences will affect their testimony. Like adults, they can be confused and deceived. However, it is rare for children to deliberately lie about abuse except to minimize its frequency or deny its actual occurrence.

To be effective, prosecutors must learn as much as they can about children, their capabilities, and about the dynamics of child abuse. Although specialized training is recommended, it is not absolutely necessary. Books and articles on child development and child abuse are now readily available. Experiences with children in both your professional and personal life can certainly be a helpful reference. Knowing how to talk to children and what to expect from those who have been abused can immeasurably improve your ability to evaluate and prosecute cases. Moreover, by adopting a sensitive and caring approach you can gain the trust of children and their families and elicit the most accurate accounts of criminal activity.

The material which follows provides a basic framework for understanding the dynamics of child abuse and dealing with child victims.

## A. OVERVIEW OF VICTIMS AND VICTIMIZATION

### 1. Victims

Victims are boys and girls ranging in age from infants to almost emancipated teenagers. They come from all ethnic and cultural groups, social and economic classes, rural and urban areas, and have varying levels of intellectual or physical ability. They are abused in a variety of ways, from isolated incidents of excessively harsh discipline to regular sadistic physical assaults, and from a single act of sexual fondling to repeated passively accepted intercourse over a period of years.

#### *a. CHARACTERISTICS AND IMPACTS OF VICTIMIZATION*

Although children generally dislike the experience of being abused, they may believe it is normal or deserved. Offenders use a variety of strategies to persuade children to tolerate abuse and keep it a secret, usually involving convincing them that it is proper parental

conduct or by threatening severe consequences for its disclosure. Often children (rightly) believe they will cause harm to others or destroy important relationships by telling someone about the abuse.

Child victims are sometimes intentionally misled, forced into outrageous activities, and sometimes drugged by the offender to decrease their credibility should they disclose the abuse. If a child's account of sexual abuse involves, for example, strangely dressed figures, the presence of animals, loud music or unfamiliar settings, she is less likely to be believed by police or a jury. However, there *are* cases involving costumed abusers and a great deal of both physical and sexual child abuse has been uncovered in ritualistic cults. Discrediting the victim because her account involves acts that are shocking and offensive to ordinary sensibilities can mean that a serious crime has been overlooked. While many would rather believe children invent bizarre stories, the possibility that they may be true should be carefully explored.

The child usually feels she has no choice but to submit to acts of abuse. She goes along with it not because the experience is enjoyed but because it is inescapable. This often explains why the child "accommodates" or returns to the offender. A child's survival mechanisms in response to abuse often create severe psychological (including in extreme cases multiple personality disorders) and behavioral problems that make it more difficult for her to be believed and to rid herself of the effects of abuse.

A child's values and expectations about herself, others and the world are often permanently altered by victimization. Since many disorders have their origin in child abuse, abuse is itself a risk factor for a range of later problems from substance abuse to sexual deviance and other criminal activity. A variety of the most commonly seen reactions to abuse are discussed in Section C. of this chapter.

### b. THE NEED FOR SENSITIVITY

#### (1) General Principles

Child abuse typically provokes intense emotions and continuing disruption in the daily lives of victims and their families. Prosecutors dealing with these cases are often faced with individuals who are extremely upset and for whom the impacts of victimization fade very slowly, in some cases becoming worse before they become better. As victims, children are the least likely to understand the complexities of the legal system or be able to represent their interests. The need for sensitivity on the part of prosecutors dealing with child abuse cases is consequently especially critical. Extra time must be set aside for victims and their families to overcome their natural apprehension about the criminal justice system (often magnified in child abuse cases) and instill confidence regarding your abilities and commitment.

It is important to communicate your respect for their feelings and circumstances and to listen without reacting negatively or judgmentally. Recognize that a victim and her family will not appreciate being treated as though that case is only one of many or less serious than others with which you are dealing. Clear and honest answers to questions and explanations about your role and what to expect will go far in establishing trust.

Victim-witness advocates within a prosecutor's office and other victim support and advocacy services within a community can provide valuable support for victims throughout the criminal justice process. Prosecutors should take advantage of such programs and work with them to respond more effectively to the needs of child abuse victims and their families. Unless the process itself is positive and responsive, even a successful case outcome will make little difference to the victim and her family.

#### (2) Ethnic and Cultural Diversity

An effective prosecutorial response to child abuse must be sensitive to ethnic and cultural diversity. Different values, different approaches to parenting, different views of law enforcement and the role of public agencies, different family constellations, different beliefs

about sexuality and discipline, to say nothing of language differences can all affect the investigation and prosecution process.

Sensitivity first demands that prosecutors and investigators support efforts to see that individuals in their communities who speak different languages are not discouraged from coming forward to report abuse or from cooperating with investigations. Frequently, non-English speaking victims fail to report crimes because of lack of awareness of available resources, inability to communicate, or fear of exposure and retribution. Outreach into minority communities is therefore needed to ensure public awareness of child abuse laws and resources for help.

Second, communication with a child of a different background can usually be significantly enhanced if you consult with other professionals familiar with the child's community. Prior experiences with the legal system may have been negative—leading minority families to expect prejudice, discrimination or, at best, misunderstanding from public employees. An individual who can serve as a translator or intermediary between you and the child or family can help reduce their discomfort with a system that is often confusing and intimidating.

Even when the victim speaks English, there may be language barriers resulting from the family's use of unusual terms to discuss certain matters. Cultural beliefs may be incompatible with laws prosecutors must enforce or may lead individuals to emphasize certain aspects of the abusive incident while ignoring others. Concern for privacy may be extremely high, bolstered by family networks that may exert strong resistance against what can be perceived as shameful, overly intrusive intervention into family matters.

Recognize and be sensitive to the special impact the litigation process may have on individuals of different ethnic backgrounds. But avoid the temptation to generalize based simply on membership in a particular minority group. Each case is unique and will demand special attention. A familiarity with available literature (see reference list at the end of this chapter) and consultation with knowledgeable individuals will improve your skills and success.

## 2. Offenders

Understanding the victimization process requires recognition of the dynamics of deviance that control the offender. However, just as there is no typical victim, there is no typical offender. Offenders range in age, psychological, physical, economic and demographic characteristics, and history. While they do not fit neatly into a profile, some general observations can be made. One is that abusers are usually in a position of authority or trust in relation to their victims. Another is that many abusers appear to be normal and fairly intelligent, successfully employed, active in community affairs and do not have prior criminal records.

