

67

CHAPTER II

# *Investigation*

A good investigation is the key to successful prosecution of a child abuse case. There are no substitutes for careful and thorough investigations, and no shortcuts to produce what you need to make informed decisions about filing charges and presenting a convincing case at trial.

Effective and complete investigations require skill, an adequate commitment of time and resources, and a recognition of the special features of child abuse cases. Information gained from the investigative process will provide the basis for determining whether a child's allegation of abuse is believed, whether evidence exists which verifies or corroborates an allegation of abuse, whether the existing evidence justifies the filing of criminal charges, and whether the evidence justifies conviction by a jury. Mistakes made at the outset often cannot be remedied and may undermine an otherwise viable case.

Unlike most other crimes, child abuse investigations routinely involve people and agencies other than law enforcement. Child protective services personnel are often the first to receive a report of suspected abuse and may be the first to interview both children and offenders. Successful resolution of cases, therefore, requires coordination during the investigation among all those involved—the prosecutor, police, children's protective services, the medical community, and mental health therapists. Keep in mind that each participant in the investigative process will have specific roles and objectives, some of which may overlap, but which need to be clearly delineated and separated. Coordination can be achieved in a variety of ways and each community's approach must be designed to fit the unique needs and characteristics of that community, as discussed more fully in Chapter VII. At a minimum, prosecutors handling child abuse cases should be aware of all actors in the investigative process in their community and take the initiative to ensure that investigations are conducted promptly and properly.

Many prosecutors are involved at the investigative stage of child abuse cases, participating in joint interviews with victims or consulting with law enforcement and child protective services about steps in the investigation of individual cases. In communities where protocols have been or are being developed to specify the role and responsibilities of different participants in the child abuse investigation process, the prosecutor's input is essential. And the prosecutor is clearly the logical person to assume leadership in any effort to improve and redesign investigative responses to child abuse cases.

The specifics of a child abuse investigation will differ depending on: the type of abuse alleged—physical, sexual or both; the age of the child and ability to talk; how soon the report is received after an abuse incident; and other factors varying from case to case. Too often, police and prosecutors have perceived these incidents as simply one-on-one cases, with the child as the only source of evidence—"the only witness." They have therefore seen no need to investigate beyond an initial (and sometimes inadequate or inappropriate) interview with the child. The assumption has been that since traditional forms of corroboration such as eyewitnesses or definitive medical evidence are lacking, there is no point in looking for verification or corroboration elsewhere.

In reality the trial of a child abuse case probably never involves only the testimony of the child. Usually the prosecutor calls a number of witnesses to testify about matters relating to the allegation of abuse, and it is their testimony that helps to corroborate the charge. Though the child must certainly be the focus of any investigation in a child abuse case, much more emphasis should be given to improving interviews and identifying alternative ways in which investigations can reveal relevant information.

68

Investigative interviews must be thorough. When a child can be interviewed, the interview must be conducted by someone with skill and knowledge. Search warrants should be sought and searches carried out before suspected offenders have the opportunity to change, hide or destroy potential evidence. Investigators should take photographs and when appropriate, arrange for medical examinations and scientific tests as soon as possible. They should conduct thorough interviews of additional witnesses before they are likely to be influenced by outside pressures or concerns. Suspected offenders, where possible, should be interviewed and given a chance to tell their side of the story. With the exception of the victim interview, the investigation is much the same as that of any other serious felony and should be approached as such. The aim of the investigation is to determine all pertinent facts and ascertain the truth.

## A. INTERVIEWING THE CHILD VICTIM

The child must be the focal point of any investigation of an allegation of physical or sexual abuse. If the child is able to talk, one of the first steps is usually an interview with the child. A good interview is probably the single most important part of the investigation and will serve in almost all cases as the basis for evaluating the child's credibility and the reliability of the abuse report.

Interviewing a child about abuse—whether the child is very young or a teenager—requires special skill and sensitivity. Techniques used in interviewing adult crime victims will not work with children. Likewise, adolescents, grade-school-age children and preschoolers must all be handled differently. It is essential, therefore, that the interview in any case having a potential for filing criminal charges be conducted by someone who communicates effectively with the child and is knowledgeable about the needs of the legal system. An understanding of the dynamics of child abuse and the developmental abilities of children of different ages will help the interviewer tremendously. (See Chapter I, Section D., for related discussion.)

Prosecutors handling child abuse cases must develop the ability to interview children well. In some circumstances, they may be involved in investigative interviews. In those cases when they are not, prosecutors responsible for deciding whether to file charges must be able to judge the quality of prior interviews. You may wish to talk with the child yourself before the charging decision is made.

The ability to talk with a child in court and elicit facts about the abuse is critical when trying a child abuse case. This section of the manual on interviewing children is therefore directed specifically to prosecutors. However, the same principles apply to anyone talking with a child about abuse prior to a criminal trial, and especially to those who initially interview the child even if their "official" duties are not to gather information for the prosecutor. The manner in which interviews are conducted and the information provided by the child will *always* be issues in initiating and trying criminal child abuse cases.

Consult the literature and talk to other professionals about interviewing children whenever possible. A partial list of references appears at the end of this chapter. Becoming aware of effective techniques and strategies, as well as criticisms or difficulties you may encounter will help you improve your skills and develop your own approach. There is no single right way to interview children. There are many effective strategies as well as many inappropriate ways to proceed.

The purpose of the interview is to gather as much reliable information as possible from a child about an allegation of abuse. During the interview process, the interviewer must remain open-minded and try not to be influenced by any preconceived ideas about what a child is going to say. The questions asked should allow for an intelligent determination about the legitimacy of abuse allegations. It would be naive to presume that *all* reports of abuse are authentic. It would also be wrong to assume that the majority of cases of suspected abuse are false. If interviews are geared toward assessing the validity of accusations of abuse and eliciting information that verifies or refutes the allegation, this process need not be confrontive, adversarial or unduly traumatic for the child. Sensitivity does not require sacrificing objectivity.

## 1. Preparing for the Interview

Prior to the interview session, the prosecutor should thoroughly review any available information relevant to the case including police reports, medical reports, child protective services' records and other materials. Even the most thorough and detailed documents will often not provide everything the prosecutor needs to know to file a charge or conduct the interview. If possible, speak to others involved in the case, such as the physician who examined the child, the child's parent or guardian, the therapist or victim advocate who has been in contact with the child and her family, and the principal investigator, to gain better insight into the case as well as the personality and developmental status of the child. It is a good idea to tell the child's caretakers not to rehearse the child before she sees you and to let you explain in detail who you are and why you need to talk with her. It is best if they simply tell the child that you are someone who works with children and needs her help. Biographical and background information such as age, grade in school, siblings and other family members, residence, and whether the child suffers from any physical, mental, or learning disability, are essential to know before the interview takes place.

When a child has a disability of some kind, it is important to find out before the interview whether you will need special help to communicate. Depending on the situation, you may want another person with you. For instance, a therapist or special education teacher known to the child could help when she has a mental, learning or developmental disability. If the child is deaf but can sign, a court-certified American sign language interpreter with whom the child is comfortable would be needed to communicate.

Special consideration and planning are needed to communicate with the child who speaks a different language. In arranging for an interpreter proficient in the child's language to be present during the interview, subsequent meetings and court appearances, you should also ensure that some training and orientation is provided. Some communities will have skilled and sensitive bilingual personnel available, often working with the child and family welfare or health related organizations. In others, more effort will be required to locate an appropriate interpreter.

Find out, if possible, whether the child can read, write, count or tell time. If a sexual abuse allegation is involved, review any information available about her knowledge or familiarity with anatomy or sexual behavior and the terminology used by the family for the genital areas.

The circumstances of the assault or what has been revealed about the assault up to that time should be determined. You must ascertain what took place, where, when, by whom, and to whom it was reported as well as the child's reaction to the assault and subsequent disclosure process. The exact words used to describe what happened, any behavioral or physical signs of distress, and by whom they were noticed should be determined. It is also important to note the reaction of those close to the child and whether she is in a safe, stable and supportive environment. Finally, from what you learn, assess the potential problems and defenses you may face if criminal proceedings are instituted against the offender.

There is nothing new about stressing preparation for interviewing witnesses in criminal cases. Realizing, however, the unique problems associated with abuse cases and the significance of the child's credibility in determining the outcome of the case should provide an extra impetus for thorough preparation. Use the information you learn before the interview to alert you to any possible alternative explanations for the abuse allegation, to help you formulate appropriate questions, and to understand the child and her terms and situation. Do *not* expect that this information will necessarily be repeated by the child nor that it represents the full extent of what occurred. Be ready for anything and careful to control any expectations or reactions that could influence the child.

## 2. Interview Location and Circumstances

The physical location of the interview is important. The surroundings should be suited to the child's feeling of well-being and free from commotion distracting to both the child and

the interviewer. Police department facilities are generally not conducive for the interview. A young child can feel intimidated by the large number of busy adults—some wearing guns, some in uniform—as she is being led to the traditionally stark detective's office or interview room. Recognizing this, many police agencies and prosecutors' offices have designed special interview rooms to accommodate the needs of child witnesses. These should be used if available.

The appearance of the interview room should make children feel welcome. An attractive wall covered with cheerful illustrations or familiar storybook figures could be helpful. Some prosecutors put up pictures drawn by different children they have interviewed; others take young children to the office copy machine and photocopy their hands, have them sign their first name, and then post these on the wall. This can serve several purposes. Displaying a child's drawing or hand is a way of showing interest in the child and perhaps making her feel special. If she returns to prepare for trial, for instance, there will be something of hers to make the setting more familiar. And seeing other children's drawings or the hands of other children on the wall shows the child that there are other victims out there who have also talked to prosecutors and, hopefully, she will not feel quite as alone. Using a child's first name only will obviously help to protect her confidentiality.

If possible, the furniture should be suitable to children. The seating arrangement and the room itself should be comfortable and provide the victim with space to move around, explore and touch items in the room. Children do not like to be confined. They may wish to sit in a chair, on the floor, or on an adult's lap and the interview room should provide for some flexibility to do so. If finding space is a problem and other waiting or witness rooms cannot be inexpensively converted, then, at the very least, the prosecutor should have a few toys available and otherwise try to make his or her office comfortable for children. Ultimately, it is the interviewer who makes the biggest difference in the success of the interview. Fancy interview rooms will not make up for an interviewer's lack of skill, but skill at interviewing can overcome a lack of special facilities.

The child's activities during the interview should be somewhat but not overly limited. A few toys such as a puppet, dollhouse, coloring book, crayons or paper and pencil can occupy a child's physical needs to be doing something while allowing her to talk—perhaps with less restraint. A room designed for children need not be expensive; basic furnishings might include pictures, toys and simple furniture. Keep in mind, however, that too large a room and too many toys can distract a child from discussing the abuse.

The use of aids such as anatomical dolls to help children point out relevant parts of the anatomy and explain what happened in sexual abuse situations has gained widespread attention. Sometimes a child will tell a puppet about abuse or talk into a toy phone rather than answer direct questions from the interviewer. Some professionals use a completed or partially completed sketch of the body and ask the child to draw or circle relevant parts of the anatomy on the sketch. Additional aids include drawings (on paper, blackboards, coloring books, sand trays, "Etch-a-Sketch"), clay, doll houses, regular dolls or stuffed animals, sentence completion and role-playing exercises, letters to offenders, and having a child write down what happened. These devices can certainly be helpful when a child has difficulty in expressing what acts occurred and what parts of the body were involved, but they should be used carefully. (See Seciton A.7. of this chapter). You must be cautious when you use aids not to get in "over your head" and start interpreting too much since some techniques require special training used as an adjunct to therapy with a child. Too much reliance on them by the untrained professional who is not providing treatment can bring criticism both in and out of the courtroom.

The child should not be fed anything during the interview process unless approval has been sought from the parent or guardian. Even if approved, refreshments should be limited to a drink, sugarless gum or candy, peanuts or similar fare. Once again, you do not want to distract the child too much. Some prosecutors recommend that refreshment be offered only after the interview is over. Waiting until after the interview may prevent later claims by the defense of "bribing" the child to say what you wanted.

The time scheduled for the interview should not be a period when the child is likely to be hungry, sleepy or otherwise distracted. Shortly after breakfast, an hour after the noon meal,

or midafternoon are generally thought to be the times when children are most alert. Allowing enough time so that the interview does not have to be rushed is also important. Setting aside a total of an hour and a half is not uncommon and should provide sufficient time to conduct a good interview without overtaxing the child. Two hours may be too long unless you have an unusually alert child. Time spent actually discussing the abuse allegation will probably be much less. The length of your interview should be dictated, however, by your assessment of the child as you go along. Be flexible enough so that the child and others involved will not be too inconvenienced by the time set for the interview. Taking the child out of school should be avoided unless absolutely necessary. Be prompt when the child arrives. Do not keep her waiting. The quicker you begin the interview, the better off you will be. Any appreciable delay increases a child's anxiety level and impatience at having to be there at all.

The room and the interviewer should provide the child with a feeling of privacy. Victims often feel an enormous amount of shame, guilt and embarrassment and are less likely to "open up" if interruptions occur by extraneous persons or phone calls. It is also much more difficult to establish and maintain rapport with the child if the phone rings or you are called outside of the interview setting. Arrange to have your calls taken by someone else during the time period scheduled for the interview and prohibit unscheduled appearances by others during the interview session.

### 3. Who Should Be Present at the Interview

Unfortunately, many agencies may need to participate in the interview process or, at the very least, need different questions answered during the initial interview. Reducing the number of repetitive interviews and different interviewers should be a goal in child abuse cases. Too many interviews and interviewers are stressful to the child, often unnecessary, and can lead to seemingly inconsistent statements. An obvious preference would be a single interviewer with an overall understanding of the needs of each agency involved in the child abuse investigative process, who could serve as the information gatherer for all agencies. Agency representatives could confer with the interviewer before the interview and brief him or her about the situation and the kinds of questions that need to be raised. A victim-witness advocate could accompany the child to provide support and act as a witness to the interview. Having a witness present is particularly important when the prosecutor conducts an interview, so that he or she does not end up being the only witness to the child's statements.

If a single interviewer is not feasible, effort should still be made to limit participants to as few people as possible. When the prosecutor is involved, take steps to ensure that the same prosecutor handles that case subsequently. Vertical prosecution is beneficial to both the child and the case and can eliminate many problems that arise when a new prosecutor is involved at different stages. If a single interviewer is not possible, there should be joint interviews in which only the necessary agency representatives participate, e.g., police, prosecutor, and child protective services' personnel. Limiting the number of people present to those necessary will lessen the possibility of the child feeling uncomfortable, overwhelmed, or "bombarded." If the interview session is shared, and each representative has an opportunity to ask questions, the prosecutor could take the lead or serve as an arbiter to ensure that necessary information is elicited and the interview is conducted appropriately.

Since the interview of the child is so important to the investigative process, joint interviews require one person to assume control. This should be spelled out in advance. Successful interviewing is difficult under the best of circumstances without the added confusion of many voices and interests. Particular care must be taken to establish joint interview procedures in parental abuse cases since they almost always involve multiple agencies.

The presence of parents, relatives or others closely involved with the child, while she is being questioned about abuse, is not a good idea. Children are often ashamed of what happened and may be reluctant to reveal the abuse or its extent in front of family members. Further, the revelation of abuse in the presence of people who care for the child, and perhaps care for the suspect even more, is usually upsetting or shocking and will provoke emotional reactions that interfere with the interview. Children can sense the approving or disapproving

glances and gestures of family members. Not only does this heighten their anxiety, it may cause them to look to parents for permission to speak as well as for approval of answers.

A prosecutor should explain the interview procedure and the reasons for it to anyone accompanying the child. It is important to reassure parents and other supporters and to allay some of their concerns if possible. Explain the need to offset the frequent defense argument, "If a child is able to disclose the alleged abuse only when Mom or Dad are present, who do you think put her up to making such wild accusations?" After the interview, spend some time with the parents or other supporters of the child to gather additional information and answer any questions. Establishing rapport with the parents as well as with the child will help you with later trial preparation.

If the child is uncommunicative and insists that a parent or other person be present instead of a victim advocate, it should be allowed. An apprehensive child will not offer as good or complete a statement if denied those whom she wishes to be present. If this occurs, try having that support person stay only for introductory and preliminary parts of the interview, until the child feels comfortable with you. The specific discussion of abuse can wait until the family member or support person leaves, although the child can be told where he or she will be and given permission to go to the person if needed. The interview is, in fact, not easy for even the well-meaning and supportive parent to sit through without comment. An inappropriate or ill-timed comment can disrupt the entire interview. If this does occur, be understanding. You must remember that it is their child—their loved one—who has suffered the abuse. Moreover, your negative reaction to a family member's comment may in turn cause the child to react negatively to you.

