are secretors. (See discussion of this subject in Chapter V, Section C.4.a, and related transcript following that chapter.) Specimens of the victim's blood and saliva are needed as control samples by the lab, so that her secretor status and genetic markers can be compared to the evidence of secretions obtained during the medical exam and to blood and saliva samples of the suspect. The medical exam is the logical time at which to collect these control samples since similar evidence is already being taken.

### (h) Additional Tests As Needed

Additional samples or tests may be appropriate, depending on the specific facts of the case and timing of the medical exam. For instance, a pregnancy test should be done with a post-pubertal girl whenever pregnancy is a possibility. Blood alcohol testing and toxicology screens can be done when an assault occurred recently and if there is reason to believe the victim had ingested drugs or alcohol (perhaps provided by the suspect) prior to or during the abuse.

### (4) Evidence Collection Procedures and Use of "Rape Kits"

Whenever *any* evidence is obtained, it is important to label, preserve and store it properly. It is especially important to handle evidence collected during the medical exam properly. Protocols can and should be very specific about the following:
- Where samples are collected (from what parts of the body);
- When samples should be taken;
- By whom samples should be taken;
- How samples are collected so contamination and improper processing are avoided;
- How samples are packaged, sealed and labeled, specifying the date, the doctor's and the victim's identity, and the area of the body from which the sample was taken, etc;
- Who handles samples and how the chain of custody is recorded;
- How samples are stored—i.e., locked space to which others have limited or no access such as freezer or refrigerator, evidence room, etc;
- How and when samples are transferred between medical personnel and law enforcement.

Proper packing and storage of these samples are two of the most important aspects of the evidence collection procedures and protocol. For example, swabs and slides must often be air dried, preferably in a stream of cool air, to promote rapid drying and maximum preservation of genetic marker enzymes. Once dried, they are ordinarily refrigerated or frozen. Blood samples need to be stored in the appropriate type of tube and usually require refrigeration. Both the medical staff and law enforcement people who handle these must know how and be able to properly package and store such samples.

It is advisable to keep the number of people who handle evidence to a minimum so it will later be easier to determine and present evidence about chain of custody. It is important that the names of those involved in the medical examination and collection and handling of evidence be legible and that enough information is recorded to locate them in the event their testimony is needed.

Many hospitals use commercially available sexual assault or rape "kits" which are specially designed to facilitate collection of forensic evidence in cases involving recent sexual assaults, including those in which the victim is a child. They can be very useful in smaller jurisdictions which handle fewer cases since they promote uniformity in how samples are collected and make it less likely something will be overlooked or done improperly. (Larger hospitals often develop their own kits.) Some of the items commonly included are checklists of specimens to be collected, paper bags for collecting clothing, tubes with swabs to collect secretions, glass slides, special tubes for blood typing syphilis serology, combs for pubic and scalp hair collection, orange sticks for fingernail scrapings, envelopes for hair samples and other evidence, items needed to collect saliva samples such as gauze squares or swabs and tubes, and forms for recording chain of custody information.

If these kits are used in your jurisdiction, familiarize yourself with them and determine

whether they call for the collection of all needed evidence in an appropriate manner. If you see a need for additional or changed procedures, take steps to incorporate them into the current evidence collection protocol or find another kit which includes everything you want.

## F. ADDITIONAL INVESTIGATIVE TECHNIQUES

### 1. Forensic Analysis

Traditional forensic experts may play a role in the investigation of child abuse cases. Many areas have state-run or private crime laboratories available to provide these services, and some police agencies make use of the FBI to analyze certain types of evidence. Whenever an investigation produces evidence requiring analysis, request it immediately. Some examples include drug identification, handwriting analysis, hair and fiber comparisons, detection of semen on clothing or other surfaces, and blood and other serology analysis. Section E. of this chapter refers to some of the specific analyses a criminalist might do and Chapter V, contains information on presenting testimony at trial in some of these areas, including two transcripts of testimony from forensic experts in sexual abuse cases.

Prosecutors handling child abuse cases must be familiar with the capabilities of any local crime laboratories. It can be educational to visit local facilities and see firsthand what they do. Criminalists are usually happy to show you around and explain what they can and cannot do to help you in child abuse cases. Making the effort to establish personal contact with these experts will pay dividends later. If there are no such labs nearby, you should at least learn where you *can* send evidence for analysis and what results to expect.

As already pointed out, the manner in which evidence is marked, handled, secured and preserved will be extremely important in determining its later utility. Prosecutors should work with doctors, hospitals, police agencies, and crime labs in their area to ensure that all evidence is handled properly and chain of custody is maintained. Criminalists at the crime lab can tell you how different items of evidence must be handled and stored so that they will later be able to conduct necessary tests. These kinds of practical necessities can and should be specified and included in any step-by-step protocols developed in your community to address child abuse investigation. The details will vary depending on available resources and existing procedures.

### 2. Polygraphs and PSEs

Polygraphs (lie detectors) and, more recently, psychological stress evaluators (PSEs or voice-stress analyzers) are tools used by a number of police agencies to assist them in criminal investigations. Opinions about their reliability differ greatly. Certainly you will want to know whether these tools are used in your jurisdiction and, if so, how. Their primary usefulness in child abuse investigations will be with suspects. While few prosecutors or suspects will stipulate to the admissibility of the results of polygraph or PSE examinations (thus preventing their use as evidence at trial), these procedures may encourage additional statements which *can* be used as evidence. The results are one more factor for the prosecutor to consider when evaluating a case. They are not, and should not be controlling.

Suspects cannot be forced to undergo these examinations, and victims should not be required to either. These tools were designed with adults in mind and thus are not appropriate for use with children in any case. In an exceptionally unusual case an officer may contemplate having a victim in her late teens take a polygraph or PSE examination—e.g., if she initiates a request to be examined. If this occurs, the officer should contact and consult with the prosecutor before proceeding. Prosecutors then need to evaluate the situation with extreme care before deciding if it would be helpful or wise.

### 3. Hypnosis

Several years ago, hypnosis was more widely used by police officers as a means of encouraging a witness' recall of details. Today, following a number of unfavorable appellate court opinions, it is used much less. Witnesses to a crime who have been hypnotized are generally allowed to testify only about facts recalled before hypnosis, and in some cases, may not be allowed to testify at all. For these reasons, hypnosis of witnesses in child abuse cases (especially children) is *not* recommended. It is crucial to inform parents and caretakers of a child who are involved in any case with the potential for prosecution, not to have the child undergo hypnosis on their own. If hypnosis has already occurred or you are considering its use, make sure you are familiar with case law in your own jurisdiction and elsewhere.

## G. CASES INVOLVING MASS VICTIMIZATION

The typical example of a multi-victim abuse case is the sexual abuse of children in a day care or school setting. These cases must be handled differently than those involving abuse of children by a family member. (The dynamics of an intrafamilial case generally remain consistent regardless of the number of victims involved.) This section focuses on unique considerations of cases in which many children are abused by a ''paid care giver'' or similar caretaker outside the family.

### 1. Investigation

Decisive and speedy action in these situations is essential. The police and child protective service agencies in your community should *immediately* notify you about such allegations, and you should then formulate a plan for careful and coordinated investigation. Known victims should be thoroughly interviewed and complete medical examinations should be conducted without delay. (See Chapter II, Section A. for detailed suggestions related to interviewing children.)

Identify the offender(s), and other victims if possible, and try to pinpoint where the other children and adults were when victims were assaulted. It is of primary importance to safeguard any other children who could also be victimized.

If the offender(s) are known, the evidence is consistent and clear, and an arrest will not interfere with the continuing investigation, the offender(s) should be arrested. If this cannot be accomplished, you might consider working with the management of the facility to prevent the suspect's continued contact with children. Depending upon the information you possess and realizing the implications of its release, even confidentially, to these authorities, the suspect's suspension, leave of absence, or transfer to an office away from children and under the watchful eye of others may be possible. Always beware, however, of the possibility that those in charge are involved or will be protective of the suspect.

If the offender(s) are not known, the investigation must continue without disclosure. Consider using undercover investigators posing as utility workers in the facility to monitor the movements of potential suspects. Another technique is to seek court orders authorizing wire taps and installation of disguised video cameras in areas where it is suspected that abuse occurred. These devices should be used to monitor and record the activities of suspected abusers, with special care paid to their interactions with children. Obviously, the police should *not* wait to record the victimization of any child, but should move in to intervene and arrest a suspect when something is said or done endangering a child or indicating the suspect's intention to abuse a child.

Search warrants for the facility and suspects' residences should be obtained as soon as probable cause to search exists. Difficulties arise, however, in cases in which there are multiple offenders but some remain unknown and the investigation is still at an early stage. The decision to move quickly with regard to known offenders, will obviously alert unknown offenders and thus must be dictated by the prosecutor's assessment of both ''making the case'' and protecting other children from future abuse. Be alert for any evidence of con-

spiracy among multiple offenders. Phone records and correspondence indicating contacts between offenders should be obtained if at all possible.

Obtain a list of the names and addresses of all the children in the particular group, class or grade that appears to be the subject of the abuse as well as an employee list for the facility. Investigators should conduct home interviews of these children as quickly as possible as well as other children who have recently left, those who have been absent temporarily, and other former students or children who interacted with the suspect(s). If the children who allegedly have been abused have not attended the institution for a year or more, you may wish to bring them back to school to help them remember details and recount events.

Obtain employee photographs, if possible, to use in compiling photographic spreads to be displayed to victims for identification purposes. Placing victims in concealed and safe locations to point out the molester is also a possibility, depending upon the facts of the case and legal requirements in your jurisdiction. In many jurisdictions a search warrant to enter the building may be necessary and, as always, the timing of execution may be very important.

## 2. Interviewing Large Numbers of Children

Unlike the child abuse case involving one victim, a prosecutor will probably be unable to conduct personal initial interviews with the large number of children involved in the day care abuse setting. He or she must rely upon a staff, if available, or upon police investigators and child protection service personnel to help screen initial interviews. The prosecutor or prosecutors who will try the case should limit their interviews to those children who admit being abused. If the number of children abused is large, it may be necessary to have several prosecutors conduct the interviews. If so, the prosecutor who interviewed a particular child should handle the examination of that child at trial.

These cases take time, energy and resources. If your staff lacks experience with them, it is beneficial to arrange for someone knowledgeable about multiple victims cases (another prosecutor, a therapist, a caseworker, a detective, etc.) to meet with those who will be working on the case and suggest what to expect and how to approach the investigation. It is important to consult with child abuse specialists before and not after problems arise. Their information and cooperative efforts will help in dealing with and interviewing parents as well.

