# EXHIBIT 1

4

1

Honorable Benjamin H. Settle

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

8

9

10

CLYDE RAY SPENCER, MATTHEW RAY SPENCER, and KATHRYN E. TETZ,

NO. C11-5424 BHS

11

Plaintiffs,

12

v.

DEFENDANT MICHAEL DAVIDSON'S DISCLOSURE OF REBUTTAL EXPERT TESTIMONY

13

14

15

16

17

18

FORMER DEPUTY PROSECUTING ATTORNEY FOR CLARK COUNTY JAMES M. PETERS, DETECTIVE SHARON KRAUSE, SERGEANT MICHAEL DAVIDSON, CLARK COUNTY PROSECUTOR'S OFFICE, CLARK COUNTY SHERIFF'S OFFICE, THE COUNTY OF CLARK, SHIRLEY SPENCER, and JOHN DOES ONE THROUGH TEN,

Defendants.

19

20

Defendant Michael Davidson hereby discloses the following rebuttal expert witnesses

21

and testimony pursuant to Federal Rule of Civil Procedure ("FRCP") 26(a)(2):

22

23

24

1.    **Ronald Klein**, Ph.D.
      10 North Post St.
      Suite 216
      Spokane, WA 99201-0705

25

Dr. Klein's report setting forth his opinions is attached hereto as Exhibit 1, along with

26

supporting material referenced in his report.  His CV is attached as Exhibit 2, and his

DEFENDANT DAVIDSON'S DISCLOSURE OF
REBUTTAL EXPERT TESTIMONY
No. C11-5424-BHS                    - 1 -

FREIMUND JACKSON TARDIF & BENEDICT GARRATT, PLLC
711 Capitol Way S., Suite 602
Olympia, WA  98501
Telephone: (360) 534-9960
Facsimile: (360) 534-9959

5

1   identification of fees and prior testimony are attached as Exhibit 3.  Dr. Klein will provide

2   testimony via declaration or affidavit in support of a motion to exclude the testimony of Dr.

3   Kuncel.   Dr. Klein may also provide testimony at trial regarding the psychological or

4   emotional damage, if any, sustained by plaintiff Clyde Ray Spencer and regarding his

5   examination of plaintiff Clyde Ray Spencer, to be arranged by agreement of counsel subject to

6
    the provisions of FRCP 35(b) or by motion, and the results of that examination.
7

8

9         2.     **Phillip Esplin**, Ed.D.,
                 7131 E. Buena Terra Way
10               Scottsdale AZ 85253

11        In addition to offering his own opinions as previously disclosed, Dr. Esplin will rebut

12  opinions expressed by plaintiff's experts, including Dr. William Bernet's opinions.  Dr. Esplin

13
    will testify that fairness requires defendants' conduct to be measured by the standards
14
15  generally accepted among field investigators during the time the investigation at issue

16  occurred, that the standard of care for child sex abuse investigators, such as existed during the

17  relevant time period of August 1984 to May 1985, was not breached by defendants, and that

18  reasonable investigators in 1984-1985 could not have known that the investigative techniques

19
    used by defendants were so coercive and abusive that they would yield false information.
20
21        Defendant Davidson also discloses the rebuttal experts identified by co-defendants

22  Sharon Krause and James Peters, including the report and rebuttal opinions of **Rebecca Roe**,

23  and incorporates herein those co-defendants' rebuttal expert disclosures as if fully set forth.

24  Defendant Davidson reserves the right to supplement or amend this disclosure as more

25  information becomes available through discovery and further investigation.

26

DEFENDANT DAVIDSON'S DISCLOSURE OF
REBUTTAL EXPERT TESTIMONY
No. C11-5424-BHS                - 2 -

FREIMUND JACKSON TARDIF & BENEDICT GARRATT, PLLC
711 Capitol Way S., Suite 602
Olympia, WA 98501
Telephone: (360) 534-9960
Facsimile: (360) 534-9959

1    DATED this 7th day of November, 2012.

2                              s/ Jeffrey A. O. Freimund
                              JEFFREY A. O. FREIMUND, WSBA No. 17384
3                              Freimund Jackson Tardif & Benedict Garratt, PLLC
                              711 Capitol Way South, Suite 602
4                              Olympia, WA  98502
                              Telephone:  (360) 534-9960
5                              Fax:  (360) 534-9959
                              jeffF@fjtlaw.com
6                              Attorney for Defendant Michael Davidson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on November 7, 2012, I caused to be electronically served

3    Defendant Davidson's Disclosure of Rebuttal Expert Testimony on the attorneys of record for

4    the parties as follows:

5

6        Douglas H. Johnson, Attorney Pro Hac Vice for Plaintiff Clyde Ray Spencer,
             dhjohnson43@aol.com

7
         Kathleen T. Zellner, Attorney Pro Hac Vice for Plaintiff Clyde Ray Spencer,
8            kathleen.zellner@gmail.com

9        Daniel T. Davies, Attorney for Plaintiff Clyde Ray Spencer
             dandavies@dwt.com
10
         Daniel J. Judge, Attorney for Defendant James M. Peters
11           danielj@atg.wa.gov

12       Patricia C. Fetterly, Attorney for Defendant James M. Peters
             Patriciaf1@atg.wa.gov
13
         Guy Bogdanovich, Attorney for Defendant Sharon Krause
14           gbogdanovich@lldkb.com

15

16

17                                         s/Janice Flaherty
                                          JANICE FLAHERTY
18                                        Legal Assistant to
                                          JEFFREY A. O. FREIMUND, WSBA No. 17384
19                                        Freimund Jackson Tardif & Benedict Garratt, PLLC
                                          711 Capitol Way South, Suite 602
20                                        Olympia, WA 98502
                                          Telephone: (360) 534-9960
21                                        Fax: (360) 534-9959
                                          jeffF@fjtlaw.com
22                                        Attorney for Defendant Michael Davidson

23

24

25

26

8

# EXHIBIT 1

9

# Ronald M. Klein, Ph.D.

Behavioral Medicine Service
10 North Post Street, Suite 216
Spokane, WA 99201   (509) 838-1285
ronklein@ronkleinphd.com

11/05/2012

Bernard Veljacic, Attorney
Clark County Prosecutor's Office
PO Box 5000
Vancouver WA 98666-5000

Re:    Dr. Kuncel's 10/04/2012 report on Clyde Ray Spencer

Dear Mr. Veljacic:

At your request I reviewed the forensic report prepared by Ruth Kuncel, Ph.D. regarding Mr. Spencer who is currently a plaintiff in a legal action. You asked me to state my opinions about that report from the standpoint of the practice of writing and submitting forensic reports to be used for legal purposes, something which I have done for the past 30 years. To assist this process, I have attached the Specialty Guidelines for Forensic Psychology and the Ethical Code for Psychologists, both from the American Psychological Association (APA). These foundational documents are the product of considerable professional effort from a large number of expert psychologists, were duly presented to the governing board of APA and adopted by the organization. I invite you and others involved in this case to review the material in depth. To summarize, forensic reports are written from an objective viewpoint (not an advocacy viewpoint), seeks out objective data, utilizes multiple data points (from records, interview, and psychological testing), compiles that data to arrive at opinions supported by that data, and expresses those opinions (orally and/or in writing) to answer questions posed by the attorneys in any given case. My overall opinion is that Dr. Kuncel failed to follow these basic standards; the remainder of this report will detail the bases for my opinions, using page numbers corresponding to the pages of Dr. Kuncel's 10/04/2012 report to allow the reader to more easily attach my critiques to specific entries in her report. However, I will begin with some overarching concerns.

Critique of Dr. Kuncel's report on Clyde Ray Spencer begins with the basics. She apparently never met Mr. Spencer and conducted the entire evaluation by a series of long distance telephone conversations. Her contact with him consisted of 4 phone conversations (totaling approximately 5 hours total). I am not aware of any factors that would have prevented one party to travel to the location of the other party (or meet each other halfway) to conduct the evaluation in the usual face to face manner. This is particularly important in a case with such complexity and detail. Obviously, the data lost without observation of non-verbal behavior (especially with the extraordinary statements Spencer made) is considerable.

Kuncel report of Spencer
11/05/2012
Dr. Klein

Dr. Kuncel lists several records she reviewed in preparing her report but then makes zero references to any information in any report. Therefore one can not determine whether any of the information in the records conflicts with or confirms Spencer's statements and allegations, whether the records provide a different but still plausible version of events from Spencer's statements, and simply what material of significance is contained in any records. Furthermore there was no stated request for further records, even though the need for more records is clear after reading Dr. Kuncel's report. She makes reference to several psychological evaluations performed in conjunction with periodic parole board review but presents not a word from any of those reports. Failure to include previously obtained psychological information is obviously below standards; even if the forensic reviewer ends up disputing previously obtained information from other psychologists, one has to begin that process by stating the previous findings and why those may have been considered unreliable or inaccurate.

Dr. Kuncel did no psychological testing whatsoever. This is an important type of data that balances out historical records and face to face interview; testing adds the element of the person's relative standing to the general population on a number of psychological variables and often to specific subpopulations meaningfully related to this specific individual. In Spencer's situation specifically, test findings currently could have been compared with findings obtained in the several previous evaluations. Validity scales on tests are especially useful in a situation such as this where considerable secondary gain is potentially available. Thus of the three usual and customary sources of information in a forensic report: records, interview, and testing, there are serious problems in all three areas in Dr. Kuncel's report.

Dr. Kuncel did not indicate when she was simply quoting Spencer or identifying certain phrasing as his phrasing rather than her own formulation. Accordingly I am taking what she has written as her statements and her formulation. Furthermore, if Dr. Kuncel's comments throughout the whole report are actually Spencer's statements without clear attribution, it puts Dr. Kuncel as essentially Spencer's mouthpiece, which is not the role of the forensic evaluator. The forensic evaluator is required to approach each case from a neutral objective standpoint and collect sufficient data to answer the questions posed by counsel, regardless of whether the answers are advantageous or non-advantageous to counsel's argument. The forensic evaluator certainly elicits information from the individual but is not simply a stenographer. Meaningful opinions are constructed upon analyzing all relevant information and making judgments about validity and consistency of information.

After the introductory comments in her report, she begins her findings on page 2 ("Chronology of Events..." etc.) by making several statements about Spencer's law enforcement and military background, with adjectives like "decorated" and "honorably." However, the case is not about his vocational accomplishments or his performance in his occupations. The case is about whether there were psychological damages suffered as a consequence of his incarceration, with

2

Kuncel report of Spencer
11/05/2012
Dr. Klein

special attention to the recanting of testimony that originally formed part of the basis of his incarceration. By beginning her report in this manner, she strays far from objective ground and appears to be defending a client (i.e. serving as an advocate) rather than objectively addressing the issues and obtaining information that would accomplish that task.

p. 2 "Based upon [first wife] Shirley's reported assertions in 8/84 that [5 year old daughter] Kathryn had told her about instances of possible sexual abuse, Dr. Spencer reported the matter to appropriate authorities as was his legal and ethical duty. Dr. Spencer soon became the sole focus of the investigation of the alleged abuse of his children Matt and Kathryn." Dr. Kuncel fails to establish whom Kathryn was originally accusing (was it Spencer?), on what basis did Spencer have a legal and ethical duty to report Kathryn's allegations of abuse to authorities, and on what basis (on what evidence) did Spencer become the sole focus of the investigation.

p. 3 "Spencer was not informed of the scope or frequency" of questioning of his children. If Spencer was the focus of an investigation, why would he have been informed of the scope or frequency of questioning of potential witnesses, even if they were his children. Dr. Kuncel goes on to cite the "pressure" the boy (son) was under but gives no basis for this assumption that carries with it an implied bias against the legal investigative process; one person's "pressure" is another person's careful and deliberate investigation. This translates to favoring the plaintiff and being biased against the defendant in the current action.

p.3 "it was reportedly all over town that his wife was sleeping with a detective investigating this case and Ray had been set up." All over town is vague and unverifiable; and appears to be giving immediate credibility to inappropriate gossip. No basis was given for accusation of marital infidelity. A forensic report should not be a vehicle for spreading gossip; if accusations are made, there should be a foundation for the bases of these statements and some comment about how much weight she assigned to these and why.

Spencer had reportedly cheated on first wife so therefore knew from personal experience that even people who generally do the right thing can in certain circumstances do the wrong thing. Plus he would have been sufficiently street smart to know that such behavior on his part might stimulate the recipient (his ex-wife) to retaliate against him in some way.

p. 3 "each harassing interview representing a new source of anguish and fear" inappropriately characterizes investigative interviews as harassment without establishing any basis for doing so. Therefore we can not tell from Dr. Kuncel's description if any alleged anguish or fear was a reasonable emotional reaction to a thorough and proper investigation or instead was an emotional reaction to a botched and improper abuse of police powers. Also on p. 3 regarding the first polygraph exam "he was falsely told that he had failed." No basis is given for what is essentially an accusation by Dr. Kuncel of wrongdoing on the part of law enforcement. Making unsupported

3

12

Kuncel report of Spencer
11/05/2012
Dr. Klein

accusations has no place in a forensic evaluation. Also on p. 3 "watching his whole being go downhill" language is vague and unprofessional. Further on p. 3, when he called the crisis line "he scared the guy who answered the phone": What actually was said; and what actions were taken? We are not told facts; we are given hints of emotion that are apparently supposed to convey some meaning but do not.

p.3 on 01/02/1985 he was charged with statutory rape of his daughter. Then in next paragraph "Since Dr. Spencer wasn't guilty of abuse and had regularly dropped this child off for preschool, it never occurred to him that it was a setup." Having said he was charged and offering no information about charges dropped or dismissed, there is no basis for Dr. Kuncel to say he wasn't guilty of abuse. There was no basis for Dr. Kuncel to weigh in on any judicial decision other than to simply report or refer to an actual decision handed down by the Court. She gives no indication that the Court had determined Spencer not guilty. Furthermore it seems highly unlikely that an experienced police officer would be so totally naïve about how "set ups" work. Spencer is then said to be arrested for "allegedly abusing his stepson"; does Dr. Kuncel have any basis to declare that arrest was improper or unjustified?

p.4 a "negative medical examination" of his stepson does not mean that the child was not sexually abused. It only speaks to the issue of actual rape; there are of course several types of sexual abuse that would not result in a "positive" medical examination. "If these allegations were true and he couldn't remember anything about these allegations, then he must be seriously mentally ill and he shouldn't be out on the streets." This statement is very puzzling. Is Dr. Kuncel saying this or is Spencer saying this? Is Dr. Dr. Kuncel proclaiming him to be mentally ill? Is Dr. Dr. Kuncel claiming to know whether Spencer really did or did not remember "anything" about these allegations? Is Dr. Kuncel simply acting as stenographer, writing down everything Spencer is saying without making it clear she is quoting him and without making it clear whether there is a basis to assign meaningful weight to Spencer's statements?

Further on p. 4 "if [son] Matt would say something like that [allegations of abuse], it must be true." It is highly unlikely that an experienced law enforcement officer would be unaware that an individual, a child (even his son) is capable of saying something that wasn't true for a variety of reasons in a variety of situations. Spencer reportedly claimed that he feared for his sanity; Dr. Kuncel should have been able to identify (and state) that neither having a difference of opinion nor being unable to remember an event are signs of insanity and do not lead to insanity. Rather these are rather commonplace events. If anything, his linking possible insanity with such commonplace events would introduce the possibility of gross exaggeration of psychological problems, which would then lead a skilled forensic evaluator to further explore that possibility, both with interview techniques and with psychological tests.

4

13

Kuncel report of Spencer
11/05/2012
Dr. Klein

Still on p. 4 referring to the children "They were just babies." Obviously they were not "babies"; they apparently were interviewed and provided information which presumably led to the arrest of Spencer. It is not clear why Dr. Kuncel would make such an odd statement. Another odd statement was that after filing a complaint, Spencer was successful in persuading "jail officials" to order the detective (investigating the criminal matter by interviewing Spencer in prison) to leave the prison facility and not return. The likelihood of this actually occurring seems extremely low such that Dr. Kuncel should have obtained clear and convincing information to give this any weight: i.e. the form and content of the complaint, what it was based on, to whom it was filed, who made the determination and on what basis. Without that, it appears on the surface to not be true, and would lead a forensic evaluator to interview further to determine why Spencer would have said that and whether there is gross exaggeration in Spencer's presentation. Dr. Kuncel refers to "the inappropriate interrogation tactics used on the children" as though this were a statement of fact, agreed to by all. However Dr. Kuncel gives no indication or verification that the investigation of the children was improper in any way and it goes against standards to take a stance so obviously aligned with one of the parties, especially with no actual evidence to support it. Her actions give the impression of being biased in favor of Spencer, whether or not that is her attempt.

Still on p. 4 Dr. Kuncel states that on 05/14/1985, Spencer "underwent deep hypnosis and was administered a "truth serum." Seriously. Given that the US Supreme Court ruled back in 1963 that information gained through such techniques as the administration of sodium pentothal or similar chemical was inadmissible, it is unlikely that Spencer underwent that procedure. The forensic examiner again would obtain verification that these measures were used on Spencer rather than embarrass herself by simply going along with whatever Spencer is telling her. The forensic examiner is required to exercise judgment, recognize that plaintiffs may make self-serving statements in a context where secondary gain is possible, may exaggerate, and therefore verification processes are required. Even a simple reference to the records (author/date/content) would be helpful in this regard. Dr. Kuncel doesn't make a single reference to anything in the records despite a series of rather outlandish claims by Spencer.

Still on p. 4 Spencer's attorney "advised him to throw himself on the mercy of the court." With the possible exception of 1930s era Warner Brothers crime movies (e.g. James Cagney, Edward G. Robinson, etc.) nobody talks like this. Therefore when a forensic evaluator hears a comment using such stilted or unlikely phrasing, the likelihood of an exaggerated or distorted piece of information is increased and the aforementioned process for trying to determine validity must be activated. Dr. Kuncel gives no indication that this was done or even considered. There is simply an ongoing unquestioning acceptance of everything Spencer is saying, no matter how unlikely it may be. This pattern continues at the bottom of page 4 and onto page 5 with a description of how incompetent the previous attorney was, even to the point of that attorney supposedly claiming there had been a fire (and therefore destruction of records?).

5

14

Kuncel report of Spencer
11/05/2012
Dr. Klein

On p. 5, the verbal report of incompetence is extended even to the previous judge in this matter who was said to have had "an agenda" because of an issue between Spencer and the judge's daughter. Basically Spencer is accusing the judge both of bias, and of incompetence (by not recusing himself, if the claims were true), and by simply accepting uncritically with what is being said and not voicing even basic cautions, Dr. Kuncel is joining in with these accusations. Not only does this fail to follow professional standards, it fails to follow common sense and judgment. There are two additional factors; one is that these allegations by Spencer and echoed by Dr. Kuncel are so outlandish that it should have triggered at least some response from Dr. Kuncel that the allegations may not be genuine. The other is to point out that the potential function of these possibly non-genuine allegations is to absolve Spencer of any responsibility for what has transpired, and instead to distribute blame to others (who are not presently in a position to defend themselves). This extends to Dr. Kuncel that he entered an Alford plea because he was: a) not fully sane, and b) was taking (unspecified) medications that "interfered with his thinking." The key problem here is not Spencer's allegations: he is free to allege whatever he pleases. The key is Dr. Kuncel uncritically accepting each of these allegations without exploring them, analyzing them, and making some statement about why they should or should not be given weight in the formulation of her opinions. The "He didn't want to go to trial because he didn't think he would get a fair trial" comment begs at least for an explanation as to why he thought that, whether he had a rational thought process to analyze that, whether he could viably explain his thought process to Dr. Kuncel. One of the basic points of any psychological evaluation is to analyze the thought process of the person being evaluated.

Also on p. 5 "His wife had cashed his retirement check, leaving him penniless to mount a defense." Again there is absolutely no explanation as to how it would come to pass that his entire retirement funds would be contained in one check, how it would come to pass that his wife could cash Spencer's check, and how it would come to pass that he was otherwise "penniless" (a term I have not seen since reading the novels of Charles Dickens many years ago).

p. 7 Dr. Kuncel appears to be unilaterally stating that physical assault in incarceration is not governed by any rules/laws or any other form of institutional control. Thus after echoing previous statements suggesting Spencer's attorney was incompetent and that the presiding judge was incompetent, Dr. Kuncel finishes the trifecta by implying that the warden/prison system is also incompetent. As a forensic evaluator, Dr. Kuncel has an obligation to not make such extreme statements unless reasonable evidence exists and unless she clearly lists what that evidence is. Otherwise she is unprofessionally defaming these basic elements of the criminal justice system. The discussion about "inmates would have asked to see the paperwork" (referring to the charges resulting in his incarceration) appears simply bizarre.

6

15

Kuncel report of Spencer
11/05/2012
Dr. Klein

p.8   Referring to many of the other inmates, Dr. Kuncel wrote: "the state had reared them." This is an odd statement applied to a large heterogeneous mass of humans, seemingly pejorative and prejudicial. This seems to fall below professional standards, plus there is no clear purpose in including the statement in the first place. Also on p. 8 there are unexplained inconsistencies: first we are told Spencer was so frightened that he would be beaten or killed in jail that he could hardly maintain the basic ability to function; then we are told that while in prison he enrolled in a college program and earned a Ph.D. in clinical psychology. No explanation is given as to how these two factors could co-exist. On a more detailed note, there is no explanation as to how he could have specifically earned a Ph.D. in clinical psychology since that degree typically requires the student to complete a one year internship working in the field (which Spencer could not have done due to his incarceration) and to complete a research dissertation (which also seems unlikely given Spencer's circumstances). Again it is incumbent upon Dr. Kuncel to explain how these could all co-exist and/or to have explored these topics sufficiently with Spencer rather than simply accepting each statement without some level of challenge.

p. 9  Spencer attended a parole hearing every two years but over the course of two decades he was repeatedly denied. Dr. Kuncel should have requested copies of Parole Board decisions and included aspects of those decisions in the report to more fully understand Spencer and to introduce a source of information other than Spencer's own statements to her over the phone. Apparently the parole hearings included information from psychological evaluations, making it virtually mandatory that Dr. Kuncel obtain those documents and compare/contrast that information with the information Dr. Kuncel herself was obtaining. There is no reason to fail to obtain this information and to fail to include that data in Dr. Kuncel's report. Interestingly Dr. Kuncel uses the term " He was *subjected* also to repeated psychological/psychiatric evaluations typically related to requests for parole." Subjected? Is that supposed to imply that undergoing a psychological evaluation is a form of punishment? Was it not a routine request by a parole board to more fully understand the current status of the person requesting parole? Would Dr. Kuncel say that Spencer was *subjected* to the evaluation that she performed? Was the evaluation that she performed some sort of punitive event? Dr. Kuncel, referring to the reports, unbelievably wrote: "Some reports were written by individuals with inadequate skills who weren't going to write the truth or interpret the data to proper standards." Following such an extreme, accusatory statement, I would have expected a competent forensic evaluator to identify the basis of concluding the persons writing the reports had inadequate skills, weren't going to write "the truth" (a high standard indeed!) and weren't going to interpret the data to proper standards. There is no problem with evaluators making strong statements in reports, so long as the bases for such powerful statements are clearly stated in a way that allows them to be evaluated. Dr. Kuncel gives us none of that and thus falls below standards once again.

p. 11  Dr. Kuncel describes the restrictions that accompanied the parole Spencer was finally granted (ankle bracelet, curfew, travel restrictions, etc.) but characterized all this as "He was

7

16

treated like a predator who might re-offend" rather than noting the State had an interest in (and obligation to) keeping the public secure. As it was with the original attorney, judge, and warden, all being accused of various types of incompetence, so too on p. 11 do we read about the IRS firing Spencer because criminal records were mishandled by an unspecified person or agency ("an error was made"). At no time does Dr. Kuncel appear to grapple with the commonality of all these statements: that Spencer is never responsible for what has happened to him; the blame is to be distributed among everybody else.

p. 12 "He hadn't driven a car in twenty years; freeways were new to him and he found them terrifying." The interstate highway system was built in the 1950s. They were well in place prior to Spencer's incarceration. This is not a major point but only adds to the non-credible information Spencer is providing and Dr. Kuncel apparently accepting without question, challenge, or even attempts to clarify for the sake of consistency.

