# EXHIBIT  1

1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY  )
SPENCER and KATHRYN E. TETZ,    )
                              )
             Plaintiffs,   )
                              )
       vs.               )   No. 11-cv-05424-BHS
                              )
FORMER DEPUTY PROSECUTING     )
ATTORNEY FOR CLARK COUNTY JAMES )
M. PETERS, DETECTIVE SHARON   )
KRAUSE and SERGEANT MICHAEL    )
DAVIDSON,                  )
                              )
            Defendants.   )


VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

SHIRLEY JEAN SPENCER

DATE TAKEN:  December 6, 2012
TIME:       9:00 a.m.
PLACE:      613 W. 11th Street
            Vancouver, Washington


COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR




Rider & Associates, Inc.

360.693.4111

2

APPEARANCES


FOR THE PLAINTIFFS:          MS. KATHLEEN T. ZELLNER
(via videoconference)        Law Offices of Kathleen T.
                             Zellner, LLP
                             Esplanade IV
                             1901 Butterfield Rd., Ste. 650
                             Downers Grove, IL   60515


FOR DEFENDANT PETERS:        MS. PATRICIA CAMPBELL FETTERLY
(via videoconference)        Assistant Attorney General
                             Torts Division
                             P.O. Box 40126
                             Olympia, WA   98504-0116

FOR DEFENDANT DAVIDSON:      MR. JEFFREY A.O. FREIMUND
(via videoconference)        Freimund Jackson Tardif Benedict
                             711 Capitol Way South, Ste. 602
                             Olympia, WA   98502

FOR DEFENDANT KRAUSE:        MR. GUY BOGDANOVICH
(via videoconference)        Law Lyman Daniel Kamerrer &
                             Bogdanovich, P.S.
                             P.O. Box 11880
                             Olympia, WA   98508-1880

FOR THE WITNESS:             MR. WILLIAM H. DUNN
                             Attorney at Law
                             P.O. Box 1016
                             Vancouver, WA   98666-1016










Rider & Associates, Inc.

360.693.4111

3

SHIRLEY JEAN SPENCER   12.06.12

I  N  D  E  X

| Examination | | Page |
|---|---|---|
| By Ms. Zellner | | 4 |
| By Ms. Fetterly | | 130 |
| By Mr. Bogdanovich | | 144 |
| By Ms. Zellner | | 147 |
| By Ms. Fetterly | | 151 |

EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit A | Tabbed File | 4 |
| Exhibit B | Handwritten statement | 150 |

Rider & Associates, Inc.

360.693.4111

**4**

1    SHIRLEY JEAN SPENCER,
2  called as a witness in behalf of the Plaintiffs, having
3  been duly sworn, was examined and testified as follows:
4    (Deposition Exhibit A was marked for
5  identification.)
6
7    EXAMINATION
8  BY MS. ZELLNER:
9    Q. Please state your full name for the record,
10  including any middle name, and spell your last name.
11    A. Shirley Jean Spencer, S-p-e-n-c-e-r.
12    MS. ZELLNER: Let the record reflect this is
13  the deposition of Shirley Jean Spencer taken pursuant to
14  subpoena and proper notice to all of the parties.
15  BY MS. ZELLNER:
16    Q. I know that you've testified before under oath,
17  but I want to go over a few of the rules so that we can
18  make this go as smoothly as possible.
19    I need for you to make all of your answers
20  audible, so shaking your head or saying ha, or whatever,
21  or um, will not work. So do you understand that?
22    A. I understand.
23    Q. Try to let me ask the question before you give
24  your answer so that we're not cutting each other off.
25  Do you understand that?

**5**

1    A. I understand.
2    Q. You understand that you're under oath when you
3  give this deposition.
4    A. I understand.
5    Q. Correct?
6    A. Correct.
7    Q. If you answer a question, I'm going to assume
8  that you understood the question. So if there's
9  something in the question I ask you you don't
10  understand, it's perfectly acceptable for you to say I
11  don't understand the question. So do you understand
12  what I'm telling you?
13    A. I do.
14    Q. Would you give me your -- and the other thing
15  is, if you do want to take a break, that's fine, except
16  if a question is pending. So if I ask a question,
17  that's not the time to take a break. So do you
18  understand that?
19    A. I understand.
20    Q. Okay. Tell me your date of birth.
21    A. 4-27-42.
22    Q. And where did you grow up?
23    A. Grade school on the coast in Oregon and high
24  school around the Spokane area.
25    Q. What are the names of your parents?

**6**

1    A. My mom's name was -- let's see -- Alice
2  Robertson and my dad's name was Garyl Robertson.
3    Q. Did either of your parents work?
4    A. My dad did. My mom worked later on in her
5  life.
6    Q. What was your father's occupation?
7    A. He had many occupations. He had his own gun
8  repair shop. He drove Coca-Cola truck. He worked for
9  Safeway. Oh, and he was also a policeman when he was
10  young.
11    Q. What was his highest level of education?
12    A. Honestly, I don't have a clue.
13    Q. What about with your mother, when did she start
14  working?
15    A. Pardon? I didn't hear you.
16    Q. With your mother, what types of jobs did your
17  mother hold?
18    A. She worked in a clothing store in Spokane and
19  she worked in a bank in Portland. Those are the only
20  ones I really recall.
21    Q. Do you know if your mother finished high
22  school?
23    A. No, I don't know that.
24    Q. Did you have or do you have siblings?
25    A. I do.

**7**

1    Q. How many siblings do you have?
2    A. Five.
3    Q. Could you give me their names and where they
4  live.
5    A. Cindy Morgan and she lives in Battle Ground,
6  Washington. Did you ask for ages? I don't remember.
7    Q. No, I didn't ask for ages, just names and where
8  they're living.
9    A. All right. And Robert Morgan, at the present
10  he's in Hazel Dell, Washington. And Ralph Morgan, Hazel
11  Dell, Washington. Sherri Montgomery, Orchards,
12  Washington. And Matthew Hansen in Battle Ground,
13  Washington.
14    Q. Are all of your siblings still alive?
15    A. Well, I lost a baby --
16    Q. I'm talking about -- we might be --
17    A. Sorry.
18    Q. Yeah, I realize that you misunderstood the
19  original question.
20    Before we get to your children, I was asking
21  you about your brothers and sisters, so your siblings.
22  So did you have or do you have siblings?
23    A. I do.
24    Q. Let's go through -- how many do you have?
25    A. Two.

20

1   outgoing? Just give me some words to describe her at
2   that point.
3       A. She was a very outgoing little girl.
4       Q. Was she affectionate with you?
5       A. Yeah, she was a little girl that liked to be
6   hugged.
7       Q. And did she -- what did she call you when she
8   addressed you? Did she call you by your first name or
9   what did she call you?
10      A. Well, I can't even remember. I think she
11  called me Shirley or Mama Shirley. It's so long ago,
12  ma'am, I can't remember for sure.
13      Q. Okay. And I know some of these -- some things
14  people remember, and I'm sure there's a lot of things
15  you won't remember. It's a long time ago.
16      And then with Matt, do you remember what he
17  called you? Did he call you mom or did he call you --
18      A. It was probably the same. I don't remember for
19  sure.
20      Q. Okay. And then how would you describe Matt at
21  that point in 1984?
22      A. Reserved, shy, angry acting. He was not real
23  receptive of coming up or being there, whatever. I
24  mean, I don't know if this is his usual, you know,
25  demeanor, but that's how he was acting.

21

1       Q. Did he eventually warm up to you or not?
2       A. Yeah, kind of. Not, you know, not a lot.
3       Q. And then you also had your son, Matthew Hansen;
4   is that right?
5       A. Yes, ma'am.
6       Q. And how old was Matt in 1984?
7       A. In '84 he would have been four.
8       Q. Was his birthday February 20th?
9       A. Yes, ma'am.
10      Q. And how did your son -- I know in this case
11  people referred to him as Little Matt and they referred
12  to the older Matt as being Matt, so I'll probably do
13  that.
14      A. That's what we did.
15      Q. Yeah. And how did Little Matt get along with
16  Ray's children?
17      A. Very well. He called them his friends.
18      Q. And we're just, again, focused on that summer.
19  How did Ray -- how would you describe, in general - and
20  we'll get more specific as we go - but how did Ray treat
21  your son? Did he treat them like his own son or was
22  there a difference?
23      A. He was very, very strict with him. I was
24  probably a little more lenient and he was very strict.
25      Q. Do you think, as of the summer of 1984, that

22

1   your son, Matt, formed an attachment to Ray?
2       A. He did.
3       Q. So what I want to do, we've sent a lot of
4   documents to you and mostly just to help you remember
5   things, but I want to go to -- and I've got a group
6   Exhibit A that has various tabs in it.
7       MS. ZELLNER: Did you receive those documents,
8   Mr. Dunn?
9       MR. DUNN: Yes.
10      MR. BOGDANOVICH: We have not received those
11  documents here. Can we see if they have arrived yet?
12      THE REPORTER: Can the attorneys present please
13  identify themselves?
14      MR. FREIMUND: Jeff Freimund, F-r-e-i-m-u-n-d.
15  And I am the attorney for defendant Mike Davidson.
16      MR. BOGDANOVICH: I am Guy Bogdanovich. I
17  represent defendant Sharon Krause.
18      MS. FETTERLY: I'm Patricia Fetterly. I
19  represent James Peters.
20      And we have not, Ms. Zellner, received those
21  documents here yet. How lengthy are they? It might be
22  easier to fax them. There might be a hold-up in the
23  faxing.
24      MS. ZELLNER: I think we e-mailed them two
25  hours ago, but we can certainly fax, so why don't we do

23

1   that.
2       MR. DUNN: We have copies of these in our
3   files.
4       MR. BOGDANOVICH: In the meantime, I brought a
5   set that we can probably try to work from so that we
6   don't have to wait. Let's get the fax going, and then
7   we'll resume.
8       MS. FETTERLY: The fax is 360-357-5761.
9       MR. BOGDANOVICH: Ms. Zellner, until we get the
10  documents the way you've grouped them, I think we're all
11  familiar with the way they were paginated as 1 of 8 or
12  22 of 22. If you go into the groups, if you can just
13  kind of try to identify them by subject and how many
14  pages, we can probably figure out how to follow along.
15      MS. ZELLNER: Sure. The entire packet I want
16  marked as group Exhibit A, and then there are various
17  tabs to group Exhibit A.
18  BY MS. ZELLNER:
19      Q. But I want to start, Ms. Spencer, with your
20  handwritten letter. You do have that?
21      A. I have it.
22      Q. So what I'd like to do is -- because it is
23  handwritten, have you read it out loud. We'll go two or
24  three sentences at a time and then stop and let me ask
25  you any questions, then we'll go a little bit further.

24

1   We'll just work our way through it slowly because it's
2   an important document in the case.
3        So tell me the circumstances under which you
4   decided to write a letter.
5        A. Kathryn Spencer wanted me to do sexual favors
6   for her and she wanted to do sexual favors to me. And
7   it was on an evening of watching a video movie with her
8   and Big Matt and Little Matt. Her dad was gone.
9        Q. How long -- and you said that the visit lasted
10  six weeks. How far into the visit do you think that
11  was? And was it a week or two or three weeks?
12       A. It was just two days before she went home, so
13  it was the end of the sixth week.
14       Q. And up to the point of this event that happens
15  on -- and I believe it's August 24th, 1984, had Kathryn
16  done anything that seemed of a sexual nature to you up
17  to that point?
18       A. No, ma'am.
19       Q. Did you notice any behavior on her part that
20  you would characterize as being sexual in nature?
21       A. She seemed to be a very sexual little girl for
22  a five-year-old. Always want to go sit on men's lap and
23  hanging on him and hugging on him and wanting to kiss on
24  him and stuff, just kind of unusual for me. I've never
25  seen that before.

