# EXHIBIT  2

1          UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF WASHINGTON

3              AT TACOMA

4    _____

CLYDE RAY SPENCER, MATTHEW        )
5    RAY SPENCER, and KATHRYN E.       )
TETZ,                             )
6                                      )
             Plaintiffs,          )
7                                      )
    vs.                           )    NO. 3:11-cb-05424-BHS
8                                      )
FORMER PROSECUTING ATTORNEY       )
9    FOR CLARK COUNTY JAMES M.         )
PETERS, DETECTIVE SHARON          )
10   KRAUSE, SERGEANT MICHAEL          )
DAVIDSON, CLARK COUNTY            )
11   PROSECUTOR'S OFFICE, CLARK        )
COUNTY SHERIFF'S OFFICE, THE      )
12   COUNTY OF CLARK and JOHN DOES )
ONE THROUGH TEN,                  )
13                                     )
             Defendants.          )
14   _____

15   DEPOSITION UPON ORAL EXAMINATION OF JAMES MICHAEL DAVIDSON
    _____
16

17

18

19             Monday, November 5, 2012
                Olympia, Washington

20

21

22

23

24

25

Page 2

1   APPEARANCES:

2       FOR THE PLAINTIFF CLYDE RAY SPENCER
        (VIA VIDEOCONFERENCE):
3
4                           MS. KATHLEEN ZELLNER
                            KATHLEEN T. ZELLNER & ASSOC.
5                           DOUGLAS JOHNSON
                            Esplanade IV
6                           1901 Butterfield Rd., Ste. 650
                            Downers Grove, IL  60515
7       FOR DEFENDANT JAMES M. PETERS:

8                           MS. PATRICIA FETTERLY
                            ASSISTANT ATTORNEY GENERAL
9                           P.O. Box 40126
                            Olympia, WA  98504-0126
10
11      FOR DEFENDANT DETECTIVE SHARON KRAUSE:

12                          MR. GUY BOGDANOVICH
                            LAW, LYMAN, DANIEL
13                             KAMERRER & BOGDANOVICH, P.S.
                            P.O. BOX 11880
14                          Olympia, WA  98508-1880

15      FOR DEFENDANT SERGEANT MICHAEL DAVIDSON:

16                          MR. JEFFREY A.O. FREIMUND
                            FREIMUND JACKSON TARDIF &
17                             BENEDICT GARRATT, PLLC
                            711 Capitol Way South, Ste. 602
18                          Olympia, WA  98501

19      ALSO PRESENT:       SHARON KRAUSE

20

21

22

23

24

25

Page 3

1                          I N D E X

2   EXAMINATION                                    PAGE/LINE

3   MS. ZELLNER                                      5      14

4

5

6

7

8

9                  I N D E X   E X H I B I T

10  EXHIBIT NO.            DESCRIPTION              PAGE/LINE

11  NO. 1        Clark County Sheriff's Office      105     9
                 Indexes; 3 pgs.
12
    NO. 2        Krause Utility Report,              22     18
13               7/14/84-8/26/84, Summary of
                 Contacts; 11 pgs.
14
    NO. 3        Krause Utility Report, 2/28/85,      5      8
15               Warrant/Arrest/Interview; 5 pgs.

16  NO. 4        Kathryn Spencer Medical Exam         5      8
                 Report; Matt Hansen Medical Exam
17               Report; Detective Flood Report Re
                 All Materials and Medical Findings
18               to Clark County; Ray Supplemental
                 Response Re Knowledge of Krause
19               and Davidson of Hansen Records; 11
                 pgs.
20
    NO. 5        Letter from Stanley Abrams to       47     17
21               Davidson Re Polygraph; 1 pg.

22  NO. 6        Vancouver Police Department          5      8
                 Internal Affairs Documents; 11
23               pgs.

24  NO. 7        Declarations of Ray Spencer, Leo     5      8
                 Clark, Fran Hines, John Pearce,
25               and Lynda Harper; 19 pgs.

## Page 4

| | EXHIBIT NO. | DESCRIPTION | PAGE/LINE |
|---|---|---|---|
| 1 | | | |
| 2 | NO. 8 | Declaration of Peter Camiel; 4 pgs. | 5  8 |
| 3 | | | |
| 4 | NO. 9 | Deposition of Shirley Spencer, 6/4/96; 18 pgs. | 5  8 |
| 5 | | | |
| 6 | NO. 10 | Deposition of Shirley Spencer, 8/30/96; 28 pgs. | 5  8 |
| 7 | NO. 11 | Deposition of Michael Davidson, 7/25/96; 66 pgs. | 5  8 |
| 8 | | | |
| 9 | NO. 12 | Habeas Hearing Testimony of Michael Davidson; 17 pgs. | 5  8 |
| 10 | NO. 13 | Interview of James Michael Davidson, 10/26/09; 7 pgs. | 5  8 |
| 11 | | | |
| 12 | NO. 14 | Interview of Shirley Spencer, 10/26/09; 11 pgs. | 5  8 |
| 13 | NO. 15 | Conditional Commutation of Clyde Ray Spencer; 3 pgs. | 5  8 |
| 14 | | | |
| 15 | NO. 16 | - Court of Appeals of the State of Washington, Published Opinion; 19 pgs. | 5  8 |
| 16 | | | |
| 17 | NO. 17 | Supreme Court of the State of Washington, Ruling Denying Review; 7 pgs. | 5  8 |
| 18 | | | |
| 19 | NO. 18 | Typed Notes re Kathryn Spencer with "Davidson 2133" Handwritten on top of page Unidentified Handwritten Notes; 5 pgs. | {19   1 |
| 20 | | | |
| 21 | NO. 19 | Fax from Michael Davidson to Ellen Hanegan-Cruse, 10/23/06; 1 pg. | 120  22 |
| 22 | | | |
| 23 | NO. 20 | Transcript of Trial, Spencer v. Klauser, 10/6/96; 14 pgs. | 5  8 |
| 24 | NO. 21 | Roe Report dated 11/27/84; 3 pgs. | 51  12 |
| 25 | | | |

## Page 5

1    BE IT REMEMBERED that on Monday, November 5,

2    2012, at 9:01 a.m. at 2102 Carriage Drive SW, Building C,

3    Olympia, Washington, before DIXIE J. CATTELL, Certified

4    Court Reporter, appeared JAMES MICHAEL DAVIDSON, the

5    witness herein;

6         WHEREUPON, the following proceedings were had,

7    to wit:

8              (EXHIBIT NOS. 1-21 MARKED)

9

10   JAMES MICHAEL DAVIDSON,     having been first duly sworn,

11                testified as follows:

12

13              EXAMINATION

14   BY MS. ZELLNER:

15   Q   Would you state your full name for the record and spell

16       your last name.

17   A   James Michael Davidson, D-A-V-I-D-S-O-N.

18         MS. ZELLNER:   Let the record reflect this is the

19   deposition of James Michael Davidson taken pursuant to

20   notice and continued to today's date by agreement of the

21   parties.

22   Q   Mr. Davidson, you've been deposed before in this matter,

23       correct?

24   A   Yes.

25   Q   And do you understand that it's very important for you to

## Page 6

1    understand my questions before giving your answer?  Do you

2    understand that?

3    A   Yes, ma'am.

4    Q   So that if my question isn't clear to you, it will be

5        difficult for you to give a clear answer.  So I'm going to

6        ask you if you don't understand a question to ask me to

7        repeat it because whatever answer you give, we will assume

8        that you understood the question.  Is that fair?

9    A   Yes.

10   Q   Now, I want to get some background information on you.  How

11       old are you?

12   A   68.

13   Q   And what is your date of birth?

14   A   March the 8th, 1944.

15   Q   What is your highest level of education?

16   A   I lack approximately 30 hours.  I have an associate of arts

17       and science degree, and I lack approximately 30 hours to

18       have completed my bachelor's degree.

19   Q   And where did you attend your post-high school training or

20       education?  What school did you go to?

21   A   Clark College in Vancouver, Washington.

22   Q   What years were you at Clark College?

23   A   I believe 1973 to 1975.

24   Q   And then you said you did not complete your bachelor's

25       degree?

## Page 7

1    A   That's correct.

2    Q   What was your first employment after you left college?

3    A   I was already employed.

4    Q   Okay.  And where were you employed?

5    A   Clark County Sheriff's Department.

6    Q   What was your title at that time?

7    A   Deputy Sheriff.

8    Q   When did you join the Department?

9    A   July 3rd, 1972.

10   Q   Now, at a certain point did you advance to become a

11       supervisor of -- in the Clark County Sheriff's office?

12   A   To clarify, which rank are we talking about?

13   Q   Well, let's just direct your attention to 1984.  What was

14       your title at that time?

15   A   Sergeant.

16   Q   Did you have any supervisory responsibility in 1984?

17   A   Yes.

18   Q   Could you describe your supervisory responsibility?

19   A   I was a supervisor in charge of the Criminal Investigation

20       Unit within the Clark County Sheriff's Department.

21   Q   How many officers reported to you?

22   A   I can only guess at this point.  It's been a number of

23       years, but I believe it was somewhere around ten.

24   Q   And what were your responsibilities to those officers?

25   A   Assignment of cases, review of reports, review of the

ZELLNER (James Michael Davidson, 11/5/12)

### Page 16

1  office?
2  A  I assume that those are contained within the file that was
3  provided to me from him.
4  Q  Right.  And you have reviewed those documents?
5  A  To the best of my ability, yes, ma'am.
6  Q  Now, in that first meeting, just for purposes of my
7  question, assume it occurred on September 21, 1984.  What
8  was the purpose of the Spencers' trip or visit to your
9  office?  What was your understanding of why they were
10  coming to your office?
11  A  It was in response to the -- to the report that
12  Mrs. Spencer had initiated.
13  Q  When you say Mrs. Spencer had initiated a report, what's
14  the basis of that conclusion that she initiated it?
15  A  My recollection is, is that we received a report from one
16  of our patrol deputies in which she had initiated a call to
17  our office regarding improper sex -- or improper conduct
18  with a minor child.
19  Q  And you believed that Shirley Spencer called in and
20  reported that alleged improper conduct to your office?
21  A  Yes, ma'am.
22  Q  Did you assign anyone to the case when that call that
23  you're describing was made?
24  A  First of all, again, let me restate that it was not based
25  upon the call.  It was based upon the report that was

### Page 17

1  forwarded to my office from the deputy that responded to
2  that call.
3  Q  And what was the deputy's name who responded to that call?
4  A  I don't know that that's even contained in this file, but I
5  don't recall the deputy's name.
6  Q  Okay.  So a written report came in and you reviewed the
7  report?
8  A  Correct.
9  Q  And the patrol deputy had interviewed Shirley Spencer?
10  A  I believe that's correct, yes, ma'am.
11  Q  And what was your understanding at that point in time --
12  and that was in the summer of 1984.  What was your
13  understanding of the allegations or report that Shirley
14  Spencer was making?
15  A  There was some indication that there was some improper
16  touching of a minor child.
17  Q  By whom -- who had been doing the improper touching in the
18  report that you looked at?
19  A  Mr. Spencer.
20  Q  Did the child allege that anyone else had been engaged in
21  improper touching?
22  A  At that particular point in time, I don't recall anybody
23  else being indicated.
24  Q  So the first time you're notified about the case or become
25  aware of it is through your patrol deputy's report, and

### Page 18

1  that report describes Shirley Spencer calling into your
2  office about improper touching of a minor child by Ray
3  Spencer; is that correct?
4  A  That's -- yes, ma'am.
5  Q  So when you received that information, do you assign a
6  detective to the case?
7  A  I did, yes.
8  Q  Okay.  And who do you assign?
9  A  Well, in this -- are we talking this particular instance or
10  any instance?
11  Q  No, we're just talking about the call that came in from
12  Shirley Spencer.  Did you make the assignment -- the
13  allegations against Ray Spencer, did you make an assignment
14  of that case to any detective --
15  A  Yes, I did.
16  Q  -- that you were supervising?
17  And was that Detective Sharon Krause?
18  A  It was, yes.
19  Q  Why did you assign Sharon Krause as the detective to handle
20  the claims about Ray Spencer?
21  A  I can't state at that point that I had a specific reason.
22  I oftentimes reviewed caseloads, reviewed the nature of the
23  allegation, and would assign an investigator because of
24  their particular expertise.
25  Q  And did Sharon Krause have -- in 1984 did she have any

