# EXHIBIT  3

1

1   UNITED STATES DISTRICT COURT

2   FOR THE WESTERN DISTRICT OF WASHINGTON

3   AT TACOMA

4

5   CLYDE RAY SPENCER, MATTHEW          )
    RAY SPENCER, and KATHRYN E.        )
    TETZ,                              )
6                                      )
                Plaintiffs,            )
7                                      )
         vs.                           )    NO. 3:11-cb-05424-BHS
8                                      )
    FORMER PROSECUTING ATTORNEY        )
9   FOR CLARK COUNTY JAMES M.          )
    PETERS, DETECTIVE SHARON           )
10  KRAUSE, SERGEANT MICHAEL           )
    DAVIDSON, CLARK COUNTY             )
11  PROSECUTOR'S OFFICE, CLARK         )
    COUNTY SHERIFF'S OFFICE, THE       )
12  COUNTY OF CLARK and JOHN DOES      )
    ONE THROUGH TEN,                   )
13                                     )
                Defendants.            )
14

15   DEPOSITION UPON ORAL EXAMINATION OF SHARON KRAUSE

16

17

18

19          Tuesday, November 6, 2012
               Olympia, Washington

20

21

22

23

24

25

```
 1    APPEARANCES:

 2         FOR THE PLAINTIFF CLYDE RAY SPENCER
           (VIA VIDEOCONFERENCE):
 3
                              MS. KATHLEEN ZELLNER
 4                            MR. DOUGLAS JOHNSON
                              KATHLEEN T. ZELLNER & ASSOC.
 5                            Esplanade IV
                              1901 Butterfield Rd., Ste. 650
 6                            Downers Grove, IL  60515

 7         FOR DEFENDANT JAMES M. PETERS:

 8                            MS. PATRICIA FETTERLY
                              ASSISTANT ATTORNEY GENERAL
 9                            P.O. Box 40126
                              Olympia, WA  98504-0126
10
           FOR DEFENDANT DETECTIVE SHARON KRAUSE:
11
                              MR. GUY BOGDANOVICH
12                            LAW, LYMAN, DANIEL
                                 KAMERRER & BOGDANOVICH, P.S.
13                            P.O. BOX 11880
                              Olympia, WA  98508-1880
14
           FOR DEFENDANT SERGEANT MICHAEL DAVIDSON:
15
                              MR. JEFFREY A.O. FREIMUND
16                            FREIMUND JACKSON TARDIF &
                                 BENEDICT GARRATT, PLLC
17                            711 Capitol Way South, Ste. 602
                              Olympia, WA  98501
18

19

20

21

22

23

24

25
```

Page 3

1                    I N D E X

| EXAMINATION | PAGE/LINE | |
|---|---|---|
| MS. ZELLNER | 7 | 16 |
| MR. FREIMUND | 195 | 1 |
| MS. ZELLNER | 197 | 8 |
| MR. FREIMUND | 201 | 7 |
| MS. ZELLNER | 201 | 13 |

I N D E X   E X H I B I T

| EXHIBIT NO. | DESCRIPTION | PAGE/LINE | |
|---|---|---|---|
| NO. 1 | Clark County Sheriff's Index, 8/30/84; 2 pgs. | 9 | 19 |
| NO. 2 | Clark County Sheriff's Index, 11/8/84; 2 pgs. | 14 | 10 |
| NO. 3 | R. Stephenson Report of Interview with Ray and Shirley Spencer (Shirley's Handwritten Statement Attached); 9 pgs. | 18 | 16 |
| NO. 4 | Detective Flood Report Re Interview with Ray, Shirley, Katie, Matt & DeAnne; 10 pgs. | 26 | 3 |
| NO. 5 | Detective Flood Report - "All Investigation and Medical Findings sent to Clark County"; 1 pg. | 32 | 21 |
| NO. 6 | Rebecca Roe Report Re Declination of Case by King County; 3 pgs. | 34 | 4 |
| NO. 7 | Krause Report Re Receipt of Release Allowing Clark County to Send Information to Anne Link (with release attached); 1 pg. | 36 | 18 |

## Page 4

| EXHIBIT NO. | DESCRIPTION | PAGE/LINE |
|---|---|---|
| 1 | | |
| 2 | | |
| NO. 8 | Krause Report Re Report of Medical Exam of Katie Spencer; Katie Spencer's Medical Exam Report; Matt Hansen's Medical Exam Report; 8 pgs. | 37  10 |
| NO. 9 | Krause Report Re Summary of Contacts with Ray Spencer; 14 pgs. | 38  19 |
| NO. 10 | Krause Report Re Interview of Karen Stone; 7 pgs. | 62  22 |
| NO. 11 | Krause Report Re Interview of Katie Spencer (Interview #1); 15 pgs. | 69  6 |
| NO. 12 | Krause Report Re Interview of Phyllis Day; 3 pgs. | 148  20 |
| NO. 13 | Krause Report Re Interview of Kathryn Roe; 4 pgs. | 149  3 |
| NO. 14 | Krause Report Re Interview of Matt Spencer (Interview #1); 11 pgs. | 135  24 |
| NO. 15 | Krause Report Re Interview of Linda Lawrence; 5 pgs. | 151  11 |
| NO. 16 | Krause Report Re Interview of DeAnne Spencer; 22 pgs. | 151  11 |
| NO. 17 | Krause Report Re Interview of Katie Spencer (Interview #2); 12 pgs. | 142  10 |
| NO. 18 | Krause Report Re Interview of Shirley Spencer Re Domestic Disturbance; 8 pgs. | 152  4 |
| NO. 19 | Krause Report Re Interview of Shirley Spencer and Matt Hansen (Interview #1); 24 pgs. | 7  7 |

## Page 5

| EXHIBIT NO. | DESCRIPTION | PAGE/LINE |
|---|---|---|
| NO. 20 | Krause Report Re Matt Hansen & Arrest/Warrant; Arrest & Warrant Documents (with Peters Affidavit); 13 pgs. | 159  9 |
| NO. 21 | Krause Report Re Interview of Matt Hansen (Interview #2); 6 pgs. | 159  17 |
| NO. 22 | Krause Report Re Interview of Matt Hansen (Interview #3) & Shirley Spencer; 9 pgs. | 159  1 |
| NO. 23 | Krause Report Re Interview of Matt Spencer (Interview #2); 14 pgs. | 160  11 |
| NO. 24 | Krause Report Re Interview of Katie Spencer (Interview #3); 6 pgs. | 160  22 |
| NO. 25 | Krause Report Re Polygraph of DeAnne Spencer (with report of polygraph attached); 4 pgs. | 162  12 |
| NO. 26 | Complaint for Arrest Warrant; 5 pgs. | 162  15 |
| NO. 27 | Ray Spencer Change of Plea Transcript; 66 pgs. | 164  8 |
| NO. 28 | Stanley Abrams' Letter to Davidson Re Polygraph Examinations; 1 pg. | 165  5 |
| NO. 29 | Vancouver PD: Correspondence from Cpt. King to Chief Davis, 9/4/84; 3 pgs. | 166  2 |
| NO. 30 | Vancouver PD Correspondence from Cpt. King to Chief Davis, 9/12/84; 3 pgs. | 166  13 |
| NO. 31 | Ray Spencer Declaration; 11 pgs. | 167  8 |
| NO. 32 | Lee Coleman Report to Parole Board; 6 pgs. | 167  15 |
| NO. 33 | Affidavit of Peter Camiel; 4 pgs. | 7  7 |

## Page 6

| EXHIBIT NO. | DESCRIPTION | PAGE/LINE |
|---|---|---|
| NO. 34 | Krause Deposition, 5/22/96; 72 pgs. | 169  2 |
| NO. 35 | Shirley Spencer Deposition, 6/4/96; 18 pgs. | 7  7 |
| NO. 36 | Shirley Spencer Evidence Deposition, 8/30/96; 27 pgs. | 7  7 |
| NO. 37 | Krause Federal Habeas Hearing Transcript; 31 pgs. | 7  7 |
| NO. 38 | Reference Hearing Transcripts During Hearing on Spencer's PRP; 28 pgs. | 7  7 |
| NO. 39 | Tim Hammond Interview of Sharon Krause; 9 pgs. | 7  7 |
| NO. 40 | Tim Hammond Interview of Shirley Spencer; 11 pgs. | 7  7 |
| NO. 41 | Tim Hammond Interview of DeAnne Spencer; 15 pgs. | 7  7 |
| NO. 42 | Tim Hammond Interview of Michael Davidson; 7 pgs. | 7  7 |
| NO. 43 | Krause's Answers to Plaintiff's Interrogatories; 22 pgs. | 7  7 |
| NO. 44A | Krause Document Production (KRAUSE 1-399) | 7  7 |
| NO. 44B | Krause Document Production (KRAUSE 400-793) | 7  7 |

## Page 7

1   BE IT REMEMBERED that on Tuesday, November 6,

2   2012, at 9:04 a.m. at 2102 Carriage Drive SW, Building C,

3   Olympia, Washington, before DIXIE J. CATTELL, Certified

4   Court Reporter, appeared SHARON KRAUSE, the witness herein;

5   WHEREUPON, the following proceedings were had,

6   to wit:

7   (EXHIBIT NOS. 1-44A & B MARKED)

8

9   SHARON KRAUSE,   having been first duly sworn by

10   the Notary, testified as follows:

11

12   MS. ZELLNER:  Let the record reflect this is the

13   deposition of Sharon Krause taken pursuant to notice and

14   continued to today's date by agreement of the parties.

