# EXHIBIT 5

ORIGINAL

**In The Matter Of:**

*Clyde Ray Spencer, et al. v.*
*Former Deputy Prosecuting Attorney for Clark Co., et al*

---

*William Bernet, M.D.*
*December 4, 2012*

---

*Vowell & Jennings, Inc.*
*214 Second Avenue North*
*Suite 207*
*Nashville, Tennessee 37201*
*615-256-1935*



Original File 120412DB.txt
Min-U-Script® with Word Index

Clyde Ray Spencer, et al. v.
Former Deputy Prosecuting Attorney for Clark Co., et al

William Bernet, M.D.
December 4, 2012

---

Page 0

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENCER, MATTHEW    )NO. C11-5424BHS
RAY SPENCER, and KATHRYN E.   )
TETZ,                          )
                               )
              Plaintiffs,      )
                               )
vs.                            )
                               )
FORMER DEPUTY PROSECUTING ATTORNEY )
FOR CLARK COUNTY JAMES M. PETERS, )
DETECTIVE SHARON KRAUSE, SERGEANT )
MICHAEL DAVIDSON, CLARK COUNTY )
PROSECUTOR'S OFFICE, CLARK COUNTY )
SHERIFF'S OFFICE, THE COUNTY OF )
CLARK and JOHN DOES ONE THROUGH )
TEN,                           )
                               )
              Defendants.      )

VIDEOTAPED/VIDEOCONFERENCED DEPOSITION OF:

WILLIAM BERNET, M.D.

Taken on Behalf of the Defendant/Michael Davidson

December 4, 2012

VOWELL & JENNINGS, INC.
Court Reporting Services
207 Washington Square Building
214 Second Avenue North
Nashville, Tennessee 37201
(615) 256-1935

---

Page 2

1   APPEARANCES:

2   For the Plaintiffs:

3          KATHLEEN T. ZELLNER, ESQ.
           -and-
4          DOUGLAS H. JOHNSON, ESQ.
           -and-
5          ANN NOLTE, ESQ.
           (Via Videoconference)
6          Kathleen T. Zellner & Associates, P.C.
           Esplanade IV
7          1901 Butterfield Road, Suite 650
           Downers Grove, Illinois 60515
8          630-955-1212
           kathleen.zellner@gmail.com
9          dhjohnson43@aol.com

10  For the Defendant/Michael Davidson:

11
           JEFFREY A.O. FREIMUND, ESQ.
12         (Via Videoconference)
           Freimund Jackson Tardif & Benedict
13         Garratt, PLLC
           711 Capitol Way South, Suite 602
14         Olympia, WA 98508-1880
           360-534-9560
15         jefff@fjtlaw.com

16
    For the Defendant/James Peters:
17
           PATRICIA C. FETTERLY, ESQ.
18         (Via Videoconference)
           Assistant Attorney General
19         Attorney General's Office
           P.O. Box 40126
20         Olympia, WA 98504-0126
           306-586-6300
21         PatriciaFl@atg.wa.gov

22

23

24

25

---

Page 3

1   APPEARANCES CONTINUED:

2   For the Defendant/Doug Johnson:

3          GUY BOGDANOVICH, ESQ.

           (Via Videoconference)

4          Law, Lyman, Daniel, Kamerrer
           & Bogdanovich, P.S.

5          2674 R.W. Johnson Blvd. SW, Tumwater, WA

           P.O. Box 11880

6          Olympia, WA 98508-1880

           360-754-3480

7          gbogdanovich@lldkb.com

8

9   Also Present:  LYNN GRZECH, Videographer
                   DIXIE CATTELL

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 4

INDEX

| Witness | Page |
|---|---|
| WILLIAM BERNET, M.D. | |
| Examination by Mr. Freimund | 7 |
| Examination by Ms. Fetterly | 103 |
| Examination by Mr. Bogdanovich | 133 |
| Examination by Mr. Freimund | 145 |
| Examination by Mr. Bogdanovich | 158 |
| Examination by Ms. Zellner | 160 |
| Examination by Ms. Fetterly | 165 |

EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 1 | Forensic Psychiatric Consultation Dr. Bernet 10/05/12 | 105 |
| 2 | Forensic Psychiatric Consultation - Revised Report 11/06/12 | 128 |
| | Reporter's Certificate | 172 |
| | Errata Sheet | 173 |

---

**Page 5**

1  The videotaped/videoconferenced deposition
2  of WILLIAM BERNET, M.D., taken on behalf of the
3  Defendant/Michael Davidson, on the 4th day of
4  December, 2012, at 2:11 p.m., in the offices of
5  Vowell & Jennings, Inc., 214 2nd Avenue North,
6  Suite 207, Nashville, Tennessee, 37201, for all
7  purposes under the Rules of Civil Procedure.
8  The formalities as to notice, caption,
9  certificate, et cetera, are waived.  All
10  objections, except as to the form of the
11  questions, are reserved to the hearing.
12  It is agreed that Deborah J. Harris, being
13  a Notary Public and Court Reporter for the
14  State of Tennessee, may swear the witness, and
15  that the reading and signing of the completed
16  deposition by the witness are reserved.
17  * * *
18
19
20
21
22
23
24
25

---

**Page 6**

1  THE VIDEOGRAPHER: We are on the record.
2  Here begins Volume 1, Videotape No. 1, in the
3  deposition of William Bernet, M.D., in the
4  matter of Clyde Ray Spencer, Matthew Ray
5  Spencer, and Kathryn E. Tetz versus Former
6  Deputy Prosecuting Attorney for Clark County,
7  James M. Peters, Detective Sharon Krause,
8  Sergeant Michael Davidson, Clark County
9  Prosecutor's Office, Clark County Sheriff's
10  Office, the County of Clark, and John Does 1
11  through 10, United States District Court,
12  Western District of Washington at Tacoma,
13  No. C11-5424BHS.
14  The time on the video monitor is 14:11.
15  Today's date is December 4, 2012.  This video
16  deposition is taking place at 214 2nd Avenue
17  North, Nashville, Tennessee.
18  Counsel, please identify yourselves and
19  state whom you represent.
20  MS. ZELLNER: Kathleen Zellner,
21  Z-E-L-L-N-ER, on behalf of the Plaintiff, Clyde
22  Ray Spencer.
23  MR. JOHNSON: Doug Johnson, J-O-H-N-S-O-N,
24  also on behalf of the Plaintiff.
25  MS. NOLTE: Ann Nolte, N-O-L-T-E, also on

---

**Page 7**

1  behalf of the Plaintiff.
2  MR. FREIMUND: Jeff Freimund,
3  F-R-E-I-M-U-N-D, on behalf of Defendant Michael
4  Davidson.
5  MS. FETTERLY: Patricia Fetterly on behalf
6  of Defendant James Peters.
7  MR. BOGDANOVICH: Guy Bogdanovich on
8  behalf of Defendant Sharon Krause.
9  THE VIDEOGRAPHER: Thank you.  Would the
10  court reporter please swear in the witness.
11  WILLIAM BERNET, M.D.
12  was called as a witness, and after having been first
13  duly sworn, testified as follows:
14  EXAMINATION
15  QUESTIONS BY MR. FREIMUND:
16  Q  Dr. Bernet, would you please state your
17  full name for the record and spell your last name.
18  A  My name is William Bernet, B-E-R-N-E-T.
19  Q  What is your professional address,
20  Dr. Bernet?
21  A  It's 209 Oxford House, Vanderbilt
22  University, Nashville, Tennessee.
23  Q  And the ZIP code there, please?
24  A  It's -- the university ZIP code is
25  37232-4245.

---

**Page 8**

1  Q  Okay.  Thank you.  I understand you've had
2  your deposition taken in the past on a few
3  occasions.
4  Do you consider yourself familiar with the
5  general procedures for depositions and I can spare
6  you going through those, or would you like me to
7  refresh your memory on that?
8  A  I think I'm familiar.
9  Q  Okay.  As you know, sir, I am Jeff
10  Freimund, and I'm representing one of the defendants
11  in this lawsuit, Michael Davidson.  And you've
12  submitted a report to the plaintiff lawyers who have
13  retained you in this case.
14  And in that report, would you agree, sir,
15  that you don't have any criticisms of what my
16  client, Michael Davidson, did in this matter; that
17  your focus is on Sharon Krause and James Peters?
18  A  Yes, that's correct.
19  Q  Okay.  So you have no opinions to offer in
20  this case that Michael Davidson did anything
21  improper or wrong; is that accurate?
22  A  Yes, that's correct.
23  Q  Okay.  I want to talk to you first, if I
24  may, just about interviewing children in general and
25  get your background on that.

---

Clyde Ray Spencer et al. Case 3:11-cv-05424-BHS Document 134-5 Filed 01/16/13 Page 5 of 38 William Bernet, M.D.
Former Deputy Prosecuting Attorney for Clark Co., et al
December 4, 2012

Page 9

1 To what extent, if any, have you ever been
2 or acted as a front-line field investigator of child
3 sexual abuse, where you're one of the officials like
4 a police officer or child protective service worker
5 or the like, who conducts the initial formal
6 interview of a suspected child abuse victim?
7 A I have never been an official interviewer
8 for the forensic interview although there have been
9 times when I did the initial interview simply
10 because I was the one who identified that child
11 abuse was happening.
12 Q And in what capacity were you the one in
13 which you first identified child abuse was
14 happening? Were you a psychiatrist for the child or
15 what was the context, please?
16 A Let's see. One that comes to mind is I
17 was conducting a custody evaluation, and I
18 discovered that it seemed likely or at least
19 possible that child abuse had occurred.
20 Q Okay. Any other time where you've been,
21 to your knowledge, the first formal interviewer of a
22 child sexual abuse victim other than that one time
23 you just referenced?
24 A Not that I can think of right now.
25 Q And it's safe for me to assume, sir, that

Page 10

1 you've never been a police officer or a child
2 protective service investigator?
3 A That's correct.
4 Q Okay. Have you ever provided training to
5 front-line field investigators? And when I use that
6 term front-line field investigators, I'm speaking of
7 police officers, CPS workers, and the like, who as
8 part of their duties are engaged in the first formal
9 interviews of suspected child sexual abuse victims?
10 A I have given presentations on evaluating
11 children who may have been abused. I don't think
12 it's in the context that you're thinking of, but it
13 was the kind of thing where mental health people or
14 social workers, for instance, could have been in the
15 audience. But I have never done training
16 specifically for a group of policemen or a group of
17 child protection workers.
18 Q Okay. The trainings that you've typically
19 provided, are those typically to psychiatrists
20 and/or psychologists?
21 A Yes.
22 Q Were you providing training to anybody
23 about child interviewing techniques during the 1984
24 to 1985 time period?
25 A Well, I'm trying to reconstruct where I

Page 11

1 would have been then. I was living either in
2 Washington, D.C., or nearby in Virginia. And so I
3 was supervising child psychiatry trainees and adult
4 psychiatry trainees. So that topic may well have
5 come up. And I may have given presentations by that
6 point at meetings -- at professional meetings on
7 this topic. I mean, if I knew you were going to ask
8 me, I could go back. I mean, I have a list of
9 presentations that I have given, but I don't have
10 that with me.
11 Q That's in your resume --
12 A No, it's --
13 Q Your CV?
14 A No. All the presentations that I have
15 ever given are not in my CV. They're in another
16 document.
17 Q Okay. Would you agree that you do not
18 have any knowledge or expertise or opinion about
19 what training was being provided to front-line field
20 investigators before or during the time frame of
21 1984, 1985?
22 A That's correct. I'm not familiar with
23 specific curricula or specific training programs
24 during that time.
25 Q All right. Am I correct, sir, that in

Page 12

1 your initial written report that you prepared in
2 this case for Ms. Zellner, you were not really
3 focusing on the standards applicable to child
4 interviewing techniques that -- to extent they
5 existed during the 1984 and 1985 time frame, and in
6 your supplemental report, you kind of first started
7 focusing on that time frame; is that a fair
8 understanding of the difference between your two
9 reports?
10 A Yes.
11 Q Why was it in your second that you focused
12 for the first time on the 1984 and 1985 time frame?
13 A What happened was that I believe
14 Ms. Zellner received the report of Dr. Phillip
15 Esplin which made some attempt to address that
16 topic, and then she asked me to read his report.
17 And so to some extent what I was commenting on was
18 responding to his report.
19 Q Okay. Are you familiar with Dr. Esplin?
20 I mean, have you read his works and have some
21 knowledge about his expertise?
22 A Yes.
23 Q Would you regard him as a person who does
24 have expertise in interviewing suspected victims --
25 suspected child victims of sexual abuse?

Clyde R. Spencer, et al. 05424-BHS   Document 134-5   Filed 01/16/13   Page 6 of 38
Former Deputy Prosecuting Attorney for Clark Co., et al
William Bernet, M.D.
December 4, 2012

---

Page 13

1  A  Yes, he does.
2  Q  Would you also regard him as an expert in
3  kind of the evolution in the field regarding the
4  techniques that are used by investigators of child
5  sexual abuse?
6  A  I don't know if he is or not.  I know that
7  he discussed that topic in the statement he made --
8  or the report he made, but I don't know if he's an
9  expert in that.
10  Q  Do you record yourself as an expert in the
11  evolution or history of techniques in child
12  interviewing?
13  A  I guess it depends on your definition of
14  expert.  I don't think I'm an authority in that
15  field, but I would probably be considered an expert
16  simply because it's part of training and in general
17  of conducting forensic evaluations of children.
18  Q  Would you agree that back in the 1984 and
19  1985 time frame, there was no commonly accepted
20  script for use by field investigators when
21  conducting interviews of suspected child sexual
22  abuse?
23  A  I don't know if there was.
24  Q  Do you know if there is one to this day?
25  A  Oh, there are several different protocols

---

Page 14

1  for conducting interviews that I'm aware of.  One is
2  called the RATAC, R-A-T-A-C.  And one is produced by
3  a government agency called the NICHD interview
4  protocol.  And there may be others.  So I know there
5  are protocols now.
6  Q  All right.  Are you aware of whether the
7  NICHD protocol was authored in part by Dr. Esplin?
8  A  Yes, I think he participated in that.
9  Q  Would you agree, sir, that none of those
10  protocols that you just referenced were in existence
11  during 1984-1985 time frame?
12  A  Yes, I believe that's correct.
13  Q  Would you agree that there is no clear
14  protocol or script, if you will, for how to avoid
15  asking leading or suggestive questions during the
16  course of a child sex abuse interview during the
17  time frame of 1984 to 1985?
18  A  I don't know if there was.
19  Q  What's your definition of a leading
20  question?
21  A  Well, here.  I'll compare what I think --
22  at least what I consider a suggestive question with
23  a leading question.  A suggestive question is when
24  the interviewer says, Did Uncle Joe touch your
25  private part?  Because it suggests that Uncle Joe

---

Page 15

1  may have done something.  A leading question would
2  be to the effect, Didn't Uncle Joe touch your
3  private part?
4       So that's the distinction that I make.  I
5  don't know.  I think other people don't even make
6  that distinction but they consider them the same
7  thing.
8  Q  I understand those are examples of them,
9  but -- but can you give me a definition for a
10  leading question?
11  A  Well, to make the comparison again, a
12  suggestive question has the answer embedded
13  somewhere in the question as a proposed answer.  A
14  leading question not only has the answer embedded in
15  the question, but it's asked in such a way that the
16  person who is being asked the question is expected
17  to give that answer.  There's an ex -- a leading
18  question has an expectation in it that's higher than
19  what's in a suggestive question, at least in the
20  distinction that I'm making.
21  Q  Back in the 1984 or 1985 time frame, do
22  you think those definitions you just provided were
23  clearly established and known by field investigators
24  conducting child sex abuse interviews?
25  A  I don't know, as I said before, exactly

---

Page 16

1  what training people would have had.  But I think
2  that the problem of asking leading and suggestive
3  questions has been known for many, many years.  I
4  don't know how it was defined or what the
5  instructions may have been for field investigators.
6  But I think the problem, the concept of leading and
7  suggestive questions, has been known for a hundred
8  years.
9  Q  Would you agree, though, Dr. Bernet, that
10  one of the difficulties that academicians struggled
11  with, and to some extent I think still do, is
12  defining what constitutes leading or suggestive
13  questions in the context of conducting interviews of
14  suspected child abuse victims?
15  A  I don't know that there's difficulty.  I
16  think that there's a difficulty sometimes in
17  actually conducting the interview.  But I don't know
18  that there's difficulty in defining what a
19  suggestive question is -- at least I haven't heard
20  that.
21  Q  Okay.  Are you familiar with the article
22  that was written by Roland Summit in 1983 -- or it
23  was published in 1983, I should say more accurately,
24  entitled, "The Child Sexual Abuse Accommodation
25  Syndrome"?

