# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

---

CLYDE RAY SPENCER, MATTHEW RAY )
SPENCER and KATHRYN E. TETZ, )
)
Plaintiffs, )
)
v. ) No. 11-5424 BHS
)
FORMER DEPUTY PROSECUTING ATTORNEY FOR )
CLARK COUNTY JAMES M. PETERS, DETECTIVE)
SHARON KRAUSE, SERGEANT MICHAEL )
DAVIDSON, CLARK COUNTY PROSECUTOR'S )
OFFICE, CLARK COUNTY SHERIFF'S OFFICE, )
THE COUNTY OF CLARK, SHIRLEY SPENCER )
and JOHN DOES ONE through TEN, )
)
Defendants. )
)

---

DEPOSITION UPON ORAL EXAMINATION OF

MATTHEW RAY SPENCER

---

Tuesday, November 13, 2012
10:00 a.m.
1201 Third Avenue, Suite 2200
Seattle, Washington




Reported by Marlis J. DeJongh, CCR, RPR

Lic. No. DE-JO-NM-J498K9

Page 2

APPEARANCES

For the Plaintiffs:   KATHLEEN J. ZELLNER
                      and DOUGLAS H. JOHNSON
                      Attorneys
                      1901 Butterfield Road,
                      Suite 650
                      Downers Grove, Illinois 60515

For Defendant Davidson:   JEFFREY A.O. FREIMUND
                          Attorney
                          711 Capitol Way S, Suite 602
                          Olympia, Washington 98501

For Defendant Krause:   GUY BOGDANOVICH
                        Attorney
                        2674 R W Johnson Blvd. SW
                        Tumwater, Washington 98512

For Defendant Peters:   PATRICIA C. FETTERLY
                        Assistant Attorney General
                        7141 Cleanwater Drive SW
                        Olympia, Washington 98504

Court Reporter:   MARLIS J. DeJONGH, CCR, RPR
                  1400 Hubbell, Suite 1510
                  Seattle, Washington 98101

Page 3

INDEX OF EXAMINATION

                                          Page(s)
Examination of Matthew Ray Spencer
  By Mr. Bogdanovich          4
  By Mr. Freimund            109
  By Ms. Fetterly            133
  By Ms. Zellner             149
  By Mr. Bogdanovich         191
  By Mr. Freimund            194
  By Ms. Fetterly            196
  By Mr. Bogdanovich         198

INDEX OF EXHIBITS

No.  Description                          Marked

1.  Document 0000309-319                    42
2.  3/25/85 Utility Report                  55
3.  Declaration of Matthew                  57
    Ray Spencer
4.  3/2/03 Letter to Governor Locke         81
5.  Hearing Transcript, 7/10/09             89

Page 4

1   MATTHEW RAY SPENCER, deponent herein, being first duly
2      sworn on oath, was examined and
3      testified as follows:
4
5              EXAMINATION
6   BY MR. BOGDANOVICH:
7       Q.  Would you state your full name and spell your last
8   name, please.
9       A.  Matthew Spencer, M-a-t-t-h-e-w, Ray, R-a-y,
10  Spencer, S-p-e-n-c-e-r.
11      Q.  Mr. Spencer, have you ever had your deposition
12  taken before?
13      A.  I've never had a deposition. I've only made
14  testimony in court.
15      Q.  Are you referring to the occasion when you appeared
16  in court in July 2009 in connection with a hearing about
17  your recantation of statements that you had made about abuse
18  by your father?
19      A.  Correct.
20      Q.  I want to mention a few things about the deposition
21  procedure to ask you to keep in mind today.
22      Obviously there is a verbatim record being made, so one
23  of the things I need to ask you to do is make sure and wait
24  until I finish my question before you start your answer, and
25  I will try to do the same thing, wait for you to completely

