# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

```
CLYDE RAY SPENCER, MATTHEW RAY      )
SPENCER and KATHRYN E. TETZ,        )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )  No. 11-5424 BHS
                                    )
FORMER DEPUTY PROSECUTING ATTORNEY FOR )
CLARK COUNTY JAMES M. PETERS, DETECTIVE)
SHARON KRAUSE, SERGEANT MICHAEL     )
DAVIDSON, CLARK COUNTY PROSECUTOR'S )
OFFICE, CLARK COUNTY SHERIFF'S OFFICE, )
THE COUNTY OF CLARK, SHIRLEY SPENCER.)
and JOHN DOES ONE through TEN,      )
                                    )
            Defendants.             )
                                    )
```

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

CLYDE RAY SPENCER

Monday, November 12, 2012
10:00 a.m.
1201 Third Avenue, Suite 2200
Seattle, Washington

Reported by Marlis J. DeJongh, CCR, RPR

Lic. No. DE-JO-NM-J498K9

Page 2

APPEARANCES

For the Plaintiffs: KATHLEEN J. ZELLNER
and DOUGLAS H. JOHNSON
Attorneys
1901 Butterfield Road,
Suite 650
Downers Grove, Illinois 60515

For Defendant Davidson: JEFFREY A.O. FREIMUND
Attorney
711 Capitol Way S, Suite 602
Olympia, Washington 98501

For Defendant Krause: GUY BOGDANOVICH
Attorney
2674 R W Johnson Blvd. SW
Tumwater, Washington 98512

For Defendant Peters: PATRICIA C. FETTERLY
Assistant Attorney General
7141 Cleanwater Drive SW
Olympia, Washington 98504

Videographer: DAN BASSETT
PROLUMINA
601 Union Street, Suite 1420
Seattle, Washington 98101

Court Reporter: MARLIS J. DeJONGH, CCR, RPR
1400 Hubbell, Suite 1510
Seattle, Washington 98101

Page 3

INDEX OF EXAMINATION

Page(s)

Videotaped Examination of
Clyde Ray Spencer

By Mr. Freimund        5
By Ms. Fetterly        198
By Mr. Bogdanovich     237

INDEX OF EXHIBITS

| No. | Description | Marked |
|---|---|---|
| 1. | Utility Report, 7/14/84 – 8/26/84 | 13 |
| 2. | 1/2/85 Office Correspondence | 14 |
| 3. | 1/29/85 Office Correspondence | 80 |
| 4. | City of Vancouver Notice of Dismissal | 89 |
| 5. | Incident Report, 2/3/85 | 101 |
| 6. | Utility Report, 2/22/85 | 118 |
| 7. | Utility Report, 2/28/85 | 144 |
| 8. | Statement of Defendant on Plea of Guilty | 175 |
| 9. | Notice of Violations/Stipulated Agreement | 185 |
| 10. | Clark County Information Document | 202 |
| 11. | Utility Report, 10/16/84 | 212 |

Page 4

1  VIDEOGRAPHER: We are on record.
2  This is the videotaped portion in the deposition of
3  Clyde Ray Spencer. My name is Dan Bassett. I'm the
4  videographer here today, employed by Prolumina. The
5  court reporter is Marlis DeJongh from Marlis DeJongh &
6  Associates.
7  The deposition is being recorded this 12th day of
8  November 2012. The time now is 10:02 a.m.
9  We are located at 1201 Third Avenue, Suite No. 2200
10 in Seattle, Washington 98101.
11 The deposition is being recorded in the matter of
12 Spencer, et al., versus Former Deputy Prosecuting
13 Attorney for Clark County, James Peters, et al. The
14 Case number is 11-5424 DHS in the United States District
15 Court for the Western District of Washington at Tacoma.
16 The deposition was noticed by Jeff Freimund.
17 Counsel and all present please identify yourselves
18 for the record and then the witness may be sworn in.
19 MS. ZELLNER: Kathleen Zellner on behalf of the
20 plaintiff Ray Spencer.
21 MR. JOHNSON: Doug Johnson also on behalf of the
22 plaintiff Ray Spencer.
23 MR. FREIMUND: Jeff Freimund on behalf of Defendant
24 Mike Davidson.
25 MS. FETTERLY: Patricia Fetterly on behalf of

