# EXHIBIT 9

1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY )
SPENCER and KATHRYN E. TETZ, )
                               )
        Plaintiffs,            )
                               )
    vs.                        )   No. 11-cv-05424-BHS
                               )
FORMER DEPUTY PROSECUTING      )
ATTORNEY FOR CLARK COUNTY JAMES)
M. PETERS, DETECTIVE SHARON    )
KRAUSE and SERGEANT MICHAEL    )
DAVIDSON,                      )
                               )
        Defendants.            )


VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

ARTHUR DAVID CURTIS


DATE TAKEN:  December 10, 2012
TIME:        9:00 a.m.
PLACE:       613 W. 11th Street
             Vancouver, Washington


         COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR




                    Rider & Associates, Inc.

                        360.693.4111

2

APPEARANCES

| | |
|---|---|
| FOR THE PLAINTIFFS:<br>(via videoconference) | MS. KATHLEEN T. ZELLNER<br>Law Offices of Kathleen T. Zellner, LLP<br>Esplanade IV<br>1901 Butterfield Rd., Ste. 650<br>Downers Grove, IL   60515 |
| FOR DEFENDANT PETERS: | MS. PATRICIA CAMPBELL FETTERLY<br>Assistant Attorney General<br>Torts Division<br>P.O. Box 40126<br>Olympia, WA   98504-0116 |
| FOR DEFENDANT DAVIDSON:<br>(via videoconference) | MR. JEFFREY A.O. FREIMUND<br>Freimund Jackson Tardif Benedict<br>711 Capitol Way South, Ste. 602<br>Olympia, WA   98502 |
| FOR DEFENDANT KRAUSE:<br>(via videoconference) | MR. GUY BOGDANOVICH<br>Law Lyman Daniel Kamerrer & Bogdanovich, P.S.<br>P.O. Box 11880<br>Olympia, WA   98508-1880 |
| FOR CLARK COUNTY: | MR. BERNARD F. VELJACIC<br>Deputy Prosecuting Attorney<br>604 W. Evergreen<br>P.O. Box 5000<br>Vancouver, WA   98666-5000 |

Rider & Associates, Inc.

360.693.4111

3

ARTHUR DAVID CURTIS   12.10.12

I N D E X

| Examination | Page |
|---|---|
| By Ms. Zellner | 5 |
| By Mr. Bogdanovich | 65 |
| By Ms. Fetterly | 67 |
| By Ms. Zellner | 82 |
| By Mr. Freimund | 93 |
| By Ms. Fetterly | 96 |
| By Ms. Zellner | 99 |

EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| 1 | 11-27-84 Krause report | 5 |
| 2 | 12-20-84 Utility Report | 5 |
| 3 | Information | 5 |
| 4 | 1-3-85 Officer Correspondence | 5 |
| 5 | 1-9-85 letter to Davis from Curtis | 5 |
| 6 | 1-9-85 letter to Malang from Curtis | 5 |
| 7 | 1-9-85 letter to Roe from Curtis | 5 |
| 8 | 5-9-85 letter to Linde from Peters | 5 |
| 9 | 5-15-85 letter to Malang from Curtis | 5 |
| 10 | 7-1-92 letter to Goodfriend from Curtis | 5 |
| 11 | 12-2-92 letter to Indeterminate Sentencing Review Board from Duffy | 5 |
| 12 | The Oregonian article | 5 |
| 13 | 10-12-05 e-mail to Biffle from Curtis | 5 |
| 14 | 9-23-05 e-mail to Curtis from Rice | 5 |
| 15 | 10-27-09 e-mail to Curtis from Hunter | 5 |
| 16 | 10-25-09 Booking Docket | 5 |
| 17 | 8-19-09 letter to Hunter from Krause | 5 |
| 18 | Affidavit of Authenticity | 5 |
| 19 | Rule Denying Review | 5 |
| 20 | Press release | 5 |
| 21 | 5-23-85 reporting | 5 |
| 22 | 11-3-09 letter to Peters from Curtis | 5 |
| 23 | Declaration of Peters | 5 |

