# EXHIBIT 10

Page 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY )
SPENCER, and KATHRYN E. TETZ, )
　　　　　)
　　Plaintiffs, )
vs.　　　) No. 3:11-cv-05424-BHS
　　　　　)
FORMER PROSECUTING ATTORNEY FOR )
CLARK COUNTY JAMES J. PETERS, )
DETECTIVE SHARON KRAUSE, )
SERGEANT MICHAEL DAVIDSON, )
CLARK COUNTY PROSECUTOR'S )
OFFICE, CLARK COUNTY SHERIFF'S )
OFFICE, THE COUNTY OF CLARK and )
JOHN DOES ONE THROUGH TEN, )
　　　　　)
　　Defendants. )

DEPOSITION UPON ORAL EXAMINATION OF

REBECCA J. ROE

Thursday, December 13, 2012

Taken at 810 3rd Avenue, Suite 500
Seattle, Washington
1:36 p.m.

REPORTED BY: KAREN M. GRANT, CCR NO. 2155
DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360)352-2506  *  (800)888-9714

Page 2

APPEARANCES

For Plaintiff Clyde Ray Spencer (via telephone):
　DOUGLAS JOHNSON
　Kathleen T. Zellner & Associates
　Esplanade IV
　1901 Butterfield Road, Suite 650
　Downers Grove, IL  60515
　(620)955-1212
　kathleen.zellner@gmail.com

For Defendant James M. Peters:
　PATRICIA C. FETTERLY
　Assistant Attorney General
　P.O. Box 40126
　Olympia, Washington  98504-0126
　(360)586-6300
　patriciaf1@atg.wa.gov

For Defendant Detective Sharon Krause:
　GUY BOGDANOVICH
　Law, Lyman, Daniel, Kamerrer & Bogdanovich
　P.O. Box 11880
　Olympia, Washington  98508-1880
　(360)754-3480
　gbogdanovich@lldkb.com

--oOo--

Page 3

EXAMINATION INDEX

COUNSEL:　　　　　　　　PAGE:
Examination by Mr. Johnson . . . . . . . . . . 4
Examination by Mr. Bogdanovich . . . . . . . 222
Examination by Ms. Fetterly . . . . . . . . . 223

--oOo--

EXHIBIT INDEX

NO: MARKED: DESCRIPTION:
1　　4　　Decline notice dated 11/27/84, prepared by
　　　　　Rebecca J. Roe; 3 pages

2　　4　　Transcription of the videotaped interview
　　　　　of Kathryn Spencer on 12/11/1984; 59 pages

3　　4　　Report of Rebecca J. Roe, with her CV
　　　　　attached, dated November 7, 2012; 15 pages

--oOo--

Page 4

　　REBECCA J. ROE,
witness herein, having been first duly sworn on oath,
was examined and testified as follows:

　　(Exhibits 1-3 pre-marked.)
　　EXAMINATION
BY MR. JOHNSON:
　Q.　Ma'am, could you please state and spell your name?
　A.　Rebecca, R-e-b-e-c-c-a, Jane, J-a-n-e, Roe, R-o-e.
　　MR. JOHNSON: Let the record reflect that this is the discovery deposition of Rebecca Roe taken pursuant to notice -- I'm sorry. Yes, taken pursuant to notice and continued to this time and date by agreement of the parties.
　Q.　(By Mr. Johnson) Ms. Roe, you've been deposed before; is that correct?
　A.　Yes.
　Q.　About how many occasions?
　A.　You know, I think I've probably been deposed about six times, maybe, five or six times.
　Q.　All right. And how many depositions have you taken? I bet it's going to be a higher number.
　A.　Oh, that's going to be a much higher number.

