UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | | |
|---|---|---|
| CLYDE RAY SPENCER, MATTHEW RAY SPENCER and KATHRYN E. TETZ, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | No. 11-cv-05424-BHS |
| FORMER DEPUTY PROSECUTING ATTORNEY FOR CLARK COUNTY JAMES M. PETERS, DETECTIVE SHARON KRAUSE and SERGEANT MICHAEL DAVIDSON, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

ARTHUR DAVID CURTIS

DATE TAKEN:   December 10, 2012
TIME:         9:00 a.m.
PLACE:        613 W. 11th Street
              Vancouver, Washington

COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR

EXHIBIT _____C_____

Rider & Associates, Inc.

360.693.4111

108

ARTHUR DAVID CURTIS    12.10.12

Page 5

1                    ARTHUR DAVID CURTIS,

2    called as a witness in behalf of the Plaintiffs, having

3    been duly sworn, was examined and testified as follows:

4            (Deposition Exhibits No. 1 through 25 were

5    marked for identification.)

6

7                     EXAMINATION

8    BY MS. ZELLNER:

9        Q.   Could you state your full name for the record,

10   including your middle name.

11       A.   Arthur David Curtis.

12       Q.   And Curtis is spelled with a C?

13       A.   Yes.

14       Q.   Just a couple of rules.  Let's try to not talk

15   over each other.  There's a little bit of problem, just

16   with the technology of a lag time, so let me complete my

17   question before you answer, and I'll try to do the same

18   so you can fully answer the question.

19           If you need a break, let us know.  And if you

20   answer a question, I will assume that you understood the

21   question.  If you don't, just tell me and I can rephrase

22   it.

23           Are those rules clear?

24       A.   Yes.

25       Q.   What is your current occupation?

ARTHUR DAVID CURTIS    12.10.12

Page 6

1       A.   I'm retired.

2       Q.   And how long have you been retired?

3       A.   Almost two years.

4       Q.   Where did you attend law school and what year

5   did you graduate?

6       A.   I attended law school at Northwestern School of

7   Law at Lewis & Clark College in Portland, Oregon.   I

8   graduated in 1974.

9       Q.   And then when did you become licensed to

10  practice law in Washington?

11      A.   In 1975.

12      Q.   And when were you first elected as the Clark

13  County prosecutor?

14      A.   I was elected in 1981.

15      Q.   How many terms did you serve?

16      A.   Well, I was appointed -- actually, I was

17  appointed and then I ran in a special election in 1981.

18  And then I ran every four years thereafter starting in

19  1982.

20      Q.   Is it correct, did you serve, then, eight terms

21  in total?

22      A.   '82, '86, '90, '94, '98, 2002 -- seven full

23  terms, plus the partial term.

24      Q.   And what year were you appointed?

25      A.   I was appointed in 1981.

ARTHUR DAVID CURTIS    12.10.12

1     Q.  And at that point when you become aware of his

2   arrest, are you provided with Shirley Spencer's

3   handwritten letter describing her interaction with Katie

4   Spencer in August of 1984?

5     A.  Well, we were provided with police reports and

6   other documents that would have pertained to the

7   investigation, but I can't tell you specifically whether

8   that document was one of the items reviewed.

9     Q.  Was it your understanding that the initial,

10  I'll call it, outcry by Katie Spencer was made to her

11  stepmother?

12    A.  I don't recall.

13    Q.  Do you recall reviewing the documents yourself

14  or did you simply make the assignment of the case to one

15  of your deputy prosecutors?

16    A.  I don't recall that either.

17    Q.  Do you assign the case fairly soon after the

18  arrest?

19    A.  Yes.

20    Q.  Who do you assign it to?

21    A.  Well, I believe that case was assigned to Mr.

22  Peters.

23    Q.  If you could explain to me or describe for me

24  what was the probable cause for the arrest of Mr.

25  Spencer the first time, the January 3rd arrest.

Page 16

1      A.  Well, generally, as I recall, it was based upon

2  the allegations being made by Katie regarding sexual

3  activity that she was involved with with Mr. Spencer.

4      Q.  Was there, other than Katie Spencer's

5  allegations, was there any other basis for the probable

6  cause to arrest that you're aware of?

7      A.  Well, whatever would have been included in the

8  police reports.  I believe there was an interview that

9  she had with Sharon Krause and I know that there was a

10  written statement that Shirley Spencer had written out,

11  several pages long, that I reviewed, and I don't know if

12  that was part of the original file or not.  I would

13  assume it would have been, but I can't say for sure.

14      Q.  Under Washington law at the time, is it correct

15  that Shirley Spencer would not have been able to testify

16  to the substance of those allegations but only to the

17  fact that sexual abuse had been reported to her?

18      A.  As I recall 9844 had gone into effect, the

19  Child Hearsay Statute in the state of Washington, before

20  that incident occurred.  That's my recollection.

21      Q.  So in your opinion, would the Shirley Spencer

22  letter describing the allegations, would that have been

23  part of the probable cause for the arrest?

24      A.  If it was incorporated in the police report,

25  sure.

ARTHUR DAVID CURTIS     12.10.12

Page 18

1      A.   Had I ever talked to Sharon Krause about sexual

2   abuse cases?

3      Q.   Yes.  Not this case but just in general, had

4   you ever had conversations or meetings with Sharon

5   Krause prior to an arrest about a pending investigation

6   of a child sexual abuse case?

7      A.   Oh, sure, I've talked to Sharon Krause all the

8   time.  She was the go-to person for sex crimes -- child

9   sex crimes in the sheriff's office at that time.

