Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

CLYDE RAY SPENCER, MATTHEW )
RAY SPENCER, and KATHRYN E. )
TETZ, )
 )
        Plaintiffs, )
 )
    vs. )          NO. 3:11-cb-05424-BHS
 )
FORMER PROSECUTING ATTORNEY )
FOR CLARK COUNTY JAMES M. )
PETERS, DETECTIVE SHARON )
KRAUSE, SERGEANT MICHAEL )
DAVIDSON, CLARK COUNTY )
PROSECUTOR'S OFFICE, CLARK )
COUNTY SHERIFF'S OFFICE, THE )
COUNTY OF CLARK and JOHN DOES )
ONE THROUGH TEN, )
 )
        Defendants. )

DEPOSITION UPON ORAL EXAMINATION OF JAMES M. PETERS

Thursday, November 8, 2012
Olympia, Washington

EXHIBIT___D___

Page 7

1            BE IT REMEMBERED that on Thursday, November 8,

2       2012, at 9:02 a.m. at 2102 Carriage Drive SW, Building C,

3       Olympia, Washington, before DIXIE J. CATTELL, Certified

4       Court Reporter, appeared JAMES M. PETERS, the witness

5       herein;

6            WHEREUPON, the following proceedings were had,

7       to wit:

8                         (EXHIBIT NOS. 1-41 MARKED)

9    JAMES M. PETERS,          having been first duly sworn,

10                            testified as follows:

11

12                         EXAMINATION

13   BY MR. JOHNSON:

14   Q   Good morning, sir.  Could you please state your name and

15       spell it?

16   A   Good morning.  My name is James M. Peters, J-A-M-E-S M.

17       P-E-T-E-R-S.

18   Q   Let the record reflect this is the discovery deposition of

19       James M. Peters taken pursuant to notice, and this

20       deposition will be taken in accordance with all applicable

21       rules.

22            Mr. Peters, have you ever been deposed before?

23   A   I have.

24   Q   On how many occasions?

25   A   I don't recall.

JOHNSON (James M. Peters, 11/8/12)

Page 29

1     you've probably questioned a lot more witnesses than I

2     have.  You understand there's a difference between "I don't

3     recall" and "I absolutely did not" --

4  A  You understand --

5  Q  -- is what I'm asking?

6  A  You also understand, Counsel, that it's been 28 years ago?

7  Q  I do understand that.

8  A  All right.

9  Q  So the best you can do is you don't think you did, right?

10  A  I'm pretty sure I didn't.

11  Q  So you are pretty sure that you did not speak with Katie

12     Spencer prior to December 10, 1984, correct?

13  A  Yes.

14  Q  All right.  Now, did you assess Katie Spencer's

15     competency -- well, strike that.

16         Is it fair to say that on December 11 of 1984 one of

17     the purposes you were interacting with Katie Spencer was to

18     take a look at her competency?

19  A  No.  It was the only --

20  Q  Okay.  That was not one of your purposes?

21  A  It was the only purpose.

22  Q  Okay.  Now, prior to sitting down with her -- well, strike

23     that.  Let's take you prior to the moment the videotape

24     captures.  Prior to that, had you made an assessment of

25     Katie Spencer's competency?

JOHNSON (James M. Peters, 11/8/12)

Page 45

1    So you would not know if you ruled out imaginative

2    recreation or not, correct?

3  A  I would agree with that.

4  Q  All right.  What did you do to rule out suggestibility in

5    your interview of Katie Spencer on December 11 of 1984?

6         MS. FETTERLY:  Objection; asked and answered.

7  A  My -- my role in interviewing Ms. Spencer at that time was

8    to determine whether she might be held competent by a court

9    and whether she could relate any of the allegations to me.

10   That was what I was there to do.

11 Q  (By Mr. Johnson)  Okay.  And so did you do anything with

12   regard to ruling out suggestibility at that time?

13        MS. FETTERLY:  Object to form.

14 A  Counsel, she'd already made the allegations related to her

15   father to three other people before I talked to her, and I

16   was not there to conduct a forensic interview.  I was there

17   to determine whether she might be found competent and

18   whether she could relate her account to me.

19 Q  (By Mr. Johnson)  We'll get there, but let me ask you this.

20   Did you do anything to rule out suggestibility when you

21   interviewed Kathryn Spencer on December 11 of 1984?

22        MS. FETTERLY:  Object as to form.

23 A  I can't recall if I thought about that in 1984.  It's 28

24   years ago.

25 Q  (By Mr. Johnson)  Okay.  You don't know if you did anything

JOHNSON (James M. Peters, 11/8/12)

Page 46

1    with regard to ruling out suggestibility or not; is that
2    correct?
3  A  I can't recall if that was on my mind 28 years ago.
4  Q  Oh, okay.  Has your understanding of suggestibility in the
5    context of interviewing a child alleged victim of sexual
6    abuse changed since 1984?
7  A  Was your question has -- ask your question again, please.
8  Q  Sure.  I'll try to make it better.  You said that you don't
9    recall if suggestibility was on your mind when you
10   interviewed Katie Spencer in December 11 of 1984.  Was that
11   your assertion?
12 A  That's because my task, the reason I went there to talk to
13   her, was to determine whether -- whether she might be found
14   competent by the judge and if there -- if there were a
15   charge and a trial, and if she could recount what she had
16   previously told three other people with regard to her
17   father's alleged abuse to me, who would be the person who
18   would have to question her in court.
19 Q  Okay.  So let me see if I can take that answer and move on.
20   Because you were doing what you just testified to, is it
21   fair to say that you did not do anything with regard to
22   determining the suggestibility of Katie Spencer on
23   December 11 of 1984?
24          MS. FETTERLY:  Object as to form.
25 A  I think I answered the question, Counsel.  I told you --

JOHNSON (James M. Peters, 11/8/12)

Page 56

1            MS. FETTERLY:  I don't think there was any.  Go
2      ahead and ask your question.

3   A  Ask the question.

4   Q  (By Mr. Johnson)  Okay.  Would you agree that in
5      determining the competence of an alleged sexual abuse
6      victim back on December 11 of 1984, it was important and
7      necessary to determine whether the child had the mental
8      capacity at the time of the occurrence concerning which the
9      child is to testify, to receive an accurate impression of
10     it?

