Page 136

```
 1        and 11 of 1984 was to determine if abuse really had

 2        occurred; is that correct?

 3   A    No.

 4   Q    So your testimony that determining whether or not Katie

 5        Spencer had been abused was not anything you were trying to

 6        determine when you met with Katie Spencer on December 10

 7        and December 11 of 1984?

 8   A    I am saying that, yes.

 9   Q    Okay.

10   A    That had already been determined by the investigators.  My

11        job was to find out if she was competent and could testify.

12   Q    If Katie Spencer had told a consistent story to you on

13        December 11 of 1984 that you believe established that Ray

14        Spencer had abused her sexually, is it -- and you had

15        videotaped that interview, you would have used that video

16        as evidence of probable cause; is that correct?

17   A    No, the video wasn't evidence of anything.  It was the

18        child's statement.  Whether there was a video or not would

19        have been irrelevant.  Prior statements that she made to

20        Sharon and Shirley and Ann Link were not videoed, but they

21        were evidence of probable cause.

22   Q    So you would not have used a videotape reflecting Katie

23        Spencer telling a consistent, believable story about sexual

24        abuse as evidence of probable cause in further proceedings

25        regarding Ray Spencer; is that correct?
```

220

JOHNSON (James M. Peters, 11/8/12)

Page 137

1    A    What further proceedings are you referring to?

2    Q    A criminal prosecution.

3    A    I think you're mixing things, Counsel.  The determination

4         of probable cause was a decision in the state of Washington

5         that the prosecutor makes.  It's not as if there's a

6         hearing before a magistrate where -- like we have in

7         federal court where the magistrate makes that decision.  So

8         the video wouldn't have been evidence.  It would have

9         been -- it would have been proof that she said those

10        things.  It would have been -- but the fact was the

11        evidence would be what she said.  And that would simply

12        have been conveyed to Mr. Curtis, and he would have made

13        the decision, whatever decision he chose to make.

14   Q    Would you have turned that video over to the defense?

15   A    Of course.  Before trial it definitely would have been

16        turned over.

17   Q    If Katie Spencer was able to tell her story without

18        contradictions on the videotape when you interviewed her on

19        December 11 of 1984, that would have been relevant to

20        whether or not there was probable cause for the arrest of

21        Ray Spencer, correct?

22   A    Of course.

23             MS. FETTERLY:  Object to form.  When you say

24        probable cause, for arrest or prosecution?  They're two

25        separate concepts.

JOHNSON (James M. Peters, 11/8/12)

1   A   I missed that, Counsel.

2   Q   (By Mr. Johnson)   I'm aware.

3           MS. FETTERLY:   Then you better clarify which one

4       you mean.

5   A   Which are you referring to?

6   Q   (By Mr. Johnson)   Well, if Katie Spencer was table to tell

7       her story consistently without contradiction on videotape

8       when you interviewed her on December 11, 1984, would that

9       have been relevant to probable cause for the arrest of Ray

10      Spencer?

11  A   Well, Katie's interview, whether she was consistent or not

12      consistent, was relevant to probable cause to charge.

13  Q   Katie couldn't keep her story straight when you interviewed

14      her on December 11, 1984, could she?

15  A   It depends on what you mean by keep her story straight.

16      She was -- she was --

17  Q   Well, you just saw the video.   Could she?

18  A   I did.   She was a difficult witness, but I don't know if

19      you've had the experience of talking to five-year-olds

20      about sex.   It's a very difficult thing for both the

21      interviewer and the child being interviewed, and they're

22      frequently all over the place.

23  Q   In your -- I'm just talking about Katie Spencer.   She

24      denied to you on more than one occasion that anything

25      improper had happened with her and Ray, correct?

JOHNSON (James M. Peters, 11/8/12)

Page 139

1    A   I don't believe she ever said that.

2    Q   You don't believe that she ever denied anything bad

3        happening between Ray and her?

4    A   Well, your question was she denied to you multiple times

5        that anything improper had happened between her and Ray,

6        and I don't recall her -- I don't recall that happening.

7    Q   All right.  If that had happened, that would suggest that,

8        at least to some extent, that nothing bad had happened with

9        Ray, correct?

10   A   You used a pronoun if "that" had happened.  I'm not sure

11       what you're saying.

12   Q   Okay.  If Katie had denied to you more than once that Ray

13       had sexually abused her, that would suggest, at least to

14       some extent, that Ray had not sexually abused her, correct?

15   A   You have to look at the totality of the interview and the

16       totality of the facts to weigh whether or not you have --

17       you believe there's some credibility to the story.

18       Children --

19   Q   So, in your opinion -- in your opinion, her denying it

20       really didn't mean anything?

21               MS. FETTERLY:  Object to the form.

22   A   You're assuming that she denied something.  And, again,

23       you're using pronouns, which are not clear as to what the

24       reference is.

25   Q   (By Mr. Johnson)  All right.  If she denied -- would there

223

Page 141

1    it?  That's a leading question.  There are directed

2    questions; there are questions that give choices; and there

3    are open-ended questions, and probably others that I'm not

4    thinking of right now.

5  Q  Okay.  In getting a credible story from a child, would you

6    agree that the child's story is more likely to be true if

7    you use open narrative questions?

8  A  Yes.  That's often -- that is the preferred method, to

9    begin an interview --

10  Q  All right.

11  A  -- and I believe I did begin it that way.

12  Q  But the great majority of your questioning is not what we

13    would call open narrative, is it?

14  A  That wasn't very successful, so I used other types of

15    questions.

16  Q  What other types of questions?

17  A  I gave her lots of choices.  I mean, you'd have to refer to

18    the tape or the transcript.  I don't have immediate recall.

