```
 1    office did not have probable cause to arrest?
 2  A I would -- that question just assumes facts that are --
 3    that don't allow me to answer it honestly.  If you'll break
 4    it down into single questions --
 5  Q Okay, that's perfect.  That's fine.
 6  A If you break it down into single questions --
 7  Q I'll change it since you said you can't answer it.
 8         Would you agree that, in your prior testimony, you
 9    have never admitted you interviewed Katie Spencer when no
10    probable cause existed?
11  A It's the same question.  Why don't you just ask me one
12    question at a time without the --
13  Q No, that's fine.  We'll try a couple more.
14         In your prior testimony, is it correct that you have
15    never admitted the existence of the videotape?
16  A True.
17  Q And is it correct that you have never admitted in your
18    prior testimony that you made a videotape prior to the
19    arrest of Ray Spencer?
20  A Well, I was never asked directly, and during the times I
21    was asked about interviews, what popped into my head was
22    the interviews in Sacramento, and I did recollect that.
23         However, I did not recollect the interview with
24    Kathryn, and there actually were various times over the
25    years when I watched interviews being conducted by skilled
```

```
 1      interviewers, video interviewers, and I remembered back
 2      that I had interviewed a child, but I could not remember --
 3      and didn't -- and that the interview didn't go that well,
 4      but I could not recollect which case that it was. I have
 5      done literally hundreds and hundreds, if not thousands, of
 6      cases over the years.
 7   Q  And I will again use that answer as another example of
 8      going on and on and wasting time when it had nothing to do
 9      with what the question was. I'll go back to the question
10      now. It doesn't ask you how many hundreds you've done or
11      if you've watched videos on TV.
12              I'm asking you, is it correct that you never admitted
13      that you made a videotape prior to the arrest of Ray
14      Spencer in your sworn testimony?
15   A  I can -- I've never -- I did not recollect interviewing
16      Kathryn Spencer in this case at the time I was asked
17      questions of that nature.
18   Q  So you agree you have never admitted it in your sworn
19      testimony?
20   A  Yes.
21   Q  Correct?
22   A  I answered your question. Yes.
23   Q  Okay. Did you document the fact that that videotape had
24      been created in any way whatsoever?
25   A  Other than the videotape itself, no.
```

JOHNSON (James M. Peters, 11/8/12)

Page 236

1  Q  All right. Just so we're clear, you got out of there and
2     left the videotape and you didn't know what happened to it?
3  A  I left it in the custody of the Sheriff's office.
4  Q  Okay. Did you ever discuss with Sharon Krause what to do
5     with that videotape?
6  A  I don't recall having done so.
7  Q  Okay. Even -- you know that it was disclosed in 2009?
8  A  Yes.
9  Q  What do you know about that disclosure?
10 A  The first I heard of it was receiving a telephone call from
11    a television producer who told me about it, and my initial
12    response was shock and surprise, and I told her the same
13    thing I just told you a minute ago, that I recalled
14    interviewing a child; I did not recall which case it was.
15 Q  Sharon Krause had called you before that television
16    producer about the video, hadn't she?
17 A  No, she did not.
18 Q  Did she ever call you and contact you about the videotape?
19 A  She did not.
20 Q  Have you ever discussed the videotape with her?
21       I think you might have gotten cut off.
22 A  No, I'm here. I'm just trying to think about that. I
23    had -- I had drinks with her after she testified in the
24    presence of the lawyers, and it came up generally. We
25    didn't talk specifically about it.

