Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

CLYDE RAY SPENCER, MATTHEW )
RAY SPENCER, and KATHRYN E. )
TETZ, )
)
            Plaintiffs, )
)
      vs. )          NO. 3:11-cb-05424-BHS
)
FORMER PROSECUTING ATTORNEY )
FOR CLARK COUNTY JAMES M. )
PETERS, DETECTIVE SHARON )
KRAUSE, SERGEANT MICHAEL )
DAVIDSON, CLARK COUNTY )
PROSECUTOR'S OFFICE, CLARK )
COUNTY SHERIFF'S OFFICE, THE )
COUNTY OF CLARK and JOHN DOES )
ONE THROUGH TEN, )
)
            Defendants. )

---

DEPOSITION UPON ORAL EXAMINATION OF ~~SHIRLEY~~ _Sharon_ KRAUSE

---

Tuesday, November 6, 2012
Olympia, Washington

---

EXHIBIT _F_

Page 3

```
 1                        I N D E X

 2   EXAMINATION                                    PAGE/LINE

 3   MS. ZELLNER                                    7      16

 4   MR. FREIMUND                                  195      1

 5   MS. ZELLNER                                   197      8

 6   MR. FREIMUND                                  201      7

 7   MS. ZELLNER                                   201     13

 8

 9

10                  I N D E X   E X H I B I T

11   EXHIBIT NO.           DESCRIPTION            PAGE/LINE

12   NO. 1        Clark County Sheriff's Index,     9     19
                  8/30/84; 2 pgs.
13
     NO. 2        Clark County Sheriff's Index,    14     10
14                11/8/84; 2 pgs.

15   NO. 3        R. Stephenson Report of Interview 18    16
                  with Ray and Shirley Spencer
16                (Shirley's Handwritten Statement
                  Attached); 9 pgs.
17
     NO. 4        Detective Flood Report Re         26     3
18                Interview with Ray, Shirley,
                  Katie, Matt & DeAnne; 10 pgs.
19
     NO. 5        Detective Flood Report - "All     32     21
20                Investigation and Medical Findings
                  sent to Clark County"; 1 pg.
21
     NO. 6        Rebecca Roe Report Re Declination 34     4
22                of Case by King County; 3 pgs.

23   NO. 7        Krause Report Re Receipt of       36     18
                  Release Allowing Clark County to
24                Send Information to Anne Link
                  (with release attached); 1 pg.
25
```

284

| EXHIBIT NO. | DESCRIPTION | PAGE/LINE | |
|---|---|---|---|
| NO. 8 | Krause Report Re Report of Medical Exam of Katie Spencer; Katie Spencer's Medical Exam Report; Matt Hansen's Medical Exam Report; 8 pgs. | 37 | 10 |
| NO. 9 | Krause Report Re Summary of Contacts with Ray Spencer; 14 pgs. | 38 | 19 |
| NO. 10 | Krause Report Re Interview of Karen Stone; 7 pgs. | 62 | 22 |
| NO. 11 | Krause Report Re Interview of Katie Spencer (Interview #1); 15 pgs. | 69 | 6 |
| NO. 12 | Krause Report Re Interview of Phyllis Day; 3 pgs. | 148 | 20 |
| NO. 13 | Krause Report Re Interview of Kathryn Roe; 4 pgs. | 149 | 3 |
| NO. 14 | Krause Report Re Interview of Matt Spencer (Interview #1); 11 pgs. | 135 | 24 |
| NO. 15 | Krause Report Re Interview of Linda Lawrence; 5 pgs. | 151 | 11 |
| NO. 16 | Krause Report Re Interview of DeAnne Spencer; 22 pgs. | 151 | 11 |
| NO. 17 | Krause Report Re Interview of Katie Spencer (Interview #2): 12 pgs. | 142 | 10 |
| NO. 18 | Krause Report Re Interview of Shirley Spencer Re Domestic Disturbance; 8 pgs. | 152 | 4 |
| NO. 19 | Krause Report Re Interview of Shirley Spencer and Matt Hansen (Interview #1); 24 pgs. | 7 | 7 |

ZELLNER (Sharon Krause, 11/6/12)

Page 7

1              BE IT REMEMBERED that on Tuesday, November 6,

2       2012, at 9:04 a.m. at 2102 Carriage Drive SW, Building C,

3       Olympia, Washington, before DIXIE J. CATTELL, Certified

4       Court Reporter, appeared SHARON KRAUSE, the witness herein;

5              WHEREUPON, the following proceedings were had,

6       to wit:

7                               (EXHIBIT NOS. 1-44A & B MARKED)

8

9       SHARON KRAUSE,          having been first duly sworn by

10                              the Notary, testified as follows:

11

12              MS. ZELLNER:  Let the record reflect this is the

13       deposition of Sharon Krause taken pursuant to notice and

14       continued to today's date by agreement of the parties.

15                          EXAMINATION

16       BY MS. ZELLNER:

17       Q  Ms. Krause, would you state your full name and spell your

18          last name.

19       A  Sharon Krause, K-R-A-U-S-E.

20              MS. ZELLNER:  I would ask today that we put

21       everyone in the room's name on the record.  I can start

22       with us.

23          I'm Kathleen Zellner.  I represent the plaintiff, Ray

24       Spencer.

25              MR. JOHNSON:  My name is Doug Johnson.  I

Page 11

1    sensitive investigation, and initially I recall that there

2    was communication between the prosecutor's office,

3    Sheriff's office, and the city police.

4         And so as it progressed, I know that there were

5    reports going over to the prosecutor; it wasn't when

6    everything was done that it went over.  During that

7    investigation, they were getting them.

8         It was my practice, if we ended up going to trial, I

9    would always sit down with the prosecutor prior to that and

10   go through everything and make sure they had everything,

11   but it --

12 Q  Okay.  So let me see if I understand it.  So what you would

13   do, what your custom and practice was on a case like the

14   Spencer case, would be to send over the reports as they

15   were being done.  But then, in addition to that, if the

16   case went to trial, you would sit down and go through the

17   documents and make sure that the prosecutor had all of the

18   documents?  Is that pretty much what you're saying?

19 A  That was my practice.  And prior to trial, sit down and go

20   through everything and make sure that I had what I needed

21   and the prosecutor had everything I had or, you know, was

22   in our file.

