UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

CLYDE RAY SPENCER, MATTHEW

RAY SPENCER, and KATHRYN E.

TETZ,

> CERTIFIED COPY

              Plaintiffs,

              vs.                          Case No:   C11-5425BHS

FORMER DEPUTY PROSECUTING

ATTORNEY FOR CLARK COUNTY JAMES

M. PETERS, DETECTIVE SHARON

KRAUSE, SERGEANT MICHAEL DAVIDSON,

CLARK COUNTY PROSECUTOR'S OFFICE,

CLARK COUNTY SHERIFF'S OFFICE,

THE COUNTY OF CLARK and JOHN

DOES ONE THROUGH 10,

              Defendants.

_____/

VIDEOTAPED DEPOSITION OF

DEANNE SPENCER

Friday, November 16, 2012

EXHIBIT____H____

Reported by Jennifer F. Milne, CSR No. 10894

427

1          BE IT REMEMBERED that on November 16, 2012,

2     commencing at the hour of 9:41 a.m., at GOLDEN STATE

3     REPORTING & VIDEO, 3800 Watt Avenue, Suite 201,

4     Sacramento, California, before me, Jennifer Milne, a

5     Certified Shorthand Reporter, empowered to administer

6     oaths and affirmations pursuant to Section 2093(b) of

7     the Code of Civil Procedure, personally appeared

8                         DEANNE SPENCER,

9     a witness herein, who, having been duly sworn, was

10    examined and testified as follows:

11               (Exhibit Nos. 1 through 27 was

12               marked for identification.)

13         THE VIDEOGRAPHER:  Hello, my name is Sandra

14    Lapointe, notary public, and I'll be videotaping today's

15    proceedings.

16          I'm here on behalf of Golden State Reporting &

17    Video located in Sacramento, California.  We are here in

18    the matter of Spencer versus Peters; Case Number

19    C11-5424BHS for the United States District Court Western

20    District of Washington at Tacoma.

21          The time on the video monitor is 9:41 a.m.

22    Today's date is November 16th, 2012.  Our location is

23    Golden State Reporting & Video, 3800 Watt Avenue, Suite

24    201, Sacramento, California.

25          This will be the deposition of DeAnne Spencer.

428

```
 1                    EXAMINATION
 2   BY MS. FETTERLY:
 3       Q   Ms. Spencer, would you please state your full
 4   name for the reporter, please.
 5       A   DeAnne Sue Spackman Spencer.
 6       Q   And where do you live?
 7       A   I live at -- my address?
 8       Q   Yes.
 9       A   It's 7 -- 7618 Lakewood Park Drive --
10       Q   It's all right.  It's okay.
11       A   I'm sorry.
12           Sacramento, California 95828.
13       Q   Thank you.  Ms. Spencer, I recognize the subject
14   matter of this deposition is very emotional to you.
15   And, please, at any time if you feel you need a break,
16   please let me know or the other attorneys if they happen
17   to be questioning you.
18           Do you agree to that?
19       A   I do.
20       Q   Okay.  And, again, I would emphasize that if you
21   do feel you need a break, every effort will be made, of
22   course, to accommodate that.  Don't feel shy about that.
23       A   Yes.
24       Q   Is that agreed?
25       A   Yes.
```

429

```
 1          A   My two children and I.

 2          Q   Okay.  No one else?

 3          A   No.  A babysitter that was there with them

 4   during the day, but...

 5          Q   A female babysitter?

 6          A   Yes.

 7          Q   And were you working at this time?

 8          A   I was.

 9          Q   What were -- where were you working?

10          A   I was working for --

11              THE REPORTER:  I'm sorry.  "I was working

12   for" --

13              THE WITNESS:  New West Dialysis.

14              THE REPORTER:  Thank you.

15   BY MS. FETTERLY:

16          Q   And did any -- and directing your attention to

17   when you were coming home from work that day.  Was there

18   any -- did anything unusual occur when you pulled up in

19   front of your house or entered your driveway?

20          A   Yes.  When I pulled into the driveway, there was

21   a tall, blond man standing there.  And when I got out of

22   the car, he introduced himself as Pat Flood, and he said

23   "I'm from the Juvenile Division."

24          Q   Take your time.  Take your time.

25          A   This is so --
```

430

1    Q   Take your time.

2    A   "I'm from the Juvenile Division."  And I

3  thought, "Oh, God.  He's got custody."  And then --

4    Q   Who are you referring to when you say "he"?

5    A   My ex-husband.

6        And then in the next breath, he said, "There's

7  been a report that your daughter has been molested.  And

8  my partner and I have been here for two hours.  We had

9  to make sure that your children were safe and not in any

10  imminent danger."  And so I -- I started to collapse,

11  and he said, "You need to maintain.  Your children are

12  watching out the door so you need to maintain" so I did.

