UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENDER, MATTHEW               )NO. C11-5424BHS
RAY SPENDER, and KATHRYN E.              )
TETZ,                                    )
                                         )
                    Plaintiffs,          )
vs.                                      )
                                         )
FORMER DEPUTY PROSECUTING ATTORNEY       )
FOR CLARK COUNTY JAMES M. PETERS,        )
DETECTIVE SHARON KRAUSE, SERGEANT        )
MICHAEL DAVIDSON, CLARK COUNTY           )
PROSECUTOR'S OFFICE, CLARK COUNTY        )
SHERIFF'S OFFICE, THE COUNTY OF          )
CLARK and JOHN DOES ONE THROUGH          )
TEN,                                     )
                                         )
                    Defendants.          )
                                         )
_____

COPY

VIDEOTAPED/VIDEOCONFERENCED DEPOSITION OF:

WILLIAM BERNET, M.D.

Taken on Behalf of the Defendant/Michael Davidson

December 4, 2012

VOWELL & JENNINGS, INC.
Court Reporting Services
207 Washington Square Building
214 Second Avenue North
Nashville, Tennessee 37201
(615) 256-1935

EXHIBIT I

460

1        The videotaped/videoconferenced deposition

2    of WILLIAM BERNET, M.D., taken on behalf of the

3    Defendant/Michael Davidson, on the 4th day of

4    December, 2012, at 2:11 p.m., in the offices of

5    Vowell & Jennings, Inc., 214 2nd Avenue North,

6    Suite 207, Nashville, Tennessee, 37201, for all

7    purposes under the Rules of Civil Procedure.

8        The formalities as to notice, caption,

9    certificate, et cetera, are waived.  All

10   objections, except as to the form of the

11   questions, are reserved to the hearing.

12       It is agreed that Deborah J. Harris, being

13   a Notary Public and Court Reporter for the

14   State of Tennessee, may swear the witness, and

15   that the reading and signing of the completed

16   deposition by the witness are reserved.

17              * * *

18

19

20

21

22

23

24

25

461

```
 1        behalf of the Plaintiff.
 2             MR. FREIMUND:  Jeff Freimund,
 3        F-R-E-I-M-U-N-D, on behalf of Defendant Michael
 4        Davidson.
 5             MS. FETTERLY:  Patricia Fetterly on behalf
 6        of Defendant James Peters.
 7             MR. BOGDANOVICH:  Guy Bogdanovich on
 8        behalf of Defendant Sharon Krause.
 9             THE VIDEOGRAPHER:  Thank you.  Would the
10        court reporter please swear in the witness.
11                  WILLIAM BERNET, M.D.
12   was called as a witness, and after having been first
13             duly sworn, testified as follows:
14                      EXAMINATION
15   QUESTIONS BY MR. FREIMUND:
16        Q    Dr. Bernet, would you please state your
17   full name for the record and spell your last name.
18        A    My name is William Bernet, B-E-R-N-E-T.
19        Q    What is your professional address,
20   Dr. Bernet?
21        A    It's 209 Oxford House, Vanderbilt
22   University, Nashville, Tennessee.
23        Q    And the ZIP code there, please?
24        A    It's -- the university ZIP code is
25   37232-4245.
```

462

1           To what extent, if any, have you ever been

2     or acted as a front-line field investigator of child

3     sexual abuse, where you're one of the officials like

4     a police officer or child protective service worker

5     or the like, who conducts the initial formal

6     interview of a suspected child abuse victim?

7           A     I have never been an official interviewer

8     for the forensic interview although there have been

9     times when I did the initial interview simply

10    because I was the one who identified that child

11    abuse was happening.

12          Q     And in what capacity were you the one in

13    which you first identified child abuse was

14    happening?  Were you a psychiatrist for the child or

15    what was the context, please?

16          A     Let's see.  One that comes to mind is I

17    was conducting a custody evaluation, and I

18    discovered that it seemed likely or at least

19    possible that child abuse had occurred.

20          Q     Okay.  Any other time where you've been,

21    to your knowledge, the first formal interviewer of a

22    child sexual abuse victim other than that one time

23    you just referenced?

24          A     Not that I can think of right now.

25          Q     And it's safe for me to assume, sir, that

463

1    you've never been a police officer or a child

2    protective service investigator?

3         A    That's correct.

4         Q    Okay.  Have you ever provided training to

5    front-line field investigators?  And when I use that

6    term front-line field investigators, I'm speaking of

7    police officers, CPS workers, and the like, who as

8    part of their duties are engaged in the first formal

9    interviews of suspected child sexual abuse victims?

