1          A     These are all things that would be good to

2     determine, preferably by not asking leading

3     questions.

4          Q     But once again, you know, in a non ideal

5     world that -- that might become necessary, and it

6     would not violate the standard of care to do so in

7     those circumstances, correct?

8          A     In some circumstances, that's correct.

9          Q     All right.  And another area of inquiry

10    that would be appropriate is to ask whether any

11    photographs or videotaping was involved during the

12    course of sexual abuse, too, right?

13         A     Yes.

14         Q     All right.  I'm going to move down to

15    subsection G -- I'm sorry, subsection H, "Physical

16    Examination of the Sexually Abused Child."

17              And first of all, you state there under

18    item No. 1, quote:  "Most sexually abused children

19    do not have any corroborating physical findings,"

20    end quote.

21              Again, that kind of goes back to what we

22    were describing earlier, that the majority of kids

23    who have been sexually abused there isn't any

24    medical evidence of the abuse, right?

25         A     Yes.

495

1    abuse, in incest, that recantations happen sometimes

2    because the child is pressured by family members to

3    take back the allegation.

4        Q    Do you recall that back in 1983, that

5    Roland Summit was saying, quote:  "Whatever a child

6    says about sexual abuse, she is likely to reverse

7    it," end quote?

8        A    I don't remember that specific comment.

9        Q    Okay.  But do you recall that generally he

10   was suggesting that at least in incest cases like

11   what we're dealing with in this case, recantations

12   occur with significant frequently?

13       A    Yes.

14       Q    And you would agree with that assessment

15   by Dr. Summit, would you not?

16       A    I really don't know what the numbers are.

17   I can just say that it happens sometimes, but I

18   don't -- I have no idea what the numbers would be.

19       Q    Okay.  Would you agree that one basis for

20   a recantation, or what might cause a child to

21   recant, is if their abuser is released from prison

22   and is now -- they are now at risk of abuse

23   reoccurring?

24       A    I don't know.  I don't think I have ever

25   heard that.

496

1    that concept, that it was very, very rare for

2    children to exaggerate because I don't -- even

3    10 percent -- even if my other number is 10 percent,

4    that's not rare.  That's hundreds of thousands of

5    cases a year, 10 percent of all children who

6    allegedly were abused.  So I don't agree with his

7    contention that it was rare for children to make

8    false statements.

9        Q    He put it at 99 percent are true.  You put

10   it at around 90 percent are true.  So that's --

11   that's -- you are in dispute with him?  Is that what

12   you are saying?

13       A    Yes.  That -- well, that would have been

14   my dispute in 1993 when I used that figure.

15       Q    Right.  Do you know if you had a dispute

16   with that figure of 99.9 percent of child

17   disclosures of sexual abuse are true, whether you

18   disputed that around the 1990 -- 1984 to 1985 time

19   frame?

20       A    I don't know.

21       Q    Okay.  Have you ever been involved in a

22   case involving multiple perpetrators and multiple

23   victims?

24       A    Well, I'm not sure.  I know I have been

25   involved in cases of multiple victims, and I -- I --

497

1    were you focused on professionally during that time

2    period?  What were you doing?

3         A    During that period of time, I was living

4    and practicing child psychiatry in northern

5    Virginia, in Alexandria, Virginia, and I was mainly

6    doing outpatient psychiatric evaluations and

7    psychotherapy of children and teenagers and

8    occasionally adults.  So most of my work was as a

9    clinician doing therapy, and I was doing an

10   occasional forensic evaluation.

11        Q    Would you agree, Dr. Bernet, that you do

12   not have an expert opinion on what the standard of

13   care was for police officers or child protective

14   services workers during the 1984-1985 time period,

15   on the topic of child sexual abuse interview

16   techniques?

17        A    I think I'm an expert on some aspects of

18   it.  In other words, as I stated before, I don't

19   know exact protocols that might have been available.

