# EXHIBIT A

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9

CLYDE RAY SPENCER, et. al.,                )        No. 3:11-cv-05424-BHS
                                           )
10   Plaintiffs,                           )        PLAINTIFFS' FIRST SET OF
                                           )        INTERROGATORIES TO
11   v.                                    )        DEFENDANT SHARON KRAUSE
                                           )        AND ANSWERS THERETO
12   JAMES M. PETERS, et. al.,             )
                                           )
13   Defendant.                            )
                                           )
14

15        Plaintiffs, by their undersigned attorneys, request that Defendant Sharon Krause answer

16   the following Interrogatories within 30 days after service hereof.

17                        **INSTRUCTIONS AND DEFINITIONS**

18        1.     Respond to each interrogatory separately and completely.

19        2.     For each interrogatory response, identify each person who answers and/or assists

20   in answering, and state each such person=s relationship, if any, with defendant.

21        3.     For any interrogatory as to which an objection or claim of privilege is asserted,

22   fully state the grounds for such objection or claim of privilege, so as to permit the adjudication

23   of the propriety of the objection or claim of privilege.  In addition, with respect to any

24   document identified as responsive to any of these interrogatories and as to which an objection

25   or claim of privilege is made:

26             a.     State the date of the document;

27   PLAINTIFF'S FIRST SET OF INTERROGATORIES TO
     DEFENDANT SHARON KRAUSE
     (3:11-cv-05424-BHS) — 1
     DWT 20424296v1 0094078-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206 622 3150 main  206 757 7700 fax

1       My involvement would have been making the results of my investigation, including

2   reports, witness interviews, victim interviews, and suspect interviews available to the

3   Prosecutor's Office, specifically Prosecutor Arthur Curtis and Deputy Prosecutor Jim Peters, or

4   both. They prepared and filed a motion and affidavit for an arrest warrant. Ultimately, the

5   Judge who signed the arrest warrant determined that there was probable cause to arrest.

6       The evidence supporting probable cause is detailed in the above-referenced reports,

7   interviews, motion and affidavit, all of which are in plaintiffs' possession and can be reviewed

8   for responsive information pursuant to FRCP 33(d).

9       INTERROGATORY NO. 16: List the witness interviews that you have knowledge of

10   that were conducted between August 30, 1985 and May 16, 1985, inclusive, relating to the

11   investigation of Ray Spencer as a perpetrator of sexual abuse. Please identify those witness

12   interviews by date and who was present.

13       ANSWER: Pursuant to FRCP 33(d), see the police reports and records from the Clark

14   County Sheriff's Office investigation, the Vancouver Police Department's internal

15   investigation, and the Sacramento Police Department's investigation. I know of no interviews

16   which are not documented in those records.

17       INTERROGATORY NO. 17: Were you present for any videotaped/audiotaped

18   interviews of Matthew Ray Spencer, Kathryn Spencer (now Kathryn Tetz) and Matt Hansen

19   relating to the investigation of Ray Spencer? If yes, please identify by providing the name(s) of

20   the child interviewed, the name of the interviewer and the names of other persons present.

21       ANSWER: The only time was when Jim Peters did a videotaped interview with

22   Kathryn Spencer (now Kathryn Tetz). I was present briefly at the beginning, and then I left.

23   Deanne Spencer was also present, as was a video camera operator, who I believe was a male.

24       INTERROGATORY NO. 18: Do you agree with the Washington Supreme Court that

25   Michael Davidson=s personal relationship with Shirley Spencer began during the investigation

26   of Ray Spencer? Please describe what you know about that personal relationship.

27   PLAINTIFF'S FIRST SET OF INTERROGATORIES TO
DEFENDANT SHARON KRAUSE
(3:11-cv-05424-BHS) — 13
DWT 20424296v1 0094078-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle WA 98101-3045
206 622 3150 main  206 757 7700 fax

ANSWER: Objection, compound – this interrogatory consists of at least two discrete subparts, bringing the total number of interrogatories asked at this point to at least 23. Objection is also based upon the grounds that this interrogatory is argumentative and misleading.

Without waiving said objections, I do not agree that Michael Davidson's personal relationship with Shirley Spencer began during the investigation. Although I do not recall the exact date that Michael Davidson made me aware that he and Shirley had a relationship other than professional, I do recall that it was a considerable length of time after my interview with Shirley's son Matthew Hanson. I do not believe for one minute that it was during the investigation of Clyde Ray Spencer.

During the initial part of the investigation until a time when Matthew Hansen reported that he had been sexually abused by Clyde Ray Spencer, Shirley Spencer was always very, very supportive and protective of her then husband. She appeared to be very upset about what was occurring, specifically in regards to her husband. It was apparent that she refused to even consider the possibility that Ray Spencer could have done the things his daughter Kathryn was reporting. Her main focus of concern was Kathryn's safety and her husband's well-being. Also, Michael Davidson was my immediate supervisor. Because of the sensitivity of this investigation, my contact with Michael Davidson was probably on a daily basis. There were a number of times during the investigation when I had the opportunity to observe the interaction between Shirley Spencer and Michael Davidson. At no time did I ever observe any interaction between the two of them that would have given me cause to be concerned that there was anything other than a professional relationship between them.

At the time Michael Davidson told me he and Shirley Spencer were seeing each other, I was not the only person at the Sheriff's Officer who became aware of it. Based on what others in the department were saying to me and conversation I heard, it appeared to be fairly common knowledge. I have absolutely no doubt in my mind, if this information would have surfaced or

PLAINTIFF'S FIRST SET OF INTERROGATORIES TO
DEFENDANT SHARON KRAUSE
(3:11-cv-05424-BHS) — 14
DWT 20424296v1 0094078-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle WA 98101-3045
206 622 3150 main  206 757 7700 fax

1  even been suspected during the investigation, the Sheriff's Administration would have dealt

2  with it immediately and Michael Davidson would not have been allowed to supervise or

3  participate in the investigation in any capacity.

4       Several years prior to this investigation, I was assigned a case involving an alleged adult

5  rape/kidnap victim. After the Vancouver Police and Clark County Sheriff's Office had spent

6  hundreds of man hours investigating her claims, it was learned that this women had fabricated

7  everything. At one point during the investigation, I became aware that a Clark County Deputy

8  was having an intimate relation with the alleged victim. This deputy and his wife were also

9  very close personal friends of me and my husband. We camped together with our families,

10  went boating, fishing and were spending a considerable amount of time together. At one point

11  he told me my husband "was the best friend he had ever had." When I learned about his

12  relationship with the alleged victim, I immediately reported it to the Sheriff's Office

13  Administration, I believe it was to the Sheriff directly. I was extremely upset and angry when I

14  learned what was happening. Later that same day I confronted the deputy, let him know what I

15  had learned and made him aware that I had reported it to my superiors. I also told him, "I have

16  no intention of losing my job or my reputation over your stupidity." I was aware that he was

17  reprimanded or disciplined in some way by the Administration; however, I am not aware of the

18  nature of the discipline. Except for times when it became necessary to talk because we all

19  worked for the same department, neither my husband nor I had any contact with him or his wife

20  away from work for many years.

21       There is absolutely no doubt in my mind that if at any time during the Spencer

22  investigation I became concerned or aware that the relationship between Michael Davidson and

23  Shirley Spencer was anything other than professional, I would have responded in the same way

24  I did in the past, and would have immediately reported it to the Sheriff. I took my

25  responsibilities as a law enforcement officer very, very seriously and understood I had a legal

26

27

PLAINTIFF'S FIRST SET OF INTERROGATORIES TO
DEFENDANT SHARON KRAUSE
(3:11-cv-05424-BHS) — 15
DWT 20424296v1 0094078-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206 622 3150 main  206 757 7700 fax

1   responsibility. In addition, I also felt I had a real moral responsibility to do what was right for

2   everyone concerned, including those who were being accused.

3       It is hard for me to fathom how anyone could believe that I would have jeopardized my

4   career, my reputation, or could have been so underhanded and deceitful that I would be a party

5   to a conspiracy that would cause an innocent man to go to prison for 25 years so that two

6   people could have an intimate relationship. That just did not happen.

7       INTERROGATORY NO. 19: Describe each and every conversation, meeting, or other

8   contact, with Michael Davidson that you had regarding the investigation and allegations against

9   Ray Spencer, prior to May 16, 1985. Please identify time and date of contact, the content of the

10  conversation and identify each and every person present. Please describe specific tasks

11  assigned to you by Michael Davidson in regard to the Ray Spencer investigation.

12      ANSWER: Objection, compound – this interrogatory consists of at least two discrete

13  subparts, bringing the total number of interrogatories asked at this point to at least 25.

14      See answer to Interrogatory No. 13.

15      INTERROGATORY NO. 20: When did you learn that a medical examination of

16  Kathryn Spencer (now Tetz) had been performed on August 30, 1984? Do you have any

17  knowledge that the report of the medical examination of Kathryn Spencer (now Tetz) that was

18  performed on August 30, 1984 was provided to the Clark County Prosecutor=s Office prior to

19  May 16, 1995? If so, please explain. Do you know why the official index of the Clark County

20  Sheriff=s Office listing the documents collected during the investigation of Ray Spencer dated

21  November 8, 1985 does not list the report of Kathryn Spencer=s medical examination? Please

22  explain.

