# EXHIBIT D

1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

CLYDE RAY SPENCER, MATTHEW   )
RAY SPENCER, and KATHRYN E.  )
TETZ,                        )
                             )
        Plaintiffs,          )
                             )
    vs.                      )   NO. 3:11-cb-05424-BHS
                             )
FORMER PROSECUTING ATTORNEY  )
FOR CLARK COUNTY JAMES M.    )
PETERS, DETECTIVE SHARON     )
KRAUSE, SERGEANT MICHAEL     )
DAVIDSON, CLARK COUNTY       )
PROSECUTOR'S OFFICE, CLARK   )
COUNTY SHERIFF'S OFFICE, THE )
COUNTY OF CLARK and JOHN DOES )
ONE THROUGH TEN,             )
                             )
        Defendants.          )

---

DEPOSITION UPON ORAL EXAMINATION OF SHARON KRAUSE

---

Tuesday, November 6, 2012
Olympia, Washington

1    receive these from you last Friday, and so she hasn't had

2    much time to have them available, but she has been given

3    them and has reviewed them.

4        And I also notice the notebooks provided to Dixie

5    Cattell stop at 43 in the index. And then I saw the index

6    you sent to me does include the two training seminar

7    material items as 44A and B. So we've got both of those

8    indexes here today.

9        MS. ZELLNER: Right. Yeah, 44A and 44B are

10   actually from your production requests to us.

11       MR. BOGDANOVICH: Correct.

12       MS. ZELLNER: So 44A and B have your Bates

13   stamps on them. Is that your understanding?

14       MR. BOGDANOVICH: Yeah, that is my

15   understanding. I just wanted to make sure Dixie knew that

16   44 wasn't included in her index.

17       MS. ZELLNER: Okay, thank you for that

18   clarification.

19   Q  (By Ms. Zellner) Ms. Krause, let's start with what we've

20   labeled Exhibit 1 in the binder. If you could turn to that

21   document. If we look at Bates stamp 251, August 30, 1984.

22   Do you see that document?

23   A  I do.

24   Q  Bates stamp 251 and 252, was that index prepared by you?

25   A  I'm sure it was.

10

1    Q  And why are you sure that it was?  Was that a common

2        practice for you to prepare indexes on your case files?

3    A  Not on every case, but when we had a major case --

4            I have to apologize for my voice, but I had a throat

5        infection this summer, and so it's a little raspy.

6    Q  Sure.  Okay.

7    A  When it involved more than one victim or it involved

8        several children or several witnesses, then I would prepare

9        this index.  In the event somebody later needed to find

10       something, they would know which section it was in.

11   Q  And was the index stored with the file, or where was it

12       kept in the Sheriff's Department?

13   A  You know, it -- usually when I prepared the index, it was

14       after the case was completed and I'm putting it all

15       together, and then that index would be attached to the

16       complete file.

17   Q  And do you know if the complete file with the index that

18       was prepared on August 30, 1984, was at some point in time

19       sent to the prosecutor's office before Ray Spencer's plea?

20   A  I can't say that, no.  I don't know that that index went

21       there.

22   Q  Who was responsible for gathering up the documents in a

23       case including the index and sending them over to the

24       prosecutor's office, sending the documents?

25   A  It depended on the case.  If -- you know, this was a real

11

1       sensitive investigation, and initially I recall that there

2       was communication between the prosecutor's office,

3       Sheriff's office, and the city police.

4           And so as it progressed, I know that there were

5       reports going over to the prosecutor; it wasn't when

6       everything was done that it went over.  During that

7       investigation, they were getting them.

8           It was my practice, if we ended up going to trial, I

9       would always sit down with the prosecutor prior to that and

10      go through everything and make sure they had everything,

11      but it --

12    Q  Okay.  So let me see if I understand it.  So what you would

13      do, what your custom and practice was on a case like the

14      Spencer case, would be to send over the reports as they

15      were being done.  But then, in addition to that, if the

16      case went to trial, you would sit down and go through the

17      documents and make sure that the prosecutor had all of the

18      documents?  Is that pretty much what you're saying?

19    A  That was my practice.  And prior to trial, sit down and go

20      through everything and make sure that I had what I needed

21      and the prosecutor had everything I had or, you know, was

22      in our file.

23    Q  And did you ever have the experience with the prosecutor's

24      office when you would have that meeting and go through and

25      describe each report, each piece of evidence, where the

1   prosecutor would tell you that they didn't need certain

2   reports or items and send you back with those to your

3   office?

4   A  I don't ever remember that happening.  If it did, I don't

5   remember.  Even insignificant things would have been, you

6   know, that I felt or they felt were -- would still be

7   included in the case file.  And I don't recall ever a time

8   them sending me back with reports.

9   Q  And do you recall at any time ever withholding any reports

10   from your file or was it your policy to give them -- to

11   give the prosecutor everything in your file on every case

12   that went to trial?

13   A  It would have been my policy to give them everything, and

14   then they would make a determination whether it was

15   relevant or not.  Some things obviously I knew were.  But

16   there were other things -- you know, I'm not a lawyer.  So

17   some things may have been real important from their

18   perspective, so everything I had would go there.

19   Q  Right.  And then you would let them make the decision about

20   whether it was relevant or not?  Is that fair?

21   A  Absolutely.  Yes.

22   Q  Okay.  So we got on this first index, a list.  If you look

23   all the way through to the end on page 252, we have a list

24   of 18 items.  Do you see that?

25   A  I do, uh-huh.

13

1    Q  And this list was prepared on August 30, 1984, correct?

2    A  I'm not sure if it was August 30 that I prepared it or

3        that's when this investigation began.  I'd have to look.

4    Q  Okay.  So that makes sense.  It may actually be when you

5        started the list that you put that date on, but the date

6        doesn't mean that the list was completed at that point; is

7        that correct?

8    A  No, not really because I probably would not have even

9        started this list.  I mean, I didn't add to the list as I

10       went along.  I would have made this list at the point in

11       time that I felt everything was done, and then I would put

12       it in a notebook of some form and prepare the list at that

13       time.

14   Q  All right.  Can you tell from looking at the items on this

15       list what span of time is covered by this list made --

16       that's dated August 30th?  Does it cover a particular span

17       of time?

18   A  I don't know how accurate the span of time would be, just

19       looking at it.  The last date noted is 10/2/84.

20            MR. BOGDANOVICH:  No.  No.

21   A  Oh, 10/18, 10/17.  It would have -- I recall that at the

22       end -- at one point in time during the first part of the

23       investigation I made a little Utility Report indicating

24       that I was suspending the investigation.  I suspect that's

25       when this was made.  So it would have covered that portion

14

1    of the investigation.

2  Q  (By Ms. Zellner)  Okay.  That makes sense, and when we get

3    to the Utility Report, if you could mention that to me, we

4    may be able to confirm that from the Utility Report --

5  A  Okay.

6  Q  -- because I've never, you know, really heard an

7    explanation of this before.  So if you'll just remind me

8    when we get to the Utility Report, we can see if we can

9    connect it up.  So that's Exhibit 1.

10    Now, if we look at Exhibit 2, it appears to be

11    another index, and that's at Bates stamp 3, Bates stamp 3.

12    There's just one page of that.  Do you recognize this

13    document?

14  A  It looks like what I would have done, like the first one.

15  Q  All right.  And it's dated November 8, 1984, correct?

16  A  It is.

17  Q  Now, you probably heard the question before.  How do you

18    explain the fact that the earlier dated index has more

19    items on it, including the Kathryn Spencer medical report?

20  A  Again, I'm -- I think that this index included the second

21    portion, but I don't know.  I can't honestly answer that.

22  Q  Okay.  So that you think the November 8th index included

23    items from the first index, from Exhibit 1?

24    MS. FETTERLY:  Object to the form of the

25    question.

15

1   A   I don't know.  I don't know.  I'd have to look at the

2       reports and. . .

3   Q   (By Ms. Zellner)  Right.  And we will do that.  The issue,

4       I think, is that on August 30, 1984, it's referenced the

5       medical examination report on Kathryn Spencer is included

6       in the August 30th report.  Do you see that under section

7       3?

8   A   Number -- or looking at Exhibit 1?

9   Q   Yes.

10  A   Yes, yes.

11  Q   Section 3?

12  A   Yes, I see that.

13  Q   And then if you'd look over at Exhibit 2, there is no

14      longer mention of the medical examination report on Kathryn

15      Spencer.  Do you see that?

16  A   I do.

17  Q   Okay.  And do you have any explanation why the medical

18      report was not referenced in the second index?

19  A   No, with the exception of what I explained before, that

20      there was that first section and there was an additional

21      investigation, so I don't.  I can't explain that to you.

22      But, obviously, it was in the first one.

23  Q   Do you have any independent recollection of whether the

24      medical report on Kathryn Spencer's exam was turned over to

25      the prosecutor's office?

16

1   A  Could you ask me that again?

2   Q  Sure.

3   A  Thank you.

4   Q  Do you have any independent recollection of whether Kathryn

5      Spencer's medical examination was turned over to the

6      prosecutor's office during the investigation?

7   A  No independent recollection.  It's been so long.

8   Q  Have you -- oh, I know.  Has there been anything you've

9      read in all of these exhibits that's triggered your memory

10     or made you believe that that medical report was turned

11     over to the prosecutor's office?

12  A  I can't -- I can't imagine why -- first of all, I wouldn't

13     have -- there wouldn't be any reason for me not to have

14     done that, and that was our practice.  Everything went

15     there.  However, this -- there were reports on that

16     investigation going over to the prosecutor's piecemeal.

17     I've thought about this a lot since we've got, you know,

18     got involved in this.  There were reports going over not in

19     one big lump.  They were going as we went along.  So there

20     wouldn't have been any reason for me not to have sent that

21     over.

22         Also I've worked with Jim Peters for years, and he is

23     so meticulous, I can't imagine at least discussing that

24     with him, but I'm sure that wasn't the only case he was

25     doing, and this certainly wasn't the only case I was

17

1    responsible for.  But it's possible that that report went

2    to our Records, just that report, what the Utility Report

3    covered.  Now, where it went from Records or if it went to

4    anyplace, I can't say.  I -- however, obviously, I put a

5    copy in my notebook.

6        It was also my practice, when we had a major case, to

7    have two notebooks.  One was my working notebook that I

8    could scribble on, and the other was for the major case

9    with the original reports.

10       So there wouldn't have been any reason why it

11   wouldn't have gone over.  I would have sent it to Records.

12   There were times when I would make copies for the PA, the

13   prosecutor, and I'd put a note on, when I sent them to

14   records, "I've copied these for the PA" or "they have their

15   copies" or "these are for the PA."  So if it went to

16   Records, I don't know if it went from our Records to the

17   prosecutor.  After it went there, I don't know where it

18   went.  And I have no independent recollection about taking

19   it over.

20   Q  All right.  So when material was transmitted from your

21      office to the prosecutor's, it would go to the Records

22      Department in the Sheriff's Department first, and then they

23      would send it over --

24   A  Yes.

25   Q  -- to the prosecutor; is that right?

18

1    A  Yes.

2    Q  Did you ever send -- did you ever send reports directly to

3       the prosecutor's office or did the reports always go to the

4       Records Department?

5    A  It would have to have gone through Records.  I may be the

6       one that made the copies while I was making my copy, but I

7       would attach a note saying, you know, these are for the PA

8       or this needs to go to the prosecutor, but I don't remember

9       directly taking reports over and giving it to them without

10      it going through Records, because it would have had to have

11      been documented.

12   Q  Okay.  So just on these first two exhibits, though, so it's

13      clear for the record, that you did prepare both Exhibit 1

14      and Exhibit 2?

15   A  I think I did.  It looks like my work.

16   Q  Okay.  All right.  Let's go to Exhibit 3, and let me ask

17      you -- and any amount of time you need to look over things

18      is fine.  It appears that this is a report authored by an

19      Officer Stevenson; is that correct?

20   A  That's what it looks like.

21          MR. BOGDANOVICH:  Counsel, I'm sorry, before we

22      leave Exhibit 2 --

23          MS. ZELLNER:  Yes.

24          MR. BOGDANOVICH:  -- I wanted to ask if you

25      could clarify -- there's some handwriting on the Exhibit 2

19

1    index.

2            MS. ZELLNER:  Right.

3            MR. BOGDANOVICH:  Is that --

4            MS. ZELLNER:  Let's do clarify it with her

5    because these are the copies that we got, and I don't know

6    where the handwriting came from, so let me ask her if, in

7    fact, she recognizes the handwriting on Bates stamp 3.

8    Q  (By Ms. Zellner)  Is that your handwriting?

9    A  No.

10   Q  Is there handwriting on Exhibit 1?  I don't think there is.

11           MR. BOGDANOVICH:  I don't think there was, but I

12   know there's handwriting on quite a few of the exhibits in

13   these two notebooks, and I was going to ask for each one if

14   you could verify whose it is.

15           MS. ZELLNER:  Sure, let's do that.  Yeah, I

16   think it's good to do that because we don't know either.

17   We haven't written on these.

18   Q  (By Ms. Zellner)  But to go back to my question on

19   Exhibit 3, do you recognize Exhibit 3?

20   A  Do I recognize it?  Do I have an independent --

21   Q  Yeah.  Have you -- pardon me?

22   A  I read it now.  I didn't remember it or recognize it until

23   I read it.

24   Q  Okay.  But you do remember that an Officer Stevenson was

25   dispatched to the Spencer home in Washington?

26

1    Q  -- in 1984?

2    A  I do.

3    Q  All right, let's look at Plaintiff's Exhibit 4, and I'm

4       going to ask you if you recognize this exhibit.  It's got a

5       number of pages.  Do you recognize this exhibit as being

6       one of the reports prepared by Officer Flood?

7    A  I do recognize it.

8    Q  Okay.  And you had -- this report was sent to your

9       department and would have been in your file during the

10      investigation?

11          MR. BOGDANOVICH:  Well, Counsel, before we go

12      any further with questions, could you maybe clarify, if you

13      can, or ask about the handwriting?  I think there are

14      several pages.

15          MS. ZELLNER:  I will, yeah.  Let me -- I just

16      want to get her to confirm that the report would have been

17      in her files and that she's recognizing it.

