# EXHIBIT I

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENCER, MATTHEW
RAY SPENCER, and KATHRYN E.
TETZ,

                  Plaintiffs,

vs.

FORMER DEPUTY PROSECUTING ATTORNEY
FOR CLARK COUNTY JAMES M. PETERS,
DETECTIVE SHARON KRAUSE, SERGEANT
MICHAEL DAVIDSON, CLARK COUNTY
PROSECUTOR'S OFFICE, CLARK COUNTY
SHERIFF'S OFFICE, THE COUNTY OF
CLARK and JOHN DOES ONE THROUGH
TEN,

                  Defendants.

) NO. C11-5424BHS
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

VIDEOTAPED/VIDEOCONFERENCED DEPOSITION OF:

WILLIAM BERNET, M.D.

Taken on Behalf of the Defendant/Michael Davidson

December 4, 2012

VOWELL & JENNINGS, INC.
Court Reporting Services
207 Washington Square Building
214 Second Avenue North
Nashville, Tennessee 37201
(615) 256-1935

1    would have been then.  I was living either in
2    Washington, D.C., or nearby in Virginia.  And so I
3    was supervising child psychiatry trainees and adult
4    psychiatry trainees.  So that topic may well have
5    come up.  And I may have given presentations by that
6    point at meetings -- at professional meetings on
7    this topic.  I mean, if I knew you were going to ask
8    me, I could go back.  I mean, I have a list of
9    presentations that I have given, but I don't have
10   that with me.
11        Q     That's in your resume --
12        A     No, it's --
13        Q     Your CV?
14        A     No.  All the presentations that I have
15   ever given are not in my CV.  They're in another
16   document.
17        Q     Okay.  Would you agree that you do not
18   have any knowledge or expertise or opinion about
19   what training was being provided to front-line field
20   investigators before or during the time frame of
21   1984, 1985?
22        A     That's correct.  I'm not familiar with
23   specific curricula or specific training programs
24   during that time.
25        Q     All right.  Am I correct, sir, that in

1    A    Yes, he does.

2    Q    Would you also regard him as an expert in

3    kind of the evolution in the field regarding the

4    techniques that are used by investigators of child

5    sexual abuse?

6    A    I don't know if he is or not. I know that

7    he discussed that topic in the statement he made --

8    or the report he made, but I don't know if he's an

9    expert in that.

10    Q    Do you record yourself as an expert in the

11    evolution or history of techniques in child

12    interviewing?

13    A    I guess it depends on your definition of

14    expert. I don't think I'm an authority in that

15    field, but I would probably be considered an expert

16    simply because it's part of training and in general

17    of conducting forensic evaluations of children.

18    Q    Would you agree that back in the 1984 and

19    1985 time frame, there was no commonly accepted

20    script for use by field investigators when

21    conducting interviews of suspected child sexual

22    abuse?

23    A    I don't know if there was.

24    Q    Do you know if there is one to this day?

25    A    Oh, there are several different protocols

1  for conducting interviews that I'm aware of.  One is

2  called the RATAC, R-A-T-A-C.  And one is produced by

3  a government agency called the NICHD interview

4  protocol.  And there may be others.  So I know there

5  are protocols now.

6        Q    All right.  Are you aware of whether the

7  NICHD protocol was authored in part by Dr. Esplin?

8        A    Yes, I think he participated in that.

9        Q    Would you agree, sir, that none of those

10  protocols that you just referenced were in existence

11  during 1984-1985 time frame?

12        A    Yes, I believe that's correct.

13        Q    Would you agree that there is no clear

14  protocol or script, if you will, for how to avoid

15  asking leading or suggestive questions during the

16  course of a child sex abuse interview during the

17  time frame of 1984 to 1985?

18        A    I don't know if there was.

19        Q    What's your definition of a leading

20  question?

21        A    Well, here.  I'll compare what I think --

22  at least what I consider a suggestive question with

23  a leading question.  A suggestive question is when

24  the interviewer says, Did Uncle Joe touch your

25  private part?  Because it suggests that Uncle Joe

1    may have done something.  A leading question would

2    be to the effect, Didn't Uncle Joe touch your

3    private part?

4           So that's the distinction that I make.  I

5    don't know.  I think other people don't even make

6    that distinction but they consider them the same

7    thing.

8        Q    I understand those are examples of them,

9    but -- but can you give me a definition for a

10   leading question?

11       A    Well, to make the comparison again, a

12   suggestive question has the answer embedded

13   somewhere in the question as a proposed answer.  A

14   leading question not only has the answer embedded in

15   the question, but it's asked in such a way that the

16   person who is being asked the question is expected

17   to give that answer.  There's an ex -- a leading

18   question has an expectation in it that's higher than

19   what's in a suggestive question, at least in the

20   distinction that I'm making.

21       Q    Back in the 1984 or 1985 time frame, do

22   you think those definitions you just provided were

23   clearly established and known by field investigators

24   conducting child sex abuse interviews?

25       A    I don't know, as I said before, exactly

1    what training people would have had.  But I think
2    that the problem of asking leading and suggestive
3    questions has been known for many, many years.  I
4    don't know how it was defined or what the
5    instructions may have been for field investigators.
6    But I think the problem, the concept of leading and
7    suggestive questions, has been known for a hundred
8    years.
9         Q    Would you agree, though, Dr. Bernet, that
10   one of the difficulties that academicians struggled
11   with, and to some extent I think still do, is
12   defining what constitutes leading or suggestive
13   questions in the context of conducting interviews of
14   suspected child abuse victims?
15        A    I don't know that there's difficulty.  I
16   think that there's a difficulty sometimes in
17   actually conducting the interview.  But I don't know
18   that there's difficulty in defining what a
19   suggestive question is -- at least I haven't heard
20   that.
21        Q    Okay.  Are you familiar with the article
22   that was written by Roland Summit in 1983 -- or it
23   was published in 1983, I should say more accurately,
24   entitled, "The Child Sexual Abuse Accommodation
25   Syndrome"?

1       A     Yes, I have read it, some time ago.

2       Q     Would you agree that that was a fairly

3  significant article in the arena of academicians

4  studying child sexual abuse issues?

5       A     I think it was significant and widely

6  quoted.  From what my understanding is, I think it

7  was also misunderstood about what Dr. Summit was

8  trying to say.  But it certainly has been quoted a

9  lot.

10      Q     And to your knowledge, one of -- one of

11  the components that was quoted a lot would be one of

12  his conclusions that -- I'll just read it verbatim.

13  He said, quote:  "Very few children, no more than

14  two or three per thousand, have ever been found to

15  exaggerate or to invent claims of sexual

16  molestation," end quote.

17            Would you regard that as one of the more

18  widely-known precepts within that article?

19      A     Well, I think that's one of the more

20  controversial parts of the article.  I guess he also

21  said something to the effect that children don't lie

22  about sexual abuse, or maybe that's the same

23  statement paraphrased in another way.  And I think

24  that most people would disagree with that number

25  that he cited.  Currently -- most people currently

1    would disagree with that.

2         Q    Do you think back in the 1983 to '85 time

3    frame that most people would have disagreed with

4    that number that he was saying, that no more than

5    two or three per thousand children have been found

6    to exaggerate or invent claims of sexual

7    molestation?

8         A    I'm quite sure that there would have been

9    discussion and disagreement about that statement,

10   but I really don't know -- I don't know whether most

11   people would have disagreed with it.  I think that

12   would have been --

13        Q    In fact -- I'm sorry?

14        A    I think that would have been a statement

15   that some people would have challenged or disagreed

16   with, but I -- I really don't have any way to know

17   whether the majority of professionals would have

18   done that.

19        Q    Well, the next sentence immediately after

20   that one I just quoted you from Roland Summit's

21   article reads as follows, quote:  "It has become a

22   maxim among child sexual abuse intervention

23   counselors and investigators that children never

24   fabricate the kinds of explicit sexual manipulations

25   they divulge in complaints or interrogations," end

1   quote.

2          Would you agree with that observation by

3   Dr. Summit that, at least back in 1983, it was a

4   maxim, M-A-X-I-M, among investigators that children

5   don't lie when they provide explicit details of

6   sexual abuse?

7       A    I think that most people would agree that

8   it would be unusual for a child to knowingly lie,

9   but that sometimes they did.  And -- and -- and I

10  think that most people would have been aware that --

11  that children may have come to wrongly believe that

12  something happened.  In other words, I think in the

13  1980s and before that, it was understood that the

14  child isn't necessarily knowingly lying but the

15  child might be representing something that is not

16  correct because of the way the child had been

17  previously questioned.  In other words, the child

18  might be unknowingly giving a false statement.

19      Q    Understood.  Would you agree though, sir,

20  that the vast majority -- and I am speaking from the

21  perception of the field investigator, just so we can

22  be clear on that, not as a psychiatrist or

23  psychologist.

24          But from the perspective of a field

25  investigator, wouldn't you agree that most field

1    investigators during 1984-85 time period would be of

2    the view that children do not lie when they disclose

3    sexual abuses with graphic details?

4            MS. ZELLNER:   I want to interject an

5        objection because the answer calls for

6        speculation the way it's phrased.

7    BY MS. WILLIAMS:

8        Q    Do you understand my question, Doctor?

9        A    I think so.

10           But again, I think that, yes, most people

11   would have thought that children -- it is unusual

12   for children to knowingly, purposefully make things

13   up.  But that is not the same thing as saying that

14   it's unusual for children to make false statements.

