# EXHIBIT J

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA


CLYDE RAY SPENCER, MATTHEW

RAY SPENCER, and KATHRYN E.

TETZ,

CERTIFIED COPY

          Plaintiffs,

          vs.                          Case No:   C11-5425BHS

FORMER DEPUTY PROSECUTING

ATTORNEY FOR CLARK COUNTY JAMES

M. PETERS, DETECTIVE SHARON

KRAUSE, SERGEANT MICHAEL DAVIDSON,

CLARK COUNTY PROSECUTOR'S OFFICE,

CLARK COUNTY SHERIFF'S OFFICE,

THE COUNTY OF CLARK and JOHN

DOES ONE THROUGH 10,

          Defendants.

_____/

               VIDEOTAPED DEPOSITION OF

               DEANNE SPENCER

               Friday, November 16, 2012


          Reported by Jennifer F. Milne, CSR No. 10894

```
 1   make sure that my kids were --
 2            MS. FETTERLY:  Why don't we take a break.  Let's
 3   take a break.
 4            THE VIDEOGRAPHER:  Okay.  We're going to go off
 5   the record.  It's 10:04 a.m.
 6                 (Brief recess.)
 7            THE VIDEOGRAPHER:  We're back on the record.
 8   It's 10:09 a.m.
 9   BY MS. FETTERLY:
10       Q   Before we had a break, Ms. Spencer, we were
11   talking about the fact that you had arranged to have a
12   medical examination of Katie.
13       A   That's correct.
14       Q   And we've established that was on August 30th,
15   1984.
16            Where did that examination take place?
17       A   It took place at U.C. Med Center in Sacramento.
18       Q   And that is a Davis campus, I take it?
19       A   Yes.
20       Q   And did you -- as you were advised to by, you
21   said, a social worker.  Did you have a discussion with
22   Katie at that time before the examination --
23       A   I did.
24       Q   -- as to what would happen at this examination?
25       A   What I said to her was -- we were in the car,
```

1    and we were on our way, and she was looking at me, like,

2    you know, what's going on?  And I said, "Well, we know

3    that daddy's touched in you places that daddies aren't

4    supposed to touch little girls.  And we want to make

5    sure you're not hurt."

6        Q   Okay.  And what was her response?

7        A   She curled into a ball, rolled to the side of

8    the door and began yelling, "Mommy, please don't let

9    them touch me there.  Please don't let them touch me

10   there."

11       Q   Did you proceed to the medical center, then?

12       A   I did.

13       Q   Okay.  And who was present when -- when the

14   examination, at least attempted examination, took place?

15       A   There was a female doctor, a female nurse, and a

16   female social worker and myself.

17       Q   And what happened during this process?  And you

18   were present the entire time; is that right?

19       A   Yes.

20       Q   So describe what happened during -- when you and

21   Katie and the medical staff were in the examination

22   room?

23       A   They -- we took her shoes off and then the

24   doctor started to -- she was sitting on my lap.  And the

25   doctor started to take her tights off, and she began

1    screaming and kicking and yelling.  And none of us could

2    get them off of her.

3        Q  Was there ever, on this occasion, a vaginal

4    examination done of your daughter on that date?

5        A  No.

6        Q  Okay.  What type of examination, if any, was

7    done -- and this was while she was on your lap; is that

8    right?

9        A  She was on my lap, yeah.

10       Q  Was she ever on an examination table?

11       A  No.

12       Q  Okay.  Were there any instruments inserted into

13   her?

14       A  No.

15       Q  Was the physician even able to probe into her

16   vaginal area?

17       A  No.

18       Q  Okay.  So what was examined, if anything, during

19   this examination?

20       A  Nothing.

21       Q  And that was because --

22       A  We couldn't -- she was hysterical.  We could not

23   get her tights off.  She still had her dress on.  We

24   couldn't get her tights off.

25       Q  Handing you what has been marked as Exhibit

1    Number 3, can you identify this document?

2        A  Yes.

3        Q  And what is it, to the best of your knowledge?

4        A  It's the medical report from that visit, it

5    looks like.

6        Q  It's a three-page document?

7        A  Correct.

8        Q  Would you agree that on the third page there's a

9    handwriting that says "No physical finding"?

10       A  That's correct.

11       Q  And how do you explain that particular finding?

12   Was that following an actual vaginal examination?

13       A  No.

14       Q  Okay.  How would you explain the writing of

15   those conclusions?

16       A  I can't explain it.

17       Q  Could there possibly be no physical findings

18   because an actual examination was not done, an actual

19   pelvic examination was not done?

20       A  That would be my assumption.

21       Q  And then did you take Katie home that day after

22   the examination?

23       A  Actually, the social worker -- I was told while

24   I was there that there's been an apparent trauma.  You

25   need to get her into some sort of counseling or therapy.

1    therapist ever state to you, "I think she made these

2    allegations up"?

3         A   No.

4         Q   Did she ever state to you, "she" being the

5    therapist, "I don't think anything actually happened"?

6         A   No.

7         Q   Was it your understanding that the therapy she

8    was pursuing with Katie was that she had been -- in

9    fact, been improperly touched by her father?

10        A   Yes.

11        Q   Did -- and -- in the same time period, did you

12   notice any unusual behavior on Katie's part that may or

13   may not, based on your understanding of child

14   development, have been consistent or inconsistent with

15   physical sexual abuse?

16        A   At times I felt uncomfortable of some of her

17   behaviors, especially around, oh, like her uncles --

18   it's so long ago.

19        Q   I know.

20        A   But I just -- I can't put my finger on it.  I

21   was just uncomfortable.

22        Q   Okay.  Did you ever observe her to rub her

23   genital area in this time frame?

24        A   Yes; but I didn't think anything of it.

25        Q   Did she ever ask you to apply medicine to her

1    genital area in this time frame?

2         A    Yes.

3         Q    Okay.  Had you ever done that in the past?

4         A    She had a sore like on the top of the vaginal

5    area, not inside, but on the top.  And when I took her

6    to the doctor, he said it was a viral infection.  And he

7    gave me medication to put on.

8         Q    And how -- when did this occur in relation to

9    the fall of 1984 time frame?  Was it in the same time

10   frame, or was that earlier?

