# EXHIBIT A

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | | |
|---|---|---|
| CLYDE RAY SPENCER, MATTHEW RAY SPENCER and KATHRYN E. TETZ, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 11-cv-05424-BHS |
| FORMER DEPUTY PROSECUTING ATTORNEY FOR CLARK COUNTY JAMES M. PETERS, DETECTIVE SHARON KRAUSE and SERGEANT MICHAEL DAVIDSON, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

SHIRLEY JEAN SPENCER

DATE TAKEN:   December 6, 2012
TIME:         9:00 a.m.
PLACE:        613 W. 11th Street
              Vancouver, Washington

COURT REPORTER:   Teresa L. Rider, CRR, RPR, CCR

Rider & Associates, Inc.

360.693.4111

SHIRLEY JEAN SPENCER   12.06.12

```
 1       A.   My mom's name was -- let's see -- Alice
 2   Robertson and my dad's name was Garyl Robertson.
 3       Q.   Did either of your parents work?
 4       A.   My dad did.  My mom worked later on in her
 5   life.
 6       Q.   What was your father's occupation?
 7       A.   He had many occupations.  He had his own gun
 8   repair shop.  He drove Coca-Cola truck.  He worked for
 9   Safeway.  Oh, and he was also a policeman when he was
10   young.
11       Q.   What was his highest level of education?
12       A.   Honestly, I don't have a clue.
13       Q.   What about with your mother, when did she start
14   working?
15       A.   Pardon?  I didn't hear you.
16       Q.   With your mother, what types of jobs did your
17   mother hold?
18       A.   She worked in a clothing store in Spokane and
19   she worked in a bank in Portland.  Those are the only
20   ones I really recall.
21       Q.   Do you know if your mother finished high
22   school?
23       A.   No, I don't know that.
24       Q.   Did you have or do you have siblings?
25       A.   I do.
```

SHIRLEY JEAN SPENCER   12.06.12

1       A.  Yes, ma'am.

2       Q.  Do you know approximately how old you were by

3   that point?

4       A.  Let me think.  I want to say about 35.

5       Q.  And again, was the divorce filed in Clark

6   County?

7       A.  Yes, ma'am.

8       Q.  My question, again, who divorced whom?

9       A.  I divorced him.

10      Q.  And what were the grounds that you divorced him

11  on?

12      A.  He was stealing from me and my friends and

13  gambling.

14      Q.  Of the three husbands you've named, do any of

15  them have prison records?

16      A.  Dan Turley, I found out later.

17      Q.  Do you know what he went to prison for?

18      A.  No, it was long before I knew him.  I don't.

19      Q.  So you divorced, then, Mr. Cummings, right?

20      A.  Yes, ma'am.

21      Q.  And then do you know approximately what year it

22  was when you divorced him?

23      A.  I'm going to say about 1980.

24      Q.  And then I'm assuming that Ray Spencer was your

25  fourth husband.

SHIRLEY JEAN SPENCER    12.06.12

1      A.   Yes, ma'am.

2      Q.   Is that right?

3      A.   Yes, that's right.

4      Q.   And, of course, you have not remarried, right?

5      A.   No, ma'am.

6      Q.   And when do you meet Mr. Spencer, if you

7   remember?

8      A.   I was working for C-Tran in Clark County in

9   1982, I think.

10      Q.   And do you remember actually meeting him the

11   first time?

12      A.   Yes, ma'am.

13      Q.   And just tell me a little bit about that

14   meeting.

15      A.   The office for C-Tran was on Main and 15th and

16   Mill Plain, between there, and there was a little

17   Spic-N-Span drive-in restaurant there.  Our parking lot

18   was there with them and we both frequented the

19   Spic-N-Span restaurant to eat.

20      Q.   How long after you -- I'm assuming, then, once

21   you met, then, you started dating.  Is that fair?

22      A.   That's fair, somewhere in there.

23      Q.   Okay.  How long do you date Mr. Spencer before

24   you marry?

25      A.   It was -- we didn't marry until '83, so about a

SHIRLEY JEAN SPENCER   12.06.12

1   year.

2        Q.   I want to go back and ask you a little bit, and

3   we'll come back, obviously, to the Spencer case, but I

4   want to ask you about your childhood.

5             Were you the victim of child sexual abuse?

6        A.   These are nice questions.  Yes, ma'am.

7        Q.   Okay.  And can you just tell me who the abuser

8   was?

9        A.   There was more than one.

10       Q.   Were the abusers family members or strangers or

11  friends of the family?

12       A.   Family.

13       Q.   And over what period of time were you sexually

14  abused?

15       A.   You know, I can't tell you that.  I was real

16  little when my dad did it.  I was, like, seven or nine

17  when my uncle.  And I was like sixth grade when my

18  brother did.  This is tough.

19       Q.   Yeah.  I just want to -- I don't mean to pry,

20  but -- I'm sorry to have to ask you these questions, and

21  I'm very sympathetic with what happened to you, but I

22  think it's important just in who you are and your

23  history.

24            Were there any other instances of abuse, other

25  than what you've mentioned?

SHIRLEY JEAN SPENCER   12.06.12

Page 27

1   the circumstances under which that was happening.  Was

2   that in the evening or was that -- explain that to me.

3       A.  Anytime the kids were, you know, might want to

4   go to bed or were going to bed, you know, they liked

5   their backs and their tummies or their legs and feet

6   rubbed, still kind of a practice we do today.

7       Q.  And that was something that you and Mr. Spencer

8   did to the children.  They also did that to you?

9       A.  Yes, ma'am.

10      Q.  If you want to continue.

11      A.  While she rubbed my tummy, she slid her hand up

12  and tried to expose my top a few times and I said,

13  Kathryn, and then she paid close attention -- then I

14  paid close attention.  She would put her arm across my

15  chest and then try to move my robe and feel my breasts

16  and sneak to see if Big Matt was watching.

17      Q.  Okay.  So just so I can visualize that a little

18  bit better, when you say she put her arm across your

19  chest, so she's reaching -- you've got on your bathrobe

20  and under your pajamas; is that right?

21      A.  Yes, ma'am.

22      Q.  And she reaches across you at some point?

23      A.  Yeah.

24      Q.  Is she trying to undo your robe?

25      A.  No, she was like reach across and hug me, like

SHIRLEY JEAN SPENCER   12.06.12

Page 28

1   (indicating).  You're laying beside somebody and you

2   throw your arm across their chest, that way, like a hug.

3        Q.  All right.  And then you say she tries to move

4   your robe and feel your breast.  What do you

5   specifically remember her doing, like, how did she try

6   to remove your robe?

7        A.  She kind of pushed up under and moving it apart

8   up under my pajamas, because she was -- move your hand

9   down, trying to move it.  I don't know how to explain

10   it, other than that.

11        Q.  So she does that and then you see her look over

12   at Pat.  Was Matt asleep, Big Matt, was he asleep?

13        A.  Yes, ma'am.

14        Q.  Okay.  So let's continue on, then.

15        A.  Then she tried to slide her hand back to my

16   tummy -- or let's see.  She slid her hand back to my

17   tummy, and all of a sudden she slid her hand down to my

18   front.  Startled, I said, Kathryn.  And she jerked her

19   hand away.

20        Q.  So kind of describe, just with a little more

21   detail, kind of describe that movement that she makes so

22   that we can understand.

23        A.  Well, rubbing my tummy and she tries to put her

24   hand down my front real quick.

