# EXHIBIT E

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

1              IN THE UNITED STATES DISTRICT COURT

2            IN THE WESTERN DISTRICT OF WASHINGTON

3                          AT TACOMA

4   _____

5   CLYDE RAYMOND SPENCER,            )
                                      )
6                    Petitioner,      )
                                      )
7        vs.                          )   No. C94-5238RJB
                                      )
8   JOSEPH KLAUSER, Warden, Idaho     )
    State Institution; CHRISTINE      )
9   GREGOIRE, Attorney General,       )
    State of Washington,              )
                                      )
10                                    )
                   Respondents.   )
11  _____

12

13  _____

14            DEPOSITION UPON ORAL EXAMINATION

15                            OF

16                    SHARON A. KRAUSE

17  _____

18

19  DATE TAKEN:  May 22, 1996

20
    TIME:   10:30 a.m.
21

22  PLACE:   Hall of Justice
             Longview, Washington
23

24

25
                        SUZAN R. WELLS
                    Archer Associates, Inc.
                        P. O. Box 1092
                    Longview, Washington  98632
                        (360) 423-2195

Spencer002543

1       police officers with any of the Sacramento law

2       enforcement agencies?

3   A   I remember I did.  I don't remember who it was.  I think

4       -- and I'm guessing.  I think it was before I went down

5       I spoke with one of the detectives or an officer down

6       there.

7   Q   Do you recall whether or not you received any reports

8       from Sacramento before you went down to interview

9       witnesses in Sacramento?

10  A   I don't recall.

11  Q   At some point in time during the course of your

12      investigation, did you suggest or refer DeAnne Spencer

13      to any doctors to have Kathryn Spencer examined?

14  A   To be honest with you, I don't recall specifically

15      discussing that with her.  However, I would be real

16      surprised if I didn't.  That's all I can tell you.  I

17      don't remember.

18  Q   And based on what you've already told us about your

19      protocol, it would be your usual practice to refer the

20      parent to have the child examined?

21  A   Exactly.

22  Q   Do you recall the general nature of the allegations that

23      were coming from Kathryn Spencer?

24  A   No.

25  Q   Do you recall, let me ask and see if this refreshes your

Sharon A. Krause

14
Spencer002556

```
 1            memory, that some of the allegations included
 2            vaginal-penile penetration?
 3     A      To be honest with you, I don't remember what she told me
 4            happened.
 5     Q      Okay.
 6     A      There have been thousands of cases since and I really
 7            don't remember specifically.
 8                                  (Deposition Exhibit No. 1 was
 9                                     marked for identification.)
10     Q      (By Mr. Camiel:)  Ms. Krause, I'm handing you what's
11            been marked as Exhibit 1 to your deposition and it's
12            four pages.  The top page is titled Utility Report.  Why
13            don't you take a look at that.  I'm going to ask whether
14            or not that is what you received from Mr. Samson along
15            with his letter.
16     A      It is.
17     Q      Do you recall, prior to your receiving these documents
18            from Mr. Samson, do you recall having seen this report
19            before and the records that are attached?
20     A      I'm assuming I did.  That's my report.  I had no
21            independent recollection of it if -- I know that I did
22            because that's my report.
23     Q      All right.  When you say that's your report, you're
24            referring to the top page?
25     A      The little face sheet.  And it's indicating that these
```

Sharon A. Krause

ZELLNER (Sharon Krause, 11/6/12)

16

1   A   Could you ask me that again?

2   Q   Sure.

3   A   Thank you.

4   Q   Do you have any independent recollection of whether Kathryn

5       Spencer's medical examination was turned over to the

6       prosecutor's office during the investigation?

7   A   No independent recollection.  It's been so long.

8   Q   Have you -- oh, I know.  Has there been anything you've

9       read in all of these exhibits that's triggered your memory

10      or made you believe that that medical report was turned

11      over to the prosecutor's office?

12  A   I can't -- I can't imagine why -- first of all, I wouldn't

13      have -- there wouldn't be any reason for me not to have

14      done that, and that was our practice.  Everything went

15      there.  However, this -- there were reports on that

16      investigation going over to the prosecutor's piecemeal.

17      I've thought about this a lot since we've got, you know,

18      got involved in this.  There were reports going over not in

19      one big lump.  They were going as we went along.  So there

20      wouldn't have been any reason for me not to have sent that

21      over.

22          Also I've worked with Jim Peters for years, and he is

23      so meticulous, I can't imagine at least discussing that

24      with him, but I'm sure that wasn't the only case he was

25      doing, and this certainly wasn't the only case I was

```
1          magnifying during an exam of a child, anal or

2          vaginally.  It's my understanding that if there are

3          lesions or there's been tearing and healing, it may be

4          detected with a colposcope and it wouldn't by the naked

5          eye.

6    Q    Have you been involved in cases before where the

7          prosecution has presented photographs that were taken

8          with colposcopic exam?

9    A    Well, I'm usually excluded from the courtroom when

10         that's going on, but I'm sure -- I know there's been

11         cases I've been involved in where that was utilized by

12         the physicians.

13   Q    Have you reviewed with physicians as a part of some of

14         your investigations photographs depicting physical

15         evidence of sex abuse through colposcopic exam?

16   A    I don't know that I've ever sat down with a physician

17         and done that.  But I've seen photographs in training.

18   Q    Now, the report Exhibit No. 1 that you have in front of

19         you, do you know whether or not this report was ever

20         forwarded to the Clark County prosecutor's office?

21   A    Like I explained, I'm told it wasn't in their file.  If

22         they have all the other reports, I can't imagine them

23         not having this one.  Also, based on Jim Peters and

24         knowing him and knowing how meticulous he is and knowing

25         historically what I would do, there is no doubt in my
```

Sharon A. Krause

1    mind if they didn't have a copy, he was aware of it when

2    I got it.  We talked.

3          If CAIC -- If I have a prosecutor on a case, he may

4    not have the whole case file or I may still have some

5    reports I haven't shipped up to him, but there would be

6    no doubt in my -- 99 percent sure that he had this

7    information.  I can't imagine him not having the report

8    if he had all the rest of the reports.  And I'm told

9    that it was in Vancouver Police internal investigation

10   file that they did.  So why would I send it to him and

11   not the prosecutor?  That doesn't make sense.

12  Q  Do you know how it was that Vancouver Police Department

13     received your reports, your investigative reports in the

14     Spencer case?

15  A  Not really.  I don't remember -- I know that they were

16     doing an investigation.  My mind just went blank.  Jim

17     Holtz with Vancouver Police worked on it.  I spoke to

18     him.  I think he may have done some interviews.  It

19     seems like there were other people.  I don't remember if

20     they got them from the prosecutor or they got them from

21     me or they got them from records.  I don't know.

22  Q  Now, you indicated that you spoke I guess recently with

23     Kim Farr, deputy prosecuting attorney.  And as I

24     understand it, Kim Farr indicated that a review had been

25     done of the prosecutor's files and they didn't have the

Sharon A. Krause

1     referred to a clinic or to a doctor for a sexual assault

2     exam?

3  A   To be honest with you, I don't remember.  I don't have a

4     recollection of that.

