# EXHIBIT O

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

172

1
2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

3

4          CLYDE RAYMOND SPENCER,            )         Docket No. C94-5238RJB
                                             )
5                        Petitioner,         )         Tacoma, Washington
                                             )         September 4, 1996
6               v.                           )         1:30 p.m.
                                             )
7          JOSEPH KLAUSER, Warden,           )
           Idaho State Institution;          )
8          CHRISTINE GREGOIRE, Attorney      )
           General, State of Washington.     )
9                                            )
                         Respondent.         )
10         _____   )

11                              VOLUME II
                            TRANSCRIPT OF TRIAL
12              BEFORE THE HONORABLE ROBERT J. BRYAN
                     UNITED STATES DISTRICT JUDGE.
13

14         APPEARANCES:

15         For the Petitioner:          PETER A. CAMIEL
                                        Mair, Camiel & Kovach, P.S.
16                                      710 Cherry Street
                                        Seattle, Washington   98104
17
           For the Respondents:         JOHN J. SAMSON
18                                      DONNA H. MULLEN
                                        Assistant Attorneys General
19                                      Post Office Box 40116
                                        Olympia, Washington   98504-0116
20

21
           Court Reporter:              Julaine V. Ryen
22                                      Post Office Box 885
                                        Tacoma, Washington 98401-0885
23                                      (206) 593-6591

24
           Proceedings recorded by mechanical stenography, transcript
25         produced by Reporter on computer.

COPY

268

1  his motivation for giving those kinds of responses.  I just
2  don't know.
3          THE COURT:  Other questions of the doctor?
4          MS. MULLEN:  No further questions, Your Honor.
5          MR. CAMIEL:  No, Your Honor.
6          THE COURT:  Thank you, Doctor.
7          THE WITNESS:  Thank you.
8          THE COURT:  You may be excused.
9       (Witness excused.)
10         MR. CAMIEL:  We have another witness ready.
11    MANUEL R. GALAVIZ, PETITIONER'S WITNESS, SWORN OR AFFIRMED
12                    DIRECT EXAMINATION
13  BY MR. CAMIEL:
14  Q.  Could you please state your name and spell your last name.
15  A.  Manual Raymond Galaviz.  G-a-l-a-v-i-z.
16  Q.  And it's Dr. Galaviz?
17  A.  Yes.
18  Q.  Doctor, what's your professional address?
19  A.  My professional address, 123 -- 12607 Southeast Mill Plain
20  Boulevard.
21  Q.  What's the nature of your employment?
22  A.  I'm a family physician.
23  Q.  Doctor, where did you attend medical school?
24  A.  University of California, Davis.
25  Q.  And what year did you finish up medical school?

270

1  training regarding diagnosing and treating injuries such as

2  bruises?

3  A.  Yes.

4  Q.  Lacerations?

5  A.  Yes.

6  Q.  Tears in the tissue?

7  A.  Yes.

8  Q.  Doctor, I would like you to turn your attention to 1985, if

9  you would, please.  In the blue notebook in front of you, if you

10 could turn to tab number 2, which is Exhibit No. 2.

11      Do you recognize what the documents are under tab No. 2?

12 A.  These are my progress notes from a visit March 6th, 1985.

13 Q.  Who is your patient?

14 A.  Matthew Hansen.

15 Q.  Have you been recently asked to review these notes?

16 A.  Yes, I have.

17 Q.  How was it that Matthew Hansen became your patient on

18 March 6th, 1985?

19 A.  I believe they called for an appointment and happened to be

20 on my schedule, like many other patients.

21 Q.  Do you know whether or not Matthew Hansen was referred to

22 you by another physician?

23 A.  I do not.

24 Q.  Do you have a recollection of your meeting with Mr. Hansen,

25 Matthew Hansen?

271

1   A.   As far as a photographic appearance, no.  Not specifically.

2   Q.   Apart from the -- independent of the medical record, which

3   is Exhibit No. 2, do you remember the occasion that you met with

4   Matthew Hansen?

5   A.   Vaguely.

6   Q.   Do you remember why it was that he had -- he or his parent

7   had made an appointment to meet with you?

8   A.   Can I refer to my progress notes?

9   Q.   Yes.

10  A.   Well, it was specifically to look for any physical evidence

11  of injury.

12  Q.   All right.  Matthew Hansen, I take it, wasn't a regular

13  patient of yours?

14  A.   Not that I recall at this time.  I have thousands of

15  patients.

16  Q.   You don't recall that you had ever seen him before this

17  time?

18  A.   Not that I recall now.

19  Q.   You indicated that the purpose for the appointment was to

20  look for evidence of injury.  Were you given a suspected cause

21  as to why there might be some injury to look for?

22  A.   I was given the information that Matthew had been sexually

23  abused.

