# EXHIBIT R

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENDER, MATTHEW        )NO. C11-5424BHS
RAY SPENDER, and KATHRYN E.       )
TETZ,                             )
                                  )
                  Plaintiffs,     )
                                  )
vs.                               )
                                  )
FORMER DEPUTY PROSECUTING ATTORNEY )
FOR CLARK COUNTY JAMES M. PETERS,  )
DETECTIVE SHARON KRAUSE, SERGEANT  )
MICHAEL DAVIDSON, CLARK COUNTY     )
PROSECUTOR'S OFFICE, CLARK COUNTY  )
SHERIFF'S OFFICE, THE COUNTY OF    )
CLARK and JOHN DOES ONE THROUGH    )
TEN,                               )
                                   )
                  Defendants.      )
_____)


VIDEOTAPED/VIDEOCONFERENCED DEPOSITION OF:

WILLIAM BERNET, M.D.

Taken on Behalf of the Defendant/Michael Davidson

December 4, 2012


_____

VOWELL & JENNINGS, INC.
Court Reporting Services
207 Washington Square Building

214 Second Avenue North

Nashville, Tennessee 37201

(615) 256-1935

1        Tape No. 1.  Going off the record.  The time is

2        15:25.

3             (Break was taken from 3:25 p.m. until

4        3:37 p.m.)

5             THE VIDEOGRAPHER:  We're back on the

6        record.  Here marks the beginning of Tape

7        No. 2.  The time is 15:37.

8   BY MR. FREIMUND:

9        Q    Dr. Bernet, I'm still asking you questions

10  about your March 1997 article entitled "Practice

11  Parameters for the Forensic Evaluation of Children

12  and Adolescents Who May Have Been Physically or

13  Sexually Abused."  And I'm still on page 434 of that

14  article.  And I'd like to take you to subsection C

15  entitled "Process of the Interview of the Child

16  Including Mental Status Examination."

17            Do you see where I am?

18       A    Yes, I do.

19       Q    The first step there is you say choose a

20  relaxed and neutral location.

21            Would you agree that the hotel room that

22  Sharon Krause interviewed Kathryn Spencer and

23  Matt -- Matthew Spencer for the first time was a

24  relaxed and neutral location?

25       A    No.

1      Q     What was un-relaxing and nonneutral about

2    that location?

3      A     It's not neutral because the interviewer's

4    hotel room is a personal space.  And it would be

5    pretty unusual to take a child into kind of the

6    personal space or the personal living space or even

7    bedroom of the interviewer.

8      Q     Would you agree that the police department

9    where some of the interviews occurred was a relaxed

10   and neutral location?

11     A     I don't know enough about it to say that.

12   I think in one of the interviews there was some

13   noise going on that they commented on.  I mean, I --

14   I don't -- I don't know how to characterize a place

15   that I'm not really familiar with.

16     Q     What would you regard as an adequately

17   relaxed and neutral location in which a police

18   officer should conduct an interview of a suspected

19   child sexual abuse victim?

20     A     I think an office space is okay if --

21   ideally, there would be a way for the child to sit

22   in a chair, you know, and if -- that the child --

23   for instance, if there's a table, where the child

24   can reach the table and the officer can sit at the

25   table too.  I mean, I think that's a common

1    So I'm not objecting to use -- I'm not giving a

2    broad objection to the use of the dolls.

3        Q     Before I close, I just want to confirm,

4    are the opinions that you've set forth in this

5    Exhibit 1 and then the supplement to your initial

6    report, do those documents and the opinions you

7    provided today contain all of your opinions that you

8    have made to date in this case?

9        A     Yes.  I guess -- you see the second -- the

10   second report actually has more opinions in it than

11   the report you and I have been looking at.  And I

12   guess to be specific about the opinions -- well, let

13   me just go down this real quick just to make sure

14   we're on the same page.

15            I had an opinion that the interviews

16   conducted by Detective Krause were flawed in

17   different ways, of different kinds of questions.

18   That the interview conducted by Mr. Peters was

19   flawed because of the suggestive, leading, and

20   repetitive questions, and he was coercive.

21            And then I have an opinion that the

22   interviews conducted by both Detective Krause and

23   Mr. Peters were improper, coercive, and

24   psychologically abusive to the extent that the

25   interviewers knew or should have known that they

1    say -- I should say -- that they knew or should have

2    known that it -- it could lead to unreliable

3    information.  And I want to pin you down on that,

4    sir.

5            Are you saying that they knew that these

6    kids were giving them false information, or are you

7    saying they knew or should have known that because

8    of the use of repetitive questioning on some of the

9    kids, leading questions on some of the kids, that

10   they knew that false information was coming from

11   those kids?

12       A    Yes.  I would say that they knew or should

13   have known that the information was unreliable and

14   that it could well be false.

15       Q    Okay.  But let's make this distinction,

16   and I want to be careful about it.

17           Wouldn't you agree that there's a

18   difference between something being unreliable and

19   something being categorically false?

