# EXHIBIT BB

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT

1ST DEGREE STATUTORY RAPE, RCW 9A.44.070
LOCATION OF INCIDENT:   17681 NE Lucia Falls Road
                        Yacolt, Washington
DATE OF INCIDENT:       Refer to Summary


| DATE & TIME: | 03-25-85 | 1315 hours |
|---|---|---|
| LOCATION: | CCSO, Investigation Unit | |
| INCIDENT: | Interview with Victim | |

VICTIM:          SPENCER, Kathryn E.           dob: 01-13-79
                 aka:  Kathy
                 aka:  Katie
                 3930 Becerra Way
                 Sacramento, California        phone: (916) 482-6057

SUSPECT:         SPENCER, Clyde Ray            dob:  01-09-48
                 aka:  Ray SPENCER
                 17681 NE Lucia Falls Road
                 Yacolt, Washington            phone: 687-1407

ATTACHED:        Copy of a cartoon drawing used during my conversation
                 with the above listed victim regarding what she called
                 specific parts of her body


CCSO Case #84-8506, S.A.KRAUSE, K-43                    page 1 of 6

Spencer-00623

SUMMARY:

On the afternoon of 03-25-85, after I had talked with Matt SPENCER, I spoke alone with Kathryn SPENCER regarding the possibility that there was additional information that Katie had not shared with me during my conversations with her prior to this date.  During my interview with Matt HANSEN and Matt SPENCER, both indicated that there had been a number of times when Ray SPENCER had been sexually involved with all of the children when they were all present.  During my prior conversations with Katie, she was alleging that she had been the victim of sexual abuse by her father; however, she had not shared any information regarding her brother, Matt, or step-brother, Matt HANSEN, also being victimized.

The interview with Katie was done in an interview room located at the Clark County Sheriff's Office with only Katie and I present. Initially, I advised Katie that I wanted to talk to her alone because I thought possibly there were some things that she had forgotten to tell me before. I also advised her that because I had talked to Matt and Little Matt, and because of what they had said, I felt it was important that I talk with her alone.  At that time Katie stated to me, "What did my brother, Matt, say?"  I asked her which brother and she stated, "Big Matt."  At that time I advised her that during my conversation with Big Matt and Little Matt, both told me that her father, Ray, had done something to them.  Katie immediately stated, "I promised Big Matt I wouldn't say anything. I'm glad he told."  I asked Katie if she felt better since she told and she stated, "I feel a lot better and I know Matt will, too."  I asked her if she could remember the reason she couldn't tell me about Big Matt and Little Matt and she stated, "Because I promised Big Matt."  Katie then stated, "I came this close to telling you." When she made that statement she had her first finger and thumb approximately one half inch apart, and was holding her hand up in the air, making a gesture like one would do if you were showing a measurement.

I asked Katie how she felt about her father and Katie stated, "Well, if he goes to jail, that's his fault, not my fault, because he's the one that's doing all the lying."

I asked Katie if she could remember how old she was the last time something happened with her father, and she stated, "The same age I

CCSO Case #84-8506, S.A.KRAUSE, K-43                    page 2 of 6

was when we were here last summer at the house by the river, because that's where he did it." I asked her if he ever did it at anybody else's house and Katie stated, "He did it a long time ago at Karen's house, and I can't remember how old I was then." I asked her if Karen knew what was happening and Katie stated, "Karen wasn't there when he'd do it." I asked her if she could tell me what her father did the last time he did something and Katie stated, "Well, he puts his wiener in my pee-pee."

At that time I asked Katie if she remembered the picture we used last time I talked to her when we talked about parts of her body and she advised that she did. I indicated to her again that I wanted to make sure I didn't forget what she called things, and with the aid of a cartoon drawing I determined what Katie called specific parts of her body. During that conversation she indicated she called breasts on a female body "boobies," the navel a "belly button," the buttocks a "butt," the genital area of a female body a "pee-pee," and the penis on a male body a "wiener."

I asked Katie what she had on when her daddy did the last thing to her she could remember, and she stated, "I had to have all my clothes off." I asked her if anyone else was there and she stated, "Yah, my brothers were there and they had to have their clothes off, too." I asked her if her brothers saw what happened to her and Katie stated, "Yah, they saw what happened to me and I saw what happened to them." I asked her what her brothers saw and Katie stated, "They saw my dad put his wiener in my pee-pee and he puts his wiener in their butts." Katie then stated, "My brothers have to put their weiners in my butt, too."

I asked Katie if she could remember how old she was when at the house by the river and she stated, "I think I was six then." Katie then stated, "He did it to me when I was five and he did it to me when I was four, and I'm sure of that." I asked her where she was living with her daddy before the house by the river and she stated, "It was this brown house and he did it to my brothers there, too."

I asked Katie what part of the house she would be in when things would happen with her dad and she stated, "In the living room and in my dad's bedroom mostly." She then stated, "He always did it in his bedroom." I asked her who was there when it happened in the living room and she stated, "He

CCSO Case #84-8506, S.A.KRAUSE, K-43                              page 3 of 6

Just did it to me.  Little Matt was asleep, but Big Matt was awake." I asked her who was there when it happened in the bedroom and she stated, "Mostly me and Big Matt and Little Matt and my dad, but sometimes just me and my dad."

I asked Katie if anything her father ever did hurt her, and she stated, "He made us all cry cause he hurt us." I asked her if she could remember where Shirley was when that happened and she stated, "She was still at work.  She was always at work." I asked her if she could remember what her daddy would say when things happened and she stated, "He just says mean things." I asked her if she could remember any of the mean things and she advised that she could not.  I asked her if she could remember what Big Matt or Little Matt said or anything she might have said and she stated, "We didn't say words, we just mostly cried." I asked Katie if her father ever said anything about if she should tell anyone, and she stated, "No way! He said, 'You better not tell' or 'you shouldn't tell anybody'." I asked her if he would say that in a nice voice and she immediately responded, "No, a mean voice, and it was loud."

I asked Katie if she ever saw anyone else touch her father's body and she stated, "He'd make them guys put their mouth on his wiener." I asked her what guys and she said, "My brothers, my dad made my brothers put their mouth on his wiener." I asked her if anybody else had to put their mouth on her father's weiner and she stated, "I did."

I asked Katie if they had to touch her father in any other way, and she stated, "He'd make us put our fingers in his bottom hole." When Katie made that statement she had her thumb folded into the palm of her hand and was extending four fingers.

I asked Katie if anything else happened with "bottoms" and she stated, "He puts his wiener in our bottoms, and he makes us lay on our face and then he sticks it in our bottom, and that really hurts." I asked her where that happened and she stated, "Sometimes in his bedroom and that's what he did to me in the living room." I asked her if she was standing up or what when that happened and Katie stated, "I was laying on a pillow on the floor, like you know, my face was on the pillow." Katie then stated, "He makes my brothers put their wiener in my bottom, too, but that doesn't hurt so much, but they don't like to do that either." I asked her if her father made her brothers do anything

Spencer-00626

else to her and Katie stated, <u>"He makes them put their wiener in my pee-pee hole</u> <u>and that's what he does, and that really hurts when he does it."</u>

        I asked Katie if her father ever kissed her in a way that she didn't like and she stated, "I don't like him to kiss me anyway." I asked her how her father kissed her that she didn't like and Katie stated, <u>"Well, it's sorta not kissing, but he makes Big Matt and Little Matt kiss my</u> <u>pee-pee, and I had to kiss the boys' pee-pees and my dad's wiener."</u>

        I asked Katie if her father made her touch him in any way that she did not like and she stated, <u>"He makes me touch his wiener with my</u> <u>hand and wiggle his wiener, and he makes me touch Big Matt's and Little Matt's</u> <u>weiners, too."</u>

        I asked Katie if it was bothering her to tell me these things and Katie stated, "A little bit, but I don't care about him now, not one little bit."

        I asked Katie if anything else happened about bottoms when they were with her father and she stated, "Just what I told you, like he makes us put our fingers in each others'' bottoms and his bottom, and he makes everybody stick their wiener in my bottom, and he does that to me."

        During the remainder of my conversation with Katie, the information she shared was consistent with what is described in the above paragraphs. Several times during that time she indicted that she "didn't like her father anymore and that she didn't care what happened to him because he was lying."

        Katie also talked about Shirley SPENCER and Matt HANSEN, indicating that she was glad she could see them and at one point she stated, "I'm really lucky because I have two real moms now."

        I asked Katie if she would like me to tell her mother what we had talked about and she indicated that she would, and that she would rather not be in the room. She also indicated she did not care if her grandmother was present because "it wasn't her fault anyway, it was her dad's fault." I asked Katie if she would like me to call her therapist in Sacramento and tell her what we had talked about and she appeared to be eager for me to do that.

CCSO Case #84-8506, S.A.KRAUSE, K-43                page 5 of 6

Spencer-00627

After I spoke with Katie, I spoke with Deanne SPENCER and Phyllis DAY without Katie present and during that conversation shared with them specifically what we had talked about.  After that conversation I had Katie come back into the room and in the presence of her grandmother and mother, I repeated the specific allegations that Katie had made to me so that she would know that I had told her mother everything.

This investigation is pending.

CCSO Case #84-8506, S.A.KRAUSE, K-43                    page 6 of 6

Spencer-00628

# EXHIBIT CC

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment (C11-5424BHS)

St v. Clyde Spencer                          3/25/10
        Mtg --w- ADC, SJ

TH ref -er V 'Little Matt' 3 different
    times.
        - first peer - year ago
        - second harder
        - last - 2 wks ago
            - peer presentation again
            - ptly able to relate details
              of abuse DK had read to
              him from
                - however also gave info
                  that was inaccurate
        - V about 5 y/o when he met
          Shaun Krause (SK)
        - case is 25 yrs old
    so V has no recall of abuse that
        occurred at same time as broker
        & ouster
        - V also does not now recall all the abuse claimed to     be easier
    V doesn't want to testify, but will if recessary

    V's behavior/demeanor - fled

    SJ has a stack of docs from AG
        - SK tch medical reports; claimed in
          at least one deposition that she
          .lives

2

ADC feels V's mother slcked in recent
statement that 9 V was not assaulted

Mailed received 8/25/10

SJ — opinion
— looks like kids molested & it was ?
— can't prove it at trial

ADC
— our pos
— nst innocent
— PG
— 3 vs 1 t — 1 not sure 1 —
— much dir. not present — RG
— not enough ev. to prove BRD. new
—

# EXHIBIT DD

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment (C11-5424BHS)

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

In re the Personal Restraint of

CLYDE R. SPENCER,

Petitioner.

NO.  8 4 1 3 7 - 3

RULING DENYING REVIEW

      The State seeks discretionary review of a published Court of Appeals decision granting Clyde Spencer's personal restraint petition and remanding to the trial court to allow Spencer to withdraw his *Alford*[1] plea to multiple sex offenses allegedly committed against his son, daughter, and stepson more than 25 years ago. RAP 16.14(c); RAP 13.5A(a)(1).

      Mr. Spencer was a Vancouver city police officer. In the fall of 1984 he was investigated for allegedly sexually abusing his five-year-old daughter, K.S., and his eight-year-old son, M.S. Mr. Spencer's daughter initially indicated that she was abused by multiple persons, including her mother (Mr. Spencer's former wife), but the investigation focused on Mr. Spencer. The children were interviewed multiple times by Clark County Sheriff's Detective Sharon Krause. K.S. indicated to Krause that her

---

[1] In an *Alford* plea, the defendant does not admit guilt but concedes that the state's evidence is strong and most likely will result in conviction. *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

father had abused her. In contrast, M.S. denied his father had abused him, and he adhered to that denial for months.

