# EXHIBIT II

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

281

FILED

RECEIVED     LODGED

JAN 16 1997

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
DEPUTY

1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
2                           AT TACOMA

3
    CLYDE RAYMOND SPENCER,          )      Docket No. C94-5298BRJB
4                                   )
                    Petitioner,     )      Tacoma, Washington
5                                   )      September 5, 1996
            v.                      )      9:30 a.m.
6                                   )
    JOSEPH KLAUSER, Warden,         )
7   Idaho State Institution;        )
    CHRISTINE GREGOIRE, Attorney    )
8   General, State of Washington.   )
                                    )
9                    Respondent.    )
                                    )

10

11                           VOLUME III
                        TRANSCRIPT OF TRIAL
12              BEFORE THE HONORABLE ROBERT J. BRYAN
                    UNITED STATES DISTRICT JUDGE.
13

14  APPEARANCES:

15  For the Petitioner:        PETER A. CAMIEL
                               Mair, Camiel & Kovach, P.S.
16                             710 Cherry Street
                               Seattle, Washington   98104
17
    For the Respondents:       JOHN J. SAMSON
18                             DONNA H. MULLEN
                               Assistant Attorneys General
19                             Post Office Box 40116
                               Olympia, Washington   98504-0116
20

21
    Court Reporter:            Julaine V. Ryen
22                             Post Office Box 885
                               Tacoma, Washington 98401-0885
23                             (206) 593-6591

24
    Proceedings recorded by mechanical stenography, transcript
25  produced by Reporter on computer.

ORIGINAL 94

Spencer-03477

```
 1     (Defendant present.)

 2                          MORNING SESSION.

 3          THE COURT:  I understand we have Dr. Magee on the

 4  phone.

 5          THE CLERK:  Yes.

 6          THE COURT:  Is this your next witness?

 7          MR. CAMIEL:  Yes.

 8          THE COURT:  Dr. Magee, can you hear me all right?

 9          DR. MAGEE:  Can you speak a little louder?

10          THE COURT:  Yes, I can.  I can speak as loud as you

11  want.

12          DR. MAGEE:  Okay.  That's fine.

13          THE COURT:  We are in court.  I'm Judge Bryan.  Mr.

14  Camiel is here representing Mr. Spencer, and Mr. Samson and Ms.

15  Mullen are here representing the state.

16     You're a witness called by Mr. Camiel, and the first --

17  first, it's my understanding here that we have all stipulated

18  that your testimony could be taken by telephone conference

19  call.  You should understand that the rules are the same as if

20  you were actually present here in court.

21     Do you understand that?

22          DR. MAGEE:  Yes.

23          THE COURT:  The first thing I must do is to put you

24  under oath.

25          KATHRYN MAGEE, PLAINTIFF'S WITNESS, SWORN OR AFFIRMED
```

290

1   A.   She's actually a little thin for her height, but she's

2   completely within normal limits.  It's only when you fall off of

3   the growth curve completely that it's considered abnormal.

4   Q.   All right.

5   A.   Which means you're below the zero percentile.

6   Q.   All right.  If you could continue please.  Thank you.

7         THE COURT:  Give her a question.

8   Q.   (By Mr. Camiel)  Doctor, after noting the height and weight,

9   what else did you do in terms of your examination?

10  A.   Well, based on this record, as I said, I don't recall.  It

11  looks like I did sort of a general overview of looking at her

12  skin and muscular-skeletal system and noted some bug bites on

13  her, and then it looks like I did a general external pelvic

14  exam, noting that there was no redness, that the hymen appeared

15  intact, and that there were no lacerations externally and no

16  swelling noted.

17  Q.   Doctor, as a general practice, how would you conduct the

18  pelvic examination, the external pelvic examination you

19  described?

20  A.   On a child this age, usually what we would do is have her --

21  well, we would probably try and have her lay on the table, but

22  if that was too traumatic, we would have her just lay back in

23  her mother's lap and go into what we call a frog position, where

24  she sort of bends her knees and then just spreads her legs

25  apart.

1  Q.   And in conducting this kind of an examination, do you use
2  any instruments or devices?
3  A.   There were no instruments used in this exam.  If her hymen
4  had been ruptured, we may have used a speculum to view inside.
5  It does look like I did some cultures, you know, to check her
6  for -- I think it's both genitalia and anus cultures were done.
7  Q.   Do you know whether or not you conducted a rectal or anal
8  examination of this child?
9  A.   I cannot tell from my note whether I did anything more than
10  culture her anus.  I have nothing written down about it, so I
11  just -- as I don't remember the case, I can't say.
12  Q.   So it's possible that you did, but it's just as likely that
13  you didn't?
14  A.   Yeah.  I mean, my guess is usually what we did is we just
15  looked at the outside and did not actually do a digital exam
16  just because it was so traumatic.
17  Q.   And in looking at the outside, what kinds of things would
18  you be looking for?
19  A.   Lacerations, bruising, swelling.
20  Q.   And I take it if you noted any such things, those would
21  appear in your report?
22  A.   I would imagine so, but I cannot say for certain that I
23  looked since it's not noted one way or the other on the report.
24  Q.   How do you go about taking a culture from the anus?
25  A.   Normally I would basically spread the buttocks apart and

292

1  slip the swab in.  So I can only imagine that I at least saw it
2  grossly.
3  Q.  All right.
4  A.  But I did not note it on my record.
5  Q.  Doctor, was the facility that you were working at, the
6  University of California Davis in Sacramento, was that a
7  facility that regularly received referrals from law enforcement
8  to conduct these kinds of examinations?
9  A.  Frequently.
10  Q.  Were kids coming in every day for these kinds of exams?
11  A.  Most every day.
12  Q.  And during the period of time that you had your rotation in
13  this area, do you know how many examinations you conducted of
14  this type?
15  A.  I don't know exactly.  I could probably guess that I
16  conducted maybe 15 or 20.
17  Q.  Doctor, on the third page of the report, you've indicated
18  that you added some language at the top of the page, the words
19  "Mother said"?
20  A.  Uh-huh.  Yes.
21  Q.  Can you --
22  A.  From what I can tell from this record, the child actually
23  did not say anything.
24  Q.  In the middle of the page, you have, under the diagnostic
25  conclusion section, the statement, "Child's story consistent

293

1    with history of molestation."  Was that something that was
2    written by the social worker?
3    A.  No, I wrote that.
4    Q.  Okay.
5    A.  But in reality it is in error.  It should have said,
6    "Mother's version of child's story consistent with history of
7    molestation."
8    Q.  Below that you have the phrase, "No physical findings."
9    Does that refer back to page 2 with regard to the "pelvic within
10   normal limits" and the other notes that you have?
11   A.  Yes.  I did not find any evidence of either sexual abuse or
12   physical abuse.
13   Q.  Doctor, based on your experience having conducted, you
14   believe, perhaps 15 or 20 of these examinations and the training
15   that you received, if Kathryn Spencer, who was five years old,
16   had been fully penetrated vaginally by an adult male, by an
17   adult male penis, would you have expected that there would be
18   some observable trauma to the child?
19   A.  Well, I would imagine if she was fully penetrated that her
20   hymen would have appeared abnormal.  However, she could have
21   been partially penetrated, and if enough time had elapsed, there
22   would be no physical findings.
23   Q.  If this child had been penetrated by as many as four adult
24   males on multiple occasions, in your opinion, would that have
25   made it even more likely that there would have been some

