1

2

3

4                                                          Honorable Judge Benjamin Settle

5

6

7

8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                    AT TACOMA

10   CLYDE RAY SPENCER, MATTHEW RAY      )
     SPENCER, and KATHRYN E. TETZ,       )      No. C11-5424BHS
11                                       )
                  Plaintiffs,            )
12                                       )
            v.                           )      **DECLARATION OF WILLIAM**
13                                       )      **BERNET, M.D.**
     FORMER DEPUTY PROSECUTING           )
14   ATTORNEY FOR CLARK COUNTY JAMES     )
     M. PETERS, DETECTIVE SHARON KRAUSE, )
15   SERGEANT MICHAEL DAVIDSON, CLARK    )
     COUNTY PROSECUTOR'S OFFICE, CLARK   )      **NOTICE DATE:**
16   COUNTY SHERIFF'S OFFICE, THE COUNTY )      **February 22, 1013**
     OF CLARK and JOHN DOES ONE THROUGH  )
17   TEN,                                )
                                         )
18                Defendants.            )
                                         )

19         I, William Bernet, M.D., make the following declaration under penalty of perjury:

20         I received my medical degree from Harvard Medical School in 1967.  I completed a

21   residency in adult psychiatry and a fellowship in child psychiatry at Massachusetts Mental

22   Health Center.  I am currently licensed to practice medicine in Tennessee, and I am board

23   certified in psychiatry, child psychiatry, and forensic psychiatry.  I have had extensive clinical

24   experience in the field of general psychiatry, child psychiatry and forensic psychiatry since

25   1970.  I have also held several faculty appointments as a professor in psychiatry, most recently

26   at the Vanderbilt University School of Medicine.

27

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 1

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1  I have conducted research and been published regarding proper interview techniques of

2  suspected victims of child sex abuse, including but not limited to the following:

3         Bernet W. (1993).  False Statements and the Differential Diagnosis of Abuse
         Allegations.  *Journal of Child and Adolescent Psychiatry* 32:903-910.
4

5         Bernet W., Chang D. K. (1997).  The Differential Diagnosis of Ritual Abuse
         Allegations.  *Journal of Forensic Sciences* 42:32-8

6
         Bernet W. (1997).  Practice Parameters for the Forensic Evaluation of Children
7         and Adolescents Who May Have Been Physically or Sexually Abused.  *Journal
         of Child and Adolescent Psychiatry* 36:423-442
8

9         Bernet W. (1997).  Allegations of Abuse Created in a Single Interview.  *Journal
         of Child and Adolescent Psychiatry* 36:966-970
10
         Bernet W. (2000).  Interviewing Adolescents.  In *Current Diagnosis and
11        *Treatment in Psychiatry*, edited by M. H. Ebert, P. T. Loosen, and B. Nurcombe.
         New York: McGraw-Hill
12

13 I have also testified as an expert witness in issues related to my field of practice and

14 study, including proper interviewing techniques of suspected victims of child sex abuse, in

15 several states including Tennessee, Alabama, Arkansas, Arizona, Florida, Georgia, Iowa,

16 Kentucky, Louisiana, Maryland, Massachusetts, Mississippi, Missouri, New Mexico, Virginia,

17 West Virginia, and Wisconsin.

18        Kathleen Zellner, Esq., asked me to review several documents regarding the

19
   investigation and prosecution of Clyde Ray Spencer related to allegations of sexual abuse
20
21 perpetrated against his daughter, Kathryn Spencer, his son, Matthew Spencer ("Big Matt"), and

22 his step-son, Matthew Hansen ("Little Matt").  In conducting this consultation, I initially

23 reviewed the following documents:

24        • Clark County Sheriff's Office Investigative File, August 1984 to March 1985.

25        • Medical report regarding Kathryn Spencer, August 30, 1984.

26
          • Medical report regarding Matthew Hansen, March 6, 1985.
27

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 2

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1    • Report from King County Prosecutor Rebecca Roe to Clark County Sheriff's Office,

2    November 27, 1984.

3    • Handwritten notes of interviews of Kathryn, Big Matt, and information purportedly

4    from their respective therapists, May 9, 1985.

5    • Verbatim Report of Proceedings, a hearing before the Honorable Thomas Lodge,

6    May 3, 16, and 23, 1985.

7    • Report by Lee Coleman, M.D., August 29, 1991 .

8
9    • Letter from Prosecuting Attorney Arthur D. Curtis to Mr. Howard Goodfriend, July 1,

10    1992.

11    • Declaration of Matthew Ray Spencer, February 27, 2006.

12    • Letter from Matthew Spencer to Clemency and Pardons Board, July 7, 2006.

13    • Affidavit of Kathryn Elizabeth Spencer Tetz, January 23, 2007.

14
     • Declaration of Kathryn E. Spencer, September 14, 2007.
15
16    • Hearing before the Honorable Robert Lewis, July 10, 2009.

17    • Opinion of Court of Appeals of the State of Washington, *In the Matter of the Personal*

18    *Restraint of Clyde R. Spencer.*

19    • Opinion of the Supreme Court of the State of Washington, *In re the Personal Restraint*

20    *of Clyde R. Spencer,* July 12, 2010.

21    • Complaint, *Clyde Ray Spencer vs. Peters, Krause, Davidson, et al.,* June 2, 2011.

22
     • Declaration of James M. Peters in Support of Defendants' Motion for Summary
23
     Judgment, May 10, 2012.
24
25    • Statement of Phillip W. Esplin, Ed.D., October 9, 2012.

26    I also reviewed a videotaped recording of an interview of Kathryn Spencer conducted

27    by James Peters on December 11, 1984, as well as a transcript of that interview.

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 3

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1  I was specifically asked by Kathleen T. Zellner to analyze the interviews that were

2  conducted of each of the children to determine, based on the interviewing techniques utilized

3  and the manner in which the interviews were conducted, whether the interviewer either knew or

4  should have known that Mr. Spencer was innocent, or that the interview techniques employed

5  were so coercive and abusive that the interviewer knew or should have known that they would

6  yield false information.

7  The opinions expressed herein are all stated within a reasonable degree of scientific,

8

9  medical and psychiatric certainty and are based on my education, training and experience in the

10  field.

11  **ANALYSIS OF DET. SHARON KRAUSE'S INTERVIEWS**

12  I reviewed the typed reports of the following interviews conducted by Detective Sharon

13  Krause:

14  • Kathryn Spencer, October 16, 1984 (Exhibit A)

15  • Matt Spencer, October 17, 1984 (Exhibit B)

16

17  • Kathryn Spencer, October 18, 1984 (Exhibit C)

18  • Matt Hansen, February 28, 1985 (Exhibit D)

19  • Matt Hansen, March 7, 1985 (Exhibit E)

20  • Matt Hansen, March 21, 1985 (Exhibit F)

21  • Matt Spencer, March 25, 1985 (Exhibit G)

22

23  • Kathryn Spencer, March 25, 1985 (Exhibit H)

24  True and correct copies of the interviews as reported by Det. Krause are attached to this

25  Declaration.

26

27

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 4

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

**Purpose of Detective Krause's Interviews of Kathryn, Big Matt, and Little Matt**

The records indicate that Det. Krause was not interviewing the children for the fundamental purpose of learning whether they had been abused by anybody and, if so, by whom. In contrast, she was simply trying to see if Kathryn and Little Matt would repeat statements that they had previously made to other people regarding Mr. Spencer.

