1

2

3

4

Honorable Judge Benjamin Settle

5

6

7          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
8                  AT TACOMA

9   CLYDE RAY SPENCER,                    )
                                          )   No. C11-5424BHS
                         Plaintiff,       )
10                                        )   **PLAINTIFF'S REDRAFTED**
        v.                                )   **RESPONSE TO DEFENDANT**
11                                        )   **KRAUSE'S SECOND MOTION**
    JAMES M. PETERS, et al.,              )   **FOR SUMMARY JUDGMENT**
12                                        )
                         Defendants.      )   **NOTE ON MOTION**
13                                        )   **CALENDAR:**
                                          )   **Friday, April 12, 2013**
14  _____)

15                **I.  LAW AND ARGUMENT**

16          Summary judgment is proper if the pleadings, the discovery and disclosure materials on

17   file, and any affidavits show that there is no genuine issue of material fact and that the movant

18   is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c).  A genuine dispute exists if

19   there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to

20   resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253

21   (1986).  Courts draw all factual inferences in favor of the nonmoving party.  *Costanich v. Dep't*

22   *of Soc. & Health Services*, 627 F.3d 1101, 1113 (9th Cir. 2010).

23

24

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT                    Kathleen T. Zellner & Associates, P.C.
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT                              LAW OFFICES
(C11-5424BHS) — 1                                              1901 Butterfield Road
                                                               Suite 650 Downers Grove, Illinois  60515
                                                               630.955.1212 main · 630.955.1111 fax

**A.  Plaintiff has elicited evidence demonstrating a conspiracy**

The elements to establish a cause of action for conspiracy under § 1983 are: "(1) the existence of an express or implied agreement among the defendant officers to deprive a person of his  constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement." *Avalos v. Baca,* 596 F.3d 583, 592 (9th Cir. 2010).  The agreement or "meeting of the minds" between the defendants "need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010).  "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy."  *Id.*

Krause first argues that Davidson's relationship with Shirley Spencer ("Shirley") did not begin until June, 1985.  (Dkt. 139, p. 5-6).  Krause relies on the self-serving testimony of Davidson and Shirley as to when they started seeing each other socially.  (*Id.*)  However, strong evidence exists that Davidson was romantically attracted to Shirley from when he first met her and that his actions to conspire to frame Ray began at that point in time.

Davidson and Shirley met on September 21, 1984.  Redrafted Declaration of Kathleen T. Zellner ("Zellner Dec."), Exhibit ("Ex.") A (excerpts of Shirley Spencer deposition), at p. 56.  Over the prior ten years, Davidson's marriage had sustained "a slow disintegration." Zellner Dec., Ex. F (excerpts of Davidson deposition), p. 31.  On September 21, Shirley recalled being upset and told Davidson that she knew he "was trying to ruin [her] marriage and [her] husband's job." Zellner Dec., Ex. A, at p. 56.  Starting in October and continuing over the course of the investigation, Ray noticed that his marriage was deteriorating and "there was no more sex, there was no more closeness." Zellner Dec., Ex. C (excerpts of Ray Spencer deposition), at pp. 8-9, 54, 56-57.  Ray confirmed that Shirley was spending great amounts of

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1    time with Davidson during this time.  *Id*. at pp. 55-58.  Shirley admitted in prior sworn

2    testimony that she was at the Clark County Sheriff's Office "constantly."  Zellner Dec., Ex. D

3    (excerpts of Shirley Spencer habeas evidence deposition), at p. 18.

4         On November 1, Ray and Shirley arrived at the Sheriff's Office, at which time

5    Davidson separated them, seating Shirley in his office and placing Ray in an interview room.

6    Zellner Dec., Ex. B (Krause utility report with various dates), at pp. 9-12.  During that

7    interview Davidson accused Ray of molesting his daughter, Kathryn Spencer ("Kathryn").  *Id.*,

8    at pp. 11-12.  After his February arrest, when Ray was in the county jail, Davidson visited him

9    and told him that Shirley no longer loved him.  Zellner Dec., Ex. C, at p. 57.

10        Shirley testified that on another occasion, she took a quitclaim deed to the house she

11   shared with Ray to Krause at the Sheriff's office.  Zellner Dec., Ex. A, at p. 62.  Krause gave

12   the deed to Davidson to "see if he could have Ray sign it."  *Id.*  Ray refused to sign the deed

13   when Davidson brought it to him in jail. *Id.*  Subsequently, Ray's signature was forged on the

14   deed.  Zellner Dec., Ex. VV (declaration of Ray Spencer), at ¶¶6-7.  Menona Landrum, the

15   notary whose seal and purported signature appear on the deed, worked at the sheriff's office.

16   (Dkt. 147 (Declaration of Menona Landrum), at ¶1).  Landrum was unable to verify her

17   signature as the notary on the deed.  She kept her seal in an unlocked desk drawer, has no

18   memory of notarizing the signature of any jail inmate on a quitclaim deed or any other type of

19   document, and to her knowledge has never met Ray.  (*Id*., at ¶¶ 4-6).  In May of 1985, Shirley

20   moved out of that house, filed for divorce in early June, and she and Davidson purchased

21   another house in the fall of 1985.  Zellner Dec., Ex. A, at pp. 116-18, 148.  The forged

22   quitclaim deed allowed Shirley to dispose of her house with Ray so that she and Davidson

23   could purchase their own house.  *Id*.  Krause's participation in the effort to have Ray sign the

24   quitclaim deed in March 1985 establishes her knowledge of the relationship.

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 3

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650 Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1        Prior admissions by Krause and the State provide evidence that the relationship between

2   Davidson and Shirley took place <u>during</u> the investigation, and that Krause knew about the

3   relationship.  During the prior habeas proceedings Krause testified that she was aware that

4   Davidson was having a romantic relationship with Shirley during the investigation, and,

5   according to Krause, "So was everybody else."  Zellner Dec., Ex. E (excerpts of Sharon Krause

6   habeas deposition), at pp. 38-39.  Krause again confirmed the existence of the relationship

7   during the investigation when she testified, "My memory of [the relationship], that was way on

8   into the investigation that I became aware of that."  *Id*., at p. 39.  The Washington Appellate

9   Court noted that the State did not contest the existence of the relationship during the

10  investigation.  Zellner Dec., Ex. M (Washington Court of Appeals order), at p. 12.

