# EXHIBIT C

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

VIDEOTAPED DEPOSITION OF CLYDE RAY SPENCER, 11/12/12

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

---

CLYDE RAY SPENCER, MATTHEW RAY )
SPENCER and KATHRYN E. TETZ, )
)
       Plaintiffs, )
)
     v. ) No. 11-5424 BHS
)
FORMER DEPUTY PROSECUTING ATTORNEY FOR )
CLARK COUNTY JAMES M. PETERS, DETECTIVE)
SHARON KRAUSE, SERGEANT MICHAEL )
DAVIDSON, CLARK COUNTY PROSECUTOR'S )
OFFICE, CLARK COUNTY SHERIFF'S OFFICE, )
THE COUNTY OF CLARK, SHIRLEY SPENCER )
and JOHN DOES ONE through TEN, )
)
       Defendants. )
)

---

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

CLYDE RAY SPENCER

---

Monday, November 12, 2012
10:00 a.m.
1201 Third Avenue, Suite 2200
Seattle, Washington

Reported by Marlis J. DeJongh, CCR, RPR

Lic. No. DE-JO-NM-J498K9

MARLIS J. DeJONGH & ASSOCIATES
www.marlisdejongh.com

VIDEOTAPED DEPOSITION OF CLYDE RAY SPENCER, 11/12/12

8

1    A.   That's correct.

2    Q.   Who was a part of this conspiracy?

3    A.   Jim Peters, Michael Davidson, and Sharon Krause.

4    Q.   Nobody else?

5    A.   No.

6    Q.   So it was just those three people that conspired

7 against you even though you also named Shirley Spencer, the

8 County, Clark County sheriff's office and the Clark County

9 prosecutor's office?

10    A.   Michael Davidson was employed by the Clark County

11 sheriff's.  I think Shirley Spencer was a pawn in this.

12    Q.   So she was involved in the conspiracy unwittingly?

13    A.   I think she was, yes.

14    Q.   All right.  When did this conspiracy form?

15    A.   I noticed that my marriage was changing around

16 October of 2004.  Up until that point in time I had a

17 stable, loving relationship with my wife.  Suddenly the

18 arguments began.  This was after the polygraph that

19 Detective Davidson indicated I had failed.

20    My wife went there, and after that, she apparently went

21 to the jail, or went to the county sheriff's almost on a

22 daily basis.  I would call her for hours and she would not

23 answer, and she would indicate that she had been at the

24 county jail or at the sheriff's department speaking with

25 Davidson.

1    I believe that the relationship started at that point,

2    and they manipulated her from on.

3        Q.   And you have pretty clear memories of that time

4    frame of October 1984?

5        A.   I know that's when the relationship seemed to

6    totally reverse.  Up until that time she was supportive of

7    me, loving.  Suddenly there was no personal relationships.

8        You have to understand Shirley's mental state.  She

9    is, she's a fragmented individual.  She's obsessed with

10   jealousy.  Her feelings of how to, a relationship should be,

11   there should be a physical confrontation and then a makeup

12   afterwards.  So all of a sudden it began around that period

13   of time.

14       Q.   That period of time being October 1984?

15       A.   Correct.

16       Q.   What -- and that's when you think the conspiracy

17   formed, was sometime around October 1984, just to be clear?

18       A.   It is.

19       Q.   What was the goal of the conspiracy, or what was

20   the agreement to do?

21       A.   I think that the agreement was to get me out of the

22   picture.  Davidson sleeping with my wife.  Krause is

23   building a career.  She is working in conjunction with Jim

24   Peters.  They're giving lectures up and down the coast.

25       Q.   So why -- what is Peters' motivation in this

VIDEOTAPED DEPOSITION OF CLYDE RAY SPENCER, 11/12/12

39

1   Q.   Do you think she was doing so on purpose in order
2   to hurt herself?
3   A.   We had an accident.  We had -- we had an argument.
4   Shirley, as I previously indicated, has a propensity for
5   violence.
6       I walked out, walked down the road, stayed down there
7   15, 20 minutes.  When I came back the argument ensued again.
8   Shirley turned, ran out the sliding doors and jumped over
9   the deck.  I assumed that she had fallen down into the
10  river.  I jumped over to help her.  She in fact had landed
11  on a ledge right below.  I fell 30 feet down into the rocks.
12  Q.   What were you arguing about?
13  A.   I have no idea now.  At that point in time we were
14  in the middle of this investigation.  The marriage was
15  starting to go downhill.
16  Q.   Were you arguing about the fact that Shirley
17  Spencer had concerns that you were cheating on her and
18  having affairs with other women in your marriage?
19  A.   The truth of the matter is I never had an affair
20  with anyone when I was with Shirley.  Now Shirley would
21  assume there would be some relationship.
22  Q.   So your testimony under oath, sir, is you were
23  100 percent faithful to Shirley Spencer and never had an
24  affair or sexual relations with any other person during the
25  entire time you were married to her?

