# EXHIBIT E

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

1           IN THE UNITED STATES DISTRICT COURT

2          IN THE WESTERN DISTRICT OF WASHINGTON

3                  AT TACOMA

4

5  CLYDE RAYMOND SPENCER,      )

6            Petitioner,  )

7    vs.                 )  No. C94-5238RJB

8  JOSEPH KLAUSER, Warden, Idaho  )
   State Institution; CHRISTINE  )
9  GREGOIRE, Attorney General,   )
   State of Washington,        )

10             Respondents.  )

**ORIGINAL**

11

12

13

14      DEPOSITION UPON ORAL EXAMINATION

15               OF

16         SHARON A. KRAUSE

17

18

19  DATE TAKEN:  May 22, 1996

20
   TIME:  10:30 a.m.
21

22  PLACE:  Hall of Justice
          Longview, Washington
23

24

25

SUZAN R. WELLS
Archer Associates, Inc.
P. O. Box 1092
Longview, Washington  98632
(360) 423-2195

Spencer002543

1    whether or not something occurred without leading them.

2    Afterward I always spoke to the parents again alone

3    without the child present, shared with them what the

4    child said to me, and then had the child come back into

5    the room and in summary tell the parents what the child

6    told me so the child didn't leave there thinking maybe

7    the parents didn't know what happened.  And there's

8    reasons why I did all of those things.

9        Make reports, do any follow-up that, you know, can

10   assist in establishing whether or not something

11   occurred, attempt to interview the accused if possible.

12   Sometimes we made arrests.  And then forward the reports

13   to the prosecutor.

14   Q   Let me ask you, when the investigation concerned a young

15       child, say under the age of ten, and the allegations

16       included allegations of either vaginal or anal

17       penetration, would you refer the parent and child to a

18       physician for a sexual assault examination?

19   A   Yes.

20   Q   Did you have particular physicians or places that you

21       would refer parents and children to in Vancouver?

22   A   Initially when I began doing this, no.  There were times

23       when we might have made referrals to -- you know, people

24       have their own physicians, to Vancouver Clinic.  There

25       are some people -- There are a number of doctors now in

Sharon A. Krause

1     police officers with any of the Sacramento law

2     enforcement agencies?

3  A   I remember I did.  I don't remember who it was.  I think

4     -- and I'm guessing.  I think it was before I went down

5     I spoke with one of the detectives or an officer down

6     there.

7  Q   Do you recall whether or not you received any reports

8     from Sacramento before you went down to interview

9     witnesses in Sacramento?

10  A   I don't recall.

11  Q   At some point in time during the course of your

12     investigation, did you suggest or refer DeAnne Spencer

13     to any doctors to have Kathryn Spencer examined?

14  A   To be honest with you, I don't recall specifically

15     discussing that with her.  However, I would be real

16     surprised if I didn't.  That's all I can tell you.  I

17     don't remember.

18  Q   And based on what you've already told us about your

19     protocol, it would be your usual practice to refer the

20     parent to have the child examined?

21  A   Exactly.

22  Q   Do you recall the general nature of the allegations that

23     were coming from Kathryn Spencer?

24  A   No.

25  Q   Do you recall, let me ask and see if this refreshes your

Sharon A. Krause

Spencer002656

1      memory, that some of the allegations included

2      vaginal-penile penetration?

3   A  To be honest with you, I don't remember what she told me

4      happened.

5   Q  Okay.

6   A  There have been thousands of cases since and I really

7      don't remember specifically.

8                          (Deposition Exhibit No. 1 was

9                           marked for identification.)

10  Q  (By Mr. Camiel:)  Ms. Krause, I'm handing you what's

11     been marked as Exhibit 1 to your deposition and it's

12     four pages.  The top page is titled Utility Report.  Why

13     don't you take a look at that.  I'm going to ask whether

14     or not that is what you received from Mr. Samson along

15     with his letter.

16  A  It is.

17  Q  Do you recall, prior to your receiving these documents

18     from Mr. Samson, do you recall having seen this report

19     before and the records that are attached?

20  A  I'm assuming I did.  That's my report.  I had no

21     independent recollection of it if -- I know that I did

22     because that's my report.

23  Q  All right.  When you say that's your report, you're

24     referring to the top page?

25  A  The little face sheet.  And it's indicating that these

Sharon A. Krause

1     things are attached.

2  Q   All right.  And that face sheet is titled a Utility

3     Report?

4  A   That's correct.

5  Q   And it indicates a date of 10-12-84?

6  A   It does.

7  Q   The narrative portion of the report indicates that

8     copies of Therapeutic/Diagnostic Procedures Report

9     forwarded to this department by University of California

10    Davis Medical Center in Sacramento, California,

11    reference an examination conducted on Kathryn Spencer

12    regarding sexual abuse allegations involving Kathryn and

13    her natural father Clyde Ray Spencer.  According to your

14    report, it appears that these records were sent directly

15    from the medical facility to your office.

16  A   It appears that way.

17  Q   In order to get these reports, would you have had to

18    have Kathryn Spencer's mother execute a medical records

19    release?

20  A   Most -- It's my experience that most physicians would

21    ask that there be a medical release.  I don't

22    necessarily always ask.  Oftentimes the physician has

23    someone sign a release at the time the exam is done.  So

24    I don't remember whether I sent her something and asked

25    or -- I sent something and asked for the report or if

Sharon A. Krause

16

1   magnifying during an exam of a child, anal or

2   vaginally.  It's my understanding that if there are

3   lesions or there's been tearing and healing, it may be

4   detected with a colposcope and it wouldn't by the naked

5   eye.

6   Q   Have you been involved in cases before where the

7       prosecution has presented photographs that were taken

8       with colposcopic exam?

9   A   Well, I'm usually excluded from the courtroom when

10      that's going on, but I'm sure -- I know there's been

11      cases I've been involved in where that was utilized by

12      the physicians.

13  Q   Have you reviewed with physicians as a part of some of

14      your investigations photographs depicting physical

15      evidence of sex abuse through colposcopic exam?

16  A   I don't know that I've ever sat down with a physician

17      and done that.  But I've seen photographs in training.

18  Q   Now, the report Exhibit No. 1 that you have in front of

19      you, do you know whether or not this report was ever

20      forwarded to the Clark County prosecutor's office?

21  A   Like I explained, I'm told it wasn't in their file.  If

22      they have all the other reports, I can't imagine them

23      not having this one.  Also, based on Jim Peters and

24      knowing him and knowing how meticulous he is and knowing

25      historically what I would do, there is no doubt in my

Sharon A. Krause

1    mind if they didn't have a copy, he was aware of it when

2    I got it.  We talked.

3         If CAIC -- If I have a prosecutor on a case, he may

4    not have the whole case file or I may still have some

5    reports I haven't shipped up to him, but there would be

6    no doubt in my -- 99 percent sure that he had this

7    information.  I can't imagine him not having the report

8    if he had all the rest of the reports.  And I'm told

9    that it was in Vancouver Police internal investigation

10   file that they did.  So why would I send it to him and

11   not the prosecutor?  That doesn't make sense.

12  Q  Do you know how it was that Vancouver Police Department

13     received your reports, your investigative reports in the

14     Spencer case?

15  A  Not really.  I don't remember -- I know that they were

16     doing an investigation.  My mind just went blank.  Jim

17     Holtz with Vancouver Police worked on it.  I spoke to

18     him.  I think he may have done some interviews.  It

19     seems like there were other people.  I don't remember if

20     they got them from the prosecutor or they got them from

21     me or they got them from records.  I don't know.

