# EXHIBIT G

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

1

1    UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF WASHINGTON

3    AT TACOMA

4
     CLYDE RAY SPENCER, MATTHEW        )
5    RAY SPENCER, and KATHRYN E.      )
     TETZ,                            )
6                                     )
            Plaintiffs,               )
7                                     )
       vs.                            )     NO. 3:11-cb-05424-BHS
8                                     )
     FORMER PROSECUTING ATTORNEY      )
9    FOR CLARK COUNTY JAMES M.        )
     PETERS, DETECTIVE SHARON         )
10   KRAUSE, SERGEANT MICHAEL         )
     DAVIDSON, CLARK COUNTY           )
11   PROSECUTOR'S OFFICE, CLARK       )
     COUNTY SHERIFF'S OFFICE, THE     )
12   COUNTY OF CLARK and JOHN DOES    )
     ONE THROUGH TEN,                 )
13                                    )
            Defendants.               )
14

15        DEPOSITION UPON ORAL EXAMINATION OF SHARON KRAUSE

16

17

18
                  Tuesday, November 6, 2012
19                   Olympia, Washington

20

21

22

23

24

25

6

| | EXHIBIT NO. | DESCRIPTION | PAGE/LINE | |
|---|---|---|---|---|
| 1 | | | | |
| 2 | NO. 34 | Krause Deposition, 5/22/96; 72 pgs. | 169 | 2 |
| 3 | | | | |
| 4 | NO. 35 | Shirley Spencer Deposition, 6/4/96; 18 pgs. | 7 | 7 |
| 5 | NO. 36 | Shirley Spencer Evidence Deposition, 8/30/96; 27 pgs. | 7 | 7 |
| 6 | | | | |
| 7 | NO. 37 | Krause Federal Habeas Hearing Transcript; 31 pgs. | 7 | 7 |
| 8 | NO. 38 | Reference Hearing Transcripts During Hearing on Spencer's PRP; 28 pgs. | 7 | 7 |
| 9 | | | | |
| 10 | NO. 39 | Tim Hammond Interview of Sharon Krause; 9 pgs. | 7 | 7 |
| 11 | | | | |
| 12 | NO. 40 | Tim Hammond Interview of Shirley Spencer; 11 pgs. | 7 | 7 |
| 13 | NO. 41 | Tim Hammond Interview of DeAnne Spencer; 15 pgs. | 7 | 7 |
| 14 | | | | |
| 15 | NO. 42 | Tim Hammond Interview of Michael Davidson; 7 pgs. | 7 | 7 |
| 16 | NO. 43 | Krause's Answers to Plaintiff's Interrogatories; 22 pgs. | 7 | 7 |
| 17 | | | | |
| 18 | NO. 44A | Krause Document Production (KRAUSE 1-399) | 7 | 7 |
| 19 | NO. 44B | Krause Document Production (KRAUSE 400-793) | 7 | 7 |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

ZELLNER (Sharon Krause, 11/6/12)

9

1    receive these from you last Friday, and so she hasn't had
2    much time to have them available, but she has been given
3    them and has reviewed them.
4         And I also notice the notebooks provided to Dixie
5    Cattell stop at 43 in the index.  And then I saw the index
6    you sent to me does include the two training seminar
7    material items as 44A and B.  So we've got both of those
8    indexes here today.
9              MS. ZELLNER:  Right.  Yeah, 44A and 44B are
10   actually from your production requests to us.
11             MR. BOGDANOVICH:  Correct.
12             MS. ZELLNER:  So 44A and B have your Bates
13   stamps on them.  Is that your understanding?
14             MR. BOGDANOVICH:  Yeah, that is my
15   understanding.  I just wanted to make sure Dixie knew that
16   44 wasn't included in her index.
17             MS. ZELLNER:  Okay, thank you for that
18   clarification.
19   Q  (By Ms. Zellner)  Ms. Krause, let's start with what we've
20      labeled Exhibit 1 in the binder.  If you could turn to that
21      document.  If we look at Bates stamp 251, August 30, 1984.
22      Do you see that document?
23   A  I do.
24   Q  Bates stamp 251 and 252, was that index prepared by you?
25   A  I'm sure it was.

ZELLNER (Sharon Krause, 11/6/12)

10

| | | |
|---|---|---|
| 1 | Q | And why are you sure that it was?  Was that a common |
| 2 | | practice for you to prepare indexes on your case files? |
| 3 | A | Not on every case, but when we had a major case -- |
| 4 | | I have to apologize for my voice, but I had a throat |
| 5 | | infection this summer, and so it's a little raspy. |
| 6 | Q | Sure.  Okay. |
| 7 | A | When it involved more than one victim or it involved |
| 8 | | several children or several witnesses, then I would prepare |
| 9 | | this index.  In the event somebody later needed to find |
| 10 | | something, they would know which section it was in. |
| 11 | Q | And was the index stored with the file, or where was it |
| 12 | | kept in the Sheriff's Department? |
| 13 | A | You know, it -- usually when I prepared the index, it was |
| 14 | | after the case was completed and I'm putting it all |
| 15 | | together, and then that index would be attached to the |
| 16 | | complete file. |
| 17 | Q | And do you know if the complete file with the index that |
| 18 | | was prepared on August 30, 1984, was at some point in time |
| 19 | | sent to the prosecutor's office before Ray Spencer's plea? |
| 20 | A | I can't say that, no.  I don't know that that index went |
| 21 | | there. |
| 22 | Q | Who was responsible for gathering up the documents in a |
| 23 | | case including the index and sending them over to the |
| 24 | | prosecutor's office, sending the documents? |
| 25 | A | It depended on the case.  If -- you know, this was a real |

11

1.   sensitive investigation, and initially I recall that there

2    was communication between the prosecutor's office,

3    Sheriff's office, and the city police.

4        And so as it progressed, I know that there were

5    reports going over to the prosecutor; it wasn't when

6    everything was done that it went over.   During that

7    investigation, they were getting them.

8        It was my practice, if we ended up going to trial, I

9    would always sit down with the prosecutor prior to that and

10   go through everything and make sure they had everything,

11   but it --

12  Q  Okay.  So let me see if I understand it.  So what you would

13     do, what your custom and practice was on a case like the

14     Spencer case, would be to send over the reports as they

15     were being done.  But then, in addition to that, if the

16     case went to trial, you would sit down and go through the

17     documents and make sure that the prosecutor had all of the

18     documents?  Is that pretty much what you're saying?

19  A  That was my practice.  And prior to trial, sit down and go

20     through everything and make sure that I had what I needed

21     and the prosecutor had everything I had or, you know, was

22     in our file.

23  Q  And did you ever have the experience with the prosecutor's

24     office when you would have that meeting and go through and

25     describe each report, each piece of evidence, where the

14

1    of the investigation.

2  Q  (By Ms. Zellner)  Okay.  That makes sense, and when we get

3     to the Utility Report, if you could mention that to me, we

4     may be able to confirm that from the Utility Report --

5  A  Okay.

6  Q  -- because I've never, you know, really heard an

7     explanation of this before.  So if you'll just remind me

8     when we get to the Utility Report, we can see if we can

9     connect it up.  So that's Exhibit 1.

