# EXHIBIT O

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

172

1                    UNITED STATES DISTRICT COURT
2                 WESTERN DISTRICT OF WASHINGTON
                          AT TACOMA
3

CLYDE RAYMOND SPENCER,          )        Docket No. C94-5238RJB
4                               )
                Petitioner,     )        Tacoma, Washington
5                               )        September 4, 1996
        v.                      )        1:30 p.m.
6                               )
JOSEPH KLAUSER, Warden,         )
7  Idaho State Institution;     )
CHRISTINE GREGOIRE, Attorney    )
8  General, State of Washington. )
                                )
9               Respondent.     )
                                )
10  ─────────────────────────────

11                        VOLUME II
                    TRANSCRIPT OF TRIAL
12          BEFORE THE HONORABLE ROBERT J. BRYAN
               UNITED STATES DISTRICT JUDGE.
13

14  APPEARANCES:

15  For the Petitioner:        PETER A. CAMIEL
                               Mair, Camiel & Kovach, P.S.
16                             710 Cherry Street
                               Seattle, Washington   98104
17

18  For the Respondents:       JOHN J. SAMSON
                               DONNA H. MULLEN
19                             Assistant Attorneys General
                               Post Office Box 40116
20                             Olympia, Washington   98504-0116

21

22  Court Reporter:            Julaine V. Ryen
                               Post Office Box 885
23                             Tacoma, Washington 98401-0885
                               (206) 593-6591
24

25  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.

COPY

Spencer003066



268

1  his motivation for giving those kinds of responses.  I just
2  don't know.
3          THE COURT:  Other questions of the doctor?
4          MS. MULLEN:  No further questions, Your Honor.
5          MR. CAMIEL:  No, Your Honor.
6          THE COURT:  Thank you, Doctor.
7          THE WITNESS:  Thank you.
8          THE COURT:  You may be excused.
9      (Witness excused.)
10         MR. CAMIEL:  We have another witness ready.
11     MANUEL R. GALAVIZ, PETITIONER'S WITNESS, SWORN OR AFFIRMED
12                     DIRECT EXAMINATION
13 BY MR. CAMIEL:
14 Q.  Could you please state your name and spell your last name.
15 A.  Manual Raymond Galaviz.  G-a-l-a-v-i-z.
16 Q.  And it's Dr. Galaviz?
17 A.  Yes.
18 Q.  Doctor, what's your professional address?
19 A.  My professional address, 123 -- 12607 Southeast Mill Plain
20 Boulevard.
21 Q.  What's the nature of your employment?
22 A.  I'm a family physician.
23 Q.  Doctor, where did you attend medical school?
24 A.  University of California, Davis.
25 Q.  And what year did you finish up medical school?

Spencer003162

270

1  training regarding diagnosing and treating injuries such as

2  bruises?

3  A.   Yes.

4  Q.   Lacerations?

5  A.   Yes.

6  Q.   Tears in the tissue?

7  A.   Yes.

8  Q.   Doctor, I would like you to turn your attention to 1985, if

9  you would, please.  In the blue notebook in front of you, if you

10  could turn to tab number 2, which is Exhibit No. 2.

11     Do you recognize what the documents are under tab No. 2?

12  A.   These are my progress notes from a visit March 6th, 1985.

13  Q.   Who is your patient?

14  A.   Matthew Hansen.

15  Q.   Have you been recently asked to review these notes?

16  A.   Yes, I have.

17  Q.   How was it that Matthew Hansen became your patient on

18  March 6th, 1985?

19  A.   I believe they called for an appointment and happened to be

20  on my schedule, like many other patients.

21  Q.   Do you know whether or not Matthew Hansen was referred to

22  you by another physician?

23  A.   I do not.

24  Q.   Do you have a recollection of your meeting with Mr. Hansen,

25  Matthew Hansen?

271

1   A.   As far as a photographic appearance, no.   Not specifically.

2   Q.   Apart from the -- independent of the medical record, which

3   is Exhibit No. 2, do you remember the occasion that you met with

4   Matthew Hansen?

5   A.   Vaguely.

6   Q.   Do you remember why it was that he had -- he or his parent

7   had made an appointment to meet with you?

8   A.   Can I refer to my progress notes?

9   Q.   Yes.

10  A.   Well, it was specifically to look for any physical evidence

11  of injury.

12  Q.   All right.   Matthew Hansen, I take it, wasn't a regular

13  patient of yours?

14  A.   Not that I recall at this time.   I have thousands of

15  patients.

16  Q.   You don't recall that you had ever seen him before this

17  time?

18  A.   Not that I recall now.

19  Q.   You indicated that the purpose for the appointment was to

20  look for evidence of injury.   Were you given a suspected cause

21  as to why there might be some injury to look for?

22  A.   I was given the information that Matthew had been sexually

23  abused.

24  Q.   And were you given information as to the type of sexual

25  abuse that was being alleged?

272

1  A.   The information I got was that he was sexually abused anally

2  and orally.

3  Q.   Did you receive information that he had been -- that the

4  sexual abuse had occurred by an adult male, his stepfather?

