# EXHIBIT V

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

## REPORT OF REBECCA J. ROE

I am licensed to practice law in the State of Washington and have been so licensed since 1977. I obtained my Bachelor of Arts Degree from the University of Washington in 1973. I attended Seattle University School of Law and obtained my Juris Doctorate Degree in 1977. I am presently a principal in the law firm of Schroeter, Goldmark, and Bender located in Seattle, Washington. I have been engaged in the private practice of law with the firm of Schroeter, Goldmark, and Bender since 1994. My practice now consists almost exclusively of representing plaintiffs in personal injury cases, employment cases, and other claims in which damages are sought.

Between 1977 and 1994 I was employed as a Deputy Prosecuting Attorney for King County. I was one of three Deputy Prosecutors that formed the Special Assault Unit in 1979. (The Honorable Robert S. Lasnik was one of the others.) The Unit was responsible for prosecuting child sexual abuse cases. A foundation for the Unit was the "joint interview." The "joint interview" meant a deputy prosecutor and detective would jointly interview child victims to determine whether the child gave a credible report of abuse and was competent to testify. Other purposes were to build rapport between the child and the prosecutor in the event the case was filed and going to trial.

I have personally prosecuted hundreds of child sex abuse cases and have interviewed hundreds of child victims as part of my prosecution of these cases.

I was the supervising Senior Deputy Prosecutor of the Special Assault Unit for King County between 1981 and 1994. My duties in that position included supervision of up to 12 deputy prosecuting attorneys in that unit which was responsible for the prosecution of all sex crimes and all crimes against children including child rape cases and cases of physical abuse

1

It is my opinion that the reports of Detective Krause dated March 7, 21, and 25, 1985, which reported her later interviews with Matthew Spencer and Kathryn Spencer were further evidence which, if believed by jurors, would support a finding by a jury that Mr. Spencer was guilty of the rape of his two children and stepson. There was nothing in any of these reports or the earlier reports of Detective Krause which would lead a reasonable prosecuting attorney to believe that Mr. Spencer was innocent of the charges which were filed against him or that the allegations contained in the reports were fabricated or the result of coercion.

The video recording of the interview of Mr. Peters' December 11, 1984 interview of Kathryn Spencer prior to the filing of the original information also did not contain evidence that Mr. Spencer was innocent of the charges which were filed against him two weeks later. Although the investigation of a child abuse victim's allegations are done by law enforcement officers as it was in this case, in King County we had a protocol for a joint interview of the child prior to making a charging decision. The purpose of the joint interview was to evaluate the child's competence as a witness, evaluate the credibility of the child, and assess the likelihood the child would be able to repeat in court the allegations that he or she had previously made to law enforcement officers. The interview conducted by James Peters on December 11, 1984 was typical of this type of interview. Kathryn's demeanor, which initially included a reluctance to talk about the events, was also typical of many young victims of sexual abuse who are reluctant to report allegations. There are many reasons children are reluctant to talk about abuse. They are often told by their abusers not to tell anyone about the abuse. Children are often embarrassed to talk about what happened. They frequently feel guilty or ashamed and believe they are somehow at fault or did something wrong. When the perpetrator is a person of authority in the child's life, as clearly a parent would be, there are often great pressures upon the child not to

8

disclose because the parent is often someone they love, despite the abuse. More often than not, children were reluctant for one reason or the other. This makes further questioning necessary even if a child initially does not disclose at the beginning of an interview.

I have received the report of plaintiff's liability expert William Bernet M.D. and disagree with many of his opinions, expressed as conclusions, concerning the December 11, 1984 interview. Contrary to Dr. Bernet's statements, there were no major inconsistencies in Kathryn's narrative concerning the abuse once she began to speak about it. She remained consistent that the abuse took place in the living room at the "house by the river." She reported her father as perpetrator of the abuse even when given other choices by Mr. Peters. Dr. Bernet criticizes the presence of Kathryn's mother during the interview. While not our preference, this was a common practice at the time. He criticizes the use of anatomically correct dolls. The use of dolls was accepted practice at the time. He criticizes the fact that the tape was turned off while the parties took a break at one point during the interview. In my experience it is not unusual for breaks to occur prior to the completion of a child interview since a child's attention span and ability to focus is much less than an adult's requiring more frequent breaks.

