# EXHIBIT II

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)



281

1       UNITED STATES DISTRICT COURT
2       WESTERN DISTRICT OF WASHINGTON
                AT TACOMA

3

CLYDE RAYMOND SPENCER,          )       Docket No. C94-5298RJB
4                               )
            Petitioner,         )       Tacoma, Washington
5                               )       September 5, 1996
        v.                      )       9:30 a.m.
6                               )
JOSEPH KLAUSER, Warden,         )
7   Idaho State Institution;    )
CHRISTINE GREGOIRE, Attorney    )
8   General, State of Washington. )
                                )
9           Respondent.         )
                                )

10

11                      VOLUME III
                TRANSCRIPT OF TRIAL
12      BEFORE THE HONORABLE ROBERT J. BRYAN
            UNITED STATES DISTRICT JUDGE.

13

14  APPEARANCES:

15  For the Petitioner:         PETER A. CAMIEL
                                Mair, Camiel & Kovach, P.S.
16                              710 Cherry Street
                                Seattle, Washington   98104
17
    For the Respondents:        JOHN J. SAMSON
18                              DONNA H. MULLEN
                                Assistant Attorneys General
19                              Post Office Box 40116
                                Olympia, Washington   98504-0116
20

21
    Court Reporter:             Julaine V. Ryen
22                              Post Office Box 885
                                Tacoma, Washington 98401-0885
23                              (206) 593-6591

24
    Proceedings recorded by mechanical stenography, transcript
25  produced by Reporter on computer.

ORIGINAL99

282

1          (Defendant present.)

2                          MORNING SESSION.

3              THE COURT:  I understand we have Dr. Magee on the

4      phone.

5              THE CLERK:  Yes.

6              THE COURT:  Is this your next witness?

7              MR. CAMIEL:  Yes.

8              THE COURT:  Dr. Magee, can you hear me all right?

9              DR. MAGEE:  Can you speak a little louder?

10             THE COURT:  Yes, I can.  I can speak as loud as you

11     want.

12             DR. MAGEE:  Okay.  That's fine.

13             THE COURT:  We are in court.  I'm Judge Bryan.  Mr.

14     Camiel is here representing Mr. Spencer, and Mr. Samson and Ms.

15     Mullen are here representing the state.

16         You're a witness called by Mr. Camiel, and the first --

17     first, it's my understanding here that we have all stipulated

18     that your testimony could be taken by telephone conference

19     call.  You should understand that the rules are the same as if

20     you were actually present here in court.

21         Do you understand that?

22             DR. MAGEE:  Yes.

23             THE COURT:  The first thing I must do is to put you

24     under oath.

25             KATHRYN MAGEE, PLAINTIFF'S WITNESS, SWORN OR AFFIRMED

Spencer-03478

290

1  A.  She's actually a little thin for her height, but she's

2  completely within normal limits.  It's only when you fall off of

3  the growth curve completely that it's considered abnormal.

4  Q.  All right.

5  A.  Which means you're below the zero percentile.

6  Q.  All right.  If you could continue please.  Thank you.

7       THE COURT:  Give her a question.

8  Q.  (By Mr. Camiel)  Doctor, after noting the height and weight,

9  what else did you do in terms of your examination?

10  A.  Well, based on this record, as I said, I don't recall.  It

11  looks like I did sort of a general overview of looking at her

12  skin and muscular-skeletal system and noted some bug bites on

13  her, and then it looks like I did a general external pelvic

14  exam, noting that there was no redness, that the hymen appeared

15  intact, and that there were no lacerations externally and no

16  swelling noted.

17  Q.  Doctor, as a general practice, how would you conduct the

18  pelvic examination, the external pelvic examination you

19  described?

20  A.  On a child this age, usually what we would do is have her --

21  well, we would probably try and have her lay on the table, but

22  if that was too traumatic, we would have her just lay back in

23  her mother's lap and go into what we call a frog position, where

24  she sort of bends her knees and then just spreads her legs

25  apart.

291

1   Q.   And in conducting this kind of an examination, do you use
2   any instruments or devices?
3   A.   There were no instruments used in this exam.   If her hymen
4   had been ruptured, we may have used a speculum to view inside.
5   It does look like I did some cultures, you know, to check her
6   for -- I think it's both genitalia and anus cultures were done.
7   Q.   Do you know whether or not you conducted a rectal or anal
8   examination of this child?
9   A.   I cannot tell from my note whether I did anything more than
10  culture her anus.   I have nothing written down about it, so I
11  just -- as I don't remember the case, I can't say.
12  Q.   So it's possible that you did, but it's just as likely that
13  you didn't?
14  A.   Yeah.   I mean, my guess is usually what we did is we just
15  looked at the outside and did not actually do a digital exam
16  just because it was so traumatic.
17  Q.   And in looking at the outside, what kinds of things would
18  you be looking for?
19  A.   Lacerations, bruising, swelling.
20  Q.   And I take it if you noted any such things, those would
21  appear in your report?
22  A.   I would imagine so, but I cannot say for certain that I
23  looked since it's not noted one way or the other on the report.
24  Q.   How do you go about taking a culture from the anus?
25  A.   Normally I would basically spread the buttocks apart and

Spencer-03487

292

1  slip the swab in.  So I can only imagine that I at least saw it

2  grossly.

3  Q.  All right.

4  A.  But I did not note it on my record.

5  Q.  Doctor, was the facility that you were working at, the

6  University of California Davis in Sacramento, was that a

7  facility that regularly received referrals from law enforcement

8  to conduct these kinds of examinations?

9  A.  Frequently.

10  Q.  Were kids coming in every day for these kinds of exams?

11  A.  Most every day.

12  Q.  And during the period of time that you had your rotation in

13  this area, do you know how many examinations you conducted of

14  this type?

15  A.  I don't know exactly.  I could probably guess that I

16  conducted maybe 15 or 20.

17  Q.  Doctor, on the third page of the report, you've indicated

18  that you added some language at the top of the page, the words

19  "Mother said"?

20  A.  Uh-huh.  Yes.

21  Q.  Can you --

22  A.  From what I can tell from this record, the child actually

23  did not say anything.

24  Q.  In the middle of the page, you have, under the diagnostic

25  conclusion section, the statement, "Child's story consistent

293

1  with history of molestation."  Was that something that was

2  written by the social worker?

3  A.  No, I wrote that.

4  Q.  Okay.

5  A.  But in reality it is in error.  It should have said,

6  "Mother's version of child's story consistent with history of

7  molestation."

8  Q.  Below that you have the phrase, "No physical findings."

9  Does that refer back to page 2 with regard to the "pelvic within

10  normal limits" and the other notes that you have?

11  A.  Yes.  I did not find any evidence of either sexual abuse or

12  physical abuse.

13  Q.  Doctor, based on your experience having conducted, you

14  believe, perhaps 15 or 20 of these examinations and the training

15  that you received, if Kathryn Spencer, who was five years old,

16  had been fully penetrated vaginally by an adult male, by an

17  adult male penis, would you have expected that there would be

18  some observable trauma to the child?

19  A.  Well, I would imagine if she was fully penetrated that her

20  hymen would have appeared abnormal.  However, she could have

21  been partially penetrated, and if enough time had elapsed, there

22  would be no physical findings.

23  Q.  If this child had been penetrated by as many as four adult

24  males on multiple occasions, in your opinion, would that have

25  made it even more likely that there would have been some



421

1                      C E R T I F I C A T E

2

3       I certify that the foregoing is a correct transcript from

4 the record of proceedings in the above-entitled matter.

5

6

7

8      JULAINE V. RYEN              January 15, 1997
                                         Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Spencer-03617

# EXHIBIT JJ

# Investigation and Prosecution of Child Abuse

*American Prosecutors Research Institute*
*National Center for Prosecution of Child Abuse*
*1033 N. Fairfax Street, Suite 200*
*Alexandria, Virginia 22314*
*(703) 739-0321*

Spencer-09670

© 1987 by the American Prosecutors Research Institute. Second printing 1989.

