# EXHIBIT QQ

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

423

1     UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF WASHINGTON
2        AT TACOMA

3

CLYDE RAYMOND SPENCER,   )  Docket No. C94-5238RJB
4           )
     Petitioner,  )  Tacoma, Washington
5           )  September 6, 1996
    v.      )  1:00  p.m.
6           )
JOSEPH KLAUSER, Warden,   )
7 Idaho State Institution;  )
 CHRISTINE GREGOIRE, Attorney )
8 General, State of Washington. )
           )
9     Respondent.  )
           )

10

11        VOLUME IV
       TRANSCRIPT OF TRIAL
12   BEFORE THE HONORABLE ROBERT J. BRYAN
     UNITED STATES DISTRICT JUDGE.

13

14 APPEARANCES:

15 For the Petitioner:   PETER A. CAMIEL
           PETER MAIR
16          Mair, Camiel & Kovach, P.S.
          710 Cherry Street
17          Seattle, Washington  98104

18 For the Respondents:  JOHN J. SAMSON
           DONNA H. MULLEN
19          Assistant Attorneys General
          Post Office Box 40116
20          Olympia, Washington  98504-0116

21

 Court Reporter:    Julaine V. Ryen
22          Post Office Box 885
          Tacoma, Washington 98401-0885
23          (206) 593-6591

24

 Proceedings recorded by mechanical stenography, transcript
25 produced by Reporter on computer.

SER -148
Spencer003921

522

1    consult with counsel with a reasonable degree of rational

2    understanding.  His mental illness and the drugs he ingested did

3    not substantially impair his ability to make a reasoned choice

4    among the alternatives presented or to understand the nature and

5    consequences of his actions.  He understood the nature of the

6    charges, the consequences of his plea, and he was able to assist

7    in his own defense.  He evidenced at that time coherence and

8    rationality and a lack of psychosis.  He did not exhibit unusual

9    behavior, and I think that he was legally competent and not

10   entitled to relief on that basis.

11        Mr. Spencer testifies here that he doesn't remember

12   anything.  He doesn't remember a lot of things in this case, he

13   tells us, and, you know, I don't have a direct answer for that,

14   but certainly it is to his advantage not to remember, or to

15   choose not to remember those events.  I'm not satisfied that I

16   really believe that he doesn't remember the entry of the plea.

17        Now, so far as the Brady issues are concerned, there are two

18   prongs of this.  Of course, one is the first question, whether

19   the medical report or reports should have been turned over; and

20   second is the question of the effect of failure to turn those

21   over.  I want to address the first question tonight.

22        Based on everything I've read in this file, I am afraid that

23   I've come to the conclusion that Mr. Davidson, formerly of the

24   Clark County Sheriff's Office, I guess -- or was that the

25   Vancouver police?  The sheriff's office, I believe -- that he's

Spencer003963

1  just not very credible, and I don't particularly believe what he

2  has told us.  Ms. Krause doesn't recall this.  Shirley Spencer,

3  in her affidavit, had a very vague recollection -- well, Shirley

4  Spencer didn't recall the part about the lad's medical report,

5  Exhibit 2.  And Ms. Spencer, in regard to that, had some very

6  vague and unconvincing testimony about that medical report.

7     It's hard in considering Exhibit 2 to reconstruct what

8  happened and what are the probabilities about that report.  I

9  sometimes have to look inward and see what I really think, and I

10  guess what I think about that is that I think that the sheriff's

11  office was aware that Matthew Hansen had been to a doctor for

12  this exam.  I think he went as a result of the recommendation of

13  Detective Krause.  I'm not at all sure, however, that the

14  sheriff's department had a report to hand over at that time.  I

15  don't know at this point where this report came from or whether

16  they had it.  I guess the evidence on that subject is

17  sufficiently cloudy, so my conclusion is that probably that

18  report was not in the hands of the sheriff's office or the

19  prosecution prior to the plea.

20     Clearly, however, Exhibit 1 was in the hands of the

21  sheriff's office.  Clearly, they had an obligation, based on the

22  omnibus order, to hand that document over to the defense, and

23  they had that obligation -- if I can find the right exhibit;

24  Exhibit 32 -- they had that obligation clearly on the 25th of

25  January of 1985 and thereafter.

Spencer003964

527

1  answer to this out as soon as I can.

2          THE DEFENDANT:  Thank you, Your Honor.

3      (Recessed at 4:25 p.m.)

4

5                    C E R T I F I C A T E

6

7      I certify that the foregoing is a correct transcript from

8  the record of proceedings in the above-entitled matter.

9

10

11

12                                          January 15, 1997
          JULAINE V. RYEN                        Date

13

14

15

16

17

18

19

20

21

22

23

24

25

SER ~195

Spencer003968

# EXHIBIT RR

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

1

1

2

3

IN THE UNITED STATES DISTRICT COURT

4

FOR THE WESTERN DISTRICT OF WASHINGTON AT TACOMA

5

6

CLYDE RAYMOND SPENCER,         )
                               )
7                              )        ORIGINAL
          Petitioner,          )
8                              )
                               )
9         v.                   )    No.   C94-5238 RJB
                               )
10  JOSEPH KLAUSER, Warden, Idaho )
    State Institution; CHRISTINE )
11  GREGOIRE, Attorney General,  )
    State of Washington,         )
12                               )
          Respondents.           )
13  _____)

14

15

16                   DEPOSITION OF MICHAEL DAVIDSON

                     Taken on behalf of Petitioner
17

18                          July 25, 1996

19                          *   *   *   *

20

21  BE IT REMEMBERED THAT, pursuant to Washington Rules of Civil
    Procedure, the deposition of Michael Davidson was taken before
22  Kathleen L. Greene, on July 25, 1996, commencing at the hour of
    10:00 a.m., the proceedings being reported at Attorney
23  General's Office, 500 W 8th Street, Suite 110, Vancouver,
    Washington.

24

25           FREE WORD INDEXING WITH EVERY TRANSCRIPT

                        Naegeli & Associates
                 1-503-227-1544    1-800-528-3335

Spencer002858

14

1      A.   Not specifically.   I was with Detective Krause

2    during portions of the interview of Billy Matt Hansen.

3      Q.   Were you present with Detective Krause for portions

4    of one interview of Matt Hansen or more than one?

5      A.   I don't know that I can be accurate with that.

6    There was probably more than one.   Not all of that was

7    pertaining to Ray Spencer.

8      Q.   Were you present during the interviews of either of

9    the other two children?

10     A.   I don't believe I was present during those

11   interviews.

12     Q.   Do you recall whether you prepared any report

13   involving the Spencer case?

14     A.   I can't specifically recall preparing a report,

15   because I think most of my function was as a supervisor.

16     Q.   Do you recall reviewing Detective Krause's reports

17   in this case?

18     A.   Yes, I do.

19          (Exhibit No. 1 Marked for Identification.)

20     MR. CAMIEL:   (Continued)

21     Q.   I'm handing you what's been marked as Exhibit No. 1

22   to your deposition.   If you could take a look at those pages

23   for a moment.

24     A.   Okay.

25     Q.   If you'd turn back to the first page of Exhibit 1,

Spencer002871

1    the report?

2        A.   Certainly not that I can recall.

3        Q.   You've already referenced two interviews, or

4    attempted interviews, you've had with Ray Spencer.  Did you

5    also have contact with Mr. Spencer after he was incarcerated

6    at the Clark County Jail?

7        A.   Not to my recollection, no, sir.

8        Q.   Do you recall whether you went up to the Clark

9    County Jail, ever, after Mr. Spencer was incarcerated, to

10   visit him?

