1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

THE HONORABLE BENJAMIN SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENCER , MATTHEW RAY
SPENCER, and KATHRYN E. TETZ,

                Plaintiffs,

v.

FORMER DEPUTY PROSECUTING
ATTORNEY FOR CLARK COUNTY JAMES
M. PETERS, DETECTIVE SHARON
KRAUSE, SERGEANT MICHAEL
DAVIDSON, CLARK COUNTY
PROSECUTOR'S OFFICE, CLARK
COUNTY SHERIFF'S OFFICE, THE
COUNTY OF CLARK and JOHN DOES ONE
THROUGH TEN,

                Defendants.

NO.  C11 5424 BHS

DECLARATION OF GUY
BOGDANOVICH IN SUPPORT OF
DEFENDANT SHARON KRAUSE'S
SECOND SUMMARY JUDGMENT
REPLY

NOTE ON MOTION CALENDAR:
Friday, April 12, 2013

PURSUANT TO 28 U.S.C. § 1746, Guy Bogdanovich declares as follows:

    1.  I am competent to testify in all respects, and make this declaration from personal knowledge. I am the attorney of record for defendant Sharon Krause in the above-entitled action.

    2.  Attached hereto as **Exhibit A** are true and correct copies of the title page and the following pages from the Deposition of Shirley Jean Spencer: 42, 85, 88, 96-99, 105 and 146.

    3.  Attached hereto as **Exhibit B** are true and correct copies of the title page and the following pages from the Deposition of Kathryn Elizabeth Tetz: 94.

**DECLARATION OF GUY BOGDANOVICH
IN SUPPORT OF DEFENDANT SHARON KRAUSE'S
SECOND MOTION FOR SUMMARY JUDGMENT - 1**
Cause No: C11-5424 BHS

*LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.*
ATTORNEYS AT LAW
2674 RW JOHNSON BLVD SW, TUMWATER, WA 98512
PO BOX 11880, OLYMPIA, WA 98508-1880
(360) 754-3480  FAX: (360) 357-3511

1    4. Attached hereto as **Exhibit C** is a true and correct copy of a Utility Report written by

2    Sharon Krause dated 2-22-85, authenticated during and attached to the Deposition of Sharon Krause

3    as Deposition Exhibit 18.

4    5. Attached hereto as **Exhibit D** are true and correct copies of the title page, Deposition

5    Exhibit 4, and the following pages from the Deposition of Matthew Ray Spencer: 81-82, and 107-

6    08.

7    6. Attached hereto as **Exhibit E** are true and correct copy of the title page and following

8    pages from the Deposition of Clyde Ray Spencer: 152-54 and 159-60.

9    7. Attached hereto as **Exhibit F** are true and correct copies of the title page and the

10   following pages from the Deposition of Menona Landrum: 20 and 40-41.

11   I declare under penalty of perjury under the laws of the State of Washington and the United

12   States of America that the foregoing is true and correct.

13   DATED this 12th day of April, 2013 at Tumwater, Washington.

14

15                              */s/ Guy Bogdanovich*
                              _____
16                              Guy Bogdanovich

17

18

19

20

21

22

23

24

25

26

**DECLARATION OF GUY BOGDANOVICH**
**IN SUPPORT OF DEFENDANT SHARON KRAUSE'S**
**SECOND MOTION FOR SUMMARY JUDGMENT - 2**
Cause No: C11-5424 BHS

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON BLVD SW, TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480  FAX: (360) 357-3511*

# EXHIBIT A

1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY   )
SPENCER and KATHRYN E. TETZ,    )
                     )
          Plaintiffs,   )
                     )
   vs.              )  No. 11-cv-05424-BHS
                     )
FORMER DEPUTY PROSECUTING      )
ATTORNEY FOR CLARK COUNTY JAMES  )
M. PETERS, DETECTIVE SHARON    )
KRAUSE and SERGEANT MICHAEL    )
DAVIDSON,                )
                     )
          Defendants.   )


VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

SHIRLEY JEAN SPENCER


DATE TAKEN:  December 6, 2012
TIME:      9:00 a.m.
PLACE:      613 W. 11th Street
         Vancouver, Washington


COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR




Rider & Associates, Inc.

360.693.4111

42

1    you're going to instruct her not to answer, I would ask

2    you to answer my question over his objection.

3         MR. DUNN:  You can go ahead and answer.

4         THE WITNESS:  Would you repeat it, now, please?

5    BY MS. ZELLNER:

6    Q.  Sure.  Do you believe that this -- at this

7    point when Kathryn was telling you these things about

8    being sexually abused by multiple abusers, that you

9    personally were very sensitive to this issue of abuse

10   because of your history?

11   A.  No, never entered my mind about me.

12   Q.  Okay.  All right.  So let's continue on.

13   A.  She said that Big Matt stuck his finger in her

14   sometimes.  I asked her about any other men or women and

15   she said no, every time Big Matt came around she said,

16   shush, Matt's coming.  She said, you won't tell dad, and

17   I said, no.  And don't you say anything.  She said dad

18   told me not to say anything -- to tell you.

19   Q.  Okay.  And you're still at the beach when she's

20   telling you all this information?

21   A.  Yes, ma'am.

22   Q.  And you hadn't written the letter yet, right?

23   A.  No, ma'am.

24   Q.  And Ray has come home, but he's left for his

25   motorcycle conference.

85

1    the night, he would have had jammies.

2        Q.  Did you tell Sharon Krause before you took

3    Matt, Little Matt, to the motel that you were going to

4    do that?

5        A.  No, why would I do that?

6        Q.  I'm not asking you that.  I'm asking if you

7    told her that.  Did she have knowledge that you were

8    going to do that?

9        A.  That I was going to take him to the motel?  No,

10   I didn't tell her.

11       Q.  Yeah.

12       A.  No.

13       Q.  Okay.  Did you consider her to be an expert in

14   child molestation?

15       A.  How would I know that?  I've never been through

16   this.

17       Q.  You didn't know?

18       A.  How would I know this?  I've never been through

19   that.

