1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CLYDE RAY SPENCER,

8                           Plaintiff,

9    v.

10   JAMES M. PETERS, et al.,

11                           Defendants.

CASE NO. C11-5424 BHS

ORDER GRANTING IN PART
SUMMARY JUDGMENT

12

13         This matter comes before the Court on Defendant James M. Peters's ("Peters")

14   renewed motion for summary judgment (Dkt. 135). The Court has considered the

15   pleadings filed in support of and in opposition to the motion and the remainder of the file

16   and hereby grants in part the motion for the reasons stated herein.

17                            **I. PROCEDURAL HISTORY**

18         On June 2, 2012, Plaintiffs Clyde Ray Spencer ("Mr. Spencer") and his two

19   children, Matthew Ray Spencer ("Matthew") and Kathryn E. Tetz ("Kathryn") filed a

20   complaint against Peters, a former deputy prosecuting attorney for Clark County

21   Prosecutor's Office and five other named Defendants, including John and Jane Does 1

22   through 10. Dkt. 1.

1    The lawsuit alleges state tort claims and violations of federal civil rights. Dkt. 1 at

2    45-67. Mr. Spencer alleges seven causes of action under 42 U.S.C. § 1983 ("§ 1983"),

3    plus four state law claims.  *Id.* at 45-65. His federal claims are for malicious prosecution,

4    deprivation of due process, "destruction or concealment of exculpatory evidence,"

5    conspiracy, "failure to intervene, false arrest, and false imprisonment" and conspiracy.

6    *Id.* at 45-58, 289-349.  His state law claims are for malicious prosecution, intentional

7    infliction of emotional distress ("IIED"), conspiracy, and defamation.  *Id.* at 59-65, 350-

8    82. These federal and state claims are alleged against all Defendants except Shirley

9    Spencer, who is a named Defendant only as to Mr. Spencer's § 1983 conspiracy claim

10   and his state law claims for IIED and conspiracy.  *See id.*  Kathryn and Matthew allege

11   state law claims for loss of consortium.  *Id.* at 66-67, 383-94. Their claims are alleged

12   against all Defendants, except Ms. Spencer.  *Id.*

13       On May 24, 2012, Peters filed a motion for summary judgment. Dkt. 68. On June

14   18, 2012, Plaintiffs filed a response to Peters's motion and requested a continuance. Dkt.

15   78. On June 22, 2012, Peters filed a reply. On July 2, 1012, Peters filed a sur-reply.

16   Dkt. 87.  The Court granted in part and denied in part Peters's motion for summary

17   judgment.  Dkt. 97.  The Court dismissed with prejudice all state law claims against

18   Peters and permitted Spencer to pursue further discovery under 56(d) for all remaining §

19   1983 claims against Peters.[1]  *Id.* at 25.

20

21   _____

22       [1] The remaining Plaintiff in this action is Mr. Spencer. The remaining Defendants are
     Peters, Michael Davidson and Sharon Krause.  *See* Dkt. 91, 93 and 97.

## II. FACTUAL BACKGROUND

This case has a rather extensive background, involving allegations that take place over the span of almost thirty years.  In 1985, by way of an *Alford* plea, Mr. Spencer was convicted of multiple counts of sexually abusing his children Matthew, then age nine, and Kathryn, then age six, and his step-son Matthew Hansen ("Hansen"), then age five, and sentenced to life in prison. Dkt. 1 at 6; 63-8; & 63-9. Subsequently, Mr. Spencer filed numerous petitions with the state and federal courts challenging his arrest, conviction, and incarceration.

**A.    Initial Allegations**

Mr. Spencer is a former police officer of the Vancouver Police Department ("VPD").  Dkt. 63-3 at 2.  In the summer of 1984, while he was employed by the VPD, Mr. Spencer and his now former wife, Shirley Spencer ("Shirley"), and Hansen were visited by Kathryn and Matthew, children from his prior marriage to DeAnne Spencer ("DeAnne").  Dkt. 1 at 6-7. Upon Mr. Spencer's return from a seminar, Shirley advised him that Kathryn made inconsistent allegations of sexual abuse, including ones against him.  *Id*. at 7 & 63 at 2. The allegations were reported to Child Protective Services ("CPS") in Vancouver, Washington and to CPS in Sacramento, California, where the children resided with their biological mother, DeAnne.  *Id*.

On August 29, 1984, Detective P. Flood ("Flood") of the Sacramento County Sheriff's Department, due to a referral from Sacramento CPS regarding allegations of abuse by Kathryn Spencer, made contact by phone with Mr. Spencer and Shirley. Dkt. 158 at 5-9.  In his report, Flood records telephonic interviews with Mr. Spencer and

1    Shirley. *Id*.  In part, Flood indicates that Shirley reported to him that Kathyrn had

2    disclosed allegations of sexual abuse by her father, including, for example, that "daddy

3    wanted me to rub his pee pee and he rubbed [mine]" and that "she sat on her father's lap

4    with her father's penis between her legs." *Id*. at 9.  Shirley also told Flood that Kathryn

5    reported that "[s]he put it in her mouth and he tried to put his penis into her pee pee but it

6    hurt." *Id*.  Additionally, Shirley reported that Kathryn told her about her "daddy kissing

7    her on her pee pee" and that it happened "lots of times." *Id*.  Shirley also told Flood that

8    Kathryn had made allegations against her mother DeAnne, including that "her mom

9    wanted her to rub her titties and pee pee." *Id*.  According to Flood's report, Shirley told

10   him that Kathryn had made these allegations while they were lying on the floor watching

11   television and Kathryn "kept moving my bathrobe … to expose my breasts and one time

12   she put her hand too far down toward the vaginal area," which Shirley told Kathryn was

13   unacceptable. *Id*.  Then, Kathryn said to Shirley "'rub my pee pee'" because it "'fe[els]

14   good.'" *Id*.  Flood's report indicates that he told Shirley and Mr. Spencer to contact their

15   local law enforcement so that they could both be interviewed by those authorities. *Id*. at

16   10.

17         On that same day, Flood interviewed Kathryn, Matthew and DeAnne in person.

18   *Id*. at 11-14.  Flood's report indicates that Kathryn stated, among other things, that

19   DeAnne only touches her "potty" when she is putting medicine on it. *Id*. at 11.  Flood

20   also indicates Kathryn reported that "she did tell Shirley everything that Shirley advised

21   me of but then when asked to explain it or asked specific questions about it, [Kathryn]

22   would say that she couldn't remember the words so she couldn't tell me." *Id*.  Flood's

1 report also states that he asked Kathryn "if someone told her not to tell about it and she

2 indicated by shaking her head yes." *Id*. He further states that "[w]hen asked if someone

3 had touched her pee pee she shook her head yes and when asked who, she would say

4 daddy and then a few moments later she said not daddy, no one." *Id*. Finally, Flood's

5 report states that Kathryn indicated that "her and her father played a game but she didn't

6 want to talk about the game." *Id*.

7        Unlike Kathryn, Matthew indicated to Flood that he knew nothing about Kathryn's

8 alleged abuse and denied his father or mother touched him inappropriately. *Id*. at 12.

9 Among other information, Flood's report states that Matthew indicated that his sister told

10 stories and changed her stories. *Id*.

11       When interviewing DeAnne, Flood's report indicates in part that she knew nothing

12 of these allegations. *Id*. at 13. She denied inappropriately touching Kathryn. *Id*. at 14.

13 DeAnne also indicated that her sister told her that she worried about Kathryn and Ray,

14 stating to DeAnne that "something was not right but she couldn't elaborate what." *Id*. at

15 13. Flood's report also notes that DeAnne told him that she had not had a man stay in the

16 house for a long time, and there had been a "man that was there and bothered the children

17 so [she] would not let a man stay in the house any longer." *Id*. DeAnne indicated that

18 she never left the children alone with a man. *Id*.

