1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8

9

10

11

12

CLYDE RAY SPENCER,

Plaintiff,

v.

JAMES M. PETERS, et al.,

Defendants.

CASE NO. C11-5424 BHS

ORDER GRANTING IN PART
AND DENYING IN PART
KRAUSE'S MOTION FOR
SUMMARY JUDGMENT

13      This matter comes before the Court on Defendant Sharon Krause's ("Krause")

14  second motion for summary judgment (Dkt. 139). The Court has considered the pleadings

15  filed in support of and in opposition to the motion and the remainder of the file and

16  hereby grants in part and denies in part the motion for the reasons stated herein.

17                    **I.      PROCEDURAL HISTORY**

18      On June 2, 2012, Plaintiffs Clyde Ray Spencer ("Mr. Spencer") and his two

19  children, Matthew Ray Spencer ("Matthew") and Kathryn E. Tetz ("Kathryn"), filed a

20  complaint against Krause, a former detective for the Clark County Sheriff's Office

21  ("Sheriff's Office") and five other named Defendants, including John and Jane Does 1

22  through 10. Dkt. 1.

1       The lawsuit alleges state tort claims and violations of federal civil rights. Dkt. 1 at

2   45-67. Mr. Spencer alleges seven causes of action under 42 U.S.C. § 1983 ("§ 1983"),

3   plus four state law claims.  *Id*. at 45-65.  His federal claims are for malicious prosecution,

4   deprivation of due process, "destruction or concealment of exculpatory evidence,"

5   conspiracy, "failure to intervene, false arrest, and false imprisonment" and conspiracy. *Id*.

6   at 45-58, 289-349.  His state law claims are for malicious prosecution, intentional

7   infliction of emotional distress ("IIED"), conspiracy, and defamation. *Id*. at 59-65, 350-

8   82.  These federal and state claims are alleged against all Defendants except Shirley

9   Spencer, who is a named Defendant only as to Mr. Spencer's § 1983 conspiracy claim

10  and his state law claims for IIED and conspiracy.  *See id*.  Kathryn and Matthew allege

11  state law claims for loss of consortium.  *Id*. at 66-67, 383-9.  Their claims are alleged

12  against all Defendants, except Ms. Spencer.  *Id*.

13      On May 23, 2012, Krause filed a motion for summary judgment. Dkt. 65. On June

14  18, 2012, Plaintiffs filed a response to Krause's motion and requested a continuance. Dkt.

15  72. On June 22, 2012, Krause filed a reply. Dkt. 83. On July 2, 2012, Plaintiffs filed a

16  surreply. Dkt. 87.

17      On October 16, 2012, the Court issued an order granting in part and denying in

18  part Krause's motion for summary judgment and Spencer's motion to continue.  Dkt. 93.

19  In that order, the Court dismissed all state law claims against Krause, permitted Spencer

20  to pursue further discovery on all § 1983 claims, consistent with the findings the Court

21  had made, and denied without prejudice Krause's request for summary judgment based

22  on qualified immunity.  *See id*. at 27-28.

1    On January 16, 2013, Krause filed the instant motion for summary judgment.  Dkt.

2    139.  On March 21, 2013, Spencer filed a response in opposition to Krause's motion.

3    Dkt. 166.  On April 12, 2013, Krause filed a reply brief.[1]  Dkt. 171.

4    ## II.    FACTUAL BACKGROUND

5    As multiple Court orders reflect, this case has a rather extensive background

6    involving allegations that take place over the span of almost thirty years. In 1985, by way

7    of an *Alford* plea, Mr. Spencer was convicted of multiple counts of sexually abusing his

8    children Matthew, then age nine, and Kathryn, then age six, and his step-son Matthew

9    Hansen ("Hansen"), then age five, and sentenced to life in prison. Dkt. 1 at 6; 63-8; & 63-

10   9.  Subsequently, Mr. Spencer filed numerous petitions with the state and federal courts

11   challenging his arrest, conviction, and incarceration.

12   **A.    Initial Allegations**

13   Mr. Spencer is a former police officer of the Vancouver Police Department

14   ("VPD").  Dkt. 63-3 at 2.  In the summer of 1984, while he was employed by the VPD,

15   Mr. Spencer and his now former wife, Shirley Spencer ("Shirley"), and Hansen were

16   visited by Kathryn and Matthew, children from his prior marriage to DeAnne Spencer

17   ("DeAnne").  Dkt. 1 at 6-7. Upon Mr. Spencer's return from a seminar, Shirley advised

18   him that Kathryn made inconsistent allegations of sexual abuse, including ones against

19   him.  Id. at 7 & 63 at 2.  The allegations were reported to Child Protective Services

20

21   [1] To avoid recitation of the entire procedural history terminating Defendants from this

22   case, in summary fashion, the Court notes the only Defendants remaining in this action are
     Krause and Michael Davidson.

1  ("CPS") in Vancouver, Washington and to CPS in Sacramento, California, where the

2  children resided with their biological mother, DeAnne. *Id.*

3      On August 29, 1984, Detective P. Flood ("Flood") of the Sacramento County

4  Sheriff's Department, due to a referral from Sacramento CPS regarding allegations of

5  abuse by Kathryn Spencer, made contact by phone with Mr. Spencer and Shirley. Dkt.

6  158 at 5-9. In his report, Flood records telephonic interviews with Mr. Spencer and

7  Shirley. *Id.*  In part, Flood indicates that Shirley reported to him that Kathyrn had

8  disclosed allegations of sexual abuse by her father, including, for example, that "daddy

9  wanted me to rub his pee pee and he rubbed [mine]" and that "she sat on her father's lap

10 with her father's penis between her legs." *Id.* at 9.  Shirley also told Flood that Kathryn

11 reported that "[s]he put it in her mouth and he tried to put his penis into her pee pee but it

12 hurt." *Id.*  Additionally, Shirley reported that Kathryn told her about her "daddy kissing

13 her on her pee pee" and that it happened "lots of times." *Id.*  Shirley also told Flood that

14 Kathryn had made allegations against her mother DeAnne, including that "her mom

15 wanted her to rub her titties and pee pee." *Id.* According to Flood's report, Shirley told

16 him that Kathryn had made these allegations while they were lying on the floor watching

17 television and Kathryn "kept moving my bathrobe … to expose my breasts and one time

18 she put her hand too far down toward the vaginal area," which Shirley told Kathryn was

19 unacceptable. *Id.* Then, Kathryn said to Shirley "'rub my pee pee'" because it "'fe[els]

20 good.'" *Id.*  Flood's report indicates that he told Shirley and Mr. Spencer to contact their

21 local law enforcement so that they could both be interviewed by those authorities. *Id.* at

22 10.

On that same day, Flood interviewed Kathryn, Matthew and DeAnne in person. *Id*. at 11-14.  Flood's report indicates that Kathryn stated, among other things, that DeAnne only touches her "potty" when she is putting medicine on it.  *Id*. at 11.  Flood also indicates Kathryn reported that "she did tell Shirley everything that Shirley advised me of but then when asked to explain it or asked specific questions about it, [Kathryn] would say that she couldn't remember the words so she couldn't tell me." *Id*.  Flood's report also states that he asked Kathryn "if someone told her not to tell about it and she indicated by shaking her head yes." *Id*.  He further states that "[w]hen asked if someone had touched her pee pee she shook her head yes and when asked who, she would say daddy and then a few moments later she said not daddy, no one." *Id*.  Finally, Flood's report states that Kathryn indicated that "her and her father played a game but she didn't want to talk about the game." *Id*.

Unlike Kathryn, Matthew indicated to Flood that he knew nothing about Kathryn's alleged abuse and denied his father or mother touched him inappropriately. *Id*. at 12. Among other information, Flood's report states that Matthew indicated that his sister told stories and changed her stories.  *Id*.

When interviewing DeAnne, Flood's report indicates in part that she knew nothing of these allegations.  *Id*. at 13. She denied inappropriately touching Kathryn.  *Id*. at 14. DeAnne also indicated that her sister told her that she worried about Kathryn and Ray, stating to DeAnne that "something was not right but she couldn't elaborate what."  *Id*. at 13.  Flood's report also notes that DeAnne told him that she had not had a man stay in the house for a long time, and there had been a "man that was there and bothered the children

1    so [she] would not let a man stay in the house any longer." *Id*.  DeAnne indicated that

2    she never left the children alone with a man.  *Id*.

