# Exhibit A

1

1        UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF WASHINGTON

3              AT TACOMA

4
     CLYDE RAY SPENCER, MATTHEW      )
5    RAY SPENCER, and KATHRYN E.     )
     TETZ,                           )
6                                    )
                Plaintiffs,          )
7                                    )
         vs.                         )    NO. 3:11-cb-05424-BHS
8                                    )
     FORMER PROSECUTING ATTORNEY     )
9    FOR CLARK COUNTY JAMES M.       )
     PETERS, DETECTIVE SHARON        )
10   KRAUSE, SERGEANT MICHAEL        )
     DAVIDSON, CLARK COUNTY          )
11   PROSECUTOR'S OFFICE, CLARK      )
     COUNTY SHERIFF'S OFFICE, THE    )
12   COUNTY OF CLARK and JOHN DOES   )
     ONE THROUGH TEN,                )
13                                   )
                Defendants.          )
14

15    DEPOSITION UPON ORAL EXAMINATION OF SHARON KRAUSE

16

17

18
                  Tuesday, November 6, 2012
19                   Olympia, Washington

20

21

22

23

24

25

2

1   APPEARANCES:

2       FOR THE PLAINTIFF CLYDE RAY SPENCER
        (VIA VIDEOCONFERENCE):
3
                                    MS. KATHLEEN ZELLNER
4                                   MR. DOUGLAS JOHNSON
                                    KATHLEEN T. ZELLNER & ASSOC.
5                                   Esplanade IV
                                    1901 Butterfield Rd., Ste. 650
6                                   Downers Grove, IL   60515

7       FOR DEFENDANT JAMES M. PETERS:

8                                   MS. PATRICIA FETTERLY
                                    ASSISTANT ATTORNEY GENERAL
9                                   P.O. Box 40126
                                    Olympia, WA   98504-0126
10
        FOR DEFENDANT DETECTIVE SHARON KRAUSE:
11
                                    MR. GUY BOGDANOVICH
12                                  LAW, LYMAN, DANIEL
                                      KAMERRER & BOGDANOVICH, P.S.
13                                  P.O. BOX 11880
                                    Olympia, WA   98508-1880
14
        FOR DEFENDANT SERGEANT MICHAEL DAVIDSON:
15
                                    MR. JEFFREY A.O. FREIMUND
16                                  FREIMUND JACKSON TARDIF &
                                      BENEDICT GARRATT, PLLC
17                                  711 Capitol Way South, Ste. 602
                                    Olympia, WA   98501
18

19

20

21

22

23

24

25

Dixie Cattell & Associates
Court Reporters & Videoconferencing

ZELLNER (Sharon Krause, 11/6/12)

95

1    A   No, I don't.  And that's honest.  I don't remember that

2        interview.  I don't remember getting ready for that or

3        where it was done.  I'm not even sure it was the Sheriff's

4        office camera.  I do not remember it.

5    Q   Okay.  Now, this interview we're talking about in

6        Exhibit 11, the one that we have your notes on, do you have

7        an independent recollection of that interview?

8    A   With Kathryn at the hotel?

9    Q   Yeah.

10   A   Some events I did.

11   Q   Okay.  Well, let's go back to the videotape.  You said

12       something about your garage?  Tell me about the videotape

13       in your garage.  Was it in your garage?  I don't know.

14   A   It was in my garage.

15   Q   And when did you discover it?  What year was it?

16   A   It should be reflected on my letter to Denny Hunter, with

17       the prosecutor's office, because the minute I found the

18       tape, I took it in, viewed it, and I immediately called

19       Dennis Hunter, and I sent it off to the prosecutor that

20       very same day.

21   Q   Do you think that that was possibly in 2009 when you

22       discovered it in your garage?

23   A   I'd have to look for sure, but I think it was.  Whenever it

24       was I sent it up there.

25   Q   And what were you doing in your garage that led you to

ZELLNER (Sharon Krause, 11/6/12)

96

1    discover the videotape?

2  A  I was going to clean or go through the boxes, because that

3     wasn't the only box.  I had a bunch of boxes I needed to go

4     in there and clean them out.

5  Q  Okay.  And were those boxes, the other boxes, did they

6     contain information from other cases that you'd worked on

7     at the Sheriff's Department?

8  A  No.  I saw nothing from other cases.

9  Q  Okay.  Did -- was the videotape the only thing that was in

10    those boxes that was potentially evidence in a case?

11          MR. BOGDANOVICH:  Object to the form of the

12    question.

13          But go ahead.

14  A  I don't believe that videotape was evidence, or it wouldn't

15    have been in that box.

16  Q  (By Ms. Zellner)  What else was in the box?

17  A  All of the training materials that we provided you with.  I

18    was surprised I had -- I was pretty sure I had my training

19    notebook, but the seminars and the things that I presented

20    at, certificates that I got from work, there was a

21    Spellcheck, some cards, business cards, from the Sheriff's

22    office.  I had some little badges that I used to give

23    children occasionally.  I had a couple of those in there.

24    Some extra handouts from training were in those boxes.

25  Q  Was there any identifying -- was the videotape labeled in

ZELLNER (Sharon Krause, 11/6/12)

100

1   A  So I found it in my garage in Arizona.  I viewed it.  As

2       soon as I saw what it was or knew what it was, I called the

3       prosecutor's office.  I spoke to Dennis Hunter, and based

4       on his instructions, I wrapped it up and took it directly

5       to the post office and mailed it out that very same day I

6       found it.

7   Q  Okay.  So you mailed it to Mr. Hunter, and then when do you

8       next hear about the videotape?  Does anyone call and

9       interview you?

