# EXHIBIT 1

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT

STATUTORY RAPE, 1ST DEGREE, RCW 9A.44.070
LOCATION OF INCIDENT:   17681 NE Lucia Falls Road, Yacolt, Washington
DATE OF INCIDENT:       Between 07-14-84 and 08-26-84

DATE & TIME:            10-18-84                  2100 hours
LOCATION:               Holiday Inn, Room #135
                        5321 Date Avenue
                        Sacramento, California 95841-2597
INCIDENT:               Witness Interview

PERSON INTERVIEWED:     SPENCER, DeAnne Sue         dob: 02-04-50
                        3930 Becerra Way
                        Sacramento, California      phone: (916) 482-6057
                        Work phone: (916) 920-0256, Ext. #34

VICTIM:                 SPENCER, Kathryn E.         dob: 01-13-79
                        3930 Becerra Way
                        Sacramento, California      phone: (916) 482-6057

SUSPECT:                SPENCER, Clyde Ray          dob: 01-09-48
                        aka: Ray SPENCER
                        17681 NE Lucia Falls Road
                        Yacolt, Washington          phone: (206) 687-2407
                        Work phone: (206) 696-8292

CCSO Case #84-8506   S.A.KRAUSE/K-43                          page 1 of 22

SUMMARY:

Prior to my going to California on October 15, 1984, I had talked with Deanne SPENCER on the telephone. During my conversations with her she indicated that she would make her children available to me and assist in any way she could if I were to come to Sacramento. During the last conversation I had with her just prior to going to Sacramento, I indicated to her that I would call her when I arrived in Sacramento to make arrangements to talk with her children.

On the afternoon of the 15th I made phone contact with DeAnne SPENCER at her place of employment. She advised that her children would be at their grandmother's residence that evening. DeAnne SPENCER suggested that she meet with me at the hotel and that I could follow her in my vehicle to her residence so I would be familiar with its location, and also accompany her to pick up her children so that would give me the opportunity to become acquainted with them.

DeAnne SPENCER met with me at approximately 2000 hours and at that time I did follow her in my vehicle to her residence. When we arrived at her residence with only she and I present we talked briefly regarding the allegations reportedly being made by Katie SPENCER, indicating that Katie and her natural father, Ray SPENCER, had some type of sexual contact.

During the time we talked, DeAnne SPENCER indicated that she was also concerned about Matthew because he appeared to be acting out. She advised that Matthew had not indicated why he was upset other than he apparently "threw a tantrum" approximately one week before I went to Sacramento. DeAnne related that she and her children had gone out to breakfast with her family after church and apparently that's where they were when Matt became so upset. She related that he was screaming things at her, calling her a liar and indicating to her that he was going to go live with his father as soon as he could, and she "would not be able to do anything about it."

She also advised me that on Wednesday, October 10, 1984, she discovered thirty dollars missing from Symphony Club money she had.

She advised that Matt had some things and had indicated to her that his friend
bought them for him and when the money showed up missing, she questioned Matt.
Apparently, initially Matt lied but then admitted that he had taken the money.
DeAnne SPENCER related that all of the things Matt was doing were very unlike
him.

DeAnne SPENCER also related that during the meeting
with Detective FLOOD and also with Katie's therapist, Katie apparently was not
indicating anymore than there had been something sexual between her and her
father.

DeAnne SPENCER advised me that she was scheduled to
take a polygraph on Tuesday morning, October 16, 1984, regarding her ever being
sexually involved with her daughter, Katie.

After I talked with DeAnne for a short period of time I
rode with her in her vehicle to pick up her children at Phyllis DAY'S
residence.  When we arrived at the grandmother's residence, DeAnne SPENCER
introduced me to her children; however, we were not specific as to why I was
there or who I was.

After we arrived at DeAnne SPENCER'S residence with her
children and prior to my leaving, I made arrangements to pick Katie SPENCER up
the following day for the purpose of my interviewing her regarding any
information she might share with me.  During the entire week I saw DeAnne
SPENCER on several occasions; however, I did not talk to her in any depth at
all until the evening of October 18, 1984.  That interview was done in my room
at the Holiday Inn with myself, DeAnne SPENCER and her sister, Linda LAWRENCE,
present.  During that conversation DeAnne SPENCER related the following.

Initially, DeAnne SPENCER provided me with the dates
her children were with their father since she and Ray SPENCER separated and
divorced.  They are as follows:

#1 - The first visit occurred during Easter of 1981.
Ray SPENCER reportedly came to Sacramento and the children stayed with him in a
motel.

#2 - Six weeks during the summer months of 1981.  At
that time Ray SPENCER was living with a female subject named Karen STONE and

the SPENCER children stayed at Karen STONE'S residence during summer visitation.

#3 - One week during Easter of 1982. Katie and Matt went to Los Angeles with their father.

#4 - Nine week visitation during the summer of 1982. Ray SPENCER was still living with Karen STONE and the visitation took place at Karen STONE'S residence in Vancouver.

#5 - Two weeks during Christmas of 1982. That visit also took place at Karen STONE'S residence.

#6 - One week during Easter of 1983. Katie and Matt accompanied their father to Los Angeles.

#7 - Seven weeks during the summer of 1983. Reportedly that was just after Ray SPENCER married his present wife, Shirley, and the visitation took place at Shirley's residence.

#8 - One week during Easter of 1984. Matthew and Katie accompanied Ray SPENCER, his wife, Shirley, and her son, Matt, to Los Angeles.

#9 - Six weeks during the summer of 1984. Katie and Matt visited with their father in Vancouver, Washington from July 14th to August 26th. At that time Ray and Shirley SPENCER were living at their present location in Yacolt, Washington.

DeAnne SPENCER advised that the summer of 1984 visitation was the last time her children saw their father, Ray. She also related that she drove her children to Vancouver for that visitation and picked them up. I asked DeAnne SPENCER if she could describe Ray SPENCER'S residence and she indicated that she had not seen it because when she called Ray from Vancouver to let him know she and the children were in town, he did not want her to come to his residence and requested that she meet him at Battle Ground Police Station. She also indicated that that is where she was when she picked the children up.

DeAnne SPENCER advised me that approximately one month prior to Matt and Katie going to Vancouver for the 1984 summer visitation, almost on a daily basis Katie would become upset and at times "hysterical," crying and indicating she did not want to go to her father's. DeAnne SPENCER

stated to me, "I felt like my hands were tied." She indicated that she told her children that she did not have any control because the court had ordered those visits and if they really did not want to go up there during the summer they should talk to their father and tell him. She also related that she did not suspect that Katie was upset because of any type of abuse; she felt maybe Katie just wanted to spend more time during the summer with her friends, etc. She related approximately two weeks before the children were scheduled to leave, Katie finally resolved herself to the fact that she was going and told her mother, "Okay, I'll go, but I'm not going to have fun."

DeAnne SPENCER also advised me approximately two weeks before the children left for their father's, Matthew had shared with her that he had been having bad nightmares that "terrified him." She indicated that initially Matt didn't want to talk about the nightmares; however, at some point he agreed to share with her, and when he did he indicated that in the dream Katie fell off of the balcony into the water at Ray and Shirley SPENCER'S residence. Deanne SPENCER advised me that she told her son she could understand why that would be a fearful thing to dream about, and also advised him that he did have some control if he was afraid that was going to happen, indicating that he did not have to be out on the balcony without an adult if he was uncomfortable. She also advised that she told Matt just not to go out on the balcony or let Katie go out if there was not an adult there. She indicated Matt stated, "What happens when there's a bunch of people out there and it gets all crazy?" DeAnne related that she told Matt he could still control whether he and his sister were out there and if he was uncomfortable he should not go out onto the balcony.

DeAnne SPENCER related that during the 1983 summer visitation, Ray and Shirley SPENCER were not living in Yacolt; however, apparently they were remodeling the house on Lucia Falls Road and the children had been there.

I asked DeAnne SPENCER about any kind of behavior changes or unusual behaviors she may have observed reference Katie. DeAnne SPENCER related that Katie's attitude towards men has concerned her for some time. Specifically, it was "like Katie seemed to know how to manipulate men."

She also advised that her mother felt Katie did that in a more "adult way" and different from most four or five year old children. DeAnne related that she had attributed it to Katie not having a father around all the time and wanting attention. She indicated that the observation she had made reference Katie's behavior around men was that it was "more of a sexual thing than just wanting attention." When I asked her if she could be more specific she indicated that Katie liked to sit on men's laps, and when she did that she would observe Katie rubbing on them, making reference to an arm or a leg. She also indicated that Katie was "real clinging and would kiss in a way that did not appear to be appropriate for a four or five year old." She then stated to me, "Katie would just do things that didn't seem right, but I still felt it was probably because her dad wasn't around all the time."

DeAnne SPENCER indicated that after Katie would come home from visiting her father, she would consistently be using a very "whiney voice." Also, Katie used that same voice whenever she would talk to her father on the telephone. DeAnne SPENCER stated to me, "I can't really describe it but I know that it really upset her brother. It was just a lot of baby talk and whining and that seemed to go on for a couple of weeks before I could get her to stop doing it."

DeAnne SPENCER also related when Katie returns home she is very "demanding." She advised that if Katie did not get her way by demanding something, she would start with the "whiney voice." DeAnne SPENCER also related that she recalled after the 1983 summer visit that she noticed when Katie was around other men she would begin using that voice again and would get her way a lot of times because of it.

DeAnne SPENCER also related that after the 1983 visitation he noticed there were a number of times when she observed Katie rubbing the genital area of her own body. She indicated when Katie got home after the 1983 visitation, there were several times that Katie would ask her mother to put medicine on the genital area of her (Katie) body, indicating that it was sore. DeAnne SPENCER related, "At some point I realized that she was wanting medicine a lot." She continued that there was a time when there did not

appear to be any irritation and so she told Katie that she was big enough to put the medicine on herself and she had her do it after that.

She also related that after the summer 1983 visitation was over and Katie was home, Katie "seemed to be real preoccupied with DeAnne SPENCER'S breasts." DeAnne SPENCER advised me that she thought probably it was because Katie had a new step-mother and when Katie would sit on Shirley's lap and on her mother's lap she may have felt that there was some difference. She advised that that was the only explanation she could come up with regarding how Katie was behaving.

DeAnne SPENCER related that after the Easter trip in 1983, on one occasion she walked into the bathroom and saw Katie touch Matthew's penis. She indicated from that time on she just made sure that the two were not together in the bathtub. She indicated that she just felt probably it was a curiosity thing and did not think about it anymore.

DeAnne SPENCER related that after the 1983 summer visitation her sister-in-law, Shaun, was babysitting for Katie and Matt. Apparently at some time during that time period, Shaun caught Katie and her cousin, Danny, who is approximately two years older, under the covers with their clothes off. When she asked them about what they were doing, they indicated they were playing house and "that's what moms and dads do." DeAnne SPENCER related that her sister-in-law explained to the children that that was not how you played house. She also advised me that a teenage babysitter she has by the first name of Laurie, told her that whenever Katie plays with Barbie dolls she always has the "adult doll naked in bed." Apparently, Laurie has made those observations since the 1984 summer visitation.

Linda LAWRENCE and DeAnne SPENCER both mentioned the condition of a nightgown Katie had after she returned from the 1984 visit. Linda LAWRENCE related that the gown had something on the back similar to "Daddy's Princess." Apparently, Katie had spent the night at Shaun's house when Linda LAWRENCE noticed the nightie and also Shaun. When I asked her what it was about the night gown that was bothering her, she indicated that the whole front where the crotch would be was worn almost completely through. Apparently, DeAnne SPENCER threw that gown away when it was brought to her attention.

I asked DeAnne SPENCER about the sore that Karen STONE had related she had seen when Katie came for a summer visitation, apparently during the summer months of 1982. DeAnne SPENCER related that Katie had spent Easter week with her father in 1982 and then nine weeks in that summer. Apparently, between the two visitation, Katie developed a sore on the labium. She advised that this sore developed about one week before the children were scheduled to go with their father. She indicated that she took Katie to the doctor and he indicated it was some type of a viral infection and gave her Desitin and Neosporin to apply to the infected area. DeAnne SPENCER stated when she brought it to Ray SPENCER'S attention, he was "furious with her and demanded to know where the hell she got that kind of sore."

