1

                    UNITED STATES DISTRICT COURT

              WESTERN DISTRICT OF WASHINGTON AT TACOMA

CLYDE RAY SPENCER, MATTHEW    )
RAY SPENCER, and KATHRYN E.   )
TETZ,                         )
                              )
              Plaintiffs,     )
                              )
   vs.                        )    No. C11 5424 BHS
                              )
FORMER DEPUTY PROSECUTING     )
ATTORNEY FOR CLARK COUNTY     )
JAMES M. PETERS, DETECTIVE    )
SHARON KRAUSE, SERGEANT       )
MICHAEL DAVIDSON, CLARK       )
COUNTY PROSECUTOR'S OFFICE,   )
CLARK COUNTY SHERIFF'S        )
OFFICE, THE COUNTY OF CLARK   )
and JOHN DOES ONE THROUGH     )
TEN,                          )
                              )
              Defendants.     )
------------------------------

              DEPOSITION UPON ORAL EXAMINATION

                             OF

                      MENONA LANDRUM

DATE TAKEN:  Monday, March 18, 2013
TIME:        1:00 p.m.
PLACE:       613 W. 11th Street
             Vancouver, Washington
COURT REPORTER:  Andrea L. Stayberg, CCR

                                                                    2

1                          APPEARANCES

2    FOR THE PLAINTIFF, CLYDE RAY SPENCER:

3                              MS. KATHLEEN T. ZELLNER
                               LAW OFFICES OF KATHLEEN
4                              T. ZELLNER
                               1901 Butterfield Road
5                              Suite 650
                               Downers Grove, Illinois
6

7                              MR. DOUGLAS H. JOHNSON
                               LAW OFFICES OF KATHLEEN
8                              T. ZELLNER   ·
                               1901 Butterfield Road
9                              Suite 650
                               Downers Grove, Illinois
10

11   FOR THE DEFENDANT, JAMES M. PETERS:

12                             MS. PATRICIA C. FETTERLY
                               ASSISTANT ATTORNEY GENERAL
13                             TORTS DIVISION
                               P.O. Box 40126
14                             Olympia, Washington

15
     FOR THE DEFENDANT, SHARON KRAUSE:
16
                               MR. GUY BOGDANOVICH
17                             LAW, LYMAN, DANIEL,
                               KAMERRER & BOGDANOVICH
18                             P.O. Box 11880
                               Olympia, Washington
19

20   FOR THE DEFENDANT, MICHAEL DAVIDSON:

21                             MR. JEFFREY A. O. FREIMUND
                               FREIMUND, JACKSON
22                             & TARDIF
                               711 Capitol Way South
23                             Suite 602
                               Olympia, Washington
24

25   ALSO PRESENT:             None

3

1                              I  N  D  E  X

2      Examination                                          Page

3      By Mr.  Bogdanovich                                     4

4      By Mr.  Freimund                                       59

5      By Ms.  Zellner                                        83

6
       Further Examination
7
       By Mr.  Bogdanovich                                    89
8

9

10

11

12

13

14                               EXHIBITS

15     Exhibit No.     Description                          Page

16         1           Subpoena to Testify                    7

17         2           Declaration of Menona D.  Landrum      21

18         3           Declaration of Clyde Ray Spencer       29

19         4           Subpoena in a Civil Case               53

20

21

22

23

24

25

4

MENONA LANDRUM,

2    called as a witness in behalf of the Defendants, having

3    been duly sworn, was examined and testified as follows:

4

5                      EXAMINATION

6    BY MR. BOGDANOVICH:

7         Q.   Would you state your full name, please.

8         A.   Menona Dawn Landrum.

9         Q.   How do you spell your last name?

10        A.   L-A-N-D-R-U-M.

11            THE REPORTER:  Is Dawn, D-A-W-N?

12            THE WITNESS:  D-A-W-N.

13   BY MR. BOGDANOVICH:

14        Q.   And we might as well have you spell Menona for

15   the record, too, please.

16        A.   M-E-N-O-N-A.

17        Q.   Ms. Landrum, have you ever had your deposition

18   taken before?

19        A.   No.

20        Q.   I'm going to ask you to keep a couple things in

21   mind here as we talk today.  Andrea is making a verbatim

22   record of all my questions and all of your answers, so I

23   need to have you answer verbally rather than nodding

24   your head, is one thing I'll ask you to keep in mind.

