30

1    Q. And on this copy it has an Exhibit C

2    designation at the bottom in the middle.

3        A. "C", I don't see any "C".

4        Q. I think if you flip to the page before the one

5    you're looking at --

6        A. Oh, okay, got it.

7        Q. The document that has the title Quit-Claim

8    Deed, it's numbered -- the Spencer page number in the

9    bottom right corner, 006060, do you see that?

10       A. Correct.

11       Q. That wasn't one of the two pages you brought

12   with you today, was it?

13       A. No.

14       Q. But you have seen that title page to the

15   Quit-Claim Deed?

16       A. The one you're talking about now?

17       Q. Yeah, the one that has the words Quit-Claim

18   Deed.

19       A. No.

20       Q. Okay. You've not seen that one?

21       A. No.

22       Q. Let's turn to the next page in Exhibit 3, it's

23   numbered in the bottom right, Spencer 006061. Have you

24   ever seen that document before?

25       A. No.

31

1      Q.  Okay.  Let's turn to the next page, it's

2   numbered in the bottom right corner, Spencer 006062.

3      A.  Yes.

4      Q.  Is that one of the pages that Mr. Henderson

5   showed you at the meeting?

6      A.  Yes.

7      Q.  Okay.  And then I think the page behind that,

8   which is numbered in the right corner, 006063, that's

9   the other page that you brought a copy of today,

10  correct?

11     A.  Yes.

12     Q.  Did Mr. Henderson leave you the copy of those

13  two pages from that first meeting you had with him?

14     A.  Yes.

15     Q.  Okay.  Let's look at the page with the notary

16  section at the bottom that has your name on it, that's

17  numbered Spencer 006062, okay?

18     A.  Okay.

19     Q.  Is it your testimony that your name where it

20  appears twice on this document in the notary section, is

21  it your testimony that that is not your signature?

22     A.  Yes.

23     Q.  Okay.  And how do you know it's not your

24  signature?

25     A.  The "E" down below looks like an "O", it's

32

1    under the line, every signature I've ever done has been

2    on the line or above.  The "D" is not the same as I sign

3    any paper.

4          Q.   Okay.  Anything else?

5          A.   I don't know why the 15 is written in instead

6    of typed in.

7          Q.   Did you always type in a date the day when you

8    notarized a document?

9        .  A.   Yes.

10         Q.   Okay.  Anything else that you base that

11    testimony on that this is not your signature?

12         A.   No.

13         Q.   And when you said the "E" is below the line,

14    your name it looks like actually is written in twice in

15    this notary block, do you see that?  The top section

16    where it says I, and then the name appears Menona D.

17    Landrum, that appears to have been written, doesn't it?

18         A.   Yes.

19         Q.   That "E" is above the line, correct?

20         A.   Correct.

21         Q.   So when you said the "E" being below the line,

22    you're talking about the actual signature?

23         A.   Yes.

24         Q.   And when you said the "D" is not the same as

25    you put it on any paper, are you referring to both "Ds",

33

1    both middle initials?

2         A.   They're incorrect.

3         Q.   Okay.  And both of them are?

4         A.   Yes.

5         Q.   Okay.  And there's nothing about the way

6    Landrum appears in either place that causes you to

7    conclude that that's not your signature?

8         A.   No.

9         Q.   Okay.  I want to back up and go back to the

10   meeting, the first meeting you had with Mr. Henderson at

11   your house he showed you the two pages that we've

12   identified?

13        A.   Yes.

14        Q.   What did he tell you?  You said he said they

15   believed the signature was forged, whose signature did

16   he tell you he believed was forged?

17        A.   Mine.

18        Q.   Okay.  Did he tell you anything about whether

19   he or the attorneys he was working for believed that

20   Mr. Spencer's signature was forged?

21        A.   No.

22        Q.   Okay.  Did he tell you why they believed your

23   signature had been forged?

