57

Q.   And I see that behind the subpoena, it appears to be the fifth page behind the subpoena.   And what was it about the "D" on that one?

A.   The "D" goes down, the "D" here goes this way (indicating), and my other "D" went this way (indicating).

Q.   You're talking about -- and I don't know if this is a technical term or what, but the tail on the capital "D" you're indicating on the Quit-Claim Deed it slants --

A.   Slants that way (indicating).

Q.   -- toward your last name?

A.   Yeah.

Q.   And on this Health Enrollment Application it goes straight down?

A.   And if you look at the next page it's more definite that it goes down and not -- it goes -- not that way (indicating).

Q.   And then if you go a couple more pages back there's a W-4A Employee's Withholding Allowance form, just keep flipping back from that form.

A.   This way?

Q.   No, the back, towards the back of the group.

A.   Oh, okay.   Now, see this "D" goes down, too, and that one goes that way (indicating).

Objection - see p. 53.

See response p. 53

58

1    Q.   Okay.  That page right there (indicating), that

2  "D", the tail on that "D" slants towards your last name,

3  correct?

4    A.   Right.

5    Q.   So it appears you did it both ways at times,

6  correct?

7    A.   Right.

8    Q.   And that Employee's Withholding Allowance

9  Certificate is dated 1987?

10    A.   Right.

11    Q.   And if you turn the next page, there's a second

12  page to that W-4A form it appears or maybe this is a

13  different form, it also says 1987 in the top right

14  corner.

15    A.   Uh-huh.

16    Q.   That "D" tail also slants toward Landrum,

17  correct?

18    A.   Uh-huh.

19    Q.   For the record, that's yes?

20    A.   That "E" is always above the line, it's never

21  below the line like that thing is, that's why I'm saying

22  this is not my signature.

23    Q.   Okay.  But my question was:  From this second

24  form, 1987, the tail of the "D" does slant toward the

25  Landrum?

Objection -
see p. 53.
See response
p. 53

59

1    A.  Right.

2    Q.  All right.

3        MR. BOGDANOVICH:  Ms. Landrum, I think that's

4  all the questions I have.  I'm going to let the other

5  attorneys have their chance now.

6        THE WITNESS:  Okay.

7        MR. BOGDANOVICH:  Thank you.

8

9                 EXAMINATION

10  BY MR. FREIMUND:

11    Q.  Ms. Landrum, I was introduced to you before we

12  went on the record, but, for the record, I'm Jeff

13  Freimund and I represent defendant, Michael Davidson.

14  Just picking up where Mr. Bogdanovich left off, do you

15  still have Exhibit 4 in front of you?

16    A.  Uh-huh.

17    Q.  He left off having you look at that W-4 form --

18    A.  Uh-huh.

19    Q.  -- dated in 1987.

20    A.  Uh-huh.

21    Q.  There's actually two of them, one dated July

22  1st, 1987 and the next page is dated February 11, 1987,

23  do you see that?

24    A.  Yes.

25    Q.  Would you agree that the "D" in your signature

Objection - see p. 53
See response p. 53.

60

1   there appears much like the "D" that appears in your

2   signature that is attached to Exhibit 3, the second to

3   last page on the notary for the Quit-Claim Deed?

4       A.  Right.

5           MS. ZELLNER:  Wait a minute, I need to get the

6   page number we're referring to, what's your Bate stamp?

7           MR. FREIMUND:  The second to the last page.

8           MS. ZELLNER:  Does it have a Bate stamp?

9           MR. FREIMUND:  It has your Bate stamp number

10  006062.

11  BY MR. FREIMUND:

12      Q.  And your answer was those "Ds" do appear

13  similar, correct?

14      A.  Yeah, but the "E" is always above the line,

15  it's not down below, and it doesn't look like an "O".

16      Q.  Okay.  So what you're saying then, just so I'm

17  understanding, is what you're basing your belief on is

18  your signature being forged is solely that the "E" in

19  the second letter of your first name appears below the

20  line, is that accurate or not?

21          MS. ZELLNER:  I'm objecting, again, it

22  mischaracterizes her testimony.

