1   clarify information a child has given you if they're not
2   able to clearly describe things that have happened to
3   them.  If they tell you about something that's happened
4   to them, you might use the dolls to help them clarify
5   their description.
6       Q   Do you recall if you ever used anatomical dolls
7   in your treatment of Kathryn Spencer?
8       A   I don't recall using anatomical doll with
9   her.
10      Q   Is there a reason that you would not have used
11  them?
12      A   She didn't disclose to me abuse, so it might
13  have been considered leading or suggestive.
14      Q   Now, did California, in 1984 and 1985, have a
15  child abuse and neglect reporting act?
16      A   Yes, they did.
17      Q   And what was your -- what is your general
18  understanding of what that act required of you as a
19  practitioner?
20      A   You're required to report abuse; physical,
21  sexual neglect; mistreatment of a child.
22      Q   Do you recall if you ever made such a report in
23  California about Kathryn Spencer?
24      A   I don't recall making any report about her.
25  No.

```
1      Q    And is it your understanding under the child
2   abuse and neglect reporting act in California that you
3   would have been required to make such a report if
4   Kathryn Spencer had divulged sexual abuse to you?
5      A    Yes.
6           MR. FREIMUND:  Objection.  Leading.  Calls for
7   a legal conclusion.
8           Go ahead and answer.
9           THE COURT REPORTER:  I'm sorry, Counsel.
10  Who -- what was your name?
11          MR. FREIMUND:  That was Jeff Freimund.  I
12  objected.  It was leading and calls for a legal
13  conclusion.
14          But go ahead and answer.
15  BY MS. ZELLNER:
16     Q    Yeah.  You can answer with that objection.
17     A    I'm sorry.  What was the question again?
18          MS. ZELLNER:  Could you read the question back,
19  please.
20          THE COURT REPORTER:  Gentlemen, please state
21  your name prior to making your objection.  Thank you.
22                    (Record read.)
23  BY MS. ZELLNER:
24     Q    Do you have any recollection of discussions
25  with anyone in law enforcement about Kathryn Spencer?
```

*Handwritten margin note (right side):* objection leading & calls for legal conclusion

*Handwritten margin note (right side):* Rresponse -Not a legal conclusion; it is her understanding of what she was obligated to do at the time

Deposition of Ann Link, Ph.D.

SPENCER VS. PETERS

1    A   I have a vague recollection of talking to

2  someone in law enforcement and informing them that

3  Kathryn had not disclosed abuse information to me.

4    Q   And do you recall who the person or persons

5  were that you spoke to?

6    A   I do not.

7    Q   Do you recall the time frame of when you might

8  have been contacted by law enforcement?

9    A   I don't recall a specific date.  No.

10   Q   Do you recall having any discussion with a

11  prosecutor or -- and another attorney about

12  Kathryn Spencer's treatment with you?

13   A   I don't recall that.  No.

14   Q   All right.  Now, if we could look at the

15  different exhibits for today's deposition, I want to

16  start with Plaintiffs' Exhibit 1.

17       (Plaintiffs' Exhibit 1 was previously marked

18  for identification and is attached hereto.)

19  BY MS. ZELLNER:

20   Q   And tell me, Doctor, when you have that exhibit

21  in front of you.

22   A   I have it in front of me.

23   Q   Do you recognize your signature on this exhibit

24  on page -- it's page 3?

25   A   Yes.

Plaintiff objects to lines 10-13 based on motion in limine #13, dkt. 202 at 15 (seeking to bar testimony related to May 9 interviews; if motion is denied, Plaintiff reserves right to supplement highlighting.

see defendants response to plltfs' miL #13

object. ft. 1:504 hearsay and cumulative

| | | |
|---|---|---|
| 1 | Q | And does this -- what do you understand this |
| 2 | | document to be? |
| 3 | A | This is an affidavit. |
| 4 | Q | And do you understand that this affidavit is |
| 5 | | made under penalty of perjury? |
| 6 | A | Yes. |
| 7 | Q | And did you have this affidavit notarized? |
| 8 | A | No. |
| 9 | Q | Is it notarized? |
| 10 | A | I'm sorry.  Which one are we talking about? |
| 11 | Q | I'm talking about Exhibit 1.  There's a notary |
| 12 | | on it on page -- |
| 13 | A | Okay.  Oh.  I'm sorry.  Yes.  I see that. |
| 14 | Q | Page 4.  Do you recall having the affidavit |
| 15 | | notarized? |
| 16 | A | Yes. |
| 17 | Q | Okay.  Now, I want to direct you -- is the |
| 18 | | affidavit true and correct to the best of your |
| 19 | | knowledge? |
| 20 | A | Yes. |
| 21 | Q | I want to direct your attention to |
| 22 | | Plaintiffs' Exhibit 2. |
| 23 | | (Plaintiffs' Exhibit 2 was previously marked |
| 24 | | for identification and is attached hereto.) |
| 25 | | THE WITNESS:  I have that.  Yes.  Wait. |

