behalf of Ms. Fetterly, and I represent Jim Peters.

My first question relates to the gentleman by the name of Jim Rulli.

Do you know who is?

A No.

Q Do you ever recall meeting him?

A No.

Q Okay. Do you know Jim Peters?

A No.

Q Do you ever recall meeting him?

A No.

Q Okay. Do you ever recall talking to Mr. Rulli either in person or over the telephone?

A No.

Q Okay. Do you ever recall speaking to Mr. Peters either in person or over the telephone?

A No. I don't recall that.

Q Okay. Do you recall having any meeting in which Mr. Peters and Mr. Rulli were together speaking with you?

A No. I don't recall that.

Q Okay. So is it fair to say -- well, I'll just ask it. Do you recall telling anybody by the name of Jim Peters anything in a conversation either in person or over the phone?

A No.

Q Okay. So is it fair to say you don't recall the content of anything you told Mr. Peters either in person or over the phone?

A Yes.

Q Okay. With respect to Mr. Rulli, I would ask the same question.

Do you recall ever speaking with him in person or over the phone?

A No.

Q Okay. Do you recall the content of anything you told Mr. Rulli either in person or over the phone?

A No. I don't have a recollection of that.

MR. JUDGE: Thank you. I don't have any further questions.

EXAMINATION

BY MR. JUSTICE:

Q Ms. Link, my name is John Justice. I'm an attorney representing Sharon Krause. I have a couple questions for you.

You mentioned that you did recall speaking with Sharon Krause at some point in time; is that correct?

A Yes.

Q Do you remember when those conversations took place?

Objection based on motion in limine 13, dkt. 202 at 15; Plaintiff reserves right to supplement highlighting if motion is denied.

See Ds' response to Pl's MIL #13

A No, I don't.

Q Do you remember if there was more than one conversation?

A No.

Q Do you remember meeting -- whether or not you met with her in person?

A No. I don't recall that.

Q Is it possible that you did and just don't recall?

A It's possible.

Q And do you recall the contents of any of the conversations that you had with Sharon Krause?

A I remember finding out that she had met with Katie Spencer and that she had said Katie revealed details of sexual abuse to her and that she'd spent some -- a fair amount of time with her.

Q Do you remember if that information was relayed to you while you were in the middle of counseling Katie Spencer or at some point other than that? I mean can you pinpoint where in your relationship with Katie Spencer that information came to you?

A I think it was while I was still doing therapy with Katie Spencer.

Q Did you --

A It was around that -- it was --

Q Did you attempt to confirm or dispel that information that you had received from Sharon Krause in your sessions with Katie Spencer?

A Not that I recall. No.

Q If you received information from someone other than your patient that they have possibly -- that your patient has been possibly the victim of sexual abuse, does that fall within your mandatory reporting requirements under the California law?

A Yes.

Q And yet you do not recall whether or not after receiving that information from Sharon Krause that you reported that information to the authorities?

A That's correct.

Q But you are saying that you would normally do that if you had received information from a third party not necessarily limited to your patient; is that correct?

A Correct.

Q Any other details or information that you recall in your communications with Sharon Krause, either receiving from her or communicating to her, that you haven't disclosed in this deposition?

A No. I have no other recollections of talking to Sharon Krause.

Q I'm curious about the development of the declaration that we have received from you.

Did you at any point in time in your recent communications with plaintiffs' counsel write down your recollection of your therapy with Katie Spencer and share that with plaintiffs' counsel?

A Write it down? No.

Q Did you type it out? Is there any other written document that you have created that was provided to plaintiffs' counsel prior to the declaration being created?

A No.

Q So the first written document that attempted to formulate your testimony in this declaration came from the plaintiffs' counsel?

A I'm sorry. What was the question?

Q The question was is it true to say that the first written document that was characterized as your testimony in this case came from the plaintiffs' counsel.

A You mean the affidavit that we developed?

Q Yes.

A Yes.

Q I want to apologize for jumping around a little bit. That kind of comes from going last.

But you mentioned that you received your Ph.D.

from an institution, and I didn't catch the name of that institution.

A Professional School of Psychology.

Q Where's that located at?

A San Francisco.

Q Was that -- were you in person there or is that a distance learning facility?

A Some of the classes were in Sacramento. Some of them were in San Francisco.

Q So it's an actual brick and mortar institution?

A Yeah. We attended classes in San Francisco.

Q And is that at a place called the Professional School of Psychology or is it -- do they have two different branches? I'm not understanding that.

A Well, I just recall we went to classes at the Professional School of Psychology in San Francisco. I don't remember exactly the address or buildings.

Q And you said something about Sacramento as well.

Did they have a branch in Sacramento?

A I believe so.

Q What was your dissertation in?

A It was about altruistic behavior in schizophrenics.

Q Is that published? Is it available online?

A I don't believe it's online. No. It wasn't published.

MR. JUSTICE: That's all the questions I have.

MS. ZELLNER: I've got a few questions. This is Kathleen Zellner again just for clarification.

FURTHER EXAMINATION

BY MS. ZELLNER:

Q Dr. Link, could you look back at Exhibit 1, your affidavit.

A Yes.

Q Okay. If you look at paragraph 7, could you read that into the record, please.

A "I specifically recall that at no point during my sessions with Kathryn did she describe being molested by anyone."

