**THE HONORABLE BENJAMIN SETTLE**

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

CLYDE RAY SPENCER

Plaintiff,

v.

DETECTIVE SHARON KRAUSE and SERGEANT MICHAEL DAVIDSON,

Defendants.

**NO. C11 5424 BHS**

**DECLARATION OF SHARON KRAUSE FOR MOTION IN LIMINE ISSUES RAISED BY THE COURT**

**NOTE ON MOTION CALENDAR: Thursday, December 26, 2013**

PURSUANT TO 28 U.S.C. § 1746, Sharon Krause declares as follows:

1. I am competent to testify in all respects, and make this declaration from personal knowledge to provide the Court with the foundational information requested at the Pretrial Conference regarding the sources and extent of my knowledge about Ray Spencer's rape of Rhonda Short, his lies to his supervisors at the Vancouver Police Department, and his threats to harm persons involved with the criminal investigation, including me and Michael Davidson.

2. During a phone conversation I had with DeAnne Spencer prior to me going to Sacramento in October of 1984 to conduct victim and witness interviews, DeAnne told me that while she and Ray were living in California a neighbor girl named Rhonda Short accused Ray of raping her. It was my understanding from that conversation with



*LAW, LYMAN, DANIEL, KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON BLVD SW, TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480 FAX: (360) 357-3511*

DeAnne that Rhonda was approximately 12 years old at the time of the rape, and that Ray had denied anything happened between him and Rhonda. This reported rape was potentially very significant to our investigation, given the similarity of the alleged crimes and the age of the reported victims. It was my intention to follow up with DeAnne about the Rhonda Short rape when I interviewed her in person in Sacramento.

3. Sgt. Davidson and I spoke briefly to Dr. Abrams before he conducted his second polygraph examination of Spencer on September 24, 1984, and Dr. Abrams expressed concern that there may have been something bothering Spencer causing the inconclusive results of the first polygraph exam. I believed it might have something to do with the reported rape of Rhonda Short, so I told Dr. Abrams what DeAnne had told me about it. After the second polygraph examination concluded, Dr. Abrams told Sgt. Davidson and me that he asked Spencer about Rhonda Short, and Spencer admitted that he had sex with her but claimed Rhonda was 19 a the time and the sex was consensual. Spencer's admission to having sex with Rhonda conflicted with the information I had received from DeAnne about Rhonda's age and lack of consent, and I continued to believe the Rhonda Short incident was potentially very significant to our investigation and intended to get more information from DeAnne when I interviewed her in person. True and complete copies of pages 8 and 9 of 12 of one of my Utility Reports in which I explained my discussion of the reported Rhonda Short rape with Dr. Abrams are attached hereto as **Exhibit A**.

4. When I was in Sacramento in October 1984 I interviewed DeAnne Spencer in person and asked her to tell me more specifically about Spencer's reported rape of Rhonda Short. True and complete copies of pages 9 -12 of 22 of one of my Utility Reports in which I explained what DeAnne told me at that time about Spencer's rape of Rhonda Short are attached hereto as **Exhibit B**. When conducting a criminal investigation into allegations of the type involved here it is important to gather as much information as possible about the suspect, victims and witnesses in order to have a



*LAW, LYMAN, DANIEL, KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON BLVD SW, TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480 FAX: (360) 357-3511*

context against which to assess the credibility of all involved and the probability that the suspect committed the crime under investigation. DeAnne's description of Spencer's behavior before and after the Short family reported the rape seemed consistent with other information I obtained about Spencer's tendency to manipulate others. Although DeAnne told me at that time that Rhonda was 19 years old when the rape occurred, she described Rhonda as "emotionally very, very immature," suggesting to me a vulnerability of the victim that would make it more likely he would take similar advantage of another vulnerable victim such as his young daughter. Also, the fact that Spencer had admitted to having sex with Rhonda Short when confronted with the issue during his second polygraph exam after having continuously denied it to DeAnne for years cast doubt in my mind about his credibility, when he was denying having sexually assaulted his daughter Kathryn despite Kathryn's disclosures of the assaults to Shirley Spencer and to me.

