# Exhibit A

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

CLYDE RAY SPENCER,
MATTHEW RAY SPENCER, and
KATHRYN E. TETZ,

Plaintiffs,

vs.

Case No. C11-5425BHS

FORMER DEPUTY PROSECUTING ATTORNEY
FOR CLARK COUNTY JAMES M. PETERS,
DETECTIVE SHARON KRAUSE,
SERGEANT MICHAEL DAVIDSON,
CLARK COUNTY PROSECUTOR'S OFFICE,
CLARK COUNTY SHERIFF'S OFFICE,
THE COUNTY OF CLARK, AND
JOHN DOES ONE THROUGH TEN,

Defendants.

Deposition of

ANN LINK, PH.D.

Monday, December 17, 2012

Plaintiff filed motion in limine #13 seeking to bar evidence related to alleged interviews of Kathryn and Matt Spencer on May 9, 1985, dkt. 202 at 15. Consistent with that motion, Plaintiff has not highlighted testimony from Dr. Link regarding her knowledge of James Peters, James Rulli, or anything else related to the alleged May 9 interviews. Plaintiff reserves the right to supplement his highlighting depending on the Court's rulings on motions in limine.

Reported by Karen Cosgrove, CSR No. 12425

Response: see defendants' response to plaintiff's motion in limine #13

TELEPHONIC APPEARANCES

FOR PLAINTIFFS:

KATHLEEN T. ZELLNER & ASSOCIATES
KATHLEEN T. ZELLNER, ATTORNEY AT LAW
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(630) 955-1212 kathleen.zellner@gmail.com

FOR DEFENDANT MICHAEL DAVIDSON:

FREIMUND, JACKSON, TARDIF & BENEDICT GARRATT
JEFFREY A.O. FREIMUND, ATTORNEY AT LAW
711 Capitol Way South, Suite 602
Olympia, Washington
(360) 534-9960 jeffF@fjtlaw.com

FOR DEFENDANT SHARON KRAUSE:

LAW, LYMAN, DANIEL, KAMERRER & BOGDANOVICH
JOHN E. JUSTICE, ATTORNEY AT LAW
P.O. Box 11880
Olympia, Washington 98508-1880
(360) 754-3480 jjustice@lldkb.com
gbogdanovich@lldkb.com

TELEPHONIC APPEARANCES (CONT'D)

FOR DEFENDANT JAMES M. PETERS:

ATTORNEY GENERAL'S OFFICE
TORTS DIVISION
DANIEL J. JUDGE, ATTORNEY AT LAW
P.O. Box 40126
Olympia, Washington 98504-0116
(360) 586-6300 DanielJ@atg.wa.gov

# INDEX

## EXAMINATIONS

| | Page |
|---|---|
| Examination by Ms. Zellner | 6 |
| Examination by Mr. Freimund | 42 |
| Examination by Mr. Judge | 76 |
| Examination by Mr. Justice | 78 |
| Further Examination by Ms. Zellner | 83 |
| Further Examination by Mr. Freimund | 86 |

## PLAINTIFFS' EXHIBITS

| Exhibit No. | Description | Page |
|---|---|---|
| 1 | Four-page Declaration of Ann Link, Ph.D. | 15 |
| 2 | One-page November 30, 2012, letter from Ann Link, Ph.D. | 16 |
| 3 | One-page Authorization For Release of Information | 17 |
| 4 | Five pages including two-page 12/11/12 email with three-page Declaration of Ann Link, Ph.D. | 19 |
| 5 | Five pages including two-page 12/12/12 "Revised Declaration" email with three-page Declaration of Ann Link, Ph.D. | 23 |
| 6 | Seven-page 12/12/12 "Document" email with attachments | 24 |
| 7 | Four-page 12/13/12 "Spencer v. Peters, et al." email with attachments | 32 |

PLAINTIFFS' EXHIBITS (CONT'D)

| Exhibit No. | Description | Page |
|---|---|---|
| 8 | Four-page Clark County Sheriff's Office, Washington, Utility Report Bates-stamped Spencer-00501 through Spencer-00501 | 32 |
| 9 | Four-page Clark County Sheriff's Office, Washington, Utility Report Bates-stamped Spencer-00461 through Spencer-00465 | 36 |
| 10 | Two-page Clark County Sheriff's Office, Washington, Utility Report Bates-stamped Spencer-00607 through Spencer-00608 | 39 |
| 11 | Two-page Clark County Sheriff's Office, Washington, Utility Report Bates-stamped Spencer-001982 through Spencer-001986 | 40 |
| 12 | Six pages including one-page May 23, 1985, "Sentencing," page 46, Bates-stamped Spencer-01094; one-page starting "The therapist," page 47, Bates-stamped Spencer-01095; two-page starting "Mr. Rulli," page 53 through 54, Bates-stamped Spencer-01101 through Spencer-01102; two-page "Washington State Child Abuse Reporting Laws" | 40 |

BE IT REMEMBERED that on December 17, 2012, commencing at the hour of 9:09 a.m. at the offices of Golden State Reporting & Video, 3800 Watt Avenue, Suite 201, Sacramento, California, before me, Karen Cosgrove, a Certified Shorthand Reporter, empowered to administer oaths and affirmations pursuant to Section 2093(b) of the Code of Civil Procedure, personally appeared

ANN LINK, PH.D.,

a witness herein, having been duly sworn, was examined and testified as follows:

MS. ZELLNER: Let the record reflect this is the deposition of Dr. Ann Link taken pursuant to subpoena and set for today's date.

