was because there were concerns she might have been a victim of sexual abuse. Right?

A Yes.

Q Given that awareness, did you direct any of your therapeutic efforts to addressing that concern that she -- this five-year-old girl -- might be a victim of sexual abuse?

A Well, my method of therapy with her was nondirective play therapy.

Q Okay. Did you make any therapeutic efforts to address the concerns that this five-year-old girl might be the victim of sexual abuse?

A I used therapeutic play therapy to encourage -- to reduce anxiety and encourage communication and promote positive coping.

Q Okay. And do you have any memory at all of whether those therapeutic efforts seemed to have any beneficial effect on Kathryn Spencer?

A Yes. She did get less anxious and more communicative.

Q But you don't recall what it was that she communicated to you as she improved her communication skills with you; is that accurate?

A No. That's accurate.

Q Now, you said earlier you don't recall using

anatomic dolls with Kathryn Spencer.

Are you testifying that you did not in fact use anatomic dolls with Kathryn Spencer or you just don't have a clear memory of that 25 years later?

A I don't recall using anatomical dolls with her.

Q So you may have and you just don't remember; is that accurate?

A It's possible but not likely.

Q Okay. Now, you said that you don't recall that you contacted California law enforcement authorities or CPS to report sexual abuse disclosures by Kathryn Spencer made to you.

Is it correct that you just don't have a memory of that but you are not testifying that in fact you never made such a call?

A I don't have any memory of making such a call.

Q So you might have and you just don't remember it; is that accurate?

A I don't remember it.

Q I understand you don't remember it, but my question is a little more nuanced than that.

Is it true that you might have made such a call and you just do not currently remember doing so?

Objection -Line of questioning from line 7 to page 51, line 1 has been asked and answered -Also cumulative and argumentative

Goes to weight see 9th Cir. model Instr. 1.11

A I have no recollection of making such a call.

Q Is it your understanding if as in this case where you'd been told as a therapist that this child that you are providing therapy to has already disclosed that she was a victim of sexual abuse by her father that if in therapy that child confirmed that to you, you would have an independent obligation to once again disclose that previously disclosed report of abuse? Is that your understanding of your requirements?

A Yes.

Q So every time a child discusses a sexual abuse incident with you in therapy, each time you have to call CPS.

Is that your understanding?

A I'm not sure I understand the question.

Q I'm just asking for your understanding, ma'am.

Is it your understanding that while in the course of therapy of any child, every time that child discloses sexual abuse, even if it's been previously reported, you have to nonetheless report it again? Is that your understanding?

A No. That's not my understanding. If I had --

Q Is it your understanding that once sexual abuse involving a particular child and a particular perpetrator has been disclosed and reported, your obligation to

repeatedly report that same incident is nonexistent?

MS. ZELLNER: Objection to the form of the question.

BY MR. FREIMUND:

Q Do you understand my question, ma'am?

A No.

Q Let me try again then. And please, if at any time you don't understand my question, don't hesitate to say so.

My question is -- is once a disclosure of sexual abuse has been made to the authorities involving a particular victim and a particular perpetrator, is it your understanding that you have no obligation to report that same abuse when a child repeats it in your presence during a therapy session?

MS. ZELLNER: Objection to form. It's compound, confusing, and it assumes facts not in evidence.

BY MR. FREIMUND:

Q Did you understand the question that time, Ms. Link?

A No.

Q What is it about it that you're missing? And maybe I can be a little clearer.

A Are you talking about if the child had told me

on a previous occasion and I had reported it that I would not have to report it every therapy session that a child talked about it? Is that what you're asking?

Q Well, we can start with that. And what's your answer with that?

A No. I would not have to report every --

Q Okay. Let's take another situation.

You are aware -- let's use the facts of this case. You are aware that this child had previously disclosed that she had been sexually abused by her father and the authorities were aware of that fact.

If the child made a disclosure to you that she had been sexually abused by her father and you know that has already been reported, would you feel an obligation to report it again?

A Yes.

Q Do you think you're required to do so?

A Well, I think I'm required to if I believe there's abuse and there's -- it's not clear whether what the child has told me is the same or different as someone else has reported it.

Q Okay. Now, you said you had a vague recollection of talking to law enforcement at some point.

Is it your vague recollection that that happened on only one occasion or did it happen on more

See Δ's response to Π's MIL #13

than one occasion?

A I don't recall.

Q And you have no memory of when it happened either, I take it.

A No, I don't.

Q And you have no memory of whether it was a prosecutor, a criminal defense lawyer, a police officer, or what have you.

Is that also the state of your memory?

A Yes, it is.

Q So when you've reviewed these notes that indicate on at least two occasions, if not more, you did speak with prosecutors, criminal defense lawyers, and police officers regarding the abuse reported by Kathryn Spencer, you aren't saying that that never happened. You're just saying you don't recall if it happened; is that accurate?

A I'm sorry. What was the question again?

Q Is it accurate, after you've reviewed all these notes indicating that you did speak with prosecutors, a criminal defense lawyer for Mr. Spencer, and a police officer that your testimony is you don't recall those interactions occurring, but you are not testifying that those interactions never happened?

