# Exhibit B

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

CLYDE RAY SPENCER, MATTHEW

RAY SPENCER, and KATHRYN E.

TETZ,

Plaintiffs,

vs.                                    Case No:   C11-5425BHS

FORMER DEPUTY PROSECUTING

ATTORNEY FOR CLARK COUNTY JAMES

M. PETERS, DETECTIVE SHARON

KRAUSE, SERGEANT MICHAEL DAVIDSON,

CLARK COUNTY PROSECUTOR'S OFFICE,

CLARK COUNTY SHERIFF'S OFFICE,

THE COUNTY OF CLARK and JOHN

DOES ONE THROUGH 10,

Defendants.

_____/

CERTIFIED COPY

VIDEOTAPED DEPOSITION OF

DEANNE SPENCER

Friday, November 16, 2012

Reported by Jennifer F. Milne, CSR No. 10894

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS (Telephonic):

 4       LAW OFFICES OF KATHLEEN T. ZELLNER & ASSOCIATES

 5       KATHLEEN T. ZELLNER, ATTORNEY AT LAW

 6       DOUG JOHNSON, ATTORNEY AT LAW

 7       Esplanade IV1901 Butterfield Road, Suite 650

 8       Downers Grove, IL  60515

 9       (630) 955-1212

10                                              Plaintiff Objects
                                                Basis: Dkt. 202
11   FOR THE DEFENDANT JAMES PETERS:            (Plaintiff's Motions in
                                                Limine)at 16.
12       ATTORNEY GENERAL'S OFFICE

13       PATRICIA C. FETTERLY, ASSISTANT ATTORNEY GENERAL

14       P.O. Box 40126

15       Olympia, WA  98504-0116

16       (360) 586-6300

17

18   FOR THE DEFENDANT MICHAEL DAVIDSON (Video conference):

19       FREIMUND, JACKSON & TARDIF, LLP

20       JEFF FREIMUND, ATTORNEY AT LAW

21       711 Capitol Way South, Suite 602

22       Olympia, WA 98501

23       (360) 534-9960

24

25
```

```
 1    APPEARANCES  (Contd.)

 2

 3    FOR THE DEFENDANT SHARON KRAUSE (Video conference):

 4         LAW, LYMAN, DANIEL, KAMERRER & BOGDANOVICH

 5         GUY BOGDANOVICH, ATTORNEY AT LAW

 6         P.O. Box 11880

 7         Olympia, WA  98508-1880

 8         (360)  754-3480

 9

10    THE VIDEOGRAPHER:

11         Sandra Lapointe

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2                        EXAMINATIONS

 3

 4                                                    PAGE

 5    Examination by Ms. Fetterly                        9

 6    Examination by Mr. Freimund                       86

 7    Examination by Mr. Bogdanovich                   106

 8    Examination by Ms. Zellner                       109

 9    Further Examination by Ms. Fetterly              158

10

11                         EXHIBITS

12

13    NUMBER              DESCRIPTION                  PAGE

14       1     Robble Waters Sheriff Continuation Report    7

15       2     Clark County Sheriff's Office, Washington

16             Utility Report                              7

17       3     U.C. Davis Medical Center Sacramento

18             Therapeutic/Diagnostic Procedures Report    7

19       4     Clark County Sheriff's Office, Washington

20             Utility Report                              7

21       5     Supplemental Report and handwritten document 7

22       6     Clark County Sheriff's Office, Washington

23             Utility Report                              7

24       7     Clark County Sheriff's Office, Washington

25             Utility Report                              7
```

```
 1    EXHIBITS (Contd.)

 2

 3    NUMBER              DESCRIPTION                          PAGE

 4      8      Clark County Sheriff's Office, Washington

 5             Utility Report                                    7

 6      9      Clark County Sheriff's Office, Washington

 7             Utility Report                                    7

 8     10      Clark County Sheriff's Office, Washington

 9             Utility Report                                    7

10     11      Clark County Sheriff's Office, Washington

11             Utility Report                                    7

12     12      Clark County Sheriff's Office, Washington

13             Utility Report                                    7

14     13      Police Department City of Vancouver,

15             Washington Office Correspondence                  7

16     14      Clark County Sheriff's Office, Washington

17             Utility Report                                    7

18     15      Clark County Sheriff's Office, Washington

19             Utility Report                                    7

20     16      Handwritten notes                                 7

21     17      Table of Contents and Witness List                7

22     18      Letter to Governor Gary Locke, from

23             DeAnne Spencer                                    7

24     19      Letter to Governor Gary Locke, from

25             Matt Spencer                                      7
```

1   EXHIBITS (Contd.)

2

| 3 | NUMBER | DESCRIPTION | PAGE |
|---|--------|-------------|------|
| 4 | 20 | Declaration of Matthew Ray Spencer | 7 |
| 5 | 21 | Declaration of Kathryn E. Spencer | 7 |
| 6 | 22 | Hearing transcript dated July 10, 2009 | 7 |
| 7 | 23 | Statement of DeAnne Spencer | 7 |
| 8 | 24 | Statement of Statement of Phyllis Day | 7 |
| 9 | 25 | Letter dated February 9, 1991, and | |
| 10 | | Pacific Northwest Bell bill | 7 |
| 11 | 26 | Interview of Katie Spencer, 12/11/84 | 7 |
| 12 | 27 | Clark County Sheriff's Office, | |
| 13 | | Washington Incident Report | 7 |

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          BE IT REMEMBERED that on November 16, 2012,

 2   commencing at the hour of 9:41 a.m., at GOLDEN STATE

 3   REPORTING & VIDEO, 3800 Watt Avenue, Suite 201,

 4   Sacramento, California, before me, Jennifer Milne, a

 5   Certified Shorthand Reporter, empowered to administer

 6   oaths and affirmations pursuant to Section 2093(b) of

 7   the Code of Civil Procedure, personally appeared

 8                    DEANNE SPENCER,

 9   a witness herein, who, having been duly sworn, was

10   examined and testified as follows:

11               (Exhibit Nos. 1 through 27 was

12               marked for identification.)

13          THE VIDEOGRAPHER:  Hello, my name is Sandra

14   Lapointe, notary public, and I'll be videotaping today's

15   proceedings.

16          I'm here on behalf of Golden State Reporting &

17   Video located in Sacramento, California.  We are here in

18   the matter of Spencer versus Peters; Case Number

19   C11-5424BHS for the United States District Court Western

20   District of Washington at Tacoma.

21          The time on the video monitor is 9:41 a.m.

22   Today's date is November 16th, 2012.  Our location is

23   Golden State Reporting & Video, 3800 Watt Avenue, Suite

24   201, Sacramento, California.

25          This will be the deposition of DeAnne Spencer.
```

1  The attorney noticing this deposition is Patricia

2  Fetterly.  The court reporter is Jennifer Milne with

3  Golden State Reporting & Video.

4          The attorneys will now introduce themselves and

5  state their representations.

