went off together?

A Yes.

Q Okay. And how -- do you recall that interaction?

A Well, I know that there was -- my kids did not seem to be afraid or anything. They seemed to be comfortable.

Q Okay. Now, you've indicated that Katie had a very strong negative reaction about going for the medical examination a month and a half earlier --

A Correct.

Q -- do you recall that?

Did she have any similar reaction when you told her that she was going to go off with Sharon in her car to another location?

A She did not.

Q Did she express any fear or hesitation to you?

A She did not.

Q If she had, would you have said she couldn't go?

A Absolutely.

Q Okay. And then when -- we're aware from records that Ms. Krause did take her to her hotel room and did question Katie.

When she returned from that interview, do you recall Katie's demeanor?

Plaintiff objects to line of questioning from page 48-49. Dkt. 202 at 21. Lack of personal knowledge about feelings of other; Irrelevant and lacking probative value under FRE 402 and 403. Hearsay under FRE 802.

A She just -- there was no -- nothing unusual.

Q Did she say anything to you, "she" being your daughter, "I don't want to ever see that lady again. I didn't like that lady"? Anything like that?

A She did not.

Q Okay. And, in fact, she did see her, I think, again a couple of days later?

A I believe so.

Q Because there is a report, one dated October 16, 1984, and one dated October 18th, which report interviews between your daughter and Ms. Krause in Ms. Krause's car and hotel room.

Continued objection

Do you recall that?

A Yes.

Q Okay. When she was -- you must have had to tell Katie that she was going to go with Ms. Krause a second time before she left on the 18th, I take it?

A Yes.

Q Do you recall Katie making any statements like "I don't want to go. I don't like that lady. I" -- or words to that effect?

A She did not.

Q Did you have to force her to go?

A I did not.

Q Okay. And the records document that during or

at least before the interviews Ms. Krause at one point purchased a cold drink for Katie.

Did Katie like pop?

A She did.

Q Okay. Do you think she would have falsely accused her father of sexual abuse in exchange for a pop?

A I do not.

Q What about an ice cream? There is documentation that an ice cream was bought for Katie. Do you think she would have made a false accusation against her father or agreed to a false accusation against her father in exchange for an ice cream?

A I do not.

Q And then what about Matthew? The reports indicate that Ms. Krause interviewed your son, Matthew, on October 17th, also taking her to his hotel room.

Objection - not a question.

Do you recall Matthew expressing any hesitation of going with Ms. Krause?

A No.

Q Did he express any thoughts to you when he came back that he didn't like her or he felt uncomfortable or words to that effect?

Same objection as stated on p. 48.

A No.

Q Okay. And you're aware, now, I take it, and

maybe then, following the interviews that at least Katie at this time did make statements to Ms. Krause that she had been sexually abused by her father.

Were you aware of that then?

A Yes.

Q Do you believe that those allegations were fabricated?

A I do not.

Q Okay. Why is that?

A Her behavior, her demeanor. Just -- just the way she -- just the way she behaved.

Q And by "her," you're referring to --

A My daughter.

Q Your daughter. And what about Ms. Krause? Do you have -- do you think it's likely she fabricated those allegations based on your interactions with her in this time frame?

A I do not.

Q And why is that?

A As I stated earlier, she conducted herself in a professional manner and there was never any indication to me that -- either from my children or her, that the stories were being made up.

Q Okay. And did you want these allegations to be investigated thoroughly in this time frame?

Objection to line of questioning from p. 50, line 25 to p. 52, line 6.
-Dkt. 202 at 21.
-This testimony calls for a speculative legal conclusion. Defense is seeking to substitute opinion of Ms. Spencer for that of the jury. Also inadmissible under FRE 402 and 403.

A Absolutely.

Q Did you want the investigation to just be stopped and have no one from Clark County to come down and follow up once the California Authority said it was going back to Clark County?

A No.

Q Okay. Now, approximately a month later, records document that you were interviewed by a Detective Halls from the Vancouver Police Department. He came to your home --

A Correct.

Q -- after he made a trip and interviewed some other people, I think -- first in Southern California, then he came up to Sacramento.

Do you remember that interview with Detective Halls?

A Yes.

Q And did he indicate to you why he was coming to interview you in November of 1984?

A Yes.

Q And what did he tell you?

A He said that they were investigating Ray for some things that they had heard, found out about. And he said Ray had made a couple of comments or a couple of statements about me that he needed to question me about.

Object -Not a question -Calls for speculation about what "Halls" did.

Objection to page 52, line 7 to page 56, line 20. -Dkt. 202 at 14. -Constitutes blatant hearsay testimony without exception under FRE 802. -FRE 402 and 403. -FRE 602 lack of personal knowledge - speculation.

Q And was he more specific as to what statements Ray had made about you that the -- that a representative from the Vancouver Police Department needed to follow up on?

A He did.

Q What did he say?

A He said, "I have to ask you two questions. The first one is, did you come back to Sacramento when you left Ray and go into a drug rehab program?"

Q Did that statement shock you?

A Yes.

Q Was that statement true?

A Absolutely not.

