1    that this disclosure occurred?

2        A   Yes.

3        Q   Did you -- I'm sorry.

4           Were you ever present at any other times during

5    therapy sessions with either Ann Link or Debbie Moore in

6    which Katie made other disclosures of sexual abuse by

7    her father other than this one you've just described?

8        A   Not that I recall.

9        Q   Okay.  Did Ann Link or Debbie Moore ever report

10   to you that Katie was making disclosures of sexual abuse

11   by her father during therapy sessions that you were not

12   present at?

13       A   I believe we had conversations -- Ann Link and I

14   had conversations with regard to what she was -- what

15   Katie was talking about in therapy for the purpose of

16   helping me to be able to respond to Katie when behaviors

17   occurred.

18       Q   Can you tell us, please, what some of those

19   conversations or suggestions that you received from Ann

20   Link about how to respond to Katie's behaviors based on

21   what she was telling Ms. Link?

22       A   She just said if, you know, she was doing

23   something that you felt inappropriate, just remind her;

24   let her know that, you know, that's not -- I don't know

25   if she said that's not okay to do.  I was told -- I was

*Objection -Hearsay and double hearsay without exception*

1  treated very delicately.  And I was given information

2  that would help my children to feel safe and

3  comfortable.  And then -- but I was also told that if

4  they didn't want to talk about it, don't push it.  If

5  they did, be open to what they had to say.

6       Q  Did you ever have concerns that Katie was

7  engaging in excessive masturbation at any time?

8       A  No.

9       Q  Now, let's go to Matt and his therapists, Connie

10  Nichols and James Cooper.

11       Did they ever share with you whether or not Matt

12  was talking about sexual abuse by his father with

13  those -- either of those therapists?

14       A  Connie Nichols was his therapist before we were

15  told that he was a party to it.  When we found that out,

16  she suggested he have a different therapist.  So no with

17  her.  She treated him in a different manner.

18       As far as James Cooper, the only incident I

19  remember was when I was invited in and he was talking

20  about how a volcano builds within a child when things

21  happen.  And one of his therapy -- one of his ways of

22  providing therapy was to -- he has a sandbox and the

23  children were allowed to take pictures or draw pictures,

24  do whatever they needed, and then light them on fire.

25  It was sort of therapy, fire therapy.

Continued hearsay objection

Objection -Hearsay and double hearsay. -Trying to insert expert testimony through a lay witness.

1      Q    That was the incident you described earlier

2   about burning the picture?

3      A    Correct.

4      Q    You read through earlier today that Exhibit 27,

5   which was the handwritten note by Shirley Spencer

6   regarding statements that Katie made to Shirley.

7          After reviewing that document, can you tell us

8   whether you thought the words that Shirley

9   reported Katie as using sounded kind of like the way

10  Katie would talk back then in 1984 when she was about

11  five years old?

12     A    Yes.

13     Q    Do you think that that was true as well from the

14  police reports that you read that were describing words

15  Katie was using back then around age five?

16     A    Yes.

17     Q    Do you also think in reviewing the police

18  reports that described Matt's disclosures of abuse that

19  those reports seemed to be using words that Matt was

20  using back during that time period when he was about

21  eight or nine years old?

22     A    Yes.

23     Q    After Detective Krause would interview your

24  children, would she usually meet with you afterwards?

25     A    Yes.

*Objection –No identification of particular words, phrases, or even Krause reports. Lack of foundation.*

Deposition of Deanne Spencer                    SPENCER VS. PETERS

```
 1        Q  Would she summarize what the kids had told her
 2   during her interviews of them on each occasion?
 3        A  Yes.
 4        Q  When she would give that summary, did you
 5   observe her to be looking at any notes that she had or
 6   was she just doing it off the top of her head?
 7        A  Sharon Krause always had notes.
 8        Q  So when she would give you those summaries,
 9   would she be flipping through her notes as she was
10   summarizing it for you?
11        A  Yes.
12        Q  Do you recall any of those summaries of what
13   Krause told you?
14        A  I do not.
15        Q  Okay.  After having reviewed the police reports
16   written by Detective Krause, do you have any reason to
17   believe that the information reported in those reports
18   is different in any way from what she summarized for you
19   after each of those interviews?
20        A  No.
21        Q  I want to talk a little bit about Rhonda Short
22   now, please.
23            Was that -- that incident where Ray Spencer had
24   sex with Rhonda Short ever investigated by the police,
25   to your knowledge?
```

Objection
-Line 14
states she
does not
remember -
lack of
foundation

See next
page

1      A   No.

2      Q   At the time, I mean.

3      A   No.

4      Q   Were there any interactions with your neighbors

5   after that incident?

6      A   No.

7      Q   You don't recall where the family members for

8   Rhonda Short confronted either you or Ray or both?

9      A   I'm sorry.  I thought you meant after it all

10  occurred.  Yes, it was, I think, about a week or so

11  later.  They called -- Rhonda's mother -- Rhonda's

12  father called me at my house and said, "I need you to

13  come over here."  And I went next door.  And when I

14  walked in, she had an uncle and Rhonda and her mother

15  and father were in the living room.  And her father,

16  Jerry Short, said, "When we were away, Ray raped

17  Rhonda."  And I said, "Whoa.  Stop.  Don't say another

18  word.  My husband needs to be in here."  And I went

19  outside and got him and brought him in.

20      Q   What happened next?

21      A   Rhonda sat on the couch and told us that she

22  had -- he had called her and wanted her to come over.

23  And when she got there -- I was in Sacramento with the

24  children, with my son.  I was pregnant with my daughter.

25  And her parents were out of town.  And she told that --

Objection to page 95, line 21 to page 98, line 15 regarding Rhonda Short.  This testimony is objected to in Plaintiff's motion in limine, dkt. 202 at 2-3.  This testimony also contains inadmissible hearsay.

1    she told everybody in the room that she -- he had asked

2    her to come over, and he had music on.  And they were

3    sitting on the couch and one thing led to another, and

4    he raped her.