Although some sociologists, psychologists and others tend to classify types of offenders—i.e., pedophiles, incest offenders, ''dirty old men,'' fixated and regressed offenders, etc., courts generally prohibit the use of offender profile evidence at trial (see related discussion in Chapter V, Section C.). Categorizing the offender within any particular profile might be relevant at sentencing but will not assist the prosecutor in initial evaluations or presentation of evidence in child abuse cases. The person who physically or sexually abuses a child has committed a crime, no matter what category he fits or does not fit. His reasons for committing these crimes or the ''type'' of behavior involved do not lessen the negative impacts of victimization on the child.

All offenders choose their victims, pursue them, and groom them until they can successfully victimize them. Often the abuser knows exactly what he wants in a child victim including age, gender and personality. Plainly and simply, children do not cause abuse. The sole responsibility for the exploitation and victimization of children lies with abusers who take advantage of their vulnerability. Rationalizations offered by the offenders do not excuse the crime or guarantee it will not be repeated. It almost always will if ignored, and blaming the victim makes this outcome a virtual certainty.

It is not unusual for an abuser to devote a great deal of time and attention to an affection-

starved child for the purpose of her eventual sexual exploitation. The process and subtleties involved can take days, weeks or even months to lessen a child's inhibitions about engaging in sexual activities which may then escalate and continue over a number of years. The offender often finds this "grooming" process as interesting and exciting as the acts of sexual contact themselves, and the time it takes is of no real significance to him.

## B. VULNERABILITY OF CHILDREN

By their very nature, children make perfect victims. Their vulnerability is widely recognized, and authorities including Kenneth Lanning in *Child Molesters: A Behavioral Analysis*, (Washington, D.C.: National Center for Missing and Exploited Children, 1986) point to specific factors that make children ideal victims.

### 1. Children Are Easily Influenced By Adults

Children are brought up to respect and obey adults. This is ingrained in them through parental child-rearing techniques and the child's total dependence upon adults. To a child, adults hold positions of power and authority and generally exercise some form of control over the child. Moreover, mere physical size plays an important part in the child's world and certainly enhances the dominating presence of the adult in that world.

The most significant and influential adults in a child's world are those with whom they have most frequent contact and whom they are taught to obey such as parents, teachers, police officers, scout leaders, relatives and babysitters. When the abuser is in this group, his chance of success in terms of exploiting the child, exercising control over her and preventing disclosure is immediately increased.

### 2. Children Are Naturally Trusting and Curious

Young children have a natural curiosity about everything, including sex. This curiosity, along with their trusting nature, enhances their potential to be victims. They generally have little or no understanding of sex despite the prominence it plays in television programming, movies, magazines, advertisements and casual conversation between parents or peers. But, their curiosity can be exploited by child molesters who establish rapport over time and gradually undertake the process of victimization.

### 3. Attention and Affection Fulfillment

Children need affection from parents and peers. This is their single most exploitable characteristic. Children seek to be included in the activities of friends and people close to them, particularly when those activities involve an adult paying attention to them. Attention makes them feel important and worthwhile. Children from broken or dysfunctional homes who suffer emotional neglect are often even more vulnerable to exploitation by child abusers.

### 4. Adolescent Defiance and Peer Pressure

More common in children who have reached adolescence, defiance of parental limitation or control can be used to the child molester's advantage. The potential for victimization increases when the child does the opposite of what she has been instructed to do. Rebelliousness may also lead to new friends and experiences that take the child out of familiar settings. When victimization is the result of these new experiences, the child is even less likely to disclose the abuse for fear of blame or punishment.

In addition, an adolescent is more likely to try an activity in which she knows her friends are involved. Peer pressure is very significant in the daily life of a teenager. The child molester knows this and often follows a course of conduct designed to attract adolescents to his environment. He treats the adolescent as an equal, offers friendship, gifts, alcohol, drugs

and a place for adolescents to gather and experiment with new things or listen to music. Once there, sexually explicit books, magazines and photographs may help to introduce and promote previously taboo subjects. Video equipment can be used to show pornographic films depicting teenagers engaging in sexual activity with each other and with people of the offender's age. Frequently the offender will take photographs of adolescents posing nude in front of newcomers who are then asked if they wish to participate. He may have the newcomers observe sexual activity between the offender and other adolescents to further lower their inhibitions. Once adolescents have been lured or tricked into participating in these activities, the threat of public exposure may be used to obtain continued participation or submission.

### 5. Children with Disabilities

The natural vulnerability of children which makes them such ideal victims is usually magnified when the child victim has a physical, emotional or developmental disability. When repeated failures and negative attitudes of others have led to a very low self-image, for example, the child can be even more susceptible to an offender's exaggerated display of attention and affection.

Children with disabilities often feel isolated and alone. Children with learning disabilities particularly lack the maturity and communication skills to establish and maintain supportive peer relationships. Obvious physical handicaps can cause isolation from peers as well. Even constructive criticism may be misinterpreted as, "You can't do anything right." This isolation creates the need for acceptance and, given the chance, the child abuser will readily fill this need.

Adolescent defiance might also be magnified for children with disabilities. Isolation from peers means more time spent at home with parents. This enhances the tension many children and parents experience during the teenage years and provides another motive for defiance. There is also the possibility that the offender will consider the adolescent's vulnerability attractive. For example, the physically mature fifteen-year-old with a learning disability may be too naive and inexperienced to know the offender's behavior is wrong and too timid to object. This innocence may attract the offender and maintain his interest in abusing.

In addition, physical or developmental handicaps often add stress and frustration to the already difficult job of raising or teaching a child. A child's inability to perform at the same physical and intellectual level as other children the same age, coupled with a parent's lack of understanding of the particular disability, often places a disabled child at greater risk of physically abusive punishment.

## C. INDICATORS OF ABUSE

### 1. Indicators of Sexual Abuse

A child's report is the single most significant indicator of sexual abuse. Other significant indicators are medical and physical symptoms suggesting sexual abuse such as injury to the genital or anal area, the presence of sexually transmitted diseases or evidence of seminal fluid on or in the child's body, clothing, etc. These factors are covered in detail in Chapter II.