More than one interview is often necessary, especially with young children, to gain their trust so that they feel comfortable revealing the full extent of abuse. Anyone with experience with children knows that most children will not relate the complete story of abuse at one, two or even three interview sessions. The interviewer must exercise patience and understanding while trying to unravel the details of what was done and by whom. And whenever possible, the same interviewer should remain throughout the process. Nothing can damage a prosecution more than premature charging (and later dismissals) caused by inexperience or impatience on the part of the interviewers or investigators.

Whoever conducts the investigative interview with a child should be familiar with the criminal justice system and cognizant of the dynamics of child abuse, especially child sexual abuse. The interviewer must be aware, for example, of the pressures on the child when the alleged offender is a parent or close relation, particularly after the initial interview session when other family members learn of the allegations. A well-schooled investigator will know how best to combat these pressures, establish rapport with a child, enlist the aid of support people for the child, and pursue the investigation despite the many barriers confronted along the way. Understanding basic concepts of child development will assist immeasurably in being able to communicate with children of different ages. (See related discussion in Chapter 1, Section D.)

Despite traditional notions to the contrary, both men and women can be appropriate and effective interviewers. In most cases, the gender of the interviewer will be of no consequence. What *does* matter is the degree of sensitivity and ability of the interviewer to communicate. The interviewer should be careful not to set up a situation which calls to mind the circumstances of a traumatic abusive incident—i.e., a man interviewing a child alone in a small room with the door closed in a case involving alleged abuse in a small closed room where the child was alone with the male offender. As a result of their experience, some children may be uncomfortable with any male or female interviewer. If a child shows a marked distrust of the interviewer simply on the basis of his or her sex, be flexible enough to make adjustments.

## 4. Recording Information From the Interview

Many prosecutors prefer not to use video or audio tape recording equipment during an interview with a child (see Chapter VI for a more complete discussion of electronic aids). A

young child can become too involved with or distracted by video and audio tape recording devices and teenagers may be embarrassed and reluctant to talk if taped. The quality of tapes cannot always be assured and can be subject to later disputes. And, if a child speaks softly or moves around, her statements may not be recorded. Moreover, a child will frequently reveal more information about the abuse after the initial interview, but only the initial interview was taped. The less detailed or effective interview can then be used at trial by the defense to discredit the child's allegations of abuse. There may also be discrepancies between the taped interview and the child's testimony which the defense may use to attack the child's credibility. Further, you always run the risk of defense criticism that you should have recorded every meeting or session with the child. The defense will suggest that if you did not, subsequent unrecorded statements of the child should be ignored. These are simply a few of the issues discussed in more detail in Chapter VI.

It is important, however, to have some way of accurately recording the details of your interview. The police investigator or victim-witness advocate can be assigned to take careful notes or you can take notes yourself, keeping in mind the potential in your jurisdiction for discovery or disclosure of such notes to the defense. In some jurisdictions, such as Minnesota, the notes or a summary of them *are* discoverable. Explain to the child why you need to take notes and enlist her help in recording all the important facts. You may be surprised when the child alerts you to something ''important'' to put down. Take down the exact words the child uses to describe the abuse. If taking notes during the interview becomes unworkable, write down a summary of what was said as exactly as possible immediately following the interview. In addition to information elicited from the child, your notes should include, in a separate section, your impressions of the child—her demeanor, credibility, appearance, and similar traits. This will help you to recall the interview and evaluate the case.

## 5. Conducting the Interview: General Principles and Building Rapport

When the child first arrives, be sure to greet her with all of the adults present. Briefly explain who you are and what you do in terms the child can understand, such as, ''I am a lawyer whose job is to talk to children and find out about problems they might be having so I can try to help.'' When you begin the interview, find out if the child knows why she is there and what she may have been told to expect. Try to correct any misgivings or misimpressions that she may have.

Examples of questions you may wish to begin with include the following: ''Do you know why you are here?'' ''What do you think is going to happen today?'' ''What did (your mom, the caseworker, etc.) tell you would happen, tell you to do or tell you to say today when we talked?'' ''Did *anyone* tell you what to say?'' ''Do you know what prosecutors do?'' ''What do you think my job is?'' These last questions help give you an idea of how the child views you. Often she may expect you to act like television images of attorneys and be apprehensive.

The child needs to receive support, reassurance and encouragement to tell you the truth, whatever it may be. Therefore, it is important that you make it clear that this is a serious matter and that the most important thing is for her to tell the truth. She should be told that you will not be shocked, surprised or angry about anything she tells you and that you need to know everything that happened. Let the child know that she is not at fault, and that there are many other children out there who have been in similar situations and talked to prosecutors. As an interviewer, you must remain open, neutral and objective, and beware of any reactions which could be interpreted as reinforcing certain responses and discouraging others. Your purpose is to elicit what really happened. Be careful not to create any false impressions about what you can or will do for the child. Telling her that ''everything will be all right'' or that you only want to help the offender is unrealistic. You must be honest and acknowledge there are circumstances over which you have no control such as whether she will be in foster care or not. The child must be able to rely on your word if she is to trust you enough to be candid about the allegation of abuse.

Try to make the child feel comfortable by asking easy initial questions appropriate to her age, such as last name, birthdate, grade, school, teacher's name, favorite subject, names of others in the family, pets, friends, activities, favorite toys, games, movies and television shows. Sharing personal information to which the child can relate—such as your own pets, school experiences, or relationship with other children her age—will often help establish rapport. Remember to be flexible by allowing young children freedom to move around, sit on the floor, or become acquainted with the interview room itself. Don't sit behind a desk; this can be intimidating. Sit on the floor with the child if that makes things more comfortable.

Next, try to assess the preschool or grade-school-age child's developmental level by determining, for instance, whether she can read, write, count, tell time, recite the alphabet, describe her favorite television characters, recall her last birthday, remember Christmas gifts, or what she had for breakfast yesterday. Additional questions could include whether she understands money values, has any responsibilities around the house, understands what is meant by "before" and "after," whether she is allowed to go around the neighborhood alone, stay at home alone, make dinner, or feed her pets. Determine whether a young child can distinguish between telling the truth and telling a lie, and what the consequences are for telling a lie (e.g., punishment such as not being allowed to watch television). Preliminary questions such as these should develop rapport and provide the interviewer with a good sense of whether or not a young child can meet the legal requirements of competency. (See competency questions in Chapter V, Section C.1.d.[2].)

Establishing a common terminology is essential. Use language the child understands. If you do not, the result is often confusion, blank looks, or embarrassment. Avoid words like "incident," "penetration," "prior," "ejaculation," etc. Keep in mind that young children may have dolls, stuffed animals, pets and imaginary friends who have names and are a significant part of the child's life. You will not want to be confused by this when trying to connect events in the child's daily routine with the people around her. Ask the child to describe people she mentions. Sometimes abusers introduce themselves to children by using fictional names or names associated with well-known television or storybook characters. This is to undermine the child's credibility in the eyes of anyone she may tell about the abuse. Determining how she knows a person's name, where she met the person and what the person looks like should help clear up problems of identification.

Remember too, that a child may have a name for someone which is inconsistent with that person's relationship to her. For example, "Uncle Bill" may be a close family friend rather than a natural uncle. Similar problems arise in situations when the family has split up. Fathers, stepfathers and boyfriends may all be called "Daddy" or by their first name. With a young child, consider having her guardian bring photographs to the interview of people involved in her daily life (if available). Do *not* use them to identify the abuser. Their sole purpose is to identify people close to the child before any abuse issues are raised. If used otherwise, you may provide the defense with an issue regarding the suggestibility of identification procedures.

Be flexible. Your style or approach will vary depending upon the age and individual characteristics of the child being interviewed. Your goal is to establish trust, reaffirm that you are there to help her, and elicit an accurate account of what happened. Throughout the interview, try to strike a balance between being professional, objective and firm while still being friendly and understanding. Remember, she is probably as curious about you as you are about her. Try not to let young children get carried away with themselves or become too silly.

## 6. Eliciting Facts About the Abuse

Ask questions that are direct, simple, and as open-ended as possible, depending upon the child's level of comprehension and ability to respond. Avoid leading questions. It is important to be sure that the information given by a child is really coming from her and not

provided by the interviewer. Young children will probably be unable to respond to completely open-ended questions such as "What happened?" Instead, give children options and be specific without leading. For instance, when trying to find out where abuse occurred you could first ask "Where did that happen?" If the child is unable to answer, you could choose a location you believe to be unlikely, such as the kitchen, and ask, "Was it in the kitchen?" The child then often say, "No, it was in the bedroom." Appropriate follow-up questions could be, "Can you tell me more about the bedroom?" "Whose bedroom was it?" And if necessary, "Was it your brother's?" "Yours?" "Your dad's?" These questions should be asked one at a time, giving the child a chance to answer each question. Compound questions are often confusing for a young child.

If your questions have become specific and narrow, producing "yes" and "no" responses in order to elicit needed information from the child, try asking the child additional questions to clarify the answers and determine their reliability. One technique would be to ask, "Did it happen in the hallway?" "In the car?" "In the yard?" "In the closet?" If the child answers "no" to some questions and "yes" to others, this generally indicates she is not simply agreeing with everything. A "yes" or "no" answer to every option you present, on the other hand (especially if these result in clear contradictions), should cause concern and you must evaluate the case with great care. It may be that the child is extremely uncomfortable and does not want to answer questions, or it may be that she is unable to answer.

There are other techniques for seeking further explanations of "yes" and "no" answers. To explore where the abuse occurred, you could ask, "How did you get to the bedroom?" An answer such as, "I was asleep and he came in and got in bed with me," or, "He carried me there after Mom left for work," should confirm the reliability of the child's answers.

Try not to ask questions which sound accusatory such as, "Why didn't you try to stop him?" "Why did you let him touch you?" or, "Why did you wait so long to tell anyone?" Questions like these will only make the child feel more guilty than she probably feels already and reluctant to be open with you. There are better ways to find out what you need to know. For example, you could say, "Were you able to try to stop him?" "Explain what you were thinking/how you felt/what you did, when he touched you." "Did you tell anyone about it?"

Remember that children can be very literal so choose your words carefully and vary the way you ask questions to ensure you understand each other. One example of a child's concreteness occurred during a trial in which the prosecutor tried to get the four-year-old victim to indicate where on her body she had been "hurt." Asking "Where did you get hurt? Do you have a name for the place you got hurt?", the child's answer was, "At home." Similar problems can occur with such questions as, "Did he touch you in any other way?" If the child thinks of touching as using hands or fingers, she may not reveal being touched by a penis. Similarly, if you ask, "Did you touch or do anything to (the offender)?" it may appear as if you are asking whether she initiated some activity. If she perceives that she was *made* to do something, her answer could be negative. When these situations occur, go further by asking, "Did any other part of his body touch you?" "Did he make you do anything?" Your sensitivity to her state of mind and use of language may go far to solve such communication problems.

Children often make cryptic statements, the meaning of which is not immediately obvious to the interviewer. Rather than assuming you know what the child means or ignoring statements because they do not seem to make sense, pursue them. Try to clarify what the child is talking about and find out what she means. Although you will not always be successful, it is important to make such efforts since these statements are likely to come up again later. Never threaten or try to force a reluctant child to talk or continue an interview. Let the child know that your questions may sometimes be confusing and that it is better to say so rather than try to answer a question she does not understand. Explain that you know some questions might be embarrassing and that she should tell you if she would rather not answer, instead of saying she doesn't know or can't remember. It is important to communicate that there are no right or wrong answers; all you want is for her to tell the truth. Assure her that you don't expect her to know everything. Pressure during the interview can

INVESTIGATION

cause a self-conscious and apprehensive child to withdraw and be further traumatized. If the
child becomes distressed, try talking about less threatening subjects for a while and then ease
back into the more uncomfortable topic. If the child still indicates she does not want to talk
about it, or if she is giving obviously unreliable information, stop the interview. You can
always try again another time if there is a likelihood that the situation will improve.

If you sense that a child is fearful of revealing what happened, ask directly whether she is
scared to tell you and if so, what frightens or worries her. Try to deal with her fears and
diffuse them honestly. For example, if the child tells you she is afraid she will be in trouble,
ask her why she thinks that and reassure her if possible. If she indicates that she has been
threatened in some way, you should let her know how you can protect her. (See suggestions
in following section.) If she says she is afraid that the offender will go to jail, explain that it
will be up to a judge to decide whether jail is needed, but that it will be the offender's fault,
not hers, if jail is ordered. The child's extreme anxiety in divulging the abuse is under-
standable. Many have kept their silence for years in the face of threats, and the benefits of
telling this ''special secret'' may not be at all clear. This is especially true when other family
members have denounced the child and pressured her to recant. You must acknowledge and
respect the great risk she is often taking in telling you.

### a. FINDING OUT WHAT HAPPENED

A good prelude to questions about sexual abuse with a young child is to ask the child to
identify various parts of the body. Start with the arms, legs, head, etc., then move on to the
genitals, breasts and buttocks. For example, you could ask, ''What do you call the part of
your body that you walk on?'' ''Can you point to it?'' Lead up to, ''What part of your body
eats food?'' ''Can you show me where your nose is?'' ''What do you call the part of your
body that you go to the bathroom with?'' And, ''Can you show me where that is?'' Find out
what terms are used by the child and use them as you continue the interview. Resist the
temptation to teach a child the proper anatomical terms. They will sound unnatural and the
child will appear to be coached if they are not words she would normally use.

Another method which is sometimes effective with young children is to use pictures of
incomplete ''stick'' figures and ask the child to complete them. Not only will this help to
establish your rapport with children who enjoy participating in an activity, it will frequently
elicit relevant information such as the inclusion of genitals on unadorned figures. This
inclusion may indicate sexual abuse since an unabused child is unlikely to focus on that area
of her anatomy. The abuse victim, on the other hand, is more likely to feel that her genital
area is the only part of her of value to the outside world.

### (1) Sample Questions in Sexual Abuse Allegations

With a sexual abuse allegation, it is obviously important to have the child describe where
she was touched and how. The following are sample questions intended to elicit pertinent
information. Not all questions will be appropriate in all situations and additional questions
should be asked as necessary.
''Can you tell me what happened?''
''Have you ever been touched in a way that made you feel funny or
uncomfortable?''
''By whom?''
''How did it start?'' and ''What happened next?''
''What part of his body did he use to touch you (hand, mouth, penis, etc.)?''
''Where did he put his finger/his mouth/his penis?''
''What part of your body did he touch?''
''What kind of touching was it?'' (If the child is puzzled by this
question or can't answer, you could ask, ''Was it like this?'' and make
a hitting motion on your chair or a table. Often she will then
correct you and demonstrate the kind of touching.)

"How did it make you feel?" (Do not assume it necessarily hurt or was perceived by the child as unpleasant.)

"Did he touch you anywhere else?"

"Did he touch you with anything else?"

"How were you dressed?"

"How was he dressed?"

"Did you always have your clothes on?"

"Did he always have his clothes on?" (Because a child may be very literal and consider clothing pulled up or down and not completely taken off as "on," you often need to question further.)

"Were you standing up, sitting down, or what?"

"Did he kiss you—where?" (You may need to question further here, since the child may have experienced "licking" or "sucking" rather than kissing.)

"Did he want you to touch him anywhere?" "Where?" "How?"

If the child describes touching or being touched by or seeing a man's penis ask questions about it:

"What did that part of his body look like?"

"Was it the same as yours?"

"What do you call that on a man?"

"How long or big around was it?"

"What direction was it pointing?"

"Did anything come out of it?"

"Where did the stuff that came out land?" If the child says, "In the toilet," you need to question further to determine whether the offender was perhaps simply urinating. If the child says, "In my mouth," you might then want to ask what it tasted like. It is this level of detail that can validate the allegation.

"What did it look like?"

"What did it feel like?"

"Who cleaned it up?" "How was it cleaned up?"

"Did he show you anything?" (Books, magazines, pictures, implements, etc.)

"What did he tell you about what he was doing?"

"Did he take pictures?" If yes, "What were you doing, or what did he want you to do when he took the pictures?"

With teenage girls, "Were you worried about getting pregnant?" If not, ask, "Why?"

"Have you seen a doctor?"

### (2) Physical Abuse Allegations/Sample Questions

Physical abuse allegations will most often involve the child's parent or caretaker. The children most difficult to interview in these cases are those who have not disclosed abuse themselves but have been brought to your attention by a report from someone else. A teacher, for example, may notice a pattern of physical injuries that seem consistent with child abuse; or a doctor may suspect abuse as a result of examining or treating a child. In these situations, the child may not have initially revealed the abuse because she has been led to believe she deserves to be punished and does not recognize the assault as inappropriate or abusive. For good reason, she may fear worse punishment if she tells. Further, she may be ashamed of her parents' or caretakers' abusive treatment and the bruises or scars it has left on her body.