Interview the children separately as you would in any other case. If possible, do not schedule interviews which require a number of the children to wait in the same area. Try to determine through separate interviews whether there seems to be a common pattern of behavior by the offender(s). Did the offender take the children individually to one area of the day care facility or a few children to different areas at different times? Did any of the children witness acts in which they were not involved? Did the offender photograph them or others in their presence? Was any sexual paraphernalia used and can they draw the particular items? What were the other teachers and children doing before, after, and during the time in which they were being victimized? As in all child abuse cases, probe to determine how the offender(s) maintained the victims' silence.

Keep in mind that the primary defense focus in multiple victim sexual abuse cases will be on the investigative process, especially the child's interviewer and interview format. A common defense theme in more visible mass victimization cases has been the so-called "biasing effect" of interviewers on children disclosing the abuse. In these cases the defense has claimed that the manner of questioning employed as well as the interviewer's expectations and relationship with the children "put ideas into their heads."

One way to defeat this argument is by dividing small groups of children among investigators and social workers. However, if you choose to employ a number of different interviewers, you must ensure that some communication is shared regarding emerging patterns of behavior or other unique aspects of the abuse. Interview approaches should be consistent to keep the necessity for reinterviewing at a minimum. Try to encourage parents and children involved in the same case not to interact and "contaminate" each other. Warn

parents of the dangers and resulting criticisms if they exchange information or try to interview children themselves. This topic is explored further in the section which follows on pre-trial case management.

### 3. Interviewing Employees of the School or Center

Interview all employees of the facility. The purpose, in part, is to determine as much as possible about relationships among the staff, friendships, work habits, personal idiosyncrasies, activities, likes and dislikes. Recognize that some employees may know about the abuse but have been shamed or threatened into silence. Tracking the daily routine or schedule of employees can provide some insight into who may have had an opportunity to commit the abuse.

### 4. Investigative Grand Jury

The grand jury has long been an effective investigative tool for uncovering complex, multi-defendant organized criminal activity. It may be useful in uncovering large-scale sexual abuse at preschool or day care facilities, as well, particularly for those cases in which not all offenders are known, and employees or others with knowledge of the abuse are reluctant or refuse to cooperate with investigating authorities.

Grand jury investigations can result in a myriad of leads for corroborative evidence, and in highly publicized cases often generate a spate of volunteered information from outside witnesses. The strength of the grand jury lies in its ability to compel testimony. Its contempt powers generally ensure answers from even the most uncooperative witnesses, while the threat of perjury may tend to keep them closer to the truth than they otherwise might be.

Since an individual whose testimony has been compelled is immune from prosecution (with use immunity automatic in most jurisdictions) you must exercise care in choosing whose testimony to compel if a waiver of immunity cannot be obtained. Compelling testimony from a witness believed only to have peripheral information who then confesses to molesting scores of children would obviously be undesirable. However, this is a rare occurrence. Investigating authorities should be able to steer you to witnesses who are not principally involved, but have helpful information. Starting with known victims and uninvolved employees, and then moving, if necessary, to those who may be peripherally involved should lead you to identify other victims and the principal offenders. Then, if there is need, consideration can be given to granting immunity to the least culpable offender if the case cannot be successfully prosecuted without "turning" one offender against the others.

Not only can the testimony of witnesses be "locked in" with recordation at grand jury sessions, but the secrecy of the proceedings protects the investigation as well. Moreover, grand jury subpoenas are a very effective way to obtain necessary documents and records.

Although a grand jury investigation will not disturb the normal manner in which a prosecutor interviews child victims, one or more of the children may be required to testify before the grand jury. In most jurisdictions, grand jury proceedings are less formal than regular court hearings. Having the child testify before trial may provide the prosecutor with the ability to evaluate each child's strengths and weaknesses in a setting similar to, but not as stressful as, the actual trial.

Keep in mind that not all children who have been victimized need to testify before the grand jury. The grand jury will generally rely upon the prosecutor to decide whom to call as witnesses—though the grand jury has the power to call anyone it wishes. If several children will be testifying, consider having them meet together briefly, not to discuss the facts of the case, but to have a child who has already testified dispel any fears the other children may have.

The possibility of a "runaway" grand jury is a concern to some prosecutors, especially with regard to investigations that are likely to catch the public's eye. Sweeping indictments by a grand jury despite a disparity of evidence concerning different suspects can destroy the

credibility of the entire investigation and jeopardize the outcome of future investigations as well. Although "runaway" grand juries are extremely rare, they are generally caused by the prosecutor's inability to control the direction and momentum of the investigation. A prosecutor must guide the grand jury by educating its members. Serving only as an evidence-presenter and legal adviser without taking a position is not in anyone's best interest.

### 5. Pre-Trial Case Management

The parents of abused children and the children should be encouraged to seek counseling and therapy. Keep information concerning community resources and qualified therapists close at hand. Also, it is extremely important to keep the parents advised of the current status of their child's case. Maintain regular contact with them personally, or through a representative, preferably your Victim's Assistance Unit. Parents, frustrated with the delays often associated with a complicated criminal justice system, can take these frustrations out on the prosecutor, especially if they feel left out or communication has been inconsistent. Coordination, regular scheduling and communication will assist in alleviating many problems.

Parents who are undergoing group therapy often develop relationships with parents of other abused children which can help them cope with mutual difficulties. Victims may also be involved in group therapy with other abused children. These kinds of support networks can be very valuable. As the prosecutor handling the case, however, you should be aware of the problems that could arise if several victims or parents involved in the same case are in group therapy together. It is not unlikely that they would compare notes and talk about the case with each other in this setting prior to trial. Whether they actually do, and whether their discussions influence their recollection or later testimony, the situation alone creates this potential and an issue to be exploited by defense attorneys. If possible, recommend that different victims of the same offender(s) and different parents of victims in a single case not attend the same group therapy sessions. At a minimum, you need to explain carefully to each parent and victim the possible problems created if they talk with each other about the case prior to trial. Let them know that discussing the case with other witnesses could decrease the chances of obtaining a conviction.

Be sure to ascertain whether any civil actions have been filed which may be related to the abuse in the facility. You may need to request restraining orders or take other appropriate action to preclude civil defense attorneys from interviewing the children during the pendency of the criminal case.

## H. CHILD HOMICIDE AND PHYSICAL ABUSE CASES

Of the total number of child abuse cases referred to the prosecutor's office, most involve allegations of sexual abuse. This may not, however, reflect reality. Physical abuse cases, despite their lack of prominence in criminal prosecutions, still represent the vast majority of child abuse. The numbers of *both* sexual and physical abuse cases reported each year continue to rise. According to the National Committee for Prevention of Child Abuse, *Fact Sheet* No. 9, April 1987, child abuse fatalities in 34 states rose an average of 23 percent between 1985 and 1986 with over 1,200 reported nationwide in 1986. The average age of the victims of these fatalities, as indicated by the same source, was 2.6 years of age. The American Humane Association has reported that half of these children die from either the cumulative result of repeated beatings or a single violent episode, and the other half die as a result of neglect with parents failing to provide for the child's basic needs.

This information points out the great need for prosecutors and other professionals to develop special expertise in physical as well as sexual abuse cases, and not to overlook or underestimate either the scope or importance of physical abuse as a major problem in our society. Steps should be taken to ensure that physical abuse cases are referred to police and prosecutors to investigate and evaluate. Chapter I describes some of the most common indicators of physical abuse.

Once referred for investigation, physical abuse cases require immediate and thorough contact with the parents or caretakers of the deceased or injured child concerning the following:

- When they first noticed the injury and how it appeared;
- When the child first appeared to be sick or injured;
- Where the child was and who was with the child during *all* recent periods including a significant period before the injury was noticed;
- Were there any prior injuries or illnesses of the child including bruises?
- What was the child's schedule or routine?
- What were the witnesses' reactions on discovering the injury and to whom did they talk?
- At what level was the child's development—was she walking, climbing, rolling over, etc.?
- Did the child have any prior hospitalization or treatment?
- Does the family have a family physician and a regular pediatrician?
- Who were the child's closest friends, the school attended, etc.?

Evidence units should be sent to the child's residence, yard or any other place likely to be proffered as the location of an "accidental" injury. They should photograph or videotape these locations, if possible, as well as any large objects or toys present in the location; such items could also be seized. Complete statements should be taken from all medical or hospital personnel regarding their observations and evaluation of the child, any comments made by the custodial adults related to the injury of the child or other pertinent information, the behavior of the custodial adults while in their presence, and anything they believe would be helpful to the investigation.

As with sexual abuse, it is necessary to interview all other family members and siblings within the residence, any other caretaker of the child and anyone who may have regular contact with the child.

Generally, the medical examiner in the child homicide case and the treating physician in a non-fatal physical abuse case will be the critical witness. It is extremely important, there-fore, that the medical examiner in a homicide be apprised of and have the opportunity to review any relevant evidence recovered by the police prior to the autopsy (if possible) or, at the very least, prior to completing the autopsy report. If a procedure is not in place to provide the medical examiner with scene photographs, evidence unit reports, offender statements, and like information early on, such a procedure should be implemented. As an example, reviewing photographs and scale diagrams of the backyard where parents claim that their child "accidentally" fell and hit her head would be helpful to the medical examiner in determining whether the child's death could have occurred as claimed. Without such infor-mation, it would be much more difficult. The information provided to the medical examiner should include all suspect and witness statements in addition to the other evidence gathered during the investigation. A medical examiner unaware that an offender has confessed might designate the cause of death in his or her report as "undetermined," if the details about the manner of death of the child contained in the confession have not been brought to his or her attention.

Like the medical examiner, any treating or examining physician in a physical abuse case in which the child survived, must be apprised at the earliest opportunity of all information gathered during the investigation. When the suspected abuse has been reported to the police department before an examination of the child, the investigating officer should meet with the physician prior to the examination and provide this information.

# I.  <u>INVESTIGATIVE CHECKLISTS</u>

Checklists can be valuable tools in carrying out the investigation of child abuse cases. A wide variety of checklists have been developed by different jurisdictions to reflect individual needs and approaches. A single checklist cannot adequately address the unique facts and circumstances of each child abuse case, but it can provide guidance to those conducting investigations and evaluating allegations. Checklists are typically used by law enforcement

officers and sometimes by child protective services personnel with investigative responsibilities.

The following checklist contains a comprehensive itemization of factors you may wish to consider for inclusion in checklists developed for your jurisdiction. These items pertain primarily to matters of concern to criminal investigations by police officers. Most are discussed in greater detail in the text of this chapter. In order to make checklists as practical as possible, prosecutors should work with police, child protective services personnel, and attorneys handling civil dependency, neglect and removal actions to determine the specific steps relevant to child abuse investigations in their jurisdiction. All areas pertinent to the investigator's duties should be covered. These could include: statutory elements of specific crimes that apply to child abuse within that jurisdiction; steps and standards that must be followed in determining whether a child is at risk and should be removed from the home, and whether and when to arrest a suspect; and special investigative techniques to be employed such as polygraphs and video or audio taping of statements.