On p. 16 Dr. Dr. Kuncel's opinions finally begin. "What if he had committed these monstrous crimes [sexual abuse of his own children] and didn't know it?" No basis is given for any amnesia, alteration of mental status, or any other reason why he wouldn't have known what actions he did or didn't commit. Dr. Kuncel's obligation is to either present information, if it exists, bolstering Spencer's statement; or to identify that there is no known basis for his statements, leading one to diminish the amount of weight to be attributed to Spencer's long list of verbal statements. Dr. Kuncel does write at some length about stresses that exist inside prisons; such stresses are well known, though there is no mandate (to the best of my knowledge) to make prisons a stress-free environment.

p. 17 Statements are made about Spencer not receiving letters or information about his children. Exactly whose fault is that? Was he denied mail by prison authorities (if so, for what reason) or were no letters sent to him? The point is that Dr. Kuncel has the responsibility to explore and get clarity on such issues before throwing them into the report. Dr. Kuncel does appear to have taken the stance that when the children (now grown) recanted their earlier testimony, it meant sexual abuse never happened. That is not a foregone conclusion. Recanting of testimony essentially means that the person giving testimony either lied originally, or lied when they recanted, since both statements can not be true. If Dr. Kuncel has some reason for her beliefs, those should be stated clearly in a forensic report. Instead Dr. Kuncel launches into an emotional discussion about Spencer missing out on "the joys of loving and being loved" and implies this was caused by the criminal justice system rather than by the sworn testimony of those same family members leading to his being found guilty. Dr. Kuncel wrote in general terms about the difficulties re-establishing relationships after being incarcerated for so long but doesn't describe any actual attempts to do so. This is a common problem throughout the report: making general statements about how difficult or negative something is but putting forward no actual behavioral data as to what Spencer actually did or didn't do in response to the challenges he faced. Forensic

8

Kuncel report of Spencer
11/05/2012
Dr. Klein

reports have to describe actual behaviors along with some statements about whether those were adaptive or maladaptive, with data to support the characterizations.

p. 18 Spencer's violation of his marital vows is skipped over rather briefly (it receives considerably fewer words that the description of food in prison) despite the fact that it is an example of boundary violation; childhood sexual abuse is also an example of boundary violation. Dr. Kuncel makes the statement that a "womanizer who liked big busted women" is incompatible with someone turning "to a five year old for sex." I would challenge Dr. Kuncel to demonstrate that persons who sexually abuse children never or rarely have sex with adults; to the best of my knowledge, no such data exist. Besides, "turning to a five year old for sex" improperly states the nature of that activity which is sexual assault and power based rather than the mutual exchange of sexual activity that goes on between adults. The later discussion on p. 19 with Dr. Kuncel essentially absolving Spencer of any wrong doing in his two failed marriages, not holding him accountable for apparently multiple boundary violations during those marriages, and then actually blaming his two wives for the problems is beyond any reasonable approach to a forensic report; Dr. Kuncel appears to have abandoned any point of objectivity and is instead putting forth a case as an advocate would.

p. 19 Dr. Kuncel wrote that Spencer was denied friendships. But there was nothing said that indicated that Spencer was denied visitors for 20 years. Regardless of the charges on which he was convicted by virtue of the testimony in his case, I saw nothing in Dr. Kuncel's report that visits from friends were denied or even discouraged.

p. 20-21 Dr. Kuncel describes the already understood restrictions of prison life: that if you are in prison, you don't get to attend family events, don't get to engage in outdoor recreation, don't have stimulating activities, etc. This is one of the main points of incarceration: being denied such opportunities as part of your punishment and also keeping the community safer. My understanding is Spencer was only in such a situation because he was found guilty of criminal acts. This long string of descriptions of the hardships of prison life is more properly the province of plaintiff's counsel, not a forensic evaluator.

In summary, Dr. Kuncel falls far short of the established guidelines on how to conduct a forensic evaluation and compose a written report of that evaluation. Please feel free to contact me if further information is required.


Ronald M. Klein, Ph.D.
Behavioral Medicine Service

9

18

## SPECIALTY GUIDELINES FOR FORENSIC PSYCHOLOGY

### Adopted by APA Council of Representatives, August 3, 2011

### (Unofficial version-official version is in press, *American Psychologist*)

## INTRODUCTION

In the past 50 years forensic psychological practice had expanded dramatically. The American Psychological Association has a division devoted to matters of law and psychology (APA Division 41, the American Psychology-Law Society), a number of scientific journals devoted to interactions between psychology and the law exist (e.g., *Law and Human Behavior, Psychology, Public Policy and Law, Behavioral Sciences and the Law*), and a number of key texts have been published and undergone multiple revisions (e.g., Grisso, 1986, 2003; Melton, Petrila, Poythress, & Slobogin, 1987, 1997; Melton, Petrila, Poythress, Slobogin, Lyons, & Otto, 2007; Rogers, 1988, 1997, 2008). In addition, training in forensic psychology is available in pre-doctoral, internship and post-doctoral settings, and the American Psychological Association recognized forensic psychology as a specialty in 2001, with subsequent re-certification in 2008.

Because the practice of forensic psychology differs in important ways from more traditional practice areas (Monahan, 1980) the Specialty Guidelines for Forensic Psychologists were developed and published in 1991 (Committee on Specialty Guidelines for Forensic Psychologists, 1991). Because of continued developments in the field in the ensuing 20 years, forensic practitioners' ongoing need for guidance, and policy requirements of the American Psychological Association, the 1991 Specialty Guidelines for Forensic Psychologists were revised, with the intent of benefitting forensic practitioners and recipients of their services alike.

The goals of these *Guidelines* are to improve the quality of forensic psychological services; enhance the practice and facilitate the systematic development of forensic psychology; encourage a high level of quality in professional practice; and encourage forensic practitioners to acknowledge and respect the rights of those they serve. These *Guidelines* are intended for use by psychologists when engaged in the practice of forensic psychology as described below, and may also provide guidance on professional conduct to the legal system, and other organizations and professions.

For the purposes of these *Guidelines*, forensic psychology refers to professional practice by any psychologist working within any sub-discipline of psychology (e.g., clinical, developmental, social, cognitive) when applying the scientific, technical, or specialized knowledge of psychology to the law to assist in addressing legal, contractual, and administrative matters. Application of the *Guidelines* does not depend on the practitioner's typical areas of practice or expertise, but rather on the service provided in the case at hand. These *Guidelines* apply in all matters in which psychologists provide expertise to judicial, administrative, and educational systems including, but not limited to, examining or treating persons in anticipation of or subsequent to legal, contractual, administrative, proceedings; offering expert opinion about psychological issues in the form of *amicus* briefs or testimony to judicial, legislative or administrative bodies; acting in an adjudicative capacity; serving as a trial consultant or otherwise offering expertise to attorneys, the courts, or others; conducting research in connection with, or in the anticipation of, litigation; or involvement in educational activities of a forensic nature.

Psychological practice is not considered forensic solely because the conduct takes place in, or the product is presented in, a tribunal or other judicial, legislative, or administrative forum. For example, when a party (such as a civilly or criminally detained individual) or another individual (such as a child whose parents are involved in divorce proceedings) is ordered into treatment with a practitioner, that treatment is not necessarily the practice of forensic psychology. In addition, psychological testimony that is solely based on the provision of psychotherapy and does not include psycholegal opinions is not ordinarily considered forensic practice.

For the purposes of these *Guidelines*, "forensic practitioner" refers to a psychologist when engaged in the practice of forensic psychology as described above. Such professional conduct is considered forensic from the time the practitioner reasonably expects to, agrees to, or is legally mandated to, provide expertise on an explicitly psycholegal issue. The provision of forensic services may include a wide variety of psycholegal roles and functions. For example, as researchers, forensic practitioners may participate in the collection and dissemination of data that are relevant to various legal issues. As advisors, forensic practitioners may provide an attorney with an informed understanding of the role that psychology can play in the case at hand. As consultants, forensic practitioners may explain the practical implications of relevant research, examination findings, and the opinions of other psycholegal experts. As examiners, forensic practitioners may assess an individual's functioning and report findings and opinions to the attorney, a legal tribunal, an employer, an insurer, or others (American Psychological Association, 2010; American Psychological Association, 2011a). As treatment providers, forensic practitioners may provide therapeutic services tailored to the issues and context of a legal proceeding. As mediators or negotiators, forensic practitioners may serve in a third-party neutral role and assist parties in resolving disputes. As arbiters, special masters, or case managers with decision-making authority, forensic practitioners may serve parties, attorneys, and the courts (American Psychological Association, 2011b).

These guidelines are informed by the American Psychological Association's (APA's) Ethical Principles of Psychologists and Code of Conduct (hereinafter referred to as the EPPCC; APA, 2002). The term guidelines refers to statements that suggest or recommend specific professional behavior, endeavors, or conduct for psychologists. Guidelines differ from standards in that standards are mandatory and may be accompanied by an enforcement mechanism. Guidelines are aspirational in intent. They are intended to facilitate the continued systematic development of the profession and facilitate a high level of practice by psychologists. Guidelines are not intended to be mandatory or exhaustive and may not be applicable to every professional situation. They are not definitive, and

they are not intended to take precedence over the judgment of psychologists.

As such, the *Guidelines* are advisory in areas in which the forensic practitioner has discretion to exercise professional judgment that is not prohibited or mandated by the EPPCC or applicable law, rules, or regulations. The *Guidelines* neither add obligations to nor eliminate obligations from the EPPCC, but provide additional guidance for psychologists. The modifiers used in the *Guidelines* (e.g., reasonably, appropriate, potentially) are included in recognition of the need for professional judgment on the part of forensic practitioners; ensure applicability across the broad range of activities conducted by forensic practitioners; and reduce the likelihood of enacting an inflexible set of guidelines that might be inapplicable as forensic practice evolves. The use of these modifiers, and the recognition of the role of professional discretion and judgment, also reflects that forensic practitioners are likely to encounter facts and circumstances not anticipated by the *Guidelines* and they may have to act upon uncertain or incomplete evidence. The *Guidelines* may provide general or conceptual guidance in such circumstances. The *Guidelines* do not, however, exhaust the legal, professional, moral and ethical considerations that inform forensic practitioners, for no complex activity can be completely defined by legal rules, codes of conduct, and aspirational guidelines.

The *Guidelines* are not intended to serve as a basis for disciplinary action or civil or criminal liability. The standard of care is established by a competent authority not by the *Guidelines*. No ethical, licensure, or other administrative action or remedy, nor any other cause of action, should be taken *solely* on the basis of a forensic practitioner acting in a manner consistent or inconsistent with these *Guidelines*.

In cases in which a competent authority references the *Guidelines* when formulating standards, the authority should consider that the *Guidelines* attempt to identify a high level of quality in forensic practice. Competent practice is defined as the conduct of a reasonably prudent forensic practitioner engaged in similar activities in similar circumstances. Professional conduct evolves and may be viewed along a continuum of adequacy, and

20

"minimally competent" and "best possible" are usually different points along that continuum.

The *Guidelines* are designed to be national in scope and are intended to be consistent with state and federal law. In cases in which a conflict between legal and professional obligations occur, forensic practitioners make known their commitment to the EPPCC and the *Guidelines* and take steps to achieve an appropriate resolution consistent with the EPPCC and *Guidelines*.

The format of the *Guidelines* is different from most other practice guidelines developed under the auspices of APA. This reflects the history of the *Guidelines* as well as the fact that the Guidelines are considerably broader in scope than any other APA-developed guidelines. Indeed, these are the only APA-approved guidelines that address a complete specialty practice area. Despite this difference in format, the *Guidelines* function as all other APA guideline documents.

This document replaces the 1991 *Specialty Guidelines for Forensic Psychologists* which were approved by the American Psychology-Law Society, Division 41 of the American Psychological Association and the American Board of Forensic Psychology. The current revision has also been approved by the Council of Representatives of the American Psychological Association. Appendix I includes a discussion of the revision process, enactment, and current status of these *Guidelines*. Appendix II includes definitions and terminology as used for the purposes of these *Guidelines*.

## 1. RESPONSIBILITIES

### 1.01 Integrity

Forensic practitioners strive for accuracy, honesty, and truthfulness in the science, teaching, and practice of forensic psychology and they strive to resist partisan pressures to provide services in any ways that might tend to be misleading or inaccurate.

### 1.02 Impartiality and Fairness

When offering expert opinion to be relied upon by a decision maker, providing forensic therapeutic services, or teaching or conducting research, forensic practitioners strive for accuracy, impartiality, fairness, and independence (EPPCC Standard 2.01). Forensic practitioners recognize the adversarial nature of the legal system and strive to treat all participants and weigh all data, opinions, and rival hypotheses impartially.

When conducting forensic examinations, forensic practitioners strive to be unbiased and impartial, and avoid partisan presentation of unrepresentative, incomplete, or inaccurate evidence that might mislead finders of fact. This guideline does not preclude forceful presentation of the data and reasoning upon which a conclusion or professional product is based.

When providing educational services, forensic practitioners seek to represent alternative perspectives, including data, studies, or evidence on both sides of the question, in an accurate, fair and professional manner, and strive to weigh and present all views, facts, or opinions impartially.

When conducting research, forensic practitioners seek to represent results in a fair and impartial manner. Forensic practitioners strive to utilize research designs and scientific methods that adequately and fairly test the questions at hand, and they attempt to resist partisan pressures to develop designs or report results in ways that might be misleading or unfairly bias the results of a test, study, or evaluation.

### 1.03 Avoiding Conflicts of Interest

Forensic practitioners refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships could reasonably be expected to impair their impartiality, competence, or effectiveness, or expose others with whom a professional relationship exists to harm (EPPCC Standard 3.06).

Forensic practitioners are encouraged to identify, make known, and address real or apparent conflicts of interest in an attempt to maintain the public confidence and trust, discharge professional obligations, and maintain professional responsibility, impartiality, and accountability (EPPCC Standard 3.06). Whenever possible, such conflicts are revealed to all parties as soon as they become known to the psychologist. Forensic practitioners consider whether a prudent and competent forensic practitioner engaged in similar circumstances would determine that the ability to make a proper decision is likely to become impaired under the immediate circumstances.

When a conflict of interest is determined to be manageable, continuing services are provided and documented in a way to manage the conflict, maintain accountability, and preserve the trust of relevant others (also see Section 4.02 below).

## 2. COMPETENCE

### 2.01 Scope of Competence

When determining one's competence to provide services in a particular matter, forensic practitioners may consider a variety of factors including the relative complexity and specialized nature of the service, relevant training and experience, the preparation and study they are able to devote to the matter, and the opportunity for consultation with a professional of established competence in the subject matter in question. Even with regard to subjects in which they are expert, forensic practitioners may choose to consult with colleagues.

### 2.02 Gaining and Maintaining Competence

Competence can be acquired through various combinations of education, training, supervised experience, consultation, study, and professional experience. Forensic practitioners planning to provide services, teach, or conduct research involving populations, areas, techniques, or technologies that are new to them are encouraged to undertake relevant education, training, supervised experience, consultation, or study.

Forensic practitioners make ongoing efforts to develop and maintain their competencies (EPPCC Section 2.03). To maintain the requisite knowledge and skill, forensic practitioners keep abreast of developments in the fields of psychology and the law.

### 2.03 Representing Competencies

Consistent with the EPPCC, forensic practitioners adequately and accurately inform all recipients of their services (e.g., attorneys, tribunals) about relevant aspects of the nature and extent of their experience, training, credentials, and qualifications, and how they were obtained (EPPCC Standard 5.01)

### 2.04 Knowledge of the Legal System and the Legal Rights of Individuals

Forensic practitioners recognize the importance of obtaining a fundamental and reasonable level of knowledge and understanding of the legal and professional standards, laws, rules, and precedents that govern their participation in legal proceedings and that guide the impact of their services on service recipients (EPPCC Standard 2.01).

Forensic practitioners aspire to manage their professional conduct in a manner that does not threaten or impair the rights of affected individuals. They may consult with, and refer others to, legal counsel on matters of law. Although they do not provide formal legal advice or opinions, forensic practitioners may provide information about the legal process to others based on their knowledge and experience. They strive to distinguish this from legal opinions, however, and encourage consultation with attorneys as appropriate.

### 2.05 Knowledge of the Scientific Foundation for Opinions and Testimony

Forensic practitioners seek to provide opinions and testimony that are sufficiently based upon adequate scientific foundation, and reliable and valid principles and methods that have been applied appropriately to the facts of the case.

22

When providing opinions and testimony that are based on novel or emerging principles and methods, forensic practitioners seek to make known the status and limitations of these principles and methods.

## 2.06 Knowledge of the Scientific Foundation for Teaching and Research

Forensic practitioners engage in teaching and research activities in which they have adequate knowledge, experience, and education (EPPCC Standard 2.01), and they acknowledge relevant limitations and caveats inherent in procedures and conclusions (EPPCC Standard 5.01).

## 2.07 Considering the Impact of Personal Beliefs and Experience

Forensic practitioners recognize that their own cultures, attitudes, values, beliefs, opinions, or biases may affect their ability to practice in a competent and impartial manner. When such factors may diminish their ability to practice in a competent and impartial manner, forensic practitioners may take steps to correct or limit such effects, decline participation in the matter, or limit their participation in a manner that is consistent with professional obligations.

## 2.08 Appreciation of Individual and Group Differences

When scientific or professional knowledge in the discipline of psychology establishes that an understanding of factors associated with age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, socioeconomic status, or other relevant individual and cultural differences affects implementation or use of their services or research, forensic practitioners consider the boundaries of their expertise, make an appropriate referral if indicated, or gain the necessary training, experience, consultation, or supervision (EPPCC Standard 2.01, American Psychological Association, 2003; American Psychological Association, 2004; American Psychological Association, 2011c; American Psychological

Association, in press; American Psychological Association Task Force on Guidelines for Assessment and Treatment of Persons with Disabilities, 2011).

Forensic practitioners strive to understand how factors associated with age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, socioeconomic status, or other relevant individual and cultural differences may affect and be related to the basis for people's contact and involvement with the legal system.

Forensic practitioners do not engage in unfair discrimination based on such factors or on any basis proscribed by law (EPPCC Standard 3.01). They strive to take steps to correct or limit the effects of such factors on their work, decline participation in the matter, or limit their participation in a manner that is consistent with professional obligations.

## 2.09 Appropriate Use of Services and Products

Forensic practitioners are encouraged to make reasonable efforts to guard against misuse of their services and exercise professional discretion in addressing such misuses.

## 3. DILIGENCE

### 3.01 Provision of Services

Forensic practitioners are encouraged to seek explicit agreements that define the scope of, time-frame of, and compensation for their services. In the event that a client breaches the contract or acts in a way that would require the practitioner to violate ethical, legal or professional obligations, the forensic practitioner may terminate the relationship.

Forensic practitioners strive to act with reasonable diligence and promptness in providing agreed-upon and reasonably anticipated services. Forensic practitioners are not bound, however, to provide services not reasonably anticipated when retained, nor to provide every possible aspect or

variation of service. Instead, forensic practitioners may exercise professional discretion in determining the extent and means by which services are provided and agreements are fulfilled.

## 3.02 Responsiveness

Forensic practitioners seek to manage their workloads so that services can be provided thoroughly, competently, and promptly. They recognize that acting with reasonable promptness, however, does not require the forensic practitioner to acquiesce to service demands not reasonably anticipated at the time the service was requested, nor does it require the forensic practitioner to provide services if the client has not acted in a manner consistent with existing agreements, including payment of fees.

## 3.03 Communication

Forensic practitioners strive to keep their clients reasonably informed about the status of their services, comply with their clients' reasonable requests for information, and consult with their clients about any substantial limitation on their conduct or performance that may arise when they reasonably believe that their clients expect a service that is not consistent with their professional obligations. Forensic practitioners attempt to keep their clients reasonably informed regarding new facts, opinions, or other potential evidence that may be relevant and applicable.

## 3.04 Termination of Services

The forensic practitioner seeks to carry through to conclusion all matters undertaken for a client unless the forensic practitioner-client relationship is terminated. When a forensic practitioner's employment is limited to a specific matter, the relationship may terminate when the matter has been resolved, anticipated services have been completed, or the agreement has been violated.

## 4. RELATIONSHIPS

Whether a forensic practitioner-client relationship exists depends on the circumstances and is determined by a number of factors which may include the information exchanged between the potential client and the forensic practitioner prior to, or at the initiation of, any contact or service, the nature of the interaction, and the purpose of the interaction.

In their work, forensic practitioners recognize that relationships are established with those who retain their services (e.g., retaining parties, employers, insurers, the court) and those with whom they interact (e.g., examinees, collateral contacts, research participants, students). Forensic practitioners recognize that associated obligations and duties vary as a function of the nature of the relationship.

## 4.01 Responsibilities to Retaining Parties

Most responsibilities to the retaining party attach only after the retaining party has requested and the forensic practitioner has agreed to render professional services and an agreement regarding compensation has been reached. Forensic practitioners are aware that there are some responsibilities, such as privacy, confidentiality, and privilege that may attach when the forensic practitioner agrees to consider whether a forensic practitioner-retaining party relationship shall be established. Forensic practitioners, prior to entering into a contract, may direct the potential retaining party not to reveal any confidential or privileged information as a way of protecting the retaining party's interest in case a conflict exists as a result of pre-existing relationships.

At the initiation of any request for service, forensic practitioners seek to clarify the nature of the relationship and the services to be provided including the role of the forensic practitioner (e.g., trial consultant, forensic examiner, treatment provider, expert witness, research consultant); which person or entity is the client; the probable uses of the services provided or information obtained; and any limitations to privacy, confidentiality, or privilege.

24

## 4.02 Multiple Relationships

A multiple relationship occurs when a forensic practitioner is in a professional role with a person and, at the same time or at a subsequent time, is in a different role with the same person; is involved in a personal, fiscal, or other relationship with an adverse party; at the same time is in a relationship with a person closely associated with or related to the person with whom the forensic practitioner has the professional relationship; or offers or agrees to enter into another relationship in the future with the person or a person closely associated with or related to the person (EPPCC Standard 3.05).

Forensic practitioners strive to recognize the potential conflicts of interest and threats to objectivity inherent in multiple relationships. Forensic practitioners are encouraged to recognize that some personal and professional relationships may interfere with their ability to practice in a competent and impartial manner and they seek to minimize any detrimental effects by avoiding involvement in such matters whenever feasible or limiting their assistance in a manner that is consistent with professional obligations.

### 4.02.01 Therapeutic-Forensic Role Conflicts

Providing forensic and therapeutic psychological services to the same individual or closely related individuals involves multiple relationships that may impair objectivity and/or cause exploitation or other harm. Therefore, when requested or ordered to provide either concurrent or sequential forensic and therapeutic services, forensic practitioners are encouraged to disclose the potential risk and make reasonable efforts to refer the request to another qualified provider.  If referral is not possible, the forensic practitioner is encouraged to consider the risks and benefits to all parties and to the legal system or entity likely to be impacted, the possibility of separating each service widely in time, seeking judicial review and direction, and consulting with knowledgeable colleagues. When providing both forensic and therapeutic services, forensic practitioners seek to minimize the potential negative effects of this circumstance (EPPCC Standard 3.05).

### 4.02.02 Expert Testimony by Practitioners Providing Therapeutic Services

Providing expert testimony about a patient who is a participant in a legal matter does not necessarily involve the practice of forensic psychology even when that testimony is relevant to a psycholegal issue before the decision-maker.  For example, providing testimony on matters such as a patient's reported history or other statements, mental status, diagnosis, progress, prognosis, and treatment would not ordinarily be considered forensic practice even when the testimony is related to a psycholegal issue before the decision-maker.  In contrast, rendering opinions and providing testimony about a person on psycholegal issues (e.g., criminal responsibility, legal causation, proximate cause, trial competence, testamentary capacity, the relative merits of parenting arrangements) would ordinarily be considered the practice of forensic psychology.

Consistent with their ethical obligations to base their opinions on information and techniques sufficient to substantiate their findings (EPPCC Standards 2.04, 9.01), forensic practitioners are encouraged to provide testimony only on those issues for which they have adequate foundation and only when a reasonable forensic practitioner engaged in similar circumstances would determine that the ability to make a proper decision is unlikely to be impaired.  As with testimony regarding forensic examinees, the forensic practitioner strives to identify any substantive limitations that may affect the reliability and validity of the facts or opinions offered, and communicates these to the decision maker.

### 4.02.03 Provision of Forensic Therapeutic Services

Although some therapeutic services can be considered forensic in nature, the fact that therapeutic services are ordered by the court does not necessarily make them forensic.

In determining whether a therapeutic service should be considered the practice of forensic psychology, psychologists are encouraged to

consider the potential impact of the legal context on treatment, the potential for treatment to impact the psycholegal issues involved in the case, and whether another reasonable psychologist in a similar position would consider the service to be forensic and these *Guidelines* to be applicable.

Therapeutic services can have significant effects on current or future legal proceedings. Forensic practitioners are encouraged to consider these effects and minimize any unintended or negative effects on such proceedings or therapy when they provide therapeutic services in forensic contexts.

### 4.03 Provision of Emergency Mental Health Services to Forensic Examinees

When providing forensic examination services an emergency may arise that requires the practitioner to provide short term therapeutic services to the examinee in order to prevent imminent harm to the examinee or others. In such cases, the forensic practitioner is encouraged to limit disclosure of information and inform the retaining attorney, legal representative, or the court in an appropriate manner. Upon providing emergency treatment to examinees, forensic practitioners consider whether they can continue in a forensic role with that individual so that potential for harm to the recipient of services is avoided (EPPCC 3.04).

### 5. FEES

### 5.01 Determining Fees

When determining fees forensic practitioners may consider salient factors such as their experience providing the service, the time and labor required, the novelty and difficulty of the questions involved, the skill required to perform the service, the fee customarily charged for similar forensic services, the likelihood that the acceptance of the particular employment will preclude other employment, the time limitations imposed by the client or circumstances, the nature and length of the professional relationship with the client, the client's ability to pay for the service, and any legal requirements.

### 5.02 Fee Arrangements

Forensic practitioners are encouraged to make clear to the client the likely cost of services whenever it is feasible, and make appropriate provisions in those cases in which the costs of services is greater than anticipated or the client's ability to pay for services changes in some way.

Forensic practitioners seek to avoid undue influence that might result from financial compensation or other gains. Because of the threat to impartiality presented by the acceptance of contingent fees and associated legal prohibitions, forensic practitioners strive to avoid providing professional services on the basis of contingent fees. Letters of protection, financial guarantees, and other security for payment of fees in the future are not considered contingent fees unless payment is dependent on the outcome of the matter.