25

1        Q. And is that -- did you notice that fairly soon
2   after she arrived?
3        A. Yeah, pretty much the whole time she was there,
4   yes.
5        Q. And which men did you see Kathryn act that way
6   around?
7        A. Her dad, my sons, friends of Ray's that would
8   come over.
9        Q. Anybody else?
10       A. I can't think of anybody. It really didn't
11  happen with women, except, you know, she liked to be
12  hugged.
13       Q. So leading up to this evening on Friday, August
14  24th, you'd made those observations about her.
15            Let's just start out, if you could read into
16  the record, your words. Let's go like three sentences
17  and then I can ask questions.
18       A. Friday, August 24th, 1984, about 9:00 p.m. The
19  kids all wanted to sleep on the floor in the living
20  room, front room and watch a videotape as they had the
21  night before.
22       Q. Okay. And let me ask you, up until this
23  evening, it sounds like you had done this before with
24  them where you lie on the floor and you watch a video,
25  right?

26

1        A. You know, I honestly can't recall of how many
2   times that was or would have been. I know for sure two,
3   you know.
4        Q. And the other time that that happened, I'm
5   assuming that there was no sexual activity or attempts
6   on Kathryn's part --
7        A. No.
8        Q. -- is that right?
9        A. That's right.
10       Q. Okay. So continue on. While they were
11  watching --
12       A. While they were watching the cartoon, I took a
13  shower. When I finished, I put on a movie and Kathryn
14  and Big Matt asked me to lay between them on the floor
15  while they watched the movie. Ray was at work.
16       Q. When you did lie on the floor between them, how
17  were you dressed at that point?
18       A. I would have had my pajamas and bathrobe on.
19       Q. Okay. So continue from there.
20       A. Around 10:00 or 10:30, the boys fell asleep.
21  Kathryn asked me if she could rub my tummy, which was
22  normal for we all rubbed each others backs, legs, feet
23  and tummies, et cetera. Sometimes it was a whole family
24  project.
25       Q. Tell me a little bit more about that. Tell me

27

1   the circumstances under which that was happening. Was
2   that in the evening or was that -- explain that to me.
3        A. Anytime the kids were, you know, might want to
4   go to bed or were going to bed, you know, they liked
5   their backs and their tummies or their legs and feet
6   rubbed, still kind of a practice we do today.
7        Q. And that was something that you and Mr. Spencer
8   did to the children. They also did that to you?
9        A. Yes, ma'am.
10       Q. If you want to continue.
11       A. While she rubbed my tummy, she slid her hand up
12  and tried to expose my top a few times and I said,
13  Kathryn, and then she paid close attention -- then I
14  paid close attention. She would put her arm across my
15  chest and then try to move my robe and feel my breasts
16  and sneak to see if Big Matt was watching.
17       Q. Okay. So just so I can visualize that a little
18  bit better, when you say she put her arm across your
19  chest, so she's reaching -- you've got on your bathrobe
20  and under your pajamas; is that right?
21       A. Yes, ma'am.
22       Q. And she reaches across you at some point?
23       A. Yeah.
24       Q. Is she trying to undo your robe?
25       A. No, she was like reach across and hug me, like

**28**

1  (indicating).  You're laying beside somebody and you
2  throw your arm across their chest, that way, like a hug.
3      Q.  All right.  And then you say she tries to move
4  your robe and feel your breast.  What do you
5  specifically remember her doing, like, how did she try
6  to remove your robe?
7      A.  She kind of pushed up under and moving it apart
8  up under my pajamas, because she was -- move your hand
9  down, trying to move it.  I don't know how to explain
10  it, other than that.
11      Q.  So she does that and then you see her look over
12  at Pat.  Was Matt asleep, Big Matt, was he asleep?
13      A.  Yes, ma'am.
14      Q.  Okay.  So let's continue on, then.
15      A.  Then she tried to slide her hand back to my
16  tummy -- or let's see.  She slid her hand back to my
17  tummy, and all of a sudden she slid her hand down to my
18  front.  Startled, I said, Kathryn.  And she jerked her
19  hand away.
20      Q.  So kind of describe, just with a little more
21  detail, kind of describe that movement that she makes so
22  that we can understand.
23      A.  Well, rubbing my tummy and she tries to put her
24  hand down my front real quick.
25      Q.  Okay.  And when you say she tried to put her

**29**

1  hand down your front, you still have your pajamas and
2  your robe on, right?
3      A.  Yes, ma'am.
4      Q.  And how far down does she extend her hand?
5      A.  She just barely got, you know, under my pajama
6  waist.
7      Q.  Okay.  So she actually put her hand inside the
8  robe and under your pajamas --
9      A.  Yes.
10      Q.  -- is that right, that's what she did?
11      A.  Yes.
12      Q.  Okay.  So if you could please continue.
13      A.  She jerked her hand away.  She said, Mommy, can
14  I rub your pee pee.  I said, no, Kathryn.  She said, can
15  I rub -- yeah, can I rub your pee pee, and when I'm
16  done, will you rub my pee pee.  And she said, it feels
17  good.  Can I?
18      Q.  So let's talk about that comment on her part.
19  So you remember that she -- at that point she called you
20  mommy, right?
21      A.  Yes.  Yes, she did.
22      Q.  And does she use the term pee pee?
23      A.  Yes, ma'am, she did.
24      Q.  And had you ever heard her use that term
25  before?

**30**

1      A.  I don't know.  I couldn't tell you that.  I
2  can't remember.
3      Q.  But you're sure that -- you're sure that she
4  used that word pee pee?
5      A.  Yes, ma'am.
6      Q.  Okay.  And then she asked you if she could rub
7  your pee pee and when I'm done will you rub my pee pee.
8  She said, it feels good.  Can I?  Now, was she speaking
9  in complete sentences when she said that to you or was
10  she gesturing?  I'm just trying to get a sense of her
11  level of expression.
12      A.  I think she was saying it in complete
13  sentences.  I don't know, ma'am.  It's so long ago, I
14  can't remember exactly.  I don't remember exactly what
15  she said and did.
16      Q.  Okay.  And was this the only occasion in your
17  life, other than with your son, Matt Hansen, that any
18  child had reported sexual abuse to you?  Had you ever
19  been in that situation before?
20      A.  Other than what happened to me, no, never been
21  in that situation with my older children, ever.
22      Q.  And did this -- what she was doing, did it
23  remind you of anything that had happened to you as a
24  child?
25      A.  Actually not.  It just shocked me.

**31**

1      Q.  Now, let's continue on.  It says you say, no,
2  right?  I said, No.
3      A.  Yes.  You want me to read?
4      Q.  Right.  Karen is Karen Stone, though, right?
5      A.  Yes, ma'am.
6      Q.  Okay.  Yeah, if you could continue on.
7      A.  She said, Karen let me rub her pee pee.  And I
8  said, no.  I will rub your back and your tummy, not your
9  pee pee.  She kept insisting she wanted me to do this
10  for it felt so good.
11      Q.  How do you know that pee pee, in what she's
12  telling you, how do you know that that refers to her
13  genitals?  How do you know that that's what she means?
14      A.  Well, I don't know what else it would mean.
15      Q.  But does she point at her -- does she point in
16  the area where she wants you to rub or did she just use
17  that term?
18      A.  She just tried to push my hand there.
19      Q.  And where does she push your hand to?
20      A.  She got, you know, just below tummy level,
21  that's it, before I jerked my hand away.
22      Q.  So am I correct, though, that she doesn't --
23  she doesn't put your hand on her genitals, right?
24      A.  No.
25      Q.  And other than saying that she wants you to rub

32

1   her pee pee and pushing your hand down below her tummy,
2   does she do anything else that would indicate that she
3   wants some type of sexual contact with you?
4       A. Other than that, that's it.
5       Q. I'm just trying to see if there's anything else
6   that you remember. All right?
7           So if we start in where she again said, Karen
8   and my mommy, do you see that?
9       A. Okay.
10      Q. Would you read those three sentences?
11      A. Again or after that, after my mommy?
12      Q. Just start reading where you left off.
13      A. And my mommy let me rub their titties and their
14  pee pee. At that I started questioning her about Karen
15  and her mommy, and then she told me her daddy was always
16  hurting her and Karen was -- oh, no -- my dad was away
17  hunting and Karen was laying on the bed with Kathryn.
18  Karen had Kathryn untie her robe and rub her tummy then
19  her breasts then she let her rub her pee pee.
20      Q. Okay. And again, this is referring to Karen
21  Stone; is that right?
22      A. Yes, ma'am.
23      Q. Now, when Kathryn told you about this sexual
24  activity between herself and Karen, did you believe her?
25      A. I didn't know what to think. I was shocked. I

33

1   was upset, yeah. I wasn't sure what was going on. No
2   reason --
3       Q. Did she seem like she was telling the truth
4   about Karen Stone?
5       A. I, you know, can't tell you.
6       Q. During those six weeks that you were with her
7   in 1984, did you ever catch her in any type of lie about
8   anything?
9       A. No.
10      Q. Did she ever make up stories in your presence
11  that you found out later were not true?
12      A. None that I know of.
13      Q. So after she tells you about Karen Stone, what
14  happens after that?
15      A. You want me to read some more?
16      Q. Yeah.
17      A. I asked her then what she said, Karen once
18  rubbed her pee pee.
19      Q. Tell me what kind of questions were you asking
20  her to get her to open up to you and talk.
21      A. Just what I have written here, nothing else.
22      Q. Okay. Well, it just says that you asked
23  questions, but I wondered if you remember how you got
24  her to open up and talk about Karen Stone.
25      A. She's the one that --

34

1       Q. Did you ask her -- I'm sorry. I cut you off.
2   Go ahead.
3       A. No. She just volunteered that information. I
4   didn't ask her that.
5       Q. As you sit here today, do you think that Karen
6   Stone molested Kathryn Spencer?
7       A. I had no idea. I wasn't sure who did what,
8   just from what Kathryn told me. That's all I knew. I
9   had never been involved in this kind of thing before, so
10  it was new to me.
11      Q. And the letter was written up, was it not, at
12  Ray Spencer's request?
13      A. Absolutely not.
14      Q. Tell me about that.
15      A. I called CPS or Child Protective Services and
16  told them what she had said, and they asked me to write
17  it down. I asked them if I should get some batteries
18  and record it because I had a recorder, and they said,
19  no, it wouldn't told hold up, just to write it down and
20  they'd have an officer pick up the paperwork. Ray
21  wasn't even home.
22      Q. So you make the first call to Child Protective
23  Services. Do you call the next morning after that
24  episode with Kathryn?
25      A. Yes, ma'am.

35

1       Q. And do you remember who you spoke to?
2       A. No, ma'am, I don't.
3       Q. But they advised you not to tape record, right,
4   because it wouldn't hold up in court?
5       A. Yes, they told me to write it all down.
6       Q. Okay. And so when you had written it down,
7   when you're actually writing it, is Ray Spencer home
8   yet?
9       A. No, he's not.
10      Q. So you complete the entire document, what we've
11  marked as the first tap in group Exhibit A, you complete
12  that before he gets home, right?
13      A. Yes, ma'am.
14      Q. All right. Let's continue on.
15      A. Okay. I was just waiting on you to ask me.
16  Sorry.
17      Q. Okay.
18      A. I asked Kathryn how many times did this happen
19  and she said a few. I then asked her about her mommy,
20  DeAnne. She said pretty much the same things, that they
21  rubbed each others tummies, tops and pee pees.
22      Q. All right. And so now she's telling you about
23  her mother doing that. And does she do that with
24  questions from you? Do you say has anyone else touched
25  you inappropriately or does she just volunteer DeAnne's

36

1    name?
2        A. She volunteered her mommy.  She didn't say
3    DeAnne.  She just said mommy.
4        Q. When she's talking, do you start making notes
5    or how do you actually put the letter together the next
6    day, just from memory?
7        A. Yes, ma'am, part of it.
8        Q. So then if you could start with where it says,
9    I said was this only.  Do you see that?
10       A. Yeah.  Was this only when mama put medicine on
11   your pee pee because it was sore?  And she said, no.
12   She rubbed it other times.
13       Q. Now, were you aware that Kathryn had a sore in
14   the vaginal area?
15       A. Not the summer that she came to our house.
16   That was -- I heard about that was the summer that Ray
17   was living with Karen Stone.
18       Q. Okay.  And when you put -- the reason that you
19   put the description about putting medicine on is because
20   you knew that information, right, that Kathryn had had
21   the vaginal sore and medicine had been put on it?
22       A. Well, that and the fact that kids don't wipe
23   good, sometimes they get sore.
24       Q. Okay.  And then she said, no, correct?
25       A. She said, no.