### Page 19

1  particular expertise?
2  A  She did.
3  Q  And what was her expertise?
4  A  Child abuse investigations.
5  Q  Had you assigned, up to that point in time, other child
6  abuse cases to her?
7  A  I had, yes.
8  Q  Okay.  And do you know approximately how many cases you'd
9  assigned to her up, until 1984, of alleged sexual abuse of
10  a child?
11  A  No, ma'am, I could not tell you.
12  Q  More than 50?
13  A  Again, I wouldn't even -- I'd hesitate to speculate.
14  Q  Okay.  Well, you might hesitate to speculate, but we have
15  no idea the number of these types of cases that your
16  department was handling in 1984, so if you could just give
17  me an approximation.  I mean, did you have more than 100
18  cases a year in Clark County at that time?
19  A  I'm certain that we did, yes, ma'am.
20  Q  Okay.  Did you have more than 200?
21  A  Again, speculative only, I'm certain that we did.
22  Q  So what -- do you direct Sharon Krause as to what you want
23  her to do in the initial investigation of the Ray Spencer
24  case?
25  A  First of all, I'm not certain that I understand what you're

ZELLNER (James Michael Davidson, 11/5/12)

## Page 20

1  asking in terms of my directing her to do anything, I
2  assigned her an investigation for her to follow up.
3  Q  Okay.  But you'll have to explain -- you've said that you
4  were supervising her, and I'm asking you, did you give her
5  any specific assignment?  You might have told her
6  everything she had to do.  You might have told her nothing
7  to do.  I have no idea how the department was structured at
8  that time.  When you make an assignment, did you meet with
9  the detective?  Did you meet with her about the case
10  face-to-face?
11  A  I'm certain that I -- I met with her at the time of the
12  assignment, correct.
13  Q  Did you tell her "I want you to go to the house and
14  interview the child and interview Shirley Spencer"?
15  A  I do not recall doing that, and I don't believe that I
16  would have had to do that.  Detective Krause was a very
17  intelligent investigator, had had a tremendous amount of
18  experience in investigating these cases, and I didn't
19  need -- I wouldn't need to tell her a specific direction at
20  that point.
21  Q  Is it your understanding that she -- and this is in the
22  summer of 1984 when this is reported to your department.
23  Is it your understanding that she goes to the Spencer home
24  and does an interview at that point in the summer of 1984?
25  A  I don't recall whether she went to the house and did an

## Page 21

1  interview or whether the Spencers came to our office and --
2  and we conducted an interview there or an interview was
3  conducted.
4  Q  Now, how old was the child who had made the alleged claim
5  about abuse?
6  A  My recollection is that she was about five years old.
7  Q  Did your department have any written protocols for
8  interviewing a child at the age of five?
9  A  Not to my knowledge, no.
10  Q  You would agree with me that a child's competency would
11  have to be established in the investigation; is that right?
12  A  Are we talking legal definition of competency?
13  Q  We're talking about competency that you would establish in
14  interviewing a five-year-old to decide if they were
15  credible.  Have you ever heard the term "competency"?
16  A  I certainly have.
17  Q  Okay.  What's your understanding of what that term means?
18  A  My understanding is they have an understanding of what they
19  are saying and that there's truthfulness or validity to
20  their allegation.
21  Q  And I'm asking you, are you aware at any point in time in
22  the early stages of the investigation prior to the first
23  set of charges, are you aware of any competency interview
24  being done of Katie Spencer?
25  A  I'm not aware.

## Page 22

1  Q  And when you say you're not aware, does that mean it may
2  have been done or it may not have been done?
3  A  I can't answer that question because I don't -- again, I
4  don't have all of the access to all of the reports.  I've
5  not reviewed all of the reports, and due to the passage of
6  time I can't recall specifically.
7  Q  You have reviewed, though, the different documents that
8  were sent to you, the exhibits, have you not, that my
9  office sent you that contain Sharon Krause's utility
10  reports?
11  A  Yes.
12  Q  They're marked as -- yeah, they're marked as Exhibit 2.
13  They're dated 7/14/84 to 8/26/84, and it's a summary of
14  contacts made with the Spencer family?
15  A  Yes.
16  Q  You have reviewed that?
17  A  Yes.
18  Q  Okay.  And feel free to refer to that exhibit.  I'd like to
19  have that marked as we're going to be a little bit out of
20  order, but that's Plaintiff's Exhibit 2 if you want to
21  review that.  And I'm asking you if anywhere in Krause's
22  utility report, Plaintiff's Exhibit 2, is there any
23  indication that she established a competency of Katie
24  Spencer?
25  A  May I refer to the report again?

## Page 23

1  Q  Yes, please do.
2  A  (Witness complying).  I'm not certain that I find in here
3  any contact with Kathryn Spencer specifically.
4  Q  Okay.  Do you see any reference in the utility report to
5  any information that would establish the competency of
6  Kathryn Spencer?
7  A  Again, in my review of the reports, the only indications
8  that I see are contacts specifically with Ray and Shirley
9  Spencer.
10  Q  And did Ray or Shirley Spencer provide any information in
11  Plaintiff's Exhibit 2 about the competency of Katie
12  Spencer?
13  A  In reading the reports, I don't see any, no.
14  Q  Okay.  And isn't it true that on 8/29/84 when Ray and
15  Shirley Spencer came to your office and the initial call
16  came in, that the initial report from Katie Spencer was
17  that there had been several people involved in abusing her,
18  not just her father?  I'll refer you to Bates stamp 31.
19       On the first page of that report, it says "Kathryn
20  had also reportedly told Shirley Spencer that her natural
21  mother, DeAnne Spencer, her brother Matthew, and an
22  ex-girlfriend of Ray Spencer named Karen Stone had also had
23  some sexual contact with her, Kathryn."  Do you see that?
24  Page 2 of 12.
25  A  I do see that, yes, ma'am.

ZELLNER (James Michael Davidson, 11/5/12)

## Page 36

1  you consider it improper for you to form anything other
2  than a professional relationship with a witness?
3  A  I would -- again, my response to that is that my code of
4  conduct would have been -- there was no personal
5  relationship with Mrs. Spencer, if that's what you're
6  asking, during the course of that investigation.
7  Q  We're going -- we will go through that.
8      So when you meet with her on 9/21, do you recall when
9  your next contact with her is?
10  A  I do not.
11  Q  At some point you must indicate to her that you have some
12  interest in her other than as a witness in the case, right?
13  A  No, ma'am.
14  Q  So, explain to us, if you would, what are the circumstances
15  of your first encounter with Shirley Spencer?  I'm not
16  talking about sexual encounter.  When did that occur when
17  she went from being a witness in the case to having a
18  personal relationship with you?
19  A  My best recollection is, is that it occurred sometime June
20  or July of 1985 after Mr. Spencer --
21  Q  What -- go ahead.
22  A  -- after Mr. Spencer had been sentenced and had -- I
23  believe had been sentenced to the penitentiary.
24  Q  Is that around the time that you moved into her house?
25  A  I did not move into her house at that point, no, ma'am.

## Page 37

1  Q  What was the date of when you moved into her house?
2  A  I can't be specific with that, but it would have been
3  probably fall of 1985.
4  Q  I'm assuming when you move into her house, that's not when
5  the relationship transforms from Mrs. Spencer as a
6  professional -- or as a witness into a personal
7  relationship, right?  You've already got the relationship
8  by the time you move into the house in the fall of 1985?
9  A  We're talking personal relationship now; is that correct?
10  Q  Correct.
11  A  My first recollection is, is that we had a social encounter
12  sometime the end of June, the first part of July, which
13  involved having a drink at a restaurant called Waddles in
14  Portland.
15  Q  And that was you say, in June or July of 1985?
16  A  Correct.
17  Q  Okay.  And how did that social encounter get set up?  Who
18  contacted who?
19  A  My recollection is that she came into the office and
20  specifically to see Detective Krause to thank her for all
21  of her efforts and hard work.  If memory serves me correct,
22  Detective Krause was not in the office at that time so she
23  stopped by my office.  I was in the office.
24  Q  What did she say?
25  A  I can't recall the specific conversation, but during the

## Page 38

1  course of that conversation, whether I said it or she said
2  it, we made an arrangement at some point in time in the
3  future to have a drink.
4  Q  Was that the first time that you went out in public with
5  Mrs. Spencer?
6  A  That is the first time that I ever saw Mrs. Spencer on a
7  social basis.
8  Q  Now, when that conversation occurred in your office, did
9  you think about the fact that if Mr. Spencer withdrew his
10  guilty plea, that Mrs. Spencer could end up as a witness at
11  his trial?
12  A  I'm not certain that I can even answer that question.  I
13  don't believe I had any conscious thought of that.  At the
14  point that we made that contact, I assumed that the case
15  was in its final disposition.
16  Q  You didn't expect to be sitting here today, right, 25, 28
17  years later?
18  A  No, ma'am.
19  Q  So what made you think that Mrs. Spencer would be willing
20  to go out in public with you and have a drink?  Her husband
21  had just been sent to prison, correct?
22  A  Within a month, month and a half, correct.
23  Q  What made you think that Mrs. Spencer would find that
24  request appropriate or that she would be willing to do
25  that?

## Page 39

1  A  I'm not certain that she did not initiate that
2  conversation.
3  Q  And do you remember the gist of the conversation?
4  A  Not -- not at this date.  That's been, as you say, 25 to 30
5  years ago.  And certainly with the passage of time I do not
6  recall specific conversation's contents.
7  Q  Did you find Mrs. Spencer to be an attractive woman?
8  A  During the course of our personal involvement, yes.
9  Q  So going back from that time in June of 1985 -- how soon --
10  at what point did you begin having sexual relations with
11  Mrs. Spencer?
12  A  I'm -- again, I can't be precise as to dates or times or
13  places.  I can -- I can only assume that that first social
14  meeting transformed into some -- a personal romantic
15  relationship at some point in time in the future, but
16  specific dates I have no recollection of.
17  Q  When you had sexual relations with Mrs. Spencer, where did
18  you have those sexual relations?  Did you ever have those
19  sexual relations in Ray Spencer's house?
20  A  No, ma'am.
21  Q  Never?
22  A  Never.
23  Q  Where did you have sexual relations with Shirley Spencer?
24  A  At the time she would have been living in a residence on
25  Cole-Witter Road.  That's in Clark County.  It's -- I

ZELLNER (James Michael Davidson, 11/5/12)

## Page 40

1  believe it's spelled C-O-L-E, dash, W-I-T-T-E-R.
2  Q  So you had sexual encounters with her at that address?
3  A  Correct.
4  Q  How many times did you visit Mrs. Spencer at that address
5  and have sexual relations with her?
6  A  Over what period of time?
7  Q  You'll have to tell me.
8  A  I -- I couldn't give you an answer to that.  I don't know.
9  Q  Over -- was it ever two or three years?  Was it over a
10  year?
11  A  We ultimately ended up -- I ended up moving into that
12  residence with her -- as I testified or as I stated
13  previously, I ended up living at that residence with her
14  two or three years.
15  Q  Was that home ever -- excuse me.  I'm sorry.  I cut you
16  off.  What did you say?
17  A  I said I lived with her for a period of probably, total
18  time, two to three years at that residence.
19  Q  Do you know what years you lived there?
20  A  My recollection is that our relationship terminated in late
21  '88 or early '89.  As I stated previously, I recall moving
22  into that residence sometime -- I'm going to say sometime
23  in a window of late September to November of 1985.
24  Q  Was that house that you've described on Cole-Witter Road,
25  was that ever owned by Ray Spencer in joint tenancy with