15   EXAMINATION

16   BY MS. ZELLNER:

17   Q  Ms. Krause, would you state your full name and spell your

18   last name.

19   A  Sharon Krause, K-R-A-U-S-E.

20   MS. ZELLNER:  I would ask today that we put

21   everyone in the room's name on the record.  I can start

22   with us.

23   I'm Kathleen Zellner.  I represent the plaintiff, Ray

24   Spencer.

25   MR. JOHNSON:  My name is Doug Johnson.  I

ZELLNER (Sharon Krause, 11/6/12)

## Page 16

1  A Could you ask me that again?
2  Q Sure.
3  A Thank you.
4  Q Do you have any independent recollection of whether Kathryn
5  Spencer's medical examination was turned over to the
6  prosecutor's office during the investigation?
7  A No independent recollection. It's been so long.
8  Q Have you -- oh, I know. Has there been anything you've
9  read in all of these exhibits that's triggered your memory
10 or made you believe that that medical report was turned
11 over to the prosecutor's office?
12 A I can't -- I can't imagine why -- first of all, I wouldn't
13 have -- there wouldn't be any reason for me not to have
14 done that, and that was our practice. Everything went
15 there. However, this -- there were reports on that
16 investigation going over to the prosecutor's piecemeal.
17 I've thought about this a lot since we've got, you know,
18 got involved in this. There were reports going over not in
19 one big lump. They were going as we went along. So there
20 wouldn't have been any reason for me not to have sent that
21 over.
22      Also I've worked with Jim Peters for years, and he is
23 so meticulous, I can't imagine at least discussing that
24 with him, but I'm sure that wasn't the only case he was
25 doing, and this certainly wasn't the only case I was

## Page 17

1  responsible for. But it's possible that that report went
2  to our Records, just that report, what the Utility Report
3  covered. Now, where it went from Records or if it went to
4  anyplace, I can't say. I -- however, obviously, I put a
5  copy in my notebook.
6      It was also my practice, when we had a major case, to
7  have two notebooks. One was my working notebook that I
8  could scribble on, and the other was for the major case
9  with the original reports.
10      So there wouldn't have been any reason why it
11 wouldn't have gone over. I would have sent it to Records.
12 There were times when I would make copies for the PA, the
13 prosecutor, and I'd put a note on, when I sent them to
14 records, "I've copied these for the PA" or "they have their
15 copies" or "these are for the PA." So if it went to
16 Records, I don't know if it went from our Records to the
17 prosecutor. After it went there, I don't know where it
18 went. And I have no independent recollection about taking
19 it over.
20 Q All right. So when material was transmitted from your
21 office to the prosecutor's, it would go to the Records
22 Department in the Sheriff's Department first, and then they
23 would send it over --
24 A Yes.
25 Q -- to the prosecutor; is that right?

## Page 18

1  A Yes.
2  Q Did you ever send -- did you ever send reports directly to
3  the prosecutor's office or did the reports always go to the
4  Records Department?
5  A It would have to have gone through Records. I may be the
6  one that made the copies while I was making my copy, but I
7  would attach a note saying, you know, these are for the PA
8  or this needs to go to the prosecutor, but I don't remember
9  directly taking reports over and giving it to them without
10 it going through Records, because it would have had to have
11 been documented.
12 Q Okay. So just on these first two exhibits, though, so it's
13 clear for the record, that you did prepare both Exhibit 1
14 and Exhibit 2?
15 A I think I did. It looks like my work.
16 Q Okay. All right. Let's go to Exhibit 3, and let me ask
17 you -- and any amount of time you need to look over things
18 is fine. It appears that this is a report authored by an
19 Officer Stevenson; is that correct?
20 A That's what it looks like.
21      MR. BOGDANOVICH: Counsel, I'm sorry, before we
22 leave Exhibit 2 --
23      MS. ZELLNER: Yes.
24      MR. BOGDANOVICH: -- I wanted to ask you if you
25 could clarify -- there's some handwriting on the Exhibit 2

## Page 19

1  index.
2      MS. ZELLNER: Right.
3      MR. BOGDANOVICH: Is that --
4      MS. ZELLNER: Let's do clarify it with her
5  because these are the copies that we got, and I don't know
6  where the handwriting came from, so let me ask her if, in
7  fact, she recognizes the handwriting on Bates stamp 3.
8  Q (By Ms. Zellner) Is that your handwriting?
9  A No.
10 Q Is there handwriting on Exhibit 1? I don't think there is.
11      MR. BOGDANOVICH: I don't think there was, but I
12 know there's handwriting on quite a few of the exhibits in
13 these two notebooks, and I was going to ask for each one if
14 you could verify whose it is.
15      MS. ZELLNER: Sure, let's do that. Yeah, I
16 think it's good to do that because we don't know either.
17 We haven't written on these.
18 Q (By Ms. Zellner) But to go back to my question on
19 Exhibit 3, do you recognize Exhibit 3?
20 A Do I recognize it? Do I have an independent --
21 Q Yeah. Have you -- pardon me?
22 A I read it now. I didn't remember it or recognize it until
23 I read it.
24 Q Okay. But you do remember that an Officer Stevenson was
25 dispatched to the Spencer home in Washington?

| Page 20 |
|---|
| 1  A  That's what this report reflects, yes. |
| 2  Q  Okay. Do you know when approximately you were assigned to |
| 3     the case, the Spencer case? |
| 4  A  I think there's a little card in there that -- or a copy of |
| 5     a card, when that was assigned to me. However, it should |
| 6     be noted in one of my reports when I got the investigation. |
| 7  Q  Okay. Yeah. And I haven't -- maybe we will come across |
| 8     that. I hadn't seen that. Do you believe that you were |
| 9     the one that dispatched Officer Stephenson to the |
| 10    residence, to the Spencer residence -- |
| 11 A  No, I don't believe that. |
| 12 Q  -- to do an initial -- |
| 13    You did not; is that right? |
| 14 A  I don't believe that I did. |
| 15 Q  Okay. Did you -- at a certain point in time, were you |
| 16    provided with this report of Officer Stephenson -- |
| 17 A  I'm sure I was. |
| 18 Q  -- in your investigation? |
| 19 A  I was. |
| 20    MR. BOGDANOVICH:  Sharon, I'm going to ask that |
| 21    you please try to let Ms. Zellner finish her question |
| 22    before you start talking so that we don't create problems |
| 23    for Ms. Cattell. |
| 24    THE WITNESS:  Okay. Sorry. |
| 25 Q  (By Ms. Zellner) There's just a little bit of lag time |

| Page 21 |
|---|
| 1     between the questions. It's just because of the |
| 2     communication, I think. |
| 3     Tell me, do you have an independent recollection of |
| 4     when you were first notified about the Spencer case? Do |
| 5     you have any time frame? |
| 6  A  No independent recollection, no. Only what's in the |
| 7     report. |
| 8  Q  Were you assigned to the Spencer case as an investigator in |
| 9     1984? |
| 10 A  Yes. |
| 11 Q  And who assigned you to be the investigator? |
| 12 A  It would have been Michael Davidson. He was my supervisor |
| 13    and the sergeant of our unit. |
| 14 Q  What sort of duties did you observe that Michael Davidson |
| 15    had? You said that he was the supervisor. On a day-to-day |
| 16    basis what would he do? What did you observe him doing? |
| 17 A  My observations were that he assigned cases. We had -- |
| 18 Q  Okay. |
| 19 A  -- homicide investigators, check fraud investigators. That |
| 20    whole unit, he assigned investigations. He would oversee |
| 21    what was going on. We -- |
| 22 Q  Let me stop you there. When you say -- and let's just |
| 23    confine this to the Spencer case. Was the Spencer case -- |
| 24    and I'm talking just in a general sense. We'll get more to |
| 25    the specific details in a minute. But what was Mr. -- or |

| Page 22 |
|---|
| 1     what was Davidson's role in the Spencer case as a |
| 2     supervisor? |
| 3  A  He assigned the case to me. I kept him informed. I'm sure |
| 4     at times he made suggestions to me about where I should |
| 5     proceed or things I should do. We were a fairly small unit |
| 6     so there were times when, if I needed assistance, he would |
| 7     be there to do that. He communicated -- |
| 8  Q  How many -- |
| 9  A  I'm sorry. |
| 10 Q  Oh, go ahead. I'm sorry. No, you go ahead. He |
| 11    communicated? |
| 12 A  He would be the one who communicated with the |
| 13    administration and kept them informed. |
| 14 Q  Did he communicate on the Spencer case with the |
| 15    prosecutor's office, or was that just you that communicated |
| 16    with the prosecutor's office? I'm just talking about what |
| 17    you have personal knowledge of. |
| 18 A  I'm sure I wasn't the only one who communicated with them. |
| 19    I can't say if he did. However, some of the reports |
| 20    reflect that he was present. |
| 21 Q  Would you communicate with him pretty much on a daily basis |
| 22    about the Spencer case? |
| 23 A  I have no independent recollection. However, as sensitive |
| 24    as that case was, I'm sure that we communicated daily. |
| 25 Q  Did you have -- did the Department have daily briefing |

| Page 23 |
|---|
| 1     sessions on their cases -- |
| 2  A  No. |
| 3  Q  -- where the investigator would sit down with the |
| 4     supervisor and discuss the case, or was it not that formal? |
| 5  A  It wasn't that formal. |
| 6  Q  When you say it was a small department, how many -- how |
| 7     many investigators reported to Davidson in that time frame |
| 8     of 1984? |
| 9  A  I can't say for sure. I think yesterday Michael Davidson |
| 10    said ten, but there wasn't any more than that, I'm sure. |
| 11 Q  Okay. So it's about that size, about ten investigators, |
| 12    approximately ten? |
| 13 A  Approximately, including everybody, and that would be our |
| 14    evidence tech and -- and the investigators. |
| 15 Q  Would you describe Detective Davidson's role in the Spencer |
| 16    investigation as a -- let's see, how do I want to phrase |
| 17    this? He's described himself as having a hands-on approach |
| 18    in the case. Would you say that he did or was he just |
| 19    reviewing reports? |
| 20    MR. FREIMUND:  I'm going to object to the extent |
| 21    that mischaracterized, but please go ahead and answer. |
| 22 A  Can you ask me that again, please? |
| 23 Q  (By Ms. Zellner) Sure. I'm just trying to determine the |
| 24    level -- the degree of involvement that Detective Davidson |
| 25    had in the Spencer case. Could you be more specific about |