Clyde Ray Spencer, et al. 05424-BHS    Document 134-5    Filed 01/16/13    Page 7 of 38
Former Deputy Prosecuting Attorney for Clark Co., et al

William Bernet, M.D.
December 4, 2012

1    A   Yes, I have read it, some time ago.
2    Q   Would you agree that that was a fairly
3 significant article in the arena of academicians
4 studying child sexual abuse issues?
5    A   I think it was significant and widely
6 quoted.  From what my understanding is, I think it
7 was also misunderstood about what Dr. Summit was
8 trying to say.  But it certainly has been quoted a
9 lot.
10    Q   And to your knowledge, one of -- one of
11 the components that was quoted a lot would be one of
12 his conclusions that -- I'll just read it verbatim.
13 He said, quote: "Very few children, no more than
14 two or three per thousand, have ever been found to
15 exaggerate or to invent claims of sexual
16 molestation," end quote.
17         Would you regard that as one of the more
18 widely-known precepts within that article?
19    A   Well, I think that's one of the more
20 controversial parts of the article.  I guess he also
21 said something to the effect that children don't lie
22 about sexual abuse, or maybe that's the same
23 statement paraphrased in another way.  And I think
24 that most people would disagree with that number
25 that he cited.  Currently -- most people currently

1 would disagree with that.
2    Q   Do you think back in the 1983 to '85 time
3 frame that most people would have disagreed with
4 that number that he was saying, that no more than
5 two or three per thousand children have been found
6 to exaggerate or invent claims of sexual
7 molestation?
8    A   I'm quite sure that there would have been
9 discussion and disagreement about that statement,
10 but I really don't know -- I don't know whether most
11 people would have disagreed with it.  I think that
12 would have been --
13    Q   In fact -- I'm sorry?
14    A   I think that that would have been a statement
15 that some people would have challenged or disagreed
16 with, but I -- I really don't have any way to know
17 whether the majority of professionals would have
18 done that.
19    Q   Well, the next sentence immediately after
20 that one I just quoted you from Roland Summit's
21 article reads as follows, quote:  "It has become a
22 maxim among child sexual abuse intervention
23 counselors and investigators that children never
24 fabricate the kinds of explicit sexual manipulations
25 they divulge in complaints or interrogations," end

1 quote.
2         Would you agree with that observation by
3 Dr. Summit that, at least back in 1983, it was a
4 maxim, M-A-X-I-M, among investigators that children
5 don't lie when they provide explicit details of
6 sexual abuse?
7    A   I think that most people would agree that
8 it would be unusual for a child to knowingly lie,
9 but that sometimes they did.  And -- and -- and I
10 think that most people would have been aware that --
11 that children may have come to wrongly believe that
12 something happened.  In other words, I think in the
13 1980s and before that, it was understood that the
14 child isn't necessarily knowingly lying but the
15 child might be representing something that is not
16 correct because of the way the child had been
17 previously questioned.  In other words, the child
18 might be unknowingly giving a false statement.
19    Q   Understood.  Would you agree though, sir,
20 that the vast majority -- and I am speaking from the
21 perception of the field investigator, just so we can
22 be clear on that, not as a psychiatrist or
23 psychologist.
24         But from the perspective of a field
25 investigator, wouldn't you agree that most field

1 investigators during 1984-85 time period would be of
2 the view that children do not lie when they disclose
3 sexual abuses with graphic details?
4         MS. ZELLNER: I want to interject an
5     objection because the answer calls for
6     speculation the way it's phrased.
7 BY MS. WILLIAMS:
8    Q   Do you understand my question, Doctor?
9    A   I think so.
10         But again, I think that, yes, most people
11 would have thought that children -- it is unusual
12 for children to knowingly, purposefully make things
13 up.  But that is not the same thing as saying that
14 it's unusual for children to make false statements.
15    Q   Okay.  I'm looking at your article dated
16 September of 1993 entitled, "False Statements in the
17 Differential Diagnosis of Abuse Allegations." And
18 in that article on page 904, you said, quote: "The
19 allegation may be true as one of the differential
20 diagnoses."
21         And you said, quote:  "This is usually the
22 case, perhaps 90 percent of the time," period, end
23 quote.  And you cited an article dated 1981 by
24 Cantwell, C-A-N-T-W-E-L-L.
25         Do you adhere to that view, Dr. Bernet,

## Page 21

1  that perhaps 90 percent of the time when a child
2  makes a disclosure of sexual abuse, that it may be
3  accurate and truthful?
4      A  I don't really know the -- the exact
5  percentage.  That was very old research which now,
6  of course, is 30 years ago.  If I had to estimate it
7  now, I would say that certainly the majority of the
8  time children make statements they are being
9  accurate and truthful.  But I don't really know the
10  percentage to apply to that.
11      Q  Okay.  But back in 1993 when you wrote
12  this article, were you of the view that that
13  percentage was perhaps around 90 percent of the
14  time?
15      A  Yes, that -- that was the only research I
16  could find at that time, so that's why I cited that.
17      Q  Okay.  Would you agree that in this
18  article where you are just kind of listing 12 -- I'm
19  sorry, 17 different potential diagnoses, as you put
20  it, of truth or veracity in a disclosure of sexual
21  abuse that you were lacking a method by which you
22  could determine whether, in fact, the disclosure was
23  true or false?
24      A  Well, that was not part of this paper.
25  That -- that was not intended to be part of this

## Page 22

1  paper that I wrote.  Any methodology issues weren't
2  what I discussed in this paper.
3      Q  Have you ever written about that topic?
4  You know, and just as a kind of clue, what I'm
5  alluding to in part is, like, Dr. Esplin's article
6  in which he was a co-author entitled, "Establishing
7  Ground Truth in Studies of Child Sexual Abuse."  And
8  what -- I give you that as context just so you
9  understand there's a -- what I'm asking is have you
10  ever published articles related to the effort for
11  establishing bases for determining -- a scientific
12  bases or other bases for determining whether a
13  particular disclosure of sexual abuse by a child is
14  true or false?
15      A  Yes.  At least that topic was discussed in
16  a document that I wrote which is in the CV under --
17  in 1997 called "Practice Parameters for the Forensic
18  Evaluation of Children and Adolescents Who May Have
19  Been Physically or Sexually Abused."  At least part
20  of that document addresses methodology issues.
21      Q  Okay.  Do you have that in front of you?
22      A  Yes.
23      Q  That article?  I'm just looking at page
24  424 of that article right below review -- the title
25  "Review of the Literature."

## Page 23

1      Do you see that paragraph?
2      A  Yes.
3      Q  And in that first paragraph there where
4  you're describing the literature that you reviewed
5  for purposes of writing this article, you noted that
6  the search of literature you conducted occurred in
7  August of 1994, and the search covered articles
8  written during the time period of 1990 to 1994.
9      Is that an accurate understanding of what
10  you wrote?
11      A  Yes.
12      Q  Okay.  So you weren't -- this paper that
13  you wrote in March of 1997 was focusing on
14  literature that came into existence at least five
15  years after the investigation that occurred in this
16  case in 1984 and 1985, correct?
17      A  That's what it focused on, although just
18  glancing at these references, there were many
19  references here from earlier than 1990.
20      Q  Yeah.  In fact, just on that point, on
21  the -- in the next page under "A Brief History of
22  Child Maltreatment," the last paragraph in that
23  section, you noted that "it took a separate societal
24  realization during the 1970s to acknowledge the
25  extent of sexual abuse.  It was known that incest

## Page 24

1  occurred, but most people believed that it must be
2  very unusual and that it happened primarily among
3  very deviant families."  And then you concluded by
4  saying, quote: "We now know that incest and other
5  forms of sexual abuse are not rare," end quote.
6      Is that still your view, that incest and
7  sexual abuse of children is not a rare event?
8      A  Yes.
9      Q  Now, this article -- just so we're clear,
10  is this article or the intent of this article
11  directed to provide training to front-line and field
12  investigators of child sexual abuse allegations, or
13  is it directed more to academicians?
14      A  It was addressed to practitioners.  It was
15  addressed to anybody, whether a psychiatrist or
16  social workers or anybody conducting this type of
17  evaluation.  It was not addressed to academic types.
18      Q  Okay.  So your intention in writing this
19  was to help provide some instruction in 1997 to
20  field investigators among others?
21      A  Yes.
22      Q  Okay.  And starting on page 428 there, you
23  begin to describe a, quote, "step-wise" -- step,
24  hyphen, wise interview that a Mr. -- or Dr. Yuille
25  wrote about in 1993, right?

Page 25

1    A  Yes.
2    Q  Was that the first article that you're
3  aware of where an author provided a kind of
4  systematic approach to conducting child sexual abuse
5  victim interviews -- and by that first article, I'm
6  referring to Dr. Yuille's article in 1993.
7    A  I don't know if it was the first one.
8    Q  Okay.  Are you aware of any before that
9  one?
10    A  Not that I can cite right now.
11    Q  Okay.  And just for the record,
12  Dr. Yuille's name is spelled Y-U-I-L-L-E, right?
13    A  Let me see.  Yes, as far as I can tell, it
14  is.  Dr. Yuille.  I think his name is John Yuille.
15    Q  Oh.  If I mispronounced it, I apologize.
16    You noted there, though, in your article
17  in reference to Dr. Yuille's step-wise interview
18  approach that, quote:  "It is not known
19  scientifically or empirically whether the step-wise
20  interview is preferable to other interview methods
21  in eliciting accurate reports," end quote.
22    Is that your understanding to this day as
23  well, that there hasn't been scientific or empirical
24  studies confirming that that interview approach is
25  more likely to elicit accurate reports than in other

Page 26

1  interview methods?
2    A  No.  I think there has been research, and
3  you know, the -- the Yuille method, this step-wise
4  interview is very similar to NICHD approach.  And I
5  don't really know the history of it.  I don't know
6  whether one grew out of the other, but I know that
7  the NICHD method has been studied in an attempt to
8  see whether or not it's reliable and whether any
9  accurate -- more accurate than anything else.
10    Q  And, of course, those studies all occurred
11  since the 1990s, right?
12    A  I believe so, yes.
13    Q  Dr. Yuille suggests that it is appropriate
14  to attempt to build rapport with a child before
15  beginning an interview.
16    Is that your understanding?
17    A  Yes.
18    Q  Would you agree with that?
19    A  Yes.
20    Q  All right.
21    A  Usually building rapport takes the form of
22  talking about neutral subjects.
23    Q  Sure.  And after building rapport, would
24  you agree with Dr. Yuille's approach that an
25  interviewer should start with general questions such

Page 27

1  as, quote:  "Do you know why you are talking with me
2  today," end quote?
3    A  Well, down the line, you do that.  I mean,
4  there are a couple of things you do before that, but
5  eventually you would say something like that.
6    Q  Okay.  And the couple of things you would
7  do before that, according to Dr. Yuille, would be to
8  describe two specific events and discuss with the
9  child the need to tell the truth, right?
10    A  Yes.  The idea is to train the child in
11  giving a free narrative statement.  That's why you
12  ask the child to describe two specific events,
13  because later in the interview you want the child to
14  give a free narrative statement of the alleged
15  abuse.
16    Q  All right.  Would you agree with
17  Dr. Yuille's approach that after you've engaged in
18  rapport building, described two specific events,
19  discussed telling the truth and introduced the topic
20  of concern in the form of saying something like, Do
21  you know why you are talking with me today, that it
22  might be appropriate to, quote -- and I'm just
23  quoting your article here, "proceed, if necessary,
24  to more specific questions such as, quote, 'Has
25  anything happened to you,' end quote; or quote, 'Has

Page 28

1  anyone done something to you,'" end quote.
2    A  Yes.
3    Q  Would you agree with that?
4    A  Yes.
5    Q  All right.  And then you also indicate
6  that it may be helpful in initiating disclosures to
7  use drawings, that the child or the interviewer can
8  make an outline of a person and have the child --
9  ask the child to add and name each body part and
10  describe its function, right?
11    A  Yes.
12    Q  And if sexual abuse is suspected when the
13  genitals are described, the interviewer could ask
14  whether the child has seen or touched that part of
15  another person and who has seen or touch that part
16  on the child, right?  You would agree that would be
17  an appropriate interview technique, correct?
18    A  If you need to go that way, yes.  I mean,
19  I guess ideally you wouldn't be going down that path
20  at that stage in the interview; but in some
21  circumstances, you might need to do that.
22    Q  All right.  And then you talk about
23  pre-narrative, general questions, and then you go to
24  specific questions.  I want to ask you about that --
25  specific questions if necessary, to be fair.

Page 29

1  You indicate that, quote: "It may be
2  helpful to obtain clarification by asking more
3  specific questions. For example, the interviewer
4  may follow up on inconsistencies in a gentle,
5  nonthreatening manner. If the child has used a term
6  that seems inappropriate for a child, the
7  interviewer may ask where he or she learned that
8  word. In asking specific questions, one should
9  avoid repetitive questions. Also, one should avoid
10  rewarding answers, particularly with praise."
11  Is that still your view, sir?
12  A  Yes.
13  Q  And then you go on to interview aids. And
14  you say that "using anatomical dolls with
15  representation of genitals may be useful in
16  understanding exactly what sort of abusive activity
17  occurred."
18  Do you still agree with that, that using
19  anatomically correct dolls in the course of
20  interviewing a suspected child sexual abuse victim
21  may be appropriate and useful in the course of
22  determining what happened?
23  A  In some circumstances, I think it is.
24  Certainly not during the free narrative stage,
25  but -- and not during the elicitation -- the

Page 30

1  eliciting of basically what happened, but sometimes
2  I think it's helpful to -- for the child to use them
3  to demonstrate what happened after the child has
4  already described what happened.
5  Q  Would you agree that that is a little bit
6  controversial, though, the use of anatomically
7  correct dolls? Over the years, there are some
8  people who say you shouldn't use them and some
9  people say it's perfectly appropriate to use them,
10  and all shades in between?
11  A  The controversial issue had to do with
12  using the dolls as a diagnostic aid. There was a
13  time when the dolls were first introduced that some
14  people had the idea that you could tell by the way
15  the child played with these dolls whether or not the
16  child had been sexually abused. In other words,
17  that a child who was sexual abused, supposedly would
18  play with the dolls in more sexually explicit
19  manner. In other words, it was being used to
20  diagnose sexual abuse. So that was what was
21  controversial, and I think everybody now has gotten
22  rid of that. I think almost nobody would approve
23  that use of the dolls. But it's less controversial
24  as to using the dolls not as a diagnostic tool but
25  as a way to demonstrate what the child is trying to

Page 31

1  say.
2  Q  Back in the 1984-1985 time period, would
3  you agree that during that time frame, it was kind
4  of generally accepted that the anatomically correct
5  dolls could be used as a diagnostic tool as well as
6  a -- as -- as the other tool you were referencing?
7  A  I don't know when that distinction was
8  made and when that clarification was made.
9  Q  Okay. Your article goes on to talk about
10  false denials, that it's not -- would you agree,
11  sir, that it is not unusual for a child to make a
12  false denial of sexual abuse? In other words, when
13  sexual abuse topics are discussed with a child, it's
14  not uncommon for a child, at least initially, to
15  deny that any abuse occurred when it is later
16  determined that, in fact, sexual abuse did occur?
17  A  Yes, I would agree that that happens.
18  Q  Would you agree that it happens quite
19  frequently, that more often than not children will
20  initially deny abuse?
21  A  Oh, I don't know the exact numbers. I
22  don't know that it happens more likely than it
23  doesn't happen, but I would certainly agree that
24  it's common for it to happen.
25  Q  All right. And when a child initially

Page 32

1  denies abuse, is it your view that at that point a
2  child interview should stop, recognizing that it's
3  common for children to initially deny abuse?
4  A  I think it would depend on the overall
5  circumstances of the evaluation. It would depend on
6  what other information the person has. You would --
7  you would collect information, for instance,
8  about -- from other sources, collateral sources,
9  about exactly how the suspicion even arose. And if
10  there was a strong basis for the suspicions in the
11  first place, then there might be a reason to go
12  ahead with the interview and try other methods with
13  the child or perhaps meet with the child on a --
14  again.
15  But if the original basis for the
16  suspicion was very, very small, then you might
17  simply go with the denial and say, you know, there
18  is very little suspicion in the first place and now
19  the child is making a denial so there's no reason to
20  go ahead.
21  Q  Just based on that answer, sir, would you
22  agree that a field investigator like a police
23  officer or a CPS worker attempting to interview a
24  suspected victim of child sexual abuse has to make
25  numerous judgment calls during the course of a

Clyde Ray Spencer, et al, v.... Case 3:11-cv-05424-BHS   Document 134-5   Filed 01/16/13   Page 11 of 38   William Bernet, M.D.
Former Deputy Prosecuting Attorney for Clark Co., et al
December 4, 2012

Page 33

1 specific interview on whether to proceed, how to
2 proceed, and so on?
3     A  Yes.  There are many decisions.
4     Q  And would you agree that there is no such
5 thing as a perfect interview or a perfect scripted
6 interview, that every interviewer is going to make a
7 judgment call that could be second guessed by
8 somebody such as yourself?
9     A  I don't really know.  I'm sure there are
10 some interviews that are very, very good and others
11 that are problematic.  And I'm sure that people have
12 somewhat different styles.  I -- you know, I think
13 that the whole thrust of my evaluation is that even
14 though people have different styles, the idea of
15 avoiding suggestive leading and repetitive
16 questions, there isn't -- I mean, I think everybody
17 would agree with that.
18     Q  Would you agree that even a child who has
19 subjected -- has undergone leading, suggestive, or
20 coercive interview techniques may still provide a
21 valid disclosure of sexual abuse that is verifiable?
22     A  Well, do you mean by verifiable, by other
23 outside information?  Is that what you mean by
24 verifiable?
25     Q  Yeah, sure.  Like a confession, a plea of

Page 34

1 guilty, polygraph results.
2         MS. ZELLNER: I'm going to object to --
3 let me interject -- wait, wait, wait.
4         Let me interject an objection, okay,
5 because it's an incomplete hypothetical, it
6 calls for speculation.  You can answer it,
7 Doctor, if you understand the question.
8         THE WITNESS: Well, I think I do.  And I
9 think I would agree that it is possible that
10 even a very poorly conducted interview might
11 conceivably produce an accurate statement of
12 what happened.  It's theoretical -- it is
13 theoretically possible for a very bad interview
14 to have an accurate result.  But the problem is
15 you have no way to know it.  I mean, that's
16 the -- that's -- of course, the problem is when
17 you're done with the very bad interview, you
18 have no way to know whether the statement is a
19 result of the interview or a result of
20 something that actually happened.
21 BY MR. FREIMUND:
22     Q  And that's -- that's your view in this
23 case, I take it then, that you have no way of
24 knowing whether the statements made by the children
25 in this case were accurate recounts of what actually

Page 35

1 happened versus something that may not be accurate?
2     A  I don't -- based on what I reviewed, I
3 don't have enough information to have an opinion
4 about that.  I think there is too much missing
5 information to know, at least for me to have an
6 opinion about that.
7     Q  Okay.  I'm reading a little bit further in
8 your article entitled "Practice parameters for the
9 Forensic Evaluation of Children and Adolescents Who
10 May Have Been Physically or Sexually Abused" that is
11 dated March of 1997.  And there under the heading of
12 "The Child's Credibility" on page 431, can I direct
13 your attention to that portion of your article,
14 please.
15     A  Yes.
16     Q  Near the -- in that first paragraph,
17 you're talking about some studies that listed
18 factors that were thought to show enhanced
19 credibility.  One of them was the child uses his or
20 her own vocabulary rather than adult terms and tells
21 the story from his or her point of view.  And
22 another is the child reenacts the trauma in
23 spontaneous play.
24         Do you see where I'm referring to there?
25     A  Yes.