Page 5

1   finish your answer before I start my next question so that
2   we don't end up with two people talking at once. That
3   becomes very difficult for our court reporter to transcribe.
4   Okay?
5       A.  Okay.
6       Q.  Also I need you to answer audibly, whether that's
7   yes, no, or whatever words are necessary, rather than
8   shaking your head or nodding, because, again, I can see that
9   across the table and understand what you're communicating to
10  me but it doesn't come out on a written record. So if you
11  can try to remember to answer audibly, I would appreciate
12  it, okay?
13      A.  Okay.
14      Q.  Also if I ask any questions that you don't
15  understand or are confusing to you for any reason, let me
16  know that and I'll see if I can figure out a way I can
17  rephrase it to make sure that you're answering the question
18  that I'm intending you to answer. Okay?
19      A.  Okay.
20      Q.  If you need to take a break at any time, let me
21  know and we can do that. The only condition on that is that
22  you can't ask for a break if there's been a question posed
23  to you. You need to answer a question first and then let me
24  know if you need the break. All right?
25      A.  All right.

Page 54

1  she ask you more than once or just once?
2     A. Maybe on more than one occasion.
3     Q. Did your mother after that first interview with
4  Detective Krause, did she tell you anything about what
5  Kathryn had said about whether she had been molested or
6  touched inappropriately by your father?
7     A. I believe that's when I was informed, my dad needs
8  help, my sister had been molested.
9     Q. And that's something you were told by your mother?
10    A. Correct, and Detective Krause.
11    Q. Well, and I want to focus on your mother right now
12 for these questions.
13    Did she give you any more specifics than what you've
14 just described?
15    A. No.
16    Q. Was that the only time you talked to Detective
17 Krause?
18    A. I believe so, in Sacramento.
19    Q. Was there another occasion somewhere other than
20 Sacramento where you again talked to Detective Krause about
21 these issues?
22    A. That was in Vancouver.
23    Q. Do you remember how long after the first interview
24 with Detective Krause the second one occurred?
25    A. I can't recall. Could have been months.

Page 55

1     Q. And this first interview that's reported in
2  Exhibit 1, we know that was mid October of '84. Do you
3  recall if you and Kathryn had your annual Christmas two-week
4  visit to your father that Christmas of '84?
5     A. We did not go up there that Christmas.
6     Q. Did you want to go there that Christmas?
7     A. Yeah.
8     Q. Did you ask your mom why you weren't going?
9     A. Yes.
10    Q. What did she say?
11    A. Your father needs help, you can't go see him.
12    Q. At any time between when you talked to Detective
13 Flood up to the time we're talking about now right after
14 this first interview with Detective Krause had you talked to
15 your dad?
16    A. I don't recall.
17    Q. Do you think it's possible you did and you're not
18 sure?
19    A. I don't think I did.
20       (Exhibit No. 2 marked for identification.)
21    Q. Mr. Spencer, you have been handed what has been
22 marked as Exhibit No. 2 to your deposition and I'm going to
23 ask you to take whatever time you need to to review that.
24    A. (Witness reviewing document.)
25    Q. It looks like you've had a chance to finish your

Page 56

1  review of the document that's been marked as Exhibit 2. Is
2  that correct?
3     A. Correct.
4     Q. Have you seen that document before?
5     A. I have.
6     Q. When did you first see this?
7     A. I believe in the last couple of months.
8     Q. Well, do you -- we talked about you having
9  testified at a court hearing in July of 2009. Correct?
10    A. Correct.
11    Q. And you signed a declaration, a written declaration
12 under penalty of perjury before that hearing in which you
13 said that your father never molested you, correct?
14    A. Correct.
15    Q. Do you remember what year you signed that written
16 declaration?
17    A. Didn't you just say 2009?
18    Q. 2009 was the year that you testified in the court
19 hearing.
20    A. I don't recall exactly. I believe that was the
21 year before.
22    Q. You recall signing the declaration before you went
23 in and testified in that court hearing?
24    A. I believe so.
25       MR. BOGDANOVICH: Why don't we go ahead and get