Page 5

1  Defendant James Peters.
2  MR. BOGDANOVICH: Guy Bogdanovich on behalf of
3  defendant Sharon Krause.
4
5  CLYDE RAY SPENCER,   deponent herein, being first duly
6                        sworn on oath, was examined and
7                        testified as follows:
8
9                EXAMINATION
10 BY MR. FREIMUND:
11 Q. Please state your full name for the record and
12 spell your last name.
13 A. Clyde Ray Spencer, S-p-e-n-c-e-r.
14 Q. Mr. Spencer, what is your date of birth?
15 A. 1/9/48.
16 Q. How old are you now?
17 A. 64.
18 Q. Are you on any medications today?
19 A. Nothing but the medications I took last night for
20 the PTSD and the nightmares.
21 Q. What did you take last night?
22 A. I don't have that information with me. I mean, I
23 can get it for you. My attorney can get it for you.
24 Q. Do you recall the name of the drug that you took?
25 You have to answer out loud, please.

Page 6

1  A. No, I don't.
2  Q. Do you recall how much you took?
3  A. I don't. The prescribed medication, whatever
4  the psychiatrist has dictated. I didn't take anything
5  extra.
6  Q. Was it one pill, two pills, three pills? What?
7  A. One pill was for nightmares, one for sleep.
8  Q. How often do you take those medications? On a
9  daily basis?
10 A. On a daily basis.
11 Q. At what times of the day do you take those
12 medications?
13 A. Before bed.
14 Q. Do you take any medications in the mornings?
15 A. No.
16 Q. Where do you currently reside?
17 A. Los Angeles --
18   MS. ZELLNER: Actually, right, we won't be
19   providing his specific address. So he will appear for
20   the trial but we're not going to give you the address.
21   He has some safety concerns about some of the people in
22   this case, so...
23 Q. You're worried some people in this case are going
24 to come after you where you reside?
25 A. That's a possibility.

Page 7

1  Q. Is that your worry?
2  A. Yes.
3  Q. Tell me what town you reside in.
4  A. Los Angeles.
5  Q. Los Angeles, California?
6  A. Yes.
7  Q. How long have you resided there?
8  A. Probably a year and a half now.
9  Q. How long have you been out of prison?
10 A. I was released in December of 2004.
11 Q. So during the past eight years, approximately, have
12 any of the defendants in this case made any effort to
13 contact you?
14 A. Not that I know of.
15 Q. But nonetheless you're afraid that they're going to
16 sometime in the next future years?
17 A. The possibility is there.
18 Q. Are you afraid of anybody else?
19 A. No.
20 Q. So it's just the three named defendants that you're
21 afraid of?
22 A. Correct.
23 Q. Your allegation in this case, sir, as set forth in
24 your complaint is that there was a conspiracy to frame you
25 for crimes that you didn't commit. Is that right?

Page 8

1  A. That's correct.
2  Q. Who was a part of this conspiracy?
3  A. Jim Peters, Michael Davidson, and Sharon Krause.
4  Q. Nobody else?
5  A. No.
6  Q. So it was just those three people that conspired
7  against you even though you also named Shirley Spencer, the
8  County, Clark County sheriff's office and the Clark County
9  prosecutor's office?
10 A. Michael Davidson was employed by the Clark County
11 sheriff's. I think Shirley Spencer was a pawn in this.
12 Q. So she was involved in the conspiracy unwittingly?
13 A. I think she was, yes.
14 Q. All right. When did this conspiracy form?
15 A. I noticed that my marriage was changing around
16 October of 2004. Up until that point in time I had a
17 stable, loving relationship with my wife. Suddenly the
18 arguments began. This was after the polygraph that
19 Detective Davidson indicated I had failed.
20   My wife went there, and after that, she apparently went
21 to the jail, or went to the county sheriff's almost on a
22 daily basis. I would call her for hours and she would not
23 answer, and she would indicate that she had been at the
24 county jail or at the sheriff's department speaking with
25 Davidson.