Rider & Associates, Inc.
360.693.4111

**Page 4**

ARTHUR DAVID CURTIS 12.10.12

EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| 24 | 8-25-10 handwritten notes | 5 |
| 25 | 12-11-84 videotaped interview of Kathryn Spencer | 5 |
| 26 | Information | 64 |
| 27 | Handwritten notes | 64 |
| 28 | Handwritten notes | 64 |
| 29 | Handwritten message | 64 |
| 30 | 6-10-92 letter to Curtis from Goodfriend | 64 |
| 31 | Motion for Order Compelling Disclosure of Medical Records | 64 |
| 32 | 7-1-92 letter to Goodfriend from Curtis | 64 |

Rider & Associates, Inc.
360.693.4111

**Page 5**

1 ARTHUR DAVID CURTIS,
2 called as a witness in behalf of the Plaintiffs, having
3 been duly sworn, was examined and testified as follows:
4     (Deposition Exhibits No. 1 through 25 were
5 marked for identification.)
6
7             EXAMINATION
8 BY MS. ZELLNER:
9     Q. Could you state your full name for the record,
10 including your middle name.
11     A. Arthur David Curtis.
12     Q. And Curtis is spelled with a C?
13     A. Yes.
14     Q. Just a couple of rules. Let's try to not talk
15 over each other. There's a little bit of problem, just
16 with the technology of a lag time, so let me complete my
17 question before you answer, and I'll try to do the same
18 so you can fully answer the question.
19     If you need a break, let us know. And if you
20 answer a question, I will assume that you understood the
21 question. If you don't, just tell me and I can rephrase
22 it.
23     Are those rules clear?
24     A. Yes.
25     Q. What is your current occupation?

**Page 6**

1     A. I'm retired.
2     Q. And how long have you been retired?
3     A. Almost two years.
4     Q. Where did you attend law school and what year
5 did you graduate?
6     A. I attended law school at Northwestern School of
7 Law at Lewis & Clark College in Portland, Oregon. I
8 graduated in 1974.
9     Q. And then when did you become licensed to
10 practice law in Washington?
11     A. In 1975.
12     Q. And when were you first elected as the Clark
13 County prosecutor?
14     A. I was elected in 1981.
15     Q. How many terms did you serve?
16     A. Well, I was appointed -- actually, I was
17 appointed and then I ran in a special election in 1981.
18 And then I ran every four years thereafter starting in
19 1982.
20     Q. Is it correct, did you serve, then, eight terms
21 in total?
22     A. '82, '86, '90, '94, '98, 2002 -- seven full
23 terms, plus the partial term.
24     Q. And what year were you appointed?
25     A. I was appointed in 1981.

**Page 7**

1     Q. Can you describe for the record what documents
2 you've reviewed to prepare yourself for the deposition
3 today?
4     A. Well, I was asked to review a number of
5 documents, some of which I believe were provided by you
6 and some provided by my attorneys. There's numerous
7 documents. I don't know how you want me to explain
8 that.
9     Q. Well, we'll just do it document at a time as we
10 identify them for the record.
11     Have you met with any of the defense attorneys
12 in the case --
13     A. Yes.
14     Q. -- prior to -- okay. And who have you met
15 with?
16     A. Mr. Veljacic and Ms. Fetterly.
17     Q. When did you first meet with Ms. Fetterly?
18     A. Last week.
19     Q. And where did that meeting take place?
20     A. In Woodland, Washington, at a restaurant.
21     Q. How long did that meeting last?
22     A. I think it was an hour, hour and a half.
23     Q. Did Ms. Fetterly bring documents for you to
24 review at that point?
25     A. Yes.