Page 81

1  Because you're saying at this point that even if the
2  child does talk, the case is unwinnable, correct?
3     A. I don't know if I would say I agree that it's
4  a strong conclusion. It depends on what you -- what you
5  mean by that.
6     Q. Is a fair interpretation of the conclusion
7  that you've set forth -- and I will read it again. The
8  conclusion I'm referring to is: "The case is
9  unwinnable, even assuming you can get the child to
10 talk." Do you see that?
11    A. I do.
12    Q. Is a fair interpretation of that conclusion
13 that, even if the child does talk, in your opinion, the
14 case was unwinnable?
15    A. Based -- yes, I think that's fair.
16    Q. Okay. And then you wrote at the bottom -- is
17 that your signature at the bottom of the third page?
18    A. Yup.
19    Q. Do you agree that in this report we've been
20 looking at, you did not write that Ray Spencer, quote,
21 "may well be guilty," unquote?
22    A. I did not use those words.
23    Q. And do you agree where -- did you give any
24 suggestions, that you can recall, of what could be done
25 with regard to the Ray Spencer case so that it could

Page 82

1  become legally sufficient?
2     A. I don't recall.
3     Q. You would agree with me there certainly aren't
4  any suggestions on the face of the report, correct?
5     A. Correct.
6     Q. And you did not write to do a videotaped
7  interview of Katie Spencer?
8     A. Right.
9     Q. And you have no recollection of advising
10 anyone at the King County Prosecutor's Office to conduct
11 a videotaped interview of Katie Spencer?
12    A. Right.
13    Q. And would you agree that a videotaped
14 interview of a five-year-old child regarding sexual
15 abuse can be a very traumatic experience for that
16 five-year-old child?
17        MS. FETTERLY: Object as to form.
18    A. I don't know how to answer that.
19    Q. Okay. That's fine.
20        Do you agree that, at the time you signed this
21 decline notice, it was honest, accurate, and complete?
22    A. To the best of my recollection. Correct.
23    Q. And, again, there was absolutely no charge to
24 the Clark County Prosecutor's Office for this decline
25 notice, correct?

Page 83

1     A. Correct.
2        You mean monetary charge?
3     Q. Yes.
4     A. Right.
5     Q. This is something you did because you were
6  well versed in the field and it was part of your duties
7  and responsibilities, you felt, at least, of your
8  profession?
9     A. Correct.
10    Q. And because you had spent a lot of your career
11 at that point in this field, you wanted to give those
12 people the benefit and knowledge of your experience; is
13 that correct?
14    A. I don't know that that was my thinking. My
15 thinking was that I wanted to give them my best input as
16 to a charging decision.
17    Q. Okay. What was the probable cause for Ray
18 Spencer's arrest?
19        MS. FETTERLY: Are you saying at this
20 point in time, before January of 1985?
21        MR. JOHNSON: Let me withdraw that.
22    Q. (By Mr. Johnson) Is it fair to say that you
23 would not recommend filing a case if there was no
24 probable cause to charge?
25    A. Correct.

Page 84

1     Q. Okay. Now, at the time you submitted this
2  report, was it your opinion that, although the case was
3  legally insufficient, there was probable cause to
4  charge?
5     A. Yes.
6     Q. All right. Can you tell me what that was?
7     A. Well, as I indicated here, although I believe
8  child was clearly abused, and I do believe she was, she
9  voluntarily made statements to Shirley that -- and under
10 circumstances that indicated reliability and a child who
11 was -- had been abused and was engaging in highly
12 sexualized behavior.
13        So I clearly believed, as I said here, she was
14 abused, and, as I also wrote, probably by the defendant,
15 and that was based on her statements to both Shirley,
16 again, and also to Sharon Krause.
17    Q. Okay.
18    A. You know, she described abuse she was -- to
19 people. The initial statements are often the most
20 important, and they were made to somebody who did not
21 have, as I understood it, motive to, you know, fabricate
22 or suggest this testimony to the child. You know, so,
23 yeah, I believe there was clearly probable cause.
24    Q. Okay. You just mentioned Shirley. Can you
25 tell me what you knew about Shirley Spencer at that