10     Q.   And was it a common practice of yours or your

11  deputy prosecutors to have contact with an investigator,

12  like Sharon Krause, prior to the arrest of the sex abuse

13  case?

14     A.   Not necessarily prior to the arrest, because

15  there was a lot of pending investigations that she may

16  have been working on that she wouldn't discuss with us

17  until she got to a probable cause situation.

18     Q.   And do you recall with the Katie Spencer

19  allegations prior to January 3rd, 1985, speaking to any

20  of the investigators on the case?  You said no about

21  Sharon Krause, you don't remember, but anyone else that

22  was investigating?

23     A.   No, I don't recall.

24     Q.   In terms of the involvement of you or your

25  deputy prosecutors in the investigation of sex abuse

ARTHUR DAVID CURTIS    12.10.12

Page 19

1    cases, did you become involved in the investigation of

2    those cases prior to the arrest?

3         A.   No.

4         Q.   And that would be true of sex abuse cases or

5    any other type of investigation, correct?

6         A.   Pretty much, right.

7         Q.   Did you ever advise investigators about

8    probable cause to arrest?  Did they ever seek your

9    counsel about whether they had enough to make the

10   arrest?

11        A.   Occasionally.

12        Q.   Do you remember if they did that on the Ray

13   Spencer case prior to the first arrest?

14        A.   No, I don't recall.

15        Q.   You said that the initial assignment was made

16   to Jim Peters; is that right?

17        A.   That's my recollection.

18        Q.   And do you know whether Jim Peters at the time

19   you made your assignment to him of the case after the

20   arrest, do you know if he'd had any contact with Sharon

21   Krause prior to the arrest about the investigation?

22        A.   I don't recall.

23        Q.   Do you know if any background investigation was

24   ever done of Shirley Spencer?

25        A.   No, I don't.

114

ARTHUR DAVID CURTIS    12.10.12

Page 21

1       A.   Yes.

2       Q.   Did Mr. Peters - and we're just talking about

3   the first arrest - did Mr. Peters ever report to you

4   that he did not think that the case should be charged?

5       A.   Not that I recall.

6       Q.   Did you rely on Mr. Peters' evaluation of the

7   sufficiency of the evidence to charge the case?

8       A.   Yes.

9       Q.   And I'm assuming that you didn't conduct an

10  independent evaluation of the legal sufficiency of the

11  evidence yourself, did you?

12      A.   Well, I discussed the -- yes, I did.  I

13  discussed the -- what Mr. Peters had determined in his

14  interview that he conducted with Katie prior to filing

15  the charge.

16      Q.   And is that -- which interview are you

17  referring to?

18      A.   I don't know what interview it was.  But as I

19  recall, he interviewed the girl and we filed the charge

20  -- I filed the charge.

21      Q.   Right.  Are you referring to the videotaped

22  interview that was done December 11th, 1984?

23      A.   I don't know if it was the videotaped interview

24  or whether it was a separate interview.  I just know

25  that he had interviewed her.

ARTHUR DAVID CURTIS    12.10.12

Page 22

1      Q.   And tell me, if you can, what did Mr. Peters

2    tell you about his interview of Katie Spencer that

3    convinced you that charges should be filed.

4      A.   Well, as I recall, he told me that he had

5    interviewed her about the allegations, that she appeared

6    to him to be competent, that she would stand up under

7    scrutiny on the witness stand.  He thought he could use

8    her as a witness, and that she was believable in her

9    allegations against Mr. Spencer.

10     Q.   So he told you that she was competent and she

11   was also credible.  Would that be a fair statement?

12     A.   Yes.  In his opinion, yes.

13     Q.   And is it also a fair statement that you relied

14   exclusively upon that opinion to file the charges?

15          MS. FETTERLY:   Object as to form.

16   BY MS. ZELLNER:

17     Q.   You can answer.

18     A.   I can't say exclusively because I probably

19   conversed with Sharon Krause, as well.

20     Q.   So assuming that you talked to Sharon Krause

21   also about the allegations, would it be a fair statement

22   to say that based upon what Sharon Krause told you and

23   what Jim Peters told you that you decided then to file

24   the charges?

25     A.   I probably would have read the police reports,

ARTHUR DAVID CURTIS    12.10.12

Page 23

1    as well.  So it would have been a combination of those

2    three factors:  of my personal review of the police

3    reports and the allegations contained therein, my

4    conversation with Sharon Krause as to her assessment of

5    the victim and Jim Peters' input as to his assessment,

6    as well.  It was probably a combination of those three

7    things.

8        Q.  Of those three things, did any of those three

9    things have more weight than the others with you in

10   making that decision?

11       A.  No, because it was all pretty -- as I recall,

12   it was all pretty consistent.  Everybody was basically

13   concluding the same thing.

14       Q.  Do you know if prior to making the charging

15   decision, other than the police reports, did you ever

16   look at or review a videotape that was made December

17   11th, 1984, of Jim Peters' interview with Katie Spencer?

18       A.  I don't believe that I reviewed that tape, no.

19       Q.  Do you know if prior to filing the charges on

20   January 3rd, had you been informed that there was a

21   videotape?

22       A.  Not that I recall.

23       Q.  And would you expect one of your deputy

24   prosecutors, if they had videotaped the interview with

25   the child, a child witness in a sex abuse case, to have

ARTHUR DAVID CURTIS   12.10.12

Page 24

1   informed you of that?

2       A.  Not necessarily, but I can't say it -- that's

3   all I can say.  Not necessarily.

4       Q.  If you had been informed that there was a

5   videotape of the child, would you have wanted to have

6   reviewed the videotape before making the charging

7   decision?