11  A  I think I answered that question already.

12  Q  Okay.  Go ahead.

13  A  The answer was, I believe, that you need to make a
14     determination as to whether the child had the ability to
15     remember past events.  I think we're saying the same thing.

16  Q  All right.  What did you do to assure that the child had
17     the mental capacity at the time of the occurrence
18     concerning which she was to testify that she had an ability
19     to receive an accurate impression of it?

20  A  Well, again, without -- without having either the
21     transcript or the tape available to look at, I can't be
22     specific, and I'm under oath, and I'm supposed to be
23     specific.  But, in general, she described events and
24     behaviors attributed to her father, not attributed to
25     anyone else, that showed precocious sexual knowledge that a

JOHNSON (James M. Peters, 11/8/12)

Page 57

```
 1        five-year-old ordinarily would not have, behaviors that she

 2        had previously described to three other people who were

 3        doing either therapeutic or forensic interviews describing

 4        past events and did so, albeit with some difficulty, during

 5        that interview.

 6    Q   Okay.  Would you agree that in establishing competence --

 7        this may sound a little bit alike, but I'm going to ask

 8        this one.  Would you agree that, when you were establishing

 9        competence of a child sex abuse victim back in December 11

10        of 1984, it was important to determine that the child had a

11        memory sufficient to retain an independent recollection of

12        the occurrence?

13    A   Counsel, competence is decided by a judge at a competency

14        hearing.  In the state of Washington ordinarily that

15        occurred on the first morning of trial.  My job was not to

16        determine competence.  I did not have a robe and I was not

17        a judge.  My job was to determine and relay back to the

18        prosecuting attorney impressions as to whether she might be

19        found competent should charges be brought.

20    Q   All right.  And in that role you just described, was it

21        important for you to determine if Katie Spencer, on

22        December 11, 1984, had a memory sufficient to retain an

23        independent recollection of the occurrence?

24               MS. FETTERLY:  Objection.  Asked and answered.

25    A   I think now I've answered it at least three times.
```

JOHNSON (James M. Peters, 11/8/12)

Page 67

1   A   I don't recall.

2   Q   All right.  Would it be appropriate to ask, in establishing

3       Katie Spencer's competency, whether she knew what building

4       she was in?

5   A   I don't know why that would be appropriate or

6       inappropriate.  How would she know?  It was a big building.

7   Q   All right.  Would it have been appropriate in evaluating

8       her competency to ask her what town she was in?

9   A   There are lots of questions that could be asked, Counsel,

10      and it wouldn't be inappropriate to ask that.

11  Q   Would you agree there are lots of questions that could have

12      been asked that weren't on December 11, 1984?

13  A   There are plenty of questions that could have been asked,

14      yes.

15  Q   That would have been appropriate and relevant in

16      determining or evaluating her competency, correct?

17  A   I asked sufficient questions to allow me to make a

18      recommendation to the prosecuting attorney that I thought

19      that if this case were charged, she probably would be found

20      competent by the judge.

21  Q   How do you know that?

22  A   That was my opinion.  That's all I was asked to do.

23  Q   Would it have been appropriate in evaluating her competency

24      to determine if she knew her ABC's?

25  A   That would be a question that could be asked, yes.

189

JOHNSON (James M. Peters, 11/8/12)

Page 77

1      her to say things to you, did you?

2   A  I don't think that would be, first of all, a

3      developmentally appropriate question to ask a

4      five-year-old.  I doubt if she could answer that

5      appropriately.

6   Q  And that's why you didn't ask it, right?

7   A  You're asking me whether I asked a five-year-old child

8      whether someone else who had interviewed her weeks before,

9      or in this case months, six or seven weeks before, had told

10     her to say things.  I didn't ask that question and

11     probably -- I didn't ask that question.

12  Q  All right.  And Sharon Krause actually had interviewed her

13     more recently than all those weeks before.  You know that,

14     right?

15  A  I interviewed Katie on December 11, and I'd have to look at

16     notes to refresh my recollection, but I thought Sharon had

17     interviewed her in October.

18  Q  All right.  You got notes of this?

19  A  I prepared a time line that would help me remember the

20     order in which things happened.

21  Q  Do you have notes, Mr. Peters, of your interview of Katie

22     Spencer on December 11, 1984?

23  A  No.

24              MS. FETTERLY:  Object to the form.

25              THE WITNESS:  I can answer that question.

190

JOHNSON (James M. Peters, 11/8/12)

Page 82

1   A   I don't believe credibility is one of the elements that

2       would be considered by the judge in Washington anyway.

3       Maybe in Illinois.  That's not one of the elements of

4       competency.  That's an issue for the --

5   Q   Okay.  And I'm talking about the evaluation -- let me put

6       it this way.  Were you assessing Katie Spencer's

7       credibility on December 11, 1984, when you interviewed her

8       on videotape?

9   A   To the extent that I was testing to see whether she would

10      identify anybody else, in terms of the previous interview

11      with Shirley where she had named other people, she made it

12      clear that she was not and that the behaviors that she

13      described to me, both with words and behaviors, were

14      uniquely related to males.  She described male sexual

15      behavior, not female sexual behavior.