19  Q  Okay.  We'll get there, but would you agree with me that a

20    great majority of the talking on the tape is by you and not

21    Katie?

22  A  Talking?  There was plenty of communication going on.  Most

23    of -- many of her responses were nonverbal, but clear.  You

24    could see what the answer was, yes or no.  So the --

25  Q  But with regard -- I'm just asking about you about the

JOHNSON (James M. Peters, 11/8/12)

Page 142

```
 1      talking, not anything else.  Is the great majority of the
 2      talking on the tape your talking and not hers?
 3   A  Most of the words, yes, that's true.
 4   Q  All right.  Did the videotape establish probable cause for
 5      the arrest of Ray Spencer?
 6   A  The probable cause was based upon the investigation.  And
 7      the videotape was very similar to the rest of the
 8      investigation, but it didn't -- it didn't rebut probable
 9      cause.  She abided by her claims, she demonstrated overt
10      sexual acts consistent with what she had previously relayed
11      to the investigators and the therapist, and left the case,
12      in my opinion, in about the same place that it was when I
13      got it, and that was it was a very problematic case, that,
14      as I said, was in about the same place as when I started
15      the interview.
16   Q  Was probable cause established -- for the arrest of Ray
17      Spencer established prior to December 10 of '84?
18              MS. FETTERLY:  Again, clarify.  Are you saying
19      probable cause to arrest or probable cause to charge?
20      You're continually mixing those terms up.
21              MR. JOHNSON:  Would you read that question back.
22              THE COURT REPORTER:  Question:  "Was probable
23      cause established -- for the arrest of Ray Spencer
24      established prior to December 10 of '84?"
25              MR. JOHNSON:  Do you want to withdraw that
```

JOHNSON (James M. Peters, 11/8/12)

Page 143

1     objection?

2          MS. FETTERLY:  But you're continually mixing

3     them.  I want the witness to be clear what you're asking

4     him.

5          MR. JOHNSON:  You need her to with read it back

6     for you to withdraw the objection?  See, when I used the

7     term "arrest," I meant arrest.

8          MS. FETTERLY:  Okay.

9  A  I can answer the question.

10 Q  (By Mr. Johnson)  I figured.

11 A  Mr. Spencer was not arrested.  He made a voluntary

12    appearance.  There was probable cause to charge him, but

13    when he made his -- when he was first charged by Mr. Curtis

14    on January 3rd, he made a voluntary appearance.  He wasn't

15    arrested, so I think that's the concern.

16 Q  Was there probable cause to arrest Ray Spencer prior to

17    December 10 of 1984?

18 A  There was probable cause to charge, and I guess if someone

19    had sought an arrest warrant, that's a decision for a judge

20    to make, but Mr. Curtis made the decision there was

21    probable cause to charge him.  And --

22 Q  All right.  And I'm asking you whether or not there was

23    probable cause to arrest Ray Spencer prior to December 10

24    of 1984?

25          MS. FETTERLY:  Same objection.  I think the

JOHNSON (James M. Peters, 11/8/12)

Page 144

```
 1      witness has clarified that prosecutors don't arrest.  I
 2      mean, what -- I mean, what -- same objection.
 3                  MR. JOHNSON:  I'm not asking what prosecutors do
 4      or what they don't do.  I'm asking him was there probable
 5      cause to arrest, and maybe he doesn't have an opinion.
 6   Q  (By Mr. Johnson)  Yes, no, I don't know?  Was there
 7      probable cause to arrest Ray Spencer prior to December 10
 8      of 1984, if you have an opinion?
 9   A  I believe there was probable cause, yes.
10   Q  To arrest?
11   A  Arrest, charge; it's the same standard, Counsel.  Just a
12      judge gets -- a judge gets involved in the decision to
13      arrest.
14   Q  Do you want to meet with your counsel and describe to her
15      what you just said because I've been hearing the
16      contradictory thing for last ten minutes?
17   A  One goes to -- in Washington State, the prosecuting
18      attorney makes the decision to charge.  If you're going to
19      get an arrest warrant, you have to go to a judge and get
20      the warrant.
21                  MS. FETTERLY:  And that was the purpose of my
22      objection.
23   Q  (By Mr. Johnson)  I'm not asking you about any of that, and
24      I think you've answered the question.
25                  You would have disclosed the tape if it was relevant
```

227

JOHNSON (James M. Peters, 11/8/12)

Page 145

1    to probable cause to arrest, wouldn't you have?

2  A  Counsel, if I had been the lead prosecutor in the case from

3    the get-go, the tape would have been disclosed from the

4    get-go.  I was not the lead prosecutor in the case from the

5    time it was charged until probably the second or third week

6    of April 1985.

7  Q  Who was that?

8  A  Barb Linde.

9  Q  Barb Linde was the lead prosecutor in the case in the time

10    period you just described; is that correct?

11  A  She was.

12  Q  Is there any documentation that reflects that?

13  A  Yes, there is.

14  Q  What is that?

15  A  There are three letters from Art Curtis dated January 9,

16    1985.  One is to Norm Maleng, the King County prosecutor,

17    thanking him for assigning a deputy prosecuting attorney,

18    outside counsel, to prosecute Mr. Spencer.

19        The second letter is to Rebecca Roe forwarding the

20    reports to her and similarly thanking King County for

21    agreeing to take over the case.  And the third letter is to

22    Leland Davis, the Chief of Police of Vancouver, similarly

23    saying that the case had been referred to outside counsel,

24    and at the end of the letter asking him to relay that to

25    his officers.  Because of the sensitive nature of the case,

JOHNSON (James M. Peters, 11/8/12)

Page 146

1       it had been referred to outside counsel.  There's

2       additional documentation of that if you'd like me to

3       clarify.