1  Q  You mean just this week?
2  A  Yeah. After she --
3  Q  Okay.
4  A  It was just a social thing. I hadn't seen her in about 16
5     or 18 years --
6  Q  Okay.
7  A  -- so -- and prior to that, we had had some very cursory
8     conversations regarding the lawsuit generally after we
9     heard we were being sued, but, you know, and I may have
10    asked her about that video, how she found it and so forth,
11    but it was all after the fact.
12 Q  All right. What did she tell you about how she found it?
13 A  She said she found it in her garage when she was cleaning
14    up and looked at it and immediately called the prosecutor's
15    office and told them about it.
16 Q  And what did she tell you about how she found it in her
17    garage? How did it get there?
18 A  Oh. I think she said it was just in a bunch of junk or a
19    bunch of materials that she -- that moved with her.
20 Q  How did it get to those materials? Did she tell you that?
21 A  I don't recall.
22 Q  Well, you just talked to her recently, right?
23 A  Well, we didn't talk about that recently. It was just --
24    when it first came out -- I just don't even remember.
25 Q  Well, I think you said that you talked to her about it

```
 1      after this lawsuit was filed, correct?
 2   A  It was either after the lawsuit was filed or after the
 3      producer called me; I really didn't remember which.  It was
 4      sometime after the producer called me.
 5   Q  And you never really were able to ascertain from her what
 6      happened here with regard to how it got in her garage; is
 7      that what you're telling us?
 8   A  She would be the best witness to that.  I don't remember
 9      what she told me other than it got there amongst a bunch of
10      other stuff that she moved.  I have a lot of stuff like
11      that too that follows me around.
12   Q  All right.  You admit you had drinks with Sharon Krause.
13      She's a social friend, right?
14   A  Well, I hadn't seen her in 16 or 18 years, so I guess I
15      wouldn't say she's currently a social friend.  She's a
16      former acquaintance.
17   Q  But, I mean, she's more than that, right?  I mean, you guys
18      did a lot of touring together presenting your expertise
19      throughout the country, right?
20   A  We spoke at various conferences, yes.
21   Q  How many times did she talk about the Spencer case?
22   A  I don't recall ever.
23   Q  How many times did you?
24   A  Never.
25   Q  Was the videotape played at any of the presentations?
```

1   A   It was not.
2   Q   Those presentations, weren't they -- didn't you talk about
3       war stories and things like that?
4   A   Occasionally.
5   Q   Okay.  And, I mean, I've had the pleasure of being involved
6       in some of those.  It seems like almost always there are
7       stories told about various cases that have been worked
8       upon.  Has that been your experience?
9   A   Typically cases that go to trial are the ones that you
10      become most familiar with, and those are the ones you talk
11      about.
12  Q   So it's your testimony that you never mentioned anything
13      about the Ray Spencer prosecution in any of the
14      presentations you and Ms. Krause did together --
15  A   I have no recollection.
16  Q   -- is that correct?
17  A   You know, we -- I don't believe we did.  But, you know,
18      I've given -- started doing presentations in about 1981
19      long before I knew anything about Ray Spencer.
20  Q   Okay.  You just kind of kept -- didn't talk about Ray
21      Spencer very much; is that what it was?
22  A   I don't believe I talked about Ray Spencer at all.
23  Q   This was a pretty unique case, right?
24  A   Not really.
25  Q   Oh, I thought you said there was several things about it

1    that was unusual. Was I wrong?
2  A What was unusual was that this was a sensitive case because
3    he was a police officer. That's very unusual. And it was
4    unusual that the victims lived in California and that two
5    of them were very young.
6  Q Is that unusual that a major piece of evidence was
7    relocated to an investigator's garage?
8  A Well, of course I didn't know anything about that, and I
9    don't --
10 Q Okay. So that was unusual, right, that the evidence was
11   found in the investigator's garage many years after the
12   fact?
13         MS. FETTERLY: Object to the characterization of
14   the tape as evidence.
15         But you can answer if you can.
16 A I would have thought that the tape would be in evidence.
17 Q (By Mr. Johnson) All right. Had you ever heard of such a
18   thing before in your long career, of evidence being found
19   in an investigator's garage?
20 A Actual original evidence? I would say no.
21 Q Sure.
22 A No. Copies perhaps.
23 Q Okay. Do you have any knowledge as to what Sharon Krause
24   had, whether it was a copy or an original?
25 A I don't know. I assume it was the original, but I don't

```
 1      know.
 2   Q  Okay.  Do you know where the original is right now?
 3   A  All I know is the tape that was found in Sharon's garage.
 4   Q  When you said earlier that some of the things on the tape
 5      were inaudible, did you ever ask for the original to try to
 6      make a better transcript to see if that might be better?
 7   A  I had a digital copy, and, no, I didn't ask for the
 8      original, but I wouldn't want the original, and, actually,
 9      it would have been extremely difficult or impossible for me
10      to work with a VHS tape.
11   Q  Okay.
12   A  I had a digital copy that I could start and stop easily.
13   Q  How do you know it was a VHS tape?
14   A  That's what was used at the time.
15   Q  Oh, okay.  When you did this type of interview?
16              MS. FETTERLY:  Object to the form.
17   A  That was the only -- only interview of this nature that I
18      ever did.
19   Q  (By Mr. Johnson)  So what do you mean by that's what was
20      used at the time, if this is the only one you did?
21   A  That's a compound question, but I'll try to answer it.  The
22      Sheriff's office had video equipment.  At the time the
23      state of the art, I believe, was VHS tape.  If I'm wrong
24      about that, then I'm wrong.  I'm just assuming that's what
25      it was.
```