23 Q  And did you ever have the experience with the prosecutor's

24   office when you would have that meeting and go through and

25   describe each report, each piece of evidence, where the

Page 21

```
 1      between the questions.  It's just because of the

 2      communication, I think.

 3            Tell me, do you have an independent recollection of

 4      when you were first notified about the Spencer case?  Do

 5      you have any time frame?

 6   A  No independent recollection, no.  Only what's in the

 7      report.

 8   Q  Were you assigned to the Spencer case as an investigator in

 9      1984?

10   A  Yes.

11   Q  And who assigned you to be the investigator?

12   A  It would have been Michael Davidson.  He was my supervisor

13      and the sergeant of our unit.

14   Q  What sort of duties did you observe that Michael Davidson

15      had?  You said that he was the supervisor.  On a day-to-day

16      basis what would he do?  What did you observe him doing?

17   A  My observations were that he assigned cases.  We had --

18   Q  Okay.

19   A  -- homicide investigators, check fraud investigators.  That

20      whole unit, he assigned investigations.  He would oversee

21      what was going on.  We --

22   Q  Let me stop you there.  When you say -- and let's just

23      confine this to the Spencer case.  Was the Spencer case --

24      and I'm talking just in a general sense.  We'll get more to

25      the specific details in a minute.  But what was Mr. -- or
```

288

Page 24

1     his involvement?  We know he reviewed reports.  Anything

2     else?

3  A  I indicated before there were times when we discussed it.

4     I'm sure he made suggestions about things that I should do.

5     He had input into that.  I don't recall -- he wasn't

6     present during all of the interviews with the children or

7     witnesses.  He was present when -- on occasion when we

8     spoke with Ray Spencer.  He was present when Ray Spencer

9     was arrested.  But, again, we were small and we all were

10    buried with cases, so he was always willing to help when he

11    could.

12  Q  Okay.  You described the Spencer case as being sensitive.

13    What do you mean by that term?

14  A  He was a city police officer, and in all fairness and out

15    of respect for him, when we got the initial complaint, that

16    certainly didn't mean that he had done these things.  And

17    it was hard.  It was hard on all of us.  You know, these

18    are people that we rely on and depend on on a daily basis

19    if we need help or if we're in trouble.  And so it was

20    sensitive.  It was -- you know, I'm being honest with you

21    when I say it was difficult for all of us, including

22    Mr. Spencer, I'm sure, but it was difficult for us.

23        There's a -- you know, we rely on each other.  That's

24    all we have when we get into trouble and we're cops.  And

25    so you have this kinship, and it may not be a situation

ZELLNER (Sharon Krause, 11/6/12)

Page 26

1    Q  -- in 1984?

2    A  I do.

3    Q  All right, let's look at Plaintiff's Exhibit 4, and I'm

4       going to ask you if you recognize this exhibit.  It's got a

5       number of pages.  Do you recognize this exhibit as being

6       one of the reports prepared by Officer Flood?

7    A  I do recognize it.

8    Q  Okay.  And you had -- this report was sent to your

9       department and would have been in your file during the

10      investigation?

11              MR. BOGDANOVICH:  Well, Counsel, before we go

12      any further with questions, could you maybe clarify, if you

13      can, or ask about the handwriting?  I think there are

14      several pages.

15              MS. ZELLNER:  I will, yeah.  Let me -- I just

16      want to get her to confirm that the report would have been

17      in her files and that she's recognizing it.

18   Q  (By Ms. Zellner)  Do I have a "yes" to that --

19   A  Yes.

20   Q  -- question?

21       All right.  Then, just to get Counsel's question

22      resolved, there is handwriting on different pages of this

23      report, and I'll just ask you, do you recognize the

24      handwriting on the Flood report?

25   A  No, I don't recognize it.

Page 28

```
 1     that you know you were aware.  What made you -- what's made

 2     you know you were aware?

 3  A  In reading the reports, there was a conversation with Ray

 4     Spencer and Shirley Spencer, I think, where I told him part

 5     of what was holding us up, we were waiting for those

 6     reports.

 7          And when I went to California, I recall that I spoke

 8     to Detective Flood prior to talking to the children, and

 9     I'm sure that I had his report by then.

10  Q  Okay.  And looking at the section of his report, it's the

11     last page -- actually, it's four pages from the end.  Let

12     me see if it's Bates stamped.  It's when he's actually

13     talking about his interview.  He's talking about Detective

14     Madrigal and I made contact at the Becerra residence.  Do

15     you see that page?

16  A  Yes, I guess this is it.

17  Q  25.

18  A  25?

19  Q  Right.  Right.

20          Now, Detective Flood describes Kathryn Spencer as

21     being extremely shy in talking to him; is that correct?

22  A  That's correct.  When -- well, can I -- he says --

23  Q  Yeah.

24  A  -- she was extremely shy in talking to me about these

25     things, but prior to that --
```

ZELLNER (Sharon Krause, 11/6/12)

Page 30

1  Q  (By Ms. Zellner)  Do you agree with me that the report says

2     that -- and I read it to you -- that "She indicated that

3     her mother did touch her on her potty but only when she was

4     putting medicine on it," correct?  I'm reading it

5     correctly?

6  A  Yes.

7  Q  Okay.  She's not describing being sexually molested, is

8     she, in that sentence?

9  A  No.

10 Q  Okay.  "She indicated that she did tell Shirley everything

11    that Shirley advised me of but when asked to explain it or

12    asked specific questions about it, she would say that she

13    couldn't remember the words so she couldn't tell me."  Do

14    you see -- am I reading that correctly?

15 A  That's what it states, yes.

16 Q  And I'm asking you as an experienced investigator of child

17    abuse if that sentence has any significance to you in terms

18    of the child's ability to retell the story?

19 A  You know, it doesn't -- it does and it doesn't.  First of

20    all, "She indicated she did tell Shirley everything that

21    Shirley advised me of."  I have no idea specifically what

22    Flood told her or said to her.  Then "When asked to explain

23    it and asked specific questions about it, she would say she

24    couldn't remember the words."  But it's difficult for me to

25    make an opinion one way or the other because Flood isn't

ZELLNER (Sharon Krause, 11/6/12)

Page 31

1      specific about what he did say to her or tell her or ask

2      her.

3    Q  Okay.  In the last sentence it says, "When asked if someone

4      had touched her pee-pee, she shook her head yes, and when

5      asked who, she would say Daddy, and then a few minutes

6      later she would say, Not Daddy, no one."  Am I reading that

7      correctly?