13  He said, "We've been here for two hours.  It's obvious

14  that they're not in any imminent danger.  We're going to

15  redirect the investigation back up north."

16    Q   Okay.  Did you take that to mean that you were

17  even possibly a suspect in regard to these allegations?

18    A   I did not believe it at that time.

19    Q   You learned it later?

20    A   Yes.

21    Q   Okay.  But was it clear, then, in your

22  communication with Detective Flood that he and his

23  partner didn't feel the children were in any way in

24  danger in your home?

25    A   Yes.  Correct.

431

```
 1        Q   Now, directing your attention to the next day,

 2   August 30th, what happened on that date that you

 3   remember specifically about these incident -- this

 4   incident?

 5        A   I -- the company that I worked for, my boss, her

 6   husband worked for the Child Abuse Council.  And when I

 7   called her to tell her what was happening, she said,

 8   "We're going to need to get her an examination."  So I

 9   spoke with a social worker at my office and asked her

10   "How do I go about this?  What do I do?"  And she said,

11   "You make an appointment at U.C. Med Center."  And I

12   said, "What do I tell my daughter?"  And she says, "You

13   tell her" -- sorry.  I thought I can handle this better.

14        Q   Take your time.

15        A   She said, "Tell her that her" -- "that you know

16   that her daddy's touched her in places daddies aren't

17   supposed to touch little girls," and you needed to make

18   sure she wasn't hurt.

19        Q   And you knew that from what Detective Flood told

20   you her allegations were?

21        A   Yes.

22        Q   Were you -- how were you feeling about this

23   whole situation at this time?

24        A   I -- for a while, I felt at a loss.  I was

25   devastated, but I knew that first and foremost I had to
```

432

```
 1   make sure that my kids were --

 2             MS. FETTERLY:  Why don't we take a break.  Let's

 3   take a break.

 4             THE VIDEOGRAPHER:  Okay.  We're going to go off

 5   the record.  It's 10:04 a.m.

 6             (Brief recess.)

 7             THE VIDEOGRAPHER:  We're back on the record.

 8   It's 10:09 a.m.

 9   BY MS. FETTERLY:

10       Q  Before we had a break, Ms. Spencer, we were

11   talking about the fact that you had arranged to have a

12   medical examination of Katie.

13       A  That's correct.

14       Q  And we've established that was on August 30th,

15   1984.

16          Where did that examination take place?

17       A  It took place at U.C. Med Center in Sacramento.

18       Q  And that is a Davis campus, I take it?

19       A  Yes.

20       Q  And did you -- as you were advised to by, you

21   said, a social worker.  Did you have a discussion with

22   Katie at that time before the examination --

23       A  I did.

24       Q  -- as to what would happen at this examination?

25       A  What I said to her was -- we were in the car,
```

433

```
 1    and we were on our way, and she was looking at me, like,

 2    you know, what's going on?  And I said, "Well, we know

 3    that daddy's touched in you places that daddies aren't

 4    supposed to touch little girls.  And we want to make

 5    sure you're not hurt."

 6         Q  Okay.  And what was her response?

 7         A  She curled into a ball, rolled to the side of

 8    the door and began yelling, "Mommy, please don't let

 9    them touch me there.  Please don't let them touch me

10    there."

11         Q  Did you proceed to the medical center, then?

12         A  I did.

13         Q  Okay.  And who was present when -- when the

14    examination, at least attempted examination, took place?

15         A  There was a female doctor, a female nurse, and a

16    female social worker and myself.

17         Q  And what happened during this process?  And you

18    were present the entire time; is that right?

19         A  Yes.

20         Q  So describe what happened during -- when you and

21    Katie and the medical staff were in the examination

22    room?

23         A  They -- we took her shoes off and then the

24    doctor started to -- she was sitting on my lap.  And the

25    doctor started to take her tights off, and she began
```