10        A    I have given presentations on evaluating

11   children who may have been abused.  I don't think

12   it's in the context that you're thinking of, but it

13   was the kind of thing where mental health people or

14   social workers, for instance, could have been in the

15   audience.  But I have never done training

16   specifically for a group of policemen or a group of

17   child protection workers.

18        Q    Okay.  The trainings that you've typically

19   provided, are those typically to psychiatrists

20   and/or psychologists?

21        A    Yes.

22        Q    Were you providing training to anybody

23   about child interviewing techniques during the 1984

24   to 1985 time period?

25        A    Well, I'm trying to reconstruct where I

464

```
 1    would have been then.  I was living either in
 2    Washington, D.C., or nearby in Virginia.  And so I
 3    was supervising child psychiatry trainees and adult
 4    psychiatry trainees.  So that topic may well have
 5    come up.  And I may have given presentations by that
 6    point at meetings -- at professional meetings on
 7    this topic.  I mean, if I knew you were going to ask
 8    me, I could go back.  I mean, I have a list of
 9    presentations that I have given, but I don't have
10    that with me.
11         Q    That's in your resume --
12         A    No, it's --
13         Q    Your CV?
14         A    No.  All the presentations that I have
15    ever given are not in my CV.  They're in another
16    document.
17         Q    Okay.  Would you agree that you do not
18    have any knowledge or expertise or opinion about
19    what training was being provided to front-line field
20    investigators before or during the time frame of
21    1984, 1985?
22         A    That's correct.  I'm not familiar with
23    specific curricula or specific training programs
24    during that time.
25         Q    All right.  Am I correct, sir, that in
```

465

```
 1    your initial written report that you prepared in

 2    this case for Ms. Zellner, you were not really

 3    focusing on the standards applicable to child

 4    interviewing techniques that -- to the extent they

 5    existed during the 1984 and 1985 time frame, and in

 6    your supplemental report, you kind of first started

 7    focusing on that time frame; is that a fair

 8    understanding of the difference between your two

 9    reports?

10         A    Yes.

11         Q    Why was it in your second that you focused

12    for the first time on the 1984 and 1985 time frame?

13         A    What happened was that I believe

14    Ms. Zellner received the report of Dr. Phillip

15    Esplin which made some attempt to address that

16    topic, and then she asked me to read his report.

17    And so to some extent what I was commenting on was

18    responding to his report.

19         Q    Okay.  Are you familiar with Dr. Esplin?

20    I mean, have you read his works and have some

21    knowledge about his expertise?

22         A    Yes.

23         Q    Would you regard him as a person who does

24    have expertise in interviewing suspected victims --

25    suspected child victims of sexual abuse?
```

466

1      A     Yes, he does.

2      Q     Would you also regard him as an expert in

3  kind of the evolution in the field regarding the

4  techniques that are used by investigators of child

5  sexual abuse?

6      A     I don't know if he is or not.  I know that

7  he discussed that topic in the statement he made --

8  or the report he made, but I don't know if he's an

9  expert in that.

10      Q     Do you record yourself as an expert in the

11  evolution or history of techniques in child

12  interviewing?

13      A     I guess it depends on your definition of

14  expert.  I don't think I'm an authority in that

15  field, but I would probably be considered an expert

16  simply because it's part of training and in general

17  of conducting forensic evaluations of children.

18      Q     Would you agree that back in the 1984 and

19  1985 time frame, there was no commonly accepted

20  script for use by field investigators when

21  conducting interviews of suspected child sexual

22  abuse?

23      A     I don't know if there was.

24      Q     Do you know if there is one to this day?

25      A     Oh, there are several different protocols

467

1    for conducting interviews that I'm aware of.  One is

2    called the RATAC, R-A-T-A-C.  And one is produced by

3    a government agency called the NICHD interview

4    protocol.  And there may be others.  So I know there

5    are protocols now.

6        Q    All right.  Are you aware of whether the

7    NICHD protocol was authored in part by Dr. Esplin?

8        A    Yes, I think he participated in that.

9        Q    Would you agree, sir, that none of those

10   protocols that you just referenced were in existence

11   during 1984-1985 time frame?

12       A    Yes, I believe that's correct.

13       Q    Would you agree that there is no clear

14   protocol or script, if you will, for how to avoid

15   asking leading or suggestive questions during the

16   course of a child sex abuse interview during the

17   time frame of 1984 to 1985?

18       A    I don't know if there was.

19       Q    What's your definition of a leading

20   question?