20   But I do think, based on what I know about child

21   development and interview techniques, that certain

22   basic principles have been -- were known to

23   everybody, to professionals during that time,

24   specifically the problems with leading suggestive

25   and repetitive questions, the problems with, for

498

1    instance, bribing a child to say certain things or

2    praising the child for having said certain things,

3    that -- I believe that it's been common knowledge

4    that adults have to be careful about how they

5    influence the child.  And so I believe I'm

6    knowledgeable and have expertise in that regard.

7         Q    Any other subjects related to child

8    interviewing technique other than what you just

9    described that you believe you have an expertise

10   about related to standards that were applicable

11   during the 1984 to 1985 time period?

12        A    Well, I think what I related generally

13   comes under the heading of coerciveness, that asking

14   leading and suggestive and repetitive questions are

15   forms of coercion.  Praising the child is a form of

16   coercion, in a sense.  Threatening the child that

17   certain things are going to happen unless the child

18   makes statements that the interviewer is looking

19   for.  I think that those are the things that I would

20   have an opinion about and that I think were well

21   known in the 1980s.

22        Q    Okay.  And I just want to get a complete

23   list.  Is there anything else beyond what you've

24   just described?

25        A    Well, I guess we could look at my report

499

1    have been aware of the concept of avoiding

2    suggestive and leading questions.

3        Q    Okay.

4        A    In other words, the purpose of the

5    articles is just to demonstrate how prevalent that

6    understanding was, and -- but as far as

7    Dr. Krause -- Detective Krause goes, she herself

8    said that she was aware of the problems of leading

9    questions.

10       Q    Would it be your belief that Detective

11   Krause also would be aware, as you've testified here

12   earlier today, that in some instances, particularly

13   with a reluctant child witness, that it may be

14   necessary and appropriate to use both leading and

15   suggestive questions during the course of a child

16   sexual abuse interview back in the 1984, '85 time

17   frame?

18       A    Yes, I think that was her opinion.

19       Q    And that -- that's still true today among

20   professionals, is it not?

21       A    Yes, I think we might disagree on whether

22   it was an appropriate thing to do in the case, you

23   know, the actual case that is before us.  But I

24   think that the general notion is -- people would

25   agree to it.  I'm not sure people would agree on

500

1    point that one was given to him.

2         Q    Is it your belief to a reasonable degree

3    of psychiatric certainty that if a child interviewer

4    offers a hot chocolate to a child before

5    interviewing them, that that has a significant

6    increase in inappropriately -- an increase in the

7    likelihood of inappropriately coercing that child to

8    make a false disclosure of sexual abuse?

9         A    I don't think I would put it like that.

10   But see, I don't think we're looking at a single

11   instance.  I think we are looking at a pattern.

12   We're looking at a pattern of her treating the

13   children and in seeing them in a personal space,

14   taking -- going to the mall with one of them.

15   There's a pattern of engaging them in an overly

16   personal way.

17             And I think that that would -- would lead

18   the children to try to be more cooperative and try

19   to say what the interviewer is looking for.

20        Q    Is it your belief that Detective Krause

21   fabricated the statements that the children were

22   making to her as she reported in her police reports?

23        A    I don't know if she did that.  I think

24   it's possible she -- she could have misstated the

25   way the conversations went.  I'm -- I'm not -- I

501

1    the children, especially to five-year-old Kathryn,

2    seemed grown up.  There are complex sentences.

3    There are compound sentences just the way they are

4    stated seems overly grown up for this little girl.

5    So it -- I'm sort of wondering whether the little

6    girl really said those things, or whether Detective

7    Krause said those things, and then the girl agreed

8    with her.

9         Q    I understand you think it -- there's some

10   indication that might have happened.  Let me pin you

11   down.

12             Can you say to a reasonable degree of

13   certainty that it, in fact, happened?  That

14   Detective Krause was fabricating statements that

15   these children made during the course of her

16   interviews?

17        A    No, I don't think I can say that that

18   strongly, but it's -- it's certainly something that

19   I would wonder about and that whoever ultimately

20   decides these things would have to add that together

21   with whatever other information the finder of fact

22   has to decide about that.