23      ANSWER: Defendant Krause objects to responding to this and the remaining

24  interrogatories and discrete subparts because plaintiff has not sought or obtained leave of Court

25  as required by FRCP 33(a)(1) to serve additional interrogatories beyond the twenty-five,

26  including discrete subparts, permitted by FRCP 33(a)(1).

27  PLAINTIFF'S FIRST SET OF INTERROGATORIES TO
    DEFENDANT SHARON KRAUSE
    (3:11-cv-05424-BHS) — 16
    DWT 20424296v1 0094078-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle WA 98101-3045
206 622 3150 main   206 757 7700 fax

**VERIFICATION**

STATE OF ARIZONA ){{
}} ss.

COUNTY OF MOHAVE )

Sharon Krause, being first duly sworn, on oath deposes and says that she is a defendant herein and that she has read the within and foregoing Answers to Plaintiffs' First Interrogatories to Sharon Krause, knows the contents thereof, and believes the same to be true.

Typed Name: Sharon Krause

SUBSCRIBED AND SWORN to before me this _29th_ day of _October_ 2012.

NOTARY PUBLIC in and for the State of
Arizona, residing at _Bullhead City_
My appointment expires _August 5, 2013_
Print Name _Antonio Sierra_

ANTONIO SIERRA
Notary Public - Arizona
Mohave County
My Comm. Expires Aug 5, 2013

**CERTIFICATION**

The undersigned attorney for defendant Sharon Krause has read the foregoing answers and objections to interrogatories and they are in compliance with FRCP 26(g).

ANSWERS AND OBJECTIONS dated this _26th_ day of _October_, 2012.

_WSBA#14777_

PLAINTIFF'S FIRST SET OF INTERROGATORIES TO
DEFENDANT SHARON KRAUSE
(3:11-cv-05424-BHS) — 19
DWT 20424296v1 0094078-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle WA 98101-3045
206 622 3150 main  206 757 7700 fax

# EXHIBIT B

1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

CLYDE RAY SPENCER, MATTHEW    )
RAY SPENCER, and KATHRYN E.   )
TETZ,                          )
                     )
      Plaintiffs,    )
                   )
   vs.         )   NO. 3:11-cb-05424-BHS
                 )
FORMER PROSECUTING ATTORNEY   )
FOR CLARK COUNTY JAMES M.     )
PETERS, DETECTIVE SHARON      )
KRAUSE, SERGEANT MICHAEL      )
DAVIDSON, CLARK COUNTY        )
PROSECUTOR'S OFFICE, CLARK    )
COUNTY SHERIFF'S OFFICE, THE  )
COUNTY OF CLARK and JOHN DOES )
ONE THROUGH TEN,              )
                 )
      Defendants.    )

---

DEPOSITION UPON ORAL EXAMINATION OF JAMES MICHAEL DAVIDSON

---

Monday, November 5, 2012
Olympia, Washington

1      office?

2      A  I assume that those are contained within the file that was

3         provided to me from him.

4      Q  Right.  And you have reviewed those documents?

5      A  To the best of my ability, yes, ma'am.

6      Q  Now, in that first meeting, just for purposes of my

7         question, assume it occurred on September 21, 1984.  What

8         was the purpose of the Spencers' trip or visit to your

9         office?  What was your understanding of why they were

10        coming to your office?

11     A  It was in response to the -- to the report that

12        Mrs. Spencer had initiated.

13     Q  When you say Mrs. Spencer had initiated a report, what's

14        the basis of that conclusion that she initiated it?

15     A  My recollection is, is that we received a report from one

16        of our patrol deputies in which she had initiated a call to

17        our office regarding improper sex -- or improper conduct

18        with a minor child.

19     Q  And you believed that Shirley Spencer called in and

20        reported that alleged improper conduct to your office?

21     A  Yes, ma'am.

22     Q  Did you assign anyone to the case when that call that

23        you're describing was made?

24     A  First of all, again, let me restate that it was not based

25        upon the call.  It was based upon the report that was

1    forwarded to my office from the deputy that responded to

2    that call.

3  Q  And what was the deputy's name who responded to that call?

4  A  I don't know that that's even contained in this file, but I

5    don't recall the deputy's name.

6  Q  Okay.  So a written report came in and you reviewed the

7    report?

8  A  Correct.

9  Q  And the patrol deputy had interviewed Shirley Spencer?

10  A  I believe that's correct, yes, ma'am.

11  Q  And what was your understanding at that point in time --

12    and that was in the summer of 1984.  What was your

13    understanding of the allegations or report that Shirley

14    Spencer was making?

15  A  There was some indication that there was some improper

16    touching of a minor child.

17  Q  By whom -- who had been doing the improper touching in the

18    report that you looked at?

19  A  Mr. Spencer.

20  Q  Did the child allege that anyone else had been engaged in

21    improper touching?

22  A  At that particular point in time, I don't recall anybody

23    else being indicated.

24  Q  So the first time you're notified about the case or become

25    aware of it is through your patrol deputy's report, and

ZELLNER (James Michael Davidson, 11/5/12)

18

1      that report describes Shirley Spencer calling into your

2      office about improper touching of a minor child by Ray

3      Spencer; is that correct?

4    A  That's -- yes, ma'am.

5    Q  So when you received that information, do you assign a

6      detective to the case?

7    A  I did, yes.

8    Q  Okay.  And who do you assign?

9    A  Well, in this -- are we talking this particular instance or

10     any instance?

11    Q  No, we're just talking about the call that came in from

12     Shirley Spencer.  Did you make the assignment -- the

13     allegations against Ray Spencer, did you make an assignment

14     of that case to any detective --

15    A  Yes, I did.

16    Q  -- that you were supervising?

17        And was that Detective Sharon Krause?

18    A  It was, yes.

19    Q  Why did you assign Sharon Krause as the detective to handle

20     the claims about Ray Spencer?

21    A  I can't state at that point that I had a specific reason.

22     I oftentimes reviewed caseloads, reviewed the nature of the

23     allegation, and would assign an investigator because of

24     their particular expertise.

25    Q  And did Sharon Krause have -- in 1984 did she have any

19

1    particular expertise?

2  A  She did.

3  Q  And what was her expertise?

4  A  Child abuse investigations.

5  Q  Had you assigned, up to that point in time, other child

6    abuse cases to her?

7  A  I had, yes.

8  Q  Okay.  And do you know approximately how many cases you'd

9    assigned to her up, until 1984, of alleged sexual abuse of

10    a child?

11  A  No, ma'am, I could not tell you.

12  Q  More than 50?

13  A  Again, I wouldn't even -- I'd hesitate to speculate.

14  Q  Okay.  Well, you might hesitate to speculate, but we have

15    no idea the number of these types of cases that your

16    department was handling in 1984, so if you could just give

17    me an approximation.  I mean, did you have more than 100

18    cases a year in Clark County at that time?

19  A  I'm certain that we did, yes, ma'am.

20  Q  Okay.  Did you have more than 200?

21  A  Again, speculative only, I'm certain that we did.

22  Q  So what -- do you direct Sharon Krause as to what you want

23    her to do in the initial investigation of the Ray Spencer

24    case?

25  A  First of all, I'm not certain that I understand what you're

20

1    asking in terms of my directing her to do anything.  I

2    assigned her an investigation for her to follow up.

3    Q  Okay.  But you'll have to explain -- you've said that you

4    were supervising her, and I'm asking you, did you give her

5    any specific assignment?  You might have told her

6    everything she had to do.  You might have told her nothing

7    to do.  I have no idea how the department was structured at

8    that time.  When you make an assignment, did you meet with

9    the detective?  Did you meet with her about the case

10   face-to-face?

11   A  I'm certain that I -- I met with her at the time of the

12   assignment, correct.

13   Q  Did you tell her "I want you to go to the house and

14   interview the child and interview Shirley Spencer"?

15   A  I do not recall doing that, and I don't believe that I

16   would have had to do that.  Detective Krause was a very

17   intelligent investigator, had had a tremendous amount of

18   experience in investigating these cases, and I don't

19   need -- I wouldn't need to tell her a specific direction at

20   that point.

21   Q  Is it your understanding that she -- and this is in the

22   summer of 1984 when this is reported to your department.

23   Is it your understanding that she goes to the Spencer home

24   and does an interview at that point in the summer of 1984?

25   A  I don't recall whether she went to the house and did an

1    Q  What was the date of when you moved into her house?

2    A  I can't be specific with that, but it would have been

3        probably fall of 1985.

4    Q  I'm assuming when you move into her house, that's not when

5        the relationship transforms from Mrs. Spencer as a

6        professional -- or as a witness into a personal

7        relationship, right?  You've already got the relationship

8        by the time you move into the house in the fall of 1985?