18   Q  (By Ms. Zellner)  Do I have a "yes" to that --

19   A  Yes.

20   Q  -- question?

21          All right.  Then, just to get Counsel's question

22      resolved, there is handwriting on different pages of this

23      report, and I'll just ask you, do you recognize the

24      handwriting on the Flood report?

25   A  No, I don't recognize it.

ZELLNER (Sharon Krause, 11/6/12)

27

1    Q  Okay.  Now going to -- what was your understanding of

2        Officer Flood's involvement in the early stages of the

3        Spencer investigation?

4    A  Again, it's not based on independent recollection.  It's

5        based on my review of these reports, but that he -- his

6        department apparently was contacted by Children's

7        Protective Services.  He was assigned to follow up on the

8        complaint that they had.  Based on the -- and he made a

9        phone call to the Spencer residence, spoke -- it's my

10       understanding it was Shirley Spencer he was trying to

11       contact initially, but he spoke with Ray Spencer and then

12       spoke with Shirley Spencer.  Based on concerns, he went to

13       the house and interviewed the children, also subsequently

14       spoke with the mother.

15   Q  Okay.  And is it your understanding of the evolution of the

16       case that Officer Flood was the first law enforcement

17       officer to conduct interviews of the Spencer children?

18   A  I believe so.  I think he was the first one.

19   Q  Do you know if at the time you conducted your first

20       interview of Kathryn Spencer you were aware of the details

21       of Officer Flood's interview of Kathryn Spencer?

22   A  I would think it would be reflected in the report, but I

23       assume -- I believe that I was aware.  In fact, I know I

24       was aware that he had spoke with them.

25   Q  Okay.  And what it seems like you just -- have just stated

ZELLNER (Sharon Krause, 11/6/12)

1    Q  Right, not in general?

2    A  Yeah.

3    Q  Okay, yeah, not -- he's saying about the allegations, she

4        is extremely shy, correct?

5    A  Correct.

6    Q  Okay.  And then when Officer Flood inquires about the

7        specific allegations, Kathryn Spencer tells him several

8        things.  She tells him that her mother has touched her on

9        her potty, but she was only putting medicine on her.  Do

10       you see that?

11   A  That's what the report states, yes.

12   Q  And she also indicated that she did tell Shirley everything

13       that Shirley had told him, but then when asked to explain

14       it or asked specific questions about it she would say she

15       couldn't remember the words so she couldn't tell me.

16           Does that have any investigative significance to you,

17       that the child is, in this first interview, not remembering

18       the words that were told to her?

19           MR. BOGDANOVICH:  I'm going to object to the

20       form.

21           MR. FREIMUND:  I join that objection.  When you

22       said "told to her," --

23           MS. FETTERLY:  To her.

24           MR. FREIMUND:  -- I don't think that accurately

25       characterizes the report.

1    Q  (By Ms. Zellner)  Do you agree with me that the report says

2        that -- and I read it to you -- that "She indicated that

3        her mother did touch her on her potty but only when she was

4        putting medicine on it," correct?  I'm reading it

5        correctly?

6    A  Yes.

7    Q  Okay.  She's not describing being sexually molested, is

8        she, in that sentence?

9    A  No.

10   Q  Okay.  "She indicated that she did tell Shirley everything

11       that Shirley advised me of but when asked to explain it or

12       asked specific questions about it, she would say that she

13       couldn't remember the words so she couldn't tell me."  Do

14       you see -- am I reading that correctly?

15   A  That's what it states, yes.

16   Q  And I'm asking you as an experienced investigator of child

17       abuse if that sentence has any significance to you in terms

18       of the child's ability to retell the story?

19   A  You know, it doesn't -- it does and it doesn't.  First of

20       all, "She indicated she did tell Shirley everything that

21       Shirley advised me of."  I have no idea specifically what

22       Flood told her or said to her.  Then "When asked to explain

23       it and asked specific questions about it, she would say she

24       couldn't remember the words."  But it's difficult for me to

25       make an opinion one way or the other because Flood isn't

31

1    specific about what he did say to her or tell her or ask

2    her.

3    Q  Okay.  In the last sentence it says, "When asked if someone

4    had touched her pee-pee, she shook her head yes, and when

5    asked who, she would say Daddy, and then a few minutes

6    later she would say, Not Daddy, no one."  Am I reading that

7    correctly?

8    A  Yes.

9    Q  And then it says, "Kathryn indicated that her father --

10   that her and her father played a game but she didn't want

11   to talk about the game," and "When asked if someone had

12   touched her on her pee-pee, she would say yes, stop and

13   think for a moment, and then indicate that it was her

14   mother putting on the medicine."  Am I reading that

15   correctly?

16   A  That's what it states, yes.

17   Q  And then on the last page, it appears that Officer Flood

18   "made contact with Matthew, the brother of the victim in

19   this case, and he indicated he knew nothing about what we

20   were talking about."  Am I reading that correctly?

21   A  That's what it states, yes.

22   Q  And then Matthew went on, and he denied that his mother or

23   father had taken any inappropriate actions against him; is

24   that right?

25   A  That's what it states.

34

1    wouldn't have been in my file. And there's also

2    information, I think in one of my reports, where I

3    documented that I had received them.

4    Q  Let's look at Exhibit 6. Again, this is a handwritten

5    report from the King County Prosecuting Attorney's Office.

6    Had you, during the course of the investigation, received

7    this three-page handwritten report in Plaintiff's

8    Exhibit 6?

9    A  I have no recollection, independent recollection, about

10    this report, nor do I recall receiving it.

11    Q  Do you recall ever discussing with anyone during the

12    Spencer case the findings of this Prosecutor Roe in her

13    report?

14    A  I have some memory of discussing this, and I don't remember

15    if it was with Jim Peters or Art Curtis or both. I knew

16    who Becky Roe was because I did training at the police

17    academy and I met her there, so I knew who she was, and I

18    remember that. And I also recall that I had -- this wasn't

19    my request that she review that. It went from the

20    prosecutor's office. So, you know, I was aware of that.

21    But other than that, as far as specifics, I have no

22    independent recollection, nor do I recall if I ever saw

23    this.

24    Q  Okay. And when -- we were talking about this yesterday, so

25    on Bates stamp 227, on that first page of the report, at

35

1    the top it's filled out, it says "Suspect:  Clyde Ray

2    Spencer; Referred Crime:  Officer Sharon Krause, Clark

3    County Sheriff."  Did you provide that information to

4    Prosecutor Roe to fill out this report, or do you think

5    someone else did, because she apparently knew you were

6    assigned to the case, so that's why I wondered if you know

7    how that information got to Prosecutor Roe?

8    A  It wasn't from me.  And it says:  Referred Crime SR

9    something and 1 or a 10, and then it says Officer Sharon

10   Krause and Agency and the Case Number, but it wasn't

11   anything that I provided her with or sent up to her.  This

12   was done independent of me.

13   Q  Okay.  So that -- so you didn't provide her with any of the

14   information contained in the report.  Would that be a fair

15   statement?

16   A  Not directly.  If she had my reports, in that respect --

17   Q  I understand that --

18   A  -- but yeah.

19   Q  -- but I'm just trying to establish if you remember if

20   there was direct contact between you and Prosecutor Roe

21   prior to her writing this report, and I believe what you're

22   saying is there wasn't?

23   A  I don't recall there was.  If there was, I'm not

24   remembering that.

25   Q  Okay.  And then did the prosecutor's office, either

36

1       Mr. Peters or Mr. Curtis, inform you at some point that

2       they had asked Rebecca Roe to review the case?

3    A  I think I already stated that I have some independent

4       memory because I knew who she was and I remember the name,

5       and that it -- they sent some information to her to be

6       reviewed, but I don't know whether I got that from Art

7       Curtis, from Jim Peters or both of them.

8    Q  Okay.  And when you say "they sent," are you saying that it

9       was the prosecutor that communicated with Rebecca Roe?  I'm

10      just trying to clarify that.  It wasn't you, so was it the

11      prosecutor?

12   A  It wasn't me.

13   Q  Was it the prosecutors?

14   A  I don't know.  I'm assuming it was, but I have no -- I

15      don't know.

16   Q  Well, it wasn't Mr. Davidson, was it?

17   A  Oh, no.

18   Q  All right.  Then if we look at Exhibit 7, do you recognize

19      this two-page document?

20   A  I recognize the first page as my work product.

21   Q  Okay.

22          MR. BOGDANOVICH:  Our --

23   A  That's all I have.

24          MR. BOGDANOVICH:  Our copies only have one page

25      for Exhibit 7, not two.

60

1    it was reports or one of us.  I just don't remember that.

2    Q  Right.  And that's always the common practice with a

3       polygraph because someone has to provide the information --

4    A  Right.

5    Q  -- so the examiner can formulate the questions.  Right.

6          Okay.  Your next entry is on 11/1/84 and in that

7       entry you reference having traveled to Sacramento; is that

8       right?

9    A  Correct.

10   Q  Now, on page 10 of 12 on that report, there's -- the second

11      paragraph states that the -- it says, "The daughter's

12      therapist felt it would not be the child's best interest

13      for us to come to Sacramento."  Do you see that entry?

14   A  You're on page 10?

15   Q  Yeah.  Page 10, second paragraph, the last sentence.

16   A  I don't --

17          MR. BOGDANOVICH:  The second full paragraph.

18          THE WITNESS:  Oh, okay.

19   A  Okay.  Can you ask me that again -- I'm sorry -- the

20      question?

21   Q  (By Ms. Zellner)  Right.  There's an entry that indicates

22      that Katie Spencer's therapist had expressed the opinion

23      that it would not be in Katie's best interest for you to go

24      to Sacramento.  Do you see that?

25   A  Initially.  It was prior to me going down.

1    Q  And then -- okay.  Do you have -- is there anything in your

2        file that indicates that she -- that you saw in these

3        documents that she'd changed her mind and said it was a

4        good idea for you to interview Kathryn Spencer?

5    A  I don't remember reading anything.  There was some

6        information referenced Matt, but not Katie.  But I know

7        that had she told me it wasn't a good idea, I wouldn't have

8        gone down there.

9    Q  Well, she actually did say she didn't think it wasn't a

10       good idea, correct?

11            MR. BOGDANOVICH:  Ob --

12   A  At some point initially --

13            MR. BOGDANOVICH:  Yeah, object to the form of

14       question.

15        Go ahead.

16   Q  (By Ms. Zellner)  Okay.  But, I mean, you had that

17       information, you've documented it, that she had said it

18       wouldn't be in the child's best interest, correct?  At some

19       point in time she told you that?

20   A  Initially.  It's in the report.

21   Q  Then are you saying there was a conversation with her where

22       she said that it was okay to interview Katie --

23   A  I don't have any --

24   Q  -- Spencer?

25   A  I'm sorry.  I don't have any independent memory of that.

62

1    However, I can assure you I would not have gone down there

2    and tried to talk to her if I thought the therapist thought

3    that wasn't a good idea.

4    Q  That might be, but I'm looking for evidence of that and I

5    could not find anything from the therapist stating that.

6    And it sounds like you continued. . . .

7                        (Videoconference connection lost)

8                        (Recessed at 10:48 a.m.)

9                        (Reconvened at 10:49 a.m.)

10          MS. ZELLNER:  Can you hear us?

11          MR. BOGDANOVICH:  Yes.

12   Q  (By Ms. Zellner)  Okay.  In this meeting with Ray Spencer

13      on 11/1/84, Sergeant Davidson is present in that meeting,

14      is he not?

15   A  That's correct.

16   Q  And at the end of the meeting on page 12 of 12, you record

17      that Sergeant Davidson made statements indicating that he

18      felt something had occurred between Ray Spencer and Katie

19      based on the statements Katie had made to you and to

20      Shirley Spencer; is that right?

21   A  That's what it -- yes.  The report states that.

22   Q  And he -- okay.  Now, you have -- I want to go in this

23      order, but -- okay, so let's go to Exhibit 10, which is

24      dated 10/2/84, and this is an interview with Karen Stone,

25      correct?

ZELLNER (Sharon Krause, 11/6/12)

75

1      And then you tell her It's important to talk with me,

2  and I need to talk to her.

3      And Katie said, "You can talk, but I don't want to."

4      So Katie indicated to you at the mall that she did

5  not want to talk about the subject matter of which she'd

6  told Shirley, correct?

7  A  Correct.

8  Q  But despite her making that statement, you go ahead and

9     interview her anyway, right?

10  A  Yes, I did.

11  Q  Okay.

12      Do you know what a suggestive question is?  Can you

13  define that for me?  In a child interview what's a

14  suggestive question?

15  A  I don't know what your definition of "suggestive" is.

16  Q  I'm asking you what yours is.  Surely you know that term

17     from being a child interviewer.

18  A  Okay, "suggestive."  If -- I think "suggestive" to me would

19     be indicating facts to the child.  An example would be "I

20     know your daddy touched your privates.  Can you tell me

21     about that?"

22  Q  And would you agree with me that a interviewer, even at

23     this time, in 1984, should not be asking the child

24     suggestive questions?

25  A  Ideally, it would be nice -- it would have been nice to go

76

1    into a room with the child and sit down and ask the child

2    to tell you what happened.  But I can assure you that when

3    you go into the room to interview a little tiny person

4    about sexual things, the ball sort of stops there, and the

5    interview is dictated based on what the child does, says,

6    and I can have all kinds of ideas in my head about what

7    should happen, but that isn't necessarily going to happen

8    because every child is different.  And so you evaluate that

9    interview and the techniques based on the child.

10   Q  And there are no parameters of what is acceptable in

11   interviewing a child?  It just depends on who the child is

12   and what you decide to do; is that what you're saying?

13        MR. BOGDANOVICH:  Object to the form.  Again,

14   without context as to time.

15   A  There are -- I tried so hard not to put words in their

16   mouth.  I interviewed children -- if they weren't sexually

17   abused, I didn't even want them to know about those things,

18   but I was on a daily basis, almost every day, talking to

19   little teeny, tiny people about big people stuff.  So

20   trying to get that information with [sic] them without

21   leading was real important to me.  And I think that makes

22   it real credible and I've seen reports that were so

23   suggestive that it took away any credibility there was.

24   So, you know, I can't tell you -- I just know that each --

25   each child is different and each child's going to dictate

1    how you proceed with the interview.