15       Q    Okay.  I'm looking at your article dated

16   September of 1993 entitled, "False Statements in the

17   Differential Diagnosis of Abuse Allegations."  And

18   in that article on page 904, you said, quote:  "The

19   allegation may be true as one of the differential

20   diagnoses."

21           And you said, quote:  "This is usually the

22   case, perhaps 90 percent of the time," period, end

23   quote.  And you cited an article dated 1981 by

24   Cantwell, C-A-N-T-W-E-L-L.

25           Do you adhere to that view, Dr. Bernet,

1  that perhaps 90 percent of the time when a child
2  makes a disclosure of sexual abuse, that it may be
3  accurate and truthful?
4      A    I don't really know the -- the exact
5  percentage.  That was very old research which now,
6  of course, is 30 years ago.  If I had to estimate it
7  now, I would say that certainly the majority of the
8  time children make statements they are being
9  accurate and truthful.  But I don't really know the
10  percentage to apply to that.
11      Q    Okay.  But back in 1993 when you wrote
12  this article, were you of the view that that
13  percentage was perhaps around 90 percent of the
14  time?
15      A    Yes, that -- that was the only research I
16  could find at that time, so that's why I cited that.
17      Q    Okay.  Would you agree that in this
18  article where you are just kind of listing 12 -- I'm
19  sorry, 17 different potential diagnoses, as you put
20  it, of truth or veracity in a disclosure of sexual
21  abuse that you were lacking a method by which you
22  could determine whether, in fact, the disclosure was
23  true or false?
24      A    Well, that was not part of this paper.
25  That -- that was not intended to be part of this

1        A    Yes.

2        Q    Was that the first article that you're

3   aware of where an author provided a kind of

4   systematic approach to conducting child sexual abuse

5   victim interviews -- and by that first article, I'm

6   referring to Dr. Yuille's article in 1993.

7        A    I don't know if it was the first one.

8        Q    Okay.  Are you aware of any before that

9   one?

10       A    Not that I can cite right now.

11       Q    Okay.  And just for the record,

12   Dr. Yuille's name is spelled Y-U-I-L-L-E, right?

13       A    Let me see.  Yes, as far as I can tell, it

14   is.  Dr. Yuille.  I think his name is John Yuille.

15       Q    Oh.  If I mispronounced it, I apologize.

16            You noted there, though, in your article

17   in reference to Dr. Yuille's step-wise interview

18   approach that, quote:  "It is not known

19   scientifically or empirically whether the step-wise

20   interview is preferable to other interview methods

21   in eliciting accurate reports," end quote.

22            Is that your understanding to this day as

23   well, that there hasn't been scientific or empirical

24   studies confirming that that interview approach is

25   more likely to elicit accurate reports than in other

1    interview methods?

2         A    No.  I think there has been research, and

3    you know, the -- the Yuille method, this step-wise

4    interview is very similar to NICHD approach.  And I

5    don't really know the history of it.  I don't know

6    whether one grew out of the other, but I know that

7    the NICHD method has been studied in an attempt to

8    see whether or not it's reliable and whether any

9    accurate -- more accurate than anything else.

10        Q    And, of course, those studies all occurred

11   since the 1990s, right?

12        A    I believe so, yes.

13        Q    Dr. Yuille suggests that it is appropriate

14   to attempt to build rapport with a child before

15   beginning an interview.

16             Is that your understanding?

17        A    Yes.

18        Q    Would you agree with that?

19        A    Yes.

20        Q    All right.

21        A    Usually building rapport takes the form of

22   talking about neutral subjects.

23        Q    Sure.  And after building rapport, would

24   you agree with Dr. Yuille's approach that an

25   interviewer should start with general questions such

1   anyone done something to you,'" end quote.

2          A      Yes.

3          Q      Would you agree with that?

4          A      Yes.

5          Q      All right.  And then you also indicate

6   that it may be helpful in initiating disclosures to

7   use drawings, that the child or the interviewer can

8   make an outline of a person and have the child --

9   ask the child to add and name each body part and

10  describe its function, right?

11         A      Yes.

12         Q      And if sexual abuse is suspected when the

13  genitals are described, the interviewer could ask

14  whether the child has seen or touched that part of

15  another person and who has seen or touch that part

16  on the child, right?  You would agree that would be

17  an appropriate interview technique, correct?

18         A      If you need to go that way, yes.  I mean,

19  I guess ideally you wouldn't be going down that path

20  at that stage in the interview; but in some

21  circumstances, you might need to do that.

22         Q      All right.  And then you talk about

23  pre-narrative, general questions, and then you go to

24  specific questions.  I want to ask you about that --

25  specific questions if necessary, to be fair.

1          You indicate that, quote:  "It may be
2     helpful to obtain clarification by asking more
3     specific questions.  For example, the interviewer
4     may follow up on inconsistencies in a gentle,
5     nonthreatening manner.  If the child has used a term
6     that seems inappropriate for a child, the
7     interviewer may ask where he or she learned that
8     word.  In asking specific questions, one should
9     avoid repetitive questions.  Also, one should avoid
10    rewarding answers, particularly with praise."
11          Is that still your view, sir?
12    A     Yes.
13    Q     And then you go on to interview aids.  And
14    you say that "using anatomical dolls with
15    representation of genitals may be useful in
16    understanding exactly what sort of abusive activity
17    occurred."
18          Do you still agree with that, that using
19    anatomically correct dolls in the course of
20    interviewing a suspected child sexual abuse victim
21    may be appropriate and useful in the course of
22    determining what happened?
23    A     In some circumstances, I think it is.
24    Certainly not during the free narrative stage,
25    but -- and not during the elicitation -- the

1    eliciting of basically what happened, but sometimes

2    I think it's helpful to -- for the child to use them

3    to demonstrate what happened after the child has

4    already described what happened.

5        Q    Would you agree that that is a little bit

6    controversial, though, the use of anatomically

7    correct dolls?  Over the years, there are some

8    people who say you shouldn't use them and some

9    people say it's perfectly appropriate to use them,

10   and all shades in between?

11       A    The controversial issue had to do with

12   using the dolls as a diagnostic aid.  There was a

13   time when the dolls were first introduced that some

14   people had the idea that you could tell by the way

15   the child played with these dolls whether or not the

16   child had been sexually abused.  In other words,

17   that a child who was sexual abused, supposedly would

18   play with the dolls in more sexually explicit

19   manner.  In other words, it was being used to

20   diagnose sexual abuse.  So that was what was

21   controversial, and I think everybody now has gotten

22   rid of that.  I think almost nobody would approve

23   that use of the dolls.  But it's less controversial

24   as to using the dolls not as a diagnostic tool but

25   as a way to demonstrate what the child is trying to

1    say.

2        Q     Back in the 1984-1985 time period, would

3    you agree that during that time frame, it was kind

4    of generally accepted that the anatomically correct

5    dolls could be used as a diagnostic tool as well as

6    a -- as -- as the other tool you were referencing?

7        A     I don't know when that distinction was

8    made and when that clarification was made.

9        Q     Okay.  Your article goes on to talk about

10   false denials, that it's not -- would you agree,

11   sir, that it is not unusual for a child to make a

12   false denial of sexual abuse?  In other words, when

13   sexual abuse topics are discussed with a child, it's

14   not uncommon for a child, at least initially, to

15   deny that any abuse occurred when it is later

16   determined that, in fact, sexual abuse did occur?

17       A     Yes, I would agree that that happens.

18       Q     Would you agree that it happens quite

19   frequently, that more often than not children will

20   initially deny abuse?

21       A     Oh, I don't know the exact numbers.  I

22   don't know that it happens more likely than it

23   doesn't happen, but I would certainly agree that

24   it's common for it to happen.

25       Q     All right.  And when a child initially

1   denies abuse, is it your view that at that point a

2   child interview should stop, recognizing that it's

3   common for children to initially deny abuse?

4       A    I think it would depend on the overall

5   circumstances of the evaluation.  It would depend on

6   what other information the person has.  You would --

7   you would collect information, for instance,

8   about -- from other sources, collateral sources,

9   about exactly how the suspicion even arose.  And if

10  there was a strong basis for the suspicions in the

11  first place, then there might be a reason to go

12  ahead with the interview and try other methods with

13  the child or perhaps meet with the child on a --

14  again.

15          But if the original basis for the

16  suspicion was very, very small, then you might

17  simply go with the denial and say, you know, there

18  is very little suspicion in the first place and now

19  the child is making a denial so there's no reason to

20  go ahead.

21      Q    Just based on that answer, sir, would you

22  agree that a field investigator like a police

23  officer or a CPS worker attempting to interview a

24  suspected victim of child sexual abuse has to make

25  numerous judgment calls during the course of a

1  specific interview on whether to proceed, how to

2  proceed, and so on?

3      A    Yes.   There are many decisions.

4      Q    And would you agree that there is no such

5  thing as a perfect interview or a perfect scripted

6  interview, that every interviewer is going to make a

7  judgment call that could be second guessed by

8  somebody such as yourself?

9      A    I don't really know.  I'm sure there are

10  some interviews that are very, very good and others

11  that are problematic.  And I'm sure that people have

12  somewhat different styles.  I -- you know, I think

13  that the whole thrust of my evaluation is that even

14  though people have different styles, the idea of

15  avoiding suggestive leading and repetitive

16  questions, there isn't -- I mean, I think everybody

17  would agree with that.