11        A    I'm sorry.  I don't remember.

12        Q    Okay.  Do you think it was before, possibly?

13        A    Yeah, I do believe it was before.

14        Q    Okay.  Did you notice anything unusual about the

15   nightgown Katie brought back from her visits with her

16   father in the summer of 1984?

17        A    It just seemed to be worn, you know.  A little

18   strangely -- I mean worn -- worn out.

19        Q    Can you be more specific?  Was it fraying at the

20   sides or any particular place or --

21        A    More of in the area of where she might have had

22   her underwear.

23        Q    Go ahead.  Take a break.

24        A    Okay.

25        Q    And your response was more in her underwear

```
 1   area?

 2        A   Yeah.   Yes.

 3        Q   And what particularly did you notice about that

 4   nightgown in that regard?

 5        A   I just remember it said "Daddy's Little

 6   Princess" on it.  It made me very uncomfortable.  I

 7   can't tell you why.

 8        Q   Okay.  What did you do with that nightgown?

 9        A   I threw it away.

10        Q   Was that after the allegations of abuse had

11   been -- had surfaced?

12        A   Yes.

13        Q   Did you learn at some point that you were

14   actually a suspect; that your former husband was telling

15   authorities up in Clark County that it was actually you

16   or possibly a man in your home that was abusing Katie?

17        A   Yes.

18        Q   Okay.  And when, approximately, did you learn

19   about that?

20        A   It was -- it was not long after Pat Flood had

21   come over.  I mean, it was within that few-months time

22   period.  I don't remember exactly when.

23        Q   And at that time, were there any men living in

24   your household?

25        A   No.
```

1    Q   That was the incident you described earlier

2   about burning the picture?

3       A   Correct.

4       Q   You read through earlier today that Exhibit 27,

5   which was the handwritten note by Shirley Spencer

6   regarding statements that Katie made to Shirley.

7           After reviewing that document, can you tell us

8   whether you thought the words that Shirley

9   reported Katie as using sounded kind of like the way

10  Katie would talk back then in 1984 when she was about

11  five years old?

12      A   Yes.

13      Q   Do you think that that was true as well from the

14  police reports that you read that were describing words

15  Katie was using back then around age five?

16      A   Yes.

17      Q   Do you also think in reviewing the police

18  reports that described Matt's disclosures of abuse that

19  those reports seemed to be using words that Matt was

20  using back during that time period when he was about

21  eight or nine years old?

22      A   Yes.

23      Q   After Detective Krause would interview your

24  children, would she usually meet with you afterwards?

25      A   Yes.

1      Q   Would she summarize what the kids had told her

2   during her interviews of them on each occasion?

3      A   Yes.

4      Q   When she would give that summary, did you

5   observe her to be looking at any notes that she had or

6   was she just doing it off the top of her head?

7      A   Sharon Krause always had notes.

8      Q   So when she would give you those summaries,

9   would she be flipping through her notes as she was

10  summarizing it for you?

11     A   Yes.

12     Q   Do you recall any of those summaries of what

13  Krause told you?

14     A   I do not.

15     Q   Okay.   After having reviewed the police reports

16  written by Detective Krause, do you have any reason to

17  believe that the information reported in those reports

18  is different in any way from what she summarized for you

19  after each of those interviews?

20     A   No.

21     Q   I want to talk a little bit about Rhonda Short

22  now, please.

23         Was that -- that incident where Ray Spencer had

24  sex with Rhonda Short ever investigated by the police,

25  to your knowledge?

1        A    They do.

2        Q    And I believe you said that the County had paid

3    airfare for you and Kathryn for you to come up on that

4    trip?

5        A    Yes.

6        Q    You were asked some questions by Ms. Fetterly

7    about the videotaped interview in a break that occurred

8    during the taping.

9             You had also testified that Sharon Krause was

10   present for just the first few minutes of that taped

11   interview and then she left.

12            Do you recall that?

13       A    Yes.

14       Q    Did you talk to Sharon Krause during the break

15   and the taping?

16       A    I don't remember.

17       Q    Do you remember if you saw or talked to Sharon

18   Krause immediately after the videotaped interview

19   concluded that day?

20       A    I believe I did.

21       Q    Do you recall what was discussed?

22       A    I do not.

23       Q    Do you remember hearing any conversation among

24   anybody, whether it's Jim Peters or the video operator

25   or Sharon Krause, about what was going to be done with

1  the videotape when the interview ended?

2      A  I don't remember.  I don't recall.

3          MR. BOGDANOVICH:  Thank you, Ms. Spencer.

4  That's all I have.

5          THE WITNESS:  You're welcome.

6          MS. FETTERLY:  Ms. Zellner?

7          MS. ZELLNER:  I've got a few questions.

8          MS. FETTERLY:  Do you want to take a --

9          THE WITNESS:  (Witness shakes head.)

10          MS. FETTERLY:  The witness said she doesn't need

11  a break, Ms. Zellner, so --

12          MS. ZELLNER:  Does or does not?

13          MS. FETTERLY:  Does not.

14          MS. ZELLNER:  Okay.  Good.

15                       EXAMINATION

16  BY MS. ZELLNER:

17      Q  Ms. Spencer, would you tell me -- identify for

18  the record all of the documents that you reviewed before

19  today's deposition?

20      A  Let's see.  There was a couple -- the letter

21  that I wrote for my son.  That was 19.  Exhibit Number

22  11, the Utility Report from the Sheriff's Office.

23      Q  Anything else?

24      A  Give me a moment, please.

25      Q  Yeah, you cut off.  I just heard Exhibit 11 and

1   have the words on the tape, correct?

2        A   I do now.

3        Q   If you look at page 14, and if you come down

4   about probably 13 lines, it says "Peters" --

5        A   Okay.

6        Q   -- "How come you told me they were upstairs?"

7   And he says, "Huh?  Did you forget?"  And Katie answers,

8   "Yes."  Peter says, "Okay.  That's fine.  Well, do you

9   remember -- before this time that you just told me

10  about, did Ray do that to you before?"

11          Do you see that statement?

12       A   I do.

13       Q   Now, do you remember that when the -- when the

14  break was taken that there was discussion between Peters

15  and Katie of what she was going to say?

16       A   There was no discussion in my presence about

17  what Katie was to say.