25        Q.  Okay.  And when you say she tried to put her

SHIRLEY JEAN SPENCER    12.06.12

Page 29

1   hand down your front, you still have your pajamas and

2   your robe on, right?

3        A.  Yes, ma'am.

4        Q.  And how far down does she extend her hand?

5        A.  She just barely got, you know, under my pajama

6   waist.

7        Q.  Okay.  So she actually put her hand inside the

8   robe and under your pajamas --

9        A.  Yes.

10       Q.  -- is that right, that's what she did?

11       A.  Yes.

12       Q.  Okay.  So if you could please continue.

13       A.  She jerked her hand away.  She said, Mommy, can

14  I rub your pee pee.  I said, no, Kathryn.  She said, can

15  I rub -- yeah, can I rub your pee pee, and when I'm

16  done, will you rub my pee pee.  And she said, it feels

17  good.  Can I?

18       Q.  So let's talk about that comment on her part.

19  So you remember that she -- at that point she called you

20  mommy, right?

21       A.  Yes.  Yes, she did.

22       Q.  And does she use the term pee pee?

23       A.  Yes, ma'am, she did.

24       Q.  And had you ever heard her use that term

25  before?

SHIRLEY JEAN SPENCER   12.06.12

Page 31

1       Q.   Now, let's continue on.  It says you say, no,

2   right?  I said, No.

3       A.   Yes.  You want me to read?

4       Q.   Right.  Karen is Karen Stone, though, right?

5       A.   Yes, ma'am.

6       Q.   Okay.  Yeah, if you could continue on.

7       A.   She said, Karen let me rub her pee pee.  And I

8   said, no.  I will rub your back and your tummy, not your

9   pee pee.  She kept insisting she wanted me to do this

10  for it felt so good.

11      Q.   How do you know that pee pee, in what she's

12  telling you, how do you know that that refers to her

13  genitals?  How do you know that that's what she means?

14      A.   Well, I don't know what else it would mean.

15      Q.   But does she point at her -- does she point in

16  the area where she wants you to rub or did she just use

17  that term?

18      A.   She just tried to push my hand there.

19      Q.   And where does she push your hand to?

20      A.   She got, you know, just below tummy level,

21  that's it, before I jerked my hand away.

22      Q.   So am I correct, though, that she doesn't --

23  she doesn't put your hand on her genitals, right?

24      A.   No.

25      Q.   And other than saying that she wants you to rub

SHIRLEY JEAN SPENCER  12.06.12

Page 54

1    came into my mind was that he was affectionate with

2    children.  And like if we would be walking in the mall

3    and he'd see a beautiful little child, he'd stop the

4    woman and tell her how pretty her child was or things

5    like that.  And I thought, wow, and I didn't think

6    anything abnormal about it, except that I've never seen

7    a man do that.

8        Q.   But other than that, was there anything else

9    that you observed in Ray Spencer's interactions with

10   children up until the point of Katie's statements?

11       A.   No, ma'am.

12       Q.   Now, when you go to the Clark County sheriff's

13   department, do you recall the first time that you go

14   there?

15       A.   Do I recall the first time I was there?

16       Q.   Yes.

17       A.   You mean when I accompanied him for his

18   polygraph?

19       Q.   Right.  My understanding is that's the first

20   time you went to the Clark County sheriff's

21   department --

22       A.   Yes.

23       Q.   -- about this case?

24       A.   Yes.

25       Q.   Who did you meet when you were at the sheriff's

SHIRLEY JEAN SPENCER   12.06.12

Page 56

1    the polygraph and everything, because I loved my

2    husband, I was pretty upset that we were even there,

3    even though all this came down.

4        Q.  And did your husband, was your observation that

5    he was corroborating in that first meeting?

6        A.  He seemed mad, angry.

7        Q.  Was he cooperating, though, with the

8    investigation?

9        A.  I guess.  I don't remember for sure, but I

10   guess.

11       Q.  Well, he agreed to take the polygraph, right?

12       A.  Right.

13       Q.  And so after he took the polygraph, did anyone

14   tell you how he had done on that first polygraph?

15       A.  I don't remember that anybody other than Ray

16   told me.  There was something about being inconclusive.

17   I don't remember the department telling me that.

18       Q.  Did you have any conversation with Officer

19   Davidson that first time about Ray or about the case?

20       A.  Well, we were in his office after the

21   polygraph, and that's when I was so angry.  I didn't

22   even like Mr. Davidson at the time.  I told him he was

23   trying to ruin my marriage and my husband's job.

24       Q.  And I'm just curious why you would be telling

25   Detective Davidson that you thought he was trying to

SHIRLEY JEAN SPENCER    12.06.12

Page 62

1    economy wasn't doing real good and I never could sell

2    it.  And I couldn't live there anymore, either.

3        Q.  So what happened to the house, was it rented?

4        A.  Huh-uh.  My son and his friend lived in it

5    while I had it listed for sale.  And I couldn't sell it,

6    so the realtor paid me $5,000 and took it over.

7        Q.  Now, you say that the house ended up being

8    titled in both names.  When you sold the house, how did

9    you sell it without Mr. Spencer's signature or signing

10   over his claim on the house?

11       MR. DUNN:  I have to object, Counsel.  It's

12   assuming that's what happened, and it's not accurate.

13       MS. ZELLNER:  Well, let's let her answer the

14   question, and then we'll correct any inaccuracies.

15   BY MS. ZELLNER:

16       Q.  How did you sell the house with his name on the

17   title?

18       A.  I didn't sell the house.  I said the realtor

19   took it over.

20           But what I did was I took a quitclaim deed down

21   to the sheriff's office.  Mrs. Krause gave it to Mr.

22   Davidson to see if he could have Ray sign it.  Ray

23   refused to sign it at that time.  And he did sign it,

24   and I don't even remember why, how or when, but, I mean,

25   I got the date, August 16th of -- was it '84, '85? --

Page 84

1    had to go to see my counselor.  He'd been asking me and

2    asking me if I would bring Matt over for a visit,

3    because Matt was struggling.  He couldn't understand why

4    he couldn't see his daddy.  And at that time, I said he

5    could stay there while I went to the meeting, but when I

6    got done, he asked if he could spend the night.

7        Q.   Which meeting did you go to?  And we're talking

8    about February 16th, 1985.

9        A.   It was with my counselor, Jeannette Dezsofi.

10       Q.   Did your counselor -- did you inform your

11   counselor that you had dropped your son off at the

12   motel?

13       A.   I don't think it would have come up.  There was

14   no reason why.

15            We're working on our marriage.  We don't know

16   if Ray is guilty or not.  We don't know about the boys.

17   There was, in my mind, nothing wrong with leaving him

18   there.

19       Q.   When you took him to the motel, is it correct

20   that you didn't have pajamas for him?

21       A.   No, because he wasn't going to spend the night.

22            I had a meeting with my counselor.  Ray and I

23   had been shopping that day and I was going to pick him

24   up and take him home.  Ray convinced me to leave him for

25   the night; otherwise, if I knew he was going to spend

SHIRLEY JEAN SPENCER   12.06.12

Page 100

1    A.  Yes.

2    Q.  Did she offer to assist you in trying to deal

3 with the situation?

4    A.  I think at that time she wanted to show me

5 Kathryn's report.

6    Q.  So do you remember that around February 22nd of

7 1985 that you actually meet with her in person and she

8 shows you the reports on Kathryn?

9    A.  Yeah.  Yes.

10   Q.  Does she also talk to you about DeAnne Spencer

11 and meeting with her?