5  Q   How about Matt Spencer?

6  A   Same.  I don't remember.

7  Q   I spoke with Mr. Samson a few weeks ago concerning your

8     deposition, and I understand from him that you may have

9     indicated that one of the reasons that the medical

10    reports may not have been disclosed has to do with the

11    fact that Mr. Spencer entered a guilty plea.

12  A  No.  I told you when -- When we do a major case or when

13    most of us do, the reports don't usually leave one at a

14    time.  You may include those in a notebook until the

15    whole thing is done and you copy, although you still are

16    communicating and at times there may be some reports

17    that the prosecutor requests.  My recollection of that

18    is we were kind of going full bore and all of a sudden

19    Mr. Rulli and Mr. Peters went to California, talked with

20    the children, came back, and Spencer did a Newton.  I

21    don't think he pled -- it was a Newton plea is what I --

22    that's what my memory is of that.

23       And so once that happened, I wouldn't have

24    continued an active investigation.  It would kind of be

25    done.  And it's possible that, you know, that could have

Sharon A. Krause

1   A   Yes.  I'm sure it was.

2   Q   What was significant about that?  Why was that a

3       problem?

4   A   Well, I think that's a big problem.  We weren't looking

5       at one.  There could have been others.  The other thing

6       that concerned me personally was that I remember him

7       saying some of the other men had guns on their ankles.

8   Q   You were concerned that these other potential suspects

9       might be police officers?

10  A   Absolutely.

11  Q   Was there an investigation that followed up on that?

12  A   There was.  And I remember Jim Holtz and I discussing

13      that.

14  Q   Jim Holtz was with the Vancouver Police Department?

15  A   Was the detective who was doing it.  Other than that, I

16      can't really tell you.  We were never able to identify,

17      you know, if there was, who they were.

18  Q   Now, during the period of time of the Spencer

19      investigation, did you become aware that your

20      supervisor, Mike Davidson, began having a romantic

21      relationship with Shirley Spencer?

22              MR. SAMSON:  I'll object on the

23      grounds of relevancy.  This claim was addressed by the

24      ninth circuit and was rejected by the ninth circuit so I

25      don't think the issue is really relevant anymore to this

Sharon A. Krause

```
 1            action.  But you can answer if you want.
 2    Q     (By Mr. Camiel:)  You can answer.
 3    A     I was aware of it, yes.  So was everybody else.
 4    Q     Was that ongoing while you were conducting your
 5            investigation?
 6    A     My memory of that, that was way on into the
 7            investigation that I became aware of that.  And I don't
 8            -- I don't remember if it -- You know, it's been so
 9            long.  My recollection of that is that when I became
10            aware of that, it was long after I had interviewed
11            Little Matt.  And I don't remember if it was before he
12            pled or after, to be honest with you.  But at some point
13            I became -- but it was --
14    Q     At the point where you learned about it, you've
15            indicated that it was long after you'd interviewed
16            Little Matt.
17    A     It seems to me.  That's what I think it was.  That's my
18            memory.
19    Q     I wanted to identify "Little Matt" as Matt Hansen.
20    A     Correct.
21    Q     Matt Hansen is the Matt that lived up here in the state
22            of Washington?
23    A     Right.  His mother is Shirley Spencer.
24    Q     When you learned that your supervisor, Michael Davidson,
25            was involved with Shirley Spencer, at the point where
```

Sharon A. Krause

CERTIFICATE OF NOATRY PUBLIC

STATE OF WASHINGTON)
                    : ss.
County of Clark     )

       I, SUZAN R. WELLS, a notary public for the State of
Washington, do hereby certify that SHARON A. KRAUSE, a
witness, personally appeared before me at the time and place
mentioned in the caption herein; that said witness was by me
first duly sworn on oath, and examined upon oral
interrogatories propounded by counsel; that said examination,
together with the testimony of said witness was written by
me in machine shorthand and thereafter reduced to
typewriting; and that the foregoing transcript constitutes a
full, true and accurate record of said examination of and
testimony given by said witness, and of all other oral
proceedings had during the taking of said deposition, and of
the whole thereof.

       Witness my hand and notarial seal the __28th__ day of
May, 1996.


                              _Suzan R. Wells_____
                              SUZAN R. WELLS,  CSR #WELLSSR325BH
                              Notary Public for the State of
                              Washington, residing at Vancouver,
                              Washington.  My commission
                              expires on 8/29/97.


                                                    51
Spencer002593

| FPLEMENTAL RPT. | ☐ CONTINUATION OF: | | TYPED BY: S. Krause |
|---|---|---|---|
| | ☐ Incident Rpt.   ☐ Supplemental Rpt. | | PROCESSED BY: |
| DENT CLASSIFICATION (INCLUDE R.C.W. NO.) | | | DATA ENTRY BY: |

ᵃecent Liberties/Statutory Rape 1st Degree

| I OF INCIDENT | | DATE OF INCIDENT | PRESENT DATE |
|---|---|---|---|
| 81 N.E. Lucia Falls Rd., Yacolt, Wash. | | Summer of 1984 | 10-12-84 |

ADDITIONAL PERSONS INFO – ATTACH ADDITIONAL INCIDENT REPORTS. DETAIL ADDITIONAL PERSON INFORMATION NOT COVERED IN BOXES
ADDITIONAL SUSPECT INFO – ATTACH ADDITIONAL INCIDENT REPORTS. DETAIL ADDITIONAL SUSPECT INFORMATION NOT COVERED IN BOXES
INJURED PERSONS – (VICTIMS, WITNESSES, OFFICERS, SUSPECTS) – DETAIL INJURIES, MEDICAL EXAM. DISPOSITION
ADDITIONAL PROPERTY – ATTACH UTILITY/PROPERTY REPORT. DETAIL INFORMATION NOT INCLUDED IN BOXED PROPERTY SECTION

5. PHYSICAL EVIDENCE – DETAIL WHAT AND WHERE FOUND, BY WHOM, AND DISPOSITION
6. VEHICLES – SUSPECT VEHICLE INFORMATION IN SAME ORDER AS VEHICLE SECTION. ADDITIONAL VEHICLE INFORMATION NOT INCLUDED IN BOXES
7. PARENT, GUARDIAN'S NAME, ADDRESS, PHONE NUMBER OF JUVENILE IN DETENTION INDICATE IF CONTACTED AND IF INCIDENT ADJUSTED
8. LIST DOCUMENTS ATTACHED – (AIR FORM, MEDICAL RELEASE, WAIVERS, ETC.)
9. RECONSTRUCT INCIDENT AND DESCRIBE INVESTIGATION
10. SYNOPSIS FOR PROSECUTOR ON CLEARED CRIMES AND CUSTODIES

EM NO. ARE LISTED IN ORDER OF STEP 1 TO 10. IF STEP IS UNNECESSARY, OMIT.

| M | CODE | PERSONS CODE | NAME OF VICTIM / OTHER  LAST, FIRST, MIDDLE |
|---|---|---|---|
| | | | SPENCER, Kathryn        Dob: 01-13-79 |
| | | | |
| | V1 | | Copies of Therapeutic/Diagnostic Procedures Report forwarded |
| | | | to this department by University of California Davis Medical Cent. |
| | | | Sacramento, California reference; an examination conducted on |
| | | | Kathryn Spencer regarding sexual abuse allegations involving |
| | | | Kathryn and her natural father, Clyde Ray Spencer. |