24  Q.   And were you given information as to the type of sexual

25  abuse that was being alleged?

272

1  A.   The information I got was that he was sexually abused anally
2  and orally.
3  Q.   Did you receive information that he had been -- that the
4  sexual abuse had occurred by an adult male, his stepfather?
5  A.   Yes.
6  Q.   Do you recall what type of examination you did when Matt
7  Hansen came in to your office?
8  A.   I initially did a questioning about general information,
9  and proceeded to an exam from the head, neck, down to the
10 muscular-skeletal system.
11 Q.   Do you recall when Matt Hansen came in, was he accompanied
12 by his mother?
13 A.   Yes, she was, I believe, according to my note.
14 Q.   Do you recall her being present during your examination of
15 her son?
16 A.   I believe so.
17 Q.   Do you recall any conversations with Matt Hansen's mother,
18 Shirley Spencer, regarding how it was that she got to you?
19 A.   According to my notes, Matthew had been in counseling and
20 the counselor had learned that Matthew had described anal and
21 oral sexual manipulation.
22 Q.   Do you recall whether or not Matthew Hansen's mother
23 indicated whether or not she had been in touch with police
24 officers or whether police were involved in the investigation of
25 alleged abuse of Matt?

273

1   A.   I do not recall that.

2   Q.   You indicated you conducted an examination.  You started

3   from the head and worked your way down?

4   A.   Yes.

5   Q.   Where did the examination take place?

6   A.   In my office there in Vancouver.

7   Q.   You indicated you started with the head and you worked your

8   way down.  At some point, did your examination include a genital

9   and anal examination?

10   A.   Yes, it did.  An external genital and anal exam.

11   Q.   Why were you conducting a genital and anal examination?

12   A.   For -- well, in a normal five-year pediatric exam, that's

13   part of the exam, but in this case also looking for external

14   injury, trauma.

15   Q.   What kinds of external injury or trauma were you looking

16   for?

17   A.   Anything out of the ordinary.

18   Q.   Were you looking for things such as bruises?

19   A.   Yes, if they were present.

20   Q.   Or redness?

21   A.   Yes, if it was present.

22   Q.   Or swelling?

23   A.   Yes.

24   Q.   Lacerations?

25         THE COURT:   Counsel, you're going at this as though it

274

1  wasn't 4:31.  I assume that Dr. Galaviz would like to get back

2  to Vancouver tonight, if you can finish in four, five minutes.

3           MR. CAMIEL:  I will do the best I can, Your Honor.

4           THE COURT:  I can tell you what he's going to say.  I'm

5  not sure why we are going through all this.  He did a physical

6  exam and it came up negative.

7      Right?

8           THE WITNESS:  Yes.

9           THE COURT:  What else do you have to add?

10 Q.  (By Mr. Camiel)  Doctor, when you conducted the anal

11 examination, how did you do that?

12 A.  I simply looked externally.

13 Q.  How was Matthew positioned?

14 A.  I don't recall exactly.  I generally try to make it as least

15 traumatic to the patient as possible because that's very

16 embarrassing to them, and I simply generally look when they are

17 standing.

18 Q.  Is it possible you had Matthew on your lap or over your knee

19 when you conducted that exam?

20 A.  No.

21 Q.  Had you conducted exams where there had been allegations of

22 child sexual abuse before this exam that you conducted?

23 A.  Since I'm not -- that's not my area, and generally it's an

24 office exam, I can't recall.  Maybe a handful in my five years

25 of being a physician.

275

1   Q.  You submitted an affidavit for the attorney general.  Do you

2   recall your affidavit that you submitted?

3   A.  Yes, I do.

4   Q.  Do you recall indicating to the attorney general that you

5   had -- you had been minimally exposed to child abuse cases?

6   A.  Yes.

7   Q.  When Shirley Spencer came in and explained to you what the

8   allegations were involving Matt, did you feel the need to refer

9   him to another physician to conduct the exam, or did you feel

10  that you would be able to conduct the exam and determine whether

11  or not there were any present injuries that might have been

12  caused by the alleged sexual abuse?

13  A.  The reason for the visit that day was to simply look to see

14  if there was any obvious physical injury to this child.

15  Q.  Did you see anything that even appeared to be suspicious as

16  having been caused by child abuse, sexual abuse?

17  A.  I recall, according to my note, that he was just -- kind of

18  kept to himself and was quiet, but as far as physical, visual,

19  other evidence, I didn't recall any.

20  Q.  Do you believe that if you had -- if there had been physical

21  injury present in Matt's genital or anal area that you would

22  have been able to observe that at the time you conducted the

23  exam?

24  A.  Again, I'm not an expert in this, but I -- if it was there

25  obvious, I would have picked it up.  Externally.