20       A    Yes.  You know, I think I tried to make

21   the distinction in the very last sentence of the

22   discussion part of that conclusion on the next page.

23   And I say:  "When interviews are conducted in that

24   manner, it is likely that false information will be

25   elicited and the children's statements become

1    children on a regular basis would have known that

2    that's a problem.  And in fact, Detective Krause,

3    herself, said that.  She, herself, said in her own

4    report I'm being careful not to ask leading

5    questions.  So she did know the general principles

6    that I have been talking about.

7         Q    Okay.  Well, let's go to page 19 of

8    Exhibit 2.  And in the first full paragraph there,

9    you quote Dr. Esplin's conclusion as being:  "Given

10   the standard of care and the information available

11   to field professionals during the 1984 or the 1985

12   time frame, reasonable field professionals would not

13   have known that the investigative techniques

14   utilized in this case were so coercive and abusive

15   that false information would result."

16            What I'm suggesting to you, Dr. Bernet, is

17   that's a diametrically opposite conclusion from what

18   you reached in -- on page 22 under No. 3.

19        A    Okay.

20        Q    Would you agree with that?

21        A    Yes, I think I would.  And I think the

22   difference is that Dr. Esplin is taking the position

23   that those front-line field professionals are

24   only -- their behavior is only determined by

25   whatever written guidelines existed.  And I'm taking

1                REPORTER'S CERTIFICATE

2              I certify that the witness in the

3     foregoing videotaped/videoconferenced deposition,

4     WILLIAM BERNET, M.D., was by me duly sworn to

5     testify in the within-entitled cause; that the said

6     deposition was taken at the time and place therein

7     named; that the testimony of said witness was

8     reported by me, a Shorthand Reporter and Notary

9     Public of the State of Tennessee authorized to

10    administer oaths and affirmations, and said

11    testimony, pages 7 through 171, was thereafter

12    transcribed into typewriting.

13             I further certify that I am not of counsel

14    or attorney for either or any of the parties to said

15    deposition, nor in any way interested in the outcome

16    of the cause named in said deposition.

17             IN WITNESS WHEREOF, I have hereunto set my

18    hand the 11th day of December, 2012.

19

20

21

22

23

24
                 Deborah J. Harris, TLCR No. 472
25               My commission expires: 5/03/2016

# EXHIBIT S

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

STANLEY ABRAMS, PH.D.
*Clinical Psychologist*

GOOD SAMARITAN MEDICAL BUILDING
2222 N.W. LOVEJOY • SUITE 401
PORTLAND, OREGON 97210
(503) 221-0632

October 11, 1984

Sgt. Michael Davidson
Clark County Sheriff's Office
Vancouver, WA

Re:  Raymond Spencer

Dear Sgt. Davidson:

A polygraph examination was administered to the above
named subject at your request on September 21.  An attempt
was made to determine if he were truthful in his denial of
ever having any sexual contact with his daughter Katherine.
To ascertain this, the following critical questions were
asked:

1.  Have you ever fondled your daughter's genitals?  No
2.  Regarding your daughter, have you ever had any oral
    sexual contact with her?  No
3.  Have you ever attempted to penetrate your daughter?  No

The test was composed of eleven questions and was repeated
five times.  Despite the additional administrations of the
test, the findings had to be considered inconclusive.  Numer-
ically, there was a slight trend in the direction of deception,
but again, a definite decision could not be reached.  Because
of this Officer Spencer was reexamined on September 24.  This
time the critical questions consisted of:

1.  Have you at any time had oral sex with Katherine?  No
2.  Regarding Katherine, have you ever had oral sex with
    her?  No
3.  In so far as oral sexual contact is concerned, has there
    ever been any with your daughter?  No

This test was made up of ten questions and was administered
three times.  The subject demonstrated consistently greater
physiologic responses on the three critical questions listed
above as compared to the control items.  While this was sufficient
to be indicative of deception, Officer Spencer's scores were
not very high so that the examiner does not feel as certain
about the validity of these findings as in most examinations.
Hopefully, further corroboration of these results will be obtained.

Cordially,

Stanley Abrams, Ph.D.

SA/cj

# EXHIBIT T

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA


CLYDE RAY SPENCER, MATTHEW
RAY SPENCER, and KATHRYN E.
TETZ,

            Plaintiffs,

    vs.

FORMER DEPUTY PROSECUTING
ATTORNEY FOR CLARK COUNTY
JAMES M. PETERS, DETECTIVE
SHARON KRAUSE, SERGEANT
MICHAEL DAVIDSON, CLARK
COUNTY PROSECUTOR'S OFFICE,
CLARK COUNTY SHERIFF'S
OFFICE, THE COUNTY OF CLARK
and JOHN DOES ONE THROUGH
TEN,

            Defendants.
                        /

Case No. C11-5424BHS


DEPOSITION OF DAVID RASKIN, Ph.D.
Pages 1 - 140, inclusive

Wednesday, December 5, 2012
12:30 p.m. AKST

Taken by Defendant
at
59975 Eider Avenue
Homer, Alaska 99603


Reported by:  Leonard J. DiPaolo, RPR, CRR

DAVID C. RASKIN, Ph.D. - December 5, 2012

1  would be certainly the ones to ask, "Well, let's do our

2  own evaluation.  I want to see independently what we think

3  is there."