The Clark County Sheriff's Office submitted its investigation report on K.S. to the King County Prosecutor's Office for an independent evaluation. In November 1984 King County Senior Deputy Prosecutor Rebecca Roe, known for her expertise in prosecuting child sex abuse cases, opined that the case was unwinnable because significant inconsistencies in K.S.'s version of events indicated an inability to distinguish fact from fantasy. In December 1984 a deputy prosecutor conducted a videotaped interview of K.S., assisted by Ms. Krause and K.S.'s mother, but the tape was not disclosed until October 2009. Notwithstanding Ms. Roe's assessment, the State charged Mr. Spencer in January 1985 with first degree statutory rape and indecent liberties committed against K.S.

Meanwhile, Mr. Spencer's then-current wife, Shirley Spencer, entered into a sexual relationship with the lead detective investigating the case. That detective supervised Ms. Krause, whom he notified of the relationship. While the charges were pending against him, Mr. Spencer stayed in a motel. Ms. Spencer dropped off her son, M.H., to spend the night with Mr. Spencer. Afterward, Ms. Spencer alleged that her son reported being abused by his stepfather while at the motel. Detective Krause interviewed M.H., who related that Mr. Spencer engaged in sexual intercourse with him, including penetrating the boy's rectum with his penis. The allegation resulted in the State adding three counts of first degree statutory rape committed against M.H.

As noted above, Mr. Spencer's son M.S. originally denied being abused. But after persistent interviewing by Ms. Krause, including an alleged threat to make the boy undergo a polygraph examination, M.S. reported that his father had abused him. Medical examinations of K.S. and M.H. disclosed no physical evidence of

molestation despite their reports of repeated anal and vaginal intercourse. The State did not disclose those reports.

Ultimately, the State charged Mr. Spencer with 16 counts: 10 counts of first degree statutory rape and six counts of complicity to first degree statutory rape. The complicity counts were based on allegations that Mr. Spencer forced the children to engage in sexual intercourse with each other. One or more of the children purportedly alleged that Mr. Spencer took photographs of the sexual activity, but the State found no such evidence.

In May 1985 Mr. Spencer, who was heavily medicated at the time for depression, entered an *Alford* plea to 11 counts: seven counts of first degree statutory rape (two involving K.S., two involving M.S., and three involving M.H.) and four counts of complicity to first degree statutory rape (one involving K.S. and M.S., two involving M.S. and M.H., and one involving K.S. and M.H.). The trial court imposed two consecutive life sentences on the first two statutory rape charges (one involving K.S., the other involving M.S.) and 171-month sentences on each of the remaining nine counts, to run concurrently with each other but consecutive to the life sentences.

Mr. Spencer collaterally challenged his judgment and sentence without success. He had partial success in 1995 when the United States Court of Appeals for the Ninth Circuit remanded his case to the United States District Court for the Western District of Washington for an evidentiary hearing on various issues, including Mr. Spencer's competency at the time of his plea and the State's nondisclosure of medical reports. *See Spencer v. Klauser*, 70 F.3d 1280, 1995 WL 710610 (9th Cir.) (unpublished). But after the evidentiary hearing, the district court denied habeas relief and the Ninth Circuit affirmed, reasoning that the medical reports would not have caused Mr. Spencer to choose a trial over pleading guilty. *See Spencer v. Klauser*, 129 F.3d 127, 1997 WL 686029, at *1 (9th Cir.) (unpublished).

Case 3:11-cv-05424-BHS   Document 153-13   Filed 02/14/13   Page 15 of 66

Mr. Spencer sought a commutation from then-Governor Gary Locke. M.S. signed a letter urging the governor to deny commutation. In 2004, apparently after Mr. Spencer finished his 171-month sentence and had started serving his first life sentence, Governor Locke conditionally commuted his sentence. The governor specifically made note of the withheld medical reports, the lack of alleged photographic evidence, Ms. Krause's questionable interview techniques and the children's inconsistent stories, and the affair between Ms. Spencer and the lead detective. The commutation required Mr. Spencer to complete three years of community supervision, which he accomplished.

A newspaper reporter investigating the case contacted M.S. The reporter facilitated M.S.'s contact with Mr. Spencer for the first time since the convictions. Meanwhile, K.S. took an interest in the case and contacted her brother, and she later met with Mr. Spencer for the first time in more than two decades. In 2006 M.S. sent a letter to Governor Christine Gregoire urging her to grant Mr. Spencer a full pardon. M.S. asserted in the letter that relentless interviews by law enforcement officers, including Ms. Krause, browbeat him into falsely accusing his father of abusing him.

In December 2007 Mr. Spencer filed the current personal restraint petition in Division Two of the Court of Appeals, seeking to have his convictions vacated or to hold a reference hearing. The petition was supported by the sworn declarations of M.S. and K.S. M.S. asserted that his father had never molested him and that he had never seen his father molest K.S. or M.H. K.S. claimed that she had no memory of being molested by her father and no recollection of any sexual activity involving M.S. or M.H. K.S. further asserted that if she had been sexually abused as described in police reports (repeated vaginal and anal intercourse), she would remember it.

The Court of Appeals ordered the trial court to conduct a reference hearing limited to determining whether M.S.'s and K.S.'s testimony at the hearing would be

consistent with their declarations. M.S. and K.S. testified at the reference hearing and were subjected to an extensive cross-examination by the State. Regarding the letter addressed to the governor, M.S. claimed it was actually written by their mother and that they merely signed it. K.S. recalled her mother asking M.S. to sign the letter. The trial court entered written findings that the testimony was factually consistent with the written declarations. The Court of Appeals then issued a published decision holding that the factual basis for Mr. Spencer's *Alford* plea was so undermined as to justify withdrawal of the plea. *See In re Pers. Restraint of Spencer*, 152 Wn. App. 698, 715, 218 P.3d 924 (2009). The State moved for reconsideration, introducing new evidence, including a transcript of a recent interview with M.H. in which he agreed with abuse allegations read to him by a deputy prosecutor. The State also submitted the previously undisclosed 1984 interview video, which had been in Ms. Krause's personal possession since that time.[2] The court denied reconsideration. The State now seeks this court's discretionary review.

To obtain this court's review, the State must demonstrate that the Court of Appeals decision conflicts with a decision of this court or another Court of Appeals decision, or that it is raising a significant constitutional question or an issue of substantial public interest. RAP 13.4(b). The State fails to address these criteria, much less shows that any of them applies.

A defendant may withdraw an *Alford* plea for manifest injustice when newly discovered evidence, viewed in balance with the record, changes the factual basis for the plea. *In re Per. Restraint of Ice*, 138 Wn. App. 745, 748, 158 P.3d 1228 (2007), *review denied*, 163 Wn.2d 1008 (2008). The Court of Appeals held that M.S.'s and K.S.'s recantations, viewed in light of the record, undermined the factual basis for Mr. Spencer's *Alford* plea sufficiently to justify withdrawal. I agree. Eight of

---

[2] Ms. Krause claimed she stumbled upon the recording while cleaning out her garage.

the 11 charges were based on statements extracted from K.S. and M.S. in a highly questionable interview method. Both have recanted, albeit M.S. with greater force than his sister. The recantations are plausible when viewed in light of the interview method, the failure to disclose the medical report of K.S. (which showed no physical evidence of sexual abuse), and the absence of evidence to corroborate the children's allegations that Mr. Spencer photographed the abuse. And the undisputed fact that Ms. Spencer engaged in sexual relations with the lead detective casts a shadow over the entire case.

The sudden appearance of an interview videotape after nearly 25 years further undermines the reliability of the State's prosecution of Mr. Spencer. The notion that the State would simply lose track of and forget about a videotape in which a prosecutor interviews a complaining witness is difficult to fathom. As the Court of Appeals properly observed in its order denying reconsideration, the tape (which I have viewed) undercuts the State's theory of the case, since it confirms the unreliable child interview techniques the State employed at that time and indicates a potential disclosure violation that may be sufficient on its own to justify collateral relief.

The State complains that the Court of Appeals improperly weighed witness credibility. But the State itself urged the Court of Appeals to hold that the recantations lacked credibility. The Court of Appeals merely directed the trial court to determine whether M.S.'s and K.S.'s testimony was consistent with their declarations. The trial court found the testimony to be consistent, and the record amply supports those findings. The Court of Appeals properly relied on the trial court's findings in determining in light of the record properly before it whether the new evidence undermined Mr. Spencer's *Alford* plea so as to justify collateral relief.

The State relies heavily on M.H.'s "statement" (presented for the first time in its motion for reconsideration) that the rape allegations pertaining to him were

true.[3] Given that not all of the complaining witnesses recanted, the Court of Appeals properly limited Mr. Spencer's remedy to withdrawal of the plea, rather than outright reversal of the convictions. *See State v. Macon*, 128 Wn.2d 784, 804, 911 P.2d 1004 (1996) (reversal required where recanted evidence was sole basis for conviction). In any event, M.S. unequivocally stated that he did not see his father engage in any abuse involving M.H. And K.S. stated that she could not recall seeing any such abuse and that she would have remembered it if she had. Moreover, the previously undisclosed medical report regarding M.H. showed no signs of physical abuse even though he was examined not long after Mr. Spencer allegedly anally raped him.[4] Furthermore, M.H. made his disclosures to Ms. Krause, who seemingly employed the same questionable techniques she applied when interviewing M.S. and K.S. And M.H.'s mother was then having an affair with Ms. Krause's supervisor. Although M.H.'s unrecanted allegations alone may form a factual basis for supporting an *Alford* plea on the statutory rape charges pertaining solely to him, the record clearly indicates that Mr. Spencer pleaded to all charges as part of a package deal. He is therefore allowed to withdraw his plea on all counts. *See State v. Weyrich*, 163 Wn.2d 554, 556 n.2, 182 P.3d 965 (2008).

The motion for discretionary review is denied.

COMMISSIONER

July 12, 2010

---

[3] M.H.'s "statement" is the transcript of an interview in which he indicates agreement with portions of the plea hearing transcript read to him by a deputy prosecutor.
[4] As noted above, the federal court denied habeas relief on the basis of the undisclosed medical reports, but that was before M.S. and K.S. came forward with their recantations and before disclosure of the video recording of the 1984 interview.

# EXHIBIT EE

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT

STATUTORY RAPE, 1ST DEGREE, RCW 9A.44.070
LOCATION OF INCIDENT:   17681 NE Lucia Falls Road, Yacolt, Washington
DATE OF INCIDENT:       Between 07-14-84 and 08-26-84

DATE & TIME:            10-18-84                    2100 hours
LOCATION:               Holiday Inn, Room #135
                        5321 Date Avenue
                        Sacramento, California 95841-2597
INCIDENT:               Witness Interview

PERSON INTERVIEWED:     SPENCER, DeAnne Sue          dob: 02-04-50
                        3930 Becerra Way
                        Sacramento, California       phone: (916) 482-6057
                        Work phone: (916) 920-0256, Ext. #34

VICTIM:                 SPENCER, Kathryn E.          dob: 01-13-79
                        3930 Becerra Way
                        Sacramento, California       phone: (916) 482-6057

SUSPECT:                SPENCER, Clyde Ray           dob: 01-09-48
                        aka: Ray SPENCER
                        17681 NE Lucia Falls Road
                        Yacolt, Washington           phone: (206) 687-2407
                        Work phone: (206) 696-8292

CCSO Case #84-8506   S.A.KRAUSE/K-43                         page 1 of 22

SUMMARY:

Prior to my going to California on October 15, 1984, I had talked with Deanne SPENCER on the telephone. During my conversations with her she indicated that she would make her children available to me and assist in any way she could if I were to come to Sacramento. During the last conversation I had with her just prior to going to Sacramento, I indicated to her that I would call her when I arrived in Sacramento to make arrangements to talk with her children.