421

```
 1                    C E R T I F I C A T E

 2

 3        I certify that the foregoing is a correct transcript from

 4   the record of proceedings in the above-entitled matter.

 5

 6

 7

 8   _____        January 15, 1997
         JULAINE V. RYEN                          Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Spencer-03617

# EXHIBIT JJ

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

# Investigation and Prosecution of Child Abuse

American Prosecutors Research Institute
National Center for Prosecution of Child Abuse
1033 N. Fairfax Street, Suite 200
Alexandria, Virginia 22314
(703) 739-0321

Spencer-09670

© 1987 by the American Prosecutors Research Institute. Second printing 1989.

American Prosecutors Research Institute, 1033 N. Fairfax Street, Suite 200, Alexandria, Virginia 22314. All rights reserved. No part of this document may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying or recording by any information storage and retrieval system, without permission in writing from the publisher.

Printed in the United States of America

The National Center for Prosecution of Child Abuse is a program of the American Prosecutors Research Institute, a nonprofit research and technical assistance affiliate of the National District Attorneys Association. This document was prepared under Cooperative Agreement Number 86-JN-CX-K001 from the Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice. Points of view or opinions in this document are those of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice.

Spencer-09671

Once a case has been called for trial, there are several considerations in deciding whether to conduct the competency exam prior to or after jury selection. You are certainly more likely to have the judge decide a close case in your favor if the court has already expended time and resources on jury selection. However, in a case in which you have no other admissible evidence and the child is almost certainly going to be ruled incompetent, you run the real risk of alienating the judge for future cases by putting everyone through jury selection on a case with only a slight possibility of going forward. Try to make a reasonable assessment of the likelihood of the child being found competent and remain mindful not to squander court time.

### (b) Who Should Question the Child

It is debatable who should actually conduct the competency exam, the court or the prosecutor. If you have a sensitive judge who knows the law and can ask questions likely to get answers, it may be reasonable to have the court do the questioning for the reason that it practically, although not legally, forestalls defense questioning at that stage. If the judge is unable to get the child to respond, the prosecutor must step in and try to get the child talking.

However, many prosecutors prefer to do the initial questioning themselves for a number of reasons. One obvious advantage of the prosecutor assuming responsibility for asking the questions is that the child is familiar with the prosecutor and vice versa. The child is more likely to feel comfortable with the prosecutor and be responsive, and the prosecutor is more likely to know how to effectively question that particular child. Since the judge is a stranger to the child, there is a greater chance that the child, and perhaps the judge, will feel uncomfortable, and the child may feel intimidated if the judge initially asks the questions at the competency hearing. Moreover, a kind, thorough prosecutor whose questions are tailored to suit the child's personality and level of development will often cause the judge to cut off a defense attorney's cross-examination in areas already covered.

### (c) Type of Questions/Sample Questions

Whether the judge, prosecutor, or defense attorney is doing the questioning, the questions should be limited to determining whether the child meets the minimal requirements of competency. The child should be deemed competent if "capable of testifying in any meaningful fashion whatsoever." *United States* v. *Banks*, 520 F.2d 627 (7th Cir. 1975). Furthermore, questions related to the facts of the abuse should not be permitted, or should be severely limited if absolutely required under the law in your jurisdiction. The child's answers to such questions will not reveal whether or not she can relate facts "truly" since that is the issue that the jury is there to decide and the reason that you are having a trial. Questions about *uncontested* facts occurring at around the same time as the abuse can be asked to demonstrate the child's ability to recall accurately and truly and to relate pertinent facts.

Following are some examples of appropriate types of questions to ask in order to establish competency of child witnesses. Specific questions should be chosen and formulated based on the age and circumstances of the particular child before the court.

- "What is your name?"
- "How old are you?"
- "When is your birthday?"
- "Did you have a party last year?"
- "Who was there?"
- "What presents did you get?"
- "Do you go to school?"
- "What is the name of your school?"
- "What is the name of your teacher?"
- "Did you go to school last year?"
- "What was your teacher's name last year?"
- "What grade are you in now?"
- "Do you know anybody in this room?"

# EXHIBIT KK

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

# United States District Court
## Western District of Washington

| | |
|---|---|
| CLYDE RAYMOND SPENCER | )    Case No. |
| | )    C94-5238 RJB |
|       Petitioner, | ) |
| | ) |
|       vs. | ) |
| | ) |
| JOSEPH KLAUSER, Warder, Idaho State | ) |
| Institution, | ) |
| | ) |
|       Respondent. | ) |

## DEPOSITION OF JAMES MATTHEW PETERS

### July 30, 1996

Reported by
Jodi C. Williams



THE COURT REPORTERS
TUCKER
AND ASSOCIATES
208-345-3704 • 1-800-424-2354
Fox 208-345-3713
605 WEST FORT STREET
P.O. BOX 1625 • BOISE, ID 83701
Home Page: http://www.webfactor.com/tucker/
E-Mail: tucker@rmci.net

ORIGINAL

Realtime · CaseView · Nationwide Case Management · Business Meetings · 10-Day Turnaround

Spencer002621

13

1      Q.    What was the result of the King County

2   prosecutor's review of the case?

3      A.    Now, you have to understand that the case

4   was reviewed only when we had one victim, a female,

5   five-year-old victim.

6      Q.    Yes.

7      A.    The status of the case changed later when

8   two other children came forward with allegations.

9          But at the time, they concurred with me

10  that the case wasn't provable.  And we declined it

11  as a result of that.

12     Q.    Why did you believe the case wasn't

13  provable?

14     A.    I don't remember the specifics.  That's

15  12 years ago.  I don't remember the specifics of

16  why not.

17          But at the time and to this day, I go

18  through a three-step analysis with every criminal

19  case.  And that is, first, to determine whether it

20  appears that a crime was committed.  And, secondly,

21  whether I can prove it beyond a reasonable doubt.

22  And, third, whether there is some reasonable way

23  short of bringing the power of the government down

24  on somebody to resolve the matter, such as pretrial

25  diversion or civil compromise or something short of

29

1   you've probably questioned a lot more witnesses than I

2   have.  You understand there's a difference between "I don't

3   recall" and "I absolutely did not" --

4   A   You understand --

5   Q   -- is what I'm asking?

6   A   You also understand, Counsel, that it's been 28 years ago?

7   Q   I do understand that.

8   A   All right.

9   Q   So the best you can do is you don't think you did, right?

10  A   I'm pretty sure I didn't.

11  Q   So you are pretty sure that you did not speak with Katie

12      Spencer prior to December 10, 1984, correct?

13  A   Yes.

14  Q   All right.  Now, did you assess Katie Spencer's

15      competency -- well, strike that.

16          Is it fair to say that on December 11 of 1984 one of

17      the purposes you were interacting with Katie Spencer was to

18      take a look at her competency?

19  A   No.  It was the only --

20  Q   Okay.  That was not one of your purposes?

21  A   It was the only purpose.

22  Q   Okay.  Now, prior to sitting down with her -- well, strike

23      that.  Let's take you prior to the moment the videotape

24      captures.  Prior to that, had you made an assessment of

25      Katie Spencer's competency?

07/11/96    16:39        ATTY GEN CORRECTIONS DIV        002

RECEIVED

1

'86 JUL 15 AM 9 27

2

ATTORNEY GENERAL
OF WASHINGTON
CORRECTIONS DIVISION

3                                                    HONORABLE ROBERT J. BRYAN

4              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
5                       AT TACOMA

6    CLYDE RAYMOND SPENCER,            )
                                        )    NO. C94-5238RJB
7              Petitioner,              )
                                        )
8    vs.                                )    AFFIDAVIT OF
                                        )    JAMES MATTHEW PETERS
9    JOSEPH KLAUSER, et al.,            )