For example, Det. Krause explicitly told Kathryn that they needed to talk about what Kathryn had previously said to her stepmother, Ms. Shirley Spencer. Det. Krause wrote, "I indicated to Katie again that it was very important that I talk with her because of things Shirley had said to me." Ex. A, p. 3. Likewise, Det. Krause explicitly told Little Matt that they needed to talk about what he had previously said to his mother, Ms. Shirley Spencer. She wrote, "I told Matt that I wanted to talk to him because of some of the things he had said to his mother. I then stated to Matt, 'Some of the things you said to your mom make me wonder if maybe your private parts were touched by someone.'" Ex D, p 15.

With regard to Big Matt, Det. Krause was apparently not approaching the interview with an open mind, but she was trying to see if he would confirm statements that had been made by Kathryn. Det. Krause wrote, " Initially I asked Matt if he knew what I wanted to talk to him about and Matt stated, 'About Kathy and my dad.' . .. I indicated to Matt that that was the reason I wanted to talk to him .. .. I indicated to Matt that that was one of the reasons I wanted to talk to him because he may have seen or heard something that might be important regarding what Katie was saying." Ex B, p. 3.

**Repetitive Questions by Det. Krause**

Some of the questions posed by Det. Krause were repetitive, that is, she had a style of asking the same questions over and over. For example, Det. Krause repeatedly asked Kathryn

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 5

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

whether her father said anything to her during the alleged sexual activities. In her reports, Det.Krause said:

• "I asked Katie if she could remember anything her Daddy said when that was happening and Katie stated, 'I don't remember'" Ex. C, p.7

• "I asked Katie if she could remember if her Daddy had said anything when that happened, advising her that it was really important to remember what he might have said, and Katie stated, 'He just doesn't say nothing to me.'" Ex. C, p.8

• Det. Krause persisted with a suggestive question, "Does he say he likes you?" At that point, Katie gave into the suggestion and replied, "He says he loves me" Ex. C, p.8

• Det. Krause persisted with, "I told Katie that 'sometimes it was hard to remember things that you didn't like talking about but if you closed your eyes and were very quiet sometimes you would remember something' and asked her to close her eyes and try really hard to remember if her father might have said anything." Again, Kathryn gave into the suggestion and quoted her father as saying, "What do I say, baby girl?" Ex. C, p.8

• Det. Krause persisted again, "I asked her if she could remember anything else and she indicated that she wanted to color for a while" Ex. C, p.8

Det. Krause repeatedly interviewed Big Matt and repeatedly asked him if he had been sexually abused by his father. As an adult, Mr. Matthew Spencer recalled how Det. Krause asked him over and over what his father had done, until he eventually gave in and described multiple acts of sexual abuse, which he later recanted. Det. Krause's own reports indicate how she repeatedly conveyed to Big Matt that she wanted him to describe sexual abuse by his father, Mr. Spencer:

• Regarding her meeting with Big Matt on March 24, 1985, Det. Krause wrote, "During

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 6

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

my initial conversation with Matt Spencer, I advised him as to why he was at the Sheriff's Office and why his mother had brought him and Kathryn to Vancouver, specifically, that during my investigation I had obtained information that possibly Matt (Spencer) had also been victimized by his father, Ray Spencer. Matt advised me that he "knew why he was here, but nothing ever happened to him." Ex. G, p. 2.

• "When I began to specifically talk with Matt about the possibility of him also being a victim, Matt advised me several times that 'nothing ever happened to him." Ex. G, p. 3.

• "Matt and I talked for several more minutes about the possibility of him being a victim and he continued to deny that anything had ever happened." Ex. G, p. 3.

• Det. Krause recorded that she persisted even though Big Matt wanted to terminate the interview.  She said, "At that point during the conversation Matt asked me if 'I was about through asking him questions.' I indicated to Matt that I needed for him to talk with me longer because it was important that I know everything that happened. There were several times during our conversation that morning when Matt would ask if I was done asking him questions." Ex. G, p. 4.

• Det. Krause persisted: "At one point in the conversation I indicated to Matt that I was extremely concerned that possibly something was happening to him or that he may have seen something he was not telling me, and if he were to leave without sharing it, I knew it would bother him ... Matt indicated that 'nothing was bothering him.'" Ex. G, p. 5.

• Det. Krause brought up the idea that if Big Matt were older, she would want to use a lie detector to see if he was telling the truth. That was Det. Krause's way of saying that Big Matt was not telling her the truth. Ex. G, p. 5.

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 7

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

1  • Det. Krause then applied more pressure to Big Matt by saying, "At that time I stated
2  to Matt that I felt I only had one recourse and that was to find out why 'Little Matt'
3  was lying about something happening to Big Matt.' I indicated to Matt that I was
4  going to call Shirley Spencer and have her bring Little Matt to my office so I could
5  find out why he said the things he had about Big Matt.'" Ex. G, p. 6

6  • Det. Krause then suggested that Big Matt may have forgotten what his father had
7  done to him, and Big Matt started to give in to her persistent, repetitive questioning.
8  He said, "Yah, I remember a lot of things, but a lot of things I don't think I remember."
9
10 Ex. G, p. 6

11 • Det. Krause then elicited from Big Matt a series of allegations: his father put his penis
12 in Big Matt's bottom and Kathryn's bottom and Kathryn's front hole and in Little
13 Matt's bottom; his father made all of them put their mouths on those parts; his father
14 made Kathryn put her mouth on Big Matt's penis and Little Matt's penis; his father
15 made Big Matt and Little Matt put their mouths on Kathryn's vagina; his father put
16 his penis in their bottoms and made them put their fingers in Kathryn's bottom; his
17
18 father told them not to tell anybody; his father made Big Matt put his penis in his
19 father's butt; his father made Big Matt, Little Matt, and Kathryn put their fingers in his
20 butt; they all had to suck his father's penis; his father put his penis in Kathryn's vagina
21 and butt; his father's penis "doesn't hang down," but "goes straight out like it's really
22 hard" Ex. G, p. 9; and he and his father touched each other's penises in the shower.
23 Ex. G, p. 10

24
25 Asking repetitive questions sends a message to the person being interviewed, that is,
26 that the interviewer is expecting to receive specific types of information. In this case,
27 Det. Krause was communicating to Kathryn that she really wanted her to produce

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 8

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

specific statements made by Mr. Spencer. She was communicating to Big Matt that she really wanted him to agree that he had been sexually abused by his father. Also, Det. Krause was communicating that she was not going to take "no" for an answer, which is a powerful message for an adult to give to a young child.

### Suggestive Questions by Det. Krause

Some of the questions posed by Det. Krause were suggestive, that is, they suggested a particular answer. For example:

• Det. Krause repeatedly suggested to Kathryn that she might "remember things [she] had forgotten," so they might need to talk again. Ex. A, p 13.

• Det. Krause repeatedly encouraged Kathryn to talk about what happened with her father, such as, "Remember what we were going to talk about? What was the first thing you can remember happened?" Ex. C, p. 6.

• In the interview of October 18, 1984, Det. Krause asked Kathryn suggestive questions in order to describe in greater detail what her father did, such as: whether it was daytime or nighttime; if she could remember what her father said; if she was standing up when it happened; how the male doll should be laying; how Kathryn's clothes were removed; whether her father kissed her; whether he kissed her anywhere besides the mouth; whether her father did anything that hurt her; whether she ever took a bath with anyone; and whether there was anything else that happened with her father.

• In the interview of February 28, 1985, Det. Krause asked Little Matt suggestive questions in order to describe in greater detail what his stepfather, Mr. Spencer, did, such as: whether Mr. Spencer ever did anything that hurt him; whether his stepfather did anything else that hurt him; whether there was anything else that happened; whether something happened involving the bubble bath; whether Mr. Spencer kissed him;

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 9

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

1   whether he was standing up when it happened; whether Mr. Spencer said anything;

2   whether he ever saw anything come out of Mr. Spencer's penis; whether the pee ever

3   went anywhere other than the toilet; whether Mr. Spencer ever said any bad words;

4   whether he ever saw Mr. Spencer touch any other children; whether he saw Mr.