11       Krause's claim that no common objective between Defendants has been shown is

12  incorrect.  The common objective of the conspiracy was to frame Ray for the sexual abuse of

13  his children.  (*See* argument as to Krause's assertion of qualified immunity, *infra*.)  While the

14  conspirators may have had separate motivations, the objective was the same and that is all the

15  law requires.  Further, while Krause may have acted, in part, to further her career, the evidence

16  also suggests that she continued to pursue Ray for the sexual abuse of Matt Hansen ("Hansen")

17  and Matt Spencer ("Matthew") after it was clear Ray was not guilty of abusing Kathryn.

18   Krause's actions had already destroyed Ray's marriage, his career, submitted him to public

19  scorn and caused him to seek mental health treatment.  Stories of Ray's alleged "rape" of his

20  five-year-old daughter were published in numerous newspapers.  Zellner Dec., Ex. N

21  (newspaper articles detailing arrest).  One can reasonably infer she was fabricating evidence

22  about the sexual abuse of Matthew and Hansen to ensure a conviction to avoid civil liability for

23  fabricating Kathryn's allegations.

24

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 4

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

Krause ignores the substantial amount of exculpatory evidence that was not disclosed to Ray, which provides a sufficient basis for a jury to find the existence of a conspiracy. Krause has admitted (Dkt. 139, p. 20) she was aware of the medical examination of Kathryn, that she received a copy of the report, and that she drafted a utility report on the subject. Zellner Ex. E, at pp. 14-15. The report indicated no physical findings of abuse. *Id.* at Dep. Ex. 1. Davidson admitted that the protocol for an allegation of vaginal rape would be to refer the victim for an examination, and that he reviewed the progress of the case, including reports. Zellner Dec., Ex. F, at pp. 12, 24, 98. Krause testified that she believed Peters would have also been aware of the medical report. Zellner Dec., Ex. E., at p. 27-28.

Not only were Defendants aware of the report, but there is also evidence that they deliberately concealed it from Ray and the prosecutor making the charging decision. There are two indices from the Clark County Sheriff's Office regarding Ray's case. Krause testified that she authored both of them. Zellner Dec., Ex. G (excerpts of Krause deposition), at pp. 9, 14. The first one, dated August 30, 1984, lists "Medical Examination Reports on Kathryn Spencer" as Section #3. Zellner Dec., Ex. G, at Dep. Ex. 1. The second one, dated November 8, 1984, omits Kathryn's medical report. Zellner Dec., Ex. G, at Dep. Ex. 2. Krause is unable to explain this omission. Zellner Dec., Ex. G, at p. 15.

The evidence also suggests Krause was aware of the medical report of Hansen. *See infra* Part B3. Likewise, Davidson, the supervisor in the case, likely also knew about Hansen's medical examination. When asked whether she discussed the fact that Hansen had been examined with either Krause or Davidson, Shirley Spencer testified, "I'm sure I did because they told me to go." Zellner Dec., Ex. WW, p. 10. Like Kathryn's medical report, the Hansen medical report showed "no evidence for any physical injury." Zellner Dec., Ex. O (excerpt of Dr. Manuel Galaviz testimony at habeas hearing), at p. 275; Zellner Dec., Ex. P ( Hansen

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 5

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1   medical exam). The concealment of these reports provides evidence of a conspiracy to frame

2   Ray.

3          Krause and Peters were indisputably aware of the videotaped interview of Kathryn

4   dated December 11, 1984 (Dkt. 96), as was Davidson, yet they did not cause it to be disclosed.

5   Zellner Dec., Ex. F, at p. 72-73.  The video shows Kathryn's refusal to implicate her father in

6   wrongdoing and the coercive, improper interview techniques of the State.  *See* Zellner Dec.,

7   Ex. L.  Because of its potentially exculpatory nature, Prosecutor Arthur Curtis ("Curtis")

8   immediately disclosed the tape when he learned of its existence in 2009.  Zellner Dec., Ex. W

9   (excerpts of Arthur Curtis deposition), at pp. 49-50.

10         The evidence establishes that Defendants knew of Rebecca Roe's written opinion that

11  the case should not be charged.[1]  Zellner Dec., Ex. G, at p. 34; Zellner Dec., Ex. H, at p. 62;

12  Zellner Dec., Ex. Q (excerpts of Peters' deposition), at p. 73.  Also, the evidence establishes

13  that the Roe report was never provided to Curtis.  Zellner Dec., Ex. W, at p. 29.  Roe concluded

14  that there were serious problems with the case and that it was "unwinnable" even if they could

15  "get the child to talk."  Zellner Dec., Ex. H (excerpts of Rebecca Roe deposition), at p. 13 and

16  Dep. Ex. 1, at p. 3.  Still, Defendants continued to conspire in their efforts to frame Ray.

17         The failure of Defendants to disclose the videotape, the medical reports, or the Roe

18  report, and the continuous prosecution of Ray despite the overwhelming evidence of innocence,

19  establishes a conspiracy among them to deprive Ray of his constitutional rights and maliciously

20  prosecute him for crimes he did not commit.  As further evidence of this conspiracy,

21  Defendants did not disclose the videotape until 25 years after the information was filed, despite

22

23  _____

    [1] Davidson testified that "to his knowledge" he was unaware of the Roe report prior to Ray's arrest. (Zellner Dec.,
    Ex. F, at p. 51).  Davidson's testimony lacks credibility, and a reasonable jury could infer from the evidence that as
24  Krause's supervisor on the investigation he would have been made aware of the report.

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 6

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1    the fact that they were called to testify in Ray's numerous legal efforts to challenge the basis of

2    his conviction.  Zellner Dec., Ex. DD, at p. 6.

3         Finally, but importantly, both Kathryn and Matthew have testified that Ray did not

4    sexually molest them in any way at any time.  Zellner Dec., Ex. I (excerpts of Matthew Spencer

5    deposition), at p. 64; Zellner Dec., Ex. J (excerpts of Kathryn Spencer deposition), at p. 19.

6    Matthew has testified he did not tell Krause the things attributed to him.  Zellner Dec., Ex. I, at

7    pp. 42, 47-52, 61-62, 64, 68, 71.  Kathryn has testified that during the break of her videotaped

8    interview, Peters coached her, using anatomical dolls, and told her what he wanted her to do

9    and say, when the interview resumed.  Zellner Dec., Ex. J, at pp. 72-73, 99.  Krause gave

10   Kathryn treats in an attempt to induce her to make statements against Ray.  *Id.*, at pp. 37-43.

11   One can reasonably infer that Krause and her co-conspirators acted contrary to the evidence

12   and pursuant to a conspiracy with the common goal of framing Ray.