48

1    misstating what happened on purpose or is it Ms. Arden who

2    is erroneously recording what you told her on that day?

3        A.    Shirley was concerned about the fact that she had

4    jumped and for all practical purposes attempted suicide.  So

5    she asked me not to say anything about it and that's what we

6    told Ms. Arden.

7        Q.    So you did accurately -- I'm sorry, you did -- let

8    me start over.

9        Ms. Arden was accurately recording what you told her,

10   which is that the two -- you and your wife had gone outside

11   to see how high the water was and Shirley slipped and fell

12   down the embankment and you tried to assist her and then

13   fell yourself?

14       A.    That's correct.

15       Q.    So you were deliberately telling Ms. Arden a lie,

16   correct?

17       A.    I think I answered that.

18       Q.    That is correct, you lied to her, right?

19       A.    That's right.

20       Q.    She goes on to report that you told her that you

21   drove -- they had driven themselves to the hospital for

22   treatment of their injuries.  Who drove?

23       A.    I drove and Shirley shifted.

24       Q.    So you drove with a concussion while Shirley

25   shifted with a broken leg?

VIDEOTAPED DEPOSITION OF CLYDE RAY SPENCER, 11/12/12

54

1    polygraph I had come in and spoke to Davidson and Krause.  I

2    can't swear to that but it seems to me that there was some

3    contact prior to that polygraph.

4    Q.   Okay.  Would it have been like a week or two before

5    that polygraph where that contact occurred?

6    A.   Probably was because I kept calling them and asked

7    them, let's schedule this, let's get it done.

8    Q.   Okay.  So between that contact a week or two before

9    the polygraph exam and two years prior when you were working

10    with Sergeant Davidson in serving the search warrant you had

11    zero contact with him?

12    A.   Correct.

13    Q.   Do you believe at the time you took the first

14    polygraph examination at the Clark County sheriff's office

15    in September 1984 that this conspiracy to frame you had

16    already begun?

17    A.   I don't believe so.

18    Q.   Why is that you do not believe so?

19    A.   Because it wasn't until, up to that point, that my

20    marriage was fairly stable, and it was only after Shirley

21    Spencer started coming down to the sheriff's department

22    every day and spending time with Davidson that it seemed

23    like our whole relationship changed.

24    Q.   So you have a clear memory that almost every day

25    Shirley Spencer was leaving your home and you were observing

55

1   her leaving your home?

2        A.   No, I wasn't observing her.

3        Q.   Oh.

4        A.   I would call and she wouldn't answer.  And I would

5   ask her where she was and she admitted that she was at the

6   county sheriff's talking to Davidson.

7        There was no reason for her to go back there.  She had

8   given her statement.  She came there when I took the first

9   polygraph.  There was no reason for her to go back to the

10  sheriff's department.

11       Q.   Okay.  So she would tell you that I'm going to

12  visit Sergeant Davidson at the Clark County sheriff's

13  office?

14       A.   Yes.

15       Q.   And she would tell you that every day when you

16  would call her?

17       A.   Whenever I would call and she wouldn't answer and I

18  would ask her where she had been, that's what she told me.

19       Q.   Okay.  What I'm trying to get at, sir, is why do

20  you think it was happening every day, as you put it?  Were

21  you calling her every day and she was telling you that this

22  is where I was every day, or what?

23       A.   Well, I don't know for a fact it was every day.  I

24  know for a fact that when I'd call and she wouldn't answer,

25  and then it would be two or three hours later I would

VIDEOTAPED DEPOSITION OF CLYDE RAY SPENCER, 11/12/12

56

1    finally get ahold of her and I would ask her where she had

2    been and she would say, I was at the sheriff's department

3    talking to Davidson.

4        Q.   All right.  And would you call your wife every day

5    while you were working?