22  Q  Now, you indicated that you spoke I guess recently with

23     Kim Farr, deputy prosecuting attorney.  And as I

24     understand it, Kim Farr indicated that a review had been

25     done of the prosecutor's files and they didn't have the

Sharon A. Krause

1    A    Yes.  I'm sure it was.

2    Q    What was significant about that?  Why was that a

3         problem?

4    A    Well, I think that's a big problem.  We weren't looking

5         at one.  There could have been others.  The other thing

6         that concerned me personally was that I remember him

7         saying some of the other men had guns on their ankles.

8    Q    You were concerned that these other potential suspects

9         might be police officers?

10   A    Absolutely.

11   Q    Was there an investigation that followed up on that?

12   A    There was.  And I remember Jim Holtz and I discussing

13        that.

14   Q    Jim Holtz was with the Vancouver Police Department?

15   A    Was the detective who was doing it.  Other than that, I

16        can't really tell you.  We were never able to identify,

17        you know, if there was, who they were.

18   Q    Now, during the period of time of the Spencer

19        investigation, did you become aware that your

20        supervisor, Mike Davidson, began having a romantic

21        relationship with Shirley Spencer?

22                        MR. SAMSON:  I'll object on the

23        grounds of relevancy.  This claim was addressed by the

24        ninth circuit and was rejected by the ninth circuit so I

25        don't think the issue is really relevant anymore to this

Sharon A. Krause

| | | |
|---|---|---|
| 1 | | action.  But you can answer if you want. |
| 2 | Q | (By Mr. Camiel:)  You can answer. |
| 3 | A | I was aware of it, yes.  So was everybody else. |
| 4 | Q | Was that ongoing while you were conducting your |
| 5 | | investigation? |
| 6 | A | My memory of that, that was way on into the |
| 7 | | investigation that I became aware of that.  And I don't |
| 8 | | -- I don't remember if it -- You know, it's been so |
| 9 | | long.  My recollection of that is that when I became |
| 10 | | aware of that, it was long after I had interviewed |
| 11 | | Little Matt.  And I don't remember if it was before he |
| 12 | | pled or after, to be honest with you.  But at some point |
| 13 | | I became -- but it was -- |
| 14 | Q | At the point where you learned about it, you've |
| 15 | | indicated that it was long after you'd interviewed |
| 16 | | Little Matt. |
| 17 | A | It seems to me.  That's what I think it was.  That's my |
| 18 | | memory. |
| 19 | Q | I wanted to identify "Little Matt" as Matt Hansen. |
| 20 | A | Correct. |
| 21 | Q | Matt Hansen is the Matt that lived up here in the state |
| 22 | | of Washington? |
| 23 | A | Right.  His mother is Shirley Spencer. |
| 24 | Q | When you learned that your supervisor, Michael Davidson, |
| 25 | | was involved with Shirley Spencer, at the point where |

Sharon A. Krause

## CERTIFICATE OF NOATRY PUBLIC

STATE OF WASHINGTON)
                     : ss.
County of Clark      )

I, SUZAN R. WELLS, a notary public for the State of Washington, do hereby certify that SHARON A. KRAUSE, a witness, personally appeared before me at the time and place mentioned in the caption herein; that said witness was by me first duly sworn on oath, and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness was written by me in machine shorthand and thereafter reduced to typewriting; and that the foregoing transcript constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other oral proceedings had during the taking of said deposition, and of the whole thereof.

Witness my hand and notarial seal the 28th day of May, 1996.

SUZAN R. WELLS, CSR #WELLSSR325BH
Notary Public for the State of
Washington, residing at Vancouver,
Washington. My commission
expires on 8/29/97.

51

Spencer002593

| PPLEMENTAL RPT. | ☐ CONTINUATION OF: | | TYPED BY: S. Krause |
| | ☐ Incident Rpt. ☐ Supplemental Rpt. | | PROCESSED BY: |

| 'T CLASSIFICATION (INCLUDE R.C.W. NO.) | | DATA ENTRY BY: |
| 'ecent Liberties/Statutory Rape 1st Degree | | |

| 'I OF INCIDENT | DATE OF INCIDENT | PRESENT DATE |
| 81 N.E. Lucia Falls Rd., Yacolt, Wash. | Summer of 1984 | 10-12-84 |

ADDITIONAL PERSONS: INFO – ATTACH ADDITIONAL INCIDENT REPORTS. DETAIL ADDI-
TIONAL PERSON INFORMATION NOT COVERED IN BOXES.
ADDITIONAL SUSPECT INFO – ATTACH ADDITIONAL INCIDENT REPORTS. DETAIL ADDI-
TIONAL SUSPECT INFORMATION NOT COVERED IN BOXES.
INJURED PERSONS – (VICTIMS, WITNESSES, OFFICERS, SUSPECTS) – DETAIL INJURIES, MEDICAL
EXAM, DISPOSITION.
ADDITIONAL PROPERTY – ATTACH UTILITY/PROPERTY REPORT. DETAIL INFORMATION NOT
INCLUDED IN BOXED PROPERTY SECTION.

5. PHYSICAL EVIDENCE – DETAIL WHAT AND WHERE FOUND. BY WHOM, AND DISPOSITION.
6. VEHICLES – SUSPECT VEHICLE INFORMATION IN SAME ORDER AS VEHICLE SECTION. ADDI-
TIONAL VEHICLE INFORMATION NOT INCLUDED IN BOXES.
7. PARENT, GUARDIAN'S NAME, ADDRESS, PHONE NUMBER OF JUVENILE IN DETENTION.
INDICATE IF CONTACTED AND IF INCIDENT ADJUSTED.
8. LIST DOCUMENTS ATTACHED – (JAIL FORM, MEDICAL RELEASE, WAIVERS, ETC.)
9. RECONSTRUCT INCIDENT AND DESCRIBE INVESTIGATION.
10. SYNOPSIS FOR PROSECUTION ON CLEARED CRIMES AND CUSTODIES.

EM NO, ARE LISTED IN ORDER OF STEP 1 TO 10. IF STEP IS UNNECESSARY, OMIT.

| M | CODE | PERSONS CODE | NAME OF VICTIM / OTHER LAST, FIRST, MIDDLE |
| | | | SPENCER, Kathryn          Dob: 01-13-79 |
| | | | |
| | V1 | | Copies of Therapeutic/Diagnostic Procedures Report forwarded |
| | | | to this department by University of California Davis Medical Cent. |
| | | | Sacramento, California reference: an examination conducted on |
| | | | Kathryn Spencer regarding sexual abuse allegations involving |
| | | | Kathryn and her natural father, Clyde Ray Spencer. |

CASE NO. 84-8506

| ☐ CPS ☐ JOH | ☐ CMHP ☐ PAT ☐ ARREST | ☐ DSHS ☐ SIU ☐ EXCEPTIONAL | ☐ PATROL ☒ DETECTIVE ☐ UNFOUNDED | REPORTING OFFICER: Sharon A. Krause | DIST. K/43 Detectives |
| / BY 'IONAL DIST: | | | | REVIEWED BY: | DATE: |