10        Now, if we look at Exhibit 2, it appears to be

11     another index, and that's at Bates stamp 3, Bates stamp 3.

12     There's just one page of that.  Do you recognize this

13     document?

14  A  It looks like what I would have done, like the first one.

15  Q  All right.  And it's dated November 8, 1984, correct?

16  A  It is.

17  Q  Now, you probably heard the question before.  How do you

18     explain the fact that the earlier dated index has more

19     items on it, including the Kathryn Spencer medical report?

20  A  Again, I'm -- I think that this index included the second

21     portion, but I don't know.  I can't honestly answer that.

22  Q  Okay.  So that you think the November 8th index included

23     items from the first index, from Exhibit 1?

24            MS. FETTERLY:  Object to the form of the

25     question.

ZELLNER (Sharon Krause, 11/6/12)

15

1   A   I don't know.  I don't know.  I'd have to look at the

2       reports and. . .

3   Q   (By Ms. Zellner)  Right.  And we will do that.  The issue,

4       I think, is that on August 30, 1984, it's referenced the

5       medical examination report on Kathryn Spencer is included

6       in the August 30th report.  Do you see that under section

7       3?

8   A   Number -- or looking at Exhibit 1?

9   Q   Yes.

10  A   Yes, yes.

11  Q   Section 3?

12  A   Yes, I see that.

13  Q   And then if you'd look over at Exhibit 2, there is no

14      longer mention of the medical examination report on Kathryn

15      Spencer.  Do you see that?

16  A   I do.

17  Q   Okay.  And do you have any explanation why the medical

18      report was not referenced in the second index?

19  A   No, with the exception of what I explained before, that

20      there was that first section and there was an additional

21      investigation, so I don't.  I can't explain that to you.

22      But, obviously, it was in the first one.

23  Q   Do you have any independent recollection of whether the

24      medical report on Kathryn Spencer's exam was turned over to

25      the prosecutor's office?

ZELLNER (Sharon Krause, 11/6/12)

16

1    A    Could you ask me that again?

2    Q    Sure.

3    A    Thank you.

4    Q    Do you have any independent recollection of whether Kathryn

5         Spencer's medical examination was turned over to the

6         prosecutor's office during the investigation?

7    A    No independent recollection.  It's been so long.

8    Q    Have you -- oh, I know.  Has there been anything you've

9         read in all of these exhibits that's triggered your memory

10        or made you believe that that medical report was turned

11        over to the prosecutor's office?

12   A    I can't -- I can't imagine why -- first of all, I wouldn't

13        have -- there wouldn't be any reason for me not to have

14        done that, and that was our practice.  Everything went

15        there.  However, this -- there were reports on that

16        investigation going over to the prosecutor's piecemeal.

17        I've thought about this a lot since we've got, you know,

18        got involved in this.  There were reports going over not in

19        one big lump.  They were going as we went along.  So there

20        wouldn't have been any reason for me not to have sent that

21        over.

22             Also I've worked with Jim Peters for years, and he is

23        so meticulous, I can't imagine at least discussing that

24        with him, but I'm sure that wasn't the only case he was

25        doing, and this certainly wasn't the only case I was

ZELLNER (Sharon Krause, 11/6/12)

17

1    responsible for.  But it's possible that that report went
2    to our Records, just that report, what the Utility Report
3    covered.  Now, where it went from Records or if it went to
4    anyplace, I can't say.  I -- however, obviously, I put a
5    copy in my notebook.
6         It was also my practice, when we had a major case, to
7    have two notebooks.  One was my working notebook that I
8    could scribble on, and the other was for the major case
9    with the original reports.
10        So there wouldn't have been any reason why it
11   wouldn't have gone over.  I would have sent it to Records.
12   There were times when I would make copies for the PA, the
13   prosecutor, and I'd put a note on, when I sent them to
14   records, "I've copied these for the PA" or "they have their
15   copies" or "these are for the PA."  So if it went to
16   Records, I don't know if it went from our Records to the
17   prosecutor.  After it went there, I don't know where it
18   went.  And I have no independent recollection about taking
19   it over.
20   Q  All right.  So when material was transmitted from your
21      office to the prosecutor's, it would go to the Records
22      Department in the Sheriff's Department first, and then they
23      would send it over --
24   A  Yes.
25   Q  -- to the prosecutor; is that right?

ZELLNER (Sharon Krause, 11/6/12)

27

1    Q   Okay.  Now going to -- what was your understanding of
2        Officer Flood's involvement in the early stages of the
3        Spencer investigation?
4    A   Again, it's not based on independent recollection.  It's
5        based on my review of these reports, but that he -- his
6        department apparently was contacted by Children's
7        Protective Services.  He was assigned to follow up on the
8        complaint that they had.  Based on the -- and he made a
9        phone call to the Spencer residence, spoke -- it's my
10       understanding it was Shirley Spencer he was trying to
11       contact initially, but he spoke with Ray Spencer and then
12       spoke with Shirley Spencer.  Based on concerns, he went to
13       the house and interviewed the children, also subsequently
14       spoke with the mother.
15   Q   Okay.  And is it your understanding of the evolution of the
16       case that Officer Flood was the first law enforcement
17       officer to conduct interviews of the Spencer children?
18   A   I believe so.  I think he was the first one.
19   Q   Do you know if at the time you conducted your first
20       interview of Kathryn Spencer you were aware of the details
21       of Officer Flood's interview of Kathryn Spencer?
22   A   I would think it would be reflected in the report, but I
23       assume -- I believe that I was aware.  In fact, I know I
24       was aware that he had spoke with them.
25   Q   Okay.  And what it seems like you just -- have just stated

ZELLNER (Sharon Krause, 11/6/12)

34

1   wouldn't have been in my file.  And there's also
2   information, I think in one of my reports, where I
3   documented that I had received them.
4   Q  Let's look at Exhibit 6.  Again, this is a handwritten
5      report from the King County Prosecuting Attorney's Office.
6      Had you, during the course of the investigation, received
7      this three-page handwritten report in Plaintiff's
8      Exhibit 6?
9   A  I have no recollection, independent recollection, about
10     this report, nor do I recall receiving it.
11  Q  Do you recall ever discussing with anyone during the
12     Spencer case the findings of this Prosecutor Roe in her
13     report?
14  A  I have some memory of discussing this, and I don't remember
15     if it was with Jim Peters or Art Curtis or both.  I knew
16     who Becky Roe was because I did training at the police
17     academy and I met her there, so I knew who she was, and I
18     remember that.  And I also recall that I had -- this wasn't
19     my request that she review that.  It went from the
20     prosecutor's office.  So, you know, I was aware of that.
21     But other than that, as far as specifics, I have no
22     independent recollection, nor do I recall if I ever saw
23     this.
24  Q  Okay.  And when -- we were talking about this yesterday, so
25     on Bates stamp 227, on that first page of the report, at