5  A.   Yes.

6  Q.   Do you recall what type of examination you did when Matt

7  Hansen came in to your office?

8  A.   I initially did a questioning about general information,

9  and proceeded to an exam from the head, neck, down to the

10  muscular-skeletal system.

11  Q.   Do you recall when Matt Hansen came in, was he accompanied

12  by his mother?

13  A.   Yes, she was, I believe, according to my note.

14  Q.   Do you recall her being present during your examination of

15  her son?

16  A.   I believe so.

17  Q.   Do you recall any conversations with Matt Hansen's mother,

18  Shirley Spencer, regarding how it was that she got to you?

19  A.   According to my notes, Matthew had been in counseling and

20  the counselor had learned that Matthew had described anal and

21  oral sexual manipulation.

22  Q.   Do you recall whether or not Matthew Hansen's mother

23  indicated whether or not she had been in touch with police

24  officers or whether police were involved in the investigation of

25  alleged abuse of Matt?

273

1   A.   I do not recall that.

2   Q.   You indicated you conducted an examination.  You started

3   from the head and worked your way down?

4   A.   Yes.

5   Q.   Where did the examination take place?

6   A.   In my office there in Vancouver.

7   Q.   You indicated you started with the head and you worked your

8   way down.  At some point, did your examination include a genital

9   and anal examination?

10   A.   Yes, it did.  An external genital and anal exam.

11   Q.   Why were you conducting a genital and anal examination?

12   A.   For -- well, in a normal five-year pediatric exam, that's

13   part of the exam, but in this case also looking for external

14   injury, trauma.

15   Q.   What kinds of external injury or trauma were you looking

16   for?

17   A.   Anything out of the ordinary.

18   Q.   Were you looking for things such as bruises?

19   A.   Yes, if they were present.

20   Q.   Or redness?

21   A.   Yes, if it was present.

22   Q.   Or swelling?

23   A.   Yes.

24   Q.   Lacerations?

25        THE COURT:  Counsel, you're going at this as though it

1  wasn't 4:31.  I assume that Dr. Galaviz would like to get back

2  to Vancouver tonight, if you can finish in four, five minutes.

3         MR. CAMIEL:  I will do the best I can, Your Honor.

4         THE COURT:  I can tell you what he's going to say.  I'm

5  not sure why we are going through all this.  He did a physical

6  exam and it came up negative.

7     Right?

8         THE WITNESS:  Yes.

9         THE COURT:  What else do you have to add?

10  Q.  (By Mr. Camiel)  Doctor, when you conducted the anal

11  examination, how did you do that?

12  A.  I simply looked externally.

13  Q.  How was Matthew positioned?

14  A.  I don't recall exactly.  I generally try to make it as least

15  traumatic to the patient as possible because that's very

16  embarrassing to them, and I simply generally look when they are

17  standing.

18  Q.  Is it possible you had Matthew on your lap or over your knee

19  when you conducted that exam?

20  A.  No.

21  Q.  Had you conducted exams where there had been allegations of

22  child sexual abuse before this exam that you conducted?

23  A.  Since I'm not -- that's not my area, and generally it's an

24  office exam, I can't recall.  Maybe a handful in my five years

25  of being a physician.

275

1   Q.   You submitted an affidavit for the attorney general.   Do you

2   recall your affidavit that you submitted?

3   A.   Yes, I do.

4   Q.   Do you recall indicating to the attorney general that you

5   had -- you had been minimally exposed to child abuse cases?

6   A.   Yes.

7   Q.   When Shirley Spencer came in and explained to you what the

8   allegations were involving Matt, did you feel the need to refer

9   him to another physician to conduct the exam, or did you feel

10  that you would be able to conduct the exam and determine whether

11  or not there were any present injuries that might have been

12  caused by the alleged sexual abuse?

13  A.   The reason for the visit that day was to simply look to see

14  if there was any obvious physical injury to this child.

15  Q.   Did you see anything that even appeared to be suspicious as

16  having been caused by child abuse, sexual abuse?

17  A.   I recall, according to my note, that he was just -- kind of

18  kept to himself and was quiet, but as far as physical, visual,

19  other evidence, I didn't recall any.

20  Q.   Do you believe that if you had -- if there had been physical

21  injury present in Matt's genital or anal area that you would

22  have been able to observe that at the time you conducted the

23  exam?

24  A.   Again, I'm not an expert in this, but I -- if it was there

25  obvious, I would have picked it up.   Externally.

Spencer003169

276

1   Q.  After the exam was conducted, do you recall whether or not

2   you were ever contacted by any detectives or police officers

3   concerning your examination of Matt?

4   A.  I don't believe so.

5   Q.  Did you make a report, as is required by statute, concerning

6   suspected child abuse to anyone?

7   A.  I don't recall.

8   Q.  Were you familiar at that time with a statutory requirement

9   that you report suspected child abuse?

10  A.  Yes.  But I think I was in the intermediate.  I wasn't

11  the -- from my recollection, I wasn't -- this was already in the

12  process.  It wasn't new.