In my opinion this interview was not exculpatory and was not evidence of innocence on the part of Mr. Spencer. Although it would have been produced in discovery prior to Kathryn's testimony if charges were filed, established legal precedent in 1984 and 1985 did not require that it be disclosed at the time that charges were filed. The timing of the disclosure often varied at this time from county to county. In my opinion, given the standard of practice in December of 1984 nothing in this interview was so coercive or abusive that it would lead a reasonable prosecutor to know that the techniques used would yield false information.

9

My rate of compensation for records review and other matters relating to serving as an expert witness in this case is $300 per hour.

Dated November 7 2012

REBECCA J. ROE

# EXHIBIT W

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY )
SPENCER and KATHRYN E. TETZ, )
                         )
          Plaintiffs, )
                         )
    vs.                  )    No. 11-cv-05424-BHS
                         )
FORMER DEPUTY PROSECUTING    )
ATTORNEY FOR CLARK COUNTY JAMES )
M. PETERS, DETECTIVE SHARON    )
KRAUSE and SERGEANT MICHAEL     )
DAVIDSON,                   )
                         )
          Defendants. )

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

ARTHUR DAVID CURTIS

DATE TAKEN:   December 10, 2012
TIME:         9:00 a.m.
PLACE:        613 W. 11th Street
             Vancouver, Washington

COURT REPORTER:   Teresa L. Rider, CRR, RPR, CCR

Rider & Associates, Inc.

360.693.4111

ARTHUR DAVID CURTIS   12.10.12

Page 20

1       Q.   Do you know -- I'm sorry.  I cut you off.  You

2   said no.

3       A.   No, I don't know if that happened.  No meaning

4   that I don't know if that occurred or not, no.

5       Q.   Do you know if Shirley Spencer was polygraphed?

6       A.   No, I don't know.

7       Q.   Do you know or did you become aware that

8   Shirley Spencer had been abused, sexually abused, as a

9   child?

10      A.   No, I did not know that.

11      Q.   Are you aware that the Washington Supreme Court

12   has actually ruled, at least in one case, that a witness

13   reporting abuse who's also been a sex abuse victim

14   themselves is not reliable?

15           MR. FREIMUND:  Object to the form.

16           You can still answer, though, sir.

17           THE WITNESS:  I'm not aware of that case.

18   BY MS. ZELLNER:

19      Q.   When you made the assignment to Mr. Peters,

20   explain to me what that assignment entailed.  What were

21   his duties when you made the assignment?

22      A.   To evaluate the case to see whether there was

23   sufficient evidence for us to charge.

24      Q.   And did Mr. Peters report back to you that

25   there was sufficient evidence for you to charge?

Case 3:11-cv-05424-BHS   Document 168-11   Filed 03/21/13   Page 9 of 31

1      A.   Yes.

2      Q.   Did Mr. Peters - and we're just talking about

3  the first arrest - did Mr. Peters ever report to you

4  that he did not think that the case should be charged?

5      A.   Not that I recall.

6      Q.   Did you rely on Mr. Peters' evaluation of the

7  sufficiency of the evidence to charge the case?

8      A.   Yes.

9      Q.   And I'm assuming that you didn't conduct an

10  independent evaluation of the legal sufficiency of the

11  evidence yourself, did you?

12     A.   Well, I discussed the -- yes, I did.  I

13  discussed the -- what Mr. Peters had determined in his

14  interview that he conducted with Katie prior to filing

15  the charge.

16     Q.   And is that -- which interview are you

17  referring to?

18     A.   I don't know what interview it was.  But as I

19  recall, he interviewed the girl and we filed the charge

20  -- I filed the charge.

21     Q.   Right.  Are you referring to the videotaped

22  interview that was done December 11th, 1984?

23     A.   I don't know if it was the videotaped interview

24  or whether it was a separate interview.  I just know

25  that he had interviewed her.