American Prosecutors Research Institute, 1033 N. Fairfax Street, Suite 200, Alexandria, Virginia 22314. All rights reserved. No part of this document may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying or recording by any information storage and retrieval system, without permission in writing from the publisher.

Printed in the United States of America

The National Center for Prosecution of Child Abuse is a program of the American Prosecutors Research Institute, a nonprofit research and technical assistance affiliate of the National District Attorneys Association. This document was prepared under Cooperative Agreement Number 86-JN-CX-K001 from the Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice. Points of view or opinions in this document are those of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice.

Spencer-0967.1

Once a case has been called for trial, there are several considerations in deciding whether to conduct the competency exam prior to or after jury selection. You are certainly more likely to have the judge decide a close case in your favor if the court has already expended time and resources on jury selection. However, in a case in which you have no other admissible evidence and the child is almost certainly going to be ruled incompetent, you run the real risk of alienating the judge for future cases by putting everyone through jury selection on a case with only a slight possibility of going forward. Try to make a reasonable assessment of the likelihood of the child being found competent and remain mindful not to squander court time.

### (b) Who Should Question the Child

It is debatable who should actually conduct the competency exam, the court or the prosecutor. If you have a sensitive judge who knows the law and can ask questions likely to get answers, it may be reasonable to have the court do the questioning for the reason that it practically, although not legally, forestalls defense questioning at that stage. If the judge is unable to get the child to respond, the prosecutor must step in and try to get the child talking.

However, many prosecutors prefer to do the initial questioning themselves for a number of reasons. One obvious advantage of the prosecutor assuming responsibility for asking the questions is that the child is familiar with the prosecutor and vice versa. The child is more likely to feel comfortable with the prosecutor and be responsive, and the prosecutor is more likely to know how to effectively question that particular child. Since the judge is a stranger to the child, there is a greater chance that the child, and perhaps the judge, will feel uncomfortable, and the child may feel intimidated if the judge initially asks the questions at the competency hearing. Moreover, a kind, thorough prosecutor whose questions are tailored to suit the child's personality and level of development will often cause the judge to cut off a defense attorney's cross-examination in areas already covered.

### (c) Type of Questions/Sample Questions

Whether the judge, prosecutor, or defense attorney is doing the questioning, the questions should be limited to determining whether the child meets the minimal requirements of competency. The child should be deemed competent if "capable of testifying in any meaningful fashion whatsoever." *United States* v. *Banks*, 520 F.2d 627 (7th Cir. 1975). Furthermore, questions related to the facts of the abuse should not be permitted, or should be severely limited if absolutely required under the law in your jurisdiction. The child's answers to such questions will not reveal whether or not she can relate facts "truly" since that is the issue that the jury is there to decide and the reason that you are having a trial. Questions about *uncontested* facts occurring at around the same time as the abuse can be asked to demonstrate the child's ability to recall accurately and truly and to relate pertinent facts.

Following are some examples of appropriate types of questions to ask in order to establish competency of child witnesses. Specific questions should be chosen and formulated based on the age and circumstances of the particular child before the court.

- "What is your name?"
- "How old are you?"
- "When is your birthday?"
- "Did you have a party last year?"
- "Who was there?"
- "What presents did you get?"
- "Do you go to school?"
- "What is the name of your school?"
- "What is the name of your teacher?"
- "Did you go to school last year?"
- "What was your teacher's name last year?"
- "What grade are you in now?"
- "Do you know anybody in this room?"

# EXHIBIT KK

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

# United States District Court
## Western District of Washington

CLYDE RAYMOND SPENCER )   Case No.
                                         )   C94-5238 RJB
                    Petitioner, )
                                         )
            vs. )
                                         )
JOSEPH KLAUSER, Warden, Idaho State )
Institution, )
                                         )
                    Respondent. )

## DEPOSITION OF JAMES MATTHEW PETERS

### July 30, 1996

Reported by
Jodi C. Williams



THE COURT REPORTERS

TUCKER
AND ASSOCIATES
208-345-3704 • 1-800-424-2354
Fax 208-345-3713
605 WEST FORT STREET
P.O. BOX 1625 • BOISE, ID 83701
Home Page: http://www.webfactor.com/tucker/
E-Mail: tucker@micl.net

ORIGINAL

13

1    Q.    What was the result of the King County

2  prosecutor's review of the case?

3    A.    Now, you have to understand that the case

4  was reviewed only when we had one victim, a female,

5  five-year-old victim.

6    Q.    Yes.

7    A.    The status of the case changed later when

8  two other children came forward with allegations.

9         But at the time, they concurred with me

10 that the case wasn't provable.  And we declined it

11 as a result of that.

12   Q.    Why did you believe the case wasn't

13 provable?

14   A.    I don't remember the specifics.  That's

15 12 years ago.  I don't remember the specifics of

16 why not.

17        But at the time and to this day, I go

18 through a three-step analysis with every criminal

19 case.  And that is, first, to determine whether it

20 appears that a crime was committed.  And, secondly,

21 whether I can prove it beyond a reasonable doubt.

22 And, third, whether there is some reasonable way

23 short of bringing the power of the government down

24 on somebody to resolve the matter, such as pretrial

25 diversion or civil compromise or something short of

1    were to see her initial -- or see her reports, I

2    could probably tell you.  But I don't recall,

3    specifically.

4        Q.   Do you recall whether or not Kathryn

5    Spencer was initially naming other abusers as well

6    as her father?  Does that ring a bell?

7        A.   No.

8            (Exhibit *-003 marked.)

9        Q.   BY MR. CAMIEL:  Handing you what has been

10   marked Exhibit No. *-003 which appears to be a copy

11   of the affidavit that you submitted?

12       A.   Yes.

13       Q.   If you could turn to the second page of

14   the affidavit, it's paragraph number four.

15          You indicate in that paragraph -- part of

16   what you indicate is that you don't have an

17   independent memory of seeing or discussing before,

18   during, or after the pendency of the Spencer case,

19   any medical report on the female victim,

20   Mr. Spencer's daughter, Kathryn Spencer.

21          Had you heard about, during the pendency

22   of the Spencer case, the fact that Matt Hansen, one

23   of the other alleged victims in the case, had been

24   to a doctor for a sexual-abuse examination?

25       A.   Not that I recall.

31

1    Q.   DeAnne?

2    A.   I met them both.

3    Q.   It was DeAnne?

4    A.   Yes.

5    Q.   Did you ever interview Matt Hansen?

6    A.   I don't think so.  It was never my

7    practice, nor is it my practice now, to get

8    involved in interviews with child molesting victims

9    unless I'm certain the case is going to go to

10   trial.  I think they have to tell their story to

11   too many grown-ups that they don't know without

12   having to meet another grown-up and tell the ugly

13   details to them.

14        So I don't have any memory of doing that,

15   and it wouldn't have been my practice to do that.

16        Now, if I had, there would be detailed

17   notes because I always took notes.  And there would

18   be notes in the file.  So I'm not saying I didn't,

19   but I don't think I did.

20        That case was heading toward trial.  But

21   I usually didn't get involved with actually

22   preparing the child for trial until a couple of

23   weeks before when I was sure it was going to go.

24        I might have met them.  And, in fact, my

25   practice would have been to meet the child, take

07/11/96    16:39      ATTY GEN CORRECTIONS DIV           002

RECEIVED

'96 JUL 15 AM 9 27

ATTORNEY GENERAL
OF WASHINGTON
CORRECTIONS DIVISION

HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAYMOND SPENCER,

      Petitioner,

    vs.

JOSEPH KLAUSER, et al.,

      Respondent.