11       A.   No.

12       Q.   When you indicate no, are you indicating that you

13   didn't go up there or that you don't recall?

14       A.   I'm indicating that I didn't go up there.

15       Q.   Did you ever tell anyone that you went up to the

16   Clark County Jail and visited with Ray Spencer?

17            MR. SAMSON:   I'm going to have to object,

18   Peter, unless you can show how this is relevant to the issues

19   currently before the District Court.  I don't believe it's

20   relevant.  The Ninth Circuit has affirmed the denial of a

21   claim regarding force of plea and the alleged visits of

22   Sergeant Davidson at the Clark County Jail.  And I don't

23   believe that it's relevant.  So unless you can tie it to the

24   issues, I would object on the grounds of relevancy.

25            MR. CAMIEL:   For the record, one of Mr.

1    Spencer's claims has to do with his competency.  There have
2    been allegations that Mr. Davidson visited him in jail when
3    he was incarcerated.  He did, therefore, if he did make such
4    visits, have the opportunity to observe Mr. Spencer's
5    demeanor and make judgements about his competency.  And based
6    on that, these are relevant questions.

7         MR. CAMIEL:  (Continued)

8         Q.  Mr. Davidson, are you familiar with a person who was
9    working back at the Clark County Jail back in 1984, 1985,
10   named Linda Harper?

11        A.  Not, specifically, no, sir.

12        Q.  Do you recognize the name?

13        A.  No, I don't.

14        Q.  Okay.  Did you ever tell Shirley Spencer that you
15   went to the Clark County Jail and visited with Mr. Spencer?

16        A.  Certainly not that I recall.

17        Q.  Do you know of any reason why you would tell her
18   that, if you did?

19                 MR. SAMSON:  I would object on the grounds
20   that it calls for speculation.  Mr. Davidson has testified he
21   doesn't recall ever meeting Mr. Spencer, so how can he recall
22   a reason why he would have made a statement that he didn't
23   make.

24        A.  I'll stand.  I don't recall.

25        Q.  I'm going to ask you to take a look at a portion of

1    a deposition.  And for the record, this is the deposition of

2    Shirley Spencer taken on June 4 of this year, page 13,

3    beginning on line 20, going over to page 14, down to line 12.

4    And I've marked the area in yellow highlighting.

5         A.   Okay.

6         Q.   You've looked at the portion of Shirley Spencer's

7    deposition?

8         A.   I have.

9         Q.   Does that refresh your recollection, at all, as to

10   whether or not you ever went to the Clark County Jail and

11   visited Mr. Spencer?

12        A.   It does not.

13        Q.   You continue to maintain that you did not visit him

14   at the Clark County Jail?

15        A.   To my recollection, I do not recall ever visiting

16   Mr. Spencer at all in the Clark County Jail.

17        Q.   Do you recall ever being advised, by any members of

18   the Clark County Jail staff, to leave the jail and not to

19   visit Mr. Spencer anymore?

20             MR. SAMSON:  I would object on the grounds

21   of relevancy, again.  You indicated that the questions had to

22   do with the observations of Mr. Davidson of Mr. Spencer at

23   the jail.  He's indicated that he doesn't recall being there.

24   Any statements the Clark County Jail staff may have made to

25   Mr. Davidson or may not have made to Mr. Davidson don't have

1   any relation to observations about Mr. Spencer's competency.

2   So I would object on the grounds of relevancy, unless you can

3   tie it in.

4                     MR. CAMIEL:   I think it's relevant.   And

5   I'm going to ask him to answer.

6       A.   I'm going to have to respond that, at this point, I

7   conclude it's not relevant to this deposition.

8       Q.   Are you refusing to answer the question?

9       A.   I believe I already answered it in terms that I

10  don't recall ever visiting Mr. Spencer in jail.

11      Q.   All right.   Do you recall ever going to the jail

12  with Mr. Spencer's retirement check from the Vancouver Police

13  Department and presenting him with the check and asking him

14  to endorse it?

15      A.   I do not recall that, no.

16      Q.   During the Ray Spencer investigation, did you become

17  aware that, at some point in time, Mr. Spencer had been

18  hospitalized for depression?

19      A.   I don't recall that either, no.

20      Q.   During the Spencer investigation, at any point, did

21  you become aware that Mr. Spencer was taking medication?

22      A.   No, sir.

23      Q.   When the sheriff's office prepared its files, was

24  there an index cover sheet that was used on the sheriff's

25  office files?

Spencer002883

1    recall an incident like that, but I can't be positive.

2        Q.   Do you recall whether or not any reports were

3    prepared concerning the interview with Matt Hansen regarding

4    being sexually abused by other police officers?

5        A.   Without looking at the report file, no, sir.

6        Q.   Did you have any contact with Mr. Spencer's

7    attorney, James Rulli, while the Spencer case was pending?

8        A.   I recall Mr. Rulli being in the office and

9    discussing the case.  I don't know whether I was personally

10   involved in that discussion or not.

11       Q.   When you say "in the office", what office are you

12   talking about?

13       A.   Clark County Sheriff's Department.

14       Q.   Do you recall whether you had any contact with

15   Deputy Prosecutor Peters regarding the Spencer case?

16       A.   I recall, yes.

17       Q.   Do you recall what the nature of any discussions

18   were that you had with Mr. Peters?

19       A.   There was a number of discussions with Mr. Peters

20   regarding this investigation.  I can't recall specifically

21   the nature of each of those individual discussions.

22       Q.   Do you recall whether any of the discussions

23   concerned any medical reports involving any of the children

24   in the Spencer case?

25       A.   I have no specific recollection of that, no.

Spencer002894

43

1
2
3  STATE OF OREGON        )
                          )  ss.
4  COUNTY OF COLUMBIA     )
5
6            I, Kathleen Greene, court reporter and Notary
7  Public in and for the state of Oregon, do herby certify:
8            That the witness named in the deposition, prior to
9  being examined, was by me first duly sworn;
10           That said deposition was taken before me at the
11  time and place therein set forth and was taken down by me in
12  shorthand and thereafter transcribed into typewriting under
13  my direction and supervision;
14           That said deposition is a true record of the
15  testimony given by the witness and of all objections made at
16  the time of the examination;
17           I further certify that I am neither counsel for
18  nor related to any party to said action, nor in any way
19  interested in the outcome thereof.
20           IN WITNESS WHEREOF, I have subscribed my name and
21  affixed my seal this 31st day of July, 1996.
22
23  _____
24           Notary Public in and for the
                  State of Oregon
25

                Naegeli & Associates
          1-503-227-1544    1-800-528-3335

Spencer002900

# EXHIBIT SS

1

1          UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
2                    AT TACOMA

3

CLYDE RAYMOND SPENCER,          )      Docket No. C94-5238RJB
4                                )
              Petitioner,        )      Tacoma, Washington
5                                )      September 3, 1996
          v.                     )      9:30 a.m.
6                                )
JOSEPH KLAUSER, Warden,          )
7  Idaho State Institution;      )
CHRISTINE GREGOIRE, Attorney     )
8  General, State of Washington.  )
                                 )
9              Respondents.       )
                                 )

10

11                    VOLUME I
                TRANSCRIPT OF TRIAL
12       BEFORE THE HONORABLE ROBERT J. BRYAN
            UNITED STATES DISTRICT JUDGE.