20       Q.  In February of 1985, did you know anything

21   about Sharon Krause's credentials?

22       A.  Just that she was the investigating detective,

23   that's all I knew.  I didn't know about her credentials.

24   The County was handling the investigation.  I didn't

25   look at her credentials.

88

1   Matt's birthday, 2-20-85, Ray Spencer comes to your

2   house; is that right?

3       A.  For a birthday party.

4       Q.  And up until that time, 2-20-85, had you given

5   a gun to Michael Davidson as a gift, had you given him

6   one of Ray's gun?

7       A.  Never, ever have I ever given a gun to Mike

8   Davidson.

9       Q.  Had you discussed with Mike Davidson, prior to

10  taking Little Matt to the Salmon Creek Motel, had you

11  had any discussions with Mr. Davidson about taking

12  Little Matt to the motel?

13      A.  No.  There was no reason for me to have a

14  discussion with him about it.

15      Q.  So the answer is no, right?

16      A.  That's what I said.  No.

17      Q.  So what happens at this birthday party with

18  Little Matt when Ray Spencer arrives?

19      A.  First thing he did when he came in, before we

20  even got going on the birthday, is he went upstairs and

21  checked -- his guns weren't in his gun cabinet and he

22  wanted his guns, and he got hostile about it.

23      Q.  Why weren't his guns in the gun cabinet?

24      A.  They were up in the attic.

25      Q.  Who put them there?

SHIRLEY JEAN SPENCER   12.06.12

96

1   A.  I have told you everything I can remember at

2   the moment.

3   Q.  Did Sharon Krause know that you had been the

4   victim of sex abuse as a child?

5   MR. FREIMUND:  Object, calls for speculation.

6   Go ahead and answer, though.

7   THE WITNESS:  I don't know that I ever did, no.

8   That wasn't something -- no, it wasn't something I would

9   have just told anybody.  It's hard enough to tell you.

10  BY MS. ZELLNER:

11  Q.  My question, though, is do you have any recall

12  of telling Sharon Krause that?  I believe your answer is

13  no.

14  A.  I said no.

15  Q.  Did you ever at any point tell Mike Davidson

16  that you'd been a victim of sexual abuse as a child?

17  A.  Lord, I don't remember that.

18  Q.  Did Sharon Krause ever ask you if you'd been

19  the victim of child sexual abuse?

20  A.  I don't remember any talking with her at all

21  about my childhood.

22  Q.  And then with Mike Davidson, did he ever ask

23  you that question?

24  A.  Yeah, I think we discussed it, but I don't

25  remember exactly what we discussed.

SHIRLEY JEAN SPENCER   12.06.12

97

1          Q.  Do you know at what point in time you discussed

2     it?

3          A.  After we were living together.

4          Q.  What about the prosecutor, James Peters, did

5     you have any discussions with him at all?

6          A.  I don't even remember him, so I couldn't say

7     yes to that at all.  I don't remember him.

8          Q.  Were you ever treated for alcoholism?

9          A.  I'm not a drinker.  I'm a non-drinker.

10         Q.  Okay.  At any point were you a drinker?

11         A.  Never.

12         Q.  Okay.  So in the medical summary, Tab 17, page

13     374.

14         A.  All right.  I'm using my attorney's.  I don't

15     find mine yet.

16         Q.  Okay.  It's entitled the Oregon Health Sciences

17     University.  Do you see that caption across the top?

18         A.  Oh, yeah.  I see it.

19         Q.  Okay.  It's Bates stamp 1037.  And under

20     discharge medications, there's a statement:  His wife is

21     also seeking individual counseling at Alcoholics

22     Anonymous, and the wife and patient are going to receive

23     marital counseling at a later date.  The patient was

24     able to return to work at the time of discharge.

25              MR. FREIMUND:  I object, that misreads the

SHIRLEY JEAN SPENCER 12.06.12

98

1    document. You said Alcoholics Anonymous, and it says

2    Al-Anon. There's a difference.

3    BY MS. ZELLNER:

4        Q. Okay. Let's do it your way. Al-Anon.

5            MS. FETTERLY: A big difference.

6    BY MS. ZELLNER:

7        Q. So is that true?

8            MS. ZELLNER: Miss Fetterly, I ask that you not

9    start testifying.

10   BY MS. ZELLNER:

11       Q. Go ahead.

12       A. That's absolutely not true. I've never been a

13   drinker, ever. And maybe I should clarify it. Once or

14   twice a year I have one drink. I can't drink any more

15   than that because I go numb. I don't drink. And I

16   never have gone to Al-Anon or whatever this is or

17   Alcoholics Anonymous. I'm not a drinker.

18       Q. Okay. Just asking the question.

19           Let's go back to the Salmon Creek Motel. What

20   time did you pick Little Matt up the next day?

21       A. Actually, I did not pick him up. Ray brought

22   him to the restaurant down in Vancouver, the Who Song &

23   Larry's and we had lunch. He brought Matt to me.

24       Q. And what did you observe about Little Matt, if

25   anything?

Rider & Associates, Inc.
360.693.4111

SHIRLEY JEAN SPENCER   12.06.12

99

1      A. He was very flushed, like he had a fever, very

2    lethargic. He didn't want to talk. He just wanted to

3    lay his head on the table. And I thought he was sick.

4    I didn't know what was the matter with him.

5      Q. Anything else?

6      A. I was going to take him back to the bathroom,

7    and Ray said, no, let me do it and he took him. And

8    when he came back, he acted like nothing happened. He

9    sat up, ate, talked.

10      Q. Do you remember anything else about his

11    condition at the restaurant?

12      A. Not at the restaurant, no.

13      Q. At a certain point in time after Little Matt

14    has spent the night at the Salmon Creek Motel, do you

15    have further contact with Sharon Krause?

16      A. I don't think so, except with the gun

17    situation, you know, him picking his guns up, for not

18    having his guns. It was after that.

19      Q. Okay. Do you remember on or about February

20    21st that you got a phone call from Sharon Krause and

21    that in the phone call she mentioned that the two of you

22    had not spoken since she interviewed the kids in

23    Sacramento?

24      A. Right.

25      Q. Do you remember anything like that?

105

1    temperature when he was sick.