19 **B.      Additional Investigation, Initial Charges & Arrest**

20       On August 30, 1984, Officer R. Stephenson ("Officer Stephenson") of the Clark

21 County Sheriff's Office was dispatched to contact Mr. Spencer regarding Kathryn's

22 allegations of child abuse. Dkt. 64-1. Officer Stephenson went to Mr. Spencer's home in

1    Washington.  *Id*. at 2.  At that time, Shirley Spencer provided a six-page handwritten

2    statement detailing the allegations that Kathryn Spencer relayed to her on August 24,

3    1984.  Among the many details, Shirley writes that Kathryn wanted her to "rub her pee

4    pee" which Kathryn said "felt good."  *Id*. at 4-5. Shirley records that Kathryn told her she

5    did this with her mother and Karen Stone, a former girlfriend of her father. *Id*. at 5-6.

6    According to Shirley's statement, Kathryn described oral sex with her father and stated

7    that he placed his penis between her legs and tried to insert it "in her little hole" but

8    stopped when they realized "it was too big."  *Id*. at 8-9. Shirley also stated that Kathryn

9    told her that her father told her "not to tell."  *Id*. at 8.

10          After Shirley's report was referred to Sacramento, California CPS and law

11   enforcement cleared DeAnne of sex abuse allegations, the investigation was referred back

12   to Clark County, Washington.  Dkt. 138-10 at 25.  In October 1984, Defendant Sharon

13   Krause ("Krause"), a detective with the Clark County Sheriff's Office, was assigned to

14   investigate the Spencer case.  *Id*. at 6.  Defendant Michael Davidson ("Davidson"), also a

15   detective with the Clark County Sheriff's Office, was Krause's supervisor and the

16   sergeant of the unit.  *Id*.

17          On October 16, 1984, five-year-old Kathryn was interviewed by Krause, who

18   made a written report of Kathryn's allegations of sexual abuse by her father.  Dkt. 138-11

19   & 12 at 1-5.  In Krause's report of her interview with Kathryn, in which she used

20   anatomically correct dolls, Kathryn described an incident very similar to what Shirley

21   described Kathryn had engaged in on the night that Kathryn made the alleged disclosures

22   to Shirley.  *See id.*  Krause records that Kathryn described how she touched Shirley on

1   the breasts and stated the "pee pee got touched too," indicating that she touched Shirley's

2   genitals. *Id*. at 33. According to Krause, Kathryn said Shirley indicated she didn't like it.

3   *Id*. Krause also records that Kathryn said this happened when she told Shirley about "a

4   secret about my daddy's wiener." *Id*. Among other details, Krause's report further states

5   that Kathryn indicated that her father placed his penis in her mouth and engaged in oral

6   sex with her. Dkt. 138-12 at 1. In Krause's report, she further indicates Kathryn stated

7   that her father told her not to tell anybody, and she said she lied to Shirley about anyone

8   else touching her. *Id*. at 3.

9       On October 18, 1984, Krause also interviewed DeAnne. Dkt. 138-12. In Krause's

10  interview report, she states, among other information, that DeAnne described sexualized

11  behaviors in which Kathryn engaged after returning from visits with her father in 1983

12  and 1984, including, for example, masturbation, touching her brother Matthew's penis in

13  the bathtub, playing under the covers naked with her cousin Danny. *Id*. at 10-12.

14  According to Krause's report, DeAnne also related that "during the meeting with

15  Detective Flood and also with Katie's therapist, Katie apparently was not indicating

16  anymore than there had been something sexual between her and her father." *Id*. at 8

17      On the same day, October 18, 1984, Krause interviewed Kathryn a second time.

18  Dkt. 138-12 at 28-39. In addition to some of the same disclosures referenced in the

19  above paragraph, Krause reports that Kathryn, using both anatomically correct dolls as

20  well as verbal language, told Krause that her father "tried to sick his big wiener in my

21  pee-pee, but he did that once;" that "I would have to kiss his wiener;" he "makes me

22  touch his pee-pee;" and kisses her vagina. *Id*. at 36.

1    Arthur Curtis ("Curtis"), the then-elected Clark County Prosecutor (Dkt. 138-4 at

2    3), assigned Peters as the prosecutor in the Spencer case. *Id*. at 7.  In late November

3    1984, the Clark County Prosecutor's office sent the Spencer file for review to King

4    County Prosecutor, Rebecca Roe ("Roe").  Dkt. 137 at 3 (January 15, 2013 Roe

5    Declaration).[2]  The purpose of Roe's review was to provide an opinion concerning

6    whether criminal charges of child rape should be filed against Mr. Spencer. *Id*. at 4.  The

7    Spencer file was sent to King County for review in part because Mr. Spencer was then

8    employed as a police officer with the Vancouver, Washington Police Department, which

9    is located in Clark County. *Id*.

10    The file Roe reviewed contained the reports by Sacramento law enforcement

11    officers and the Clark County Sheriff's Office reports concerning allegations of sexual

12    abuse made by Kathryn to Shirley. *Id*. at 3.  Also included in the file were narrative

13    reports prepared by Krause, which documented her interviews with Kathryn on October

14    16 and 18, 1984, as well as the August 30, 1984 report which included the narrative

15    written by Shirley after Kathryn disclosed the allegations of abuse to her. *Id*. at 3-4.  On

16    November 27, 1984, Roe concluded that the case was not "filable" due to problems with

17    what Kathryn had said, may not be willing to say, or may not be competent to testify to at

18    _____

19    [2] Mr. Spencer asks the Court to strike the declarations of Peters and Roe filed after their
deposition (presumably Dkts. 136 and 137), arguing they are sham affidavits because they

20    contradict each declarant's prior declaration and deposition. Dkt. 167 at 7, n. 1. For the Court to
disavow an affidavit as a sham, the "inconsistency between a party's deposition testimony and

21    subsequent affidavit must be clear and unambiguous." *Yeager v. Bowlin*, 693 F.3d 1076, 1080
(9th Cir. 2012). In his response, Mr. Spencer fails to show that the inconsistencies he alleges are

22    clear and unambiguous.  Therefore, the motion to strike the declarations is denied.

1   trial.  *Id.*  For example, inconsistencies in Kathryn's statements, her reluctance to talk

2   about abuse, and Kathryn's statements about rubbing Shirley in combination with other

3   statements created questions of "fact v. fantasy," which Roe indicated was "built in

4   reasonable doubt," all factored into Roe's recommendation.  *Id.* at 1-3.  While Roe

5   opined that the case was "unwinnable," she also stated "I believe the child was clearly

6   abused and probably by the defendant…."  *Id.* at 3.

7        On December 11, 1984, Peters interviewed Kathryn.  Dkt. 138-17 (Videotape

8   Transcript).  The interview was videotaped.  *Id.* & 96 (DVD of Interview).  Peters has

9   testified that this interview was performed at the direction of Curtis in Peters's function

10  as a deputy prosecutor whose role "was to determine and relay back to the prosecuting

11  attorney impressions as to whether she might be found competent should charges be

12  brought" and whether she could relate the allegations back to him.  Dkt. 138-6 at 4, 6 and

13  8.  Although Curtis did not explicitly state that he directed Peters to interview Kathryn,

14  Curtis was Peters's supervisor and in Curtis's deposition he did state "we definitely

15  weren't going to make a filing decision until [Peters] had interviewed the child."  Dkt.

16  138-4 at 17.  Additionally, regarding Peters's interview of Kathryn, Curtis was asked and

17  answered the following in deposition:

18      Q:   … Was the purpose of that interview to assist in making the decision
             whether or not to file charges?
19      A:   Yes, because although we certainly respected what Ms. Roe had to
             say, she did not actually interview Katie in coming to a conclusion.  She
20      only reviewed the police report. So we felt it would be very important for
             Mr. Peters to actually interview her, see whether he agreed with Ms. Roe's
21      assessment or whether he thought the case was prosecutable.