3    **B.    Additional Investigation, Initial Charges & Arrest**

4          On August 30, 1984, Officer R. Stephenson ("Officer Stephenson") of the Clark

5    County Sheriff's Office was dispatched to contact Mr. Spencer regarding Kathryn's

6    allegations of child abuse.  Dkt. 64-1.  Officer Stephenson went to Mr. Spencer's home in

7    Washington. *Id*. at 2. At that time, Shirley provided a six-page handwritten statement

8    detailing the allegations that Kathryn relayed to her on August 24, 1984.  Among the

9    many details, Shirley writes that Kathryn wanted her to "rub her pee pee" which Kathryn

10   said "felt good." *Id*. at 4-5. Shirley records that Kathryn told her she did this with her

11   mother and Karen Stone, a former girlfriend of her father.  *Id*. at 5-6. According to

12   Shirley's statement, Kathryn described oral sex with her father and stated that he placed

13   his penis between her legs and tried to insert it "in her little hole" but stopped when they

14   realized "it was too big." *Id*. at 8-9. Shirley also stated that Kathryn told her that her

15   father told her "not to tell." *Id*. at 8.

16         After Shirley's report was referred to Sacramento, California CPS and law

17   enforcement cleared DeAnne of sex abuse allegations, the investigation was referred back

18   to Clark County, Washington.  Dkt. 138-10 at 25.  In October 1984, Krause, a detective

19   was assigned to investigate the Spencer case.  *Id*. at 6. Defendant Michael Davidson

20   ("Davidson"), also a detective with the Clark County Sheriff's Office, was Krause's

21   supervisor and the sergeant of the unit.  *Id*.

22

1        On October 16, 1984, five-year-old Kathryn was interviewed by Krause, who

2  made a written report of Kathryn's allegations of sexual abuse by her father.  Dkt. 138-11

3  & 12 at 1-5.  In Krause's report of her interview with Kathryn, in which she used

4  anatomically correct dolls, Kathryn described an incident very similar to what Shirley

5  described Kathryn had engaged in on the night that Kathryn made the alleged disclosures

6  to Shirley.  *See id.*  Krause records that Kathryn described how she touched Shirley on

7  the breasts and stated the "pee pee got touched too," indicating that she touched Shirley's

8  genitals. *Id*. at 33. According to Krause, Kathryn said Shirley indicated she didn't like it.

9  *Id.*  Krause also records that Kathryn said this happened when she told Shirley about "a

10  secret about my daddy's wiener."  *Id*.  Among other details, Krause's report further states

11  that Kathryn indicated that her father placed his penis in her mouth and engaged in oral

12  sex with her.  Dkt. 138-12 at 1.  In Krause's report, she also indicates Kathryn stated that

13  her father told her not to tell anybody, and she said she lied to Shirley about anyone else

14  touching her.  *Id*. at 3.

15        On October 18, 1984, Krause also interviewed DeAnne. Dkt. 138-12. In Krause's

16  interview report, she states, among other information, that DeAnne described sexualized

17  behaviors in which Kathryn engaged after returning from visits with her father in 1983

18  and 1984, including, for example, masturbation, touching her brother Matthew's penis in

19  the bathtub, playing under the covers naked with her cousin Danny. *Id*. at 10-12.

20  According to Krause's report, DeAnne also related that "during the meeting with

21

22

1  Detective Flood and also with Katie's[2] therapist, Katie apparently was not indicating

2  anymore than there had been something sexual between her and her father." *Id*. at 8.

3      On the same day, October 18, 1984, Krause interviewed Kathryn a second time.

4  Dkt. 138-12 at 28-39.  In addition to some of the same disclosures referenced in the

5  above paragraph, Krause reports that Kathryn, using both anatomically correct dolls as

6  well as verbal language, told Krause that her father "tried to sick his big wiener in my

7  pee-pee, but he did that once;" that "I would have to kiss his wiener;" he "makes me

8  touch his pee-pee;" and kisses her vagina.  *Id*. at 36.

9      Arthur Curtis ("Curtis"), the then-elected Clark County Prosecutor (Dkt. 138-4 at

10  3), assigned James M. Peters ("Peters") as the prosecutor in the Spencer case. *Id*. at 7. In

11  late November 1984, the Clark County Prosecutor's office sent the Spencer file for

12  review to King County Prosecutor, Rebecca Roe ("Roe"). Dkt. 137 at 3 (January 15,

13  2013 Roe Declaration).  The purpose of Roe's review was to provide an opinion

14  concerning whether criminal charges of child rape should be filed against Mr. Spencer.

15  *Id*. at 4.  The Spencer file was sent to King County for review in part because Mr.

16  Spencer was then employed as a police officer with the Vancouver, Washington Police

17  Department, which is located in Clark County. *Id*.

18      The file Roe reviewed contained the reports by Sacramento law enforcement

19  officers and the Clark County Sheriff's Office reports concerning allegations of sexual

20  abuse made by Kathryn to Shirley.  *Id*. at 3. Also included in the file were narrative

21  _____

22      [2] DeAnne is referring to Kathryn as "Katie."

1  reports prepared by Krause, which documented her interviews with Kathryn on October

2  16 and 18, 1984, as well as the August 30, 1984 report which included the narrative

3  written by Shirley after Kathryn disclosed the allegations of abuse to her. *Id*. at 3-4. On

4  November 27, 1984, Roe concluded that the case was not "filable" due to problems with

5  what Kathryn had said, may not be willing to say, or may not be competent to testify to at

6  trial. *Id*. For example, inconsistencies in Kathryn's statements, her reluctance to talk

7  about abuse, and Kathryn's statements about rubbing Shirley in combination with other

8  statements created questions of "fact v. fantasy," which Roe indicated was "built in

9  reasonable doubt," all factored into Roe's recommendation. *Id*. at 1-3. While Roe opined

10 that the case was "unwinnable," she also stated "I believe the child was clearly abused

11 and probably by the defendant…." *Id*. at 3.

12        On December 11, 1984, Peters interviewed Kathryn.  Dkt. 138-17 (Videotape

13 Transcript). The interview was videotaped. *Id*. & 96 (DVD of Interview). Peters has

14 testified that this interview was performed at the direction of Curtis in Peters's function

15 as a deputy prosecutor whose role "was to determine and relay back to the prosecuting

16 attorney impressions as to whether she might be found competent should charges be

17 brought" and whether she could relate the allegations back to him.  Dkt. 138-6 at 4, 6 and

18 8. Although Curtis did not explicitly state that he directed Peters to interview Kathryn,

19 Curtis was Peters's supervisor and in Curtis's deposition he did state "we definitely

20 weren't going to make a filing decision until [Peters] had interviewed the child."  Dkt.

21 138-4 at 17.  Additionally, regarding Peters's interview of Kathryn, Curtis was asked and

22 answered the following in deposition:

1    Q:   … Was the purpose of that interview to assist in making the
decision whether or not to file charges?

2    A:   Yes, because although we certainly respected what Ms. Roe had
to say, she did not actually interview Katie in coming to a conclusion. She

3    only reviewed the police report. So we felt it would be very important for
Mr. Peters to actually interview her, see whether he agreed with Ms. Roe's

4    assessment or whether he thought the case was prosecutable.

5    Dkt. 138-5 at 3-4. While Curtis does not recall viewing the video before filing charges, he

6    relied in part on Peters's evaluation of Kathryn in making his charging decision. Dkt.

7    168-11 at 11.

8        During Peters's interview with Kathryn, DeAnne was present throughout. Dkts.

9    137-17 at 1-34. DeAnne maintains that in her presence there was "no discussion about

10   what Katie was to say" during the sixty-six minute break in the interview, which is not

11   recorded, and there is no indication that Kathryn was ever out of DeAnne's presence

12   during the break.  Dkt. 168-13 at 50. The interview itself reveals that the information

13   about Spencer's alleged sexual conduct with Kathryn, which the child communicated

14   largely through non-verbal means (e.g. nodding of the head and demonstration of events

15   through the use of anatomically correct dolls) was cumulative of and consistent with what

16   Krause and Shirley had already reported as Kathryn having alleged.  *See* Dkt. 96 and

17   138-17.