10  A  I don't remember.

11  Q  Did you talk to Mr. Peters about finding the tape?

12  A  At some point in time I talked to him about that, but I

13      don't remember when that was.

14  Q  Was it within a year of finding it or was it fairly soon

15      thereafter?

16  A  I don't remember when it was I talked to him, but I do

17      recall that there was some conversation about that tape.

18  Q  And what did Mr. Peters tell you about the tape?  Because

19      he remembered it, right?

20           MS. FETTERLY:  Object to form.

21         You can answer if you know.

22  A  I don't know.  I don't remember specifically what he said.

23      I. . .  I don't remember --

24  Q  (By Ms. Zellner)  But he knew that the interview had taken

25      place, didn't he --

ZELLNER (Sharon Krause, 11/6/12)

101

1              MS. FETTERLY:  Object to the form.

2    Q  (By Ms. Zellner)  -- or did he have amnesia too?

3              MS. FETTERLY:  Object as to form; argumentative.

4              MR. BOGDANOVICH:  Counsel, I object to the form

5       of the question.  I don't think that's appropriate under

6       the rules for taking a deposition.

7    Q  (By Ms. Zellner)  Can you explain to me whether Mr. Peters,

8       when you talked to him, indicated to you that he remembered

9       the video?

10   A  I don't recall whether initially he said I remember the

11      video or not.  At some point in time there was some

12      discussion.  I can't be more specific than that.

13   Q  Some discussion of what?

14   A  About this tape.  Why it was made or why it was in my

15      garage.  I think that was initially -- at some point in

16      time we were told not to discuss things with each other,

17      and neither one of us talked about that.

18   Q  Okay.  But you do remember having a conversation with

19      Mr. Peters specifically about the videotape; is that right?

20              MR. BOGDANOVICH:  Object.  Asked and answered.

21   Q  (By Ms. Zellner)  Is that right?

22   A  At some point in time I know that Jim Peters and I

23      discussed the tape, my finding the tape.

24   Q  Did Mr. Peters tell you, "I don't remember that interview

25      either"?  Did he tell you that?

1    A   I can't answer that because I don't remember if he ever

2        said that specifically.

3    Q   Did Mr. Peters indicate that he knew that a videotape had

4        been made?

5    A   I don't -- I can't answer that either because I don't

6        remember specifically what he said.  I can't --

7    Q   So you just have a total blank about what Mr. Peters said

8        about the tape?

9    A   Well, I can't be specific.  All I can remember is there was

10       some conversation.  I didn't remember the tape or why it

11       was done or when it was done.  And it almost seems to me

12       initially he even had some questions about it, but I can't

13       be specific.

14   Q   Okay.  So you have the conversation with Mr. Peters about

15       the tape.  Do you speak to anyone else about the tape

16       between when you found it and today, other than your

17       attorneys?  Have you talked to anyone else about it?

18   A   Other than the attorney, I don't -- and Mr. Hunter, I don't

19       remember discussing that tape with anyone else.  If I did,

20       I don't remember.

21   Q   Did you discuss it with Mr. Davidson?

22   A   You know, I don't remember a conversation with Michael

23       Davidson about that tape.  I'm not saying I didn't.  I'm

24       saying I don't remember ever discussing it with him.

25   Q   Did you only have one conversation with Jim Peters about

ZELLNER (Sharon Krause, 11/6/12)

103

1     the tape?

2  A  I remember at some point in time having a conversation

3     about that tape.  Whether there was another conversation, I

4     don't recall.

5  Q  When you left that interview, the videotaped interview,

6     after a few minutes, do you recall being given the

7     videotape?  Even if you don't remember the interview, do

8     you recall being given the videotape?

9  A  No, I don't.

10  Q  How do you think the videotape came into your possession?

11  A  Again, I'm speculating.  What I think is I told you it

12     wasn't an investigative interview.  It was a time when

13     those two could get acquainted; he could establish her

14     competency.  And at the end of that interview it was given

15     to me, and it went in a drawer in my desk.

16         When we moved from the Sheriff's office building to

17     CAIC, I had packed up a bunch of stuff that I wasn't using.

18     That included -- some of the things I just explained that I

19     had in those boxes went to CAIC.  The boxes were stored

20     there.

21         When I retired, I took that stuff with me, those

22     boxes I had in storage, and we lived at the beach.  They

23     went in my garage at the beach.  We sold that house, and

24     all that stuff went into storage for two years until we

25     bought a home in Arizona, and it ended up in my garage down

1    there.  And because of all kinds of things that were going

2    on with my life, cleaning my garage was not a priority.

3    And so finally I just made up my mind I had to go through

4    that stuff.  And, you know, there was other things.  I had

5    boxes of all kinds of garbage out there, you know, that I

6    needed to go through, so I think that's what happened --

7  Q  Prior -- go ahead.

8  A  -- with the tape.

9  Q  Did you find any other items in your garage that you mailed

10    back to Dennis Hunter other than the videotape?

11  A  No.  I don't believe -- I sent him the tape.  That was the

12    only thing I had.

13  Q  After you watched the tape, do you agree that the tape

14    should have been in the Spencer files --

15            MR. BOGDANOVICH:  Object.  Asked --

16  Q  (By Ms. Zellner)  -- of the Sheriff's Department?

17            MR. BOGDANOVICH:  Object.  I think it's been

18    asked and answered.

19            MS. ZELLNER:  I don't think it has.  I haven't

20    asked that question.