DeAnne SPENCER then related to me that the summer after she and Ray SPENCER split up (1981) she developed a case of herpes. She indicated her doctor told her that it was one of the worst he had seen. DeAnne SPENCER indicated that the sore she observed on Katie's labium reminded her a lot of a herpes blister. I asked her if she knew where she contracted the herpes and she advised at that time she had been seeing two different men and when she became aware that she had herpes, she called both men who subsequently were examined by a physician and both provided documentation that neither had the herpes. DeAnne SPENCER then related that the sensation she got prior to the herpes breaking out was something that she had experienced "many, many times" when she was married to Ray. She advised that she was never aware of any breaking out but did recall having that same "sensation." DeAnne SPENCER indicated that when they were married, almost every time she got that sensation, Ray would say something to her a day or two before, indicating that she should go to the doctor and be checked because he "was experiencing some burning when he urinated." DeAnne SPENCER stated to me, "Ray would come in and say, 'You better get to a doctor because you have that infection again'." She related that she would go to the doctor and whatever he gave her would usually remedy the problem. However, she stated that the last time, prior to seeing the doctor and finding out she had herpes, she figured it was "probably no big deal again," just some type of a normal vaginal or sexual infection.

I asked DeAnne SPENCER if Ray SPENCER could have had herpes without her knowing. She indicated that he was a person who was very clean and to the point that he was "pre-occupied" with being clean. She related there were a lot of times when they never had physical relations (intercourse) and she never questioned whether or not she could have contracted something. She also stated to me, "I don't think if he had them I would have even known it because there were months when we would not be sexually involved." DeAnne SPENCER indicated she had no reason other than the fact that the other two gentlemen did not have herpes to believe that she may have contracted it from Ray SPENCER. She also advised me that she had no knowledge as to whether or not he did, in fact, have herpes or if what Katie had on her labium was a herpes sore.

During one of my conversations with Ray SPENCER, he indicated that Katie had made some kind of a statement to Shirley SPENCER reference Ray SPENCER and DeAnne SPENCER sleeping together after Shirley and Ray SPENCER would have been married. I asked DeAnne SPENCER about that and she indicated that there were only two occasions after she and Ray SPENCER separated that he stayed at her house when he picked up the kids. She indicated once was just prior to Ray marrying Shirley SPENCER and on both of those occasions he and the children slept in the living room. She indicated there had never been any sexual contact between them.

During a phone conversation I had with DeAnne SPENCER, prior to going to California, she had mentioned that while they were living in Los Angeles, a neighbor girl named Rhonda accused Ray of raping her. I asked her if she could be more specific about what that incident involved. DeAnne SPENCER related the following. They lived in Los Angeles for approximately six years and at that time had neighbors named Jerry, Roxie and Rhonda. She indicated Rhonda was nineteen years old when the incident occurred; however, Rhonda was "emotionally very, very immature."

Apparently this incident reportedly occurred in November of 1978. DeAnne SPENCER indicated that Ray had consistently tried to isolate her from her family and then all of a sudden about one week before Thanksgiving, Ray suggested that she and Matt go to Sacramento to spend some

time with her family. She indicated at that same time Rhonda's family had gone to Europe and she was home alone. DeAnne related that she talked with Ray several times during that week she was gone on the telephone, and then one evening during a phone call when he had called her, he indicated that he was concerned about Rhonda because she was "acting really strange." She also reported that he told her, "I think she's got something up her sleeve and I'm worried about it." DeAnne advised me that she told Ray if he was worried just not to be alone with Rhonda or give her an opportunity to say anything. DeAnne SPENCER indicated the following evening she had to call Ray and when she did he whispered in the phone that "Rhonda was in there." He also reportedly told DeAnne he was going to tell Rhonda that she had to leave because he was going to a friend's house for dinner, and DeAnne advised that she told Ray she thought that was a good idea.

DeAnne SPENCER then related that on Thanksgiving Rhonda and her family ate dinner with them (SPENCERS). She advised that a couple days or so before December 4th, Ray mentioned to her that he was nervous about Rhonda. She indicated that he had mentioned Rhonda several times after she returned home from Sacramento and that he appeared to be nervous about something. She related that during that conversation, before December 4th, Ray said something similar to, "What if she says something about me or what if she says I did something? I really wouldn't be able to do anything about it." DeAnne advised me that she told Ray that he shouldn't even worry about it because it wasn't going to happen.

DeAnne SPENCER indicted on Sunday, December 4th, she received a phone call from Rhonda's father, Jerry, and at that time he reportedly stated to DeAnne SPENCER, "I want to see you at my house now without Ray." DeAnne SPENCER advised me that she could tell Jerry was upset and so she went right over to Rhonda's house. She indicated when she went out of the house Ray was working in the garage on a toy chest for Matthew and at that time she was "very pregnant with Katie" because Katie was born in January.

DeAnne SPENCER indicated when she got to Jerry's house, Rhonda's uncle, a cousin, Rhonda's parents and Rhonda were sitting in the living room. She advised that she knew something was wrong and when she came in

Jerry appeared to be upset and she remembered him jingling his change in his pocket. She said at some point she was really uncomfortable and asked, "What's up?" At that time Rhonda's father reportedly stated, "Well, it seems as though when we were all away Ray raped Rhonda." DeAnne SPENCER advised me that she became very upset and stated, "Whoa, whoa, wait a minute. Hold it. I want my husband here. I don't want anymore to go on. He needs to be here." She advised at that time she went out and told Ray, "You're not going to believe it, Ray, but she did it." DeAnne SPENCER advised me, "I remember the look on his face. The blood just drained and he said, 'No kidding?'" At that time DeAnne and Ray SPENCER went back into Rhonda's house and DeAnne SPENCER advised that Ray looked at Rhonda and said something like, "Rhonda, how could you say these things?" DeAnne SPENCER advised me that she (DeAnne) "totally defended Ray." She indicated at that time she looked at Rhonda and told her, "Okay, Rhonda, I want it from you. I want to know what happened, and I want to know the truth." DeAnne related that at that time Rhonda said something about "Ray calling her up and inviting her over and when she got her he had music playing and the lights were low and he had on nice clothes." DeAnne related that at that time Ray said something like, "Rhonda, how could you?" And DeAnne advised me that she told Ray to shut up and let Rhonda talk. Apparently at that time Rhonda indicated that when she got over to SPENCERS "she and Ray were on the couch and started talking and kissing and one thing lead to another, and then they wound up in bed." DeAnne SPENCER advised me by that time Rhonda was sobbing and she (DeAnne) turned to Ray and told him, "Okay, I want to hear your side of it."

Ray then indicated that he was outside working on the toy box in the garage and that he was covered with dirt when Rhonda called and said that she wanted to talk to him because she was having problems with a boyfriend, so he told her to come over, even though he was feeling very uncomfortable. He indicated when she got there they talked about the problem and then he told her what he thought she should do about it. DeAnne SPENCER stated, "Then he told me I called him in the middle of that conversation." Reportedly, Ray SPENCER then indicated that he told Rhonda she would have to go because he was going to a friend's for dinner. DeAnne SPENCER advised me that Ray always denied that he had even "so much as touched Rhonda." (During a

conversation Ray SPENCER had with Dr. ABRAMS, prior to my going to Sacramento, he admitted that he had been sexually involved with a neighbor girl in Los Angeles, however, indicated it was not rape, it was consensual sex.)

DeAnne indicated after Ray gave his side of the story, Rhonda was still "just sobbing" and Rhonda's uncle apparently was saying things like "he was going to blow Ray's head off." Apparently, Rhonda's parents were making statements indicating that she did not come over to discuss problems with Ray ever, and DeAnne advised me that Ray had told her sometime back that Rhonda told him that her cousin had molested her. DeAnne SPENCER indicated things were getting out of hand and she told Rhonda's parents, "Wait a minute. I want to tell you how Rhonda came to us several times with problems and once told us about six months ago that a cousin, Donnie, had molested her, and she was afraid to tell anyone." DeAnne SPENCER advised me that she told Rhonda's family that she was present when Rhonda shared that. She indicated, however, that was not true, that it was information that Ray had given to her. Apparently, Donnie's father, who was at the house indicated at that time that maybe the whole thing was a big misunderstanding. She advised that Rhonda's father stood up and Ray was asking him, "Don't you believe me?" Rhonda's father reportedly responded that he didn't know what to believe, but he knew "one thing for sure; their friendship had been terminated."

DeAnne SPENCER related that when they left Rhonda's house she and Ray went to a friend's house who was also a policeman. She indicated that Ray instructed her specifically not to discuss what had occurred; however, when they got to the friend's house Ray was the one that brought up the subject and apparently shared with the friend. DeAnne SPENCER indicated she remembered the friend telling him not to worry because if the girl's parents were going to call the cops they would have done it already. DeAnne SPENCER advised that that was the end of it, and Ray always denied that he had ever done anything to Rhonda, and she (DeAnne) believed him for many years.

I asked DeAnne SPENCER if she could provide me with some background information regarding how they had met, etc. She indicated at the time she met Ray SPENCER, Ray was an air traffic controller at Mathers Air

Base. She indicated she was eighteen years old at that time and had an apartment of her own. Apparently they initially met in a book store and that same evening he took her out and "moved in with her three days later." DeAnne advised that Ray was at Mathers for two years and then released from the service. Reportedly, before he was released, he had applied for an air traffic controller job; however, because the president had eliminated something like fourteen hundred jobs, Ray was not able to do that. Apparently, the president did notify those people who had applied that they were opening up positions as sky marshalls. DeAnne SPENCER related that the day after she and Ray SPENCER were married he was notified that he had been accepted as one of those who could be a sky marshall. She indicated that he was really excited about that offer because it gave him the opportunity to be a "cop." She advised that he had checked into the requirements for Sacramento and California Highway Patrol and because of his height he did not qualify.

She indicated that Ray was then sent to the FBI academy for training for sky marshall and that it was located in Virginia. After the training was completed he was assigned to the Chicago area. DeAnne SPENCER indicated that Ray arrived in Chicago on January 7th and she got there January 9th. She advised that she was there only a month when he was assigned to fly the San Juan turn around out of New York so she was alone. She indicated when he came home he talked to her about his "stewardess friends" and how "neat they thought he was." She indicated he had three nice blankets with him that he indicated were given to him by the stewardesses from different airlines.

Apparently, DeAnne SPENCER went to work at a bank in the Chicago area shortly after she moved there. She indicated that there was a female at the bank named Angie and initially she and Angie were very good friends. However, towards the last couple of months that DeAnne SPENCER was employed there she felt Angie was acting differently around her. She also indicated that when the bank had a going away party for her, she felt very uncomfortable many times because of the interaction between Angie and Ray SPENCER. DeAnne SPENCER advised me that approximately two years ago she found out from another mutual friend that Ray SPENCER and the female named Angie were having an affair during the time DeAnne worked at the bank.

DeAnne and Ray SPENCER spent six months in Chicago,
then moved to Los Angeles and were there six years.  She advised that when they
moved to Los Angeles Ray went to work for the Treasury Department and initially
was working in the airport when they installed the new detectors and was also
doing "undercover work in the airport."  DeAnne SPENCER related from there Ray
went to work for the U.S. Treasury and was working with the Harbor Patrol doing
undercover narcotics work on the boats.

DeAnne SPENCER indicated when Ray was working for the
Harbor Patrol he confiscated a lot of paraphrenalia in their raids and "lots of
guns."  I asked her how many guns he had and she indicated that he told her he
was buying them but she knew he had approximately four rifles and there were
handguns.  She indicated she remembered one gun that Ray specifically told her
not to mention to anyone because he wasn't supposed to have it.  I asked her if
she could describe it and she stated, "I think he called it a short sub machine
gun."  She advised that he mentioned several times that she was not supposed to
tell anybody because he wasn't supposed to have it.  I asked her if she could
describe it and she described it as having a fairly short barrel, being black
in color, with a big handle that had a clip in it.