25   In conversation it's common for people to nod and I can

5

1   see what you're doing but it doesn't come out on our

2   transcript, so if you forget to answer verbally I'll

3   prompt you to give me an answer.

4       A.   Okay.

5       Q.   Also in conversation, especially if we go for a

6   while -- I don't expect we should take too long today.

7   But in conversation, especially after a while, you may

8   know what the rest of my question is going to be and

9   have a tendency to start answering it before I'm

10  completely done asking the question, so I'll ask you to

11  be patient, again, for Andrea's benefit, and make sure I

12  finish speaking before you start answering, okay?

13      A.   Okay.

14      Q.   And I'll try and do the same for you.  If you

15  need to take a break at any point, let us know and we

16  can certainly do that.  The only thing I would ask you

17  to do is answer any question that's been posed to you

18  before you request a break.

19      A.   Okay.

20      Q.   All right.  Are you currently taking any

21  medication that might affect your ability to recall

22  events and testify accurately today?

23      A.   No.

24      Q.   What is your current address?

25      A.   10602 Northeast 19th Street, Vancouver 98664.

6

1      Q.   How long have you lived at that address?

2      A.   Eleven years.

3      Q.   How long have you lived in Vancouver or the

4   Vancouver area?

5      A.   Forty years.

6      Q.   You are married?

7      A.   Yes.

8      Q.   And what's your husband's name?

9      A.   Joseph.

10     Q.   How long have you been married to Joseph?

11     A.   Fifty-eight years.

12     Q.   And I don't need too much information, but it's

13   my understanding your husband has some kind of medical

14   issues currently?

15     A.   He does, yes.

16     Q.   Are you going to be able to participate despite

17   whatever those issues are?

18     A.   Yes.

19     Q.   All right.  We appreciate you coming in, it

20   sounds like you got a lot going on, but there's some

21   important issues that's been raised.

22     A.   Right.

23     Q.   I'm sure you know that the reason we've asked

24   you to come in today has to do with your previous

25   employment at the Clark County Sheriff's Office.

7

1      A.   Right.

2      Q.   Who have you talked to, prior to entering the

3  room here, for your deposition about the Spencer

4  lawsuit?

5      A.   Paul Henderson and Kathleen Zellner.

6      Q.   And who was the first person you talked to

7  about this lawsuit?

8      A.   Paul Henderson.

9      Q.   Can you tell me what the circumstances were,

10 did you meet him personally, did one of you call the

11 other?

12     A.   He called me, came to my house.

13     Q.   When was that?

14     A.   January, whatever the date, I'm not positive.

15     Q.   I see you did bring an envelope with you today.

16     A.   Yes.

17     Q.   I'm going to go ahead and have Andrea mark a

18 document here, and then I'm going to ask you about what

19 you may have brought.

20          MR. BOGDANOVICH:  Mark this Exhibit 1.

21          (Deposition Exhibit No. 1 marked for

22 identification.)

23 BY MR. BOGDANOVICH:

24     Q.   Ms. Landrum, I'm going to show you what's been

25 marked for identification as Exhibit No. 1 to your

8

1    deposition.  I'm going to give you a minute to look at
2    that --
3          A.   Okay.
4          Q.   -- or however long you may want to take a look
5    at it to familiarize yourself with it.
6          A.   Okay.
7          Q.   Now, it consists of three pages, are you
8    familiar with those three pages?
9          A.   Yes.
10         Q.   Does that appear to you to be a copy of the
11   Subpoena to Testify at a Deposition in a Civil Action,
12   which I mailed to you in connection to this deposition
13   today?
14         A.   Yes.
15         Q.   And have you brought any records with you in
16   response to that subpoena?
17         A.   A copy of this, of the subpoena.
18         Q.   Okay.
19         A.   The letter that you sent.
20         Q.   Anything else?
21         A.   My declaration that I gave to Paul Spencer and
22   a copy of the --
23         Q.   Would you mind just opening the envelope, so we
24   can see.
25         A.   Yeah, not at all.

1     Q.   And, again, for the record, you said Paul

2   Spencer, did you mean Paul Henderson?

3     A.   Paul Henderson, I'm sorry.   What happened to

4   them, oh, here they are.   This is what I have a copy of,

5   these letters that you sent to me.