24        A.   No.

25        Q.   And you didn't ask?

Objection -
hearsay

Response -
not offered
for truth of
statement, it
is relevant
to the
witness being
influenced by
her
interviewer

34



1    A.   No.

2    Q.   Okay.  I think you mentioned, when you said how

3    you first became aware, that there was going to be a

4    program about Mr. Spencer from the article in The

5    Columbian, and it sounded like what you understood from

6    the article was that he had been falsely prosecuted or

7    accused?

8    A.   Yes.

9    Q.   Did you form an opinion based upon what you

10   read, the first time you read about that, in the local

11   newspaper as to whether he had been actually falsely

12   accused?

13   A.   Did I form an opinion?

14   Q.   Right.

15   A.   No.

16   Q.   How about after you watched the 20/20 program,

17   did you have a belief as to whether he had been falsely

18   accused after you saw that program?

19   A.   Yes.

20   Q.   What was your belief or opinion?

21   A.   That he had been falsely arrested, falsely

22   prosecuted.

23   Q.   Okay.  Between the time you saw the 20/20

24   program and when Mr. Henderson called you, had you

25   talked to anybody about Mr. Spencer's case?

35

1    A.   No.

2    Q.   And I think you just said Mr. Henderson didn't

3    tell you anything about why they believed your signature

4    had been forged?

5    A.   Not that I recall.

6    Q.   Would you agree with me that based on you

7    having seen that 20/20 program and formed an opinion, in

8    your own mind, that Mr. Spencer had been falsely accused

9    and falsely prosecuted, that that probably influenced

10   how you received the information from Mr. Henderson that

11   your signature may have been forged on this document?

12   A.   No.

13   Q.   And why do you think that didn't?

14   A.   I don't know, why would I have an opinion, and

15   that's my privilege.

16   Q.   During all of the years that you worked for the

17   Clark County Sheriff's Office, were you ever aware of

18   the situation where a document that bore your notary

19   signature had been forged?

20   A.   Not to my knowledge.

21   Q.   Okay.  If you would look at Exhibit 2, which is

22   the copy of your declaration.

23            (Witness complied.)

24   Q.   In paragraph five at the bottom of the first

25   page, the second sentence says, "I have no memory of

36

1    being called up to the jail to notarize the signature of

2    an inmate on a quit-claim deed or any other type of

3    document."  Did I read that accurately?

4         A.   Uh-huh.

5         Q.   For the record, that's yes?

6         A.   Yes.

7         Q.   Is it possible you may have gone up to the jail

8    and notarized a document for an inmate and you just

9    don't recall it?

10        A.   No.

11        Q.   You're absolutely certain you never did go to

12   the jail and notarized a document?

13        A.   Right.

14        Q.   Okay.  And then paragraph six on the next page,

15   the sentence reads, "To my knowledge, I have never met

16   Mr. Spencer or ever seen him in person."  Did I read

17   that accurately?

18        A.   Right.

19        Q.   Is it possible you may have met Mr. Spencer or

20   seen him at some point during the few months he was

21   incarcerated in the Clark County Jail and you simply

22   don't remember it?

23        A.   No.

24        Q.   And why are you certain that that's not

25   possible?

37

1          A.  Never happened.

2          Q.  Okay.  Do you know what Mr. Spencer looked like

3     back in 1985?

4          A.  No.

5          Q.  And I'm wondering then how you can be so

6     certain that you never laid eyes on Mr. Spencer, if you

7     wouldn't have even known what he looked like?

8               MS. ZELLNER:  You're talking about when he's in

9     jail?

10              MR. BOGDANOVICH:  Right, during 1985.

11              THE WITNESS:  I didn't see him, I never saw

12    inmates.

13    BY MR. BOGDANOVICH:

14         Q.  Is it your testimony that you never notarized

15    any document for any inmate during the whole time you

16    worked for the sheriff's office?

17         A.  That's right.

18         Q.  Okay.  And the other clerk, the jail clerk, you

19    said she was a notary?

20         A.  Uh-huh.

21         Q.  Do you know whether she ever notarized any

22    documents for inmates?