23  BY MR. FREIMUND:

24      Q.  You may answer it, is that accurate?

25      A.  You may what?

Objection - see p. 53.

Response p. 53

61

1          Q.   She can object for the record, but you still

2     have to answer it.

3          MS. ZELLNER:   Yeah, I'm objecting.   Did you

4     understand the question?

5          MR. FREIMUND:   She's objecting for the record,

6     you still have to answer the question.   Do you want me

7     to ask it again?

8          THE WITNESS:   Please.

9     BY MR. FREIMUND:

10         Q.   Is it your testimony now that the only reason

11    why you believe that your signature was forged on this

12    Quit-Claim Deed notary is because the "E" in the second

13    letter of your first name appears below the line, you're

14    acknowledging the "Ds" are similar?

15         MS. ZELLNER:   The same objection.

16         MR. FREIMUND:   You can still answer.

17         THE WITNESS:   Just a minute.   But see you're

18    looking at those, there are other signatures here that

19    don't look like that "D".

20         MR. FREIMUND:   I understand that, some do, some

21    don't.

22    BY MR. FREIMUND:

23         Q.   And I think what you established with

24    Mr. Bogdanovich, sometimes your "D" tailed off to your

25    last name and sometimes it tailed off towards your first

.

Objection – see p. 53; asked and answered

Response – p. 53

62

1    name, right; is that correct?

2        A.   Sometimes it did, sometimes it didn't.

3        Q.   So given that sometimes the "D" would tail off

4    towards your last name, like it did on the notary for

5    the Quit-Claim Deed, we are narrowing it down now and

6    looking at the differences between these signatures on

7    your Quit-Claim Deed notary and these signatures on

8    these documents provided by Clark County.  The only

9    difference that you can point to consistently being

10   different is that the "E" is below the line on the

11   notary of the Quit-Claim Deed and it does not appear

12   below the line on the Clark County documents; is that

13   true?

14       A.   Right.

15       Q.   Okay.  And as you acknowledged earlier on at

16   least one of the Clark County documents the "E" does

17   appear below the line even there, too, right?  It's the

18   second to last page on Exhibit 4.

19       A.   The one that said Incentive Program?

20       Q.   Yes, you're right, Notice of Intent to

21   Participate in Incentive Program.

22       A.   It's not below the line like this is

23   (indicating).

24       Q.   It is below the line, just not as far.

25       A.   That doesn't look anything like it.

Objection - see p. 53

Response p. 53

63

1    Q.  What's the difference, it's just below the line
2    but not as far or is there any other difference?
3    A.  This is below the line, this one is not
4    (indicating).
5    Q.  You think the "E" on the second to last page of
6    Exhibit 4 does not travel below the line?
7    A.  Not that much.
8    Q.  Okay.  So it does a little bit, but you're just
9    saying it doesn't travel as much?
10   A.  No, it doesn't.  It's lost on that one, this
11   one you can see it (indicating).
12   Q.  Okay.  So it is true, wouldn't you agree
13   Ms. Landrum, that on occasion, at least when you would
14   sign your name, the "E" would at least sometimes appear
15   a little below the line and that it wasn't uniformly 100
16   percent accurate that it never appeared below the line,
17   wouldn't you agree?
18   A.  Do you see it below the line on any of the
19   others?
20   Q.  I see it below the line on this one, that's why
21   I'm asking the question.
22   A.  No, that's minimal.
23   Q.  Okay.  Would you agree, though, that sometimes
24   the "E" when you sign your name, perhaps on very rare
25   occasions, but none the less, would sometimes travel

Objection - see p. 53.

Response p. 53

64

Objection - see p. 53.

See response p. 53

1    below the line?

2        A.   No.

3        Q.   That never happened?

4        A.   No.

5        Q.   So you would say, second to last page of

6    Exhibit 4, that "E" does not travel below the line,

7    that's your testimony?