Response-Setting foundation for authenticat ion; no out of ct of court statement introduced

Response - Id.

objection, hearsay and cumulative

```
1    BY MS. ZELLNER:

2         Q    Yeah.

3         A    Oh, yeah.

4         Q    And identify this document for the record.

5         A    This is a letter from me to Ms. Zellner stating

6    that I can't disclose whether I had treated

7    Kathryn Spencer or not and would need a release of

8    information or a valid court order to talk about it.

9         Q    And then that's your signature on the letter?

10        A    Yes.

11        Q    And it was sent, I believe, on

12   November 30, 2012.

13        A    Yes.

14        Q    And then if we turn to the next page, which is

15   Plaintiffs' Exhibit 3, could you identify that document

16   for the record.

17             (Plaintiffs' Exhibit 3 was previously marked

18   for identification and is attached hereto.)

19             THE WITNESS:  Authorization for Release of

20   Information.

21   BY MS. ZELLNER:

22        Q    And what's your understanding of the purpose of

23   this document?

24        A    It was authorizing -- it was an authorization

25   to discuss over the telephone with Kathleen Zellner the
```

1    case -- my memories of Kathryn Spencer.

2        Q   And do you recall that conversation?  For the

3    record, I'll say with Kathleen Zellner.

4        A   Over the telephone?

5        Q   Yes.

6        A   Yes.

7        Q   And do you remember approximately when that

8    conversation occurred?  I think you got the release on

9    December 10th.

10       A   I don't recall.  Just a couple of days, I

11   guess.

12       Q   All right.  And do you remember in that

13   conversation what was discussed about Kathryn Spencer's

14   treatment by you in 1984 and 1985?

15       A   Well, I believe that I was asked if I

16   remembered the case and what I remembered about it, and I

17   said that I did remember treating Kathryn Spencer; that

18   she was around 5 years old and came in for alleged sexual

19   abuse.

20       Q   Did you discuss in that conversation whether

21   you had any of Kathryn Spencer's records?

22       A   Yes.  I said that I did not have records but

23   that I had an independent recollection of the case.

24       Q   And in that conversation, did you provide

25   information to Ms. Zellner about whether or not

1    Kathryn Spencer had divulged sexual abuse to you?

2         A    I believe I did.

3         Q    Do you remember anything else about the

4    conversation?

5         A    I had several conversations with Ms. Zellner,

6    so I don't remember exactly what I said in each one

7    but...

8         Q    Okay.

9         A    I don't know.  She may -- I may have asked

10   for -- she may have told me about some background about

11   the case.

12        Q    Anything else that you remember?  And we're

13   just at this point talking about the first conversation.

14        A    No.  I don't remember exactly.

15             (Plaintiffs' Exhibit 4 was previously marked

16   for identification and is attached hereto.)

17   BY MS. ZELLNER:

18        Q    Okay.  If we look at the next page,

19   Plaintiffs' Exhibit 4, do you recognize this email?

20        A    Yes.

21        Q    And what was your understanding of the purpose

22   of this email?

23        A    To let me know that there was going to be some

24   information sent that I could review and sign with a

25   notary.

1       Q    Does the email indicate it was sent to you in

2   Word format so you could make any changes or deletions?

3       A    Yes.

4       Q    Now, if we look at -- within that same group

5   exhibit, Plaintiffs' Exhibit 4, there is an affidavit

6   then that was sent to you.  If you can, go to that first

7   affidavit.

8       A    Is that right after that?

9       Q    Yeah.  It's unsigned.

10      A    Yes.

11      Q    Okay.  And if I could direct you to

12  paragraph 6, paragraph 6 for the record states, "After

13  meeting with Kathryn's mother, I met privately with

14  Kathryn on multiple occasions.  During my sessions with

15  Kathryn, she manifested a high level of anxiety.  For

16  example, I recall Kathryn balled up on the floor.  I

17  utilized play therapy, a form of psychotherapy, in an

18  attempt to communicate with Kathryn and assess her

19  underlying psychological state."

20           Do you see that paragraph?

21      A    Yes.

22      Q    If we look back at the affidavit that you

23  signed on December 13th, if you could go to paragraph 6,

24  the last sentence of paragraph 6 --

25      A    Is this Exhibit 1?

```
 1        Q    Yeah.  Exhibit 1.

 2        A    Yes.  I see.

 3        Q    So paragraph 6 has been modified.

 4             Do you see that?

 5        A    Yes.

 6        Q    And it states in the last sentence of

 7   Exhibit 1, paragraph 6, "I utilized play therapy, comma,

 8   form of psychotherapy, comma, to reduce anxiety, comma,

 9   encourage communication, and provide healthy coping."

10             Do you see that --

11        A    Yes.

12        Q    -- language in Exhibit 1, paragraph 6?

13        A    Yes.  Excuse me.  It says, "Promote healthy

14   coping."  Yes.  I see that.

15        Q    And was that sentence modified by you?

16        A    Yes, it was.

17        Q    And did you modify the sentence to better

18   explain what play therapy was?

19        A    Yes.  I felt that was a better description of

20   play therapy.

21        Q    And then if we look at paragraph 8 in the

22   original affidavit sent to you, it states for the record,

23   "During that time period, I never used dolls to elicit

24   information from a child regarding possible abuse because

25   in my view some dolls are suggestive, period.  I did not
```