Q Is it a correct statement that you have an independent recollection that Kathryn Spencer did not describe being sexually abused to you?

A Yes.

Q Then if we look at paragraph 10, could you read that into the record.

A "I never would have told any person, including law enforcement, that Kathryn had described any abuse to me because she had not done so."

Response: the declaration is a properly authenticated exhibit to this deposition; Dr. Link's testimony that certain statements are true is the evidence; Plaintiff is not seeking to substitute the affidavit for her testimony; also, lines 17-20 are not subject to objection to exhibit;

Objection Ex. 1 is hearsay and cumulative

Q Okay. Is that a true statement?

A Yes.

Q When counsel -- if Kathryn Spencer did not report sexual abuse to you, would you have reported to Prosecutor Peters that Kathryn Spencer had been sexually abused?

MR. JUDGE: Objection to the form of the question.

THE COURT REPORTER: I'm sorry. Who was that?

MR. JUDGE: I'm sorry. Dan Judge.

BY MS. ZELLNER:

Q If Kathryn Spencer did not report sexual abuse to you, would you have reported that she had been sexually abused to Prosecutor Peters?

MR. JUDGE: Objection to the form.

Go ahead.

THE WITNESS: If she had not reported to me that she was sexually abused, would I have reported it to Peters? Is that what you're asking?

BY MS. ZELLNER:

Q Right.

A I'm sorry.

Q Right. Would you have reported it to Prosecutor Peters if she had not told you that she had been sexual abused?

A No, I would not have.

Q Would you have reported to Defense Attorney Rulli if she had not been sexually abused?

A No.

Q And would you have reported to Sharon Krause if she had not been sexually abused?

A No.

Q Now, you had stated previously that you don't recall using anatomical dolls with Kathryn Spencer.

Kathryn Spencer you say -- you remember did not describe being molested by anyone. Correct?

A Correct.

Q So would there be any reason for you to use anatomical dolls with Kathryn Spencer if she made no report of abuse to you?

A No.

Q Would that be considered proper? Would that conform with the standard of care for a psychologist, do you believe, to not show the dolls -- anatomical dolls if someone had not been abused?

A Yes.

MS. ZELLNER: Okay. All right. I don't have any further questions.

///

Response -What she understood as proper; relevant to what she would have done during therapy with Katie, i.e., not use anatomic dolls.

objection: improper opinion; no foundation

FURTHER EXAMINATION

BY MR. FREIMUND:

Q I just have one follow-up question -- this is Jeff Freimund -- in regards to your training, Ms. Link. Back in 1984 and 1985 when you were a psychology intern and Ph.D. candidate, do you recall receiving any training whatsoever on interview techniques that should be used with child victims of sexual abuse?

A Yes.

Q What do you recall receiving training from? I'm sorry. Who do you recall receiving such training from?

A What was your -- what was your statement preceding that question?

Q You mean what kind of training am I talking about?

A No. No. What did you say before?

Can you just read the last couple of questions there?

Q I'm just asking -- you said that you recall receiving training back in 1984 and 1985 when you were a psychology intern and Ph.D. candidate regarding the interview techniques that are used for child sexual abuse victims and I'm asking who you received that training from.

Response: Relevant to show what techniques Dr. Link utilized during Katie's therapy, which resulted in no disclosures.

Objection, irrelevant; insufficient foundation of expertise

Response to Defense objection from page 87 to 89:
-Id.
-The fact that Dr. Link was properly trained and utilized techniques from her training is relevant to the strength of Katie's non-disclosure and supports claim that Krause misquoted and misrepresented statements attributed to Katie.



A I received training actually during my MFT experience with Dr. Mary Ann Frank.
Q What's your MFT experience? I don't know what you're referring to.
A Marriage, family -- marriage, family, and child counseling license that I had at the time.
Q Okay. What was the nature of your training? How long a session was it?
A It was multiple sessions.
Q And this was specifically on interview techniques that are used with child sexual abuse victims?
A Yes.
Q Okay. And is it interview techniques in the forensic sense of being an investigator of child sexual abuse allegations that you were being trained on?
A No.
Q What was the context of the training then?
A Therapy.
Q So it was how to administer therapy to child sexual abuse victim that you're talking about?
A Yes. It was how to administer therapy as well as how to interview them about it in a therapy context.
Q Okay. And what do you recall knowing back in 1984 and '85 about interviewing children in a therapy

objection, irrelevant & FRE 403, confuses and misleads re: remaining issues in the case

context regarding sexual abuse allegations?

A That if the child disclosed sexual abuse to you, then you might clarify what they have said by using anatomically correct dolls to help them communicate what had happened to them.

Q All right. Anything else?

A That there was -- it was very important not to make any kind of leading statements or questions to children, particularly if they had not testified or given statements. It was very important not to contaminate evidence they might give.

Same response as p. 87

Same objections as on p. 87

Q Okay. Anything else?

A Well, it was important to reassure them and help them to feel safe and to feel like they hadn't done anything wrong. That, you know, it was okay to talk about their feelings and things like that.

Q Okay. Anything else that you can remember that you received training on in this regard?

A That you shouldn't in any way say anything, you know, or imply anything that they should say in a court or any kind of legal proceeding that might sway their impressions of what had happened to them.

Q Okay. Anything else that you remember receiving training about in regard to interviewing techniques in the therapeutic context to child sexual