5. From the time I was first assigned to investigate the Spencer case in late August 1984 I was in contact with Spencer's superiors at the Vancouver Police Department, including Capt. King, Lt. Woodward and Cpl. Hulse. I was asked to provide copies of the Sheriff's Office investigative reports to the Vancouver Police Department, and I did so periodically. I also periodically communicated regarding the status of and information learned during our respective Sheriff's Office criminal investigation and the Vancouver Police Department's internal affairs investigation. It was my understanding the Vancouver investigation had been initiated due to the allegations we were investigating regarding Spencer and his daughter Kathryn, but that the Vancouver investigation also involved Spencer's reported rape of Rhonda Short and incidents involving Spencer allegedly lying to his superiors at the Vancouver Police Department regarding his actions during an undercover operation. Sometimes the communications between the Vancouver police investigators and me would be by



*LAW, LYMAN, DANIEL, KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON BLVD SW, TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480 FAX: (360) 357-3511*

phone, other times one or more of the Vancouver police investigators would come to the Sheriff's Office and talk to me in person.

6. I recall an occasion where I was visited at my office by either Cpl. Hulse alone or by Cpl. Hulse and Lt. Woodward together shortly after Cpl. Hulse had gone to Sacramento in late November 1984 and conducted interviews of witnesses to the incidents they were investigating. I was told at this meeting that Cpl. Hulse had interviewed Rhonda Short and she said that Spencer had raped her, and that a male cousin or other relative of Rhonda's was interviewed and he said that Rhonda had told him about being raped by Spencer at or around the time the rape had occurred. I was told that DeAnne Spencer was interviewed and gave an account of the incident consistent with what DeAnne had told me when I interviewed her. I was also told at this meeting that Cpl. Hulse found Rhonda Short to be naive and not very sophisticated. I recall that the word "slow" was also used to describe her mental capacity. All of this information seemed to me to confirm what I had been told by DeAnne about Spencer raping Rhonda Short, and it raised the level of my concern about the likelihood of Spencer taking advantage of another vulnerable victim like his young daughter, and later the other two young victims, and my growing concern that Spencer was not credible. Also, the fact that DeAnne Spencer provided Cpl. Hulse with the same account she provided to me bolstered DeAnne's credibility in my view.

7. I was also told at this same meeting that Cpl. Hulse interviewed DeAnne about allegations that Spencer had lied to his superiors about something having to do with his undercover operations. I do not recall the specifics of the undercover operation, but I do recall being told that one of the issues had to do with Spencer improperly having sex with a female confidential informant, and I was told that Cpl. Hulse was given copies of documents by DeAnne which confirmed that Spencer had attempted to solicit DeAnne's help in lying about his undercover activities to his superiors at the Vancouver Police Department. This information was significant to me



*LAW, LYMAN, DANIEL, KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON BLVD SW, TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480 FAX: (360) 357-3511*

because it gave me more reason to doubt Spencer's credibility when denying any sexual contact with the children involved in this case. Also, Spencer's cover-up of having sex with a female informant while on under-cover duty diminished his credibility in my view, and was another example of him manipulating situations to take sexual advantage of others.

8. Finally, I was informed by Cpl. Hulse during a telephone communication on February 5, 1985 that he had obtained information that Spencer was making statements indicating that he was "going to start getting some people because he was tired of this," and that Spencer had mentioned me and Sgt. Davidson by name, as well as numerous Vancouver Police officers. True and correct copies of pages 2 and 3 of 8 of one of my Utility Reports in which I described these threats are attached hereto as **Exhibit C**. Although Shirley Spencer was not mentioned by name in this report, these threats formed part of the basis for my concern that Spencer might have caused harm to Shirley, which prompted my request the following day for a welfare check at the Spencer residence and eventually led to my communication with Shirley for the first time since October 1984 and Shirley's subsequent expression of concerns to me about her son Matthew Hansen. I also found these threats to "get" the law enforcement officers who were involved in his investigations to be consistent with Spencer's pattern of deflecting blame onto others which had become apparent from information obtained from many others, and in my mind it increased the likelihood of his guilt for the crimes charged and decreased his credibility as compared to others interviewed.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED this 26th day of December, 2013 at Ft. Mohave, Arizona.