EXAMINATION

BY MS. ZELLNER:

Q Dr. Link, could you state your full name and spell your last name.

A Yes. My name is Ann Louise Link spelled L-i-n-k.

Q Where is your professional office located?

A 5801 North Avenue, Carmichael, California 95608.

Q And what is your current profession?

A Psychologist.

Q Are you licensed in any state as a psychologist?

A I'm licensed in the state of California as a psychologist.

Q And how long have you been licensed in California?

A Since 1988.

Q Could you describe your highest level of education.

A I graduated from the Professional School of Psychology out of San Francisco, California in 1985.

Q And what degrees do you hold?

A I have a Bachelor's of Science in nursing from the University of Oregon, '67; Master of Arts in counseling, University of San Francisco, '79; and the Ph.D. from the Professional School of Psychology in '85.

Q Could you tell me your job description in 1984.

A In 1984 I was working as a psychology intern and I was also working as a marriage, family, and child counselor at another clinic.

Q Were you -- when you were working as a psychology intern, were you being supervised in your work?

A Yes.

Q And who were you working for?

A Dr. John Prinzing.

Q And could you spell his last name, please.

A P-r-i-n-z-i-n-g.

Q And was Dr. Prinzing acting as your supervisor in 1984?

A Yes, he was.

Q And in 1984 were you working on any degree at that point?

A Yes, I was.

Q And what degree were you working on in 1984?

A Ph.D. in psychology.

Q In 1984 what was your custom and practice about preserving or keeping patient records?

A It was not our policy to keep records beyond seven years after a person turned 18.

Q Where was your office located in 1984?

A I don't have the exact office address. It was Alhambra Psychotherapy Center on Alhambra in Sacramento, California.

Q Have you searched your records for any records of Kathryn Spencer?

A I have.

Q And have you been able to locate any records of Kathryn Spencer?

A No, I have not.
Q Do you believe that those records have been destroyed pursuant to your recordkeeping policy?
A Yes, I do.
Q Do you have an independent recollection of treating Kathryn Spencer?
A I do.
Q Do you know the approximate time period when you were treating Kathryn Spencer?
A Approximately '84, '85.
Q And were you treating her at the offices that you've described for us in Sacramento?
A Yes. On Alhambra Boulevard.
Q And pursuant to your treatment of Kathryn Spencer, did you meet with Kathryn Spencer's mother?
A I did.
Q Did -- what was your purpose in meeting with Kathryn Spencer's mother? Do you remember her name?
A Deanne Spencer.
Q And what was your purpose in meeting with Deanne Spencer?
A To get background information on Kathryn.
Q And do you remember any information that Deanne Spencer conveyed to you?

A She told me that there was alleged sexual abuse by Kathryn's father up in Washington.

Q Did Deanne Spencer participate or sit in on the therapy sessions that you had with Kathryn?

A No.

Q Why is that?

A Because it was important for the child to feel relaxed and comfortable working out her problems in play therapy on her own.

Q Tell me, about how old was Kathryn Spencer when you first began treating her?

A She was around 5 years old.

Q And what do you remember about Kathryn Spencer's condition when you first began treating her?

A She was very anxious and withdrawn. She laid down on the floor in the fetal position with a blanket over her and didn't speak at all the first session or two.

Q Did you -- in that first session or two, what observations did you make about her psychological condition?

A Well, she appeared to be highly anxious.

Q And you said that -- tell me about the therapy that you used in your treatment of Kathryn Spencer.

A I used play therapy and I used --

Q Yeah. What does play therapy involve?

A Play therapy involves creating a safe environment for a child to hopefully express their feelings and work through their issues with the use of toys and art supplies and dollhouse dolls. Things like that.

Q And do you remember the approximate time in 1984 when you began your treatment? Was it at the beginning, middle, or end of 1984?

A I don't recall.

Q Do you remember how many sessions that you had with Kathryn Spencer?

A I don't remember the exact number, but it was quite a few.

Q Was it more than six?

A Yes.

Q Do you think it was more than twelve or --

A Yes.

Q Now, you said that you used play therapy.

Was the purpose of that or part of the purpose to encourage Kathryn to communicate with you?

A Yes.

Q And what did you observe over the multiple sessions with Kathryn about her communication with you?

A That she had come in for alleged sexual abuse but she did not talk about the abuse.

Q Did she talk to you about other things?

A She wasn't highly verbal, but over the course of therapy, she did talk about some other things. I'm not sure of the exact details.

Q Over the course of the therapy, did you notice any reduction in her anxiety?

A I did.

Q Now, during your sessions with Kathryn Spencer, did she ever describe being sexually molested by anyone?

A She did not.

Q What type of play supplies did you use in your therapy with Kathryn Spencer?

A Toys. Dolls. Like dollhouse dolls and art supplies.

Q When you say dolls, what type of dolls are you referring to?

A Regular children's dolls.

Q Did you ever -- are you familiar with anatomical dolls?

A I am.

Q And what are anatomical dolls used for?

A Anatomical dolls are used to clarify or help

clarify information a child has given you if they're not able to clearly describe things that have happened to them. If they tell you about something that's happened to them, you might use the dolls to help them clarify their description.

Q Do you recall if you ever used anatomical dolls in your treatment of Kathryn Spencer?

A I don't recall using anatomical doll with her.

Q Is there a reason that you would not have used them?

A She didn't disclose to me abuse, so it might have been considered leading or suggestive.

Q Now, did California, in 1984 and 1985, have a child abuse and neglect reporting act?

A Yes, they did.

Q And what was your -- what is your general understanding of what that act required of you as a practitioner?