Is that a fair understanding of your testimony?

To the extent the carry over testimony designated by the defense opens the door to matters in plaintiff's motion in limine 13, dkt. 202 at 15, Plaintiff objects and reserves right to supplement highlighting if motion is denied.

See next page

A I'm testifying that I don't recall them.
Q Are you testifying that they never happened?
A I am testifying that I don't have a recollection of it.
Q And would you agree, ma'am, that not having a recollection is not the same thing as saying something never happened? Would you agree with that?
A I'm not sure I understand what you're saying.
Q Let me try again then.
Would you agree that there is a difference between saying I don't remember something happened and saying I know something did not happen?
A Yes.
Q Would you agree there's a difference between those two statements?
A I guess I would agree. Yes.
Q And that's what I'm trying to focus on is that -- that difference between those two statements.
Would you agree that when you say, I don't recall talking with prosecutors and another criminal defense attorney and police officer, you are not saying that never happened? You're just saying, I don't have a memory of that happening.
Would that be a fair understanding of your testimony?

Objection to page 54 line 19 through page 56, line 1 based on dkt. 202 at 15. Plaintiff reserves right to supplement highlighting if motion is denied.

Additional basis for page 55, line 5 to page 56, line 1: asked and answered, cumulative, argumentative

See A's response to TTS MIL #13

Goes to weight, see 9th Cir. model Instr. 1.11

A Yes.

Q Thank you. Now let's turn to group Exhibit 6 from the Plaintiffs' Group Exhibit 6. There's an email there from the plaintiff lawyer in which it says, "Per your request, please find the attached documents."

Did you ask the plaintiff lawyer to send you the documents that are attached in Group Exhibit 6? I'm sorry. If you answered, I didn't hear it.

A I believe I said I would be interested in seeing it.

Q In seeing what? What exactly did you tell the plaintiff lawyer you'd be interested in seeing?

A Other information about the case, if there was any.

Q And why did you think there might be other information about the case? Is that based on something Ms. Zellner told you or what?

A Yes. She's the only person I've talked to about the case.

Q Yes. And what is it you asked her for specifically?

A I didn't specifically ask her for anything.

Q Well, it says, "Per your request, please find the attached documents," and I'm just trying to find out what was your request.

A Oh, I see.

Q What did you ask for?

A Yes.

MS. ZELLNER: I'm going to object because it's asked and answered. She's already told you that she said she'd be interested in looking at documents.

MR. FREIMUND: I understand that.

BY MR. FREIMUND:

Q And what I'm asking for is a little bit more precision, if you have it, Ms. Link.

Do you recall specifically what you asked or requested to review?

A Documents that refer to me. Parts of the documents that mention me in them.

Q So you're pretty sure that you only asked to review documents that mention you in them.

Is that your memory?

A I'm not sure about that.

Q Okay. Well, what is it you asked to review then?

MS. ZELLNER: Objection. She's asked and answered the question. You're badgering her.

MR. FREIMUND: No. She said that she asked for documents that referenced her and then she said no; I don't think I limited it to that, or that was my

understanding.

BY MR. FREIMUND:

Q So what I'm trying to figure out -- to the best of your ability, Ms. Link, what was it you requested to review?

MS. ZELLNER: Objection. Asked and answered.

BY MR. FREIMUND:

Q You may still answer, please.

A Well, documents in which my name was mentioned.

Q Okay. That's your best memory of what you asked for?

A Yeah.

Q Okay. Why did you ask for those documents that your name was mentioned in?

A Because I wanted to know what kind of information people had said about me.

Q Looking at Group Exhibit 6 where -- the second page in these documents that you received per your request that mention your name, you were asked to read or listen to Ms. Zellner read, I should say, portions from a deposition transcript apparently involving James Peters.

Do you see those pages 97 and 98 --

A Yes.

Q -- and 125?

A Yes.

Q And you said that the portion where Mr. Peters is reporting as is similarly reflected in his -- or somebody's notes that there -- you had told him that Kathryn Spencer had disclosed sexual abuse to you on or around November 1 of 1984.

A What line are you on?

Q I'm on page 98, line 11. And then I'm also referencing back to those handwritten notes of the interview that are about four pages back from that page.

A Yes.

Q And both the transcript testimony and those written notes that were apparently taken 25-plus years ago references that you told the prosecutor, Mr. Peters, that Kathryn Spencer had disclosed sexual abuse to you on November 1, 1984.

Do you see that?

A Is that page 98?

Q Yes. And also the handwritten notes that is under Spencer-00809. That's the same thing.

Do you see both of those documents?

A Yes.

Q All right. And is it your testimony that that -- you never made that statement to Mr. Peters or is it your testimony you do not recall making that statement

Objection to testimony designated by defense on pages 59 and 60 on basis of dkt. 202 at 15. Plaintiff reserves right to supplement if motion is denied. Additionally, at this point the testimony is cumulative, it has been asked and answered, speculative, and hearsay

See A's response to Π's MIL # 13

Goes to weight See 9th Cir. model Instr. 1.11

to Mr. Peters?

A I have no recollection of making that statement to Mr. Peters.