6          MS. ZELLNER:  My name is Kathleen Zellner, and I

7  represent the plaintiff, Ray Spencer.

8          MR. JOHNSON:  Doug --

9          MS. FETTERLY:  My name is -- go ahead.  I'm

10  sorry.

11          MR. JOHNSON:  Doug Johnson, also for the

12  plaintiff.                                     Objection

13          MS. FETTERLY:  My name is Patricia Fetterly.   -Id.

14  I'm an Assistant Attorney General for the State of

15  Washington.  I represent the defendant, James Peters.

16          MR. BOGDANOVICH:  Guy Bogdanovich on behalf of

17  Defendant Sharon Krause.

18          MR. FREIMUND:  I'm Jeff Freimund.  I represent

19  Defendant Michael Davidson.

20          THE VIDEOGRAPHER:  The court reporter may now

21  swear in the witness.

22                  (Whereupon the witness, DeAnne Spencer,

23                  was sworn in.)

24  ///

25  ///

```
 1                        EXAMINATION

 2    BY MS. FETTERLY:

 3        Q   Ms. Spencer, would you please state your full

 4    name for the reporter, please.

 5        A   DeAnne Sue Spackman Spencer.

 6        Q   And where do you live?

 7        A   I live at -- my address?

 8        Q   Yes.

 9        A   It's 7 -- 7618 Lakewood Park Drive --

10        Q   It's all right.  It's okay.

11        A   I'm sorry.

12            Sacramento, California 95828.

13        Q   Thank you.  Ms. Spencer, I recognize the subject

14    matter of this deposition is very emotional to you.

15    And, please, at any time if you feel you need a break,

16    please let me know or the other attorneys if they happen

17    to be questioning you.                    Objection
                                                  -FRE 402
18            Do you agree to that?               -FRE 403

19        A   I do.

20        Q   Okay.  And, again, I would emphasize that if you

21    do feel you need a break, every effort will be made, of

22    course, to accommodate that.  Don't feel shy about that.

23        A   Yes.

24        Q   Is that agreed?

25        A   Yes.
```

1      Q   Okay.  Now, are you presently married?

2      A   No.

3      Q   Have you ever been married?

4      A   Once.

5      Q   And what was the name of your -- is the name of

6   your former spouse?

7      A   Clyde Ray Spencer.

8      Q   Do you have children?

9      A   I do.

10     Q   What are their names and their ages?

11     A   Matthew Ray Spencer; he's 36.  Kathryn Elizabeth

12  Spencer Tetz; she is 32.

13     Q   And can you give me a description of your

14  educational background starting with high school.

15     A   Graduated high school in 1968 from John F.

16  Kennedy High School in Sacramento.

17     Q   Now, did you grow up in the Sacramento area?

18     A   I did from the time I was about five.

19     Q   Okay.  And then after high school, I take it

20  you've had some higher education?

21     A   It took about ten years of getting my

22  associate's degree.  And then in 2005, I attained my

23  bachelor's degree.

24     Q   And in what field did you obtain your bachelor's

25  degree?

1     A   Interdisciplinary studies, which is education.

2     Q   Okay.  And do you have an education credential?

3     A   I have an emergency credential for teaching, but

4  I'm not the -- the regular full-time credential.

5     Q   And do you have teaching experience, work

6  experience?

7     A   Yes.  I taught for eight years in a Catholic

8  high school for girls, and I've been teaching for the

9  past seven years as a preschool teacher and then an

10  after-school program for K through 2nd.

11     Q   And when you taught high school in the private

12  Catholic school, what subjects did you teach?

13     A   I was the computer teacher in business tech and

14  the department chair.

15     Q   And how long did you hold that position?

16     A   Eight years.

17     Q   And as far as your present employment, what are

18  your duties?

19     A   I have a preschool program in the morning where

20  I teach -- I work with two other teachers, and we have

21  24 children in our room for three hours.  And then in

22  the afternoon, we have a child care -- we provide child

23  care and education for children who are at the school

24  where I -- where our facilities are housed.

25     Q   Okay.  And as part of your academic training, do

Objection
-FRE 402
-FRE 403
-Not
disclosed
as expert
-Dkt. 202
at

Objection (pp.
11-12)
-Id.

1    you have academic training in child development and

2    similar subjects?

3         A   Yes.   I have over 40 units in early childhood

4    education.

5         Q   Now, turning to the time that you were married

6    to Ray Spencer, when were you and he married?

7         A   On August 28th, 1971.

8         Q   How old were you when you and he married?

9         A   21.

10        Q   And how long were you and he married?

11        A   Ten years.

12        Q   And I don't think I asked you:   What is your

13   date of birth?

14        A   February 4th, 1950.

15        Q   So your age today is?

16        A   62.

17        Q   62.

18            And when did you and Mr. Spencer separate?

19        A   It was in 1979 in November, and I left -- I left

20   the state of Washington, December 4th.

21        Q   And that anticipates my next couple questions.

22   At the time you separated, which I think you said was

23   1979, were you and Mr. Spencer and your two children

24   living in the state of Washington?

25        A   Yes.

```
1         Q   And were you actually living in Clark County,
2    Washington?
3         A   Well --
4              THE REPORTER:  I'm sorry.  I didn't hear you.
5              THE WITNESS:  Battleground.  I think that was
6    Clark County.
7              MS. FETTERLY:  (To the reporter) That's the name
8    of the town.
9    BY MS. FETTERLY:
10        Q   And what brought your family to that area
11   originally?
12        A   We had lived in L.A. and we decided we didn't
13   want to raise our children there; so he looked into
14   getting into law school in Sacramento or getting into
15   the police department at Vancouver, which he eventually
16   took.
17        Q   So it was Mr. Spencer's employment with the
18   Vancouver Police Department that brought you and the
19   family, and he, of course, to the -- Washington?
20        A   Correct.
21        Q   And how old were your children at the time of
22   your separation?
23        A   Let's see.  That was '84.  So Matthew was five,
24   and Katie was around two.
25        Q   And can you -- who initiated the dissolution of
```

1    the marriage and the separation?