Q What was your response when he asked you that?

A I laughed and said, "You've got to be kidding. Absolutely not."

Q And did you indicate -- I mean, was it clear to you that Detective Halls had been told this by Ray?

A Correct.

Q Okay. And was there anything else discussed?

A He said to me -- he says "I have to" -- "I have to ask you. According to Ray, he divorced you because he got tired of all the bikers coming to the house" when we lived up in Washington.

Q And what was your reaction to that statement?

Continued objection from page 53.

A I again laughed and said, "I wish I had as much fun as he said I did."

Q Were you -- did you socialize with what would be thought of as a biker crowd?

A No, I did not.

Q Did you even ride a motorcycle?

A The last time I rode a motorcycle was the day before I found out I was pregnant with my daughter and that was on our motorcycle that he had.

Q That Ray owned?

A Yes.

Q And then were there any other matters discussed with Detective Halls on this occasion? And specifically was there a discussion about Rhonda Short?

A Yes. He told me that he had gone to L.A. and visited with her. And he said when he -- when he interviewed her, she told him the story and his comment was, it was -- she told it as though it had happened the day before.

Q Meaning it was very fresh in her mind?

A Correct.

Q And how long before 19- -- November of 1984 had the incident between your -- your former husband and Rhonda Short occurred?

A About six years.

Continued objection from p. 53.

Additional basis of objection to testimony on page 54, line 13 to 55, line 19: Dkt. 202 at 2-3.

Q Okay. And what did he convey to you was Rhonda Short's version of what happened between her and your former husband?

A That she had been raped by Ray.

Q She did not have what could be described as consensual sexual relations with Ray?

A No.

Q Okay. And at the time this -- the sexual activity between Rhonda Short and Ray had occurred, would she have been legally capable of consenting to sexual relations, to your knowledge?

A If 17 is legal, then yes. If 17 is not, then no.

Q Okay. But she was underage; was that --

A Correct.

Q -- your specific recollection?

A Yes.

Q Okay. Did Detective Halls discuss anything else with you?

A Not that I recall.

Q Okay. Is it possible he discussed anything that occurred while Ray was working undercover for the Vancouver Police Department?

A I don't remember.

Q Is that -- is it you don't remember. It's

Continued objection from page 53 with additional basis stated on page 54.

Additional basis to lines 1-17: calls for legal conclusion and improper opinion.

Additional basis to line 18 to page 56, line 6: lack of personal knowledge (admits she does not remember).

possible or --

A I don't remember. It is possible.

Q Meaning if his notes documented that, you wouldn't necessarily doubt that --

A I would not.

Q -- or contradict?

And, again, I don't know if I asked you: Did Detective Halls tell you why he was asking you these rather personal questions about Ray Spencer at this time?

A He just said that -- something to the effect that they were doing an internal investigation on him.

Q Okay. On him being Ray Spencer?

A Ray Spencer, yes.

Q And, again, were you fabricating any answers in response to Detective Halls' questions motivated by a desire to hurt Ray Spencer?

A I was not.

Q Were you telling the truth?

A I was.

Q Okay. Now, I want to turn your attention to an interview that took place the following month, December 11th, 1984.

And before I ask you about that -- after Detective Krause interviewed your children and you in

Continued objection from page 53.

Object -FRE 402, 403 and 802.

October and returned to Vancouver, did she -- by mid-December, two months later, did she give you any follow-up on the progress or lack of progress on the investigation as to who had sexually abused or might have sexually abused Katie?

A I don't remember.

Q But at some point records show that you and Katie came to Vancouver on -- and were in Vancouver on December 10th and 11th.

Do you recall that trip?

A Yes, I do.

Q Okay. And how did you and Katie get there? You met -- did you drive? Fly?

A I believe -- I believe we were flown up by the department, whoever was the investigating department. I don't know who paid for it.

Q But you didn't pay for it?

A No, I did not.

Q Someone from Clark County paid for the tickets?

A Correct.

Q Did Matt accompany you and Katie?

A No, he did not.

Q So it was just you and Katie flew where? To Portland?

A I believe we flew into Portland, and I don't

know if we rented a car or we were picked up.

Q And where did you go after you arrived in Portland?

A I think we -- we went to a hotel room that was -- I believe it was near the police station in Vancouver.

Q And then do you recall anything else happening the day you arrived?

A I don't remember if that's the day we went to the department or if that's the day we -- at one point, I met with Sharon Krause and Jim Peters, but I don't remember if that was that day or the next day or whenever it was before he interviewed Katie.

Q Now, was this the first time you had met Jim Peters?

A Yes.

Q And what was -- strike that.

And who -- where did Jim Peters work? Was he with the Sheriff's Department or somewhere else?

A I forget his title. Clark County prosecutors, I believe.

Q And did an interview take place between Jim -- James Peters and your daughter, Katie, on December 11th, 1984?

A Yes.

Q Okay. Were you present the entire time that she was with Mr. Peters for that interview?

A Yes.

Q Okay. Where did the interview start out?