5        Q    What was Ray Spencer's reaction while Rhonda

6    Short was accusing him in the presence of her family

7    members and you of having raped her?

8        A    He said something to the effect of, "Rhonda, how

9    could you say that?"  And then he turned to her father

10   and, "Jerry, how could I do that?  How could you believe

11   that?"

12       Q    Did he deny having sex with her at all?

13       A    I don't remember if he denied, but I know at one

14   point he -- it was consensual, according to him.

15       Q    Do you think it was during that meeting with

16   Rhonda's relatives and her father that Ray Spencer was

17   saying that he had consensual sex with his, as you said,

18   17-year-old daughter?

19       A    I believe it was during that conversation, but I

20   can't remember if it was -- I'm sorry.  I just -- I

21   can't remember if that was specifically stated then.  I

22   do know that he was denying that anything had happened.

23       Q    Okay.  When you say "denying that anything

24   happened," I'm trying to differentiate between

25   consensual sex and non-consensual sex.

1          Was he denying that sex occurred at all or was

2     he denying that non-consensual sex occurred?

3          A   I believe he was denying non -- nothing had

4     happened.

5          Q   So he's saying no sex at all occurred?

6          A   At that time, yes.

7          Q   Okay.

8          A   No.  Excuse me.  I would like to re -- rephrase

9     that.

10         Q   Sure.

11         A   When -- I can't remember if it was after we went

12    to their parents' house and went back to our home when

13    he told me he didn't -- it wasn't rape; it was

14    consensual.  She came to him.  I don't remember if he

15    said that in front of them or just to me.

16         Q   Okay.  You earlier indicated that you were aware

17    that Ray Spencer was unfaithful to you during your

18    marriage.

19         A   Correct.

20         Q   Did he ever tell you how many times or did you

21    have some understanding of how many different women it

22    was that he had sex with while married to you?

23         A   I can recall several incidences.

24         Q   What's your best estimate of how many different

25    women he was unfaithful to you with?

Objection to page 98, line 16 to page 99, line 19 regarding alleged infidelities, Rhonda Short, and allegations regarding the Vancouver Police department, see Dkt. 202 at 2-6, 14, and 21.

```
 1        A   I believe four or five that I know of.

 2        Q   Do you recall that one of those four or five

 3   women, aside from Rhonda Short, was a Ms. Staggman or

 4   Steigman that he was involved with during an undercover

 5   operation with the Vancouver Police Department?

 6        A   I don't recall that name, but I do recall him

 7   telling me that when he was undercover -- he came home

 8   one night and said his cover had been blown by a snitch.

 9        Q   Did he ever tell you that he was having sex with

10   that person?

11        A   No, he did not.

12        Q   Okay.  When Detective Halls from the Vancouver

13   Police Department interviewed you in the course of the

14   Internal Affairs investigation that Vancouver P.D. was

15   conducting regarding Ray Spencer, do you recall giving

16   him documents or letters or drafts of letters that Ray

17   worked with you on to describe his involvement during

18   that undercover operation?

19        A   I don't recall.

20        Q   Okay.  You mentioned that in May of 1985, a few

21   weeks after the first time you met Mr. Rule or were

22   interviewed by him -- or the children were interviewed

23   by him and Mr. Peters, you had plans to go up to

24   Vancouver for the trial.

25            Did you actually leave San Francisco and head to
```

Objection - not a question; dkt. 202 at 13.

Deposition of Deanne Spencer                    SPENCER VS. PETERS

```
 1    Vancouver for the trial?  Or did you ever get up to       Continued
 2    Vancouver after that interview by Mr. Rule and            objection
 3    Mr. Peters is my question?
 4         A   Sacramento, you mean?
 5              MS. FETTERLY:  You said "San Francisco."
 6              MR. FREIMUND:  I beg your pardon, ma'am.  I
 7    meant Sacramento.  Thank you.
 8              THE WITNESS:  Yes, I believe we flew up.  It was
 9    during -- I think it was during the week that trial was
10    supposed to take place.  I remember that we flew because
11    United Airlines went on strike, and we had to take a
12    puddle hopper to San Jose from Sacramento.  And all       Objection
13    three of us threw up in the very back and then we had to   - irrelevant
14    put all of our clothes that we threw up on -- because
15    there were no bags.  The pilots were right in front of
16    us.  There were no bags.  So we put them into our
17    coats -- or put our coats into these garbage bags that
18    the cleaning lady in the bathroom at the airport had
19    given us.  And then we had to get on the flight to fly
20    up to Vancouver.
21    BY MR. FREIMUND:
22         Q   When you arrived at Vancouver, were your
23    children interviewed by anybody during the entire time
24    you were there for that trial?
25         A   Not that I recall.
```

1    Q   During the interview a couple of weeks before

2    that when Mr. Rule and Mr. Peters were there in

3    Sacramento, did you have some understanding of who it

4    was between the two of them that was interviewing your

5    children?  Was it Mr. Rule?  Was Mr. Peters observing or

6    was it vice versa or what?

7        A   I just saw through the glass and -- as far as I

8    can remember, it was Mr. Rule asking questions, but I

9    really don't have a clear recollection of it.

10       Q   Understandable.  Now, I'd like to direct your

11   attention to Exhibit 19, which is the letter your son

12   asked you to write that's dated March 2nd, 2003.

13           Did you observe your son to read that letter

14   before he signed it, or did he just scribble on it

15   without reading?

16       A   He read it.

17       Q   Did he say anything, ask for any changes or

18   anything like that before signing it?

19       A   No.

20       Q   How can you be certain he read it?

21       A   I watched him.

22       Q   Did he just kind of scan it, or did it look to

23   you like he read it line by line?