Child sexual abuse is sometimes manifested by identifiable physical and behavioral symptoms, but not all abused children will exhibit such symptoms. The presence or absence of any one or several is not always conclusive evidence. There may be other explanations for abnormal behavior which you must evaluate when handling a case. However, while there is no set pattern, an awareness of possible symptoms should help you recognize and assess potentially abusive situations. The following three sections describe behaviors generally considered to be most suggestive of the possibility of sexual abuse.

THE VICTIM

### a. AGE-INAPPROPRIATE KNOWLEDGE OF SEXUAL BEHAVIOR

Sexual knowledge inappropriate to the child's age can be a significant indicator of sexual abuse in very young children. It may take many forms. A very young child's graphic simulation of sexual intercourse or oral sex would be suspect, as would a young child's comment, for example, about "white stuff coming out of Daddy's pee pee." The older the child, the more complicated and difficult it is to determine what is or is not age-inappropriate knowledge because of the greater exposure to and availability of sexual reading and viewing materials. The following chapter on "Investigation" discusses this issue in detail.

### b. PERSISTENT INAPPROPRIATE SEXUAL PLAY AND AGGRESSIVE SEXUAL BEHAVIOR

Although sexual conduct or experimentation and play between children is not unusual, the form of play is usually consistent with their age level. A seven-year-old boy and girl playing doctor would arouse no unusual concern, but a four-year-old who exhibits persistent and excessive sexual curiosity with his or her playmates should. Many child victims turn their anger and new-found sexual knowledge on younger playmates, forcing smaller and weaker youngsters to submit to acts they have suffered.

### c. BECOMING MANIPULATIVE OR OVERLY SEDUCTIVE OR SEXUAL

A sexually abused child quickly learns that to obtain attention or affection she must satisfy the sexual needs of the abuser, and this may result in behaviors which seem seductive or have sexual overtones. Frequently, this same behavior will be exhibited toward nonabusers, with the child expecting her actions to provoke approval. Incest victims may appear to be acting overly mature and their relationship with the offender seem inappropriately intimate. More aggressive children soon learn that they can manipulate the offender to provide them with things they want by threatening to terminate or reveal the relationship. This characteristic is not uncommon to the street-wise adolescent. It is learned behavior—taught and reinforced by the abuser, who may be the only adult to whom she feels important.

## 2. Indicators of Physical Abuse

Indicators of physical abuse can come from observations of and information provided by the child, as well as explanations and actions of the child's parent(s) or caretaker(s). If available information reveals any of the following situations, potentially criminal physical abuse may be indicated and careful review and investigation is warranted.

- A child has injuries inconsistent with the caretaker's description of how the child was hurt.
- Unreasonable forms of punishment have been used to discipline a child.
- A child has intentionally, recklessly or negligently been placed in circumstances seriously dangerous to her health or safety (regardless of actual injury).
- A child's death is unexplained by caretakers, the explanation is inconsistent with the child's injuries, or the facts suggest the death was unlikely to have resulted from accidental causes.

### a. SOFT TISSUE INJURIES

Unusual physical injuries in a child may indicate physical abuse. Soft tissue injuries—bruises, abrasions, welts, lacerations, etc.—in unusual locations should be suspect. Accidental injuries in children generally occur at bony prominences such as knees, elbows, shins, etc., and are less likely in areas such as the buttocks, lower back, genitals, inner thighs, cheeks, ear lobes, mouth and neck. A child with multiple bruises at different stages of

healing (especially if deep and over large areas of the body), adult bite marks, injuries suggesting tying, binding or tethering, or patterned injuries suggestive of inflicted injury (grabbing, pinching, squeezing, slapping, strap or belt marks, looped cord marks, imprints or lacerations from other objects—tatooing, punctures, coat hangers, knives, etc.) should be evaluated for potential physical abuse.

### b. INTERNAL INJURIES

Abdominal or internal injuries with organ damage are indicative of a great deal of force. Such injuries are not normally caused by falls from couches and beds, but result from automobile accidents or falls from high places (two stories or more). Repeated hitting or pummeling of a child, however, *can* cause internal injury—ruptured or perforated livers or spleens or damaged kidneys, bladders, intestines, colons, pancreas, etc. Visible signs of such injuries may not be apparent for several days when nausea, vomiting, hemorrhaging, swelling or shock then may occur. Expert medical diagnosis is needed to recognize these injuries and the amount of force required to cause them. When no credible evidence of accidental cause can be found, physical abuse should be considered.

### c. HEAD INJURIES

Research findings indicate that a combination of head injuries and long-bone fractures are significant indicators of physical abuse in children. Head injuries can cause death, brain damage, loss of eyesight or hearing and partial or complete paralysis. They should always be carefully evaluated. Severe shaking or blunt trauma to the skull can cause subdural hematomas—blood trapped in the space around the brain. Current medical opinion concludes such injuries are *never* spontaneous despite early medical theories advancing this possibility.

When a child has been violently shaken causing a subdural hematoma, there is usually no external bruising, swelling or skull fracture. There may be evidence of bone chips at the cervical vertebrae, compression rib fractures (indicating the adult held the child under the arms and around the chest), damage to neck muscles and ligaments (with the child unable to turn her head up and down or sideways), spinal cord damage, or retinal hemorrhages and seizures.

Subdural hematomas *with* skull fractures, swelling of the scalp and apparent bruising are caused by some sort of external blunt force trauma—i.e., striking a child's head against a wall or floor or striking with a fist or weapon. Other highly suspect injuries, when no credible evidence of accidental cause exists, include: intracranial hemorrhaging, skull fractures, eye injuries (such as retinal hemorrhages, black eyes, detached retinas, cataracts, dilated or fixed pupils, sudden loss of sight, etc.), ear injuries (''cauliflower'' ear, sudden hearing loss, bruising to the ear and surrounding area, blood in the ear canal, etc.), injuries to the nose (deviated septum, bridge of nose swollen or bent, etc.), and injuries to the mouth (chipped, missing or loose teeth, lacerations of the frenulum, lips or tongue, petechia—small spots of blood from broken capillaries—near corners of the mouth, etc.).

### d. BROKEN BONES/SKELETAL INJURIES

Certain kinds of skeletal injuries and fractures similarly indicate the possibility of physical abuse. These include multiple fractures at different stages of healing, repeated fractures to the same bone, spiral fractures, rib fractures and back rib fractures (particularly in children under three), ''chip'' fractures at the end of long bones, fractures due to yanking and jerking, and injuries to bones without actual breaking caused by repeated hitting (epiphyseal-metaphyseal injuries or subperiosteal proliferation).