It is often helpful in such cases to begin the interview with a discussion of the kinds of punishment used in the child's home. Be careful to broach this subject in a nonjudgmental way so that the child does not misinterpret your line of questioning and think she is in trouble with you. You might begin by acknowledging that you were occasionally punished as a child, and could discuss some of the commonly accepted reasons for and types of punishment. The following questions may be appropriate in physical abuse cases.

78

"What would happen to you if you did something bad or wrong?"
"Would you be punished in some way?"
"Who would punish you?"
"What would he or she do?" (Ask the child to describe any objects used.)
"Do you know why (the offender) did this to you?"
"Did he say anything about it while he was doing it?" "What?"
"How often does that happen?"
"What did you think about that?"
"How did you feel about it?"

If the child has injuries such as bruises, scars, broken bones, etc., you can ask directly, "How did that happen?" If the child gives an impossible or unlikely explanation, and especially if she demonstrates discomfort and reluctance to talk, you might try pointing out, "I talked with the doctor in the hospital about how he thought it happened, and what you're saying doesn't make sense to me—can you tell me *exactly* how it happened?" Or, "If someone else had done this to you, would you feel like you could tell me?" Because physical abuse covers such a wide range of situations, specific questions will vary from case to case. Be flexible in your approach. Try to be as matter-of-fact as possible when you discuss the subject with the child, and be alert to both verbal and non-verbal reactions to your questions.

### (3) Child's Fears/Reasons for Secrecy

Try to determine if any threats, promises, or requests were made or rewards given to the child to prevent her from revealing the abuse—i.e., to "keep it a secret." This type of information may be difficult to discover because of the coercion applied or because of the child's positive feelings for the offender, but you should approach the problem directly. It may be helpful to use the following questions as a guideline.
"Did he want you to tell other people about it?"
If the answer to the above is "no," "How do you know he didn't?"
"What did you think would happen if you told?"
"What did he say?"
The following questions are more directed and leading, and should be used only if necessary.
"Did he tell you not to tell?"
"Did he say something would happen or that you would get into trouble if you told?"
"Did he give you anything afterwards or do anything for you?"
"Did he say it was to be a secret?"

If it appears that the child has been threatened and is particularly frightened, you should try to address her fears openly. Find out the type of threat made and who made it. Be aware that the threat may not have been made by the abuser but by an accomplice or someone close to him. Once this is revealed, it may be easier to break the intimidator's hold on the child by discrediting unrealistic threats or instilling confidence in the child that she will be protected.

Some prosecutors have found it effective to bring in the detective assigned to the case to talk to the child, not about the case but about his or her responsibility to protect the child and her family. Have him or her show the child his or her badge or pictures of his or her children and pets and otherwise make the child feel comfortable. It is likely that the child has already met the officer but has associated him or her with uncovering a secret for which she or her family will be harmed. He or she is less likely to be viewed as someone responsible for preventing harm to her family. A weekly follow-up call by the officer to the child just to say hello and talk for a minute or two can do wonders.

If a child is not responsive to this approach, many interviewers try to get the child involved in an activity which will help the child unconsciously bring her fears and their causes to the surface. Asking the child to list her "favorite" people and things and then the most "scary" people and things in her life may provide clues upon which to direct your efforts. (See additional suggestions in Section A.7. of this chapter.)

### b. FINDING OUT WHO WAS INVOLVED

A child's identification of the abuser will probably not be elaborate. Most children know the offender and will be able to name him, although in some cases the child may not fully understand his relationship to her. You should be able to ascertain from other sources the nature and extent of the relationship. It is important to determine how the child felt about the offender before the abuse and how she feels about him now.

Ask the child whether or not she has been touched like that or has had similar things done to her before. Even with teenagers there is a need to know if there may be another explanation for any medical findings. Find out who the first person was that she told about the abuse and whether anyone else knows about it. Determine whether the child knows others who may have been victimized by the offender.

The following are examples of questions in these areas.

"How did you feel about (name of offender) before this happened?"
"How do you feel about him now?"
"Does anyone else know about this?"
"Who?" "How do they know about it?"
"Did you tell anyone about it?"
"Who was the first person you told/tried to tell?"
"What did that person say/do?"
"Who did you tell next?" and "What did they say/do?"
"Who else did you tell?"
"Was anyone else around when this happened?"
"Where were they?"
"What were they doing?"
"Do you think he has done this to anyone else?"
"Who?" "Why do you think that?"
Or, "How do you know?"
"Has anything like this ever happened to you before?"
"Has anyone else ever done anything like this to you?"

### c. FINDING OUT WHEN AND HOW OFTEN IT HAPPENED

Ascertaining from the child precisely when the assault or assaults took place is normally difficult. A child's response will generally depend upon her particular developmental level, how recently the last incident occurred, and the number or continuing nature of assaults the child has experienced. Children may confuse incidents that occurred at different times, especially if the abuse was chronic. Despite these difficulties, do your best to find out when the abuse occurred and how often. If you file the case, you will need to decide what time period to allege and the number of charges to file. (See Chapter III, Section B.3.b. and c.)

Normally you should refrain from asking a child the exact number of times she was assaulted. Rather, try to determine whether it was more than once and, if so, how frequently—every day, about once a week, about once a month, or whatever. Also, try to determine if there was a time of day the abuse normally took place. If, for example, it occurred during Mom's regularly scheduled shopping time or during periods in which Mom was working at her part-time job, the prosecutor can try to verify the offender's exploitation opportunities. On occasion, children may recall specific incidents by associating them with other important events in their lives such as holidays, birthdays, grade in school, or summer outings. If this happens, you can check with others who know the child to verify dates.

Ask the child how the abuse started and what she can remember about the first time it happened. Ask her if she can recall the last abuse episode and how or why it ended. Try to narrow down the time frame by asking the child if she can remember how old she was, what grade she was in, what school she was going to, what house or city she was living in, or similar questions about other events in her life at each of these times. Occasionally, an older

INVESTIGATION

child will keep a diary or calendar, sometimes making reference to abuse incidents or the abuser, or to other events that coincide with abuse.

### d. FINDING OUT WHERE IT TOOK PLACE

Abuse frequently occurs in the child's or offender's home, but it can also occur in a variety of other locations. If the child has moved around, it is important for jurisdictional purposes to find out in what state the abuse occurred and the county or town for purposes of venue. If you discover that the abuse occurred somewhere outside your jurisdiction, do not just end the interview. Question the child further to find out if anything might have happened in your jurisdiction as well. Also, complete the interview so that you are not suddenly cutting off the child's confidences, and then explain that you will be contacting the appropriate jurisdiction and passing on the information.

Do your best to relay a complete account of the interview to the proper officials so that you minimize the chances of a repetitive interview in the new jurisdiction.

Besides determining the general location of the abuse, obtain whatever descriptive information the child can give about the room or immediate location in which the abuse took place and where and how close family members or others were at the time. Determine whether the child can give you details about the precise location of the abuse—e.g., on a bed, on a sofa, or on the floor by the bed. Tracking the child's normal daily and weekend routine can often be helpful in corroborating the location of abuse occurring outside the home, for example, in a car, at school, or in an office. Always ask if there was anyplace else abuse occurred after the child has described one location.

## 7. Special Techniques

The foregoing discussion assumes you have been able to converse with the child and elicit verbal responses. Alternative strategies may be called for in other situations as discussed below.

### a. RELUCTANT OR RECANTING VICTIMS

The prosecutor handling child abuse cases should not be surprised nor too discouraged by a child's reluctance to reveal abuse. The complex and confusing nature of an abusive relationship or incident makes reluctance to tell a natural reaction. Even the most sensitive, well-educated and experienced interviewer will not always be able to elicit meaningful responses from every child. Flexibility, ingenuity and sensitivity are necessary to overcome a child's reluctance. Each case and each child will be unique. Your style and questions must be tailored to fit the needs of the individual at that particular time; consequently, there is no script of questions or single method of interviewing that will guarantee success in every case.

#### (1) Sensitivity to Child's Emotions

Try to be alert to the child's feelings and reactions as you speak and be aware of your *own* emotions. Sometimes it is difficult to maintain poise when a child suddenly reveals something shocking. Be prepared for anything, remain neutral, and respond in a non-judgmental manner. If you are taken by surprise, say something like, "And what happened next?" to give you some time to collect your thoughts and decide how best to respond. If you are feeling pressured to get information from the child, are anxious, enthusiastic, sad, upset or repulsed by what she has described, and if these feelings are apparent to the child, she is less likely to be open with you. The apprehension an abused child already has about disclosing will cause her to be extra sensitive to any potentially negative or pushy messages you communicate, whether deliberate or not. Always consider how your questions, tone of voice, and body language are likely to be interpreted by the child and adjust them to set the child at ease.

It is often helpful to acknowledge the difficulty a child has when she is sad, scared, embarrassed, confused or perhaps guilty as she talks to you. Appropriate questions or comments include: "Sometimes it can be kind of hard/scary/embarrassing/sad/confusing to talk about these things." "Does it make you feel bad to talk about this?" "How are you feeling?" "Lots of kids feel sad/embarrassed/scared/worried/confused talking about stuff like this—why do you think they might feel this way?" "Can you tell me how you're feeling?" "Can you tell me what you're thinking right now?" "I would like to understand what might be bothering you so I can try to help." Letting the child know you understand her difficulty and giving her a chance to express her feelings will often make it easier for her to tell you what happened.

### (2) Special Strategies

A variety of other techniques are available to try to encourage children to discuss abuse issues. Sometimes these are used by professionals as part of their standard procedure at the beginning of an interview and other times only when a child has difficulty. The references listed at the end of this chapter contain detailed discussions of a number of these ideas and are good resources for anyone who interviews children frequently. Some of these techniques will be briefly reviewed below and in later sections.

Lists can be used, as pointed out previously in Section A.6.a.(3) of this chapter. A child can be asked to list the people she lives with or comes in contact with and then asked to tell what she likes and does not like about each one. She can be asked to list her "most favorite" people or things and "least favorite" people or things, "good secrets" (those which will always eventually be told such as surprise parties and presents) and "bad secrets" (those which someone *never* wants you to tell), examples of "good touching" and "bad touching," things she is afraid of, places and people she feels safe in or with, and those she does not. You can ask her to tell you what she has liked and not liked about growing up, or what was the most fun and the least fun she's ever had. The use of lists such as these with appropriate questions about why someone or something is on a particular list often prompts a child to reveal abuse, which can then naturally lead to a more detailed discussion.

Another approach is to ask the child if she has any problems you might be able to help her with, reiterating that your job is to help children and families with problems. If the child does not respond, you might ask her to describe problems she is good at solving, and problems that might need someone else's help to solve. Sometimes this will lead a child to disclose.

Discussions about privacy sometimes yield information about abuse. Some interviewers have children draw a diagram showing rooms in their house, or use a doll house and ask if they know what privacy is—being alone when you want to be. They then ask when the child likes to have privacy, where in the house she has privacy, what she does when she has privacy, and how others react when she wants privacy.

More than one interview may be necessary with the reluctant or recanting child. Sometimes it is best to simply let the child get to know you and build trust and rapport in the initial interview. Disclosures may occur later. Also, they may be tentative as the apprehensive child gauges your response and the consequences of her revelation. You must allow for the child to tell you at her own speed and realize that her emotional state will not necessarily conform to your expectations or need for a clear and complete statement. When there are delays in disclosure, it is important to have the interviewer remain the same. One way to minimize problems in the case of multiple interviews is to avoid letting too much time pass between interviews. Try seeing the child two or three times in one week if possible.

If a child is still reluctant to talk about what has happened, consider asking her to show you or tell you in drawing, by using anatomical dolls, by writing it down, by telling a puppet or other doll, by whispering it to you or a tape recorder, or by role-playing. (Some of these methods are discussed in greater detail in the sections which follow.) Whatever method you try, *never* ask or tell a child during an interview to "pretend" or "imagine" with regard to anything you talk about. Furthermore, do not promise that no one else will be told what she tells you.

INVESTIGATION

If you are considering one of these strategies to help the child reveal what happened, find out as much as you can in advance from books, articles and talks with other professionals. Always be careful to consider how your use of a special technique will come across in court if the case should go to trial. If the child is in therapy, it would be wise to check with the therapist for suggestions on how you might best communicate with the child and overcome her reluctance.

If you are interviewing a child you believe to have been abused (based on all the available evidence) who has recanted or taken back a portion of earlier statements, let her know that children who have been abused sometimes decide to say it did not really happen because it is so difficult to handle the confusing feelings and everything that happens when they tell. Follow with, ''Could that be you?'' or, ''Could you be doing that?'' A child might be asked, ''Can you think of any reasons a child might change a story about what happened to her?'' This could clue you in to her reasons. Another tactic would be to ask her what she told the person to whom she originally reported the abuse, and then tell her you do not understand why she said one thing then and another now. Often the child will be unable to give a convincing explanation regarding why she supposedly lied when she first told. You might then be able to get her talking about the pressures that led her to say nothing happened.

Still another approach is to ask the child to explain what she would do or say if something like this really *had* happened—would she decide to tell or not tell? It is not uncommon for the recanting child to say she would not tell and then you could ask her why. As she explains her reasons, which usually involve all the negative consequences she has experienced from telling, you could point out that all these things seem to be happening to her. You wonder if saying nothing happened is her way of trying to stop the unpleasantness she is going through. If the offender has confessed, yet the child is recanting, ask her why she thinks he admitted something if it didn't really happen.

As frustrating as these situations are, you must try to understand the child who recants. She is almost certainly a child in turmoil, and aggressive confrontation rarely, if ever, will help resolve the turmoil—at least in the short run. Your best chance of gaining her trust lies in showing her that you are genuinely concerned, supportive and sympathetic to the pressures she faces. You won't break through her denial by making her more miserable. Only when she believes that revealing the truth will result in more positive than negative repercussions will she be comfortable enough to do so.

*b. USE OF DOLLS*

Anatomical dolls are widely used in prosecutors' offices, police departments, and caseworkers' and therapists' offices across the country. They are sold by a number of manufacturers, and sets including boys, girls, men, women and with different hair and skin colors are available. These dolls normally have openings for mouths, anuses and vaginas, and include breasts, penises and testicles. Sometimes when a child is hesitant to tell you or has difficulty finding words to explain sexual abuse, she may be willing to use the dolls to show you what happened. Anatomical dolls should not be used with every child however; some children will be uncomfortable with them, others will not need them. If you plan to use the dolls to assist with interviewing, careful thought and attention must be paid to your methods.

Many professionals recommend that the dolls be used only *after* a child has related that sexual abuse occurred. This will avoid later objections to their use based on concerns that they are suggestive of sexual activity because of their body parts and can lead a child to play with them in a way which indicates abuse where none actually happened. Such concerns are increasingly voiced by defense attorneys. The controversy over the use of anatomical dolls also points out the need not to read too much into a child's play alone with them. Children are naturally curious and can be expected to touch, poke, and explore the dolls when first introduced. Unless the child's play is accompanied by a clear explanation that the child is showing you what someone did to her, it does not necessarily signify abuse. For further information on this topic consult related articles on the reference list at the end of this chapter.

When introducing the dolls to a child, it is important to clearly establish right away that the dolls are yours. Otherwise the child may think she can take them with her when you are done. Using dolls with hair and skin color appropriate to the child's ethnic and cultural heritage and situation can be very helpful, if such are available. You might start by saying, "I have some special dolls that help me talk to children. Would you like to see them?" You could then explain that they are special because they have all their body parts, and show the child by undressing one and perhaps having her undress one or more. See how she reacts and try something else if she is too uncomfortable with them.

Determine whether the child can point out which doll is a boy, a girl, a man, and a woman. Using the dolls, you may want to have the child point out and name different parts of the anatomy. When the child seems at ease with them, you can try having her use the dolls to show you how the abuse happened, asking if she can help you to understand exactly what happened by showing you with the dolls. Then have her pick a doll to be her, one to be the offender, and any others which are appropriate. Remember not to ask her to pretend or imagine when using the dolls. As the child uses the dolls, ask her to clarify what is going on with questions such as, "What is happening now?" If she asks you to help or do something with them, do so, but ask her to be specific in telling you what to do. Do not do anything with them on your own unless you are instructed to by the child. Using the dolls to get details in this way may give you information you otherwise would not have.