These and other aspects of the investigation differ in each community. Some areas have separate checklists for physical and sexual abuse of children; some use a checklist specifically for intrafamilial sexual abuse; others for individual crimes; and still others use brief forms listing basic areas to be covered in the interview with a child. Any or all of these can be useful. The important point is to consider all the information needed to respond appropriately to the crime of child abuse and tailor your checklist to reflect those needs.

*Criminal Child Abuse Investigative Checklist*

## 1. REVIEW AND NOTE AVAILABLE INFORMATION

_____ How and by whom reported
_____ CPS report/caseworker and action taken to date
_____ Police reports
_____ Medical exam or autopsy/findings/name of doctor
_____ Witness statements
_____ Prior reports concerning this child
_____ Prior reports/complaints/convictions concerning this suspect
_____ Records check (local, state, FBI) re: suspect

## 2. CONTACT CHILD VICTIM

_____ Note vital statistics: DOB, height, weight, etc.
_____ Note home address, school/grade attended
_____ Note any known disabilities
_____ Note observations of physical appearance
_____ Note demeanor, emotions displayed
_____ Take photos of injuries
_____ Make referrals to counseling and other support services

*Victim Interview*
(To be done whenever possible)

_____ Explain your role
_____ Elicit background information, put child at ease, assess developmental/intellectual level
_____ Determine whether medical exam has occurred
_____ Determine child's expectations, fears, desired consequences
_____ Provide information and let child know how to contact you

*Obtain Detailed Description of Abuse*

_____ Name of offender and relationship to victim (family, friend, stranger, etc.)
_____ Physical description of offender
_____ When abuse occurred
    _____ Once or more than once
    _____ How often
    _____ Child's age at time
    _____ First incident
    _____ Most recent incident
    _____ Time of day/duration
    _____ Association with other events
    _____ Recollection of individual incidents
_____ Location(s) of abuse (state, county, city, building, room, other)
_____ Any corroborative details: specific descriptions of clothing, furniture or other items, of other people nearby, of tv shows on at time, of child's feelings at time of abuse, etc.
_____ Enticements, bribes, gifts, promises, explanations, threats, intimidation by offender
_____ Elements of secrecy
_____ Offender's words during abuse
_____ Whether victim has diary/journal
_____ Whether victim has correspondence from offender
_____ Whether victim gave correspondence or other items to offender
_____ Whether other witnesses present

120

_____ Where other family members were
_____ Whether other victims seen/known
_____ Victim's attitude toward offender then/now—close, loving, hostile, fearful, etc.
_____ First person victim told about abuse and his/her reaction
_____ If applicable, why victim delayed in disclosing
_____ Others victim told and reactions
_____ Drugs used by offender or given to victim
_____ Alcohol used by offender or given to victim
_____ Prior abuse (physical or sexual) of victim
             _____ By this offender
             _____ By anyone else

### Add for Sexual Abuse

_____ Clarify child's terms for anatomy
_____ Note child's exact words describing abuse
_____ Nature of abuse
             _____ Oral/vaginal/anal contact
             _____ Fondling/penetration
             _____ Made to perform sex acts on offender
             _____ Use of pornography (films, magazines, pictures)
             _____ Use of foreign objects, sexual devices, contraceptives, lubricants
             _____ Whether photos taken of victim
             _____ Whether victim saw photos of other children
             _____ Clothes on or off—victim *and* offender
             _____ Pain, bleeding or discharge
             _____ Offender's behavior/words during and after sex acts
             _____ Whether child saw/felt ejaculation
_____ Description of any unusual physical characteristics of offender—scars, tatoos, birth-
             marks, etc.
_____ Description of offender's genitals—pubic hair (color), penis (erect/flaccid, circumcised or
             not), or any other unusual or unique features
_____ If offender ejaculated, where—in child's mouth/vagina/rectum, elsewhere on child's
             body, on bedding/carpet/clothing, etc.
_____ Did child wipe self or offender clean it up—if so, with what and where is it

### Add for Physical Abuse

_____ Any weapons used: description and location
_____ Child's explanation for specific injuries
_____ Reason (if known) for offender's use of force—punishment, anger, etc.
_____ Whether offender violent toward others
_____ Whether child has had prior medical problems or treatment and if so, when and what

## 3. MEDICAL EXAMINATION OF VICTIM

_____ Find out if exam already done; if so,
             _____ When
             _____ By whom conducted
             _____ Who sought medical attention for child
_____ If not already done, arrange as soon as possible
_____ Obtain consent to acquire medical reports; arrange for legible copies
_____ Interview doctor and other involved medical personnel and determine how to contact in
             future
_____ Document any statements made by victim

INVESTIGATION                                                                    II-55

_____ Note any special procedures used
        _____ Colposcope _____ Photos
        _____ Toluidine blue dye _____ Photos
        _____ Proctoscopy or anoscopy
        _____ CAT scan
        _____ X-rays/skeletal survey
        _____ Screen for blood disorders/clotting studies
        _____ Consultation with/referral to other experts
        _____ Other
_____ Collect any physical evidence gathered by doctor
        _____ Specimens and samples
        _____ Photos
        _____ Child's clothing worn during assault
_____ Arrange for necessary crime lab analysis
        _____ Presence of sperm, acid phosphatase, P30
        _____ Blood/serology analysis
        _____ Hair comparison
        _____ Fiber comparison
        _____ Other

*Medical Evidence/Observations Consistent with Sexual Abuse*

_____ Evidence of violence anywhere on body
        _____ Bleeding, bruises, abrasions
        _____ Bite marks
        _____ Broken bones
        _____ Other
_____ Positive results for presence of semen
        _____ Flourescence with Wood's Lamp
        _____ Motile/non-motile sperm
        _____ Positive acid phosphatase or P30
_____ Pregnancy
_____ Sexually transmitted disease present
        _____ Gonorrhea
        _____ Syphilis
        _____ Chlamydia trachomatis
        _____ AIDS
        _____ Herpes
        _____ Trichomonas vaginalis
        _____ Venereal warts
        _____ Nonspecific vaginitis
        _____ Pubic lice
        _____ Any vaginal/penile discharge
        _____ Other
_____ Itching, irritation or trauma of any kind in genital or anal area
_____ Foreign debris in genital or anal area
_____ Vaginal area injury/findings
        _____ Enlarged vaginal opening in prepubertal child (4-10 mm. or over)
        _____ Posterior fourchette lacerations
        _____ Other lacerations/scarring, and location
        _____ Redness, focal edema or abnormalities (synechiae, changes in vascularity,
                    etc.)
        _____ Absent or thinned hymenal ring
        _____ Laxity of pubococcygeus muscle—gaping vaginal opening

_____ Anal area injury/findings
    _____ Reflex relaxation of anal sphincter
    _____ Positive wink reflex
    _____ Complete or partial loss of sphincter control
    _____ Lacerations, scarring, erythema
    _____ Fan-shaped scarring
    _____ Loss of normal skin folds around anus
    _____ Thickening of skin and mucous membranes
    _____ Skin tags
    _____ Gaping anus (over 15 mm.) with enlargement of surrounding perianal skin

### *Medical Evidence/Observations Consistent with Physical Abuse*

_____ Doctor's opinion regarding cause of child's death or injury as non-accidental
_____ Delay or failure to seek medical treatment by child's parent(s)/caretaker(s)
_____ History given inconsistent with severity, type or location of injury
_____ History inconsistent with child's developmental level/ability to injure self
_____ Different explanations of injury from different family members
_____ Child fearful, unwilling to explain cause of injury
_____ Change in details during history-taking or to different people
_____ Current physical injury accompanied by signs of multiple prior injuries or neglect, e.g.,
    malnutrition, lack of regular medical care, etc.
_____ Parenting disorders apparent, e.g., alcoholism, drug abuse, psychotic behavior, etc.
_____ Parent/caretaker irritated, evasive, vague, reluctant to give information
_____ Doctor's opinion that child's injuries are consistent with battered child syndrome

### *Injuries Suspicious for Physical Abuse*

| Soft Tissue Injuries |
|---|

Bruises, Abrasions, Welts and Lacerations
_____ In location other than bony prominences, such as buttocks, lower back, genitals, inner
    thighs, cheeks, ear lobes, mouth, neck, etc.
_____ Multiple bruises at different stages of healing over large area of body, especially if deep
_____ Adult bite marks
_____ Wrap-around, tethering or binding injuries
    _____ Neck, ankle or wrist circumferential injuries; rope burns
    _____ Injuries due to choking or gagging
    _____ Trunk encirclement bruising
_____ Patterns/imprints/lacerations suggesting inflicted injury
    _____ Grab, pinch, squeeze or slap marks
    _____ Strap or belt marks
    _____ Looped cord marks
    _____ Imprints or lacerations from other objects—tatooing, punctures, whips,
        sticks, belt buckles, rings, spoons, hairbrush, coat hangers, knives, etc.

| Internal or Abdominal Injuries |
|---|

_____ History or severity of injury indicates child was pummelled, thrown or swung against wall
    or other object, kicked, or hit with blunt, concentrated force

INVESTIGATION                                                        II-57

_____   Lack of history indicating auto accident or fall from high place
_____   Internal/organ damage
            _____   Ruptured or perforated liver
            _____   Injuries to spleen
            _____   Injuries to intestines
            _____   Injuries to kidneys
            _____   Injuries to bladder
            _____   Pancreatic injury
            _____   Other internal organs
_____   External symptoms
            _____   Nausea, vomiting
            _____   Constipation
            _____   Shock
            _____   Blood in urine
            _____   Swelling, pain, tenderness

| Head Injuries |
|---|

_____   Multiple bruises/lumps on scalp
_____   Hemorrhaging beneath scalp or hair missing due to hair pulling
_____   Subdural hematomas (never spontaneous)
_____   Suspect caused by violent shaking if:
            _____   Bone chips at cervical vertebrae
            _____   Compression fractures to ribs
            _____   Damage to neck muscles and ligaments—child unable to turn head to side or
                          up and down
            _____   Spinal cord damage
            _____   No skull fracture or external bruising or swelling
            _____   Whiplash or shaken baby syndrome diagnosis
_____   Suspect caused by abusive blunt force trauma if
            _____   Skull fracture
            _____   Scalp swelling and apparent bruising
            _____   Parent/caretaker denies recent trauma, fall or other injury sufficient to
                          account for injury or claims accidental force such as fall from couch, bed
                          or crib which is insufficient to cause such injury
_____   Subarachnoid or other intracranial hemorrhages with no sufficient "accidental" ex-
              planation
_____   Skull fractures without history of significant "accidental" force
_____   Injuries to eyes without sufficient accidental or other explanation
            _____   Retinal hemorrhaging, especially if other evidence of non-accidental head
                          trauma present
            _____   Black eyes
            _____   Detached retinas
            _____   Petechia (small spots of blood from broken capillaries) or other bleeding in
                          eye
            _____   Cataracts
            _____   Sudden loss in visual acuity
            _____   Pupils fixed, dilated or unresponsive to light
            _____   Eyes not tracking or following motion
_____   Ear injuries without appropriate explanation
            _____   Sudden hearing loss
            _____   "Cauliflower" ear
            _____   Bruising to ear or surrounding area