### 5.03 Pro Bono Services

Forensic psychologists recognize that some persons may have limited access to legal services as a function of financial disadvantage and strive to contribute a portion of their professional time for little or no compensation or personal advantage (EPPCC Principle E).

### 6. INFORMED CONSENT, NOTIFICATION AND ASSENT

Because substantial rights, liberties, and properties are often at risk in forensic matters, and because the methods and procedures of forensic practitioners are complex and may not be accurately anticipated by the recipients of forensic services, forensic practitioners strive to inform service recipients about the nature and parameters of the services to be provided (EPPCC Standards 3.04, 3.10).

### 6.01 Timing and Substance

Forensic practitioners strive to inform clients, examinees, and others who are the recipients of forensic services as soon as is feasible about the

26

nature and extent of reasonably anticipated forensic services.

In determining what information to impart, forensic practitioners are encouraged to consider a variety of factors including the person's experience or training in psychological and legal matters of the type involved and whether the person is represented by counsel. When questions or uncertainties remain after they have made the effort to explain the necessary information, forensic practitioners may recommend that the person seek legal advice.

## 6.02 Communication with Those Seeking to Retain a Forensic Practitioner

As part of the initial process of being retained, or as soon thereafter as previously unknown information becomes available, forensic practitioners strive to disclose to the retaining party information that would reasonably be anticipated to affect a decision to retain or continue the services of the forensic practitioner. This disclosure may include, but is not limited to, the fee structure for anticipated services; prior and current personal or professional activities, obligations and relationships that would reasonably lead to the fact or the appearance of a conflict of interest; the forensic practitioner's knowledge, skill, experience, and education relevant to the forensic services being considered, including any significant limitations; and the scientific bases and limitations of the methods and procedures which are expected to be employed.

## 6.03 Communication with Forensic Examinees

Forensic practitioners inform examinees about the nature and purpose of the examination (EPPCC Standard 9.03; American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, 1999). Such information may include the purpose, nature, and anticipated use of the examination; who will have access to the information; associated limitations on privacy, confidentiality, and privilege including who is authorized to release or access the information

contained in the forensic practitioner's records; the voluntary or involuntary nature of participation, including potential consequences of participation or non-participation, if known; and, if the cost of the service is the responsibility of the examinee, the anticipated cost.

## 6.03.01 Persons Not Ordered or Mandated to Undergo Examination

If the examinee is not ordered by the court to participate in a forensic examination, the forensic practitioner seeks his or her informed consent (EPPCC Standards 3.10, 9.03). If the examinee declines to proceed after being notified of the nature and purpose of the forensic examination, the forensic practitioner may consider postponing the examination, advising the examinee to contact his or her attorney, and notifying the retaining party about the examinee's unwillingness to proceed.

## 6.03.02 Persons Ordered or Mandated to Undergo Examination or Treatment

If the examinee is ordered by the court to participate, the forensic practitioner can conduct the examination over the objection, and without the consent, of the examinee (EPPCC Standards 3.10, 9.03). If the examinee declines to proceed after being notified of the nature and purpose of the forensic examination, the forensic practitioner may consider a variety of options including postponing the examination, advising the examinee to contact his or her attorney, and notifying the retaining party about the examinee's unwillingness to proceed.

When an individual is ordered to undergo treatment but the goals of treatment are determined by a legal authority rather than the individual receiving services, the forensic practitioner informs the service recipient of the nature and purpose of treatment, and any limitations on confidentiality and privilege (EPPCC Standards 3.10, 10.01).

### 6.03.03 Persons Lacking Capacity to Provide Informed Consent

Forensic practitioners appreciate that the very conditions that precipitate psychological examination of individuals involved in legal proceedings can impair their functioning in a variety of important ways, including their ability to understand and consent to the evaluation process.

For examinees adjudicated or presumed by law to lack the capacity to provide informed consent for the anticipated forensic service, the forensic practitioner nevertheless provides an appropriate explanation, seeks the examinee's assent, and obtain appropriate permission from a legally authorized person, as permitted or required by law (EPPCC Standards 3.10, 9.03).

For examinees whom the forensic practitioner has concluded lack capacity to provide informed consent to a proposed, non-court-ordered service, but who have not been adjudicated as lacking such capacity, the forensic practitioner strives to take reasonable steps to protect their rights and welfare (EPPCC Standard 3.10). In such cases, the forensic practitioner may consider suspending the proposed service or notifying the examinee's attorney or the retaining party.

### 6.03.04 Evaluation of Persons Not Represented by Counsel

Because of the significant rights that may be at issue in a legal proceeding, forensic practitioners carefully consider the appropriateness of conducting a forensic evaluation of an individual who is not represented by counsel. Forensic practitioners may consider conducting such evaluations or delaying the evaluation so as to provide the examinee with the opportunity to consult with counsel.

### 6.04 Communication with Collateral Sources of Information

Forensic practitioners disclose to potential collateral sources information that might reasonably be expected to inform their decisions about participating that may include, but may not be limited to, who has retained the forensic practitioner; the nature, purpose, and intended use of the examination or other procedure; the nature of and any limits on privacy, confidentiality, and privilege; and whether their participation is voluntary (EPPCC Standard 3.10).

### 6.05 Communication in Research Contexts

When engaging in research or scholarly activities conducted as a service to a client in a legal proceeding, forensic practitioners attempt to clarify any anticipated use of the research or scholarly product, disclose their role in the resulting research or scholarly products, and obtain whatever consent or agreement is required. In advance of any scientific study, forensic practitioners seek to negotiate with the client the circumstances under and manner in which the results may be made known to others. Forensic practitioners strive to balance the potentially competing rights and interests of the retaining party with the inappropriateness of suppressing data, for example, by agreeing to report the data without identifying the jurisdiction in which the study took place. Forensic practitioners represent the results of research in an accurate manner (EPPCC Standard 5.01).

### 7. CONFLICTS IN PRACTICE

In forensic psychology practice conflicting responsibilities and demands may be encountered. When conflicts occur, forensic practitioners seek to make the conflict known to the relevant parties or agencies, and consider the rights and interests of the relevant parties or agencies in their attempts to resolve the conflict.

### 7.01 Conflicts with Legal Authority

When their responsibilities conflict with law, regulations, or other governing legal authority, forensic practitioners make known their commitment to the EPPCC, and take steps to resolve the conflict. In situations in which the EPPCC or *Guidelines* are in conflict with the law,

28

attempts to resolve the conflict are made in accordance with the EPPCC (EPPCC Standard 1.02).

When the conflict cannot be resolved by such means, forensic practitioners may adhere to the requirements of the law, regulations, or other governing legal authority, but only to the extent required and not in any way that violates a person's human rights (EPPCC Standard 1.03).

Forensic practitioners are encouraged to consider the appropriateness of complying with court orders when such compliance creates potential conflicts with professional standards of practice.

### 7.02 Conflicts with Organizational Demands

When the demands of an organization with which they are affiliated or for whom they are working conflict with their professional responsibilities and obligations, forensic practitioners strive to clarify the nature of the conflict and, to the extent feasible, resolve the conflict in a way consistent with professional obligations and responsibilities (EPPCC Standard 1.03).

### 7.03 Resolving Ethical Issues with Fellow Professionals

When an apparent or potential ethical violation has caused, or is likely to cause, substantial harm, forensic practitioners are encouraged to take action appropriate to the situation and consider a number of factors including the nature and the immediacy of the potential harm; applicable privacy, confidentiality, and privilege; how the rights of the relevant parties may be affected by a particular course of action; and any other legal or ethical obligations (EPPCC Standard 1.04). Steps to resolve perceived ethical conflicts may include, but are not limited to, obtaining the consultation of knowledgeable colleagues, obtaining the advice of independent counsel, and conferring directly with the client.

When forensic practitioners believe there may have been an ethical violation by another professional, an attempt is made to resolve the issue by bringing it to the attention of that individual, if that attempt does not violate any rights or privileges that may be involved, and if an informal resolution appears appropriate (EPPCC Standard 1.04). If this does not result in a satisfactory resolution, the forensic practitioner may have to take further action appropriate to the situation, including making a report to third parties of the perceived ethical violation (EPPCC Standard 1.05). In most instances, in order to minimize unforeseen risks to the party's rights in the legal matter, forensic practitioners consider consulting with the client before attempting to resolve a perceived ethical violation with another professional.

### 8. PRIVACY, CONFIDENTIALITY, AND PRIVILEGE

Forensic practitioners recognize their ethical obligations to maintain the confidentiality of information relating to a client or retaining party, except insofar as disclosure is consented to by the client or retaining party, or required or permitted by law (EPPCC Standard 4.01).

### 8.01 Release of Information

Forensic practitioners are encouraged to recognize the importance of complying with properly noticed and served subpoenas or court orders directing release of information, or other legally proper consent from duly authorized persons, unless there is a legally valid reason to offer an objection. When in doubt about an appropriate response or course of action, forensic practitioners may seek assistance from the retaining client, retain and seek legal advice from their own attorney, or formally notify the drafter of the subpoena or order of their uncertainty.

### 8.02 Access to Information

If requested, forensic practitioners seek to provide the retaining party access to, and a meaningful explanation of, all information that is in their records for the matter at hand, consistent with the relevant law, applicable codes of ethics and professional standards, and institutional rules and

regulations. Forensic examinees typically are not provided access to the forensic practitioner's records without the consent of the retaining party. Access to records by anyone other than the retaining party is governed by legal process, usually subpoena or court order, or by explicit consent of the retaining party. Forensic practitioners may charge a reasonable fee for the costs associated with the storage, reproduction, review, and provision of records.

### 8.03 Acquiring Collateral and Third Party Information

Forensic practitioners strive to access information or records from collateral sources with the consent of the relevant attorney or the relevant party, or when otherwise authorized by law or court order.

### 8.04 Use of Case Materials in Teaching, Continuing Education, and Other Scholarly Activities

Forensic practitioners using case materials for purposes of teaching, training, or research strive to present such information in a fair, balanced, and respectful manner. They attempt to protect the privacy of persons by disguising the confidential, personally identifiable information of all persons and entities who would reasonably claim a privacy interest; using only those aspects of the case available in the public domain; or obtaining consent from the relevant clients, parties, participants, and organizations to use the materials for such purposes (EPPCC Standard 4.07; also see Sections 11.06 and 11.07 of these guidelines).

## 9. METHODS AND PROCEDURES

### 9.01 Use of Appropriate Methods

Forensic practitioners strive to utilize appropriate methods and procedures in their work. When performing examinations, treatment, consultation, educational activities or scholarly investigations, forensic practitioners seek to maintain integrity by examining the issue or problem at hand from all reasonable perspectives and seek information that will differentially test plausible rival hypotheses.

### 9.02 Use of Multiple Sources of Information

Forensic practitioners ordinarily avoid relying solely on one source of data, and corroborate important data whenever feasible (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, in press). When relying upon data that have not been corroborated, forensic practitioners seek to make known the uncorroborated status of the data, any associated strengths and limitations, and the reasons for relying upon the data.

### 9.03 Opinions Regarding Persons Not Examined

Forensic practitioners recognize their obligations to only provide written or oral evidence about the psychological characteristics of particular individuals when they have sufficient information or data to form an adequate foundation for those opinions or to substantiate their findings (EPPCC Standard 9.01). Forensic practitioners seek to make reasonable efforts to obtain such information or data, and they document their efforts to obtain it. When it is not possible or feasible to examine individuals about whom they are offering an opinion, forensic practitioners strive to make clear the impact of such limitations on the reliability and validity of their professional products, opinions, or testimony.

When conducting a record review or providing consultation or supervision that does not warrant an individual examination, forensic practitioners seek to identify the sources of information on which they are basing their opinions and recommendations, including any substantial limitations to their opinions and recommendations.

## 10. ASSESSMENT

### 10.01 Focus on Legally Relevant Factors

Forensic examiners seek to assist the trier of fact to understand evidence or determine a fact in issue, and they provide information that is most relevant to the psycholegal issue. In reports and

30

testimony forensic practitioners typically provide information about examinees' functional abilities, capacities, knowledge, and beliefs, and address their opinions and recommendations to the identified psycholegal issues (American Bar Association and American Psychological Assocation, 2008; Grisso, 1986, 2003; Heilbrun, Marczyk, DeMatteo, & Mack-Allen, 2007).

Forensic practitioners are encouraged to consider the problems that may arise by using a clinical diagnosis in some forensic contexts, and consider and qualify their opinions and testimony appropriately.

## 10.02 Selection and Use of Assessment Procedures

Forensic practitioners use assessment procedures in the manner and for the purposes that are appropriate in light of the research on or evidence of their usefulness and proper application (EPPCC Standard 9.02, American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, in press9). This includes assessment techniques, interviews, tests, instruments, and other procedures and their administration, adaptation, scoring, and interpretation, including computerized scoring and interpretation systems.

Forensic practitioners use assessment instruments whose validity and reliability have been established for use with members of the population assessed. When such validity and reliability have not been established, forensic practitioners consider and describe the strengths and limitations of their findings. Forensic practitioners use assessment methods that are appropriate to an examinee's language preference and competence, unless the use of an alternative language is relevant to the assessment issues (EPPCC Standard 9.02).

Assessment in forensic contexts differs from assessment in therapeutic contexts in important ways that forensic practitioners strive to take into account when conducting forensic examinations. Forensic practitioners seek to consider the strengths and limitations of employing traditional assessment procedures in forensic examinations (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, in press). Given the stakes involved in forensic contexts, forensic practitioners strive to ensure the integrity and security of test materials and results (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, in press9).

When the validity of an assessment technique has not been established in the forensic context or setting in which it is being used, the forensic practitioner seeks to describe the strengths and limitations of any test results and explain the extrapolation of these data to the forensic context Because of the many differences between forensic and therapeutic contexts, forensic practitioners consider and seek to make known that some examination results may warrant substantially different interpretation when administered in forensic contexts (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, in press).

Forensic practitioners consider and seek to make known that forensic examination results can be affected by factors unique to, or differentially present in, forensic contexts including response style, voluntariness of participation, and situational stress associated with involvement in forensic or legal matters (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, in press).

## 10.03 Appreciation of Individual Differences

When interpreting assessment results forensic practitioners consider the purpose of the assessment as well as the various test factors, test-taking abilities, and other characteristics of the person being assessed, such as situational,

31

personal, linguistic, and cultural differences that might affect their judgments or reduce the accuracy of their interpretations (EPPCC Standard 9.06). Forensic practitioners strive to identify any significant strengths and limitations of their procedures and interpretations.

Forensic practitioners are encouraged to consider how the assessment process may be impacted by any disability an examinee is experiencing, make accommodations as possible, and consider such when interpreting and communicating the results of the assessment (American Psychological Association Task Force on Guidelines for Assessment and treatment of Persons with Disabilities, 2011).

### 10.04 Consideration of Assessment Settings

In order to maximize the validity of assessment results, forensic practitioners strive to conduct evaluations in settings that provide adequate comfort, safety and privacy.

### 10.05 Provision of Assessment Feedback

Forensic practitioners take reasonable steps to explain assessment results to the examinee or a designated representative in language they can understand (EPPCC Standard 9.10). In those circumstances in which communication about assessment results is precluded, the forensic practitioner explains this to the examinee in advance (EPPCC Standard 9.10).

Forensic practitioners seek to provide information about professional work in a manner consistent with professional and legal standards for the disclosure of test data or results, interpretation of data, and the factual bases for conclusions.

### 10.06 Documentation and Compilation of Data Considered

Forensic practitioners are encouraged to recognize the importance of documenting all data they consider with enough detail and quality to allow for reasonable judicial scrutiny and adequate discovery by all parties. This documentation includes, but is not limited to, letters and consultations; notes, recordings, and transcriptions; assessment and test data, scoring reports and interpretations; and all other records in any form or medium that were created or exchanged in connection with a matter.

When contemplating third party observation or audio/video-recording of examinations forensic practitioners strive to consider any law that may control such matters, the need for transparency and documentation, and the potential impact of observation or recording on the validity of the examination and test security (American Psychological Association Committee on Psychological Tests and Assessment, 2007).

### 10.07 Provision of Documentation

Pursuant to proper subpoenas or court orders, or other legally proper consent from authorized persons, forensic practitioners seek to make available all documentation described in 10.05, all financial records related to the matter, and any other records including reports (and draft reports if they have been provided to a party, attorney, or other entity for review), that might reasonably be related to the opinions to be expressed.

### 10.08 Recordkeeping

Forensic practitioners establish and maintain a system of recordkeeping and professional communication (EPPCC Standard 6.01; American Psychological Association, 2007), and attend to relevant laws and rules. When indicated by the extent of the rights, liberties, and properties that may be at risk, the complexity of the case, the amount and legal significance of unique evidence in the care and control of the forensic practitioner, and the likelihood of future appeal, forensic practitioners strive to inform the retaining party of the limits of recordkeeping times. If requested to do so, forensic practitioners consider maintaining such records until notified that all appeals in the matter have been exhausted, or sending a copy of any unique components/aspects of the record in their care and control to the retaining party before destruction of the record.

32

## 11. PROFESSIONAL AND OTHER PUBLIC COMMUNICATIONS

### 11.01 Accuracy, Fairness, and Avoidance of Deception

Forensic practitioners make reasonable efforts to ensure that the products of their services, as well as their own public statements and professional reports and testimony, are communicated in ways that promote understanding and avoid deception (EPPCC Standard 5.01).

When in their role as expert to the court or other tribunals, the role of forensic practitioners is to facilitate understanding of the evidence or dispute. Consistent with legal and ethical requirements, forensic practitioners do not distort or withhold relevant evidence or opinion in reports or testimony. When responding to discovery requests and providing sworn testimony, forensic practitioners strive to have readily available for inspection all data which they considered, regardless of whether the data supports their opinion, subject to and consistent with court order, relevant rules of evidence, test security issues, and professional standards (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, in press; American Psychological Association Committee on Legal Issues, 2006; Bank & Packer, 2007; Golding, 1990).

When providing reports and other sworn statements or testimony in any form, forensic practitioners strive to present their conclusions, evidence, opinions, or other professional products in a fair manner. Forensic practitioners do not, by either commission or omission, participate in misrepresentation of their evidence, nor do they participate in partisan attempts to avoid, deny or subvert the presentation of evidence contrary to their own position or opinion (EPPCC Standard 5.01). This does not preclude forensic practitioners from forcefully presenting the data and reasoning upon which a conclusion or professional product is based.

### 11.02 Differentiating Observations, Inferences, and Conclusions

In their communications, forensic practitioners strive to distinguish observations, inferences, and conclusions. Forensic practitioners are encouraged to explain the relationship between their expert opinions and the legal issues and facts of the case at hand.

### 11.03 Disclosing Sources of Information and Bases of Opinions

Forensic practitioners are encouraged to disclose all sources of information obtained in the course of their professional services, and to identify the source of each piece of information that was considered and relied upon in formulating a particular conclusion, opinion or other professional product.

### 11.04 Comprehensive and Accurate Presentation of Opinions in Reports and Testimony

Consistent with relevant law and rules of evidence, when providing professional reports and other sworn statements or testimony, forensic practitioners strive to offer a complete statement of all relevant opinions that they formed within the scope of their work on the case, the basis and reasoning underlying the opinions, the salient data or other information that was considered in forming the opinions, and an indication of any additional evidence that may be used in support of the opinions to be offered. The specific substance of forensic reports is determined by the type of psycholegal issue at hand as well as relevant laws or rules in the jurisdiction in which the work is completed.

Forensic practitioners are encouraged to limit discussion of background information that does not bear directly upon the legal purpose of the examination or consultation. Forensic practitioners avoid offering information that is irrelevant and that does not provide a substantial basis of support for their opinions, except when required by law (EPPCC Standard 4.04).

33

## 11.05 Commenting Upon Other Professionals and Participants in Legal Proceedings

When evaluating or commenting upon the work or qualifications of other professionals involved in legal proceedings, forensic practitioners seek to represent their disagreements in a professional and respectful tone, and base them on a fair examination of the data, theories, standards and opinions of the other expert or party.
When describing or commenting upon clients, examinees, or other participants in legal proceedings, forensic practitioners strive to do so in a fair and impartial manner. Forensic practitioners strive to report the representations, opinions, and statements of clients, examinees, or other participants in a fair and impartial manner.

## 11.06 Out of Court Statements

Ordinarily, forensic practitioners seek to avoid making detailed public (out-of-court) statements about legal proceedings in which they have been involved. However, sometimes public statements may serve important goals such as educating the public about the role of forensic practitioners in the legal system, the appropriate practice of forensic psychology, and psychological and legal issues that are relevant to the matter at hand. When making public statements, forensic practitioners refrain from releasing private, confidential, or privileged information, and attempt to protect persons from harm, misuse, or misrepresentation as a result of their statements (EPPCC Standard 4.05).

## 11.07 Commenting Upon Legal Proceedings

Forensic practitioners strive to address particular legal proceedings in publications or communications only to the extent that the information relied upon is part of a public record, or when consent for that use has been properly obtained from any party holding any relevant privilege (also see Section 8.04).

When offering public statements about specific cases in which they have not been involved, forensic practitioners offer opinions for which there is sufficient information or data and make clear the limitations of their statements and opinions resulting from having had no direct knowledge of or involvement with the case (EPPCC Standard 9.01).

34

# References

American Bar Association & American Psychological Association. (2008). Assessment of older adults with diminished capacity: A handbook for psychologists. Washington, DC: American Bar Association and American Psychological Association.

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education (in press). *Standards for educational and psychological testing (third edition)*. Washington, DC: American Educational Research Association.

American Psychological Association (in press). Guidelines for psychological practice with gay, lesbian, and bisexual clients. *American Psychologist*.

American Psychological Association (2003). Guidelines on multicultural education, training, research, practice, and organizational change for psychologists. American Psychologist, 58, 377-402.

American Psychological Association. (2004). Guidelines for psychological practice with older adults. American Psychologist, 59, 4, 236–260. Washington, DC: Author.

American Psychological Association (2007). Record keeping guidelines, *American Psychologist, 62*, 993-1004.

American Psychological Association (2010). *Ethical principles of psychologists and code of conduct:* Retrieved July 26, 2010, from http://www.apa.org/ethics/code/index.aspx

American Psychological Association (2010). Guidelines for child custody evaluations in legal proceedings. *American Psychologist, 65*, 863-867.

American Psychological Association (2011a). Guidelines for psychological evaluations in child protection matters. Washington, DC: Author.

American Psychological Association (2011b). Guidelines for the practice of parenting coordination. Washington, DC: Author.
American Psychological Assocation (2011c). Guidelines for the evaluation of dementia and age related cognitive change. Washington, DC: Author.

American Psychological Association Committee on Legal Issues (2006). Strategies for private practitioners coping with subpoenas or compelled testimony for client records or test data. *Professional Psychology: Research and practice, 37*, 215-222.

American Psychological Association Committee on Psychological Tests and Assessment (2007). *Statement on third party observers in psychological testing and assessment: A Framework for Decision Making.* Washington, DC: Author.

American Psychological Association Task Force on Guidelines for Assessment and treatment of Persons with Disabilities (2011). *Guidelines for assessment of and intervention with persons with disabilities.* Washington, DC: Author.
Bank, S., & Packer, R. (2007). Expert witness testimony: Law, ethics, and practice. In A.M. Goldstein (Ed.), *Forensic Psychology: Emerging topics and expanding roles* (pp. 421-445). Hoboken, NJ: J. Wiley & Sons.

Golding, S. L. (1990). Mental health professionals and the courts: The ethics of expertise. *International Journal of Law and Psychiatry, 13,* 261-307.

Grisso, T. (1986). *Evaluating competencies: forensic assessments and instruments,* New York: Plenum.

Grisso, T. (2003). *Evaluating competencies: forensic assessments and instruments (second edition),* New York: Kluwer/Plenum.

Heilbrun, K., Marczyk, G., DeMatteo, D., & Mack-Allen, J. (2007). A principles-based approach to forensic mental health assessment:

35

Utility and update. In A.M. Goldstein (Ed.), *Forensic Psychology: Emerging topics and expanding roles* (pp. 45-72). Hoboken, NJ: J. Wiley & Sons.

Melton, G., Petrila,, J., Poythress, N., & slobogin, 1987). *Psychological evaluations for the courts: A handbook for mental health professionals and lawyers*. New York: Guilford.

Melton, G., Petrila,, J., Poythress, N., & Slobogin, C. (1997). *Psychological evaluations for the courts: A handbook for mental health professionals and lawyers (second edition)*. New York: Guilford.

Melton, G., Petrila,, J., Poythress, N., & Slobogin, C., Lyons, P., & Otto, R. K. (2007). *Psychological evaluations for the courts: A handbook for mental health professionals and lawyers (third edition)*. New York: Guilford.

Monahan, J. (Ed.). (1980). Who is the client? The ethics of psychological intervention in the criminal justice system Washington, D. C.: American Psychological Association. [1]

Rogers, R. (Ed.)(1988). *Clinical assessment of malingering and deception*. New York: Guilford.

Rogers, R. (Ed.)(1997). *Clinical assessment of malingering and deception (second edition)*. New York: Guilford.

Rogers, R. (Ed.)(2008). *Clinical assessment of malingering and deception (third edition)*. New York: Guilford.