37

1        Do you want me to read more?
2        Q. Yeah.  Yeah, let's go all the way to --
3        A. Pardon?
4        Q. Yeah, continue, please.
5        A. She rubbed it other times when it didn't need
6    medicine.  And again asked me if I would rub her pee
7    pee.  I said I would rub her back and her tummy, not her
8    pee pee.
9        Q. Okay.  Let's continue on.
10       A. She then said, daddy lets me rub his pee pee
11   and he rubs my pee pee.  That really tore me up.  So I
12   kept it light as we watched the videotape and tried to
13   question her more.  I asked her where the boys were when
14   this happened and she said asleep.
15       Do you want me to go on?
16       Q. Yeah, let's stop at that point.  When she says
17   daddy, do you know at that point if she's referring to
18   Ray Spencer or she's referring to someone back at her
19   mother's home in Sacramento?
20       A. I only knew of Ray, her own dad.  I didn't know
21   that there was any person in Sacramento.
22       Q. And I ask that question because you said she
23   was calling you mommy, right?
24       A. Yes.
25       Q. So did you think at that point that she was

38

1    referring to Ray Spencer or you just didn't know at that
2    point?
3        A. I thought she was referring to Ray Spencer.  I
4    didn't know of anybody else.
5        Q. Okay.  Can you continue on?
6        A. I asked where the boys were when this happened
7    and she said asleep.  I asked her where I was and she
8    said you were at work.  I asked her how many times, one,
9    two or three, and she said a whole bunch.  She said
10   daddy told her not to tell.  I said, then, why are you
11   telling me, Kathryn?
12       Q. Let's go a little bit further.
13       A. She said, I wanted you to know.  I said, are
14   you going to tell your mommy, DeAnne?  And she said, no,
15   she would never do that.  I asked her why?  She said
16   mommy -- I asked her why, she said mommy would laugh at
17   me.  I asked her if she was going to tell anyone else,
18   and she said no.
19       Q. Okay.  So are you asking her if she is going to
20   tell anyone?
21       A. Yes.
22       Q. And then she's telling you, no, that she isn't
23   going to tell anybody, right?
24       A. Right.  Do you want me to go on?
25       Q. Yeah.

39

1        A. Ray came home from work and I didn't know what
2    to do or say.  I never came up against anything like
3    this before.  I was scared for Kathryn.  Many things ran
4    through my mind:  What to do?  What to say?  How to say
5    it?  But I just couldn't do or say anything to him until
6    I talked with Kathryn more.
7        The next day Ray left for work.  I took the
8    kids to the beach.  While the boys swam, Kathryn laid on
9    the blanket to keep warm and we talked some more.  She
10   said the same story about her mom and Karen and went
11   into more detail about her dad and her big -- and Big
12   Matt.
13       Q. Okay.  So let me just stop you there because
14   I'm trying to figure out in the sequence.
15       We know that this event with Kathryn occurs on
16   Friday, August 24th.  Is it on Saturday that you write
17   this letter up or do you remember?
18       A. Yeah, I don't remember the day of the week.  I
19   just remember it was, like, the 24th.  I don't remember
20   the day of the week, though.  I'm assuming it was a
21   Saturday because I probably wouldn't have been able to
22   take them to the beach.  I'd have been working.
23       Q. And it appears that by Saturday that Ray is
24   home; is that right?
25       A. I don't know that it was Saturday.  It was the

40

1   day after they left. He didn't come home until the day
2   after they left.
3     Q. Because on that passage you read back up a
4   paragraph, it says Ray came home from work and I didn't
5   know what to do or say.
6     A. Right.
7     Q. I've never -- right, so I'm just trying to
8   figure this out. Was Ray at work on Saturday and he
9   came home?
10     A. He came home from work and then he left for a
11   motorcycle convention in Seattle, I think it was, the
12   next morning.
13     Q. Okay. So he's just you home for a short period
14   of time. Is he home that night, that Friday night?
15     A. Just that night.
16     Q. So you have this conversation with Kathryn,
17   then Ray comes home, but you don't say anything to him
18   at that point; is that right?
19     A. That's right.
20     Q. And tell me, because Kathryn has named all
21   these people, her mother, Karen Stone, Ray Spencer and
22   Big Matt, tell me why you didn't say anything to Ray
23   Spencer at that point?
24     A. I didn't know what to say or how to say it.
25   The whole thing had me just upset and I didn't know what

41

1   to do or say.
2     Q. And would it be a fair statement to say that at that
3   point you didn't really know whether Kathryn was telling
4   you the truth or she just made all of this up?
5     A. I wouldn't have had a clue where it all came
6   from. I wouldn't assume she would lie. I didn't know
7   her to lie, but I just didn't have a clue where it all
8   came from. It was such a shock.
9     Q. And you would agree that she's describing
10   multiple abusers to you, right?
11     A. Yes, ma'am.
12     Q. And that's similar, I think, to what happened
13   to you, right, not just one person, but there's multiple
14   abusers?
15     A. That has nothing to do with me. But, yes.
16     Q. Well, wouldn't you be more sensitized to this
17   issue, though, having been abused yourself?
18     MR. DUNN: I'm going to object to this type of
19   questioning. You're asking for conclusions or opinions
20   about matters that she's not qualified to give and
21   doesn't -- it would require her to speculate. It would
22   require her to speculate on matters that don't have
23   anything to do with evidence.
24     MS. ZELLNER: Your objection is noted for the
25   record. This is a federal deposition. And unless

42

1   you're going to instruct her not to answer, I would ask
2   you to answer my question over his objection.
3     MR. DUNN: You can go ahead and answer.
4     THE WITNESS: Would you repeat it, now, please?
5   BY MS. ZELLNER:
6     Q. Sure. Do you believe that this -- at this
7   point when Kathryn was telling you these things about
8   being sexually abused by multiple abusers, that you
9   personally were very sensitive to this issue of abuse
10   because of your history?
11     A. No, never entered my mind about me.
12     Q. Okay. All right. So let's continue on.
13     A. She said that Big Matt stuck his finger in her
14   sometimes. I asked her about any other men or women and
15   she said no, every time Big Matt came around she said,
16   shush, Matt's coming. She said, you won't tell dad, and
17   I said, no. And don't you say anything. She said dad
18   told me not to say anything -- to tell you.
19     Q. Okay. And you're still at the beach when she's
20   telling you all this information?
21     A. Yes, ma'am.
22     Q. And you hadn't written the letter yet, right?
23     A. No, ma'am.
24     Q. And Ray has come home, but he's left for his
25   motorcycle conference.

43

1     A. Yes, ma'am.
2     Q. So then what else does she tell you? Let's
3   continue on.
4     A. Dad told me not to tell you and you tell me not
5   to tell dad. I said that's a little different. She
6   said, again -- she again asked me about why I wouldn't
7   rub her pee pee. I couldn't make her feel dirty, so
8   change the subject and she said -- let's see. I don't
9   know where I'm at. Hang on.
10     Q. Sure. I think it says she said I rubbed you --
11     A. Yeah. I'm sorry. She said, yeah, I rubbed
12   you. I said, Kathryn, you rubbed my tummy, not my pee
13   pee. And you --
14     Q. I think it says you touched it mom told you no.
15     A. Yeah, you touched it and mom told you no. She
16   said, I know, but can I, Mom, it feels good? I said,
17   no, and started questioning her again.
18     And she said dad would lay on his back and she
19   would lay on his tummy and they started out with dad --
20   oh, man, I'm having a hard time, I'm sorry,
21   concentrating here -- and in his robe and shorts and in
22   her nightie and panties. And then she said she took off
23   her panties and dad, that -- slid daddy's down and he
24   put his pee pee between her legs. I asked her then,
25   what I said --

**44**

1    Q. Let's stop.  There's a couple of things I want
2  to ask you about.
3    A. Okay.
4    Q. You said when you began that last passage, it
5  says she said I rubbed you.  I said, Kathryn, you rubbed
6  my tummy, not my pee pee.  Am I reading that correctly?
7    A. That's right.
8    Q. So she's just said that you rubbed her and yet
9  you know that that's not true.  All that was rubbed was
10  her tummy.
11    A. Was her tummy.
12    Q. So right there in that one sentence, she's
13  telling you that you've also rubbed her and you're
14  telling her, no, that wasn't my pee pee.  Do you
15  understand what I'm saying?  She's actually
16  misconstruing what went on between you and her at that
17  point, because it specifically said, she said, I rubbed
18  you.  I said, Kathryn, you rubbed my tummy and not my
19  pee pee.  Do you see that?
20    A. Right.
21    Q. So you're correcting her when she says that she
22  had actually rubbed you, right?
23    MR. DUNN:  I'm going to object to the form of
24  that question because it's argumentative and calls for
25  conclusions.

**45**

1    MR. BOGDANOVICH: I'll object.
2    MS. ZELLNER:  Your objection is noted.
3  BY MS. ZELLNER:
4    Q. Did I read that correctly?  Is it correct that
5  you wrote down, not my pee pee, correct?
6    A. That's correct.  She rubbed my tummy not my pee
7  pee.
8    Q. But you corrected her, am I right?
9    MR. BOGDANOVICH:  Object to the form of the
10  question.  It's argumentative and inaccurate.
11  BY MS. ZELLNER:
12    Q. You can answer over that objection.
13    A. I don't know how to answer it, other than to
14  say she rubbed my tummy, not my pee pee.  So I guess if
15  that's a correction, that's a correction.
16    Q. All right.  So then if we go down to where you
17  left off, pick up where you left off.
18    A. Daddy put his pee pee between her legs.  I
19  asked her then what she said.  He tried to put it in her
20  little hole but it was too big.  I said, didn't it hurt?
21  And she said, yes.  I said, then what did you do?  And
22  she said, I told daddy it was too big.  And he said,
23  what can I say, baby girl.
24    Q. Now, I'm assuming that you're trying to quote
25  her directly, am I right?

**46**

1    A. Yes, ma'am.
2    Q. And how long after you're on the beach do you
3  write this letter?
4    A. As soon as we got home.  So we were down there
5  a couple of hours.
6    Q. So when you get home, you write the letter from
7  your memory of what she told you on the beach and also
8  at the house.
9    A. Yes, ma'am.
10    Q. And you would agree with me that the letter is
11  fairly detailed, wouldn't you?
12    A. I think so.  I tried to be accurate.
13    Q. And you tried to put in as much detail as you
14  could, right?
15    A. I put in only what she told me.
16    Q. Okay.  So let's continue on, if you'll keep
17  reading.
18    A. She said, I don't know.  I said, then what.
19  She said to her -- he then kissed her pee pee and she
20  kissed his and tried to or did put it in her mouth.  I
21  asked her if she ever got sore and she said yes.  And I
22  said, from what?  And she said -- what's that word? --
23  from -- and she said from rubbing it.  I can't read my
24  own writing.
25    Q. Please continue.

**47**

1    A. I asked her if he said nice things to her and
2  she said he kisses me and tells me he loves me and tells
3  me I have a pretty bottom.  I asked her if she liked
4  this and she said, yes, and she loves her daddy.  And
5  does he do these things to me?  And I said, that's
6  different, Kathryn.
7    Q. And so your testimony is that what you've got
8  written here is exactly what Kathryn Spencer told you at
9  the beach, right?
10    A. Yes, ma'am.
11    Q. Okay.  Let's continue.  We've got about a
12  paragraph to go.
13    A. Kathryn feels good about all this.  She likes
14  it and wants it more.  And she said she wants to know
15  what it feels like to do more.  I don't know how to tell
16  her that this wasn't right without making her feel bad
17  or dirty.
18    I asked her if she was telling me stories and
19  she said, no.  I said, you wouldn't tell me lies?  She
20  said, no.  You're not making it up?  No.  I asked her if
21  she had -- she was afraid of me and she said, yes.  And
22  I said, why?  I've never -- I have never spanked you.
23  Are you afraid of that?  And she said, well, my mommy,
24  DeAnne, would spank me and send me to my room.  I said,
25  you know I wouldn't do that.  She said, I know.  And I

48

1  said, then is this all so?  And she said, yes.
2      I then got batteries, called Crises and asked
3  them if I should tape this and they said it wouldn't do
4  any good.  It wouldn't hold up in court, so I didn't
5  tape her.
6      Ray called and I told him then -- and then he
7  took it to California Crisis when he got home.
8      Q.  Go ahead.
9      A.  I told him before he got home, when he called
10  and asked me what was wrong.
11      Q.  And you described everything that Kathryn had
12  told you?
13      A.  When he called home, I was upset and all I said
14  was Kathryn accused you of molesting her.  And he said,
15  Is that all?  Oh, well, I'll take care of that when I
16  get home.
17      Q.  Well, Kathryn actually had accused him of
18  molesting her.  She'd accused her mother, DeAnne
19  Spencer, of molesting her.  She'd accused Matt Spencer
20  of molesting her and she had accused Karen Stone of
21  molesting her, right?
22      A.  Yes, ma'am.
23      Q.  So did you tell Ray Spencer in that phone
24  conversation that she'd accused all those other people
25  of molesting her?