## Page 41

1  his wife?
2  A  I can only respond in the sense that I can tell you what
3  Mrs. Spencer told me about that house.
4  Q  Okay.  What did she tell you?
5  A  She told me that she had purchased the house after she sold
6  the home that she and Ray Spencer owned.  I have no idea as
7  to what the financial arrangements were or anything else
8  between Mr. Spencer and her.
9  Q  So going back to your -- we'll come back to this
10  relationship.
11  A  Okay.  Excuse me for just a moment.  Could I ask for a
12  brief recess?  I have --
13  Q  Oh, of course.  Certainly.
14  A  I have some serious back issues that I need to -- and I can
15  only sit for short periods of time.
16  Q  Okay, that would be fine.  Would you like to take what,
17  five minutes?
18  A  Five minutes would be perfect.
19  Q  Okay.
20  A  Thank you.
21  Q  Very good.
22      (Recessed at 10:05 a.m.)
23      (Reconvened at 10:12 a.m.)
24  Q  (By Ms. Zellner) I want to continue on with my questions
25  about the relationship with Shirley Spencer.  At a certain

## Page 42

1  point you become aware that Shirley Spencer is going to
2  divorce Ray Spencer?  Is that right?
3  A  I'm thinking about how to answer that question because
4  obviously when she and I lived together and at some point
5  during our social involvement, I was aware that she had
6  divorced Ray Spencer or was in the process.  I don't recall
7  specifically the details of that.  I don't know that we had
8  a lengthy discussion at all about her divorce.
9  Q  So she doesn't -- she doesn't confide in you that she's
10  going to divorce Ray Spencer?  You don't talk about that
11  prior to you moving into the house?
12  A  I don't recall ever having a discussion during my
13  professional contact with Shirley about her divorcing Ray
14  Spencer, no.
15  Q  When did you divorce your wife?  Was it 1986?
16  A  I believe the document that we provided you, I think it was
17  July of 1986 that was the divorce was final.
18  Q  Do you know where your ex-wife currently lives, which
19  state?
20  A  Idaho, I believe.
21  Q  And when is the last time that you've talked to her?
22  A  I have rarely had communication was her since our divorce.
23  I can't -- I think the last time that I can recall seeing
24  her or having any conversation was at one of my grandsons'
25  graduations, which would have been probably -- well, the

## Page 43

1  last one is 21, so that would have been the last --
2  probably at least four years ago.
3  Q  At any time did you have sexual relations with Shirley
4  Spencer in your marital home with your wife Linda?
5  A  No, I did not.
6  Q  Did -- If a witness has said that Linda found you in bed
7  with Shirley Spencer in your home, would that be incorrect
8  or untrue?
9  A  It would absolutely be untrue.
10  Q  Did your wife know of your relationship with Shirley
11  Spencer prior to your divorce?
12  A  I'm certain that she did, in that once Shirley and I
13  established a social relationship, it was not something
14  that we were attempting to hide.
15  Q  Do you believe -- at that time were you in love with
16  Shirley Spencer, at the time you established this
17  relationship outside of her role as a witness?
18  A  Can we refine the time frame?  I'm not certain that --
19  there was an evolutionary process there, and I suppose at
20  some point in time I could say I was in love with Shirley
21  Spencer, but that evolved over a period of time.
22  Q  Well, by the time you moved into her home with her, would
23  you say your relationship had progressed to that point?
24  A  I would say that there certainly was an emotional
25  attachment at the time that we moved in together.

ZELLNER (James Michael Davidson, 11/5/12)

## Page 44

1  Otherwise we wouldn't have done so.
2  Q  Did Shirley Spencer credit you with Ray's arrest and
3     conviction?
4  A  I believe that she probably held Detective Krause, you
5     know, in that esteem. She knew that I obviously
6     participated in some of the case, but Detective Krause was
7     the primary investigator and her primary contact during the
8     course of this investigation involving Mr. Spencer.
9  Q  Did you and -- let me back up on the question with your
10    ex-wife. Have you discussed this civil case with your
11    ex-wife at any point in time since we filed it?
12 A  As I stated before, I've had very little contact with my
13    ex-wife since we were divorced in 1986. I have no -- I
14    have no recollection at all of ever discussing this case
15    with her.
16 Q  When you say you have no recollection, does that mean you
17    may have, but you don't remember or are you telling me you
18    did not have any conversations with her?
19 A  Again, defining the fact that I have had very limited
20    communications with her over the last some 25 or 26 years,
21    and additionally the fact that I have no specific
22    recollection at all of ever discussing this case with her
23    because I've had very little contact with her since the
24    time we were divorced.
25 Q  So based on all that, your answer to my question is no, you

## Page 45

1  have not discussed this case with her?
2  A  As far as I can remember, no.
3  Q  Going back to the relationship with Shirley Spencer, would
4     you agree that in the beginning of this investigation,
5     there were some problems with Katie Spencer's description
6     of what had happened and who was involved in her alleged
7     sexual abuse?
8  A  If we're talking about the information that was contained
9     in the report -- what do you mean by problems? I'm not
10    certain that -- what are we talking about, defining
11    problems?
12 Q  Well, Ray Spencer was arrested twice, right? The first
13    arrest was just for a misdemeanor, am I correct?
14 A  I believe so, correct.
15 Q  And he was just arrested for a misdemeanor because
16    apparently the case wasn't strong enough to charge him with
17    a felony?
18 A  I can't, nor do I believe that I have knowledge about the
19    particulars of why it was charged or he was arrested in the
20    manner that he was, under the charge that he was.
21 Q  Who was in charge of making those decisions?
22 A  I would assume that it would have been a consultation with
23    the prosecuting attorney's office, whatever deputy
24    prosecutor was assigned at that time.
25 Q  Up until Ray's first arrest, had you had any communications

## Page 46

1  with Jim Peters about the Ray Spencer case?
2  A  Again, I can't recall specific -- we had specific
3     conversations with Mr. Peters during the course of the
4     entire investigation. Can I sit here today and define
5     specifically what time frames that those conversations took
6     place and in relationship to what portion of the
7     investigation? I cannot.
8  Q  Did you have conversations with Mr. Peters -- we know that
9     the entire case started in July of 1984. Did you have
10    conversations with Mr. Peters in that time span from July
11    up until Mr. Spencer's first arrest, just that time period?
12    Do you have a recollection of that?
13 A  I do not have a recollection of that, no.
14 Q  Do you, at a certain point, learn that there's going to be
15    an arrest of Ray Spencer for misdemeanor charges?
16 A  I can only say that I would assume that I would have
17    learned that information without having specific detail.
18 Q  How do you -- how do you define probable cause?
19 A  That -- anything that would lead a reasonable person to
20    believe that a crime had been committed.
21 Q  All right. So can you tell me what was the probable cause
22    for the first arrest of Ray Spencer on a misdemeanor
23    charge?
24 A  Again, I cannot tell you that because I wasn't involved in
25    that portion or that decision-making process.

## Page 47

1  Q  Well, you've had an opportunity to look at this material.
2     You have no sense of why he was arrested the first time,
3     what the evidence was?
4  A  I have the information that's provided in the report, which
5     would indicate that the allegations were made by his
6     daughter, Kathryn Spencer.
7  Q  Was there any other evidence that you're aware of, from
8     reviewing the materials you've been provided, to what was
9     the basis for the probable cause to arrest him the first
10    time?
11 A  I believe there's an indication that he'd taken a polygraph
12    examination. I don't know that that factored into the
13    decision-making process. Again, I can't answer what all of
14    the factors were considered in making the determination --
15 Q  Okay. Well, let's look at --
16 A  -- to arrest him.
17 Q  Oh, I'm sorry. Let's look at Plaintiff's Exhibit 5 in the
18    materials that I sent you.
19 A  Okay. We're referring to the report by Stanley Abrams,
20    Ph.D.?
21 Q  Yes. Is it your understanding that Dr. Abrams gave two
22    polygraph tests to Ray Spencer?
23 A  That's my understanding, yes, ma'am.
24 Q  And the first test, Dr. Abrams concluded, was inconclusive;
25    is that right?

ZELLNER (James Michael Davidson, 11/5/12)

### Page 48

1 A That's what's reflected in the report, yes.
2 Q Well, you don't have anything other than his report, right?
3 You don't have any information for us about the polygraph
4 other than what's in the report?
5 A That's correct.
6 Q Okay. Now, the second test, he finds that there's
7 deception, correct?
8 A That's what's indicated again in the report, yes.
9 Q Right. But Spencer's scores were not very high, so the
10 examiner does not feel as certain about the validity of
11 these findings as in most examinations? You are aware of
12 that conclusion by Dr. Abrams?
13 A That's again what he has prepared -- in his prepared report
14 that's what it indicates; correct.
15 Q So you would agree with me that polygraph exam -- I mean,
16 we all know it's not admissible, but did not factor into
17 any probable cause analysis for Ray Spencer's first arrest?
18 A Again, I'm going to respond that I can't -- I don't know
19 what all of the factors were that were involved with the
20 probable cause to arrest Mr. Spencer. I wasn't involved in
21 that decision-making process.
22 Q Do you know -- okay. Do you know other than -- are you
23 aware, as you sit here today, of any other evidence that
24 would have established probable cause for the arrest of Ray
25 Spencer the first time?

### Page 49

1 A Other than -- are we talking other than her statement?
2 Q Yes, other than her statement.
3 A That's my assumption; that was the basis of the charges or
4 the probable cause.
5 Q And you would agree that Shirley Spencer, up until the
6 first arrest, was very consistent in her statements that
7 she did not believe Ray had committed sexual abuse of their
8 daughter and she'd never -- well, that she didn't believe
9 that he was guilty of the sexual abuse, right?
10 A That's again what's indicated in the reports. I don't have
11 any personal knowledge of that.
12 Q And then one of the other people that was identified by
13 Kathryn Spencer as having abused her was Karen Stone. Do
14 you recognize that name?
15 A That -- that name was indicated in the report as well,
16 correct.
17 Q Right. And Karen Stone was interviewed and she stated that
18 she and Ray had a normal sexual relationship and she never
19 suspected him of any abuse of Katie; is that correct?
20 A That's again what's indicated in the report, yes.
21 Q And you're aware that at a certain point in time Ray
22 Spencer called the Sacramento Police Department?
23 A Again, that's indicated in the report, yes.
24 Q Okay. And there would be no reason for us to believe that
25 anything of significance is not reflected in these reports,

### Page 50

1 correct?
2 A In terms of -- what are we talking about in terms of
3 significance as it relates to the reports? Which portion
4 are we talking about?
5 Q I'm talking about the entire case.
6 A There are a number of --
7 Q I'm talking about the entire case. You're not aware of any
8 reports that have been concealed or not turned over, are
9 you?
10 A None at all that I recall.
11 Q So we can assume for the purposes of this questioning that
12 all significant information about the Ray Spencer
13 investigation is contained in the police reports that were
14 disclosed during the course of the investigation, his
15 guilty plea, and all the subsequent habeas proceedings,
16 right?
17 A To my knowledge, that would be correct, yes.
18 Q Right. You don't remember anything that hasn't been
19 disclosed, do you?
20 A Not that I can recall, no.
21 Q Okay. Now, you're aware of a Detective Flood in Sacramento
22 who looked at the initial allegations of Katie Spencer?
23 A I'm aware only of that name in that it's reflected in the
24 report, correct.
25 Q And Dr. or -- I'm sorry -- Detective Flood declined to

### Page 51

1 pursue any charges in Sacramento; is that correct?
2 A I'm not aware that -- at least that there was any
3 allegations that any of this occurred in California.
4 Q Well, you're aware that a prosecutor named Rebecca Roe
5 evaluated the evidence for King County, that she was asked
6 to evaluate whether the case was legally sufficient?
7 A I'm aware that there's a section contained in this file
8 that says she reviewed the case that was referred to her
9 from Clark County. That has nothing --
10 Q Right.
11 A -- to do with Detective Flood.
12 Q Plaintiff's Exhibit 21, if you could look at that, that's a
13 report that's signed off on by Rebecca Roe?
14 A I have that copy here, yes, ma'am.
15 Q Yes. Have you reviewed this report in your preparation for
16 the deposition today?
17 A I reviewed it to the best of my ability. I will have to
18 say that there's some of the -- some of the penmanship that
19 I was not able to discern exactly what she was writing.
20 Q Well, she does, at the top on her report, mark the box that
21 says case is being returned because it is legally
22 insufficient. Do you see that notation?
23 A I do, yes, ma'am.
24 Q And she points out some of the problems -- and this is
25 November 27 of 1984 -- some of the problems that she saw

ZELLNER (James Michael Davidson, 11/5/12)