## Page 24

1    his involvement? We know he reviewed reports. Anything
2    else?
3    A I indicated before there were times when we discussed it.
4    I'm sure he made suggestions about things that I should do.
5    He had input into that. I don't recall -- he wasn't
6    present during all of the interviews with the children or
7    witnesses. He was present when -- on occasion when we
8    spoke with Ray Spencer. He was present when Ray Spencer
9    was arrested. But, again, we were small and we all were
10    buried with cases, so he was always willing to help when he
11    could.
12    Q Okay. You described the Spencer case as being sensitive.
13    What do you mean by that term?
14    A He was a city police officer, and in all fairness and out
15    of respect for him, when we got the initial complaint, that
16    certainly didn't mean that he had done these things. And
17    it was hard. It was hard on all of us. You know, these
18    are people that we rely on and depend on on a daily basis
19    if we need help or if we're in trouble. And so it was
20    sensitive. It was -- you know, I'm being honest with you
21    when I say it was difficult for all of us, including
22    Mr. Spencer, I'm sure, but it was difficult for us.
23    There's a -- you know, we rely on each other. That's
24    all we have when we get into trouble and we're cops. And
25    so you have this kinship, and it may not be a situation

## Page 25

1    where you spend your off hours with someone, but there's
2    this trust, and so everybody was being real careful.
3    Q Okay. And we can go through that in more detail, but as
4    you sit here today, knowing everything that you know about
5    the case, do you still hold the opinion that Mr. Spencer is
6    guilty of the charges of molesting his children?
7    MR. BOGDANOVICH: I'm going to object to the
8    form of the question, but you can go ahead and answer the
9    question.
10    A Based on my knowledge and what happened during the
11    investigation, first of all, I wasn't the one that said he
12    molested his children, his children did, but I believed
13    that he was responsible.
14    Q (By Ms. Zellner) Okay. So even today, knowing the
15    children have recanted, you still hold the opinion that he
16    was guilty as charged?
17    MR. BOGDANOVICH: Same objection. I think it's
18    incomplete and misleading and probably irrelevant too.
19    But you can answer.
20    A Okay. Could you ask me again, the question?
21    Q (By Ms. Zellner) Yes. It's a simple question.
22    A Um-hmm.
23    Q As you sit here today, do you still hold the opinion that
24    Ray Spencer is guilty of having molested his children --
25    A I do.

## Page 26

1    Q -- in 1984?
2    A I do.
3    Q All right, let's look at Plaintiff's Exhibit 4, and I'm
4    going to ask you if you recognize this exhibit--It's got a
5    number of pages. Do you recognize this exhibit as being
6    one of the reports prepared by Officer Flood?
7    A I do recognize it.
8    Q Okay. And you had -- this report was sent to your
9    department and would have been in your file during the
10    investigation?
11    MR. BOGDANOVICH: Well, Counsel, before we go
12    any further with questions, could you maybe clarify, if you
13    can, or ask about the handwriting? I think there are
14    several pages.
15    MS. ZELLNER: I will, yeah. Let me -- I just
16    want to get her to confirm that the report would have been
17    in her files and that she's recognizing it.
18    Q (By Ms. Zellner) Do I have a "yes" to that --
19    A Yes.
20    Q -- question?
21    All right. Then, just to get Counsel's question
22    resolved, there is handwriting on different pages of this
23    report, and I'll just ask you, do you recognize the
24    handwriting on the Flood report?
25    A No, I don't recognize it.

## Page 27

1    Q Okay. Now going to -- what was your understanding of
2    Officer Flood's involvement in the early stages of the
3    Spencer investigation?
4    A Again, it's not based on independent recollection. It's
5    based on my review of these reports, but that he -- his
6    department apparently was contacted by Children's
7    Protective Services. He was assigned to follow up on the
8    complaint that they had. Based on the -- and he made a
9    phone call to the Spencer residence, spoke -- it's my
10    understanding it was Shirley Spencer he was trying to
11    contact initially, but he spoke with Ray Spencer and then
12    spoke with Shirley Spencer. Based on concerns, he went to
13    the house and interviewed the children, also subsequently
14    spoke with the mother.
15    Q Okay. And is it your understanding of the evolution of the
16    case that Officer Flood was the first law enforcement
17    officer to conduct interviews of the Spencer children?
18    A I believe so. I think he was the first one.
19    Q Do you know if at the time you conducted your first
20    interview of Kathryn Spencer you were aware of the details
21    of Officer Flood's interview of Kathryn Spencer?
22    A I would think it would be reflected in the report, but I
23    assume -- I believe that I was aware. In fact, I know I
24    was aware that he had spoke with them.
25    Q Okay. And what it seems like you just -- have just stated

## Page 28

1  that you know you were aware. What made you -- what's made
2  you know you were aware?
3  A  In reading the reports, there was a conversation with Ray
4  Spencer and Shirley Spencer, I think, where I told him part
5  of what was holding us up, we were waiting for those
6  reports.
7      And when I went to California, I recall that I spoke
8  to Detective Flood prior to talking to the children, and
9  I'm sure that I had his report by then.
10  Q  Okay. And looking at the section of his report, it's the
11  last page -- actually, it's four pages from the end. Let
12  me see if it's Bates stamped. It's when he's actually
13  talking about his interview. He's talking about Detective
14  Madrigal and I made contact at the Becerra residence. Do
15  you see that page?
16  A  Yes, I guess this is it.
17  Q  25.
18  A  25?
19  Q  Right. Right.
20      Now, Detective Flood describes Kathryn Spencer as
21  being extremely shy in talking to him; is that correct?
22  A  That's correct. When -- well, can I -- he says --
23  Q  Yeah.
24  A  -- she was extremely shy in talking to me about these
25  things, but prior to that --

## Page 29

1  Q  Right, not in general?
2  A  Yeah.
3  Q  Okay, yeah, not -- he's saying about the allegations, she
4  is extremely shy, correct?
5  A  Correct.
6  Q  Okay. And then when Officer Flood inquires about the
7  specific allegations, Kathryn Spencer tells him several
8  things. She tells him that her mother has touched her on
9  her potty, but she was only putting medicine on her. Do
10  you see that?
11  A  That's what the report states, yes.
12  Q  And she also indicated that she did tell Shirley everything
13  that Shirley had told him, but then when asked to explain
14  it or asked specific questions about it she would say she
15  couldn't remember the words so she couldn't tell me.
16      Does that have any investigative significance to you,
17  that the child is, in this first interview, not remembering
18  the words that were told to her?
19      MR. BOGDANOVICH: I'm going to object to the
20  form.
21      MR. FREIMUND: I join that objection. When you
22  said "told to her," --
23      MS. FETTERLY: To her.
24      MR. FREIMUND: -- I don't think that accurately
25  characterizes the report.

## Page 30

1  Q  (By Ms. Zellner) Do you agree with me that the report says
2  that -- and I read it to you -- that "She indicated that
3  her mother did touch her on her potty but only when she was
4  putting medicine on it," correct? I'm reading it
5  correctly?
6  A  Yes.
7  Q  Okay. She's not describing being sexually molested, is
8  she, in that sentence?
9  A  No.
10  Q  Okay. "She indicated that she did tell Shirley everything
11  that Shirley advised me of but when asked to explain it or
12  asked specific questions about it, she would say that she
13  couldn't remember the words so she couldn't tell me." Do
14  you see -- am I reading that correctly?
15  A  That's what it states, yes.
16  Q  And I'm asking you as an experienced investigator of child
17  abuse if that sentence has any significance to you in terms
18  of the child's ability to retell the story?
19  A  You know, it doesn't -- it does and it doesn't. First of
20  all, "She indicated she did tell Shirley everything that
21  Shirley advised me of." I have no idea specifically what
22  Flood told her or said to her. Then "When asked to explain
23  it and asked specific questions about it, she would say she
24  couldn't remember the words." But it's difficult for me to
25  make an opinion one way or the other because Flood isn't

## Page 31

1  specific about what he did say to her or tell her or ask
2  her.
3  Q  Okay. In the last sentence it says, "When asked if someone
4  had touched her pee-pee, she shook her head yes, and when
5  asked who, she would say Daddy, and then a few minutes
6  later she would say, Not Daddy, no one." Am I reading that
7  correctly?
8  A  Yes.
9  Q  And then it says, "Kathryn indicated that her father --
10  that her and her father played a game but she didn't want
11  to talk about the game," and "When asked if someone had
12  touched her on her pee-pee, she would say yes, stop and
13  think for a moment, and then indicate that it was her
14  mother putting on the medicine." Am I reading that
15  correctly?
16  A  That's what it states, yes.
17  Q  And then on the last page, it appears that Officer Flood
18  "made contact with Matthew, the brother of the victim in
19  this case, and he indicated he knew nothing about what we
20  were talking about." Am I reading that correctly?
21  A  That's what it states, yes.
22  Q  And then Matthew went on, and he denied that his mother or
23  father had taken any inappropriate actions against him; is
24  that right?
25  A  That's what it states.