Page 36

1     Q  Okay.  As part of your review of records
2 in this case, Doctor, did you review the initial
3 disclosure of sexual abuse that Kathryn Spencer made
4 to Shirley Spencer, her stepmother, which Shirley
5 Spencer in a handwritten statement described?
6     A  Yes.
7     Q  Okay.  Is it -- would you agree, sir, that
8 that was the first disclosure of sexual abuse in
9 this case, as far as you know?
10     A  Yes.  That was the first --
11     Q  Would you also --
12     A  I think I would prefer to use the word
13 allegation.  It was the first allegation of sexual
14 abuse.
15     Q  All right.  And do you fault, for lack of
16 a better word, the interview techniques that Shirley
17 Spencer used when questioning Kathryn Spencer when
18 she was attempting to touch her breasts and --
19 Shirley Spencer's breasts?  In other words, do you
20 fault the way in which Shirley Spencer questioned
21 the child?
22     A  Well, I might if I had more information.
23 We don't know exactly what happened in that
24 conversation.  We do know that Ms. Spencer later
25 said that she went back and asked Kathryn even more

Page 37

1 questions. I think the next day, there was an
2 opportunity. They went to the beach or something.
3 And Ms. Spencer said that she was interested to get
4 even more information, so she went back and asked
5 more questions. And so we don't know exactly what
6 happened in that conversation. And for instance,
7 specifically we don't know whether Ms. Spencer could
8 have been suggesting acts to Kathryn.
9     Q   Based on what we do know from reviewing
10 what she wrote in her description of what happened
11 on the occasion she was speaking to Kathryn Spencer
12 about these issues, what -- do you fault anything
13 that she records in that written statement?
14     A   Well, I don't know what you mean by
15 "fault," I mean -- because we don't know what really
16 happened, and she doesn't spell out what really
17 happened.
18         So I guess I would fault her lack of
19 sufficient detail as to what happened in the
20 conversation to really be able to assess the
21 conversation.
22     Q   Would it be fair to say based on that
23 answer that you cannot say whether or not Shirley
24 Spencer used leading or suggestive or coercive
25 interview techniques when she was speaking with

Page 38

1 Kathryn Spencer after Kathryn Spencer allegedly
2 attempt to touch her private areas?
3     A   That is correct. We do not know whether
4 Ms. Spencer used that kind of questioning.
5     Q   Are you aware that Kathryn Spencer later
6 disclosed sexual abuse to her therapist?
7     A   Well --
8     Q   Before she was interviewed by -- before
9 she was interviewed by Detective Krause?
10     A   Yes, I mean I -- yes, I have heard that.
11 We don't, of course, know what really happened in
12 those conversations either.
13         MS. ZELLNER: I want to interject an
14 objection. That misstates the evidence.
15         THE REPORTER: Was that Ms. Zellner?
16         MS. ZELLNER: Yes.
17 BY MR. FREIMUND:
18     Q   So you would agree, would you not,
19 Dr. Bernet, that you cannot -- you do not have an
20 opinion that the therapist for Kathryn Spencer used
21 leading or suggestive or coercive interview
22 techniques when Kathryn Spencer disclosed sexual
23 abuse by her father to that therapist?
24     A   I think I understand your question. I --
25 and it's that I -- I don't know what happened in

Page 39

1 those therapy meetings. So I don't know whether
2 that kind of questioning occurred.
3     Q   Okay. Do you know what kind of
4 questioning occurred by the Sacramento Police
5 Department, Detective Flood, when he questioned both
6 Kathryn Spencer and Matthew Spencer before they were
7 interviewed by Detective Krause?
8     A   No, I don't know what questioning occurred
9 there.
10     Q   So once again, based on your lack of
11 knowledge, you can -- you have no opinion one way or
12 another whether he used suggestive, leading or
13 coercive interviewing techniques, correct?
14     A   Yes.
15     Q   You indicated in your article -- I'm just
16 going down a little further on that same section
17 entitled "Child's Credibility." I think it's --
18 well, it's at the very bottom before you start the
19 next section on physical examination of children who
20 may have been abused. And the last two sentences
21 before you start that next section, you say that
22 these criteria that you've just gone through for
23 assessing credibility have been based on clinical
24 experience and on limited preliminary research --
25 and again, we're talking 1987 -- 1997 when you were

Page 40

1 writing this -- and that "it should not be -- be
2 taken to be infallible and could be misunderstood or
3 misused."
4         Could you explain a little bit what you're
5 trying to say there, or just elaborate a little bit
6 on what you're saying there, please.
7     A   I think that even now assessing
8 credibility in this kind of circumstance, you can't
9 do it by just taking one little piece of what
10 happened, one little statement that the child said
11 or the way the child said it, that you have to make
12 a list of a number of different factors, and that no
13 one of them is -- usually, no one of them is
14 determinative. But you somehow have to combine the
15 information from these different factors.
16     Q   Okay. The last sentence in there, you
17 said: "Finally, it should be noted that a child's
18 spontaneous statement made while he or she was
19 emotionally upset may have substantial value later
20 in court." And you cite a 1992 case.
21         What are you referring to there, please?
22     A   I don't know what the case was at this
23 point.
24     Q   Well, that's fine. I meant more what was
25 the point you were trying to make?

Clyde Ray Spencer, et al. v. ... 05424-BHS   Document 134-5   Filed 01/16/13   Page 13 of 38   William Bernet, M.D.
Former Deputy Prosecuting Attorney for Clark Co., et al
December 4, 2012

Page 41

1  A  That sometimes statements elicited
2  spontaneously might be more useful and more reliable
3  than statements that are brought out during the
4  course of an interview.
5  Q  Would you agree, at least based on the
6  written description that Shirley Spencer made of
7  Kathryn Spencer's first disclosure or outcry of
8  abuse, fits within that category of being a
9  spontaneous statement, at least as described by
10  Shirley Spencer in her written report?
11  A  You know, I would have to actually look at
12  exactly how Ms. Spencer worded it. I'm not really
13  sure. In other words, the -- the part that was
14  spontaneous was, Will you rub my tummy? Can I rub
15  your tummy? And so on.
16    And then it got off into this other area
17  of touching, and she claimed that her mother touched
18  her, which sounded -- maybe that was spontaneous.
19  She claimed that the friend of the dad -- I guessed
20  the dad's girlfriend touched her. And then there
21  was more and more questioning.
22    I don't really know how to answer the
23  question without actually looking at exactly what
24  Ms. Spencer said about whether it sounded
25  spontaneous.

Page 42

1  Q  You don't happen to have that before you?
2  A  I have it.
3  Q  I understand if you don't.
4  A  I have it somewhere here, yes. I have it
5  with me.
6  Q  You do have it with you?
7  A  Yes. Do you want me to find it?
8  Q  Yes. If it would be fairly easy for you
9  to locate.
10  A  I have her written statement.
11  Q  Okay. And look -- looking at that, I
12  would -- I'll just go back to my prior question.
13  And that is, would you agree that Kathryn Spencer's
14  initial disclosure of sexual abuse by her father and
15  others to Shirley Spencer as described by Shirley
16  Spencer in that document would fit in the category
17  of a spontaneous disclosure of sexual abuse?
18  A  Okay. It looks like to me that the first
19  statement made by Kathryn suggesting abusive
20  behavior is halfway down the second page where she
21  says -- well, actually it says here she again said.
22  It says: "She again said Karen and my mommy let me
23  rub their titties and pee-pee."
24    So I'm not -- that says again. I'm not
25  sure if she said that earlier. I cannot find that

Page 43

1  being said earlier, so I'm not exactly sure -- oh,
2  yeah. Let's see. Oh, yeah. Up -- I guess higher
3  up on the page she says: "She said it feels good to
4  rub the pee-pee." And she says: "She said Karen
5  let me rub her pee-pee. I said, No, I will rub your
6  back" -- and so on.
7    So, I guess your question is whether this
8  sentence right here where she says: "She said Karen
9  let me rub her pee-pee," is that -- that's what
10  you're asking me, was that a spontaneous statement?
11  Q  I'm just asking in general, the
12  disclosures throughout that. If you want to just
13  say some are spontaneous, some are not, or all of
14  them are. That's what I'm trying to find out, what
15  your view would be.
16  A  Well, that's the initial allegation.
17  Well, this -- this is not act -- even based on what
18  we have here, this is not actually what I would
19  consider a spontaneous statement. This is a very
20  common circumstance where a child is misbehaving in
21  some way, and the child is reprimanded and told, You
22  shouldn't be doing that. You're not supposed to be
23  doing that.
24    In other words, the child had been
25  touching Shirley Spencer's breasts and attempted to

Page 44

1  touch her genital area. And Ms. Spens -- Shirley
2  Spencer said, You're not supposed to do that. So
3  the child feels reprimanded. She feels that she
4  either did something wrong or she thinks she did
5  something wrong.
6    And the child then says, Oh, somebody else
7  did this. I did this with somebody else. Somebody
8  else let me do this. In other words, that's not
9  spontaneous. That is in reaction to the child's
10  feeling that she is in some kind of trouble. And
11  she defends herself or she deflects the blame, if
12  there is any blame, from herself doing things that
13  are bad to somebody else. And she ends up in the
14  next few minutes blaming her mother, this woman
15  named Karen, and ultimately her father, that they
16  all had been touching her because she's being
17  criticized for too much touching. So that -- that's
18  not what I would consider spontaneous.
19  Q  Okay. Would you consider that sexualized
20  behavior by Kathryn Spencer to touch Shirley
21  Spencer's breasts and attempt to touch her genital
22  area?
23  A  Oh, it's certainly sexualized behavior.
24  And she reportedly had been masturbating. Her
25  mother described her as masturbating a lot. And so

Page 45

1  yes, that she had manifested sexualized behavior. I
2  don't -- I don't have enough information to know
3  that it's abnormal sexualized behavior in that it's
4  common for children to masturbate, and it's common
5  for children to try to touch adults. There isn't
6  really enough information to know whether it's
7  within the general range of normal or whether it was
8  unusual.
9      Q  Do you know -- I'm sorry. I just want a
10 little clarification on that.
11         Are you saying that in your view that type
12 of sexualized behavior by Kathryn Spencer at the age
13 of five is normal behavior and quite common among
14 five-year-old girls?
15     A  I don't know that it's common. But I
16 think they do it sometimes. You know, this is --
17     Q  If the child is -- I'm sorry. Go ahead.
18     A  Well, this is a situation where the child
19 has lived in different homes. There have been
20 different women present in the homes. She
21 apparently had a history of masturbation,
22 excessive -- what one might call excessive. I don't
23 know -- I don't really know if I would call it
24 abnormally excessive because I really don't know how
25 much it was. But it was enough that it concerned

Page 46

1  her mother.
2         So she did manifest -- as far as I can
3  tell, she did manifest more sexualized behavior than
4  an average child. But I really don't know whether
5  it's enough that I would consider it, you know,
6  pathological.
7      Q  Would you consider it a red flag that she
8  might be a victim of sexual abuse?
9      A  Yes, I would consider it a -- a -- a --
10 well, that she's been exposed to something that
11 she -- or else possibly that -- that she was not
12 parented well regarding this topic. For instance,
13 maybe --
14     Q  Who was it? Do you -- I'm sorry. Go
15 ahead.
16     A  Maybe when she was masturbating back home
17 where she lived with her mother most of the time,
18 maybe her mother didn't handle it very well. Maybe
19 as a result, she did it even more and then she got
20 even more interested and did other sexualized
21 behavior. In other words, I don't -- we don't know
22 enough about the history to know what it's a red
23 flag of.
24     Q  But it is a red flag of something?
25     A  Yeah, it's -- it's a flag in the sense

Page 47

1  that children who behave like this, especially if
2  it's persistent. In other words, if this were a
3  one-time event and if the child responds to
4  counsel -- to -- in the admonition.
5         In other words, if it's a one-time event
6  that she tries to touch Ms. Spencer's breasts and
7  private parts, and if she responds to the admonition
8  of, Don't do that; we don't do that here, then I
9  would just say I wouldn't -- I guess I wouldn't
10 worry about it.
11        But if it persists despite being told not
12 to do it, then it's more likely that it's a problem.
13     Q  All right. This is a little deviation off
14 the topic, but would you agree, Dr. Bernet, that
15 most male children starting at, like, around age
16 three or perhaps even younger are capable of having
17 erections?
18     A  Yes, they are. In infancy, boys can have
19 erections.
20     Q  And that continues through, at least --
21 maybe until their later years in life?
22     A  Yes.
23     Q  I mean, there is no -- no break in
24 adolescence in that ability or ages five through ten
25 for male children to be able to have an erection?

Page 48

1      A  Yes, that's correct.
2      Q  Okay. I want to go a little bit further
3  in your article that we've been looking at. The
4  same page where you talk about physical examination
5  of children who may have been abused. And then at
6  the bottom of that first paragraph there, you say
7  quote: "In most cases of sexual abuse, there are no
8  abnormal physical findings. In Adams, et al 1994
9  study, the genital examination in sexually abused
10 girls was clearly abnormal in only fourteen percent
11 of the cases."
12        Does that -- does that continue to be your
13 understanding, sir, that even in cases where it's
14 known that a child -- a girl was sexually abused,
15 it's very rare that there will be abnormal physical
16 findings in a medical examination?
17     A  It depends, on what the abuse
18 was, what the nature of the abuse was. Certainly,
19 if the abuse was fonding, then it would be very
20 unlikely that there would be abnormal findings. If
21 the sexual abuse was penetration -- was vaginal
22 penetration, then it's more likely that there would
23 be findings.
24     Q  How much more likely? Do you know?
25     A  No.

Clyde Raye Spencer, et al vi. 05424-BHS   Document 134-5   Filed 01/16/13   Page 15 of 38
William Bernet, M.D.
Former Deputy Prosecuting Attorney for Clark Co., et al
December 4, 2012

## Page 49

1  Q  I'm just -- I'm just wondering about this
2  quote you -- in this -- in your article where you
3  said the genital examination in sexually abused
4  girls was clearly abnormal in 14 percent of those --
5  in 14 percent of cases.
6  Do you know whether or not that 14 percent
7  is referring to cases in which sexual intercourse
8  was alleged?
9  A  At this point, I don't.
10  Q  Okay.  Do you have any reason to believe
11  that -- that the percentage of cases in which sexual
12  intercourse is alleged that result in normal genital
13  examinations is anything greater than 14 percent?
14  A  I don't know.
15  Q  Okay.  I'm jumping forward in your article
16  now, sir, where starting on page 433, you have an
17  outline of practice parameters for the forensic
18  evaluation of children and adolescents who may have
19  been physically or sexually abused.  And there's a
20  lot of stuff in there at the beginning that I don't
21  know, at least in my eyes, isn't particularly
22  important to the issues in this case.
23  But I would like to start under the
24  diagnostic assessment.  Under subsection A1 there,
25  you said that it's important to obtain the history

## Page 50

1  and how the allegation originally arose and
2  subsequent statements that were made.
3  Along that line, sir, would you agree that
4  the earliest interview of a child oftentimes has the
5  most credibility?
6  A  Well, I certainly have heard that, that
7  the earlier -- the sooner the interview is after the
8  actual abuse, the more likely -- the more accurate
9  is the report.  I mean, I have heard that and it
10  seems logical that that would be the case.
11  Q  All right.  Let's go down a little further
12  then, please.  Under subsection 4, you talk about
13  symptoms and behavioral changes that sometimes occur
14  in sexually abused children.  Under category B
15  there, or item B, you speak of disassociative [sic]
16  reactions and hysterical symptoms, such as periods
17  of amnesia, daydreaming, trance-like states,
18  hysterical seizures, and multiple personality
19  disorders.
20  Would you agree, sir, that at least some
21  victims of child sexual abuse will report that they
22  have no memory of it or amnesia about it?
23  A  Yes.  I believe that that's been
24  described.
25  Q  Would you agree that one explanation of

## Page 51

1  that may be that in the course of being traumatized,
2  if you will, by a sexually abusive act, some
3  children disassociate and, in the vernacular, check
4  out as a protective response?
5  A  Yes, that's correct.  The word is actually
6  dissociate.
7  Q  I apologize if I mispronounced that.
8  Sorry.
9  You go on to describe other symptoms and
10  behavioral changes that sometimes occur in sexually
11  abused children under subsection D there.
12  Disturbances in sexual behaviors, including sexual
13  hyperarousal manifested by frequent or open
14  masturbation, excessive sexual curiosity, imitating
15  intercourse, inserting objects into vagina or anus,
16  sexual promiscuity, and sexually aggressive behavior
17  towards others, or age-inappropriate sexual
18  knowledge.
19  Would you agree, sir, that Kathryn Spencer
20  displayed some of those behaviors, or maybe more
21  accurately, several of those behaviors you just
22  listed there?
23  A  Well, let's see.  We have information that
24  she engaged in frequent masturbation.  And I guess
25  you would call it sexually aggressive behavior

## Page 52

1  toward others in that she attempted to touch the
2  breasts and genital area of her stepmother.  I don't
3  actually know whether she had age-inappropriate
4  sexual knowledge.  I know that -- I know she
5  described things that young children don't know
6  about usually, but I don't -- I don't know how she
7  came about to describe those things.
8  Q  Would you agree from the descriptions,
9  among other things, attempting to touch Shirley
10  Spencer's breasts and genital area, that she
11  displayed excessive sexual curiosity?
12  A  Yes, you can call it that -- or yeah.  I
13  guess I referred to it as aggressive behavior, but
14  it could be either one or both.
15  Q  Okay.  We've been going about an hour and
16  twenty minutes or so, sir.  Would you like to take a
17  break or do you want to press on?
18  A  I'll take a quick break.
19  MS. ZELLNER:  Actually -- yeah, we need to
20  take a quick break too.
21  MR. FREIMUND:  Okay.  Why don't we all
22  stay on the video line but take five minutes.
23  Would that work for you?
24  MS. ZELLNER:  Yes.
25  THE VIDEOGRAPHER:  Here marks the end of

Page 53

1   Tape No. 1. Going off the record. The time is
2   15:25.
3       (Break was taken from 3:25 p.m. until
4   3:37 p.m.)
5       THE VIDEOGRAPHER: We're back on the
6   record. Here marks the beginning of Tape
7   No. 2. The time is 15:37.
8   BY MR. FREIMUND:
9   Q  Dr. Bernet, I'm still asking you questions
10  about your March 1997 article entitled "Practice
11  Parameters for the Forensic Evaluation of Children
12  and Adolescents Who May Have Been Physically or
13  Sexually Abused." And I'm still on page 434 of that
14  article. And I'd like to take you to subsection C
15  entitled "Process of the Interview of the Child
16  Including Mental Status Examination."
17      Do you see where I am?
18  A  Yes, I do.
19  Q  The first step there is you say choose a
20  relaxed and neutral location.
21      Would you agree that the hotel room that
22  Sharon Krause interviewed Kathryn Spencer and
23  Matt -- Matthew Spencer for the first time was a
24  relaxed and neutral location?
25  A  No.