Page 57

1  this marked right now.
2        (Exhibit No. 3 marked for identification.)
3     Q. I think it may be easier if we have you review that
4  right now. Would you go ahead and review what is marked as
5  Exhibit 3 and maybe we can refer to both of these as we
6  continue our discussion.
7     A. (Witness reviewing document.)
8     Q. It appears you've finished your review of the
9  document marked Exhibit 3?
10    A. I have.
11    Q. Does that appear to be an accurate copy of the
12 declaration that you signed in which you indicated that you
13 had not been abused by your father?
14    A. Correct.
15    Q. And that's your signature that appears on
16 Page 5?
17    A. Correct.
18    Q. And it's dated February 27, 2006, correct?
19    A. Correct.
20    Q. And the reason I wanted to bring this up now, if
21 you look at Page 4 of Exhibit 3, your declaration,
22 Paragraph 18, you said in that declaration, I have had the
23 opportunity to review the report written by Detective Krause
24 concerning her March 24, 1985 interview with me. Do you see
25 that statement?

## Page 86

1  Victim Witness paid for it so I was able to go whenever
2  needed.
3  Q. Well, and did it start -- I think you said it
4  started fairly soon after your father went to prison?
5  A. Yeah.
6  Q. And you were roughly nine still then?
7  A. Correct.
8  Q. And are you saying the therapy continued until
9  about the time you turned 18?
10 A. Yeah, but not consistently every week. After about
11 13, then it tapered off and once every few months I would go
12 see him.
13 Q. How about from when you were nine until you were
14 13, would you see him literally on average weekly?
15 A. Yeah.
16 Q. For how long each time?
17 A. An hour.
18 Q. Did you want to be having those sessions with
19 Mr. Cooper at that time?
20 A. No. I believe they were very unproductive.
21 Q. Did you ever raise objections to going?
22 A. All the time.
23 Q. I think we talked a little bit, you said you acted
24 out in school, had some discipline incidents. Was your
25 behavior something that you discussed with Mr. Cooper?

## Page 87

1  A. Correct. Usually when I was in trouble that's when
2  I had to go see him.
3  Q. And I would assume that would be more the case,
4  like you said, after you turned 13, got into the teenage
5  years?
6  A. Correct.
7  Q. At some point you began using drugs, didn't you?
8  A. Correct.
9  Q. When was that? When did you start?
10 A. 19, 18, 19.
11 Q. And what drugs did you use?
12 A. I had used methamphetamines.
13 Q. Any others?
14 A. No.
15 Q. How often were you using methamphetamines when you
16 first started?
17 A. Every month or so, maybe once or twice.
18 Q. And how would you use it?
19 A. Snort it.
20 Q. Did your use increase after a period of time?
21 A. It had for a while.
22 Q. To what frequencies?
23 A. Maybe once every couple days.
24 Q. How long did that go on?
25 A. For a couple years.

## Page 88

1  Q. Were you working while you were using at that
2  frequency?
3  A. Yes.
4  Q. Did you discuss your methamphetamines use with
5  Mr. Cooper?
6  A. No. He was not in the picture. This was after
7  him.
8  Q. Did you pretty much stop seeing Mr. Cooper as soon
9  as you turned 18?
10 A. Yeah. It wasn't paid for anymore.
11 Q. At any point did you obtain any treatment for your
12 methamphetamine use?
13 A. No.
14 Q. At some point did you stop completely?
15 A. Yeah. I'm stopped right now. I've been stopped
16 for years.
17 Q. When did you stop completely?
18 A. I don't know, early 20s or so.
19    MR. BOGDANOVICH: I am going to have a little more
20 I want to pursue. Do you want to take a break now?
21    Let's go off the record.
22    (Recess taken at 12:30 p.m.)
23
24
25