Page 9

1  I believe that the relationship started at that point,
2  and they manipulated her from on.
3  Q. And you have pretty clear memories of that time
4  frame of October 1984?
5  A. I know that's when the relationship seemed to
6  totally reverse. Up until that time she was supportive of
7  me, loving. Suddenly there was no personal relationships.
8    You have to understand Shirley's mental state. She
9  is, she's a fragmented individual. She's obsessed with
10 jealousy. Her feelings of how to, a relationship should be,
11 there should be a physical confrontation and then a makeup
12 afterwards. So all of a sudden it began around that period
13 of time.
14 Q. That period of time being October 1984?
15 A. Correct.
16 Q. What -- and that's when you think the conspiracy
17 formed, was sometime around October 1984, just to be clear?
18 A. It is.
19 Q. What was the goal of the conspiracy, or what was
20 the agreement to do?
21 A. I think that the agreement was to get me out of the
22 picture. Davidson sleeping with my wife. Krause is
23 building a career. She is working in conjunction with Jim
24 Peters. They're giving lectures up and down the coast.
25 Q. So why -- what is Peters' motivation in this

Page 10

1  conspiracy that you believe existed?
2      A. He's building a career too.
3      Q. So Davidson had one motive to conspire, and Krause
4  and Peters had a different motive to conspire. Is that what
5  you're saying?
6      A. Well, I'm saying that Davidson sleeping with my
7  wife. Krause, if you read her reports -- I was a police
8  officer in law enforcement 14 years. You don't, you know --
9  there is no audio, there is no video of these, of these
10 reported interviews with the kids. She comes back a week
11 later and writes a 20 page report with quotation marks. I'm
12 sorry, I don't buy that. She falsified those reports.
13     Davidson was her immediate supervisor. He would have
14 known about it. She would have had to give him everything.
15 Peters is there, he has it.
16     Q. Okay. Let's go back to my question though. My
17 question to you is, is it your belief that Davidson had a
18 motive underlying this conspiracy that was different than
19 the motive that Peters and Krause had?
20     A. Well, obviously Peters and Krause are not sleeping
21 with my wife, so yes.
22     Q. Do you think Peters and Krause were acting in order
23 to further this, a relationship between Mike Davidson and
24 your wife?
25     A. Whether they were acting to further that

Page 11

1  relationship I have no idea. But I know they took an active
2  part in this conspiracy.
3      Q. Okay. So Krause and Peters had an agreement in
4  this conspiracy to further their career by framing you for a
5  crime you claim you didn't commit, right?
6      A. Correct.
7      Q. But Mr. Davidson had a separate and independent
8  reason for attempting to frame you for a crime you didn't
9  commit, as you claim. Is that your testimony?
10     A. Davidson is the lead supervisor. Krause works
11 directly for him. He's controlling that investigation. She
12 has to run things through him. There is no way that I'll
13 ever believe that he wasn't aware of what was going on. And
14 he had his own motivation for directing that investigation.
15     Q. So his motivation was independent and different
16 from the motivation of Krause and Peters, correct?
17     A. Correct.
18     Q. Who was the ringleader of this conspiracy?
19     A. I think Davidson. He's controlling the
20 investigation.
21     Q. Was Mr. Rulli involved in the conspiracy?
22     A. No.
23     Q. Who were the other pawns, if there were any, in
24 this conspiracy? You mentioned Shirley Spencer was a pawn
25 in the conspiracy. Were there others?