### Page 16

1  A. Well, generally, as I recall, it was based upon
2  the allegations being made by Katie regarding sexual
3  activity that she was involved with with Mr. Spencer.
4  Q. Was there, other than Katie Spencer's
5  allegations, was there any other basis for the probable
6  cause to arrest that you're aware of?
7  A. Well, whatever would have been included in the
8  police reports. I believe there was an interview that
9  she had with Sharon Krause and I know that there was a
10 written statement that Shirley Spencer had written out,
11 several pages long, that I reviewed, and I don't know if
12 that was part of the original file or not. I would
13 assume it would have been, but I can't say for sure.
14 Q. Under Washington law at the time, is it correct
15 that Shirley Spencer would not have been able to testify
16 to the substance of those allegations but only to the
17 fact that sexual abuse had been reported to her?
18 A. As I recall 9844 had gone into effect, the
19 Child Hearsay Statute in the state of Washington, before
20 that incident occurred. That's my recollection.
21 Q. So in your opinion, would the Shirley Spencer
22 letter describing the allegations, would that have been
23 part of the probable cause for the arrest?
24 A. If it was incorporated in the police report,
25 sure.

### Page 17

1  Q. Was there anything else that established
2  probable cause for the arrest other than statements made
3  by Katie Spencer to, let's say, Shirley Spencer or
4  Sharon Krause, was there anything else?
5  A. There may have been, but I don't recall.
6  Q. Prior to this arrest on January 3rd, 1985, had
7  you personally had any contact with Sharon Krause about
8  her investigation?
9  A. I don't recall.
10 Q. When you say you don't recall, does that mean
11 you may have but you don't remember?
12 A. Yes.
13 Q. Or you don't recall actually ever meeting with
14 her or talking to her?
15 A. No, I don't recall. It was 26 years ago and I
16 just don't recall.
17 Q. If a police report indicates contact made with
18 the prosecutor about polygraphing a woman named Karen
19 Stone, do you have any recall of being the prosecutor
20 that was contacted about that?
21 A. No, I don't.
22 Q. Had you, on other cases prior to the arrest,
23 had you had any meetings or conversations with
24 Investigator Krause? And I'm talking about just sexual
25 abuse cases of a child.

### Page 18

1  A. Had I ever talked to Sharon Krause about sexual
2  abuse cases?
3  Q. Yes. Not this case but just in general, had
4  you ever had conversations or meetings with Sharon
5  Krause prior to an arrest about a pending investigation
6  of a child sexual abuse case?
7  A. Oh, sure, I've talked to Sharon Krause all the
8  time. She was the go-to person for sex crimes -- child
9  sex crimes in the sheriff's office at that time.
10 Q. And was it a common practice of yours or your
11 deputy prosecutors to have contact with an investigator,
12 like Sharon Krause, prior to the arrest of the sex abuse
13 case?
14 A. Not necessarily prior to the arrest, because
15 there was a lot of pending investigations that she may
16 have been working on that she wouldn't discuss with us
17 until she got to a probable cause situation.
18 Q. And do you recall with the Katie Spencer
19 allegations prior to January 3rd, 1985, speaking to any
20 of the investigators on the case? You said no about
21 Sharon Krause, you don't remember, but anyone else that
22 was investigating?
23 A. No, I don't recall.
24 Q. In terms of the involvement of you or your
25 deputy prosecutors in the investigation of sex abuse

### Page 19

1  cases, did you become involved in the investigation of
2  those cases prior to the arrest?
3  A. No.
4  Q. And that would be true of sex abuse cases or
5  any other type of investigation, correct?
6  A. Pretty much, right.
7  Q. Did you ever advise investigators about
8  probable cause to arrest? Did they ever seek your
9  counsel about whether they had enough to make the
10 arrest?
11 A. Occasionally.
12 Q. Do you remember if they did that on the Ray
13 Spencer case prior to the first arrest?
14 A. No, I don't recall.
15 Q. You said that the initial assignment was made
16 to Jim Peters; is that right?
17 A. That's my recollection.
18 Q. And do you know whether Jim Peters at the time
19 you made your assignment to him of the case after the
20 arrest, do you know if he'd had any contact with Sharon
21 Krause prior to the arrest about the investigation?
22 A. I don't recall.
23 Q. Do you know if any background investigation was
24 ever done of Shirley Spencer?
25 A. No, I don't.