Page 85

1  time?
2  A. I knew that she was -- well, I certainly
3  believe I knew she was his then current wife.
4  Q. Okay.
5  A. I mean, if the statements had been made --
6  and, again, now I'm telling you based on what I've read,
7  but if the statements had been -- the initial statements
8  had been made to his ex-wife, I would have viewed them
9  with substantially more skepticism because that is the
10 area where we most often saw, you know, fabricated or
11 suggested -- highly suggestable statements.
12     So I did not see that Shirley, you know, had
13 any motivation to be making -- making up statements by
14 Katie or leading Katie to make false statements.
15 Q. If Shirley did have a motivation, whatever it
16 was, to make up statements, would that have played
17 materially into your analysis?
18 A. It depends. Yes.
19 Q. So the first notice, it's very important, and
20 I think you just described it, evaluating everything
21 about the person who the first report by the child is
22 made to, correct?
23 A. Correct.
24 Q. So, what did you know about Shirley Spencer at
25 the time? I think you told me what you didn't know.

Page 86

1  What did you know?
2  A. I would have only known what's in the police
3  reports, as far as I can tell.
4  Q. And if there was a motivation that Shirley
5  had, would you have expected that to be set forth in the
6  police reports?
7  A. I'm not -- again, I'm not sure how to -- I'm
8  assuming I would have been able to glean it somewhere in
9  the police reports.
10 Q. If the police reports were accurate, correct?
11 A. Correct.
12 Q. And you relied on the police reports when you
13 made your decision, correct?
14 A. Yes.
15 Q. Did you know Sharon Krause?
16 A. Yes.
17 Q. And what did you know about her?
18 A. You know, I just can't remember very much that
19 I knew, except for I did know from, again I'm assuming,
20 WAPA - that's the state association for prosecuting
21 attorneys - I knew her as somebody who was doing a lot
22 of investigations of child sexual abuse and was very
23 committed to the -- to the issue and to doing a good job
24 and to treating victims the way they should be treated.
25 Q. So you didn't question anything about the

Page 87

1  report she submitted, correct?
2  A. No, that's not what I said. I always question
3  about it, but you're asking me what I knew about her.
4  Q. Okay. So you did question Sharon Krause's
5  reports?
6     MS. FETTERLY: Object as to form.
7  A. I can't answer that question.
8  Q. Did you question the veracity of her reports
9  or didn't you?
10 A. Did I -- are you asking me, did I believe she
11 just made up stuff and put it in her reports? No, I
12 didn't believe that.
13 Q. And, no, I'm not really asking you that.
14    Let me try it again. Did you take Sharon
15 Krause's reports at face value?
16 A. Did I -- I assumed that Sharon Krause
17 accurately reported the conversations that she had with
18 the people that she reported having conversations with,
19 including Katie.
20    (Off-the-record discussion.)
21 Q. (By Mr. Johnson) Did you question the
22 veracity of the reports because they reflected that
23 Katie was speaking in complete sentences and referring
24 to her father as "Ray"?
25 A. I don't -- I don't recall that.

Page 88

1  Q. That's something that you might pay attention
2  to, correct?
3  A. Well, the fact that somebody refers to their
4  parent by their first name I don't find unusual; didn't
5  then, don't now. So that wouldn't -- I wouldn't put
6  anything on that.
7  Q. Would you put something on it if Sharon
8  Krause's reports reflected Katie calling her dad Ray
9  repeatedly, yet in the discussion between Mr. Peters and
10 Katie, she doesn't once utter the word "Ray"?
11 A. I don't -- I don't think that's particularly
12 noteworthy.
13 Q. It's not?
14 A. No.
15 Q. Let's assume the language is completely
16 different, as reflected in the reports of Sharon Krause,
17 from the language Katie uses on the video. Let's just
18 assume that. Is that something you would take into
19 consideration in determining whether or not the
20 allegations are correct?
21 A. I might.
22 Q. Okay. For instance, if -- did you find --
23    Let me ask you this: In the reports of Sharon
24 Krause, did you find the quotes to be improbable for a
25 five-year-old child? And by that, I mean the quotes