8       A.  I may have.

9       Q.  We'll come back to the videotape.  But were you

10  at some time made aware that a videotape of Katie

11  Spencer had been made?

12      A.  Yes.

13      Q.  Do you remember when you learned that there was

14  a videotape that had been made?

15      A.  Well, from what I can recall, I don't remember

16  anything about a videotape until fairly -- well, fairly

17  recently in the scheme of the time of this case.  It was

18  after he was released from prison and the post-release

19  issues were occurring.

20      Q.  And just for point of reference, that was in

21  2009.  After you learned that there had been a videotape

22  made, have you ever reviewed that videotape up until

23  today?

24      A.  Yes.  My recollection is that that was the

25  first that I knew of the videotape.  And when I became

ARTHUR DAVID CURTIS    12.10.12

Page 25

1    aware of its existence, I wanted to review it

2    personally, which I did.

3         Q.  And you probably reviewed it in 2009 or '10,

4    somewhere in that time frame?

5         A.  Thereabouts, right.

6         Q.  When you reviewed the videotape, had you been

7    provided with an official court transcript or court

8    reporter transcript of the video?

9         A.  I don't believe so.  I believe I just reviewed

10   it in the office next to my office on a TV.  I plugged

11   the video in and I just looked at it.  I don't recall a

12   transcript being attached to it.

13        Q.  So if we go back to -- and we'll come back to

14   the videotape -- but if we go back to the January

15   charging decision, would you characterize from that

16   point forward your involvement in the Spencer case as

17   actively involved, were you actively involved in the

18   case?

19        A.  The case was assigned to Mr. Peters, and I

20   would say I was active in an oversight capacity.

21   Because he was a Vancouver police officer, it was deemed

22   to be a quote, unquote, high profile case, and part of

23   my office guidelines was to keep me informed.  Part of

24   my office guideline was to keep me informed on all high

25   profile cases.

Page 26

1      Q.  And at a certain point in time prior to the

2   charging decision being made in January, you had

3   actually had the case sent to a King County prosecutor

4   named Rebecca Roe; is that right?

5      A.  That's correct.

6      Q.  So that was done November 27th of 1984.  And I

7   think I'll -- we've marked and sent Rebecca Roe's

8   report, I'll refer to that as Plaintiffs' Exhibit 1,

9   and I'll give you a minute to find that document.

10      A.  I have it right here.  Thank you.

11      Q.  Okay.  Tell me, what were the decisions that

12   you made leading up to sending it out to Rebecca Roe or

13   why did you send it to Rebecca Roe.

14      A.  She was known in the state of Washington as an

15   expert in the field of child sex abuse cases and we

16   wanted her opinion as to whether she felt that it was

17   legally sufficient to charge.

18      Q.  Up until that point in time, Rebecca Roe had

19   not only prosecuted a lot of sex abuse cases, but she'd

20   also written articles about the prosecution of sex abuse

21   cases; is that right?

22      A.  Probably.  I don't know specifically what her

23   background was.  I know she was well respected.

24      Q.  And just explain a little bit more, I think you

25   talked about it was a high profile case, a sensitive

120

ARTHUR DAVID CURTIS    12.10.12

Page 27

1    case.  What was the exact reason that you decided to

2    send it to her?  You said her expertise.  Was there

3    another reason that you sent it out?

4         A.  Well, I believe at the time Mr. Spencer was

5    still a member of the Vancouver Police Department and I

6    felt that because we had a close working relationship

7    with that department that an appearance of fairness

8    issue arose and it would be good to ask someone outside

9    of our office to review the case.

10        Q.  Had you ever sent another sex abuse case to

11   Rebecca Roe?

12        A.  I don't recall.

13        Q.  If we could just go through her report, the

14   Bates stamp is 227.  I'm on the first page of the

15   report.

16             In her numbered paragraphs, would you read that

17   one of the concerns that Rebecca Roe identifies is that

18   the child, Katie Spencer, appears to be reluctant to

19   talk about the allegations.

20        A.  That's what it says, yes.

21        Q.  Okay.  And, in fact, Ms. Roe notes that:

22   Sharon Krause had to spend several hours one-on-one with

23   the victim, who also indicated that she would not talk

24   about it with boys, is that correct, that's what the

25   report said?

121

ARTHUR DAVID CURTIS    12.10.12

1      Q.  Because even in those first couple of

2  paragraphs, Rebecca Roe seems to be expressing the

3  opinion that the case may have reasonable doubt built

4  into it, wouldn't you say?

5      A.  That's her opinion, yes.

6      Q.  Would it be a fair statement to say, though,

7  that her opinion, if provided to you, would have been

8  something you would have taken into consideration in

9  making your charging decision?

10      A.  Yes.

11      Q.  Then she goes on in paragraph 3 and she points

12  out that there are inconsistencies, she says, not

13  surprisingly in the child's statements over -- I believe

14  it says overall issues.  And then she gives a list.  She

15  said a number of times, many times versus one time.

16  That inconsistency would have been something that you

17  would have wanted to know about, right, in making the

18  charging decision?

19      A.  Yes.

20      Q.  And then she also points out what the defendant

21  was wearing, and she says defendant nude versus

22  defendant wearing underwear versus defendant wearing a

23  robe.  That inconsistency would be important to know

24  before making the charging decision, don't you think?

25      A.  Yes.

ARTHUR DAVID CURTIS    12.10.12

Page 38

1   take a break at a convenient time?

2          MS. ZELLNER:  Let's let him look at this

3   document, we'll take a break and we'll come back and let

4   him ask you about it.