16              And so to that extent, I was, to that extent, judging

17      her credibility.  She described sexual behavior that a

18      five-year-old child would not know about if they hadn't

19      experienced it that was consistent with what she told

20      Shirley and consistent with what she told Sharon and

21      consistent with what she told Ann Link.  Not completely

22      consistent; there were clearly inconsistencies within what

23      she said, but she indicated to Shirley that Ray Spencer had

24      engaged in inappropriate sexual behavior with her.  She did

25      the same with Sharon and excluded the other people, and she

JOHNSON (James M. Peters, 11/8/12)

Page 83

 1      did the same with Ann Link and similar with me.  So to the

 2      extent that that was a credibility assessment, and I think

 3      it was, I did that.

 4   Q  So you made a credibility assessment of Katie Spencer on

 5      December 11 of 1984, correct?

 6   A  To the extent of what I just described.

 7   Q  Is it a fair statement to say that one of the purposes of

 8      you interviewing Katie Spencer on December 11, 1984, was to

 9      evaluate her credibility?

10   A  My purpose of interviewing Katie Spencer was very clear.

11      It was to determine whether she might be found competent

12      and whether she might be able to testify in court.

13   Q  And let me ask you this, and maybe it's a "yes," "no," or

14      "I don't know," but I'm going to ask you if you agree with

15      this statement.  One of the purposes of your interview of

16      Katie Spencer on December 11 of 1984, one of the purposes

17      was to assess Katie Spencer's credibility?

18   A  Credibility is an issue for the finder of fact.  If the

19      finder of fact believes her story, if the prosecuting

20      attorney made the decision to file the charges, that is an

21      issue for the jury.

22   Q  So is it fair to say that then -- that didn't answer my

23      question.  Yes, no, or you can't answer the question?  I'll

24      ask it again.

25                MS. FETTERLY:  Objection.  Go ahead.

JOHNSON (James M. Peters, 11/8/12)

Page 85

1    like an answer to this question without a narrative about

2    all the other things you're adding on now for the third

3    time.

4         Is it a fair statement to say that on December 11 of

5    1984, one of the purposes of you interviewing Katie Spencer

6    was to evaluate the credibility of Katie Spencer?

7  A  I've already answered that question.  My purpose was to

8    determine competency or the probability of competency and

9    whether she could testify -- whether she could tell me the

10   story that there -- later could be related in court so the

11   jury could determine her credibility.

12 Q  And I am not asking you what -- to lay out what your

13   purpose was.  I'm asking you again, and I believe in good

14   faith the answer is "yes," "no," or "I can't answer the

15   question as you posed it."

16        Was one of your purposes on December 11, 1984, when

17   you interviewed Katie Spencer, to assess the credibility of

18   Katie Spencer?

19 A  You can beat that horse till it's dead, Counsel.  I've

20   answered the question.

21 Q  Is your answer "yes"?

22 A  I've answered your question.

23 Q  Is your answer "no"?

24 A  I've answered your question, Counsel.

25 Q  Is your answer "I can't answer the question as you posed

Page 86

1      it"?

2    A  Counsel, I think you're getting abusive.  I've answered

3       your question.

4    Q  You haven't answered the question, and I'm going to ask you

5       again.  And you know you haven't answered the question.

6                MS. FETTERLY:  I'll object to that statement.

7    Q  (By Mr. Johnson)  Was one of your purposes -- was one of

8       your purposes, Mr. Peters, in interviewing Katie Spencer on

9       December 11 of 1984 to assess the credibility of Katie

10      Spencer?

11   A  I've answered your question, Counsel.

12   Q  What is your answer?

13   A  I'll just have the court reporter read it back to you.

14      I've answered it probably three times.

15   Q  Give it to me one more time, please.

16   A  My purpose in interviewing Katie Spencer was to determine

17      whether she might be competent to testify should this case

18      be charged and whether she could relay the story to me as

19      the investigation had -- had funneled it down to the way it

20      was at the point that I understood it to be.  That was my

21      purpose.

22   Q  All right.  And we'll reserve the right to have an answer

23      to that question, reopen the deposition, and approach the

24      judge in the future, if need be.  If you have an answer to

25      that question, sir, by the end of the deposition, please

Page 93

```
 1        contacted Clark County about the allegations before anyone

 2        else did?

 3     A  I believe that the allegations in this case were reported

 4        to authorities initially by Shirley Spencer, and that got

 5        the ball rolling.  What happened subsequent to that, first

 6        of all, I don't recall; and, second, if something -- if

 7        what you're trying to imply is what happened would

 8        certainly be subject to interpretation if the person was

 9        trying to cover his tracks.  But the initial report was

10        made by Shirley Spencer to authorities.

11     Q  And I'm not trying to imply anything, sir.  I'm just trying

12        to get your answers.

13           Do you agree that Ray Spencer was the first person to

14        report the allegations to the Vancouver Police Department?

15     A  I don't recall.  I'd have to look at the reports to see.

16     Q  Okay.  And if he indeed -- let's assume for the purposes of

17        this question that Ray Spencer was the first person to

18        report the allegations you say Katie made to the Vancouver

19        Police Department.  That would not be consistent with Ray

20        Spencer's guilt, would it?

21     A  No, it might be consistent with him trying to cover up

22        because he knew it had already been reported.

23     Q  And would that be your opinion?

24     A  You asked -- either way I answered that question, it would

25        have been my opinion, Counsel.
```

JOHNSON (James M. Peters, 11/8/12)