4   Q   Sure.

5   A   In my review of the prosecutor's file, which I've done in

6       the last couple of months, I encountered a note.  It was a

7       While-You-Were-Out note that was written by a receptionist

8       on April 4, 1985, documenting a call from Barb Linde to Art

9       Curtis requesting a call back.  I also noted a -- one of

10      those small-sized yellow pads, the five-by-seven yellow

11      pads, a copy of that -- it wasn't yellow; it was a copy --

12      in Art Curtis' handwriting of notes that he took, and I

13      recognized Mr. Curtis' handwriting because I worked with

14      him first in the public defender's office for a year and

15      then more than ten years in the prosecutor's office,

16      documenting his call back to Barb Linde on April 4th, 1985.

17          And, by the way, I was in Hawaii at that time.  I

18      wasn't even in the office, where Barb Linde informed

19      Mr. Curtis that she had an aggravated murder trial

20      scheduled for the last week of May and the first week of

21      June of 1985.

22          Additional documentation is -- are letters dated, as

23      I recall it, May 9.  They wouldn't have been written on

24      May 9 because I was in Sacramento with Jim Rulli, but they

25      would have been dictated.  We didn't have computers back

JOHNSON (James M. Peters, 11/8/12)

Page 147

```
1     then.  They were dictated and things got typed, so they
2     were sometimes dated not on the date it was dictated.  A
3     letter from me to Barb Linde, referring to -- thanking her
4     for her participation as outside counsel, and referring to
5     a telephone conversation she and I had several weeks
6     before, two weeks before, I think it says, where we had
7     talked about me taking the case over from her because of
8     her conflict and the fact that there were -- the case was
9     in a different posture now and having two new victims from
10    when I had initially seen it back in December.
11  Q  Where is Barb Linde now?
12  A  She's a Superior Court judge in Seattle.
13  Q  Do you see her on occasion?
14  A  I've never seen her.  I haven't seen her since -- I may
15    have seen her at a prosecutors' conference back when I was
16    a state prosecutor, but I barely knew her.
17  Q  So she's not a social friend?
18  A  No.
19  Q  Okay, let me take you to December 10 of 1984.  On that day,
20    and this is the date before the video, did you learn
21    anything from your interaction with Katie Spencer that was
22    relevant in the case?
23  A  I don't recall that at all, and the only reason I even know
24    it happened, even know that I talked to her on the 10th,
25    was from -- I think I may have mentioned it in a prior
```

JOHNSON (James M. Peters, 11/8/12)

Page 162

1     weren't there?

2  A  I assume they were.

3  Q  And they were available in Washington?

4  A  I assume so.

5  Q  And you certainly could have purchased one or had your

6     office purchase one and you could have conducted this

7     interview at the Clark County prosecutor's office; is that

8     correct?

9  A  That was three questions, Counsel.  I certainly could have

10    purchased one myself.  I didn't.  I hadn't.

11       Whether the Clark County prosecutor's office

12    purchased one wasn't my decision.  I wasn't a management

13    person.  I had nothing to do with the budget.

14       And I forgot your third question.

15  Q  Okay.  I'll just ask you one question.  This could have

16    been done in the Cook County prosecutor's office, correct?

17  A  Probably not.

18  Q  I'm sorry.

19  A  It was 2500 miles away.

20  Q  Okay.  This could have been -- this interview of Katie

21    Spencer could have been done in the Clark County

22    prosecutor's office; is that correct?

23  A  Well, first of all, we didn't have the equipment, although

24    I suppose some could have been brought in.  So physically

25    could it have been done?  Yes.

231

Page 163

1    Q   All right.

2    A   Not with equipment that was available there, though.

3    Q   Okay.  Had you ever been involved in a case where an

4        alleged child sex abuse victim had been videotaped at the

5        Clark County Sheriff's office?

6    A   No, I don't think so.

7    Q   After this, had you ever -- did you ever do it again?

8    A   Did I ever do it again?

9    Q   Yes.

10               MS. FETTERLY:  Are you suggesting in that

11       question that this witness videotaped another child

12       witness, or are you suggesting that Clark County Sheriff's

13       office did?  Your question is unclear.

14   Q   (By Mr. Johnson)  Okay.  Were you ever involved in an

15       interview of a child sex abuse victim at the Clark County

16       Sheriff's office after this interview with Katie Spencer?

17   A   Oh, I have no idea.  I don't recall.

18   Q   Do you recall --

19   A   I can tell you -- I can tell you I never ever did an

20       investigative interview with a child, meaning an initial

21       interview, a fact-finding interview.  I've never done one

22       of those with any witness.

23   Q   I'm talking about -- we both know there's an interpretation

24       difference of opinion, but what I'm asking you about is the

25       videotaping of a child sex abuse victim.

Page 164

1          Were you, Mr. Peters -- I'm talking about you -- ever

2     again after December 11, 1984, involved in interviewing a

3     child witness at the Clark County state -- Sheriff's

4     office --

5   A  No.

6   Q  -- with regard to sex abuse allegations?

7   A  No.  Videotaping an interview of the child?  Is that what

8     your question was?

9   Q  Yes.

10  A  No.

11  Q  Yes.  All right.  So this one stuck out in your mind; is

12    that correct?

13  A  Which one stuck out of in my mind?

14  Q  This videoed interview of Katie Spencer.  It's the only one

15    you ever did over there, right?

16  A  The fact of the video interview stuck out in my mind, yes.

17    The fact of the interview.

18  Q  You wouldn't -- okay.

19          You never caused this videotape to be disclosed to

20    anyone, did you?