1  Q  Okay. Moving to something different, would you agree that
2     a charging decision always involved a determination of
3     whether probable cause exists?
4  A  Yes.
5  Q  All right. So you would make a decision to charge after
6     determining probable cause exists, correct?
7  A  Yes.
8  Q  You reviewed the Cook County prosecutor's office -- I'm
9     sorry -- the Clark County prosecutor's office file in
10    preparation for the habeas case that you were involved in,
11    correct?
12 A  No.
13 Q  Oh. Did you ever go and look at the file or review the
14    file in the Clark County prosecutor's office --
15 A  Can I clarify? I did not review it. I was tasked with a
16    particular task, and that was to see if there was a medical
17    report in there, so --
18 Q  Did you look -- oh, strike that. Go ahead.
19 A  So I went to the prosecutor's office, was given access to
20    the banker's box full of paperwork, and I went page by page
21    through those materials looking for a medical report. I
22    didn't stop and read anything, so I wouldn't say that I
23    reviewed it.
24 Q  Did you see any report or notes reflecting your interview
25    of Katie in the prosecution file at that time?

JOHNSON (James M. Peters, 11/8/12)

Page 243

1  A  I didn't take notes of my interview with Katie, so there
2     wouldn't be notes there.
3  Q  Okay. Did you -- I didn't know if you remembered or not;
4     it was so long ago. Did you see any notes or a report in
5     that file when you reviewed it?
6              MS. FETTERLY: Concerning what?
7  Q  (By Mr. Johnson) Okay, let's go back. You just described
8     how you were looking for, I think, a medical exam in the
9     prosecution's file back around the time the habeas case was
10    proceeding --
11 A  Yes.
12 Q  -- is that correct?
13 A  Yes.
14 Q  At that time when you were looking, did you see any notes
15    or any report reflecting in any way that you had performed
16    an interview of Katie Spencer on December 11, 1984?
17 A  No.
18 Q  Okay. You would agree, would you not, with this statement:
19    Medical exams of children to investigate whether that child
20    has suffered sexual abuse can be and often are painful
21    experiences?
22 A  I -- yeah, I think I'd agree with that.
23 Q  Okay. And would you agree that medical exams of children
24    to investigate whether that child has suffered sexual abuse
25    are necessary procedures?

Page 246

1  that you had a duty to disclose certain items of evidence,
2  correct?
3  A  Witness statements, exculpatory material, yes. Certain
4     materials --
5  Q  That wasn't my question.
6  A  Well, what is your question then?
7  Q  Back in 1984, you understood that you had a duty as a
8     prosecutor to disclose certain items of evidence to the
9     defense?
10 A  Yes.
11 Q  All right. And at that time were you in the habit of
12    disclosing irrelevant materials to the defense in a
13    criminal prosecution?
14 A  Yes.
15 Q  Okay. So you might turn over anything; is that correct?
16 A  Yes.
17 Q  Even if it had nothing to do with the case?
18 A  Well, if it was -- no, if it had nothing to do with the
19    case, it wouldn't have been in the file.
20 Q  You agree the Katie Spencer medical report would have been
21    disclosed to the defense as a routine matter if you had it,
22    correct?
23 A  I do, and I believe it would have been had the case gone to
24    trial because Sharon and I would have got together and
25    compared her reports with the reports that were in the

1    prosecutor's file, which I had just taken over a couple
2    weeks before, and anything that was not there would have
3    been disclosed.
4  Q So you're saying that there was no obligation to disclose
5    it even if you had it prior to the plea of Ray Spencer?
6  A I didn't say that, Counsel, at all.
7         MS. FETTERLY:  No.
8  Q (By Mr. Johnson) Okay. All right. You agree that medical
9    exams of potential sexual abuse victims can help you either
10   confirm or refute the allegations?
11 A Absolutely.
12 Q Okay. And do you differentiate between types of rape?
13   Have you done that in your experience?
14 A Under Washington law the definition of rape includes
15   oral-genital contact, and it includes penetration of the
16   genital area or the rectum, however slight. So, yes, you
17   can distinguish types of rape under Washington law, at the
18   time, anyway.
19 Q And have you ever offered opinions that there is a
20   difference between a nonforcible rape and a forcible rape?
21 A Oh, yes, there's definitely a difference.
22 Q Okay. What's a nonforcible rape?
23 A Well, there are sex offenders whose modus operandi does not
24   involve force, and in particular with child molesters, in
25   particular, incest cases, where the offender has a loving