8    A  Yes.

9    Q  And then it says, "Kathryn indicated that her father --

10      that her and her father played a game but she didn't want

11      to talk about the game," and "When asked if someone had

12      touched her on her pee-pee, she would say yes, stop and

13      think for a moment, and then indicate that it was her

14      mother putting on the medicine."  Am I reading that

15      correctly?

16   A  That's what it states, yes.

17   Q  And then on the last page, it appears that Officer Flood

18      "made contact with Matthew, the brother of the victim in

19      this case, and he indicated he knew nothing about what we

20      were talking about."  Am I reading that correctly?

21   A  That's what it states, yes.

22   Q  And then Matthew went on, and he denied that his mother or

23      father had taken any inappropriate actions against him; is

24      that right?

25   A  That's what it states.

Page 48

1  Q  And Shirley Spencer was very upset and confused about what

2     was going on, right?

3  A  Ray Spencer came in that 9/21 to take the polygraph.

4  Q  Right.  And Shirley Spencer was with him, correct?

5  A  Correct.  That's correct.

6  Q  And then Mike Davidson was also present, and he talked to

7     Shirley Spencer, you and Mike Davidson?

8  A  Correct.

9  Q  Okay.  Shirley Spencer was extremely upset and confused

10    about what was going on, correct?

11 A  Based on the report, she was having a real hard time.

12 Q  Right.  And you even document that she was crying or she

13    was attempting to hold back tears?

14 A  That's correct.

15 Q  Is that accurate?

16 A  Yes.

17 Q  Shirley Spencer makes -- apparently indicates that she

18    found it was very difficult to believe that there was even

19    a possibility that her husband Ray would have had any type

20    of sexual contact with Kathryn.  That's correct?

21 A  That's what it reflects, the report, yes.

22 Q  And Shirley Spencer also indicated that she lived -- during

23    the time she had lived with Spencer, she never observed

24    anything that would have concerned her regarding Ray

25    Spencer having a problem specifically being sexually

ZELLNER (Sharon Krause, 11/6/12)

Page 49

```
 1        attracted to children.  That's the information she conveyed
 2        to you?
 3   A    Yes.
 4   Q    And she also told you that she had a four-year-old son and
 5        grandchildren, and she would have been concerned about
 6        their safety if she even suspected something like that
 7        would happen, right?
 8   A    Correct.
 9   Q    Shirley Spencer said that she wished she had never said
10        anything, correct, because of all the problems it had
11        caused?
12   A    Yes.
13   Q    Shirley Spencer, during that meeting, never indicates to
14        you that she suspects her husband Ray of abusing Kathryn or
15        the other children; is that right?
16   A    Could you ask me that again?
17   Q    Sure.  There's no indication in your meeting with Shirley
18        Spencer on 9/21/84 that she has any doubt about Ray
19        Spencer's innocence of the allegations?
20   A    I think initially in this interview she consistently
21        expressed her feelings that, you know, she didn't -- well,
22        let me rephrase.
23            She said she found it hard to believe.  She never saw
24        anything that would have caused her concern.  However, she
25        was the one who called and reported based on Kathryn's
```

295

ZELLNER (Sharon Krause, 11/6/12)

Page 50

```
 1        initial disclosure.  So I can't say what Shirley Spencer
 2        felt, but, you know, she had concerns and so she acted on
 3        those.
 4    Q   Right.  But you would agree Ray Spencer's actually the one
 5        who had her write up everything that Kathryn had told to
 6        her, correct, that Ray asked her to document?
 7                  MR. BOGDANOVICH:  Object to the form.
 8              You can answer.
 9    Q   (By Ms. Zellner)  Is that your understanding, that Ray had
10        asked her to document the allegations?
11    A   What I understand is when I spoke to him, he told me he
12        told her to write it down.  You know, that's the
13        information I had.
14    Q   Well, she actually did write up the allegations, right?
15    A   She did, and I had a copy of those.
16    Q   Right.  And my point is, at this meeting, without trying to
17        read her mind, she doesn't express any concern that Ray
18        Spencer had molested her daughter Kathryn?  Would you agree
19        with that?
20    A   I guess I don't like the word "concerned."  She didn't want
21        to believe it.  I don't think -- you know, she was
22        reluctant to even entertain the possibility.  I can't say
23        whether she had concerns.  I think she had concerns, but --
24    Q   Well, she was -- okay.  But she wasn't concerned about Ray
25        Spencer.  In that interview on page 7 of 12, she's actually
```

ZELLNER (Sharon Krause, 11/6/12)

Page 68

1          MR. BOGDANOVICH:  Counsel, could we kind of look

2     for a place to take the break we discussed after the last

3     interruption and maybe see about getting a backup phone

4     line set up?

5          MS. ZELLNER:  Yeah.

6          MR. BOGDANOVICH:  And I think the witness asked

7     about a break too.

8          MS. ZELLNER:  Sure.  Why don't we go ahead and

9     break, and then when we come back, I want to go into

10    Exhibit 11, which is the interview of Katie Spencer.

11         MR. BOGDANOVICH:  Okay.

12         MS. ZELLNER:  How long do you want to break?

13         MR. BOGDANOVICH:  Well, I don't know.  I was

14    going to ask Ms. Cattell -- do you want to go off the

15    record so we can talk about the logistics of this?

16         THE COURT REPORTER:  Yes.

17                              (Recessed at 11:08 a.m.)

18                              (Reconvened at 11:25 a.m.)

19   Q  (By Ms. Zellner)  All right, let's go to Exhibit -- it

20      would be 11.