434

```
 1    screaming and kicking and yelling.  And none of us could

 2    get them off of her.

 3        Q  Was there ever, on this occasion, a vaginal

 4    examination done of your daughter on that date?

 5        A  No.

 6        Q  Okay.  What type of examination, if any, was

 7    done -- and this was while she was on your lap; is that

 8    right?

 9        A  She was on my lap, yeah.

10        Q  Was she ever on an examination table?

11        A  No.

12        Q  Okay.  Were there any instruments inserted into

13    her?

14        A  No.

15        Q  Was the physician even able to probe into her

16    vaginal area?

17        A  No.

18        Q  Okay.  So what was examined, if anything, during

19    this examination?

20        A  Nothing.

21        Q  And that was because --

22        A  We couldn't -- she was hysterical.  We could not

23    get her tights off.  She still had her dress on.  We

24    couldn't get her tights off.

25        Q  Handing you what has been marked as Exhibit
```

435

```
 1    Number 3, can you identify this document?
 2         A   Yes.
 3         Q   And what is it, to the best of your knowledge?
 4         A   It's the medical report from that visit, it
 5    looks like.
 6         Q   It's a three-page document?
 7         A   Correct.
 8         Q   Would you agree that on the third page there's a
 9    handwriting that says "No physical finding"?
10         A   That's correct.
11         Q   And how do you explain that particular finding?
12    Was that following an actual vaginal examination?
13         A   No.
14         Q   Okay.  How would you explain the writing of
15    those conclusions?
16         A   I can't explain it.
17         Q   Could there possibly be no physical findings
18    because an actual examination was not done, an actual
19    pelvic examination was not done?
20         A   That would be my assumption.
21         Q   And then did you take Katie home that day after
22    the examination?
23         A   Actually, the social worker -- I was told while
24    I was there that there's been an apparent trauma.  You
25    need to get her into some sort of counseling or therapy.
```

436

1    therapist ever state to you, "I think she made these

2    allegations up"?

3        A   No.

4        Q   Did she ever state to you, "she" being the

5    therapist, "I don't think anything actually happened"?

6        A   No.

7        Q   Was it your understanding that the therapy she

8    was pursuing with Katie was that she had been -- in

9    fact, been improperly touched by her father?

10       A   Yes.

11       Q   Did -- and -- in the same time period, did you

12   notice any unusual behavior on Katie's part that may or

13   may not, based on your understanding of child

14   development, have been consistent or inconsistent with

15   physical sexual abuse?

16       A   At times I felt uncomfortable of some of her

17   behaviors, especially around, oh, like her uncles --

18   it's so long ago.

19       Q   I know.

20       A   But I just -- I can't put my finger on it.  I

21   was just uncomfortable.

22       Q   Okay.  Did you ever observe her to rub her

23   genital area in this time frame?

24       A   Yes; but I didn't think anything of it.

25       Q   Did she ever ask you to apply medicine to her

437

1    genital area in this time frame?

2         A   Yes.

3         Q   Okay.  Had you ever done that in the past?

4         A   She had a sore like on the top of the vaginal

5    area, not inside, but on the top.  And when I took her

6    to the doctor, he said it was a viral infection.  And he

7    gave me medication to put on.

8         Q   And how -- when did this occur in relation to

9    the fall of 1984 time frame?  Was it in the same time

10   frame, or was that earlier?

11        A   I'm sorry.  I don't remember.

12        Q   Okay.  Do you think it was before, possibly?

13        A   Yeah, I do believe it was before.

14        Q   Okay.  Did you notice anything unusual about the

15   nightgown Katie brought back from her visits with her

16   father in the summer of 1984?

17        A   It just seemed to be worn, you know.  A little

18   strangely -- I mean worn -- worn out.

19        Q   Can you be more specific?  Was it fraying at the

20   sides or any particular place or --

21        A   More of in the area of where she might have had

22   her underwear.