21       A    Well, here.  I'll compare what I think --

22   at least what I consider a suggestive question with

23   a leading question.  A suggestive question is when

24   the interviewer says, Did Uncle Joe touch your

25   private part?  Because it suggests that Uncle Joe

468

1    may have done something.  A leading question would

2    be to the effect, Didn't Uncle Joe touch your

3    private part?

4            So that's the distinction that I make.  I

5    don't know.  I think other people don't even make

6    that distinction but they consider them the same

7    thing.

8        Q    I understand those are examples of them,

9    but -- but can you give me a definition for a

10   leading question?

11       A    Well, to make the comparison again, a

12   suggestive question has the answer embedded

13   somewhere in the question as a proposed answer.  A

14   leading question not only has the answer embedded in

15   the question, but it's asked in such a way that the

16   person who is being asked the question is expected

17   to give that answer.  There's an ex -- a leading

18   question has an expectation in it that's higher than

19   what's in a suggestive question, at least in the

20   distinction that I'm making.

21       Q    Back in the 1984 or 1985 time frame, do

22   you think those definitions you just provided were

23   clearly established and known by field investigators

24   conducting child sex abuse interviews?

25       A    I don't know, as I said before, exactly

469

1   what training people would have had.   But I think

2   that the problem of asking leading and suggestive

3   questions has been known for many, many years.   I

4   don't know how it was defined or what the

5   instructions may have been for field investigators.

6   But I think the problem, the concept of leading and

7   suggestive questions, has been known for a hundred

8   years.

9        Q    Would you agree, though, Dr. Bernet, that

10   one of the difficulties that academicians struggled

11   with, and to some extent I think still do, is

12   defining what constitutes leading or suggestive

13   questions in the context of conducting interviews of

14   suspected child abuse victims?

15        A    I don't know that there's difficulty.   I

16   think that there's a difficulty sometimes in

17   actually conducting the interview.   But I don't know

18   that there's difficulty in defining what a

19   suggestive question is -- at least I haven't heard

20   that.

21        Q    Okay.   Are you familiar with the article

22   that was written by Roland Summit in 1983 -- or it

23   was published in 1983, I should say more accurately,

24   entitled, "The Child Sexual Abuse Accommodation

25   Syndrome"?

470

1    would disagree with that.

2        Q    Do you think back in the 1983 to '85 time

3    frame that most people would have disagreed with

4    that number that he was saying, that no more than

5    two or three per thousand children have been found

6    to exaggerate or invent claims of sexual

7    molestation?

8        A    I'm quite sure that there would have been

9    discussion and disagreement about that statement,

10   but I really don't know -- I don't know whether most

11   people would have disagreed with it.  I think that

12   would have been --

13       Q    In fact -- I'm sorry?

14       A    I think that would have been a statement

15   that some people would have challenged or disagreed

16   with, but I -- I really don't have any way to know

17   whether the majority of professionals would have

18   done that.

19       Q    Well, the next sentence immediately after

20   that one I just quoted you from Roland Summit's

21   article reads as follows, quote:  "It has become a

22   maxim among child sexual abuse intervention

23   counselors and investigators that children never

24   fabricate the kinds of explicit sexual manipulations

25   they divulge in complaints or interrogations," end

471

1     quote.

2              Would you agree with that observation by

3     Dr. Summit that, at least back in 1983, it was a

4     maxim, M-A-X-I-M, among investigators that children

5     don't lie when they provide explicit details of

6     sexual abuse?

7        A     I think that most people would agree that

8     it would be unusual for a child to knowingly lie,

9     but that sometimes they did.  And -- and -- and I

10    think that most people would have been aware that --

11    that children may have come to wrongly believe that

12    something happened.  In other words, I think in the

13    1980s and before that, it was understood that the

14    child isn't necessarily knowingly lying but the

15    child might be representing something that is not

16    correct because of the way the child had been

17    previously questioned.  In other words, the child

18    might be unknowingly giving a false statement.

19       Q     Understood.  Would you agree though, sir,

20    that the vast majority -- and I am speaking from the

21    perception of the field investigator, just so we can

22    be clear on that, not as a psychiatrist or

23    psychologist.

24             But from the perspective of a field

25    investigator, wouldn't you agree that most field

472

1    say.

2        Q    Back in the 1984-1985 time period, would

3    you agree that during that time frame, it was kind

4    of generally accepted that the anatomically correct

5    dolls could be used as a diagnostic tool as well as

6    a -- as -- as the other tool you were referencing?