23        Q    Okay.  I'm going to talk about briefly

24   false positive and false negative error rates in the

25   course of child disclosures of sexual abuse.

502

1    suggestive, leading and repetitive questions; the

2    problems of threatening a child.  I think those are

3    so basic that I think it's fair to apply those

4    criticisms.

5         Q    You will not be offering an opinion in

6    this case, will you, that any particular child

7    involved here was, in fact, sexually abused or not

8    sexually abused?  That's not going to be something

9    you are going to be opining about, is it?

10        A    That is correct.  I'm not having an

11   opinion about the ultimate question.

12        Q    Sure.  And you -- you haven't interviewed

13   any of the people involved in this case, whether

14   it's the investigator, the children, the father or

15   anybody, right?

16        A    That's correct.

17        Q    Is it also correct that you have never

18   been acknowledged as an expert in any area in the

19   State of Washington or in Washington federal courts?

20        A    That is correct.  I have never testified

21   in the State of Washington.

22        Q    Okay.  And you're not licensed to practice

23   in the State of Washington either, are you?

24        A    That's correct.

25        Q    Would you agree that even to this day

503

1      Q     Is it your understanding that the RATAC

2   protocol you mentioned before was similarly focused

3   on children who made a prior outcry as distinguished

4   from those who have not?

5      A     Yeah.  Well, it's -- it's my understanding

6   that both of those were developed primarily for --

7   from children who have made disclosures or

8   allegations, but that both of them can still be used

9   with other children, although I suppose you would

10   have to make some modifications.  But I think you're

11   correct, that they were originally designed for

12   children who had previously made some kind of

13   statement.

14      Q     Would you agree that there is -- that

15   every child is different, and thus every interview

16   is different in some respect because you have to

17   address the particular child being interviewed?  In

18   other words, there is no one-size-fits-all

19   interview?

20      A     Well, I think there are general principles

21   that fit all.

22      Q     Right.

23      A     But the way it actually plays out, I'm

24   sure every child is different.

25      Q     And there are different judgment calls

504

1    close to finishing, although I'm sure others will

2    have questions for you.

3              We talked about how many interviews, and

4    you were saying one, two, to three might not be --

5    would be within the realm of reason, but beyond

6    three might not be.

7              What about length of interviews?  Are you

8    aware of some standard of care that existed back in

9    the 1984, '85 time frame about how long a child sex

10   abuse interview should last before you're developing

11   concerns that it might become coercive in some way?

12        A    No, I don't have any specific information

13   on that.

14        Q    Okay.  Do you know whether there's some

15   consensus currently as to the length of time a child

16   sexual abuse interview should be limited to avoid

17   the risk of becoming coercive?

18        A    No, I haven't heard it stated in that way.

19   I think usually you try to size up based on how the

20   child is doing and kind of the attention span of the

21   child.  I -- I would imagine that typical interviews

22   would -- would not go beyond an hour, and probably

23   the average might take 45 or 50 minutes.  But I

24   don't know any specific rules.  In general, younger

25   children seem to tolerate less -- they can handle a



```
 1              MS. FETTERLY:  Is that the one that you
 2       are giving to the reporter?
 3              THE WITNESS:  Yes, it is.
 4              MS. FETTERLY:  Okay.  Maybe the reporter
 5       could mark that and just verify that it's the
 6       19-page narrative report.  And then the CV is
 7       attached to it.  Has that now been marked?
 8              THE REPORTER:  It has been.  Just one
 9       moment.  Let me check.  (Reviews document.)  It
10       is a 19-page exhibit.  The CV is not attached.
11              MS. FETTERLY:  I don't need to have the CV
12       attached, just the 19 pages that's dated
13       October 5, 2012.
14              THE REPORTER:  Yes, ma'am.  It is marked
15       as Exhibit 1.
16              MS. FETTERLY:  Okay.  Thank you.
17              (Marked Exhibit No. 1.)
18       BY MS. FETTERLY:
19          Q    If you -- Doctor, could you turn to page
20       12 of Exhibit 1, please.
21          A    Yes, I have it.
22          Q    Okay.  And the first paragraph on page --
23       the top of page 12, you're referencing Mr. Peters'
24       interview of Kathryn which took place December 11,
25       1984.  And you stated:  "Conducting the interview of
```

506

1  Kathryn, Mr. Peters' purpose was not to determine

2  whether Kathryn had been abused by her father or by

3  anyone.  He was not conducting an investigation of

4  what may have happened to Kathryn."