9    A  We're talking personal relationship now; is that correct?

10   Q  Correct.

11   A  My first recollection is, is that we had a social encounter

12       sometime the end of June, the first part of July, which

13       involved having a drink at a restaurant called Waddles in

14       Portland.

15   Q  And that was you say, in June or July of 1985?

16   A  Correct.

17   Q  Okay.  And how did that social encounter get set up?  Who

18       contacted who?

19   A  My recollection is that she came into the office and

20       specifically to see Detective Krause to thank her for all

21       of her efforts and hard work.  If memory serves me correct,

22       Detective Krause was not in the office at that time so she

23       stopped by my office.  I was in the office.

24   Q  What did she say?

25   A  I can't recall the specific conversation, but during the

38

1    course of that conversation, whether I said it or she said

2    it, we made an arrangement at some point in time in the

3    future to have a drink.

4    Q  Was that the first time that you went out in public with

5    Mrs. Spencer?

6    A  That is the first time that I ever saw Mrs. Spencer on a

7    social basis.

8    Q  Now, when that conversation occurred in your office, did

9    you think about the fact that if Mr. Spencer withdrew his

10   guilty plea, that Mrs. Spencer could end up as a witness at

11   his trial?

12   A  I'm not certain that I can even answer that question.  I

13   don't believe I had any conscious thought of that.  At the

14   point that we made that contact, I assumed that the case

15   was in its final disposition.

16   Q  You didn't expect to be sitting here today, right, 25, 28

17   years later?

18   A  No, ma'am.

19   Q  So what made you think that Mrs. Spencer would be willing

20   to go out in public with you and have a drink?  Her husband

21   had just been sent to prison, correct?

22   A  Within a month, month and a half, correct.

23   Q  What made you think that Mrs. Spencer would find that

24   request appropriate or that she would be willing to do

25   that?

47

1    Q  Well, you've had an opportunity to look at this material.

2        You have no sense of why he was arrested the first time,

3        what the evidence was?

4    A  I have the information that's provided in the report, which

5        would indicate that the allegations were made by his

6        daughter, Kathryn Spencer.

7    Q  Was there any other evidence that you're aware of, from

8        reviewing the materials you've been provided, to what was

9        the basis for the probable cause to arrest him the first

10       time?

11   A  I believe there's an indication that he'd taken a polygraph

12       examination.  I don't know that that factored into the

13       decision-making process.  Again, I can't answer what all of

14       the factors were considered in making the determination --

15   Q  Okay.  Well, let's look at --

16   A  -- to arrest him.

17   Q  Oh, I'm sorry.  Let's look at Plaintiff's Exhibit 5 in the

18       materials that I sent you.

19   A  Okay.  We're referring to the report by Stanley Abrams,

20       Ph.D.?

21   Q  Yes.  Is it your understanding that Dr. Abrams gave two

22       polygraph tests to Ray Spencer?

23   A  That's my understanding, yes, ma'am.

24   Q  And the first test, Dr. Abrams concluded, was inconclusive;

25       is that right?

1    A  That's what's reflected in the report, yes.

2    Q  Well, you don't have anything other than his report, right?

3       You don't have any information for us about the polygraph

4       other than what's in the report?

5    A  That's correct.

6    Q  Okay.  Now, the second test, he finds that there's

7       deception, correct?

8    A  That's what's indicated again in the report, yes.

9    Q  Right.  But Spencer's scores were not very high, so the

10      examiner does not feel as certain about the validity of

11      these findings as in most examinations?  You are aware of

12      that conclusion by Dr. Abrams?

13   A  That's again what he has prepared -- in his prepared report

14      that's what it indicates, correct.

15   Q  So you would agree with me that polygraph exam -- I mean,

16      we all know it's not admissible, but did not factor into

17      any probable cause analysis for Ray Spencer's first arrest?

18   A  Again, I'm going to respond that I can't -- I don't know

19      what all of the factors were that were involved with the

20      probable cause to arrest Mr. Spencer.  I wasn't involved in

21      that decision-making process.

22   Q  Do you know -- okay.  Do you know other than -- are you

23      aware, as you sit here today, of any other evidence that

24      would have established probable cause for the arrest of Ray

25      Spencer the first time?

STANLEY ABRAMS, PH.D.
*Clinical Psychologist*

GOOD SAMARITAN MEDICAL BUILDING
2222 N.W. LOVEJOY • SUITE 401
PORTLAND, OREGON 97210
(503) 221-0632

October 11, 1984

Sgt. Michael Davidson
Clark County Sheriff's Office
Vancouver, WA

Re:  Raymond Spencer

Dear Sgt. Davidson:

A polygraph examination was administered to the above
named subject at your request on September 21.  An attempt
was made to determine if he were truthful in his denial of
ever having any sexual contact with his daughter Katherine.
To ascertain this, the following critical questions were
asked:

1.  Have you ever fondled your daughter's genitals?  No
2.  Regarding your daughter, have you ever had any oral
    sexual contact with her?  No
3.  Have you ever attempted to penetrate your daughter?  No

The test was composed of eleven questions and was repeated
five times.  Despite the additional administrations of the
test, the findings had to be considered inconclusive.  Numer-
ically, there was a slight trend in the direction of deception,
but again, a definite decision could not be reached.  Because
of this Officer Spencer was reexamined on September 24.  This
time the critical questions consisted of:

1.  Have you at any time had oral sex with Katherine?  No
2.  Regarding Katherine, have you ever had oral sex with
    her?  No
3.  In so far as oral sexual contact is concerned, has there
    ever been any with your daughter?  No

This test was made up of ten questions and was administered
three times.  The subject demonstrated consistently greater
physiologic responses on the three critical questions listed
above as compared to the control items.  While this was sufficient
to be indicative of deception, Officer Spencer's scores were
not very high so that the examiner does not feel as certain
about the validity of these findings as in most examinations.
Hopefully, further corroboration of these results will be obtained.

Cordially,

Stanley Abrams, Ph.D.

SA/cj

EXHIBIT
5

Spencer000055

CORRECTION SHEET

DEPOSITION OF:  James Michael Davidson
DATE:  11/5/2012
CASE:  Clyde Ray Spencer, et al. v. Former Prosecuting Attorney for Clark County
James M. Peters, et al.
REPORTER:  Dixie Cattell, CCR, RPR

Instructions:  Please carefully read your deposition and on this correction sheet make any
changes or corrections in form or substance that you feel should be made.  You may add
additional sheets, if necessary.  After completing this form, please sign your name in this space
provided.  Please do not mark the transcript.  Thank you.

| PAGE NO./LINE NO. | CORRECTION | REASON FOR CORRECTION |
|---|---|---|
| Page 6, line 16 | I lack approximately 30 hours for my BS degree | Part of initial response not included or not understood |
| Page 9, line 10 | Patrol or Detective | Initial response incomplete or not understood. |
| Page 29, line 25 | Replace "she' with "it". | She is incorrect as it refers "personally" rather than citing the report. |
| Page 36, line 22 | "Convicted" | Initial response inaccurate or not misunderstood. |
| Page 42, line 17 | July 1986 | Correct "1985 |
| Page 47, line 15-16 | Unknown | Question and answer appear incomplete. |
| Page 48, line 19 | Error in sentence structure. | Strike, "that were" |
| Page 58, line 21 | Incomplete answer. | "Detective Krause" |
| Page 64, lines 11-19-24 | Creek | Omitted |
| Page 65, lines 3-7 | Creek | Omitted |
| Page 67, line 13 | Creek | Omitted |

I, the undersigned, James Michael Davidson, do hereby certify that I have read the
foregoing deposition, and that, to the best of my knowledge, said deposition is true and
accurate (with the exception of the corrections listed above).

_12-10-12_
DATE

_James Mush Davelson_
DEPONENT'S SIGNATURE

# EXHIBIT C

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY   )
SPENCER and KATHRYN E. TETZ,   )
          )
      Plaintiffs,   )
          )
  vs.        )   No. 11-cv-05424-BHS
          )
FORMER DEPUTY PROSECUTING   )
ATTORNEY FOR CLARK COUNTY JAMES   )
M. PETERS, DETECTIVE SHARON   )
KRAUSE and SERGEANT MICHAEL   )
DAVIDSON,   )
          )
      Defendants.   )


VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

SHIRLEY JEAN SPENCER

DATE TAKEN:  December 6, 2012
TIME:        9:00 a.m.
PLACE:       613 W. 11th Street
        Vancouver, Washington


COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR




Rider & Associates, Inc.

360.693.4111

1   that.

2       MR. DUNN:  We have copies of these in our

3   files.

4       MR. BOGDANOVICH:  In the meantime, I brought a

5   set that we can probably try to work from so that we

6   don't have to wait.  Let's get the fax going, and then

7   we'll resume.

8       MS. FETTERLY:  The fax is 360-357-5761.

9       MR. BOGDANOVICH:  Ms. Zellner, until we get the

10   documents the way you've grouped them, I think we're all

11   familiar with the way they were paginated as 1 of 8 or

12   22 of 22.  If you go into the groups, if you can just

13   kind of try to identify them by subject and how many

14   pages, we can probably figure out how to follow along.