2    Q  (By Ms. Zellner)  Okay.  Well, one of the criticisms of

3        your interviewing, and let's get to specifics --

4    A  Sure.

5    Q  -- in this interview of Katie Spencer is that you had a

6        style of asking the same question over and over again.  The

7        criticism is that Detective Krause repeatedly asked Kathryn

8        whether her father said anything to her during the alleged

9        sexual activities.  Do you recall that line of questioning

10       to Kathryn?

11   A  I'm sure that I asked her.  I did most of the interviews,

12       once a child had indicated there was some sexual contact,

13       that's a question I would ask them because oftentimes when

14       I would tell them "That helps me understand what they were

15       thinking when that happened," and some real credible

16       information comes from that.

17   Q  Well, let me tell you what the expert says, okay?  I'm

18       going to give you some examples of the repetitive

19       questions, and I'm -- because I'm giving you a chance to

20       respond to this.  He outlines five repetitive questions in

21       this interview.  The first one is, "I asked Katie if she

22       could remember anything her daddy said when that was

23       happening."

24            And Katie stated, "I don't remember."  This is at

25       page 126, 127.

1    Then you ask --

2        MR. BOGDANOVICH:  Excuse me, Counsel.  What

3    document are you referring to, 126?

4        MS. ZELLNER:  That's the Bates stamp number in

5    front of you.

6        MR. BOGDANOVICH:  Is that your expert report?

7        MS. ZELLNER:  Yes.

8        MR. BOGDANOVICH:  Oh, okay.  I don't have that

9    in front of me.  Was that included in your exhibits or --

10       MS. ZELLNER:  Yeah.  It is on page -- it's --

11   let's go up to because I want to ask these with the Bates

12   stamp numbers.  I don't want to sit here for another three

13   hours.

14       MR. BOGDANOVICH:  Right.

15       MS. ZELLNER:  Okay.  So this is Exhibit 17.

16       MR. BOGDANOVICH:  Okay, thank you.

17       MS. ZELLNER:  And it's page 126.  Now, my

18   purpose is not to get her to tell me that these things are

19   in the report because they're in there.  I want to pose the

20   question whether she considers these four questions to be

21   repetitive.  So I would like to read them.  They're in

22   quotes.  Now, if you want to sit here and we can look up

23   each one, we'll do it that way, but we will probably have

24   to continue the dep because there's so many of them.

25       MR. BOGDANOVICH:  No, I'm not agreeing there

1    would be any valid reason to continue the dep, but what it

2    appears you've done is I had understood we were talking

3    about Exhibit 11 in that one report, and now it looks like

4    you're quoting from a report that's actually Exhibit 17,

5    right?

6           MS. ZELLNER:  Right, yeah.

7           MR. BOGDANOVICH:  Okay.

8           MS. ZELLNER:  Because there are criticisms of

9    each interview that was done, I want to talk to her about

10   asking repetitive questions.

11         So if we can go to Exhibit 17, page 126, she asks

12   Katie Spencer if she could remember anything that her daddy

13   said when it was happening and Katie stated, "I don't

14   remember."

15         MR. BOGDANOVICH:  And that's an interview on

16   10/18/84, correct?

17         MS. ZELLNER:  Correct.

18         MR. BOGDANOVICH:  And I do think it's

19   important -- all I'd ask is that you give as brief as

20   possible description about which exhibit and what interview

21   date you're quoting from.

22         MS. ZELLNER:  Right.  These are all going to be

23   from that interview, Exhibit 17.

24         MR. BOGDANOVICH:  Oh, okay.

25         MS. ZELLNER:  But I'm not asking to confirm she

80

1    asked that, because it's in the report --

2         MR. BOGDANOVICH:  Understood.

3         MS. ZELLNER:  -- you know.

4         MR. BOGDANOVICH:  Understood.

5    Q  (By Ms. Zellner)  Okay, so we're talking about the use of

6       repetitive questions.  Let me ask you this.  Do you think

7       that it's proper technique for a forensic interviewer to

8       ask a child repetitive questions in an interview?

9    A  I think it can be.  It depends on the circumstances and if

10      you're taking things out of context.

11   Q  Well, actually, I'm just looking at my expert's report,

12      who's renowned, and he's singled out numerous repetitive

13      questions that you asked, and he's going to offer the

14      opinion that that was improper.  And I'm giving you a

15      chance to respond.  You said you think it's proper to ask

16      repetitive questions?

17   A  I think it can be.  It depends on the circumstances, and it

18      depends on what the context of that was.  What she said,

19      what I'm saying, you take it out of context --

20   Q  Well, let's look at these questions.  Okay?

21   A  Okay.

22   Q  There's four of them from that interview.  So the first one

23      is, "I asked Katie if she could remember anything her daddy

24      said when that was happening," and Katie stated "I don't

25      remember."  Okay?  That was the first response.

87

1    videotape?

2         MS. FETTERLY:  Yes, I have, and I note

3    particularly in the transcript you prepared there's no

4    indication --

5         MS. ZELLNER:  I'm not talking about the

6    transcript.  I'm asking her if she has listened to the

7    tape.

8         MS. FETTERLY:  Okay.  Are you asking -- I just

9    wanted to pose a continuing objection -- I know you're

10   going to reference a transcript -- a continuing objection

11   to reference to that transcript as being an accurate

12   representation of the interview.

13        MS. ZELLNER:  I got it.  That's fine.

14        MS. FETTERLY:  With that, you may question her

15   about that.

16   Q  (By Ms. Zellner)  Have you ever listened to the videotape?

17      Have you watched it without a transcript?

18   A  One time.

19   Q  When?

20   A  It was minutes after I found it in my garage.

21   Q  When you listened to the videotape, do you recall that

22      Katie Spencer said that she hated her stepmother and

23      thought she was dumb?

24   A  I do.  I want to clarify something.  That videotape I

25      watched once, and then I sent it on to the prosecutor's.

1    Since that time, I got a CD disc. I watched that CD one

2    time, but that was more when I was -- actually, when I was

3    doing the interrogatories. Prior to that, I had looked at

4    it.

5  Q  Okay, let's talk about -- we'll come back to this interview

6    with Katie. Let's talk about that videotaped interview.

7    How did you happen to be present on that date for a few

8    minutes of that interview? How did you come to be there?

9  A  I -- when I viewed the tape the first time, I didn't

10   remember the tape. I don't remember the interview. I

11   don't remember or didn't remember why it was done. And

12   when I saw -- when I was going through the boxes and I saw

13   her name on it, I had no memory whatsoever about that tape

14   or why I was --

15  Q  If you could answer my question.

16  A  I don't know.

17  Q  If you -- you watched the tape and you were there for a few

18   minutes, right?

19  A  Yes.

20  Q  Okay. My question to you isn't about you discovering it in

21   your garage. My question is: How did you come to be

22   invited to that interview on December 11, 1984?

23  A  I don't know.

24  Q  You have no idea why you were there?

25  A  I have no memory of that interview whatsoever

1    independently.

2  Q  Okay.  But you are aware that an interview took place,

3    correct?

4  A  I am, based on what I saw on the tape, yes.

5  Q  Okay.  And Mr. Peters conducted the interview; is that

6    right?

7  A  Based on what's on the tape, I would say that's correct.

8  Q  And Katie Spencer at some point early in the interview

9    indicated that she wanted you to not be present for the

10    interview?

11  A  No, that's not exactly correct.  After watching -- when I

12    watched that, those two times I told you about, I think

13    it's -- it appears to me she's real concerned about who's

14    running the camera, and Katie had -- or Kathryn had told me

15    she didn't like to talk to men about this.  And I just felt

16    it wasn't -- I have some feelings about what that

17    interview -- why it was done, what it was for.  But I don't

18    believe it was an investigative interview.  Had it been, I

19    would not have left the room, and I would have entered that

20    tape into evidence.  And Katie -- I just felt like with Jim

21    Peters, her mother and the camera man, it may be better for

22    me to leave.  It was a time when Jim Peters could get to

23    know her and establish rapport.  There wasn't any reason

24    for me to be there.

25    I suggested to her, I said, "Would you like me to

1    leave?

2         And she said, "Yes."  But she didn't ask me prior to

3    that to leave the room.

4    Q  So you remember that she made that request of you to leave

5    the room?

6    A  No.

7         MR. BOGDANOVICH:  Object to the form.  It's been

8    asked and answered.

9    Q  (By Ms. Zellner)  Could you clarify your answer, please?

10        MR. BOGDANOVICH:  Object.  It's been asked and

11   answered, clearly.

12        Go ahead.

13   A  What I -- what I was trying to say is I suggested I leave

14   the room.  It wasn't her suggestion.  And I asked her if

15   she would feel better if I left the room and I don't even

16   remember now if I said something to her about not so many

17   people.  But she said yes and I left the room.  There was

18   no reason for me to stay there.

19   Q  Why was the interview conducted?

20   A  I think I know why it was conducted, but I told you I have

21   no independent memory of that interview whatsoever, but I

22   don't believe, based on what I saw, it was an investigative

23   interview.

24   Q  It really doesn't matter your opinion -- I didn't ask you

25   that.  I'm trying to establish -- you've just told me that

1    you have a recollection of leaving the room, and you've

2    also told me you have no memory of the interview, the

3    purpose of it. So I'm asking you: Do you have any

4    recollection, after having watched the tape twice, as to

5    why the interview was done?

6            MR. BOGDANOVICH: I'm going to object to the

7    form of the question. I think it's argumentative,

8    misstates prior testimony, and it's been asked and

9    answered.

10           Go ahead.

11   A  I have no independent recollection about that interview,

12   about who was present, when it was done or the reason. The

13   only information I have is what I viewed on those two times

14   I told you about, and based on what I saw, I formed an

15   opinion.

16   Q  (By Ms. Zellner)  Okay. And what was that opinion that you

17   formed watching the tape twice?

18   A  The opinion reference why it was done?

19   Q  I'm just asking you. You're the one who said you formed an

20   opinion. What was it?

21   A  Okay. My opinion is that it was not an investigative

22   interview, and had it been, I would not have left the room.

23   Had it been, I would have marked that tape for

24   identification and placed it into evidence. And I believe

25   it was an interview done for the sole purpose of Mr. Peters

92

1    getting acquainted with Kathryn in the event we went to

2    trial and also for him to establish her credibility.

3    That's my opinion.

4    Q  And do you believe, in watching the tape twice, that

5    Kathryn Spencer's competency was established in that

6    interview?

7    A  I watched -- okay, let me think.  Do I believe her

8    competency. . . ?  To some degree in the second portion.  I

9    think the first part of the interview she was real

10    reluctant to talk to him.  During the second part she

11    opened up and was talking to him.  So I think there was

12    some competency established.

13    Q  When you left the room, where did you go?

14    A  We had little work cubicles, and that's where I was, in my

15    work space.

16    Q  Could you view the interview from a different place?  Was

17    there a way to view the room?

18    A  No.  It looked --

19    Q  And then --

20        MR. BOGDANOVICH:  I'm sorry.  Was there more you

21    wanted to say?

22        THE WITNESS:  Yeah.

23    A  You know, I don't remember even where it was done.

24    However, based on what I saw on that tape, I think it was

25    in a little conference room off the Detective Unit, so

1     there would be no way to view it.

2     Q  (By Ms. Zellner)  Okay.  So the Sheriff's Department then

3        did have the ability to videotape interviews, is that

4        correct, at that time?

5     A  Not really.  I wouldn't say that was correct.  We used

6        video cameras at crime scenes occasionally or homicides,

7        but we really weren't set up to actually do an interview.

8     Q  Well, one was done though, right, with a videotape?

9     A  Obviously that one was, yes.

10    Q  Right.  So that occurred -- when the break was taken for an

11       hour and five minutes, did you have any contact with anyone

12       who was in that room during the interview?

13    A  I don't recall.

14    Q  Well, when you say you don't recall, might you have had

15       contact and you just don't remember it?

16    A  I don't remember anything about that, the circumstances of

17       that interview, so I can't say.  I really do not remember.

18    Q  So you don't know where you went -- or you said you went to

19       a cubicle; you do remember that?

20    A  I don't remember that.  That's what I said to her on the

21       tape.  I'm going to go over to my office or work space or

22       something similar.  That's the only reason I said that.  I

23       don't remember.  I don't remember the interview, I don't

24       remember the day, and I don't remember where I went.  I

25       remember -- I only am basing that on what I saw in the

94

1      tape.

2    Q  Okay.  And prior to that interview, during the course of

3      the investigation up to December 11, 1984, did you have

4      conversations with Jim Peters about the case?

5    A  Oh, I'm certain I did.

6    Q  And did you have more than two conversations with Jim

7      Peters from the beginning of this case in the summer of '84

8      up until December 11, 1984?

9    A  I'm sure I would have, yes.

10   Q  Did you have more than a half a dozen conversations with

11     Mr. Peters?

12   A  Unless it's documented in a report specifically, I would

13     have no way of telling you how many times I met with him.

14   Q  Oh, you met with him too.  How many times did you meet with

15     him, would you estimate, between the beginning of the case

16     up to this interview of December 11?

17   A  I don't have any idea unless it's documented in a report,

18     or the same with the phone conversation, unless it's

19     documented in a report, whether I met with him, with Art

20     Curtis or both of them, I would have no way of knowing

21     that.  I don't remember.

22   Q  Okay.  You are obviously present for some of that

23     interview.  Do you have any recollection of why you were

24     present at the interview?  You may not know why he was.  Do

25     you know why you were there?

1   A   No, I don't.  And that's honest.  I don't remember that

2       interview.  I don't remember getting ready for that or

3       where it was done.  I'm not even sure it was the Sheriff's

4       office camera.  I do not remember it.

5   Q   Okay.  Now, this interview we're talking about in

6       Exhibit 11, the one that we have your notes on, do you have

7       an independent recollection of that interview?

8   A   With Kathryn at the hotel?

9   Q   Yeah.

10  A   Some events I did.

11  Q   Okay.  Well, let's go back to the videotape.  You said

12      something about your garage?  Tell me about the videotape

13      in your garage.  Was it in your garage?  I don't know.

14  A   It was in my garage.

15  Q   And when did you discover it?  What year was it?

16  A   It should be reflected on my letter to Denny Hunter, with

17      the prosecutor's office, because the minute I found the

18      tape, I took it in, viewed it, and I immediately called

19      Dennis Hunter, and I sent it off to the prosecutor that

20      very same day.

21  Q   Do you think that that was possibly in 2009 when you

22      discovered it in your garage?