18      Q    Would you agree that even a child who has

19  subjected -- has undergone leading, suggestive, or

20  coercive interview techniques may still provide a

21  valid disclosure of sexual abuse that is verifiable?

22      A    Well, do you mean by verifiable, by other

23  outside information?  Is that what you mean by

24  verifiable?

25      Q    Yeah, sure.  Like a confession, a plea of

1    guilty, polygraph results.

2           MS. ZELLNER:  I'm going to object to --

3        let me interject -- wait, wait, wait.

4           Let me interject an objection, okay,

5        because it's an incomplete hypothetical, it

6        calls for speculation.  You can answer it,

7        Doctor, if you understand the question.

8           THE WITNESS:  Well, I think I do.  And I

9        think I would agree that it is possible that

10       even a very poorly conducted interview might

11       conceivably produce an accurate statement of

12       what happened.  It's theoretical -- it is

13       theoretically possible for a very bad interview

14       to have an accurate result.  But the problem is

15       you have no way to know it.  I mean, that's

16       the -- that's -- of course, the problem is when

17       you're done with the very bad interview, you

18       have no way to know whether the statement is a

19       result of the interview or a result of

20       something that actually happened.

21   BY MR. FREIMUND:

22       Q    And that's -- that's your view in this

23   case, I take it then, that you have no way of

24   knowing whether the statements made by the children

25   in this case were accurate recounts of what actually

1    happened versus something that may not be accurate?

2        A    I don't -- based on what I reviewed, I

3    don't have enough information to have an opinion

4    about that.  I think there is too much missing

5    information to know, at least for me to have an

6    opinion about that.

7        Q    Okay.  I'm reading a little bit further in

8    your article entitled "Practice parameters for the

9    Forensic Evaluation of Children and Adolescents Who

10   May Have Been Physically or Sexually Abused" that is

11   dated March of 1997.  And there under the heading of

12   "The Child's Credibility" on page 431, can I direct

13   your attention to that portion of your article,

14   please.

15       A    Yes.

16       Q    Near the -- in that first paragraph,

17   you're talking about some studies that listed

18   factors that were thought to show enhanced

19   credibility.  One of them was the child uses his or

20   her own vocabulary rather than adult terms and tells

21   the story from his or her point of view.  And

22   another is the child reenacts the trauma in

23   spontaneous play.

24           Do you see where I'm referring to there?

25       A    Yes.

1      Q    Okay.  As part of your review of records

2   in this case, Doctor, did you review the initial

3   disclosure of sexual abuse that Kathryn Spencer made

4   to Shirley Spencer, her stepmother, which Shirley

5   Spencer in a handwritten statement described?

6      A    Yes.

7      Q    Okay.  Is it -- would you agree, sir, that

8   that was the first disclosure of sexual abuse in

9   this case, as far as you know?

10      A    Yes.  That was the first --

11      Q    Would you also --

12      A    I think I would prefer to use the word

13   allegation.  It was the first allegation of sexual

14   abuse.

15      Q    All right.  And do you fault, for lack of

16   a better word, the interview techniques that Shirley

17   Spencer used when questioning Kathryn Spencer when

18   she was attempting to touch her breasts and --

19   Shirley Spencer's breasts?  In other words, do you

20   fault the way in which Shirley Spencer questioned

21   the child?

22      A    Well, I might if I had more information.

23   We don't know exactly what happened in that

24   conversation.  We do know that Ms. Spencer later

25   said that she went back and asked Kathryn even more

1    questions.  I think the next day, there was an
2    opportunity.  They went to the beach or something.
3    And Ms. Spencer said that she was interested to get
4    even more information, so she went back and asked
5    more questions.  And so we don't know exactly what
6    happened in that conversation.  And for instance,
7    specifically we don't know whether Ms. Spencer could
8    have been suggesting acts to Kathryn.
9        Q    Based on what we do know from reviewing
10   what she wrote in her description of what happened
11   on the occasion she was speaking to Kathryn Spencer
12   about these issues, what -- do you fault anything
13   that she records in that written statement?
14       A    Well, I don't know what you mean by
15   "fault," I mean -- because we don't know what really
16   happened, and she doesn't spell out what really
17   happened.
18            So I guess I would fault her lack of
19   sufficient detail as to what happened in the
20   conversation to really be able to assess the
21   conversation.
22       Q    Would it be fair to say based on that
23   answer that you cannot say whether or not Shirley
24   Spencer used leading or suggestive or coercive
25   interview techniques when she was speaking with

1    Kathryn Spencer after Kathryn Spencer allegedly

2    attempt to touch her private areas?

3         A    That is correct.  We do not know whether

4    Ms. Spencer used that kind of questioning.

5         Q    Are you aware that Kathryn Spencer later

6    disclosed sexual abuse to her therapist?

7         A    Well --

8         Q    Before she was interviewed by -- before

9    she was interviewed by Detective Krause?

10        A    Yes, I mean I -- yes, I have heard that.

11   We don't, of course, know what really happened in

12   those conversations either.

13             MS. ZELLNER:  I want to interject an

14        objection.  That misstates the evidence.

15             THE REPORTER:  Was that Ms. Zellner?

16             MS. ZELLNER:  Yes.

17   BY MR. FREIMUND:

18        Q    So you would agree, would you not,

19   Dr. Bernet, that you cannot -- you do not have an

20   opinion that the therapist for Kathryn Spencer used

21   leading or suggestive or coercive interview

22   techniques when Kathryn Spencer disclosed sexual

23   abuse by her father to that therapist?

24        A    I think I understand your question.  I --

25   and it's that I -- I don't know what happened in

1    those therapy meetings.  So I don't know whether
2    that kind of questioning occurred.
3         Q    Okay.  Do you know what kind of
4    questioning occurred by the Sacramento Police
5    Department, Detective Flood, when he questioned both
6    Kathryn Spencer and Matthew Spencer before they were
7    interviewed by Detective Krause?
8         A    No, I don't know what questioning occurred
9    there.
10        Q    So once again, based on your lack of
11   knowledge, you can -- you have no opinion one way or
12   another whether he used suggestive, leading or
13   coercive interviewing techniques, correct?
14        A    Yes.
15        Q    You indicated in your article -- I'm just
16   going down a little further on that same section
17   entitled "Child's Credibility."  I think it's --
18   well, it's at the very bottom before you start the
19   next section on physical examination of children who
20   may have been abused.  And the last two sentences
21   before you start that next section, you say that
22   these criteria that you've just gone through for
23   assessing credibility have been based on clinical
24   experience and on limited preliminary research --
25   and again, we're talking 1987 -- 1997 when you were

1    touch her genital area.  And Ms. Spens -- Shirley

2    Spencer said, You're not supposed to do that.  So

3    the child feels reprimanded.  She feels that she

4    either did something wrong or she thinks she did

5    something wrong.

6           And the child then says, Oh, somebody else

7    did this.  I did this with somebody else.  Somebody

8    else let me do this.  In other words, that's not

9    spontaneous.  That is in reaction to the child's

10   feeling that she is in some kind of trouble.  And

11   she defends herself or she deflects the blame, if

12   there is any blame, from herself doing things that

13   are bad to somebody else.  And she ends up in the

14   next few minutes blaming her mother, this woman

15   named Karen, and ultimately her father, that they

16   all had been touching her because she's being

17   criticized for too much touching.  So that -- that's

18   not what I would consider spontaneous.

19       Q    Okay.  Would you consider that sexualized

20   behavior by Kathryn Spencer to touch Shirley

21   Spencer's breasts and attempt to touch her genital

22   area?

23       A    Oh, it's certainly sexualized behavior.

24   And she reportedly had been masturbating.  Her

25   mother described her as masturbating a lot.  And so

1  yes, that she had manifested sexualized behavior. I

2  don't -- I don't have enough information to know

3  that it's abnormal sexualized behavior in that it's

4  common for children to masturbate, and it's common

5  for children to try to touch adults. There isn't

6  really enough information to know whether it's

7  within the general range of normal or whether it was

8  unusual.

9       Q    Do you know -- I'm sorry. I just want a

10  little clarification on that.

11            Are you saying that in your view that type

12  of sexualized behavior by Kathryn Spencer at the age

13  of five is normal behavior and quite common among

14  five-year-old girls?

15       A    I don't know that it's common. But I

16  think they do it sometimes. You know, this is --

17       Q    If the child is -- I'm sorry. Go ahead.

18       A    Well, this is a situation where the child

19  has lived in different homes. There have been

20  different women present in the homes. She

21  apparently had a history of masturbation,

22  excessive -- what one might call excessive. I don't

23  know -- I don't really know if I would call it

24  abnormally excessive because I really don't know how

25  much it was. But it was enough that it concerned

1    her mother.

2              So she did manifest -- as far as I can

3    tell, she did manifest more sexualized behavior than

4    an average child.  But I really don't know whether

5    it's enough that I would consider it, you know,

6    pathological.

7        Q    Would you consider it a red flag that she

8    might be a victim of sexual abuse?

9        A    Yes, I would consider it a -- a -- a --

10   well, that she's been exposed to something that

11   she -- or else possibly that -- that she was not

12   parented well regarding this topic.  For instance,

13   maybe --

14       Q    Who was it?  Do you -- I'm sorry.  Go

15   ahead.