18       Q   You're 100 percent positive of that?

19       A   I was very cautious about what was said around

20  my children.  And there was no discussion about what to

21  say or anything other -- that I recall.

22       Q   Okay.  When you say "in your presence," isn't it

23  true that on the break that Sharon Krause also rejoined

24  you, your daughter, and Peters for a few minutes?

25       A   I believe so.

1    Q   And so did you observe your daughter having any

2    interaction with Sharon Krause?

3        A   Other than "hi" conversations?

4        Q   I am correct that Sharon Krause was with you and

5    Mr. Peters and Katie on the break, correct?

6        A   I believe so.

7        Q   This break takes over an hour.  Do you recall

8    that?

9        A   I do not.

10       Q   Why do you still use your ex-husband's last

11   name?

12       A   When I divorced their father, and especially

13   after this incident occurred, I did not want my children

14   to think I was divorcing myself from them and that I was

15   not wanting to identify with who they were, which was a

16   Spencer.  So I kept his last name.

17       Q   So even though he's been convicted of these

18   terrible crimes, you decided to keep his last name?

19       A   If I kept his last name, then my children would

20   not think, in my opinion and in my belief -- if I kept

21   his last name, then they couldn't be bad people because

22   my name was their name.  And that if -- even though

23   their father, who I told them was ill and needed help --

24   I did not want them to think that they would also be

25   ill.

1    Q   Okay.  When you leave after Katie's

2  videotaped -- actually, when you go back in the room for

3  the second part of the videotaping, do you move to a

4  different location?

5    A   I believe we moved to a different room.

6    Q   Was that -- or were you led to believe that was

7  Sharon Krause's office?

8    A   I don't recall.

9    Q   Was it an office-like room, or was it more of a

10  conference room?  Do you remember?

11    A   I believe it was more like a small conference

12  room with a table and some chairs.

13    Q   Do you remember; were you upstairs or downstairs

14  in the Sheriff's building?

15    A   I don't recall.

16    Q   And when the video is concluded, I'm sure that

17  you have a brief discussion with Mr. Peters.  Do you

18  remember that conversation with Mr. Peters when the

19  video ended?

20    A   I do not.

21    Q   Do you remember seeing Mr. -- Sharon Krause

22  around?  Did she come back in the room at the end of the

23  video?

24    A   I don't remember.

25    Q   Okay.  And do you see Mr. Peters take the

1    videotape out of the camera?

2        A   I don't remember.

3        Q   And did you observe, at any point, the videotape

4    being put in a desk drawer?

5        A   I don't remember.

6        Q   And did you think it was important for the

7    videotape to be made?

8        A   I did.

9        Q   Well, you went to all of the effort to travel

10   there, right, to try to cooperate so they can make the

11   videotape?

12       A   Correct.

13       Q   And you would agree with me certainly in the

14   first half of the tape that it's somewhat stressful for

15   Katie to go through the interview?

16       A   Yes.

17       Q   And you would not have put your daughter through

18   that for no reason, right?

19       A   Correct.

20       Q   And assuming as a good mother, which you seem to

21   be, that you would be concerned and want to make sure

22   that Katie's statements were true and correct about what

23   had happened?

24       A   Yes.

25       Q   And your understanding was the videotape was

# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

---

CLYDE RAY SPENCER, MATTHEW RAY         )
SPENCER and KATHRYN E. TETZ,           )
                                       )
          Plaintiffs,                  )
                                       )
     v.                                ) No. 11-5424 BHS
                                       )
FORMER DEPUTY PROSECUTING ATTORNEY FOR )
CLARK COUNTY JAMES M. PETERS, DETECTIVE)
SHARON KRAUSE, SERGEANT MICHAEL        )
DAVIDSON, CLARK COUNTY PROSECUTOR'S    )
OFFICE, CLARK COUNTY SHERIFF'S OFFICE, )
THE COUNTY OF CLARK, SHIRLEY SPENCER   )
and JOHN DOES ONE through TEN,         )
                                       )
          Defendants.                  )
                                       )

---

DEPOSITION UPON ORAL EXAMINATION OF

KATHRYN ELIZABETH TETZ

---

Wednesday, November 14, 2012
10:00 a.m.
1201 Third Avenue, Suite 2200
Seattle, Washington

Reported by Marlis J. DeJongh, CCR, RPR
Lic. No. DE-JO-NM-J498K9

Page 34

1   rewarding you at the end of each interview session?

2       A.   Yes.

3       Q.   Is that right?

4       A.   Yes.

5       Q.   What did she reward you with, or what do you

6   remember her rewarding you with?

7       A.   Sodas, ice cream.

8       Q.   But she didn't give you money, I take it?

9       A.   No.

10      Q.   She didn't give you items that had any particular

11  value, such as maybe a doll that was expensive or --

12      A.   Not that I remember.

13      Q.   -- a bicycle?

14      A.   But when you're five it might as well have been

15  something of value.

16      Q.   Okay, but that wasn't my question.

17           MS. ZELLNER:  She answered it.

18      A.   I answered it.

19      Q.   So the extent of her rewards, as you remember it,

20  was giving you sodas and ice cream?

21      A.   Yes.

22      Q.   And set those aside for a minute, I want to go back

23  to Exhibit 1.  In Paragraph 8 you testified under oath on

24  September 14, 2007, I do have a vague recollection of having

25  been questioned by Detective Krause.  I don't recall the

Page 35

1    details of the questioning and I don't recall the responses

2    that I gave at that time even after reading the detective's

3    reports.

4        This was your testimony then?

5        A.    Yes.

6        Q.    And that's still true today?

7        A.    Yes.

8        Q.    And 9 is, you state, Paragraph 9, it is my belief

9    that if I had been sexually abused in the manner described

10   in the police reports alleged against my father I would have

11   a memory of this having occurred.  I have no such memory

12   because I have --  I assume that's to be a no -- memory

13   whatsoever of having been sexually abused by my father.  I

14   am concerned that I was never abused and that my father was

15   wrongfully convicted.

16       That was your testimony at the time under oath.

17   Correct?

18       A.    Yes.

19       Q.    And that's true today, is it not?

20       A.    Yes.

21       Q.    Now I would have you take a couple minutes, or as

22   much time as you need, I don't want to pressure you for

23   time, to read Exhibits 2, 3 and 4.