12   A.  Yeah, I'm sure.  I'm sure she probably did talk

13 to me about DeAnne.

14   Q.  And did she also, in that meeting, does she

15 tell you that she's concerned or at least worried about

16 Little Matt?

17   A.  It wasn't until after the gun situation, I

18 think, that I talked to her about Little Matt, after the

19 -- after his birthday.

20   Q.  Because I think, just to help you with the time

21 frame, so his birthday is on 2-20.  And then sometime -

22 and I've got the date of February 22nd - you have a

23 meeting.  But you do remember having a meeting with her

24 in person; is that right?

25   A.  Yes, yes.

SHIRLEY JEAN SPENCER   12.06.12

1     Q.   And do you remember in that meeting what the

2     discussion was about your son, Little Matt?

3     A.   I remember her asking me that she was concerned

4     maybe something happened to Matt or not.

5     Q.   Okay.  Did Detective Krause offer to interview

6     Little Matt at that time?

7     A.   Yes, she did.

8     Q.   At first did you indicate to her that you might

9     -- you would prefer that -- let me rephrase that.

10         Did you indicate to her that you'd like to

11    discuss the potential of her interviewing Little Matt

12    with your therapist?

13    A.   Yes.

14    Q.   And tell me what was your thinking about that.

15    Were you just trying to be careful, or why did you want

16    to talk to the therapist first?

17    A.   I just thought that it would be good for him to

18    see a therapist instead, you know, no other reason that

19    I can think of.

20    Q.   At that point in time, around February 22nd,

21    you didn't know anything that had supposedly happened at

22    the motel; is that right?

23    A.   No, I didn't.

24    Q.   And then at a certain point in time, around

25    February 27th, do you have a meeting with Detective

SHIRLEY JEAN SPENCER    12.06.12

Page 102

1    Krause in her office?

2         A.  Yes.

3         Q.  In that meeting, do you remember her asking you

4    if Matt had ever complained about his penis hurting or

5    rectum?  Do you remember her asking you those questions?

6         A.  Yeah, about his bottom hurting, because he had

7    complained about his bottom hurting or tummy hurting.

8         Q.  And had Little Matt's complaints about his

9    bottom and his tummy hurting, had they been after

10   February 16th, after the Salmon Creek?

11        A.  Yeah, it was after the birthday, I'm pretty

12   sure.

13        Q.  Did you take Little Matt for a medical exam at

14   a certain point in time?

15        A.  Yes, I did.

16        Q.  What were the results of the medical exam on

17   Little Matt?

18        A.  I really wasn't privy to that information.  He

19   just said it was hard to tell in a child that small

20   because their muscles are so flexible, strong, whatever

21   he said.  I don't remember the exact words he said.

22        Q.  Was it your idea to take Little Matt for the

23   exam or did Detective Krause recommend it?

24        A.  Detective Krause recommended it.

25        Q.  And after Little Matt's medical exam, did you

SHIRLEY JEAN SPENCER   12.06.12

1    talk to Detective Krause about the medical findings on

2    Little Matt?

3         A.   Well, I didn't know the medical findings.  I

4    just said I had taken him.  And all I know is what he

5    said that it was hard to tell, but he didn't tell me the

6    results.

7         Q.   Okay.  We're talking about the doctor?

8         A.   Yes.

9         Q.   The doctor did not tell you that he was

10   observing injury, though, correct?

11        A.   He didn't tell me one way or another.

12        Q.   Did you ever follow up to find out from

13   Detective Krause about what the doctor said in his

14   medical report?

15        A.   No.

16        Q.   Did Detective Davidson also know about the

17   medical exam of Little Matt?

18        A.   I have no idea.  I wasn't really talking with

19   Mike Davidson, just Sharon Krause, so I have no idea

20   what he knew.

21        Q.   So going back to your interaction with Sharon

22   Krause, and we're in that time period about February

23   22nd, did you at a certain point in time conclude that

24   Little Matt had been sexually molested by Ray Spencer?

25        A.   Did I conclude that he was?

SHIRLEY JEAN SPENCER   12.06.12

Page 104

1      Q.  Right.

2      A.  I didn't conclude anything.  I just know what

3  Sharon Krause said he said.  I don't know.  I don't know

4  conclude.

5      Q.  When the information comes out that Little Matt

6  has been sexually -- allegedly sexually molested by Ray

7  Spencer, does the information go to Sharon Krause and

8  then Sharon Krause tells you what Little Matt said?

9      A.  She told me what his reports were to her, yes.

10     Q.  Did Little Matt ever report anything directly

11  to you during that time period?

12     A.  He talked to me about the bubble bath and he

13  was afraid to take bubble baths.  That was clear back

14  when Ray was there.

15     Q.  Did Little Matt tell you why he was afraid to

16  take bubble baths?

17     A.  He told Sharon.

18     Q.  So just so it's clear on the record, does

19  Little Matt ever describe any of the sexual molestation

20  of him that allegedly occurred at the motel?

21     A.  At the motel?  No.

22     Q.  Does Little Matt ever describe to you any

23  sexual molestation that occurred to him by Ray Spencer?

24     A.  Clear back then it was just him being afraid to

25  take a bubble bath and for me to take his rectal

1    temperature when he was sick.

2        Q.   All right.  Other than that information,

3    though, was there anything else that Little Matt told

4    you about related to any sexual molestation?

5        A.   No.

6        Q.   Did Little Matt ever, after the Salmon Creek

7    Motel, did he ever tell you that nothing had happened at

8    the motel?

9        A.   He has never recanted anything to this date.

10       Q.   But I'm asking you back around February 22nd,

11   did Little Matt ever tell you that nothing had happened

12   at the motel?

13       A.   No, he did not tell me nothing had happened at

14   the motel.

15       Q.   I'm correct that he doesn't tell you what

16   happened.  He tells Sharon Krause.

17       A.   Yeah.  I only remember some things about the

18   temperature and the bubble bath.

19       Q.   Did Sharon Krause then interview Little Matt at

20   some point in time about the Salmon Creek Motel?

21       A.   She did about me taking him over there.

22       Q.   And then after she interviews him, she reports

23   to you what he said.

24       A.   Oh, I don't remember.

25       Q.   Is that correct?

SHIRLEY JEAN SPENCER    12.06.12

Page 106

1        A.   I don't remember.  I'm sure, you know.  You

2    know, I've read so many reports and trying to put my

3    mind around what happened back then and read the

4    reports, I don't know what he said.

5        Q.   Well, would it be a fair statement that your --

6    all of your information about Little Matt being molested

7    at the Salmon Creek Motel came from Sharon Krause?

8        A.   I think most all of it.

9        Q.   Well, other than the bubble bath and the rectal

10   temperature, was there anything else --

11       A.   Huh-uh.

12       Q.   -- that Little Matt told you?

13       A.   Nothing I can think of at the moment.

14       Q.   I want to direct your attention to group

15   Exhibit A and Tab 16.  It's an interview in The

16   Columbian.  And I'll let you find that.

17       A.   Okay.

18       Q.   Let's go to -- there's a couple of quotes in

19   this article supposedly of you, and I just want to

20   confirm whether they're accurate.

21            So if you go to the third page of the article

22   and go to the first -- go to the fourth paragraph.  It

23   starts, it says:  It was hard.

24       A.   Okay.

25       Q.   So they've got you quoted here.  I'll read the

SHIRLEY JEAN SPENCER    12.06.12

1    just read.  Okay?