CASE NO. 84-8506

| ☐ CPS | ☐ CMHP | ☐ DSHS | ☐ PATROL | REPORTING OFFICER: | DIST. |
|---|---|---|---|---|---|
| ☐ JOH | ☐ PAT | ☐ SIU | ☒ DETECTIVE | Sharon A. Krause  K/43 Detectives | |
| J BY  | ☐ ARREST | ☐ EXCEPTIONAL | ☐ UNFOUNDED | | |
| TIONAL DIST: | | | | REVIEWED BY: | DATE: |

EXHIBIT
Spencer002594
Krause

USE PATIENT PLATE

**UNIVERSITY OF CALIFORNIA DAVIS**
**MEDICAL CENTER**
**SACRAMENTO**

**THERAPEUTIC/DIAGNOSTIC**
**PROCEDURES REPORT**

032 084 97 17 4 3 R
SPENCER, KATHRYN E.
F 01 13 79 EXP 10 84

762 / PED ACC
30 AUG84
08 30 84

All cases of Suspected Child Abuse Neglect are to be reported by telephone and in writing (by submitting this form) to the designated agencies (C and D below) within 36 hours. (Penal Code Section 11161.5 and 11161.7)

## GENERAL INFORMATION

| Patient's Name | Unit# |
|---|---|
| Spencer Kathryn | |

| Address | City | State | Phone |
|---|---|---|---|
| 3930 Bellbria | Sacramento | CA | 482-6057 |

| Age | Birthdate | Race | Sex | Date, Time of Examination | Place of Examination |
|---|---|---|---|---|---|
| 5 | 1-13-79 | C | F | 8-30-84  Peds Acute | 1:30 |

| Reporting Party's Name | UCD Department | Phone |
|---|---|---|
| Kathryn Eells-Magee, M.D. | Family Practice | 453-3630 |

### FAMILY—Parents:

| Name (Last, First, Middle) | Birthdate | Sex | Race | Name (Last, First, Middle) | Birthdate | Sex | Race |
|---|---|---|---|---|---|---|---|
| Spencer DeAnne | | F | C | Clyde Ray Spencer | | M | C |

| Address | | | | Address | | | |
|---|---|---|---|---|---|---|---|
| 3930 Bechria | | | | | | | Vancouver |

| Home Phone | Business Phone | Home Phone | Business Phone |
|---|---|---|---|
| ( ) | ( ) | ( ) | ( ) |

### Siblings:

| Name | Birthdate | Sex | Race | Name | Birthdate | Sex | Race |
|---|---|---|---|---|---|---|---|
| 1. Matthew | 8yr. | M | C | 4. | | | |
| 2. | | | | 5. | | | |
| 3. | | | | 6. | | | |

Child's Family/Home Environment—Include risk factors in parent and/or child. Specify who is/are caretaker(s).

Katue lives with mother and sibling. Parents divorced. Father has visitation for six weeks in summer, week at Easter, and two at Christmas every other year.

Previous reports of abuse of child or in family?  ☐ Yes  ☑ No  If yes, describe when, who involved, etc.

| Print Last Name | Signature | Date of Report |
|---|---|---|
| Eells-Magee | K Eells-Magee | 8/30/84 |

032 084 97 17 4 3 R

762/PED ACC

SPE'IEL, 'ATHRYN E.
F ..1 1? 7? [ XP 10 84
4 B6 4E2 (957 .....

08 30 84

UNIVERSITY OF CALIFORNIA DAVIS
**MEDICAL CENTER**
SACRAMENTO

**THERAPEUTIC/DIAGNOSTIC
PROCEDURES REPORT**

..PEC: 13:23
**PHYSICAL EXAMINATION**

**Patient's General Appearance:**

White female child recovering in her

mother's lap.

Ht ___110.5___ cm ___15ᵗʰ___ %ile

Wt ___17.0___ kg ___15ᵗʰ___ %ile

Hc _____ cm _____ %ile

Locate and describe in detail *any* injuries or findings related to maltreatment. Indicate location of lesions/findings; shade for bruises or burns. Beside each injury indicated note *color, size, pattern, texture,* and *sensation.* Note if *recognizable imprint* or bruise goes *around curve.*



4 erythema
bug bite

A pelvic examination should not be performed unless the parent, guardian or minor consent *or* unless necessary as part of treatment. See Department of Health Regulations Title 22, Division 2, Victims of Sexual Assault.

Pelvic
No erythema
hymen intact
No lacerations.
No swelling

**FINDINGS:** Pelvic within normal limits.

Fundoscopic Examination—☐ Normal  ☐ Abnormal  ☒ Not done
Development Assessment—☒ Normal  ☐ Questionable  ☐ Abnormal,  by ☐ DDST  ☐ Estimate  ☐ Other
Behavioral Assessment—☐ Normal during visit  ☒ Abnormal during visit (Specify) _relieved to sink§scean_
                                                                                              through exan
X-ray bone survey—☐ Normal  ☒ Not done  ☐ Abnormal (findings) _____
Hemostasis tests performed—☐ PT  ☐ PTT  ☐ Platelets  ☒ None  ☐ Other _____ Results _____
Cultures for gonorrhea performed—☒ genitalia  ☒ throat  ☒ anus.  VDRL—☐ Done  ☒ Not done
Menarche age _____  Periods regular?  ☐ Yes  ☐ No  L.M.P. _____
Pregnancy test—☐ Positive  ☐ Negative  ☒ Not performed

| Signature | Print Last Name | Date of Report |
|---|---|---|
| Eells-Monee | Eells-Monee | 8/30/84 |

762/PED ACC

032 084 97 17 4 3R
SPENCER, KATHRYN E.
F C1 13 70  EXP 10 84
4 PG 482 E057

08 30 84

**UNIVERSITY OF CALIFORNIA DAVIS
MEDICAL CENTER
SACRAMENTO**

**THERAPEUTIC/DIAGNOSTIC
PROCEDURES REPORT**

MALTREATMENT HISTORY: 13: 23

Give history of event(s) including time, date, place, perpetrator, circumstance, people present, etc. Underline name of person giving each version, e.g., Father said . . . Child said . . . Officer said . . .

Mother said

Children were visiting father in bulls during Summer. Returned to mother on 8-26. Step brother reported to Vancouver police that the father had molested. Report was based on remarks Katie had made to Step mother on 8-24-84. Katie refused to talk or answer questions during Exam. She has refused to talk with mother re giving report. M Spencer.

Diagnostic Conclusion(s):
Child's story consistant with history of molestation. No physical findings.