276

1  Q.  After the exam was conducted, do you recall whether or not

2  you were ever contacted by any detectives or police officers

3  concerning your examination of Matt?

4  A.  I don't believe so.

5  Q.  Did you make a report, as is required by statute, concerning

6  suspected child abuse to anyone?

7  A.  I don't recall.

8  Q.  Were you familiar at that time with a statutory requirement

9  that you report suspected child abuse?

10  A.  Yes.  But I think I was in the intermediate.  I wasn't

11  the -- from my recollection, I wasn't -- this was already in the

12  process.  It wasn't new.

13  Q.  So it was your understanding that it had already been

14  reported?

15  A.  The fact that the patient had been with a counselor told me

16  that this was kind of an ongoing thing, part of an ongoing

17  process.

18  Q.  Did you have any understanding as to whether the police or

19  law enforcement had been notified?

20  A.  I believe so.

21  Q.  You believe you understood that they had been notified?

22  A.  Yes.  As far as having been with a counselor, I believe they

23  somehow were involved.  If that was -- that was part of their

24  job.

25  Q.  Did you refer Matt Hansen to anyone else for any additional

1  or follow-up examination?

2  A.  According to my exam and my plan, I did not have that in my
3  plan.

4  Q.  If you had seen something that you were not certain about
5  based on your level of experience, would you have referred him
6  to another physician who had more experience?

7  A.  I think my job was just strictly to look for physical
8  evidence of injury, and so since I did not find any obvious
9  external evidence, at that point then I didn't pursue it any
10 further.

11          MR. CAMIEL:  Thank you.  That's all I have.

12                    CROSS-EXAMINATION

13 BY MR. SAMSON:

14 Q.  Dr. Calaviz, I just have some short questions.

15      First, you're not an expert in the area of child abuse?

16 A.  No, I'm not.

17 Q.  You've only been minimally exposed to that?

18 A.  That's correct.

19 Q.  And at the time, you had only been a practicing doctor who
20 had finished residency for about a year and a half?

21 A.  That's correct.

22          THE COURT:  So far I already heard those three
23 answers.

24          MR. SAMSON:  Yes, Your Honor.

25 Q.  (By Mr. Samson)  Doctor, you testified that if there had --

279

1            MR. SAMSON:   Thank you.

2       Thank you, Your Honor.

3            MR. CAMIEL:   Your Honor, could I ask a couple

4   follow-up?

5                     REDIRECT EXAMINATION

6   BY MR. CAMIEL:

7   Q.   Doctor, if a five-year-old child is penetrated anally and it

8   results in tearing of tissue, can that result in scarring?

9   A.   Conceivably.

10  Q.   And might that scarring still be visible three weeks after

11  the incident of the penetration?

12  A.   It depends where the scarring is.

13  Q.   You didn't see any scarring or any indication that there

14  were any healed injuries, did you?

15  A.   Not to the extent of my exam.

16           MR. CAMIEL:   Thank you.

17           THE COURT:   Thank you, Doctor.  You may be excused.

18           THE WITNESS:   Thank you.

19      (Witness excused.)

20           THE COURT:   Okay.  We will take this up again at 9:30

21  tomorrow morning.

22      (Recessed.)

23                   C E R T I F I C A T E
        I certify that the foregoing is a correct transcript from
24  the record of proceedings in the above-entitled matter.

25  _____        January  15, 1997
         JULAINE V. RYEN                          Date

# EXHIBIT P

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

NKDA

UC                                    Q MEDS

3/6/85            Rm 5

Dr. Garo          5 40

| see below | Height 43½   Wt. 43 pds |
| | Temp | BP. |
| | Head | Chest |
| | General | Playing c̄ coloring book — |
| | Skin | tends to loop to self thong/ |
| | Eyes | cooperative c̄ exam |
| | ENT | |
| | Chest | |
| | Heart | |
| | Abdomen | |
| | Extremities | Well exam |
| | CNS | |

S/ Here for physical exam to R/o injury that
may have been sustained 2° child sexual abuse
by step father.- recently disclosed.  Father's
2 other children (by another woman) were apparently
sexually molested over period of ? 1-3 yr.
Seeing outside counselor / ? where mother
described anal, digital and oral sexual manipulation
c̄/by step father - the last time ~ 3wks/ago.  Was had
no observation. physical you c̄ ā last visit-
c̄ step father ~ 3wks/ago had to appetite, lost 3#

SER −24
00001089
Peter Camiel
Spencer003797

# KAISER
# PERMANENTE
## MEDICAL CARE PROGRAM

| DATE | LOCATION | STATION | |
|---|---|---|---|
| | NAME | | SERVICE COI |

HEALTH RECORD NO.    D.O.B.