4      Q.   Is it possible that Sergeant Davidson and maybe

5  his superiors in the sheriff's office elected not to do

6  that evaluation?

7      A.   Anything is possible.  If they did, then I would

8  question what their motives were for doing or not doing

9  that.  It certainly is not a very good procedure at the

10  very least, and it's dangerous at best because -- at

11  worst, I should say, because here you have, as I said, a

12  very serious situation.  You have a rather tentative

13  equivocal report from the examiner, and to proceed as they

14  did and tell the examinee that he failed both tests on the

15  basis of such an equivocal report without doing an

16  independent evaluation is a very dangerous and risky

17  procedure.

18      Q.   Now you base your statement that Mr. Spencer was

19  told that he failed both.  You base that upon your

20  interview with Mr. Spencer, do you not?

21      A.   In part, but also in the documents that I

22  reviewed.

23          Excuse me, as I recall, Sergeant Davidson

24  told Mr. Spencer that he thought that he failed the first

25  test, and, "I think you did something."  And that was not

1      A.    He is deceased.

2      Q.    Now, turning to Dr. Abrams, would you not agree

3    that he was considered to be a qualified polygraphy expert

4    in the Pacific Northwest during the 1980s?

5      A.    He had that reputation among many people.  He also

6    had a somewhat different reputation among other people.

7      Q.    Did you have any professional disagreements with

8    Dr. Abrams over the years regarding the use of polygraphs?

9      A.    Well, not regarding the use of polygraph so much

10   as the actual practice of polygraph in terms of how tests

11   should be constructed, how they should be interpreted, how

12   they are administered.

13     Q.    What were those disagreements that you had?

14     A.    Well, it actually started the very first time that

15   I met Dr. Abrams.  Do you want me to detail that -- those

16   events?

17     Q.    Yes, go ahead, please.

18     A.    Well, I don't remember the exact year, but if my

19   memory serves me correctly, it was about 1980 -- I'm

20   sorry, 1976, I think, when I was asked to participate in

21   the case of the United States versus Patricia Hearst.  And

22   that participation consisted of arranging and conducting

23   polygraph examinations on Ms. Hearst with regard to her

24   role in the robbery of the Hibernia Bank in San Francisco.

25               And a team of experts was assembled by the

DAVID C. RASKIN, Ph.D. - December 5, 2012

1   office of Al -- Mr. Bailey's partner, I'm trying to

2   remember his last name.  And the person heading that team

3   was a man named Charles Zimmerman, a polygraph examiner.

4   Mr. Zimmerman arranged for Dr. Abrams, myself, and my then

5   graduate student, Dr. Gordan Barland, to come to San

6   Francisco to conduct polygraph examinations on Ms. Hearst.

7             And when we arrived, the first thing I

8   discovered -- I had laid out certain ground rules for my

9   participation, which included everybody agreeing in

10  advance what questions would be asked, everybody

11  independently reviewing the results, and only if we all

12  independently agreed on the results would we produce a

13  written report if asked to do so.

14            When I arrived, I found that Mr. Zimmerman

15  had already violated that by conducting a test himself,

16  but we ignored that because it was a worthless test.

17            Then we began to do work on the case.  And

18  we conducted two tests on two different days of Ms.

19  Hearst.  The results were mixed because they did not

20  accept my suggestions that they ask very direct, concrete

21  questions only, such as, "Did they threaten to kill you if

22  you didn't participate in the bank robbery?"

23            They had a very strange defense that you

24  may be aware of that involved brainwashing, and that was

25  factored in to how the polygraphs should be used, and that

DAVID C. RASKIN, Ph.D. - December 5, 2012

28

1    was very, very poor and bad polygraph technique.

2                   Mr. Abrams -- Dr. Abrams did not object to

3    that, so that was the first sign that I had the feeling

4    that he was not exactly up to standard.

5                   Then we conducted two tests with questions

6    that were insisted upon by the defense team, to which I

7    objected, but those were the questions they wanted.  We

8    did them; she had mixed results because they were improper

9    questions.  They involved state of mind questions.

10                  And we went back to the office to

11   independently review these tests, and in the meantime Mr.

12   Zimmerman had told Mr. Bailey she had passed these tests,

13   and they had contacted the news media about it.  And I had

14   to correct that and catch Mr. Bailey in the judge's

15   chambers and had him come out to tell him that he was

16   misinformed and to tell the news media to stop.

17                  Then we went back to the office and we all

18   sat down with the charts to independently evaluate them.

19   Meanwhile, Mr. Zimmerman said we must write a supportive

20   report.  Well, we sat down and all independently evaluated

21   the charts.  She had clear problems on the state of mind

22   questions, which I predicted, and then student Barland,

23   now Dr. Barland, also agreed that there were the same

24   problems.