On the afternoon of the 15th I made phone contact with DeAnne SPENCER at her place of employment. She advised that her children would be at their grandmother's residence that evening. DeAnne SPENCER suggested that she meet with me at the hotel and that I could follow her in my vehicle to her residence so I would be familiar with its location, and also accompany her to pick up her children so that would give me the opportunity to become acquainted with them.

DeAnne SPENCER met with me at approximately 2000 hours and at that time I did follow her in my vehicle to her residence. When we arrived at her residence with only she and I present we talked briefly regarding the allegations reportedly being made by Katie SPENCER, indicating that Katie and her natural father, Ray SPENCER, had some type of sexual contact.

During the time we talked, DeAnne SPENCER indicated that she was also concerned about Matthew because he appeared to be acting out. She advised that Matthew had not indicated why he was upset other than he apparently "threw a tantrum" approximately one week before I went to Sacramento. DeAnne related that she and her children had gone out to breakfast with her family after church and apparently that's where they were when Matt became so upset. She related that he was screaming things at her, calling her a liar and indicating to her that he was going to go live with his father as soon as he could, and she "would not be able to do anything about it."

She also advised me that on Wednesday, October 10, 1984, she discovered thirty dollars missing from Symphony Club money she had.

CCSO Case #84-8506  S.A.KRAUSE/K-43                                    page 2 of 22

She advised that Matt had some things and had indicated to her that his friend bought them for him and when the money showed up missing, she questioned Matt. Apparently, initially Matt lied but then admitted that he had taken the money. DeAnne SPENCER related that all of the things Matt was doing were very unlike him.

DeAnne SPENCER also related that during the meeting with Detective FLOOD and also with Katie's therapist, Katie apparently was not indicating anymore than there had been something sexual between her and her father.

DeAnne SPENCER advised me that she was scheduled to take a polygraph on Tuesday morning, October 16, 1984, regarding her ever being sexually involved with her daughter, Katie.

After I talked with DeAnne for a short period of time I rode with her in her vehicle to pick up her children at Phyllis DAY'S residence.  When we arrived at the grandmother's residence, DeAnne SPENCER introduced me to her children; however, we were not specific as to why I was there or who I was.

After we arrived at DeAnne SPENCER'S residence with her children and prior to my leaving, I made arrangements to pick Katie SPENCER up the following day for the purpose of my interviewing her regarding any information she might share with me.  During the entire week I saw DeAnne SPENCER on several occasions; however, I did not talk to her in any depth at all until the evening of October 18, 1984.  That interview was done in my room at the Holiday Inn with myself, DeAnne SPENCER and her sister, Linda LAWRENCE, present.  During that conversation DeAnne SPENCER related the following.

Initially, DeAnne SPENCER provided me with the dates her children were with their father since she and Ray SPENCER separated and divorced.  They are as follows:

#1 - The first visit occurred during Easter of 1981. Ray SPENCER reportedly came to Sacramento and the children stayed with him in a motel.

#2 - Six weeks during the summer months of 1981.  At that time Ray SPENCER was living with a female subject named Karen STONE and

Spencer-00503

the SPENCER children stayed at Karen STONE'S residence during summer visitation.

#3 - One week during Easter of 1982. Katie and Matt went to Los Angeles with their father.

#4 - Nine week visitation during the summer of 1982. Ray SPENCER was still living with Karen STONE and the visitation took place at Karen STONE'S residence in Vancouver.

#5 - Two weeks during Christmas of 1982. That visit also took place at Karen STONE'S residence.

#6 - One week during Easter of 1983. Katie and Matt accompanied their father to Los Angeles.

#7 - Seven weeks during the summer of 1983. Reportedly that was just after Ray SPENCER married his present wife, Shirley, and the visitation took place at Shirley's residence.

#8 - One week during Easter of 1984. Matthew and Katie accompanied Ray SPENCER, his wife, Shirley, and her son, Matt, to Los Angeles.

#9 - Six weeks during the summer of 1984. Katie and Matt visited with their father in Vancouver, Washington from July 14th to August 26th. At that time Ray and Shirley SPENCER were living at their present location in Yacolt, Washington.

DeAnne SPENCER advised that the summer of 1984 visitation was the last time her children saw their father, Ray. She also related that she drove her children to Vancouver for that visitation and picked them up. I asked DeAnne SPENCER if she could describe Ray SPENCER'S residence and she indicated that she had not seen it because when she called Ray from Vancouver to let him know she and the children were in town, he did not want her to come to his residence and requested that she meet him at Battle Ground Police Station. She also indicated that that is where she was when she picked the children up.

DeAnne SPENCER advised me that approximately one month prior to Matt and Katie going to Vancouver for the 1984 summer visitation, almost on a daily basis Katie would become upset and at times "hysterical," crying and indicating she did not want to go to her father's. DeAnne SPENCER

Spencer-00504

stated to me, "I felt like my hands were tied." She indicated that she told her children that she did not have any control because the court had ordered those visits and if they really did not want to go up there during the summer they should talk to their father and tell him. She also related that she did not suspect that Katie was upset because of any type of abuse; she felt maybe Katie just wanted to spend more time during the summer with her friends, etc. She related approximately two weeks before the children were scheduled to leave, Katie finally resolved herself to the fact that she was going and told her mother, "Okay, I'll go, but I'm not going to have fun."

DeAnne SPENCER also advised me approximately two weeks before the children left for their father's, Matthew had shared with her that he had been having bad nightmares that "terrified him." She indicated that initially Matt didn't want to talk about the nightmares; however, at some point he agreed to share with her, and when he did he indicated that in the dream Katie fell off of the balcony into the water at Ray and Shirley SPENCER'S residence. Deanne SPENCER advised me that she told her son she could understand why that would be a fearful thing to dream about, and also advised him that he did have some control if he was afraid that was going to happen, indicating that he did not have to be out on the balcony without an adult if he was uncomfortable. She also advised that she told Matt just not to go out on the balcony or let Katie go out if there was not an adult there. She indicated Matt stated, "What happens when there's a bunch of people out there and it gets all crazy?" DeAnne related that she told Matt he could still control whether he and his sister were out there and if he was uncomfortable he should not go out onto the balcony.

DeAnne SPENCER related that during the 1983 summer visitation, Ray and Shirley SPENCER were not living in Yacolt; however, apparently they were remodeling the house on Lucia Falls Road and the children had been there.

I asked DeAnne SPENCER about any kind of behavior changes or unusual behaviors she may have observed reference Katie. DeAnne SPENCER related that Katie's attitude towards men has concerned her for some time. Specifically, it was "like Katie seemed to know how to manipulate men."

CCSO Case #84-8506  S.A.KRAUSE/K-43                                page 5 of 22

She also advised that her mother felt Katie did that in a more "adult way" and different from most four or five year old children. DeAnne related that she had attributed it to Katie not having a father around all the time and wanting attention. She indicated that the observation she had made reference Katie's behavior around men was that it was "more of a sexual thing than just wanting attention." When I asked her if she could be more specific she indicated that Katie liked to sit on men's laps, and when she did that she would observe Katie rubbing on them, making reference to an arm or a leg. She also indicated that Katie was "real clinging and would kiss in a way that did not appear to be appropriate for a four or five year old." She then stated to me, "Katie would just do things that didn't seem right, but I still felt it was probably because her dad wasn't around all the time."

DeAnne SPENCER indicated that after Katie would come home from visiting her father, she would consistently be using a very "whiney voice." Also, Katie used that same voice whenever she would talk to her father on the telephone. DeAnne SPENCER stated to me, "I can't really describe it but I know that it really upset her brother. It was just a lot of baby talk and whining and that seemed to go on for a couple of weeks before I could get her to stop doing it."

DeAnne SPENCER also related when Katie returns home she is very "demanding." She advised that if Katie did not get her way by demanding something, she would start with the "whiney voice." DeAnne SPENCER also related that she recalled after the 1983 summer visit that she noticed when Katie was around other men she would begin using that voice again and would get her way a lot of times because of it.

DeAnne SPENCER also related that after the 1983 visitation he noticed there were a number of times when she observed Katie rubbing the genital area of her own body. She indicated when Katie got home after the 1983 visitation, there were several times that Katie would ask her mother to put medicine on the genital area of her (Katie) body, indicating that it was sore. DeAnne SPENCER related, "At some point I realized that she was wanting medicine a lot." She continued that there was a time when there did not

CCSO Case #84-8506  S.A.KRAUSE/K-43                    page 6 of 22

appear to be any irritation and so she told Katie that she was big enough to put the medicine on herself and she had her do it after that.

She also related that after the summer 1983 visitation was over and Katie was home, Katie "seemed to be real preoccupied with DeAnne SPENCER'S breasts." DeAnne SPENCER advised me that she thought probably it was because Katie had a new step-mother and when Katie would sit on Shirley's lap and on her mother's lap she may have felt that there was some difference.  She advised that that was the only explanation she could come up with regarding how Katie was behaving.

DeAnne SPENCER related that after the Easter trip in 1983, on one occasion she walked into the bathroom and saw Katie touch Matthew's penis. She indicated from that time on she just made sure that the two were not together in the bathtub. She indicated that she just felt probably it was a curiosity thing and did not think about it anymore.

DeAnne SPENCER related that after the 1983 summer visitation her sister-in-law, Shaun, was babysitting for Katie and Matt. Apparently at some time during that time period, Shaun caught Katie and her cousin, Danny, who is approximately two years older, under the covers with their clothes off.  When she asked them about what they were doing, they indicated they were playing house and "that's what moms and dads do." DeAnne SPENCER related that her sister-in-law explained to the children that that was not how you played house. She also advised me that a teenage babysitter she has by the first name of Laurie, told her that whenever Katie plays with Barbie dolls she always has the "adult doll naked in bed." Apparently, Laurie has made those observations since the 1984 summer visitation.

Linda LAWRENCE and DeAnne SPENCER both mentioned the condition of a nightgown Katie had after she returned from the 1984 visit. Linda LAWRENCE related that the gown had something on the back similar to "Daddy's Princess." Apparently, Katie had spent the night at Shaun's house when Linda LAWRENCE noticed the nightie and also Shaun. When I asked her what it was about the night gown that was bothering her, she indicated that the whole front where the crotch would be was worn almost completely through.  Apparently, DeAnne SPENCER threw that gown away when it was brought to her attention.

CCSO Case #84-8506  S.A.KRAUSE/K-43                    page 7 of 22

I asked DeAnne SPENCER about the sore that Karen STONE had related she had seen when Katie came for a summer visitation, apparently during the summer months of 1982. DeAnne SPENCER related that Katie had spent Easter week with her father in 1982 and then nine weeks in that summer. Apparently, between the two visitation, Katie developed a sore on the labium. She advised that this sore developed about one week before the children were scheduled to go with their father. She indicated that she took Katie to the doctor and he indicated it was some type of a viral infection and gave her Desitin and Neosporin to apply to the infected area. DeAnne SPENCER stated when she brought it to Ray SPENCER'S attention, he was "furious with her and demanded to know where the hell she got that kind of sore."