                                        )
10             Respondent.             )
                                        )
11   ─────────────────────────────────

12   STATE OF IDAHO          )
                             )    ss.
13   County of ADA           )

14       I, JAMES MATTHEW PETERS, being first duly sworn on oath, deposes and

15   says:

16   1. I am an Assistant United States Attorney, currently assigned in Boise, Idaho. As

17   an Assistant U.S. Attorney, I prosecute violent crime and child sexual abuse crimes.

18   2. Prior to my acceptance of a position as Assistant U.S. Attorney in 1990, I was

19   a Senior Attorney with the American Prosecutor's Research Institute, National Center

20   for Prosecution of Child Abuse, in Alexandria, Virginia from 1987 to 1990. In that

21   position I provided training and technical assistance to prosecutors and investigators

22   involved in child abuse cases in the U.S., Canada, Australia, and Puerto Rico. I have

23   written numerous articles regarding the investigation and prosecution of child abuse

24   cases and assisted in drafting the federal "Child Victim Bill of Rights" now codified

25   as 18 U.S.C. § 3509.

26   3. During the period 1977 to 1987, I was a Deputy Prosecuting Attorney in Clark



AFFIDAVIT OF
JAMES MATTHEW PETERS

07/11/96     16:40     ATTY GEN CORRECTIONS DIV

1  County, Vancouver, Washington. I was the Deputy Prosecuting Attorney in State
2  v. Spencer, Clark County Superior Court Cause No. 85-1-0007-2.

3  4. I remember Mr. Spencer and the Spencer case. I do not have an Independent
4  memory of seeing or discussing, before, during, or after the pendency of the Spencer
5  case, any medical report on the female victim, Mr. Spencer's daughter, Kathryn
6  Spencer.

7  5. Approximately three to four months ago, while on other business in Vancouver,
8  at the request of the Assistant Attorney General for the State of Washington, I
9  reviewed the prosecutor's file in State v. Spencer. There was no medical report in
10 the file. A notation had been made by the paralegal, Linda Engelbart, that she had
11 reviewed the file several years earlier and could not locate any medical report on
12 Kathryn Spencer.

13 6. During the time of Mr. Spencer's case, it was the practice of the Clark County
14 Prosecuting Attorney to make the entire prosecutor's file available to defense
15 attorneys. Defense attorneys, after signing a statement that material copied would
16 not be duplicated and given to others, could duplicate any material. To the best of
17 my knowledge, all material available in the prosecutor's file in State v. Spencer was
18 disclosed to the defense.

19 7. I have reviewed the medical report completed at U.C. Davis on Kathryn Spencer.
20 While the report is legally relevant, and would have been disclosed to the defense
21 as a routine matter in the ordinary course of discovery if it had been made available
22 to the Prosecuting Attorney, it is my opinion that the report would not have affected
23 any rational person's decision to change his plea. That is because Washington state
24 law provides that sexual intercourse occurs upon the penetration, however slight,
25 of the child's vagina, anus, or mouth by the perpetrator's penis, finger, or other
26 object. Medical evidence indicating that Kathryn had an "Intact hymen" was not

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1  inconsistent with Mr. Spencer's guilt, because sexual intercourse can occur with
2  only minimal penetration, which would leave no physical signs.

3  8. Second, the absence of physical findings of sexual abuse in young children is
4  common. With intra-familial abuse, the perpetrator seldom acts in a violent manner,
5  and often takes great care to avoid hurting the child physically. Generally, there
6  would have been no physical findings of oral intercourse or limited penetration by a
7  finger or penis of the vagina. Although the charge of sexual intercourse with a child
8  requires proof of penetration, even slight penetration is sufficient.   Proof of
9  penetration does not require physical findings such as redness, swelling, laceration,
10 or scars. Here, the lack of physical findings does not disprove penetration.

11 9. In addition, the report reveals that the reporting physician did not perform a
12 complete physical examination for sexual abuse. Other than taking cultures for
13 gonorrhea, the physician did not examine the mouth or anus. No colposcopic
14 examination was completed. Since the early 1980's, the colposcope has come into
15 increased use in expert medical examinations of suspected sexual abuse victims.
16 The colposcope is a binocular optical instrument providing magnification. It is
17 equipped with a high-quality light, and many include cameras for photographs, slides,
18 or videotapes. They are non-intrusive and do not touch or penetrate the child. The
19 colposcope can help trained physicians detect and interpret lacerations, scarring or
20 other trauma of the vaginal or anal areas that may not be visible to the naked eye,
21 or give a more accurate opinion regarding the absence of such damage. In my
22 opinion, a complete medical exam would have included a colposcopic examination
23 with photos, or at least the taking of 35 millimeter photographs which would allow
24 for second opinions regarding the examination by review of photographs, slides, or
25 videotapes and protect the child from defense requests for a second medical
26 examination.

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116

07/11/96    16:41    HITT GEN CORRECTIONS D**

10. Additionally, the phrase "intact hymen", which was used in the U.C. Davis medical report, is not used by experts in the field of sexual abuse and indicates that the examination was probably done by a medical practitioner without specialized training. Expert physical examinations describe precisely the appearance of the hymenal ring and genitalia.

11. Based upon my experience in dealing with sexual abuse prosecutions, I consider the report to be a "neutral" statement.

12. If the report had been used at trial, I would have called an expert physician in the field of child sexual abuse to testify regarding the non-expert and incomplete nature of the examination, the common lack of physical findings in children due to rapid healing and or care taken in manipulation of the child's external genitalia and vagina, and the delay in examination. It is possible that the expert could also have testified regarding the documented behavioral characteristics of Kathryn as typical and consistent with behavior of children who have been sexually abused or molested.

13. In addition to eliciting testimony which would challenge the scope and content of the physical evaluation of Kathryn Spencer and emphasizing the reported behavior as indicative of abuse, I would have been able to utilize the report to admit statements made to the examining physician for purposes of medical diagnosis pursuant to Washington Rule of Evidence 803(4). These statements would have included a history of sexual abuse by Mr. Spencer.

14. I believe this report would have been of extremely limited value to the defense because the findings were not inconsistent with the petitioner's guilt. The inadequate scope of the examination, the significant research indicating lack of physical findings are common in child sexual abuse and molestation cases, the opportunity to discuss Kathryn's behavioral changes as being consistent with victims

AFFIDAVIT OF
JAMES MATTHEW PETERS

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116

1 | of child molestation, and the opportunity to again elicit her statements regarding the
2 | sexual abuse further minimize the materiality of this report to Mr. Spencer's defense.
3 | 15.  Independent and separate reports from Mr. Spencer's son, Matthew Spencer,
4 | and the stepson, Matthew Hansen, verified the incidents of sexual intercourse with
5 | Kathryn Spencer.  As a result, the strength of the case lay not with the allegations
6 | made by Kathryn, but by the corroborating statements made by the two boys and
7 | the charges of statutory rape and complicity to statutory rape as supported by the
8 | statements of the two boys.  There is no reasonable likelihood that Spencer, facing
9 | 16 counts of statutory rape and complicity to statutory rape, would have altered his
10 | decision to change his plea because of a neutral medical report about Kathryn
11 | Spencer.

12 |     DATED this _12_ day of July, 1996

13
14 | JAMES MATTHEW PETERS
    Assistant U.S. Attorney

15
16 |     SUBSCRIBED AND SWORN to before me, _PAMELA L. BROPHY_,
    this _12th_ day of July, 1996.

17
18 | NOTARY PUBLIC in and for the State of
    Idaho.  My Commission expires:
19 |     _4/22/2000_

20
21
22
23
24
25
26

AFFIDAVIT OF
JAMES MATTHEW PETERS

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
P.O. Box 40116
Olympia, WA 98504-0116

# REPORTER'S CERTIFICATE

STATE OF IDAHO      )
                        )   ss.
County of Ada        )

        I, Jodi C. Williams, a Notary Public in and for the State of Idaho, do hereby certify:

        That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth;