5   Spencer touch any child other than Kathryn and himself; and whether Mr. Spencer

6   ever said anything about telling other people.

7       Apparently, Det. Krause's suggestive questions were prompting Little Matt to make

8   allegations that were more and more elaborate.  Progression of statements from rather simple

9   allegations to complex, elaborate allegations is sometimes a sign that the child is simply

10   providing the interviewer with what he thinks she wants to hear.  Basically, the child realizes

11   that the interviewer is very interested in hearing about sexual activities, so the child cooperates

12   by describing and perhaps making up accounts of sexual activities. For example:

13       • In her first interview of Little Matt on February 28, 1985, she asked a series of

14   suggestive questions, to which Little Matt stated:  his "dad" touched his peepee with his

15   hand; it happened "a lots" of times; it hurt when his dad touched his penis; his dad made

16   Little Matt touch the dad's penis with his hand; his dad kissed his penis; his dad made

17   Little Matt kiss the dad's penis; Little Matt had to touch his dad's "bottom" with his

18   hand; his dad put his finger in Little Matt's bottom; his dad put his penis in Little Matt's

19   bottom; Little Matt saw white pee come out of his dad's penis, which sometimes got on

20   the floor and on Little Matt's bottom; his dad put his penis in Kathryn's vagina lots

21   of times; his dad put his finger in Big Matt's bottom; and his dad put his penis in Big

22   Matt's bottom.

23       • In her second interview of Little Matt on March 7, 1985, she posed additional

24   suggestive questions, to which Little Matt provided responses that were more

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 10

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

and more elaborate. When Det. Krause asked Little Matt "if anything else happened to Big Matt's body," Little Matt added to what he had previously said: that he and Kathryn put their fingers in Big Matt's body and Big Matt did that to Kathryn and Little Matt. He also added that he had to stick his fingers and his penis in Kathryn's "circle spot," i.e., vagina. Ex E, p. 3.

• When Det. Krause asked Little Matt "if he could remember if anyone else had to touch Big Matt's body," Ex E, p. 4. Little Matt added that he had to kiss Big Matt's penis.

• In her third interview of Little Matt on March 21 , 1985, Det. Krause made it clear that she wanted to write down whatever he wanted to tell her.  Furthermore, Det. Krause educated 5-year-old Little Matt regarding the details of female sexual anatomy: "I indicated to Matt at that time that girls had a hole in their 'circle spot' and stated to Matt, 'Did you have to touch right outside that hole part?' Matt stated, 'No, he makes me touch inside that hole.'" Ex. F, p. 4.

• When asked if his daddy made him do anything else, Little Matt added that he had to put his thumb in Big Matt's bottom. Ex. F, p. 4.

• When asked if anything else happened with Big Matt, Little Matt added that Big Matt had to put his penis in the hole in Kathryn's circle spot. Ex. F, p. 4.

• When asked if his daddy made him touch anybody else, Little Matt added that he had to use his own "wiener" to touch Big Matt's penis and bottom. Ex. F, p. 5.

• When asked if anything else happened to Kathryn, Little Matt added that all three males (his dad, Big Matt, and Little Matt himself) put their penises in Kathryn's circle spot hole. Ex. F, p. 5.

• When asked if anything else happened to Kathryn's circle spot, Little Matt added that

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 11

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

1   he and Big Matt put their fingers in Kathryn's circle spot hole. Ex. F, p. 5.

2   • When asked if he could remember what his daddy said, Little Matt added, "Mostly he

3   says in a loud voice not to tell." Ex. F, p. 5.

4   • When asked if he had to do anything else to Kathryn, Little Matt added that he had to

5   put his finger and his thumb in her bottom, and also in Big Matt's bottom. Ex. F, p. 5.

6   • When asked if he had to kiss Kathryn, Little Matt added, "Yes, he makes me kiss her

7   on the bottom, and he made me kiss her hole part, too." He then added, "He made

8   Big Matt kiss her hole part, too." Ex. F, p. 5.

9

10  • When asked if anything ever happened in a place other than their house and the motel,

11  Little Matt added a new location, that his dad touched him "in the tent." Ex. F, p. 6.

12  • When asked what else happened regarding Big Matt, Little Matt added, "He'd make

13  Big Matt grab my peepee and touch it, and squeezes it and that hurts." Ex. F, p. 7.

14  • When asked if his dad ever took and pictures of him, Little Matt added, "He takes

15  pictures when we didn't have nothing on . . . .. They were gross pictures of Big Matt

16  and Kathryn and me." Ex. F, p. 7.

17

18  • When asked if his dad ever showed him "any books with bad pictures," Little Matt

19  added, "He has naked people books . . . .. They were running with no clothes on." Ex. F,

20  p. 8. Det. Krause used anatomically correct, male and female dolls with Kathryn and

21  Little Matt. It is notable that all of the dolls were naked when Det. Krause introduced

22  them to the children. When an interviewer provides naked anatomically correct dolls, it

23  suggests the child to use the dolls to illustrate sexual acts.

24

25  Det. Krause apparently had a rather detailed discussion with Big Matt about human

26  sexuality, including a discussion of sexual intercourse and "making love." She asked Big Matt,

27  age 9, whether he masturbated. In conducting those conversations, Det. Krause was

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 12

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

1  communicating to Big Matt that she was interested in talking about sexual acts and she may
2  have suggested specific behaviors that he could tell her about.

3      Most children and adolescents - in interviews or conversations with adults - try to be
4  cooperative. They try to give responses that they think will be the "correct answers," that is,
5  responses that will please the adults. With that in mind, suggestive questions are very
6  problematic. In some cases, children and adolescents simply adopt the story-line that has
7  unwittingly been suggested by the interviewer. Once they have stated and adopted the account
8  suggested by the adult, they continue to recite that account in subsequent interviews. In some
9  cases, children and adolescents develop false memories of sexual abuse simply because of
10 conversations they had with parents, interviewers, and therapists.

### Leading Questions by Det. Krause

13     Some of the questions posed by Det. Krause were leading questions, that is, they
14 requested or encouraged a particular answer. (A suggestive question is, "Did Billy hit you on
15 the head?" A leading question is, "Billy hit you on the head, didn't he?") For example, Det.
16 Krause asked questions indicating that the child had just given the wrong answer:

18     • When Kathryn was using the anatomically correct dolls to illustrate genital touching,
19         Det. Krause said, "How many times did that happen?" When Kathryn stated, "One
20         time," Det. Krause asked her if she was sure about that, implying that Kathryn had
21         not given the correct answer. Ex. C, p. 6.

22     • When Det. Krause and Kathryn were talking about kissing, Det. Krause wrote, "I
23         asked Katie how many times the kissing thing happened .... Katie stated, 'All I can
24         remember is one time. ' I asked her if it might have happened more than once and Katie
25         stated, 'I guess it might have. I just don't remember.'" Ex. C, p. 9.

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 13

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

## Det. Krause's Coercive Style of Interviewing

The overall tone of Det. Krause's interview style was coercive.  Her use of repetitive, suggestive, and leading questions communicated to the children that she expected certain responses from them. Additional features of the interviews were coercive, such as:

Det. Krause persisted in questioning Kathryn after the child had repeatedly told her that she did not want to talk with her. For example:

• Det. Krause said, "I asked Katie if she could tell me more about [Daddy's wiener] and Katie shook her head no. I asked her if she would like to think about that for a while and she did not respond. I let Katie lay there for several minutes with her back to me and then I indicated to her that maybe if would be easier for her to show me with the dolls" Ex. A, p. 9.