13      **B1.  Krause is not entitled to qualified immunity based upon probable cause**

14      "Law enforcement officers may obviously rely on statements made by the victims of a

15   crime to identify potential suspects. But such information does not, on its own, support a

16   finding of probable cause if the information is not reasonably trustworthy or reliable."  *Stoot v.*

17   *City of Everett*, 582 F.3d 910, 919 (9th Cir. 2009).   Here, there was no reasonably trustworthy

18   or reliable information to support a finding of probable cause, and, unlike the cases cited by

19   Krause, no reasonable investigator in Krause's position would have believed her conduct was

20   lawful.

21      Krause argues, without support, that probable cause existed prior to her investigation

22   based upon Kathryn's alleged disclosures of abuse to Shirley on August 24, 1984, and

23   Detective Flood on August 28, 1984. (Dkt. 139, p. 9).  **Krause directly contradicted this**

24   **assertion in her deposition when she admitted that as of September 21, 1984, almost a**

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 7

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

**month after Kathryn's alleged "disclosures," there was no probable cause.** Zellner Dec., Ex. G, at p. 49-51. Krause's clear admission, which is overwhelmingly supported by the evidence, defeats the argument that Kathryn's alleged statements to Shirley or Detective Flood established probable cause.

Without question, there is a factual dispute as to what if anything Kathryn purportedly told Shirley and then Krause during subsequent interviews about being sexually abused. Kathryn testified she does not remember saying things to Shirley, did not say those things to Shirley and would not have said many of those things because she would not have used such words. Zellner Dec., Ex. J, at pp. 85-87, 93-94. In fact, Kathryn denies that any conversation about sexual abuse took place while she and Shirley were laying on the floor in the living room. *Id*. at p. 97. Kathryn explained that the only reference to sexual abuse was made when Shirley and Kathryn were in the laundry room and Shirley brought up the subject, asking Kathryn if her "daddy" had ever touched her inappropriately. *Id.* Suspiciously, Shirley's written summary attributed certain words to Kathryn in describing the alleged sexual abuse, such as "pee-pee," that are not used by Kathryn in Detective Flood's report (where she refers to her genitals as her "potty" and denies improper touching) and are not used by her in the intense interview conducted by Peters. Zellner Dec., Grp. Ex. K (Flood report), at p. 00404; (Dkt. 96); Zellner Dec., Ex. L (transcript of videotape).

Additionally, in her written summary Shirley claims that Kathryn was trying to touch her breasts and vagina. At her deposition, however, Shirley demonstrated non-sexual touching by Kathryn and admitted that Kathryn was not trying to undo her robe, but rather simply attempting to hug Shirley. Zellner Dec., Ex. A, at pp. 27-28. Shirley explains that Kathryn placed Shirley's hand "just below tummy level." *Id.*, at p. 31. Clearly, Shirley distorted her interaction with Kathryn because of her own unresolved sexual trauma as a child. *Id*., at p. 16.

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 8

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650 Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

Shirley proceeded to memorialize these distortions in written summary in order to report these events to the authorities because, as she explained, she was ignored as a child when she tried to report her own sexual abuse.  *Id.*

Any reasonable officer, after performing even a cursory investigation, would have realized that Shirley was an unreliable witness.  She was emotionally unstable, obsessively jealous of other females, violent, and potentially suicidal.  Zellner Dec., Ex. C, at pp. 39, 48; Zellner Dec., Ex. B, at pp. 6, 9.  She had been sexually abused by her father, who was a police officer, and by her uncle and brother.  Zellner Dec., Ex. A, at pp. 6, 16.  Ray was her fourth husband.  *Id.*, at pp. 14-15.  She has contradicted herself under oath throughout these proceedings and when confronted with prior statements attributed to her, she repeatedly claims she was misquoted.  Zellner Dec., Ex. A, at p. 109.

Shirley's written account of Kathryn's alleged statements is not credible and is insufficient to establish probable cause for additional reasons.  Shirley wrote that Kathryn, who was five years old, accused numerous other perpetrators, including Deanne Spencer, Karen Stone and her older brother, Matthew.  Zellner Dec., Ex. A, at Dep. Ex. B at pp. 2, 5.  Per the statement, Kathryn even went so far as to accuse Shirley of inappropriate touching:  "[Kathryn] said I rubbed you."  *Id.*, at Dep. Ex. B at p. 5.  Rebecca Roe ("Roe") certainly recognized the problems presented by Kathryn's initial statements to Shirley:

> 2)  Initial naming of multiple suspects is very disturbing and child explanation that she thought it wouldn't hurt Shirley's feelings as much just didn't make the disturbances go away.  Combined with p. 5 of Shirley's handwritten statement, where child talked about rubbing Shirley, it creates questions about fact vs. fantasy. I believe this point is a built in reasonable doubt.

Zellner Dec., Ex. H, at pp. 73-74, and at Dep. Ex. 1, pp. 1-2.  Shirley herself apparently did not believe Kathryn's alleged statement to be true, as she advised law enforcement that she believed Ray was innocent.  Zellner Dec. Ex. B, at p. 6; Zellner Dec., Ex. G, at pp. 48-49.

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650 Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

Kathryn's statements to Detective Flood negate probable cause.  *See* Zellner Dec., Ex. G, at p. 51.  Krause's claim that "Detective Flood reported Kathryn Spencer confirmed she had told Shirley Spencer everything Shirley reported in her written summary" is incorrect.  (Dkt. 139, at p. 12).  Flood reported that Kathryn "indicated that she did tell Shirley everything that Shirley advised me of but then when asked to explain it or asked specific questions about it, she would say that she couldn't remember the words so she couldn't tell me."  Zellner Dec., Grp. Ex. K, p. 00404.[2]  When Flood asked Kathryn if someone had touched her on her pee pee, Kathryn responded, "not daddy, no one," and explained that her mother touched her "potty" when applying medicine.  *Id.* at p. 404.

Flood also talked to Matthew.  Matthew said that he "knew nothing about what [they] were talking about," and that neither his mother nor father had ever touched him improperly.  *Id.*, at p. 405.  He further stated that Kathryn had never said she had been abused and that Kathryn "did tell stories and change her stories a lot" "usually to get out of trouble."  *Id.* DeAnne Spencer ("DeAnne"), Matthew and Kathryn's mother, showed immediate hostility toward Ray but admitted to Flood that "neither Matthew or Kathryn [had told her] anything about this."  *Id.*, at 406.  DeAnne did explain that another man "bothered the children so [she] would not let a man stay in the house any longer."  *Id.*  Clearly Flood did not believe probable cause to arrest Ray existed because he took no further action. Certainly if he believed Kathryn had been sexually abused Ray would have been immediately arrested.