6        A.   Yeah, I call my wife every day.  Do you call yours?

7        Q.   Would you ask -- so every day when you would call

8    your wife as a regular matter of routine she would tell you

9    every single time, I was over with Sergeant Davidson at

10   Clark County sheriff's office?

11       A.   As I previously stated, whenever she would not

12   answer the phone and I would ask her where she's been she

13   indicated that she was at the sheriff's office with Sergeant

14   Davidson.

15       Q.   So at this point, I take it, you began to have

16   suspicions that your wife was cheating on you with Sergeant

17   Davidson?

18       A.   No, I think it was after Davidson came to the

19   county jail and told me that my wife no longer loved me.

20       Q.   So at this time when your wife is telling you that

21   almost every day she's going to the sheriff's office and

22   meeting with Sergeant Davidson at the sheriff's office you

23   didn't have any suspicions that there might be something

24   going on between the two of them?

25       A.   I noticed that my marriage was falling apart at

MARLIS J. DeJONGH & ASSOCIATES
www.marlisdejongh.com

VIDEOTAPED DEPOSITION OF CLYDE RAY SPENCER, 11/12/12

57

1   that point in time.   There was no more sex, there was no

2   more closeness.

3        We had this mysterious three or four-hour lapses that

4   she's gone.   There was no justification for her to be at the

5   sheriff's department.   I don't know that I put it together

6   that she and Davidson were having an affair.

7        Q.   So as a trained police officer you didn't have any

8   suspicions at all of that going on?

9            MS. ZELLNER:   At what point in time, if you could

10       be specific.

11           MR. FREIMUND:   I think we're pretty clear on the

12       point in time, aren't we?

13           MS. ZELLNER:   Well, if you could restate the point

14       in time.

15       Q.   During this point in time, between the time that,

16   when you were saying that Shirley Spencer was going every

17   day or almost every day to the sheriff's office and meeting

18   with Detective, I'm sorry, Sergeant Davidson, that's the

19   period of time we've been talking about, right?

20       A.   Correct.

21       Q.   During that period of time when almost every day

22   you were calling your wife and she was telling you that she

23   was meeting with Sergeant Davidson at the Clark County

24   sheriff's office, you didn't have any suspicions that

25   something was going on between them.   Is that right?

58

1          MS. ZELLNER:   Objection, vague, what something
2     means.
3          MR. FREIMUND:   A relationship.
4     A.    I don't know that I ever sat down and thought about
5     that.   I didn't know she was cheating on me.
6     Q.    And how long a period of time was this that you
7     believe you were calling your wife almost every day and she
8     was missing for two or three hours almost every day and
9     reporting to you that she was meeting with Sergeant
10    Davidson?   How long did that go on?
11    A.    That went on until I was arrested.
12    Q.    So what are we talking, four or five months?
13    A.    Yes.
14    Q.    All right.   And during that four or five-month time
15    period where almost daily interaction was occurring with
16    Sergeant Davidson, at no point during that four or five
17    months you had any suspicions that they might be having a
18    relationship.   Is that accurate?
19         MS. ZELLNER:   Objection, asked and answered.
20    A.    I think I've answered it.
21    Q.    Could you answer again, please.   Is that accurate?
22    A.    That's accurate.
23    Q.    Did you ever ask anybody else at the sheriff's
24    office, or otherwise, if they saw your wife there, maybe
25    having concerns she wasn't telling you where she really was?

VIDEOTAPED DEPOSITION OF CLYDE RAY SPENCER, 11/12/12

65

1   Q.   Do you know how long he was watching the two of

2   you?

3   A.   I have no idea.

4   Q.   Any other problems that you believe arose in

5   relation to Matt based on his observations of you two having

6   sex?

7   A.   No.

8   Q.   Do you recall being told after the first polygraph

9   examination was administered by Dr. Abrams that he felt your

10  responses tended to be deceptive but said that he decided

11  that the results were inconclusive?

12  A.   I remember him telling me I failed.

13  Q.   So your recollection is Dr. Abrams told you you

14  failed the first polygraph?

15  A.   Yes.  And actually it was Davidson that told me

16  that I failed.

17  Q.   Why was it, do you think then, that they wanted to

18  take another polygraph of you if you failed the first one?

19  A.   That would be pure speculation on my part.  I have

20  no idea why they would want me to take another one.  You

21  would have to ask Sergeant Davidson that.