EXHIBIT

Spencer002594
Krause

USE PATIENT PLATE

**UNIVERSITY OF CALIFORNIA DAVIS**
**MEDICAL CENTER**
**SACRAMENTO**

**THERAPEUTIC/DIAGNOSTIC**
**PROCEDURES REPORT**

762 / PED . ACC
03 AUG 04
08 30 04

D32 084 97 17 4 3R
SPENCER, KATHRYN E.
F 01 13 79  EXP 10 84

All cases of Suspected Child Abuse Neglect are to
be reported by telephone and in writing (by sub-
mitting this form) to the designated agencies (C and
D below) within 36 hours. (Penal Code Section
11161.5 and 11161.7)

## GENERAL INFORMATION

**Patient's Name**  Spencer Kathryn      **Unit#**

| Address | City | State | Phone |
|---|---|---|---|
| 3930 Bechria | Sacramento | CA | 453 - 6057 |

| Age | Birthdate | Race | Sex | Date, Time of Examination | Place of Examination |
|---|---|---|---|---|---|
| S | 1-13-79 | C | F | 8-30-84   Ross Ave 14 | 1.30. |

**Reporting Party's Name**  Kathryn Eells - Magee, M.D.   **UCD Department** Family Practice   **Phone** 453-3630

## FAMILY—Parents:

| Name (Last, First, Middle) | Birthdate | Sex | Race | Name (Last, First, Middle) | Birthdate | Sex | Race |
|---|---|---|---|---|---|---|---|
| Spancer DeAnne | | F | C | Clyde Ray Spencer | | M | C |
| **Address** 3930 bechria | | | | **Address** Vancouver | | | |
| **Home Phone** ( ) | **Business Phone** ( ) | | | **Home Phone** ( ) | **Business Phone** ( ) | | |

## Siblings:

| Name | Birthdate | Sex | Race | Name | Birthdate | Sex | Race |
|---|---|---|---|---|---|---|---|
| 1. Matthew | 8yr. | M | C | 4. | | | |
| 2. | | | | 5. | | | |
| 3. | | | | 6. | | | |

**Child's Family/Home Environment—Include risk factors in parent and/or child. Specify who is/are caretaker(s).**

Katie lives with mother and sibling. Parents divorced. Father
has visitation for six weeks in Summer, week at Easter,
and two at Christmas every other year.

**Previous reports of abuse of child or in family?** ☐ Yes  ☒ No  **If yes, describe when, who involved, etc.**

| Print Last Name | Signature | Date of Report |
|---|---|---|
| Eells · Magee | K Eells-Magee | 8/30/84 |

032 084 97 17 4 3R

762/PED ACC

SPE***EL, *ATH*YN E.
F = 1 13 74  IX* 10 84
4 *0 462 C057 ......

00 30 04

*****: 13:23

**UNIVERSITY OF CALIFORNIA DAVIS
MEDICAL CENTER
SACRAMENTO**

**THERAPEUTIC/DIAGNOSTIC
PROCEDURES REPORT**

**PHYSICAL EXAMINATION**

**Patient's General Appearance:**

White female child crawling in her

mother's lap.

Ht ___110.5___ cm ___25th___ %ile
Wt ___17.0___ kg ___15th___ %ile
Hc_____ cm _____ %ile

Locate and describe in detail *any* injuries or findings related to maltreatment. Indicate location of lesions/findings; shade for bruises or burns. Beside each injury indicated note *color, size, pattern, texture,* and *sensation.* Note if recognizable imprint or bruise goes *around curve.*

4 erythematous bug bite

A pelvic examination should not be performed unless the parent, guardian or minor consent *or* unless necessary as part of treatment. See Department of Health Regulations Title 22, Division 2, Victims of Sexual Assault.

Pelvic
No erythema
Hymen intact
No lacerations
No swelling

**FINDINGS:** Pelvic within normal limits.

Fundoscopic Examination—☐ Normal  ☐ Abnormal  ☒ Not done
Development Assessment—☒ Normal  ☐ Questionable  ☐ Abnormal,  by ☐ DDST  ☐ Estimate  ☐ Other
Behavioral Assessment—☐ Normal during visit  ☒ Abnormal during visit (Specify) *cried throughout exam*
X-ray bone survey—☐ Normal  ☒ Not done  ☐ Abnormal (findings) _____
Hemostasis tests performed—☐ PT  ☐ PTT  ☐ Platelets  ☒ None  ☐ Other _____  Results _____
Cultures for gonorrhea performed—☒ genitalia  ☒ throat  ☒ anus,  VDRL—☐ Done  ☒ Not done
Menarche age _____  Periods regular?  ☐ Yes  ☐ No  L.M.P. _____
Pregnancy test—☐ Positive  ☐ Negative  ☒ Not performed

| Signature | Print Last Name | Date of Report |
|---|---|---|
| Dr. P*l*t*-Morse | Eells-Mogee | 8/30/84 |

762 / P E D   A C C

**UNIVERSITY OF CALIFORNIA DAVIS**
**MEDICAL CENTER**
**SACRAMENTO**

D32 D84 97 17 4 3R
SPENCER, KATHRYN E.
F  C1 13 7C  EXP 10 84
4 PG 482 C057

08 30 84

**THERAPEUTIC/DIAGNOSTIC**
**PROCEDURES REPORT**

13 : 23

MALTREATMENT HISTORY:

Give history of event(s) including time, date, place, perpetrator, circumstance, people present, etc. Underline name of person giving each version, e.g., Father said . . . Child said . . . Officer said . . .

Mother said

Children were visiting father's bldg during summer. Returned
to mother on 8-26. Step brother reported to Vancouver police
that the father had molested. Report was based on Kasie's
Kasie had made to Sep mother on 8-24-84. Kasie refused to
talk or answer questions during Exam. She has refused to talk
with mother. Anything. Repost.                    M. Eccles

Diagnostic Conclusion(s):

Child's story consistant with history of molestation.
No physical findings.

**MANAGEMENT**

1. Reported to:  Officer _____ ID No. _____ Department: Sherill   Phone: 446-5191

   Dependent Intake or CPS Worker _____ Department _____   Phone: 366-2386

2. Medical Follow-up:  Date _____ Time: 9.29-84
   ☐ Scan F/U Clinic   ☐ P.M.D. (Name) _____   ☐ Other _____
   ☐ UCD Clinic (Name) _____
   ☐ None (Why not?) _____

3. Mental Health Follow-up:  Date _____ Time _____
   ☑ Referred to Victim Witness
   ☐ None _____

4. Disposition:
   Police Hold?  ☐ Yes  ☑ No
   ☐ Receiving Home   ☐ Foster home   ☐ Relative's home   ☑ Parent's home   ☐ Other
   ☐ Hospitalized

5. Other Treatment:

| Print Last Name | Signature | Date of Report |
|---|---|---|
| Eells - Magee | K. Eccles - Magee | 8/30/84 |

SUSPICION OF ABUSE

# EXHIBIT F

1

1          UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF WASHINGTON

3                  AT TACOMA

4
   CLYDE RAY SPENCER, MATTHEW        )
5  RAY SPENCER, and KATHRYN E.       )
   TETZ,                             )
6                                    )
7              Plaintiffs,           )
                                     )
7      vs.                           )   NO. 3:11-cb-05424-BHS
                                     )
8                                    )
   FORMER PROSECUTING ATTORNEY       )
9  FOR CLARK COUNTY JAMES M.         )
   PETERS, DETECTIVE SHARON          )
10 KRAUSE, SERGEANT MICHAEL          )
   DAVIDSON, CLARK COUNTY            )
11 PROSECUTOR'S OFFICE, CLARK        )
   COUNTY SHERIFF'S OFFICE, THE      )
12 COUNTY OF CLARK and JOHN DOES     )
   ONE THROUGH TEN,                  )
13                                   )
              Defendants.            )
14

15  DEPOSITION UPON ORAL EXAMINATION OF JAMES MICHAEL DAVIDSON

16

17

18
                 Monday, November 5, 2012
19                 Olympia, Washington

20

21

22

23

24

25

ZELLNER (James Michael Davidson, 11/5/12)

12

1    Q  So you assigned cases.  What else did you do as a

2       supervisor?