ZELLNER (Sharon Krause, 11/6/12)

48

1  Q  And Shirley Spencer was very upset and confused about what
2     was going on, right?
3  A  Ray Spencer came in that 9/21 to take the polygraph.
4  Q  Right.  And Shirley Spencer was with him, correct?
5  A  Correct.  That's correct.
6  Q  And then Mike Davidson was also present, and he talked to
7     Shirley Spencer, you and Mike Davidson?
8  A  Correct.
9  Q  Okay.  Shirley Spencer was extremely upset and confused
10    about what was going on, correct?
11 A  Based on the report, she was having a real hard time.
12 Q  Right.  And you even document that she was crying or she
13    was attempting to hold back tears?
14 A  That's correct.
15 Q  Is that accurate?
16 A  Yes.
17 Q  Shirley Spencer makes -- apparently indicates that she
18    found it was very difficult to believe that there was even
19    a possibility that her husband Ray would have had any type
20    of sexual contact with Kathryn.  That's correct?
21 A  That's what it reflects, the report, yes.
22 Q  And Shirley Spencer also indicated that she lived -- during
23    the time she had lived with Spencer, she never observed
24    anything that would have concerned her regarding Ray
25    Spencer having a problem specifically being sexually

1    attracted to children.  That's the information she conveyed

2    to you?

3  A  Yes.

4  Q  And she also told you that she had a four-year-old son and

5    grandchildren, and she would have been concerned about

6    their safety if she even suspected something like that

7    would happen, right?

8  A  Correct.

9  Q  Shirley Spencer said that she wished she had never said

10    anything, correct, because of all the problems it had

11    caused?

12  A  Yes.

13  Q  Shirley Spencer, during that meeting, never indicates to

14    you that she suspects her husband Ray of abusing Kathryn or

15    the other children; is that right?

16  A  Could you ask me that again?

17  Q  Sure.  There's no indication in your meeting with Shirley

18    Spencer on 9/21/84 that she has any doubt about Ray

19    Spencer's innocence of the allegations?

20  A  I think initially in this interview she consistently

21    expressed her feelings that, you know, she didn't -- well,

22    let me rephrase.

23        She said she found it hard to believe.  She never saw

24    anything that would have caused her concern.  However, she

25    was the one who called and reported based on Kathryn's

50

1    initial disclosure.  So I can't say what Shirley Spencer
2    felt, but, you know, she had concerns and so she acted on
3    those.
4  Q  Right.  But you would agree Ray Spencer's actually the one
5    who had her write up everything that Kathryn had told to
6    her, correct, that Ray asked her to document?
7            MR. BOGDANOVICH:  Object to the form.
8        You can answer.
9  Q  (By Ms. Zellner)  Is that your understanding, that Ray had
10   asked her to document the allegations?
11 A  What I understand is when I spoke to him, he told me he
12   told her to write it down.  You know, that's the
13   information I had.
14 Q  Well, she actually did write up the allegations, right?
15 A  She did, and I had a copy of those.
16 Q  Right.  And my point is, at this meeting, without trying to
17   read her mind, she doesn't express any concern that Ray
18   Spencer had molested her daughter Kathryn?  Would you agree
19   with that?
20 A  I guess I don't like the word "concerned."  She didn't want
21   to believe it.  I don't think -- you know, she was
22   reluctant to even entertain the possibility.  I can't say
23   whether she had concerns.  I think she had concerns, but --
24 Q  Well, she was -- okay.  But she wasn't concerned about Ray
25   Spencer.  In that interview on page 7 of 12, she's actually

ZELLNER (Sharon Krause, 11/6/12)

51

1    expressing concern about the children's biological mother,

2    DeAnne Spencer, if you'll look at page 7 of 12, two

3    paragraphs from the bottom.  She was expressing concerns

4    about DeAnne Spencer and that she might have a man living

5    with her that could be responsible for this.

6  A  She did tell me that, yes.

7  Q  Do you see that?

8  A  Um-hmm.

9  Q  Right.

10 A  Yes.

11 Q  So, certainly at this point in your investigation, you

12    would say that -- or would you agree that there was

13    absolutely no probable cause to arrest Ray Spencer for

14    molesting Katie Spencer?

15 A  I don't think at that point there would have been probable

16    cause, no.

17 Q  Right.  And you would agree with me that sometimes in an

18    investigation, there are indications that there is not

19    probable cause to arrest someone, correct?

20 A  Could you ask me that again?

21 Q  Right.  As you proceed in this investigation, you clear

22    certain people, like you end up clearing Karen Stone of any

23    involvement even though she's mentioned in the initial

24    allegations.  Do you recall doing that?

25 A  Yes.

1   indicated that Vancouver Police, I think it was Holtz, told

2   him that they had information Spencer had contacted Karen

3   Stone. And her demeanor changed after that as far as my

4   contact with her.

5        So Katie, Kathryn, said she had lied. I talked to

6   her, Karen Stone, and so it was a process of trying to

7   eliminate those other people. And, you know, there was no

8   evidence other than her -- Kathryn's first statement that

9   implicated Karen Stone. So I guess I just wanted to talk

10  to him about that. Do we leave it at that, or do I push on

11  her? And she was having a terrible time also.

12                          (Videoconference connection lost)

13                          (Recessed at 10:53 a.m.)

14                          (Reconvened at 11:02 a.m.)

15                          (The last question and answer

16                          were read back by the reporter).

17  Q  (By Ms. Zellner)  Okay, so let me pick up from there.  Were

18  you talking to Jim Peters when you say you were talking to

19  the prosecutor?

20  A  It doesn't indicate who exactly I talked to.  It would have

21  been Jim or Art or both --

22  Q  Okay.  So --

23  A  -- or Curtis.

24  Q  Would it be a fair statement to say the only two

25  prosecutors you talked to about your investigation of Ray

ZELLNER (Sharon Krause, 11/6/12)

65

```
 1        Spencer would either be Jim Peters or Art Curtis?
 2     A  I believe initially.  If there were others, I don't
 3        remember, but the prosecutor assigned to that case was Jim
 4        Peters --
 5     Q  Okay.
 6     A  -- so I don't know.  I don't remember.
 7     Q  Do you -- if we go back to this page 7 of 7, the last
 8        paragraph, it says "After that conversation, I did meet
 9        with the prosecutor and it was agreed that at this time it
10        was not necessary based on the fact that Karen Stone had
11        denied any type of sexual contact, and, further, that was
12        corroborated by Kathryn Spencer during the time I spent
13        with her when Kathryn indicated that she had lied about
14        Karen Stone."  Is that accurate?
15     A  That's what it states, yes.
16     Q  Okay.  So what role was the prosecutor -- I guess, let me
17        rephrase it.  Is it correct that you were consulting with
18        the prosecutor during the investigation about which
19        witnesses to pursue and which to not pursue?
20                  MS. FETTERLY:  Object to form.
21              But you can answer.
22     A  I don't think that's a fair statement because he wasn't
23        directing my investigation.  No.  I didn't consult with the
24        prosecutor.
25     Q  (By Ms. Zellner)  But you did seek the advice of the
```

Dixie Cattell & Associates
Court Reporters & Videoconferencing

66

1    prosecutor about Karen Stone, correct --

2  A  I did, based on --

3  Q  -- about the situation with Karen Stone?

4  A  I'm sorry. Based on --

5  Q  Right. Is that correct?

6  A  That's correct.

7  Q  And your purpose in talking to the prosecutor was to get an

8     agreement with him that it wasn't necessary to pursue the

9     investigation of Karen Stone?