13  Q.  So it was your understanding that it had already been

14  reported?

15  A.  The fact that the patient had been with a counselor told me

16  that this was kind of an ongoing thing, part of an ongoing

17  process.

18  Q.  Did you have any understanding as to whether the police or

19  law enforcement had been notified?

20  A.  I believe so.

21  Q.  You believe you understood that they had been notified?

22  A.  Yes.  As far as having been with a counselor, I believe they

23  somehow were involved.  If that was -- that was part of their

24  job.

25  Q.  Did you refer Matt Hansen to anyone else for any additional

Spencer003170

277

1   or follow-up examination?

2   A.  According to my exam and my plan, I did not have that in my

3   plan.

4   Q.  If you had seen something that you were not certain about

5   based on your level of experience, would you have referred him

6   to another physician who had more experience?

7   A.  I think my job was just strictly to look for physical

8   evidence of injury, and so since I did not find any obvious

9   external evidence, at that point then I didn't pursue it any

10  further.

11          MR. CAMIEL:  Thank you.  That's all I have.

12                      CROSS-EXAMINATION

13  BY MR. SAMSON:

14  Q.  Dr. Calaviz, I just have some short questions.

15      First, you're not an expert in the area of child abuse?

16  A.  No, I'm not.

17  Q.  You've only been minimally exposed to that?

18  A.  That's correct.

19  Q.  And at the time, you had only been a practicing doctor who

20  had finished residency for about a year and a half?

21  A.  That's correct.

22          THE COURT:  So far I already heard those three

23  answers.

24          MR. SAMSON:  Yes, Your Honor.

25  Q.  (By Mr. Samson)  Doctor, you testified that if there had --

Spencer003171

279

1          MR. SAMSON:   Thank you.

2     Thank you, Your Honor.

3          MR. CAMIEL:   Your Honor, could I ask a couple

4     follow-up?

5                    REDIRECT EXAMINATION

6     BY MR. CAMIEL:

7     Q.   Doctor, if a five-year-old child is penetrated anally and it

8     results in tearing of tissue, can that result in scarring?

9     A.   Conceivably.

10    Q.   And might that scarring still be visible three weeks after

11    the incident of the penetration?

12    A.   It depends where the scarring is.

13    Q.   You didn't see any scarring or any indication that there

14    were any healed injuries, did you?

15    A.   Not to the extent of my exam.

16          MR. CAMIEL:   Thank you.

17          THE COURT:   Thank you, Doctor.   You may be excused.

18          THE WITNESS:   Thank you.

19    (Witness excused.)

20          THE COURT:   Okay.   We will take this up again at 9:30

21    tomorrow morning.

22    (Recessed.)

23                    C E R T I F I C A T E
      I certify that the foregoing is a correct transcript from
24    the record of proceedings in the above-entitled matter.

25    _____          January 15, 1997
              JULAINE V. RYEN                        Date

Spencer003173

# EXHIBIT P

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

NKDA
Q MEDS

UC
3/6/85         Rm 5
Dr. Gazi       540

See below     Height 43½    Wt. 43 pds
              Temp          BP.
              Head          Chest
              General    Playing & coloring book —
              Skin       talk to [illegible] to self story/
              Eyes       cooperative @ exam
              ENT
              Chest
              Heart
              Abdomen
              Extremities    Well [illegible]
              CNS

S/ Here for physical exam to R/o injury that
may have been sustained 2° child sexual abuse
by step father - recently disclosed.  Father
2 other children (by another woman) were apparently
sexually molested over period of ? 1-3 yar.
Seeing outside counselor / Y whave mother
described anal, digital and oral sexual manipulation
t/by father - he last time ~ 3 wks/ago.  Was led
[illegible] obvious - physical Y/o & @ last visit
- & stepfather ~ 3 wks/ago) had to appetite, [illegible]

SER -24
00001089
Peter Camiel
Spencer003797

## KAISER PERMANENTE
### MEDICAL CARE PROGRAM

| | DATE | LOCATION | STATION | |
|---|---|---|---|---|
| | | NAME | | SERVICE CO... |
| HEALTH RECORD NO. | | | O.O.B. | |
| GROUP NO. | | | MEDICARE CLAS... | |
| | BENEFIT ARRAY. | | | |

_self more, not interested in doing usual
things & just seemed generally ill x few days.
Main concern now is if any physical
injury has been done —
See R.E._   No evidence for any
physical injury presently.