ARTHUR DAVID CURTIS   12.10.12

1      Q.   And tell me, if you can, what did Mr. Peters
2  tell you about his interview of Katie Spencer that
3  convinced you that charges should be filed.
4      A.   Well, as I recall, he told me that he had
5  interviewed her about the allegations, that she appeared
6  to him to be competent, that she would stand up under
7  scrutiny on the witness stand.  He thought he could use
8  her as a witness, and that she was believable in her
9  allegations against Mr. Spencer.
10     Q.   So he told you that she was competent and she
11  was also credible.  Would that be a fair statement?
12     A.   Yes.  In his opinion, yes.
13     Q.   And is it also a fair statement that you relied
14  exclusively upon that opinion to file the charges?
15         MS. FETTERLY:   Object as to form.
16  BY MS. ZELLNER:
17     Q.   You can answer.
18     A.   I can't say exclusively because I probably
19  conversed with Sharon Krause, as well.
20     Q.   So assuming that you talked to Sharon Krause
21  also about the allegations, would it be a fair statement
22  to say that based upon what Sharon Krause told you and
23  what Jim Peters told you that you decided then to file
24  the charges?
25     A.   I probably would have read the police reports,

ARTHUR DAVID CURTIS   12.10.12

1   as well.  So it would have been a combination of those

2   three factors:  of my personal review of the police

3   reports and the allegations contained therein, my

4   conversation with Sharon Krause as to her assessment of

5   the victim and Jim Peters' input as to his assessment,

6   as well.  It was probably a combination of those three

7   things.

8       Q.  Of those three things, did any of those three

9   things have more weight than the others with you in

10  making that decision?

11      A.  No, because it was all pretty -- as I recall,

12  it was all pretty consistent.  Everybody was basically

13  concluding the same thing.

14      Q.  Do you know if prior to making the charging

15  decision, other than the police reports, did you ever

16  look at or review a videotape that was made December

17  11th, 1984, of Jim Peters' interview with Katie Spencer?

18      A.  I don't believe that I reviewed that tape, no.

19      Q.  Do you know if prior to filing the charges on

20  January 3rd, had you been informed that there was a

21  videotape?

22      A.  Not that I recall.

23      Q.  And would you expect one of your deputy

24  prosecutors, if they had videotaped the interview with

25  the child, a child witness in a sex abuse case, to have

ARTHUR DAVID CURTIS   12.10.12

Page 24

1   informed you of that?

2       A.   Not necessarily, but I can't say it -- that's

3   all I can say.  Not necessarily.

4       Q.   If you had been informed that there was a

5   videotape of the child, would you have wanted to have

6   reviewed the videotape before making the charging

7   decision?

8       A.   I may have.

9       Q.   We'll come back to the videotape.  But were you

10  at some time made aware that a videotape of Katie

11  Spencer had been made?

12      A.   Yes.

13      Q.   Do you remember when you learned that there was

14  a videotape that had been made?

15      A.   Well, from what I can recall, I don't remember

16  anything about a videotape until fairly -- well, fairly

17  recently in the scheme of the time of this case.  It was

18  after he was released from prison and the post-release

19  issues were occurring.

20      Q.   And just for point of reference, that was in

21  2009.  After you learned that there had been a videotape

22  made, have you ever reviewed that videotape up until

23  today?

24      A.   Yes.  My recollection is that that was the

25  first that I knew of the videotape.  And when I became

ARTHUR DAVID CURTIS   12.10.12

1   aware of its existence, I wanted to review it

2   personally, which I did.

3       Q.   And you probably reviewed it in 2009 or '10,

4   somewhere in that time frame?

5       A.   Thereabouts, right.

6       Q.   When you reviewed the videotape, had you been

7   provided with an official court transcript or court

8   reporter transcript of the video?

9       A.   I don't believe so.  I believe I just reviewed

10  it in the office next to my office on a TV.  I plugged

11  the video in and I just looked at it.  I don't recall a

12  transcript being attached to it.

13      Q.   So if we go back to -- and we'll come back to

14  the videotape -- but if we go back to the January

15  charging decision, would you characterize from that

16  point forward your involvement in the Spencer case as

17  actively involved, were you actively involved in the

18  case?

19      A.   The case was assigned to Mr. Peters, and I

20  would say I was active in an oversight capacity.

21  Because he was a Vancouver police officer, it was deemed

22  to be a quote, unquote, high profile case, and part of

23  my office guidelines was to keep me informed.  Part of

24  my office guideline was to keep me informed on all high

25  profile cases.