NO. C94-5238RJB

AFFIDAVIT OF
JAMES MATTHEW PETERS

STATE OF IDAHO    )
               ) ss.
County of ADA    )

    I, JAMES MATTHEW PETERS, being first duly sworn on oath, deposes and says:

1. I am an Assistant United States Attorney, currently assigned in Boise, Idaho. As an Assistant U.S. Attorney, I prosecute violent crime and child sexual abuse crimes.

2. Prior to my acceptance of a position as Assistant U.S. Attorney in 1990, I was a Senior Attorney with the American Prosecutor's Research Institute, National Center for Prosecution of Child Abuse, in Alexandria, Virginia from 1987 to 1990. In that position I provided training and technical assistance to prosecutors and investigators involved in child abuse cases in the U.S., Canada, Australia, and Puerto Rico. I have written numerous articles regarding the investigation and prosecution of child abuse cases and assisted in drafting the federal "Child Victim Bill of Rights" now codified as 18 U.S.C. § 3509.

3. During the period 1977 to 1987, I was a Deputy Prosecuting Attorney in Clark

EXHIBIT 3

AFFIDAVIT OF
JAMES MATTHEW PETERS

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116

1 | County, Vancouver, Washington. I was the Deputy Prosecuting Attorney in State

2 | v. Spencer, Clark County Superior Court Cause No. 85-1-0007-2.

3 | 4. I remember Mr. Spencer and the Spencer case. I do not have an independent

4 | memory of seeing or discussing, before, during, or after the pendency of the Spencer

5 | case, any medical report on the female victim, Mr. Spencer's daughter, Kathryn

6 | Spencer;

7 | 5. Approximately three to four months ago, while on other business in Vancouver,

8 | at the request of the Assistant Attorney General for the State of Washington, I

9 | reviewed the prosecutor's file in State v. Spencer. There was no medical report in

10 | the file. A notation had been made by the paralegal, Linda Engelbart, that she had

11 | reviewed the file several years earlier and could not locate any medical report on

12 | Kathryn Spencer.

13 | 6. During the time of Mr. Spencer's case, it was the practice of the Clark County

14 | Prosecuting Attorney to make the entire prosecutor's file available to defense

15 | attorneys. Defense attorneys, after signing a statement that material copied would

16 | not be duplicated and given to others, could duplicate any material. To the best of

17 | my knowledge, all material available in the prosecutor's file in State v. Spencer was

18 | disclosed to the defense.

19 | 7. I have reviewed the medical report completed at U.C. Davis on Kathryn Spencer.

20 | While the report is legally relevant, and would have been disclosed to the defense

21 | as a routine matter in the ordinary course of discovery if it had been made available

22 | to the Prosecuting Attorney, it is my opinion that the report would not have affected

23 | any rational person's decision to change his plea. That is because Washington state

24 | law provides that sexual intercourse occurs upon the penetration, however slight,

25 | of the child's vagina, anus, or mouth by the perpetrator's penis, finger, or other

26 | object. Medical evidence indicating that Kathryn had an "intact hymen" was not

2

1 | inconsistent with Mr. Spencer's guilt, because sexual intercourse can occur with
2 | only minimal penetration, which would leave no physical signs.

3 | 8.  Second, the absence of physical findings of sexual abuse in young children is
4 | common.  With intra-familial abuse, the perpetrator seldom acts in a violent manner,
5 | and often takes great care to avoid hurting the child physically.  Generally, there
6 | would have been no physical findings of oral intercourse or limited penetration by a
7 | finger or penis of the vagina.  Although the charge of sexual intercourse with a child
8 | requires proof of penetration, even slight penetration is sufficient.    Proof of
9 | penetration does not require physical findings such as redness, swelling, laceration,
10 | or scars.  Here, the lack of physical findings does not disprove penetration.

11 | 9.  In addition, the report reveals that the reporting physician did not perform a
12 | complete physical examination for sexual abuse.  Other than taking cultures for
13 | gonorrhea, the physician did not examine the mouth or anus.  No colposcopic
14 | examination was completed.  Since the early 1980's, the colposcope has come into
15 | increased use in expert medical examinations of suspected sexual abuse victims.
16 | The colposcope is a binocular optical instrument providing magnification.  It is
17 | equipped with a high-quality light, and many include cameras for photographs, slides,
18 | or videotapes.  They are non-intrusive and do not touch or penetrate the child.  The
19 | colposcope can help trained physicians detect and interpret lacerations, scarring or
20 | other trauma of the vaginal or anal areas that may not be visible to the naked eye,
21 | or give a more accurate opinion regarding the absence of such damage.  In my
22 | opinion, a complete medical exam would have included a colposcopic examination
23 | with photos, or at least the taking of 35 millimeter photographs which would allow
24 | for second opinions regarding the examination by review of photographs, slides, or
25 | videotapes and protect the child from defense requests for a second medical
26 | examination.

07/11/96   16:41   HITT BEN CORRECTING ...

10. Additionally, the phrase "Intact hymen", which was used in the U.C. Davis medical report, is not used by experts in the field of sexual abuse and indicates that the examination was probably done by a medical practitioner without specialized training. Expert physical examinations describe precisely the appearance of the hymenal ring and genitalia.

11. Based upon my experience in dealing with sexual abuse prosecutions, I consider the report to be a "neutral" statement.

12. If the report had been used at trial, I would have called an expert physician in the field of child sexual abuse to testify regarding the non-expert and incomplete nature of the examination, the common lack of physical findings in children due to rapid healing and or care taken in manipulation of the child's external genitalia and vagina, and the delay in examination. It is possible that the expert could also have testified regarding the documented behavioral characteristics of Kathryn as typical and consistent with behavior of children who have been sexually abused or molested.

13. In addition to eliciting testimony which would challenge the scope and content of the physical evaluation of Kathryn Spencer and emphasizing the reported behavior as indicative of abuse, I would have been able to utilize the report to admit statements made to the examining physician for purposes of medical diagnosis pursuant to Washington Rule of Evidence 803(4). These statements would have included a history of sexual abuse by Mr. Spencer.

14. I believe this report would have been of extremely limited value to the defense because the findings were not inconsistent with the petitioner's guilt. The inadequate scope of the examination, the significant research indicating lack of physical findings are common in child sexual abuse and molestation cases, the opportunity to discuss Kathryn's behavioral changes as being consistent with victims

AFFIDAVIT OF
JAMES MATTHEW PETERS

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116

4

1  of child molestation, and the opportunity to again elicit her statements regarding the

2  sexual abuse further minimize the materiality of this report to Mr. Spencer's defense.

3  15.  Independent and separate reports from Mr. Spencer's son, Matthew Spencer,

4  and the stepson, Matthew Hansen, verified the incidents of sexual intercourse with

5  Kathryn Spencer.  As a result, the strength of the case lay not with the allegations

6  made by Kathryn, but by the corroborating statements made by the two boys and

7  the charges of statutory rape and complicity to statutory rape as supported by the

8  statements of the two boys.  There is no reasonable likelihood that Spencer, facing

9  16 counts of statutory rape and complicity to statutory rape, would have altered his

10  decision to change his plea because of a neutral medical report about Kathryn

11  Spencer.

12       DATED this _12_ day of July, 1996

13

14                               JAMES MATTHEW PETERS
                             Assistant U.S. Attorney

15       SUBSCRIBED AND SWORN to before me, _Pamela L. Brophy_

16  this _12_ day of July, 1996.

17                               NOTARY PUBLIC in and for the State of

18                               Idaho. My Commission expires:
                             _4/22/2000_

19

20

21

22

23

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116

# REPORTER'S CERTIFICATE

STATE OF IDAHO      )
                          )    ss.

County of Ada         )

I, Jodi C. Williams, a Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true, and verbatim record of the said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this _6th_ day of _August_ , 1996.

_Jodi C. Williams_
NOTARY PUBLIC in and for the State of Idaho; residing at Mountain Home, Idaho.