13

14  APPEARANCES:

15  For the Petitioner:         PETER A. CAMIEL
                                Mair, Abercrombie, Camiel &
16                                 Rummonds
                                710 Cherry Street
17                              Seattle, Washington   98104

18  For the Respondents:        JOHN J. SAMSON
                                DONNA H. MULLEN
19                              Assistant Attorneys General
                                Post Office Box 40116
20                              Olympia, Washington  98504-0116

21

Court Reporter:                 Julaine V. Ryen
22                              Post Office Box 885
                                Tacoma, Washington 98401-0885
23                              (206) 593-6591

24

Proceedings recorded by mechanical stenography, transcript
25  produced by Reporter on computer.



64

1    JAMES M. DAVIDSON, PETITIONER'S WITNESS, SWORN OR AFFIRMED

2                        DIRECT EXAMINATION

3   BY MR. CAMIEL:

4   Q.   Could you please state your full name and spell your last

5   name.

6   A.   James Michael Davidson.   D-a-v-i-d-s-o-n.

7   Q.   Mr. Davidson, are you currently employed?

8   A.   No, I'm not.

9   Q.   What was your last employment?

10  A.   Clark County Sheriff's Department.

11  Q.   How long were you with the Clark County Sheriff's

12  Department?

13  A.   Twenty years.

14  Q.   And during a part of that 20-year stint in the Clark County

15  Sheriff's Department, did you supervise detectives who

16  investigated child sex crimes?

17  A.   I did.

18  Q.   And were you Detective Sharon Krause's supervisor during the

19  Spencer case investigation?

20  A.   Yes, I was.

21  Q.   As supervisor, would you have reviewed Detective Krause's

22  reports?

23  A.   In a general sense, yes.

24  Q.   When you indicate "in a general sense," can you describe

25  what you mean by that?

1  Q.  Do you know which index was turned over to the prosecuting

2  attorney's office?

3  A.  I do not.

4  Q.  Did you have contact with Mr. Spencer after he was arrested

5  and in the Clark County Jail?

6  A.  Not that I recall, no.

7  Q.  Do you recall whether or not you ever went up and visited

8  him at the Clark County Jail?

9  A.  To my recollection, I never went and visited Mr. Spencer.

10  Q.  Did you have any contact with Mr. Spencer by telephone once

11  he was under arrest and in the Clark County Jail?

12  A.  To my recollection, no, sir.

13          MR. CAMIEL:  Your Honor, that's all I have.

14          MR. SAMSON:  Thank you, Your Honor.

15                      CROSS-EXAMINATION

16  BY MR. SAMSON:

17  Q.  Mr. Davidson, if you could look at Exhibit No. 24 in the

18  blue book.

19  A.  Yes, sir.

20  Q.  Is it true there are only nine sections referenced in that

21  exhibit?

22  A.  That's correct, yes.

23  Q.  Could you look at Exhibit No. 25.

24  A.  Yes, sir.

25  Q.  Is there actually 18 sections referenced?

1  had occurred on that day?

2  A.  Not really.  There were parts in it that I'm assuming it's

3  correct.  There's parts in it I don't remember.

4  Q.  After the sodium amytal interview, were you continuing to

5  take the other prescribed medication?

6  A.  Yes.

7  Q.  Did you continue to take medication after your plea?

8  A.  Yes.

9  Q.  For how long?

10  A.  Till I reached the state penitentiary.

11  Q.  And how long after you were in the state penitentiary did

12  you continue to take medication?

13  A.  Probably for a week.  Something like that.

14        THE COURT:  Counsel, it's 3:30 -- 4:30.  We will pick

15  this up again at 1:30 tomorrow afternoon.

16    Thank you.  You may step down.

17    (Witness excused.)

18                    C E R T I F I C A T E
          I certify that the foregoing is a correct transcript from
19  the record of proceedings in the above-entitled matter.

20  _____              January 8, 1997
          JULAINE V. RYEN                          Date

21

22

23

24

25

# EXHIBIT TT

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

1

1        UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
2                  AT TACOMA

3

CLYDE RAYMOND SPENCER,          )      Docket No. C94-5238RJB
4                               )
              Petitioner,       )      Tacoma, Washington
5                               )      September 3, 1996
         v.                     )      9:30 a.m.
6                               )
JOSEPH KLAUSER, Warden,         )
7   Idaho State Institution;    )
CHRISTINE GREGOIRE, Attorney    )
8   General, State of Washington. )
                                )
9             Respondents.      )
                                )
10

11                      VOLUME I
                  TRANSCRIPT OF TRIAL
12        BEFORE THE HONORABLE ROBERT J. BRYAN
             UNITED STATES DISTRICT JUDGE.
13

14  APPEARANCES:

15  For the Petitioner:      PETER A. CAMIEL
                             Mair, Abercrombie, Camiel &
16                              Rummonds
                             710 Cherry Street
17                           Seattle, Washington   98104

18  For the Respondents:     JOHN J. SAMSON
                             DONNA H. MULLEN
19                           Assistant Attorneys General
                             Post Office Box 40116
20                           Olympia, Washington   98504-0116

21

Court Reporter:              Julaine V. Ryen
22                           Post Office Box 885
                             Tacoma, Washington 98401-0885
23                           (206) 593-6591

24

Proceedings recorded by mechanical stenography, transcript
25  produced by Reporter on computer.

COPY

144

1          THE COURT:  I might have questions for you, in

2     addition.

3        Do you understand that?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  And have you discussed with Mr. Camiel

6     whether it's appropriate for you to testify in this case?

7          THE WITNESS:  Yes, sir, I have.

8          THE COURT:  And you're satisfied with those

9     discussions?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  And you're satisfied he understands his

12     rights in regard to testifying here, Mr. Camiel, and it is

13     appropriate for him to testify?

14          MR. CAMIEL:  Yes, Your Honor.

15          THE COURT:  You may proceed.

16                    DIRECT EXAMINATION

17     BY MR. CAMIEL:

18     Q.   State your full name.

19     A.   Clyde Ray Spencer, S-p-e-n-c-e-r.

20     Q.   Mr. Spencer, you're currently being held at McNeil Island,

21     but immediately before that where were you incarcerated?

22     A.   At the Idaho Corrections Institution, Idaho.

23          THE COURT:  Where is that?

24          THE WITNESS:  The Idaho Correctional Institution.

25          THE COURT:  Where is that?

Spencer003037

162

1  A.  Yes, I did.

2  Q.  Who were some of the people that visited you while you were

3  at the jail?

4  A.  Joan Wilson, Leo Clark.  Some of the police officers came

5  and visited.

6  Q.  Were you visited by Sergeant Davidson?

7  A.  Yes.

8        MR. SAMSON:  Objection, Your Honor.  That's

9  irrelevant.  That claim was dismissed by the Ninth Circuit.

10        MR. CAMIEL:  Your Honor, I'm not raising that with

11  regard to the coercion claim but with regard to the competency

12  claim.

13        THE COURT:  The answer may stand.

14  A.  Yes, I was.

15  Q.  (By Mr. Camiel)  Did he visit you as a personal friend?

16  A.  No, he did not.

17  Q.  When Sergeant Davidson would come up and visit you, in what

18  part of the jail would he have contact with you?

19  A.  Face to face in the medical unit.

20  Q.  Do you have a recollection of how long after you were in the

21  jail that Sergeant Davidson began coming up to see you?

22  A.  Almost immediately.

23  Q.  When he came up to see you, do you recall what his reason

24  was?