2       Q.  All right.  Other than that information,

3    though, was there anything else that Little Matt told

4    you about related to any sexual molestation?

5       A.  No.

6       Q.  Did Little Matt ever, after the Salmon Creek

7    Motel, did he ever tell you that nothing had happened at

8    the motel?

9       A.  He has never recanted anything to this date.

10      Q.  But I'm asking you back around February 22nd,

11   did Little Matt ever tell you that nothing had happened

12   at the motel?

13      A.  No, he did not tell me nothing had happened at

14   the motel.

15      Q.  I'm correct that he doesn't tell you what

16   happened.  He tells Sharon Krause.

17      A.  Yeah.  I only remember some things about the

18   temperature and the bubble bath.

19      Q.  Did Sharon Krause then interview Little Matt at

20   some point in time about the Salmon Creek Motel?

21      A.  She did about me taking him over there.

22      Q.  And then after she interviews him, she reports

23   to you what he said.

24      A.  Oh, I don't remember.

25      Q.  Is that correct?

1    you and Ray went into the sheriff's office for Ray to

2    take polygraph examinations. Do you remember --

3        A. I did read those.

4        Q. In your review of that report, did you find any

5    inaccuracies in what Detective Krause was reporting?

6        A. No, sir.

7        Q. You recall specifically, though, one of the

8    polygraph incident reports documented in many quotations

9    of statements made by Ray in anger, where he was using

10   the F word repeatedly, and she recorded those

11   accurately?

12       A. Yes, I remember those.

13       Q. And then specifically do you remember reviewing

14   a 22-page report that documented Detective Krause's

15   interactions with you and then her interview with your

16   son, Matt, in February of 1985?

17       A. I remember reading those, yes.

18       Q. And again, I'd ask you the same question, did

19   you find any inaccuracies in the way Detective Krause

20   documented what was said during those events?

21       A. No, I didn't find any inaccuracies.

22       Q. One of Detective Krause's report documented

23   something you told her about Leo Clark calling you at

24   some point and you told Detective Krause that he "got in

25   your face." Do you remember that incident?

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY          )
SPENCER and KATHRYN E. TETZ,            )
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 ) No. 11-5424 BHS
                                        )
FORMER DEPUTY PROSECUTING ATTORNEY FOR )
CLARK COUNTY JAMES M. PETERS, DETECTIVE)
SHARON KRAUSE, SERGEANT MICHAEL         )
DAVIDSON, CLARK COUNTY PROSECUTOR'S     )
OFFICE, CLARK COUNTY SHERIFF'S OFFICE,  )
THE COUNTY OF CLARK, SHIRLEY SPENCER    )
and JOHN DOES ONE through TEN,          )
                                        )
          Defendants.                   )
                                        )

DEPOSITION UPON ORAL EXAMINATION OF
KATHRYN ELIZABETH TETZ

Wednesday, November 14, 2012
10:00 a.m.
1201 Third Avenue, Suite 2200
Seattle, Washington

Reported by Marlis J. DeJongh, CCR, RPR
Lic. No. DE-JO-NM-J498K9

Page 94

1    what these sexual acts are, so to be able to describe them

2    to her isn't even something I would have done.

3        Q.    Did you use the term pee-pee at that time, if you

4    recall?

5        A.    I did.

6        Q.    And I want to make sure I understand what you're

7    saying about this whole handwritten statement by Shirley

8    Spencer.  Are you saying that you specifically recall and

9    know that you did not say anything even of this nature to

10   her in August of 1984?

11       A.    I know I didn't say these things to her.  I know

12   myself and I know the vocabulary I was capable of at this

13   time and I did not say these things to her.

14       Q.    Is there anything you recall about your

15   relationship with Shirley Spencer at that time that might

16   enable you to speculate, and I know this would be

17   speculation on your part, but to speculate why she would

18   totally fabricate some kind of a conversation like this with

19   you?

20       A.    It's just another thing that shows my dad was

21   framed in this whole thing.  She had an affair going on with

22   someone who was very close to this case.  It's very

23   convenient for her.

24       Q.    Well, there was no case on August 24, 1984, was

25   there?

# EXHIBIT C

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT

FIRST DEGREE STATUTORY RAPE, RCW 9A.44.070
LOCATION OF INCIDENT:     17681 NE Lucia Falls Road
                          Yacolt, Washington
DATE OF INCIDENT:         Refer to Summary

DATE & TIME:        02-22-85                         9:30 AM
LOCATION:           CCSO, Investigation Unit
INCIDENT:           Interview with the wife
                    of the suspect

SUSPECT:            SPENCER, Clyde Ray              dob: 01-05-48
                    aka:   Ray SPENCER
                    17681 NE Lucia Falls Road
                    Yacolt, Washington              phone: 687-1407

PERSON INTERVIEWED:     SPENCER, Shirley J.          dob: 04-27-42
                        17681 NE Lucia Falls Road
                        Yacolt, Washington           phone: 687-1407

DETAILS:
                On February 3, 1985 Clark County deputies responded to
the SPENCER residence on a domestic disturbance.  For details refer to Clark
County case #85-14-0073.  I spoke with Deputy Don KERR who initiated the report
regarding the disturbance and was advised by him, as a result of that

CCSO Case #84-8506, S.A.KRAUSE, K-43 .                    page 1 of 8



EXHIBIT
18

Spencer000134

P.A. ✓ 03-28-85 SL

disturbance Ray SPENCER had moved out of his residence and apparently was admitted to the psychiatric ward at the University of Oregon Medical Hospital.

On February 5, 1985 I was advised by Detective HULSE of the Vancouver Police Department that SPENCER was no longer at the University of Oregon and was presently staying in the Value Motel located in the Hazel Dell area of Vancouver. Detective HULSE also advised me that he had information that SPENCER was making statements, indicating that he was "going to start getting some people because he was tired of this." SPENCER reportedly had specifically mentioned my name, Sgt. Mike DAVIDSON and numerous Vancouver Police officers.