22

Q:      Am I correct that that was not part of the ongoing police
investigation or an investigation conducted by your office but went strictly
to the decision of whether or not to charge?
A:      No.  It was done for the purpose of allowing us to do a more
thorough assessment on whether or not we thought the case was, in fact,
filable.

Dkt 138-5 at 3-4. While Curtis does not recall viewing the video before filing charges, he

relied in part on Peters's evaluation of Kathryn in making his charging decision. Dkt.

168-11 at 11.

During Peters's interview with Kathryn, DeAnne was present throughout. Dkts.

137-17 at 1-34.  DeAnne maintains that in her presence there was "no discussion about

what Katie was to say" during the sixty-six minute break in the interview, which is not

recorded, and there is no indication that Kathryn was ever out of DeAnne's presence

during the break.  Dkt. 168-13 at 50.   The interview itself reveals that the information

about Spencer's alleged sexual conduct with Kathryn, which the child communicated

largely through non-verbal means (e.g. nodding of the head and demonstration of events

through the use of anatomically correct dolls) was cumulative of  and consistent with

what Krause and Shirley had already reported as Kathryn having alleged.  *See* Dkt. 96

and 138-17.

Although Peters had "serious reservations" about filing charges against Spencer,

Curtis has testified that it was "my call," and stated that "I felt like it was going to be a

tough case and the buck ultimately stopped with me as the elected prosecutor, and I was

willing to sign the information knowing that fact." Dkt. 138-5 at 1. When asked during

1  his deposition why he filed the charges against Spencer, despite some of the problems

2  with proof in the case, Curtis stated:

3              Well, I knew that it was a tough case. At the time I knew that Mr.
       Peters had some reservations about filing it, even after his interview with
4       Katie Spencer. Obviously, Becky Roe had reservations, as well…. The
       thing that kept coming back to me was the part of her letter, Rebecca Roe's
5       letter to us on page 3 where she says here: There are several problems.
       Although I believe [the] child was clearly abused and probably by the
6       defendant, the case is unwinnable even assuming you can get the child to
       … talk.
7              I did not come to the decision to file this case lightly. I felt like there
       were some problems with the case, but it was my policy as the elected
8       prosecutor to take an aggressive stand in my county towards child abusers.
       And the fact that Becky Roe concluded the child was abused, allegations
9       were against this specific defendant, I decided that that's what juries are
       for….
10             That's the posture I had on many of these sex abuse cases in Clark
       County over the years….. [I]f we could win or get convictions on these
11      types of cases even 50 percent of the time, we were doing a service to the
       criminal justice system and our community.
12
    Dkt. 138-4 at 39-40.  Upon review of and reliance on all the police reports and allegations
13
    contained therein, his conversation with Krause as to her assessment of Kathryn, Peters's
14
    assessment of Kathryn, and potentially the report of Roe itself or at least Peters's
15
    representation thereof, Curtis made his decision to charge Mr. Spencer.  Dkt. 168-11 at
16
    11 and 14.  On January 2, 1985, Curtis charged Mr. Spencer with two counts of sexually
17
    abusing Kathryn; he was arrested and then released on his personal recognizance.  Dkt.
18
    138-5 at 29.
19
           After Curtis filed the initial charges against Mr. Spencer, the record reflects that
20
    on January 9, 1985, Curtis sent a letter to the chief of police asking that a special
21
    prosecutor from King County be assigned the case, as he mistakenly thought that Mr.
22

1    Spencer was still employed by VPD. Dkt. 138-4 at 31. Barbara Linde ("Linde"), a

2    prosecutor from King County was assigned to the case, and the King County Prosecutor's

3    Office was involved in the case until around April 4, 1985. *See* Dkt. 138-4 at 5-7 & 138-5

4    at 22 and 26. However, Peters intermittently continued to be involved in the case as it

5    developed until the Clark County Prosecutor's Office reassumed full responsibility for

6    the prosecution in late April or early May 1985. *See, e.g.,* Dkt. 138-5 at 26-27.

7    **C.     Additional Allegations, Further Charges & Plea**

8           After the abuse allegations surfaced, Mr. Spencer was separated from his wife and

9    moved into the Salmon Creek Motel. Dkt. 1 at 17. On February 16, 1985, Shirley took

10   four-year-old Hansen to the Salmon Creek Motel to stay the night with Mr. Spencer. Dkt.

11   1 at 17 & 64-3 at 9. On February 28, 1985, Krause interviewed Hansen.  Dkt. 1 at 17 &

12   64-3. In her report, Krause indicated that Hansen alleged Mr. Spencer had committed

13   multiple acts of violent sexual abuse at home and at the Salmon Creek Motel; Hansen

14   also indicated that he witnessed abuse of Kathryn and Matthew and that they were forced

15   to touch each other. Dkt. 1 at 17 & 64-3 at 16-22. On the same day of Hansen's

16   interview, the Clark County Prosecutor's Office, through Peters, filed an amended

17   information charging Mr. Spencer with three counts of statutory rape of Hansen. Dkt. 63-

18   6.  Later that day, Mr. Spencer was arrested pursuant to a warrant. Dkt. 63-4 & 5.

19   Davidson was one of the arresting officers.  Dkt. 1 at 18 & 62 at 5. Although it is

20   disputed as to what the nature of their relationship was and when it began, Davidson and

21   Ms. Spencer became involved, and Davidson informed his subordinate Krause about his

22

1    involvement with Ms. Spencer.  *See, e.g.*, Dkt. 1 at 21, 48 at 3-4, 53 at 4, 63-20 at 13, &

2    73-1 at 11-14.

3         On March 25, 1985, Krause interviewed nine-year-old Matthew. Dkt. 64-5.

4    According to Krause's report, after Matthew denied several times that his father abused

5    him, he told Krause that Mr. Spencer abused him, Kathryn, and Hansen and made them

6    touch each other. *Id*. According to another interview report by Krause, that same day, she

7    re-interviewed Kathryn, who corroborated Matthew and Hansen's statements. Dkt. 64-6.

8    The Clark County Prosecutor's Office, through Peters, filed a second amended

9    information, charging Mr. Spencer with ten counts of first degree statutory rape and six

10   counts of complicity to first degree statutory rape based on the disclosures of all three

11   children. Dkt. 63-6. On May 16, 1985, Mr. Spencer entered an *Alford* plea of guilty to

12   multiple counts of sexually abusing Matthew, Kathryn and Hansen. Dkt. 1 at 6 & 63-7.

13   **D.    Mr. Spencer Challenges his Arrest, Conviction and Incarceration**

14        During his incarceration, Mr. Spencer filed numerous Personal Restraint Petitions

15   ("PRPs") and appeals therefrom.  His challenges involved alleged failures to disclose

16   exculpatory evidence, such as Roe's opinion regarding whether to proceed with the case,

17   and the medical reports of Kathryn and Matthew which did not corroborate the type of

18   abuse alleged, as well as other claims, such as allegations that Davidson coerced him into

19   pleading.  Dkt. 63-11-16 & 21-25.

20        After several unsuccessful appeals, the relevant facts of which will be discussed

21   throughout this order, Mr. Spencer's prison sentence was commuted to community

22   supervision in 2004 by then Governor Locke.  Dkt. 63-18.  Following his release from

1    prison, Kathryn and Matthew recanted their prior allegations of sexual abuse by Mr.

2    Spencer.  Dkt. 63-20.  Hansen has not recanted his allegations of sexual abuse by Mr.

3    Spencer.  *See* Dkt. 54 & 54-1.

4           In 2009, the state court of appeals ruled Mr. Spencer could withdraw his *Alford*

5    plea of guilty based, in part, on two of the three victims' recantations, and vacated his

6    convictions.  *See* Dkt. 63-20 & 22. The Washington State Supreme Court denied the

7    state's motion for discretionary review of the court of appeals 2009 decision.  Dkt. 63-24.

8    In September 2010, the Superior Court of Washington for Clark County granted the Clark

9    County Prosecutor's motion to dismiss the charges against Mr. Spencer without

10   prejudice.  Dkt. 63-26.