18       Although Peters had "serious reservations" about filing charges
against Spencer, Curtis has testified that it was "my call," and stated that "I

19   felt like it was going to be a tough case and the buck ultimately stopped
with me as the elected prosecutor, and I was willing to sign the information

20   knowing that fact." Dkt. 138-5 at 1. When asked during his deposition why
he filed the charges against Spencer, despite some of the problems with

21   proof in the case, Curtis stated:

     Well, I knew that it was a tough case. At the time I knew that Mr.
22   Peters had some reservations about filing it, even after his interview with

1    Katie Spencer. Obviously, Becky Roe had reservations, as well…. The
     thing that kept coming back to me was the part of her letter, Rebecca Roe's
2    letter to us on page 3 where she says here: There are several problems.
     Although I believe [the] child was clearly abused and probably by the
3    defendant, the case is unwinnable even assuming you can get the child to
     … talk.
4            I did not come to the decision to file this case lightly. I felt like there
     were some problems with the case, but it was my policy as the elected
5    prosecutor to take an aggressive stand in my county towards child abusers.
     And the fact that Becky Roe concluded the child was abused, allegations
6    were against this specific defendant, I decided that that's what juries are
     for….
7            That's the posture I had on many of these sex abuse cases in Clark
     County over the years….. [I]f we could win or get convictions on these
8    types of cases even 50 percent of the time, we were doing a service to the
     criminal justice system and our community.
9

10   Dkt. 138-4 at 39-40.  Upon review of and reliance on all the police reports and allegations

11   contained therein, his conversation with Krause as to her assessment of Kathyrn, Peters's

12   assessment of Kathryn, and potentially the report of Roe itself or at least Peters's

13   representation thereof, Curtis made his decision to charge Mr. Spencer.  Dkt. 168-11 at

14   11 and 14.  On January 2, 1985, Curtis charged Mr. Spencer with two counts of sexually

15   abusing Kathryn; he was arrested and then released on his personal recognizance.  Dkt.

16   138-5 at 29.

17           After Curtis filed the initial charges against Mr. Spencer, the record reflects that

18   on January 9, 1985, Curtis sent a letter to the chief of police asking that a special

19   prosecutor from King County be assigned the case, as he mistakenly thought that Mr.

20   Spencer was still employed by VPD.  Dkt. 138-4 at 31.  Barbara Linde ("Linde"), a

21   prosecutor from King County was assigned to the case, and the King County Prosecutor's

22   Office was involved in the case until around April 4, 1985.  See Dkt. 138-4 at 5-7 & 138-

1  5 at 22 and 26.  However, Peters intermittently continued to be involved in the case as it

2  developed until the Clark County Prosecutor's Office reassumed full responsibility for

3  the prosecution in late April or early May 1985.  *See, e.g.*, Dkt. 138-5 at 26-27.

4  **C.     Additional Facts, Allegations, Further Charges & Plea**

5          On February 3, 1985, Clark County deputies responded to a domestic disturbance

6  at the Spencer residence; Krause was informed of this by Deputy Don Kerr. Dkt. 172 at

7  18-19.  The uncontroverted record indicates that, after this disturbance, Spencer moved

8  out of his residence with Shirley, and Krause was informed of this information by

9  Detective Hulse of the VPD.  *Id*. at 19.  In Mr. Spencer's complaint he indicates that after

10 the abuse allegations surfaced, he was separated from his wife and moved into the

11 Salmon Creek Motel.  Dkt. 1 at 17.  This is consistent with the information provided to

12 Krause by Detective Hulse.  Dkt. 172 at 20.

13         On or about February 16, 1985, Shirley took four-year-old Hansen to the Salmon

14 Creek Motel to stay the night with Mr. Spencer.  Dkt. 1 at 17 & 64-3 at 9.  On February

15 20, 2013, Krause, at home ill, was phoned by the Sheriff's Office Communications

16 Center that Clark County deputies again responded to a civil disturbance at the Spencer

17 residence regarding a dispute over guns that Mr. Spencer, who was at the house for a

18 birthday celebration, found missing from the gun case, then demanded them from

19 Shirley, who refused to give them to him.  Dkt. 172 at 19.  Mr. Spencer himself called the

20 Sheriff's Office and requested they be on standby.  *Id*.  The uncontroverted evidence

21 indicates that Krause spoke with Detective Hulse regarding Spencer's release agreement,

22 which confirmed that he had agreed he was to have no weapons.  *Id*.

1  The uncontroverted evidence in the record further indicates that, on February 21,

2  1985, Krause attempted to make phone contact with Shirley at home, and she found out

3  from the phone company that Shirley's phone was out of order.  *Id*. at 20.  On the same

4  day, the uncontroverted evidence also indicates that Krause asked the Sheriff's Office

5  patrol unit to make a welfare check on Shirley and her family at the Spencer's Lucia Falls

6  Road residence.  *Id*. at 20.  Krause was advised by dispatch that Shirley had left for work

7  and the phone was apparently off the hook.  *Id*.  Based on that information, Krause

8  phoned Shirley at work, and Shirley returned her call at 4:30 that same day. *Id*.

9  In Krause's February 22, 1985 report of her February 21, 1985 phone conversation

10  with Shirley, she writes that she told Shirley a number of things.  Dkt. 172 at 20-25.

11  During their conversation, Krause indicates that her motivation in sending out officers to

12  do a welfare check was because Krause did not know "what Ray Spencer's state of mind

13  was and also because of the information I had obtained regarding the two disturbances."

14  *Id*. at 20.  Krause's report also indicates that she was also contacting Shirley because she

15  "had not had the opportunity to talk with her since [she] returned from Sacramento,"

16  where she had interviewed Kathryn, Matthew and DeAnne. *Id.*  According to the report,

17  Krause made arrangements to meet with Shirley the next day, February 22, 1985, to

18  discuss the status of her investigation.  *Id*. at 20-21.

19  According to Krause's February 22, 1985 report, she met with Shirley on that

20  day. Dkt. 172 at 21-25.  In part, Krause's report records that "several times during our

21  conversation Shirley Spencer expressed concerns about her son, [Hansen], and how all of

22  this was affecting him."  *Id*. at 22.  Krause records that she told Shirley she would talk

1   with Hansen.  *Id.* at 25.  The report indicates that "Shirley Spencer advised me that she

2   would talk with her therapist and get back to me regarding my interviewing [Hansen]."

3   *Id.*  Additionally, Krause's report indicates that Shirley said she would consider having

4   Krause interview Hansen, and Krause said she would contact Shirley during the "first

5   part of next week."  *Id.*

6          On February 26, 1985, the Tuesday of the following week, Krause contacted

7   Shirley by phone. Dkt. 168-12 at 5. Based on that phone conversation and two follow-up

8   interviews (on February 27 and 28, 1985), one with Shirley and one with Hansen, Krause

9   drafted an approximately 22-page report purporting to reflect what Shirley and Hansen

10  reported regarding Spencer's abuse of Hansen, Kathryn and Matthew.  Dkt. 168-12 at 4-

11  25 and 64-3.

12          In her February 28, 1985 report, Krause indicates that during their conversation on

13  February 22, 1985, Shirley indicated that "there had been a couple of occasions when she

14  briefly asked her son, [Hansen about Spencer inappropriately touching him], and that

15  [Hansen] was not indicating that anything has ever occurred sexually between he [sic]

16  and Ray Spencer."  Dkt. 168-12 at 5.  However, during Krause's follow-up phone call to

17  Shirley on February 26, 1985, she thought that "Ray might have done something to

18  [Hansen]." *Id.*  Among other information, Krause's report also indicates that Shirley

19  advised her that Hansen said "daddy had done something but it was too gross and he

20  didn't want to talk about it."  *Id.* at 6.

21          On February 27, 1985, Krause interviewed Shirley in person.  Dkt. 168-12.  In her

22  report, Krause writes that Shirley told Krause that Hansen has disclosed to her that

1   Spencer has physically or sexually abused him on a number of occasions, including at the

2   Salmon Creek Motel. *Id.* at 10-12.  The allegations Shirley told Krause that Hansen had

3   disclosed involved what appear to be descriptions of oral sex and anal penetration. *Id.* at

4   10 -11.  Krause concludes her interview of Shirley with the notation that she has arranged

5   for Shirley to take Hansen to the Sheriff's Office the following morning for an interview.

6   *Id.* at 17.