21            MR. BOGDANOVICH:  Go ahead.

22  A  No.

23  Q  (By Ms. Zellner)  Do you agree that the tape --

24            MS. ZELLNER:  I notice she keeps looking at

25    Counsel, but I wish she would just answer the question.

1          MR. BOGDANOVICH:  I'm sorry.  Somebody passed a

2     note to me that I think may have distracted the witness.

3     And beyond that, I'd object to your characterization.

4          But go ahead.  I want you to remember, Sharon,

5     even --

6          MS. ZELLNER:  She's done that repeatedly in this

7     deposition --

8          MR. BOGDANOVICH:  Even if --

9          MS. ZELLNER:  -- but if she'd just answer my

10    question.

11         MR. BOGDANOVICH:  Even if I object, Sharon, you

12    should go ahead and answer if you can, unless I tell you

13    not to.

14         THE WITNESS:  Okay.  That was my concern:  If

15    he's objecting, was I supposed to answer?

16         Okay, the question again, please.

17         MS. ZELLNER:  Could the court reporter read the

18    question back?

19         THE COURT REPORTER:  Question:  "After you

20    watched the tape, do you agree that the tape should have

21    been in the Spencer files of the Sheriff's Department?"

22  A  My answer is no.

23  Q  (By Ms. Zellner)  Then why did you call Dennis Hunter to

24    turn the tape in?

25         MR. BOGDANOVICH:  Object.  Asked and answered.

ZELLNER (Sharon Krause, 11/6/12)

1       Go ahead.

2  A  That first time when I interviewed it -- or when I viewed

3     it, I had no idea what it was.  In retrospect and thinking

4     about that, and I've thought about it a lot, like other

5     things in this case, I don't think it was evidence at all.

6     I think it was a casual thing and why -- it wasn't my idea

7     to tape it, I don't believe.  And for whatever reason, if

8     it had been for evidence, it would have been placed into

9     evidence.  And that's how I think it ended up in my desk.

10        MS. ZELLNER:  Okay.  I want to stop right now

11    and take a break.  Our food is here so we'll come back to

12    those.

13        MR. BOGDANOVICH:  How long do you want to break,

14    Counsel?

15        MS. ZELLNER:  Twenty minutes.

16        MR. BOGDANOVICH:  Twenty?

17        MS. ZELLNER:  Yes.

18                   (Recessed at 12:22 p.m.)

19                  (Reconvened at 12:54 p.m.)

20  Q  (By Ms. Zellner)  When did you retire from the Sheriff's

21     Department?  What was the year and date?

22  A  I think it was October 5, 1995.

23  Q  And where was your office located in the Sheriff's

24     Department?

25  A  It was located in the Investigative Unit, and that was on

ZELLNER (Sharon Krause, 11/6/12)

107

1          the main floor.

2      Q   Did you have -- what were the dimensions of your office,

3          the size?

4      A   I had a little cubicle, work space, carpeted, all of us

5          did -- I don't know -- maybe -- I'm terrible at feet.

6          Seven, six feet, seven feet by maybe square, that square,

7          with a desk.

8      Q   Kind of like a jail cell?

9      A   No.

10     Q   About the same?  Kind of like a jail cell, right?  About

11         the same size?

12     A   I don't know.  I've never been in a jail cell.

13     Q   Did you keep boxes at your desk?

14     A   On occasion I might have had a box in there, but there

15         wasn't that much room.

16     Q   Did you keep seminar materials?

17     A   Most of my seminar material -- I did have seminar materials

18         but not at work.

19     Q   So you kept your seminar material at home?

20     A   That's correct.

21     Q   And at the time you left the Sheriff's Department where

22         were you living?

23     A   We just sold a condo in Vancouver and we bought a home in

24         Long Beach, Washington.

25     Q   When -- tell me about the internal procedures for

1        cataloguing and indexing evidence at the Sheriff's

2        Department during the Ray Spencer investigation.  So what

3        was the internal system to track evidence?

4    A   This is by -- my memory is that when we had a piece of

5        evidence, it was bagged or packaged, whatever the case may

6        be.  We had evidence tags that were attached, and there

7        would also be a report logging the evidence, and then it

8        would be -- we'd turn it in to our Evidence Department and

9        they would secure it.

10   Q   Okay.  So if you had a piece of evidence such as a

11       videotape, explain to me how that would be logged in to the

12       system.

13   A   It would have been the same thing.  It would have been

14       marked with identification, logged on an evidence sheet,

15       and secured in our Evidence Department.

16   Q   Okay.  And with the Ray Spencer case, who was in charge of

17       marking evidence with an ID?  Who was responsible for that?

18   A   It would have been whichever officer secured the evidence

19       or had the evidence.

20   Q   So whoever secured the evidence was responsible for marking

21       the evidence and then logging it?

22   A   Marking it for identification, securing it, logging it, and

23       checking it into evidence, yes.

24   Q   Okay.  And were there certain tags that were used to mark

25       it, like did it say "Evidence" and have a number on it, or

1        how was that done?  What did the tags look like?

2    A   You know, it's been so long ago, I don't remember it having

3        a number.  I remember it had a case number.  The case

4        number, for instance, if it was a homicide and we had 50

5        pieces of evidence, it would be -- each one would be

6        numbered one, and the case number two, and case number

7        whatever.  But it's been a long time.  I don't remember

8        what the tag looked like.

9    Q   Okay.  And then with the Spencer case, was there a log,

10       written log, that would identify each piece of evidence?

11   A   I don't recall there being any physical evidence in terms

12       of tangible things.

13   Q   Okay.  Were your -- was there something similar to the

14       indexes you made that tracked the evidence, or was the

15       index the system for tracking evidence?