DeAnne SPENCER indicated at some point Ray became very
unhappy with the people he was working with at the Harbor Patrol and
specifically was upset with a black supervisor, indicating that this man was
"after him."  DeAnne SPENCER advised me that she didn't know what happened but
Ray shared with her shortly after that "that something had happened to the
black guy and he got his."

Apparently, about that same time, Ray SPENCER indicated
to DeAnne that he was seeing a female subject named Norma again.  She advised
that Norma reportedly was a girlfriend of Ray's prior to him meeting her.
DeAnne SPENCER indicated that Ray was telling her a story about this Norma
being married to a millionaire and that she wanted to put Ray through law
school.  DeAnne SPENCER advised that that upset her because she felt if anyone
should do that she should work and put him through school.  Around that same
time SPENCER apparently applied at Vancouver Police and also at a law school in
the Sacramento area.  I asked her how he happened to apply in this area and she

indicated that he had a sister who lived in this area and had advised him about the job.

DeAnne SPENCER related that Ray was a very bright person and when he attended Long Beach State and was working full time he was an A-B student. She advised that while they were in the Los Angeles area Ray worked and went to school most of the time. Apparently, Ray indicated to DeAnne that he had taken the law exam and had "really flunked it." She advised me that she never understood that because she knew he was intelligent and would not have been surprised if he maybe did not pass it or was not accepted; however, she just couldn't understand him "flunking it totally." DeAnne SPENCER advised me that she really did not know if Ray ever even took the test, she only knew what he had told her.

DeAnne SPENCER indicated to me that it was when Ray was going to college in Los Angeles that he used to talk about having a friend named "Dennis" at school. At some point Ray indicated that Dennis was going to be in Europe and he would be watching his house for him. She advised me that she used to get really uncomfortable whenever Ray was going to Dennis' house because he always took a shower, cleaned up and put on cologne to go check the house, and she really felt uncomfortable because she believed he was doing something else.

DeAnne SPENCER indicated that Ray brought home a beautiful sweater and hat one day, indicating that his friend, Dennis, had bought it for him in Europe and it was a gift for watching the house.

DeAnne SPENCER indicated that just prior to Christmas that year Ray came home with a sack indicating it was presents for Dennis and Dennis' family and that he instructed her to "stay out of it; it was none of her business." She advised that Ray put the sack in a room that he had designated as his "den" and normally she "stayed pretty much out of there." She advised as soon as Ray left she took the sack into the bathroom and looked inside because she felt he was not telling her the truth. She indicated in the sack was a book of poems, some Estee Lauder and very feminine things. She advised me "either Dennis was a girl or a homosexual because those were not gifts for a man." She also related that Ray got her the same book of poems that

he had in the sack.  She indicated when she confronted him about the book he became really angry, telling her that he meant what he wrote on her book but did not mean what he wrote in the other book of poems.  Also, reportedly Ray indicated that he bought that book of poems for "some chick he rolled in the hay with that had done some typing for him and that it was none of DeAnne's fucking business." DeAnne SPENCER stated to me, "He had so much control over me it was stupid, but I ended up apologizing to him for what I had done and he had just stood there telling me that he had had an affair with another woman."  She also related she recalled seeing the first name of Cindy written in the book.

DeAnne SPENCER indicated she recalled times when she was married to Ray SPENCER that he would tell her that when he walked into a bar he could point out people that were either "cops or criminal because there was such a fine line between them."

I asked DeAnne SPENCER about the comment on the clothes, and she stated, "They were very slutty clothes he bought me."  She advised that Ray had a friend named Ernie GARCIA whose wife wore a lot of makeup and also apparently Ray's sister, and that he wanted her to wear the false eyelashes and wear a lot of makeup.  She indicated that most of the clothes Ray bought her were from Fredrick's of Hollywood. She stated to me, "He loved to take me out in public when I looked like that and I believed him that I looked nice."  She then stated, "Around the house I dressed like an old lady and when I was with him I wore very low cut and revealing clothing."

DeAnne SPENCER indicated that when they left Los Angeles they moved to Vancouver where Ray went to work for Vancouver Police. She indicated after they moved up to the Vancouver area she rarely even saw him because he got off work at 11:00 PM in the evening and would never get home before 2:00, 3:00 or 4:00 AM.  She advised when she questioned him about it he reportedly would say "he had to stop and have a few beers to lighten up."  She also advised that Ray told her that "this is how it was to be married to a cop, and all cops were like that."

DeAnne SPENCER also related that in December of 1979 Ray was involved in some kind of undercover detail with Vancouver Police involving gambling in downtown Vancouver.  DeAnne SPENCER had rough notes of

reports Ray SPENCER was preparing regarding that investigation. DeAnne SPENCER also showed me a poem signed by the same woman as named in the drafts of the report as the snitch which was addressed to Ray SPENCER. DeAnne SPENCER indicated that at some point during the investigation Ray SPENCER told Vancouver Police that his snitch "burned him;" however, she advised that Ray told her he lied to the department because he just wanted "out."

When DeAnne and Ray SPENCER separated, DeAnne SPENCER found a box of letters, some very intimate, that were address to Ray SPENCER during the time DeAnne SPENCER was married to him. DeAnne SPENCER advised me that she would make any of the information regarding the gambling incident or letters available to whoever might want them, regarding this investigation.

During the time I talked with DeAnne SPENCER I asked her about the alleged pornographic books that SPENCER reportedly had. DeAnne SPENCER advised me that Ray did have a number of books that were "hard core porno." She advised that she would guess that he had approximately fifty of them. She also related that during the time she was married to him there were a number of times when they either passed adult movie theatres or in conversation when Ray SPENCER would mention he had seen a specific movie. DeAnne SPENCER advised me that she had accompanied her husband on two occasions in Los Angeles to an adult movie; however, that was the only time. She advised when she questioned Ray about when he was seeing all the movies he would indicate to her it was usually when he was "out with the guys or working an undercover assignment." She also indicated that since the time he was involved in any kind of police work at all there were many times when he did not come home for days and would tell her he was working undercover. However, she never really knew what he was doing.

During my conversation with DeAnne SPENCER I asked her if Ray had ever requested her to do anything that she objected to sexually or if she had ever observed him to have any unusual sexual habits during the time she was married to him. DeAnne SPENCER indicated that there were a number of things that bothered her. Specifically, he was involved with so many other women during the time they were married, and there would be weeks and months go by without them having any physical contact. She also advised that Ray

purchased an electric dildo (a simulated penis) and that he would tell her to masturbate herself with it when he was not around. She stated to me, "Then he wanted me to tell him about it later and that seemed to excite him." DeAnne SPENCER stated to me, "I can't believe I'm telling you this and that I was so stupid, but I tried so hard to please him." DeAnne SPENCER also related that there were many times when Ray would want to have anal sex with her or insert the "dildo" into her rectum. She indicated that there were many times when Ray had her insert the "dildo" into his rectum or would ask her to insert her finger into his rectum during their sexual activities. She related she "often wondered why that did not cause him some discomfort." I asked DeAnne SPENCER if the "dildo" had a vibrating mechanism and she indicated it did vibrate but that it didn't use batteries, it was one that you plug into the wall.

During the time I talked with DeAnne SPENCER I asked her what the circumstances were regarding her separating and divorcing Ray SPENCER. At that time she related the following. She and Ray had planned on taking a vacation with the whole family and had talked about going to Canada. Reportedly, they were scheduled to leave on a Thursday. DeAnne SPENCER indicated that Wednesday night, the evening prior to them going, she had made a comment to Ray about him making sure he got home early enough because they would be leaving that Thursday. She indicated that he became extremely upset and told her "it was none of her fucking business what time he got home." She advised me that they began arguing and that that went on for several hours. She advised apparently at sometime he suggested that maybe she just needed to get away for awhile and that she should go visit her friend, Cindy, in Los Angeles. DeAnne SPENCER advised me that her friend had offered to send her a plane ticket to come visit her on several occasions. She related that Ray finally asked her what she was going to do and wondered if she had decided to go to Los Angeles and she indicated that maybe that would be best if she just got away, so she made reservations to go to visit her friend.

DeAnne said the plan was for Ray to keep the children and for her to get away alone. She advised, "All of a sudden he suggested I take Matthew, indicating that Matthew wanted to go with me." She advised that the whole purpose was for her to get away and that part of their problem was

that he was not spending any time with his children, and she felt that would give he and Matt some time alone. DeAnne SPENCER indicated after he kept talking about Matt going for several minutes she finally became upset and told him, "We'll ask him what he wants to do." DeAnne SPENCER related she was really furious because Ray marched right in there and asked Matt, who was only four years old, "Do you want to fly on a big airplane with your mom or do you want to stay with Dad?" DeAnne SPENCER stated to me, "Of course, you know what Matt said." She advised that she confronted him because of how he had asked Matt and told him, "You knew what his answer was going to be." She advised that Ray got upset and went back in and asked Matt, "Do you want to stay with Daddy or do you want to go with Mom?" She advised that Matt said, "I want to go on a big airplane."

DeAnne SPENCER advised that Ray told her he would keep Kathryn and for her to go ahead and take a couple days off and that Kathryn would be fine. DeAnne SPENCER related that initially Ray wanted her to drive the car to the airport and leave it; however, she had him take her there and she remembered feeling "very uncomfortable with leaving Katie behind." She advised at one point she looked at Katie and Katie seemed happy being with her father so she really lost the uncomfortable feeling.

DeAnne SPENCER related once she got to Los Angeles Thursday night, she called Ray to tell him that she and Matt had arrived safely, and Ray told her that he had "called her mother and told her what happened and suggested she better call her mother and let her know she was okay." DeAnne advised me that she really didn't know what he was talking about but called her mother and that Ray had called Phyllis DAY, indicating that "DeAnne wigged out and left him and Katie and took Matt with her, and that he didn't know where she was." DeAnne SPENCER stated to me, "I couldn't believe it. I called my mother and was just freaking out." She then related that her mother told her to calm down, that she was glad she knew where she was and to go ahead and spend a couple of days and maybe it would make things better for them. DeAnne SPENCER related that she called Ray back that evening and talked with him and during that conversation he kept making statements similar to, "What do you think, I'm the worse person in the world?" She advised that she

told him that she did not think he was the worse person but thought that he did."

DeAnne SPENCER related the following day, Friday, he called her back and told her that he had been thinking about what she said to him the evening before and that he had decided to keep the house and the kids and "he would send her clothes to her so she could walk the streets with her girlfriend." He also reportedly advised her to send Matt back on a plane when he had finished his vacation.

DeAnne SPENCER related that approximately two years before she and Ray separated, Ray met a clinical psychologist in California named Chuck LADLEY, at some kind of conference. She advised that while Ray was at the conference he called her, indicating that he had talked with a psychologist and felt that if she could come down and talk to him too that he could help them work out some of their problems. She related that she made arrangements for someone to care for the children and drove to where he was immediately and she spoke with him in a casual setting regarding their problems and the doctor felt that he could help them.

DeAnne SPENCER advised me as soon as she had talked to Ray regarding what he said reference sending her clothes to her, etc. she made a call to Sacramento to Dr. LADLEY'S office and got no response. she indicated that she subsequently called his residence and made arrangements with his wife to come to Sacramento to talk to him. She also advised me that when she saw Dr. LADLEY the two years before he indicated to her that he felt Ray had problems and also indicated to her that he thought Ray was a pathological liar. DeAnne SPENCER indicated she rented a car the next morning and drove to Sacramento and did meet with Dr. LADLEY, who advised her to go on back to Vancouver immediately.

DeAnne SPENCER related that she flew into Portland on Sunday evening and rented a car and that evening stayed in Portland with her friend's mother. DeAnne SPENCER indicated her friend, Patty, used to be married to a Vancouver Police Officer, Officer HULSE. DeAnne SPENCER related the following morning she drove to Vancouver and saw an attorney. Also, she was extremely concerned about Katie's whereabouts nd subsequently called Patty to

see if she might know where Katie was. She advised that Patty told her that she was taking care of Katie and indicated that when DeAnne left for California Ray called and told her (Patty) that he didn't have any money and was going to have to go back to work and asked her if she could take care of Katie, which she did. DeAnne SPENCER related that she called her attorney and asked if it would be okay if she went to Patty's home and retrieved her daughter and he advised her that she should do that.