6     Q.   So you brought a copy of the subpoena that I

7   sent you, my letter, under cover of which the subpoena

8   arrived?

9     A.   Right.

10     Q.   And then you brought an unsigned copy of your

11   two page declaration of Menona D. Landrum, correct?

12     A.   Yes.

13     Q.   And then the other two pages, one is a

14   Quit-Claim Deed that's numbered Spencer 006062 and a

15   second page, Exhibit "A" to the Deed, which is numbered

16   Spencer 006063; is that correct?

17     A.   Right.

18     Q.   And that's all of the records and documents

19   that you had that were responsive to the subpoena?

20     A.   That's all I had, right.

21     Q.   I would like to go back and discuss with you

22   your employment with the Clark County Sheriff's Office.

23     A.   Okay.

24     Q.   Can you tell me when you first started working

25   for the Clark County Sheriff's Office?

10

1    A.  1971.

2    Q.  And what was your position that you first hired

3  on at?

4    A.  A clerk.

5    Q.  What were your duties as a clerk?

6    A.  Putting mugshots in a book and fingerprints.

7    Q.  Were you a commissioned law enforcement

8  officer?

9    A.  Yes.

10    Q.  Okay.  Did you attend some kind of a basic law

11  enforcement academy?

12    A.  No.

13    Q.  What kind of qualifications did you need to

14  have to be hired in that commissioned law enforcement

15  officer clerk position?

16    A.  High school education, I had to take a civil

17  service test.

18    Q.  Anything else?

19    A.  No.

20    Q.  What year did you graduate from high school?

21    A.  1946.

22    Q.  And from where?

23    A.  Sandy High School in Sandy, Oregon.

24    Q.  Did you work as a law enforcement officer

25  anywhere before you started with the Clark County

11

1  Sheriff's Office?

2     A.  No.

3     Q.  Did the Clark County Sheriff's Office, when you

4  first started, did it have a criminal division that had

5  employees separate from a civil division?

6     A.  Yes.

7     Q.  And which division were you hired in?

8     A.  Civil.

9     Q.  So when you talked about your duties being

10  taking mugshots -- and what else did you say?

11     A.  Mugshots and fingerprints.

12     Q.  That was in your capacity as a civil deputy --

13  or excuse me, a civil clerk?

14     A.  I became a civil deputy when one of the ladies

15  that had that position passed away.

16     Q.  And how long after you first started did that

17  happen?

18     A.  Probably two years, a year and a half.

19     Q.  So by, roughly, '73 or '74?

20     A.  Right.

21     Q.  And at that point you took the position as a

22  civil clerk?

23     A.  Right.

24     Q.  Did you have any other duties besides taking

25  mugshot photos and fingerprints?

12

1        A.   I didn't do those after I became a civil

2   deputy.

3        Q.   Okay.  Those were responsibilities you had as

4   part of the criminal division?

5        A.   No, I wasn't in the criminal division.

6        Q.   Never were?

7        A.   Never.

8        Q.   Tell me then, what responsibilities did you

9   have after you became the civil deputy?

10       A.   Setting up papers for service, civil papers,

11   and doing returns on them.

12       Q.   Anything else?

13       A.   No.

14        Q.   Okay.  It's my understanding that I have been

15   provided a copy of your declaration that you signed in

16   this case, and I believe it indicates that it was

17   required that you be a notary public to hold that civil

18   -- and I've been saying civil deputy, but I think you

19   referred to it as a civil clerk, is that the

20   description?

21        A.   Correct.

22        Q.   When did you first obtain your notary public

23   certification?

24       A.   Maybe about 1974, 1975.

25       Q.   Would it have been whenever you started this

13

1    civil clerk?

2         A.   No.

3         Q.   Was it after, sometime after you started?

4         A.   Yes, because the chief civil deputy did the

5    notarizing before he retired, then I had to have a

6    notary.

7         Q.   Who was the chief civil deputy?

8         A.   Fred Highland.

9         Q.   Do you know anything about Fred Highland's

10   whereabouts, currently?

11        A.   Fred Highland is deceased.

12        Q.   How long did you work as the civil clerk for

13   the Clark County Sheriff's Office?