23         A.  I have no idea.

24         Q.  Paragraph four of your declaration, it's on the

25    first page, this is Exhibit 2, you say, "Throughout the

38

1    years that I was with the sheriff's office, I kept my
2    notary seal in a drawer of my desk.  For a period of
3    time, I locked the drawer before leaving the office at
4    the end of the day.  When I arrived at work one morning,
5    I discovered that someone had pried open the drawer
6    during the night.  The seal was still there and nothing
7    else appeared to be missing.  When I realized how easily
8    the drawer could be forced open, I saw no purpose in
9    continuing to keep it locked overnight."  Did I read
10   that accurately?
11        A.   Correct.
12        Q.   Can you tell me when that incident occurred,
13   when you arrived at work and discovered that your drawer
14   had been pried opened during the night?
15        A.   No.
16        Q.   Can you say whether it was sometime in the '70s
17   as opposed to the '80s?
18        A.   No.
19        Q.   Can you say whether it was before or after
20   1985?
21        A.   No.
22        Q.   And it sounded like from the way you were
23   describing the layout of the area where you worked, the
24   public could walk in and could have access to your desk?
25             MS. ZELLNER:  Objection, you're confusing the

39

1   locations and time.  You've got the layout before they

2   moved to the new building, you've got the old layout.

3   BY MR. BOGDANOVICH:

4        Q.  Well, let me ask you Ms. Landrum, we talked

5   about the jail moved from the fifth floor of the

6   courthouse to across the street.

7        A.  Yes.

8        Q.  Did your office also relocate to the same

9   building where the jail moved to?

10       A.  Yes.

11       Q.  Okay.  And once that move occurred -- and you

12  said that was in April of 1985?

13       A.  ~~Correct.~~ *Errata: Incorrect, it was April 1984.*

14       Q.  Where was your work station located in the new

15  building?

16       A.  On the ground floor.

17       Q.  And where was the jail?

18       A.  I believe there's a walkway between our

19  building and the jail.

20       Q.  Okay.  When you say "walkway," can you -- I

21  mean, was the jail also on the ground floor?

22       A.  No, there's two or three floors, I believe.

23       Q.  To the jail?

24       A.  To the jail.

25       Q.  Were they both above the ground floor where

40

1   your work station was?

2        A.   Yes.

3        Q.   Do you happen to remember the address for your

4   office?

5        A.   No, I don't.

6        Q.   Okay.  Were there any other offices that

7   occupied a floor or more than one floor between your

8   ground floor work station and whatever floors were

9   occupied by the jail?

10       A.   No.

11       Q.   So the jail was immediately above your ground

12   floor?

13       A.   Right.

14       Q.   Did this overnight break-in to your desk

15   drawer, did that occur, if you know, before or after you

16   moved to this new location?

17       A.   Before.

18       Q.   Okay.  Did you make any report of this prying

19   open of your desk drawer overnight?

20       A.   No.

21       Q.   Why didn't you?

22       A.   It was a prank.

23       Q.   Why do you say it was a prank?

24       A.   One of the fellow people was a prankster, the

25   desk drawer was right open.

41

1    Q.   Who was the prankster you're referring to?

2    A.   I cannot reveal that.

3    Q.   Why not?

4    A.   I'm not going to involve him.

5    Q.   Well, I'm going to ask you, please, to identify

6    who the individual is.  I mean, we're in the middle of a

7    civil lawsuit with some significant claims and issues

8    and, you know, you are obligated to respond truthfully

9    and accurately with questions that we ask you today.  So

10   I would ask you to, please, identify the individual you

11   referred to as the prankster.

12   A.   His name is Harold Teters.

13   Q.   Okay.  And what was Mr. Teters' position, was

14   he an employee of the sheriff's office?

15   A.   He was a deputy sheriff, served civil papers.

16   Q.   Did you ever confirm with Mr. Teters that he

17   was the one that had pried open your desk drawer?

18   A.   Oh, he joked about it.

19   Q.   Did he tell you why he had done it?

20   A.   No.

21   Q.   You said the seal was still there and that you

22   had to have the seal that you would place on papers that

23   you notarized, correct?

24   A.   Yes.

25   Q.   And that's the seal you're referring to that

Right margin note: Objection - attorney instructing the witness; not a question  Response - needed to fairly explain the need to overcome the witness' reluctance to answer

42

1    was still there?