8        A.   Yes.

9        Q.   Okay.  Ms. Landrum, do you recall approximately

10   a week and a half ago where I was on the telephone with

11   Mr. Bogdanovich and we requested to speak to you?

12       A.   Yes.

13       Q.   And you said you didn't want to speak to us,

14   that you would rather a deposition occur.  I'm

15   paraphrasing, those weren't your exact words, but was

16   that your intent that you didn't want to speak to either

17   Mr. Bogdanovich or I?

18       A.   On the phone.

19       Q.   Why was that?

20       A.   Well, for one reason, I mean, you call and this

21   is like short notice, you want a conference call and I

22   have a lot on my plate right now and I didn't want to do

23   this on the telephone.

24       Q.   Uh-huh.  Do you recall that we had arranged --

25   or Mr. Bogdanovich more accurately had arranged with you

65

1   the day before that this would be a time that was

2   available to you to speak with us?

3      A.  Yes.

4      Q.  Did something change in those approximately 24

5   hours?

6      A.  No, I just had time to think about it, and I

7   wanted to confer with my attorney.

8      Q.  Who is your attorney.

9      A.  Greg Call here in Vancouver.

10      Q.  Okay.  So you spoke to your attorney and then

11   after that -- and I don't want to know what your

12   attorney told you or what you talked about, but after

13   that conversation you decided that you would not speak

14   to us over the telephone?

15      A.  Correct.

16      Q.  But you were willing to speak to Ms. Zellner

17   over the telephone or meet her in person?

18      A.  I never have spoke to her on the telephone.

19      Q.  It was Mr. Henderson you were willing to speak

20   to over the telephone?

21      A.  I have spoke to him on the phone, yes.

22      Q.  Why were you willing to speak to Mr. Henderson

23   on the telephone, but you weren't willing to speak to

24   Mr. Bogdanovich or I over the telephone?

25      A.  I told you, it was short notice, I had a lot on

66

1   my plate and I still do and I just didn't want to do

2   this on the telephone.

3        Q.   Is it because you feel allied to one side or

4   the other?

5        A.   Feel what?

6        Q.   You're allied, in alliance to one side or the

7   other?

8        A.   No.

9        Q.   You feel like you're neutral in this?

10       A.   Yes.

11       Q.   When you first met with Ms. Zellner -- you said

12   that was today, right?

13       A.   Correct.

14       Q.   And you've never spoken to her before today?

15       A.   No.

16       Q.   Did you confer with your lawyer before agreeing

17   to speak with her?

18       A.   Yes.

19       Q.   Okay.  So it was okay to speak with her but not

20   okay to speak with us; is that accurate?

21       A.   I didn't have to do it on the telephone.

22       Q.   It was in person?

23       A.   Correct.

24       Q.   When you spoke with Ms. Zellner today, where

25   did you meet?

1      A.   At a hotel here in town.

2      Q.   Was that her hotel?

3      A.   The Hilton Hotel.

4      Q.   Did you meet in her hotel room?

5      A.   No, in a conference room.

6      Q.   How long was that meeting?

7      A.   About an hour.

8      Q.   And that was earlier this morning, I take it?

9      A.   Uh-huh.

10     Q.   You need to answer out loud, please.

11     A.   Oh, yes, I'm sorry.

12     Q.   What time was that meeting?

13     A.   Eleven o'clock.

14     Q.   Okay.  And you finished that meeting around

15   noon?

16     A.   Yes.

17     Q.   And you traveled directly to where we are now,

18   the place of this deposition?

19     A.   No, Paul and I went and had lunch.

20     Q.   So you had lunch and then you got here within

21   an hour?

22     A.   Yes.

23     Q.   You mentioned that during that meeting with

24   Ms. Zellner you spoke about what to expect at the

25   deposition and what questions would likely be asked of

68

1    you.  Did you talk about the case at all?

2         A.  Not that much, no.

3         Q.  To the extent you can remember, what did you

4    discuss about the case?

5         A.  About Ray Spencer's time in jail, just what to

6    expect here.

7         Q.  What was discussed about Ray Spencer's time in

8    jail?

9         A.  Well, that he had been framed.

10        Q.  Who told you that?

11        A.  The attorneys.

12        Q.  They told you he had been framed?

13        A.  Of course I already knew that.

14        Q.  What else did they tell you, other than they

15   believed he had been framed?  For example, did they tell

16   you why they thought he had been framed, give you

17   examples, or information?