1    use any dolls during my sessions with Kathryn, and

2    Kathryn never demonstrated any abuse to me using dolls."

3          Was that -- did I correctly read what was in

4    paragraph 8 of the first affidavit that my office sent to

5    you?

6        A    Yes.

7        Q    And then in your final affidavit, the one that

8    you actually signed, that's been modified to read, During

9    play session with Kathryn, I never used play therapy

10   supplies, including toys, dollhouse dolls, and art

11   materials.  I used play therapy supplies, including toys,

12   dollhouse dolls, and art materials.  Kathryn did not

13   demonstrate any abuse to me using play therapy supplies.

14         Is that -- was that modification done by you to

15   the original affidavit that we sent you?

16       A    Yes.

17       Q    And what was the purpose of modifying the

18   original paragraph 8?

19       A    It was my intention to more correctly say what

20   I did do in the therapy sessions with Kathryn.

21       Q    And you had, in fact, used -- I think you

22   called them dollhouse dolls --

23       A    Yes.

24       Q    -- with Kathryn?

25       A    Yes.

1        Q     Okay.

2        A     Regular play dolls that don't have anatomical

3    parts.

4              (Plaintiffs' Exhibit 5 was previously marked

5    for identification and is attached hereto.)

6    BY MS. ZELLNER:

7        Q     Okay.  And then in -- if we look at

8    Group Exhibit 5, the first note email that's sent to you,

9    that's December 12 at 3:50 p.m.

10             Do you see that?

11       A     Yes.

12       Q     And it indicates to you that there's -- "Please

13   sign Kathryn's authorization and your revised declaration

14   attached."  That was sent at 3:50 p.m.

15             And then at 5:26 p.m., another note was sent

16   saying, "Sorry about the confusion.  Please find your

17   revised declaration attached."

18             Do you remember receiving that document?

19       A     Yes.

20       Q     Okay.  And then you did receive then an

21   authorization, which is within that Group Exhibit 5.

22   It's actually in like five or six pages.

23             You received an authorization of -- again, from

24   Kathryn Spencer, authorizing you to release information

25   about her for purposes of this deposition; is that

1    correct?

2        A    Yes.

3            (Plaintiffs' Exhibit 6 was previously marked

4    for identification and is attached hereto.)

5    BY MS. ZELLNER:

6        Q    Okay.  And then on December 12th, 2012, in

7    Group Exhibit 6, documents were sent to you from my

8    office for your review; is that correct?

9        A    Yes.

10       Q    I want to focus on certain parts of these

11   documents in Group Exhibit 6, and so if you could turn to

12   the second page, at the top it says, "James M. Peters,

13   11/8/12," page 97, and it also has the name "Johnson" at

14   the top.

15           Do you see that?

16       A    I do.

17       Q    Okay.  Did you have the opportunity to read

18   this document prior to sending your affidavit back on

19   December 13th?

20           I'm sorry.  I didn't hear you.  I think -- do

21   you see the documents?

22       A    I see the document.  Yes.  I was just trying to

23   figure out --

24       Q    If we go to --

25       A    What was the --

1       Q   -- page 97 of the document, did you see

2   reference in Mr. Peters' deposition on page -- it starts

3   actually on page 97, but at the top of 98, did you see

4   reference to your name in Mr. Peters' dep?

5       A   Yes.

6       Q   And if we look at page 98, at 9 through 22,

7   Mr. Peters states at line 5 -- or the question at line 5

8   is "November 1st was the first time you say -- you say

9   Katie Spencer reported it.  Correct?

10          "ANSWER:  I didn't say that.

11          "QUESTION:  To Ann Link.

12          "ANSWER:  Oh.  All I know is what Ann Link told

13   me.  I don't know about anything else."  That's at line 9

14   and 10.

15          "QUESTION:  "Okay.  And that first revelation

16   that you're talking about came to Ann Link as Ann Link

17   told you on November 1st of 1984.  Correct?

18          "ANSWER:  Just to be clear, there had been

19   prior revelations to Shirley Spencer and to

20   Sharon Krause.  The first revelation.

21          "QUESTION:  I'm just talking about Ann Link.

22          "ANSWER:  As far as I know, when Mr. Rulli and

23   I talked to Ann Link in Sacramento, she told us that

24   Katie had disclosed to her sexual abuse by Ray.

25   Described it with anatomical dolls, including fellatio --