/s/ Sharon Krause
Sharon Krause



*LAW, LYMAN, DANIEL, KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON BLVD SW, TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480 FAX: (360) 357-3511*

# EXHIBIT A

sending me to Sacramento; however, that had not been determined as of yet. I also advised Shirley SPENCER that the information we had received from Sacramento indicated that Kathryn was in therapy and that at this point she was extremely reluctant to discuss anything with anyone and that we felt it may be more beneficial to wait until she was able to open up and talk.

At some point during the time Ray SPENCER was with Dr. ABRAMS, Dr. ABRAMS came out of the polygraph examination room and advised Detective Sgt. DAVIDSON and me that based on Ray SPENCER'S responses during the polygraph exam he (Dr. ABRAMS) would have to consider the findings inconclusive. He also advised us that SPENCER'S responses would tend to be deceptive; however, they were inconclusive. Prior to SPENCER leaving, Sgt. DAVIDSON and Dr. ABRAMS spoke with him; however, I was not present during that conversation.

Prior to Ray SPENCER leaving our office we made arrangements for Dr. ABRAMS to conduct a second examination on September 24th based on the inconclusive results of the examination this date.

DATE & TIME: 09-24-84

INCIDENT: Contact with Ray SPENCER at Clark County Sheriff's Office

On the 24th of September Dr. ABRAMS met with Ray SPENCER at the Clark County Sheriff's Office and administered a second polygraph exam. Prior to the time of the examination, Detective Sgt. DAVIDSON and I spoke briefly regarding the examination questions and the results of the prior exam. During that conversation Dr. ABRAMS expressed concern that there may be something that was specifically bothering Ray SPENCER, causing the inconclusive results. At that time I shared with Dr. ABRAMS the information I had obtained from Deanne SPENCER regarding SPENCER reportedly "raping a neighbor girl by the name of Rhonda during the time they were living in California" prior to the SPENCER'S moving to Vancouver.

After Dr. ABRAMS conducted the examination he made contact with Sgt. DAVIDSON and me and advised that the results of the polygraph examination were indicative of deception, mentioning that the score was a "minus



EXHIBIT A

thirteen." He also advised that he had talked with SPENCER regarding the alleged rape and although SPENCER apparently had denied any sexual contact with the neighbor girl named Rhonda when he was confronted by the alleged victim's father and Deann SPENCER when it was initially reported. He did admit to Dr. ABRAMS that he had had sex with her, however, he indicated it was consensual. The initial information I got from Deanne SPENCER was that Rhonda was approximately twelve years old. However, Dr. ABRAMS advised that Ray SPENCER indicated that Rhonda was nineteen years old at the time she "consented to have sex with him." (Refer to Dr. Stan ABRAMS' report regarding the results of those examination.)

During the time the SPENCERS were at our office on the 24th I only spoke briefly with Shirley SPENCER. Again, she expressed concerns, indicating that she did not feel her husband was responsible for this, and as this investigation became more involved she "wished she had never reported it in the first place." She also expressed feelings of guilt, indicating she felt she was the cause of Ray being suspended and also talked about violating Kathryn's trust regarding Kathryn asking her not to say anything.

After Dr. ABRAMS advised Detective Sgt. DAVIDSON and me that the results of the polygraph indicated SPENCER was being deceptive when he indicated he had not been sexually involved with his daughter, Sgt. DAVIDSON and Dr. ABRAMS spoke with SPENCER. I was not present during that interview. Sgt. DAVIDSON did advise me that during their conversation with SPENCER he denied that he had ever had any type of sexual contact with his daughter and had no explanation as to why the results of the polygraph would indicate he was being deceptive.