A You're required to report abuse; physical, sexual neglect; mistreatment of a child.

Q Do you recall if you ever made such a report in California about Kathryn Spencer?

A I don't recall making any report about her. No.

Q And is it your understanding under the child abuse and neglect reporting act in California that you would have been required to make such a report if Kathryn Spencer had divulged sexual abuse to you?

A Yes.

MR. FREIMUND: Objection. Leading. Calls for a legal conclusion.

Go ahead and answer.

THE COURT REPORTER: I'm sorry, Counsel. Who -- what was your name?

MR. FREIMUND: That was Jeff Freimund. I objected. It was leading and calls for a legal conclusion.

But go ahead and answer.

BY MS. ZELLNER:

Q Yeah. You can answer with that objection.

A I'm sorry. What was the question again?

MS. ZELLNER: Could you read the question back, please.

THE COURT REPORTER: Gentlemen, please state your name prior to making your objection. Thank you.

(Record read.)

BY MS. ZELLNER:

Q Do you have any recollection of discussions with anyone in law enforcement about Kathryn Spencer?

objection leading & calls for legal conclusion

Rresponse -Not a legal conclusion; it is her understanding of what she was obligated to do at the time

A I have a vague recollection of talking to someone in law enforcement and informing them that Kathryn had not disclosed abuse information to me.

Q And do you recall who the person or persons were that you spoke to?

A I do not.

Q Do you recall the time frame of when you might have been contacted by law enforcement?

A I don't recall a specific date. No.

Q Do you recall having any discussion with a prosecutor or -- and another attorney about Kathryn Spencer's treatment with you?

A I don't recall that. No.

Q All right. Now, if we could look at the different exhibits for today's deposition, I want to start with Plaintiffs' Exhibit 1.

(Plaintiffs' Exhibit 1 was previously marked for identification and is attached hereto.)

BY MS. ZELLNER:

Q And tell me, Doctor, when you have that exhibit in front of you.

A I have it in front of me.

Q Do you recognize your signature on this exhibit on page -- it's page 3?

A Yes.

Plaintiff objects to lines 10-13 based on motion in limine #13, dkt. 202 at 15 (seeking to bar testimony related to May 9 interviews; if motion is denied, Plaintiff reserves right to supplement highlighting.

see defendants Response to pltfs MIL #13

objection E.R. 403 / hearsay and cumulative

Q And does this -- what do you understand this document to be?
A This is an affidavit.
Q And do you understand that this affidavit is made under penalty of perjury?
A Yes.
Q And did you have this affidavit notarized?
A No.
Q Is it notarized?
A I'm sorry. Which one are we talking about?
Q I'm talking about Exhibit 1. There's a notary on it on page --
A Okay. Oh. I'm sorry. Yes. I see that.
Q Page 4. Do you recall having the affidavit notarized?
A Yes.
Q Okay. Now, I want to direct you -- is the affidavit true and correct to the best of your knowledge?
A Yes.
Q I want to direct your attention to Plaintiffs' Exhibit 2.
(Plaintiffs' Exhibit 2 was previously marked for identification and is attached hereto.)
THE WITNESS: I have that. Yes. Wait.

Response -Setting foundation for authentication; no out of court statement introduced

Response - Id.

objection, hearsay and cumulative

BY MS. ZELLNER:

Q Yeah.

A Oh, yeah.

Q And identify this document for the record.

A This is a letter from me to Ms. Zellner stating that I can't disclose whether I had treated Kathryn Spencer or not and would need a release of information or a valid court order to talk about it.

Q And then that's your signature on the letter?

A Yes.

Q And it was sent, I believe, on November 30, 2012.

A Yes.

Q And then if we turn to the next page, which is Plaintiffs' Exhibit 3, could you identify that document for the record.

(Plaintiffs' Exhibit 3 was previously marked for identification and is attached hereto.)

THE WITNESS: Authorization for Release of Information.

BY MS. ZELLNER:

Q And what's your understanding of the purpose of this document?

A It was authorizing -- it was an authorization to discuss over the telephone with Kathleen Zellner the

case -- my memories of Kathryn Spencer.

Q And do you recall that conversation? For the record, I'll say with Kathleen Zellner.

A Over the telephone?

Q Yes.

A Yes.

Q And do you remember approximately when that conversation occurred? I think you got the release on December 10th.

A I don't recall. Just a couple of days, I guess.

Q All right. And do you remember in that conversation what was discussed about Kathryn Spencer's treatment by you in 1984 and 1985?

A Well, I believe that I was asked if I remembered the case and what I remembered about it, and I said that I did remember treating Kathryn Spencer; that she was around 5 years old and came in for alleged sexual abuse.

Q Did you discuss in that conversation whether you had any of Kathryn Spencer's records?

A Yes. I said that I did not have records but that I had an independent recollection of the case.

Q And in that conversation, did you provide information to Ms. Zellner about whether or not

Kathryn Spencer had divulged sexual abuse to you?

A I believe I did.

Q Do you remember anything else about the conversation?

A I had several conversations with Ms. Zellner, so I don't remember exactly what I said in each one but...

Q Okay.

A I don't know. She may -- I may have asked for -- she may have told me about some background about the case.

Q Anything else that you remember? And we're just at this point talking about the first conversation.

A No. I don't remember exactly.

(Plaintiffs' Exhibit 4 was previously marked for identification and is attached hereto.)

BY MS. ZELLNER:

Q Okay. If we look at the next page, Plaintiffs' Exhibit 4, do you recognize this email?

A Yes.

Q And what was your understanding of the purpose of this email?