Q Okay. But you're not saying you never made that statement to Mr. Peters. You're just saying, I do not recall making that statement; isn't that accurate?

A That's accurate.

MS. ZELLNER: Objection. Asked and answered. She testified the statement was false.

BY MR. FREIMUND:

Q I didn't hear your answer, Ms. Link.

Is that accurate? My question to you, was that accurate?

A I'm sorry.

Q You want me to ask you again?

A Yes.

Q Is it a fair understanding of your testimony that you do not recall making the statement to Mr. Peters that Kathryn Spencer disclosed sexual abuse to you on November 1, 1984, but you are not testifying under oath that you didn't make that statement to him at some point? You just don't recall making that statement.

MS. ZELLNER: Asked and answered. Objection.

BY MR. FREIMUND:

Q Please answer the question.

A I don't recall making that statement. I don't have any recollection.

Q Does that mean you never made such a statement or does that mean you just don't remember whether you did make such a statement?

A I have no recollection of the statement.

Q I understand that. But, you know, I don't want to walk through this, again, ma'am, but I'm just trying to make that distinction once again on whether you do not remember this or are you saying it never happened.

So my question is are you saying you never made such a statement to Mr. Peters or are you saying, I cannot remember whether or not I made such a statement to Mr. Peters? Which is it?

A I'm saying that I have no recollection of making the statement.

Q All right. So you are not saying you never made such a statement; is that correct?

MS. ZELLNER: Objection. Asked and answered.

MR. FREIMUND: That has not been answered.

BY MR. FREIMUND:

Q Please answer it.

A What was it again?

Q Are you saying you never made such a statement to Mr. Peters?

A I have no recollection of making a statement to Mr. Peters about that.

Q But you can't say that you never made such a statement either, can you?

A I have no recollection of it.

Q All right. Now, you previously -- in looking at those handwritten notes, you previously indicated that several of the things that are written there in those handwritten notes that were taken 25-plus years ago are accurate. That Mr. Peters accurately noted that you were a Ph.D. candidate. Whatever that second line is. That you were also a registered nurse and you were licensed in marriage counseling, and you never testified before.

All that was accurately recorded by him, wasn't it?

A Yes.

Q Okay. But you're saying other portions of these notes are not accurately recorded, or are you saying, I don't remember saying those things at that time?

A I don't remember saying those things at that time.

Q Okay. Do you remember -- just looking at the notes there, there's kind of circled Arabic numerals on the left-hand margin. Ms. Zellner asked you about the

See A's response to π's MIL #13 & goes to weight and credibility of allegation that Peters' notes are inaccurate in other respects

Objection -Id. -Also hearsay, speculative about notes, cumulative, asked and answered.

first circled Arabic numeral 1.

The next, Arabic numeral 2, talks about sleep problems. Unable to sleep alone. Had to sleep in same room with mother. Nightmares. Unable to go to sleep before mom got home or if mom went out.

Do you recall those being some of the symptoms that Kathryn Spencer was displaying or reporting during the time you were providing therapy to her?

A I don't recall specific symptoms.

Q Okay. Do you think that that was an inaccurate notation of what you may have said to Mr. Peters or whoever it is who wrote these notes?

MS. ZELLNER: Objection. It misstates the evidence. She doesn't remember saying this to anybody.

MR. FREIMUND: I understand that.

BY MR. FREIMUND:

Q I'm saying -- I'm asking a little something different though, Ms. Link, and that is are you saying that these notes of what you reportedly told somebody back in 1985 are inaccurate.

A I'm not saying they're inaccurate. I'm saying that I don't remember all the specific symptoms that she had or telling Mr. Peters specific symptoms.

Q Okay. Let's go to the next page, under Arabic numeral 3, which says, "When she came back from

Objection -Same objection and reservation based on dkt. 202 at 15; also speculative and hearsay.

Same response as immediately above

Objection -Id.

Same response

Washington, she displayed, quote, overreactive anger, end quote, to things that earlier had not bothered her. Indicates post-traumatic anxiety. Reported by Deanne."

Are you testifying that those notes are inaccurate or you just don't recall saying those things back then?

MS. ZELLNER: Objection. The note says it was reported by Deanne. It doesn't say it was reported by Dr. Link. She can't testify as to what Deanne reported.

MR. FREIMUND: That's your mischaracterization of what the notes are talking about, Counsel. I'm asking this witness, are you saying those notes of what this individual is reporting you talked to him about are inaccurate.

MS. ZELLNER: You're misstating the notes. On page 0081, it says that information is reported by Deanne. It doesn't say it's reported by Dr. Link, so it's improper to ask her to speculate on that.

MR. FREIMUND: Counsel, you know that it's not a proper objection, and I'd appreciate you not attempting to go coach witnesses.

MS. ZELLNER: I'm not coaching the witness. The document says, "Reported by Deanne." If it said, reported by Ann Link, she could answer it. It doesn't

say that, so you're the one who's trying to mislead her.

MR. FREIMUND: So you're saying -- you're reading of this is that Deanne reported that these behaviors indicate post-traumatic anxiety behavior? I beg to differ.