2         A    Well, I filed.    I filed.

3         Q    And why did you elect to terminate the marriage?

4         A    I felt that he was not -- sorry.

5         Q    Take your time.

6         A    He was not giving enough time and attention to

7    his children.    I felt they -- sorry.

8         Q    Take your time.

9         A    He was not -- he was not giving the time and

10   attention to his children.    I felt he was neglecting

11   them and then there was -- we had a big fight.    And he

12   sent me away to L.A., then called me and told me "Don't

13   bother coming home," to send Matthew home when I was

14   through and I could go ahead -- he sent me my clothes,

15   and I could run the streets with my girlfriend.

16        Q    Those were his words, that you could, quote,

17   "run the streets"?

18        A    Yes.

19        Q    Were you offended by that comment?

20        A    I was devastated.

21        Q    Because I take it that was not what you were

22   doing?

23        A    No.

24        Q    Okay.    During the time of your marriage, was

25   Mr. Spencer ever unfaithful to you?

Objection (pp. 14-15) -Dkt. 202 at 5-7 -FRE 402 -FRE 403 -This testimony has no relevance or probative value to the issues in this case. The defense has never cited this testimony as adding anything to the case.

```
 1        A   Yes.

 2        Q   On one occasion or more than one occasion?

 3        A   More than one.

 4        Q   Did this factor into your decision to terminate

 5   the marriage?

 6        A   No, not really; because I felt that I made the

 7   decision to allow that to happen.  But it was -- I'm

 8   sorry.

 9        Q   Go ahead.

10        A   It was my decision to allow his behavior.  I

11   believed it was what police officers did, and I excused

12   it.  But when it started to affect my children and their

13   relationship with him, I couldn't -- I didn't want that

14   to go on anymore.

15        Q   Now, did you receive primary custody of your two

16   children following the separation and divorce?

17        A   I did.

18        Q   Did you eventually return to the Sacramento

19   area?

20        A   I did.

21        Q   Okay.  And why did you make that decision?

22        A   I grew up in Sacramento.  My entire family was

23   here, and I felt that would be the best place to raise

24   them with the social support that I would have.

25        Q   And approximately when did you relocate back to
```

1    Sacramento?

2        A    December 4th.

3        Q    Of what year?

4        A    1979.

5        Q    And you've been here, and basically the children

6    also been here, ever since?

7        A    Yes.

8        Q    Initially following the separation and divorce,

9    did Mr. Spencer have rather extensive visitation rights

10   with the children during holidays and during the summer?

11       A    He had two weeks at Christmas, a week at Easter,

12   I think, and then six weeks in the summer.  And I think

13   one summer he was there for longer, like, eight or nine

14   weeks.  I can't remember.  But it was six weeks that

15   they were there, minimum.

16       Q    Okay.  Now, at some point, did you learn that

17   Mr. Spencer had remarried?

18       A    Yes.  I think it was the -- 1983, the third

19   summer when he came down to get them.  And he said, "Oh,

20   by the way, I'm getting married."  And I -- I thought it

21   was to Karen, the person I know that he had been living

22   with, and he said, "Oh, no.  It's to Shirley," who I

23   didn't know.

                                              Objection
                                              -FRE 402
                                              -FRE 403

24       Q    And Karen would be Karen Stone?

25       A    Yes.

1        Q    That was a girlfriend of his?

2        A    Yes.                                    Objection
                                                      -Id.
3        Q    Okay.   And what was your reaction to the fact

4    that he was getting married again?   Did you have any

5    feelings of jealousy or anything like that?

6        A    No.   I was just a little surprised that it

7    wasn't Karen, and then I was -- I had, you know, a

8    little bit of concern about the fact that the kids

9    didn't know this person that was going to be their

10   stepmother.

11       Q    So did the children go to visit their father in

12   the summer of 1983?

13       A    Yes.

14       Q    Okay.   And where was he living at this time,

15   "he" being Ray Spencer?

16       A    I believe he was living with Shirley in her

17   home.   I don't know.

18       Q    Okay.   Did you learn later that that was a house

19   that was on a river?

                                                      Objection
20       A    I learned that they did live in a house on the   -Lack of
                                                      foundation
21   river.                                           -Lack of
                                                      personal
22       Q    And that that was Shirley's home --     knowledge
                                                      -FRE 602
23       A    Yes.

24       Q    -- at least she owned before her marriage to

25   Ray?

1          A   Yes.   Yes.

2          Q   And then was -- going into the next year, did

3     the visitations continue into -- after the summer of

4     1983, for example, Christmas and maybe Easter?

5          A   Yes.

6          Q   Okay.   And was there visitation -- extensive

7     visits scheduled for the summer of 1984?

8          A   Yes.   They went up for six weeks.

9          Q   Six weeks.   And I want to direct your attention

10    to the time frame before the children left for that

11    visit with their father and now their stepmother,

12    Shirley Spencer, in the summer of 1984.

13          Did she --

14          MR. JOHNSON:   Sorry to interrupt.   Could I just

15    ask the witness to speak up a little bit.   We're having

16    just a little bit of trouble.

17          THE WITNESS:   Yes.   I'm sorry.

18          MS. FETTERLY:   Could I move the phone closer to

19    her?   She's very soft-spoken.

20          MR. JOHNSON:   I understand.

21          THE WITNESS:   I can boom if you want me to.

22          MS. FETTERLY:   Let's get it a little closer,

23    because I agree it's very -- I don't feel guilty about

24    that.

25          THE WITNESS:   Is that better?

*Objection -Not relevant to the testimony*

(cont.)

1          MS. ZELLNER:  Yes, that's much better.

2          THE WITNESS:  Okay.

3          MS. FETTERLY:  Let me move some documents out of

4     the way.

5     BY MS. FETTERLY:

6          Q   Referring Ms. Spencer to that time frame; in

7     other words, you were anticipating the children going

8     back to their father and stepmother's home.  And this

9     was still the house on the river; is that right?

10         A   Well, I had visited the house once, and it

11    wasn't the house on the river.  It was a different

12    house.  So I'm assuming it was a house on the river they

13    were going to.

14         Q   Okay.  In anticipation of this visit, did you

15    notice any particular behavior on Katie's part that you

16    observed, as her mother, as being unusual?

17         A   Yes.  She was -- for about a month before,

18    almost on a daily basis, she was very upset and did not

19    want to go but wouldn't say why.

20         Q   Okay.  Did you try to talk to her about why she

21    might not want to go?