A It was in a room in the police department, I believe, with a video camera. And Jim, myself. I think Sharon was there for a few minutes, and then she left. And then there was a police officer at the video camera.

Q Was he uniformed?

A He was.

Q Okay. And what do you remember about that part of the interview where it was being filmed by a uniformed officer?

A I just remember Katie sitting on my lap.

Q Okay. Did -- at any point during that interview, did you feel that Jim Peters intimidated her?

A I do not.

Q If he had, what would you have done?

A I would have left the room with her.

Q You wouldn't have allowed him to continue?

A Absolutely not.

Q And as I understand it, you were with her the entire time that Mr. Peters spoke with her --

A I was.

Q -- is that right?

~~Plaintiff reserves right to object if defendants supplement highlighting.~~

Objection to lines 15-21 -Lack of personal knowledge as to whether Kathryn was intimidated; improper hypothetical

* If Defendants' Motion in Limine is denied on the issue of exclusion of the Peters interview of Kathryn or the related videotape or transcript, defendants will introduce the testimony designated with a "dash" line ( | ) in left margin

Now, was there a break where the tape was turned off and the three of you moved to another location for the rest of the interview?

A I believe we did go to another room.

Q Okay. When that interview resumed, was the uniformed officer still there operating the camera?

A No.

Q At any time during that break, did Mr. Peters coach her with what he wanted her to say when the tape was turned back on again?

A Not in my presence.

Q Okay. Was she in your presence the entire time?

A Correct.

Q Can we conclude from that that he did not, then, coach her --

A Correct.

Q -- at any time during that day?

What about you? Did you coach her --

A I did not.

Q -- as to what to say?

A I did not.

Q Did he say -- ever say "If you tell me" -- words to the effect that "If you tell me what I want to hear or show me with the dolls what I want to be shown" -- and there were dolls used, correct?

Plaintiff agrees that lines 1-13 should be presented to jury

Objection - leading; improper conclusion

Objection to line 22 through page 61, line 4.
-Hearsay
-Asked and answered; cumulative

A Correct.

Q -- "then you can go home" --

A No.

Q -- "you can leave"?

If he had pressured her, coached her, what would you have done?

A I would have walked out of the room with her.

Q And then we know that -- that you and Katie and he went back on tape?

A Correct.

Q And do you recall her demeanor changing at all?

A She was much more at ease, much more comfortable, little playful.

Q What do you attribute that to, given the fact that she wasn't comfortable in the earlier session?

A The only thing I could think of was the police officer was no longer in the room.

Q Because he wasn't there operating the tape?

A Correct.

Q I'm going to hand you what has been marked as Exhibit 26, which is a purported transcript of that interview.

Can you take a look at that, please.

MR. FREIMUND: Ms. Fetterly, given that's a lengthy transcript, do you want to take a break while

Objection to lines 5-7; improper hypothetical; lack of personal knowledge

Objection to lines 11-13 - video speaks for itself

Objection to lines 14-19 - lack of personal knowledge; no foundation

Objection to lines 21-23 - Exhibit 26 will not be presented at trial, see objection on page 63.

she's reviewing it?

MS. FETTERLY: I think that's a good idea.

Is that agreeable, Ms. Zellner?

MS. ZELLNER: That's fine.

THE VIDEOGRAPHER: Okay. We're going to go off the record. It's 10:57 a.m.

(Brief recess.)

THE VIDEOGRAPHER: Okay. We're back on the record. It's 11:10 a.m.

BY MS. FETTERLY:

Q Ms. Spencer, referring, again, to the interview that took place in your presence of your daughter by Jim Peters on December 11th, 1984.

Were -- in your recollection, were -- as being present throughout the entire interview, were any of Katie's responses non-verbal such as the shake of the head no or a shake of the head yes?

A Many of them. Excuse me. Many of them.

Q In fact, were the majority of her responses non-verbal?

A That's correct.

Q Were there also non-verbal responses where in response to questioning she would place the dolls in one position or another?

A She did at one point.

Objection -The video speaks for itself - jury can conclude contents of video by viewing it; Ms. Spencer's assessment is irrelevant, speculative, and hearsay

Q Okay. And have you had a chance to review Exhibit 26?
A I have.
Q And based on your recollection of what occurred in that interview and what you just said, do you believe that is an accurate transcription of that interview?
A No.
Q And why is that?
A There's -- there seems to be a lot of words that Katie said or a lot of things that she did and she did not speak very much that day.
Q And what about -- does it reflect the non-verbal responses that you just referred to, such as shaking or nodding her nod?
A I didn't see any.
Q Okay. Does it reflect where she would position the dolls in response to questions from Mr. Peters?
A I didn't see indicating that she did.
Q Now, Katie was on your lap the entire part of the first -- part of the interview?
A Yes.
Q And you were with her, right next to her, I take it, for the second part after the break; is that correct?
A Yes. At one point we got down on the floor, all

Objection to lines 1-18 -Neither party has introduced exhibit 26 as a trial exhibit. Plaintiff has provided the defense with a transcript made by a certified court reporter, which he intends to use at trial. The jury can assess any alleged differences in content of video and transcript.

three of us.