24       A   I don't recall.

25       Q   Okay.  When you -- you mentioned that you had

Objection
-Dkt.
202 at 15
-Lack of
foundation

```
 1   said you were writing a letter and Matt said he would
 2   like you to write one for him.
 3           Did any similar conversation related --
 4   regarding writing a letter to the governor occur with
 5   Katie at that time?
 6       A   I don't recall.
 7       Q   Okay.  Give me one moment.
 8           At the sentencing hearing for Ray Spencer, do
 9   you recall who else was present there?  Shirley Spencer
10   was there, too, wasn't she?
11       A   That's correct.
12       Q   Did you have any conversations with Shirley
13   Spencer during that hearing or after -- before or
14   afterwards that day?
15       A   I just remember sitting next to her, and I
16   believe we were holding hands and listening to the
17   sentencing.  I don't recall having, you know, in depth
18   conversations with her.  There was just a sense of -- I
19   felt a sense of relief.
20       Q   Did you go or participate in the hearing that
21   occurred in July of 2009 where your children testified
22   in Clark County Superior Court regarding their
23   recantations of abuse by their father?
24       A   No.
25       Q   When did you first learn that -- I'm going to
```

Objection
-calls for
hearsay
-not
responsive

1    start with Matt first and then go to Katie.

2           When did you first learn that Matt was saying

3    that the abuse never happened?  Did he ever tell you

4    that?

5        A   He did the first -- when it first began.  When

6    the investigation first began.

7        Q   Okay.  So at first he denied any abuse.  And

8    then, I take it, your understanding is he later then

9    disclosed the abuse after little Matt Hansen made

10   disclosures; is that accurate?

11       A   That's correct.

12       Q   After he made those disclosures back in early

13   1985, when was the first time after that that you became

14   aware that your son, Matt, was saying the abuse did not

15   happen with his father?

16       A   I don't recall because we didn't discuss it very

17   much, if at all.  It was something that he discussed in

18   therapy, and it was not something that he talked with me

19   about very much.

20       Q   When did you first become aware of it?  Was it

21   before or after this hearing in 2009 that Matt was

22   saying it did not happen?

23       A   I -- I'm sorry.  I don't know.

24       Q   Okay.  Maybe you don't know the answer to this

25   either, but I'd like to ask you the same question about

*Objection
-Leading
-Hearsay
-Lack of
foundation*

*Objection
-Lack of
foundation
-Nonresponsive*

1    Katie.

2          When did you first become aware that Katie was

3    saying her father did not sexually abuse her or at least

4    she couldn't remember that he sexually abused her?

5          A    That would have been around the time that we got

6    information that he was being released or that he was --

7    he'd been released on his -- with a conditional pardon

8    or something.  It was around that time.

9          Q    So the first time you were aware where your

10   daughter, Katie, was saying that she doesn't remember

11   the abuse or that it didn't happen was after she was

12   advised that her father was being released from prison?

13         A    There was one other occasion.  I had kept a

14   journal, and she had asked to read it when she was about

15   19.  She read the journal over the weekend and brought

16   it back and said, "That must have been very hard for

17   you, Mom."  And she said, "I don't remember anything."

18   But -- I don't know if she said, "It must have happened"

19   or "I believe it happened" or -- but I know she said, "I

20   don't remember it happening."  And then it was "That

21   must have been hard for you."

22         Q    Your recollection is, though, she said something

23   like "It must have happened" or what?  I didn't get

24   that.  I'm sorry.

25         A    I just remember specific -- specifically her

Objection
-hearsay;
speculati
ve;
nonrespon
sive

1    saying "I don't remember, but that must have been hard

2    for you." And I said, "Yes. It was hard for you, too."

3    And I don't know -- I think she said something to the

4    effect of -- that she indicated that it was possible

5    that it could have happened from what she read from my

6    journals, but I can't speak for her.

7         Q   I understand that. Do you still have those

8    journals?

9         A   No, I do not.

10        Q   What became of them?

11        A   I don't know. They were -- my son borrowed

12   them, and I didn't get them back.

13        Q   Did you ask for them back from your son, Matt?

14        A   I have not. But there was a lot of things

15   occurring in his life. He was going through an issue

16   with a girlfriend and moved into a friend's house and

17   some other things going on. So I just never bothered

18   him about it.

19        Q   So far as you know, does Matt still have those

20   journals?

21        A   I don't know.

22        MR. FREIMUND:   Okay.   I know this has been very

23   hard for you, Ms. Spencer, and I know you aren't here

24   voluntarily.   But I do appreciate taking the time to

25   answer my questions.   That's all I have for you.   Thank

- continued objection
- Objection -Lack of foundation; hearsay
- Objection -Not a question or witness testimony

1    you.

2              THE WITNESS:   You're welcome.

3                        EXAMINATION

4    BY MR. BOGDANOVICH:

5         Q   Ms. Spencer, I'm Guy Bogdanovich.   I'm Sharon

6    Krause's attorney.   And I have just a couple in

7    follow-up.

8              Was Ray ordered to pay you child support --

9         A   Yes.

10        Q   -- as part of the divorce?

                                        *Objection - lines 8-23*
*-Irrelevant*
*-FRE 403*

11        A   Yes.

12        Q   Okay.   Did he pay that?

13        A   He did.

14        Q   Did he pay it until he was imprisoned?

15        A   He did, except during the summers when I sent it

16   back to him.

17        Q   Was he -- well, why would you send it back to

18   him?

19        A   He told me that he needed it for child care.

20   And since he had the children, I felt that was fair.

21        Q   Okay.   That wasn't part of the court order; that

22   was just something you decided to do?

23        A   Yes.

24        Q   I would like you to tell me more, if you're

25   able, about Ray's relationship with your two children

1   back when you were still married and at the time that

2   you said it became a concern to you.

3        A   It just mostly was a matter of -- he wasn't

4   around.  I was aware that when we had family members up,

5   he was there.  And he would, you know, have a good time

6   and play with all the kids.  But on a day-to-day basis,

7   he wasn't around much.

8        Q   Do you know what he was doing with his time?

9        A   Working.

10       Q   How about when he wasn't working; do you know

11  what he was doing?