### e. BURNS

Some burns suggest inflicted injury to a child. Burns on unusual parts of the body—palms, soles, genitals, etc.—and multiple burns of different patterns and stages of healing are examples. Hot water burns suggesting immersion or dipping (oval shape around buttocks and perianal region), "doughnut" burns (child held down so only area surrounding buttocks burned), and immersion of hands or feet ("glove" or "stocking" burns) are extremely suspicious. Usually these will have even immersion lines with no splash marks indicating the child was prevented from getting away or forcibly restrained. Contact burns consistent with cigarettes, cigars, match tips, objects such as heating grates, stove burners, irons, curling irons, etc., are also consistent with abuse, especially when the imprint of the object is clear with distinct margins, deep and uniform. A child who has accidentally brushed against or otherwise contacted a hot surface will jump back, roll around or do whatever is possible to try to get away. The imprint of the burn is therefore likely to be different than one inflicted forcibly.

### f. CARETAKER'S ACTIONS OR EXPLANATIONS

When a child has been seriously injured and her parent(s) or caretaker(s) delay seeking medical attention or go out of their way to obtain medical care from someone unfamiliar with the child or family, careful evaluation of their reasons should take place. Parents or care-takers who are irritated, evasive, vague or reluctant to give information when asked to explain the cause of a child's injuries may be trying to hide the real reasons. Suspicious explanations include those that are inconsistent with the nature, extent or location of injury; that attribute an injury to accident or self-infliction when the child's developmental ability to sit, stand or walk on her own would make the injury impossible; or that change over time or with different reporters.

Additional indicators of situations which may involve physical abuse include: signs of severe neglect—malnutrition or starvation, lack of regular medical care, extreme unsanitary conditions, etc.—signs of parenting disorders such as alcoholism, drug abuse and psychotic behavior, and signs of a child's unwillingness to reveal the cause of an injury.

### 3. Behavioral Indicators Common to Both Sexual and Physical Child Abuse Victims

Abused children often, but not always, display signs of distress. Their confusion and anxiety are likely to affect all aspects of their lives to some extent, though different children will react to abuse in different ways. The following discussion covers some of the ways that both physically and sexually abused children might manifest this distress. While behavioral indicators such as these, standing alone, are insufficient to conclude that a child has been abused, they have emerged on a regular enough basis to be a signal to investigate a particular case further. Like any sudden and unusual change in a child's behavior, efforts should be made to determine the cause. These symptoms and behaviors are not all-inclusive, but when present together with other evidence of abuse, they can provide crucial corroboration of an allegation.

### a. SUBMISSIVENESS

Frequently, an abused child learns through repeated experience that she must submit to anything asked of her to avoid being punished or totally ignored. She becomes complacent and accepting of whatever happens and shows little reaction to painful or normally un-comfortable situations. Very young children may display this passivity by apparent indiffer-ence to their environment. They can seem almost oblivious.

THE VICTIM                                                                                      I-9

### b. AGGRESSIVE ACTING-OUT/INCORRIGIBILITY

Running away from home, committing criminal acts or turning to prostitution are characteristics common to abused children. Research has shown the majority of runaways are running from abusive and violent families; and children who become involved in prostitution are overwhelmingly characterized by a history of sexual abuse. Their low self-image combined with a belief that sex is their only desirable (and salable) characteristic make them natural prey for further exploitation. Entry into delinquency is often a product of dysfunctional abusive family lives and subsequent susceptibility to negative peer pressure. The violence or severity of criminal acts by young offenders seems to be correlated with the level of violence they experienced at home.

### c. SCHOOL-RELATED BEHAVIOR

Children who are abused at home often get to school early and stay as late as possible. Excessive absences from school excused by the parent regardless of a child's school performance are also common, since the purpose may be to keep the child at home with the abuser. Continual bouts of fatigue—falling asleep at her desk—may mean a child has been kept awake all night or stayed awake in fear. Since an abused child has no security and is torn by emotions—love, hate, self-pity, anger and fear—she often has great difficulty concentrating in school. This is often accompanied by a sudden drop in academic performance. Listless or nonparticipatory behavior at school functions or events, such as failing to "suit up" for gym classes or activities which require dressing or undressing or showering in front of others is common. Many children fear others will find out simply by looking at them. Abrupt changes in personal relationships and aloofness from long-time school friends often result. Fear of discovery, guilt and embarrassment combine to cause isolation (making the burden of abuse even worse). Well-liked authority figures such as teachers, especially those who have shown a particular caring for the abused child, are shunned. Betrayed by a parent or trusted adult, the abused child does not risk further betrayal.

Unexplained hostility, aggressive anger, and bouts of destructiveness may also be noted by teachers. The abused child often carries a great deal of rage and frustration, and often acts out in ways that get her in further trouble. School officials unaware of the presence or dynamics of abuse may be antagonized by such "problem" students. Their common reaction is to punish or separate the child—further increasing her alienation.

### d. UNWARRANTED FEARS AND SELF-DESTRUCTIVENESS

A young boy or girl who suddenly refuses to go to school, visit a favorite relative, or turns to alcohol or drugs may be reacting to abuse. Self-inflicted harm such as burning, disfiguring, or hair pulling is also seen in many children who punish themselves for the abusive relationship. Other children will gain a great deal of weight or "cross-dress" (dress like the opposite sex) in an effort to make themselves unattractive to the abuser.

### e. SLEEP DISTURBANCES AND REGRESSIVE BEHAVIOR

Nightmares, insomnia and fear of sleeping alone are common to the abused child. A child's regression to a younger developmental level may also be indicative of abuse—i.e., the toilet-trained child who reverts to bed-wetting or other "accidents," or the child who suddenly clings to her parent when approaching school or the home of the abuser.

### f. SEVERE DEPRESSION, SUICIDAL FEELINGS

Seemingly unprovoked crying spells, self-imposed isolation and long periods of sleep can be manifestations of severe depression felt by an abused child. Discussions of death or suicide gestures and attempts may also be associated with abuse.