*c. USE OF DRAWINGS*

Almost every prosecutor who has worked with children knows the value of letting a child draw or color, either as she waits or as a way of breaking the ice and getting acquainted. Some prosecutors' offices even have special coloring books which tell a child what to expect during the court process and which she can keep. Drawing is sometimes used in a more directed fashion as an aid to interviewing and a way of getting additional information about abuse. Special training and expertise is needed to *interpret* a child's drawings and prosecutors should not attempt to do so. However, in some cases you might want to consider asking questions and listening to the child as she draws. Do not count on having the child's drawings admitted as evidence though, since they may not always be deemed admissible by the judge.

It is often revealing to ask a child to draw her family in a case involving abuse within the family. Note whether there is normal ordering and relative sizing of individuals in the child's family. Who the child draws first, largest, or with exaggerated hands or other bodily features may tell you whom she perceives as most powerful within her world. Make sure she draws herself also. Omission of arms and hands is not unusual in the self-portrait of a sexually abused child; this may indicate feelings of powerlessness. Pay attention to a child's scribbling which often signifies anxiety, particularly when the child obliterates a portion of someone's body. If the child draws genitalia without being asked, try to find out the reason.

As she draws, ask her to tell you the name of each person and perhaps what they are thinking, feeling, and will be doing next. Ask her if this includes everyone in her family and if necessary clarify what family—natural, foster, etc. Ask her to include anyone else with whom she lives. At this point you could ask the child to list what she likes and does not like about each person she has drawn.

If the child is unwilling to draw people, you can try having her draw her home. You can ask her to draw the different rooms as if you were flying over and could see them from above. You could then ask her to describe some of the things which go on in the different rooms and perhaps discuss privacy.

As the child gets close to disclosing abuse, drawing allows her to break eye contact which might make her uncomfortable. If a child reinforces something she draws, ask about it since this usually indicates it is something she is thinking about. When she actually does disclose, ask her to draw if that makes it easier, and then to explain exactly what she has drawn. Be sure to keep any pictures the child draws for you, indicating who drew them and when on the back. Take notes about what the child says as she describes her pictures, but do so on another piece of paper in case you show the pictures to the child at some future time.

84

### d. TEENAGERS

Interviewing techniques with teenagers vary with the individual. Peer group acceptance and pressure is paramount in the daily life of teenagers and may control whether they will relate exactly what happened to them. Try to be supportive, yet don't be afraid to be direct. As with the young child, a prosecutor needs to establish rapport with an adolescent before the interview begins in earnest. Try to get a sense for the teenager beforehand if possible by talking briefly with someone who knows her and reviewing any available records. Express a genuine interest but don't draw the preliminaries out too long. An apprehensive adolescent will be sensitive and suspicious if you spend a long time with "small talk."

Your initial meeting with the teenager should establish a relationship, cover any common ground that may exist, and provide basic information. Be aware that a teenager's image of a prosecutor may be negative. Not only are you a stranger but you are an authority figure closely aligned with the police who may be disliked and feared or should at least be avoided. Being professional but personable will go a long way to crack the otherwise unpleasant image of the prosecutor.

Covering common ground initially is the best way to offset any of the akwardness common to strangers of distinct age groups who must ultimately discuss embarrasing and frequently painful experiences. A good victim advocate can be of considerable help at this stage by moving the conversation around, sharing anecdotes and experiences, showing a friendly as well as professional rapport with the prosecutor, and later by helping the prosecutor in assessing how best to handle future interviews or meetings. The victim advocate should not remain during the entire interview, but should leave at some prearranged signal or time. This permits the prosecutor to have a pesonal exchange with the teenager if then appropriate.

Adolescents will generally be impressed with your interest in the significant events in their lives—school activities, hobbies, likes, and dislikes. Whether correct or not, a problem common to most teenagers is their feeling that parents do not take as much interest in them or the important events in their life as they should.

Although there will be some differences in approach depending upon whether the teenager is a boy or a girl, it helps to acknowledge the difficulties of discussing these subjects with both. At the right moment tell the teenager that you know she probably does not want to be in your office or have anything to do with the police, you or the courts. Assure her that you understand but explain how widespread the problem of abuse is. Give her examples of the number of cases you have had similar to hers involving young men and women of the same age. Let her know that her feelings are similar to those of anyone victimized in this manner and that your job is to serve as her guide through the criminal justice system. It is important to convey your experience, knowledge, and skill in this area without promising to perform miracles. Part of the teenager's problem—common to most victims injected into the criminal justice system—is her lack of knowledge about what to expect.

As you talk to the adolescent about abuse, keep in mind that you need to find out who, what, when, where, how, and how often. Embarrassment can be your biggest hurdle with this age group. Make clear you are *not* judging her and explain how important it is to be honest with you. If the offender's knowledge of the child's age is an issue or potential defense in your case or jurisdiction, be sure to cover this subject fully with the adolescent. Find out whether she ever misrepresented her age to the offender, whether the offender knew or celebrated her birthday, knew her grade in school and had any other information that might show his awareness of her age.

Give the teenager an honest appraisal of the case and how you are going to help her prepare. Give examples she can understand and provide her with overall basic information. Let her know that you care not only about the outcome of the case but about her welfare.

Alert the teenager to the dangers of speaking to others about any facet of the case or any details of the abuse (friends or otherwise). Try not to alarm her, but apprise her of the possibility that the defense will use investigators if you anticipate this could occur. Moreover, mention that the defense could subpoena anyone they believe she has spoken to about

the abuse *or any denials* of abuse. Explain to her that denials to friends (meant to avoid the embarrassment or stigma associated with the abuse) can be damaging should a trial become necessary. Give her whatever assurances you can about protecting her name and details of the case from widespread public disclosure. It helps if you can say the newspaper does not print victims' names and that you can ask for other witnesses including her parents to be excluded from the courtroom when she testifies if she wishes.

Some prosecutors arrange to show the victim around the office while introducing her to one or two other prosecutors and perhaps another victim advocate. The idea is to introduce her to others as you would a friend or acquaintance without referring to her as a victim. This approach has a threefold purpose: it will give her a little insight into the rhythm of a prosecutor's office; it will demonstrate there are more than a few friendly people there; and it should provide her with a sense of relief that she is not looked upon or treated differently because she has been abused. This should have an overall positive effect on her and help you prepare for trial.

Stay in touch with the adolescent on a regular basis prior to trial. Teenagers are even more likely than younger victims to carry a great deal of guilt and reduced self-esteem as a result of abuse. Often they will have had to deal with an abusive situation for a lengthy time, and it will have caused other problems in their lives. If you lose contact with the teenage victim, you may face unnecessary difficulties by not knowing what is going on with her.

If the teenage girl describes abuse involving intercourse, always ask whether she was concerned about becoming pregnant. If she indicates she was not because of something the offender said or did—e.g., he used a condom or told her he had a vasectomy—you will have some possible corroborative evidence. If she indicates no precautions were taken, you need to make sure she is seen by a doctor who will give her a pregnancy test. Often the teenager will not have told her parents about intercourse, will not want to, and thus will not have had appropriate medical attention.

When interviewing adolescent boys, keep in mind that there are usually special difficulties. For young boys, a sexual assault by a male will provoke concern about their masculinity, both from the standpoint of what other people may think and from what they assume the offender thought in selecting them. An assault by a female, on the other hand, presents its own problems for young boys since it may be viewed by others as not very serious or certainly nothing to complain about. Try to be sensitive to their feelings and help them understand how they were taken advantage of and why they are not responsible for what occurred. Encouraging the adolescent victim—male or female—to obtain counseling is one of the most important things you can do.

When the teenager is reluctant to tell you about the abuse, she will sometimes be willing to write it down. Another technique which is helpful with some is to ask them to complete sentences such as:

"I would like to..."
"The best thing that ever happened to me was..."
"The worst thing that ever happened to me was..."
"My biggest problem is..."
"I am afraid..."
"There are some times when..."

Even if what they write does not mention the abuse, they often reveal something that will allow you to discuss their feelings and can lead to a discussion about abuse. Be patient and convey a sense of respect for their feelings.

## 8. Ending the Interview

End your interview with the child on a positive note. Thank and praise her for being brave, doing well and helping you. Have her help you review your notes for accuracy if you think it appropriate. Children usually respond to requests for assistance quite well. Ask if the child has any questions for you and answer them honestly. It is extremely important not to mislead the child—she must be able to trust you. If you intend to see the child again, mention it to her

and try to make it something she will look forward to. Whether you explain to the child what will happen next, including possible court appearances, should be based upon your interview experience. At the very least, let the child know how she can contact you if she remembers anything else about the abuse or has questions. Often, giving the child your business card makes her feel important and helps to establish rapport for any future contact. If the child has not disclosed abuse but you suspect something happened, it is a good idea to talk to the child about places where and people with whom she feels safe. Discuss how she would go about protecting herself if she found herself in a threatening situation.

If the interview is near to the trial date, you may wish to talk about what will happen at the trial and prepare her for the always present possibility of a last minute continuance. Do not, however, extract promises from the child regarding upcoming testimony. Most children cannot project themselves into an unknown situation and predict how they will behave. Remonstrations about testifying in court or the ''trial'' will have little real meaning to the child and may cause distress or outright fear.

Provide the parents or child's guardian with simple, straightforward information about what will happen next in the criminal justice system, the approximate time period involved, and the likelihood of trial vis-a-vis a guilty plea. Giving them practical insight into the system based upon your experiences will lessen the impact of any problems you may encounter. Make no promises you cannot keep. Instead, enlist their cooperation and let them know who to contact for status reports, emergencies, additional statements or questions of the child, or any other reason. Also, express your appreciation and understanding for the effort that they are making by reporting the abuse and following through on the process.

## 9. Assessing Validity

Determining whether a report of abuse is reliable and valid is a process of evaluating all available information and evidence. The existence of evidence such as eyewitnesses, confessions, or pictures, home movies or videotapes depicting the abuse should leave virtually no doubt about the authenticity of an allegation. Likewise, conclusive medical evidence will make the determination easy. Realistically, however, this kind of definitive corroborative evidence is rare, particularly in child sexual abuse cases. In the majority of cases you are left with the child's statements to you and others, together with evidence that may be consistent with, but in and of itself, does not prove abuse. These factors include behavioral and emotional characteristics of the child and suspect seen by others, indirect medical findings, items which conform to descriptions given by the child, and the existence or lack of opportunity for the suspected offender. As a result, the child's statements represent the primary source of information with which to assess the validity of an allegation of abuse. This section will focus on factors to consider in evaluating the credibility and reliability of a child's statements.

### a. ELIMINATION OF OTHER EXPLANATIONS

Throughout the investigation and during your interview with a child, consider alternative explanations for the charges that would indicate there was no abuse or that someone *else* was responsible or that other, perhaps additional, perpetrators were involved. As you talk with the child, look for sufficient confirmation of the people involved and circumstances described so that you can rule out any possibility of deliberate falsehood, misinterpretation of innocent contacts, or coaching by someone else. Keep in mind potential defenses raised by the suspect and determine to your satisfaction whether you can eliminate other possibilities that might account for the child's statements.

### b. DETAIL

In a sexual abuse case, the nature and amount of detail supplied by the child may be convincing. A young child who has been sexually abused will often demonstrate an accurate

knowledge of sexual anatomy and functioning beyond the norm for her age and background. For example, a four- or five-year-old may describe a penis becoming erect and then ejaculating, perhaps accompanied by masturbation, in a way which leaves no doubt that she witnessed a sexual act by the male offender. Accurate relation of details such as the taste or consistency of semen would allow you to eliminate other potential sources of knowledge for this information such as cable television, pornographic magazines or movies, or witnessing others engaged in sexual activity. Often a child will recount idiosyncratic or highly personalized details which lend credence to her statement—e.g., telling you what she was thinking, how it felt, or details significant to her. A child's total inability to furnish details demonstrating familiarity with a sexual act supposedly committed on her may indicate the absence of abuse, unless this can be explained by fear, embarrassment or lack of verbal skills. Remember too though, that the younger a child is, the fewer details she will be able to provide. Nevertheless, always look to see whether the child can furnish details, what those details are, and whether some other experience (prior abuse or exposure to pornography or sexual activity of others) could account for the amount and accuracy of knowledge she has.

### c. WORDS USED

The words used by a child to describe something which really happened should generally be her own and age-appropriate. For instance, a three-year-old's description of sexual abuse as, "My dad peed on my tummy...he was pressing his butt (her word for both male and female genitalia) against my butt and we were stuck together," is graphic and appropriate to her age. It is highly unlikely an adult would have coached a child in such terms. The use of non-leading questions provides further assurance that these are her own words. Later statements of a child may include language used by others and may sound less credible. In such cases look at earlier statements and descriptions she gave. Make sure you know terms normally used by the child to describe anatomy. Some children are taught adult terminology such as "penis," "vagina," and "anus" at a young age, and their use of such words need not signify unreliability. Others sometimes learn colorful, descriptive, slang or sometimes even technical words from an abuser. However, words like "rape" or "molest" coming from a young child in early interviews are fairly unusual and may be suspect.

### d. CONSISTENCY AND VARIATION

In determining the reliability of a child's statements, another factor is internal consistency—within a single interview as well as over time and different interviews. This is not to say that the child's account will be exactly the same each time. A statement that sounds memorized or like a rote recital when repeated should be scrutinized carefully. Such cases may indicate coaching. A genuine account can be expected to show variation about peripheral aspects, particularly when multiple incidents have occurred, but should not contain major changes about core, central events such as *who* was responsible for the abuse. (With multiple perpetrators, however, the child may not reveal all of them right away.) Progressive disclosure by the child in which she gradually reveals the extent of abuse—i.e., telling you additional rather than totally *different* information in subsequent interviews—as she feels more comfortable, is not indicative of an unreliable statement.

Recantation when there is pressure on the child such as an unsupportive family, also does not necessarily mean prior statements were untrue. If a child does recant, you must look for the reason. Considered in the context of the entire situation, this is not always inconsistent with a legitimate abuse allegation.

A child who has been coached to lie or is lying on her own will normally tell an entire story from the beginning without hesitating. Keep in mind, however, when you talk to a child who has been interviewed a number of times before, she may have developed a style of relating information which sounds like rote recital as a way of coping with repeated requests to divulge difficult and embarrassing facts. Your ability to review complete information

about the circumstances of and her vocabulary in initial disclosures should allow you to
evaluate the situation more confidently.

### e. CHILD'S MANNER AND EMOTIONAL RESPONSE

Often a child's actions, reactions, emotions and general affect during the interview will
give you a good sense of whether an account is genuine. Based mainly on the interviewer's
instinct and intuition, these factors are probably more subjective than objective, but can be
some of the best measures of a child's credibility. If a child expresses emotion during an
interview, consider whether it seems believable and genuine. When a child is hesitant or
reluctant to discuss questions related to anatomy or abuse, note whether she seems simply
embarrassed or fearful and perhaps ashamed. A child who feels responsible for or guilty
about the abuse, who is honestly fearful of her revelation's negative consequences, or
protective and truly concerned for the welfare of the abuser is showing characteristics
compatible with honesty. When you initially ask questions about abuse, the child may be
hesitant to respond or may deny any knowledge of the event. Ask yourself whether she
seems sincerely unfamiliar with what you are saying or is avoiding your questions delib-
erately. Children who become uncomfortable and evasive are probably afraid, and this can
be an important clue to the validity of an allegation. Blank or quizzical looks, on the other
hand, could indicate a real lack of knowledge of what you are asking about. (Be sure you are
not simply being misunderstood by the child.)

### f. CONTENT OF STATEMENT

Related to your assessment of the child's vocabulary, details provided, consistency and/or
variation of statement, and general emotional response, does your evaluation of whether the
actions she describes make sense? Is she telling you something which is physically impos-
sible? Could she or someone else have misinterpreted an innocent touch as sexual? Elicit and
consider all the details you can and use common sense. Does her description seem to fit
common patterns of abusive situations? Suzanne Sgroi, in her *Handbook of Clinical Inter-
vention in Child Sexual Abuse* (Lexington, Massachusetts: Lexington Books, 1982), con-
siders the presence of the following elements in a child's account of sexual abuse as
indicative of credibility:
- Description of multiple incidents over time, particularly where the offender is known to
  and has a relationship with the child;
- Description of a progression of sexual activity—e.g., beginning with fondling and leading
  to oral sex and then to vaginal or anal intercourse; usually over time rather than in a single
  incident, especially if occurring within the child's family;
- Elements of secrecy indicating express or implied understanding between the offender and
  child that she was *not* to tell; and
- Elements of pressure or coercion indicating a misuse of the power, dominance or authority
  of the adult offender including:
  *Engagement phase:* misrepresentation of moral standards, use of bribes, pressure or
  coercion to force or trick a child into submitting to sexual activity;
  *Secrecy phase:* tactics similar to those used in engagement phase used to prevent dis-
  closure;
  *Suppression phase:* pressure or coercion used to undermine child's credibility and force
  withdrawal of complaint following disclosure.