124

_____ Petechia in ear
_____ Blood in ear canal
_____ Injuries to nose without appropriate explanation
_____ Deviated septum
_____ Fresh or clotted blood in nostrils
_____ Bridge of nose bent or swollen
_____ Injuries to mouth without appropriate explanation
_____ Chipped, missing or loose teeth caused by blow to mouth
_____ Bruising in corners and lacerations of frenulum, of upper and lower lip, and of tongue—indicative of exterior gag
_____ Petechia inside nostrils, around nose, or near corners of mouth—could indicate manual suffocation if child has stopped breathing

---

| Skeletal Injuries |

_____ Multiple fractures at different stages of healing
_____ Repeated fractures to same bone
_____ Spiral fractures (usually femur, tibia, forearm or humerus)
_____ Rib fractures, especially in children less than 3
_____ Bone chips in bones connecting at elbow or knee, caused by jerking and shaking (avulsion of the metaphyseal tips)
_____ Growth plate separations caused by shaking—"bucket handle" and "corner" fractures
_____ Injury to bone—bleeding and thickening/calcification—which is repeatedly hit but not broken (sub-periosteal proliferation—apparent on x-ray)
_____ Fractures to bones not usually accidentally broken, such as scapula and sternum

---

| Inflicted Burns |

_____ Child burned on unusual part of body—palms, soles, genitals, etc.
_____ Parent/caretaker delays in seeking medical help
_____ Multiple burns of different ages and different burn patterns
_____ Symmetrical, patterned burn with sharp margins—no indication of child trying to get away (child held down or hot object deliberately applied)
_____ Hot water burns
_____ Immersion/dipping burn—oval shape, usually buttocks and genital area
_____ Doughnut-shaped burn—surrounding buttocks (indicates child forcibly held down)
_____ Glove or stocking burn—immersion of hand or foot
_____ Even immersion lines, lack of splash burns (child prevented from thrashing around, trying to get out)
_____ Contact burns
_____ Cigarette, cigar, match tip, pilot light flame burns—usually deep circular burns
_____ Imprint of object responsible for burn with sharp margins—usually deep and uniform burn:
_____ Stove burner (star, circular, coil shapes)
_____ Heating grate, radiator
_____ Iron
_____ Curling iron
_____ Heated knife or hanger
_____ Other

125

## 4. CONTACT OTHER WITNESSES

_____ Determine *all* people with relevant information about victim or offender and obtain statements (complainant, victim's parents/caretakers, family members, friends, medical personnel, co-workers, teachers, CPS personnel, neighbors, therapists, etc.)

_____ Note identifying information for each witness: DOB, address, phone, employment, relationship to victim and/or offender, marital status, etc.

_____ Check for prior criminal record of witness

_____ Note witness' demeanor and attitude toward victim and/or offender, and reaction to allegations

_____ Determine degree of familiarity with victim and/or offender

_____ Determine whether they witnessed any unusual or inappropriate behavior/contact between offender and victim or other children

_____ Determine whether they know of or suspect any other children who were victimized or at risk

_____ Determine whether they know of additional potential witnesses

_____ Determine whether they can verify/refute *any* facts supplied by victim or offender

_____ Awareness of any motives of victim or others to falsely accuse offender

_____ Observation of any physical/medical symptoms in victim (see preceding list)

_____ Observation or knowledge of *any* unusual behavior/behavior changes in victim before or after disclosure; some possibilities include:

### Behavioral Extremes

_____ Constant withdrawal, depression, suicide gestures/attempts or self-destructive behavior

_____ Overly compliant or passive

_____ Overly eager to please

_____ Afraid to talk or answer questions in parent's/suspect's presence

_____ Avoiding suspect or refusal to be with suspect

_____ Fearful of a place—day care, school, babysitter's, suspect's room, etc.

_____ Fear of all males, all females or all adults

_____ Wary of physical contact

_____ Unusual self-consciousness, e.g., unwilling to change clothes for PE class or to participate in recreational activities

_____ Constant fatigue, listlessness or falling asleep in class

_____ Excessively self-controlled; never cries or exhibits curiosity

_____ Frequent unexplained crying

_____ Apprehensive when other children cry

_____ Poor peer relationships or deterioration in existing friendships

_____ Inability to concentrate

_____ Unusual craving for physical affection

_____ Unexplained or extreme aggressiveness, hostility, physical violence

_____ Turning against a parent, relative, friend, etc.

_____ Delinquency, including theft, assaultive behavior, etc.

_____ Alcohol or drug use/abuse

_____ Running away

_____ Frequent absences/truancy from school

_____ Early arrival, late departure and very few absences from school

_____ Sudden increase or loss in appetite

_____ Change in school performance or study habits

_____ Compulsion about cleanliness—wanting to wash or feeling dirty all the time

*Psychosomatic Symptoms*

_____  Headaches
_____  Stomach aches
_____  Rashes
_____  Stuttering

*Regressive Behavior*

_____  Return to accidents/bed-wetting
_____  Baby talk, acting like a baby
_____  Excessive clinging
_____  Thumb sucking
_____  Carrying blanket
_____  Wanting to nurse
_____  Otherwise acting younger than age

*Sleep Disturbances*

_____  Bad dreams
_____  Refusal/reluctance to sleep
_____  Excessive sleeping
_____  Sleep walking
_____  Sudden fear of darkness
_____  Other sleep pattern changes

*Unusual Sexual Behavior or Knowledge*

_____  Acting out sexually with toys, other children
_____  Excessive masturbation
_____  French kissing
_____  Sexually provocative talk
_____  Seductive behavior toward adults
_____  Preoccupation with sexual organs of self or others
_____  Sexually explicit drawings
_____  Sexual knowledge beyond norm for age

*Other Behaviors*

_____  Dressed inappropriately for weather, e.g., *always* in long sleeves, etc.
_____  Enuresis/encopresis
_____  Pseudo-mature behavior
_____  Extreme hunger
_____  Sudden weight loss or gain
_____  Personality disorders

## 5. INTERVIEW WITNESSES TO WHOM VICTIM MADE STATEMENTS

_____  Cover all applicable areas in 4.
_____  Determine exact circumstances of child's disclosure to them
            _____  When and where statements made
            _____  Who else present
            _____  Words used by child
            _____  Details provided by child

_____ Incident precipitating disclosure, e.g., spontaneous disclosure, child responding to questions, etc.
_____ Child's demeanor/emotional state
_____ Child's attitude toward offender
_____ Child's expressed concerns/fears
_____ Witness' reaction to child

## 6. INTERVIEW COMPLAINANT (first reporter, if other than child)

_____ Cover all applicable areas in 4. and 5.
_____ Determine what caused them to report
　　　_____ Child's disclosure, *or*
　　　_____ Suspicions based on other factors without disclosure from child
_____ Assess potential motives of complainant

## 7. INTERVIEW VICTIM'S PARENT(S)/CARETAKER(S)

_____ Cover all applicable areas in 4., 5. and 6.
_____ Determine child's medical and mental health history
　　　_____ Obtain names of doctor(s)/therapist(s)
　　　_____ Obtain consent to receive relevant medical records
_____ Prior abuse of victim—when, where, who, action taken, results
_____ Prior accusations of abuse by victim—when, where, who, action taken, results
_____ Child's general personality/functioning—school performance, hobbies, friends, etc.
_____ Child's normal schedule/routine
_____ Verification of timing/events related by child
_____ Suspect's access to victim (past and present)
_____ Ongoing difficulties in family (e.g., divorce, custody or visitation disputes, arguments, etc.) and victim's awareness of/reaction to them
_____ Determine whether supportive of victim

### For Physical Abuse

_____ When injury/sickness of victim first noticed
_____ What they know or suspect about cause
_____ Where child was/who with child for substantial time before and all times up to injury/sickness becoming apparent
_____ Prior illnesses or injuries of child
_____ Prior medical treatment of child and name of provider(s)
_____ Suspect's responsibility, if any, for discipline of child; normal methods used
_____ Action taken when noticed injury/sickness

### For Sexual Abuse

_____ Determine child's awareness of/exposure to sexual matters
　　　_____ TV, movies, videos, magazines, etc.
　　　_____ Observation of adults
　　　_____ Talking to others—sex education in school, friends, personal safety curriculum
_____ Determine sleeping arrangements (intrafamilial abuse)
_____ Determine who bathed victim

128

INVESTIGATION

## 8. INTERVIEW OTHER FAMILY MEMBERS OF VICTIM

_____  Cover all applicable areas in 4., 5., 6. and 7.
_____  Determine whether they saw/heard any direct or indirect evidence of abuse
_____  Determine if they were ever victims

## 9. INTERVIEW SUSPECT'S SPOUSE, SIGNIFICANT OTHER OR OTHERS IN FAMILY/ HOUSEHOLD

_____  Cover all applicable areas in 4., 5., 6., 7. and 8.
_____  Determine statements made by suspect
_____  Suspect's reaction to allegation or explanation for it
_____  Unusual behavior of suspect before or after allegation
_____  Suspect's opportunity to abuse child—time with child, alone or otherwise
_____  Relationship known/observed between victim and suspect
_____  Whether suspect owns/owned/possessed items, clothes, etc., described the victim
_____  Other children in contact with suspect
_____  Prior arrests, accusations, convictions of suspect
_____  Suspect's violence toward others
_____  Suspect's employment—past and present
_____  Suspect's residence—past and present
_____  Prior marriages of suspect
_____  All children/step-children of suspect
_____  Suspect's physical and mental health
           _____  Prior illnesses/infections/treatment
           _____  Alcohol or drug abuse
           _____  Names of doctors/therapists seen
_____  Description of witness' relationship with suspect
_____  Description of witness' background—marital, employment, etc.
_____  Whether suspect (or witness) keeps diary, journal, calendar, computer records, address book, etc.
_____  Whether suspect has another residence, post office box, storage area, etc.
_____  Unusual hobbies or interests of suspect