36

## APPENDIX I: BACKGROUND OF THE *GUIDELINES* AND THE REVISION PROCESS

### A. History of the *Guidelines*

The previous version of the *Specialty Guidelines for Forensic Psychologists* (Committee on Ethical Guidelines for Forensic Psychologists, 1991) was approved by the American Psychology-Law Society, Division 41 of the American Psychological Association, and the American Academy of Forensic Psychology in 1991. The current revision, now called the *Specialty Guidelines for Forensic Psychology* (referred to as *Guidelines* throughout this document), replace the 1991 *Specialty Guidelines for Forensic Psychologists*.

### B. Revision Process

This revision of the *Guidelines* was coordinated by the Committee for the Revision of the Specialty Guidelines for Forensic Psychology, which was established by the American Academy of Forensic Psychology and the American Psychology-Law Society (Division 41 of the American Psychological Association) in 2002 and operated through 2011. This Committee consisted of two representatives from each organization (Solomon Fulero, PhD, JD, Stephen Golding, PhD, ABPP, Lisa Piechowski, PhD, ABPP, Christina Studebaker, PhD) a Chairperson (Randy Otto, PhD, ABPP), and a liaison from APA Division 42 (Jeffrey Younggren, PhD, ABPP).

This document was revised in accordance with American Psychological Association Rule 30.08 and the APA policy document *Criteria for the development and evaluation of practice guidelines* (APA, 2001). The Committee posted announcements regarding the revision process to relevant electronic discussion lists and professional publications (i.e., Psylaw-L email listserve, American Academy of Forensic Psychology listserve, American Psychology-Law Society Newsletter). In addition, an electronic discussion list devoted solely to issues concerning revision of the *Guidelines* was operated between

December 2002 and July 2007, followed by establishment of an e-mail address in February 2008 (sgfp@yahoo.com). Individuals were invited to provide input and commentary on the existing *Guidelines* and proposed revisions via these means. In addition, two public meetings were held throughout the revision process at biennial meetings of the American Psychology-Law Society.

Upon development of a draft that the Revisions Committee deemed suitable, the revised *Guidelines* were submitted for review to the Executive Committee of the American Psychology-Law Society and Division 41 of the American Psychological Association, and to the American Board of Forensic Psychology. Once the revised *Guidelines* were approved by these two organizations, they were submitted to the American Psychological Association for review, commentary, and acceptance, consistent with the American Psychological Association's Criteria for Practice Guideline Development and Evaluation (Committee on Professional Practice and Standards, 2001) and Rule 30-8. They were subsequently revised by the Revisions Committee and were adopted by the American Psychological Association Council of Representatives on August, 3, 2011.

### C. Developers and Support

The *Specialty Guidelines for Forensic Psychology* were developed by the American Psychology-Law Society (Division 41 of the American Psychological Association) and the American Academy of Forensic Psychology.

### D. Current Status

These *Guidelines* are scheduled to expire August 3, 2021. After this date, users are encouraged to contact the American Psychological Association Practice Directorate to confirm that this document remains in effect.

37

## APPENDIX II: DEFINITIONS AND TERMINOLOGY

For the purposes of these *Guidelines*:

*Appropriate*, when used in relation to conduct by a forensic practitioner means that, according to the prevailing professional judgment of competent forensic practitioners, the conduct is apt and pertinent and is considered befitting, suitable and proper for a particular person, place, condition, or function. "Inappropriate" means that, according to the prevailing professional judgment of competent forensic practitioners, the conduct is not suitable, desirable, or properly timed for a particular person, occasion, or purpose; and may also denote improper conduct, improprieties, or conduct that is discrepant for the circumstances.

*Agreement* refers to the objective and mutual understanding between the forensic practitioner and the person or persons seeking the professional service and/or agreeing to participate in the service.  See also Assent, Consent, and Informed Consent.

*Assent* refers to the agreement, approval, or permission, especially regarding verbal or nonverbal conduct, that is reasonably intended and interpreted as expressing willingness, even in the absence of unmistakable consent.  Forensic practitioners attempt to secure assent when consent and informed consent can not be obtained or when, because of mental state, the examinee may not be able to consent.

*Consent* refers to agreement, approval, or permission as to some act or purpose.

*Client* refers to the attorney, law firm, court, agency, entity, party, or other person who has retained, and who has a contractual relationship with, the forensic practitioner to provide services.

*Conflict of Interest* refers to a situation or circumstance in which the forensic practitioner's objectivity, impartiality, or judgment may be jeopardized due to a relationship, financial, or any other interest that would reasonably be expected to substantially affect a forensic practitioner's professional judgment, impartiality, or decision-making.

*Decisionmaker* refers to the person or entity with the authority to make a judicial decision, agency determination, arbitration award, or other contractual determination after consideration of the facts and the law.

*Examinee* refers to a person who is the subject of a forensic examination for the purpose of informing a decision maker or attorney about the psychological functioning of that examinee.

*Forensic Examiner* refers to a psychologist who examines the psychological condition of a person whose psychological condition is in controversy or at issue.

*Forensic Practice* refers to the application of the scientific, technical, or specialized knowledge of psychology to the law and the use of that knowledge to assist in resolving legal, contractual, and administrative disputes.

*Forensic Practitioner* refers to a psychologist when engaged in forensic practice.

*Forensic Psychology* refers to all forensic practice by any psychologist working within any sub-discipline of psychology (e.g., clinical, developmental, social, cognitive).

*Informed Consent* denotes the knowledgeable, voluntary, and competent agreement by a person to a proposed course of conduct after the forensic practitioner has communicated adequate information and explanation about the material risks and benefits of, and reasonably available alternatives to, the proposed course of conduct.

*Legal Representative* refers to a person who has the legal authority to act on behalf of another.

*Party* refers to a person or entity named in litigation, or who is involved in, or is witness to, an activity or relationship that may be reasonably anticipated to result in litigation.

38

*Reasonable* or *Reasonably*, when used in relation to conduct by a forensic practitioner, denotes the conduct of a prudent and competent forensic practitioner who is engaged in similar activities in similar circumstances.

*Record* or *Written Record* refers to all notes, records, documents, memorializations, and recordings of considerations and communications, be they in any form or on any media, tangible, electronic, hand-written, or mechanical, that are contained in, or are specifically related to, the forensic matter in question or the forensic service provided.

*Retaining Party* refers to the attorney, law firm, court, agency, entity, party, or other person who has retained, and who has a contractual relationship with, the forensic practitioner to provide services.

*Tribunal* denotes a court or an arbitrator in an arbitration proceeding, or a legislative body, administrative agency, or other body acting in an adjudicative capacity. A legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of legal argument or evidence by a party or parties, renders a judgment directly affecting a party's interests in a particular matter.

*Trier of Fact* refers to a court or an arbitrator in an arbitration proceeding, or a legislative body, administrative agency, or other body acting in an adjudicative capacity. A legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of legal argument or evidence by a party or parties, renders a judgment directly affecting a party's interests in a particular matter.



AMERICAN PSYCHOLOGICAL ASSOCIATION

# ETHICAL PRINCIPLES OF PSYCHOLOGISTS AND CODE OF CONDUCT

Adopted August 21, 2002
Effective June 1, 2003

With the 2010 Amendments
Adopted February 20, 2010
Effective June 1, 2010

# ETHICAL PRINCIPLES OF PSYCHOLOGISTS AND CODE OF CONDUCT

## CONTENTS

INTRODUCTION AND APPLICABILITY

PREAMBLE

GENERAL PRINCIPLES
Principle A:   Beneficence and Nonmaleficence
Principle B:   Fidelity and Responsibility
Principle C:   Integrity
Principle D:   Justice
Principle E:   Respect for People's Rights and Dignity

ETHICAL STANDARDS
1.      *Resolving Ethical Issues*
1.01    Misuse of Psychologists' Work
1.02    Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority
1.03    Conflicts Between Ethics and Organizational Demands
1.04    Informal Resolution of Ethical Violations
1.05    Reporting Ethical Violations
1.06    Cooperating With Ethics Committees
1.07    Improper Complaints
1.08    Unfair Discrimination Against Complainants and Respondents

2.      *Competence*
2.01    Boundaries of Competence
2.02    Providing Services in Emergencies
2.03    Maintaining Competence
2.04    Bases for Scientific and Professional Judgments
2.05    Delegation of Work to Others
2.06    Personal Problems and Conflicts

3.      *Human Relations*
3.01    Unfair Discrimination
3.02    Sexual Harassment
3.03    Other Harassment
3.04    Avoiding Harm
3.05    Multiple Relationships
3.06    Conflict of Interest
3.07    Third-Party Requests for Services
3.08    Exploitative Relationships
3.09    Cooperation With Other Professionals
3.10    Informed Consent
3.11    Psychological Services Delivered to or Through Organizations
3.12    Interruption of Psychological Services

4.      *Privacy and Confidentiality*
4.01    Maintaining Confidentiality

4.02    Discussing the Limits of Confidentiality
4.03    Recording
4.04    Minimizing Intrusions on Privacy
4.05    Disclosures
4.06    Consultations
4.07    Use of Confidential Information for Didactic or Other Purposes

5.      *Advertising and Other Public Statements*
5.01    Avoidance of False or Deceptive Statements
5.02    Statements by Others
5.03    Descriptions of Workshops and Non-Degree-Granting Educational Programs
5.04    Media Presentations
5.05    Testimonials
5.06    In-Person Solicitation

6.      *Record Keeping and Fees*
6.01    Documentation of Professional and Scientific Work and Maintenance of Records
6.02    Maintenance, Dissemination, and Disposal of Confidential Records of Professional and Scientific Work
6.03    Withholding Records for Nonpayment
6.04    Fees and Financial Arrangements
6.05    Barter With Clients/Patients
6.06    Accuracy in Reports to Payors and Funding Sources
6.07    Referrals and Fees

7.      *Education and Training*
7.01    Design of Education and Training Programs
7.02    Descriptions of Education and Training Programs
7.03    Accuracy in Teaching
7.04    Student Disclosure of Personal Information
7.05    Mandatory Individual or Group Therapy
7.06    Assessing Student and Supervisee Performance
7.07    Sexual Relationships With Students and Supervisees

8.      *Research and Publication*
8.01    Institutional Approval
8.02    Informed Consent to Research
8.03    Informed Consent for Recording Voices and Images in Research

8.04    Client/Patient, Student, and Subordinate Research Participants
8.05    Dispensing With Informed Consent for Research
8.06    Offering Inducements for Research Participation
8.07    Deception in Research
8.08    Debriefing
8.09    Humane Care and Use of Animals in Research
8.10    Reporting Research Results
8.11    Plagiarism
8.12    Publication Credit
8.13    Duplicate Publication of Data
8.14    Sharing Research Data for Verification
8.15    Reviewers

9.      *Assessment*
9.01    Bases for Assessments
9.02    Use of Assessments
9.03    Informed Consent in Assessments
9.04    Release of Test Data
9.05    Test Construction
9.06    Interpreting Assessment Results
9.07    Assessment by Unqualified Persons
9.08    Obsolete Tests and Outdated Test Results
9.09    Test Scoring and Interpretation Services
9.10    Explaining Assessment Results
9.11    Maintaining Test Security

10.     *Therapy*
10.01   Informed Consent to Therapy
10.02   Therapy Involving Couples or Families
10.03   Group Therapy
10.04   Providing Therapy to Those Served by Others
10.05   Sexual Intimacies With Current Therapy Clients/Patients
10.06   Sexual Intimacies With Relatives or Significant Others of Current Therapy Clients/Patients
10.07   Therapy With Former Sexual Partners
10.08   Sexual Intimacies With Former Therapy Clients/Patients
10.09   Interruption of Therapy
10.10   Terminating Therapy

2010 AMENDMENTS TO THE 2002 "ETHICAL PRINCIPLES OF PSYCHOLOGISTS AND CODE OF CONDUCT"

41

# INTRODUCTION AND APPLICABILITY

The American Psychological Association's (APA's) Ethical Principles of Psychologists and Code of Conduct (hereinafter referred to as the Ethics Code) consists of an Introduction, a Preamble, five General Principles (A–E), and specific Ethical Standards. The Introduction discusses the intent, organization, procedural considerations, and scope of application of the Ethics Code. The Preamble and General Principles are aspirational goals to guide psychologists toward the highest ideals of psychology. Although the Preamble and General Principles are not themselves enforceable rules, they should be considered by psychologists in arriving at an ethical course of action. The Ethical Standards set forth enforceable rules for conduct as psychologists. Most of the Ethical Standards are written broadly, in order to apply to psychologists in varied roles, although the application of an Ethical Standard may vary depending on the context. The Ethical Standards are not exhaustive. The fact that a given conduct is not specifically addressed by an Ethical Standard does not mean that it is necessarily either ethical or unethical.

This Ethics Code applies only to psychologists' activities that are part of their scientific, educational, or professional roles as psychologists. Areas covered include but are not limited to the clinical, counseling, and school practice of psychology; research; teaching; supervision of trainees; public service; policy development; social intervention; development of assessment instruments; conducting assessments; educational counseling; organizational consulting; forensic activities; program design and evaluation; and administration. This Ethics Code applies to these activities across a variety of contexts, such as in person, postal, telephone, Internet, and other electronic transmissions. These activities shall be distinguished from the purely private conduct of psychologists, which is not within the purview of the Ethics Code.

Membership in the APA commits members and student affiliates to comply with the standards of the APA Ethics Code and to the rules and procedures used to enforce them. Lack of awareness or misunderstanding of an Ethical Standard is not itself a defense to a charge of unethical conduct.

The procedures for filing, investigating, and resolving complaints of unethical conduct are described in the current Rules and Procedures of the APA Ethics Committee. APA may impose sanctions on its members for violations of the standards of the Ethics Code, including termination of APA membership, and may notify other bodies and individuals of its actions. Actions that violate the standards of the Ethics Code may also lead to the imposition of sanctions on psychologists or students whether or not they are APA members by bodies other than APA, including state psychological associations, other professional groups, psychology boards, other state or federal agencies, and payors for health services. In addition, APA may take action against a member after his or her conviction of a felony, expulsion or suspension from an affiliated state psychological association, or suspension or loss of licensure. When the sanction to be imposed by APA is less than expulsion, the 2001 Rules and Procedures do not guarantee an opportunity for an in-person hearing, but generally provide that complaints will be resolved only on the basis of a submitted record.

The Ethics Code is intended to provide guidance for psychologists and standards of professional conduct that can be applied by the APA and by other bodies that choose to adopt them. The Ethics Code is not intended to be a basis of civil liability. Whether a psychologist has violated the Ethics Code standards does not by itself determine whether the psychologist is legally liable in a court action, whether a contract is enforceable, or whether other legal consequences occur.

The modifiers used in some of the standards of this Ethics Code (e.g., *reasonably, appropriate, potentially*) are included in the standards when they would (1) allow professional judgment on the part of psychologists, (2) eliminate injustice or inequality that would occur without the modifier, (3) ensure applicability across the broad range of activities conducted by psychologists, or (4) guard against a set of rigid rules that might be quickly outdated. As used in this Ethics Code, the term *reasonable* means the prevailing professional judgment of psychologists engaged in similar activities in similar circumstances, given the knowledge the psychologist had or should have had at the time.

The American Psychological Association's Council of Representatives adopted this version of the APA Ethics Code during its meeting on August 21, 2002. The Code became effective on June 1, 2003. The Council of Representatives amended this version of the Ethics Code on February 20, 2010. The amendments became effective on June 1, 2010 (see p. 15 of this pamphlet). Inquiries concerning the substance or interpretation of the APA Ethics Code should be addressed to the Director, Office of Ethics, American Psychological Association, 750 First Street, NE, Washington, DC 20002-4242. The Ethics Code and information regarding the Code can be found on the APA website, http://www.apa.org/ethics. The standards in this Ethics Code will be used to adjudicate complaints brought concerning alleged conduct occurring on or after the effective date. Complaints will be adjudicated on the basis of the version of the Ethics Code that was in effect at the time the conduct occurred.

The APA has previously published its Ethics Code as follows:

American Psychological Association. (1953). *Ethical standards of psychologists.* Washington, DC: Author.
American Psychological Association. (1959). Ethical standards of psychologists. *American Psychologist, 14*, 279–282.
American Psychological Association. (1963). Ethical standards of psychologists. *American Psychologist, 18*, 56–60.
American Psychological Association. (1968). Ethical standards of psychologists. *American Psychologist, 23*, 357–361.
American Psychological Association. (1977, March). Ethical standards of psychologists. *APA Monitor*, 22–23.
American Psychological Association. (1979). *Ethical standards of psychologists.* Washington, DC: Author.
American Psychological Association. (1981). Ethical principles of psychologists. *American Psychologist, 36*, 633–638.
American Psychological Association. (1990). Ethical principles of psychologists (Amended June 2, 1989). *American Psychologist, 45*, 390–395.
American Psychological Association. (1992). Ethical principles of psychologists and code of conduct. *American Psychologist, 47*, 1597–1611.
American Psychological Association. (2002). Ethical principles of psychologists and code of conduct. *American Psychologist, 57*, 1060–1073.

Request copies of the APA's Ethical Principles of Psychologists and Code of Conduct from the APA Order Department, 750 First Street, NE, Washington, DC 20002-4242, or phone (202) 336-5510.

42

In the process of making decisions regarding their professional behavior, psychologists must consider this Ethics Code in addition to applicable laws and psychology board regulations. In applying the Ethics Code to their professional work, psychologists may consider other materials and guidelines that have been adopted or endorsed by scientific and professional psychological organizations and the dictates of their own conscience, as well as consult with others within the field. If this Ethics Code establishes a higher standard of conduct than is required by law, psychologists must meet the higher ethical standard. If psychologists' ethical responsibilities conflict with law, regulations, or other governing legal authority, psychologists make known their commitment to this Ethics Code and take steps to resolve the conflict in a responsible manner in keeping with basic principles of human rights.

## PREAMBLE

Psychologists are committed to increasing scientific and professional knowledge of behavior and people's understanding of themselves and others and to the use of such knowledge to improve the condition of individuals, organizations, and society. Psychologists respect and protect civil and human rights and the central importance of freedom of inquiry and expression in research, teaching, and publication. They strive to help the public in developing informed judgments and choices concerning human behavior. In doing so, they perform many roles, such as researcher, educator, diagnostician, therapist, supervisor, consultant, administrator, social interventionist, and expert witness. This Ethics Code provides a common set of principles and standards upon which psychologists build their professional and scientific work.

This Ethics Code is intended to provide specific standards to cover most situations encountered by psychologists. It has as its goals the welfare and protection of the individuals and groups with whom psychologists work and the education of members, students, and the public regarding ethical standards of the discipline.

The development of a dynamic set of ethical standards for psychologists' work-related conduct requires a personal commitment and lifelong effort to act ethically; to encourage ethical behavior by students, supervisees, employees, and colleagues; and to consult with others concerning ethical problems.

## GENERAL PRINCIPLES

This section consists of General Principles. General Principles, as opposed to Ethical Standards, are aspirational in nature. Their intent is to guide and inspire psychologists toward the very highest ethical ideals of the profession. General Principles, in contrast to Ethical Standards, do not represent obligations and should not form the basis for imposing sanctions. Relying upon General Principles for either of these reasons distorts both their meaning and purpose.

## Principle A: Beneficence and Nonmaleficence

Psychologists strive to benefit those with whom they work and take care to do no harm. In their professional actions, psychologists seek to safeguard the welfare and rights of those with whom they interact professionally and other affected persons, and the welfare of animal subjects of research. When conflicts occur among psychologists' obligations or concerns, they attempt to resolve these conflicts in a responsible fashion that avoids or minimizes harm. Because psychologists' scientific and professional judgments and actions may affect the lives of others, they are alert to and guard against personal, financial, social, organizational, or political factors that might lead to misuse of their influence. Psychologists strive to be aware of the possible effect of their own physical and mental health on their ability to help those with whom they work.

## Principle B: Fidelity and Responsibility

Psychologists establish relationships of trust with those with whom they work. They are aware of their professional and scientific responsibilities to society and to the specific communities in which they work. Psychologists uphold professional standards of conduct, clarify their professional roles and obligations, accept appropriate responsibility for their behavior, and seek to manage conflicts of interest that could lead to exploitation or harm. Psychologists consult with, refer to, or cooperate with other professionals and institutions to the extent needed to serve the best interests of those with whom they work. They are concerned about the ethical compliance of their colleagues' scientific and professional conduct. Psychologists strive to contribute a portion of their professional time for little or no compensation or personal advantage.

## Principle C: Integrity

Psychologists seek to promote accuracy, honesty, and truthfulness in the science, teaching, and practice of psychology. In these activities psychologists do not steal, cheat, or engage in fraud, subterfuge, or intentional misrepresentation of fact. Psychologists strive to keep their promises and to avoid unwise or unclear commitments. In situations in which deception may be ethically justifiable to maximize benefits and minimize harm, psychologists have a serious obligation to consider the need for, the possible consequences of, and their responsibility to correct any resulting mistrust or other harmful effects that arise from the use of such techniques.

## Principle D: Justice

Psychologists recognize that fairness and justice entitle all persons to access to and benefit from the contributions of psychology and to equal quality in the processes, procedures, and services being conducted by psychologists. Psychologists exercise reasonable judgment and take precautions to ensure that their potential biases, the boundaries of

43

their competence, and the limitations of their expertise do not lead to or condone unjust practices.

## Principle E: Respect for People's Rights and Dignity

Psychologists respect the dignity and worth of all people, and the rights of individuals to privacy, confidentiality, and self-determination. Psychologists are aware that special safeguards may be necessary to protect the rights and welfare of persons or communities whose vulnerabilities impair autonomous decision making. Psychologists are aware of and respect cultural, individual, and role differences, including those based on age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status, and consider these factors when working with members of such groups. Psychologists try to eliminate the effect on their work of biases based on those factors, and they do not knowingly participate in or condone activities of others based upon such prejudices.

## ETHICAL STANDARDS

### 1. Resolving Ethical Issues

#### 1.01 Misuse of Psychologists' Work

If psychologists learn of misuse or misrepresentation of their work, they take reasonable steps to correct or minimize the misuse or misrepresentation.

#### 1.02 Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority

If psychologists' ethical responsibilities conflict with law, regulations, or other governing legal authority, psychologists clarify the nature of the conflict, make known their commitment to the Ethics Code, and take reasonable steps to resolve the conflict consistent with the General Principles and Ethical Standards of the Ethics Code. Under no circumstances may this standard be used to justify or defend violating human rights.

#### 1.03 Conflicts Between Ethics and Organizational Demands

If the demands of an organization with which psychologists are affiliated or for whom they are working are in conflict with this Ethics Code, psychologists clarify the nature of the conflict, make known their commitment to the Ethics Code, and take reasonable steps to resolve the conflict consistent with the General Principles and Ethical Standards of the Ethics Code. Under no circumstances may this standard be used to justify or defend violating human rights.

#### 1.04 Informal Resolution of Ethical Violations

When psychologists believe that there may have been an ethical violation by another psychologist, they attempt to resolve the issue by bringing it to the attention of that individual, if an informal resolution appears appropriate and the intervention does not violate any confidentiality rights that may be involved. (See also Standards 1.02, Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority, and 1.03, Conflicts Between Ethics and Organizational Demands.)

#### 1.05 Reporting Ethical Violations

If an apparent ethical violation has substantially harmed or is likely to substantially harm a person or organization and is not appropriate for informal resolution under Standard 1.04, Informal Resolution of Ethical Violations, or is not resolved properly in that fashion, psychologists take further action appropriate to the situation. Such action might include referral to state or national committees on professional ethics, to state licensing boards, or to the appropriate institutional authorities. This standard does not apply when an intervention would violate confidentiality rights or when psychologists have been retained to review the work of another psychologist whose professional conduct is in question. (See also Standard 1.02, Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority.)

#### 1.06 Cooperating With Ethics Committees

Psychologists cooperate in ethics investigations, proceedings, and resulting requirements of the APA or any affiliated state psychological association to which they belong. In doing so, they address any confidentiality issues. Failure to cooperate is itself an ethics violation. However, making a request for deferment of adjudication of an ethics complaint pending the outcome of litigation does not alone constitute noncooperation.

#### 1.07 Improper Complaints

Psychologists do not file or encourage the filing of ethics complaints that are made with reckless disregard for or willful ignorance of facts that would disprove the allegation.

#### 1.08 Unfair Discrimination Against Complainants and Respondents

Psychologists do not deny persons employment, advancement, admissions to academic or other programs, tenure, or promotion, based solely upon their having made or their being the subject of an ethics complaint. This does not preclude taking action based upon the outcome of such proceedings or considering other appropriate information.

### 2. Competence

#### 2.01 Boundaries of Competence

(a) Psychologists provide services, teach, and conduct research with populations and in areas only within the boundaries of their competence, based on their education, training, supervised experience, consultation, study, or professional experience.

44

(b) Where scientific or professional knowledge in the discipline of psychology establishes that an understanding of factors associated with age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, or socioeconomic status is essential for effective implementation of their services or research, psychologists have or obtain the training, experience, consultation, or supervision necessary to ensure the competence of their services, or they make appropriate referrals, except as provided in Standard 2.02, Providing Services in Emergencies.

(c) Psychologists planning to provide services, teach, or conduct research involving populations, areas, techniques, or technologies new to them undertake relevant education, training, supervised experience, consultation, or study.