49

1      A.  I don't remember.
2      Q.  Did you tell Ray Spencer that you had written a
3  letter?
4      A.  I don't remember what I said on the phone
5  anymore.
6      Q.  Okay.  But I want to make sure that your
7  testimony under oath is that Ray Spencer did not tell
8  you to write up what Kathryn had said to him.  Am I
9  correct, he did not tell you that?
10      A.  Absolutely not.  He did not tell me that.  CPS
11  told me that.
12      Q.  So when you reference CPS in that last sentence
13  that you just read me, and it says, I then got
14  batteries, called the crisis line because I didn't know
15  what to do.  I asked crisis line if I should tape
16  Kathryn.  She said it wouldn't do any good, wouldn't
17  hold up in court, so I didn't tape her.
18      Would you agree with me that you don't document
19  the fact that the Crisis worker told you to write up the
20  allegations that Kathryn made?
21      A.  I guess I didn't --
22      Q.  I don't see it.
23      A.  I guess I didn't document that, but they told
24  me to write it up, write it down.
25      Q.  Is there any reason you didn't write that down?

50

1      A.  I didn't think about writing it down, I guess.
2      Q.  Okay.  So when does Ray come home?
3      A.  He came home the next day after the kids left.
4      Q.  Now, you knew the kids were going to return to
5  Sacramento, right?
6      A.  I did.
7      Q.  Okay.  And you knew that Kathryn had accused
8  her own mother of molesting her, right?
9      A.  I did.
10      Q.  And did you attempt to contact anybody before
11  Ray got home in Sacramento, since Kathryn was going home
12  to her mother?
13      A.  No.
14      Q.  So when Ray gets home, tell me as best you can
15  about your conversation with him, what you said to him,
16  what he said to you, and does he come home on Saturday
17  or Sunday?
18      A.  I don't remember whether it was Saturday or
19  Sunday.  I think it was Sunday, but I don't remember for
20  sure.
21      Q.  Okay.  So when he comes home, is your letter
22  already written?
23      A.  Yeah.  Yes, ma'am.
24      Q.  So do you show Mr. Spencer your letter?
25      A.  Yes, he read the letter.

51

1      Q.  Okay.  Did he tell you to take anything out of
2  the letter?
3      A.  No.
4      Q.  Did he tell you to alter it in any way?
5      A.  No.
6      Q.  Did he tell you not to give the letter to
7  authorities, to the law authorities?
8      A.  No.
9      Q.  So what do you remember about your conversation
10  with Mr. Spencer when he came home?
11      A.  What he said was it was DeAnne turning the kids
12  against him or some guy that was probably living with
13  her, but DeAnne has been trying to turn the kids against
14  him and he thought that she probably set him up to say
15  these things -- set them up to say these things.
16      Q.  Did he then try to report these allegations to
17  any law enforcement agency?
18      A.  Yeah, he made phone calls.  I think it was to
19  Vancouver or Clark County, I don't even know, and
20  Sacramento.
21      Q.  Did he at any point tell you to keep these
22  allegations quiet?
23      A.  No.
24      Q.  Did he at any point tell you when he gets home,
25  I might lose my job.  We've got to keep this quiet?

56

1  the polygraph and everything, because I loved my
2  husband, I was pretty upset that we were even there,
3  even though all this came down.
4     Q. And did your husband, was your observation that
5  he was corroborating in that first meeting?
6     A. He seemed mad, angry.
7     Q. Was he cooperating, though, with the
8  investigation?
9     A. I guess. I don't remember for sure, but I
10  guess.
11     Q. Well, he agreed to take the polygraph, right?
12     A. Right.
13     Q. And so after he took the polygraph, did anyone
14  tell you how he had done on that first polygraph?
15     A. I don't remember that anybody other than Ray
16  told me. There was something about being inconclusive.
17  I don't remember the department telling me that.
18     Q. Did you have any conversation with Officer
19  Davidson that first time about Ray or about the case?
20     A. Well, we were in his office after the
21  polygraph, and that's when I was so angry. I didn't
22  even like Mr. Davidson at the time. I told him he was
23  trying to ruin my marriage and my husband's job.
24     Q. And I'm just curious why you would be telling
25  Detective Davidson that you thought he was trying to

57

1  ruin your marriage.
2     A. I guess because -- I don't know. It's just I
3  was angry. I was angry at him, and I loved my husband
4  and I thought everything was going to be ruined because
5  of all of this.
6     Q. And then after that first meeting, do you
7  obtain any information about Kathryn's interview in
8  Sacramento with Detective Flood?
9     A. I'm not sure I understand.
10     Q. Okay. Well, did you learn at some point right
11  in that time frame - and we're in the August, September
12  of 1984 - did you learn that when Kathryn was
13  interviewed by Detective Flood, that she was not telling
14  him about the allegations that you'd put in your letter?
15     A. I think I heard that later from Ray, but I
16  don't remember hearing it from Detective Flood. If I
17  did, I don't remember.
18     Q. And when you returned -- is your second trip to
19  the Clark County sheriff's department for that second
20  polygraph, and it's right at the end of September,
21  around the 24th, do you remember that, going back?
22     A. I remember going back with Ray, yes.
23     Q. And had anything happened in your discussions
24  with Ray up to that point that made you suspect that
25  these allegations might be true, or did you still

58

1  believe he was innocent?
2     A. I still believed he was innocent. I wanted to
3  believe he was innocent. I loved my husband.
4     Q. Did anyone ever suggest that you be polygraphed
5  on your conversation with Kathryn?
6     A. Not that I recall.
7     Q. After the second polygraph, do you learn what
8  the result is of that polygraph?
9     A. I heard that it was supposed to be positive,
10  but I don't recall who told me that. I don't remember
11  if it was Ray or Mike Davidson when we were in his
12  office together. I don't remember.
13     Q. How would you describe, in that second visit to
14  the Clark County sheriff's office, how would you
15  describe Mr. Spencer's interaction with Officer
16  Davidson?
17     A. I don't think he liked him. I don't think he
18  was, you know, he was -- I don't remember, hollering or
19  cussing or what it was, he was angry. I was angry. I
20  don't know. He thought that he was being railroaded or
21  something.
22     Q. Did Officer Davidson make any statements in
23  your presence that indicated he thought Mr. Spencer was
24  guilty?
25     A. I wished I could remember that, but I'm not

59

1  sure what his statements were at the time. I think I
2  was so upset and so confused I don't remember.
3     Q. What was your reaction to learning that Mr.
4  Spencer had supposedly flunked the polygraph?
5     A. Confusion, because my husband, I wanted to
6  believe him. I loved him. He convinced me that it had
7  to be somebody else. It wasn't him.
8     Q. Did your attitude about his innocence begin to
9  change after you found out he didn't pass the polygraph
10  the second time?
11     A. I don't think that my attitude changed. I was
12  confused and angry and upset and didn't know what was
13  going on, and he was, you know, just as stressed as I
14  was. It was such a stressed time. I don't know. But
15  my attitude hadn't really changed in the way that I
16  thought he might be guilty at that time.
17     Q. Could you tell me, just in the whole sequence
18  of events, what was the turning point for you in your
19  opinion that he was guilty? What was the turning point?
20     A. I think it was when we found out about my son.
21     Q. So would you say up until that time, you still
22  had doubts about whether he was guilty or not?
23     A. Yes.
24     Q. Okay. Now, at a certain point, Mr. Spencer
25  checks himself into the Oregon Health Science

80

1   have any meetings with Sharon Krause and Mike Davidson
2   that you recall?
3       A. The only one -- meetings that I recall with
4   Mike Davidson were with Ray. The rest -- any other
5   time, it would have been pretty much Sharon. She was
6   the interviewer.
7       Q. So when you say -- you're talking about the
8   polygraph examination meetings, right, where Davidson
9   was present?
10      A. Right.
11      Q. And then at a certain point in time, does Ray
12  move out of the Lucia Falls house?
13      A. Yes, but I can't remember the dates.
14      Q. Is it sometime after this second domestic
15  disturbance?
16      A. Yes.
17      Q. Where does Ray go when he moves out of the
18  house?
19      A. I guess he went to a hotel.
20      Q. Well, actually, do you remember, he went to the
21  Salmon Creek Motel? Do you remember that name?
22      A. I remember the Salmon Creek. But I think he
23  went somewhere before that and then the Salmon Creek
24  Motel. I definitely remember the Salmon Creek one.
25      Q. Right. I think you're correct. He went to

81

1   another hotel, then he went to Salmon Creek.
2       But when he gets to Salmon Creek, are you
3   having conversations with him? Is he still calling you?
4       A. Yes, he's still calling me. We were still
5   trying to work on our marriage. We still, you know,
6   don't know definitely who did what with Kathryn, you
7   know. He's still telling me he's innocent and we're
8   trying to make our marriage work.
9       Q. I want to direct you to a declaration that Ray
10  Spencer gave. It's Tab 5. And my purpose in doing that
11  is just to read the statement to you that he made and
12  ask you if that's a true statement. So if you want to
13  look at the document, you can, or I can simply read it
14  to you.
15      A. Go ahead.
16      MR. DUNN: We've got it here.
17      MS. ZELLNER: Sure.
18  BY MS. ZELLNER:
19      Q. Tab 5, Bates stamp 1162.
20      A. Okay.
21      Q. The specific statement is Ray Spencer claimed
22  in that declaration that when he was at the Salmon Creek
23  Motel, he'd asked you to spend the night with him a
24  number of times.
25      Do you remember him ever asking that?

82

1       MR. DUNN: Where is this, Counsel?
2       MS. ZELLNER: It's tab 5. It's page 1162. But
3   I'm asking her if she remembers that.
4       THE WITNESS: Oh, yeah.
5   BY MS. ZELLNER:
6       Q. He did ask you, right, to spend the night?
7       A. Yeah.
8       Q. Okay. And did you ever go there and spend the
9   night at the Salmon Creek Motel?
10      A. No, not ever. I've never been.
11      Q. And did you ever make the statement to Ray
12  Spencer when he asked you to spend the night at the
13  motel - and this is a quote that he's quoting you as
14  saying: I can't. If I do, I can't go through with
15  this.
16      MR. DUNN: Where is that, Counsel? That's on
17  page 4? What paragraph are you referring to?
18      MS. ZELLNER: I'm at Tab 5, 1162 -- I'm going
19  to give you the paragraph.
20      MR. FREIMUND: Paragraph 11.
21      MR. DUNN: Here we are.
22  BY MS. ZELLNER:
23      Q. Okay. So I'm asking her if that is a correct
24  quote. Did you ever say, I can't. If I do, I can't go
25  through with this? Did you ever make that statement to

83

1   Ray Spencer?
2       A. No, I did not, absolutely not. I'm still
3   working on my marriage. Why would I say that? Excuse
4   me. That's asking you.
5       Q. Now, at a certain point you take your son, Matt
6   Hansen, to the Salmon Creek Motel; is that right?
7       A. That's right.
8       Q. And how old was your son at that point?
9       A. Four or five. Five, I think he turned five.
10      Q. Because his birthday is February 20th, right?
11      A. What was the date of the visit?
12      Q. February 16th.
13      A. Oh, that's before his birthday, then. Yeah, I
14  did.
15      Q. And I'm curious why you would take your son to
16  spend the night with Mr. Spencer when he's been arrested
17  for child molestation.
18      A. Well, actually at that time we didn't know that
19  he was guilty. We didn't know who was guilty or if they
20  were guilty. I still believed in my husband. We didn't
21  know about Matt or Big Matt. And we're still working on
22  our marriage.
23      Q. So you took your four-year-old son to a motel
24  and left him with Mr. Spencer; is that right?
25      A. Yes. We'd been shopping that day and then I