Page 56

1 A Again, I'm not making a determination. I'm not a deputy
2 prosecutor. That's talking in terms of a prosecution case.
3 I'm simply looking at the statement of fact, and that from
4 an investigator's standpoint there are a number of
5 witnesses who are reluctant to talk about, particularly
6 young children, who are reluctant to talk about sexual
7 abuse, from my knowledge.
8 Q (By Ms. Zellner) So, you were aware at this time, were you
9 not, that Kathryn Spencer was reluctant to talk about the
10 allegations?
11 A I'm certain that I was informed at some point during the
12 course of the investigation that she was -- that she was
13 struggling to disclose the information, or reluctant.
14 Let's use your words.
15 Q And you also -- I'm sorry. Go ahead.
16 A We'll use your words that she was reluctant to talk about
17 it, correct.
18 Q Those are the prosecutor's words.
19 Was there a reason that Sharon Krause's interview
20 with Kathryn Spencer were not taped? You all had tape
21 recorders, right, back in 1984? Was there a reason it
22 wasn't taped?
23 A Again, we certainly did tape interviews. I don't believe
24 at the time that we taped interviews with victims. And I
25 recall no specific procedure that required or did not

Page 57

1 require us to tape those interviews.
2 Q So some interviews were taped and some were not?
3 A Again, my statement is, is that with suspects we did do
4 taped interviews. And that's not suspects of a particular
5 crime. That's any broad-ranged crime that we dealt with.
6 Not necessarily -- I'm not aware that there was any policy
7 concerning taped interviews, period, but certainly not
8 interviews involving children or victims of crimes.
9 Q Okay. And I'm not asking you if there was a policy. I'm
10 asking you, was there a reason that this interview was not
11 taped?
12 A I can't --
13 Q I'm not asking if there was a policy.
14 A I can't answer that question. I don't know that -- you
15 know, I don't know what went on in terms of the interview
16 of that child, so I can't answer that question.
17 Q And you know that there have been allegations made that
18 these interviews between Sharon Krause and Kathryn Spencer
19 were coercive? Are you aware of that?
20 A I've read that in the reports, yes.
21 Q And are you aware or did you ever review with Sharon Krause
22 her method of interviewing children? Do you have any idea
23 of her methodology when she interviewed children in 1984?
24 A First, let me say that in my belief Detective Krause was
25 probably one of the best child interviewers that we had

Page 58

1 within the Sheriff's Department and probably one of the
2 best that was around at that time. Her knowledge and
3 expertise in interviewing children, she had been the
4 subject of teaching classes in interviewing techniques.
5 I'm not aware at that time that there was anything coercive
6 about her techniques at all.
7 Q Well, were you aware that her typical interview included a
8 series of leading questions to the child?
9 A Again, in that time frame, in the '84 to '90 era, her
10 interview techniques were proper, from my understanding,
11 and that it was not improper to ask leading question.
12 Q And you're aware of the papers that she's written in that
13 time frame about not asking leading questions? Are you
14 aware of that?
15 A I have never read a paper that Detective Krause has
16 authored. I can't answer that question.
17 Q Did you have any of the specifics at that time in 1984
18 about her technique in interviewing Kathryn Spencer? Where
19 was the interview done, do you know?
20 A Again, I -- I believe one interview was conducted within
21 the Clark County Sheriff's Department. I know Detective --
22 Q How about any other --
23 A I know Detective Krause also went to Sacramento and
24 interviewed Kathryn and her brother.
25 Q On this report of Prosecutor Roe, she also references,

Page 59

1 which we've talked about a little bit, the "initial naming
2 of multiple suspects is very disturbing and child's
3 explanation that she thought it wouldn't hurt" -- I'm at
4 the top of 228 -- "explanation that she thought it wouldn't
5 hurt Shirley's feelings as much just didn't make the" --
6 indecipherable -- "go away. Combined with page 5 of
7 Shirley's handwritten statement, where child talked about
8 rubbing Shirley, it creates questions about fact versus
9 fantasy. I believe this point is a built-in reasonable
10 doubt."
11 Did you become aware at any point in the
12 investigation prior to the felony charges that there were
13 questions about the child's ability to distinguish between
14 fact and fantasy?
15 A Well, again, as I stated previously, I have never -- I had
16 never reviewed this report at the time that -- in the time
17 frame that we're talking about, so I obviously was not
18 aware that this statement had been made by the
19 prosecutor's -- by Mrs. Roe or Ms. Roe.
20 Q And I understand that. I'm talking about the subject
21 matter of the prosecutor's opinion, that there were
22 questions about the child's ability to distinguish fact
23 versus fantasy and that this point is a built-in reasonable
24 doubt. Were you aware -- not that the prosecutor had said
25 that, but that there was a question about Kathryn Spencer's

ZELLNER (James Michael Davidson, 11/5/12)

## Page 64

1 offered. I'm aware that particularly when there was a
2 discussion of her going to California to interview both of
3 the children. I don't recall specifically what directions,
4 or at this point due to the passage of time there's no
5 reports to reflect what I would have suggested, and I have
6 no independent recollection of that.
7 Q But you do agree that the reports reflect your involvement
8 at various stages of the investigation, don't you?
9 A I recall specifically being involved in certain portions of
10 that investigation, yes, ma'am.
11 Q Prior to the incident at the Salmon Motel where Matt Hansen
12 was allegedly molested, the case only had evidence of a
13 misdemeanor at that point, right, and then there was the
14 Matt Hansen alleged molestation, and then suddenly the case
15 became a felony case?
16 A I believe the allegations rose to a claim of a felony case
17 after Mr. -- that young Matt Hansen, Shirley's son, made a
18 disclosure, correct.
19 Q Now, Matt Hansen was taken to the Salmon Motel by Shirley
20 Spencer, right?
21 A I believe that she stated that, correct.
22 Q And despite the fact that her husband was out on personal
23 recognizance for molesting their daughter, Shirley Spencer
24 took her son to the Salmon Motel to spend the night with
25 Ray, right?

## Page 65

1 A That's again what her statement is, correct.
2 Q Did you advise Shirley Spencer prior to the incident, the
3 alleged incidents at the Salmon Motel, might not be a good
4 idea for the children to be around Ray Spencer? Have you
5 ever had that discussion?
6 A First, I had no discussion with Mrs. Spencer with regard to
7 her taking her child to the Salmon Creek Motel, no.
8 Q Well, you had expressed in an earlier report, the
9 Exhibit 2, you had expressed to Ray Spencer after he took
10 his second polygraph that you thought he had done something
11 to Kathryn Spencer, correct? You believed he was guilty of
12 that abuse?
13 A I believe that I stated that the polygraph indicated that
14 he was -- that he was deceptive in regards to the issue
15 involving Kathryn Spencer, correct.
16 Q And you also went further and you expressed the opinion
17 that you thought he had, in fact -- to him -- that you
18 thought he had, in fact, abused Kathryn Spencer, correct?
19 A Can I read that statement so that I don't misstate it?
20 Q Yeah, if you want to go back to Exhibit 2. It's on Bates
21 stamp 41, Exhibit 2, page 12 of 12. It's the first
22 sentence in the last paragraph.
23 A My statement is Sergeant Davidson, and this was -- this
24 report was prepared by Detective Krause. "Sergeant
25 Davidson made statements indicating that he felt something

## Page 66

1 had occurred between Ray Spencer and Katie based on the
2 statements Katie had made to me, Krause and Shirley
3 Spencer," and at that time Shirley stated -- or "Spencer
4 stated, 'I don't fucking care what you think or my daughter
5 says or my wife says. I fucking didn't touch her and
6 fucking get off my ass or arrest me.' At that time the
7 conversation with Spencer was terminated."
8 Q Correct, that's what it states. And so my question to you
9 is: Does that refresh your recollection that at that point
10 in time on 9/21/84 that you believed that Ray Spencer had,
11 in fact, sexually abused his daughter, Katie Spencer?
12 A As I stated -- as I stated -- it's reflected in the
13 report -- I believed something had occurred. I wasn't
14 specific as to what I believed had occurred.
15 Q Did you believe it was something illegal?
16 A I certainly believed that -- yes, ma'am, because it was
17 reflected in the questions that were asked in the polygraph
18 examination, and the framework of those statements were
19 made based upon the results of the polygraph.
20 Q Do you believe it was something sexual in nature that Ray
21 Spencer had done to his daughter? Did you believe that?
22 A Again, that was the questions that were asked in the
23 polygraph, and that's simply what I was restating.
24 Q So that's a "yes"?
25 A That's my response, yes, ma'am.

## Page 67

1 Q Okay. So you believed on 9/21/84 that Ray Spencer had, in
2 fact, sexually abused his daughter? I'm not asking you why
3 you believed it. I'm asking if you believe that's a fact.
4 A That's calling for a conclusion that I don't think I can
5 have. I --
6 Q Yes, that's what we do in depositions. I'm asking you --
7 it's a yes-or-no question. Okay? Did you believe as of
8 9/21/84 that Ray Spencer had molested his daughter, Kathryn
9 Spencer?
10 A I believed that there was an indication to that effect,
11 yes, ma'am.
12 Q Okay. Now, going back to the Matt Hansen incident at the
13 Salmon Motel, were you surprised that Shirley Spencer had
14 taken Matt Hansen to the Salmon Motel to spend the night
15 with Ray Spencer after he had been charged with sexually
16 abusing Kathryn?
17 A I don't know that I can answer my emotional state at that
18 point and respond in saying I was surprised. Nothing in
19 law enforcement surprises me.
20 Q Okay. Would you agree that was probably -- if Ray Spencer
21 was a child molester that was a bad decision on Shirley
22 Spencer's part?
23 A Again, you're asking for me to conclude or to offer or to
24 render an opinion on something that I had no control over.
25 That was somebody else's decision.

ZELLNER (James Michael Davidson, 11/5/12)

## Page 68

1  Q  Did you ask Shirley Spencer to take Matt Hansen to the
2     Salmon Motel?
3  A  I had no contact with Mrs. Spencer in regards to whether or
4     not she took Matt Hansen to the motel or not.
5  Q  Did you tell Shirley Spencer to take Matt Hansen to the
6     Salmon Motel without pajamas?
7  A  Again, I had no contact --
8  Q  It's a yes or no. Just yes or no.
9        MR. FREIMUND: Well, it's already been asked and
10    answered. I'd object, but go ahead and answer again.
11 A  Again, I can answer no emphatically, but I would offer an
12    explanation to that "no."
13 Q  (By Ms. Zellner) Does the fact that Shirley Spencer took
14    her son to this supposed child molester, while he's out on
15    personal recognizance, strike you as odd behavior?
16 A  You're asking me to sit in judgment on something for some
17    reason I don't have any way to render an opinion on.
18 Q  Well, supposedly when Matt Hansen got to the Salmon Motel
19    without his pajamas, all these sexual abuses occurred of
20    him, correct?
21 A  That's what -- if we're talking young Matt Hansen, that's
22    what he reported. We're talking Shirley's son. That's
23    what he reported during a later interview, correct.
24 Q  Right. And that incident at the Salmon Motel was the basis
25    for charging Ray with felonies in February of 1985,

## Page 69

1     correct?
2  A  I think there was some additional interviews that were
3     conducted with his son and his daughter in California, and
4     collectively that was the basis for charging him with those
5     crimes, correct.
6  Q  Okay. But the Matt Hansen incident was a big part of the
7     charging, wasn't it?
8  A  I don't know that I can answer that. That would be the
9     prosecutor's position to answer.
10 Q  You went to the Salmon Motel to attempt to corroborate Matt
11    Hansen's story, didn't you?
12 A  I was requested to do that, that's correct.
13 Q  And you reported back that there was a television that was
14    mounted high on the wall. Do you remember that?
15 A  I do recall that, yes, ma'am.
16 Q  And what was the importance of your observation about the
17    television being mounted high on the wall?
18 A  That was part of what Shirley's son was stating that was
19    part of the room description during the time that he spent
20    with Ray at the Salmon Creek Motel.
21 Q  Well, there wasn't any question that he spent the night
22    with Ray Spencer, right? There was no question he was in
23    the room, correct?
24 A  There's none -- I'm not clear as to why you're asking that,
25    because that's the purpose of corroboration.