## Page 60

1    it was reports or one of us. I just don't remember that.
2    Q   Right. And that's always the common practice with a
3    polygraph because someone has to provide the information --
4    A   Right.
5    Q   -- so the examiner can formulate the questions. Right.
6        Okay. Your next entry is on 11/1/84 and in that
7    entry you reference having traveled to Sacramento; is that
8    right?
9    A   Correct.
10   Q   Now, on page 10 of 12 on that report, there's -- the second
11   paragraph states that the -- it says, "The daughter's
12   therapist felt it would not be the child's best interest
13   for us to come to Sacramento." Do you see that entry?
14   A   You're on page 10?
15   Q   Yeah. Page 10, second paragraph, the last sentence.
16   A   I don't --
17       MR. BOGDANOVICH: The second full paragraph.
18       THE WITNESS: Oh, okay.
19   A   Okay. Can you ask me that again -- I'm sorry -- the
20   question?
21   Q   (By Ms. Zellner) Right. There's an entry that indicates
22   that Katie Spencer's therapist had expressed the opinion
23   that it would not be in Katie's best interest for you to go
24   to Sacramento. Do you see that?
25   A   Initially. It was prior to me going down.

## Page 61

1    Q   And then -- okay. Do you have -- is there anything in your
2    file that indicates that she -- that you saw in these
3    documents that she'd changed her mind and said it was a
4    good idea for you to interview Kathryn Spencer?
5    A   I don't remember reading anything. There was some
6    information referenced Matt, but not Katie. But I know
7    that had she told me it wasn't a good idea, I wouldn't have
8    gone down there.
9    Q   Well, she actually did say she didn't think it wasn't a
10   good idea, correct?
11       MR. BOGDANOVICH: Ob --
12   A   At some point initially --
13       MR. BOGDANOVICH: Yeah, object to the form of
14   question.
15       Go ahead.
16   Q   (By Ms. Zellner) Okay. But, I mean, you had that
17   information, you've documented it, that she had said it
18   wouldn't be in the child's best interest, correct? At some
19   point in time she told you that?
20   A   Initially. It's in the report.
21   Q   Then are you saying there was a conversation with her where
22   she said that it was okay to interview Katie --
23   A   I don't have any --
24   Q   -- Spencer?
25   A   I'm sorry. I don't have any independent memory of that.

## Page 62

1    However, I can assure you I would not have gone down there
2    and tried to talk to her if I thought the therapist thought
3    that wasn't a good idea.
4    Q   That might be, but I'm looking for evidence of that and I
5    could not find anything from the therapist stating that.
6        And it sounds like you continued. . . .
7        (Videoconference connection lost)
8        (Recessed at 10:48 a.m.)
9        (Reconvened at 10:49 a.m.)
10       MS. ZELLNER: Can you hear us?
11       MR. BOGDANOVICH: Yes.
12   Q   (By Ms. Zellner) Okay. In this meeting with Ray Spencer
13   on 11/1/84, Sergeant Davidson is present in that meeting,
14   is he not?
15   A   That's correct.
16   Q   And at the end of the meeting on page 12 of 12, you record
17   that Sergeant Davidson made statements indicating that he
18   felt something had occurred between Ray Spencer and Katie
19   based on the statements Katie had made to you and to
20   Shirley Spencer; is that right?
21   A   That's what it -- yes. The report states that.
22   Q   And he -- okay. Now, you have -- I want to go in this
23   order, but -- okay, so let's go to Exhibit 10, which is
24   dated 10/2/84, and this is an interview with Karen Stone,
25   correct?

## Page 63

1    A   Correct.
2    Q   All right. If you go to page 7 of that interview, you make
3    the statement at the top of that page, I advised -- "I
4    advised Stone that I would -- that I would talk with the
5    prosecutor and call her back." Do you see that on page 7
6    of 7?
7    A   Yes.
8    Q   Okay. And am I correct that apparently -- and take a
9    minute or a few minutes to look at this report, but you
10   were attempting to get Stone to take a polygraph with
11   Dr. Abrams; is that right?
12   A   Correct.
13   Q   And Stone was somewhat reluctant to do that, would you say?
14   A   At some point, she was, yes.
15   Q   Okay. And so she tells you, and I'm at the top of 7, that
16   she doesn't want to take the polygraph unless it's
17   absolutely necessary and you make a call to the prosecutor
18   and tell her you'll call her back. Can you tell me why you
19   were calling the prosecutor about Karen Stone taking the
20   polygraph?
21   A   I can only refer to my report, but it's -- I don't
22   necessarily think it was all the polygraph, her not wanting
23   to take it. I talked to Kathryn. Kathryn said she lied.
24       One thing that happened when I was in California is I
25   got a call from Mike Davidson, or when I spoke to him, he

## Page 68

1  MR. BOGDANOVICH: Counsel, could we kind of look
2  for a place to take the break we discussed after the last
3  interruption and maybe see about getting a backup phone
4  line set up?
5  MS. ZELLNER: Yeah.
6  MR. BOGDANOVICH: And I think the witness asked
7  about a break too.
8  MS. ZELLNER: Sure. Why don't we go ahead and
9  break, and then when we come back, I want to go into
10  Exhibit 11, which is the interview of Katie Spencer.
11  MR. BOGDANOVICH: Okay.
12  MS. ZELLNER: How long do you want to break?
13  MR. BOGDANOVICH: Well, I don't know. I was
14  going to ask Ms. Cattell -- do you want to go off the
15  record so we can talk about the logistics of this?
16  THE COURT REPORTER: Yes.
17  (Recessed at 11:08 a.m.)
18  (Reconvened at 11:25 a.m.)
19  Q (By Ms. Zellner) All right, let's go to Exhibit -- it
20  would be 11.
21  MR. BOGDANOVICH: Actually, Counsel --
22  Q (By Ms. Zellner) It's a 14-page report, correct?
23  MR. BOGDANOVICH: Counsel, before you go to 11,
24  I wanted to clarify for 10, there was some underlining and
25  circles on some of those pages. It goes back to my earlier

## Page 69

1  questions, if you could maybe ask if --
2  MS. ZELLNER: Sure. Yes.
3  Q (By Ms. Zellner) Ms. Krause, is the writing on Exhibit 10,
4  is any of that writing yours?
5  A No.
6  Q All right. Now, on Exhibit 11, it's a 14-page document,
7  can you tell us for the record what it is?
8  A It's a Utility Report that I dictated. It was typed for
9  me.
10  Q And have you had an opportunity to look at this report
11  during the break?
12  A Not during this break, but I have looked at it. And
13  there's also a bunch of writing on this throughout the
14  report. I recognize none of that. None's mine.
15  Q All right. Now, some of the writing on the 14 pages is
16  yours. Attached to, I guess it would be, Bates stamp 71,
17  after page 14 there's a drawing. Do you see that drawing?
18  A I do.
19  Q And is that a drawing that you used during your interview
20  of Kathryn Spencer?
21  A It is.
22  Q All right. Now, does this report truly and accurately
23  reflect your entire interview with Kathryn Spencer on that
24  date, 10/16/84?
25  A I'm assuming it does, yes. I took notes during the time I

## Page 70

1  talked to her.
2  Q What did you do with the notes that you took?
3  A You know, at some point in time, notes were destroyed, and
4  it was because we did not have the capability of storing
5  all those things. So once it was transcribed, at some
6  point in time they would be shredded.
7  Q Okay. So I want to ask you now about certain specifics of
8  your interview with Kathryn Spencer on that date of
9  10/16/84. Your report indicates on page 2 of 14.
10  Actually, let's start on page 1, that you took Kathryn
11  Spencer to a mall to purchase a coat for yourself because
12  you had not taken one with you; is that correct?
13  A That's correct.
14  Q Okay. Why would you be taking a child witness to a mall to
15  buy a coat?
16  A I have to back up. Prior -- and I recall this
17  specifically. Prior to going to Sacramento, I spoke to
18  Detective Flood, and I asked him if there would be some
19  place in his department that I could interview her. And he
20  said, well, if he needed to do that, he probably could.
21  But I thought -- my impression of that conversation was
22  that he was -- you know, it wasn't his case, and I
23  understand that, and everybody's busy.
24  And I learned -- I talked to hundreds of children. I
25  learned a long time ago that the worst place to interview a