Page 54

1   Q  What was un-relaxing and nonneutral about
2   that location?
3   A  It's not neutral because the interviewer's
4   hotel room is a personal space. And it would be
5   pretty unusual to take a child into kind of the
6   personal space or the personal living space or even
7   bedroom of the interviewer.
8   Q  Would you agree that the police department
9   where some of the interviews occurred was a relaxed
10  and neutral location?
11  A  I don't know enough about it to say that.
12  I think in one of the interviews there was some
13  noise going on that they commented on. I mean, I --
14  I don't -- I don't know how to characterize a place
15  that I'm not really familiar with.
16  Q  What would you regard as an adequately
17  relaxed and neutral location in which a police
18  officer should conduct an interview of a suspected
19  child sexual abuse victim?
20  A  I think an office space is okay if --
21  ideally, there would be a way for the child to sit
22  in a chair, you know, and if -- that the child --
23  for instance, if there's a table, where the child
24  can reach the table and the officer can sit at the
25  table too. I mean, I think that's a common

Page 55

1   arrangement. I think the -- the decor of the office
2   should be at least not provocative. In other words,
3   I guess it -- I don't know that it really has to be
4   child friendly particularly, but at least it should
5   be neutral and not provocative in any way.
6   Q  Your next item there is if possible
7   audiotape or videotape the interview.
8       Would you agree, sir, that there is no
9   commonly accepted standard of care requiring that
10  child sexual abuse interviews should be or must be
11  audio-taped or videotaped?
12  A  I really don't know if there was in 1984.
13  I believe that now there is. I believe that
14  currently it's -- it's -- almost everybody agrees
15  that interviews should be electronically recorded.
16  Q  Do you know when that agreement was
17  arrived at temporally?
18  A  No.
19  Q  Would you agree that even in the 1990s,
20  there was extensive debate about whether child
21  sexual abuse interviews should be audiotaped or
22  videotaped?
23  A  Yes, I believe that is correct. I -- so
24  people have gone back and forth about that. I don't
25  hear much debate about it currently. As far as I

Page 56

1   know, almost everybody currently believes that they
2   should be recorded.
3   Q  Would you agree that back in the 1984 to
4   1985 time frame, it was unusual that a field
5   investigator would audiotape or videotape a child
6   sexual abuse interview?
7   A  I don't know.
8   Q  Okay. In your next item, you say:
9   "Establish rapport which may require two or three
10  interviews. Keep the number of interviews to a
11  minimum as multiple interviews may encourage
12  combative relation."
13      Would you agree, sir, that there is no
14  generally accepted limit on the number of interviews
15  that should occur of a child sexual abuse victim?
16  A  I think almost everybody would agree with
17  what is stated here, that one, two, or perhaps three
18  interviews are reasonable. And it would be very
19  unusual to want to have more than that. You would
20  have to have a really, really good reason to need
21  more interviews than that.
22  Q  So you would say, then, that at least
23  currently there's common acceptance that three
24  interviews is typically the limit, but, you know,
25  there may be cases where you would exceed that? Is

1  that what you are saying?
2     A   Yes.  What I'm saying currently is that
3  one or two interviews probably covered the vast
4  majority of cases.  Maybe occasionally somebody
5  needs three.  I -- I -- I think you would have -- it
6  would be very unusual in my mind to need more than
7  that.
8     Q   Would you agree, sir, that you do not know
9  whether that was the standard of care back in the
10  1984 and 1985 time frame, that one, two or three
11  interviews is the limit?
12    A   I don't know.
13    Q   All right.  I think we've gone through
14  some of these other ones where you talk about
15  testing, ability to recall historical events --
16  (inaudible.)
17        (Reporter requests clarification.)
18    Q   -- accurately assess the child's
19  understanding of telling the truth, and encouraging
20  spontaneous narratives.  So I'm going to go down to
21  the Item 7, where you say:  "Proceed from more
22  general statements to more specific questions."
23        Would you agree, sir, that what you're
24  recommending in this article then is that a
25  funneling technique should be used in child sexual

1  abuse interviews, where you begin at the top of the
2  funnel with broad, general questions and then you
3  progressively narrow it down to more specific
4  questions?
5     A   Yes.  That's what this has been called.
6  And you don't always need to even narrow down.  In
7  other words, sometimes you get whatever information
8  you need from asking the broad questions.  But --
9  but sometimes you do need to proceed to more
10  specific questions.
11    Q   And the occasions on when you may need to
12  proceed to more specific questions sometimes are if
13  a child is resistant to disclosing abuse.  As you
14  indicated, that quite commonly happens.
15        So in that type of circumstance, that
16  would be one situation where it would be appropriate
17  to start asking more specific questions, correct?
18    A   Yes.  Sometimes that's the case.
19    Q   All right.  In your next item, Item No. 8,
20  you say:  "Avoid repetitive questions, either/or
21  questions, multiple questions.  As much as possible,
22  avoid leading and suggestive questions."
23        Would you agree, sir, that sometimes it is
24  appropriate and not possible to avoid asking leading
25  and suggestive questions in a child sex abuse

1  interview involving a child who is reluctant to
2  disclose?
3     A   I think that sometimes that is necessary,
4  but it has to be done with the full understanding
5  that what the child then says, you do not really
6  know for sure whether the child is simply endorsing
7  what the interviewer suggested or whether it's
8  actually eliciting factual information.
9        So you have to do it very cautiously and
10 you have to do it with that knowledge that whatever
11 you get from that process may or may not be
12 historically accurate.
13    Q   Would you also agree, sir, that the two
14 interview protocols or scripts that you referenced
15 earlier, the one by I believe it was NICH [sic], and
16 the other one, that both of those interview
17 protocols do include the use of leading and
18 suggestive questions if necessary when interviewing
19 reluctant child witnesses?
20    A   Yes.
21    Q   So even to this day, currently the
22 recommended interview protocols for reluctant child
23 witnesses advocate, if need be, the use of leading
24 and suggestive questioning during the interview?
25    A   I believe that's correct, but it's with

1  the understanding that you're not really sure --
2  when you get answers, you're not really sure about
3  the reliability of those answers.
4     Q   Okay.  Let's go down to Item No. 9, used
5  restatement, i.e., repeating the child's recount
6  back to the child.
7        What you are suggesting there is that it's
8  appropriate for a child interviewer to kind of
9  repeat back to the child what the child has
10 disclosed to them about sexual abuse; is that true?
11    A   Yes.  You're doing that carefully, of
12 course.  And you're basically giving the child an
13 opportunity to tell you whether or not you have the
14 information correctly.
15    Q   Okay.  And I'm going to kind of blend
16 Items 10 and 11 together there.
17        You say that in general the examination
18 should take place without the parent present; but if
19 a child is very young, consider having a family
20 member in the room.
21        Would you agree that that's one of those
22 judgment calls that an interviewer has to make about
23 whether or not to have the parent present in the
24 room during the interview, particularly for a
25 younger child?

Clyde Ray Spencer, et al v. 05424-BHS   Document 134-5   Filed 01/16/13   Page 18 of 38
Former Deputy Prosecuting Attorney for Clark Co., et al
William Bernet, M.D.
December 4, 2012

Page 61

1   A   Yes. I think ultimately the -- that's --
2   the interviewer is going to have to figure that out.
3   And, again, if you do allow the parent to be present
4   or if that's necessary, you have to take that into
5   consideration that that might influence what the
6   child says.
7   Q   Okay. I'm going to skip No. 12 where you
8   talk about using age-appropriate techniques and go
9   to 13 where you say: "Determine the child's terms
10  for body parts and sexual acts."
11      Is that referencing what we were talking
12  about before, where it's appropriate for an
13  interviewer to have a drawing of a human body and
14  have the child identify body parts, including
15  genitalia and so forth, and identify -- have the
16  child identify by name what they call those body
17  parts? Is that what you're talking about there?
18  A   Yes. And some protocols do include that.
19  For instance, the RATAC protocol includes that as
20  part of a routine interview. The NICHD protocol
21  doesn't. They -- they actually discourage it. So
22  different people have different ways of going about
23  that. But it is accepted by some people.
24  Q   When you say RATAC, is that an acronym?
25  A   Yes. R-A-T-A-C is an acronym for an

Page 62

1   interview technique.
2   Q   Would you happen to know what each of
3   those letters in that acronym stand for?
4   A   Yeah. I think it's rapport, anatomic
5   definitions, something, then the A is abuse
6   scenario, and the C is closure. So that's some of
7   what that stands for. Oh, terminology. The T is
8   terminology, I think.
9   Q   Okay.
10  A   So it's rapport. The anatomic -- pictures
11  is you actually look at the body parts. And I think
12  T is terminology. A is abuse scenario. And C is
13  closure.
14  Q   Well, what is your understanding of what
15  is meant by "abuse scenario" in that acronym?
16  A   It's eliciting a description of what
17  happened from the child with the same, you know,
18  cautions of trying not to ask leading and suggestive
19  and repetitive questions.
20  Q   Okay. I'm going to go down now to
21  subsection D where you say content. It's entitled
22  "Content of the interview of the child." And you
23  indicate "the following areas should be explored
24  during the interview." The first one is you're
25  saying that it's appropriate for an interviewer to

Page 63

1   ask a child whether the child was to disclose or not
2   disclose anything, you know, whether they were told
3   to keep a secret, basically, right?
4   A   Yes.
5   Q   And it's also appropriate to ask the child
6   who it was that they are saying abused them, right?
7   A   Uh-huh. Well, you know, you keep
8   referring to "ask." Of course, ideally this kind of
9   information came out during the free narrative
10  description by the child. So you don't --
11  Q   Okay.
12  A   -- you don't end up having to ask these
13  questions.
14  Q   But in a less-than-ideal world where the
15  child did not disclose that in the pre-narrative, it
16  would be appropriate to ask a specific question
17  about who it was who touched them inappropriately,
18  would it not?
19  A   You may need to do that with the
20  understanding that every time you ask a question,
21  you might be contaminating the child's understanding
22  and memory.
23  Q   Sure. But it might nonetheless be an
24  appropriate interview technique in that
25  circumstance, correct?

Page 64

1   A   Yes, it might be.
2   Q   And it also might be appropriate to ask a
3   child what it was that the -- what kind of touching
4   the alleged perpetrator engaged in, right?
5   A   Yes.
6   Q   It's appropriate to ask the location where
7   the abuse occurred, right?
8   A   Yes.
9   Q   It's also appropriate to ask, you know,
10  when it started and when it ended, put some dates on
11  it, correct?
12  A   Yes.
13  Q   And the number of times that the abuse
14  happened is an appropriate inquiry for an
15  interviewer to pursue, right?
16  A   Yes.
17  Q   It's also appropriate to ask the child to
18  describe how the abuse first happened and then how
19  it progressed over time, correct?
20  A   Yes.
21  Q   And again, it's appropriate to see if the
22  child can describe how the perpetrator of the abuse
23  convinced the child to keep -- to keep the abuse
24  secret. Isn't that also an appropriate thing for an
25  interviewer to do?

Clyde Bergemann, et al 05424-BHS    Document 134-5    Filed 01/16/13    Page 19 of 38
Former Deputy Prosecuting Attorney for Clark Co., et al                     William Bernet, M.D.
                                                                           December 4, 2012

Page 65

1     A   These are all things that would be good to
2 determine, preferably by not asking leading
3 questions.
4     Q   But once again, you know, in a non ideal
5 world that -- that might become necessary, and it
6 would not violate the standard of care to do so in
7 those circumstances, correct?
8     A   In some circumstances, that's correct.
9     Q   All right. And another area of inquiry
10 that would be appropriate is to ask whether any
11 photographs or videotaping was involved during the
12 course of sexual abuse, too, right?
13     A   Yes.
14     Q   All right. I'm going to move down to
15 subsection G -- I'm sorry, subsection H, "Physical
16 Examination of the Sexually Abused Child."
17       And first of all, you state there under
18 item No. 1, quote: "Most sexually abused children
19 do not have any corroborating physical findings,"
20 end quote.
21       Again, that kind of goes back to what we
22 were describing earlier, that the majority of kids
23 who have been sexually abused there isn't any
24 medical evidence of the abuse, right?
25     A   Yes.

Page 66

1     Q   Let's go on to Roman numeral three on the
2 next page --
3     A   (Witness complies.)
4     Q   -- where it's entitled "Possible
5 Explanations of Denials of Abuse." You indicate:
6 "Sometimes children may deny or retract allegations
7 of abuse and that may occur for several reasons."
8 And then you list them.
9     First of all, are you able to quantify --
10 I apologize if I asked you this before. I don't
11 think I did, but if I did please say so.
12       But are you able to quantify whether it is
13 more frequent that a child will initially deny abuse
14 when formally interviewed by a police officer or a
15 child protective services worker or -- as compared
16 to how common it is that the child will initially
17 disclose abuse in that formal -- first formal
18 interview?
19     A   I'm under the impression that it is more
20 common to disclose abuse than to deny it in the
21 first interview. But I can't cite the research
22 right now to support that. But that's my
23 impression.
24     Q   Having said that, it's not unusual, on the
25 flip side, that a child will deny abuse in the

Page 67

1 initial interview as well, though, right?
2     A   That's correct. I think it was some of
3 the research done by Steven Ceci where he and his
4 colleagues said that it happens both ways, but it's
5 more common for the disclosure to happen than for a
6 denial to happen.
7     Q   Is that that Ceci and Bruck article,
8 B-R-U-C-K?
9     A   Well, they did a lot of work together.
10 I'm not sure who did this particular study.
11     Q   And just for the record, is it your
12 understanding that Ceci's name is spelled C-E-C-I?
13     A   Yes.
14     Q   How common is it, to your understanding,
15 that a child who makes a disclosure of abuse
16 recants -- later recants that disclosure?
17     A   According to that same material by Steven
18 Ceci, I think he would say that, yes, that happens,
19 but it does not happen frequently. But I cannot
20 give you specific numbers.
21     Q   Do you recall in Roland Summit's 1983
22 article entitled "A Child Sexual Abuse Accommodation
23 Syndrome," that there was some discussion about
24 recantations?
25     A   Yes. Dr. Summit said that in family

Page 68

1 abuse, in incest, that recantations happen sometimes
2 because the child is pressured by family members to
3 take back the allegation.
4     Q   Do you recall that back in 1983, that
5 Roland Summit was saying, quote: "Whatever a child
6 says about sexual abuse, she is likely to reverse
7 it," end quote?
8     A   I don't remember that specific comment.
9     Q   Okay. But do you recall that generally he
10 was suggesting that at least in incest cases like
11 what we're dealing with in this case, recantations
12 occur with significant frequently?
13     A   Yes.
14     Q   And you would agree with that assessment
15 by Dr. Summit, would you not?
16     A   I really don't know what the numbers are.
17 I can just say that it happens sometimes, but I
18 don't -- I have no idea what the numbers would be.
19     Q   Okay. Would you agree that one basis for
20 a recantation, or what might cause a child to
21 recant, is if their abuser is released from prison
22 and is now -- they are now at risk of abuse
23 reoccurring?
24     A   I don't know. I don't think I have ever
25 heard that.

**Page 69**

1   Q   Okay.  I want to turn back now, if we
2 could, please, to your September 1993 article
3 entitled "False Statements and the Differential
4 Diagnosis of Abuse Allegations."
5      Do you have that back in front of you
6 again?
7   A   Yes, I do.
8   Q   Okay.  On the first page, page 903, there
9 of the article, the last paragraph on that page,
10 assuming you have the same page arrangements as I
11 do, there's a paragraph that begins, quote:  "There
12 is a disagreement on how to conduct and what to
13 conclude from evaluations of children who may have
14 been abused," end quote.
15      Would you agree that back in 1993 when you
16 wrote this article, there was substantial
17 disagreement among experts such as yourself on child
18 psychiatry as to how to conduct a child sexual abuse
19 interview?
20   A   I think there were disagreements about
21 some of the details.  I don't think there were
22 disagreements about the fundamentals.  Just as an
23 example, a few minutes ago we were talking about
24 those two protocols.  And the RATAC protocol
25 includes showing the anatomical pictures and

**Page 70**

1 eliciting names of body parts, but the NICHD does
2 not.  So there has -- that's a detail, I suppose.
3 So there is disagreement about that, but I don't
4 think that there's disagreement about fundamental
5 issues.
6   Q   Would you agree back in the 1984 and 1985
7 time frame there were more disagreements about how
8 to conduct a child sexual abuse interview than there
9 were in the 1993 time period that you wrote this
10 article?
11   A   I don't know.
12   Q   Okay.  Would you agree that different
13 experts reviewing the same case, reviewing the same
14 interviews of a particular child or children, will
15 arrive at different conclusions regarding the
16 probability that sexual abuse had occurred?
17   A   Well, I know there's been research to that
18 effect.  I think -- it depends, of course, on how
19 much information is given to the various experts and
20 the various clinicians.  If you give less
21 information, then the clinicians and the experts
22 have to base a decision -- and it's a more random
23 decision -- as to whether or not abuse actually
24 happened.
25      If you give more information and more

**Page 71**

1 detailed information and significant information,
2 then you're more likely to have agreement.
3   Q   But you would agree even when experts are
4 given the same, very detailed information, it's
5 common that they will reach different conclusions
6 regarding the probability that sexual abuse had
7 occurred, reviewing the same material?
8   A   Well, I'm sure that happens.  I don't know
9 if it's common.  And of course, when they do that,
10 they should explain their basis for their opinions.
11 But I -- in other words, I just don't know what
12 "common" means in that context.
13   Q   Okay.  I guess what I'm referring to, it
14 would not be unusual for different experts to reach
15 different conclusions after reviewing the exact same
16 detailed information.
17   A   I don't know if it would be unusual.  I
18 know it can happen, but I really don't know how to
19 quantify it.
20   Q   Okay.  In this 1993 article, under the
21 heading "The Current Problem," you state, quote:
22 "There are guidelines for distinguishing the
23 truthful from the untruthful child, but child
24 psychiatrists do not have a consistent way to
25 understand and classify the untruthful child."