## Page 89

1         AFTERNOON SESSION
2          (1:15 p.m.)
3  (Exhibit No. 5 marked for identification.)
4
5         EXAMINATION (continued)
6  BY MR. BOGDANOVICH:
7  Q. We have taken our lunch break, Mr. Spencer. Are
8  you ready to proceed?
9  A. I am.
10 Q. I'm going to show you what has been marked as
11 Exhibit 5, and because of the size of this one I am not
12 necessarily going to ask you to go through each and every
13 page.
14    I'm going to represent to you that Exhibit 5 is a copy
15 of the transcript of the hearing that we had discussed a
16 little bit earlier in your testimony today, the July 10,
17 2009 hearing that's been referred to as the reference
18 hearing regarding your recantation and your sister Kathryn's
19 recantation.
20    And what I have copied here is from the cover page. And
21 they are numbered, you will see for reference, the page
22 numbers appear near the top right corner.
23    I have copied this transcript through Page 58, which is
24 where your testimony ended, okay. And I will be referring
25 to certain questions.

Page 90

1  Again, I don't want you to read through this 58 pages
2  right now but I will try to give you enough context for
3  specific questions that you will understand what the context
4  was. And if you need to look up or back a few questions,
5  I'll certainly allow you to do that.
6  Before we go any further I wanted to direct your
7  attention to the bottom of Page 14. And this is where you
8  were discussing the March 1985 interview by Detective
9  Krause.
10  And you see at Line 18 your attorney was questioning
11  you. It indicates at the top this was your direct
12  examination, not your attorney, your father's, Mr. Camiel.
13  Line 18 he asked you a question: When you had been
14  telling the detective that you had not been molested, did
15  the detective seem to accept your answer?
16  Answer: She never accepted a quote, no, end quote,
17  answer.
18  Question: How do you know that?
19  Answer: Because it wasn't until I said, quote, yes, end
20  quote, is when the questioning stopped.
21  And then there was this exchange. Question: When you
22  said, quote, yes, end quote, what did you tell the
23  detective?
24  And your answer: I told her that he had molested me and
25  my sister and my stepbrother and that there had been more

Page 91

1  than one individual involved and --
2  And then your answer was interrupted.
3  You were sworn to tell the truth during your testimony
4  at that July 10, 2009 hearing, correct?
5  A. Correct.
6  Q. And did you tell the truth that day?
7  A. I believe to the best of my ability.
8  Q. And today you were sworn to tell the truth again in
9  this deposition, correct?
10  A. Correct.
11  Q. And you testified earlier today, you specifically
12  denied a couple times that you had told Detective Krause
13  that your sister or your stepbrother had been molested.
14  So my question to you at this point is, which is true,
15  did you or did you not tell Detective Krause that your
16  sister and stepbrother had also been molested by your
17  father?
18  A. Detective Krause told me that my sister and
19  stepbrother had been molested. I went along with it.
20  Q. So your answer now is, yes, you did tell Detective
21  Krause in March 1985 that not just you but also your sister
22  and stepbrother had been molested by your father?
23  A. She informed me that they had been molested.
24  Q. That's not my question. I want to get to the point
25  here. Is your testimony now, and it was one way in the

Page 92

1  reference hearing and it's been a different way today so I'm
2  just trying to find out when we walk out of here which
3  version are you going to swear to.
4  So did you tell Detective Krause in March of 1985 that
5  you and your sister and your stepbrother were molested by
6  your father?
7  A. She told me I was molested and I agreed to it.
8  Q. So the answer to my question is, yes, you did tell
9  her?
10  A. I agreed to it.
11  Q. And then also if you look at Page 29 of the
12  Exhibit 5 there was a question starting at Line 2. You were
13  asked, Question: You were interviewed by your father's
14  attorney Mr. Jim Rulli, weren't you?
15  Your answer: I believe so.
16  Question: Down in Sacramento.
17  Answer: I believe so.
18  Question: And you told Attorney Rulli that in fact you
19  had been abused.
20  Answer: I told everybody when I was nine that I had
21  been abused.
22  That's your testimony at that time, correct?
23  A. That's my testimony at that time.
24  Q. Now again today I think you specifically denied
25  ever having been interviewed by Mr. Rulli?