Page 12

1      A. I think the kids' mother DeAnne was. I think she
2  was going on what was being relayed to her, the allegations
3  that were supposedly being made. You can't read these
4  reports and expect me to buy into the fact that the
5  statements that are being made in those reports from Krause
6  that a five-year-old has said that, I'm not buying it. I'm
7  sorry.
8      Q. At the time your daughter Kathryn Spencer made a
9  disclosure you weren't buying it that something happened?
10     A. I wasn't buying that I had anything to do with it.
11     Q. Did you think she was a victim of sexual abuse at
12 the time she made her disclosure?
13     A. I had no idea. But two years before that when she
14 came up, one of the first visits after the divorce, there
15 appeared to be what was a cigarette burn on her vaginal
16 area.
17     The information I was receiving was that her mother was
18 running the streets pretty hard after the divorce. My
19 assumption was when they made a statement that daddy did it,
20 it was probably some guy that the ex-wife had in there. And
21 she even admitted to Detective Flood from Sacramento County
22 sheriff's that there had been a guy there that had been
23 bothering the kids and she got rid of him.
24     Q. So you did think that there was a possibility that
25 your daughter Kathryn Spencer was sexually abused when she

Page 13

1  first disclosed abuse to Shirley Spencer in August of 1984?
2      A. As a father I was not going to ignore the
3  possibility. That's why I initiated the investigation,
4  that's why I called Child Protective Services, both in
5  California and the state of Washington, the sheriff's
6  department and my department.
7      Q. So it's your testimony, sir, that you were the
8  first one to contact any law enforcement entity or any
9  hotline or CPS worker about the disclosures of sexual abuse
10 that were made by your daughter Kathryn Spencer?
11     A. That's correct.
12     MR. FREIMUND: Let's mark this as Exhibit 1 to
13 Mr. Spencer's deposition, please.
14     (Exhibit No. 1 marked for identification.)
15     Q. You indicated earlier, sir, that you have read the
16 police reports by Detective Sharon Krause related to the
17 investigation involving sexual abuse committed by yourself,
18 right?
19     A. Yes.
20     Q. Do you recognize Exhibit 1 as a copy of one such
21 report that you previously read?
22     A. (Witness reviewing document.)
23 Yes, I have read this.
24     Q. We'll get back to that in a moment.
25     MR. FREIMUND: Let's mark this as Exhibit 2 to

Page 14

1  Mr. Spencer's deposition, please.
2  (Exhibit No. 2 marked for identification.)
3  Q. In the course of your review of documents in this
4  case, Mr. Spencer, did you also review the Internal Affairs
5  investigation reports that were completed by the Vancouver
6  Police Department where you were employed back in August of
7  1984?
8  A. Yes.
9  Q. Are you familiar with this Exhibit 2 as being one
10 of the documents that were enclosed with the Internal
11 Affairs investigation conducted by the Vancouver Police
12 Department?
13 A. Yes.
14 Q. Let me direct you to Page 2.
15 Well, before I do, I'm sorry, let's start at Page 1.
16 First of all, this is documenting an interaction that you
17 had with Carol Arden, A-r-d-e-n, a PAT service officer, that
18 occurred on August 30th of 1984, correct?
19 A. It appears to be, yes.
20 Q. What is a PAT officer?
21 A. People's assistance team.
22 COURT REPORTER: I'm sorry?
23 THE WITNESS: People's assistance team.
24 Q. Is that like a victim assistance? Is that what
25 their role is typically?