64

1  A. Several times, yes.
2  Q. Why did you feel, in the Spencer case, even
3  though I'm sure you felt that most of the people that
4  you convicted didn't deserve a pardon, but why did you
5  feel compelled to write a letter? What was going on at
6  that point that made you feel that it would be important
7  to write this letter?
8  A. Well, because we didn't feel he deserved
9  commutation of sentence, let alone pardon.
10 Q. And then what was your reaction when the
11 governor did grant Mr. Spencer some relief?
12 A. Shock and disappointment.
13 MS. ZELLNER: If we could take a five-minute
14 break, I don't think I have too many more questions. Is
15 that okay?
16 MR. FREIMUND: Sure.
17 (Discussion off the record.)
18 (Deposition Exhibits No. 26 through 32 were
19 marked for identification.)
20 BY MS. ZELLNER:
21 Q. I just have one more question. Would you agree
22 that after the second information was filed by Mr.
23 Peters that he was the lead prosecutor on the Ray
24 Spencer case up through the sentencing?
25 A. Yes.

65

1  MS. ZELLNER: I don't have any further
2  questions.
3  MR. FREIMUND: I have no questions.
4  MR. BOGDANOVICH: I do have a couple.
5
6  EXAMINATION
7  BY MR. BOGDANOVICH:
8  Q. Mr. Curtis, this is Guy Bogdanovich. I'm the
9  attorney for defendant Sharon Krause.
10 Had you ever received any complaints from
11 either defendants or criminal defense attorneys
12 regarding Detective Krause's truthfulness in conducting
13 investigations or writing reports?
14 A. No.
15 MR. BOGDANOVICH: That's all I have.
16 MS. FETTERLY: Before I get started, I had the
17 reporter mark some of the documents that I had sent. I
18 didn't have her mark all of them because many of them
19 are duplicative to plaintiffs' counsel's documents.
20 I had her mark as Exhibit 26, the copy I sent
21 of the information that was dated January 2nd, 1985, and
22 filed the next day, January 3rd. So that's 26.
23 And I had her mark as 27, it's a photocopy of
24 handwritten notes on appears to be a notepad. The top
25 says Defendant Clyde Ray Spencer and then it says Count

66

1  1, stat rape 1; count 2, at the bottom it has some
2  shorthand notations.
3  MS. ZELLNER: Yeah, Pat, if we could just, when
4  you get to those, have him read those, because our
5  copies are really illegible, if you can have him read
6  them when they get them.
7  MS. FETTERLY: I recognize that. I believe
8  they might be from microfilm, that's why.
9  29 is a phone message note. It says, To AC,
10 4-4, meaning, I guess, April 4th. It says 10:57 a.m.
11 The next line says Barbara Linde. So that's 29.
12 And 28 is also a photocopy of a notepad. At
13 the top is written 4-4-85. And it says at the top, and
14 underlined, Barbara Linde.
15 And 30 is a letter to Mr. Curtis dated June
16 10th, 1992, from Howard Goodfriend.
17 31 is a motion for Order Compelling Disclosure
18 of Medical Records from Mr. Goodfriend that's dated June
19 10th, 1992.
20 And 32 is a letter from Mr. Curtis to Mr.
21 Goodfriend dated July 1, 1992.
22 Are we ready, then?
23 MR. FREIMUND: Ready on this end.
24 MS. ZELLNER: We're ready.
25 ///

67

1  EXAMINATION
2  BY MS. FETTERLY:
3  Q. Mr. Curtis, I'm handing you what's been marked
4  as Exhibit 26, and can you identify that as the
5  information that you signed on January 2nd, 1985, in the
6  Spencer case?
7  A. It's dated January 2nd. It's filed January
8  3rd, so I signed it either on the 2nd or the 3rd.
9  Q. Comparing a copy of the same document that was
10 marked and discussed earlier in your deposition as
11 Exhibit 3, but am I correct that the difference between
12 the two documents is Exhibit 3 appears to have a
13 conformed signature for you, whereas Exhibit 26 has an
14 actual signature?
15 A. That's correct.
16 Q. And is the signature on Exhibit 26 your actual
17 signature?
18 A. It is.
19 Q. There was much discussion earlier about whether
20 or not you had reviewed Exhibit 1, which is Rebecca
21 Roe's report dated November 27, 1984. Do you recall
22 that line of questioning, initial questioning?
23 A. Yes.
24 Q. And then there was some discussion of exhibits,
25 particularly Exhibit 6 and Exhibit 7, and am I correct