Page 93

1  correct?
2      A. No. I can't remember exactly what I was
3  thinking happened when I wrote this 28 years ago.
4      Q. Okay. But --
5      A. What I'm saying is that I reviewed the
6  materials I would have reviewed -- or I did review, and
7  I made the statement that I believed she was clearly
8  abused, and probably by the defendant, and I believe
9  that's likely the acts I was thinking had occurred.
10     Q. Okay. So your recent review has assisted you
11 in recalling what you thought occurred, correct?
12     A. My recent review has led me to be able to
13 answer your question at all.
14     Q. And you've been paid for your recent review,
15 correct?
16         MS. FETTERLY: Objection.
17     A. I've already answered that too.
18     Q. Have you been paid for your recent review that
19 has assisted in your memory of what you were thinking in
20 1984 when you issued your report?
21         MS. FETTERLY: Objection; argumentative.
22     A. No.
23         MR. BOGDANOVICH: Can we take our break
24 now, Counsel? Is this a good time?
25         (Off-the-record discussion.)

Page 94

1          (Deposition at recess.)
2      Q. (By Mr. Johnson) Ms. Roe, have you ever read
3  Judge Settle's opinion? I didn't hear you mention it
4  when you talked about what you reviewed. Have you ever
5  read Judge Settle's opinion with regard to Mr. Peters
6  and immunity?
7      A. Yes. Yes, I did.
8      Q. Okay.
9      A. But I can't -- I can't tell you that I
10 remember what he said. But, yes, I did.
11     Q. Okay. Would you agree with me that basically
12 step one involved probable cause to arrest and step two
13 involves probable cause to charge, with regard to a
14 criminal investigation and prosecution?
15     A. No.
16     Q. Okay. So can you have probable cause to
17 charge? Do you ever evaluate that before probable cause
18 to arrest?
19     A. Yes, I oftentimes filed charges before there
20 had been an arrest.
21     Q. Okay. Well, would you agree that Ray Spencer
22 had not been arrested as of November 27th of 1984?
23     A. To tell you the truth, I can't remember.
24     Q. Okay.
25     A. I'm sure it's in there somewhere, but I can't

Page 95

1  remember.
2      Q. Okay. And you haven't been able to ascertain
3  that from your recent review of the documents?
4      A. Well, I'm sure I could go back and look at
5  them, but I wasn't focused on that.
6      Q. Okay. Do you believe that probable cause for
7  the arrest of Ray Spencer was established before you
8  rendered your decision on November 27th of 1984?
9      A. I believe, at the time the statements were
10 made to Shirley, who represented them to Sacramento,
11 that they could have had probable cause then.
12     Q. They could have had or they did?
13     A. They could have. I don't know whether they
14 did or not. I think they transferred the investigation.
15     Q. Okay. But I'm asking you whether or not
16 probable cause existed for the arrest of Ray Spencer
17 prior to November 27th of 1984.
18         MS. FETTERLY: Objection; asked and
19 answered.
20     A. Yes.
21     Q. Yes or no?
22     A. Yes.
23     Q. It did exist; is that correct?
24     A. Yes.
25     Q. Okay. What was the probable cause for Ray

Page 96

1  Spencer's arrest at that time?
2      A. The same stuff that -- the same items that
3  were probable cause for the belief that he had abused
4  Katie that I've already discussed.
5      Q. Same exact stuff?
6      A. The statements made to Shirley and the
7  statements made to Sharon Krause.
8      Q. And you say that without knowing a thing about
9  Shirley's motivations, correct?
10     A. Correct.
11     Q. Or her history?
12     A. I don't know what you mean by that.
13     Q. Okay. If there was, and I guess you have said
14 there was probable cause to arrest Ray Spencer prior to
15 your involvement in the case, would you have expected
16 him to be arrested promptly?
17     A. I have no -- I have no idea what the practices
18 were in other jurisdictions.
19     Q. Do you think their practice was to let sexual
20 offenders run free, without any restrictions on their
21 access to their children?
22         MR. BOGDANOVICH: Object to the form of
23 the question.
24     A. No.
25     Q. If there was probable cause to arrest Ray