5          MS. FETTERLY:  Can I just clarify before we go

6   off record that all counsel received documents I

7   e-mailed late last week, about six or seven pages?

8          MR. FREIMUND:  I did.

9          MS. ZELLNER:  We did, too.  We've got them.  So

10  we'll be back.

11          (Discussion off the record.)

12  BY MS. ZELLNER:

13      Q.  So what I've labeled as Plaintiffs' Exhibit 3,

14  is that the information that was filed by your office

15  and signed by you on January 3rd, 1985?

16      A.  Yes.  January 2nd, I believe.

17      Q.  Oh, I'm sorry.  January 2nd, 1985.

18          And in your opinion when this document was

19  filed, was it a legally sufficient charge that your

20  office was making?

21      A.  Yes.

22      Q.  Do you recall whose idea was it to refer the

23  case to Rebecca Roe?  Was that an idea that you had come

24  up with?

25      A.  I don't recall.

123

1        Q.  At any time up until -- well, did anyone in
2    your office as of January 2nd, 1985, express the opinion
3    that the case should not be filed and that it was too
4    weak to file it?
5        A.  My recollection is that Mr. Peters had some
6    reservations about it.
7        Q.  And because he had those reservations, then was
8    the decision made that he would interview Katie Spencer
9    and then report back to you whether he thought the case
10   was strong enough to file?
11       A.  I don't know if his reservations were based
12   upon the Becky Roe letter or the police reports or a
13   combination thereof, but we definitely weren't going to
14   make a filing decision until he had interviewed the
15   child.
16       Q.  Right.  And then the child was interviewed, and
17   your understanding was that those reservations had
18   resolved and that you were filing a legally sufficient
19   case; isn't that right?
20           MS. FETTERLY:  Object as to form.
21           THE WITNESS:  Mr. Peters came back to me after
22   concluding the interview and gave me his opinions as to
23   whether or not the case should be filed.  I took it
24   under advisement and made the ultimate decision to file.
25   BY MS. ZELLNER:

124

1      Q.  And after the interview when Mr. Peters advised

2   you, he advised you, did he not, that the case was

3   viable and it should be filed?

4      A.  I think he expressed the reservations about the

5   girl and whether or not she could withstand scrutiny,

6   but I believe he concluded that she was, like I said

7   earlier, she was competent, although barely, and would

8   be able to testify truthfully as to what had occurred.

9      Q.  You would agree that competency is really a

10  different determination than credibility, would you not?

11     A.  Correct.

12     Q.  But Mr. Peters had informed you that he

13  believed that she was competent, I think you said

14  barely, and that I'm assuming that she also was credible

15  in her allegations.

16     A.  Yes.  Competency is a threshold determination

17  that has to be made by the judge prior to trial.  He

18  could have found her credible but not competent.

19     Q.  Right.  And typically in a competency

20  evaluation, questions about the abuse itself are not

21  even asked; isn't that right?  The questions are about

22  whether the child knows their birthday and where they

23  live and their ABCs and things like that, wouldn't you

24  agree?

25     A.  Yes.

125

1      A.   Yes, it says Omnibus Application By Defendant

2   and Court.

3      Q.   Correct.  Right.  Do you recognize those

4   initials?

5      A.   Well, they appear to be Jim Peters' initials.

6      Q.   And in this motion on the first page, the last

7   number is No. 6 and it's checked off and it says:  For

8   discovery of the names and addresses of plaintiffs'

9   witnesses and their statements, do you see that?  And

10  then the answer is JP will provide.

11     A.   Right.

12     Q.   Now, would you agree that Mr. Peters, in

13  answering the omnibus, is indicating that he will

14  provide the names and addresses of plaintiffs' witnesses

15  and their statements, that all statements of the

16  witnesses would have to be provided by your office to

17  the defense, correct?

18     A.   Yes.

19     Q.   And, actually, under Washington law at the

20  time, it required prosecutors to produce not only what

21  was in their file but any documents that they had

22  knowledge of; is that correct?

23          MR. FREIMUND:  Object to the form.

24          You may answer, though.

25          THE WITNESS:  Well, I'm sorry.  Could you

ARTHUR DAVID CURTIS   12.10.12

Page 45

1      Q.  Right.  And, actually, you are aware that Brady

2   disclosures have to be made regardless of whether

3   there's a trial or not.  Are you aware of that?

4            MR. FREIMUND:  Object to the form.

5            You may answer.

6            THE WITNESS:  Brady is a continuing obligation

7   on the part of the prosecution, yes.

8   BY MS. ZELLNER:

9      Q.  And do you have any knowledge as to whether or

10  not your office ever produced the videotaped statement

11  of Katie Spencer that was made on December 11th, 1984,

12  to the defense prior to Mr. Spencer's guilty plea?

13     A.  I don't have any personal knowledge of that.

14  And I'd like to also clarify my prior answer where I

15  said there usually was a continuing obligation on both

16  sides to produce evidence.  If you look at the last page

17  of the omnibus application, it says:  All information

18  promised to be supplied in the future will be provided

19  ten days before trial.  That was the specific agreement

20  in this case.

21     Q.  Right.  And this case was actually first set

22  for trial on February 27th, 1985, correct, then it was

23  continued?  But the original trial date on the Spencer

24  case was February 27th, 1985, right?

25     A.  I don't recall.

Page 46

1     Q.  Are you aware that the case was continued a

2   couple of times?

3     A.  I don't have specific recollection of that, no.

4   It wouldn't surprise me because most of these cases got

5   continued past the first trial date.

6     Q.  Sure.  So actually, the statement that you read

7   that it was to be provided in advance of the trial, ten

8   days before trial, that would apply to the trial date

9   that was pending at the time that this motion was made,

10   right?