Page 97

```
 1   Q   Did you have any understanding that Shirley Spencer had
 2       made statements that she did not believe Ray had done
 3       anything to Katie?
 4   A   I know she was standing by her husband.  I remember that.
 5   Q   Okay.  Did you know that Katie had stated that she did not
 6       want to talk to boys about the abuse?
 7   A   To whom and when?  I don't remember that.
 8   Q   Okay.  You can take a look at Exhibit 3, if you'd like.
 9       This is Rebecca Roe's report on page 1.
10   A   (Witness complying).
11   Q   Seven lines up from the bottom.
12   A   (Witness perusing document)  I see where that's written
13       there.  It says, "Sharon Krause had to spend several hours
14       one-on-one with victim who also indicated she would not
15       talk about it, quote, with boys, end quote."
16   Q   All right.  And staying on that page since you have it in
17       front of you, did you also know that Katie did not talk to
18       a female counselor about it?
19   A   Actually, that's in -- I see that is written in Rebecca
20       Roe's report, but that's not accurate.
21   Q   Well, Rebecca Roe reported that Katie would not talk to a
22       female counselor about it, correct?
23   A   I see what's written in Rebecca Roe's report, but as I told
24       you, that's inaccurate.  I talked to the female counselor
25       myself who told me that she had been speaking with Katie
```

JOHNSON (James M. Peters, 11/8/12)

Page 99

1    A   Sharon Krause had interviewed Katie Spencer, yes.

2    Q   Yeah.  You also knew as of, on or about, November 27 of

3        1984 that Katie Spencer -- the words you say she said were

4        uncorroborated by anything?

5    A   Oh, I would disagree with that.

6    Q   What was the corroboration of Katie Spencer as of

7        November 27, 1984?  Something other than her words that you

8        say she said.

9    A   Well, Counsel, when five-year-old children display

10       precocious sexual knowledge of intimate sexual acts such as

11       fellatio and cunnilingus, according to at least the law in

12       the state of Washington at the time, that is corroboration,

13       and it is admissible.  There's a case that I recall from

14       way back when that I used -- that I was familiar with from

15       having prosecuted these cases called In Re Penelope B, and

16       that allowed the admission of out-of-court statements that

17       would be otherwise be hearsay of witnesses describing

18       precocious sexual knowledge on the part of a very young

19       child.

20           And in this case it's my opinion that Shirley and/or

21       Sharon and/or Ann Link would all have been allowed to

22       testify that Katie demonstrated that precocious sexual

23       knowledge.  That is corroboration.

24   Q   All right.  And other than what you've just described, was

25       there any corroboration?  What I'm talking about is

JOHNSON (James M. Peters, 11/8/12)

Page 107

```
 1   A   Well, I recall when the reports first came in, I quickly
 2       reviewed them.  I made my own assessment of what I would do
 3       if the ultimate decision were mine, which of course it was
 4       not.  I spoke with him, told him my opinion, suggested to
 5       him that because of the sensitive nature of the case that
 6       he might want to refer it to outside counsel for review
 7       because my recommendation was at that point going to be I
 8       didn't think we could prove the case.
 9   Q   I'm sorry.  What was that you just said?
10   A   I said my recommendation was going to be that I didn't
11       think we could prove the case.  I thought he did it, I
12       thought there was probable cause, but I thought there were
13       proof issues.
14           And I suggested that he refer it to Becky Roe, whom I
15       knew.  I knew from her teaching at our prosecutors'
16       conferences and because she was the head of the Sexual
17       Assault Center.  And based on that recommendation while I
18       was in the first-degree murder trial on or about
19       November 12 Art Curtis referred the case to Becky Roe, and
20       it was as a result of that that she wrote her
21       recommendation of November 27.  So from the very beginning
22       when the case first came in, Art Curtis was actively
23       involved with it.
24   Q   Can you give me the date of what you just described, all
25       those things?  What time period are we talking about?
```

JOHNSON (James M. Peters, 11/8/12)

Page 108

1  A  Which things are you referring to?

2  Q  Okay, well, you said from the very beginning.  What was the

3     beginning?

4  A  Well, the beginning was when the reports came in on

5     November 1st.

6  Q  Okay, that was --

7  A  There may have been phone calls or conversations prior to

8     that, but the case was initially -- my recollection from

9     reviewing these reports is that they were first submitted

10     to us on or about November 1st.

11  Q  Okay.  And then when you -- you said you made your

12     recommendation that it wasn't provable, when was that?

13  A  I don't recall.

14  Q  I'm sorry.  What you said about when it wasn't provable,

15     when was that?

16  A  I don't recall.  I don't recall that date, but I do recall

17     that I assessed it, mindful of the fact that I was

18     preparing for a first-degree murder case, I assessed it as

19     best I could given the other things I was focused on, and I

20     told Mr. Curtis what my thoughts were.

21         Now, those kind of conversations happen in

22     prosecutors' offices all the time.  You kick it around.

23     What do you think about this?  What do you think about

24     that?

25  Q  Again --

199

JOHNSON (James M. Peters, 11/8/12)

Page 109

1   A   And I would have done that in this case.  And based upon --

2   Q   I'm not asking that.  What were the proof issues you're

3       referring to?

4   A   The same things that Becky Roe talked about.  The fact that

5       she had --

6   Q   Go ahead and list them for me.  Give me your proof issues

7       rather than hers.

8   A   Well, the fact that she had named two other individuals as

9       potential perpetrators.  I think those were resolved by law

10      enforcement and clarified by the fact that the other two

11      alleged perpetrators could not have performed fellatio on

12      her as she described, because they were females, and could

13      not have attempted penile penetration which she described,

14      because they were females.

15          So the weight of the evidence tended to suggest that

16      it was a male perpetrator and how the circumstance of

17      alleged female perpetrators came up in the conversation

18      with Shirley, nobody really knows, because it was between

19      Katie and Shirley.  But that was an obvious issue that

20      would have clouded any trial should it have gone.  It

21      didn't mean that it didn't happen; it didn't mean there

22      wasn't probable cause.