21  A  I believe Mr. Curtis knew about it and certainly Sharon

22    Krause knew about it.

23  Q  Did you cause it to be disclosed to Art Curtis?

24  A  I just testified that I believe Art Curtis knew about it.

25    What do you mean by "cause it to be disclosed"?  Maybe

JOHNSON (James M. Peters, 11/8/12)

Page 165

```
 1      we're playing word games.  What do you mean by that?
 2   Q  Did you give him the tape?
 3   A  I didn't have a copy of the tape.  The tape remained in
 4      Sharon Krause's office -- or in the Sheriff's office.
 5   Q  We'll come back to that, but I'm asking you if you gave Art
 6      Curtis a copy of the tape or the original of the tape.
 7   A  No, I never had a copy of the tape.
 8   Q  Did you give Sharon Krause the tape?
 9   A  No.
10   Q  All right.  So did you cause the tape to be disclosed to
11      anyone other than what you've said about Art Curtis and
12      Sharon Krause?
13   A  Me personally?
14   Q  Yes.
15   A  Cause it to be disclosed?
16   Q  Yes.
17   A  No.  No.
18   Q  Okay.
19   A  I mean, there was another --
20   Q  Did you ever tell anyone about --
21   A  There was another Sheriff's deputy there.
22   Q  And who was that?
23   A  His name was Jeff.
24   Q  Jeff.  Okay.  He was -- what's Jeff's last name?
25   A  I don't remember.
```

234

Page 167

1      answer.

2   A  I don't -- I don't recall that I did.

3   Q  (By Mr. Johnson)   And it's fair to say that you absolutely

4      did not, correct?

5   A  Yes.

6   Q  I want you to assume that on December 11 of 1984 you were

7      able to establish in your mind, meaning you were able to

8      arrive at the opinion that Katie Spencer was clearly lying

9      about Ray's sexually molesting her when you met with Katie.

10     Is it fair to say that if you had concluded that, you would

11     not have recommended charging Ray?

12  A  I -- I -- yes.   But the question assumes I did recommend

13     charging Ray, and that's a false assumption.

14  Q  Oh, you did not recommend charging Ray --

15  A  I did not.

16  Q  -- with --

17  A  I did not.

18  Q  Did you have any input in to the charging decision?

19  A  Yes, we had a conversation about it.   Yes, I did have

20     input.

21  Q  And is that on January 3rd of 1984 [sic]?

22  A  Second or 3rd.

23  Q  All right.   At that time did you tell -- strike that.   What

24     was your input?

25  A  I remember the meeting.   I believe that Sharon was there

JOHNSON (James M. Peters, 11/8/12)

Page 168

1    and Art was there, and I told him that based on my

2    interview with Katie that I believed she was probably

3    competent, but that she was a very difficult witness and

4    would have a difficult time testifying, but she probably

5    could qualify as a witness.

6  Q  And what else did you -- was your input?

7  A  Well, that she -- that she indicated that she had been

8    molested by her father and that the most prominent one that

9    I recalled was that she remembered oral sex, which -- with

10   a man, with a man's penis, which clearly distinguished what

11   she experienced from the concerns that there may have been

12   female perpetrators and that she had also indicated some

13   sexual contact both while she was laying down facing up and

14   when she was lying down facing down with her father.

15   That's what I recall.

16 Q  You remember saying all that?

17 A  No.

18 Q  You remember saying all that?

19 A  No, I don't remember saying all that.  I remember conveying

20   to Mr. Curtis what I had seen.

21 Q  Did you make a recommendation on January 2nd or 3rd, 1984,

22   [sic] to Art Curtis as to whether or not Ray Spencer should

23   be charged with sexually related crimes against Katie?

24 A  Yeah, I told him I wouldn't charge it and I didn't want my

25   name on the charging document.

236

JOHNSON (James M. Peters, 11/8/12)

Page 169

1   Q   Did you tell Art Curtis about the videotaped interview with

2       Katie?

3   A   Yes.

4              MS. FETTERLY:  Asked and answered.

5   Q   (By Mr. Johnson)  In that meeting did you tell him that?

6   A   I don't recall.

7   Q   Did he ask you for the videotape?

8   A   I don't recall.  I didn't have it anyway, but I don't

9       recall.

10  Q   Did --

11  A   I think I may have said --

12  Q   Would you have obtained it?

13  A   I think I may have said, "You can go down and look at it if

14      you want to."

15  Q   Did he need your permission?

16  A   No, I'm telling him that's where it is, in the Sheriff's

17      office.  He didn't need my permission.

18  Q   You knew where it was on January 2nd or 3rd of 1984 [sic];

19      is that correct?

20  A   In the Sheriff's office, yes.

21  Q   Where is the Sheriff's office?

22  A   I had no idea.  When I -- Jeff had it.  And what he did

23      with it, I don't know.

24  Q   How do you know Jeff had it?

25  A   It was in the camera.  Jeff had access or had control of

237

JOHNSON (James M. Peters, 11/8/12)

Page 170

1     the camera.

2  Q  You're assuming that?

3  A  Well, it was -- he set it up.  He controlled it while --

4     during the first part of the interview, and I'm confident

5     he came and picked it up when we were done with the second

6     part of the interview.

7  Q  Did you observe him come pick it up?

8  A  I don't recall.

9  Q  You did not observe him come pick it up, correct?

10 A  I don't recall, Counsel.  You can draw --

11 Q  Again, if you were to assume --

12 A  I'm drawing inferences from obvious facts.  He brought it

13    in, he set it up, he turned it on.  We finished the

14    interview.  I left.  I -- you know, you could draw

15    reasonable inferences from those facts.

16 Q  So you left the room with the videotape still in the

17    camera?

18 A  Well, the room was Sharon Krause's office.

19 Q  Okay.  Did you do it in a cubicle?

20 A  Well, I don't know if -- at one point she had a cubicle.

21    At one point she had an office.  I don't recall which at

22    that point, because she changed.