1   relationship with the child, but also has a sexually
2   deviant interest, there is often no force, in contrast with
3   a stranger or somebody motivated by anger or power or
4   control who might not care about the child and might engage
5   in forcible rape. That's the distinction, as I understand
6   it, in my experience.
7 Q Okay. We talked a little bit about offering legal advice
8   to the police. Do you know what I'm talking about when I
9   talk about the Salmon Creek Motel incident?
10 A The incident with Little Matt?
11 Q Yes. Directing you to that, did you offer legal advice to
12   the police regarding following up on the incident with
13   Little Matt at that motel?
14 A Well, I -- as I recall, and my recollection is vague, but,
15   as I recall, Sharon came in with information, and I was
16   looking for some corroboration, so I asked them to go out
17   and see if they could get some corroboration. I don't
18   think that's legal advice. I think that's asking for
19   follow-up information pursuant to making a decision about
20   whether to seek an arrest warrant.
21 Q Who did you ask and what did you ask them to do?
22 A I don't have any recollection. It's too long ago.
23 Q Mr. Davidson told him you told -- strike that.
24       Mr. Davidson told us that you told him to go over to
25   the Salmon Creek Motel and do some things. Do you recall

1          that?
2    A   I don't recall it, but it certainly could have happened,
3          and if it did, it's probably reflected in the affidavit.
4    Q   And you were asking then -- you would have been asking them
5          to gather evidence, correct?
6    A   Follow-up information.  Routine --
7    Q   That would be to gather evidence regarding the incident
8          with Little Matt, as you described it, correct?
9    A   Yes.
10   Q   I just want to go through some things here.  Did you
11         disclose to Ray Spencer or to his lawyer at any time the
12         report of the medical exam of Matt Hansen?
13   A   No.  I don't believe I ever saw that report.
14   Q   Did you disclose to Ray Spencer or his lawyer at any time
15         the Rebecca Roe report?
16   A   No, I don't believe that was disclosable.  That was just an
17         opinion of another prosecutor.
18   Q   Did you disclose to Ray Spencer or his lawyer at any time
19         any information whatsoever to apprise them that you had met
20         with Katie on December 10 of 1984?
21   A   No.
22   Q   Did you disclose to Ray Spencer or to his lawyer at any
23         time any information whatsoever that you had conducted a
24         videotaped interview of Katie Spencer on December 11 of
25         1984?

1   A   No.
2   Q   Just running through some things here.  That's why it's
3       quiet for a little bit.
4           I asked you about the allegations that other men were
5       involved in the sexual molestation.  Other than the words
6       you say that children said, did you ever corroborate
7       allegations regarding other men molesting the children with
8       any physical or other tangible evidence?
9   A   I passed my notes of those interviews with Mr. Rulli on to
10      law enforcement and I --
11  Q   Did you ever learn that there was any corroboration for
12      those statements?
13  A   No.  They had suspicions, but no --
14  Q   Did you -- go ahead.
15  A   -- corroboration.
16  Q   And were any photos of any sexual abuse of these children
17      ever located, to your knowledge?
18  A   No.
19  Q   And were any pornographic magazines ever located in the
20      home of Ray Spencer?
21  A   I don't know if anyone looked, but we had eyewitness
22      testimony about them.
23  Q   Who was that?
24  A   DeAnne Spencer in the report, initial report, to Sharon
25      Krause talked about that.