21         MR. BOGDANOVICH:  Actually, Counsel --

22   Q  (By Ms. Zellner)  It's a 14-page report, correct?

23         MR. BOGDANOVICH:  Counsel, before you go to 11,

24    I wanted to clarify for 10, there was some underlining and

25    circles on some of those pages.  It goes back to my earlier

ZELLNER (Sharon Krause, 11/6/12)

Page 69

```
 1       questions, if you could maybe ask if --
 2                   MS. ZELLNER:  Sure.  Yes.
 3   Q   (By Ms. Zellner)  Ms. Krause, is the writing on Exhibit 10,
 4       is any of that writing yours?
 5   A   No.
 6   Q   All right.  Now, on Exhibit 11, it's a 14-page document,
 7       can you tell us for the record what it is?
 8   A   It's a Utility Report that I dictated.  It was typed for
 9       me.
10   Q   And have you had an opportunity to look at this report
11       during the break?
12   A   Not during this break, but I have looked at it.  And
13       there's also a bunch of writing on this throughout the
14       report.  I recognize none of that.  None's mine.
15   Q   All right.  So none of the writing on the 14 pages is
16       yours.  Attached to, I guess it would be, Bates stamp 71,
17       after page 14 there's a drawing.  Do you see that drawing?
18   A   I do.
19   Q   And is that a drawing that you used during your interview
20       of Kathryn Spencer?
21   A   It is.
22   Q   All right.  Now, does this report truly and accurately
23       reflect your entire interview with Kathryn Spencer on that
24       date, 10/16/84?
25   A   I'm assuming it does, yes.  I took notes during the time I
```

ZELLNER (Sharon Krause, 11/6/12)

Page 70

```
 1     talked to her.
 2   Q What did you do with the notes that you took?
 3   A You know, at some point in time, notes were destroyed, and
 4     it was because we did not have the capability of storing
 5     all those things.  So once it was transcribed, at some
 6     point in time they would be shredded.
 7   Q Okay.  So I want to ask you now about certain specifics of
 8     your interview with Kathryn Spencer on that date of
 9     10/16/84.  Your report indicates on page 2 of 14.
10     Actually, let's start on page 1, that you took Kathryn
11     Spencer to a mall to purchase a coat for yourself because
12     you had not taken one with you; is that correct?
13   A That's correct.
14   Q Okay.  Why would you be taking a child witness to a mall to
15     buy a coat?
16   A I have to back up.  Prior -- and I recall this
17     specifically.  Prior to going to Sacramento, I spoke to
18     Detective Flood, and I asked him if there would be some
19     place in his department that I could interview her.  And he
20     said, well, if he needed to do that, he probably could.
21     But I thought -- my impression of that conversation was
22     that he was -- you know, it wasn't his case, and I
23     understand that, and everybody's busy.
24         And I learned -- I talked to hundreds of children.  I
25     learned a long time ago that the worst place to interview a
```

1    child is at their residence because there's too many

2    distractions and you end up having to look at everything

3    they got for Christmas and their birthday.

4         And the other thing I was concerned about was that

5    there was a divorce.  And you know, I didn't know -- I got

6    a little bit of information from my end, but I didn't know

7    if there was some really bad blood there, if Mom was

8    putting the kids up to saying things.  I did not want to do

9    the interview in the house.  And I also learned that you

10   have to establish a rapport with the child.

11        If their father, in fact, at that point had done

12   these things -- he was a policeman; I was a policeman --

13   and I don't want children to be threatened by that.  So I

14   elected to take her with me to the hotel and do that

15   interview where I could control it and it was private.  And

16   it would give me some time to spend with Kathryn and kind

17   of evaluate where she was as far as her being competent.

18        And I wanted her to be comfortable with me.  If these

19   things were said and they weren't true, I wanted her to

20   know it was okay for her to tell me they weren't true.  If

21   there was more than what she reported initially, I wanted

22   her to be comfortable and be able to do that.

23        So I needed a coat, so I thought that would give us

24   some time alone where I could get acquainted and I could

25   establish a rapport with her and also kind of evaluate

ZELLNER (Sharon Krause, 11/6/12)

Page 74

1    Was that one your interview techniques?

2                    MR. BOGDANOVICH:  Object to the form.

3            You can answer.

4    A  Could you ask me the question again?

5    Q  (By Ms. Zellner)  Were you attempting in this -- and I've

6    just read to you, on page 2 of 14, your conversation with

7    Katie.  Were you trying to see if you could get Katie to

8    repeat the statements that Shirley had made about

9    Mr. Spencer?

10   A  I believe what I was attempting to do is solicit

11   independent information from her regarding what did or

12   didn't occur.  Her repeating what she told Shirley Spencer

13   wasn't going to accomplish anything one way or the other.

14   Q  Okay.  But that -- I mean, I've read that correctly, right,

15   that you indicated to Katie that you had come to California

16   so that I could talk to her?  "I indicated to Katie that

17   when I talked with Shirley in Vancouver, Shirley told me

18   that Katie had shared some things with her in private, and

19   that's what I wanted to talk to Katie about."  That's what

20   you announced to Katie, correctly [sic]?

21   A  Correct.

22   Q  Am I correct?  Okay.

23          You have this conversation that starts in the mall

24   and Katie tells you, "I don't want to talk about that

25   anymore."

ZELLNER (Sharon Krause, 11/6/12)

Page 75

1          And then you tell her It's important to talk with me,

2     and I need to talk to her.

3          And Katie said, "You can talk, but I don't want to."

4          So Katie indicated to you at the mall that she did

5     not want to talk about the subject matter of which she'd

6     told Shirley, correct?

7  A  Correct.

8  Q  But despite her making that statement, you go ahead and

9     interview her anyway, right?

10 A  Yes, I did.

11 Q  Okay.

12         Do you know what a suggestive question is?  Can you

13    define that for me?  In a child interview what's a

14    suggestive question?

15 A  I don't know what your definition of "suggestive" is.

16 Q  I'm asking you what yours is.  Surely you know that term

17    from being a child interviewer.

18 A  Okay, "suggestive."  If -- I think "suggestive" to me would

19    be indicating facts to the child.  An example would be "I

20    know your daddy touched your privates.  Can you tell me

21    about that?"

22 Q  And would you agree with me that a interviewer, even at

23    this time, in 1984, should not be asking the child

24    suggestive questions?

25 A  Ideally, it would be nice -- it would have been nice to go

ZELLNER (Sharon Krause, 11/6/12)

Page 76

```
 1       into a room with the child and sit down and ask the child
 2       to tell you what happened.  But I can assure you that when
 3       you go into the room to interview a little tiny person
 4       about sexual things, the ball sort of stops there, and the
 5       interview is dictated based on what the child does, says,
 6       and I can have all kinds of ideas in my head about what
 7       should happen, but that isn't necessarily going to happen
 8       because every child is different.  And so you evaluate that
 9       interview and the techniques based on the child.
10    Q  And there are no parameters of what is acceptable in
11       interviewing a child?  It just depends on who the child is
12       and what you decide to do; is that what you're saying?
13              MR. BOGDANOVICH:  Object to the form.  Again,
14       without context as to time.
15    A  There are -- I tried so hard not to put words in their
16       mouth.  I interviewed children -- if they weren't sexually
17       abused, I didn't even want them to know about those things,
18       but I was on a daily basis, almost every day, talking to
19       little teeny, tiny people about big people stuff.  So
20       trying to get that information with [sic] them without
21       leading was real important to me.  And I think that makes
22       it real credible and I've seen reports that were so
23       suggestive that it took away any credibility there was.
24       So, you know, I can't tell you -- I just know that each --
25       each child is different and each child's going to dictate
```

ZELLNER (Sharon Krause, 11/6/12)

Page 79

1    would be any valid reason to continue the dep, but what it

2    appears you've done is I had understood we were talking

3    about Exhibit 11 in that one report, and now it looks like

4    you're quoting from a report that's actually Exhibit 17,

5    right?