23        Q   Go ahead.  Take a break.

24        A   Okay.

25        Q   And your response was more in her underwear

438

```
 1   area?

 2        A   Yeah.   Yes.

 3        Q   And what particularly did you notice about that

 4   nightgown in that regard?

 5        A   I just remember it said "Daddy's Little

 6   Princess" on it.   It made me very uncomfortable.   I

 7   can't tell you why.

 8        Q   Okay.   What did you do with that nightgown?

 9        A   I threw it away.

10        Q   Was that after the allegations of abuse had

11   been -- had surfaced?

12        A   Yes.

13        Q   Did you learn at some point that you were

14   actually a suspect; that your former husband was telling

15   authorities up in Clark County that it was actually you

16   or possibly a man in your home that was abusing Katie?

17        A   Yes.

18        Q   Okay.   And when, approximately, did you learn

19   about that?

20        A   It was -- it was not long after Pat Flood had

21   come over.   I mean, it was within that few-months time

22   period.   I don't remember exactly when.

23        Q   And at that time, were there any men living in

24   your household?

25        A   No.
```

439

1      A   My understanding was it was -- I don't know if

2   you call it conclusive.   I was telling the truth.

3      Q   So you were then ruled out as a suspect totally?

4      A   Correct.

5      Q   Now, once you were ruled out as a suspect, do

6   you -- based on what Shirley Spencer wrote in this

7   seven-page document, would you have wanted the

8   investigation to just stop?

9      A   Absolutely not.

10      Q   And why is that?

11      A   It -- with what I was experiencing with my

12   children and with their behaviors and with the

13   information that I had, I wanted to make sure that this

14   didn't happen again to them.

15      Q   And there was an investigation pursued that you

16   participated in as a witness, was there not?   An

17   investigation by the Clark County Sheriff's Office?

18      A   Correct.

19      Q   And do you recognize the name Sharon Krause?

20      A   I do.

21      Q   And who is Sharon Krause?

22      A   She was the detective handling the case.

23      Q   For Clark County, Washington?

24      A   Correct.

25      Q   And when -- do you recall first -- we know she

440

```
 1    came down from records -- came down and met with you and

 2    your children on -- October 15th, I believe, was the

 3    date she arrived in Sacramento.

 4          Do you recall her coming, in that time frame, to

 5    Sacramento?

 6       A  I do.

 7       Q  Now, before that, did you have any telephone

 8    conversations with Detective Krause?

 9       A  I think there were a couple.

10       Q  Did she ask you some questions about your

11    marriage to Ray in those conversations?

12       A  She did.

13       Q  Did she ask you some questions about any

14    infidelities that happened during the time of that

15    marriage?

16       A  She did.

17       Q  Did she ask you about a woman named Rhonda

18    Short?

19       A  She did.

20       Q  Okay.  And who is Rhonda Short?

21       A  Rhonda was a next-door neighbor when we lived in

22    L.A.

23       Q  And how old was Rhonda when you lived next door

24    to her?

25       A  We were there for six years.  So when we left,
```

441

```
 1    she was about 17.

 2         Q   She was a minor?

 3         A   Correct.

 4         Q   Okay.  Was she in high school?

 5         A   Correct.

 6         Q   And how would you describe, based on your

 7    recollection of Ms. Short, her mental capacity?  Was

 8    she -- and, again, based on your academic training and

 9    work experience with children and adolescents, do you

10    recall her mental capacity as being that of, say, the

11    average 17-year-old adolescent female?

12             MS. ZELLNER:  Objection.  She's not testifying

13    as an expert.

14             MS. FETTERLY:  You can answer, if you can.

15             THE WITNESS:  I can't -- I can't attest to her

16    mental ability.  But in my observation, she was

17    emotionally about 14.

18    BY MS. FETTERLY:

19         Q   Would you describe her as somewhat of a

20    vulnerable young lady?

21         A   Yes.

22         Q   Okay.  And what did you tell Sharon Krause just

23    about Rhonda Short?

24         A   I told her about an incident where Rhonda had

25    accused Ray of raping her.
```

442

1       Q   And this conversation about Rhonda Short and

2   some other things took place with Sharon Krause before

3   she came to Sacramento?

4       A   Correct.

5       Q   Okay.  And we've -- you've testified that you

6   recall Ms. Krause coming to Sacramento on or about

7   October 15th or 16th of 1984?

8       A   Correct.

9       Q   And was this prearranged that she would come

10  down to meet with you?