7        A    I don't know when that distinction was

8    made and when that clarification was made.

9        Q    Okay.  Your article goes on to talk about

10   false denials, that it's not -- would you agree,

11   sir, that it is not unusual for a child to make a

12   false denial of sexual abuse?  In other words, when

13   sexual abuse topics are discussed with a child, it's

14   not uncommon for a child, at least initially, to

15   deny that any abuse occurred when it is later

16   determined that, in fact, sexual abuse did occur?

17       A    Yes, I would agree that that happens.

18       Q    Would you agree that it happens quite

19   frequently, that more often than not children will

20   initially deny abuse?

21       A    Oh, I don't know the exact numbers.  I

22   don't know that it happens more likely than it

23   doesn't happen, but I would certainly agree that

24   it's common for it to happen.

25       Q    All right.  And when a child initially

473

1    denies abuse, is it your view that at that point a

2    child interview should stop, recognizing that it's

3    common for children to initially deny abuse?

4        A    I think it would depend on the overall

5    circumstances of the evaluation.  It would depend on

6    what other information the person has.  You would --

7    you would collect information, for instance,

8    about -- from other sources, collateral sources,

9    about exactly how the suspicion even arose.  And if

10   there was a strong basis for the suspicions in the

11   first place, then there might be a reason to go

12   ahead with the interview and try other methods with

13   the child or perhaps meet with the child on a --

14   again.

15            But if the original basis for the

16   suspicion was very, very small, then you might

17   simply go with the denial and say, you know, there

18   is very little suspicion in the first place and now

19   the child is making a denial so there's no reason to

20   go ahead.

21       Q    Just based on that answer, sir, would you

22   agree that a field investigator like a police

23   officer or a CPS worker attempting to interview a

24   suspected victim of child sexual abuse has to make

25   numerous judgment calls during the course of a

474

```
 1    guilty, polygraph results.
 2             MS. ZELLNER:  I'm going to object to --
 3         let me interject -- wait, wait, wait.
 4         Let me interject an objection, okay,
 5         because it's an incomplete hypothetical, it
 6         calls for speculation.  You can answer it,
 7         Doctor, if you understand the question.
 8             THE WITNESS:  Well, I think I do.  And I
 9         think I would agree that it is possible that
10         even a very poorly conducted interview might
11         conceivably produce an accurate statement of
12         what happened.  It's theoretical -- it is
13         theoretically possible for a very bad interview
14         to have an accurate result.  But the problem is
15         you have no way to know it.  I mean, that's
16         the -- that's -- of course, the problem is when
17         you're done with the very bad interview, you
18         have no way to know whether the statement is a
19         result of the interview or a result of
20         something that actually happened.
21    BY MR. FREIMUND:
22         Q    And that's -- that's your view in this
23    case, I take it then, that you have no way of
24    knowing whether the statements made by the children
25    in this case were accurate recounts of what actually
```

475

1    happened versus something that may not be accurate?

2         A    I don't -- based on what I reviewed, I

3    don't have enough information to have an opinion

4    about that.   I think there is too much missing

5    information to know, at least for me to have an

6    opinion about that.

7         Q    Okay.   I'm reading a little bit further in

8    your article entitled "Practice parameters for the

9    Forensic Evaluation of Children and Adolescents Who

10   May Have Been Physically or Sexually Abused" that is

11   dated March of 1997.   And there under the heading of

12   "The Child's Credibility" on page 431, can I direct

13   your attention to that portion of your article,

14   please.

15        A    Yes.

16        Q    Near the -- in that first paragraph,

17   you're talking about some studies that listed

18   factors that were thought to show enhanced

19   credibility.   One of them was the child uses his or

20   her own vocabulary rather than adult terms and tells

21   the story from his or her point of view.   And

22   another is the child reenacts the trauma in

23   spontaneous play.

24             Do you see where I'm referring to there?

25        A    Yes.

474

1      questions.  I think the next day, there was an

2      opportunity.  They went to the beach or something.

3      And Ms. Spencer said that she was interested to get

4      even more information, so she went back and asked

5      more questions.  And so we don't know exactly what

6      happened in that conversation.  And for instance,

7      specifically we don't know whether Ms. Spencer could

8      have been suggesting acts to Kathryn.

9           Q    Based on what we do know from reviewing

10     what she wrote in her description of what happened

11     on the occasion she was speaking to Kathryn Spencer

12     about these issues, what -- do you fault anything

13     that she records in that written statement?

14          A    Well, I don't know what you mean by

15     "fault," I mean -- because we don't know what really

16     happened, and she doesn't spell out what really

17     happened.