5          And then that's what you stated in your

6  report, correct?

7      A    Yes, it is.

8      Q    Okay.  So in your view, the interview

9  conducted by Prosecutor Peters in December of 1984

10 was not an investigative interview?

11     A    That's correct.

12     Q    Okay.  And then you go on to say:

13 "Instead, Mr. Peters knew what Kathryn had

14 previously said to Detective Krause.  Mr. Peters was

15 simply trying to get Kathryn to repeat for the video

16 camera what she had previously stated to Detective

17 Krause."  And then you go on to quote sections of

18 the interview.

19         Would it be correct that, as you state,

20 rather than to determine whether or not the abuse

21 occurred, Mr. Peters was actually conducting his

22 interview of Kathryn to evaluate her competence as a

23 witness if the case were to be charged?

24     A    Yes.  That's my understanding that that's

25 what Mr. Peters said in his deposition.

507

1      Q    Okay.  And, likewise, that he would be

2  also trying to evaluate her qualifications as a

3  witness, again, if the case were to be charged; is

4  that correct?

5      A    Yes.  That's what he said in his

6  deposition.

7      Q    And you would have no reason to question

8  that, I take it?  Meaning, question the purpose of

9  the interview as he testified?

10     A    Well, I think it's correct to say that as

11 far as I can tell, he was trying to size up whether

12 she would be an appropriate witness, whether she

13 could say the things to him that she had previously

14 said.

15          I think he and I have a different

16 definition of evaluation of competence.  I know that

17 he -- he states in his deposition that he was trying

18 to assess her competence as a witness.  And I would

19 have a different definition of how to do that.  So

20 that's just a different -- maybe we just have a

21 different way of looking at that.

22     Q    But you would agree that ultimately, that

23 whether a witness is competent or not is a decision

24 for the court; you would agree with that?

25     A    Yes, that's my understanding.

508

1        Q    So again, going back to the distinction

2   that you drew in your report between the purpose of

3   Detective Krause when she did her interviews, which

4   was an investigation of the allegations, compared to

5   the purp -- Mr. Peters' purpose for his interview,

6   you would agree that Mr. Peters' purpose was to make

7   a determination -- a determination of whether or not

8   criminal charges should be brought?  Was that your

9   understanding?

10       A    Yes.

11       Q    And if they were brought, how Kathryn

12   would fare as a witness?

13       A    Yes.

14       Q    Correct?

15       A    Yes.

16       Q    And as we know from what happened in this

17   case, charges were filed against Mr. Spencer; is

18   that consistent with your understanding?

19       A    Yes.

20       Q    Okay.  And do you know who actually made

21   the decision to file those charges?

22       A    In his deposition, I believe that

23   Mr. Peters said that his supervisor made that

24   decision.

25       Q    The elected prosecutor?

509

1        A    Yes.

2        Q    Okay.  Do you have any reason to question

3   the accuracy of that?

4        A    No.  I don't know any -- that's not

5   something I would know about.

6        Q    Okay.  Now, in response to Mr. Freimund's

7   questions that you were asked, you stated that a

8   relatively, as I recall, small portion of your

9   forensic practice involved the evaluation of

10  interview techniques of what you and he were

11  discussing as the front-line investigators, meaning

12  police officers or child protective services

13  workers; is that correct?

14       A    Yes.

15       Q    Okay.  Other than this case, have you ever

16  had occasion to evaluate interview techniques

17  utilized by a prosecuting attorney in making a

18  decision whether to file criminal charges against a

19  suspect?

20       A    I don't remember such a situation.

21       Q    Have you ever had occasion to research

22  yourself protocols that are appropriate for a

23  prosecutor to utilize in conducting such interviews?