15       MS. ZELLNER:  Sure.  The entire packet I want

16   marked as group Exhibit A, and then there are various

17   tabs to group Exhibit A.

18   BY MS. ZELLNER:

19     Q.  But I want to start, Ms. Spencer, with your

20   handwritten letter.  You do have that?

21     A.  I have it.

22     Q.  So what I'd like to do is -- because it is

23   handwritten, have you read it out loud.  We'll go two or

24   three sentences at a time and then stop and let me ask

25   you any questions, then we'll go a little bit further.

24

1    We'll just work our way through it slowly because it's

2    an important document in the case.

3        So tell me the circumstances under which you

4    decided to write a letter.

5        A.  Kathryn Spencer wanted me to do sexual favors

6    for her and she wanted to do sexual favors to me.  And

7    it was on an evening of watching a video movie with her

8    and Big Matt and Little Matt.  Her dad was gone.

9        Q.  How long -- and you said that the visit lasted

10   six weeks.  How far into the visit do you think that

11   was?  And was it a week or two or three weeks?

12       A.  It was just two days before she went home, so

13   it was the end of the sixth week.

14       Q.  And up to the point of this event that happens

15   on -- and I believe it's August 24th, 1984, had Kathryn

16   done anything that seemed of a sexual nature to you up

17   to that point?

18       A.  No, ma'am.

19       Q.  Did you notice any behavior on her part that

20   you would characterize as being sexual in nature?

21       A.  She seemed to be a very sexual little girl for

22   a five-year-old.  Always want to go sit on men's lap and

23   hanging on him and hugging on him and wanting to kiss on

24   him and stuff, just kind of unusual for me.  I've never

25   seen that before.

25

1    Q. And is that -- did you notice that fairly soon

2    after she arrived?

3    A. Yeah, pretty much the whole time she was there,

4    yes.

5    Q. And which men did you see Kathryn act that way

6    around?

7    A. Her dad, my sons, friends of Ray's that would

8    come over.

9    Q. Anybody else?

10   A. I can't think of anybody. It really didn't

11   happen with women, except, you know, she liked to be

12   hugged.

13   Q. So leading up to this evening on Friday, August

14   24th, you'd made those observations about her.

15       Let's just start out, if you could read into

16   the record, your words. Let's go like three sentences

17   and then I can ask questions.

18   A. Friday, August 24th, 1984, about 9:00 p.m. The

19   kids all wanted to sleep on the floor in the living

20   room, front room and watch a videotape as they had the

21   night before.

22   Q. Okay. And let me ask you, up until this

23   evening, it sounds like you had done this before with

24   them where you lie on the floor and you watch a video,

25   right?

26

1    A.  You know, I honestly can't recall of how many

2   times that was or would have been.  I know for sure two,

3   you know.

4    Q.  And the other time that that happened, I'm

5   assuming that there was no sexual activity or attempts

6   on Kathryn's part --

7    A.  No.

8    Q.  -- is that right?

9    A.  That's right.

10    Q.  Okay.  So continue on.  While they were

11   watching --

12    A.  While they were watching the cartoon, I took a

13   shower.  When I finished, I put on a movie and Kathryn

14   and Big Matt asked me to lay between them on the floor

15   while they watched the movie.  Ray was at work.

16    Q.  When you did lie on the floor between them, how

17   were you dressed at that point?

18    A.  I would have had my pajamas and bathrobe on.

19    Q.  Okay.  So continue from there.

20    A.  Around 10:00 or 10:30, the boys fell asleep.

21   Kathryn asked me if she could rub my tummy, which was

22   normal for we all rubbed each others backs, legs, feet

23   and tummies, et cetera.  Sometimes it was a whole family

24   project.

25    Q.  Tell me a little bit more about that.  Tell me

1   the circumstances under which that was happening.  Was

2   that in the evening or was that -- explain that to me.

3       A.  Anytime the kids were, you know, might want to

4   go to bed or were going to bed, you know, they liked

5   their backs and their tummies or their legs and feet

6   rubbed, still kind of a practice we do today.

7       Q.  And that was something that you and Mr. Spencer

8   did to the children.  They also did that to you?

9       A.  Yes, ma'am.

10      Q.  If you want to continue.

11      A.  While she rubbed my tummy, she slid her hand up

12  and tried to expose my top a few times and I said,

13  Kathryn, and then she paid close attention -- then I

14  paid close attention.  She would put her arm across my

15  chest and then try to move my robe and feel my breasts

16  and sneak to see if Big Matt was watching.

17      Q.  Okay.  So just so I can visualize that a little

18  bit better, when you say she put her arm across your

19  chest, so she's reaching -- you've got on your bathrobe

20  and under your pajamas; is that right?

21      A.  Yes, ma'am.

22      Q.  And she reaches across you at some point?

23      A.  Yeah.

24      Q.  Is she trying to undo your robe?

25      A.  No, she was like reach across and hug me, like

1    (indicating).  You're laying beside somebody and you

2    throw your arm across their chest, that way, like a hug.

3       Q.  All right.  And then you say she tries to move

4    your robe and feel your breast.  What do you

5    specifically remember her doing, like, how did she try

6    to remove your robe?

7       A.  She kind of pushed up under and moving it apart

8    up under my pajamas, because she was -- move your hand

9    down, trying to move it.  I don't know how to explain

10   it, other than that.

11      Q.  So she does that and then you see her look over

12   at Pat.  Was Matt asleep, Big Matt, was he asleep?

13      A.  Yes, ma'am.

14      Q.  Okay.  So let's continue on, then.

15      A.  Then she tried to slide her hand back to my

16   tummy -- or let's see.  She slid her hand back to my

17   tummy, and all of a sudden she slid her hand down to my

18   front.  Startled, I said, Kathryn.  And she jerked her

19   hand away.

20      Q.  So kind of describe, just with a little more

21   detail, kind of describe that movement that she makes so

22   that we can understand.

23      A.  Well, rubbing my tummy and she tries to put her

24   hand down my front real quick.

25      Q.  Okay.  And when you say she tried to put her

1    hand down your front, you still have your pajamas and

2    your robe on, right?

3         A.  Yes, ma'am.

4         Q.  And how far down does she extend her hand?

5         A.  She just barely got, you know, under my pajama

6    waist.

7         Q.  Okay.  So she actually put her hand inside the

8    robe and under your pajamas --

9         A.  Yes.

10        Q.  -- is that right, that's what she did?

11        A.  Yes.

12        Q.  Okay.  So if you could please continue.

13        A.  She jerked her hand away.  She said, Mommy, can

14   I rub your pee pee.  I said, no, Kathryn.  She said, can

15   I rub -- yeah, can I rub your pee pee, and when I'm

16   done, will you rub my pee pee.  And she said, it feels

17   good.  Can I?

18        Q.  So let's talk about that comment on her part.

19   So you remember that she -- at that point she called you

20   mommy, right?

21        A.  Yes.  Yes, she did.

22        Q.  And does she use the term pee pee?

23        A.  Yes, ma'am, she did.

24        Q.  And had you ever heard her use that term

25   before?

1    A.  I don't know.  I couldn't tell you that.  I

2    can't remember.

3    Q.  But you're sure that -- you're sure that she

4    used that word pee pee?

5    A.  Yes, ma'am.

6    Q.  Okay.  And then she asked you if she could rub

7    your pee pee and when I'm done will you rub my pee pee.

8    She said, it feels good.  Can I?  Now, was she speaking

9    in complete sentences when she said that to you or was

10   she gesturing?  I'm just trying to get a sense of her

11   level of expression.

12   A.  I think she was saying it in complete

13   sentences.  I don't know, ma'am.  It's so long ago, I

14   can't remember exactly.  I don't remember exactly what

15   she said and did.

16   Q.  Okay.  And was this the only occasion in your

17   life, other than with your son, Matt Hansen, that any

18   child had reported sexual abuse to you?  Had you ever

19   been in that situation before?

20   A.  Other than what happened to me, no, never been

21   in that situation with my older children, ever.

22   Q.  And did this -- what she was doing, did it

23   remind you of anything that had happened to you as a

24   child?

25   A.  Actually not.  It just shocked me.

1    Q. Now, let's continue on.  It says you say, no,

2   right?  I said, No.

3    A. Yes.  You want me to read?

4    Q. Right.  Karen is Karen Stone, though, right?

5    A. Yes, ma'am.

6    Q. Okay.  Yeah, if you could continue on.

7    A. She said, Karen let me rub her pee pee.  And I

8   said, no.  I will rub your back and your tummy, not your

9   pee pee.  She kept insisting she wanted me to do this

10   for it felt so good.

11    Q. How do you know that pee pee, in what she's

12   telling you, how do you know that that refers to her

13   genitals?  How do you know that that's what she means?

14    A. Well, I don't know what else it would mean.

15    Q. But does she point at her -- does she point in

16   the area where she wants you to rub or did she just use

17   that term?

18    A. She just tried to push my hand there.

19    Q. And where does she push your hand to?

20    A. She got, you know, just below tummy level,

21   that's it, before I jerked my hand away.