23  A   I'd have to look for sure, but I think it was.  Whenever it

24      was I sent it up there.

25  Q   And what were you doing in your garage that led you to

1    discover the videotape?

2  A  I was going to clean or go through the boxes, because that

3     wasn't the only box.  I had a bunch of boxes I needed to go

4     in there and clean them out.

5  Q  Okay.  And were those boxes, the other boxes, did they

6     contain information from other cases that you'd worked on

7     at the Sheriff's Department?

8  A  No.  I saw nothing from other cases.

9  Q  Okay.  Did -- was the videotape the only thing that was in

10    those boxes that was potentially evidence in a case?

11         MR. BOGDANOVICH:  Object to the form of the

12    question.

13       But go ahead.

14  A  I don't believe that videotape was evidence, or it wouldn't

15    have been in that box.

16  Q  (By Ms. Zellner)  What else was in the box?

17  A  All of the training materials that we provided you with.  I

18    was surprised I had -- I was pretty sure I had my training

19    notebook, but the seminars and the things that I presented

20    at, certificates that I got from work, there was a

21    Spellcheck, some cards, business cards, from the Sheriff's

22    office.  I had some little badges that I used to give

23    children occasionally.  I had a couple of those in there.

24    Some extra handouts from training were in those boxes.

25  Q  Was there any identifying -- was the videotape labeled in

1      any way?

2      A  It was.

3      Q  What did it -- how was it labeled?

4      A  I don't recall specific -- it either said Interview with

5         Kathryn Spencer or Kathryn Spencer Interview, and that's

6         what caught my attention, when I saw the little label on

7         the outside of it.

8      Q  Did it have a case number on it?

9      A  You know, I don't remember.  I don't remember it had a case

10        number or -- I didn't remember there being a date, but it

11        could have been.

12     Q  Was it a VHS tape?

13     A  Yes.

14     Q  It was?

15     A  Yeah.

16     Q  Did you say "yes"?

17     A  Yes.

18     Q  Where is that tape now?

19     A  I have no idea.  I told you already the minute I viewed it,

20        saw what it was, I called the prosecutor's office, spoke to

21        Denny Hunter, packaged it up, went to the post office and

22        shipped it off to him that day.

23     Q  Okay.  So who is Denny Hunter?

24     A  I think at the time, Dennis Hunter worked for the

25        prosecutor's office, and I think at the time he was the

1      chief criminal deputy.

2   Q  So you took the tape, you went inside, you sat down, you

3      watched it, correct?

4   A  Yes.  Immediately after I found it.

5   Q  Okay.  Then why did you call Denny Hunter?

6   A  Well, it's kind of ironic that I ran across that tape after

7      there were some issues about Ray Spencer again.  And when I

8      viewed it, she clearly on the second portion was acting out

9      with the dolls, and not only that, I couldn't remember

10     where that tape came from when it was done, and I thought

11     somebody needed to have it.  They needed to have that tape.

12  Q  And why did you think -- I'm just trying to get into the

13     details of this.  Why did you think they needed to have the

14     tape?  Why did you think it was significant?  Specifically

15     why did you think it was?

16  A  Because at the time I couldn't even remember when it was

17     made or why it was made and if it had any significance.  I

18     couldn't imagine why it was in my stuff in my garage.  So

19     I -- that's why I called.

20  Q  And when you spoke to Dennis Hunter, what did you tell him?

21  A  I told him the circumstances of finding it and --

22  Q  Tell me specifically what you told him.  Give me the

23     general idea of what you said.  Did you say "I was cleaning

24     out my garage" and -- I mean, how did you explain it?

25  A  I don't remember exactly what I told him.  I think -- as I

1    explained in the letter to him, I let him know I was out

2    there cleaning. I ran across this tape. I saw the label

3    on it that I told you about. I immediately went in and

4    viewed it; couldn't remember when it was done, why it was

5    done, and because it was -- this other stuff with Spencer

6    had -- you know, I knew that there were some things going

7    on. I thought they needed to have it. I didn't know why I

8    had it when I --

9    Q  What did you know was going on at that point in time?

10   A  Well, I think that was in -- at the time I found it, I knew

11      that he had some, you know, there was some court action

12      involving him, that he had filed, and I think at that time

13      it was -- there'd been all kinds of articles in the paper.

14      I don't remember if that was prior to 20/20 calling me all

15      the time or Oprah Winfrey calling me all the time, her

16      program, but there was some activity, so I was aware

17      that -- and, like I said, it was ironic that I ran across

18      it at that time. I didn't know why I had it or what it

19      was.

20   Q  So when you talked to -- after you watched it and you

21      talked to Mr. Hunter, then you packaged it up and sent it

22      to him or you took it to him, or how did you transmit it?

23   A  Denny Hunter was in Vancouver, Washington. I live in

24      Arizona.

25   Q  Okay.

1   A  So I found it in my garage in Arizona. I viewed it. As

2      soon as I saw what it was or knew what it was, I called the

3      prosecutor's office. I spoke to Dennis Hunter, and based

4      on his instructions, I wrapped it up and took it directly

5      to the post office and mailed it out that very same day I

6      found it.

7   Q  Okay. So you mailed it to Mr. Hunter, and then when do you

8      next hear about the videotape? Does anyone call and

9      interview you?

10  A  I don't remember.

11  Q  Did you talk to Mr. Peters about finding the tape?

12  A  At some point in time I talked to him about that, but I

13     don't remember when that was.

14  Q  Was it within a year of finding it or was it fairly soon

15     thereafter?

16  A  I don't remember when it was I talked to him, but I do

17     recall that there was some conversation about that tape.

18  Q  And what did Mr. Peters tell you about the tape? Because

19     he remembered it, right?

20          MS. FETTERLY: Object to form.

21       You can answer if you know.

22  A  I don't know. I don't remember specifically what he said.

23     I . . . I don't remember --

24  Q  (By Ms. Zellner) But he knew that the interview had taken

25     place, didn't he --

1      MS. FETTERLY:  Object to the form.

2    Q  (By Ms. Zellner)  -- or did he have amnesia too?

3      MS. FETTERLY:  Object as to form; argumentative.

4      MR. BOGDANOVICH:  Counsel, I object to the form

5    of the question.  I don't think that's appropriate under

6    the rules for taking a deposition.

7    Q  (By Ms. Zellner)  Can you explain to me whether Mr. Peters,

8    when you talked to him, indicated to you that he remembered

9    the video?

10   A  I don't recall whether initially he said I remember the

11   video or not.  At some point in time there was some

12   discussion.  I can't be more specific than that.

13   Q  Some discussion of what?

14   A  About this tape.  Why it was made or why it was in my

15   garage.  I think that was initially -- at some point in

16   time we were told not to discuss things with each other,

17   and neither one of us talked about that.

18   Q  Okay.  But you do remember having a conversation with

19   Mr. Peters specifically about the videotape; is that right?

20      MR. BOGDANOVICH:  Object.  Asked and answered.

21   Q  (By Ms. Zellner)  Is that right?

22   A  At some point in time I know that Jim Peters and I

23   discussed the tape, my finding the tape.

24   Q  Did Mr. Peters tell you, "I don't remember that interview

25   either"?  Did he tell you that?

1    A   I can't answer that because I don't remember if he ever

2        said that specifically.

3    Q   Did Mr. Peters indicate that he knew that a videotape had

4        been made?

5    A   I don't -- I can't answer that either because I don't

6        remember specifically what he said.  I can't --

7    Q   So you just have a total blank about what Mr. Peters said

8        about the tape?

9    A   Well, I can't be specific.  All I can remember is there was

10       some conversation.  I didn't remember the tape or why it

11       was done or when it was done.  And it almost seems to me

12       initially he even had some questions about it, but I can't

13       be specific.

14   Q   Okay.  So you have the conversation with Mr. Peters about

15       the tape.  Do you speak to anyone else about the tape

16       between when you found it and today, other than your

17       attorneys?  Have you talked to anyone else about it?

18   A   Other than the attorney, I don't -- and Mr. Hunter, I don't

19       remember discussing that tape with anyone else.  If I did,

20       I don't remember.

21   Q   Did you discuss it with Mr. Davidson?

22   A   You know, I don't remember a conversation with Michael

23       Davidson about that tape.  I'm not saying I didn't.  I'm

24       saying I don't remember ever discussing it with him.

25   Q   Did you only have one conversation with Jim Peters about

1    the tape?

2    A  I remember at some point in time having a conversation

3       about that tape.  Whether there was another conversation, I

4       don't recall.

5    Q  When you left that interview, the videotaped interview,

6       after a few minutes, do you recall being given the

7       videotape?  Even if you don't remember the interview, do

8       you recall being given the videotape?

9    A  No, I don't.

10   Q  How do you think the videotape came into your possession?

11   A  Again, I'm speculating.  What I think is I told you it

12      wasn't an investigative interview.  It was a time when

13      those two could get acquainted; he could establish her

14      competency.  And at the end of that interview it was given

15      to me, and it went in a drawer in my desk.

16          When we moved from the Sheriff's office building to

17      CAIC, I had packed up a bunch of stuff that I wasn't using.

18      That included -- some of the things I just explained that I

19      had in those boxes went to CAIC.  The boxes were stored

20      there.

21          When I retired, I took that stuff with me, those

22      boxes I had in storage, and we lived at the beach.  They

23      went in my garage at the beach.  We sold that house, and

24      all that stuff went into storage for two years until we

25      bought a home in Arizona, and it ended up in my garage down

104

1    there.  And because of all kinds of things that were going

2    on with my life, cleaning my garage was not a priority.

3    And so finally I just made up my mind I had to go through

4    that stuff.  And, you know, there was other things.  I had

5    boxes of all kinds of garbage out there, you know, that I

6    needed to go through, so I think that's what happened --

7    Q  Prior -- go ahead.

8    A  -- with the tape.

9    Q  Did you find any other items in your garage that you mailed

10   back to Dennis Hunter other than the videotape?

11   A  No.  I don't believe -- I sent him the tape.  That was the

12   only thing I had.

13   Q  After you watched the tape, do you agree that the tape

14   should have been in the Spencer files --

15        MR. BOGDANOVICH:  Object.  Asked --

16   Q  (By Ms. Zellner)  -- of the Sheriff's Department?

17        MR. BOGDANOVICH:  Object.  I think it's been

18   asked and answered.

19        MS. ZELLNER:  I don't think it has.  I haven't

20   asked that question.

21        MR. BOGDANOVICH:  Go ahead.

22   A  No.

23   Q  (By Ms. Zellner)  Do you agree that the tape --

24        MS. ZELLNER:  I notice she keeps looking at

25   Counsel, but I wish she would just answer the question.

105

1        MR. BOGDANOVICH:  I'm sorry.  Somebody passed a

2    note to me that I think may have distracted the witness.

3    And beyond that, I'd object to your characterization.

4        But go ahead.  I want you to remember, Sharon,

5    even --

6        MS. ZELLNER:  She's done that repeatedly in this

7    deposition --

8        MR. BOGDANOVICH:  Even if --

9        MS. ZELLNER:  -- but if she'd just answer my

10   question.

11       MR. BOGDANOVICH:  Even if I object, Sharon, you

12   should go ahead and answer if you can, unless I tell you

13   not to.

14       THE WITNESS:  Okay.  That was my concern:  If

15   he's objecting, was I supposed to answer?

16       Okay, the question again, please.

17       MS. ZELLNER:  Could the court reporter read the

18   question back?

19       THE COURT REPORTER:  Question:  "After you

20   watched the tape, do you agree that the tape should have

21   been in the Spencer files of the Sheriff's Department?"

22   A  My answer is no.

23   Q  (By Ms. Zellner)  Then why did you call Dennis Hunter to

24   turn the tape in?

25       MR. BOGDANOVICH:  Object.  Asked and answered.

106

1      Go ahead.

2    A  That first time when I interviewed it -- or when I viewed

3      it, I had no idea what it was.  In retrospect and thinking

4      about that, and I've thought about it a lot, like other

5      things in this case, I don't think it was evidence at all.

6      I think it was a casual thing and why -- it wasn't my idea

7      to tape it, I don't believe.  And for whatever reason, if

8      it had been for evidence, it would have been placed into

9      evidence.  And that's how I think it ended up in my desk.

10      MS. ZELLNER:  Okay.  I want to stop right now

11      and take a break.  Our food is here so we'll come back to

12      those.

13      MR. BOGDANOVICH:  How long do you want to break,

14    Counsel?

15      MS. ZELLNER:  Twenty minutes.

16      MR. BOGDANOVICH:  Twenty?

17      MS. ZELLNER:  Yes.

18                (Recessed at 12:22 p.m.)

19                (Reconvened at 12:54 p.m.)

20    Q  (By Ms. Zellner)  When did you retire from the Sheriff's

21      Department?  What was the year and date?

22    A  I think it was October 5, 1995.

23    Q  And where was your office located in the Sheriff's

24      Department?

25    A  It was located in the Investigative Unit, and that was on

134

1    A  Yes.

2    Q  Okay.  And then in a later interview, which we'll get to,

3       but on page 123, you bought an ice cream sundae for Katie

4       at a Dairy Queen, correct?

5    A  On page 123?  I think we did.  We talked in the car?

6    Q  Yeah.

7    A  Yeah.

8    Q  And then with Big Matt, or Matt Spencer, you bought for him

9       a hot chocolate at a coffee shop?

10   A  I believe that's correct.  At the motel.

11   Q  Okay.  And then you also bought him or got him a soft drink

12      at the Sheriff's office.  Do you remember giving the

13      children those things to eat and drink?

14   A  I don't necessarily remember it, but I remember reading

15      that that's what occurred.

16   Q  Okay.  Did you also -- in your interviews with the

17      children, did you also comment to them about what the other

18      children had said about Mr. Spencer?  And we could go to

19      page 83, but before we go to this, I'll give you the

20      specific page numbers.  Was that a technique that you used?

21      You'd tell one child what the other child had said?

22   A  Not if I could help it.

23   Q  Okay.  Well, we've got -- I've got five examples of you

24      doing that.  On page 83 your report says, quote, at that

25      time I indicated to Big Matt that what Katie had said was

1      that her father had touched her on her private areas.  This

2      is at page 83.

3  A  Okay.

4  Q  So I'm asking you, assuming that you've said that, do you

5      believe that's a good method of interviewing a child?