16       A    Maybe when she was masturbating back home

17   where she lived with her mother most of the time,

18   maybe her mother didn't handle it very well.  Maybe

19   as a result, she did it even more and then she got

20   even more interested and did other sexualized

21   behavior.  In other words, I don't -- we don't know

22   enough about the history to know what it's a red

23   flag of.

24       Q    But it is a red flag of something?

25       A    Yeah, it's -- it's a flag in the sense

1      A     Yes, that's correct.

2      Q     Okay.  I want to go a little bit further

3  in your article that we've been looking at.  The

4  same page where you talk about physical examination

5  of children who may have been abused.  And then at

6  the bottom of that first paragraph there, you say

7  quote:  "In most cases of sexual abuse, there are no

8  abnormal physical findings.  In Adams, et al 1994

9  study, the genital examination in sexually abused

10  girls was clearly abnormal in only fourteen percent

11  of the cases."

12          Does that -- does that continue to be your

13  understanding, sir, that even in cases where it's

14  known that a child -- a girl was sexually abused,

15  it's very rare that there will be abnormal physical

16  findings in a medical examination?

17     A     It depends, I think, on what the abuse

18  was, what the nature of the abuse was.  Certainly,

19  if the abuse was fonding, then it would be very

20  unlikely that there would be abnormal findings.  If

21  the sexual abuse was penetration -- was vaginal

22  penetration, then it's more likely that there would

23  be findings.

24     Q     How much more likely?  Do you know?

25     A     No.

1      Q    I'm just -- I'm just wondering about this

2   quote you -- in this -- in your article where you

3   said the genital examination in sexually abused

4   girls was clearly abnormal in 14 percent of those --

5   in 14 percent of cases.

6           Do you know whether or not that 14 percent

7   is referring to cases in which sexual intercourse

8   was alleged?

9      A    At this point, I don't.

10     Q    Okay.  Do you have any reason to believe

11   that -- that the percentage of cases in which sexual

12   intercourse is alleged that result in normal genital

13   examinations is anything greater than 14 percent?

14     A    I don't know.

15     Q    Okay.  I'm jumping forward in your article

16   now, sir, where starting on page 433, you have an

17   outline of practice parameters for the forensic

18   evaluation of children and adolescents who may have

19   been physically or sexually abused.  And there's a

20   lot of stuff in there at the beginning that I don't

21   know, at least in my eyes, isn't particularly

22   important to the issues in this case.

23           But I would like to start under the

24   diagnostic assessment.  Under subsection A1 there,

25   you said that it's important to obtain the history

1   that may be that in the course of being traumatized,

2   if you will, by a sexually abusive act, some

3   children disassociate and, in the vernacular, check

4   out as a protective response?

5       A    Yes, that's correct.  The word is actually

6   dissociate.

7       Q    I apologize if I mispronounced that.

8   Sorry.

9           You go on to describe other symptoms and

10  behavioral changes that sometimes occur in sexually

11  abused children under subsection D there.

12  Disturbances in sexual behaviors, including sexual

13  hyperarousal manifested by frequent or open

14  masturbation, excessive sexual curiosity, imitating

15  intercourse, inserting objects into vagina or anus,

16  sexual promiscuity, and sexually aggressive behavior

17  towards others, or age-inappropriate sexual

18  knowledge.

19          Would you agree, sir, that Kathryn Spencer

20  displayed some of those behaviors, or maybe more

21  accurately, several of those behaviors you just

22  listed there?

23      A    Well, let's see.  We have information that

24  she engaged in frequent masturbation.  And I guess

25  you would call it sexually aggressive behavior

1  toward others in that she attempted to touch the

2  breasts and genital area of her stepmother.  I don't

3  actually know whether she had age-inappropriate

4  sexual knowledge.  I know that -- I know she

5  described things that young children don't know

6  about usually, but I don't -- I don't know how she

7  came about to describe those things.

8      Q    Would you agree from the descriptions,

9  among other things, attempting to touch Shirley

10  Spencer's breasts and genital area, that she

11  displayed excessive sexual curiosity?

12     A    Yes, you can call it that -- or yeah.  I

13  guess I referred to it as aggressive behavior, but

14  it could be either one or both.

15     Q    Okay.  We've been going about an hour and

16  twenty minutes or so, sir.  Would you like to take a

17  break or do you want to press on?

18     A    I'll take a quick break.

19         MS. ZELLNER:  Actually -- yeah, we need to

20         take a quick break too.

21         MR. FREIMUND:  Okay.  Why don't we all

22         stay on the video line but take five minutes.

23         Would that work for you?

24         MS. ZELLNER:  Yes.

25         THE VIDEOGRAPHER:  Here marks the end of

1    arrangement.  I think the -- the decor of the office
2    should be at least not provocative.  In other words,
3    I guess it -- I don't know that it really has to be
4    child friendly particularly, but at least it should
5    be neutral and not provocative in any way.
6         Q    Your next item there is if possible
7    audiotape or videotape the interview.
8              Would you agree, sir, that there is no
9    commonly accepted standard of care requiring that
10   child sexual abuse interviews should be or must be
11   audio-taped or videotaped?
12        A    I really don't know if there was in 1984.
13   I believe that now there is.  I believe that
14   currently it's -- it's -- almost everybody agrees
15   that interviews should be electronically recorded.
16        Q    Do you know when that agreement was
17   arrived at temporally?
18        A    No.
19        Q    Would you agree that even in the 1990s,
20   there was extensive debate about whether child
21   sexual abuse interviews should be audiotaped or
22   videotaped?
23        A    Yes, I believe that is correct.  I -- so
24   people have gone back and forth about that.  I don't
25   hear much debate about it currently.  As far as I

1    know, almost everybody currently believes that they
2    should be recorded.
3        Q    Would you agree that back in the 1984 to
4    1985 time frame, it was unusual that a field
5    investigator would audiotape or videotape a child
6    sexual abuse interview?
7        A    I don't know.
8        Q    Okay.  In your next item, you say:
9    "Establish rapport which may require two or three
10   interviews.  Keep the number of interviews to a
11   minimum as multiple interviews may encourage
12   combative relation."
13            Would you agree, sir, that there is no
14   generally accepted limit on the number of interviews
15   that should occur of a child sexual abuse victim?
16       A    I think almost everybody would agree with
17   what is stated here, that one, two, or perhaps three
18   interviews are reasonable.  And it would be very
19   unusual to want to have more than that.  You would
20   have to have a really, really good reason to need
21   more interviews than that.
22       Q    So you would say, then, that at least
23   currently there's common acceptance that three
24   interviews is typically the limit, but, you know,
25   there may be cases where you would exceed that?  Is

1  that what you are saying?

2      A     Yes.   What I'm saying currently is that

3  one or two interviews probably covered the vast

4  majority of cases.  Maybe occasionally somebody

5  needs three.  I -- I -- I think you would have -- it

6  would be very unusual in my mind to need more than

7  that.

8      Q     Would you agree, sir, that you do not know

9  whether that was the standard of care back in the

10  1984 and 1985 time frame, that one, two or three

11  interviews is the limit?

12     A     I don't know.

13     Q     All right.  I think we've gone through

14  some of these other ones where you talk about

15  testing, ability to recall historical events --

16  (inaudible.)

17              (Reporter requests clarification.)

18     Q     -- accurately assess the child's

19  understanding of telling the truth, and encouraging

20  spontaneous narratives.  So I'm going to go down to

21  the Item 7, where you say:  "Proceed from more

22  general statements to more specific questions."

23              Would you agree, sir, that what you're

24  recommending in this article then is that a

25  funneling technique should be used in child sexual

1   abuse interviews, where you begin at the top of the

2   funnel with broad, general questions and then you

3   progressively narrow it down to more specific

4   questions?

5        A    Yes.   That's what this has been called.

6   And you don't always need to even narrow down.   In

7   other words, sometimes you get whatever information

8   you need from asking the broad questions.   But --

9   but sometimes you do need to proceed to more

10  specific questions.

11       Q    And the occasions on when you may need to

12  proceed to more specific questions sometimes are if

13  a child is resistant to disclosing abuse.   As you

14  indicated, that quite commonly happens.

15            So in that type of circumstance, that

16  would be one situation where it would be appropriate

17  to start asking more specific questions, correct?

18       A    Yes.   Sometimes that's the case.

19       Q    All right.   In your next item, Item No. 8,

20  you say:   "Avoid repetitive questions, either/or

21  questions, multiple questions.   As much as possible,

22  avoid leading and suggestive questions."

23            Would you agree, sir, that sometimes it is

24  appropriate and not possible to avoid asking leading

25  and suggestive questions in a child sex abuse

1    interview involving a child who is reluctant to

2    disclose?

3        A    I think that sometimes that is necessary,

4    but it has to be done with the full understanding

5    that what the child then says, you do not really

6    know for sure whether the child is simply endorsing

7    what the interviewer suggested or whether it's

8    actually eliciting factual information.

9             So you have to do it very cautiously and

10   you have to do it with that knowledge that whatever

11   you get from that process may or may not be

12   historically accurate.

13       Q    Would you also agree, sir, that the two

14   interview protocols or scripts that you referenced

15   earlier, the one by I believe it was NICH [sic], and

16   the other one, that both of those interview

17   protocols do include the use of leading and

18   suggestive questions if necessary when interviewing

19   reluctant child witnesses?