24       But before you do that, I just want to be clear,

25   Mr. Camiel, as I understand it, provided you with Exhibit 2,

# EXHIBIT L

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY      )
SPENCER and KATHRYN E. TETZ,        )
                                    )
            Plaintiffs,             )
                                    )
        v.                          )  No. 11-5424 BHS
                                    )
FORMER DEPUTY PROSECUTING ATTORNEY FOR )
CLARK COUNTY JAMES M. PETERS, DETECTIVE)
SHARON KRAUSE, SERGEANT MICHAEL     )
DAVIDSON, CLARK COUNTY PROSECUTOR'S )
OFFICE, CLARK COUNTY SHERIFF'S OFFICE, )
THE COUNTY OF CLARK, SHIRLEY SPENCER )
and JOHN DOES ONE through TEN,      )
                                    )
            Defendants.             )
                                    )

DEPOSITION UPON ORAL EXAMINATION OF

MATTHEW RAY SPENCER

Tuesday, November 13, 2012
10:00 a.m.
1201 Third Avenue, Suite 2200
Seattle, Washington

Reported by Marlis J. DeJongh, CCR, RPR
Lic. No. DE-JO-NM-J498K9

Page 89

```
 1                     AFTERNOON SESSION
 2                       (1:15 p.m.)
 3           (Exhibit No. 5 marked for identification.)
 4
 5                   EXAMINATION (continued)
 6    BY MR. BOGDANOVICH:
 7        Q.    We have taken our lunch break, Mr. Spencer.  Are
 8    you ready to proceed?
 9        A.    I am.
10        Q.    I'm going to show you what has been marked as
11    Exhibit 5, and because of the size of this one I am not
12    necessarily going to ask you to go through each and every
13    page.
14        I'm going to represent to you that Exhibit 5 is a copy
15    of the transcript of the hearing that we had discussed a
16    little bit earlier in your testimony today, the July 10,
17    2009 hearing that's been referred to as the reference
18    hearing regarding your recantation and your sister Kathryn's
19    recantation.
20        And what I have copied here is from the cover page.  And
21    they are numbered, you will see for reference, the page
22    numbers appear near the top right corner.
23        I have copied this transcript through Page 58, which is
24    where your testimony ended, okay.  And I will be referring
25    to certain questions.
```

1    Again, I don't want you to read through this 58 pages

2   right now but I will try to give you enough context for

3   specific questions that you will understand what the context

4   was.  And if you need to look up or back a few questions,

5   I'll certainly allow you to do that.

6    Before we go any further I wanted to direct your

7   attention to the bottom of Page 14.  And this is where you

8   were discussing the March 1985 interview by Detective

9   Krause.

10    And you see at Line 18 your attorney was questioning

11   you.  It indicates at the top this was your direct

12   examination, not your attorney, your father's, Mr. Camiel.

13    Line 18 he asked you a question:  When you had been

14   telling the detective that you had not been molested, did

15   the detective seem to accept your answer?

16    Answer:  She never accepted a quote, no, end quote,

17   answer.

18    Question:  How do you know that?

19    Answer:  Because it wasn't until I said, quote, yes, end

20   quote, is when the questioning stopped.

21    And then there was this exchange.  Question:  When you

22   said, quote, yes, end quote, what did you tell the

23   detective?

24    And your answer:  I told her that he had molested me and

25   my sister and my stepbrother and that there had been more

Page 91

1    than one individual involved and --

2        And then your answer was interrupted.

3        You were sworn to tell the truth during your testimony

4    at that July 10, 2009 hearing, correct?

5        A.   Correct.

6        Q.   And did you tell the truth that day?

7        A.   I believe to the best of my ability.

8        Q.   And today you were sworn to tell the truth again in

9    this deposition, correct?

10       A.   Correct.

11       Q.   And you testified earlier today, you specifically

12   denied a couple times that you had told Detective Krause

13   that your sister or your stepbrother had been molested.

14       So my question to you at this point is, which is true,

15   did you or did you not tell Detective Krause that your

16   sister and stepbrother had also been molested by your

17   father?

18       A.   Detective Krause told me that my sister and

19   stepbrother had been molested.  I went along with it.

20       Q.   So your answer now is, yes, you did tell Detective

21   Krause in March 1985 that not just you but also your sister

22   and stepbrother had been molested by your father?

23       A.   She informed me that they had been molested.

24       Q.   That's not my question.  I want to get to the point

25   here.  Is your testimony now, and it was one way in the

Page 92

1   reference hearing and it's been a different way today so I'm

2   just trying to find out when we walk out of here which

3   version are you going to swear to.

4       So did you tell Detective Krause in March of 1985 that

5   you and your sister and your stepbrother were molested by

6   your father?

7       A.   She told me I was molested and I agreed to it.

8       Q.   So the answer to my question is, yes, you did tell

9   her?

10      A.   I agreed to it.

11      Q.   And then also if you look at Page 29 of the

12  Exhibit 5 there was a question starting at Line 2.  You were

13  asked, Question:  You were interviewed by your father's

14  attorney Mr. Jim Rulli, weren't you?

15      Your answer:  I believe so.

16      Question:  Down in Sacramento.

17      Answer:  I believe so.

18      Question:  And you told Attorney Rulli that in fact you

19  had been abused.

20      Answer:  I told everybody when I was nine that I had

21  been abused.

22      That's your testimony at that time, correct?

23      A.   That's my testimony at that time.

24      Q.   Now again today I think you specifically denied

25  ever having been interviewed by Mr. Rulli?

Page 100

1  told Mr. Camiel?

2      A.    Apparently it's, Matthew wants to recant his

3  statements.

4      Q.    And then did you meet with Mr. Camiel on that same

5  trip up to Renton?

6      A.    I believe so.

7      Q.    Where did you meet with him?

8      A.    Seattle.

9      Q.    At his office?

10     A.    Correct.

11     Q.    Did your father go with you?

12     A.    Yes.

13     Q.    Did anyone else accompany the two of you?

14     A.    No.

15     Q.    What happened at Mr. Camiel's office?

16     A.    I filed an official report, declaration, began

17  that.  I believe it's where this is drafted.