2    BY MS. ZELLNER:

3       Q.  So my question to Ms. Spencer is did you tell

4    the reporter that your son was interviewed for weeks and

5    weeks --

6       A.  I don't remember --

7       Q.  -- by the detective?

8       A.  Sorry.  I don't remember ever telling the

9    reporter anything like this.  I didn't even like them,

10   didn't even want anything to do with them.  And I know

11   that even Tuesday I said weeks and weeks, because that's

12   what it felt like back then.  It felt like that I was

13   there forever and this was going on forever.  I was

14   stressed out to the limit, so...

15   BY MS. ZELLNER:

16      Q.  And my question was just did you tell the

17   reporter --

18      A.  No, I don't recall --

19      Q.  You don't recall?

20      A.  (Witness shakes head negatively.)

21      Q.  So you may have told him, but you don't know.

22      A.  I don't know why I would have even said that to

23   her because I didn't even like talking to her when she

24   wanted to interview me.

25      Q.  So we've got a statement in this newspaper

SHIRLEY JEAN SPENCER    12.06.12

```
 1      A.   Not offhand, no.

 2      Q.   Do you know the street name?

 3      A.   I just know where I go.  I don't pay attention.

 4   It's right off Highway 99 in Hazel Dell.

 5      Q.   How old is Ralph?

 6      A.   50.

 7      Q.   And you said his friend's name was Bill

 8   Squires?

 9      A.   I think that's what it was.  I'm not sure.

10      Q.   Do you have any idea where Bill Squires is

11   today?

12      A.   He's deceased, committed suicide.

13      Q.   When did you move out of the Lucia Falls house?

14      A.   1985, 5 of 1985, which would be May of '85.

15      Q.   And where did you move?

16      A.   To a house across the river.

17      Q.   Does the house across the river have an address

18   that you remember?

19      A.   Yeah.  Can I get it out?

20      Q.   Sure.

21      A.   I don't remember it on the top of my head, but

22   I have it written down.

23      Q.   Okay.

24      A.   It's 18308 N.E. Cole Witter, C-o-l-e, another

25   name Witter, Road, Battle Ground, Washington.
```

Case 3:11-cv-05424-BHS   Document 153-1   Filed 02/14/13   Page 24 of 51

```
 1      Q.   Thank you.

 2           And then when you moved to the house on Cole

 3  Witter Road, do you live there with anybody else?

 4      A.   Mike Davidson moved in around the fall.

 5      Q.   You're talking about the fall of 1985?

 6      A.   Yes, I think it was.  That was June.  Yeah,

 7  fall, it was right after that.

 8      Q.   And then how long do you live in that house on

 9  Cole Witter Road with Mike Davidson?

10      A.   On and off for two or three, four years.  I

11  couldn't even tell you.  It's so long ago.  I don't have

12  dates.  It's not something I remember, dates.  It was on

13  and off, though, for at least a couple of years.

14      Q.   And then do you move somewhere else with

15  Detective Davidson?

16      A.   No, he moved out.

17      Q.   Do you remember giving statements previously

18  that your relationship with Davidson lasted about five

19  years?

20      A.   Well, I wasn't sure.  I couldn't remember

21  exactly, two, three, four, five years.  I don't know.  I

22  don't keep track of all that.

23      Q.   But you're aware, aren't you, from looking at

24  past statements that you've made that you've said five

25  years?
```

SHIRLEY JEAN SPENCER    12.06.12

1        A.   Yeah, I'm aware of it.

2        Q.   And then what year is it, is it 1989 when you

3    part company with Detective Davidson?

4        A.   It could have been around there.  Like I said,

5    I don't keep track of it.  I don't know.

6        Q.   Why did you split up with Detective Davidson?

7        A.   Because there was a lot of issues with Matt and

8    I, a lot of anger and a lot of, you know, we're upset

9    all the time and mistrust, you know.  It just wasn't

10   working for us.

11           And I really wasn't in love with him, I guess,

12   because when we started dating in June, it was mainly

13   somebody to lean on, I guess, you know.  I was so

14   confused and upset and so was Matt.

15       Q.   When you say -- you said that Matt had some

16   problems with anger and --

17       A.   Yeah, a lot of issues.

18       Q.   What were the issues?

19       A.   He'd hit and push and cry and stuff like that.

20       Q.   Where does Matt Hansen live today?

21       A.   He lives in a little place on my property.

22       Q.   And how would you describe your relationship

23   with Matt Hansen as of today?

24       A.   We have a good relationship.

25       Q.   How old is he now?

Page 148

1      A.   He didn't make very much more than me, I don't
2   think.   Probably 25 to 23,000, somewhere in there.   Not
3   very much.
4      Q.   And then after he lost his job, would it be a
5   fair statement to say that that was a big financial
6   burden on you?
7      A.   Yes, ma'am, it was hard.
8      Q.   And after -- of course, after he went to jail,
9   that was also difficult, was it not, for you not to have
10  that second income?
11     A.   Yes, ma'am.
12     Q.   Would you say you were struggling financially
13  at that point?
14     A.   I struggled my whole life.   Yes, ma'am.
15     Q.   During that time period, did you consider
16  filing for bankruptcy or did you just try to keep going?
17     A.   No, I didn't do bankruptcy at that time.
18     Q.   Did you at some point later file for
19  bankruptcy?
20     A.   Yeah, but that's a long time after, 2000, 1999
21  or something.
22     Q.   You filed for divorce from Ray Spencer in June
23  of 1985; is that right?
24     A.   I think that was the date.   Yeah, June 6th.
25     Q.   I'm sorry.   June 6th.

SHIRLEY JEAN SPENCER   12.06.12

Page 150

1  month, something like that.

2      Q.  Did he contribute anything else to your

3  financial support?

4      A.  No.

5          MS. ZELLNER:  All right.  I don't have any more

6  questions.

7          MR. DUNN:  I don't have any questions.

8          MS. ZELLNER:  Would you like to reserve

9  signature so she can read it, or do you want to waive?

10         MR. DUNN:  You can read this and watch it, or

11  you can just rely on the court reporter to be accurate.

12         THE WITNESS:  I'll rely on her.

13         MR. DUNN:  We'll waive signature.

14         MS. ZELLNER:  Thank you for your time.  We'll

15  see you in April.  That's the trial date.  Thank you.

16         MS. FETTERLY:  Is anyone ordering this?

17         MS. ZELLNER:  Yeah, we're going to order it.

18         MS. FETTERLY:  We'll each take copies.

19         MR. FREIMUND:  I would like an electronic copy,

20  if you could get my e-mail information.

21         MS. FETTERLY:  Me, also.

22         MS. ZELLNER:  The plaintiff would, too.

23         MR. BOGDANOVICH:  So would I.

24             (Deposition Exhibit B was marked for

25  identification.)

SHIRLEY JEAN SPENCER   12.06.12

Page 151

```
 1           MS. FETTERLY:  I'd ask the reporter to hand Ms.
 2   Spencer the document that has now been marked as Exhibit
 3   B.
 4           THE WITNESS:  I have it.
 5
 6                        EXAMINATION
 7   BY MS. FETTERLY:
 8       Q.  And Ms. Spencer, can you take a look at that
 9   document, and just -- I just want you to verify that
10   that is actually a copy of the handwritten statement you
11   made on or about August 25th, 1984, which documents your
12   conversation with Kathryn Spencer of August 24 and 25,
13   1984; is that correct?
14       A.  That's correct.
15       Q.  Is that a true and accurate copy of your
16   original notes --
17       A.  Exactly.
18       Q.  -- documenting those conversations?
19       A.  Exactly.
20       Q.  Just so the record was clear, in the earlier
21   portion of your deposition, there was some rather
22   extensive questioning by Ms. Zellner concerning your
23   handwritten document.  And previously the record had
24   stated that that document was Tab A-1.  Do you recall
25   that testimony where you were questioned about that
```

SHIRLEY JEAN SPENCER   12.06.12

Page 152

1    handwritten document at some length?