**MANAGEMENT**

1. Reported to:  Officer _____ ID No. _____ Department _____ Phone 446-5191
   Pat Flint
   Dependent Intake or CPS Worker _____ Department _____ Phone 866-2386

2. Medical Follow-up:  Date _____ Time _____
   ☑ Scan F/U Clinic  ☐ P.M.D. (Name) 9·29-84 .
   ☐ UCD Clinic (Name) _____  ☐ Other _____
   ☐ None (Why not?) _____

3. Mental Health Follow-up:  Date _____ Time _____
   ☑ Referred to Victim Witness
   ☐ None _____

4. Disposition:
   Police Hold?  ☐ Yes  ☑ No
   ☐ Receiving Home  ☐ Foster home  ☐ Relative's home  ☑ Parent's home  ☐ Other
   ☐ Hospitalized

5. Other Treatment:

| Print Last Name | Signature | Date of Report |
|---|---|---|
| Eells - Magee | Y. Eells-Magee | 8/30/84 |

SUSPECTED CHILD ABUSE

# EXHIBIT F

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

1

```
 1                   UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF WASHINGTON

 3                          AT TACOMA

 4
      CLYDE RAY SPENCER, MATTHEW      )
 5    RAY SPENCER, and KATHRYN E.     )
      TETZ,                           )
 6                                    )
                 Plaintiffs,          )
 7                                    )
            vs.                       )    NO. 3:11-cb-05424-BHS
 8                                    )
      FORMER PROSECUTING ATTORNEY     )
 9    FOR CLARK COUNTY JAMES M.       )
      PETERS, DETECTIVE SHARON        )
10    KRAUSE, SERGEANT MICHAEL        )
      DAVIDSON, CLARK COUNTY          )
11    PROSECUTOR'S OFFICE, CLARK      )
      COUNTY SHERIFF'S OFFICE, THE    )
12    COUNTY OF CLARK and JOHN DOES   )
      ONE THROUGH TEN,                )
13                                    )
                 Defendants.          )
14

15    DEPOSITION UPON ORAL EXAMINATION OF JAMES MICHAEL DAVIDSON

16

17

18                    Monday, November 5, 2012
19                      Olympia, Washington

20

21

22

23

24

25
```

ZELLNER (James Michael Davidson, 11/5/12)

12

1    Q   So you assigned cases.  What else did you do as a
2        supervisor?
3    A   Reviewed the progress of cases.
4    Q   How often would you review the progress of cases --
5    A   It would depend --
6    Q   -- in 1984?
7    A   It would depend upon the case, the nature of the
8        allegation.
9    Q   Well -- all right.  Did you have weekly reviews or did you
10       have daily reviews?
11   A   Again, there was no established policy on reviews because
12       it would depend upon the type of investigation.
13   Q   And when you would review a case, what would that involve?
14   A   It would entail reviewing the progress that the officers
15       were having, the individual detective that was assigned,
16       review their progress on a particular case, review if there
17       were any problems, review what follow-up needed to be done.
18   Q   Did you have face-to-face meetings, then, with these
19       detectives?
20   A   In order to review their progress, yes.
21   Q   So you had verbal communication with them; is that correct?
22   A   That's correct.
23   Q   Okay.  And then you also reviewed their reports?
24   A   Yes, ma'am.
25   Q   Okay.  And then did you sign off on their reports?

ZELLNER (James Michael Davidson, 11/5/12)

24

1   Q   Do you know through the investigation -- well, let me ask
2       you this.  That's different than what you had initially
3       told me that the call came in and just reported Ray Spencer
4       had alleged by sexually abused his daughter?  You would
5       agree with that, right?
6   A   I'm sorry?
7   Q   You would agree that Katie or Kathryn Spencer's initial
8       report involved allegations against other people, DeAnne
9       Spencer, her brother Matthew, Karen Stone?  You're aware
10      that Katie Spencer had claimed all of those people had
11      sexually abused her?
12  A   Let me ask you what you're asking.  I'm not certain -- are
13      you asking me about the original report or about the report
14      that I'm looking at here?
15  Q   I'm talking about the report on 8/29/84.  We talked about
16      the original report to the patrol officer that you
17      reviewed, okay?  Then you tell you assigned the case to
18      Sharon Krause, and she began working on the case, correct?
19  A   That's correct.
20  Q   Okay.  And she began preparing reports that you were
21      reviewing?
22  A   Correct.
23  Q   Okay.  And you at some point did review this report on
24      8/29/84?
25  A   We're talking the initial report from the deputy sheriff?

ZELLNER (James Michael Davidson, 11/5/12)

31

1    having at that time?

2  A  My wife and I had been married for about 24 years.  We'd

3     had a slow disintegration of our marriage over probably the

4     prior ten years.  We had stayed together principally

5     because we had three children.

6  Q  When you say that -- how would you describe the state of

7     your marriage in 1984 around the time when you first met

8     Shirley Spencer?

9  A  I was living at home and we -- we had -- my wife and I had

10    a social contact.  It was not a regular, normal marriage in

11    the sense that you would normally expect it to be.

12 Q  And when you say not -- did you have -- were you still

13    having sexual relations with your wife at that point?

14           MR. FREIMUND:  I think this is getting pretty

15    far down the road into personal, private information that

16    is not relevant.

17           MS. ZELLNER:  I think I have completely -- well,

18    that's not a proper objection in a federal case.  You'd

19    have to assert a privilege and instruct him not to answer,

20    and I believe that we have a green light from Judge Settle

21    that we can explore the relationship that he had with

22    Shirley Spencer, and part of that I want to explore is the

23    quality of his marriage at the time he met her.

24           MR. FREIMUND:  I would disagree with your

25    analysis of having a green light, as you put it.  I think

ZELLNER (James Michael Davidson, 11/5/12)

45

```
 1        have not discussed this case with her?
 2     A  As far as I can remember, no.
 3     Q  Going back to the relationship with Shirley Spencer, would
 4        you agree that in the beginning of this investigation,
 5        there were some problems with Katie Spencer's description
 6        of what had happened and who was involved in her alleged
 7        sexual abuse?
 8     A  If we're talking about the information that was contained
 9        in the report -- what do you mean by problems?  I'm not
10        certain that -- what are we talking about, defining
11        problems?
12     Q  Well, Ray Spencer was arrested twice, right?  The first
13        arrest was just for a misdemeanor, am I correct?
14     A  I believe so, correct.
15     Q  And he was just arrested for a misdemeanor because
16        apparently the case wasn't strong enough to charge him with
17        a felony?
18     A  I can't, nor do I believe that I have knowledge about the
19        particulars of why it was charged or he was arrested in the
20        manner that he was, under the charge that he was.
21     Q  Who was in charge of making those decisions?
22     A  I would assume that it would have been a consultation with
23        the prosecuting attorney's office, whatever deputy
24        prosecutor was assigned at that time.
25     Q  Up until Ray's first arrest, had you had any communications
```

ZELLNER (James Michael Davidson, 11/5/12)

46

1    with Jim Peters about the Ray Spencer case?

2  A  Again, I can't recall specific -- we had specific

3    conversations with Mr. Peters during the course of the

4    entire investigation.  Can I sit here today and define

5    specifically what time frames that those conversations took

6    place and in relationship to what portion of the

7    investigation?  I cannot.

8  Q  Did you have conversations with Mr. Peters -- we know that

9    the entire case started in July of 1984.  Did you have

10    conversations with Mr. Peters in that time span from July

11    up until Mr. Spencer's first arrest, just that time period?

12    Do you have a recollection of that?

13  A  I do not have a recollection of that, no.

14  Q  Do you, at a certain point, learn that there's going to be

15    an arrest of Ray Spencer for misdemeanor charges?

16  A  I can only say that I would assume that I would have

17    learned that information without having specific detail.

18  Q  How do you -- how do you define probable cause?

19  A  That -- anything that would lead a reasonable person to

20    believe that a crime had been committed.

21  Q  All right.  So can you tell me what was the probable cause

22    for the first arrest of Ray Spencer on a misdemeanor

23    charge?