GROUP NO.    MEDICARE CLAS

BENEFIT ARRAY.

self more, not interested in doing usual
things + just seemed generally ill x 5 days.
Main concern now is if any physical
injury has been done —
        See P.E.    No evidence for any
        physical injury presently.

VC

FEB 25 1986   KA —    meds —    Km

CLINIC (SB) C/SE: 64    T - 99.8

4 y/o female Pt. c/c cough, (R) ear pain, swollen
Glands (R) + (L) side's of neck
cough + ST x 3-4 days. Ear
x 1 day

c/o  f. above

Px:  ENT.  (R) TM is intact + very red
        Throat is clear
        (R) anterior + posterior cervical
        adenitis

Lungs clear to P+A

Tx.  ROM

Rx:  Amox susp 250 mg / 5 ml 15 TID   150 mg
        Elix of T+L c Cod   2½ ml q 4 h x
        Rec 10-14 days

SER -25

00001090
Peter Camiel

Spencer003798

# EXHIBIT Q

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment (C11-5424BHS)

1

1           UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF WASHINGTON

3                   AT TACOMA

4

   CLYDE RAY SPENCER, MATTHEW      )
5  RAY SPENCER, and KATHRYN E.     )
   TETZ,                           )
6                                  )
                                   )
7           Plaintiffs,            )
                                   )
        vs.                        )   NO. 3:11-cb-05424-BHS
8                                  )
   FORMER PROSECUTING ATTORNEY     )
9  FOR CLARK COUNTY JAMES M.       )
   PETERS, DETECTIVE SHARON        )
10 KRAUSE, SERGEANT MICHAEL        )
   DAVIDSON, CLARK COUNTY          )
11 PROSECUTOR'S OFFICE, CLARK      )
   COUNTY SHERIFF'S OFFICE, THE    )
12 COUNTY OF CLARK and JOHN DOES   )
   ONE THROUGH TEN,                )
13                                 )
            Defendants.            )
14

15     DEPOSITION UPON ORAL EXAMINATION OF JAMES M. PETERS

16

17

18
                    Thursday, November 8, 2012
19                    Olympia, Washington

20

21

22

23

24

25

JOHNSON (James M. Peters, 11/8/12)

73

1   is that they have an inability to differentiate between

2   fact and fantasy?

3   A   The competency determination is made in court, and that is

4   one thing that a court would consider.

5   Q   And in evaluating Kate's competency on December 11 of 1984,

6   did you determine -- you, not a Court -- whether she could

7   distinguish fact from fantasy?

8   A   I don't recall that I did.

9   Q   All right.  And you recall that Rebecca Roe at one point

10   believed that Katie Spencer was unable to distinguish fact

11   from fantasy, at least as of December 27 of 1984?

12   A   I remember Rebecca Roe's report, and I read it again, and I

13   recall that she mentioned something about that in her

14   report in addition to other things in her report suggesting

15   that the child had been abused most probably by her father.

16   Q   Have you seen Rebecca Roe's recent report --

17   A   I saw it yesterday.

18   Q   -- she submitted in early --

19   A   I saw it yesterday --

20   Q   She didn't use those terms --

21   A   We're talking over -- oh, my gosh.

22   Q   Yeah, go ahead.

23   A   I saw it late yesterday afternoon.

24   Q   Okay.  She didn't use those terms that her father most

25   probably had abused Katie, did she?

112

1    Q   I'm not asking you whether -- other cases or anything like
2        that.  Did you personally supervise the Spencer
3        investigation?
4    A   Absolutely not.
5    Q   Did Art Curtis supervise the Spencer investigation?
6    A   I don't believe so.  I don't know what he -- I don't know
7        what happened in his --
8    Q   Can you --
9    A   I don't know what happened in his office, but I certainly
10       doubt it.
11   Q   And did any other prosecutor that you're aware of supervise
12       the investigation?
13   A   The only other prosecutors that were involved were just
14       tangential for routine matters, and I'm sure they did not.
15   Q   Who were they?
16   A   Mike Foister was present at the initial arraignment when
17       Mr. Spencer turned himself in in January.  And Jim Gavid, I
18       saw a note in the file that he must have appeared at a
19       hearing in March or April.  It was in his handwriting.
20       Other than that, the only other prosecutor that was
21       involved was -- of course, you know about Rebecca Roe, and
22       then the case was assigned to Barb Linde from the King
23       County prosecutor's office for about three and a half
24       months.
25   Q   Now, speaking of Rebecca Roe, she's a specialist in sex

JOHNSON (James M. Peters, 11/8/12)

120

1    appear to be specifically sexual; others could have been

2    indicative of lots of things.  And I'm pretty sure that's

3    what I said.

4    Q  Okay.  With regard to Katie Spencer's excessive

5       masturbation, is that documented anywhere in the file?