25                  Dr. Abrams had misinterpreted the charts

1   completely and did not see those problems.  And it became

2   clear to me when we looked at his score sheets after we

3   were all finished that he did not know how to correctly

4   interpret polygraph charts.

5           So we ended up in a meeting with Mr.

6   Zimmerman, and Mr. Zimmerman said, "Well, we have to write

7   a supportive report."  And I said to him, "What do you

8   mean by a supportive report?"  He said, "We have to write

9   a report that supports her truthfulness."  And I said

10  "Sorry, Charlie," I had known him from other cases, "I

11  can't do that because it's not correct."  Dr. Abrams never

12  objected.  And that made me, again, very concerned.

13          And then we ended up conducting two more

14  tests on her.  I conducted one that was properly designed,

15  which she clearly passed.  Dr. Abrams conducted one using

16  questions that I had told him the night before, "That

17  question shouldn't be used, it's an improper question and

18  it is not a proper polygraph question."

19          He asked the question anyway.  She had a

20  problem with the question.  He scored her as truthful.  I

21  scored her clearly as having a problem on that question.

22  Another indication that he did not know how to formulate

23  questions, he did not know how to properly conduct a test,

24  and he did not know how to correctly interpret the

25  results.

DAVID C. RASKIN, Ph.D. - December 5, 2012

1      After that there were a number of minor

2  interactions where he didn't understand in different

3  contexts how the psychophysiology of polygraphs works.  He

4  was trained as a clinical psychologist.  He didn't

5  understand these things.  It was clear to me he didn't

6  understand instrumentation.

7      And we also ended up testifying on opposite

8  sides of at least one case, I believe, with regard to the

9  admissibility of a polygraph.

10      So my opinion of Dr. Abrams is shaped by

11  those things.

12  Q.   So if I understand your concerns about Dr. Abrams

13  you've expressed, you had some -- in this rather high

14  profile case, you had some professional disagreements on

15  how to interpret the score sheet and disagreements on the

16  questions that were posed to the subject, would that be

17  accurate?

18  A.   That, as well as his professional integrity when

19  it came to not objecting to write a misleading report.

20  Q.   Meaning he was silent on the subject when the

21  other polygraphy expert wished to write that report, is

22  that what you saying?

23  A.   Yes.  He didn't object.  He was willing to go

24  along with it, apparently.

25  Q.   Well, despite these professional objections you

1      had, or disagreements, you would agree, as you testified
2      earlier, that Dr. Abrams was considered to be a qualified
3      polygraphy expert in the Pacific Northwest in the 1980s,
4      is that correct?
5          A.    By some people, but by others not.
6          Q.    Now, is it truer than not that polygraphs are
7      primarily used in the criminal context to rule out
8      suspects of crime rather than to add other suspects?
9          A.    That depends upon the policies of the agency.
10         Q.    Do you know what the policies were of the Clark
11     County Sheriff's Office?
12         A.    I do not.
13         Q.    Have you ever done any work for them as a
14     consultant?
15         A.    Clark County Sheriff's Office?  I don't recall
16     having done work for them.
17         Q.    You mentioned Sergeant Davidson being in the -- I
18     think you called him the polygrapher for that office.  Do
19     you know what his qualifications were in that regard?
20         A.    No.  I've never seen his curriculum vitae, but I
21     assume that he was properly trained at an accepted school
22     and had the requisite experience to conduct polygraph
23     exams, but I haven't seen the evidence of that.
24         Q.    Do you have any opinions as to whether -- or
25     knowledge as to whether he's one that would be qualified

DAVID C. RASKIN, Ph.D. - December 5, 2012

1     A.    Well, they didn't seem to be confused.  Sergeant

2  Davidson told him that he had failed, and he thought he

3  had done something to his daughter.  I think it's a poorly

4  written report, and I would certainly like to see the

5  basis for the report.

6           And I think that Sergeant Davidson, as a

7  polygraph examiner, should certainly have wanted to review

8  those, particularly since he was then willing to say that

9  Mr. Spencer was lying and had done something to his

10  daughter.

11     Q.    But in any case, Dr. Abrams does not clearly state

12  in his report that there was -- that he had failed those

13  polygraphs, is that correct?

14     A.    He said he failed the second polygraph.  He said

15  the first one was not conclusive.  And I would should add

16  that these two polygraph tests are substantially different

17  in terms of the questions, and that's another thing that

18  was not addressed and is a weakness in this.

19           Why did the second test that apparently

20  they said he failed and Sergeant Davidson relied upon, why

21  did that only concern oral sex when the first one

22  concerned all of the allegations that his daughter had

23  made?  And the most serious allegation, the sexual

24  penetration, was not even included in the second test, and

25  there is no explanation of that.