DeAnne SPENCER then related to me that the summer after she and Ray SPENCER split up (1981) she developed a case of herpes. She indicated her doctor told her that it was one of the worst he had seen. DeAnne SPENCER indicated that the sore she observed on Katie's labium reminded her a lot of a herpes blister. I asked her if she knew where she contracted the herpes and she advised at that time she had been seeing two different men and when she became aware that she had herpes, she called both men who subsequently were examined by a physician and both provided documentation that neither had the herpes. DeAnne SPENCER then related that the sensation she got prior to the herpes breaking out was something that she had experienced "many, many times" when she was married to Ray. She advised that she was never aware of any breaking out but did recall having that same "sensation." DeAnne SPENCER indicated that when they were married, almost every time she got that sensation, Ray would say something to her a day or two before, indicating that she should go to the doctor and be checked because he "was experiencing some burning when he urinated." DeAnne SPENCER stated to me, "Ray would come in and say, 'You better get to a doctor because you have that infection again'." She related that she would go to the doctor and whatever he gave her would usually remedy the problem. However, she stated that the last time, prior to seeing the doctor and finding out she had herpes, she figured it was "probably no big deal again," just some type of a normal vaginal or sexual infection.

Spencer-00508

I asked DeAnne SPENCER if Ray SPENCER could have had herpes without her knowing. She indicated that he was a person who was very clean and to the point that he was "pre-occupied" with being clean. She related there were a lot of times when they never had physical relations (intercourse) and she never questioned whether or not she could have contracted something. She also stated to me, "I don't think if he had them I would have even known it because there were months when we would not be sexually involved." DeAnne SPENCER indicated she had no reason other than the fact that the other two gentlemen did not have herpes to believe that she may have contracted it from Ray SPENCER. She also advised me that she had no knowledge as to whether or not he did, in fact, have herpes or if what Katie had on her labium was a herpes sore.

During one of my conversations with Ray SPENCER, he indicated that Katie had made some kind of a statement to Shirley SPENCER reference Ray SPENCER and DeAnne SPENCER sleeping together after Shirley and Ray SPENCER would have been married. I asked DeAnne SPENCER about that and she indicated that there were only two occasions after she and Ray SPENCER separated that he stayed at her house when he picked up the kids. She indicated once was just prior to Ray marrying Shirley SPENCER and on both of those occasions he and the children slept in the living room. She indicated there had never been any sexual contact between them.

During a phone conversation I had with DeAnne SPENCER, prior to going to California, she had mentioned that while they were living in Los Angeles, a neighbor girl named Rhonda accused Ray of raping her. I asked her if she could be more specific about what that incident involved. DeAnne SPENCER related the following. They lived in Los Angeles for approximately six years and at that time had neighbors named Jerry, Roxie and Rhonda. She indicated Rhonda was nineteen years old when the incident occurred; however, Rhonda was "emotionally very, very immature."

Apparently this incident reportedly occurred in November of 1978. DeAnne SPENCER indicated that Ray had consistently tried to isolate her from her family and then all of a sudden about one week before Thanksgiving, Ray suggested that she and Matt go to Sacramento to spend some

Spencer-00509

time with her family. She indicated at that same time Rhonda's family had gone to Europe and she was home alone. DeAnne related that she talked with Ray several times during that week she was gone on the telephone, and then one evening during a phone call when he had called her, he indicated that he was concerned about Rhonda because she was "acting really strange." She also reported that he told her, "I think she's got something up her sleeve and I'm worried about it." DeAnne advised me that she told Ray if he was worried just not to be alone with Rhonda or give her an opportunity to say anything. DeAnne SPENCER indicated the following evening she had to call Ray and when she did he whispered in the phone that "Rhonda was in there." He also reportedly told DeAnne he was going to tell Rhonda that she had to leave because he was going to a friend's house for dinner, and DeAnne advised that she told Ray she thought that was a good idea.

DeAnne SPENCER then related that on Thanksgiving Rhonda and her family ate dinner with them (SPENCERS). She advised that a couple days or so before December 4th, Ray mentioned to her that he was nervous about Rhonda. She indicated that he had mentioned Rhonda several times after she returned home from Sacramento and that he appeared to be nervous about something. She related that during that conversation, before December 4th, Ray said something similar to, "What if she says something about me or what if she says I did something? I really wouldn't be able to do anything about it." DeAnne advised me that she told Ray that he shouldn't even worry about it because it wasn't going to happen.

DeAnne SPENCER indicted on Sunday, December 4th, she received a phone call from Rhonda's father, Jerry, and at that time he reportedly stated to DeAnne SPENCER, "I want to see you at my house now without Ray." DeAnne SPENCER advised me that she could tell Jerry was upset and so she went right over to Rhonda's house. She indicated when she went out of the house Ray was working in the garage on a toy chest for Matthew and at that time she was "very pregnant with Katie" because Katie was born in January.

DeAnne SPENCER indicated when she got to Jerry's house, Rhonda's uncle, a cousin, Rhonda's parents and Rhonda were sitting in the living room. She advised that she knew something was wrong and when she came in

CCSO Case #84-8506  S.A.KRAUSE/K-43                              page 10 of 22

Spencer-00510

Jerry appeared to be upset and she remembered him jingling his change in his pocket. She said at some point she was really uncomfortable and asked, "What's up?" At that time Rhonda's father reportedly stated, "Well, it seems as though when we were all away Ray raped Rhonda." DeAnne SPENCER advised me that she became very upset and stated, "Whoa, whoa, wait a minute. Hold it. I want my husband here. I don't want anymore to go on. He needs to be here." She advised at that time she went out and told Ray, "You're not going to believe it, Ray, but she did it." DeAnne SPENCER advised me, "I remember the look on his face. The blood just drained and he said, 'No kidding?'" At that time DeAnne and Ray SPENCER went back into Rhonda's house and DeAnne SPENCER advised that Ray looked at Rhonda and said something like, "Rhonda, how could you say these things?" DeAnne SPENCER advised me that she (DeAnne) "totally defended Ray." She indicated at that time she looked at Rhonda and told her, "Okay, Rhonda, I want it from you. I want to know what happened, and I want to know the truth." DeAnne related that at that time Rhonda said something about "Ray calling her up and inviting her over and when she got her he had music playing and the lights were low and he had on nice clothes." DeAnne related that at that time Ray said something like, "Rhonda, how could you?" And DeAnne advised me that she told Ray to shut up and let Rhonda talk. Apparently at that time Rhonda indicated that when she got over to SPENCERS "she and Ray were on the couch and started talking and kissing and one thing lead to another, and then they wound up in bed." DeAnne SPENCER advised me by that time Rhonda was sobbing and she (DeAnne) turned to Ray and told him, "Okay, I want to hear your side of it."

Ray then indicated that he was outside working on the toy box in the garage and that he was covered with dirt when Rhonda called and said that she wanted to talk to him because she was having problems with a boyfriend, so he told her to come over, even though he was feeling very uncomfortable. He indicated when she got there they talked about the problem and then he told her what he thought she should do about it. DeAnne SPENCER stated, "Then he told me I called him in the middle of that conversation." Reportedly, Ray SPENCER then indicated that he told Rhonda she would have to go because he was going to a friend's for dinner. DeAnne SPENCER advised me that Ray always denied that he had even "so much as touched Rhonda." (During a

Spencer-00511

conversation Ray SPENCER had with Dr. ABRAMS, prior to my going to Sacramento, he admitted that he had been sexually involved with a neighbor girl in Los Angeles, however, indicated it was not rape, it was consensual sex.)

DeAnne indicated after Ray gave his side of the story, Rhonda was still "just sobbing" and Rhonda's uncle apparently was saying things like "he was going to blow Ray's head off." Apparently, Rhonda's parents were making statements indicating that she did not come over to discuss problems with Ray ever, and DeAnne advised me that Ray had told her sometime back that Rhonda told him that her cousin had molested her. DeAnne SPENCER indicated things were getting out of hand and she told Rhonda's parents, "Wait a minute. I want to tell you how Rhonda came to us several times with problems and once told us about six months ago that a cousin, Donnie, had molested her, and she was afraid to tell anyone." DeAnne SPENCER advised me that she told Rhonda's family that she was present when Rhonda shared that. She indicated, however, that was not true, that it was information that Ray had given to her. Apparently, Donnie's father, who was at the house indicated at that time that maybe the whole thing was a big misunderstanding. She advised that Rhonda's father stood up and Ray was asking him, "Don't you believe me?" Rhonda's father reportedly responded that he didn't know what to believe, but he knew "one thing for sure; their friendship had been terminated."

DeAnne SPENCER related that when they left Rhonda's house she and Ray went to a friend's house who was also a policeman. She indicated that Ray instructed her specifically not to discuss what had occurred; however, when they got to the friend's house Ray was the one that brought up the subject and apparently shared with the friend. DeAnne SPENCER indicated she remembered the friend telling him not to worry because if the girl's parents were going to call the cops they would have done it already. DeAnne SPENCER advised that that was the end of it, and Ray always denied that he had ever done anything to Rhonda, and she (DeAnne) believed him for many years.

I asked DeAnne SPENCER if she could provide me with some background information regarding how they had met, etc. She indicated at the time she met Ray SPENCER, Ray was an air traffic controller at Mathers Air

Spencer-00512

Base.  She indicated she was eighteen years old at that time and had an apartment of her own.  Apparently they initially met in a book store and that same evening he took her out and "moved in with her three days later."  DeAnne advised that Ray was at Mathers for two years and then released from the service.  Reportedly, before he was released, he had applied for an air traffic controller job; however, because the president had eliminated something like fourteen hundred jobs, Ray was not able to do that.  Apparently, the president did notify those people who had applied that they were opening up positions as sky marshalls.  DeAnne SPENCER related that the day after she and Ray SPENCER were married he was notified that he had been accepted as one of those who could be a sky marshall.  She indicated that he was really excited about that offer because it gave him the opportunity to be a "cop."  She advised that he had checked into the requirements for Sacramento and California Highway Patrol and because of his height he did not qualify.

She indicated that Ray was then sent to the FBI academy for training for sky marshall and that it was located in Virginia.  After the training was completed he was assigned to the Chicago area.  DeAnne SPENCER indicated that Ray arrived in Chicago on January 7th and she got there January 9th.  She advised that she was there only a month when he was assigned to fly the San Juan turn around out of New York so she was alone.  She indicated when he came home he talked to her about his "stewardess friends" and how "neat they thought he was."  She indicated he had three nice blankets with him that he indicated were given to him by the stewardesses from different airlines.

Apparently, DeAnne SPENCER went to work at a bank in the Chicago area shortly after she moved there.  She indicated that there was a female at the bank named Angie and initially she and Angie were very good friends.  However, towards the last couple of months that DeAnne SPENCER was employed there she felt Angie was acting differently around her.  She also indicated that when the bank had a going away party for her, she felt very uncomfortable many times because of the interaction between Angie and Ray SPENCER.  DeAnne SPENCER advised me that approximately two years ago she found out from another mutual friend that Ray SPENCER and the female named Angie were having an affair during the time DeAnne worked at the bank.

CCSO Case #84-8506  S.A.KRAUSE/K-43                                    page 13 of 22

DeAnne and Ray SPENCER spent six months in Chicago, then moved to Los Angeles and were there six years. She advised that when they moved to Los Angeles Ray went to work for the Treasury Department and initially was working in the airport when they installed the new detectors and was also doing "undercover work in the airport." DeAnne SPENCER related from there Ray went to work for the U.S. Treasury and was working with the Harbor Patrol doing undercover narcotics work on the boats.