        That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true, and verbatim record of the said deposition.

        I further certify that I have no interest in the event of the action.

        WITNESS my hand and seal this _12th_ day of _August_, 1996.

        _Jodi C. Williams_
        NOTARY PUBLIC in and for the State of Idaho; residing at Mountain Home, Idaho.

        My commission expires 2-7-2001.

# EXHIBIT LL

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

Service accepted and receipt of
true copy acknowledged this
25 day of January, 1985.

ARTHUR D. CURTIS
Prosecuting Attorney

BY James M. Peters
Deputy Prosecuting Attorney

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF CLARK

STATE OF WASHINGTON,          )
                              )
              Plaintiff,      )   No. 85-1-00007-2
                              )
      v.                      )   OMNIBUS APPLICATION BY DEFENDANT
                              )   AND ORDER OF COURT
CLYDE RAY SPENCER,            )
                              )
              Defendant.      )

DATE: 1-25-85

NOTICE TO:  DEPUTY PROSECUTING ATTORNEY

              1.   MOTION BY DEFENDANT

      Pursuant to and in accordance with Rule 4.5 of the Criminal
Rules for Superior Court, Plaintiff makes application or motions
checked as follows:

_____  1.  To dismiss for failure of the information to state
             an offense.

_____  2.  To sever Defendant's case and for separate trial.

_____  3.  To sever counts and for a separate trial.

___✓___  4.  To make more definite and certain.

             Answer: _____  will do

___✓___  5.  For discovery of all oral, written or recorded
             statements made by Defendant to investigating officers
             or to third parties and in the possession of the
             Plaintiff.

             Answer: _JP_  will provide

___✓___  6.  For discovery of the names and addresses of Plaintiff's
             witnesses and their statements.

             Answer: _JP_  will provide

OMNIBUS APPLICATION BY DEFENDANT
AND ORDER OF COURT - 1

FILED

JAN 25 1985

George J. Miller, Clerk, Clark Co.

FERGUSON, EIESLAND, & RULLI
ATTORNEYS AT LAW
401 W. 13th STREET
P.O. BOX 1839
VANCOUVER, WASHINGTON 98666
(206) 693-5635

Spencer-00025

7. To inspect physical or documentary evidence in Plaintiff's possession.

Answer: _____ will provide

8. To suppress physical evidence in Plaintiff's possession because of (1) illegal search, (2) illegal arrest.

9. For hearing under Rule 3.5: — *Reserve*

10. To suppress evidence of the identification of the Defendant.

11. To take the deposition of witnesses.

12. To secure the appearance of a witness at trial or hearing.

13. To inquire into the conditions of pretrial release.

II.  TO REQUIRE THE PROSECUTION

14. To state:

(a)  If there was an informer involved;

(b)  Whether he will be called as a witness at the trial; and

(c)  To state the name and address of the informer or claim the privilege.

15. To disclose evidence in Plaintiff's possession, favorable to Defendant on the issue of guilt.

Answer: _____ will provide

_____ none known

16. To disclose whether it will rely on prior acts or convictions of a similar nature for proof of knowledge or intent.

Answer: _____ will disclose

_____ none known

17. To advise whether any expert witness will be called, and if so, supply:

(a)  Name of witness, qualifications and subject of testimony;

OMNIBUS APPLICATION BY DEFENDANT
AND ORDER OF COURT - 2

FERGUSON, EIESLAND, & BULLI
ATTORNEYS AT LAW
401 W. 13th STREET
P.O. BOX 1029
VANCOUVER, WASHINGTON 98666
(206) 693-9616

(b)  Report.

Answer:  _____ will disclose

_____ none known

18.  To supply any reports or tests of physical or mental examinations in the control of the prosecution.

Answer:  _____ will provide

_____ none known

19.  To supply any reports of scientific tests, experiments, or comparisons and other reports to experts in the control of the prosecution pertaining to this case.

Answer:  _____ will provide

_____ none known

20.  To permit inspection and copying of any books, papers, documents, photographs or tangible objects which the prosecution:

(a)  obtained from or belonging to the Defendant, or

(b)  which will be used at the hearing or trial.

*None known / will provide any*

21.  To supply any information known concerning a prior conviction of persons whom the prosecution intends to call as witnesses at the hearing or trial.

Answer:  _____ will provide

_____ none known

22.  To inform the Defendant of any information he has indicating entrapment of the Defendant.

Answer:  _____ will provide

_____ none known

23.  Additionally,

For a hearing to determine whether the victim is competent to testify at trial.

For a continuance of the trial date.

OMNIBUS APPLICATION BY DEFENDANT
AND ORDER OF COURT - 3

FERGUSON, EIESLAND, & RULLI
ATTORNEYS AT LAW

Spencer-00027



DATED this _25_ day of January , 1985.

James E. Rulli
James E. Rulli
Attorney for Defendant

Requested items not answered are disputed. All information
promised to be supplied in the future will be provided by
ten days before trial.

James L. Peter
Deputy Prosecuting Attorney

O R D E R

The foregoing requests are granted as noted above.

DATED this _25_ day of January , 1985.

Judge of the Superior Court

OMNIBUS APPLICATION BY DEFENDANT
AND ORDER OF COURT - 4

FERGUSON, EIESLAND, & RULLI
ATTORNEYS AT LAW
601 W. 13th STREET
P.O. BOX 1339
VANCOUVER, WASHINGTON 98666
(206) 693-3212

Spencer-00028

# EXHIBIT MM

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment (C11-5424BHS)

April 22, 2009

Dennis M. Hunter
Chief Deputy Prosecuting Attorney
P.O. Box 5000
Vancouver, WA 98666-5000

     Re: Clyde Ray Spencer

Dear Denny:

I received your letter of April 17 regarding Mr. Spencer's latest legal maneuvering. He certainly deserves credit for perseverance.

I don't really know what I have to offer in this proceeding beyond what is already of record in your file, and in my testimony in the federal habeas case. The only thing you might not have is the essay I sent to the Columbian in response to their tendentious series about Mr. Spencer in 2005. They printed an abridged verison of what I had originally sent them. A copy of the original is enclosed. This was my best effort at the time to recall the case, though memories do start to fade after several decades.

Sincerely,

Jim Peters

Your one-sided series on the "injustice" meted out to former Vancouver Police officer Ray
Spencer, by the Clark County judicial system, is unbefitting your newspaper's normally objective
reporting. The reporters strongly suggest that Spencer was the victim of fabricated charges.
They imply that an overzealous Sheriff's Department investigator, driven by a self-serving
supervisor, drummed up false allegations passed along by prosecutors who wrongly believed
them genuine. They imply that Spencer's lawyer represented him ineffectively.

I was the Clark County Deputy Prosecutor assigned to Spencer's child molestation case while it
was being investigated through and including his "no contest" plea. I left the employ of Clark
County in 1987, so I was not involved in his many appeals and post-conviction proceedings,
though I was a witness in a federal habeas corpus matter regarding his case in the mid-'90's and
spoke briefly with Mr. Spencer in the presence of his attorney then. In 1998, at the request of
Spencer's attorney, Peter Camiel of Seattle, I wrote to the Sentencing Review Board
recommending that they equitably interpret my recommendation of a "life" sentence to mean the
high end of the sentencing range under the Sentencing Reform Act, coupled with mandatory sex
offender treatment. I have no axe to grind against Mr. Spencer. He has served his time and I
wish him the best. But I do take issue with your biased, agenda-driven series on his case.

All but buried in the emotionally-charged rhetoric and carefully chosen interviews is the fact that
three different children – at different times and in separate interviews – accused him of savagely

1

Spencer-08798

molesting them.  Twenty one years later, as far as I know, none of them have changed their stories,

Missing from the lengthy series is the fact that virtually every argument your reporters make suggesting Spencer's innocence was presented to a state or federal court over the last two decades, and rejected.  Missing also is an explanation why this supposedly "innocent man," who as a police officer, was intimately familiar with the criminal justice system, would change his plea from "not guilty" to "no contest" on the eve of his trial.  And these are just the most glaring omissions.

As a person who was very close to the case, I have a pretty good idea why he followed the path he did, and it had nothing to do with overzealousness, ill-will, naivete, or ineffective assistance of counsel.  It had to do with the "blue code of silence," which motivates some police officers to put loyalty to fellow officers above the truth, even at the expense of self.  I explained the circumstances to your reporter, but apparently it did not fit his agenda, and he omitted it from the piece.