• "Katie stated several times prior to my leaving the residence ' that she did not want to talk about it anymore.' However, prior to my leaving, I did indicate to Katie that I would call her the following day or stop by to see if she had changed her mind" Ex. C, p. 2.

One of Det. Krause's methods of coercion was to mislead the children into thinking that they were helping their father by making statements about him. In fact, Det. Krause had no interest at all in "helping" Mr. Spencer.  For example:

• Det. Krause said to Kathryn, "Sometimes people did things they weren't supposed to do because they were sick and needed help .... I told Katie that that was why it was important for us to talk. In order for us to help somebody who was sick we needed to know what was wrong" Ex. A, p. 10.

• Kathryn adopted Det. Krause's explanation. According to Det. Krause, "Katie then talked about her Daddy 'needing help' and stated, 'Cause he can't get help if he

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 14

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

doesn't tell the truth, can he?'" Ex. C, p. 4.

• Det. Krause reinforced that notion. When Kathryn said, "He really has to be helped, doesn't he?," Det. Krause wrote, "I told her when a big person does that to a child, they do need help" Ex. C, p. 11.

• Det. Krause said to Big Matt, "I advised Matt that when someone bigger than a child did that it was wrong but that many times they probably didn't do it because they were being bad, it was because they were sick. ... There were many times when the grownup person told the truth and asked for help and instead of going to jail they would get help" Ex. B, p. 6.

• "I told Matt that if his father had done it and was sick our only goal was to get his father help" Ex. B, p. 7.

• Subsequently, Det. Krause said to Big Matt, "I asked Matt if he thought his father needed help and had a problem . ... I asked Matt if he thought his father needed a little help or a lot of help . . .. I asked Matt if he could tell me what his father needed help for" Ex. G, p. 3.

Also, Det. Krause had a regular practice of telling each child what the other children had said about Mr. Spencer. That is not a good method of interviewing, because introducing that information may contaminate the memory and the statements of the children. Det. Krause said:

• "At that time I indicated to [Big] Matt that what Katie has said was that her father had touched her on her private areas" Ex. B, p 4.

• "I indicated to [Big] Matt that [the genital area] was one of the things that Katie had said to me" Ex. B, p 5.

• "At that time I told [Big] Matt that during the conversation with Katie the day before

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 15

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

1  she indicated to me that during the summer visit in Vancouver, her father had put his

2  mouth on the private area of her body and had also made her put her mouth on his

3  (father's) penis. I related to Matt that Katie had also made statements indicating that her

4  father had placed his bare penis on the private part of her body where she goes to the

5  bathroom from" Ex. B, pp. 5-6.

6  • On March 25, 1985, Det. Krause and Big Matt discussed what Little Matt and Kathryn

7  had previously said about Mr. Spencer.

8  • On March 25, 1985, Det. Krause and Kathryn discussed what Little Matt and Big

9

10 Matt had previously said about Mr. Spencer.

11              **Det. Krause's Pattern of Reinforcing Positive Behavior**

12      Det. Krause employed unusual interview techniques, which would have encouraged the

13 children to be more cooperative with her:

14      1. Det. Krause interviewed Kathryn and Big Matt in her motel room in Sacramento.

15 Using her own space for an investigative interview would have conveyed to the children that

16 they had a close, personal relationship, which may have encouraged the children to share or

17

18 make up personal information. Also, sitting or lying on a bed in a bedroom may have prompted

19 the children to think and fantasize about sexual touching.

20      2. Det. Krause gave the children treats to eat and drink, which they may have

21 interpreted as rewards for doing and saying what Det. Krause wanted. The treats included:

22      • A soft drink for Kathryn at a shopping mall

23      • Hot chocolate for Kathryn at a motel coffee shop

24      • A taco and drink for Kathryn at a drive-in restaurant

25      • An ice cream sundae for Kathryn at a Dairy Queen

26

27      • Hot chocolate for Big Matt at a motel coffee shop

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 16

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

• A soft drink for Big Matt at the Sheriffs Office

3. Det. Krause shaped the children's responses by praising the child when he or she gave the answer that that Det. Krause wanted:

• "I indicated to [Katie] that I knew that it would be hard to talk about things like we had talked about but I advised her that she had done 'really good' and assured her again that she was not in any trouble" Ex. A, p. 11.

• "I picked up Katie's coat and indicated to her that she had done really good and that we would go" Ex. A, p. 11.

• Det. Krause repeatedly reassured Kathryn that Ms. Shirley Spencer and Det. Krause herself were proud of Kathryn "for telling the truth" Ex. A, p. 12.

• "I indicated to Deanna Spencer that Katie was a 'good helper' and that she had talked with me and had really helped me. At that time Katie was standing on the couch and jumped into her mother's arms and stated, 'Aren't you proud of me 'cause I told the truth'" Ex. A, p. 13.

• "I said again that Katie did really good and was a good helper by talking to me" Ex. A, p. 14.

• In response, Kathryn clearly wanted to be praised for talking to Det. Krause. Kathryn said she knew her stepmother, Shirley Spencer, would be proud of her "for telling the truth." Ex. A, p. 12. She also said her mother, Deanne Spencer, would be proud of her "for telling" Ex. A, p. 13.

• With regard to Big Matt, Det. Krause said, "After I had talked with Deanne Spencer and Mrs. Day, I had Matt come back into the room and in the presence of all three, I assured Matt, as did his mother and grandmother, that he was not in any trouble, and

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

that they were proud of him for telling, and they understood how difficult it was" Ex. G,

pp. 12-13

### ANALYSIS OF MR. JAMES M. PETERS' INTERVIEW OF KATHRYN

I also analyzed James Peters' interview of Kathryn Spencer on December 11, 1984. A

true and correct copy of a transcript of the interview I reviewed is attached to this Declaration

as Exhibit I.

#### Purpose of Mr. Peters' Interview of Kathryn

Usually, when conducting an interview of a child who may have been abused, the

purpose of the interview is to determine whether the abuse occurred, who did it, and what

happened. In conducting the interview of Kathryn, Mr. Peters' purpose was not to determine

whether Kathryn had been abused by her father or by anybody. He was not conducting a

proper investigation of what may have happened to Kathryn. Instead, Mr. Peters knew what

Kathryn had previously said to Det. Sharon Krause. Mr. Peters was simply trying to get

Kathryn to repeat for the video camera what she had previously stated to Det. Krause. He made

that purpose clear at the outset of the interview:

• Mr. Peters said, "Well, I heard last night... I got a call on the phone from Sharon

that you said you were going to talk to me about it too. Is that right?" Ex. I, p. 11

• And then, "Good. That's good. Well, Sharon told me that when you talked to her it

was easier for you to talk when you used some dolls. Is that right?" Ex. I, p. 12

• Later, when introducing the anatomically correct dolls, Mr. Peters reiterated his desire

that Kathryn repeat what she had done with Det. Krause. He said, "What's the

person's name? . . . I know I know, but I want you to tell me. Is it the same person

that you told Sharon about?" Ex. I, p. 15

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 18

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

In a declaration prepared in May 2012, Mr. Peters said that his purpose in interviewing Kathryn was "to evaluate her competence as a witness, how she would present as a witness in the event the decision to charge was made and to weigh whether or not her testimony or her testimony, in combination with other evidence, would be sufficient to obtain a conviction. I also used the interview to establish a rapport with her in the event I later had to question her on the witness stand."