Krause, however, continued her investigation despite Flood's report and the children's denials that they had been abused.  Krause traveled to Sacramento, and met with Kathryn. Krause took Kathryn to the mall and then to a hotel room, acts which Peters and Dr. Bernet

---

[2] As a further indication of her unreliability, what Shirley told Flood materially differed from the story she set forth in her written summary.  As examples, Shirley told Flood nothing about Kathryn making accusations against multiple perpetrators, and Shirley did not write in her statement that Kathryn had watched her dad have sex.  *Id.*, at pp. 402-03.

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1    testified were improper. Zellner Dec., Ex. Q, at p. 154; Zellner Dec., Ex. R (excerpts of

2    Dr.William Bernet deposition), at pp. 53-54.  According to Kathryn, Krause bought her treats

3    such as sodas, ice cream and hot chocolate, indicating to Kathryn she would be rewarded if she

4    said what  Krause wanted her to say.  Zellner Dec., Ex. J, at pp. 33-34, 37-38, 40, 43, 45.

5     Kathryn testified that the clear message was if she accused Ray, she "was going to get

6    something out of it." *Id*. at p. 40.  Krause prepared written reports reflecting what she claimed

7    Kathryn had told her.  As detailed below, substantial evidence indicates that Krause fabricated

8    the statements attributed to Kathryn in her reports.

9         Krause argues that Ray showed deception on a polygraph examination.  This assertion

10   is false.  As to the first polygraph test, Dr. Abrams reported that "a definite decision could not

11   be reached."  Zellner Dec., Ex. S (report of polygraph examinations).  For unknown reasons, a

12   second polygraph with different questions was performed and Dr. Abrams reported that while

13   Ray's answers "were sufficient to be indicative of deception, Officer Spencer's scores were not

14   very high so that the examiner does not feel as certain about the validity of these findings as in

15   most examinations."  *Id*.  Notwithstanding these ambiguous results, Krause reported that the

16   result was "minus 13."  Zellner Dec., Ex. B, p. 8.  Plaintiff's expert, Dr. Raskin, has testified

17   Krause's report is <u>false</u> because minus 13 would be "a clear, conclusive, deceptive result" and

18   that is inconsistent with the Abrams' report.  Zellner Dec., Ex. T (excerpts of Dr. David Raskin

19   deposition), at p. 135.  The polygraph result does not add to probable cause.  Rather, the

20   circumstances surrounding the test demonstrate Krause's willingness to fabricate evidence in a

21   malicious effort to frame Ray.

22        Dr. Ann Link is a psychologist who conducted over 12 therapy sessions with Kathryn

23   after she allegedly disclosed sexual abuse.  Zellner Dec., Ex. U (excerpts of Link deposition), at

24   p. 11.  Throughout discovery, Defendants have cited the fact that Kathryn disclosed sexual

abuse to Dr. Link as evidence of probable cause.  *See, e.g.*, Zellner Dec., Ex. Q, at p. 136. Now, Defendants have quietly abandoned this contention because after Dr. Link's deposition, they know it is false. Dr. Link testified that although Kathryn came to her office due to alleged sexual abuse, and although Dr. Link utilized techniques to create open communication, Kathryn never described being sexually abused by anyone.  Zellner Dec., Ex. U, pp. 11-12, and at Dep. Ex. 1, at ¶7. Dr. Link informed law enforcement that Kathryn had not made any disclosures of abuse to her despite multiple sessions of therapy.  *Id.* at pp. 14-15; also, *Id.*, at Dep. Ex. 1, ¶¶9-10.

Defendants' contention that DeAnne Spencer reported that Kathryn was demonstrating sexualized behavior and excessively masturbating prior to the Krause interviews is likewise false.  DeAnne testified that she never had any concerns that Kathryn was excessively masturbating or exhibiting improper sexual behavior as a child.  Zellner Dec., Ex. FF (excerpts of DeAnne Spencer deposition), at pp. 33, 93.

On November 27, 1984, even after Krause had completed her first two interviews of Kathryn, Roe opined that the case was not provable or fileable.  Zellner Dec., Ex. H, at Dep. Ex. 1.[3]  Likewise, Prosecutor Peters has repeatedly admitted the unreliability of Kathryn's disclosures and the weakness of the case against Ray.  *See* Zellner Dec., Ex. MM (James Peters letter to Columbian newspaper); Zellner Dec., Ex. KK, at Dep. Ex. 3 (Declaration of James Peters, July 12, 1996) at ¶15; Zellner Dec., Ex. Q, p. 134.  In fact, Peters testified in prior proceedings that he agreed with Roe's assessment, so he "declined it as a result."  Zellner Dec., Ex. KK, at p. 13.  The only evidence that was  obtained between Roe's report and the filing of the information against Ray was Peters' videotaped interview of Kathryn.  This interview, which speaks for itself, confirms that there was no probable cause based upon any alleged

---

[3] Roe made this assessment even without knowledge of Kathryn's medical exam.

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 12

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1  statements of Kathryn.  Zellner Dec., Ex. L; *see also infra* Part B2; Plaintiff's Response to

2  Davidson's Renewed Motion for Summary Judgment, Section B, at pp. 14-15, 18-19.

3       Recently, after Roe was retained and compensated as Peters' expert in this civil case,

4  Roe changed her previous assessment and now contends that probable cause existed.  However,

5  Roe has provided no basis for her new opinion and admitted that several factors present in the

6  case detracted from probable cause.  Zellner Dec., Ex. H, at pp. 75, 77, 79-80.  In light of all

7  the above, no reasonable officer could have believed probable cause existed at the time Ray

8  was charged in January, 1985.

9       Krause argues that "all of the same circumstances existed and justified plaintiff's arrest

10  in February 28, 1985 following the disclosures by additional victims."  This sweeping

11  statement is demonstrably false.[4]  Krause filed her official report ending the investigation on

12  December 20, 1984.  Zellner Dec., Ex. X (Krause report dated December 20, 1984).  Despite

13  the official conclusion of the investigation and with full knowledge that there was no evidence

14  Hansen had  been abused, Krause began to fabricate evidence portraying Hansen as another

15  victim of Ray.

16       Krause pursued Hansen relentlessly in an effort to fabricate corroboration for the

17  prosecution's "weak" case.  On February 3, 1984, Ray and Shirley argued and Ray moved out

18  of the marital home into a motel.  Zellner Dec., Ex. NN, at ¶¶8, 10; Zellner Dec., Ex. C, at pp.