22  Q.   Okay.  It's your belief though that Davidson, at

23  least as he relayed to you, was that you failed the first

24  polygraph examination and yet he wanted you to take a second

25  one?

VIDEOTAPED DEPOSITION OF CLYDE RAY SPENCER, 11/12/12

101

1    to fire you because they believed that on one or more

2    occasions between July 14th and August 26, 1984 you had

3    sexual contact with and did engage or attempt to engage in

4    sexual intercourse with your daughter Karen Spencer --

5    Kathryn Spencer, I'm sorry, then age five, correct?

6        A.    That's what it says, yes.

7        Q.    That was a lie too?

8        A.    That was a lie too.

9        MR. FREIMUND:  Mark this as Exhibit 5, please.

10       (Exhibit No. 5 marked for identification.)

11       Q.    Before I start asking you about Exhibit 5 though, I

12    just want to be clear that in your mind Detective Davis

13    wasn't part of the conspiracy to frame you for, among other

14    things, sexually abusing your daughter but nonetheless, for

15    reasons of his own, i.e., public relations purposes, he

16    confirmed that you had and determined that you had sexually

17    abused your daughter.  Is that right?

18        A.    Based on reports that were falsified.  There isn't

19    a report that Detective Krause wrote that was valid.  If you

20    review those reports, I know my daughter and my daughter did

21    not say the things that are in those reports.

22       So he's basing it on the information he's receiving from

23    the county, which was false.  I was arrested without

24    probable cause.  You can't have probable cause based on

25    false reporting.

108

1   front of you.  It says Sunday, 2/3/85.

2        Q.   Okay.  And your belief is, even though this officer

3   typed the present date on which he's writing this, typing

4   this report is February 4th, 1985, that isn't true because

5   he told you later he did it days later after he was ordered

6   to do so?

7        A.   Yeah, he was told that he had to write a report on

8   it.

9        Q.   Right, and he did so days later though?

10       A.   Well, that was the information I had.

11       Q.   So you think when he typed in present date 2/4/85,

12   he -- that isn't true, that actually it was, had to be days

13   after 2/4/85, correct?

14       A.   All I know is what he told me.

15       Q.   So based on what he told you, you think that he

16   typed in the wrong date there, correct?

17       A.   Based on what he told me.  I have no idea.

18       Q.   All right.  And you're saying you don't recall

19   telling Shirley you wanted a divorce on or around

20   February 3rd, 1985?

21       A.   I recall telling Shirley that I was leaving, that

22   this wasn't working.  We weren't communicating, she wasn't

23   talking.

24       Q.   But you don't recall using the word divorce?

25       A.   No.

1    Q.    And when you told Shirley that you were leaving,

2    she was upset and did not want you to leave.  Is that

3    accurate?

4    A.    Well, again Shirley went into one of her manic

5    states.  I think that trying to rip off my testicles pretty

6    much explains what her mental state was.

7    Q.    So it is true that she didn't want you to leave,

8    she wanted you to stay.  Is that right?

9    A.    No, I think she wanted to keep my testicles and let

10   me go.

11   Q.    Okay.

12   A.    She said, you won't take these with you.

13   Q.    Okay.  So you think it was mutual at this point on

14   February 3rd, '85 that the two of you should separate?

15   A.    I don't know how mutual it was but I knew that it

16   couldn't continue the way it was.  All I wanted to do was

17   leave.

18   Q.    Okay.  And now you mentioned that this fellow

19   Robert, Robert was Shirley's son from a prior relationship,

20   right?

21   A.    Yes.

22   Q.    Do you recall how old approximately Ray and Robert

23   were?

24   A.    Robert was probably 25, 26.  Her other son was

25   probably 21, 22.  Something like that.

VIDEOTAPED DEPOSITION OF CLYDE RAY SPENCER, 11/12/12

122

1 February 20, 1985 she wasn't at work because she was ill but

2 yet while at home she received a call that Clark County

3 deputies had responded again to the Spencer residence on a

4 civil standby regarding some guns.

5  Do you recall an incident on or about February 20, 1985

6 where the police again came to your home this time in

7 relationship to issues regarding some weapons you had there?

8  A. Yes.

9  Q. So Detective Krause is accurately reporting that

10 this incident did in fact occur, is she not?