3    A  Reviewed the progress of cases.

4    Q  How often would you review the progress of cases --

5    A  It would depend --

6    Q  -- in 1984?

7    A  It would depend upon the case, the nature of the

8       allegation.

9    Q  Well -- all right.  Did you have weekly reviews or did you

10      have daily reviews?

11    A  Again, there was no established policy on reviews because

12      it would depend upon the type of investigation.

13    Q  And when you would review a case, what would that involve?

14    A  It would entail reviewing the progress that the officers

15      were having, the individual detective that was assigned,

16      review their progress on a particular case, review if there

17      were any problems, review what follow-up needed to be done.

18    Q  Did you have face-to-face meetings, then, with these

19      detectives?

20    A  In order to review their progress, yes.

21    Q  So you had verbal communication with them; is that correct?

22    A  That's correct.

23    Q  Okay.  And then you also reviewed their reports?

24    A  Yes, ma'am.

25    Q  Okay.  And then did you sign off on their reports?

24

```
1    Q   Do you know through the investigation -- well, let me ask
2        you this.  That's different than what you had initially
3        told me that the call came in and just reported Ray Spencer
4        had alleged by sexually abused his daughter?  You would
5        agree with that, right?
6    A   I'm sorry?
7    Q   You would agree that Katie or Kathryn Spencer's initial
8        report involved allegations against other people, DeAnne
9        Spencer, her brother Matthew, Karen Stone?  You're aware
10       that Katie Spencer had claimed all of those people had
11       sexually abused her?
12   A   Let me ask you what you're asking.  I'm not certain -- are
13       you asking me about the original report or about the report
14       that I'm looking at here?
15   Q   I'm talking about the report on 8/29/84.  We talked about
16       the original report to the patrol officer that you
17       reviewed, okay?  Then you tell you assigned the case to
18       Sharon Krause, and she began working on the case, correct?
19   A   That's correct.
20   Q   Okay.  And she began preparing reports that you were
21       reviewing?
22   A   Correct.
23   Q   Okay.  And you at some point did review this report on
24       8/29/84?
25   A   We're talking the initial report from the deputy sheriff?
```

```
1    having at that time?
2  A My wife and I had been married for about 24 years. We'd
3    had a slow disintegration of our marriage over probably the
4    prior ten years. We had stayed together principally
5    because we had three children.
6  Q When you say that -- how would you describe the state of
7    your marriage in 1984 around the time when you first met
8    Shirley Spencer?
9  A I was living at home and we -- we had -- my wife and I had
10   a social contact. It was not a regular, normal marriage in
11   the sense that you would normally expect it to be.
12 Q And when you say not -- did you have -- were you still
13   having sexual relations with your wife at that point?
14          MR. FREIMOND: I think this is getting pretty
15   far down the road into personal, private information that
16   is not relevant.
17          MS. ZELLNER: I think I have completely -- well,
18   that's not a proper objection in a federal case. You'd
19   have to assert a privilege and instruct him not to answer,
20   and I believe that we have a green light from Judge Settle
21   that we can explore the relationship that he had with
22   Shirley Spencer, and part of that I want to explore is the
23   quality of his marriage at the time he met her.
24          MR. FREIMOND: I would disagree with your
25   analysis of having a green light, as you put it. I think
```

ZELLNER (James Michael Davidson, 11/5/12)

45

1    have not discussed this case with her?

2  A  As far as I can remember, no.

3  Q  Going back to the relationship with Shirley Spencer, would

4     you agree that in the beginning of this investigation,

5     there were some problems with Katie Spencer's description

6     of what had happened and who was involved in her alleged

7     sexual abuse?

8  A  If we're talking about the information that was contained

9     in the report -- what do you mean by problems?  I'm not

10    certain that -- what are we talking about, defining

11    problems?

12 Q  Well, Ray Spencer was arrested twice, right?  The first

13    arrest was just for a misdemeanor, am I correct?

14 A  I believe so, correct.

15 Q  And he was just arrested for a misdemeanor because

16    apparently the case wasn't strong enough to charge him with

17    a felony?

18 A  I can't, nor do I believe that I have knowledge about the

19    particulars of why it was charged or he was arrested in the

20    manner that he was, under the charge that he was.

21 Q  Who was in charge of making those decisions?

22 A  I would assume that it would have been a consultation with

23    the prosecuting attorney's office, whatever deputy

24    prosecutor was assigned at that time.

25 Q  Up until Ray's first arrest, had you had any communications

ZELLNER (James Michael Davidson, 11/5/12)

46

1    with Jim Peters about the Ray Spencer case?

2  A  Again, I can't recall specific -- we had specific

3     conversations with Mr. Peters during the course of the

4     entire investigation.  Can I sit here today and define

5     specifically what time frames that those conversations took

6     place and in relationship to what portion of the

7     investigation?  I cannot.

8  Q  Did you have conversations with Mr. Peters -- we know that

9     the entire case started in July of 1984.  Did you have

10     conversations with Mr. Peters in that time span from July

11     up until Mr. Spencer's first arrest, just that time period?

12     Do you have a recollection of that?

13  A  I do not have a recollection of that, no.

14  Q  Do you, at a certain point, learn that there's going to be

15     an arrest of Ray Spencer for misdemeanor charges?

16  A  I can only say that I would assume that I would have

17     learned that information without having specific detail.

18  Q  How do you -- how do you define probable cause?

19  A  That -- anything that would lead a reasonable person to

20     believe that a crime had been committed.

21  Q  All right.  So can you tell me what was the probable cause

22     for the first arrest of Ray Spencer on a misdemeanor

23     charge?

24  A  Again, I cannot tell you that because I wasn't involved in

25     that portion or that decision-making process.

1    pursue any charges in Sacramento; is that correct?

2  A  I'm not aware that -- at least that there was any

3    allegations that any of this occurred in California.

4  Q  Well, you're aware that a prosecutor named Rebecca Roe

5    evaluated the evidence for King County, that she was asked

6    to evaluate whether the case was legally sufficient?

7  A  I'm aware that there's a section contained in this file

8    that says she reviewed the case that was referred to her

9    from Clark County.  That has nothing --

10  Q  Right.

11  A  -- to do with Detective Flood.

12  Q  Plaintiff's Exhibit 21, if you could look at that, that's a

13    report that's signed off on by Rebecca Roe?

14  A  I have that copy here, yes, ma'am.

15  Q  Yes.  Have you reviewed this report in your preparation for

16    the deposition today?

17  A  I reviewed it to the best of my ability.  I will have to

18    say that there's some of the -- some of the penmanship that

19    I was not able to discern exactly what she was writing.

20  Q  Well, she does, at the top on her report, mark the box that

21    says case is being returned because it is legally

22    insufficient.  Do you see that notation?