10           MR. BOGDANOVICH:  I'm going to object to the

11    form of the question.  I think it's been asked and

12    answered.

13        But go ahead.

14           MS. ZELLNER:  Well, all right.

15  Q  (By Ms. Zellner)  Your words are, "I did meet with the

16    prosecutor and it was agreed that at this time it was not

17    necessary."  And then I have already read the other part of

18    that sentence.  So you did meet with the prosecutor, and

19    you did get the prosecutor's agreement that it wasn't

20    necessary to pursue the investigation of Karen Stone,

21    correct?

22  A  That's what it states, yes.

23  Q  Okay.  And in the last sentence, it states, "Based on the

24    statements made by Stone and Kathryn Spencer and also all

25    other information that has developed in this investigation,

67

1     any investigation regarding Karen Stone as a suspect will

2     be suspended as unfounded."  Correct?

3  A  Correct.

4           MR. BOGDANOVICH:  Counsel, I'm going to object.

5     I think you added an "all" that isn't in the sentence you

6     just read.  You said, "and also all other information."

7     And it says, "also other information."

8           MS. ZELLNER:  Okay.  Did I misread it?  I'll

9     reread it.

10          MR. BOGDANOVICH:  Yeah, you just added an "all"

11     that isn't in there.

12  Q  (By Ms. Zellner)  Okay.  So this is correct, "Based on the

13     statements made by Stone and Kathryn Spencer, and also

14     other information that has developed in this investigation,

15     any investigation regarding Karen Stone as a suspect will

16     be suspended as unfounded."  I'm correctly reading that,

17     right?

18  A  That's what I read.  It's correct.

19  Q  That's correct?

20  A  Yeah.

21  Q  All right.  And it's correct that you decide to suspend the

22     investigation of Karen Stone as unfounded after you talk to

23     the prosecutor and reach an agreement about that?

24  A  I suppose that's correct.  I discussed it with him.

25  Q  All right.

ZELLNER (Sharon Krause, 11/6/12)

93

1    there would be no way to view it.

2  Q  (By Ms. Zellner)  Okay.  So the Sheriff's Department then

3    did have the ability to videotape interviews, is that

4    correct, at that time?

5  A  Not really.  I wouldn't say that was correct.  We used

6    video cameras at crime scenes occasionally or homicides,

7    but we really weren't set up to actually do an interview.

8  Q  Well, one was done though, right, with a videotape?

9  A  Obviously that one was, yes.

10  Q  Right.  So that occurred -- when the break was taken for an

11    hour and five minutes, did you have any contact with anyone

12    who was in that room during the interview?

13  A  I don't recall.

14  Q  Well, when you say you don't recall, might you have had

15    contact and you just don't remember it?

16  A  I don't remember anything about that, the circumstances of

17    that interview, so I can't say.  I really do not remember.

18  Q  So you don't know where you went -- or you said you went to

19    a cubicle; you do remember that?

20  A  I don't remember that.  That's what I said to her on the

21    tape.  I'm going to go over to my office or work space or

22    something similar.  That's the only reason I said that.  I

23    don't remember.  I don't remember the interview, I don't

24    remember the day, and I don't remember where I went.  I

25    remember -- I only am basing that on what I saw in the

ZELLNER (Sharon Krause, 11/6/12)

94

1    tape.

2   Q  Okay.  And prior to that interview, during the course of

3      the investigation up to December 11, 1984, did you have

4      conversations with Jim Peters about the case?

5   A  Oh, I'm certain I did.

6   Q  And did you have more than two conversations with Jim

7      Peters from the beginning of this case in the summer of '84

8      up until December 11, 1984?

9   A  I'm sure I would have, yes.

10  Q  Did you have more than a half a dozen conversations with

11     Mr. Peters?

12  A  Unless it's documented in a report specifically, I would

13     have no way of telling you how many times I met with him.

14  Q  Oh, you met with him too.  How many times did you meet with

15     him, would you estimate, between the beginning of the case

16     up to this interview of December 11?

17  A  I don't have any idea unless it's documented in a report,

18     or the same with the phone conversation, unless it's

19     documented in a report, whether I met with him, with Art

20     Curtis or both of them, I would have no way of knowing

21     that.  I don't remember.

22  Q  Okay.  You are obviously present for some of that

23     interview.  Do you have any recollection of why you were

24     present at the interview?  You may not know why he was.  Do

25     you know why you were there?

1    those conversations, or those conversations took place in

2    that area, but I don't ever remember going upstairs to talk

3    to him in the jail, and I don't remember that Mike Davidson

4    did.

5   Q  Okay. So you don't have a memory of it?

6   A  No, I don't.

7   Q  Okay. So it may have occurred, you don't remember it?

8   A  I think if it occurred, I'd remember it.

9   Q  Okay. Let's look at Exhibit 20. Can you tell me --

10          MR. BOGDANOVICH: Do you need to take a break?

11          THE WITNESS: (Shakes head).

12   Q  -- identify that for the record?

13   A  20? It's a report I dictated, typed for me, and it was

14    2/20/85, suspect interview.

15   Q  And is that, again, an accurate report of your interview?

16   A  It should be, yes.

17   Q  And then let's go to 21. Can you identify that for me?

18   A  Minus all handwriting on it. It's a report I prepared --

19    dictated. It was prepared for me or typed, dated 3/7/85,

20    Interview with Victim, interview with Matthew Alan Hansen.

21   Q  And, again, is that an accurate rendition of your interview

22    with Matthew Hansen, the quotes and everything else?

23   A  Yes. Yes.

24   Q  Is that "yes"?

25   A  Yes.

202

1                    C E R T I F I C A T E

2          I, DIXIE J. CATTELL, the undersigned Registered

3    Professional Reporter and Washington Certified Court Reporter,

4    do hereby certify:

5          That the foregoing deposition of SHARON KRAUSE was

6    taken before me and completed on the 6th day of November,

7    2012, and thereafter transcribed by me by means of

8    computer-aided transcription; that the deposition is a full,

9    true and complete transcript of the testimony of said witness;

10         That the witness, before examination, was, by me,

11   duly sworn to testify the truth, the whole truth, and nothing

12   but the truth, and that the witness reserved signature;

13         That I am not a relative, employee, attorney or

14   counsel of any party to this action or relative or employee of

15   such attorney or counsel, and I am not financially interested

16   in the said action or the outcome thereof;

17         That I am herewith securely sealing the deposition of

18   SHARON KRAUSE and serving the same upon MS. KATHLEEN ZELLNER.

19         IN WITNESS HEREOF, I have hereunto set my hand

20   this_____day of_____, 2012.