VC

FEB 25 1986   KA —☺   meds ☺

CLINIC (SB) CASE: 641 ☺   T- 99.8

9. complains Po c/c cough, (R) ear pain, swollen
glands (R) +(L), sides of neck
cough & ST x 3-4 days. Ear ...
x 4 day

c/o Fr above

Px: ENT. @ TM is intact & very red
Throat is clear
(R) anterior & posterior cervical
adenitis

Lungs: clear to PEA

Tay: ROM

Rx: Amox ... 250 ... / 5 ... TID 150 mG
Elix of Tyl ē Cod ... ...
Rec: 10-14 days

SER -25

00001090
Peter Camiel

Spencer003798

# EXHIBIT Q

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

1

1                 UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF WASHINGTON

3                          AT TACOMA

4
     CLYDE RAY SPENCER, MATTHEW      )
5    RAY SPENCER, and KATHRYN E.     )
     TETZ,                           )
6                                    )
                  Plaintiffs,        )
7                                    )
            vs.                      )      NO. 3:11-cb-05424-BHS
8                                    )
     FORMER PROSECUTING ATTORNEY     )
9    FOR CLARK COUNTY JAMES M.       )
     PETERS, DETECTIVE SHARON        )
10   KRAUSE, SERGEANT MICHAEL        )
     DAVIDSON, CLARK COUNTY          )
11   PROSECUTOR'S OFFICE, CLARK      )
     COUNTY SHERIFF'S OFFICE, THE    )
12   COUNTY OF CLARK and JOHN DOES   )
     ONE THROUGH TEN,                )
13                                   )
                  Defendants.        )
14

15      DEPOSITION UPON ORAL EXAMINATION OF JAMES M. PETERS

16

17

18
                      Thursday, November 8, 2012
19                       Olympia, Washington

20

21

22

23

24

25

JOHNSON (James M. Peters, 11/8/12)

73

1     is that they have an inability to differentiate between

2     fact and fantasy?

3  A  The competency determination is made in court, and that is

4     one thing that a court would consider.

5  Q  And in evaluating Kate's competency on December 11 of 1984,

6     did you determine -- you, not a Court -- whether she could

7     distinguish fact from fantasy?

8  A  I don't recall that I did.

9  Q  All right.  And you recall that Rebecca Roe at one point

10    believed that Katie Spencer was unable to distinguish fact

11    from fantasy, at least as of December 27 of 1984?

12  A  I remember Rebecca Roe's report, and I read it again, and I

13    recall that she mentioned something about that in her

14    report in addition to other things in her report suggesting

15    that the child had been abused most probably by her father.

16  Q  Have you seen Rebecca Roe's recent report --

17  A  I saw it yesterday.

18  Q  -- she submitted in early --

19  A  I saw it yesterday --

20  Q  She didn't use those terms --

21  A  We're talking over -- oh, my gosh.

22  Q  Yeah, go ahead.

23  A  I saw it late yesterday afternoon.

24  Q  Okay.  She didn't use those terms that her father most

25    probably had abused Katie, did she?

JOHNSON (James M. Peters, 11/8/12)

97

1  Q  Did you have any understanding that Shirley Spencer had

2      made statements that she did not believe Ray had done

3      anything to Katie?

4  A  I know she was standing by her husband.  I remember that.

5  Q  Okay.  Did you know that Katie had stated that she did not

6      want to talk to boys about the abuse?

7  A  To whom and when?  I don't remember that.

8  Q  Okay.  You can take a look at Exhibit 3, if you'd like.

9      This is Rebecca Roe's report on page 1.

10  A  (Witness complying).

11  Q  Seven lines up from the bottom.

12  A  (Witness perusing document)  I see where that's written

13      there.  It says, "Sharon Krause had to spend several hours

14      one-on-one with victim who also indicated she would not

15      talk about it, quote, with boys, end quote."

16  Q  All right.  And staying on that page since you have it in

17      front of you, did you also know that Katie did not talk to

18      a female counselor about it?

19  A  Actually, that's in -- I see that is written in Rebecca

20      Roe's report, but that's not accurate.

21  Q  Well, Rebecca Roe reported that Katie would not talk to a

22      female counselor about it, correct?

23  A  I see what's written in Rebecca Roe's report, but as I told

24      you, that's inaccurate.  I talked to the female counselor

25      myself who told me that she had been speaking with Katie

JOHNSON (James M. Peters, 11/8/12)

98

1   since September and that on November 1st, 1984, Katie had

2   described the abuse to her using anatomical dolls.

3   Q   That was Ann Link, right?

4   A   Yes.

5   Q   November 1st was the first time you say -- you say -- Katie

6       Spencer reported it, correct?

7   A   I didn't say that.

8   Q   To Ann Link?

9   A   Oh, all I know is what Ann Link told me.  I don't know

10      about anything else.

11  Q   Okay.  And that first revelation that you're talking about

12      came to Ann Link as Ann Link told you on November 1st of

13      '84, correct?

14  A   Just to be clear, there had been prior revelations to

15      Shirley Spencer and to Sharon Krause.  The first

16      revelation --

17  Q   I'm just talking about Ann Link.

18  A   As far as I know, when Mr. Rulli and I talked to Ann Link

19      in Sacramento, she told us that Katie had disclosed to her

20      sexual abuse by Ray, described it with anatomical dolls,

21      including fellatio, my word, not hers, oral sex with a man,

22      on November 1st.

23  Q   That was after Sharon Krause had spent a substantial period

24      of time with Sharon Krause -- I mean with Katie Spencer,

25      correct?