ARTHUR DAVID CURTIS   12.10.12

Page 29

1     Q.   She also notes that on page 5 of Shirley's

2   handwritten statement, she says, where child talked

3   about rubbing Shirley, and she comments, it creates

4   questions about fact versus fantasy.  I believe this

5   point is a built-in reasonable doubt.

6          Were you aware that when she's describing

7   Shirley's letter, that there's actually an entry on page

8   5 where Katie Spencer talked about rubbing Shirley?

9   Were you aware of that statement that Katie had made?

10     A.   I don't recall.

11     Q.   When Rebecca Roe's report came in, I'm sure

12   that you reviewed it carefully, correct?

13     A.   If I had the report, I would have reviewed it.

14   I don't have independent recollection of reviewing it.

15     Q.   Is it possible that, perhaps, the report went

16   to someone else other than you, like, maybe it went to

17   Mr. Peters?

18     A.   Oh, it would have gone to the assigned deputy,

19   yeah.  This report would not -- probably would not have

20   come to me directly.

21     Q.   So it's possible that maybe you didn't see the

22   report before you made the charging decision in January?

23     A.   Well, I don't have any independent recollection

24   of reviewing the report, so I guess to answer your

25   question, yeah, it's possible.

1          A.   It wouldn't be uncommon.

2          Q.   This is something that -- not this particular

3     report, but you've seen this type of documentation from

4     the sheriff's office to your office saying we're

5     referring the case to you.

6          A.   Yeah, it's kind of a red flag to us that we

7     don't intend to do anything more unless there's a

8     follow-up request by the prosecutor.

9          Q.   So is it a correct statement that the charging

10    decision that was made was based upon the police

11    reports, sounds like the Shirley Spencer letter,

12    possibly Rebecca Roe's report, but certainly an

13    interview that Jim Peters did with Katie Spencer, would

14    that be fair?  Is that everything that made up the

15    probable cause to charge?

16         A.   It would be whatever was in the police report

17    in conjunction with Mr. Peters' interview, of Katie,

18    which would have been a crucial piece of evidence, in

19    conjunction with -- yes, if Shirley Spencer's letter was

20    in the file and part of the police report, then that

21    would have been part of the review.

22         Q.   And if we look at Exhibit 3, it's the

23    information that was filed.  Could you just identify

24    that document and your signature?

25              MR. FREIMUND:  When you get a chance, could we

ARTHUR DAVID CURTIS   12.10.12

1      Q.  And after the interview when Mr. Peters advised

2   you, he advised you, did he not, that the case was

3   viable and it should be filed?

4      A.  I think he expressed the reservations about the

5   girl and whether or not she could withstand scrutiny,

6   but I believe he concluded that she was, like I said

7   earlier, she was competent, although barely, and would

8   be able to testify truthfully as to what had occurred.

9      Q.  You would agree that competency is really a

10  different determination than credibility, would you not?

11     A.  Correct.

12     Q.  But Mr. Peters had informed you that he

13  believed that she was competent, I think you said

14  barely, and that I'm assuming that she also was credible

15  in her allegations.

16     A.  Yes.  Competency is a threshold determination

17  that has to be made by the judge prior to trial.  He

18  could have found her credible but not competent.

19     Q.  Right.  And typically in a competency

20  evaluation, questions about the abuse itself are not

21  even asked; isn't that right?  The questions are about

22  whether the child knows their birthday and where they

23  live and their ABCs and things like that, wouldn't you

24  agree?

25     A.  Yes.

ARTHUR DAVID CURTIS    12.10.12

Page 45

1          Q.   Right.  And, actually, you are aware that Brady

2    disclosures have to be made regardless of whether

3    there's a trial or not.  Are you aware of that?

4               MR. FREIMUND:  Object to the form.

5               You may answer.

6               THE WITNESS:  Brady is a continuing obligation

7    on the part of the prosecution, yes.

8    BY MS. ZELLNER:

9          Q.   And do you have any knowledge as to whether or

10   not your office ever produced the videotaped statement

11   of Katie Spencer that was made on December 11th, 1984,

12   to the defense prior to Mr. Spencer's guilty plea?