My commission expires 2-7-2001.

Spencer002704

# EXHIBIT LL

Service accepted and receipt of
true copy acknowledged this
__25__ day of __January__, 1985.

ARTHUR D. CURTIS
Prosecuting Attorney

By _James A. Peters_
Deputy Prosecuting Attorney

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF CLARK

STATE OF WASHINGTON,

           Plaintiff,

    v.

CLYDE RAY SPENCER,

           Defendant.

No. 85-1-00007-2

OMNIBUS APPLICATION BY DEFENDANT
AND ORDER OF COURT

DATE: 1-25-85

NOTICE TO: DEPUTY PROSECUTING ATTORNEY

### 1. MOTION BY DEFENDANT

Pursuant to and in accordance with Rule 4.5 of the Criminal Rules for Superior Court, Plaintiff makes application or motions checked as follows:

    1. To dismiss for failure of the information to state an offense.

    2. To sever Defendant's case and for separate trial.

    3. To sever counts and for a separate trial.

✓    4. To make more definite and certain.

       Answer: _____ will do

✓    5. For discovery of all oral, written or recorded statements made by Defendant to investigating officers or to third parties and in the possession of the Plaintiff.

       Answer: _SP_ will provide

✓    6. For discovery of the names and addresses of Plaintiff's witnesses and their statements.

       Answer: _SP_ will provide

OMNIBUS APPLICATION BY DEFENDANT
AND ORDER OF COURT - 1

FERGUSON, EIESLAND, & BULLI
ATTORNEYS AT LAW

FILED

JAN 2 5 1985

George J. Mills, Clerk, Clark Co.

7. To inspect physical or documentary evidence in Plaintiff's possession.

Answer: _____ will provide

8. To suppress physical evidence in Plaintiff's possession because of (1) illegal search, (2) illegal arrest.

9. For hearing under Rule 3.5. - Reserve

10. To suppress evidence of the identification of the Defendant.

11. To take the deposition of witnesses.

12. To secure the appearance of a witness at trial or hearing.

13. To inquire into the conditions of pretrial release.

## II. TO REQUIRE THE PROSECUTION

14. To state:

(a) If there was an informer involved;

(b) Whether he will be called as a witness at the trial; and

(c) To state the name and address of the informer or claim the privilege.

15. To disclose evidence in Plaintiff's possession, favorable to Defendant on the issue of guilt.

Answer: _____ will provide

_____ none known

16. To disclose whether it will rely on prior acts or convictions of a similar nature for proof of knowledge or intent.

Answer: _____ will disclose

_____ none known

17. To advise whether any expert witness will be called, and if so, supply:

(a) Name of witness, qualifications and subject of testimony;

OMNIBUS APPLICATION BY DEFENDANT
AND ORDER OF COURT - 2

FERGUSON, BIESLAND, & RULLI
ATTORNEYS AT LAW
601 W. 15th STREET
P.O. BOX 1459
VANCOUVER, WASHINGTON 98661
(206) 693-3613

Spencer-00026

(b) Report.

Answer: _____ will disclose

_____ none known

18. To supply any reports or tests of physical or mental examinations in the control of the prosecution.

Answer: _____ will provide

_____ none known

19. To supply any reports of scientific tests, experiments, or comparisons and other reports to experts in the control of the prosecution pertaining to this case.

Answer: _____ will provide

_____ none known

20. To permit inspection and copying of any books, papers, documents, photographs or tangible objects which the prosecution:

(a) obtained from or belonging to the Defendant; or

(b) which will be used at the hearing or trial.

21. To supply any information known concerning a prior conviction of persons whom the prosecution intends to call as witnesses at the hearing or trial.

Answer: _____ will provide

_____ none known

22. To inform the Defendant of any information he has indicating entrapment of the Defendant.

Answer: _____ will provide

_____ none known

23. Additionally,

For a hearing to determine whether the victim is

competent to testify at trial.

For a continuance of the trial date.

OMNIBUS APPLICATION BY DEFENDANT
AND ORDER OF COURT - 3

FERGUSON, KIESLAND, & RULLI

Spencer-00027



DATED this 25 day of January, 1981.

James E. Rulli
Attorney for Defendant

Requested items not answered are disputed. All information promised to be supplied in the future will be provided by ten days before trial.

Deputy Prosecuting Attorney

O R D E R

The foregoing requests are granted as noted above.

DATED this 25 day of January, 1981.

Judge of the Superior Court

OMNIBUS APPLICATION BY DEFENDANT
AND ORDER OF COURT - 4

FERGUSON, EISSLAND, & RULLI

Spencer-00028

# EXHIBIT MM

April 22, 2009

Dennis M. Hunter
Chief Deputy Prosecuting Attorney
P.O. Box 5000
Vancouver, WA 98666-5000

     Re: Clyde Ray Spencer

Dear Denny:

I received your letter of April 17 regarding Mr. Spencer's latest legal maneuvering. He certainly deserves credit for perseverance.

I don't really know what I have to offer in this proceeding beyond what is already of record in your file, and in my testimony in the federal habeas case. The only thing you might not have is the essay I sent to the Columbian in response to their tendentious series about Mr. Spencer in 2005. They printed an abridged verison of what I had originally sent them. A copy of the original is enclosed. This was my best effort at the time to recall the case, though memories do start to fade after several decades.

Sincerely,

Jim Peters

Your one-sided series on the "injustice" meted out to former Vancouver Police officer Ray Spencer, by the Clark County judicial system, is unbefitting your newspaper's normally objective reporting. The reporters strongly suggest that Spencer was the victim of fabricated charges. They imply that an overzealous Sheriff's Department investigator, driven by a self-serving supervisor, drummed up false allegations passed along by prosecutors who wrongly believed them genuine. They imply that Spencer's lawyer represented him ineffectively.

I was the Clark County Deputy Prosecutor assigned to Spencer's child molestation case while it was being investigated through and including his "no contest" plea. I left the employ of Clark County in 1987, so I was not involved in his many appeals and post-conviction proceedings, though I was a witness in a federal habeas corpus matter regarding his case in the mid-'90's and spoke briefly with Mr. Spencer in the presence of his attorney then. In 1998, at the request of Spencer's attorney, Peter Camiel of Seattle, I wrote to the Sentencing Review Board recommending that they equitably interpret my recommendation of a "life" sentence to mean the high end of the sentencing range under the Sentencing Reform Act, coupled with mandatory sex offender treatment. I have no axe to grind against Mr. Spencer. He has served his time and I wish him the best. But I do take issue with your biased, agenda-driven series on his case.

All but buried in the emotionally-charged rhetoric and carefully chosen interviews is the fact that three different children – at different times and in separate interviews – accused him of savagely

1

Spencer-08798

molesting them.  Twenty one years later, as far as I know, none of them have changed their stories.

Missing from the lengthy series is the fact that virtually every argument your reporters make suggesting Spencer's innocence was presented to a state or federal court over the last two decades, and rejected.  Missing also is an explanation why this supposedly "innocent man," who as a police officer, was intimately familiar with the criminal justice system, would change his plea from "not guilty" to "no contest" on the eve of his trial.  And these are just the most glaring omissions.

As a person who was very close to the case, I have a pretty good idea why he followed the path he did, and it had nothing to do with overzealousness, ill-will, naivete, or ineffective assistance of counsel.  It had to do with the "blue code of silence," which motivates some police officers to put loyalty to fellow officers above the truth, even at the expense of self.  I explained the circumstances to your reporter, but apparently it did not fit his agenda, and he omitted it from the piece.

Approximately one month before Spencer's scheduled trial, I traveled to Sacramento to observe Spencer's attorney, now Superior Court Judge Jim Rulli, interview two of the alleged victims, both primary school children who resided with Spencer's ex wife.  The day before our trip, one or both children (memory fails me which) told a counselor that Spencer had not acted alone, that other men had been involved in the alleged abuse, and that at least one of them had taken

2

Spencer-08799

sexually explicit pictures. They said that these "other men" wore guns on their ankles. The children convincingly repeated these new allegations to Rulli and me the next day.