25        MR. SAMSON:  Objection, Your Honor.  It calls for

163

1  speculation as to the reason for the alleged visit.
2       THE COURT:  I don't know if you're asking him --
3       MR. CAMIEL:  What was discussed.
4       THE COURT:  -- what was his opinion or what Davidson
5  said.
6  Q.  (By Mr. Camiel)  What did Davidson say when he came up to
7  see you?
8       MR. SAMSON:  I would object on the ground that it calls
9  for hearsay, Your Honor.
10      THE COURT:  I gather this is not offered for the truth
11  of what Davidson said but rather for the effect it may have had
12  on Mr. Spencer?
13      MR. CAMIEL:  Exactly.
14      THE COURT:  He may answer, with that limitation.
15  A.  The majority of the time Sergeant Davidson would come to the
16  jail he would remove me from that area, take me down and
17  interrogate me down in his office or one of the interrogation
18  rooms of the sheriff's department itself.
19  Q.  (By Mr. Camiel)  Was he accompanied by anyone else?
20  A.  At times with Detective Krause.
21  Q.  What did they tell you?  What did Sergeant Davidson tell
22  you?
23      MR. SAMSON:  Objection.  Hearsay, Your Honor.
24      THE COURT:  He may answer, but it's the same
25  limitation.

164

1    A.   Sergeant Davidson continued to attempt to get me to plead

2    guilty.  He alleged the damage that was going to be done to my

3    children if I made them testify.  On a number of occasions, his

4    purpose for removing me from the jail and taking me to the

5    sheriff's department was to have me meet with my current wife at

6    the time in an effort to get me to sign over documents, power of

7    attorney, quitclaim deed to my house, my retirement check, etc.

8    Q.   (By Mr. Camiel)  Did there ever come a point in time

9    where -- let me ask you:

10       What was the tenure of the discussion with Sergeant

11   Davidson?  Was it calm?

12   A.   Initially I would say that he acted in a fairly professional

13   manner.  As time for trial became closer, however, he became

14   very abrasive, to the point that it almost had physical

15   confrontation.  At one point he stated that "Your wife used to

16   love you."  When I asked him what he knew about my wife, he

17   quickly walked out of the jail.

18   Q.   Did you ever attempt to refuse to meet with Sergeant

19   Davidson?

20   A.   Yes, I did.

21   Q.   Were you successful in refusing to meet with him?

22   A.   Closer to the end, because his behavior became so bizarre

23   that the other jailers noted it, too.  And at one point when he

24   was going to remove me from the jail, I asked that the jailer in

25   charge contact the sergeant in charge of the jail, which he did.

165

1  Q.  Were Davidson's visits upsetting to you?

2  A.  Yes, they were.  Extremely.

3  Q.  Did there come a point in time where you discussed with Mr.

4  Rulli pleading guilty?

5  A.  No.  I never discussed pleading guilty with Mr. Rulli.  I

6  was not guilty.

7  Q.  Was it your intent to go to trial?

8  A.  Yes, it was.  Most definitely.

9  Q.  When Mr. Rulli told you that he hadn't a defense prepared,

10  what occurred after that meeting?

11  A.  Was this the first time, approximately five weeks before,

12  or --

13  Q.  Was there another time?

14  A.  Yes.  A couple of days before we were scheduled to go to

15  trial.

16  Q.  What happened at that meeting?

17  A.  Again, Mr. Rulli indicated that he had no defense to the

18  charges.  He had no witnesses that he could call or any solid

19  evidence that he could put on that would refute the state's

20  case.

21  Q.  Mr. Spencer, you've got a notebook in front of you.  I would

22  like you to turn to tab number 1.

23      Do you remember the first time you ever saw this document?

24  A.  The first time I ever saw this document was a couple of

25  months ago.

1  had occurred on that day?

2  A.  Not really.  There were parts in it that I'm assuming it's

3  correct.  There's parts in it I don't remember.

4  Q.  After the sodium amytal interview, were you continuing to

5  take the other prescribed medication?

6  A.  Yes.

7  Q.  Did you continue to take medication after your plea?

8  A.  Yes.

9  Q.  For how long?

10  A.  Till I reached the state penitentiary.

11  Q.  And how long after you were in the state penitentiary did

12  you continue to take medication?

13  A.  Probably for a week.  Something like that.

14      THE COURT:  Counsel, it's 3:30 -- 4:30.  We will pick

15  this up again at 1:30 tomorrow afternoon.

16    Thank you.  You may step down.

17    (Witness excused.)

18                    C E R T I F I C A T E
           I certify that the foregoing is a correct transcript from
19  the record of proceedings in the above-entitled matter.

20  _____        January 8, 1997
              JULAINE V. RYEN                      Date

21

22

23

24

25

Spencer003063

# EXHIBIT UU

## DECLARATION OF LYNDA HARPER

I, Lynda Harper, make the following statement under penalty of perjury:

1.    I was employed at the Clark County Jail in the medical unit as a medical officer in 1985 when Clyde Ray Spencer, former Vancouver City Police Officer, was an inmate there.

2.    Clyde Ray Spencer was kept in the medical unit of the jail.

3.    I specifically recall Clyde Ray Spencer because he was one of only two inmates in the medical unit at the time.

4.    I was aware that he was taking several medications at the time that he was incarcerated, but I don't recall exactly what medicines he was being given.

During the time that Clyde Ray Spencer was an inmate, I recall that police officers would could up to interview him. At times, he was taken from the jail down to the Sheriff's office.

5.    I recall that there was one police officer in particular, whose name I cannot recall, who came to see Mr. Spencer on a number of occasions.

6.    I remember that Clyde Ray Spencer did not want to see this officer and at times, Mr. Spencer refused to come out. I remember that there was a problem with this officer continually coming to the jail to see Ray Spencer and I remember that a complaint was made by Mr. Spencer to try to keep the officer from continually coming to see him. I remember that after the visits with the officer, Clyde Ray Spencer would be upset.

7.    With regard to Clyde Ray Spencer's demeanor, I remember that he was very, very down. He was quiet and mellow and non-excitable.

Declaration of Linda Harper - 1

Spencer003540

8.    With regard to his case, I remember Mr. Spencer always maintaining that he was innocent. I was very surprised when I heard that he entered the pleas of guilty.

9.    I recall that I was upset by the way that Mr. Spencer was being treated. He was asking not to be seen by this one police officer who was repeatedly coming up to see him; that his wishes were being ignored.

10.   I recall Mr. Spencer telling me after he had been taken from the jail to see a doctor to have a truth serum or sodium amytal test performed, that he had passed the test and that there was no evidence that he was guilty.

DATED this ___4___ day of ___February___, 1994.

Lynda Harper

# EXHIBIT VV

1
2
3
4
5                                                              Honorable Judge Benjamin Settle
6
7
8                         UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                    AT TACOMA

10   CLYDE RAY SPENCER,                          )
                                                 )   No. C11-5424BHS
11                      Plaintiff,               )
                                                 )
12          v.                                   )
                                                 )   DECLARATION OF CLYDE
13   FORMER DEPUTY PROSECUTING                   )   RAY SPENCER
     ATTORNEY FOR CLARK COUNTY JAMES             )
14   M. PETERS, DETECTIVE SHARON KRAUSE,)
     and SERGEANT MICHAEL DAVIDSON,              )
15                                               )
                        Defendants.              )
16                                               )
                                                 )
17                                               )
                                                 )
18 _____)

19          Pursuant to 28 U.S.C. § 1746, Clyde Ray Spencer declares under penalty of perjury

20   under the laws of the State of Illinois and the United States of America that the following is

21   true and accurate:

22          1.      My name is Clyde Ray Spencer. I am the Plaintiff in the above-captioned

23   matter. I have direct and personal knowledge of the facts stated in this declaration, and will

24   testify to them if called upon to do so.