On 02-08-85 I was advised that SPENCER had moved out of the Value Motel and was living in apartment #17 at the Salmon Creek Motel located at 11981 NE Highway 99, Vancouver, Washington.

On 02-20-85 I did not go to work because I was ill. Early on the afternoon of the 20th I received a phone call from the Communications Center advising that Clark County deputies had responded again to the SPENCER residence on a civil standby regarding some guns. I was also advised that apparently SPENCER had gone to his residence for a birthday celebration and when he arrived noted his weapons were not in a gun case, which resulted in him demanding his wife produce the guns. Apparently, Shirley SPENCER was refusing to give Ray SPENCER his guns and Ray SPENCER called Clark County requesting a civil standby. I advised the dispatcher that I was sure part of SPENCER'S original release agreement was that he was not to possess any weapons and advised them I would call them right back.

After talking with dispatch, I made phone contact with Detective HULSE at Vancouver Police who had a copy of SPENCER'S release agreement, and Detective HULSE confirmed that SPENCER was to have no weapons and advised me that he would call dispatch. For additional details, refer to Clark County Case #85-46-0033.

When I initiated this investigation regarding allegations made by Ray SPENCER'S natural daughter, Kathryn, indicating that Ray SPENCER had been sexually involved with her, I had an occasion to speak with Shirley SPENCER. However, during that conversation she advised that she had no information other than the statements Kathryn had made to her, indicating that Ray SPENCER may have been sexually involved with his daughter.

CCSO Case #B4-8506, S.A.KRAUSE, K-43                                    page 2 of 8

Spencer000135

During the month of October, 1984 I responded to Sacramento, California where I spoke with Kathryn SPENCER. After returning to Vancouver, on one occasion Detective Sgt. Mike DAVIDSON and I attempted to interview Ray SPENCER regarding the allegations his daughter was making; however, SPENCER was not cooperative, refused to waive his rights and also refused to speak with us. From that time on, I had not had an opportunity to meet with Shirley SPENCER, nor discuss with her the results of my findings in California.

On 02-21-85 I attempted to make phone contact with Shirley SPENCER at her residence a number of times and the line was busy. After trying for over two hours I checked with the phone company and was advised that the phone was out of order. Being concerned because of the disturbance the day before and also because SPENCER was reportedly making statements indicating that he was "going to get even with specific individuals," I asked that our patrol unit make contact at the SPENCER residence on Lucia Falls Road and make a welfare check regarding Shirley SPENCER and her family. I was subsequently advised by dispatch that the officer who responded was advised that Shirley SPENCER had already left for work and that apparently the phone was off the hook.

After being advised of that information I made phone contact at Shirley SPENCER'S place of employment and left a message asking that she return my phone call. At approximately 4:30 PM on the afternoon of the 21st, Shirley SPENCER did return my phone call. During that conversation I advised her that it was me who had asked the officer to respond to her residence and do a welfare check, based on concerns I had not knowing what Ray SPENCER'S state of mind was and also because of the information I had obtained regarding the two disturbances. Shirley SPENCER advised that she appreciated us checking on her and indicated that her son had told her that the County responded to the house.

During that conversation I indicated to Shirley SPENCER that I had not had the opportunity to talk with her since I returned from Sacramento and if that would assist her in dealing with all this I would be willing to do that. I indicated to Shirley SPENCER that if she felt she would be more comfortable I would contact Detective HULSE and also have him with me during the time we talked. She indicated that she did not feel that was

CCSO Case #84-850b, S.A.KRAUSE, K-43                        page 3 of 8

necessary, and prior to terminating our phone conversation I made arrangements for her to meet with me at approximately 9:20 AM on the morning of the 22nd.

During the initial part of my conversation with Shirley SPENCER I shared with her some information regarding what the status of this investigation was. I advised her that I knew this was difficult for her at best regarding all that had happened in her life, and advised her that I felt it maybe I had the opportunity to talk with her and share some information with her regarding specifically what I had learned from Kathryn SPENCER and also information regarding some of the background information that might assist her in dealing with this.

It was obvious that Shirley SPENCER was extremely confused about what was happening and also that she was feeling a lot of guilt. Specifically, she felt if she had reported this before Kathryn had returned to California it may have been easier for all concerned. Shirley SPENCER talked about not knowing what Kathryn had said and also whether or not Kathryn was being victimized in California, causing her (Shirley SPENCER) a lot of anguish. At one point during the conversation I indicated to Shirley that I had not had the opportunity to share any information with her husband because he would not talk with us. She advised me on the day that Ray SPENCER came into our office he had told her that we "refused to tell him anything."

During the time I talked with Shirley I allowed her to review my reports regarding what Kathryn SPENCER had related to me. She indicated that she felt much better knowing that Kathryn had not been interviewed in Sacramento in her mother's presence like Ray SPENCER had told her. She also seemed to be more comfortable when she learned that Kathryn and Matt were involved in therapy.

During my conversation with Shirley I also talked to her about my contacts with Deanne SPENCER and shared with her my observations of Deanne SPENCER regarding her interaction with her children, and feelings about what was occurring with the SPENCER children. It was obvious, based on statements that Shirley SPENCER made to me, that her impression of Deanne SPENCER was based solely on what her husband had told her. It was also obvious that Ray SPENCER was not always truthful in what he shared with his present wife, Shirley.

CCSO Case #84-8506, S.A.KRAUSE, K-43                        page 4 of 8

Spencer000137

I asked Shirley SPENCER if she was aware if Ray SPENCER had herpes. At that time she indicated to me that during their entire relationship Ray SPENCER has continually blamed her for an unknown infection that he apparently gets. She also advised that on a number of occasions he has told her that he knew he had an infection and that he also knew he had caught it from her. She advised that they have argued about that because she knew she did not have any type of infection, and told him if he did he must have got it from someone else. Shirley advised me that on one occasion he told her that he had even talked to their family physician who also indicated it was her fault. Shirley SPENCER indicated to me that when her husband would tell her he had an infection and had caught it from her there would be periods of time then that he would not have any sexual contact with her. I asked her if she had ever observed any kind of irritation around his genitals and she indicated that she had, and that the area would appear to be red and inflamed and that she noticed some kind of "bumps or breaking out." She did advise that she had no knowledge as to whether or not he did have herpes.