11                              **III. DISCUSSION**

12   **A.      Summary Judgment Standard**

13          Summary judgment is proper only if the pleadings, the discovery and disclosure

14   materials on file, and any affidavits show that there is no genuine issue as to any material

15   fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

16   The moving party is entitled to judgment as a matter of law when the nonmoving party

17   fails to make a sufficient showing on an essential element of a claim in the case on which

18   the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

19   323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

20   could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

21   *Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must

22   present specific, significant probative evidence, not simply "some metaphysical doubt").

*See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

626, 630 (9th Cir. 1987).

　　　　The determination of the existence of a material fact is often a close question. The

Court must consider the substantive evidentiary burden that the nonmoving party must

meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

issues of controversy in favor of the nonmoving party only when the facts specifically

attested by that party contradict facts specifically attested by the moving party.  The

nonmoving party may not merely state that it will discredit the moving party's evidence

at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.

Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

nonspecific statements in affidavits are not sufficient, and missing facts will not be

presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.	Probable Cause**

　　　　"Probable cause exists where the facts and circumstances within their [the

officers'] knowledge and of which they had reasonably trustworthy information [are]

sufficient in themselves to warrant a [person] of reasonable caution in the belief that an

offense has been or is being committed."  *Stoot v. City of Everett*, 528 F.3d 910, 918

(2009) (*citing Brinegar v. United* States, 338 U.S. 160, 175–76 (1949) (internal quotation

1   marks omitted); *Ornelas v. United States*, 517 U.S. 690, 696 (1996).  Further, "[b]ecause

2   many situations which confront officers in the course of executing their duties are more

3   or less ambiguous, room must be allowed for some mistakes on their part. But the

4   mistakes must be those of reasonable [people], acting on facts leading sensibly to their

5   conclusions of probability." *Id.* (*citing Brinegar*, 338 U.S. at 176).

6          Probable cause is a complete defense to claims of false arrest, false imprisonment

7   and malicious prosecution.  *See Lassiter v. City of Bremerton*, 556 F. 3d 1049, 1054-55

8   (9th Cir. 2009).

9          **1.      Disclosures of Kathryn**

10         There is simply no material evidence in the record that, in 1984, when Krause

11  interviewed Kathyrn, Shirley Spencer, and DeAnne Spencer, Peters and Curtis would

12  have had any reason to doubt the veracity of Krause's interview reports or the

13  appropriateness of her professional skills in interviewing children and family members

14  allegedly involved in child sexual abuse cases.  In fact, the evidence reflects that Krause

15  had an excellent reputation for her professional work at that time.  In 1984 and 1985,

16  Krause was recognized as a thorough and competent investigator, who had an

17  "impeccable reputation" with the Clark County Prosecutor's Office and was one of the

18  "best [investigator's] in the country."  Dkt. 138-5 at 1-3 (December 10, 2012 Deposition

19  of Arthur Curtis).  Mr. Spencer presents no evidence to contradict that Krause had an

20  impeccable reputation for her work.  Nor does Mr. Spencer point to any information

21  which would indicate that the Clark County Prosecutor's office knew or should have

22

1  known that Krause had a history of fabricating evidence or reputation for coercing

2  children into making false allegations of abuse.

3      Although Mr. Spencer maintains that Flood's reports "negate probable cause"

4  (Dkt. 167 at 4), the Court disagrees.  There is no material evidence in Flood's reports,

5  including his interviews with Shirley and Kathryn, demonstrating that the veracity of

6  Krause's interview reports should have been regarded by Peters, Curtis or Roe as suspect,

7  much less fabricated.  Flood's August 29, 1984 report does state that, in his interview

8  with Kathryn, she "indicated that she did tell Shirley everything that Shirley advised me

9  of but then when asked to explain it or asked specific questions about it, she would say

10 that she couldn't remember the words so she couldn't tell me."  Dkt. 168-6 at 33.  The

11 report also indicates that when Kathryn was asked if "someone had touched her pee pee

12 she shook her head yes and when asked who, she would say daddy and then a few

13 minutes later she said not daddy, no one." *Id*.  Further, Flood's report also states in part

14 that "Kathryn indicated that her and her father played a game but she didn't want to talk

15 about the game." *Id*.

16     Although it is true that there are some inconsistencies in Kathryn's statements to

17 Flood and as between Flood's and Krause's later reports, Flood's reports neither negate

18 probable cause, nor demonstrate that a genuine issue of material facts exists regarding the

19 veracity of Krause's later reports about the abuse of Kathryn.  Flood's interviews were

20 just part of the initial investigation in Sacramento and indicated a need for follow-up

21 investigation.  Indeed, Flood's reports were forwarded to Clark County's Sheriff's Office

22 for further investigation.

1          In Krause's October 18, 1984 interview report with DeAnne Spencer, Krause

2   indicates that DeAnne reported Kathryn engaged in sexualized behavior upon return from

3   visits with her father in 1983 and 1984. *See* Dkt. 138-12.  DeAnne Spencer has testified

4   in a recent deposition that she did not express concerns to Krause about Kathryn

5   engaging in excessive masturbation, which would provide some corroborating evidence

6   of Kathryn's allegations of abuse.  Dkt. 168-13 at 50.  *See In re: Dependency of Penelope*

7   *B.*, 104 Wn.2d 643, 654-55 (1985) (evidence of precocious sexual behavior by child

8   would be admissible and provide corroboration of child's abuse allegations). This recent

9   testimony is not relevant to the Court's determination of whether in 1984 and 1985 Peters

10  or Curtis knew or should have known that the information collected by Krause from

11  DeAnne was false, if it indeed is, and thus negated probable cause.

12         Additionally, based in part on Shirley's December 2012 deposition testimony,

13  Spencer argues that Shirley "[c]learly distorted her interaction with Kathryn because of

14  her own unresolved sexual trauma as a child."  Dkts. 167 at 3 & 168-1 at 6 (Deposition of

15  Shirley Spencer).   Shirley's uncontradicted testimony indicates that she suffered abuse as

16  a child.  Mr. Spencer asserts that such abuse impacted her emotional or mental health

17  such that her six-page written statement about Kathyrn's abuse disclosures and Shirley's

18  alleged statements to Krause about the abuse were unreliable.  Dkt. 167 at 3.

19  Specifically, Mr. Spencer states in his response that Shirley was an "emotionally

20  unstable" person, who was "jealous," "violent[,] and potentially suicidal."  *Id*. (*citing*

21  Dkt. 168-2 at 39 and 48 (November 12, 2012 Deposition of Mr. Spencer)).  Yet, in Mr.

22  Spencer's brief, he does not support his opinion of Shirley's mental instability with the

1    testimony of a qualified expert.  Nor does he specifically demonstrate that, even if his

2    psychological assessments were correct, at the time of any of the charging decisions,

3    Peters or Curtis knew or should have known that Shirley's abuse history or her alleged

4    emotional or mental instability were so "clear[]" (*id.*) and severe that any reasonable

5    person would view some or all of Shirley's statements as unreliable or patently

6    fabricated.  Further, that Shirley believed in Mr. Spencer's innocence but reported the

7    abuse allegations Kathryn allegedly made to her (*see, e.g.,* Dkt. 167 at 4) also fails to

8    raise a genuine issue of material fact that Peters or Curtis should have known her

9    statements were unreliable.  *Id.*  A person may believe someone is innocent of child

10   abuse but hear information to the contrary that he or she finds necessary to report.

11          Mr. Spencer also argues that there is a factual dispute as to what if anything

12   Kathryn purportedly told Shirley and then Krause about being sexually abused. Dkt. 167

13   at 2.  In Kathyrn's November 2012 deposition, she indicates that "she does not remember

14   saying things to Shirley, did not say those things to Shirley and would not have said

15   many of those things because she would not have used such words." *Id.*; Dkt. 168-6 at

16   18-22.  In fact, Kathyrn now denies that any conversation about sexual abuse took place

17   while she and Shirley were lying on the floor in the living room (*id.*; Dkt. 168-6 at 23), as

18   has been reported by Shirley and Krause.  As the Court has found with regard to the 1984

19   and 1985 statements of Shirley and DeAnne and the interview reports of Krause, Mr.