7          On February 28, 1985, Krause interviewed Hansen. Dkt. 1 at 17 & 64-3. In her

8   report, Krause indicated that Hansen alleged Mr. Spencer had committed multiple acts of

9   violent sexual abuse at home and at the Salmon Creek Motel; Hansen also indicated that

10   he witnessed abuse of Kathryn and Matthew and that they were forced to touch each

11   other.  Dkt. 1 at 17 & 64-3 at 16-22.  On the same day of Hansen's interview, the Clark

12   County Prosecutor's Office, through Peters, filed an amended information charging Mr.

13   Spencer with three counts of statutory rape of Hansen.  Dkt. 63-6.  Later that day, Mr.

14   Spencer was arrested pursuant to a warrant.  Dkt. 63-4 & 5.  Davidson was one of the

15   arresting officers.  Dkt. 1 at 18 & 62 at 5.  Although it is disputed as to what the nature of

16   their relationship was and when it began, Davidson and Ms. Spencer became involved,

17   and Krause became aware of his involvement with Ms. Spencer. *See, e.g.,* Dkt. 1 at 21,

18   48 at 3-4, 53 at 4, 63-20 at 13, & 73-1 at 11-14.

19          On March 25, 1985, Krause interviewed nine-year-old Matthew.  Dkt. 64-5.

20   According to Krause's report, after Matthew denied several times that his father abused

21   him, he told Krause that Mr. Spencer abused him, Kathryn, and Hansen and made them

22   touch each other. *Id.*  According to another interview report by Krause, that same day,

1  she re-interviewed Kathryn, who corroborated Matthew and Hansen's statements.  Dkt.

2  64-6.  The Clark County Prosecutor's Office, through Peters, filed a second amended

3  information, charging Mr. Spencer with ten counts of first degree statutory rape and six

4  counts of complicity to first degree statutory rape based on the disclosures of all three

5  children.  Dkt. 63-6.  On May 16, 1985, Mr. Spencer entered an *Alford* plea of guilty to

6  multiple counts of sexually abusing Matthew, Kathryn and Hansen. Dkt. 1 at 6 & 63-7.

7  **D.**    **Mr. Spencer Challenges his Arrest, Conviction and Incarceration**

8        During his incarceration, Mr. Spencer filed numerous Personal Restraint Petitions

9  ("PRPs") and appeals therefrom. His challenges involved alleged failures to disclose

10  exculpatory evidence, such as Roe's opinion regarding whether to proceed with the case,

11  and the medical reports of Kathryn and Matthew which did not corroborate the type of

12  abuse alleged, as well as other claims, such as allegations that Davidson coerced him into

13  pleading.  Dkt. 63-11-16 & 21-25.

14        After several unsuccessful appeals, the relevant facts of which will be discussed

15  throughout this order, Mr. Spencer's prison sentence was commuted to community

16  supervision in 2004 by then Governor Locke.  Dkt. 63-18.  Following his release from

17  prison, Kathryn and Matthew recanted their prior allegations of sexual abuse by Mr.

18  Spencer.  Dkt. 63-20.  Hansen has not recanted his allegations of sexual abuse by Mr.

19  Spencer.  *See* Dkt. 54 & 54-1.

20        In 2009, the state court of appeals ruled Mr. Spencer could withdraw his *Alford*

21  plea of guilty based, in part, on two of the three victims' recantations, and vacated his

22  convictions.  *See* Dkt. 63-20 & 22. The Washington State Supreme Court denied the

1    state's motion for discretionary review of the court of appeals 2009 decision.  Dkt. 63-24.

2    In September 2010, the Superior Court of Washington for Clark County granted the Clark

3    County Prosecutor's motion to dismiss the charges against Mr. Spencer without

4    prejudice.  Dkt. 63-26.

5                                    **III.    DISCUSSION**

6           Krause argues that all remaining claims against her should be dismissed.  *See* Dkt.

7    139.  She maintains there is no evidence of conspiracy.  Dkt. 139 at 5- 7.  Krause also

8    argues that she is entitled to qualified immunity based on the existence of probable cause

9    and thus dismissal of claims for malicious prosecution, false arrest and false

10   imprisonment.  Dkt. 139 at 7-10.  She further argues that she is entitled to qualified

11   immunity because there is no genuine issue of material fact as to whether she coerced or

12   otherwise fabricated the victims' abuse allegations or other evidence.  *Id*. at 10-19.

13   Additionally, she argues that she is entitled to qualified immunity for the alleged failure

14   to disclose evidence.  *Id*. at 19-23.  Finally, Krause argues that there is no genuine issue

15   of material fact that she proximately caused damages to Mr. Spencer.  *Id*. at 23-24.

16          Mr. Spencer maintains that he has elicited evidence of a conspiracy to imprison

17   him, and Krause was involved.  Dkt. 166 at 2-7.  He also argues that Krause is not

18   entitled to qualified immunity based on probable cause because she did not rely on

19   reasonably trustworthy information, she coerced statements regarding abuse from the

20   children or she otherwise fabricated evidence of the abuse, and she knowingly withheld

21   relevant evidence or supplied false information to Curtis.  *Id*. at 7-20.  Spencer further

22   maintains that Krause is not entitled to qualified immunity based on the fabrication of

1   evidence for similar reasons she argues that Krause is not entitled to immunity based on

2   probable cause.  *Id.* at 17-20.   Additionally, Mr. Spencer maintains that Krause is not

3   entitled to qualified immunity for the failure to disclose evidence.  *Id*. at 20-23.  Finally,

4   Mr. Spencer argues Krause proximately caused his injury.  *Id*. at 23.

5   **A.      Summary Judgment Standard**

6          Summary judgment is proper only if the pleadings, the discovery and disclosure

7   materials on file, and any affidavits show that there is no genuine issue as to any material

8   fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

9   The moving party is entitled to judgment as a matter of law when the nonmoving party

10  fails to make a sufficient showing on an essential element of a claim in the case on which

11  the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

12  323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

13  could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

14  *Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must

15  present specific, significant probative evidence, not simply "some metaphysical doubt").

16  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

17  if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

18  jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc*., 477

19  U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

20  626, 630 (9th Cir. 1987).

21         The determination of the existence of a material fact is often a close question. The

22  Court must consider the substantive evidentiary burden that the nonmoving party must

1   meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

2   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

3   issues of controversy in favor of the nonmoving party only when the facts specifically

4   attested by that party contradict facts specifically attested by the moving party.  The

5   nonmoving party may not merely state that it will discredit the moving party's evidence

6   at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

7   *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

8   nonspecific statements in affidavits are not sufficient, and missing facts will not be

9   presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

10  **B.     Qualified Immunity**

11          To determine whether a defendant is entitled to qualified immunity from § 1983

12  claims is a two-step inquiry.  *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001).

13  A Court must determine whether (1) a federal constitutional right has been violated, and

14  (2) even if a violation occurred, whether the right was clearly established at the time of

15  the challenged conduct sufficient to make a reasonable officer aware that he was

16  violating the right.  *Id*.

17          The Court begins its discussion of qualified immunity with an analysis of whether

18  the evidence demonstrates that a genuine issue of material fact exists that Krause coerced

19  the children into accusing Mr. Spencer of abuse or otherwise fabricated evidence against

20  him regarding the abuse.  The Court starts its analysis here because if genuine issues of

21  material fact exist as to the aforementioned issues, then more likely than not there will be

22  genuine issues of material fact related to Mr. Spencer's claims that probable cause did not

1  exist, Krause was involved in the alleged conspiracy to imprison Mr. Spencer, and she

2  was a proximate cause of Mr. Spencer's injuries.

3        **1.**     **Alleged Fabrication of Evidence**

4       "[T]here is a clearly established constitutional due process right not to be

5  subjected to criminal charges on the basis of false evidence that was deliberately

6  fabricated by the government." *Devereaux*, 263 F.3d at 1074-75.  To the extent that a

7  plaintiff raises a deliberate-fabrication-of-evidence claim, a plaintiff

8          must, at a minimum, point to evidence that supports at least one of the
        following two propositions: (1) Defendants continued their investigation of

9          [the plaintiff] despite the fact that they knew or should have known that he
        was innocent; or (2) Defendants used investigative techniques that were so

10          coercive and abusive that they knew or should have known that those
        techniques would yield false information.

11
12  *Devereaux*, 263 F.3d at 1076.  Evidence of deliberate misquotation and misrepresentation

13  of witness statements "are circumstantial methods of proving deliberate fabrication."

14  *Costantich v. Dep't of Social and Health Services*, 627 F.3d 1101, 1111 (9th Cir. 2010).

15       Krause argues she is entitled to qualified immunity because Mr. Spencer has not

16  demonstrated any genuine issue of material fact exists to show that Krause acted alone or

17  in concert with other defendants to violate Spencer's constitutional rights by using

18  coercive interview techniques when interviewing Kathryn, Matthew and Hansen or by

19  deliberately fabricating statements and other evidence against Mr. Spencer.  *See, e.g,* Dkt.
139 at 3.