16   A   No.  If there was evidence, it would have been noted in --

17       it would have been in the -- that report would be in the

18       case file.  And there would -- you know, if I did it, if I

19       secured the evidence, I would make a little Utility Report

20       indicating that we had collected this evidence and that it

21       was secured or whatever happened to it.  But it would be --

22       Utility Report, Evidence Reports, would be in the file.

23   Q   Okay.  So in the reports that we have, like the reports

24       that we have given you for today's deposition, I didn't see

25       any logs in there of evidence.  I see Utility Reports.  Why

ZELLNER (Sharon Krause, 11/6/12)

110

1    is that?  Were there logs or were there not for Spencer?

2  A  There were logs, but those log -- you would still have to

3     have a face sheet and a Utility Report indicating that the

4     evidence was collected, and attached to that Utility would

5     be copies of the evidence log.

6  Q  Okay.  And when you were at the videotaped interview for

7     those few minutes, did you make any notes, videotaped

8     interview of Kathryn Spencer?

9  A  The only thing I can tell you is when I viewed it, I wasn't

10    writing anything down, so I don't have any recollection of

11    taking any kind of notes when I was -- the short time I was

12    there.

13 Q  Okay.  And then you said that when you sat down and viewed

14    the video that you took notes?

15 A  No.  Those two times I viewed it that I told you about, I

16    don't recall seeing myself writing on anything.

17 Q  Oh, I see what you're saying.

18 A  Yeah.

19 Q  You're saying when you watched yourself on the video, you

20    didn't see yourself writing?

21 A  No.

22 Q  Okay.  And when you watched yourself and watched the video,

23    did you ever see Mr. Peterson writing?

24 A  Mr. Peters?  I don't recall --

25 Q  Peters.  I'm sorry.

ZELLNER (Sharon Krause, 11/6/12)

111

1   A  Yeah.  I don't recall seeing him writing.

2   Q  Now, you said that your office was a cubicle and that this

3      videotape was packed up when you retired and gathered your

4      materials from your office.  Is that what you're saying,

5      you packed up your office and you packed up the tape?

6   A  When -- initially we were located in the Sheriff's office,

7      in the main building.

8   Q  Right.

9   A  And there was some stuff there that, odds and ends, when we

10     moved to the Child Abuse Intervention Center, which was a

11     complete separate building, I put all that stuff in boxes.

12     And I had a couple drawers in my desk, and so I put that in

13     a box, and when we went to CAIC, it was stored there.  It

14     wasn't things that I was using.

15        And then when I retired, I took those boxes, along

16     with some other stuff I'd managed to accumulate, put that

17     in boxes and went to the house at the beach, and those

18     boxes went in the garage.  My husband, late husband, and I

19     sold that house, and we were going to look for a house in

20     Arizona, so all of our furniture, including those boxes,

21     were stored for two years, and then when we bought a house

22     in Arizona, we had everything moved down there.  Those same

23     boxes ended up in my garage again.  Because there was so

24     much going on in my life, that just wasn't a priority.

25   Q  And how many boxes do you think that you packed up when you

ZELLNER (Sharon Krause, 11/6/12)

175

```
 1        And you've never seen any type of report that was
 2   created about the videotaped interview of Katie Spencer on
 3   12/11?
 4   A  No.
 5   Q  In 1984, you had the power as an investigator in the
 6      Sheriff's Department to arrest people, correct?
 7   A  That's correct.
 8   Q  For felonies?  Did you have the power to arrest people for
 9      felonies?
10   A  Yes, but I didn't have any more power than a patrol -- any
11      commissioned officer would have had the same power as I
12      did.  I didn't have any special power.
13   Q  Right.  All right.
14        How would you -- how would you define, or give us
15      your definition of evidence, because you've referred to the
16      videotape not being evidence.
17   A  My definition of evidence would be some -- an item, a
18      tangible thing, although it could be a statement, that
19      verifies or disproves, that a crime has been committed --
20   Q  Okay.
21   A  -- and not necessarily a crime.  It may be a cumulative.
22      It may be part of what proves that, but something that is
23      significant to that investigation.
24   Q  When you were making a determination in disclosing
25      information to the prosecutor's office if something was
```

202

1                C E R T I F I C A T E

2          I, DIXIE J. CATTELL, the undersigned Registered

3    Professional Reporter and Washington Certified Court Reporter,

4    do hereby certify:

5          That the foregoing deposition of SHARON KRAUSE was

6    taken before me and completed on the 6th day of November,

7    2012, and thereafter transcribed by me by means of

8    computer-aided transcription; that the deposition is a full,

9    true and complete transcript of the testimony of said witness;

10         That the witness, before examination, was, by me,

11   duly sworn to testify the truth, the whole truth, and nothing

12   but the truth, and that the witness reserved signature;

13         That I am not a relative, employee, attorney or

14   counsel of any party to this action or relative or employee of

15   such attorney or counsel, and I am not financially interested

16   in the said action or the outcome thereof;

17         That I am herewith securely sealing the deposition of

18   SHARON KRAUSE and serving the same upon MS. KATHLEEN ZELLNER.

19         IN WITNESS HEREOF, I have hereunto set my hand

20   this_____day of_____, 2012.

21

22

23                    _____
                      Dixie J. Cattell, RPR, CCR
24                    NCRA Registered Professional Reporter
                      Washington Certified Court Reporter CSR#2346
25                    License Expires July 16, 2013.