DeAnne SPENCER indicated that after she had seen the lawyer she did talk with Ray on one occasion and he was indicating he didn't know whether or not he should get an attorney. She advised me that she told him she really didn't think it was necessary because he knew she would be fair and would only ask for half of what they had. Apparently, on Thanksgiving DeAnne SPENCER'S parents came up to help her pack and retrieve her part of the belongings. However, she advised that Ray served her with some type of a paper indicating that she couldn't remove anything from the residence and she did not move out of the home with her belongings until December 4, 1981.

During my conversation with DeAnne SPENCER reference the separation she indicated that during the divorce proceeding, Ray SPENCER advised the court that he had been staying with Karen STONE since he moved out of his residence. However, she advised me that she had no knowledge as to when Ray actually met Karen or how.

During my interview with DeAnne SPENCER she related that she did not realize how much control Ray had over her during the time she was married to him; however, looking back she "cannot believe how he influenced her." She stated to me, "Whenever I caught him doing something, going out with someone, having an affair or whatever, he would turn it around and make me feel bad." She also advised that Ray was a very emotional person and could be very convincing at that. DeAnne SPENCER talked again about the time that Ray SPENCER reportedly called her at work when she was working at the phone company and the only thing he said initially to her was that he was "going blind," and then hung up the telephone. She advised me that she just panicked and at some point was able to determine that Ray SPENCER had had a physical and during the physical the doctor mentioned that he had the potential of getting glaucoma.

She stated to me, "No matter what happened, he could make it into a catastrophe and have everybody upset and scared to death before you figured out what was going on.

        Prior to terminating our conversation DeAnne SPENCER advised me that she would make any information she had available to whoever needed it and also would provide us with a medical release to obtain any medical records or therapy records on Katie or Matt.

        This investigation to be continued.

# EXHIBIT 2

*INVESTIGATING CHILD SEXUAL ABUSE ALLEGATIONS*

*SHARON A. KRAUSE, DETECTIVE*
*CLARK COUNTY SHERIFF'S OFFICE*
*VANCOUVER, WASHINGTON*

Investigating allegations of child sexual abuse may be one of the most difficult and time-consuming investigations officers are called upon to deal with. These investigations must be complete and comprehensive, which necessitates the skills of someone who understands the dynamics of child sexual abuse and has specialized training.  Reports should include a detailed account of the abuse and provide the prosecutor with any information available that will corroborate the victim's statements or allow them to make a just and fair decision as to how they should respond.  A complete investigation goes far beyond a single interview with one child and one suspect. A deficient investigation may result in the child continuing to be victimized by the offender and/or the child being additionally victimized by the criminal justice system or an innocent person being wrongly convicted.  We have both a legal and moral responsibility to each person involved.

A.   *A completed police investigation should contain the following information.*

   1.   *DETAILED REPORTS.*

      a.   *Information that led to the initial investigation.*

      b.   *Victim(s) interview(s).*

      c.   *Witness interviews.*

      d.   *Search Warrant information, when appropriate.*

      e.   *Polygraph information reports, when appropriate.*

      f.   *Suspect interview.*

      g.   *Suspect arrest or status reports.*

      h.   *Any prior criminal history or lack of relating to suspect.*

      i.   *Any prior victimization information relating to victim.*

      j.   *Evidence reports.*

1

KRAUSE 00034

  *k.* *Medical and/or therapy reports.*

  *l.* *Photographs, when appropriate.*

B. *VICTIM BACKGROUND INFORMATION REPORTS.*

 1. <u>*WHO INITIATED THE ORIGINAL COMPLAINT AND WHY.*</u>

  *a.* *Who, if anyone, questioned the child prior to the first investigative interview.*

  *b.* *Where the conversation took place.*

  *c.* *Who did the questioning and who was present.*

  *d.* *Specifically, what questions were asked.*

 2. <u>*DOCUMENTATION OF ANY STATEMENTS THE CHILD MADE PRIOR TO THE FIRST INVESTIGATION INTERVIEW.*</u>

  *a.* *Teachers or counselors.*

  *b.* *Physicians.*

  *c.* *Peers.*

  *d.* *Relatives.*

  *e.* *Acquaintances.*

 3. <u>*INTERVIEW THE CHILD'S PARENTS OR GUARDIAN. INSTRUCTIONS YOU GAVE PARENT/GUARDIAN.*</u>

  *a.* *Disclosure.*

  *b.* *Behavioral changes.*

  *c.* *Information (Indicators) that may support the parent's concerns.*

    *- observations by other adults;*
    *- complaints;*
    *- prior medical/therapy.*

  *d.* *Prior victimizations.*

  *e.* *Motive for fabrication or child to lie.*

   *(1)* *Custody disputes.*

2

KRAUSE 00035

      (2)  Child's knowledge of suspect.

      (3)  Relationship with suspect.

      (4)  Prior conflicts with suspect.

  f.  Suspect access and opportunity to molest child.

  g.  Any background information they have about suspect and his/her family.

  h.  What information child has regarding pending investigation.

  i.  What information child has been given reference sexual abuse or sexuality.

      (1)  Conversation with parent.

      (2)  Books.

      (3)  Prior victimizations.

      (4)  Any association with acquaintances or other family members who were victims.

C.  VICTIM(S) INTERVIEW REPORT.

  1.  Where the interview was conducted and who was present.

  2.  Time interview was initiated and concluded.

  3.  What was discussed prior to specific allegations.

    a.  Describe child's verbal skills.

    b.  Establish child's comprehension level.

    c.  Establish that child has independent recall.

  4.  How the interview was documented.

    a.  If notes were taken.

    b.  Tape/video.

  5.  If the child knew who you were and why you wanted to talk to him/her prior to your meeting.

3

KRAUSE 00036

6.   Child's demeanor and emotional state during the interview.

   a.   Embarrassment.

   b.   Nervousness.

   c.   Eye contact.

   d.   Any unusual behavior.

7.   Child's activities during interview.

   a.   Drawing.

   b.   Coloring.

   c.   Playing.

8.   How you established child's terminology for body parts.

9.   Establish that the child knows the difference between a truth and a lie.

10.   Description of sexual acts that occurred between child and the offender.

11.   Progression and duration of sexual abuse.

12.   Isolate specific incidents when possible.

13.   Reason the child delayed reporting, if appropriate.

14.   Date, time and location of where incidents occurred.

15.   Suspect M.O. during molestation.

   a.   Any statements the suspect made to the victim, including his terminology for sexual acts and body parts.

   b.   Threats or bribes.

   c.   Special requests he/she made of the child.

   d.   Demeanor or activity during sexual acts.

   e.   If victim was photographed.

4

KRAUSE 00037

      f.  If suspect showed victim any sexually explicit adult materials or pornography.

      g.  If any "sexual toys" were used.

      h.  If suspect or victim documented abuse.

      i.  If suspect talked about other victims.

      j.  If suspect discussed his/her sexual activities with adult or other children.

18.  Identification of any additional victims and/or suspects.

19.  Description of the child's support system and evaluating the child's safety.

20.  Child's description of suspect.

      a.  General physical description.

      b.  Description of genitalia.

      c.  Describe any unusual marks, tattoos or identifiers on the suspect.

      d.  Verbalize.

      e.  Specific request.

      f.  Use of pornography.

21.  Allow child to draw if they want to or are willing.

      a.  Sexual activity that occurred.

      b.  Suspect body

22.  Document the use of any investigative aids.

      a.  Anatomical dolls

      b.  Puppets, stuffed animals, books, etc.

      c.  Diagrams or drawings.

D.  WITNESS INTERVIEW REPORTS.

1.  Anyone having access to the child that might have noted behavioral changes.

KRAUSE 00038

2. Anyone the child made statements to.

3. Physicians that did the medical examination.

4. Therapy reports.

5. Anyone with knowledge about the suspect and prior similar acts.

   a. Prior spouse.

      1. Terminology.

      2. Unusual request.

      3. Verbiage.

   b. Children not living with suspect.

   c. Adult sexual partners.

6. Anyone who might have witnessed suspicious activity between child and offender.

7. Previous victims.

E. SUSPECT INTERVIEW REPORTS.

  1. CIRCUMSTANCES OF INTERVIEW.

    a. How initial contact was made and when.

    b. Who initiated initial contact, you or suspect.

    c. Date and time.

    d. Location and who was present.

    e. Rights.

    f. Document, coffee, cigarettes, potty breaks.

  2. PERSONAL HISTORY.

    a. Where he has lived and when.

    b. Employment history.

    c. Family structure.

6

KRAUSE 00039

   d.   Marital status, prior marriages, girlfriends, children, grandchildren and determine location of same.

   e.   Hobbies, interests; what he does in spare time.

   f.   Criminal History.

       a.  Both sexual and non-sexual crimes.

   g.   Alcohol or drug abuse.

   h.   Was suspect a victim and details.

3.   <u>DETERMINE WHAT SPECIFIC INFORMATION SUSPECT HAS REGARDING INVESTIGATION.</u>

   a.   Who he/she has been talking to.

   b.   May assist you in determining where he got information for alibi or denial as the interview progresses.

   c.   Has he had contact with victim(s) and/or family.

   d.   Has he had contact with other witnesses.

   e.   Who is or isn't being supportive of victim.

4.   <u>SEXUAL CHARACTERISTICS.</u>

   a.   Sexual preference.

   b.   Frequency.

   c.   Unusual acts.

       1.  S&M
       2.  Cross-Dressing
       3.  Fetishes
       4.  Bestiality
       5.  Association with nudist
       6.  Swingers.

   d.   Prostitution.

KRAUSE 00040

e.  Pornography/Adult Materials.

    1.  Tapes/Magazines
    2.  Frequents adult book stores
    3.  Facilities where nudes perform.

f.  Fantasies.

g.  Masturbation.

    1.  Frequency
    2.  Materials he looks at or aids he uses at
       the time
    3.  What he thinks about
    4.  Where this occurs.

h.  Extramarital affairs.

5.  _STATEMENTS RELATING TO VICTIM._

a.  Not just statements relating to abuse.

b.  Any admissions.

c.  Excuses or alibis.

d.  Suspect's description of victim.

e.  Access to victim and opportunity.