14        A.   Until 1991 when I retired.

15        Q.   And were your job duties, for that entire

16   period that you served in that capacity, to set up the

17   civil papers for service and then do the returns?

18        A.   Correct.

19        Q.   And then, apparently, you also -- after you

20   obtained your notary status you would notarize documents

21   at work?

22        A.   Yes.

23        Q.   Could you tell me what kinds of documents you

24   would be called upon to notarize?

25        A.   Civil documents.

14

1    Q.  Anything in particular come to mind?

2    A.  Pay, rents and vacates, summons and complaints,

3    any civil paper.

4    Q.  Can you describe for me what the office set up

5    was, the sheriff's office set up when you worked there?

6    And maybe I should break that down, it may have changed

7    over the period of time you were there, but let's maybe

8    start when you first started working in the civil clerk

9    position.  How was the office configured?

10   A.  There were three other desks in the area that I

11   was in.

12   Q.  The area that you were in, was it some kind of

13   open area that the public could walk into?

14   A.  Yes.

15   Q.  And would have access to all three of the desks

16   that occupied that space?

17   A.  Yes.

18   Q.  Okay.  Who occupied the other two desks?

19   A.  There was a warrant clerk, the jail clerk.

20   Q.  Who was the jail clerk, if you recall, when you

21   first started?

22   A.  Alice Wilde, W-I-L-D-E.

23   Q.  How long did Ms. Wilde serve as the jail clerk

24   there?

25   A.  She retired before I did, probably until 1990.

15

1      Q.   And do you remember when she started?  Was she
2  working as the jail clerk when you started in the civil
3  clerk position?
4      A.   Yes.
5      Q.   Do you know what her duties were as jail clerk?
6      A.   She kept track of money, promissory money, what
7  other duties, I don't know.
8      Q.   Was it your understanding that the Clark County
9  Sheriff's Office was responsible for running the Clark
10 County Jail?
11     A.   Yes.
12     Q.   Did you ever have any responsibilities with
13 regard to the jail?
14     A.   No.
15     Q.   Did your job cause you to be at your desk most
16 or all of each day you were at work?
17     A.   Yes.
18     Q.   Did you ever have occasion while you were
19 working at that desk -- and I'm just confining this now
20 to, we said the period of time when you first started
21 working as the civil clerk, you described this general
22 open area when you entered the sheriff's office, civil
23 division where there were your three desks.  During that
24 period of time, while you occupied one of those three
25 desks, was there ever occasions where inmates were

Rider & Associates, Inc.
360.693.4111

16

1  brought down by the jail clerk to that area of the

2  sheriff's office?

3       A.   No.

4       Q.   You don't recall any occasion, not even one

5  where an inmate was brought down?

6       A.   No.

7       Q.   Okay.   Do you have any knowledge, whether it's

8  firsthand or just from talking to the jail clerk or

9  anyone, do you have any knowledge as to whether inmates

10  were ever taken from the jail and brought down to

11  different locations in the sheriff's office?

12       A.   No.

13       Q.   And I guess I should maybe have you describe

14  for us, please, where was the jail in relation to where

15  your civil side of the sheriff's office was located?

16       A.   It was on the fifth floor.

17            MS. ZELLNER:   Can I object just for a second,

18  just because I know the time frame on this.   There are

19  two different locations that are at issue here, there's

20  the old jail and the courthouse and the new jail where

21  Spencer ended up years later, so just so you know, I

22  think she's talking about the old jail.

23            MR. BOGDANOVICH:   Okay.

24  BY MR. BOGDANOVICH:

25       Q.   In light of Ms. Zellner's objection, I was

17

1    asking you about -- and I want to try to start just with

2    when you first started working as the civil clerk and

3    you had this three desk configuration, let's just take

4    it at that point first.

5         A.   Okay.

6         Q.   When you first started, where was the jail in

7    relation to your work station?

8         A.   On the fifth floor.

9         Q.   Of what?

10        A.   Of the courthouse.

11        Q.   Okay, the courthouse building.   And what floor

12   were you on?