2        A.   Yes.

3        Q.   Did anything else appear to be missing from

4    your drawer that morning you discovered it had been

5    pried open?

6        A.   No.

7        Q.   Did you ever ask Deputy Teters specifically why

8    he pried your drawer open?

9        A.   No.

10       Q.   It was your impression that he did it because

11   that was kind of his nature?

12       A.   Right.

13       Q.   Can you give me examples of any other practical

14   jokes he had pulled around the office?

15       A.   He put paper clips together and strung them all

16   over the top of my desk.

17       Q.   Anything else?

18       A.   No.

19       Q.   All right.   I want to go back and ask you once

20   you moved into the new location that you occupied in the

21   new building across the street, when the jail and your

22   office moved in April of 1985, can you describe what the

23   configuration was of your work area?   1984 (per errata sheet)

24       A.   It was just a big room full of desks.

25       Q.   Okay.   Were there still three desks or were

43

1   there more?

2       A.   Well, I know the warrant clerk had a desk in

3   there, I'm sure there were more than one or two desks,

4   but it was just a big room.

5       Q.   So in that respect, it was a similar layout to

6   the previous office space you had occupied?

7       A.   Right.

8       Q.   And was your desk accessible by members of the

9   public entering the civil division?

10      A.   Correct, we had a window we could open and

11  close, opened at eight o'clock in the morning and closed

12  at five o'clock at night to the public.

13      Q.   Where was the window situated in relation to

14  your desk?

15      A.   Right in front of my desk, like I'm sitting

16  here (indicating) and there's that window.

17      Q.   Okay.  Was the window somehow attached to your

18  desk?

19      A.   No.

20      Q.   Was it at like a greeting counter of some sort?

21      A.   Yeah, there was a counter where you waited on

22  the public.

23      Q.   Okay.  Could the public walk around the counter

24  to get back into the area where your desk was?

25      A.   They could, but they didn't, there's a door.

44

1    Q.   Was the door kept locked?

2    A.   No.

3    Q.   Was there always a sheriff's office employee

4    stationed at that front reception desk or did they

5    just --

6    A.   No.

7    Q.   Go ahead.

8    A.   Not stationed at that window.

9    Q.   Was part of your job responsibility to get up

10   and address members of the public that would come in?

11   A.   My desk was close enough that I could sit at it

12   and talk to the people standing facing me.

13   Q.   Was that part of your job duties?

14   A.   Yes.

15   Q.   To respond to members of the public that came

16   to that desk and window?

17   A.   Correct.

18   Q.   Okay.  And I get the impression from the way

19   you've described this incident where Deputy Teters pried

20   open your desk drawer, it doesn't sound to me like you

21   had any concern at that point that somebody had secretly

22   misused your notary instrument?

23   A.   Not to my knowledge.

24   Q.   Did you ever have reason to suspect anytime

25   that you worked at the sheriff's office that someone had

45

1    improperly taken your notary equipment and used them?

2        A.   No.

3        Q.   During the entire time that you worked there,

4    were you ever made aware of any circumstances in which

5    Sharon Krause was accused of forging any documents?

6        A.   No.

7        Q.   How about Michael Davidson, were you ever aware

8    of any situation where he was accused of forging any

9    documents?

10       A.   No.

11       Q.   Have you talked to Sharon Krause at anytime

12   since you left the employment of the sheriff's office?

13       A.   No.

14       Q.   I want to go back to the first meeting that you

15   had with Mr. Henderson at your house.  You said he told

16   you about his belief that your signature had been forged

17   on one page of the two that he showed you, what happened

18   after that?

19       A.   We just had a discussion about the case and my

20   job.

21       Q.   Okay.  Can you tell me anything specifically

22   that you discussed about that?

23       A.   No.

24       Q.   Did Mr. Henderson tell you any other details

25   about the case?