18        A.  Not particularly, no.

19        Q.  You say you already knew he had been framed,

20   right?

21        A.  Well, if you read the newspaper and listen to

22   TV, you know if you have any brain at all what's going.

23        Q.  So do you think every time something's reported

24   in the newspaper or on 20/20 it's one hundred percent

25   accurate?

Objection -
calls for
hearsay

Response -
not offered
to prove
truth of
statements,
shows
interviewer
influence on
witness

Objection -
calls for
hearsay

Response -
same as
above

69

1    A.   Oh, no, you only believe half of what's in the

2    newspaper.

3    Q.   Okay.  But in this instance you believe all of

4    it; is that accurate?

5    A.   I don't know if I believe it all, I'm entitled

6    to an opinion.

7    Q.   Well, sure, I'm not questioning that, I'm just

8    trying to understand what your belief is in this

9    instance.  You believe that based upon what you read in

10   the newspaper and what you saw on a 20/20 news program

11   that it's one hundred percent accurate that Ray Spencer

12   was framed?

13   A.   Yes.

14   Q.   And you have no other sources of information

15   performing that belief, other than what you read in the

16   newspaper and watched on a 20/20 news program or heard

17   from Mr. Spencer's lawyers?

18   A.   Correct.

19   Q.   Okay.  I want to go back to Exhibit 1 to your

20   deposition, that is the subpoena you received.  I'm

21   handing you Exhibit 1 to your deposition and I just want

22   to clarify in Exhibit 1, among other things you were

23   asked if you had any paperwork at all that bore your

24   signature as a notary public that was dated between 1971

25   through 1991 and you have no such document; is that

70

1  correct?

2      A.  I do not.

3      Q.  And you were also asked if you had any log

4  books that were kept in connection with being a notary,

5  and you indicated you have no such log books either at

6  this time?

7      A.  No.

8      Q.  And you have no records, whatsoever, that

9  contain your signature dated between 1971 and 1991, is

10  that also true?

11      A.  No document?

12      Q.  Yeah, that's the last line there, any and all

13  records dated between 1971 and 1991 which bear your

14  signature.

15      A.  No.

16      Q.  Okay, you don't have anything like that.  So

17  the only documents that we have during those time

18  frames, would you agree at least so far that you're

19  aware of, that do bear your signature, are contained in

20  Exhibit 4?

Objection –
see p. 53
Response –
see p. 53

21      A.  Yes.

22      Q.  As I understand it, when Mr. Henderson met with

23  you the second time on January 24, 2013 he presented you

24  with a typed up declaration and you signed it without

25  making any changes to the declaration; is that true?

71

1    A.   Correct.

2    Q.   Had he read it to you beforehand over the phone

3    and asked you or gave you any chance to make changes to

4    it?

5    A.   He did.

6    Q.   Okay.  When did that telephone call occur?

7    A.   Oh, come on.

8    Q.   Was it between your first meeting and your

9    second meeting?

10    A.   That's correct.

11    Q.   I thought you said you had a meeting, he called

12    you in advance, he came to your house after making

13    arrangements, and after that first meeting ended you

14    arranged he would meet you again at your house?

15    A.   Right.

16    Q.   I didn't hear you say that there was a phone

17    call in between the two meetings earlier and that's

18    where my confusion lies.  Are you saying now there was a

19    telephone call from Mr. Henderson between the two

20    meetings?

21    A.   Right, he read the declaration to me on the

22    phone to see if I wanted to make any changes.

23    Q.   Okay.  And did you make any changes?

24    A.   No.

25    Q.   When he read it to you over the phone, you said

72

1    yes, that's fine?

2         A.   Yes.

3         Q.   Okay.   How long was that phone call?

4         A.   I'm guessing five minutes, I have no idea.

5         Q.   Do you recall anything else?   I'm jumping

6    around here a little bit, I apologize, I'm just looking

7    at my notes.   Do you recall anything else you talked

8    about with Ms. Zellner earlier this morning, other than

9    what to expect at a deposition, what questions would

10   likely be asked at the deposition, and that she was

11   telling you that Ray Spencer had been framed, is there

12   anything else that you recall?