DATE & TIME: 11-01-84 10:42 AM
INCIDENT: Contact with Ray SPENCER at the Clark County Sheriff's Office

During the week of October 15th I was in Sacramento, California continuing the investigation regarding the allegations that Kathryn SPENCER was making. On the morning of 11-01-84 Detective Sgt. DAVIDSON made phone contact with Ray SPENCER and asked if he would respond to the Sheriff's

# EXHIBIT B

I asked DeAnne SPENCER if Ray SPENCER could have had herpes without her knowing. She indicated that he was a person who was very clean and to the point that he was "pre-occupied" with being clean. She related there were a lot of times when they never had physical relations (intercourse) and she never questioned whether or not she could have contracted something. She also stated to me, "I don't think if he had them I would have even known it because there were months when we would not be sexually involved." DeAnne SPENCER indicated she had no reason other than the fact that the other two gentlemen did not have herpes to believe that she may have contracted it from Ray SPENCER. She also advised me that she had no knowledge as to whether or not he did, in fact, have herpes or if what Katie had on her labium was a herpes sore.

During one of my conversations with Ray SPENCER, he indicated that Katie had made some kind of a statement to Shirley SPENCER reference Ray SPENCER and DeAnne SPENCER sleeping together after Shirley and Ray SPENCER would have been married. I asked DeAnne SPENCER about that and she indicated that there were only two occasions after she and Ray SPENCER separated that he stayed at her house when he picked up the kids. She indicated once was just prior to Ray marrying Shirley SPENCER and on both of those occasions he and the children slept in the living room. She indicated there had never been any sexual contact between them.

During a phone conversation I had with DeAnne SPENCER, prior to going to California, she had mentioned that while they were living in Los Angeles, a neighbor girl named Rhonda accused Ray of raping her. I asked her if she could be more specific about what that incident involved. DeAnne SPENCER related the following. They lived in Los Angeles for approximately six years and at that time had neighbors named Jerry, Roxie and Rhonda. She indicated Rhonda was nineteen years old when the incident occurred; however, Rhonda was "emotionally very, very immature."

Apparently this incident reportedly occurred in November of 1978. DeAnne SPENCER indicated that Ray had consistently tried to isolate her from her family and then all of a sudden about one week before Thanksgiving, Ray suggested that she and Matt go to Sacramento to spend some



EXHIBIT B

time with her family. She indicated at that same time Rhonda's family had gone to Europe and she was home alone. DeAnne related that she talked with Ray several times during that week she was gone on the telephone, and then one evening during a phone call when he had called her, he indicated that he was concerned about Rhonda because she was "acting really strange." She also reported that he told her, "I think she's got something up her sleeve and I'm worried about it." DeAnne advised me that she told Ray if he was worried just not to be alone with Rhonda or give her an opportunity to say anything. DeAnne SPENCER indicated the following evening she had to call Ray and when she did he whispered in the phone that "Rhonda was in there." He also reportedly told DeAnne he was going to tell Rhonda that she had to leave because he was going to a friend's house for dinner, and DeAnne advised that she told Ray she thought that was a good idea.

DeAnne SPENCER then related that on Thanksgiving Rhonda and her family ate dinner with them (SPENCERS). She advised that a couple days or so before December 4th, Ray mentioned to her that he was nervous about Rhonda. She indicated that he had mentioned Rhonda several times after she returned home from Sacramento and that he appeared to be nervous about something. She related that during that conversation, before December 4th, Ray said something similar to, "What if she says something about me or what if she says I did something? I really wouldn't be able to do anything about it." DeAnne advised me that she told Ray that he shouldn't even worry about it because it wasn't going to happen.

DeAnne SPENCER indicted on Sunday, December 4th, she received a phone call from Rhonda's father, Jerry, and at that time he reportedly stated to DeAnne SPENCER, "I want to see you at my house now without Ray." DeAnne SPENCER advised me that she could tell Jerry was upset and so she went right over to Rhonda's house. She indicated when she went out of the house Ray was working in the garage on a toy chest for Matthew and at that time she was "very pregnant with Katie" because Katie was born in January.