A To let me know that there was going to be some information sent that I could review and sign with a notary.

Q Does the email indicate it was sent to you in Word format so you could make any changes or deletions?

A Yes.

Q Now, if we look at -- within that same group exhibit, Plaintiffs' Exhibit 4, there is an affidavit then that was sent to you. If you can, go to that first affidavit.

A Is that right after that?

Q Yeah. It's unsigned.

A Yes.

Q Okay. And if I could direct you to paragraph 6, paragraph 6 for the record states, "After meeting with Kathryn's mother, I met privately with Kathryn on multiple occasions. During my sessions with Kathryn, she manifested a high level of anxiety. For example, I recall Kathryn balled up on the floor. I utilized play therapy, a form of psychotherapy, in an attempt to communicate with Kathryn and assess her underlying psychological state."

Do you see that paragraph?

A Yes.

Q If we look back at the affidavit that you signed on December 13th, if you could go to paragraph 6, the last sentence of paragraph 6 --

A Is this Exhibit 1?

Q Yeah. Exhibit 1.
A Yes. I see.
Q So paragraph 6 has been modified.
Do you see that?
A Yes.
Q And it states in the last sentence of Exhibit 1, paragraph 6, "I utilized play therapy, comma, form of psychotherapy, comma, to reduce anxiety, comma, encourage communication, and provide healthy coping."
Do you see that --
A Yes.
Q -- language in Exhibit 1, paragraph 6?
A Yes. Excuse me. It says, "Promote healthy coping." Yes. I see that.
Q And was that sentence modified by you?
A Yes, it was.
Q And did you modify the sentence to better explain what play therapy was?
A Yes. I felt that was a better description of play therapy.
Q And then if we look at paragraph 8 in the original affidavit sent to you, it states for the record, "During that time period, I never used dolls to elicit information from a child regarding possible abuse because in my view some dolls are suggestive, period. I did not

use any dolls during my sessions with Kathryn, and Kathryn never demonstrated any abuse to me using dolls."

Was that -- did I correctly read what was in paragraph 8 of the first affidavit that my office sent to you?

A Yes.

Q And then in your final affidavit, the one that you actually signed, that's been modified to read, During play session with Kathryn, I never used play therapy supplies, including toys, dollhouse dolls, and art materials. I used play therapy supplies, including toys, dollhouse dolls, and art materials. Kathryn did not demonstrate any abuse to me using play therapy supplies.

Is that -- was that modification done by you to the original affidavit that we sent you?

A Yes.

Q And what was the purpose of modifying the original paragraph 8?

A It was my intention to more correctly say what I did do in the therapy sessions with Kathryn.

Q And you had, in fact, used -- I think you called them dollhouse dolls --

A Yes.

Q -- with Kathryn?

A Yes.

Q Okay.

A Regular play dolls that don't have anatomical parts.

(Plaintiffs' Exhibit 5 was previously marked for identification and is attached hereto.)

BY MS. ZELLNER:

Q Okay. And then in -- if we look at Group Exhibit 5, the first note email that's sent to you, that's December 12 at 3:50 p.m.

Do you see that?

A Yes.

Q And it indicates to you that there's -- "Please sign Kathryn's authorization and your revised declaration attached." That was sent at 3:50 p.m.

And then at 5:26 p.m., another note was sent saying, "Sorry about the confusion. Please find your revised declaration attached."

Do you remember receiving that document?

A Yes.

Q Okay. And then you did receive then an authorization, which is within that Group Exhibit 5. It's actually in like five or six pages.

You received an authorization of -- again, from Kathryn Spencer, authorizing you to release information about her for purposes of this deposition; is that

Deft. object on basis that this testimony was not timely designated pursuant to LCR 31(e)

correct?

A Yes.

(Plaintiffs' Exhibit 6 was previously marked for identification and is attached hereto.)

BY MS. ZELLNER:

Q Okay. And then on December 12th, 2012, in Group Exhibit 6, documents were sent to you from my office for your review; is that correct?

A Yes.

Q I want to focus on certain parts of these documents in Group Exhibit 6, and so if you could turn to the second page, at the top it says, "James M. Peters, 11/8/12," page 97, and it also has the name "Johnson" at the top.

Do you see that?

A I do.

Q Okay. Did you have the opportunity to read this document prior to sending your affidavit back on December 13th?

I'm sorry. I didn't hear you. I think -- do you see the documents?

A I see the document. Yes. I was just trying to figure out --

Q If we go to --

A What was the --

Plaintiff's response - Plaintiff did timely designate this testimony, contingent upon court's rulings on MIL; also, Defendants are not prejudiced

Deft. object, Id.

Plaintiff's response, Id.

Q -- page 97 of the document, did you see reference in Mr. Peters' deposition on page -- it starts actually on page 97, but at the top of 98, did you see reference to your name in Mr. Peters' dep?

A Yes.

Q And if we look at page 98, at 9 through 22, Mr. Peters states at line 5 -- or the question at line 5 is "November 1st was the first time you say -- you say Katie Spencer reported it. Correct?

"ANSWER: I didn't say that.

"QUESTION: To Ann Link.

"ANSWER: Oh. All I know is what Ann Link told me. I don't know about anything else." That's at line 9 and 10.

"QUESTION: "Okay. And that first revelation that you're talking about came to Ann Link as Ann Link told you on November 1st of 1984. Correct?

"ANSWER: Just to be clear, there had been prior revelations to Shirley Spencer and to Sharon Krause. The first revelation.

"QUESTION: I'm just talking about Ann Link.