MS. ZELLNER: It says, "Reported by Deanne."

MR. FREIMUND: That is the last line. I agree with you. That is the last line. That is not the entire entry.

MS. ZELLNER: So? It --

MR. FREIMUND: So let me ask the question.

MS. ZELLNER: If you can ask her if she -- if this information was reported by her, it would be fine, but it says, "Reported by Deanne."

BY MR. FREIMUND:

Q Ms. Link, are you testifying that the notes that are reflected in this exhibit under Arabic numeral 3 are inaccurate?

A I don't recall details specified in that note.

Q Okay. Do you recall perhaps being of the belief that Kathryn Spencer was displaying behaviors that would be indicative of post-traumatic anxiety?

A She had symptoms of anxiety that could have

been due to post-traumatic stress or could have been due to something else.

Q What other things do you think post -- I'm sorry -- those anxiety symptoms might have been attributable to based on your knowledge and information received regarding Kathryn Spencer?

A Upsetting things in the child's life.

Q Like what?

A Divorce. Separation. Family problems. Things like that.

Q What family problems were you aware of?

A I don't remember specific information about her family problems.

Q But you do remember one of the family problems was a report that her father had sexually abused her. Right?

A Yes. Yes. I thought you --

Q But you don't remember any others besides that particular problem?

A I thought you meant her current situation in Sacramento. I'm sorry.

Q Do you remember any other particular family problems, other than that her father had reportedly sexually abused her?

A No.

Objection -Leading -Asked and answered Argumentative

leading is appropriate given witness' hostility goes to weight

Q Do you remember being told that when Kathryn Spencer returned from Washington after visiting her father, she displayed, quote, overreactive anger to things earlier that had not bothered her?

A I don't remember being told that.

Q Again, just because you don't remember being told that doesn't mean you were not told that; isn't that true?

A That's true.

Q Let's look at item No. 4 immediately below that. It says, "Difficulty communication."

You've already testified to that. Right? That you do remember that Kathryn Spencer had difficulty communicating.

A Yes.

Q The next line. I'm not sure what it means and maybe you can help me by reading it.

It says, "Reported by Deanne, observed by Ann Link, when subject of Washington visit, Deanne reported that was very uncharacteristic of Katie."

In reading that, do you have any glimmer of what's being referred to there?

A No.

Q The next line says, "Symptoms have gotten less through therapy," and you've already testified that note

Objection to lines 1-9 as hearsay.

Objection to lines 10 to 14 as cumulative; asked and answered, as indicated by "You've already testified to that." -Plaintiff also restates objection and reservation re dkt. 202 at 15.

Objection to carry over -Id.

see above & Δ's response to π's MIL #13

same as above

is accurate. Correct? That you do remember symptoms got less through therapy. Right?

A Yes.

Q Then the last note says, "The last time I saw her was March 13th before she went to Washington. Had surgery," it looks like.

Does that refresh your memory that that accurately reports the last time you had seen Kathryn Spencer, at least as of that time that these notes were taken, was on March 13, 1985?

A No. That does not refresh my memory.

Q Okay. Do you have any reason to disagree with that notation though or the accuracy of it?

I'm sorry. I didn't hear your answer.

A I don't have a memory of what the date was that I last saw her.

Q I understand that. I'm just asking, do you have any reason to disagree with the accuracy of that statement that as of the time these notes were taken, the last time you'd seen her was March 13, 1985? Do you have any reason to disagree with that?

A Yes, I do.

Q And what's your reason for disagreeing with that?

A Because I don't remember the last date that I

saw her.

Q Okay. It could be true. You just don't remember; is that right? Is that right?

A That's probably true. I don't remember.

Q Let's go back up to Item 1 there that Ms. Zellner was asking you questions about.

On the items that we're -- it says, "On November 1, she demonstrated with dolls for Ann." And then the next line says, "Parts. Boobies. Pee pee. Wiener. Bottom."

Are you saying that you are certain that Kathryn Spencer did not describe body parts using those terms or are you saying you cannot recall whether she described body parts using those terms?

A I do not recall demonstrating with anatomical dolls with her.

Q Try listening to my question now. I'm asking you, are you saying -- do you recall Kathryn Spencer using those terms to describe body parts or are you saying Kathryn Spencer never used those terms to describe body parts?

A I don't remember Kathryn Spencer describing body parts listed in that "A."

Q Are you saying she never used those terms?

A I'm saying I don't have any recollection of her

Objection based on motion in limine #13, dkt. 202 at 15; Plaintiff reserves right to supplement highlighting if motion denied. Also, object based on speculative and hearsay testimony. Also, questions have been asked and answered.

see Δs's response to π's mIL #13 & goes to weight

using those terms.

Q The next line says, "Only able to whisper them."

Is that consistent with the memory that you do have that she had difficult communication problems with you?

A I don't have a recollection of that description there.

Q Do you remember her just whispering to you sometimes when she was communicating to you during therapy?

A I don't specifically remember that.

Q Are you certain it never happened?

A I don't recollect it happening.

Q Does that mean you're not certain whether it happened?

A It means I don't have a recollection of it happening.