22         A   I did.  But she would just say she didn't want

23    to go, and I would tell her that -- I actually told her

24    that I didn't have a whole lot of say-so about it, that

25    the Courts had said that, you know, she should go up

Objection
-Lack of
foundation and
personal
knowledge
-FRE 602

Objection
-Dkt. 202
at 21
-FRE 402
-FRE 403
-Hearsay
without
exception
under FRE
802

1   there.   And if she was not comfortable about it, that      (cont.)

2   she should talk to her dad.

3        Q   And what about her brother, Matt?   Did you

4   notice anything particularly unusual about his behavior

5   before this summer visit?

6        A   There was an incident where he -- about two

7   weeks before, he related to me a nightmare that he had.

8   And it was about a party and a bunch of people at their

9   house and how he was worried about, you know, Katie

10  falling off the balcony.   And I said, "Well, you have

11  some say-so over that.   You can keep your sister off the

12  balcony if you're not comfortable.   Talk to your dad

13  about it."   And he said, "What if the guys" -- "What if

14  everybody gets all crazy?"   And I said, "Well, again,

15  talk to your dad and just, you know, keep your

16  sister" -- "You and your sister stay off the balcony."

17        Q   And was this a balcony that was on a deck

18  overlooking the river?

19        A   I think so.

20        Q   Is that what he described?

21        A   Yes.

22        Q   Okay.   Was that consistent with what you

23  understood to be the description of Shirley Spencer's

24  home?

25        A   Yes.

*Objection -Dkt. 202 at 21 -FRE 802 hearsay without exception -FRE 402 -FRE 403*

*Objection -Id. -Lack of foundation and personal knowledge under FRE 602*

1    Q   Was there any mentioned when Matt related this

2    dream to you about any -- what he called "daddy's

3    friends" being there in this dream?

4        A   Just, you know, a bunch of people getting --

5    "What if a bunch of people get crazy?" I think is what

6    he said.

7        Q   Those were his words?

8        A   Uh-huh.

9        Q   Was there any mention, when he relayed his

10   nightmare to you, about a hot tub?

11       A   He had said something to me about there being a

12   hot tub.  I don't know if that was in reference to a

13   nightmare or just telling me about the hot tub and the

14   bubble bath.

15       Q   Now, did -- what was your reaction when Matt

16   told you about this upsetting dream?

17       A   I was concerned.  But, again, I -- I didn't know

18   what it was about, and I just thought that maybe the

19   kids didn't want to be away from me.  I didn't know.

20       So I just tried to, you know, comfort him and

21   let him know that if he was really frightened, that when

22   he got up there, he can talk to his dad.

23       Q   How would you describe the communication between

24   you and Mr. Spencer in this time frame about the

25   arrangements of the visitation and similar matters?

Objection
-FRE 802
Hearsay without
exception
-FRE 402
-FRE 403
-Speculative
testimony
-Lack of
personal
knowledge
FRE 602

```
 1        A   It was limited.   It was limited.

 2        Q   Okay.  Did you bear him any ill will at this

 3   point at all?

 4        A   No.  No.  I was home with my family, and...

 5        Q   And did the visitation proceed --

 6        A   Yes.

 7        Q   -- as planned?  The summer of '84, that is.

 8            Who provided the transportation?

 9        A   I think he came down and picked them up.  I

10   can't remember if I drove them up or if he came down.

11        Q   And what about to retrieve them?

12        A   I drove up to pick them up, and I was informed

13   that I would need to go to the Battleground Police

14   Station because he would -- he was going to be out of

15   town.  So I was to meet Shirley at the Battleground

16   Police Station.

17        Q   And approximately what time frame was this?

18        A   What do you mean?

19        Q   A date.  Was it in August?

20        A   August 20 -- it was the Sunday?  August 24th, I

21   believe.

22        Q   And that's when you met Shirley Spencer?

23        A   Correct.

24        Q   At the Battleground Police --

25        A   Correct.
```

1    Q -- Station and picked up the children?

2    A Yes.

3    Q Did you have any conversation with Shirley on

4    that occasion, that you recall?

5    A Just, you know, "How are you? Here's the kids."

6    Q She didn't relay anything unusual about the

7    visitation to you?

8    A No.

9    Q Then did you return home as planned to

10   Sacramento with the children?

11   A I did.

12   Q Okay. And then how old was Katie at this time?

13   A Let's see. Five. '84. Yeah, five.

14   Q Okay. And was she starting school that year?

15   A Kindergarten, yes.

16   Q And what about Matt? How old was he?

17   A Let's see. He would have been eight, nine.

18   Sorry. Well, my math is not really good right at the

19   moment. I think he's about three or four years older

20   than her.

21   Q Now, directing your attention to the date,

22   August 29th, 1984. By this time you and the children

23   are back in your home in Sacramento; is that right?

24   A Yes.

25   Q And who was in your household at this time?

| | |
|---|---|
| 1 | A   My two children and I. |
| 2 | Q   Okay.  No one else? |
| 3 | A   No.  A babysitter that was there with them |
| 4 | during the day, but... |
| 5 | Q   A female babysitter? |
| 6 | A   Yes. |
| 7 | Q   And were you working at this time? |
| 8 | A   I was. |
| 9 | Q   What were -- where were you working? |
| 10 | A   I was working for -- |
| 11 | THE REPORTER:  I'm sorry.  "I was working |
| 12 | for" -- |
| 13 | THE WITNESS:  New West Dialysis. |
| 14 | THE REPORTER:  Thank you. |
| 15 | BY MS. FETTERLY: |
| 16 | Q   And did any -- and directing your attention to |
| 17 | when you were coming home from work that day.  Was there |
| 18 | any -- did anything unusual occur when you pulled up in |
| 19 | front of your house or entered your driveway? |
| 20 | A   Yes.  When I pulled into the driveway, there was |
| 21 | a tall, blond man standing there.  And when I got out of |
| 22 | the car, he introduced himself as Pat Flood, and he said |
| 23 | "I'm from the Juvenile Division." |
| 24 | Q   Take your time.  Take your time. |
| 25 | A   This is so -- |

Objection (continued
to next page)

1        Q   Take your time.

2        A   "I'm from the Juvenile Division."   And I

3    thought, "Oh, God.   He's got custody."   And then --

4        Q   Who are you referring to when you say "he"?

5        A   My ex-husband.

6            And then in the next breath, he said, "There's

7    been a report that your daughter has been molested.   And

8    my partner and I have been here for two hours.   We had

9    to make sure that your children were safe and not in any

10   imminent danger."   And so I -- I started to collapse,

11   and he said, "You need to maintain.   Your children are

12   watching out the door so you need to maintain" so I did.