Q Okay. Did you feel Mr. Peters was intimidating her at any point during that interview?

A No.

Q And that would be in the first part where he's sitting in a chair and she's -- you're in a chair and he's on your lap -- or she's on your lap; is that correct?

A Yes.

Q And what about the second part of the interview when the three of you were on the floor? Did you believe he was intimidating her?

A No.

Q And if you had felt that at any point he was intimidating her, what would you have done?

A I would have left the room with her.

Q I want to now move forward to the time frame March of 1985. Records document that Sharon Krause interviewed Katie and interviewed Matt -- interviewed them separately on March 25th, 1985.

Do you recall why those interviews had been scheduled?

A I don't know. Excuse me. No, I don't recall the date.

Q And you don't recall the reason those were being

Objection to lines 2-16 -lack of personal knowledge about whether Katie was intimidated.

continued objection - also improper hypothetical

Objection -Not a question.

Introduction is allowed and necessary

Objection to line 21 to page 65, line 24 [-Speculative lacking foundation,] hearsay.

waived FRCP 32(d)(3)

Not hearsay, it is offered to show background and context for interactions with Krause

scheduled?

A My recollection of timeline is, you know -- is skewed. I can -- I remember a couple of incidents, but --

Q Let me just ask this: By this time, by March of 1985, had there been some allegations, information conveyed to you that Matt Hanson, Shirley's Spencer son, had accused Ray Spencer of sexual abuse?

A Yes.

Q Do you think that could have prompted -- the new allegations could have prompted these new interviews by Detective Krause in March of 1985?

A Yes. That's one of the memories I have of that particular incident. I just didn't have the date.

Q Okay. And if the record showed that Matt Hanson made disclosure mid to late February and into early March of 1985, that would make sense why Sharon Krause was interviewing your children again on March 25th, 1985?

A Correct.

Q Okay. And -- on this occasion, how did the children get to Vancouver? You talked about being flown up in December, but you and Katie were flown by Clark County when she was interviewed by Jim Peters.

Do you recall how the three of you, meaning

yourself and your two children, got to Vancouver on -- for the interview that took place on March 25th, 1985?

A My mother and I drove them up.

Q Okay. And do you recall where the interviews took place?

A At the police department.

Q Okay. And this was by Sharon Krause's time not by James Peters?

A Correct.

Q And do you recall anything specific that happened at the conclusion of the interview of Matt by Ms. Krause? And let me -- in preface to that, were you with the children during the interviews, or did you and your mother wait outside?

A We were with -- I was with him -- both of us were with him initially, and then we left the room. And Sharon Krause was with him for about 20, 30 minutes; and then she came out and asked us to come back in.

Q Okay. And was Matt in the room when you and your mother came back in?

A Yes.

Q Okay. And do you remember anything in particular that happened when you and your mother were brought back into the interview room?

A Sharon said something to the effect that Matthew

See next page

had shared some things with her. And she looked to Matthew and said, "Would you tell your mom and grandma what you shared with me? And is it okay if I write down what you're saying? I want to make sure I get your words correct."

Objection
-Hearsay
-FRE 403

Q And what do you recall Matt saying?

A He said very little, but he said, "That happened to me, too."

Q And what was he referring to?

A Being -- his daddy doing things to him, too.

Q Did you make any -- form any opinion that Matt had been forced to make -- your son, Matt, had been forced to make those statements to you and your mother?

A No.

Q Did you believe he had been intimidated in any way by Sharon Krause?

A No.

Objection
-Hearsay
-Speculation / lack of foundation
-Improper opinion testimony
-Opinion not relevant.
-Seeking to substitute Ms. Spencer's testimony for jury question.

Q Okay. And did you accept those statements as being credible?

A I did.

Q And why was that?

A I don't know how to put it into words. I just -- I know my son.

Q You would have known if he had been forced to say that?

A Yes.

Q And, now, directing your attention to the following months, now going into May.

Was it your understanding that the case against your former husband had been amended to include allegations that he had abused his stepson, Matt Hansen, as well as your son --

A Correct.

Q -- Matt?

A That's correct.

Q Okay. And I want to direct your attention to the day before May 9th, 1985. Did Matt make any statements to you that you found unusual?

A He did.

Q Your son, Matt, now, I'm talking about.

A Yes. Yes, he did.

Q What were the circumstances when he made the statement to you the day before May 9th of 1985?

A It was the day before Jim Rule and Jim Peters were coming to Sacramento to meet with the children in preparation for trial, which was supposed to be two weeks later, I believe.

Q Who is Jim Rule?

A I believe he was Ray's attorney.

Q Okay. So you knew they were coming?

Objection to
-Matt's statements are hearsay.
-Dkt. 202 at 15.
-FRE 402 and 403.

A Yes.

Q Okay.

A And it was -- we were meeting with them the next day. But that night --

Q Take your --

A -- I was at my aunt's house. And she has a hot tub outside, but I was inside talking with her. And Matthew kept coming in saying, "Mommy, Mommy. Come out to the tub. Come out to the hot tub." And I kept telling him "I will."