12       A   No, I do not.

13       Q   Did I understand your testimony correctly that

14  when you came up to the Vancouver area in May of 1985,

15  the trip during which Jim Peters did the videotaped

16  interview with Kathryn -- did you say that it was just

17  you and Kathryn that came up?

18       A   Yes.

19       Q   What was done with Matt while you were up here

20  with Kathryn?

21       A   I believe he was with his aunt and uncle in

22  Sacramento.

23       Q   And which aunt and uncle would that have been?

24       A   David and Shawn Spackman, my brother.

25       Q   Do they still live in Sacramento?

*Objection
-Vague
question
-FRE 402
and 403
Proper question and
answer highly
probative of
matters of
relationship with
children and
damages*

*Objection to
line 13
through page
108, line 5
-Irrelevant
and
unnecessary*

* Objected by defendants if matters in dispute about Peters interview and type and thoroughness are denied

```
 1        A   They do.

 2        Q   And I believe you said that the County had paid

 3    airfare for you and Kathryn for you to come up on that

 4    trip?

 5        A   Yes.

 6        Q   You were asked some questions by Ms. Fetterly

 7    about the videotaped interview in a break that occurred

 8    during the taping.

 9            You had also testified that Sharon Krause was

10    present for just the first few minutes of that taped

11    interview and then she left.

12            Do you recall that?

13        A   Yes.

14        Q   Did you talk to Sharon Krause during the break

15    and the taping?

16        A   I don't remember.

17        Q   Do you remember if you saw or talked to Sharon

18    Krause immediately after the videotaped interview

19    concluded that day?

20        A   I believe I did.

21        Q   Do you recall what was discussed?

22        A   I do not.

23        Q   Do you remember hearing any conversation among

24    anybody, whether it's Jim Peters or the video operator

25    or Sharon Krause, about what was going to be done with
```

Plaintiff agrees that line 6 through page 109, line 1 should be submitted to the jury

```
 1   the videotape when the interview ended?
 2        A   I don't remember.  I don't recall.
 3            MR. BOGDANOVICH:   Thank you, Ms. Spencer.
 4   That's all I have.
 5            THE WITNESS:   You're welcome.
 6            MS. FETTERLY:   Ms. Zellner?
 7            MS. ZELLNER:   I've got a few questions.
 8            MS. FETTERLY:   Do you want to take a --
 9            THE WITNESS:   (Witness shakes head.)
10            MS. FETTERLY:   The witness said she doesn't need
11   a break, Ms. Zellner, so --
12            MS. ZELLNER:   Does or does not?
13            MS. FETTERLY:   Does not.
14            MS. ZELLNER:   Okay.   Good.
15                      EXAMINATION
16   BY MS. ZELLNER:
17        Q   Ms. Spencer, would you tell me -- identify for
18   the record all of the documents that you reviewed before
19   today's deposition?
20        A   Let's see.   There was a couple -- the letter
21   that I wrote for my son.   That was 19.   Exhibit Number
22   11, the Utility Report from the Sheriff's Office.
23        Q   Anything else?
24        A   Give me a moment, please.
25        Q   Yeah, you cut off.   I just heard Exhibit 11 and
```

```
 1    that was it.

 2          A    That's it so far.  I'm reviewing the rest.

 3          Q    Just take your time.

 4          A    The letter that I wrote for my son.

 5          Q    Exhibit 19?

 6          A    That would be Exhibit 19.

 7          Q    Right.

 8          A    The Exhibit 26, just today.  And I believe

 9    that's all that I can -- that I can see.

10          Q    Now, tell me:  The documents that you reviewed,

11    who provided you with those documents?

12          A    Patricia Fetterly.

13          Q    And when did she provide you with the documents?

14          A    When we met last night.

15          Q    Tell me about your meeting last night.  About

16    what time did you meet?

17          A    It was about 10:30.

18          Q    And where did you meet?

19          A    In the hotel lobby where she was staying.

20          Q    How long did the meeting last?

21          A    Until about 1:00 o'clock.

22          Q    I want you to tell me about what was discussed

23    in that meeting.

24          A    Just that -- what to expect today.

25          Q    What were you told?
```

1          A   That -- who all would be present.

2          Q   Okay.

3          A   And that questions would be asked and then

4    everybody who was also present, the other attorneys,

5    would be given the opportunity to also ask questions of

6    me.

7          Q   What else?

8          A   I -- I don't know.

9          Q   Did you say you met from 10:30 p.m. until 1:00

10   a.m.?  Did I understand you correctly?

11         A   Yes.

12         Q   You met for two and a half hours.

13             Did you review the police reports with

14   Ms. Fetterly?

15             MS. FETTERLY:  Are you -- are you suggesting

16   other than Exhibit 11, just so we're clear?

17             MS. ZELLNER:  I don't know.  I mean, I don't

18   what she reviewed.  She can just tell me.