*g. SUDDEN CHANGES IN APPETITE, MOODS OR GROOMING HABITS*

Refusal to eat or gorging may be the result of a child's wish to change her appearance to avoid being the subject of sexual abuse. Excessive bathing, showering and scrubbing certain parts of the body raw may indicate the child's attempts to eradicate the sense of "dirtiness" as a result of abuse. Other physically abused children stop bathing and appear frequently in torn and filthy clothes—evidence of their low self-regard.

## D. CHILD DEVELOPMENT FACTORS

As professionals who work with children know, children think, feel and act differently from adults. Cognitive, emotional and social growth begin at birth and gradually develop through childhood, with limits at each stage defining their ability to recall and relate events. The child's perception and feelings about abuse are also determined by individual rates of growth. Personality, family characteristics, other life experiences and any pre-existing physical or psychological disabilities are clearly important. Characteristics of the abuse itself and especially its duration, the victim's relationship to the offender, the presence or absence of violence, and the possible consequences of full disclosure all influence how the child will report and what she will say about the abuse. The relationship of child developmental stages to the reporting and describing of abuse are discussed below.

### 1. Infants and Toddlers/Pre-Verbal Stage

When the child is unable to give verbal accounts of abuse and possesses only the most rudimentary verbal skills, she may use these in combination with gestures to suggest an abusive episode—e.g., the child may point to the genital area and say, "Owee, Dadda, owee." There must be additional evidence to form a basis for concluding sexual abuse: medical evidence (evidence of injury and/or infection), eyewitnesses, and/or evidence of the child's unusual or changed reactions to the offender (e.g., fear, crying).

### 2. Preschoolers (3-5 Years of Age)

Children at this age are still completely dependent on adult family members to meet all their physical and emotional needs. They think in an egocentric way. They are the center of their world, and they do not understand interrelationships among individuals or families. Security is their uppermost concern. They have no real awareness of outside events or options and look to the family for all their information.

Pre-conceptual, concrete, intuitive thinking is characteristic. They do not understand causality, abstractions, metaphors, analogies or irony. Early verbalizations are likely to be loose, disorganized, circumstantial, brief and will usually contain relevant and irrelevant details. Although they can recall events, they cannot give accurate information regarding antecedents, sequences, or context. Time and space are personalized and not necessarily logical. There may be some understanding of the concepts of "before" and "after," but information about specific times or dates is not at all reliable, no matter what the child actually says. Verbal abilities may exceed the actual cognitive capabilities of the child. Children play and learn by duplicating behaviors and situations they observe. At this age, children have a *very* short attention span, become restless, are active and spontaneous, will change the subject, quickly lose interest in a topic and may revert to "I don't know," or "I can't remember," during an interview to avoid boredom.

The offender is almost always a relative or caretaker since this age group does not usually have independent relationships. When sexual abuse is involved they do not know the behavior is sexual or wrong; they may be aware that it hurts or feels good or because it is concealed, is unusual. If committed by an authority figure, children will be fearful of telling since they see adults as omnipotent. Their feelings toward the offender will reflect the degree of dependence they have on him. Children at this age are unable to make up sexually explicit

stories or to have learned about sexual behavior except through direct experience. They may exhibit reactions to the experience because they do not yet verbalize adequately.

When abuse is suspected in this age group, clues may come from the child's behavior. The child may simulate sexual activities with dolls, pets, or other children, or demonstrate sexual behavior such as open mouth kissing, touching the genitals of adults, or talking in a sexual way. They may react in fear or discomfort if touched on the genitals while being bathed or changed—e.g., "Don't hurt me like Daddy does"—or display knowledge about sexual acts—e.g., erections, oral or anal sex, ejaculations. They may ask unusual questions or react differently to the offender than they have in the past—e.g., thumb sucking, nightmares after visits, crying, bed-wetting. Finally, the child may have medical symptoms or psychosomatic symptoms such as vaginal infections, bladder infections, stomach aches or headaches.

Often a child discloses because of a change in circumstances that makes the child feel it may be safe to tell (e.g., parents' divorce). Documentation of behavioral changes or indicators, the context of disclosure, and the exact words of the child may be used as supportive evidence.

### 3. First Through Fifth Graders (6-10 Years of Age)

At school, children begin to have a life of their own with activities and relationships outside the family. Their world expands to include friends and other adults such as teachers or neighbors, and their sources of information correspondingly increase. Although they continue to rely on the family for most physical and emotional needs, there is a gradual shift. They do not, however, have a clear sense of separate identity from family and adults and may feel responsible for external events such as their parents' divorce. Peers become important as playmates but not as a basic source of emotional support. Same sex relationships are most common, often accompanied by negative attitudes toward the opposite sex.

At this stage, children still think in fairly concrete terms but they begin to understand concepts and symbolism. As knowledge and skills increase, they learn to read, write and communicate better. They can generally place themselves in time and space using events and activities as identifying markers. They also learn about secrets and deception.

Abused children at this stage generally know that certain behavior is unacceptable since it usually occurs under forced or deceptive circumstances. Their lack of control over their lives, however, prevents them from challenging or resisting it. The experience usually confuses and scares them. Some children do not seem to mind the abuse or tolerate it because they are getting something in exchange like money, presents or special attention. Once they have become a part of an ongoing situation, they may feel as much to blame and as worthy of punishment as the offender.

Behavioral clues to sexual or physical assaults at this age may include becoming withdrawn, having nightmares, coming home with unaccounted-for money, depression, aggressiveness or regression to younger behaviors. Relationships to peers and others may show change. They may demonstrate sexually stylized behavior, reflecting children's versions of adult behavior. Documentation of these behavioral indicators can be used as supportive evidence of abuse.

### 4. Puberty/Fifth Through Seventh Graders (10-13 Years of Age)

Physical changes of puberty affect girls about one to two years earlier than boys. Their developing bodies produce feelings of self-consciousness and awkwardness. Almost everything is embarrassing. Sexual thoughts and feelings begin at this time. Changes in hormones and accompanying major physical developments cause moodiness, extreme swings in feelings and emotional outbursts.

There is a strong desire to be accepted by the peer group, and anyone who is different is ostracized. Friendships start to be significant sources of emotional intimacy while family relationships become conflict-ridden, although still the primary source of support. The child begins to challenge family and societal rules but usually only tentatively. Shoplifting, drug experimentation and sexual contact may be attempted.