At some time during the course of your dealings with abused children, it is highly likely
you will encounter descriptions of very strange sounding activity or aspects of the abuse.
These could involve pornography, sadistic behavior, or ritualistic behavior perhaps with
satanic or other cult-type overtones. This can occur in both physical and sexual abuse
situations. No matter how unusual, do not automatically discount a child's statements
because they contain such information. Listen carefully to see if the child is giving a clear,
vivid and detailed description of events.

89

The more outrageous abuse seems, the more skeptical many people become because they prefer not to believe such acts could actually be perpetrated against vulnerable children. The sad reality is that some people are capable of committing horrendous offenses against children. In fact, abusers may deliberately include unusual features in their abuse to protect themselves—i.e., making the child less believable in the event she discloses. A convincing and detailed description of highly unusual behavior, assuming the things described are not physically impossible and the child is otherwise in touch with reality, may add to rather than detract from the child's credibility. Children do not have the capacity to fabricate a plausible scenario involving matters wholly outside their experience. (See Chapter I for further related information.)

### g. EXISTENCE OF POTENTIAL MOTIVE TO FABRICATE

Your evaluation should consider what motives the child may have to fabricate or others may have to coach a child to allege abuse when none occurred. Keep in mind that when children lie it is normally to avoid trouble rather than create it, and an abuse allegation typically has many negative consequences. The younger a child is, the less likely she is to have the ability to invent and maintain a persuasive and cohesive story about abuse, particularly sexual abuse. Further, the mere existence of motives should not in and of itself lead you to conclude that an allegation is invalid.

If the child is old enough to tell you, ask her what she would like to see happen as a result of having disclosed the abuse. A child who says she only wants the abuse to stop is unlikely to have ulterior motives. Sometimes an indication of desired or anticipated consequences and who led her to expect them will make vengeful motives apparent. Anger and wanting the offender punished are natural reactions, however. If anger is the only emotion exhibited, the case may deserve closer scrutiny. Moreover, if the anger seems misdirected, explore other possible explanations.

If the child has been a victim of abuse in the past, determine what the abuse was and what happened. You must then consider the likelihood that she could be seeking a result which occurred before—e.g., attention or removal from home. An abused child often becomes the victim of more than one abuser. For example, a child who has been sexually abused frequently equates affection with sex and may later use sexually provocative behavior (consciously or unconsciously) to get attention. That behavior can make her more vulnerable to future abuse. Similarly, a child exposed to physical abuse in a violent family may continue to be abused after the initial offender has left the home since the nonabusing parent tends to continue forming relationships with abusive people.

Recent concern about false allegations has been greatest when accusations against a parent surface during a divorce or custody dispute. These situations are among the most difficult to assess but deserve serious attention. All of the factors previously discussed should be considered. Chapter 7, ''Child Sexual Abuse Allegations in Divorce Proceedings,'' of *Sexual Abuse of Young Children* by Kee MacFarlane (New York: The Guilford Press, 1986), is an excellent resource on this topic.

The primary worry when a divorce and custody dispute are involved is that one spouse coached the child to allege abuse in order to hurt the other parent or gain custody. Professionals who deal with these cases regularly recognize that while this is not impossible, it is probably rare. Parents who genuinely care for their children are unlikely to put them through the additional distress, confusion and unpleasantness that accompanies abuse allegations unless they really believe something happened. Factors which might indicate coaching include little emotional reaction from the child as she describes abuse, use of adult words only, lack of variation and lack of convincing detail in statements.

Pay attention to the origin of the report. If the child confided in someone other than the nonabusing spouse, there may be less reason to suspect coaching. Try to figure out what the child's reasons were for disclosing abuse at the time of the divorce or custody battle. Perhaps the abuse began at this time with stress contributing to the offender's propensity toward abuse or use of abuse as a way of punishing his spouse. In addition, the timing of the

revelation may simply indicate it is the first safe opportunity for the child to reveal the abuse with the offender gone from the home or about to go. Then, too, the child may be afraid of the prospect of having to live alone with the abuser. As MacFarlane points out, these and other explanations are legitimate reasons a child might not tell about abuse until a divorce is pending.

Much can be learned by meeting with and determining the reactions, feelings and demeanor of the nonabusive spouse. If this parent has coached the child to lie, you can often tell. For instance, the parent may refuse to let you speak with the child alone and then show no response or inappropriate responses as the child recites what sounds like a memorized account. Talking with the parent will also give you a chance to consider whether there is a possibility of an honest misinterpretation or overreaction to something the child said or did, or whether the child could have some other reason for making an untrue allegation.

The circumstances and content of a child's statements provide the best measure of an allegation's validity. Skillful and careful interviewing will go far to make the task of assessing validity easier.

## B. INTERVIEWING OTHER WITNESSES

### 1. In General

The purpose of interviewing other witnesses is to gather as much evidence as possible and to determine whether any corroboration exists. During these interviews, the interviewer should listen for direct and circumstantial evidence as well as anticipate, evaluate, and prepare to meet potential defense claims. Anything that can be checked out should be.

A thorough investigation requires interviews with all potential witnesses. The prosecutor should encourage investigating officers to begin identifying and interviewing potential witnesses as soon as possible. Some witnesses will be obvious—the person who reported the allegation to authorities, the suspect's spouse, and other members of the child's family. Other witnesses may be identified as a result of information elicited from the child.

### a. BENEFITS OF EARLY INTERVIEWS BY INVESTIGATOR

Early interviews are crucial for a number of reasons. They will help you avoid unpleasant surprises later. Witnesses must be contacted and pinned down before their accounts are tainted by information from outside sources, they take sides with the victim or suspect, and they forget relevant details. The police need to determine what, if any, additional evidence to search for before it is lost, hidden, destroyed or changed. Early contacts are also beneficial in educating and gaining the cooperation of additional witnesses.

While you will undoubtedly want to talk with some of these witnesses yourself prior to making a charging decision and going to trial, the prosecutor should not be the first or only person to contact and interview them. Besides being too late to obtain the maximum benefit from any information they produce, statements made to the prosecutor alone leave you without a witness to testify at trial, should you need to confirm or impeach their testimony.

### b. CONDUCT OF INTERVIEWS AND CONTENT OF REPORTS

All witnesses should be interviewed separately. The investigator should refrain from telling one witness what others have said so as not to influence him or her. The facts related by these witnesses should be set forth in as much detail as possible in the officer's report and in their own words. Using quotation marks is a good way of indicating the exact words of the witness but should be used only if they really are the exact words. Witnesses can be asked to write statements as well, but these will not always cover everything the investigator wants to know.

Instruct officers not to insert personal opinions or conclusions in their reports. This is especially important in child abuse cases since defense attorneys will seize on any opinions

appearing in the reports, either to discredit the child or to argue that the officer and therefore the entire investigation was biased. Claims that investigators "program" children to make unfounded allegations or are engaged in "witch hunts" can be defeated if an open-minded and objective approach is taken and reflected in investigative reports.

The officer should talk with these witnesses in person rather than over the phone. Factual observations about the appearance and demeanor of the witness should be recorded. Besides providing information with which to assess the credibility of the witness, a face-to-face meeting allows the witness to assess the competence and credibility of the investigator and, one hopes, instills trust and the desire to cooperate. The interviewer should be professional and not mislead the witness or make false promises.

Witnesses who are likely to be in contact with the child or each other should be instructed not to question or rehearse the child, not to investigate the case on their own, and not to compare notes. Explain why these requests are being made—i.e., to assure that information provided by the child and others is accepted as reliable and free of outside influence.

For the same reason, the interviewer should not relay too many details concerning what the child or other witnesses have said even at the end of the interview. After a case has been resolved (e.g., once an offender has pled guilty or a verdict has been returned) such information can be shared. Knowing this may make it easier for nervous parents of the victim or other interested witnesses to comply.

Witnesses should be asked to contact the investigating officer or the prosecutor immediately if they remember any other information, have further relevant observations, or the child or suspect says anything new. It is a good idea to encourage witnesses to document questions, observations and statements by the child or others in writing. Referrals to support groups or therapy can also be made whenever appropriate during these interviews.

## 2. Interview of Complainant and Others to Whom Victim Made Statements

The complainant or person who first reported the abuse allegation to the authorities is one of the first people who should be interviewed. The investigator should determine what caused him or her to make the report and how he or she discovered the abuse. If a revelation by the victim caused him or her to suspect abuse, ask him or her to recount the details and circumstances. The same information should be sought from anyone else to whom the child made statements about the abuse. The following areas should be explored with these witnesses.

- What were the exact circumstances under which disclosure occurred? Was it a deliberate and voluntary disclosure by the child, or did she accidentally say something which caused the witness to suspect abuse? Was anyone else present?
- What words did the child use?
- What was the child's demeanor/emotional state as she told?
- What concerns or fears, if any, did the child express?
- Did she give details? If so, what were they and how were they elicited?
- What was the child's attitude toward the suspect?
- How did the witness react/what did he or she say to the child?
- Did the witness believe the child? Why or why not?
- Is the witness aware of any reason the child might lie about the suspect?
- Does the witness know anything else about the child or the suspect that might be relevant?

When interviewing these witnesses, pay careful attention to whether they have anything to gain or lose as a result of the allegation. Pertinent factors include their relationship to the suspect and child, attitude toward the suspect and child, and attitude toward the allegation. In addition to providing the investigator with useful information, all of the foregoing will affect whether statements made by the child can be introduced as evidence at trial under a special or traditional hearsay exception. (See Chapter V, Section C.2.)

If the complainant has reported an abuse allegation without any statement from the child, the interviewer must ascertain precisely what the complainant saw or heard. The com-

plaintant's demeanor, attitudes, relationship to the victim and suspect and potential motives to fabricate are as important here, if not more so, as they are in situations involving a disclosure by the victim. The information provided by the complainant will form the basis for further investigation aimed at verifying or refuting the allegation.

### 3. Interview of Victim's Parents or Caretakers

The child's nonoffending parent(s) or caretaker(s) are an extremely important source of knowledge about the child. Their support or lack of support for the child is another crucial factor since their involvement —which is unavoidable in all but the most unusual cases—can be either a tremendous help or hindrance to the investigator and prosecutor.

Interviews with them should focus on enlisting their cooperation, instilling confidence, and obtaining information about the child and the offender, if he is known to them. (See Section B.4. of this chapter for a discussion of interviewing the suspect's spouse or girlfriend/boyfriend.) These witnesses should be asked questions about the child's situation before disclosure and her subsequent reactions, behavior and well-being. Their general observations as well as specific knowledge about any details related by the child may corroborate the allegation and thus should be solicited right away. Try to maintain contact with them throughout the criminal justice process, perhaps through the prosecutor's victim-witness program. Update them on what is going on and ask them to keep you advised.

Specific questions should be asked in these areas.
- What, if anything, did the child say about the abuse and does she talk about it? (See preceding Section B.2.)
- Was any unusual behavior exhibited before disclosure or after? (e.g., changes in sleep patterns, changes in conduct or school performance, fear of the suspect, complaints of pain, or any other factors described in Chapter I, Section C as possible indicators or effects of abuse.)
- What is the child's medical history? (Secure permission to obtain hospital and medical records.)
- Has the child been abused before or made previous allegations of abuse?
- Can the witness verify any fact related by the child—e.g., the suspect's access to child including any time spent alone with her, timing of activities such as vacations or other outings, celebrations, moving to a new house or starting/ending school, unusual features of the suspect or his home/car/belongings, etc.?
- What was the quality of the relationship between child and suspect?
- What else is going on in the child's life—e.g., relationships with friends; involvement in hobbies or outside activities; any physical, mental or learning disabilities; juvenile court involvement including dependency proceedings; etc.?
- What was the witness' response to the child and the allegation? Was the witness supportive and helpful or not?
- For physical abuse cases: see suggestions in Section F of this chapter.
- For sexual abuse cases: determine the child's exposure to or awareness of sexual matters through contact with others, television, videos or movies, magazines, observation of adults, etc.

### 4. Interview of Suspect's Spouse

The suspect's spouse or someone involved in a similar close relationship with him such as his girlfriend should always be interviewed as soon as possible. In many cases the suspect's spouse (or ''significant other'') will also be the child's nonoffending parent or caretaker, and the areas listed above relating to the child should be covered. In all cases the investigator should elicit as much information about the suspect as he can from this witness.

The approach will probably differ depending on whether the witness is supportive of the suspect. The supportive spouse will often be called as a witness by the defense if the case

goes to trial so checking out her story early has obvious advantages. She will often be the best source of information about defenses you will face if criminal charges are filed. Further, in most states the husband-wife privilege and spousal incompetency provisions will not apply in child abuse situations and you may wish to call her as a witness yourself.

In questioning her regarding both physical and sexual abuse cases, the following areas should be explored. Be careful, however, not to give a hostile witness information that might cause her to destroy or hide evidence or otherwise contrive a statement tailored to contradict your case.

- Statements made by the suspect to her or others.
- Suspect's reaction to the allegation.
- Whether, looking back, she can recall anything unusual or suspicious, even if she did nothing about it at the time. (She may need encouragement if she feels guilty about not reacting and is concerned she will look bad or be in trouble.)
- Whether the suspect owns, or has owned, any items/clothes/weapons, etc., described by the child. If he no longer has them, when, where and why did he discard them?
- Whether the suspect was ever alone with the child—when, for how long, and who else can verify this.
- Whether the suspect was responsible for the child's care.
- Suspect's relationship with the child and whether there were any problems between them.
- Whether she knows of any motive for the child to lie about the suspect.
- Other children with whom the suspect associates or has contact.
- Whether the suspect has previously been arrested for or convicted of a crime.
- Where suspect has lived and worked.
- Whether prior accusations have been made against the suspect.
- Whether she or the suspect keep a diary, calendar, address book, computer records, etc.

If the case involves physical abuse alone, explore the following areas.

- Whether the suspect was responsible for discipline of the child. If so, what methods/implements/amount of force were used.
- Whether the suspect had been violent with her or anyone else.

If the case involves sexual abuse alone, explore the following areas.

- Whether the suspect ever bathed the child.
- What the sleeping arrangements were in the home.
- Whether the suspect has any scars, tatoos, birthmarks, or unusual features on or near genitals. (Compare this information with that given by the child and examine and photograph suspect if appropriate.)
- Whether the suspect has or uses pornography (photos, magazines, movies, videos), sexual aids or implements, birth control devices, etc.
- Whether the suspect has or had any venereal disease, and, if so, whether he sought treatment and whether she contracted anything from him.
- Whether the suspect engages in any strange or distinctive sexual practices. (Compare this to the child's descriptions.)
- Whether the suspect has had a vasectomy. (This is useful if the child has indicated she was told by the suspect not to worry about pregnancy because he was "fixed.")

## 5. Interviewing Other Members of the Victim's Family

In addition to interviews of the victim's parents or immediate caretakers, others in the victim's family and household should not be overlooked. The interviewer should determine whether they were ever told about the abuse by the victim (Section B.2.) and can provide any direct or indirect corroboration. Direct evidence might include having seen or heard some aspect of the abuse as it occurred, having been asked to conceal information by either the child or the offender, or having been asked to leave or locked out of the house/room or otherwise distracted so as to prevent them from witnessing the abuse. Types of indirect evidence would be observations of behavioral, emotional or physical indicators of abuse and

interactions between the victim and suspect. The investigator should ascertain whether others in the family can verify any details given by the child and ask questions similar to those suggested in Section B.3.

If the suspect is a family member or someone known to the family, try to determine whether other children in the family were victimized. The same sensitivity and care needed to interview the reported victim should extend to other children. If they were also abused, their fear, guilt or embarrassment is likely to be as great or greater than that already encountered since they have not yet disclosed the abuse. If other children in the family have left home, they should be contacted. Their reasons for leaving should be ascertained, together with any other relevant information.

### 6. Additional Witnesses

Use common sense to identify additional witnesses to be interviewed. The type of case will often dictate whom you should interview—physical or sexual abuse, single versus multiple incidents, intrafamilial or not, known versus unknown offender. Following are some categories of other witnesses to keep in mind.

#### a. OTHER CHILDREN ACCESSIBLE TO SUSPECT

It is extremely rare for a person to commit a single act of abuse against a single child, though it is possible. If the suspect has contact with or access to other children through family, work, recreational or volunteer activities, it is important to find out who they are and whether they have been approached by or abused by him. Physical evidence which has been recovered such as pictures in the suspect's possession or address books may provide leads regarding other possible victims.