*For Sexual Abuse*

_____  Sleeping arrangements in home
_____  Children's bathing responsibilities in home
_____  Distinctive anatomical features (if any) of suspect, e.g., scars, tatoos, birthmarks, etc.
_____  Suspect's use (if any) of pornography, sexual aids or implements, birth control
_____  Presence of sexually transmitted disease in suspect or witness
_____  Strange/unusual/distinctive sexual practices or preferences of suspect

*For Physical Abuse*

_____  Suspect's responsibility for child's discipline
           _____  Usual methods/frequency
           _____  Amount of force
           _____  Use of weapons/implements
           _____  Loss of control
_____  Any expressions of frustration, disappointment or anger with child by suspect
_____  Suspect's access to weapons/implements consistent with child's injuries

## 10. INTERVIEW SUSPECT

_____ Advise of *Miranda* rights
_____ Stress interested only in hearing and determining the truth
_____ Obtain background, biographical information
    _____ DOB
    _____ Vital statistics: height, weight, etc.
    _____ Past and present residences
    _____ Past and present employment
    _____ Marital status/prior marriages
    _____ Number of, names, locations and ages of all children
    _____ Mailing address(es), P.O. box(es)
    _____ Neighborhood/community organizations or affiliations
    _____ Hobbies and interests
    _____ Magazine subscriptions, especially if sexually-oriented
_____ Suspect's schedule and routine—e.g., work and leisure time, vacation time, etc.
_____ Note suspect's demeanor and any changes during interview, e.g., angry, uncomfortable, vague, evasive, amused, unconcerned, etc.
_____ Any indication of psychosis, mental health problems, alcohol or drug dependence, physical or medical problems
_____ Suspect's familiarity with victim and victim's routine
    _____ Acknowledgement/awareness of victim's age or any disabilities
    _____ Acknowledgement of time alone with victim
_____ Suspect's description of nature and quality of his relationship with victim
_____ Suspect's description of victim
    _____ ''Problem child''
    _____ ''Special'' child
    _____ Good/bad
    _____ Obedient/disobedient
    _____ Smart/dumb
    _____ Honest/dishonest (''pathological liar'')
    _____ ''Bruises easy''
    _____ ''Clumsy''
    _____ ''Always/never in trouble''
    _____ Unrealistic expectations of child
    _____ Complaints about minor, irrelevant or unrelated problems with child
    _____ Other
_____ Suspect's description of ways of dealing with problems with child
_____ Suspect's description of relationship with spouse, complainant, other important witnesses
_____ Corroboration of *any* details supplied by victim
_____ Suspect's explanation, *in detail*, of reasons for allegation of abuse
    _____ Victim's motive to lie
    _____ Motive of others to lie
    _____ Details of ''unintended'' or ''accidental'' touching or injury
    _____ Detailed explanation of how child initiated event
    _____ Detailed explanation of injuries observed on child
    _____ Explanation for why delayed or did not seek medical attention for injured child
    _____ Extent and details of any abusive conduct suspect admits
_____ Request names and locations of anyone who can corroborate information given by suspect
_____ Request access to any items which could corroborate suspect's claims, e.g., calendar, work records, etc.
_____ Request names of suspect's friends and co-workers; if someone you are aware of is left out by suspect, find out reason why
_____ Ask suspect to verify he has told truth and whether he has anything else to say

130

INVESTIGATION

## 11. SEARCH FOR/SEIZE PHYSICAL EVIDENCE

*From Victim*

_____ Photos of injuries/general appearance
_____ Clothing worn at time of assault, especially if torn, bloody, etc.
_____ Bedding, etc. which may contain evidence
_____ Items received from suspect
_____ Calendars, diaries, journals, etc.
_____ Other

*From Scene*

_____ Photos/diagrams
_____ Take measurements of areas/items involved, especially in physical abuse cases with claim
             of accident or self-infliction of injury by child
_____ Note surface child supposedly landed on in ''fall'' case, e.g., wood, concrete, carpeted,
             etc., and measure distance from child's supposed position to point of impact
_____ In burn cases:
             _____ Seize/photograph items consistent with pattern of contact burn
             _____ Check water temperature at hot water heater and faucets in hot water burn
                          cases
             _____ Measure height of tub/sink and note what tub/sink (or other site of burn)
                          is made of
             _____ Test to determine surface temperature of items used to burn child and check
                          for body residue on them
_____ In criminal neglect cases:
             _____ Note/document/photograph general appearance of home before ''cleaned
                          up'' by suspect(s)
             _____ Determine whether utilities on/working
             _____ Determine availability/condition of food appropriate for child
             _____ Determine condition of appliances (stove, refrigerator, etc.) and whether
                          working
             _____ Determine condition/safety of electrical and plumbing features
             _____ Determine condition/cleanliness of sleeping areas and items, clothing for
                          child, etc.

*Any Applicable Relevant Evidence From Suspect, Suspect's Residence, Office, etc.*

_____ Use search warrant if necessary; *always* request consent
_____ Photos to show suspect's appearance and/or unusual/distinctive physical features
_____ Fingerprints
_____ Hair, blood, saliva, semen, fingernail scrapings, dental impressions as applicable to facts
_____ Handwriting exemplars, voice tapes
_____ Clothing with potential evidentiary value
_____ Occupancy papers
_____ Phone records
_____ Bank or credit card records
_____ Work records
_____ Drugs or alcohol
_____ Pictures, negatives, videos, home movies of victim or other children
_____ Camera and/or developing equipment
_____ Weapons/implements used to threaten or injure child
_____ Items left at suspect's or with suspect by child
_____ Pornographic items (films, pictures, magazines, videos, etc.)
_____ Sexual aids or devices
_____ Computer records, journals, calendars, diaries, address books, etc.
_____ Any unique/distinctive items described by victim (furnishings, pictures, clothing, lubri-
             cants, etc.)

INVESTIGATION                                                                  II-65

## 12. UTILIZE ADDITIONAL INVESTIGATIVE TECHNIQUES AS APPROPRIATE

_____ Obtain 911 tape
_____ Wire tap orders/pen-registers
_____ Undercover officer surveillance
_____ Video surveillance
_____ Polygraph or PSE of suspect
_____ Special crime lab testing/analysis
_____ Consultation with outside experts
_____ Other

133

*Sample Form Used For Medical Examinations in Sexual Assault Cases (Texas)*

**Sexual Assault Examination: Children and Adolescents**

Read through the Instructions/Checklist before proceeding with exam.

---

Has the Patient Reached Puberty?
This form contains no questions about menarche, pregnancy, etc.
Consider using the adult form if these questions will be pertinent.

---

_____ 1.  Obtain victim or parent's signature on evidence collection consent form if possible. However, *in any case of suspected child abuse, consent is not required for examination by a physician, including the taking of photographs.* Lack of signed consent should *not* delay examination of the patient. (See Texas Family Code, Section 35.04)

_____ 2.  Complete history and physical examination and record on enclosed form.

_____ 3.  During the physical examination, the following procedures should be performed in this order:

IF THE PATIENT *HAS NOT* BATHED, COLLECT HAIR SAMPLES:

_____ a.  Place a paper towel under the patient's buttocks and, using disposable comb, comb pubic hair region and place towel, comb and combings in envelope labeled ''Pubic Hair Combings''. Seal envelope, label with patient's name, and sign your name.

_____ b.  Cut sample of pubic hair, if present, with scissors (about 10-12 hairs, cut close) and place in envelope labeled ''Pubic Hair Standards.'' Seal envelope, label with patient's name, and sign your name.

IF THE RECENT ASSAULT WAS WITHIN 72 HOURS, PROCEED AS FOLLOWS:

_____ c.  With a cotton-tipped applicator, moistened with water, make two slides of vaginal and/or cervical mucus contents. Do not fix. *Allow to air dry* 2-3 minutes and place slides in a slide holder. Seal slide holder, label with patient's name, and sign your name.

_____ d.  Use another 2 moistened applicators to collect vaginal contents and place both in dry test tube. Cap tube, label with patient's name, and sign your name.

_____ e.  Using a plastic pipet or cotton-tipped applicator, obtain a sample from the vaginal pool and place on a slide. Cover with cover slip and examine under the microscope for motile spermatozoa. Record finding on exam form; discard the pipet and slide.

_____ 4.  In cases involving oral-genital contact in the previous 24 hours, swab the mouth (particularly the gums and pharynx) of the victim with separate cotton-tipped applicators and repeat steps 3c, 3d, and 3e above.

_____ 5.  In cases involving rectal-genital contact in the last 72 hours, swab the rectum with separate cotton-tipped applicators and repeat steps 3c, 3d, and 3e above.

_____ 6.  Seminal fluid may be observed on the perineal area, especially in children. If so, use separate cotton-tipped applicators to swab this area, and repeat steps 3c, 3d, and 3e above.

_____ 7.  Obtain vaginal (or cervical), rectal and pharyngeal cultures for Neiserria gonorrhea. Use Transgrow medium. Hold bottle upright when swabbing culture medium; recap as quickly as possible to avoid carbon dioxide escaping.

_____ 8.  Obtain 6-10 ml blood sample. Place 5 ml in a red top tube for RPR (Health Department) and 1-5 ml in a second red top tube for comparison with semen type by the crime laboratory.

_____ 9.  Double check to be sure all specimens are labeled with *patient's name, specimen source, date,* and *your signature.* Place all samples, *excluding* gonorrhea culture and RPR, in sealed envelope.

INVESTIGATION

*Special Procedures*

_____ 1. If patient states he/she scratched the assailant, obtain fingernail scrapings or cuttings from both hands and place in separate, labeled envelopes. Seal envelopes, label with patient's name, and sign your name.

_____ 2. If police have not already done so, collect clothing worn during the assault if available.

_____ 3. If indicated, obtain appropriate x-rays which should remain at the hospital.

_____ 4. If indicated, obtain photographs of trauma. Photographs of abused children will be taken by Community Relations photographer at Medical Center Hospital (24 hours a day). (Do not call the University photographer.)

| | |
|---|---|
| Nurse's Name Printed | Physician's Name Printed |
| Nurse's Signature | Physician's Signature |

**Sexual Assault Information**

POLICE CASE SERVICE # _____ E.R. Admission Date _____/_____/_____

POLICE JURISDICTION _____

Time of E. R. Admission _____

Name of Patient _____ Hospital # _____

Name of Police Officer/Paramedic w/Pt. _____

Date of Assault _____/_____/_____ Time of Assault _____

## CONSENT FORMS

### *AUTHORIZATION FOR COLLECTION OF EVIDENCE/RELEASE OF INFORMATION*

I hereby authorize the collection of all specimens necessary for treatment and the collection of all evidence for investigative purposes. Further, I hereby waive physician/patient relationship of confidentiality and authorize the release of these records including any laboratory reports to the Police Department and the Office of the District Attorney having jurisdiction.