(d) When psychologists are asked to provide services to individuals for whom appropriate mental health services are not available and for which psychologists have not obtained the competence necessary, psychologists with closely related prior training or experience may provide such services in order to ensure that services are not denied if they make a reasonable effort to obtain the competence required by using relevant research, training, consultation, or study.

(e) In those emerging areas in which generally recognized standards for preparatory training do not yet exist, psychologists nevertheless take reasonable steps to ensure the competence of their work and to protect clients/patients, students, supervisees, research participants, organizational clients, and others from harm.

(f) When assuming forensic roles, psychologists are or become reasonably familiar with the judicial or administrative rules governing their roles.

## 2.02   Providing Services in Emergencies

In emergencies, when psychologists provide services to individuals for whom other mental health services are not available and for which psychologists have not obtained the necessary training, psychologists may provide such services in order to ensure that services are not denied. The services are discontinued as soon as the emergency has ended or appropriate services are available.

## 2.03   Maintaining Competence

Psychologists undertake ongoing efforts to develop and maintain their competence.

## 2.04   Bases for Scientific and Professional Judgments

Psychologists' work is based upon established scientific and professional knowledge of the discipline. (See also Standards 2.01e, Boundaries of Competence, and 10.01b, Informed Consent to Therapy.)

## 2.05   Delegation of Work to Others

Psychologists who delegate work to employees, supervisees, or research or teaching assistants or who use the services of others, such as interpreters, take reasonable steps to (1) avoid delegating such work to persons who have a multiple relationship with those being served that would likely lead to exploitation or loss of objectivity; (2) authorize only those responsibilities that such persons can be expected to perform competently on the basis of their education, training, or experience, either independently or with the level of supervision being provided; and (3) see that such persons perform these services competently. (See also Standards 2.02, Providing Services in Emergencies; 3.05, Multiple Relationships; 4.01, Maintaining Confidentiality; 9.01, Bases for Assessments; 9.02, Use of Assessments; 9.03, Informed Consent in Assessments; and 9.07, Assessment by Unqualified Persons.)

## 2.06   Personal Problems and Conflicts

(a) Psychologists refrain from initiating an activity when they know or should know that there is a substantial likelihood that their personal problems will prevent them from performing their work-related activities in a competent manner.

(b) When psychologists become aware of personal problems that may interfere with their performing work-related duties adequately, they take appropriate measures, such as obtaining professional consultation or assistance, and determine whether they should limit, suspend, or terminate their work-related duties. (See also Standard 10.10, Terminating Therapy.)

## 3.   Human Relations

## 3.01   Unfair Discrimination

In their work-related activities, psychologists do not engage in unfair discrimination based on age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, socioeconomic status, or any basis proscribed by law.

## 3.02   Sexual Harassment

Psychologists do not engage in sexual harassment. Sexual harassment is sexual solicitation, physical advances, or verbal or nonverbal conduct that is sexual in nature, that occurs in connection with the psychologist's activities or roles as a psychologist, and that either (1) is unwelcome, is offensive, or creates a hostile workplace or educational environment, and the psychologist knows or is told this or (2) is sufficiently severe or intense to be abusive to a reasonable person in the context. Sexual harassment can consist of a single intense or severe act or of multiple persistent or pervasive acts. (See also Standard 1.08, Unfair Discrimination Against Complainants and Respondents.)

## 3.03   Other Harassment

Psychologists do not knowingly engage in behavior that is harassing or demeaning to persons with whom they interact in their work based on factors such as those persons' age, gender, gender identity, race, ethnicity, culture, national

origin, religion, sexual orientation, disability, language, or socioeconomic status.

### 3.04   Avoiding Harm

Psychologists take reasonable steps to avoid harming their clients/patients, students, supervisees, research participants, organizational clients, and others with whom they work, and to minimize harm where it is foreseeable and unavoidable.

### 3.05   Multiple Relationships

(a) A multiple relationship occurs when a psychologist is in a professional role with a person and (1) at the same time is in another role with the same person, (2) at the same time is in a relationship with a person closely associated with or related to the person with whom the psychologist has the professional relationship, or (3) promises to enter into another relationship in the future with the person or a person closely associated with or related to the person.

A psychologist refrains from entering into a multiple relationship if the multiple relationship could reasonably be expected to impair the psychologist's objectivity, competence, or effectiveness in performing his or her functions as a psychologist, or otherwise risks exploitation or harm to the person with whom the professional relationship exists.

Multiple relationships that would not reasonably be expected to cause impairment or risk exploitation or harm are not unethical.

(b) If a psychologist finds that, due to unforeseen factors, a potentially harmful multiple relationship has arisen, the psychologist takes reasonable steps to resolve it with due regard for the best interests of the affected person and maximal compliance with the Ethics Code.

(c) When psychologists are required by law, institutional policy, or extraordinary circumstances to serve in more than one role in judicial or administrative proceedings, at the outset they clarify role expectations and the extent of confidentiality and thereafter as changes occur. (See also Standards 3.04, Avoiding Harm, and 3.07, Third-Party Requests for Services.)

### 3.06   Conflict of Interest

Psychologists refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships could reasonably be expected to (1) impair their objectivity, competence, or effectiveness in performing their functions as psychologists or (2) expose the person or organization with whom the professional relationship exists to harm or exploitation.

### 3.07   Third-Party Requests for Services

When psychologists agree to provide services to a person or entity at the request of a third party, psychologists attempt to clarify at the outset of the service the nature of the relationship with all individuals or organizations involved. This clarification includes the role of the psychologist (e.g.,

therapist, consultant, diagnostician, or expert witness), an identification of who is the client, the probable uses of the services provided or the information obtained, and the fact that there may be limits to confidentiality. (See also Standards 3.05, Multiple Relationships, and 4.02, Discussing the Limits of Confidentiality.)

### 3.08   Exploitative Relationships

Psychologists do not exploit persons over whom they have supervisory, evaluative, or other authority such as clients/patients, students, supervisees, research participants, and employees. (See also Standards 3.05, Multiple Relationships; 6.04, Fees and Financial Arrangements; 6.05, Barter With Clients/Patients; 7.07, Sexual Relationships With Students and Supervisees; 10.05, Sexual Intimacies With Current Therapy Clients/Patients; 10.06, Sexual Intimacies With Relatives or Significant Others of Current Therapy Clients/Patients; 10.07, Therapy With Former Sexual Partners; and 10.08, Sexual Intimacies With Former Therapy Clients/Patients.)

### 3.09   Cooperation With Other Professionals

When indicated and professionally appropriate, psychologists cooperate with other professionals in order to serve their clients/patients effectively and appropriately. (See also Standard 4.05, Disclosures.)

### 3.10   Informed Consent

(a) When psychologists conduct research or provide assessment, therapy, counseling, or consulting services in person or via electronic transmission or other forms of communication, they obtain the informed consent of the individual or individuals using language that is reasonably understandable to that person or persons except when conducting such activities without consent is mandated by law or governmental regulation or as otherwise provided in this Ethics Code. (See also Standards 8.02, Informed Consent to Research; 9.03, Informed Consent in Assessments; and 10.01, Informed Consent to Therapy.)

(b) For persons who are legally incapable of giving informed consent, psychologists nevertheless (1) provide an appropriate explanation, (2) seek the individual's assent, (3) consider such persons' preferences and best interests, and (4) obtain appropriate permission from a legally authorized person, if such substitute consent is permitted or required by law. When consent by a legally authorized person is not permitted or required by law, psychologists take reasonable steps to protect the individual's rights and welfare.

(c) When psychological services are court ordered or otherwise mandated, psychologists inform the individual of the nature of the anticipated services, including whether the services are court ordered or mandated and any limits of confidentiality, before proceeding.

(d) Psychologists appropriately document written or oral consent, permission, and assent. (See also Standards 8.02,

46

Informed Consent to Research; 9.03, Informed Consent in Assessments; and 10.01, Informed Consent to Therapy.)

### 3.11 Psychological Services Delivered to or Through Organizations

(a) Psychologists delivering services to or through organizations provide information beforehand to clients and when appropriate those directly affected by the services about (1) the nature and objectives of the services, (2) the intended recipients, (3) which of the individuals are clients, (4) the relationship the psychologist will have with each person and the organization, (5) the probable uses of services provided and information obtained, (6) who will have access to the information, and (7) limits of confidentiality. As soon as feasible, they provide information about the results and conclusions of such services to appropriate persons.

(b) If psychologists will be precluded by law or by organizational roles from providing such information to particular individuals or groups, they so inform those individuals or groups at the outset of the service.

### 3.12 Interruption of Psychological Services

Unless otherwise covered by contract, psychologists make reasonable efforts to plan for facilitating services in the event that psychological services are interrupted by factors such as the psychologist's illness, death, unavailability, relocation, or retirement or by the client's/patient's relocation or financial limitations. (See also Standard 6.02c, Maintenance, Dissemination, and Disposal of Confidential Records of Professional and Scientific Work.)

### 4. Privacy and Confidentiality

### 4.01 Maintaining Confidentiality

Psychologists have a primary obligation and take reasonable precautions to protect confidential information obtained through or stored in any medium, recognizing that the extent and limits of confidentiality may be regulated by law or established by institutional rules or professional or scientific relationship. (See also Standard 2.05, Delegation of Work to Others.)

### 4.02 Discussing the Limits of Confidentiality

(a) Psychologists discuss with persons (including, to the extent feasible, persons who are legally incapable of giving informed consent and their legal representatives) and organizations with whom they establish a scientific or professional relationship (1) the relevant limits of confidentiality and (2) the foreseeable uses of the information generated through their psychological activities. (See also Standard 3.10, Informed Consent.)

(b) Unless it is not feasible or is contraindicated, the discussion of confidentiality occurs at the outset of the relationship and thereafter as new circumstances may warrant.

(c) Psychologists who offer services, products, or information via electronic transmission inform clients/patients of the risks to privacy and limits of confidentiality.

### 4.03 Recording

Before recording the voices or images of individuals to whom they provide services, psychologists obtain permission from all such persons or their legal representatives. (See also Standards 8.03, Informed Consent for Recording Voices and Images in Research; 8.05, Dispensing With Informed Consent for Research; and 8.07, Deception in Research.)

### 4.04 Minimizing Intrusions on Privacy

(a) Psychologists include in written and oral reports and consultations, only information germane to the purpose for which the communication is made.

(b) Psychologists discuss confidential information obtained in their work only for appropriate scientific or professional purposes and only with persons clearly concerned with such matters.

### 4.05 Disclosures

(a) Psychologists may disclose confidential information with the appropriate consent of the organizational client, the individual client/patient, or another legally authorized person on behalf of the client/patient unless prohibited by law.

(b) Psychologists disclose confidential information without the consent of the individual only as mandated by law, or where permitted by law for a valid purpose such as to (1) provide needed professional services; (2) obtain appropriate professional consultations; (3) protect the client/patient, psychologist, or others from harm; or (4) obtain payment for services from a client/patient, in which instance disclosure is limited to the minimum that is necessary to achieve the purpose. (See also Standard 6.04e, Fees and Financial Arrangements.)

### 4.06 Consultations

When consulting with colleagues, (1) psychologists do not disclose confidential information that reasonably could lead to the identification of a client/patient, research participant, or other person or organization with whom they have a confidential relationship unless they have obtained the prior consent of the person or organization or the disclosure cannot be avoided, and (2) they disclose information only to the extent necessary to achieve the purposes of the consultation. (See also Standard 4.01, Maintaining Confidentiality.)

### 4.07 Use of Confidential Information for Didactic or Other Purposes

Psychologists do not disclose in their writings, lectures, or other public media, confidential, personally identifiable information concerning their clients/patients, students, research participants, organizational clients, or other recipi-

ents of their services that they obtained during the course of their work, unless (1) they take reasonable steps to disguise the person or organization, (2) the person or organization has consented in writing, or (3) there is legal authorization for doing so.

## 5.   Advertising and Other Public Statements

### 5.01   Avoidance of False or Deceptive Statements

(a) Public statements include but are not limited to paid or unpaid advertising, product endorsements, grant applications, licensing applications, other credentialing applications, brochures, printed matter, directory listings, personal resumes or curricula vitae, or comments for use in media such as print or electronic transmission, statements in legal proceedings, lectures and public oral presentations, and published materials. Psychologists do not knowingly make public statements that are false, deceptive, or fraudulent concerning their research, practice, or other work activities or those of persons or organizations with which they are affiliated.

(b) Psychologists do not make false, deceptive, or fraudulent statements concerning (1) their training, experience, or competence; (2) their academic degrees; (3) their credentials; (4) their institutional or association affiliations; (5) their services; (6) the scientific or clinical basis for, or results or degree of success of, their services; (7) their fees; or (8) their publications or research findings.

(c) Psychologists claim degrees as credentials for their health services only if those degrees (1) were earned from a regionally accredited educational institution or (2) were the basis for psychology licensure by the state in which they practice.

### 5.02   Statements by Others

(a) Psychologists who engage others to create or place public statements that promote their professional practice, products, or activities retain professional responsibility for such statements.

(b) Psychologists do not compensate employees of press, radio, television, or other communication media in return for publicity in a news item. (See also Standard 1.01, Misuse of Psychologists' Work.)

(c) A paid advertisement relating to psychologists' activities must be identified or clearly recognizable as such.

### 5.03   Descriptions of Workshops and Non-Degree-Granting Educational Programs

To the degree to which they exercise control, psychologists responsible for announcements, catalogs, brochures, or advertisements describing workshops, seminars, or other non-degree-granting educational programs ensure that they accurately describe the audience for which the program is intended, the educational objectives, the presenters, and the fees involved.

### 5.04   Media Presentations

When psychologists provide public advice or comment via print, Internet, or other electronic transmission, they take precautions to ensure that statements (1) are based on their professional knowledge, training, or experience in accord with appropriate psychological literature and practice; (2) are otherwise consistent with this Ethics Code; and (3) do not indicate that a professional relationship has been established with the recipient. (See also Standard 2.04, Bases for Scientific and Professional Judgments.)

### 5.05   Testimonials

Psychologists do not solicit testimonials from current therapy clients/patients or other persons who because of their particular circumstances are vulnerable to undue influence.

### 5.06   In-Person Solicitation

Psychologists do not engage, directly or through agents, in uninvited in-person solicitation of business from actual or potential therapy clients/patients or other persons who because of their particular circumstances are vulnerable to undue influence. However, this prohibition does not preclude (1) attempting to implement appropriate collateral contacts for the purpose of benefiting an already engaged therapy client/patient or (2) providing disaster or community outreach services.

## 6.   Record Keeping and Fees

### 6.01   Documentation of Professional and Scientific Work and Maintenance of Records

Psychologists create, and to the extent the records are under their control, maintain, disseminate, store, retain, and dispose of records and data relating to their professional and scientific work in order to (1) facilitate provision of services later by them or by other professionals, (2) allow for replication of research design and analyses, (3) meet institutional requirements, (4) ensure accuracy of billing and payments, and (5) ensure compliance with law. (See also Standard 4.01, Maintaining Confidentiality.)

### 6.02   Maintenance, Dissemination, and Disposal of Confidential Records of Professional and Scientific Work

(a) Psychologists maintain confidentiality in creating, storing, accessing, transferring, and disposing of records under their control, whether these are written, automated, or in any other medium. (See also Standards 4.01, Maintaining Confidentiality, and 6.01, Documentation of Professional and Scientific Work and Maintenance of Records.)

(b) If confidential information concerning recipients of psychological services is entered into databases or systems of records available to persons whose access has not been consented to by the recipient, psychologists use coding or other techniques to avoid the inclusion of personal identifiers.

(c) Psychologists make plans in advance to facilitate the appropriate transfer and to protect the confidentiality of records and data in the event of psychologists' withdrawal from positions or practice. (See also Standards 3.12, Interruption of Psychological Services, and 10.09, Interruption of Therapy.)

### 6.03   Withholding Records for Nonpayment

Psychologists may not withhold records under their control that are requested and needed for a client's/patient's emergency treatment solely because payment has not been received.

### 6.04   Fees and Financial Arrangements

(a) As early as is feasible in a professional or scientific relationship, psychologists and recipients of psychological services reach an agreement specifying compensation and billing arrangements.

(b) Psychologists' fee practices are consistent with law.

(c) Psychologists do not misrepresent their fees.

(d) If limitations to services can be anticipated because of limitations in financing, this is discussed with the recipient of services as early as is feasible. (See also Standards 10.09, Interruption of Therapy, and 10.10, Terminating Therapy.)

(e) If the recipient of services does not pay for services as agreed, and if psychologists intend to use collection agencies or legal measures to collect the fees, psychologists first inform the person that such measures will be taken and provide that person an opportunity to make prompt payment. (See also Standards 4.05, Disclosures; 6.03, Withholding Records for Nonpayment; and 10.01, Informed Consent to Therapy.)

### 6.05   Barter With Clients/Patients

Barter is the acceptance of goods, services, or other nonmonetary remuneration from clients/patients in return for psychological services. Psychologists may barter only if (1) it is not clinically contraindicated, and (2) the resulting arrangement is not exploitative. (See also Standards 3.05, Multiple Relationships, and 6.04, Fees and Financial Arrangements.)

### 6.06   Accuracy in Reports to Payors and Funding Sources

In their reports to payors for services or sources of research funding, psychologists take reasonable steps to ensure the accurate reporting of the nature of the service provided or research conducted, the fees, charges, or payments, and where applicable, the identity of the provider, the findings, and the diagnosis. (See also Standards 4.01, Maintaining Confidentiality; 4.04, Minimizing Intrusions on Privacy; and 4.05, Disclosures.)

### 6.07   Referrals and Fees

When psychologists pay, receive payment from, or divide fees with another professional, other than in an employer–employee relationship, the payment to each is based on the services provided (clinical, consultative, administrative, or other) and is not based on the referral itself. (See also Standard 3.09, Cooperation With Other Professionals.)

## 7.   Education and Training

### 7.01   Design of Education and Training Programs

Psychologists responsible for education and training programs take reasonable steps to ensure that the programs are designed to provide the appropriate knowledge and proper experiences, and to meet the requirements for licensure, certification, or other goals for which claims are made by the program. (See also Standard 5.03, Descriptions of Workshops and Non-Degree-Granting Educational Programs.)

### 7.02   Descriptions of Education and Training Programs

Psychologists responsible for education and training programs take reasonable steps to ensure that there is a current and accurate description of the program content (including participation in required course- or program-related counseling, psychotherapy, experiential groups, consulting projects, or community service), training goals and objectives, stipends and benefits, and requirements that must be met for satisfactory completion of the program. This information must be made readily available to all interested parties.

### 7.03   Accuracy in Teaching

(a) Psychologists take reasonable steps to ensure that course syllabi are accurate regarding the subject matter to be covered, bases for evaluating progress, and the nature of course experiences. This standard does not preclude an instructor from modifying course content or requirements when the instructor considers it pedagogically necessary or desirable, so long as students are made aware of these modifications in a manner that enables them to fulfill course requirements. (See also Standard 5.01, Avoidance of False or Deceptive Statements.)

(b) When engaged in teaching or training, psychologists present psychological information accurately. (See also Standard 2.03, Maintaining Competence.)

### 7.04 Student Disclosure of Personal Information

Psychologists do not require students or supervisees to disclose personal information in course- or program-related activities, either orally or in writing, regarding sexual history, history of abuse and neglect, psychological treatment, and relationships with parents, peers, and spouses or significant others except if (1) the program or training facility has clearly identified this requirement in its admissions and program materials or (2) the information is necessary to evaluate or obtain assistance for students whose personal problems could reasonably be judged to be preventing them from performing their training- or professionally related activities in a competent manner or posing a threat to the students or others.

49

## 7.05 Mandatory Individual or Group Therapy

(a) When individual or group therapy is a program or course requirement, psychologists responsible for that program allow students in undergraduate and graduate programs the option of selecting such therapy from practitioners unaffiliated with the program. (See also Standard 7.02, Descriptions of Education and Training Programs.)

(b) Faculty who are or are likely to be responsible for evaluating students' academic performance do not themselves provide that therapy. (See also Standard 3.05, Multiple Relationships.)

## 7.06 Assessing Student and Supervisee Performance

(a) In academic and supervisory relationships, psychologists establish a timely and specific process for providing feedback to students and supervisees. Information regarding the process is provided to the student at the beginning of supervision.

(b) Psychologists evaluate students and supervisees on the basis of their actual performance on relevant and established program requirements.

## 7.07 Sexual Relationships With Students and Supervisees

Psychologists do not engage in sexual relationships with students or supervisees who are in their department, agency, or training center or over whom psychologists have or are likely to have evaluative authority. (See also Standard 3.05, Multiple Relationships.)

## 8. Research and Publication

### 8.01 Institutional Approval

When institutional approval is required, psychologists provide accurate information about their research proposals and obtain approval prior to conducting the research. They conduct the research in accordance with the approved research protocol.

### 8.02 Informed Consent to Research

(a) When obtaining informed consent as required in Standard 3.10, Informed Consent, psychologists inform participants about (1) the purpose of the research, expected duration, and procedures; (2) their right to decline to participate and to withdraw from the research once participation has begun; (3) the foreseeable consequences of declining or withdrawing; (4) reasonably foreseeable factors that may be expected to influence their willingness to participate such as potential risks, discomfort, or adverse effects; (5) any prospective research benefits; (6) limits of confidentiality; (7) incentives for participation; and (8) whom to contact for questions about the research and research participants' rights. They provide opportunity for the prospective participants to ask questions and receive answers. (See also Standards 8.03, Informed Consent for Recording Voices and Images in Research; 8.05,

Dispensing With Informed Consent for Research; and 8.07, Deception in Research.)

(b) Psychologists conducting intervention research involving the use of experimental treatments clarify to participants at the outset of the research (1) the experimental nature of the treatment; (2) the services that will or will not be available to the control group(s) if appropriate; (3) the means by which assignment to treatment and control groups will be made; (4) available treatment alternatives if an individual does not wish to participate in the research or wishes to withdraw once a study has begun; and (5) compensation for or monetary costs of participating including, if appropriate, whether reimbursement from the participant or a third-party payor will be sought. (See also Standard 8.02a, Informed Consent to Research.)

## 8.03 Informed Consent for Recording Voices and Images in Research

Psychologists obtain informed consent from research participants prior to recording their voices or images for data collection unless (1) the research consists solely of naturalistic observations in public places, and it is not anticipated that the recording will be used in a manner that could cause personal identification or harm, or (2) the research design includes deception, and consent for the use of the recording is obtained during debriefing. (See also Standard 8.07, Deception in Research.)

## 8.04 Client/Patient, Student, and Subordinate Research Participants

(a) When psychologists conduct research with clients/patients, students, or subordinates as participants, psychologists take steps to protect the prospective participants from adverse consequences of declining or withdrawing from participation.

(b) When research participation is a course requirement or an opportunity for extra credit, the prospective participant is given the choice of equitable alternative activities.

## 8.05 Dispensing With Informed Consent for Research

Psychologists may dispense with informed consent only (1) where research would not reasonably be assumed to create distress or harm and involves (a) the study of normal educational practices, curricula, or classroom management methods conducted in educational settings; (b) only anonymous questionnaires, naturalistic observations, or archival research for which disclosure of responses would not place participants at risk of criminal or civil liability or damage their financial standing, employability, or reputation, and confidentiality is protected; or (c) the study of factors related to job or organization effectiveness conducted in organizational settings for which there is no risk to participants' employability, and confidentiality is protected or (2) where otherwise permitted by law or federal or institutional regulations.

50

### 8.06 Offering Inducements for Research Participation

(a) Psychologists make reasonable efforts to avoid offering excessive or inappropriate financial or other inducements for research participation when such inducements are likely to coerce participation.

(b) When offering professional services as an inducement for research participation, psychologists clarify the nature of the services, as well as the risks, obligations, and limitations. (See also Standard 6.05, Barter With Clients/Patients.)

### 8.07 Deception in Research

(a) Psychologists do not conduct a study involving deception unless they have determined that the use of deceptive techniques is justified by the study's significant prospective scientific, educational, or applied value and that effective nondeceptive alternative procedures are not feasible.

(b) Psychologists do not deceive prospective participants about research that is reasonably expected to cause physical pain or severe emotional distress.

(c) Psychologists explain any deception that is an integral feature of the design and conduct of an experiment to participants as early as is feasible, preferably at the conclusion of their participation, but no later than at the conclusion of the data collection, and permit participants to withdraw their data. (See also Standard 8.08, Debriefing.)

### 8.08 Debriefing

(a) Psychologists provide a prompt opportunity for participants to obtain appropriate information about the nature, results, and conclusions of the research, and they take reasonable steps to correct any misconceptions that participants may have of which the psychologists are aware.

(b) If scientific or humane values justify delaying or withholding this information, psychologists take reasonable measures to reduce the risk of harm.

(c) When psychologists become aware that research procedures have harmed a participant, they take reasonable steps to minimize the harm.

### 8.09 Humane Care and Use of Animals in Research

(a) Psychologists acquire, care for, use, and dispose of animals in compliance with current federal, state, and local laws and regulations, and with professional standards.

(b) Psychologists trained in research methods and experienced in the care of laboratory animals supervise all procedures involving animals and are responsible for ensuring appropriate consideration of their comfort, health, and humane treatment.

(c) Psychologists ensure that all individuals under their supervision who are using animals have received instruction in research methods and in the care, maintenance, and handling of the species being used, to the extent appropriate

to their role. (See also Standard 2.05, Delegation of Work to Others.)