84

1    had to go to see my counselor. He'd been asking me and
2    asking me if I would bring Matt over for a visit,
3    because Matt was struggling. He couldn't understand why
4    he couldn't see his daddy. And at that time, I said he
5    could stay there while I went to the meeting, but when I
6    got done, he asked if he could spend the night.
7        Q. Which meeting did you go to? And we're talking
8    about February 16th, 1985.
9        A. It was with my counselor, Jeannette Dezsofi.
10       Q. Did your counselor -- did you inform your
11   counselor that you had dropped your son off at the
12   motel?
13       A. I don't think it would have come up. There was
14   no reason why.
15          We're working on our marriage. We don't know
16   if Ray is guilty or not. We don't know about the boys.
17   There was, in my mind, nothing wrong with leaving him
18   there.
19       Q. When you took him to the motel, is it correct
20   that you didn't have pajamas for him?
21       A. No, because he wasn't going to spend the night.
22          I had a meeting with my counselor. Ray and I
23   had been shopping that day and I was going to pick him
24   up and take him home. Ray convinced me to leave him for
25   the night; otherwise, if I knew he was going to spend

85

1    the night, he would have had jammies.
2        Q. Did you tell Sharon Krause before you took
3    Matt, Little Matt, to the motel that you were going to
4    do that?
5        A. No, why would I do that?
6        Q. I'm not asking you that. I'm asking if you
7    told her that. Did she have knowledge that you were
8    going to do that?
9        A. That I was going to take him to the motel? No,
10   I didn't tell her.
11       Q. Yeah.
12       A. No.
13       Q. Okay. Did you consider her to be an expert in
14   child molestation?
15       A. How would I know that? I've never been through
16   this.
17       Q. You didn't know?
18       A. How would I know this? I've never been through
19   that.
20       Q. In February of 1985, did you know anything
21   about Sharon Krause's credentials?
22       A. Just that she was the investigating detective,
23   that's all I knew. I didn't know about her credentials.
24   The County was handling the investigation. I didn't
25   look at her credentials.

86

1        Q. I just want to understand your thought process
2    taking your four-year-old child to a motel and leaving
3    him with someone who'd been charged with child
4    molestation.
5        A. I didn't believe he was guilty at the time. I
6    loved my husband. I didn't know if it was DeAnne or
7    Karen or Matt or her or if it was anybody at the time.
8    If I thought it was, I wouldn't have left him there.
9        MR. DUNN: Ms. Zellner, I'm going to ask that
10   you move on. I think this is getting down to the point
11   where you're badgering my client. I don't see this line
12   of questioning as productive any further, unless you've
13   got some matters you want to go into. But you've
14   drilled this in as far as it should go, I think.
15       MS. ZELLNER: Well, over your objections -
16   again, this is a federal deposition. I'm not sure that
17   you're aware of the issues - but your objection is noted
18   for the record.
19   BY MS. ZELLNER:
20       Q. And I'll ask, Ms. Spencer, is there anything in
21   addition to what you told me about your thought process
22   in leaving Little Matt at the Salmon Creek Motel,
23   anything else you want to add?
24       A. There's nothing else to add.
25       Q. I'm not asking you that.

87

1        MR. DUNN: Counsel, please don't interrupt her
2    answers.
3        THE WITNESS: I don't know what to say. I'm
4    telling you what I feel, what I know and what's fact.
5    There were a lot of people that she had accused of doing
6    this. At this time, it wasn't proved to me that he was
7    guilty of anything. We're working on our marriage. I
8    believed my husband. He said it was DeAnne trying to
9    turn the kids against him. I believed him. And I would
10   not have subjected my son, if I'd have known in my heart
11   for sure that he was -- had done something to Kathryn.
12   I wouldn't have done it.
13   BY MS. ZELLNER:
14       Q. Now, you said that you weren't sure who had
15   done it because Kathryn had accused DeAnne, and she'd
16   accused Little Matt and Karen Stone, but you would agree
17   with me that none of those people had been arrested for
18   Kathryn's allegations of molestation, right, except Ray
19   Spencer?
20       A. Yes. And I still believed Ray Spencer.
21       Q. Okay. So you, then, pick your son up the next
22   day after he's spent the night with Ray Spencer; is that
23   right?
24       A. I did.
25       Q. And I think on your son's birthday, Little

96

1      A. I have told you everything I can remember at
2  the moment.
3      Q. Did Sharon Krause know that you had been the
4  victim of sex abuse as a child?
5          MR. FREIMUND: Object, calls for speculation.
6          Go ahead and answer, though.
7          THE WITNESS: I don't know that I ever did, no.
8  That wasn't something -- no, it wasn't something I would
9  have just told anybody. It's hard enough to tell you.
10  BY MS. ZELLNER:
11      Q. My question, though, is do you have any recall
12  of telling Sharon Krause that? I believe your answer is
13  no.
14      A. I said no.
15      Q. Did you ever at any point tell Mike Davidson
16  that you'd been a victim of sexual abuse as a child?
17      A. Lord, I don't remember that.
18      Q. Did Sharon Krause ever ask you if you'd been
19  the victim of child sexual abuse?
20      A. I don't remember any talking with her at all
21  about my childhood.
22      Q. And then with Mike Davidson, did he ever ask
23  you that question?
24      A. Yeah, I think we discussed it, but I don't
25  remember exactly what we discussed.

97

1      Q. Do you know at what point in time you discussed
2  it?
3      A. After we were living together.
4      Q. What about the prosecutor, James Peters, did
5  you have any discussions with him at all?
6      A. I don't even remember him, so I couldn't say
7  yes to that at all. I don't remember him.
8      Q. Were you ever treated for alcoholism?
9      A. I'm not a drinker. I'm a non-drinker.
10      Q. Okay. At any point were you a drinker?
11      A. Never.
12      Q. Okay. So in the medical summary, Tab 17, page
13  374.
14      A. All right. I'm using my attorney's. I don't
15  find mine yet.
16      Q. Okay. It's entitled the Oregon Health Sciences
17  University. Do you see that caption across the top?
18      A. Oh, yeah. I see it.
19      Q. Okay. It's Bates stamp 1037. And under
20  discharge medications, there's a statement: His wife is
21  also seeking individual counseling at Alcoholics
22  Anonymous, and the wife and patient are going to receive
23  marital counseling at a later date. The patient was
24  able to return to work at the time of discharge.
25          MR. FREIMUND: I object, that misreads the

98

1  document. You said Alcoholics Anonymous, and it says
2  Al-Anon. There's a difference.
3  BY MS. ZELLNER:
4      Q. Okay. Let's do it your way. Al-Anon.
5          MS. FETTERLY: A big difference.
6  BY MS. ZELLNER:
7      Q. So is that true?
8          MS. ZELLNER: Miss Fetterly, I ask that you not
9  start testifying.
10  BY MS. ZELLNER:
11      Q. Go ahead.
12      A. That's absolutely not true. I've never been a
13  drinker, ever. And maybe I should clarify it. Once or
14  twice a year I have one drink. I can't drink any more
15  than that because I go numb. I don't drink. And I
16  never have gone to Al-Anon or whatever this is or
17  Alcoholics Anonymous. I'm not a drinker.
18      Q. Okay. Just asking the question.
19          Let's go back to the Salmon Creek Motel. What
20  time did you pick Little Matt up the next day?
21      A. Actually, I did not pick him up. Ray brought
22  him to the restaurant down in Vancouver, the Who Song &
23  Larry's and we had lunch. He brought Matt to me.
24      Q. And what did you observe about Little Matt, if
25  anything?

99

1      A. He was very flushed, like he had a fever, very
2  lethargic. He didn't want to talk. He just wanted to
3  lay his head on the table. And I thought he was sick.
4  I didn't know what was the matter with him.
5      Q. Anything else?
6      A. I was going to take him back to the bathroom,
7  and Ray said, no, let me do it and he took him. And
8  when he came back, he acted like nothing happened. He
9  sat up, ate, talked.
10      Q. Do you remember anything else about his
11  condition at the restaurant?
12      A. Not at the restaurant, no.
13      Q. At a certain point in time after Little Matt
14  has spent the night at the Salmon Creek Motel, do you
15  have further contact with Sharon Krause?
16      A. I don't think so, except with the gun
17  situation, you know, him picking his guns up, for not
18  having his guns. It was after that.
19      Q. Okay. Do you remember on or about February
20  21st that you got a phone call from Sharon Krause and
21  that in the phone call she mentioned that the two of you
22  had not spoken since she interviewed the kids in
23  Sacramento?
24      A. Right.
25      Q. Do you remember anything like that?

100

1    A. Yes.
2    Q. Did she offer to assist you in trying to deal
3  with the situation?
4    A. I think at that time she wanted to show me
5  Kathryn's report.
6    Q. So do you remember that around February 22nd of
7  1985 that you actually meet with her in person and she
8  shows you the reports on Kathryn?
9    A. Yeah. Yes.
10   Q. Does she also talk to you about DeAnne Spencer
11 and meeting with her?
12   A. Yeah, I'm sure. I'm sure she probably did talk
13 to me about DeAnne.
14   Q. And did she also, in that meeting, does she
15 tell you that she's concerned or at least worried about
16 Little Matt?
17   A. It wasn't until after the gun situation, I
18 think, that I talked to her about Little Matt, after the
19 -- after his birthday.
20   Q. Because I think, just to help you with the time
21 frame, so his birthday is on 2-20. And then sometime -
22 and I've got the date of February 22nd - you have a
23 meeting. But you do remember having a meeting with her
24 in person; is that right?
25   A. Yes, yes.

101

1    Q. And do you remember in that meeting what the
2  discussion was about your son, Little Matt?
3    A. I remember her asking me that she was concerned
4  maybe something happened to Matt or not.
5    Q. Okay. Did Detective Krause offer to interview
6  Little Matt at that time?
7    A. Yes, she did.
8    Q. At first did you indicate to her that you might
9  -- you would prefer that -- let me rephrase that.
10        Did you indicate to her that you'd like to
11 discuss the potential of her interviewing Little Matt
12 with your therapist?
13   A. Yes.
14   Q. And tell me what was your thinking about that.
15 Were you just trying to be careful, or why did you want
16 to talk to the therapist first?
17   A. I just thought that it would be good for him to
18 see a therapist instead, you know, no other reason that
19 I can think of.
20   Q. At that point in time, around February 22nd,
21 you didn't know anything that had supposedly happened at
22 the motel; is that right?
23   A. No, I didn't.
24   Q. And then at a certain point in time, around
25 February 27th, do you have a meeting with Detective

102

1  Krause in her office?
2    A. Yes.
3    Q. In that meeting, do you remember her asking you
4  if Matt had ever complained about his penis hurting or
5  rectum? Do you remember her asking you those questions?
6    A. Yeah, about his bottom hurting, because he had
7  complained about his bottom hurting or tummy hurting.
8    Q. And had Little Matt's complaints about his
9  bottom and his tummy hurting, had they been after
10 February 16th, after the Salmon Creek?
11   A. Yeah, it was after the birthday, I'm pretty
12 sure.
13   Q. Did you take Little Matt for a medical exam at
14 a certain point in time?
15   A. Yes, I did.
16   Q. What were the results of the medical exam on
17 Little Matt?
18   A. I really wasn't privy to that information. He
19 just said it was hard to tell in a child that small
20 because their muscles are so flexible, strong, whatever
21 he said. I don't remember the exact words he said.
22   Q. Was it your idea to take Little Matt for the
23 exam or did Detective Krause recommend it?
24   A. Detective Krause recommended it.
25   Q. And after Little Matt's medical exam, did you

103

1  talk to Detective Krause about the medical findings on
2  Little Matt?
3    A. Well, I didn't know the medical findings. I
4  just said I had taken him. And all I know is what he
5  said that it was hard to tell, but he didn't tell me the
6  results.
7    Q. Okay. We're talking about the doctor?
8    A. Yes.
9    Q. The doctor did not tell you that he was
10 observing injury, though, correct?
11   A. He didn't tell me one way or another.
12   Q. Did you ever follow up to find out from
13 Detective Krause about what the doctor said in his
14 medical report?
15   A. No.
16   Q. Did Detective Davidson also know about the
17 medical exam of Little Matt?
18   A. I have no idea. I wasn't really talking with
19 Mike Davidson, just Sharon Krause, so I have no idea
20 what he knew.
21   Q. So going back to your interaction with Sharon
22 Krause, and we're in that time period about February
23 22nd, did you at a certain point in time conclude that
24 Little Matt had been sexually molested by Ray Spencer?
25   A. Did I conclude that he was?