## Page 70

1  Q  All you corroborated, though, with the television, was that
2     Matt Spencer was in the room, right? That doesn't
3     corroborate sexual abuse.
4  A  Nobody said that. I simply was corroborating --
5  Q  Actually, it does say that. It does say that in the
6     report, that that was the piece of corroborating evidence.
7     I'm just asking you -- I'm not aware that Ray Spencer ever
8     denied that Matt Hansen was dropped off at the motel. Are
9     you aware that Ray Spencer ever denied that?
10 A  Without reviewing the reports of Ray Spencer's statements,
11    I can't answer that question. I don't know whether or not
12    he did. I was requested to go to the Salmon Creek Motel to
13    corroborate the interior of the motel room provided by
14    young Matt Hansen, Shirley Spencer's son. That's what I
15    did.
16 Q  There was no physical evidence in the room of any sexual
17    abuse, correct?
18 A  At the time that I was there I don't know that I was
19    looking for that type of -- I was looking for corroborative
20    information.
21 Q  So you were not there to look for corroborative
22    information?
23 A  I said -- that was my statement. I was there to look for
24    corroborative information.
25 Q  Right. What else besides the television on the wall

## Page 71

1     corroborated Matt Hansen's allegations of sexual abuse,
2     other than his own statement?
3  A  That would be his -- whatever was contained in that
4     statement as it pertained to that room.
5  Q  Okay. Now, Shirley Spencer starts out believing that Ray
6     Spencer was not a pedophile. Would you agree with me?
7  A  I would agree that she believed that Ray Spencer was not
8     sexually involved with her -- his daughter. I don't know
9     that the word "pedophile" ever came into play.
10 Q  But she started out believing Ray was innocent of
11    allegations against him, correct?
12 A  That's reflected in her statement and in the reports,
13    correct.
14 Q  In fact, the case was so weak you could only charge him
15    with a misdemeanor initially, right?
16 A  Again, I was not responsible for the charging. I don't
17    have any idea as to why -- why the prosecutor's office
18    charged him with a misdemeanor. I would assume it was
19    based upon the allegations as it pertained to the statute
20    and how he would have to charge the case. I can only
21    speculate as to that. That would be Mr. Peter's
22    responsibility.
23 Q  But after the Matt Hansen incident at the Salmon Motel,
24    then that, you say, combined with more interviews with the
25    children resulted in the felony charges, right?

ZELLNER (James Michael Davidson, 11/5/12)

## Page 72

1  A  That's correct, yes.

2  Q  You became aware during the investigation that there was a

3    videotaped interview made of Kathryn Spencer at the

4    Sheriff's Department on December 21, 1984, correct?

5  Q  Now, are you making a statement --

6  Q  Yeah --

7  A  -- or is that a question?

8  Q  It's a question.  You became aware that a videotaped

9    interview was done of Kathryn Spencer on December 11, 1984,

10   during the course of the investigation?

11  A  I was aware that there was a videotaped interview done.  I

12   don't recall the dates, and I don't recall when I was made

13   aware of that.

14  Q  Were you made aware of the videotaped interview prior to

15   the charges being brought against Ray Spencer on

16   February 28, 1985?

17  A  I can't recall that, ma'am.

18  Q  When you say you can't recall it, do you mean that you

19   can't give me a specific date?

20  A  I'm stating that I can't recall when I was made aware of

21   that videotape.  Due to the passage of time -- this has

22   been some 26, 27 years ago -- I can't recall that specific

23   information, no, ma'am.

24  Q  Well, we've all been provided -- we have thousands of pages

25   of documents, and you've been provided with several hundred

## Page 73

1    pages of documents about this case, correct?

2  A  Correct.

3  Q  And you are aware as you sit here today that there was a

4    videotaped interview done of Kathryn Spencer, correct?

5  A  I am today, yes, ma'am.

6  Q  And do you have any idea in the last 25 years when you

7    became aware of that videotaped interview?

8  A  I can say that I was probably aware of it at some time

9    during the 25 years.  I can't be specific, and I don't

10   recall -- again, I don't recall that.

11  Q  Do you recall whether you became aware of that videotaped

12   interview prior to Ray Spencer being sentenced?

13  A  No, I cannot.

14  Q  Have you reviewed the videotaped interview?

15  A  I was provided a copy of that videotaped interview in 2009

16   or 2010 by then-Chief Criminal Deputy Prosecutor Dennis

17   Hunter as part and party --

18  Q  Was that the first time --

19  A  I'm sorry.

20  Q  I'm sorry.

21  A  -- as part and party --

22  Q  Was that the first --

23  A  -- to the appeal.

24  Q  Was that the first time that you became aware of a

25   videotaped interview having been conducted of Kathryn

## Page 74

1    Spencer?

2  A  I can't honestly answer that question because I don't

3    recall.

4  Q  Do you have any problems with your memory, any

5    health-related problems?

6  A  No, ma'am.

7  Q  On the videotaped interview when you were made aware of it,

8    did you review the interview?

9  A  I reviewed the CD that Mr. Hunter provided me, correct.

10  Q  And were you told that the videotape itself had been

11   disclosed by Detective Krause in 2009?

12  A  He informed me of that, yes, and I believe it was contained

13   within the information that I was provided at that time.

14  Q  And were you also made aware of the fact that she found the

15   videotape in her garage in 2009?

16  A  That was also contained in the information I was provided,

17   correct.

18  Q  So let's talk about the fact that the videotape was in

19   Sharon Krause's garage.  What is your understanding of how

20   the videotape went from the Sheriff's Department to Sharon

21   Krause's garage?

22  A  I don't have an understanding of that because I don't know

23   that I was offered an explanation.

24  Q  Would you agree that it would be totally improper for a

25   detective to take evidence from a file and take it home and

## Page 75

1    not disclose it for 25 years?

2  A  Well, first of all, we're presupposing that I would know

3    that she had done that, and I don't know that.

4  Q  When you found out that she'd done that, do you consider

5    that improper?

6        MR. BOGDANOVICH:  Object to the form of the

7    question.

8        MS. ZELLNER:  It's not actually not a valid

9    objection in a federal dep.  You've either got to object on

10   privilege or not at all.

11       MR. FREIMUND:  Actually, you are permitted to

12   object to form.

13       MR. BOGDANOVICH:  The question is misleading.

14  Q  (By Ms. Zellner)  Could you answer the question, please?

15  A  Could you restate the question, please.

16       MS. ZELLNER:  Could you read the question back,

17   please?

18       THE COURT REPORTER:  Question:  "When you found

19   out that she'd done that, do you consider that improper?"

20  A  I did not have an opinion because I didn't know the

21   circumstances under which that had occurred.

22  Q  (By Ms. Zellner)  Can you tell me any circumstances under

23   which that would be proper?  Give me a scenario, any

24   scenario that would make that proper, for her to take

25   evidence from the file to her home and not disclose it for

ZELLNER (James Michael Davidson, 11/5/12)

## Page 76

1  25 years while Mr. Spencer sits in prison? Can you give me
2  any scenario?
3  A  First --
4       MR. BOGDANOVICH: Object to the form of the
5  question. It's argumentative and misleading.
6       You can answer.
7  Q  (By Ms. Zellner) I can no longer see you on the screen.
8  If you could move forward.
9  A  I'm sorry. I was sitting back so he could ask the
10  question.
11      In any case, I'm not certain that I can offer a
12  speculation under those circumstances. I don't know the
13  circumstances that involve this.
14  Q  Okay. Well, the circumstances, I want you just to assume
15  these are the circumstances. Detective Sharon Krause in
16  2009 found a videotape of Kathryn Spencer's interview from
17  December 11, 1984, and she disclosed that. Those are the
18  facts, okay? My question to you is -- my original question
19  was, is it proper for Sharon Krause to have taken evidence
20  from the Spencer file home and kept it for 25 years?
21      MR. BOGDANOVICH: Object to the form.
22  Q  (By Ms. Zellner) You apparently don't know whether that's
23  okay? I'm I right? Do you know if that's proper?
24      MR. FREIMUND: I'm going to object. It's been
25  asked and answered and it's mischaracterizing.

## Page 77

1       MS. ZELLNER: It hasn't been answered.
2       MR. FREIMUND: It has been answered twice now,
3  but go ahead and answer it.
4       MS. ZELLNER: It's one of the key issues in the
5  case. It's one of the key issues that Judge Settle wants
6  an answer to, and so I would like to be able to explore,
7  without objections that, quite frankly, aren't proper,
8  whether this witness has any knowledge about how the
9  videotape ended up at Sharon Krause's house.
10      MR. FREIMUND: And he's already told you what he
11  knows, but he can tell you again.
12      Go ahead.
13      MS. ZELLNER: Right. And then the second
14  question was, is it proper -- he's the supervisor. He's in
15  the case on his supervisory liability.
16  Q  (By Ms. Zellner) Is it proper for Sharon Krause to have
17  taken the videotape home? Is that proper? Was that being
18  done in your Sheriff's Department?
19      MR. FREIMUND: Again, I object. That's been
20  asked and answered.
21      But go ahead and answer again.
22  A  Again, it's speculation because I don't know the
23  circumstances under which that tape was taken home, and I
24  don't know that it was evidence at the point that she took
25  it home.

## Page 78

1  Q  (By Ms. Zellner) Yes. Well, give me again any scenario
2  that would justify a detective taking home evidence from a
3  file, a criminal file. Give me any scenario that would
4  justify that. I've never heard of that. I'd like to hear
5  it.
6       MR. FREIMUND: I'd object again. Asked and
7  answered.
8       Go ahead and answer again.
9  A  Again, it's only speculative. I don't know the
10  circumstances under which that videotape was taken home. I
11  can't give you a scenario if I don't know what
12  circumstances it was taken home. If it was used as a
13  training aid, for instance, that might be one possibility.
14  The case was resolved.
15  Q  (By Ms. Zellner) Do you have -- do you have information
16  that the videotape in the last 25 years has been used as a
17  training aid by Sharon Krause?
18  A  I have no information to that, no, ma'am.
19  Q  Do you have any information as to what the videotape was
20  being used for when it was in the possession of Sharon
21  Krause at her home?
22  A  I believe I just answered that. I said no.
23  Q  Is it correct, then, you never instructed Sharon
24  Krause to take the videotape to her house?
25  A  First of all, let me restate, I had no knowledge about the

## Page 79

1  disposition of the videotape.
2  Q  If you could just answer the question. It's a simple
3  question, okay?
4  A  I'm answering the question, to the best of my ability,
5  Q  It's a "yes" or "no." Did you instruct Sharon Krause to
6  take the videotape to her home?
7  A  No,
8  Q  Did you give Sharon Krause permission to take the videotape
9  to her home?
10  A  No, with an exclamation.
11  Q  Did the videotape have any type of identification on it
12  that would show that it was in the Ray Spencer file? Did
13  it have a number? Did it have an inventory number? Did it
14  have anything like that?
15  A  Again, I can't give you an answer to that question because
16  I've not seen the videotape, the particular tape in
17  question,
18  Q  Okay. In 1984 and 1985, when evidence was gathered in a
19  case, physical evidence, was it given an inventory number?
20  A  The inventory number would have been the case number that
21  was assigned to that particular investigation.
22  Q  So if the videotape had a number on it, it would be the
23  case number of the file?
24  A  That -- yes, ma'am.
25  Q  And would all physical evidence be labeled with an

ZELLNER (James Michael Davidson, 11/5/12)

## Page 80

1  inventory number?
2  A  I can never make a statement of all.  That would be --
3  Q  Was that your procedure --
4  A  -- the normal course or normal process, correct.
5  Q  Did you at any time -- have you inquired in the department
6  about the chain of custody with the videotape at any time?
7  A  Again, I'm going back to my original statement.  I don't
8  know anything about or the circumstances involving the
9  specific videotape, so, no, I would not have made an
10  inquiry.
11  Q  Were you present -- were you at work in the Sheriff's
12  Department on the day that Katie Spencer was brought in and
13  interviewed?
14  A  I -- without looking at work records, I can't be specific,
15  no, ma'am.
16  Q  So you don't know one way or the other?  You may have been
17  present?
18  A  I may have been; I may not have been.  I had a number of
19  responsibilities.
20  Q  Okay.  Were you aware that Katie Spencer had been
21  interviewed at the Sheriff's Department?
22  A  I believe if there was a report that reflected that she'd
23  been interviewed at the Sheriff's Department and I reviewed
24  that report, I would have been aware of that, yes.
25  Q  You have reviewed a report of the videotaped interview?