## Page 71

1  child is at their residence because there's too many
2  distractions and you end up having to look at everything
3  they got for Christmas and their birthday.
4  And the other thing I was concerned about was that
5  there was a divorce. And you know, I didn't know -- I got
6  a little bit of information from my end, but I didn't know
7  if there was some really bad blood there, if Mom was
8  putting the kids up to saying things. I did not want to do
9  the interview in the house. And I also learned that you
10  have to establish a rapport with the child.
11  If their father, in fact, at that point had done
12  these things -- he was a policeman; I was a policeman --
13  and I don't want children to be threatened by that. So I
14  elected to take her with me to the hotel and do that
15  interview where I could control it and it was private. And
16  it would give me some time to spend with Kathryn and kind
17  of evaluate where she was as far as her being competent.
18  And I wanted her to be comfortable with me. If these
19  things were said and they weren't true, I wanted her to
20  know it was okay for her to tell me they weren't true. If
21  there was more than what she reported initially, I wanted
22  her to be comfortable and be able to do that.
23  So I needed a coat, so I thought that would give us
24  some time alone where I could get acquainted and I could
25  establish a rapport with her and also kind of evaluate

## Page 132

1    A Um-hmm.
2    Q -- am I correct that you, on a number of occasions in this
3      interview, you assure Kathryn that Shirley Spencer and you
4      were proud of her for telling the truth?
5    A At least once, and it could have been more, yes.
6    Q And on page 69 I think you stated, "I indicated to DeAnne
7      Spencer that Katie was a, quote, good helper, end quote,
8      and that she had talked with me and had really helped me.
9      At that time Katie was standing on the couch and jumped
10     into her mother's arm and stated, quote, Aren't you proud
11     of me 'cause I told the truth?'" Did you make that
12     statement?
13   A Yes.
14   Q And did you also say -- this is on page 70 -- "I said again
15     that Katie did really good and was a good helper by talking
16     to me"?
17   A Yes.
18   Q Okay. And was that something in your interview technique
19     that you usually did, was that you would praise a child for
20     describing sexual abuse to you?
21         MR. BOGDANOVICH: Object to the form of the
22     question.
23   A No, not necessarily. It was -- I praised children who
24     didn't report sexual abuse.
25   Q (By Ms. Zellner) Who did not report sexual abuse?

## Page 133

1    A Exactly.
2    Q But this interview you have just stated that you did praise
3      her for telling you the truth, correct?
4    A Yes.
5    Q Okay. And you are -- would you agree with the statement
6      that you're shaping the responses of the children by
7      praising them when they give you the response you want?
8         MR. BOGDANOVICH: Object to the form of the
9      question. I think it's argumentative, misleading.
10   A On 14 at the top, what it says is I asked or said again
11     that Katie did really good, a good helper by talking to
12     me, not by saying her dad molested her.
13   Q (By Ms. Zellner) I see. Well, originally she did not want
14     to talk to you; is that correct?
15   A There were several times when she got real quiet and
16     wouldn't talk and then she would, but, you know, I saw that
17     all the time.
18   Q Our expert has made a list of things that you gave to Matt,
19     Big Matt, Matt Spencer and Katie Spencer during the course
20     of your interviewing with them. We talked about the soft
21     drink that you bought for her on page 58. On page 59 you
22     bought hot chocolate for her. On page 68, of course you've
23     just read the whole thing, you just comment on the fact
24     that you've bought a taco and a drink for her at a drive-in
25     restaurant, correct? That's a fact?

## Page 134

1    A Yes.
2    Q Okay. And then in a later interview, which we'll get to,
3      but on page 123, you bought an ice cream sundae for Katie
4      at a Dairy Queen, correct?
5    A On page 123? I think we did. We talked in the car?
6    Q Yeah.
7    A Yeah.
8    Q And then with Big Matt, or Matt Spencer, you bought for him
9      a hot chocolate at a coffee shop?
10   A I believe that's correct. At the motel.
11   Q Okay. And then you also bought him or got him a soft drink
12     at the Sheriff's office. Do you remember giving the
13     children those things to eat and drink?
14   A I don't necessarily remember it, but I remember reading
15     that that's what occurred.
16   Q Okay. Did you also -- in your interviews with the
17     children, did you also comment to them about what the other
18     children had said about Mr. Spencer? And we could go to
19     page 83, but before we go to this, I'll give you the
20     specific page numbers. Was that a technique that you used?
21     You'd tell one child what the other child had said?
22   A Not if I could help it.
23   Q Okay. Well, we've got -- I've got five examples of you
24     doing that. On page 83 your report says, quote, at that
25     time I indicated to Big Matt that what Katie had said was

## Page 135

1    that her father had touched her on her private areas. This
2      is at page 83.
3    A Okay.
4    Q So I'm asking you, assuming that you've said that, do you
5      believe that's a good method of interviewing a child?
6    A I -- I need to explain. First of all, I wouldn't have done
7      that normally. However, Matt -- it was different with him.
8      And it's like I said before, if I interviewed 100, I
9      probably would do it 100 different ways, even though you
10     have a protocol and you try to do things.
11         Matt was real concerned about what his sister had
12     said, and I knew Detective Flood had talked to them, and he
13     had some information. I didn't know what his mother had
14     said, but he clearly had some idea of what was going on.
15     So, no, if I had a choice, I wouldn't have done it that
16     way, but I didn't think I had any other way I could do it.
17   Q Do you agree, though, that giving information from one
18     child to the other child about the details of the alleged
19     offense can contaminate the memory of the child, that
20     that's the problem with doing that?
21   A I don't know if I'd say contaminate the memory. I don't
22     think that's a preferable way to do it. However, again,
23     sometimes you just don't have choices.
24   Q Okay. Well, the second example of that is on page 84. And
25     that's going to be in Exhibit 14. Can you tell me what

ZELLNER (Sharon Krause, 11/6/12)

37 (Pages 136 to 139)

## Page 136

1  Exhibit 14 is?  If you'd look at the first page, that's
2  another Utility Report that you prepared, correct?
3  A  Right.  That's the first -- 10/17/84 interview with Matthew
4  Ray Spencer.
5  Q  Right.  And in that interview on page 84, it says, quote, I
6  indicated to Big Matt that the genital area was one of the
7  things that Katie had said to me.  So, again, you felt that
8  you had to pass on information to Matt of what Katie had
9  said?
10  A  At that point in time I said that to Matt, I'd have to look
11  specifically at what the conversation was before.  That
12  wouldn't be the way I'd prefer to do it, but for some
13  reason I felt like I had to do it that way.
14  Q  Okay.  And then also on page 84 and 85, you state to Matt,
15  "At that time I told Big Matt that during the conversation
16  with Katie the day before she indicated to me that during
17  the summer visit in Vancouver, her father had put his mouth
18  on the private areas of her body and also had made her put
19  her mouth on her father's penis.  I related to Matt that
20  Katie had also made the statements indicating that her
21  father had placed his bare penis on the private parts of
22  her body where she goes to the bathroom from."  That's on
23  84 and 85.
24     So, again, would you give me the same answer, that's
25  not a preferable method, but that's what you did?

## Page 137

1  A  That wouldn't be the -- right.  It wouldn't be the
2  preferable method of doing that.  However, whatever was
3  going on in that interview, I felt it was necessary.
4  Q  Okay.  And do you also -- do you have a recollection of
5  discussing with Big Matt what his stepbrother, Matt Hansen,
6  and Katie had previously said about Mr. Spencer?  So did
7  you convey information to Big Matt about what Little Matt
8  had said about Ray Spencer molesting him?
9  A  The second interview with Matthew Spencer, I did indicate
10  to him that both Kathryn and Little Matt, they called him,
11  had said some things occurred to them, but also that he was
12  also a victim.  And I, without reading the report, wouldn't
13  remember that.
14  Q  Okay.  One of the other methods that you used in these
15  interviews -- and I could give you the page cites.  The
16  first one is on page 66, so that's Exhibit 11 -- you tell
17  the children that by telling you information that it would
18  allow, in this case, Mr. Spencer to get help.  So you,
19  specifically on page 66 of this Exhibit 11, say to Kathryn,
20  "Sometimes people did things they weren't supposed to do
21  because they were sick and needed help."  "I told Katie
22  that that was why it was important for us to talk.  In
23  order for to us to help someone who was sick, we needed to
24  know what was wrong."  What was your reason for telling
25  Katie that you were trying to get help for Mr. Spencer?