**Page 72**

1      Would you agree with the first part of
2 that, that at least as of the time you wrote this
3 article in 1993, even child psychiatrists had not
4 arrived at a consistent way to understand and
5 classify the untruthful child?
6   A   Right.  That had to do with, basically,
7 the terminology, that people use the same words for
8 different behaviors.  And I give examples here of
9 the difference between confabulation and
10 pathological lying for example.  So -- so people
11 were using these -- they were throwing these words
12 around and meaning different things by the same
13 words.  And so I was attempting to give definitions
14 to these different mechanisms.
15   Q   And you give different names to 17
16 different mechanisms that might be categories in
17 which you would classify an untruthful child, right,
18 in this article?
19   A   Yeah, actually, 16.
20   Q   Sixteen?
21   A   Since number one is -- it's true.
22   Q   Oh, yeah.  You're right.  I'm sorry.  I
23 beg your pardon.
24      So 16 untruthful ones.  And out of that
25 16, only one of them is based on an interviewer

**Page 77**

1　I can't think off the top of my head whether I have
2　had cases of multiple perpetrators, but it's
3　possible. I just don't know.
4　　Q　When you say you've had cases, that would
5　be as a forensic evaluator who is coming in after
6　the fact to analyze the interview techniques used by
7　field investigators at the scene, right?
8　　A　Yes. Well, for the most part. I mean, I
9　have had other cases where I was the therapist, but
10　most of the cases I have seen, I have done a
11　forensic evaluation after somebody else had already
12　done an initial assessment.
13　　Q　When you use that phrase, you did a
14　forensic evaluation, describe what that means, what
15　you do. I mean you're -- what is it -- your role,
16　what is your role in that context?
17　　A　My role in doing a forensic evaluation is
18　to address some legal question.
19　　Q　Among other legal questions, you might be
20　asked in -- when doing a forensic evaluation as to
21　criticize the interviewing techniques used by the
22　police officers or CPS workers involved in the
23　investigations in a particular case; is that true?
24　　A　Yes, that might be. Sometimes that might
25　be the case.

**Page 78**

1　　Q　Is that typically your role when it comes
2　to child sexual abuse cases, that your role is to
3　criticize the interview techniques used by police
4　officers or CPS workers?
5　　A　No, I don't think it's -- that's not the
6　most frequent thing, my role. I have had other
7　roles. For instance, in a child custody evaluation,
8　sometimes allegations are made. And so these are
9　cases that have not come to the attention of DCS or
10　child protection, and so I would be interviewing the
11　children to see my impression of whether some form
12　of abuse happened.
13　　　And then I have had other cases where
14　everybody agrees that the child was abused, and so
15　the issue is damages, you know, what should happen,
16　you know, for instance in a lawsuit, in a civil
17　lawsuit, how badly was the child abused and how much
18　damages should be. So I guess I have had different
19　roles.
20　　Q　Are you typically hired by the plaintiff
21　in these types of civil actions that you are
22　describing for damages?
23　　A　Well, I guess by both. It's been both
24　ways. I'm not really sure what's been -- probably
25　in terms of numbers of children, probably more the

**Page 79**

1　plaintiff than the defendant.
2　　Q　When was the first time that you gave a
3　deposition or trial testimony in a case involving
4　child sex abuse where you were criticizing the
5　interviewing techniques used by a police officer or
6　a law -- or a CPS worker?
7　　A　Well --
8　　Q　And if you -- if all you can give me is,
9　like, a time frame, late 90s, I'm satisfied with
10　that. I don't expect precision on the date.
11　　A　Yeah. You know, I have a list of
12　testimony, but -- which I provided to you, but it
13　doesn't go back that far.
14　　Q　Yeah, that's why my question.
15　　A　I can recall a situation which would have
16　been approximately 1984 or 1985 or maybe 1986 where
17　I reviewed a transcript of an interview, and I was
18　very critical of the repetitive questions that --
19　and the -- essentially the bribery that the
20　interviewer was conducting. And so that -- that
21　would have been in maybe '85 or '86.
22　　Q　Was that in the context of a criminal case
23　or a civil case or do you remember?
24　　A　Well, I can remember the interview, but I
25　can't remember the situation. I'm not sure. I'm

**Page 80**

1　not sure.
2　　Q　Do you recall what state -- what state it
3　was --
4　　A　Yes, it --
5　　Q　-- where this interview occurred?
6　　A　It would have been in Virginia.
7　　Q　Did it become fairly common for you, after
8　that '85, '86 time period where you were engaged by
9　lawyers from one side or another to analyze and
10　critique interview techniques in child sexual abuse
11　cases?
12　　A　I don't think I would describe it as
13　common. I mean, I have done hundreds of forensic
14　evaluations, and this kind of question is a small
15　percentage of all those evaluations I have done.
16　　Q　When you say "this kind of question," can
17　you specify?
18　　A　What you just said, critiquing the
19　evaluation done or the interview done by a child
20　protection worker would be a very small percentage
21　of all the forensic evaluations I have ever done.
22　　Q　That is what you are doing in this case,
23　though, right?
24　　A　Yes.
25　　Q　Back in the 1983 to 1985 time period, what

Clyde Ray Spencer, et al 05424-BHS   Document 134-5   Filed 01/16/13   Page 22 of 38
Former Deputy Prosecuting Attorney for Clark Co., et al
William Bernet, M.D.
December 4, 2012

Page 81

1  were you focused on professionally during that time
2  period?  What were you doing?
3      A  During that period of time, I was living
4  and practicing child psychiatry in northern
5  Virginia, in Alexandria, Virginia, and I was mainly
6  doing outpatient psychiatric evaluations and
7  psychotherapy of children and teenagers and
8  occasionally adults.  So most of my work was as a
9  clinician doing therapy, and I was doing an
10  occasional forensic evaluation.
11      Q  Would you agree, Dr. Bernet, that you do
12  not have an expert opinion on what the standard of
13  care was for police officers or child protective
14  services workers during the 1984-1985 time period,
15  on the topic of child sexual abuse interview
16  techniques?
17      A  I think I'm an expert on some aspects of
18  it.  In other words, as I stated before, I don't
19  know exact protocols that might have been available.
20  But I do think, based on what I know about child
21  development and interview techniques, that certain
22  basic principles have been -- were known to
23  everybody, to professionals during that time,
24  specifically the problems with leading suggestive
25  and repetitive questions, the problems with, for

Page 82

1  instance, bribing a child to say certain things or
2  praising the child for having said certain things,
3  that -- I believe that it's been common knowledge
4  that adults have to be careful about how they
5  influence the child.  And so I believe I'm
6  knowledgeable and have expertise in that regard.
7      Q  Any other subjects related to child
8  interviewing technique other than what you just
9  described that you believe you have an expertise
10  about related to standards that were applicable
11  during the 1984 to 1985 time period?
12      A  Well, I think what I related generally
13  comes under the heading of coerciveness, that asking
14  leading and suggestive and repetitive questions are
15  forms of coercion.  Praising the child is a form of
16  coercion, in a sense.  Threatening the child that
17  certain things are going to happen unless the child
18  makes statements that the interviewer is looking
19  for.  I think that those are the things that I would
20  have an opinion about and that I think were well
21  known in the 1980s.
22      Q  And I just want to get a complete
23  list.  Is there anything else beyond what you've
24  just described?
25      A  Well, I guess we could look at my report

Page 83

1  and see if there's anything else that I criticize in
2  here.  (Witness reviews document.)
3          Oh, well, I do criticize
4  Detective Krause's approach of telling each child
5  what the other children said.  So I guess I would
6  say that's something I know about.
7      Q  Okay.
8      A  I think that the idea of conducting the
9  interview in a neutral place would have been
10  understood by almost everybody at that period of
11  time.  I think -- those are the main things that
12  I -- I was criticizing these interviews about.
13      Q  Okay.  And let me direct you to page 23 of
14  your report, under Item 4 there you say: "In 1984
15  and 1985 when the investigative interviews were
16  conducted by Detective Krause and Mr. Peters, it was
17  well known to both psychologists and legal
18  practitioners that both children and adults could be
19  influenced by repetitive, leading and suggestive
20  questioning."  And then you go on to say:
21  "Explained earlier in this report, there is ample
22  evidence that both psychological and legal
23  professionals have been interested in the
24  suggestibility of both child and adult witnesses
25  since the early part of the 20th century."

Page 84

1          Are you attempting to be careful there
2  about making the distinction between what
3  psychologists and lawyers and such knew or were
4  reading about or had interest in as compared to
5  police officers and line-field investigators?
6  Because you go on to say there: "I'm not suggesting
7  that Detective Krause or Mr. Peters necessarily read
8  or studied any of the scholarly work cited in the
9  report."
10          Was that -- what you were directing that,
11  those comments to, is what psychologists and lawyers
12  had interest in as distinguished from police
13  officers?
14      A  No, I was not trying to make that
15  distinction.
16      Q  Okay.
17      A  I think I was lump --
18      Q  So you were saying --
19      A  I was lumping police officers and
20  detectives under legal professionals.
21      Q  Okay.  So you're thinking that -- your
22  opinion is that Detective Krause would have been
23  aware of all of these articles you're talking about?
24      A  No.  Not that she would have been aware,
25  necessarily, of those specific articles.  She would

Page 85

1 have been aware of the concept of avoiding
2 suggestive and leading questions.
3     Q   Okay.
4     A   In other words, the purpose of the
5 articles is just to demonstrate how prevalent that
6 understanding was, and -- but as far as
7 Dr. Krause -- Detective Krause goes, she herself
8 said that she was aware of the problems of leading
9 questions.
10     Q   Would it be your belief that Detective
11 Krause also would be aware, as you've testified here
12 earlier today, that in some instances, particularly
13 with a reluctant child witness, that it may be
14 necessary and appropriate to use both leading and
15 suggestive questions during the course of a child
16 sexual abuse interview back in the 1984, '85 time
17 frame?
18     A   Yes, I think that was her opinion.
19     Q   And that -- that's still true today among
20 professionals, is it not?
21     A   Yes, I think we might disagree on whether
22 it was an appropriate thing to do in the case, you
23 know, the actual case that is before us.  But I
24 think that the general notion is -- people would
25 agree to it.  I'm not sure people would agree on

Page 86

1 whether it was done correctly in this case.
2     Q   Okay.  Do you think that it was
3 inappropriate and a violation of the standard of
4 care to the extent you are aware of one that existed
5 in the 1984 or '85 time period for Detective Krause
6 to offer a drink to these children if they were
7 thirsty?
8     A   I think a drink of water would have been
9 fine.  I don't --
10     Q   Do you think that she was offering
11 something other than water; is that where you're
12 drawing the line?
13     A   Well, yes.  You know, like, hot chocolate
14 seems like a special drink.  That's kind of like a
15 very -- that's kind of like a treat.  That's kind of
16 like a special drink, and you don't have hot
17 chocolate just because you're thirsty.  You have hot
18 chocolate sort of as a treat.
19     Q   Okay.  Is it your understanding that she
20 offered hot chocolate before, during or after the
21 interviews of children?
22     A   Well, my memory is that the hot chocolate
23 that she gave to Kathryn was before they went to her
24 motel room.  I'm not sure when the hot chocolate she
25 gave to Matthew Spencer -- I'm not sure at what

Page 87

1 point that one was given to him.
2     Q   Is it your belief to a reasonable degree
3 of psychiatric certainty that if a child interviewer
4 offers a hot chocolate to a child before
5 interviewing them, that that has a significant
6 increase in inappropriately -- an increase in the
7 likelihood of inappropriately coercing that child to
8 make a false disclosure of sexual abuse?
9     A   I don't think I would put it like that.
10 But see, I don't think we're looking at a single
11 instance.  I think we are looking at a pattern.
12 We're looking at a pattern of her treating the
13 children and in seeing them in a personal space,
14 taking -- going to the mall with one of them.
15 There's a pattern of engaging them in an overly
16 personal way.
17         And I think that that would -- would lead
18 the children to try to be more cooperative and try
19 to say what the interviewer is looking for.
20     Q   Is it your belief that Detective Krause
21 fabricated the statements that the children were
22 making to her as she reported in her police reports?
23     A   I don't know if she did that.  I think
24 it's possible she -- she could have misstated the
25 way the conversations went.  I'm -- I'm not -- I

Page 88

1 don't know whether I would call it fabrication.
2 Maybe that is the right word.  But, I think it's
3 possible that she would say things in a suggestive
4 way, and then she would essentially get the child to
5 agree with it.  But then when she wrote up the
6 report, she put it as though the child had said
7 those things.
8     Q   How do you know that happened?
9     A   Well, there are a couple of reasons to
10 think that might have happened.  One is the -- the
11 interview that was provided to me by Phyllis Day who
12 was the children's grandmother, the maternal
13 grandmother.  And she described being present
14 during -- during, I guess, a wrap-up session with
15 Big Matt when Matthew had been interviewed by
16 Detective Krause, and then they came back together
17 again.  And she described that that's what Detective
18 Krause did during this wrap-up session, that
19 Detective Krause would say, You know, your daddy did
20 such and such.  And Matthew would agree.  And your
21 daddy did something else.  And Matthew would agree.
22 So that's one reason to think that might have gone
23 down that way.
24         The other reason is that some of the
25 statements quoted by Detective Krause attributed to

Page 89

1 the children, especially to five-year-old Kathryn,
2 seemed grown up. There are complex sentences.
3 There are compound sentences just the way they are
4 stated seems overly grown up for this little girl.
5 So it -- I'm sort of wondering whether the little
6 girl really said those things, or whether Detective
7 Krause said those things, and then the girl agreed
8 with her.
9    Q  I understand you think it -- there's some
10 indication that might have happened. Let me pin you
11 down.
12       Can you say to a reasonable degree of
13 certainty that it, in fact, happened? That
14 Detective Krause was fabricating statements that
15 these children made during the course of her
16 interviews?
17    A  No, I don't think I can say that that
18 strongly, but it's -- it's certainly something that
19 I would wonder about and that whoever ultimately
20 decides these things would have to add that together
21 with whatever other information the finder of fact
22 has to decide about that.
23    Q  Okay. I'm going to talk about briefly
24 false positive and false negative error rates in the
25 course of child disclosures of sexual abuse.

Page 90

1    Do you understand what I'm talking about
2 when I use those phrases, or would you like me to
3 explain that a little better?
4    A  No, I think I know what you mean. A false
5 positive would be a -- an allegation made by the
6 child that's not true. And a false negative would
7 be a denial made by a child that's not true -- at
8 least I believe that's what you mean.
9    Q  Yeah, you're right on.
10       When you were writing your article back in
11 1993 on the differential diagnosis of abuse
12 allegations, were you able to kind of balance or
13 analyze false positive and false negative error
14 rates, or was that even part of the study that you
15 were conducting in that article?
16    A  That was not something I attempted to do.
17    Q  Is that something that you have attempted
18 to do in any other publications?
19    A  No. I have not conducted that kind of
20 research.
21    Q  Okay. Did you go to the Cornell
22 conference that was addressing child sexual abuse,
23 interview techniques and so forth and issues related
24 to child sexual abuse generally?
25    A  This was about ten years ago, and -- that

Page 91

1 led to their --
2    Q  Yes, approximately ten or fifteen years
3 ago?
4    A  And then they put everything together in a
5 book. But to answer your question, no, I did not go
6 to that conference.
7    Q  Okay. Are you familiar with after -- or
8 did you read the book that was produced as a result
9 of that conference?
10    A  Yeah. I think there were two or three
11 books for different conferences, and I -- I have
12 read some of them. I don't -- off the top of my
13 head, I'm not sure which ones. But yes, I have one
14 of two or them in my library.
15    Q  What -- what was your understanding of
16 the -- that Cornell conference? Was it your
17 understanding that there was a lot of debate about
18 various issues, or was there a lot of uniformity?
19    A  I think this is the book by John Doris
20 called "The Suggestibility of Children's
21 Recollections." I believe that book was the result
22 of the first of those conferences you are talking
23 about.
24       My general impression was that there was
25 agreement about general principles and there was

Page 92

1 disagreement about many details. Just as an
2 example, ages. I think some people felt that older
3 children were just as reliable as adults, and other
4 people felt, no, older children have memory problems
5 similar to the way younger children do, and that we
6 need to do more studies to try to sort this out. I
7 mean, so there was disagreement about certain
8 details. But there was agreement that children can
9 develop false beliefs and false memories based on
10 things that are said to them, and that sometimes
11 that's a factor in child abuse allegations.
12    Q  Would you agree that the line
13 investigators, first-line investigators in child
14 sexual abuse investigations, among the other
15 judgment calls and dilemmas that they must deal with
16 is addressing the issue of false positives versus
17 false negatives and the error rates associated with
18 each? It might not do so in those words, but isn't
19 that what they have to do in part?
20    A  Well, I doubt that they consciously think
21 about it in that way. I -- I do think that they have to
22 think about the possibility that everything happens,
23 that a child who says that he was abused, maybe he
24 was or maybe he wasn't. And a child who denies that
25 he was abused, maybe he was and maybe he wasn't.