Page 93

1  A. I don't remember Jim Rulli being there. I'm not
2  saying that didn't happen. I just don't recall. I recall
3  Jim Peters.
4  Q. Does seeing your sworn testimony in this
5  July 10, 2009 proceeding now refresh your recollection that
6  you did in fact get interviewed by Mr. Rulli?
7  A. I don't recall being interviewed by Mr. Rulli. I'm
8  not saying it didn't happen but I don't recall that
9  conversation.
10  Q. And as we sit here you can't say one way or another
11  whether you told Mr. Rulli that you had been abused?
12  A. I'm not saying I didn't but I don't remember.
13  Q. I'm trying to remember where we left off. I think
14  you had explained to me your methamphetamine use period, and
15  I think you had just said you had stopped completely using
16  methamphetamine by your early 20s?
17  A. Uh-huh.
18  Q. That was around the time you were 18 and 19 when
19  you were using fairly regularly you said, right?
20  A. Pretty regularly.
21  Q. I want to kind of try to fast-forward here, if I
22  can, to the time period around when you provided this
23  declaration dated February 27, 2006.
24  You've told me about the two occasions where Mr. Camiel
25  and someone with him on the second occasion tried to contact

Page 98

1  A. Not at that time, no.
2  Q. Just kind of explain to me what happened from
3  there?
4  A. We communicated through e-mail and probably a few
5  months later I came up here.
6  Q. During those few months did you communicate at all
7  with Mr. Camiel or anyone from his office?
8  A. No.
9  Q. How did you get up -- when you say up here, where
10 was your father living at that time?
11 A. Renton.
12 Q. And you flew up to SeaTac?
13 A. Correct.
14 Q. How did you get to SeaTac?
15 A. Airplane.
16 Q. Who purchased the plane ticket?
17 A. My father.
18 Q. Did anyone else come up with you?
19 A. No.
20 Q. What happened when you got to the SeaTac airport?
21 A. My father picked me up and we went to his
22 apartment.
23 Q. What did you do there?
24 A. Talked and talked and talked.
25 Q. Did the subject of whether he had molested you come

Page 99

1  up?
2  A. We left that alone for a while. We didn't talk
3  about that.
4  Q. How long did you stay at his apartment that day
5  that he picked you up?
6  A. I stayed there for, I believe, two days.
7  Q. Did the two of you -- was anyone else there with
8  him?
9  A. No.
10 Q. Did the two of you go anywhere or did you just stay
11 at the apartment for the two days?
12 A. He couldn't really go anywhere. He was on house
13 arrest.
14 Q. What happened after the end of the couple of days?
15 A. I informed him that I'm up here to make a
16 declaration, I'm up here to recant my statements.
17 Q. And when you use the words, I'm up here to make a
18 declaration, by the end of two days at your father's
19 apartment in Renton had you communicated with Mr. Camiel?
20 A. At the second day.
21 Q. And did you call him or did he call you?
22 A. My father called him.
23 Q. And what did your father tell him, if you heard?
24 A. I didn't hear the conversation.
25 Q. Do you have any understanding of what your father

Page 100

1  told Mr. Camiel?
2  A. Apparently it's, Matthew wants to recant his
3  statements.
4  Q. And then did you meet with Mr. Camiel on that same
5  trip up to Renton?
6  A. I believe so.
7  Q. Where did you meet with him?
8  A. Seattle.
9  Q. At his office?
10 A. Correct.
11 Q. Did your father go with you?
12 A. Yes.
13 Q. Did anyone else accompany the two of you?
14 A. No.
15 Q. What happened at Mr. Camiel's office?
16 A. I filed an official report, declaration, began
17 that. I believe it's where this is drafted.
18 Q. When you say this, you're referring to the
19 declaration of Matthew Ray Spencer we've marked as
20 Exhibit 3?
21 A. Correct.
22 Q. Who typed it up?
23 A. Peter's office.
24 Q. Was it Mr. Camiel or somebody else at his office?
25 A. I didn't see it.