Page 15

1  A. Typically, yes.
2  Q. Do they also have a role in working with police
3  officers who are undergoing or are interacting with their
4  supervisors?
5  A. They are part of the police department.
6  Q. I understand that, but do they have a role in
7  assisting police officers when they're interacting with
8  their supervisors?
9  A. Yes.
10 Q. What is that role?
11 A. Supportive. They can help -- you know, you bring
12 the problems to them. They can recommend counseling,
13 depending on what the situation is.
14 Q. And this report by Ms. Arden indicates that on
15 August 30th, 1984, if you look at the bottom of the second
16 paragraph on the first page, that the two of you spent
17 approximately 45 minutes talking in private. Is that
18 accurate?
19 A. Well, based on what the report says. You know,
20 that was 30 years ago so I can't recall a time frame there.
21 Q. Okay. Do you have any reason to doubt the accuracy
22 of Ms. Arden's estimate that it was about 45 minutes that
23 the two of you spoke privately on that day?
24 A. I'm afraid you would have to ask Ms. Arden that.
25 I'm sorry.

Page 16

1  Q. My question to you though is, do you have any
2  reason to doubt the accuracy of what Ms. Arden said?
3  A. I have no reason to doubt the accuracy or the
4  inaccuracy of it.
5  Q. All right. Now let's look at the second page of
6  Exhibit 2, please. I will direct your attention to the
7  first full paragraph on that page which kind of looks like
8  the second paragraph on the page.
9  And Ms. Arden here is documenting what you were telling
10 her about your daughter Kathryn Spencer's initial disclosure
11 of abuse.
12 Is it your understanding, sir, that that is the fact,
13 that the first person that your daughter Kathryn Spencer
14 disclosed sexual abuse by you, the first person she told
15 that to was your wife at the time Shirley Spencer?
16 A. Yes.
17 Q. And do you believe your wife Shirley Spencer was a
18 pawn in a conspiracy at the time that disclosure was made to
19 her by Kathryn Spencer?
20 A. I have no way of knowing that because I have no way
21 of knowing when the affair started.
22 Q. So you don't know if she was a pawn --
23 A. I can't say.
24 Q. -- at that point or not?
25 A. No, I can't say.

Page 17

1  Q. Do you recall Shirley being very upset and alarmed
2  about what she had heard from Kathryn?
3  A. I do.
4  Q. Do you recall Shirley Spencer telling you that she
5  was so upset and alarmed about what she heard from Kathryn
6  that she made a decision to call the Vancouver hotline and
7  report the sexual abuse that was disclosed to her by Kathryn
8  Spencer?
9  A. This is the first I am aware of that. And as a
10 matter of fact, I don't even know if they had a Vancouver
11 hotline.
12 Q. Okay. So your belief is if Ms. Arden recorded in
13 writing way back when in 1984 that you told her that Shirley
14 had initiated the investigation, if you will, by calling the
15 Vancouver hotline, you wouldn't know one way or another if
16 your -- if she accurately recorded your statements at the
17 time?
18 A. That's right.
19 Q. Okay. Ms. Arden then goes on to say, and I'm
20 starting at the third paragraph on Page 2 of Exhibit 2, Ray
21 said that the hotline worker advised Shirley to report it to
22 the proper authorities.
23 Do you know if that is an accurate recitation of what
24 you told Ms. Arden back on August 30th of 1984?
25 A. I never told Ms. Arden that because it would not be

1         REPORTER'S CERTIFICATE

2

3  STATE OF WASHINGTON    )
                          ) ss.
4  COUNTY OF KING         )

5

6        I, MARLIS J. DeJONGH, CCR, RPR, a Notary Public in
7  and for the State of Washington, do hereby certify:
8  That prior to being examined, the witness named in the
9  foregoing deposition was duly sworn to testify the truth,
10 the whole truth and nothing but the truth;
11       That said deposition was taken down by me in
12 shorthand at the time and place therein named and thereafter
13 transcribed by means of computer-aided transcription, and
14 that the foregoing transcript contains a full, true and
15 verbatim record of the said deposition;
16       I further certify that I have no interest in the
17 event of the action.
18       WITNESS my hand and seal this 27th day of November,
19 2012.

20

21

22              Notary Public in and for the State
                of Washington, residing in Seattle.
                My commission expires 01/2016.
23              Lic. No. DE-JO-NM-J498K9

24

25