Case 3:11-cv-05424-BHS   Document 134-9   Filed 01/16/13   Page 8 of 12

20 (Pages 68 to 71)

**Page 68**

1  that Exhibit 6 and 7 is correspondence between you and
2  Norm Maleng, the King County prosecutor, that is dated
3  -- is that January 5th, 1985?
4      A. I can't tell if that's January 5th or -- looks
5  almost like a 9th.
6      Q. Okay. 9th. And then there's a letter to
7  Rebecca Roe dated January 9, 1985.
8      A. Right.
9      Q. These documents are basically thanking Mr.
10 Maleng for providing a special prosecutor, namely Ms.
11 Roe in this case, correct?
12     A. Yes.
13     Q. In reviewing these documents, and I think there
14 were some other testimony, that Mr. Peters expressed
15 some reluctance to proceed or saw some problems about
16 proceeding to file charges in January of 1985. Does
17 that refresh your recollection as to whether or not you
18 likely reviewed Exhibit 1, Ms. Roe's report, prior to
19 filing the initial charges?
20     A. Yes. We specifically asked Ms. Roe to review
21 the case for us. And I would find it hard to believe
22 that we would ask her to review a case and then not
23 review her -- review this letter which incorporates her
24 opinions and rationale. It wouldn't make any sense to
25 me that I wouldn't have reviewed the letter. But I

**Page 69**

1  don't have any independent recollection 26 years later
2  of having done so.
3      Q. But do you believe in reviewing the subsequent
4  documents that it's likely you did?
5      A. Yes.
6      Q. Now, handing you what's been marked as Exhibit
7  27, can you identify that, please?
8      A. This is a document that I prepared. In the old
9  days, we would have yellow pads that we would use to
10 write out contents of informations. I put at the top D,
11 which is defendant, Clyde Ray Spencer, and then Count 1,
12 Count 2, Stat Rape 1, and Indecent Liberties, Count 2.
13     I asked my secretary to provide or to compare
14 the information alleging the dates of -- on one or more
15 occasion between July 18, 1984, and August 26th, 1984,
16 and see if CCSofW - which is County of Clark, State of
17 Washington - and then I listed the victim as Kathryn E.
18 Spencer who was five years of age at the time. Count
19 No. 2, Indecent Liberties, I cited the pertinent part of
20 the statute. There's a 1(a) and 1(b), which was being
21 charged under 1(b), same dates.
22     And at the bottom appears shorthand from my
23 long-time secretary, Carol Axford, which I don't read
24 shorthand so I don't know what it says, other than she
25 was -- I probably asked her to docket it for the next

**Page 70**

1  day or that day, which is the 9 -- I can't read the rest
2  of it.
3      Q. Would that have been a document, meaning
4  Exhibit 27, which was basically your rough draft and
5  instructions to staff that went into preparing Exhibit
6  26, which was the initial information?
7      A. Yes.
8      Q. And am I correct that Exhibit 27, other than
9  the shorthand at the bottom, was all in your
10 handwriting?
11     A. Yes.
12     Q. Why did you make the decision to file the
13 initial charges against Ray Spencer?
14     A. Well, I knew that it was a tough case. At the
15 time I knew that Mr. Peters had some reservations about
16 filing it, even after his interview with Katie Spencer.
17 Obviously, Becky Roe had reservations, as well.
18     But as I recall, the thing that kept coming
19 back to me was the part of her letter, Rebecca Roe's
20 letter to us on page 3 where she says here: There are
21 several problems. Although I believe child was clearly
22 abused and probably by the defendant, the case is
23 unwinnable even assuming you can get the child to
24 testify -- or to talk.
25     I recall that I did not come to the decision to