Page 97

1  Spencer prior to November 27th of 1984, wouldn't you
2  agree he was a dangerous man, especially with regard to
3  Katie Spencer?
4        MR. BOGDANOVICH: Object to the form.
5     A. You're linking two concepts together that I
6  can't answer in the way you're asking them. I've just
7  told you, I charged lots of cases and people were not
8  arrested.
9     Q. Okay. But I'm now asking you whether or not,
10 assuming there was probable cause to arrest Ray Spencer,
11 as you've testified, at that time, prior to
12 November 27th of 1984, wouldn't you be of the opinion he
13 was a dangerous man, especially with regard to Katie
14 Spencer?
15       MS. FETTERLY: Object as to form. That
16 seems to imply that he was --
17    A. Yeah. I'm just -- I simply can't answer it
18 the way you've put it. His dangerousness and the issue
19 of probable cause are different issues.
20    Q. Can you have probable cause to charge without
21 probable cause to arrest?
22    A. I don't know. Probably.
23    Q. Do you know?
24    A. Probably.
25    Q. As of November 27th of 1984, what was the

Page 98

1  admissible evidence that could have been presented
2  against Ray Spencer if his case had proceeded to trial?
3     A. Shirley's testimony.
4     Q. Okay.
5     A. Perhaps Sharon Krause's testimony.
6     Q. Okay.
7     A. And Katie would have been competent, I
8  believe. The question would have been whether she would
9  have testified.
10    Q. Okay. Let's take the first one. So it's your
11 testimony that Shirley Spencer's testimony would have
12 been admissible as to Katie's outcry?
13    A. Yes.
14    Q. And what would be the vehicle to get that in?
15    A. The ancient doctrine of hue and cry; excited
16 utterance, or otherwise know as the res gestae
17 exception; and the Child Hearsay law.
18    Q. Okay. When you rendered your opinion, did you
19 review the hue and cry law, or did you need to?
20    A. When I review -- when I issued my opinion in
21 1984?
22    Q. Yes.
23    A. I would have been current on the law at that
24 time.
25    Q. Are you current on the law now?

Page 99

1     A. Not as current as I was then.
2     Q. Okay. And with regard to the hue and cry
3  doctrine, would you agree that back then, at the time
4  we're talking about, it did not allow a witness to
5  testify to details of abuse, only that the abuse
6  occurred?
7     A. Yes.
8     Q. Okay. And then we have, you said, Sharon
9  Krause's testimony, perhaps. What vehicle would you
10 have gotten that in with?
11    A. Child Hearsay.
12    Q. Is that a statute?
13    A. Yes.
14    Q. When was the statute?
15    A. 9A.44. Somewhere in 9A.44.
16    Q. And would you have been current on the law at
17 that time?
18    A. Correct.
19    Q. Are you still current on the law?
20    A. No.
21    Q. All right. And how about -- you said Katie --
22 you said she would have been competent --
23    A. Yes.
24    Q. -- is that correct?
25    A. Yes.

Page 100

1     Q. What makes you say Katie would have been
2  competent?
3     A. Because she understood the concept of truth
4  and lies, and the difference, and the need to tell the
5  truth, and I had qualified innumerable five-year-olds.
6     Q. Okay. And you just testified she knew the
7  truth or the importance of telling it. What are you
8  basing that on? Sharon Krause's reports?
9     A. Right.
10    Q. Anything else?
11    A. I think -- I think primarily on those reports,
12 but also my general familiarity at that point in time
13 with five-year-olds being permitted to testify.
14    Q. Okay. Do you find it -- you do recall that
15 your report says Katie had problems with fact versus
16 fantasy, correct?
17    A. Correct.
18    Q. Is that something that suggests to you that
19 Katie is competent?
20    A. I still believe she would have been competent.
21    Q. Okay. In the reports, I'll represent to you
22 these are some of the things that Katie said, as
23 reflected by Sharon Krause. I think we may differ as to
24 whether these things were said, but this is what the
25 report reflects:

Page 193

1   Q. Okay. On page 9 -- well, hold on a second.
2   Some of these we covered, so I'm skipping.
3   A. That's good news.
4   Q. Yeah. That's why I thought I'd tell you that.
5       In your report, Exhibit 3, how many drafts of
6   this report were prepared?
7   A. That's a really good question. I don't know.
8   Q. Is it fair to say there were drafts prepared?
9   A. I'm sure there was more than one, but I don't
10  know how many.
11  Q. Okay. And would you exchange with
12  Ms. Fetterly the drafts and kind of go over them and get
13  to the ultimate product?
14  A. I only recall exchanging one draft with her.
15  Q. Okay. And can I --
16  A. And it was pretty close to my final draft, if
17  I remember correctly.
18  Q. "Pretty close." Would you admit that you guys
19  talked about revisions to the draft and then ultimately
20  put a report together that you submitted?
21  A. I'm sure -- I'm sure we did.
22  Q. Okay. Do you have a copy of the draft that
23  you could preserve?
24  A. No, I don't think I do.
25  Q. Can you tell me what happened to it, or any

Page 194

1   revisions you have?
2   A. Well, I would have -- after I did a final, I
3   would have deleted them.
4   Q. All right. Well, if you still have them, can
5   I ask you not to delete them?
6   A. Sure.
7   Q. Thank you.
8       Was Jim Peters affiliated with the American
9   Prosecutor Research Institute?
10  A. Not that I recall.
11  Q. Do you know if he gave -- if he submitted any
12  material for the first draft that was published in
13  1987 -- or the first book that was published in 1987?
14  A. I think this is where we started the
15  deposition. And not that I recall.
16  Q. All right. Patti Toth is affiliated with the
17  American Prosecutor Research Institute, correct?
18  A. Yes.
19  Q. Have you talked with her about this case?
20  A. No.
21  Q. Were you aware that she had initially been
22  disclosed as an expert that may testify in this case?
23  A. Somewhere I was made aware of that, yes.
24  Q. Do you know what happened?
25  A. No.

Page 195

1   Q. Do you know why she's not testifying?
2   A. No.
3   Q. And she was one of the main authors of that
4   book, correct?
5   A. She was the staff -- my recollection is, she
6   was the staff person, and so she was -- yes, she was
7   very involved.
8   Q. Okay. On page 3 of the report, I believe you
9   note that protocols have evolved?
10  A. Yes.
11  Q. In the time frame from October of 1984 through
12  May of 1985, did protocols for these types of child
13  interviews include threatening a child?
14  A. I don't recall that there were protocols at
15  that time period.
16  Q. Were there guidelines that suggested that
17  threatening a child was something proper to do?
18  A. I doubt it.
19  Q. All of the time period I'm talking about now
20  will be October of 1984 through May of 1985. With that
21  in mind, were there any guidelines or protocols at that
22  time in Washington that suggested praising a child for
23  accusing a suspect after making initial denials was
24  proper?
25  A. There were no protocols in Washington at that

Page 196

1   time.
2   Q. Were there any guidelines that suggested that
3   praising a child for accusing a suspect after making
4   initial denials was proper?
5   A. There were no guidelines in Washington at that
6   time.
7   Q. Was it generally understood that praising a
8   child for accusing after making initial denials was
9   proper?
10      MS. FETTERLY: Object as to form.
11  A. I can't answer that question.
12  Q. So you think that may have been a proper thing
13  to do in a child interview?
14  A. No.
15  Q. Okay. Were there any guidelines or protocols
16  that suggested that it was proper to coerce a child to
17  accuse suspects?
18  A. No.
19  Q. Were there any guidelines that suggested that
20  it was proper to interview a child wherein sexual abuse
21  was suggested and then fail to advise a suspect that the
22  interview took place?
23  A. As I've previously said, there were no
24  protocols or guidelines.
25  Q. Was there any guidance whatsoever regarding