11            MS. FETTERLY:  Object as to form.

12   BY MS. ZELLNER:

13     Q.  Whatever the trial date was, the disclosures

14   had to be made ten days in advance; is that right?

15     A.  That's the specific agreement here, correct.

16     Q.  Right.  So if the trial date was February 27th,

17   1985, the disclosures had to be made by February 17th,

18   1985, correct?

19            MS. FETTERLY:  Object as to form.

20            THE WITNESS:  Yes, unless the parties knew that

21   there was going to be a continuance, which I don't know

22   if that -- there's a lot of informal discussion that

23   goes on between the attorneys on trial dates.  Defense

24   might have said I'm going to ask for a continuance and

25   Mr. Peters might have said, fine, I won't oppose it,

128

ARTHUR DAVID CURTIS    12.10.12

Page 47

1    because that's pretty normal course of action.

2    BY MS. ZELLNER:

3        Q.  But there's no question that all of Katie

4    Spencer's statements had to be produced within ten days

5    of the trial date; is that correct?

6            MS. FETTERLY:  Object as to form.  It says

7    witnesses.

8    BY MS. ZELLNER:

9        Q.  Isn't that what you just read to us?

10       A.  No.  It says ten days before trial, meaning the

11   actual trial, not the trial date.

12       Q.  You think that's the Brady disclosure

13   requirement, regardless of what this document says?

14           MS. FETTERLY:  Object as to form.  You're

15   talking about two different things, statement of

16   witnesses or Brady information.

17           MS. ZELLNER:  I'm just asking him his

18   understanding of Brady.

19   BY MS. ZELLNER:

20       Q.  If your disclosure requirements were limited to

21   whether or not the case went to trial --

22       A.  Brady is a continuing obligation.

23       Q.  -- regardless --

24       A.  In other words, you can't hold on to -- you

25   don't hold off Brady information that you have in your

Page 48

1    possession and wait ten days before trial.

2        Q.  Right.  We're in agreement.

3            You would agree that the videotape which you

4    found out about in apparently 2009 and was made December

5    11th, 1984, had to be disclosed prior to the guilty plea

6    of Ray Spencer.

7            MR. VELJACIC:  Object to form.

8            THE WITNESS:  There was a discussion that

9    occurred after I became aware of that tape as to whether

10   or not it was Brady evidence.  And I made the decision

11   to disclose it because I said something to the effect

12   I'm not going to split that hair.

13   BY MS. ZELLNER:

14       Q.  Tell me about when that decision was made.  Was

15   that made in 2009?

16       A.  Yes.

17       Q.  So you find out, I'm assuming for the first

18   time, that the video has been discovered by Sharon

19   Krause in her garage.

20       A.  That was my understanding, yes.

21       Q.  How are you informed of that information?  Who

22   informed you?

23       A.  My recollection is that she sent the tape with

24   a letter to my chief criminal deputy, Dennis Hunter - it

25   might have been Mike Kinnie, but I thought it was Dennis

130

ARTHUR DAVID CURTIS   12.10.12

Page 49

1    Hunter - and then thereafter, Mr. Hunter informed me of

2    the existence of the tape.

3        Q.  Were you still the Clark County prosecutor at

4    the time that the tape was discovered in 2009?

5        A.  Yes.

6        Q.  And I'm assuming that you reviewed, then, the

7    tape, is that right, the video?

8        A.  Yes.

9        Q.  And then who did you instruct that it should be

10   disclosed?

11       A.  Mr. Hunter and/or Mr. Kinnie.

12       Q.  And tell me just the thought process leading up

13   to your decision to disclose it.

14       A.  Well, when I reviewed the tape, I did not see

15   it as being Brady evidence myself.  But I also, in

16   reviewing it, saw that the defense could take the

17   position that it was Brady evidence.  And that's why

18   when we had the discussion about whether or not it

19   needed to be disclosed, I said I'm not going to split

20   that hair because I could see it from both sides.

21       Q.  Right.  And so then you ordered -- was it Mr.

22   Hunter, to disclose the video?

23       A.  That's my recollection.

24       Q.  And that occurred, I think, sometime in 2009.

25       A.  It would have been shortly after it was

1    talk to, one of the national media shows, 20/20,

2    whatever it was, to discuss the case, but I can't

3    remember if I specifically talked to him or whether I

4    delegated that to Mr. Hunter.

5        Q.  During the time that Mr. Peters was in your

6    office working for you, did you become social friends

7    with him?

8        A.  We actually both started as public defenders

9    and then became prosecutors, and we had socialized

10   occasionally over the years.

11       Q.  And then I'm assuming after he left the office,

12   probably you had no more social interaction with him.

13       A.  That's correct.  He moved to Idaho.

14       Q.  Tell me about your understanding of -- let me

15   ask you this.  When did you first become aware that

16   Sergeant Davidson and Shirley Spencer had had a personal

17   relationship?

18       A.  I don't know that they did have a personal

19   relationship.  I have no independent knowledge of that.

20   But when did I first hear that they may have had a

21   relationship, is that your question?

22       Q.  Yes.  Right.

23       A.  Well, it was way after the plea and sentencing.

24   That's all I can tell you.

25       Q.  When you learned of that fact, regardless of

132

Page 54

1       Q.   And would you agree that he was in charge of

2   the Ray Spencer prosecution through sentencing of Ray

3   Spencer?

4       A.   Yes.

5       Q.   Now, there's the original or there's the

6   February 28th information and then there's an affidavit

7   of Mr. Peters that's attached at Bates stamp 422.