23          There was plenty of other corroboration.  I mean, the

24      child has precocious sexual knowledge.  She had apparently

25      engaged in excessive masturbation.  She learned that

Page 110

1     someplace.  Her mother described her underwear being worn

2     through where she had been apparently masturbating.

3          There were a number of other behavioral indicators

4     that were consistent with a child having been traumatized.

5     The trauma could have been sexual abuse.  It could have

6     been other things as well.  But there were clearly proof

7     issues that would have come up at trial.

8          And my thought at that point in time I was focused on

9     a first-degree murder trial was that this is a problem

10    case.

11  Q  At the time you're talking about, when you made this

12    assessment, you knew Katie had lied about Karen Stone,

13    correct?

14  A  I knew that there had been allegations of -- that Sharon

15    and -- Sharon Stone -- that Karen Stone and DeAnne Spencer

16    had engaged in inappropriate behavior.  I also knew that

17    they had been cleared as suspects.

18  Q  And that's why I read the report.  That Katie had lied

19    about them, correct?

20  A  If you want to use the word "lie."  I'll grant you that

21    it's in the report.

22  Q  Okay.  When -- did the Clark County prosecutor's office

23    supervise the investigation into these allegations?

24  A  No.

25  Q  So are you aware that Michael Davidson said the Clark

Page 112

1    Q   I'm not asking you whether -- other cases or anything like

2        that.  Did you personally supervise the Spencer

3        investigation?

4    A   Absolutely not.

5    Q   Did Art Curtis supervise the Spencer investigation?

6    A   I don't believe so.  I don't know what he -- I don't know

7        what happened in his --

8    Q   Can you --

9    A   I don't know what happened in his office, but I certainly

10       doubt it.

11   Q   And did any other prosecutor that you're aware of supervise

12       the investigation?

13   A   The only other prosecutors that were involved were just

14       tangential for routine matters, and I'm sure they did not.

15   Q   Who were they?

16   A   Mike Foister was present at the initial arraignment when

17       Mr. Spencer turned himself in in January.  And Jim Gavid, I

18       saw a note in the file that he must have appeared at a

19       hearing in March or April.  It was in his handwriting.

20       Other than that, the only other prosecutor that was

21       involved was -- of course, you know about Rebecca Roe, and

22       then the case was assigned to Barb Linde from the King

23       County prosecutor's office for about three and a half

24       months.

25   Q   Now, speaking of Rebecca Roe, she's a specialist in sex

JOHNSON (James M. Peters, 11/8/12)

Page 113

1    abuse prosecutions?

2  A  Yes.

3  Q  And you referred the case to her in part because you didn't

4    want it to look like you were favoring Ray Spencer in the

5    investigation?

6  A  If you -- by you, you mean the plural you, the prosecutor's

7    office, it was actually Art Curtis who made the referral on

8    my recommendation.

9  Q  And that was why, so it would not look like the

10   prosecutor's office was favoring Ray Spencer?

11  A  I think there were multiple reasons for it.  The reason I

12   personally made the suggestion was that I did not feel

13   confident about the case, about prosecuting the case.

14       In our office we had what you'd call colloquially

15   "File it, you try it," and if you file a case, it's your

16   responsibility to finish it.  I personally, at that point,

17   particularly given all the other things I had on my plate

18   at that time, which were substantial, did not want to try

19   this case based upon the initial reports.

20       And so that was -- that was my initial impetus.

21   There's obviously the concern that about 40 percent of our

22   cases came from the Vancouver Police Department, and for us

23   to prosecute one of their members obviously would create

24   dissension amongst the members.  That was a big concern

25   that we talked about as well.

JOHNSON (James M. Peters, 11/8/12)

Page 114

1  Q  Is it fair to say that during this time period we're

2     talking about -- November/December of 1984 -- you made all

3     the charging decisions regarding the prosecution of sex

4     crimes involving children in Clark County?

5  A  Not exactly.  I was the person who was the regular intake

6     person for the sex crimes.  If I was involved in trials, as

7     I was in this case, and frequently was, if it was an

8     emergent matter, then it would go to someone else.

9        If it was a routine matter, then it would just get

10    put in a box and I would get to it, and I would make -- in

11    a routine case I would make a charging decision, and then

12    the supervisors would assign the case out to one deputy

13    prosecutor or another.  I didn't keep them all.

14       If it was a sensitive case, no decision would be made

15    without the boss's input.

16  Q  Okay.  You mentioned earlier that you recommended that the

17    case be submitted to Rebecca Roe?

18  A  I definitely did that.

19  Q  You did that?

20  A  I did that.

21  Q  Okay.  And then that recommendation was made to Art Curtis?

22  A  Yes.

23  Q  Was anyone else involved in that decision?

24  A  Well, it was between a subordinate and his supervisor.  I

25    don't know if the criminal chief may have been involved.

JOHNSON (James M. Peters, 11/8/12)

Page 115

1    I'm not sure.  I don't remember.

2  Q  Who was the criminal chief?

3  A  Roger Bennett.

4  Q  And how about Sharon Krause, was she involved in that

5     decision?

6  A  Not in the decision.  I'm sure she may have known about it,

7     but, I mean, she was -- in the hierarchy of the Sheriff's

8     Office, she was a detective.  They had their supervisors

9     and a Sheriff who were in their hierarchy.  Our hierarchy

10    was different.

11  Q  When that submission was made, you wanted to make sure that

12     Rebecca Roe had all the evidence available, correct?

13  A  I was in trial when that decision was made.  Art Curtis

14     submitted that while I was in trial.  I was not involved in

15     that in any way.

16  Q  So you were not involved in any way as to what evidence

17     would be submitted to Rebecca Roe for her review; is that

18     correct?

19  A  No.  I'm sure Art Curtis had the file, and he sent her

20     whatever he had.  That's my assumption.