23 Q  Will you give it to me again?  You left that room and a

24    videotape that you had played a role in creating of a minor

25    child being questioned about sexual abuse of her father

JOHNSON (James M. Peters, 11/8/12)

Page 171

```
 1    without the camera man present and proceeded on your way;
 2    is that correct?
 3  A I don't recall.  I'm sure the custody of the --
 4  Q Did you take any steps --
 5  A I'm sure the custody of the tape was taken over by somebody
 6    in the Sheriff's office.
 7  Q And can you name the person in the Sheriff's office that
 8    you are sure took custody of the tape?
 9  A No, I can't recall.
10  Q And you did not observe anyone in the Sheriff's office
11    taking custody of that tape, correct?
12  A I don't recall.
13  Q That means you don't know one way or the other, right?
14  A I don't know one way or the other.  It was 28 years ago.
15           MS. FETTERLY:  Do you need a break?
16           THE WITNESS:  No.
17  Q (By Mr. Johnson)  All right.  Did you write anything on
18    that -- let's go back to the beginning in that videotape.
19    Did you write anything on the tape?
20  A I don't recall having done so.
21  Q Well, you would assume, wouldn't you, that the tape was
22    labeled?
23  A I -- you're -- now you're asking me to assume.  I don't
24    recall.  The tape didn't belong to me.  The tape was the
25    property of the Sheriff's office and it remained with the
```

JOHNSON (James M. Peters, 11/8/12)

Page 172

```
 1      Sheriff's office.
 2   Q  You don't know that, though, right?  Right?
 3   A  Well, I do know that.
 4   Q  Oh, you do.  Okay.  So when did it remain with the
 5      Sheriff's office?
 6   A  Common sense, Counsel, it was created in the Sheriff's
 7      office.  It ended up with Sharon Krause.  Therefore, it
 8      remained in the Sheriff's office.
 9   Q  Did you say Jeff wrote on the tape?
10   A  I did not.
11   Q  And are you aware of anyone that wrote on the tape?
12   A  I don't know.  I don't recall.
13   Q  Was it your understanding -- and I understand it involves
14      assumptions and speculation -- that that tape was taken and
15      logged into evidence as any other piece of evidence would
16      have been at the Clark County Sheriff's office?
17              MR. BOGDANOVICH:  Object to the form of the
18      question.  I think it lacks foundation.
19   A  I don't know.
20   Q  (By Mr. Johnson)  Do you have any understanding of how
21      evidence was logged in to the Clark County Sheriff's office
22      in 1984?
23   A  Vaguely.  I was not involved in investigations, but I saw
24      the product of investigations.
25   Q  What's your vague understanding of how evidence was logged
```

Page 173

1    in?  Because you understand what a chain of custody is,

2    right?

3  A  Yes, I do.  Officers would write a report.  Sometimes there

4    would be a specific property report that would list items

5    one, two, three, four, five and identify what they are, and

6    they would go in evidence.

7  Q  Did you ever see that type of report reflecting what

8    happened to the December 11, 1984, video interview that you

9    did with Katie Spencer?

10 A  No.

11 Q  Did you -- did you tell Art Curtis that you were going to

12   meet with Katie prior to when you met with Katie?

13 A  I don't recall.

14 Q  Let me -- why would you leave the Sheriff's Department and

15   the tape there if you made that tape to evaluate Katie's

16   competency?

17 A  You're asking me to speculate and remember something from

18   28 years ago.  I don't recall.

19 Q  No.  I'm asking you in this -- you'd agree this was a very,

20   very serious procedure that you performed with Katie

21   Spencer, correct?

22 A  It was an important procedure.

23 Q  Okay.  And I'm asking you why you would videotape that

24   interview and then depart the Sheriff's Department without

25   the tape after you had taken such steps to have videotaped

JOHNSON (James M. Peters, 11/8/12)

Page 174

```
 1      your evaluation of Katie's competency?  Why would you do
 2      that?
 3   A  That would have been the original document or the original
 4      recording, which we would never have kept in our office.
 5   Q  Why not?
 6   A  We didn't keep any evidence in our office.
 7   Q  Did you ask anybody about what would happen to the tape
 8      after you left?
 9   A  I don't recall.
10   Q  You may have; you may not have, is that correct?
11   A  I just -- yes, I don't recall.
12   Q  Did you have any concerns that this tape contained a
13      five-year-old child talking about -- to you about sexual
14      molestation of her vaginally, et cetera, and her father,
15      who had not been charged yet, did you have any concerns
16      that this could get into the wrong hands because you left
17      without giving any directions whatsoever to anyone about
18      what to do with it?
19   A  No, because it was left it with Sharon Krause, Sharon
20      Krause's office.
21   Q  Sharon Krause was not present at the end of the interview,
22      correct?
23   A  I believe she was there.  I mean, I don't have immediate --
24   Q  Was she --
25   A  I don't have any independent recollection of anything other
```

JOHNSON (James M. Peters, 11/8/12)

Page 175

1      than what's on the video, but she was there at the

2      beginning at her office and it was during work hours.  So I

3      have to infer that she was there.  I remember her saying,

4      as she left, on the tape that "I'll just be outside at my

5      office."

6   Q  Okay.  So you don't have any recollection one way or the

7      other as to whether you had any interaction with her after

8      the taping stopped, correct?

9   A  I don't recall, that's right.

10  Q  So she may have been there and she may not have been there?

11  A  I'm confident she was there.

12  Q  And tell me why.

13  A  Because she was there from the beginning -- at the

14     beginning.  She said she'd be in her office.  We moved into

15     her office, finished the interview, and I'm confident that

16     she was there.  She would not have left with her victim

17     whose case she was responsible for.  In the closed area of

18     the Sheriff's office you couldn't -- it was a locked area.

19     You couldn't get in there without a Sheriff's deputy.  She

20     would not have left.

21  Q  She wouldn't.  So you know, as you sit here today, you're

22     sure that she didn't have a doctor's appointment, she

23     didn't get ill, she didn't go to lunch, she didn't depart?

24     You're absolutely sure she was there even though you don't

25     remember seeing her; is that correct?

Page 177

1    A   Oh, I'm sure not.

2    Q   Did you tell Ray's lawyer, James Rulli?

3            MS. FETTERLY:   In December of -- you mean before

4        the interview?  Is that the time period you're talking

5        about?

6            MR. JOHNSON:   Well taken.

7    Q   (By Mr. Johnson)   Did you tell Ray's lawyer, if he had one,

8        prior to December 11 of 1984 that you were going to meet

9        with Katie?