| | | |
|---|---|---|
| 1 | | causing the incarceration of Ray Spencer? |
| 2 | A | I -- no, the judge incarcerated him. |
| 3 | Q | All right. Did you tell Sharon Krause to remove the video |
| 4 | | from the Sheriff's Department? |
| 5 | A | I did not. |
| 6 | Q | Okay. If you did not tell her to remove the video, then |
| 7 | | she removed the video on her own, correct? |
| 8 | | MR. BOGDANOVICH: Object. Lacks foundation. |
| 9 | A | I don't have any idea what the circumstances were of the |
| 10 | | video being removed from the Sheriff's office. |
| 11 | Q | (By Mr. Johnson) Don't you agree it's a reasonable |
| 12 | | inference that if you didn't direct her to remove the |
| 13 | | video, she removed it on her own? |
| 14 | | MR. BOGDANOVICH: Object. Lack of foundation. |
| 15 | | Calls for speculation. |
| 16 | A | I think an equally likely inference is that in a haste of |
| 17 | | retiring and moving, she threw a lot of stuff from her desk |
| 18 | | into boxes, which I have done myself, and perhaps you have |
| 19 | | too, and simply moved and moved the boxes and didn't look |
| 20 | | into those boxes for years. |
| 21 | Q | (By Mr. Johnson) And removing that video that way, you |
| 22 | | would agree that would be improper conduct? |
| 23 | | MR. BOGDANOVICH: Object. Lacks foundation. |
| 24 | | Calls for speculation. |
| 25 | A | If it were intentional and malicious, it would have been. |

1        If it were simply in the course of retiring and moving and
2        an accident, it would not be.
3   Q    (By Mr. Johnson)  Okay.  Did you tell Sharon Krause not to
4        disclose the video to anyone after she made you aware of
5        it?
6   A    She didn't make me aware of it.  A producer from a
7        television show made me aware of it after it had been
8        disclosed.
9   Q    Did you tell Sharon Krause that?
10  A    Yeah, I called her and asked her about it.
11  Q    Do you recall anything more about what she said?
12  A    No.  Well, she told me how she disclosed it and how she --
13       or how she found it and how she called the prosecutor's
14       office and told them about it.
15  Q    As you previously stated?
16  A    If I previously stated, then yes.
17  Q    If you did not tell Sharon not to disclose it -- well,
18       strike that.
19           Did you ever tell Sharon Krause to disclose the video
20       at any time?
21  A    No, because I didn't -- I didn't know about it until after
22       it had been disclosed.  And, as I said, I learned about it
23       from Nikki Batiste, who was television producer.
24  Q    Just so the record is clear, you knew about the videotape
25       the moment it was created, correct?

1  Q  They're different things, right, like you said earlier?
2  A  They're related.
3         MR. JOHNSON:  Okay, we'd like a two-minute
4     break.  I think we're done.  And we'll only be two minutes.
5                              (Recessed at 4:09 p.m.)
6                              (Reconvened at 4:09 p.m.)
7         MR. JOHNSON:  We're all done.
8         MR. BOGDANOVICH:  This is Guy Bogdanovich.  I've
9     got a follow-up or two.
10                       EXAMINATION
11  BY MR. BOGDANOVICH:
12  Q  Mr. Peters, you mentioned that if the case was going to go
13     to trial that you would have sat down with Sharon Krause
14     and reviewed the file, and then I think you've testified
15     that's when you would have made the decision what needs to
16     be disclosed; is that correct?
17  A  That's correct.
18  Q  And whose responsibility would it have been to make the
19     decision of what needs to be disclosed to the criminal
20     defense attorney?
21  A  Ultimately the responsibility would have been mine --
22  Q  Okay.
23  A  -- at the point I was back in the case.  There was another
24     lawyer involved for three and a half months before I became
25     involved in the charged case.

1  Q  But whether it would have been you or another prosecutor
2     assigned to the case, that would have been the prosecutor's
3     decision to make; is that correct?
4  A  Yes. Once we'd reviewed the discovery with the
5     investigator and compared what we had with what they had.
6              MR. BOGDANOVICH: All right. Thanks. That's
7     all I have.
8              MS. FETTERLY: There are no further questions
9     here.
10             MR. FREIMUND: Reserve signature?
11             MS. FETTERLY: Yeah, we'll reserve signature.
12             MR. FREIMUND: Do you want to talk about the
13    exhibits?
14             MR. BOGDANOVICH: Yeah.
15         Counsel, we wanted to make sure -- I think we raised
16    it a couple times and never really, I don't think, had a
17    clear agreement or understanding. Was it your intention
18    that everything in all of the three different groupings of
19    notebooks that you sent as deposition exhibits be marked
20    and attached to the depositions of these three witnesses as
21    exhibits?
22             MS. ZELLNER: Yes, that's what we want.
23             MR. BOGDANOVICH: Okay. And I think I made my
24    record during Sharon Krause's, but I do want to state an
25    objection to any later admissibility of any of the exhibits