6                    MS. ZELLNER:  Right, yeah.

7                    MR. BOGDANOVICH:  Okay.

8                    MS. ZELLNER:  Because there are criticisms of

9    each interview that was done, I want to talk to her about

10   asking repetitive questions.

11        So if we can go to Exhibit 17, page 126, she asks

12   Katie Spencer if she could remember anything that her daddy

13   said when it was happening and Katie stated, "I don't

14   remember."

15                   MR. BOGDANOVICH:  And that's an interview on

16   10/18/84, correct?

17                   MS. ZELLNER:  Correct.

18                   MR. BOGDANOVICH:  And I do think it's

19   important -- all I'd ask is that you give as brief as

20   possible description about which exhibit and what interview

21   date you're quoting from.

22                   MS. ZELLNER:  Right.  These are all going to be

23   from that interview, Exhibit 17.

24                   MR. BOGDANOVICH:  Oh, okay.

25                   MS. ZELLNER:  But I'm not asking to confirm she

304

1            MR. BOGDANOVICH:  And that's on page what, again

2     so that the witness can follow?  This is Exhibit 17.  What

3     page was that quote on?

4            MS. ZELLNER:  As I've said three times, it's on

5     page 126, 127.

6            MR. BOGDANOVICH:  Can you direct her on the page

7     so that she can follow?

8     Q  (By Ms. Zellner)  Do you find the entry on the page?

9            MS. ZELLNER:  I'm not going to sit here and

10     direct her.

11     Q  (By Ms. Zellner)  Let me ask you, is Exhibit 17 a true and

12     accurate report of your interview with Katie Spencer?

13     A  It should be, yes.

14     Q  Okay.  So assume for the purposes of my question that you

15     asked her, "I asked Katie if she could remember anything

16     her daddy said when that was happening," and Katie stated,

17     "I don't remember."  Assume that's correct, okay?

18     A  Okay.

19     Q  Okay.  You then asked Katie -- assume this is correct.  "I

20     asked Katie if she could remember if her daddy had said

21     anything when that happened, advising her it was really

22     important to remember what he may have said," and Katie

23     said, "He just doesn't say nothing to me."  Okay, that's

24     the second response -- all right? -- assuming that's

25     correct?

ZELLNER (Sharon Krause, 11/6/12)

Page 82

1   A   Okay.

2   Q   All right.  Then there's a third question.  You state,

3       "Does he say he likes you?  At that point Katie gave in to

4       the suggestion and replied, "He says he loves me."  So you

5       asked her the first two questions, and then you finally get

6       her to say, "He says he loves me," correct?

7               MR. BOGDANOVICH:  I'm going to object to the

8       form of the question.  I think it's misleading and

9       incomplete and unfair to refuse to direct the witness to

10      the portion of the interview where these quotes appear and

11      then ask her to justify why she repeated the questions.

12              MS. ZELLNER:  My question initially was:  Does

13      she think that repetitive questions are proper, and she

14      stated, "It depends."

15              MR. BOGDANOVICH:  Correct.

16              MS. ZELLNER:  So I'll leave her answer like

17      that, and my expert will just simply cite back to this

18      report.

19  Q   (By Ms. Zellner)  So let's go back to Exhibit 11, to your

20      interview.  Is that -- is this -- is this report in

21      Exhibit 11 a complete and accurate copy of your entire

22      interview with Katie Spencer?

23  A   On that date it should be, with the exception of the

24      writing we already discussed.

25  Q   Okay.  When you take Katie to the mall, you apparently sit

Page 83

```
 1        down and you have food with her, right, or a drink?  You

 2        have a soft drink --

 3    A   I believe so.

 4    Q   -- buy her a drink?

 5    A   I believe that's correct.

 6    Q   Okay.  And do you think that that's proper interviewing

 7        technique, to purchase anything for a child of this age

 8        before you start interviewing them?

 9    A   I don't think it's improper.  If she weren't a victim, my

10        giving her a pop isn't going to cause her to say her father

11        put his penis in her.

12    Q   And what is that based on?  Do you have literature that's

13        based on?

14    A   What I'm saying is I don't think the Coke or buying her

15        something is going to cause her to fabricate sexual

16        involvement with her father, or any child.

17    Q   That's your opinion, correct?

18    A   That's my opinion, right.

19    Q   Is it based on any literature?

20    A   It's based on the hundreds of children that I dealt with.

21    Q   Okay.  So that's based on your personal experience, that it

22        doesn't affect them if you buy things for them before the

23        interview?

24                MR. BOGDANOVICH:  Object to the form.

25                Go ahead.
```

307

ZELLNER (Sharon Krause, 11/6/12)

Page 84

1  A  There's a difference between "buy things."  I don't know

2     what you mean about "things."  But a Coke, it. . .  I don't

3     think buying her a Coke or buying any child or getting

4     something to drink is going to cause them to fabricate

5     details of molestation.

6  Q  Okay.  And then when you returned to the hotel on page 3 of

7     14, Exhibit 11, at the hotel, you again -- she expresses a

8     desire for a cup of hot chocolate, and then you buy her a

9     cup of hot chocolate, correct?

10 A  I believe that's correct, yes.

11 Q  And when you get to your room, she turns on the TV and

12    removes her shoes?

13 A  I believe that's in the report, correct.

14 Q  Okay.  And then you're taking notes the entire time; is

15    that right?

16 A  I was taking notes from the time I started talking with

17    her.

18 Q  Page 3 of 14, the last full paragraph, she states to you,

19    "I don't want to talk about my dad, I don't want to talk

20    about my stepmother," correct?