11      A   Yes.

12      Q   Was she also going to meet with your children?

13      A   Yes.

14      Q   Did you explain anything about the fact that she

15  would be coming to your children?

16      A   I don't recall.

17      Q   Okay.  Did she come to your home?

18      A   She did.  She met me at my home, and we drove

19  over to my mother's house to pick up my kids and come

20  back to my house.

21      Q   And what was your impression on first meeting

22  her when she came to your home?  Records document that

23  this was on October 16th, 1984.  Does that sound

24  accurate to you?

25      A   Yes.

443

```
 1        A  I again laughed and said, "I wish I had as much

 2   fun as he said I did."

 3        Q  Were you -- did you socialize with what would be

 4   thought of as a biker crowd?

 5        A  No, I did not.

 6        Q  Did you even ride a motorcycle?

 7        A  The last time I rode a motorcycle was the day

 8   before I found out I was pregnant with my daughter and

 9   that was on our motorcycle that he had.

10        Q  That Ray owned?

11        A  Yes.

12        Q  And then were there any other matters discussed

13   with Detective Halls on this occasion?  And specifically

14   was there a discussion about Rhonda Short?

15        A  Yes.  He told me that he had gone to L.A. and

16   visited with her.  And he said when he -- when he

17   interviewed her, she told him the story and his comment

18   was, it was -- she told it as though it had happened the

19   day before.

20        Q  Meaning it was very fresh in her mind?

21        A  Correct.

22        Q  And how long before 19- -- November of 1984 had

23   the incident between your -- your former husband and

24   Rhonda Short occurred?

25        A  About six years.
```

444

1        Q   Okay.  And what did he convey to you was Rhonda

2    Short's version of what happened between her and your

3    former husband?

4        A   That she had been raped by Ray.

5        Q   She did not have what could be described as

6    consensual sexual relations with Ray?

7        A   No.

8        Q   Okay.  And at the time this -- the sexual

9    activity between Rhonda Short and Ray had occurred,

10   would she have been legally capable of consenting to

11   sexual relations, to your knowledge?

12       A   If 17 is legal, then yes.  If 17 is not, then

13   no.

14       Q   Okay.  But she was underage; was that --

15       A   Correct.

16       Q   -- your specific recollection?

17       A   Yes.

18       Q   Okay.  Did Detective Halls discuss anything else

19   with you?

20       A   Not that I recall.

21       Q   Okay.  Is it possible he discussed anything that

22   occurred while Ray was working undercover for the

23   Vancouver Police Department?

24       A   I don't remember.

25       Q   Is that -- is it you don't remember.  It's

445

1      Q   Okay.   Were you present the entire time that she

2   was with Mr. Peters for that interview?

3      A   Yes.

4      Q   Okay.   Where did the interview start out?

5      A   It was in a room in the police department, I

6   believe, with a video camera.   And Jim, myself.   I think

7   Sharon was there for a few minutes, and then she left.

8   And then there was a police officer at the video camera.

9      Q   Was he uniformed?

10     A   He was.

11     Q   Okay.   And what do you remember about that part

12  of the interview where it was being filmed by a

13  uniformed officer?

14     A   I just remember Katie sitting on my lap.

15     Q   Okay.   Did -- at any point during that

16  interview, did you feel that Jim Peters intimidated her?

17     A   I do not.

18     Q   If he had, what would you have done?

19     A   I would have left the room with her.

20     Q   You wouldn't have allowed him to continue?

21     A   Absolutely not.

22     Q   And as I understand it, you were with her the

23  entire time that Mr. Peters spoke with her --

24     A   I was.

25     Q   -- is that right?

446

```
1            Now, was there a break where the tape was turned
2    off and the three of you moved to another location for
3    the rest of the interview?
4         A  I believe we did go to another room.
5         Q  Okay.  When that interview resumed, was the
6    uniformed officer still there operating the camera?
7         A  No.
8         Q  At any time during that break, did Mr. Peters
9    coach her with what he wanted her to say when the tape
10   was turned back on again?
11        A  Not in my presence.
12        Q  Okay.  Was she in your presence the entire time?
13        A  Correct.
14        Q  Can we conclude from that that he did not, then,
15   coach her --
16        A  Correct.
17        Q  -- at any time during that day?
18           What about you?  Did you coach her --
19        A  I did not.
20        Q  -- as to what to say?
21        A  I did not.
22        Q  Did he say -- ever say "If you tell me" -- words
23   to the effect that "If you tell me what I want to hear
24   or show me with the dolls what I want to be shown" --
25   and there were dolls used, correct?
```

447

1      A   Correct.

2      Q   -- "then you can go home" --

3      A   No.

4      Q   -- "you can leave"?

5          If he had pressured her, coached her, what would

6   you have done?