18               So I guess I would fault her lack of

19     sufficient detail as to what happened in the

20     conversation to really be able to assess the

21     conversation.

22          Q    Would it be fair to say based on that

23     answer that you cannot say whether or not Shirley

24     Spencer used leading or suggestive or coercive

25     interview techniques when she was speaking with

477

1    Kathryn Spencer after Kathryn Spencer allegedly

2    attempt to touch her private areas?

3       A     That is correct.  We do not know whether

4    Ms. Spencer used that kind of questioning.

5       Q     Are you aware that Kathryn Spencer later

6    disclosed sexual abuse to her therapist?

7       A     Well --

8       Q     Before she was interviewed by -- before

9    she was interviewed by Detective Krause?

10       A     Yes, I mean I -- yes, I have heard that.

11    We don't, of course, know what really happened in

12    those conversations either.

13       MS. ZELLNER:  I want to interject an

14       objection.  That misstates the evidence.

15       THE REPORTER:  Was that Ms. Zellner?

16       MS. ZELLNER:  Yes.

17    BY MR. FREIMUND:

18       Q     So you would agree, would you not,

19    Dr. Bernet, that you cannot -- you do not have an

20    opinion that the therapist for Kathryn Spencer used

21    leading or suggestive or coercive interview

22    techniques when Kathryn Spencer disclosed sexual

23    abuse by her father to that therapist?

24       A     I think I understand your question.  I --

25    and it's that I -- I don't know what happened in

478

1    those therapy meetings.  So I don't know whether

2    that kind of questioning occurred.

3         Q     Okay.  Do you know what kind of

4    questioning occurred by the Sacramento Police

5    Department, Detective Flood, when he questioned both

6    Kathryn Spencer and Matthew Spencer before they were

7    interviewed by Detective Krause?

8         A     No, I don't know what questioning occurred

9    there.

10        Q     So once again, based on your lack of

11   knowledge, you can -- you have no opinion one way or

12   another whether he used suggestive, leading or

13   coercive interviewing techniques, correct?

14        A     Yes.

15        Q     You indicated in your article -- I'm just

16   going down a little further on that same section

17   entitled "Child's Credibility."  I think it's --

18   well, it's at the very bottom before you start the

19   next section on physical examination of children who

20   may have been abused.  And the last two sentences

21   before you start that next section, you say that

22   these criteria that you've just gone through for

23   assessing credibility have been based on clinical

24   experience and on limited preliminary research --

25   and again, we're talking 1987 -- 1997 when you were

479

1    writing this -- and that "it should not be -- be

2    taken to be infallible and could be misunderstood or

3    misused."

4           Could you explain a little bit what you're

5    trying to say there, or just elaborate a little bit

6    on what you're saying there, please.

7    A    I think that even now assessing

8    credibility in this kind of circumstance, you can't

9    do it by just taking one little piece of what

10   happened, one little statement that the child said

11   or the way the child said it, that you have to make

12   a list of a number of different factors, and that no

13   one of them is -- usually, no one of them is

14   determinative.  But you somehow have to combine the

15   information from these different factors.

16   Q    Okay.  The last sentence in there, you

17   said:  "Finally, it should be noted that a child's

18   spontaneous statement made while he or she was

19   emotionally upset may have substantial value later

20   in court."  And you cite a 1992 case.

21          What are you referring to there, please?

22   A    I don't know what the case was at this

23   point.

24   Q    Well, that's fine.  I meant more what was

25   the point you were trying to make?

480

1     Q    You don't happen to have that before you?

2     A    I have it.

3     Q    I understand if you don't.

4     A    I have it somewhere here, yes.  I have it

5 with me.

6     Q    You do have it with you?

7     A    Yes.  Do you want me to find it?

8     Q    Yes.  If it would be fairly easy for you

9 to locate.

10    A    I have her written statement.

11    Q    Okay.  And look -- looking at that, I

12 would -- I'll just go back to my prior question.

13 And that is, would you agree that Kathryn Spencer's

14 initial disclosure of sexual abuse by her father and

15 others to Shirley Spencer as described by Shirley

16 Spencer in that document would fit in the category

17 of a spontaneous disclosure of sexual abuse?

18    A    Okay.  It looks like to me that the first

19 statement made by Kathryn suggesting abusive

20 behavior is halfway down the second page where she

21 says -- well, actually it says here she again said.

22 It says:  "She again said Karen and my mommy let me

23 rub their titties and pee-pee."