24       A    No.

25       Q    Are you familiar with any body of academic

510

1     literature on that subject that would have been in

2     effect in 1984?

3        A     No, not that specifically -- not that

4     specifically relates to prosecutors. I mean, some

5     of the bibliography that I came up with about

6     interviewing children and coercion and so on did

7     reference both legal literature and psychological

8     literature, and it referenced attorneys. It didn't

9     specifically talk about prosecuting attorneys.

10       Q     Are you aware of what a prosecuting

11    attorney would look for in -- in determining or

12    making evaluations of the competence of a witness?

13       A     Well, my understanding from Mr. Peters'

14    deposition is that he is looking to see whether the

15    potential witness can tell a coherent account of

16    what happened, a coherent, logical account that

17    seems believable, that that's what he's looking for.

18       Q     And there would be certainly nothing

19    inappropriate with interviewing the witness to do

20    that, or the potential witness, to make that

21    evaluation; would that be correct?

22       A     That's correct. I think that prosecutors

23    do that.

24       Q     Okay. And are you aware of the procedure

25    utilized in the State of Washington to initiate

1    criminal prosecutions?

2          A    No, not specifically.  I -- he may have

3    described it in his deposition; but other than that,

4    I wouldn't be familiar with it.

5          Q    Okay.  Specifically, do you know whether a

6    grand jury indictment is typically used as opposed

7    to the prosecutor himself or herself filing

8    information outlining facts which, if proven, could

9    lead to a conviction?

10         A    Right.  I'm not -- I don't know which way

11   that happens.

12         Q    And assuming that more commonly the latter

13   procedure, meaning that if the grand jury

14   procedure -- the grand jury indictment is used

15   rarely, and it's more common to use the filing of

16   information, do you know or have any understanding

17   of what a prosecutor looks for in reviewing a police

18   report which documents the interview of witnesses in

19   making a determination whether or not to file

20   charges?

21         A    No.

22         Q    Do you know what standard a prosecutor

23   would utilize to determine whether the allegation --

24   or whether the information set forth in a police

25   report is fabricated or not?

512

1       A       Not specifically.  I think the ultimate

2    standard is probable cause, but I don't know

3    specifically what standard they might have to

4    determine fabrication.

5       Q       As I understood your earlier testimony,

6    you could not state with reasonable certainty in

7    response to one of Mr. Freimund's questions that

8    Detective Krause's reports contained fabrications;

9    is that correct?

10      A       That's correct.  I can only raise that

11   concern.  That would have to be combined with other

12   information.

13      Q       So would it be fair to say that there

14   would be no way that Mr. Peters could determine with

15   any sort of reasonable certainty in reviewing

16   Detective Krause's report whether or not they

17   contained fabricated information?

18      A       I don't think you can do it simply from

19   what's written on the paper.  I think you have to

20   combine that with other information that you might

21   know about the case.

22      Q       Okay.  And that would include, of course,

23   the handwritten statements provided by Shirley

24   Spencer, which, as Mr. Freimund pointed to you, was

25   the first disclosure from Kathryn in this case?

513

1       A      That would be one of the things that you

2    would consider.

3       Q      Okay.   What else would be considered?

4       A      Well, if he's trying to figure out whether

5    Detective Krause put down any fabricated information

6    in her reports, I suppose he would take into

7    consideration whatever he happened to know about

8    Detective Krause, perhaps other information that he

9    knows about the case, information that he might know

10   about the children.

11      Q      So one of the things he would look for

12   would be whether or not she had provided accurate

13   information to him in the past.

14             Would that be accurate?

15      A      He would probably be interested in that,

16   and taking that into consideration.

17      Q      And if she, in fact, had, would that be

18   something that would lead a prosecutor toward not

19   assuming that the reports contained fabricated

20   evidence?

21      A      Yes, it probably would.

22      Q      And you go on in the report to make a

23   certain number of critiques about the interview

24   conducted by Mr. Peters in December of 1984.

25             On a page -- or at several points between

514

1    be harmful to her father?