22    Q. So am I correct, though, that she doesn't --

23   she doesn't put your hand on her genitals, right?

24    A. No.

25    Q. And other than saying that she wants you to rub

SHIRLEY JEAN SPENCER   12.06.12

32

1    her pee pee and pushing your hand down below her tummy,

2    does she do anything else that would indicate that she

3    wants some type of sexual contact with you?

4    A.  Other than that, that's it.

5    Q.  I'm just trying to see if there's anything else

6    that you remember.  All right?

7    So if we start in where she again said, Karen

8    and my mommy, do you see that?

9    A.  Okay.

10    Q.  Would you read those three sentences?

11    A.  Again or after that, after my mommy?

12    Q.  Just start reading where you left off.

13    A.  And my mommy let me rub their titties and their

14    pee pee.  At that I started questioning her about Karen

15    and her mommy, and then she told me her daddy was always

16    hurting her and Karen was -- oh, no -- my dad was away

17    hunting and Karen was laying on the bed with Kathryn.

18    Karen had Kathryn untie her robe and rub her tummy then

19    her breasts then she let her rub her pee pee.

20    Q.  Okay.  And again, this is referring to Karen

21    Stone; is that right?

22    A.  Yes, ma'am.

23    Q.  Now, when Kathryn told you about this sexual

24    activity between herself and Karen, did you believe her?

25    A.  I didn't know what to think.  I was shocked.  I

1    was upset, yeah.  I wasn't sure what was going on.  No

2    reason --

3         Q.  Did she seem like she was telling the truth

4    about Karen Stone?

5         A.  I, you know, can't tell you.

6         Q.  During those six weeks that you were with her

7    in 1984, did you ever catch her in any type of lie about

8    anything?

9         A.  No.

10        Q.  Did she ever make up stories in your presence

11   that you found out later were not true?

12        A.  None that I know of.

13        Q.  So after she tells you about Karen Stone, what

14   happens after that?

15        A.  You want me to read some more?

16        Q.  Yeah.

17        A.  I asked her then what she said, Karen once

18   rubbed her pee pee.

19        Q.  Tell me what kind of questions were you asking

20   her to get her to open up to you and talk.

21        A.  Just what I have written here, nothing else.

22        Q.  Okay.  Well, it just says that you asked

23   questions, but I wondered if you remember how you got

24   her to open up and talk about Karen Stone.

25        A.  She's the one that --

1    Q. Did you ask her -- I'm sorry. I cut you off.

2    Go ahead.

3    A. No. She just volunteered that information. I

4    didn't ask her that.

5    Q. As you sit here today, do you think that Karen

6    Stone molested Kathryn Spencer?

7    A. I had no idea. I wasn't sure who did what,

8    just from what Kathryn told me. That's all I knew. I

9    had never been involved in this kind of thing before, so

10    it was new to me.

11    Q. And the letter was written up, was it not, at

12    Ray Spencer's request?

13    A. Absolutely not.

14    Q. Tell me about that.

15    A. I called CPS or Child Protective Services and

16    told them what she had said, and they asked me to write

17    it down. I asked them if I should get some batteries

18    and record it because I had a recorder, and they said,

19    no, it wouldn't told hold up, just to write it down and

20    they'd have an officer pick up the paperwork. Ray

21    wasn't even home.

22    Q. So you make the first call to Child Protective

23    Services. Do you call the next morning after that

24    episode with Kathryn?

25    A. Yes, ma'am.

35

1    Q. And do you remember who you spoke to?

2    A. No, ma'am, I don't.

3    Q. But they advised you not to tape record, right,

4    because it wouldn't hold up in court?

5    A. Yes, they told me to write it all down.

6    Q. Okay. And so when you had written it down,

7    when you're actually writing it, is Ray Spencer home

8    yet?

9    A. No, he's not.

10    Q. So you complete the entire document, what we've

11    marked as the first tap in group Exhibit A, you complete

12    that before he gets home, right?

13    A. Yes, ma'am.

14    Q. All right. Let's continue on.

15    A. Okay. I was just waiting on you to ask me.

16    Sorry.

17    Q. Okay.

18    A. I asked Kathryn how many times did this happen

19    and she said a few. I then asked her about her mommy,

20    DeAnne. She said pretty much the same things, that they

21    rubbed each others tummies, tops and pee pees.

22    Q. All right. And so now she's telling you about

23    her mother doing that. And does she do that with

24    questions from you? Do you say has anyone else touched

25    you inappropriately or does she just volunteer DeAnne's

36

1    name?

2        A. She volunteered her mommy. She didn't say

3    DeAnne. She just said mommy.

4        Q. When she's talking, do you start making notes

5    or how do you actually put the letter together the next

6    day, just from memory?

7        A. Yes, ma'am, part of it.

8        Q. So then if you could start with where it says,

9    I said was this only. Do you see that?

10       A. Yeah. Was this only when mama put medicine on

11   your pee pee because it was sore? And she said, no.

12   She rubbed it other times.

13       Q. Now, were you aware that Kathryn had a sore in

14   the vaginal area?

15       A. Not the summer that she came to our house.

16   That was -- I heard about that was the summer that Ray

17   was living with Karen Stone.

18       Q. Okay. And when you put -- the reason that you

19   put the description about putting medicine on is because

20   you knew that information, right, that Kathryn had had

21   the vaginal sore and medicine had been put on it?

22       A. Well, that and the fact that kids don't wipe

23   good, sometimes they get sore.

24       Q. Okay. And then she said, no, correct?

25       A. She said, no.

1        Do you want me to read more?

2     Q.  Yeah.  Yeah, let's go all the way to --

3     A.  Pardon?

4     Q.  Yeah, continue, please.

5     A.  She rubbed it other times when it didn't need

6  medicine.  And again asked me if I would rub her pee

7  pee.  I said I would rub her back and her tummy, not her

8  pee pee.

9     Q.  Okay.  Let's continue on.

10    A.  She then said, daddy let's me rub his pee pee

11 and he rubs my pee pee.  That really tore me up.  So I

12 kept it light as we watched the videotape and tried to

13 question her more.  I asked her where the boys were when

14 this happened and she said asleep.

15       Do you want me to go on?

16    Q.  Yeah, let's stop at that point.  When she says

17 daddy, do you know at that point if she's referring to

18 Ray Spencer or she's referring to someone back at her

19 mother's home in Sacramento?

20    A.  I only knew of Ray, her own dad.  I didn't know

21 that there was any person in Sacramento.

22    Q.  And I ask that question because you said she

23 was calling you mommy, right?

24    A.  Yes.

25    Q.  So did you think at that point that she was

SHIRLEY JEAN SPENCER   12.06.12

38

1   referring to Ray Spencer or you just didn't know at that

2   point?

3       A. I thought she was referring to Ray Spencer. I

4   didn't know of anybody else.

5       Q. Okay. Can you continue on?

6       A. I asked where the boys were when this happened

7   and she said asleep. I asked her where I was and she

8   said you were at work. I asked her how many times, one,

9   two or three, and she said a whole bunch. She said

10  daddy told her not to tell. I said, then, why are you

11  telling me, Kathryn?

12      Q. Let's go a little bit further.

13      A. She said, I wanted you to know. I said, are

14  you going to tell your mommy, DeAnne? And she said, no,

15  she would never do that. I asked her why? She said

16  mommy -- I asked her why, she said mommy would laugh at

17  me. I asked her if she was going to tell anyone else,

18  and she said no.

19      Q. Okay. So are you asking her if she is going to

20  tell anyone?

21      A. Yes.

22      Q. And then she's telling you, no, that she isn't

23  going to tell anybody, right?

24      A. Right. Do you want me to go on?

25      Q. Yeah.

1    A.  Ray came home from work and I didn't know what

2  to do or say.  I never came up against anything like

3  this before.  I was scared for Kathryn.  Many things ran

4  through my mind:  What to do?  What to say?  How to say

5  it?  But I just couldn't do or say anything to him until

6  I talked with Kathryn more.

7    The next day Ray left for work.  I took the

8  kids to the beach.  While the boys swam, Kathryn laid on

9  the blanket to keep warm and we talked some more.  She

10  said the same story about her mom and Karen and went

11  into more detail about her dad and her big -- and Big

12  Matt.

13    Q.  Okay.  So let me just stop you there because

14  I'm trying to figure out in the sequence.

15    We know that this event with Kathryn occurs on

16  Friday, August 24th.  Is it on Saturday that you write

17  this letter up or do you remember?

18    A.  Yeah, I don't remember the day of the week.  I

19  just remember it was, like, the 24th.  I don't remember

20  the day of the week, though.  I'm assuming it was a

21  Saturday because I probably wouldn't have been able to

22  take them to the beach.  I'd have been working.

23    Q.  And it appears that by Saturday that Ray is

24  home; is that right?

25    A.  I don't know that it was Saturday.  It was the

SHIRLEY JEAN SPENCER   12.06.12

40

1   day after they left.  He didn't come home until the day

2   after they left.