6  A  I -- I need to explain.  First of all, I wouldn't have done

7      that normally.  However, Matt -- it was different with him.

8      And it's like I said before, if I interviewed 100, I

9      probably would do it 100 different ways, even though you

10      have a protocol and you try to do things.

11         Matt was real concerned about what his sister had

12      said, and I knew Detective Flood had talked to them, and he

13      had some information.  I didn't know what his mother had

14      said, but he clearly had some idea of what was going on.

15      So, no, if I had a choice, I wouldn't have done it that

16      way, but I didn't think I had any other way I could do it.

17  Q  Do you agree, though, that giving information from one

18      child to the other child about the details of the alleged

19      offense can contaminate the memory of the child, that

20      that's the problem with doing that?

21  A  I don't know if I'd say contaminate the memory.  I don't

22      think that's a preferable way to do it.  However, again,

23      sometimes you just don't have choices.

24  Q  Okay.  Well, the second example of that is on page 84.  And

25      that's going to be in Exhibit 14.  Can you tell me what

1    Exhibit 14 is?  If you'd look at the first page, that's

2    another Utility Report that you prepared, correct?

3  A  Right.  That's the first -- 10/17/84 interview with Matthew

4    Ray Spencer.

5  Q  Right.  And in that interview on page 84, it says, quote, I

6    indicated to Big Matt that the genital area was one of the

7    things that Katie had said to me.  So, again, you felt that

8    you had to pass on information to Matt of what Katie had

9    said?

10  A  At that point in time I said that to Matt, I'd have to look

11    specifically at what the conversation was before.  That

12    wouldn't be the way I'd prefer to do it, but for some

13    reason I felt like I had to do it that way.

14  Q  Okay.  And then also on page 84 and 85, you state to Matt,

15    "At that time I told Big Matt that during the conversation

16    with Katie the day before she indicated to me that during

17    the summer visit in Vancouver, her father had put his mouth

18    on the private areas of her body and also had made her put

19    her mouth on her father's penis.  I related to Matt that

20    Katie had also made the statements indicating that her

21    father had placed his bare penis on the private parts of

22    her body where she goes to the bathroom from."  That's on

23    84 and 85.

24       So, again, would you give me the same answer, that's

25    not a preferable method, but that's what you did?

1    A  That wouldn't be the -- right.  It wouldn't be the

2        preferable method of doing that.  However, whatever was

3        going on in that interview, I felt it was necessary.

4    Q  Okay.  And do you also -- do you have a recollection of

5        discussing with Big Matt what his stepbrother, Matt Hansen,

6        and Katie had previously said about Mr. Spencer?  So did

7        you convey information to Big Matt about what Little Matt

8        had said about Ray Spencer molesting him?

9    A  The second interview with Matthew Spencer, I did indicate

10       to him that both Kathryn and Little Matt, they called him,

11       had said some things occurred to them, but also that he was

12       also a victim.  And I, without reading the report, wouldn't

13       remember that.

14   Q  Okay.  One of the other methods that you used in these

15       interviews -- and I could give you the page cites.  The

16       first one is on page 66, so that's Exhibit 11 -- you tell

17       the children that by telling you information that it would

18       allow, in this case, Mr. Spencer to get help.  So you,

19       specifically on page 66 of this Exhibit 11, say to Kathryn,

20       "Sometimes people did things they weren't supposed to do

21       because they were sick and needed help."  "I told Katie

22       that that was why it was important for us to talk.  In

23       order for to us to help someone who was sick, we needed to

24       know what was wrong."  What was your reason for telling

25       Katie that you were trying to get help for Mr. Spencer?

195

1           EXAMINATION

2   BY MR. FREIMUND:

3   Q  Ms. Krause, could I direct you to Exhibit 34 that was

4      supplied to you by Ms. Zellner, the plaintiff's lawyer in

5      this case, and particularly direct your attention to pages

6      38 through 41 of Exhibit 34.  And if you would just briefly

7      review that, I have some questions.

8   A  Page 38?

9   Q  To 41, yes.

10  A  Um-hmm.  Okay.

11  Q  Let me know when you've had a chance to review that,

12     please.

13  A  Okay.

14  Q  After reviewing your testimony from the 1996 evidentiary

15     hearing, can you tell us, please, when you found out that

16     Mike Davidson developed a personal relationship with

17     Shirley Spencer?

18  A  I don't remember the date.  I remember it was along -- it

19     seems like a long time after that.  And, again, I've

20     thought about it a lot.  I don't believe for one second it

21     was during the Spencer investigation.

22           MS. ZELLNER:  I want to object to that being

23     nonresponsive.

24           MR. FREIMUND:  I didn't find it nonresponsive.

25  Q  (By Mr. Freimund) But can you tell us, then, was it before

1    or after Plaintiff Ray Spencer was convicted on an Alfred

2    plea of guilty that you first found out that Mike Davidson

3    had developed a personal relationship with Shirley Spencer?

4  A  I believe it was after.

5  Q  Why do you have that belief?  What makes you think that it

6    was after he was convicted?

7  A  I had an incident prior to this when one of our good

8    friends, who is a deputy, of my late husband and I had

9    inappropriate contact with a victim in a case we were

10   investigating intimate contact.  The minute I heard, I was

11   in reporting to administration.  Had I suspected, had I

12   seen anything that would have led me to believe there was

13   something going on between the two of them, or I was

14   certain there was, I would have immediately reported it to

15   a supervisor.

16       And I told my friend before, I said, "I'm not losing

17   my reputation and job over your stupidity," and I told him

18   I'd reported it.

19       The other thing is that it seems to me at the time I

20   became aware of it, it was pretty much common knowledge.  I

21   would hear other people talking about, and Shirley Spencer

22   was coming into the Department at times.  I have no doubt

23   in my mind if that would have been during the Spencer

24   investigation, administration would have pulled him out of

25   there so fast, he wouldn't have been allowed to do anything

1     involving that investigation. That's why I don't, you

2     know, why I believe what I do.

3          MR. FREIMUND: Thank you. I don't have any

4     further questions at this point.

5          MS. FETTERLY: I have no questions.

6          MS. ZELLNER: Actually, I do.

7               EXAMINATION

8     BY MS. ZELLNER:

9     Q  On the issue of the relationship, at some point Sergeant

10    Davidson and Mrs. Spencer go public with their

11    relationship. You sat in his deposition yesterday,

12    correct?

13    A  Yes.

14    Q  Okay. And he described going out on June 16, 1985, having

15    a drink with her after Mr. Spencer had been convicted and

16    probably shipped off to prison. Do you remember that?

17    A  Yes.

18          MR. FREIMUND: I object. That mischaracterizes.

19    He didn't give any precise date like that.

20          MS. ZELLNER: He most certainly did. He even

21    told us the restaurant they went to.

22          MR. FREIMUND: He did tell you the restaurant.

23    He did not say it was June 16. You're mistaken.

24          MS. ZELLNER: He said June 16. Well, we'll look

25    at the transcript.

200

1       MS. ZELLNER:  Let my finish my question.

2       MR. FREIMUND:  I'm going to object that that's

3   an improper hypothetical --

4   Q  (By Ms. Zellner)  Would that be true that it would be

5   improper --

6       MR. FREIMUND:  -- that it assumes facts not in

7   evidence.

8   Q  (By Ms. Zellner)  -- and you would have reported it?

9       MR. FREIMUND:  I've now got to say my objection

10  on the record.

11      MS. ZELLNER:  Intimidated.

12  Q  (By Ms. Zellner)  Just answer the question, please.

13      MR. FREIMUND:  I think you're going to have to

14  restate it because I was getting my objection on the record

15  while you were trying to talk over me.

16      MS. ZELLNER:  I was trying to finish the

17  question.  Typically the objection comes when the question

18  is finished.

19      MR. FREIMUND:  It was to your last question.

20  Q  (By Ms. Zellner)  I'll ask you again if you would have

21  reported -- if you had had knowledge, that Sergeant

22  Davidson had a romantic relationship with Shirley Spencer

23  prior to Ray Spencer's arrest, you would have reported

24  that, correct?

25  A  Yes.

201

1    Q  Okay.  And you would have reported it because that is

2       improper, is it not?

3    A  Absolutely.

4           MS. ZELLNER:  Okay.  I don't have any further

5       questions.

6                  EXAMINATION

7    BY MR. FREIMUND:

8    Q  You didn't make any such report in this case, did you?

9    A  No, I didn't.

10          MR. FREIMUND:  Thank you.

11          MS. FETTERLY:  I have no questions.

12                 EXAMINATION

13   BY MS. ZELLNER:

14   Q  And that's because you didn't know there was any

15      relationship going on, right, during the investigation?  Is

16      that true?

17   A  That's true, there was never any indication to me that it

18      was anything other than professional.

19          MS. ZELLNER:  Okay.  Thank you.

20          MR. BOGDANOVICH:  And we will reserve signature.

21       Thank you, Counsel.

22          MS. ZELLNER:  See you Thursday.

23          MR. FREIMUND:  Yeah, same place.

24                     (Concluded at 3:49 p.m.)

25                     (Signature reserved)



**FRANK KANEKOA**
*Sheriff*

ROBERT L. SONGER
*Undersheriff*

GARRY E. LUCAS
*Chief*
*Criminal Deputy*

RICHARD A. DYER
*Chief*
*Civil Deputy*

THOMAS H. WENTWORTH
*Chief*
*Jail Administrator*

DOUGLAS E. RAY
*Lieutenant*
*Special Services*

DALE A. CONN
*Lieutenant Operations*

F. LARRY BYLER
*Lieutenant Operations*

DOUGLAS W. MAAS
*Sector/Planning Research*

JAVID A. McKAY
*Administrative Assistant*

ARTHUR L. UTTERBACK
*Lieutenant*
*Special Services*
*Custody Division*

JOSEPH R. DUNEGAN
*Lieutenant Operations*
*Custody Division*



CLARK COUNTY SHERIFF'S OFFICE
P.O. BOX 410
1200 FRANKLIN STREET
VANCOUVER, WASHINGTON 98666
(206) 699-2311

August 30, 1984

INDEX

CCSO Case #84-8506

VICTIM:           SPENCER, Kathryn E.        Dob; 03-13-79
                  3930 Becerra Way
                  Sacramento, California
                  (916) 482-6057

SUSPECT:          SPENCER, Clyde Ray          Dob; 01-09-48
                  17681 N.E. Lucia Falls rd.
                  Yacolt, Washington
                  (206) 687-1407

SECTION #1.       CCSO Crime Reports
                  Written Statement by Shirley Spencer

SECTION #2.       Sacramento Co. Sheriff's Office Reports

SECTION #3.       Medical Examination Reports on Kathryn
                  Spencer

SECTION #4.       Release of Information from DeAnne Spencer
                  reference Therapist, Ann Link

SECTION #5.       Letter of request from CPS regarding
                  status of Ray Spencer

SECTION #6.       Interview with Kathryn Spencer
                  10-16-84

SECTION #7.       Interview with Kathryn Spencer
                  10-18-84

SECTION #8.       Interview with Matthew Spencer
                  10-17-84



EXHIBIT
1

00000251

Spencer000001





**FRANK KANEKOA**
*Sheriff*

ROBERT L. SONGER
*Undersheriff*

GARRY E. LUCAS
*Chief*
*Criminal Deputy*

RICHARD A. DYER
*Chief*
*Civil Deputy*

THOMAS H. WENTWORTH
*Chief*
*Jail Administrator*

DOUGLAS S. RAY
*Lieutenant*
*Special Services*

DALE A. CONN
*Lieutenant Operations*

F. LARRY BYLER
*Lieutenant Operations*

DOUGLAS W. MAAS
*Sergeant/Planning Research*

DAVID A. McRAY
*Administrative Assistant*

ARTHUR L. UTTERBACK
*Lieutenant*
*Special Services*

JOSEPH R. DUNEGAN
*Lieutenant Operations*
*Custody Division*

# CLARK COUNTY SHERIFF'S OFFICE

P.O. BOX 410
1200 FRANKLIN STREET
VANCOUVER, WASHINGTON 98660
(206) 699-2211

page #2
CCSO 84-8506

SECTION #9.    Interview with Kathryn Roe
10-17-84

SECTION #10.   Interview with Phyllis Day
10-17-84

SECTION #11.   Interview with Linda Lawrence
10-18-84

SECTION #12.   Interview with DeAnne Spencer
10-16-84

SECTION #13.   Polygraph Reports on DeAnne Spencer
from Sacramento Co. Sheriff's Office

SECTION #14.   Interview with Karen Stone
10-02-84

SECTION #15.   Interview with Ray Spencer(dates vary)
Interview with Shirley Spencer

SECTION #16.   Polygraph Reports on DeAnne Spencer
from Dr. Stanley Abrams, PH.D.

SECTION #17.   Misc. Reports and information/CCSO

SECTION #18.   Misc. Reports and information/VPD

00000252

Spencer000002





ANK KANEKOA
*Sheriff*

HARLES E. BRINK, JR.
*Undersheriff*

ROBERT L SONGER
*Chief*
*Criminal Deputy*

MAS H WENTWORTH
*Chief*
*Civil Deputy*

RICHARD A DYER
*Chief*
*Jail Administration*

GARRY E LUCAS
*Lieutenant*
*Special Services*

DOUGLAS S RAY
*Lieutenant Operations*

MARVIN A MILLER
*Lieutenant*
*Adm Services*

R L UTTERBACK
*Lieutenant*
*Correctional Supervisor*

CLARK COUNTY SHERIFF'S OFFICE

P.O. BOX 410
1200 FRANKLIN STREET
VANCOUVER, WASHINGTON 98666
(206) 699-2211

NOVEMBER 8, 1984

INDEX

CCSO Case #84-8506

VICTIM:        SPENCER, Kathryn E.      Dob; 03-13-79
               3930 Becerra Way
               Sacramento, California
               (916) 482-6057

SUSPECT:       SPENCER, Clyde Ray       Dob; 01-09-48
               17681 N.E. Lucia  Falls Rd.
               Yacolt, Washington
               (206) 687-1407

Section #1:    CCSO Crime Reports
               Written Statement by Shirley Spencer

Section #2:    Sacramento Co. Sheriff's Office Reports

Section #3.    Polygraph Report/Dr. Abrams

Section #4:    Interview with Kathryn Spencer
               10-16-84, *by known as Sarita*            *# Kathryn*

Section #5:    Interview with Kathryn Spencer
               10-18-84

Section #6:    Interview with Matthew Spencer *Eighth*
               10-17-84 *by known as Sarita*   *(Audisclosure)*

Section #7:    Interview with Kathryn Roe
               10-17-84,

Section #8:    Interview with Linda Lawrence
               10-18-84

Section #9:    Interview with Phyllis Day
               10-17-84

EXHIBIT
2
*tabbies*

Spencer000003

UTILITY REPORT

| ] SUPPLEMENTAL RPT. | ☐ CONTINUATI⸝ ʹF:<br>☐ Incident Rpt.   ☐ Supplemental Rpt. | | TYPED BY: S. Krause |
| PROCESSED BY: |
| DATA ENTRY BY: |

ᴺENT CLASSIFICATION (INCLUDE R.C.W. NO.)