20       A    Yes.

21       Q    So even to this day, currently the

22   recommended interview protocols for reluctant child

23   witnesses advocate, if need be, the use of leading

24   and suggestive questioning during the interview?

25       A    I believe that's correct, but it's with

1   the understanding that you're not really sure --

2   when you get answers, you're not really sure about

3   the reliability of those answers.

4       Q    Okay.  Let's go down to Item No. 9, used

5   restatement, i.e., repeating the child's recount

6   back to the child.

7           What you are suggesting there is that it's

8   appropriate for a child interviewer to kind of

9   repeat back to the child what the child has

10  disclosed to them about sexual abuse; is that true?

11      A    Yes.  You're doing that carefully, of

12  course.  And you're basically giving the child an

13  opportunity to tell you whether or not you have the

14  information correctly.

15      Q    Okay.  And I'm going to kind of blend

16  Items 10 and 11 together there.

17          You say that in general the examination

18  should take place without the parent present; but if

19  a child is very young, consider having a family

20  member in the room.

21          Would you agree that that's one of those

22  judgment calls that an interviewer has to make about

23  whether or not to have the parent present in the

24  room during the interview, particularly for a

25  younger child?

1      A     Yes.   I think ultimately the -- that's --
2   the interviewer is going to have to figure that out.
3   And, again, if you do allow the parent to be present
4   or if that's necessary, you have to take that into
5   consideration that that might influence what the
6   child says.
7      Q     Okay.   I'm going to skip No. 12 where you
8   talk about using age-appropriate techniques and go
9   to 13 where you say:   "Determine the child's terms
10  for body parts and sexual acts."
11            Is that referencing what we were talking
12  about before, where it's appropriate for an
13  interviewer to have a drawing of a human body and
14  have the child identify body parts, including
15  genitalia and so forth, and identify -- have the
16  child identify by name what they call those body
17  parts?   Is that what you're talking about there?
18     A     Yes.   And some protocols do include that.
19  For instance, the RATAC protocol includes that as
20  part of a routine interview.   The NICHD protocol
21  doesn't.   They -- they actually discourage it.   So
22  different people have different ways of going about
23  that.   But it is accepted by some people.
24     Q     When you say RATAC, is that an acronym?
25     A     Yes.   R-A-T-A-C is an acronym for an

1   interview technique.

2       Q   Would you happen to know what each of

3   those letters in that acronym stand for?

4       A   Yeah.  I think it's rapport, anatomic

5   definitions, something, then the A is abuse

6   scenario, and the C is closure.  So that's some of

7   what that stands for.  Oh, terminology.  The T is

8   terminology, I think.

9       Q   Okay.

10      A   So it's rapport.  The anatomic -- pictures

11  is you actually look at the body parts.  And I think

12  T is terminology.  A is abuse scenario.  And C is

13  closure.

14      Q   Well, what is your understanding of what

15  is meant by "abuse scenario" in that acronym?

16      A   It's eliciting a description of what

17  happened from the child with the same, you know,

18  cautions of trying not to ask leading and suggestive

19  and repetitive questions.

20      Q   Okay.  I'm going to go down now to

21  subsection D where you say content.  It's entitled

22  "Content of the interview of the child."  And you

23  indicate "the following areas should be explored

24  during the interview."  The first one is you're

25  saying that it's appropriate for an interviewer to

1    ask a child whether the child was to disclose or not

2    disclose anything, you know, whether they were told

3    to keep a secret, basically, right?

4        A    Yes.

5        Q    And it's also appropriate to ask the child

6    who it was that they are saying abused them, right?

7        A    Uh-huh.  Well, you know, you keep

8    referring to "ask."  Of course, ideally this kind of

9    information came out during the free narrative

10   description by the child.  So you don't --

11       Q    Okay.

12       A    -- you don't end up having to ask these

13   questions.

14       Q    But in a less-than-ideal world where the

15   child did not disclose that in the pre-narrative, it

16   would be appropriate to ask a specific question

17   about who it was who touched them inappropriately,

18   would it not?

19       A    You may need to do that with the

20   understanding that every time you ask a question,

21   you might be contaminating the child's understanding

22   and memory.

23       Q    Sure.  But it might nonetheless be an

24   appropriate interview technique in that

25   circumstance, correct?

1       A    Yes, it might be.

2       Q    And it also might be appropriate to ask a

3   child what it was that the -- what kind of touching

4   the alleged perpetrator engaged in, right?

5       A    Yes.

6       Q    It's appropriate to ask the location where

7   the abuse occurred, right?

8       A    Yes.

9       Q    It's also appropriate to ask, you know,

10  when it started and when it ended, put some dates on

11  it, correct?

12      A    Yes.

13      Q    And the number of times that the abuse

14  happened is an appropriate inquiry for an

15  interviewer to pursue, right?

16      A    Yes.

17      Q    It's also appropriate to ask the child to

18  describe how the abuse first happened and then how

19  it progressed over time, correct?

20      A    Yes.

21      Q    And again, it's appropriate to see if the

22  child can describe how the perpetrator of the abuse

23  convinced the child to keep -- to keep the abuse

24  secret.  Isn't that also an appropriate thing for an

25  interviewer to do?

1    A    These are all things that would be good to
2  determine, preferably by not asking leading
3  questions.
4    Q    But once again, you know, in a non ideal
5  world that -- that might become necessary, and it
6  would not violate the standard of care to do so in
7  those circumstances, correct?
8    A    In some circumstances, that's correct.
9    Q    All right.  And another area of inquiry
10  that would be appropriate is to ask whether any
11  photographs or videotaping was involved during the
12  course of sexual abuse, too, right?
13    A    Yes.
14    Q    All right.  I'm going to move down to
15  subsection G -- I'm sorry, subsection H, "Physical
16  Examination of the Sexually Abused Child."
17      And first of all, you state there under
18  item No. 1, quote:  "Most sexually abused children
19  do not have any corroborating physical findings,"
20  end quote.
21      Again, that kind of goes back to what we
22  were describing earlier, that the majority of kids
23  who have been sexually abused there isn't any
24  medical evidence of the abuse, right?
25    A    Yes.

1    initial interview as well, though, right?

2        A    That's correct.  I think it was some of

3    the research done by Steven Ceci where he and his

4    colleagues said that it happens both ways, but it's

5    more common for the disclosure to happen than for a

6    denial to happen.

7        Q    Is that that Ceci and Bruck article,

8    B-R-U-C-K?

9        A    Well, they did a lot of work together.

10   I'm not sure who did this particular study.

11       Q    And just for the record, is it your

12   understanding that Ceci's name is spelled C-E-C-I?

13       A    Yes.

14       Q    How common is it, to your understanding,

15   that a child who makes a disclosure of abuse

16   recants -- later recants that disclosure?

17       A    According to that same material by Steven

18   Ceci, I think he would say that, yes, that happens,

19   but it does not happen frequently.  But I cannot

20   give you specific numbers.

21       Q    Do you recall in Roland Summit's 1983

22   article entitled "A Child Sexual Abuse Accommodation

23   Syndrome," that there was some discussion about

24   recantations?

25       A    Yes.  Dr. Summit said that in family

1   abuse, in incest, that recantations happen sometimes
2   because the child is pressured by family members to
3   take back the allegation.
4        Q    Do you recall that back in 1983, that
5   Roland Summit was saying, quote:  "Whatever a child
6   says about sexual abuse, she is likely to reverse
7   it," end quote?
8        A    I don't remember that specific comment.
9        Q    Okay.  But do you recall that generally he
10  was suggesting that at least in incest cases like
11  what we're dealing with in this case, recantations
12  occur with significant frequently?
13       A    Yes.
14       Q    And you would agree with that assessment
15  by Dr. Summit, would you not?
16       A    I really don't know what the numbers are.
17  I can just say that it happens sometimes, but I
18  don't -- I have no idea what the numbers would be.
19       Q    Okay.  Would you agree that one basis for
20  a recantation, or what might cause a child to
21  recant, is if their abuser is released from prison
22  and is now -- they are now at risk of abuse
23  reoccurring?
24       A    I don't know.  I don't think I have ever
25  heard that.

1    not sure.

2         Q    Do you recall what state -- what state it

3    was --

4         A    Yes, it --

5         Q    -- where this interview occurred?

6         A    It would have been in Virginia.

7         Q    Did it become fairly common for you, after

8    that '85, '86 time period where you were engaged by

9    lawyers from one side or another to analyze and

10   critique interview techniques in child sexual abuse

11   cases?

12        A    I don't think I would describe it as

13   common.  I mean, I have done hundreds of forensic

14   evaluations, and this kind of question is a small

15   percentage of all those evaluations I have done.

16        Q    When you say "this kind of question," can

17   you specify?

18        A    What you just said, critiquing the

19   evaluation done or the interview done by a child

20   protection worker would be a very small percentage

21   of all the forensic evaluations I have ever done.

22        Q    That is what you are doing in this case,

23   though, right?

24        A    Yes.

25        Q    Back in the 1983 to 1985 time period, what

1   were you focused on professionally during that time

2   period?  What were you doing?

3       A    During that period of time, I was living

4   and practicing child psychiatry in northern

5   Virginia, in Alexandria, Virginia, and I was mainly

6   doing outpatient psychiatric evaluations and

7   psychotherapy of children and teenagers and

8   occasionally adults.  So most of my work was as a

9   clinician doing therapy, and I was doing an

10  occasional forensic evaluation.