18     Q.    When you say this, you're referring to the

19  declaration of Matthew Ray Spencer we've marked as

20  Exhibit 3?

21     A.    Correct.

22     Q.    Who typed it up?

23     A.    Peter's office.

24     Q.    Was it Mr. Camiel or somebody else at his office?

25     A.    I didn't see it.

Page 101

1      Q.    Was it handed to you in this form that we see it

2   marked here as Exhibit 3?

3      A.    I believe so.

4      Q.    Do you know how Mr. Camiel's office came up with

5   the content?

6      A.    Came up through me.

7      Q.    Just explain to me how this was drafted?

8      A.    I came in, gave an interview, and they typed it up.

9      Q.    And does this declaration accurately reflect the

10  content of the statements you made to Mr. Camiel that day?

11     A.    Most of it is.

12     Q.    When you say most of it, are there parts that you

13  don't feel are accurate?

14     A.    Yeah, Paragraph 18, While I believe that I did tell

15  her the things written in the report attributed to me about

16  my father sexually abusing me, none of it is true.

17     When it comes to that, I went along with what she had

18  told me had happened to me.  There wasn't anything that I

19  had generated on my own except for after that maybe the

20  details of maybe a couple of things, the yellow sweater, red

21  Porsche.  Other than that I went along with what she told me

22  to say.

23     Q.    Well, do you now think that this, the statement

24  that you just read, the second sentence in Paragraph 18 is

25  not accurate?

Page 102

1      A.    I believe it could have been written a little bit
2  better.
3      Q.    How?  How do you believe it should have been
4  written?
5      A.    Well, I didn't tell her the things written.  They
6  were told to me and I agreed to them.
7      Q.    Anything else in this declaration that you believe
8  you should have changed before you signed it?
9      A.    Not that I can see at the moment.
10     Q.    And I guess I should ask, did you read this
11  declaration from start to finish before you signed it?
12     A.    I scanned it.
13     Q.    What does that mean?  Did you or didn't you read it
14  from start --
15     A.    I didn't study it, no.  I didn't study it.
16     Q.    You understood that whatever it said you were
17  subscribing to under penalty of perjury?
18     A.    Yeah.  I also understand that I had other
19  information handed to me after this was written.
20     Q.    What do you mean by that?
21     A.    Well, there's a videotape of Jim Peters, okay.  I
22  had never seen that until after this was done.  That
23  reassured me that I know that what was told to me was what I
24  had to agree to to make people happy.
25     Q.    But I'm not understanding.  What difference would

DECLARATION OF MATTHEW SPENCER

1

2

3

4

5

6

7    CLARK COUNTY SUPERIOR COURT FOR THE STATE OF WASHINGTON

8

STATE OF WASHINGTON

9                                      No. 85-2-00007-2
        VS.
10

11   CLYDE RAY SPENCER              DECLARATION OF MATTHEW RAY
                                     SPENCER
12   ─────────────────────────

13       I, MATTHEW RAY SPENCER DECLARE UNDER PENALTY OF PERJURY UNDER

14   THE LAWS OF THE STATE OF WASHINGTON AND THE UNITED STATES THAT THE

15   FOLLOWING FACTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

16

17   1.   I AM THE SON OF CLYDE RAY SPENCER WHO WAS CONVICTED IN 1985

18        IN CLARK COUNTY WASHINGTON OF HAVNG SEXUALLY ABUSED ME, MY

19        SISTER KATHRYN AND MY STEPBROTHER MATT HANSEN.

20   2.   I CURRENTLY RESIDE IN CALIFORNIA AND WORK AS AN AUTOMOTIVE

21        TECHNICIAN. I HAVE HAD TWO YEARS OF COLLEGE.

22   3.   IN 1985 I WAS NINE YEARS OLD. MY DATE OF BIRTH IS NOVEMBER

23        28, 1975.

24

25

DECLARATION OF MATTHEW SPENCER
1



Mair & Camiel, P.S.
710 Cherry Street
Seattle, WA  98104
Phone:  206-624-1551
Facsimile:  206-623-5951

DECLARATION OF MATTHEW SPENCER

4.  I AM NOW 30 YEARS OLD AN I AM MAKING THIS DECLARATION OF MY OWN FREE WILL WITHOUT ANY THREAT, PROMISE, INCUCEMENT OR PRESSURE PUT UPON ME.

5.  IN 1984 I LIVED WITH MY MOTHER AND SISTER IN CALIFORNIA. MY FATHER LIVED IN THE STATE OF WASHINGTON. MY SISTER AND I CAME TO VISIT DURING THE SUMMER.

6.  I HAVE HAD NO CONTACT WITH MY FATHER, CLYDE RAY SPENCER OR HIS ATTORNEY OR INVESTIGATOR SINCE 1984, ALTHOUGH I AM AWARE OF THE FACT THAT OVER THE YEARS THE ATTORNEY WORKING FOR MY FATHER HAS ATTEMPTED TO CONTACT ME AND THAT  MY FATHER WROTE LETTERS AND SENT CHRISTMAS GIFTS.

7.  I AM AWARE THAT OVER THE YEARS  MY MOTHER OBJECTED TO MY BEING INTERIVEWED BY MY FATHER'S ATTORNEY OR INVESTIGATOR AND TOLD THEM NOT TO CONTACT ME.

8.  IN 2005 I LEARNED THAT MY FATHER HAD BEEN RELEASED FROM PRISON AFTER SERVING OVER 20 YEARS.

9.  THE FIRST CONTACT I HAVE HAD WITH MY FATHER WAS THROUGH A NEWPAPER REPORTER, KEN OLSON FROM THE VANCOUVER COLUMBIAN WHO TOLD ME HE WAS WRITING AN ARTICLE ABOUT MY FATHER'S CASE AND WANTED TO INTEVIEW ME.  AT THE TIME THAT THE REPORTER CONTACTED ME  IN ABOUT SEPTEMBER OF 2005 I TOLD THE REPORTER I WANTED TO COME TO SEATTLE TO MEET WITH MY FATHER.

DECLARATION OF MATTHEW SPENCER
2

Hair & Camiel, P.S.
710 Cherry Street
Seattle, WA  98104
Phone:  206-624-1551
Facsimile:  206-623-5951

DECLARATION OF MATTHEW SPENCER

10. IN LATE 2005 MY FATHER SENT ME AN E-MAIL AND WE EXCHANGED E-MAILS THAT LED TO MY VISITING WITH HIM IN SEATTLE FOR THE FIRST TIME IN LATE FEBRUARY 2006.