2          A.   Yeah, I remember.  Ours just said exhibits.

3          Q.   And you read extensively in response to Ms.

4    Zellner's question from that document.

5          A.   Yes, ma'am.

6          Q.   Is that the document you read from earlier in

7    your deposition the document that's been marked as

8    Exhibit B?

9          A.   Yes, ma'am.

10               MS. FETTERLY:   Thank you.   I wanted to clarify

11    that for the record.

12               (Deposition concluded at 2:12 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SHIRLEY JEAN SPENCER    12.06.12

Page 153

1                        CERTIFICATE
2
3

STATE OF WASHINGTON )
4                   ) ss.
County of Clark     )

5
6          I, the undersigned Washington Certified Court
Reporter, pursuant to RCW 5.28.010 authorized to
7  administer oaths and affirmations in and for the State
of Washington, do hereby certify:

8
          That the annexed and foregoing deposition
9  consisting of Pages 4 through 152 of the testimony of
each witness named herein was taken stenographically
10 before me and reduced to a typed format under my
direction;

11
          I further certify that according to CR 30(e)
12 the witness was given the opportunity to examine, read
and sign the deposition after the same was transcribed,
13 unless indicated in the record that the review was
waived;

14
          I further certify that all objections made at
15 the time of said examination to my qualifications or the
manner of taking the deposition or to the conduct of any
16 party have been noted by me upon each said deposition;

17         I further certify that I am not a relative or
employee of any such attorney or counsel, and that I am
18 not financially interested in the said action or the
outcome thereof;

19
          I further certify that each witness before
20 examination was by me duly sworn to testify the truth,
the whole truth and nothing but the truth;

21
          I further certify that the deposition, as
22 transcribed, is a full, true and correct transcript of
the testimony, including questions and answers, and all
23 objections, motions and exceptions of counsel made and
taken at the time of the foregoing examination and was
24 prepared pursuant to Washington Administrative Code
308-14-135, the transcript preparation format guideline;

25

Rider & Associates, Inc.
360.693.4111

SHIRLEY JEAN SPENCER   12.06.12

Page 154

1          I further certify that I am sealing the
deposition in an envelope with the title of the above
2   cause and the name of the witness visible, and I am
delivering the same to the appropriate authority;
3
           I further advise you that as a matter of firm
4   policy, the Stenographic notes of this transcript will
be destroyed three years from the date appearing on this
5   Certificate unless notice is received otherwise from any
party or counsel hereto on or before said date;
6
           IN WITNESS WHEREOF, I have hereunto set my hand
7   and affixed my Washington State CCR Seal this 8th day of
December 2012.
8

9

10

11
                    Certified Court Reporter No. 2119
12                  in and for the State of Washington
                    residing at Vancouver, Washington
13                  My CCR certification
                    Expires 12-03-12
14

15

16

17

18

19

20

21

22

23

24

25

84-8506

①

Fri. Aug. 24, 1984, about 9:00 pm.
the kids all wanted to sleep on the
front room floor and watch the
videos as they had the night before.
While they were watching the cartoon
I took a shower. When I finished
I put on a movie and Kathryn and
Big Matt asked me to lay between
them on the floor. While watching
the movie Ray was at work.
Around 10:00 or 10:30, the boys fell
asleep. Kathryn asked me if we
could rub my tummy, which was
normal for we all rub each others
back, legs, feet, tummys etc, some-
times a whole family project. While
she rubbed my tummy she slid
her hand up and tryed to explore
my top a few times and I said
Kathryn and then said Close
att. to his actions. She would
put her arm across my chest
and tried to rub my plate and
feel my breast and sneak a look
to see if Big Matt was watching.
I again said Kathryn and she slid
her hand back to my tummy. All
of a sudden she slid her hand

Exhibit __6__
Date: 12-6-12  S. Spencer
Rider & Associates
800-869-0864

Spencer-05222

84-850L

(3)

down to my front. Startled, I said
Kathryn, and she jerked her hand
away. She said mommie can
I rub your peepie. I said no
Kathryn. she said, can I rub your
peepee and when I'm done
will you rub my peepee. She
said it feels good can I. she
said Karen let me rub his peepee.
I said no. I will your back
and tummy not your peepee.
She kept insisting she wanted
me to do this for it felt so good.
She would grab my hand and
try to push it to her peepee. I
said no. she again said Karen
and my mommie let me rub
this, this and peepee. At that
I started questioning her about
Karen, then her mom. she told
me her dad was away hunting
and Karen was laying on the bed
with Kathryn. Karen had Kathryn
untie her robe and rub her
tummy, then her breast, then she
let her rub her peepee. I asked her
then what and she said Karen
rubbed her peepee.

Spencer-05223

84-8506

(3)

I asked Kathryn how many
times did this happen. She said
a few. I then asked her about
her mom. She said pretty much
the same things, that they rubbed
each others tummys - legs and
per pees. I said was this only
when mommie put medicant
on your pee pee? 'Cause it was
sore. She said no. She rubbed
it other times when it didn't
need medicine. She again asked
me if I would rub their pee pees,
I said I would rub her back.
and tummy not his pee pee.
She then said daddy lets me
rub his pee pee and he rubs my
pee pee. That really hurt me up.
So I kept it light as we watched
the video and tryed to question
her more. I asked her where
the kids were when this happened
and she said asleep. I asked
her where I was and she said
at work. I asked her how many
times [C]? [A]? [T]? 3 she said a whole
bunch. She said daddy told her
not to tell. I said then why

Spencer-05224

84-8506

C ④

are you telling me Kathryn I
said I wanted you to know I
said are you going to tell your
mommy? I said no, and she said
no she would never do that.
I asked her why, she said
mommy would laugh at me.
I asked her if she was going
to tell anyone else. She said
no. Ray came home from work
and I didn't know what to do
or say. I've never come up against
anything like this before. I was
scared for Kathryn, Ray, Many
things ran thru my mind what
to do, what to say or how to say
it, but I just couldn't do or say
anything till I talked with Kathryn
more and the next day Ray
left for work, I took the kids to
the beach. While the boys swam
Kathryn laid on the blanket to
keep warm and we talked some
more. She said her sorry story
about her mom and Karen and
went into more detail about her
dad and hers and Big Matt.