24  A  Again, I cannot tell you that because I wasn't involved in

25    that portion or that decision-making process.

ZELLNER (James Michael Davidson, 11/5/12)

51

1      pursue any charges in Sacramento; is that correct?

2  A  I'm not aware that -- at least that there was any

3      allegations that any of this occurred in California.

4  Q  Well, you're aware that a prosecutor named Rebecca Roe

5      evaluated the evidence for King County, that she was asked

6      to evaluate whether the case was legally sufficient?

7  A  I'm aware that there's a section contained in this file

8      that says she reviewed the case that was referred to her

9      from Clark County.  That has nothing --

10  Q  Right.

11  A  -- to do with Detective Flood.

12  Q  Plaintiff's Exhibit 21, if you could look at that, that's a

13      report that's signed off on by Rebecca Roe?

14  A  I have that copy here, yes, ma'am.

15  Q  Yes.  Have you reviewed this report in your preparation for

16      the deposition today?

17  A  I reviewed it to the best of my ability.  I will have to

18      say that there's some of the -- some of the penmanship that

19      I was not able to discern exactly what she was writing.

20  Q  Well, she does, at the top on her report, mark the box that

21      says case is being returned because it is legally

22      insufficient.  Do you see that notation?

23  A  I do, yes, ma'am.

24  Q  And she points out some of the problems -- and this is

25      November 27 of 1984 -- some of the problems that she saw

ZELLNER (James Michael Davidson, 11/5/12)

52

1    with the sufficiency of the case.  One of the first

2    problems she sees is that the child, Kathryn Spencer, is

3    extremely reluctant to talk about the facts and that Sharon

4    Krause had to spend several hours one-on-one with the

5    victim who indicated that she did not want to talk about

6    it.

7         Were you aware of this information before Ray was

8    charged in February of the felonies?  Were you aware of the

9    Roe report?

10        MR. BOGDANOVICH:  I'm going to object to the

11   form of the question.  I think it left off part of the

12   report that was being quoted.

13        MR. FREIMUND:  You can go ahead and answer.

14        MS. ZELLNER:  I can read the entire entry in.

15   Q  (By Ms. Zellner)  First of all, were you aware of this

16      report before the felony charges were brought against Ray

17      Spencer in February of 1985?

18   A  To my knowledge, I was not.

19   Q  When did you become aware of this report?

20   A  I believe it would have been during the course of the

21      appeal process.

22   Q  Is it your testimony that this report was never in the

23      Clark County Sheriff's file?

24   A  That would not be my testimony, no, ma'am.

25   Q  So what is your testimony about this report?  I mean,

ZELLNER (James Michael Davidson, 11/5/12)

53

1      obviously, it was authored on November 27, 1984.  Were you

2      unaware of it?

3    A  You're asking me at the time that Mr. Spencer was charged

4      with the felonies, was I aware this report existed?

5    Q  Right.

6    A  My response is I have no recollection of that, no, ma'am.

7    Q  When you say -- you've repeatedly said you have no

8      recollection, and when you say you have no recollection of

9      the existence of this report, are you saying that it may

10     have been in the file and you just don't remember it?

11   A  I'm saying that it's very likely it could have been in the

12     file and that I didn't see it because this report was

13     obviously not prepared for my review.

14   Q  Would you have had -- would you have looked at all of the

15     reports that Sharon Krause received in this investigation?

16     Were you doing that on the Ray Spencer case?

17   A  I would have reviewed the reports that Detective Krause

18     would have authored.

19   Q  Would you have reviewed any material that others authored,

20     like Dr. Abrams?

21   A  I believe that Dr. Abrams' report was sent directly to me.

22     If you notice in the address, it was addressed to me.  So,

23     correct, yes, I would have.

24   Q  Okay.  And then you're saying with this report you don't

25     recall in this time frame that it was prepared, 11/27/84,

1   A   If during the course of the investigation, I had some
2       reason to be informed of that, that would be correct.  But,
3       again, this information was provided to the prosecuting
4       attorney's office.  I don't know when or if I was ever made
5       aware of this particular report.
6   Q   Yeah, and I understand that about the report, and that is
7       not my question.  My question is if you understood that
8       there were problems with Kathryn Spencer's rendition of
9       events prior to the charges being brought against Ray
10      Spencer on February 28th.  Is this a news flash to you?
11      Did you not know there were these problems that existed at
12      the time?
13  A   I'm aware that after the fact that there were some problems
14      with this investigation initially.  That was after the
15      fact, not during the course of that investigation.
16  Q   And wasn't it part of your duties and responsibilities to
17      learn if there were problems with the veracity of witnesses
18      in the cases that you were investigating?
19  A   If I were investigating the case, certainly.  If I were the
20      supervisor, I wasn't necessarily informed of every aspect
21      of that investigation.
22  Q   Were you informed at any time before February 28, 1985,
23      that Kathryn Spencer had been inconsistent in some of the
24      details of her report of sexual abuse by her father --
25  A   Again, I'm going to answer --

ZELLNER (James Michael Davidson, 11/5/12)

63

1  Q  -- at any time?

2  A  -- I have no specific recollection of that information.

3  Q  And if you had gotten that information, would that have

4     been important in your assessment of the veracity of the

5     claim?  Would that have been important to know as a

6     supervising detective?

7  A  I can only speculate that, first of all, certainly that

8     kind of information would be important.  Again, the only

9     reason that it would be important is how we approached the

10    investigation from that point on.

11 Q  Did you make decisions in the Ray Spencer case about how

12    the investigation was going to be conducted, or did you

13    delegate all of that to Sharon Krause?

14 A  I don't know that in any case that I specifically outlined

15    the way any investigation assigned to any investigator

16    would be conducted.

17 Q  Okay.  I'm asking about this case, okay?

18 A  Okay.

19 Q  This specific case.

20    Did you direct Sharon Krause at any point to perform

21    any task in regard to this investigation?  Did you say "Go

22    out and reinterview the child, go out and tape record it"?

23    Did you ever make any suggestion?

24 A  I'm certain that probably during the course of that

25    investigation that there were some suggestions that I

ZELLNER (James Michael Davidson, 11/5/12)

64

1       offered.  I'm aware that particularly when there was a

2       discussion of her going to California to interview both of

3       the children.  I don't recall specifically what directions,

4       or at this point due to the passage of time there's no

5       reports to reflect what I would have suggested, and I have

6       no independent recollection of that.

7    Q  But you do agree that the reports reflect your involvement

8       at various stages of the investigation, don't you?

9    A  I recall specifically being involved in certain portions of

10      that investigation, yes, ma'am.

11   Q  Prior to the incident at the Salmon Motel where Matt Hansen

12      was allegedly molested, the case only had evidence of a

13      misdemeanor at that point, right, and then there was the

14      Matt Hansen alleged molestation, and then suddenly the case

15      became a felony case?

16   A  I believe the allegations rose to a claim of a felony case

17      after Mr. -- after young Matt Hansen, Shirley's son, made a

18      disclosure, correct.

19   Q  Now, Matt Hansen was taken to the Salmon Motel by Shirley

20      Spencer, right?

21   A  I believe that she stated that, correct.

22   Q  And despite the fact that her husband was out on personal

23      recognizance for molesting their daughter, Shirley Spencer

24      took her son to the Salmon Motel to spend the night with

25      Ray, right?

ZELLNER (James Michael Davidson, 11/5/12)

69

1    correct?