6    A  Yes, it's in Sharon Krause's report of Shirley Spencer.

7    Q  Okay.  How about --

8    A  Now, you may have --

9    Q  -- the underwear --

10   A  I'm sorry, Counsel.

11         Some inferences may have to be drawn.  I have some

12   notes.  Can I refer to them?

13   Q  Sure.

14   A  Okay.  This is -- these are notes that I took last week

15      from Sharon Krause's interview with DeAnne Spencer from

16      October 15th.  It would have been October 15, 1984.

17              MR. JOHNSON:  And could we just mark his notes

18   as Exhibit No. 44 if they are not deemed privileged?

19              MS. FETTERLY:  That's fine.

20              THE WITNESS:  Okay.

21              MS. FETTERLY:  44.

22                          (EXHIBIT NO. 44 MARKED)

23              THE COURT REPORTER:  44's been marked.

24   A  So with regard to what I call possible behavioral

25      indicators or red flags, some of which could mean lots of

134

1     cleared, and her brother said she made up stories; is that

2     correct?

3  A  That's obviously a multiple, compound question.  My -- I

4     declined or, excuse me, I expressed my personal belief at

5     the time that we would have difficulty proving the case,

6     and then in the context of all the other things that were

7     on my plate at that time, and our "You file it, you try it"

8     rule, I didn't want to try this case.  So my recommendation

9     was not to pursue it.

10  Q  Because it was weak, right?

11  A  It was definitely weak.

12  Q  All right.  Now, what did you do on the case with regard to

13     the case between November 27, 1984, and December 11 of

14     1984?

15  A  Nothing.  I was very busy with another -- with something

16     else.

17  Q  When was that meeting with Karen Stone?  I guess you said

18     maybe that was Art Curtis, but just to mention, a

19     prosecutor spoke with Sharon Krause, and you said you

20     weren't sure if that was Art Curtis or yourself.  Has

21     anything refreshed your recollection as to whether you had

22     that meeting with Sharon Krause about Karen Stone?

23  A  I think -- your question assumes something that may not be

24     accurate.  You're assuming there was a meeting.  I would --

25     more likely --

136

1    and 11 of 1984 was to determine if abuse really had
2    occurred; is that correct?
3  A  No.
4  Q  So your testimony that determining whether or not Katie
5    Spencer had been abused was not anything you were trying to
6    determine when you met with Katie Spencer on December 10
7    and December 11 of 1984?
8  A  I am saying that, yes.
9  Q  Okay.
10 A  That had already been determined by the investigators.  My
11   job was to find out if she was competent and could testify.
12 Q  If Katie Spencer had told a consistent story to you on
13   December 11 of 1984 that you believe established that Ray
14   Spencer had abused her sexually, is it -- and you had
15   videotaped that interview, you would have used that video
16   as evidence of probable cause; is that correct?
17 A  No, the video wasn't evidence of anything.  It was the
18   child's statement.  Whether there was a video or not would
19   have been irrelevant.  Prior statements that she made to
20   Sharon and Shirley and Ann Link were not videoed, but they
21   were evidence of probable cause.
22 Q  So you would not have used a videotape reflecting Katie
23   Spencer telling a consistent, believable story about sexual
24   abuse as evidence of probable cause in further proceedings
25   regarding Ray Spencer; is that correct?

JOHNSON (James M. Peters, 11/8/12)

145

1       to probable cause to arrest, wouldn't you have?

2   A   Counsel, if I had been the lead prosecutor in the case from

3       the get-go, the tape would have been disclosed from the

4       get-go. I was not the lead prosecutor in the case from the

5       time it was charged until probably the second or third week

6       of April 1985.

7   Q   Who was that?

8   A   Barb Linde.

9   Q   Barb Linde was the lead prosecutor in the case in the time

10      period you just described; is that correct?

11   A   She was.

12   Q   Is there any documentation that reflects that?

13   A   Yes, there is.

14   Q   What is that?

15   A   There are three letters from Art Curtis dated January 9,

16      1985. One is to Norm Maleng, the King County prosecutor,

17      thanking him for assigning a deputy prosecuting attorney,

18      outside counsel, to prosecute Mr. Spencer.