DAVID C. RASKIN, Ph.D. - December 5, 2012

1                    And there was discussion about the

2    questions among Detective Davidson, Dr. Abrams, and I

3    believe Sergeant Krause at one time.  And I would like to

4    know what those discussions were and why they decided to

5    change the questions the way they did to omit the most

6    serious question and the most serious allegation.  That

7    makes you suspect that there is a lot of stuff going on

8    there that is manipulation to obtain a particular desired

9    result.

10       Q.   Well, it wouldn't have been appropriate to ask

11   exactly the same questions again, would it?

12       A.   It certainly could be.  You would want to know why

13   there were these problems.  But if you ask me, when I look

14   at this, and when I look at the totality of the things

15   that I reviewed, a reasonable hypothesis is that the first

16   test, which Dr. Abrams considered inconclusive, probably

17   showed that Mr. Spencer did not have any problem with the

18   questions about fondling his daughter's genitals or

19   penetration, but there might have been some indication on

20   the oral sex, so they followed up only on the allegation

21   of oral sex for that reason.

22                    And furthermore, since there could be no

23   medical evidence to disprove oral sex, they probably felt

24   that that was the most productive area to get him to fail

25   a test and not be able to prove otherwise and then be able

DAVID C. RASKIN, Ph.D. - December 5, 2012

135

1    obtained."

2                   So would you, as a polygraph expert, then

3    attempt to review information in this case that might have

4    provided that further corroboration as a result?

5                   MR. FREIMUND:  Objection, leading.

6                   MR. BOGDANOVICH:  Join.

7                   MS. FETTERLY:  Join.

8                   THE WITNESS:  Time for me to answer?

9    BY MS. ZELLNER:

10       Q.   Could you answer my question?

11       A.   Yes.  You would -- I mean, it's a plea from the

12   polygraph examiner to get more information, and you would

13   certainly want to pursue that.

14                  And furthermore, Dr. Abrams' statement is a

15   rather strange statement in two respects.  One is that he

16   said he didn't feel as certain, as in most examinations,

17   because of the score, but the score was reported both by,

18   I think it was Sergeant Davidson and clearly by Sergeant

19   Krause, that the score was minus 13.  That's a strong

20   deceptive result.  It is not a wishy washy one.  That's a

21   clear, conclusive, deceptive result.  You only have to

22   have minus six to have a deceptive result, and this is

23   minus 13.

24                  So there is strong incentive for everybody

25   to be heeding Dr. Abrams' plea to further corroborate the

139

## CERTIFICATE

I, LEONARD J. DiPAOLO, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public in and for the State of Alaska, do hereby certify:

That the witness in the foregoing proceedings was by me duly sworn; that the proceedings were then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed under my direction by computer transcription; that the foregoing is a true record of the testimony and proceedings taken at that time; and that I am not a party to nor have I any interest in the outcome of the action herein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal this 11th day of December, 2012.

_____

LEONARD J. DiPAOLO
Notary Public for Alaska
My Commission Expires: 2-3-2016

#2374

# EXHIBIT U

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA


CLYDE RAY SPENCER,
MATTHEW RAY SPENCER, and
KATHRYN E. TETZ,

        Plaintiffs,

     vs.                     Case No. C11-5425BHS

FORMER DEPUTY PROSECUTING ATTORNEY
FOR CLARK COUNTY JAMES M. PETERS,
DETECTIVE SHARON KRAUSE,
SERGEANT MICHAEL DAVIDSON,
CLARK COUNTY PROSECUTOR'S OFFICE,
CLARK COUNTY SHERIFF'S OFFICE,
THE COUNTY OF CLARK, AND
JOHN DOES ONE THROUGH TEN,

        Defendants.
_____/


Deposition of

ANN LINK, PH.D.

Monday, December 17, 2012


Reported by Karen Cosgrove, CSR No. 12425

1       A   She told me that there was alleged sexual abuse

2   by Kathryn's father up in Washington.

3       Q   Did Deanne Spencer participate or sit in on the

4   therapy sessions that you had with Kathryn?

5       A   No.

6       Q   Why is that?

7       A   Because it was important for the child to feel

8   relaxed and comfortable working out her problems in play

9   therapy on her own.

10      Q   Tell me, about how old was Kathryn Spencer when

11  you first began treating her?

12      A   She was around 5 years old.

13      Q   And what do you remember about

14  Kathryn Spencer's condition when you first began treating

15  her?

16      A   She was very anxious and withdrawn.  She laid

17  down on the floor in the fetal position with a blanket

18  over her and didn't speak at all the first session or

19  two.

20      Q   Did you -- in that first session or two, what

21  observations did you make about her psychological

22  condition?

23      A   Well, she appeared to be highly anxious.

24      Q   And you said that -- tell me about the therapy

25  that you used in your treatment of Kathryn Spencer.

1        A    I used play therapy and I used --

2        Q    Yeah.   What does play therapy involve?

3        A    Play therapy involves creating a safe

4    environment for a child to hopefully express their

5    feelings and work through their issues with the use of

6    toys and art supplies and dollhouse dolls.   Things like

7    that.