DeAnne SPENCER indicated when Ray was working for the Harbor Patrol he confiscated a lot of paraphrenalia in their raids and "lots of guns." I asked her how many guns he had and she indicated that he told her he was buying them but she knew he had approximately four rifles and there were handguns. She indicated she remembered one gun that Ray specifically told her not to mention to anyone because he wasn't supposed to have it. I asked her if she could describe it and she stated, "I think he called it a short sub machine gun." She advised that he mentioned several times that she was not supposed to tell anybody because he wasn't supposed to have it. I asked her if she could describe it and she described it as having a fairly short barrel, being black in color, with a big handle that had a clip in it.

DeAnne SPENCER indicated at some point Ray became very unhappy with the people he was working with at the Harbor Patrol and specifically was upset with a black supervisor, indicating that this man was "after him." DeAnne SPENCER advised me that she didn't know what happened but Ray shared with her shortly after that "that something had happened to the black guy and he got his."

Apparently, about that same time, Ray SPENCER indicated to DeAnne that he was seeing a female subject named Norma again. She advised that Norma reportedly was a girlfriend of Ray's prior to him meeting her. DeAnne SPENCER indicated that Ray was telling her a story about this Norma being married to a millionaire and that she wanted to put Ray through law school. DeAnne SPENCER advised that that upset her because she felt if anyone should do that she should work and put him through school. Around that same time SPENCER apparently applied at Vancouver Police and also at a law school in the Sacramento area. I asked her how he happened to apply in this area and she

CCSO Case #84-8506  S.A. KRAUSE/K-43                    page 14 of 22

Spencer-00514

indicated that he had a sister who lived in this area and had advised him about the job.

DeAnne SPENCER related that Ray was a very bright person and when he attended Long Beach State and was working full time he was an A-B student.  She advised that while they were in the Los Angeles area Ray worked and went to school most of the time. Apparently, Ray indicated to DeAnne that he had taken the law exam and had "really flunked it." She advised me that she never understood that because she knew he was intelligent and would not have been surprised if he maybe did not pass it or was not accepted; however, she just couldn't understand him "flunking it totally."  DeAnne SPENCER advised me that she really did not know if Ray ever even took the test, she only knew what he had told her.

DeAnne SPENCER indicated to me that it was when Ray was going to college in Los Angeles that he used to talk about having a friend named "Dennis" at school.  At some point Ray indicated that Dennis was going to be in Europe and he would be watching his house for him.  She advised me that she used to get really uncomfortable whenever Ray was going to Dennis' house because he always took a shower, cleaned up and put on cologne to go check the house, and she really felt uncomfortable because she believed he was doing something else.

DeAnne SPENCER indicated that Ray brought home a beautiful sweater and hat one day, indicating that his friend, Dennis, had bought it for him in Europe and it was a gift for watching the house.

DeAnne SPENCER indicated that just prior to Christmas that year Ray came home with a sack indicating it was presents for Dennis and Dennis' family and that he instructed her to "stay out of it; it was none of her business."  She advised that Ray put the sack in a room that he had designated as his "den" and normally she "stayed pretty much out of there." She advised as soon as Ray left she took the sack into the bathroom and looked inside because she felt he was not telling her the truth.  She indicated in the sack was a book of poems, some Estee Lauder and very feminine things.  She advised me "either Dennis was a girl or a homosexual because those were not gifts for a man." She also related that Ray got her the same book of poems that

Spencer-00515

he had in the sack.  She indicated when she confronted him about the book he became really angry, telling her that he meant what he wrote on her book but did not mean what he wrote in the other book of poems.  Also, reportedly Ray indicated that he bought that book of poems for "some chick he rolled in the hay with that had done some typing for him and that it was none of DeAnne's fucking business." DeAnne SPENCER stated to me, "He had so much control over me it was stupid, but I ended up apologizing to him for what I had done and he had just stood there telling me that he had had an affair with another woman."  She also related she recalled seeing the first name of Cindy written in the book.

DeAnne SPENCER indicated she recalled times when she was married to Ray SPENCER that he would tell her that when he walked into a bar he could point out people that were either "cops or criminal because there was such a fine line between them."

I asked DeAnne SPENCER about the comment on the clothes, and she stated, "They were very slutty clothes he bought me."  She advised that Ray had a friend named Ernie GARCIA whose wife wore a lot of makeup and also apparently Ray's sister, and that he wanted her to wear the false eyelashes and wear a lot of makeup.  She indicated that most of the clothes Ray bought her were from Fredrick's of Hollywood. She stated to me, "He loved to take me out in public when I looked like that and I believed him that I looked nice."  She then stated, "Around the house I dressed like an old lady and when I was with him I wore very low cut and revealing clothing."

DeAnne SPENCER indicated that when they left Los Angeles they moved to Vancouver where Ray went to work for Vancouver Police. She indicated after they moved up to the Vancouver area she rarely even saw him because he got off work at 11:00 PM in the evening and would never get home before 2:00, 3:00 or 4:00 AM.  She advised when she questioned him about it he reportedly would say "he had to stop and have a few beers to lighten up."  She also advised that Ray told her that "this is how it was to be married to a cop, and all cops were like that."

DeAnne SPENCER also related that in December of 1979 Ray was involved in some kind of undercover detail with Vancouver Police involving gambling in downtown Vancouver.  DeAnna SPENCER had rough notes of

Spencer-00516

reports Ray SPENCER was preparing regarding that investigation.  DeAnne SPENCER also showed me a poem signed by the same woman as named in the drafts of the report as the snitch which was addressed to Ray SPENCER.  DeAnne SPENCER indicated that at some point during the investigation Ray SPENCER told Vancouver Police that his snitch "burned him;" however, she advised that Ray told her he lied to the department because he just wanted "out."

When DeAnne and Ray SPENCER separated, DeAnne SPENCER found a box of letters, some very intimate, that were address to Ray SPENCER during the time DeAnne SPENCER was married to him.  DeAnne SPENCER advised me that she would make any of the information regarding the gambling incident or letters available to whoever might want them, regarding this investigation.

During the time I talked with DeAnne SPENCER I asked her about the alleged pornographic books that SPENCER reportedly had.  DeAnne SPENCER advised me that Ray did have a number of books that were "hard core porno."  She advised that she would guess that he had approximately fifty of them.  She also related that during the time she was married to him there were a number of times when they either passed adult movie theatres or in conversation when Ray SPENCER would mention he had seen a specific movie. . DeAnne SPENCER advised me that she had accompanied her husband on two occasions in Los Angeles to an adult movie; however, that was the only time.  She advised when she questioned Ray about when he was seeing all the movies he would indicate to her it was usually when he was "out with the guys or working an undercover assignment."  She also indicated that since the time he was involved in any kind of police work at all there were many times when he did not come home for days and would tell her he was working undercover.  However, she never really knew what he was doing.

During my conversation with DeAnne SPENCER I asked her if Ray had ever requested her to do anything that she objected to sexually or if she had ever observed him to have any unusual sexual habits during the time she was married to him.  DeAnne SPENCER indicated that there were a number of things that bothered her.  Specifically, he was involved with so many other women during the time they were married, and there would be weeks and months go by without them having any physical contact.  She also advised that Ray

CCSO Case #84-8506  S.A.KRAUSE/K-43                                    page 17 of 22

purchased an electric dildo (a simulated penis) and that he would tell her to masturbate herself with it when he was not around. She stated to me, "Then he wanted me to tell him about it later and that seemed to excite him." DeAnne SPENCER stated to me, "I can't believe I'm telling you this and that I was so stupid, but I tried so hard to please him." DeAnne SPENCER also related that there were many times when Ray would want to have anal sex with her or insert the "dildo" into her rectum. She indicated that there were many times when Ray had her insert the "dildo" into his rectum or would ask her to insert her finger into his rectum during their sexual activities. She related she "often wondered why that did not cause him some discomfort." I asked DeAnne SPENCER if the "dildo" had a vibrating mechanism and she indicated it did vibrate but that it didn't use batteries, it was one that you plug into the wall.

During the time I talked with DeAnne SPENCER I asked her what the circumstances were regarding her separating and divorcing Ray SPENCER. At that time she related the following. She and Ray had planned on taking a vacation with the whole family and had talked about going to Canada. Reportedly, they were scheduled to leave on a Thursday. DeAnne SPENCER indicated that Wednesday night, the evening prior to them going, she had made a comment to Ray about him making sure he got home early enough because they would be leaving that Thursday. She indicated that he became extremely upset and told her "it was none of her fucking business what time he got home." She advised me that they began arguing and that that went on for several hours. She advised apparently at sometime he suggested that maybe she just needed to get away for awhile and that she should go visit her friend, Cindy, in Los Angeles. DeAnne SPENCER advised me that her friend had offered to send her a plane ticket to come visit her on several occasions. She related that Ray finally asked her what she was going to do and wondered if she had decided to go to Los Angeles and she indicated that maybe that would be best if she just got away, so she made reservations to go to visit her friend.

DeAnne said the plan was for Ray to keep the children and for her to get away alone. She advised, "All of a sudden he suggested I take Matthew, indicating that Matthew wanted to go with me." She advised that the whole purpose was for her to get away and that part of their problem was

Spencer-00518

that he was not spending any time with his children, and she felt that would give he and Matt some time alone. DeAnne SPENCER indicated after he kept talking about Matt going for several minutes she finally became upset and told him, "We'll ask him what he wants to do." DeAnne SPENCER related she was really furious because Ray marched right in there and asked Matt, who was only four years old, "Do you want to fly on a big airplane with your mom or do you want to stay with Dad?" DeAnne SPENCER stated to me, "Of course, you know what Matt said." She advised that she confronted him because of how he had asked Matt and told him, "You knew what his answer was going to be." She advised that Ray got upset and went back in and asked Matt, "Do you want to stay with Daddy or do you want to go with Mom?" She advised that Matt said, "I want to go on a big airplane."

DeAnne SPENCER advised that Ray told her he would keep Kathryn and for her to go ahead and take a couple days off and that Kathryn would be fine. DeAnne SPENCER related that initially Ray wanted her to drive the car to the airport and leave it; however, she had him take her there and she remembered feeling "very uncomfortable with leaving Katie behind." She advised at one point she looked at Katie and Katie seemed happy being with her father so she really lost the uncomfortable feeling.

DeAnne SPENCER related once she got to Los Angeles Thursday night, she called Ray to tell him that she and Matt had arrived safely, and Ray told her that he had "called her mother and told her what happened and suggested she better call her mother and let her know she was okay." DeAnne advised me that she really didn't know what he was talking about but called her mother and that Ray had called Phyllis DAY, indicating that "DeAnne wigged out and left him and Katie and took Matt with her, and that he didn't know where she was." DeAnne SPENCER stated to me, "I couldn't believe it. I called my mother and was just freaking out." She then related that her mother told her to calm down, that she was glad she knew where she was and to go ahead and spend a couple of days and maybe it would make things better for them. DeAnne SPENCER related that she called Ray back that evening and talked with him and during that conversation he kept making statements similar to, "What do you think, I'm the worse person in the world?" She advised that she

Spencer-00519

told him that she did not think he was the worse person but thought that he did."

DeAnne SPENCER related the following day, Friday, he called her back and told her that he had been thinking about what she said to him the evening before and that he had decided to keep the house and the kids and "he would send her clothes to her so she could walk the streets with her girlfriend." He also reportedly advised her to send Matt back on a plane when he had finished his vacation.

DeAnne SPENCER related that approximately two years before she and Ray separated, Ray met a clinical psychologist in California named Chuck LADLEY, at some kind of conference. She advised that while Ray was at the conference he called her, indicating that he had talked with a psychologist and felt that if she could come down and talk to him too that he could help them work out some of their problems. She related that she made arrangements for someone to care for the children and drove to where he was immediately and she spoke with him in a casual setting regarding their problems and the doctor felt that he could help them.