Approximately one month before Spencer's scheduled trial, I traveled to Sacramento to observe Spencer's attorney, now Superior Court Judge Jim Rulli, interview two of the alleged victims, both primary school children who resided with Spencer's ex wife.  The day before our trip, one or both children (memory fails me which) told a counselor that Spencer had not acted alone, that other men had been involved in the alleged abuse, and that at least one of them had taken

2

Spencer-08799

sexually explicit pictures. They said that these "other men" wore guns on their ankles. The children convincingly repeated these new allegations to Rulli and me the next day.

Without question, that was the turning point in the case. Until then, every indication was that Mr. Spencer was going to trial. All that changed just a few days after we returned to Vancouver.

An extensive investigation was launched to identify these alleged accomplices. Since many of Spencer's acquaintances were law enforcement officers, and ankle holsters are a common accouterment worn by police officers, the investigation focused on area lawmen. Some plausible leads were developed, but there was never enough evidence regarding the identity of the alleged accomplices to obtain a search warrant or charge anyone else. That is why investigators were unable to search for the pictures elsewhere. (Spencer's house was searched, with the consent of his wife, but no child pornography was found). We offered Spencer a chance to identify the accomplices, but he refused.

Just a few days later, Spencer astounded all of us by changing his plea to "no contest" without the benefit of any plea agreement.

Many of us suspected that this was a product of the "blue code of silence," which motivates some officers to keep quiet about misconduct and protect one another at all costs. The Los Angeles Police Department endured well-publicized scandals that encompassed the "blue code." The Christopher Commission, writing on the LAPD, found that "perhaps the greatest single barrier to

3.

the effective investigation and adjudication of complaints is the officers' unwritten 'code of silence' . . . [the principle that] an officer does not provide adverse information against a fellow officer." I explained this to your reporter, but he chose to leave this critical information out of his story.

It seems strange that *The Columbian* would tarnish the reputation of Sharon Krause, a superb investigator whose tireless and impartial work was respected by defense attorneys and prosecutors alike, and praised in the pages of this newspaper in the 1980's. Krause was widely sought out by law enforcement agencies throughout the west as an instructor and taught at many conferences for judges, lawyers and mental health professionals throughout the country on the appropriate techniques for interviewing children. Her written material was incorporated into the book "Investigation and Prosecution of Child Abuse," published by the American Prosecutor's Research Institute in 1993. She was a tenacious investigator, but she was no zealot and resolved many cases by recommending that no charges be filed.

What was the point – besides slanting the story – of dredging up old gossip regarding her supervisor's affair with Spencer's wife, while leaving out the fact that the courts that took evidence on that issue found the affair began after the fact and had no bearing on the investigation? Such malicious reporting makes for titillating reading but is hardly responsible journalism.

4

Spencer-08801

Your criticism of Jim Rulli is also not warranted, particularly since judicial ethics restrict the extent to which he can respond. I tried several cases against Mr. Rulli when he was a defense attorney, including cases involving child sexual abuse, and he was always prepared, competent and ethical. One thing that singled Rulli out from his contemporaries was that he vigorously contested the relevant issues but would not waste the court's time with frivolous red herrings, which is exactly what many arguments posited by your reporters are. For example, the results of polygraph tests, interviews under the influence of so-called "truth serum," hypnotically refreshed memory, and the opinions of mental health professionals regarding an accused's guilt or innocence are notoriously unreliable, and are not admissible in a criminal trial. The same is true for the claim by Spencer's nieces and nephews that he never attempted to molest them; such evidence of "good behavior" is simply not admissible at trial. Just as killers do not attack every person they encounter, child molesters do not molest every child they know. Finally, contrary to your reporter's claim, Rulli did request a competency hearing to test the alleged victim's ability to testify, a fact that I discussed with the reporter. It is a standard request in all cases involving very young witnesses. Such hearings are normally held just before the trial. In this case, no competency hearing was held because Spencer changed his plea.

Was this a clear-cut case? Not at all. Early on, when all we had was a confusing account by a young child, uncorroborated, our assessment was to decline prosecution because of insufficient evidence. To avoid the appearance of favoritism because of Spencer's status as a police officer, we asked for a second opinion from the King County Prosecutor's Office, and it concurred with ours. But when two additional children, who lived in a different household and had a different

5

Spencer-08802

mother, made disclosures that corroborated the initial complainant, we were convinced that there was sufficient evidence to file charges and let a jury decide whom to believe. The citizens of Clark County who would have made up that jury never got the chance to consider whether to believe the children, or to accept the defense contentions, because Ray Spencer withdrew his not guilty plea and changed it to "no contest."

One thing I spoke to your reporter about was the subject of videotaping interviews with suspected child abuse victims. Afterward, I sent him an email summarizing the advantages and disadvantages of this practice. I found it strange that he did not mention that in the series. Here is what I told him:

"Videotaping can serve several useful purposes in litigation involving young witnesses including 1) preserving the child's initial statements and any spontaneity, emotion or detail that is often absent in a later account given at a trial, many months or years after the event; 2) avoiding duplication of efforts by sharing the video with others involved in the investigation; 3) encouraging the defendant to plead guilty, thereby sparing the child from testifying in court; 4) presenting the video to the grand jury, where local law permits, in lieu of the child's live testimony; and 5) as a teaching tool to help the interviewer and others improve techniques.

In making a videotape, the following concerns, disadvantages or risks should be taken into consideration: The child or the interviewer may be uncomfortable about

6

being videotaped, resulting in a stilted or unproductive session. Several

interviews may be necessary to elicit a full account, even when a skilled

professional conducts the interview. Videotaping every contact with a child, who

may blurt out details at the most inopportune moment, is a practical impossibility.

Videos can be used to harass or intimidate the child on cross-examination, or

reviews may regard the testimony as more credible because it was given on video.

Videos might be shown out of context or fall in the hands of those who have no

professional obligations of confidentiality or concern for the child's best interest."

Reasonable minds can differ on the advisability of videotaping interviews. Having experienced

both systems, I favor the practice of videotaping, but realize it is not always practical or possible.

We have learned a lot since 1984 about how to conduct better investigations in child abuse cases.

Still, the fundamental principles remain the same now as then. In Mr. Spencer's case, the

investigation was fair. The person conducting the child interviews (Krause) was experienced and

objective, and there was no rush to judgment. The decision, ultimately, to charge Mr. Spencer

was the result of a thorough, deliberative process. The decision to take the fact-finding away

from the jury was Spencer's alone.

Ray Spencer could have had a trial. He could have made many of the same arguments your

reporters make and, to the extent they were admissible, hoped a jury of his peers believed him.

Similarly, you could have written a balanced piece, let your readers draw their own conclusions,

and left the rhetoric to the editorial page. Sadly, neither of those things happened.

7

Jim Peters

800 Park Boulevard, Suite 600

Boise, ID 83712

208-334-1211

jim.peters@usdoj.gov

8

Spencer-08805

# EXHIBIT NN

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

1

2

3

4    SUPERIOR COURT OF WASHINGTON FOR CLARK COUNTY

5    STATE OF WASHINGTON                    )
                                            )
6              Plaintiff,                   )    NO. 85-1-00007-2