## Repetitive Questions by Mr. Peters

Some of the questions posed by Mr. Peters were repetitive, that is, he had a style of asking the same questions over and over. For example:

At the beginning of the interview, Mr. Peters wanted Kathryn to name the adult male doll they would be using the re-enact the alleged abuse. Mr. Peters repeatedly asked Kathryn whom that doll represented:

• "Who is this one going to be? Is this me?"

• "Who is it then? Is this your mommy?"

• "Is it somebody who lives in Sacramento?"

• "Is it somebody who lives in Vancouver?"

• "What's the person's name?"

• "I want you to tell me. Is it the same person that you told Sharon about?"

• "Ah, Okay. Who is that? Is it Matt?"

• "Okay. Is it somebody else who lives in Vancouver?"

• "What kind of job does the policeman -- does the person do?"

• "Oh, do you remember his first name?"

• "What do you call that person?"

• "You call the person 'Mom?'"

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 19

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

1    • "What do you call him?" At that point, Kathryn finally said, "Daddy." Ex. I, pp. 14-
2    16.

3        Later in the interview, Mr. Peters repeatedly asked Kathryn to say the word she used for
4    breasts:

5    • "Right here on the chest. What's this part called? Do you know?"

6    • "What's it called? Is it called a nose?"

7    • "No. It's important for you to tell me ' cause I don't know what your words are for
8    that."

9    

10   • "Did you tell Sharon before? How about if we got her cartoon and see what you told

11   her before? ... Is this the cartoon that she used when she talked to you before? Let's

12   see, she wrote down that you call this place on the chest ' boobies.' Is that right?"

13   • "Is that what you call that place right on the chest? Boobies?"  Ex. I, pp. 18-19

14   Mr. Peters repeated the same interrogation for other body parts.

15       Mr. Peters wanted to know if Mr. Spencer told Kathryn to keep their alleged activities a
16   
17   secret, which sometimes occurs in cases of child sexual abuse. He repeatedly asked Kathryn

18   questions until he got the answer he wanted:

19   • Mr. Peters said, "When he did that to you, did he say anything to you?" Ex. I, p. 55

20   • When Kathryn said no, Mr. Peters said, "How about afterwards?"

21   • When Kathryn said no again, Mr. Peters persisted, "Did he tell you anything about
22   telling people about it?"

23   • When Kathryn said no again, Mr. Peters asked, "Did he tell you not - ?"
24   
25   • Kathryn then said, "Yes, yes, yes, yes." Mr. Peters said, "What did he tell you?"

26   • When Kathryn said, "Nothing," Mr. Peters said, "Did he tell you anything about

27   telling other people?"

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 20

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

• Kathryn started to give in to the questioning. She said, "I don't know."

• When Mr. Peters said, "Sounded like you remembered just a minute ago," Kathryn resisted and said, "I didn't remember."

• When Mr. Peters persisted, "Did he tell you not to tell other people?" Kathryn gave in and said, "Yes."

• Then, Mr. Peters complimented Kathryn for giving the right answer, "Oh, okay. It was real good for you to tell though." Ex. I, pp. 55-56

Through repetitive questioning, Mr. Peters was communicating to Kathryn that he really wanted her to name the alleged perpetrator. He was communicating to Kathryn that he wanted her to say that her father told her not to tell anyone what they had done together. Also, Mr. Peters made it clear that he was not going to take "no" for an answer.

**Suggestive Questions by Mr. Peters**

Some of the questions posed Mr. Peters were suggestive, that is, they suggested a particular answer. For example, Mr. Peters said:

• "Do you remember, when you were staying at the house by the river, some things happening that made you feel bad?" Ex. I, p. 9.

• "Well, can you show me what Daddy did?" Ex. I, p. 17.

• "Let's see, did Daddy touch you some place?" Ex. I, p. 18.

• "Can you show me how your Daddy touched you? Just take the dolls and show me?" Ex. I,  p. 22.

• "This is your Daddy and this is Katie. Show me what happened last summer." Ex. I, p. 25.

• "One question we forgot to ask. It's real important. Does the girl doll have any clothes on?" Ex. I, p.  30

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 21

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

• "You told me earlier that he touched you. Can you show me how?" Ex. I, p. 38

Mr. Peters engaged Kathryn in a remarkably suggestive conversation about penile erections. He said:

• "You know how boys' wieners hang down like this usually?"

• "Is that the way your Dad's was?"

• "Okay. Did it always stay like that? Or did it change some way?"

• "How about with my finger? It's just a little finger. Or show me with your finger."

Mr. Peters was using his finger to illustrate a penis.

• "Well, can you tell me if it changed?"

• "Did it always hang just down or did it hang some other way?"

• "Can you show me with the girl? With the little dolly's arm what happened?" Ex. I, pp. 37-38. Mr. Peters was trying to have Kathryn use the doll's arm to illustrate a change in her father's penis.

In the latter part of the interview, Mr. Peters continued that line of questioning:

• "Do you remember anything about Ray's peepee when this was going on?"

• "Was it hanging down like this or was it doing something else?" Ex. I, pp. 48-49

• "Did you see anything come out of his peepee? Or out of his wiener, I mean?"

Mr. Peters was using suggestive questions to influence Kathryn to give him the answers he was hoping for. In this case, of course, Mr. Peters was hoping that Kathryn would describe penile erection and ejaculation.

### Leading Questions by Mr. Peters

Some of the questions posed by Mr. Peters were leading questions, that is, they requested or encouraged a particular answer.

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 22

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

1   At the outset of the interview, for example, Mr. Peters asked Kathryn the following

2   leading questions:

3   • "Yeah, this is hard to talk about, isn't it?"

4   • "Well, sometimes when big people touch little people in their private places, it's hard

5   to talk about.  Right?"

6   • "You've already talked to some people about this, haven't you?"

7   • "Who'd you talk to? Your mom, right?"

8   • "No? Somebody named Shirley?"

9

10   • "Yes. Good, and who else? Who else have you talked to about it? Sharon?" Ex. I, p.

11   10.

12   During the latter part of the interview, Mr. Peters said, "Did Ray say something about

13   your bottom?" When Kathryn said no, he challenged her with, "You sure?" When she

14   continued to say no, Mr. Peters persisted, "Did you tell Sharon he said something about your

15   bottom?" and "You don't remember or no?" Ex. I, p. 49.

16

17   Also, during the latter part of the interview, Mr. Peters said, "Did he ever put his....

18   wiener in your peepee before?" Kathryn said no. Then, Mr. Peters said, "Did he ever put his

19   mouth on you before like you showed me?" When Kathryn said no, Mr. Peters persisted, "You

20   sure? Hm?" Ex. I, p. 51.

21   There are several dangers in that type of questioning:  (1) The questioner is eliciting

22   particular answers by suggesting and encouraging specific responses. When questions are asked

23   in that manner, the responses may be factual or may simply be following the lead of the

24   interviewer. (2) In a more general manner, the questioner is training the child to be responsive

25   and to follow the suggestions of the interviewer. That style of questioning is sometimes used by

26

27   attorneys in cross-examination (and Mr. Peters was of course a prosecuting attorney), but it is

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 23

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

not appropriate for a forensic interview of a child. (3) When using a pattern of repetitive, suggestive, and leading questions, the questioner is communicating to the child that that he or she is expecting and perhaps demanding answers, so the child tries to please the interviewer by searching for and providing the responses that seem to be correct.

### Mr. Peters' Coercive Style of Interviewing

The overall tone of Mr. Peters' interview style is coercive. His use of repetitive, suggestive, and leading questions communicated to Kathryn that he expected certain responses from her. Additional features of the interview were coercive, such as having Kathryn's mother in the room, so at times Mr. Peters and Ms. Deanne Spencer teamed up to encourage Kathryn to make certain statements. Also, it was clear that Det. Sharon Krause was nearby, so that may have also created pressure on Kathryn.