19  108-09.  On or about February 19, 1984, Shirley dropped Hansen off to spend the night with

20  Ray at his hotel, but provided no pajamas for Hansen. Zellner Dec., Ex. NN (Ray Spencer

21  declaration May 1986), at ¶¶12; Zellner Dec., Ex. C, at p. 125.  Previously, when Ray would

22
23
24

_____

[4] The fact that Curtis was "happy" about  the new abuse allegations of Matthew and Hansen demonstrated his concern about the weakness of the probable cause evidence supporting the original charges. Curtis was misled about the evidence supporting probable cause  and significant exculpatory information was concealed from him.  Zellner Dec., Ex. W, at pp. 55-56; *see infra.*

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 13

1    ask Shirley to spend the night she would say, "If I do I can't go through with this."  *Id.*, at p.

2    122.  Clearly Shirley was being asked to set up Ray at the Salmon Creek motel  by Krause and

3    Davidson.  After February 19, Shirley was repeatedly contacted by Krause who advised her that

4    she wanted to show Shirley the reports she had written purporting to reflect her interviews of

5     Kathryn and told her she believed that Ray had abused Hansen.  However, Shirley told Krause

6    on February 22 that Hansen had denied that Ray had abused him.  Zellner Dec., Ex. A, pp. 100-

7    01; Zellner Dec., Ex. Y (Krause report dated  February 28, 1985 ), at p. 2.  Shirley told Krause

8    that Hansen denied any abuse had ever taken place.  *Id*.  Krause did not relent and asked

9    Shirley for permission to interview Hansen.  Zellner Dec., Ex. A, at p. 101.  Shirley declined,

10   stating that she wanted to discuss Krause's request with Hansen's therapist.  *Id*.

11       On February 26, 1985, a week after Hansen stayed with Ray, Krause telephoned Shirley

12   again.  In her report of this conversation, Krause wrote that Shirley told her that Hansen

13   disclosed to Shirley that Ray had abused him.  Zellner Dec., Ex. Y, at p. 3.   Krause wrote

14   Hansen complained of rectal pain and told Shirley that "daddy had done something but it was

15   too gross and he didn't want to talk about it."  *Id*.  Krause wrote that she again asked to speak

16   with Hansen herself.  *Id*.  Krause met with Shirley on February 27, 1985.  *Id*. at p. 4.  Krause

17   wrote that during this session, Shirley reported that Hansen disclosed that he had been

18   repeatedly sexually abused by Ray.  *Id*. at 7-9.  Krause's report includes Shirley's alleged

19   descriptions of Hansen telling Shirley about oral sex, anal sex, pain, and how Ray had hurt him

20   at the Salmon Creek Motel "in the stomach, groin and on his bottom."  *Id*. at p. 9.

21       Shirley testified in her recent deposition that Hansen never disclosed such things to her.

22   Specifically, Shirley was asked if she ever concluded that Ray had sexually molested her son,

23   Hansen, and Shirley testified, "I didn't conclude anything.  I just know what Sharon Krause

24   said he said.  I don't know."  Zellner Dec., Ex. A, at pp. 103-04.  Shirley repeatedly denied that

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650 Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1    Hansen ever accused Ray of abuse. *Id*., at 104-05. This sworn testimony establishes the falsity

2    of Krause's reports on the key issue of whether probable cause existed as to Hansen. Clearly,

3    Krause lied as to what Shirley told her prior to her interview of Hansen, and one can reasonably

4    infer that Krause further lied about the result of her long sought after interview of Hansen.[5]

5    Krause testified in her deposition that her report was accurate. Zellner Dec., Ex. G, at p. 159.

6    The affidavit of Peters attached to the February 28, 1985 application for warrant specifically

7    references the false fact that Krause's interview of Hansen was the result of Shirley's concern

8    that Ray had sexually molested his step-son. Zellner Dec., Ex. OO, at p. 1. At the very least,

9    Plaintiff has shown a genuine issue of material fact as to whether probable cause existed as to

10   the allegations involving Hansen.

11        Like Hansen, Matthew had never complained to anyone that Ray had sexually abused

12   him prior to Davidson and Krause's "investigation." In fact, Matthew denied any abuse to

13   Detective Flood, stating that neither his mother nor his father had taken any inappropriate

14   actions toward him. Zellner Dec., Ex. K, at p. 00404. He denied any abuse when Krause first

15   interviewed him in October, 1984. Zellner Dec., Ex. I, at p. 41, and at Ex. 1 at p. 3. Despite

16   Matthew's denials, Krause pursued him and ultimately re-interviewed him on March 25, 1985.

17   According to her report, Matthew again repeatedly denied he had been abused. *Id*., at Dep. Ex.

18   1 at p. 5. Then, Krause brought up the possibility of a lie detector test. *Id*. Krause also told

19   Matthew that Hansen must have been lying and suggested that Hansen was going to be in

20   trouble since Matthew was denying the abuse. *Id*. at Dep. Ex. 1 at p. 6. Krause reported that

21   after that threat, Matthew agreed that he too was abused. *Id*. at Dep. Ex. 1 at p. 6-13. Matthew

22

23   ───────────────
     [5] While Krause argues Hansen has not recanted, documents of an interview with Hansen obtained through
     discovery demonstrate that Hansen told law enforcement in 2010 that he "has no recall of abuse that occurred at
     same time as brother and sister" and he "does not now recall all the abuse he earlier claimed." Zellner Dec., Ex.

24   CC (notes of interviews with Hansen).

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT                    Kathleen T. Zellner & Associates, P.C.
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT                              LAW OFFICES
(C11-5424BHS) — 15                                                    1901 Butterfield Road
                                                               Suite 650Downers Grove, Illinois  60515
                                                               630.955.1212 main · 630.955.1111 fax

testified in his deposition that Krause's reports attributed words to him that he did not say.  *Id*. at pp. 47-51 61-68.  He repeatedly testified that he never told Krause any of the things she wrote regarding sexual abuse of him, Kathryn, or Hansen.  *Id*. at pp. 64, 68, 91-92. Matthew has established the falsity of the Krause police reports regarding his alleged abuse by his father.

Krause argues that Ray additionally made statements upon his arrest implicating himself in the abuse of Hansen.  This, however, is a disputed issue of fact.  Ray denied that he ever said, "I must have done it if Little Matt said I did, this can't be my ex-wife this time." Zellner Dec., Ex. C, at p. 154.