11  A. Yeah.  This was after Shirley Spencer had dropped

12 her five-year-old off at my motel.

13  Now I don't know about you, but I had already been

14 arrested for supposedly pedophilia with my daughter.  What

15 reasonable woman would drop her five-year-old off there if

16 she thought there was any danger of it.

17  And why is it that for a week before that every time I

18 asked Shirley to stay she would say, I can't because if I do

19 I can't go through with this.

20  That was a setup.  The whole thing was a setup between

21 Krause, Davidson and Peters.  They manipulated Shirley, they

22 knew their case was weak.  They didn't have probable cause

23 to make the first arrest because it was based on false

24 reporting.

25  Q. So you think a deputy prosecuting attorney Jim

125

1  charged with pedophilia thinking that this child could be

2  sexually abused and they did all that so that they could

3  falsely frame you for sexual abuse.  Is that what your

4  theory is?

5      A.   They did all that because they had no reason to

6  believe that that child was in danger.  They had falsified

7  these records.  They were in a relationship.

8      I believe after the medical exam of my daughter, based

9  on the severity that they had alleged, they couldn't prove

10 it.  They hid the medical exam on her, they hid the medical

11 exam on my stepson.  You tell me why.

12     Q.   So you think that they thought that little boy was

13 in no danger at all from you because they happened to

14 believe that you were completely innocent of the charges and

15 therefore it was perfectly safe for them to convince Shirley

16 Spencer to take her five-year-old son to stay at your place

17 even though you had been arrested for pedophilia?

18     A.   If Shirley believed that I was guilty she would not

19 have done that.  She did it because it buffered their case.

20 It was a setup from the start.

21     She shows up there after a week of saying, I can't spend

22 the night because if I do I can't go through with this, and

23 she shows up out of the blue without any pajamas, without

24 any toys, without anything for that child.

25     Q.   So again my question is, you believe that Sergeant

153

1     A.   Yes.

2     Q.   Do you recall saying that repeatedly?

3     A.   I did.

4     Q.   Do you recall saying, I can't remember this, my

5 God, why can't I remember it?

6     A.   I probably said that, yes.

7     Q.   Do you think you probably said, could I have done

8 this and not remember it?

9     A.   I could have said that, yes.

10    Q.   You were kind of feeling that, weren't you, that

11 maybe I did this and I'm just not remembering it?

12    A.   No.  All of my support group at that point in time

13 was gone.  I had lost my job, my wife was gone, my children

14 were gone.  I'm at that point that I've been classified as

15 clinically depressed.  I'm heavily medicated.  I'm beginning

16 to question my own sanity.

17    Q.   Do you think you would have said something like,

18 could I have done this and not remember it and really felt

19 that way?

20    A.   I'll tell you what, if I had all the documents that

21 were withheld, the medical exams, the affair, the

22 information on that, the videotape, there was no way in

23 anything that I wouldn't have went forward with this.

24    Q.   Do you remember feeling in your own heart of hearts

25 that you had a concern, wow, could I have done this and just

154

1    not remember it?

2         A.    No.

3         Q.    You never had that feeling?

4         A.    No.

5         Q.    Never?

6         A.    Never.

7         Q.    Do you recall believing that DeAnne Spencer had put

8    her daughter up to saying something had happened between you

9    and Kathryn and that something being sexual?

10        A.    I wouldn't have put it past my ex-wife.

11        Q.    Do you recall telling somebody that, that you

12   thought --

13        A.    No, I don't recall telling somebody that.

14        Q.    Do you recall saying to anyone, I must have done it

15   if Little Matt said I did.  This can't be my ex-wife this

16   time.

17        A.    No.  What I did say was when Big Matt, when I found

18   out he was charged.

19        Q.    When he was charged?

20        A.    Or when he said that I did it, that's the point

21   that I really questioned any basis for these allegations.

22   Not with Little Matt.  He's a five-year-old.

23        Q.    So when Big Matt said that you sexually abused him,

24   that's when you began to question the, it can't be my

25   ex-wife this time, or what?  I'm not following you.