23  A  I do, yes, ma'am.

24  Q  And she points out some of the problems -- and this is

25    November 27 of 1984 -- some of the problems that she saw

ZELLNER (James Michael Davidson, 11/5/12)

52

1    with the sufficiency of the case.  One of the first

2    problems she sees is that the child, Kathryn Spencer, is

3    extremely reluctant to talk about the facts and that Sharon

4    Krause had to spend several hours one-on-one with the

5    victim who indicated that she did not want to talk about

6    it.

7         Were you aware of this information before Ray was

8    charged in February of the felonies?  Were you aware of the

9    Roe report?

10              MR. BOGDANOVICH:  I'm going to object to the

11   form of the question.  I think it left off part of the

12   report that was being quoted.

13              MR. FREIMUND:  You can go ahead and answer.

14              MS. ZELLNER:  I can read the entire entry in.

15   Q  (By Ms. Zellner)  First of all, were you aware of this

16   report before the felony charges were brought against Ray

17   Spencer in February of 1985?

18   A  To my knowledge, I was not.

19   Q  When did you become aware of this report?

20   A  I believe it would have been during the course of the

21   appeal process.

22   Q  Is it your testimony that this report was never in the

23   Clark County Sheriff's file?

24   A  That would not be my testimony, no, ma'am.

25   Q  So what is your testimony about this report?  I mean,

ZELLNER (James Michael Davidson, 11/5/12)

53

1    obviously, it was authored on November 27, 1984.  Were you
2    unaware of it?
3  A  You're asking me at the time that Mr. Spencer was charged
4    with the felonies, was I aware this report existed?
5  Q  Right.
6  A  My response is I have no recollection of that, no, ma'am.
7  Q  When you say -- you've repeatedly said you have no
8    recollection, and when you say you have no recollection of
9    the existence of this report, are you saying that it may
10    have been in the file and you just don't remember it?
11  A  I'm saying that it's very likely it could have been in the
12    file and that I didn't see it because this report was
13    obviously not prepared for my review.
14  Q  Would you have had -- would you have looked at all of the
15    reports that Sharon Krause received in this investigation?
16    Were you doing that on the Ray Spencer case?
17  A  I would have reviewed the reports that Detective Krause
18    would have authored.
19  Q  Would you have reviewed any material that others authored,
20    like Dr. Abrams?
21  A  I believe that Dr. Abrams' report was sent directly to me.
22    If you notice in the address, it was addressed to me.  So,
23    correct, yes, I would have.
24  Q  Okay.  And then you're saying with this report you don't
25    recall in this time frame that it was prepared, 11/27/84,

ZELLNER (James Michael Davidson, 11/5/12)

62

1    A   If during the course of the investigation, I had some
2        reason to be informed of that, that would be correct.   But,
3        again, this information was provided to the prosecuting
4        attorney's office.   I don't know when or if I was ever made
5        aware of this particular report.
6    Q   Yeah, and I understand that about the report, and that is
7        not my question.   My question is if you understood that
8        there were problems with Kathryn Spencer's rendition of
9        events prior to the charges being brought against Ray
10       Spencer on February 28th.   Is this a news flash to you?
11       Did you not know there were these problems that existed at
12       the time?
13   A   I'm aware that after the fact that there were some problems
14       with this investigation initially.   That was after the
15       fact, not during the course of that investigation.
16   Q   And wasn't it part of your duties and responsibilities to
17       learn if there were problems with the veracity of witnesses
18       in the cases that you were investigating?
19   A   If I were investigating the case, certainly.   If I were the
20       supervisor, I wasn't necessarily informed of every aspect
21       of that investigation.
22   Q   Were you informed at any time before February 28, 1985,
23       that Kathryn Spencer had been inconsistent in some of the
24       details of her report of sexual abuse by her father --
25   A   Again, I'm going to answer --

ZELLNER (James Michael Davidson, 11/5/12)

63

1   Q  -- at any time?

2   A  -- I have no specific recollection of that information.

3   Q  And if you had gotten that information, would that have

4      been important in your assessment of the veracity of the

5      claim?  Would that have been important to know as a

6      supervising detective?

7   A  I can only speculate that, first of all, certainly that

8      kind of information would be important.  Again, the only

9      reason that it would be important is how we approached the

10     investigation from that point on.

11   Q  Did you make decisions in the Ray Spencer case about how

12     the investigation was going to be conducted, or did you

13     delegate all of that to Sharon Krause?

14   A  I don't know that in any case that I specifically outlined

15     the way any investigation assigned to any investigator

16     would be conducted.

17   Q  Okay.  I'm asking about this case, okay?

18   A  Okay.

19   Q  This specific case.

20         Did you direct Sharon Krause at any point to perform

21     any task in regard to this investigation?  Did you say "Go

22     out and reinterview the child, go out and tape record it"?

23     Did you ever make any suggestion?

24   A  I'm certain that probably during the course of that

25     investigation that there were some suggestions that I

ZELLNER (James Michael Davidson, 11/5/12)

64

1    offered. I'm aware that particularly when there was a

2    discussion of her going to California to interview both of

3    the children. I don't recall specifically what directions,

4    or at this point due to the passage of time there's no

5    reports to reflect what I would have suggested, and I have

6    no independent recollection of that.

7  Q But you do agree that the reports reflect your involvement

8    at various stages of the investigation, don't you?

9  A I recall specifically being involved in certain portions of

10   that investigation, yes, ma'am.

11 Q Prior to the incident at the Salmon Motel where Matt Hansen

12   was allegedly molested, the case only had evidence of a

13   misdemeanor at that point, right, and then there was the

14   Matt Hansen alleged molestation, and then suddenly the case

15   became a felony case?

16 A I believe the allegations rose to a claim of a felony case

17   after Mr. -- after young Matt Hansen, Shirley's son, made a

18   disclosure, correct.

19 Q Now, Matt Hansen was taken to the Salmon Motel by Shirley

20   Spencer, right?

21 A I believe that she stated that, correct.

22 Q And despite the fact that her husband was out on personal

23   recognizance for molesting their daughter, Shirley Spencer

24   took her son to the Salmon Motel to spend the night with

25   Ray, right?

ZELLNER (James Michael Davidson, 11/5/12)

69

1    correct?

2  A  I think there was some additional interviews that were

3     conducted with his son and his daughter in California, and

4     collectively that was the basis for charging him with those

5     crimes, correct.

6  Q  Okay.  But the Matt Hansen incident was a big part of the

7     charging, wasn't it?

8  A  I don't know that I can answer that.  That would be the

9     prosecutor's position to answer.

10 Q  You went to the Salmon Motel to attempt to corroborate Matt

11    Hansen's story, didn't you?

12 A  I was requested to do that, that's correct.

13 Q  And you reported back that there was a television that was

14    mounted high on the wall.  Do you remember that?

15 A  I do recall that, yes, ma'am.

16 Q  And what was the importance of your observation about the

17    television being mounted high on the wall?

18 A  That was part of what Shirley's son was stating that was

19    part of the room description during the time that he spent

20    with Ray at the Salmon Creek Motel.

21 Q  Well, there wasn't any question that he spent the night

22    with Ray Spencer, right?  There was no question he was in

23    the room, correct?

24 A  There's none -- I'm not clear as to why you're asking that,

25    because that's the purpose of corroboration.

ZELLNER (James Michael Davidson, 11/5/12)

70

1    Q  All you corroborated, though, with the television, was that

2       Matt Spencer was in the room, right?  That doesn't

3       corroborate sexual abuse.