21

22

23
                        _____
24                      Dixie J. Cattell, RPR, CCR
                        NCRA Registered Professional Reporter
25                      Washington Certified Court Reporter CSR#2346
                        License Expires July 16, 2013.

Dixie Cattell & Associates
Court Reporters & Videoconferencing



FRANK KANEKOA
*Sheriff*

ROBERT L. SONGER
*Undersheriff*

GARRY E. LUCAS
*Chief*
*Criminal Deputy*

RICHARD A DYER
*Chief*
*Civil Deputy*

THOMAS H. WENTWORTH
*Chief*
*Jail Administrator*

DOUGLAS S RAY
*Lieutenant*
*Special Services*

DALE A. CONN
*Lieutenant Operations*

F. LARRY DYLER
*Lieutenant Operations*

DOUGLAS W. MAAS
*ector/Planning Research*

DAVID A. McKAY
*Administrative Assistant*

HUB L. UTTERBACK
*Lieutenant*
*Custody Division*

JOSEPH K DUNEGAN
*Lieutenant Operations*
*Custody Division*



## CLARK COUNTY SHERIFF'S OFFICE

P.O. BOX 410
1200 FRANKLIN STREET
VANCOUVER, WASHINGTON 98666
(206) 699-1211

August 30, 1984

INDEX

CCSO Case #84-8506

| | | |
|---|---|---|
| VICTIM: | SPENCER, Kathryn E.<br>3930 Becerra Way<br>Sacramento, California<br>(916) 482-6057 | Dob: 03-13-79 |
| SUSPECT: | SPENCER, Clyde Ray<br>17681 N.E. Lucia Falls rd.<br>Yacolt, Washington<br>(206) 687-1407 | Dob: 01-09-48 |

SECTION #1.    CCSO Crime Reports
               Written Statement by Shirley Spencer

SECTION #2.    Sacramento Co. Sheriff's Office Reports

SECTION #3.    Medical Examination Reports on Kathryn
               Spencer

SECTION #4.    Release of Information from DeAnne Spencer
               reference Therapist, Ann Link

SECTION #5.    Letter of request from CPS regarding
               status of Ray Spencer

SECTION #6.    Interview with Kathryn Spencer
               10-16-84

SECTION #7.    Interview with Kathryn Spencer
               10-18-84

SECTION #8.    Interview with Matthew Spencer
               10-17-84



EXHIBIT

1

00000251

Spencer000001



**FRANK KANEKOA**
*Sheriff*

ROBERT L. SONGER
*Undersheriff*

GARRY E. LUCAS
*Chief*
*Criminal Deputy*

RICHARD A. DYER
*Chief*
*Civil Deputy*

THOMAS H. WENTWORTH
*Jail Administrator*

DOUGLAS S. RAY
*Lieutenant*
*Special Services*

DALE A. CONN
*Lieutenant Operations*

F. LARRY BYLER
*Lieutenant Operations*

DOUGLAS W. MAAS
*Sergeant/Planning Research*

DAVID J. McKAY
*Administrative Assistant*

THUEL UTTERBACK
*Lieutenant*
*Special Services*
*Custody Division*

JOSEPH K. DUNEGAN
*Lieutenant Operations*
*Custody Division*



## CLARK COUNTY SHERIFF'S OFFICE

P.O. BOX 410
1200 FRANKLIN STREET
VANCOUVER, WASHINGTON 98666
(206) 699-2211

page #2
CCSO 84-8506

SECTION #9.     Interview with Kathryn Roe
                10-17-84

SECTION #10.    Interview with Phyllis Day
                10-17-84

SECTION #11.    Interview with Linda Lawrence
                10-18-84

SECTION #12.    Interview with DeAnne Spencer
                10-18-84

SECTION #13.    Polygraph Reports on DeAnne Spencer
                from Sacramento Co. Sheriff's Office

SECTION #14.    Interview with Karen Stone
                10-02-84

SECTION #15.    Interview with Ray Spencer (dates vary)
                Interview with Shirley Spencer

SECTION #16.    Polygraph Reports on DeAnne Spencer
                from Dr. Stanley Abrams, PH.D.

SECTION #17.    Misc. Reports and information/CCSO

SECTION #18.    Misc. Reports and information/VPD

00000252
Spencer000002





:ANK KANEKOA
*Sheriff*

HARLES E. BRINK, JR.
*Undersheriff*

ROBERT L. SONGER
*Chief*
*Criminal Deputy*

MAS H. WENTWORTH
*Chief*
*Civil Deputy*

RICHARD A. DYER
*Chief*
*Jail Administrator*

GARRY L. LUCAS
*Lieutenant*
*Special Services*

DOUGLAS S. RAY
*Lieutenant Operations*

MARVIN A. MILLER
*Lieutenant*
*Adm Services*

R L. UTTERBACK
*Lieutenant*
*Criminal Supervisor*

# CLARK COUNTY SHERIFF'S OFFICE

P.O. BOX 410
1200 FRANKLIN STREET
VANCOUVER, WASHINGTON 98666
(206) 699.2311

NOVEMBER 8, 1984

INDEX

CCSO Case #84-8506

VICTIM:                    SPENCER, Kathryn E.     Dob; 03-13-79
                           3930 Becerra Way
                           Sacramento, California
                           (916) 482-6057

SUSPECT:                   SPENCER, Clyde Ray      Dob; 01-09-48
                           17681 N.E. Lucia  Falls Rd.
                           Yacolt, Washington
                           (206) 687-1407

Section #1:                CCSO Crime Reports
                           Written Statement by Shirley Spencer

Section #2:                Sacramento Co. Sheriff's Office Reports

Section #3.                Polygraph Report/Dr. Abrams

Section #4:                Interview with Kathryn Spencer
                           10-16-84 by Krause in Sacto.    "Letter"

Section #5:                Interview with Kathryn Spencer
                           10-18-84

Section #6:                Interview with Matthew Spencer "Big Matt"
                           10-17-84 by Krause in Sacto.  (Audisclosures)

Section #7:                Interview with Kathryn Roe
                           10-17-84

Section #8:                Interview with Linda Lawrence
                           10-18-84

Section #9:                Interview with Phyllis Day
                           10-17-84



EXHIBIT
2

Spencer000003

# EXHIBIT H

Page 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY       )
SPENCER, and KATHRYN E. TETZ,        )
                                     )
              Plaintiffs,            )
                                     )
     vs.                             )   No. 3:11-cv-05424-BHS
                                     )
FORMER PROSECUTING ATTORNEY FOR      )
CLARK COUNTY JAMES J. PETERS,        )
DETECTIVE SHARON KRAUSE,             )
SERGEANT MICHAEL DAVIDSON,           )
CLARK COUNTY PROSECUTOR'S            )
OFFICE, CLARK COUNTY SHERIFF'S       )
OFFICE, THE COUNTY OF CLARK and      )
JOHN DOES ONE THROUGH TEN,           )
                                     )
              Defendants.            )

DEPOSITION UPON ORAL EXAMINATION OF

REBECCA J. ROE

Thursday, December 13, 2012

Taken at 810 3rd Avenue, Suite 500
Seattle, Washington

1:36 p.m.