JOHNSON (James M. Peters, 11/8/12)

112

1   Q   I'm not asking you whether -- other cases or anything like
2       that.  Did you personally supervise the Spencer
3       investigation?
4   A   Absolutely not.
5   Q   Did Art Curtis supervise the Spencer investigation?
6   A   I don't believe so.  I don't know what he -- I don't know
7       what happened in his --
8   Q   Can you --
9   A   I don't know what happened in his office, but I certainly
10      doubt it.
11  Q   And did any other prosecutor that you're aware of supervise
12      the investigation?
13  A   The only other prosecutors that were involved were just
14      tangential for routine matters, and I'm sure they did not.
15  Q   Who were they?
16  A   Mike Foister was present at the initial arraignment when
17      Mr. Spencer turned himself in in January.  And Jim Gavid, I
18      saw a note in the file that he must have appeared at a
19      hearing in March or April.  It was in his handwriting.
20      Other than that, the only other prosecutor that was
21      involved was -- of course, you know about Rebecca Roe, and
22      then the case was assigned to Barb Linde from the King
23      County prosecutor's office for about three and a half
24      months.
25  Q   Now, speaking of Rebecca Roe, she's a specialist in sex

1      appear to be specifically sexual; others could have been
2      indicative of lots of things.  And I'm pretty sure that's
3      what I said.
4   Q  Okay.  With regard to Katie Spencer's excessive
5      masturbation, is that documented anywhere in the file?
6   A  Yes, it's in Sharon Krause's report of Shirley Spencer.
7   Q  Okay.  How about --
8   A  Now, you may have --
9   Q  -- the underwear --
10  A  I'm sorry, Counsel.
11         Some inferences may have to be drawn.  I have some
12     notes.  Can I refer to them?
13  Q  Sure.
14  A  Okay.  This is -- these are notes that I took last week
15     from Sharon Krause's interview with DeAnne Spencer from
16     October 15th.  It would have been October 15, 1984.
17            MR. JOHNSON:  And could we just mark his notes
18     as Exhibit No. 44 if they are not deemed privileged?
19            MS. FETTERLY:  That's fine.
20            THE WITNESS:  Okay.
21            MS. FETTERLY:  44.
22                        (EXHIBIT NO. 44 MARKED)
23            THE COURT REPORTER:  44's been marked.
24  A  So with regard to what I call possible behavioral
25     indicators or red flags, some of which could mean lots of

JOHNSON (James M. Peters, 11/8/12)

134

1    cleared, and her brother said she made up stories; is that
2    correct?
3  A  That's obviously a multiple, compound question.  My -- I
4    declined or, excuse me, I expressed my personal belief at
5    the time that we would have difficulty proving the case,
6    and then in the context of all the other things that were
7    on my plate at that time, and our "You file it, you try it"
8    rule, I didn't want to try this case.  So my recommendation
9    was not to pursue it.
10  Q  Because it was weak, right?
11  A  It was definitely weak.
12  Q  All right.  Now, what did you do on the case with regard to
13    the case between November 27, 1984, and December 11 of
14    1984?
15  A  Nothing.  I was very busy with another -- with something
16    else.
17  Q  When was that meeting with Karen Stone?  I guess you said
18    maybe that was Art Curtis, but just to mention, a
19    prosecutor spoke with Sharon Krause, and you said you
20    weren't sure if that was Art Curtis or yourself.  Has
21    anything refreshed your recollection as to whether you had
22    that meeting with Sharon Krause about Karen Stone?
23  A  I think -- your question assumes something that may not be
24    accurate.  You're assuming there was a meeting.  I would --
25    more likely --

1     and 11 of 1984 was to determine if abuse really had

2     occurred; is that correct?

3  A  No.

4  Q  So your testimony that determining whether or not Katie

5     Spencer had been abused was not anything you were trying to

6     determine when you met with Katie Spencer on December 10

7     and December 11 of 1984?

8  A  I am saying that, yes.

9  Q  Okay.

10 A  That had already been determined by the investigators.  My

11    job was to find out if she was competent and could testify.

12 Q  If Katie Spencer had told a consistent story to you on

13    December 11 of 1984 that you believe established that Ray

14    Spencer had abused her sexually, is it -- and you had

15    videotaped that interview, you would have used that video

16    as evidence of probable cause; is that correct?

17 A  No, the video wasn't evidence of anything.  It was the

18    child's statement.  Whether there was a video or not would

19    have been irrelevant.  Prior statements that she made to

20    Sharon and Shirley and Ann Link were not videoed, but they

21    were evidence of probable cause.

22 Q  So you would not have used a videotape reflecting Katie

23    Spencer telling a consistent, believable story about sexual

24    abuse as evidence of probable cause in further proceedings

25    regarding Ray Spencer; is that correct?

145

1    to probable cause to arrest, wouldn't you have?

2  A  Counsel, if I had been the lead prosecutor in the case from

3    the get-go, the tape would have been disclosed from the

4    get-go.  I was not the lead prosecutor in the case from the

5    time it was charged until probably the second or third week

6    of April 1985.

7  Q  Who was that?

8  A  Barb Linde.

9  Q  Barb Linde was the lead prosecutor in the case in the time

10    period you just described; is that correct?