13         A.   I don't have any personal knowledge of that.

14   And I'd like to also clarify my prior answer where I

15   said there usually was a continuing obligation on both

16   sides to produce evidence.  If you look at the last page

17   of the omnibus application, it says:  All information

18   promised to be supplied in the future will be provided

19   ten days before trial.  That was the specific agreement

20   in this case.

21         Q.   Right.  And this case was actually first set

22   for trial on February 27th, 1985, correct, then it was

23   continued?  But the original trial date on the Spencer

24   case was February 27th, 1985, right?

25         A.   I don't recall.

ARTHUR DAVID CURTIS    12.10.12

1        Q.  Are you aware that the case was continued a

2   couple of times?

3        A.  I don't have specific recollection of that, no.

4   It wouldn't surprise me because most of these cases got

5   continued past the first trial date.

6        Q.  Sure.  So actually, the statement that you read

7   that it was to be provided in advance of the trial, ten

8   days before trial, that would apply to the trial date

9   that was pending at the time that this motion was made,

10  right?

11           MS. FETTERLY:  Object as to form.

12  BY MS. ZELLNER:

13       Q.  Whatever the trial date was, the disclosures

14  had to be made ten days in advance; is that right?

15       A.  That's the specific agreement here, correct.

16       Q.  Right.  So if the trial date was February 27th,

17  1985, the disclosures had to be made by February 17th,

18  1985, correct?

19           MS. FETTERLY:  Object as to form.

20           THE WITNESS:  Yes, unless the parties knew that

21  there was going to be a continuance, which I don't know

22  if that -- there's a lot of informal discussion that

23  goes on between the attorneys on trial dates.  Defense

24  might have said I'm going to ask for a continuance and

25  Mr. Peters might have said, fine, I won't oppose it,

ARTHUR DAVID CURTIS   12.10.12

Page 47

1   because that's pretty normal course of action.

2   BY MS. ZELLNER:

3       Q.   But there's no question that all of Katie

4   Spencer's statements had to be produced within ten days

5   of the trial date; is that correct?

6           MS. FETTERLY:  Object as to form.  It says

7   witnesses.

8   BY MS. ZELLNER:

9       Q.   Isn't that what you just read to us?

10      A.   No.  It says ten days before trial, meaning the

11  actual trial, not the trial date.

12      Q.   You think that's the Brady disclosure

13  requirement, regardless of what this document says?

14          MS. FETTERLY:  Object as to form.  You're

15  talking about two different things, statement of

16  witnesses or Brady information.

17          MS. ZELLNER:  I'm just asking him his

18  understanding of Brady.

19  BY MS. ZELLNER:

20      Q.   If your disclosure requirements were limited to

21  whether or not the case went to trial --

22      A.   Brady is a continuing obligation.

23      Q.   -- regardless --

24      A.   In other words, you can't hold on to -- you

25  don't hold off Brady information that you have in your

ARTHUR DAVID CURTIS    12.10.12

Page 48

1    possession and wait ten days before trial.

2        Q.   Right.   We're in agreement.

3             You would agree that the videotape which you

4    found out about in apparently 2009 and was made December

5    11th, 1984, had to be disclosed prior to the guilty plea

6    of Ray Spencer.

7             MR. VELJACIC:   Object to form.

8             THE WITNESS:   There was a discussion that

9    occurred after I became aware of that tape as to whether

10   or not it was Brady evidence.   And I made the decision

11   to disclose it because I said something to the effect

12   I'm not going to split that hair.

13   BY MS. ZELLNER:

14       Q.   Tell me about when that decision was made.   Was

15   that made in 2009?

16       A.   Yes.

17       Q.   So you find out, I'm assuming for the first

18   time, that the video has been discovered by Sharon

19   Krause in her garage.

20       A.   That was my understanding, yes.

21       Q.   How are you informed of that information?   Who

22   informed you?

23       A.   My recollection is that she sent the tape with

24   a letter to my chief criminal deputy, Dennis Hunter - it

25   might have been Mike Kinnie, but I thought it was Dennis

ARTHUR DAVID CURTIS    12.10.12

Page 49

1    Hunter — and then thereafter, Mr. Hunter informed me of

2    the existence of the tape.

3        Q.   Were you still the Clark County prosecutor at

4    the time that the tape was discovered in 2009?