Without question, that was the turning point in the case. Until then, every indication was that Mr. Spencer was going to trial. All that changed just a few days after we returned to Vancouver.

An extensive investigation was launched to identify these alleged accomplices. Since many of Spencer's acquaintances were law enforcement officers, and ankle holsters are a common accouterment worn by police officers, the investigation focused on area lawmen. Some plausible leads were developed, but there was never enough evidence regarding the identity of the alleged accomplices to obtain a search warrant or charge anyone else. That is why investigators were unable to search for the pictures elsewhere. (Spencer's house was searched, with the consent of his wife, but no child pornography was found). We offered Spencer a chance to identify the accomplices, but he refused.

Just a few days later, Spencer astounded all of us by changing his plea to "no contest" without the benefit of any plea agreement.

Many of us suspected that this was a product of the "blue code of silence," which motivates some officers to keep quiet about misconduct and protect one another at all costs. The Los Angeles Police Department endured well-publicized scandals that encompassed the "blue code." The Christopher Commission, writing on the LAPD, found that "perhaps the greatest single barrier to

3.

Spencer-08800

the effective investigation and adjudication of complaints is the officers' unwritten 'code of silence' . . . [the principle that] an officer does not provide adverse information against a fellow officer." I explained this to your reporter, but he chose to leave this critical information out of his story.

It seems strange that *The Columbian* would tarnish the reputation of Sharon Krause, a superb investigator whose tireless and impartial work was respected by defense attorneys and prosecutors alike, and praised in the pages of this newspaper in the 1980's. Krause was widely sought out by law enforcement agencies throughout the west as an instructor and taught at many conferences for judges, lawyers and mental health professionals throughout the country on the appropriate techniques for interviewing children. Her written material was incorporated into the book "Investigation and Prosecution of Child Abuse," published by the American Prosecutor's Research Institute in 1993. She was a tenacious investigator, but she was no zealot and resolved many cases by recommending that no charges be filed.

What was the point – besides slanting the story – of dredging up old gossip regarding her supervisor's affair with Spencer's wife, while leaving out the fact that the courts that took evidence on that issue found the affair began after the fact and had no bearing on the investigation? Such malicious reporting makes for titillating reading but is hardly responsible journalism.

4

Spencer-08801

Your criticism of Jim Rulli is also not warranted, particularly since judicial ethics restrict the extent to which he can respond. I tried several cases against Mr. Rulli when he was a defense attorney, including cases involving child sexual abuse, and he was always prepared, competent and ethical. One thing that singled Rulli out from his contemporaries was that he vigorously contested the relevant issues but would not waste the court's time with frivolous red herrings, which is exactly what many arguments posited by your reporters are. For example, the results of polygraph tests, interviews under the influence of so-called "truth serum," hypnotically refreshed memory, and the opinions of mental health professionals regarding an accused's guilt or innocence are notoriously unreliable, and are not admissible in a criminal trial. The same is true for the claim by Spencer's nieces and nephews that he never attempted to molest them; such evidence of "good behavior" is simply not admissible at trial. Just as killers do not attack every person they encounter, child molesters do not molest every child they know. Finally, contrary to your reporter's claim, Rulli did request a competency hearing to test the alleged victim's ability to testify, a fact that I discussed with the reporter. It is a standard request in all cases involving very young witnesses. Such hearings are normally held just before the trial. In this case, no competency hearing was held because Spencer changed his plea.

Was this a clear-cut case? Not at all. Early on, when all we had was a confusing account by a young child, uncorroborated, our assessment was to decline prosecution because of insufficient evidence. To avoid the appearance of favoritism because of Spencer's status as a police officer, we asked for a second opinion from the King County Prosecutor's Office, and it concurred with ours. But when two additional children, who lived in a different household and had a different

5

Spencer-08802

mother, made disclosures that corroborated the initial complainant, we were convinced that there was sufficient evidence to file charges and let a jury decide whom to believe. The citizens of Clark County who would have made up that jury never got the chance to consider whether to believe the children, or to accept the defense contentions, because Ray Spencer withdrew his not guilty plea and changed it to "no contest."

One thing I spoke to your reporter about was the subject of videotaping interviews with suspected child abuse victims. Afterward, I sent him an email summarizing the advantages and disadvantages of this practice. I found it strange that he did not mention that in the series. Here is what I told him:

"Videotaping can serve several useful purposes in litigation involving young witnesses including 1) preserving the child's initial statements and any spontaneity, emotion or detail that is often absent in a later account given at a trial, many months or years after the event; 2) avoiding duplication of efforts by sharing the video with others involved in the investigation; 3) encouraging the defendant to plead guilty, thereby sparing the child from testifying in court; 4) presenting the video to the grand jury, where local law permits, in lieu of the child's live testimony; and 5) as a teaching tool to help the interviewer and others improve techniques.

In making a videotape, the following concerns, disadvantages or risks should be taken into consideration: The child or the interviewer may be uncomfortable about

6

Spencer-08803

being videotaped, resulting in a stilted or unproductive session. Several interviews may be necessary to elicit a full account, even when a skilled professional conducts the interview. Videotaping every contact with a child, who may blurt out details at the most inopportune moment, is a practical impossibility. Videos can be used to harass or intimidate the child on cross-examination, or reviews may regard the testimony as more credible because it was given on video. Videos might be shown out of context or fall in the hands of those who have no professional obligations of confidentiality or concern for the child's best interest."

Reasonable minds can differ on the advisability of videotaping interviews. Having experienced both systems, I favor the practice of videotaping, but realize it is not always practical or possible. We have learned a lot since 1984 about how to conduct better investigations in child abuse cases. Still, the fundamental principles remain the same now as then. In Mr. Spencer's case, the investigation was fair. The person conducting the child interviews (Krause) was experienced and objective, and there was no rush to judgment. The decision, ultimately, to charge Mr. Spencer was the result of a thorough, deliberative process. The decision to take the fact-finding away from the jury was Spencer's alone.

Ray Spencer could have had a trial. He could have made many of the same arguments your reporters make and, to the extent they were admissible, hoped a jury of his peers believed him. Similarly, you could have written a balanced piece, let your readers draw their own conclusions, and left the rhetoric to the editorial page. Sadly, neither of those things happened.

7

Spencer-08804

Jim Peters

800 Park Boulevard, Suite 600

Boise, ID 83712

208-334-1211

jim.peters@usdoj.gov

8

Spencer-08805

# EXHIBIT NN

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

1

2

3

4             SUPERIOR COURT OF WASHINGTON FOR CLARK COUNTY

5    STATE OF WASHINGTON                    )

6                        Plaintiff,         )    NO. 85-1-00007-2

7                  v.                       )    DECLARATION OF
                                            )    CLYDE RAY SPENCER
8    CLYDE RAY SPENCER                       )

9                        Defendant.          )

10

11       1.   I am the defendant/petitioner in the above-entitled

12   action and I make this declaration upon my personal knowledge

13   and belief.

14       2.   I was divorced from my first wife, DeAnne Spencer in

15   1981. I had custody of my two children, Matt and Katheryn

16   (Katie) for six weeks in the summer. The rest of the year these

17   children were in Sacramento with my ex-wife. I remarried in

18   1983, and my new wife, Shirley, had a son who was four years old

19   at the time.