25          2.      I have reviewed a photocopy of the check issued to me by State of Washington

26   dated February 20, 1985 in the amount of $12,994.51. I have also reviewed a photocopy of the

27

     DECLARATION OF CLYDE RAY SPENCER          Kathleen T. Zellner & Associates, P.C.
     (C11-5424BHS) — 1                                     LAW OFFICES
                                                        1901 Butterfield Road
                                                            Suite 650
                                                   Downers Grove, Illinois 60515

Spencer006056

1  back of the check which has a signature of "Clyde R. Spencer." A true and correct copy of the

2  front and back of the check I reviewed is attached as Exhibit A to this declaration.

3       3.      The signature on the back of the check in Exhibit A is a forgery. I did not sign

4  the check, nor did I give anyone permission to sign my name.

5       4.      I have also reviewed an "Affidavit of Forged Endorsement," a true and correct

6  copy of which is attached as Exhibit B to this declaration. I recognize my signature on the

7  affidavit.

8       5.      I filled out and signed the Affidavit of Forged Endorsement on July 22, 1985,

9  after I learned that my name had been forged on the above-described check.

10       6.      I have also reviewed a copy of a quitclaim deed purported to be signed by me as

11  Grantor for the property located at 17681 Lucia Falls Road in Yacolt, Washington dated March

12  15, 1985. A true and correct copy of the deed I reviewed is attached as Exhibit C to this

13  declaration.

14       7.      The signature "Clyde Ray Spencer" is a forgery. I did not sign the deed, and I

15  did not have anyone permission to sign my name.

16       I declare under penalty of perjury that the foregoing is true and correct.

17       DATED this 12th day of December, 2012 in Downers Grove, Illinois

18

19                              Clyde Ray Spencer

20

21  Signed and Subscribed to Before Me

     this 17 day of December, 2012

22

23

24  Notary Public

25

26  A. MORTIMER
COMM. #1908716
Notary Public-California
LOS ANGELES COUNTY
My Comm. Exp. OCT 3, 2014

27

DECLARATION OF CLYDE RAY SPENCER
(C11-5424BHS) — 2

Kathleen T. Zellner & Associates, P.C.
LAW OFFICES
1901 Butterfield Road
Suite 650



PIONEER NATIONAL
TITLE INSURANCE

A TICOR COMPANY

Filed for Record at Request of

AFTER RECORDING MAIL TO:
Carl F. Burkheimer Jr.
10011 N.W. 11th Ave.
Vancouver, Wa.  98685

8509250154

## Quit Claim Deed

THE GRANTOR SHIRLEY SPENCER, AS HER SEPARATE ESTATE.

for and in consideration of ASSUMPTION OF DEBT ONLY

conveys and quit claims to CARL F. BURKHEIMER JR. and RUTH BURKHEIMER,
Husband and wife

the following described real estate, situated in the County of Clark

State of Washington including any interest therein which grantor may hereafter acquire:

beginning at a point in the center of the Vancouver-Yacolt Road at the intersection
of said County Road and the East line of the Southwest quarter of the Northwest
quarter of Section 18, Township 4 North, Range 3 East of the Willamette Meridian,
in Clark County, Washington; running thence Easterly 75 feet, more or less, along
said County Road; thence South to the North bank of the East Fork of the Lewis
River; thence Westerly along the North bank of said River; 75 feet, more or less;
thence North to the point of beginning; said tract to be 75 feet wide East and
West.
ALSO, beginning at a point in the center of the County Road which is 75 feet East
of the center line of the Northwest quarter of Section 18, Township 4 North, Range
3 East of the Willamette Meridian; thence South to the North bank of the East Fork
of the Lewis River; thence Easterly 25 feet, more or less, along the North bank of
the River; thence North to the center of the County Road; thence West to the point
of beginning. Said tract to be 25 feet wide at any point.
ALSO, beginning at a point located in the center of the Yacolt-Battle Ground
Highway, said point being on the East line of that certain tract of land at this
date owned by Roy Lane and described as follows:
All that portion of the Southwest quarter of the Northwest quarter of Section 18,
Township 4 North, Range 3 East of the Willamette Meridian, lying North of the East
Fork of the Lewis River in Clark County, Washington; thence South to the North Bank
of said Lewis River; thence Westerly along the Lewis River 40 feet; thence North to
the center of the above Yacolt-Battle Ground Highway; thence East 40 feet to the
point of beginning.

EXCEPT, County Roads.
ALSO, the West 15 feet, measured at right angles to the West line thereof, of that
portion of the Northwest quarter of Section 18, Township 4 North, Range 3 East of
the Willamette Meridian in Clark County, Washington, described as follows:
Beginning at a point on the Southerly line of County Road No. 12 that is 1217.02
feet West of the East line of the Northwest quarter of said Section 18; said point
being the Northwest corner of the Lawrence C. Larkin and Lilo L. Larkin tract, as
described in deed recorded under Auditor's File No. G 553620; thence Westerly along
the Southerly line of said County Road No. 12, a distance of 33 feet, more or less,
to the Northeast corner of the Shirley J. Turley tract, as described in deed
recorded under Auditor's File No. 7709290041; thence South along the East line of
said Turley tract to the North bank of the East Fork of the Lewis River; thence
Easterly along the North bank of said River to the West line of the said Larkin
Tract; thence North along said West line, 99 feet, more or less, to the point of
beginning.



EXHIBIT
C

Spencer006060

Attached

FILED FOR RECORD

Carl Counkheimer

SEP 25  4 21 PH '85

AUD. IN
DAVID HICHENGR

Dated this _25th_ day of September, 1985.

Shirley J Spencer [SEAL]
_____ [SEAL]

0272

WASHINGTON,
Clark

personally appeared before me Shirley Spencer
the individual described in and who executed the within and foregoing instrument, and
she signed the same as her free and voluntary act and deed, for the
uses mentioned.

hand and official seal this 25th day of September, 1985

_____
Notary Public in and for the State of Washington,
residing at Vancouver

Spencer006061

8508160171

TO CLEAR TITLE ONLY

## QUIT-CLAIM DEED
### (Statutory Form)

THE GRANTOR( ) ___CLYDE RAY SPENCER____

of __17681 Lucia Falls Road_____, City of __Yacolt___

County of ___Clark____, Washington, for and in consideration of ___

love and affection and to clear title

convey, n and quit-claim s to ___SHIRLEY SPENCER as her separate estate

_____ of _17681 Lucia Falls Road___

In the City of __Yacolt___, County of ___Clark___, State of __Washington__, all interest in the following described Real Estate:

See Exhibit "A" attached hereto, and incorporated
herein by this reference

2 5 7678   1-16 85

situate in the county of ___Clark___, State of Washington.

5th day of __March___, 19 85.

_Clyde Ray Spencer_
Grantor(s)

1333

STATE OF WASHINGTON,  } ss.   (Individual Acknowledgment)

County of ___Clark___

I, _Donna D. Landrum_, Notary Public in and for the State of Washington, do hereby certify, that on this _15th_ day of __March___, 19.85, personally appeared before me __Clyde Ray Spencer___ described in and who executed the within Instrument and to me known to be the individual___ described in and who executed the within Instrument and acknowledged that __he___ signed the same as __his___ free and voluntary act and deed for the uses and purposes herein mentioned.