Shirley SPENCER also advised me that she learned that her husband has had a number of affairs during their relationship and that she (Shirley) has talked with Karen STONE since Ray was arrested the first time. She indicated that during one of her conversations with Karen STONE, Karen STONE advised her that Ray SPENCER also continued to blame her for some type of infection he indicated he caught from her (Karen STONE). STONE also reportedly told Shirley SPENCER on one occasion she caught Ray reading a book about herpes and asked him if "he was trying to tell her something." Apparently Ray SPENCER told STONE that he was just curious and was reading the book for that reason.

Several times during our conversation Shirley SPENCER expressed concerns about her son, Matthew, and how all of this was affecting him. She indicated that "Little Matt" was very confused about why his father could not live with them and also advised that Matt cared a lot about Ray SPENCER. She indicated there was a time, sometime around Christmas, on one occasion when Ray was going to take down the Christmas tree and he and Matt had words about something. Shirley advised that she was in another room and heard Matt say something to Ray similar to, "You're not my daddy." She advised me that when she and Ray first started spending time together there were maybe two or

Spencer000138

three times when that came up; however, Matt "worshipped the ground Ray walked on." She stated to me, "All of a sudden I heard Ray hollering and saying something to Matt like, 'You're right, I'm not your dad, I don't wanta be your dad and I don't know who your dad is.'" Shirley indicated that she immediately went into the room and confronted Ray, advising him that Matt was just a baby and she could not understand why he was treating him the way he was.

I asked Shirley SPENCER if, since our conversation we had during the initial part of the investigation, she had recalled anything that may make her wonder if her husband had been sexually involved with Kathryn. She stated to me, "I don't know if I should be telling you this because you're not on Ray's side, but there was one time shortly after Kathryn and Matt left, and I came home late. and Katie was still up." She then indicated that when she did get home the other children were sleeping and Ray made a gesture indicating to her that Kathryn was pretending she was asleep. Shirley SPENCER stated to me, "I remember feeling uncomfortable about that but I don't know why." She then stated, "It was just one of those things you cannot explain, and then I remember the next day that Kathryn told me she hurt down there and I didn't check her." 

I indicated to Shirley SPENCER that I had been advised by Deputy KERR that the confrontation they had on 02-03-85 involved her finding out that her husband had been seeing other women. Shirley SPENCER advised me that there were times during their marriage that she knew or suspected that Ray was seeing other women; however, she just did not want to believe it. She advised me that it apparently had been going on for a long time, even possibly prior to their marriage. She advised me that she had talked to Karen STONE and Karen STONE advised her on the day that Ray SPENCER had asked Shirley to marry him he had also asked Karen STONE to accompany him to California.

Shirley SPENCER advised me that recently she became concerned and was very confused about what she knew and what Ray SPENCER was telling her because "she had caught him in several lies."

I talked with Shirley SPENCER regarding an accident that she and her husband had had during the initial part of our investigation when they were allegedly getting in or out of the boat which resulted in Shirley

CCSO Case #84-8506, S.A.KRAUSE, K-43                              page 6 of 8

Spencer000139

SPENCER breaking her ankle and Ray SPENCER being in a cast.   Shirley SPENCER
advised me that the "accident was not really how they said."

        1   indicated   to   Shirley   SPENCER   that   during   my
conversation with Deanne SPENCER'S family there were several who talked about
the "way Ray SPENCER had made Deanne SPENCER dress during their marriage;
specifically that there were statements made reference Ray dressing Deanne like
a whore." Shirley SPENCER advised me that there were times when Ray asked her to
dress in a way that she felt was inappropriate, specifically mentioning that he
wanted her to go out without a bra and also a time when she and Ray were going
out to eat pizza with other VPD officers.   She advised that she was very
uncomfortable with what he wanted her to do and just refused to do it.

        During the time I spent with Shirley SPENCER I also
expressed concerns about the possibility that Ray may have done something to her
son, Matt.   Shirley SPENCER indicated to me that she had talked with Matt and
that Matt told her that Ray had never touched him in any inappropriate way.

        During our conversation I also advised her that I felt
it was strange that Ray SPENCER did not mention his daughter, Kathryn, once
during our conversation with him on the day he refused to talk with us,
specifically since that seemed to be the big issue with him prior to my talking
to Kathryn. Shirley SPENCER advised me that she has thought about this a lot and
also felt it was strange that Ray never mentioned his children, that he "just
worried about himself."

        During my initial interview with Ray SPENCER and his
wife there was some mention of Matt SPENCER (Ray SPENCER'S natural son) watching
Ray and Shirley SPENCER having sexual intercourse during the summer visitation.
I asked Shirley SPENCER if she knew for sure if Matt actually watched them and
she advised she only knew what Ray had told her.   I indicated to her that based
on what Matt said, as soon as he realized what they were doing he immediately
went back to bed.

        Shirley SPENCER advised me that during her conversation
with Karen STONE, Karen STONE also advised her that during the relationship she
had with Ray SPENCER there were a number of time when he was going out with
other women. During my interview with Karen STONE she continued to indicate that

CCSO Case #84-8506, S.A.KRAUSE, K-43 ·                          page 7 of 8

Spencer000140

their relation was one without any problems and Shirley SPENCER advised me, based on what Karen shared with her that that was not the truth.

Shirley SPENCER indicated to me that she was seeing a counselor, Jeannette R. DEZOFI, who has an office located at 2005 Broadway, Vancouver, Washington, phone: 695-1874. She advised with all that was occurring in her life she felt it was very important for her to seek some counseling to assist her in sorting out all of this.

During the conversation I had with Shirley SPENCER I advised her that I would be willing to talk with her son, Matt, and felt it was important because Matt apparently was not understanding what was going on regarding his father, and also that during that time I could talk with Matt in an attempt to determine if there had been any type of sexual contact between Matt and his step-father, Ray SPENCER, knowing that children rarely report sexual abuse to their parent or parents. Shirley SPENCER advised me that she would talk with her therapist and get back to me regarding my interviewing her son.