20   Spencer does not demonstrate that any specific information referred to in his response

21   indicates that Peters or Curtis should have had reason to doubt the information about

22   what Kathryn had allegedly reported.  *See supra.*  Indeed, although rather reluctantly at

1  first and not used as evidence of probable cause, Kathryn relayed essentially the same

2  information regarding her father's alleged sexual abuse to Peters in the December 1984

3  interview as she had allegedly conveyed to Shirley and Krause.

4      Mr. Spencer also argues that Kathryn's statements would not have been

5  admissible and that undermines Peters's claim that probable cause existed.  Dkt. 167 at 8.

6  However, the admissibility of Kathryn's statements in a criminal trial against Mr.

7  Spencer would have been a determination for the state court to make.  *See* RCW

8  9A.44.120.  Nonetheless, before filing charges, it would be reasonable for a prosecutor's

9  office to form an opinion as to whether its central witness in a child abuse case would be

10  competent to testify.  In fact, Peters did do so by interviewing Kathryn and reporting to

11  Curtis his assessment of whether a court would find Kathryn competent and whether she

12  could repeat what she had allegedly told Krause and Shirley.  *See infra.*

13      Mr. Spencer asserts that the record demonstrates that "Peters never advised …

14  Curtis … not to charge Ray," and with the use of select excerpts from Curtis's testimony,

15  Mr. Spencer essentially argues that Peters did indeed advise Curtis to charge Ray.  *See*

16  Dkt. 167 at 6.  Although the record may not be crystal clear as to whether Peters directly

17  stated to Curtis that Mr. Spencer should not be charged, the Court views Mr. Spencer's

18  representation of Curtis's testimony about what Peters expressed to him as somewhat

19  misleading.  *See* Dkt. 167 at 6.  According to Curtis's own testimony, Peters was clearly

20  reticent about filing charges against Mr. Spencer.  In deposition, Curtis states that Peters

21  had "serious reservations," about whether or not to file charges against Mr. Spencer.  Dkt.

22  138-4 at 1.  Indeed, Curtis testified that Peters's reservations persisted, "even after his

1    interview with Katie." Dkt. 138-4 at 146-47.   Despite Peters's reticence and knowing it

2    was going to be "a tough case" with "some problems," Curtis made the decision to charge

3    Mr. Spencer.  *Id*.  Curtis's testimony is not inconsistent with Peters's testimony that he

4    "told [Curtis] I wouldn't charge it and I didn't want my name on the charging document."

5    Dkt. 138-7 at 17.

6           Additionally, contrary to Mr. Spencer's assertion that Roe's opinion undermines

7    Peters's position that probable cause existed or that her report would have been helpful to

8    Mr. Spencer, much less "exculpatory," the Court finds just the opposite.  *See, e.g.* Dkt.

9    167 at 6-7.  As the Court noted in its prior order, Roe's opinion would likely not have

10   been admissible in court (Dkt. 97 at 20), a statement that Mr. Spencer never contradicts

11   with supporting case law.  Even if it were admissible, read as a whole, Roe's report

12   supports that, despite inconsistencies within Kathryn's allegations, probable cause existed

13   in November 1984.  Roe clearly states "I believe the child was clearly abused and

14   probably by the defendant…." Dkt. 137 at 3.  The apprehensions Roe expresses in her

15   report do not involve whether probable cause existed but whether or not a conviction

16   could have been sustained by proof beyond a reasonable doubt.

17          It is clear that prosecutors Peters, Curtis and Roe found that Mr. Spencer's case

18   was problematic.  However, even though Curtis states that "we all had reservations when

19   the case was initially filed" (Dkt. 138-5 at 2), that statement is not evidence that either he

20   or Peters believed probable cause did not exist.  As Peters indicates in an "essay" he sent

21   to the Colombian newspaper in 2005 regarding its series on Spencer, Spencer's case was

22   not clear cut.  *See* Dkt.168-14 at 35.  Peters writes that "early on, when all we had was a

1   confusing account by a young child, uncorroborated, our assessment was to decline

2   prosecution because of insufficient evidence." *Id*.  Although Spencer argues otherwise

3   (Dkt. 167 at 8 (*citing, e.g.*, Dkt. 168-14 at 35)), taken together with other evidence in the

4   record, the Court does not interpret this statement as evidence showing a genuine issue of

5   material fact that in 1984 or 1985 Peters believed there was no probable cause to charge

6   Mr. Spencer based on Kathryn's allegations as conveyed by Shirley, reported by Krause

7   and Flood and corroborated in part by DeAnne Spencer's observations of Kathryn's

8   sexually precocious behavior.  Like Peters's statement in his 1996 deposition where he

9   indicates that Roe concurred with him that the "case wasn't provable," Peters goes on to

10  explain what he means by "provable" as "whether I can prove [the crime] beyond a

11  reasonable doubt."  Dkt. 168-14 at 15.   As Peters argues, the "standard to determine

12  whether probable cause exists is not whether the prosecutor will convince a jury of the

13  defendant's guilt beyond a reasonable doubt."  Dkt. 170 at 4.

14        Based on the facts that neither Peters nor Curtis had any reason to doubt the

15  veracity of Krause's reports and the evidence therein, the statements made by Shirley

16  Spencer, including her written statement as well as her statements to Krause and Flood,

17  DeAnne's statements to Krause regarding Kathyrn's precocious sexual conduct, the

18  Court finds that in 1984 or 1985, it was reasonable for Peters and Curtis to find that

19  probable cause existed and to file charges against Mr. Spencer for the abuse of Kathryn.

20  As Peters correctly observes, even if there was no corroborating testimony, since 1975,

21  RCW 9A.44.020(1) has provided that "in order to convict a person of any crime defined

22

1   in this chapter [including child rape] it shall not be necessary that the testimony of the

2   alleged victim be corroborated." Dkt. 135 at 4, n.8.

3        Because the Court has determined that there is not genuine issue of material fact

4   as to whether it was reasonable for Peters and Curtis to find that probable cause existed

5   with respect to the January 2, 1985 charges against Mr. Spencer, the claims for false

6   arrest, malicious prosecution, and false imprisonment regarding the same must be

7   dismissed as a matter of law. *See Lassiter*, 556 F.3d at 1054-55.

8        **2.**     **Disclosures of Hansen and Matthew**

9        Peters argues that probable cause existed to support the arrest on the amended

10   charges against Mr. Spencer for the abuse of Hansen. Dkt. 135 at 18. He maintains that

11   his arrest warrant application relies on the allegations reported by Krause in her

12   interviews of Hansen on February 27 and 28, 1985. *Id*. He states that his application for

13   a warrant did not rely on Kathryn's statements and thus his December 11, 1984 interview

14   with her is not relevant to the new allegations made by Hansen, which alone were the

15   subject of the new charges filed against Mr. Spencer in February 1985. *Id*. Peters denies

16   that he ever supervised the investigation or was involved in the investigation. Dkt. 170 at

17   5. Instead, he maintains that he reviewed and relied on the reports of Krause, requested

18   Davidson to "verify the description of the motel room" in which Hansen was allegedly

19   abused, prepared the relevant papers for filing and submitted them to the court on

20   February 28, 1985, all of which were prosecutorial functions. Dkts. 170 at 7; 63-4 at 2-6

21   (application for arrest warrant and supporting affidavit). Peters asserts that he was

22   entitled to rely on Krause's reports when preparing the aforementioned documents. Dkt.