20       Mr. Spencer argues that there are factual issues about what, if anything, Kathryn

21  told Krause or her mother regarding the alleged abuse (*see., e.g.,* Dkt. 166 at 8 and 19);

22

1   whether Krause deliberately fabricated Hansen's allegations of abuse (*Id.* at 13-15);

2   whether Krause coerced, deliberately fabricated or misrepresented some or all of the

3   alleged statements Matthew made about abuse by Mr. Spencer (*Id.* at 15-17 and 19).

4   Additionally, Spencer claims that Krause recorded a "false" score on Mr. Spencer's

5   polygraph test, thus fabricating further evidence against him.  *Id.* at 17. Mr. Spencer also

6   maintains throughout that Krause knew or should have known that he was innocent but

7   continued her investigation. *See* Dkt. 166.

8         **2.      Coercive Interview Techniques**

9         Mr. Spencer makes two types of deliberate fabrication of evidence claims: (1) that

10   Krause deliberately, grossly misquoted or misrepresented statements of abuse by the

11   alleged victims; and (2) that Krause used coercive interview techniques to manipulate the

12   alleged child victims into making false allegations of abuse against Mr. Spencer.  *See*

13   Dkt. 166 at 13-19.

14        As to Mr. Spencer's claims that Krause used coercive interview techniques such

15   that she knew or should have known they would yield false information, as a matter of

16   law, the Court must find that Krause is entitled to qualified immunity for those claims.

17   Even though the Court may find improper some of Krause's methods used during

18   interviews of the three children, Mr. Spencer fails to cite any case demonstrating that in

19   1984 and 1985 a reasonable officer knew or should have known that, for example,

20   suggestive, leading or aggressive questioning of a child victim would yield false

21   information.  Consistent with *Devereaux*, the Court finds in 1984 and 1985, and now,

22   "there is no constitutional due process right to have child witnesses in a child sexual

1   abuse investigation interviewed in a particular manner, or to have the investigation

2   carried out in a particular way." *Devereaux*, 263 F.3d at 1075.  In 1984 and 1985,

3   Krause, like other "[i]nterviewers of child witnesses of suspected sexual abuse must be

4   given some latitude in determining when to credit witnesses' denials and when to

5   discount them, and we are not aware of any federal law-constitutional, decisional, or

6   statutory-that indicates precisely where the line must be drawn." *Id.*  Through citation to

7   recent Ninth Circuit case law, Krause has further demonstrated an absence of a genuine

8   issue of material fact as to whether she is entitled to qualified immunity for the alleged

9   use of coercive interview techniques, because, as Krause observes, in analyzing qualified

10  immunity:

> we ask whether [the constitutional right to have a witness interviewed in a
> particular way had] contours [which] were sufficiently clear that every
> reasonable official would have understood that what he is doing violates
> that right. (citations omitted).  While we do not require a case directly on
> point, …existing precedent must have placed the statutory or constitutional
> question beyond debate.

Dkt. 171 at 2 (*citing Mattos v. Agarano*, 661 F.3d 433, 442-42 (9th Cir. 2011) (citations

omitted)).  Mr. Spencer has cited no such precedent that would have placed Krause on

notice that her interview techniques were so coercive and abusive that she knew or should

have known they would yield false evidence thus putting them beyond constitutional

debate.

### 3.      Deliberate Misquotation or Misrepresentation

As noted above, Mr. Spencer also claims that Krause deliberately fabricated

evidence by misquoting or misrepresenting what the alleged child victims said to her.

1  *See infra.* Evidence of deliberate misquotation and misrepresentation of witness

2  statements "are circumstantial methods of proving deliberate fabrication." *Costanich v.*

3  *Dep't of Social and Health Services*, 627 F.3d at 1111.  Under *Costanich*, while

4  "questions of tone or characterization" of witness statements or simple "misstatements"

5  in an investigator's report are not evidence of deliberate fabrication, "actual

6  misrepresentations" or "[r]eporting that a witness said something she did not cannot be

7  … characterized as a 'misstatement.'" *Costanich,* 627 F.3d at 1113.  In analyzing the

8  facts of *Costanich*, where witnesses disputed that they made statements the investigator

9  attributed to them through the use of quotation marks, the Ninth Circuit found that

10  purposeful use of quotation marks around purported witness statements in an

11  investigative report could support a trier of fact's conclusion that the investigator

12  deliberately fabricated evidence.   *Costanich,* 627 F.3d at 1112. Such actions may

13  illustrate "an investigator whose unlawful motivation is illustrated by her state of mind

14  regarding the alleged perpetrator's innocence …." *Costanich,* 627 F.3d at 1111.  Thus,

15  evidence of deliberate misquotation and actual misrepresentations can demonstrate the

16  "Defendants continued their investigation of [the Plaintiff] despite the fact that they knew

17  or should have known that he was innocent." *Devereaux*, 263 F.3d at 1076 (when

18  plaintiff raises a deliberate-fabrication-of-evidence claim, a plaintiff must, at a minimum,

19  point to evidence that supports at least one of the following two propositions, only one of

20  which is at issue here: whether the officer knew or should have known the plaintiff was

21  innocent but continued the investigation anyway).

22

1        **a.     Kathryn**

2        When asked to review the six-page statement made by Shirley Spencer indicating

3 that on August 24, 1984, while they were lying on the living room floor, Kathryn told her

4 that she had been sexually abused by her father, Kathryn testified she had no recollection

5 of making those allegations to her step-mother, and she stated "I did not say those things

6 to her. These are Shirley's words." Dkt. 168-6 at 20 (November 14, 2012 Dep. of

7 Kathryn (Spencer) Tetz). Kathryn also testified that she has no memory of speaking with

8 Flood or James Rulli, his father's attorney. *Id*. In her deposition, Kathryn further stated

9 that she would "have no knowledge of what these sexual acts are, so to be able to

10 describe them to [Shirley] isn't even something I would have done." *Id*. at 21-22. Then,

11 Kathryn goes on to testify that "I know I didn't say these things to [Shirley]. I know

12 myself and I know the vocabulary I was capable of at this time and I did not say these

13 things to her." *Id*. Although Kathryn admits that Shirley asked if Spencer had touched

14 her inappropriately, she maintains that occurred while they were in the laundry room in

15 the house by the river, not "laying on the floor in the living room" as all the reports

16 indicate. *Id*. at 23. However, Kathryn also testified "I don't remember how I responded

17 [to Shirley]," and she indicated that "I somehow answered whatever it was that I

18 answered to her." *Id*.

19        In addition, Kathryn denies having been abused, or at least that she doesn't

20 remember the abuse occurring. In her November 14, 2012 deposition, she testified that

21 she "knew her whole life that [the abuse] had not happened." Dkt. 168-6 at 3. Later in

22

1  reviewing her former testimony under oath, Kathryn agrees that her testimony now

2  remains the same:

> 3  I have absolutely no memory of my father ever having sexually abused me
>    or inappropriately touching me in any way whatsoever.  I believe that if my
> 4  father had in fact engaged in the type of sexual abuse described in
>    [Krause's] reports and in the charges brought against my father I would
> 5  remember such actions.

6  Dkt. 168-6 at 4.  She subsequently testifies once again: "I know that it did not happen."

7  *Id*. at 5.  Kathryn further testified that contrary to Krause's reports, she felt

8  "uncomfortable" with Krause and found the anatomical "dolls" "disgusting," rather than

9  fun to play with.  *Id*. at 7.  She also stated that Krause "was a stranger to me and she got

10  me to agree with what she was telling me by rewarding me at the end of each session" by

11  giving her treats, such as sodas, ice cream, a sundae and hot chocolate.  *Id*. at 6-8 and 13.