# Exhibit B

1

1              UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WASHINGTON

3                      AT TACOMA

4   _____

    CLYDE RAY SPENCER, MATTHEW        )
5   RAY SPENCER, and KATHRYN E.       )
    TETZ,                             )
6                                     )
                   Plaintiffs,        )
7                                     )
         vs.                          )   NO. 3:11-cb-05424-BHS
8                                     )
    FORMER PROSECUTING ATTORNEY       )
9   FOR CLARK COUNTY JAMES M.         )
    PETERS, DETECTIVE SHARON          )
10  KRAUSE, SERGEANT MICHAEL          )
    DAVIDSON, CLARK COUNTY            )
11  PROSECUTOR'S OFFICE, CLARK        )
    COUNTY SHERIFF'S OFFICE, THE      )
12  COUNTY OF CLARK and JOHN DOES     )
    ONE THROUGH TEN,                  )
13                                    )
                   Defendants.        )
14  _____

15      DEPOSITION UPON ORAL EXAMINATION OF JAMES M. PETERS

16  _____

17

18

19                Thursday, November 8, 2012
                     Olympia, Washington

20

21

22

23

24

25

2

1    APPEARANCES:

2        FOR THE PLAINTIFF CLYDE RAY SPENCER
         (VIA VIDEOCONFERENCE):

3

4                              MS. KATHLEEN ZELLNER
                               MR. DOUGLAS JOHNSON
                               KATHLEEN T. ZELLNER & ASSOC.
5                              Esplanade IV
                               1901 Butterfield Rd., Ste. 650
6                              Downers Grove, IL  60515

7        FOR DEFENDANT JAMES M. PETERS:

8                              MS. PATRICIA FETTERLY
                               ASSISTANT ATTORNEY GENERAL
9                              P.O. Box 40126
                               Olympia, WA  98504-0126

10

11       FOR DEFENDANT DETECTIVE SHARON KRAUSE:

12                             MR. GUY BOGDANOVICH
                               LAW, LYMAN, DANIEL
13                               KAMERRER & BOGDANOVICH, P.S.
                               P.O. BOX 11880
                               Olympia, WA  98508-1880

14

15       FOR DEFENDANT SERGEANT MICHAEL DAVIDSON:

16                             MR. JEFFREY A.O. FREIMUND
                               FREIMUND JACKSON TARDIF &
17                               BENEDICT GARRATT, PLLC
                               711 Capitol Way South, Ste. 602
18                             Olympia, WA  98501

19

20

21

22

23

24

25

Dixie Cattell & Associates
Court Reporters & Videoconferencing

JOHNSON (James M. Peters, 11/8/12)

17

1   Q   And as your counsel just mentioned, we also sent a
2       transcript of that video.  Did you have a chance to review
3       that?
4               MS. FETTERLY:  Object to the form of the
5       question to the extent that presumes that that's an
6       accurate transcript of that video.
7           But you can answer.
8   A   I reviewed it, and it is inaccurate and incomplete.
9   Q   (By Mr. Johnson)  Okay.  And maybe we could -- tell me in
10      general why it's inaccurate.
11  A   Many of Kathryn's responses to my questions were inaudible,
12      and it would require a careful and skilled transcriber who
13      has an eye and an ear toward children who can both watch
14      her responses as well as listen to them to accurately
15      create a transcript that has integrity, and this one
16      clearly does not.
17  Q   And we'll get to some of those points later.  Did you
18      request anyone to create a transcript of that video?
19  A   Did I request anyone to?
20  Q   Yes, in preparation for this deposition.
21  A   I didn't request anyone to.
22  Q   Okay.  Have you seen a transcript of that video other than
23      what our office provided to you that you say lacks
24      integrity?
25  A   Have I seen one?

21

1      please.

2    A  Let me clarify, Counsel.  You, in your last statement,

3       indicated that the transcript was completed.  And I would

4       tell you, just so the record is clear, it is a draft in

5       progress.  It is not completed.

6    Q  (By Mr. Johnson)  And you understand that we're entitled --

7       or are you forming an opinion, Mr. Peters, as to whether

8       we're entitled or not entitled to all drafts?

9    A  I only commented on whether the transcript is completed,

10      Counsel.

11   Q  Okay.  Let me ask you:  Did you have assistance of anyone

12      in preparing your transcription?

13   A  No.

14   Q  And have you watched that -- how many occasions have you

15      watched that video?

16   A  Four or five.

17   Q  Okay.  And did you watch that video in the presence of

18      anyone else?

19   A  No.

20   Q  And when did you say the first time you watched the video

21      was?

22   A  I don't recall the exact date, but it was the middle couple

23      weeks of October 2012.

24   Q  Okay.  You also prepared a declaration in this case,

25      correct?

JOHNSON (James M. Peters, 11/8/12)

53

1    telling the truth and telling a lie.  And -- and I was
2    satisfied that we established that.
3  Q Anything else that you did to demon -- did to demon --
4    strike that.
5         Was there anything else besides what you just
6    testified to, because I want to give you a chance to be
7    complete, that you did so that you could learn that Katie
8    Spencer demonstrated an understanding of the obligation to
9    speak the truth on the witness stand?
10 A I would have to go through -- there were over 300 questions
11   that I asked her, and I don't have recall as to the
12   specifics of those questions.
13 Q All right.  And that's -- go ahead.
14 A I don't have recall of the specifics of the questions.
15 Q All right.  Okay.  You've watched the tape and spent nearly
16   40 hours with it, I think you told me, right?
17 A Yes, preparing a draft transcript.
18 Q Yeah, you prepared a draft, which although not complete,
19   you spent at least 40 hours on, correct?
20 A That's right.
21 Q All right.  Can you add anything to your answer about what
22   you did to assure that Katie Spencer demonstrated an
23   understanding of the obligation to speak the truth on the
24   witness stand other than what you've testified to?
25 A The tape speaks for itself.  I would have to refer to