F.  *SEARCH WARRANT INFORMATION REPORTS.*

1.  Detailed description of any corroborative evidence.

2.  Information that may only corroborate what the child is saying and not necessarily prove the suspect's guilt.

3.  Appropriate Search Warrant reports and forms.

G.  *MEDICAL REPORTS.*

1.  Relating to victim examination.

2.  Therapy reports, if it applies.

3.  School health room.

4.  Suspect therapy and evaluation reports.

8

KRAUSE 00041

H.    *EVIDENCE REPORTS.*

    1.   *Details of evidence obtained from child and suspect.*

    2.   *Any laboratory examination reports.*

    3.   *Search Warrant evidence reports.*

I.    *PHOTOGRAPHS.*

    1.   *Victim Injuries.*

    2.   *Suspect identifiers.*

    3.   *Evidence photographs.*

*9*

KRAUSE 00042

# EXHIBIT 3

# CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
## INCIDENT REPORT

| | | |
|---|---|---|
| **IJURY** ☐ OFFICER ☐ SUSPECT ☑ VICTIM | ☐ SUPPLEMENTAL REPORT | TYPED BY: |
| ☐ HAZARD TO OFFICER ☐ DOMESTIC VIOLENCE ☐ VICTIM REQUESTS NON-DISCLOSURE | ☒ CRIME ☐ VEHICLE ☐ MISSING ☐ ARREST ☐ DECEASED ☐ INFORMATION ☐ JUVENILE ☐ ADULT | PROCESSED BY: / DATA ENTRY BY: |

**ICIDENT CLASSIFICATION (INCLUDE R.C.W. NO.)**
DOMESTIC VIOLENCE/SIMPLE ASSAULT 9A.36.040

**OCATION** 17681 Lucia Falls Rd.

| WHEN REPORTED | DAY OF WEEK | WHEN OCC | | | | | | TIME OCC | | | DAY OF WEEK | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2-13 85 0002 | Sunday | 2 13 85 | M | D | Y | 0002 | TO | TIME | | | Sun. | TO | DAY |

☐ EVIDENCE SUBMITTED ☐ FINGERPRINT SEARCH MADE ☐ FINGERPRINTS FOUND ☐ LAB EXAM REQUESTED ☐ PHOTOS K-9 USE: ☐ Y ☐ N ☐ UNAVAIL

**PERSONS** V1-VICTIM C1-COMPLAINANT R1-REGISTERED OWNER W1-WITNESS P1-PARENT F1-FIRM NAME

| CODE | NAME: LAST | FIRST | MIDDLE | PI# | SEX | RACE | DOB |
|---|---|---|---|---|---|---|---|
| V1 | SPENCER | RAY | C. | | M | W | 1-9-48 |

**HOME ADDRESS** 17681 Lucia Falls Rd. — **HOME PHONE–BPC** 687-1407

**BUSINESS – SCHOOL ADDRESS** ----------  **WORK HOURS** ----  **BUSINESS PHONE** —

| CODE | NAME: LAST | FIRST | MIDDLE | PI# | SEX | RACE | DOB |
|---|---|---|---|---|---|---|---|
| V2 | MORGAN | ROBERT | A. | | M | W | 6-23-61 |

**HOME ADDRESS** Unk. New York State Address — **HOME PHONE–BPC** Mess. 687-1407

**BUSINESS – SCHOOL ADDRESS** ----------  **WORK HOURS** ----  **BUSINESS PHONE**

| CODE | NAME: LAST | FIRST | MIDDLE | PI# | SEX | RACE | DOB |
|---|---|---|---|---|---|---|---|
| W1 | MORGAN | RALPH | H. | | M | W | 8-24-62 |

**HOME ADDRESS** 17681 Lucia Falls Rd. — **HOME PHONE–BPC** 687-1407

**BUSINESS – SCHOOL ADDRESS** ----------  **WORK HOURS** ----  **BUSINESS PHONE** ----

S1 - SUSPECT  M1 - MISSING  X1 - MENTAL HEALTH  Q1 - RUNAWAYS  Y1 - DETOX  D1 - DECEASED  A1 S1- ASSOCIATE

| CODE | NAME: LAST | FIRST | MIDDLE | DOB | SEX | RACE | PI # |
|---|---|---|---|---|---|---|---|
| S1 | SPENCER | SHIRLEY | J. | 4-27-42 | F | W | |

| HT | WT | BUILD | HAIR | EYES | ADDRESS | PHONE |
|---|---|---|---|---|---|---|
| 5-7 | 125 | thin | blo | blu | 17681 Lucia Falls Rd. | 687-1407 |

**CLOTHING, TATTOOS, DESCRIPTION, ALIAS** Varied — **BAIL** -----

**CHARGE DETAILS (INCLUDE ORDINANCE OR R.C.W. NO., CITATION NO., OR WARRANT NO.)**
Possible Simple Assault 9A.36.040
**BOOKED / WHERE** ☐ YES ☐ NO -----  **BOOKING NUMBER** ---

| CODE | NAME: LAST | FIRST | MIDDLE | DOB | SEX | RACE | PI # |
|---|---|---|---|---|---|---|---|
| S2 | SPENCER | RAY | C. | 1-9-48 | M | W | |

| HT | WT | BUILD | HAIR | EYES | ADDRESS | PHONE |
|---|---|---|---|---|---|---|---|
| 5-7 | 165 | med | brn | brn | 17681 Lucia Falls Rd. | 687-1407 |

**CLOTHING, TATTOOS, DESCRIPTION, ALIAS** Varied — **BAIL** -----

**CHARGE DETAILS (INCLUDE ORDINANCE OR R.C.W. NO., CITATION NO., OR WARRANT NO.)**
Possible Simple Assault 9A.36.040
**BOOKED / WHERE** ☐ YES ☐ NO -----  **BOOKING NUMBER** ----

RCW 9A.84.040: MAKING FALSE REPORTS TO PUBLIC OFFICERS: (1) A PERSON COMMITS THE CRIME OF MAKING A FALSE REPORT IF HE (SHE) WILLFULLY MAKES ANY UNTRUE, MISLEADING, OR EXAGGERATED STATEMENT IN ANY REPORT TO A POLICE OR FIRE DEPARTMENT. (2) MAKING A FALSE REPORT IS A MISDEMEANOR.

☐ RELEASED PROPERTY TO _____
☐ I ACCEPT THE LIABILITY FOR TOWING AND STORAGE
☐ THE NAMED JUVENILE IS PRESENTLY A RUNAWAY
☐ NAMED PERSON IS PRESENTLY MISSING

☐ I HAVE READ, UNDERSTAND, AND AGREE TO THE ABOVE.

**SIGNATURE OF PERSON**

**CASE MANAGEMENT DECISION** ☐ REFERRED ☐ SUSPENDED
☐ CA ☐ CPS ☐ CMHP ☐ DSHS ☐ PATROL
☒ PA ☐ JDH ☐ PAT ☐ SIU ☐ DETECTIVE
**CLEARED BY:** ☐ ARREST ☐ EXCEPTIONAL ☐ UNFOUNDED
**EXCEPTIONAL DIST:**

**REPORTING OFFICER** Don Kurti  **DIST.** 5-41
**REVIEWED BY**  **DATE**

**CASE NO.** 85-14-73

ATTACH PROPERTY REPORT FOR CONT.     ...TION OF PROPERTY: STOLEN / LOST/DAMAGED

**PROPERTY SECTION**

PS-STOLEN   PL-LOSS   PD-DAMAGED   PI-INVENTORY

| PROP. CODE | QUANTITY | ARTICLE TYPE | | SERIAL NO. | | BRAND/NAME | | MODEL | | VALUE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PERSON CODE | COLOR | | | | CALIBER | | MARKS/OWNER APPLIED NO | | | | ☐ MORGAN ☐ WADC ☐ NCIC |
| PROP. CODE | QUANTITY | ARTICLE TYPE | DESCRIPTION (FOR WEAPONS INDICATE TYPE OF ACTION) | SERIAL NO. | | BRAND/NAME | | MODEL | | VALUE | |
| PERSON CODE | COLOR | | | | CALIBER | | MARKS/OWNER APPLIED NO. | | | | ☐ MORGAN ☐ WADC ☐ NCIC |
| PROP. CODE | QUANTITY | ARTICLE TYPE | DESCRIPTION (FOR WEAPONS INDICATE TYPE OF ACTION) | SERIAL NO. | | BRAND/NAME | | MODEL | | VALUE | |
| PERSON CODE | COLOR | | | | CALIBER | | MARKS/OWNER APPLIED NO. | | | | ☐ MORGAN ☐ WADC ☐ NCIC |
| PROP. CODE | QUANTITY | ARTICLE TYPE | DESCRIPTION (FOR WEAPONS INDICATE TYPE OF ACTION) | SERIAL NO. | | BRAND/NAME | | MODEL | | VALUE | |
| PERSON CODE | COLOR | | | | CALIBER | | MARKS/OWNER APPLIED NO. | | | | ☐ MORGAN ☐ WADC ☐ NCIC |
| PROP. CODE | QUANTITY | ARTICLE TYPE | DESCRIPTION (FOR WEAPONS INDICATE TYPE OF ACTION) | SERIAL NO. | | BRAND/NAME | | MODEL | | VALUE | |
| PERSON CODE | COLOR | | | | CALIBER | | MARKS/OWNER APPLIED NO. | | | | ☐ MORGAN ☐ WADC ☐ NCIC |

**VEHICLE SECTION**   VS-STOLEN   VR-RECOVERED   VT-TOWED   VL-LOCATED   VV-VICTIM'S VEHICLE   SV-SUSPECT VEHICLE

| CODE | LICENSE NUMBER | STATE | | LIC-YR | | TYPE | | ARSON LOSS | TOTAL LOSS | |
|---|---|---|---|---|---|---|---|---|---|---|
| | KEYS IN VEHICLE ☐Yes ☐No | THEFT INS ☐Yes ☐No | PERSUASION GIVEN ☐Yes ☐No | VALUE | | | | VIN NUMBER | | ROLD ☐Yes ☐No |
| VEHICLE YEAR | MAKE | MODEL | STYLE | COLOR | DESCRIPTION | | | CHARGE/CITE NO. | TOWED BY/LOCATION | LETTER SENT ☐YES ☐NO |

I CERTIFY I HAVE RECEIVED LISTED VEHICLE:   SIGNATURE: ___ X ___   (SIGNATURE)

TOWING    EMPLOYEE, OWNER, OR AUTHORIZED AGENT TAKING POSSESSION OF THE LISTED VEHICLE

DAMAGE TO VEHICLE ☐YES ☐NO
SPECIFY DAMAGE BY SHADING IN DAMAGE AREA   ☐ TOP   ☐ UNDERSIDE     7 5 3 1 / 8 6 4 2

**NARRATIVE SECTION**

CODES TO USE

1. ADDITIONAL PERSON INFO – **ATTACH ADDITIONAL INCIDENT RE-PORTS.** DETAIL ADDITIONAL PERSON INFORMATION NOT COVERED IN BOXES.
2. ADDITIONAL SUSPECT INFO – **ATTACH ADDITIONAL INCIDENT RE-PORTS.** DETAIL ADDITIONAL SUSPECT INFORMATION NOT COVERED IN BOXES.
3. INJURED PERSONS – (VICTIMS, WITNESSES, OFFICERS, SUSPECTS). DETAIL INJURIES, MEDICAL EXAM, DISPOSITION.
4. ADDITIONAL PROPERTY – **ATTACH UTILITY/PROPERTY REPORT.** DETAIL INFORMATION NOT INCLUDED IN BOXED PROPERTY SECTION.

5. PHYSICAL EVIDENCE – DETAIL WHAT AND WHERE IT WAS FOUND, BY WHOM AND DISPOSITION.
6. VEHICLES – SUSPECT VEHICLE INFORMATION IN SAME ORDER AS VEHICLE SECTION. ADDITIONAL VEHICLE INFORMATION NOT INCLUDED IN BOX.
7. PARENT – GUARDIAN'S NAME, ADDRESS, PHONE NUMBER OF JUVENILE IN DETENTION, OR INDICATE IF CONTACTED.
8. LIST DOCUMENTS ATTACHED – (AIR FORM, MEDICAL RELEASE, WAIVERS, ETC.)
9. RECONSTRUCT INCIDENT AND DESCRIBE INVESTIGATION.
10. SYNOPSIS FOR PROSECUTOR ON CLEARED CRIMES AND CUSTODIES

PERSONS: V1, C1, W1, R1, P1, P1, D1
SUSPECT-MISSING: S1, S2, M1, X1, Y1
VEHICLE: VS, VR, VT, VL, VL, SV
PROPERTY: PS, PL, PD, PI

ITEM NUMBERS ARE LISTED IN ORDER OF STEP 1-10; IF STEP IS UNNECESSARY, DO NOT LIST IT.

| ITEM | CODE | |
|---|---|---|
| 0 | | |

On above listed date and time, I was dispatched and responded to 17681 Lucia Falls Rd to a report of a disturbance. Upon my arrival, I was contacted by Robert and Ralph Morgan, and Shirley Spencer. At the time of my arrival, they were holding Ray Spencer to the floor. Shirley first explained to me that she is currently married to Ray Spencer, and that Robert and Ralph Morgan are her sons from a previous marriage. Shirley told me that Ray has been criminaly charged with molesting his four year old girl from a past marriage that Ray had.

## CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
### UTILITY REPORT

PAGE ___2___ OF ___?___

| ☐ SUPPLEMENTAL RPT. | ☒ CONTINUATION OF: | | TYPED BY: |
|---|---|---|---|
| | ☒ Incident Rpt.   ☐ Supplemental Rpt. | | PROCESSED BY: |
| INCIDENT CLASSIFICATION (INCLUDE R.C.W. NO.) | | | DATA ENTRY BY: |

INCIDENT CLASSIFICATION (INCLUDE R.C.W. NO.)
POSSIBLE SIMPLE ASSAULT 9A.36.040

| LOCATION OF INCIDENT | DATE OF INCIDENT | PRESENT DATE |
|---|---|---|
| 17681 Lucia Falls Rd. | 2-3-85 | 2-4-85 |

1. ADDITIONAL PERSONS INFO – **ATTACH ADDITIONAL INCIDENT REPORTS.** DETAIL ADDITIONAL PERSON INFORMATION NOT COVERED IN BOXES.
2. ADDITIONAL SUSPECT INFO – **ATTACH ADDITIONAL INCIDENT REPORTS.** DETAIL ADDITIONAL SUSPECT INFORMATION NOT COVERED IN BOXES.
3. INJURED PERSONS – (VICTIMS, WITNESSES, SUSPECTS) – DETAIL INJURIES, MEDICAL EXAM, DISPOSITION.
4. ADDITIONAL PROPERTY – ATTACH UTILITY/PROPERTY REPORT. DETAIL INFORMATION NOT INCLUDED IN BOXED PROPERTY SECTION.

5. PHYSICAL EVIDENCE – DETAIL WHAT AND WHERE-FOUND, BY WHOM, AND DISPOSTION.
6. VEHICLES – SUSPECT VEHICLE INFORMATION IN SAME ORDER AS VEHICLE SECTION. ADDITIONAL VEHICLE INFORMATION NOT INCLUDED IN BOXES
7. PARENT, GUARDIAN'S NAME, ADDRESS, PHONE NUMBER OF JUVENILE IN DETENTION.
8. LIST DOCUMENTS ATTACHED – (AIR FORM, MEDICAL RELEASE, WAIVERS, ETC.)
9. RECONSTRUCT INCIDENT AND DESCRIBE INVESTIGATION.
10. SYNOPSIS FOR PROSECUTOR ON CLEARED CRIMES AND CUSTODIES.

ITEM NO. ARE LISTED IN ORDER OF STEP 1 TO 10. IF STEP IS UNNECESSARY, OMIT.

| ITEM | CODE | PERSONS CODE | NAME OF VICTIM / OTHER  LAST, FIRST, MIDDLE. |
|---|---|---|---|
| 9 | | | |

I then allowed Robert, Ralph and Shirley to let Ray up off the floor.

I then interviewed Ray as to what had happened this evening and he told

me the following; Ray told me that he has been under a great deal of

stress in the past four months.  Ray said that he has been accused of

molesting his daughter, which Ray said is not true.  Ray told me that

tonight he was in bed with his wife and they got into an argument.

Ray said that it was caused by the stress build up of the charges

against him.  Ray also said that this past Friday, he was fired from

his job which is creating a financial burden on the family.  Ray said

that while he was in bed arguing with his wife, he decided that he

felt the best solution to the marriage problem would be to get a

divorce.  Ray said that he told Shirley that he wanted a divorce,

then he got up out of bed and was starting to gather some clothes

together to leave for the night.  Ray said that his wife Shirley became

very upset, got out of bed and jumped on him and grabbed Ray by his

testicles and squeezed hard.  Ray said that during that comotion,

Shirley's son Robert came up stairs to the room to see what was goin

on.  Ray said that Robert pulled Shirley off of him and then

Robert tried to get Ray's attention by placing his hand on

Ray's chest.  Ray said that he realized that Robert was just

CASE NO.

| ☐ CA ☐ PA CLEARED BY: XCEPTIONAL DIST: | ☐ CPS ☐ JDH | ☐ CMHP ☐ PAT ☐ ARREST | ☐ DSHS ☐ SIU ☐ EXCEPTIONAL | ☐ PATROL ☐ DETECTIVE ☐ UNFOUNDED | REPORTING OFFICER: Don Keis Jr. | DIST. 5-41 |
|---|---|---|---|---|---|---|
| | | | | | REVIEWED BY: | DATE: |

CLARK COUNTY SHERIFF'S OFFICE          PAGE _3_ OF _72_

| ITEM | CODE | |
|---|---|---|
| 9 | | trying to help, but Ray said he did not want to listen to what Robert |
| | | had to say. Ray said that Robert was persistant and kept putting |
| | | the palm of his left hand on Ray's chest. Ray said that he kept |
| | | telling Robert "get your fucking hand off me". Ray said that he |
| | | repeadedly told Robert that and that Robert continued to touch his |
| | | chest. Ray said that he finally blew up and with his left arm, |
| | | he knocked Robert's arm away and punched Robert in the face with his |
| | | closed right fist. Ray said at that time Robert, Ralph and Shirley |
| | | jumped on him until I arrived. |
| | |     I then talked to Robert and he told me that he was here visiting |
| | | from New York for two weeks. Robert told me that he was down stairs |
| | | and heard some screaming voices but could not make out what was being |
| | | said. He also said that he heard some scuffling around, so he went |
| | | to see what was going on. Robert said that his mom Shirley was holding |
| | | onto Ray and that he seperated them. Robert said that he was aware |
| | | that the family has been under a lot of pressure and is aware of Ray's |
| | | criminal charges. Robert said that he was attempting to talk to Ray |
| | | and had placed his hand on Ray's chest in attempt to talk to Ray and |
| | | to difuse the situation. Robert said that Ray kept telling him |
| | | "get your fucking hand off me". Robert said just as he was taking |
| | | his hand away, Ray knocked his arm with his arm and then punched |
| | | Robert in the face with a closed fist. Robert said that Ray jumped |
| | | on him and started hitting him several times, until Ralph and his |
| | | mom Shirley were able to pull Ray off of him and they then physically |
| | | restrained Ray to the floor until I arrived. |
| | |     I then talked to Shirley who told me the same as Ray had told me. |
| | | Shirley told me that Ray said he wanted a Divorce and got out of bed. |

# CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
## UTILITY REPORT

PAGE 4 OF 6

| ☐ SUPPLEMENTAL RPT. | ☒ CONTINUATION OF:<br>☒ Incident Rpt.   ☐ Supplemental Rpt. | | TYPED BY: |
|---|---|---|---|
| | | | PROCESSED BY: |

NUMBER CLASSIFICATION (INCLUDE R.C.W. NO.)

POSSIBLE SIMPLE ASSAULT 9A.36.040

DATA ENTRY BY:

| LOCATION OF INCIDENT | DATE OF INCIDENT | PRESENT DATE |
|---|---|---|
| 17681 Lucia Falls Rd. | 2-3-85 | 2-4-85 |

1. ADDITIONAL PERSONS INFO – **ATTACH ADDITIONAL INCIDENT REPORTS.** DETAIL ADDITIONAL PERSON INFORMATION NOT COVERED IN BOXES.
2. ADDITIONAL SUSPECT INFO – **ATTACH ADDITIONAL INCIDENT REPORTS.** DETAIL ADDITIONAL SUSPECT INFORMATION NOT COVERED IN BOXES.
3. INJURED PERSONS – (VICTIMS, WITNESSES, OFFICERS, SUSPECTS) – DETAIL INJURIES, MEDICAL EXAM, DISPOSITION.
4. ADDITIONAL PROPERTY – **ATTACH UTILITY/PROPERTY REPORT.** DETAIL INFORMATION NOT INCLUDED IN BOXED PROPERTY SECTION.
5. PHYSICAL EVIDENCE – DETAIL WHAT AND WHERE FOUND, BY WHOM, AND DISPOSITION.
6. VEHICLES – SUSPECT VEHICLE INFORMATION IN SAME ORDER AS VEHICLE SECTION. ADDITIONAL VEHICLE INFORMATION NOT INCLUDED IN BOXES.
7. PARENT, GUARDIAN'S NAME, ADDRESS, PHONE NUMBER OF JUVENILE IN DETENTION. INDICATE IF CONTACTED AND IF INCIDENT ADJUSTED.
8. LIST DOCUMENTS ATTACHED – (AIR FORM, MEDICAL RELEASE, WAIVERS, ETC.)
9. RECONSTRUCT INCIDENT AND DESCRIBE INVESTIGATION.
10. SYNOPSIS FOR PROSECUTOR ON CLEARED CRIMES AND CUSTODIES.

ITEM NO. ARE LISTED IN ORDER OF STEP 1 TO 10. IF STEP IS UNNECESSARY, OMIT.

| ITEM | CODE | PERSONS CODE | NAME OF VICTIM / OTHER  LAST, FIRST, MIDDLE. |
|---|---|---|---|

**9** She said she became upset, got out of bed and jumped on Ray and grabbed his testicles. Shirley said that her son Robert came into the room shortly after that and was trying to calm the situation down. She said that Robert had lightly placed his hand on Ray's chest and was trying to talk to Ray. Shirley said that Ray repeatedly told Robert "get your fucking hand off of me". Shirley said that Ray then hit Robert in the face with a fist and then jumped on Robert and kept hitting Robert. She said that her other son Ralph and herself pulled Ray off of Robert and then Robert helped her and Ralph hold Ray to the ground until I arrived.

I talked very brief with Ralph as he was laying on a couch with a back problem from a previous injury. Ralph told me that he did not see anything until Ray was on top of Robert and was hitting Robert. Ralph said he then helped hold Ray down on the floor until I arrived.

While talking with Shirley, it became known to me that Ray had recently spent three to four weeks in the mental ward at the University Oregon Medical School for suicidal tendencies. At the time of this incident, no one wanted to pursue the matter. I became more concerned about Ray's mental disorder than I was about

CASE NO.

| ☐ CA ☐ PA<br>CLEARED BY:<br>EXCEPTIONAL DIST: | ☐ CPS ☐ JDH | ☐ CMHP ☐ PAT ☐ ARREST | ☐ DSHS ☐ SIU ☐ EXCEPTIONAL | ☐ PATROL ☐ DETECTIVE ☐ UNFOUNDED | REPORTING OFFICER: Donald L. King Jr. | DIST. 5-41 |
|---|---|---|---|---|---|---|
| | | | | | REVIEWED BY: | DATE: |

CLARK COUNTY SHERIFF'S OFFICE

| CODE | |
|---|---|
| | any criminal charges at that time. Ray was willing to go back to the hospital for a mental evaluation. I contacted Tom Gibson (VPD) who is a personal friend of Ray's, and he agreed to take Ray to the hospital. |

I then transported Ray in my patrol car to NE 112th Ave and E. Mill Plain where I met with Gibson who then transported Ray the the hospital. I talked later with Gibson and he confirmed to me that he did in fact transport and admitt Ray into the mental ward at the University of Oregon Medical school.

While I was transporting Ray to Gibsons location, Ray told me about his charges of molesting his daughter. Ray told me that this past summer, his daughter was visiting him from California. He said that one day his daughter told his current wife Shirley that her mommy, brother and Ray's old girlfriend used to play with her in a bad way. Ray said that his daughter showed Shirley that they used to touch her chest and private parts. He said that his daughter then told Shirley that Ray used to do it also. Ray said that when this was brought to his attention, he contacted child protective services and reported this so it could be investigated. Ray said that he was then informed that a case worker contacted his ex-wife in California and his daughter for an interview. He said that he was upset because they did not interview his daughter by herself. Ray said that after the interview was over, he was then the only suspect or person named by his daughter as to molesting her. Ray said that he has requested that his daughter be examined by a doctor, but that has not been done. Ray also told me that he has been offered by the prosecutors, that if he pleads guilty, that he will not spend any time in jail and would only be conseled as an out patient. Ray said that he was not guilty,

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON

UTILITY REPORT

PAGE 6 OF 7

☐ SUPPLEMENTAL RPT.  ☒ CONTINUATION OF:

☒ Incident Rpt.  ☐ Supplemental Rpt.

| | |
|---|---|
| TYPED BY: | |
| PROCESSED BY: | |
| DATA ENTRY BY: | |

INCIDENT CLASSIFICATION (INCLUDE R.C.W. NO.)