13        A.   The ground floor.

14        Q.   At some point is it true that the Clark County

15   Sheriff's Office moved the jail to a different location?

16        A.   Correct.

17        Q.   And when did that occur?

18        A.   April of 1985.   1984 (pursuant to errata sheet)

19        Q.   And in April, do you remember was it April 1st?

20        A.   No.

21        Q.   Do you remember the specific date?

22        A.   I don't remember.

23        Q.   In April of 1985, where was the jail relocated

24   to?                        1984 (pursuant to errata sheet)

25        A.   Across the street from the courthouse.

18

1     Q.   Do you know the address?

2     A.   Not offhand.

3     Q.   What street was that on, do you recall that?

4     A.   No.

5     Q.   Okay.   Do you know, is the Clark County Jail

6  still situated at that location today?

7     A.   Yes.

8     Q.   Okay.   And let me back up then and try to

9  clarify the question.   I was asking you about whether

10  you knew anything about inmates ever being taken or

11  escorted from the jail to the sheriff's office, and I

12  think you said you weren't aware either through your

13  direct involvement or even secondhand knowledge that

14  that had ever occurred; is that --

15     A.   That's correct.

16     Q.   And is that true for either location that the

17  jail was at while you worked for the sheriff's office?

18     A.   Yes.

19     Q.   Was there ever an occasion at either location

20  of the jail where you went to the jail to notarize an

21  inmate's signature on something?

22     A.   No.

23     Q.   Okay.   Were you the only notary public employed

24  by the Clark County Sheriff's Office?

25     A.   No.

19

1    Q.   Okay.   How many others were there?

2    A.   One.

3    Q.   And who was that?

4    A.   Her name was Joan Shelton (phonetic).

5    Q.   What was her title with the sheriff's office?

6    A.   She was a clerk also.

7    Q.   Also in the civil division like you?

8    A.   No, she worked in the detective division.

9    Q.   Do you know what years she worked at the

10   sheriff's office?

11   A.   She was there when I went there, she was there

12   when I retired, and she since passed away.

13   Q.   Okay.   Do you know Sharon Krause?

14   A.   I know who she is.

15   Q.   And how do you know who she is?

16   A.   Because she worked in the same office,

17   building.

18   Q.   Okay.   Did you ever have occasion to do any

19   official sheriff's office business with Sharon Krause?

20   A.   No.

21   Q.   How about Michael Davidson, did you ever work

22   directly in any capacity with Michael Davidson?

23   A.   No.

24   Q.   Did you ever meet Sharon Krause or did you just

25   know who she was and that she worked for the sheriff's

20

1    office?

2         A.   That she worked for the sheriff's office.

3         Q.   Did you ever meet her?

4         A.   Through work, that's all.

5         Q.   Okay.  Did you ever do anything socially with

6    Sharon Krause?

7         A.   No.

8         Q.   How about Michael Davidson?

9         A.   No.

10        Q.   Did you ever meet Michael Davidson?

11        A.   Through work, that's all.

12        Q.   Did you ever have any personal interaction at

13   work with Sharon Krause that caused you to question her

14   honesty?

15        A.   No.

16        Q.   How about Michael Davidson, did you ever have

17   any interaction with him that caused you to question his

18   honesty?

19        A.   No.

20        Q.   Did you know a deputy by the name of Ray

21   Pacheco?

22        A.   The name's familiar.

23        Q.   Do you recall anything about him?

24        A.   No.

25        Q.   Were you ever aware of any Clark County

Objection –
relevance

Response –
probative of
possible
others in
Sheriff's
Office who
might engage
in misconduct
of type
alleged
against
Defendants

Rider & Associates, Inc.
360.693.4111

21

1    sheriff's deputies that were criminally prosecuted?

2        A.   I think this Pacheco was.

3        Q.   Okay.  Do you recall --

4        A.   I don't recall the case.

5        Q.   To your knowledge, did Mr. Pacheco lose his job

6    as a result of that criminal prosecution?

7        A.   I believe so, yes.

8        Q.   Are there any other deputies or former deputies

9    with Clark County Sheriff's Office that you are aware of

10   that were criminally prosecuted for anything?

11       A.   No.

12       Q.   Okay.

13            MR. BOGDANOVICH:   Can I have you mark this as

14   Exhibit 2?

15            (Deposition Exhibit No. 2 marked for

16   identification.)

17   BY MR. BOGDANOVICH:

18       Q.   Ms. Landrum, I'm going to hand you what's been

19   marked as Exhibit 2 to your deposition, and I have some

20   questions for you, after you've had a chance to review

21   it.