Objection –
question
includes
hearsay; if
prior
objection is
sustained,
assumes
facts not in
evidence

46

1     A.  No.

2     Q.  He didn't describe what Mr. Spencer's

3  allegations are against Sharon Krause or Michael

4  Davidson or James Peters?

5     A.  Yes.

6     Q.  What did he tell you?

7     A.  That that Quit-Claim Deed had been forged.

8     Q.  And I asked you previously whose signature he

9  believed had been forged and you said he told you they

10  thought yours had been forged?

11     A.  Right.

12     Q.  But I think you said he didn't say anything

13  about their believing that Mr. Spencer's signature was

14  forged?

15     A.  No.

16     Q.  Okay.  Anything else that he told you about the

17  case or Mr. Spencer's claims against the people he's

18  suing?

19     A.  No.

20     Q.  He didn't describe anything about a conspiracy

21  among Sharon Krause and Michael Davidson and James

22  Peters to falsely accuse or frame Mr. Spencer?

23     A.  No.

24     Q.  Had you picked that up from the 20/20 program?

25     A.  Yes.

Objection -
calls for
hearsay

Rider & Associates, Inc.
360.693.4111

1    Q.   And based on your viewing of the 20/20 program,

2    it sounds like you had formed an opinion that it did in

3    fact happen?

4    A.   Yes.

5    Q.   And was that opinion based on anything other

6    than what you saw on the 20/20 program and what you had

7    read previous to that in The Columbian?

8    A.   No.

9    Q.   Did Mr. Henderson type up this declaration

10   while he was at that first meeting at your house?

11   A.   No.

12   Q.   Okay.  Is there anything else you recall about

13   what was discussed between you and Mr. Henderson at that

14   first meeting, other than what you've told us?

15   A.   No.

16   Q.   Okay.  When Mr. Henderson left your house at

17   the end of that first meeting, did you have some

18   understanding or agreement of what was going to happen

19   next, if anything?

20   A.   Well, he was going to write this declaration,

21   that's all I know.

22   Q.   Okay.  After he left your residence, what was

23   the next communication you had with Mr. Henderson?

24   A.   On the 24th when I signed the declaration.

25   Q.   Did he come back to your house?

Objection –
calls for
hearsay

Rider & Associates, Inc.
360.693.4111

48

1    A.  He came back to my house.

2    Q.  He had this declaration with him at that point?

3    A.  Correct.

4    Q.  Did you sign it exactly as he brought it back

5    to you?

6    A.  Yes.

7    Q.  Did Mr. Henderson tape record any part of the

8    conversation he had with you when he was at your house

9    the first time?

10   A.  No.

11   Q.  Was he taking notes that you could see?

12   A.  Yes.

13   Q.  Did Mr. Henderson bring anybody with him when

14   he came to your house the second time?

15   A.  No.

16   Q.  I think you said he was alone the first time as

17   well?

18   A.  Right.

19   Q.  Did he bring anything with him other than this

20   declaration at the second meeting?

21   A.  No.

22   Q.  How long did the first meeting last the first

23   time he came to your house?

24   A.  Thirty minutes, but we talked about other

25   things other than this case.

49

1    Q.   Okay.   And I've asked you a few times to tell

2    me as best you recall any specifics about what you

3    discussed with Mr. Henderson about the case.   I mean, is

4    there anything else that comes to mind now, that you

5    haven't testified to already?

6    A.   No.

7    Q.   How long was Mr. Henderson at your house the

8    second time when he brought this declaration?

9    A.   Probably 30 minutes, 45 minutes.

10   Q.   What happened during that 30 or 45 minutes?

11   A.   We went over the declaration.

12   Q.   Did you have any questions for Mr. Henderson

13   about any of the wording in the declaration?

14   A.   No.

15   Q.   So I'm wondering why you would have taken 30 or

16   45 minutes, if you had no questions about the

17   declaration.

18   A.   We talked about my husband's illness, we talked

19   about personal things, it had nothing to do with the

20   case.

21   Q.   Can you tell me how long you think you actually

22   talked about your declaration or the case with

23   Mr. Henderson the second time he came to your house?

24   A.   No.

25   Q.   Okay.   Have you talked to Mr. Henderson since

Objection -
calls for
hearsay

Rider & Associates, Inc.
360.693.4111

1    he left your house from that second meeting he had with

2    you?