13        A.   No.

14        Q.   And you said earlier you don't recall any of

15   the questions she said that you should expect to get

16   today; is that accurate?

17        A.   That's true.

18        Q.   I'm sorry, ma'am, but in the space of

19   essentially two to three hours you've forgotten what she

20   told you to expect in the way of questions?

21        A.   I guess.

22        Q.   Let's talk about Exhibit 2, please, that's the

23   declaration that you signed.   In paragraph four of

24   Exhibit 2 when Mr. Bogdanovich was asking you questions

25   about it, he was saying, "Can you recall when this

Objection - calls for hearsay; asked and answered
Response - not offered to prove truth, shows potential impact on witness's conclusions

Objection - argumentative
Response - probative of witness' memory and credibility

1  incident occurred with your drawer being pried opened?"

2  And you said, "No, you couldn't recall when it

3  occurred."  He asked you specifically, "Can you say it

4  was before or after 1985?"  And you said, "No, I can't

5  specify that."  Do you recall that testimony?

6       A.   Uh-huh.

7       Q.   You have to answer out loud.

8       A.   Yes, sorry.

9       Q.   It's all right, it's very common.  And is that

10  still your testimony that you cannot recall whether or

11  not that drawer was pried open before or after 1985?

12       A.   Had to be before.

13       Q.   Okay.  So you're clarifying that testimony,

14  right?

15       A.   Yes.

16       Q.   And the reason why you're clarifying that

17  testimony is because in light of Ms. Zellner's objection

18  about the timing of when you moved your office that

19  triggered some memory for you; is that accurate?

20       A.   Right.

21       Q.   And that memory trigger was that you're certain

22  that your office moved to the new building in April of

23  1985, correct?

24       A.   ~~Correct.~~ *Errata: Incorrect. The office moved April 1984.*

25       Q.   Do you recall how soon before your office move

74

*Errata: 1984*

1    occurred in April ~~1985~~ that this incident occurred with

2    your drawer being pried open?

3         A.   No.

4         Q.   Was it years before, months before, days

5    before?

6         A.   I don't know.

7         Q.   So it might have been several years before

8    that?

9         A.   Could have.

10        Q.   Could have been in the 1970s that this

11   happened?

12        A.   Could have.

13        Q.   And you're certain it was Mr. Harold Teters who

14   was the one that pried open your drawer, correct?

15        A.   Yes.

16        Q.   To your knowledge, did anybody ever open your

17   drawer that contained your notary stamp at anytime other

18   than when Mr. Teters did it sometime between 1971 and

19   1985?

20        A.   No.

21        Q.   To your knowledge, nobody ever accessed your

22   notary stamp while you worked at the Clark County

23   Sheriff's Office; is that accurate?

24        A.   Had access?

25        Q.   Ever take it from you, use it without your

75

1    permission?

2         A.   No.

3         Q.   That never happened?

4         A.   No.

5         Q.   Do you believe that Sergeant Michael Davidson

6    or Detective Sharon Krause took your notary stamp and

7    used it to forge the Quit-Claim Deed that is attached to

8    Exhibit 3 of your deposition?

9         A.   Give me that question again from the beginning.

10        Q.   Sure.  Do you believe that Detective Sharon

11   Krause or Sergeant Michael Davidson took your notary

12   stamp and used it to forge your signature on Exhibit 3,

13   second to last page, which is the Quit-Claim Deed?

14        A.   I don't know.

15        Q.   Okay.  I understand you don't know.  Do you

16   believe that to have happened?

17        A.   Could have.

18        Q.   It could not have as well, right?

19        A.   Possibly.

20        Q.   You think, more likely than not, that it did

21   occur?

22        A.   I don't know.

23        Q.   So you would not say, more likely than not,

24   that they did take it?  Let me rephrase it.