DeAnne SPENCER indicated when she got to Jerry's house, Rhonda's uncle, a cousin, Rhonda's parents and Rhonda were sitting in the living room. She advised that she knew something was wrong and when she came in

Jerry appeared to be upset and she remembered him jingling his change in his pocket. She said at some point she was really uncomfortable and asked, "What's up?" At that time Rhonda's father reportedly stated, "Well, it seems as though when we were all away Ray raped Rhonda." DeAnne SPENCER advised me that she became very upset and stated, "Whoa, whoa, wait a minute. Hold it. I want my husband here. I don't want anymore to go on. He needs to be here." She advised at that time she went out and told Ray, "You're not going to believe it, Ray, but she did it." DeAnne SPENCER advised me, "I remember the look on his face. The blood just drained and he said, 'No kidding?'" At that time DeAnne and Ray SPENCER went back into Rhonda's house and DeAnne SPENCER advised that Ray looked at Rhonda and said something like, "Rhonda, how could you say these things?" DeAnne SPENCER advised me that she (DeAnne) "totally defended Ray." She indicated at that time she looked at Rhonda and told her, "Okay, Rhonda, I want it from you. I want to know what happened, and I want to know the truth." DeAnne related that at that time Rhonda said something about "Ray calling her up and inviting her over and when she got her he had music playing and the lights were low and he had on nice clothes." DeAnne related that at that time Ray said something like, "Rhonda, how could you?" And DeAnne advised me that she told Ray to shut up and let Rhonda talk. Apparently at that time Rhonda indicated that when she got over to SPENCERS "she and Ray were on the couch and started talking and kissing and one thing lead to another, and then they wound up in bed." DeAnne SPENCER advised me by that time Rhonda was sobbing and she (DeAnne) turned to Ray and told him, "Okay, I want to hear your side of it."

Ray then indicated that he was outside working on the toy box in the garage and that he was covered with dirt when Rhonda called and said that she wanted to talk to him because she was having problems with a boyfriend, so he told her to come over, even though he was feeling very uncomfortable. He indicated when she got there they talked about the problem and then he told her what he thought she should do about it. DeAnne SPENCER stated, "Then he told me I called him in the middle of that conversation." Reportedly, Ray SPENCER then indicated that he told Rhonda she would have to go because he was going to a friend's for dinner. DeAnne SPENCER advised me that Ray always denied that he had even "so much as touched Rhonda." (During a

conversation Ray SPENCER had with Dr. ABRAMS, prior to my going to Sacramento, he admitted that he had been sexually involved with a neighbor girl in Los Angeles, however, indicated it was not rape, it was consensual sex.)

DeAnne indicated after Ray gave his side of the story, Rhonda was still "just sobbing" and Rhonda's uncle apparently was saying things like "he was going to blow Ray's head off." Apparently, Rhonda's parents were making statements indicating that she did not come over to discuss problems with Ray ever, and DeAnne advised me that Ray had told her sometime back that Rhonda told him that her cousin had molested her. DeAnne SPENCER indicated things were getting out of hand and she told Rhonda's parents, "Wait a minute. I want to tell you how Rhonda came to us several times with problems and once told us about six months ago that a cousin, Donnie, had molested her, and she was afraid to tell anyone." DeAnne SPENCER advised me that she told Rhonda's family that she was present when Rhonda shared that. She indicated, however, that was not true, that it was information that Ray had given to her. Apparently, Donnie's father, who was at the house indicated at that time that maybe the whole thing was a big misunderstanding. She advised that Rhonda's father stood up and Ray was asking him, "Don't you believe me?" Rhonda's father reportedly responded that he didn't know what to believe, but he knew "one thing for sure; their friendship had been terminated."

DeAnne SPENCER related that when they left Rhonda's house she and Ray went to a friend's house who was also a policeman. She indicated that Ray instructed her specifically not to discuss what had occurred; however, when they got to the friend's house Ray was the one that brought up the subject and apparently shared with the friend. DeAnne SPENCER indicated she remembered the friend telling him not to worry because if the girl's parents were going to call the cops they would have done it already. DeAnne SPENCER advised that that was the end of it, and Ray always denied that he had ever done anything to Rhonda, and she (DeAnne) believed him for many years.