"ANSWER: As far as I know, when Mr. Rulli and I talked to Ann Link in Sacramento, she told us that Katie had disclosed to her sexual abuse by Ray. Described it with anatomical dolls, including fellatio --

Deft. object, Id.

Plaintiff's response, Id.

my word, not hers -- oral sex with a man, on November 1st."

Do you see that statement of Mr. Peters?

A Yes.

Q Is that true or false that you told Mr. Peters and Mr. Rulli that Katie had disclosed or described on anatomical dolls fellatio, oral sex with a man?

MR. JUDGE: Objection. This is Dan Judge. Objection to the form of the question.

Go ahead.

BY MS. ZELLNER:

Q You can answer.

A I'm sorry. Did you want me to answer?

Q Yeah. Is that true or false that you told Mr. Peters and Mr. Rulli that Katie had disclosed to you sexual abuse by Ray. "Described it with anatomical dolls, including fellatio -- my word, not hers -- oral sex with a man, on November 1st."

See Defs' response to Pltfs MIL #13

Objection based on dkt. 202 at 15. If denied, reserve right to supplement

A In my --

MR. JUDGE: This is Dan Judge. Same objection.

BY MS. ZELLNER:

Q Okay. Is that true or false?

A In my recollection --

MR. JUDGE: Objection.

MS. ZELLNER: Okay.

THE WITNESS: Did you want me to --
MS. ZELLNER: I've got the objection noted. Could you let the witness answer?
THE WITNESS: Am I supposed to answer?
BY MS. ZELLNER:
Q Yes.
A Oh. Sorry. No. That's false, according to my recollections.
Q And if we look at page 125 of Mr. Peters' deposition, we look at -- hang on just a minute.
It says at line 12 -- this is Mr. Peters' answer: "The information now -- your question was compound. Had multiple subjects in it. But the behavioral indicators portion of it was relayed to me by Ann Link, and it's in the notes of Rulli and my interview with Ann Link."
Do you see that answer?
A Yes.
Q Okay. And that leads me to the notes of Mr. Peters, which follow those two pages.
And have you had an opportunity to look at those notes?
A Yes.
Q And let's look at where your name is mentioned.
At the bottom it says, "Spencer," Bates

Objection to lines 7-8 based on dkt. 202 at 15, seeking to bar testimony related to alleged interviews of Matt and Katie on May 9th, 1985 in Sacramento. If denied, Plaintiff reserves right to supplement

See Δ's response to π's MIL #13

Objection based on dkt. 202 at 15 and notes are hearsay. If motion in limine denied, reserve right to supplement

Same as above

stamp 00808, and your name is the second named at the top of that page.

Do you see that?

A I see that.

Q Okay. And Mr. Peters has recorded some information about you. Correct?

A Correct.

Q Okay. And it's true that you were a Ph.D. candidate. Right?

A Yes.

Q Okay. And I can't read -- can you read the rest of the writing?

A "A registered psychology" -- I can't read the third one.

Q Okay.

A "Intern" maybe, although it ends in T. I'm not sure.

Q And then under that, "registered nurse," is that true?

A Yes. True.

Q And then licensed -- it says, "Licensed marriage."

A Yes.

Q And what -- do you know what that would refer to?

see Δ's response to Π's MIL #13

Objection to lines 5-25 and line 1 of page 29 -Id.

A Possibly --

MR. JUDGE: Objection to the form of -- this is Dan Judge. Objection to the form of the question.

BY MS. ZELLNER:

Q Doctor, you can answer over the objections.

A Licensed marriage, family, and child counselor.

Q And then under that, it says, "Never testified."

Do you see that?

A Yes.

Q Do you know if that was true at that time? Had you ever testified before?

A No.

Q Okay. If we look at the next page, "Spencer" -- it's Bates-stamped 00809.

A Yes.

Q Okay. And in that note it states, "On November 1st, she demonstrated with dolls for Ann."

Do you see that?

A Yes.

Q Okay. And then can you read into the record the rest of the note?

MR. JUDGE: Objection to the form of the question. This is Dan Judge again.

Objection -Id.

Objection -Id.

see A's resp. to π's mIL #13

Same as above

Go ahead.

THE WITNESS: You wanted me to read the note?

BY MS. ZELLNER:

Q Yeah.

A "She demonstrated with dolls for Ann parts" -- could be "boobies, pee pee, wienie, bottom. Only able to" --

Q Let me stop you there.

Did Katie Spencer ever demonstrate with dolls for you body parts? I.e., boobies, pee pee, wiener, and bottom?

A Not that I recall.

Q Could you read under -- read B for us.

A "Only able to whisper these."

Q Okay. And then C. Can you read that?

A "Designated adult male doll as a dad. Girl as self."

Q And then the subparts 1 through 5.

A "Kiss breasts. Cunnilingus. Fellatio. Anal." I'm not sure about that word. Perhaps "intercourse. Sexual" --

Q Okay. And then to the right of that, is there writing?

A Yes.

Q What's that say?

see A's response to MIL TT's #13

Objection - Id.

Objection to lines 15-25 and lines 1-3 of page 31 - Id.

Same as above

A It says, "Said it hurt."

Q Okay. Is that true or false that that information was demonstrated to you with dolls?

MR. JUDGE: Objection. This Dan Judge. Objection to the form of the question.

BY MS. ZELLNER:

Q You can answer.

A It's false in terms of what I remember about the case and what I did with Katie.

Objection -Id

See A's Resp. to MIL It's #13

Q If that information had been related to you, would you have had a legal obligation to report it under California law at that point in time?