Q And once again, ma'am, there's a very important distinction I'm trying to make here, and I'd appreciate you trying to answer my question. There is a difference between whether you recall something happened and being certain that it never happened, and that is the distinction I am trying to get here.

Are you certain that it never happened that

Kathryn Spencer would occasionally whisper to you during therapy sessions?

A I don't remember her whispering to me during therapy sessions.

Q Are you certain that it never happened?

A No. I don't remember it happening.

Q All right. And that's certainly understandable. It's been over 25 years. That's why I want to be very clear on this distinction.

Now, what is under Group Exhibit 6, are those all the documents that you have received from plaintiffs' counsel in this case, other than drafts of your declaration?

A Under -- the exhibits under 6?

Q Yes.

A There's Exhibit 6. There's Exhibit 7.

What was it you were asking?

Q I appreciate your clarification, and that does cause me to rephrase my question. Thank you for pointing that out.

What I'm asking is other than the drafts of your declarations and the releases that were signed both for you to talk to Ms. Zellner and to be deposed about your treatment of Kathryn Spencer -- other than those documents, are the documents that are contained in

Plaintiffs' Exhibit Group 6 through Plaintiffs' Exhibit 12 all of the documents that you have received from the plaintiff lawyers in this case?

A Yes.

Q And it's true -- is it not? -- you've received no documents from any of the defense lawyers or anybody representing the defendants. You received documents only selected by the plaintiff lawyers. Correct?

A Yes.

Q Let's look at Exhibit 9, please.

On Exhibit 9 Ms. Zellner said that this constitutes a note by Detective Krause in which she reports that on October 17, 1984, Detective Krause accompanied Katie and her mother, Deanne Spencer, to a therapy session. Now, you said you don't recall that occurring where a police officer accompanied Deanne Spencer to a therapy session with you and Kathryn Spencer.

Is it your testimony that that never happened or is it your testimony that you don't remember whether or not that happened?

A I don't remember it happening.

Q Let's go to Exhibit 10. Ms. Zellner related to you that this is a report from officer -- I'm sorry -- Detective Krause, and it reports that Deanne Spencer told

Objection Irrelevant Defense could have submitted exhibits

Objection to pages 72-73 - hearsay; testimony can be admissible without documents, see pages 36-39.

goes to bias

offered to show Krause accurately reported this event

Detective Krause she had advised the children's therapist that a boy by the name of Matt Hansen had said he had observed both Kathryn and Matt Spencer being victimized by their father.

Is it your testimony that that never happened? That you never received that information? Or is it your testimony you just don't recall whether you received that information?

A I don't recall if I received that information.

Q Okay. The next sentence reads, "I also have had phone conversation on occasion with both the therapists and provided them with any information I had that may assist them in dealing with the Spencer children."

Now, you do recall that that's accurate; do you not? You did say you recall speaking on the phone with Detective Krause. Correct?

A I remember having some communication with Detective Krause.

Q I want to be very clear on this point, Ms. Link.

Is it your testimony that Kathryn Spencer never disclosed sexual abuse by her father to you or is it your testimony that you don't remember whether Kathryn Spencer

disclosed sexual abuse by her father to me? Which of the two is it?

A I have no recollection that she disclosed sexual abuse by her father to me.

Q So of the two choices I gave you, you chose the second one. Correct?

MS. ZELLNER: Objection. That misstates what she testified to.

BY MR. FREIMUND:

Q Is that correct, ma'am?

A Can you repeat the question?

Q Sure.

MR. FREIMUND: I ask that the reporter read it back, please.

(Record read.)

THE WITNESS: Kathryn Spencer never disclosed abuse information regarding her father to me.

BY MR. FREIMUND:

Q So you're certain now that that never happened.

A Yes.

Q All right. Let's look at Exhibit 12.

Ms. Zellner represented to you that Exhibit 12 is part of an excerpt from the sentencing hearing for Ray Spencer in which she read for you first an unidentified person that may or may not be Mr. Peters

saying, "Mr. Rulli and I, when we were in Sacramento, talked to the therapist of Matthew Spencer and Kathryn Spencer and they indicated that the children were experiencing substantial psychological and behavioral problems of the type typically seen in victims of sexual abuse."

You said in answer to Ms. Zellner's questions you don't recall telling the prosecutors and Mr. Spencer's criminal defense attorney that Kathryn Spencer was displaying these types of behavioral problems that are typically seen in victims of sexual abuse.

Once again, I want to be clear. Are you saying you don't recall telling them that or are you saying you never would have told them any such thing?

A What page are you on?

Q Page 47, the second page of Exhibit 12.

A Page 47. Okay.

Q It has Spencer-01095 on the bottom right-hand corner, using the plaintiff lawyer's numbering system?

A 01095. And what was your question again?

Q Are you -- just reading that where --

A Starting with --

Q The paragraph -- "Mr. Rulli and I, when we were in Sacramento, talked to the therapist of Matthew Spencer

With respect to page 75, line 25 through page 76, line 10
Plaintiff restates objection and reservation based on dkt. 202 at 15; also, asked and answered

and Kathryn Spencer, and they indicated that the children were experiencing substantial psychological and behavioral problems of the type typically seen in victims of sexual abuse."