13   He said, "We've been here for two hours.   It's obvious

14   that they're not in any imminent danger.   We're going to

15   redirect the investigation back up north."

16       Q   Okay.   Did you take that to mean that you were

17   even possibly a suspect in regard to these allegations?

18       A   I did not believe it at that time.

19       Q   You learned it later?

20       A   Yes.

21       Q   Okay.   But was it clear, then, in your

22   communication with Detective Flood that he and his

23   partner didn't feel the children were in any way in

24   danger in your home?

25       A   Yes.   Correct.

Objection
(continued
from
previous
page)
-FRE 402
-FRE 403
-FRE 802
-FRE 602
lack of
foundation
and
personal
knowledge
-This is
completely
irrelevant
baseless
speculative
and hearsay
testimony

1    Q   Now, directing your attention to the next day,

2    August 30th, what happened on that date that you

3    remember specifically about these incident -- this

4    incident?

5        A   I -- the company that I worked for, my boss, her

6    husband worked for the Child Abuse Council.  And when I

7    called her to tell her what was happening, she said,

8    "We're going to need to get her an examination."  So I

9    spoke with a social worker at my office and asked her

10   "How do I go about this?  What do I do?"  And she said,

11   "You make an appointment at U.C. Med Center."  And I

12   said, "What do I tell my daughter?"  And she says, "You

13   tell her" -- sorry.  I thought I can handle this better

14       Q   Take your time.

15       A   She said, "Tell her that her" -- "that you know

16   that her daddy's touched her in places daddies aren't

17   supposed to touch little girls," and you needed to make

18   sure she wasn't hurt.

19       Q   And you knew that from what Detective Flood told

20   you her allegations were?

21       A   Yes.

22       Q   Were you -- how were you feeling about this

23   whole situation at this time?

24       A   I -- for a while, I felt at a loss.  I was

25   devastated, but I knew that first and foremost I had to

Defendants represent that they may try to introduce this testimony if certain motions in limine are denied. Plaintiff objects on hearsay, relevancy, FRE 403, and lack of personal knowledge grounds. This is clearly inadmissible hearsay that is attempting to distract the jury.

Deposition of Deanne Spencer          SPENCER VS. PETERS

1    make sure that my kids were --

2              MS. FETTERLY:  Why don't we take a break.  Let's

3    take a break.

4              THE VIDEOGRAPHER:  Okay.  We're going to go off

5    the record.  It's 10:04 a.m.

6                    (Brief recess.)

7              THE VIDEOGRAPHER:  We're back on the record.

8    It's 10:09 a.m.

9    BY MS. FETTERLY:

10        Q    Before we had a break, Ms. Spencer, we were

11   talking about the fact that you had arranged to have a

12   medical examination of Katie.

13        A    That's correct.

14        Q    And we've established that was on August 30th,

15   1984.

16             Where did that examination take place?

17        A    It took place at U.C. Med Center in Sacramento.

18        Q    And that is a Davis campus, I take it?

19        A    Yes.

20        Q    And did you -- as you were advised to by, you

21   said, a social worker.  Did you have a discussion with

22   Katie at that time before the examination --

23        A    I did.

24        Q    -- as to what would happen at this examination?

25        A    What I said to her was -- we were in the car,

*(Margin annotations, handwritten)*

Objection continued from previous page

Objection - Hearsay, irrelevant, and lacking probative value substantially outweighed by FRE 403 factors

1    and we were on our way, and she was looking at me, like,

2    you know, what's going on?  And I said, "Well, we know

3    that daddy's touched in you places that daddies aren't

4    supposed to touch little girls.  And we want to make

5    sure you're not hurt."

6         Q   Okay.  And what was her response?

7         A   She curled into a ball, rolled to the side of

8    the door and began yelling, "Mommy, please don't let

9    them touch me there.  Please don't let them touch me

10   there."

11        Q   Did you proceed to the medical center, then?

12        A   I did.

13        Q   Okay.  And who was present when -- when the

14   examination, at least attempted examination, took place?

15        A   There was a female doctor, a female nurse, and a

16   female social worker and myself.

17        Q   And what happened during this process?  And you

18   were present the entire time; is that right?

19        A   Yes.

20        Q   So describe what happened during -- when you and

21   Katie and the medical staff were in the examination

22   room?

23        A   They -- we took her shoes off and then the

24   doctor started to -- she was sitting on my lap.  And the

25   doctor started to take her tights off, and she began

Objection
continued
from
previous
page

Objection
(pp.
28-30)
Id.
Dkt.
202 at 21

Deposition of Deanne Spencer          SPENCER VS. PETERS

```
 1    screaming and kicking and yelling.  And none of us could

 2    get them off of her.

 3         Q   Was there ever, on this occasion, a vaginal

 4    examination done of your daughter on that date?

 5         A   No.

 6         Q   Okay.   What type of examination, if any, was

 7    done -- and this was while she was on your lap; is that

 8    right?

 9         A   She was on my lap, yeah.

10         Q   Was she ever on an examination table?

11         A   No.

12         Q   Okay.   Were there any instruments inserted into

13    her?

14         A   No.

15         Q   Was the physician even able to probe into her

16    vaginal area?

17         A   No.

18         Q   Okay.   So what was examined, if anything, during

19    this examination?

20         A   Nothing.

21         Q   And that was because --

22         A   We couldn't -- she was hysterical.  We could not

23    get her tights off.  She still had her dress on.  We

24    couldn't get her tights off.

25         Q   Handing you what has been marked as Exhibit
```

Objection
continued from
page 28

1    Number 3, can you identify this document?

2        A   Yes.

3        Q   And what is it, to the best of your knowledge?

4        A   It's the medical report from that visit, it

5    looks like.

6        Q   It's a three-page document?

7        A   Correct.

8        Q   Would you agree that on the third page there's a

9    handwriting that says "No physical finding"?

10        A   That's correct.

11        Q   And how do you explain that particular finding?

12    Was that following an actual vaginal examination?

13        A   No.

14        Q   Okay.  How would you explain the writing of

15    those conclusions?

16        A   I can't explain it.

17        Q   Could there possibly be no physical findings

18    because an actual examination was not done, an actual

19    pelvic examination was not done?

20        A   That would be my assumption.

21        Q   And then did you take Katie home that day after

22    the examination?