Q You were thinking he just wanted you to come out and see him in the hot tub?

A And I was trying to have a conversation with my aunt. So he was so persistent that I finally said, "Okay." It was about 30 minutes later. "Okay. I'm coming." I went out -- the minute I got into the tub, he says, "Mommy, some of daddy's friends did that, too." And I said, "That's very brave of you to be able to say that. Can you tell me who they were?"

"No. Ask little Matt. Ask little Matt." I said, "Okay." I asked -- I think I asked him a couple of other questions, but his response was "Ask little Matt. Ask little Matt."

Q And what did you think when Matt -- your son, Matthew, made the statement to you -- which appears to

Continued Objection from page 68.

be totally spontaneous?

A Yeah.

Q Was it in response to questions from anybody?

A No.

Q And the last time he'd been questioned by anybody about this had been six weeks earlier when he spoke with Sharon Krause; is that right?

A Correct.

Q What did you take of these comments?

A I, again, was devastated and just -- I believed him. And I actually didn't know what to do with it. I was very thankful that I had a therapist because that's who I was able to contact and -- I'm sorry.

Q Go ahead. Take your time. Do you need to have some water or --

A No. I'm okay. Thank you.

Q Now, you said the next day your children were scheduled to be interviewed by Mr. Rule; is that correct?

A Mr. Rule and Mr. Peters.

Q And was this the only occasion that Mr. Peters interviewed your son, Matthew?

A That I recall, yes.

Q You don't recall any interview similar to the one he did with Katie where he was alone with him. It

Continued objection

Continued objection; additional basis: Ms. Spencer's belief irrelevant, as is her grateful feelings about a therapist.

See next page

was possibly just you present?

A No.

Q And where did the interviews take place on May 9th, 1985?

A It was here in Sacramento. I believe it was at Juvenile -- the Juvenile Division. Somewhere there.

Q And did you drive your children to that appointed time --

A I did.

Q -- at the appointed time?

And did you meet -- you already knew Mr. Peters, I take it? You met him when you were in Vancouver with Katie in December?

A Correct.

Q Is that the only time before May 9th that you'd met Mr. Peters --

A Correct.

Q -- or had any communication with him whatsoever?

A Correct.

Q And had you ever met Mr. Rule before?

A No.

Q But I take it you knew who he was?

A Yes.

Q Okay. And did you feel -- you understood that in order to defend his client, meaning -- his client

Objection to testimony on page 70, line 17 to page 75, line 7. All testimony and evidence regarding alleged May 9 interviews is subject to motion in limine. Dkt. 202 at 15 (FRE 402 and 403). -Addt'l basis: numerous hearsay statements without exception.

then being Ray Spencer, that Mr. Rule had asked to interview your children --

A Yes.

Q -- is that correct?

Did you give him permission to interview your children?

A I did.

Q Okay. And did you ask that the prosecutor be present as well?

A Yes.

Q And that request was honored?

A Yes.

Q Did you attend the interviews with the two lawyers and your children?

A I believe they were in a room with a glass window, and I was seated outside in the waiting area.

Q And do you remember either of your children expressing any hesitation about speaking to their father's lawyer and to Mr. Peters on this occasion?

A No.

Q Okay. When -- after you were -- met Mr. Peters again --

And I take it you had to be introduced for the first time to Mr. Rule?

A Correct.

Continued objection from page 71

Q -- was that presumably done by Mr. Peters, that introduction?

A Yes.

Q Did you say anything about what Matt had stated to you in the hot tub, the prior evening?

A I did.

Q And were your children present when you made this statement?

A Yes.

Q Okay. What did you say?

A I just said that I had some good news and some bad news. And then I told them that Matthew told me that several of his dad's friends had done that, too.

Q And by "done that," what were you referring to?

A Had had inappropriate relations or had -- had messed with him.

Q Had sexual contact?

A Yes.

Q Okay. In other words, not just touching them in a physical manner but touching them improper --

A In a sexual manner, yes.

Q In a sexual manner.

And what did you mean by you said you had some good news and some bad news. Why did you use that phrase?

Continued objection from page 71

A Well, I guess it would be good news for the prosecutor and bad news for the defense attorney.

Q Then did the interviews take place with your children?

A Yes.

Q Were they done separately?

A Yes.

Q And other than watching through the glass, you didn't participate, I take it?

A No.

Q Okay. And when they came out of the interview room, first of all, Matt, did he say anything to you about the interview?

A I don't recall.

Q Did he say anything to you that he felt pressured by Jim Peters?

A No.

Q And in observing the interviews through the glass, if you'd seen something that made you uncomfortable, that either lawyer was pressuring either of your children, what would you have done?

A I would gone in and taken them out.

Q They were interviewing them with your consent, I take it?

A Correct.

Continued objection from page 71

Q Okay. And then after the lawyers left and went back to Washington, what was the next thing you heard about the case?

A I recall that we were -- we went up there one more time in preparation for trial. And at some point prior to that, we were told that there wouldn't be a trial. He had pled guilty.

Q Meaning you were planning to go back up?