19   BY MS. ZELLNER:

20         Q   Did you review the police reports with

21   Ms. Fetterly?

22         A   I did not.  I don't want to review anything -- I

23   don't want to be here, just so that you know.  I want --

24   I did not want to do any more than I had to do.

25         Q   I understand.  I just want to know about the

```
 1    two-and-a-half-hour meeting you had with Ms. Fetterly.

 2            So my specific question was, did you review any

 3    police reports when you were with Ms. Fetterly?

 4        A    Just Exhibit 11.

 5        Q    Did you review Exhibit 19?

 6        A    Yes.  I said that.

 7        Q    Okay.  And did you review -- you reviewed

 8    Exhibit 26, today?

 9        A    Today, correct.

10        Q    Okay.  So tell me what else you talked about in

11    your two-and-a-half-hour meeting.

12        A    She was just asking some background questions

13    and --

14        Q    What kind of background questions?

15        A    Just about what you heard today.

16        Q    Okay.  Anything else that you remember?

17        A    No.

18        Q    All right.  You don't remember anything else?

19        A    Just about what she said today.

20        Q    So background questions.  Any other subject

21    matter you discussed with her?

22        A    No.

23        Q    So you have no recall of anything else other

24    than what you've told me?

25        A    Correct.
```

```
 1        Q   Let's go back to -- we're going to go back to
 2   some of these reports.  Let's go to the Exhibit 1 --
 3   what we marked as Exhibit 1.  It's the initial report on
 4   August 29th, 1994.
 5        If you could get that report in front of you.
 6        A   I have it.
 7        Q   Okay.  On the third page of that report -- let
 8   me let you turn to page 3.
 9        A   They're all marked page 1.
10        MS. FETTERLY:  Just so the record is clear,
11   Ms. Zellner, on the copy of this report that's been
12   marked as Exhibit 1.  There's some handwriting on it.
13   We've had this come up in other depositions.  There's
14   also handwriting on some of the other police reports you
15   might refer to.  I just want to just state that for the
16   record and make that clear.
17        MS. ZELLNER:  I think we've clearly established
18   that the handwriting doesn't belong to anyone that's
19   been identified yet in the case.  I'm not going to ask
20   her about the handwriting.
21        MS. FETTERLY:  I just want to clarify that the
22   documents that I think you sent over for this
23   deposition, some of those do have handwriting.  But with
24   that --
25        MS. ZELLNER:  Did you get that cleared then?  Is
```

```
 1    there anything else you want to say about the

 2    handwriting?

 3              MS. FETTERLY:  No.

 4    BY MS. ZELLNER:

 5         Q   Okay.  Ms. Spencer, your daughter reported

 6    that -- in this initial interview with Detective Flood

 7    that one time while her dad was hunting, Kathryn said

 8    that her mom wanted her to rub her titties and peepee.

 9              Do you see that?

10         A   I am not finding it.

11         Q   It's on page -- it's the third page of the

12    exhibit.  So there's one, two, and then there's three.

13    And there's a paragraph that's indented.  It's about ten

14    lines long.

15         A   Where it says "On Friday night"?

16         Q   Yes.

17         A   Okay.

18         Q   And if you -- at the end of that paragraph,

19    three lines up from the bottom, "One time while her dad

20    was hunting"?

21         A   Okay, I see it.

22         Q   Did that happen?  Is that a true statement?

23         A   No, it is not.

24         Q   So you would agree with me that Katie, in her

25    very first interview with Detective Flood, was not
```

1  | accurate; would you not?

2  |     A   I don't know.  I wasn't -- I didn't hear the

3  | interview.  I wasn't there.

4  |     Q   Well, if Katie said that, is that a true or

5  | false statement?

6  |     A   This is a false statement.

7  |     Q   So, then, if you would go two more pages, same

8  | exhibit, Exhibit 1.

9  |     A   I have -- can I ask a question?

10 |     Q   Actually, I'd rather that you could just answer

11 | my question.

12 |     A   Okay.

13 |     Q   But certainly if you need clarification, I

14 | will --

15 |     A   I do need clarification on this statement.

16 |     Q   That's fine.

17 |     A   When she said "One time while her dad was

18 | hunting, Kathryn said that her mom wanted to rub her

19 | titties and peepee," I don't know what mom she's

20 | referring to because she called Shirley "Mom" also.

21 |     Q   Okay.  But certainly that doesn't apply to you,

22 | right?  That incident never happened?

23 |     A   It does not apply to me.

24 |     Q   Okay.  And then let's go to -- let's go to the

25 | very -- let's go to the next page -- at the top where it

1    starts -- it said, "She just kept insisting it was lots

2    of times."

3         A    I'm there.

4         Q    Okay.  Then let's go -- let's go down to the

5    second paragraph from the bottom on that page.  The one

6    that starts "At this point."

7         A    Yes.

8         Q    Okay.  It says, "At this point I was concerned

9    for the welfare of the children.  And it was possible

10   that the mother was living with another man and that man

11   was the one involved in the molest."

12             Do you see that?

13        A    I do.

14        Q    Is that a true statement?  Were you living with

15   anyone else at that time?

16        A    I never lived with another man and there was no

17   man in the house at that time, no.

18        Q    All right.  So, then, let's go to -- a little

19   bit farther in the report.  Let's go to the next page

20   and then the following page, which ends with a short

21   paragraph.

22        A    Yes.

23        Q    Matt is being interviewed at that point.  Are

24   you with me?  It says, "I made contact with Matthew."

25        A    Yes.

1    Q  Okay.  At the end of that paragraph, it says,

2  referring to Matt, "He also indicated that his sister

3  had not told him anything about this in the past but

4  indicated she does tell stories and change her stories a

5  lot.  That's usually to get out of trouble."

6       My question is, would that be -- is that an

7  accurate statement that Matt made?  We're assuming he

8  made this statement.  But would that be accurate?

9    A  I don't recall my daughter telling stories.

10  We're talking about a long time ago.  But as far as

11  making up stories, nothing like this.

12    Q  Okay.  But we just -- a few minutes ago, I just

13  read you a statement that Kathryn referred to her mother

14  as wanting her to rub her titties and peepee.  So --

15    A  The word was "mom"?

16    Q  Yeah, it is "mom."

17    A  And she called both of us, Shirley and I, "Mom."

18  So I don't know what mom she's referring to.

19    Q  If she's referring to you -- I think you said

20  that wouldn't be true.  So that would be an example of

21  making up a story?

22    A  Unless she was talking about Shirley.

23    Q  Again, we don't know if that happened with

24  Shirley, right?

25    A  Correct.

1      Q   Okay.  So then let's go to the next page, and

2   we're still on the Flood report.  It starts "After

3   interviewing the children."

4      A   Yes.

5      Q   Okay.  If we go down to the indented paragraph,

6   the third paragraph, and it's prefaced by saying "The

7   following is a brief summary of the information given by

8   DeAnne Spencer."

9      A   Yes.

10      Q   Do you see that before the paragraphs are

11   indented?