The preteen sexually abused child knows that such behavior is wrong. Self-consciousness, fear of blame, feeling responsible for the abuse, perhaps because of her own physical changes, all inhibit her from disclosing the abuse. She may tell a friend or indicate something is happening, and subsequently feel guilty about her participation and previous silence. A common reaction is to block it out and act as if everything is fine.

When children in this age group are being victimized, their behavioral changes may be interpreted simply as part of normal development. A new relationship with the adult offender—i.e., treatment as a social equal, worse treatment, or treatment as the mother or head of household—may become apparent. The child may exhibit age-inappropriate behavior such as acting or dressing older or younger than she is or associating with older or younger children. She may have few friends and rarely invite people home or talk on the telephone. Depression or violent aggressiveness typifies severe cases.

### 5. Adolescents/Eighth Through Twelfth Graders (13-17 Years of Age)

This age group is almost fully physically developed. Many adolescents are sexually active with peers to some degree, and most are certainly well aware of and interested in sexual matters. Peer relationships are often of greater immediate significance than family relationships.

The shift toward greater independence continues, often accompanied by a high level of testing behavior. Conflict with authority, represented by parents and societal expectations, is normal. Teenagers may be very intense, have extreme reactions to situations and take themselves very seriously. They want to appear competent and find it hard to admit when they need help.

In many cases, sexually abused adolescents have a long history of abuse perpetrated by a parent whose behavior they are now no longer willing or able to tolerate. Aware now of the difference between what is normal for others and what their experiences as victims have been, they begin to consider alternatives to living in an abusive situation.

Adolescent victims may have overt emotional or behavioral problems in response to victimization. They may be rebellious, fail, be suspended or truant from school, get in trouble with the law, use drugs or alcohol, suffer depression, have suicidal tendencies or self-mutilate, sexually act out through promiscuity or prostitution, run away or experience psychosomatic disorders such as headaches, abdominal pain or hysterical reactions.

### E. REPORTING ABUSE

The time at which children report abuse varies. Sometimes the disclosure is an attempt to prevent current abuse from continuing. In other instances the revelation comes long after its last occurrence. Motivations vary. Sometimes a school presentation or a public service announcement alerting victims to available community resources and encouraging them to seek help triggers the disclosure. Sometimes a question by a parent or remark by a friend provides an opportunity to speak out. In many cases it takes a long time (often several years) for the child to muster the nerve to risk the anticipated consequences of disclosure. In a substantial number of cases, the report of abuse is elicited by adults who question the child because of some unusual or suspicious behavior they have observed. As discussed, numerous psychological and developmental factors affect how children report and describe abuse.

### 1. Reliability of Abuse Reports

While many cases are classified as "unfounded" or "unsubstantiated," the term does *not* necessarily mean that a child has made a false accusation of abuse. A recent study by David Jones and J. Melbourne McGraw examined all cases of sexual abuse reported over a one-year period to the Department of Social Services in Denver, Colorado. Although 47% of the cases were labeled unfounded, 41% of this figure did not involve false reports. Insufficient information to form an opinion (24%) and legitimate suspicions dispelled by investigation (17%) both contributed to this statistic. Only 8% of all reports of abuse were

found to be fictitious, with only 2% of these from children (*Journal of Interpersonal Violence*, Vol. 2, No. 1, 1987). This figure is consistent with an earlier study by J. J. Peters, reported in *American Journal of Psychotherapy*, Vol. 30, 1976, which concluded that in the 64 cases surveyed only 6% of the children's reports of abuse were false.

Unfounded reports can result from vague complaints and legitimate suspicions. They can also result from an inability or unwillingness to do complete and careful investigations. When investigative agencies such as the police and child protective services have inadequate resources, frequent staff turnover, little training, and poor record keeping practices, the thoroughness of child abuse investigations suffers. A recent nationwide survey by the House Select Committee on Children, Youth and Families ("Abused Children in America: Victims of Official Neglect," 1987) found that despite a 55% increase in reports of abuse between 1981 and 1985, federal, state and local resources to address the problem rose less than 2% overall. In over half the states, resources either declined or failed to keep pace with the influx of reports. Thus, according to testimony submitted to an April 29, 1987 hearing of the House Subcommittee on Select Education, "As states reported. . .their ability to respond to abused children and families or those known to be at risk was seriously compromised by shrinking budgets."

Unfounded reports are rarely attributable to deliberate deceit or lying by children. There have been no studies demonstrating that children can be influenced to fabricate entire events despite some current accusations about parental or professional brainwashing. The opposite, in fact, is truer. It is clear that rather than exaggerating or fabricating incidents of abuse, children are much more likely to minimize and deny abuse because of pressure or fear. Typically, physically abused children cover up the abuse by offering alternative explanations for the injury and sexual abuse victims recant or refuse to repeat the story to avoid the pain. Moreover, there is no scientific evidence that children are capable of fantasizing abuse experiences, especially young children, since imagined events normally have some base in actual experiences and knowledge. While an older child might have delusions, they are usually based on actual events in her past and only occur in conjunction with a severe and obvious psychiatric disorder.

## 2. Children's Memory and Suggestibility

It is well established that both adult and child witnesses are unable to remember experiences exactly as they occurred. Most individuals do not record every detail of an event in their memory and retrieval processes vary.

Studies show that all witnesses may be subject to suggestibility in certain ways. Elizabeth Loftus and Graham Davies surveyed the existing studies in "Distortions in the Memory of Children," published in the *Journal of Social Issues*, Vol. 40, No. 2, 1984. They found that there is little evidence to support a conclusion that children five years of age and over are substantially less reliable or more suggestible than adults. The authors concluded that if children are more suggestible than adults the reason is not solely age, but more of an interaction between age and other variables such as interest in the event, time factor involved, language sophistication and type of recall given (e.g., written, multiple choice, free recall or recognition).

There are developmental differences in the ability of children to recall events. Children provide less information in free recall processes than adults and do require some assistance or prompting. They are unable to remember peripheral details completely but their memory for the central event is quite precise and accurate. Young children cannot provide accurate and precise information about time and sequencing. Children, like adults, will have difficulty recalling and distinguishing separate incidents of abuse if they have been repeatedly abused. What this means is that children remember differently than adults do because of less developed cognitive capacities. Children recall less, but what they do recall is no less accurate than adults.