#### b. OTHERS IN REGULAR CONTACT WITH VICTIM OR SUSPECT

Teachers, friends, classmates, neighbors, school nurses, school bus drivers, clergymen, therapists, caseworkers, employers, co-workers, family or other physicians, and day care providers are other examples of potential witnesses who may have helpful information related to the suspect or victim. (See Chapter V, Section C.6.) If any of these people are likely to be germane to the case and will be in contact with the victim or suspect during the investigation or after charges are filed, efforts to at least let them know how to reach the investigating officer or prosecutor and inform them of the basics of the case can be beneficial. This may yield information if they later become aware of something pertinent, and may prevent them from acting in ways that could be detrimental to the child or the case— i.e., questioning her about the abuse, spreading rumors, or changing their accounts based on outside influences.

## C. INTERVIEW OF THE SUSPECT

An important part of any child abuse investigation is the attempt to interview the suspect. This should *always* be done. The prosecutor should make sure that line officers and detectives understand the importance of the suspect interview and take steps to incorporate it into their standards procedures and response to child abuse cases. Otherwise, officers may arrest suspects, gather evidence and submit reports without trying to interview the suspect. By that time, it is likely to be too late because the suspect will have obtained an attorney and be unwilling to make a statement. This discussion will not elaborate upon the variety of interrogation techniques available to a skilled investigator, but will touch upon important considerations for the investigator and prosecutor, the purpose and benefits of the interview, and some common offender traits.

## 1. Who Should Conduct the Interview

The suspect interview should be the exclusive responsibility of law enforcement. Police officers have the power to arrest suspects, if deemed appropriate, and are in the best position to protect themselves and others from any danger that might surface during the interview. Police officers have generally also received training in conducting interrogations and have greater experience in talking with criminal suspects of all kinds. In selected cases in some jurisdictions, the police will work together with the prosecutor to determine when and how to interview the suspect, and may wish to have a prosecutor present.

## 2. When to Conduct the Interview

Ideally, contact with the suspect and his interview should not take place until the investigation is close to conclusion. This will allow the investigator to have a better picture of the entire situation so that he or she can derive maximum benefit from the interview in terms of what questions to ask and how to evaluate information received. Since the sooner the suspect is alerted to the allegation and investigation, the greater the chances he will try to influence witnesses, flee, hide damaging evidence or fabricate favorable evidence, it is crucial that the police and prosecutor agree with others involved in the investigative process not to notify suspects prematurely. Others include child protective service and school personnel. Concerns for victims' safety and other factors may necessitate earlier meetings with suspects than are desirable, however, and investigators should be ready to move quickly. Once an initial report has been made, the need to gather evidence expeditiously is great.

## 3. Purpose and Benefits of the Interview

A suspect interview will not only provide him with an opportunity to tell ''his side of the story,'' it will give the investigator a chance to extract a confession, partial admissions or statements that clearly fly in the face of known facts and evidence. The suspect interview may also elicit statements that result in other investigative leads or insight into potential defenses—alibis, potential motives to fabricate, assertion of facts which make the abuse unlikely or impossible, etc. The object of the interview is plainly to generate as much information from the suspect as possible. It is also to attempt to verify or refute previously gathered information. Further attempts to verify information given by the suspect should always be made following this interview.

## 4. Beginning the Interview

Obtaining as much information as possible prior to contacting the suspect will prepare the investigator well for conducting this interview. This does not mean, however, that the investigator should start by presenting the suspect with all the evidence collected so far. Doing so may cause him simply to deny and say nothing further, while alerting him to the evidence against which he needs to defend himself. Needless to say, advising the suspect of his *Miranda* rights should be done in all traditional interview settings in order to preserve any relevant statements for use at trial.

Experienced investigators recommend that the interview begin by establishing rapport so that the suspect is comfortable enough to talk. Open-ended questions, at least at first, are likely to generate more information than specific and leading questions. The interviewer should make it very clear to the suspect that he or she is interested only in obtaining the truth. He or she should try to get the the suspect to commit himself to telling the truth and then affirm it at the end of the interview. If the suspect later changes his story at trial and claims he was tricked or forced to say something by the investigator, this can be very helpful.

## 5. Verifying Information Given by the Victim

In a manner consistent with the approach taken during the interview, the investigator should determine whether the suspect will corroborate anything at all that the victim may have indicated. Admissions of familiarity with the victim, her family or her routine, agreement with her description of his physical features or possessions, his home, room or items within it (if the abuse was alleged to have taken place at that location) or acknowledgment of time spent alone with the victim can be useful.

## 6. Common Reactions and Explanations of the Suspect

### a. DENIALS AND EXCUSES

Commonly, a suspect's initial response to the interviewer will be to deny he abused the child. Officers should not simply accept and record the denial as the suspect's full statement, but should go beyond it and ask the offender to explain why an untrue allegation would have been made. If the victim is known to the suspect, the investigator should ask the suspect whether their relationship was a good one, possibly eliminating a motive on the part of the child to fabricate a claim of abuse. If, for example, the suspect indicates at the time of the interview that he and the child are close and he cannot imagine why the child would make up a story, it is effective to confront him with this statement if he offers a motive for the child's allegation at trial. If the suspect ascribes a motive to the victim at the interview stage, further investigation can be geared toward evaluating and perhaps disproving that motive at trial.

The suspect may offer a reason for the touching or abuse which is foolhardy or even ludicrous. Statements such as "I put my finger in her vagina to check her out because I've seen her with that thirteen-year-old up the street" or, "I was showing her what to look out for when she gets a little older," are not unusual. Statements from a parent or relative describing touching, fondling, and even instances of digital and penile penetration, often claim it was some form of medical examination or treatment. Actual examples of offender explanations for abuse include descriptions of genital fondling as checking for lumps; anal penetration as giving an enema; and general touching as applying ointment or giving a massage. One father told police investigators that he was sucking the venom out of a mosquito bite supposedly suffered by his teenage daughter. He had been observed by another daughter on the living room couch with his head between the nude teenager's legs. These kinds of statements are invaluable when at trial the offender has developed more plausible explanations or excuses.

If the investigator knows the suspect is lying, the investigator should ask for details and allow the suspect to continue at length rather than immediately accuse him of lying. Your ability to prove that specific facts given by the suspect to the officer were deliberately false can be valuable evidence at trial. Also, the more detailed and complex the suspect's excuses and explanations are, the harder it will be for him to convincingly change his story at trial.

### b. MINIMIZATION

Even when the suspect eventually admits he has committed a crime and abused the child, he is likely to minimize its seriousness and extent. He may admit only what the child has already revealed, which may not be everything—one reason not to tell him exactly what the investigator already knows. On the other hand, he is more likely to admit more than the child has so far disclosed if he thinks the investigator already knows everything. He may claim that the child is exaggerating, and it did not happen as often as she says or include everything she described. Whatever his position, the details provided by the suspect are useful to the prosecutor. In argument, for example, you can point out that the offender began by denying, but little by little has revealed more when faced with the facts. If he acknowledges even more of the abuse at trial but continues to minimize its extent, you can characterize this as a continuation of the pattern to make himself appear as blameless as possible.

### c. BLAMING THE VICTIM

Another reaction of the suspect may be to shift responsibility to the victim. The officer should document these statements especially carefully since they involve admitting the acts. The suspect may try to present himself as having been taken advantage of by a "seductive four-year-old" or forced to mete out punishment to a disobedient child, for instance. He may portray himself as a wonderful citizen or someone with a problem (e.g., mental or physical illness, drinking or drug addiction) who should not be held responsible for his acts. Such information gives the investigator and prosecutor an edge in knowing what to investigate further and prepare for at trial.

### 7. Deciding Whether To Arrest

The suspect interview is the logical time to consider whether the suspect should be arrested if a decision has not yet been made. Police officers should be encouraged to consult with the prosecutor beforehand about this issue, and prosecutors should see that arrest decisions are made wisely. If the officer plans to contact the suspect at his home and knows he or she will want to arrest him, he or she should obtain an arrest warrant ahead of time (and a search warrant assuming probable cause to search exists). If contact with the suspect occurs elsewhere, a probable cause arrest (for a felony) should be possible in most jurisdictions.

Factors which enter into this decision include the suspect's likelihood to flee upon learning of the allegation, to tamper with or destroy evidence, or to present a danger to the victim or others. Obviously, the greater a threat he presents with regard to any or all of these, the more reason there is to arrest. Premature arrests, however, can do more harm than good if suspects are released right away because the investigation is not sufficient to be able to charge and hold him. This points out again the disadvantages of contacting a suspect too soon.

Another factor in intrafamilial abuse cases involves deciding whether the arrest is likely to alienate the victim and other crucial witnesses to such an extent that they refuse to cooperate with the investigation and prosecution of the case. In such circumstances, it may be best not to arrest, particularly when the victim and others are not at risk and the suspect is admitting his involvement and taking steps to obtain treatment.

Before he is contacted and an arrest decision is made, some effort should be made to check into the suspect's background including his prior criminal history and any similar complaints against him. Unless this is done, there is always the chance that outstanding arrest warrants will be overlooked or the suspect released without bail or on low bail. (See Chapter IV, Section E.7.) Such mistakes only diminish the confidence of victims and the public in the criminal justice system.

## D. PHYSICAL EVIDENCE AND SEARCH WARRANTS

A thorough investigation requires the police to gather any physical evidence that exists. This is probably the most neglected area of investigation in child abuse cases, particularly those involving intrafamilial abuse, multiple incidents and delayed disclosure. While the need to search for and opportunity to recover physical evidence are perhaps more apparent to the police officer and prosecutor when a single incident, unknown assailant or immediate report are involved, much can be gained by making concerted efforts to identify and recover physical evidence in *all* cases. While lack of physical evidence does not mean an allegation is untrue or cannot be prosecuted, any physical evidence which is corroborative of the child's account is invaluable at trial. The probability of finding such evidence is greatest if attempts to obtain it are made early. Before an investigation begins and at each stage as it progresses, police and prosecutors should anticipate and look for potential physical evidence.

### 1. Types of Physical Evidence

#### a. FROM THE VICTIM

The victim will often be a source of physical evidence. The medical examination may yield information from the doctor's observations and recovery of samples. This is discussed further in Section E of this chapter. Beyond this, however, investigators need to be alert to anything else from the victim that might lead to physical evidence.

Police investigators have the responsibility to take or arrange for photographs of the victim. Whenever the child has an observable physical injury as a result of abuse, photographs should be taken. It is imperative to use a good 35 millimeter camera (*not* an instant camera alone). Officers should know how to operate the camera and not scrimp on film. It is useful if close-up shots contain a ruler or some other way of determining scale.

Investigators should ask the child or her caretakers to provide them with anything they or the child have which could be a source of evidence. Possibilities include items the child received from the suspect—e.g., correspondence, gifts, pictures, clothes, receipts of purchases he made for her, alcohol, drugs, magazines, etc. These can be examined for fingerprints if identity is an issue. If it is not, they are useful to provide corroboration in other ways. Clothing she wore while with the suspect especially if unwashed since the assault may contain evidence, e.g., bloodstains, rips, seminal stains, hairs or fibers, and her bedding or carpet may as well, if the case involves sexual abuse and possible ejaculation in her bed or on the floor. (See Section E.4.c.[3] of this chapter and Chapter V, Sections C.3. and 4.) Calendars and diaries might also be available.

If the abuse occurred within the family and the nonoffending spouse is cooperative with the investigation, she may be able to provide other items over which she has joint control with the suspect. Officers may then be able to examine, diagram and photograph the scene of the alleged abuse, and should do so whenever possible. If appropriate, they could visit the scene with the victim as a way of gaining better understanding and perhaps additional details from her.

#### b. FROM THE SUSPECT

Physical evidence can sometimes be obtained from a suspect voluntarily but in many cases must be acquired pursuant to arrest or via court order or search warrant. Examples include evidence about or from his person—e.g., pictures (especially of unusual physical features), hair, blood, saliva and semen samples, handwriting exemplars, fingerprints, voice tapes (for voiceprint analysis), fingernail scrapings, the clothing he is wearing and items he is carrying. (See Chapter IV, Section B.3.a.) The contents of the suspect's home, office, car, storage facility and his other belongings are additional sources of potential evidence, as are records related to the suspect—e.g., bank, credit card, and phone records, etc. It is obviously unnecessary to seize all of these in every case; these are simply items which should be kept in mind when considering what the facts of the case call for.

### 2. Use of Search Warrants

As victims and other witnesses are interviewed, pay attention to anything they say that could indicate a piece of physical evidence. Officers should then act quickly to obtain and execute search warrants for these items. Legal requirements related to drafting warrants and local policies about responsibility for preparing and authorizing them vary widely from jurisdiction to jurisdiction, so police and prosecutors need to work together to determine how best to proceed. Use of the so-called "expertise search warrant" as an investigative tool, usually in relation to the activities of a known or suspected pedophile with numerous victims, child pornography, cult activities, or other proactive investigations, should be considered by anyone with the manpower and expertise to do so. Helpful information

relevant to this kind of search warrant can be found in "Considerations in Obtaining and Using Expertise Search Warrants in Cases of Preferential Child Molesters" by Janet E. Kosid appearing in *Interviewing Child Victims of Sexual Exploitation*, (Washington, DC: National Center for Missing and Exploited Children, 1987), *The Sexual Exploitation of Children* by Seth Goldstein (New York: Elsevier Science Publishing Co., 1987), and *Child Molesters: A Behavioral Analysis* by Kenneth V. Lanning (Washington, DC: National Center for Missing and Exploited Children, 1986). The discussion here will focus on general principles pertaining to the use of traditional warrants in commonly encountered child abuse cases.

### a. WHAT TO DO

Officers should be as detailed and complete as possible in listing items they wish to search for, the possible locations of those items and their reasons for believing the items exist and can be found in those locations. They should never leave a suspect alone at the scene or otherwise allow him the chance to get rid of or conceal evidence while seeking the warrant. If necessary, telephonic warrant procedures should be used or another officer should be left with the suspect or at the scene while the warrant is obtained.

When serving the warrant, officers should always attempt to get consent to search before mentioning the warrant. Valid consent given by the suspect or someone else with authority to consent can prevent suppression of seized evidence if the warrant is later invalidated for any reason. It is crucial that evidence be carefully marked and packaged so that you later know exactly where it was found, when and by whom. Taking pictures or videotapes as the search is conducted can be extremely helpful to document where items were found, and to later convey an accurate picture of the setting to the judge and jury. If, during the search, officers come across evidence of additional crimes not mentioned in the warrant—e.g., drugs, child pornography, etc.—it should be seized as well. The plain view doctrine should allow such seizure without a new warrant when the officer has probable cause to believe that he is seeing evidence of a crime. *Arizona* v. *Hicks*, 480 U.S. 321 (1987).

While all of these suggestions are general and apply to the use of warrants in all criminal cases, they are especially useful to keep in mind in child abuse cases.

### b. WHAT TO LOOK FOR

Some of the things a search warrant can be used to obtain in a child abuse case are:
- Weapons or implements used by the offender to threaten or injure a child.
- Items left by the child with the offender—e.g., pictures, drawings, letters, clothing, toys, etc.
- Drugs or alcohol described by the child as provided to her by the offender.
- Pictures, negatives, undeveloped film, videotapes, movies when the child indicates these were taken of her by the offender, whether she was fully or partially clothed, alone or with someone else, involved in suggestive poses or sexual activity or whatever.
- Cameras used to take pictures of the child or developing and printing equipment used by the offender to process the film.
- Pictures, negatives, videotapes, movies of other children seen by the victim while with the offender or of other children seen with the offender since these might indicate other potential victims.
- Books, magazines, movies (pornographic or not), toys or any other unique items a child saw, read or played with while with the offender as part of his "grooming" of the victim.
- Computer records, journals, diaries or calendars belonging to the suspect which were seen by the child, or described by another witness in a way suggesting their relevance as evidence.
- Sexual aids or devices used with the child—e.g., petroleum jelly, other lubricants, condoms, dildos, vibrators, contraceptive foam or jelly, etc.

INVESTIGATION

- Suspect's address book or notations showing victim's address or phone number when child indicates she gave phone number or address to him, or he called or visited her at home.
- Suspect's bank records, receipts or charge account records showing money withdrawn, checks written or items purchased for the victim by the offender.
- Suspect's phone records/bills showing calls made to the victim.
- Suspect's work records or time sheets showing opportunity/times available to the suspect to be with the victim.
- Occupancy papers such as rental agreement, lease, rent receipts, mail, utility bills, tax assessments, etc., identifying the resident of a particular residence if this is an issue—for instance, if the child points out a location where the abuse took place but is unable to name the offender.
- Any unique item described by the child indicating her description of an offender or location is accurate if this is relevant to the allegation, her credibility or perceptive abilities. For example, if the child describes the suspect's bedroom, sheets and other furnishings accurately from her recollection of the setting where abuse occurred, and the suspect denies that the child was ever in his bedroom, these items would be relevant. Likewise, if she accurately describes a distinctive piece of underclothing seen on the suspect during an incident of abuse and there is no other apparent explanation for her ability to do so, the underclothing is relevant evidence.