Person
Examined _____ Date _____/_____/_____

Witness _____ Address _____

Parent or
Guardian _____ Address _____

### *AUTHORIZATION FOR PHOTOGRAPHS*

I hereby authorize the taking of photographs for evidence purposes.

Person
Examined _____ Date _____/_____/_____

Witness _____ Address _____

Parent or
Guardian _____ Address _____

INVESTIGATION                                                                II-69

**Sexual Assault Examination. Date _____ Time _____**

Time elapsed since assault _____

1. History of assault/abuse. (Include victim's description of events, using victim's own words whenever possible.) If more space is needed, use additional paper.
2. Is there a history of other assaults?         Yes ( )   No ( )   Unknown ( )
   If yes, describe.
3. During assault:
   Did penis penetrate vulva?                    Yes ( )   No ( )   Unknown ( )
   Did assailant ejaculate?                      Yes ( )   No ( )   Unknown ( )
   Was there oral penetration?                   Yes ( )   No ( )   Unknown ( )
   Was there anal penetration?                   Yes ( )   No ( )   Unknown ( )
   Did assailant wear condom?                    Yes ( )   No ( )   Unknown ( )
4. Since assault has patient:
   Bathed or showered?                           Yes ( )   No ( )   Unknown ( )
   Defecated?                                    Yes ( )   No ( )   Unknown ( )
   Urinated?                                     Yes ( )   No ( )   Unknown ( )
5. Has patient any knowledge of:
   Any present illness?                          Yes ( )   No ( )   Unknown ( )
   Any present medication?                       Yes ( )   No ( )   Unknown ( )
   Any drug allergy?                             Yes ( )   No ( )   Unknown ( )
6. History of previous vaginal or rectal
   surgical procedures?                          Yes ( )   No ( )   Unknown ( )
7. Age: _____   Temp: _____   Pulse: _____   RR: _____   BP: _____
8. General Appearance:
9. Emotional Status: (describe)
10. Clothing: Stained?   Yes ( )   No ( )      Foreign Material?   Yes ( )   No
    Describe:
11. Body surface: Bruises?   Yes ( )   No ( )   Scratches?   Yes ( )   No ( )
    Lacerations?   Yes ( )   No ( )
    Describe and indicate on drawings.
12. HEENT:
13. Neck:
14. Chest/Breasts:
    Tanner stage?
15. Abdomen:
16. Back:
PELVIC EXAM: Include all signs of trauma, debris, etc., and locate on diagram.
17. Vulva:
    Tanner Stage (pubic hair):
18. Hymen (describe):      Acute injury?
19. *Vagina (Use water as lubricant):
20. *Cervix:
21. *Uterus:
22. *Adnexae:
    *Speculum and bimanual exam not necessary in prepubertal child unless there are signs
     of internal injury (e.g., vaginal bleeding). If internal exam is necessary, consider
     admission for general anesthesia and gynecology consult.
23. Rectal:
Spermatozoa present? Yes ( )  Not Seen ( )  Motile? Yes ( )  No ( )  What source?
Procedure not done because _____
X Rays taken?      Yes ( )   No ( )      Photographs taken?   Yes ( )   No ( )
Describe if taken:                       Describe if taken:
I certify that this is a true and correct copy of the records concerning the examination of the
patient named _____.

_____        _____
Physician's Signature                   Date

136

137



*Sample Diagram*



139

*Definitions of Selected Medical Terms Relevant to Sexual Abuse*

(Based on a list compiled by Bruce A. Woodling, M.D., Director, Ambulatory Forensic Medicine, Ventura, California.)

**Male and Female Anatomy**

| | |
|---|---|
| *Anus* | Opening to the rectum. |
| *Rectum* | Terminal aspect of the colon. |

**Female Anatomy**

| | |
|---|---|
| *Labia Majora* | Outer lips to vagina. Covered by pubic hair after menarche (onset of menstruation). |
| *Labia Minora* | Inner lips to vagina. |
| *Urethra* | Opening to the bladder. |
| *Clitoris* | Erectile tissue analogous to a male penis located above urethra and covered by the clitoral hood. |
| *Posterior fourchette* | External tissue extending from the hymen toward the anus, contained within the labia majora. |
| *Hymen* | A fine membrane which separates the external genitalia from the vagina. The outer surface is a dry, squamous epithelium and the inner surface a moist mucous membrane. All females have this structure. |
| *Vagina* | Tubular structure with convoluted rugae which stretches anatomically from the hymen to the cervix. |
| *Posterior fornix* | Vaginal cavity located beneath the cervix. |
| *Cervical os* | Opening to the cervix. |
| *Uterus* | Reproductive organ composed of a cervix, corpus and fundus. |
| *Adnexae* | Pelvic appendages adjacent to the uterus, usually including the fallopian tubes and ovaries. |

**Male Anatomy**

| | |
|---|---|
| *Urethra* | Tube in penis extending from the bladder to the exterior. |
| *Testes* | Male sex organs which produce spermatozoa. |
| *Scrotum* | Sac which contains the testes. |
| *Epididymis* | Tube which passes from the testes to the vas deferens. |
| *Vas deferens* | Tube which communicates from the epididymis to the urethra. |
| *Prostate* | Gland which produces semen. |
| *Penis* | Male sex organ composed of erectile tissue through which the urethra passes. |

**Injuries**

| | |
|---|---|
| *Ecchymosis* | Bruise |
| *Contusion* | Tender injury either with or without an ecchymotic change. |
| *Petechiae* | Small hemorrhages about pinhead size. May be singular or multiple. |

(* indicates features/areas designated on vaginal area diagram.)

II-74                                          INVESTIGATION

*Synechiae*          Small scars which connect two tissues, e.g., hymen
                     to vagina, posterior fourchette or fossa navicularis.
*Abrasion*           Abraded injury through the basal layer of skin.
*Laceration*         Sharp transection (cut) through the skin.
*Transection*        Cut or tear through a tissue.

### *Bruise Characteristics*

| Age | Typical Appearance |
| --- | --- |
| less than one day | red, red/blue or purple with crisp margins; swollen and tender |
| 1-2 days | blue-black or blue-brown to dark purple with fading margins; still swollen and tender |
| 3-5 days | yellow-green to brown with indistinct margins |
| 5-7 days | yellow and fading |
| over one week | yellow-brown and fading |

*References:*

Durfee, Heger and Woodling, Chapter 4: ''Medical Evaluation,'' *Sexual Abuse of Young Children,* The Guilford Press, 1986.

E. F. Wilson, ''Estimation of the Age of Cutaneous Contusions in Child Abuse,'' *Pediatrics,* Vol. 60, No. 750, 1977.

142

143

*Reference List*

## A. INTERVIEWING THE CHILD VICTIM

### 1. Generally

Goldstein, *Interviewing Child Molestation Victims,* in THE SEXUAL EXPLOITATION OF CHILDREN: A PRACTICAL GUIDE TO ASSESSMENT, INVESTIGATION AND INTERVENTION 175-246 (Elsevier Science 1987).

D. Jones & M. McQuisiton, INTERVIEWING THE SEXUALLY ABUSED CHILD (C. Henry Kempe Center 1985).

Kelley, *Interviewing the Sexually Abused Child: Principles and Techniques,* 5 J. EMERGENCY NURSING 234 (1985).

MacFarlane & Krebs, *Techniques for Interviewing and Evidence Gathering,* in SEXUAL ABUSE OF YOUNG CHILDREN 67-100 (Guilford Press 1986).

W. Spaulding, INTERVIEWING CHILD VICTIMS OF SEXUAL EXPLOITATION (National Center for Missing and Exploited Children 1987).

### 2. Anatomically Correct Dolls

Boat & Everson, *Using* ANATOMICAL DOLLS: GUIDELINES FOR INTERVIEWING YOUNG CHILDREN IN SEXUAL ABUSE INVESTIGATIONS (Univ. N. Carolina 1986).

M. Friedemann & M. Morgan, INTERVIEWING SEXUAL ABUSE VICTIMS USING ANATOMICAL DOLLS, THE PROFESSIONAL'S GUIDEBOOK (Migima Designs 1985).

Gabriel, *Anatomically Correct Dolls in the Diagnosis of Sexual Abuse of Children,* 2 J. MELANIE KLEIN SOC'Y 40 (1985).

White, Strom, Santilli & Halpin, *Interviewing Young Sexually Abused Victims with Anatomically Correct Dolls,* 10 CHILD ABUSE & NEGLECT 519 (1986).

### 3. Assessing Validity

Conerly, *Assessment of Suspected Child Abuse,* in SEXUAL ABUSE OF YOUNG CHILDREN 30-51 (Guilford Press 1986).

Faller, *Is the Child Victim of Sexual Abuse Telling the Truth?,* 8 CHILD ABUSE & NEGLECT 473 (1984).

Green, *True and False Allegations of Sexual Abuse in Child Custody Disputes,* 25 J. Am. ACAD. CHILD PSYCHIATRY 449 (1986).

Hibbard & Hoekelman, *Genitalia in Children's Drawings: An Association with Sexual Abuse,* 79 PEDIATRICS 129 (1987).

Jones & McGraw, *Reliable and Fictitious Accounts of Sexual Abuse to Children,* 2 J. INTERPERSONAL VIOLENCE 27 (March 1987).

Layman, *Authenticity of Report Guidelines in Child Sexual Abuse Cases,* in LEGAL ISSUES IN CHILD SEXUAL ABUSE CASES 7-16 (Arkansas Child Sexual Abuse Education Commission 1986).

MacFarlane, *Child Sexual Abuse Allegations in Divorce Proceedings,* in SEXUAL ABUSE OF YOUNG CHILDREN (Guilford Press 1986).

INVESTIGATION

Sgroi, Porter & Blick, *Validation of Child Sexual Abuse*, in HANDBOOK OF CLINICAL INTERVENTION IN CHILD SEXUAL ABUSE 39-79 (D.C. Heath 1982).

## B. INTERVIEWING THE SUSPECT

Goldstein, *Interviewing the Offender*, in THE SEXUAL EXPLOITATION OF CHILDREN: A PRACTICAL GUIDE TO ASSESSMENT, INVESTIGATION AND INTERVENTION 247-262 (Elsevier Science 1987).

## C. MEDICAL EXAMINATIONS IN SEXUAL ABUSE CASES

### 1. Generally

S. Anderson & L. Berliner, EVALUATION OF THE CHILD SEXUAL ASSAULT IN THE HEALTH CARE SETTING: A MEDICAL TRAINING MANUAL (Sexual Assault Center, University of Washington 1983).