(d) Psychologists make reasonable efforts to minimize the discomfort, infection, illness, and pain of animal subjects.

(e) Psychologists use a procedure subjecting animals to pain, stress, or privation only when an alternative procedure is unavailable and the goal is justified by its prospective scientific, educational, or applied value.

(f) Psychologists perform surgical procedures under appropriate anesthesia and follow techniques to avoid infection and minimize pain during and after surgery.

(g) When it is appropriate that an animal's life be terminated, psychologists proceed rapidly, with an effort to minimize pain and in accordance with accepted procedures.

### 8.10 Reporting Research Results

(a) Psychologists do not fabricate data. (See also Standard 5.01a, Avoidance of False or Deceptive Statements.)

(b) If psychologists discover significant errors in their published data, they take reasonable steps to correct such errors in a correction, retraction, erratum, or other appropriate publication means.

### 8.11 Plagiarism

Psychologists do not present portions of another's work or data as their own, even if the other work or data source is cited occasionally.

### 8.12 Publication Credit

(a) Psychologists take responsibility and credit, including authorship credit, only for work they have actually performed or to which they have substantially contributed. (See also Standard 8.12b, Publication Credit.)

(b) Principal authorship and other publication credits accurately reflect the relative scientific or professional contributions of the individuals involved, regardless of their relative status. Mere possession of an institutional position, such as department chair, does not justify authorship credit. Minor contributions to the research or to the writing for publications are acknowledged appropriately, such as in footnotes or in an introductory statement.

(c) Except under exceptional circumstances, a student is listed as principal author on any multiple-authored article that is substantially based on the student's doctoral dissertation. Faculty advisors discuss publication credit with students as early as feasible and throughout the research and publication process as appropriate. (See also Standard 8.12b, Publication Credit.)

### 8.13 Duplicate Publication of Data

Psychologists do not publish, as original data, data that have been previously published. This does not preclude republishing data when they are accompanied by proper acknowledgment.

---

51

### 8.14 Sharing Research Data for Verification

(a) After research results are published, psychologists do not withhold the data on which their conclusions are based from other competent professionals who seek to verify the substantive claims through reanalysis and who intend to use such data only for that purpose, provided that the confidentiality of the participants can be protected and unless legal rights concerning proprietary data preclude their release. This does not preclude psychologists from requiring that such individuals or groups be responsible for costs associated with the provision of such information.

(b) Psychologists who request data from other psychologists to verify the substantive claims through reanalysis may use shared data only for the declared purpose. Requesting psychologists obtain prior written agreement for all other uses of the data.

### 8.15   Reviewers

Psychologists who review material submitted for presentation, publication, grant, or research proposal review respect the confidentiality of and the proprietary rights in such information of those who submitted it.

### 9.    Assessment

### 9.01   Bases for Assessments

(a) Psychologists base the opinions contained in their recommendations, reports, and diagnostic or evaluative statements, including forensic testimony, on information and techniques sufficient to substantiate their findings. (See also Standard 2.04, Bases for Scientific and Professional Judgments.)

(b) Except as noted in 9.01c, psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the individuals adequate to support their statements or conclusions. When, despite reasonable efforts, such an examination is not practical, psychologists document the efforts they made and the result of those efforts, clarify the probable impact of their limited information on the reliability and validity of their opinions, and appropriately limit the nature and extent of their conclusions or recommendations. (See also Standards 2.01, Boundaries of Competence, and 9.06, Interpreting Assessment Results.)

(c) When psychologists conduct a record review or provide consultation or supervision and an individual examination is not warranted or necessary for the opinion, psychologists explain this and the sources of information on which they based their conclusions and recommendations.

### 9.02   Use of Assessments

(a) Psychologists administer, adapt, score, interpret, or use assessment techniques, interviews, tests, or instruments in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of the techniques.

(b) Psychologists use assessment instruments whose validity and reliability have been established for use with members of the population tested. When such validity or reliability has not been established, psychologists describe the strengths and limitations of test results and interpretation.

(c) Psychologists use assessment methods that are appropriate to an individual's language preference and competence, unless the use of an alternative language is relevant to the assessment issues.

### 9.03 Informed Consent in Assessments

(a) Psychologists obtain informed consent for assessments, evaluations, or diagnostic services, as described in Standard 3.10, Informed Consent, except when (1) testing is mandated by law or governmental regulations; (2) informed consent is implied because testing is conducted as a routine educational, institutional, or organizational activity (e.g., when participants voluntarily agree to assessment when applying for a job); or (3) one purpose of the testing is to evaluate decisional capacity. Informed consent includes an explanation of the nature and purpose of the assessment, fees, involvement of third parties, and limits of confidentiality and sufficient opportunity for the client/patient to ask questions and receive answers.

(b) Psychologists inform persons with questionable capacity to consent or for whom testing is mandated by law or governmental regulations about the nature and purpose of the proposed assessment services, using language that is reasonably understandable to the person being assessed.

(c) Psychologists using the services of an interpreter obtain informed consent from the client/patient to use that interpreter, ensure that confidentiality of test results and test security are maintained, and include in their recommendations, reports, and diagnostic or evaluative statements, including forensic testimony, discussion of any limitations on the data obtained. (See also Standards 2.05, Delegation of Work to Others; 4.01, Maintaining Confidentiality; 9.01, Bases for Assessments; 9.06, Interpreting Assessment Results; and 9.07, Assessment by Unqualified Persons.)

### 9.04   Release of Test Data

(a) The term *test data* refers to raw and scaled scores, client/patient responses to test questions or stimuli, and psychologists' notes and recordings concerning client/patient statements and behavior during an examination. Those portions of test materials that include client/patient responses are included in the definition of *test data*. Pursuant to a client/patient release, psychologists provide test data to the client/patient or other persons identified in the release. Psychologists may refrain from releasing test data to protect a client/patient or others from substantial harm or misuse or misrepresentation of the data or the test, recognizing that in many instances release of confidential information under these circumstances is regulated by law. (See also Standard 9.11, Maintaining Test Security.)

(b) In the absence of a client/patient release, psychologists provide test data only as required by law or court order.

## 9.05   Test Construction

Psychologists who develop tests and other assessment techniques use appropriate psychometric procedures and current scientific or professional knowledge for test design, standardization, validation, reduction or elimination of bias, and recommendations for use.

## 9.06   Interpreting Assessment Results

When interpreting assessment results, including automated interpretations, psychologists take into account the purpose of the assessment as well as the various test factors, test-taking abilities, and other characteristics of the person being assessed, such as situational, personal, linguistic, and cultural differences, that might affect psychologists' judgments or reduce the accuracy of their interpretations. They indicate any significant limitations of their interpretations. (See also Standards 2.01b and c, Boundaries of Competence, and 3.01, Unfair Discrimination.)

## 9.07   Assessment by Unqualified Persons

Psychologists do not promote the use of psychological assessment techniques by unqualified persons, except when such use is conducted for training purposes with appropriate supervision. (See also Standard 2.05, Delegation of Work to Others.)

## 9.08   Obsolete Tests and Outdated Test Results

(a) Psychologists do not base their assessment or intervention decisions or recommendations on data or test results that are outdated for the current purpose.

(b) Psychologists do not base such decisions or recommendations on tests and measures that are obsolete and not useful for the current purpose.

## 9.09   Test Scoring and Interpretation Services

(a) Psychologists who offer assessment or scoring services to other professionals accurately describe the purpose, norms, validity, reliability, and applications of the procedures and any special qualifications applicable to their use.

(b) Psychologists select scoring and interpretation services (including automated services) on the basis of evidence of the validity of the program and procedures as well as on other appropriate considerations. (See also Standard 2.01b and c, Boundaries of Competence.)

(c) Psychologists retain responsibility for the appropriate application, interpretation, and use of assessment instruments, whether they score and interpret such tests themselves or use automated or other services.

## 9.10   Explaining Assessment Results

Regardless of whether the scoring and interpretation are done by psychologists, by employees or assistants, or by automated or other outside services, psychologists take reasonable steps to ensure that explanations of results are given to the individual or designated representative unless the nature of the relationship precludes provision of an explanation of results (such as in some organizational consulting, preemployment or security screenings, and forensic evaluations), and this fact has been clearly explained to the person being assessed in advance.

## 9.11   Maintaining Test Security

The term *test materials* refers to manuals, instruments, protocols, and test questions or stimuli and does not include *test data* as defined in Standard 9.04, Release of Test Data. Psychologists make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with law and contractual obligations, and in a manner that permits adherence to this Ethics Code.

## 10.   Therapy

## 10.01 Informed Consent to Therapy

(a) When obtaining informed consent to therapy as required in Standard 3.10, Informed Consent, psychologists inform clients/patients as early as is feasible in the therapeutic relationship about the nature and anticipated course of therapy, fees, involvement of third parties, and limits of confidentiality and provide sufficient opportunity for the client/patient to ask questions and receive answers. (See also Standards 4.02, Discussing the Limits of Confidentiality, and 6.04, Fees and Financial Arrangements.)

(b) When obtaining informed consent for treatment for which generally recognized techniques and procedures have not been established, psychologists inform their clients/patients of the developing nature of the treatment, the potential risks involved, alternative treatments that may be available, and the voluntary nature of their participation. (See also Standards 2.01e, Boundaries of Competence, and 3.10, Informed Consent.)

(c) When the therapist is a trainee and the legal responsibility for the treatment provided resides with the supervisor, the client/patient, as part of the informed consent procedure, is informed that the therapist is in training and is being supervised and is given the name of the supervisor.

## 10.02 Therapy Involving Couples or Families

(a) When psychologists agree to provide services to several persons who have a relationship (such as spouses, significant others, or parents and children), they take reasonable steps to clarify at the outset (1) which of the individuals are clients/patients and (2) the relationship the psychologist will have with each person. This clarification includes the psychologist's role and the probable uses of the services provided or the information obtained. (See also Standard 4.02, Discussing the Limits of Confidentiality.)

(b) If it becomes apparent that psychologists may be called on to perform potentially conflicting roles (such

53

as family therapist and then witness for one party in divorce proceedings), psychologists take reasonable steps to clarify and modify, or withdraw from, roles appropriately. (See also Standard 3.05c, Multiple Relationships.)

### 10.03 Group Therapy

When psychologists provide services to several persons in a group setting, they describe at the outset the roles and responsibilities of all parties and the limits of confidentiality.

### 10.04 Providing Therapy to Those Served by Others

In deciding whether to offer or provide services to those already receiving mental health services elsewhere, psychologists carefully consider the treatment issues and the potential client's/patient's welfare. Psychologists discuss these issues with the client/patient or another legally authorized person on behalf of the client/patient in order to minimize the risk of confusion and conflict, consult with the other service providers when appropriate, and proceed with caution and sensitivity to the therapeutic issues.

### 10.05 Sexual Intimacies With Current Therapy Clients/Patients

Psychologists do not engage in sexual intimacies with current therapy clients/patients.

### 10.06 Sexual Intimacies With Relatives or Significant Others of Current Therapy Clients/Patients

Psychologists do not engage in sexual intimacies with individuals they know to be close relatives, guardians, or significant others of current clients/patients. Psychologists do not terminate therapy to circumvent this standard.

### 10.07 Therapy With Former Sexual Partners

Psychologists do not accept as therapy clients/patients persons with whom they have engaged in sexual intimacies.

### 10.08 Sexual Intimacies With Former Therapy Clients/Patients

(a) Psychologists do not engage in sexual intimacies with former clients/patients for at least two years after cessation or termination of therapy.

(b) Psychologists do not engage in sexual intimacies with former clients/patients even after a two-year interval except in the most unusual circumstances. Psychologists who engage in such activity after the two years following cessation or termination of therapy and of having no sexual contact with the former client/patient bear the burden of demonstrating that there has been no exploitation, in light of all relevant factors, including (1) the amount of time that has passed since therapy terminated; (2) the nature, duration, and intensity of the therapy; (3) the circumstances of termination; (4) the cli-

ent's/patient's personal history; (5) the client's/patient's current mental status; (6) the likelihood of adverse impact on the client/patient; and (7) any statements or actions made by the therapist during the course of therapy suggesting or inviting the possibility of a posttermination sexual or romantic relationship with the client/patient. (See also Standard 3.05, Multiple Relationships.)

### 10.09 Interruption of Therapy

When entering into employment or contractual relationships, psychologists make reasonable efforts to provide for orderly and appropriate resolution of responsibility for client/patient care in the event that the employment or contractual relationship ends, with paramount consideration given to the welfare of the client/patient. (See also Standard 3.12, Interruption of Psychological Services.)

### 10.10 Terminating Therapy

(a) Psychologists terminate therapy when it becomes reasonably clear that the client/patient no longer needs the service, is not likely to benefit, or is being harmed by continued service.

(b) Psychologists may terminate therapy when threatened or otherwise endangered by the client/patient or another person with whom the client/patient has a relationship.

(c) Except where precluded by the actions of clients/patients or third-party payors, prior to termination psychologists provide pretermination counseling and suggest alternative service providers as appropriate.

# 2010 AMENDMENTS TO THE 2002 "ETHICAL PRINCIPLES OF PSYCHOLOGISTS AND CODE OF CONDUCT"

The American Psychological Association's Council of Representatives adopted the following amendments to the 2002 "Ethical Principles of Psychologists and Code of Conduct" at its February 2010 meeting. Changes are indicated by underlining for additions and striking through for deletions. A history of amending the Ethics Code is provided in the "Report of the Ethics Committee, 2009" in the July-August 2010 issue of the *American Psychologist* (Vol. 65, No. 5).

Original Language With Changes Marked

## Introduction and Applicability

If psychologists' ethical responsibilities conflict with law, regulations, or other governing legal authority, psychologists make known their commitment to this Ethics Code and take steps to resolve the conflict in a responsible manner. ~~If the conflict is unresolvable via such means, psychologists may adhere to the requirements of the law, regulations, or other governing authority~~ in keeping with basic principles of human rights.

## 1.02   Conflicts Between Ethics and Law, Regulations, or Other Governing Legal Authority

If psychologists' ethical responsibilities conflict with law, regulations, or other governing legal authority, psychologists <u>clarify the nature of the conflict,</u> make known their commitment to the Ethics Code<u>,</u> and take <u>reasonable</u> steps to resolve the conflict <u>consistent with the General Principles and Ethical Standards of the Ethics Code.</u> ~~If the conflict is unresolvable via such means, psychologists may adhere to the requirements of the law, regulations, or other governing legal authority.~~ <u>Under no circumstances may this standard be used to justify or defend violating human rights.</u>

## 1.03   Conflicts Between Ethics and Organizational Demands

If the demands of an organization with which psychologists are affiliated or for whom they are working <u>are in</u> conflict with this Ethics Code, psychologists <u>clarify the nature of the conflict,</u> make known their commitment to the Ethics Code, and ~~to the extent feasible, resolve the conflict in a way that permits adherence to the Ethics Code.~~ <u>take reasonable steps to resolve the conflict consistent with the General Principles and Ethical Standards of the Ethics Code. Under no circumstances may this standard be used to justify or defend violating human rights.</u>

# NOTES

56



AMERICAN
PSYCHOLOGICAL
ASSOCIATION

750 First Street, NE
Washington, DC 20002–4242

Printed in the United States of America

57

# EXHIBIT 2

# CURRICULUM VITAE

I.     Name: **Ronald M. Klein**

     Professional Address:
         10 North Post St.
         Suite 216
         Spokane, WA  99201-0705
         509-838-1285        Fax: 509-344-1011
         ronklein@ronkleinphd.com

II.     **EDUCATION**

     B.A.  (1972) Boston University: Psychology
     Ph.D. (1978) Washington University (St. Louis); Clinical Psychology

     Scholastic Awards and Honors

     1972-1973  National Defense Education Act Title IV Fellowship
     1973-1974  National Institute of Mental Health Fellowship
     1975-1976  Washington University Tuition Scholarship
     1975-1977  Washington University Graduate Research assistantship

III. **PROFESSIONAL EXPERIENCE**

July 2003- Present
     Full time private practice encompassing psychotherapy, assessment, neuropsychological assessment, and forensic consultation.

     Continuing as Eastern Washington University, Department of Physical Therapy, Guest Faculty

     Medical Expert (Psychology) for Social Security Administration, Office of Disability and Adjudication Review: assist Administrative Law Judges to interpret psychological records to determine level of psychological impairment and vocational strengths/weaknesses (September 2001-May 2012)

     Neuropsychological Consultant for Group Health Cooperative (2007-2009)

November 1998- June 2003
     Part-time private practice including psychotherapy, assessment, neuropsychological assessment, and forensic consultation.

Sacred Heart Medical Center, Psychological Consultant to Inland Northwest Thoracic Organ Transplant Program, Kidney Transplant Program, and Kidney Dialysis Center. Direct assessment, treatment and consultation with adults and adolescents in these patient treatment programs. Staff training and consultation to the Renal Service Line.

Continuing as Eastern Washington University, Guest Faculty, Physical Therapy

<u>September 1982 - October 1998</u>
Sacred Heart Medical Center, Director, Behavioral Medicine Service; Direct assessment, treatment and consultation with adults and adolescents.Supervision of psychological and organizational aspect of several patient treatment programs, including Inland Northwest Thoracic Organ Transplant Program, Kidney Transplant Program, and general Behavioral Medicine Service (psychological aspects of medical disease and disability). Clinical Director of Pain Rehabilitation Clinic (1982-1994). Part-time private practice.

Eastern Washington University, Guest Faculty, Physical Therapy and Guest Faculty, Psychology: Lectures, supervision of graduate students, teaching Psychological Aspects of Physical Therapy.

Washington State University, Adjunct Assistant Professor, Department of Psychology plus Intercollegiate Center for Nursing Education: Supervision of graduate student practicum and research.

Spokane Mental Health Center, Adjunct Staff Psychologist for American Psychological Association approved Predoctoral Psychology Internship Program.

<u>October 1980 - July 1982</u>
University of Washington Burn Center: Consultant, clinical intervention, staff training, and psychosocial research activities.

<u>July 1977 - July 1982</u>
University of Washington Medical School, Assistant Professor, Department of Rehabilitation Medicine: Assessment and psychological intervention of physically disabled patients and their families. Teaching of medical and allied health personnel regarding application of behavioral methods to comprehensive rehabilitation programs. Research on behavioral measurement of disability.

<u>October 1977 - September 1980</u>
United States Public Health Service Hospital, Seattle, Washington. Consultant: Staff consultation and clinical assessment to Department of Rehabilitation Medicine and Cardiac Rehabilitation Program. Case consultation to Medicine, Neurology, and Primary Care Services.

60

2

September 1975 - June 1977
> Washington University of St. Louis, Research Associate, under supervision of Anthony Schuham, Ph.D. Conducted research studies on grant from National Institute of Alcoholism and Alcohol Abuse.

January 1976 - May 1976
> St. Louis State Hospital, Heroin Detoxification Unit. Consultant: Conducted staff interviews, systematically observed group process at staff meetings, issued report with recommendations to reduce staff dissension and ineffective ward procedures.

September 1974 - August 1975
> Jewish Hospital of St. Louis, Psychology Intern (APA approved internship): Individual and group psychotherapy in outpatient and inpatient psychiatric units, and a medical rehabilitation unit. Some experience in family therapy and behavior modification.

October 1974 - August 1975
> Narcotics Service Council (NASCO West), Consultant: Group psychotherapy with parents of adolescent drug abusers.

June 1968 - August 1972
> Massachusetts General Hospital, Child Development Laboratory, Psychological Technician for C. Keith Conners, Ph.D.: Psychological testing of hyperkinetic children with learning disabilities; assisted in research on analysis of reading dysfunctions and on pharmacological treatment of Attention Deficit Disorder with Hyperactivity (ADHD).

IV.  **PROFESSIONAL LICENSES AND CERTIFICATES**

National Register of Health Service Providers in Psychology, Washington, D.C., 1983 - Present, Registrant # 31244

State of Washington Division of Professional Licensing (Psychology), 1979 - Present. License # 636.

Certificate of Training, Missouri State Alcoholism Training and Information Program; Missouri Department of Mental Health and Washington University Social Science Institute, 1976.

V.  **PROFESSIONAL ORGANIZATIONS**

American Psychological Association
> Division of Health Psychology
> Division of Neuropsychology
> Division of Law and Psychology

Washington State Psychological Association

VI.   **RESEARCH PUBLICATIONS**

Klein, R.M. and Charlton, J.E.:  Behavioral observation and analysis of pain behavior in severely burned patients. PAIN 9:27-40, 1980.

Klein, R.M. and Fowler, R.S.:  The use of a minicalculator timer as a pressure relief training device.  Archives of Physical  Medicine and Rehabilitation, 62:500-501, 1981.

Klein, R.M.:  Adaptive behaviors in severely burned patients undergoing debridement procedures.  Western Psychological Association, Annual Proceedings, 1980 (abstract).

Klein, R.M. and Charlton, J.E.:  Analysis of pain behavior in severely burned patients. American Burn Association, Twelfth Annual Proceedings, 1980 (abstracts).

Klein, R.M. and Bell, B.:  Self-care skills: Behavioral measurement with the Klein-Bell ADL scale.  Archives of Physical Medicine and Rehabilitation, 63:335-338, 1982.

Klein, R.M.: Behavior and chronic pain.  In Manual of Physical Medicine and Rehabilitation, Gary A. Okamoto, Editor.  W.B. Saunders Co., Philadelphia, 1984.

King, N.J. and Klein, R.M.:  Developing cooperative patient behavior in the dental setting.  Journal of the Canadian Dental Association, 2:151-154, 1985.

King, N.J. and Klein, R.M.: Sexual counseling with spinal cord injured persons. Australian Family Physician, 14:47-51, 1985.

Thomas, S.A.; Remenyi, A.G.; Leonard, R.; King, N.J.; and Klein, R.M.: Psychological services in rehabilitation.  Australian Psychologist, 20:43-50, 1986.

VII.   **RESEARCH AND CLINICAL PRESENTATIONS**

Schuham, A.; Steinglass, P.; Klein, R.M.; Wolin, S.; and Guerin, P.: The alcoholic family; new research findings and their clinical implications.  Annual meeting of the American Orthopsychiatric Association, New York, April, 1979.

Charlton, J.E.; Burns, M.; Heimbach, D.M.; Chapman, C.R.; Klein, R.M.; and Freund, P.: Factors affecting pain complaints in patients with burns.  Annual meeting of the American Pain Society, San Diego, September, 1979.

Klein, R.M. and Charlton, J.E.: The use of behavioral observation to analyze pain behavior in burn patients.  Annual meeting of the American Pain Society, San Diego, September, 1979.

62

Klein, R.M. and Charlton, J.E.: Analysis of pain behavior in severely burned patients. Annual meeting of the American Burn Association, San Antonio, March, 1980.

Klein, R.M.: Adaptive behaviors in severely burned patients. Annual meeting of the Western Psychological Association, Honolulu, May, 1980.

Klein, R.M. and Bell, B.: Research application for Occupational Therapy: An update of the Klein-Bell ADL Scale. Annual meeting of the Washington State Occupational Therapy Association, Seattle, October, 1980.

Bell, B. and Klein, R.M.: Objective measurement of activities of daily living. The Klein-Bell ADL Scale. Annual meeting of the American Occupational Therapy Association, San Antonio, March, 1981.

Klein, R.M.: Staff reactions to behaviors of burn patients. Annual meeting of the American Psychological Association, Los Angeles, August, 1981.

Charlton, J.E.; Klein, R.M.; Gagliardi, G.; Barsa, J.; and Heimbach, D.M.: Assessment of pain and pain relief in patients with burns. Third World Congress on Pain of the International Association for the Study of Pain, Edinburgh, Scotland, September, 1981.

Klein, R.M.; Johnson, C.; and Sandel, E.: Controlling pain during exercise. Annual meeting of the American Burn Association, Boston, May, 1982.

Klein, R.M.: Anoxic encephalopathy in burn patients due to smoke inhalation. Annual meeting of the American Psychological Association, Washington, D.C., August, 1982.

Klein, R.M.; Clode, J.; and Hammond, S.: Psychology and Medicine: Role of the psychologist in a general medicine setting. Semi-annual meeting of the Washington State Psychological Association, Pasco, May, 1983.

Klein, R.M.: Health-enhancing variables in the treatment of severe burn injuries. Washington State Psychological Associations, Chapter I meeting, Spokane, May, 1983.

Klein, R.M.: Chronic pain management. Conjoint Conferences: Sacred Heart Medical Center, University of Washington Medical Education Committee and Pfizer Laboratories, Spokane, April 1984, February, 1987, April 1989.

Boltwood, M.; Klein, R.M.; and Marvin, J.: A computerized psychosocial data base: Clinical and research applications. Annual meeting of the American Burn Associations, San Francisco, April, 1984.

63

Klein, R.M.: Psychology in the general hospital: Translating from the laboratory to the bedside. Psychology Day, Eastern Washington University, Department of Psychology, Cheney, May, 1984.

Klein, R.M.: Communicating code status to patients and families. Conjoint conference: Sacred Heart Medical Center, Spokane, May, 1984.

Klein, R.M.: Issues facing the brain injured. Governor's Committee on Employment of the Handicapped, and State of Washington Division of Vocational Rehabilitation, Spokane, June, 1984.

Klein, R.M.; Weisbrod, K.; and Young, J.: Assessing a patient's decisional capacity. Part of a workshop entitled Challenging Choices: Continuing care and difficult decisions. Sacred Heart Medical Center, Spokane, May 1985.