104

1    Q. Right.
2    A. I didn't conclude anything. I just know what
3  Sharon Krause said he said. I don't know. I don't know
4  conclude.
5    Q. When the information comes out that Little Matt
6  has been sexually -- allegedly sexually molested by Ray
7  Spencer, does the information go to Sharon Krause and
8  then Sharon Krause tells you what Little Matt said?
9    A. She told me what his reports were to her, yes.
10   Q. Did Little Matt ever report anything directly
11 to you during that time period?
12   A. He talked to me about the bubble bath and he
13 was afraid to take bubble baths. That was clear back
14 when Ray was there.
15   Q. Did Little Matt tell you why he was afraid to
16 take bubble baths?
17   A. He told Sharon.
18   Q. So just so it's clear on the record, does
19 Little Matt ever describe any of the sexual molestation
20 of him that allegedly occurred at the motel?
21   A. At the motel? No.
22   Q. Does Little Matt ever describe to you any
23 sexual molestation that occurred to him by Ray Spencer?
24   A. Clear back then it was just him being afraid to
25 take a bubble bath and for me to take his rectal

105

1  temperature when he was sick.
2    Q. All right. Other than that information,
3  though, was there anything else that Little Matt told
4  you about related to any sexual molestation?
5    A. No.
6    Q. Did Little Matt ever, after the Salmon Creek
7  Motel, did he ever tell you that nothing had happened at
8  the motel?
9    A. He has never recanted anything to this date.
10   Q. But I'm asking you back around February 22nd,
11 did Little Matt ever tell you that nothing had happened
12 at the motel?
13   A. No, he did not tell me nothing had happened at
14 the motel.
15   Q. I'm correct that he doesn't tell you what
16 happened. He tells Sharon Krause.
17   A. Yeah. I only remember some things about the
18 temperature and the bubble bath.
19   Q. Did Sharon Krause then interview Little Matt at
20 some point in time about the Salmon Creek Motel?
21   A. She did about me taking him over there.
22   Q. And then after she interviews him, she reports
23 to you what he said.
24   A. Oh, I don't remember.
25   Q. Is that correct?

106

1    A. I don't remember. I'm sure, you know. You
2  know, I've read so many reports and trying to put my
3  mind around what happened back then and read the
4  reports, I don't know what he said.
5    Q. Well, would it be a fair statement that your --
6  all of your information about Little Matt being molested
7  at the Salmon Creek Motel came from Sharon Krause?
8    A. I think most all of it.
9    Q. Well, other than the bubble bath and the rectal
10 temperature, was there anything else --
11   A. Huh-uh.
12   Q. -- that Little Matt told you?
13   A. Nothing I can think of at the moment.
14   Q. I want to direct your attention to group
15 Exhibit A and Tab 16. It's an interview in The
16 Columbian. And I'll let you find that.
17   A. Okay.
18   Q. Let's go to -- there's a couple of quotes in
19 this article supposedly of you, and I just want to
20 confirm whether they're accurate.
21       So if you go to the third page of the article
22 and go to the first -- go to the fourth paragraph. It
23 starts, it says: It was hard.
24   A. Okay.
25   Q. So they've got you quoted here. I'll read the

107

1  quote into the record and then just tell me if it's
2  accurate or not. The quote is: It was hard, said
3  Shirley Spencer, the doctors at OHSU were trying to
4  convince me Ray was a good guy, that he wasn't a child
5  molester. The sheriff's department was on the opposite
6  end.
7        Reading that quote -- go ahead, is that
8  accurate?
9    A. I didn't say that, but I remember the doctor
10 saying he was a good guy. He didn't do this.
11   Q. So you're saying that you did not say this to
12 the author of this article; is that correct?
13   A. I said this to a reporter?
14   Q. Yes, it's an article. It's a newspaper
15 article.
16   A. Yeah.
17   Q. Yes, you're quoted in the newspaper article.
18 I'm simply asking you, did you make that statement?
19   A. I don't remember it.
20   Q. Now, if we look -- if you go another two pages
21 -- if you go to the next page, so it's Bates stamp 5599.
22   A. I don't see a Bates stamp, do you?
23   Q. It's page 4 of the article.
24   A. Okay. I have it.
25   Q. So in the first -- actually, it's the second

120

1    A. I think it's been about a year ago.
2    Q. Do you know what the crime was?
3    A. Yeah, he got into drugs.
4    Q. So the charge against him related to drugs?
5    A. Yeah, drugs or breaking into my house when he
6  was on drugs.
7    Q. Does Matt Hansen have any children?
8    A. He has a daughter, a five-year-old daughter.
9    Q. And does he have custody of her or does her
10  mother?
11    A. The mother has custody.
12    Q. What is the mother's name?
13    A. Stephanie.
14    Q. What's her last name?
15    A. Snow.
16    Q. Do they also live close to you?
17    A. No. They live an hour away in Rainier, Oregon.
18    Q. You said that you first -- I think you said
19  something about your first date with Detective Davidson
20  was in June, was it, of 1985?
21    A. Yes.
22    Q. When is the last time that you talked to
23  Michael Davidson?
24    A. Oh, my gosh, 15, 20 years ago. I can't even
25  tell you for sure.

121

1    Q. So I'm assuming from that answer that you've
2  never talked to him about this case, right?
3    A. No -- well, when I went to a deposition a long
4  time ago, I asked him about a medical report that had
5  been misplaced. I asked him about that. But that's
6  still about 15 years ago, I think. I don't even know.
7    Q. What did Michael Davidson tell you about a
8  medical report in that conversation?
9    A. It was after I had my deposition and heard
10  about it, I asked him about it. And he said that he
11  didn't remember it, but they'd found one.
12    Q. And was the one they found on your son, Little
13  Matt?
14    A. I don't know who it was on, which one it was
15  on. I want to say Kathryn, but I may be wrong.
16    Q. Did you ever talk to him about the medical
17  report on your son, Little Matt?
18    A. I don't think so. I talked to him about
19  whether he had the report on one or the other of them,
20  but what it was about I didn't ask him. I mean, what it
21  said.
22    Q. And did he talk to you about visiting Ray
23  Spencer when he was in jail before he went to prison?
24    A. The only time I know of that he visited Ray in
25  jail was taking my -- what do you call it?

122

1    MR. DUNN: Deed.
2    THE WITNESS: -- that paper I took in there,
3  quitclaim deed. He didn't talk to me about seeing him
4  any other time.
5  BY MS. ZELLNER:
6    Q. Did Michael Davidson ever tell you that he'd
7  gotten in trouble with the jail staff, jail personnel,
8  for visiting Ray Spencer?
9    A. No.
10    Q. He never told you that?
11    A. Not that I remember.
12    Q. Okay. Did Michael Davidson ever tell you that
13  he had attempted to convince Ray Spencer to plead
14  guilty?
15    A. No.
16    Q. Would you agree with me that the first time you
17  go out in public with Michael Davidson is in June of
18  1985?
19    A. 1985, in June.
20    Q. That's the first time you go out in public,
21  right?
22    A. Well, never saw him privately before then,
23  either.
24    Q. When does -- does he ask you out or do you ask
25  him out?

123

1    A. He called and asked me if I'd like to meet him
2  for a drink. And that was in June of '85.
3    Q. And why is it that you started dating Michael
4  Davidson?
5    A. I don't know. I don't have an answer for that.
6  I just met him and talked to him, and I guess I liked
7  him then, liked our conversation. And I guess I just
8  needed, like I said, somebody to lean on.
9    Q. When you say that you talked to him, were you
10  having phone conversations with him before June?
11    A. No.
12    Q. So did you at any point meet Michael Davidson's
13  wife, Linda Davidson?
14    A. I saw her one time, one time only, and it was
15  at her -- I'm trying to think if it was a son or a
16  daughter -- I think it was a son's wedding. That's the
17  only time I ever saw her. And we never really had a
18  conversation. I met her. That was it.
19    Q. Did you ever go to Michael Davidson's house
20  prior to him moving into your house?
21    A. No, I didn't even know where he lived.
22    Q. Is there any other reason that you became
23  involved with Michael Davidson, other than what you've
24  just told us?
25    A. No, because I didn't even like him in the

124

1  beginning because I thought he was ruining my marriage
2  and my husband's career.
3    Q. Would you describe yourself in those months of
4  August, September, October up until Ray's arrest in
5  January, would you describe yourself as vulnerable?
6    A. When, again? What was the dates?
7    Q. August to January 3rd of 1985.
8    A. Oh, you mean, when I was still with Ray?
9    Q. Yes.
10    A. No. I wasn't vulnerable. I think that --
11    Q. Were you --
12    A. -- emotionally we were upset. We were having
13  problems in the marriage.
14    Q. Would you describe yourself in those months as
15  being emotionally stable?
16    A. Yes.
17    Q. Did you and Michael Davidson ever discuss Ray's
18  case once you were living together?
19    A. Lord, you know, I don't really remember. I'm
20  sure there was probably times, like, I got a letter from
21  Ray from prison and I didn't want to have any mail, and
22  I think I discussed it with him. And then he called --
23  I don't know if it was his boss or the prison or where,
24  for him not to be able to communicate with me. It
25  wasn't really a big topic at that time, I mean, subject

125

1  to talk about. Let's put it that way.
2    Q. When Ray Spencer pleads guilty, do you find out
3  about that in advance of when he pleads guilty in May of
4  1985?
5    A. I hadn't heard about it, that he pleaded
6  guilty. All I heard was he took, what he called a
7  Newton plea, or whatever it was. I hadn't heard until
8  later on that he'd pled guilty.
9    Q. And who told you, if you remember, that Ray
10  Spencer was going to take the Newton plea?
11    A. Probably Sharon. She's probably about the only
12  one I talked to very much.
13    Q. Do you know -- Ray Spencer pleads guilty on May
14  16th, 1985. Do you know how long before that you knew
15  that he was going to enter a Newton plea?
16    A. No.
17    Q. Was it a month before?
18    A. Ma'am, I don't have a clue.
19      MS. ZELLNER: Let me take a two-minute break.
20  I want to see if I have any questions.
21      (Discussion off the record.)
22      MS. ZELLNER: Can we go back on.
23  BY MS. ZELLNER:
24    Q. Do you know, Ms. Spencer, if at any time before
25  Ray's plea on May 16th, 1985, did you ever meet with any

126

1  prosecutor involved with Ray's case?
2    A. You know, I don't remember meeting -- I don't
3  even remember the prosecutors. I remember the names,
4  but I don't remember meeting with them. I may have, but
5  I don't remember.
6    Q. Do you remember anybody preparing you for Ray's
7  trial? Do you remember anybody talking to you about the
8  fact you might have to give testimony or anybody
9  approach you about that?
10    A. No.
11    Q. And then were you interviewed by the Vancouver
12  Police Department before they terminated Ray in January
13  of 1985?
14    A. I was, but I think it was Captain Davis and Jim
15  Hulse, I think.
16    Q. And have you had the opportunity to look at
17  those reports? Did you look at them when you met with
18  Ms. Fetterly?
19    A. No -- well, we did go over one thing, that was
20  the baby-sitter situation.
21    Q. With Rhonda Short?
22    A. Yeah.
23    Q. Is that who it was?
24    A. Yes.
25    Q. And with Stephanie Snow, can you give me