## Page 81

1  A  I didn't say that.  I said if there was a report that
2  reflected that interview.
3  Q  Okay.  Was there -- should there have been a report made of
4  the interview?
5  A  I would normally say, and I can't say specifically
6  pertaining to this, but the normal course would be that you
7  would author a report pertaining to an interview of a
8  victim or witness or suspect.
9  Q  And if I told you that no such report has been produced,
10  would you be surprised that a report wasn't made?
11  A  I would only -- we're basing that upon your statement, not
12  to my personal knowledge.  I don't know that there was no
13  report made.
14  Q  You've never seen it, have you, a report made of the
15  videotaped interview?
16  A  Again, I can't tell you that because I don't recall.
17  Without reviewing the entire file, I wouldn't know.
18  Q  In the documents that we sent you, did you see a report of
19  the videotaped interview in those documents?
20  A  Again, if I have permission to go back and reflect through
21  the reports, I will look to see if I have any record of
22  that.
23  MS. ZELLNER:  Okay, why don't we take a
24  ten-minute break and let him look through those documents
25  and tell me if there's a report that we've all missed.

## Page 82

1  MR. FREIMUND:  Okay.
2  (Recessed at 11:16 a.m.)
3  (Reconvened at 11:27 a.m.)
4  Q  (By Ms. Zellner)  So did you have an opportunity to look
5  through the documents I sent, to confirm whether there was
6  or was not a report made about the videotaped interview?
7  A  There's no indication in the file, no, ma'am.
8  Q  Okay.  And was it part of the custom and practice of
9  prosecutors in Clark County to do interviews at the
10  Sheriff's Department?
11  A  I cannot speak to customs and practices regarding
12  prosecuting attorneys' procedures.
13  Q  Did you ever observe the prosecutor doing an interview at
14  the Sheriff's office?
15  A  Off the top of my head I can not recall specifically an
16  incident where a prosecutor interviewed someone at the
17  Sheriff's office.
18  Q  Were you ever told what the purpose of that videotaped
19  interview with Katie Spencer was at any point up to today?
20  A  I don't specifically recall being told what the purpose of
21  that videotaped interview was.  I have some slight recall.
22  Q  Could you explain the slight recall you do have?
23  A  I believe it was done for the purposes of the prosecuting
24  attorney's office to make a charging determination.
25  Q  And who told you that, that that was the purpose?

## Page 83

1  A  Again, I can't recall whether I read it in a file or
2  whether I was given that information verbally.  It could
3  have been from Denny Hunter during the course of our
4  conversations over the telephone years after this.  This
5  case has gone on forever, so. . . .
6  Q  Other than that, what you've called that slight
7  information, do you have any other knowledge as to the
8  purpose of the videotape being made of Kathryn Spencer?
9  A  No, ma'am.
10  Q  Have you ever discussed, up until today, the existence of
11  the videotape with Sharon Krause?
12  A  I believe we had a conversation over the phone at some
13  point in time, probably within the last five years or less.
14  Q  Tell me -- tell me about that conversation about the
15  videotape.  What do you remember Sharon Krause saying to
16  you?
17  A  My recollection is, is that she recalled finding the
18  videotape in her garage.
19  Q  Did you -- did she explain to you why the videotape had
20  been made?
21  A  I don't recall her making a statement in regards to that at
22  all, no.
23  Q  Okay.  Can you state with complete certainty, that during
24  the course of the investigation of Ray Spencer leading up
25  to the charges in February of 1985, that you did not review

ZELLNER (James Michael Davidson, 11/5/12)

Page 84

1    the videotaped interview of Kathryn Spencer, or may you
2    have? I don't know.
3    A  I can state with certainly I did not review the videotape
4    made during that time frame.
5    Q  And would reviewing the videotape be something that you
6    would have done in the normal course of your duties and
7    responsibilities if you'd known of it?
8    A  No, ma'am.
9    Q  It would not be something you would do?
10   A  No.
11   Q  Okay. Would reviewing a report that the videotape had been
12   made, would that be something that you would routinely do
13   as part of your duties and responsibilities?
14   A  Assuming that a report was made, yes, ma'am.
15   Q  Okay. Now, going back on the Roe report, that was
16   Plaintiff's Exhibit 21, assuming the Roe report of 11/27/84
17   was contained in the file, the Sheriff's Department file,
18   would that have been one of your duties to review that
19   report?
20   A  Since I'm not specifically certain that this report came to
21   the Sheriff's department, I can't answer that question that
22   I would have reviewed this report. There's no indication
23   from the information provided that it was contained within
24   the Sheriff's Department's file.
25   Q  Right. And my question assumes that it was. I'm just

Page 85

1    asking you -- it sounds like, from what you've said before,
2    you tried to reviewed the reports in the file. If this
3    report had been in the file, you would have reviewed; is
4    that fair?
5    A  If the report was in the file, I would have reviewed it if
6    I reviewed the entire case, correct.
7    Q  Okay. Do you recall who requested you to go to the Salmon
8    Creek Motel to try to corroborate Matt Hansen's story?
9    A  My recollection was that it was the Deputy Prosecutor Jim
10   Peters.
11   Q  What's your -- when do you recall Jim Peters first getting
12   involved in the Ray Spencer case? It must have been
13   between the misdemeanor charges and felony charges, or
14   prior to that?
15   A  My recollection was that once the report was forwarded to
16   the prosecuting attorney's office, Mr. Peters was involved
17   from that point on. That's my recollection.
18   Q  And you're talking about the report of the Matt Hansen
19   allegations?
20   A  I'm talking about the initial report with regards to
21   Kathryn Spencer.
22   Q  Okay. So the very earliest report that the patrol officer
23   took; is that right?
24   A  I don't know that I can state that he was involved at that
25   point. I can say that as a result of our follow-up

Page 86

1    investigation of that particular allegation, Mr. Peters at
2    some point in time during that initial investigation became
3    involved. That's my recollection.
4    Q  Okay. And he was involved before the misdemeanor charges;
5    is that right?
6    A  If they were charged as misdemeanors, and I'm not certain
7    that that was the case.
8    Q  Okay.
9    A  You're saying misdemeanors. I'm not certain that that's
10   what was charged.
11   Q  Well, assume that the first charges are misdemeanors. Was
12   Mr. Peters involved before that?
13   A  Before the charges?
14   Q  Yes.
15   A  Again, I can't answer it just exactly the point that
16   Mr. Peters was involved. My recollection was he was
17   involved early on once the case was referred to the
18   prosecutor's office for review.
19   Q  Okay. And do you know in your discussion, that phone
20   conversation with Sharon Krause, did you learn where the
21   original videotape of the interview is?
22   A  My understanding was -- let me ask a question then about
23   what you're asking. Are you asking about where the
24   original interview occurred, or are you asking about where
25   the original tape was?

Page 87

1    Q  The original tape.
2    A  My understanding was, is that that was the one that she
3    found in her garage.
4    Q  Right. But do you know where that original tape is as of
5    today?
6    A  I do not know, no.
7    Q  In your discussion with Sharon Krause, did she tell you how
8    the videotape ended up in her garage for -- until 2009?
9    Did she give you some explanation for why the videotape was
10   in her garage?
11   A  If she did, I don't recall specifically what she said about
12   that -- I'm simply aware that she told me that she had
13   found it in her garage.
14   Q  Did she tell you -- did Sharon Krause tell you why she
15   decided to disclose the videotape in 2009?
16   A  Again, I can't, with any reasonable certainty, tell you
17   that she explained to me that,
18   Q  Has she ever explained that to you at any time up to today
19   possibly --
20   A  She has not, no.
21   Q  Has someone else explained it to you?
22   A  To my knowledge, no.
23   Q  So you don't have any idea how the videotape ended up in
24   her garage?
25   A  Other than what she told me, that she had found it in her

ZELLNER (James Michael Davidson, 11/5/12)

## Page 88

1　garage, that's what I recall.
2　Q Okay. Going back to your relationship with Shirley
3　Spencer, you at a certain point in time informed Sharon
4　Krause about your involvement with Shirley Spencer? Is
5　that correct?
6　A I believe that I did tell her about our relationship, yes.
7　Q And do you recall when you told her about your
8　relationship?
9　A Now, we're talking about the personal relationship. It
10　would have occurred sometime after she and I started seeing
11　each other socially.
12　Q So the first time you informed Sharon Krause of the
13　relationship was after that June 1985, I'll call it a date
14　that you had with Mrs. Spencer?
15　A Well, that would be the only reason why I would inform her
16　of that, because that's when it occurred.
17　Q But what I'm asking you, is that when you informed her,
18　sometime around that time frame, around June of 1985?
19　A I can't be specific of the time, but it would be somewhere
20　in that approximate time range, that's correct.
21　Q Prior to that time had you ever discussed any type of
22　relationship with Mrs. Spencer with Sharon Krause, prior to
23　June of 1985?
24　A There was no relationship to discuss prior to June of that
25　year.

## Page 89

1　Q But my question is not that. Okay? You know that in the
2　Federal District opinion the Court has specifically stated,
3　and just to explain to you why I keep going over this,
4　"Although it's a disputed fact as to what the nature of
5　their relationship was and when it began, Davidson and
6　Ms. Spencer became involved, and Davidson informed his
7　subordinate, Krause, about his involvement with
8　Mrs. Spencer." Okay?
9　　So that's why I'm asking you the time frame, and
10　you've just told me June of 1985 is when you informed
11　Sharon Krause of the relationship?
12　A It would have been -- again, we didn't have a personal
13　relationship prior to the time that I've just previously
14　stated. So when I informed Sharon of my personal
15　relationship, it would have been sometime after the time
16　that we began seeing each other socially. Whether I could
17　say June or July or August, I can't say that.
18　Q Okay. So if we have witnesses that say that your
19　relationship with Ms. Spencer started during the
20　investigation prior to Mr. Spencer's plea, those witnesses
21　would be incorrect; is that right?
22　A That's correct, yes, ma'am.
23　Q Okay. And why is it that you, in June of 1985, decided to
24　pursue a relationship with Mrs. Spencer?
25　A As I previously indicated in my statement, this was more

## Page 90

1　happenstance over a casual conversation that occurred in my
2　office sometime during that time frame, where Mrs. Spencer
3　came in to see Detective Krause and to thank her for her
4　efforts in regards to the Spencer, the investigation
5　concerning her son and Mr. Spencer.
6　Q Would it be a correct statement that you actually were
7　intending, before June of 1985, to ask Mrs. Spencer out to
8　begin dating her, but you waited until June of 1985?
9　A That would certainly be an incorrect statement.
10　Q So you formed the intent on June of 1985 for the first time
11　to ask Mrs. Spencer out?
12　A Again, my response to that is, is that I'm not certain
13　whether I asked or she asked at the time that we had that
14　contact in the Sheriff's Department.
15　Q Did you report your personal relationship, going out with
16　Ms. Spencer, to any of your superiors at any time?
17　A I don't recall whether I reported it directly or they
18　became aware of it as a result of the obvious, which would
19　be that we were seen together.
20　Q When you say "the obvious," you were together, you
21　mean seen together in public?
22　A Correct.
23　Q Okay. Tell me about the conversations. First, what
24　superior officer did you report the relationship to?
25　A Again, I'm not certain that I did report the relationship

## Page 91

1　to. I'm not certain that it just did not become common
2　knowledge from people observing the fact that she and I
3　were seen together in public.
4　Q How do you know that it became common knowledge that you
5　were being seen together? Who told you that?
6　A I can't recall specifically who told me that. I just know
7　it was --
8　Q Was it somebody within the --
9　A I just know that we had been seen together at public
10　events. For instance, we had gone to a party at some point
11　in time and were seen in public, so. . . .
12　Q Do you recall where the party occurred?
13　A I don't at this time, no, ma'am.
14　　MR. FREIMUND: Ms. Zellner, I don't mean to
15　interrupt, but --
16　　MS. ZELLNER: Oh, I saw your food.
17　　MR. FREIMUND: Yeah. So whenever you're at a
18　convenient stopping point, I just wanted to alert you to
19　it. Whenever you're ready.
20　　MS. ZELLNER: Yeah. Why don't we go ahead
21　because I did see her bring the food in. So why don't we
22　break. When do you want to start up again?
23　　MR. FREIMUND: I would think 15 to 20 minutes
24　should be ample for us to wolf down our meal.
25　　MS. ZELLNER: Okay. Why don't we say 20

ZELLNER (James Michael Davidson, 11/5/12)

### Page 96

1  documents in addition to what I've given you?