## Page 138

1  A  Well, prior to that, at that time I indicate to Katie that
2  sometimes people did things that were not good to do
3  because they were bad, but sometimes people did things they
4  weren't supposed to do because they were sick and needed
5  help.  I indicated to Katie when a grown-up person touches
6  a child's body in a way that they shouldn't, it was
7  possibly because the grown-up person was sick and needed
8  help.  I indicated to her that it was a different kind of
9  sick.  It was like their -- it's a different kind of sick
10  than when you got a stomachache or the flu.  It was like
11  the grown-up person's thinking was sick, so --
12  Q  Okay.  But that is something that you did repeatedly in
13  your interviews with the Spencer children, is it not --
14  A  It was.  I talked about --
15  Q  -- you told them that helping -- is that true?
16  A  When I talked to all children, how do I explain sexual
17  dysfunction or why an adult would do that, so that was my
18  way of explaining why it might happen.  Somebody's thinking
19  was sick.  And I did talk to those children.
20  Q  Okay.  But I have one, two, three, four, five, I have six
21  examples of you telling the Spencer children that if they
22  told you the details of the sexual abuse that that would
23  help Mr. Spencer, and my question to you is:  Why were you
24  doing that?
25     MR. BOGDANOVICH:  I'm going to object to the

## Page 139

1  form of question.  I think it lacks foundation and is not
2  consistent with specific entries in specific reports, which
3  in fairness should be provided to the witness.
4     MR. FREIMUND:  I'm going to object --
5     MS. ZELLNER:  Okay, let's go through -- we'll go
6  through all six of them.
7     MR. FREIMUND:  I'm going to object to the
8  preamble of the question as not being a question, it's
9  argumentative, but the latter part is a question.
10  Q  (By Ms. Zellner)  We talked about page 66.  Let's go to
11  page 124, Bates stamp 124.
12     MR. BOGDANOVICH:  Counsel, if you could direct
13  us to roughly where in the page you're reading from before
14  you start your quote.
15     MS. ZELLNER:  Sure.
16  Q  (By Ms. Zellner)  So page 124, "Katie then talked about her
17  daddy needing help.  You stated, 'Cause he can't get help
18  if he doesn't tell the truth, can he?'"
19     MR. BOGDANOVICH:  Well, Counsel, could you tell
20  us where that is on the page --
21     MS. ZELLNER:  Sure.
22     MR. BOGDANOVICH:  -- and give the witness a
23  chance to get there.  I think she's kind of struggling to
24  catch up as you're reading.
25     MS. ZELLNER:  Yeah, this is all Bates stamp in

## Page 192

1  A Correct. But I have to add, again, this was not a document
2  that I produced. This was a document --
3  Q Would --
4  A I'm sorry.
5  Q Would you agree with this? I didn't produce it; your
6  attorneys did. Do you agree with that statement?
7    Do you have to get a detailed history of the abuse --
8  A Yes.
9  Q -- when you do the investigation?
10  A Yes, I agree with that.
11  Q Do you have to get corroborative detail?
12  A Hopefully.
13  Q And if photographs are described by the victims, do you
14  attempt to find the photographs?
15  A Yes.
16  Q Okay. Do you attempt to learn of distinguishing
17  characteristics of the suspect?
18  A Yes.
19  Q Okay. And you give -- there's an example, not that you
20  gave us, but in the document about a description of the
21  subject's penis. That might be important, right? It was
22  important in Michael Jackson's case.
23  A It could be, yes, very much.
24  Q Then you would also try to gather physical evidence if any
25  existed, correct?

## Page 193

1  A Correct.
2  Q And then parents -- it states parents should be advised to
3  seek a prompt medical exam when penetration occurs. And
4  that would also be part of the investigation protocol,
5  would it not?
6  A Yes.
7  Q Okay. The materials that you've provided us in your
8  packet, just so I'm clear about it, some of the materials
9  you authored, and then some of them you just used over the
10  years in your seminars?
11  A Correct.
12    MS. ZELLNER: Okay, we don't have any further
13  questions.
14  Q (By Ms. Zellner) Are you intending to review any more
15  documents, or have we presented you with the documents that
16  reflect your investigation in the Spencer case?
17    MR. BOGDANOVICH: Well, I'm going to object to
18  the form of question. I think it looks like the documents
19  that you gave us in the two-notebook Krause Deposition
20  Exhibits are the same reports that we've seen from other
21  sources, but I don't know that this witness is in a
22  position, given how many years it's been since she retired,
23  to verify whatever "all documents in the case" would mean.
24    MS. ZELLNER: Will there be a point in time when
25  that might be done? Are you intending to have her look at

## Page 194

1  the original file, just so we know, or are you going to
2  produce those documents to us?
3    MR. BOGDANOVICH: Well, at this point, Counsel,
4  and I don't want to speak out of turn, because I know
5  you've just served some voluminous Request for Production,
6  and we're working on how they're going to be responded to,
7  but I can tell you at this point as I sit here, I don't
8  know that there is still a Sheriff's office case file on
9  this incident, so --
10    MS. ZELLNER: Okay.
11    MR. BOGDANOVICH: I think, as you can tell,
12  she's reviewed what you sent her. And, like I said, it's
13  consistent with what we had seen too.
14    MS. ZELLNER: Okay. Well, I'm sure whatever you
15  do it will be in good faith, so -- I mean, it is difficult
16  because the case is so old.
17    MR. BOGDANOVICH: Right.
18    MS. ZELLNER: Would you like to waive or reserve
19  signature?
20    MR. FREIMUND: Actually, I have a follow-up
21  question.
22    MS. ZELLNER: Oh, you have questions?
23    MR. FREIMUND: Yeah.
24    MS. ZELLNER: Oh, sure. Go ahead.
25      *   *   *

## Page 195

1      EXAMINATION
2  BY MR. FREIMUND:
3  Q Ms. Krause, could I direct you to Exhibit 34 that was
4  supplied to you by Ms. Zellner, the plaintiff's lawyer in
5  this case, and particularly direct your attention to pages
6  38 through 41 of Exhibit 34. And if you would just briefly
7  review that, I have some questions.
8  A Page 38?
9  Q To 41, yes.
10  A Um-hmm. Okay.
11  Q Let me know when you've had a chance to review that,
12  please.
13  A Okay.
14  Q After reviewing your testimony from the 1996 evidentiary
15  hearing, can you tell us, please, when you found out that
16  Mike Davidson developed a personal relationship with
17  Shirley Spencer?
18  A I don't remember the date. I remember it was along -- it
19  seems like a long time after that. And, again, I've
20  thought about it a lot. I don't believe for one second it
21  was during the Spencer investigation.
22    MS. ZELLNER: I want to object to that being
23  nonresponsive.
24    MR. FREIMUND: I didn't find it nonresponsive.
25  Q (By Mr. Freimund) But can you tell us, then, was it before

## Page 196

1  or after Plaintiff Ray Spencer was convicted on an Alfred
2  plea of guilty that you first found out that Mike Davidson
3  had developed a personal relationship with Shirley Spencer?
4  A  I believe it was after.
5  Q  Why do you have that belief?  What makes you think that it
6  was after he was convicted?
7  A  I had an incident prior to this when one of our good
8  friends, who is a deputy, of my late husband and I had
9  inappropriate contact with a victim in a case we were
10  investigating intimate contact.  The minute I heard, I was
11  in reporting to administration.  Had I suspected, had I
12  seen anything that would have led me to believe there was
13  something going on between the two of them, or I was
14  certain there was, I would have immediately reported it to
15  a supervisor.
16       And I told my friend before, I said, "I'm not losing
17  my reputation and job over your stupidity," and I told him
18  I'd reported it.
19       The other thing is that it seems to me at the time I
20  became aware of it, it was pretty much common knowledge.  I
21  would hear other people talking about, and Shirley Spencer
22  was coming into the Department at times.  I have no doubt
23  in my mind if that would have been during the Spencer
24  investigation, administration would have pulled him out of
25  there so fast, he wouldn't have been allowed to do anything

## Page 197

1  involving that investigation.  That's why I don't, you
2  know, why I believe what I do.
3       MR. FREIMUND:  Thank you.  I don't have any
4  further questions at this point.
5       MS. FETTERLY:  I have no questions.
6       MS. ZELLNER:  Actually, I do.
7            EXAMINATION
8  BY MS. ZELLNER:
9  Q  On the issue of the relationship, at some point Sergeant
10  Davidson and Mrs. Spencer go public with their
11  relationship.  You sat in his deposition yesterday,
12  correct?
13  A  Yes.
14  Q  Okay.  And he described going out on June 16, 1985, having
15  a drink with her after Mr. Spencer had been convicted and
16  probably shipped off to prison.  Do you remember that?
17  A  Yes.
18       MR. FREIMUND:  I object.  That mischaracterizes.
19  He didn't give any precise date like that.
20       MS. ZELLNER:  He most certainly did.  He even
21  told us the restaurant they went to.
22       MR. FREIMUND:  He did tell you the restaurant.
23  He did not say it was June 16.  You're mistaken.
24       MS. ZELLNER:  He said June 16.  Well, we'll look
25  at the transcript.

## Page 198

1       MR. FREIMUND:  Yeah, please do.
2  Q  (By Ms. Zellner)  You were not a social friend of Sergeant
3  Davidson's, were you?
4  A  No, there were times over the years when, you know, we did
5  things together, a couple, but no.
6  Q  Did he confide in you about the status of his marriage
7  during the Spencer investigation?
8  A  No.
9  Q  And he wasn't confiding information to you about his sexual
10  life with different women during the Spencer investigation?
11  A  No, absolutely not.
12  Q  And so -- and you're indicating that when the prior
13  relationship occurred with someone that you knew, you
14  reported that right away; is that correct?
15  A  Right away, yes.
16  Q  And that's because it's so improper for a law enforcement
17  officer to have a relationship with a witness, correct?
18  That's why you were reporting it?
19  A  I can't -- I don't think I could say with a witness, but
20  with a witness -- this was an alleged victim in my case.
21  Q  Okay.  Well, with a victim.  A victim with a witness.  But
22  you would agree with me that it would be a violation of any
23  Code of Conduct by a law enforcement officer to have a
24  personal relationship with a witness in a case, wouldn't
25  you?