Clyde Ray Spencer, et al. v.                                William Bernet, M.D.
Former Deputy Prosecuting Attorney for Clark Co., et al         December 4, 2012

---

Page 93

1  That they have to think about all these different
2  possibilities. But I don't know that they have any
3  awareness of the frequency that those things happen.
4      Q  Would you agree that that's kind of the
5  heart of the problem when trying to determine as an
6  interviewer how to go about -- what techniques to
7  use in a particular interview?
8      A  Well, sure. That's what the task is, but
9  I don't think you need to know statistics to do
10 that.
11     Q  How is it that an interviewer should
12 appropriately determine or distinguish between a
13 false denial from a true denial when a perpetrator
14 is in a position and has the opportunity to commit
15 sexual abuse on that child?
16     A  Well, what we suggested in this other
17 document we were looking at is that there's a whole
18 procedure for conducting one of these evaluations
19 which goes beyond simply the interview. In other
20 words, the forensic interview is just one piece of
21 what a total evaluation consists of. Just as an
22 example, you would also want to have a really clear
23 understanding of how the suspicion arose. You know,
24 what was that very first conversation that led to a
25 suspicion or that led to the child making some of

---

Page 94

1  kind of statement? What are the other forces that
2  the child might have been exposed to that might
3  explain the statements that the child is now making?
4  What are other factors in the family that might
5  reflect influences on the child?
6      So there's a whole list of things that the
7  interviewer or the evaluator should take into
8  consideration in addition to what the child says or
9  doesn't say in the interview.
10     Q  Would you agree that a limitation of that
11 interview technique that you are describing -- or
12 I'm sorry, evaluation process that you were
13 describing. In other studies in this area, one of
14 the limitations was how do you determine whether a
15 particular disclosure is true or false? I mean,
16 these are things that kind of allow you to -- things
17 to consider when making that determination. But
18 going back to phrase, "get to the ground truth," I
19 mean, what -- there are limits on our ability to
20 make a determination over whether a particular
21 disclosure is true or false to this day, are there
22 not?
23     A  Well, I'm sure there are limits. But
24 there is -- there is a way to go about it to reduce
25 the uncertainty which basically involves collecting

---

Page 95

1  a lot of information and considering a lot of
2  different factors, or for that matter finding a
3  really, really reasonable alternative explanation.
4  For instance, if in the process of doing the
5  evaluation you discover that the child has some kind
6  of mental disorder that is in the -- and the
7  allegation is actually a product of that mental
8  disorder. So you have a clear-cut alternative
9  explanation for why -- how the allegation arose. So
10 I think that you're right, that there are limits to
11 the amount of certainty that we can have. But I
12 think there are methods of collecting thorough
13 information that reduces the uncertainty.
14     Q  Okay. Do you think it's fair to apply the
15 knowledge base that you have as a doctor in child
16 psychiatry and all the articles you've read and
17 written about child interview techniques to people
18 on the front line like police officers who don't
19 have the same education and training and were
20 operating in a different environment back in 1984
21 and '85 before this ongoing evolution of knowledge
22 was kind of in its infancy in some respects?
23     A  I think it's fair to apply the general
24 principles that I have mentioned several times: The
25 problems of being coercive; the problems of

---

Page 96

1  suggestive, leading and repetitive questions; the
2  problems of threatening a child. I think those are
3  so basic that I think it's fair to apply those
4  criticisms.
5      Q  You will not be offering an opinion in
6  this case, will you, that any particular child
7  involved here was, in fact, sexually abused or not
8  sexually abused? That's not going to be something
9  you are going to be opining about, is it?
10     A  That is correct. I'm not having an
11 opinion about the ultimate question.
12     Q  Sure. And you -- you haven't interviewed
13 any of the people involved in this case, whether
14 it's the investigator, the children, the father or
15 anybody, right?
16     A  That's correct.
17     Q  Is it also correct that you have never
18 been acknowledged as an expert in any area in the
19 State of Washington or in Washington federal courts?
20     A  That is correct. I have never testified
21 in the State of Washington.
22     Q  Okay. And you're not licensed to practice
23 in the State of Washington either, are you?
24     A  That's correct.
25     Q  Would you agree that even to this day

---

**Page 97**

1  there is no consensus among professionals on the use
2  of a particular protocol for conducting a child
3  inter -- a child sexual abuse interview for a child
4  who has not made a prior disclosure?
5      A  I'm not exactly sure what you are saying.
6  In other words, you are suggesting a situation where
7  the investigator might have reason to think that the
8  child has been abused but the child has never said
9  so?  Is that --
10     Q  Right.  I'm distinguishing between a child
11 who has made a so-called prior outcry from a child
12 who has not made a prior disclosure, but they are,
13 whether through another child or other information,
14 an investigator has reason to believe that they may
15 or may not be -- well, that they may be a victim of
16 child sexual abuse?
17     A  Yes, I understand.  I'm not aware of any
18 universally accepted protocol, but I guess I would
19 say that everybody would agree on the general
20 principles that we've been talking about.
21     Q  Okay.  Is it your understanding that the
22 NICHD protocol that you mentioned before was focused
23 on children who have made a prior outcry as
24 distinguished from children who have not?
25     A  Yes.

**Page 98**

1      Q  Is it your understanding that the RATAC
2  protocol you mentioned before was similarly focused
3  on children who have made a prior outcry as distinguished
4  from those who have not?
5      A  Yeah.  Well, it's -- it's my understanding
6  that both of those were developed primarily for --
7  from children who have made disclosures or
8  allegations, but that both of them can still be used
9  with other children, although I suppose you would
10 have to make some modifications.  But I think you're
11 correct, that they were originally designed for
12 children who had previously made some kind of
13 statement.
14     Q  Would you agree that there is -- that
15 every child is different, and thus every interview
16 is different in some respect because you have to
17 address the particular child being interviewed?  In
18 other words, there is no one-size-fits-all
19 interview?
20     A  Well, I think there are general principles
21 that fit all.
22     Q  Right.
23     A  But the way it actually plays out, I'm
24 sure every child is different.
25     Q  And there are different judgment calls

**Page 99**

1  that have to be made in virtually every child sexual
2  abuse interview, is there not?
3      A  Yes.  In any interview you have to make
4  some choices.
5      Q  Would you agree that it is easier to
6  criticize how somebody else performed the child
7  interview than it is to actually do one yourself?
8      A  No.  I think both of them -- both of those
9  roles require a level of professionalism and
10 knowledge and expertise, whichever -- whether you
11 are doing it or you are reviewing somebody else's.
12 I think both of them are challenging things to do.
13     Q  Do you think it's -- would you agree that
14 it's more challenging to actually have to be the
15 interviewer than to be the critic of the
16 interviewer?
17     A  Not all -- not necessarily, no.  In other
18 words, in a way, being the critic, you have to put
19 yourself in that person's position and consider what
20 that person was hearing and experiencing, as well as
21 what you know about how to do it just from other
22 circumstances.  So I don't know that one of them is
23 easier than the other one.
24     Q  Okay.  I'm just going through my notes
25 here.  If you would bear with me, sir, I'm getting

**Page 100**

1  close to finishing, although I'm sure others will
2  have questions for you.
3          We talked about how many interviews, and
4  you were saying one, two, to three might not be --
5  would be within the realm of reason, but beyond
6  three might not be.
7          What about length of interviews?  Are you
8  aware of some standard of care that existed back in
9  the 1984, '85 time frame about how long a child sex
10 abuse interview should last before you're developing
11 concerns that it might become coercive in some way?
12     A  No, I don't have any specific information
13 on that.
14     Q  Okay.  Do you know whether there's some
15 consensus currently as to the length of time a child
16 sexual abuse interview should be limited to avoid
17 the risk of becoming coercive?
18     A  No, I haven't heard it stated in that way.
19 I think usually you try to size up based on how the
20 child is doing and kind of the attention span of the
21 child.  I -- I would imagine that typical interviews
22 would -- would not go beyond an hour, and probably
23 the average might take 45 or 50 minutes.  But I
24 don't know any specific rules.  In general, younger
25 children seem to tolerate less -- they can handle a

Case 3:11-cv-05424-BHS   Document 134-5   Filed 01/16/13   Page 27 of 38

Clyde Ray Spencer, et al. v.                                    William Bernet, M.D.
Former Deputy Prosecuting Attorney for Clark Co., et al         December 4, 2012

Page 101

1  shorter time, and older children handle longer
2  times.
3     Q   Would you agree that the studies show that
4  boys are less likely to disclose child sex abuse
5  than girls are?
6     A   Yes, that's my understanding, especially
7  if you included adolescents in that, that males
8  disclose less than females do.
9     Q   Does it become even less likely that a
10 male would disclose sexual abuse -- childhood sexual
11 abuse if the perpetrator of the abuse is another
12 male, thus creating concerns about homosexuality or
13 other issues?
14    A   I don't know if it is.  I mean, that seems
15 like it might be, but I -- I really don't know if
16 that's been studied.
17    Q   Okay.  As a result, though, of what you do
18 know, that it has been studied that boys are less
19 likely to disclose abuse than girls, does that lead
20 reasonably to child interviewers perhaps using
21 different interviewing techniques with boys than
22 girls and having to be, more often than with girls,
23 becoming more direct in their questioning of the
24 boys than the girls?
25    A   I don't know if it would or not.  It

Page 102

1  obviously wouldn't change the basic principles, but
2  it might change the details of how you go about it.
3     Q   Okay.  Would you agree that sometimes it's
4  necessary for a child interviewer to essentially
5  motivate a child to disclose through use of more
6  direct questioning or other interviewing techniques
7  when there is reason to believe that abuse occurred,
8  but the child -- and that it occurred to that child
9  and the child is not disclosing or is reluctant to
10 disclose?
11    A   I guess it depends on what you mean by
12 motivating.  The danger -- as I have said earlier,
13 the danger of doing anything like that, of pushing
14 the child in a certain direction, is the danger of
15 eliciting wrong or false information.  And I think
16 the more motivating the interviewer becomes, the
17 less reliable the information is going to be.
18        MR. FREIMUND:  Well, Dr. Bernet, those are
19    all the questions I have at this time.  I
20    appreciate your patience with me and for taking
21    the time to talk with me today.  Thank you.
22        THE VIDEOGRAPHER:  Counsel --
23        MR. JOHNSON:  Can we take a short break?
24        THE VIDEOGRAPHER:  Okay.  I need to change
25    tapes.

Page 103

1        MR. JOHNSON:  Yes.  We'll take a short
2     break, sure.
3        THE VIDEOGRAPHER:  Okay.  Here marks the
4     end of Tape No. 2.  Going off the record.  The
5     time is 16:59.
6        (Break was taken from 4:59 p.m. until
7     5:11 p.m.)
8        THE VIDEOGRAPHER:  We are back on the
9     record.  Here marks the beginning of Tape
10    No. 3.  The time is 17:11.
11            EXAMINATION
12  QUESTIONS BY MS. FETTERLY:
13    Q   Doctor, my name is Patricia Fetterly and I
14  represent one of the other defendants, James Peters.
15  I'd like to reference the top of page 12 of your
16  report in which you begin your discussion of the
17  interview conducted by...
18        MS. ZELLNER:  Patricia, let me just
19    interject here.  Could you mark that as an
20    exhibit?  I think it will be clearer for the
21    court.
22        MS. FETTERLY:  The report?
23        MS. ZELLNER:  Yes.  Just label it as an
24    exhibit.
25        MS. FETTERLY:  Right.  It has to be in

Page 104

1     Tennessee.  Does the reporter have a copy -- or
2     Doctor, do you have an extra copy of your
3     report that you could have the reporter mark?
4        THE WITNESS:  Yes.
5        MS. FETTERLY:  Okay.  Do you want to --
6     maybe you could hand it to the reporter and
7     have her mark that.
8        THE WITNESS:  (Witness complies.)
9        THE REPORTER:  This will be Exhibit No. 1.
10       THE WITNESS:  We are talking about the
11    report that is dated November 6, 2012 at the
12    very end?
13       MS. FETTERLY:  Actually, I'm talking
14    about -- it's just titled "Forensic Psychiatric
15    Consultation."  It's a...
16       THE WITNESS:  So it doesn't say revised on
17    it?
18       MS. FETTERLY:  I'm -- the one I have in
19    front of me does not.  But it was your initial
20    report.
21       THE WITNESS:  Okay.
22       MS. FETTERLY:  Which was the total of --
23    not including the attachment was 19 pages.
24    It's dated October 5, 2012.
25       THE WITNESS:  Okay.

Clyde Ray Spencer, et al. v. al 05424-BHS   Document 134-5   Filed 01/16/13   Page 28 of 38
Former Deputy Prosecuting Attorney for Clark Co., et al
William Bernet, M.D.
December 4, 2012

**Page 109**

1    A  Yes.
2    Q  Okay.  Do you have any reason to question
3  the accuracy of that?
4    A  No.  I don't know any -- that's not
5  something I would know about.
6    Q  Okay.  Now, in response to Mr. Freimund's
7  questions that you were asked, you stated that a
8  relatively, as I recall, small portion of your
9  forensic practice involved the evaluation of
10  interview techniques of what you and he were
11  discussing as the front-line investigators, meaning
12  police officers or child protective services
13  workers; is that correct?
14    A  Yes.
15    Q  Okay.  Other than this case, have you ever
16  had occasion to evaluate interview techniques
17  utilized by a prosecuting attorney in making a
18  decision whether to file criminal charges against a
19  suspect?
20    A  I don't remember such a situation.
21    Q  Have you ever had occasion to research
22  yourself protocols that are appropriate for a
23  prosecutor to utilize in conducting such interviews?
24    A  No.
25    Q  Are you familiar with any body of academic

**Page 110**

1  literature on that subject that would have been in
2  effect in 1984?
3    A  No, not that specifically -- not that
4  specifically relates to prosecutors.  I mean, some
5  of the bibliography that I came up with about
6  interviewing children and coercion and so on did
7  reference both legal literature and psychological
8  literature, and it referenced attorneys.  It didn't
9  specifically talk about prosecuting attorneys.
10    Q  Are you aware of what a prosecuting
11  attorney would look for in -- in determining or
12  making evaluations of the competence of a witness?
13    A  Well, my understanding from Mr. Peters'
14  deposition is that he is looking to see whether the
15  potential witness can tell a coherent account of
16  what happened, a coherent, logical account that
17  seems believable, that that's what he's looking for.
18    Q  And there would be certainly nothing
19  inappropriate with interviewing the witness to do
20  that, or the potential witness, to make that
21  evaluation; would that be correct?
22    A  That's correct.  I think that prosecutors
23  do that.
24    Q  Okay.  And are you aware of the procedure
25  utilized in the State of Washington to initiate

**Page 111**

1  criminal prosecutions?
2    A  No, not specifically.  I -- he may have
3  described it in his deposition; but other than that,
4  I wouldn't be familiar with it.
5    Q  Okay.  Specifically, do you know whether a
6  grand jury indictment is typically used as opposed
7  to the prosecutor himself or herself filing
8  information outlining facts which, if proven, could
9  lead to a conviction?
10    A  Right.  I'm not -- I don't know which way
11  that happens.
12    Q  And assuming that more commonly the latter
13  procedure, meaning that if the grand jury
14  procedure -- the grand jury indictment is used
15  rarely, and it's more common to use the filing of
16  information, do you know or have any understanding
17  of what a prosecutor looks for in reviewing a police
18  report which documents the interview of witnesses in
19  making a determination whether or not to file
20  charges?
21    A  No.
22    Q  Do you know what standard a prosecutor
23  would utilize to determine whether the allegation --
24  or whether the information set forth in a police
25  report is fabricated or not?

**Page 112**

1    A  Not specifically.  I think the ultimate
2  standard is probable cause, but I don't know
3  specifically what standard they might have to
4  determine fabrication.
5    Q  As I understood your earlier testimony,
6  you could not state with reasonable certainty in
7  response to one of Mr. Freimund's questions that
8  Detective Krause's reports contained fabrications;
9  is that correct?
10    A  That's correct.  I can only raise that
11  concern.  That would have to be combined with other
12  information.
13    Q  So would it be fair to say that there
14  would be no way that Mr. Peters could determine with
15  any sort of reasonable certainty in reviewing
16  Detective Krause's report whether or not they
17  contained fabricated information?
18    A  I don't think you can do it simply from
19  what's written on the paper.  I think you have to
20  combine that with other information that you might
21  know about the case.
22    Q  Okay.  And that would include, of course,
23  the handwritten statements provided by Shirley
24  Spencer, which, as Mr. Freimund pointed to you, was
25  the first disclosure from Kathryn in this case?