Page 101

1  Q. Was it handed to you in this form that we see it
2  marked here as Exhibit 3?
3  A. I believe so.
4  Q. Do you know how Mr. Camiel's office came up with
5  the content?
6  A. Came up through me.
7  Q. Just explain to me how this was drafted?
8  A. I came in, gave an interview, and they typed it up.
9  Q. And does this declaration accurately reflect the
10 content of the statements you made to Mr. Camiel that day?
11 A. Most of it is.
12 Q. When you say most of it, are there parts that you
13 don't feel are accurate?
14 A. Yeah, Paragraph 18, While I believe that I did tell
15 her the things written in the report attributed to me about
16 my father sexually abusing me, none of it is true.
17    When it comes to that, I went along with what she had
18 told me had happened to me. There wasn't anything that I
19 had generated on my own except for after that maybe the
20 details of maybe a couple of things, the yellow sweater, red
21 Porsche. Other than that I went along with what she told me
22 to say.
23 Q. Well, do you now think that this, the statement
24 that you just read, the second sentence in Paragraph 18 is
25 not accurate?

```
                                                               202
 1                      REPORTER'S CERTIFICATE
 2

 3    STATE OF WASHINGTON   )
                            )  ss.
 4    COUNTY OF KING        )

 5

 6          I, MARLIS J. DeJONGH, CCR, RPR, a Notary Public in
 7    and for the State of Washington, do hereby certify:
 8    That prior to being examined, the witness named in the
 9    foregoing deposition was duly sworn to testify the truth,
10    the whole truth and nothing but the truth;
11          That said deposition was taken down by me in
12    shorthand at the time and place therein named and thereafter
13    transcribed by means of computer-aided transcription, and
14    that the foregoing transcript contains a full, true and
15    verbatim record of the said deposition;
16          I further certify that I have no interest in the
17    event of the action.
18          WITNESS my hand and seal this 29th day of November,
19    2012.
20

21
                            Notary Public in and for the State
22                          of Washington, residing in Seattle.
                            My commission expires 01/2016.
23                          Lic. No. DE-JO-NM-J498K9
24

25
```

DECLARATION OF MATTHEW SPENCER

CLARK COUNTY SUPERIOR COURT FOR THE STATE OF WASHINGTON

STATE OF WASHINGTON

VS.   No. 85-2-00007-2

CLYDE RAY SPENCER

DECLARATION OF MATTHEW RAY SPENCER

I, MATTHEW RAY SPENCER DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON AND THE UNITED STATES THAT THE FOLLOWING FACTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

1. I AM THE SON OF CLYDE RAY SPENCER WHO WAS CONVICTED IN 1985 IN CLARK COUNTY WASHINGTON OF HAVNG SEXUALLY ABUSED ME, MY SISTER KATHRYN AND MY STEPBROTHER MATT HANSEN.
2. I CURRENTLY RESIDE IN CALIFORNIA AND WORK AS AN AUTOMOTIVE TECHNICIAN. I HAVE HAD TWO YEARS OF COLLEGE.
3. IN 1985 I WAS NINE YEARS OLD. MY DATE OF BIRTH IS NOVEMBER 28, 1975.

DECLARATION OF MATTHEW SPENCER
1



Mair & Camiel, P.S.
710 Cherry Street
Seattle, WA 98104.
Phone: 206-624-1551
Facsimile: 206-623-5951

DECLARATION OF MATTHEW SPENCER

4. I AM NOW 30 YEARS OLD AN I AM MAKING THIS DECLARATION OF MY OWN FREE WILL WITHOUT ANY THREAT, PROMISE, INCUCEMENT OR PRESSURE PUT UPON ME.