**Page 71**

1  file this case lightly. I felt like there were some
2  problems with the case, but it was my policy as the
3  elected prosecutor to take an aggressive stand in my
4  county towards child abusers. And the fact that Becky
5  Roe concluded the child was abused, allegations were
6  against this specific defendant, I decided that that's
7  what juries are for, to make that determination, not for
8  me as a prosecutor, to go back to a four-year-old girl
9  and say, you know, we believe you were molested as you
10 say you were. We believe you, but we're not going to
11 believe you of the point of giving you your day in
12 court.
13     That's the posture I had on many of these sex
14 abuse cases in Clark County over the years. We felt
15 that if we could win or get convictions on these types
16 of cases even 50 percent of the time, we were doing a
17 service to the criminal justice system and our
18 community. We did get convictions many times on these
19 tough cases; sometimes we didn't.
20     But I was not going to let my belief that this
21 defendant was guilty and that this victim had been
22 abused by this defendant to be overridden by a policy of
23 not at least giving it our best shot in a court of law.
24     Q. Did Jim Peters pressure you to file the initial
25 information in January?

Page 72

1  A. No. In fact, my recollection was that he had
2  some serious reservations, as well.
3      But, again, it was my call. That's why I
4  charged it. Even though he was in charge of -- was
5  going to be in charge of the prosecution, I charged it
6  because I felt like it was going to be a tough case and
7  the buck ultimately stopped with me as the elected
8  prosecutor, and I was willing to sign the information
9  knowing that fact.
10     Q. Did Sharon Krause pressure you to file these
11 charges?
12     A. No. As in all of these cases that I had with
13 Mrs. Krause over the years, her credibility -- her
14 reputation as being one of the best in the country -- I
15 mean, she traveled around with Jim Peters teaching this
16 stuff all over the country.
17     Q. Was this even before these were filed?
18     A. I believe so. In fact, I think Mr. Peters
19 alludes in the one letter from just getting back from
20 Hawaii, because they were doing one of their seminars
21 over there. That's my recollection. That may not be
22 the case.
23     But she had an impeccable reputation with our
24 office. I relied on her and her interview, conclusions
25 substantially in making the decision to file this case.

Page 73

1  I obviously relied on Mr. Peters, as well, but
2  I think we all had reservations when the case was
3  originally filed. And that's why I said that we were
4  delighted when additional victims came forward,
5  unfortunately, on events that occurred after he got
6  released from jail. But we obviously, at that point,
7  felt that we had a very, very strong case.
8      Q. And just so we're clear about the time frame
9  here, I think in response to one of Ms. Zellner's
10 earlier questions, you indicated you first learned about
11 the Spencer case after he was arrested. That would have
12 been, I take it, after January 3rd, 1985, which was the
13 first information. Would you like to amend that answer
14 at this point?
15     A. I don't know the exact date of his arrest. But
16 I was probably informed of the investigation prior to
17 his actual arrest, just because, as I said, as a high
18 profile case, it was a policy by my deputies to keep me
19 informed on things that I might be reading about in the
20 newspaper the next day.
21     Q. So you would have learned about this case
22 before you actually filed the information?
23     A. Yes. If I misspoke, I'm sorry.
24     Q. I just wanted to clarify.
25     Going back to Sharon Krause, had you ever had

Page 74

1  occasion to know or have it be brought to your attention
2  by anyone in law enforcement or by your deputies or by
3  defense lawyers that Ms. Krause had ever fabricated
4  information and put that fabricated information into her
5  reports?
6      A. Absolutely not.
7      Q. Did you ever know of situations where she had
8  coerced child witnesses into making false statements?
9      A. Absolutely not.
10     Q. Now, there's a reference to an interview that
11 Mr. Peters conducted after Ms. Roe made her initial
12 report. Was the purpose of that interview to assist in
13 making the decision whether or not to file charges?
14     A. Yes, because although we certainly respected
15 what Ms. Roe had to say, she did not actually interview
16 Katie in coming to a conclusion. She only reviewed the
17 police report. So we felt it would be very important
18 for Mr. Peters to actually interview her, see whether he
19 agreed with Ms. Roe's assessment or whether he thought
20 the case was prosecutable.
21     Q. Am I correct that that was not part of the
22 ongoing police investigation or an investigation
23 conducted by your office but went strictly to the
24 decision of whether or not to charge?
25     A. No. It was done for the purpose of allowing us