Page 197

1  the matters I'm talking about?
2      A. The closest thing to guidance was -- came from
3  people at Harborview Sexual Assault Center.
4      Q. Okay.
5      A. And early -- and some of the earliest kind of
6  trainings were also provided by people who worked for
7  DSHS and CPS, so --
8      Q. [Inaudible.]
9      A. What?
10         MR. BOGDANOVICH: Go ahead. You weren't
11 finished.
12     Q. (By Mr. Johnson) Go ahead and finish.
13     A. And I don't -- I don't recall when anything
14 was written down as guidelines. And I've been, you
15 know, trying to remember that and track back through
16 that, and I -- I can't. I can't come up with any point
17 at which there were the first written guidelines about
18 child interviewing.
19     Q. Okay. And I'm just talking about what was
20 generally known in the field. You've mentioned some
21 entities that offered guidance, and of course we have
22 your book that was available back at this time, correct?
23     A. Right.
24     Q. Okay. And you would agree that no guidelines
25 or guidance, whether written or otherwise, suggested

Page 198

1  that it was proper to coerce a child to accuse a suspect
2  during a child sex abuse interview, correct?
3      A. Correct.
4      Q. And there were no guidelines, from what we've
5  discussed, those entities you discussed, there were no
6  guidelines that suggested that a child should be
7  interviewed on videotape and the tape discarded without
8  disclosure to the defense, correct?
9      A. Right.
10     Q. And, indeed, that would be a very potential
11 violation of "Brady vs. Maryland," correct?
12     A. It would be a potential violation of "Brady
13 vs. Maryland."
14     Q. Okay. Would you also agree that in the time
15 frame we're talking about, 1984-1985, it was generally
16 known by those in this field that videotapes of these
17 types of interviews could potentially be used to hinder
18 prosecutions in child sex cases?
19     A. It's generally known that they could be
20 helpful or hinder.
21     Q. Okay.
22     A. It was certainly that videotapes could be
23 probative.
24     Q. If the videotapes are not disclosed in a case,
25 they can't be used to a defense attorney's advantage,

Page 199

1  correct?
2      A. Correct.
3      Q. Do you also agree that the erasure of a
4  videotaped interview, such as the one in this case,
5  could be regarded as the destruction of evidence?
6      A. I'm just trying to put myself back then. But
7  I think so.
8      Q. Okay. And that would be a very serious
9  charge, correct?
10         MR. BOGDANOVICH: Object to the form.
11     A. I think destruction of evidence is a serious
12 charge.
13     Q. And it is indeed -- destruction of evidence is
14 actually a crime, correct?
15     A. If you mean under -- under certain
16 circumstances, yes.
17     Q. And would you agree with me that the
18 destruction of a videotape from a child sex abuse
19 interview by a prosecutor could have detrimental
20 consequences to a prosecutor's career?
21         MS. FETTERLY: Are you speaking
22 generally --
23     A. Depending on the time frame and how well
24 established it was and, you know, willfulness and all
25 that other stuff, yes.

Page 200

1      Q. Okay.
2      A. All those things would be taken into
3  consideration.
4      Q. Okay. Do you agree that conducting multiple
5  information-gathering interviews, in the context we're
6  speaking of, can affect the outcome of a case?
7      A. What do you mean? Multiple interviews of the
8  same person or multiple interviews of different people?
9      Q. Sure. With regard to multiple interviews of a
10 child in a case of suspected sexual abuse of that child,
11 would you agree that conducting multiple information-
12 gathering interviews can affect the outcome of the case?
13     A. Yes.
14     Q. And that was well known in 1984 and '85,
15 correct?
16     A. Well, I don't know how to answer that. I
17 guess I just -- I guess I don't know the answer to that.
18     Q. Okay. Let me ask you this: Would you agree
19 that a child's ongoing description may become
20 contaminated by verbal input and personal reactions of
21 different adults with whom they interact, in the context
22 we're speaking of?
23     A. They might.
24     Q. That was a known danger in 1984 and '85, that
25 a child's ongoing descriptions could become contaminated