8       A.   Yes, I have that.

9       Q.   Have you reviewed that affidavit recently?

10      A.   No, I have not.

11      Q.   Tell me, what was your understanding of the

12  subsequent charges that were filed against Mr. Spencer.

13  What were the allegations, the new allegations?

14      A.   Well, my recollection is that Mr. Spencer had

15  been released from jail after the original allegations

16  against Katie and was either staying or living in a

17  motel, Salmon Creek Motel, and saw -- was allowed access

18  to the other two children, Big Matt and Little Matt, and

19  additional allegations of sex abuse occurred in the

20  motel which occurred after his release from jail, which

21  precipitated the filing of the amended information.

22  That's my recollection.

23      Q.   Okay.  And again, do you recall what evidence

24  you reviewed or gathered before this second information

25  was filed?  I'm assuming you looked at police reports

133

ARTHUR DAVID CURTIS    12.10.12

Page 55

1   again, right?

2       A.  Well, at this point, I may or may not have.  It

3   may have already been assigned to Mr. Peters, and he may

4   have independently reviewed it and just told me what had

5   occurred.

6       Q.  And this time, there's nothing sent out, like

7   to Rebecca Roe, I'm assuming, because Mr. Peters had

8   been discharged from the Vancouver Police Department.

9           MR. FREIMUND:  I object to the form.  I think

10  you misstated, Ms. Zellner.

11          MS. ZELLNER:  I'm sorry.  I said Peters.

12  BY MS. ZELLNER:

13      Q.  By the time we get to February, has the

14  potential problem with the Vancouver Police Department

15  resolved itself because Mr. Spencer was discharged?

16      A.  My recollection is that we ended up taking the

17  case back because -- partially because of that factor,

18  yes.

19      Q.  And then you're describing that with the second

20  information that's filed in February, that you may have

21  had less direct involvement in looking at the underlying

22  evidence.  Is that fair, is that what you remember?

23      A.  I remember being provided with information

24  regarding his re-arrest and the fact that there were two

25  additional victims and at that point becoming, I

Page 56

1    wouldn't say relieved, but more happy with my original

2    filing decision because the case obviously became a lot

3    stronger.

4         Q.   Because you had these other alleged victims

5    that helped to corroborate Katie Spencer's allegations,

6    right?

7         A.   Yes, correct.

8         Q.   Okay.  And, again, would you have --

9         A.   If I could finish my answer, then.

10        Q.   Oh, of course.

11        A.   Not only did they corroborate or give

12   credibility to Katie's allegations but provided new

13   allegations as to sexual abuse that occurred on both of

14   them separately as victims.  So we now had three

15   victims, not just two boys corroborating one victim, we

16   had three separate victims.

17        Q.   And so would it be a fair statement to say that

18   you relied upon Mr. Peters in making your decision to

19   file this second information with the new charges?

20        A.   Well, I didn't file the amended information.

21   But it's fair to say that Mr. Peters filed the

22   information, the amended information, adding in the new

23   victims, based on the information he received in the

24   police reports, correct.

25        Q.   And he kept you apprised of the developments,

1    right, and you approved him filing the amended

2    information?

3        A.  Well, I don't know if I specifically approved

4    it.  It was kind of a no-brainer at that point.  In

5    other words, he didn't come to me and say we have two

6    additional victims here.  Do you think I should file an

7    amended information?  At that point, it would have been

8    we have two new victims.  I'm filing an amended

9    information.  There would have been no need for a

10   discussion on it.

11       Q.  Is that your recollection of how the events

12   developed leading up to Mr. Peters filing this Second

13   Amended Information?

14       A.  Pretty much, yes.

15       Q.  If we look at Exhibit 4, the first two pages,

16   it's a document from Leland Davis, the chief of the

17   Vancouver Police Department.  Is your understanding that

18   after the first charges were filed on January 3rd, that

19   on January 8th that Mr. Spencer was terminated as a

20   member of the Vancouver Police Department?  Is that

21   document consistent with your recollection of when he

22   was terminated?

23           MR. VELJACIC:  I'll object to the form as

24   compound.

25           But go ahead and answer.

136

ARTHUR DAVID CURTIS   12.10.12

Page 58

1            THE WITNESS:  I don't have any reason to

2     dispute the dates, no.

3     BY MS. ZELLNER:

4         Q.  And then if we look at what we've marked as

5     Plaintiffs' Exhibit 9, that's a letter, January 9th,

6     1985, and ask you if you can identify that as a document

7     that you prepared.

8         A.  Yes.

9         Q.  I'm sorry.  That's actually Exhibit 6 -- if we

10    go up to what we've got labeled as Exhibit 7, it's a

11    letter to Becky Roe from you and it's dated January 9th,

12    1985.  Is that a letter that you authored?

13        A.  Yes.

14        Q.  And that letter to Becky Roe indicates that the

15    case is presently set for trial on February 27th and

16    28th, 1985, before the Honorable Thomas L. Lodge; is

17    that correct?

18        A.  Yes.

19        Q.  And what was your purpose in sending that

20    letter to Becky Roe?

21        A.  Well, the first sentence says that I was

22    sending it to provide her with copies of the police

23    reports, the information, other relevant documents, and

24    then to thank her for taking the case.

25        Q.  And what was going on at that point?  It says:

1   We appreciate your office accepting the responsibility

2   for acting as Special Deputy Prosecuting Attorney in

3   this matter due to the conflict we feel exists in our

4   office.

5           What was the purpose of what you were doing at

6   that point?

7       A.  Again, these are questions, why did we ask them

8   to handle the prosecution?