21  Q  Are you aware of what she sent her?

22  A  No.  I've seen the --

23  Q  Rebecca Roe was a --

24  A  I've seen the letter.  The letter just said -- says the

25     reports are attached.  No, no, wait a minute.  That was a

Page 116

1      different time.  That was when it was sent to -- submitted

2      for prosecution to King County.  I'm not sure about whether

3      I've seen a letter related to submitting it to Rebecca Roe.

4      I take that back.  I was thinking of something else.

5  Q  At that time -- at that time Rebecca Roe was a highly

6      respected expert in the area of sex abuse prosecutions,

7      correct?

8  A  She was.  Yes, she was.

9  Q  And she still is?

10  A  I believe she's been in private practice for a long time.

11      I don't think she's prosecuted a case for 17 or 18 years.

12      But her opinions would certainly be --

13  Q  Okay.

14  A  -- would be credible.

15  Q  All right.  At the time the case was submitted to Rebecca

16      Roe, can you estimate how many hours of videotaped footage

17      existed of Sharon Krause's meetings with Katie?

18  A  I don't believe there were any.

19  Q  Can you tell me how many hours of videotaped footage of you

20      with Katie existed?

21  A  There were none.

22  Q  You're sure of that?

23  A  On November 12, 1984?

24  Q  Novem -- as of November 27, on or about the time it was

25      submitted to Rebecca Roe.

206

Page 117

1  A  I'm sorry.  Your facts are incorrect.  The matter was

2     submitted to Rebecca Roe on or about November 12 --

3  Q  Okay.

4  A  -- and she wrote her opinion.  She was in Seattle.  This

5     was transmitted by mail, so Mr. Curtis, it's my

6     understanding, referred it to her on or about November 12,

7     and I was in trial at that time.

8  Q  Do you know how many -- can you estimate how many hours of

9     videotaped footage existed of any Clark County law

10    enforcement officials and Katie?

11 A  Well, I'm sure there were none because they didn't have a

12    facility to interview children, and obvious from the

13    interview that I did, it was a poor -- we used the squad

14    room.  They did not have a child interview room at that

15    point.  That's something that changed a few years later.

16 Q  So you're unaware as to whether there's any videotaped

17    footage out there?

18 A  I'm not unaware.  I'm sure there aren't any, there isn't

19    any.

20 Q  Because if there was, you would know about it, correct?

21 A  I believe so.

22 Q  Because that's pretty important stuff, videotaped footage

23    of an investigator with a witness?

24 A  Clark County -- neither the Clark County Sheriff's office,

25    nor the Vancouver Police Department videotaped interviews

JOHNSON (James M. Peters, 11/8/12)

Page 118

1      at that point with child abuse or any other victim, abuse

2      victims.

3    Q   Had they done so, it would be very important for you to

4        know about it as the Clark County prosecutor, correct?

5    A   Had they done so, I would have known about it.

6    Q   Okay.

7                MR. FREIMUND:  You know, it's lunchtime here.

8                MR. JOHNSON:  Our lunch just came, yeah.

9                MR. FREIMUND:  Yeah.  Okay.  Do you want to take

10       a break for about 20 minutes?

11               MR. JOHNSON:  How long do you want?

12               MS. FETTERLY:  We've been doing 20 minutes.

13       Twenty minutes?

14               MR. JOHNSON:  That's fine.

15               MS. FETTERLY:  That would be 20 after 12 here.

16               MR. JOHNSON:  All right.

17                                 (Recessed at 12:01 p.m.)

18                                 (EXHIBIT NOS. 42 & 43 MARKED)

19                                 (Reconvened at 12:39 p.m.)

20   Q   (By Mr. Johnson)  Mr. Peters, other than the proof issues

21       with the case you've already described, are there any other

22       proof issues?

23               MS. FETTERLY:  What point in time?

24   A   At what point in time are you referring?

25   Q   (By Mr. Johnson)  Let's take November 27 of 1984.

Page 119

```
 1   A   Well, there's always the vagaries when you have a young
 2       child and whether that child will be found to be competent
 3       and whether they'll cooperate with you going forward.  So
 4       that would always be an issue in any case with a child this
 5       young.  Our office had done cases, not me personally, but
 6       other attorneys, with children as young as four.  But
 7       that's an issue; that would always be an issue.
 8   Q   Okay.  Any other issues with regards specifically to the
 9       Spencer case?  Any proof issues you have not mentioned?
10   A   Probably are some.  I don't offhand remember them right
11       now.
12                  MS. FETTERLY:  Counsel, again, you're referring
13       to the same -- are you referring to the same time period,
14       November of '84.
15                  MR. JOHNSON:  Yes.
16                  MS. FETTERLY:  Okay.
17                  MR. JOHNSON:  Yes.
18   Q   (By Mr. Johnson)  Now, also same time period, you had
19       mentioned, I believe, that Katie was exhibiting behavioral
20       things suggesting she had been abused.  You stated that she
21       was excessively masturbating; is that correct?
22   A   Maybe I need to correct your question.  I indicated --
23   Q   Sure.
24   A   -- that she had been exhibiting behavioral indicators that
25       could be indicative of a lot of things.  Some of them
```

209

Page 120

1    appear to be specifically sexual; others could have been

2    indicative of lots of things.  And I'm pretty sure that's

3    what I said.

4  Q  Okay.  With regard to Katie Spencer's excessive

5    masturbation, is that documented anywhere in the file?

6  A  Yes, it's in Sharon Krause's report of Shirley Spencer.

7  Q  Okay.  How about --

8  A  Now, you may have --

9  Q  -- the underwear --

10  A  I'm sorry, Counsel.

11       Some inferences may have to be drawn.  I have some

12    notes.  Can I refer to them?