10   A   Well, I don't remember, but I would say probably not.

11   Q   All right.   And whether or not he was Ray's lawyer at the

12       time, did you tell James Rulli that you were going to meet

13       with Katie?

14   A   That was the question I thought I just answered.  I don't

15       recall, but probably not.

16   Q   All right.   When you began interviewing Katie on

17       December 11 of 1984, it was your desire that she would

18       implicate her father; is that correct?

19   A   I believed that she already had implicated her father at

20       least three times to three different people, and my job

21       there was to test to see if she might be competent and be

22       able to recount the abuse to a male, to me, because I would

23       be the person who most likely would have been assigned.   It

24       turned out that there was a female assigned afterwards.

25       But at that point in time that was my purpose.

Page 178

1    Q   It was your desire to have her implicate her father on

2        videotape; is that correct?

3    A   I had no desire.  You're implying something that -- you're

4        trying to twist things.  My desire was to see if she was

5        competent and could relay what she had previously relayed

6        to the investigators.

7    Q   One of your goals was to get Katie to implicate her father

8        on videotape, correct?

9    A   My goal was to determine whether she was competent to

10       testify about what had happened with her father, so -- it's

11       two ways of saying the same thing.  She had previously --

12   Q   One of your goals --

13   A   She had previously implicated her father.

14   Q   And I'm not asking you what she previously implicated.  I'm

15       asking you:  Was one of your goals to have Katie implicate

16       her father on videotape on December 11 of 1984, or was it

17       not?

18   A   My goal was to see if she could relay -- yes.  Yes.

19   Q   Because I'm not asking you what -- I'm asking you whether

20       these are your goals, not what any other goals you had

21       were.

22   A   My goal was to see if she was competent to testify.

23   Q   Yeah, you keep saying -- the record is very clear on that's

24       your testimony, but I'm asking you about other goals, if

25       there were any.  If there weren't, you can certainly say,

JOHNSON (James M. Peters, 11/8/12)

Page 180

1    maybe it wasn't.

2  A  That would have been an investigatory task that had already

3    been accomplished by the investigators.

4  Q  That isn't my question for you to characterize what I'm

5    asking.

6  A  That's my answer.

7  Q  Was that one of your -- was one of your goals on that day

8    to clear Ray of any wrongdoing?

9  A  That wasn't my goal.

10  Q  All right.  Was the plan for that interview for DeAnne to

11    be present?

12  A  No.

13  Q  Why was she?

14  A  Because Katie insisted on it.  I had a choice of --

15  Q  Where did Katie insist on it?

16  A  Before we came in.

17  Q  Does Katie insist on it on the tape?

18  A  No, it was before we went to the room and started the

19    interview.

20  Q  I thought you just told me you don't recall anything that

21    happened before the interview.

22           MS. FETTERLY:  You were talking about

23    December 10th.  He's talking about December 11.

24           MR. JOHNSON:  No, I was talking about

25    December 11 too.  We covered that too, if you look at your

JOHNSON (James M. Peters, 11/8/12)

Page 181

1        notes.

2    A   Okay.  Well, I do remember -- you know, you prompt someone

3        and it causes you to remember things, but the reason why

4        DeAnne was there, was because Katie didn't want to go in

5        the room without her mom, and I was given -- I had a choice

6        of either having this child who had allegedly been molested

7        by a man go in a room with the door closed with two men

8        against her will or have her mother there, and she wanted

9        her mother there.

10   Q   So you recall that now?

11   A   Yes.  You didn't ask me that before.

12   Q   Okay.  Oh, I didn't ask you whether or not you recalled

13       anything else on December 11, 1984?

14   A   There's a difference -- you know as well as I do, Counsel,

15       that there's a difference between asking somebody an

16       open-ended question -- it's like interviewing children as

17       well and getting a "Well, I don't remember" and then asking

18       a directed question, as you just did, which prompted my

19       memory.

20   Q   Okay.  So maybe I'll ring some other bells.  Was the plan

21       for Sharon Krause to be present?

22   A   No.

23   Q   Okay.  Why is she there at the beginning of the tape?

24   A   I can -- you're going to not like me saying this because it

25       relates to other cases, but our practice -- we've done a

JOHNSON (James M. Peters, 11/8/12)

Page 182

```
 1    lot of cases together before.  And in the generic
 2    run-of-the mill case, I didn't talk to the kids until
 3    shortly within a few weeks of trial when we knew it was
 4    going to go to trial.  This case was different for a lot of
 5    reasons.
 6              But the practice that we had was Sharon would be
 7    there, introduce me, kind of build a little bit of rapport,
 8    and then come up with an excuse to leave so I could
 9    interview the child and see if she would talk without
10    Sharon being there, because Sharon provided a great deal of
11    comfort.  I mean, she was a motherly or grandmotherly-type
12    figure, and I was, you know, I was a young man who played a
13    different role.  So it was a -- it was a common practice
14    for her to come up with a reason to leave, but it was
15    something preplanned.
16  Q  So it was a common practice for you and Sharon Krause to at
17    least start these types of interviews together; is that
18    correct?
19  A  Yes.
20              MS. FETTERLY:  Object to form.
21  Q  (By Mr. Johnson)  How many times did --
22  A  It depends on what you mean by "these kinds of interviews."
23    Interviews with children, yes.  But this interview was the
24    first -- this competency interview was unusual.
25  Q  (By Mr. Johnson)  Oh, we found something we can agree on.
```

248

JOHNSON (James M. Peters, 11/8/12)

Page 187

1    Q  Okay.

2    A  And I said, "I don't recall."

3    Q  Okay.  And you can't tell from looking at the transcript

4       what -- if it caused you concern or not?