21 A  Correct.

22 Q  And you said to her, "I indicated to Katie again that it

23    was very important that I talk with her because of things

24    Shirley had said to me."  Right?

25 A  Correct.

ZELLNER (Sharon Krause, 11/6/12)

Page 85

1   Q   And you say that Katie stated, "I like my stepmother.

2       She's a really nice person."

3   A   Correct.

4   Q   All right.  Now, you're aware that shortly after this,

5       around December 11, there was a videotaped interview of

6       Katie Spencer made?

7   A   Yes.

8   Q   And you were at the interview; is that right?

9                   MS. FETTERLY:  Object to the form.

10  A   I was --

11  Q   (By Ms. Zellner)  Is that --

12  A   I was in there for --

13                  THE WITNESS:  It's okay if I --

14                  MS. FETTERLY:  Go ahead.

15  A   I was just in there for a few minutes, so I wasn't there.

16  Q   But you knew that a videotaped interview was made of Katie

17      Spencer on December 11, 1984?

18  A   Yes, I did.

19  Q   And you were present at the interview, correct?

20                  MS. FETTERLY:  Object to the form.

21  A   I was present only during maybe five minutes initially, and

22      I left the room.

23  Q   (By Ms. Zellner)  Who was present at that interview?

24  A   I didn't even remember the interview.  Jim Peters from the

25      prosecutor's office; Katie Spencer; her mother -- Kathryn

 1       Spencer; her mother, DeAnne Spencer.  There was also

 2       someone operating a camera.

 3   Q   Was his first name Jim?

 4   A   I have no idea.

 5   Q   Did he work for the Sheriff's Department?

 6   A   You know, I don't remember who it was.  I don't have any

 7       information that would indicate to me who it was.

 8   Q   And have you read a transcript of that interview of Katie

 9       Spencer?

10   A   Jim with -- during that tape?  I've read through it.  I

11       didn't read it word for word the whole thing.

12   Q   So you remember in that interview that --

13               MS. FETTERLY:  I just wanted -- wait a minute.

14       Ms. Zellner -- wait a minute, Ms. Zellner.  I just want to

15       pose an objection or a clarification.  Are you referring to

16       the transcript your office prepared?

17               MS. ZELLNER:  Yes, I am.

18               MS. FETTERLY:  Okay.  Because I want to pose an

19       objection --

20               MS. ZELLNER:  She said she read through it.

21               MS. FETTERLY:  Okay.  But I just want to impose

22       a continuing objection here that that necessarily

23       accurately reflects that interview, but with that --

24               MS. ZELLNER:  That's fine.

25   Q   (By Ms. Zellner)  Have you ever listened to or watched the

```
 1     videotape?
 2              MS. FETTERLY:  Yes, I have, and I note
 3     particularly in the transcript you prepared there's no
 4     indication --
 5              MS. ZELLNER:  I'm not talking about the
 6     transcript.  I'm asking her if she has listened to the
 7     tape.
 8              MS. FETTERLY:  Okay.  Are you asking -- I just
 9     wanted to pose a continuing objection -- I know you're
10     going to reference a transcript -- a continuing objection
11     to reference to that transcript as being an accurate
12     representation of the interview.
13              MS. ZELLNER:  I got it.  That's fine.
14              MS. FETTERLY:  With that, you may question her
15     about that.
16   Q  (By Ms. Zellner)  Have you ever listened to the videotape?
17     Have you watched it without a transcript?
18   A  One time.
19   Q  When?
20   A  It was minutes after I found it in my garage.
21   Q  When you listened to the videotape, do you recall that
22     Katie Spencer said that she hated her stepmother and
23     thought she was dumb?
24   A  I do.  I want to clarify something.  That videotape I
25     watched once, and then I sent it on to the prosecutor's.
```

Page 88

```
 1        Since that time, I got a CD disc.  I watched that CD one
 2        time, but that was more when I was -- actually, when I was
 3        doing the interrogatories.  Prior to that, I had looked at
 4        it.
 5   Q    Okay, let's talk about -- we'll come back to this interview
 6        with Katie.  Let's talk about that videotaped interview.
 7        How did you happen to be present on that date for a few
 8        minutes of that interview?  How did you come to be there?
 9   A    I -- when I viewed the tape the first time, I didn't
10        remember the tape.  I don't remember the interview.  I
11        don't remember or didn't remember why it was done.  And
12        when I saw -- when I was going through the boxes and I saw
13        her name on it, I had no memory whatsoever about that tape
14        or why I was --
15   Q    If you could answer my question.
16   A    I don't know.
17   Q    If you -- you watched the tape and you were there for a few
18        minutes, right?
19   A    Yes.
20   Q    Okay.  My question to you isn't about you discovering it in
21        your garage.  My question is:  How did you come to be
22        invited to that interview on December 11, 1984?
23   A    I don't know.
24   Q    You have no idea why you were there?
25   A    I have no memory of that interview whatsoever
```

ZELLNER (Sharon Krause, 11/6/12)

Page 89

1     independently.

2   Q  Okay.  But you are aware that an interview took place,

3     correct?

4   A  I am, based on what I saw on the tape, yes.

5   Q  Okay.  And Mr. Peters conducted the interview; is that

6     right?

7   A  Based on what's on the tape, I would say that's correct.

8   Q  And Katie Spencer at some point early in the interview

9     indicated that she wanted you to not be present for the

10     interview?

11   A  No, that's not exactly correct.  After watching -- when I

12     watched that, those two times I told you about, I think

13     it's -- it appears to me she's real concerned about who's

14     running the camera, and Katie had -- or Kathryn had told me

15     she didn't like to talk to men about this.  And I just felt

16     it wasn't -- I have some feelings about what that

17     interview -- why it was done, what it was for.  But I don't

18     believe it was an investigative interview.  Had it been, I

19     would not have left the room, and I would have entered that

20     tape into evidence.  And Katie -- I just felt like with Jim

21     Peters, her mother and the camera man, it may be better for

22     me to leave.  It was a time when Jim Peters could get to

23     know her and establish rapport.  There wasn't any reason

24     for me to be there.

25         I suggested to her, I said, "Would you like me to

313

Page 90

1    leave?

2         And she said, "Yes."  But she didn't ask me prior to

3    that to leave the room.

4  Q  So you remember that she made that request of you to leave

5    the room?

6  A  No.

7              MR. BOGDANOVICH:  Object to the form.  It's been

8    asked and answered.

9  Q  (By Ms. Zellner)  Could you clarify your answer, please?

10             MR. BOGDANOVICH:  Object.  It's been asked and

11   answered, clearly.