7      A   I would have walked out of the room with her.

8      Q   And then we know that -- that you and Katie and

9   he went back on tape?

10     A   Correct.

11     Q   And do you recall her demeanor changing at all?

12     A   She was much more at ease, much more

13  comfortable, little playful.

14     Q   What do you attribute that to, given the fact

15  that she wasn't comfortable in the earlier session?

16     A   The only thing I could think of was the police

17  officer was no longer in the room.

18     Q   Because he wasn't there operating the tape?

19     A   Correct.

20     Q   I'm going to hand you what has been marked as

21  Exhibit 26, which is a purported transcript of that

22  interview.

23         Can you take a look at that, please.

24         MR. FREIMUND:  Ms. Fetterly, given that's a

25  lengthy transcript, do you want to take a break while

```
 1   she's reviewing it?

 2              MS. FETTERLY:  I think that's a good idea.

 3              Is that agreeable, Ms. Zellner?

 4              MS. ZELLNER:  That's fine.

 5              THE VIDEOGRAPHER:  Okay.  We're going to go off

 6   the record.  It's 10:57 a.m.

 7                   (Brief recess.)

 8              THE VIDEOGRAPHER:  Okay.  We're back on the

 9   record.  It's 11:10 a.m.

10   BY MS. FETTERLY:

11        Q  Ms. Spencer, referring, again, to the interview

12   that took place in your presence of your daughter by Jim

13   Peters on December 11th, 1984.

14           Were -- in your recollection, were -- as being

15   present throughout the entire interview, were any of

16   Katie's responses non-verbal such as the shake of the

17   head no or a shake of the head yes?

18        A  Many of them.  Excuse me.  Many of them.

19        Q  In fact, were the majority of her responses

20   non-verbal?

21        A  That's correct.

22        Q  Were there also non-verbal responses where in

23   response to questioning she would place the dolls in one

24   position or another?

25        A  She did at one point.
```

449

```
 1   three of us.

 2        Q   Okay.  Did you feel Mr. Peters was intimidating

 3   her at any point during that interview?

 4        A   No.

 5        Q   And that would be in the first part where he's

 6   sitting in a chair and she's -- you're in a chair and

 7   he's on your lap -- or she's on your lap; is that

 8   correct?

 9        A   Yes.

10        Q   And what about the second part of the interview

11   when the three of you were on the floor?  Did you

12   believe he was intimidating her?

13        A   No.

14        Q   And if you had felt that at any point he was

15   intimidating her, what would you have done?

16        A   I would have left the room with her.

17        Q   I want to now move forward to the time frame

18   March of 1985.  Records document that Sharon Krause

19   interviewed Katie and interviewed Matt -- interviewed

20   them separately on March 25th, 1985.

21        Do you recall why those interviews had been

22   scheduled?

23        A   I don't know.  Excuse me.  No, I don't recall

24   the date.

25        Q   And you don't recall the reason those were being
```

450

```
 1   scheduled?

 2       A   My recollection of timeline is, you know -- is

 3   skewed.   I can -- I remember a couple of incidents,

 4   but --

 5       Q   Let me just ask this:   By this time, by March of

 6   1985, had there been some allegations, information

 7   conveyed to you that Matt Hanson, Shirley's Spencer son,

 8   had accused Ray Spencer of sexual abuse?

 9       A   Yes.

10       Q   Do you think that could have prompted -- the new

11   allegations could have prompted these new interviews by

12   Detective Krause in March of 1985?

13       A   Yes.  That's one of the memories I have of that

14   particular incident.   I just didn't have the date.

15       Q   Okay.   And if the record showed that Matt Hanson

16   made disclosure mid to late February and into early

17   March of 1985, that would make sense why Sharon Krause

18   was interviewing your children again on March 25th,

19   1985?

20       A   Correct.

21       Q   Okay.   And -- on this occasion, how did the

22   children get to Vancouver?   You talked about being flown

23   up in December, but you and Katie were flown by Clark

24   County when she was interviewed by Jim Peters.

25           Do you recall how the three of you, meaning
```