24     So I'm not -- that says again.  I'm not

25 sure if she said that earlier.  I cannot find that

481

1   touch her genital area.  And Ms. Spens -- Shirley

2   Spencer said, You're not supposed to do that.  So

3   the child feels reprimanded.  She feels that she

4   either did something wrong or she thinks she did

5   something wrong.

6        And the child then says, Oh, somebody else

7   did this.  I did this with somebody else.  Somebody

8   else let me do this.  In other words, that's not

9   spontaneous.  That is in reaction to the child's

10  feeling that she is in some kind of trouble.  And

11  she defends herself or she deflects the blame, if

12  there is any blame, from herself doing things that

13  are bad to somebody else.  And she ends up in the

14  next few minutes blaming her mother, this woman

15  named Karen, and ultimately her father, that they

16  all had been touching her because she's being

17  criticized for too much touching.  So that -- that's

18  not what I would consider spontaneous.

19      Q    Okay.  Would you consider that sexualized

20  behavior by Kathryn Spencer to touch Shirley

21  Spencer's breasts and attempt to touch her genital

22  area?

23      A    Oh, it's certainly sexualized behavior.

24  And she reportedly had been masturbating.  Her

25  mother described her as masturbating a lot.  And so

482

1   her mother.

2         So she did manifest -- as far as I can

3   tell, she did manifest more sexualized behavior than

4   an average child.  But I really don't know whether

5   it's enough that I would consider it, you know,

6   pathological.

7      Q   Would you consider it a red flag that she

8   might be a victim of sexual abuse?

9      A   Yes, I would consider it a -- a -- a --

10   well, that she's been exposed to something that

11   she -- or else possibly that -- that she was not

12   parented well regarding this topic.  For instance,

13   maybe --

14      Q   Who was it?  Do you -- I'm sorry.  Go

15   ahead.

16      A   Maybe when she was masturbating back home

17   where she lived with her mother most of the time,

18   maybe her mother didn't handle it very well.  Maybe

19   as a result, she did it even more and then she got

20   even more interested and did other sexualized

21   behavior.  In other words, I don't -- we don't know

22   enough about the history to know what it's a red

23   flag of.

24      Q   But it is a red flag of something?

25      A   Yeah, it's -- it's a flag in the sense

483

1          A     Yes, that's correct.

2          Q     Okay.  I want to go a little bit further

3     in your article that we've been looking at.  The

4     same page where you talk about physical examination

5     of children who may have been abused.  And then at

6     the bottom of that first paragraph there, you say

7     quote:  "In most cases of sexual abuse, there are no

8     abnormal physical findings.  In Adams, et al 1994

9     study, the genital examination in sexually abused

10    girls was clearly abnormal in only fourteen percent

11    of the cases."

12              Does that -- does that continue to be your

13    understanding, sir, that even in cases where it's

14    known that a child -- a girl was sexually abused,

15    it's very rare that there will be abnormal physical

16    findings in a medical examination?

17         A     It depends, I think, on what the abuse

18    was, what the nature of the abuse was.  Certainly,

19    if the abuse was fonding, then it would be very

20    unlikely that there would be abnormal findings.  If

21    the sexual abuse was penetration -- was vaginal

22    penetration, then it's more likely that there would

23    be findings.

24         Q     How much more likely?  Do you know?

25         A     No.

484

1          Q     I'm just -- I'm just wondering about this

2     quote you -- in this -- in your article where you

3     said the genital examination in sexually abused

4     girls was clearly abnormal in 14 percent of those --

5     in 14 percent of cases.

6                Do you know whether or not that 14 percent

7     is referring to cases in which sexual intercourse

8     was alleged?

9          A     At this point, I don't.

10         Q     Okay.  Do you have any reason to believe

11    that -- that the percentage of cases in which sexual

12    intercourse is alleged that result in normal genital

13    examinations is anything greater than 14 percent?

14         A     I don't know.

15         Q     Okay.  I'm jumping forward in your article

16    now, sir, where starting on page 433, you have an

17    outline of practice parameters for the forensic

18    evaluation of children and adolescents who may have

19    been physically or sexually abused.  And there's a

20    lot of stuff in there at the beginning that I don't

21    know, at least in my eyes, isn't particularly

22    important to the issues in this case.

23                But I would like to start under the

24    diagnostic assessment.  Under subsection A1 there,

25    you said that it's important to obtain the history

485

1    and how the allegation originally arose and

2    subsequent statements that were made.

3            Along that line, sir, would you agree that

4    the earliest interview of a child oftentimes has the

5    most credibility?