2         A    Well, it's my understanding that he wanted

3    to see if she would be a good witness.  And if she

4    did turn out to be a really good witness, he would

5    have been in a position to charge Mr. Spencer with

6    crimes.  And so he was hoping that she would say to

7    him what she had previously said to Detective

8    Krause.

9         Q    And you think that would be a motive for

10   him to wish that she -- wish her to make

11   disclosures?  Is that you're saying?

12        A    Sure.  That's what motivates prosecutors

13   is to prosecute people.

14        Q    Would you agree that much of the

15   information contained in this interview by

16   Mr. Peters was duplicative of the interviews of

17   Detective Krause earlier in 1984 of Kathryn?

18        A    Oh --

19        Q    In other words, at some point she didn't

20   wish to discuss the issues and the disclosures.  And

21   then she would make some statements, and then made

22   some other statements that might not be consistent

23   with abuse?

24        A    That's right.  She said a lot of different

25   things in this interview.  I mean, she said -- even

515

1    though she didn't talk very much, at one point she

2    said nothing happened that summer.  And later in the

3    interview, she is acting out sexual behaviors.  So

4    some -- so there are different parts of what she

5    says in this interview that are consistent with

6    things that she said previously.  I think that's

7    what you asked me.  I think you asked me if --

8          Q    What?  I didn't catch it.

9          A    Oh.  There are certain parts of what she

10   says to Mr. Peters that are consistent with what she

11   had previously said to Detective Krause.

12         Q    Correct.  That was my -- my question.

13              And then -- so in fact, this interview

14   really was pretty cumulative of what -- of Detective

15   Krause's interviews of Kathryn in October of 1984.

16              Would that be correct?

17         A    Well, it's cumulative in a very

18   non-convincing way.

19         Q    Right.

20         A    Because -- it's cumulative because he brow

21   beats her.  And then they take an hour off where

22   something happens.  In other words, it is cumulative

23   but it's very unconvincing because it's so coercive

24   there.

25         Q    Now, as far as the break in the interview,

516

1    things in that had to do with how to address

2    competency.

3         Q    And do you know what that -- those were

4    the factors that a Washington court in 1984 would

5    have applied in determining the competence of a

6    child witness?

7         A    I think they are very similar.  The only

8    reason why I know it is because it came up in

9    Mr. Peters' deposition.  There was some discussion

10   of the four factors that the court would take into

11   consideration.  And the court's four factors were

12   very similar to these four factors.

13        Q    And so you would agree that really one of

14   the primary purposes of that December 1984 interview

15   was to make the prosecutor's own evaluation whether

16   or not a court would deem Kathryn competent to

17   testify.

18             Would that be accurate?

19        A    Well, he was doing one part of that

20   evaluation.  He was doing the part --

21        Q    But it went toward that --

22        A    Yes.

23        Q    -- toward that goal?

24        A    Yes, it did go to that goal.

25        Q    And that would have related directly,

517

1    would it not, to the decision whether or not to

2    charge Mr. Spencer with a crime; is that correct?

3         A    That's my understanding simply from what

4    was stated in the deposition.

5         Q    And, again, you have no reason to doubt

6    that, that that was the purpose of that interview,

7    correct?

8         A    That's correct.

9         Q    So getting back again -- thank you for

10   clarifying any additional opinions you have.  I just

11   want to be clear that with this addition, that all

12   the opinions you've made to date in regard to this

13   case are contained in either Exhibit 1 or Exhibit 2

14   or what you testified to today; is that correct?

15        A    Yes, it is.

16        Q    Okay.  Do you have plans to do further

17   work on this case and possibly make further

18   opinions?

19        A    If additional information is provided to

20   me, that might happen.  But I don't have any

21   immediate knowledge that that's going to happen.

22        Q    And if that were to happen, would you

23   agree to convey those supplemental opinions to

24   Ms. Zellner --

25        A    Yes.

518

1    naked.  So to me it's -- it struck me as very, very

2    unusual.