3       Q.  Because on that passage you read back up a

4   paragraph, it says Ray came home from work and I didn't

5   know what to do or say.

6       A.  Right.

7       Q.  I've never -- right, so I'm just trying to

8   figure this out.  Was Ray at work on Saturday and he

9   came home?

10      A.  He came home from work and then he left for a

11  motorcycle convention in Seattle, I think it was, the

12  next morning.

13      Q.  Okay.  So he's just you home for a short period

14  of time.  Is he home that night, that Friday night?

15      A.  Just that night.

16      Q.  So you have this conversation with Kathryn,

17  then Ray comes home, but you don't say anything to him

18  at that point; is that right?

19      A.  That's right.

20      Q.  And tell me, because Kathryn has named all

21  these people, her mother, Karen Stone, Ray Spencer and

22  Big Matt, tell me why you didn't say anything to Ray

23  Spencer at that point?

24      A.  I didn't know what to say or how to say it.

25  The whole thing had me just upset and I didn't know what

1    to do or say.

2        Q. And would it be a fair statement to say at that

3    point you didn't really know whether Kathryn was telling

4    you the truth or she just made all of this up?

5        A. I wouldn't have had a clue where it all came

6    from. I wouldn't assume she would lie. I didn't know

7    her to lie, but I just didn't have a clue where it all

8    came from. It was such a shock.

9        Q. And you would agree that she's describing

10   multiple abusers to you, right?

11       A. Yes, ma'am.

12       Q. And that's similar, I think, to what happened

13   to you, right, not just one person, but there's multiple

14   abusers?

15       A. That has nothing to do with me. But, yes.

16       Q. Well, wouldn't you be more sensitized to this

17   issue, though, having been abused yourself?

18       MR. DUNN: I'm going to object to that type of

19   questioning. You're asking for conclusions or opinions

20   about matters that she's not qualified to give and

21   doesn't -- it would require her to speculate. It would

22   require her to speculate on matters that don't have

23   anything to do with evidence.

24       MS. ZELLNER: Your objection is noted for the

25   record. This is a federal deposition. And unless

1    you're going to instruct her not to answer, I would ask

2    you to answer my question over his objection.

3         MR. DUNN:  You can go ahead and answer.

4         THE WITNESS:  Would you repeat it, now, please?

5    BY MS. ZELLNER:

6         Q.  Sure.  Do you believe that this -- at this

7    point when Kathryn was telling you these things about

8    being sexually abused by multiple abusers, that you

9    personally were very sensitive to this issue of abuse

10   because of your history?

11        A.  No, never entered my mind about me.

12        Q.  Okay.  All right.  So let's continue on.

13        A.  She said that Big Matt stuck his finger in her

14   sometimes.  I asked her about any other men or women and

15   she said no, every time Big Matt came around she said,

16   shush, Matt's coming.  She said, you won't tell dad, and

17   I said, no.  And don't you say anything.  She said dad

18   told me not to say anything -- to tell you.

19        Q.  Okay.  And you're still at the beach when she's

20   telling you all this information?

21        A.  Yes, ma'am.

22        Q.  And you hadn't written the letter yet, right?

23        A.  No, ma'am.

24        Q.  And Ray has come home, but he's left for his

25   motorcycle conference.

1      A. Yes, ma'am.

2      Q. So then what else does she tell you?  Let's

3  continue on.

4      A. Dad told me not to tell you and you tell me not

5  to tell dad.  I said that's a little different.  She

6  said, again -- she again asked me about why I wouldn't

7  rub her pee pee.  I couldn't make her feel dirty, so

8  change the subject and she said -- let's see.  I don't

9  know where I'm at.  Hang on.

10     Q. Sure.  I think it says she said I rubbed you --

11     A. Yeah.  I'm sorry.  She said, yeah, I rubbed

12  you.  I said, Kathryn, you rubbed my tummy, not my pee

13  pee.  And you --

14     Q. I think it says you touched it mom told you no.

15     A. Yeah, you touched it and mom told you no.  She

16  said, I know, but can I, Mom, it feels good?  I said,

17  no, and started questioning her again.

18        And she said dad would lay on his back and she

19  would lay on his tummy and they started out with dad --

20  oh, man, I'm having a hard time, I'm sorry,

21  concentrating here -- and in his robe and shorts and in

22  her nightie and panties.  And then she said she took off

23  her panties and dad, that -- slid daddy's down and he

24  put his pee pee between her legs.  I asked her then,

25  what I said --

1      Q. Let's stop.  There's a couple of things I want

2    to ask you about.

3      A. Okay.

4      Q. You said when you began that last passage, it

5    says she said I rubbed you.  I said, Kathryn, you rubbed

6    my tummy, not my pee pee.  Am I reading that correctly?

7      A. That's right.

8      Q. So she's just said that you rubbed her and yet

9    you know that that's not true.  All that was rubbed was

10   her tummy.

11     A. Was her tummy.

12     Q. So right there in that one sentence, she's

13   telling you that you've also rubbed her and you're

14   telling her, no, that wasn't my pee pee.  Do you

15   understand what I'm saying?  She's actually

16   misconstruing what went on between you and her at that

17   point, because it specifically said, she said, I rubbed

18   you.  I said, Kathryn, you rubbed my tummy and not my

19   pee pee.  Do you see that?

20     A. Right.

21     Q. So you're correcting her when she says that she

22   had actually rubbed you, right?

23          MR. DUNN:  I'm going to object to the form of

24   that question because it's argumentative and calls for

25   conclusions.

1      MR. BOGDANOVICH: I'll object.

2      MS. ZELLNER: Your objection is noted.

3    BY MS. ZELLNER:

4      Q. Did I read that correctly? Is it correct that

5    you wrote down, not my pee pee, correct?

6      A. That's correct. She rubbed my tummy not my pee

7    pee.

8      Q. But you corrected her, am I right?

9      MR. BOGDANOVICH: Object to the form of the

10   question. It's argumentative and inaccurate.

11   BY MS. ZELLNER:

12     Q. You can answer over that objection.

13     A. I don't know how to answer it, other than to

14   say she rubbed my tummy, not my pee pee. So I guess if

15   that's a correction, that's a correction.

16     Q. All right. So then if we go down to where you

17   left off, pick up where you left off.

18     A. Daddy put his pee pee between her legs. I

19   asked her then what she said. He tried to put it in her

20   little hole but it was too big. I said, didn't it hurt?

21   And she said, yes. I said, then what did you do? And

22   she said, I told daddy it was too big. And he said,

23   what can I say, baby girl.

24     Q. Now, I'm assuming that you're trying to quote

25   her directly, am I right?

SHIRLEY JEAN SPENCER   12.06.12

46

1      A. Yes, ma'am.

2      Q. And how long after you're on the beach do you

3   write this letter?

4      A. As soon as we got home.  So we were down there

5   a couple of hours.

6      Q. So when you get home, you write the letter from

7   your memory of what she told you on the beach and also

8   at the house.

9      A. Yes, ma'am.

10     Q. And you would agree with me that the letter is

11  fairly detailed, wouldn't you?

12     A. I think so.  I tried to be accurate.

13     Q. And you tried to put in as much detail as you

14  could, right?

15     A. I put in only what she told me.

16     Q. Okay.  So let's continue on, if you'll keep

17  reading.

18     A. She said, I don't know.  I said, then what.

19  She said to her -- he then kissed her pee pee and she

20  kissed his and tried to or did put it in her mouth.  I

21  asked her if she ever got sore and she said yes.  And I

22  said, from what?  And she said -- what's that word? --

23  from -- and she said from rubbing it.  I can't read my

24  own writing.

25     Q. Please continue.

1      A.  I asked her if he said nice things to her and

2    she said he kisses me and tells me he loves me and tells

3    me I have a pretty bottom.  I asked her if she liked

4    this and she said, yes, and she loves her daddy.  And

5    does he do these things to me?  And I said, that's

6    different, Kathryn.

7       Q.  And so your testimony is that what you've got

8    written here is exactly what Kathryn Spencer told you at

9    the beach, right?

10       A.  Yes, ma'am.

11       Q.  Okay.  Let's continue.  We've got about a

12    paragraph to go.

13       A.  Kathryn feels good about all this.  She likes

14    it and wants it more.  And she said she wants to know

15    what it feels like to do more.  I don't know how to tell

16    her that this wasn't right without making her feel bad

17    or dirty.

18       I asked her if she was telling me stories and

19    she said, no.  I said, you wouldn't tell me lies?  She

20    said, no.  You're not making it up?  No.  I asked her if

21    she had -- she was afraid of me and she said, yes.  And

22    I said, why?  I've never -- I have never spanked you.

23    Are you afraid of that?  And she said, well, my mommy,

24    DeAnne, would spank me and send me to my room.  I said,

25    you know I wouldn't do that.  She said, I know.  And I

1    said, then is this all so? And she said, yes.

2         I then got batteries, called Crises and asked

3    them if I should tape this and they said it wouldn't do

4    any good. It wouldn't hold up in court, so I didn't

5    tape her.