-'ecent Liberties/Statutory Rape 1st Degree

| ᴸ⸝N OF INCIDENT<br>₁7681 N.E. Lucia Falls Rd., Yacolt, Wash. | DATE OF INCIDENT<br>Summer of 1984 | PRESENT DATE<br>10-12-84 |

1 ADDITIONAL PERSONS INFO - ATTACH ADDITIONAL INCIDENT REPORTS. DETAIL ADDI-
  TIONAL PERSON INFORMATION NOT COVERED IN BOXES
2 ADDITIONAL SUSPECT INFO - ATTACH ADDITIONAL INCIDENT REPORTS. DETAIL ADDI-
  TIONAL SUSPECT INFORMATION NOT COVERED IN BOXES
3 INJURED PERSONS - (VICTIMS, WITNESSES, OFFICERS, SUSPECTS) - DETAIL INJURIES, MEDICAL
  EXAM, DISPOSITION.
4 ADDITIONAL PROPERTY - ATTACH UTILITY-PROPERTY REPORT, DETAIL INFORMATION NOT
  INCLUDED IN BOXED PROPERTY SECTION.

5. PHYSICAL EVIDENCE - DETAIL WHAT AND WHERE FOUND, BY WHOM, AND DISPOSITION
6. VEHICLES - SUSPECT VEHICLE INFORMATION IN SAME ORDER AS VEHICLE SECTION. ADDI-
   TIONAL VEHICLE INFORMATION NOT INCLUDED IN BOXES
7. PARENT, GUARDIAN'S NAME, ADDRESS, PHONE NUMBER OF JUVENILE IN DETENTION
   INDICATE IF CONTACTED AND IF INCIDENT ADJUSTED
8. LIST DOCUMENTS ATTACHED - (AIR FORM, MEDICAL RELEASE, WAIVERS, ETC.)
9. RECONSTRUCT INCIDENT AND DESCRIBE INVESTIGATION.
10. SYNOPSIS FOR PROSECUTOR ON CLEARED CRIMES AND CUSTODIES

ITEM NO. ARE LISTED IN ORDER OF STEP 1 TO 10. IF STEP IS UNNECESSARY, OMIT.

| ITEM | CODE | PERSONS CODE | NAME OF VICTIM  OTHER  LAST, FIRST, MIDDLE | |
|------|------|------|------|------|
| | | | SPENCER, Kathryn | Dob: 01-13-79 |
| | | | | |
| 8 | VI | | Copies of  Therapeutic/Diagnostic Procedures Report forwarded | |
| | | | to  this department by University of California Davis Medical Cen- | |
| | | | Sacramento, California reference: an examination conducted on | |
| | | | Kathryn Spencer regarding sexual abuse allegations involving | |
| | | | Kathryn and her natural father, Clyde Ray Spencer. | |

CASE NO. 84-8506

| CA | ☐ CPS<br>☐ JDH | ☐ CMHP<br>☐ PAT | ☐ DSHS<br>☐ SIU | ☐ PATROL<br>☒ DETECTIVE | REPORTING OFFICER:<br>Sharon A. Krause  K/43 | DIST.<br>Detectives |
| ᴰ BY<br>ᴸTIONAL DIST: | ☐ ARREST | ☐ EXCEPTIONAL | ☐ UNFOUNDED | REVIEWED BY: | | DATE: |
| | | | | | DATE: |

EXHIBIT
8

00000276
Spencer000213

A 1983

UNIVERSITY OF CALIFORNIA
MEDICAL CENTER
SACRAMENTO

## THERAPEUTIC/DIAGNOSTIC PROCEDURES REPORT

762 / PED ACC

30 AUG84

08 30 84

All cases of Suspected Child Abuse Neglect are to be reported by telephone and in writing (by submitting this form) to the designated agencies (C and D below) within 36 hours. (Penal Code Section 11161.5 and 11161.7)

.TIENT PLATE

032 084 97 17 4 3R
SPENCER, KATHRYN E.
F 01 13 79  EXP 10 84

### GENERAL INFORMATION

**Unit#**

**Patient's Name**  SPencer Kathryn

**Address**  3930 Belbria  **City** Sacramento  **State** CA  **Phone** 483-6057

**Age** S  **Birthdate** 1-13-79  **Race** C  **Sex** F  **Date, Time of Examination** 8-30-84 Poss Acute  **Place of Examination** 1:30

**Reporting Party's Name**  Kathryn Eells-Magee M.D. Family Practice  **UCD Department**  **Phone** 453-3630

### FAMILY—Parents:

| Name (Last, First, Middle) | Birthdate | Sex | Race | Name (Last, First, Middle) | Birthdate | Sex | Race |
|---|---|---|---|---|---|---|---|
| Spencer DeAnne | | F | C | Clyde Ray Spencer | | m | C |

**Address** 3930 Bechria  **Address** VanCoBuer

**Home Phone** ( )  **Business Phone** ( )  **Home Phone** ( )  **Business Phone** ( )

### Siblings:

| Name | Birthdate | Sex | Race | Name | Birthdate | Sex | Race |
|---|---|---|---|---|---|---|---|
| 1. Matthew | 8yr | m | C | 4. | | | |
| 2. | | | | 5. | | | |
| 3. | | | | 6. | | | |

**Child's Family/Home Environment—Include risk factors in parent and/or child. Specify who is/are caretaker(s).**

Katie lives with mother and sibling. Parents divorced. Father has visitation for six weeks in summer, week at Easter, and two at Christmas every other year.

**Previous reports of abuse of child or in family?** ☐ Yes ☒ No  If yes, describe when, who involved, etc.

**Print Last Name** Eells-Magee  **Signature** K Eells-Magee  **Date of Report** 8/30/84

Spencer000214

7621/PED ACC

032 084 97 17 4 3R
SPE.TEL, .ATHRYN E.
F .1 13 7t [XP 10 84
4 RG 462 CCS?

06 30 84

UNIVERSITY OF CALIFORNIA DAVIS
MEDICAL CENTER
SACRAMENTO

THERAPEUTIC/DIAGNOSTIC
PROCEDURES REPORT

..... 13: 23
PHYSICAL EXAMINATION

**Patient's General Appearance:**

White female child recurring in her
mothers lap.

Ht _110.5_ cm _25th_ %ile

Wt _17.0_ kg _15th_ %ile

Hc _____ cm _____ %ile

Locate and describe in detail *any* injuries or findings related to maltreatment. Indicate location of lesions/findings;
shade for bruises or burns. Beside each injury indicated note *color, size, pattern, texture,* and *sensation.* Note if
*recognizable imprint* or bruise goes *around curve.*



4 erythmi
bug bite

A pelvic examination should not be performed unless the parent, guardian or minor consent *or* unless necessary a:
part of treatment. See Department of Health Regulations Title 22, Division 2, Victims of Sexual Assault.

Pelvic
No erythema
hymen intact
No lacerations.
No swelling

**FINDINGS:** Pelvic within normal limits.

Fundoscopic Examination—☐ Normal ☐ Abnormal ☒ Not done
Development Assessment—☒ Normal ☐ Questionable ☐ Abnormal, by ☐ DDST ☐ Estimate ☐ Other
Behavioral Assessment—☐ Normal during visit ☒ Abnormal during visit (Specify) _____
_____ through exam
X-ray bone survey—☐ Normal ☒ Not done ☐ Abnormal (findings) _____ Results _____
Hemostasis tests performed—☐ PT ☐ PTT ☐ Platelets ☒ None ☐ Other _____
Cultures for gonorrhea performed—☒ genitalia ☒ throat ☒ anus. VDRL—☐ Done ☒ Not done
Menarche age _____ Periods regular? ☐ Yes ☐ No  L.M.P. _____
Pregnancy test—☐ Positive ☐ Negative ☒ Not performed

| Signature | Print Last Name | Date of Report |
|---|---|---|
| Pella-Morce | Eells-Morce | 8/30/84 |

Spencer000215

☐ CONTINUATION OF:

762 / PED ACC

**UNIVERSITY OF CALIFORNIA DAVIS**
**MEDICAL CENTER**
**SACRAMENTO**

032 084 97 17 4 3R

SPENCER, KATHRYN E.
C1 13 75  EXP 10 84
4 PG 482 E057

08 30 84

**THERAPEUTIC/DIAGNOSTIC**
**PROCEDURES REPORT**

13:23
MALTREATMENT HISTORY:

Give history of event(s) including time, date, place, perpetrator, circumstance, people present, etc. Underline name of person giving each version, e.g., <u>Father</u> said . . . <u>Child</u> said . . . <u>Officer</u> said . . . <u>other</u> said

Children were visiting father's, bills during summer. Returned
to mother on 8-26. Stepmother reported to Vancouver police
that the father had molested. Report was based on Kenae's.
Katie had made to stepmother in 8-24-84. Katie refused to
talk or answer questions during exam. She has refused to talk
with mother or attending nurse. No sister.

**Diagnostic Conclusion(s):**

Child's story consistant with history of molestation.
No physical findings.

**MANAGEMENT**

| | | | |
|---|---|---|---|
| **1. Reported to:** Officer | ID No. | Department | **Phone** 446-5191 |
| Dependent intake or CPS Worker | | Department | **Phone** 366-2386 |

2. Medical Follow-up:  Date _____ Time _____
   ☑ Scan F/U Clinic  ☐ P.M.D. (Name) __9-29-84__
   ☐ UCD Clinic (Name) _____  ☐ Other _____
   ☐ None (Why not?) _____

3. Mental Health Follow-up:  Date _____ Time _____
   ☑ Referred to Victim Witness
   ☐ None _____

4. Disposition:
   Police Hold?  ☐ Yes  ☑ No
   ☐ Receiving Home  ☐ Foster home  ☐ Relative's home  ☑ Parent's home  ☐ Other
   ☐ Hospitalized
   ☐ Other Treatment:

| Print Last Name | Signature | Date of Report | |
|---|---|---|---|
| Eells-Magee | Y. Eells-Magee | 8/30/84 | Spencer000216 |

*Matt Spencer*
*1st interview*
*w/ Krause*

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT

STATUTORY RAPE, 1ST DEGREE, RCW 9A.44.070
LOCATION OF INCIDENT:   17681 NE Lucia Falls Road, Yacolt, Wa.
DATE OF INCIDENT:       Between 07-14-84 and 08-26-84


DATE & TIME:        :   10-17-84                    1745 hours
LOCATION:               Holiday Inn, Room #135
                        5321 Date Avenue
                        Sacramento, California 95841-2597
INCIDENT:               Interview with Witness

WITNESS:            )   SPENCER, Matthew Ray        dob: 11-28-75
                        aka: Matt
                        3930 Becerra Way
                        Sacramento, California      phone: (916) 482-6057


VICTIM:                 SPENCER, Kathryn E.         dob: 01-13-79


SUSPECT:                SPENCER, Clyde Ray          dob: 01-09-48
                        17681 NE Lucia Falls Road
                        Yacolt, Washington


SUMMARY:
                        -  On the evening of 10-15-84, after I had arrived in
Sacramento, California; I met the SPENCER children briefly when I accompanied

CCSO Case #84-8506, S.A.KRAUSE, K-43

EXHIBIT
**14**
tabbies

Spencer000080

their mother to pick them up at the grandmother's residence.  During the time I was around the children that evening I was introduced to them; however, they were not advised as to who I was, reference how I was employed or why I was in Sacramento.

When we returned to Deanna SPENCER'S residence with the children, it was approximately 10:00 PM and the children immediately prepared to go to bed.  However, at one point when we were discussing the weather I mentioned that the Sacramento weather was worse than it was in Washington. Matt SPENCER immediately stated, "My dad lives in Vancouver, Washington.  He's a policeman; he's a cycle cop."  Matt then asked me if I knew his dad and I indicated to Matt that I did know his father and told him that was the reason that I had come to Sacramento, so I could talk with him and with Katie.  Matt did not ask me any more questions that evening and I did not volunteer any additional information at that time.

On the evening of 10-16-84, when I returned Katie SPENCER to her residence, I made arrangements to pick Matt SPENCER up the following day after he got home from school for the purpose of my interviewing him reference any knowledge he might have regarding this situation.  Because I accompanied Katie and her mother to a therapy session of the afternoon of the 17th, and also because I had to see a dentist during the late afternoon, I was not able to pick Matt up until approximately 5:00 PM.

When I picked Matt up at his residence he was aware that we were going to my motel so that we could talk privately.  Matt appeared to be willing to accompany me and at no time expressed any reluctance or concern about doing so.  During the time we were in my vehicle en route to the motel Matt was very talkative and did not question me about what we would be talking about.

When we arrived at the motel we toured the building and had a hot chocolate in the coffee shop prior to discussing any of the specifics regarding the concerns at hand.  After we finished the hot chocolate we returned to my room and, like Katie, the first thing Matt did was to turn on the television.  At that time I indicated to Matt that he knew where I lived, then asked if he knew what my job was.  Matt stated, "A policeman."  When I asked him

why he guessed a policeman Matt stated, "Well, because you said you knew my
dad."

Initially I asked Matt if he knew what I wanted to talk
to him about and Matt stated, "About Kathy and my dad." I asked him why he
thought that was what I wanted to talk to him about, and Matt indicated it was
because "I was a policeman and because he knew Katie had said something but he
didn't know for sure what it was." I indicated to Matt that that was the reason
I wanted to talk to him, and Matt stated, "I guess Katie said my dad did
something last summer or something, but I never saw anything." I indicated to
Matt that that was one of the reasons I wanted to talk to him because he may
have seen or heard something that might be important regarding what Katie was
saying. At that time Matt stated to me, "Can you tell me what she said because
nobody will tell me anything?" I advised Matt that I would explain as much as I
could to him and he stated, "I'm sure glad because I'd like to know what's
going on."