11      Q    Would you agree, Dr. Bernet, that you do

12  not have an expert opinion on what the standard of

13  care was for police officers or child protective

14  services workers during the 1984-1985 time period,

15  on the topic of child sexual abuse interview

16  techniques?

17      A    I think I'm an expert on some aspects of

18  it.  In other words, as I stated before, I don't

19  know exact protocols that might have been available.

20  But I do think, based on what I know about child

21  development and interview techniques, that certain

22  basic principles have been -- were known to

23  everybody, to professionals during that time,

24  specifically the problems with leading suggestive

25  and repetitive questions, the problems with, for

1      instance, bribing a child to say certain things or

2      praising the child for having said certain things,

3      that -- I believe that it's been common knowledge

4      that adults have to be careful about how they

5      influence the child.  And so I believe I'm

6      knowledgeable and have expertise in that regard.

7          Q      Any other subjects related to child

8      interviewing technique other than what you just

9      described that you believe you have an expertise

10     about related to standards that were applicable

11     during the 1984 to 1985 time period?

12         A      Well, I think what I related generally

13     comes under the heading of coerciveness, that asking

14     leading and suggestive and repetitive questions are

15     forms of coercion.  Praising the child is a form of

16     coercion, in a sense.  Threatening the child that

17     certain things are going to happen unless the child

18     makes statements that the interviewer is looking

19     for.  I think that those are the things that I would

20     have an opinion about and that I think were well

21     known in the 1980s.

22         Q      Okay.  And I just want to get a complete

23     list.  Is there anything else beyond what you've

24     just described?

25         A      Well, I guess we could look at my report

1   and see if there's anything else that I criticize in
2   here.   (Witness reviews document.)
3           Oh, well, I do criticize
4   Detective Krause's approach of telling each child
5   what the other children said.  So I guess I would
6   say that's something I know about.
7       Q    Okay.
8       A    I think that the idea of conducting the
9   interview in a neutral place would have been
10  understood by almost everybody at that period of
11  time.  I think -- those are the main things that
12  I -- I was criticizing these interviews about.
13      Q    Okay.  And let me direct you to page 23 of
14  your report, under Item 4 there you say:   "In 1984
15  and 1985 when the investigative interviews were
16  conducted by Detective Krause and Mr. Peters, it was
17  well known to both psychologists and legal
18  practitioners that both children and adults could be
19  influenced by repetitive, leading and suggestive
20  questioning."  And then you go on to say:
21  "Explained earlier in this report, there is ample
22  evidence that both psychological and legal
23  professionals have been interested in the
24  suggestibility of both child and adult witnesses
25  since the early part of the 20th century."

1    have been aware of the concept of avoiding

2    suggestive and leading questions.

3         Q    Okay.

4         A    In other words, the purpose of the

5    articles is just to demonstrate how prevalent that

6    understanding was, and -- but as far as

7    Dr. Krause -- Detective Krause goes, she herself

8    said that she was aware of the problems of leading

9    questions.

10        Q    Would it be your belief that Detective

11   Krause also would be aware, as you've testified here

12   earlier today, that in some instances, particularly

13   with a reluctant child witness, that it may be

14   necessary and appropriate to use both leading and

15   suggestive questions during the course of a child

16   sexual abuse interview back in the 1984, '85 time

17   frame?

18        A    Yes, I think that was her opinion.

19        Q    And that -- that's still true today among

20   professionals, is it not?

21        A    Yes, I think we might disagree on whether

22   it was an appropriate thing to do in the case, you

23   know, the actual case that is before us.  But I

24   think that the general notion is -- people would

25   agree to it.  I'm not sure people would agree on

1    point that one was given to him.

2         Q    Is it your belief to a reasonable degree

3    of psychiatric certainty that if a child interviewer

4    offers a hot chocolate to a child before

5    interviewing them, that that has a significant

6    increase in inappropriately -- an increase in the

7    likelihood of inappropriately coercing that child to

8    make a false disclosure of sexual abuse?

9         A    I don't think I would put it like that.

10   But see, I don't think we're looking at a single

11   instance.  I think we are looking at a pattern.

12   We're looking at a pattern of her treating the

13   children and in seeing them in a personal space,

14   taking -- going to the mall with one of them.

15   There's a pattern of engaging them in an overly

16   personal way.

17        And I think that that would -- would lead

18   the children to try to be more cooperative and try

19   to say what the interviewer is looking for.

20        Q    Is it your belief that Detective Krause

21   fabricated the statements that the children were

22   making to her as she reported in her police reports?

23        A    I don't know if she did that.  I think

24   it's possible she -- she could have misstated the

25   way the conversations went.  I'm -- I'm not -- I

1    don't know whether I would call it fabrication.

2    Maybe that is the right word.  But, I think it's

3    possible that she would say things in a suggestive

4    way, and then she would essentially get the child to

5    agree with it.  But then when she wrote up the

6    report, she put it as though the child had said

7    those things.

8        Q    How do you know that happened?

9        A    Well, there are a couple of reasons to

10   think that might have happened.  One is the -- the

11   interview that was provided to me by Phyllis Day who

12   was the children's grandmother, the maternal

13   grandmother.  And she described being present

14   during -- during, I guess, a wrap-up session with

15   Big Matt when Matthew had been interviewed by

16   Detective Krause, and then they came back together

17   again.  And she described that that's what Detective

18   Krause did during this wrap-up session, that

19   Detective Krause would say, You know, your daddy did

20   such and such.  And Matthew would agree.  And your

21   daddy did something else.  And Matthew would agree.

22   So that's one reason to think that might have gone

23   down that way.

24        The other reason is that some of the

25   statements quoted by Detective Krause attributed to

1    the children, especially to five-year-old Kathryn,
2    seemed grown up.   There are complex sentences.
3    There are compound sentences just the way they are
4    stated seems overly grown up for this little girl.
5    So it -- I'm sort of wondering whether the little
6    girl really said those things, or whether Detective
7    Krause said those things, and then the girl agreed
8    with her.
9         Q    I understand you think it -- there's some
10   indication that might have happened.   Let me pin you
11   down.
12             Can you say to a reasonable degree of
13   certainty that it, in fact, happened?   That
14   Detective Krause was fabricating statements that
15   these children made during the course of her
16   interviews?
17        A    No, I don't think I can say that that
18   strongly, but it's -- it's certainly something that
19   I would wonder about and that whoever ultimately
20   decides these things would have to add that together
21   with whatever other information the finder of fact
22   has to decide about that.
23        Q    Okay.   I'm going to talk about briefly
24   false positive and false negative error rates in the
25   course of child disclosures of sexual abuse.

1    suggestive, leading and repetitive questions; the

2    problems of threatening a child.  I think those are

3    so basic that I think it's fair to apply those

4    criticisms.

5        Q    You will not be offering an opinion in

6    this case, will you, that any particular child

7    involved here was, in fact, sexually abused or not

8    sexually abused?  That's not going to be something

9    you are going to be opining about, is it?

10        A    That is correct.  I'm not having an

11    opinion about the ultimate question.

12        Q    Sure.  And you -- you haven't interviewed

13    any of the people involved in this case, whether

14    it's the investigator, the children, the father or

15    anybody, right?

16        A    That's correct.

17        Q    Is it also correct that you have never

18    been acknowledged as an expert in any area in the

19    State of Washington or in Washington federal courts?

20        A    That is correct.  I have never testified

21    in the State of Washington.

22        Q    Okay.  And you're not licensed to practice

23    in the State of Washington either, are you?

24        A    That's correct.

25        Q    Would you agree that even to this day

1   there is no consensus among professionals on the use

2   of a particular protocol for conducting a child

3   inter -- a child sexual abuse interview for a child

4   who has not made a prior disclosure?

5       A    I'm not exactly sure what you are saying.

6   In other words, you are suggesting a situation where

7   the investigator might have reason to think that the

8   child has been abused but the child has never said

9   so?  Is that --

10      Q    Right.  I'm distinguishing between a child

11  who has made a so-called prior outcry from a child

12  who has not made a prior disclosure, but they are,

13  whether through another child or other information,

14  an investigator has reason to believe that they may

15  or may not be -- well, that they may be a victim of

16  child sexual abuse?

17      A    Yes, I understand.  I'm not aware of any

18  universally accepted protocol, but I guess I would

19  say that everybody would agree on the general

20  principles that we've been talking about.

21      Q    Okay.  Is it your understanding that the

22  NICHD protocol that you mentioned before was focused

23  on children who have made a prior outcry as

24  distinguished from children who have not?

25      A    Yes.

1  Q Is it your understanding that the RATAC

2 protocol you mentioned before was similarly focused

3 on children who made a prior outcry as distinguished

4 from those who have not?

5  A Yeah.  Well, it's -- it's my understanding

6 that both of those were developed primarily for --

7 from children who have made disclosures or

8 allegations, but that both of them can still be used

9 with other children, although I suppose you would

10 have to make some modifications.  But I think you're

11 correct, that they were originally designed for

12 children who had previously made some kind of

13 statement.

14  Q Would you agree that there is -- that

15 every child is different, and thus every interview

16 is different in some respect because you have to

17 address the particular child being interviewed?  In

18 other words, there is no one-size-fits-all

19 interview?

20  A Well, I think there are general principles

21 that fit all.

22  Q Right.

23  A But the way it actually plays out, I'm

24 sure every child is different.