11. THIS VISIT WAS THE FIRST TIME I HAVE SEEN MY FATHER SINCE 1984 AND THE FIRST TIME I HAVE EVER TALKED TO HIM ABOUT THE CRIMINAL CHARGES.

12. I UNDERSTAND THAT MY FATHER WAS ACCUSED OF SEXUALLY MOLESTING ME AND MY SISTER AND MY STEPBROTHER. I ALSO KNOW THAT HE PLEADED GUILTY TO THOSE CRIMINAL CHARGES AND RECEIVED A LIFE SENTENCE.

13. I CAN STATE UNEQUIVOCALLY THAT I WAS NEVER MOLESTED IN ANY MANNER AT ANY TME BY MY FATHER.

14. I RECALL THAT IN 1985 I WAS INTERVIEWED BY A DETECTIVE AT MY HOME. HE ASKED ME IF MY FATHER HAD TOUCHED ME IMPROPERLY. I REMEMBER I TOLD THE DETECTIVE THAT I HAD NOT BEEN TOUCHED BY MY FATHER IN ANY INAPPROPRIATE WAY.

15. I KNOW THAT I WAS INTERVIEWED BY A FEMALE DETECTIVE. I REMEMBER DETECTIVE KRAUSE BY NAME. SHE WAS INVESTIGATING THE ALLEGATIONS IN 1984 OR 1985 AND CAME DOWN TO CALIFORNIA TO INTERVIEW ME AND MY SISTER. SHE DROVE ME AND MY SISTER AROUND AND TOOK US TO HER MOTEL. SHE REPEATEDLY ASKED ME IF MY FATHER HAD MOLESTED ME. SHE TOLD ME THAT MY SISTER AND LITTLE MATT HAD ADMITTED THAT HE HAD MOLESTED THEM.

DECLARATION OF MATTHEW SPENCER
3

Mair & Camiel, P.S.
710 Cherry Street
Seattle, WA 98104
Phone: 206-624-1551
Facsimile: 206-623-5951

DECLARATION OF MATTHEW SPENCER

16. I KEPT TELLING HER HE DIDN'T DO ANYTHING.  SHE WOULDN'T ACCEPT MY DENIALS AND KEPT SUGGESTING THAT HE HAD MOLESTED ME AND THAT I WASN'T BEING TRUTHFUL.

17. FINALLY I FIGURED THAT IF MY FATHER HAD MOLESTED MY SISTER AND LITTLE MATT THAT MAYBE HE HAD MOLESTED ME AS WELL SO I TOLD HER THAT HE HAD.  I MADE UP SPECIFIC DETAILS OF WHAT MY FATHER DID BASED ON WHAT THE DETECTIVE ASKED ME. NONE OF THIS WAS TRUE.

18. I HAVE HAD THE OPPORTUNIT TO REVIEW THE REPORT WRITTEN BY DETECTIVE KRAUSE CONCERNING HER MARCH 24, 1985 INTERVIEW WITH ME.  WHILE I BELIEVE THAT I DID TELL HER THE THINGS WRITTEN IN THE REPORT ATTRIBUTED TO ME ABOUT MY FATHER SEXUALLY ABUSING ME NONE OF IT IS TRUE.

19. LATER I WAS FLOWN UP TO WASHINGTON FOR ANOTHER INTERVIEW.  I RECALL I MADE UP STORIES OF OTHER POLICE OFFICERS ALONG WITH MY FATHER  BEING INVOLVED IN ABUSING ME, LITTLE MATT AND KATHRYN  AND SOMEONE DRIVING A RED PORSCHE.  NONE OF THIS WAS TRUE.

DECLARATION OF MATTHEW SPENCER
4

Mair & Camiel, P.S.
710 Cherry Street
Seattle, WA  98104
Phone:  206-624-1551
Facsimile:  206-623-5951

DECLARATION OF MATTHEW SPENCER

20. I NEVER OBSERVED MY FATHER HAVE ANY SEXUAL CONTACT WITH MY SISTER OR STEPBROTHER, MATT HANSEN,  NOR DID EITHER ONE OF THEM EVER TELL ME THAT HE DID SO.

21. OVER THE YEARS I HAVE TALKED WITH MY SISTER KATHRYN. SHE HAS TOLD ME THAT SHE MUST HAVE BLOCKED OUT THE ABUSE BY MY FATHER BECAUSE SHE HAS NO MEMORY OF HAVING BEEN ABUSED BY HIM.

22. OVER THE YEARS I HAVE ALWAYS WANTED TO COME FORWARD AND MAKE CLEAR THAT MY FATHER HAD NOT SEXUALLY ABUSED ME, BUT I HAVE NOT KNOWN HOW TO GO ABOUT SETTING THE RECORD STRAIGHT.

23. ON FEBRUARY 27TH, 2006 I MET WITH MY FATHER'S LAWYER, PETER A. CAMIEL IN SEATTLE AND TOLD HIM ALL OF THE ABOVE FACTS.

24. I HAVE CAREFULLY REVIEWED EVERY LINE OF THIS DECLARATION FOR ACCURACY.  IT IS ALL TRUE TO THE BEST OF MY KNOWLEDGE AND I AM WILLING TO GO TO COURT AND SWEAR TO THESE FACTS BEFORE A JUDGE.

DATED THIS 27TH DAY OF FEBRUARY, 2006 AT SEATTLE, WASHINGTON

MATTHEW RAY SPENCER

DECLARATION OF MATTHEW SPENCER
5

Mair & Camiel, P.S.
710 Cherry Street
Seattle, WA  98104
Phone:  206-624-1551
Facsimile:  206-623-5951

# EXHIBIT M

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

CLYDE RAY SPENCER, MATTHEW )
RAY SPENCER, and KATHRYN E. )
TETZ, )
              )
      Plaintiffs, )
              )
   vs.         )    NO. 3:11-cb-05424-BHS
              )
FORMER PROSECUTING ATTORNEY )
FOR CLARK COUNTY JAMES M. )
PETERS, DETECTIVE SHARON )
KRAUSE, SERGEANT MICHAEL )
DAVIDSON, CLARK COUNTY )
PROSECUTOR'S OFFICE, CLARK )
COUNTY SHERIFF'S OFFICE, THE )
COUNTY OF CLARK and JOHN DOES )
ONE THROUGH TEN, )
              )
      Defendants. )

DEPOSITION UPON ORAL EXAMINATION OF JAMES M. PETERS

Thursday, November 8, 2012
Olympia, Washington

114

1   Q  Is it fair to say that during this time period we're

2      talking about -- November/December of 1984 -- you made all

3      the charging decisions regarding the prosecution of sex

4      crimes involving children in Clark County?