Spencer-05225

84-8506

She said Big Matt stuck his
finger in her some times. I asked
her about any other men, or women
she said no. Every time Big Matt
came around she said Shush Matts
comming. She said you won't tell
dad and she said no, and don't
you say anything. She said dad.
told me not to tell you and you.
tell me not to tell dad. I said
that's a little different. She again
asked me about why. I wouldn't
rub her people I couldn't make
his feet dirty so changed the
subject. She said I tickled you.
I said Kathryn you rub'ed my
tummy not my penise. You, I
laughed it off and mom told
you no she said I know that
can I mom, if feels good she said
me and started questioning her
again. She said dad. would lay
on his back and she would lay
on his tummy. They started.
out with dad in his robe in
shorts and her in her nighty.
and panties. Then she said she
took off her panties and slid

84-850C

daddys clown and he put his
pee pee between his legs and raped
her. then what she said he
tried to put it in her little hole
but it was too big. I said did it
hurt and she said did. I said
then what did you do. she said,
I told daddy it was too big and
he said alright. can I say. that girl
she said I don't know. I said
then what she said he then kissed
her pee pee and she kissed his
and tried to of did put it in her
mouth. I asked her if she ever
got joy and she said yes. And it
I said from what she said from
rubbing it. I asked her if he
said nice things to her and she
said he kisses me and tells me he
loves me and tells me I have a
pretty bottom. I asked her if she
liked this and she says yes
and she told her daddy. and does
he do this to me. I said that
different Kathryn.
I Kathryn feel good about all
this. She liked it and want it
more. she said she want to know

84-8506

What it feels like to do. Mare. I
didn't know how to tell her that
this wasn't right with out making
her feel bad + dirty. I asked
her if she was telling me stories.
she said, no, I said, You wouldn't
tell me lies, she said no. Your not
making it up, No. I asked, is if
she was afraid of me. she said Yes.
I said, why some is have spotted
you. Are you afraid of that. Well
Only my mother + Dether would
spank me and send me to my
room. I said, you know I wouldn't
do that. She did I know. I
said, then is this all in. she
said Yes, I then got Battery
and Called the Crisis Line because
I didn't know what else to do.
I asked Crissie him if I afraid
I ape Kathryn. she said it wouldn't
do any good. It wouldn't hold
up in Court. so I didn't no.
Also I say they called and I
told him. Then she took it to
Sac. Calif. Crissie.

Shirley J Spencer

Spencer-05228

# EXHIBIT B

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT

FIRST DEGREE STATUTORY RAPE, RCW 9A.44.070
LOCATION OF INCIDENT:   17681 NE Lucia Falls Road
                        Yacolt, Washington
DATE OF INCIDENT:       Between 07-14-84 and 08-26-84

DATE & TIME:            Varied (See Summary)
INCIDENT:               #1 - Suspect Contact Information
                        #2 - Interview with wife of suspect
LOCATION:               Varied (See Summary)

VICTIM:                 SPENCER, Kathryn E.        dob: 01-13-79
                        3930 Becerra Way
                        Sacramento, California     phone: (916) 482-6057

SUSPECT:                SPENCER, Clyde Ray         dob: 01-09-48
                        aka: Ray SPENCER
                        17681 NE Lucia Falls Road
                        Yacolt, Washington         phone: 687-1407

ADDITIONAL PERSON
INTERVIEWED:            SPENCER, Shirley J.        dob: 04-27-42
                        17681 NE Lucia Falls Road
                        Yacolt, Washington         phone: 687-1407

CCSO Case #84-8506, S.A. KRAUSE, K-43                        page 1 of 12

Spencer-00529

DOCUMENT ATTACHED:     One (1) Advice of Rights form, dated 11-01-84
                       (Suspect SPENCER refused to sign form)


SUMMARY:

            The following is a summary of all of my contacts with
the suspect.

DATE & TIME:        08-29-84                    10:25 AM approx.
INCIDENT:           Phone Contact from Ray SPENCER

            On the morning of August 29, 1984 I received a phone
call from a male subject who identified himself as Vancouver Police Officer Ray
SPENCER.  Prior to that conversation I have on several occasions talked with Ray
SPENCER and did recognize his voice.  During that phone call, SPENCER indicated
that his five year old daughter, Kathryn SPENCER, who was living in the
Sacramento, California area with her natural mother, had reportedly made
statements to Ray SPENCER'S present wife, Shirley SPENCER, during the summer
visitation indicating that she (Kathryn) and her father had been sexually
involved.

            SPENCER advised me that there was no truth to those
allegations and that he had talked with Marguerite MATUSAK at CPS after his
wife, Shirley, told him about the allegations Kathryn was making.  SPENCER also
related that in addition to the allegations Kathryn had made regarding she and
her father being sexually involved, Kathryn had also reportedly told Shirley
SPENCER that her natural mother, Deanne SPENCER, her brother, Matthew, and an
ex-girlfriend of Ray SPENCER named Karen STONE had also had some sexual contact
with her (Kathryn).

            Ray SPENCER advised me that Marguerite MATUSAK had
advised him to call the Sheriff's Office and also Sacramento as soon as

CCSO Case #84-8506, S.A. KRAUSE, K-43                    page 2 of 12

possible. He indicated that because he lived in the Clark County jurisdiction the investigation would be handled by the county; therefore, he was calling me.

SPENCER also advised me that he had made a phone call to Sacramento based on his concerns regarding Kathryn's statement that her mother and brother were also molesting her.

SPENCER indicated to me that after his wife, Shirley, told him about the allegations Kathryn was making he had advised Shirley to write down everything she could remember and she had a written statement regarding her conversation with Kathryn. I advised SPENCER that I thought he could expedite things if he were to call and request the district car respond to his residence and take the initial crime report. (Refer to Deputy R. STEPHENSON'S crime report dated 08-30-84)

I advised Ray SPENCER that as soon as I received the initial report I would initiate an investigation and attempt to determine as soon as possible why Kathryn SPENCER had reportedly made those allegations to Shirley SPENCER.

Prior to terminating my conversation Ray SPENCER indicated that he had not had any type of sexual contact with his daughter, Kathryn. Also, based on what his wife, Shirley, had shared with him, he had concerns that Kathryn was being molested and was requesting that we contact Sacramento as soon as possible in an attempt to determine that Kathryn was not in any danger.

DATE & TIME:          09-05-84                    1630 hours
INCIDENT:             Contact at CCSO by Ray SPENCER

On the afternoon of the 5th Ray SPENCER made contact with me at the Clark County Sheriff's Office, requesting to know if I had heard anything from Sacramento regarding his daughter, Kathryn. I advised SPENCER that I had forwarded my reports to a Detective FLOOD with the Sacramento County Sheriff's Office and had also talked with him on the phone. I indicated that Detective FLOOD would be forwarding his reports to us as soon as they were completed.

CCSO Case #84-8506; S.A. KRAUSE, K-43                    page 3 of 12

I also advised Ray SPENCER that I had provided Vancouver Police Department with a copy of our crime report and the statement by Shirley SPENCER as requested by Captain KING. During that conversation SPENCER indicated to me that he had talked with the administrators in his department and they had "asked him why he didn't come to them instead of the county," indicating "that his department felt they could have conducted the investigation." SPENCER advised me that he felt because the allegations were regarding an incident in the county that it was more appropriate for the county to do the investigation.

During the time Ray SPENCER was talking with me I asked him how he felt about taking a polygraph examination regarding the specific allegations Kathryn was reportedly making. SPENCER indicated that he would.

I also talked with SPENCER about Karen STONE who apparently was another person Kathryn had indicated had fondled her. SPENCER advised that he did not feel Karen STONE would have done anything like that, however "agreed that he felt I should contact Karen STONE."

DATE & TIME:           09-07-84                      1430 hours approx.
INCIDENT:              Phone Contact with Ray and Shirley SPENCER

At approximately 1430 hours on 09-07-84 I made phone contact with Ray SPENCER regarding him taking a polygraph exam. After the phone rang several times Shirley SPENCER answered the phone. It appeared to me that possibly I had awakened her and I asked her if I had. Her response was that "they had had a bad night." Shirley SPENCER then advised me that she and Ray had had an accident the evening before which resulted in her foot being in a cast and Ray's arm being in a cast. Shirley SPENCER also advised me that the accident had something to do with either her getting in or out "of a boat, her tripping, and Ray attempting to catch her." I advised Shirley SPENCER that I was calling to reschedule the polygraph exam; however, due to their condition I would re-contact them at a later time.