2    A  I think there was some additional interviews that were

3       conducted with his son and his daughter in California, and

4       collectively that was the basis for charging him with those

5       crimes, correct.

6    Q  Okay.  But the Matt Hansen incident was a big part of the

7       charging, wasn't it?

8    A  I don't know that I can answer that.  That would be the

9       prosecutor's position to answer.

10   Q  You went to the Salmon Motel to attempt to corroborate Matt

11      Hansen's story, didn't you?

12   A  I was requested to do that, that's correct.

13   Q  And you reported back that there was a television that was

14      mounted high on the wall.  Do you remember that?

15   A  I do recall that, yes, ma'am.

16   Q  And what was the importance of your observation about the

17      television being mounted high on the wall?

18   A  That was part of what Shirley's son was stating that was

19      part of the room description during the time that he spent

20      with Ray at the Salmon Creek Motel.

21   Q  Well, there wasn't any question that he spent the night

22      with Ray Spencer, right?  There was no question he was in

23      the room, correct?

24   A  There's none -- I'm not clear as to why you're asking that,

25      because that's the purpose of corroboration.

ZELLNER (James Michael Davidson, 11/5/12)

70

```
 1    Q   All you corroborated, though, with the television, was that
 2        Matt Spencer was in the room, right?  That doesn't
 3        corroborate sexual abuse.
 4    A   Nobody said that.  I simply was corroborating --
 5    Q   Actually, it does say that.  It does say that in the
 6        report, that that was the piece of corroborating evidence.
 7        I'm just asking you -- I'm not aware that Ray Spencer ever
 8        denied that Matt Hansen was dropped off at the motel.  Are
 9        you aware that Ray Spencer ever denied that?
10    A   Without reviewing the reports of Ray Spencer's statements,
11        I can't answer that question.  I don't know whether or not
12        he did.  I was requested to go to the Salmon Creek Motel to
13        corroborate the interior of the motel room provided by
14        young Matt Hansen, Shirley Spencer's son.  That's what I
15        did.
16    Q   There was no physical evidence in the room of any sexual
17        abuse, correct?
18    A   At the time that I was there I don't know that I was
19        looking for that type of -- I was looking for corroborative
20        information.
21    Q   So you were not there to look for corroborative
22        information?
23    A   I said -- that was my statement.  I was there to look for
24        corroborative information.
25    Q   Right.  What else besides the television on the wall
```

ZELLNER (James Michael Davidson, 11/5/12)

72

1    A   That's correct, yes.

2    Q   You became aware during the investigation that there was a

3        videotaped interview made of Kathryn Spencer at the

4        Sheriff's Department on December 21, 1984, correct?

5    A   Now, are you making a statement --

6    Q   Yeah --

7    A   -- or is that a question?

8    Q   It's a question.  You became aware that a videotaped

9        interview was done of Kathryn Spencer on December 11, 1984,

10       during the course of the investigation?

11   A   I was aware that there was a videotaped interview done.  I

12       don't recall the dates, and I don't recall when I was made

13       aware of that.

14   Q   Were you made aware of the videotaped interview prior to

15       the charges being brought against Ray Spencer on

16       February 28, 1985?

17   A   I can't recall that, ma'am.

18   Q   When you say you can't recall it, do you mean that you

19       can't give me a specific date?

20   A   I'm stating that I can't recall when I was made aware of

21       that videotape.  Due to the passage of time -- this has

22       been some 26, 27 years ago -- I can't recall that specific

23       information, no, ma'am.

24   Q   Well, we've all been provided -- we have thousands of pages

25       of documents, and you've been provided with several hundred

ZELLNER (James Michael Davidson, 11/5/12)

73

| | | |
|---|---|---|
| 1 | | pages of documents about this case, correct? |
| 2 | A | Correct. |
| 3 | Q | And you are aware as you sit here today that there was a |
| 4 | | videotaped interview done of Kathryn Spencer, correct? |
| 5 | A | I am today, yes, ma'am. |
| 6 | Q | And do you have any idea in the last 25 years when you |
| 7 | | became aware of that videotaped interview? |
| 8 | A | I can say that I was probably aware of it at some time |
| 9 | | during the 25 years.  I can't be specific, and I don't |
| 10 | | recall -- again, I don't recall that. |
| 11 | Q | Do you recall whether you became aware of that videotaped |
| 12 | | interview prior to Ray Spencer being sentenced? |
| 13 | A | No, I cannot. |
| 14 | Q | Have you reviewed the videotaped interview? |
| 15 | A | I was provided a copy of that videotaped interview in 2009 |
| 16 | | or 2010 by then-Chief Criminal Deputy Prosecutor Dennis |
| 17 | | Hunter as part and party -- |
| 18 | Q | Was that the first time -- |
| 19 | A | I'm sorry. |
| 20 | Q | I'm sorry. |
| 21 | A | -- as part and party -- |
| 22 | Q | Was that the first -- |
| 23 | A | -- to the appeal. |
| 24 | Q | Was that the first time that you became aware of a |
| 25 | | videotaped interview having been conducted of Kathryn |

ZELLNER (James Michael Davidson, 11/5/12)

81

1    A  I didn't say that.  I said if there was a report that

2        reflected that interview.

3    Q  Okay.  Was there -- should there have been a report made of

4        the interview?

5    A  I would normally say, and I can't say specifically

6        pertaining to this, but the normal course would be that you

7        would author a report pertaining to an interview of a

8        victim or witness or suspect.

9    Q  And if I told you that no such report has been produced,

10       would you be surprised that a report wasn't made?

11    A  I would only -- we're basing that upon your statement, not

12       to my personal knowledge.  I don't know that there was no

13       report made.

14    Q  You've never seen it, have you, a report made of the

15       videotaped interview?

16    A  Again, I can't tell you that because I don't recall.

17       Without reviewing the entire file, I wouldn't know.

18    Q  In the documents that we sent you, did you see a report of

19       the videotaped interview in those documents?

20    A  Again, if I have permission to go back and reflect through

21       the reports, I will look to see if I have any record of

22       that.

23              MS. ZELLNER:  Okay, why don't we take a

24       ten-minute break and let him look through those documents

25       and tell me if there's a report that we've all missed.

ZELLNER (James Michael Davidson, 11/5/12)

85

1        asking you -- it sounds like, from what you've said before,

2        you tried to reviewed the reports in the file.  If this

3        report had been in the file, you would have reviewed; is

4        that fair?

5  A   If the report was in the file, I would have reviewed it if

6        I reviewed the entire case, correct.

7  Q   Okay.  Do you recall who requested you to go to the Salmon

8        Creek Motel to try to corroborate Matt Hansen's story?

9  A   My recollection was that it was the Deputy Prosecutor Jim

10       Peters.

11  Q   What's your -- when do you recall Jim Peters first getting

12       involved in the Ray Spencer case?  It must have been

13       between the misdemeanor charges and felony charges, or

14       prior to that?

15  A   My recollection was that once the report was forwarded to

16       the prosecuting attorney's office, Mr. Peters was involved

17       from that point on.  That's my recollection.