19          The second letter is to Rebecca Roe forwarding the

20      reports to her and similarly thanking King County for

21      agreeing to take over the case. And the third letter is to

22      Leland Davis, the Chief of Police of Vancouver, similarly

23      saying that the case had been referred to outside counsel,

24      and at the end of the letter asking him to relay that to

25      his officers. Because of the sensitive nature of the case,

JOHNSON (James M. Peters, 11/8/12)

146

1    it had been referred to outside counsel.  There's
2    additional documentation of that if you'd like me to
3    clarify.
4  Q  Sure.
5  A  In my review of the prosecutor's file, which I've done in
6    the last couple of months, I encountered a note.  It was a
7    While-You-Were-Out note that was written by a receptionist
8    on April 4, 1985, documenting a call from Barb Linde to Art
9    Curtis requesting a call back.  I also noted a -- one of
10   those small-sized yellow pads, the five-by-seven yellow
11   pads, a copy of that -- it wasn't yellow; it was a copy --
12   in Art Curtis' handwriting of notes that he took, and I
13   recognized Mr. Curtis' handwriting because I worked with
14   him first in the public defender's office for a year and
15   then more than ten years in the prosecutor's office,
16   documenting his call back to Barb Linde on April 4th, 1985.
17       And, by the way, I was in Hawaii at that time.  I
18   wasn't even in the office, where Barb Linde informed
19   Mr. Curtis that she had an aggravated murder trial
20   scheduled for the last week of May and the first week of
21   June of 1985.
22       Additional documentation is -- are letters dated, as
23   I recall it, May 9.  They wouldn't have been written on
24   May 9 because I was in Sacramento with Jim Rulli, but they
25   would have been dictated.  We didn't have computers back

JOHNSON (James M. Peters, 11/8/12)

154

1   Q  Did you take her to the mall that day?

2   A  I did not.

3   Q  Would that have been proper?

4   A  For me to take a child away from the office to a shopping

5      location?  Would have been improper.

6   Q  Yeah, that's my question.

7   A  For me as a male, no, that would have been improper.  I

8      wouldn't have done that.

9   Q  All right.  Did you review Katie's story with her on that

10     day?

11         MS. FETTERLY:  Are you talking about December 10

12     again?  Are we still --

13         MR. JOHNSON:  Still are, yes.

14   A  I've told you I don't have any recollection of the meeting.

15      I know it happened.  I just don't have recollection of it.

16   Q  (By Mr. Johnson)  Just trying to ring some bells.

17         Was Sharon Krause on that day with you and Katie?

18   A  I don't recall the meeting, so I'm not sure.  I can

19      speculate, but I don't recall.

20   Q  All right.  Do you know if Sharon Krause took any notes?

21      Does that ring a bell about what happened on that day with

22      Katie Spencer?

23   A  As I said, I don't recall independently the meeting.

24   Q  Any idea about how long the meeting lasted, then?  If you

25      don't recall, could it have lasted all day or maybe two

158

1   Q   For whom?

2   A   For Mr. Curtis and for myself and for whoever else

3       eventually needed it if a decision was made to file

4       charges.

5   Q   Like Ray Spencer?

6   A   Eventually.

7   Q   Because he absolutely would have needed it had you made a

8       decision to file charges, correct?

9           MS. FETTERLY:   Object as to form.

10          If you can answer.

11  A   Yes.

12  Q   (By Mr. Johnson)  Is it also true that you decided to

13      videotape Katie Spencer so that you could establish that

14      she could tell the story on her own?

15  A   I really don't recall my motivation.  You're asking me what

16      my motive was 28 years ago, and I don't recall that.

17  Q   You would have recorded this or whoever decided to record

18      it -- let me strike that.

19          The interaction with Katie Spencer would have been

20      recorded so that one could ascertain if she could tell her

21      story without suggestions from you, the interviewer; is

22      that correct?

23  A   It was recorded to document what she said.

24  Q   And one of the purposes of that was to determine whether or

25      not she could tell her story without suggestions from you,

1   Q  All right.

2   A  Not with equipment that was available there, though.

3   Q  Okay.  Had you ever been involved in a case where an

4      alleged child sex abuse victim had been videotaped at the

5      Clark County Sheriff's office?

6   A  No, I don't think so.

7   Q  After this, had you ever -- did you ever do it again?

8   A  Did I ever do it again?

9   Q  Yes.

10          MS. FETTERLY:  Are you suggesting in that

11      question that this witness videotaped another child

12      witness, or are you suggesting that Clark County Sheriff's

13      office did?  Your question is unclear.

14   Q  (By Mr. Johnson)  Okay.  Were you ever involved in an

15      interview of a child sex abuse victim at the Clark County

16      Sheriff's office after this interview with Katie Spencer?

17   A  Oh, I have no idea.  I don't recall.

18   Q  Do you recall --

19   A  I can tell you -- I can tell you I never ever did an

20      investigative interview with a child, meaning an initial

21      interview, a fact-finding interview.  I've never done one

22      of those with any witness.

23   Q  I'm talking about -- we both know there's an interpretation

24      difference of opinion, but what I'm asking you about is the

25      videotaping of a child sex abuse victim.