8        Q    And do you remember the approximate time in

9    1984 when you began your treatment?   Was it at the

10   beginning, middle, or end of 1984?

11       A    I don't recall.

12       Q    Do you remember how many sessions that you had

13   with Kathryn Spencer?

14       A    I don't remember the exact number, but it was

15   quite a few.

16       Q    Was it more than six?

17       A    Yes.

18       Q    Do you think it was more than twelve or --

19       A    Yes.

20       Q    Now, you said that you used play therapy.

21            Was the purpose of that or part of the purpose

22   to encourage Kathryn to communicate with you?

23       A    Yes.

24       Q    And what did you observe over the multiple

25   sessions with Kathryn about her communication with you?

```
 1        A    That she had come in for alleged sexual abuse
 2   but she did not talk about the abuse.
 3        Q    Did she talk to you about other things?
 4        A    She wasn't highly verbal, but over the course
 5   of therapy, she did talk about some other things.  I'm
 6   not sure of the exact details.
 7        Q    Over the course of the therapy, did you notice
 8   any reduction in her anxiety?
 9        A    I did.
10        Q    Now, during your sessions with Kathryn Spencer,
11   did she ever describe being sexually molested by
12   anyone?
13        A    She did not.
14        Q    What type of play supplies did you use in your
15   therapy with Kathryn Spencer?
16        A    Toys.  Dolls.  Like dollhouse dolls and art
17   supplies.
18        Q    When you say dolls, what type of dolls are you
19   referring to?
20        A    Regular children's dolls.
21        Q    Did you ever -- are you familiar with
22   anatomical dolls?
23        A    I am.
24        Q    And what are anatomical dolls used for?
25        A    Anatomical dolls are used to clarify or help
```

1    clarify information a child has given you if they're not
2    able to clearly describe things that have happened to
3    them.  If they tell you about something that's happened
4    to them, you might use the dolls to help them clarify
5    their description.
6         Q    Do you recall if you ever used anatomical dolls
7    in your treatment of Kathryn Spencer?
8         A    I don't recall using anatomical doll with
9    her.
10        Q    Is there a reason that you would not have used
11   them?
12        A    She didn't disclose to me abuse, so it might
13   have been considered leading or suggestive.
14        Q    Now, did California, in 1984 and 1985, have a
15   child abuse and neglect reporting act?
16        A    Yes, they did.
17        Q    And what was your -- what is your general
18   understanding of what that act required of you as a
19   practitioner?
20        A    You're required to report abuse; physical,
21   sexual neglect; mistreatment of a child.
22        Q    Do you recall if you ever made such a report in
23   California about Kathryn Spencer?
24        A    I don't recall making any report about her.
25   No.

```
 1      Q    And is it your understanding under the child
 2   abuse and neglect reporting act in California that you
 3   would have been required to make such a report if
 4   Kathryn Spencer had divulged sexual abuse to you?
 5      A    Yes.
 6           MR. FREIMUND:  Objection.  Leading.  Calls for
 7   a legal conclusion.
 8           Go ahead and answer.
 9           THE COURT REPORTER:  I'm sorry, Counsel.
10   Who -- what was your name?
11           MR. FREIMUND:  That was Jeff Freimund.  I
12   objected.  It was leading and calls for a legal
13   conclusion.
14           But go ahead and answer.
15   BY MS. ZELLNER:
16      Q    Yeah.  You can answer with that objection.
17      A    I'm sorry.  What was the question again?
18           MS. ZELLNER:  Could you read the question back,
19   please.
20           THE COURT REPORTER:  Gentlemen, please state
21   your name prior to making your objection.  Thank you.
22                       (Record read.)
23   BY MS. ZELLNER:
24      Q    Do you have any recollection of discussions
25   with anyone in law enforcement about Kathryn Spencer?
```

```
 1        A    I have a vague recollection of talking to
 2   someone in law enforcement and informing them that
 3   Kathryn had not disclosed abuse information to me.
 4        Q    And do you recall who the person or persons
 5   were that you spoke to?
 6        A    I do not.
 7        Q    Do you recall the time frame of when you might
 8   have been contacted by law enforcement?
 9        A    I don't recall a specific date.  No.
10        Q    Do you recall having any discussion with a
11   prosecutor or -- and another attorney about
12   Kathryn Spencer's treatment with you?
13        A    I don't recall that.  No.
14        Q    All right.  Now, if we could look at the
15   different exhibits for today's deposition, I want to
16   start with Plaintiffs' Exhibit 1.
17             (Plaintiffs' Exhibit 1 was previously marked
18   for identification and is attached hereto.)
19   BY MS. ZELLNER:
20        Q    And tell me, Doctor, when you have that exhibit
21   in front of you.
22        A    I have it in front of me.
23        Q    Do you recognize your signature on this exhibit
24   on page -- it's page 3?
25        A    Yes.
```

```
1                         FURTHER EXAMINATION
2    BY MR. FREIMUND:
3         Q    I just have one follow-up question -- this is
4    Jeff Freimund -- in regards to your training, Ms. Link.
5              Back in 1984 and 1985 when you were a
6    psychology intern and Ph.D. candidate, do you recall
7    receiving any training whatsoever on interview techniques
8    that should be used with child victims of sexual abuse?
9         A    Yes.
10        Q    What do you recall receiving training from?
11   I'm sorry.  Who do you recall receiving such training
12   from?
13        A    What was your -- what was your statement
14   preceding that question?
15        Q    You mean what kind of training am I talking
16   about?
17        A    No.  No.  What did you say before?
18             Can you just read the last couple of questions
19   there?
20        Q    I'm just asking -- you said that you recall
21   receiving training back in 1984 and 1985 when you were a
22   psychology intern and Ph.D. candidate regarding the
23   interview techniques that are used for child sexual abuse
24   victims and I'm asking who you received that training
25   from.
```