DeAnne SPENCER advised me as soon as she had talked to Ray regarding what he said reference sending her clothes to her, etc. she made a call to Sacramento to Dr. LADLEY'S office and got no response. she indicated that she subsequently called his residence and made arrangements with his wife to come to Sacramento to talk to him. She also advised me that when she saw Dr. LADLEY the two years before he indicated to her that he felt Ray had problems and also indicated to her that he thought Ray was a pathological liar. DeAnne SPENCER indicated she rented a car the next morning and drove to Sacramento and did meet with Dr. LADLEY, who advised her to go on back to Vancouver immediately.

DeAnne SPENCER related that she flew into Portland on Sunday evening and rented a car and that evening stayed in Portland with her friend's mother. DeAnne SPENCER indicated her friend, Patty, used to be married to a Vancouver Police Officer, Officer HULSE. DeAnne SPENCER related the following morning she drove to Vancouver and saw an attorney. Also, she was extremely concerned about Katie's whereabouts nd subsequently called Patty to

CCSO Case #84-8506  S.A.KRAUSE/K-43                     page 20 of 22

see if she might know where Katie was. She advised that Patty told her that she was taking care of Katie and indicated that when DeAnne left for California Ray called and told her (Patty) that he didn't have any money and was going to have to go back to work and asked her if she could take care of Katie, which she did. DeAnne SPENCER related that she called her attorney and asked if it would be okay if she went to Patty's home and retrieved her daughter and he advised her that she should do that.

DeAnne SPENCER indicated that after she had seen the lawyer she did talk with Ray on one occasion and he was indicating he didn't know whether or not he should get an attorney. She advised me that she told him she really didn't think it was necessary because he knew she would be fair and would only ask for half of what they had. Apparently, on Thanksgiving DeAnne SPENCER'S parents came up to help her pack and retrieve her part of the belongings. However, she advised that Ray served her with some type of a paper indicating that she couldn't remove anything from the residence and she did not move out of the home with her belongings until December 4, 1981.

During my conversation with DeAnne SPENCER reference the separation she indicated that during the divorce proceeding, Ray SPENCER advised the court that he had been staying with Karen STONE since he moved out of his residence. However, she advised me that she had no knowledge as to when Ray actually met Karen or how.

During my interview with DeAnne SPENCER she related that she did not realize how much control Ray had over her during the time she was married to him; however, looking back she "cannot believe how he influenced her." She stated to me, "Whenever I caught him doing something, going out with someone, having an affair or whatever, he would turn it around and make me feel bad." She also advised that Ray was a very emotional person and could be very convincing at that. DeAnne SPENCER talked again about the time that Ray SPENCER reportedly called her at work when she was working at the phone company and the only thing he said initially to her was that he was "going blind," and then hung up the telephone. She advised me that she just panicked and at some point was able to determine that Ray SPENCER had had a physical and during the physical the doctor mentioned that he had the potential of getting glaucoma.

CCSO Case #84-8506  S.A.KRAUSE/K-43                                    page 21 of 22



She stated to me, "No matter what happened, he could make it into a catastrophe and have everybody upset and scared to death before you figured out what was going on.

Prior to terminating our conversation DeAnne SPENCER advised me that she would make any information she had available to whoever needed it and also would provide us with a medical release to obtain any medical records or therapy records on Katie or Matt.

This investigation to be continued.

CCSO Case #84-8506  S.A.KRAUSE/K-43                                     page 22 of 22

# EXHIBIT FF

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA


CLYDE RAY SPENCER, MATTHEW

RAY SPENCER, and KATHRYN E.

TETZ,

        Plaintiffs,

        vs.                          Case No:   C11-5425BHS

FORMER DEPUTY PROSECUTING

ATTORNEY FOR CLARK COUNTY JAMES

M. PETERS, DETECTIVE SHARON

KRAUSE, SERGEANT MICHAEL DAVIDSON,

CLARK COUNTY PROSECUTOR'S OFFICE,

CLARK COUNTY SHERIFF'S OFFICE,

THE COUNTY OF CLARK and JOHN

DOES ONE THROUGH 10,

        Defendants.

_____/


VIDEOTAPED DEPOSITION OF

DEANNE SPENCER

Friday, November 16, 2012


Reported by Jennifer F. Milne, CSR No. 10894

1   therapist ever state to you, "I think she made these

2   allegations up"?

3        A   No.

4        Q   Did she ever state to you, "she" being the

5   therapist, "I don't think anything actually happened"?

6        A   No.

7        Q   Was it your understanding that the therapy she

8   was pursuing with Katie was that she had been -- in

9   fact, been improperly touched by her father?

10       A   Yes.

11       Q   Did -- and -- in the same time period, did you

12  notice any unusual behavior on Katie's part that may or

13  may not, based on your understanding of child

14  development, have been consistent or inconsistent with

15  physical sexual abuse?

16       A   At times I felt uncomfortable of some of her

17  behaviors, especially around, oh, like her uncles --

18  it's so long ago.

19       Q   I know.

20       A   But I just -- I can't put my finger on it.  I

21  was just uncomfortable.

22       Q   Okay.  Did you ever observe her to rub her

23  genital area in this time frame?

24       A   Yes; but I didn't think anything of it.

25       Q   Did she ever ask you to apply medicine to her

1    genital area in this time frame?

2         A   Yes.

3         Q   Okay.  Had you ever done that in the past?

4         A   She had a sore like on the top of the vaginal

5    area, not inside, but on the top.  And when I took her

6    to the doctor, he said it was a viral infection.  And he

7    gave me medication to put on.

8         Q   And how -- when did this occur in relation to

9    the fall of 1984 time frame?  Was it in the same time

10   frame, or was that earlier?

11        A   I'm sorry.  I don't remember.

12        Q   Okay.  Do you think it was before, possibly?

13        A   Yeah, I do believe it was before.

14        Q   Okay.  Did you notice anything unusual about the

15   nightgown Katie brought back from her visits with her

16   father in the summer of 1984?

17        A   It just seemed to be worn, you know.  A little

18   strangely -- I mean worn -- worn out.

19        Q   Can you be more specific?  Was it fraying at the

20   sides or any particular place or --

21        A   More of in the area of where she might have had

22   her underwear.

23        Q   Go ahead.  Take a break.

24        A   Okay.

25        Q   And your response was more in her underwear

```
 1   area?
 2        A    Yeah.  Yes.
 3        Q    And what particularly did you notice about that
 4   nightgown in that regard?
 5        A    I just remember it said "Daddy's Little
 6   Princess" on it.  It made me very uncomfortable.  I
 7   can't tell you why.
 8        Q    Okay.  What did you do with that nightgown?
 9        A    I threw it away.
10        Q    Was that after the allegations of abuse had
11   been -- had surfaced?
12        A    Yes.
13        Q    Did you learn at some point that you were
14   actually a suspect; that your former husband was telling
15   authorities up in Clark County that it was actually you
16   or possibly a man in your home that was abusing Katie?
17        A    Yes.
18        Q    Okay.  And when, approximately, did you learn
19   about that?
20        A    It was -- it was not long after Pat Flood had
21   come over.  I mean, it was within that few-months time
22   period.  I don't remember exactly when.
23        Q    And at that time, were there any men living in
24   your household?
25        A    No.
```

| 1 | Q What was your only concern in this time |
|---|---|

1   Q   What was your only concern in this time

2   frame once you learned about these allegations?

3       A   My children.

4       Q   And you -- as you indicated earlier, you

5   actually were a suspect at one point as someone who

6   might have possibly improperly touched your daughter?

7       A   Correct.

8       Q   Were you rather quickly ruled out as a suspect?

9       A   I was.

10      Q   Did you ever make a statement to law enforcement

11  during this time frame that you don't remember if you

12  sexually touched your daughter or words to that effect?

13      A   No.

14      Q   What was your position throughout?

15      A   My position about me?

16      Q   Yes.  About --

17      A   I never have.

18      Q   And did you make that very clear from the

19  beginning?

20      A   I did.

21      Q   Did you volunteer to take a polygraph?

22      A   I did.

23      Q   And did you take that polygraph?

24      A   I did.

25      Q   And what were the findings of the polygraph?

1        A   My understanding was it was -- I don't know if

2    you call it conclusive.  I was telling the truth.

3        Q   So you were then ruled out as a suspect totally?

4        A   Correct.

5        Q   Now, once you were ruled out as a suspect, do

6    you -- based on what Shirley Spencer wrote in this

7    seven-page document, would you have wanted the

8    investigation to just stop?

9        A   Absolutely not.

10       Q   And why is that?

11       A   It -- with what I was experiencing with my

12   children and with their behaviors and with the

13   information that I had, I wanted to make sure that this

14   didn't happen again to them.

15       Q   And there was an investigation pursued that you

16   participated in as a witness, was there not?  An

17   investigation by the Clark County Sheriff's Office?

18       A   Correct.

19       Q   And do you recognize the name Sharon Krause?

20       A   I do.

21       Q   And who is Sharon Krause?

22       A   She was the detective handling the case.

23       Q   For Clark County, Washington?

24       A   Correct.

25       Q   And when -- do you recall first -- we know she

1    treated very delicately.  And I was given information

2    that would help my children to feel safe and

3    comfortable.  And then -- but I was also told that if

4    they didn't want to talk about it, don't push it.  If

5    they did, be open to what they had to say.

6        Q   Did you ever have concerns that Katie was

7    engaging in excessive masturbation at any time?

8        A   No.

9        Q   Now, let's go to Matt and his therapists, Connie

10   Nichols and James Cooper.

11            Did they ever share with you whether or not Matt

12   was talking about sexual abuse by his father with

13   those -- either of those therapists?

14        A   Connie Nichols was his therapist before we were

15   told that he was a party to it.  When we found that out,

16   she suggested he have a different therapist.  So no with

17   her.  She treated him in a different manner.

18            As far as James Cooper, the only incident I

19   remember was when I was invited in and he was talking

20   about how a volcano builds within a child when things

21   happen.  And one of his therapy -- one of his ways of

22   providing therapy was to -- he has a sandbox and the

23   children were allowed to take pictures or draw pictures,

24   do whatever they needed, and then light them on fire.

25   It was sort of therapy, fire therapy.

```
1    have the words on the tape, correct?

2         A   I do now.

3         Q   If you look at page 14, and if you come down

4    about probably 13 lines, it says "Peters" --

5         A   Okay.

6         Q   -- "How come you told me they were upstairs?"

7    And he says, "Huh?  Did you forget?"  And Katie answers,

8    "Yes."  Peter says, "Okay.  That's fine.  Well, do you

9    remember -- before this time that you just told me

10   about, did Ray do that to you before?"

11             Do you see that statement?

12        A   I do.

13        Q   Now, do you remember that when the -- when the

14   break was taken that there was discussion between Peters

15   and Katie of what she was going to say?

16        A   There was no discussion in my presence about

17   what Katie was to say.

18        Q   You're 100 percent positive of that?

19        A   I was very cautious about what was said around

20   my children.  And there was no discussion about what to

21   say or anything other -- that I recall.

22        Q   Okay.  When you say "in your presence," isn't it

23   true that on the break that Sharon Krause also rejoined

24   you, your daughter, and Peters for a few minutes?

25        A   I believe so.
```

1          REPORTER'S CERTIFICATION OF PROCEEDINGS

2

3

4          I, Jennifer F. Milne, CSR #10894, a Certified

5     Shorthand Reporter in and for the State of California,

6     do hereby certify that, prior to being examined, the

7     witness named in the foregoing deposition was by me duly

8     sworn to testify the truth, the whole truth, and nothing

9     but the truth; that said deposition was taken down by me

10    in shorthand at the time and place named therein and was

11    thereafter transcribed under my supervision; that this

12    transcript contains a full, true and correct record of

13    the proceedings which took place at the time and place

14    set forth in the caption hereto.