                                            )
7         v.                                )    DECLARATION OF
                                            )    CLYDE RAY SPENCER
8    CLYDE RAY SPENCER                       )
                                            )
9              Defendant.                   )
     _____)

10

11        1.   I am the defendant/petitioner in the above-entitled

12   action and I make this declaration upon my personal knowledge

13   and belief.

14        2.   I was divorced from my first wife, DeAnne Spencer in

15   1981.  I had custody of my two children, Matt and Katheryn

16   (Katie) for six weeks in the summer.  The rest of the year these

17   children were in Sacramento with my ex-wife.  I remarried in

18   1983, and my new wife, Shirley, had a son who was four years old

19   at the time.

20        3.   While out of town at a police conference, my five-

21   year-old daughter approached my wife and requested sexual

22   favors.  When questioned further about this, my daughter indi-

23   cated first that her mother did these things on a regular basis,

24   and then she named her brother, Matt, Karen Stone, who I used to

25   live with in-between my divorce and remarriage, and myself.  By

26

DECLARATION OF CLYDE RAY SPENCER - 1

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE (206) 624-5159

1   the time I had returned from the police conference, the children

2   had returned to their mother in California.  My wife advised me

3   what had happened and I immediately called a friend at home who

4   works for Child Protective Services in Vancouver and explained

5   the situation.

6       4.  My concern was not only brought about by this incident,

7   but also by one that took place in the summer of 1982.  At the

8   time, I was living with Karen Stone and her two children in

9   Vancouver.  This was the first visit the children had made since

10  the divorce.  My ex-wife Deanne, had provided me with some type

11  of medication indicating that my daughter, Kathryn, had some

12  type of sore in the vaginal area.  Upon inspecting this area,

13  both Karen and I agreed that the sore looked very much like a

14  cigarette burn.  At that time, I had notified CPS in Vancouver

15  and was told that nothing could be done, since the children

16  lived out of state and the matter was dropped.

17      5.  On this occasion I was advised by this friend to con-

18  tact CPS in Sacramento the following day.  The next mornning I

19  did contact Sacramento and filed a report.  I also had my wife,

20  Shirley, sit down and write out a complete statement as to what

21  my daughter had related.  Approximately three days later I was

22  contacted by a Detective Flood of the Sacramento County Sheriff's

23  Office who requested that I file a police report.  I contacted

24  the Clark County Sheriff's Department and not only filed a re-

25  port but provided the statement that my wife wrote out.  I also

26

DECLARATION OF CLYDE RAY SPENCER - 2

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE Spencer001160

1  notified the police department that I worked for, of the situa-

2  tion.

3      6.  During the weeks that followed I consented to two poly-

4  graphs and a number of interviews with Det. Sgt. Davidson and

5  investigator Krause.  From the initial interview, pressure was

6  applied by Davidson trying to get me to confess.  The two poly-

7  graphs showed inconclusive results.

8      7.  During this interim, my daughter was interviewed in the

9  presence of her mother, and suddenly no one was named except

10  myself.

11      8.  The investigation continued for another six months in

12  which time my marriage quickly went downhill.  In January of

13  1985, I was arrested and relased on my own recognizance.

14  Shortly thereafter, I was also fired from my job as a police

15  officer. Prior to this time, I had been involved in law enforce-

16  ment for over fourteen years with no prior criminal history.

17  Not long after this, my wife and I had an agrument and separ-

18  ated.  During the heat of this argument, my wife stated, "Wait

19  until I get on that stand, I'll fix you.  I'll make sure you go

20  to prison."  At the time I assumed that this statement had only

21  been made in anger.

22      9.  Given the pressure I was under, the incredible allega-

23  tions against me and the fact that my life was falling apart, I

24  sought psychiatric treatment at Oregon Health Sciences Center in

25  Portland.  I was admitted there on two separate occasions.  I

26  was prescribed Sinequan.

DECLARATION OF CLYDE RAY SPENCER - 3

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE (206) 624-4161

1      10.  After separating, I moved into a motel.  I was without

2 transportation or funds since I had sold my truck the previous

3 week and my wife had removed all monies from our bank accounts.

4      11.  During this period of time, I was again attempting

5 reconcilliation with my wife.  On numerous occasions I would ask

6 her to come over and spend the night.  Each time I asked, she

7 would state, "I can't, if I do I can't go through with this."

8 At this time I assumed she meant that she wanted to work out our

9 problems first and I never asked her to explain.

10      12.  On or about February 19, 1985, my wife came to the

11 motel, along with my stepson.  She stated that my stepson wanted

12 to spend the night.  I thought this strange at the time since

13 she had brought no clothes, etc. for him. She seemed to be in a

14 highly agitated state.  When questioned about his clothes, she

15 indidated that he had only asked permission after leaving home.

16 I agreed to his spending the night and asked her to stay also.

17 Again she indicated that she couldn't, that if she did she

18 "couldn't go through with it."

19      13.  The evening progressed as any other if I had been

20 home.  My son was bathed, dressed in one of my T-shirts to sleep

21 in and place in bed to watch T.V.  During the bath, my son was

22 given the tops off of shaving cream cans to play with, since I

23 had no toys to give him.  At no time did I get into the bath or

24 touch my son in any inappropriate manner.

25

26

DECLARATION OF CLYDE RAY SPENCER - 4

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE 624162

14.   The following day, I accompanied my wife and son back
to our residence for his birthday.  Upon arrival, I found that
my gun collection had been removed from the gun cabinet.  When
questioned about this, my wife indicated that the guns were sup-
posedly in the attic.  When I tried to reason with her indica-
ting that this collection was very valuable and could be ruined
in a damp attic, another argument ensued.  I was again escorted
from the premises by the Clark County sheriffs.  It should be
noted that at no time were any threats made or any attempt used
regarding the firearms in the commission of a crime.

15.   Reportedly, those guns are being held at this time by
the Clark County Sheriff's Office without legal grounds.
Attempts to have them released have met with negative results.
My wife has asked for these guns as part of the divorce settle-
ment.  All but two of the weapons were in my possession prior to
the marriage.  It appears that someone within the Clark County
Sheriff's Office has taken it upon themselves to become involved
in a strictly civil matter.

16.   The following week, I moved into a friend's house
while he was out of town.  The night before my second arrest, I
spoke with my wife on the phone.  I asked her to come over so we
could talk the problems out.  Again she replied that she
couldn't that if she did, she could not go through with this.
Again she seemed to be highly agitated.  The following afternoon
I was arrested by Sgt. Davidson of the Clark County Sheriff's
Office for molestation of my stepson.

DECLARATION OF CLYDE RAY SPENCER - 5

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE (206) 621-8777

1    17.   Upon being booked, I found that my bail was exces-

2  sively high considering the fact that I was unemployed and my

3  wife had emptied the bank accounts.  When questioned about this,

4  I was advised that my wife had indicated that I had been expec-

5  ting a large amount of money and that was why the bail was set

6  so high.  I can only assume that this was a reference to my re-

7  tirement check from the police department.

8    18.   Two days after my arrest, my wife was observed going

9  through my friend's mail box apparently looking for any or all

10 checks destined for me.  I base this assumpton on the phone call

11 received by my friends, Leo and Lois Clark, a few days later.

12 The call was from Investigator Krause of the Clark County

13 Sheriff's Office.  On that occasion, the Clarks were ordered to

14 turn over all mail and/or checks arriving at that address with

15 my name on them.  The Clarks were directed to turn the items

16 over to either Investagor Krause herself or to my wife Shirley.

17 The Clarks were further advised that they would be wise to stay