Another form of coercion was promising to end the interview as soon as Kathryn told the right answers to Mr. Peters. Kathryn was clearly uncomfortable during the interview. Mr. Peters told Kathryn the unpleasant interview would end if only she would tell him what he wanted to hear:

• "Show me what happened last summer. Okay? Then we can stop all this" Ex. I, p. 25.

• "So let's just take about three deep breaths and then you show me and we'll get this all over with" Ex. I, p. 28.

• "Would you show me one more time so I'm sure I got it? ... And then we'll turn the camera off and then we' ll stop. Okay?" Ex. I, p. 57.

One of Mr. Peters' methods of coercion was to mislead Kathryn into thinking that she was helping her father by making statements about him. He basically lied to Kathryn:

• "You talked to Sharon about how important it is for you to tell what happened, remember? How we've got to get Daddy some help so he won't do this again to you or

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 24

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

to anybody else?" Ex. I, p. 17.

• "You know we just want to help your Daddy? If he did this we want to make sure he doesn't do it to you again or to anybody else again" Ex. I, p. 26

• After complimenting Kathryn for describing sexual abuse, Mr. Peters said, "So maybe we can help Ray get some help so he won't do that again" Ex. I, p. 56.

A remarkable form of coercion involved Mr. Peters' suggesting that Kathryn may have been lying in her previous statements to Det. Krause. After repeatedly asking Kathryn to tell how her father had touched her - with little success - the exasperated Mr. Peters said, "Well, let's see. Is it true or a lie? Did your Daddy touch you last summer? True or lie?" Ex. I, p. 24. Since Kathryn was refusing to tell him what her father had done, Mr. Peters was saying that she must have been lying to Det. Krause in her previous statements. When Mr. Peters asked Kathryn one more time what "happened last summer," Kathryn replied, "Nothing happened last summer." Ex. I, p. 25.  She indicated that twice more.  With that new revelation, it would have been advisable for Mr. Peters to back away from his original goal (having Kathryn repeat what she said previously to Det. Krause) and adopt a new goal for the interview (trying to determine whether anything at all happened between Kathryn and her father).

### Mr. Peters' Pattern of Reinforcing Positive Behavior

Mr. Peters also shaped Kathryn's responses by praising the child when she gave the answer that he wanted. For example:

• After Kathryn eventually agreed that she had said she would talk to Mr. Peters about big people touching little people in private places, Mr. Peters said, "Good. That's good." Ex. I, p. 12.

• After Kathryn eventually agreed that the name of the adult male doll was "Daddy," Mr. Peters said, "Oh, good. That's good." Ex. I, p. 16.

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 25

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

• After Kathryn moved her mother's hand to the doll 's tummy, Mr. Peters said, "Good." Ex. I, p. 29.

• When Kathryn agreed the events occurred in "the house by the river," Mr. Peters said, "Good. You can remember really well." Ex. I, p. 31.

• When Kathryn said the events took place at night time, Mr. Peters said, "You remember really well." Ex. I, p. 32.

• When Kathryn said Little Matt was in the house on the floor, Mr. Peters said, "Oh, you're remembering so good now" Ex. I, p. 33.

• When Kathryn said she and her father were awake in the living room, Mr. Peters said, "Good" Ex. I, p. 33.

• When Mr. Peters questioned Kathryn about the clothes she had on, he said, "You're doing so good so far" Ex. I, p. 35.

• When Kathryn indicated her father told her to take her clothes off, Mr. Peters said, "Aw, you're doing so good. You really are" Ex. I, p. 36.

• When Kathryn seemed to agree that her father touched Kathryn's peepee, Mr. Peters said, "Alright" Ex. I, p. 42.

It is obvious that Mr. Peters was shaping Kathryn's responses to conform to what he wanted to hear. When a young child is being interviewed, the child tries hard to figure out what the interviewer is looking for. When possible, the child simply follows the compliments provided by the interviewer.

### Kathryn's Change in Demeanor During the Recorded Interview

During the first part of the recorded interview, which lasted 47 minutes (9:59a.m. to 10:46), Kathryn was very defensive and resistant. She usually remained silent and did not answer Mr. Peters' questions. She communicated to some extent by moving her head up and

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 26

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

down or sideways. At times she seemed to appeal to her mother for help, but Ms. Deane

Spencer simply reinforced the questions of Mr. Peters.

A break in the interview occurred from 10:46 a.m. to 11:51 , more than one hour. We

do not know what happened during that time. However, it is notable that when the interview

resumed, Kathryn was much more talkative. She was friendly, smiling, and laughing. The

second part of the interview lasted only 11 minutes (11 :51 a.m. to 12:02 p.m.). Also, during

the second part of the interview, both Kathryn and Mr. Peters were sitting or lying on the floor

of the room.

Apparently, during the break off-camera, Kathryn and Mr. Peters used the dolls and

rehearsed what they intended to display on-camera. When the interview resumed, Mr. Peters

said, "Okay. The camera's rolling again. And while the camera was off, Katie, you showed me

some things with the dolls, didn't you?" Ex. I, p. 46. During the second part of the interview,

Kathryn used the dolls to display sexual touching between "Katie and Ray." Mr. Peters had

Kathryn demonstrate with the dolls what they had discussed during the one-hour break in the

recorded interview.

## CONTEMPORARY KNOWLEDGE REGARDING SUGGESTIBILITY OF CHILDREN

It has been generally known for at least one hundred years that children are suggestible

and can be easily influenced to adopt the assumptions and beliefs of the adults with whom they

interact. Although that concept has been most thoroughly documented in the writings of

developmental psychologists, it has been widely accepted by educators, religious leaders, and

most parents. In fact, Det. Krause herself said, "During my interview with Matt I was

attempting to be cautious about leading him or asking him any specific questions" When Det.

Krause and Mr. Peters interviewed Kathryn, Big Matt, and Little Matt, they almost certainly

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 27

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

1   knew and they clearly should have known that leading, suggestive, and repetitive questioning

2   could induce the children to make false statements and even develop false memories.

3       In his report, Dr. Philip W. Esplin pointed out that extensive research regarding the

4   suggestibility of children started in the late 1970's and has continued to the present time. He

5   said that during the 1984-1985 time frame, "The guidelines for investigative interviews of

6   children were of such a general nature as to be of limited utility to front line professionals"

7   Also, "By the mid 1990's there was scientific consensus regarding general principles, which,

8
9   when utilized in investigative interviews, would substantially reduce the risk of obtaining

10  unreliable information from both adult and children witnesses." Dr. Esplin concluded, "Given

11  the standard of care and the information available to field professionals during the 1984-1985

12  time frame, reasonable field professionals would not have known that the investigative

13  techniques utilized in this case were so coercive and abusive that false information would

14  result."

15
16      However, there is abundant evidence that mental health and legal professionals were

17  aware of the fallibility of children's memories and their susceptibility to the influence of

18  interviewers long before 1985. In summary, Ceci et al. (2005) said, "Children's vulnerability to

19  leading questions and interviewers' suggestions has been well known for over a century. Early

20  researchers, sometimes working within the context of a criminal investigation, showed that

21  children's testimony could be influenced by the manner in which questions were posed to them

22  ... . With few exceptions, these early studies of children's suggestibility led to a jaundiced

23
24  portrayal of their ability to resist an interviewer's suggestions. Beginning with the early

25  experiments of Binet and his European colleagues, and concluding with empirical studies in the

26  1920s and 1930s, early researchers viewed children as extremely susceptible to leading

27  questions and unable to stand up to an interviewer's suggestions" (citations omitted) (pp. 113-

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 28

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

114). Ceci and Bruck (1993, 1995) provided a historical overview of research regarding the suggestibility of children, which they divided into: Early Research: 1900-1914 (including Europeans such as A Binet, W. Stern, J. Varendonck, and O. Lipmann); The Dry Middle Years: 1924-1963 (including American researchers such as M. Otis, H. E. Burtt, H. Gaskill, I. Sherman, R. Messerschmidt, F. Averling, and H. Hargreaves); and The Modern Period: 1979-1992 (featuring "more than 100 studies on children's suggestibility").