In sum, Plaintiff has carried his burden of showing that no reasonable officer could have believed that probable cause existed at any time to charge Ray.  Therefore,  Krause is not entitled to qualified immunity.

Also, Krause contends that she is immunized from liability because Curtis exercised "independent judgment in deciding to file charges . . . without any pressure from Mr. Peters, Ms. Krause or Mr. Davidson."  (Dkt. 139, p. 10).  Curtis testified that in making his charging decision he relied on a combination of the police reports and the representations of Krause and Peters regarding their assessments of the victim. Zellner Dec., Ex. W, at pp. 22-23.[6]  As established,  Krause fabricated significant portions of the police reports and used coercive interview techniques, which she did not disclose to Curtis.  Krause and Peters concealed from Curtis the medical exam reports of Kathryn and the videotaped interview of Kathryn.  *Id*. at pp. 23-25, 61. Peters lied to Curtis about the interview.  *Id*. at p. 22.  And neither Peters nor Krause informed Curtis of Davidson's relationship with Shirley or the Defendants' ongoing conspiracy to frame Ray.  Because Defendants knowingly withheld relevant information and supplied false

---

[6] Curtis testified  that he has no recollection of reading or being  provided the Roe  report at the time of making the charging decision.  Zellner Dec., Ex. W, at pp. 29, 68-69.

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 16

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1    information, Curtis did not exercise "independent judgment." *See Blankenhorn v. City of*

2    *Orange*, 485 F.3d 463, 483 (9th Cir. 2007); *Barlow v. Ground,* 943 F.2d 1132 (9th Cir. 1991).

3         Likewise, Krause is not shielded from liability due to the execution of a "facially valid

4    arrest warrant" because she, Davidson, and Peters "deliberately or recklessly made false

5    statements or omissions that were material to the finding of probable cause." *KRL v. Moore*,

6    384 F.3d 1105, 1117 (9th Cir. 2004); *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

7    Plaintiff has set forth facts evidencing that no probable cause existed for the arrest of Ray

8    Spencer.  Defendants deliberately and recklessly withheld many of these facts.  Zellner Dec.,

9    Ex. OO.  Therefore, Krause is not immune. *KRL*, 384 F.3d at 1117.

10        **B2.  Krause is not entitled to qualified immunity for fabrication of evidence**

11        Krause conspicuously omits the third prong of liability under *Devereaux v. Abbey*, 263

12   F.3d 1070, 1074 (9th Cir. 2001): that Defendants deliberately misquoted and misrepresented

13   witness statements in their investigative reports and declarations. *Costanich,* 627 F.3d at 1111-

14   12.  "When genuine issues of material fact arise regarding fabrication of evidence in a child

15   abuse investigative report, a police officer is not entitled to qualified immunity." *Id.*

16        With discovery completed, it has now become clear that there is a disputed fact as to

17   whether Krause fabricated witness statements in her investigative reports.  As set forth above,

18   Shirley and Matthew have testified that they <u>did not make statements attributed to them in

19   Krause's reports</u>.  Zellner Dec., Ex. A., at pp. 103-05; Zellner Dec., Ex. I, at pp. 47-51, 61-68.

20   Krause's report claiming that Dr. Abrams advised that Ray's second polygraph test resulted in

21   a "minus 13" score, <u>is also false,</u> as Abrams' written report contradicts that conclusion.  Zellner

22   Dec., Ex. B, p. 8; Zellner Dec., Ex. T, at p. 135.  Krause manipulated indices to conceal

23   Kathryn's medical report.  *See supra*.  And there is substantial evidence that Krause conspired

24

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650 Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1  with Davidson to forge Ray's signature on the quitclaim deed to his house so that Shirley could

2  sell that house and buy a new one with Davidson.  *See supra.*

3       As clear evidence of fabrication, statements and conduct attributed to Kathryn in

4  Krause's reports are contradicted by Peters' videotaped interview of Kathryn (Dkt. 96) and Dr.

5  Link's testimony.  Krause's reports depict Kathryn providing detailed disclosures of sexual

6  molestation.  Zellner Dec., Ex. Z, AA and BB (Krause reports of interviews with Kathryn).

7   According to Krause's reports, Kathryn addressed her by her first name and stated that she

8  "really likes" Shirley.  *E.g.,* Zellner Dec., Ex. Z, at p. 4.   In the videotaped interview, however,

9  Kathryn rarely uttered words, preferring to shake her head yes or no.  Zellner Dec., Ex. L.

10  Kathryn routinely denied abuse until after she was rehearsed during the sixty six minute break.

11  Contrary to Krause's reports, Kathryn stated that she "hates" Shirley.  *Id.* at p. 53.  Kathryn

12  never addressed Peters by name.  *See generally Id.*  Dr. Link testified consistently with the

13  videotape, stating that Kathryn was "withdrawn" and non-verbal.  Zellner Dec., Ex. U, at p. 10.

14  Dr. Link also testified that, despite her efforts to utilize "play therapy" to encourage

15  communication, Kathryn never disclosed any abuse.  *Id.* at 12.  Comparing Krause's

16  representations of Kathryn's demeanor and statements with her actual demeanor and statements

17  as seen on the videotape and testified to by  Link, demonstrates the falsity of Krause's reports.

18  It would be incredible to believe that Krause obtained the disclosures listed in her reports, but

19  Peters (using coercive techniques) and Dr. Link (using psychological techniques) were unable

20  to do the same.  All of the above provides substantial evidence of deliberate fabrication of

21  evidence by Krause.  *Costanich*, 627 F.3d at 1111-12.

22       And second, the same evidence set forth in Section II.B.2 above establishing a lack of

23  probable cause demonstrates genuine issues of material fact as to whether Defendants

24  continued the investigation despite the fact they knew or should have known Ray was innocent

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 18

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1    and whether Defendants knew or should have known their pursuit of Ray was yielding

2    unreliable and/or false information.

3       Further, the videotaped interview demonstrates that Kathryn repeatedly denied abuse

4    and affirmed leading questions only after significant and unreliable coaching and manipulation.