VIDEOTAPED DEPOSITION OF CLYDE RAY SPENCER, 11/12/12

179

1    Q.    I asked if he was aware if there is a prior court
2  ruling that Michael Davidson did not coerce your guilty
3  plea.
4       I know your lawyer wants to talk about a bunch of other
5  decisions, and blah, blah, blah, but I'm asking you, are you
6  aware of that?
7    A.    I'm aware of that and I'm aware of the fact that
8  the Court made that decision based on the information he
9  had.
10   Q.    Now it's your testimony, sir, that Michael Davidson
11  visited you in the jail.  Is that right?
12   A.    It is.
13   Q.    How many times do you testify that Michael Davidson
14  visited you while you were at the Clark County jail?
15   A.    I would estimate at least a couple dozen.  It was
16  almost like he was up there every day.  He would take me
17  down, he would have Shirley in a room, he would put me in
18  the room with her trying to get me to sign over a quitclaim
19  deed to the house, sign over my retirement check, to the
20  point where I refused to come down anymore.
21       We almost had a physical confrontation which was
22  witnessed by Linda Harper, one of the jailers, and in
23  Davidson's anger he stated, Your wife used to love you but
24  she doesn't anymore.
25       And I said, What do you know about my wife.  And he

180

1    couldn't get out of the jail quick enough.

2        I filed a complaint against Sergeant Davidson.  He was

3    telling me when he wanted to take me down, you belong to me,

4    I'll tell you where you can go and where you can't.

5        It's my understanding Internal Affairs called him in

6    there and told him, what's wrong with you, stay out of that

7    jail.

8        Q.    Where did you get that understanding?

9        A.    That was the information that I had received from

10   Shirley that she apparently, Davidson had told her that he

11   had gotten in trouble for coming to the county jail, they

12   had called him in.

13       Q.    When did you Shirley tell you that?

14       A.    We have a statement.  I don't have --  she didn't

15   tell me that.  I haven't talked to her.  But we have a

16   statement where she has stated that Michael Davidson had

17   indicated to her that he had gotten in trouble for going to

18   the jail and was told to stay out of there.

19       Again, if you want a copy of that, if you don't have a

20   copy of that, I'm sure my attorney can provide that.

21       Q.    I thought you said she told you is why I was

22   asking, because I believe that was your testimony.

23       A.    No.

24       Q.    Anyway, your testimony is that Sergeant Davidson

25   was coming down to the jail almost every day while you were

VIDEOTAPED DEPOSITION OF CLYDE RAY SPENCER, 11/12/12

181

1    down there?

2        A.    Yes.

3        Q.    And you were in jail for what, three months?

4        A.    Something like that.

5        Q.    So almost every day for three months he was

6    visiting you in the jail?

7        A.    Well, you know, like I said, I can't give you a

8    number.

9        Q.    But it was almost every day?

10       A.    But it felt like it was almost every day, yes.

11       Q.    And as a seasoned police officer of course you're

12   aware that you have a right to refuse to speak to a police

13   officer, right?

14       A.    Yes.

15       Q.    Did you ever exercise that right other than the one

16   time you mentioned over these four months?

17       A.    Yes.

18       Q.    So you sometimes exercised that right and other

19   times waived that right when Sergeant Davidson would visit

20   you almost daily for four months?

21       A.    At the end there I would refuse to go.  At first he

22   would say, your wife wants to see you, she wants to talk to

23   you.  And he would take me down there and he would put me in

24   a room.  And one time I heard Shirley leave and tell

25   Davidson, he wouldn't sign that quitclaim deed to the house.

MARLIS J. DeJONGH & ASSOCIATES
www.marlisdejongh.com

266

1              REPORTER'S CERTIFICATE

2

3    STATE OF WASHINGTON      )
                              )      ss.
4    COUNTY OF KING           )

5

6         I, MARLIS J. DeJONGH, CCR, RPR, a Notary Public in

7    and for the State of Washington, do hereby certify:

8    That prior to being examined, the witness named in the

9    foregoing deposition was duly sworn to testify the truth,

10   the whole truth and nothing but the truth;

11        That said deposition was taken down by me in

12   shorthand at the time and place therein named and thereafter

13   transcribed by means of computer-aided transcription; and

14   that the foregoing transcript contains a full, true and

15   verbatim record of the said deposition;

16        I further certify that I have no interest in the

17   event of the action.

18        WITNESS my hand and seal this 27th day of November,

19   2012.