4    A  Nobody said that.  I simply was corroborating --

5    Q  Actually, it does say that.  It does say that in the

6       report, that that was the piece of corroborating evidence.

7       I'm just asking you -- I'm not aware that Ray Spencer ever

8       denied that Matt Hansen was dropped off at the motel.  Are

9       you aware that Ray Spencer ever denied that?

10   A  Without reviewing the reports of Ray Spencer's statements,

11      I can't answer that question.  I don't know whether or not

12      he did.  I was requested to go to the Salmon Creek Motel to

13      corroborate the interior of the motel room provided by

14      young Matt Hansen, Shirley Spencer's son.  That's what I

15      did.

16   Q  There was no physical evidence in the room of any sexual

17      abuse, correct?

18   A  At the time that I was there I don't know that I was

19      looking for that type of -- I was looking for corroborative

20      information.

21   Q  So you were not there to look for corroborative

22      information?

23   A  I said -- that was my statement.  I was there to look for

24      corroborative information.

25   Q  Right.  What else besides the television on the wall

1    A    That's correct, yes.

2    Q    You became aware during the investigation that there was a

3         videotaped interview made of Kathryn Spencer at the

4         Sheriff's Department on December 21, 1984, correct?

5    A    Now, are you making a statement --

6    Q    Yeah --

7    A    -- or is that a question?

8    Q    It's a question.  You became aware that a videotaped

9         interview was done of Kathryn Spencer on December 11, 1984,

10        during the course of the investigation?

11   A    I was aware that there was a videotaped interview done.  I

12        don't recall the dates, and I don't recall when I was made

13        aware of that.

14   Q    Were you made aware of the videotaped interview prior to

15        the charges being brought against Ray Spencer on

16        February 28, 1985?

17   A    I can't recall that, ma'am.

18   Q    When you say you can't recall it, do you mean that you

19        can't give me a specific date?

20   A    I'm stating that I can't recall when I was made aware of

21        that videotape.  Due to the passage of time -- this has

22        been some 26, 27 years ago -- I can't recall that specific

23        information, no, ma'am.

24   Q    Well, we've all been provided -- we have thousands of pages

25        of documents, and you've been provided with several hundred

ZELLNER (James Michael Davidson, 11/5/12)

73

1      pages of documents about this case, correct?

2    A  Correct.

3    Q  And you are aware as you sit here today that there was a

4      videotaped interview done of Kathryn Spencer, correct?

5    A  I am today, yes, ma'am.

6    Q  And do you have any idea in the last 25 years when you

7      became aware of that videotaped interview?

8    A  I can say that I was probably aware of it at some time

9      during the 25 years.  I can't be specific, and I don't

10     recall -- again, I don't recall that.

11   Q  Do you recall whether you became aware of that videotaped

12     interview prior to Ray Spencer being sentenced?

13   A  No, I cannot.

14   Q  Have you reviewed the videotaped interview?

15   A  I was provided a copy of that videotaped interview in 2009

16     or 2010 by then-Chief Criminal Deputy Prosecutor Dennis

17     Hunter as part and party --

18   Q  Was that the first time --

19   A  I'm sorry.

20   Q  I'm sorry.

21   A  -- as part and party --

22   Q  Was that the first --

23   A  -- to the appeal.

24   Q  Was that the first time that you became aware of a

25     videotaped interview having been conducted of Kathryn

ZELLNER (James Michael Davidson, 11/5/12)

81

1    A   I didn't say that.  I said if there was a report that
2        reflected that interview.
3    Q   Okay.  Was there -- should there have been a report made of
4        the interview?
5    A   I would normally say, and I can't say specifically
6        pertaining to this, but the normal course would be that you
7        would author a report pertaining to an interview of a
8        victim or witness or suspect.
9    Q   And if I told you that no such report has been produced,
10       would you be surprised that a report wasn't made?
11   A   I would only -- we're basing that upon your statement, not
12       to my personal knowledge.  I don't know that there was no
13       report made.
14   Q   You've never seen it, have you, a report made of the
15       videotaped interview?
16   A   Again, I can't tell you that because I don't recall.
17       Without reviewing the entire file, I wouldn't know.
18   Q   In the documents that we sent you, did you see a report of
19       the videotaped interview in those documents?
20   A   Again, if I have permission to go back and reflect through
21       the reports, I will look to see if I have any record of
22       that.
23           MS. ZELLNER:  Okay, why don't we take a
24       ten-minute break and let him look through those documents
25       and tell me if there's a report that we've all missed.

ZELLNER (James Michael Davidson, 11/5/12)

1   asking you -- it sounds like, from what you've said before,
2   you tried to reviewed the reports in the file.  If this
3   report had been in the file, you would have reviewed; is
4   that fair?
5   A  If the report was in the file, I would have reviewed it if
6   I reviewed the entire case, correct.
7   Q  Okay.  Do you recall who requested you to go to the Salmon
8   Creek Motel to try to corroborate Matt Hansen's story?
9   A  My recollection was that it was the Deputy Prosecutor Jim
10  Peters.
11  Q  What's your -- when do you recall Jim Peters first getting
12  involved in the Ray Spencer case?  It must have been
13  between the misdemeanor charges and felony charges, or
14  prior to that?
15  A  My recollection was that once the report was forwarded to
16  the prosecuting attorney's office, Mr. Peters was involved
17  from that point on.  That's my recollection.
18  Q  And you're talking about the report of the Matt Hansen
19  allegations?
20  A  I'm talking about the initial report with regards to
21  Kathryn Spencer.
22  Q  Okay.  So the very earliest report that the patrol officer
23  took; is that right?
24  A  I don't know that I can state that he was involved at that
25  point.  I can say that as a result of our follow-up

ZELLNER (James Michael Davidson, 11/5/12)

97

1             MR. FREIMUND:  You just specifically asked did

2     your attorneys provide you.  That's where I'm having a

3     problem.

4  Q (By Ms. Zellner)  Okay, Mr. Davidson, have you on your own

5     reviewed the Sheriff's file on the Ray Spencer

6     investigation?

7  A None other than what was provided to me by your office.

8  Q Okay.  That was really my question.

9     In the interview that was done of Matt Hansen, were

10    you asking questions or was Sharon Krause asking questions?

11  A I believe Detective Krause was.  I was simply present.

12  Q And -- okay.  In her questioning of Matt Hansen, I believe

13    he was four or five years old at the time, were any

14    questions asked about his competency?

15  A Asked of whom?

16  Q Asked of Matt Hansen.

17  A Again, without reviewing the interview that Detective

18    Krause conducted, I can't answer that question.

19  Q Did you at any point in time suggest to Shirley Spencer

20    that Matt Hansen have a medical examination?

21  A I did not, no, ma'am.

22  Q At any time did you become aware that Matt Hansen had, in

23    fact, had a medical examination?

24  A I did become aware of that.

25  Q Was it a routine practice to refer alleged victims to have

ZELLNER (James Michael Davidson, 11/5/12)

98

1    a medical examination?

2  A It would depend upon the nature of the allegation.

3  Q If there were allegations of vaginal rape, would that be

4    the kind of allegation that you would expect the alleged

5    victim would be referred for a medical exam?

6  A Yes, ma'am.

7  Q If Shirley Spencer had recalled in her testimony that you

8    did suggest to her that Matt had a -- have a medical exam

9    on these allegations, would you disagree with that

10   statement that she's made?

11            MR. FREIMUND:   I'm going to object as an

12   improper hypothetical.