REPORTED BY:   KAREN M. GRANT, CCR NO. 2155
DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360)352-2506     *     (800)888-9714

DIXIE CATTELL & ASSOCIATES, COURT REPORTERS & VIDEOCONFERENCIN

REBECCA J. ROE - 12/13/2012

1  RCW 9.94A.411. And then I reviewed the Ninth Circuit

2  Model Civil Jury Instruction defining probable cause,

3  which is Instruction 9.20. And I think that's it.

4     Q.  Okay. Let me go back a little bit. You

5  mentioned you reviewed an actual video and a video

6  interview of Katie Spencer. Are you referring to a

7  transcript plus an actual video of that interview?

8     A.  Yes. I watched the video of the interview,

9  and then I -- and then I got the transcript later.

10     Q.  All right. And do you have all those

11  materials you just talked about in front of you today?

12     A.  I do.

13     Q.  Okay. Is there anything else at all that you

14  looked at prior to the deposition today regarding this

15  case?

16     A.  I recall looking -- oh, I'm sorry. I looked

17  at and read the section of the American Prosecutors

18  Research Institute, the prosecution of child abuse

19  manual that I was one of the primary authors of, I

20  reviewed the section on investigation.

21         And I looked at a couple -- I've looked at a

22  couple of different cases, Washington case law, and --

23  but I don't have that in front of me. And I think

24  that's it.

25     Q.  All right. Do you remember the names of any

1    contained falsified information?

2        A.    No.

3        Q.    Would you expect those notes to have contained

4    falsified information?

5        A.    No.

6        Q.    In the event those notes did contain falsified

7    information, might that affect your opinions in this

8    case?

9        A.    Anything might affect my opinions in this

10   case.

11       Q.    Okay.    You mentioned you reviewed

12   correspondence between King County and Art Curtis?

13       A.    Right.

14       Q.    Was that the January 9th, 1985 letter?

15       A.    Yes.

16       Q.    Any other correspondence?

17       A.    There's January 9th, there was a letter from

18   Art Curtis to Norm on the 5th, there was a letter to

19   Chief Davis, also on the 9th, and then the letter --

20   the -- then the letter to me.  So there were three

21   letters that I looked -- that I'm including in that

22   correspondence.

23       Q.    All right.    And the letter from Art Curtis to

24   Norm Maleng was on January 5th of 1985?

25       A.    Yes, that's what it looks -- excuse me.

REBECCA J. ROE - 12/13/2012

1    That's what it looks like to me.

2        Q.   Okay.  And was Norm Maleng the prior elected

3    prosecutor of King County?

4        A.   Yes.

5        Q.   Okay.  And then what is the date of the Chief

6    Davis letter?  Is that also January 9th of 1985?

7        A.   Right.  And that was from Art Curtis to Chief

8    Davis, and then from Art Curtis to me, January 9th.

9        Q.   Okay.

10       A.   And then there's a letter May 9th, 1985, from

11   Jim Peters to Barb Linde, and then there's a letter

12   May 15th, 1985, from Art Curtis to Norm.

13       Q.   Okay.  Okay.  Thank you.

14            You also mentioned that you reviewed the Ninth

15   Circuit Model Civil Jury Instruction 9.2?

16       A.   Yeah.  9.20, yeah.

17       Q.   When was the last time you looked at that?

18       A.   This morning.

19       Q.   Okay.  Prior to when you just pulled it for

20   this case?

21       A.   I don't -- I couldn't tell you when the last

22   time I looked at it was.  I don't know that I've ever

23   looked at it.

24       Q.   Okay.  And you said you looked at prosecution

25   standards for, I believe it was RCW 9.94.11.  Can you

REBECCA J. ROE - 12/13/2012

1   tell me about what that is?

2        A.   9.94A.411 is the standards that came into

3   effect in -- I believe they took effect originally in

4   1984, that talked about what the filing standards should

5   be, and they were -- they were different between crimes

6   against persons versus crimes against property.

7        Q.   Okay.  And you answered one of my questions.

8   You believe what you reviewed came into -- was enacted

9   in 1984?

10       A.   I think it was enacted as a part of the

11  Sentencing Reform Act of 1981 that took effect in 1984.

12       Q.   And do you know what the current law is?

13       A.   I believe it's substantially the same.  I

14  don't know that it's been changed.

15       Q.   All right.  When is the last time you looked

16  at --

17       A.   I'm looking at it right now.

18       Q.   Okay.  And I'm asking you not what you're

19  looking at right now but when the last time you looked

20  at whether or not that statute had been amended.

21       A.   I don't know how to answer that.

22       Q.   Okay.

23       A.   I mean, it says on the document I'm reading

24  when -- it relates to all the times it's been amended in

25  the, you know, the WestLaw version of the law.

REBECCA J. ROE - 12/13/2012

1    correct?

2        A.    Yes.

3        Q.    I mean, we're not talking about whether or not

4    you should fix the kitchen sink.  We're talking about a

5    charging decision regarding a man who Clark County was

6    telling you may have grotesquely violated his

7    five-year-old daughter.

8                MR. BOGDANOVICH:  Object to the form.

9        A.    I was very used to dealing with making these

10   kinds of charging decisions, and they were all

11   important.

12       Q.    Who did you believe your opinion would be

13   reviewed by?

14       A.    That's a good question.  I don't really know.

15   I can't tell you, as I sit here today, who I thought

16   would review it.

17       Q.    Did you expect it to be reviewed by Jim

18   Peters?

19       A.    I can't tell you whether I did or I didn't.

20       Q.    Did you expect it to be reviewed by Sharon

21   Krause?

22       A.    Well, since the decline always goes to the

23   investigating officer, and she was the investigating

24   officer, I have to assume that she would have reviewed

25   it.

REBECCA J. ROE - 12/13/2012

```
 1        A.    I don't have any reason to believe it was
 2   incorrect.
 3        Q.    Okay.  And is it fair to say that you might
 4   have gotten that information from Jim Peters?
 5        A.    It's possible, because I don't know where I --
 6   I frankly don't know where I got it.
 7        Q.    All right.  It's important -- whether or not
 8   Katie talked to a female counselor is pretty important
 9   to this case, correct?
10        A.    I don't know if it's pretty important, or
11   whether I want to agree with "pretty important."  It
12   certainly is a fact that when -- that I felt was
13   significant enough to include in the decline.
14        Q.    Okay.  I'm just checking my notes.
15              You would agree with me that an important
16   consideration in the case is that Katie has the ability
17   to talk and verbalize sexual abuse, correct?
18        A.    Correct.
19        Q.    You also conclude:  Katie's initial naming of
20   suspects is very disturbing; is that correct?
21        A.    Right.
22        Q.    And you conclude:  Katie's explanation that
23   she thought it wouldn't hurt Shirley's feelings as much
24   just didn't make the disturbances go away; is that
25   correct?
```

REBECCA J. ROE - 12/13/2012

1        A.    Right.

2        Q.    You write that the case has built-in

3    reasonable doubt; is that correct?