11  A  She was.

12  Q  Is there any documentation that reflects that?

13  A  Yes, there is.

14  Q  What is that?

15  A  There are three letters from Art Curtis dated January 9,

16    1985.  One is to Norm Maleng, the King County prosecutor,

17    thanking him for assigning a deputy prosecuting attorney,

18    outside counsel, to prosecute Mr. Spencer.

19        The second letter is to Rebecca Roe forwarding the

20    reports to her and similarly thanking King County for

21    agreeing to take over the case.  And the third letter is to

22    Leland Davis, the Chief of Police of Vancouver, similarly

23    saying that the case had been referred to outside counsel,

24    and at the end of the letter asking him to relay that to

25    his officers.  Because of the sensitive nature of the case,

JOHNSON (James M. Peters, 11/8/12)

146

1  it had been referred to outside counsel.  There's

2  additional documentation of that if you'd like me to

3  clarify.

4 Q Sure.

5 A In my review of the prosecutor's file, which I've done in

6  the last couple of months, I encountered a note.  It was a

7  While-You-Were-Out note that was written by a receptionist

8  on April 4, 1985, documenting a call from Barb Linde to Art

9  Curtis requesting a call back.  I also noted a -- one of

10  those small-sized yellow pads, the five-by-seven yellow

11  pads, a copy of that -- it wasn't yellow; it was a copy --

12  in Art Curtis' handwriting of notes that he took, and I

13  recognized Mr. Curtis' handwriting because I worked with

14  him first in the public defender's office for a year and

15  then more than ten years in the prosecutor's office,

16  documenting his call back to Barb Linde on April 4th, 1985.

17    And, by the way, I was in Hawaii at that time.  I

18  wasn't even in the office, where Barb Linde informed

19  Mr. Curtis that she had an aggravated murder trial

20  scheduled for the last week of May and the first week of

21  June of 1985.

22    Additional documentation is -- are letters dated, as

23  I recall it, May 9.  They wouldn't have been written on

24  May 9 because I was in Sacramento with Jim Rulli, but they

25  would have been dictated.  We didn't have computers back

1   Q  Did you take her to the mall that day?

2   A  I did not.

3   Q  Would that have been proper?

4   A  For me to take a child away from the office to a shopping

5      location?  Would have been improper.

6   Q  Yeah, that's my question.

7   A  For me as a male, no, that would have been improper.  I

8      wouldn't have done that.

9   Q  All right.  Did you review Katie's story with her on that

10     day?

11             MS. FETTERLY:  Are you talking about December 10

12     again?  Are we still --

13             MR. JOHNSON:  Still are, yes.

14  A  I've told you I don't have any recollection of the meeting.

15     I know it happened.  I just don't have recollection of it.

16  Q  (By Mr. Johnson)  Just trying to ring some bells.

17             Was Sharon Krause on that day with you and Katie?

18  A  I don't recall the meeting, so I'm not sure.  I can

19     speculate, but I don't recall.

20  Q  All right.  Do you know if Sharon Krause took any notes?

21     Does that ring a bell about what happened on that day with

22     Katie Spencer?

23  A  As I said, I don't recall independently the meeting.

24  Q  Any idea about how long the meeting lasted, then?  If you

25     don't recall, could it have lasted all day or maybe two

JOHNSON (James M. Peters, 11/8/12)

158

1  Q  For whom?

2  A  For Mr. Curtis and for myself and for whoever else

3     eventually needed it if a decision was made to file

4     charges.

5  Q  Like Ray Spencer?

6  A  Eventually.

7  Q  Because he absolutely would have needed it had you made a

8     decision to file charges, correct?

9          MS. FETTERLY:  Object as to form.

10         If you can answer.

11  A  Yes.

12  Q  (By Mr. Johnson)  Is it also true that you decided to

13     videotape Katie Spencer so that you could establish that

14     she could tell the story on her own?

15  A  I really don't recall my motivation.  You're asking me what

16     my motive was 28 years ago, and I don't recall that.

17  Q  You would have recorded this or whoever decided to record

18     it -- let me strike that.

19         The interaction with Katie Spencer would have been

20     recorded so that one could ascertain if she could tell her

21     story without suggestions from you, the interviewer; is

22     that correct?

23  A  It was recorded to document what she said.

24  Q  And one of the purposes of that was to determine whether or

25     not she could tell her story without suggestions from you,

JOHNSON (James M. Peters, 11/8/12)

163

```
 1   Q  All right.
 2   A  Not with equipment that was available there, though.
 3   Q  Okay.  Had you ever been involved in a case where an
 4      alleged child sex abuse victim had been videotaped at the
 5      Clark County Sheriff's office?
 6   A  No, I don't think so.
 7   Q  After this, had you ever -- did you ever do it again?
 8   A  Did I ever do it again?
 9   Q  Yes.
10              MS. FETTERLY:  Are you suggesting in that
11      question that this witness videotaped another child
12      witness, or are you suggesting that Clark County Sheriff's
13      office did?  Your question is unclear.
14   Q  (By Mr. Johnson)  Okay.  Were you ever involved in an
15      interview of a child sex abuse victim at the Clark County
16      Sheriff's office after this interview with Katie Spencer?
17   A  Oh, I have no idea.  I don't recall.
18   Q  Do you recall --
19   A  I can tell you -- I can tell you I never ever did an
20      investigative interview with a child, meaning an initial
21      interview, a fact-finding interview.  I've never done one
22      of those with any witness.
23   Q  I'm talking about — we both know there's an interpretation
24      difference of opinion, but what I'm asking you about is the
25      videotaping of a child sex abuse victim.
```