5        A.   Yes.

6        Q.   And I'm assuming that you reviewed, then, the

7    tape, is that right, the video?

8        A.   Yes.

9        Q.   And then who did you instruct that it should be

10   disclosed?

11       A.   Mr. Hunter and/or Mr. Kinnie.

12       Q.   And tell me just the thought process leading up

13   to your decision to disclose it.

14       A.   Well, when I reviewed the tape, I did not see

15   it as being Brady evidence myself.  But I also, in

16   reviewing it, saw that the defense could take the

17   position that it was Brady evidence.  And that's why

18   when we had the discussion about whether or not it

19   needed to be disclosed, I said I'm not going to split

20   that hair because I could see it from both sides.

21       Q.   Right.  And so then you ordered -- was it Mr.

22   Hunter, to disclose the video?

23       A.   That's my recollection.

24       Q.   And that occurred, I think, sometime in 2009.

25       A.   It would have been shortly after it was

ARTHUR DAVID CURTIS    12.10.12

Page 50

1    provided to Mr. Hunter, within a few days.

2        Q.  At the time you made that decision to disclose

3    the video, did you have any conversation with Jim Peters

4    prior to your decision to disclose the video?

5        A.  I'm 99 percent sure my answer to that is no.

6        Q.  When did Mr. Peters leave the Clark County

7    prosecutor's office, if you remember?

8        A.  I'm sorry.  I could tell you the circumstances

9    under which he left, but I can't tell you exactly what

10   it was.

11           I would say it was shortly before we opened our

12   Child Abuse Intervention Center in 19 -- I'd say it was

13   around 1990 -- '89 or '90, something like that.

14       Q.  That's the center that they named after you,

15   right?

16       A.  Yes.  It's called the Children's Justice Center

17   now, but it was the CHILD ABUSE INTERVENTION CENTER.

18       Q.  Tell me, what were the circumstances of Mr.

19   Peters leaving your office.

20       A.  I granted him a one-year leave of absence to go

21   back to be the second attorney at the National Center

22   For Child Abuse with the understanding that he was going

23   to come back after that one year and help us set up a

24   child abuse intervention center.  And that's why I'm

25   saying I don't know the exact year, but it was around

ARTHUR DAVID CURTIS   12.10.12

1   again, right?

2        A.   Well, at this point, I may or may not have.   It

3   may have already been assigned to Mr. Peters, and he may

4   have independently reviewed it and just told me what had

5   occurred.

6        Q.   And this time, there's nothing sent out, like

7   to Rebecca Roe, I'm assuming, because Mr. Peters had

8   been discharged from the Vancouver Police Department.

9        MR. FREIMUND:   I object to the form.   I think

10  you misstated, Ms. Zellner.

11       MS. ZELLNER:   I'm sorry.   I said Peters.

12  BY MS. ZELLNER:

13       Q.   By the time we get to February, has the

14  potential problem with the Vancouver Police Department

15  resolved itself because Mr. Spencer was discharged?

16       A.   My recollection is that we ended up taking the

17  case back because -- partially because of that factor,

18  yes.

19       Q.   And then you're describing that with the second

20  information that's filed in February, that you may have

21  had less direct involvement in looking at the underlying

22  evidence.   Is that fair, is that what you remember?

23       A.   I remember being provided with information

24  regarding his re-arrest and the fact that there were two

25  additional victims and at that point becoming, I

ARTHUR DAVID CURTIS   12.10.12

1   wouldn't say relieved, but more happy with my original

2   filing decision because the case obviously became a lot

3   stronger.

4       Q.   Because you had these other alleged victims

5   that helped to corroborate Katie Spencer's allegations,

6   right?

7       A.   Yes, correct.

8       Q.   Okay.  And, again, would you have --

9       A.   If I could finish my answer, then.

10      Q.   Oh, of course.

11      A.   Not only did they corroborate or give

12  credibility to Katie's allegations but provided new

13  allegations as to sexual abuse that occurred on both of

14  them separately as victims.  So we now had three

15  victims, not just two boys corroborating one victim, we

16  had three separate victims.

17      Q.   And so would it be a fair statement to say that

18  you relied upon Mr. Peters in making your decision to

19  file this second information with the new charges?