20       3.   While out of town at a police conference, my five-

21   year-old daughter approached my wife and requested sexual

22   favors. When questioned further about this, my daughter indi-

23   cated first that her mother did these things on a regular basis,

24   and then she named her brother, Matt, Karen Stone, who I used to

25   live with in-between my divorce and remarriage, and myself. By

26

DECLARATION OF CLYDE RAY SPENCER - 1

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE (206) 624-9350

1   the time I had returned from the police conference, the children
2   had returned to their mother in California. My wife advised me
3   what had happened and I immediately called a friend at home who
4   works for Child Protective Services in Vancouver and explained
5   the situation.

6       4.  My concern was not only brought about by this incident,
7   but also by one that took place in the summer of 1982. At the
8   time, I was living with Karen Stone and her two children in
9   Vancouver. This was the first visit the children had made since
10  the divorce. My ex-wife Deanne, had provided me with some type
11  of medication indicating that my daughter, Kathryn, had some
12  type of sore in the vaginal area. Upon inspecting this area,
13  both Karen and I agreed that the sore looked very much like a
14  cigarette burn. At that time, I had notified CPS in Vancouver
15  and was told that nothing could be done, since the children
16  lived out of state and the matter was dropped.

17      5.  On this occasion I was advised by this friend to con-
18  tact CPS in Sacramento the following day. The next mornning I
19  did contact Sacramento and filed a report. I also had my wife,
20  Shirley, sit down and write out a complete statement as to what
21  my daughter had related. Approximately three days later I was
22  contacted by a Detective Flood of the Sacramento County Sheriff's
23  Office who requested that I file a police report. I contacted
24  the Clark County Sheriff's Department and not only filed a re-
25  port but provided the statement that my wife wrote out. I also
26

DECLARATION OF CLYDE RAY SPENCER - 2

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPH@penrose001150

1  notified the police department that I worked for, of the situa-

2  tion.

3      6.   During the weeks that followed I consented to two poly-

4  graphs and a number of interviews with Det. Sgt. Davidson and

5  investigator Krause.  From the initial interview, pressure was

6  applied by Davidson trying to get me to confess.  The two poly-

7  graphs showed inconclusive results.

8      7.   During this interim, my daughter was interviewed in the

9  presence of her mother, and suddenly no one was named except

10  myself.

11      8.   The investigation continued for another six months in

12  which time my marriage quickly went downhill.  In January of

13  1985, I was arrested and relased on my own recognizance.

14  Shortly thereafter, I was also fired from my job as a police

15  officer. Prior to this time, I had been involved in law enforce-

16  ment for over fourteen years with no prior criminal history.

17  Not long after this, my wife and I had an agrument and separ-

18  ated.  During the heat of this argument, my wife stated, "Wait

19  until I get on that stand, I'll fix you.  I'll make sure you go

20  to prison."  At the time I assumed that this statement had only

21  been made in anger.

22      9.   Given the pressure I was under, the incredible allega-

23  tions against me and the fact that my life was falling apart, I

24  sought psychiatric treatment at Oregon Health Sciences Center in

25  Portland.  I was admitted there on two separate occasions.  I

26  was prescribed Sinequan.

DECLARATION OF CLYDE RAY SPENCER - 3

LAW OFFICES OF
EDWARDS AND BARDIERI
A PROFESSIONAL SERVICE CORPORATION
3100 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 88164
TELEPHONE (206) 682-1161

10. After separating, I moved into a motel.  I was without transportation or funds since I had sold my truck the previous week and my wife had removed all monies from our bank accounts.

11. During this period of time, I was again attempting reconcilliation with my wife.  On numerous occasions I would ask her to come over and spend the night.  Each time I asked, she would state, "I can't, if I do I can't go through with this."  At this time I assumed she meant that she wanted to work out our problems first and I never asked her to explain.

12. On or about February 19, 1985, my wife came to the motel, along with my stepson.  She stated that my stepson wanted to spend the night.  I thought this strange at the time since she had brought no clothes, etc. for him. She seemed to be in a highly agitated state.  When questioned about his clothes, she indicated that he had only asked permission after leaving home. I agreed to his spending the night and asked her to stay also. Again she indicated that she couldn't, that if she did she "couldn't go through with it."

13. The evening progressed as any other if I had been home.  My son was bathed, dressed in one of my T-shirts to sleep in and place in bed to watch T.V.  During the bath, my son was given the tops off of shaving cream cans to play with, since I had no toys to give him.  At no time did I get into the bath or touch my son in any inappropriate manner.

DECLARATION OF CLYDE RAY SPENCER - 4

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE (206) 624-1662

14.   The following day, I accompanied my wife and son back
to our residence for his birthday.  Upon arrival, I found that
my gun collection had been removed from the gun cabinet.  When
questioned about this, my wife indicated that the guns were sup-
posedly in the attic.  When I tried to reason with her indica-
ting that this collection was very valuable and could be ruined
in a damp attic, another argument ensued.  I was again escorted
from the premises by the Clark County sheriffs.  It should be
noted that at no time were any threats made or any attempt used
regarding the firearms in the commission of a crime.

15.   Reportedly, those guns are being held at this time by
the Clark County Sheriff's Office without legal grounds.
Attempts to have them released have met with negative results.
My wife has asked for these guns as part of the divorce settle-
ment.  All but two of the weapons were in my possession prior to
the marriage.  It appears that someone within the Clark County
Sheriff's Office has taken it upon themselves to become involved
in a strictly civil matter.

16.   The following week, I moved into a friend's house
while he was out of town.  The night before my second arrest, I
spoke with my wife on the phone.  I asked her to come over so we
could talk the problems out.  Again she replied that she
couldn't that if she did, she could not go through with this.
Again she seemed to be highly agitated.  The following afternoon
I was arrested by Sgt. Davidson of the Clark County Sheriff's
Office for molestation of my stepson.

DECLARATION OF CLYDE RAY SPENCER - 5

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 1854
TELEPHONE (206) 624-5165

17.   Upon being booked, I found that my bail was exces-
sively high considering the fact that I was unemployed and my
wife had emptied the bank accounts.  When questioned about this,
I was advised that my wife had indicated that I had been expec-
ting a large amount of money and that was why the bail was set
so high.  I can only assume that this was a reference to my re-
tirement check from the police department.

18.   Two days after my arrest, my wife was observed going
through my friend's mail box apparently looking for any or all
checks destined for me.  I base this assumpton on the phone call
received by my friends, Leo and Lois Clark, a few days later.
The call was from Investigator Krause of the Clark County
Sheriff's Office.  On that occasion, the Clarks were ordered to
turn over all mail and/or checks arriving at that address with
my name on them.  The Clarks were directed to turn the items
over to either Investagor Krause herself or to my wife Shirley.
The Clarks were further advised that they would be wise to stay
out of the situation.  Obviously, Krause acted without authority
and used her position in law enforcement to intimidate the
Clarks.  Investagor Krause works directly under Sgt. Davidson.
It appears that a concerted effort was being made to ensure that
I had no funds available to either bail out of jail or obtain
additional legal assistance.

19.   I spent approximately ninety days in the Clark County
Jail awaiting trial.  The jail policy does not allow contact

DECLARATION OF CLYDE RAY SPENCER - 6

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE (206) 621-8777

1   visits.   However on at least six occasions I would be removed
2   from my cell by either Krause or Davidson, handcuffed and es-
3   corted downstairs.   Upon arrival, the cuffs would be removed and
4   I would be placed in a room with my wife.   On each of these oc-
5   casions, the purpose of the visit was to have me sign certain
6   papers that would benefit my wife, i.e., Quit Claim Deed on my
7   house, Power of Attorney, etc.   If I refused to sign these docu-
8   ments, I was immediately handcuffed and returned to my cell.   It
9   was apparent that Krause and Davidson knew the type of documents
10  in my wife's possession.

11      20.   On one occasion, I heard Krause tell Davidson, "It's
12  no use, she couldn't talk him into signing the Power of
13  Attorney."   At present, my wife has forged my name on checks,
14  i.e., State Retirement, Unemployment, Income Tax and overtime,
15  totaling nearly twenty-five thousand dollars.