GIVEN UNDER MY HAND AND OFFICIAL SEAL this _15th_ day of __March___ 19 85.

_Donna D. Landrum_
Notary Public in and for the State of Washington, residing at _Vancouver_ in said County.

Quit-Claim Deed (Statutory Form)
Washington Legal Black Co., Bellevue, WA   Form No. 366   911A
MATERIAL MAY NOT BE REPRODUCED IN WHOLE OR IN PART IN ANY FORM WHATSOEVER.

Spencer006062

"EXHIBIT "A"

Beginning at a point in the center of the Vancouver-Yacolt Road at the
intersection of said County Road and the East line of the Southwest quarter of the
Northwest quarter of Section 18, Township 4 North, Range 3 East of the Willamette
Meridian, in Clark County, Washington; running thence Easterly 75 feet, more or less,
along said County Road; thence South to the North bank of the East Fork of the Lewis
River; thence Westerly along the North bank of said river 75 feet, more or less; thence
North to the point of beginning; said tract to be 75 feet wide East and West.

ALSO, beginning at a point in the center of the County Road which is 75 feet
East of the center line of the Northwest quarter of Section 18, Township 4 North,
Range 3 East of the Willamette Meridian; thence South to the North bank of the East
Fork of the Lewis River; thence Easterly 25 feet, more or less, along the North
Bank of said river; thence North to the center of the County Road; thence West to
the point of beginning. Said tract to be 25 feet wide at any point.

ALSO, beginning at a point located in the center of the Yacolt-Battle Ground
Highway; said point being on the East line of that certain tract of land at this date
owned by Roy Lane and described as follows:

All that portion of the Southwest quarter of the Northwest quarter of Section 18,
Township 4 North, Range 3 East of the Willamette Meridian, lying North of the East
Fork of the Lewis River in Clark County, Washington; thence South to the North Bank
of said Lewis River; thence Westerly along the Lewis River 40 feet; thence North to the
center of the above Yacolt-Battle Ground Highway; thence East 40 feet to the point
of beginning.

EXCEPT County Roads.

ALSO, The West 15 feet, measured at right angles to the West line
thereof, of that portion of the Northwest quarter of Section 18, Township
4 North, Range 3 East of the Willamette Meridian in Clark County, Wash-
ington, described as follows:

BEGINNING at a point on the Southerly line of County Road No. 12
that is 1217.02 feet West of the East line of the Northwest quarter of
said Section 18, said point being the Northwest corner of the Lawrence
C. Larkin and Eliza L. Larkin tract as described in deed recorded under
Auditor's File No. G 553620; thence Westerly along the Southerly line
of said County Road No. 12, a distance of 33 feet, more or less, to the
Northeast corner of the Shirley J. Turley tract as described in deed
recorded under Auditor's File No. 7709290041; thence South along the
East line of said Turley tract to the North Bank of the East Fork of
the Lewis River; thence Easterly along the North Bank of said River to
the West line of the said Larkin tract; thence North along said West
line, 99 feet, more or less, to the point of beginning. 0331

FILED FOR RECORD
CLARK CO. WASH
Irwin C. Landerholm
AUG 16 4 04 PM '85
AUDITOR
DAVID MICHENER

# EXHIBIT WW

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

CLYDE RAY SPENCER,                    )
                                      )
                    Petitioner,       )
                                      )
        vs.                           )   No. C94-5238 RJB
                                      )
JOSEPH KLAUSER, Warden,               )
Idaho State Institution,              )
                                      )
                    Respondent.       )

_____

DEPOSITION UPON ORAL EXAMINATION

OF

SHIRLEY J. SPENCER

_____

DATE TAKEN:   June 4, 1996                  COPY


TIME:   1:00 p.m.


PLACE:   1104 Main Street, M-110
         Vancouver, Washington




COURT REPORTER:   CINDY J. HOLLEY, CSR


RIDER & ASSOCIATES
COURT REPORTERS
P.O. Box 245
Vancouver, Washington 98666

Spencer002455

1   Q. What's Matt's date of birth?

2   A. It's February 20th of 1980.

3   Q. Does Matt have a social security number?

4   A. Yes, he does.

5   Q. Do you know that?  I'm looking at a social security

6 card for Matthew A. Hansen and the number is 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.

7 Thank you.

8     Miss Spencer, back in late 1984 and the first part of

9 1985, do you recall that Mr. Spencer had been charged with

10 sexual abuse here in Clark County?

11   A. Yes, I know.

12   Q. And as a part of the investigation was your son Matt

13 interviewed by Clark County Sheriff's office personnel?

14   A. Yes, he was.

15   Q. Do you recall who interviewed your son?

16   A. Sharon Krause, Mike Davidson.

17   Q. As a part of the investigation concerning Mr. Spencer,

18 were you referred to take Matt to a doctor or to a clinic for

19 an examination?

20   A. Yes, I was, if you're talking physical.

21   Q. Yes.

22   A. Yes.

23   Q. Who referred you for this examination?

24   A. Who told me to go, Sharon Krause.

25   Q. And do you recall where it was that you took Matt?

1      A.   I don't remember discussing it.

2      Q.   Do you recall having a discussion with Sergeant

3  Davidson about the results of Matt's examination?

4      A.   Now we're talking 12 years ago, I don't remember.

5      Q.   Do you recall explaining to my investigator and I that

6  you did have a discussion with Sergeant Davidson and he told

7  you that the fact that the doctor didn't find anything didn't

8  mean that Matt wasn't abused?

9      A.   No, I don't remember that.

10      Q.   In fact, is that what Sergeant Davidson told you?

11      A.   I don't remember that he told me that, no.

12      Q.   Did you discuss with either Sergeant Davidson or

13  Detective Krause the fact that Matt had been examined?

14      A.   I'm sure I did because they told me to go.

15      Q.   Do you remember signing any kind of a release or a

16  waiver for the Clark County Sheriff's office to allow them to

17  get Matt's medical records?

18      A.   I don't remember it, but I probably would have if

19  they'd asked me to, but I don't remember it.

20      Q.   Well, let me clarify what you have told us, okay.

21           You were referred by you believe Sharon Krause to go

22  to have Matt physically examined; is that correct?

23      A.   Yes.

24      Q.   And the purpose of the examination was to look for any

25  evidence of sex abuse?

1                          CERTIFICATE

2

3      STATE OF WASHINGTON )
                           ) ss.
4      COUNTY OF LEWIS     )

5             I, Cindy J. Holley, a Notary Public for Washington,

6      certify that the deposition of SHIRLEY J. SPENCER here occurred

7      at the time and place set forth in the caption hereof; that at

8      said time and place I reported in Stenotype all testimony

9      adduced and other oral proceedings had in the foregoing matter;

10     that thereafter my notes were reduced to typewriting under my

11     direction; and the foregoing transcript, pages 1 to 18 both

12     inclusive, contains a full, true and correct record of all such

13     testimony adduced and oral proceedings had and of the whole

14     thereof.