I asked Shirley SPENCER if Ray had access to any other children and she indicated on occasion he had minimal access to her daughter's children; however, she did not think that Ray had ever done anything to her granddaughters, based on the short amount of time he would be with them.

Prior to Shirley SPENCER leaving my office, she indicated that she felt some comfort in knowing the facts regarding what was going on, appreciated being advised and also indicated that she would consider my speaking with her son. I advised Shirley SPENCER I would contact her during the first part of the week. I also advised her that in the event she had any problems at all regarding Ray SPENCER that she should not hesitate to request the County's assistance.

This investigation is pending.

CCSO Case #84-8506, S.A.KRAUSE, K-43                                    page 8 of 8

Spencer000141

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

---

CLYDE RAY SPENCER, MATTHEW RAY          )
SPENCER and KATHRYN E. TETZ,            )
                                        )
            Plaintiffs,                 )
                                        )
       v.                               )  No. 11-5424 BHS
                                        )
FORMER DEPUTY PROSECUTING ATTORNEY FOR  )
CLARK COUNTY JAMES M. PETERS, DETECTIVE )
SHARON KRAUSE, SERGEANT MICHAEL         )
DAVIDSON, CLARK COUNTY PROSECUTOR'S     )
OFFICE, CLARK COUNTY SHERIFF'S OFFICE,  )
THE COUNTY OF CLARK, SHIRLEY SPENCER    )
and JOHN DOES ONE through TEN,          )
                                        )
            Defendants.                 )
                                        )

---

DEPOSITION UPON ORAL EXAMINATION OF

MATTHEW RAY SPENCER

---

Tuesday, November 13, 2012
10:00 a.m.
1201 Third Avenue, Suite 2200
Seattle, Washington

Reported by Marlis J. DeJongh, CCR, RPR
Lic. No. DE-JO-NM-J498K9

Page 81

1        MR. BOGDANOVICH:  Let's go ahead and have this
2    marked.
3        (Exhibit No. 4 marked for identification.)
4    Q.    You've been handed what has been marked as Exhibit
5    No. 4 to your deposition.  I would ask you to take whatever
6    time necessary and review that.
7    A.    (Witness reviewing document.)
8    Q.    Have you reviewed Exhibit 4?
9    A.    Correct.
10   Q.    And are you familiar with that document?
11   A.    I am.
12   Q.    And is it an accurate copy of a March 2nd, 2003
13   letter that you signed directed to Governor Gary Locke?
14   A.    I signed it.  I didn't write it.
15   Q.    Did you read it before you signed it?
16   A.    Nope.
17   Q.    Who wrote it?
18   A.    My mother.  She typed it.
19   Q.    Why did you sign it if you didn't even read it?
20   A.    My mother asked me to.
21   Q.    And how old were you in March of 2003?
22   A.    Looks like it was 20 -- I don't know, 25 or so.
23   2003.
24   Q.    You weren't living with your mother at that time,
25   were you?

Page 82

1    A.    No.

2    Q.    Did you have any idea what the content of this

3  letter was before you signed it?

4    A.    No.

5    Q.    Did you bother to look to see who it was directed

6  to?

7    A.    I just signed.  My mom asked me to sign it so I

8  signed it.  I do what my mom tells me to do.

9    Q.    She just literally showed you this piece of paper

10  and said, sign it?

11    A.    Yup.

12    Q.    And you didn't read who it was addressed to or what

13  it said, you just signed it?

14    A.    Correct.

15    Q.    At any time prior to today have you reviewed the

16  letter in Exhibit 4?

17    A.    Of course.

18    Q.    Is the letter accurate?

19    A.    No.

20    Q.    Let's go through it.

21        You, say, My name is Matt Spencer.  I am the son of

22  inmate Clyde R. Spencer.  Correct?

23    A.    Correct.

24    Q.    And that's true?

25    A.    Yes.

Page 107

1    Q.    I'm going to kind of pick up on the letter that you

2  wrote that is Exhibit 4.  And you testified, I believe, that

3  you never read it, your mother typed it and you just signed

4  it.  Is that right?

5    A.    Correct.

6    Q.    And now if you would look at Exhibit 5, which is

7  your sworn testimony in a courtroom that occurred

8  July 10th, 2009 after you were put under oath, like today,

9  and testified in front of the judge.  I would direct you to

10  Page 41 of that testimony.

11    And it says, The letter you wrote is the letter dated

12  March 2nd, 2003.

13    I'm reading from Line 6?

14    I believe so.

15    And Exhibit 4 is a letter dated March 2nd, 2003, just

16  like they're referring to in this transcript, right?

17    A.    Correct.

18    Q.    And it says:  I'm going to show you what has been

19  marked as State's Exhibit No. 3.

20    Do you recall this exhibit being, I mean Exhibit 4, this

21  letter being discussed at your testimony in the courtroom in

22  2009, right?

23    A.    Correct.

24    Q.    And you say, Yes, I wrote this.

25    What date is on that letter?

Page 108

1      Where is the date?

2      That, right there.

3      Oh, March 2nd, 2003.

4      Question:  Okay, and you wrote this letter?

5      Answer:  Yeah.

6      And then let's pass a little farther on.  And on

7  Page 42, starting on line 15:  And in the letter to the

8  Governor, which is dated March of '03, when you were age 26,

9  you pled with the governor not to release him.  Isn't that

10 correct?

11     I did.

12     And you indicated that to release him would be to allow

13 him back out onto street to continue abusing other children.

14 Isn't that correct?

15     Correct.

16     This was after your meth period.

17     Correct.

18     So that was your testimony in 2009, and your testimony

19 under oath today is different.  Which of those are you going

20 to adhere to now?

21     A.   I did not write this letter.

22     Q.   So when you testified under oath to the judge that

23 you did write it in 2009, you were lying under oath?

24     A.   I did not read this whole letter.  I just scanned

25 it.  I did not write it, okay.  I signed it.