1   170 at 7. Additionally, according to his uncontradicted testimony, Peters filed the

2   amended information only after review and approval from either Linde or her supervisor

3   and Curtis.  Dkt. 136 at 2.  Peters observes that to this day, Hansen, who is now an adult,

4   maintains that he was sexually abused by Mr. Spencer.  Dkt. 170 at 7 (*citing* Dkt. 54).[3]

5        As to Hansen, Mr. Spencer argues that probable cause does not exist because he

6   maintains Peters's participated in an effort to fabricate corroboration and that Krause's

7   reports regarding Hansen's allegations were false and Peters would have known of their

8   falsity.  Dkt. 167 at 9.  In summary, Mr. Spencer maintains that Peters knew of the falsity

9   of Krause's reports due to the contrast between her reports regarding the allegations of

10  Kathryn and his own interview of her as well as Peters's knowledge and involvement in

11  the "pursuit of Hansen."  *Id.* at 10.  Further, he argues that Peters was directing the

12  investigation, after Krause had already closed the case on December 30, 1984 (Dkt. 168

13  at 12) and when she was "relentlessly targeting" Hansen.  Dkt. 167 at 8-9.  Based on the

14  statement of Curtis, who testified that Krause's December 1984 report indicated that the

15  Sheriff's Office did not intend to do any more unless follow-up was requested by the

16  prosecutor (Dkt.168-11 at 15), Mr. Spencer argues that without direction from the

17  prosecutor's office, Krause would not have continued her investigation.  *Id.*  This is a

18  rather curious assertion given Mr. Spencer's contention that Krause had been fabricating

19  _____

20      [3] Peters asks the Court to strike a declaration by Mr. Spencer's counsel at Dkt. 135-13 at
    9-11, which attaches but does not authenticate notes prepared by an unidentified person which
21  purport to contradict Hansen's 2009 sworn testimony that his father in fact abused him. Dkt. 170
    at 7, n. 2. The notes referenced are inadmissible hearsay and are stricken pursuant to 56(c)(2). In
22  any case, even if such notes were considered, it would not alter the Court's analysis or
    conclusions.

ORDER - 24

1    evidence in an effort to falsely prosecute Mr. Spencer, e.g. the reports of her interviews

2    with Kathryn, before Peters was involved in the case.  Mr. Spencer further contends that

3    although Krause's reports reflect that Shirley told her that Hansen had disclosed that Mr.

4    Spencer molested him, Shirley has testified in a recent deposition that "I didn't conclude

5    anything" and denies that Hansen ever accused Mr. Spencer of abuse.  *Id.* at 9-10 (*citing*

6    Dkt. 168-1 at 18-20).

7          The Court finds that probable cause existed to arrest Mr. Spencer on the amended

8    charges filed against him based on Krause's report of Hansen's alleged abuse.  The arrest

9    warrant itself facially relies on information from the interviews of Krause, not

10   information gathered by Peters.  Dkt. 63-4 at 2-6. Aside from speculation regarding what

11   might be termed ambiguous information surrounding which individual(s) were

12   prosecuting or assisting in the prosecution of the case when Mr. Spencer was arrested on

13   amended charges and why Krause contacted Shirley in February 1985 (Dkt.167 at 9), Mr.

14   Spencer fails to present specific, probative evidence that Peters was directing the

15   investigation or involved in investigative activities after Mr. Spencer was initially

16   charged, or that Peters, Linde or Curtis knew or should have known that Krause's reports

17   about Hansen were false, much less that Peters was collaborating with Krause or

18   Davidson to fabricate corroboration.  That Peters requested Davidson to "verify the

19   description of the room," a request Peters cites in his motion and affidavit for the

20   issuance of Mr. Spencer's warrant, also does not create a genuine issue of material fact

21   regarding the aforementioned.  The Court interprets the request for verification, which

22   was received, as part of Peters's prosecutorial duty to ensure that his motion is filed in

1    good faith.  Routine communications between prosecutors and law enforcement during an

2    ongoing investigation and subsequent prosecution does not support a conclusion that such

3    conduct constitutes "directing" an investigation.

4        As the Court found with regard to Krause's interview reports of Kathryn (*see*

5    *supra.*), there is no indication that Peters should have doubted the veracity of Krause's

6    reports about Hansen.  Regardless of what Shirley has testified to in her recent

7    deposition, the fact remains that Hansen has not recanted his allegations of abuse.  Dkts.

8    54 & 54-1.  Had he recently done so, based on what Mr. Spencer presented in his

9    response, there still would not be sufficient evidence to show that in 1985 Peters should

10   have doubted that Krause accurately reported Hansen's allegations of sexual abuse by his

11   father.  Mr. Spencer's argument that Kathyrn was not as verbally communicative with

12   Peters as she was with Krause and did not use all the same words as she did with Krause

13   to describe to him the alleged abuse that occurred does not create a genuine issue of

14   material fact that Peters knew or should have known Krause's reports about either

15   Kathryn or Hansen were false.  Dkt. 167 at 10.  As the Court has stated, in her December

16   1984 interview with Peters, Kathryn expressed, though rather reluctantly at first and

17   mostly through the use of anatomically correct dolls, abuse allegations consistent with

18   those which Krause and Shirley had recorded Kathryn reporting to both of them.  *See*

19   Dkts. 96 and 138-17.  Indeed, the assertion made by Mr. Spencer that Peters's interview

20   with Kathryn provided less detail than Krause's interviews and thus Peters should have

21   known Krause's reports were false or unreliable is somewhat at odds with Mr. Spencer's

22   theory that Peters was participating in a conspiracy to falsely prosecute him, as Peters

1   would have been coaching such a witness to corroborate in every detail her prior version

2   of the facts.  No information presented by Mr. Spencer in his response demonstrates that

3   a genuine issue of material fact exists indicating that Peters was not entitled to rely on the

4   information gathered by Krause in February 1985 to support his motion for the arrest and

5   detention of Mr. Spencer.

6          As to the allegations of abuse related to Matthew and the filing of the second

7   amended charges, Peters again relied on the interview reports of Krause.  As with

8   Krause's interview reports of Kathryn and Hansen, Mr. Spencer does not provide

9   sufficient evidence that Peters had reason to doubt the veracity of the information Krause

10  supplied to him regarding Matthew's allegations of sexual abuse by Mr. Spencer

11  allegedly disclosed to her on March 25, 1985. Dkt. 168-5 at 62-75.  Despite the fact that

12  Matthew has recanted his allegations against Mr. Spencer, in his November 2012

13  deposition, Matthew testified that he did indeed disclose to Krause that he was sexually

14  abused by his father.  Dkt. 168-5 at 16-17.  However, Matthew essentially maintains that

15  Krause coerced statements from him, that she continually told him or suggested to him

16  what had happened between him and his father, and Matthew just went along with

17  Krause because he wanted the interview to stop.  *See* Dkt. 168-5.  Again, as the Court has

18  previously found, Mr. Spencer has not sufficiently demonstrated with factual and legal

19  citation that in 1985, Peters knew or should have known that Krause's professional skills

20  in interviewing children were in fact coercive.  There is no evidence contradicting that

21  Krause had an excellent reputation as an investigator and skilled interviewer.  Relying on

22  the information before him in May of 1985, Peters had probable cause to file the second

1   amended information against Mr. Spencer for the additional counts of sexual abuse based

2   on all the information in the police reports, including but not limited to, Krause's

3   interviews of Hansen, Kathryn and Matthew and the allegations therein which

4   corroborated abuse of all three children by their father. Dkt. 63-6.

5        Not only was there probable cause before Peters interviewed Kathryn, but the

6   subsequent revelations of Hansen and Matthew corroborated and strengthened the

7   allegations Kathryn had made against Mr. Spencer.  Had charges not been filed on

8   January 2, 1985 based on the abuse of Kathryn, surely they would have been filed after

9   further investigation or disclosures by the other children of alleged abuse.