12       Based in part on the facts set forth above, Kathryn disputes that she told Shirley

13  she was abused and testified she would never even have used the words Shirley attributed

14  to her.  Dkt. 168 at 20.  However, Mr. Spencer presents no evidence disputing that

15  Kathryn was not interviewed by Detective Flood.  Further, Detective Flood's report

16  indicates that Kathryn did tell him all the things that Shirley reported, thus corroborating

17  that abuse had occurred.  Nonetheless, Flood also indicates that Kathryn "did tell Shirley

18  everything that Shirley advised me of but then when asked to explain it or asked specific

19  questions about it, [Kathryn] would say that she couldn't remember the words so she

20  couldn't tell me."  Dkt. 158 at 11.  Flood's report is vague in terms of what Kathryn

21  reported to him, it lacks any specific detail as to the words she used to described the

22

ORDER - 25

1   abuse, and it indicates Kathryn had a problem actually explaining any specifics because

2   she could not remember the words.  *Id.*

3       Additionally, in Krause's reports, there are many quoted statements that

4   purportedly reflect exactly what Kathryn described as the abuse that was perpetrated by

5   her father.  However, some of the vocabulary in the quotations is similar to that which

6   was used in Shirley's written report regarding Kathryn's alleged disclosures of abuse to

7   her, disclosures Kathryn disputes that she ever made to Shirley, in part contesting the

8   specific type of language used to describe the alleged incidents. *See supra.*

9       Similarly, the quoted language in Krause's reports, which depicts Kathryn as

10  describing in graphic detail sexual acts performed by her father, is inconsistent with

11  Kathryn's testimony that Krause would "[get] me to agree with *what she was telling me*"

12  (emphasis added), indicating that Krause was making the quoted statements and Kathryn

13  would agree with either some or all of them, rather than Kathryn herself providing the

14  graphic details of the alleged abuse and Krause simply quoting her.

15      As the above paragraphs demonstrate, a genuine issue of material fact exists (1)

16  because of the vagueness of Flood's report combined with Kathyrn's testimony denying

17  that she disclosed abuse to Shirley and she would have used the vocabulary Shirley

18  attributed to her; (2) that the information and some of the vocabulary that Kathryn denies

19  having said to Shirley was similar to what Kathryn allegedly reported to Krause; and (3)

20  that Kathryn denies making the statements she is quoted as saying to Krause.  Therefore,

21  construing all reasonable inferences in favor of the non-moving party, the evidence

22  shows a genuine issue of material fact as to whether Krause fabricated evidence, which

1    requires the jury to make credibility determinations about who they believe is being

2    truthful.  *Costanich*, 627 F.3d at 1111 ("We have previously held that when genuine

3    issues of material fact arise regarding fabrication of evidence in a child abuse

4    investigative report, a police officer is not entitled to qualified immunity because

5    [c]redibility is an issue for the trier of fact") (internal quotation and citation omitted).

6    Thus, the Court cannot grant qualified immunity on the basis that Krause did not

7    fabricate evidence because of the alleged deliberate misquotations or misrepresentations

8    of what Kathryn conveyed to Shirley and Krause.  *Costanich*, 627 F.3d at 1111-1112.

9                         **b.    Matthew**

10           Spencer argues in part that Matthew's deposition testimony indicates a genuine

11   issue of material fact exists as to whether Krause deliberately fabricated evidence in the

12   investigative reports, as Matthew has specifically testified that he did not make the

13   statements attributed to him.  Dkt. 166 at 17. Krause interviewed Matthew on October 17,

14   1984, which records alleged statements made by Matthew, in part through the use of

15   quotations. Dkt. 168-5.  In Matthew's November 13, 2012 deposition, he refutes not only

16   the accuracy of Krause's reports but also testifies that much of the content of her report

17   was not truthful.  *See* Dkt. 168-5.  For example, during the deposition counsel went

18   through many of the quotations included in Krause's October 17, 1984 report, and

19   Matthew testified that whole statements were not his.  *See, e.g*., Dkt. 168-5 at 50 and 51.

20   This report does not include any allegations that Mr. Spencer molested Matthew or that

21   Matthew witnessed Mr. Spencer sexually abusing Kathryn.  *See* Dkt. 168-5 at 51-61.

22

1   However, Matthew testified that, during the interview, Krause "insisted that I was

2   molested by my father."  *Id*. at 10.

3          Krause's March 25, 1985 report indicates that during her interview with Matthew

4   on that same day, Matthew, then age nine, made allegations of abuse against his father.

5   *See* Dkt. 168-5 at 62-75.  Again, to indicate what Matthew conveyed to her, Krause used

6   many quotations to reflect phrases or statements Matthew made relevant to the alleged

7   abuse. For example, she quotes him as stating that his father "put his penis in my bottom

8   and in Kathryn's bottom and in Kathryn's front hole and he puts it in Little Matt's,

9   [Hansen], bottom, and that really hurts us, and I hate him."  Dkt. 168-5 at 68.  Krause

10  also quotes Matthew as describing how his father forced them to touch each other, for

11  example, by stating, "He sticks his penis in our bottoms and he makes us stick our fingers

12  in each other's bottoms, and he always makes us lick on Kathyrn."  *Id*. at 69. Similarly,

13  Krause quotes Matthew as stating, "Me and Little Matt, [Hansen], have to put our penises

14  in Kathryn's bottom, and in her vagina." *Id.*  Krause also quotes Matthew as describing

15  how his father forced them all to have oral sex with him; according to Krause, Matthew

16  said, "I have to suck his penis.  We all have to do that."  *Id*.

17         During Matthew's November 13, 2012 deposition, he denies that the statements

18  attributed to him in Krause's March 25, 1985 report are true.  *Id*. at 14.  After reviewing

19  the statements attributed to him that are in her report, Matthew testified: "None of these

20  are true. My father did not molest me so these are not true."  *Id*.  He also testified that "I

21  didn't know what those words were.  I don't know what a vagina is at age 8, I don't know

22  what a penis is at age 8." *Id*. at 17.  Matthew further testified that many, if not all, the

statements in Krause's March 25, 1985 report were Krause's words not his. *See, e.g.,*

Dkt. 168-5 at 43-49.  Instead, Matthew testified that he did not describe sexual events to

Krause, rather she described them to him, and he indicated that at least some, if not most,

of the quotations in the report were what Krause told him and, ultimately, he just agreed.

*Id.* at 49 and 167.

However, as Krause correctly observes in her response brief, Matthew's

deposition testimony is inconsistent with his prior sworn testimony under oath at a

hearing and a prior declaration.  Dkt. 171 at 7-8.

> While Matthew Spencer does now deny that abuse occurred, he has flatly
> contradicted himself under oath on multiple occasions regarding the
> disclosures of abuse he made to Ms. Krause as documented in her reports.
> He swore under oath in his recantation Declaration (Dkt. 140-5, P. 34 of 48,
> lns. 14-16 (emphasis added)):  "While I believe that I did tell her the things
> written in the report attributed to me about my father sexually abusing me,
> none of it is true." Yet in his sworn deposition testimony (Docket 140-5, P.
> 29 of 48, ln. 12-P. 30 of 48, ln. 6 (emphasis added)) Matt Spencer testified:
> "Well, I didn't tell her the things written. They were told to me and I agreed
> to them." He also testified, however, that he did tell Ms. Krause of abuse
> "in detail," including "that [plaintiff] put his penis in my butt, that I put my
> penis in his butt." Dkt. 168-5, P. 14 of 75, ln. 23-P. 16 of 75, ln. 18. Making
> this contradiction worse, Matt Spencer's Declaration concluded with the
> affirmative representation under oath that "I have carefully reviewed every
> line of this declaration for accuracy. It is all true to the best of my
> knowledge and I am willing to go to court and swear to these facts before a
> judge." Docket 140-5, page 35 of 48, lines 13-16 (emphasis added). Yet
> when asked in his deposition why he didn't clarify in his recantation
> Declaration that he claims he never told Ms. Krause about the abuse but
> only agreed with what she told him, he said of his review of the declaration
> before signing: "I scanned it. Q. What does that mean? Did you or didn't
> you read it from start– A. I didn't study it no. I didn't study it." Dkt. 140-5,
> P. 30 of 48, lns. 10-15 (emphasis added).

Dkt. 171 at 7-8.

1    There are inconsistencies in Matthew's recent testimony and between his recent

2    testimony as well as his prior testimony and declaration; these inconsistencies may

3    indeed undermine his credibility. However, whether Matthew is to be believed, to what

4    extent, or as to what subject matter is for a jury to determine. The Court finds there is a

5    genuine issue of material fact as to whether Krause deliberately misquoted or

6    misrepresented the alleged statements of Matthew.  Thus, because there is a genuine issue

7    of material fact as to whether or not she fabricated evidence, Krause is not entitled to

8    qualified immunity.

9        **c.  Hansen**

10    Unlike Kathryn or Matthew, Hansen has not recanted his allegations of sexual

11    abuse.[3]  Nor is there any deposition or other testimony from Hansen accusing Krause of

12    fabricating the information he supplied to Krause about his father sexually abusing him.