112

1   Q  I'm not asking you whether -- other cases or anything like
2      that.  Did you personally supervise the Spencer
3      investigation?
4   A  Absolutely not.
5   Q  Did Art Curtis supervise the Spencer investigation?
6   A  I don't believe so.  I don't know what he -- I don't know
7      what happened in his --
8   Q  Can you --
9   A  I don't know what happened in his office, but I certainly
10     doubt it.
11  Q  And did any other prosecutor that you're aware of supervise
12     the investigation?
13  A  The only other prosecutors that were involved were just
14     tangential for routine matters, and I'm sure they did not.
15  Q  Who were they?
16  A  Mike Foister was present at the initial arraignment when
17     Mr. Spencer turned himself in in January.  And Jim Gavid, I
18     saw a note in the file that he must have appeared at a
19     hearing in March or April.  It was in his handwriting.
20     Other than that, the only other prosecutor that was
21     involved was -- of course, you know about Rebecca Roe, and
22     then the case was assigned to Barb Linde from the King
23     County prosecutor's office for about three and a half
24     months.
25  Q  Now, speaking of Rebecca Roe, she's a specialist in sex

JOHNSON (James M. Peters, 11/8/12)

145

1    to probable cause to arrest, wouldn't you have?

2  A  Counsel, if I had been the lead prosecutor in the case from

3    the get-go, the tape would have been disclosed from the

4    get-go.  I was not the lead prosecutor in the case from the

5    time it was charged until probably the second or third week

6    of April 1985.

7  Q  Who was that?

8  A  Barb Linde.

9  Q  Barb Linde was the lead prosecutor in the case in the time

10   period you just described; is that correct?

11 A  She was.

12 Q  Is there any documentation that reflects that?

13 A  Yes, there is.

14 Q  What is that?

15 A  There are three letters from Art Curtis dated January 9,

16   1985.  One is to Norm Maleng, the King County prosecutor,

17   thanking him for assigning a deputy prosecuting attorney,

18   outside counsel, to prosecute Mr. Spencer.

19       The second letter is to Rebecca Roe forwarding the

20   reports to her and similarly thanking King County for

21   agreeing to take over the case.  And the third letter is to

22   Leland Davis, the Chief of Police of Vancouver, similarly

23   saying that the case had been referred to outside counsel,

24   and at the end of the letter asking him to relay that to

25   his officers.  Because of the sensitive nature of the case,

1       it had been referred to outside counsel.  There's

2       additional documentation of that if you'd like me to

3       clarify.

4   Q   Sure.

5   A   In my review of the prosecutor's file, which I've done in

6       the last couple of months, I encountered a note.  It was a

7       While-You-Were-Out note that was written by a receptionist

8       on April 4, 1985, documenting a call from Barb Linde to Art

9       Curtis requesting a call back.  I also noted a -- one of

10      those small-sized yellow pads, the five-by-seven yellow

11      pads, a copy of that -- it wasn't yellow; it was a copy --

12      in Art Curtis' handwriting of notes that he took, and I

13      recognized Mr. Curtis' handwriting because I worked with

14      him first in the public defender's office for a year and

15      then more than ten years in the prosecutor's office,

16      documenting his call back to Barb Linde on April 4th, 1985.

17          And, by the way, I was in Hawaii at that time.  I

18      wasn't even in the office, where Barb Linde informed

19      Mr. Curtis that she had an aggravated murder trial

20      scheduled for the last week of May and the first week of

21      June of 1985.

22          Additional documentation is -- are letters dated, as

23      I recall it, May 9.  They wouldn't have been written on

24      May 9 because I was in Sacramento with Jim Rulli, but they

25      would have been dictated.  We didn't have computers back

147

```
 1        then.  They were dictated and things got typed, so they
 2        were sometimes dated not on the date it was dictated.  A
 3        letter from me to Barb Linde, referring to -- thanking her
 4        for her participation as outside counsel, and referring to
 5        a telephone conversation she and I had several weeks
 6        before, two weeks before, I think it says, where we had
 7        talked about me taking the case over from her because of
 8        her conflict and the fact that there were -- the case was
 9        in a different posture now and having two new victims from
10        when I had initially seen it back in December.
11    Q   Where is Barb Linde now?
12    A   She's a Superior Court judge in Seattle.
13    Q   Do you see her on occasion?
14    A   I've never seen her.  I haven't seen her since -- I may
15        have seen her at a prosecutors' conference back when I was
16        a state prosecutor, but I barely knew her.
17    Q   So she's not a social friend?
18    A   No.
19    Q   Okay, let me take you to December 10 of 1984.  On that day,
20        and this is the date before the video, did you learn
21        anything from your interaction with Katie Spencer that was
22        relevant in the case?
23    A   I don't recall that at all, and the only reason I even know
24        it happened, even know that I talked to her on the 10th,
25        was from -- I think I may have mentioned it in a prior
```

JOHNSON (James M. Peters, 11/8/12)

169

1    Q  Did you tell Art Curtis about the videotaped interview with
2       Katie?
3    A  Yes.
4               MS. FETTERLY:  Asked and answered.
5    Q  (By Mr. Johnson)  In that meeting did you tell him that?
6    A  I don't recall.
7    Q  Did he ask you for the videotape?
8    A  I don't recall.  I didn't have it anyway, but I don't
9       recall.
10   Q  Did --
11   A  I think I may have said --
12   Q  Would you have obtained it?
13   A  I think I may have said, "You can go down and look at it if
14      you want to."
15   Q  Did he need your permission?
16   A  No, I'm telling him that's where it is, in the Sheriff's
17      office.  He didn't need my permission.
18   Q  You knew where it was on January 2nd or 3rd of 1984 [sic];
19      is that correct?
20   A  In the Sheriff's office, yes.
21   Q  Where is the Sheriff's office?
22   A  I had no idea.  When I -- Jeff had it.  And what he did
23      with it, I don't know.
24   Q  How do you know Jeff had it?
25   A  It was in the camera.  Jeff had access or had control of

JOHNSON (James M. Peters, 11/8/12)

170

1       the camera.