POSSIBLE SIMPLE ASSAULT 9A.36.040

LOCATION OF INCIDENT

17681 Lucia Falls Rd.

DATE OF INCIDENT 2-3-85

PRESENT DATE 2-4-85

1. ADDITIONAL PERSONS INFO – **ATTACH ADDITIONAL INCIDENT REPORTS.** DETAIL ADDITIONAL PERSON INFORMATION NOT COVERED IN BOXES.
2. ADDITIONAL SUSPECT INFO – **ATTACH ADDITIONAL INCIDENT REPORTS.** DETAIL ADDITIONAL SUSPECT INFORMATION NOT COVERED IN BOXES.
3. INJURED PERSONS – (VICTIMS, WITNESSES, OFFICERS, SUSPECTS) – DETAIL INJURIES, MEDICAL EXAM, DISPOSITION.
4. ADDITIONAL PROPERTY – **ATTACH UTILITY/PROPERTY REPORT.** DETAIL INFORMATION NOT INCLUDED IN BOXED PROPERTY SECTION.
5. PHYSICAL EVIDENCE – DETAIL WHAT AND WHERE FOUND, BY WHOM, AND DISPOSITION.
6. VEHICLES – SUSPECT VEHICLE INFORMATION IN SAME ORDER AS VEHICLE SECTION. ADDITIONAL VEHICLE INFORMATION NOT INCLUDED IN BOXES.
7. PARENT, GUARDIAN'S NAME, ADDRESS, PHONE NUMBER OF JUVENILE IN DETENTION. INDICATE IF CONTACTED AND IF INCIDENT ADJUSTED.
8. LIST DOCUMENTS ATTACHED – (AIR FORM, MEDICAL RELEASE, WAIVERS, ETC.)
9. RECONSTRUCT INCIDENT AND DESCRIBE INVESTIGATION.
10. SYNOPSIS FOR PROSECUTOR ON CLEARED CRIMES AND CUSTODIES.

ITEM NO. ARE LISTED IN ORDER OF STEP 1 TO 10. IF STEP IS UNNECESSARY, OMIT.

| ITEM | CODE | PERSONS CODE | NAME OF VICTIM / OTHER  LAST, FIRST, MIDDLE. |
|---|---|---|---|
| 9 | | | and that he would not plead guilty to something that he did not do. |
| | | | Ray said "do you think I would take a chance and go to the joint"? |
| | | | He said if I was guilty, I plead guilty so I would not have to go |
| | | | to jail and I would only have to go to conseling as an out patient. |
| | | | NOTE:(While talking with Shirley, she seemed to get very upset and |
| | | | cry while telling me how much she loves Ray and has supported him |
| | | | through these rough times. Shirley told me over and over while |
| | | | crying that "I love that man to death, but I can't under stand why |
| | | | he would go to bed with another woman and cheat on me, I know he |
| | | | was going to bed and fucking that woman". Shirley told me this over |
| | | | and over. Shirley never told me who the woman was.) I asked |
| | | | Ray if he was seeing another woman besides his wife. I told him |
| | | | that his wife seemed to think he was and I told him what she had said |
| | | | to me. I told him that the reason I bring it up is that if they stay |
| | | | together, that he might want to concentrate on that area of their |
| | | | marriage as if issomething that obviously bothers Shirley. Ray told |
| | | | me that it is a long story and that it has something to do with |
| | | | issuing an employee at Vancouver Memorial Hospital two citations |
| | | | on two different occassions. He said that he is friends with |
| | | | another female employee at that hospital and that he found out |

CASE NO.

| | | | | | |
|---|---|---|---|---|---|
| ☐ CA | ☐ CPS | ☐ CMHP | ☐ DSHS | ☐ PATROL | REPORTING OFFICER: |
| ☐ PA | ☐ JDH | ☐ PAT | ☐ SIU | ☐ DETECTIVE | |
| CLEARED BY: | | ☐ ARREST | ☐ EXCEPTIONAL | ☐ UNFOUNDED | |
| EXCEPTIONAL DIST: | | | | | |

REPORTING OFFICER: Don Kruja

DIST. S-41

REVIEWED BY:

DATE:

CLARK COUNTY SHERIFF'S OFFICE                PAGE 7 OF 7

| .M | CODE | |
|----|------|---|
| | | that the one female that he has issued citations to, is calling |
| | | Shirley and telling her lies about him having an afair with this |
| | | other female friend of his at the hospital.  Ray never told me the |
| | | names of the two females. |
| | | Request P.A.s office to review this report for possible criminal |
| | | simple assault charges on Ray and/or Shirley Spencer. |

# EXHIBIT 4

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT

FIRST DEGREE STATUTORY RAPE, RCW 9A.44.070
LOCATION OF INCIDENT:    17681 NE Lucia Falls Road
                         Yacolt, Washington
DATE OF INCIDENT:        Refer to Summary

DATE & TIME:             02-22-85                      9:30 AM
LOCATION:                CCSO, Investigation Unit
INCIDENT:                Interview with the wife
                         of the suspect

SUSPECT:                 SPENCER, Clyde Ray           dob: 01-09-48
                         aka:  Ray SPENCER
                         17681 NE Lucia Falls Road
                         Yacolt, Washington           phone: 687-1407

PERSON INTERVIEWED:      SPENCER, Shirley J.          dob: 04-27-42
                         17681 NE Lucia Falls Road
                         Yacolt, Washington           phone: 687-1407

DETAILS:

        On February 3, 1985 Clark County deputies responded to
the SPENCER residence on a domestic disturbance.  For details refer to Clark
County case #85-14-0073.  I spoke with Deputy Don KERR who initiated the report
regarding the disturbance and was advised by him, as a result of that

CCSO Case #84-8506, S.A.KRAUSE, K-43                        page 1 of 8

disturbance Ray SPENCER had moved out of his residence and apparently was admitted to the psychiatric ward at the University of Oregon Medical Hospital.

On February 5, 1985 I was advised by Detective HULSE of the Vancouver Police Department that SPENCER was no longer at the University of Oregon and was presently staying in the Value Motel located in the Hazel Dell area of Vancouver. Detective HULSE also advised me that he had information that SPENCER was making statements, indicating that he was "going to start getting some people because he was tired of this." SPENCER reportedly had specifically mentioned my name, Sgt. Mike DAVIDSON and numerous Vancouver Police officers.

On 02-08-85 I was advised that SPENCER had moved out of the Value Motel and was living in apartment #17 at the Salmon Creek Motel located at 11901 NE Highway 99, Vancouver, Washington.

On 02-20-85 I did not go to work because I was ill. Early on the afternoon of the 20th I received a phone call from the Communications Center advising that Clark County deputies had responded again to the SPENCER residence on a civil standby regarding some guns. I was also advised that apparently SPENCER had gone to his residence for a birthday celebration and when he arrived noted his weapons were not in a gun case, which resulted in him demanding his wife produce the guns. Apparently, Shirley SPENCER was refusing to give Ray SPENCER his guns and Ray SPENCER called Clark County requesting a civil standby. I advised the dispatcher that I was sure part of SPENCER'S original release agreement was that he was not to possess any weapons and advised them I would call them right back.

After talking with dispatch, I made phone contact with Detective HULSE at Vancouver Police who had a copy of SPENCER'S release agreement, and Detective HULSE confirmed that SPENCER was to have no weapons and advised me that he would call dispatch. For additional details, refer to Clark County Case #85-46-0033.

When I initiated this investigation regarding allegations made by Ray SPENCER'S natural daughter, Kathryn, indicating that Ray SPENCER had been sexually involved with her, I had an occasion to speak with Shirley SPENCER. However, during that conversation she advised that she had no information other than the statements Kathryn had made to her, indicating that Ray SPENCER may have been sexually involved with his daughter.

During the month of October, 1984 I responded to Sacramento, California where I spoke with Kathryn SPENCER. After returning to Vancouver, on one occasion Detective Sgt. Mike DAVIDSON and I attempted to interview Ray SPENCER regarding the allegations his daughter was making; however, SPENCER was not cooperative, refused to waive his rights and also refused to speak with us. From that time on, I had not had an opportunity to meet with Shirley SPENCER, nor discuss with her the results of my findings in California.

On 02-21-85 I attempted to make phone contact with Shirley SPENCER at her residence a number of times and the line was busy. After trying for over two hours I checked with the phone company and was advised that the phone was out of order. Being concerned because of the disturbance the day before and also because SPENCER was reportedly making statements indicating that he was "going to get even with specific individuals," I asked that our patrol unit make contact at the SPENCER residence on Lucia Falls Road and make a welfare check regarding Shirley SPENCER and her family. I was subsequently advised by dispatch that the officer who responded was advised that Shirley SPENCER had already left for work and that apparently the phone was off the hook.

After being advised of that information I made phone contact at Shirley SPENCER'S place of employment and left a message asking that she return my phone call. At approximately 4:30 PM on the afternoon of the 21st, Shirley SPENCER did return my phone call. During that conversation I advised her that it was me who had asked the officer to respond to her residence and do a welfare check, based on concerns I had not knowing what Ray SPENCER'S state of mind was and also because of the information I had obtained regarding the two disturbances. Shirley SPENCER advised that she appreciated us checking on her and indicated that her son had told her that the County responded to the house.

During that conversation I indicated to Shirley SPENCER that I had not had the opportunity to talk with her since I returned from Sacramento and if that would assist her in dealing with all this I would be willing to do that. I indicated to Shirley SPENCER that if she felt she would be more comfortable I would contact Detective HULSE and also have him with me during the time we talked. She indicated that she did not feel that was

necessary, and prior to terminating our phone conversation I made arrangements for her to meet with me at approximately 9:20 AM on the morning of the 22nd.

During the initial part of my conversation with Shirley SPENCER I shared with her some information regarding what the status of this investigation was. I advised her that I knew this was difficult for her at best regarding all that had happened in her life, and advised her that I felt if maybe I had the opportunity to talk with her and share some information with her regarding specifically what I had learned from Kathryn SPENCER and also information regarding some of the background information that might assist her in dealing with this.

It was obvious that Shirley SPENCER was extremely confused about what was happening and also that she was feeling a lot of guilt. Specifically, she felt if she had reported this before Kathryn had returned to California it may have been easier for all concerned. Shirley SPENCER talked about not knowing what Kathryn had said and also whether or not Kathryn was being victimized in California, causing her (Shirley SPENCER) a lot of anguish. At one point during the conversation I indicated to Shirley that I had not had the opportunity to share any information with her husband because he would not talk with us. She advised me on the day that Ray SPENCER came into our office he had told her that we "refused to tell him anything."

During the time I talked with Shirley I allowed her to review my reports regarding what Kathryn SPENCER had related to me. She indicated that she felt much better knowing that Kathryn had not been interviewed in Sacramento in her mother's presence like Ray SPENCER had told her. She also seemed to be more comfortable when she learned that Kathryn and Matt were involved in therapy.

During my conversation with Shirley I also talked to her about my contacts with Deanne SPENCER and shared with her my observations of Deanne SPENCER regarding her interaction with her children, and feelings about what was occurring with the SPENCER children. It was obvious, based on statements that Shirley SPENCER made to me, that her impression of Deanne SPENCER was based solely on what her husband had told her. It was also obvious that Ray SPENCER was not always truthful in what he shared with his present wife, Shirley.

I asked Shirley SPENCER if she was aware if Ray SPENCER had herpes.  At that time she indicated to me that during their entire relationship Ray SPENCER has continually blamed her for an unknown infection that he apparently gets.  She also advised that on a number of occasions he has told her that he knew he had an infection and that he also knew he had caught it from her.  She advised that they have argued about that because she knew she did not have any type of infection, and told him if he did he must have got it from someone else.  Shirley advised me that on one occasion he told her that he had even talked to their family physician who also indicated it was her fault. Shirley SPENCER indicated to me that when her husband would tell her he had an infection and had caught it from her there would be periods of time then that he would not have any sexual contact with her. I asked her if she had ever observed any kind of irritation around his genitals and she indicated that she had, and that the area would appear to be red and inflamed and that she noticed some kind of "bumps or breaking out."  She did advise that she had no knowledge as to whether or not he did have herpes.