22            (Witness complied.)

23       A.   Okay.

24       Q.   All right.  Are you familiar with the two pages

25   that have been marked as Exhibit 2?

Objection -
relevance

Response -
see previous
response

22

1      A.   Yes.

2      Q.   And does that appear to you to be an accurate

3  copy of the Declaration of Menona D. Landrum, which you

4  signed in this case?

5      A.   Yes.

6      Q.   Who typed up this declaration?

7      A.   Paul Henderson.

8      Q.   Okay.   Where did he type it?

9      A.   I don't know.

10     Q.   Okay.   When was it first presented to you?

11     A.   On the 8th of February.

12     Q.   It appears on the second page that it was

13  signed --

14     A.   Well, wait.

15     Q.   -- on January 24th?

16     A.   Right, I'm sorry, yeah, I'm sorry.

17     Q.   So do you want to clarify or change the date

18  that this was first presented to you?

19     A.   It was presented in January.

20     Q.   Okay.

21     A.   January 24th.

22     Q.   Do you recall if you signed the declaration the

23  same day it was given to you by Mr. Henderson?

24     A.   Yes.

25     Q.   Now, did you meet Mr. Henderson in person?

23

1      A.   Yes.

2      Q.   Did you say he came to your home?

3      A.   He did.

4      Q.   And had he called you first?

5      A.   Yes.

6      Q.   Tell me as best you remember, what did

7  Mr. Henderson tell you when he called you for the first

8  time?

9      A.   That he was investigating a case pertaining to

10  James Peters, Sharon Krause and Michael Davidson.

11     Q.   Okay.  Did he tell you anything else?

12     A.   That there was a lawsuit pending.

13     Q.   Okay.  Anything else, as we sit here today,

14  that you recall he said in that first telephone call?

15     A.   That he wanted to meet with me.

16     Q.   Did he tell you why he wanted to meet with you?

17     A.   He was investigating this case.

18     Q.   Is that all you recall about why he said he

19  wanted to speak with you?

20     A.   To my knowledge.

21     Q.   Okay.  Did he say anything in that first

22  telephone conversation about a Quit-Claim Deed and

23  signatures on it?

24     A.   No.

25     Q.   Did he mention the name Clyde Ray Spencer in

24

1    that first telephone conversation?

2        A.  Yes.

3        Q.  Okay.  Did you know who that was?

4        A.  I had heard the name.

5        Q.  And when had you heard the name?

6        A.  Way back, there had been a write-up in our

7    paper just this last year, I'd seen him on 20/20.  I

8    believe there was an interview.

9        Q.  And when you talk about the write-up in the

10   paper, you think just in the last year, what's the name

11   of the newspaper?

12       A.  The Columbian.

13       Q.  What was the gist of the write-up, if you

14   remember?

15       A.  How he had been falsely arrested.

16       Q.  And how about the 20/20, that's the television

17   show you're referring to?

18       A.  Interview.

19       Q.  Right.

20       A.  Same thing.

21       Q.  Did you just happen to see that watching TV one

22   evening or had you heard there was going to be a program

23   about Mr. Spencer, so you purposely watched it?

24       A.  I had heard there was going to be, purposely

25   watched, yes.

25

1        Q.   Do you remember where you had heard about the
2   fact that the program was going to be airing?
3        A.   I think it was advertised on TV.
4        Q.   And when you saw those ads, did the name Clyde
5   Ray Spencer mean anything to you?
6        A.   Not particularly.
7        Q.   When you say "not particularly," did it mean
8   anything at all?
9        A.   Well, aren't you curious as to what it's about?
10       Q.   Well, I'm asking you.
11       A.   I would be curious as to what it was about.
12       Q.   When you first heard there was going to be a
13   program about Clyde Ray Spencer and then when you say
14   you were curious what it was going to be about, was your
15   curiosity because of the fact that the advertisements
16   made it clear he had been prosecuted in Clark County?
17       A.   We had already read the issue in the paper.
18       Q.   Okay.  So had there been an earlier newspaper
19   article that you had read about Mr. Spencer in, because
20   it's my understanding the 20/20 program aired, I don't
21   know, maybe a couple, several years ago, but you
22   mentioned a newspaper article in the last year that had
23   a write-up.  Are you saying that you had read something
24   in the local newspaper even before the 20/20 program
25   aired?