3         A.   Yes.

4         Q.   And when was that?

5         A.   On the telephone.

6         Q.   Did he call you or did you call him?

7         A.   I think he called me and said there would

8    probably be a deposition.

9         Q.   Did he tell you who would be taking the

10   deposition?

11        A.   The attorneys for the defendants.

12        Q.   Okay.  Did he tell you anything else?

13        A.   No.

14        Q.   How long did that telephone conversation last?

15        A.   Five minutes.

16        Q.   Did you talk about anything other than the fact

17   that there would probably be a deposition?

18        A.   No.

19        Q.   Did he give you the names of any people who

20   would be involved in the probable deposition?

21        A.   No.

22        Q.   Did you have any questions for Mr. Henderson

23   about the deposition he was telling you about, what that

24   would entail, who would be present, anything of that

25   nature?

51

1      A.   No.

2      Q.   Did you know what a deposition was when he

3  mentioned that?

4      A.   Vaguely.

5      Q.   Any other communications you've had with

6  Mr. Henderson?

7      A.   No.

8      Q.   And I think when I asked you at the start of

9  your deposition who you've talked to or communicated

10  with about this case you mentioned Mr. Henderson and

11  Ms. Zellner?

12      A.   Yes.

13      Q.   Tell me what communications you've had with

14  Ms. Zellner.

15      A.   Wait a minute, I haven't had any communications

16  with her until today.

17      Q.   And what communication did you have with

18  Ms. Zellner today?

19      A.   We went over the deposition process.

20      Q.   Can you tell me specifically what you went

21  over, what was said?

22      A.   No.

23      Q.   You don't recall?

24      A.   We talked about what the questions would be.

25      Q.   Did Ms. Zellner tell you what she thought the

52

1  questions would be?

2      A.   Some, yes.

3      Q.   What did she tell you?

4      A.   To answer them honestly.

5      Q.   Did she tell you what the questions were going

6  to be that she was anticipating?

7      A.   Yes.

8      Q.   Well, that's my question to you now, what

9  questions did she say she thought we would be asking

10  you?

11      A.   I can't say word for word verbatim what the

12  questions were.

13      Q.   Do you remember anything about that meeting

14  this morning and what she thought the questions would

15  be?

16      A.   No, I don't.

17      Q.   Okay.  Have you ever talked to Mr. Johnson?

18      A.   Not until today.

19      Q.   Okay.  Was he present at the meeting you had

20  with Ms. Zellner?

21      A.   Yes.

22      Q.   Did Mr. Johnson speak at the meeting or did

23  Ms. Zellner do all the talking?

24      A.   She did the talking.

25      Q.   Is there anybody else that has communicated

53

1   with you on behalf of Mr. Spencer, other than

2   Mr. Henderson and Ms. Zellner?

3       A.  No.

4       MR. BOGDANOVICH:  I have one more group of

5   documents for you to mark.

6       (Deposition Exhibit No. 4 marked for

7   identification.)

8       MR. BOGDANOVICH:  I'm just about through, the

9   other attorneys may have some questions.  Let's take a

10  break and go off the record.

11      (Off the record discussion.)

12  BY MR. BOGDANOVICH:

13      Q.  Ms. Landrum, I'm handing you what's been marked

14  as Exhibit 4 to your deposition.  I'm going to ask you

15  to take a look at that, and on this one because there

16  are quite a few pages, I want to give you a general

17  description that what I've handed you -- and I'll ask

18  you about a couple specific things in a second.  But

19  what I've handed you is a copy of a subpoena in a civil

20  case that I served on behalf of Sharon Krause on the

21  Clark County Sheriff's Office records custodian.  And

22  one of the categories of documents we asked them to

23  produce were any that bear your signature dated between

24  January 1st, 1985 and December 31st, 1991.

25      A.  Uh-huh.

Plaintiff objects to the admission of Deposition Exhibit No. 4 and all questions related thereto; the foundation for these documents has not been properly laid by the witness; also, the questions essentially seek testimony in the form of expert opinions regarding handwriting, and Defendants have disclosed no handwriting expert

Response - Plaintiff waved the foundation objection - see FRCP 32(d)(3).  The exhibit is also self-authenticating. No expert testimony is needed, the witness is describing her own observations of her own handwriting. This exhibit and testimony are the only way defendants have to examine her on these issues.