25        A.   Please do.

76

1     Q.   Can you say, more likely than not, Detective

2  Krause and/or Sergeant Michael Davidson took my notary

3  stamp and used it to forge my name and used my stamp on

4  the Quit-Claim Deed that is in Exhibit 3, second to last

5  page?

6     A.   More than likely.

7     Q.   You think more than likely that happened?

8     A.   Could have happened.

9     Q.   Why do you think it would be those two and not

10  somebody else?

11     A.   Well, they're the ones with the interest in the

12  case.

13     Q.   What's their interest in the case?

14     A.   What's their interest?

15     Q.   Yeah.

16     A.   Well, they're being sued.

17     Q.   But this happened decades before they were

18  being sued?

19     A.   Well, they were trying to get his signature and

20  he was refusing, so they were doing it.

21     Q.   Why were they trying to get his signature?

22     MS. ZELLNER:   I would just object to her

23  speculating on their motive.

24  BY MR. FREIMUND:

25     Q.   Go ahead, why do you think they were trying to

77

1    get her signature?

2        A.   His signature.

3        Q.   Okay.   I thought you said her, his then.   Why

4    do you think they were trying to get his signature?

5        A.   Because they were working evidently with the

6    wife of his, Clyde Spencer's.

7        Q.   And how do you know that?

8        A.   It's in this, about the property.

9        Q.   Okay.   Her name's on the Quit-Claim Deed, is

10   that what you're talking about?

11       A.   Her name is on -- yeah, it has to do with the

12   property.

13       Q.   Okay.   And you would figure her name would be

14   on there, right, because she's the co-owner of the

15   property, right?

16       A.   Right, but he was refusing to sign the

17   Quit-Claim Deed.

18       Q.   So why is it, do you think, Sergeant Davidson

19   and/or Detective Krause had an interest one way or

20   another in whether or not Mr. Spencer would sign the

21   Quit-Claim Deed?

22       A.   I don't know.

23       Q.   Well, you believed they did.   I'm trying to

24   figure out why you believe that.

25       A.   I don't know, I can't answer your question.

78

1      Q.   Do you believe it because that's what the

2   lawyers for Mr. Spencer told you?

3      A.   No.

4      Q.   Do you believe it because that's based on what

5   you saw in the newspaper or heard on the 20/20 show?

6      A.   Possible.

7      Q.   Is there any other bases for your belief other

8   than those three possible sources?

9      A.   No.

10      Q.   And you indicated to your knowledge Sergeant

11   Davidson and Detective Krause never forged anybody's

12   signature on anything, at least as far as you're aware

13   of, other than your belief that maybe they did so in

14   this case; is that true?

15      A.   True.

16      Q.   And this case is different why?

17      A.   I can't answer that.

18      Q.   When you said that your desk drawer had been

19   pried open sometime between 1971 and 1985, how did you

20   know it had been pried open?

21      A.   Well, it had been locked the night before and

22   it was open in the morning and the lock was all bent.

23      Q.   So it looked like somebody had used like a

24   screwdriver or something and bent the metal?

25      A.   Some foreign object, I presume.

79

1    Q.   Was it a wood desk or a metal desk?

2    A.   It was metal.

3    Q.   So the metal was bent around the area where the

4  lock was?

5    A.   As I recall.

6    Q.   So it was quite obvious that somebody had tried

7  to break into your desk drawer?

8    A.   Correct.

9    Q.   And you didn't think anything of this, you

10  didn't report it to anybody, you didn't take any steps?

11    A.   No.

12    Q.   And how long was it after you see this damage

13  to this county owned desk, that has your notary stamp in

14  it, that you find out that Mr. Teters pried open your

15  desk, how much time passed between the date you observed

16  it and the date you received information that Teters had

17  done this?

18    A.   It was probably from eight o'clock in the

19  morning to the next day.  I mean, from one day until the

20  next day when I came to work at eight o'clock in the

21  morning.  He was on duty, I was on duty.

22    Q.   For 24 hours?

23    A.   He's a prankster.

24    Q.   I understand.

25    A.   He wasn't there to take my notary seal.

80

1      Q.  He thought it was a prank to pry open your

2   locked drawer?