I asked DeAnne SPENCER if she could provide me with some background information regarding how they had met, etc. She indicated at the time she met Ray SPENCER, Ray was an air traffic controller at Mathers Air

# EXHIBIT C

disturbance Ray SPENCER had moved out of his residence and apparently was admitted to the psychiatric ward at the University of Oregon Medical Hospital.

On February 5, 1985 I was advised by Detective HULSE of the Vancouver Police Department that SPENCER was no longer at the University of Oregon and was presently staying in the Value Motel located in the Hazel Dell area of Vancouver. Detective HULSE also advised me that he had information that SPENCER was making statements, indicating that he was "going to start getting some people because he was tired of this." SPENCER reportedly had specifically mentioned my name, Sgt. Mike DAVIDSON and numerous Vancouver Police officers.

On 02-08-85 I was advised that SPENCER had moved out of the Value Motel and was living in apartment #17 at the Salmon Creek Motel located at 11901 NE Highway 99, Vancouver, Washington.

On 02-20-85 I did not go to work because I was ill. Early on the afternoon of the 20th I received a phone call from the Communications Center advising that Clark County deputies had responded again to the SPENCER residence on a civil standby regarding some guns. I was also advised that apparently SPENCER had gone to his residence for a birthday celebration and when he arrived noted his weapons were not in a gun case, which resulted in him demanding his wife produce the guns. Apparently, Shirley SPENCER was refusing to give Ray SPENCER his guns and Ray SPENCER called Clark County requesting a civil standby. I advised the dispatcher that I was sure part of SPENCER'S original release agreement was that he was not to possess any weapons and advised them I would call them right back.

After talking with dispatch, I made phone contact with Detective HULSE at Vancouver Police who had a copy of SPENCER'S release agreement, and Detective HULSE confirmed that SPENCER was to have no weapons and advised me that he would call dispatch. For additional details, refer to Clark County Case #85-46-0033.

When I initiated this investigation regarding allegations made by Ray SPENCER'S natural daughter, Kathryn, indicating that Ray SPENCER had been sexually involved with her, I had an occasion to speak with Shirley SPENCER. However, during that conversation she advised that she had no information other than the statements Kathryn had made to her, indicating that Ray SPENCER may have been sexually involved with his daughter.



EXHIBIT C

During the month of October, 1984 I responded to Sacramento, California where I spoke with Kathryn SPENCER. After returning to Vancouver, on one occasion Detective Sgt. Mike DAVIDSON and I attempted to interview Ray SPENCER regarding the allegations his daughter was making; however, SPENCER was not cooperative, refused to waive his rights and also refused to speak with us. From that time on, I had not had an opportunity to meet with Shirley SPENCER, nor discuss with her the results of my findings in California.

On 02-21-85 I attempted to make phone contact with Shirley SPENCER at her residence a number of times and the line was busy. After trying for over two hours I checked with the phone company and was advised that the phone was out of order. Being concerned because of the disturbance the day before and also because SPENCER was reportedly making statements indicating that he was "going to get even with specific individuals," I asked that our patrol unit make contact at the SPENCER residence on Lucia Falls Road and make a welfare check regarding Shirley SPENCER and her family. I was subsequently advised by dispatch that the officer who responded was advised that Shirley SPENCER had already left for work and that apparently the phone was off the hook.

After being advised of that information I made phone contact at Shirley SPENCER'S place of employment and left a message asking that she return my phone call. At approximately 4:30 PM on the afternoon of the 21st, Shirley SPENCER did return my phone call. During that conversation I advised her that it was me who had asked the officer to respond to her residence and do a welfare check, based on concerns I had not knowing what Ray SPENCER'S state of mind was and also because of the information I had obtained regarding the two disturbances. Shirley SPENCER advised that she appreciated us checking on her and indicated that her son had told her that the County responded to the house.

During that conversation I indicated to Shirley SPENCER that I had not had the opportunity to talk with her since I returned from Sacramento and if that would assist her in dealing with all this I would be willing to do that. I indicated to Shirley SPENCER that if she felt she would be more comfortable I would contact Detective HULSE and also have him with me during the time we talked. She indicated that she did not feel that was