A Yes

Deft. object, see objection p. 24. Further Deft. object on the basis that it is a legal opinion lacking foundation of legal expertise.

Plaintiff's response - Id. Also, not offered for truth of matter asserted; relevant to show witness's state of mind and her belief that if Katie Spencer had told her about abuse, she would have had obligation to report it; further, Dr. Link has established that she is familiar with and knowledgeable of reporting laws in the event abuse is reported to her.

MR. FREIMUND: Objection. Calls for a legal conclusion.

You may answer though.

THE COURT REPORTER: I'm sorry, Counsel. Who was that?

MR. FREIMUND: That was Jeff Freimund again. Sorry.

BY MS. ZELLNER:

Q Now, if we go on to page Bates stamp 227, the next document, did you review this report that was authored by Rebecca Roe?

A I did.

Q And in the report, did you find any reference to Katie's counselor in this report?

A I did.

Q Where did you find a reference to Katie's counselor?

A Five lines from the bottom, it says --

Q And -- yeah. Is that on the first page or where is it?

A That's on the first page.

Q Okay. And could you read that into the record?

A "She also did not talk to a female counselor."

Q Does that fit with your recollection of Katie Spencer's interaction with you in her care and treatment by you?

A Yes.

Q Now, you were also sent some excerpts from various utility reports authored by Sharon Krause.

(Plaintiffs' Exhibits 7 and 8 were previously marked for identification and are attached hereto)

BY MS. ZELLNER:

Q If you can go to Plaintiffs' Exhibit 8, it starts at Bates stamp 00501.

A Yes.

Q Now, if we go to this -- to the utility report

dated 10/18/84 -- if we go to Bates stamp 00503, that's page 3 of 22 of the report.

Do you have that paragraph in front of you?

A I do.

Q The paragraph states, "Deanne Spencer also related that during the meeting with Detective Flood and also with Katie's therapist, Katie apparently was not indicating anymore that there had been something sexual between her and her father."

Did I read that correctly?

A Yes.

Q And is that statement consistent with your recollection of Katie Spencer's care and treatment with you?

A Yes, it is.

Q Then if we turn to the next page, which is dated 11/1/84 -- and, again, it's authored by Sharon Krause, Bates stamp Spencer-00537. That states, "During the week of October 15th, I was in Sacramento, California, continuing the investigation regarding the allegations that Kathryn Spencer was making. On the morning of 1/1/84, Detective Sergeant Davidson made phone contact with Ray Spencer and asked if he would respond to the sheriff" -- actually, that's cut off. Yeah. It looks like 537 -- okay. It is.

If we continue to the next page, it states, "As I entered the room, Ray Spencer was indicating he was upset with the sheriff's office because of how we had handled the investigation, commenting on the length of time it had taken and also how we had dealt with the city and the, quote, overall delays, end quote.

"Sergeant Davidson and I tried to explain to him that it seemed futile on our part to respond to Sacramento initially when everyone, including his daughter's therapist, felt it would not be in the child's best interest for us to come to Sacramento."

Do you have any recollection -- does that refresh your recollection about whether you had talked to anyone in law enforcement about coming to Sacramento? About --

MR. FREIMUND: Before you answer, Ms. Link, this is Jeff Freimund. I have an objection to that.

The document is little bits -- the last several documents that plaintiffs' counsel has been reading from are little partial excerpts on a page with no clear full documentation on what you're referring to or how they're linked to one another. There's no page numbers attached to that last paragraph just read by counsel. So I object to the way in which this questioning is progressing with little bits and pieces excised from documents and taken

out of context.

But go ahead and answer.

MS. ZELLNER: And, actually, these are the excerpts word scanned through all of the documents that refer to Katie Spencer's therapist either by name or therapist. The page numbers are at the bottom. The date of the document is 11/1/84. It's authored by Sharon Krause.

So over that objection, if the court reporter could read back my question.

MR. FREIMUND: I would just say for the record, the page number at the bottom is a page number put on there by plaintiffs' counsel. It is not a page number from the actual document.

MS. ZELLNER: Actually, Jeff, the page is from the actual document and the document is 11/1/84. And rather than give her 22 pages we have given her the only reference to her in the document, so that doesn't have anything to do with my question.

My question to her is does she remember, after reading this excerpt, whether she had ever told anyone in law enforcement that it would not be in Katie's best interest for law enforcement to come to Sacramento.

BY MS. ZELLNER:

Q It's a simple question, Doctor.

Does that refresh your recollection?

MR. JUDGE: I'm going to -- this is Dan Judge. I'm going to object to the form of that question as well as lack of foundation for proper refreshing of a witness' memory.

Go ahead.

BY MS. ZELLNER:

Q Doctor, do you remember whether or not anyone from law enforcement contacted you about coming to Sacramento to interview you about Katie Spencer?

A I don't have a specific memory of that.

Q Okay. And if we go to the next report, which is Bates-stamped Spencer-00461. The date on it is 10/18/84. The author of the report is S.A. Krause.

Do you see that document?

A I'm sorry. Is this Exhibit 9?

Q No. We're still in Group Exhibit 8. Going to the next report, it's -- oh, I'm sorry. You're right. It is Plaintiffs' Exhibit 9. You're right.

(Plaintiffs' Exhibit 9 was previously marked for identification and is attached hereto)

BY MS. ZELLNER:

Q You see the first page? 461?

A Yes, I do.

Q And the date on that is 10/18/84, and, again,

see A's resp. to Π's MIL #13

Objection based on dkt. 202 at 15, seeking to bar testimony related to alleged interviews of Matt and Katie on May 9th, 1985 in Sacramento. If denied, Plaintiff reserves right to supplement

it's authored by S.A. Krause.