And my question to you is are you saying you never would have said any such thing to this prosecuting attorney and criminal defense attorney or are you saying I do not recall saying such things to those people?

A I don't recall a specific conversation with them.

Q All right. Would you agree that you believe that Kathryn Spencer was displaying behavior problems of the type that are typically seen in victims of sexual abuse?

A Of the type that can be seen in victims of sexual abuse.

Q You would agree with that. Right?

A Yes. That she had symptoms -- anxiety symptoms that could be seen in a sexual abuse victim or anxiety from other reasons. Yes.

Q All right. I don't have any more question for you, Ms. Link. Thanks for your time.

EXAMINATION

BY MR. JUDGE:

Q Ms. Link, this is Dan Judge. I'm here on

Objection to lines 11-20; asked and answered, cumulative

See A's response to π's MIL #13 and goes to weight

behalf of Ms. Fetterly, and I represent Jim Peters.

My first question relates to the gentleman by the name of Jim Rulli.

Do you know who is?

A No.

Q Do you ever recall meeting him?

A No.

Q Okay. Do you know Jim Peters?

A No.

Q Do you ever recall meeting him?

A No.

Q Okay. Do you ever recall talking to Mr. Rulli either in person or over the telephone?

A No.

Q Okay. Do you ever recall speaking to Mr. Peters either in person or over the telephone?

A No. I don't recall that.

Q Okay. Do you recall having any meeting in which Mr. Peters and Mr. Rulli were together speaking with you?

A No. I don't recall that.

Q Okay. So is it fair to say -- well, I'll just ask it. Do you recall telling anybody by the name of Jim Peters anything in a conversation either in person or over the phone?

A No.

Q Okay. So is it fair to say you don't recall the content of anything you told Mr. Peters either in person or over the phone?

A Yes.

Q Okay. With respect to Mr. Rulli, I would ask the same question.

Do you recall ever speaking with him in person or over the phone?

A No.

Q Okay. Do you recall the content of anything you told Mr. Rulli either in person or over the phone?

A No. I don't have a recollection of that.

MR. JUDGE: Thank you. I don't have any further questions.

EXAMINATION

BY MR. JUSTICE:

Q Ms. Link, my name is John Justice. I'm an attorney representing Sharon Krause. I have a couple questions for you.

You mentioned that you did recall speaking with Sharon Krause at some point in time; is that correct?

A Yes.

Q Do you remember when those conversations took place?

Objection based on motion in limine 13, dkt. 202 at 15; Plaintiff reserves right to supplement highlighting if motion is denied.

See Ds' response to TTs MIL #13

A No, I don't.

Q Do you remember if there was more than one conversation?

A No.

Q Do you remember meeting -- whether or not you met with her in person?

A No. I don't recall that.

Q Is it possible that you did and just don't recall?

A It's possible.

Q And do you recall the contents of any of the conversations that you had with Sharon Krause?

A I remember finding out that she had met with Katie Spencer and that she had said Katie revealed details of sexual abuse to her and that she'd spent some -- a fair amount of time with her.

Q Do you remember if that information was relayed to you while you were in the middle of counseling Katie Spencer or at some point other than that? I mean can you pinpoint where in your relationship with Katie Spencer that information came to you?

A I think it was while I was still doing therapy with Katie Spencer.

Q Did you --

A It was around that -- it was --

Q Did you attempt to confirm or dispel that information that you had received from Sharon Krause in your sessions with Katie Spencer?

A Not that I recall. No.

Q If you received information from someone other than your patient that they have possibly -- that your patient has been possibly the victim of sexual abuse, does that fall within your mandatory reporting requirements under the California law?

A Yes.

Q And yet you do not recall whether or not after receiving that information from Sharon Krause that you reported that information to the authorities?

A That's correct.

Q But you are saying that you would normally do that if you had received information from a third party not necessarily limited to your patient; is that correct?

A Correct.

Q Any other details or information that you recall in your communications with Sharon Krause, either receiving from her or communicating to her, that you haven't disclosed in this deposition?

A No. I have no other recollections of talking to Sharon Krause.

Q I'm curious about the development of the declaration that we have received from you.

Did you at any point in time in your recent communications with plaintiffs' counsel write down your recollection of your therapy with Katie Spencer and share that with plaintiffs' counsel?

A Write it down? No.

Q Did you type it out? Is there any other written document that you have created that was provided to plaintiffs' counsel prior to the declaration being created?

A No.

Q So the first written document that attempted to formulate your testimony in this declaration came from the plaintiffs' counsel?

A I'm sorry. What was the question?

Q The question was is it true to say that the first written document that was characterized as your testimony in this case came from the plaintiffs' counsel.

A You mean the affidavit that we developed?

Q Yes.

A Yes.

Q I want to apologize for jumping around a little bit. That kind of comes from going last.

But you mentioned that you received your Ph.D.

from an institution, and I didn't catch the name of that institution.

A Professional School of Psychology.

Q Where's that located at?

A San Francisco.