23        A   Actually, the social worker -- I was told while

24    I was there that there's been an apparent trauma.  You

25    need to get her into some sort of counseling or therapy.

Objection continued from page 28 Additionally, Ms. Spencer has not set foundation to be able to identify or discuss the report. Her conclusions about the report are completely speculative

Objection Hearsay, irrelevant, FRE 403

```
 1   And I was given the name of the Victim/Witness Program.
 2   I went home and picked up my son and drove them to the
 3   Victim/Witness Program that day.
 4       Q   And what happened after you met with and your
 5   children met with people in the Victim/Witness Program?
 6       A   We were referred to a psychologist or
 7   psychiatrist, I forget; a gentleman who then found a
 8   therapist for Katie and a therapist for Matt.  And I
 9   also had one for a while.
10       Q   And did the therapy begin at that time?
11       A   Within the week.
12       Q   Okay.  And how long did that therapy actually
13   continue?
14       A   It was pretty intensive for the first few years,
15   and then they each got a new therapist over the -- over
16   the course of about ten years, it was on and off.  As
17   they grew older and mature, the therapist would tell us,
18   "Well, they've reached a certain point."  So, you know,
19   they would -- I guess they would stop.  They didn't have
20   to go as much.
21       Q   Did you ever have any communication in this time
22   frame and later with your children's therapists?
23       A   There was a few occasions.  Like there was the
24   first few occasions with Katie when I was in the room
25   with her.
```

Objection
-FRE 402
and 403

Deposition of Deanne Spencer                    SPENCER VS. PETERS

1      Q  Okay.  Were you ever informed by any -- any

2  therapists by your children that in the opinion of any

3  of the therapists, the allegations of abuse concerning

4  Katie were fabricated?

5      A  I was not.

6      Q  Okay.  What was your impression in your

7  discussions with the therapist?  Did they ever question

8  that abuse had or had not taken place?

9      A  They did not question it.  There was -- as far

10  as I can remember, there was no question.

11      Q  And that was initially with Katie?

12      A  Yes.

13      Q  And then later with Katie and Matthew as well?

14      A  Matthew was also -- at the same time he started

15  him with a therapist, Connie Nichols, because they

16  said -- at Victim/Witness they told me that siblings or

17  anybody in the range would also need to be counseled.

18      Q  So initially it wasn't because he was thought to

19  be a victim but because he was a family member --

20      A  Yes.

21      Q  -- would that be accurate?

22      A  Yes.

23      Q  But as far as Katie in this initial time frame,

24  meaning August through, say, February of '84 through

25  February, March of the following year -- did Katie's

Objection.  This is blatant hearsay.  It is speculative.  It is introduced only confuse the question jury.  Ms. Spencer is not permitted to attempt to recall, "as [she] remember" what her "impression" was of another witness's conclusion.

1   therapist ever state to you, "I think she made these

2   allegations up"?

3        A  No.

4        Q  Did she ever state to you, "she" being the

5   therapist, "I don't think anything actually happened"?

6        A  No.

7        Q  Was it your understanding that the therapy she

8   was pursuing with Katie was that she had been -- in

9   fact, been improperly touched by her father?

10       A  Yes.

11       Q  Did -- and -- in the same time period, did you

12  notice any unusual behavior on Katie's part that may or

13  may not, based on your understanding of child

14  development, have been consistent or inconsistent with

15  physical sexual abuse?

16       A  At times I felt uncomfortable of some of her

17  behaviors, especially around, oh, like her uncles --

18  it's so long ago.

19       Q  I know.

20       A  But I just -- I can't put my finger on it.  I

21  was just uncomfortable.

22       Q  Okay.  Did you ever observe her to rub her

23  genital area in this time frame?

24       A  Yes; but I didn't think anything of it.

25       Q  Did she ever ask you to apply medicine to her

Defendants did not include pages 33 through 35 in their submission to plainitff. In the event defendants seek to introduce any testimony on pages 33 through 35, plaintiff objects on grounds set forth in dkt. 202 at 22, and FRE 802, 402, 403. Additionally, testimony in these pages is improper for a lay witness such as Ms. Spencer, who was not disclosed as an expert and is not qualified to provide expert testimony

 1    genital area in this time frame?

 2        A   Yes.

 3        Q   Okay.  Had you ever done that in the past?

 4        A   She had a sore like on the top of the vaginal

 5    area, not inside, but on the top.  And when I took her

 6    to the doctor, he said it was a viral infection.  And he

 7    gave me medication to put on.

 8        Q   And how -- when did this occur in relation to

 9    the fall of 1984 time frame?  Was it in the same time

10    frame, or was that earlier?

11        A   I'm sorry.  I don't remember.

12        Q   Okay.  Do you think it was before, possibly?

13        A   Yeah, I do believe it was before.

14        Q   Okay.  Did you notice anything unusual about the

15    nightgown Katie brought back from her visits with her

16    father in the summer of 1984?

17        A   It just seemed to be worn, you know.  A little

18    strangely -- I mean worn -- worn out.

19        Q   Can you be more specific?  Was it fraying at the

20    sides or any particular place or --

21        A   More of in the area of where she might have had

22    her underwear.

23        Q   Go ahead.  Take a break.

24        A   Okay.

25        Q   And your response was more in her underwear

*Plaintiff continues objection stated on page 33.*

1  area?

2      A  Yeah.  Yes.

3      Q  And what particularly did you notice about that

4  nightgown in that regard?

5      A  I just remember it said "Daddy's Little

6  Princess" on it.  It made me very uncomfortable.  I

7  can't tell you why.

8      Q  Okay.  What did you do with that nightgown?

9      A  I threw it away.

10      Q  Was that after the allegations of abuse had

11  been -- had surfaced?

12      A  Yes.

13      Q  Did you learn at some point that you were

14  actually a suspect; that your former husband was telling

15  authorities up in Clark County that it was actually you

16  or possibly a man in your home that was abusing Katie?

17      A  Yes.

18      Q  Okay.  And when, approximately, did you learn

19  about that?

20      A  It was -- it was not long after Pat Flood had

21  come over.  I mean, it was within that few-months time

22  period.  I don't remember exactly when.

23      Q  And at that time, were there any men living in

24  your household?

25      A  No.

Plaintiff continues objection stated on page 33.

Deposition of Deanne Spencer          SPENCER VS. PETERS

1      Q   Had there ever been?          Plaintiff continues
                                          objection from page 33.
2      A   No.

3      Q   Were you actively -- pursuing an active social

4   life with men at that time?