A Yes, we were planning -- because that was two weeks before trial.

Q The interview on May 9th was?

A Yes.

Q But I take it you didn't actually end up going back for more trial prep -- preparation?

A No. We were actually going up for trial.

Q For trial?

A That didn't take place.

Q Okay. And do you know why the trial didn't take place?

A I was told because he pled guilty.

Q And how long -- approximately how long after the May 9th interview with Mr. Rule and Mr. Peters did you learn that Ray Spencer was pleading guilty?

A It seems like it was within a couple of weeks.

Q Okay. Fairly short time?

Continued objection from page 71, with emphasis on FRE 802.

A Yes.
Q Okay. And was -- did you attend his sentencing?
A I did.
Q Okay. And what was your reaction when you heard he was sentenced to, actually, life imprisonment?
A Relief.
Q Okay. And why was that?
A My fear dissipated.
Q And what was that fear?
A That he would get out and harm them again.
Q Would you have preferred that he actually receive treatment?
A Yes.
Q As opposed to a lengthy prison sentence?
A Yes. It would have been better for my children.
Q And what did you tell your children about their father as they were growing up as to why he was no longer part of their lives; why they weren't visiting him in the summers anymore or Christmas?
A I told them that his daddy -- their daddy was sick and ill and that he needed help.
Q Did you say anything other than that to them about it?
A No.
Q Okay. Did the children continue to have

Objection -FRE 402 and 403. Ms. Spencer's feelings and hearsay statements to children are irrelevant to issues in this case.

counseling?

A They did.

Q Okay. And how long, approximately, did they have counseling?

A In intervals over about ten years.

Q As far as Katie is concerned, first, do you feel that counseling was helpful to her?

A I do.

Q And what about as to Matt; your son, Matt? Do you feel that counseling was helpful to him?

A I do.

Objection
-Irrelevant
-Improper opinion testimony.

Q I'm looking for an exhibit, Ms. Zellner. That's why there's a pause here.

At some point around the year 2003, 2004, Ms. Spencer, did you learn that Ray Spencer was seeking a commutation of his sentence from then Washington State Governor Locke?

A Yes.

Q Okay. Do you recall how you learned that?

A I believe I was notified by Clark County.

Q And did you express your feelings about that to the Governor's Office?

A I believe I wrote a letter.

Q And what were your feelings about whether or not Mr. Spencer's sentence should be commuted by 2003, 2004?

A Since he had never received any help, I didn't feel he should be released.

Q And was that consistent with your thought all along that he really should have treatment?

A Correct.

Q And I'm showing you what's been marked as Exhibit 19.

Do you recognize that document?

A Yes.

Q And what is that document?

A It's a document that my son had me write.

Q And you said your son had you write. How did it come about that your son asked you to actually write the words in that document?

A To the best of my recollection, when we found out about his dad, I had said I would write a letter to the governor. And I asked -- he asked me if I would write one for him. I said, "If you want to, you can." He said, "Would you write it for me? I'll sign it." I said, "Yes."

Objection -Hearsay

Q And this was March 2nd, 2003; is that right? Is what the letter is dated?

A Yes.

Q How old was your son, Matthew, in March of 2003?

A 28, I believe.

Q Was he living at home with you?

A No.

Q Was he financially dependent on you for his support --

A No.

Q -- in any way?

A No.

Q Now, prior to him signing this letter -- and he did sign the letter, did he not?

A Yes.

Objection
-Lack of foundation

Q Okay. We'll get to that in a moment.

Had he been approached, to your knowledge -- "he" being your son, Matthew -- by any representatives of his father's attorneys, after he turned 18, who wished to speak with him?

A I don't know if it was the attorneys, but two men -- excuse me -- showed up at our house when we lived on -- I think it was Shadow Creek or one of them. It was the second house we were at. They showed up at the house, and I remember it was early in the morning. He was on his way to go to work for his stepfather in Lodi. And he came running back in the house and grabbed a baseball bat and said, "Two of the men are here, Mom." And he started to run out, but they drove off.

Objection
-Hearsay
-Lack of relevancy or probative value

Q Was Matt over 18 at this time?

A Yes.
Q But he was still living at home, I take it?
A Yes.
Q Was it your impression from hearing what your son's reaction that he did not want to speak to any representatives of his father's attorneys?
A Yes.
Q Okay. In fact, he even said he was going to get a baseball bat to run them off?
A He did get a baseball bat and ran out with it.
Q You actually saw him get the baseball bat and run out with the bat?
A Yes.
Q Okay. But fortunately they had left?
A Yes.
Q So there was no physical confrontation?
A No.
Q Did that sort of accurately reflect any feelings Matthew had expressed in that time frame to you about the subject?
A Matthew did not speak to me very much about it, but he was afraid that day. That was obvious to me.
Q So turning back to Exhibit 19, do you recognize your son's signature on that document?
A I do.

Objection -Not relevant and based on hearsay on previous page. Ms. Spencer's impressions and what was obvious to her are inadmissible.