12      A   I do.

13      Q   It says, "I have not had any men come and stay

14   at the house for quite a long time.  There was a man

15   that was there and bothered the children so I would not

16   let a man stay in the house any longer.  The children

17   are never left alone with a man while they're with me."

18           Is that a true statement, that there was a man

19   who had come to the house and bothered the children?

20      A   There was a man that I dated briefly.  And he

21   was at the house one evening, I believe it was, and

22   Matthew was doing homework.  And I did not like the way

23   he was working homework with him.

24      Q   What was that man's name?

25      A   Dan Davidson, I believe.  I can't -- I believe.

1        Q   His name was what?

2        A   Dan Davidson, I believe.

3        Q   Dan Davidson?

4        A   Yes.

5        Q   All right.  If we go to Exhibit 2, that's the

6    Utility Report.  Let me know when you get there.

7            MR. BOGDANOVICH:  Counsel, for my benefit and

8    Mr. Freimund's here in Olympia, we didn't get copies of

9    the things that you marked as exhibits.                    *Unnecessary*

10           Can you try to reference things by date and     *information*

11   author also?

12           MS. ZELLNER:  Yes.  This is the Krause -- let me

13   get the exact date.  It's Bates stamp -- it starts with

14   Bates stamp 30, and it's the Utility Report of Sharon

15   Krause.  It's dated 7/14/84 to 8/26/84.

16   BY MS. ZELLNER:

17       Q   Okay.  Ms. Spencer, if would you go to page 36

18   of Exhibit 2.

19           MS. FETTERLY:  Did you say 36, Counsel?

20           MS. ZELLNER:  Yes, 36 of Exhibit 2.

21           MS. FETTERLY:  Are you referring to the little

22   Bates numbers?

23           MS. ZELLNER:  Yeah, I am.

24           MS. FETTERLY:  They are these little numbers

25   down here.

```
 1              THE WITNESS:   Okay.
 2              MS. ZELLNER:   The little numbers on the bottom.
 3              MS. FETTERLY:   Because there aren't 36 pages in
 4    this document.
 5              MS. ZELLNER:   No.   There's 36 pages up to that
 6    point in the exhibits or you can look at page 7 of 12.
 7    Either way.
 8              THE WITNESS:   Okay.
 9    BY MS. ZELLNER:
10       Q   Okay.   If we go down to the third full
11    paragraph -- it's an interview with Shirley Spencer.
12    And it states "Shirley Spencer indicated that what she
13    knew of the children's natural mother, DeAnne, led her
14    to believe that the children were somewhat neglected.
15    She talked of their clothing being worn out and dirty
16    when they came to visit.   She also mentioned that the
17    children cried when they had to return to Sacramento to
18    live with their mother."
19              Do you see that statement?
20       A   Yes.
21       Q   Do you agree with the statement that Shirley
22    Spencer made to the authorities about your care of your
23    children?
24       A   I do not.
25              MS. FETTERLY:   Ms. Spencer, the reporter just
```

1    indicated -- or the videographer -- there's five minutes
2    left on the tape.
3    BY MS. ZELLNER:
4        Q    I'm sorry.  You say that you do not.  Were your
5    children, in fact -- was their clothing worn out and
6    were they dirty when they visited Shirley Spencer?
7        A    Never.
8        Q    Do you have -- as you sit here today, do you
9    have any idea why Shirley Spencer would make up
10   something like that?
11       A    I do not.
12       Q    Would you say that -- were you and Shirley
13   Spencer on good terms?
14       A    I did not have a relationship with Shirley
15   Spencer.  I met her once.
16       Q    Let's go to Exhibit 4, which is another Utility
17   Report of Sharon Krause.  It's dated 12/8/04.  It's
18   seven pages long.  And I'd like you to go to page 2 of 7
19   or Bates stamp 44.
20       A    Okay.
21       Q    If you go down three paragraphs -- this is an
22   interview with Sharon Stone.  It says, "She then
23   indicated that when the children arrived for summer
24   visitation in 1981, Kathryn had a sore apparently on the
25   labium which necessitated Karen applying medication to

 1 | it.  She advised me that Ray was upset about the sore
 2 | and had called family court or something because of it."
 3 |       You were aware of the sore, correct?
 4 |       A  No, I was not.
 5 |       Q  Okay.  Were you aware that Ray had called family
 6 | court to make some type of report?
 7 |     . A  No, I was not.
 8 |       Q  Okay.  Go down to the next paragraph.  "Stone
 9 | also advised, when the children visited in December of
10 | 1981, they had lice."
11 |       Is that true, that in December of 1981, the
12 | children had lice?
13 |       A  Not that I'm aware of.
14 |       Q  So if Karen Stone reported that, that would be
15 | untrue?
16 |       A  They didn't have them when they left my house.
17 |       Q  Okay.  If we go to page 3 of 7, the next page,
18 | Bates stamp 45 --
19 |       A  Okay.
20 |       Q  Okay.  And the first full paragraph starts,
21 | "During the time I talked with Stone, she made several
22 | negative statements regarding DeAnne Spencer and when
23 | she knew of her."
24 |       Do you see that statement?
25 |       A  I do.

```
 1        Q  Okay.  And if you could read through that
 2   paragraph, I want to ask you about that paragraph.
 3        A  I've read it.
 4        Q  Do you remember an incident in the presence of
 5   Sharon -- Karen Stone picking up the children and saying
 6   that you were too hot and tired to hug them?
 7        A  I never met Karen.
 8        Q  When she describes you as a very vindictive
 9   woman, do you know why she would think that?
10        A  I do not.
11        Q  She also describes the children as being dirty
12   and unkempt when they came to visit.
13           Do you deny that?
14        A  I deny that.
15        Q  So if Shirley Spencer and Karen Stone have
16   reported that your children were dirty and unkempt, that
17   is untrue, correct?
18        A  Correct.
19        Q  Okay.  Let's go back to the medical report that
20   we talked about earlier, Katie's medical report
21           We've marked that as Exhibit 3.  Let me know
22   when you've got to that point
23        A  I have it.
24           THE REPORTER:  Counsel --
25           MS. ZELLNER:  Yes.
```

Defts. object based on Plaintiff's failure to timely designate this testimony pursuant to LCR 31(e).