### 3. Delayed Disclosure

Like the child who accommodates herself to the abuse by repeatedly returning to the abuser, delayed disclosure can be a troublesome issue to prosecutors dealing with these cases for the first time as well as to jurors. A variety of understandable factors will cause an abused child to conceal the abuse for long periods, if not forever. Fear, shame and concern about whether she will be believed are paramount in the victim's mind. Generally, she must feel that it is a good or ''safe'' time to reveal the abuse, and this may be many months or even years after the abuse.

Often the delayed disclosure will come at a time when suspicion of the child's accusation is heightened. This occurs frequently when the disclosure coincides with parental custody or divorce proceedings. Another inopportune time for the child's abuse allegation, considering the likely reaction from unenlightened adults and peers, is when she is having serious behavioral problems. Yet, in the former example, through the child's eyes, this may be the best time to disclose the abuse since the abusing parent is less of a threat and possibly the subject of closer scrutiny by others. There is also the frequent fear that the offender will gain custody and she will have no future recourse. In the latter example, the child's serious behavior problems often result from the abuse and represent stress signals that she cannot tolerate the situation any longer. The likelihood of disclosure at this time is therefore strong.

### 4. Recanting

A common problem symptomatic of child abuse is the victim's propensity to recant or retract earlier allegations of abuse. Such retractions occur often. Keep in mind that the child's fears which kept her silent may very well come true once the abuse is disclosed. The child may not be believed. If believed, the child may be blamed. The offender may be arrested, the child's parents separated, and family members or neighborhood friends may take the offender's side. The child may be considered ''dirty'' or a ''freak,'' and she may never enjoy the respect or affection she once had from family or friends. She may also be rejected openly or subtly by most of the important people in her world. Withstanding this kind of intense pressure would be difficult for a mature adult let alone a young child. Thus, it is no wonder that recanting is so frequent.

### 5. Expectations of Reporting

Children do not ordinarily report abuse in order to have the offender prosecuted. Many do not even know it is a crime or that children are protected by laws. They definitely do not understand the requirements, procedures, or laws governing criminal investigations and prosecution. Many do want offenders punished for the wrong they have done, although they may not wish a lengthy prison term. Prosecutors must make it clear that they—not the victim—are responsible for the outcome of the criminal justice process. This must be communicated to children at the outset and reinforced frequently to offset the child's feeling of responsibility for harm to the offender and her family.

## F. SPECIAL CHALLENGES

### 1. Perceptions of the Criminal Justice System

The nature of children and the dynamics of child abuse present special challenges to the criminal justice system. Although great strides have been made, there are still obstacles to overcome. One fundamental obstacle is the reluctance in many communities to view child abuse as a crime for which offenders should be held fully accountable. Many agencies and individuals continue to discourage prosecution based on the belief that, in many cases, abuse is a ''family matter,'' with treatment the only appropriate response. A related view is that involvement in the criminal justice process will increase the child victim's trauma. Another

62

emerging obstacle is the growing attempt by some citizen *and* professional groups to limit the number of child abuse cases reported to law enforcement to those that are extremely severe or those that represent extrafamilial incidents of abuse.

None of these views should be a deterrent in your efforts to prosecute cases. There is no question that abuse often reflects an extremely dysfunctional family whose members may benefit from therapeutic intervention. But to excuse physical and sexual assaults on a child that are not permitted on an adult is to abandon our commitment to the law's protection of *all* citizens. Furthermore, treatment can be and often is a component of the criminal justice system's disposition of a case, and the imposition of criminal sanctions can serve as a significant incentive to an offender to participate in treatment.

Secondly, there is increasing evidence that prosecution of child abuse—if sensitively and carefully handled—is a major factor in restoring the self-esteem and self-respect of young victims. The court experience—far from damaging the child further—can be an empowering process, freeing the victim from a nightmarish past and enabling her to look forward to a future over which she has some control.

## 2. Personal Demands on Prosecutors

The demands on prosecutors who regularly handle child abuse cases constitute a special challenge which must be recognized. Burnout is a common phenomenon—induced by cases that are overwhelmingly stressful, heartbreaking and ugly. The answer, however, on the part of many prosecutors' offices is not to abandon specialized units or personnel but to take steps to reduce the burden of these cases. Such steps include proper training, realistic caseloads, strong administrative support, and coordination of resources.

The following sections describe some of the special demands placed on prosecutors and how to resolve them.

### a. TIME

The amount of time required to evaluate and present child abuse cases is significant. In this respect they are similar to other serious criminal cases like murder or adult sexual assault for which lengthy preparation is routinely demanded. It is not uncommon for the prosecutor to meet with a child victim on multiple occasions in order to develop a relationship with which she feels comfortable, to elicit necessary information, and to assess the child's ability to testify and prepare for court. It is not unusual to deal with multiple victims of the same offender in a single case. And more often than not, multiple meetings with family members and other witnesses, including potential expert witnesses, are involved in the assessment and preparation process.

The prosecutor must often respond both to anxiety about the process and resistance to it from victims and their families. The incentive to spend substantial time is high since the prosecutor will want to minimize the risk of making mistakes in situations where the potential price of any mistake may be costly.

### b. EMOTIONAL DRAIN

The emotional toll of child abuse cases is a very strong aspect of this work. The subject of child abuse on its own provokes intense feelings, and dealing directly with a number of individual cases that are often sad and horrifying can be very difficult. It is not easy to remain detached; the cases are compelling and emotional reactions are unavoidable.

The frustration of facing numerous hurdles and the sense of personal defeat when cases are lost are consequently magnified. To manage this stress, support from administrators within your own office and other professionals in your community who share responsibility for child abuse cases is crucial. Different offices have found different ways to relieve the staff—for example, by assigning a reduced caseload to prosecutors dealing primarily with

child abuse, including a few other kinds of cases in their duties, insisting that prosecutors take regular leave, making counseling available, and encouraging regular training and seminar attendance.

### c. RISING NUMBERS AND PUBLIC EXPECTATIONS

Referrals of child abuse cases to prosecutors' offices have increased dramatically in a very short time. Public awareness, especially of sexual abuse, accounts for much of this rise in numbers. Many more cases are thus being prosecuted, with younger victims. Along with the greater volume of cases has come higher community expectations concerning sensitive and successful prosecutions. Despite the fact that many social agencies are involved in the child abuse area, prosecutors often feel they are the critical links in the chain. Success, moreover, has its own drawbacks when resources are limited. The more aggressively individual cases are pursued (requiring greater time and resources), the fewer resources are left to spread across the increasing number of cases.