## E. MEDICAL EXAMINATIONS IN SEXUAL ABUSE CASES

### 1. Reasons for Medical Examination

Whenever sexual abuse of a child is alleged or suspected, a medical examination should be done. Many of these cases will present no obvious, objective or conclusive physical evidence to confirm sexual abuse, but the possibility of such corroboration should not be overlooked. Keep in mind that the absence of such evidence does not rule out abuse.

A number of factors account for the absence of medical findings in the majority of sexual abuse cases. Among them are the frequency of delays in disclosure and the typical patterns and types of abusive conduct that occur. Evidence that may exist immediately following an assault such as bleeding, bruises, and the presence of sperm or seminal fluid will not remain for long. In addition, because of the manner in which victims are groomed and the usual progression of sexual activity—acts such as oral-genital contact, anal penetration and vulvar intercourse (penis, finger or other object placed inside the labia but not completely through the hymen)—it is possible that there will be no permanent evidence. (See Chapter V, Section C.3.c.) Even so, there are a number of important reasons to include a medical examination as part of the investigation in any sexual abuse case.

Medical evidence provides powerful and convincing corroboration. Since children who have been victims of sexual abuse often minimize its extent when they first tell, a medical examination may reveal more about what really happened. The medical examination makes it possible to provide the child with needed treatment as well as reassurance about her well-being. An examination will also prevent the defense from later asking the jury to conclude there is not enough evidence to convict simply because no exam was done.

### 2. Who Should Do Medical Examinations

Not all doctors—including pediatricians, emergency room physicians and general practitioners—have sufficient training or experience to perform the kind of sensitive and thorough medical evaluations needed in cases of alleged sexual abuse of children. Although awareness and knowledge within the medical community are increasing, many physicians have never received specific training in how to conduct these exams or are unfamiliar with the most recent improvements in techniques and procedures. Consequently, it is imperative to learn which doctors are conducting the medical exams. In many communities the process

has been haphazard. Child protective caseworkers or police have either not requested medical examinations or requested them without specifying a qualified doctor to conduct them. The result is no exam or an incomplete exam by the child's family physician.

In order to guarantee maximum benefit from the medical examination in these cases, there should be coordination among the community's prosecutors, police, child protective workers, hospitals and doctors. Make efforts to standardize the process by which children are referred for medical examinations by the police, CPS workers and others, so that the most qualified doctors conduct them. Take advantage of the resources available through programs using nurse practitioners or medical residents at nearby medical schools, or designate a single centrally located hospital or clinic to assume primary responsibility. In addition, consider participating in joint training programs with medical professionals in your area to increase mutual levels of expertise. Prosecutors and physicians can do much to educate each other about their respective needs and capabilities.

**3. Development of Protocols**

As a way of standardizing the medical examination aspect of an investigation, many areas have developed protocols specifying the referral process—when, where and to whom a suspected victim is taken to be examined—and detailed steps for the examination itself—listing procedures and equipment to be employed (such as the colposcope), and samples and evidence needed, including how it should be marked, preserved, stored, analyzed, and documented. (See Sample Form at the end of this chapter representing one community's approach.) These protocols may be only a few pages long or as many as a hundred, but should be individually designed to fit the personnel, resources, methods, and legal requirements of the particular community.

At a minimum, prosecutors need to review existing protocols so they understand current practices and can identify areas that need improvement. If there are no protocols in your community or changes are called for, meet with hospital administrators, doctors, nurses, lab technicians, criminalists, police officers, representatives of the local social services agency and local rape/abuse crisis center and any other pertinent people to attempt to develop new or revised procedures. Even if things are going well in your community without the type of formal agreement and process represented by a protocol, this is a good way of making sure that new staff or others who become involved in the cases will know what to do and how to do it properly.

It may be difficult to convince everyone who should be involved to participate and reaching an agreement may take time, but the results should be well worth the effort.

**4. Procedure and Components of the Examination**

This section summarizes some of the steps which should be considered in conducting the medical examination and describes some of the techniques available. It is not intended to be a "how-to" for doctors but an overview and guide for prosecutors. Readers who wish to obtain more detailed information on any aspect of the medical examination can start by consulting the materials included in the reference list at the end of this chapter or by contacting the National Center for the Prosecution of Child Abuse for suggestions.

*a. OBTAINING CONSENT*

When a child is examined in relation to an allegation of sexual abuse or physical abuse, especially in the hospital or emergency room setting, steps should be taken to obtain appropriate consent before examination, treatment and evidence collection. Often this is accomplished by using consent forms developed specifically for this purpose and hospital staff to inform the child's caretaker (or child if she is old enough) about the procedures to be carried out and need for consent. Specific explanations will depend on controlling state law

INVESTIGATION

and hospital policy, and perhaps reflect agreements reached with other professionals involved in the investigative process.

Mandatory reporting requirements should be explained to patients and caretakers so that they understand that medical personnel are required to refer suspected child abuse to law enforcement and/or the local social services agency. If the patient or caretaker refuses to allow samples or other evidence to be collected, the consequences of doing so should be explained—i.e., inability to analyze potential evidence and possibly undermining opportunities to pursue a civil or criminal case. If photographs will be taken in the course of the medical exam, permission should be sought with the understanding that they may be used as evidence.

Parents, of course, may initiate and authorize a request for examination, treatment, and evidence collection related to their own child by signing an appropriate consent form. Generally, parental consent is not *required* in order to examine, treat, or collect evidence for suspected child abuse. In the case of parental refusal, children may be taken into protective custody by either the local law enforcement or child protective service agency. A representative of the child protective service agency can then sign an appropriate consent form as the temporary guardian of the child to authorize the procedures.

Many states have laws permitting a child 12 years of age or older to give consent to hospital, medical and surgical care related to the diagnosis or treatment of alleged sexual assault and collection of medical evidence. These laws often permit children between the ages of 12 and 17 to consent to hospital, medical, and surgical care related to the prevention, diagnosis or treatment of pregnancy and/or sexually transmitted diseases. Such consent is not subject to disaffirmance because of minority.

Many state laws require the professional rendering medical treatment for a sexual assault to attempt to contact the child's parent(s) or legal guardian and to note in the treatment record the date and time of the attempted contact and whether it was successful. This requirement generally does not apply, and medical personnel should be encouraged *not* to observe it when they have reason to believe that the parent(s) or guardian of a child committed the sexual assault. Further, most states permit photographs to be taken of known or suspected child abuse victims without parental consent and allow their dissemination with reports to child protective service or law enforcement agencies.

### b. EXAMINER'S APPROACH AND THE MEDICAL INTERVIEW

Physicians and other medical personnel should be encouraged to recognize the need for great sensitivity in dealing with children who are alleged to have been sexually abused. They need to understand the impact of their actions on the child as well as on the viability of a potential criminal case. The medical examination usually takes place during a time of crisis. Since it can cause the victim to feel a sense of re-experiencing the abuse with all the accompanying guilt or shame, the child patient must be approached in a relaxed, unhurried and non-judgmental manner. Privacy, reassurance that she is all right and support are important.

Because the medical interview is valuable not only for the information it provides to the physician but as possible evidence for the prosecutor, prosecutors should ensure doctors are familiar with recommended interviewing techniques. Before the exam, investigators should inform doctors of the information gathered to date and should encourage them to record what the child says in her own words, along with their observations of her general appearance, emotional state and reactions to the exam. Hospital or other medical forms can be designed with specific sections for indicating these statements and observations. The following areas are often pertinent to diagnosis and treatment by the physician *and* evaluation of the case by the prosecutor. Other information related to the child's age, gender and situation would be expected to be included routinely in the medical interview.

*Type of Assault*, including number of assailants and relationships to the victim; amount of time since most recent assault; kind of sexual contact including whether there was attempted or actual vaginal, anal or oral penetration and if so, by what object; whether there was ejaculation or use of a condom or other birth control measure.

*Use of Force or Coercion*, including any weapons or threats used and injuries caused.

*Symptoms Following the Assault*, including pain, bleeding, bruises or cuts, loss of consciousness, nausea, vomiting, diarrhea, or discharge.

*Activity After Assault (if recent)*, such as bath or shower, douching, urination, defecation, eating, drinking, use of toothpaste or mouthwash, change of clothing, and use of drugs or alcohol.

*Prior Sexual Contact (included if assault within four days of exam so physician can assess whether other causes could account for physical evidence.)*

*Medical History*, including existence of any allergies, chronic illness, current acute illness and use of medications.

*Physiological Development and Gynecologic History*, including menstruation, pregnancy, use of contraceptives and sexually transmitted diseases.

### c. EXAMINATION TECHNIQUES AND EVIDENCE COLLECTION

The specific steps of the medical examination will depend to some extent on how long it has been since the most recent assault. If it is suspected that the assault is very recent, generally within the preceding 72 hours, the exam should certainly be performed immediately. The physician should look for evidence indicative of recent assault and take all appropriate samples. When the investigation indicates that it has been over one week since the most recent assault, the need to do an *immediate* exam is not as great, although one should be scheduled and conducted without too much delay. It will not be necessary in these situations to collect as many samples or items of evidence.

It is often helpful to allow a support person for the child to be present during the exam. A supportive parent who is not emotionally distraught, a hospital social worker or victim advocate are appropriate choices. In addition, all exams should begin with general procedures such as an overall assessment of the child's physical appearance and her blood pressure, pulse and temperature to put her at ease, and should progress from the least threatening and intrusive parts of the exam to the most sensitive. For example, if a recent assault is suspected and collection of clothing or fingernail scrapings is called for, this should precede inspection of the genital area and the taking of oral, vaginal or anal samples.

### (1) Evidence of Injury

In *all* medical examinations in cases of suspected sexual abuse, the physician should look for and record any sign of injury. If an injury can be photographed, it should be at that time and should include a centimeter measure to verify size and, for bruises, a color chart to verify age. (See chart regarding bruises at the end of this chapter.) As mentioned previously, a good camera—35 millimeter as opposed to instant—should be used. In addition or as an alternative, the physician should describe injuries in his report and chart or sketch them so that their extent and location are clear. Many hospitals use ''traumagrams'' or standard diagrams for this purpose.

If the child was forcibly coerced or restrained during the course of the assault, there may be injuries which reflect the force used—e.g., bleeding, abrasions, bruises, bite marks, broken bones, tenderness of the scalp from the hair being pulled, etc. Physicians should always be alert for signs of severe lacerations of the vagina, urethra, rectum or abdominal cavity which on occasion occur with young children or with a very forcible assault at any age. When objects have been inserted into the vagina or anus, there may be little external bleeding but serious intra-abdominal penetration and injury. Careful evaluation is required.

As a result of vulvar intercourse and attempted or actual penetration by a finger, penis or other object, immediate injuries such as bruising, erythema (redness), focal edema (focused

fluid retention), and tenderness of the vaginal or anal area can occur and may last from a few hours to a few days. In forcible assaults, injuries such as stellate lacerations to the external genitals may be found from the round, blunt trauma caused by a penis or curved thin lacerations from a fingernail. (See Chapter V, Section C.3.a.[3].)

### (a) Vaginal Findings

The hymen or hymenal ring is a structure present in all females, consisting of a fine membrane separating the external genitalia from the vagina. It varies considerably in thickness and elasticity. Complete penile penetration without injury may occur if the hymen is elastic, if the patient is physiologically mature, or if prior stretching of the hymen from the use of tampons or a progression of fondling and digital penetration, has occurred. The term "intact hymen" is confusing, generally considered meaningless and unlikely to be used by physicians experienced in conducting vaginal examinations of young girls. Contrary to popular opinion, sexual abuse *can* occur without leaving obvious and lasting hymenal or vaginal findings. In some cases, however, vaginal findings will be present and the following discussion describes potential findings.

Injuries to the vaginal area are usually described by and related to a clock face with the clitoris in the 12 o'clock position, anus or median raphe in the 6 o'clock position, and a line between 3 and 9 o'clock across the hymenal orifice. (See diagram of vaginal area and definitions of selected medical terms at the end of this chapter.) Stretching of the hymenal ring during attempted or completed penile penetration may cause lacerations in the posterior fourchette, without any laceration of the hymenal ring itself. These lacerations occur mostly between the 5 o'clock and 7 o'clock positions, are most common at 6 o'clock, and may even involve the perineum. Occasionally, lacerations of the hymen occur with rupturing types of injury. With manipulation or penetration by a finger or instrument, lacerations and other trauma more commonly occur above the 3 to 9 o'clock line. Trauma parallel to the hymenal opening may occur with both penile and digital/instrument penetration.

Scarring is possible when trauma such as lacerations occur and may be evident during a later examination. Healed transections, synechiae, hymenal deformity, hymenal thickening with scarring and changes in vascularity, and rounded and attenuated hymenal remnants may be observed by the physician. In children who have been chronically abused, the only evidence may be an absent or thinned hymenal ring, or an enlarged vaginal opening as a result of gradual stretching of the tissue. Maximum normal diameters of vaginal openings in children prior to puberty have been described by Cantwell and others as ranging from 4 to 10 millimeters. Cantwell, in her 1981 study, reported that a vaginal opening exceeding 4 mm. correlated with sexual abuse in 75 percent of cases evaluated. A vagina which gapes open to show an enlarged opening while a child is lying face up (caused by laxity of the pubococcygeus muscle) is thought by Woodling to be indicative of chronic penile-vaginal penetration. Small or normal vaginal openings are also possible in sexually abused children as a result of scars healing and/or contracting. Any of these findings would be consistent with vaginal penetration and sexual abuse.

### (b) Anal Findings

In many cases of anal penetration, the anus will appear perfectly normal. This is because the anus can accommodate an object such as an adult male penis just as it can accommodate a large hard stool. The use of lubricants, amount of force and number of penetrations can all affect whether there is likely to be any change in the appearance of the anus. On occasion, the examining physician may note reflex relaxation of the anal sphincter, a positive "wink reflex," complete or partial loss of sphincter control, a loss of the normal skin folds around the anus, a thickening of the skin and mucous membranes, skin tags or fan-shaped scars in the anal area of a child who has been sodomized. A gaping anus (over 15 mm.) surrounded by enlargement of the perianal skin is thought by Woodling to be indicative of chronic sodomy.

Vaginal or anal injuries of the type described above are most likely to be seen in situations in which the child has described painful penetration. As noted at the beginning of this section, however, the absence of such injuries does *not* mean sexual abuse did not occur. In fact, in the majority of child sexual abuse cases there will be no detectable injuries by the time of the medical exam. If they *do* exist, however, they represent strong evidence to support a child's account of abuse.

### (c) Use of the Colposcope

In the past several years, increasing numbers of physicians have been using the colposcope to assist in the medical examination of children alleged to have been sexually abused. The colposcope is a binocular optical instrument providing 5 to 30 power magnification. It utilizes an excellent light source and many are equipped with cameras which allow photographs to be taken. Gynecologists have used them for some time, mostly for early detection of cervical cancer.

When used with children, the colposcope can help physicians detect some lacerations, scarring or other trauma of the vaginal or anal area which they might not otherwise be able to see. It can also help them attain better visualization of injuries apparent to the naked eye. It is nonintrusive and does not touch or penetrate the child.

If colposcopy is available in your community, it can be extremely helpful in efforts to detect and document injury caused by sexual abuse. It will not perform miracles, however, and physicians must be trained and experienced in the diagnosis of sexual abuse in order to use it effectively. Concerned and conscientious physicians around the country are collaborating to share information about colposcopy, and expertise in this area can be expected to improve.

### (d) Toluidine Blue Dye

Recently, a group of doctors in Maryland reported results of a study investigating the use of toluidine blue dye to detect posterior fourchette lacerations in sexually abused and control populations. The results of this study are reported in "Toluidine Blue in the Detection of Perineal Lacerations in Pediatric and Adolescent Sexual Abuse Victim," by Jeanne Mc-Cauley, Richard L. Gorman and Gay Guzinski, in *Pediatrics,* Vol. 78, No. 6, pp. 1039-1043, December 1986. They concluded that application of the dye increased the detection of posterior fourchette lacerations (which are often quite superficial) in both young children and adolescents, and that the presence of posterior fourchette lacerations in young children was strongly suggestive of sexual abuse. No distinction could be made between sexually abused adolescents and adolescents who were consensually sexually active with peers.

It remains to be seen how widely used this method will become. Some children apparently experience stinging from the dye which may decrease its desirability for widespread use. It is, however, a new technique which physicians and prosecutors should be aware of and which may prove beneficial in the investigation of cases.