Cantwell, *Vaginal Inspection as it Relates to Child Sexual Abuse in Girls Under Thirteen*, 7 CHILD ABUSE & NEGLECT 171 (1981).

CHILD SEXUAL ABUSE: A GUIDE FOR HEALTH AND LEGAL PROFESSIONALS (A. Green & D. Schetky eds., Brunner-Mazel 1986).

Cowell, *The Gynecologic Examinations of Infants, Children and Young Adolescents*, 28 PEDIATRIC CLINICS N. AM. 247 (May 1981).

DeJong, *Epidemiologic Factors in Sexual Abuse of Boys*, 136 AM. J. DISEASES CHILDREN 990 (1982).

Durfee, Heger & Woodling, *Medical Evaluation*, in SEXUAL ABUSE OF YOUNG CHILDREN 52-66 (Guilford Press 1986).

Elam & Ray, *Sexually Related Trauma: A Review*, 15 ANNALS EMERGENCY MED. 576 (1986).

Emans & Goldstein, *The Gynecologic Examination of the Prepubertal Child with Vulvovaginitis: Use of the Knee-Chest Position*, 65 PEDIATRICS 758 (April 1980).

Enos, Contrath & Byer, *Forensic Evaluation of the Sexually Abused Child*, 78 PEDIATRICS 385 (1986).

Hammerschlag, Alpert, Rosner, Thurston, Semine, McComb & McCormack, *Microbiology of the Vagina in Children: Normal and Potentially Pathogenic Organisms*, 62 PEDIATRICS 57 (July 1978).

Hobbs & Wynne, *Buggery in Childhood—A Common Syndrome of Child Abuse*, 2 LANCET 792 (Oct. 4, 1986).

Hunter, Kilstrom, and Loda, *Sexually Abused Children: Identifying Masked Presentations in a Medical Setting*, 9 CHILD ABUSE & NEGLECT 17 (1985).

Kempe, C.H., *Sexual Abuse: Another Hidden Pediatric Problem*, 62 PEDIATRICS 382 (1978).

Krugman, *Recognition of Sexual Abuse in Children*, 8 PEDIATRICS IN REV. 25 (July 1986).

Norvell, Benrubins, and Thompson, *Investigation of Microtrauma After Sexual Intercourse*, 29 J. REPRODUCTIVE MED. 269 (April 1984).

Orr, *Emergency Management of Sexually Abused Children*, 133 AM. J. DISEASES CHILDREN 629 (1979).

INVESTIGATION                                                                                    II-79

Paul, *The Medical Examination in Sexual Offences Against Children*, 17 MED. SCI. & L. 251 (1977).

Paul, *"What Really Did Happen to Baby Jane?"—The Medical Aspects of the Investigation of Alleged Sexual Abuse of Children*, 26 MED. SCI. & L. 85 (1986).

Rimsza & Niggeman, *Medical Evaluation of Sexually Abused Children: A Review of 311 Cases*, 69 PEDIATRICS 8 (1982).

Schuh and Ralston, *Medical Interview of Sexually Abused Children*, 78 S. MED. J. 245 (March 1985).

Singleton, *The Vulvar Examination of the Premenarchal Child*, 78 J. NAT'L MED. A. 203 (1986).

Underhill & Dewhurst, *The Doctor Cannot Always Tell: Medical Examination of the "Intact" Hymen*, 1 LANCET 375 (1978).

Woodling, *Sexual Abuse and the Child*, 15 EMERGENCY MED. SERVICES 17 (April 1986).

Wynne, *Injuries to the Genitalia in Female Children*, 57 S. AFRICAN MED. J. 47 (1980).

### 2. Special Techniques

McCauley, Gorman & Guzinski, *Toluidine Blue in the Detection of Perineal Lacerations in Pediatric and Adolescent Sexual Abuse Victims*, 78 PEDIATRICS 1039 (Dec. 1986).

Teixeira, *Hymenal Colposcopic Examination in Sexual Offenses*, 2 AM. J. FORENSIC MED. & PATHOLOGY 209 (Sept. 1981).

Woodling and Heger, *The Use of the Colposcope in the Diagnosis of Sexual Abuse in the Pediatric Age Group*, 10 CHILD ABUSE & NEGLECT 111 (1986).

### 3. Sexually Transmitted Diseases

Altchek, *Vulvovaginitis, Vulvar Skin Disease, and Pelvic Inflammatory Disease*, 28 PEDIATRIC CLINICS N. AM. 397 (1981).

American Academy of Dermatology Task Force on Pediatric Dermatology, *Genital Warts and Sexual Abuse in Children*, 11 J. AM. ACAD. DERMATOLOGY 529 (Sept. 1984).

Amsel, Tolter, Spiegel, Chen, Eisenbach & Holmes, *Nonspecific Vaginitis: Diagnostic Criteria and Microbial and Epidemiologic Associations*, 74 AM. J. MED. 14 (Jan. 1983).

Bargman, *Is Genital Molluscum Contagiosum a Cutaneous Manifestation of Sexual Abuse in Children*, 14 J. AM. ACAD. DERMATOLOGY 847 (1986).

DeJong, *Sexually Transmitted Diseases in Children*, 30 AM. FAM. PHYSICIAN 185 (July 1984).

DeJong, *Sexually Transmitted Diseases in Sexually Abused Children*, 13 SEXUALLY TRANSMITTED DISEASE 123 (1986).

DeJong, Weiss & Brent, *Condyloma Acuminata in Children*, 136 AM. J. DISEASES CHILDREN 704 (1982).

Emans, *Vulvovaginitis in the Child and Adolescent*, 8 PEDIATRICS IN REV. (1986).

Farrell, *Prepubertal Gonorrhea: A Multidisciplinary Approach*, 67 PEDIATRICS 151 (1981).

146

Gardner & Jones, *Genital Herpes Acquired by Sexual Abuse of Children*, 104 J. PEDIATRICS 243 (1984).

Glaser, Hammerschlag & McCormack, *Sexually Transmitted Diseases in Victims of Sexual Assault*, 315 NEW ENG. J. MED. 625 (Sept. 1986).

Hammerschlag, Cummings, Doraiswamy, Cox & McCormack, *Nonspecific Vaginitis Following Sexual Abuse in Children*, 75 PEDIATRICS 1028 (June 1985).

Hammerschlag, Doraiswamy, Alexander, Cos, Price & Gleyzer, *Are Rectovaginal Chlamydial Infections a Marker of Sexual Abuse in Children?*, 3 PEDIATRIC INFECTIOUS DISEASE 100 (1984).

Ingram, Runyan, Collins, White, Durfee, Pearson & Occhiuti, *Vaginal Chlamydia Trachomatis Infection in Children with Sexual Contact*, 3 PEDIATRIC INFECTIOUS DISEASE 97 (March/April 1984).

Ingram, White, Durfee, & Pearson, *Sexual Contact in Children with Gonorrhea*, 136 AM. J. DISEASES CHILDREN 994 (1981).

Ingram, White, Occhiuti & Lyna, *Childhood Vaginal Infections: Association of Chlamydia Trachomitis with Sexual Contact*, 5 PEDIATRIC INFECTIOUS DISEASE 226 (1986).

Jones, Yamauchi & Lambert, *Trichomonas Vaginalis Infestation in Sexually Abused Girls*, 139 AM. J. DISEASES CHILDREN 846 (1985).

Kaplan, Fleisher, Paradise & Friedman, *Social Relevance of Genital Herpes Simplex in Children*, 138 AM. J. DISEASES CHILDREN 872 (Sept. 1984).

Neinstein, Goldenring & Carpenter, *Nonsexual Transmission of Sexually Transmitted Diseases: An Infrequent Occurrence*, 74 PEDIATRICS 67 (July 1984).

Nelson, Mohs, Dajani & Plotkin, *Gonorrhea in Preschool and School-Aged Children*, 236 J. AM. MED. A. 1359 (1976).

Paradise, Campus, Friedman & Frishmuth, *Vulvovaginitis in Premenarcheal Girls: Clinical Features and Diagnostic Evaluation*, 70 PEDIATRICS 193 (1982).

Rettig & Nelson, *Genital Tract Infection with Chlamydia Trachomatis in Prepubertal Children*, 99 J. PEDIATRICS 206 (1981).

Schachter, *Immunodiagnosis of Sexually Transmitted Diseases*, 58 YALE J. BIOLOGICAL MED. 443 (1985).

Seidel, Zonana & Totten, *Condylomata Acuminata as a Sign of Sexual Abuse in Children*, 95 J. PEDIATRICS 553 (1979).

Sgroi, *"Kids with Clap:" Gonorrhea as an Indicator of Child Sexual Assault*, 2 VICTIMOLOGY 251 (1977).

Silber & Woodward, *Sexually Transmitted Diseases in Adolescence*, 11 PEDIATRIC ANNALS 832 (1982).

Singleton, *Vaginal Discharge in Children and Adolescents*, 19 CLINICAL PEDIATRICS 799 (1980).

Wald, *Gynecologic Infections in the Pediatric Age Group*, 3 PEDIATRIC INFECTIOUS DISEASE 10 (1984 Supp. Issue).

White, Loda, Ingram & Pearson, *Sexually Transmitted Disease in Sexually Abused Children*, 72 PEDIATRICS 16 (July 1983).

147

### 4. Sperm/Semen/Acid Phosphatase and Genetic Markers

Adams & Wraxall, *Phosphates in Body Fluids: The Differentiation of Semen and Vaginal Secretion*, 3 J. FORENSIC SCI. 57 (1974).

Blake & Sensabaugh, *Genetic Markers in Human Semen: A Review*, 21 J. FORENSIC SCI. 784 (Oct. 1976).

Blake & Sensabaugh, *Genetic Markers in Human Semen (Part II)*, 23 J. FORENSIC SCI. 717 (Oct. 1978).

Dahlke, Cooke, Cunnane, Chawla & Lau, *Identification of Semen in 500 Patients Seen Because of Rape*, 68 AM. J. CLINICAL PATHOLOGY 740 (Dec. 1977).

Enos & Byer, *Spermatozoa in the Anal Canal and Rectum and in the Oral Cavity of Female Rape Victims*, 23 J. FORENSIC SCI. 231 (1978).

Findley, *Quantitation of Vaginal Acid Phosphatase and its Relationship to Time of Coitus*, 68 AM. J. CLINICAL PATHOLOGY 238 (Aug. 1977).

Gill, Jeffreys & Werrett, *Forensic Application of DNA 'Fingerprints'*, 318 NATURE 577 (1985).

Giusti, Baird, Pasquale, Balazs & Glassberg, *Application of Deoxyribonucleic Acid (DNA) Polymorphisms to the Analysis of DNA Recovered from Sperm*, 31 J. FORENSIC SCI. 409 (April 1986).