Klein, R.M.: Psychological issues in heart transplantation. Sacred Heart Medical Center, Spokane, January, 1986.

Klein, R.M.: Resolving group conflict: A nursing management forum. Sacred Heart Medical Center, Spokane, March, 1986.

Klein, R.M.: Cognitive retraining: Who? What? When? Where? Why? Current perspectives in Cognitive Rehabilitation. Sacred Heart Medical Center, Spokane, April, 1986.

Klein, R.M.: Health psychology: The new frontier. Annual Psychology Colloquium, Department of Psychology, Eastern Washington University, Cheney, May, 1986.

Klein, R.M.: Why do they behave that way? Ethical Series on the treatment of neurologically impaired patients. Sacred Heart Medical Center, May, 1986.

Klein, R.M.: Complicating factors in the rehabilitation of the injured worker. International Rehabilitation Associates, Spokane, June, 1986.

Klein, R.M.: Cognitive-emotional factors to consider in treating the neurologically compromised patient. Eastern Washington University, Department of Physical Therapy, Spokane, October 1986. Repeated annually.

Klein, R.M.: Cognitive Retraining - Bridging the gap. Washington State Speech and Hearing Association, Annual Meeting, Spokane, October, 1986.

Klein, R.M.: Enhancing Physical Therapy with chronic pain patients using behavioral techniques. Eastern Washington University, Department of Physical Therapy, Spokane, February, 1986. Repeated annually till 1994.

64

6

Klein, R.M.: Understanding the chronic pain claim. Spokane Association of Insurance Adjusters. Coeur d'Alene, October, 1987.

Klein, R.M.: Rehabilitation of the chronic pain patient. Annual meeting of the Idaho State Industrial Commission, Boise, November, 1987.

Klein, R.M.: Treatment of chronic pain in a family medicine context. Family Medicine Resident Training Program, Spokane, January, 1988.

Klein, R.M.: Stress Management - self-modification. Home Economics Association, District 81 School District, Spokane, February, 1988.

Klein, R.M.: Responding to the chronic pain claim. Washington State Department of Labor & Industries, Claims Division, Olympia, June, 1989.

Klein, R.M.: Depression as a secondary disability. National Rehabilitation Association, Eastern Washington Chapter, Spokane, July, 1989.

Klein, R.M. and Mays, P.D.: Current techniques in pain management. KREM-2 (CBS affiliate), Live call-in TV, Spokane, September, 1989.

Klein, R.M.: When pain is the problem, what is the answer? Idaho State Industrial Commission, Regional Meeting, Post Falls, September, 1989.

Klein, R.M.: Neuropsychological Testing. Medical Rehabilitation Consultants, Spokane, November, 1989.

Klein, R.M.: Psychological issues in heart transplantation. Inland Northwest Thoracic Organ Transplantation Program, Introductory Seminar, Spokane, January, 1990.

Klein, R.M.: What is a Pain Clinic? Washington Self-Insured Association, annual meeting, Spokane, February, 1990.

Klein, R.M.: Chronic pain management. Conjoint Conferences: Sacred Heart Medical Center, Spokane, April, 1990.

Klein, R.M.; Taylor, L.; and Maloney, T.: Comprehensive treatment of the trauma patient. Sacred Heart Medical Center Department of Physical Medicine and Rehabilitation Grand Rounds, Spokane, September, 1990.

Klein, R.M.: Teamwork in Health Care. Sacred Heart Medical Center Excellence in Service seminars, Spokane, January, 1991.

Klein, R.M.: Key issues in traumatic brain injury. Spokane County Bar Association, Spokane, February, 1991.

65

Klein, R.M.: Role of psychology in the medical center: making behavioral medicine work. Community Mental Health Center Proseminar Series, Spokane, February, 1991.

Klein, R.M.: Coping with stress: case in point - the Persian Gulf war. Spokane County Council on Aging, March, 1991.

Klein, R.M.: Multidisciplinary factors in the management of the chronic pain patient. Intercollegiate Center for Nursing Education, Spokane, March, 1991.

Klein, R.M.: Update on Inland Northwest Thoracic Organ Transplant Program. KZZU Radio Interview, Spokane, March, 1991.

Klein, R.M.: Hiring Team Players. Sacred Heart Medical Center. Excellence In Service seminars, July, 1991.

Klein, R.M.: Transference/Countertransference. Neurological Intensive Care Unit Nursing Staff, Sacred Heart Medical Center, October, 1991.

Klein, R.M.: Holiday Stress. Spokane Chapter of the American Heart Association, December, 1991.

Klein, R.M.: Approaching the Chronic Pain Patient. Spokane Orthopedic Study Group, February, 1992.

Klein, R.M.: Coping with manipulative drug seeking patients. Surgical Unit Nursing Staff and Social Service Staff, Sacred Heart Medical Center, March, 1992.

Klein, R.M.: Effect of Chronic Disease on Children. Holy Family Hospital, Well Spouse Group, Spokane, March, 1992.

Calhoun, R.; Watkins, P.L.; Serwat, M.; and Klein, R.M.: Hostility among chronic pain patients: Impediment to success in a rehabilitation program. Society of Behavioral Medicine, Annual Meeting, New York, March, 1992

Klein, R.M.; Dang, J.; Tyrie, M.; and Wood, V.: Adjustment after spinal cord injury. Sacred Heart Department of Physical Medicine and Rehabilitation, Grand Rounds, Spokane, April, 1992.

Klein, R.M.; and Blakely, J.: The role of functional neuropsychological assessment in the care of the elderly. Sacred Heart Medical Center, Department of Psychiatry, Grand Rounds, Spokane, May, 1992.

Klein, R.M.: Interviewing the physically disabled job applicant: Impact of the Americans With Disabilities Act. Sacred Heart Medical Center, Spokane, May, 1992.

Klein, R.M.: Marketing and maintaining hospital-based psychological services: Customer satisfaction and a smile. Washington State Psychological Association, Seattle, October, 1992.

Klein, R.M.: Psychological pitfalls in rehabilitating the injured worker. Washington State Self-Insured Association, Spokane, November, 1992.

Klein, R.M.: Stress Management Skills for chronic care nurses. Association of Nephrology Nursing, Spokane, March, 1993.

Klein, R.M.: Effect of organ transplantation on the families of recipients. Transplant Recipients Support Group, Spokane, March, 1993.

Klein, R.M.: Interviewing disabled job applicants: Preserving dignity and meeting the challenges of the Americans With Disabilities Act. Rockwood Clinic, Spokane, March 1993.

Klein, R.M.: Managing chronic pain in family practice medicine. Family Practice Residency Training Program, (University of Washington affiliated) Spokane, April, 1993.

Klein, R.M.: The ultimate act of giving: Psychological aspects of organ transplantation. Washington State Psychological Association, Chapter 1, Spokane, May, 1993.

Klein, R.M.: Handling the angry patient. Sacred Heart Medical Center, Kidney Center, August, 1993.

Klein, R.M.; Joseph S.; and Hester, P.: Lung Transplantation and quality of life. Sacred Heart Rehabilitation Center, Grand Rounds, September, 1993.

Klein, R.M.: Behavior Medicine: Psychology's Frontier. Gonzaga University Counseling Program, Spokane, October, 1993.

Klein, R.M.: Format and structure of brain injury rehabilitation programs. Medical Rehab Consultants, Spokane, October, 1993.

Klein, R.M.: Psychology goes to the hospital: Behavior Medicine in today's health care climate. Spokane Community Mental Health Center, Psychology Internship Training Program, October, 1993.

Klein, R.M. and Kerr, R.: Treatment of Unsuccessful Suicide Patients in the Emergency Room. Sacred Heart Medical Center Ethics Conference. Spokane, December, 1993.

Klein, R.M.: Managing explosive families in the Intensive Care Unit. Sacred Heart Medical Center, Spokane, February, 1994.

Klein, R.M.:  Self-Care for Oncology Nursing: Taking care of us so we can take care of them.  Rockwood Clinic, Spokane, February, 1994.

Watkins, P.L., White, M. and Klein, R.M.: Quality of Life after Lung Transplantation. Presented at Society of Behavioral Medicine annual meeting (poster session), Boston, April, 1994.

Klein, R.M.:  Effect of health care reform on daily nursing practice: New applications for stress management. Rockwood Clinic, Spokane, April, 1994.

Klein, R.M.:  A Matter of Life and Death: Multiple Roles of Psychologists in Organ Transplant Programs. Invited Address to Washington State Psychological Association, annual meeting, Spokane, April, 1994.

Klein, R.M.:  Behavioral Medicine as a career path.  Washington State University Department of Psychology, Pullman, April, 1994.

Klein, R.M.:  Effective counseling techniques with organ transplant recipients and their families. Pacific Northwest Kidney Center Social Work Association.  Spokane, May 1994.

Klein, R.M.:  Body image and psychological complications in organ transplant patients. Regional meeting, UNOS (United Network for Organ Sharing), Coeur d'Alene Resort, Coeur d'Alene, ID, June, 1994.

Klein, R.M.: "The Bad Guys: PTSD, Antisocial Personality Disorder, and Malingering." Washington Self-Insured Association, Spokane, June, 1994.

Klein, R.M.:  Psychological aspects of trauma. Seminar for ICU/Trauma Care Nurses (Mike Day, RN Coordinator), Sacred Heart Medical Center, Spokane, December, 1994.

Klein, R.M.: The Effect of Health Care Reform on the Practice of Clinical Psychology. Invited address, Washington State University Department of Psychology Colloquium, Pullman, April 1995.

Klein, R.M.: PTSD, Antisocial personality disorder, and malingering. Lorman Education Seminars of Wisconsin, Ridpath Hotel, Spokane, June 1995.

Klein, R.M.: Intrastaff conflict, Northpointe Dialysis Center, Spokane, June 1995.

Klein, R.M.: Psychological management of pain in the Post Anesthesia Care Unit, Cavanaugh's Inn at the Park, Spokane, October 1995.

Klein, R.M.: Pleasing the customer Proseminar, Psychology Internship Training Program, Spokane Mental Health Center, February, 1996

Klein, R.M.: (Repeat of) PTSD, Antisocial personality disorder, and malingering. Lorman Education Seminars of Wisconsin, Ridpath Hotel, Spokane, June, 1996.

Klein, R.M.: Assessment of the geriatric patient. Visiting Nurse Association, Sacred Heart Medical Center, Spokane, November, 1996.

Klein, R.M.: (Repeat of) Psychological aspects of trauma. Seminar for ICU/Trauma Care Nurses (Mike Day, RN Coordinator), Sacred Heart Medical Center, Spokane, December, 1996.

Klein, R.M.: Stress management for the air ambulance health care professional. NorthWest Medstar, Sacred Heart Medical Center, Spokane, February, 1997. (repeated April 1997).

Klein, R.M.: Grief counseling, Rockwood Clinic Laboratories, Spokane, March, 1997.

Klein, R.M.: Depression post transplantation, Northwest Speakers Bureau on Organ & Tissue Transplantation, Sacred Heart Medical Center, Spokane, March, 1997.

Mays, M. and Klein, R.M.: Understanding personality disorders. Spokane County Bar Association, Spokane, October, 1997.

Klein, R.M.: Consultation re psychological aspects of medical/surgical patients. Proseminar, Psychology Internship Training Program, Spokane Mental Health Center, November, 1997.

Klein, R.M.: Pain management in primary care. Family Medicine Spokane, Residency Program, Spokane, February 1998.

Klein, R.M.: Moral Challenges of Alzheimer's Disease, Panelist at Spokane Chapter Alzheimer's Association Conference, Providence Auditorium, Spokane, March 1998.

Klein, R.M.: New techniques for coping with chronic illness. American Nephrology Nurses Association, Inland Northwest Chapter, Intercollegiate Center for Nursing Education, Spokane, April 1998.

Klein, R.M.: Chronic pain management. University of Washington Physician's Assistant Training Program (Medex), Spokane, June, 1998. (Repeated June 1999, June, 2000, May 2001)

Klein, R.M.: Maximizing the value of a neuropsychological exam. Washington State Trial Lawyers Association, Legal Education Seminars, Seattle, May, 1999.

Klein, R.M.: Neuropsychological assessment. University of Washington Medical School, Dept. of Psychiatry Residency Program, Spokane Rotation, December, 1999.

Klein, R.M. and Mays, M.: How to approach personality disordered clients. Spokane County Bar Association, Spokane, February, 2000.

Klein, R.M.: Psychological Evaluations and Post Traumatic Treatment of Industrial Injuries. Western Association of Workers Compensation Boards and Commissions, Coeur d'Alene, ID, July 2000.

Klein, R.M. and Mays, M.: Practical considerations with personality disordered clients. Spokane County Bar Association, Spokane, December, 2000.

Klein, R.M.: Providing Feedback on MMPI-2 to Patients. Psychology Internship Training Program, Spokane Mental Health Center, March, 2001.

Klein, R.M.: Barriers To Healing: Bringing Tough Work Comp Cases To Closure. Lorman Education Seminars of Wisconsin, Doubletree Hotel, Spokane Valley, June 2001.

Klein, R.M.: The Transplant Patient in Developmental Crisis. United Network for Organ Sharing, Region VI Multidisciplinary Forum, West Coast River Inn, Spokane, April 2002

Klein, R.M.: Law and Psychology: Dynamic Tensions. Washington State Trial Lawyers Association, Spokane Chapter, Inn at the Park, Spokane, September 2006.

Klein, R.M.: Consultation in Multidisciplinary Settings. Eastern Washington University, Dept. of Psychology, Spokane, October 2006. (Repeated October 2007)

Klein, R.M.: Key Issues in Psychotherapy. University of Washington, Dept. of Psychiatry and Behavioral Sciences, Residency Seminar, Spokane, November 2006. (Repeated January 2007).

Klein, R.M.: Client Counseling Competition, Judge. Gonzaga University School of Law, Spokane, November 2006.

Klein, R.M.: Looking Sharp: Psychology Communicates With the Legal System. Washington State Psychological Association, Chapter 1, Spokane, March 2007.

Klein, R.M.: Responding to Psychological Crises: In Your Patients and In Yourselves. Eastern Washington University Department of Physical Therapy, Spokane, April 2007.

Klein, R.M.: Surviving Depositions. Washington State Psychological Association, Chapter 1, Spokane, September 2007.

12

Klein, R.M.: Consultation in Multidisciplinary Settings. (repeat) Eastern Washington University, Dept. of Psychology, Spokane, October 2007.

Klein, R.M.: Current Update on Neuropsychology. Washington Defense Trial Lawyers Association and Idaho Association of Defense Counsel, Coeur d'Alene, November 2007.

Klein, R.M.: The Bad Guys: Post Traumatic Stress Disorder, Antisocial Personality Disorder, and Malingering. Lorman Business Seminars, Coeur d'Alene, October 2008

Klein, R.M.: Skills Needed by Chronic Dystonia Patients. Washington State Dystonia Association, Eastern Washington Chapter, Spokane, March 2009.

Klein, R.M.: Required Skill Sets to Succeed as a Chronic Disease Patient. Parkinson's Disease Resource Center, Pacific Northwest Region, Spokane, June 2009.

Klein, R.M.: Preparing Your Mental Health Treating Expert for Trial. Idaho Trial Lawyers Association, Coeur d'Alene, September 2009

Klein, R.M.: Managing Stress in the Real Life World of Legal Practice. Spokane County Bar Association, Ethics CLE presentation, December 2011.

Klein, R.M.: Law Student Path To Stress Management. Gonzaga University Law School, Student Bar Association, Spokane, March 2012.

Klein, R.M.: Role of Experts in Litigation. University of Idaho Law School, Trial Advocacy course, Moscow, ID, October 2012.

71

# EXHIBIT 3

# Ronald M. Klein, Ph.D.

Behavioral Medicine Service
10 North Post Street, Suite 216
Spokane, WA 99201   (509) 838-1285
ronklein@ronkleinphd.com

Please note that my fee for forensic work is $350 per hour; that rate is applied for testimony, depositions, record review, direct examination of the patient, conference time with the referring attorney and any other case related activities. I charge for the time that I spend on all aspects of a case. My charges are not contingent upon whether my opinions are seen as particularly helpful for any particular party. I consider myself to be retained by the attorney who asked me to become involved in any particular case. I will therefore bill for my services to and expect payment from that attorney. A common exception is when the attorney on the opposing side of a case requests to take my deposition; in that case I expect payment from the deposing attorney (or firm). I also consider service agreements to be made in the State of Washington. I strive for objectivity in forensic matters. It is extremely helpful to have clear expectation about when an evaluation needs to be completed, since it typically takes time to interview and test the individual, gather, and review ancillary information and prepare a report, should these activities be necessary. Notice of deadlines is important to ensure that services are provided in a timely manner.

In addition to personal injury cases, I have experience in employment law issues, medical malpractice and professional liability cases, toxic exposure, and other forensic areas within psychology. I have over 30 years of experience in both clinical and neuropsychological assessment and treatment. My forensic work is split between plaintiff and defense work, roughly 40 % plaintiff and 60 % defense evaluations. From a clinical standpoint the evaluations are the same in either event and the hourly charges are the same of course. With regard to past courtroom testimony and depositions, I hope this list will be useful to you. Court testimony refers to Spokane County Superior Court unless otherwise noted.

1994

| | | |
|---|---|---|
| 2-2-94 | Deposition on Delta Darco | Attorney Richard Troberman |
| 2-3-94 | Deposition on Robert Hutchinson v. DeCaro<br>Plaintiff: Ric Fancher | Defense: Richard Lassman |
| 4-13-94 | L&I Appeals Court Testimony on Danny Riggan<br>Plaintiff: Joe Schwab | Defense: AAG |
| 5-17-94 | Court Testimony Robert Hutchinson v. DeCaro<br>Plaintiff: Ric Fancher | Defense: Richard Lassman |
| 8-10-94 | Deposition (Telephonic) on Dyan Larson v. ?<br>Plaintiff: Linda Schauble-Ruff | Defense: John Hotchkiss |
| 8-25-94 | Court Testimony (Whitman County) Dyan Larson v.?<br>Plaintiff: Linda Schauble-Ruff | Defense: John Hotchkiss |

13

| 9-23-94 | Idaho Industrial Commission Appeals on Agnes Trapp v. Sagle Fire Dept |
|---------|-----------------------------------------------------------------|
|         | Plaintiff: ??                        Defense: Max Shiels         |

| 10-12-94 | Deposition on Debra Cates v. ? |
|----------|-------------------------------|
|          | Plaintiff Mike Delay          Defense Ron Morrison |

### 1995

| 1-27-95 | Court Testimony on Robert Knievel v. West Coast Hotels |
|---------|-------------------------------------------------------|
|         | Plaintiff George Diana           Defense Mike Nelson  |

| 3-1-95 | Deposition on Doris Jonas v. Bingaman |
|--------|---------------------------------------|
|        | Plaintiff David Williams      Defense Mary Owen |

| 4-11-95 | L&I Appeals Deposition on Jeff Stanton |
|---------|----------------------------------------|
|         | Plaintiff Dan Harbaugh        Defense AAG |

| 5-16-95 | L&I (Self Insured) Appeals on Mary Kay Keilty |
|---------|-----------------------------------------------|
|         | Plaintiff ?                   Defense John Fairley, |

| 6-12-95 | L&I Appeals Testimony on Michael Galloway |
|---------|-------------------------------------------|
|         | Plaintiff Joe Schwab          Defense AAG |

| 10-31-95 | Deposition on Ted Edwards v. Mutual of Enumclaw |
|----------|-------------------------------------------------|
|          | Plaintiff Jacke Blair         Defense John Riseborough |

| 11-15-95 | Court Testimony Emmi Cole v. Gard |
|----------|-----------------------------------|
|          | Plaintiff Jerry Dyerson       Defense Steve Haskell |

| 11-29-95 | Deposition (#1) on Robert Allen v. Mollerway Freight |
|----------|------------------------------------------------------|
|          | Plaintiff Rob Crary           Defense Clark Richards |
|          | .                            |

### 1996

| 4-23-96 | Deposition (#2) on Robert Allen v. Mollerway Freight |
|---------|------------------------------------------------------|
|         | Plaintiff Rob Crary           Defense Clark Richards |

| 5-9-96 | Deposition (Idaho) Eddie Moore v. Barnard Construction |
|--------|--------------------------------------------------------|
|        | Plaintiff ?                   Defense Ned Annan        |

| 7-5-96 | Deposition (Idaho) on Sherry Sweikert  v. ? |
|--------|---------------------------------------------|
|        | Plaintiff Leander James       Defense Sam Eismann |

| 7-12-96 | Court Testimony (Kootenai County) on Frankie Derry v. Grimm |
|---------|-------------------------------------------------------------|
|         | Plaintiff Russell Jones       Defense Sam Eismann           |

74

| 11-6-96 | Deposition on Brian Dillon v. General Electric |
|---------|------------------------------------------------|
| | Plaintiff John McLendon          Defense John Bowman |

| 12-12-96 | Mediation Hearing on Arlene Stanley v. ? |
|----------|------------------------------------------|
| | Plaintiff Gene Huppin          Defense Tim Cronin |

1997

| 2-13-97 | Deposition Ben & Lahalla Nesbitt v. Clark |
|---------|--------------------------------------------|
| | Plaintiff Steve Cronin          Defense Steve Haskell |

| 2-26-97 | Court Testimony Ben & Lahalla Nesbitt v. Clark |
|---------|-------------------------------------------------|
| | Plaintiff Steve Cronin          Defense Steve Haskell |

| 2-28-97 | Deposition Isabelle Dorsey v. City of Spokane |
|---------|------------------------------------------------|
| | Plaintiff Diane Emmons          Defense Robert Beaumier |

| 8-22-97 | Deposition Nathan Derr v. Safeco Insurance Co. |
|---------|-------------------------------------------------|
| | Plaintiff Gary Pennar          Defense Michael Wolfe |

| 8-28-97 | Deposition [treating clinician] Diana Rehn v. ? |
|---------|--------------------------------------------------|
| | Plaintiff: Michael Wolfe          Defense Timothy Cronin |

| 11-20-97 | Court Testimony Cindy Nguyen v. Dr. James Doyle et al. |
|----------|---------------------------------------------------------|
| | Plaintiff Stephen Haskell          Defense Michael Myers |

| 12-9-97 | Court Testimony Heidi Yates v. Wendy's |
|---------|----------------------------------------|
| | Plaintiff Susan Embree          Defense Stephen Haskell, Mark Kamitomo |

1998

| 1-7-98 | Arbitration hearing Nathan Derr v. Safeco |
|--------|--------------------------------------------|
| | Plaintiff Gary Pennar          Defense Michael Wolfe, Michael Myers |

| 2-18-98 | Deposition  Bryce Brewer v. ? |
|---------|-------------------------------|
| | Plaintiff Don Davis          Defense Gerald Leveque et al. |

| 3-12-98 | Deposition Dennis Kuespert v. Richard Treloar, MD |
|---------|----------------------------------------------------|
| | Plaintiff Brian Waid          Defense James King, John Bowman |

| 6-26-98 | Deposition Jacqueline Harvey v. ? |
|---------|-----------------------------------|
| | Plaintiff Tom Roberts          Defense Robert Sestero |

| 7-20-98 | Court Testimony Roy Yeager v. Stevens County |

75

Plaintiff Russell VanCamp          Defense Ray Clary

7-21-98      Deposition Janet Chandler v. Simpson
             Plaintiff Ralph Pittle          Defense Stephen Lamberson

8-28-98      Deposition Terry Wiyrick v. ?
             Plaintiff Michael Platts        Defense Patrick McMahon

9-14-98      Deposition Dale Mangum v. Huntington Cycle
             Plaintiff Steven Verby          Defense Clark Richard

9-23-98      Court Testimony Dennis Kuespert v. Richard Treloar
             Plaintiff Robert Gould          Defense James King

9-29-98      Court Testimony Susan Laroque v. City of Spokane
             Plaintiff Russell VanCamp       Defense Robert Beaumier

11-6-98      Court Testimony Anita Kazee v. Kittitas County
             Plaintiff Gary Lofland          Defense Michael McMahon
             Kittitas County Superior Court

11-17-98     Deposition Connie Hemmings v. Tidymans
             Plaintiff Richard Eymann        Defense Patrick Kirby

11-24-98     Deposition Justin Hopper v. Beare
             Plaintiff David Ducharme        Defense Marc Lyons


                              1999

1-5-99       Court Testimony Kristen Delaney v. ? ins co
             Plaintiff Michael McMahon       Defense Randy Adams

2-17-99      Court Testimony Justin Hopper v. Beare
             Plaintiff David Ducharme        Defense Marc Lyons
             Shoshone County District Court, Wallace, Idaho

5-11-99      Arbitration Testimony Forrest Muthersbaugh v. State Farm Insurance
             Plaintiff Mike Verbillis        Defense Marc Lyons
             Coeur d'Alene, ID

6-22-99      Deposition  Diane Huff v. Royal Cake
             Plaintiff  Brian Miller         Defense Todd Startzel

9-9-99       Court Testimony Diane Huff v. Royal Cake
             Plaintiff  Brian Miller         Defense Todd Startzel
             Kittitas County, Ellensburg, WA

4

76

9-27-99        Deposition  Jacqueline Harvey v. State Farm Insurance Company
               Plaintiff  John Layman              Defense Robert Sestero