127

1  anymore specifics on her address?
2    A. No. I just know she lives in Rainier, Oregon.
3    Q. Does she live in a house or does she rent an
4  apartment?
5    A. She lives in a house with a boyfriend.
6    Q. After you split up with Michael Davidson, did
7  you ever have any social contact with him at a horse
8  club or some type of club?
9    A. We belong to the same saddle club, and he was
10  going with another lady that belonged there then. And I
11  saw him, but we really didn't have contact -- I mean
12  talk, you know.
13    Q. Right. But that was pretty much the only
14  contact you had with him?
15    A. Yes, ma'am.
16    Q. Now, one other note in the records, I'll just
17  ask if you remember this, do you remember an incident
18  where Michael Davidson held a gun to his head in front
19  of Little Matt?
20    A. Yes, I do remember that.
21    Q. Could you tell me just a little bit about that?
22  When did that happen?
23    A. When he was still living at my house. We were
24  arguing about something, and if I knew what it was, I'd
25  tell you, but I can't remember. I just know we were

128

1  arguing and he did that.
2       Q. Did he say anything when he held the gun to his
3  head?
4       A. I don't remember if he said something like I
5  might as well not be living or whatever. I don't really
6  know. I don't remember his exact words it was so long
7  ago.
8       Q. Okay. Did you ever have, in your relationship
9  with Michael Davidson, did you ever have any physical
10  confrontations with him?
11      A. No, no. It was verbal.
12      Q. And would you say that towards the end of that
13  relationship, before you split up, was that relationship
14  fairly stressful?
15      A. It was, because Matt and I were stressed all
16  the time. I'm sure that's probably caused a lot of it.
17      Q. And do you think the stress for you and Matt
18  came from the whole investigation and prosecution and
19  conviction of Ray Spencer?
20      A. That, and him being molested. The whole thing,
21  every all together. It was really hard on everything.
22      Q. How long did you continue your therapy with the
23  therapist that you mentioned?
24      A. I quit -- I went a couple of years and I had to
25  quit going for Matt so he could go. It was really

129

1  expensive back then.
2       Q. Did he go to the same therapist? I think it
3  was Jeannette.
4       A. Dezsofi.
5       Q. Dezsofi.
6       A. Did who, Ray or Mike?
7       Q. No. Little Matt, did Little Matt go to her?
8       A. No, he went to -- I forgot her name. It's
9  written down in those reports, but he went to her. And
10  then it was so expensive, and I think the State or the
11  County helped me pay a little bit of it. And then we
12  went to see -- we use that that was free downtown. I don't
13  even know. I don't know what you call it. It was just
14  free counseling.
15      Q. Did Michael Davidson also go to counseling
16  during the time you were with him?
17      A. He did. He did with Matt, not before.
18      Q. So Michael Davidson went to a counselor with
19  Little Matt?
20      A. With Matt and I when we were living together.
21      Q. And which counselor did you go to?
22      A. Jeanette Dezsofi.
23      Q. And how long did the three of you do that?
24      A. I don't remember.
25      MS. ZELLNER: I don't have any more questions.

130

1  Thank you for your patience.
2       THE WITNESS: I'm not very patient, am I?
3       MS. ZELLNER: No, you are. You are. It's hard
4  to remember all this.
5       MS. FETTERLY: Do you need a break? I know
6  some of the counsel will have a few questions for you.
7  Do you want a break first or do you want to proceed?
8       THE WITNESS: I'm fine.
9       MS. FETTERLY: Just for the record, my name is
10  Patricia Fetterly, and I will be the next questioner.
11
12          EXAMINATION
13  BY MS. FETTERLY:
14      Q. I just want to establish, Ms. Spencer, it is
15  true, is it not, that on August 24th and 25th, 1984,
16  when Kathryn made her disclosures to you, you didn't
17  know Mike Davidson? You'd never met him by that time;
18  is that right?
19      A. No, I never met him until Ray went in for
20  his --
21      Q. The first polygraph?
22      A. Yeah, the first polygraph.
23      Q. Would it also be fair to say that you didn't
24  even know who Mike Davidson was in August of 1984?
25      A. I didn't know who anybody was at the County.

131

1       Q. Including Mike Davidson?
2       A. Including Mike Davidson, Sharon Krause, any of
3  them.
4       Q. And you didn't know Jim Peters?
5       A. Didn't know him. And I still don't remember.
6       Q. Okay. As you just alluded to, am I correct
7  that the first time you would have met Mike Davidson
8  would be the date of the -- of your then husband's first
9  polygraph, which I think the record shows was September
10  21st, 1984? Would that be correct?
11      A. That would be correct.
12      Q. And on that occasion, you come -- you come with
13  your then husband to the Clark County sheriff's office;
14  is that right?
15      A. That's right.
16      Q. Was that your first meeting with either Mike
17  Davidson or Sharon Krause?
18      A. Yes, that was the first time I ever saw him.
19      Q. And would the next time you ever met Mr.
20  Davidson be the date of the second polygraph, which I
21  think the record established is September 24th, 1985?
22      A. That's right.
23      Q. And am I also correct from your former -- from
24  the testimony you gave a little while ago that the next
25  time you would even have gone to the sheriff's office

132

1    would have been when you were interviewed yourself by
2    Detective Krause somewhere around late February 1985?
3    Would that also be correct?
4        A. Yes.
5        Q. So you made no visits, then, to the sheriff's
6    office between September 24th, 1984, and approximately
7    February 27th, 1985. Would that be accurate?
8        A. That's accurate. As I recall.
9        Q. And am I correct that you, as you just
10   testified, were interviewed at the sheriff's office by
11   Detective Krause, I believe it's been established on
12   February 27th, 1985? Do you recall meeting Mike
13   Davidson on that occasion at the sheriff's office?
14       A. No. Sharon was the interviewer. I only saw
15   Mike there a couple of times, that I was with Ray or if
16   he walked past.
17       Q. But you didn't interact with him, would that be
18   fair to say?
19       A. That's exactly right.
20       Q. And then I believe you testified that you took
21   your son, Matt, I think the following day on February
22   28th, 1985, to the sheriff's office, and was that again
23   to be interviewed by Detective Krause?
24       A. Yes, it was.
25       Q. Did you have any interaction with Detective

133

1    Davidson on that occasion?
2        A. No, I didn't.
3        Q. And then did you have some other occasions to
4    take Matt, your son Matt, in that same time frame,
5    meaning late February 1985 maybe into early March 1985,
6    to the sheriff's office again to be interviewed by
7    Detective Krause?
8        A. I don't know how many times I was in there to
9    see her for an interview for Matt. A couple of times.
10       Q. I think there's some references in deposition
11   testimony that you gave earlier that it seemed like you
12   were there all the time or words to that effect. Was
13   that, again, to see Detective Krause in this same time
14   frame?
15       A. Yes, it was. And it did seem like it was every
16   day because it was ongoing for months, you know. And I
17   know that I wasn't there, but it felt like it, you know,
18   there was so much stress.
19       Q. It felt like it to you. I understand what your
20   answer is.
21          But am I correct, the purpose of those trips to
22   the sheriff's office in that time frame, meaning
23   February, March 1985, was not to see Detective Davidson;
24   is that right?
25       A. That's right. I didn't even like him then.

134

1        Q. Okay. And then you testified, too, on one
2    occasion interacting with Detective Davidson when on a
3    visit to see Detective Krause, you had a quitclaim deed
4    with you and she gave it to Detective Davidson to take
5    to Mr. Spencer?
6        A. Yes, that's true.
7        Q. Was that the only time that you can recall
8    interacting with Detective Davidson in the Clark County
9    sheriff's office --
10       A. Yes.
11       Q. Let me finish. -- between September 24th,
12   1984, and that date that he took the quitclaim deed?
13       A. Yes, ma'am. That's true.
14       Q. And I think you testified that your personal
15   relationship with Detective Davidson did not begin until
16   June of 1985; is that right?
17       A. That's true.
18       Q. On any time prior to you beginning to date him
19   after June of 1985, did you ever see Detective Davidson
20   alone, in private?
21       A. Never.
22       Q. And was your sole interaction with him what
23   you've just described in your testimony today, meaning
24   you saw him twice in September of 1984 when you
25   accompanied your husband for the polygraphs, and you

135

1    might have seen him in the office but not interacted
2    with him when you came to be interviewed by Detective
3    Krause, and that you saw him on one occasion sometime
4    after that where he took the quitclaim deed? Would
5    those summarize your only interactions with him with
6    Detective Davidson up to June of 1985?
7        A. That's exactly right.
8        Q. Now, I want to turn now to your home that you
9    owned on Lucia Falls Road. Was this a house on the
10   Lewis River?
11       A. Yes, ma'am, it was.
12       Q. When the Spencer children visited you in the
13   summer of 1984, was this where you and your family were
14   then living when the Spencer children came to visit?
15       A. Yeah. I lived there since '77, that same
16   house.
17       Q. Because Kathryn describes in one of the reports
18   a house on the river. To the best of your recollection,
19   that you and her father lived in, would that be that
20   house to the best of your knowledge?
21       A. That house.
22       Q. Because it was, in fact, on a river, right?
23       A. It's on the Lewis River.
24       Q. What was the purchase price of that home in
25   1977?

144

1    A. Yes, ma'am.
2    MS. ZELLNER: Objection. She said she didn't
3 know what the organization was and then you told her.
4    MS. FETTERLY: She said she didn't know then
5 but she knows now.
6    THE WITNESS: I don't know. Now, what was the
7 question? Would you repeat it? I'm sorry.
8    (Last question read by reporter.)
9    THE WITNESS: I didn't understand that then. I
10 didn't even know about it then, but I know this now,
11 what it's for. But nobody ever said anything to me
12 about it.
13    MS. FETTERLY: Thank you. I have no further
14 questions.
15
16    EXAMINATION
17 BY MR. BOGDANOVICH:
18    Q. Ms. Spencer, I'm Guy Bogdanovich. I represent
19 Sharon Krause.
20    I would like to know whether you have ever
21 reviewed the typewritten reports that Sharon Krause
22 prepared, either documenting her interviews with you or
23 her interviews with your son, Matt.
24    A. Yes, I've read them.
25    Q. Okay. When did you read those for the first

145

1 time?
2    A. I don't remember reading any of those reports
3 until I got subpoenaed. If I did, I don't remember
4 them.
5    Q. Do you remember reading -- go ahead.
6    A. And I don't remember just now, but over the
7 last eight months or so.
8    Q. You reviewed them initially around the time
9 that your deposition was taken many years ago and then
10 you reviewed them again in the last -- what? -- in the
11 last eight months?
12    A. Yeah, is what I remember.
13    Q. Okay. If you recall, specifically do you
14 remember reviewing a report where Detective Krause
15 documented all of the difference communications and
16 contacts she had with your husband, Ray, or with you or
17 with both of you together?
18    A. No, I don't remember her interviewing the two
19 of us together. I don't remember.
20    Q. And I don't mean -- I don't mean to use
21 interview in a formal or technical sense.
22    She has a report, for example, that she
23 documented that there was a phone call that occurred
24 between either her or Ray. And there's the same report
25 that contains information about the two occasions where

146

1 you and Ray went into the sheriff's office for Ray to
2 take polygraph examinations. Do you remember --
3    A. I did read those.
4    Q. In your review of that report, did you find any
5 inaccuracies in what Detective Krause was reporting?
6    A. No, sir.
7    Q. You recall specifically, though, one of the
8 polygraph incident reports documented in many quotations
9 of statements made by Ray in anger, where he was using
10 the F word repeatedly, and she recorded those
11 accurately?
12    A. Yes, I remember those.
13    Q. And then specifically do you remember reviewing
14 a 22-page report that documented Detective Krause's
15 interactions with you and then her interview with your
16 son, Matt, in February of 1985?
17    A. I remember reading those, yes.
18    Q. And again, I'd ask you the same question, did
19 you find any inaccuracies in the way Detective Krause
20 documented what was said during those events?
21    A. No, I didn't find any inaccuracies.
22    Q. One of Detective Krause's report documented
23 something you told her about Leo Clark calling you at
24 some point and you told Detective Krause that he "got in
25 your face." Do you remember that incident?