2      MR. FREIMUND: I'm going to object to the extent

3  that that does call for attorney-client privilege and work

4  product, but it's kind of tenuous, so -- are you asking

5  like did I give him copies of pleadings or correspondence

6  or that sort of thing?

7      MS. ZELLNER: No, I'm just trying to -- he's

8  saying that his recollection is confined in the documents

9  that I gave him. And my question is, have any other

10  documents pertaining to the investigation, generated by the

11  Sheriff's Department, been provided to him other than what

12  I've given him?

13      MR. FREIMUND: Well, I can answer that I have

14  given Mr. Davidson copies of summary judgment, pleadings

15  and responses and the exhibits attached thereto, and I --

16      MS. ZELLNER: Okay.

17      MR. FREIMUND: But --

18      MS. ZELLNER: Right. I'm just trying to make

19  sure that he has been provided with all of the information

20  he needs to answer the questions about the Sheriff's file.

21      MR. FREIMUND: Well, maybe you could word it in

22  a way that does not encroach on my attorney-client

23  conversations with him, and I think there's a way you could

24  do that.

25      MS. ZELLNER: Correct.

### Page 97

1      MR. FREIMUND: You just specifically asked did

2  your attorneys provide you. That's where I'm having a

3  problem.

4  Q  (By Ms. Zellner) Okay, Mr. Davidson, have you on your own

5  reviewed the Sheriff's file on the Ray Spencer

6  investigation?

7  A  None other than what was provided to me by your office.

8  Q  Okay. That was really my question.

9      In the interview that was done of Matt Hansen, were

10  you asking questions or was Sharon Krause asking questions?

11  A  I believe Detective Krause was. I was simply present.

12  Q  And -- okay. In her questioning of Matt Hansen, I believe

13  he was four or five years old at the time, were any

14  questions asked about his competency?

15  A  Asked of whom?

16  Q  Asked of Matt Hansen.

17  A  Again, without reviewing the interview that Detective

18  Krause conducted, I can't answer that question.

19  Q  Did you at any point in time suggest to Shirley Spencer

20  that Matt Hansen have a medical examination?

21  A  I did not, no, ma'am.

22  Q  At any time did you become aware that Matt Hansen had, in

23  fact, had a medical examination?

24  A  I did become aware of that.

25  Q  Was it a routine practice to refer alleged victims to have

### Page 98

1  a medical examination?

2  A  It would depend upon the nature of the allegation.

3  Q  If there were allegations of vaginal rape, would that be

4  the kind of allegation that you would expect the alleged

5  victim would be referred for a medical exam?

6  A  Yes, ma'am.

7  Q  If Shirley Spencer had recalled in her testimony that you

8  did suggest to her that Matt had a -- have a medical exam

9  on these allegations, would you disagree with that

10  statement that she's made?

11      MR. FREIMUND: I'm going to object as an

12  improper hypothetical.

13      But go ahead and answer.

14  A  I would first have to review the document in which she

15  indicated that I had suggested that.

16  Q  (By Ms. Zellner)  Well, do you have an independent

17  recollection of telling her that Matt Hansen should have a

18  medical examination?

19  A  I do not have an independent recollection of that, no,

20  ma'am.

21  Q  With a male child, when there are allegations of anal

22  penetration, would that be the kind of allegation that you

23  would expect to result in a referral to a doctor?

24  A  Well, there's some -- there's some factors that need to be

25  addressed more specifically than just a general allegation.

### Page 99

1  Q  You're aware of testifying previously when you were asked

2  that question, and with a male child where there are

3  allegations of anal penetration, would that be the kind of

4  allegation that you would expect to result in a referral to

5  a doctor? And you answered -- this is the habeas

6  deposition testimony -- "I would agree with that, yes."

7  A  Correct.

8  Q  So are you not agreeing with that now?

9  A  No, what I'm saying is that there are some parameters in

10  which we're talking time frames as opposed to when this

11  occurred and so on. There's an explanation that I would

12  offer additionally besides just responding "yes" or "no."

13  Q  Well, you don't have -- you have no training as a medical

14  doctor, right?

15  A  No, ma'am.

16  Q  Okay. And you're not holding yourself out as a child abuse

17  expert?

18  A  No, ma'am.

19  Q  Okay. Did you become aware at a certain point in time that

20  there had, in fact, been an exam of Mr. Hansen, Matt

21  Hansen?

22  A  Shirley's son? Is that who we're talking about?

23  Q  Yes, Shirley's son. Yes.

24  A  Okay. At some point in time during this entire process I

25  was aware that there was a medical exam.

ZELLNER (James Michael Davidson, 11/5/12)

## Page 100

1  Q  And was it prior to the plea of Ray Spencer in May of 1985?
2  A  No, ma'am.
3  Q  When did you become aware that there had been a medical
4      exam?
5  A  I would probably be aware that it was sometime during --
6      between the 1994-1995 deposition and the 2009 appeal that
7      the prosecutor's office did.
8  Q  So is it your -- was there a medical report of Matt Hansen
9      in the investigative file at the Sheriff's office in the
10     time period leading up to Ray Spencer's guilty plea?
11         MR. FREIMUND:  I'm going to interject another
12     objection related to the collateral estoppel issue, and
13     maybe it would be appropriate here, rather than have me
14     interrupt every time I think you're treading into that
15     area -- I'm not going to instruct him not to answer, but
16     maybe it would be appropriate if you would just give me a
17     standing objection to inquiries into areas in which the
18     federal court in this matter has already held Mr. Spencer's
19     collaterally estopped from relitigating.  If you prefer,
20     though, I can continue to interrupt you when I feel you
21     have crossed that line.
22         MS. ZELLNER:  No, you have can the standing
23     objection.  I think it would be smoother.
24         I would cite to you in the judge's order on page 26
25     in Footnote 2, "Defendants have not demonstrated that a

## Page 101

1      prior adjudication determined how or when the Hansen
2      medical report finally reached the Sheriff's office or why
3      it was withheld until 1995 when the Ninth Circuit ordered
4      the District Court to conduct the aforementioned
5      evidentiary hearing, nor has there been any legal
6      determination about who knew of the report and when.
7      Therefore, at present the Court makes no finding that
8      litigation of those factual issues, if relevant to the
9      plaintiff's claim, are barred by collateral estoppel."
10         So my questions are with the intent of trying to
11     provide that information to Judge Settle, and my question
12     is:  Does this witness know when the medical report reached
13     the Sheriff's office?
14  Q  (By Ms. Zellner)  Do you have any knowledge of that?
15  A  No, I do not.
16  Q  Okay.  And do you have any information as to why the
17     medical report was withheld until 1995?
18  A  No.
19  Q  Are you claiming that prior to the disclosure of the
20     medical report, when you became aware of it in the mid
21     '90s, that you had no knowledge of the report?
22  A  Ma'am, I'm not claiming anything.  I think I answered the
23     question.  I don't recall any information about that
24     medical report.
25  Q  But you continue to say you don't recall, and I just want

## Page 102

1      you to understand that that has legal significance, and I'd
2      like for you to clarify, are you saying that you may, in
3      fact, have seen it and you just don't remember it, or are
4      you saying that you didn't ever see it?
5  A  First, let me explain to you that I've reviewed hundreds
6      and hundreds of case reports.  Ray Spencer was only amongst
7      one of the many that I reviewed.  To recall each and every
8      detail of each report that I ever reviewed would be
9      virtually impossible at this point in time, particularly a
10     case that's in excess of 25 years old.
11  Q  Have you been involved in similar cases to Ray Spencer
12     where someone's been released after 20 years in prison
13     because evidence was concealed?
14         MR. FREIMUND:  I would object to your
15     mischaracterization of events.
16         But go ahead and answer.
17  A  I don't think that I've been involved in a case that has
18     these particular aspects of the Ray Spencer.  I certainly
19     have been involved in a large number of investigations,
20     many that were more significant --
21  Q  (By Ms. Zellner)  You realize that -- that are what?
22  A  Many that were more significant or had greater impact than
23     the Ray Spencer investigation did.
24  Q  Really?  Can you give me an example of a case that's been
25     more significant in your career?

## Page 103

1  A  Probably Ted Bundy.  Probably --
2  Q  That didn't get solved, though, in Washington, did it?
3  A  Well, we were involved in it because we had an individual
4      in our area that was operating -- at one point in time was
5      thought to be Ted Bundy, who was later identified as
6      killing several girls in our area, but was not tied to the
7      Taylor Mountain girls.
8  Q  Right.  Ted Bundy was arrested, convicted, and executed in
9      Florida.
10  A  Correct.
11  Q  Was there any other case that has been more significant
12     than the Ray Spencer case?
13  A  Oh, I could -- do we want to spend -- how many times do I
14     want to respond to that?  I could think of a number of
15     cases.  My --
16  Q  Have you been sued before?
17  A  Involving homicide cases or --
18  Q  Have you been sued before for allegations of wrongdoing in
19     an investigation in a case?
20  A  No.
21  Q  Pardon me?
22  A  No, ma'am.
23  Q  So to answer the Court's question, you do not know who --
24     of the medical report of Matt Hansen?
25  A  As I stated, I believe in my testimony, I don't recall any

ZELLNER (James Michael Davidson, 11/5/12)

## Page 104

1   information prior to 1995 with regard to that. I have not
2   had an opportunity to review the entire case report since
3   this investigation was concluded.
4   Q   What about the medical report of Kathryn Spencer, were you
5       aware of that report?
6   A   No.
7   Q   Did you become aware of that report?
8   A   I did, yes.
9   Q   Was that report in the file at the Sheriff's office at any
10      time during your supervision of this investigation?
11  A   I don't know whether it was or was not. I'm aware that it
12      was not located in 1995 or during that period of time with
13      the federal court review.
14  Q   Do you know -- do you know why either report would not have
15      been -- let's take the Katie Spencer report -- why that
16      would not have been disclosed to the prosecutor's office?
17  A   I don't know that it was not, other than what you're
18      stating today.
19  Q   Do you have proof that it was disclosed?
20  A   I have no proof either way.
21  Q   Okay. So if Mr. Peters has testified it was not disclosed
22      to his office, do you have some contrary information?
23          MS. FETTERLY: Object to the form.
24          MR. FREIMUND: You may go ahead and answer.
25          MS. FETTERLY: You can answer.

## Page 105

1   A   When you say contrary information, the only thing I'm
2       stating is that I had no knowledge specifically as it
3       relates to that medical report whether or not it got to
4       Mr. Peters' office.
5   Q   (By Ms. Zellner) Would there be any reason that that
6       medical report would not have been sent to Mr. Peters'
7       office by the Sheriff's office?
8   A   None that I can think of, no, ma'am.
9   Q   Okay. Now, you've previously, in Plaintiff's Exhibit 1, if
10      you could turn to that. There are two indexes. Let's see,
11      there's an index dated August 30, 1984, and it has 18
12      sections.
13  A   Yes.
14  Q   Okay. And in section 3, it says Medical Examination Report
15      on Kathryn Spencer. Do you see that entry?
16  A   Yes, I do.
17  Q   Okay. And who would have prepared this index?
18  A   I would believe that Detective Krause would have prepared
19      the index.
20  Q   Have you ever talked to Detective Krause about Plaintiff's
21      Exhibit 1, the index of August 30, 1984, at any time?
22  A   In the past 25 or 27 or 28 years? Is that what you're
23      asking?
24  Q   Yes.
25  A   If I talked to her about this index, it might have been

## Page 106

1   during the time that the investigation was being conducted.
2   I don't recall specifically ever discussing this index, but
3   I can't say positively that I did not.
4   Q   Is part of your custom and practice in reviewing reports,
5       would you also have reviewed the index of reports?
6   A   I'm not certain that in each and every instance where an
7       index was prepared that I reviewed the index. Again, my
8       responsibility was to review reports that were prepared by
9       the investigators. Indexes were not necessarily reports.
10  Q   Were index -- it appears, though, indexes were attached to
11      the reports, correct? Otherwise why wouldn't --
12  A   As I previously testified, I believe in 1995 indexes were
13      prepared on major cases for purposes of identifying
14      sections where particular aspects of the investigation were
15      located. Those were usually left to the investigator to
16      prepare.
17  Q   Do you notice anywhere on the August 30, 1984, index --
18      well, actually, I'll withdraw that.
19          Let's go to the second index, November 8, 1984. That
20      index has only nine sections in it. Do you see that?
21  A   I do, yes.
22  Q   And do you have any explanation for why that index would
23      not include the Kathryn Spencer medical exam report?
24  A   I have no independent knowledge at all as to why it would
25      not.