## Page 199

1  A  During the investigation?
2  Q  During the investigation or after the investigation.
3  A  Well, I don't think I can say that because you'd have to
4  know the circumstances of the person being a witness.  I
5  mean, it could be --
6  Q  Okay.  The reason you reported the prior incident was you
7  thought it was improper, correct?
8  A  Very improper.
9  Q  Okay.  And if you had, in fact, known that Sergeant
10  Davidson was having a romantic relationship with Shirley
11  Spencer during the investigation, you would have reported
12  that, right?
13  A  Absolutely.
14       MR. FREIMUND:  I'm going to object.
15  Q  (By Ms. Zellner)  And that's because --
16       MR. FREIMUND:  Hold on, hold on.  I'm going to
17  object.
18  Q  (By Ms. Zellner)  That's because --
19       MR. FREIMUND:  Hold on, Ms. Zellner.  I am going
20  to --
21  Q  (By Ms. Zellner)  -- it would have been totally improper --
22       MR. FREIMUND:  Hold on, Ms. Zellner.  I am going
23  to --
24       MS. ZELLNER:  Let me finish my question.
25       MR. FREIMUND:  No, let me object first.

1                    C E R T I F I C A T E

2          I, DIXIE J. CATTELL, the undersigned Registered

3    Professional Reporter and Washington Certified Court Reporter,

4    do hereby certify:

5          That the foregoing deposition of SHARON KRAUSE was

6    taken before me and completed on the 6th day of November,

7    2012, and thereafter transcribed by me by means of

8    computer-aided transcription; that the deposition is a full,

9    true and complete transcript of the testimony of said witness;

10         That the witness, before examination, was, by me,

11   duly sworn to testify the truth, the whole truth, and nothing

12   but the truth, and that the witness reserved signature;

13         That I am not a relative, employee, attorney or

14   counsel of any party to this action or relative or employee of

15   such attorney or counsel, and I am not financially interested

16   in the said action or the outcome thereof;

17         That I am herewith securely sealing the deposition of

18   SHARON KRAUSE and serving the same upon MS. KATHLEEN ZELLNER.

19         IN WITNESS HEREOF, I have hereunto set my hand

20   this_____day of_____, 2012.

21

22

23         _____
           Dixie J. Cattell, RPR, CCR
24         NCRA Registered Professional Reporter
           Washington Certified Court Reporter CSR#2346
25         License Expires July 16, 2013.

*Matt Spencer*
*1st interview*
*w/ Krause*

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8586
SUPPLEMENTAL RPT

STATUTORY RAPE, 1ST DEGREE, RCW 9A.44.070
LOCATION OF INCIDENT:    17681 NE Lucia Falls Road, Yacolt, Wa.
DATE OF INCIDENT:        Between 07-14-84 and 08-26-84

DATE & TIME:      :   10-17-84                    1745 hours.
LOCATION:             Holiday Inn, Room #135
                      5321 Date Avenue
                      Sacramento, California 95841-2597
INCIDENT:             Interview with Witness

WITNESS:          ?   SPENCER, Matthew Ray          dob: 11-28-75
                      aka: Matt
                      3930 Becerra Way
                      Sacramento, California         phone: (916) 482-6857

VICTIM:               SPENCER, Kathryn E.            dob: 01-13-79

SUSPECT:              SPENCER, Clyde Ray             dob: 01-09-48.
                      17681 NE Lucia Falls Road
                      Yacolt, Washington

SUMMARY:

        On the evening of 10-15-84, after I had arrived in
Sacramento, California, I met the SPENCER children briefly when I accompanied

CCSD Case #84-8586, S.A.KRAUSE, K-43


EXHIBIT 14
Spencer000080

their mother to pick them up at the grandmother's residence. During the time I was around the children that evening I was introduced to them; however, they were not advised as to who I was, reference how I was employed or why I was in Sacramento.

When we returned to Deanna SPENCER'S residence with the children, it was approximately 10:00 PM and the children immediately prepared to go to bed. However, at one point when we were discussing the weather I mentioned that the Sacramento weather was worse than it was in Washington. Matt SPENCER immediately stated, 'My dad lives in Vancouver, Washington. He's a policeman; he's a cycle cop.' Matt then asked me if I knew his dad and I indicated to Matt that I did know his father and told him that was the reason that I had come to Sacramento, so I could talk with him and with Katie. Matt did not ask me any more questions that evening and I did not volunteer any additional information at that time.

On the evening of 10-16-84, when I returned Katie SPENCER to her residence, I made arrangements to pick Matt SPENCER up the following day after he got home from school for the purpose of my interviewing him reference any knowledge he might have regarding this situation. Because I accompanied Katie and her mother to a therapy session of the afternoon of the 17th, and also because I had to see a dentist during the late afternoon, I was not able to pick Matt up until approximately 5:00 PM.

When I picked Matt up at his residence he was aware that we were going to my motel so that we could talk privately. Matt appeared to be willing to accompany me and at no time expressed any reluctance or concern about doing so. During the time we were in my vehicle en route to the motel Matt was very talkative and did not question me about what we would be talking about.

When we arrived at the motel we toured the building and had a hot chocolate in the coffee shop prior to discussing any of the specifics regarding the concerns at hand. After we finished the hot chocolate we returned to my room and, like Katie, the first thing Matt did was to turn on the television. At that time I indicated to Matt that he knew where I lived, then asked if he knew what my job was. Matt stated, "A policeman." When I asked him

Spencer000081

why he guessed a policeman Matt stated, "Well, because you said you knew my dad."

Initially I asked Matt if he knew what I wanted to talk to him about and Matt stated, "About Kathy and my dad." I asked him why he thought that was what I wanted to talk to him about, and Matt indicated it was because "I was a policeman and because he knew Katie had said something but he didn't know for sure what it was." I indicated to Matt that that was the reason I wanted to talk to him, and Matt stated, "I guess Katie said my dad did something last summer or something, but I never saw anything." I indicated to Matt that that was one of the reasons I wanted to talk to him because he may have seen or heard something that might be important regarding what Katie was saying. At that time Matt stated to me, 'Can you tell me what she said because nobody will tell me anything?' I advised Matt that I would explain as much as I could to him and he stated, 'I'm sure glad because I'd like to know what's going on.'

I asked Matt if I could just ask him some questions, first about his visit to Vancouver before we really talked about anything else, and he indicated that that was 'fine.' Matt volunteered to get up and turn the TV down so that he "could hear what I was saying."

I asked Matt when the last time he saw his father was and Matt stated, "It was last summer.' I asked Matt if his father ever babysat them when he was in Vancouver and Matt indicated that his step-mother, Shirley, went to work at approximately 10:00 PM and that his father worked til approximately 11:30 PM. Matt indicated that he, Katie and Shirley SPENCER'S son, Matt, stayed with a relative named Cindy until their father picked them up on his way home from work. Matt also indicated that "sometimes his dad babysat for them on his days off when Shirley was working."

At that time during the conversation Matt indicated to me that he wanted me to tell him "what was going on." I asked Matt if he had any idea what Katie was saying and Matt replied, "Well, I think it's somethin' about my dad doing something to her, because that's what the other detective said." Matt then advised me that he had talked to a detective in Sacramento (interview with Detective FLOOD). I asked Matt if there was anything that he

Spencer000082

hadn't told Detective FLOOD and Matt stated, "Well, I don't really remember what I told him but I never saw my dad do anything like that to Kathy. You know, like what she's saying." I indicated to Matt that I wanted to make sure that he understood what this was all about, and asked him what he thought Detective FLOOD was asking him about. Matt stated, "Well, about like my dad touching Kathy in her private areas and stuff like that." Matt then stated, "I've never seen him do anything like that to her when I was around." I asked Matt if Katie had ever said anything to him about anything like that ever happening, and Matt advised that she had not.

Matt then indicated to me that he was "really confused about what was going on." He indicated that he was "glad I was going to talk to talk to him and he finally would know what was going on." He also stated, "My dad always tells me that my mom lies to me and it's really confusing because I don't know who's telling the truth anymore." I asked Matt if he knew why I had come to California and Matt stated, "It was because of what Katie said to Shirley, I guess." I indicated to him that that was the reason and that it had nothing to do with anything that his mother had said. Matt stated, "How about my dad?" I asked him what he meant and Matt stated, "Well, did you talk to my dad?" I advised him that I had talked to his father and also Shirley. Matt asked, "Well, what does my dad say about what Katie told Shirley?" I advised Matt that when I talked to his father he denied that he had ever touched Katie in a way that he should not have. Matt asked, "Well, what did my sister, Kathy, say?" I indicated to Matt that Katie told me that some things had happened. Matt stated, "Well, could you tell me what my little sister said my dad did?" I indicated to Matt that what his sister said were not good things, and asked him if he was sure he wanted me to tell him what she was saying. Matt indicated that he "had to know what was going on, he couldn't stand it anymore."

At that time I indicated to Matt that what Katie had said was that her father had touched her on her private areas. Matt stated, "Is that all she said?" I advised him that what she had told me was more involved than that but basically that's what she was saying. Again Matt insisted that he wanted to know "just exactly what his sister was saying so he could understand."

Spencer000083

At that time I indicated to Matt that if I were going to be talking to him about bodies I needed to know what he called specific parts so I would know for sure that he was understanding what I talked about and that I would understand what he was talking about. With the aid of a cartoon drawing Matt then indicated that he called breasts on a female body 'boobs,' the navel a 'belly button,' the buttocks 'buns,' and the penis on a male body a 'penis.' When we were discussing the genital area of the body I placed a dot where the vagina would be on a female body and asked Matt what he would call that part of a girl's body that she went to the bathroom from. Matt advised that he didn't really know what to call it, it was just a 'private area'. I asked Matt if he thought a father should touch that part of his daughter's body and Matt stated, 'No way.' At that time I indicated to Matt that there could be a time when a father would need to do that or a mother, relating, if a child hurt there and had to have medicine or like when a child was a baby and a parent had to change their diapers and things like that. Matt indicated that he understood, and then stated, "But, like I know they shouldn't just touch there for no reason.' I advised him no, that there should be a reason for a father or mother to touch a child on those private areas. I asked Matt, 'Would your buns be a private spot?' and Matt indicated that it would. I asked him if his penis would be a private spot and again Matt stated that it would.