Clyde Case 3:11-cv-05424-BHS   Document 134-5   Filed 01/16/13   Page 29 of 38 William Bernet, M.D.
Former Deputy Prosecuting Attorney for Clark Co., et al
December 4, 2012

## Page 133

1     Q   -- so she can convey those to us?
2     A   Yes.
3      MS. FETTERLY: Thank you, Doctor.
4 Mr. Bogdanovich has some questions.
5       EXAMINATION
6 QUESTIONS BY MR. BOGDANOVICH:
7     Q   Good afternoon, Doctor. I don't expect
8 I'm going to take very long.
9      Are you all right to do -- to proceed or
10 would you like a break?
11     A   No, we can proceed.
12     Q   All right. Your revised report that was
13 marked as Exhibit 2 to your deposition, I see that
14 it bears a Vanderbilt University Medical Center
15 inscription on the top left of the first page; is
16 that correct?
17     A   Yes.
18     Q   Are you testifying on behalf of Vanderbilt
19 University Medical Center in this case?
20     A   No, I'm not.
21     Q   Okay. Why -- I'm wondering, then, why
22 does that appear at the top of the first page of
23 your report?
24     A   Well, this was my office stationery so
25 it's the stationery that I use in correspondence in

## Page 134

1 writing reports. So it doesn't mean -- I'm not
2 officially representing Vanderbilt University, but
3 this happens to be my office address where I'm a
4 professor at Vanderbilt University.
5     Q   Are you currently a professor at
6 Vanderbilt?
7     A   I'm retired. I'm a professor emeritus.
8     Q   When did you retire?
9     A   In June 30, 2012.
10     Q   On the bottom of page 4 of your revised
11 report, Exhibit 2, you make -- excuse me. You make
12 some references about Detective Krause's interviews
13 of Big Matt, Matthew Spencer. You say in that
14 paragraph at the bottom: "Detective Krause
15 repeatedly interviewed Big Matt and repeatedly asked
16 him if he had been sexually abused by his father.
17 As an adult, Mr. Matthew Spencer recalled how
18 Detective Krause asked him over and over what his
19 father had done until he eventually gave in and
20 described multiple acts of sexual abuse which he
21 later recanted."
22      Is that an accurate reading of your
23 report?
24     A   Yes, it is.
25     Q   So it's your understanding that the

## Page 135

1 statements that Detective Krause attributed to Big
2 Matt in her interview reports were, in fact, made by
3 Big Matt; is that correct?
4     A   Well, again, I don't know exactly how
5 those statements came down. I think -- see, the
6 problem is that Detective Krause had this
7 interviewing style of being very suggestive and
8 clearly wanting a certain kind of information from
9 the children. And so I don't really know whether
10 she's -- she made statements to Big Matt, Matthew
11 Spencer, and then asked him, Well, isn't that true,
12 what I just said, versus the child actually making
13 the statements himself. I guess I have described
14 that earlier when the grandmother observed that, the
15 follow-up, wrap-up part of the meeting, when
16 Detective Krause repeatedly would say to Big Matt,
17 Isn't it so that daddy did such and such? And Big
18 Matt would say yes.
19      So I don't know what actually happened
20 during the evaluation -- during the interview part
21 of those meetings.
22     Q   So are you now -- are you now backing away
23 from the statement that you made in your report
24 where you said: "Until he eventually gave in and
25 described multiple acts of sexual abuse." Do you

## Page 136

1 want to change that now?
2     A   Well, I'm just saying that I'm not sure
3 whether he described them or whether he described
4 them under a certain amount of coercion or whether
5 she described them and he agreed. I don't think any
6 of us know which one of those it was.
7      In her reports --
8     Q   It's --
9     A   I'm sorry. But in her report, of course,
10 she is relating that Matthew described them.
11     Q   Right. Do you notice in her reports, in
12 many instances she paraphrases or just describes
13 what the child witness has said. And in many other
14 instances, and in all of these reports, she will
15 attribute statements to children in quotes, correct?
16     A   Yes.
17     Q   And so are -- are you saying that you --
18 you believe some of what Detective Krause attributed
19 to the children in quotes was not, in fact, said in
20 those words by the children?
21     A   I didn't make the statement in such a
22 definitive manner. I said that --
23     Q   Okay.
24     A   -- based on the overall style of the
25 interviewing, it is possible that Detective Krause

Clyde Ray Spencer, et al 05424-BHS    Document 134-5    Filed 01/16/13    Page 30 of 38
William Bernet, M.D.
Former Deputy Prosecuting Attorney for Clark Co., et al
December 4, 2012

Page 137

1 made the statements, and the child was kind of put
2 in the position of agreeing with those statements.
3 And in her mind, she may have turned it around and
4 made it sound like the child made those statements.
5 In other words, I don't know which way it happened.
6    Q  Okay.  And I -- I appreciate that.  And I
7 just want to make sure we -- we finish up this
8 issue.  You're -- you're not going to be providing
9 any testimony in this case where you point to any
10 specific statement Detective Krause put in quotes
11 and your testimony is going to be that is a false
12 description of what the child said?
13    A  I don't think I would be that --
14    Q  Is that correct?
15    A  That's correct.  I would not be that
16 definitive, but I -- I guess I could say that we're
17 not sure whether those were the child's words or her
18 words.
19    Q  Okay.  Do you have any reason to believe
20 Detective Krause would have had any motive to
21 falsify information in any of her reports that she
22 generated in this case?
23    A  Well, overall she comes across as very
24 determined to get statements from the children and
25 that her perception was that the children had been

Page 138

1 abused, and that it was in a sense her mission to
2 get them to say that they had been abused.  That's
3 the way it comes across.  If I recall, she was asked
4 in her deposition whether she had ever found
5 children to have not been abused, and she gave a
6 very small number.  I kind of forget exactly what
7 was said, but her response was the vast majority of
8 people that she's evaluated really were abused.  And
9 so I think it was her mindset that these three
10 children had been abused by Mr. Spencer, and she was
11 an enthusiastic person and an energetic person who
12 saw that that was her job to get these statements.
13    So with that type -- with that kind of
14 tone, I think it's possible that she induced the
15 children to say things.
16    Q  Okay.  But that's not my question.  I
17 guess my question, to follow up on what you have
18 just explained, is it -- do you believe that
19 Detective Krause, because of her determination and
20 enthusiasm as you put it, went to the extent of
21 lying in her report about what the child victims
22 told her?
23    A  I don't know.
24    Q  In fact, you -- okay.
25    Would you expect that a nine-year-old boy

Page 139

1 would have experienced an erection at some point in
2 his life?
3    A  Yes.
4    Q  Have you ever known of a nine-year-old boy
5 who hadn't?
6    A  Well, I don't -- I don't know, but it's
7 normal for that to have happened.
8    Q  Now, you talked about the use of
9 anatomical dolls, and I think you've expressed
10 criticism because Detective Krause mentions that
11 when she used the dolls, they were provided to the
12 children naked.
13    Is that -- is that your criticism of that?
14    A  Yes.
15    Q  Okay.  Do you have any knowledge of what
16 the standard practice was in 1984 and '85 among law
17 enforcement interviewers in the use of the
18 anatomically correct dolls with -- with regard to
19 whether they would be presented to the child clothed
20 or naked?
21    A  Well, not specifically.  But I've got to
22 tell you, I have never -- I mean I have heard about
23 and read about and even used anatomical dolls, you
24 know, for many, many years.  And I have never heard
25 anybody propose showing them initially to the child

Page 140

1 naked.  So to me it's -- it struck me as very, very
2 unusual.
3    Q  Okay.  But my specific question to you is
4 do you have any basis to express an opinion about
5 whether that did or did not violate whatever
6 standard practice was in effect in 1984 and '85
7 among law enforcement or CPS field interviewers?
8    A  No, I don't have specific information
9 about that.
10    Q  You expressed criticism of Detective
11 Krause for telling each child what the other child
12 had said, correct?
13    A  Yes.
14    Q  Do you know if that violated the generally
15 accepted standard for conducting interviews among
16 field interviewers in 1984, '85?
17    A  I don't know.
18    Q  You were asked earlier today about the
19 handwritten narrative statement that Shirley Spencer
20 generated to document the first disclosure made by
21 Kathryn.
22    Do you -- you recall that testimony?
23    A  Yes, I do.
24    Q  I think you said that -- that we don't
25 know whether Shirley used leading questions at any

Page 141

1  point in her interaction with Kathryn on that first
2  occasion because we don't know everything that was
3  said.
4       But my question to you is based upon what
5  she did document in that handwritten statement, do
6  you believe she used inappropriate, leading or
7  suggestive questions?
8    A  Well, there are some suggestions of her
9  suggestive questions because -- well, the one thing
10 I remember right off the top of my head is -- is the
11 next day she said, I continued to ask questions when
12 they were at the beach and Little Matt was off doing
13 something else.  And so that -- that indicates that
14 she was determined to get to the bottom of this and
15 find out if there was additional information that
16 she could find out from Kathryn, and so...
17   Q  But does that statement in itself give you
18 a basis to conclude that she, in fact, asked leading
19 or suggestive questions?
20   A  It is simply consistent with that.
21 It's -- it -- it conveys her state of interest in
22 finding out what happened and that people who have
23 that approach frequently fall into the problems --
24 especially untrained people -- fall into the problem
25 of asking suggestive questions.  In other words, to

Page 142

1  ask her, Well, what else did he do?  What else did
2  he do?  Did he do this?  Did he do something with
3  his mouth?  Did he do something with his penis?
4       In other words, people who -- untrained
5  people who are motivated to get to the bottom of
6  what happened routinely ask questions like that.
7       MR. BOGDANOVICH: I think that's all I
8  have, Doctor.  Thank you.
9       THE WITNESS: You know, I might have
10 misstated one thing, Mr. Bogdanovich.  Let's
11 see if I can remember what it was.  Just a
12 minute ago -- let's see.  What -- you were
13 asking me about the dolls, and then it was
14 something else.  Well, I'm sorry.  I can't -- I
15 should have written down a note to myself.  It
16 wasn't a big deal, but I should have qualified
17 what I said that -- and at the moment, I can't
18 remember what it was.  And so I can't really --
19 I can't really clarify it.  I'm sorry.
20 BY MR. BOGDANOVICH:
21   Q  Do you recall if it was some comment
22 around when we were talking about the
23 anatomically-correct dolls?
24   A  It was after that.
25   Q  Was it on that subject or the next one we

Page 143

1  covered?
2    A  It was the next subject, I think.
3    Q  Perhaps you could have the court reporter,
4  if you would like, look at what the next question
5  and answer were following the last reference to
6  anatomically-correct dolls because I'd like to give
7  you a chance --
8    A  Yes.
9    Q  -- to explain whatever you had recalled.
10   A  Why don't we try to do that.
11      (Question read back.)
12      THE WITNESS: I think -- I think that's
13 it.  You were asking me if I had specific
14 information about the use of the dolls being
15 naked, whether that violated...
16   Q  Right.
17   A  And I simply said no, but I -- what I
18 meant to qual -- I should have qualified it by
19 saying that use of the dolls like that is simply
20 another example of a leading question or a
21 suggestive question.
22      In other words, if you present to a child
23 naked, anatomically-correct dolls, you are
24 suggesting to them that there's something sexual you
25 want them to demonstrate.  And so even though I'm

Page 144

1  not aware of any specific protocols or rules about
2  that, it comes -- in my mind, it comes under the
3  general heading of don't ask things in a coercive,
4  suggestive way.
5       And actually the same thing because you
6  also asked me was there a protocol regarding asking
7  children -- letting -- letting the children know
8  that other children had said certain things.  And
9  that's also suggestive.  So I mean there may or may
10 not be a specific rule, but it comes under my
11 general criticism that if you say to a child, By the
12 way, this other child told me such and such, that's
13 extremely suggestive, that -- that the child you're
14 interviewing might want to say the same thing.
15 So --
16   Q  And I understand.  Okay.
17   A  Well, I'm just saying that even though I'm
18 not aware of any specific rules or protocols, I
19 think that all those things come under the general
20 heading of a coercive, suggestive approach.
21   Q  And I understand of your gen -- your
22 opinions, generally, about leading, suggestive
23 coercive questions.  But my questions that I think
24 you had answered actually previously had to do with
25 specifically whether you were aware of standards in

**Page 145**

1  '84 and '85 that would have addressed that. And I
2  think your answer to both of those subjects was no,
3  correct?
4      A  Not specific standards, but certainly
5  generally they would have violated the general
6  principle.
7      Q  And I did mean to ask you, Doctor, are you
8  aware of any occasions where Detective Krause was
9  found to have falsified information in reports in
10  any other cases?
11      A  No.
12      MR. BOGDANOVICH: Thank you.
13      MR. FREIMUND: I need to ask some
14  follow-up here. It shouldn't take much longer,
15  but if you need to take a break first,
16  Dr. Bernet, that's fine with me.
17      THE WITNESS: No, I don't need a break.
18          EXAMINATION
19  QUESTIONS BY MR. FREIMUND:
20      Q  I want to direct your attention, please,
21  to Exhibit 2, your supplemental report after you
22  read Dr. Esplin's report.
23      Could you, first, look at pages 4 through
24  the top of page 6 when you are talking about
25  repetitive questions by Detective Krause.

**Page 146**

1      Would you agree with me that you cite no
2  examples of repetitive questioning by Detective
3  Krause in regards to her interviews of Little Matt
4  Hanson?
5      A  You're asking me about repetitive
6  questions on those two pages? That's correct. I
7  don't have any examples from Little Matt.
8      Q  Is that because you didn't find any
9  examples of the Detective Krause using repetitive
10  questioning with Little Matt?
11      A  Probably that's correct.
12      Q  Okay. Let's go to suggestive questions.
13  There you did find examples of suggestive questions
14  on pages 6 through the top of page 9 as to all three
15  of the alleged victims, right?
16      A  Yes.
17      Q  But when you go to leading questions by
18  Detective Krause on page 9, you only identify
19  leading questions as having been used with Kathryn
20  and not either Big Matt or Little Matt, correct?
21      A  Yes.
22      Q  Is that because you did not see any
23  examples of Detective Krause using leading questions
24  with both of those boys?
25      A  Yes, I think that's correct, what you just

**Page 147**

1  said.
2      Q  Okay. Let's go to the next category you
3  have there, starting at page 9 and extending to the
4  top of page ll, Detective Krause's coercive style of
5  interviewing. You indicate that she had a coercive
6  style in interviewing Kathryn Spencer and Matt
7  Spencer, but you did not find any evidence of a
8  coercive style of interviewing by Detective Krause
9  of Little Matt Hanson, did you?
10      A  I don't think so, at least not that would
11  fit under this definition that I'm using here.
12      Q  Okay. Let's go to the next area there
13  that you talk about on pages 11 and 12, Detective
14  Krause's pattern of reinforcing positive behavior.
15  You found no evidence of a pattern of reinforcing
16  positive behavior used by Detective Krause in her
17  interview of Little Matt Hanson; isn't that correct?
18      A  That is correct.
19      Q  Is it your knowledge, sir, that even
20  though you didn't find very much fault in the
21  interviews of -- Detective Krause's interviews of
22  Little Matt other than the use of suggestive
23  questioning on a few occasions, that Little Matt
24  Hanson, to your knowledge, has not recanted the
25  abuse, like, by Mr. Spencer?

**Page 148**

1      A  That is my understanding.
2      Q  Okay. And just on -- on the -- on Peters,
3  your criticism of defendant Jim Peters, you would
4  agree, would you not, that Mr. Peters had no
5  coercive influence whatsoever on the disclosures
6  made by Matt Spencer and Little Matt Hanson because
7  he had no involvement -- or no interviews of him to
8  your knowledge, right?
9      A  As far as I know, that's correct.
10      Q  Okay. So the only child that Mr. Peters
11  may have had some coercive influence on in your
12  opinion would be Kathryn Spencer and not the other
13  two boys, right?
14      A  That is correct.
15      Q  All right. I want to direct your
16  attention, now, please to page 22 of Exhibit 2 and
17  focus your attention on your third opinion there.
18      You say there that: "The investigative
19  interviews conducted by Detective Krause and
20  Mr. Peters were so improper, coercive and
21  psychologically abusive that the interviewers knew
22  or should have known that they would yield false
23  information."
24      When you were asked about that a little
25  while ago, you said that -- by Ms. Fetterly, I would

Clyde Ray Spencer, et al v.05424-BHS   Document 134-5   Filed 01/16/13   Page 33 of 38
Former Deputy Prosecuting Attorney for Clark Co., et al                    William Bernet, M.D.
                                                                          December 4, 2012

**Page 149**

1  say -- I should say -- that they knew or should have
2  known that it -- it could lead to unreliable
3  information. And I want to pin you down on that,
4  sir.
5      Are you saying that they knew that these
6  kids were giving them false information, or are you
7  ·saying they knew or should have known that because
8  of the use of repetitive questioning on some of the
9  kids, leading questions on some of the kids, that
10  they knew that false information was coming from
11  those kids?
12     A  Yes. I would say that they knew or should
13  have known that the information was unreliable and
14  that it could well be false.
15     Q  Okay. But let's make this distinction,
16  and I want to be careful about it.
17      Wouldn't you agree that there's a
18  difference between something being unreliable and
19  something being categorically false?
20     A  Yes. You know, I think I tried to make
21  the distinction in the very last sentence of the
22  discussion part of that conclusion on the next page.
23  And I say: "When interviews are conducted in that
24  manner, it is likely that false information will be
25  elicited and the children's statements become

**Page 150**

1  unreliable."
2      So that -- the problem is that when you
3  elicit a lot of information, you don't know which
4  part is correct or true and which parts are false.
5  And since you don't know, you can't figure it out.
6  The overall result is that the child is unreliable.
7  I guess that's what I'm trying to say here.
8     Q  Okay. I appreciate that qualification.
9     A  And that, yes, that they -- that they
10  should have known that some of the statements that
11  are being produced are going to be true, and some
12  are going to be false. They should have known that.
13     Q  Okay. But they couldn't know which of
14  them were true and which of them were false, could
15  they?
16     A  Well, I suppose maybe a person could
17  figure that out if you were doing a comprehensive
18  investigation, and you were going back and you
19  collected information from the very beginning, a
20  really careful analysis of how Kathryn's statements
21  originally arose. And then you could dissect from
22  there which subsequent statements were influenced by
23  the interviews by Detective Krause, and you could
24  ultimately try to figure out -- maybe not a hundred
25  percent, but you could figure out somewhat -- what

**Page 151**

1  statements were true and what statements were false.
2     Q  But which -- when -- what we are talking
3  about here, though, is you're saying that Detective
4  Krause and Mr. Peters knew or should have known that
5  particular statements were true or false. And
6  that's what I'm asking you. Which -- how would they
7  know that?
8     A  Oh, I'm not -- I don't think I said that
9  they should know particular statements. I think
10  that they should have known that you are going to
11  end up with a mishmash of some true and some false
12  information. And you have no way -- unless you
13  really do a very thorough investigation, you are not
14  going to be able to figure out which are which.
15     Q  And I want to go back to your earlier
16  testimony today just to be sure I'm understanding
17  this opinion labeled No. 3 in your report.
18      I believe, and please correct me if I'm
19  wrong, but I believe you testified you cannot say
20  that the disclosures of sexual abuse made by these
21  children saying that their father sexually abused
22  them were false.
23      You don't have an opinion on that; am I
24  right?
25     A  I don't have an opinion in the sense that