5. IN 1984 I LIVED WITH MY MOTHER AND SISTER IN CALIFORNIA. MY FATHER LIVED IN THE STATE OF WASHINGTON. MY SISTER AND I CAME TO VISIT DURING THE SUMMER.

6. I HAVE HAD NO CONTACT WITH MY FATHER, CLYDE RAY SPENCER OR HIS ATTORNEY OR INVESTIGATOR SINCE 1984, ALTHOUGH I AM AWARE OF THE FACT THAT OVER THE YEARS THE ATTORNEY WORKING FOR MY FATHER HAS ATTEMPTED TO CONTACT ME AND THAT MY FATHER WROTE LETTERS AND SENT CHRISTMAS GIFTS.

7. I AM AWARE THAT OVER THE YEARS MY MOTHER OBJECTED TO MY BEING INTERIVEWED BY MY FATHER'S ATTORNEY OR INVESTIGATOR AND TOLD THEM NOT TO CONTACT ME.

8. IN 2005 I LEARNED THAT MY FATHER HAD BEEN RELEASED FROM PRISON AFTER SERVING OVER 20 YEARS.

9. THE FIRST CONTACT I HAVE HAD WITH MY FATHER WAS THROUGH A NEWPAPER REPORTER, KEN OLSON FROM THE VANCOUVER COLUMBIAN WHO TOLD ME HE WAS WRITING AN ARTICLE ABOUT MY FATHER'S CASE AND WANTED TO INTEVIEW ME. AT THE TIME THAT THE REPORTER CONTACTED ME IN ABOUT SEPTEMBER OF 2005 I TOLD THE REPORTER I WANTED TO COME TO SEATTLE TO MEET WITH MY FATHER.

DECLARATION OF MATTHEW SPENCER
2

Maix & Camiel, P.S.
710 Cherry Street
Seattle, WA 98104
Phone: 206-624-1551
Facsimile: 206-623-5951

DECLARATION OF MATTHEW SPENCER

10. IN LATE 2005 MY FATHER SENT ME AN E-MAIL AND WE EXCHANGED E-MAILS THAT LED TO MY VISITING WITH HIM IN SEATTLE FOR THE FIRST TIME IN LATE FEBRUARY 2006.

11. THIS VISIT WAS THE FIRST TIME I HAVE SEEN MY FATHER SINCE 1984 AND THE FIRST TIME I HAVE EVER TALKED TO HIM ABOUT THE CRIMINAL CHARGES.

12. I UNDERSTAND THAT MY FATHER WAS ACCUSED OF SEXUALLY MOLESTING ME AND MY SISTER AND MY STEPBROTHER. I ALSO KNOW THAT HE PLEADED GUILTY TO THOSE CRIMINAL CHARGES AND RECEIVED A LIFE SENTENCE.

13. I CAN STATE UNEQUIVOCALLY THAT I WAS NEVER MOLESTED IN ANY MANNER AT ANY TME BY MY FATHER.

14. I RECALL THAT IN 1985 I WAS INTERVIEWED BY A DETECTIVE AT MY HOME. HE ASKED ME IF MY FATHER HAD TOUCHED ME IMPROPERLY. I REMEMBER I TOLD THE DETECTIVE THAT I HAD NOT BEEN TOUCHED BY MY FATHER IN ANY INAPPROPRIATE WAY.

15. I KNOW THAT I WAS INTERVIEWED BY A FEMALE DETECTIVE. I REMEMBER DETECTIVE KRAUSE BY NAME. SHE WAS INVESTIGATING THE ALLEGATIONS IN 1984 OR 1985 AND CAME DOWN TO CALIFORNIA TO INTERVIEW ME AND MY SISTER. SHE DROVE ME AND MY SISTER AROUND AND TOOK US TO HER MOTEL. SHE REPEATEDLY ASKED ME IF MY FATHER HAD MOLESTED ME. SHE TOLD ME THAT MY SISTER AND LITTLE MATT HAD ADMITTED THAT HE HAD MOLESTED THEM.