Page 75

1  to do a more thorough assessment on whether or not we
2  thought the case was, in fact, filable.
3      Q. Thank you.
4      Now, after the new allegations came forward in
5  February, late February 1985, in your view, did that
6  make Ms. Roe's initial concerns moot or somewhat moot?
7      A. Yes. Because at that point, we felt in having
8  three victims instead of one victim, all of whom said
9  they had been separately molested by Mr. Spencer and not
10 just corroborating what they may have seen or not seen
11 with Katie, we had additional victims, additional
12 disclosures, additional incidents, and we felt from a
13 legal standpoint, we would be able to charge the counts
14 all together and try them all together, at which time
15 the jury would hear from all three victims in one trial,
16 which we felt would provide a basis for them to find Mr.
17 Spencer guilty beyond a reasonable doubt.
18     Q. And turning to the omnibus application that was
19 referenced, I think it's exhibit -- one of the earlier
20 ones.
21     A. Part of Exhibit 3.
22     Q. Page 2. In the box where it's checked that
23 statements of witnesses would be provided, and I believe
24 you said the latter part of that document said ten days
25 before trial; is that right?

92

1  Q. Is it a fair statement to say that you didn't
2  know that Ray Spencer had been fired as of January 8th,
3  1985?
4  A. Well, just looking at these documents, that
5  appears to be the situation, because I sent the letter
6  to Mr. Malang after he had been fired saying that we
7  were asking them to review the case because he was a
8  member of the Vancouver Police Department. So
9  apparently I didn't know he had been fired.
10 Q. Right. And isn't it true that Barb Linde could
11 be brought in with Mr. Peters to try the case, but it's
12 Mr. Peters who's in charge of the case up to and if
13 there is a trial?
14 A. No. When we gave the case to King County, it
15 became their case.
16 Q. And they filed appearances?
17 A. It was our intent that they would try the case,
18 and we were trying to find a trial date that would work
19 for them so that we could relay that back to the judge.
20 Q. And then at a certain point, then, you decide
21 to take the case back, correct?
22 A. Yes.
23 Q. Well, we'll just subpoena the King County
24 prosecutor's trial file for this. I'm sure that will
25 make it clear to us their involvement in the case.

93

1  Is there anything else that you want to add
2  about the King County involvement, other than the
3  documents you've looked at?
4  MR. FREIMUND: I object to the form of that
5  question.
6  Go ahead and answer, if you can.
7  THE WITNESS: I have nothing to add.
8  MS. ZELLNER: I don't have anything else.
9  MR. FREIMUND: I did have a follow-up, I'm
10 sorry, Mr. Curtis.
11
12              EXAMINATION
13 BY MR. FREIMUND:
14 Q. My name is Jeff Freimund, and I represent one
15 of the other defendants, Mike Davidson.
16 Did you interact with Mike Davidson as the
17 Clark County prosecutor?
18 A. Yes.
19 Q. To your knowledge, what role, if any, did Mike
20 Davidson have in the criminal investigation related to
21 Clyde Ray Spencer?
22 A. I think, if anything, he was acting in a
23 supervisory capacity.
24 Q. Did you, to your recollection, ever meet Mr.
25 Davidson to discuss the Spencer investigation or