Page 221

1  it would have worked. I'm asking you whether or not it
2  is your testimony that the issue of probable cause could
3  have been raised in a pretrial motion to suppress by Ray
4  Spencer after his arrest on January 2nd or 3rd of 1985.
5      A. I can't answer your question.
6      Q. Okay. And then I take it you can't -- can you
7  answer whether or not the video could have been used to
8  negate probable cause in a pretrial motion filed?
9      A. I can't remember if, at that time, there --
10  courts were hearing what was called a Knapstad motion,
11  where it was a motion to dismiss, saying that there --
12  you could not make out the elements of a case.
13     Q. Well, let's assume that they were raising that
14  type of motion or any motion that involved the issue of
15  probable cause. Would you agree with me that Ray
16  Spencer's defense attorney could have used that video to
17  support his argument in his pretrial motion to quash
18  arrest?
19         MR. BOGDANOVICH: Object to the form.
20     A. I just can't answer that -- I believe there
21  could have been a -- some kind of motion brought, most
22  likely a motion for release, to -- that would have
23  involved a defense attorney asking the Court to consider
24  the video. It's the kind of motion that you keep
25  talking about that I -- I just don't agree with.

Page 222

1      But could a defense attorney have used the
2  video to try to bring a motion to win release? Sure,
3  they could have tried that.
4         MR. JOHNSON: Thank you very much.
5  Nothing further.
6
7         EXAMINATION
8  BY MR. BOGDANOVICH:
9      Q. I do have one follow-up, Ms. Roe. You
10  testified that based on the way your decline notices
11  would usually be sent out of your King County
12  Prosecutor's Office, you would expect that Detective
13  Krause would have received it. Was that what your
14  testimony was?
15     A. Yes.
16     Q. Do you know if, in fact, your decline notice
17  in this case was sent to Detective Krause?
18     A. No, I don't know.
19     Q. Do you know if she ever saw it during the
20  investigation of the Spencer case?
21     A. I don't know.
22         MR. BOGDANOVICH: That's all I have.
23  ///
24  ///
25  ///

Page 223

1         EXAMINATION
2  BY MS. FETTERLY:
3      Q. I just had one clarification. Is it your
4  opinion, Ms. Roe, that the videotaped interview by James
5  Peters was cumulative to the reports of Detective
6  Krause, as far as the initial reluctance of Kathryn to
7  disclose?
8      A. Yes.
9         MR. JOHNSON: Object to the form of the
10  question.
11         MS. FETTERLY: That's all I have.
12         THE WITNESS: Do you have anything else,
13  Mr. Johnson? Hello?
14         MR. JOHNSON: No. I guess, just signature
15  would be explained. We have anything further.
16         MS. FETTERLY: Are you ordering,
17  Mr. Johnson?
18         MR. JOHNSON: Yes, we are.
19         THE WITNESS: So I'm not waiving.
20         MR. JOHNSON: Okay.
21         THE WITNESS: Thanks.
22              (Off-the-record discussion.)
23
24         DEPOSITION CONCLUDED: 7:18 p.m.
25     (Signature was expressly reserved.)

Page 224

CERTIFICATE

STATE OF WASHINGTON )
                    )
COUNTY OF PIERCE    )

I, the undersigned officer of the Court, under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter transcribed under my direction;

That the witness before examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony, including questions and answers and all objections, motions, and exceptions of counsel made and taken at the time of the foregoing examination;

That I am neither attorney for, nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 26th day of December, 2012.

_____
KAREN M. GRANT
NOTARY PUBLIC in and for the
State of Washington, residing
at Edgewood.
My commission expires 3/13/14.