9       Q.  Right.  Because we know that Mr. Spencer has

10  already been terminated from the Vancouver Police

11  Department.

12          MR. FREIMUND:  Object to the form.  That

13  mischaracterizes.

14          MR. VELJACIC:  Same objection.

15          THE WITNESS:  I think I can answer the

16  question.  If you look at Exhibit No. 5 --

17  BY MS. ZELLNER:

18      Q.  Yes.

19      A.  -- Exhibit No. 4 says that Mr. Spencer was

20  terminated on January 8th.  That was sent out to his --

21  the Vancouver Police Department.

22          On January 9th, I sent a letter to the police

23  chief saying that I was asking a special prosecutor to

24  handle the case, apparently unaware of the fact that he

25  had already been terminated.

138

Page 60

1      Q.  If we look at Exhibit No. 8, that's a letter

2   dated May 9th, 1985, to Barb Linde, and appears to be

3   authored by James Peters, but it was cc'd to Becky Roe

4   and to you.

5          Do you recognize this letter?

6      A.  Just in the capacity that you've referenced it.

7   It appears to be a letter sent by Mr. Peters that I got

8   a copy of, yes.

9      Q.  In the second full paragraph, it says:  Since

10  the charges flowing from the newly discovered evidence

11  were filed within a couple weeks of the scheduled April

12  15th trial date, the defense attorney was unable to

13  prepare his case for that date.  In addition, he was

14  still working with a psychologist and a psychiatrist

15  endeavoring to get Mr. Spencer to plead guilty.

16          Do you see that entry?

17      A.  Yes.

18      Q.  Do you know if your office, particularly Mr.

19  Peters, made any direct contact with Ray Spencer's

20  psychologist or psychiatrist prior to his guilty plea?

21      A.  No, I have no knowledge of that.

22      Q.  And would you agree that unless Mr. Spencer

23  signed a release, that that would violate a

24  patient/physician confidentiality?

25          MR. FREIMUND:  Object to the form.

139

Page 61

1          You may answer.

2          THE WITNESS:  Assuming that he was talking

3    about confidential communications, yes.

4    BY MS. ZELLNER:

5          Q.  One question I should have asked previously,

6    when your office sent the file to Rebecca Roe, did you

7    obtain a release of information from Katie Spencer's

8    mother, DeAnne Spencer?

9          A.  You mean a release of information, meaning that

10   is it okay with you if we send the case up to King

11   County?

12         Q.  Correct.

13         A.  No, that would not normally be something that

14   would be done.

15         Q.  So with a child sex abuse case, a file could be

16   sent from one prosecutor to another without getting a

17   release of information from a parent of the child?

18         A.  Yes.

19         Q.  Let's look at Exhibit 10.  When did you first

20   learn that there had been medical exams done of Kathryn

21   Spencer and Matthew Hansen?  Was it later in the time,

22   like, was it in the '90s?

23         A.  It would have been after July 1, 1992.

24         Q.  And how were you informed that there had been

25   medical exams done?

140

ARTHUR DAVID CURTIS     12.10.12

Page 62

1      A.   I don't recall.

2      Q.   It appears from this letter that you had your

3    files searched and there were no medical records in the

4    prosecution files.  Would that be correct?

5      A.   Yes.

6      Q.   And did you ever inquire, after January 3rd or

7    even before, as to whether medical exams had been

8    performed on the children?

9      A.   I'm sorry.  Did you reference January 3rd?

10      Q.   Yes.

11      A.   What year are you talking about?

12      Q.   I'm talking about way back in 1985 when you

13    first bring the charges against Mr. Spencer.  Did you

14    inquire of the sheriff's department or did anyone ever

15    inform you that they were considering doing medical

16    exams or not?

17      A.   Not that I recall.

18      Q.   And, again, I'm assuming that if you had had

19    those medical exams in the prosecutor's file, of course,

20    those would have been turned over, right, during

21    discovery?

22      A.   Yes.

23      Q.   When Mr. Spencer was seeking a pardon from the

24    governor -- if we go to Exhibit 11 in that packet, if we

25    go to the third letter, it's dated February 12th, 2007,

ARTHUR DAVID CURTIS    12.10.12

Page 65

1          MS. ZELLNER:  I don't have any further

2     questions.

3          MR. FREIMUND:  I have no questions.

4          MR. BOGDANOVICH:  I do have a couple.

5

6                    EXAMINATION

7     BY MR. BOGDANOVICH:

8        Q.  Mr. Curtis, this is Guy Bogdanovich.  I'm the

9     attorney for defendant Sharon Krause.

10         Had you ever received any complaints from

11    either defendants or criminal defense attorneys

12    regarding Detective Krause's truthfulness in conducting

13    investigations or writing reports?

14       A.  No.

15         MR. BOGDANOVICH:  That's all I have.

16         MS. FETTERLY:  Before I get started, I had the

17    reporter mark some of the documents that I had sent.  I

18    didn't have her mark all of them because many of them

19    are duplicative to plaintiffs' counsel's documents.

20         I had her mark as Exhibit 26, the copy I sent

21    of the information that was dated January 2nd, 1985, and

22    filed the next day, January 3rd.  So that's 26.

23         And I had her mark as 27, it's a photocopy of

24    handwritten notes on appears to be a notepad.  The top

25    says Defendant Clyde Ray Spencer and then it says Count

Page 67

1                          EXAMINATION

2    BY MS. FETTERLY:

3        Q.  Mr. Curtis, I'm handing you what's been marked

4    as Exhibit 26, and can you identify that as the

5    information that you signed on January 2nd, 1985, in the

6    Spencer case?

7        A.  It's dated January 2nd.  It's filed January

8    3rd, so I signed it either on the 2nd or the 3rd.