13  Q  Sure.

14  A  Okay.  This is -- these are notes that I took last week

15    from Sharon Krause's interview with DeAnne Spencer from

16    October 15th.  It would have been October 15, 1984.

17            MR. JOHNSON:  And could we just mark his notes

18    as Exhibit No. 44 if they are not deemed privileged?

19            MS. FETTERLY:  That's fine.

20            THE WITNESS:  Okay.

21            MS. FETTERLY:  44.

22                        (EXHIBIT NO. 44 MARKED)

23            THE COURT REPORTER:  44's been marked.

24  A  So with regard to what I call possible behavioral

25    indicators or red flags, some of which could mean lots of

Page 121

1    things, some of them appear to be focusing on precocious

2    sexual behavior.  Here's what I noted from the interview

3    with DeAnne Spencer.

4  Q  And let me stop you for one second.  I apologize.

5              MR. JOHNSON:  Is there any Bates number,

6    Counsel, on this report that he's reading from, or is that

7    in discovery?

8              MS. FETTERLY:  No, it's simply something he

9    recently created.

10             MR. JOHNSON:  I'm not talking about his notes.

11   I'm talking about the October 15, 1984, report.

12             MS. FETTERLY:  It should be.

13             THE WITNESS:  Yeah.

14             MS. FETTERLY:  I mean, it's one of the reports,

15   the Detective Krause reports, I'm pretty certain.  I don't

16   have that right in front of me.

17  Q  (By Mr. Johnson)  Is this a report reflecting an October

18   15, 1984, interview, or is there some other date of the

19   interview and it's reflected in a report dated later?

20  A  Oh, I don't know.

21             MS. FETTERLY:  There could be some confusion on

22   the date of the interview versus the date of the report,

23   but I believe Sharon Krause only did one interview of

24   DeAnne Spencer, and I believe that's what these notes refer

25   to.

JOHNSON (James M. Peters, 11/8/12)

Page 122

```
 1              THE WITNESS:  That's right.  It was the
 2      interview she conducted with her in Sacramento.
 3              MR. FREIMUND:  If I might interject, I'm sorry,
 4      but Exhibit 42, the time line indicates, and you probably
 5      don't have this yet, but it indicates that on October 15,
 6      "Krause interviews DeAnne Spencer on the telephone."
 7              October 16, DeAnne Spencer takes polygraph.  No
 8      deception indicated.  And then there's several other
 9      entries, but at December 8, I'm sorry, October 18 it says
10      "Krause interviews DeAnne Spencer at Holiday Inn," and
11      those are the only ones I see referring to DeAnne Spencer.
12  A   I think -- this is one long continuous report of Krause's
13      visit to Sacramento, as I recall.
14  Q   All right.  Can you proceed with what you were saying?
15  A   Yes.  Well, DeAnne told Krause that Katie had met with
16      Detective Flood and a therapist and indicated there had
17      been something sexual between her and her father, but
18      nothing more than that.
19              And these possible behavioral indicators or red
20      flags, things that, like I said, could mean lots of
21      different things.  DeAnne related before Katie went up to
22      Vancouver in the summer of '84 she would become upset and
23      at times hysterical, crying and indicating she did not want
24      to go to her father's.  DeAnne indicated that Katie's
25      behavior toward men concerned her, that she seemed to know
```

Page 123

1    how to "manipulate men," those last two words in quote.

2    DeAnne related to Krause that it seemed to her to be more

3    that she was acting in an adult way different than most

4    four- to five-year-old children.

5        DeAnne -- Krause reported that DeAnne said to her

6    that Katie's behavior around men seemed sexual.  She'd sit

7    in their laps rubbing and clinging, did not seem

8    appropriate for a five-year-old.  She said that after the

9    1983 visit up to see Mr. Spencer, she observed Katie

10   rubbing the genital area of her body.  She said that after

11   the 1983 visit Katie would ask her mom to put medicine on

12   her genital area because it was sore.  She said that after

13   the 1983 visit Katie seemed preoccupied with DeAnne's

14   breasts.

15       Krause wrote that DeAnne told her after the Easter

16   1983 trip, DeAnne walked into the bathroom and saw Katie

17   touching her brother Matt's penis.  After that, DeAnne told

18   Krause that she made sure the two were not alone in the

19   bathtub.

20       The report continues that, after the 1983 visit, a

21   baby-sitter caught Katie and her two-year-old cousin under

22   the covers with their clothes off.  When asked, Katie

23   reportedly said, quote, That's what moms and dads do, end

24   quote.

25       After Katie returned from the summer of 1984 visit

JOHNSON (James M. Peters, 11/8/12)

Page 124

1   when these acts allegedly occurred, DeAnne reported that

2   the whole front area of Katie's nightgown where the crotch

3   would be was worn almost completely through, and that's

4   where I drew the inference that that suggested

5   masturbation.

6           She said that after the visits with her father in the

7   summer of '82, Katie developed a sore on her labia.  DeAnne

8   reported that the summer before she and Mr. Spencer split

9   up, which she said was 1981, she, DeAnne, developed a case

10  of herpes.  She said she believed she got it from Ray.  She

11  said that the sore that she observed on Katie's labia

12  reminded her a lot of a herpes blister, though she had no

13  proof that Ray ever had herpes or what she saw on Katie was

14  herpes, Krause reported.

15          The report continues --

16  Q  Let me stop you.  So you're not just reading the report,

17     are there other reports besides this one from which you

18     drew the conclusion about excessive masturbation, underwear

19     worn out, and precocious sexual knowledge?

20  A  I'm reporting what was in Krause's interview with Shirley.

21              MR. FREIMUND:  Or DeAnne.

22  A  I'm sorry.  I take that back.  DeAnne.

23  Q  (By Mr. Johnson)  With DeAnne?

24  A  I mixed the two up.

25  Q  You're referring to DeAnne?

JOHNSON (James M. Peters, 11/8/12)

Page 125

1    A   I was.  I'm sorry.

2    Q   Okay.  Aside from that report, are there other documents

3        that support your assertion that Katie was excessively

4        masturbating, her underwear was worn out, and she had

5        precocious sexual knowledge?