5    A  28 years ago?

6    Q  Right.

7    A  The whole interview caused me concern.

8    Q  Okay.

9    A  Whether that one word did --

10   Q  Why did it cause --

11   A  Because it --

12   Q  Why did the whole --

13   A  She was a very difficult witness to interview.  And

14      while -- while she abided by her allegations and while she

15      was competent, I relayed all of that to Curtis.  But she

16      was difficult.  She was difficult.  Five-year-olds are

17      difficult.

18   Q  Where in your transcript can you point to for us where she

19      abided by her allegations?

20   A  Can we just pause for a minute while I. . . ?

21   Q  Yeah, take your time.  Why don't you show us the first time

22      in your transcript she abides by what you say are her

23      allegations.

24          MR. FREIMUND:  Do you mind if we take a short

25      break while he's reviewing that?

Page 189

```
 1      let me answer, then I guess that's your choice.
 2   Q  Okay.  So -- okay.  Is it correct that you can't point to a
 3      first point on this transcript where she abides by her
 4      allegations?
 5   A  Well, it is a process because she first identifies who the
 6      dolls are, and then she slowly, slowly, slowly makes a
 7      disclosure up to the end where, on several occasions, she
 8      makes very overt demonstrative disclosures, but it was a
 9      process to get there.
10   Q  And you've talked about how this is very difficult, and one
11      of the reasons it could be difficult is because what you're
12      trying to elicit from her are false statements; is that
13      fair enough?
14   A  No.  I was not trying to elicit --
15   Q  Where, --
16   A  Let me finish my answer, please.  I was not trying to
17      elicit false statements.
18   Q  I thought you did.
19   A  You asked me if I was trying to elicit false statements,
20      and I was not.
21   Q  Correct.  Okay.  Where did she first abide by -- you talked
22      about the process.  Where is the first time or what are you
23      talking -- where are you pointing to?
24   A  Again, if you won't let me explain the process, the answer
25      will be difficult, but she had identified --
```

Page 193

1       testifying to, but we're just going to talk about Katie's

2       words.  Okay.  Now, you said that you -- you talked about

3       why you videotaped this.  Is it fair to say that you

4       videotaped this interview because you didn't feel you could

5       properly rely on Sharon Krause's reports to establish

6       Katie's competency?

7   A   Absolutely not.  She was a five-year --

8   Q   Had Sharon --

9   A   She was a five-year-old, and it was clear from the reports

10      that her competency was questionable.

11  Q   Thank you.

12          After -- I'm going to come back to that, but I want

13      to ask you, did you determine after you evaluated Katie's

14      competency on December 11, 1994, [sic] that she was

15      competent to provide evidence against Ray?

16  A   No, I determined that she might be competent.  She probably

17      would be competent, not that she was competent.  It was

18      questionable.  I've always believed that this was a very

19      difficult and questionable case.

20  Q   Did you determine that Katie Spencer was competent to

21      provide evidence against Ray such that he should be

22      arrested?

23  A   I believed that she was competent to testify, that if you

24      look at the interview as a whole and not just pick out

25      little parts, that she was -- there was a good chance she

JOHNSON (James M. Peters, 11/8/12)

Page 194

1   was competent.  We didn't have him arrested.  He made the

2   initial appearance voluntarily.

3  Q  You didn't cause Ray to be arrested after this interview,

4   did you?

5  A  Me personally?  I --

6  Q  Yes.

7  A  -- personally did not.

8        MS. FETTERLY:  Object to the form of the

9   question.

10  Q  (By Mr. Johnson)  You had the power to take steps to cause

11   the arrest of Ray Spencer, didn't you, at that time?

12  A  I could have, yes.  I did not.

13  Q  And you say that Katie might have been competent --

14  A  It was an issue --

15  Q  -- in your mind?

16  A  It's always an issue with a five-year-old, Counsel, and it

17   certainly was an issue with her.  That was a decision to be

18   made later by the judge.

19  Q  After you concluded this interview wherein you say Katie

20   was likely competent --

21  A  I said --

22  Q  -- you left the Sheriff's office?

23  A  Yes.

24  Q  And you took no steps to restrict the freedom of Ray

25   Spencer in any way; is that correct?

JOHNSON (James M. Peters, 11/8/12)

Page 195

 1   A   That's true.

 2   Q   Although you believed that Ray Spencer had vaginally raped

 3       his five-year-old daughter; is that correct?

 4   A   No.

 5   Q   That's not correct?

 6   A   That's not correct.

 7   Q   You did not believe that Ray Spencer had vaginally raped

 8       his five-year-old daughter after this interview of

 9       December 11, 1984 --

10   A   No.

11   Q   -- is that correct?

12   A   That's correct.

13   Q   What did you believe Ray Spencer had done to his

14       five-year-old daughter at the moment this interview

15       concluded on December 11 of 1984?

16   A   I believe, as she showed me at least two times with the

17       dolls and partially described with words, that he had

18       performed fellatio on her, that is, he had put his penis up

19       to her mouth, up to or in her mouth, and I believed that he

20       had engaged in, at minimum, sexual contact with her, as she

21       showed me, and it's clear toward the end of the interview,

22       that he had contact with her, sexual contact with her while

23       she was naked -- while he was naked with them being

24       face-to-face and then with her lying on her face and him on

25       top.  That -- that's what I concluded, was most likely what

JOHNSON (James M. Peters, 11/8/12)

Page 198

```
 1        initial denial or couple of denials and just stop.
 2     Q  Yeah, there were more than a couple of denials in what you
 3        did with Katie Spencer on December 11, of '84, correct?
 4     A  It depends on what you interpret the denials.
 5     Q  When she say "Nothing happened last summer," you interpret
 6        that to mean "Something happened last summer"?
 7     A  I interpret it to be equivocal as to --
 8     Q  Okay, all right.
 9     A  -- what the subject she was referring to was.
10     Q  Fair enough.  Now, the lion's share, I think you were
11        suggesting, of the accusations that were abided by came
12        after your break in the transcript; is that correct?
13     A  The lion's share, that would be correct, but not all of
14        them.
15     Q  Okay.  So let's talk about the break.  That lasted what,
16        about 65 minutes?
17     A  Yes.
18     Q  And was that Katie's decision to take the break?
19     A  Well, she was obviously tired out and she needed a break,
20        so it wasn't her decision; it was mine.
21     Q  Yeah, you controlled when the break was taken, correct?
22     A  Obviously, a belated decision.  I should have made it long
23        before I did.
24     Q  But you controlled it, right?  You were calling all the
25        shots?
```