12        Go ahead.

13 A  What I -- what I was trying to say is I suggested I leave

14   the room.  It wasn't her suggestion.  And I asked her if

15   she would feel better if I left the room and I don't even

16   remember now if I said something to her about not so many

17   people.  But she said yes and I left the room.  There was

18   no reason for me to stay there.

19 Q  Why was the interview conducted?

20 A  I think I know why it was conducted, but I told you I have

21   no independent memory of that interview whatsoever, but I

22   don't believe, based on what I saw, it was an investigative

23   interview.

24 Q  It really doesn't matter your opinion -- I didn't ask you

25   that.  I'm trying to establish -- you've just told me that

1      you have a recollection of leaving the room, and you've

2      also told me you have no memory of the interview, the

3      purpose of it.  So I'm asking you:  Do you have any

4      recollection, after having watched the tape twice, as to

5      why the interview was done?

6                  MR. BOGDANOVICH:  I'm going to object to the

7      form of the question.  I think it's argumentative,

8      misstates prior testimony, and it's been asked and

9      answered.

10                 Go ahead.

11   A  I have no independent recollection about that interview,

12      about who was present, when it was done or the reason.  The

13      only information I have is what I viewed on those two times

14      I told you about, and based on what I saw, I formed an

15      opinion.

16   Q  (By Ms. Zellner)  Okay.  And what was that opinion that you

17      formed watching the tape twice?

18   A  The opinion reference why it was done?

19   Q  I'm just asking you.  You're the one who said you formed an

20      opinion.  What was it?

21   A  Okay.  My opinion is that it was not an investigative

22      interview, and had it been, I would not have left the room.

23      Had it been, I would have marked that tape for

24      identification and placed it into evidence.  And I believe

25      it was an interview done for the sole purpose of Mr. Peters

ZELLNER (Sharon Krause, 11/6/12)

Page 92

1       getting acquainted with Kathryn in the event we went to

2       trial and also for him to establish her credibility.

3       That's my opinion.

4   Q   And do you believe, in watching the tape twice, that

5       Kathryn Spencer's competency was established in that

6       interview?

7   A   I watched -- okay, let me think.  Do I believe her

8       competency. . . ?  To some degree in the second portion.  I

9       think the first part of the interview she was real

10      reluctant to talk to him.  During the second part she

11      opened up and was talking to him.  So I think there was

12      some competency established.

13  Q   When you left the room, where did you go?

14  A   We had little work cubicles, and that's where I was, in my

15      work space.

16  Q   Could you view the interview from a different place?  Was

17      there a way to view the room?

18  A   No.  It looked --

19  Q   And then --

20          MR. BOGDANOVICH:  I'm sorry.  Was there more you

21      wanted to say?

22          THE WITNESS:  Yeah.

23  A   You know, I don't remember even where it was done.

24      However, based on what I saw on that tape, I think it was

25      in a little conference room off the Detective Unit, so

ZELLNER (Sharon Krause, 11/6/12)

Page 93

1   there would be no way to view it.

2   Q   (By Ms. Zellner)  Okay.  So the Sheriff's Department then

3       did have the ability to videotape interviews, is that

4       correct, at that time?

5   A   Not really.  I wouldn't say that was correct.  We used

6       video cameras at crime scenes occasionally or homicides,

7       but we really weren't set up to actually do an interview.

8   Q   Well, one was done though, right, with a videotape?

9   A   Obviously that one was, yes.

10  Q   Right.  So that occurred -- when the break was taken for an

11      hour and five minutes, did you have any contact with anyone

12      who was in that room during the interview?

13  A   I don't recall.

14  Q   Well, when you say you don't recall, might you have had

15      contact and you just don't remember it?

16  A   I don't remember anything about that, the circumstances of

17      that interview, so I can't say.  I really do not remember.

18  Q   So you don't know where you went -- or you said you went to

19      a cubicle; you do remember that?

20  A   I don't remember that.  That's what I said to her on the

21      tape.  I'm going to go over to my office or work space or

22      something similar.  That's the only reason I said that.  I

23      don't remember.  I don't remember the interview, I don't

24      remember the day, and I don't remember where I went.  I

25      remember -- I only am basing that on what I saw in the

ZELLNER (Sharon Krause, 11/6/12)

Page 94

1    tape.

2  Q  Okay.  And prior to that interview, during the course of

3     the investigation up to December 11, 1984, did you have

4     conversations with Jim Peters about the case?

5  A  Oh, I'm certain I did.

6  Q  And did you have more than two conversations with Jim

7     Peters from the beginning of this case in the summer of '84

8     up until December 11, 1984?

9  A  I'm sure I would have, yes.

10  Q  Did you have more than a half a dozen conversations with

11     Mr. Peters?

12  A  Unless it's documented in a report specifically, I would

13     have no way of telling you how many times I met with him.

14  Q  Oh, you met with him too.  How many times did you meet with

15     him, would you estimate, between the beginning of the case

16     up to this interview of December 11?

17  A  I don't have any idea unless it's documented in a report,

18     or the same with the phone conversation, unless it's

19     documented in a report, whether I met with him, with Art

20     Curtis or both of them, I would have no way of knowing

21     that.  I don't remember.

22  Q  Okay.  You are obviously present for some of that

23     interview.  Do you have any recollection of why you were

24     present at the interview?  You may not know why he was.  Do

25     you know why you were there?

ZELLNER (Sharon Krause, 11/6/12)

Page 95

1   A   No, I don't.  And that's honest.  I don't remember that

2       interview.  I don't remember getting ready for that or

3       where it was done.  I'm not even sure it was the Sheriff's

4       office camera.  I do not remember it.

5   Q   Okay.  Now, this interview we're talking about in

6       Exhibit 11, the one that we have your notes on, do you have

7       an independent recollection of that interview?

8   A   With Kathryn at the hotel?

9   Q   Yeah.

10  A   Some events I did.

11  Q   Okay.  Well, let's go back to the videotape.  You said

12      something about your garage?  Tell me about the videotape

13      in your garage.  Was it in your garage?  I don't know.

14  A   It was in my garage.

15  Q   And when did you discover it?  What year was it?

16  A   It should be reflected on my letter to Denny Hunter, with

17      the prosecutor's office, because the minute I found the

18      tape, I took it in, viewed it, and I immediately called

19      Dennis Hunter, and I sent it off to the prosecutor that

20      very same day.