451

```
 1        A   Yes.

 2        Q   And, now, directing your attention to the

 3   following months, now going into May.

 4            Was it your understanding that the case against

 5   your former husband had been amended to include

 6   allegations that he had abused his stepson, Matt Hansen,

 7   as well as your son --

 8        A   Correct.

 9        Q   -- Matt?

10        A   That's correct.

11        Q   Okay.  And I want to direct your attention to

12   the day before May 9th, 1985.  Did Matt make any

13   statements to you that you found unusual?

14        A   He did.

15        Q   Your son, Matt, now, I'm talking about.

16        A   Yes.  Yes, he did.

17        Q   What were the circumstances when he made the

18   statement to you the day before May 9th of 1985?

19        A   It was the day before Jim Rule and Jim Peters

20   were coming to Sacramento to meet with the children in

21   preparation for trial, which was supposed to be two

22   weeks later, I believe.

23        Q   Who is Jim Rule?

24        A   I believe he was Ray's attorney.

25        Q   Okay.  So you knew they were coming?
```

452

```
 1        A   Yes.

 2        Q   Okay.

 3        A   And it was -- we were meeting with them the next

 4   day.  But that night --

 5        Q   Take your --

 6        A   -- I was at my aunt's house.  And she has a hot

 7   tub outside, but I was inside talking with her.  And

 8   Matthew kept coming in saying, "Mommy, Mommy.  Come out

 9   to the tub.  Come out to the hot tub."  And I kept

10   telling him "I will."

11        Q   You were thinking he just wanted you to come out

12   and see him in the hot tub?

13        A   And I was trying to have a conversation with my

14   aunt.  So he was so persistent that I finally said,

15   "Okay."  It was about 30 minutes later.  "Okay.  I'm

16   coming."  I went out -- the minute I got into the tub,

17   he says, "Mommy, some of daddy's friends did that, too."

18   And I said, "That's very brave of you to be able to say

19   that.  Can you tell me who they were?"

20             "No.  Ask little Matt.  Ask little Matt."  I

21   said, "Okay."  I asked -- I think I asked him a couple

22   of other questions, but his response was "Ask little

23   Matt.  Ask little Matt."

24        Q   And what did you think when Matt -- your son,

25   Matthew, made the statement to you -- which appears to
```

453

1    be totally spontaneous?

2         A   Yeah.

3         Q   Was it in response to questions from anybody?

4         A   No.

5         Q   And the last time he'd been questioned by

6    anybody about this had been six weeks earlier when he

7    spoke with Sharon Krause; is that right?

8         A   Correct.

9         Q   What did you take of these comments?

10        A   I, again, was devastated and just -- I believed

11   him.   And I actually didn't know what to do with it.   I

12   was very thankful that I had a therapist because that's

13   who I was able to contact and --- I'm sorry.

14        Q   Go ahead.   Take your time.   Do you need to have

15   some water or --

16        A   No.   I'm okay.   Thank you.

17        Q   Now, you said the next day your children were

18   scheduled to be interviewed by Mr. Rule; is that

19   correct?

20        A   Mr. Rule and Mr. Peters.

21        Q   And was this the only occasion that Mr. Peters

22   interviewed your son, Matthew?