6    A    Well, I certainly have heard that, that

7    the earlier -- the sooner the interview is after the

8    actual abuse, the more likely -- the more accurate

9    is the report.  I mean, I have heard that and it

10   seems logical that that would be the case.

11   Q    All right.  Let's go down a little further

12   then, please.  Under subsection 4, you talk about

13   symptoms and behavioral changes that sometimes occur

14   in sexually abused children.  Under category B

15   there, or item B, you speak of disassociative [sic]

16   reactions and hysterical symptoms, such as periods

17   of amnesia, daydreaming, trance-like states,

18   hysterical seizures, and multiple personality

19   disorders.

20           Would you agree, sir, that at least some

21   victims of child sexual abuse will report that they

22   have no memory of it or amnesia about it?

23   A    Yes.  I believe that that's been

24   described.

25   Q    Would you agree that one explanation of

486

1   that may be that in the course of being traumatized,

2   if you will, by a sexually abusive act, some

3   children disassociate and, in the vernacular, check

4   out as a protective response?

5       A    Yes, that's correct.  The word is actually

6   dissociate.

7       Q    I apologize if I mispronounced that.

8   Sorry.

9           You go on to describe other symptoms and

10  behavioral changes that sometimes occur in sexually

11  abused children under subsection D there.

12  Disturbances in sexual behaviors, including sexual

13  hyperarousal manifested by frequent or open

14  masturbation, excessive sexual curiosity, imitating

15  intercourse, inserting objects into vagina or anus,

16  sexual promiscuity, and sexually aggressive behavior

17  towards others, or age-inappropriate sexual

18  knowledge.

19          Would you agree, sir, that Kathryn Spencer

20  displayed some of those behaviors, or maybe more

21  accurately, several of those behaviors you just

22  listed there?

23      A    Well, let's see.  We have information that

24  she engaged in frequent masturbation.  And I guess

25  you would call it sexually aggressive behavior

487

1       toward others in that she attempted to touch the

2       breasts and genital area of her stepmother.  I don't

3       actually know whether she had age-inappropriate

4       sexual knowledge.  I know that -- I know she

5       described things that young children don't know

6       about usually, but I don't -- I don't know how she

7       came about to describe those things.

8            Q    Would you agree from the descriptions,

9       among other things, attempting to touch Shirley

10      Spencer's breasts and genital area, that she

11      displayed excessive sexual curiosity?

12           A    Yes, you can call it that -- or yeah.  I

13      guess I referred to it as aggressive behavior, but

14      it could be either one or both.

15           Q    Okay.  We've been going about an hour and

16      twenty minutes or so, sir.  Would you like to take a

17      break or do you want to press on?

18           A    I'll take a quick break.

19                MS. ZELLNER:  Actually -- yeah, we need to

20           take a quick break too.

21                MR. FREIMUND:  Okay.  Why don't we all

22           stay on the video line but take five minutes.

23           Would that work for you?

24                MS. ZELLNER:  Yes.

25                THE VIDEOGRAPHER:  Here marks the end of

488

1    arrangement.  I think the -- the decor of the office

2    should be at least not provocative.  In other words,

3    I guess it -- I don't know that it really has to be

4    child friendly particularly, but at least it should

5    be neutral and not provocative in any way.

6         Q    Your next item there is if possible

7    audiotape or videotape the interview.

8              Would you agree, sir, that there is no

9    commonly accepted standard of care requiring that

10   child sexual abuse interviews should be or must be

11   audio-taped or videotaped?

12        A    I really don't know if there was in 1984.

13   I believe that now there is.  I believe that

14   currently it's -- it's -- almost everybody agrees

15   that interviews should be electronically recorded.

16        Q    Do you know when that agreement was

17   arrived at temporally?

18        A    No.

19        Q    Would you agree that even in the 1990s,

20   there was extensive debate about whether child

21   sexual abuse interviews should be audiotaped or

22   videotaped?

23        A    Yes, I believe that is correct.  I -- so

24   people have gone back and forth about that.  I don't

25   hear much debate about it currently.  As far as I

489

1    that what you are saying?

2        A    Yes.   What I'm saying currently is that

3    one or two interviews probably covered the vast

4    majority of cases.   Maybe occasionally somebody

5    needs three.   I -- I -- I think you would have -- it

6    would be very unusual in my mind to need more than

7    that.

8        Q    Would you agree, sir, that you do not know

9    whether that was the standard of care back in the

10   1984 and 1985 time frame, that one, two or three

11   interviews is the limit?