3         Q    Okay.  But my specific question to you is

4    do you have any basis to express an opinion about

5    whether that did or did not violate whatever

6    standard practice was in effect in 1984 and '85

7    among law enforcement or CPS field interviewers?

8         A    No, I don't have specific information

9    about that.

10        Q    You expressed criticism of Detective

11   Krause for telling each child what the other child

12   had said, correct?

13        A    Yes.

14        Q    Do you know if that violated the generally

15   accepted standard for conducting interviews among

16   field interviewers in 1984, '85?

17        A    I don't know.

18        Q    You were asked earlier today about the

19   handwritten narrative statement that Shirley Spencer

20   generated to document the first disclosure made by

21   Kathryn.

22             Do you -- you recall that testimony?

23        A    Yes, I do.

24        Q    I think you said that -- that we don't

25   know whether Shirley used leading questions at any

519

1              Would you agree with me that you cite no

2    examples of repetitive questioning by Detective

3    Krause in regards to her interviews of Little Matt

4    Hanson?

5         A    You're asking me about repetitive

6    questions on those two pages?  That's correct.  I

7    don't have any examples from Little Matt.

8         Q    Is that because you didn't find any

9    examples of the Detective Krause using repetitive

10   questioning with Little Matt?

11        A    Probably that's correct.

12        Q    Okay.  Let's go to suggestive questions.

13   There you did find examples of suggestive questions

14   on pages 6 through the top of page 9 as to all three

15   of the alleged victims, right?

16        A    Yes.

17        Q    But when you go to leading questions by

18   Detective Krause on page 9, you only identify

19   leading questions as having been used with Kathryn

20   and not either Big Matt or Little Matt, correct?

21        A    Yes.

22        Q    Is that because you did not see any

23   examples of Detective Krause using leading questions

24   with both of those boys?

25        A    Yes, I think that's correct, what you just

520

1    said.

2         Q    Okay.   Let's go to the next category you

3    have there, starting at page 9 and extending to the

4    top of page 11, Detective Krause's coercive style of

5    interviewing.   You indicate that she had a coercive

6    style in interviewing Kathryn Spencer and Matt

7    Spencer, but you did not find any evidence of a

8    coercive style of interviewing by Detective Krause

9    of Little Matt Hanson, did you?

10        A    I don't think so, at least not that would

11   fit under this definition that I'm using here.

12        Q    Okay.   Let's go to the next area there

13   that you talk about on pages 11 and 12, Detective

14   Krause's pattern of reinforcing positive behavior.

15   You found no evidence of a pattern of reinforcing

16   positive behavior used by Detective Krause in her

17   interview of Little Matt Hanson; isn't that correct?

18        A    That is correct.

19        Q    Is it your knowledge, sir, that even

20   though you didn't find very much fault in the

21   interviews of -- Detective Krause's interviews of

22   Little Matt other than the use of suggestive

23   questioning on a few occasions, that Little Matt

24   Hanson, to your knowledge, has not recanted the

25   abuse, like, by Mr. Spencer?

1          A     That is my understanding.

2          Q     Okay.  And just on -- on the -- on Peters,

3     your criticism of defendant Jim Peters, you would

4     agree, would you not, that Mr. Peters had no

5     coercive influence whatsoever on the disclosures

6     made by Matt Spencer and Little Matt Hanson because

7     he had no involvement -- or no interviews of him to

8     your knowledge, right?

9          A     As far as I know, that's correct.

10         Q     Okay.  So the only child that Mr. Peters

11    may have had some coercive influence on in your

12    opinion would be Kathryn Spencer and not the other

13    two boys, right?

14         A     That is correct.

15         Q     All right.  I want to direct your

16    attention, now, please to page 22 of Exhibit 2 and

17    focus your attention on your third opinion there.

18              You say there that:  "The investigative

19    interviews conducted by Detective Krause and

20    Mr. Peters were so improper, coercive and

21    psychologically abusive that the interviewers knew

22    or should have known that they would yield false

23    information."

24              When you were asked about that a little

25    while ago, you said that -- by Ms. Fetterly, I would

1    say -- I should say -- that they knew or should have

2    known that it -- it could lead to unreliable

3    information.  And I want to pin you down on that,

4    sir.