6         Ray called and I told him then -- and then he

7    took it to California Crisis when he got home.

8         Q. Go ahead.

9         A. I told him before he got home, when he called

10   and asked me what was wrong.

11        Q. And you described everything that Kathryn had

12   told you?

13        A. When he called home, I was upset and all I said

14   was Kathryn accused you of molesting her. And he said,

15   Is that all? Oh, well, I'll take care of that when I

16   get home.

17        Q. Well, Kathryn actually had accused him of

18   molesting her. She'd accused her mother, DeAnne

19   Spencer, of molesting her. She'd accused Matt Spencer

20   of molesting her and she had accused Karen Stone of

21   molesting her, right?

22        A. Yes, ma'am.

23        Q. So did you tell Ray Spencer in that phone

24   conversation that she'd accused all those other people

25   of molesting her?

1      A. I don't remember.

2      Q. Did you tell Ray Spencer that you had written a

3   letter?

4      A. I don't remember what I said on the phone

5   anymore.

6      Q. Okay. But I want to make sure that your

7   testimony under oath is that Ray Spencer did not tell

8   you to write up what Kathryn had said to him. Am I

9   correct, he did not tell you that?

10     A. Absolutely not. He did not tell me that. CPS

11   told me that.

12     Q. So when you reference CPS in that last sentence

13   that you just read me, and it says, I then got

14   batteries, called the crisis line because I didn't know

15   what to do. I asked crisis line if I should tape

16   Kathryn. She said it wouldn't do any good, wouldn't

17   hold up in court, so I didn't tape her.

18         Would you agree with me that you don't document

19   the fact that the Crisis worker told you to write up the

20   allegations that Kathryn made?

21     A. I guess I didn't --

22     Q. I don't see it.

23     A. I guess I didn't document that, but they told

24   me to write it up, write it down.

25     Q. Is there any reason you didn't write that down?

1    A. I didn't think about writing it down, I guess.

2    Q. Okay. So when does Ray come home?

3    A. He came home the next day after the kids left.

4    Q. Now, you knew the kids were going to return to

5    Sacramento, right?

6    A. I did.

7    Q. Okay. And you knew that Kathryn had accused

8    her own mother of molesting her, right?

9    A. I did.

10    Q. And did you attempt to contact anybody before

11    Ray got home in Sacramento, since Kathryn was going home

12    to her mother?

13    A. No.

14    Q. So when Ray gets home, tell me as best you can

15    about your conversation with him, what you said to him,

16    what he said to you, and does he come home on Saturday

17    or Sunday?

18    A. I don't remember whether it was Saturday or

19    Sunday. I think it was Sunday, but I don't remember for

20    sure.

21    Q. Okay. So when he comes home, is your letter

22    already written?

23    A. Yeah. Yes, ma'am.

24    Q. So do you show Mr. Spencer your letter?

25    A. Yes, he read the letter.

1    Q.  Okay.  Did he tell you to take anything out of

2    the letter?

3      A.  No.

4    Q.  Did he tell you to alter it in any way?

5      A.  No.

6    Q.  Did he tell you not to give the letter to

7    authorities, to the law authorities?

8      A.  No.

9    Q.  So what do you remember about your conversation

10   with Mr. Spencer when he came home?

11     A.  What he said was it was DeAnne turning the kids

12   against him or some guy that was probably living with

13   her, but DeAnne has been trying to turn the kids against

14   him and he thought that she probably set him up to say

15   these things -- set them up to say these things.

16   Q.  Did he then try to report these allegations to

17   any law enforcement agency?

18     A.  Yeah, he made phone calls.  I think it was to

19   Vancouver or Clark County, I don't even know, and

20   Sacramento.

21   Q.  Did he at any point tell you to keep these

22   allegations quiet?

23     A.  No.

24   Q.  Did he at any point tell you when he gets home,

25   I might lose my job.  We've got to keep this quiet?

1   Krause in her office?

2      A. Yes.

3      Q. In that meeting, do you remember her asking you

4   if Matt had ever complained about his penis hurting or

5   rectum? Do you remember her asking you those questions?

6      A. Yeah, about his bottom hurting, because he had

7   complained about his bottom hurting or tummy hurting.

8      Q. And had Little Matt's complaints about his

9   bottom and his tummy hurting, had they been after

10   February 16th, after the Salmon Creek?

11      A. Yeah, it was after the birthday, I'm pretty

12   sure.

13      Q. Did you take Little Matt for a medical exam at

14   a certain point in time?

15      A. Yes, I did.

16      Q. What were the results of the medical exam on

17   Little Matt?

18      A. I really wasn't privy to that information. He

19   just said it was hard to tell in a child that small

20   because their muscles are so flexible, strong, whatever

21   he said. I don't remember the exact words he said.

22      Q. Was it your idea to take Little Matt for the

23   exam or did Detective Krause recommend it?

24      A. Detective Krause recommended it.

25      Q. And after Little Matt's medical exam, did you

1    talk to Detective Krause about the medical findings on

2    Little Matt?

3        A.  Well, I didn't know the medical findings.  I

4    just said I had taken him.  And all I know is what he

5    said that it was hard to tell, but he didn't tell me the

6    results.

7        Q.  Okay.  We're talking about the doctor?

8        A.  Yes.

9        Q.  The doctor did not tell you that he was

10   observing injury, though, correct?

11       A.  He didn't tell me one way or another.

12       Q.  Did you ever follow up to find out from

13   Detective Krause about what the doctor said in his

14   medical report?

15       A.  No.

16       Q.  Did Detective Davidson also know about the

17   medical exam of Little Matt?

18       A.  I have no idea.  I wasn't really talking with

19   Mike Davidson, just Sharon Krause, so I have no idea

20   what he knew.

21       Q.  So going back to your interaction with Sharon

22   Krause, and we're in that time period about February

23   22nd, did you at a certain point in time conclude that

24   Little Matt had been sexually molested by Ray Spencer?

25       A.  Did I conclude that he was?

122

1      MR. DUNN: Deed.

2      THE WITNESS: -- that paper I took in there,

3   quitclaim deed. He didn't talk to me about seeing him

4   any other time.

5   BY MS. ZELLNER:

6      Q. Did Michael Davidson ever tell you that he'd

7   gotten in trouble with the jail staff, jail personnel,

8   for visiting Ray Spencer?

9      A. No.

10     Q. He never told you that?

11     A. Not that I remember.

12     Q. Okay. Did Michael Davidson ever tell you that

13  he had attempted to convince Ray Spencer to plead

14  guilty?

15     A. No.

16     Q. Would you agree with me that the first time you

17  go out in public with Michael Davidson is in June of

18  1985?

19     A. 1985, in June.

20     Q. That's the first time you go out in public,

21  right?

22     A. Well, never saw him privately before then,

23  either.

24     Q. When does -- does he ask you out or do you ask

25  him out?

1    A. He called and asked me if I'd like to meet him

2    for a drink. And that was in June of '85.

3    Q. And why is it that you started dating Michael

4    Davidson?

5    A. I don't know. I don't have an answer for that.

6    I just met him and talked to him, and I guess I liked

7    him then, liked our conversation. And I guess I just

8    needed, like I said, somebody to lean on.

9    Q. When you say that you talked to him, were you

10   having phone conversations with him before June?

11   A. No.

12   Q. So did you at any point meet Michael Davidson's

13   wife, Linda Davidson?

14   A. I saw her one time, one time only, and it was

15   at her -- I'm trying to think if it was a son or a

16   daughter -- I think it was a son's wedding. That's the

17   only time I ever saw her. And we never really had a

18   conversation. I met her. That was it.

19   Q. Did you ever go to Michael Davidson's house

20   prior to him moving into your house?

21   A. No, I didn't even know where he lived.

22   Q. Is there any other reason that you became

23   involved with Michael Davidson, other than what you've

24   just told us?

25   A. No, because I didn't even like him in the

144

1     A. Yes, ma'am.

2     MS. ZELLNER: Objection. She said she didn't

3  know what the organization was and then you told her.

4     MS. FETTERLY: She said she didn't know then

5  but she knows now.

6     THE WITNESS: I don't know. Now, what was the

7  question? Would you repeat it? I'm sorry.

8     (Last question read by reporter.)

9     THE WITNESS: I didn't understand that then. I

10  didn't even know about it then, but I know this now,

11  what it's for. But nobody ever said anything to me

12  about it.

13     MS. FETTERLY: Thank you. I have no further

14  questions.

15

16          EXAMINATION

17  BY MR. BOGDANOVICH:

18     Q. Ms. Spencer, I'm Guy Bogdanovich. I represent

19  Sharon Krause.

20     I would like to know whether you have ever

21  reviewed the typewritten reports that Sharon Krause

22  prepared, either documenting her interviews with you or

23  her interviews with your son, Matt.

24     A. Yes, I've read them.

25     Q. Okay. When did you read those for the first

145

1   time?

2       A. I don't remember reading any of those reports

3   until I got subpoenaed. If I did, I don't remember

4   them.

5       Q. Do you remember reading -- go ahead.

6       A. And I don't remember just now, but over the

7   last eight months or so.