I asked Matt if I could just ask him some questions
first about his visit to Vancouver before we really talked about anything else,
and he indicated that that was "fine." Matt volunteered to get up and turn the
TV down so that he "could hear what I was saying."

I asked Matt when the last time he saw his father was
and Matt stated, "It was last summer." I asked Matt if his father ever babysat
them when he was in Vancouver and Matt indicated that his step-mother, Shirley,
went to work at approximately 10:00 PM and that his father worked til
approximately 11:30 PM. Matt indicated that he, Katie and Shirley SPENCER'S
son, Matt, stayed with a relative named Cindy until their father picked them up
on his way home from work. Matt also indicated that "sometimes his dad babysat
for them on his days off when Shirley was working."

At that time during the conversation Matt indicated to
me that he wanted me to tell him "what was going on." I asked Matt if he had
any idea what Katie was saying and Matt replied, "Well, I think it's somethin'
about my dad doing something to her, because that's what the other detective
said." Matt then advised me that he had talked to a detective in Sacramento
(interview with Detective FLOOD). I asked Matt if there was anything that he

CCSO Case #B4-B5B6, S.A.KRAUSE, K-43                     page 3 of 10

Spencer000082

hadn't told Detective FLOOD and Matt stated, "Well, I don't really remember what I told him but I never saw my dad do anything like that to Kathy. You know, like what she's saying." I indicated to Matt that I wanted to make sure that he understood what this was all about, and asked him what he thought Detective FLOOD was asking him about. Matt stated, "Well, about like my dad touching Kathy in her private areas and stuff like that." Matt then stated, "I've never seen him do anything like that to her when I was around." I asked Matt if Katie had ever said anything to him about anything like that ever happening, and Matt advised that she had not.

Matt then indicated to me that he was "really confused about what was going on." He indicated that he was "glad I was going to talk to talk to him and he finally would know what was going on." He also stated, "My dad always tells me that my mom lies to me and it's really confusing because I don't know who's telling the truth anymore." I asked Matt if he knew why I had come to California and Matt stated, "It was because of what Katie said to Shirley, I guess." I indicated to him that that was the reason and that it had nothing to do with anything that his mother had said. Matt stated, "How about my dad?" I asked him what he meant and Matt stated, "Well, did you talk to my dad?" I advised him that I had talked to his father and also Shirley. Matt asked, "Well, what does my dad say about what Katie told Shirley?" I advised Matt that when I talked to his father he denied that he had ever touched Katie in a way that he should not have. Matt asked, "Well, what did my sister, Kathy, say?" I indicated to Matt that Katie told me that some things had happened. Matt stated, "Well, could you tell me what my little sister said my dad did?" I indicated to Matt that what his sister said were not good things, and asked him if he was sure he wanted me to tell him what she was saying. Matt indicated that he "had to know what was going on, he couldn't stand it anymore."

At that time I indicated to Matt that what Katie had said was that her father had touched her on her private areas. Matt stated, "Is that all she said?" I advised him that what she had told me was more involved than that but basically that's what she was saying. Again Matt insisted that he wanted to know "just exactly what his sister was saying so he could understand."

CCSO Case #84-8506, S.A.KRAUSE, K-43                    page 4 of 10

Spencer000083

At that time I indicated to Matt that if I were going to be talking to him about bodies I needed to know what he called specific parts so I would know for sure that he was understanding what I talked about and that I would understand what he was talking about. With the aid of a cartoon drawing Matt then indicated that he called breasts on a female body 'boobs,' the navel a 'belly button,' the buttocks 'buns,' and the penis on a male body a 'penis.' When we were discussing the genital area of the body I placed a dot where the vagina would be on a female body and asked Matt what he would call that part of a girl's body that she went to the bathroom from. Matt advised that he didn't really know what to call it, it was just a 'private area'. I asked Matt if he thought a father should touch that part of his daughter's body and Matt stated, 'No way.' At that time I indicated to Matt that there could be a time when a father would need to do that or a mother, relating, if a child hurt there and had to have medicine or like when a child was a baby and a parent had to change their diapers and things like that. Matt indicated that he understood, and then stated, 'But, like I know they shouldn't just touch there for no reason.' I advised him no, that there should be a reason for a father or mother to touch a child on those private areas. I asked Matt, 'Would your buns be a private spot?' and Matt indicated that it would. I asked him if his penis would be a private spot and again Matt stated that it would.

Matt then asked me; 'Did Kathy say my dad touched her there?' (He pointed to the dot where the genital area of the female body would be.) I indicated to Matt that that was one of the things that Katie had said to me. Matt stated, 'What else did she tell you?' I related to Matt that during my conversation with Katie one of the things she was extremely concerned about was my telling Matt what she had told me because she felt Matt would laugh at her. Matt stated, 'I wouldn't laugh at her, I love her, and it wouldn't be her fault. No way I'd laugh.' I advised Matt that if Katie were telling the truth it would be really important for her to know that it was good for her to tell. Matt stated, 'If she told you something happened, it did, because my sister is just a baby and she wouldn't lie about something like that.' Again, Matt indicated he wanted to know and at that time I told Matt that during the

Spencer000084

conversation with Katie the day before she indicated to me that during the summer visit in Vancouver, her father had put his mouth on the private area of her body and had also made her put her mouth on his (father) penis. I related to Matt that Katie had also made statements indicating that her father had placed his bare penis on the private part of her body where she goes to the bathroom from. At that time Matt looked at me and stated, "That is really gross, Sharon, you mean my dad said he didn't do that?" I advised Matt that his father indicated that he hadn't and there could be two reasons for that. One was that it had not happened. Matt interrupted me and again stated, "No way, my sister would never say that if it didn't happen. She would never lie about that." I asked Matt if he had ever seen anything during the time he visited that would make him think it might have, and Matt stated, "I never saw anything. I wish I would have because I would have punched him. That's really sick."

I indicated to Matt if it did happen his father may not be saying anything because he was embarrassed to do that, or felt scared. Matt stated, "Why would somebody's dad do that to them?" I advised Matt that I did not really understand why someone bigger than a child does that to their body but indicated maybe I could explain it another way. At that time I told Matt that where I worked the majority of the things I dealt with were cases like this where a child had said that someone bigger than them, sometimes a bigger child, or sometimes an adult, had touched their private areas and that the child was usually afraid to tell. I advised Matt that when someone bigger than a child did that it was wrong but that many times they probably didn't do it because they were being bad, but was because they were sick. I indicated to Matt that it was a different kind of sickness than a medical doctor could deal with. It was like the person's thinking was sick. I also told Matt that it was against the law for a bigger person than a child or a grownup to do that; and that a person could go to jail for something like that. However, there were many times when the grownup person told the truth and asked for help and instead of going to jail they would get help. Matt stated to me, "He sounds like he really needs help." Matt then stated, "Now I get it. That's why my mom said I can't go up at Christmas." Matt then stated, "I didn't know what was

CCSO Case #B4-8506, S.A.KRAUSE, K-43                                    page 6 of 10

Spencer000085

going on. I thought she was probably just lying to me again. My dad told me not to believe anything she said."

At that time I asked Matt how he was feeling and he stated, "You mean about my dad?" I indicated that I meant about his dad, his mother, his sister or whatever he was feeling. Matt stated, "Well, about my dad. I don't know how I feel right now. I guess I just feel like I don't have feelings." I asked him how he felt about Katie and Matt stated, "I love my sister and I know my sister wouldn't lie. I just know that. She wouldn't lie about something like that." I indicated to Matt that I thought I read someplace in Detective FLOOD'S report where Matt had told him that Katie did tell stories and that she changed her stories a lot to keep from getting into trouble. Matt stated to me, "Yah, well, I change my stories sometimes, too, but there's no way my sister would lie about that kind of stuff." I asked Matt, "How do you feel about your mom?" and Matt stated, "Now, I understand about what's going on and I feel sorry for her."

Matt then stated, "I really feel sorry for my dad, too. He is really sick, it sounds like." I told Matt that if his father had done it and was sick our only goal was to get his father help. I also told him that that was really not my decision, that the decision would be made by a judge regarding what will happen. I asked Matt if he understood what a judge was and he indicated to me that he did, and "he understood about court and the arresting people and stuff like that."

At that time I asked Matt how he felt about his step-mother, Shirley, and indicated that it was Shirley who became concerned and asked that somebody find out exactly what had happened between Katie and her father. Matt stated to me, "Well, I'm glad she got concerned, but you know, I really don't like Shirley. She's just not the kind of person I would ever want for a mom." I asked him why he felt like that and at that time observed him shrug his shoulders, stating, "I don't know, I just don't like her." I asked him if anything ever happened while he was visiting that made him feel that way and Matt stated, "Not really. I just don't care for her." I asked him if she had ever said or done anything that upset him and Matt stated, "Well, there was this one thing that kind of bothered me, but that's not the only

CCSO Case #84-8506, S.A.KRAUSE, K-43

Spencer0opg8

reason I don't like her." I asked Matt if he could tell me about that and at that time Matt indicated that on a particular evening during the summer of 1984 he was awakened by "his step-mother screaming." I asked him what she was screaming about and Matt stated, "I don't know. I woke up and when I heard her making these real loud noises I got up and went into their bedroom and I mean, you think screaming's loud." I asked Matt if the bedroom door was shut and Matt indicated, "No, the door was always open." I asked Matt what he saw and Matt stated, "Well, when I went just inside that door I could see my dad's bare buns sticking up in the air and I knew what was happening." I asked Matt if he could tell me what was happening or if he understood and Matt stated, "Yah, I knew what was happening because I watched 'Friday, the 13th' and they were making love in that movie, too." I asked Matt what he did when he saw that and Matt stated, "Well, I just went back in the bedroom and then she was making those loud noises and then they started slowing down and the noises got tinier and tinier." Matt also advised that the following day he talked to his dad about that and then stated to me, "But, I still don't understand why she was making such loud noises about that."

At that time I asked Matt if he understood why grownup people made love and he stated, "Not really." I asked Matt if he knew how women became pregnant or why they had babies, and he stated, "Well, I think I know a little bit about that." For the next few minutes Matt and I talked about why grownup people "make love" indicating to him that that was something that two people who loved each shared with each other and that was the way a person could show someone else how much they loved them and how special they were. I also told Matt that it does not hurt usually when someone does that to you when you are a grown up and if you are in love it may be something that really feels good to your body, and that's probably why Shirley was making the noises because it felt good. Matt shook his head, indicating that he understood, and I asked Matt if he had ever touched his penis with his own hand. Matt replied no. I indicated to Matt that it was okay for him to tell me if that had happened because his body belonged to him and that it was okay to touch your own body if it was done in a private place. I told him other boys his age had told me they did that and also told me that it felt good. Matt stated to me, "Yah, I've done

CCSO Case #84-8506, S.A.KRAUSE, K-43                          page 8 of 10

Spencer000087

that a couple times and it makes your penis stick up and it does feel good, but
I don't scream my head off like she did." I indicated to Matt that possibly it
felt better to Shirley and that was her way of showing his father how much she
loved him and how special he was to her. Matt replied, "Well, it makes sense
but I don't understand why she had to scream that loud." Matt then stated to
me, "I just wish they'd keep their door shut." I asked him if he had seen that
any other time and he indicated that he had not. I asked Matt if he felt like
he understood enough or if he felt like he wanted to talk about it more, and
Matt stated, "Well, I understand now, and my dad tried to tell me but I still
didn't understand about the weird noises." I asked him if he understood about
the noises now, and he stated, "Yah, I understand."

I asked Matt if he had ever heard his mother talk to
Katie about the things that Katie was saying and Matt advised that he had not.
I asked Matt if his mother had told him to say anything specifically to me, and
Matt shrugged his shoulders and stated, "No, she just told me you were going to
be talking to me. That's all."

I asked Matt if he wanted to ask me anything else and
he indicated that he didn't, then stated, "I just couldn't figure out why me
and Kathy couldn't talk to my dad or nothing, and then she said that about
Christmas and I figured she was really up to something then." I asked Matt what
he thought his mother was up to and he stated, "I don't know. It was like she
was trying to mess with my head or something because my dad told me that she
always lies to me and that I shouldn't believe anybody but him." I asked Matt
if his father ever told him anything else and Matt stated, "Yah, he tells me a
lot of stuff, I guess, but he always tells me that women are just out to
control you and to watch out for my mom and stuff like that."

Matt and I talked for several more minutes; however, it
did not appear that he had any other questions regarding what we had talked
about, nor did it appear that he had any additional information that would be
relevant to this issue. Matt and I were in the room a little less than one
hour total. Because Matt appeared to be comfortable and there was nothing else
to discuss I asked him if he was ready to go back to his house and he indicated
that he was.

Spencer000088

I transported Matt back to his residence and during that trip he appeared to be very comfortable and the majority of our conversation was about Sacramento, his school, the activities he was involved in, and his friends.

Investigation to continue.

Spencer000089

ASE NUMBER _____ 84-8506 _____

.'E/TIME _____ 5:50   10-7-84 _____

LOCATION _____ Holiday Inn. Sacramento, Ca. _____

VICTIM _____ Matt Spencer _____

SUSPECT _____ Ray Spencer _____

Reporting Officer _____ Krause _____



nose
freckles
belly button
bum
penis

Spencer000090

CORRECTION SHEET

DEPOSITION OF: Sharon Krause
DATE: 11/6/2012
CASE: Clyde Ray Spencer, et al. v. Former Prosecuting Attorney for Clark County James M. Peters, et al.
REPORTER: Dixie Cattell, CCR, RPR

Instructions: Please carefully read your deposition and on this correction sheet make any changes or corrections in form or substance that you feel should be made. You may add additional sheets, if necessary. After completing this form, please sign your name in this space provided. <u>Please do not mark the transcript</u>. Thank you.

| PAGE NO./LINE NO. | CORRECTION | REASON FOR CORRECTION |
|---|---|---|

Page #17, lines 2 & 3; change 'what' to <u>with</u>. Change 'covered' to "<u>as a cover.</u>"    possible error in transcription.