25  Q And there are different judgment calls

1  that have to be made in virtually every child sexual

2  abuse interview, is there not?

3       A    Yes.   In any interview you have to make

4  some choices.

5       Q    Would you agree that it is easier to

6  criticize how somebody else performed the child

7  interview than it is to actually do one yourself?

8       A    No.   I think both of them -- both of those

9  roles require a level of professionalism and

10  knowledge and expertise, whichever -- whether you

11  are doing it or you are reviewing somebody else's.

12  I think both of them are challenging things to do.

13       Q    Do you think it's -- would you agree that

14  it's more challenging to actually have to be the

15  interviewer than to be the critic of the

16  interviewer?

17       A    Not all -- not necessarily, no.   In other

18  words, in a way, being the critic, you have to put

19  yourself in that person's position and consider what

20  that person was hearing and experiencing, as well as

21  what you know about how to do it just from other

22  circumstances.   So I don't know that one of them is

23  easier than the other one.

24       Q    Okay.   I'm just going through my notes

25  here.   If you would bear with me, sir, I'm getting

1    close to finishing, although I'm sure others will

2    have questions for you.

3           We talked about how many interviews, and

4    you were saying one, two, to three might not be --

5    would be within the realm of reason, but beyond

6    three might not be.

7           What about length of interviews? Are you

8    aware of some standard of care that existed back in

9    the 1984, '85 time frame about how long a child sex

10   abuse interview should last before you're developing

11   concerns that it might become coercive in some way?

12      A    No, I don't have any specific information

13   on that.

14      Q    Okay. Do you know whether there's some

15   consensus currently as to the length of time a child

16   sexual abuse interview should be limited to avoid

17   the risk of becoming coercive?

18      A    No, I haven't heard it stated in that way.

19   I think usually you try to size up based on how the

20   child is doing and kind of the attention span of the

21   child. I -- I would imagine that typical interviews

22   would -- would not go beyond an hour, and probably

23   the average might take 45 or 50 minutes. But I

24   don't know any specific rules. In general, younger

25   children seem to tolerate less -- they can handle a

1   shorter time, and older children handle longer

2   times.

3        Q    Would you agree that the studies show that

4   boys are less likely to disclose child sex abuse

5   than girls are?

6        A    Yes, that's my understanding, especially

7   if you included adolescents in that, that males

8   disclose less than females do.

9        Q    Does it become even less likely that a

10  male would disclose sexual abuse -- childhood sexual

11  abuse if the perpetrator of the abuse is another

12  male, thus creating concerns about homosexuality or

13  other issues?

14       A    I don't know if it is.  I mean, that seems

15  like it might be, but I -- I really don't know if

16  that's been studied.

17       Q    Okay.  As a result, though, of what you do

18  know, that it has been studied that boys are less

19  likely to disclose abuse than girls, does that lead

20  reasonably to child interviewers perhaps using

21  different interviewing techniques with boys than

22  girls and having to be, more often than with girls,

23  becoming more direct in their questioning of the

24  boys than the girls?

25       A    I don't know if it would or not.  It

1      A      Not specifically.  I think the ultimate

2   standard is probable cause, but I don't know

3   specifically what standard they might have to

4   determine fabrication.

5      Q      As I understood your earlier testimony,

6   you could not state with reasonable certainty in

7   response to one of Mr. Freimund's questions that

8   Detective Krause's reports contained fabrications;

9   is that correct?

10     A      That's correct.  I can only raise that

11  concern.  That would have to be combined with other

12  information.

13     Q      So would it be fair to say that there

14  would be no way that Mr. Peters could determine with

15  any sort of reasonable certainty in reviewing

16  Detective Krause's report whether or not they

17  contained fabricated information?

18     A      I don't think you can do it simply from

19  what's written on the paper.  I think you have to

20  combine that with other information that you might

21  know about the case.

22     Q      Okay.  And that would include, of course,

23  the handwritten statements provided by Shirley

24  Spencer, which, as Mr. Freimund pointed to you, was

25  the first disclosure from Kathryn in this case?

1   want to change that now?

2       A    Well, I'm just saying that I'm not sure

3   whether he described them or whether he described

4   them under a certain amount of coercion or whether

5   she described them and he agreed.  I don't think any

6   of us know which one of those it was.

7            In her reports --

8       Q    It's --

9       A    I'm sorry.  But in her report, of course,

10  she is relating that Matthew described them.

11      Q    Right.  Do you notice in her reports, in

12  many instances she paraphrases or just describes

13  what the child witness has said.  And in many other

14  instances, and in all of these reports, she will

15  attribute statements to children in quotes, correct?

16      A    Yes.

17      Q    And so are -- are you saying that you --

18  you believe some of what Detective Krause attributed

19  to the children in quotes was not, in fact, said in

20  those words by the children?

21      A    I didn't make the statement in such a

22  definitive manner.  I said that --

23      Q    Okay.

24      A    -- based on the overall style of the

25  interviewing, it is possible that Detective Krause

1    made the statements, and the child was kind of put

2    in the position of agreeing with those statements.

3    And in her mind, she may have turned it around and

4    made it sound like the child made those statements.

5    In other words, I don't know which way it happened.

6         Q    Okay.  And I -- I appreciate that.  And I

7    just want to make sure we -- we finish up this

8    issue.  You're -- you're not going to be providing

9    any testimony in this case where you point to any

10   specific statement Detective Krause put in quotes

11   and your testimony is going to be that is a false

12   description of what the child said?

13        A    I don't think I would be that --

14        Q    Is that correct?

15        A    That's correct.  I would not be that

16   definitive, but I -- I guess I could say that we're

17   not sure whether those were the child's words or her

18   words.

19        Q    Okay.  Do you have any reason to believe

20   Detective Krause would have had any motive to

21   falsify information in any of her reports that she

22   generated in this case?

23        A    Well, overall she comes across as very

24   determined to get statements from the children and

25   that her perception was that the children had been

1   abused, and that it was in a sense her mission to

2   get them to say that they had been abused.  That's

3   the way it comes across.  If I recall, she was asked

4   in her deposition whether she had ever found

5   children to have not been abused, and she gave a

6   very small number.  I kind of forget exactly what

7   was said, but her response was the vast majority of

8   people that she's evaluated really were abused.  And

9   so I think it was her mindset that these three

10  children had been abused by Mr. Spencer, and she was

11  an enthusiastic person and an energetic person who

12  saw that that was her job to get these statements.

13         So with that type -- with that kind of

14  tone, I think it's possible that she induced the

15  children to say things.

16      Q   Okay.  But that's not my question.  I

17  guess my question, to follow up on what you have

18  just explained, is it -- do you believe that

19  Detective Krause, because of her determination and

20  enthusiasm as you put it, went to the extent of

21  lying in her report about what the child victims

22  told her?

23      A   I don't know.

24      Q   In fact, you -- okay.

25         Would you expect that a nine-year-old boy

1   naked.  So to me it's -- it struck me as very, very

2   unusual.

3       Q    Okay.  But my specific question to you is

4   do you have any basis to express an opinion about

5   whether that did or did not violate whatever

6   standard practice was in effect in 1984 and '85

7   among law enforcement or CPS field interviewers?

8       A    No, I don't have specific information

9   about that.

10      Q    You expressed criticism of Detective

11  Krause for telling each child what the other child

12  had said, correct?

13      A    Yes.

14      Q    Do you know if that violated the generally

15  accepted standard for conducting interviews among

16  field interviewers in 1984, '85?

17      A    I don't know.

18      Q    You were asked earlier today about the

19  handwritten narrative statement that Shirley Spencer

20  generated to document the first disclosure made by

21  Kathryn.

22          Do you -- you recall that testimony?

23      A    Yes, I do.

24      Q    I think you said that -- that we don't

25  know whether Shirley used leading questions at any

1   covered?

2       A    It was the next subject, I think.

3       Q    Perhaps you could have the court reporter,

4   if you would like, look at what the next question

5   and answer were following the last reference to

6   anatomically-correct dolls because I'd like to give

7   you a chance --

8       A    Yes.

9       Q    -- to explain whatever you had recalled.

10      A    Why don't we try to do that.

11           (Question read back.)

12           THE WITNESS:  I think -- I think that's

13      it.  You were asking me if I had specific

14      information about the use of the dolls being

15      naked, whether that violated...

16      Q    Right.

17      A    And I simply said no, but I -- what I

18  meant to qual -- I should have qualified it by

19  saying that use of the dolls like that is simply

20  another example of a leading question or a

21  suggestive question.

22           In other words, if you present to a child

23  naked, anatomically-correct dolls, you are

24  suggesting to them that there's something sexual you

25  want them to demonstrate.  And so even though I'm

1   not aware of any specific protocols or rules about
2   that, it comes -- in my mind, it comes under the
3   general heading of don't ask things in a coercive,
4   suggestive way.

5           And actually the same thing because you
6   also asked me was there a protocol regarding asking
7   children -- letting -- letting the children know
8   that other children had said certain things.  And
9   that's also suggestive.  So I mean there may or may
10  not be a specific rule, but it comes under my
11  general criticism that if you say to a child, By the
12  way, this other child told me such and such, that's
13  extremely suggestive, that -- that the child you're
14  interviewing might want to say the same thing.
15  So --

16      Q   And I understand.  Okay.

17      A   Well, I'm just saying that even though I'm
18  not aware of any specific rules or protocols, I
19  think that all those things come under the general
20  heading of a coercive, suggestive approach.