5   A  Not exactly.  I was the person who was the regular intake

6      person for the sex crimes.  If I was involved in trials, as

7      I was in this case, and frequently was, if it was an

8      emergent matter, then it would go to someone else.

9          If it was a routine matter, then it would just get

10     put in a box and I would get to it, and I would make -- in

11     a routine case I would make a charging decision, and then

12     the supervisors would assign the case out to one deputy

13     prosecutor or another.  I didn't keep them all.

14         If it was a sensitive case, no decision would be made

15     without the boss's input.

16  Q  Okay.  You mentioned earlier that you recommended that the

17     case be submitted to Rebecca Roe?

18  A  I definitely did that.

19  Q  You did that?

20  A  I did that.

21  Q  Okay.  And then that recommendation was made to Art Curtis?

22  A  Yes.

23  Q  Was anyone else involved in that decision?

24  A  Well, it was between a subordinate and his supervisor.  I

25     don't know if the criminal chief may have been involved.

1      I'm not sure.  I don't remember.

2    Q  Who was the criminal chief?

3    A  Roger Bennett.

4    Q  And how about Sharon Krause, was she involved in that

5      decision?

6    A  Not in the decision.  I'm sure she may have known about it,

7      but, I mean, she was -- in the hierarchy of the Sheriff's

8      Office, she was a detective.  They had their supervisors

9      and a Sheriff who were in their hierarchy.  Our hierarchy

10     was different.

11   Q  When that submission was made, you wanted to make sure that

12     Rebecca Roe had all the evidence available, correct?

13   A  I was in trial when that decision was made.  Art Curtis

14     submitted that while I was in trial.  I was not involved in

15     that in any way.

16   Q  So you were not involved in any way as to what evidence

17     would be submitted to Rebecca Roe for her review; is that

18     correct?

19   A  No.  I'm sure Art Curtis had the file, and he sent her

20     whatever he had.  That's my assumption.

21   Q  Are you aware of what she sent her?

22   A  No.  I've seen the --

23   Q  Rebecca Roe was a --

24   A  I've seen the letter.  The letter just said -- says the

25     reports are attached.  No, no, wait a minute.  That was a

156

1    how many times I can say that, but the interview happened

2    the next day.  The get-to-meet-you happened the day that

3    she arrived.

4    Q  So you don't remember the meeting, you made very clear.  So

5    it's possible you could have rehearsed her statements with

6    her, right?

7            MS. FETTERLY:  Object.

8    A  No, that's not possible.

9    Q  (By Mr. Johnson)  Oh, so you remember some of what happened

10    that day, right?

11            MS. FETTERLY:  Objection; argumentative.

12    Q  (By Mr. Johnson)  You remember some?

13    A  I don't remember the meeting at all, but I -- you know, I

14    don't remember the meeting.

15    Q  Just kind of speculating as to whether or not you rehearsed

16    or practiced with her?

17    A  You're asking me to speculate about all sorts of things.

18    Q  Okay.  You decided -- when did you decide or who decided

19    that the meeting on December 11 would be videotaped?

20    A  I don't recall.

21    Q  Was it Sharon Krause?

22    A  Well, the equipment was in the Sheriff's office.  I don't

23    recall.  I don't recall -- I don't recall who made the

24    decision to videotape it.

25    Q  Did Katie ask you to videotape her?

157

1   A  No.

2   Q  Did DeAnne?

3   A  No.

4   Q  Did Shirley Spencer?

5   A  No.

6   Q  Did Art Curtis?

7   A  He may have.  I don't recall.

8   Q  Was it your idea?

9   A  It may have been.

10   Q  You just don't know; is that correct?

11   A  I don't know.

12   Q  Is it possible -- is there anybody else you can think of

13       who made the decision to videotape that I haven't asked you

14       about?

15   A  The decision would have either been mine or Art Curtis'

16       because it was our interview, or maybe we talked about it.

17       I just don't recall.

18   Q  Why was it videotaped?

19   A  To document it.

20   Q  What does that mean?

21   A  To document it.  It's evident what it means.

22   Q  What's your -- I'm sorry.  What is -- it's not evident to

23       me.  Or maybe you can't explain it any further, so I can

24       understand.

25   A  To make a record of it.

169

1   Q   Did you tell Art Curtis about the videotaped interview with

2       Katie?

3   A   Yes.

4           MS. FETTERLY:  Asked and answered.

5   Q   (By Mr. Johnson)  In that meeting did you tell him that?

6   A   I don't recall.

7   Q   Did he ask you for the videotape?

8   A   I don't recall.  I didn't have it anyway, but I don't

9       recall.

10  Q   Did --

11  A   I think I may have said --

12  Q   Would you have obtained it?

13  A   I think I may have said, "You can go down and look at it if

14      you want to."

15  Q   Did he need your permission?

16  A   No, I'm telling him that's where it is, in the Sheriff's

17      office.  He didn't need my permission.

18  Q   You knew where it was on January 2nd or 3rd of 1984 [sic];

19      is that correct?

20  A   In the Sheriff's office, yes.

21  Q   Where is the Sheriff's office?

22  A   I had no idea.  When I -- Jeff had it.  And what he did

23      with it, I don't know.

24  Q   How do you know Jeff had it?

25  A   It was in the camera.  Jeff had access or had control of

170

1      the camera.

2    Q  You're assuming that?

3    A  Well, it was -- he set it up.  He controlled it while --

4      during the first part of the interview, and I'm confident

5      he came and picked it up when we were done with the second

6      part of the interview.

7    Q  Did you observe him come pick it up?

8    A  I don't recall.

9    Q  You did not observe him come pick it up, correct?

10   A  I don't recall, Counsel.  You can draw --

11   Q  Again, if you were to assume --

12   A  I'm drawing inferences from obvious facts.  He brought it

13     in, he set it up, he turned it on.  We finished the

14     interview.  I left.  I -- you know, you could draw

15     reasonable inferences from those facts.