I also spoke briefly with Ray SPENCER. He also related that both he and his wife were in a cast and he talked about him having some type of a "concussion." I advised Ray SPENCER that I was sorry I had bothered

CCSO Case #84-8506, S.A. KRAUSE, K-43                    page 4 of 12

Spencer-00532

them due to the circumstances. I indicated to him that he could contact me when he felt better and we could reschedule the polygraph exam.

During the time I was talking with Shirley SPENCER she had indicated that the reason that they were sleeping as late as they were was because they had "been at the hospital most of the night."

DATE & TIME:          09-12-84                          10:45 AM
INCIDENT:             Phone Contact with Ray SPENCER

On the morning of the 12th I received a phone call from Ray SPENCER. At that time he was inquiring as to whether or not I had heard from "down south" (Sacramento). We discussed how he was feeling regarding his accident and he indicated that he was "much better." SPENCER also advised me that he wanted to schedule the polygraph exam. I advised him that after I learned of his accident I had talked with my sergeant, Mike DAVIDSON, who is also a polygraph operator with our department. I indicated to Ray SPENCER that Sgt. DAVIDSON had advised me that it would not be possible to run a polygraph exam when Ray had his arm in a cast, and also concerns about the concussion. Ray SPENCER advised me that he did not have a cast on his arm any longer because he had only some type of sprain and not a break. I indicated to Ray SPENCER that I would contact Dr. Stan ABRAMS in Portland as we had discussed before regarding when Dr. ABRAMS would be available to administer the polygraph exam.

DATE & TIME:          09-13-84                          1445 hours
INCIDENT:             Phone Contact with Ray SPENCER

On the afternoon of the 13th I made phone contact with Ray SPENCER after talking with Dr. ABRAMS and provided Ray SPENCER with dates that Dr. ABRAMS would be available. SPENCER indicated that he did have a doctor's appointment on one of the dates and advised that he would be available to take the test on 09-21-84 at approximately 9:00 AM.

CCSO Case #84-8506, S.A. KRAUSE, K-43                    page 5 of 12

Spencer-00533

DATE & TIME:          09-18-84                          1500 hours
INCIDENT:             Phone Contact from Ray SPENCER

          On the afternoon of the 18th I received a phone call from Ray SPENCER requesting to know if we had received the reports from Sacramento, California.

DATE & TIME:          09-21-84
INCIDENT:             Contact with Ray and Shirley SPENCER
                      at the Clark County Sheriff's Office/
                      Information on Polygraph Examination

          On the morning of the 21st Ray SPENCER was scheduled to take a polygraph examination administered by Dr. Stan ABRAMS.  When SPENCER arrived at the Sheriff's Office he was accompanied by his wife, Shirley SPENCER. During the time Dr. ABRAMS was administering the polygraph exam Detective Sgt. Mike DAVIDSON and I talked briefly with Shirley SPENCER.  It was obvious that Shirley SPENCER was extremely upset and confused about what was going on.  There were several times during the time that we talked with her that she would either cry or attempt to hold back tears.  Shirley SPENCER indicated that she was extremely concerned about Kathryn's safety, based on the statements Kathryn had made.  She also indicated that she just found it very difficult to believe that there was even a possibility that her husband, Ray, would have had any type of sexual contact with Kathryn.  She also indicated that during the time she has lived with SPENCER she has never observed anything that would have concerned her regarding Ray SPENCER having a problem, specifically being sexually attracted to children.  Shirley SPENCER indicated that she had a four year old son and also grand children and would have been concerned about their safety if she even suspected something like that would happen.
          Shirley SPENCER advised that because of all the "trouble this had caused" regarding her reporting what Kathryn had said to her husband, Ray, she "wished she had never said anything."  When Shirley SPENCER made that

CCSO Case #84-8506, S.A. KRAUSE, K-43                    page 6 of 12

Spencer-00534

statement she cried and stated, "But I had to tell because I was so worried about Kathryn."

Shirley SPENCER also talked about a time during the visitation when Matthew SPENCER had come into their (Ray and Shirley) bedroom and caught she and Ray having intercourse.  Shirley SPENCER appeared to be extremely upset and cried when she indicated that Matt had "stood and watched them for several minutes."  She also advised that when Ray talked to Matt about what he had observed, Matt talked about being concerned because of the noise Shirley SPENCER was making.  Shirley SPENCER stated to us, "My God, I couldn't believe he stood there and watched us."  She also advised that she insisted that Ray talk with Matt regarding what he had observed.  She also cried when discussing how little privacy they did have when the children were there.

During the time Shirley SPENCER talked with us she discussed Kathryn and Matt SPENCER and indicated that anytime they had been around their father she felt their interaction was very appropriate.  She made statements indicating that there were times when the children appeared to compete with her for their father's affection; however, she felt that was because they did not spend much time with their father.  She specifically mentioned Kathryn "setting between them" when she (Shirley) was sitting beside Ray.

During the time we talked with Shirley SPENCER there was some discussion about Deanne SPENCER and what Shirley SPENCER knew of Deanne.  Shirley SPENCER mentioned the fact that Deanne SPENCER may have "a man living with her that could be responsible for this" and also talked about Deanne SPENCER'S "capabilities as a mother."  Shirley SPENCER indicated that what she knew of the children's natural mother, Deanne, lead her to believe that the children were somewhat neglected.  She talked of their clothing being worn out and dirty when they came to visit.  She also mentioned that the children cried when they had to return to Sacramento to live with their mother.

During the time we talked to Shirley SPENCER she indicated that she felt we should be going to Sacramento to determine who was doing this to Kathryn because she was sure that her husband was not.  I advised her that that was something our department was contemplating, specifically

sending me to Sacramento; however, that had not been determined as of yet.  I also advised Shirley SPENCER that the information we had received from Sacramento indicated that Kathryn was in therapy and that at this point she was extremely reluctant to discuss anything with anyone and that we felt it may be more beneficial to wait until she was able to open up and talk.

At some point during the time Ray SPENCER was with Dr. ABRAMS, Dr. ABRAMS came out of the polygraph examination room and advised Detective Sgt. DAVIDSON and me that based on Ray SPENCER'S responses during the polygraph exam he (Dr. ABRAMS) would have to consider the findings inconclusive. He also advised us that SPENCER'S responses would tend to be deceptive; however, they were inconclusive.  Prior to SPENCER leaving, Sgt. DAVIDSON and Dr. ABRAMS spoke with him; however, I was not present during that conversation.

Prior to Ray SPENCER leaving our office we made arrangements for Dr. ABRAMS to conduct a second examination on September 24th based on the inconclusive results of the examination this date.

DATE & TIME:          09-24-84
INCIDENT:             Contact with Ray SPENCER at
                      Clark County Sheriff's Office

On the 24th of September Dr. ABRAMS met with Ray SPENCER at the Clark County Sheriff's Office and administered a second polygraph exam. Prior to the time of the examination, Detective Sgt. DAVIDSON and I spoke briefly regarding the examination questions and the results of the prior exam. During that conversation Dr. ABRAMS expressed concern that there may be something that was specifically bothering Ray SPENCER, causing the inconclusive results.  At that time I shared with Dr. ABRAMS the information I had obtained from Deanne SPENCER regarding SPENCER reportedly "raping a neighbor girl by the name of Rhonda during the time they were living in California" prior to the SPENCER'S moving to Vancouver.