18  Q   And you're talking about the report of the Matt Hansen

19       allegations?

20  A   I'm talking about the initial report with regards to

21       Kathryn Spencer.

22  Q   Okay.  So the very earliest report that the patrol officer

23       took; is that right?

24  A   I don't know that I can state that he was involved at that

25       point.  I can say that as a result of our follow-up

ZELLNER (James Michael Davidson, 11/5/12)

97

1          MR. FREIMUND:  You just specifically asked did
2     your attorneys provide you.  That's where I'm having a
3     problem.
4  Q  (By Ms. Zellner)  Okay, Mr. Davidson, have you on your own
5     reviewed the Sheriff's file on the Ray Spencer
6     investigation?
7  A  None other than what was provided to me by your office.
8  Q  Okay.  That was really my question.
9          In the interview that was done of Matt Hansen, were
10     you asking questions or was Sharon Krause asking questions?
11  A  I believe Detective Krause was.  I was simply present.
12  Q  And -- okay.  In her questioning of Matt Hansen, I believe
13     he was four or five years old at the time, were any
14     questions asked about his competency?
15  A  Asked of whom?
16  Q  Asked of Matt Hansen.
17  A  Again, without reviewing the interview that Detective
18     Krause conducted, I can't answer that question.
19  Q  Did you at any point in time suggest to Shirley Spencer
20     that Matt Hansen have a medical examination?
21  A  I did not, no, ma'am.
22  Q  At any time did you become aware that Matt Hansen had, in
23     fact, had a medical examination?
24  A  I did become aware of that.
25  Q  Was it a routine practice to refer alleged victims to have

ZELLNER (James Michael Davidson, 11/5/12)

98

1      a medical examination?

2    A  It would depend upon the nature of the allegation.

3    Q  If there were allegations of vaginal rape, would that be

4      the kind of allegation that you would expect the alleged

5      victim would be referred for a medical exam?

6    A  Yes, ma'am.

7    Q  If Shirley Spencer had recalled in her testimony that you

8      did suggest to her that Matt had a -- have a medical exam

9      on these allegations, would you disagree with that

10     statement that she's made?

11            MR. FREIMUND:  I'm going to object as an

12     improper hypothetical.

13            But go ahead and answer.

14   A  I would first have to review the document in which she

15     indicated that I had suggested that.

16   Q  (By Ms. Zellner)  Well, do you have an independent

17     recollection of telling her that Matt Hansen should have a

18     medical examination?

19   A  I do not have an independent recollection of that, no,

20     ma'am.

21   Q  With a male child, when there are allegations of anal

22     penetration, would that be the kind of allegation that you

23     would expect to result in a referral to a doctor?

24   A  Well, there's some -- there's some factors that need to be

25     addressed more specifically than just a general allegation.

ZELLNER (James Michael Davidson, 11/5/12)

99

1   Q  You're aware of testifying previously when you were asked

2      that question, and with a male child where there are

3      allegations of anal penetration, would that be the kind of

4      allegation that you would expect to result in a referral to

5      a doctor?  And you answered -- this is the habeas

6      deposition testimony -- "I would agree with that, yes."

7   A  Correct.

8   Q  So are you not agreeing with that now?

9   A  No, what I'm saying is that there are some parameters in

10     which we're talking time frames as opposed to when this

11     occurred and so on.  There's an explanation that I would

12     offer additionally besides just responding "yes" or "no."

13   Q  Well, you don't have -- you have no training as a medical

14     doctor, right?

15   A  No, ma'am.

16   Q  Okay.  And you're not holding yourself out as a child abuse

17     expert?

18   A  No, ma'am.

19   Q  Okay.  Did you become aware at a certain point in time that

20     there had, in fact, been an exam of Mr. Hansen, Matt

21     Hansen?

22   A  Shirley's son?  Is that who we're talking about?

23   Q  Yes, Shirley's son.  Yes.

24   A  Okay.  At some point in time during this entire process I

25     was aware that there was a medical exam.

ZELLNER (James Michael Davidson, 11/5/12)

```
 1   Q  Would you expect a later report to encompass the reports
 2      from the prior index?
 3   A  I'm not certain that I understand what you're asking.
 4   Q  Would you expect a subsequent report, a report later in
 5      time, to encompass the documents from the first report?
 6              MR. FREIMUND:  You're saying "report."  I think
 7      you mean "index."
 8              MS. ZELLNER:  Index, right.
 9              MR. FREIMUND:  Yeah.  Okay.
10   A  Again, there is a report that's indicated in the first
11      index section that there was a medical examination report
12      on Kathryn Spencer.  I see no reason why it would be
13      included in the second index since it was already referred
14      to in the first index.
15   Q  (By Ms. Zellner)  And is it your testimony since it was --
16      the report was included in the index that you would have
17      reviewed the medical report on Kathryn Spencer?
18   A  I can only -- I can only speculate at this point that if it
19      was attached to that report, I may have looked at it.  I
20      doubt if I reviewed it because I'm not a medical doctor as
21      you aptly pointed out, so I --
22   Q  The custom and practice was for the Sheriff's Department to
23      supply the prosecutor's office with all of the reports in
24      the file; is that correct?
25   A  Any report that was going to be referred to the
```

ZELLNER (James Michael Davidson, 11/5/12)

108

1    prosecutor's office was indicated as such, and the Records
. 2   Division at the Sheriff's office would ultimately refer
3    those to the prosecutor's office, correct.
4  Q  And, in your experience, would a medical report of the
5    complaining witness, one of the complaining witnessing, be
6    sent to the prosecutor's office?
7  A  Just making an assumption, I would assume that would be the
8    case, yes.
9  Q  Let's talk about when Ray Spencer was incarcerated after
10   the February 28, 1985 arrest, that time period.  Do you
11   recall whether or not, while Spencer was in jail, you ever
12   visited him in the jail?
13 A  As I previously stated, I think, in prior testimony, in
14   1995 specifically, or '96, I have no recollection of
15   visiting him at all in the jail.
16 Q  Does that mean you may have visited him and you don't
17   remember it?
18 A  I don't believe that I did, but I certainly have no
19   recollection of those events.
20 Q  Do you recall ever receiving any contact from any jail
21   staff concerning your visits to see Spencer?
22 A  If I did not go to the jail, if I have no recollection of
23   going to the jail to see him, I don't recall having any
24   contacts with jailers in regards to those visits that
25   didn't exist.

ZELLNER (James Michael Davidson, 11/5/12)

109

1    Q   Did anyone on the staff at the jail ever contact you or
2        your department about your visits to Ray Spencer?  Whether
3        they occurred or not, was there ever any contact made
4        concerning the issue of you visiting Ray Spencer?
5    A   Contact with me personally?
6    Q   You or your department.
7    A   I can't answer for my department.  I can only answer for
8        me, and no.
9    Q   So you have no personal knowledge that anyone from the jail
10       ever contacted anyone in your department about your alleged
11       visits to Ray Spencer?
12   A   That's correct.  I don't have any personal knowledge.
13   Q   Okay.  If Ray Spencer has testified that you came to the
14       jail, you removed him from the medical area and took him
15       down and interrogated him, would he be incorrect about that
16       memory?
17   A   First of all, I could not have removed him from the medical
18       area.  That simply didn't happen.  The process and the
19       protocol of the jail would not --
20   Q   I'm just asking you -- that's not my question.  I'm not
21       asking you to explain what you think would have happened at
22       the jail.  It's a simple question.  I asked you if Ray
23       Spencer is contending that you were interrogating him at
24       the jail, regardless of where you interrogated him, that he
25       is incorrect, that is untrue?  That's a "yes" or "no."