JOHNSON (James M. Peters, 11/8/12)

164

1    Were you, Mr. Peters -- I'm talking about you -- ever
2    again after December 11, 1984, involved in interviewing a
3    child witness at the Clark County state -- Sheriff's
4    office --
5  A  No.
6  Q  -- with regard to sex abuse allegations?
7  A  No.  Videotaping an interview of the child?  Is that what
8    your question was?
9  Q  Yes.
10 A  No.
11 Q  Yes.  All right.  So this one stuck out in your mind; is
12   that correct?
13 A  Which one stuck out of in my mind?
14 Q  This videoed interview of Katie Spencer.  It's the only one
15   you ever did over there, right?
16 A  The fact of the video interview stuck out in my mind, yes.
17   The fact of the interview.
18 Q  You wouldn't -- okay.
19    You never caused this videotape to be disclosed to
20   anyone, did you?
21 A  I believe Mr. Curtis knew about it and certainly Sharon
22   Krause knew about it.
23 Q  Did you cause it to be disclosed to Art Curtis?
24 A  I just testified that I believe Art Curtis knew about it.
25   What do you mean by "cause it to be disclosed"?  Maybe

193

1      testifying to, but we're just going to talk about Katie's

2      words.  Okay.  Now, you said that you -- you talked about

3      why you videotaped this.  Is it fair to say that you

4      videotaped this interview because you didn't feel you could

5      properly rely on Sharon Krause's reports to establish

6      Katie's competency?

7  A  Absolutely not.  She was a five-year --

8  Q  Had Sharon --

9  A  She was a five-year-old, and it was clear from the reports

10     that her competency was questionable.

11  Q  Thank you.

12        After -- I'm going to come back to that, but I want

13     to ask you, did you determine after you evaluated Katie's

14     competency on December 11, 1994, [sic] that she was

15     competent to provide evidence against Ray?

16  A  No, I determined that she might be competent.  She probably

17     would be competent, not that she was competent.  It was

18     questionable.  I've always believed that this was a very

19     difficult and questionable case.

20  Q  Did you determine that Katie Spencer was competent to

21     provide evidence against Ray such that he should be

22     arrested?

23  A  I believed that she was competent to testify, that if you

24     look at the interview as a whole and not just pick out

25     little parts, that she was -- there was a good chance she

JOHNSON (James M. Peters, 11/8/12)

246

1  that you had a duty to disclose certain items of evidence,
2  correct?
3  A  Witness statements, exculpatory material, yes.  Certain
4  materials --
5  Q  That wasn't my question.
6  A  Well, what is your question then?
7  Q  Back in 1984, you understood that you had a duty as a
8  prosecutor to disclose certain items of evidence to the
9  defense?
10 A  Yes.
11 Q  All right.  And at that time were you in the habit of
12 disclosing irrelevant materials to the defense in a
13 criminal prosecution?
14 A  Yes.
15 Q  Okay.  So you might turn over anything; is that correct?
16 A  Yes.
17 Q  Even if it had nothing to do with the case?
18 A  Well, if it was -- no, if it had nothing to do with the
19 case, it wouldn't have been in the file.
20 Q  You agree the Katie Spencer medical report would have been
21 disclosed to the defense as a routine matter if you had it,
22 correct?
23 A  I do, and I believe it would have been had the case gone to
24 trial because Sharon and I would have got together and
25 compared her reports with the reports that were in the

JOHNSON (James M. Peters, 11/8/12)

247

1    prosecutor's file, which I had just taken over a couple
2    weeks before, and anything that was not there would have
3    been disclosed.
4  Q  So you're saying that there was no obligation to disclose
5    it even if you had it prior to the plea of Ray Spencer?
6  A  I didn't say that, Counsel, at all.
7              MS. FETTERLY:   No.
8  Q  (By Mr. Johnson)  Okay.  All right.  You agree that medical
9    exams of potential sexual abuse victims can help you either
10   confirm or refute the allegations?
11 A  Absolutely.
12 Q  Okay.  And do you differentiate between types of rape?
13   Have you done that in your experience?
14 A  Under Washington law the definition of rape includes
15   oral-genital contact, and it includes penetration of the
16   genital area or the rectum, however slight.  So, yes, you
17   can distinguish types of rape under Washington law, at the
18   time, anyway.
19 Q  And have you ever offered opinions that there is a
20   difference between a nonforcible rape and a forcible rape?
21 A  Oh, yes, there's definitely a difference.
22 Q  Okay.  What's a nonforcible rape?
23 A  Well, there are sex offenders whose modus operandi does not
24   involve force, and in particular with child molesters, in
25   particular, incest cases, where the offender has a loving