1        A    I received training actually during my MFT

2    experience with Dr. Mary Ann Frank.

3        Q    What's your MFT experience?  I don't know what

4    you're referring to.

5        A    Marriage, family -- marriage, family, and child

6    counseling license that I had at the time.

7        Q    Okay.  What was the nature of your training?

8    How long a session was it?

9        A    It was multiple sessions.

10       Q    And this was specifically on interview

11   techniques that are used with child sexual abuse

12   victims?

13       A    Yes.

14       Q    Okay.  And is it interview techniques in the

15   forensic sense of being an investigator of child sexual

16   abuse allegations that you were being trained on?

17       A    No.

18       Q    What was the context of the training then?

19       A    Therapy.

20       Q    So it was how to administer therapy to child

21   sexual abuse victim that you're talking about?

22       A    Yes.  It was how to administer therapy as well

23   as how to interview them about it in a therapy context.

24       Q    Okay.  And what do you recall knowing back in

25   1984 and '85 about interviewing children in a therapy

1   context regarding sexual abuse allegations?

2       A    That if the child disclosed sexual abuse to

3   you, then you might clarify what they have said by using

4   anatomically correct dolls to help them communicate what

5   had happened to them.

6       Q    All right.  Anything else?

7       A    That there was -- it was very important not to

8   make any kind of leading statements or questions to

9   children, particularly if they had not testified or given

10  statements.  It was very important not to contaminate

11  evidence they might give.

12      Q    Okay.  Anything else?

13      A    Well, it was important to reassure them and

14  help them to feel safe and to feel like they hadn't done

15  anything wrong.  That, you know, it was okay to talk

16  about their feelings and things like that.

17      Q    Okay.  Anything else that you can remember that

18  you received training on in this regard?

19      A    That you shouldn't in any way say anything, you

20  know, or imply anything that they should say in a court

21  or any kind of legal proceeding that might sway their

22  impressions of what had happened to them.

23      Q    Okay.  Anything else that you remember

24  receiving training about in regard to interviewing

25  techniques in the therapeutic context to child sexual

Deposition of Ann Link, Ph.D.                    SPENCER VS. PETERS

```
 1 | STATE OF CALIFORNIA
 2 |
 3 |
 4 |          I, Karen Cosgrove, CSR 12425, a Certified
 5 | Shorthand Reporter in and for the State of California, do
 6 | hereby certify that, prior to being examined, the witness
 7 | named in the foregoing deposition was by me duly sworn to
 8 | testify the truth, the whole truth, and nothing but the
 9 | truth; that said deposition was taken down by me in
10 | shorthand at the time and place named therein and was
11 | thereafter transcribed under my supervision; that this
12 | transcript contains a full, true and correct record of
13 | the proceedings which took place at the time and place
14 | set forth in the caption hereto; that this transcript was
15 | prepared in accordance with the minimum transcript format
16 | standards as set forth by the California Certified
17 | Shorthand Reporters Board.
18 |          I further certify that I have no interest in
19 | the event of this action.
20 |
21 | EXECUTED this 31st day of December, 2012.
22 |
23 |
24 |                          _____
25 |                                Karen Cosgrove
```

12/13/2012  10:13   9164895624               C.C. COUNSELING                    PAGE   01

1
2
3
4                                                      Honorable Judge Benjamin Settle
5
6
7
8                        UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF WASHINGTON
9                               AT TACOMA

10   CLYDE RAY SPENCER, MATTHEW RAY
     SPENCER, and KATHRYN E. TETZ,              )   No. C11-5424BHS
11                                              )
                         Plaintiffs,            )   DECLARATION OF ANN LINK,
12                                              )   Ph.D.
           v.                                   )
13                                              )
     FORMER DEPUTY PROSECUTING                  )
14   ATTORNEY FOR CLARK COUNTY JAMES            )
     M. PETERS, DETECTIVE SHARON KRAUSE,        )
15   SERGEANT MICHAEL DAVIDSON, CLARK           )
     COUNTY PROSECUTOR'S OFFICE, CLARK          )
16   COUNTY SHERIFF'S OFFICE, THE COUNTY        )
     OF CLARK and JOHN DOES ONE THROUGH         )
17   TEN,                                       )
                                                )
18                       Defendants.            )

19        Pursuant to 28 U.S.C. § 1746, Ann Link, Ph.D., declares under penalty of perjury under

20   the laws of the State of California and the United States of America that the following is true

21   and accurate:

22        1. My name is Ann Link, Ph.D. I am a licensed clinical psychologist practicing in the

23

24   state of California. My business address is 5801 North Avenue, Carmichael, California.