15          I further certify that I have no interest in the

16    event of this action.

17

18

19    EXECUTED this 26th day of November, 2012.

20

21

22                    _____

23                    JENNIFER MILNE

24

25

# EXHIBIT GG

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT

FIRST DEGREE STATUTORY RAPE
LOCATION OF INCIDENT:   17681 NE Lucia Falls Road
                        Yacolt, Washington
DATE OF INCIDENT:       Refer to summary

| DATE & TIME: | 03-07-85 | 11:00 AM |
|---|---|---|
| LOCATION: | CCSO, Investigation Unit | |
| INCIDENT: | Interview with Victim | |

VICTIM:              HANSEN, Matthew Alan          dob: 02-20-80
                     17681 NE Lucia Falls Road
                     Yacolt, Washington            phone: 687-2407

SUSPECT:             SPENCER, Clyde Ray            dob: 01-09-48
                     aka:  Ray SPENCER
                     17681 NE Lucia Falls Road
                     Yacolt, Washington            phone: 687-2407

DOCUMENTS ATTACHED:  #1 - Copy of the cartoon drawing used during my
                     conversation with the above listed victim regarding
                     what he called specific parts of the body
                     #2 - A drawing done by victim during the interview
                     regarding the number of times a specific sexual act
                     had occurred.

CCSO Case #84-8506, S.A.KRAUSE, K-43                          page 1 of 4

Spencer-00617

SUMMARY:

On 02-28-85 I interviewed the above listed victim, Matt HANSEN, regarding allegations of sexual contact between Matt and his step-father, Ray SPENCER. During that interview with Matt on the 28th, he related a number of sexual contacts had occurred between he and his step-father at his residence on Lucia Falls Road. Matt also advised me during that interview that he had witnessed his step-father having sexual contacts with Kathryn and Matthew SPENCER, who are the natural children of Clyde Ray SPENCER. Towards the end of my interview with Matt on the 28th he indicated that he was tired and the interview was terminated.

On the morning of March 7, 1985 Matt's mother, Shirley SPENCER, brought him to my office again for the purpose of my interviewing Matt in an attempt to determine if there were additional details regarding him being victimized, and also what he had witnessed regarding the sexual contacts between Ray SPENCER and his natural children, Katie and Matt SPENCER.

My interview with Matt HANSEN was done on the morning of 03-07-85 was done in an interview room located in the investigation unit of the Clark County Sheriff's Office with only Matt and I present. Matt appeared to be much more relaxed and comfortable being with me than he had during my initial contact with him on 02-28-85. I indicated to Matt that I wanted to talk to him again "in case he had forgotten to tell me something this first time I talked to him." I also advised him "that I wanted to make sure that I wrote down everything he told me the first time." Matt stated to me, "That's okay if we talk but I don't know if I forgot anything."

I asked Matt initially if he could tell me what he remembered about what happened between his friend and his daddy, Ray SPENCER. Matt stated to me, "You mean Kathryn?" I advised him that I did mean Kathryn. I asked Matt if he could remember where Kathryn was when something happened to her and Matt stated, "At my house." I asked Matt who else something happened to and Matt stated, "Just me and Big Matt." I asked him where Big Matt was when he saw something happen and Matt stated, "At my house too with me and Kathryn." I asked Matt if he could remember what part of the house they were in when something happened and Matt stated, "In the bedroom." I asked Matt if he could remember how old he was when something happened to him and Matt stated, "Mostly four." I

CCSO Case #B4-B506, S.A.KRAUSE, K-43                    page 2 of 4

asked him if it could have happened before he was four and after thinking for several seconds, Matt stated, "No, I just think four mostly." I asked Matt who was in the bedroom with his dad when something happened and Matt stated, "Just Dad and Big Matt and Kathryn and me."

I asked Matt if he could remember what he would have on when something happened and Matt stated, "First I'd have my pants on but my dad made me take my pants off and then I didn't have nothing on." I asked him what his daddy had on and Matt stated, "Nothing, just like me." Matt then stated, "Kathryn had her pants on at first too but my dad made her take 'um off." I asked him what Big Matt had on and Matt stated, "My dad just makes us all take out pants off so we don't have nothing on." I asked Matt if he could remember where his mother was when something happened to him in the bedroom and Matt stated, "Mostly when my mom was at work he did it to me and Kathryn and Big Matt and that's why she didn't know, cause she was at work."

I asked Matt if he could remember where they were when most of the things happened and Matt stated, "Well, mostly in my dad's bedroom cause he has a waterbed and it's bigger.  It's really a giant bed." Matt then stated, "Sometimes it happened in my bedroom and Big Matt's bedroom and Kathryn's bedroom."

At that time I indicated to Matt that I wanted to make sure I knew what happened to Big Matt and asked him if he could tell me again what he remembered that he saw. Matt stated, "Well, he just kissed Big Matt's pee-pee and he puts his finger in Big Matt's body and he puts his pee-pee in Big Matt's body, too." I asked Matt if anything else happened to Big Matt's body (bottom) and Matt sat for several seconds and stated, "Well, me and Kathryn had to put our fingers in Matt's body and he had to do that to us." I asked Matt if he could remember why they had to do that and Matt stated, "Cause that's what my dad makes us do." Matt then stated, "Oh yah, Sharon, you know what I had to do, I had to do it to Kathryn's circle spot." I asked Matt if he could remember exactly what he had to do to Kathryn's "circle spot" and Matt stated, "I had to stick my fingers and my pee-pee in there." I asked Matt how many times that had happened and at that time Matt took my pen and turned the page of the tablet I was writing on and I observed him make an up and down motion with the pen across

Spencer-00619

the entire width of the page.  Matt stated to me when he finished the line,
"That's a lotta times, isn't it, Sharon?"

    I asked Matt if he could remember if anyone else had to
touch Big Matt's body and Matt stated, "Well, I had to kiss Big Matt's pee-pee
and Kathryn and I had to put our fingers in Big Matt's body," Matt then stated,
"But that's what we had to do to each others."

    At that point in our interview Matt indicated again that
he was tired and he was hungry, so the interview was terminated.

    After I talked with Matt I spoke alone with his mother
and then in Matt's presence shared with Shirley SPENCER again in detail what he
son had told me during my interview alone with him.

    This investigation is pending.

Spencer-00620

# EXHIBIT HH

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT

1ST DEGREE STATUTORY RAPE, RCW 9A.44.070
LOCATION OF INCIDENT:    17681 NE Lucia Falls Road
                         Yacolt, Washington
DATE OF INCIDENT:        Refer to Summary


DATE & TIME:        03-21-85                    10:30 AM
LOCATION:           CCSO, Investigation Unit
INCIDENT:           Interview with Victim


VICTIM:             HANSEN, Matthew Alan        dob: 02-20-80
                    17681 NE Lucia Falls Road
                    Yacolt, Washington          phone: 687-2407

SUSPECT:            SPENCER, Clyde Ray          dob: 01-09-48
                    aka:  Ray SPENCER
                    17681 NE Lucia Falls Road
                    Yacolt, Washington          phone: 687-2407

BACKGROUND
INFORMATION:

                    On 02-28-85 and also 03-07-85, I spoke with the above
listed victim, Matt HANSEN, regarding allegations Matt was making, indicating
that he had had a number of sexual contacts with his step-father, Ray SPENCER.
Matt HANSEN also advised me that he had witnessed his step-father, Ray SPENCER,
having sexual contacts with Ray SPENCER'S natural children, Kathryn and Matt
SPENCER.  Between my initial contact with Matt HANSEN and this date, 03-21-85, I

CCSO Case #84-8506, S.A.KRAUSE, K-43                        page 1 of 9

have had a number of contacts with Matt's mother, Shirley SPENCER, and also Deanne SPENCER, who is the natural mother of Kathryn and Matt SPENCER.

After my first interview with Matt HANSEN, when he advised me that Matt SPENCER and Kathryn were also victims of sexual abuse by Ray SPENCER, I immediately advised Kathryn's and Matt's mother. Both Kathryn and Matt have been in therapy in Sacramento, California where they presently reside, since the latter part of August, 1984. During the phone calls I have had with Deanne SPENCER in the past several weeks, she has related to me a number of times that the therapist who has been seeing Matt SPENCER was concerned that Matt was a victim of sexual abuse; however, at no time, apparently, would Matt relate details to the therapist. A number of times Deanne SPENCER has also advised me of incidents regarding unusual behaviors exhibited by Matt SPENCER, specifically, that Matt was having "bursts of anger," that he had "kicked holes in the walls and doors," that he was checking windows and doors to make sure that they were secured during the evening hours, and had also apparently begun refusing to sleep in his bedroom alone. Deanne SPENCER also indicated to me that in the recent weeks, Matt had on several occasions curled up "in a fetal position" between his bed and the wall, and was making statements indicating that he "didn't want to live."

When Matt HANSEN advised me that he had observed both Kathryn and Matt SPENCER being victimized by their father, I immediately advised Deanne SPENCER by telephone. Deanne SPENCER related to me that she, in turn, advised the children's therapists. I also have had phone conversation on occasion with both the therapists and provided them with any information I had that may assist them in dealing with the SPENCER children.

During the days following the information regarding the SPENCER children provided to me by Matt HANSEN, Deanne SPENCER indicated that she was contemplating bringing Kathryn and Matt back to Vancouver for the purpose of my interviewing specifically Matt, in an attempt to determine what exactly had occurred. She also indicated that she believed that Matt may "open up to me" when he was reluctant to do that with his therapist. I advised Deanne SPENCER that I would attempt to talk with Matt HANSEN one additional time prior to her making that decision regarding whether or not she was coming to Vancouver, and also asked that she speak with the therapists and determine if

CCSO Case #84-8506, S.A.KRAUSE, K-43                          page 2 of 9

Spencer-00608

they felt my interviewing the children was advisable.  Deanne SPENCER later advised me over the phone that although Matt's therapist indicated there was some reluctance for her to really pursue the issue at this time with Matt, she did not feel that my interviewing him would be harmful to him, and reportedly indicated to Deanne SPENCER that because I was in an authority position, Matt may be more willing to open up to me.  I advised Deanne SPENCER that I had an appointment to interview Matt HANSEN again on 03-21-85 and asked that she wait until that interview had been completed, and we would make a decision based on the information Matt HANSEN was able to provide me with.

INTERVIEW WITH:        Matt HANSEN on 03-21-85

During both of the contacts I had with Matt HANSEN prior to this date, he expressed that he was tiring and I did not attempt to push him for any additional details, and each time we terminated the interview.  However, having concerns that there was still some detail Matt HANSEN may be able to provide me with, I did schedule an additional interview with him for the 21st of March, 1985. With the permission of Shirley SPENCER, the interview with Matt was done with only Matt and I present. That was done in an interview room located in the investigation unit of the Clark County Sheriff's Office.

Initially, I advised Matt that before when we had talked he was tired and even though I didn't want to have to talk to him again about what he had told me regarding he and his father, there were still some questions I needed to ask him about what had happened.  I also advised Matt that I knew it was hard for children to "talk about the things we had already talked about;" however, because I wasn't there, I did not know exactly what had happened, and it was important for him to remember as many things as he could because that would help me in understanding.  I also advised Matt that it was important for all of us to understand exactly what had happened to Kathryn and Big Matt, too. Little Matt stated, "I know." I asked him if he minded talking with me and he appeared to be eager to do that, and did not appear to be reluctant in any way.