18 out of the situation.  Obviously, Krause acted without authority

19 and used her position in law enforcement to intimidate the

20 Clarks.  Investagor Krause works directly under Sgt. Davidson.

21 It appears that a concerted effort was being made to ensure that

22 I had no funds available to either bail out of jail or obtain

23 additional legal assistance.

24    19.   I spent approximately ninety days in the Clark County

25 Jail awaiting trial.  The jail policy does not allow contact

26

DECLARATION OF CLYDE RAY SPENCER - 6

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE 624-0017

1   visits.  However on at least six occasions I would be removed

2   from my cell by either Krause or Davidson, handcuffed and es-

3   corted downstairs.  Upon arrival, the cuffs would be removed and

4   I would be placed in a room with my wife.  On each of these oc-

5   casions, the purpose of the visit was to have me sign certain

6   papers that would benefit my wife, i.e., Quit Claim Deed on my

7   house, Power of Attorney, etc.  If I refused to sign these docu-

8   ments, I was immediately handcuffed and returned to my cell.  It

9   was apparent that Krause and Davidson knew the type of documents

10   in my wife's possession.

11      20.   On one occasion, I heard Krause tell Davidson, "It's

12   no use, she couldn't talk him into signing the Power of

13   Attorney."  At present, my wife has forged my name on checks,

14   i.e., State Retirement, Unemployment, Income Tax and overtime,

15   totaling nearly twenty-five thousand dollars.

16      21.   During the time spent in the Clark County Jail, Sgt.

17   Davidson made numerous trips to my cell even though he was ad-

18   vised both by my attorney and myself that I had no desire to

19   waive my constitutional rights.  As Sgt. Davidson put it on one

20   of his numerous visits, "you belong to me now, I'll tell you

21   what your rights are."

22      22.   On Davidson's initial visits, he repeatedly attempted

23   to use the children to get me to plead guilty.  He would state

24   that if I didn't plead guilty, the children would be permanently

25   affected mentally for the rest of their lives, if I forced them

26

DECLARATION OF CLYDE RAY SPENCER - 7

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE 624-0874

1   to testify. As the date for trial neared, Sgt. Davidson's

2   visits became more frequent and his attitude more abusive. On

3   two of his final visits a physical confrontation nearly took

4   place.

5       23. On one of these occasions, Davidson became extremely

6   irate when I refused to accompany him downstairs again.

7   Davidson started yelling, stating, "Your wife used to love

8   you." When I questioned him about the term "used to ," he be-

9   came flustered, evasive in his answer and quickly left the jail.

10      24. On the final confrontation, Davidson brushed by the

11   custody officer in charge after being advised that I did not

12   wish to speak with him. When he refused to leave my cell, I

13   asked that Custody Officer Harper notify the sergeant on duty.

14   Davidson advised that this jail belonged to him and he wasn't

15   leaving. However, Sgt. Harris ordered Davidson from the jail,

16   telling Officer Harper that if I didn't wish to talk with

17   Davidson, that I didn't have to. As Davidson left, he stated,

18   "I am not finished with you yet." This was overheard by Officer

19   Linda Harper and inmate John Pearce.

20      25. The next day I filed a complaint with the lieutenant

21   of the jail, which was substantitated by Officer Harper. I was

22   advised by the lieutenant that Sgt. Davidson had absolutely no

23   authority in the jail. In fourteen years of law enforcement, I

24   have never had the occaion or found the need to go to the ex-

25   tremes that Davidson did, in an attempt to extract a confession

26

DECLARATION OF CLYDE RAY SPENCER - 8

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE 624 0974

1  out of an individual.  It was obvious that even at that time,

2  Davidson had taken a strong personal interest in my case and was

3  determined to get me to confess whether I was guilty or not.

4       26.  During the time spent in the jail, I was visited ap-

5  proximately six times by my attorney, James Rulli.  At times I

6  would appear in court without ever being advised ahead of time

7  by my attorney the purpose of the appearance.

8       27.  Approximately five weeks before trial, my attorney

9  advised me that he had no defense for me and that I should plead

10 guilty.  I refused, indicating that I was not going to plead

11 guilty to crimes I didn't commit.  I asked him if the children

12 had received any type of medical examinations to substantiate

13 that they had in fact been molested.  He indicated to me that

14 since they were reported victims, they could not be forced to

15 submit to an exam.  To my knowledge, he never even asked.

16      28.  At this point, the question arose as to whether I had

17 herpes.  My first wife DeAnne indicated tht she had contracted

18 herpes after our divorce, but felt that she had got it from me.

19 I had my medical doctor, Gary Nylander, do a complete blood

20 workup on me which showed no sign of the disease.  I asked that

21 my attorney have my daughter checked and again he refused.  My

22 reason was that since my first wife had been named as a suspect

23 and had admitted to having herpes, thar if it showed in my

24 daughter and my tests were clear, suspicion would be focused

25 elsewhere.

26

DECLARATION OF CLYDE RAY SPENCER - 9

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98161
TELEPHONE 621-0973

29.   During this period of time, I requested and completed a number of written tests, hypnosis and Sodium Amythol in an attempt to prove my innocence. After completion of both the hypnosis sessions and the Sodium Amytol, the doctor advised that he found nothing which would indicate my guilt.

30.   During the entire time I was held in Clark County Jail, I was taking various antidepressants and/or tranquilizers which had been prescribed for me. These drugs did not appear to alleviate the feeling of desperation and depression which I felt throughout my confinement. I believe these drugs affected my ability to enter into a freely made and voluntary guilty plea. Certainly when combined with Davidson's browbeating and my attorney's lack of a defense, I can now, in hindsight, understand why I agreed to give up my right to stand trial. However, at the time, I truly felt that I had no choice.

31.   I was sentenced and sent to the prison facility at Shelton, Washington. Approximately two weeks after arriving, I was served with divorce papers. Approximately one month later, I received information that my wife and Sgt. Davidson were living together. Apparently Davidson had been caught by his wife in bed with my wife. My wife and Davidson are reportedly living together and Davidson is in the process of divorcing his wife.

32.   For my concern over the safety and well being of my children, I now find myself serving two consecutive life terms

DECLARATION OF CLYDE RAY SPENCER - 10

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE (206) 624-6094

1   plus sixteen years for crimes I did not commit.

2       I certify (or declare) under penalty of perjury under the
    laws of the State of Washington that the foregoing is true and
3   correct.

4
    _5/2/86_ _Slite Grut - Just_     _Clyde Ray Spencer_
5   Date          Place              Clyde Ray Spencer

6

7   5264H/tdf

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF CLYDE RAY SPENCER - 11

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE WASHINGTON 98164
TELEPHONE 624-0974

Spencer001169

# EXHIBIT OO

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

1   STATE OF WASHINGTON )
                        :ss
2   COUNTY OF CLARK     )

3       JAMES M. PETERS, being first duly sworn, upon oath,

4   deposes and states:

5       That I am a Deputy Prosecuting Attorney for Clark

6   County, Washington, and in the course of that capacity have

7   personal knowledge that Clyde Ray Spencer is presently

8   pending trial before Department 3 of the Superior Court of

9   Clark County, Washington for the crimes of Statutory Rape

10  in the First Degree and Indecent Liberties involving his

11  daughter, Kathryn E. Spencer, age five, said trial is set

12  to begin April 15th, 1985.

13      In my official capacity, on February 28th, 1985,

14  I was contacted by Detective Sharon N. Krause of the

15  Clark County Sheriff's Office, who is known to your affiant

16  to be a reliable and credible individual and who reported

17  the following information:

18      That this morning, February 28th, 1985, she was

19  contacted by Shirley Spencer, who is the wife of the

20  defendant, Clyde Ray Spencer, and her five year old son,

21  Mathew Allen Charles Hanson, whose date of birth is November

22  28, 1975.  During the course of that contact Krause had

23  occasion to interview Mathew Allen Charles Hanson based on

24  concerns expressed by Shirley Spencer that her son, age five,