The following quotations - from the scientific, legal, and popular literature prior to 1985 - are in chronological order. These quotations illustrate the general awareness of the danger of asking children leading and suggestive questions.

Hugo Mtinsterberg (1908), a professor at Harvard University and an early president of the American Psychological Association, wrote a book about psychological aspects of crime, law enforcement, and legal practices. He discussed a "factor which, more than anything else, devastates memory and plays havoc with our best intended recollections: that is, the power of suggestion." Mtinsterberg said, "Where the perception was fairly correct, the recollection may be entirely distorted by suggestive side influences. We have spoken of the experiments which prove the powerful influence of suggestive questions ... . And even if the memory itself is correct, the narration may be dictated by suggestive influences and the reported story itself may work backwards with auto-suggestive influence on the memory. There are not a few who finally believe their hunting stories after they have told them repeatedly" (pp. 197 -198).

Dr. Guy Montrose Whipple (1909), an educational psychologist and prolific writer, described a psychological test that was designed to quantify the susceptibility of witnesses to leading and suggestive questions. Whipple said, "The one factor that more than any other is responsible for the poor reports of children is their excessive suggestibility, especially in the

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 29

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

years before puberty" (p. 162). Whipple (1911) also thought, "Children are the most dangerous of all witnesses" because of their willingness to give in to suggestive questions.

Professor William Stern (1910), a German psychologist, delivered an important series of lectures at Clark University, Worcester, Massachusetts. He discussed the psychology of testimony and explained why children make false statements. Stern said, "Since a large part of the falsification in the report is usually a result of questioning, the questioner is himself coresponsible for the false report of the child ... . One should therefore interrogate no more than is absolutely necessary and should formulate his questions as 'unsuggestively' as possible."

T. H. Pear and Stanley Wyatt (1914) studied the memory and suggestibility of normal and "mentally defective" children, age 10 to 14, with a "picture test" and an "event test." After presenting the test, the researchers asked the children what they remembered in a narrative format and with specific questions. They found, "Most of the children are susceptible to suggestion, the susceptibility increasing as the interval between the event and the process of recall becomes greater."

M. R. Brown (1926), a legal scholar, said, "Create, if you will, an idea of what the child is to hear or see, and the child is very likely to hear or see what you desire" (p. 133).

Dwight Gaylord McCarty (1929) wrote *Psychology for the Lawyer*. He said, "There is a very common impression that children are more suggestible than adults" (p. 270). McCarty suggested that a devious lawyer could, if he desired, control the testimony of a child by means of suggestion, and could elicit evidence from the child that was false and unreliable.

Dillard S. Gardner (1933), a legal scholar, wrote about testimonial errors and the factors that determine the accuracy and reliability of witnesses. He reviewed both legal and psychological writings of the time and commented: "Children up to the age of puberty are extremely suggestible." Also, "Leading questions, as the law has long recognized, by their

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 30

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

suggestiveness encourage errors." Also, "The form of the question is itself suggestive, as it may as frequently suggest the wrong, as the right, answer. ... Every experienced lawyer knows instances proving the power of suggestion to alter and to create testimony."

Philip George Zimbardo, Ph.D., a distinguished professor at Stanford University, served as president of the American Psychological Association. Zimbardo (1967) explained how persistent, "coercive" questioning by investigators sometimes causes suspects to adopt the storyline suggested by the interviewers and make false confessions. He commented that investigators "make use of all kinds of fears, including the common fear of lie detector tests." Zimbardo's article was published in a popular journal available to the general public, *Psychology Today.*

Since the 1970s, Elizabeth F. Loftus, Ph.D., and her colleagues have extensively studied how adults' and children's memories of events can be changed by questions posed after the events occurred. Loftus (1975), for example, reported a large study of college students who were questioned after viewing a short film. She concluded, "We suggest that information acquired during a complex experience is apparently integrated into some overall memory representation. Subsequent information about that event - for example, that introduced inadvertently via questions containing true or false presuppositions - is also integrated, and can alter the initial representation." In other words, suggestive questions can change a person's memory of a past event. At the time she conducted that research, Dr. Loftus was a professor at the University of Washington.

Philip Dale, Elizabeth Loftus, and Linda Rathbun ( 1978) showed young children brief movies and then asked them both open-ended questions and suggestive and leading questions. The authors concluded, "First, that children are ' suggestible,' and, second, that children are aware of the expectation conveyed by certain linguistic forms such as *the.* . .. Thus one finding

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 31

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

of this study is that, under certain conditions, children are aware of the additional meaning conveyed by the definite article."

Elizabeth Loftus (1979) also published a book for the general public regarding the reliability of eyewitness testimony. She wrote, "External information provided from the outside can intrude into the witness's memory, as can his own thoughts, and both can cause dramatic changes in his recollection. People's memories are fragile things. It is important to realize how easily information can be introduced into memory, to understand why this happens, and to avoid it when it is undesirable" (p. 87).

Barbara VanOss Marin, Deborah Lett Holmes, Mark Guth, and Paul Kovac (1979) discussed the competency and credibility of children when testifying in legal proceedings. They studied the suggestibility of witnesses and found that both children and adults were significantly influenced by suggestive questions.

Helen R. Dent and Geoffrey M. Stephenson (1979) stated the problem in stronger terms. They said, "It is a well-documented fact that children are particularly susceptible to suggestion. Examples can be given both from studies of actual court cases and from laboratory experiments. Some of the more dramatic of the case studies have concerned incidents in which the parent or some other influential adult has been incorrectly led to the conclusion that a child has been, in one way or another, sexually assaulted" (citation omitted).

Ronald L. Cohen and Mary Anne Harnick (1980) stated beliefs regarding the suggestibilityof children that were generally held at the time of their research: "The law assumes that a child's perception of the world differs from that of an adult; that children are more likely to confuse fact and fantasy; that a child's memory is not equal to an adult's; and that this already inferior memory is more subject to distortion than is that of an adult" (citations omitted). Also, "The law places limits on the use of leading questions .. .. And, of course,

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 32

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

precourtroom interrogations [of children] by parents, police, etc., which are not carried out under the supervision of the court, are an even more dangerous source of suggestion." After presenting their research, those authors concluded, "Suggestive or leading questions can have effects at all age levels. In particular, leading questions may provide witnesses with responses in instances where they have no recollection of the actual events. This type of interrogation should obviously be avoided in the elicitation of eyewitness testimony."

## CONCLUSIONS

**1. The interviews of Kathryn Spencer, Matt Spencer, and Matt Hansen conducted by Det. Sharon Krause between October 1984 and March 1985 were seriously flawed in many ways, as described previously in this report.**

Det. Krause's interviews of the three children were seriously flawed because: Det. Krause asked repetitive, suggestive, and leading questions; her interview style was coercive; and she improperly told each child what the other children allegedly had stated. As a result, the children's statements with regard to the allegations of abuse they made against Mr. Clyde Ray Spencer were unreliable.