5    Zellner Dec., Ex. L; Zellner Dec., Ex. DD, at p. 6.  And Dr. Link testified that Kathryn <u>never</u>

6    disclosed abuse to her.  Zellner Dec., Ex. U, at pp. 14-15.[7]

7       Krause does not rebut the evidence showing she falsified, misrepresented, and

8    misquoted witnesses and evidence.  Instead, she makes a standard of care argument, relying on

9    the opinions of Dr. Philip Esplin ("Esplin").  However, this is not a standard of care case.  The

10    evidence of fabrication is overwhelming without expert opinion.  And, to the extent it is

11    necessary, Dr. William Bernet testified that regardless of what standards existed at the time, the

12    interviews were so "improper, coercive and psychologically abusive . . . that the interviewers

13    knew or should have known that they would yield false results."  Zellner Dec., Ex. R, at p. 127,

14    *see also* pp. 149, 156-57; Bernet Dec. at pp. 4-18, 33-35.  Dr. Link's deposition testimony

15    refutes Krause's argument that the prevailing thought in 1984-1985 was that children could not

16    be manipulated into providing false allegations of sexual abuse.  Zellner Dec., Ex. U, at pp. 86-

17    88. Krause concededly knew the importance of not manipulating a child witness, stating in a

18    report of her interview with Matthew that she "was attempting to be cautious about leading

19    [Matthew] or asking him any specific questions."  Zellner Dec., Ex. I, at Dep. Ex. 2, p. 4.

20       Plaintiff has carried his burden of establishing all three prongs of liability under

21    *Devereaux.*  In light of the discovery in this case, the balance clearly tips in favor of liability

22    under the third prong--deliberate fabrication and misrepresentation.

23

24

---

[7] Krause was aware of the videotaped interview and Kathryn's refusal to allege abuse to an independent psychologist.  Zellner Dec., Ex. EE (report of interview October 18, 1984 with DeAnne Spencer), at p. 3.

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650 Downers Grove, Illinois 60515
630.955.1212 main · 630.955.1111 fax

**B3.  Krause is not entitled to qualified immunity for alleged *Brady* violations**

Krause's failure to disclose Hansen's and Kathryn's medical reports, the videotaped interview of Kathryn, and the Roe report deprived Ray of his constitutional rights.  Krause argues that she did not possess the medical report on Hansen. (Dkt. 139, p. 20).  However, Shirley testified that Krause recommended Hansen be examined.  (*Id*.)  Krause admits her normal practice was to refer parents to have their children examined.  Zellner Dec., Ex. E, at p. 10.  In a prior proceeding, Shirley was asked whether she discussed the fact that Hansen had been examined and she testified "I'm sure I did because they told me to go."  Zellner Dec., Ex. WW, at p. 10.  Shirley testified further that she told Krause the examination had taken place and she was "sure" she discussed the results with Krause.  Zellner Dec. Ex. D, at p. 18.  Given her relentless pursuit of  Hansen, it defies logic that Krause would not have spoken to Shirley about the examination, considering she met with Shirley and Hansen the next day.  Zellner Dec., Ex. P; Zellner Dec., Ex. GG (report of March 7, 1985 interview of Hansen).  The Hansen exam report was clearly exculpatory.  According to Krause's reports, Hansen was repeatedly abused anally, orally and painfully.  Zellner Dec., Ex. Y, at pp. 6-8, 18, 20; Zellner Dec., Ex. GG, at pp. 1-4; Zellner Dec., Ex. HH, at pp. 3-9.  But the medical report showed no signs of physical abuse.  Zellner Dec., Ex. O, at pp. 270-77; Zellner Dec., Ex. P.

Krause admits that she was aware of Kathryn's medical report, but argues that she did not deliberately withhold Kathryn's medical report.  (Dkt. 139, p. 20).  Krause's position is untrue given her obvious manipulation of the Clark County Sheriff's Office Index.  *See supra* B1.  As with the Hansen report, the negative findings in Kathryn's exam tend to establish Ray's innocence as it indicated there was no evidence of physical abuse.  Krause argues that DeAnne's testimony that no physical exam took place casts doubt on the scope of Kathryn's examination.  Deanne's testimony, however, is refuted by Dr. Magee, who testified at length to

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1   her physical exam, including the fact that Kathryn's vaginal and rectal cultures yielded negative

2   results.  Zellner Dec., Ex. II, at pp. 290-93.

3         Krause deliberately withheld the videotaped interview.  It is undisputed that she

4   concealed the video for over 25 years and failed to make a report of the interview, which would

5   have been the "normal course" of conduct in the Sheriff's office.  Zellner Dec., Ex. F, p. 81.

6   Krause was present at the beginning of the interview and it undisputedly ended up in her

7   possession.  Krause's argument that she had no knowledge or recollection of the whereabouts

8   of the tape until she discovered it in her garage in 2009 is not credible and, as explained by the

9   Washington Supreme Court, "difficult to fathom."  Zellner Dec., Ex. DD, at p. 6.  Krause

10  suggests her testimony is corroborated by Peters, because he too testified that he has no

11  recollection or knowledge about the videotape, which is even more "difficult to fathom"

12  considering he has testified that he never conducted another videotaped interview in his career,

13  Zellner Dec., Ex. Q, at p. 164, and, as this Court recognized, his videotaped interview of

14  Kathryn was contrary to his usual practice.  If anything, Krause's and Peters' unified

15  unfathomable amnesia is evidence of their conspiracy.  Likewise, Krause's argument that the

16  purpose of the interview was to establish competency is rebutted by evidence demonstrating the

17  interview was investigatory in nature.  See Plaintiff's Response to Defendant Peters' Renewed

18  Motion for Summary Judgment, at Section III.C.  And Krause's argument that she did not

19  receive a copy of the Roe report (Dkt. 139, at p. 22) ignores the fact that her name was on the

20  report and Roe's testimony that the report would have been sent to Krause.  Zellner Dec., Ex.

21  H, at p. 62.

22         In sum, the evidence supports that Krause knew of and possessed the two medical

23  reports, the videotaped interview and the Roe report.  By failing to disclose this information,

24  Krause violated Ray's constitutional rights.  The Constitution requires that a guilty plea be

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 21

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650 Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

"intelligent and voluntary." *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995). A plea cannot meet this standard if "there is a reasonable probability that but for [its disclosure], the defendant would have refused to plead and would have gone to trial." *Id.* Here, the videotaped interview alone is exculpatory, as it "undercuts the State's theory of the case," establishes the coercive interview techniques utilized by the Defendants, shows that Kathryn did not voluntarily disclose any abuse, and shows the State's awareness of the malicious influence that was exerted onto Kathryn. *See* Zellner Dec., Ex. DD, at p. 6; Zellner Dec., Ex. W, at p. 37; Zellner Dec. The medical reports establish that there was no physical corroboration of the alleged disclosures. And the Roe report provides an expert opinion recommending that the case not be prosecuted. Had Ray, or any reasonable person in his position, known of this information, he would not have pled guilty. Zellner Dec., Ex. C, at p. 153.[8]