20

21                          Notary Public in and for the State
                            of Washington, residing in Seattle.
22                          My commission expires 01/2016.
                            Lic. No. DE-JO-NM-J498K9
23

24

25

MARLIS J. DeJONGH & ASSOCIATES
www.marlisdejongh.com

# EXHIBIT D

WITNESS: SHIRLEY SPENCER  8-30-96  (PETER CAMIEL)                    1

1                    UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF WASHINGTON

3                            AT TACOMA

4    ----------------------------------------------------------

5    CLYDE RAYMOND SPENCER,          )

6              Petitioner,           )

7        vs.                         )    NO. C94-5238RJB

8    JOSEPH KLAUSER, Warden, Idaho)

9    State Institution; CHRISTINE )

10   GREGOIRE, Attorney General,  )

11   State of Washington,            )

12            Respondents.           )

13   ----------------------------------------------------------

14              DEPOSITION UPON ORAL EXAMINATION

15                            OF

16                   SHIRLEY JEAN SPENCER

17   ----------------------------------------------------------

18                         2:30 p.m.

19                      August 30, 1996

20                     710 Cherry Street

21                    Seattle, Washington

22

23

24   Jeffory A. Wilson                    ORIGINAL

25   Court Reporter

MILLS & UCHIDA COURT REPORTERS (206)292-9063 SEATTLE, WASHINGTON

Spencer002474

1      A.   Yes, she did.

2      Q.   Did she tell you why you should have your son

3   examined?

4      A.   In case there was any problems because of the

5   abuse, or due to the abuse.

6      Q.   How long before you actually went in and saw the

7   doctor was it that Detective Krause told you you should

8   take Matt in to see a doctor?

9      A.   I don't understand.  How long before what?

10      Q.   How many days before you actually took your son to

11   see the doctor was it that the detective told you that you

12   ought to do that?

13      A.   I don't recall.  We're talking a long time ago.  I

14   don't know.  There was a few days, a week, or immediately.

15   I don't recall.  I know it was no long delay, but I

16   couldn't tell you for sure.

17      Q.   When Detective Krause told you that you ought to

18   take your son in to be examined, did she give you the name

19   of a particular doctor to take him to?

20      A.   No.

21      Q.   Did she tell you to take your son to his regular

22   physician?

23      A.   Yes.

24      Q.   Did she explain to you what you ought to tell the

25   doctor about the purpose for the exam?

Spencer002484

WITNESS: SHIRLEY SPENCER  8-30-96  (PETER CAMIEL)        18

1        Q.   -- from the sex abuse?

2        A.   Yes.  Any kind of idea that there might have been

3    penetration.

4        Q.   Do you recall the day after the examination of

5    Matt meeting with Detective Krause and with your son?

6        A.   I was down at the police station almost every day,

7    half a day for that whole time, you know, so I'm sure I did

8    talk to them after that, but as far as them telling me

9    anything about the physical, they did not, and I've never

10   seen any paperwork on it.

11       Q.   Okay.  But I want to make clear that after the

12   examination, you do recall that you did meet with the

13   police?

14       A.   I'm sure I did.  I don't recall, you know, what

15   days.  Like I said, I was down there constantly.

16       Q.   Did you tell Detective Krause that you had

17   followed her recommendation and had your son examined?

18       A.   Yes.

19       Q.   And did you tell Detective Krause what the doctor

20   had told you?

21       A.   I'm sure I did.  I can't recall.  I mean, a lot of

22   things were discussed that year, that few months.  So I

23   don't know, but I'm sure I did.

24       Q.   Do you recall whether the detective asked you who

25   the doctor was that examined your son?

1                          C E R T I F I C A T E

2       STATE OF WASHINGTON        )

3                                  ) ss.

4       COUNTY OF KING             )

5               I, the undersigned Notary Public in and for the

6       State of Washington, do hereby certify that:

7               I am not a relative or employee or counsel of any

8       of the parties to said action, or a relative or employee of

9       any such attorney or counsel, and that I am not financially

10      interested in the said action or the outcome thereof;

11              The witness, before examination, was duly sworn to

12      testify the truth, the whole truth and nothing but the

13      truth; and

14              The transcript attached hereto is a true record of

15      the proceedings.

16              In witness whereof, I have hereunto set my hand

17      and affixed my seal this 2nd day of September

18      1996.

19

20                              .....Jeffory A. Wilson.....

21                              JEFFORY A. WILSON

22                              CSR NO. WILSOJA426M8

23                              Notary Public in and for the

24                              State of Washington, residing

25                              at Seattle.