13        But go ahead and answer.

14  A I would first have to review the document in which she

15   indicated that I had suggested that.

16  Q (By Ms. Zellner)  Well, do you have an independent

17   recollection of telling her that Matt Hansen should have a

18   medical examination?

19  A I do not have an independent recollection of that, no,

20   ma'am.

21  Q With a male child, when there are allegations of anal

22   penetration, would that be the kind of allegation that you

23   would expect to result in a referral to a doctor?

24  A Well, there's some -- there's some factors that need to be

25   addressed more specifically than just a general allegation.

ZELLNER (James Michael Davidson, 11/5/12)

99

1   Q   You're aware of testifying previously when you were asked

2       that question, and with a male child where there are

3       allegations of anal penetration, would that be the kind of

4       allegation that you would expect to result in a referral to

5       a doctor?  And you answered -- this is the habeas

6       deposition testimony -- "I would agree with that, yes."

7   A   Correct.

8   Q   So are you not agreeing with that now?

9   A   No, what I'm saying is that there are some parameters in

10      which we're talking time frames as opposed to when this

11      occurred and so on.  There's an explanation that I would

12      offer additionally besides just responding "yes" or "no."

13  Q   Well, you don't have -- you have no training as a medical

14      doctor, right?

15  A   No, ma'am.

16  Q   Okay.  And you're not holding yourself out as a child abuse

17      expert?

18  A   No, ma'am.

19  Q   Okay.  Did you become aware at a certain point in time that

20      there had, in fact, been an exam of Mr. Hansen, Matt

21      Hansen?

22  A   Shirley's son?  Is that who we're talking about?

23  Q   Yes, Shirley's son.  Yes.

24  A   Okay.  At some point in time during this entire process I

25      was aware that there was a medical exam,

ZELLNER (James Michael Davidson, 11/5/12)

107

1   Q  Would you expect a later report to encompass the reports

2      from the prior index?

3   A  I'm not certain that I understand what you're asking.

4   Q  Would you expect a subsequent report, a report later in

5      time, to encompass the documents from the first report?

6            MR. FREIMUND:  You're saying "report."  I think

7      you mean "index."

8            MS. ZELLNER:  Index, right.

9            MR. FREIMUND:  Yeah.  Okay.

10  A  Again, there is a report that's indicated in the first

11     index section that there was a medical examination report

12     on Kathryn Spencer.  I see no reason why it would be

13     included in the second index since it was already referred

14     to in the first index.

15  Q  (By Ms. Zellner)  And is it your testimony since it was --

16     the report was included in the index that you would have

17     reviewed the medical report on Kathryn Spencer?

18  A  I can only -- I can only speculate at this point that if it

19     was attached to that report, I may have looked at it.  I

20     doubt if I reviewed it because I'm not a medical doctor as

21     you aptly pointed out, so I --

22  Q  The custom and practice was for the Sheriff's Department to

23     supply the prosecutor's office with all of the reports in

24     the file; is that correct?

25  A  Any report that was going to be referred to the

ZELLNER (James Michael Davidson, 11/5/12)

108

1     prosecutor's office was indicated as such, and the Records

.2     Division at the Sheriff's office would ultimately refer

3     those to the prosecutor's office, correct.

4   Q  And, in your experience, would a medical report of the

5     complaining witness, one of the complaining witnessing, be

6     sent to the prosecutor's office?

7   A  Just making an assumption, I would assume that would be the

8     case, yes.

9   Q  Let's talk about when Ray Spencer was incarcerated after

10     the February 28, 1985 arrest, that time period.  Do you

11     recall whether or not, while Spencer was in jail, you ever

12     visited him in the jail?

13   A  As I previously stated, I think, in prior testimony, in

14     1995 specifically, or '96, I have no recollection of

15     visiting him at all in the jail.

16   Q  Does that mean you may have visited him and you don't

17     remember it?

18   A  I don't believe that I did, but I certainly have no

19     recollection of those events.

20   Q  Do you recall ever receiving any contact from any jail

21     staff concerning your visits to see Spencer?

22   A  If I did not go to the jail, if I have no recollection of

23     going to the jail to see him, I don't recall having any

24     contacts with jailers in regards to those visits that

25     didn't exist.

ZELLNER (James Michael Davidson, 11/5/12)

109

1   Q   Did anyone on the staff at the jail ever contact you or

2       your department about your visits to Ray Spencer?   Whether

3       they occurred or not, was there ever any contact made

4       concerning the issue of you visiting Ray Spencer?

5   A   Contact with me personally?

6   Q   You or your department.

7   A   I can't answer for my department.   I can only answer for

8       me, and no.

9   Q   So you have no personal knowledge that anyone from the jail

10      ever contacted anyone in your department about your alleged

11      visits to Ray Spencer?

12  A   That's correct.   I don't have any personal knowledge.

13  Q   Okay.   If Ray Spencer has testified that you came to the

14      jail, you removed him from the medical area and took him

15      down and interrogated him, would he be incorrect about that

16      memory?

17  A   First of all, I could not have removed him from the medical

18      area.   That simply didn't happen.   The process and the

19      protocol of the jail would not --

20  Q   I'm just asking you -- that's not my question.   I'm not

21      asking you to explain what you think would have happened at

22      the jail.   It's a simple question.   I asked you if Ray

23      Spencer is contending that you were interrogating him at

24      the jail, regardless of where you interrogated him, that he

25      is incorrect, that is untrue?   That's a "yes" or "no."

ZELLNER (James Michael Davidson, 11/5/12)

110

1   A   At this point I did not interview him in the jail.

2   Q   Okay.  Did you ever go to the jail with Detective Krause

3       for her to go in and see Spencer?

4   A   Not to my recollection, no, ma'am.

5   Q   Have you -- did you at any time prior to Mr. Spencer's

6       guilty plea make a statement to him "Your wife used to love

7       you"?

8   A   I have read that in the file.  I do not believe that I ever

9       made that statement, no, ma'am.

10  Q   Well, was that true, that his wife used to love him?

11  A   From the information that was provided in these reports

12      that you provided me, there's certainly an indication that

13      she did.

14  Q   That she did love him?

15  A   Correct.

16  Q   So, at that point in time, you made no such statement to

17      Ray Spencer, correct?

18  A   That's my recollection.

19  Q   Did you ever send Shirley Spencer to attempt to get a Power

20      of Attorney from Ray Spencer?

21  A   Can you explain that question a little bit further?  Did I

22      ever send Shirley Spencer?  What are you saying?

23  Q   Did you ever request -- did you ever request that Shirley

24      Spencer visit Ray Spencer in the jail and sign a Power of

25      Attorney?  Did you ever make that request?

ZELLNER (James Michael Davidson, 11/5/12)

111

1    A  No.

2    Q  Did you ever send Sharon Krause to the jail to visit Ray

3       Spencer, for any reason?

4    A  I could not specifically recall that happening, no, ma'am.

5    Q  Do you recall -- you said you recalled no complaints being

6       made by the jail staff of your visiting Ray Spencer; is

7       that correct?

8    A  I've read in the file where there was a complaint or an

9       allegation made by a correction officer that deals with an

10      officer, not naming me specifically.  That was in the file

11      that you provided me.

12   Q  Are you aware of any witness statements that have been

13      obtained where the witnesses have said you were, in fact,

14      at the jail visiting Ray Spencer?

15   A  I read a statement by or an affidavit by a Mr. Purse, I

16      believe, in which he indicated that was the case, correct.