4        A.    Right.

5        Q.    You write, "Combined with page 5 of Shirley's

6    handwritten statement, where child talked about rubbing

7    Shirley, it creates questions of fact vs. fantasy"; is

8    that correct?

9        A.    Right.

10       Q.    And I wanted to ask you so I don't have to go

11   through it twice -- let me read a couple of these again.

12             When you concluded:  "Although I believe child

13   was clearly abused, and probably by the defendant, the

14   case is unwinnable," does that add to the probable cause

15   analysis, that conclusion alone?

16       A.    I don't understand the question.

17       Q.    Let me see if I can make it better with some

18   of the others.  When you conclude that Katie did not

19   talk to a female counselor, does that add to probable

20   cause?

21       A.    I guess I just -- I'm -- I don't understand

22   how you're using the term "add to probable cause."

23       Q.    Okay --

24       A.    If you're trying to say:  Does the fact she

25   wouldn't talk to a female counselor make it more or less

REBECCA J. ROE - 12/13/2012

```
 1   likely that her father abused her, my answer would be,
 2   it doesn't say anything, one way or the other.
 3        Q.   Okay.  So the fact that Katie did not talk to
 4   a female counselor does not, in your opinion, detract
 5   from a probable cause analysis?
 6        A.   Correct.
 7        Q.   Okay.  Where it says, "Katie's initial naming
 8   of suspects is very disturbing," does that add or
 9   detract from a probable cause analysis?
10        A.   That detracts from a probable cause analysis.
11        Q.   You said "detracts"?
12        A.   Yes.
13        Q.   Okay.  And when it says, "Katie's explanation
14   that she thought it wouldn't hurt Shirley's feelings as
15   much just didn't make the disturbances go away," does
16   that conclusion add or detract from a probable cause
17   analysis?
18        A.   Detract.
19        Q.   And when you conclude that:  "Combined with
20   page 5 of Shirley's handwritten statement, where child
21   talked about rubbing Shirley, it creates questions of
22   fact vs. fantasy," does that add or detract from a
23   probable cause analysis?
24        A.   Detracts.
25        Q.   And when you say -- when you conclude:  "There
```

REBECCA J. ROE – 12/13/2012

Page 77

1    the interviews with Sharon Krause, would that add to the
2    probable cause analysis?
3        A.   It depends on what she was consistent about,
4    because, just as with inconsistencies, some are material
5    and some aren't.  With consistencies, some are material
6    and some are not.
7        Q.   So she could be consistent all over the place,
8    but it still might not add to the probable cause
9    analysis; is that correct?
10       A.   That's correct.
11       Q.   Okay.  And she could be inconsistent just all
12   over the place, and it wouldn't detract from the
13   probable cause analysis, in your mind; is that correct?
14       A.   I'm not going to let it -- let the record
15   stand like that.  It would depend on what she was
16   inconsistent about.
17       Q.   Okay.  You also concluded that you found it
18   disturbing that she's inconsistent on whether it
19   happened more than once.  Does that add or detract from
20   the probable cause analysis?
21       A.   Detracts.
22       Q.   You also concluded:  "I don't expect
23   consistency on number of times for a five year old, but
24   question of one vs. more than one should be consistent."
25   When you draw that conclusion and you say "should be

REBECCA J. ROE - 12/13/2012

1      Q.    The question of once versus more than once is

2   a material inconsistency in Katie's reporting, as

3   related in Sharon Krause's reports, correct?

4      A.    I believed that it was.

5      Q.    Okay.  Another conclusion you draw is:  If it

6   happened more than one time, to account for inconsistent

7   explanations, I'd expect ejaculation at some point being

8   described."  Does the fact that no ejaculation was ever

9   described by Katie add or detract from the probable

10  cause analysis?

11            MR. BOGDANOVICH:  Object to the form, in

12  that it didn't specify time.

13     A.    It detracts.

14     Q.    Okay.  And due to the objection, is it your

15  understanding that Katie did not report anything akin to

16  observing anything like -- strike that.

17            Obviously she's not going to use the term

18  "ejaculation"?

19     A.    Right.

20     Q.    But can we agree that, at the time you

21  reviewed the case, Katie had made no report suggesting

22  she witnessed anything akin to ejaculation, as it would

23  be described by a normal five-year-old?

24     A.    That's my recollection and that's what I wrote

25  here.

REBECCA J. ROE - 12/13/2012

1      Q.   Okay.  So would you agree that you concluded

2  that if it happened more than one time, to account for

3  inconsistent explanations, you would expect ejaculation

4  at some point being described, and the fact that it

5  wasn't detracted from the probable cause analysis?

6      A.   Right.

7      Q.   And you did you conclude that:  "Here there

8  are several problems"?

9      A.   Right.

10     Q.   And does that add or detract to the probable

11  cause analysis?

12     A.   Well, it's just restating what we just said,

13  that it detracts.

14     Q.   Okay.  You also write, "...the case is

15  unwinnable, even assuming you can get the child to

16  talk."  Is that what you concluded?

17     A.   Correct.

18     Q.   Okay.  Did you know, at that time, whether

19  there were any plans to try to get the child to talk?

20     A.   I don't recall that I knew anything about

21  that, one way or the other.

22     Q.   Did you give any advice to the Clark County

23  office about how they should get the child to talk?

24     A.   I don't recall.

25     Q.   And this is a strong conclusion, right?

REBECCA J. ROE - 12/13/2012

1   the word "wiener"?

2          A.   I don't remember.

3          Q.   If I told you that the words pee-pee, butt,

4   and wiener were only said by Jim Peters, do you have any

5   reason to dispute that?

6          A.   No.

7          Q.   On what page does Katie Spencer begin to speak

8   about the abuse?

9          A.   I have no idea.

10          Q.   Okay.  Have you ever tried to determine on

11   what page Katie begins to speak about the abuse?

12          A.   No.

13          Q.   Have you ever tried to determine at any point

14   on the video - in the transcript, the video, or

15   otherwise - where, precisely, Katie begins to speak

16   about the abuse?

17          A.   No.

18          Q.   All right.  Would you agree, on multiple

19   occasions, that Mr. Peters makes statements to Katie

20   suggesting that Katie told Sharon about the abuse?

21          A.   Yes.

22          Q.   And is that proper?

23          A.   Pardon?

24          Q.   Is that a proper way to do this interview?

25          A.   It's not improper.

REBECCA J. ROE - 12/13/2012

1    would, at least to some degree, strengthen Ray's defense

2    to the charges against him?

3                    MS. FETTERLY:  Are you referring to just

4    the videotaped interview or other statements by Katie?