JOHNSON (James M. Peters, 11/8/12)

164

```
 1        Were you, Mr. Peters -- I'm talking about you -- ever
 2   again after December 11, 1984, involved in interviewing a
 3   child witness at the Clark County state -- Sheriff's
 4   office --
 5   A  No.
 6   Q  -- with regard to sex abuse allegations?
 7   A  No.  Videotaping an interview of the child?  Is that what
 8   your question was?
 9   Q  Yes.
10   A  No.
11   Q  Yes.  All right.  So this one stuck out in your mind; is
12   that correct?
13   A  Which one stuck out of in my mind?
14   Q  This videoed interview of Katie Spencer.  It's the only one
15   you ever did over there, right?
16   A  The fact of the video interview stuck out in my mind, yes.
17   The fact of the interview.
18   Q  You wouldn't -- okay.
19        You never caused this videotape to be disclosed to
20   anyone, did you?
21   A  I believe Mr. Curtis knew about it and certainly Sharon
22   Krause knew about it.
23   Q  Did you cause it to be disclosed to Art Curtis?
24   A  I just testified that I believe Art Curtis knew about it.
25   What do you mean by "cause it to be disclosed"?  Maybe
```

JOHNSON (James M. Peters, 11/8/12)

193

1    testifying to, but we're just going to talk about Katie's

2    words.  Okay.  Now, you said that you -- you talked about

3    why you videotaped this.  Is it fair to say that you

4    videotaped this interview because you didn't feel you could

5    properly rely on Sharon Krause's reports to establish

6    Katie's competency?

7  A  Absolutely not.  She was a five-year --

8  Q  Had Sharon --

9  A  She was a five-year-old, and it was clear from the reports

10   that her competency was questionable.

11  Q  Thank you.

12         After -- I'm going to come back to that, but I want

13   to ask you, did you determine after you evaluated Katie's

14   competency on December 11, 1994, [sic] that she was

15   competent to provide evidence against Ray?

16  A  No, I determined that she might be competent.  She probably

17   would be competent, not that she was competent.  It was

18   questionable.  I've always believed that this was a very

19   difficult and questionable case.

20  Q  Did you determine that Katie Spencer was competent to

21   provide evidence against Ray such that he should be

22   arrested?

23  A  I believed that she was competent to testify, that if you

24   look at the interview as a whole and not just pick out

25   little parts, that she was -- there was a good chance she

JOHNSON (James M. Peters, 11/8/12)

246

1    that you had a duty to disclose certain items of evidence,

2    correct?

3  A  Witness statements, exculpatory material, yes.  Certain

4    materials --

5  Q  That wasn't my question.

6  A  Well, what is your question then?

7  Q  Back in 1984, you understood that you had a duty as a

8    prosecutor to disclose certain items of evidence to the

9    defense?

10  A  Yes.

11  Q  All right.  And at that time were you in the habit of

12    disclosing irrelevant materials to the defense in a

13    criminal prosecution?

14  A  Yes.

15  Q  Okay.  So you might turn over anything; is that correct?

16  A  Yes.

17  Q  Even if it had nothing to do with the case?

18  A  Well, if it was -- no, if it had nothing to do with the

19    case, it wouldn't have been in the file.

20  Q  You agree the Katie Spencer medical report would have been

21    disclosed to the defense as a routine matter if you had it,

22    correct?

23  A  I do, and I believe it would have been had the case gone to

24    trial because Sharon and I would have got together and

25    compared her reports with the reports that were in the

1    prosecutor's file, which I had just taken over a couple

2    weeks before, and anything that was not there would have

3    been disclosed.

4  Q  So you're saying that there was no obligation to disclose

5    it even if you had it prior to the plea of Ray Spencer?

6  A  I didn't say that, Counsel, at all.

7          MS. FETTERLY:   No.

8  Q  (By Mr. Johnson)   Okay.   All right.   You agree that medical

9    exams of potential sexual abuse victims can help you either

10    confirm or refute the allegations?

11  A  Absolutely.

12  Q  Okay.   And do you differentiate between types of rape?

13    Have you done that in your experience?

14  A  Under Washington law the definition of rape includes

15    oral-genital contact, and it includes penetration of the

16    genital area or the rectum, however slight.   So, yes, you

17    can distinguish types of rape under Washington law, at the

18    time, anyway.

19  Q  And have you ever offered opinions that there is a

20    difference between a nonforcible rape and a forcible rape?