20      A.   Well, I didn't file the amended information.

21  But it's fair to say that Mr. Peters filed the

22  information, the amended information, adding in the new

23  victims, based on the information he received in the

24  police reports, correct.

25      Q.   And he kept you apprised of the developments,

ARTHUR DAVID CURTIS   12.10.12

Page 61

1          You may answer.

2          THE WITNESS:  Assuming that he was talking

3    about confidential communications, yes.

4    BY MS. ZELLNER:

5        Q.   One question I should have asked previously,

6    when your office sent the file to Rebecca Roe, did you

7    obtain a release of information from Katie Spencer's

8    mother, DeAnne Spencer?

9        A.   You mean a release of information, meaning that

10   is it okay with you if we send the case up to King

11   County?

12       Q.   Correct.

13       A.   No, that would not normally be something that

14   would be done.

15       Q.   So with a child sex abuse case, a file could be

16   sent from one prosecutor to another without getting a

17   release of information from a parent of the child?

18       A.   Yes.

19       Q.   Let's look at Exhibit 10.  When did you first

20   learn that there had been medical exams done of Kathryn

21   Spencer and Matthew Hansen?  Was it later in the time,

22   like, was it in the '90s?

23       A.   It would have been after July 1, 1992.

24       Q.   And how were you informed that there had been

25   medical exams done?

ARTHUR DAVID CURTIS   12.10.12

Page 68

1    that Exhibit 6 and 7 is correspondence between you and

2    Norm Malang, the King County prosecutor, that is dated

3    -- is that January 5th, 1985?

4        A.   I can't tell if that's January 5th or -- looks

5    almost like a 9th.

6        Q.   Okay.   9th.   And then there's a letter to

7    Rebecca Roe dated January 9, 1985.

8        A.   Right.

9        Q.   These documents are basically thanking Mr.

10   Malang for providing a special prosecutor, namely Ms.

11   Roe in this case, correct?

12       A.   Yes.

13       Q.   In reviewing these documents, and I think there

14   were some other testimony, that Mr. Peters expressed

15   some reluctance to proceed or saw some problems about

16   proceeding to file charges in January of 1985.   Does

17   that refresh your recollection as to whether or not you

18   likely reviewed Exhibit 1, Ms. Roe's report, prior to

19   filing the initial charges?

20       A.   Yes.   We specifically asked Ms. Roe to review

21   the case for us.   And I would find it hard to believe

22   that we would ask her to review a case and then not

23   review her -- review this letter which incorporates her

24   opinions and rationale.   It wouldn't make any sense to

25   me that I wouldn't have reviewed the letter.   But I

ARTHUR DAVID CURTIS    12.10.12

Page 69

1    don't have any independent recollection 26 years later

2    of having done so.

3        Q.   But do you believe in reviewing the subsequent

4    documents that it's likely you did?

5        A.   Yes.

6        Q.   Now, handing you what's been marked as Exhibit

7    27, can you identify that, please?

8        A.   This is a document that I prepared.  In the old

9    days, we would have yellow pads that we would use to

10   write out contents of informations.  I put at the top D,

11   which is defendant, Clyde Ray Spencer, and then Count 1,

12   Count 2, Stat Rape 1, and Indecent Liberties, Count 2.

13           I asked my secretary to provide or to compare

14   the information alleging the dates of -- on one or more

15   occasion between July 18, 1984, and August 26th, 1984,

16   and see if CCSofW - which is County of Clark, State of

17   Washington - and then I listed the victim as Kathryn E.

18   Spencer who was five years of age at the time.  Count

19   No. 2, Indecent Liberties, I cited the pertinent part of

20   the statute.  There's a 1(a) and 1(b), which was being

21   charged under 1(b), same dates.

22           And at the bottom appears shorthand from my

23   long-time secretary, Carol Axford, which I don't read

24   shorthand so I don't know what it says, other than she

25   was -- I probably asked her to docket it for the next

ARTHUR DAVID CURTIS   12.10.12

Page 82

1   defense.

2       Q.   And in your experience, does that type of

3   expert testimony, meaning that the prosecutor calls,

4   alleviate that doubt?

5       A.   Yes.   We've had many cases where that's

6   alleviated the doubt and the defendant has been

7   convicted.