16      21.   During the time spent in the Clark County Jail, Sgt.
17  Davidson made numerous trips to my cell even though he was ad-
18  vised both by my attorney and myself that I had no desire to
19  waive my constitutional rights.   As Sgt. Davidson put it on one
20  of his numerous visits, "you belong to me now, I'll tell you
21  what your rights are."

22      22.   On Davidson's initial visits, he repeatedly attempted
23  to use the children to get me to plead guilty.   He would state
24  that if I didn't plead guilty, the children would be permanently
25  affected mentally for the rest of their lives, if I forced them
26

DECLARATION OF CLYDE RAY SPENCER - 7

LAW OFFICES OF
EDWARDS AND BARDIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98165
TELEPHONE 624-4001

1   to testify.  As the date for trial neared, Sgt. Davidson's

2   visits became more frequent and his attitude more abusive.  On

3   two of his final visits a physical confrontation nearly took

4   place.

5        23.  On one of these occasions, Davidson became extremely

6   irate when I refused to accompany him downstairs again.

7   Davidson started yelling, stating, "Your wife used to love

8   you."  When I questioned him about the term "used to ," he be-

9   came flustered, evasive in his answer and quickly left the jail.

10       24.  On the final confrontation, Davidson brushed by the

11  custody officer in charge after being advised that I did not

12  wish to speak with him.  When he refused to leave my cell, I

13  asked that Custody Officer Harper notify the sergeant on duty.

14  Davidson advised that this jail belonged to him and he wasn't

15  leaving.  However, Sgt. Harris ordered Davidson from the jail,

16  telling Officer Harper that if I didn't wish to talk with

17  Davidson, that I didn't have to.  As Davidson left, he stated,

18  "I am not finished with you yet."  This was overheard by Officer

19  Linda Harper and inmate John Pearce.

20       25.  The next day I filed a complaint with the lieutenant

21  of the jail, which was substantiated by Officer Harper.  I was

22  advised by the lieutenant that Sgt. Davidson had absolutely no

23  authority in the jail.  In fourteen years of law enforcement, I

24  have never had the occaion or found the need to go to the ex-

25  tremes that Davidson did, in an attempt to extract a confession

26

DECLARATION OF CLYDE RAY SPENCER - 8

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE 623/8337

1   out of an individual.  It was obvious that even at that time,

2   Davidson had taken a strong personal interest in my case and was

3   determined to get me to confess whether I was guilty or not.

4       26.  During the time spent in the jail, I was visited ap-

5   proximately six times by my attorney, James Rulli.  At times I

6   would appear in court without ever being advised ahead of time

7   by my attorney the purpose of the appearance.

8       27.  Approximately five weeks before trial, my attorney

9   advised me that he had no defense for me and that I should plead

10  guilty.  I refused, indicating that I was not going to plead

11  guilty to crimes I didn't commit.  I asked him if the children

12  had received any type of medical examinations to substantiate

13  that they had in fact been molested.  He indicated to me that

14  since they were reported victims, they could not be forced to

15  submit to an exam.  To my knowledge, he never even asked.

16      28.  At this point, the question arose as to whether I had

17  herpes.  My first wife DeAnne indicated tht she had contracted

18  herpes after our divorce, but felt that she had got it from me.

19  I had my medical doctor, Gary Nylander, do a complete blood

20  workup on me which showed no sign of the disease.  I asked that

21  my attorney have my daughter checked and again he refused.  My

22  reason was that since my first wife had been named as a suspect

23  and had admitted to having herpes, thar if it showed in my

24  daughter and my tests were clear, suspicion would be focused

25  elsewhere.

26

DECLARATION OF CLYDE RAY SPENCER - 9

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE 621-0672

29. During this period of time, I requested and completed a number of written tests, hypnosis and Sodium Amythol in an attempt to prove my innocence. After completion of both the hypnosis sessions and the Sodium Amytol, the doctor advised that he found nothing which would indicate my guilt.

30. During the entire time I was held in Clark County Jail, I was taking various antidepressants and/or tranquilizers which had been prescribed for me. These drugs did not appear to alleviate the feeling of desperation and depression which I felt throughout my confinement. I believe these drugs affected my ability to enter into a freely made and voluntary guilty plea. Certainly when combined with Davidson's browbeating and my attorney's lack of a defense, I can now, in hindsight, understand why I agreed to give up my right to stand trial. However, at the time, I truly felt that I had no choice.

31. I was sentenced and sent to the prison facility at Shelton, Washington. Approximately two weeks after arriving, I was served with divorce papers. Approximately one month later, I received information that my wife and Sgt. Davidson were living together. Apparently Davidson had been caught by his wife in bed with my wife. My wife and Davidson are reportedly living together and Davidson is in the process of divorcing his wife.

32. For my concern over the safety and well being of my children, I now find myself serving two consecutive life terms

DECLARATION OF CLYDE RAY SPENCER - 10

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE, WASHINGTON 98164
TELEPHONE 624-8937

1   plus sixteen years for crimes I did not commit.

2          I certify (or declare) under penalty of perjury under the
    laws of the State of Washington that the foregoing is true and
3   correct.

4
    5/2/86   Silits  Creek - Int.y        Clyde Ray Spencer
5   Date            Place                 Clyde Ray Spencer

6

7   5264B/tdf

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF CLYDE RAY SPENCER - 11

LAW OFFICES OF
EDWARDS AND BARBIERI
A PROFESSIONAL SERVICE CORPORATION
3701 BANK OF CALIFORNIA CENTER
SEATTLE WASHINGTON 98164
TELEPHONE 624-0974

Spencer001169

# EXHIBIT OO

1   STATE OF WASHINGTON )
                         :ss
2   COUNTY OF CLARK      )

3        JAMES M. PETERS, being first duly sworn, upon oath,

4   deposes and states:

5        That I am a Deputy Prosecuting Attorney for Clark

6   County, Washington, and in the course of that capacity have

7   personal knowledge that Clyde Ray Spencer is presently

8   pending trial before Department 3 of the Superior Court of

9   Clark County, Washington for the crimes of Statutory Rape

10  in the First Degree and Indecent Liberties involving his

11  daughter, Kathryn H. Spencer, age five, said trial is set

12  to begin April 15th, 1985.

13       In my official capacity, on February 28th, 1985,

14  I was contacted by Detective Sharon N. Krause of the

15  Clark County Sheriff's Office, who is known to your affiant

16  to be a reliable and credible individual and who reported

17  the following information:

18       That this morning, February 28th, 1985, she was

19  contacted by Shirley Spencer, who is the wife of the

20  defendant, Clyde Ray Spencer, and her five year old son,

21  Mathew Allen Charles Hanson, whose date of birth is November

22  28, 1975.  During the course of that contact Krause had

23  occasion to interview Mathew Allen Charles Hanson based on

24  concerns expressed by Shirley Spencer that her son, age five,

25  may have been sexually molested by Clyde Ray Spencer within

26  the preceding twelve months.  During the course of her

27  interview with Mathew Allen Charles Hanson, age five, Krause

28  determined the following information:

29       Mathew appeared to be a bright and verbal child

30  who was easy to understand and informed Krause that he

31  had observed his father engaged in sexual acts with both

32  his step-sister, Kathryn Spencer, who is the victim of

FILED

FEB 28 1985

CLARK COUNTY PROSECUTING ATTORNEY
1200 FRANKLIN
P O BOX 5000
VANCOUVER, WASHINGTON 99668
(206) 699-2261

Spencer-00599

1    Counts I and II of the present Information, and his
2    step-brother, Mathew Spencer, age nine, who is the
3    natural son of Clyde Ray Spencer;
4            Mathew also related to Deputy Krause that he
5    himself had been victimized by Ray Spencer on numerous
6    occasions describing in detail acts of having to perform
7    fellatio on his father, his father performing fellatio
8    on him, his father penetrating his rectum digitally, he
9    having to perform digital penetration upon his father
10   and his father performing penal penetration upon the
11   child's rectum;
12           Specifically, Mathew indicated that during
13   the sum of 1984 when his step-siblings, Katy and big
14   Matt were present at his residence on the Lewis River
15   in Clark County, Washington, his stepfather took him
16   into the master bedroom of the house while his mother,
17   Shirley, was at work.  Further, that Clyde Ray Spencer,
18   and he were both naked during this contact and that
19   Clyde Ray Spencer engaged him in anal penetration of
20   Mathews rectum and required Mathew to perform fellatio
21   upon Clyde Ray Spencer;
22           Further Mathew described to Deputy Krause that
23   sometime after his step-sister, Katy, left to return to
24   her home in California, which Krause advises was on
25   August 27th, 1984, a number of additional acts occurred.
26   Specifically, on one occasion he and the defendant, Ray
27   Spencer were in the bathtub and Ray Spencer forced
28   Mathew's head under the bath water and caused him to
29   put his mouth on Ray's erect penis.  Mathew further
30   indicated to Krause that there were bubbles in the bath-
31   tub when this occurred.
32           In interviewing Spencer's wife, Shirley, Shirley

MOTION AND AFFIDAVIT - 3

CLARK COUNTY PROSECUTING ATTORNEY
1200 FRANKLIN
P. O. BOX 5000
VANCOUVER, WASHINGTON 98666
(206) 699-2261

Spencer-00600

1  indicated that on one occasion after Katy left she attempted

2  to put bubble bath in Mathew's bathwater and Mathew expressed

3  extreme fear of having bubbles in his bathwater.

4       Further, that Shirley Spencer indicated to Deputy

5  Krause that on or about February 16, 1985, Ray Spencer was

6  residing at the Salmon Creek Motel located in Clark County,

7  Washington.  She indicated that she had an appointment in

8  the evening of that date and had agreed with Ray Spencer

9  to leave Mathew in his care at the Salmon Creek Motel.

10  She indicated she dropped Mathew off in Room 17 of that

11  motel and described the room as an upstairs room located

12  at the back of the complex with a television set mounted

13  high upon the wall.  In her interview with Mathew, Krause

14  learned that during that interaction with Ray Spencer,

15  Mathew was again sexually assaulted.  Mathew indicated

16  that Ray Spencer inserted his penis into Mathew's rectum

17  and also forced Mathew to put his mouth on Ray Spencer's

18  penis.

19       Further, your affiant requested that Sgt. Mike

20  Davidson of the Clark County Sheriff's Office verify the

21  description of the motel room on February 28, 1985 at 1:20

22  p.m. your affiant was advised that Davidson had personally

23  viewed the room and determined the existence of the television

24  mounted high on the wall.  Further, he verified that Spencer

25  was registered at the Salmon Creek Motel between February 6th

26  and February 20, 1985.

27       Wherefore, based upon the foregoing information,

28  your affiant believes there is good and sufficient information

29  to believe that Clyde Ray Spencer is guilty of an additional

30  three counts of Statutory Rape in the First Degree and your

31  affiant prays that he be apprehended and brought before the

32  Court for further proceedings.
MOTION AND AFFIDAVIT - 4

CLARK COUNTY PROSECUTING ATTORNEY
1200 FRANKLIN
P O BOX 5000
VANCOUVER, WASHINGTON 98666
(206) 699-2261

Further your affiant saith not.

James H Peters
Deputy Prosecuting Attorney

SUBSCRIBED AND SWORN TO BEFORE ME THIS 28 day of February, 1985.

Notary Public in and for the
State of Washington residing
at Vancower, therein.

MOTION AND AFFIDAVIT - 5

CLARK COUNTY PROSECUTING ATTORNEY
1200 FRANKLIN
P. O. BOX 5000
VANCOUVER, WASHINGTON 98668
(206) 699-2261

Spencer-00602

# EXHIBIT PP

281

1
                  UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON

2
                       AT TACOMA

3

CLYDE RAYMOND SPENCER,         )     Docket No. C94-5238RJB
4
                      )
        Petitioner,   )     Tacoma, Washington
5
                      )     September 5, 1996
       v.             )     9:30 a.m.
6
                      )
JOSEPH KLAUSER, Warden,      )
7
Idaho State Institution;    )
CHRISTINE GREGOIRE, Attorney  )
8
General, State of Washington. )
                      )
9
        Respondent.   )
                      )
10

11
                        VOLUME III
                 TRANSCRIPT OF TRIAL
12
       BEFORE THE HONORABLE ROBERT J. BRYAN
         UNITED STATES DISTRICT JUDGE.
13

14
APPEARANCES:

15
For the Petitioner:      PETER A. CAMIEL
                    Mair, Camiel & Kovach, P.S.
16
                    710 Cherry Street
                    Seattle, Washington  98104
17

For the Respondents:     JOHN J. SAMSON
18
                    DONNA H. MULLEN
                    Assistant Attorneys General
19
                    Post Office Box 40116
                    Olympia, Washington  98504-0116
20

21
Court Reporter:         Julaine V. Ryen
22
                    Post Office Box 885
                    Tacoma, Washington 98401-0885
23
                    (206) 593-6591

24
Proceedings recorded by mechanical stenography, transcript
25
produced by Reporter on computer.

COPY

1      JAMES M. PETERS, PETITIONER'S WITNESS, SWORN OR AFFIRMED

2                    DIRECT EXAMINATION

3    BY MR. CAMIEL:

4    Q.  Would you state your full name and spell your last name,

5    please.

6    A.  My name is James Matthew Peters.  P-e-t-e-r-s.

7    Q.  And your professional address?

8    A.  Box 32, Boise, Idaho.

9    Q.  Mr. Peters, how are you currently employed?

10   A.  I'm an assistant United States attorney in the District of

11   Idaho.

12   Q.  Were you previously employed as a deputy prosecuting

13   attorney in Clark County?

14   A.  Yes, I was.

15   Q.  And were you the primary deputy prosecuting attorney in the

16   case involving Mr. Spencer?

17   A.  That's true.

18   Q.  Mr. Peters, do you recall when charges were initially filed

19   against Mr. Spencer?

20   A.  No, I do not.

21   Q.  Do you recall the fact that there was more than one

22   information filed against Mr. Spencer?

23   A.  Yes.

24   Q.  It was amended on occasion.

25   A.  I do recall that.

Spencer003217

1   from questioning, and during counseling, it's usually not

2   questioning.  It's usually open-ended therapy and things come

3   up.  I don't know if that's questioning.

4   Q.  That's one reason why a lot of judges think these things

5   always should be on videotape, so we have a record of it,

6   because we really don't know --

7   A.  Unfortunately --

8   Q.  -- how these things occur.

9   A.  -- parents don't videotape their children all the time every

10  day and disclosures don't come up in a planned setting.

11  Q.  In this case, did you or the police, on your behalf or

12  working with you, investigate into the family situation these

13  kids were living in?

14  A.  Which family situation?

15  Q.  Well, the ones they were living in.

16  A.  Well, Matt Hansen was living with Mr. Spencer and his wife,

17  and Matt Spencer and Kathryn Spencer were living during the

18  school year in Sacramento with their mother and during the

19  summer with Mr. Spencer and his wife.  So I don't know what you

20  mean by ---

21  Q.  I mean the California home.  Was there any investigation

22  into that home or what was going on there to determine if some

23  of the precocious behavior of these children, precocious sexual

24  behavior and knowledge of these children grew out of whatever

25  was happening in that home?

421

1                    C E R T I F I C A T E

2

3        I certify that the foregoing is a correct transcript from

4   the record of proceedings in the above-entitled matter.

5

6

7

                                          January 15, 1997
8        JULAINE V. RYEN                         Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Spencer003308