15            I further advise you that as a matter of firm policy,

16     the Stenographic notes of this transcript will be destroyed

17     two years from the date appearing on this Certificate unless

18     notice is received otherwise from any party or counsel hereto

19     on or before said date;

20            Witness my hand and notarial seal at Mossyrock,

21     Washington, this 10th day of June 1996.

22

23

24                              Cindy J. Holley, CSR #HOLLECJ399P5
                                Notary Public for Washington
25                              My commission expires:  11-9-96

# EXHIBIT XX

Redrafted Declaration of Kathleen T. Zellner
In Support of Plaintiff's Redrafted Responses to
Defendants' Renewed/Second Motions for Summary Judgment
(C11-5424BHS)

IN THE SUPE   R/DISTRICT COURT OF THE STATE OF   CTION
IN AND FOR THE COUNTY OF CLARK

STATE OF WASHINGTON

Case No.

vs

Clyde Spencer

MOR RELEASE AGREEMENT

YOU ARE HEREBY RELEASED ON THE CONDITIONS INDICATED BELOW:

| | | | |
|---|---|---|---|
| ☐ PERSONAL PROMISE 699-2436 | YOUR PERSONAL RECOGNIZANCE, on your promise to appear at all scheduled hearings, trials, or otherwise as required by the Court, during release, you are to abide by the following conditions: | ☐ SUPERVISED RELEASE 699-2436 | YOU ARE RELEASED ON CONDITIONAL SUPERVISION. You hereby agree to be placed in the custody of the Supervised Release Officer and abide by any conditions or agreements as listed below: |

703 West 15th Street
Vancouver, Washington

- You are to obey all laws.
- You are to obtain and/or maintain full-time employment.
- You are to have no contact whatsoever with victim(s)

- You are to keep in touch with your attorney.
- Your travel is restricted to C l ar C — Mult   County
- You are not to possess or use alcoholic beverages or drugs.
- You are not to possess or use firearms.
- You are to contact _____ (In person, by phone) every Wednesday, between 246pm at 699-2436, 703 West 15th Street.

687-1147

| YOU ARE TO LIVE: | At: | 1 7681 | Lacie Falls Rd 94021 | |
|---|---|---|---|---|
| | | Address | | Telephone |
| | With: | Wife-and Relationship to Defendant | | |

And: Not move without first obtaining permission of the Court.

GENERAL CONDITIONS: I do hereby agree that I shall appear at all times and places as ordered by the Court. Further, I shall appear for trial; and, if convicted, appear for judgment and execution of judgment. I will obey all Orders of the Court and comply with any conditions the Court may impose, including but not limited to those listed above.
I understand that if I violate any condition of this release agreement, I may be immediately arrested and then detained pending trial.
FAILURE TO APPEAR: Should you be released under this agreement, with the requirement of a subsequent personal appearance before this or any other Court of the State of Washington, and should you knowingly fail to appear without lawful excuse, you may be charged with the crime of bail jumping. Bail jumping, committed by an individual charged with a felony, is punishable by imprisonment not to exceed 10 years, by a fine not to exceed $10,000 or both. 9A.76.170

For information concerning this release, call: Release on Recognizance 699-2436
Supervised Release 699-2436

I understand that I am liable for those penalties as prescribed by law for willful failure to appear or for violation of any condition of this agreement upon which I am released. If I am apprehended outside the State of Washington, I hereby waive extradition.

| J. Kulli | Attorney | [signature] |
|---|---|---|
| Witness | Title | Signature of Defendant |

If a criminal complaint or information is filed against you on or before _____, 19__, this agreement continues in effect until your case is concluded. If no criminal complaint or information is filed by such date, this agreement will then terminate and, as of that date, you are released from any requirements or responsibilities imposed by it.

SO ORDERED: This 2 day of January, 1985   [signature]
Judge/Recognizance Officer

| YOUR NEXT COURT DATE IS: | 1-1-85 | 1:30 | #3 Lodge |
|---|---|---|---|
| | Date | Time | |

Court: 1200 Franklin Street

Distribution: White, Court file; Canary, RDR; Pink, Defendant; Goldenrod, Jail; Green, P.A.

Spencer-00860

# EXHIBIT YY

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT

STATUTORY RAPE I, RCW 9A.44.070

LOCATION OF INCIDENT:   17681 NE Lucia Falls Road
                        Yacolt, Washington

DATE OF INCIDENT:       Between 07-14-84 and 08-26-84

DATE & TIME:            10-02-84                     10:00 AM
LOCATION:               CCSO, Investigation Unit
INCIDENT:               Suspect/Witness Interview

PERSON INTERVIEWED:     STONE, Karen Sue              dob: 03-27-44
                        8811 NE 80th Street
                        Vancouver, Washington         phone: 892-6676
                        Employed:
                        Industrial Pump Sales Co.
                        1202 W. Fourth Plain
                        Vancouver, Washington         phone: 699-4676

VICTIM:                 SPENCER, Kathryn E.           dob: 01-13-79
                        3909 Becerra Way
                        Sacramento, California        phone: (916) 482-6057

SUSPECT:                SPENCER, Clyde Ray            dob: 01-09-48
                        aka: Ray SPENCER
                        17681 NE Lucia Falls Road
                        Yacolt, Washington            phone: 687-1407

CCSO Case #84-8506, S.A.KRAUSE, K-43                          page 1 of 7

Spencer-00427

SUMMARY:

On 08-30-84 Deputy R. STEPHENSON with the Clark County Sheriff's Office did an initial investigation regarding allegations of sexual abuse involving the above listed suspect and his daughter, Kathryn SPENCER. The information in Deputy STEPHENSON'S report indicated that in addition to Kathryn SPENCER naming her father as a suspect, Kathryn also indicated that there was an occasion when she had had some type of sexual contact with an ex-girl friend of Mr. SPENCER named Karen STONE during a visitation with her father in Vancouver. Based on that information I made phone contact with Karen STONE on October 1, 1984 and made arrangements with her to meet with me the following afternoon.

The interview with Karen STONE was done in the investigative unit of the Clark County Sheriff's Office with only Karen STONE and I present. During the initial part of our conversation STONE indicated that she first either met or began living with SPENCER about Christmas of 1979. She indicated that she met him "right after he started working for Vancouver Police" and also that his wife at that time, Deanne SPENCER, was still in California.

She indicated the first time she was with SPENCER'S children, Kathryn and Matt SPENCER, was during spring break in 1980 when Ray SPENCER went to get them for visitation. She also advised that the children stayed with them during the summer of 1981. When I indicated to Karen STONE that Kathryn had made some statement about Karen touching the genital area of her (Kathryn) body, Karen STONE advised that "she had." She then indicated that when the children arrived for summer visitation in 1981 Kathryn had a sore apparently on the labium which necessitated Karen applying medication to it. She advised me that Ray was upset about the sore and had called "Family Court or something because of it."

STONE also advised when the children visited in December of 1981 they had "lice." She indicated that "Ray was always very protective of his children." During the conversation with STONE several times she indicated she "could just not believe that Ray would ever do anything like that because he was so sweet and he cared so much about his children."

She advised that during the first summer, 1980, when Ray had his children for visitation Ray was working swing shift. She stated, "He just wouldn't have had time to do anything like that."

CCSO Case #84-8506, S.A.KRAUSE, K-43                          page 2 of 7

STONE advised me that during the time SPENCER'S children visited them when she and Ray SPENCER were living together 'the children always wanted to sleep with their dad.' She advised that they didn't always do that; however, there were a number of times when they would get in bed with Ray and Karen.

During the time I talked with STONE she made several negative statements regarding Deanne SPENCER and when she knew of her, specifically that there was a time during the first Christmas that they had the children and had returned to California that "their mother made them exchange the kids in a snowy parking lot," that when Deanne SPENCER picked the children up during the last summer STONE and Ray SPENCER were together Deanne SPENCER wouldn't "even hug her children because she said she was too hot and tired," that Deanne SPENCER was a "very vindictive woman," and that 'the SPENCER children were always very dirty and unkempt when they came to visit."