Governor Gary Locke
Office of the Governor
PO Box 40002
Olympia, WA 98504-0002
March 2, 2003

Re: Inmate Clyde R. Spencer #910743

Dear Governor Locke,

My name is Matt Spencer.  I am the son of inmate Clyde R. Spencer.  I received
information that my father has requested clemency.  It is difficult to put into words the
amount of security since his incarceration.  The thought that he may be released has set
me on edge.  Will I have to spend the rest of my life looking over my shoulder?  My
childhood was spent in baseball parks and therapy offices.  Baseball parks thanks to my
mom, therapy offices thanks to my father.  The nightmares have gone but the emotional
terror he and his friends subjected me and my sister to, surfaces with thoughts of him.  He
even hired investigators to hunt me down when I was 19 years old.  They waited outside
my house at 5:00am one morning to try and confront me.  I was enraged but able to scare
them off with a baseball bat.  My mother hired an attorney to serve them with papers to
leave us alone.  To this day he has not admitted his crimes, nor has he received any
rehabilitation.  His inability to take responsibility for his actions is what concerns me the
most.  I know he has received several degrees while in prison (something I have never
been able to afford).  I also know he has been a model prisoner.  That does not surprise
me.  There are no children in prison.  Perhaps if he admitted and began rehabilitation I
would feel differently but he has not.  I am afraid not only for myself, my sister and my
mom but also for any children he may come in contact with.  It is my hope you will deny
his request.

Respectfully Yours,

Matt Spencer
C/O  7622 Lakewood Park Drive
Sacramento, CA 95828

EXHIBIT
4
M Spencer
11-13-12

05Duo-

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENCER, MATTHEW RAY          )
SPENCER and KATHRYN E. TETZ,            )
                                        )
        Plaintiffs,                     )
                                        )
    v.                      ) No. 11-5424 BHS
                                        )
FORMER DEPUTY PROSECUTING ATTORNEY FOR )
CLARK COUNTY JAMES M. PETERS, DETECTIVE)
SHARON KRAUSE, SERGEANT MICHAEL         )
DAVIDSON, CLARK COUNTY PROSECUTOR'S    )
OFFICE, CLARK COUNTY SHERIFF'S OFFICE, )
THE COUNTY OF CLARK, SHIRLEY SPENCER   )
and JOHN DOES ONE through TEN,          )
                                        )
        Defendants.                     )
                                        )

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

CLYDE RAY SPENCER

Monday, November 12, 2012
10:00 a.m.
1201 Third Avenue, Suite 2200
Seattle, Washington

Reported by Marlis J. DeJongh, CCR, RPR

Lic. No. DE-JO-NM-J498K9

1    the bottom of the first page.

2        A.  What a surprise.  No, I don't recall that.

3        Q.  Do you believe that it, as reflected by the last

4    page of Exhibit 7, that you in fact were advised of your

5    Miranda rights, signing the document saying you received

6    that advice and then you did nonetheless choose to speak to

7    Detective Krause and Sergeant Davidson?

8        A.  I signed that document.  That's the only thing I

9    can confirm.  Again, I don't put any credence in anything

10   that Krause ever filled out.

11       Q.  Is it your memory, sir, or is it your testimony

12   today that you refused to speak to the officers on the day

13   of your arrest February 28, 1985 and everything in this

14   report is completely made up?

15       A.  Everything Krause ever made was made up.

16       Q.  So that would be true of this report as well?

17       A.  Sure.

18       Q.  So you refused to speak to the officers?

19       A.  I don't recall one way or the other but I won't put

20   credence in anything Krause has put down there.  Again,

21   we've got quotations.  It doesn't happen that way.  I'm

22   sorry.

23       Q.  Do you recall telling anybody, whether it was

24   Krause, Davidson, the judge, your lawyer, what have you,

25   that I can't remember doing, sexually abusing my kids?

153

1    A.  Yes.

2    Q.  Do you recall saying that repeatedly?

3    A.  I did.

4    Q.  Do you recall saying, I can't remember this, my

5  God, why can't I remember it?

6    A.  I probably said that, yes.

7    Q.  Do you think you probably said, could I have done

8  this and not remember it?

9    A.  I could have said that, yes.

10    Q.  You were kind of feeling that, weren't you, that

11  maybe I did this and I'm just not remembering it?

12    A.  No.  All of my support group at that point in time

13  was gone.  I had lost my job, my wife was gone, my children

14  were gone.  I'm at that point that I've been classified as

15  clinically depressed.  I'm heavily medicated.  I'm beginning

16  to question my own sanity.

17    Q.  Do you think you would have said something like,

18  could I have done this and not remember it and really felt

19  that way?

20    A.  I'll tell you what, if I had all the documents that

21  were withheld, the medical exams, the affair, the

22  information on that, the videotape, there was no way in

23  anything that I wouldn't have went forward with this.

24    Q.  Do you remember feeling in your own heart of hearts

25  that you had a concern, wow, could I have done this and just

154

1    not remember it?

2       A.  No.

3       Q.  You never had that feeling?

4       A.  No.

5       Q.  Never?

6       A.  Never.

7       Q.  Do you recall believing that DeAnne Spencer had put

8    her daughter up to saying something had happened between you

9    and Kathryn and that something being sexual?

10      A.  I wouldn't have put it past my ex-wife.

11      Q.  Do you recall telling somebody that, that you

12   thought --

13      A.  No, I don't recall telling somebody that.

14      Q.  Do you recall saying to anyone, I must have done it

15   if Little Matt said I did.  This can't be my ex-wife this

16   time.

17      A.  No.  What I did say was when Big Matt, when I found

18   out he was charged.

19      Q.  When he was charged?

20      A.  Or when he said that I did it, that's the point

21   that I really questioned any basis for these allegations.

22   Not with Little Matt.  He's a five-year-old.

23      Q.  So when Big Matt said that you sexually abused him,

24   that's when you began to question the, it can't be my

25   ex-wife this time, or what?  I'm not following you.

159

1    Shirley was getting after me for drinking so much.

2        A.  Uh-huh.

3        Q.  Is it true that Shirley was getting after you for

4    drinking so much back in the February 1985 range?