10        Because the Court has determined that there is not genuine issue of material fact as

11   to whether it was reasonable for Peters to find that probable cause existed with respect

12   the amended charges and warrant for Mr. Spencer's arrest as well as the second amended

13   information he filed against Mr. Spencer were supported by probable cause, the claims

14   for false arrest, malicious prosecution, and false imprisonment regarding the same must

15   be dismissed as a matter of law.  *See Lassiter*, 556 F.3d 1049, 1054-55.

16   **C.    Absolute Immunity**

17        Prosecutors performing their official prosecutorial functions are entitled to

18   absolute immunity against constitutional torts. *Lacey v. Maricopa County*, 693 F. 3d 896,

19   912 (9th Cir. 2012). Without the promise of immunity from suit, a prosecutor would be

20   distracted from his duties and timid in pursuing prosecutions rather than exercising the

21   independent judgment and discretion that his office requires. *See id*. Moreover, "the

22   judicial process is available as a check on prosecutorial actions," and it reduces the need

1  for private suits for damages to keep prosecutors in line. *Burns v. Reed*, 500 U.S. 478,

2  492 (1991).

3       At the same time, absolute immunity is an extreme remedy, and it is justified only

4  where "any lesser degree of immunity could impair the judicial process itself." *Kalina v.*

5  *Fletcher*, 522 U.S. 118, 127 (1997) (*quoting Malley v. Briggs*, 475 U.S. 335, 342 (1986)).

6  Immunity attaches to "the nature of the function performed, not the identity of the actor

7  who performed it." *Id.* (*quoting Forrester v. White*, 484 U.S. 219, 229 (1988)) (internal

8  quotation marks omitted). The prosecutor thus "bears the burden of showing that ...

9  immunity is justified for the function in question." *Burns*, 500 U.S. at 486.

10      Determining what functions are prosecutorial is an inexact science. The functions

11  are those "intimately associated with the judicial phase of the criminal process," in which

12  the prosecutor is acting as "an officer of the court." *Van de Kamp v. Goldstien*, 555 U.S.

13  335, 342 (2009) (*quoting Imbler v. Pechman*, 424 U.S. at 430–31 (1976)). Absolute

14  immunity also protects those functions in which the prosecutor acts as an "advocate for

15  the State," even if they "involve actions preliminary to the initiation of a prosecution and

16  actions apart from the courtroom." *Burns*, 500 U.S. at 486 (*quoting Imbler*, 424 U.S. at

17  431 n. 33). These actions need not relate to a particular trial and may even be

18  administrative in nature, yet are connected to the trial process and "necessarily require

19  legal knowledge and the exercise of related discretion." *Van de Kamp*, 555 U.S. at 344.

20      Functions for which absolute prosecutorial immunity have been granted include

21  actions such as the lawyerly functions of organizing and analyzing evidence and law, and

22  then presenting evidence and analysis to the courts and grand juries on behalf of the

1  government; they also include internal decisions and processes that determine how those

2  functions will be carried out.  *See Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

3  Prosecutors are not necessarily immune from actions taken outside of this process,

4  including those normally performed by a detective or police officer, like gathering

5  evidence, *see id.*, and those separate from the process, like providing legal advice to the

6  police.  *See Burns*, 500 U.S. at 495–96.  It has long been the law of this circuit that a

7  decision whether to prosecute or not prosecute is entitled to absolute immunity.  *Slater v.*

8  *Clarke*, 700 F.3d 1200, 1203 (9th Cir. 2012) (citation omitted).  This is so because the

9  decision whether to prosecute, "involve[s] a balancing of myriad factors, including

10  culpability, prosecutorial resources and public interests." *Id.*

11        **1.  Interview of Kathryn**

12        Although Mr. Spencer maintains that Peters's interview of Kathryn was a non-

13  prosecutorial function, done for the purposes of investigation, Mr. Spencer has not

14  presented sufficient evidence to demonstrate a genuine issue of material fact that it was a

15  non-prosecutorial function.  Dkt. 167 at 14.  The only concrete, specific evidence in the

16  record is the testimony of Peters and Curtis indicating that Peters's interview was

17  performed in his capacity as deputy prosecutor for the purposes of evaluating Kathryn's

18  competency and was completed at the direction of or in cooperation with Curtis, in order

19  to assist in the determination of whether or not to file charges against Mr. Spencer at a

20  time when probable cause already existed.  Dkts. 138-6 at 4, 6 and 8, 138-4 at 17, 138-5

21  at 3-4, & 168-11 at 11.  Thus, Peters is absolutely immune for his conduct related to his

22  December 11, 1984 interview with Kathryn.

### 2.  Investigation

As to Mr. Spencer's other allegations that Peters was involved in investigative activities or supervised the investigation, the Court finds that Mr. Spencer does not demonstrate that a genuine issue of material fact exists that Peters acted outside his role as prosecutor throughout the case such that Peters alone, or in concert with Krause or Davidson, caused injury to Mr. Spencer.

Among several other unpersuasive arguments addressed throughout this order, Mr. Spencer contends that in his deposition testimony Davidson indicates Peters was part of the investigation, and was even supervising it, "early on," and thus this conduct would disallow the application of absolute immunity to some or all of Peters's actions.  Dkt. 167 at 12 and 18 (*citing* Dkt. 168-3 at 21-22 and 44-48). A closer read of the pages to which Mr. Spencer cites, however, does not indicate that Davidson takes the position that Peters was involved in investigative activities, much less that he was functioning as a supervisor "early on."  *See* Dkt. 168-3 at 21-22 and 44-48.  Rather, the specific testimony Mr. Spencer points to indicates that Davidson does not have a clear memory of who he talked to at the prosecutor's office when the case was initiated, and that while he remembers having conversations with Peters about the case, Davidson cannot specifically recall when.  *See id.* at 21-22.  Although an excerpt from Davidson's deposition does indicate that "the prosecutor's office was involved during the investigation" (Dkt. 168-3 at 47), the testimony cited by Mr. Spencer does not provide specific evidence of the type of activities in which the prosecutor's office, or Peters in particular, was engaged and which would show that Peters was not acting in a prosecutorial capacity.   This testimony

1 | reveals only that the prosecutor's office interfaced with the Clark County Sheriff's office

2 | during the course of the investigation.

3 |       Mr. Spencer also asserts that Peters's "trip to Sacramento in March, 1985 to

4 | interview witnesses must be defined as investigatory." Dkt. 167 at 9.  However, Mr.

5 | Spencer fails to cite to the record and show that Peters actually took a trip to Sacramento

6 | in March 1985 to interview witness.  *Id.*  It is not the Court's duty to scour such a

7 | voluminous record in search of a genuine issue of triable fact; it relies on the non-moving

8 | party to identify evidence in the record to preclude summary judgment.  *See Keenan v.*

9 | *Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996).  Based on evidence cited to in Peters's

10 | briefing, the Court finds that the record reflects Peters took a May 3, 1985 trip to

11 | Sacramento with Mr. Spencer's attorney James Rulli to interview witnesses.  Dkt. 170 at

12 | 8 (*citing* Dkt. 136 at 4). Yet, these interviews could not be defined as investigatory.

13 | Rather, they were done in preparation for trial, after the second amended charges had

14 | been filed, and just before Mr. Spencer pled guilty.  *Id.*

15 |     **3.  Disclosure of Evidence**

16 |       Peters argues that he is entitled to either absolute or qualified immunity for

17 | failure to disclose Roe's report and the medical reports of Kathryn and Hansen.

18 | The Court found in its previous order that Peters is entitled to absolute immunity for

19 | failure to disclose all of the above:

20 |     [A]s the Court concluded in its order on Davidson and Krause's motions for
    summary judgment, Mr. Spencer is collaterally estopped from relitigating

21 |     the issues of whether the state unconstitutionally withheld Kathryn's
    medical report prior to his plea and whether Hansen's report, combined

22 |     with Kathryn's medical report, would have caused Spencer to go to trial

1
2
    rather than plead guilty in violation of *Brady*. Dkts. 91 at 26-27 and 93 at 12-13. Finally, as the Court determined in its previous orders, Mr. Spencer is estopped from relitigating the issue of whether the failure to disclose Roe's opinion was unconstitutional. Dkts. 91 at 27-28 & 93 at 12-13.