13    However, given that (1) Kathryn and Matthew have recanted the abuse allegations,

14    even though Krause's report alleges that Hansen, at age four, stated that he witnessed Mr.

15    Spencer abusing Kathryn and Matthew, and (2) there are genuine issues of material fact

16    regarding whether Krause fabricated Kathryn and Matthew's allegations of abuse, there is

17    also a genuine issue of material fact regarding whether Krause fabricated Hansen's

18    allegations. *See, e.g.*, Dkt. 168-12 at 17-25.  Thus, Krause is not entitled to qualified

19

20

---

21        [3] Krause argues that a declaration by Mr. Spencer's counsel, which attaches but does not
authenticate notes prepared by an unidentified person which purport to contradict Hansen's 2009

22    sworn testimony that his father in fact abused him, is inadmissible hearsay.  Dkt. 171 at 6 n.3.
The notes referenced are inadmissible hearsay and are stricken pursuant to 56(c)(2).

1  immunity with respect to whether she fabricated Hansen's allegations of abuse against

2  Mr. Spencer.

3  **C.    Probable Cause**

4          "Probable cause exists where the facts and circumstances within [the

5  officers'] knowledge and of which they had reasonably trustworthy information [are]

6  sufficient in themselves to warrant a [person] of reasonable caution in the belief that an

7  offense has been or is being committed."  *Stoot v. City of Everett*, 528 F.3d 910, 918

8  (2009) (*citing Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (internal quotation

9  marks omitted); *Ornelas v. United States*, 517 U.S. 690, 696 (1996).  Further, "[b]ecause

10 many situations which confront officers in the course of executing their duties are more

11 or less ambiguous, room must be allowed for some mistakes on their part. But the

12 mistakes must be those of reasonable [people], acting on facts leading sensibly to their

13 conclusions of probability."  *Id.* (*citing Brinegar*, 338 U.S. at 176).

14         Probable cause is a complete defense to claims of false arrest, false imprisonment

15 and malicious prosecution. *See Lassiter v. City of Bremerton*, 556 F. 3d 1049, 1054-55

16 (9th Cir. 2009).

17         Because there are genuine issues of fact regarding whether Krause fabricated

18 evidence in the child victims statements, which was, in large part, what the Prosecutor's

19 Office relied on to find probable cause existed and to charge Mr. Spencer with multiple

20 counts of abuse (Dkt. 168-11 at 11 and 14), the Court cannot grant qualified immunity on

21 the basis that probable cause exists and must deny summary judgment on Krause's claims

22 for false arrest, malicious prosecution and false imprisonment.  *See supra.*

**D.      Disclosures of Evidence**

Krause argues she is entitled to qualified immunity for failure to disclose alleged *Brady* material.  Dkt. 139 at 19-23.  Mr. Spencer claims that Krause is not entitled to qualified immunity for failure to disclosure multiple items of *Brady* material.  Dkt. 166 at 20.  The items at issue are Roe's report, Kathryn's medical report, Hansen's medical report, and the videotaped interview of Kathryn.  *Id.*

**1.      Roe's Report**

It is undisputed that the Prosecutor's Office possessed Roe's report.  Further, as the Court has concluded, Mr. Spencer is collaterally estopped from litigating whether Roe's report was unconstitutionally withheld.  *See supra.*  Additionally, despite the fact that Krause was aware of Roe's report, Mr. Spencer provides no evidence or case law to support that the failure to disclose Roe's report in anyway creates § 1983 liability for Krause, even assuming Roe's report was exculpatory and admissible evidence.

**2.      Kathryn's Medical Report**

As to the medical report of Kathryn, there is genuine issue of material fact as to whether the Prosecutor's Office ever had this piece of evidence.  It is undisputed that Krause was aware of Kathryn's medical report and had it in her possession.  Further, discrepancies exist between Krause's two evidence indices sent to the Prosecutor's Office in the Spencer case, the first of which documents the existence of Kathyn's medical report and the second of which deletes the report from the index.  Dkts. 164-4 at 24 and 27.  During her recent deposition, Krause was unable to account for the discrepancies in the indexes (Dkt. 168-4 at 8) and provided testimony effectively indicating that she was

1    not sure whether Kathryn's medical report made it to the Prosecutor's Office. *See id.* at 9-

2    10.  The foregoing information is sufficient to create a genuine issue of material fact as to

3    whether Kathryn has liability for failure to disclose Kathryn's medical report.

4           **3.**     **Hansen's Medical Report**

5           With regard to Hansen's medical report, during a prior proceeding the Court

6    found that the Sheriff's Office never received a copy of his medical report.  Dkt. 63-15.

7    Although Mr. Spencer presents some evidence indicating that, while the Sheriff's Office

8    did not receive the report, Krause was aware of the report's existence (Dkt. 166 at 20).

9    Shirley testified that Krause recommended Hansen be examined.  *Id.*  Krause admits her

10   normal practice was to refer parents to have their children examined.  Dkt. 168-3 at 4

11   (May 22, 1996 Habeas Deposition of Sharon Krause).  In a prior proceeding, Shirley was

12   asked whether, as a part of the investigation, she was referred to take Hansen to have a

13   medical exam.  Shirley responded affirmatively and indicated that "Sharon Krause" "told

14   her to go."  Dkt. 168-15 at 40 (June 4, 1996, Habeas Deposition of Shirley Spencer).

15   Additionally, in her deposition, Shirley testified to the following:

16          Q.     Did you discuss with either Sergeant Davidson or Detective
     Krause the fact that Matt had been examined?

17          A.     I'm sure I did because they told me to go.
            Q.     Do you remember signing any kind of a release or a waiver

18   for the Clark County Sheriff's office to allow them to get Matt's medical
     records?

19          A.     I don't remember it, but I probably would have if they'd asked
     me to, but I don't remember it.

20   Dkt. 168-15 at 41.

21

22

1    In Shirley's more recent deposition, she confirms that Krause told her to take

2    Hansen in for a medical exam, and she did so (Dkt. 140-1 at 52-53). She also testified

3    that she told Krause she had taken Hansen for an exam, but Shirley indicates that she

4    didn't have the medical report and stated, "Well, I didn't know the medical findings. I just

5    said [to Krause] I had taken him.  And all I know is what [the doctor] said that it was hard

6    to tell [if Hansen was abused], but he didn't tell me the results."  *Id*. at 53. However, this

7    time, Shirley testifies that she didn't know if Davidson knew about the medical exam. *Id.*

8        If Krause followed her usual practice and she and Shirley did indeed talk about the

9    results of the exam, Krause would have been aware that a doctor would have produced

10   some record of Hansen's examination, as Krause dealt with child sexual abuse cases

11   regularly. That Krause apparently did not collect the report itself, as it was not in the

12   possession of the Sheriff's Office, but rather Krause just listened to whatever Shirley told

13   her, could lead a reasonable juror to infer that Krause deliberately failed to collect

14   relevant evidence that was common place for detectives to review in child abuse cases.

15   **4.    Videotaped Interview of Kathryn**

16       It is undisputed that the videotaped interview of Kathryn by Peters was not

17   disclosed to the defense and was stored in Krause's garage. Although Peters was aware of

18   videotape's existence, neither Peters nor Krause have any independent memory about

19   what happened to it after the interview.[4]  Dkts. 140-5 at 44- and 140-2 at 9.  As Krause

20

21       [4] In the Court's order on Peter's motion for summary judgment, it found Peters was
22   entitled to absolute immunity for the interviewing of Kathryn Spencer and for failure to disclose
     that item of evidence.  *See* Dkts. 174 and 179.

notes, she "testified that she has no knowledge or recollection of the whereabouts of the tape until she discovered it in a box of materials in her garage in 2009 which were included materials she packed up and took with her when she retired in 1995, that she immediately viewed it and called Clark County Deputy Prosecutor Denny Hunter to report its existence, and mailed the original to Mr. Hunter the same day." Dkt. 139 at 21 (*citing* Dkt. 140-2 at 9-10).

Given the above, there is a genuine issue of material fact as to (1) whether Krause failed to disclose the videotaped interview of Kathryn Spencer, as that item could reasonably be construed as exculpatory evidence, even if cumulative of evidence already disclosed, and (2) the medical reports of Kathryn and Hansen, items that arguably have exculpatory value for Mr. Spencer. Thus, qualified immunity is denied.