2   Q   You're assuming that?

3   A   Well, it was -- he set it up.  He controlled it while --

4       during the first part of the interview, and I'm confident

5       he came and picked it up when we were done with the second

6       part of the interview.

7   Q   Did you observe him come pick it up?

8   A   I don't recall.

9   Q   You did not observe him come pick it up, correct?

10  A   I don't recall, Counsel.  You can draw --

11  Q   Again, if you were to assume --

12  A   I'm drawing inferences from obvious facts.  He brought it

13      in, he set it up, he turned it on.  We finished the

14      interview.  I left.  I -- you know, you could draw

15      reasonable inferences from those facts.

16  Q   So you left the room with the videotape still in the

17      camera?

18  A   Well, the room was Sharon Krause's office.

19  Q   Okay.  Did you do it in a cubicle?

20  A   Well, I don't know if -- at one point she had a cubicle.

21      At one point she had an office.  I don't recall which at

22      that point, because she changed.

23  Q   Will you give it to me again?  You left that room and a

24      videotape that you had played a role in creating of a minor

25      child being questioned about sexual abuse of her father

174

1     your evaluation of Katie's competency?  Why would you do

2     that?

3  A  That would have been the original document or the original

4     recording, which we would never have kept in our office.

5  Q  Why not?

6  A  We didn't keep any evidence in our office.

7  Q  Did you ask anybody about what would happen to the tape

8     after you left?

9  A  I don't recall.

10  Q  You may have; you may not have, is that correct?

11  A  I just -- yes, I don't recall.

12  Q  Did you have any concerns that this tape contained a

13     five-year-old child talking about -- to you about sexual

14     molestation of her vaginally, et cetera, and her father,

15     who had not been charged yet, did you have any concerns

16     that this could get into the wrong hands because you left

17     without giving any directions whatsoever to anyone about

18     what to do with it?

19  A  No, because it was left it with Sharon Krause, Sharon

20     Krause's office.

21  Q  Sharon Krause was not present at the end of the interview,

22     correct?

23  A  I believe she was there.  I mean, I don't have immediate --

24  Q  Was she --

25  A  I don't have any independent recollection of anything other

175

1    than what's on the video, but she was there at the

2    beginning at her office and it was during work hours.  So I

3    have to infer that she was there.  I remember her saying,

4    as she left, on the tape that "I'll just be outside at my

5    office."

6  Q  Okay.  So you don't have any recollection one way or the

7    other as to whether you had any interaction with her after

8    the taping stopped, correct?

9  A  I don't recall, that's right.

10  Q  So she may have been there and she may not have been there?

11  A  I'm confident she was there.

12  Q  And tell me why.

13  A  Because she was there from the beginning -- at the

14    beginning.  She said she'd be in her office.  We moved into

15    her office, finished the interview, and I'm confident that

16    she was there.  She would not have left with her victim

17    whose case she was responsible for.  In the closed area of

18    the Sheriff's office you couldn't -- it was a locked area.

19    You couldn't get in there without a Sheriff's deputy.  She

20    would not have left.

21  Q  She wouldn't.  So you know, as you sit here today, you're

22    sure that she didn't have a doctor's appointment, she

23    didn't get ill, she didn't go to lunch, she didn't depart?

24    You're absolutely sure she was there even though you don't

25    remember seeing her; is that correct?

JOHNSON (James M. Peters, 11/8/12)

176

1    A   I'm confident she was there, but I don't remember seeing
2        her because I don't remember anything other than what I've
3        seen on the video.
4    Q   And you just said that the Sheriff's office kept all the
5        evidence; is that correct?
6    A   Yes.
7    Q   Was this videotape evidence?
8                MR. BOGDANOVICH:   Object to the form of the
9        question.
10   A   It was evidence of my interview with Katie.
11   Q   (By Mr. Johnson)   And it was evidence relevant to the Ray
12       Spencer case, correct?
13   A   It was.
14   Q   Did you tell Rebecca Roe you were going to meet with Katie?
15   A   No.   I would have no reason to do that.   She worked
16       elsewhere.
17   Q   Did you tell Mr. Davidson?
18   A   I don't think so, although his office was a short distance
19       away in the same -- in the same large room.
20   Q   I didn't ask you where his office was.   I was asking you
21       whether you told him.
22   A   I don't recall having done so, but I don't recall not
23       having done so.   He may have been there.
24   Q   Did you tell Shirley that you were going to meet with
25       Katie?

216

1    A  I'm sure I could find some more if I dug through them.

2    Q  All right.  Well, we won't make you do that right now.

3       With regard to mistakes, was it a mistake of yours

4       not to make sure the video was disclosed?

5    A  You know, I'm glad you asked that question.  The first

6       three and a half months from the time that case was charged

7       I was not involved as the prosecutor in the case.  I did

8       two things to assist, but the case was assigned to someone

9       else, and I had no idea what discovery was provided and

10      what wasn't.