Shirley SPENCER also advised me that she learned that her husband has had a number of affairs during their relationship and that she (Shirley) has talked with Karen STONE since Ray was arrested the first time. She indicated that during one of her conversations with Karen STONE, Karen STONE advised her that Ray SPENCER also continued to blame her for some type of infection he indicated he caught from her (Karen STONE).  STONE also reportedly told Shirley SPENCER on one occasion she caught Ray reading a book about herpes and asked him if "he was trying to tell her something."  Apparently Ray SPENCER told STONE that he was just curious and was reading the book for that reason.

Several times during our conversation Shirley SPENCER expressed concerns about her son, Matthew, and how all of this was affecting him.  She indicated that "Little Matt" was very confused about why his father could not live with them and also advised that Matt cared a lot about Ray SPENCER.  She indicated there was a time, sometime around Christmas, on one occasion when Ray was going to take down the Christmas tree and he and Matt had words about something.  Shirley advised that she was in another room and heard Matt say something to Ray similar to, "You're not my daddy." She advised me that when she and Ray first started spending time together there were maybe two or

three times when that came up; however, Matt "worshipped the ground Ray walked on." She stated to me, "All of a sudden I heard Ray hollering and saying something to Matt like, 'You're right, I'm not your dad, I don't wanta be your dad and I don't know who your dad is.'" Shirley indicated that she immediately went into the room and confronted Ray, advising him that Matt was just a baby and she could not understand why he was treating him the way he was.

I asked Shirley SPENCER if, since our conversation we had during the initial part of the investigation, she had recalled anything that may make her wonder if her husband had been sexually involved with Kathryn. She stated to me, "I don't know if I should be telling you this because you're not on Ray's side, but there was one time shortly after Kathryn and Matt left, and I came home late, and Katie was still up." She then indicated that when she did get home the other children were sleeping and Ray made a gesture indicating to her that Kathryn was pretending she was asleep. Shirley SPENCER stated to me, "I remember feeling uncomfortable about that but I don't know why." She then stated, "It was just one of those things you cannot explain, and then I remember the next day that Kathryn told me she hurt down there and I didn't check her."

I indicated to Shirley SPENCER that I had been advised by Deputy KERR that the confrontation they had on 02-03-85 involved her finding out that her husband had been seeing other women. Shirley SPENCER advised me that there were times during their marriage that she knew or suspected that Ray was seeing other women; however, she just did not want to believe it. She advised me that it apparently had been going on for a long time, even possibly prior to their marriage. She advised me that she had talked to Karen STONE and Karen STONE advised her on the day that Ray SPENCER had asked Shirley to marry him he had also asked Karen STONE to accompany him to California.

Shirley SPENCER advised me that recently she became concerned and was very confused about what she knew and what Ray SPENCER was telling her because "she had caught him in several lies."

I talked with Shirley SPENCER regarding an accident that she and her husband had had during the initial part of our investigation when they were allegedly getting in or out of the boat which resulted in Shirley

SPENCER breaking her ankle and Ray SPENCER being in a cast. Shirley SPENCER advised me that the "accident was not really how they said."

I indicated to Shirley SPENCER that during my conversation with Deanne SPENCER'S family there were several who talked about the "way Ray SPENCER had made Deanne SPENCER dress during their marriage; specifically that there were statements made reference Ray dressing Deanne like a whore." Shirley SPENCER advised me that there were times when Ray asked her to dress in a way that she felt was inappropriate, specifically mentioning that he wanted her to go out without a bra and also a time when she and Ray were going out to eat pizza with other VPD officers. She advised, that she was very uncomfortable with what he wanted her to do and just refused to do it.

During the time I spent with Shirley SPENCER I also expressed concerns about the possibility that Ray may have done something to her son, Matt. Shirley SPENCER indicated to me that she had talked with Matt and that Matt told her that Ray had never touched him in any inappropriate way.

During our conversation I also advised her that I felt it was strange that Ray SPENCER did not mention his daughter, Kathryn, once during our conversation with him on the day he refused to talk with us, specifically since that seemed to be the big issue with him prior to my talking to Kathryn. Shirley SPENCER advised me that she has thought about this a lot and also felt it was strange that Ray never mentioned his children, that he "just worried about himself."

During my initial interview with Ray SPENCER and his wife there was some mention of Matt SPENCER (Ray SPENCER'S natural son) watching Ray and Shirley SPENCER having sexual intercourse during the summer visitation. I asked Shirley SPENCER if she knew for sure if Matt actually watched them and she advised she only knew what Ray had told her. I indicated to her that based on what Matt said, as soon as he realized what they were doing he immediately went back to bed.

Shirley SPENCER advised me that during her conversation with Karen STONE, Karen STONE also advised her that during the relationship she had with Ray SPENCER there were a number of time when he was going out with other women. During my interview with Karen STONE she continued to indicate that

their relation was one without any problems and Shirley SPENCER advised me, based on what Karen shared with her that that was not the truth.

Shirley SPENCER indicated to me that she was seeing a counselor, Jeannette R. DEZOFI, who has an office located at 2005 Broadway, Vancouver, Washington, phone: 695-1874. She advised with all that was occurring in her life she felt it was very important for her to seek some counseling to assist her in sorting out all of this.

During the conversation I had with Shirley SPENCER I advised her that I would be willing to talk with her son, Matt, and felt it was important because Matt apparently was not understanding what was going on regarding his father, and also that during that time I could talk with Matt in an attempt to determine if there had been any type of sexual contact between Matt and his step-father, Ray SPENCER, knowing that children rarely report sexual abuse to their parent or parents. Shirley SPENCER advised me that she would talk with her therapist and get back to me regarding my interviewing her son.

I asked Shirley SPENCER if Ray had access to any other children and she indicated on occasion he had minimal access to her daughter's children; however, she did not think that Ray had ever done anything to her granddaughters, based on the short amount of time he would be with them.

Prior to Shirley SPENCER leaving my office, she indicated that she felt some comfort in knowing the facts regarding what was going on, appreciated being advised and also indicated that she would consider my speaking with her son. I advised Shirley SPENCER I would contact her during the first part of the week. I also advised her that in the event she had any problems at all regarding Ray SPENCER that she should not hesitate to request the County's assistance.

This investigation is pending.

# EXHIBIT 5

CLARK COUNTY SHERIFF'S OFFICE, WASHINGTON
UTILITY REPORT

CASE #84-8506
SUPPLEMENTAL RPT


STATUTORY RAPE, 1ST DEGREE, RCW 9A.44.070
LOCATION OF INCIDENT:   17601 NE Lucia Falls Road, Yacolt, Wa.
DATE OF INCIDENT:       Between 07-14-84 and 08-26-84


DATE & TIME:            10-17-84                   2100 hours
LOCATION:               6340 Shady Springs
                        Sacramento, California
INCIDENT:               Witness Interview

PERSON INTERVIEWED:     ROE, Kathryn Marie         dob: 07-07-60
                        6016 Sunrise Vista Drive, #19
                        Citrus Heights, California 95610

VICTIM:                 SPENCER, Kathryn E.        dob: 01-13-79
                        3930 Becerra Way
                        Sacramento, California     phone: (916) 482-6057

SUSPECT:                SPENCER, Clyde Ray         dob: 01-09-48
                        aka: Ray SPENCER
                        17601 NE Lucia Falls Road
                        Yacolt, Washington         phone: 687-1407
                        Work phone: (206) 696-8292

SUMMARY:

CCSO Case #84-8506, S.A.KRAUSE, K-43                      page 1 of 4

During a phone conversation with Deanna SPENCER prior to my going to Sacramento, she indicated that there was a time when her younger sister, Kathryn, was approximately thirteen or fourteen years old when the SPENCERS were living in the Los Angeles area that Ray SPENCER made some inappropriate advances towards Kathryn.

While I was in Sacramento I made arrangements to talk with Kathryn ROE at her mother's residence on the evening of 10-17-84. During that conversation ROE related the following.

When she was approximately fourteen years of age she had gone to Los Angeles to stay for the summer with Ray and Deanna SPENCER, who were married at that time. She indicated that at that time Ray was working and that his hours were real irregular and there were many times when just she and Ray were alone at the residence during the day.

ROE advised that she recalled one specific incident that occurred during the afternoon hours when she was staying there. Also, she and Ray were alone at home that day and at some point Ray asked her if she wanted to go in and take a nap with him. ROE advised that he asked her several times and was not forceful about it, but it was an unusual request because she had no reason to take a nap; she was not tired, and she had never slept in the same bed with Ray SPENCER. ROE advised me that she remembered feeling "really funny about him asking her to do that;" however, she also advised that he did not specifically make any other request other than for her to nap with him.

ROE also advised that she remembered another time when Ray SPENCER and her sister had been arguing and Ray asked Kathryn if she wanted to go with him to get some Kentucky chicken or something similar for dinner. She advised that she did accompany him and when they were in the car she remembered Ray asking her how old she was. Also, when she indicated to him she was fourteen he made a statement similar to, "Gee, too bad you're not a little older. You and I could have a good time." Kathryn advised me she remembered feeling "flattered" at the time but also remembered "feeling really funny about him saying that."

Kathryn ROE also advised me that "there were many, many times" when Ray would say things to her that she felt were "very

inappropriate." Specifically, he continually commented on her breasts and the way she looked. ROE advised that he was always telling her she was "cute, etc." She advised me that she can remember lots of times feeling very uncomfortable and looking at her sister when Ray would make those statements, and because Deanna SPENCER did not respond she (Kathryn) was really confused about the way it was making her feel.

Kathryn also related that during the time she was there that summer Ray was "always commenting about the way she looked." She related that same summer she had bought a new tank top (T-shirt type blouse) and that it was one that you did not wear a bra over. She indicated that she had a light weight jacket that she wore over the tank top. Apparently Ray or Deanna SPENCER were going to take a picture of her and at the time Kathryn was wearing that tank top and jacket. Kathryn advised me that she remembered Ray telling her that she "should take her jacket off so her nipples would show."

Kathryn also related that during that summer in Los Angeles she used to sneak into the bedroom and read "hard core porno books that Ray had." When I asked her what she meant when she indicated they were "hard core porno," specifically asking if she was talking about something like Playboy or Penthouse, Kathryn advised that they "weren't anything like Playboy." She then related that she recalled books about people being sexually involved with animals, remembering one with dogs, and a specific one where a girl was involved sexually with a rat. She also indicated that there were a number of books that were about teen aged girls or very young girls and older men.

During the time that I was talking to Kathryn she asked me if anyone had talked to me about the way "Ray had Deanna dress." I advised her that I wasn't aware of what she was talking about, and she stated, "Well, he used to have her dress like a common whore." I asked her if she could be more specific and she indicated that there were a number of times when she and her sister would tell Deanna how awful she looked. Everyday she would wear a different colored wig and the hairdos were really exaggerated. She mentioned her having blonde wigs, black wigs and grey wigs. She also indicated that Ray would like Deanna to wear false eyelashes and an excessive amount of makeup.

At that time Kathryn asked me to accompany her to a play room in her mother's house to look at a family portrait. When I looked at the portrait initially I did not recognize Deanna SPENCER. Kathryn then related that the day the picture was taken it was an extremely hot summer day and everyone was dressed accordingly, wearing summer outfits. She advised that it was a family type picnic and when Deanna and Ray got there, Deanna had on a floor length polyester formal. Kathryn also called my attention to the breast area of the photograph of Deanna and stated, "Everything he had her wear looked like this. Her breasts were hanging out of her clothes." Deanna SPENCER is quite "busty" and a lot of her breasts were exposed in that photograph. Deanna SPENCER was also wearing a blonde hair piece and apparently had tinted her hair; therefore, I did not recognize her as now she has brown hair. In the photograph Matt appears to be somewhere around twelve months old.

I asked Kathryn ROE if she had ever made any observations reference Ray SPENCER'S attitude toward his children. She indicated that she thought Ray was "verbally abusive towards Matt." She then indicated that there was a time when Matt was approximately four years old and their family had all come to Vancouver to visit Deanna and her family. Kathryn related that there were several times during that visit that she became concerned and was aware that Ray was being "very verbally abusive towards Matt and it bothered her a lot because Matt was so little."

Kathryn ROE related that she did not spend much time around Deanna and her children and was not able to offer any additional information reference any behavior changes the children may have experienced, etc.

Investigation to continue.