26

1       A.  Yes.

2       Q.  And was there another article roughly in the

3  last year that you've read?

4       A.  No.

5       Q.  So that comment to the newspaper article being

6  in the last year, that was an approximation?

7       A.  Probably.

8       Q.  But your recollection is that you read about

9  Mr. Spencer in The Columbian before the 20/20 program

10  aired?

11       A.  Yes.

12       Q.  And when you first read about Mr. Spencer and

13  his case, you made no connection from any personal

14  involvement with Mr. Spencer prior to that; is that

15  accurate?

16       A.  No.

17       Q.  That is accurate?

18       A.  That is accurate.

19       Q.  Sorry, that was an awkward question but I think

20  I understand your answer.  How long did your telephone

21  conversation with Paul Henderson last the first time he

22  called you and said he wanted to speak with you?

23       A.  Five minutes.

24       Q.  Okay.  And you've told me everything you recall

25  about that conversation?

27

1       A.   Right.

2       Q.   And by the end of that conversation, had you

3   made an agreement with Mr. Henderson that he could come

4   to your home and speak with you?

5       A.   Yes.

6       Q.   Did he, in fact, then come to your house to

7   speak with you?

8       A.   Yes.

9       Q.   Did he bring this declaration with him to that

10  meeting at your house?

11      A.   Not that meeting, we had two meetings at my

12  house.

13      Q.   Okay.  Let's talk about the first meeting.  Do

14  you remember when he came to your house?

15           MS. ZELLNER:  Do you mean the date?

16           MR. BOGDANOVICH:  Right.

17           THE WITNESS:  This was the second visit, the

18  first one was probably ten days prior to this, I'm

19  estimating.

20  BY MR. BOGDANOVICH:

21      Q.   When you're saying ten days prior to this,

22  you're pointing to the --

23      A.   The 24th.

24      Q.   -- January 24th date that you signed your

25  declaration?

28

1    A.   Correct.

2    Q.   Did anyone come with Mr. Henderson or was he

3    alone?

4    A.   He was alone.

5    Q.   Did he bring anything with him?

6    A.   A briefcase.

7    Q.   Okay.  And did he show you anything that was in

8    his briefcase?

9    A.   He showed me the -- what do you call it, where

10   is it, the Quit-Claim Deed is what he showed me.

11   Q.   Okay.  And what he showed you, is it the two

12   pages that you brought with you to your deposition

13   today?

14   A.   Yes.

15   Q.   Are those the only two pages that he showed you

16   from what was in his briefcase?

17   A.   Yes.

18   Q.   Did he appear to have other papers, though, in

19   his briefcase?

20   A.   Yes.

21   Q.   Okay.  What did Mr. Henderson tell you about

22   why he was showing you the Quit-Claim Deed?

23   A.   Because they think it's forgery.

24   Q.   And when you say "they think it's forgery," who

25   are you referring to?

Objection -
hearsay;
calls for
speculation
Response - not
offered for
truth, it is
relevant to
impact this
information may
have had on
Landrum's
conclusion about
her own
signature

Rider & Associates, Inc.
360.693.4111

29

1      A.   He and his attorney.

2      Q.   And was it your understanding that

3   Mr. Henderson worked for Mr. Spencer's attorneys?

4      A.   Yes.

5      Q.   Did he tell you that when he first called you?

6      A.   Yes.

7      Q.   I guess I'm going to go ahead and have another

8   exhibit marked, because I think we may need to refer to

9   it.

10          MR. BOGDANOVICH:   This will be Exhibit No. 3.

11          (Deposition Exhibit No. 3 marked for

12   identification.)

13   BY MR. BOGDANOVICH:

14      Q.   Ms. Landrum, I am going to show you what's been

15   marked for identification as Exhibit 3 to your

16   deposition and I'm going to ask you to take whatever

17   time you need to review that and I'll have some

18   questions for you.

19               (Witness complied.)

20      A.   Okay.

21      Q.   All right.   Have you ever seen all of the pages

22   that have been marked as Exhibit 3?

23      A.   Not all of them.

24      Q.   Okay.   Which ones have you seen prior to today?

25      A.   The Quit-Claim Deed.