54

1    Q.   So behind the copy of the subpoena are copies

2   of all of the documents that the Clark County Sheriff's

3   Office records custodian produced in response to that

4   subpoena, so I just wanted to give you that by way of

5   background.

6        A.   Okay.

7        Q.   You're free to review them in any detail you

8   would like at this point.   Our interest in them,

9   obviously, was wherever your signature appeared, and

10   that's what my couple of questions will pertain to.

11        A.   That's my nickname.

12        Q.   Apparently you were known by Nonie?

13        A.   Yes, in fact, one of my civil deputies called

14   me "Noe Noe."

15                 (Witness complied.)

16        A.   Okay.

17        Q.   All right.   You've had a chance to look over

18   these documents and, like I said, with my description I

19   don't necessarily expect you to remember each entry on

20   each document.   But what I would like to do is direct

21   you to the second to the last page of the document

22   stapled together as Exhibit 4, it's entitled -- at the

23   top it looks like Notice of Intent to Participate in

24   Incentive Program, do you see that?

25        A.   Uh-huh.

Objection - see p. 53
Response - see p. 53

Rider & Associates, Inc.
360.693.4111

55

1    Q.   Does that appear to you to be your signature

2  down toward the bottom right-hand side?

3    A.   Uh-huh.

4    Q.   Dated February 1st, 1988; is that correct?   Do

5  you see the date just to the left of your signature?

6    A.   Yes.

7    Q.   Okay.   And do you see the "E" in Menona?

8    A.   Uh-huh.

9    Q.   It does appear partly below the line, correct?

10    A.   Very little.

11    Q.   And having reviewed these documents now, I

12  think the only other reason you testified to in support

13  of your belief that your signature on the Quit-Claim

14  Deed was forged by someone, is that the two "Ds" look

15  different than you signed your "Ds".

16    A.   The "Es" -- oh, the "Ds".

17    Q.   Yeah, the "Ds", yeah, your middle initial.

18  What's your middle name?

19    A.   Dawn.

20    Q.   Dawn.   And that was you said the "E" below the

21  line and the two "Ds" looked different.   Those were the

22  only two reasons you gave in support of your belief that

23  your Quit-Claim Deed signatures were forged, correct?

24    A.   Right.

25    Q.   Okay.   What is it about the "Ds"?

Rider & Associates, Inc.
360.693.4111

Objection - see p. 53.

See response p. 53

Objection - misstates her testimony; previously testified that she had never notarized any document for an inmate

Response - accurate question

56

1      MS. ZELLNER:  Just a minute, I want to object

2   to that question.  She gave reasons why the actual

3   signature to her indicates a forgery, but she gave you

4   other reasons, she had never notarized an inmate.

5      MR. FREIMUND:  Well, Kathy, make an objection,

6   but come on, let's not play these games.

7      MS. ZELLNER:  It's not a game, he's -- I'll

8   make the objection, he's mischaracterizing her entire

9   testimony.

10      MR. BOGDANOVICH:  Okay.  And she's entitled to

11   object.

12   BY MR. BOGDANOVICH:

13      Q.  But my question to you is:  Have you seen

14   anything in these other signatures we see of yours in

15   Exhibit 4 that supports your statement about the "Ds" on

16   the Quit-Claim Deed being different than the way you

17   signed them?

18      A.  Yes, the "D", my "Ds" normally went down like

19   this (indicating).

20      Q.  Okay.  Let's get --

21      A.  Those go underneath, they're not all the same.

22      Q.  Before you get to the comment you just made,

23   could you tell us which document by title in Exhibit 4,

24   there are titles at the top of the documents.

25      A.  Oh, okay, Health Enrollment Application.

Objection - see p. 53.
See response p. 53