3      A.  Yeah, I think so.

4      Q.  So 24 hours later he told you that he was the

5   one that had done this?

6      A.  About that.

7      Q.  Did he say why he thought it was funny to try

8   to break into a locked drawer of your desk?

9      A.  I don't know what he said.

10     Q.  Okay.  You testified that you have no memory of

11  inmates from the jail coming down into the civil

12  division office for any reason at all; is that right?

13     A.  That's right.

14     Q.  So they never left the jail as far as you're

15  aware, inmates in the jail never left the jail and came

16  down into other parts of the building?

17     A.  Not to my part of the building.

18     Q.  Okay.  Would they come to other parts of the

19  building, the inmates?

20     A.  They might have, detectives might have taken

21  them right past my desk to go over to the detective

22  department.

23     Q.  So they might have walked right in front of

24  your desk, but not exactly in the section where your

25  desk is, is that what you're saying?

81

1    A.  In the old building, yes.

2    Q.  In the old building is where you were until --

3    A.  1985. Errata: 1984

4    Q.  April 1985, correct?

5    A.  Right. Errata: Wrong, It was April 1984.

6    Q.  So in the old building before April 1985 there

7    would be times where inmates would be escorted from the

8    jail by detectives to areas very close to where your

9    desk was; is that correct?

10   A.  Yes.

11   Q.  And when we say "very close," how close?

12   A.  When they were going by my desk?

13   Q.  Yes.

14   A.  Oh, five, six feet.

15   Q.  So you would see jail inmates with regularity?

16   A.  Yes, once in a while.

17   Q.  And if jail inmates had something notarized

18   while they were in the jail, how would that get

19   accomplished, if you know?

20   A.  I don't know.

21   Q.  Okay.  You're aware that sometimes jail inmates

22   would have a need to have documents notarized while

23   they're in the jail, don't you?

24   A.  Maybe.

25   Q.  Okay.  When you moved to the new office in

82

1 April of ~~1985~~, would you still see inmates from your

   1984 (per errata)

2 desk being escorted by police officers?

3     A.  Never. (Errata) after we moved in April 1984.

4     Q.  And why was that, what changed?

5     A.  I don't know, maybe they went to them, and when

6 they went to court, they didn't come through our part of

7 the building.

8     Q.  Okay.  So they used a different route, in other

9 words?

10     A.  Yes.

11     Q.  You indicated in your declaration, that's

12 Exhibit 2, that you were acquainted at work with

13 Sergeant Davidson and Detective Krause, did you have any

14 dislike towards either of those individuals?

15     A.  No.

16     Q.  Did they ever appear to you to act in any way

17 that was less than professional and respectful?

18     A.  No.

19     Q.  Did they ever appear to you to engage in any

20 activities or say anything that you felt was

21 inappropriate or improper?

22     A.  No.

23     Q.  And would you agree that you knew both of them

24 as acquaintances, at least that you saw most working

25 days, for twenty years?

83

1      A.   Yes.

2      Q.   All right.

3           MR. FREIMUND:   That's all the questions I have

4    for you, thank you.

5           THE WITNESS:   You're welcome.

6           MS. FETTERLY:   I have no questions.

7           MS. ZELLNER:   I've got a couple.


9                        EXAMINATION

10   BY MS. ZELLNER:

11     Q.   I want you to look at this exhibit, the

12   Quit-Claim Deed exhibit and I want you to assume for the

13   purposes of my question that this signature looks

14   identical to your signature, okay?

15     A.   Right.

16     Q.   Just assume that.   Is there any other reason

17   that you believe your signature is forged on this

18   document?   Other than the way it looks, is there any

19   other reason that you know you didn't notarize Clyde Ray

20   Spencer's signature?

21     A.   For one thing, why would I write in the date,

22   normally everything was typed in.

23     Q.   Right.   But isn't it correct that you never

24   notarized an inmate's signature?

25     A.   That's right.

*Objection, leading*

Response - question is proper to develop witness's testimony and clarify confusion created by defense counsel's questions regarding basis for knowledge that signature was forged

Rider & Associates, Inc.
360.693.4111