If you look at the second page, 462 --

A Yes.

Q -- in that excerpt, it says, "On the afternoon of 10/17/84, I accompanied Katie and her mother, Deanne Spencer, to a therapy session. Regarding that session, refer to additional utility report."

Do you recall -- independent of this document, do you recall ever meeting anyone from law enforcement that accompanied Katie and her mother to Katie's therapy sessions?

A I don't recall that. No.

Q Okay. And then on page 464 --

A Yes.

Q Okay. And that's also from the same report by Sharon Krause.

Have you reviewed page 464 and 465?

A Yes.

Q Okay. And on 465, Katie Spencer is quoted as saying, quote, I just didn't want to have to say those words to Ann, but maybe I can tell her later when I tell her a story, period, and then there's quotation marks.

And then it says in paren, "The therapist, Ann Link, uses play therapy with Katie during the one-hour session."

Does that information on 464 and 465 have any effect on your recollection of whether Katie had disclosed any abuse to you?

MR. JUDGE: This is Dan Judge. Objection to the form of the question.

BY MS. ZELLNER:

Q Over that can you answer?

A I'm sorry. What was the question again?

Q Yeah. You did read those two pages. Correct?

A I did read those two pages. Yes.

Q Okay. And does that refresh your recollection or does did that have any effect on your opinion that Katie Spencer never told you about being sexually abused?

MR. JUDGE: Objection to the form of the question. This is Dan Judge again.

MR. FREIMUND: This is Jeff Freimund. I join in that objection too.

MS. ZELLNER: We'll just note your form objections if you could let her answer the question.

MR. FREIMUND: Well, it doesn't call for an opinion. That was what you'd asked her.

MS. ZELLNER: She's expressed opinions in her affidavit.

Actually, I can withdraw that question.

Okay. Now, on page -- if we go to Plaintiffs' Exhibit 10, that's a report dated March 21, 1985, authored by Sharon Krause.

(Plaintiffs' Exhibit 10 was perviously marked for identification and is attached hereto.)

BY MS. ZELLNER:

Q And if you go to the second page of that report, it states, "When Matt Hansen advised me that he had observed both Kathryn and Matt Spencer being victimized by their father, I immediately advised Deanne Spencer by telephone. Deanne Spencer related to me that she in turn advised the children's therapist. I also have had phone conversations on occasion with both the therapists and provided them with any information I had that may assist them in dealing with the Spencer children."

Do you have any recollection of Deanne Spencer advising you about any sexual abuse of Matt Hansen?

A No. I don't have any recollection of that.

Q Okay. And do you recall having a phone conversation with Detective Sharon Krause about Kathryn Spencer?

A I believe there was some communication with Shane Krause.

Q Okay. And do you recall the specifics of any communication with Sharon Krause?

A Possibly that she had gotten Katie to reveal details about the sexual abuse; that she had spent some hours with her.

Q Okay. And then were you yourself able to get Kathryn to relate incidents of sexual abuse after you'd talked to Sharon Krause?

A No. I don't have any recollection that she did.

MS. ZELLNER: All right. Now, if we skip -- we can skip Plaintiffs' Exhibit 11.

Let's go to Plaintiffs' Exhibit 12. It's labeled "Sentencing," and there are -- the Bates stamp at the bottom of the first page is Spencer-01095.

(Plaintiffs' Exhibits 11 and 12 were perviously marked for identification and are attached hereto.)

BY MS. ZELLNER:

Q Do you see that?

A Yes.

Q Okay. And this paragraph states, "The therapist in the reports and the mother's report that the therapists are saying that it's going to be a long-term process of therapy for these children before they're healthy and the reason for that is the ongoing sexual

abuse. Mr. Rulli and I, when we were in Sacramento, talked to the therapist of Matthew Spencer and Kathryn Spencer, and they indicated that the children were experiencing substantial psychological and behavioral problems of the type typically seen in victims of sexual abuse."

Stopping there, do you recall talking to Mr. Peters or Mr. Rulli in Sacramento and telling them that the children were experiencing substantial psychological and behavioral problems of the type typically seen in sexual abuse?

A I don't have any recollection of that conversation.

Q Okay. And then if we go to -- on page -- it's Bates-stamped 01101. It's the last two pages of the exhibit. Page 53. At the bottom it says, "Mr. Rulli."

A Is that 01102?

Q It's 01101.

A Yes.

Q Okay. It starts, "Mr. Rulli: Your Honor, in response to Mr. Peters' comments when I interviewed" -- dash, dash -- "sat in on the interview with the children in the therapist's office, I got the impression from the therapist that the children were coming along."

Do you recall ever sitting in your office with

Objection to lines 7-8 based on dkt. 202 at 15, seeking to bar testimony related to alleged interviews of Matt and Katie on May 9th, 1985 in Sacramento. If denied, Plaintiff reserves right to supplement

See A's response to π's MIL # 13

Mr. Peters and Mr. Rulli with the children in your office having any discussion with them?

A No. I don't --

MR. FREIMUND: Object to the form. That would be child, not children.

But ahead and answer.

THE COURT REPORTER: I'm sorry. Who was that?

MR. FREIMUND: Jeff Freimund. I'm sorry.

BY MS. ZELLNER:

Q Do you recall the children, Matt and Katie Spencer, ever being in your office together?

A No. I don't recall that.

MS. ZELLNER: I don't have any further questions.