Q Was that -- were you in person there or is that a distance learning facility?

A Some of the classes were in Sacramento. Some of them were in San Francisco.

Q So it's an actual brick and mortar institution?

A Yeah. We attended classes in San Francisco.

Q And is that at a place called the Professional School of Psychology or is it -- do they have two different branches? I'm not understanding that.

A Well, I just recall we went to classes at the Professional School of Psychology in San Francisco. I don't remember exactly the address or buildings.

Q And you said something about Sacramento as well.

Did they have a branch in Sacramento?

A I believe so.

Q What was your dissertation in?

A It was about altruistic behavior in schizophrenics.

Q Is that published? Is it available online?
A I don't believe it's online. No. It wasn't published.
MR. JUSTICE: That's all the questions I have.
MS. ZELLNER: I've got a few questions. This is Kathleen Zellner again just for clarification.

FURTHER EXAMINATION

BY MS. ZELLNER:
Q Dr. Link, could you look back at Exhibit 1, your affidavit.
A Yes.
Q Okay. If you look at paragraph 7, could you read that into the record, please.
A "I specifically recall that at no point during my sessions with Kathryn did she describe being molested by anyone."
Q Is it a correct statement that you have an independent recollection that Kathryn Spencer did not describe being sexually abused to you?
A Yes.
Q Then if we look at paragraph 10, could you read that into the record.
A "I never would have told any person, including law enforcement, that Kathryn had described any abuse to me because she had not done so."

Response: the declaration is a properly authenticated exhibit to this deposition; Dr. Link's testimony that certain statements are true is the evidence; Plaintiff is not seeking to substitute the affidavit for her testimony; also, lines 17-20 are not subject to objection to exhibit;

Objection Ex. 1 is hearsay and cumulative

Q Okay. Is that a true statement?
A Yes.
Q When counsel -- if Kathryn Spencer did not report sexual abuse to you, would you have reported to Prosecutor Peters that Kathryn Spencer had been sexually abused?
MR. JUDGE: Objection to the form of the question.
THE COURT REPORTER: I'm sorry. Who was that?
MR. JUDGE: I'm sorry. Dan Judge.
BY MS. ZELLNER:
Q If Kathryn Spencer did not report sexual abuse to you, would you have reported that she had been sexually abused to Prosecutor Peters?

Deft. object, see p. 24

Plaintiff's response, see p. 24

MR. JUDGE: Objection to the form.
Go ahead.
THE WITNESS: If she had not reported to me that she was sexually abused, would I have reported it to Peters? Is that what you're asking?
BY MS. ZELLNER:
Q Right.
A I'm sorry.
Q Right. Would you have reported it to Prosecutor Peters if she had not told you that she had been sexual abused?

A No, I would not have.

Q Would you have reported to Defense Attorney Rulli if she had not been sexually abused?

A No.

Q And would you have reported to Sharon Krause if she had not been sexually abused?

A No.

Q Now, you had stated previously that you don't recall using anatomical dolls with Kathryn Spencer.

Kathryn Spencer you say -- you remember did not describe being molested by anyone. Correct?

A Correct.

Q So would there be any reason for you to use anatomical dolls with Kathryn Spencer if she made no report of abuse to you?

A No.

Q Would that be considered proper? Would that conform with the standard of care for a psychologist, do you believe, to not show the dolls -- anatomical dolls if someone had not been abused?

A Yes.

MS. ZELLNER: Okay. All right. I don't have any further questions.

///

Response -What she understood as proper; relevant to what she would have done during therapy with Katie, i.e., not use anatomic dolls.

objection; improper opinion; no foundation

FURTHER EXAMINATION

BY MR. FREIMUND:

Q I just have one follow-up question -- this is Jeff Freimund -- in regards to your training, Ms. Link.

Back in 1984 and 1985 when you were a psychology intern and Ph.D. candidate, do you recall receiving any training whatsoever on interview techniques that should be used with child victims of sexual abuse?

A Yes.

Q What do you recall receiving training from? I'm sorry. Who do you recall receiving such training from?

A What was your -- what was your statement preceding that question?

Q You mean what kind of training am I talking about?

A No. No. What did you say before?

Can you just read the last couple of questions there?

Q I'm just asking -- you said that you recall receiving training back in 1984 and 1985 when you were a psychology intern and Ph.D. candidate regarding the interview techniques that are used for child sexual abuse victims and I'm asking who you received that training from.

Response: Relevant to show what techniques Dr. Link utilized during Katie's therapy, which resulted in no disclosures.

Objection: irrelevant; insufficient foundation of expertise

Response to Defense objection from page 87 to 89:
-Id.
-The fact that Dr. Link was properly trained and utilized techniques from her training is relevant to the strength of Katie's non-disclosure and supports claim that Krause misquoted and misrepresented statements attributed to Katie.

A I received training actually during my MFT experience with Dr. Mary Ann Frank.

Q What's your MFT experience? I don't know what you're referring to.

A Marriage, family -- marriage, family, and child counseling license that I had at the time.

Q Okay. What was the nature of your training? How long a session was it?

A It was multiple sessions.