5      A   Only when my children weren't there.

6      Q   Then you would occasionally date?

7      A   Yes.

8      Q   But no one was living in the home?

9      A   No.

10     Q   Okay.   Did you ever have a -- what has been

11  described by Mr. Spencer as a black boyfriend at this

12  time -- in this time frame?          Objection
                                          -FRE 402, 403, and 802.
13     A   I did.                         This is completely irrelevant
                                          testimony only meant to deter
14     Q   At one time you did?           from issues in this case.

15     A   Yes.

16     Q   Okay.   And was he living in the home?

17     A   No.

18     Q   You have been described that you were, quote,

19  "running the streets" in this time frame by Mr. Spencer.

20         Is that an accurate description of your life --

21  of what you were doing in this time frame?

22     A   No.   I was actually working and taking my

23  children -- we had three days a week that I had to make

24  arrangements to get to different therapies, and I made

25  arrangements to get them into things like gymnastics.

(continued objection)

1    Anything I could do to find -- to give them as healthy a

2    life as I possibly could during the turmoil.

3         Q    What about immediately before this time frame?

4    The records indicate that Mr. Spencer told law

5    enforcement in Clark County that he was concerned that

6    someone in your home, specifically a man in your home,

7    might possibly have touched Katie.   Could that have been

8    possible?

9         A    Absolutely not.   They were never -- I never left

10   them alone with any man.   And so anytime -- a couple of

11   people that they did meet were only in my presence.

12   And -- no, absolutely not.

13        Q    Okay.   Would Katie possibly have gotten a

14   cigarette burn in your home?

15        A    No.

16        Q    Do you even smoke?

17        A    No.

18        Q    Would you have smoked something that could be

19   described that smelled funny such as marijuana in this

20   time frame in front of your children?

21        A    Not in front of my children, no.

22        Q    Okay.   So what was the focus of your life,

23   really, since your separation up through the time your

24   children were grown?

25        A    My only focus and my only intention and my only

Objection -Id.   This is more irrelevant testimony based on hearsay.

See next page.

1    concern was providing them with the best possible life I

2    could, getting them the best care I could so that they

3    grow to be healthy; healthy and happy, well-adjusted

4    people.

5         Q    And did you have to provide financial support

6    for them as well?

7         A    Yes.

8         Q    And did this take a considerable amount of your

9    time as well?

10        A    Yes.

11        Q    Okay.   Were -- did you have particular animosity

12   against your former husband in this time period where

13   you were -- might wish to frame him for a crime he did

14   not commit?

15        A    My only concern is my children.

16        Q    In fact, were you hoping these allegations were

17   true?

18        A    I did not want them to be true because then if

19   that's the case, then my children went through hell.

20   But I -- I believed it and so I did what I could for

21   them.

22        Q    Okay.   Did you conspire or agree with Shirley

23   Spencer in this time frame to have Ray charged with a

24   crime that he didn't commit?

25        A    No.

Objection to all questions on page 38 (and spill over from 37) in accord with dkt. 202 at 21.  This testimony is irrelevant, lacks probative value to the issues in this case, is unfairly prejudicial, is intended to confuse the jury, and calls for legal conclusions

1      Q   Did you have any contact with Shirley Spencer

2   during this time frame?

3      A   No.

4      Q   Okay.   I'm handing you what has been marked as

5   Exhibit 27, which is a report of the Clark County

6   Sheriff's Office, dated August 30th, 1984, the day after

7   you met with Detective Flood, and includes a handwritten

8   statement, which has been established was written by

9   Shirley Spencer.

10         Can you take a minute or two to just review the

11   portion of this exhibit that concerns Shirley Spencer's

12   handwritten statement.

13      A   Do you want me to look at what's highlighted?

14      Q   No.   Just this.   Just take a few minutes.   Take

15   as much time as you need to read the statement.

16         Ms. Spencer, have you had an opportunity to

17   review that seven-page handwritten statement prepared by

18   Shirley Spencer?

19      A   I have.

20      Q   Okay.   Would you -- have you seen that --

21   actually seen that document before?

22      A   No, I have not.

23      Q   Would you agree that that document details some

24   very specific sexual knowledge on the part of your

25   daughter who was then age five?

Plaintiff objects to the line of questioning on pages 39 and 40 based on FRE 602, 702, and dkt. 202 at 21. This is improper speculative opinion testimony. It is also irrelevant and its probative value is substantially outweighed by FRE 403 factors.

1        A    Yes, it does.

2        Q    Do you know how she would have known that

3    information?

4        A    I do not.

5        Q    Okay.   Could she have learned any of those

6    things from anything in your home?

7        A    No.

8             MR. JOHNSON:    Objection.    Speculation.

9    BY MS. FETTERLY:

10       Q    Why do you say "no"?

11       A    I didn't have anything in my home that would be

12   objectionable.

13       Q    You didn't have pornography?

14       A    I didn't have pornography.    I didn't have books

15   or anything along that line or anything.

16       Q    Did you ever discuss matters such as this,

17   meaning details of sexual matters, with your

18   five-year-old daughter?

19       A    I did not.

20       Q    Now, assuming Ms. Shirley Spencer did, in fact,

21   bring these -- this statement forward in August of 1984,

22   would you want -- and this statement concerning what

23   your daughter had told her, would -- would you want

24   these statements investigated?

25       A    Absolutely.

Continued
objection
from page 39

1          Q   These allegations investigated?

2          A   Absolutely.

3          Q   Would you want law enforcement to simply

4      disregard it as the mere fantasy of a five-year-old

5      child?

6          A   Absolutely not.

7          Q   And did you communicate in any way with Shirley

8      Spencer in this time frame about these allegations?

9          A   I did not.

10         Q   Okay.  I think you testified that you met her a

11     day or two after -- well, she dates this August 24th --

12     that you met her a day or two later and picked up your

13     children from her; is that correct?

14         A   It was a Sunday.  The Sunday before -- the 29th

15     was a Sunday before the -- Wednesday, the 29th, whatever

16     that day was.

17         Q   So would it be fair to say that you were not

18     part of any conspiracy with Shirley to falsely accuse

19     her then husband and your former husband, Ray Spencer?

20         A   I was not.

21         Q   Okay.  Could you describe yourself as a -- a

22     pawn in a conspiracy that Shirley and others might have

23     been involved in to falsely accuse Ray Spencer of a

24     crime?

25         A   No.

Objection -FRE 402 and 403.

Objection -FRE 402, 403, 602, 702. Improper and irrelevant opinion testimony on a legal conclusion.