Q Did you force him to sign that document?
A I did not.
Q Could he have -- you have forced him to sign that document?
A No.
Q Did you have any financial leverage over him at that time?
A No. I was actually living with my father.
Q And physically, you seem -- you appear to be a rather slight lady.
How much was -- how tall was Matt at this time?
A He's six-foot.
Q Could you have physically forced him to sign that letter?
A I don't see how that would be possible.
Q To the best of your understanding, based on what you observed at the time, did Matt Spencer freely and willingly sign Exhibit 19?
A Yes.
Q If he had said, "I don't want to sign it" --
A I would have thrown it away.
Q Did you -- strike that.
You testified earlier that you were interviewed by Sharon Krause on one occasion in October of 1985; is that right?

Objection - improper opinion and legal conclusion testimony

A Yes.

Q And showing you -- it's Exhibit 11. Do you recognize Exhibit 11 as Ms. Krause's report of that interview?

A Yes, I do.

Q Have you had occasion before testifying today to review that report?

A I have.

Q Okay. Is that report, Exhibit 11, an accurate report of what you stated to Ms. Krause --

A Yes.

Q -- on October 18th of 1984 --

A Yes.

Q -- following her interview?

Now, did she take notes during the interview?

A She always took notes.

Q Okay. So she didn't have a tape recorder, though, I take it?

A I don't remember.

Q Okay. But you do recall specifically that she took notes?

A Yes.

Q So would it be fair to say that she didn't write Exhibit 11 strictly from her memory, that she did have some notes?

Objection -Plaintiff disputes admissibility of Exhibit 11, as it is irrelevant and for reasons stated in dkt. 202 at 2-3, 21.

Objection -calls for speculation

A Correct.

Q Is -- following your review of Exhibit 11, is there anything contained in Exhibit 11 that is false information that you didn't tell her?

A No.

Q Okay. In other words, is there anything in that report that is information fabricated by Sharon Krause?

A No.

Q Is that -- is that report an accurate description of what you told her --

A Yes.

Q -- during that interview?

Now, do you have any reason to believe that Sharon Krause fabricated allegation based on what your children told her in that same time frame?

A I do not.

Q And why is that?

A Based on my experience with my children and the things they said to me without anybody else present, there would be -- I don't see how she could or why she would even do that. I can't speak for her, but I don't see any -- I'm not sure -- I don't know how to really answer that. It's just, I guess you could say, a gut feeling. But I did not give her any false information, and I never had any indication that she was writing

Objection to testimony regarding exhibit 11 (see page 82)

Objection -Lack of personal knowledge; speculative -Irrelevant -FRE 403 -Improper opinion testimony -Not disclosed or qualified as expert.

false information or making up stories.

Q Could you -- could you imagine any possible motivation that she would have had to falsify information about what your children said to her?

A No, I can't.

Q Did she ever give you any indication that she was hoping to find -- or hoping to conduct the investigation of the allegations in a manner that Ray Spencer would be charged with crimes?

A No.

Q Okay. What are your feelings now towards Sharon Krause?

A I've not seen or spoken to her in many years, but I still have always felt a great deal of respect and admiration for her.

Q And why do you say that?

A Because of the manner in which she dealt with my children and the professional manner with how she dealt with me and the whole situation.

Q Can you be a little more specific as to the manner in which she dealt with your children?

A She always would tell them, you know, this is -- "This is what I'm going to do. Is that okay with you? I'm going to write this down so I" -- "so I don't make a mistake. I get the right words. Is that okay with

Continued objection

This testimony continues to be based on speculation and improper opinions. The testimony is also irrelevant to the issues in this case.

Ms. Spencer has not established any foundation for this speculative hearsay

you?" She did the same with me. She -- there was never any intimidation. It was always -- she did what she could to make them comfortable and safe.

Cont. Object.

Q Finally, before I finish my questioning, are you here voluntarily today?

A No, I'm not. I've said I don't want to be a part of this. This is my children and their father. And I didn't want to be anywhere in this.

Q But you are here today. But you are only here, I take it, because you've been subpoenaed?

A Correct.

Q You had no choice but to be here?

A I did not.

MS. FETTERLY: Thank you. I have no further questions. Ms. Spencer, I know it's been hard for you and feel free if you want a break. Likely the other lawyers will want to ask you some questions. So if you want a break, please do not hesitate to say you do.

Unnecessary

THE WITNESS: No. I'm fine.

MS. FETTERLY: You are. You want to continue?

THE WITNESS: Yes.

MS. FETTERLY: Counsel?

MR. FREIMUND: I can go unless Ms. Zellner wants to go first.

MS. ZELLNER: You can go, and then I'll go last.

MR. FREIMUND: Okay.

MR. BOGDANOVICH: I'll follow Mr. Freimund briefly.

Continued objection from page 85

EXAMINATION

BY MR. FREIMUND:

Q Mrs. Spencer -- or Ms. Spencer; I'm sorry. My name is Jeff Freimund, and I represent another of the defendants in this lawsuit that your ex-husband is bringing. Specifically, I represent a sergeant -- a former retired sergeant of the Clark County Sheriff's Office by the name of Mike Davidson.