Plaintiff's response - Plaintiff did timely designate this testimony, subject to the

Court's rulings on MIL. Defendants also are not prejudiced.

Deposition of Deanne Spencer                    SPENCER VS. PETERS

1    THE REPORTER:  -- the videographer only has

2    one minute left of tape.  Is this a good time for her to

3    change tape?

4         MS. ZELLNER:  Yeah, that will be great.  How

Objection -Unnecessary information

5    long will it take?

6         THE VIDEOGRAPHER:  A couple seconds.  We're

7    going to go off the record.  It's 12:39 p.m.

8         (Off the record.)

9         THE VIDEOGRAPHER:  Okay.  We're back on the

10   record.  It's 12:40 p.m.

11   MS. ZELLNER:

12        Q   Ms. Spencer, if you would go to the second page

13   of the medical report.

14        A   Yes.

15        Q   Do you see the drawings of the child?

16        A   I do.

17        Q   Let's look -- am I correct that your medical

18   training is limited to dialysis; would that be correct?

19        A   I don't have medical training.  I worked in the

20   office of a dialysis clinic.

21        Q   Oh, I misunderstood.  So did you have an

22   administrative job?

23        A   I did.

24        Q   Okay.  If you look at the writing on the left

25   side of the second page of the medical report of your

Deft. object, Id. (see p. 123).

Plaintiff's response, Id. (see p. 123).

Plaintiff has submitted a motion in limine seeking to bar Ms. Spencer from testifying about the Katie Spencer medical exam, see dkt. 202 at 21-22.  If that motion is denied, plaintiff will supplement highlighting seeking to admit page 124, line 12 to page 126, line 25

Golden State Reporting & Video Services (866) 324-4727          Page: 124

Deposition of Deanne Spencer                SPENCER VS. PETERS

1      daughter Kathryn, you notice that it says "pelvic."

2                Do you see that?

3          A    I do.

4          Q    And it says "No erythema."

5                Do you know what that is?

6          A    I do not.

7          Q    That is redness in the pelvis.   Is it your

8    testimony that Kathryn's pelvis was not examined?

9          A    That's correct.

10         Q    So if Dr. McGee wrote that the hymen was intact,

11   it's your testimony that she never examined Kathryn to

12   determine if the hymen was intact, correct?

13         A    That's correct.

14         Q    And if Dr. McGee documented "No lacerations in

15   the pelvis," it's your testimony that she never examined

16   the pelvis?

17         A    That's correct.

18         Q    Okay.   And if Dr. McGee documented "No swelling

19   in the pelvis," it's your testimony that she never

20   examined the pelvis for swelling, correct?

21         A    Correct.

22         Q    Okay.   So if Dr. McGee contends that she did do

23   a pelvic examination, she's incorrect, right?

24         A    Yes.

25         Q    Let's go down a little farther where it

Deft. object,
Id.

Plaintiff's
response, Id.

Deposition of Deanne Spencer                    SPENCER VS. PETERS

```
 1    indicates "Findings."   If we go down to the
 2    "Cultures" -- one, two, three, four, five -- six lines
 3    down.   "Cultures for gonorrhea performed."
 4          Do you see that?
 5      A   I do.
 6      Q   And you note that there were -- this indicates
 7    cultures were taken from the genitalia.
 8          Do you see that?
 9      A   I do.
10      Q   And you're denying that happened?
11      A   I am denying that.   I also see that it says "Not
12    done."
13      Q   No.   That isn't referring to that.   That's the
14    VD test.   So it's marked "genitalia," "throat" and
15    "anus."   And then on the "VDRL," it's marked "Not done."
16          So if Dr. McGee will testify that there were
17    cultures done for the genitalia, throat and anus, you're
18    denying that cultures were taken from the vaginal area,
19    correct, and the anus?
20      A   Correct.
21      Q   And do you have any explanation why Dr. McGee
22    would write up inaccurate medical findings on her exam?
23      A   I do not.   You would have to speak to the
24    doctor.
25      Q   I have.   All right.
```

Deft. object,
Id.

Plaintiff's
response, Id.

```
1              Let's go to Exhibit 11, which is the Sharon

2    Krause report dated 10/18/84.  I want you to go, if you

3    would, to page 8 of 22.

4        A   Okay.

5        Q   If you go to the first full paragraph, which

6    extends to the bottom of the page.  I want you to come

7    down, if you would, about seven lines, where it says "I

8    asked her if she knew" -- actually, let's start at the

9    top.

10           "DeAnne Spencer related to me that the summer

11   after she and Ray Spencer split up, in 1981, she

12   developed a case of herpes."

13           Do you see that?

14       A   I do.

15       Q   And that's true, correct?

16       A   Correct.

17       Q   Okay.  "She indicated her doctor told her it was

18   one of the worst he had seen."

19           Am I reading that correctly?

20       A   Yes.

21       Q   And DeAnne Spencer indicated that the sore she

22   observed on Katie's labium reminded her a lot of a

23   herpes blister."

24           Now, maybe I misunderstood, but I thought you

25   had said that you weren't aware of that sore; am I
```

Objection -Testimony from p. 127, line 128, line 16 is subject to motion in limine, see dkt. 202 at 6.
-Hearsay -FRE 402 and 403.

1  right?

2          MS. FETTERLY:  Object to the form.  Which sore?

3          MS. ZELLNER:  Herpes blister.

4          MS. FETTERLY:  Again, which -- there may be a

5  question about the time period.

6          With that, you can answer if you can.

7          THE WITNESS:  I don't know if there were two

8  sores.  The sore that you spoke of where Karen Stone

9  talked about, I was not aware of that; however, there

10 was a sore I spoke about in one of my statements that I

11 had taken Katie to the doctor and said it was a viral

12 infection and I had -- that's the sore I was referring

13 to here.