Despite these difficulties, many prosecutors are not only maintaining their commitment to providing justice for child victims of abuse, but extending their work to include an interest in relevant legislation, investment of time to improving their skills, development of support networks, and participation in community efforts designed to educate the public about the realities of child abuse and the legal system.

The following chapters discuss how best to approach and handle all aspects of child abuse litigation.

*Reference List*

Browne & Finkelhor, *Impact of Child Sexual Abuse: A Review of the Research*, 99 PSYCHOLOGICAL BULL. 66 (1986).

A. Burgess, THE SEXUAL VICTIMIZATION OF ADOLESCENTS (National Institute of Mental Health 1985).

A. Burgess, A.N. Groth, L. Holmstrom & S. Sgroi, SEXUAL ASSAULT OF CHILDREN AND ADOLESCENTS (D.C. Heath 1978).

Chance & Goldstein, *Face-Recognition Memory: Implications for Children's Eyewitness Testimony*, 40 J. SOC. ISSUES 69 (Summer 1984).

Christoffel, Anzinger & Amari, *Homicide in Childhood: Distinguishable Patterns of Risk Related to Developmental Levels of Victims*, 4 AM. J. FORENSIC MED. & PATHOLOGY 129 (1983).

Cohen & Harnick, *The Susceptibility of Child Witnesses to Suggestion*, 4 LAW & HUM. BEHAV. 201 (1980).

DeJong, Emmett & Hervada, *Sexual Abuse of Children: Sex, Race and Age-Dependent Variations*, 136 AM. J. DISEASES CHILDREN 129 (1982).

ETHNICITY AND FAMILY THERAPY (M. McGoldrick, J.K. Pearce & J. Giordano eds., Guilford Press 1982).

Faller, *Is the Child Victim of Sexual Abuse Telling the Truth?*, 8 CHILD ABUSE & NEGLECT 473 (1984).

Gomes-Schwartz, Horowitz, & Sauzier, *Severity of Emotional Distress Among Sexually Abused Pre-school, School Age and Adolescent Children*, 35 HOSP. & COMMUNITY PSYCHIATRY 503 (1985).

Goodman & Hegelson, *Child Sexual Assault: Children's Memory and the Law*, 40 U. MIAMI L. REV. 181 (1985).

Goodman & Reed, *Age Differences in Eyewitness Testimony*, 10 LAW & HUM. BEHAV. 317 (1986).

J. Goodwin, SEXUAL ABUSE: INCEST VICTIMS AND THEIR FAMILIES (John Wright 1982).

Green, *True and False Allegations of Sexual Abuse in Child Custody Disputes*, 25 J. AM. ACAD. CHILD PSYCHIATRY 449 (1986).

Johnson & Foley, *Differentiating Fact from Fantasy: The Reliability of Children's Memory*, 40 J. SOC. ISSUES 33 (Summer 1984).

Jones & McGraw, *Reliable and Fictitious Accounts of Sexual Abuse to Children*, 2 J. INTERPERSONAL VIOLENCE 27 (March 1987).

Kaufman, *Child Abuse—Family Victimology*, 10 VICTIMOLOGY 62 (1985).

Kelly & Scott, *Sociocultural Considerations in Child Sexual Abuse*, in SEXUAL ABUSE OF YOUNG CHILDREN 151-163 (Guilford Press 1986).

V. LaPoint, REPORT ON RESEARCH ON CHILD ABUSE AND NEGLECT AMONG BLACK, HISPANIC, ASIAN-AMERICAN, AND NATIVE AMERICAN CHILDREN IN THE UNITED STATES (Center for Studies of Minority Group Mental Health, National Institute of Mental Health, unpublished).

Layman, *Working with Children of Different Ages*, in LEGAL ISSUES IN CHILD SEXUAL ABUSE CASES 3-6 (Arkansas Child Sexual Abuse Education Commission 1986).

65

K. Lindholm & R. Willey, CHILD ABUSE AND ETHNICITY: PATTERNS OF SIMILARITIES AND DIFFERENCES (Spanish Speaking Mental Health Research Center 1983).

Loftus & Davies, *Distortions in the Memory of Children,* 40 J. SOC. ISSUES 51 (Summer 1984).

Lourie, *The Phenomenon of the Abused Adolescent: A Clinical Study,* 2 VICTIMOLOGY 268 (1977).

Lusk & Waterman, *Effects of Sexual Abuse on Children,* in SEXUAL ABUSE OF YOUNG CHILDREN 101-118 (Guilford Press 1986).

MacFarlane, *Child Sexual Abuse Allegations in Divorce Proceedings,* in SEXUAL ABUSE OF YOUNG CHILDREN 121-150 (Guilford Press 1986).

Marin, Holmes, Guth & Kovac, *The Potential of Children as Eyewitnesses: A Comparison of Children and Adults on Eyewitness Tasks,* 3 LAW & HUM. BEHAV. 295 (1979).

E. Porter, TREATING THE YOUNG MALE VICTIM OF SEXUAL ASSAULT: ISSUES AND INTERVENTION STRATEGIES (Safer Society Press 1986).

THE PSYCHOSOCIAL DEVELOPMENT OF MINORITY GROUP CHILDREN (G.J. Powell ed., Brunner/Mazel 1983).

SEXUALLY ABUSED CHILDREN AND THEIR FAMILIES (P.B. Mzarek & C. Henry Kempe eds., Pergamon 1981).

Sgroi, Blick, & Porter, *A Conceptual Framework for Child Abuse,* in HANDBOOK OF CLINICAL INTERVENTION IN CHILD SEXUAL ABUSE 9-37 (D.C. Heath 1982).

Spencer & Dunklee, *Sexual Abuse of Boys,* 78 PEDIATRICS 133 (1986).

Terr, *Time Sense Following Psychic Trauma: A Clinical Study of Ten Adults and Twenty Children,* 53 AM. J. PSYCHIATRY 244 (1983).

Waterman, *Family Dynamics of Incest with Young Children,* in SEXUAL ABUSE OF YOUNG CHILDREN 204-219 (Guilford Press 1986).

D. Whitcomb, E. Shapiro & L. Stellwagen, WHEN THE VICTIM IS A CHILD: ISSUES FOR JUDGES AND PROSECUTORS 13-22 (National Institute of Justice 1985).