### (2) Sexually Transmitted Diseases

During the medical exam, doctors should be mindful of the possibility that sexual abuse of children may lead them to contract sexually transmitted diseases. Transmission to children occurs in the same manner as to adults—via oral, anal or vaginal contact. Appropriate specimens should be taken to culture or otherwise detect viral, bacterial or other agents which could cause disease if it is known that the suspect is infected (or at high risk for a sexually transmitted disease), if the child is exhibiting symptoms of infection potentially caused by such diseases, or if the history given or circumstances lead to suspicion that transmission of disease is possible. These samples should be taken whether there appears to have been a recent assault or not, since sexually transmitted diseases may persist and

sometimes not even manifest themselves until some time after infection. Physicians should keep in mind that children may be reluctant to reveal the full extent of sexual abuse and thus may not report oral, anal or vaginal contact or penetration right away.

Testing for sexually transmitted diseases normally requires taking specimens from the mouth, throat and rectum. For boys the urethra will be included and for girls the vaginal area (endocervix with an adolescent girl and vaginal pool for a pre-pubertal girl). If a child has a discharge, samples of it are taken to smear and stain for microscopic examination and to culture. Sensitive doctors will spare the child any unnecessary discomfort and keep intra-cavity probing to a minimum. For instance, a speculum exam of the vagina would only be necessary if the pre-pubertal girl has had active bleeding, signs of significant genital trauma or suspicion of penetration or other sexual contact that could transmit disease. When it is necessary, doctors can use smaller instruments than they would with adults or older girls. Often one sample from an area can be used for all culture and forensic studies. On occasion when these exams are extremely traumatic for and resisted by the child who has been a victim, the physician may use anesthesia.

If the medical exam of the child uncovers evidence of a potential sexually transmitted disease, immediate steps must be taken to have the suspect examined and tested. Of course, he should not be in contact with the child when this occurs. Police officers should act quickly to obtain appropriate warrants or court orders. Investigation of others to whom the suspect might have transmitted the disease should also occur at this time. (See Chapter V, Section C.3.a.[2].)

The following diseases or conditions seen in the child could indicate sexual abuse.

- *Gonorrhea*—can cause urethritis (infection of the urethra), cervicitis (infection/inflammation of the cervix), pelvic inflammatory disease (infection of the fallopian tubes and/or ovaries), pharyngitis (inflammation of the pharynx, the cavity at the back of the nose and throat), conjunctivitis (inflammation of the mucous membrane lining the inner eyelid and part of the eyeball), proctitis (rectal infection), perihepatitis, and other infections.
- *Syphilis*—can cause chancres (lesions) in the genital area or mouth, among other things; seen rarely.
- *Chlamydia Trachomatis*—can cause urethritis, cervicitis, conjunctivitis, trachoma (also a disease of the eye causing inflammation of the inner surface of the eyelid), and additional vaginal, rectal or other infections; discharge may be evident. Chlamydia is increasingly recognized as the most common sexually transmitted agent. Recent research by doctors at Mount Sinai Hospital Medical Center, New York City and Rush Medical College, Chicago, as reported in *Child Protection Report*, Vol. XIII, No. 8, April 17, 1987, led the authors to conclude that genital or rectal chlamydial infection in children under 13 is "virtual proof" of sexual contact, and they recommend routine testing for chlamydia in all suspected abuse cases. Apparently difficult to culture, chlamydia is currently being studied with more frequency.
- *Acquired Immune Deficiency Syndrome (AIDS)*—research is only beginning to be conducted, but information available makes it clear that it can be and is most often sexually transmitted; if a child is diagnosed as having AIDS, sexual abuse is most likely the cause in the absence of evidence of fetal acquisition from the mother, blood transfusions or drug use (via injection).
- *Herpes*—Herpes simplex virus (HSV) can cause genital lesions or oral infection with similar lesions; culture studies are necessary to determine if the virus is type 1 or type 2.
- *Trichomonas Vaginalis*—can cause urethritis and vaginitis; purulent vaginal discharge common in infected females, although it is seen rarely in prepubertal children; males often have no symptoms.
- *Venereal Warts (Condyloma Acuminata)*—these warts are common in sexually active adults and teenagers and may be found in children in their genital or anal areas; there are a number of sub-types of the virus which causes these warts and there can be a long (two-to-nine month) incubation period.

- *Nonspecific Vaginitis (Gardnerella Vaginalis)*—can cause thin and homogeneous vaginal discharge.
- *Pubic Lice*

The foregoing list is not meant to be all-inclusive of every potential sexually transmitted disease, condition or agent. A number of others are listed in the literature, including hemophilus hominues, hepatitis, granuloma inguinale, ureaplasma urealyticum, mycoplasma hominis, molluscum contagiosum and others. Sometimes a child may test positive for one of these viruses, bacteria or agents without having had any observable symptoms. If one of these conditions shows up in a child who has described being sexually abused, and especially if the suspect has the condition as well, there should be little question about the validity of the allegation. Even if the suspect does not have the disease or condition when tested, there is always the possibility that he had it and it cleared spontaneously or he sought treatment.

More difficult issues arise when the child is pre-verbal and tests positive for a sexually transmitted disease. You must then consult with a knowledgeable physician about the possibility or likelihood of transmission in some way other than by sexual contact. Some of these are thought to be transmitted solely by sexual contact. Some may be transmitted to the newborn by her mother, usually during delivery. With some others, nonsexual contact *may* theoretically cause infection. With most, however, sexual transmission is nearly always the cause of infection. Find out whether the child has taken an antibiotic, such as erythromycin or penicillin, and if so when the last dose was. This could potentially allow you to narrow the time period within which she contracted the disease and possibly rule out transmission from the mother.

A recommendation of the Centers for Disease Control, in their 1985 *Sexually Transmitted Diseases Treatment Guidelines* states: "Diagnosis of *any* sexually transmitted diseases in a child who is prepubertal but not neonatal raises the strong possibility of sexual abuse until proven otherwise" (emphasis added). Whenever you have this type of evidence, consultation with a medical expert is required. Testimony addressing the characteristics of the disease, methods of transmission, likelihood of transmission by other than sexual contact and any other issues should be elicited from the expert at trial. (See related discussion in Chapter V, Section C.3.a. [2] and 3.d.)

### (3) Collection of Evidence When Recent Assault

Whenever available information suggests the possibility that an incident of sexual abuse has occurred within the prior week, the medical exam should include some additional steps. The physician's decision about what evidence to look for and what to collect should be based on the specific nature of the known or suspected abuse, as well as just how long it has been since the last incident. For instance, looking for evidence of sperm or seminal fluid is appropriate if the offender is male and may have ejaculated; collection of the child's clothing is unnecessary unless she is wearing the clothes she had on at the time of or immediately following the abuse.

### (a) Wood's Lamp

A Wood's Lamp is a long wave ultraviolet light that can be used to scan clothing or the body for evidence of dried or moist secretions, stains or subtle injury. Semen usually exhibits a green or blue fluorescence under this light but may not fluoresce when fresh. Furthermore, on clothing made of fluorescent synthetic material or washed in light optical density detergent, seminal stains may appear as areas of absent or diminished fluorescence. Subtle bodily injury such as rope marks and recent contusions can often be seen with a Wood's Lamp. Most hospitals and many doctors have Wood's Lamps and use them to detect such evidence when a child is being examined within 72 hours of an abusive incident. If observations such as these have been made, diagrams should be used to record the location and extent of stains and/or injury.

108

Any dried or moist secretions and stains on a child's body such as blood or semen, should be collected in an appropriate manner. (Clothing is discussed in the following section.) For example, the site of heavily crusted blood or semen stains can be scraped with the edge of a clean glass slide or the back of a clean scalpel blade into a paper bindle (a small package or envelope). If found on hair, the matted hairs can be cut and placed in a paper bindle as well. Thinner stains can be collected with the use of swabs moistened in distilled water which are then air dried and packaged in an envelope or tube. Secretions which are still moist can be collected with dry swabs to avoid dilution, air dried and packaged in the same way. Normally, these specimens would then be submitted by law enforcement to a crime labora- tory for analysis.

### (b) Clothing

The child should not be required to undress until the exam is ready to begin. If her clothing has possible evidentiary value, it should be collected by medical staff and appropriately packaged and labeled before being turned over to the investigating officer. If the child does not have a change of clothing with her, the investigating officer should accompany her home after the exam to collect the clothing for later submission to the appropriate crime laboratory.

The examining physician should note and describe the condition of the clothing if it was worn during or right after the abuse—i.e., whether there are any rips, blood or semen stains, dirt, hairs, or other foreign material on it. Many physicians place a piece of clean paper on the floor to avoid collecting floor dirt or debris, then place another piece of clean paper on top of that, and have the child disrobe while standing on the paper. Any loose material which falls from the clothing can then be collected by folding and retaining the piece of paper on top.

Wet clothing should be allowed to thoroughly dry before packaging and individual pieces of clothing should be placed in separate *paper* bags. Plastic should never be used because it retains moisture and can thus cause mold and deterioration. When clothing is folded to be placed in the bags, folds should not be made across any stains and care should be taken not to allow stains to transfer to the bag, other garments or different areas of the same garment. Some medical personnel and others place a piece of tissue paper against stains and fold the clothing inward in order to accomplish this. Investigating officers should arrange for detailed examination and analysis of stains or secretions found on clothing by a crime laboratory.

### (c) Fingernail Scrapings and Foreign Material Collection

Fingernail scrapings are generally taken from the child when there is some indication that they might contain evidence, for example if she scratched the suspect during a recent assault. (They would likewise be taken from the suspect if he may have scratched the victim.) Evidence recovered from them can include blood, tissue, fibers or possibly even feces if digital anal penetration is suspected. A clean knife, toothpick or manicure stick can be used to collect these scrapings into paper bindles, usually one for each hand.

Other foreign materials such as grass, dirt and hair found on the victim's body can also be placed in paper bindles with careful diagramming and documentation of their location. This kind of evidence would also be submitted to a crime laboratory for analysis.

### (d) Bite Marks

Though somewhat rare, assailants will sometimes bite children they abuse or vice versa. If this has occurred, the physician should swab the immediate area of the bite mark to collect saliva for later crime lab analysis. Photographs should also be taken. If they are to have value in later attempts to identify the assailant, these photos must be of good quality with as little distortion as possible. The camera should not be angled when the pictures are taken, but aimed straight at the surface where the mark appears. Close-ups with a centimeter ruler are

needed. If the child is seen immediately after an assault, marks may only be faintly visible. Investigating officers should follow-up and take additional photos in 24 to 36 hours when bruising may be more fully developed. If such evidence is to be used to try to identify the suspect, consult immediately with a forensic odontologist and consider making impressions of the bite marks.

### (e) Hair Samples

When a child is examined soon after an alleged sexual assault, her clothing and body are usually inspected by the doctor for any loose hairs that may have come from the suspect. These should be collected in a bindle and sealed. Pubic hair combings are done on post-pubertal children by having the child sit on a piece of paper towel or paper and using a new clean comb or brush to comb down and remove loose hairs or foreign material onto the paper which can then be folded and placed in an envelope.

If there is a need to match these specimens to hair of the suspect, reference head and/or pubic hair samples from the child also need to be collected. These reference samples are then turned over to the criminalist conducting the hair analysis to compare to any loose hairs recovered and known hairs from the suspect. Some jurisdictions opt to collect such reference samples at the time of the medical exam unless clearly unnecessary; others opt to wait and do so only when it is clear a case is going to trial and hair analysis is needed. Individual crime labs, doctors and hospitals should be involved in determining how many hairs should be cut and how many plucked from the child's head and pubic area. (See Chapter V, Section C.4.b. and the transcript of an expert's testimony on this subject at the end of that chapter.)

### (f) Collection of Samples to Detect Sexual Contact

Specimens should be taken by the doctor from secretions in or on the child's mouth, genital, rectal or other area of the body to examine and test for the presence of sperm and seminal fluid whenever there appears to have been a possibility of recent ejaculation. These specimens would normally be taken at the same time that specimens are taken for determining the presence of sexually transmitted diseases. Obviously, positive findings constitute convincing evidence of sexual contact by a male offender.

Because sperm and other seminal fluid indicators deteriorate rapidly, the likelihood of positive results will depend on how recent the assault was, whether the child washed, bathed, urinated or defecated and what area of the body is involved, among other things. This evidence is lost most quickly in the mouth where salivary enzymes and bacteria contribute to deterioration. Rarely can any evidence of semen in the mouth be detected more than a few hours after assault; six hours is thought to be the longest such evidence will survive. Forty-eight hours is generally estimated to be the longest for such evidence in the vagina and rectum, although sperm may survive in the cervix and be detectable in samples from the endocervix, if available, for several days.

Specimens are collected from the mouth by using a swab in areas such as the gums, folds of the cheek, under the tongue and the pharynx. On occasion the physician may deem it helpful to have the child blow her nose on a gauze square as well. Specimens from the vagina and rectum can be collected with swabs during speculum or bimanual exams, or if these are not done, by using a saline wash and pipettes or saline-moistened swabs. Because of the discomfort involved in a speculum exam, endocervical samples will usually not be obtained from young girls unless it appears necessary from either the history given or other physical evidence observed. The discussion which follows covers the items most commonly looked for to detect semen.

### (i) Presence of Sperm—Wet Mount and Permanent Smears

Wet mount slides are generally made immediately after specimens are collected, by combining a drop of the secretion from a swab or pipette with a drop of nutrient medium on

the slide. The examining physician, a lab technician from the hospital or other appropriate person then examines the slide right away under a high power microscope to determine whether sperm is present, and if so, whether motile, non-motile or both. Motile sperm indicates a very recent ejaculation; it may be present for only a half hour and rarely would be seen after six to eight hours. Some of the factors affecting motility and/or presence of sperm include body temperature, amount of ejaculate, vaginal pH, use of contraceptives, existence of vaginitis or other infection, post-assault hygiene, the child's position—laying down or upright—and whether the offender has had a vasectomy.

Permanent smears (dry mount slides) are usually made also from the samples obtained. They can be stained to help visualize sperm, kept indefinitely and examined by either medical or crime lab personnel. Sometimes non-motile sperm can be seen on these slides when no sperm were seen on the wet mount due to the increased ability to identify them on the stained smear. Non-motile sperm may be present in rectal and vaginal secretions up to 12 to 20 hours following ejaculation, and in extremely rare cases might be found up to 48 to 72 hours later. (On other surfaces such as clothing, they could potentially be present much longer.) Both wet mount and permanent smears need to be appropriately labeled and retained as evidence.

### (ii) Acid Phosphatase

Acid phosphatase is an enzyme found in significantly higher concentrations in seminal fluid than in other bodily fluids. Though other sources such as bleach and mayonnaise contain it, human acid phosphatase can be differentiated from them. It will be present in semen even when the male has had a vasectomy and has no sperm in his semen.

High concentrations of 130-1800 IU/L or more are present in semen while vaginal secretions normally contain less than 50 IU/L. Thus, elevated levels of acid phosphatase in samples taken from the victim's vagina, rectum or mouth are consistent with recent ejaculation. Acid phosphatase levels in the vagina may return to normal within as little as three hours of ejaculation and usually within 72 hours. Normal levels return even more rapidly to the mouth and rectum. (High levels may be detectable on clothing or other surfaces for months or years.)

Tests for acid phosphatase can be done in either the hospital or a crime lab and either aspirated secretions or cool air dried swabs can be used. Refrigeration is needed for wet samples and is helpful for preserving dried samples.

### (iii) P 30 (Semen Glycoprotein of Prostatic Origin)

In some jurisdictions, testing of samples for the presence of P 30 is done. P 30, semen glycoprotein of prostatic origin, is present in high levels (normally 1.55 mg/ml) in seminal fluid, in low levels (normally 260 ng/ml) in male urine, and is not found at all in the vaginal fluid, urine or saliva of females. Both normal and vasectomized males will have P 30 present in their semen. Specimens are collected in the same manner as those for acid phosphatase testing—i.e., dried swabs. Positive P 30 tests indicate that sexual contact occurred within 48 hours of collecting the sample since levels will decline and be undetectable within that time. (As with properly preserved non-motile sperm and acid phosphatase on other surfaces, P 30 may be detectable for much longer in its dried state.)

### (g) Genetic Markers in Bodily Fluids

When evidence has been retrieved during the medical exam, or otherwise during the investigation, which may contain the offender's bodily fluids—e.g., semen, saliva, etc.—blood and saliva samples should be taken from the victim so that additional tests can be done at the crime lab which may assist in identifying the offender. These tests are for genetic markers (blood group antigens such as ABO blood type, PGM-phosphoglucomutase-type, EsD-esterase D-type, Pep-A type, and others) found in the bodily fluids of people who