Graves, Sensabaugh & Blake, *Postcoital Detection of a Male Specific Semen Protein*, 312 NEW ENG. J. MED. 338 (1985).

Jeffreys, Wilson & Thein, *Individual-Specific 'Fingerprints' of Human DNA*, 316 NATURE 76 (1985).

Schumann, *Prostatic Acid Phosphatase*, 66 AM. J. CLINICAL PATHOLOGY 944 (Dec. 1976).

Sensabaugh, *Forensic Biology—Is Recombinant DNA Technology in its Future?*, 31 J. FORENSIC SCI. 393 (1986).

Sensabaugh, Blake & Northey, *Genetic Markers in Human Semen (Part III)*, 25 J. FORENSIC SCI. 470 (July 1980).

Sharpe, *The Significance of Spermatozoa in Victims of Sexual Offences*, 89 CANADIAN MED. J. A. 513 (Sept. 7, 1963).

Toates, *The Forensic Identification of Semen by Isoelectric Focusing of Seminal Acid Phosphatase*, 14 FORENSIC SCI. INT'L 191 (1979).

## D. OTHER FORENSIC EVIDENCE—BITE MARKS

Anderson & Hudson, *Self-Inflicted Bite Marks in Battered Child Syndrome*, 7 FORENSIC SCI. 71 (1976).

Beckstead, Rawson & Giles, *Review of Bite Mark Evidence*, 99 J. AM. DENTAL A. 69 (1979).

Dinkel, *The Use of Bite Mark Evidence as an Investigative Aid*, 19 J. FORENSIC SCI. 535 (1974).

Furness, *A General Review of Bitemark Evidence*, 2 AM. J. FORENSIC MED. & PATHOLOGY 49 (March 1981).

Goodbody, Turner & Turner, *The Differentiation of Toothed Marks: Case of Special Forensic Interest*, 16 MED. SCI. & L. 44 (1976).

INVESTIGATION

Levine, *The Solution of a Battered Child Homicide by Dental Evidence: Report of Case*, 87 J. AM. DENTAL A. 1234 (Nov. 1973).

Rawson, Koot, Martin, Jackson, Novosel, Richardson & Bender, *Incidence of Bite Marks in a Selected Juvenile Population: A Preliminary Report*, 29 J. FORENSIC SCI. 254 (Jan. 1984).

Schwartz, Woolridge & Stege, *Oral Manifestations and Legal Aspects of Child Abuse*, 95 J. AM. DENTAL A. 586 (1977).

Sims & Cameron, *Bite Marks in the Battered Baby Syndrome*, 13 MED. SCI. & L. 207 (July 1973).

## E. CHILD HOMICIDE

Abel, *Childhood Homicide in Erie County, New York*, 77 PEDIATRICS 709 (May 1986).

Bass, Kravath & Glass, *Death-Scene Investigation in Sudden Infant Death*, 315 NEW ENG. J. MED. 100 (1986).

Christoffel, Zieserl & Chiaramonte, *Should Child Abuse be Suspected When A Child Dies Unexpectedly?*, 139 AM. J. DISEASES CHILDREN 876 (1985).

Copeland, *Homicide in Childhood: The Metro-Dade County Experience from 1956 to 1982*, 6 AM. J. FORENSIC MED. & PATHOLOGY 21 (1985).

Emerick, Foster & Campbell, *Risk Factors for Traumatic Infant Death in Oregon, 1973 to 1982*, 77 PEDIATRICS 518 (1986).

Jason, *Child Homicide Spectrum*, 137 AM. J. DISEASES CHILDREN 573 (June 1983).

Jason & Andereck, *Fatal Child Abuse in Georgia: The Epidemiology of Severe Physical Abuse*, 7 CHILD ABUSE & NEGLECT 1 (1983).

Krugman, *Fatal Child Abuse: Analysis of 24 Cases*, 12 PEDIATRICIAN 68 (1983-1985).

## F. PHYSICAL ABUSE

### 1. Generally

Bombet, *The Significance of Bruising in Battered Children*, 26/7 LAW & ORDER 52 (July 1978).

Caffey, *Significance of the History in the Diagnoses of Traumatic Injury to Children*, 67 J. PEDIATRICS 1008 (1965).

Ellerstein, *The Cutaneous Manifestations of Child Abuse and Neglect*, 133 AM. J. DISEASES CHILDREN 906 (Sept. 1979).

Feldman & Brewer, *Child Abuse, Cardiopulmonary Resuscitation and Rib Fractures*, 73 PEDIATRICS 339 (March 1984).

Helfer, Slovis & Black, *Injuries Resulting When Small Children Fall Out of Bed*, 60 PEDIATRICS 533 (Oct. 1977).

Johnson, Apolo, Joseph & Corbitt, *Child Abuse Diagnosis and the Emergency Department Chart*, 2 PEDIATRIC EMERGENCY CARE 6 (March 1986).

Johnson & Showers, *Injury Variables in Child Abuse*, 9 CHILD ABUSE & NEGLECT 207 (1985).

Kleinman, Marks & Blackborne, *The Metaphyseal Lesion in Abused Infants: A Radiologic-Histopathologic Study*, 146 AM. J. ROENTGENOLOGY 895 (1986).

Kravitz, Driessen, Gamberg & Korach, *Accidental Falls from Elevated Surfaces in Infants from Birth to One Year of Age*, 44 PEDIATRICS 869 (Nov. 1969 Supp. to Vol. 44, No. 5).

Lenoski & Hunter, *Specific Patterns of Inflicted Burn Injuries*, 17 J. TRAUMA 842 (1977).

Leonidas, *Skeletal Trauma in the Child Abuse Syndrome*, 12 PEDIATRIC ANNALS 875 (Dec. 1983).

McClelland & Heiple, *Fractures in the First Year of Life*, 136 AM. J. DISEASES CHILDREN 26 (Jan. 1982).

Merten, Radkowski & Leonidas, *The Abused Child: A Radiological Reappraisal*, 146 RADIOLOGY 377 (1983).

Money, *The Syndrome of Abuse Dwarfism*, 131 AM. J. DISEASES CHILDREN 508 (May 1977).

O'Hare & Eden, *Bleeding Disorders and Non-Accidental Injury*, 59 ARCHIVES DISEASE CHILDHOOD 860 (1984).

Pascoe, Hildebrandt, Tarrier & Murphy, *Patterns of Skin Injury in Nonaccidental and Accidental Injury*, 64 PEDIATRICS 245 (Aug. 1979).

Putnam & Stein, *Self-Inflicted Injuries in Childhood*, 24 CLINICAL PEDIATRICS 514 (Sept. 1985).

Rosenberg, Meyers & Shackleton, *Prediction of Child Abuse in an Ambulatory Setting*, 70 PEDIATRICS 879 (Dec. 1982).

Wilson, *Estimation of Age of Cutaneous Contusions in Child Abuse*, 60 PEDIATRICS 750 (Nov. 1977).

Woodley & Evans, *Significance of Skeletal Lesions in Infants Resembling Those of Traumatic Origin*, 158 J. AM. MED. A. 539 (June 1953).

### 2. Head Injury

Billmere & Myers, *Serious Head Injury in Infants: Accident or Abuse?*, 75 PEDIATRICS 340 (Feb. 1985).

Hardwood-Nash, Hendrick & Hudson, *The Significance of Skull Fractures in Children*, 101 RADIOLOGY 151 (1971).

Hobbs, *Skull Fracture and the Diagnosis of Abuse*, 59 ARCHIVES DISEASE CHILDHOOD 246 (1984).

McClelland, Rekate, Kaufman & Persse, *Cerebral Injury in Child Abuse: A Changing Profile*, 7 CHILD'S BRAIN 225 (1980).

Merton & Osborne, *Craniocerebral Trauma in the Child Abuse Syndrome*, 12 PEDIATRIC ANNALS 882 (Dec. 1983).

Merton, Osborne, Radkowski & Leonidas, *Craniocerebral Trauma in the Child Abuse Syndrome*, 14 PEDIATRIC RADIOLOGY 272 (1984).

Tate, *Facial Injuries Associated with the Battered Child Syndrome*, 9 BRIT. J. ORAL SURGERY 41 (July 1971).

### 3. Ocular Injury

Eisenbrey, *Retinal Hemorrhages in the Battered Child,* 5 CHILD'S BRAIN 40 (1979).

Harcourt & Hopkins, *Ophthalmic Manifestations of the Battered-Baby Syndrome,* 3 BRIT. MED. J. 398 (1971).

Harley, *Ocular Manifestations of Child Abuse,* 17 J. PEDIATRIC OPHTHALMOLOGY & STRABISMUS 5 (Jan./Feb. 1980).

Jensen, Smith & Olson, *Ocular Clues to Child Abuse,* 8 J. PEDIATRIC OPHTHALMOLOGY 270 (1971).

Kanter, *Retinal Hemorrhage After Cardiopulmonary Resuscitation or Child Abuse,* 108 J. PEDIATRICS 430 (1986).

Mushin, *Ocular Damage in the Battered Baby Syndrome,* 3 BRIT. MED. J. 402 (1971).

Mushin & Morgan, *Ocular Injury in the Battered Baby Syndrome,* 72 BRIT. J. OPHTHALMOLOGY 343 (1971).

Tomasi & Rosman, *Purtscher Retinopathy in the Battered Child Syndrome,* 129 AM. J. DISEASES CHILDREN 1335 (1975).

Weidenthal & Levin, *Retinal Detachment in a Battered Infant,* 81 AM. J. OPHTHALMOLOGY 725 (1976).

There are further references to special issues surrounding physical abuse (Battered Child Syndrome, Munchausen Syndrome by Proxy, and Shaken Baby Syndrome/Whiplash Injuries) in the reference list for Chapter V.

### G. ROLE OF LAW ENFORCEMENT

Davies, *The Sexual Abuse of Children: Cases Submitted to a Police Laboratory and the Scientific Evidence,* 26 MED. SCI. & L. 103 (1986).

Goldstein, *Investigating Child Sexual Exploitation: Law Enforcement's Role,* 53 FBI L. ENFORCEMENT BULL. 22 (Jan. 1984).

Hertica, *Police Interviews of Sexually Abused Children,* 56 FBI L. ENFORCEMENT BULL. 12 (April 1987).

K. Lanning, CHILD MOLESTERS: A BEHAVIORAL ANALYSIS (National Center for Missing and Exploited Children 1986).

McGovern, *Delicate Inquiry: The Investigator's Role in Child Abuse,* 2 VICTIMOLOGY 277 (1977).

Wagner, *Crime Scene Investigation in Child-Abuse Cases,* 7 AM. J. FORENSIC MED. & PATHOLOGY 94 (1986).