10-1-99        Arbitration Testimony  Jose Michael Munoz-Flores v. Federated American
                    Insurance Company
               Plaintiff  Roger Felice              Defense John Bowman
               Atty William Etter presiding

10-4-99        Deposition  Glenn Longsdorff v. Burlington Northern RR
               Plaintiff  Theodore Willhite         Defense Daniel Kinerk

10-12-99       Deposition  Michael Roemer v. Echo Bay Co.
               Plaintiff  Michelle Wolkey           Defense Patrick Kirby

10-18-99       Deposition  Michael Chouinard v. Weyerhauser
               Plaintiff  Ric Fancher               Defense Geoff Swindler

10-19-99       Deposition  Cathy Cross-Collins v. Woods
               Plaintiff  Kenneth Howard            Defense Troy Nelson

10-27-99       Court Testimony  Jennifer Burton v. Washington State University
               Plaintiff  Stephen Nordstrom         Defense Loretta Lamb

11-9-99        Deposition  Ronald Radtke v. BNRR
               Plaintiff  Frederic Bremseth         Defense Daniel Kinerk

11-22-99       Deposition  Katrina Taft v. Bouma
               Plaintiff  Rex Blackburn             Defense Michael Myers

12-13-99       Deposition  Barbara Bell v. State of Washington, Garrett et al.
               Plaintiff  Janet Rice                Defense William Cornell and Paul Triesch

2000

2-28-00        Deposition  Freddie Roberts v. St. Mary Medical Center
               Plaintiff  Ric Fancher               Defense Greg Arpin

3-6-00         Court Testimony  Heidi Byrum v. Keith Johnson
               Plaintiff  Hugh Evans                Defense Richard Feltman

3-24-00        Deposition  Debbie Kosewski v. Nationwide Ins. Co.
               Plaintiff  Richard Eymann            Defense Todd Startzel

4-18-00        Deposition  [treating clinician] Debbie Carney v. Farmers Ins. Co.
               Plaintiff  Robyn Pugsley             Defense Ward Andrews

4-18-00    Deposition Beverly "Candi" Brisson v. Terry Hale, DDS et al.
Plaintiff (SIF) Wes Scrivner    Defense H. James Magnuson

4-24-00    Deposition DeeAnn Smith v. Jones
Plaintiff David Ducharme,    Defense John Cafferty

4-28-00    Court Testimony DeeAnn Smith v. Jones
Plaintiff David Ducharme    Defense Michael Ramsden
Kootenai County, Coeur d'Alene, ID

5-09-00    Court Testimony Michael Roemer v. Echo Bay Mining Co.
Plaintiff Michelle Wolkey    Defense James Kalamon
Ferry County, Republic, WA

6-26-00    Deposition Tracy Knudson v. NABI, Inc.
Plaintiff Mike Williams    Defense Geoff Swindler

8-15-00    Arbitration Testimony Robert Larson v. Wederspahn
Plaintiff Ron Mullin    Defense Andrew Bohrnsen

8-24-00    Arbitration Testimony Susan Torgerson v. State Farm Insurance
Plaintiff James Domanico    Defense Steve Cronin

9-5-00    Court Testimony Corrine Dunn v. David Dunn
AAG Tobin Carlson

10-10-00    Deposition Francisco Padilla v. Idaho Special Indemnity Fund
Claimant Steven Verby    Defense Wes Scrivner

10-23-00    Deposition Jamie Ryan v. Purvis
Plaintiff Christine Weaver    Defense Everett Coulter
(continued on 11-20-00)

11-16-00    Court Testimony    [treating clinician] Joyce Larkin v. Carlson
Plaintiff Michael Riccelli    Defense Michael Nelson

12-15-00    Deposition    [treating clinician] Tim Stone v. McKinstry
Plaintiff Don Curran    Defense Ron Morrison, Andrew Bohrnsen

2001

1-16-01    Deposition    Christine Brazington v. Peplinski
Plaintiff Lloyd Herman    Defense Michael Wolfe

1-23-01    Court Testimony    Elizabeth Davis v. Ken Davis
Plaintiff Craig Odergaard    Defense Marc Lyons

78

Kootenai County, Coeur d'Alene, ID

| | |
|---|---|
| 2-5-01 | Deposition   Lenora Guza v. Dr. Hogsett, Valley Hosp et al.<br>Plaintiff  Michael Maurer           Defense Daniel Stowe |
| 2-21-01 | Arbitration Testimony       Tim Thomas v. Mutual of Enumclaw<br>Plaintiff  Luke McKeen           Defense Troy Nelson<br>Grant County, Ephrata, WA |
| 3-26-01 | Deposition          James Foster v. Kassim<br>Plaintiff  John Bardelli           Defense Stephen Phillabaum |
| 3-27-01 | Arbitration Testimony (telephonically)       David Hudson  (Work Comp, Idaho)<br>Claimant  Connie Taylor           Defense  Paul Penland |
| 4-16-01 | Deposition          Jackie Pittman v. Dr. Heaps<br>Plaintiff  office of Keith Douglass     Defense Christopher Mertens |
| 4-24-01 | Arbitration Testimony       Susan Riggs v. Pemco Insurance<br>Plaintiff  Alan Gauper           Defense Troy Nelson |
| 4-30-01 | Deposition          (treating clinician) Diane Cross v. Pemco Insurance<br>Plaintiff  Richard Feltman           Defense Troy Nelson |
| 5-03-01 | Court Testimony          Jamie Ryan v. Purvis<br>Plaintiff  Christine Weaver           Defense Everett Coulter |
| 5-09-01 | Deposition          Don Hite v. U. of Montana<br>Plaintiff  Brian Delaney           Defense Gary Graham |
| 5-17-01 | Court Testimony       Lenora Gusa v. Hogsett, and Empire Health<br>Plaintiff  Michael Mauer           Defense Andrew Bohrnsen |
| 6-12-01 | L&I (Self Insured) Appeals on Robert Valley v. Palm Harbor Homes<br>Claimant  Robert Milhem           Defense Jon Floyd |
| 9-7-01 | Deposition          Jack Short v. Loomis et al.<br>Plaintiff  M. Scott Wolfram           Defense Clark Richards<br>(continued on 9-21-01) |
| 10-15-01 | Deposition          Nellie McLinden (Work Comp Idaho)<br>Claimant  Steven Verby           Defense  Ken Mallea |
| 10-29-01 | Deposition          Kevin Berg v. Weddle, Allied Mutual Insurance Co.<br>Plaintiff  Richard Feltman           Defense  Todd Startzel, Steven Cronin, and |

Ward Andrews

11-05-01    Deposition          Tamara Ellis v. Rodd & Oja
            Plaintiff  Joseph Cooney          Defense  Ward Andrews

12-03-01    Deposition          Dennis Veter v. St. John et al.
            Plaintiff  Richard Eymann          Defense James King


                              2002

1-14-02     Deposition:         Michael Travis v. Phan
            Plaintiff  Charles Bean          Defense Steven Cronin

1-21-02     Deposition:         Janet Chandler v. Dr. Simpson
            Plaintiff  Ralph Pittle          Defense William Etter

1-29-02     Court Testimony:    Janet Chandler v. Dr. Simpson
            Plaintiff  Ralph Pittle          Defense William Etter
            Whitman County Superior Court, Colfax, WA

3-12-02     Arbitration Testimony:    Eileen Bailly v. Kemper Ins.
            Plaintiff  Richard Feltman          Defense  John Bowman

3-25-02     Deposition:         (treating psychologist) Wade Krauss v. Vandervert
            Plaintiff  John R. Layman          Defense  Daniel Stowe

4-01-02     Deposition:         Nathan Tracy v. Industrial Transfer
            Plaintiff  John Allison          Defense John Riseborough

4-05-02     Arbitration:        Judith Jansen v. Gregory Rehmann, MD
            Plaintiff: Larry Axtell          Defense Stephen Lamberson

4-30-02     Deposition:         Jeff Kuntz v. Kootenai Electric and Lamar, Inc.
            Plaintiff: Daniel Keefe          Defense: Andrew Bohrnsen

6-24-02     Deposition:         Nicole Minier v. Shopko
            Plaintiff: Michelle Wolkey          Defense Christopher Kerley

7-29-02     Deposition:         Mary Ann McKenney v. Madden
            Plaintiff: Jacqueline Shea          Defense Christopher Kerley

8-16-02     Deposition:         Paul Madden v. Dr. and Dr. Nielsen
            Plaintiff: Jeffrey Jones          Defense Michael Myers

11-15-02    Deposition:         Mark Webb v. Kim Churpurdia, Ph.D.
            Plaintiff: Kathleen Paukert          Defense Everett Coulter and Bob Sestero

2003

| 2-14-03 | Deposition: | James LaVigne v. Green |
| | Plaintiff: Jacqueline Newcomb | Defense: Everett Coulter |

3-3-03    Deposition:    Howard Hickman v. Bell
Plaintiff: Lloyd Herman    Defense: Jane Brown

3-13-03    Arbitration:    Roger Waller v. Safeco Ins. Co.
Plaintiff: Jay Violette    Defense: Michael Wolfe

3-14-03    Deposition:    Brian Judge v. West Valley School District
Plaintiff: Robert Crary    Defense: Andrew Bohrnsen

4-3-03    Court Testimony:    James LaVigne v. Green
Plaintiff: Jacqueline Newcomb    Defense: Everett Coulter

4-4-03    Deposition:    James Spurgetis (Matthew Davis) v. Stevens County and
State of Washington
Plaintiff: Charles Hamilton    Defense: Hugh Evans and Jarrold Cartwright

5-8-03    Court Testimony:    Kathy Moden v. Viola Moden and State Farm Ins. Co.
Plaintiff: John Walker    Defense: Michael McNichols
Latah County Superior Court, Moscow, ID

5-9-03    Deposition:    Pardner Wynn v. Jolene Earin, Ph.D.
Plaintiff: Amy Rimov    Defense: Chris Kerley

5-12-03    Court Testimony:    Cheryl Forbes and Colleen Myers v. ABM Janitorial
Plaintiff: Mary Schultz    Defense: Keller Allen

6-9-03    Deposition:    Robert Stout v. Grange Ins. (UIM)
Plaintiff: Richard Eymann    Defense: Brad Smith

6-23-03    Court Testimony:    Steve Bell v. Town of Cheney
Plaintiff: George Guinn    Defense: Michael Bolasina

7-14-03    Deposition:    Delia Gomez (Sackman) v. Wilke
Plaintiff: Roger Felice    Defense: Philip Welchman

7-23-03    Court Testimony:    Pardner Wynn v. Jolene Earin, Ph.D.
Plaintiff: Mary Schultz    Defense: James King

8-5-03    Court Testimony:    Delia Gomez v. Sondra (Sackman) Wilke
Plaintiff: Roger Felice    Defense: Philip Welchman
Adams County Superior Court, Ritzville, WA

81

9-11-03        Deposition:          Angel Good et al. v. Fluor Daniel Corp. et al.
               Plaintiffs: Michael Schwartz  Defense: W. Randall Squires, Clark Nichols
                                             Robert Hailey, Robert Sestero

9-19-03        Deposition:          Glenna Nelson v. Jeffrey Gonda et al.
               Plaintiff: John Manley              Defense: Paul Schierer

9-25-03        Deposition:          John Klag v. White, et al.
               Plaintiff: Kenneth Isserlis         Defense: Joseph Harrington

9-30-03        Court Testimony:     Margaret Ogden v. Robert Ogden
               Plaintiff: Julie Harrington         Defense: Martin Salina

10-15-03       Deposition (telephonically):  Rusty Bonser v. Okanogan County
               Plaintiff: Scott Volyn             Defense: H. Terrance Lackie

10-23-03       Deposition:    Kirk/Humphrey v. Mazda NA, Ford Motor Co., et al.
               Plaintiff: Robert Rembert          Defense: Mike Williams

11-10-03       Court Testimony:  Danelle Winchel v. Paton
               Plaintiff: Steven Krafchick         Defense: Michael Wolfe

11-11-03       Deposition:    John Holt v. City of Renton
               Plaintiff: Tyler Firkins            Defense: Michael Bolasina

11-18-03       Court Testimony:  John Holt v. City of Renton
               Plaintiff: Tyler Firkins            Defense: Michael Bolasina
               United States District Court, Tacoma, WA

12-10-03       Deposition:    Dirk Erickson v. Gonzaga Prep
               Plaintiff: Loren Cochran            Defense: Andrew Bohrnsen

2004

3-19-04        Court Testimony:     Dirk Erickson v. Gonzaga Prep
               Plaintiff: Loren Cochran            Defense: Andrew Bohrnsen

3-24-04        Deposition:          Lynn and Byrd Stuter v. Stevens County
               Plaintiff: Mary Schultz             Defense: Michael McFarland & C. Kerley

3-29-04        Deposition:          Randy Hoisington v. Kathleen Ives
               Plaintiff: Douglas Lambarth         Defense: Jacke Blair

4-09-04        Testimony:           Paul Madden v. Dr. and Dr. Nielsen
               Plaintiff: Jeffrey Jones            Defense: Michael Myers
               Dispute Resolution Center, Seattle, WA

82

6-16-04      Court Testimony:    John Klag v. U.S. Army Corps of Engineers
Plaintiff: Ken Isserlis          Defense: Joseph Harrington
United States District Court, Eastern District, Yakima, WA : Judge McDonald

6-25-04      Deposition:      In Re Hanford Nuclear Reservation Litigation
Plaintiffs: Richard Eymann     Defense: Randall Squires

7-19-04      Deposition:     Matthew Galloway v. Schuler
Plaintiff: Lloyd Herman      Defense: Philip Welchman

7-21-04      Deposition:     Ed Aguilar v. CH2MHill Hanford Group
Plaintiff: John Sheridan     Defense: James Kalamon

8-17-04      Deposition:     Stuart Davis v. Christian Zimmerman, MD
Plaintiff: Sean McFetridge     Defense: Nancy Jo Garrett

9-20-04      Deposition:     John, James, Joseph Doe v. Diocese of Spokane
Plaintiff: Timothy Kosnoff     Defense: Donald Stone

11-08-04     Deposition:     John and Jane Doe v. Diocese of Spokane
Plaintiff: John Allison      Defense: Jane Brown

12-14-04     Court Testimony:    Morris Coyle et al. v. Hennessey-Smith Funeral Homes
Plaintiff: Robert Caruso      Defense: Carl Oreskovich


2005

1-04-05      Deposition:     Cam and Sara Phillips v. White
Plaintiff: Michael Ealy      Defense: Ron Morrison

2-03-05      Deposition:     Gina Spain v. McMillan
Plaintiff: Mike Williams     Defense: Frederick Loats

2-16-05      Court Testimony:    Donald Hite v. U. of Montana
Plaintiff: Brian Delaney      Defense: Gary Graham
Missoula County Superior Court, Missoula, MT

2-21-05      Court Testimony:    Ed Aguilar v. CH2MHill
Plaintiff: John Sheridan     Defense: James Kalamon
United States District Court, Eastern District, Richland, WA  Judge Robar

4-20-05      Deposition: Keith and Leilani Scribner v. Banner Fuel et al.
Plaintiff: Tim Fennessey     Defense: Tom Merrick

6-15-05      Deposition: Dann Douglas v. CH2M Hill

83

Plaintiff: Lloyd Herman        Defense: Terry Scanlon

9-12-05      Deposition: Jeanne Bichler v. Glenrose Plumbing
Plaintiff: Byron Powell        Defense: Andrew Mitchell

9-28-05      Court Testimony:    Gina Spain v. Lowell McMillan
Plaintiff: Mike Williams       Defense: Frederick Loats
United States District Court, Coeur d'Alene, ID

11-10-05     Court Testimony:    Jeanne Bichler v. Glenrose Plumbing
Plaintiff: Byron Powell        Defense: Andrew Mitchell

11-15+16-05   Deposition:       Kerry Edwards v. Roger Edwards
Plaintiff: Patrick Cronin       Defense: Max Etter

11-17-05     Deposition:       Pat Barnes v. Morton Brigham, et al.
Plaintiff: John Tait         Defense: John Lerma

## 2006

02-09-06     Deposition:       Betty Jo Winters v. Airway Heights
Plaintiff: Laura Lee Stover     Defense: Ron Van Wert

06-20-06     Court Testimony:    Maxine Proper v. Mimnaugh
Plaintiff: John Bardelli       Defense: Michael Wolfe

06-28-06     Deposition:       William Hill v. Idaho Asphalt Supply
Plaintiff: James Sweetser      Defense: Edward Johnson

08-10-06     Deposition:       David Ward v. Bellingham-Sumas Stages
Plaintiff: William Maxey      Defense: Steven Stocker

11-03-06     Court Testimony:    David Ward v. Bellingham-Sumas Stages
Plaintiff: William Maxey      Defense: Steven Stocker

11-07-06     Deposition:       Christine Dotson v. West
Plaintiff: Lloyd Herman      Defense: Geoff Swindler

11-09-06     Arbitration Testimony: Bret Bogar v. Farmers Grange Ins.
Plaintiff: Tim Gresback       Defense: Michael McNichols

12-20-06     Deposition:       Pam Riley v. Spokane Radio
Plaintiff: Susan Troppman     Defense: Laurel Siddoway

12-28-06     Deposition:       Crystal Bear v. Ford Motor Co.
Plaintiff: Richard Eymann     Defense: Caryn Jorgensen

84

## 2007

| | | |
|---|---|---|
| 02-20-07 | Deposition: | Douglas Buchanan v. Danison and Okanogan County |
| | Plaintiff: Lorna Lewis | Defense: Christopher Kerley |

| | | |
|---|---|---|
| 05-09-07 | Court Testimony: | Pam Riley v. Spokane Radio/KXLY |
| | Plaintiff: Susan Troppman | Defense Laurel Siddoway |

| | | |
|---|---|---|
| 05-14-07 | Deposition: | Josie Jensen v. BNRR |
| | Plaintiff: Dean Brett | Defense: Troy Nelson |

| | | |
|---|---|---|
| 06-05-07 | Arbitration Testimony: | Jean Abrams v. State Farm Ins. |
| | Plaintiff: William J. Flynn | Defense: Tom Scribner |

| | | |
|---|---|---|
| 06-15-07 | Deposition: | Kimberly Kallestad v. Dr. Collins |
| | Plaintiff: Mary Schultz | Defense: James Owen |

| | | |
|---|---|---|
| 06-27-07 | Deposition: | George Riggs v. Nancy Thurston et al. |
| | Plaintiff: Steven Palmer | Defense: Stephen Osborne |

| | | |
|---|---|---|
| 07-17-07 | Court Testimony: | Douglas Buchanan v. Okanogan Health District |
| | Plaintiff: Joe Schwab | Defense: Christopher Kerley |

| | | |
|---|---|---|
| 08-31-07 | Court Testimony: | George Riggs v. Nancy Thurston et al. |
| | Plaintiff: Steven Palmer | Defense: Stephen Osborne |

| | | |
|---|---|---|
| 10-17-07 | Deposition: | Pam Wynecoop v. David Mendoza |
| | Plaintiff: Mike Howard | Defense: Kathleen Paukert |

| | | |
|---|---|---|
| 12-17-07 | Deposition: | Barbette Ingle v. Washington State University |
| | Plaintiff: John Allison | Defense: Jerrold. Cartwright, AAG |

## 2008

| | | |
|---|---|---|
| 04-30-08 | Court Testimony: | James Armstrong v. Ekl |
| | Plaintiff: Michael Mauer | Defense: Timothy Cronin |

| | | |
|---|---|---|
| 07-23-08 | Deposition: | Jon Christeson v. Dal-Tile |
| | Plaintiff: Michael Myers | Defense: Steve Lamberson |

| | | |
|---|---|---|
| 07-30-08 | Deposition: | DD and MB v. Briscoe Schools |
| | Plaintiff: Steven Reich | Defense: Dana Henderson |

| | | |
|---|---|---|
| 08-06-08 | Court Testimony: | Kimberly Kallestad v. Patrick Collins, DDS |
| | Plaintiff: Mary Schultz | Defense: John Versnel |

| | | |
|---|---|---|
| 10-17-08 | Deposition: | Fred Bedard v. US Bakery et al. |
| | Plaintiff: Mark Mostul | Defense: John Soltys |

45

10-29-08     Deposition:          FV, GV, JV  v. Seattle University et al.
             Plaintiff: Michael Shaffer          Defense: Colleen Kinerk

11-03-08     Court Testimony:     Barbette Ingle v. WSU
             Plaintiff: John Allison          Defense: Dannette Allen, AAG
             Whitman County Superior Court, Colfax, WA

11-11-08     Deposition:          Kevin Smith v. Garland Construction Services
             Plaintiff: Starr Kelso          Defense: Jon Bauman

11-25-08     Deposition:          FV, GV, JV  v. Seattle University et al. (cont.)
             Plaintiff: John Allison          Defense: Colleen Kinerk


## 2009

01-12-09     Deposition:          Douglas DiBiasi v. Starbucks and Spokane County
             Plaintiff: Richard Wall          Defense: Mary Gaston/Heather Yakely

03-25-09     Testimony:           Lou Oliveros v. Romm Construction
             Plaintiff: Pat Roach          Defense: Stephen Osborne
             Benton County Superior Court, Kennewick, WA

04-22-09     Arbitration Testimony:     Tronlie Bolt v. Grange Insurance Co.
             Plaintiff: Vern Harkins          Defense: Brad Smith

06-25-09     Administrative Hearing, WA DOH:  Pam Jones v. Lincoln Hospital
             Plaintiff: Dena Allen          Defense: Everett Coulter

11-16-09     Testimony:           Douglas DiBiasi v. Starbucks and Spokane County
             Plaintiff: Richard Wall          Defense: Mary Gaston; Heather Yakely
             United States District Court, Spokane, WA

12-09-09     Deposition:          Larry Newkirk v. ConAgra et al.
             Plaintiff: Richard Eymann          Defense: Gregory Arpin


## 2010

08/04/2010     Deposition:          Michael/Matthew Smith v. DSHS
               Plaintiff: William Gilbert          Defense: Carl Warring

09/28/2010     Deposition:          Joseph Pilkington v. Farmers Insurance Co.
               Plaintiff: Roger Felice          Defense: John Bowman

$86$

| 12/02/2010 | Deposition: | Beverly Ridley-Gardner v. Spokane County |
| | Plaintiff: Paul Mack | Defense: H. Terrance Lackie |

| 12/09/2010 | Deposition: | Jameel Hasan v. Eastern Washington University |
| | Plaintiff: Jeffrey Finer | Defense: Amy Clemmons |

## 2011

| 02/9/2011 | Deposition: | Jan Penfold v. Palisades School District |
| | Plaintiff: Steven Lacy | Defense: Patrick Moberg |

| 04/22/2011 | Deposition: | Elias Samaha v. State of Washington DOT |
| | Plaintiff: Richard Eymann | Defense: Carl Warring |

| 05/16/2011 | Deposition: | Estate of John Adams, Jr. v. CWCMH |
| | Plaintiff: E. Allen Walker | Defense: Megan Murphy |

| 08/11/2011 | Deposition: | Lorie Gruse v. Steven Gruse |
| | Plaintiff: Mark Belanger | Defense: Gregory Arpin |

| 10/20/2011 | Deposition: | Russell Glenn v. Monson-Mullaly |
| | Plaintiff: Steven Robinson | Defense: Todd Startzel |

| 10/20/2011 | Testimony: | Daniel Dixon v. City of Coeur d'Alene |
| | Plaintiff: Larry Beck | Defense: T. Haman |
| | United States District Court, Coeur d'Alene, ID | |

| 11/07/2011 | Testimony: | Richard Blizzard v. John Lundeby, MD |
| | Plaintiff: Michael Howard | Defense: Michael Ramsden |

| 11/08/2011 | Deposition: | Janice Lyonnais v. Jeffrey Williams, MD et al. |
| | Plaintiff: Mary Schultz | Defense: Ryan Beaudoin |

## 2012

| 03/30/2012 | Deposition: | Lisa Van Lear v. State of WA et al. |
| | Plaintiff: Brad Moore | Defense: Carl Warring/Steve Cronin |

| 05/24/2012 | Deposition: | Raymond Peyron v. Prov. Sacred Heart Medical Center |
| | Plaintiff: Jon Neill | Defense: Daniel Keefe |

| 07/25/2012 | Testimony: | Gary Patterson v. Les Schwab Tires |
| | Plaintiff: William Flynn | Defense: Timothy Cronin |
| | Benton County Superior Court, Kennewick, WA | |

| 08/21/2012 | Deposition: | Janice Williams v. Eastern State Hospital/State of WA |

15

87

|            | Plaintiff: Paul Burns | Defense: Amy Clemmons |

| 09/05/2012 | Deposition:<br>Plaintiff: Dana Henderson | Ken Santora v. Central Valley School District<br>Defense: Heather Yakely |

09/20/2012    Testimony:    Estate of John Adams, Jr. v. CWCMH<br>
            Plaintiff: E. Allen Walker        Defense: Megan Murphy<br>
            Yakima County Superior Court, Yakima, WA

09/28/2012    Deposition:    Ginger Smith v. Lundy<br>
            Plaintiff: Bradley Axtell          Defense: Todd Startzel

10/30/2012    Deposition:    Michael Richardson v. Lake Pend Oreille School District<br>
            Plaintiff: Larry Beck             Defense: Bret Walther

Ronald M. Klein, Ph.D.
Behavioral Medicine Service

88