147

1    A. I do remember that incident. He did.
2    Q. Can you tell me what the context was, what
3 happened?
4    A. He thought that he hadn't done anything, that
5 we had marriage problems and we should work on that.
6 And he knew Ray.
7    Q. And when you used the words to Detective Krause
8 to describe Leo Clark's conduct, that he got in your
9 face, specifically what did he do or say that made you
10 use that term?
11    A. Well, he was just very angry because Ray was
12 his friend. And he didn't think that Ray would do that
13 kind of thing, you know, so he thought we had a marriage
14 problem.
15    MR. BOGDANOVICH: That's all I have, Ms.
16 Spencer. Thank you.
17    MR. FREIMUND: I have no questions, Ms.
18 Spencer. Thank you for your time.
19    MS. ZELLNER: Actually, I have just a couple of
20 follow-ups for Ms. Fetterly.
21
22    EXAMINATION
23 BY MS. ZELLNER:
24    Q. What was Ray Spencer's salary at the time he
25 got fired?

148

1     A. He didn't make very much more than me, I don't
2  think. Probably 25 to 23,000, somewhere in there. Not
3  very much.
4     Q. And then after he lost his job, would it be a
5  fair statement to say that that was a big financial
6  burden on you?
7     A. Yes, ma'am, it was hard.
8     Q. And after -- of course, after he went to jail,
9  that was also difficult, was it not, for you not to have
10 that second income?
11    A. Yes, ma'am.
12    Q. Would you say you were struggling financially
13 at that point?
14    A. I struggled my whole life. Yes, ma'am.
15    Q. During that time period, did you consider
16 filing for bankruptcy or did you just try to keep going?
17    A. No, I didn't do bankruptcy at that time.
18    Q. Did you at some point later file for
19 bankruptcy?
20    A. Yeah, but that's a long time after, 2000, 1999
21 or something.
22    Q. You filed for divorce from Ray Spencer in June
23 of 1985; is that right?
24    A. I think that was the date. Yeah, June 6th.
25    Q. I'm sorry. June 6th.

149

1     A. Yeah. I have it written down.
2     Q. And then Michael Davidson, then, also filed for
3  divorce from his wife Linda; is that right?
4     A. I guess he did.
5     Q. Well, when he was living with you, he was
6  divorced from her, wasn't he?
7     A. Yes, he said he was.
8     Q. Now, did Michael Davidson contribute to helping
9  you pay the bills and all of that when he moved into the
10 house with you?
11    A. Yeah, he helped me. But it wasn't that house.
12 It was the other house, the one on Cole Witter Road.
13    Q. Right. But did you share expenses, your
14 household expenses?
15    A. Yes, ma'am.
16    Q. And what kind of salary was he making at the
17 time?
18    A. Oh, I don't have a clue. I never asked him
19 what his salary was. I don't have a clue, ma'am.
20    Q. Well, he made more than Ray Spencer, correct?
21    A. I don't know what he made. I can't tell you
22 that. I don't know. We had separate banking and
23 everything. I don't know.
24    Q. Did you split the bills evenly?
25    A. Not really. I think he paid me about 300 a

150

1  month, something like that.
2     Q. Did he contribute anything else to your
3  financial support?
4     A. No.
5        MS. ZELLNER: All right. I don't have any more
6  questions.
7        MR. DUNN: I don't have any questions.
8        MS. ZELLNER: Would you like to reserve
9  signature so she can read it, or do you want to waive?
10       MR. DUNN: You can read this and watch it, or
11 you can just rely on the court reporter to be accurate.
12       THE WITNESS: I'll rely on her.
13       MR. DUNN: We'll waive signature.
14       MS. ZELLNER: Thank you for your time. We'll
15 see you in April. That's the trial date. Thank you.
16       MS. FETTERLY: Is anyone ordering this?
17       MS. ZELLNER: Yeah, we're going to order it.
18       MS. FETTERLY: We'll each take copies.
19       MR. FREIMUND: I would like an electronic copy,
20 if you could get my e-mail information.
21       MS. FETTERLY: Me, also.
22       MS. ZELLNER: The plaintiff would, too.
23       MR. BOGDANOVICH: So would I.
24       (Deposition Exhibit B was marked for
25 identification.)

151

1        MS. FETTERLY: I'd ask the reporter to hand Ms.
2  Spencer the document that has now been marked as Exhibit
3  B.
4        THE WITNESS: I have it.
5
6        EXAMINATION
7  BY MS. FETTERLY:
8     Q. And Ms. Spencer, can you take a look at that
9  document, and just -- I just want you to verify that
10 that is actually a copy of the handwritten statement you
11 made on or about August 25th, 1984, which documents your
12 conversation with Kathryn Spencer of August 24 and 25,
13 1984; is that correct?
14    A. That's correct.
15    Q. Is that a true and accurate copy of your
16 original notes --
17    A. Exactly.
18    Q. -- documenting those conversations?
19    A. Exactly.
20    Q. Just so the record was clear, in the earlier
21 portion of your deposition, there was some rather
22 extensive questioning by Ms. Zellner concerning your
23 handwritten document. And previously the record had
24 stated that that document was Tab A-1. Do you recall
25 that testimony where you were questioned about that

152

1   handwritten document at some length?

2       A.  Yeah, I remember.  Ours just said exhibits.

3       Q.  And you read extensively in response to Ms.

4   Zellner's question from that document.

5       A.  Yes, ma'am.

6       Q.  Is that the document you read from earlier in

7   your deposition the document that's been marked as

8   Exhibit B?

9       A.  Yes, ma'am.

10          MS. FETTERLY:  Thank you.  I wanted to clarify

11  that for the record.

12          (Deposition concluded at 2:12 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SHIRLEY JEAN SPENCER  12.06.12

153

1                              CERTIFICATE

2

3

        STATE OF WASHINGTON )
4                           )  ss.
        County of Clark     )

5

6              I, the undersigned Washington Certified Court
        Reporter, pursuant to RCW 5.28.010 authorized to
7       administer oaths and affirmations in and for the State
        of Washington, do hereby certify:

8

               That the annexed and foregoing deposition
9       consisting of Pages 4 through 152 of the testimony of
        each witness named herein was taken stenographically
10      before me and reduced to a typed format under my
        direction;

11

               I further certify that according to CR 30(e)
12      the witness was given the opportunity to examine, read
        and sign the deposition after the same was transcribed,
13      unless indicated in the record that the review was
        waived;

14

               I further certify that all objections made at
15      the time of said examination to my qualifications or the
        manner of taking the deposition or to the conduct of any
16      party have been noted by me upon each said deposition;

17             I further certify that I am not a relative or
        employee of any such attorney or counsel, and that I am
18      not financially interested in the said action or the
        outcome thereof;

19

               I further certify that each witness before
20      examination was by me duly sworn to testify the truth,
        the whole truth and nothing but the truth;

21

               I further certify that the deposition, as
22      transcribed, is a full, true and correct transcript of
        the testimony, including questions and answers, and all
23      objections, motions and exceptions of counsel made and
        taken at the time of the foregoing examination and was
24      prepared pursuant to Washington Administrative Code
        308-14-135, the transcript preparation format guideline;

25

154

1          I further certify that I am sealing the
deposition in an envelope with the title of the above
2    cause and the name of the witness visible, and I am
delivering the same to the appropriate authority;
3

4          I further advise you that as a matter of firm
policy, the Stenographic notes of this transcript will
be destroyed three years from the date appearing on this
5    Certificate unless notice is received otherwise from any
party or counsel hereto on or before said date;
6

7          IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my Washington State CCR Seal this 8th day of
December 2012.
8

9

10

11

12                    Certified Court Reporter No. 2119
in and for the State of Washington
13                    residing at Vancouver, Washington
My CCR certification
14                    Expires 12-03-12

15

16

17

18

19

20

21

22

23

24

25

84-8506

○  ①

Fri. Aug. 24, 1984, about 9:00 p.m.
the kids all wanted to sleep on the
front room floor and watch the
video as they had the night before
While they were watching the picture
I took of shower. When I finished
I put on a robe and Kathryn and
Big Matt asked me to lay between
them on the floor. While watching
the movie Ray was at work.
Around 10:00 or 10:30, the boys fell
asleep. Kathryn asked me if I/she
could rub my tummy. Which was
normal for. We all rub each others
back, legs, feet, tummys etc. some-
times as whole family project. While
she rubbed my tummy she slid
her hand up and tried to expose
my top a few times and I said
Kathryn and then paid close
att. to his actions. She would
put her arm across my chest
and try to move my robe and
feel my breast and sneak a look
by see if Big Matt was watching.
I again said Kathryn and she slid
her hand back to my tummy. All
of a sudden she slid her hand

Exhibit  B
12.6.12
Date: S. Spencer
Rider & Associates
800-869-0864

Spencer-05222

84-850L

(3)

down to my front. Startled, I said
Kathryn, and she jerked her hand
away. She said mommie can
I rub your peepee. I said no
Kathryn. She said can I rub your
peepee and when I'm done
will you rub my peepee. She
said it feels good. Can I. She
said Karen let me rub her peepee.
I said no. I will rub your back
and tummy not your peepee.
She kept insisting she wanted
me to do this for it felt so good.
She would grab my hand and
try to push it to her peepee. I
said no. She again said Karen
and my mommy let me rub
their titties and peepees. At that
I started questioning her about
Karen then her mom. She told
me her dad was away hunting
and Karen was laying on the bed
with Kathryn. Karen had Kathryn
untie her robe and rub her
tummy, then her breast, then she
let her rub her peepee. I asked her
then what and she said Karen
rubbed her peepee.

Spencer-05223

84-8506

(3)

I asked Kathryn how many
times did this happen. She said
a few. I then asked her about
her mom. Denny She said pretty much
the same things that they rubed
each others tummys - tops and
peepees. I said was this only
when mommie Put mediant
on your peepee cause it was
soft. She said no. She rubed
it other times when it didn't
need mediane. She again asked
me if I would rub her peepee.
I said I would rub her back
and tummy not her peepee.
She then said daddy lets me
rub his peepee and he rubs my
peepee. That really tore me up.
So I kept it light as we watched
the video and tryed to question
her more. I asked her where
the boys were when this happened
and she said asleep. I asked
her where I was and she said
at work. I asked her how many
times 1 or 2 or 3 she said a hole
bunch. She said daddy told her
not to tell. I said then why

84-8506

(14)

are you telling me Kathryn. She
said I wanted you to know. I
said are you going to tell your
mommy Darling and she said
no. She would never do that.
I asked her why she said
mommy would laugh at me.
I ask her if she was going
to tell anyone else. she said
no. Ray came home from work.
and I didn't know what to do
or say. I have never come up against
anything like this before. I was
scared for Kathryn, Ray, Mary,
things ran thru my mind what
to do, what to say or how to say
it, but I just couldn't do or say
anything. I til I talked with Kathryn
more. and the next day Ray. I
left to work. I left the kids to
the beach. While the boys swim
Kathryn laid on the blanket to
keep warm and we talked some
more. she said her same story
about her mom and Karen and
went into more detail about her
dad and her and Big Matt.

Spencer-05225

84-8506

She said Big Matt stuck his
finger in her some times. I asked
her about any other men or women
she said no. Every time Big Matt
came around she said "shuu! Matt
comming". She said "You won't tell
dad and I said no, and don't
you say anything. She said dad
tells me not to tell you and you
tell me not to tell dad. I said
that's a little different. She again
asked me about why I wouldn't
rub her peegee. I couldn't make
her feel dirty so changed the
subject. She said I rubbed you.
I said Kathryn you rubbed my
tummy not my peegee. You
touched it once and mom told
you no. She said I know but
can I mom if feels good. I said
no and started questioning her
again. She said dad would lay
on his back and she would lay
on his tummy. They started
out with dad in his robe in
shorts and her in her nightee
and panties. Then she said she
took off her panties and slid

84-850c

Spencer-05227

84-8506

What it feels like to do more. I
didn't know how to tell her that
this wasn't right with out making
her feel bad + dirty. I asked
her if she was telling me stories,
she said no. I said you wouldn't
tell me lies, she said no. Your not
making it up. No. I asked her if
she was afraid of me she said yes.
I said why I never have spanked
you. Are you afraid of that. Well
my mommie & DeAnne would
spank me and send me to my
room. I said you know I wouldn't
do that. She did I know. I
said then is this all so. she
said yes. I then got batteries
and called the Crissis Line because
I didn't know what else to do.
I asked Cressie how if I should
tape Kathryn she said it wouldn't
do any good. It wouldn't hold
up in Court. so I didn't tape
her. Ray then called and I
told him. Then he took it to
Sac. Calif. Crissie.

                    Shirley J. Spencer

Spencer-05228