## Page 107

1   Q   Would you expect a later report to encompass the reports
2       from the prior index?
3   A   I'm not certain that I understand what you're asking.
4   Q   Would you expect a subsequent report, a report later in
5       time, to encompass the documents from the first report?
6          MR. FREIMUND: You're saying "report." I think
7       you mean "index."
8          MS. ZELLNER: Index, right.
9          MR. FREIMUND: Yeah. Okay.
10  A   Again, there is a report that's indicated in the first
11      index section that there was a medical examination report
12      on Kathryn Spencer. I see no reason why it would be
13      included in the second index since it was already referred
14      to in the first index.
15  Q   (By Ms. Zellner) And is it your testimony since it was --
16      the report was included in the index that you would have
17      reviewed the medical report on Kathryn Spencer?
18  A   I can only -- I can only speculate at this point that if it
19      was attached to that report, I may have looked at it. I
20      doubt if I reviewed it because I'm not a medical doctor as
21      you aptly pointed out, so I --
22  Q   The custom and practice was for the Sheriff's Department to
23      supply the prosecutor's office with all of the reports in
24      the file; is that correct?
25  A   Any report that was going to be referred to the

ZELLNER (James Michael Davidson, 11/5/12)

## Page 108

1  prosecutor's office was indicated as such, and the Records
2  Division at the Sheriff's office would ultimately refer
3  those to the prosecutor's office, correct.
4  Q  And, in your experience, would a medical report of the
5  complaining witness, one of the complaining witnessing, be
6  sent to the prosecutor's office?
7  A  Just making an assumption, I would assume that would be the
8  case, yes.
9  Q  Let's talk about when Ray Spencer was incarcerated after
10  the February 28, 1985 arrest, that time period.  Do you
11  recall whether or not, while Spencer was in jail, you ever
12  visited him in the jail?
13  A  As I previously stated, I think, in prior testimony, in
14  1995 specifically, or '96, I have no recollection of
15  visiting him at all in the jail.
16  Q  Does that mean you may have visited him and you don't
17  remember it?
18  A  I don't believe that I did, but I certainly have no
19  recollection of those events.
20  Q  Do you recall ever receiving any contact from any jail
21  staff concerning your visits to see Spencer?
22  A  If I did not go to the jail, if I have no recollection of
23  going to the jail to see him, I don't recall having any
24  contacts with jailers in regards to those visits that
25  didn't exist.

## Page 109

1  Q  Did anyone on the staff at the jail ever contact you or
2  your department about your visits to Ray Spencer?  Whether
3  they occurred or not, was there ever any contact made
4  concerning the issue of you visiting Ray Spencer?
5  A  Contact with me personally?
6  Q  You or your department.
7  A  I can't answer for my department.  I can only answer for
8  me, and no.
9  Q  So you have no personal knowledge that anyone from the jail
10  ever contacted anyone in your department about your alleged
11  visits to Ray Spencer?
12  A  That's correct.  I don't have any personal knowledge.
13  Q  Okay.  If Ray Spencer has testified that you came to the
14  jail, you removed him from the medical area and took him
15  down and interrogated him, would he be incorrect about that
16  memory?
17  A  First of all, I could not have removed him from the medical
18  area.  That simply didn't happen.  The process and the
19  protocol of the jail would not --
20  Q  I'm just asking you -- that's not my question.  I'm not
21  asking you to explain what you think would have happened at
22  the jail.  It's a simple question.  I asked you if Ray
23  Spencer is contending that you were interrogating him at
24  the jail, regardless of where you interrogated him, that he
25  is incorrect, that is untrue?  That's a "yes" or "no."

## Page 110

1  A  At this point I did not interview him in the jail.
2  Q  Okay.  Did you ever go to the jail with Detective Krause
3  for her to go in and see Spencer?
4  A  Not to my recollection, no, ma'am.
5  Q  Have you -- did you at any time prior to Mr. Spencer's
6  guilty plea make a statement to him "Your wife used to love
7  you"?
8  A  I have read that in the file.  I do not believe that I ever
9  made that statement, no, ma'am.
10  Q  Well, was that true, that his wife used to love him?
11  A  From the information that was provided in these reports
12  that you provided me, there's certainly an indication that
13  she did.
14  Q  That she did love him?
15  A  Correct.
16  Q  So, at that point in time, you made no such statement to
17  Ray Spencer, correct?
18  A  That's my recollection.
19  Q  Did you ever send Shirley Spencer to attempt to get a Power
20  of Attorney from Ray Spencer?
21  A  Can you explain that question a little bit further?  Did I
22  ever send Shirley Spencer?  What are you saying?
23  Q  Did you ever request -- did you ever request that Shirley
24  Spencer visit Ray Spencer in the jail and sign a Power of
25  Attorney?  Did you ever make that request?

## Page 111

1  A  No.
2  Q  Did you ever send Sharon Krause to the jail to visit Ray
3  Spencer, for any reason?
4  A  I could not specifically recall that happening, no, ma'am.
5  Q  Do you recall -- you said you recalled no complaints being
6  made by the jail staff of your visiting Ray Spencer; is
7  that correct?
8  A  I've read in the file where there was a complaint or an
9  allegation made by a correction officer that deals with an
10  officer, not naming me specifically.  That was in the file
11  that you provided me.
12  Q  Are you aware of any witness statements that have been
13  obtained where the witnesses have said you were, in fact,
14  at the jail visiting Ray Spencer?
15  A  I read a statement by or an affidavit by a Mr. Purae, I
16  believe, in which he indicated that was the case, correct.
17  Q  Okay.  And is that affidavit untrue?
18  A  Yes, ma'am.
19  Q  You're positive you never visited the jail --
20  A  I have no specific recollection --
21  Q  -- to see Ray Spencer?
22  A  I visited the jail on a number of occasions.
23  Q  No.  To see Ray Spencer?
24  A  I have no --
25  Q  You're telling us --

ZELLNER (James Michael Davidson, 11/5/12)

## Page 124

1  Q Why did you feel it was necessary for you to write this
2  letter?
3  A I was asked to write the letter by --
4  Q Well, you --
5  A -- Ellen Cruse.
6  Q Did she tell you what she wanted the content of the letter
7  to be?
8  A She simply asked me to write -- she called me and asked me
9  what my position would be. Then she asked if I would write
10  it and forward it to her.
11  Q Let me -- I want to ask you some further questions. Of
12  course we've reviewed your divorce file, and I want to
13  confirm some facts of this. You were married in 1961; is
14  that correct?
15  A Yes, ma'am.
16  Q You separated on June 16, 1985? Correct?
17  A As I testified, it was sometime from the middle to the end
18  of June or the first part of July.
19  Q That was about a month after Ray was sentenced, correct?
20  A I don't know exactly the date that he was sentenced, but I
21  believe it would have been at least -- or in that
22  proximity, correct.
23  Q And then you filed for divorce from Linda in December of
24  1985, correct?
25  A Correct.

## Page 125

1  Q And I think you described the fact that Shirley had sold
2  the house that she and Ray lived in. Do you have personal
3  knowledge of that?
4  A None other than what she told me.
5  Q But that is true, right? She told you that she had sold
6  the house, correct?
7  A Prior -- prior to her acquiring the house that she was
8  living in at the time.
9  Q Right.
10  A Correct.
11  Q And it's your testimony that you had -- you did not make
12  any effort to persuade her to get the house signed over to
13  her, to get the deed signed over to her?
14  A I had no involvement in that deed or her -- her personal
15  property at all.
16  Q So you did not discuss the sale of her house with her?
17  A No.
18  Q And your wife's divorce attorney was James H. Gregg; is
19  that correct?
20  A Yes, ma'am.
21  Q You're aware that at a certain point in this entire case,
22  all the way up to today, there were questions about what
23  had happened with Ray's retirement check from Vancouver?
24  Were you aware that allegations had been made about that?
25  A Not until I read it in this file I was not.

## Page 126

1  Q Okay. Did you at any time persuade or recommend to Shirley
2  Spencer that she forge Ray Spencer's name on his retirement
3  check?
4  A Well, first of all, I wasn't aware that Mr. Spencer was
5  retired and was receiving retirement checks.
6  Q That's not my question.
7  A By you're categorizing his retirement checks. And,
8  secondly, I had no knowledge of involvement in any of the
9  financial matters as it related to Shirley Spencer or Ray
10  Spencer.
11  Q Are you aware of any cases with Sharon Krause where there
12  have been allegations of wrongdoing on her part?
13  A I am not personally aware of any case where she was accused
14  of wrongdoing other than this Ray Spencer investigation.
15  Q Are you aware -- okay. Are you aware of the Nelson Melo
16  case?
17  A No, ma'am.
18  Q What about the Timothy McMahon case?
19  A The name doesn't ring a bell, no.
20  Q Lynn Malcom?
21  A That name, I recall -- I recall the name.
22  Q Do you recall anything specifically about the Lynn Malcom
23  case?
24  A I do not, no.
25  Q Are you aware of any convictions that were overturned,

## Page 127

1  other than this one, on cases that Sharon Krause had worked
2  on as an investigator?
3  A No.
4  Q Did you have -- during the Spencer investigation, did you
5  have any conversations or contact with James Rulli,
6  Mr. Spencer's attorney?
7  A I had no personal contact with Mr. Rulli.
8  Q Did you know Mr. Rulli?
9  A Yes, ma'am.
10  Q Did you attend the plea of Ray Spencer?
11  A No.
12  Q Did you ever look at any file documents from the Sacramento
13  County Sheriff's Department from Patrick Flood?
14  A I'm not going to -- I can't answer specifically that I
15  recall reviewing those files, but, again, I haven't had
16  access to the entire file for a number of years, so I
17  can't -- I can't recall doing that specifically.
18  Q Are you intending any time before the trial of this matter
19  in April to review the file, the Sheriff's file?
20  A If I have an opportunity to review those files, I would
21  certainly be happy to do so. Again, number one, I live a
22  considerable distance from the Sheriff's office, so it's
23  not something that I have immediate access to. Secondly,
24  I've been retired for 20 years.
25  Q Do you intend to change your testimony that you've given

Page 133

1        C E R T I F I C A T E

2        I, DIXIE J. CATTELL, the undersigned Registered

3    Professional Reporter and Washington Certified Court Reporter,

4    do hereby certify:

5        That the foregoing deposition of JAMES MICHAEL

6    DAVIDSON was taken before me and completed on the 5th day of

7    November, 2012, and thereafter transcribed by me by means of

8    computer-aided transcription; that the deposition is a full,

9    true and complete transcript of the testimony of said witness;

10       That the witness, before examination, was, by me,

11   duly sworn to testify the truth, the whole truth, and nothing

12   but the truth, and that the witness reserved signature;

13       That I am not a relative, employee, attorney or

14   counsel of any party to this action or relative or employee of

15   such attorney or counsel, and I am not financially interested

16   in the said action or the outcome thereof;

17       That I am herewith securely sealing the deposition of

18   JAMES MICHAEL DAVIDSON and promptly serving the same upon

19   MS. KATHLEEN ZELLNER.

20       IN WITNESS HEREOF, I have hereunto set my hand

21   this_____day of_____, 2012.

22

23
                        _____
24                      Dixie J. Cattell, RPR, CCR
                        NCRA Registered Professional Reporter
25                      Washington Certified Court Reporter CSR#2346
                        License Expires July 16, 2013.