Matt then asked me; 'Did Kathy say my dad touched her there?' (He pointed to the dot where the genital area of the female body would be.) I indicated to Matt that that was one of the things that Katie had said to me. Matt stated, 'What else did she tell you?' I related to Matt that during my conversation with Katie one of the things she was extremely concerned about was my telling Matt what she had told me because she felt Matt would laugh at her. Matt stated, 'I wouldn't laugh at her, I love her, and it wouldn't be her fault. No way I'd laugh.' I advised Matt that if Katie were telling the truth it would be really important for her to know that it was good for her to tell. Matt stated, "If she told you something happened, it did, because my sister is just a baby and she wouldn't lie about something like that.' Again, Matt indicated he wanted to know and at that time I told Matt that during the

Spencer000084

conversation with Katie the day before she indicated to me that during the summer visit in Vancouver, her father had put his mouth on the private area of her body and had also made her put her mouth on his (father) penis. I related to Matt that Katie had also made statements indicating that her father had placed his bare penis on the private part of her body where she goes to the bathroom from. At that time Matt looked at me and stated, "That is really gross, Sharon, you mean my dad said he didn't do that?" I advised Matt that his father indicated that he hadn't and there could be two reasons for that. One was that it had not happened. Matt interrupted me and again stated, "No way, my sister would never say that if it didn't happen. She would never lie about that." I asked Matt if he had ever seen anything during the time he visited that would make him think it might have, and Matt stated, "I never saw anything. I wish I would have because I would have punched him. That's really sick."

I indicated to Matt if it did happen his father may not be saying anything because he was embarrassed to do that, or felt scared. Matt stated, "Why would somebody's dad do that to them?" I advised Matt that I did not really understand why someone bigger than a child does that to their body but indicated maybe I could explain it another way. At that time I told Matt that where I worked the majority of the things I dealt with were cases like this where a child had said that someone bigger than them, sometimes a bigger child, or sometimes an adult, had touched their private areas and that the child was usually afraid to tell. I advised Matt that when someone bigger than a child did that it was wrong but that many times they probably didn't do it because they were being bad, it was because they were sick. I indicated to Matt that it was a different kind of sickness than a medical doctor could deal with. It was like the person's thinking was sick." I also told Matt that it was against the law for a bigger person than a child or a grownup to do that, and that a person could go to jail for something like that. However, there were many times when the grownup person told the truth and asked for help and instead of going to jail they would get help. Matt—stated—to me, "He sounds like he really needs help." Matt then stated, "Now I get it. That's why my mom said I can't go up at Christmas." Matt then stated, "I didn't know what was

Spencer000085

going on. I thought she was probably just lying to me again. My dad told me not to believe anything she said.'

At that time I asked Matt how he was feeling and he stated, 'You mean about my dad?' I indicated that I meant about his dad, his mother, his sister or whatever he was feeling. Matt stated, 'Well, about my dad. I don't know how I feel right now. I guess I just feel like I don't have feelings.' I asked him how he felt about Katie and Matt stated, 'I love my sister and I know my sister wouldn't lie. I just know that. She wouldn't lie about something like that.' I indicated to Matt that I thought I read someplace in Detective FLOOD'S report where Matt had told him that Katie did tell stories and that she changed her stories a lot to keep from getting into trouble. Matt stated to me, 'Yah, well, I change my stories sometimes, too, but there's no way my sister would lie about that kind of stuff.' I asked Matt, 'How do you feel about your mom?" and Matt stated, 'Now, I understand about what's going on and I feel sorry for her.'

Matt then stated, 'I really feel sorry for my dad, too. He is really sick, it sounds like.' I told Math that if his father had done it and was sick our only goal was to get his father help. I also told him that that was really not my decision, that the decision would be made by a judge regarding what will happen. I asked Matt if he understood what a judge was and he indicated to me that he did, and "he understood about court and the arresting people" and stuff like that."

At that time I asked Matt how he felt about his step-mother, Shirley, and indicated that it was Shirley who became concerned and asked that somebody find out exactly what had happened between Katie and her father. Matt stated to me, 'Well, I'm glad she got concerned, but you know, I really don't like Shirley. She's just not the kind of person I would ever want for a mom." I asked him why he felt like that and at that time observed him shrug his shoulders, stating, "I don't know, I just don't like her.' I asked him if anything ever happened while he was visiting that made him feel that way and Matt stated, "Not really. I just don't care for her.' I asked him if she had ever said or done anything that upset him and Matt stated, 'Well, there was this one thing that kind of bothered me, but that's not the only

CCSO Case #84-9506, S.A.KRAUSE, K-43

reason I don't like her.' I asked Matt if he could tell me about that and at that time Matt indicated that on a particular evening during the summer of 1984 he was awakened by 'his step-mother screaming.' I asked him what she was screaming about and Matt stated, 'I don't know. I woke up and when I heard her making these real loud noises I got up and went into their bedroom and I mean, you think screaming's loud.' I asked Matt if the bedroom door was shut and Matt indicated, 'No, the door was always open.' I asked Matt what he saw and Matt stated, 'Well, when I went just inside that door I could see my dad's bare buns sticking up in the air and I knew what was happening.' I asked Matt if he could tell me what was happening or if he understood and Matt stated, 'Yah, I knew what was happening because I watched 'Friday, the 13th' and they were making love in that movie, too.' I asked Matt what he did when he saw that and Matt stated, 'Well, I just went back in the bedroom and then she was making those loud noises and then they started slowing down and the noises got tinier and tinier.' Matt also advised that the following day he talked to his dad about that and then stated to me, 'But, I still don't understand why she was making such loud noises about that."

At that time I asked Matt if he understood why grownup people made love and he stated, 'Not really.' I asked Matt if he knew how women became pregnant or why they had babies, and he stated, "Well, I think I know a little bit about that." For the next few minutes Matt and I talked about why grownup people 'make love' indicating to him that that was something that two people who loved each shared with each other and that was the way a person could show someone else how much they loved them and how special they were. I also told Matt that it does not hurt usually when someone does that to you when you are a grown up and if you are in love it may be something that really feels good to your body, and that's probably why Shirley was making the noises because it felt good. Matt shook his head, indicating that he understood, and I asked Matt if he had ever touched his penis with his own hand. Matt replied no. I indicated to Matt that it was okay for him to tell me if that had happened because his body belonged to him and that it was okay to touch your own body if it was done in a private place. I told him other boys his age had told me they did that and also told me that it felt good. Matt stated to me, 'Yah, I've done

Spencer000067

that a couple times and it makes your penis stick up and it does feel good, but
I don't scream my head off like she did.' I indicated to Matt that possibly it
felt better to Shirley and that was her way of showing his father how much she
loved him and how special he was to her. Matt replied, "Well, it makes sense
but I don't understand why she had to scream that loud." Matt then stated to
me, "I just wish they'd keep their door shut." I asked him if he had seen that
any other time and he indicated that he had not. I asked Matt if he felt like
he understood enough or if he felt like he wanted to talk about it more, and
Matt stated, "Well, I understand now, and my dad tried to tell me but I still
didn't understand about the weird noises." I asked him if he understood about
the noises now, and he stated, "Yah, I understand."

I asked Matt if he had ever heard his mother talk to
Katie about the things that Katie was saying and Matt advised that he had not.
I asked Matt if his mother had told him to say anything specifically to me, and
Matt shrugged his shoulders and stated, "No, she just told me you were going to
be talking to me. That's all."

I asked Matt if he wanted to ask me anything else and
he indicated that he didn't, then stated, "I just couldn't figure out why me
and Kathy couldn't talk to my dad or nothing, and then she said that about
Christmas and I figured she was really up to something then." I asked Matt what
he thought his mother was up to and he stated, "I don't know. It was like she
was trying to mess with my head or something because my dad told me that she
always lies to me and that I shouldn't believe anybody but him." I asked Matt
if his father ever told him anything else and Matt stated, "Yah, he tells me a
lot of stuff, I guess, but he always tells me that women are just out to
control you and to watch out for my mom and stuff like that."

Matt and I talked for several more minutes; however, it
did not appear that he had any other questions regarding what we had talked
about, nor did it appear that he had any additional information that would be
relevant to this issue. Matt and I were in the room a little less than one
hour total. Because Matt appeared to be comfortable and there was nothing else
to discuss I asked him if he was ready to go back to his house and he indicated
that he was.

CCSO Case #84-8506, S.A.KRAUSE, K-43

page 9 of 10

Spencer000088

I transported Matt back to his residence and during that trip he appeared to be very comfortable and the majority of our conversation was about Sacramento, his school, the activities he was involved in, and his friends.

Investigation to continue.

Spencer000089

CASE NUMBER _84 - 8506_

TE/TIME _5:50   10 - 7 - 84_

LOCATION _Holiday Inn. Sacrament, Ca._

VICTIM _Matt Spencer_

SUSPECT _Ray Spencer_

Reporting Officer _Krause_



Spencer000090