**Page 152**

1  I have stated it here. I mean, I have thoughts
2  about that, if you want my thoughts. But I guess --
3  I wasn't really asked. I wasn't really asked to
4  figure that out or to give an opinion about that, so
5  I don't have an official opinion on that.
6     Q  And you can't say to a reasonable degree
7  of psychiatric certainty that the disclosures made
8  by these children that they were sexually abused by
9  Clyde Ray Spencer are false?
10     A  That is correct. But I've got to tell
11  you, I have a really high level of suspicion just
12  from things we've talked about here today, that
13  partly the very initial outcry made by Kathryn is in
14  the context of her doing something naughty and being
15  reprimanded. And she's reprimanded, and then she
16  suddenly says, Oh, mommy does this. That other
17  lady, Karen, does this. Daddy does it.
18      That's a classic example of how a false
19  allegation arises. And then the interviews by
20  Detective Krause are classic examples of how a
21  thought in the child then gets made into these
22  verbal statements because the child is trying
23  really, really hard to say what the interviewer is
24  assuming is the correct answer, that the interviewer
25  feels is a correct answer. So there's lots in this

Page 153

1  case that are absolutely typical of how false
2  allegations come about.
3      But to tell the truth, I wasn't asked to
4  give an opinion on that, so -- but I can just
5  explain to you that there are alternative
6  explanations that are very, very strong and
7  convincing.  The alternative explanations are
8  convincing, that I think that's kind of thing that
9  should be taken into consideration.
10     Q  Would you agree that you have no opinion
11 regarding whether Defendant Davidson knew or should
12 have known that the interviews conducted in this
13 case revealed false information?
14     A  I have not expressed that opinion, and I
15 don't think anybody is going to ask me that.  But I
16 would think that an experienced prosecutor could
17 have read over these interviews and seen that they
18 were problematic, that they were done in such a way
19 that the children were endorsing the assumptions or
20 the preconceived notions of the interviewer.  And I
21 really don't know whether he was in a position to
22 know that they were yielding some false information;
23 but I think if he had looked at them closely, he
24 would have come to the same conclusion that I have.
25     Q  Why wouldn't he come to the same

Page 154

1  conclusion that Dr. Esplin reached, that a
2  reasonable investigator would not have known that
3  they would yield false information?  Why would he
4  come to your conclusion instead of Dr. Esplin's
5  opposite conclusion?
6      A  I think that the -- the idea, the
7  fundamental principles that children can be easily
8  influenced by the way they're questioned is so -- is
9  so well known that anybody in the 1980s or 1970s or
10 1960s should have known that if you browbeat the
11 child and that if you have a preconceived notion,
12 you're going to get the child to recite what you're
13 trying to get them -- get out of them.  I mean, I
14 just think that that was so widely known that I
15 disagree.
16     See Dr. Esplin actually is simply saying
17 that it wasn't -- that that concern wasn't in the
18 official, formal directions that were given to
19 front-line investigators.  I don't know what was in
20 those actual protocols that they may have used
21 during that time.  But I'm taking the position or
22 I'm saying that this basic notion of how easily
23 influenced children are is -- is -- is a known for a
24 hundred years to any intelligent person who
25 interacts with children, and that it -- it doesn't

Page 155

1  have to be in the protocol.
2      Q  Okay.  Let me go back to my question,
3  though:  Why would a reasonable investigator agree
4  with you that, Hey, everybody would know, reading
5  these reports, that false information or at least
6  unreliable information may come out of these
7  interviews?
8      A  Well, because --
9      Q  And they disagree with Dr. Esplin who
10 reaches the opposite conclusion?
11     A  Oh, I think that you can --
12     MR. JOHNSON: I want to object, Doug, to
13     asking him -- the intention to the question is
14     compound times two, and it's been asked and
15     answered.
16 BY MR. FREIMUND:
17     Q  Do you understand my question, Doctor?
18     A  You know, I think Dr. Esplin and I are
19 saying two different things.  He is saying that
20 whatever formal directions or protocols that existed
21 at that time did not explicitly spell out don't ask
22 leading questions.  I don't know what those
23 protocols said in 1984.  I'm saying something
24 different.  I am saying any intelligent mental
25 health professional or legal person who interviews

Page 156

1  children on a regular basis would have known that
2  that's a problem.  And in fact, Detective Krause,
3  herself, said that.  She, herself, said in her own
4  report I'm being careful not to ask leading
5  questions.  So she did know the general principles
6  that I have been talking about.
7      Q  Okay.  Well, let's go to page 19 of
8  Exhibit 2.  And in the first full paragraph there,
9  you quote Dr. Esplin's conclusion as being: "Given
10 the standard of care and the information available
11 to field professionals during the 1984 or the 1985
12 time frame, reasonable field professionals would not
13 have known that the investigative techniques
14 utilized in this case were so coercive and abusive
15 that false information would result."
16     What I'm suggesting to you, Dr. Bernet, is
17 that's a diametrically opposite conclusion from what
18 you reached in -- on page 22 under No. 3.
19     A  Okay.
20     Q  Would you agree with that?
21     A  Yes, I think I would.  And I think the
22 difference is that Dr. Esplin is taking the position
23 that those front-line field professionals are
24 only -- their behavior is only determined by
25 whatever written guidelines existed.  And I'm taking

Clyde Ray Spencer, et al v. 05424-BHS   Document 134-5   Filed 01/16/13   Page 35 of 38 — William Bernet, M.D.
Former Deputy Prosecuting Attorney for Clark Co., et al
December 4, 2012

Page 157

1  the position that those front-line field
2  professionals would have known in a broader sense
3  how to have a conversation with children and the
4  implications of those conversations even if there
5  were no specific written guidelines.
6      Q  So just going back to the one other
7  question I had there.  I just want to make sure I
8  understood your testimony about defendant Davidson.
9      You referenced him as a prosecutor, I
10 think inadvertently.  But is it your view that
11 defendant Davidson knew or should have known that
12 Krause's -- Detective Krause's and Prosecutor
13 Peters' interviews would yield false information?
14     A  Yeah.  I'm sorry.  You know, I guess
15 Davidson was Detective Krause's supervisor and would
16 have reviewed this.
17     Q  Right.
18     A  Yeah, I got him mixed up with Davis, I
19 think the other guy's name is -- Curtis.  Curtis is
20 the other person.
21     That's correct.  I think that an
22 experienced investigator looking at the details of
23 those written reports would have been concerned
24 about the coercive nature of them.
25     MR. FREIMUND: All right, sir.  That's all

Page 158

1  I have for you in follow-up.  Anyone else?
2      MS. FETTERLY: Before we go off record --
3      MS. ZELLNER: Just a second.
4      MR. BOGDANOVICH: I do have a few
5  follow-ups.
6      MS. ZELLNER: Yes.  And I have two
7  questions so...
8          EXAMINATION
9  QUESTIONS BY MR. BOGDANOVICH:
10     Q  Dr. Bernet, you mentioned that it was your
11 understanding that Detective Krause testified in her
12 deposition that there were only a few cases she had
13 investigated where she did not find child abuse had
14 occurred; is that correct?
15     A  Yeah.  That's my memory of that.
16     Q  Okay.  And that would be consistent,
17 wouldn't it, with the statistics that were in the
18 Summit report at that time about the rarity of
19 children who disclose doing so falsely?
20     A  Again, we're -- I don't know if it's
21 consistent or not because I don't know whether
22 they're talking about outright, purposeful lying or
23 they're talking about false allegations that come
24 about for several -- fifteen different reasons.  So
25 I'm not sure if it's consistent.

Page 159

1      Q  All right.  Let me ask you this:  Under
2  the opinion No. 3 on your revised report that we've
3  been discussing that the investigative interviews
4  conducted by Detective Krause and Mr. Peters were so
5  improper, coercive and psychologically abusive that
6  the interviewers knew or should have known that they
7  would yield false information.
8      I take it, now, based upon the
9  clarification that's been made about your absence of
10 any findings of coercive or leading questions by
11 Detective Krause in the interview of Little Matt,
12 that this opinion, No. 3, does not apply to
13 Detective Krause's interviews of Little Matt; is
14 that correct?
15     A  Well, I'm not really sure.  You know,
16 you-all have clarified, you know, what was said here
17 earlier.  I think that to be honest with you at this
18 particular moment, I would have to say I'm not sure
19 whether they would apply to those.  And I would
20 really have to go back and look at the details of
21 those interviews to see whether or not this
22 conclusion applies to that.
23     Q  Well, when we went through the different
24 sections of your report here a few minutes ago, I
25 believe, and correct me if I'm wrong, but I believe

Page 160

1  the only examples you were able to find in all of
2  your review of all the interview reports in this
3  case with regard to Detective Krause's interviews of
4  Little Matt were questions which you deemed
5  suggestive, correct?
6      A  Yeah, what you are saying is correct.  But
7  frankly, I simply don't know whether my not
8  including other examples was I didn't find them or I
9  didn't look for them or I ran out of time.  In other
10 words, I simply -- I don't know the answer to
11 whether or not the -- conclusion 3 applies to Little
12 Matt.
13     MR. BOGDANOVICH: All right.  Thank you.
14 That's all I have.
15          EXAMINATION
16 QUESTIONS BY MS. ZELLNER:
17     Q  Okay.  I just have a couple questions,
18 Doctor.
19     Are all of the opinions in both of your
20 reports based upon a reasonable degree of medical
21 certainty?
22     A  Yes, the opinions are.
23     Q  Okay.  The second thing is, you did
24 actually review an official court transcript of the
25 videotape, right?  You received that this morning?

Page 161

1   A   Yes, I did.  Yes.
2   Q   Okay.  And that was done by an official
3   court reporter, correct?
4   A   Yes, it was.  I believe it was.
5   Q   Okay.  And then on this issue on -- well,
6   actually let's go to page 24 of Exhibit 2.
7   A   (Witness complies.)
8   Q   And do you see the last paragraph of your
9   opinion, it says -- and you're referring to Peters
10  -- "In his declaration prepared in May of 2012,
11  Mr. Peters said that one of the purposes of his
12  interview with Kathryn was, quote, to evaluate her
13  competence as a witness, end quote.  However,
14  Mr. Peters made no attempt to evaluate Kathryn's
15  competency in a traditional manner.  Rather than
16  asking Kathryn to describe a neutral past event, he
17  focused on whether Kathryn would tell him what she
18  had previously told Detective Krause.  He did not
19  appear to be evaluating her competence to testify as
20  a witness."  Have I read that correctly?
21  A   Yes, you did.
22  Q   Okay.  And is that your opinion?
23  A   Yes, it is.
24  Q   Is that a correct opinion?  Okay.
25      Now going back to page 22, the statement

Page 162

1   about the investigative interviews conducted by
2   Detective Krause and Mr. Peters was "so improper,
3   coercive, and psychologically abuse that the
4   interviewers knew or should have known they would
5   yield false information."
6       You would agree with me, would you not,
7   that's not limited to leading questions; that
8   encompasses leading, suggestive, repetitive
9   questions?  That you were not trying to limit that
10  opinion to just leading questions?
11  A   Well, that's --
12      MR. FREIMUND: Objection, leading.  That
13  was a leading question.
14      MR. BOGDANOVICH: Join.
15  BY MS. ZELLNER:
16  Q   I'm just asking you, Doctor.  It's not
17  limited?  If you look at page 23, you have not
18  limited that opinion to simply leading questions.
19  If you want to take a minute, read it.
20      MR. FREIMUND: Same objection.  That's
21  leading.
22      THE WITNESS: Well, I agree that the
23  coercive aspect of the interviews was not
24  limited to the leading, suggestive, and
25  repetitive questions.

Page 163

1       But there were also other things, such as
2   praising the child for doing certain things,
3   accusing the child of lying.  The whole thing
4   about saying that they were doing this in order
5   to be helpful to daddy is to me a coercive
6   thing to say to a six-year-old -- or a
7   five-year-old.  And so I think that the
8   coercive quality embraces a number of different
9   aspects of the interviews.
10  BY MS. ZELLNER:
11  Q   Okay.  And does that also include Little
12  Matt and Matthew Spencer, whom you laid out examples
13  of earlier?  Are you incorporating all of that into
14  that opinion?
15  A   Yes.
16      MR. BOGDANOVICH: Objection.  It's been
17  asked and answered.  He said he could not state
18  that at this time.
19      MS. ZELLNER: No.  Actually, I think
20  reading the report, it's pretty clear what the
21  report says about it.  That's why I asked him
22  to reread it and tell me if, in fact, you are
23  referring to all three children since you've
24  given multiple examples in the pages beforehand
25  of the improper questioning.

Page 164

1       MR. BOGDANOVICH: Same objection.
2       MS. FETTERLY: I join.
3       MS. ZELLNER: Well, he has a right to read
4   his opinion and be accurate.
5   BY MS. ZELLNER:
6   Q   So if you could tell me, does that opinion
7   apply to all three children?
8       MR. BOGDANOVICH: Object; asked and
9   answered.
10      THE WITNESS: Yes.
11      MS. ZELLNER: Why don't you let him
12  answer.
13      MR. BOGDANOVICH: Well, he can answer.  I
14  have not instructed him.  I have no authority
15  to.  I'm stating my objection and I will every
16  time you ask him.
17      MS. ZELLNER: Right.  You stated it twice.
18  We got it.
19  BY MS. ZELLNER:
20  Q   Could you answer my question?
21  A   Yes, it does.
22  Q   Does it apply to all three children?
23      MR. BOGDANOVICH: Objection; asked and
24  answered.
25      THE WITNESS: My conclusion does apply to

Clyde Case 3:11-cv-05424-BHS    Document 134-5    Filed 01/16/13    Page 37 of 38 am Bernet, M.D.
Former Deputy Prosecuting Attorney for Clark Co., et al
December 4, 2012

Page 165

1    all three children.
2    BY MS. ZELLNER:
3    Q   Okay. Let's put it on the record again.
4    They keep interrupting the answer.
5        Does this opinion on page 22 and 23 apply
6    to all three children?  And their objection is
7    noted.  Please answer it.
8    A   Yes, it does apply to all three children.
9    Q   Thank you.
10       THE VIDEOGRAPHER: Counsel, there's five
11   minutes left on the tape.
12       MS. ZELLNER: Yes. We're done.
13       MS. FETTERLY: I have a follow-up.
14       EXAMINATION
15   QUESTIONS BY MS. FETTERLY:
16   Q   Referring back to Deputy Prosecutor
17   Peters, I think, if I understood your earlier
18   question, Dr. Bernet, you are not testifying on a
19   degree of reasonable certainty that Deputy
20   Prosecutor Peters knew that the reports of
21   Detective Krause that were written in October of
22   1984 contained false information; is that correct?
23   A   Yes. That he -- as far as I know. I --
24   well, I guess the real answer is I don't know
25   exactly what he knew about the reliability of what

Page 166

1    she said in her report.
2        But I think the question is did I have any
3    reason -- did I have any evidence that he did know
4    and that they were fabrications?  And no, I don't
5    have any evidence to that effect.
6    Q   I just wanted to clarify that.
7        And I think as we've established, Deputy
8    Prosecutor Peters did not initiate the criminal
9    charges in January of 1985, which is the first
10   criminal charges, correct?
11   A   That is correct.
12   Q   And that followed what you described as
13   his coercive interview in December of 1984.
14       Do you know what effect that so-called
15   interview, as you described it, had on the filing of
16   the charges, the decision made by --
17       MR. JOHNSON: Same objection.  Foundation.
18       MS. FETTERLY: I'm asking if he knows.
19       THE WITNESS: It's my understanding --
20       MR. FREIMUND: Wait a second.  Ms. Zellner
21   asked questions.  You're objecting.  You're
22   only allowed to have one lawyer per side to
23   participate in this.
24       MR. JOHNSON: If you want to follow the
25   rules, you guys are going back and forth about

Page 167

1    ten times.  That is not exactly standard
2    protocol either.
3        MS. FETTERLY: We're not representing the
4    same parties.  Go ahead.  You can answer,
5    Doctor.
6        MR. JOHNSON: Same objection; foundation.
7        THE WITNESS: Can you say the question
8    over?
9    BY MS. FETTERLY:
10   Q   What effect, if any, do you know that that
11   interview, which you described as coercive that
12   Mr. Peters conducted in December of 1984, what
13   effect did that have on the decision by Mr. Curtis a
14   month later to file charges?
15       MR. JOHNSON: Same objection; foundation.
16       THE WITNESS: It's my understanding that
17   Mr. Peters' opinion was to not file charges but
18   his supervisor's opinion was to go ahead and
19   file charges.  I might have that mixed up in
20   some way, but that's my memory of what was said
21   in his deposition.
22   BY MS. FETTERLY:
23   Q   So then how is that consistent with a
24   theory that Mr. Peters was looking for a basis to
25   file charges against Mr. Spencer?

Page 168

1    A   He was disappointed.
2        MR. JOHNSON: Objection.  Same objection.
3    And vague.
4        THE WITNESS: He was disappointed in the
5    outcome of the interview.  His motivation, his
6    intention was to collect information in an
7    interview that would support filing charges but
8    he did not get what he had hoped for.
9    BY MS. FETTERLY:
10   Q   And why do you assume that?
11   A   Well, I'm assuming that that's why he was
12   doing it, that he was hoping to get a basis for
13   filing charges because that's what prosecutors do.
14   But he said --
15   Q   You're saying that you --
16   A   He said in his --
17   Q   Go ahead.
18   A   He said in his deposition that it did not
19   turn out the way he wanted it, that she was -- she
20   was not a really good witness.  And so he ended up
21   not having the information or the good witness that
22   he needed.
23   Q   Are you sure he expressed disappointment
24   that he didn't have it or he just simply said he
25   expressed the opinion to Mr. Curtis that she was

REPORTER'S CERTIFICATE

1

2          I certify that the witness in the

3   foregoing videotaped/videoconferenced deposition,

4   WILLIAM BERNET, M.D., was by me duly sworn to

5   testify in the within-entitled cause; that the said

6   deposition was taken at the time and place therein

7   named; that the testimony of said witness was

8   reported by me, a Shorthand Reporter and Notary

9   Public of the State of Tennessee authorized to

.0   administer oaths and affirmations, and said

.1   testimony, pages 7 through 171, was thereafter

.2   transcribed into typewriting.

.3          I further certify that I am not of counsel

.4   or attorney for either or any of the parties to said

.5   deposition, nor in any way interested in the outcome

.6   of the cause named in said deposition.

.7          IN WITNESS WHEREOF, I have hereunto set my

.8   hand the 11th day of December, 2012.

.9

:0

:1

:2

3   

4

5          Deborah J. Harris, TLCR No. 472
       My commission expires: 5/03/2016