DECLARATION OF MATTHEW SPENCER
3

Mair & Camiel, P.S.
710 Cherry Street
Seattle, WA 98104
Phone: 206-624-1551
Facsimile: 206-623-5951

DECLARATION OF MATTHEW SPENCER

16. I KEPT TELLING HER HE DIDN'T DO ANYTHING. SHE WOULDN'T ACCEPT MY DENIALS AND KEPT SUGGESTING THAT HE HAD MOLESTED ME AND THAT I WASN'T BEING TRUTHFUL.

17. FINALLY I FIGURED THAT IF MY FATHER HAD MOLESTED MY SISTER AND LITTLE MATT THAT MAYBE HE HAD MOLESTED ME AS WELL SO I TOLD HER THAT HE HAD. I MADE UP SPECIFIC DETAILS OF WHAT MY FATHER DID BASED ON WHAT THE DETECTIVE ASKED ME. NONE OF THIS WAS TRUE.

18. I HAVE HAD THE OPPORTUNIT TO REVIEW THE REPORT WRITTEN BY DETECTIVE KRAUSE CONCERNING HER MARCH 24, 1985 INTERVIEW WITH ME. WHILE I BELIEVE THAT I DID TELL HER THE THINGS WRITTEN IN THE REPORT ATTRIBUTED TO ME ABOUT MY FATHER SEXUALLY ABUSING ME NONE OF IT IS TRUE.

19. LATER I WAS FLOWN UP TO WASHINGTON FOR ANOTHER INTERVIEW. I RECALL I MADE UP STORIES OF OTHER POLICE OFFICERS ALONG WITH MY FATHER BEING INVOLVED IN ABUSING ME, LITTLE MATT AND KATHRYN AND SOMEONE DRIVING A RED PORSCHE. NONE OF THIS WAS TRUE.

DECLARATION OF MATTHEW SPENCER
4

Mair & Camiel, P.S.
710 Cherry Street
Seattle, WA 98104
Phone: 206-624-1551
Facsimile: 206-623-5951

DECLARATION OF MATTHEW SPENCER

20. I NEVER OBSERVED MY FATHER HAVE ANY SEXUAL CONTACT WITH MY SISTER OR STEPBROTHER, MATT HANSEN, NOR DID EITHER ONE OF THEM EVER TELL ME THAT HE DID SO.

21. OVER THE YEARS I HAVE TALKED WITH MY SISTER KATHRYN. SHE HAS TOLD ME THAT SHE MUST HAVE BLOCKED OUT THE ABUSE BY MY FATHER BECAUSE SHE HAS NO MEMORY OF HAVING BEEN ABUSED BY HIM.

22. OVER THE YEARS I HAVE ALWAYS WANTED TO COME FORWARD AND MAKE CLEAR THAT MY FATHER HAD NOT SEXUALLY ABUSED ME, BUT I HAVE NOT KNOWN HOW TO GO ABOUT SETTING THE RECORD STRAIGHT.

23. ON FEBRUARY 27TH, 2006 I MET WITH MY FATHER'S LAWYER, PETER A. CAMIEL IN SEATTLE AND TOLD HIM ALL OF THE ABOVE FACTS.

24. I HAVE CAREFULLY REVIEWED EVERY LINE OF THIS DECLARATION FOR ACCURACY. IT IS ALL TRUE TO THE BEST OF MY KNOWLEDGE AND I AM WILLING TO GO TO COURT AND SWEAR TO THESE FACTS BEFORE A JUDGE.

DATED THIS 27TH DAY OF FEBRUARY, 2006 AT SEATTLE, WASHINGTON

MATTHEW RAY SPENCER

DECLARATION OF MATTHEW SPENCER
5

Mair & Camiel, P.S.
710 Cherry Street
Seattle, WA 98104
Phone: 206-624-1551
Facsimile: 206-623-5951