94

1  prosecution?
2  A. No, I don't believe I did.
3  Q. To your knowledge, did Defendant Davidson or
4  did Michael Davidson pressure the prosecutor's office in
5  any way to file criminal charges against Clyde Ray
6  Spencer?
7  A. Absolutely not.
8  Q. To your knowledge, did he play any role
9  whatsoever in the prosecutor's office's decision to file
10 criminal charges against Clyde Ray Spencer?
11 A. No. And we did not.
12 Q. I just have one last question, and that's if
13 you could go back to Exhibit 3, the omnibus motion or
14 application, I should say, and order of the court, and
15 I'll direct your attention to the third page of that.
16 You were testifying earlier about believing there might
17 be a continuance of the trial date at the time this
18 order was signed on January 25th of 1985. If you look
19 at the bottom of the third page of that application,
20 does that refresh your memory in any way regarding a
21 continuance of the trial?
22 A. You're at the bottom of the third page?
23 Q. Yes, under Item 23, additionally.
24 A. It says that they want to have a hearing to
25 determine whether the victim is competent to testify at

95

1  trial and for a continuance of the trial date.
2  Q. What does that tell you about the prosecution's
3  obligation at that point to disclose statements by the
4  prosecution's witnesses and the timing of doing so?
5  A. Well, in conjunction with the last page where
6  the parties agree to provide information by ten days
7  before trial, it appears to me that a continuance of the
8  trial date had already been discussed with the defense
9  counsel and that the trial date set in January would not
10 be occurring.
11 Q. And from looking at Exhibit 28, your notes from
12 April 4, 1985, and a call with Barbara Linde, was it
13 your understanding that there was also discussions
14 occurring about continuing the trial again that was at
15 least at that time, I believe, set for May?
16 A. Yes, because we were discussing when would be a
17 good time for her to come down to trial, and she said
18 the last week of May and the first week of June would
19 not be good for her, so we obviously were contemplating
20 continuing the trial date to some future date.
21 Q. And again, going back to the omnibus order,
22 with those considerations in mind, does that in any way
23 affect your understanding of what the obligation would
24 be on the prosecutor's office to provide the
25 information, including witness statements and medical

1                         CERTIFICATE

2

3

    STATE OF WASHINGTON )
4                        ) ss.
    County of Clark      )
5

6        I, the undersigned Washington Certified Court
    Reporter, pursuant to RCW 5.28.010 authorized to
7   administer oaths and affirmations in and for the State
    of Washington, do hereby certify:
8
         That the annexed and foregoing deposition
9   consisting of Pages 5 through 106 of the testimony of
    each witness named herein was taken stenographically
10  before me and reduced to a typed format under my
    direction;
11
         I further certify that according to CR 30(e)
12  the witness was given the opportunity to examine, read
    and sign the deposition after the same was transcribed,
13  unless indicated in the record that the review was
    waived;
14
         I further certify that all objections made at
15  the time of said examination to my qualifications or the
    manner of taking the deposition or to the conduct of any
16  party have been noted by me upon each said deposition;

17       I further certify that I am not a relative or
    employee of any such attorney or counsel, and that I am
18  not financially interested in the said action or the
    outcome thereof;
19
         I further certify that each witness before
20  examination was by me duly sworn to testify the truth,
    the whole truth and nothing but the truth;
21
         I further certify that the deposition, as
22  transcribed, is a full, true and correct transcript of
    the testimony, including questions and answers, and all
23  objections, motions and exceptions of counsel made and
    taken at the time of the foregoing examination and was
24  prepared pursuant to Washington Administrative Code
    308-14-135, the transcript preparation format guideline;
25

108

1   I further certify that I am sealing the
deposition in an envelope with the title of the above
2   cause and the name of the witness visible, and I am
delivering the same to the appropriate authority;
3
     I further advise you that as a matter of firm
4   policy, the Stenographic notes of this transcript will
be destroyed three years from the date appearing on this
5   Certificate unless notice is received otherwise from any
party or counsel hereto on or before said date;
6
     IN WITNESS WHEREOF, I have hereunto set my hand
7   and affixed my Washington State CCR Seal this 14th day
of December 2012.
8

9

10

11

12              Certified Court Reporter No. 2119
                in and for the State of Washington
                residing at Vancouver, Washington
13              My CCR certification
                Expires 12-03-13
14

15

16

17

18

19

20

21

22

23

24

25