9        Q.  Comparing a copy of the same document that was

10   marked and discussed earlier in your deposition as

11   Exhibit 3, but am I correct that the difference between

12   the two documents is Exhibit 3 appears to have a

13   conformed signature for you, whereas Exhibit 26 has an

14   actual signature?

15       A.  That's correct.

16       Q.  And is the signature on Exhibit 26 your actual

17   signature?

18       A.  It is.

19       Q.  There was much discussion earlier about whether

20   or not you had reviewed Exhibit 1, which is Rebecca

21   Roe's report dated November 27, 1984.  Do you recall

22   that line of questioning, initial questioning?

23       A.  Yes.

24       Q.  And then there was some discussion of exhibits,

25   particularly Exhibit 6 and Exhibit 7, and am I correct

143

ARTHUR DAVID CURTIS    12.10.12

Page 68

1    that Exhibit 6 and 7 is correspondence between you and

2    Norm Malang, the King County prosecutor, that is dated

3    -- is that January 5th, 1985?

4        A.   I can't tell if that's January 5th or -- looks

5    almost like a 9th.

6        Q.   Okay.  9th.  And then there's a letter to

7    Rebecca Roe dated January 9, 1985.

8        A.   Right.

9        Q.   These documents are basically thanking Mr.

10   Malang for providing a special prosecutor, namely Ms.

11   Roe in this case, correct?

12       A.   Yes.

13       Q.   In reviewing these documents, and I think there

14   were some other testimony, that Mr. Peters expressed

15   some reluctance to proceed or saw some problems about

16   proceeding to file charges in January of 1985.  Does

17   that refresh your recollection as to whether or not you

18   likely reviewed Exhibit 1, Ms. Roe's report, prior to

19   filing the initial charges?

20       A.   Yes.  We specifically asked Ms. Roe to review

21   the case for us.  And I would find it hard to believe

22   that we would ask her to review a case and then not

23   review her -- review this letter which incorporates her

24   opinions and rationale.  It wouldn't make any sense to

25   me that I wouldn't have reviewed the letter.  But I

1   don't have any independent recollection 26 years later

2   of having done so.

3       Q.  But do you believe in reviewing the subsequent

4   documents that it's likely you did?

5       A.  Yes.

6       Q.  Now, handing you what's been marked as Exhibit

7   27, can you identify that, please?

8       A.  This is a document that I prepared.  In the old

9   days, we would have yellow pads that we would use to

10  write out contents of informations.  I put at the top D,

11  which is defendant, Clyde Ray Spencer, and then Count 1,

12  Count 2, Stat Rape 1, and Indecent Liberties, Count 2.

13          I asked my secretary to provide or to compare

14  the information alleging the dates of -- on one or more

15  occasion between July 18, 1984, and August 26th, 1984,

16  and see if CCSofW - which is County of Clark, State of

17  Washington - and then I listed the victim as Kathryn E.

18  Spencer who was five years of age at the time.  Count

19  No. 2, Indecent Liberties, I cited the pertinent part of

20  the statute.  There's a 1(a) and 1(b), which was being

21  charged under 1(b), same dates.

22          And at the bottom appears shorthand from my

23  long-time secretary, Carol Axford, which I don't read

24  shorthand so I don't know what it says, other than she

25  was -- I probably asked her to docket it for the next

ARTHUR DAVID CURTIS    12.10.12

Page 70

1    day or that day, which is the 9 -- I can't read the rest

2    of it.

3        Q.  Would that have been a document, meaning

4    Exhibit 27, which was basically your rough draft and

5    instructions to staff that went into preparing Exhibit

6    26, which was the initial information?

7        A.  Yes.

8        Q.  And am I correct that Exhibit 27, other than

9    the shorthand at the bottom, was all in your

10   handwriting?

11       A.  Yes.

12       Q.  Why did you make the decision to file the

13   initial charges against Ray Spencer?

14       A.  Well, I knew that it was a tough case.  At the

15   time I knew that Mr. Peters had some reservations about        ✓

16   filing it, even after his interview with Katie Spencer.

17   Obviously, Becky Roe had reservations, as well.

18            But as I recall, the thing that kept coming

19   back to me was the part of her letter, Rebecca Roe's

20   letter to us on page 3 where she says here:  There are

21   several problems.  Although I believe child was clearly

22   abused and probably by the defendant, the case is

23   unwinnable even assuming you can get the child to

24   testify -- or to talk.

25            I recall that I did not come to the decision to

1    file this case lightly.  I felt like there were some

2    problems with the case, but it was my policy as the

3    elected prosecutor to take an aggressive stand in my

4    county towards child abusers.  And the fact that Becky

5    Roe concluded the child was abused, allegations were

6    against this specific defendant, I decided that that's

7    what juries are for, to make that determination, not for

8    me as a prosecutor, to go back to a four-year-old girl

9    and say, you know, we believe you were molested as you

10   say you were.  We believe you, but we're not going to

11   believe you of the point of giving you your day in

12   court.

13         That's the posture I had on many of these sex

14   abuse cases in Clark County over the years.  We felt

15   that if we could win or get convictions on these types

16   of cases even 50 percent of the time, we were doing a

17   service to the criminal justice system and our

18   community.  We did get convictions many times on these

19   tough cases; sometimes we didn't.

20         But I was not going to let my belief that this

21   defendant was guilty and that this victim had been

22   abused by this defendant to be overridden by a policy of

23   not at least giving it our best shot in a court of law.

24   Q.  Did Jim Peters pressure you to file the initial

25   information in January?