6    A   Yes.

7    Q   And would those also be Sharon Krause reports --

8    A   No.

9    Q   -- authored by her?

10   A   No.

11   Q   What would those be?

12   A   The information now, your question was compound, had

13       multiple subjects in it, but the behavioral indicators

14       portion of it was relayed to me by Ann Link, and it's in

15       the notes of Rulli and my interview with Ann Link.

16   Q   All right.  Other than Ann Link and the report you've read,

17       are there other documents that reflect the excessive

18       masturbation, worn-out underwear, and precocious sexual

19       knowledge?

20   A   The initial reports documented by Shirley Spencer clearly

21       show this child had been prematurely sexualized including

22       by a male, whom she identified as her father.

23   Q   All right.  Other than that, any more?

24   A   Off the top of my head, I can't recall.

25   Q   You also stated that -- or did you state that you gave

JOHNSON (James M. Peters, 11/8/12)

Page 130

1   Q   And at that time was Ray restricted from leaving the state
2       of Washington?
3   A   I don't know why he would be.  The case was still under
4       investigation.  He'd not been before a court.  I'm sure
5       not.
6   Q   He was free to go anywhere, right?
7   A   Yes.
8   Q   And at that time you were aware that Ray owned firearms?
9   A   I was not aware of anything that Ray owned.  I can draw
10      assumptions.  I can draw assumptions, but I'm not aware.
11  Q   You would assume -- you would assume as a police officer,
12      he might have access to firearms; is that correct?
13  A   Yes.
14  Q   Okay.  And he was also living with a minor child at that
15      point; is that correct?
16  A   I don't know that I knew where he was living.
17  Q   Okay.  You are unaware -- strike that.  You were unaware of
18      him having any restrictions with regard to minor children
19      at that point, correct?
20  A   At what point, Counsel?
21  Q   Still talking about November of 1984, November 27 of 1984
22      specifically?
23  A   That's right, I'm not aware that there were.  He had not
24      been to court yet.
25  Q   Okay.  And knowing all those things that I've just laid out

JOHNSON (James M. Peters, 11/8/12)

Page 131

1      your office declined charges as of on or about November 27

2      of 1984, correct?

3  A  That's actually inaccurate.  And I recall from having read

4      my transcript of 1986 that I made have said that.  And if I

5      did, I was in error.  If you've read that transcript,

6      you'll understand that I spent -- my task at that time was

7      to find out if there was a medical report in the

8      prosecutor's file, and I spent about two hours following up

9      on that task.  That recollection was inaccurate.  It was

10     my -- it was my recommendation that it be declined.  It was

11     Rebecca Roe's recommendation that it be declined, but it

12     had not been declined.  So I was inaccurate when I said

13     that.

14  Q  When you refer to being inaccurate as to what you said,

15     Mr. Peters, are you referring to the sworn deposition you

16     gave July 30 of 1996?

17  A  I said that in some prior testimony.

18  Q  And you had been sworn to tell the truth?

19  A  I -- yes.

20  Q  And you are now saying that prior testimony regarding the

21     Ray Spencer case that you were sworn to tell the truth, yet

22     you gave inaccurate testimony --

23  A  No, I'm saying.

24  Q  -- is that correct?

25  A  No, I'm saying I had a misrecollection.  I -- my

Page 132

1    recommendation was to decline it.  Rebecca Roe's

2    recommendation was to decline it.  But the ultimate

3    decision in any prosecutor's office is made by the

4    prosecuting attorney, and so the formal process of that

5    happening had not happened.  So I just misremembered when I

6    was asked that question.

7  Q  That's not my -- so is your testimony -- strike that.  Is

8    your prior sworn testimony on this point that you're

9    describing in this case inaccurate?

10  A  Yes.

11  Q  All right.  You declined or you would say that you

12    recommended declining the charges; is that your testimony

13    today?

14  A  That was my feeling.  That was what I -- when you have

15    conversations among prosecutors, you express your opinions,

16    and that was my opinion initially.

17  Q  Have you ever documented the opinion you just gave?

18  A  I've repeated it multiple times including during that same

19    deposition that you're referring to, or the testimony --

20  Q  Have you ever documented?

21  A  That's called documentation.

22  Q  Have you ever -- okay.  Other than that, have you ever

23    documented it?

24  A  It was an opinion.  There -- no, I don't recall if it's

25    written down anywhere.  We wouldn't have done that.  That

1      cleared, and her brother said she made up stories; is that

2      correct?

3   A  That's obviously a multiple, compound question.  My -- I

4      declined or, excuse me, I expressed my personal belief at

5      the time that we would have difficulty proving the case,

6      and then in the context of all the other things that were

7      on my plate at that time, and our "You file it, you try it"

8      rule, I didn't want to try this case.  So my recommendation

9      was not to pursue it.

10  Q  Because it was weak, right?

11  A  It was definitely weak.

12  Q  All right.  Now, what did you do on the case with regard to

13     the case between November 27, 1984, and December 11 of

14     1984?

15  A  Nothing.  I was very busy with another -- with something

16     else.

17  Q  When was that meeting with Karen Stone?  I guess you said

18     maybe that was Art Curtis, but just to mention, a

19     prosecutor spoke with Sharon Krause, and you said you

20     weren't sure if that was Art Curtis or yourself.  Has

21     anything refreshed your recollection as to whether you had

22     that meeting with Sharon Krause about Karen Stone?

23  A  I think -- your question assumes something that may not be

24     accurate.  You're assuming there was a meeting.  I would --

25     more likely --