JOHNSON (James M. Peters, 11/8/12)

Page 203

```
 1   Q   Okay.  Going back to the report of Shirley Spencer that
 2       you're relying on as credible -- do you know what I'm
 3       referring to?
 4   A   I don't know what you're referring to, and I'm not -- I'm
 5       not attributing credibility to anybody's report.  I'm just
 6       saying it is what it is.
 7   Q   Okay.
 8   A   It would have been -- let me finish.
 9   Q   So Katie's outcry --
10   A   Let me finish.  Let me finish, please.  I'm sorry.  When
11       we're not in the same room, it's difficult.
12           If this case had gone to trial, it would have been
13       for the jury to decide who was credible and who wasn't.
14   Q   All right.  So you're not saying that you have any opinion
15       whatsoever about whether or not Katie's outcry, as you've
16       described it, to Shirley Spencer on or about August 24 of
17       1984 was credible; is that correct?
18   A   When a child of tender years describes precocious sexual
19       behavioral and -- that they would have no way of knowing
20       about, it tells me that somebody abused that child.
21   Q   All right.  And she accused several other people of abusing
22       her, other than Ray Spencer, to Shirley Spencer, correct?
23   A   Shirley said that she mentioned DeAnne and Karen, neither
24       of whom have penises.
25   Q   Okay, let me ask it again.  She accused other individuals
```

Dixie Cattell & Associates
Court Reporters & Videoconferencing



JOHNSON (James M. Peters, 11/8/12)

Page 216

1    A   I'm sure I could find some more if I dug through them.

2    Q   All right.  Well, we won't make you do that right now.

3            With regard to mistakes, was it a mistake of yours

4        not to make sure the video was disclosed?

5    A   You know, I'm glad you asked that question.  The first

6        three and a half months from the time that case was charged

7        I was not involved as the prosecutor in the case.  I did

8        two things to assist, but the case was assigned to someone

9        else, and I had no idea what discovery was provided and

10       what wasn't.

11           At the point that I came back into the case in the

12       second or third week of April of 1985, my attentions were

13       directed at the new allegations that had occurred when I

14       was not part of the case, a whole stack of reports from

15       March of 1985, and I was focusing on those trying to figure

16       out what had happened allegedly and what we needed to do

17       about it, getting a superseding information prepared,

18       edited, approved, and filed.  And at that point we started

19       to think about preparing for trial and --

20   Q   At what point was that that you started to think about

21       preparing for trial?  What was the date on that?

22   A   Well, Mr. -- Mr. --

23   Q   And I'm just asking for the date.  Again, if you want to

24       just answer the question instead of going off on a speech,

25       that's your choice.

JOHNSON (James M. Peters, 11/8/12)

Page 217

1   A   I don't know exactly, but it would have been about the
2       first part of May.

3   Q   All right.  And I don't -- I got lost a little bit.  I got
4       confused.  So, is your answer that it was a mistake not to
5       make sure the video was disclosed or not a mistake?

6   A   No.  What I'm saying is that if we had proceeded with trial
7       preparation and Sharon and I had sat down and, as we did in
8       other cases, figured out what the reports were, what we
9       had, what we might not have had, what had been disclosed,
10      what might not have been disclosed, we would have figured
11      that out, and it would have been disclosed.

12  Q   So as we sit here today, I'm just asking you with regard to
13      you, your role, was it a mistake for you, Mr. Peters, to
14      fail to make sure the videotaped interview of Katie Spencer
15      by you on December 11, 1984, was disclosed?

16  A   If it had gone to trial and it hadn't been disclosed, that
17      would have been a mistake.  This case ended up --

18  Q   Okay.  What about --

19  A   No, no, no.  Let me finish.

20              MS. FETTERLY:  Let him finish.

21  A   Let me finish my answer.  This case ended up as a plea
22      bargain.  That video interview contained impeachment
23      material that was relevant for impeachment if the witness
24      testified if the case went to trial.  It did not go to
25      trial.  Therefore, it was not a mistake, in my opinion.

Page 218

1    Q   (By Mr. Johnson)  You agree that the disclosure of that

2        tape to Ray Spencer would have affected his guilty plea?

3                MS. FETTERLY:  Objection.

4    A   No, I don't agree.

5    Q   (By Mr. Johnson)  Oh.  You know one way or the other?

6    A   You asked if I agreed.  That was calling for my opinion.

7    Q   Okay.  Sure.  Give me your opinion.  You have an opinion

8        one way or the other?  Are you going to jump into Ray's

9        mind and say what he would have done with that video?

10   A   Counsel, you asked me.  I gave you my answer.

11   Q   No, I'm asking you a different question now.

12               MS. FETTERLY:  Why don't you clarify?  Are you

13       asking for this witness's opinion on that question or him

14       to speculate about something Mr. Spencer thought?

15   Q   (By Mr. Johnson)  Mr. Peters, you had an ethical, legal

16       obligation to disclose that video to Ray Spencer prior to

17       the time he entered his plea.  Is that a correct statement?

18   A   I don't think so.

19   Q   All right.

20   A   The supreme --

21   Q   Mr. Peters, you understand in this case that Judge Settle

22       has found that there were inconsistencies in the sworn

23       testimony you have given regarding the interview of Kathryn

24       Spencer?

25   A   I'm not sure what you're referring to.