21  Q   Do you think that that was possibly in 2009 when you

22      discovered it in your garage?

23  A   I'd have to look for sure, but I think it was.  Whenever it

24      was I sent it up there.

25  Q   And what were you doing in your garage that led you to

ZELLNER (Sharon Krause, 11/6/12)

Page 96

```
 1      discover the videotape?

 2   A  I was going to clean or go through the boxes, because that

 3      wasn't the only box.  I had a bunch of boxes I needed to go

 4      in there and clean them out.

 5   Q  Okay.  And were those boxes, the other boxes, did they

 6      contain information from other cases that you'd worked on

 7      at the Sheriff's Department?

 8   A  No.  I saw nothing from other cases.

 9   Q  Okay.  Did -- was the videotape the only thing that was in

10      those boxes that was potentially evidence in a case?

11                   MR. BOGDANOVICH:  Object to the form of the

12      question.

13               But go ahead.

14   A  I don't believe that videotape was evidence, or it wouldn't

15      have been in that box.

16   Q  (By Ms. Zellner)  What else was in the box?

17   A  All of the training materials that we provided you with.  I

18      was surprised I had -- I was pretty sure I had my training

19      notebook, but the seminars and the things that I presented

20      at, certificates that I got from work, there was a

21      Spellcheck, some cards, business cards, from the Sheriff's

22      office.  I had some little badges that I used to give

23      children occasionally.  I had a couple of those in there.

24      Some extra handouts from training were in those boxes.

25   Q  Was there any identifying -- was the videotape labeled in
```

ZELLNER (Sharon Krause, 11/6/12)

Page 97

```
 1       any way?

 2   A   It was.

 3   Q   What did it -- how was it labeled?

 4   A   I don't recall specific -- it either said Interview with

 5       Kathryn Spencer or Kathryn Spencer Interview, and that's

 6       what caught my attention, when I saw the little label on

 7       the outside of it.

 8   Q   Did it have a case number on it?

 9   A   You know, I don't remember.  I don't remember it had a case

10       number or -- I didn't remember there being a date, but it

11       could have been.

12   Q   Was it a VHS tape?

13   A   Yes.

14   Q   It was?

15   A   Yeah.

16   Q   Did you say "yes"?

17   A   Yes.

18   Q   Where is that tape now?

19   A   I have no idea.  I told you already the minute I viewed it,

20       saw what it was, I called the prosecutor's office, spoke to

21       Denny Hunter, packaged it up, went to the post office and

22       shipped it off to him that day.

23   Q   Okay.  So who is Denny Hunter?

24   A   I think at the time, Dennis Hunter worked for the

25       prosecutor's office, and I think at the time he was the
```

ZELLNER (Sharon Krause, 11/6/12)

Page 98

1     chief criminal deputy.

2  Q  So you took the tape, you went inside, you sat down, you

3     watched it, correct?

4  A  Yes.  Immediately after I found it.

5  Q  Okay.  Then why did you call Denny Hunter?

6  A  Well, it's kind of ironic that I ran across that tape after

7     there were some issues about Ray Spencer again.  And when I

8     viewed it, she clearly on the second portion was acting out

9     with the dolls, and not only that, I couldn't remember

10    where that tape came from when it was done, and I thought

11    somebody needed to have it.  They needed to have that tape.

12  Q  And why did you think -- I'm just trying to get into the

13    details of this.  Why did you think they needed to have the

14    tape?  Why did you think it was significant?  Specifically

15    why did you think it was?

16  A  Because at the time I couldn't even remember when it was

17    made or why it was made and if it had any significance.  I

18    couldn't imagine why it was in my stuff in my garage.  So

19    I -- that's why I called.

20  Q  And when you spoke to Dennis Hunter, what did you tell him?

21  A  I told him the circumstances of finding it and --

22  Q  Tell me specifically what you told him.  Give me the

23    general idea of what you said.  Did you say "I was cleaning

24    out my garage" and -- I mean, how did you explain it?

25  A  I don't remember exactly what I told him.  I think -- as I

Page 99

1     explained in the letter to him, I let him know I was out

2     there cleaning.  I ran across this tape.  I saw the label

3     on it that I told you about.  I immediately went in and

4     viewed it; couldn't remember when it was done, why it was

5     done, and because it was -- this other stuff with Spencer

6     had -- you know, I knew that there were some things going

7     on.  I thought they needed to have it.  I didn't know why I

8     had it when I --

9  Q  What did you know was going on at that point in time?

10 A  Well, I think that was in -- at the time I found it, I knew

11     that he had some, you know, there was some court action

12     involving him, that he had filed, and I think at that time

13     it was -- there'd been all kinds of articles in the paper.

14     I don't remember if that was prior to 20/20 calling me all

15     the time or Oprah Winfrey calling me all the time, her

16     program, but there was some activity, so I was aware

17     that -- and, like I said, it was ironic that I ran across

18     it at that time.  I didn't know why I had it or what it

19     was.

20 Q  So when you talked to -- after you watched it and you

21     talked to Mr. Hunter, then you packaged it up and sent it

22     to him or you took it to him, or how did you transmit it?

23 A  Denny Hunter was in Vancouver, Washington.  I live in

24     Arizona.

25 Q  Okay.

ZELLNER (Sharon Krause, 11/6/12)

Page 100

1    A   So I found it in my garage in Arizona.  I viewed it.  As
2        soon as I saw what it was or knew what it was, I called the
3        prosecutor's office.  I spoke to Dennis Hunter, and based
4        on his instructions, I wrapped it up and took it directly
5        to the post office and mailed it out that very same day I
6        found it.
7    Q   Okay.  So you mailed it to Mr. Hunter, and then when do you
8        next hear about the videotape?  Does anyone call and
9        interview you?
10   A   I don't remember.
11   Q   Did you talk to Mr. Peters about finding the tape?
12   A   At some point in time I talked to him about that, but I
13       don't remember when that was.
14   Q   Was it within a year of finding it or was it fairly soon
15       thereafter?
16   A   I don't remember when it was I talked to him, but I do
17       recall that there was some conversation about that tape.
18   Q   And what did Mr. Peters tell you about the tape?  Because
19       he remembered it, right?
20             MS. FETTERLY:  Object to form.
21          You can answer if you know.
22   A   I don't know.  I don't remember specifically what he said.
23       I. . .  I don't remember --
24   Q   (By Ms. Zellner)  But he knew that the interview had taken
25       place, didn't he --