23        A   That I recall, yes.

24        Q   You don't recall any interview similar to the

25   one he did with Katie where he was alone with him.   It

454

```
 1   was possibly just you present?

 2        A   No.

 3        Q   And where did the interviews take place on May

 4   9th, 1985?

 5        A   It was here in Sacramento.  I believe it was at

 6   Juvenile -- the Juvenile Division.  Somewhere there.

 7        Q   And did you drive your children to that

 8   appointed time --

 9        A   I did.

10        Q   -- at the appointed time?

11            And did you meet -- you already knew Mr. Peters,

12   I take it?  You met him when you were in Vancouver with

13   Katie in December?

14        A   Correct.

15        Q   Is that the only time before May 9th that you'd

16   met Mr. Peters --

17        A   Correct.

18        Q   -- or had any communication with him whatsoever?

19        A   Correct.

20        Q   And had you ever met Mr. Rule before?

21        A   No.

22        Q   But I take it you knew who he was?

23        A   Yes.

24        Q   Okay.  And did you feel -- you understood that

25   in order to defend his client, meaning -- his client
```

455

```
 1   then being Ray Spencer, that Mr. Rule had asked to

 2   interview your children --

 3        A  Yes.

 4        Q  -- is that correct?

 5           Did you give him permission to interview your

 6   children?

 7        A  I did.

 8        Q  Okay.  And did you ask that the prosecutor be

 9   present as well?

10        A  Yes.

11        Q  And that request was honored?

12        A  Yes.

13        Q  Did you attend the interviews with the two

14   lawyers and your children?

15        A  I believe they were in a room with a glass

16   window, and I was seated outside in the waiting area.

17        Q  And do you remember either of your children

18   expressing any hesitation about speaking to their

19   father's lawyer and to Mr. Peters on this occasion?

20        A  No.

21        Q  Okay.  When -- after you were -- met Mr. Peters

22   again --

23           And I take it you had to be introduced for the

24   first time to Mr. Rule?

25        A  Correct.
```

456

1        Q    -- was that presumably done by Mr. Peters, that

2    introduction?

3        A    Yes.

4        Q    Did you say anything about what Matt had stated

5    to you in the hot tub, the prior evening?

6        A    I did.

7        Q    And were your children present when you made

8    this statement?

9        A    Yes.

10       Q    Okay.  What did you say?

11       A    I just said that I had some good news and some

12   bad news.  And then I told them that Matthew told me

13   that several of his dad's friends had done that, too.

14       Q    And by "done that," what were you referring to?

15       A    Had had inappropriate relations or had -- had

16   messed with him.

17       Q    Had sexual contact?

18       A    Yes.

19       Q    Okay.  In other words, not just touching them in

20   a physical manner but touching them improper --

21       A    In a sexual manner, yes.

22       Q    In a sexual manner.

23            And what did you mean by you said you had some

24   good news and some bad news.  Why did you use that

25   phrase?

457

```
 1          A  Well, I guess it would be good news for the

 2   prosecutor and bad news for the defense attorney.

 3          Q  Then did the interviews take place with your

 4   children?

 5          A  Yes.

 6          Q  Were they done separately?

 7          A  Yes.

 8          Q  And other than watching through the glass, you

 9   didn't participate, I take it?

10          A  No.

11          Q  Okay.  And when they came out of the interview

12   room, first of all, Matt, did he say anything to you

13   about the interview?

14          A  I don't recall.

15          Q  Did he say anything to you that he felt

16   pressured by Jim Peters?

17          A  No.

18          Q  And in observing the interviews through the

19   glass, if you'd seen something that made you

20   uncomfortable, that either lawyer was pressuring either

21   of your children, what would you have done?

22          A  I would gone in and taken them out.

23          Q  They were interviewing them with your consent, I

24   take it?

25          A  Correct.
```

458

1    Q   Okay.   And then after the lawyers left and went

2  back to Washington, what was the next thing you heard

3  about the case?

4    A   I recall that we were -- we went up there one

5  more time in preparation for trial.   And at some point

6  prior to that, we were told that there wouldn't be a

7  trial.   He had pled guilty.

8    Q   Meaning you were planning to go back up?

9    A   Yes, we were planning -- because that was two

10  weeks before trial.

11    Q   The interview on May 9th was?

12    A   Yes.

13    Q   But I take it you didn't actually end up going

14  back for more trial prep -- preparation?

15    A   No.   We were actually going up for trial.

16    Q   For trial?

17    A   That didn't take place.

18    Q   Okay.   And do you know why the trial didn't take

19  place?

20    A   I was told because he pled guilty.

21    Q   And how long -- approximately how long after the

22  May 9th interview with Mr. Rule and Mr. Peters did you

23  learn that Ray Spencer was pleading guilty?

24    A   It seems like it was within a couple of weeks.

25    Q   Okay.   Fairly short time?

459