12       A    I don't know.

13       Q    All right.   I think we've gone through

14   some of these other ones where you talk about

15   testing, ability to recall historical events --

16   (inaudible.)

17            (Reporter requests clarification.)

18       Q    -- accurately assess the child's

19   understanding of telling the truth, and encouraging

20   spontaneous narratives.   So I'm going to go down to

21   the Item 7, where you say:   "Proceed from more

22   general statements to more specific questions."

23            Would you agree, sir, that what you're

24   recommending in this article then is that a

25   funneling technique should be used in child sexual

490

1    interview involving a child who is reluctant to

2    disclose?

3         A    I think that sometimes that is necessary,

4    but it has to be done with the full understanding

5    that what the child then says, you do not really

6    know for sure whether the child is simply endorsing

7    what the interviewer suggested or whether it's

8    actually eliciting factual information.

9              So you have to do it very cautiously and

10   you have to do it with that knowledge that whatever

11   you get from that process may or may not be

12   historically accurate.

13        Q    Would you also agree, sir, that the two

14   interview protocols or scripts that you referenced

15   earlier, the one by I believe it was NICH [sic], and

16   the other one, that both of those interview

17   protocols do include the use of leading and

18   suggestive questions if necessary when interviewing

19   reluctant child witnesses?

20        A    Yes.

21        Q    So even to this day, currently the

22   recommended interview protocols for reluctant child

23   witnesses advocate, if need be, the use of leading

24   and suggestive questioning during the interview?

25        A    I believe that's correct, but it's with

491

1    the understanding that you're not really sure --

2    when you get answers, you're not really sure about

3    the reliability of those answers.

4        Q    Okay.  Let's go down to Item No. 9, used

5    restatement, i.e., repeating the child's recount

6    back to the child.

7             What you are suggesting there is that it's

8    appropriate for a child interviewer to kind of

9    repeat back to the child what the child has

10   disclosed to them about sexual abuse; is that true?

11       A    Yes.  You're doing that carefully, of

12   course.  And you're basically giving the child an

13   opportunity to tell you whether or not you have the

14   information correctly.

15       Q    Okay.  And I'm going to kind of blend

16   Items 10 and 11 together there.

17            You say that in general the examination

18   should take place without the parent present; but if

19   a child is very young, consider having a family

20   member in the room.

21            Would you agree that that's one of those

22   judgment calls that an interviewer has to make about

23   whether or not to have the parent present in the

24   room during the interview, particularly for a

25   younger child?

492

1     A    Yes.  I think ultimately the -- that's --

2    the interviewer is going to have to figure that out.

3    And, again, if you do allow the parent to be present

4    or if that's necessary, you have to take that into

5    consideration that that might influence what the

6    child says.

7     Q    Okay.  I'm going to skip No. 12 where you

8    talk about using age-appropriate techniques and go

9    to 13 where you say:  "Determine the child's terms

10    for body parts and sexual acts."

11     Is that referencing what we were talking

12    about before, where it's appropriate for an

13    interviewer to have a drawing of a human body and

14    have the child identify body parts, including

15    genitalia and so forth, and identify -- have the

16    child identify by name what they call those body

17    parts?  Is that what you're talking about there?

18     A    Yes.  And some protocols do include that.

19    For instance, the RATAC protocol includes that as

20    part of a routine interview.  The NICHD protocol

21    doesn't.  They -- they actually discourage it.  So

22    different people have different ways of going about

23    that.  But it is accepted by some people.

24     Q    When you say RATAC, is that an acronym?

25     A    Yes.  R-A-T-A-C is an acronym for an

493

1   ask a child whether the child was to disclose or not

2   disclose anything, you know, whether they were told

3   to keep a secret, basically, right?

4        A    Yes.

5        Q    And it's also appropriate to ask the child

6   who it was that they are saying abused them, right?

7        A    Uh-huh.  Well, you know, you keep

8   referring to "ask."  Of course, ideally this kind of

9   information came out during the free narrative

10  description by the child.  So you don't --

11       Q    Okay.

12       A    -- you don't end up having to ask these

13  questions.

14       Q    But in a less-than-ideal world where the

15  child did not disclose that in the pre-narrative, it

16  would be appropriate to ask a specific question

17  about who it was who touched them inappropriately,

18  would it not?

19       A    You may need to do that with the

20  understanding that every time you ask a question,

21  you might be contaminating the child's understanding

22  and memory.

23       Q    Sure.  But it might nonetheless be an

24  appropriate interview technique in that

25  circumstance, correct?

494