5            Are you saying that they knew that these

6    kids were giving them false information, or are you

7    saying they knew or should have known that because

8    of the use of repetitive questioning on some of the

9    kids, leading questions on some of the kids, that

10   they knew that false information was coming from

11   those kids?

12       A    Yes.  I would say that they knew or should

13   have known that the information was unreliable and

14   that it could well be false.

15       Q    Okay.  But let's make this distinction,

16   and I want to be careful about it.

17            Wouldn't you agree that there's a

18   difference between something being unreliable and

19   something being categorically false?

20       A    Yes.  You know, I think I tried to make

21   the distinction in the very last sentence of the

22   discussion part of that conclusion on the next page.

23   And I say:  "When interviews are conducted in that

24   manner, it is likely that false information will be

25   elicited and the children's statements become

523

1   unreliable."

2          So that -- the problem is that when you

3   elicit a lot of information, you don't know which

4   part is correct or true and which parts are false.

5   And since you don't know, you can't figure it out.

6   The overall result is that the child is unreliable.

7   I guess that's what I'm trying to say here.

8          Q    Okay.  I appreciate that qualification.

9          A    And that, yes, that they -- that they

10  should have known that some of the statements that

11  are being produced are going to be true, and some

12  are going to be false.  They should have known that.

13         Q    Okay.  But they couldn't know which of

14  them were true and which of them were false, could

15  they?

16         A    Well, I suppose maybe a person could

17  figure that out if you were doing a comprehensive

18  investigation, and you were going back and you

19  collected information from the very beginning, a

20  really careful analysis of how Kathryn's statements

21  originally arose.  And then you could dissect from

22  there which subsequent statements were influenced by

23  the interviews by Detective Krause, and you could

24  ultimately try to figure out -- maybe not a hundred

25  percent, but you could figure out somewhat -- what

524

1      statements were true and what statements were false.

2          Q    But which -- when -- what we are talking

3      about here, though, is you're saying that Detective

4      Krause and Mr. Peters knew or should have known that

5      particular statements were true or false.  And

6      that's what I'm asking you.  Which -- how would they

7      know that?

8          A    Oh, I'm not -- I don't think I said that

9      they should know particular statements.  I think

10     that they should have known that you are going to

11     end up with a mishmash of some true and some false

12     information.  And you have no way -- unless you

13     really do a very thorough investigation, you are not

14     going to able to figure out which are which.

15         Q    And I want to go back to your earlier

16     testimony today just to be sure I'm understanding

17     this opinion labeled No. 3 in your report.

18              I believe, and please correct me if I'm

19     wrong, but I believe you testified you cannot say

20     that the disclosures of sexual abuse made by these

21     children saying that their father sexually abused

22     them were false.

23              You don't have an opinion on that; am I

24     right?

25         A    I don't have an opinion in the sense that

1    I have stated it here.  I mean, I have thoughts

2    about that, if you want my thoughts.  But I guess --

3    I wasn't really asked.  I wasn't really asked to

4    figure that out or to give an opinion about that, so

5    I don't have an official opinion on that.

6         Q    And you can't say to a reasonable degree

7    of psychiatric certainty that the disclosures made

8    by these children that they were sexually abused by

9    Clyde Ray Spencer are false?

10        A    That is correct.  But I've got to tell

11   you, I have a really high level of suspicion just

12   from things we've talked about here today, that

13   partly the very initial outcry made by Kathryn is in

14   the context of her doing something naughty and being

15   reprimanded.  And she's reprimanded, and then she

16   suddenly says, Oh, mommy does this.  That other

17   lady, Karen, does this.  Daddy does it.

18            That's a classic example of how a false

19   allegation arises.  And then the interviews by

20   Detective Krause are classic examples of how a

21   thought in the child then gets made into these

22   verbal statements because the child is trying

23   really, really hard to say what the interviewer is

24   assuming is the correct answer, that the interviewer

25   feels is a correct answer.  So there's lots in this

526