8       Q. You reviewed them initially around the time

9   that your deposition was taken many years ago and then

10  you reviewed them again in the last -- what? -- in the

11  last eight months?

12      A. Yeah, is what I remember.

13      Q. Okay. If you recall, specifically do you

14  remember reviewing a report where Detective Krause

15  documented all of the difference communications and

16  contacts she had with your husband, Ray, or with you or

17  with both of you together?

18      A. No, I don't remember her interviewing the two

19  of us together. I don't remember.

20      Q. And I don't mean -- I don't mean to use

21  interview in a formal or technical sense.

22          She has a report, for example, that she

23  documented that there was a phone call that occurred

24  between either her or Ray. And there's the same report

25  that contains information about the two occasions where

146

1   you and Ray went into the sheriff's office for Ray to

2   take polygraph examinations.  Do you remember --

3       A.  I did read those.

4       Q.  In your review of that report, did you find any

5   inaccuracies in what Detective Krause was reporting?

6       A.  No, sir.

7       Q.  You recall specifically, though, one of the

8   polygraph incident reports documented in many quotations

9   of statements made by Ray in anger, where he was using

10  the F word repeatedly, and she recorded those

11  accurately?

12      A.  Yes, I remember those.

13      Q.  And then specifically do you remember reviewing

14  a 22-page report that documented Detective Krause's

15  interactions with you and then her interview with your

16  son, Matt, in February of 1985?

17      A.  I remember reading those, yes.

18      Q.  And again, I'd ask you the same question, did

19  you find any inaccuracies in the way Detective Krause

20  documented what was said during those events?

21      A.  No, I didn't find any inaccuracies.

22      Q.  One of Detective Krause's report documented

23  something you told her about Leo Clark calling you at

24  some point and you told Detective Krause that he "got in

25  your face."  Do you remember that incident?

151

1       MS. FETTERLY:  I'd ask the reporter to hand Ms.

2    Spencer the document that has now been marked as Exhibit

3    B.

4       THE WITNESS:  I have it.

5

6          EXAMINATION

7    BY MS. FETTERLY:

8       Q.  And Ms. Spencer, can you take a look at that

9    document, and just -- I just want you to verify that

10   that is actually a copy of the handwritten statement you

11   made on or about August 25th, 1984, which documents your

12   conversation with Kathryn Spencer of August 24 and 25,

13   1984; is that correct?

14      A.  That's correct.

15      Q.  Is that a true and accurate copy of your

16   original notes --

17      A.  Exactly.

18      Q.  -- documenting those conversations?

19      A.  Exactly.

20      Q.  Just so the record was clear, in the earlier

21   portion of your deposition, there was some rather

22   extensive questioning by Ms. Zellner concerning your

23   handwritten document.  And previously the record had

24   stated that that document was Tab A-1.  Do you recall

25   that testimony where you were questioned about that

152

1   handwritten document at some length?

2       A. Yeah, I remember.  Ours just said exhibits.

3       Q. And you read extensively in response to Ms.

4   Zellner's question from that document.

5       A. Yes, ma'am.

6       Q. Is that the document you read from earlier in

7   your deposition the document that's been marked as

8   Exhibit B?

9       A. Yes, ma'am.

10      MS. FETTERLY:  Thank you.  I wanted to clarify

11   that for the record.

12          (Deposition concluded at 2:12 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

84-8506

①

Fri. Aug. 24. 1984, about 9:00 p.m.
the kids all wanted to sleep on the
front room floor and watch the
video as they had the night before.
While they were watching the cartoon
I took a shower. When I finished
I put on a robe and Kathryn and
Big Matt asked me to lay between
them on the floor. While watching
the movie Ray was at work.
Around 10:00 or 10:30 the kids fell
asleep. Kathryn asked me if she
could rub my tummy, which was
normal for me all her back each others
back, legs, feet, tummys etc. some-
times all our family perfect. While
she rubbed my tummy she slid
her hand up and tried to expose
my top a few times and I said
Kathryn and then paid close
attn. to her actions. she would
put her arm across my chest
and try to move my robe and
feel my breast and sneak a look
to see if Big Matt was watching.
I again said Kathryn and she slid
her hand back to my tummy. All
of a sudden she slid her hand

Exhibit 6
12-6-12
Date: S. Spencer
Rider & Associates
800-869-0864

84-8506

(3)

down to my front. Startled, I said Kathryn, and she jerked her hand away. She said mommie can I rub your peepee. I said no Kathryn. She said, can I rub your peepee and when I'm done will you rub my peepee. She said it feels good can I. She said Karen let me rub her peepee. I said no. I'll rub your back and tummy not your peepee. She kept insisting she wanted me to do this for it felt so good. She would grab my hand and try to push it to her peeper. I said no. She again said Karen and my mommy let me rub this, titties and peepees. At that I started questioning her about Karen, then her mom. She told me her dad was away hunting and Karen was laying on the bed with Kathryn. Karen had Kathryn untie her robe and rub her tummy, then her breast, then she let her rub her peepee. I asked her then what and she said Karen rubbed her peepee.

Spencer-05223

84-8506

③

I asked Kathryn how many
times did this happen. She said
a few. I then asked her about
her mom. She said pretty much
the same things that they rubbed
each others tummys-tits and
pee pees. I said was this only
when mommie put medicant
on your pee pee? Cause it was
sore. She said no. She rubbed
it other times when it didn't
need medicant. She again asked
me if I would rub their pee pee.
I said I would rub her back
and tummy not her pee pee.
She then said daddy lets me
rub his pee pee and he rubs my
pee pee. That really tore me up.
So I kept it light as we watched
the video and tryed to question
her more. I asked her where
the boys were when this happened
and she said asleep. I asked
her where I was and she said
at work. I asked her how many
times 1 or 2 or 3 she said a whole
bunch. She said daddy told her
not to tell. I said then why

Spencer-05224

84-8506

C (4)

are you telling me Kathryn I
said I wanted you to know I
said are you going to tell you,
mommy (Diane) and she said
no she would never do that.
I asked her why she said
mommy would laugh at me
I asked her if she was going
to tell anyone else she said
no. Ray came home from work
and I didnt know what to do
or say. I've never come up against
anything like this before. I was
scared for Kathryn, Ray, Many
things ran thru my mind what
to do what to say or how to say
is, but I just couldn't do or say
anything till I talked with Kathryn
more. and the next day Ray
left for work. I took the kids to
the beach. While the boys swam
Kathryn laid on the blanket to
keep warm and we talked some
more. She said her sorry story
about her mom and Karen and
went into more detail about her
dad and her and Big Matt.

Spencer-05225

84-8506

(5)

She said Big Matt stuck his
finger in her bum time. I asked
her about any other men, or women.
she said no. Every time Big Matt
Came around she said she, I, Matt's
Comming. She said you won't tell
dad and I said no, and don't
you say anything. She said dad.
told me not to tell you and you
tell me not to tell dad. I said
that's a little different. She again
asked me about why I wouldn't
out her People, I couldn't make
her feel dirty so I changed the
subject. she said I visited you.
I said Kathryn you pushed my
tummy not my Wiefee. You
laughed it off and mom told
you No. She said I know but
I can't mom. I feel God. I said
no and started questioning her
again. She said dad would lay
On his back and she would lay
On his tummy. They started
out with dad in his Roti in
shorts and her in her nighty
and panties. Then she said she
took off her panties and she

Spencer-05226

84-850C

6

daddys claim and he put his
Pee Pee between her legs. I asked
her then what. She said he
tried to put it in her little hole,
but it was too big. I said did it
hurt and she said yes I said
then what did you do. She said,
I told daddy it was too big and
he said what can I say baby girl
she said I don't know. I told
them what. She said he then kissed
her Pee Pee, and she kissed his
and tried to or did put it in her
mouth. I asked her if she ever
got sore and she said yes. And I
said from what she fell from
rubbing it. I asked her if he
said nice things to her and she
said he kisses me and tells me he
loves me and tells me I have a
pretty bottom. I asked her if she
likes this and she says yes
and she loves her daddy. And does
he do this to me. I said thats
different Kathryn.
If Kathryn feels good about all
this she likes it and wants it
more. She said she wants to know

Spencer-05227

84-8506

What it feels like to do. More, I
didnt know how to tell her that
this wasn't right with out making
her feel bad & dirty. I asked
her if she was telling me stories.
she said no, I said you wouldn't
tell me lies, she said no. Your not
making it up. No. I asked her if
she was afraid of me she said no.
I said why. Why illness have spanked
you. Are you now afraid of that. Well
my mommie I Delphine would
spank me and send me to my
room. I said you know she wouldn't
do that. She did. I know. I
said then is this all so. she
said yes. I then got batteries
and called the Childs Line because
I didn't know what else to do.
I asked Crissie how if I should
tape Katskins. she said it wouldn't
do any good. It wouldn't hold
up in Court, so I didn't tap.
Her. I say then called and I
told him. Then she took it to
Sac Calif. Crissie.

Shirley J. Spencer

Spencer-05228