Page #12, line 25; change "he said" to <u>I said</u> error in transcript or I misspoke

Page 75, lines 1 & 2; The report reads "That it was very important that she talk with me." to clarify what report actually stated.

Page 76, line 20; change "<u>with</u>" to <u>from</u>". possible transcription error or I misspoke.

Page 88, line 3; should read "I had not looked at it" to clarify my response to Ms. Zellner.

I, the undersigned, Sharon Krause, do hereby certify that I have read the foregoing deposition, and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the corrections listed above).

12/12/12
DATE

Sharon Krause
DEPONENT'S SIGNATURE

Dixie Cattell & Associates, Court Reporters & Videoconferencing
3355 Lakemoor Circle SW, Olympia, WA  98512
dcattell@comcast.net
360-352-2506

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY      )
SPENCER and KATHRYN E. TETZ,        )

      Plaintiffs,                    )

    v.                    ) No. 11-5424 BHS

FORMER DEPUTY PROSECUTING ATTORNEY FOR )
CLARK COUNTY JAMES M. PETERS, DETECTIVE)
SHARON KRAUSE, SERGEANT MICHAEL     )
DAVIDSON, CLARK COUNTY PROSECUTOR'S   )
OFFICE, CLARK COUNTY SHERIFF'S OFFICE, )
THE COUNTY OF CLARK, SHIRLEY SPENCER   )
and JOHN DOES ONE through TEN,      )

      Defendants.              )

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

CLYDE RAY SPENCER

Monday, November 12, 2012
10:00 a.m.
1201 Third Avenue, Suite 2200
Seattle, Washington

Reported by Marlis J. DeJongh, CCR, RPR

Lic. No. DE-JO-NM-J498K9

1    Q.  Is that your worry?

2    A.  Yes.

3    Q.  Tell me what town you reside in.

4    A.  Los Angeles.

5    Q.  Los Angeles, California?

6    A.  Yes.

7    Q.  How long have you resided there?

8    A.  Probably a year and a half now.

9    Q.  How long have you been out of prison?

10   A.  I was released in December of 2004.

11   Q.  So during the past eight years, approximately, have

12   any of the defendants in this case made any effort to

13   contact you?

14   A.  Not that I know of.

15   Q.  But nonetheless you're afraid that they're going to

16   sometime in the next future years?

17   A.  The possibility is there.

18   Q.  Are you afraid of anybody else?

19   A.  No.

20   Q.  So it's just the three named defendants that you're

21   afraid of?

22   A.  Correct.

23   Q.  Your allegation in this case, sir, as set forth in

24   your complaint is that there was a conspiracy to frame you

25   for crimes that you didn't commit.  Is that right?

8

1     A.  That's correct.

2     Q.  Who was a part of this conspiracy?

3     A.  Jim Peters, Michael Davidson, and Sharon Krause.

4     Q.  Nobody else?

5     A.  No.

6     Q.  So it was just those three people that conspired

7  against you even though you also named Shirley Spencer, the

8  County, Clark County sheriff's office and the Clark County

9  prosecutor's office?

10    A.  Michael Davidson was employed by the Clark County

11  sheriff's. I think Shirley Spencer was a pawn in this.

12    Q.  So she was involved in the conspiracy unwittingly?

13    A.  I think she was, yes.

14    Q.  All right. When did this conspiracy form?

15    A.  I noticed that my marriage was changing around

16  October of 2004. Up until that point in time I had a

17  stable, loving relationship with my wife. Suddenly the

18  arguments began. This was after the polygraph that

19  Detective Davidson indicated I had failed.

20      My wife went there, and after that, she apparently went

21  to the jail, or went to the county sheriff's almost on a

22  daily basis. I would call her for hours and she would not

23  answer, and she would indicate that she had been at the

24  county jail or at the sheriff's department speaking with

25  Davidson.

9

1      I believe that the relationship started at that point,

2    and they manipulated her from on.

3      Q.   And you have pretty clear memories of that time

4    frame of October 1984?

5      A.   I know that's when the relationship seemed to

6    totally reverse.  Up until that time she was supportive of

7    me, loving.  Suddenly there was no personal relationships.

8      You have to understand Shirley's mental state.  She

9    is, she's a fragmented individual.  She's obsessed with

10   jealousy.  Her feelings of how to, a relationship should be,

11   there should be a physical confrontation and then a makeup

12   afterwards.  So all of a sudden it began around that period

13   of time.

14     Q.   That period of time being October 1984?

15     A.   Correct.

16     Q.   What -- and that's when you think the conspiracy

17   formed, was sometime around October 1984, just to be clear?

18     A.   It is.

19     Q.   What was the goal of the conspiracy, or what was

20   the agreement to do?

21     A.   I think that the agreement was to get me out of the

22   picture.  Davidson sleeping with my wife.  Krause is

23   building a career.  She is working in conjunction with Jim

24   Peters.  They're giving lectures up and down the coast.

25     Q.   So why -- what is Peters' motivation in this

1    conspiracy that you believe existed?

2        A.  He's building a career too.

3        Q.  So Davidson had one motive to conspire, and Krause

4    and Peters had a different motive to conspire.  Is that what

5    you're saying?

6        A.  Well, I'm saying that Davidson sleeping with my

7    wife.  Krause, if you read her reports -- I was a police

8    officer in law enforcement 14 years.  You don't, you know --

9    there is no audio, there is no video of these, of these

10   reported interviews with the kids.  She comes back a week

11   later and writes a 20 page report with quotation marks.  I'm

12   sorry, I don't buy that.  She falsified those reports.

13       Davidson was her immediate supervisor.  He would have

14   known about it.  She would have had to give him everything.

15   Peters is there, he has it.

16       Q.  Okay.  Let's go back to my question though.  My

17   question to you is, is it your belief that Davidson had a

18   motive underlying this conspiracy that was different than

19   the motive that Peters and Krause had?

20       A.  Well, obviously Peters and Krause are not sleeping

21   with my wife, so yes.

22       Q.  Do you think Peters and Krause were acting in order

23   to further this, a relationship between Mike Davidson and

24   your wife?

25       A.  Whether they were acting to further that

1   relationship I have no idea.  But I know they took an active

2   part in this conspiracy.

3       Q.  Okay.  So Krause and Peters had an agreement in

4   this conspiracy to further their career by framing you for a

5   crime you claim you didn't commit, right?

6       A.  Correct.

7       Q.  But Mr. Davidson had a separate and independent

8   reason for attempting to frame you for a crime you didn't

9   commit, as you claim.  Is that your testimony?

10      A.  Davidson is the lead supervisor.  Krause works

11  directly for him.  He's controlling that investigation.  She

12  has to run things through him.  There is no way that I'll

13  ever believe that he wasn't aware of what was going on.  And

14  he had his own motivation for directing that investigation.

15      Q.  So his motivation was independent and different

16  from the motivation of Krause and Peters, correct?

17      A.  Correct.

18      Q.  Who was the ringleader of this conspiracy?

19      A.  I think Davidson.  He's controlling the

20  investigation.

21      Q.  Was Mr. Rulli involved in the conspiracy?

22      A.  No.

23      Q.  Who were the other pawns, if there were any, in

24  this conspiracy?  You mentioned Shirley Spencer was a pawn

25  in the conspiracy.  Were there others?

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

———————————————————————
                        )
CLYDE RAY SPENCER, MATTHEW RAY  )
SPENCER, and KATHRYN E. TETZ,   )
                        )
        Plaintiffs,     )
                        )  No. 3:11-cv-05424-BHS
    vs.                 )
                        )
FORMER PROSECUTING ATTORNEY FOR )
CLARK COUNTY JAMES J. PETERS,   )
DETECTIVE SHARON KRAUSE,        )
SERGEANT MICHAEL DAVIDSON,      )
CLARK COUNTY PROSECUTOR'S       )
OFFICE, CLARK COUNTY SHERIFF'S  )
OFFICE, THE COUNTY OF CLARK and )
JOHN DOES ONE THROUGH TEN,      )
                        )
        Defendants.     )
———————————————————————

DEPOSITION UPON ORAL EXAMINATION OF

REBECCA J. ROE

———————————————————————

Thursday, December 13, 2012

Taken at 810 3rd Avenue, Suite 500
Seattle, Washington

1:36 p.m.

REPORTED BY:  KAREN M. GRANT, CCR NO. 2155
DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360)352-2506   *   (800)888-9714

1      Q.   Okay.  Now, at the time you submitted this

2   report, was it your opinion that, although the case was

3   legally insufficient, there was probable cause to

4   charge?

5      A.   Yes.

6      Q.   All right.  Can you tell me what that was?

7      A.   Well, as I indicated here, although I believe

8   child was clearly abused, and I do believe she was, she

9   voluntarily made statements to Shirley that -- and under

10  circumstances that indicated reliability and a child who

11  was -- had been abused and was engaging in highly

12  sexualized behavior.

13          So I clearly believed, as I said here, she was

14  abused, and, as I also wrote, probably by the defendant,

15  and that was based on her statements to both Shirley,

16  again, and also to Sharon Krause.

17     Q.   Okay.

18     A.   You know, she described abuse she was -- to

19  people.  The initial statements are often the most

20  important, and they were made to somebody who did not

21  have, as I understood it, motive to, you know, fabricate

22  or suggest this testimony to the child.  You know, so,

23  yeah, I believe there was clearly probable cause.

24     Q.   Okay.  You just mentioned Shirley.  Can you

25  tell me what you knew about Shirley Spencer at that

95

1    remember.

2        Q.   Okay.  And you haven't been able to ascertain

3    that from your recent review of the documents?

4        A.   Well, I'm sure I could go back and look at

5    them, but I wasn't focused on that.

6        Q.   Okay.  Do you believe that probable cause for

7    the arrest of Ray Spencer was established before you

8    rendered your decision on November 27th of 1984?

9        A.   I believe, at the time the statements were

10   made to Shirley, who represented them to Sacramento,

11   that they could have had probable cause then.

12       Q.   They could have had or they did?

13       A.   They could have.  I don't know whether they

14   did or not.  I think they transferred the investigation.

15       Q.   Okay.  But I'm asking you whether or not

16   probable cause existed for the arrest of Ray Spencer

17   prior to November 27th of 1984.

18           MS. FETTERLY:  Objection; asked and

19   answered.

20       A.   Yes.

21       Q.   Yes or no?

22       A.   Yes.

23       Q.   It did exist; is that correct?

24       A.   Yes.

25       Q.   Okay.  What was the probable cause for Ray

96

1    Spencer's arrest at that time?

2        A.   The same stuff that -- the same items that

3    were probable cause for the belief that he had abused

4    Katie that I've already discussed.

5        Q.   Same exact stuff?

6        A.   The statements made to Shirley and the

7    statements made to Sharon Krause.

8        Q.   And you say that without knowing a thing about

9    Shirley's motivations, correct?

10       A.   Correct.

11       Q.   Or her history?

12       A.   I don't know what you mean by that.

13       Q.   Okay.  If there was, and I guess you have said

14   there was probable cause to arrest Ray Spencer prior to

15   your involvement in the case, would you have expected

16   him to be arrested promptly?

17       A.   I have no -- I have no idea what the practices

18   were in other jurisdictions.

19       Q.   Do you think their practice was to let sexual

20   offenders run free, without any restrictions on their

21   access to their children?

22           MR. BOGDANOVICH:  Object to the form of

23   the question.

24       A.   No.

25       Q.   If there was probable cause to arrest Ray

195

1      Q.  Do you know why she's not testifying?

2      A.  No.

3      Q.  And she was one of the main authors of that

4   book, correct?

5      A.  She was the staff -- my recollection is, she

6   was the staff person, and so she was -- yes, she was

7   very involved.

8      Q.  Okay.  On page 3 of the report, I believe you

9   note that protocols have evolved?

10     A.  Yes.

11     Q.  In the time frame from October of 1984 through

12  May of 1985, did protocols for these types of child

13  interviews include threatening a child?

14     A.  I don't recall that there were protocols at

15  that time period.

16     Q.  Were there guidelines that suggested that

17  threatening a child was something proper to do?

18     A.  I doubt it.

19     Q.  All of the time period I'm talking about now

20  will be October of 1984 through May of 1985.  With that

21  in mind, were there any guidelines or protocols at that

22  time in Washington that suggested praising a child for

23  accusing a suspect after making initial denials was

24  proper?

25     A.  There were no protocols in Washington at that

196

1    time.

2    Q.  Were there any guidelines that suggested that

3    praising a child for accusing a suspect after making

4    initial denials was proper?

5    A.  There were no guidelines in Washington at that

6    time.

7    Q.  Was it generally understood that praising a

8    child for accusing after making initial denials was

9    proper?

10    MS. FETTERLY:  Object as to form.

11    A.  I can't answer that question.

12    Q.  So you think that may have been a proper thing

13    to do in a child interview?

14    A.  No.

15    Q.  Okay.  Were there any guidelines or protocols

16    that suggested that it was proper to coerce a child to

17    accuse suspects?

18    A.  No.

19    Q.  Were there any guidelines that suggested that

20    it was proper to interview a child wherein sexual abuse

21    was suggested and then fail to advise a suspect that the

22    interview took place?

23    A.  As I've previously said, there were no

24    protocols or guidelines.

25    Q.  Was there any guidance whatsoever regarding

197

1    the matters I'm talking about?

2        A.   The closest thing to guidance was -- came from

3    people at Harborview Sexual Assault Center.

4        Q.   Okay.

5        A.   And early -- and some of the earliest kind of

6    trainings were also provided by people who worked for

7    DSHS and CPS, so --

8        Q.   [Inaudible.]

9        A.   What?

10           MR. BOGDANOVICH:  Go ahead.  You weren't

11   finished.

12       Q.   (By Mr. Johnson)  Go ahead and finish.

13       A.   And I don't -- I don't recall when anything

14   was written down as guidelines.  And I've been, you

15   know, trying to remember that and track back through

16   that, and I -- I can't.  I can't come up with any point

17   at which there were the first written guidelines about

18   child interviewing.

19       Q.   Okay.  And I'm just talking about what was

20   generally known in the field.  You've mentioned some

21   entities that offered guidance, and of course we have

22   your book that was available back at this time, correct?

23       A.   Right.

24       Q.   Okay.  And you would agree that no guidelines

25   or guidance, whether written or otherwise, suggested