21      Q   And I understand of your gen -- your
22  opinions, generally, about leading, suggestive
23  coercive questions.  But my questions that I think
24  you had answered actually previously had to do with
25  specifically whether you were aware of standards in

1    '84 and '85 that would have addressed that.  And I

2    think your answer to both of those subjects was no,

3    correct?

4        A    Not specific standards, but certainly

5    generally they would have violated the general

6    principle.

7        Q    And I did mean to ask you, Doctor, are you

8    aware of any occasions where Detective Krause was

9    found to have falsified information in reports in

10   any other cases?

11       A    No.

12            MR. BOGDANOVICH:  Thank you.

13            MR. FREIMUND:  I need to ask some

14       follow-up here.  It shouldn't take much longer,

15       but if you need to take a break first,

16       Dr. Bernet, that's fine with me.

17            THE WITNESS:  No, I don't need a break.

18                          EXAMINATION

19   QUESTIONS BY MR. FREIMUND:

20       Q    I want to direct your attention, please,

21   to Exhibit 2, your supplemental report after you

22   read Dr. Esplin's report.

23            Could you, first, look at pages 4 through

24   the top of page 6 when you are talking about

25   repetitive questions by Detective Krause.

1          Would you agree with me that you cite no

2    examples of repetitive questioning by Detective

3    Krause in regards to her interviews of Little Matt

4    Hanson?

5          A    You're asking me about repetitive

6    questions on those two pages?  That's correct.  I

7    don't have any examples from Little Matt.

8          Q    Is that because you didn't find any

9    examples of the Detective Krause using repetitive

10   questioning with Little Matt?

11         A    Probably that's correct.

12         Q    Okay.  Let's go to suggestive questions.

13   There you did find examples of suggestive questions

14   on pages 6 through the top of page 9 as to all three

15   of the alleged victims, right?

16         A    Yes.

17         Q    But when you go to leading questions by

18   Detective Krause on page 9, you only identify

19   leading questions as having been used with Kathryn

20   and not either Big Matt or Little Matt, correct?

21         A    Yes.

22         Q    Is that because you did not see any

23   examples of Detective Krause using leading questions

24   with both of those boys?

25         A    Yes, I think that's correct, what you just

1    said.

2        Q    Okay.  Let's go to the next category you

3    have there, starting at page 9 and extending to the

4    top of page 11, Detective Krause's coercive style of

5    interviewing.  You indicate that she had a coercive

6    style in interviewing Kathryn Spencer and Matt

7    Spencer, but you did not find any evidence of a

8    coercive style of interviewing by Detective Krause

9    of Little Matt Hanson, did you?

10        A    I don't think so, at least not that would

11    fit under this definition that I'm using here.

12        Q    Okay.  Let's go to the next area there

13    that you talk about on pages 11 and 12, Detective

14    Krause's pattern of reinforcing positive behavior.

15    You found no evidence of a pattern of reinforcing

16    positive behavior used by Detective Krause in her

17    interview of Little Matt Hanson; isn't that correct?

18        A    That is correct.

19        Q    Is it your knowledge, sir, that even

20    though you didn't find very much fault in the

21    interviews of -- Detective Krause's interviews of

22    Little Matt other than the use of suggestive

23    questioning on a few occasions, that Little Matt

24    Hanson, to your knowledge, has not recanted the

25    abuse, like, by Mr. Spencer?

1        A      That is my understanding.

2        Q      Okay.  And just on -- on the -- on Peters,

3   your criticism of defendant Jim Peters, you would

4   agree, would you not, that Mr. Peters had no

5   coercive influence whatsoever on the disclosures

6   made by Matt Spencer and Little Matt Hanson because

7   he had no involvement -- or no interviews of him to

8   your knowledge, right?

9        A      As far as I know, that's correct.

10       Q      Okay.  So the only child that Mr. Peters

11  may have had some coercive influence on in your

12  opinion would be Kathryn Spencer and not the other

13  two boys, right?

14       A      That is correct.

15       Q      All right.  I want to direct your

16  attention, now, please to page 22 of Exhibit 2 and

17  focus your attention on your third opinion there.

18              You say there that:  "The investigative

19  interviews conducted by Detective Krause and

20  Mr. Peters were so improper, coercive and

21  psychologically abusive that the interviewers knew

22  or should have known that they would yield false

23  information."

24              When you were asked about that a little

25  while ago, you said that -- by Ms. Fetterly, I would

1   say -- I should say -- that they knew or should have
2   known that it -- it could lead to unreliable
3   information.  And I want to pin you down on that,
4   sir.

5          Are you saying that they knew that these
6   kids were giving them false information, or are you
7   saying they knew or should have known that because
8   of the use of repetitive questioning on some of the
9   kids, leading questions on some of the kids, that
10  they knew that false information was coming from
11  those kids?

12      A    Yes.  I would say that they knew or should
13  have known that the information was unreliable and
14  that it could well be false.

15      Q    Okay.  But let's make this distinction,
16  and I want to be careful about it.

17          Wouldn't you agree that there's a
18  difference between something being unreliable and
19  something being categorically false?

20      A    Yes.  You know, I think I tried to make
21  the distinction in the very last sentence of the
22  discussion part of that conclusion on the next page.
23  And I say:  "When interviews are conducted in that
24  manner, it is likely that false information will be
25  elicited and the children's statements become

1    unreliable."

2           So that -- the problem is that when you

3    elicit a lot of information, you don't know which

4    part is correct or true and which parts are false.

5    And since you don't know, you can't figure it out.

6    The overall result is that the child is unreliable.

7    I guess that's what I'm trying to say here.

8           Q    Okay.  I appreciate that qualification.

9           A    And that, yes, that they -- that they

10   should have known that some of the statements that

11   are being produced are going to be true, and some

12   are going to be false.  They should have known that.

13          Q    Okay.  But they couldn't know which of

14   them were true and which of them were false, could

15   they?

16          A    Well, I suppose maybe a person could

17   figure that out if you were doing a comprehensive

18   investigation, and you were going back and you

19   collected information from the very beginning, a

20   really careful analysis of how Kathryn's statements

21   originally arose.  And then you could dissect from

22   there which subsequent statements were influenced by

23   the interviews by Detective Krause, and you could

24   ultimately try to figure out -- maybe not a hundred

25   percent, but you could figure out somewhat -- what

1    statements were true and what statements were false.

2        Q    But which -- when -- what we are talking

3    about here, though, is you're saying that Detective

4    Krause and Mr. Peters knew or should have known that

5    particular statements were true or false.  And

6    that's what I'm asking you.  Which -- how would they

7    know that?

8        A    Oh, I'm not -- I don't think I said that

9    they should know particular statements.  I think

10   that they should have known that you are going to

11   end up with a mishmash of some true and some false

12   information.  And you have no way -- unless you

13   really do a very thorough investigation, you are not

14   going to able to figure out which are which.

15       Q    And I want to go back to your earlier

16   testimony today just to be sure I'm understanding

17   this opinion labeled No. 3 in your report.

18            I believe, and please correct me if I'm

19   wrong, but I believe you testified you cannot say

20   that the disclosures of sexual abuse made by these

21   children saying that their father sexually abused

22   them were false.

23            You don't have an opinion on that; am I

24   right?

25       A    I don't have an opinion in the sense that

1    I have stated it here.  I mean, I have thoughts

2    about that, if you want my thoughts.  But I guess --

3    I wasn't really asked.  I wasn't really asked to

4    figure that out or to give an opinion about that, so

5    I don't have an official opinion on that.

6        Q    And you can't say to a reasonable degree

7    of psychiatric certainty that the disclosures made

8    by these children that they were sexually abused by

9    Clyde Ray Spencer are false?

10       A    That is correct.  But I've got to tell

11   you, I have a really high level of suspicion just

12   from things we've talked about here today, that

13   partly the very initial outcry made by Kathryn is in

14   the context of her doing something naughty and being

15   reprimanded.  And she's reprimanded, and then she

16   suddenly says, Oh, mommy does this.  That other

17   lady, Karen, does this.  Daddy does it.

18            That's a classic example of how a false

19   allegation arises.  And then the interviews by

20   Detective Krause are classic examples of how a

21   thought in the child then gets made into these

22   verbal statements because the child is trying

23   really, really hard to say what the interviewer is

24   assuming is the correct answer, that the interviewer

25   feels is a correct answer.  So there's lots in this

1   case that are absolutely typical of how false

2   allegations come about.

3          But to tell the truth, I wasn't asked to

4   give an opinion on that, so -- but I can just

5   explain to you that there are alternative

6   explanations that are very, very strong and

7   convincing.  The alternative explanations are

8   convincing, that I think that's kind of thing that

9   should be taken into consideration.

10         Q    Would you agree that you have no opinion

11  regarding whether Defendant Davidson knew or should

12  have known that the interviews conducted in this

13  case revealed false information?

14         A    I have not expressed that opinion, and I

15  don't think anybody is going to ask me that.  But I

16  would think that an experienced prosecutor could

17  have read over these interviews and seen that they

18  were problematic, that they were done in such a way

19  that the children were endorsing the assumptions or

20  the preconceived notions of the interviewer.  And I

21  really don't know whether he was in a position to

22  know that they were yielding some false information;

23  but I think if he had looked at them closely, he

24  would have come to the same conclusion that I have.

25         Q    Why wouldn't he come to the same