16   Q  So you left the room with the videotape still in the

17     camera?

18   A  Well, the room was Sharon Krause's office.

19   Q  Okay.  Did you do it in a cubicle?

20   A  Well, I don't know if -- at one point she had a cubicle.

21     At one point she had an office.  I don't recall which at

22     that point, because she changed.

23   Q  Will you give it to me again?  You left that room and a

24     videotape that you had played a role in creating of a minor

25     child being questioned about sexual abuse of her father

171

1      without the camera man present and proceeded on your way;

2      is that correct?

3    A  I don't recall.  I'm sure the custody of the --

4    Q  Did you take any steps --

5    A  I'm sure the custody of the tape was taken over by somebody

6      in the Sheriff's office.

7    Q  And can you name the person in the Sheriff's office that

8      you are sure took custody of the tape?

9    A  No, I can't recall.

10   Q  And you did not observe anyone in the Sheriff's office

11     taking custody of that tape, correct?

12   A  I don't recall.

13   Q  That means you don't know one way or the other, right?

14   A  I don't know one way or the other.  It was 28 years ago.

15         MS. FETTERLY:  Do you need a break?

16         THE WITNESS:  No.

17   Q  (By Mr. Johnson)  All right.  Did you write anything on

18     that -- let's go back to the beginning in that videotape.

19     Did you write anything on the tape?

20   A  I don't recall having done so.

21   Q  Well, you would assume, wouldn't you, that the tape was

22     labeled?

23   A  I -- you're -- now you're asking me to assume.  I don't

24     recall.  The tape didn't belong to me.  The tape was the

25     property of the Sheriff's office and it remained with the

173

1    in?  Because you understand what a chain of custody is,

2    right?

3  A  Yes, I do.  Officers would write a report.  Sometimes there

4    would be a specific property report that would list items

5    one, two, three, four, five and identify what they are, and

6    they would go in evidence.

7  Q  Did you ever see that type of report reflecting what

8    happened to the December 11, 1984, video interview that you

9    did with Katie Spencer?

10  A  No.

11  Q  Did you -- did you tell Art Curtis that you were going to

12    meet with Katie prior to when you met with Katie?

13  A  I don't recall.

14  Q  Let me -- why would you leave the Sheriff's Department and

15    the tape there if you made that tape to evaluate Katie's

16    competency?

17  A  You're asking me to speculate and remember something from

18    28 years ago.  I don't recall.

19  Q  No.  I'm asking you in this -- you'd agree this was a very,

20    very serious procedure that you performed with Katie

21    Spencer, correct?

22  A  It was an important procedure.

23  Q  Okay.  And I'm asking you why you would videotape that

24    interview and then depart the Sheriff's Department without

25    the tape after you had taken such steps to have videotaped

174

1    your evaluation of Katie's competency?  Why would you do

2    that?

3  A  That would have been the original document or the original

4    recording, which we would never have kept in our office.

5  Q  Why not?

6  A  We didn't keep any evidence in our office.

7  Q  Did you ask anybody about what would happen to the tape

8    after you left?

9  A  I don't recall.

10  Q  You may have; you may not have, is that correct?

11  A  I just -- yes, I don't recall.

12  Q  Did you have any concerns that this tape contained a

13    five-year-old child talking about -- to you about sexual

14    molestation of her vaginally, et cetera, and her father,

15    who had not been charged yet, did you have any concerns

16    that this could get into the wrong hands because you left

17    without giving any directions whatsoever to anyone about

18    what to do with it?

19  A  No, because it was left it with Sharon Krause, Sharon

20    Krause's office.

21  Q  Sharon Krause was not present at the end of the interview,

22    correct?

23  A  I believe she was there.  I mean, I don't have immediate --

24  Q  Was she --

25  A  I don't have any independent recollection of anything other

259

1    Q  They're different things, right, like you said earlier?

2    A  They're related.

3          MR. JOHNSON:  Okay, we'd like a two-minute

4    break.  I think we're done.  And we'll only be two minutes.

5                    (Recessed at 4:09 p.m.)

6                    (Reconvened at 4:09 p.m.)

7          MR. JOHNSON:  We're all done.

8          MR. BOGDANOVICH:  This is Guy Bogdanovich.  I've

9    got a follow-up or two.

10                      EXAMINATION

11   BY MR. BOGDANOVICH:

12   Q  Mr. Peters, you mentioned that if the case was going to go

13      to trial that you would have sat down with Sharon Krause

14      and reviewed the file, and then I think you've testified

15      that's when you would have made the decision what needs to

16      be disclosed; is that correct?

17   A  That's correct.

18   Q  And whose responsibility would it have been to make the

19      decision of what needs to be disclosed to the criminal

20      defense attorney?

21   A  Ultimately the responsibility would have been mine --

22   Q  Okay.

23   A  -- at the point I was back in the case.  There was another

24      lawyer involved for three and a half months before I became

25      involved in the charged case.

1    Q  But whether it would have been you or another prosecutor

2        assigned to the case, that would have been the prosecutor's

3        decision to make; is that correct?

4    A  Yes.  Once we'd reviewed the discovery with the

5        investigator and compared what we had with what they had.

6             MR. BOGDANOVICH:  All right.  Thanks.  That's

7        all I have.

8             MS. FETTERLY:  There are no further questions

9        here.

10            MR. FREIMUND:  Reserve signature?

11            MS. FETTERLY:  Yeah, we'll reserve signature.

12            MR. FREIMUND:  Do you want to talk about the

13       exhibits?

14            MR. BOGDANOVICH:  Yeah.

15         Counsel, we wanted to make sure -- I think we raised

16       it a couple times and never really, I don't think, had a

17       clear agreement or understanding.  Was it your intention

18       that everything in all of the three different groupings of

19       notebooks that you sent as deposition exhibits be marked

20       and attached to the depositions of these three witnesses as

21       exhibits?

22            MS. ZELLNER:  Yes, that's what we want.

23            MR. BOGDANOVICH:  Okay.  And I think I made my

24       record during Sharon Krause's, but I do want to state an

25       objection to any later admissibility of any of the exhibits