After Dr. ABRAMS conducted the examination he made contact with Sgt. DAVIDSON and me and advised that the results of the polygraph examination were indicative of deception, mentioning that the score was a "minus

CCSO Case #84-8506, S.A. KRAUSE, K-43                    page 8 of 12

Spencer-00536

thirteen." He also advised that he had talked with SPENCER regarding the alleged rape and although SPENCER apparently had denied any sexual contact with the neighbor girl named Rhonda when he was confronted by the alleged victim's father and Deann SPENCER when it was initially reported. He did admit to Dr. ABRAMS that he had had sex with her, however, he indicated it was consensual. The initial information I got from Deanne SPENCER was that Rhonda was approximately twelve years old. However, Dr. ABRAMS advised that Ray SPENCER indicated that Rhonda was nineteen years old at the time she "consented to have sex with him." (Refer to Dr. Stan ABRAMS' report regarding the results of those examination.)

During the time the SPENCERS were at our office on the 24th I only spoke briefly with Shirley SPENCER. Again, she expressed concerns, indicating that she did not feel her husband was responsible for this, and as this investigation became more involved she "wished she had never reported it in the first place." She also expressed feelings of guilt, indicating she felt she was the cause of Ray being suspended and also talked about violating Kathryn's trust regarding Kathryn asking her not to say anything.

After Dr. ABRAMS advised Detective Sgt. DAVIDSON and me that the results of the polygraph indicated SPENCER was being deceptive when he indicated he had not been sexually involved with his daughter, Sgt. DAVIDSON and Dr. ABRAMS spoke with SPENCER. I was not present during that interview. Sgt. DAVIDSON did advise me that during their conversation with SPENCER he denied that he had ever had any type of sexual contact with his daughter and had no explanation as to why the results of the polygraph would indicate he was being deceptive.

DATE & TIME:          11-01-84                    10:42 AM
INCIDENT:             Contact with Ray SPENCER
                     at the Clark County Sheriff's Office

During the week of October 15th I was in Sacramento, California continuing the investigation regarding the allegations that Kathryn SPENCER was making. On the morning of 11-01-84 Detective Sgt. DAVIDSON made phone contact with Ray SPENCER and asked if he would respond to the Sheriff's

CCSO Case #84-8506, S.A. KRAUSE, K-43                    page 9 of 12

Spencer-00537

Office so that we could talk to him regarding the status of this investigation. Sgt. DAVIDSON advised me that Ray SPENCER would be en route to our department.

When Ray SPENCER arrived at the Sheriff's Office he was accompanied by his wife, Shirley. Detective Sgt. DAVIDSON seated Shirley SPENCER in his office and Ray SPENCER in an interview room. Prior to my going into the room there was some discussion between Sgt. DAVIDSON and Ray SPENCER. It was obvious to me when I entered the room that Ray SPENCER was hostile and most of his conversation was obscenities and directing anger towards us. Prior to my going into the room I asked Shirley SPENCER if she would like a cup of coffee and at that time her response was directed in a curt manner and she only responded with, "No."

As I entered the room Ray SPENCER was indicating he was upset with the Sheriff's Office because of how we had handled the investigation, commenting on the length of time it had taken and also how we had dealt with the city and the "over all delays." Sgt. DAVIDSON and I tried to explain to him that it seemed futile on our part to respond to Sacramento initially when everyone including his daughter's therapist felt it would not be in the child's best interest for us to come to Sacramento.

SPENCER also was indicating that he was upset about the "fucking polygraphs" and that they "took so fucking much time." We attempted to explain to him that we had no control over when they could be scheduled and had to work around Dr. ABRAMS' schedule. SPENCER indicated to us that he "fuckin' didn't care about ABRAMS' schedule." He also discussed the fact that he "took one fucking polygraph and we didn't get him on that one so we had to get him on the next." Again, we attempted to discuss that with him; however, he was not willing to listen.

At that time Sgt. DAVIDSON advised SPENCER that we would have to advise him of his rights prior to discussing our findings and SPENCER'S response was, "I'm not signing your fucking form." Sgt. DAVIDSON asked SPENCER if he was willing to talk and SPENCER'S response was, "Go for it." SPENCER then stated, "Do what you fuckin' have to." SPENCER then stated, "My fucking reputation and job is ruined and it's the County's fault." We advised him that we did not feel it was the County's fault, we were conducting an objective

CCSO Case #84-8506, S.A. KRAUSE, K-43                    page 10 of 12

Spencer-00538

investigation based on allegations that his daughter made, and that we felt that we had no other recourse other than to do so. SPENCER stated, "I fuckin' didn't touch my daughter." SPENCER then stated, "You wouldn't have anything now if I hadn't initiated it." Sgt. DAVIDSON advised SPENCER that he (SPENCER) had not been the one that initiated the investigation, in fact, it was his daughter who had reported to Shirley SPENCER. SPENCER then stated, "If I'd a done anything I'd waited to Christmas til they came up." Sgt. DAVIDSON then advised him again that he felt that Kathryn SPENCER had initiated the investigation by telling her step-mother and not Ray SPENCER. SPENCER then stated, "Either fuckin' arrest me or fuckin' get off my ass."

Ray SPENCER then commented again on the polygraph and talked about "the first test being inconclusive so we ran him again and then he failed." Sgt. DAVIDSON attempted to explain to SPENCER that if his results on the polygraph would have been indicative with being truthful we would have suspended the investigation and forwarded any other investigation to Sacramento. SPENCER stated, "I thought I could trust you fuckin' people. You're street people like I was and I thought you would understand." Again, Sgt. DAVIDSON attempted to explain to SPENCER that we were obligated and in a position where we could do nothing other than continue this investigation, and even though he was a police officer we did not feel we could handle it any other way.

At that time I made a statement reference SPENCER'S daughter and referred to her as "Katie." When I stated "Katie" Ray SPENCER immediately looked towards me and in a very derogatory manner stated, "Oh, I see. Obviously, you've talked to my ex-wife if you're calling her Katie." I advised SPENCER that I did call his daughter Katie and that that was at her request.

SPENCER then stated to Sgt. DAVIDSON, "Are you fuckin' done?" Sgt. DAVIDSON advised him that that would have to be his decision and indicated to him that our only concern was to get to the bottom of this matter and that he felt it was important for SPENCER to know what would happen if he were convicted of these crimes. Sgt. DAVIDSON also indicated that he thought we had conducted a fair and impartial investigation, regardless of what Ray SPENCER was saying. At one point Sgt. DAVIDSON made a statement indicating that

CCSO Case #84-8506, S.A. KRAUSE, K-43                    page 11 of 12

Spencer-00539

initially there was a misunderstanding between the two departments; however, we had been working closely with each other.  SPENCER stated, "I don't fucking care what you department problems are." He stated "he couldn't understand why we were trying to fuck him and the city."

           Sgt. DAVIDSON made statements indicating that he felt something had occurred between Ray SPENCER and Katie based on the statements Katie had made to me (KRAUSE) and Shirley SPENCER, and at that time SPENCER stated, "I don't fucking care what you think or my daughter says or my wife says, I fuckin' didn't touch her and fuckin' get off my ass or arrest it."  At that time the conversation with SPENCER was terminated.

                  This investigation is pending.

CCSO Case #84-8506, S.A. KRAUSE, K-43              page 12 of 12

Spencer-00540