ZELLNER (James Michael Davidson, 11/5/12)

110

1    A    At this point I did not interview him in the jail.

2    Q    Okay.  Did you ever go to the jail with Detective Krause

3         for her to go in and see Spencer?

4    A    Not to my recollection, no, ma'am.

5    Q    Have you -- did you at any time prior to Mr. Spencer's

6         guilty plea make a statement to him "Your wife used to love

7         you"?

8    A    I have read that in the file.  I do not believe that I ever

9         made that statement, no, ma'am.

10   Q    Well, was that true, that his wife used to love him?

11   A    From the information that was provided in these reports

12        that you provided me, there's certainly an indication that

13        she did.

14   Q    That she did love him?

15   A    Correct.

16   Q    So, at that point in time, you made no such statement to

17        Ray Spencer, correct?

18   A    That's my recollection.

19   Q    Did you ever send Shirley Spencer to attempt to get a Power

20        of Attorney from Ray Spencer?

21   A    Can you explain that question a little bit further?  Did I

22        ever send Shirley Spencer?  What are you saying?

23   Q    Did you ever request -- did you ever request that Shirley

24        Spencer visit Ray Spencer in the jail and sign a Power of

25        Attorney?  Did you ever make that request?

ZELLNER (James Michael Davidson, 11/5/12)

111

1  A  No.

2  Q  Did you ever send Sharon Krause to the jail to visit Ray

3     Spencer, for any reason?

4  A  I could not specifically recall that happening, no, ma'am.

5  Q  Do you recall -- you said you recalled no complaints being

6     made by the jail staff of your visiting Ray Spencer; is

7     that correct?

8  A  I've read in the file where there was a complaint or an

9     allegation made by a correction officer that deals with an

10    officer, not naming me specifically.  That was in the file

11    that you provided me.

12 Q  Are you aware of any witness statements that have been

13    obtained where the witnesses have said you were, in fact,

14    at the jail visiting Ray Spencer?

15 A  I read a statement by or an affidavit by a Mr. Purse, I

16    believe, in which he indicated that was the case, correct.

17 Q  Okay.  And is that affidavit untrue?

18 A  Yes, ma'am.

19 Q  You're positive you never visited the jail --

20 A  I have no specific recollection --

21 Q  -- to see Ray Spencer?

22 A  I visited the jail on a number of occasions.

23 Q  No.  To see Ray Spencer?

24 A  I have no --

25 Q  You're telling us --

ZELLNER (James Michael Davidson, 11/5/12)

112

1    A   I have no recollection of ever visiting Ray Spencer in the
2        jail.  I previously testified to that in 1995.
3    Q   You've also testified that you did not visit him at the
4        jail, correct?  Not that you don't recall, but that you
5        never visited him at the jail?
6    A   Correct.
7    Q   Do you stand by that testimony?
8    A   I do.
9    Q   When is the last time you spoke to Shirley Spencer?
10   A   For any specific reason?
11   Q   Yes.
12   A   I recall a phone call conversation somewhere around the
13       time of the depositions for the federal review in 1995 or
14       '96.  Since that time, I can't recall whether I have seen
15       her at a function on a social basis or not.
16   Q   You can't recall that?  You may have seen her at a social
17       function?
18   A   She belonged to a saddle club that I belonged to, and what
19       I'm saying is that there was -- there were times when I
20       have observed her.  I may have said hello or something of
21       that nature.  We didn't have any long, lengthy
22       conversations.
23   Q   Following your deposition in the habeas matter, did you
24       have any conversation with her?
25   A   I believe that there's an indication that we had a phone

ZELLNER (James Michael Davidson, 11/5/12)

129

1    evidence in this case mysteriously appears, so I want to
2    make sure that I'm provided with that in time to redepose
3    him.
4    Q  (By Ms. Zellner)  I want to ask you if all of the prior
5       testimony you've given under oath is true.
6    A  To the best of my knowledge and ability to recall.
7    Q  Would you agree that the investigation of Ray Spencer was
8       conducted exclusively under your supervision?
9    A  No.
10   Q  Okay.  If not, tell me why you disagree with that
11      statement.
12   A  Well, first of all, I believe the prosecutor would have
13      been involved and --
14   Q  I'm talking about the investigation.
15   A  That would have been part of --
16   Q  Yeah.
17   A  That would have been part of the prosecutor's review.  He
18      may have had --
19   Q  So you're talking about Jim Peters?
20   A  I'm talking about any -- any prosecutor that would have
21      been involved with the Spencer investigation.
22   Q  Well, do you know of any prosecutor other than Jim Peters
23      that was involved with the Spencer investigation?
24   A  I could name one specifically, yes.
25   Q  Who else besides Jim Peters?

ZELLNER (James Michael Davidson, 11/5/12)

132

1  Q  (By Ms. Zellner)  And then my question is:  If you were not

2     exclusively supervising the Ray Spencer investigation, who

3     else was involved in the Ray Spencer investigation

4     supervising it?

5  A  Again, as I indicated previously, the prosecutor -- the

6     prosecuting attorney's office was involved during the

7     course of the investigation.

8          MS. ZELLNER:  Okay.  All right.  I don't have

9     any further questions.

10         MR. FREIMUND:  I don't have any follow-up.

11         MS. ZELLNER:  Do you want to waive or reserve?

12         MR. FREIMUND:  We reserve.

13      Anybody else?

14         MR. BOGDANOVICH:  No.

15         MS. FETTERLY:  No.

16                          (Concluded at 0:00 a.m.)

17                          (Signature reserved)

18

19

20

21

22

23

24

25

133

1                    C E R T I F I C A T E

2              I, DIXIE J. CATTELL, the undersigned Registered

3    Professional Reporter and Washington Certified Court Reporter,

4    do hereby certify:

5              That the foregoing deposition of JAMES MICHAEL

6    DAVIDSON was taken before me and completed on the 5th day of

7    November, 2012, and thereafter transcribed by me by means of

8    computer-aided transcription; that the deposition is a full,

9    true and complete transcript of the testimony of said witness;

10             That the witness, before examination, was, by me,

11   duly sworn to testify the truth, the whole truth, and nothing

12   but the truth, and that the witness reserved signature;

13             That I am not a relative, employee, attorney or

14   counsel of any party to this action or relative or employee of

15   such attorney or counsel, and I am not financially interested

16   in the said action or the outcome thereof;

17             That I am herewith securely sealing the deposition of

18   JAMES MICHAEL DAVIDSON and promptly serving the same upon

19   MS. KATHLEEN ZELLNER.

20             IN WITNESS HEREOF, I have hereunto set my hand

21   this_____day of_____, 2012.

22

23                            _____
                              Dixie J. Cattell, RPR, CCR
24                            NCRA Registered Professional Reporter
                              Washington Certified Court Reporter CSR#2346
25                            License Expires July 16, 2013.


                    Dixie Cattell & Associates
                 Court Reporters & Videoconferencing