248

```
 1         relationship with the child, but also has a sexually
 2         deviant interest, there is often no force, in contrast with
 3         a stranger or somebody motivated by anger or power or
 4         control who might not care about the child and might engage
 5         in forcible rape.  That's the distinction, as I understand
 6         it, in my experience.
 7    Q    Okay.  We talked a little bit about offering legal advice
 8         to the police.  Do you know what I'm talking about when I
 9         talk about the Salmon Creek Motel incident?
10    A    The incident with Little Matt?
11    Q    Yes.  Directing you to that, did you offer legal advice to
12         the police regarding following up on the incident with
13         Little Matt at that motel?
14    A    Well, I -- as I recall, and my recollection is vague, but,
15         as I recall, Sharon came in with information, and I was
16         looking for some corroboration, so I asked them to go out
17         and see if they could get some corroboration.  I don't
18         think that's legal advice.  I think that's asking for
19         follow-up information pursuant to making a decision about
20         whether to seek an arrest warrant.
21    Q    Who did you ask and what did you ask them to do?
22    A    I don't have any recollection.  It's too long ago.
23    Q    Mr. Davidson told him you told -- strike that.
24             Mr. Davidson told us that you told him to go over to
25         the Salmon Creek Motel and do some things.  Do you recall
```

JOHNSON (James M. Peters, 11/8/12)

249

1       that?

2    A   I don't recall it, but it certainly could have happened,

3        and if it did, it's probably reflected in the affidavit.

4    Q   And you were asking then -- you would have been asking them

5        to gather evidence, correct?

6    A   Follow-up information.  Routine --

7    Q   That would be to gather evidence regarding the incident

8        with Little Matt, as you described it, correct?

9    A   Yes.

10   Q   I just want to go through some things here.  Did you

11       disclose to Ray Spencer or to his lawyer at any time the

12       report of the medical exam of Matt Hansen?

13   A   No.  I don't believe I ever saw that report.

14   Q   Did you disclose to Ray Spencer or his lawyer at any time

15       the Rebecca Roe report?

16   A   No, I don't believe that was disclosable.  That was just an

17       opinion of another prosecutor.

18   Q   Did you disclose to Ray Spencer or his lawyer at any time

19       any information whatsoever to apprise them that you had met

20       with Katie on December 10 of 1984?

21   A   No.

22   Q   Did you disclose to Ray Spencer or to his lawyer at any

23       time any information whatsoever that you had conducted a

24       videotaped interview of Katie Spencer on December 11 of

25       1984?

JOHNSON (James M. Peters, 11/8/12)

257

1    A   Oh, yes.

2    Q   All right.  And you traveled out of the jurisdiction from

3        Clark County to Sacramento, California, in this case,

4        didn't you?

5    A   Yes, I did.

6    Q   Back then, was that your custom and practice?

7    A   No, it was only time I ever did that, except going to

8        Portland perhaps or somewhere in the Portland metropolitan

9        area.

10   Q   Would you agree with this statement, as we sit here today,

11       there were problems with the investigation and prosecution

12       of this case?

13              MS. FETTERLY:  Objection.

14   A   There are challenges with every prosecution, and those

15       challenges normally, if the defense attorney believes or

16       the defendant and the defense attorney believe it's

17       sufficient, are weighed by a jury in determining the

18       credibility of the evidence.  There are always challenges.

19   Q   That word "challenges," if a case has challenges, would you

20       say that's the same thing as a case being unwinnable?

21              MS. FETTERLY:  Object to the form.  Are you

22       assuming by that that it was unwinnable all the way up to

23       the time of the guilty plea?

24              MR. JOHNSON:  I'm not assuming anything.  I'm

25       asking if he has an understanding of the English language.

263

1                       C E R T I F I C A T E

2              I, DIXIE J. CATTELL, the undersigned Registered

3    Professional Reporter and Washington Certified Court Reporter,

4    do hereby certify:

5              That the foregoing deposition of JAMES M. PETERS was

6    taken before me and completed on the 8th day of November,

7    2012, and thereafter transcribed by me by means of

8    computer-aided transcription; that the deposition is a full,

9    true and complete transcript of the testimony of said witness;

10             That the witness, before examination, was, by me,

11   duly sworn to testify the truth, the whole truth, and nothing

12   but the truth, and that the witness reserved signature;

13             That I am not a relative, employee, attorney or

14   counsel of any party to this action or relative or employee of

15   such attorney or counsel, and I am not financially interested

16   in the said action or the outcome thereof;

17             That I am herewith securely sealing the deposition of

18   JAMES M. PETERS and promptly serving the same upon MR. DOUGLAS

19   JOHNSON.

20             IN WITNESS HEREOF, I have hereunto set my hand

21   this_____day of_____, 2012.

22

23                       _____
                          Dixie J. Cattell, RPR, CCR
24                        NCRA Registered Professional Reporter
                          Washington Certified Court Reporter CSR#2346
25                        License Expires July 16, 2013.


Dixie Cattell & Associates
Court Reporters & Videoconferencing