25        2. I have personal and direct knowledge of the facts set forth in this declaration, and I

26   will testify to them if called upon to do so.

27

DECLARATION OF ANN LINK, Ph.D.
(C11-5424BHS) — 1



PLAINTIFF'S
EXHIBIT

Kathleen T, Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois

1
2
    3. In 1984 and 1985, I was a psychology intern and Ph.D. candidate. Starting in approximately September of 1984, I began treating Kathryn Spencer.

3
4
5
6
    4. My custom and practice is to keep patient records until 7 years after a patient reaches 18 years of age. As a result, I no longer have any records regarding my care and treatment of Kathryn Spencer. I do, however, have an independent recollection of my sessions with Kathryn as described in this declaration.

7
8
9
    5. Prior to my first session with Kathryn I met with Kathryn's mother to obtain background information regarding Kathryn.

10
11
12
13
    6. After meeting with Kathryn's mother I met privately with Kathryn on multiple occasions. During my sessions with Kathryn she manifested a high level of anxiety. For example, I recall Kathryn balled up on the floor. I utilized play therapy, a form of psychotherapy, to reduce anxiety, encourage communication and promote healthy coping.

14
15
16
    7. I specifically recall that at no point during my sessions with Kathryn did she describe being molested by anyone.

17
18
19
    8. During play therapy sessions with Kathryn, I used play therapy supplies including toys, doll house dolls and art materials. Kathryn did not demonstrate any abuse to me using play therapy supplies.

20
21
22
23
    9. I have a vague recollection of being contacted by a member of law enforcement from Washington, either a police officer or prosecutor, to discuss my treatment of Kathryn. At that time I told whoever I spoke with that Kathryn had not described any of the alleged abuse to me.

24
25
    10. I never would have told any person, including law enforcement, that Kathryn had described any abuse to me because she had not done so.

26
27
    11. I never had any further contact with law enforcement about being a witness to any alleged abuse.

DECLARATION OF ANN LINK, Ph.D.
(C11-5424BHS) — 2

Kathleen Y. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515

12/13/2012  18:13   9164895624                    C.C. COUNSELING                        PAGE   03

1       12. I have had the opportunity to review and make changes to this affidavit, and it is

2    accurate to the best of my memory and recollection.

3           SIGNED this _13_ day of December, 2012 in Carmichael, California.

4                                   Respectfully submitted,

5

6                                   _Ann Link Ph.D._

7                                   Ann Link, Ph.D.

8    Subscribed and Sworn to Before me
     this ___ day of December, 2012
9

10

11   Notary Public                  SEE ATTACHED FOR

12                                  REQUIRED CALIFORNIA

13                                  WORDING

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF ANN LINK, Ph.D.                          Kathleen T. Zellner & Associates, P.C.
                                                                LAW OFFICES
(C11-5424BHS) — 3                                           1901 Butterfield Road
                                                                 Suite 650
                                                           Downers Grove, Illinois 60515

12/13/2012  10:13     9164895624              C.C. COUNSELING               PAGE  04

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**     GOVERNMENT CODE § 8202

☐ See Attached Document (Notary to cross out lines 1–6 below)
☒ See Statement Below (Lines 1–6 to be completed only by document signer[s], *not* Notary)

① _Ann Link_

2 _____

3 _____

4 _____

5 _____

⑥ _Ann Link_                                      _N/A_
  Signature of Document Signer No. 1              Signature of Document Signer No. 2 (if any)

State of California

County of _Sacramento_

Subscribed and sworn to (or affirmed) before me

on this _13_ day of _Dec_, 20 _12_,
         Date        Month        Year

by

(1) _Ann Link_
        Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) ☒

                                  (and

(2) _____
        Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

Signature _Candace Childs_
           Signature of Notary Public

CANDACE C. CHILDS
Commission # 1927490
Notary Public - California
Sacramento County
My Comm. Expires Mar 31, 2015

Place Notary Seal Above

─────────────────── OPTIONAL ───────────────────

Though the information below is not required by law, it may prove valuable
to persons relying on the document and could prevent fraudulent removal
and reattachment of this form to another document.

RIGHT THUMBPRINT
OF SIGNER (if any)
Top of thumb here

RIGHT THUMBPRINT
OF SIGNER (if any)
Top of thumb here

Further Description of Any Attached Document

Title or Type of Document: _Declaration_

Document Date: _Dec 13 2012_  Number of Pages: _54_

Signer(s) Other Than Named Above: _N/A_

© 2010 National Notary Association • NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)     Item #5910

Spencer005986