I indicated to Matt that we had already talked about what he called parts of his body before, and showed him the cartoon we had used during our conversation on March 7th. In pointing to the areas identified on the

CCSO Case #84-8506, S.A.KRAUSE, K-43                                page 3 of 9

cartoon, Matt was consistent in his terminology reference what he called specific parts of the body. When I pointed to the area of the cartoon drawing where the genital area of a female would be, Matt stated, "That's where Kathryn's circle spot would be."

I advised Matt that while we were talking I was going to be writing things down again, and asked him what was the first thing he wanted me to write down. Matt stated, "Well, he made me touch Kathryn's circle spot." I asked him who made him do that, and he stated, "You know, my dad, Ray." I asked Matt what he had to "touch Kathryn's circle spot" with and Matt stated, "With my hand. He made me do it." I advised Matt that it was not his fault that anything had happened and that it was important for him to be able to tell because when things happened that we didn't like and we didn't talk about them, it bothered us. Matt stated, "It bothered me because I didn't like it." I indicated to Matt at that time that girls had a hole in their "circle spot" and stated to Matt, "Did you have to touch right outside that hole part?" Matt stated, "No, he makes me touch inside that hole."

I asked Matt if his daddy made him do anything else, and Matt stated, "He made me touch Big Matt with my thumb." When Matt stated thumb, he made a fist with his thumb extending out and I noted that he was wiggling his thumb back and forth. I asked him what part of Matt he had to touch with his thumb and he stated, "His body part." At that time I observed Matt point to the area of the cartoon drawing where the buttocks would be. I asked Matt if he had to touch Big Matt's "body part" in any special way and Matt stated, "My dad makes me stick my thumb in that hole and wiggle it."

I asked Matt what Big Matt had on when that happened and he stated, "Nothing, he didn't have nothing on, and Kathryn didn't have nothing on either." I asked Matt who else was there and he stated, "Daddy and daddy didn't have anything on either." Matt then stated, "First we had clothes on and then he always makes us take our clothes off."

I asked Matt if anything else happened with Big Matt and he stated, "Big Matt had to put his pee-pee in Kathryn's circle spot." He then stated, "He has to put it in the hole." When Matt made that statement I observed him pointing to the dot on the cartoon drawing where the genital area of a female body would be, and he stated, "The hole is in here."

CCSO Case #84-8506, S.A.KRAUSE, K-43                          page 4 of 9

Spencer-00610

I asked Matt if his daddy ever made him touch anybody else, and at that time Matt replied, "I had to touch Big Matt on his pee-pee and body." I asked him what he had to touch Big Matt's "pee-pee" and "body" with and Matt stated, "With my wiener." I asked him what he and Big Matt had on when that happened and he stated, "We didn't have nothing on." I didn't, Matt didn't and Kathryn didn't." Matt then stated, "Dad had something on sometimes, but most of the time he didn't when he did that."

I asked Matt if he could remember if anything else happened to Kathryn and Matt stated, "My dad puts his pee-pee in Kathryn's circle spot hole and he makes me do that, and he makes Big Matt do that, and we don't want to." I asked him where he would be when that happened and he said, "Most of the time on my dad's big waterbed." I asked Matt if anything else ever happened to Kathryn's "circle spot" and Matt stated, "Me and Big Matt have to put our finger in Kathryn's circle spot hole, too." I asked him how many times that happened and at that time observed Matt shrug his shoulders and then observed him hold up ten fingers, and Matt stated, "Lots of times." I asked Matt if he could remember anything that his daddy would say when he was doing that and Matt immediately responded, "Mostly he says in a loud voice not to tell." I asked Matt if his daddy said anything else and Matt replied, "That's what he says every time, and he said I would get into trouble, but I didn't, did I?" I assured Matt that he was not in any trouble and advised him that "it was good to be able to tell when things happened to you, because if you didn't it would make you feel bad." Matt then stated, "He told Big Matt he'd get into trouble, too, and he told Kathryn she'd get a spanking."

I asked Matt if his daddy made him do anything else to Kathryn and Matt stated, "Yes." I asked him if he could tell me about that, and at that time Matt held up one finger and stated, "One of these fingers, I had to." I asked him what he had to do and he stated, "I have to stick this finger in her body and my thumb in her body, and that's what I have to do to Big Matt's body." I asked Matt if he ever had to kiss Kathryn and Matt stated, "Yes, he makes me kiss her on the bottom, and he made me kiss her hole part, too." Matt then sat for a moment and appeared to be thinking, then blurted out, "He made Big Matt kiss her hole part, too." I asked him where they would be when that would happen and he stated, "In the bedroom what's mine."

CCSO Case #84-8506, S.A.KRAUSE, K-43                          page 5 of 9

Spencer-00611

I asked him if anything had ever happened to him, Big Matt and Kathryn in any other part of the house and Matt stated, "In my bedroom and in the bath tub and in my dad's bedroom, that's where he did it a lot." Matt then stated, "He did that to me at the motel, too, remember?" I asked Matt where the bath tub was and Matt stated, "The tub's upstairs and the shower's downstairs, and there's a bath tub at the motel, too." I asked Matt if anything ever happened besides the motel, away from his house, and Matt stated, "Yah, once he touched me here on my pee-pee (pointed to the cartoon drawing where the penis would be) in the tent."

I asked Matt where his mom would be when things would happen with his dad and Matt stated, "Mostly she'd just be at work." I asked if his dad ever did anything when his mother was there and Matt stated, "No, cause she had to be to work or she would'a knowed he did it."

At that time I indicated to Matt that I still had the dolls that had "pee-pees" and "circle spots" and asked him if I got the dolls if he could show me what happened. Matt indicated that he could and the first dolls that Matt took out of the sack were the anatomically correct female doll and the anatomically correct male adult doll. At that time I observed Matt place the penis of the male doll into the vaginal opening of the female doll and he stated, "Big Matt has to do this to Kathryn. It has to be down there and you have to get this all the way in there." Matt was being careful to insert the penis into the vaginal opening. Matt then took the hand of the male doll and rubbed the vaginal area of the female doll and stated, "Me and Big Matt have to do this to Kathryn." He then turned the female doll over and rubbed the hand of the male doll on the buttocks of the female doll and stated, "We have to do this to Kathryn, too." I asked Matt where Kathryn was when that happened and he stated, "On my dad's bed."

I asked Matt if anything else happened with Kathryn and at that time Matt placed the mouth of the male doll on the vaginal area of the female doll and stated, "My dad does this to Kathryn and me and Big Matt have to do that too, and it was gross." I asked Matt what Kathryn would do when her daddy did that to her, and Matt stated, "She just has her eyes open and she's crying." Matt then stated, "He does the same thing to me and Big Matt and Big Matt was crying, too." I asked him what his daddy did to him and to Big Matt and

CCSO Case #84-8506, S.A.KRAUSE, K-43                    page 6 of 9

Spencer-00612

Matt stated, "Me and Big Matt have to put our mouth on this thing, this pee-pee."

Matt held the dolls for several minutes and then stated, "Something else, I was doing to Kathryn." I asked him if he could show me what the something else was and at that time Matt stated, "Daddy makes me do like this to Kathryn." I observed Matt place the penis of the male doll into the vaginal opening of the female doll. Matt then stated, "I have to kiss Kathryn's circle spot, too." When Matt made that statement he placed the mouth of the male doll on the vaginal area of the female doll.

I asked Matt how many times he saw his father do something to Kathryn's body or to her circle spot and Matt stated, "He just keeps doing it all the time."

I asked Matt if he could tell me what happened about Big Matt and he stated, "He'd make Big Matt grab my pee-pee and touch it, and squeezes it and that hurts, but he didn't mean to hurt it, and we had to do that." I asked Little Matt if he observed Big Matt doing anything else and he stated, "Big Matt has to put his pee-pee in Kathryn's circle spot, too." At that time Matt was putting the penis of the male doll into the vaginal opening of the female doll. Matt then stated, "Dad does this to Kathryn, too. He puts his pee-pee in Kathryn's circle spot, and he does this, too, to Kathryn." At that time Matt took the hand of the male doll and was attempting to insert it into the vaginal opening of the female doll.

I asked Matt what Kathryn would have on when that happened and he stated, "Nothing on." Matt then stated, "Everytime my dad does that to Kathryn she cries and I am glad she does, but I don't like it to hurt her, but it's good she cries."

I asked Matt if his dad ever took any pictures of him he didn't like, and he stated, "He takes pictures when we didn't have nothing on." Matt then stated, "He said it was funny and I said it was gross." I asked Matt if he knew what his daddy did with the pictures, and Matt stated, "He must have a secret place. I don't know what he did." I asked Matt what the pictures were of and Matt stated, "They were gross pictures of Big Matt and Kathryn and me." I asked Matt if he could tell me what was happening in the pictures or what they were doing and Matt stated, "I was covering my eyes cause it was too gross, and

Spencer-00613

I don't know." I asked Matt if he could think about what the pictures were and Matt stated, "I can't think about that anymore."

I asked Matt if his daddy ever showed him any books with bad pictures or stories in them, and Matt immediately stated, "I know a story." I asked him if he could tell me about the story and Matt stated, "It's a story about a policeman what turned into a monster." I asked Matt if he could tell me about any books his daddy had and Matt stated, "He has naked people books." I asked him what the people were doing in the books and Matt stated, "They were running with no clothes on."

At that time I observed Matt was inserting his finger into the vaginal opening in the female doll and I asked him if he could tell me about that, and Matt stated, "This isn't a real girl, though, but me and Big Matt and my dad had to do this to Kathryn and that hurt her."

Shortly after that statement, Matt indicated that he "couldn't remember anything else to tell" and then stated, "I don't think I want to remember more today." My conversation with Matt was terminated at that time.

After I spoke with Matt I spoke with his mother alone. During that conversation she advised that she did recall Ray SPENCER having some books that she believed were "hard core porno paperbacks." She advised that she was not aware of any books he had that actually had photographs. Shirley SPENCER indicated the books she remembered were "hard core paperback books dealing with moms and children and dad and children involved in some type of sexual contact." She also related that there was an occasion when Ray SPENCER took some of that same series to his sister who was living in Port Angeles at that time.

Shirley SPENCER also advised me that prior to my speaking with her and Little Matt reporting, there were a number of times when Ray SPENCER would have her "go over and over what she would be saying if she were interviewed by the police or if she went to court." She advised he would tell her, "Let's go over it again, because you have to know what you are going to say and be prepared if you go to court." She advised me that it irritated her because she had no intentions of saying anything other than what she knew was the truth. Shirley SPENCER also advised me that there were a number of times when Ray SPENCER would tell her, "Let's get it straight, who reported this

CCSO Case #84-8506, S.A.KRAUSE, K-43                    page 8 of 9

initially." She advised me that he was real adamant that he was the one who had initially reported and wanted to make sure that she relayed that same information to anyone who might question her."

After I spoke with Shirley SPENCER alone, and she had shared the information above, and also I had advised her specifically of what Matt had told me during my conversation with him, we had Matt come back into the room and in the presence of his mother, I discussed in detail specifically what Matt had told me during my interview with him so he would know that his mother was aware of everything.

This investigation is pending.

CCSO Case #84-8506, S.A.KRAUSE, K-43                          page 9 of 9

Spencer-00615