25  may have been sexually molested by Clyde Ray Spencer within

26  the preceding twelve months.  During the course of her

27  interview with Mathew Allen Charles Hanson, age five, Krause

28  determined the following information:

29      Mathew appeared to be a bright and verbal child

30  who was easy to understand and informed Krause that he

31  had observed his father engaged in sexual acts with both

32  his step-sister, Kathryn Spencer, who is the victim of

FILED
FEB 28 1985
CLARK COUNTY PROSECUTING ATTORNEY
1200 FRANKLIN
P. O. BOX 5000
VANCOUVER, WASHINGTON 98668
(206) 699-2261

1  Counts I and II of the present Information, and his
2  step-brother, Mathew Spencer, age nine, who is the
3  natural son of Clyde Ray Spencer;
4      Mathew also related to Deputy Krause that he
5  himself had been victimized by Ray Spencer on numerous
6  occasions describing in detail acts of having to perform
7  fellatio on his father, his father performing fellatio
8  on him, his father penetrating his rectum digitally, he
9  having to perform digital penetration upon his father
10 and his father performing penal penetration upon the
11 child's rectum;
12     Specifically, Mathew indicated that during
13 the sum of 1984 when his step-siblings, Katy and big
14 Matt were present at his residence on the Lewis River
15 in Clark County, Washington, his stepfather took him
16 into the master bedroom of the house while his mother,
17 Shirley, was at work.  Further, that Clyde Ray Spencer,
18 and he were both naked during this contact and that
19 Clyde Ray Spencer engaged him in anal penetration of
20 Mathews rectum and required Mathew to perform fellatio
21 upon Clyde Ray Spencer;
22     Further Mathew described to Deputy Krause that
23 sometime after his step-sister, Katy, left to return to
24 her home in California, which Krause advises was on
25 August 27th, 1984, a number of additional acts occurred.
26 Specifically, on one occasion he and the defendant, Ray
27 Spencer were in the bathtub and Ray Spencer forced
28 Mathew's head under the bath water and caused him to
29 put his mouth on Ray's erect penis.  Mathew further
30 indicated to Krause that there were bubbles in the bath-
31 tub when this occurred.
32     In interviewing Spencer's wife, Shirley, Shirley

MOTION AND AFFIDAVIT - 3

1   indicated that on one occasion after Katy left she attempted

2   to put bubble bath in Mathew's bathwater and Mathew expressed

3   extreme fear of having bubbles in his bathwater.

4           Further, that Shirley Spencer indicated to Deputy

5   Krause that on or about February 16, 1985, Ray Spencer was

6   residing at the Salmon Creek Motel located in Clark County,

7   Washington.  She indicated that she had an appointment in

8   the evening of that date and had agreed with Ray Spencer

9   to leave Mathew in his care at the Salmon Creek Motel.

10  She indicated she dropped Mathew off in Room 17 of that

11  motel and described the room as an upstairs room located

12  at the back of the complex with a television set mounted

13  high upon the wall.  In her interview with Mathew, Krause

14  learned that during that interaction with Ray Spencer,

15  Mathew was again sexually assaulted.  Mathew indicated

16  that Ray Spencer inserted his penis into Mathew's rectum

17  and also forced Mathew to put his mouth on Ray Spencer's

18  penis.

19          Further, your affiant requested that Sgt. Mike

20  Davidson of the Clark County Sheriff's Office verify the

21  description of the motel room on February 28, 1985 at 1:20

22  p.m. your affiant was advised that Davidson had personally

23  viewed the room and determined the existence of the television

24  mounted high on the wall.  Further, he verified that Spencer

25  was registered at the Salmon Creek Motel between February 6th

26  and February 20, 1985.

27          Wherefore, based upon the foregoing information,

28  your affiant believes there is good and sufficient information

29  to believe that Clyde Ray Spencer is guilty of an additional

30  three counts of Statutory Rape in the First Degree and your

31  affiant prays that he be apprehended and brought before the

32  Court for further proceedings.

MOTION AND AFFIDAVIT - 4

CLARK COUNTY PROSECUTING ATTORNEY
1200 FRANKLIN
P. O. BOX 5000
VANCOUVER, WASHINGTON 98666
(206) 699-2261

Spencer-00601

Further your affiant saith not.

James H. Peters
Deputy Prosecuting Attorney

SUBSCRIBED AND SWORN TO BEFORE ME THIS 28 day of February, 1985.

Notary Public in and for the
State of Washington residing
at Vancouver, therein.

MOTION AND AFFIDAVIT - 5

CLARK COUNTY PROSECUTING ATTORNEY
1200 FRANKLIN
P. O. BOX 5000
VANCOUVER, WASHINGTON 98668
(206) 699-2261

Spencer-00602

# EXHIBIT PP

Declaration of Kathleen T. Zellner in
Support of Plaintiff's Response to
Defendant's Renewed/Second Motions
For Summary Judgment  (C11-5424BHS)

281

1                   UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
2                           AT TACOMA

3
CLYDE RAYMOND SPENCER,          )        Docket No. C94-5238RJB
4                               )
                Petitioner,     )        Tacoma, Washington
5                               )        September 5, 1996
        v.                      )        9:30 a.m.
6                               )
JOSEPH KLAUSER, Warden,         )
7  Idaho State Institution;     )
   CHRISTINE GREGOIRE, Attorney )
8  General, State of Washington.)
                                )
9               Respondent.     )
   _____)
10

11                          VOLUME III
                       TRANSCRIPT OF TRIAL
12          BEFORE THE HONORABLE ROBERT J. BRYAN
                 UNITED STATES DISTRICT JUDGE.
13

14  APPEARANCES:

15  For the Petitioner:        PETER A. CAMIEL
                               Mair, Camiel & Kovach, P.S.
16                             710 Cherry Street
                               Seattle, Washington   98104
17
    For the Respondents:       JOHN J. SAMSON
18                             DONNA H. MULLEN
                               Assistant Attorneys General
19                             Post Office Box 40116
                               Olympia, Washington   98504-0116
20

21
    Court Reporter:            Julaine V. Ryen
22                             Post Office Box 885
                               Tacoma, Washington 98401-0885
23                             (206) 593-6591

24
    Proceedings recorded by mechanical stenography, transcript
25  produced by Reporter on computer.



1    JAMES M. PETERS, PETITIONER'S WITNESS, SWORN OR AFFIRMED

2                    DIRECT EXAMINATION

3   BY MR. CAMIEL:

4   Q.   Would you state your full name and spell your last name,

5   please.

6   A.   My name is James Matthew Peters.  P-e-t-e-r-s.

7   Q.   And your professional address?

8   A.   Box 32, Boise, Idaho.

9   Q.   Mr. Peters, how are you currently employed?

10  A.   I'm an assistant United States attorney in the District of

11  Idaho.

12  Q.   Were you previously employed as a deputy prosecuting

13  attorney in Clark County?

14  A.   Yes, I was.

15  Q.   And were you the primary deputy prosecuting attorney in the

16  case involving Mr. Spencer?

17  A.   That's true.

18  Q.   Mr. Peters, do you recall when charges were initially filed

19  against Mr. Spencer?

20  A.   No, I do not.

21  Q.   Do you recall the fact that there was more than one

22  information filed against Mr. Spencer?

23  A.   Yes.

24  Q.   It was amended on occasion.

25  A.   I do recall that.

1  from questioning, and during counseling, it's usually not

2  questioning.  It's usually open-ended therapy and things come

3  up.  I don't know if that's questioning.

4  Q.  That's one reason why a lot of judges think these things

5  always should be on videotape, so we have a record of it,

6  because we really don't know --

7  A.  Unfortunately --

8  Q.  -- how these things occur.

9  A.  -- parents don't videotape their children all the time every

10 day and disclosures don't come up in a planned setting.

11 Q.  In this case, did you or the police, on your behalf or

12 working with you, investigate into the family situation these

13 kids were living in?

14 A.  Which family situation?

15 Q.  Well, the ones they were living in.

16 A.  Well, Matt Hansen was living with Mr. Spencer and his wife,

17 and Matt Spencer and Kathryn Spencer were living during the

18 school year in Sacramento with their mother and during the

19 summer with Mr. Spencer and his wife.  So I don't know what you

20 mean by ---

21 Q.  I mean the California home.  Was there any investigation

22 into that home or what was going on there to determine if some

23 of the precocious behavior of these children, precocious sexual

24 behavior and knowledge of these children grew out of whatever

25 was happening in that home?

421

1                     C E R T I F I C A T E

2

3        I certify that the foregoing is a correct transcript from

4   the record of proceedings in the above-entitled matter.

5

6

7

8        _____          January 15, 1997
         JULAINE V. RYEN                            Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Spencer003308