**2. The interview of Kathryn Spencer conducted by Mr. James M. Peters on December 11, 1984, was seriously flawed in many ways, as described previously in this report.**

Mr. Peters' interview of Kathryn was seriously flawed because: Mr. Peters asked repetitive, suggestive, and leading questions and his interview style was coercive. As a result, Kathryn Spencer's statements with regard to the allegations of abuse she made against her father, Mr. Clyde Ray Spencer, were unreliable.

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 33

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

**3. The investigative interviews conducted by Det. Krause and Mr. Peters were so improper, coercive, and psychologically abusive that the interviewers knew or should have known that they would yield false information.**

The goal of any investigation is to determine the truth regarding the events that are being examined; the goal is not merely to validate the assumptions or suspicions of the investigator. However, when an investigator has already made up his or her mind regarding the underlying truth, it is obvious that the person may try to influence alleged victims and witnesses to corroborate the investigator's preconceived notions. By using repetitive, suggestive, and leading questions, it is remarkably easy to influence children to provide data consistent with one's hypothesis.

The investigator may add other methods, such as praising the child when the child's answers meet expectations or accusing a child of lying when they do not. It is clear in Det. Krause's reports and in Mr. Peters' recorded interview that the interviewers were actively trying to get the children to endorse and corroborate the interviewers' conclusions that the children had been sexually abused by Mr. Spencer. It is psychologically abusive to induce a child to adopt a false belief that he or she had been sexually abused or to adopt a false belief that a parent is evil or dangerous. When interviews are conducted in that manner, it is likely that false information will be elicited and the children's statements become unreliable.

**4. In 1984 and 1985, when the investigative interviews were conducted by Det. Krause and Mr. Peters, it was well known to both psychologists and legal practitioners that both children and adults could be influenced by repetitive, leading, and suggestive questioning.**

As explained earlier in this report, there is ample evidence that both psychological and legal professionals had been interested in the suggestibility of both child and adult witnesses

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 34

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

since the early part of the twentieth century. I am not suggesting that Det. Krause or Mr. Peters

necessarily read or studied any of the scholarly works cited in this report. The various books

and scholarly papers were included in this report to demonstrate there was a widespread

awareness of the suggestibility of children, such that any competent practitioner of psychology

and law would have been exposed to that issue. As stated earlier in this report, Det. Krause

herself said, "During my interview with Matt I was attempting to be cautious about leading him

or asking him any specific questions."

**5. The style and content of the interview conducted by Mr. Peters are not consistent with his statement that he was trying to evaluate Kathryn's competence to testify.**

In this context, competency refers to the child's ability to testify in court in a reliable,

meaningful manner. The evaluation of a child's competency was addressed in the Practice

Parameters for the Forensic Evaluation of Children and Adolescents Who May Have Been

Physically or Sexually Abused, published by the American Academy of Child and Adolescent

Psychiatry (Bernet, 1997a). The four criteria that are required to establish competency are: the

child's capacity to perceive facts accurately; the capacity to recollect and recall past events; the

capacity to communicate based on personal knowledge of the facts; and the capacity to

comprehend the duty to tell the truth.

Ordinarily, an evaluator determines a child's competency by asking the child about

events that happened in the past, other than the topic under investigation. For example, the

evaluator would ask the child about specific past events, such as a birthday or a holiday or a

trip to an amusement park or zoo. The evaluator determines if the child remembers those past

events and whether the child is able to relate what happened based on his or her own

recollections. The evaluator needs to know, of course, from the child's parents or other sources

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 35

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

of information what actually occurred during those events. Then, the evaluator determines whether the child can relate details of the events under investigation based on his or her own memories of those events. Of course, the evaluator needs to do that in a manner that is not coercive and does not give away the answers through repetitive, leading, or suggestive questions.

In his declaration prepared in May 2012, Mr. Peters said that one of the purposes of his interview of Kathryn was "to evaluate her competence as a witness." However, Mr. Peters made no attempt to evaluate Kathryn's competency in a traditional manner. Rather than asking Kathryn to describe a neutral past event, he focused on whether Kathryn would tell him what she had previously told Det. Krause. He did not appear to be evaluating her competence to testify as a witness.

## ADDITIONAL CONCLUSION BASED UPON
## SUBSEQUENTLY PROVIDED INFORMATION

After giving my deposition in this matter, I received the deposition of Shirley Spencer, taken December 6, 2012. In her deposition Ms. Spencer testified that she was sexually abused by multiple members of her family. Specifically, Ms. Spencer testified that she was "real little" when her father, who was a policeman, abused her; that she was seven or nine when her uncle abused her; and she was in about sixth grade when she was abused by her brother. Ms. Spencer tried to tell her parents about the abuse, but they did not listen. Asked if anyone reported the abuse on her behalf, Ms. Spencer testified, "We were kind of seen and not heard back then." Attached to this Declaration as Exhibit J are excerpts of Shirley Spencer's deposition containing this information.

This is crucial information that, apparently, was not considered by those investigating the allegations of abuse against Mr. Spencer. Because of her own history, it is likely that Ms.

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 36

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

1  Spencer had a heightened sensitivity to the possibility of child sexual abuse. Recurrent child
2  sexual abuse, of course, is a serious form of trauma that typically has long-lasting effects for
3  the victim. It is likely that as an adult, Ms. Spencer had a heightened awareness of and a
4  heightened sensitivity to the possibility of child sexual abuse. Because of her own history, it is
5  understandable that she would be overly concerned that her child and stepchild had been
6  sexually abused. Since she was abused by a police officer, i.e., her father, it is understandable
7  that she would think that her husband, also a police officer, was capable of sexually abusing his
8
9  children. If Ms. Spencer had a heightened sensitivity regarding child sexual abuse, it is likely
10  she would question her child and stepchild in a repetitive and suggestive manner if she became
11  concerned that they had been abused. This in turn renders her reports of the information
12  allegedly provided by Kathryn Spencer and Matt Hansen less reliable than a person without
13  that history of sexual trauma.

14
                    **CURRICULUM VITAE AND REFERENCES**
15
16          A copy of my current curriculum vitae is attached to this Declaration as Exhibit J. A
17  copy of the references cited herein is attached to this Declaration as Exhibit K.
18          Signed under penalty of perjury this ___ day of February, 2013.
19
20
21                                                    William Bernet, M.D.
22
23
24
25
26
27

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 37

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

DECLARATION OF SERVICE

I hereby certify that on February 14, 2013, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the attorneys of record as follows:

| | |
|---|---|
| Patricia Campbell Fetterly<br>Daniel J. Judge<br>Robert M. McKenna<br>Assistant Attorney General<br>Torts Division<br>PO Box 40126<br>Olympia, WA 98504-0116<br>Email: patriciaf1@atg.wa.gov<br>Attorneys for Defendant James M. Peters | |
| Guy Bogdanoich<br>Law, Lyman, Daniel, Kamerrer &<br>Bogdanovich, P.S.<br>P.O. Box 11880<br>Olympia, WA 98508-1880<br>Email: gbogdanovich@lldkb.com<br>Attorney for Defendant Sharon Krause | Jeffrey A. O. Freimund<br>Freimund Jackson Tardif & Benedict<br>Garratt, PLLC<br>711 Capitol Way South, Suite 602<br>Olympia, WA 98502<br>Email: jeffF@fjtlaw.com<br>Attorneys for Defendant Michael Davidson |

/s/ Kathleen T. Zellner
Kathleen T. Zellner & Associates, P.C.
Admitted *pro hac vice*
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
Phone: (630) 955-1212
Fax: (630) 955-1111
kathleen.zellner@gmial.com
Attorney for Plaintiffs

DECLARATION OF WILLIAM BERNET
(C11-5424BHS) — 38