Krause does not refute the materiality of the withheld evidence. Instead, she relies on *United States v. Ruiz*, where the Court held, "[T]he Constitution does not require the Government to disclose material <u>impeachment</u> evidence prior to entering a <u>plea agreement</u> with a criminal defendant." 536 U.S. 622, 633 (2002) (emphasis added). *Ruiz* does not apply to this case because Defendants withheld <u>exculpatory</u>, rather than impeachment evidence. *United States v. Ohiri*, 133 F. App'x 555, 562 (10th Cir. 2005); *McCann v. Mangialardi*, 337 F.3d 782, 788 (7th Cir. 2003); *State v. Huebler*, 275 P.3d 91, 96-98 (Nev. 2012). And unlike the defendant in *Ruiz*, Ray did not plead pursuant to an agreement waiving his right to material

---

[8] In 1984 and 1985 Defendants had reasonable warning, *United States v. Lanier*, 520 U.S. 259, 269 (1997), that withholding material evidence prior to Ray's plea would violate his constitutional rights. *See Brady v. United States*, 397 U.S. 742, 748 (1970) (guilty plea must be made knowingly, intelligently, and voluntarily); *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (suppression of material evidence violates due process); *United States v. Kelly*, 543 F. Supp. 1303, 1310 (D. Mass. 1982) (ABA ethical standards require timely disclosure of exculpatory evidence). Indeed, Arthur Curtis testified that *Brady* was an <u>ongoing</u> duty and "you don't hold off *Brady* information that you have in your possession and wait ten days before trial." Zellner Dec., Ex. W, pp. 4

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 22

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650 Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1    information.  Zellner Dec., Ex. LL (Omnibus Application); *see also State v. Harris*, 667

2    N.W.2d 813, 818-822 (Wis. 2003); *U.S. v. Ruiz*, 241 F.3d 1157, 1164-65 (9th Cir. 2001)

3    (question in *Ruiz* was distinct from *Sanchez*).  *Ruiz* does not explain Krause's failure to disclose

4    the videotape during Ray's 25 year long legal pursuit.  *See Tennison v. City & County of San*

5    *Francisco*, 570 F.3d 1078, 1094 (9th Cir. 2009)

6           Finally, *Tennison* does not dictate that an investigator is immune where she conspires

7    with a prosecutor, who is acting as an investigator, to withhold exculpatory material.  The

8    *Tennison* court simply held that *Brady* liability can attach even if the prosecutor is unaware of

9    the non-disclosures.

10           **C. Krause proximately caused Ray's injury**

11           There is substantial evidence that Krause directly participated in the deprivation of

12   Ray's rights, and there can be little question that Krause knew or reasonably should have

13   known that her acts in this case would cause others (i.e., Curtis or the court) to inflict the

14   constitutional injury.   Therefore, she cannot shirk liability based on a proximate causation

15   theory.  *See Harris v. Roderick*, 126 F.3d 1189, 1196 (9th Cir. 1997); *Blankenhorn v. City of*

16   *Orange*, 485 F.3d 463, 482 (9th Cir. 2007); *Osborn v. Butler*, 712 F. Supp. 2d 1134, 1159 (D.

17   Idaho) (proximate cause established where court was merely a "conduit for the wrongful action

18   which proceeded").   Finally, Krause cannot avoid liability under *McSherry* because  Curtis did

19   not make an independent prosecuting decision.

20

21

22

23

24

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650 Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

## II.  CONCLUSION

For all the foregoing reasons, as well as the reasons and evidence set forth in Plaintiff's prior Rule 56(d) motions and his Responses to Krause's co-defendants' motions for summary judgment, which are incorporated herein by reference, Plaintiff respectfully requests that this Court deny Defendant Krause's Second Motion for Summary Judgment.

RESPECTFULLY SUBMITTED this 21st day of March, 2013.


  /s/  Kathleen T. Zellner            
Kathleen T. Zellner & Associates, P.C.
Admitted *pro hac vice*
1901 Butterfield Road
Suite 650
Downers Grove, Illinois  60515
Phone:  (630) 955-1212
Fax:  (630) 955-1111
kathleen.zellner@gmial.com
Attorney for Plaintiffs

   /s/  Daniel T. Davies            
Daniel T. Davies, WSBA # 41793
Local counsel
Davis Wright Tremaine LLP
1201 Third Avenue, Suite 2200
Seattle, Washington 98101-3045
Phone: (206) 757-8286
Fax: (206) 757-7286
Email: dandavies@dwt.com
Attorney for Plaintiffs

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650Downers Grove, Illinois  60515
630.955.1212 main · 630.955.1111 fax

1

<u>DECLARATION OF SERVICE</u>

2

    I hereby certify that on March 21, 2013, I caused the foregoing to be electronically filed

3

with the Clerk of the Court using the CM/ECF System, which will send notification of such

4

filing to the attorneys of record as follows:

5

| | |
|---|---|
| Patricia Campbell Fetterly<br>Daniel J. Judge<br>Robert M. McKenna<br>Assistant Attorney General<br>Torts Division<br>PO Box 40126<br>Olympia, WA  98504-0116<br>Email: patriciaf1@atg.wa.gov<br>Attorneys for Defendant James M. Peters | |
| Guy Bogdanoich<br>Law, Lyman, Daniel, Kamerrer &<br>Bogdanovich, P.S.<br>P.O. Box 11880<br>Olympia, WA  98508-1880<br>Email: gbogdanovich@lldkb.com<br>Attorney for Defendant Sharon Krause | Jeffrey A. O. Freimund<br>Freimund Jackson Tardif & Benedict<br>Garratt, PLLC<br>711 Capitol Way South, Suite 602<br>Olympia, WA  98502<br>Email: jeffF@fjtlaw.com<br>Attorneys for Defendant Michael Davidson |

6

7

8

9

10

11

12

13

14

   /s/  Kathleen T. Zellner   
Kathleen T. Zellner & Associates, P.C.

15

Admitted *pro hac vice*
1901 Butterfield Road

16

Suite 650
Downers Grove, Illinois  60515

17

Phone:  (630) 955-1212
Fax:  (630) 955-1111

18

kathleen.zellner@gmial.com
Attorney for Plaintiffs

19

20

21

22

23

24

PLAINTIFF'S REDRAFTED RESPONSE TO DEFENDANT
KRAUSE'S SECOND MOTION FOR SUMMARY JUDGMENT
(C11-5424BHS) — 25