17   Q  Okay.  And is that affidavit untrue?

18   A  Yes, ma'am.

19   Q  You're positive you never visited the jail --

20   A  I have no specific recollection --

21   Q  -- to see Ray Spencer?

22   A  I visited the jail on a number of occasions.

23   Q  No.  To see Ray Spencer?

24   A  I have no --

25   Q  You're telling us --

ZELLNER (James Michael Davidson, 11/5/12)

112

1    A   I have no recollection of ever visiting Ray Spencer in the

2       jail.  I previously testified to that in 1995.

3    Q   You've also testified that you did not visit him at the

4       jail, correct?  Not that you don't recall, but that you

5       never visited him at the jail?

6    A   Correct.

7    Q   Do you stand by that testimony?

8    A   I do.

9    Q   When is the last time you spoke to Shirley Spencer?

10   A   For any specific reason?

11   Q   Yes.

12   A   I recall a phone call conversation somewhere around the

13      time of the depositions for the federal review in 1995 or

14      '96.  Since that time, I can't recall whether I have seen

15      her at a function on a social basis or not.

16   Q   You can't recall that?  You may have seen her at a social

17      function?

18   A   She belonged to a saddle club that I belonged to, and what

19      I'm saying is that there was -- there were times when I

20      have observed her.  I may have said hello or something of

21      that nature.  We didn't have any long, lengthy

22      conversations.

23   Q   Following your deposition in the habeas matter, did you

24      have any conversation with her?

25   A   I believe that there's an indication that we had a phone

ZELLNER (James Michael Davidson, 11/5/12)

129

1    evidence in this case mysteriously appears, so I want to

2    make sure that I'm provided with that in time to redepose

3    him.

4    Q  (By Ms. Zellner)  I want to ask you if all of the prior

5       testimony you've given under oath is true.

6    A  To the best of my knowledge and ability to recall.

7    Q  Would you agree that the investigation of Ray Spencer was

8       conducted exclusively under your supervision?

9    A  No.

10   Q  Okay.  If not, tell me why you disagree with that

11      statement.

12   A  Well, first of all, I believe the prosecutor would have

13      been involved and --

14   Q  I'm talking about the investigation.

15   A  That would have been part of --

16   Q  Yeah.

17   A  That would have been part of the prosecutor's review.  He

18      may have had --

19   Q  So you're talking about Jim Peters?

20   A  I'm talking about any -- any prosecutor that would have

21      been involved with the Spencer investigation.

22   Q  Well, do you know of any prosecutor other than Jim Peters

23      that was involved with the Spencer investigation?

24   A  I could name one specifically, yes.

25   Q  Who else besides Jim Peters?

| | | |
|---|---|---|
| 1 | A | Art Curtis. |
| 2 | Q | So it's your testimony -- |
| 3 | | MS. FETTERLY: I'm just going to pose an |
| 4 | | objection to the form of this line of questioning, but go |
| 5 | | ahead and answer. |
| 6 | | THE WITNESS: Okay. |
| 7 | A | I'm sorry. I didn't give you a chance to -- |
| 8 | Q | (By Ms. Zellner) So can you explain to me the involvement |
| 9 | | of Art Curtis in the investigation. |
| 10 | | MS. FETTERLY: Object to the form of the |
| 11 | | question. |
| 12 | | You can answer if you can. |
| 13 | A | Ultimately I think all decisions for charging rested with |
| 14 | | the prosecuting attorney of Clark County. Therefore, Art |
| 15 | | Curtis being the prosecutor at that time, I assume he would |
| 16 | | have made any of those decisions. |
| 17 | Q | (By Ms. Zellner) But my question was: Did you have |
| 18 | | exclusive control over supervising the Ray Spencer |
| 19 | | investigation? |
| 20 | A | And, again, I'm going to respond that no, that's not a |
| 21 | | correct statement. |
| 22 | Q | And is it your testimony that prosecutor Jim Peters and Art |
| 23 | | Curtis were involved in the Ray Spencer investigation? |
| 24 | | MS. FETTERLY: Object to the form of the |
| 25 | | question. Clarify what you mean by "investigation" to be |

ZELLNER (James Michael Davidson, 11/5/12)

131

1      certain that the witness understands.

2   Q  (By Ms. Zellner)  You know what an investigation is.  I'm

3      talking about prior to charging.

4              MS. ZELLNER:  I would ask you not to coach him.

5              MS. FETTERLY:  I'm making objection to the form

6      of the question.

7              MS. ZELLNER:  You can make the objections, but

8      you can't coach the witness.  He's the one that interjected

9      their names into the investigation.  I'm asking him --

10             MS. FETTERLY:  But, Ms. Zellner, you're using a

11     legal --

12             MS. ZELLNER:  -- other than -- would you please

13     stop coaching the witness?

14             MS. FETTERLY:  You're using a legal term.

15     That's why I'm making my objection.

16             MS. ZELLNER:  "Investigation" is not a legal

17     term.

18             MS. FETTERLY:  It can be.

19  Q  (By Ms. Zellner)  Tell me again.  Was the Ray Spencer

20     investigation under your exclusive supervision prior to the

21     charging?

22             MR. FREIMUND:  Objection.  It's been asked and

23     answered twice.

24         Go ahead and answer a third time.

25  A  The third time again, I would respond no.

ZELLNER (James Michael Davidson, 11/5/12)

1    Q   (By Ms. Zellner)  And then my question is:  If you were not

2        exclusively supervising the Ray Spencer investigation, who

3        else was involved in the Ray Spencer investigation

4        supervising it?

5    A   Again, as I indicated previously, the prosecutor -- the

6        prosecuting attorney's office was involved during the

7        course of the investigation.

8                MS. ZELLNER:  Okay.  All right.  I don't have

9        any further questions.

10               MR. FREIMUND:  I don't have any follow-up.

11               MS. ZELLNER:  Do you want to waive or reserve?

12               MR. FREIMUND:  We reserve.

13           Anybody else?

14               MR. BOGDANOVICH:  No.

15               MS. FETTERLY:  No.

16                               (Concluded at 0:00 a.m.)

17                               (Signature reserved)

18

19

20

21

22

23

24

25

133

1                          C E R T I F I C A T E

2            I, DIXIE J. CATTELL, the undersigned Registered

3    Professional Reporter and Washington Certified Court Reporter,

4    do hereby certify:

5            That the foregoing deposition of JAMES MICHAEL

6    DAVIDSON was taken before me and completed on the 5th day of

7    November, 2012, and thereafter transcribed by me by means of

8    computer-aided transcription; that the deposition is a full,

9    true and complete transcript of the testimony of said witness;

10           That the witness, before examination, was, by me,

11   duly sworn to testify the truth, the whole truth, and nothing

12   but the truth, and that the witness reserved signature;

13           That I am not a relative, employee, attorney or

14   counsel of any party to this action or relative or employee of

15   such attorney or counsel, and I am not financially interested

16   in the said action or the outcome thereof;

17           That I am herewith securely sealing the deposition of

18   JAMES MICHAEL DAVIDSON and promptly serving the same upon

19   MS. KATHLEEN ZELLNER.

20           IN WITNESS HEREOF, I have hereunto set my hand

21   this          day of              , 2012.

22

23
                         _____
                         Dixie J. Cattell, RPR, CCR
24                       NCRA Registered Professional Reporter
                         Washington Certified Court Reporter CSR#2346
25                       License Expires July 16, 2013.