5                    MR. JOHNSON:  Videotaped -- strike that.

6        Q.    (By Mr. Johnson)  You would agree that the

7    videotaped interview could be used by a defense attorney

8    to defend against charges that Ray abused Big Matt or

9    Little Matt, and that would, to some degree, strengthen

10   the defense's case against those charges?

11       A.    I would agree it could be used.  I'm not sure

12   the degree to which I think it would strengthen.

13       Q.    Correct.  But to some degree, it would

14   strengthen the case, correct?

15       A.    Yes.

16       Q.    Okay.  Now I want to get back to how you were

17   contacted on the civil rights case.  You said

18   Ms. Fetterly -- or Mr. Peters contacted you first,

19   correct?

20       A.    Right.

21       Q.    And after that, did he contact you again?

22       A.    No.

23       Q.    Have you spoken with him since that first

24   contact?

25       A.    No.

REBECCA J. ROE - 12/13/2012

Page 217

1    victim in a child sex abuse case, prosecutors should

2    request an order prohibiting the defendant contact with

3    other children?

4         A.    Yes.

5         Q.    Okay.  Just a couple more.

6               It is your testimony that the video relates to

7    probable cause, correct?

8         A.    That the video relates --

9               MS. FETTERLY:  Object as to form.

10        A.    I guess I don't understand what ...

11        Q.    Was it your testimony that the information

12   gathered in the video of December 11th of 1984 relates

13   to probable cause?

14              MS. FETTERLY:  Object as to form.

15        A.    I still don't -- yeah, I'm -- I'm -- I don't

16   understand that --

17              The information in the video would be

18   information you would consider in determining whether or

19   not to file charges.

20        Q.    And the video should have been disclosed prior

21   to Ray's guilty plea, correct?

22        A.    Yes.

23        Q.    And you agree that a defense attorney could

24   have argued that the video negated probable cause,

25   correct?

REBECCA J. ROE — 12/13/2012

1          But could a defense attorney have used the

2    video to try to bring a motion to win release?  Sure,

3    they could have tried that.

4              MR. JOHNSON:  Thank you very much.

5    Nothing further.

6

7                      EXAMINATION

8    BY MR. BOGDANOVICH:

9        Q.   I do have one follow-up, Ms. Roe.  You

10   testified that based on the way your decline notices

11   would usually be sent out of your King County

12   Prosecutor's Office, you would expect that Detective

13   Krause would have received it.  Was that what your

14   testimony was?

15       A.   Yes.

16       Q.   Do you know if, in fact, your decline notice

17   in this case was sent to Detective Krause?

18       A.   No, I don't know.

19       Q.   Do you know if she ever saw it during the

20   investigation of the Spencer case?

21       A.   I don't know.

22              MR. BOGDANOVICH:  That's all I have.

23   ///

24   ///

25   ///

REBECCA J. ROE - 12/13/2012

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON      )
                              )
4    COUNTY OF PIERCE         )

5

6            I, the undersigned officer of the Court,
     under my commission as a Notary Public in and for
7    the State of Washington, hereby certify that the
     foregoing deposition upon oral examination of the
8    witness named herein was taken stenographically
     before me and thereafter transcribed under my
9    direction;

10           That the witness before examination was
     first duly sworn by me to testify truthfully;
11   that the transcript of the deposition is a full, true
     and correct transcript of the testimony, including
12   questions and answers and all objections, motions,
     and exceptions of counsel made and taken at the
13   time of the foregoing examination;

14           That I am neither attorney for, nor a
     relative or employee of any of the parties to the
15   action; further, that I am not a relative or
     employee of any attorney or counsel employed by the
16   parties hereto, nor financially interested in its
     outcome.

17

18

             IN WITNESS WHEREOF, I have hereunto set my
19   hand and seal this 26th day of December, 2012.

20

21

22
                          _____
23                        KAREN M. GRANT
                          NOTARY PUBLIC in and for the
                          State of Washington, residing
24                        at Edgewood.
                          My commission expires 3/13/14.
25

Date: 11/27/84

Dect: Clyde Ray Spencer    Referred Crime: SR 1°
Officer: Sharon Krause    Agency: Clark Co.: Case No: 84-8506
Sheriff's Office

We are declining to file this case in Superior Court for the following reason:

[ ] A. Case is being returned for filing in municipal or district court.

[ ] B. Case is being declined for non-evidentiary reasons.

[X] C. Case is being returned because it is legally insufficient.

Reasons:

Five year old victim alleges her natural father
sexually assaults her when she visits
a subsequent step-mom Shirley in Vancouver, Wa.
Initial disclosure to Shirley and victim
names. Both have no training abused her in
addition to this.

Child appears from police reports
to be extremely reluctant to talk
about facts. Sharon Krause had to
spend several hours one on one with
victim, who also indicated she
would not talk about it "with
Borja". She also did not talk to
a female counselor. This clearly
does not bode well for testifying
in court.

Initial naming of multiple →

Im interview? ___ yes ___ no    Proposed by:    Date:
I notified on ___    Approved by: [signature] Pope   Date: 11/27/84
                    King County Prosecuting Attorney's Office
                    DECLINE

(Original to file; copy to detective; Chief; Criminal Div.)

PLAINTIFF'S EXHIBIT 1
00000227
Spencer000411

suspects is very disturbing and child's
explanation that she thought it
wouldn't hurt Shirley's feelings as
much, just didn't make the "disturbance"
go away. Combined with p. 5 of Shirley's
handwritten statement, where child
talked about rubbing Shirley — it
creates questions about fact vs. fantasy.
I believe this point is a point
in reasonable doubt

3) There are inconsistencies — not
surprisingly in child's statements
over all issues:

no. of times        — many times, vs. one time
what s wearing — a nude vs. a wearing robe
what V wearing — both nude, vs. V's had
                        panties vs. V had pajamas

all the varying descriptions may
well be the result of the
descriptions of different events —
but still I find it disturbing
that she's inconsistent on whether
it happened more than once. I don't
expect consistency on number of times for
5 yr. old, but question of one vs. more than
once — should be consistent.

00000228
Spencer000412

Date: 11-27-84

Suspect: Clyde Ray Spencer    Referred Crime: Rape (Stat)

Officer: _____  Agency: _____  Case No: 84-8506

We are declining to file this case in superior court for the following reason:

☐ A. Case is being returned for filing in municipal or district court.

☐ B. Case is being declined for non-evidentiary reasons.

☐ C. Case is being returned because it is legally insufficient.

Reasons:

1) If it happened more than 1 x — to account for inconsistent explanations, we'd expect explanation at some point being described.

In sum, I think a case with a five year old and absolutely nothing else is filable if there is no significant problem with what the five year old says. Here there are several problems. Although I'd believe child was clearly abused and probably by the defendant, the case is unwinnable even assuming we can get the child to talk.

Kim Interview? ____ yes ____ no    Proposed by: _____ Date: _____

"n notified on _____    Approved by: R. Roe  Date: 11/27/84
                                 King County Prosecuting Attorney's Office

                                 DECLINE

(Original to file; copy to detective; Chief, Criminal Division)

00000229

Spencer000413