21  A  Oh, yes, there's definitely a difference.

22  Q  Okay.   What's a nonforcible rape?

23  A  Well, there are sex offenders whose modus operandi does not

24    involve force, and in particular with child molesters, in

25    particular, incest cases, where the offender has a loving

248

1    relationship with the child, but also has a sexually

2    deviant interest, there is often no force, in contrast with

3    a stranger or somebody motivated by anger or power or

4    control who might not care about the child and might engage

5    in forcible rape.  That's the distinction, as I understand

6    it, in my experience.

7  Q  Okay.  We talked a little bit about offering legal advice

8    to the police.  Do you know what I'm talking about when I

9    talk about the Salmon Creek Motel incident?

10 A  The incident with Little Matt?

11 Q  Yes.  Directing you to that, did you offer legal advice to

12    the police regarding following up on the incident with

13    Little Matt at that motel?

14 A  Well, I -- as I recall, and my recollection is vague, but,

15    as I recall, Sharon came in with information, and I was

16    looking for some corroboration, so I asked them to go out

17    and see if they could get some corroboration.  I don't

18    think that's legal advice.  I think that's asking for

19    follow-up information pursuant to making a decision about

20    whether to seek an arrest warrant.

21 Q  Who did you ask and what did you ask them to do?

22 A  I don't have any recollection.  It's too long ago.

23 Q  Mr. Davidson told him you told -- strike that.

24        Mr. Davidson told us that you told him to go over to

25    the Salmon Creek Motel and do some things.  Do you recall

JOHNSON (James M. Peters, 11/8/12)

249

1    that?

2   A  I don't recall it, but it certainly could have happened,

3    and if it did, it's probably reflected in the affidavit.

4   Q  And you were asking then -- you would have been asking them

5    to gather evidence, correct?

6   A  Follow-up information.  Routine --

7   Q  That would be to gather evidence regarding the incident

8    with Little Matt, as you described it, correct?

9   A  Yes.

10   Q  I just want to go through some things here.  Did you

11    disclose to Ray Spencer or to his lawyer at any time the

12    report of the medical exam of Matt Hansen?

13   A  No.  I don't believe I ever saw that report.

14   Q  Did you disclose to Ray Spencer or his lawyer at any time

15    the Rebecca Roe report?

16   A  No, I don't believe that was disclosable.  That was just an

17    opinion of another prosecutor.

18   Q  Did you disclose to Ray Spencer or his lawyer at any time

19    any information whatsoever to apprise them that you had met

20    with Katie on December 10 of 1984?

21   A  No.

22   Q  Did you disclose to Ray Spencer or to his lawyer at any

23    time any information whatsoever that you had conducted a

24    videotaped interview of Katie Spencer on December 11 of

25    1984?

1   A   Oh, yes.

2   Q   All right.  And you traveled out of the jurisdiction from

3       Clark County to Sacramento, California, in this case,

4       didn't you?

5   A   Yes, I did.

6   Q   Back then, was that your custom and practice?

7   A   No, it was only time I ever did that, except going to

8       Portland perhaps or somewhere in the Portland metropolitan

9       area.

10  Q   Would you agree with this statement, as we sit here today,

11      there were problems with the investigation and prosecution

12      of this case?

13          MS. FETTERLY:  Objection.

14  A   There are challenges with every prosecution, and those

15      challenges normally, if the defense attorney believes or

16      the defendant and the defense attorney believe it's

17      sufficient, are weighed by a jury in determining the

18      credibility of the evidence.  There are always challenges.

19  Q   That word "challenges," if a case has challenges, would you

20      say that's the same thing as a case being unwinnable?

21          MS. FETTERLY:  Object to the form.  Are you

22      assuming by that that it was unwinnable all the way up to

23      the time of the guilty plea?

24          MR. JOHNSON:  I'm not assuming anything.  I'm

25      asking if he has an understanding of the English language.

263

1                    C E R T I F I C A T E

2              I, DIXIE J. CATTELL, the undersigned Registered

3      Professional Reporter and Washington Certified Court Reporter,

4      do hereby certify:

5              That the foregoing deposition of JAMES M. PETERS was

6      taken before me and completed on the 8th day of November,

7      2012, and thereafter transcribed by me by means of

8      computer-aided transcription; that the deposition is a full,

9      true and complete transcript of the testimony of said witness;

10             That the witness, before examination, was, by me,

11     duly sworn to testify the truth, the whole truth, and nothing

12     but the truth, and that the witness reserved signature;

13             That I am not a relative, employee, attorney or

14     counsel of any party to this action or relative or employee of

15     such attorney or counsel, and I am not financially interested

16     in the said action or the outcome thereof;

17             That I am herewith securely sealing the deposition of

18     JAMES M. PETERS and promptly serving the same upon MR. DOUGLAS

19     JOHNSON.

20             IN WITNESS HEREOF, I have hereunto set my hand

21     this_____ day of_____, 2012.

22

23                        _____

24                        Dixie J. Cattell, RPR, CCR
                          NCRA Registered Professional Reporter
25                        Washington Certified Court Reporter CSR#2346
                          License Expires July 16, 2013.