8           MS. FETTERLY:   Let me look through my notes for

9   a minute.   I don't think I have any further questions.

10  I have no further questions.

11          MR. VELJACIC:   I have no questions.

12          MS. ZELLNER:   I have just a couple to clarify.

13

14                      EXAMINATION

15  BY MS. ZELLNER:

16      Q.   I just want to make sure that it's clear on the

17  record.   Do you recall prior to making the January

18  charging decision, January of '85 charging decision

19  against Ray Spencer, that you did, in fact, review

20  Rebecca Roe's report?

21      A.   I do not specifically remember reviewing the

22  report.   What I said was that if I asked her for an

23  opinion as to whether or not the case should be filed,

24  it would be very unusual to not review the report after

25  the specific request.

ARTHUR DAVID CURTIS    12.10.12

Page 83

1      Q.   Right.   But you don't have a distinct

2    recollection of actually doing that?

3      A.   No, I do not.

4      Q.   Correct?

5      A.   That's correct.

6      Q.   And isn't it true in Rebecca Roe's report, that

7    she said one of the problems with the information she

8    looked at was that Katie Spencer was reluctant to talk

9    about these allegations; is that right?

10     A.   That's correct.

11     Q.   Did you, in the course of cases that Sharon

12   Krause worked on, did you ever just present Sharon

13   Krause's reports to obtain a conviction without anything

14   else, without the child testifying?

15     A.   You're saying using the Child Hearsay statute

16   evidence and presenting Sharon Krause as a witness

17   without bringing the victim in?

18     Q.   Correct.   Do you remember any case that you can

19   give me the name of?

20     A.   I'm sorry.   I don't.   I can't tell you off the

21   top of my head.

22     Q.   And having looked at Rebecca Roe's report, you

23   would agree with me that one of her problems with the

24   case is that she thinks that Katie Spencer's prior

25   reports both to Sharon Krause and to Shirley Spencer are

ARTHUR DAVID CURTIS    12.10.12

Page 107

1                           CERTIFICATE
2
3
    STATE OF WASHINGTON )
4                       ) ss.
    County of Clark     )
5
6           I, the undersigned Washington Certified Court
    Reporter, pursuant to RCW 5.28.010 authorized to
7   administer oaths and affirmations in and for the State
    of Washington, do hereby certify:
8
            That the annexed and foregoing deposition
9   consisting of Pages 5 through 106 of the testimony of
    each witness named herein was taken stenographically
10  before me and reduced to a typed format under my
    direction;
11
            I further certify that according to CR 30(e)
12  the witness was given the opportunity to examine, read
    and sign the deposition after the same was transcribed,
13  unless indicated in the record that the review was
    waived;
14
            I further certify that all objections made at
15  the time of said examination to my qualifications or the
    manner of taking the deposition or to the conduct of any
16  party have been noted by me upon each said deposition;
17          I further certify that I am not a relative or
    employee of any such attorney or counsel, and that I am
18  not financially interested in the said action or the
    outcome thereof;
19
            I further certify that each witness before
20  examination was by me duly sworn to testify the truth,
    the whole truth and nothing but the truth;
21
            I further certify that the deposition, as
22  transcribed, is a full, true and correct transcript of
    the testimony, including questions and answers, and all
23  objections, motions and exceptions of counsel made and
    taken at the time of the foregoing examination and was
24  prepared pursuant to Washington Administrative Code
    308-14-135, the transcript preparation format guideline;
25

ARTHUR DAVID CURTIS   12.10.12

Page 108

1        I further certify that I am sealing the
deposition in an envelope with the title of the above
2   cause and the name of the witness visible, and I am
delivering the same to the appropriate authority;

3

        I further advise you that as a matter of firm
4   policy, the Stenographic notes of this transcript will
be destroyed three years from the date appearing on this
5   Certificate unless notice is received otherwise from any
party or counsel hereto on or before said date;

6

        IN WITNESS WHEREOF, I have hereunto set my hand
7   and affixed my Washington State CCR Seal this 14th day
of December 2012.

8

9

10

11

                Certified Court Reporter No. 2119
12              in and for the State of Washington
                residing at Vancouver, Washington
13              My CCR certification
                Expires 12-03-13

14

15

16

17

18

19

20

21

22

23

24

25