STONE advised that the last summer she was living with Ray SPENCER and the children were visiting, "The kids were crying when they left and Matt didn't want to go with his mother. He wanted to live with his father."

STONE advised me that "Matt was very defensive of his father and mother because he loved both parents." She then stated, "When Deanne left Ray she just packed up and left with the kids and another man. I guess he was a child psychologist or something like that."

STONE advised that when Deanne SPENCER moved up here shortly after Ray SPENCER went to work for Vancouver Police 'Deanne and Ray went back together or something so he did not see Karen STONE for a period of time." She advised that the SPENCERS then filed for divorce and separated. STONE stated to me, 'She (Deanne SPENCER) had already shipped Matthew off and she told Ray he could either go through the boxes of property or have his daughter, and Ray told her he wanted Kathryn, so Deanne SPENCER left Kathryn, who was a baby, with Ray and she left for California." STONE also stated, "The reason they got a divorce was that she (Deanne) didn't like Ray being a cop." She advised me again that 'Ray's ex-wife was very vindictive and tried to make his life miserable."

Karen STONE then advised me that Deanne SPENCER was never negative towards her, but Ray talked about how Deanne treated him during the time they were married.

CCSO Case #84-8506, S.A.KRAUSE, K-43                    page 3 of 7

I asked Karen STONE about her sexual involvement with SPENCER reference the allegations that Kathryn had made, and she advised that their sexual relationship was "very basic and normal." She indicated that she never saw Ray have any kind of pornographic literature. She advised that he never talked "weird." I asked her about the possibility that SPENCER might masturbate and she indicated that she did not believe he did, nor did he talk about it.

Karen STONE indicated that Ray was "always a very courteous and loving person" during the time she knew him. She indicated that he always called her if he was going to be late and that he "never went out and stayed late during the time he was with her."

I asked STONE what she knew of Ray SPENCER'S background, and she indicated that he had mentioned his mother died when he was a teenager, that he had two sisters, and that he raised himself after sixteen years of age. STONE indicated that SPENCER was never physical with her in any way and indicated again that he was "always very courteous."

STONE indicated that she and SPENCER broke up in about October or November of 1982 and at that time they quit living together. She indicated that the last time she saw him was possibly in March of April "just prior to him getting married in July." She advised that the last time she saw SPENCER he wanted her to go to California with him to see his children and she declined.

Reference STONE'S observations about Kathryn SPENCER, she indicated that "Kathryn was a very demanding child." When I asked her if she could be more specific she indicated that Kathryn would "want her way and would attempt to dominate her father's attention." STONE also stated to me, "Kathryn was a very sexual little girl." She talked again about the sore on Kathryn's labium during the visitation which prevented Kathryn from wearing panties.

I asked STONE if she ever heard SPENCER refer to Kathryn as 'baby girl" and she indicated that they both called Kathryn that.

During much of the time I talked with Kathryn STONE she talked about unrelated topics. She continued to deny that there was every any reason for her to suspicion Ray SPENCER was having any type of sexual contact with Kathryn SPENCER or any other children. She indicated that she had daughters

Spencer-00430

and that both of her daughters "loved Ray to pieces because he's such a sweet person." There were several times during my conversation with her that she talked about how "kind and cute Ray SPENCER was."

Prior to terminating the conversation with Karen STONE, I asked her if she would be willing to take a polygraph regarding the statement that Kathryn SPENCER had made indicating that there may have been some sexual contact between Karen STONE and Kathryn. STONE indicated that she really did not want to take a polygraph; however, she would be willing to do that, and expressed concern about Kathryn's well being.

On 10-09-84 I made phone contact with Karen STONE at her place of employment reference the polygraph examination. Prior to calling her I spoke to Dr. Stan ABRAMS reference when he would have time available to administer the polygraph examination. I provided STONE with the dates Dr. ABRAMS had given me and she indicated that she would call me back.

At approximately 1545 hours that same day STONE called back and indicated she would be willing to take the polygraph on October 16, 1984 at 1730 hours. I advised STONE that Dr. ABRAMS would meet with her at the Sheriff's Office.

During the week of October 15th I was in Sacramento, California continuing this investigation. During one of my conversations with Detective Sgt. Mike DAVIDSON he indicated that based on information he had obtained from Vancouver Police it appeared that Ray SPENCER had had some contact with Karen STONE. Detective Sgt. DAVIDSON also advised me that there was a mix-up regarding the scheduled polygraph, specifically that I had told STONE to meet Dr. ABRAMS at the Sheriff's Office and he understood that she would be coming to his office; therefore, the polygraph examination was not administered.

After I had returned from Sacramento, on October 31, 1984 at approximately 11:10 AM I made phone contact with Karen STONE at her place of employment. When I initially made contact with her, she was immediately very curt and defensive. She advised me that she was "really too busy to talk." She confronted me about why "I had called and ruined her day." I asked her if it would be more convenient for her to call me back and she indicated that she "couldn't call me back because the president of the company was down all week and she would not have time." STONE confronted me again, stating that she

CCSO Case #84-8506, S.A.KRAUSE, K-43                    page 5 of 7

Spencer-00431

"didn't know about the polygraph, that she was very unhappy about the way things were being handled; that it made her upset just to think about a polygraph." I indicated to STONE that it was our intention to expedite this matter and clear it up as soon as possible, and STONE immediately stated, "You mean you haven't cleared Ray yet? I don't understand how you can do this to him. What is taking you so long? Why are you making him suffer like this? The man is in agony." STONE then let me know that she was too busy to talk and I asked if she could get back to me and the conversation was abruptly terminated.

On 11-07-84 at approximately 4:45 PM I made phone contact with Karen STONE again, at her residence reference a polygraph and she immediately advised me she was too sick to talk and terminated the conversation.

On 11-16-84 at approximately 9:45 AM until 10:15 AM I made phone contact again with Karen STONE and at that time she did not appear to be so confrontive; however, she was somewhat evasive. She indicated she was feeling better; however, she would not be available to talk with me or to take a polygraph because she was going to be away for the Thanksgiving holiday and she did not want me to ruin the holiday. .She also stated to me that she "felt awful that someone was not doing something to help Kathryn and that Ray has to go through all this." She also stated that she "did not understand what was taking me so long and why we were doing this to Ray." I advised Karen STONE that I did not want to upset her for the holidays and that if it were convenient she could call me when she got back, or I would attempt to call her at a later time.

On 11-30-84 at approximately 12:00 noon I received a phone call from Dr. ABRAMS and at that time he indicated that he had some time available if I wanted to reschedule the polygraph for STONE. I made phone contact with Karen STONE and she indicated that she was not willing to "give up a Saturday for this" and advised she would have to call me back about another available time which was on a Monday evening.

On 12-03-84 I made another phone contact with STONE at her place of employment. During that conversation she was not confrontive and indicated to me that she "really didn't want to do this" (the polygraph). She asked if it was really necessary and advised me that it has been bothering her a lot. She stated, "It's got me so depressed; I'm not avoiding you, I just don't

Spencer-00432

want to do it unless it is absolutely necessary." I advised STONE that I would talk with the Prosecutor and call her back.

    After that conversation I did meet with the Prosecutor and it was agreed that at this time it was not necessary, based on the fact that Karen STONE had denied any type of sexual contact, and further that that was corroborated by Kathryn SPENCER during the time I spent with her, when Kathryn indicated that she had lied about Karen STONE. Based on the statements made by STONE and Kathryn SPENCER, and also other information that has developed in this investigation, any investigation regarding Karen STONE as a suspect will be suspended as unfounded.

Spencer-00433