5        A.  I don't recall if she was or not.  She might have.

6    I'm stuck at home all day long, I couldn't leave the phone,

7    so I'm sitting there waiting for the next shoe to fall.

8        Q.  So you were drinking a bit at that time?

9        A.  I was.

10       Q.  Was it just beer or was there another drink of

11   choice?

12       A.  No, beer.

13       Q.  Do you recall saying words to the effect that if

14   you had really done all these things that Little Matt was

15   saying, you didn't want out of jail.

16       A.  Again, I don't remember any of that in relation to

17   Little Matt.

18       Q.  All right.  So you would definitely deny though

19   that you said words to the effect that if Little Matt said I

20   did, I must have done it?

21       A.  As I've already answered that, I don't recall that

22   in regards to Little Matt.  The only time that I was really

23   concerned was when I found out that my own son had said it

24   happened.

25       Q.  So do you recall saying words to the effect that if

1    Big Matt said I did it, then I must have done it?

2        A.  When the charges were lodged in reference to Big

3    Matt, I had lost everything.  My mental state was extremely

4    low.  I was heavily medicated, I was hallucinating.  I would

5    jump at every sound.  I'm locked in a county jail in a

6    medical ward.  So, yeah, I may have said that.  That may

7    have been the final straw right there.

8        Q.  And you do recall telling the judge when you plead

9    guilty to the judge that you can't remember it and that's

10   why you were pleading guilty.  Do you remember that?

11       A.  I believe I said that to the judge, yes.

12       Q.  By the way, your belief is this judge, Judge Thomas

13   Lodge, Clark County Superior Court judge, you thought he had

14   it in for you because you had pulled over his daughter

15   sometime previously.  Is that right?

16       A.  That's correct.  She nearly ran my car -- she was

17   racing another guy and nearly ran my police car into the

18   Columbia River.

19       When I stopped her, ID'd her, saw the last name, I asked

20   if her dad was Tom Lodge and she said yes.  I went ahead and

21   released her.  And as a father I called him that night and

22   said, You may want to talk to your daughter.

23       And Judge Lodge says, what right do you have to stop my

24   daughter.  I said, I didn't know it was your daughter.  He

25   said, I want to know what right you had to stop my daughter.

# EXHIBIT F

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

CLYDE RAY SPENCER, MATTHEW   )
RAY SPENCER, and KATHRYN E. )
TETZ,                                        )
                                                 )
          Plaintiffs,   )
                                    )
   vs.                     )   No. C11 5424 BHS
                                    )
FORMER DEPUTY PROSECUTING   )
ATTORNEY FOR CLARK COUNTY   )
JAMES M. PETERS, DETECTIVE  )
SHARON KRAUSE, SERGEANT     )
MICHAEL DAVIDSON, CLARK     )
COUNTY PROSECUTOR'S OFFICE, )
CLARK COUNTY SHERIFF'S      )
OFFICE, THE COUNTY OF CLARK )
and JOHN DOES ONE THROUGH   )
TEN,                          )
                                  )
          Defendants.   )
---------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

MENONA LANDRUM

DATE TAKEN:  Monday, March 18, 2013
TIME:     1:00 p.m.
PLACE:     613 W. 11th Street
     Vancouver, Washington
COURT REPORTER:  Andrea L. Stayberg, CCR

1  office?

2     A.  That she worked for the sheriff's office.

3     Q.  Did you ever meet her?

4     A.  Through work, that's all.

5     Q.  Okay.  Did you ever do anything socially with

6  Sharon Krause?

7     A.  No.

8     Q.  How about Michael Davidson?

9     A.  No.

10     Q.  Did you ever meet Michael Davidson?

11     A.  Through work, that's all.

12     Q.  Did you ever have any personal interaction at

13  work with Sharon Krause that caused you to question her

14  honesty?

15     A.  No.

16     Q.  How about Michael Davidson, did you ever have

17  any interaction with him that caused you to question his

18  honesty?

19     A.  No.

20     Q.  Did you know a deputy by the name of Ray

21  Pacheco?

22     A.  The name's familiar.

23     Q.  Do you recall anything about him?

24     A.  No.

25     Q.  Were you ever aware of any Clark County

40

1    your work station was?

2        A.  Yes.

3        Q.  Do you happen to remember the address for your

4    office?

5        A.  No, I don't.

6        Q.  Okay.  Were there any other offices that

7    occupied a floor or more than one floor between your

8    ground floor work station and whatever floors were

9    occupied by the jail?

10       A.  No.

11       Q.  So the jail was immediately above your ground

12   floor?

13       A.  Right.

14       Q.  Did this overnight break-in to your desk

15   drawer, did that occur, if you know, before or after you

16   moved to this new location?

17       A.  Before.

18       Q.  Okay.  Did you make any report of this prying

19   open of your desk drawer overnight?

20       A.  No.

21       Q.  Why didn't you?

22       A.  It was a prank.

23       Q.  Why do you say it was a prank?

24       A.  One of the fellow people was a prankster, the

25   desk drawer was right open.

41

1    Q.  Who was the prankster you're referring to?

2    A.  I cannot reveal that.

3    Q.  Why not?

4    A.  I'm not going to involve him.

5    Q.  Well, I'm going to ask you, please, to identify

6    who the individual is.  I mean, we're in the middle of a

7    civil lawsuit with some significant claims and issues

8    and, you know, you are obligated to respond truthfully

9    and accurately with questions that we ask you today.  So

10   I would ask you to, please, identify the individual you

11   referred to as the prankster.

12   A.  His name is Harold Teters.

13   Q.  Okay.  And what was Mr. Teters' position, was

14   he an employee of the sheriff's office?

15   A.  He was a deputy sheriff, served civil papers.

16   Q.  Did you ever confirm with Mr. Teters that he

17   was the one that had pried open your desk drawer?

18   A.  Oh, he joked about it.

19   Q.  Did he tell you why he had done it?

20   A.  No.

21   Q.  You said the seal was still there and that you

22   had to have the seal that you would place on papers that

23   you notarized, correct?

24   A.  Yes.

25   Q.  And that's the seal you're referring to that