3
4
Dkt. 97 at 9.  Nothing in Mr. Spencer's responsive briefing alters the Court's prior

5
conclusion.  Although in a footnote the Court's previous order indicated that the

6
preclusive impact of prior judgments should be carefully examined because factual issues

7
such as when and how Hansen's medical report came to the Clark County Sheriff's

8
Office had not necessarily been litigated and may be relevant to Mr. Spencer's claims

9
(*see* Dkt. 97 at 10, n. 2), discovery on such factual issues would not alter the Court's legal

10
conclusion that Mr. Spencer is collaterally estopped from relitigating these issues.

11
        Further, Mr. Spencer's arguments that Peters was "aware" of the medical reports

12
"but concealed them," do not create a genuine issue of material fact. Dkt. 167 at 18.

13
While Mr. Spencer argues in part that the deposition testimony of Krause establishes that

14
"she was sure Peters would have been aware of Kathryn's medical report" (Dkt. 167 at 18

15
(*citing* Dkt. 168-4 at 16-17), Mr. Spencer mentions nothing about Hansen's report and a

16
closer read of the deposition pages cited reveals much more ambiguous testimony

17
regarding Kathryn's report.  Krause testified that while "there wouldn't have been any

18
reason why [the medical report] wouldn't have gone over [to the prosecutor's office],"

19
she also states that the process for sending things to the prosecutor's office entailed first

20
sending the items to the Sheriff's Office "Records" department, and then that department

21
would send the items to the prosecutor's office. Dkt. 168-4 at 10.  However, Krause also

22
testified that "*if* [the medical report] went to Records, I don't know if it went from our

1   Records to the prosecutor.  After it went there, I don't know where it went." *Id.*

2   (emphasis added). Krause further testifies to having "no independent recollection about

3   taking [the medical report] over [to the prosecutor's office]." *Id*.  This testimony does

4   not qualify as specific, probative evidence which supports that a genuine issue of material

5   facts exists showing that Peters knew of medical reports and was involved in their

6   concealment, in violation of Mr. Spencer's constitutional rights.

7       As to the videotaped interview with Kathryn, although it appears that Peters is

8   entitled to either absolute or qualified immunity for failure to disclose the videotape, the

9   Court finds the briefing on these issues needs to be more thorough, especially with regard

10  to citation to relevant case law.  Therefore, based on the determinations made in this

11  order, the Court requests additional briefing on the issues of whether absolute or qualified

12  immunity applies to Peters's failure to disclose the videotaped interview of Kathyrn,

13  assuming the videotape could be viewed both as exculpatory and as impeachment

14  evidence.  The briefing requirements and schedule will be set out at the end of this order.

15  **D.   Conspiracy**

16      A conspiracy in violation of § 1983 requires proof of: (1) an agreement between

17  the defendants to deprive the plaintiff of a constitutional right; (2) an overt act in

18  furtherance of  the conspiracy; and (3) an actual deprivation of constitutional rights

19  resulting from the agreement. *Avalos v. Baca*, 596 F. 3d 583, 592 (9th Cir. 2010);

20  *Gausvik v. Perez*, 239 F. Supp. 2d 1047, 1104 (E.D. Wash. 2002).  Although the

21  agreement or meeting of the minds need not be overt but can be based upon

22  circumstantial evidence, some admissible evidence as opposed to speculation is required

1    to support the conspiracy claim and each participant must share the common objective of

2    the conspiracy. *Crowe v. County of San Diego*, 608 F.3d 406,440 (9th Cir. 2010).

3        Based on the determinations the Court has already made, it finds that Mr. Spencer

4    has not demonstrated a genuine issue of material fact that Peters, either implicitly or

5    explicitly, entered into an agreement to deprive Mr. Spencer of a constitutional right.

6    Even if the Court finds that Peters is not entitled to absolute or qualified immunity for the

7    failure to disclose the videotape of his interview with Kathryn, Mr. Spencer does not

8    point to specific, probative evidence from which a reasonable inference can be drawn that

9    Peters and Krause shared the common objective to "imprison Ray for the sexual abuse of

10    Hansen and Matthew after it was clear Ray was not guilty of abusing Kathryn."[4] Dkt.

11    167 at 12. Mr. Spencer asserts in his response that Peters conspired with Krause to

12    incarcerate him for the purposes of protecting Peters's career by "avoid[ing] civil liability

13    for his actions," as Peters knew or should have known that Mr. Spencer was innocent of

14 _____

15       [4] Mr. Spencer also asserts that, during the course of the investigation, Peters was aware of the relationship between Davidson and Shirley. He argues that in Krause's deposition she stated

16 that she aware of the relationship, and "[s]o was everyone else." Dkt. 167 at 11 (*citing* Dkt. 168-3 at 10). Based on that testimony, Mr. Spencer argues that "everyone" surely would include Peters. *Id*. The evidence cited by Mr. Spencer does not, however, direct the Court to specific

17 testimony showing Krause stated that Peters in particular knew of the relationship, when or what he knew about it, or how Krause would have known that Peters had some knowledge of

18 Davidson and Shirley's relationship. *Id*. In fact, Krause states that she herself found out about the relationship "way on into the investigation," "long after I had interviewed Little Matt," who

19 is Matthew Hansen. *Id*. Peters denies he knew of the relationship until after Mr. Spencer's plea and sentencing in May 1985. Dkt. 69 at 11 (May 10, 2012 Declaration of James Peters). The

20 evidence Mr. Spencer cites neither demonstrates a genuine issue of material fact as to whether Peters knew of the relationship during the investigation, or that he was involved in a conspiracy to imprison Ray for the purposes of furthering the relationship between Davidson and Shirley or

21 for any other purpose. During his deposition, Mr. Spencer admitted that Peters was not part of the alleged conspiracy to further the relationship between Davidson and Shirley. *See* Dkt.138-13

22 at 5. According to Spencer, Peters's motive was solely career-related. *See supra*.

1    the alleged abuse of Kathryn.  *Id.*  Despite these assertions, a genuine issue of material

2    fact is not borne out by the evidence to which Mr. Spencer cites.  As this Court has

3    already found, probable cause existed to arrest Mr. Spencer on January 2, 1985, Peters's

4    interview of Kathryn did not reveal information contradicting Krause's reports, nor did

5    Peters or Curtis have any reason to doubt the veracity of Krause's reports.  Additionally,

6    the Court has found that probable cause supported the filing of both the amended and

7    second amended charges against Mr. Spencer.  *See supra.*  Mr. Spencer's assigned

8    motivation to Peters of wrongfully prosecuting Mr. Spencer amounts to mere speculation

9    and is not a credible theory supported by the record.  Therefore, the Court grants Peters's

10   summary judgment as to this claim.

11                                        **IV. ORDER**

12          Therefore, it is hereby **ORDERED** that Peters's renewed motion for summary

13   judgment (Dkt. 135) is **GRANTED in part;** and the Court **RESERVES** ruling on

14   whether Peters is entitled to absolute or qualified immunity for failure to disclose the

15   videotaped interview of Kathryn. The Court requests additional briefing on that issue as

16   follows:  Peters's initial brief is due June 24, 2013, not to exceed 12 pages. Mr. Spencer's

17   response is due July 1, 2013 not to exceed 10 pages. Peters's reply brief is due on July 8,

18   2013, not to exceed 5 pages.  The Clerk is directed to renote this motion, for

19   consideration of the immunity issue related to Peters's failure to disclose the videotaped

20

21

22

1    interview, to July 8, 2013.  All claims alleged against Peters, except the failure to disclose

2    the videotaped interview of Kathryn, are hereby **DISMISSED with prejudice**.

3          Dated this 13th day of June, 2013.

4

5

6                                    BENJAMIN H. SETTLE
                                     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 37