**E.    Conspiracy**

A conspiracy in violation of § 1983 requires proof of: (1) an agreement between the defendants to deprive the plaintiff of a constitutional right; (2) an overt act in furtherance of the conspiracy; and (3) an actual deprivation of constitutional rights resulting from the agreement. *Avalos v. Baca*, 596 F. 3d 583, 592 (9th Cir. 2010); *Gausvik v. Perez*, 239 F. Supp. 2d 1047, 1104 (E.D. Wash. 2002). Although the agreement or meeting of the minds need not be overt but can be based upon circumstantial evidence, some admissible evidence as opposed to speculation is required to support the conspiracy claim and each participant must share the common objective of the conspiracy. *Crowe v. County of San Diego*, 608 F.3d 406,440 (9th Cir. 2010).

1    Mr. Spencer's theory is that Krause conspired with Davidson for the common

2  purpose of imprisoning him, and Krause continued the investigation when she knew he

3  was innocent to "further her career" and to "avoid civil liability for fabricating Kathryn's

4  allegations."  Dkt. 166 at 4.  Mr. Spencer assigns to Davidson a different motive for

5  conspiring to imprison him, i.e. so he could pursue his romantic relationship with Mr.

6  Spencer's then-wife, Shirley.  *Id.* at 4.

7    Krause maintains there is no genuine issue of material fact as to whether she

8  conspired with Davidson to imprison Mr. Spencer.  Dkt. 139 at 5-7.  Krause argues there

9  is no direct evidence of conspiracy, and "[j]ust as it is not reasonable or rational to infer

10  an intent to conspire to further a love interest which does not exist [between Davidson

11  and Shirley], it is not reasonable or rational to infer that law enforcement officer or

12  prosecutor would conspire to frame an innocent man based upon a belief that doing so

13  would somehow enhance their career."  *Id.* at 6-7.  Thus, according to Krause, the

14  conspiracy claim should be dismissed.  *Id.* at 7.

15    According to the uncontroverted testimony of Shirley, she and Davidson met on

16  September 21, 1985, when Mr. Spencer took his first polygraph test.  Dkt. 168-1 at 12.

17  Based on past and recent deposition testimony and responses to interrogatories, Krause

18  has provided some equivocal testimony as to when she first knew of Davidson and

19  Shirley's relationship.  Krause has testified that "My recollection of [the relationship] is

20  that when I became aware of that, it was long after I interviewed Little Matt.  And I don't

21  remember if it was before [Mr. Spencer] pled or after, to be honest with you."  Dkt. 168-3

22  at 10 (May 22, 1996 Habeas Deposition of Shirley Spencer).  In a recent set of

1   interrogatories to Krause, however, she is able to definitively recall when she found out

2   about the relationship: Krause states "There is absolutely no doubt in my mind that if at

3   any time during the Spencer investigation I became concerned or aware that the

4   relationship between Michael Davidson and Shirley Spencer was anything other than

5   professional, I would have responded in the same way I did in the past, and would have

6   immediately reported it to the Sheriff." Dkt. 140-1 at 5.  Krause's recent deposition

7   testimony on the same topic is consistent with the answer that she provided in her

8   interrogatories regarding the relationship between Davidson and Shirley.  Dkt. 140-2 at

9   58 and 59.

10          According to Mr. Spencer, after his February arrest, when he was in the county

11  jail, Davidson made unwanted visits to him on multiple occasions, once told Mr. Spencer

12  that Shirley no longer loved him, and also almost got into a physical confrontation with

13  Mr. Spencer. Dkt. 168-2 at 20 -22 (November 12, 2012 Deposition of Mr. Spencer).

14  Lynda Harper ("Harper"), a former employee of the Sheriff's Office, states that she

15  "recalls one officer in particular, whose name I cannot recall who came to see Mr.

16  Spencer on a number of occasions." Dkt. 168-15 at 29 (Declaration of Lynda Harper).

17  Among other memories, she also recalls that Mr. Spencer did not want to see this officer

18  at times, and that there was a problem with this officer continually coming to see him.  *Id.*

19  Davidson testified that he does not recall ever visiting Mr. Spencer in jail.  *See, e.g.,* Dkt.

20  168-15 at 12 (July 25, 1996 Habeas Deposition of Michael Davidson).

21          Sometime prior to March 15, 1985, Shirley has testified that she brought to the

22  Sheriff's Office the quitclaim deed to the house in which she and Mr. Spencer lived.  Dkt.

1 | 168-1 at 13. As Krause observes, in Shirley's deposition, she testifies that it was

2 | Davidson, not Krause who took the deed to Mr. Spencer.  Regarding the deed, Shirley

3 | testified:

4 |       A:    I was [at the Sherriff's Office]. I gave it to Sharon. Sharon asked Mike if he would take it up. He took it up. He came back and gave it

5 | back and said he wouldn't sign it.

      ***

6 |       Q.    At any other time are you aware of whether Sharon Krause or–whether Sharon Krause got any documents in to Ray Spencer at the jail?

7 |       A.    I have no clue.

8 | Dkt. 138-2 at 13.  However, on March 15, 1985, the deed was signed and notarized.  Dkt.

9 | 168-15 at 34-37.  Mr. Spencer maintains that his signature on the deed was forged.  *Id.* at

10 | 33.  Additionally, Marina Landrum, the notary public employed by the Sheriff's Office

11 | from 1971 to 1991, was also unable to verify her signature on the deed.  Dkt. 147 at 1.  In

12 | her declaration, Landrum indicates that she has no memory of ever being called up to the

13 | jail to notarize the signature of an inmate on a quitclaim deed or any other document.  *Id.*

14 | In June 1985, Shirley filed for divorce from Mr. Spencer.  Dkt. 168-1 at 26.

15 | Davidson and Shirley have testified that their relationship began in June 1985 after Mr.

16 | Spencer entered his plea, on May 16, 1985 (Dkt. 63-7), when they started seeing each

17 | other socially.  Dkts. 168-1 at 25 (November 6, 2012 Deposition of Shirley Spencer) and

18 | 140-1 at 15 (November 5, 2012 Deposition of Michael Davidson).  They have testified

19 | that they moved in together in the fall of 1985.  Dkt. 168-1 at 24 and 140-1 at 15.

20 | While the record does not reveal direct evidence contradicting Shirley and

21 | Davidson's testimony about when their relationship began, it does demonstrate some

22 | circumstantial evidence that, when viewed in a light most favorable to the non-moving

party, could lead a rational juror to infer that Shirley and Davidson were involved, even if not in a full-fledged romantic relationship, before June 1985.  For example, the difference between Krause's testimony in the aforementioned depositions regarding when she became aware of their relationship, the contested testimony that Mr. Spencer was visited by Davidson multiple times or at least once regarding the quitclaim deed, and that the quitclaim indeed may contain forged signatures.

Given (1) that Davidson was Krause's supervisor, and thus he was a person who could potentially impact Krause's career, (2) that there is ambiguity about when Krause knew of Davidson's relationship with Shirley, (3) that Davidson and Shirley were involved at least by June 1985 and moved in together that fall, (4) that there are genuine issues of material fact as to whether Krause fabricated evidence against Mr. Spencer as well as deliberately concealed exculpatory evidence,[5] and construing all reasonable inferences in favor of the non-moving party, the Court finds there is a genuine issue of material fact as to whether Davidson and Krause conspired to imprison Mr. Spencer.

**F.**     **Proximate Cause**

Because there are genuine issues of material fact as to whether Krause fabricated evidence and engaged in a conspiracy to imprison Mr. Spencer, a genuine issue of material fact also exists regarding whether or not Krause was a proximate cause of his alleged injuries.

---

[5] Fabrication of evidence and deliberately concealing exculpatory evidence are actions which, if true, could qualify as overt acts in furtherance of a conspiracy.

1

### IV.   ORDER

2          Therefore, it is hereby **ORDERED** that Krause's motion for summary judgment

3   (Dkt. 139) is **GRANTED in part** as to the qualified immunity for (1) failure to disclose

4   Roe's report, (2) conspiring to conceal such evidence, (3) using coercive interview

5   techniques, and (4) conspiring to use coercive interview techniques for the purposes of

6   framing and imprisoning Mr. Spencer or for any other purpose. Those claims are

7   **DISMISSED with prejudice.**  Krause's motion **is DENIED in part** as to the remainder

8   of claims.

9          Dated this 21st day of August, 2013.

10

11

                        _____

12          BENJAMIN H. SETTLE
            United States District Judge

13

14

15

16

17

18

19

20

21

22