11         At the point that I came back into the case in the

12      second or third week of April of 1985, my attentions were

13      directed at the new allegations that had occurred when I

14      was not part of the case, a whole stack of reports from

15      March of 1985, and I was focusing on those trying to figure

16      out what had happened allegedly and what we needed to do

17      about it, getting a superseding information prepared,

18      edited, approved, and filed.  And at that point we started

19      to think about preparing for trial and --

20   Q  At what point was that that you started to think about

21      preparing for trial?  What was the date on that?

22   A  Well, Mr. -- Mr. --

23   Q  And I'm just asking for the date.  Again, if you want to

24      just answer the question instead of going off on a speech,

25      that's your choice.

1  A  I don't know exactly, but it would have been about the
2     first part of May.
3  Q  All right.  And I don't -- I got lost a little bit.  I got
4     confused.  So, is your answer that it was a mistake not to
5     make sure the video was disclosed or not a mistake?
6  A  No.  What I'm saying is that if we had proceeded with trial
7     preparation and Sharon and I had sat down and, as we did in
8     other cases, figured out what the reports were, what we
9     had, what we might not have had, what had been disclosed,
10    what might not have been disclosed, we would have figured
11    that out, and it would have been disclosed.
12 Q  So as we sit here today, I'm just asking you with regard to
13    you, your role, was it a mistake for you, Mr. Peters, to
14    fail to make sure the videotaped interview of Katie Spencer
15    by you on December 11, 1984, was disclosed?
16 A  If it had gone to trial and it hadn't been disclosed, that
17    would have been a mistake.  This case ended up --
18 Q  Okay.  What about --
19 A  No, no, no.  Let me finish.
20          MS. FETTERLY:  Let him finish.
21 A  Let me finish my answer.  This case ended up as a plea
22    bargain.  That video interview contained impeachment
23    material that was relevant for impeachment if the witness
24    testified if the case went to trial.  It did not go to
25    trial.  Therefore, it was not a mistake, in my opinion.

JOHNSON (James M. Peters, 11/8/12)

236

1   Q   All right.  Just so we're clear, you got out of there and
2       left the videotape and you didn't know what happened to it?
3   A   I left it in the custody of the Sheriff's office.
4   Q   Okay.  Did you ever discuss with Sharon Krause what to do
5       with that videotape?
6   A   I don't recall having done so.
7   Q   Okay.  Even -- you know that it was disclosed in 2009?
8   A   Yes.
9   Q   What do you know about that disclosure?
10  A   The first I heard of it was receiving a telephone call from
11      a television producer who told me about it, and my initial
12      response was shock and surprise, and I told her the same
13      thing I just told you a minute ago, that I recalled
14      interviewing a child; I did not recall which case it was.
15  Q   Sharon Krause had called you before that television
16      producer about the video, hadn't she?
17  A   No, she did not.
18  Q   Did she ever call you and contact you about the videotape?
19  A   She did not.
20  Q   Have you ever discussed the videotape with her?
21          I think you might have gotten cut off.
22  A   No, I'm here.  I'm just trying to think about that.  I
23      had -- I had drinks with her after she testified in the
24      presence of the lawyers, and it came up generally.  We
25      didn't talk specifically about it.

JOHNSON (James M. Peters, 11/8/12)

240

```
 1      that was unusual.  Was I wrong?
 2   A  What was unusual was that this was a sensitive case because
 3      he was a police officer.  That's very unusual.  And it was
 4      unusual that the victims lived in California and that two
 5      of them were very young.
 6   Q  Is that unusual that a major piece of evidence was
 7      relocated to an investigator's garage?
 8   A  Well, of course I didn't know anything about that, and I
 9      don't --
10   Q  Okay.  So that was unusual, right, that the evidence was
11      found in the investigator's garage many years after the
12      fact?
13              MS. FETTERLY:  Object to the characterization of
14      the tape as evidence.
15          But you can answer if you can.
16   A  I would have thought that the tape would be in evidence.
17   Q  (By Mr. Johnson)  All right.  Had you ever heard of such a
18      thing before in your long career, of evidence being found
19      in an investigator's garage?
20   A  Actual original evidence?  I would say no.
21   Q  Sure.
22   A  No.  Copies perhaps.
23   Q  Okay.  Do you have any knowledge as to what Sharon Krause
24      had, whether it was a copy or an original?
25   A  I don't know.  I assume it was the original, but I don't
```

263

1                    C E R T I F I C A T E

2           I, DIXIE J. CATTELL, the undersigned Registered

3   Professional Reporter and Washington Certified Court Reporter,

4   do hereby certify:

5           That the foregoing deposition of JAMES M. PETERS was

6   taken before me and completed on the 8th day of November,

7   2012, and thereafter transcribed by me by means of

8   computer-aided transcription; that the deposition is a full,

9   true and complete transcript of the testimony of said witness;

10          That the witness, before examination, was, by me,

11  duly sworn to testify the truth, the whole truth, and nothing

12  but the truth, and that the witness reserved signature;

13          That I am not a relative, employee, attorney or

14  counsel of any party to this action or relative or employee of

15  such attorney or counsel, and I am not financially interested

16  in the said action or the outcome thereof;

17          That I am herewith securely sealing the deposition of

18  JAMES M. PETERS and promptly serving the same upon MR. DOUGLAS

19  JOHNSON.

20          IN WITNESS HEREOF, I have hereunto set my hand

21  this_____day of_____, 2012.

22

23                    _____
                      Dixie J. Cattell, RPR, CCR
24                    NCRA Registered Professional Reporter
                      Washington Certified Court Reporter CSR#2346
25                    License Expires July 16, 2013.

Dixie Cattell & Associates
Court Reporters & Videoconferencing