EXAMINATION

BY MR. FREIMUND:

Q This is Jeff Freimund. Good morning, Ms. Link.

A Good morning.

Q I represent one of the defendants in this lawsuit, retired Sergeant Michael Davidson, for the Clark County Sheriff's Office.

What I'd like to start out by asking you is that you indicated when you first met with Kathryn Spencer she was displaying anxious and withdrawn behaviors, including curling up in a fetal position.

Would you regard that as normal behaviors for a five-year-old girl?

A No.

Q Would you regard that as indicative behaviors of the possibility that she may have been a victim of sexual abuse?

A Possibility but it could also have been due to other things.

Q Okay. Did you observe other behaviors of Kathryn Spencer back when you were interacting with her in early 1984 that you would regard as sexualized behaviors?

A No. I don't recall that.

Q When you say -- you say you don't recall quite often, and that's perfectly understandable. It's been over 25 years.

But when you say you don't recall something, does that mean it did not happen or you just don't have a memory of it?

A It means I don't have a memory of it happening.

Q Do you recall being made aware from Kathryn Spencer's mother that she believed Kathryn was engaging in excessive masturbation?

A I don't recall that.

Objection - irrelevant; answer was clear and unambiguous

Goes to weight of testimony - see 9th Cir. model Instr. 1.11

Q Okay. Again, when you say you don't recall that, it doesn't mean it didn't happen. It just means you don't remember it. Right?

Objection -Asked and answered

A Right.

Q Okay. When you use the word that you believed Kathryn Spencer was anxious and withdrawn, what were some of the symptoms of what you regarded as anxious behaviors? Can you describe something more than just that conclusion?

Goes to weight of testimony & memory see 9th Cir. Model Instr. 1.11

A She curled up on the floor underneath a blanket and didn't talk for the first several sessions.

Q Anything else that you remember that you would regard as symptomatic of anxious behavior?

A I don't remember other behaviors.

Q Okay. You stated that you didn't remember Deanne Spencer, Kathryn Spencer's mother, participating in therapy sessions.

Is that something that you just don't recall or are you saying that never happened?

A I'm saying I don't recall that.

Q So it could have happened and you just don't remember; is that right?

Objection -Asked and answered; cumulative; argumentative

A I don't recall that.

Q I understand you don't recall that. My question is though, even though you don't recall it, it

still might have happened. You just don't have a memory of it 25 years later. Right?

A I don't recall it.

Q All right. Would it be your normal practice when providing therapy to children of approximately five years of age to speak with their parents after -- before or after therapy sessions?

A Yes.

Q Do you believe that you probably complied with that standard practice with this particular child? I.e., you spoke with her mother on occasion before or after therapy sessions.

A Yes. That's very likely.

Q Okay. Do you have any recollection of how frequently that would occur? Would it be after every therapy session or how would that typically occur?

A I don't have a memory of how often that would occur in that specific case.

Q I'm just asking -- I understand you may not have a specific memory, but would it typically be your practice when providing therapy to children of approximately five years of age that you would speak with their parent or parents after every session?

A After many sessions.

Q Okay. Would it be your belief that more than

Corroborates Krause's report of the Same; "Likely" is not Speculative

likely that occurred in this case? That after many or if not most of the sessions you had with Kathryn you would speak to her mother?

A Likely.

Objection to carry over question and answer -Speculative

Q Okay. Now, you indicated -- well, before I proceed from there, I know this is a long shot but I'm going to ask it anyway.

Do you have any recollection whatsoever of what you did speak to Deanne Spencer about after any of the therapy sessions you had with Kathryn Spencer?

A I don't have any specific memories. No.

Q Do you have any vague memories?

A No.

Objection to lines 12-13 - calls for speculation

Q You were asked how many sessions you had with Kathryn Spencer, and you've acknowledged it was more than twelve.

Can you be a little bit more precise as to what your best estimate is of how many sessions you had with Kathryn Spencer over time?

A Could have been 25 plus. I'm not sure.

Q Do you recall whether your sessions were on a weekly basis or a different interval of time?

A I don't recall.

Q Do you recall whether your sessions continued for more than a year in time or less than a year in

time?

A I don't recall.

Q I'd like to direct your attention, if I may please, to Plaintiffs' Group Exhibit 6 that you were asked some questions about and particularly direct your attention to the handwritten notes of some unidentified person that starts with "Ann" at the top and they're under the plaintiffs' lawyer's numbering system, Spencer-00809.

Do you see those?

A Spencer-00809? Yes.

Q Correct.

A I see that.

Q At the top of that page there, under your first name "Ann," it says, "Began seeing Katie September 12th."

A Yes. I see that.

Q Does that coincide with your recollection that it was approximately the middle of September of 1984 that you began seeing Kathryn Spencer?

A I don't remember the month I started seeing her.

Q Do you remember it being in the summertime or early fall?

A No.

Q Okay. So you can't say one way or the other

whether that date of September 14th being the first visit is accurate.

Is that the case?

A That's the case.

Q Okay. Now, you mentioned that you didn't recall Kathryn Spencer talking about sexual abuse with you but you did say she talked about other things with you.

What was it she talked about with you during these approximately 25 therapy sessions that you had with her?

A I don't recall details of what she talked about.

Q Do you recall anything that she talked about?

A Not specifically. I don't recall anything she talked about.

Q But even though you don't recall anything she did talk about, you -- it's your belief she did not talk to you about sexual abuse or being a victim of sexual abuse.

A Yes.

Q Is that your testimony?

A Yes.

Q And you were aware -- were you not? -- That the whole reason why this girl was brought to you for therapy