Q And this was specifically on interview techniques that are used with child sexual abuse victims?

A Yes.

Q Okay. And is it interview techniques in the forensic sense of being an investigator of child sexual abuse allegations that you were being trained on?

A No.

Q What was the context of the training then?

A Therapy.

Q So it was how to administer therapy to child sexual abuse victim that you're talking about?

A Yes. It was how to administer therapy as well as how to interview them about it in a therapy context.

Q Okay. And what do you recall knowing back in 1984 and '85 about interviewing children in a therapy

objection, irrelevant & FRE 403, confusing and misleads re: remaining issues in the case

Same response as p. 87

Same objections as on p. 87

context regarding sexual abuse allegations?

A That if the child disclosed sexual abuse to you, then you might clarify what they have said by using anatomically correct dolls to help them communicate what had happened to them.

Q All right. Anything else?

A That there was -- it was very important not to make any kind of leading statements or questions to children, particularly if they had not testified or given statements. It was very important not to contaminate evidence they might give.

Q Okay. Anything else?

A Well, it was important to reassure them and help them to feel safe and to feel like they hadn't done anything wrong. That, you know, it was okay to talk about their feelings and things like that.

Q Okay. Anything else that you can remember that you received training on in this regard?

A That you shouldn't in any way say anything, you know, or imply anything that they should say in a court or any kind of legal proceeding that might sway their impressions of what had happened to them.

Q Okay. Anything else that you remember receiving training about in regard to interviewing techniques in the therapeutic context to child sexual

abuse victims?

A No. I think that's about -- those are most of the points, I believe.

Q Did you receive training on note-taking or videotaping or audiotaping those therapy sessions?

A Well, we -- note-taking but not video or audio.

Q Okay. All right. What was the training you received in regard to taking notes of your therapy sessions involving child sexual abuse victims?

A That you should use just the words that the child uses. Don't use advanced terminology that the child has not used. To have them, you know, describe what's happened to them only in their own words.

Q Have you ever seen the report written by Shirley Spencer that documents what Kathryn Spencer told Shirley Spencer that started this whole case?

A Have I seen -- did you say have I seen the document?

Q Yeah. A handwritten report written by Shirley Spencer documenting Kathryn Spencer's initial disclosure of sexual abuse by her father.

A No.

Q Have you ever seen that?

A No.

Same response as p. 87

Same objections as p. 87

goes to weight, & accurately states evidence

Objection -Irrelevant -Question misstates evidence.

MS. ZELLNER: I would object. It allegedly documents the disclosure.

BY MR. FREIMUND:

Q You've never seen that, ma'am?

A No.

Q Did you ever ask to see that?

A No.

Q All right. I don't have anything more for you.

MS. ZELLNER: Dr. Link, would you like to reserve signature so you can read the deposition before signing it?

THE WITNESS: Yes.

MS. ZELLNER: Okay. So we'll get that to you.

I'd like to go ahead and order the deposition.

THE COURT REPORTER: Very good. Did you want the exhibits attached?

MS. ZELLNER: Please.

MR. FREIMUND: This is Jeff Freimund. I would like an E-Tran, please.

And can I give you my email address?

THE COURT REPORTER: Please do.

MR. FREIMUND: It's JeffF -- that's three F's. I recommend capitalizing the third one. JeffF@Fjtlaw.com.

THE COURT REPORTER: Thank you, sir.

Anybody else?

MR. JUDGE: This is Dan Judge, and I would like an E-Tran as well, and here is my email address: DanielJ@atg.wa.gov.

THE COURT REPORTER: Thank you, sir.

Last but not least.

MR. JUSTICE: Yeah. John Justice here. I'd like an E-Tran only as well.

Ready for my email address?

THE COURT REPORTER: Yes, sir.

MR. JUSTICE: It's G -- this is not me. This is my partner. Gbogdanovich -- b-o-g-d-a-n-o-v-i-c-h -- @lldkb.com.

THE COURT REPORTER: And, gentlemen, would you like the scanned exhibits included with your E-Tran?

MR. Freimund: No, thank you, for Jeff Freimund.

MR. JUDGE: No, thank you. Dan Judge.

MR. JUSTICE: No. John Justice. No.

MS. ZELLNER: Thank you.

(Deposition concluded at 11:12 a.m.)

* * *

DEPONENT'S SIGNATURE

Please be advised I have read the foregoing deposition, pages 1 through 91, inclusive.

I hereby state there are:

(check one) _____ no corrections

_____ corrections per attached

____________ ______________________________

Date ANN LINK, PH.D.

STATE OF CALIFORNIA

I, Karen Cosgrove, CSR 12425, a Certified Shorthand Reporter in and for the State of California, do hereby certify that, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth; that said deposition was taken down by me in shorthand at the time and place named therein and was thereafter transcribed under my supervision; that this transcript contains a full, true and correct record of the proceedings which took place at the time and place set forth in the caption hereto; that this transcript was prepared in accordance with the minimum transcript format standards as set forth by the California Certified Shorthand Reporters Board.

I further certify that I have no interest in the event of this action.

EXECUTED this 31st day of December, 2012.

Karen Cosgrove