1        Q    What was your only concern in this time

2    frame once you learned about these allegations?

3        A    My children.

4        Q    And you -- as you indicated earlier, you

5    actually were a suspect at one point as someone who

6    might have possibly improperly touched your daughter?

7        A    Correct.

8        Q    Were you rather quickly ruled out as a suspect?

9        A    I was.

10        Q    Did you ever make a statement to law enforcement

11    during this time frame that you don't remember if you

12    sexually touched your daughter or words to that effect?

13        A    No.

14        Q    What was your position throughout?

15        A    My position about me?

16        Q    Yes.   About --

17        A    I never have.

18        Q    And did you make that very clear from the

19    beginning?

20        A    I did.

21        Q    Did you volunteer to take a polygraph?

22        A    I did.

23        Q    And did you take that polygraph?

24        A    I did.

25        Q    And what were the findings of the polygraph?

Objection
-FRE 402
and 403.

Objection
-Id.
-Leading

1     A   My understanding was it was -- I don't know if

2   you call it conclusive.   I was telling the truth.

3     Q   So you were then ruled out as a suspect totally?

4     A   Correct.

5     Q   Now, once you were ruled out as a suspect, do

6   you -- based on what Shirley Spencer wrote in this

7   seven-page document, would you have wanted the

8   investigation to just stop?

9     A   Absolutely not.

10    Q   And why is that?

11    A   It -- with what I was experiencing with my

12  children and with their behaviors and with the

13  information that I had, I wanted to make sure that this

14  didn't happen again to them.

15    Q   And there was an investigation pursued that you

16  participated in as a witness, was there not?   An

17  investigation by the Clark County Sheriff's Office?

18    A   Correct.

19    Q   And do you recognize the name Sharon Krause?

20    A   I do.

21    Q   And who is Sharon Krause?

22    A   She was the detective handling the case.

23    Q   For Clark County, Washington?

24    A   Correct.

25    Q   And when -- do you recall first -- we know she

Objection
-FRE 802
-FRE 602
-FRE 701
and 702.

Objection
-FRE 402,
403, dkt. 202
at 21-22.

1    came down from records -- came down and met with you and

2    your children on -- October 15th, I believe, was the

3    date she arrived in Sacramento.

4         Do you recall her coming, in that time frame, to

5    Sacramento?

6         A   I do.

7         Q   Now, before that, did you have any telephone

8    conversations with Detective Krause?

9         A   I think there were a couple.

10        Q   Did she ask you some questions about your

11   marriage to Ray in those conversations?

12        A   She did.

13        Q   Did she ask you some questions about any

14   infidelities that happened during the time of that

15   marriage?

16        A   She did.

17        Q   Did she ask you about a woman named Rhonda

18   Short?

19        A   She did.

20        Q   Okay.   And who is Rhonda Short?

21        A   Rhonda was a next-door neighbor when we lived in

22   L.A.

23        Q   And how old was Rhonda when you lived next door

24   to her?

25        A   We were there for six years.   So when we left,

Objection
-FRE 802 hearsay
-Dkt. 202 at 4

Objection
-Dkt. 202 at at
2-3 (moving to
bar any and all
evidence
and testimony re
Rhonda Short).
FRE 402,
403, and 404.

1    she was about 17.

2        Q   She was a minor?

3        A   Correct.

4        Q   Okay.  Was she in high school?

5        A   Correct.

6        Q   And how would you describe, based on your

7    recollection of Ms. Short, her mental capacity?  Was

8    she -- and, again, based on your academic training and

9    work experience with children and adolescents, do you

10   recall her mental capacity as being that of, say, the

11   average 17-year-old adolescent female?

12              MS. ZELLNER:  Objection.  She's not testifying

13   as an expert.

14              MS. FETTERLY:  You can answer, if you can.

15              THE WITNESS:  I can't -- I can't attest to her

16   mental ability.  But in my observation, she was

17   emotionally about 14.

18   BY MS. FETTERLY:

19       Q   Would you describe her as somewhat of a

20   vulnerable young lady?

21       A   Yes.

22       Q   Okay.  And what did you tell Sharon Krause just

23   about Rhonda Short?

24       A   I told her about an incident where Rhonda had

25   accused Ray of raping her.

*Continued objection; additional basis for objection to lines 6-21: improper lay witness testimony.*

*Additional basis for objection to lines 22-25: hearsay.*

1          Q   And this conversation about Rhonda Short and

2     some other things took place with Sharon Krause before

3     she came to Sacramento?          Continued objection

4          A   Correct.

5          Q   Okay.  And we've -- you've testified that you

6     recall Ms. Krause coming to Sacramento on or about

7     October 15th or 16th of 1984?

8          A   Correct.

9          Q   And was this prearranged that she would come

10    down to meet with you?

11         A   Yes.

12         Q   Was she also going to meet with your children?

13         A   Yes.

14         Q   Did you explain anything about the fact that she

15    would be coming to your children?

16         A   I don't recall.

17         Q   Okay.  Did she come to your home?

18         A   She did.  She met me at my home, and we drove

19    over to my mother's house to pick up my kids and come

20    back to my house.                              Objection

21         Q   And what was your impression on first meeting    -FRE 402,

22    her when she came to your home?  Records document that   403, and 404.
                                                              Ms.
23    this was on October 16th, 1984.  Does that sound        Spencer's
                                                              impression is
24    accurate to you?                                        irrelevant
                                                              character
25         A   Yes.                                           evidence.

1        Q   Okay.   What was your impression of Ms. Krause

2   when she came to your home?

3        A   That she was professional and -- well, that she

4   conducted herself in a very professional manner.

Continued
objection

5        Q   Did she ask your permission to interview your

6   children?

7        A   She did.

8        Q   Did she indicate that she wanted to interview

9   them without you being present?

10        A   After she talked with us, she did ask would --

11   could see take Katie to speak to her privately.

12        Q   And did she explain why she thought it was

13   important to speak to Katie privately?   I mean, she was

14   someone that Katie had -- would be -- really was a

15   stranger to Katie; would you not agree?

16        A   Agreed.

17        Q   Did Ms. Krause explain why this was necessary?

18        A   To the best of my recollection, I think she said

19   something to the effect that she felt Katie would be

20   more comfortable if I wasn't in the room with her.

21        Q   And how did you feel about that?   Did you have

22   any hesitation about her?

23        A   I did not.

24        Q   Okay.   And did -- was there an opportunity for

25   Ms. Krause to meet Katie in your presence before they