Did you, throughout the course of your involvement in the investigation and prosecution of Mr. Spencer, ever meet an individual named Michael Davidson?

A I don't recall meeting him. I don't know if he had ever been at, like, the police department when my children were interviewed. But I personally don't recall meeting him.

Q It sounds like you were at the police department on several -- Vancouver Sheriff's Office police department on several occasions during that time period from around -- through -- August through -- August of '84 through May of 1985.

Can you estimate how many times total you were

at the Clark County Sheriff's Office during that time frame?

A I think it was either two or three.

Q During any of those occasions that you were there, did you ever see Shirley Spencer at the police department?

A Not that I recall.

Q Okay. I'm going to kind of go back in the order that Ms. Fetterly asked you some questions and pick up on my notes about that. And where I'd like to start is when you first divorced the plaintiff in this lawsuit, Ray Spencer.

During those divorce proceedings, did Mr. Spencer seek to have custody of your two children?

A He did.

Q Was he -- was there a court hearing in which custody was disputed?

A We did go to trial.

Q Mr. Spencer testified that his lawyer did not show up for that hearing and somebody else appeared instead of his regular lawyer. Is that your recollection?

A I don't recall.

Q Okay. When custody was awarded to you with visitation by Ray Spencer, do you know whether or not

Objection to page 87, line 9 to page 88, line 2 -FRE 402 and 403. -Dkt. 202 at 21, 2-3

Ray Spencer sought an appeal of that decision?

A I was never aware of one.

Q You mentioned that Matt's therapist's name was Connie Nichols.

Do you recall who Katie's therapist was?

A They both had two. Connie Nichols was Matt's first therapist, and James Cooper was his second one. Katie started with Ann Link, and then her last therapist was Deborah Moore, Dr. Deborah Moore.

Q You said that on at least a few occasions you were present with Katie's therapist.

Were you also present in times with Matt's therapist?

A I was only in the room with him, I believe -- there was one occasion where I was invited in after he had had a session with -- I believe it was James Cooper, where he -- he demonstrated he burnt a picture in the sandbox.

Objection
-Speculative
-Hearsay
-FRE 402 and 403

Q Do you know what the picture was that he burned?

A It was a picture of his father.

Q Do you know approximately how old Matt was when that incident happened?

A Nine or ten.

Q Did either Connie Nichols or James Cooper ever relate to you or were you present during any therapy

sessions that they were providing to Matt where he was discussing sexual abuse by anyone including his father?

A No.

Q Were you ever present in any therapy sessions with Ann Link or -- I'm sorry. I didn't write down the second therapist for Katie.

What was her name again?

A Deborah Moore.

Q I'm sorry. Were you ever present -- present at any therapy session with either Ann Link or Debbie Moore where Katie was describing sexual abuse by anyone including her father?

A Yes.

Q Was it regarding her father that you were present at when she was describing it to the therapist?

A Yes.

Q Was it Ann Link or Debbie Moore that you were present at when Katie was describing the sexual abuse by her father?

A Ann Link.

Q Do you recall approximately how old Katie was when she was disclosing sexual abuse by her father to her therapist, Ann Link, in your presence?

A Five.

Q Do you recall what she described to Ann Link in

your presence?

A I believe she just --

(Video conference disconnected.)

MS. FETTERLY: We have a technical problem here.

THE VIDEOGRAPHER: Let's go off the record. It's 11:46 a.m.

(Brief recess.)

THE VIDEOGRAPHER: We're back on the record. It's 11:47 a.m.

BY MR. FREIMUND:

Q I'm sorry, Ms. Spencer, but I had just asked a question when we got disconnected, and I don't know if you heard the entire question; so let me ask it again.

Do you recall what Katie disclosed to Ann Link in relationship to sexual abuse by her father while you were present?

A I believe she -- I can't remember if that's when she had -- Ann Link, I believe, had a couple of anatomic dolls. And I think she showed us like her daddy putting his mouth on her genitals, and I don't recall much else.

Q Can you kind of put in time when that occurred in relationship to when Detective Flood from the Sacramento Police Department interviewed you and the kids, when Ms. Krause came down there when you went up to meet with Mr. Peters in December of '84 and

 otherwise? I mean, can you tell us when that happened approximately among those events?

A It was in between -- because we had -- the therapy was started within the first week, within the first week of August 29th. So it would have been within about three or four weeks after that.

Q Would it have been before Sharon Krause first interviewed Katie that Ann Link received this disclosure from Katie? That first interview would have been in October of 1984 by Ms. Krause, as I understand it.

A I'm sorry. I don't recall.

Q Okay. But your recollection is it was about four weeks after therapy started that Katie disclosed to Ann Link in your presence using anatomically correct dolls --

A Yes.

Q -- that her father had sexually abused her?

A Yes.

Q And you're saying therapy began approximately around the first of September of 1984?

A It began the day -- August 30th -- after -- okay. I'm sorry. August -- the Wednesday was the 29th. 30th is when I took her to the doctor. And by the 31st, I was meeting with her first therapist.

Q Okay. And that was about four weeks after that