14 BY MR. ZELLNER:

15     Q  Okay.  And are you aware of whether or not your

16 ex-husband, Ray Spencer, had been tested for herpes at

17 any time in that time period up to 1985?

18     A  I do not know.

19     Q  Now, if you would turn to the next page, page 9

20 of 22 --

21     A  I'm there.

22     Q  Okay.  Three paragraphs down.  "During the phone

23 conversation I had with DeAnne Spencer prior to going to

24 California, she had mentioned that while they were

25 living in Los Angeles, a neighbor girl named Rhonda

Objection to testimony related to Rhonda Short (p. 128-129) for reasons stated previously and Dkt. 202 at 2-3

1    accused Ray of raping her."

2           Do you see that?

3       A  I do.

4       Q  "I asked her if she could be more specific about

5    what that incident involved.  DeAnne Spencer related the

6    following:  They lived in Los Angeles for approximately

7    six years and at that time had neighbors named Jerry,

8    Roxie and Rhonda."

9           Is that an accurate statement?

10      A  Yes.

11      Q  Okay.  "She indicated Rhonda was 19 years old

12   when the incident occurred; however, Rhonda was," quote,

13   "emotionally very, very immature," end quote.

14          Did I read that correctly?

15      A  Yes.

16      Q  And you testified, if I understood a little

17   while ago, that Rhonda was 17?

18      A  I did.

19      Q  Do you deny making the statement that Rhonda was

20   actually 19 years old?

21      A  I do not deny it.

22      Q  Did your father molest your daughter, Katie

23   Spencer?

24      A  My father?  No.

25      Q  Was there -- did your stepfather molest Katie

1   Spencer?

2        A   There was an incident with my stepfather.

3        Q   Did that occur?

4        A   When she was 13.

5        Q   And what's your understanding of that incident?

6        A   She just -- my understanding is that she was

7   sleeping on the couch and there was a supposed cat fight

8   outside and that he apparently came out.  And when she

9   woke up, he was sitting on the couch next to her with no

10  clothes on, rubbing her face and kissing her cheek and

11  telling her "I know I shouldn't do this, but you're so

12  beautiful."

13       Q   Your daughter has testified that the incident

14  actually occurred in her bedroom and that your

15  stepfather was naked and actually lied (sic) on top of

16  her and kissed her neck.

17            Would that be your understanding of what

18  happened?

19       A   That's not what she related to me when it first

20  happened, the day after it happened when I picked her

21  up.

22       Q   And why was this incident not reported to the

23  police?

24       A   I asked my daughter what she wanted to do about

25  it, if she wanted me to -- to talk to him, if she wanted

```
 1   me to report it to the police, if she wanted me to --
 2   what she wanted me to do.  She said, "No.  Just forget
 3   about it.  Just forget about it."
 4       Q  And when did -- is it Clifford Day, your
 5   stepfather?
 6       A  Yes.
 7       Q  When did he become your stepfather?
 8       A  19- -- I don't know.  They've been married, I
 9   think, 35 or 36 years.
10       Q  And was Clifford Day around Katie when she was
11   under the age of five?
12       A  He was.
13       Q  And was he in your home frequently?
14       A  No.
15       Q  Was he in your home at all?
16       A  No.  We were always at my mother's house.
17       Q  But he was around Katie at your mother's house?
18       A  Yes.
19       Q  Now, going to Exhibit 11, that is the 10/18/84
20   Krause report.  If you could go to page 3 of that
21   report.
22              MS. FETTERLY:  You said Exhibit 11, Counsel?
23              MS. ZELLNER:  Yes.
24              MS. FETTERLY:  Okay.
25              THE WITNESS:  The one we're on?
```

1          MS. ZELLNER:  Yeah, the one that we looked at

2    before.

3          THE WITNESS:  Okay.  Okay.

4    BY MS. ZELLNER:

5        Q  If you look at the first full paragraph, it says

6    "DeAnne Spencer also related that during the meeting

7    with Detective Flood and also with Katie's therapist,

8    Katie apparently was not indicating anymore that there

9    had been something sexual between her and her father."

10         Do you see that statement?

11       A  I do.

12       Q  And I'm assuming that's a correct statement when

13   you made it?

14       A  Yes.

15       Q  If we go to -- you had testified about a hot tub

16   incident with your son, Matt?

17       A  Yes.

18       Q  And tell me, again, in that incident what Matt

19   related to you.

20       A  When I finally went out and sat down in the hot

21   tub with him, the first thing he said was, "Mom" --

22   "Mommy" -- "Mommy" or "Mom" -- "some of daddy's friends

23   did that, too."

24       Q  And when did this happen?

25       A  The night before the two attorneys, Jim Rule and

Objection
-FRE 402,
403, and
802.

1  Jim Peters, came up.

2      Q   Now, was that in May of 1985?

3      A   I believe so, yes.

4      Q   Okay.  If we look at -- okay.  Do you recall

5  testifying about the hot tub incident or actually giving

6  a statement about the hot tub incident at any time?

7      A   When I met with the two attorneys, I told them

8  that -- the next day what he had said to me.

9      Q   Okay.  Do you recall on 10/28/09 making a

10 statement about the hot tub?

11     A   I don't know about the date.

12     Q   You feel quite certain that the hot tub incident

13 occurred prior to the Jim Rule/Jim Peters meeting?

14     A   Yes, it did.

15     Q   You're positive?

16     A   Absolutely.  It was the night before.

17     Q   When you were being asked about smoking or using

18 marijuana, did you ever smoke marijuana out of the

19 presence of your children?

20     A   I did.

21     Q   And tell me just a little bit about your usage.

22 And, of course, we're just focused on this time period

23 in the mid-'80s.  Can you describe that for me.

24     A   Yes.  The first summer they spent with their

25 father, I -- was the first time I tried marijuana.  I

*Continued objection*