1 | did it a couple of times.  And I had gone down to L.A.

2 | to visit with a friend.  And I think we smoked some when

3 | we went out one night, and I had a very scary incident.

4 | And I never touched it again.

5 |     Q  Just -- what was the incident?  Was it just --

6 | you mean your reaction to it, right?

7 |     A  Yes.

8 |     Q  And that was something that made you

9 | uncomfortable, smoking marijuana?

10 |     A  Yes.  And I -- I know that when -- if I'm ever

11 | around any -- that smell at all, it sort of takes my

12 | breath away.  So I have made an assumption that I have

13 | an allergy to it.

14 |     Q  And when do you think was the last time you

15 | smoked marijuana?  If you could give me the year.

16 |     A  '81.  That was the first and last.

17 |     Q  '81?

18 |     A  The summer that they were with their dad was the

19 | first and the last time.

20 |     Q  I think counsel asked you before if you had

21 | dated a black man, and I think you said that you had at

22 | some point in time?

23 |     A  Yes.

24 |     Q  And do you know what the time period of that

25 | relationship was?

Objection
-FRE 402
and 403

1        A   I believe it was the first year I was home.

2   '80 -- either '81 or '82.                          Continued
                                                       objection
3        Q   And how long did that relationship last?

4        A   About six months.

5        Q   What is that gentleman's name, if you remember?

6        A   Chuck Starks.

7        Q   Starks.  Do you know where Mr. Starks currently

8   reside?

9        A   I do not.

10       Q   After your husband, Ray Spencer, pled guilty,

11  did you have any further conversations from that point

12  in time up until today with Sharon Krause?

13       A   I don't recall.  There may have been one phone

14  call.  I don't remember.

15       Q   When Mr. Spencer had its sentence commuted, do

16  you recall if you had a conversation with Sharon Krause

17  in that time period?

18       A   I do not.

19       Q   When do you remember is the last time you spoke

20  to Sharon Krause about this case?

21       A   Years ago.  I mean -- like before or shortly

22  after he was sentenced may have been the last time.  I

23  have not had contact with her.

24       Q   Was that a telephone call?

25       A   I believe so.

1        Q    Did Ms. Krause make the phone call to you?

2        A    I believe so, but I don't recall.

3        Q    Do you remember what was discussed in that

4    conversation?

5        A    No, I do not.

6        Q    Let's go back to the videotape that was made of

7    your daughter Kathryn in December of 1985.

8             You had met the night before the videotape was

9    made or the day before with the prosecutor Jim Peters,

10   correct?

11       A    I believe so, yes.

12       Q    Can you tell me, where did you and Katie meet

13   with Mr. Peters?

14       A    As far as I can remember, it was at the police

15   station.

16       Q    And do you know if it was in the morning,

17   afternoon, evening?

18       A    I can't remember if it was -- I believe it was

19   in the morning before.

20       Q    And how long were you at the police station with

21   Mr. Peters?

22       A    I don't -- I don't recall.

23       Q    Do you recall that Mr. Peters went over Katie's

24   statements with her?

25       A    No, I do not recall that.

```
 1         Q   Okay.  Let's go to what we've previously marked
 2    as Exhibit 26.   That was the transcript that counsel had
 3    talked to you about earlier.
 4         A   I have it.
 5         Q   If you look at page 1, probably about ten lines
 6    up from the bottom where Mr. Peters says "Kind of noisy.
 7    Well, you know what I heard last night.   I heard you
 8    were going to come talk to me today and tell me the
 9    stuff that you came up here to tell me yesterday; is
10    that right?"
11              Do you see that statement?
12         A   Yes.
13         Q   Does that refresh your recollection that the
14    night before that Katie had talked to Mr. Peters about
15    what she was going to tell him about on the video?
16         A   No, it does not.
17         Q   You don't have any recollection of that?
18         A   I do not.
19         Q   Okay.  Do you remember anything that you talked
20    to or Katie talked to Mr. Peters about the day before
21    this interview?
22         A   I do not.
23         Q   And who was your understanding -- because your
24    daughter had already been interviewed a few times.  What
25    was your understanding of why Mr. Peters -- I'm assuming
```

```
 1   the night before he said, "We're going to videotape the
 2   interview," correct?
 3        A   I believe so, yes.
 4        Q   And what was your understanding of why
 5   Mr. Peters wanted to re-interview Katie?
 6            MS. FETTERLY:  Object to form.
 7            You can answer.
 8            THE WITNESS:  I -- I don't know.
 9   BY MS. ZELLNER:
10        Q   She had already been interviewed, correct?
11            MS. FETTERLY:  Object to form.  By whom?
12   Mr. Peters or others?
13            MS. ZELLNER:  Yeah.  By anyone.
14   BY MS. ZELLNER:
15        Q   She's already been interviewed about the
16   incident, correct?
17        A   She had been interviewed about the incident,
18   yes.
19        Q   So you're flown in to see Mr. Peters.  Do you
20   not remember why he told you you were visiting him?
21        A   My understanding was that they were going to
22   videotape Katie.
23        Q   Right.  And I'm just asking you -- I mean, they
24   were going to videotape Katie so that they could listen
25   to her tell the story, correct?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Isn't that right? |
| 3 | A | Yes.  I said yes. |
| 4 | Q | They're creating a record of her telling the |

5   story.  Was that your understanding?

6        A   Yes.

7        Q   Okay.  Now, if we go to page 3 of the -- of

8   Exhibit 26, and you'll see that there's a time on there

9   of 10:00 o'clock.

10           Do you see that?

11       A   Yes.

12       Q   And right above that, it says -- talking to

13   Katie about her therapist Ann.  He says, "Was there a

14   lady in Sacramento?  What's her name?  You told me

15   yesterday, but I forgot."

16           And Katie says "Ann."

17           And then Peters says, "Ann.  That's right.

18   She's the lady that you go to her office once a week."

19           Do you see that text?

20       A   Yes.

21           MS. FETTERLY:  At this point, Ms. Zellner, I'm

22   not going to interrupt your questioning of this witness

23   about this exhibit, but I'm just going to voice a

24   continuing objection to the use of Exhibit 26 because it

25   purports to be a transcript of this interview, but it

```
 1    was not prepared by a certified court reporter, who has

 2    no interest in the outcome of this lawsuit.

 3            With that objection, you can answer.

 4            MS. ZELLNER:   You can make your continuing

 5    objection.

 6    BY MS. ZELLNER:

 7        Q    But I'm asking, Ms. Spencer, do you see the

 8    reference that Mr. Peters says, "You play in her office.

 9    Okay.  And you talk to her about this stuff"?

10            Do you see that?

11        A    I do.

12        Q    And then he says, "Okay.  Well, I heard last

13    night -- I got -- I got a call on the phone from Sharon

14    that you -- that you said you were going to talk to me

15    about it, too; is that right?"

16            Do you see that statement?

17        A    I do.

18        Q    Okay.  Does that refresh your recollection about

19    any conversation with Mr. Peters the night before, the

20    day before?

21        A    No.

22        Q    Okay.  Let's go to page 5.  Midway down on the

23    dialogue, Mr. Peters says, "You talked to Sharon about

24    how important it is for you to tell what happened?

25    Remember how we've got to get your daddy some help so he
```

1    won't do this again to you or anybody else?"

2           Do you see that?

3       A   I do.

4       Q   And was it -- is it a fair statement to say that

5    you believe that your ex-husband, Ray Spencer, needed to

6    get help for this supposed sickness that he had?

7       A   Yes.

8       Q   And do you recall Mr. Peters also telling Katie

9    that "We've got to get Daddy some help"?

10      A   I recall very little about that interview other

11   than my daughter being quiet most of the time.

12      Q   Okay.  If we go to the top of page 6, and it's

13   the first entry by you.  And you say to Katie, "Remember

14   what you told me last night?"

15          Do you see that?

16      A   I do.

17      Q   Do you have any recollection of reviewing

18   Katie's testimony with her the night before?

19      A   I do not.  I was dealing with a migraine

20   headache.

21      Q   Okay.  The night before or during the taping?

22      A   Both.

23      Q   Okay.  Is that something you suffer from?

24      A   Not anymore.

25          THE REPORTER:  I'm sorry, Ms. Zellner --

1          Can you have her repeat that, please?

2          MS. FETTERLY:  The court reporter asked you to

3   repeat the question, Ms. Zellner.  She didn't get it.

4   BY MR. ZELLNER:

5          Q   Had you been diagnosed with migraine headaches

6   at the time of the videotaped interview?

7          A   Not diagnosed.

8          Q   Were you being treated for migraines?

9          A   Just with -- by myself.

10          Q   If we look a little further down on page 6, it's

11   the next statement by you.  You say -- what it starts

12   with, "Remember how I helped you last night?"

13          Do you see that entry?  It's on page 6.

14          A   I'm looking.  I see it.

15          Q   Do you remember referring to what had been done

16   last night, saying "Remember how you helped me last

17   night?"

18          Do you remember saying that to your daughter?

19          A   No.

20          Q   Okay.  Let's go to page 7 at the top right above

21   the "25."

22          Do you see the "25"?

23          A   I do.

24          Q   It states "So you know it's important to always

25   tell the truth."  And Katie says, "Stop saying that.  I

```
 1    hate that word.  It's dumb."
 2             Do you recall that statement?
 3         A  I see it.
 4         Q  And if you go a little further down, Mr. Peters
 5    says, "Well, let's see, this is your daddy and this is
 6    Katie.  Show me what happened last summer.  Okay?  Then
 7    we can stop all this."
 8             Do you see that statement?  Do you see that?
 9         A  I'm looking for it.
10         Q  Okay.  It's right underneath the "25."
11         A  I see it.  I see it.
12         Q  And your daughter, Katie, says, "Nothing
13    happened last summer."
14             "Mr. Peters:  Nothing happened?"
15             "DeAnne:  Okay.  Deep breath."
16             "Katie:  Mom, nothing happened last summer."
17             Do you see those statements?
18         A  Yes.
19         Q  You remember in the interview that Katie made
20    those statements, don't you?
21         A  I remember in the interview that Katie said very
22    little.  Mostly it was head shake.  She was very
23    resistant to say -- use words.
24         Q  Okay.  But do you doubt that Katie said in this
25    passage "Nothing happened last summer"?
```

Deposition of Deanne Spencer                SPENCER VS. PETERS

```
 1        A   I can't respond to that because I do not recall
 2   this -- these many words being said.   Very little was
 3   said by my daughter.  So I cannot recall something like
 4   that.   That's pretty wordy.
 5        Q   Do you think that these words were not said in
 6   that interview?
 7        A   As I've stated, my recollection is very little
 8   was said by my daughter in this interview.
 9        Q   When was the last time you reviewed this
10   videotape?
11        A   I think the only time I saw it was on the 20/20
12   show.
13        Q   And they didn't play the full video, correct?
14        A   I don't know.
15        Q   So it would be a fair statement to say that's
16   the only time that you've seen the video?
17        A   That I recall.
18        Q   Now, if we go down further on 7, the quote from
19   you that's up -- not the bottom of the page but the one
20   that's right above it.   "You don't have to say anything.
21   Just move the dolls."
22            Do you see that statement?
23        A   I do.   I do.
24        Q   Did you make that statement?
25        A   I don't recall.
```

1          Q   You don't know one way or the other?

2          A   I do not.

3          Q   If you go to the top of page 8, the second --

4    third time your name is mentioned above the number 30.

5    It says, "You can hold my hand if you need to.   Okay?

6    You want to use my hand.   Okay?   Tell me what to do.

7    You tell me what to do and then we're gonna get this all

8    over with.   All right?   Cause we can do it, right?"

9          Do you see that passage?

10         A   I do.

11         Q   Would it be a fair statement to say that you

12   wanted your daughter to describe the abuse for

13   Mr. Peters so that you can get it all over with?

14         A   I would not say that's a fair statement.

15         Q   Now, if we go to page 10.

16         A   I'm there.

17         Q   In the middle of the page you're quoted as

18   saying, "Can you show us with the doll."   And you see

19   Katie says "Nuh-uh."

20         Do you see that?

21         A   Yes.

22         Q   Okay.   And would you agree with me at that point

23   that Katie wasn't really demonstrating anything with the

24   doll?

25         A   I don't recall.   It was -- I don't recall a lot

1    about the interview.  I just know that she wasn't saying

2    a lot.

3         Q  If we go down a little farther, Mr. Peters says,

4    "How about with my finger?  That's just a little finger.

5    Or show me with your finger."  And Katie says "No."  You

6    say "How about mine?"  Katie says "No."

7            Do you see that passage?

8         A  I see it.

9         Q  Okay.  And do you have any contrary recollection

10   that Katie was at that point in time unwilling to show

11   anything with Mr. Peters' finger or your finger?

12        A  I don't know.  I -- like I said, I recall very

13   little about the interview, but there were very little

14   words said.

15        Q  So you would -- you think that this transcript

16   is putting in words that weren't said?

17        A  I'm not comfortable with this transcript.

18        Q  Okay.  But you're comfortable with the video,

19   right, the words on the video?

20        A  I've only seen a portion of the video.  I don't

21   know what words are being said.

22        Q  But when you saw it, it didn't appear to be

23   altered, did it?

24        A  How would I know?  No.  I don't know.

25        Q  Page 11, at the top.  Now, you had told us that

1    there was a man running the video; is that correct?

2         A   Correct.

3         Q   During this interview?

4         A   Yes.

5         Q   And you recall -- you said that he was wearing a

6    uniform?

7         A   Police officer's uniform, yes.

8         Q   Okay.   And Peter specifically asked, "You want

9    Jeff to leave.   Jeff, the man standing right over there,

10   right?"

11            Do you see that question?   It's about eight down

12   from the top?

13        A   Yes.

14        Q   And then you say, "Do you want him to go out?

15   If he goes out, will you show us?"   Then you say, "Okay.

16   Then let's get brave one more time.   Squeeze my hand,

17   come on.   You can do this."

18            Do you see that?

19        A   I do.

20        Q   And would you agree with me, certainly in this

21   transcript, there's no indication of Katie saying that

22   she wants Jeff to leave the room.   Just in this

23   transcript.

24            Do you see any indication of that?

25        A   Not in this transcript.

1        Q   Okay.   Do you believe that Katie signaled or did

2   something that will show us on the video she wanted Jeff

3   to leave the room?

4        A   I can only respond to her behavior before and

5   after.

6        Q   Her behavior before and after what?

7        A   Before, when he was in the room; and after, when

8   we moved to the other room without him.

9        Q   And you made -- after this interview, have you

10   ever made a statement to anyone at any time that the

11   reason Katie got more comfortable was because Jeff left

12   the room?

13        A   I don't know if I ever made that statement, but

14   it was my conversation that she was much more at ease

15   and comfortable when the uniformed police officer left

16   the room.

17        Q   And in your journals, would I find that you

18   noted that in your journals?

19        A   I do not know.   I haven't looked at my journals

20   in a good ten years, maybe.

21        Q   Those were written at the time of these

22   incidents, correct?

23        A   Yes.

24        Q   So would I expect that if something like that

25   that happened, that would be in your journal?

```
 1        A   I don't know.   Probably.   Could be.
 2        Q   Would there have been any reason not to put in
 3    something that's significant?
 4        A   Say that again, please.
 5            MS. FETTERLY:   Object as to form.
 6            You can answer, if you can.
 7    BY MS. ZELLNER:
 8        Q   Saying that -- you do remember all these years
 9    later that Katie was uncomfortable with the uniformed
10    policeman.
11            Is that what you're telling us?
12        A   I am.
13        Q   And you kept journals apparently at the time of
14    these various incidents; isn't that correct?
15        A   I kept some, yes.
16        Q   And would there be any reason in the journal
17    that we wouldn't see reference to Jeff leaving the room
18    and Katie being uncomfortable?
19        A   It depends on how detailed I was writing.
20    Again, I was dealing with a migraine headache.   And I
21    don't know if I brought my journals with me up there.
22        Q   Was your memory better today than it was back
23    then?
24        A   I beg your pardon?
25        Q   Is your memory better today than it was back
```

Deposition of Deanne Spencer                    SPENCER VS. PETERS

```
 1    then at the time of the incident?
 2         A   Is my memory better now than back then?
 3         Q   Right.
 4         A   I don't know.
 5         Q   Right.   Let's go to page 12 right before the
 6    break where it says "Taping stops at 10:46 a.m."
 7         A   Uh-huh.
 8         Q   Do you see that?
 9         A   I do.
10         Q   And you see that Peter says, "Okay.   I think --
11    I think we should take a break now.   I think you're
12    getting pretty tired, huh?   Let's take a break and go
13    get a drink of water or something.   All right?"
14             Do you see that?
15         A   I do.
16         Q   And was your daughter provided with anything to
17    drink?
18         A   I believe we may have gotten sodas.
19         Q   And where do you remember you went to go get the
20    sodas?
21         A   I don't know if it was just a vending machine in
22    the police department.
23         Q   And then where did you -- where did you sit?
24    Did you go back in the room, or did you sit in another
25    room?
```

Deposition of Deanne Spencer                    SPENCER VS. PETERS

```
1           A   I don't remember.
2           Q   And what was done with the dolls on the break?
3           A   I --
4           Q   If you remember.
5           A   I don't remember what was done with the dolls,
6    no.
7           Q   Now, you said, after the break, Katie was more
8    cooperative, right?
9           A   Yes.  She was more at ease.
10          Q   Now, if we go to page 13 of Exhibit 26, at the
11   top, you see Mr. Peters says, "Okay.  What else did Ray
12   do?"
13          A   I see.
14          Q   And then he says, "Okay.  What else?  Anything
15   else?"  And then Katie says "Forgot that last thing."
16              Do you see that statement?
17          A   I do.
18          Q   And do you have any reason to doubt that Katie
19   made that statement, "Forgot that last thing"?
20          A   As I recall, my daughter said very little.  So
21   when you ask me to refer to these statements that she
22   made, I don't recall her making very many statements
23   other than, yes, or no or shaking her head.  So I
24   can't --
25          Q   But you understand that we have the tape, and we
```

1    have the words on the tape, correct?

2         A    I do now.

3         Q    If you look at page 14, and if you come down

4    about probably 13 lines, it says "Peters" --

5         A    Okay.

6         Q    -- "How come you told me they were upstairs?"

7    And he says, "Huh?   Did you forget?"   And Katie answers,

8    "Yes."   Peter says, "Okay.   That's fine.   Well, do you

9    remember -- before this time that you just told me

10   about, did Ray do that to you before?"

11        Do you see that statement?

12        A    I do.

13        Q    Now, do you remember that when the -- when the

14   break was taken that there was discussion between Peters

15   and Katie of what she was going to say?

16        A    There was no discussion in my presence about

17   what Katie was to say.

18        Q    You're 100 percent positive of that?

19        A    I was very cautious about what was said around

20   my children.   And there was no discussion about what to

21   say or anything other -- that I recall.

22        Q    Okay.   When you say "in your presence," isn't it

23   true that on the break that Sharon Krause also rejoined

24   you, your daughter, and Peters for a few minutes?

25        A    I believe so.

```
 1        Q   And so did you observe your daughter having any
 2   interaction with Sharon Krause?
 3        A   Other than "hi" conversations?
 4        Q   I am correct that Sharon Krause was with you and
 5   Mr. Peters and Katie on the break, correct?
 6        A   I believe so.
 7        Q   This break takes over an hour.   Do you recall
 8   that?
 9        A   I do not.
10        Q   Why do you still use your ex-husband's last
11   name?
12        A   When I divorced their father, and especially
13   after this incident occurred, I did not want my children
14   to think I was divorcing myself from them and that I was
15   not wanting to identify with who they were, which was a
16   Spencer.  So I kept his last name.
17        Q   So even though he's been convicted of these
18   terrible crimes, you decided to keep his last name?
19        A   If I kept his last name, then my children would
20   not think, in my opinion and in my belief -- if I kept
21   his last name, then they couldn't be bad people because
22   my name was their name.  And that if -- even though
23   their father, who I told them was ill and needed help --
24   I did not want them to think that they would also be
25   ill.
```

Object
Dpt. 201,
p. 3-4

```
 1        Q   Okay.   When you leave after Katie's
 2   videotaped -- actually, when you go back in the room for
 3   the second part of the videotaping, do you move to a
 4   different location?
 5        A   I believe we moved to a different room.
 6        Q   Was that -- or were you led to believe that was
 7   Sharon Krause's office?
 8        A   I don't recall.
 9        Q   Was it an office-like room, or was it more of a
10   conference room?   Do you remember?
11        A   I believe it was more like a small conference
12   room with a table and some chairs.
13        Q   Do you remember; were you upstairs or downstairs
14   in the Sheriff's building?
15        A   I don't recall.
16        Q   And when the video is concluded, I'm sure that
17   you have a brief discussion with Mr. Peters.   Do you
18   remember that conversation with Mr. Peters when the
19   video ended?
20        A   I do not.
21        Q   Do you remember seeing Mr. -- Sharon Krause
22   around?   Did she come back in the room at the end of the
23   video?
24        A   I don't remember.
25        Q   Okay.   And do you see Mr. Peters take the
```

※ 1

※ If Peters interview evidence is admitted, defendants will introduce deposed testimony p. 154, ln.25
— p. 155, ln. 5.

1   videotape out of the camera?

2         A    I don't remember.

3         Q    And did you observe, at any point, the videotape

4   being put in a desk drawer?

5         A    I don't remember.

6         Q    And did you think it was important for the

7   videotape to be made?

8         A    I did.

9         Q    Well, you went to all of the effort to travel

10  there, right, to try to cooperate so they can make the

11  videotape?

12        A    Correct.

13        Q    And you would agree with me certainly in the

14  first half of the tape that it's somewhat stressful for

15  Katie to go through the interview?

16        A    Yes.

17        Q    And you would not have put your daughter through

18  that for no reason, right?

19        A    Correct.

20        Q    And assuming as a good mother, which you seem to

21  be, that you would be concerned and want to make sure

22  that Katie's statements were true and correct about what

23  had happened?

24        A    Yes.

25        Q    And your understanding was the videotape was

*Object*
*Dkt. 201,*
*p. 3-4*

 1   being made to document Katie's statements, correct?

 2        A   Yes.

 3        Q   Okay.  Oh, just a couple more questions.

 4            I think you had told us earlier that you had

 5   taken a polygraph; is that right?

 6        A   That's correct.

 7        Q   That was really early on in the whole

 8   investigation?

 9        A   Yes.

10        Q   Okay.  And then did you take that -- was that

11   through Detective Flood that you took the polygraph?

12        A   I believe so.  It was here in Sacramento.

13        Q   Okay.  And then you were cleared -- or at least

14   that's what you were told, right?  You were cleared by

15   the polygraph?

16        A   Yes.

17        Q   Did anyone ever show you a written report of the

18   polygraph or were you just contacted and told you passed

19   it?

20        A   I don't recall if I got a copy or anything.  I

21   don't -- I think I was just contacted.

22        Q   Okay.  But that's -- that was your understanding

23   of how they cleared you from the initial group of people

24   that Katie had accused; is that right?

25        A   That's correct.

1    Q   And during the time that that -- you know, I

2   read you some of the statements that Shirley Spencer had

3   made about, you know, her opinion about you as a mother.

4   But do you believe that your children were comfortable

5   going to Ray Spencer's home with Shirley Spencer

6   involved in their care?

7    A   The first summer that they went up was the

8   summer that he was getting married, and they didn't know

9   her.  So I don't know if they were comfortable or not.

10  They were not wanting to go up there the next summer,

11  which was 1984.  And I don't know if it was they were

12  not comfortable with her or their dad.

13   Q   And when Katie -- after Ray Spencer had married

14  Shirley Spencer and Katie was going there in the

15  summers, she was quite young?  Wasn't she, like, two,

16  three, four years old?

17   A   Let's see.  I think she was three when they got

18  married -- no, she was four when they got married.  I

19  think they got married in '83.

20   Q   And would you describe her as sort of a mama's

21  girl where she would really miss you when she'd go away

22  because that's fairly young to go away for that many     Objection

23  weeks?  Did she get homesick?                            -Speculation

24   A   I don't know if she got homesick because that

25  was never related to me, but I know that she -- in '84

1    she did not want to go.

2        Q   Okay.  And would you say that during that time

3    period she -- you and she had a close relationship,

4    wouldn't you say?

5        A   Yes.

6        Q   And you continued that relationship up until the

7    present time?

8        A   Yes.

9        Q   I'm sorry.  Are you there?

10       A   Yes.  My response was "Yes."

11       Q   You said "Yes," right?  You still have a close

12   relationship with Katie?

13       A   That's correct.

14       MS. ZELLNER:  Okay.  I don't have any further

15   questions.

16       MS. FETTERLY:  I have a couple of follow-up

17   questions.  I just need a minute to pull out a document.

18       Just a couple more questions, Ms. Spencer.

19                    FURTHER EXAMINATION

20   BY MS. FETTERLY:

21       Q   Was your son, Matt, ever interviewed by Jim

22   Peters other than the interview that took place with

23   Mr. Rule and Jim Peters in Sacramento on May 9th, 1985?

24       A   No.

25       Q   Referring back to Exhibit 1 that Ms. Zellner was

Objection
-Dkt. 202 at
15.

Deposition of Deanne Spencer                    SPENCER VS. PETERS

1    questioning you about some statements in Exhibit 1,

2    which is -- let me hand that to you.   It's at least --

3    it appears to be a continuation of a report by -- of

4    Detective Flood -- it's part of Detective Flood's

5    report; is that correct?   Would that be accurate?

6    Referring to Exhibit 1.

7           The reason I say that, Counsel, because the

8    cover page of the report isn't here.

9         A   Oh, it says down here "Investigative Officer

10   Detective Flood."

11        Q   Okay.   Would you agree that is part of Detective

12   Flood's report?

13        A   Yes.

14        Q   And I want to turn to the third page of Exhibit

15   1, which I think is -- yeah.   It's page 3 of the report

16   as well.

17          The indented paragraph that starts out "On

18   Friday night, all of us slept downstairs."

19        A   Yes.

20        Q   Looking at the paragraph above that, can you

21   tell where Detective Flood got the information that's

22   set forth in this paragraph?

23        A   It looks like he called Shirley.

24        Q   Can you infer from this that he received the

25   information he put in this indented paragraph on page 3

Objection to
page 158,
line 25 to
page 160,
line 14
-Speculation
-Lack of
foundation
-Ms. Spencer
cannot
testify
about her
deductions
and the
intent of
detective
Flood's
report.

1    from Shirley Spencer?

2        A   Yes.

3        Q   That's what the report says?

4        A   Yes.

5        Q   And that's the paragraph Ms. Zellner questioned

6    you about which contains a statement -- and actually,

7    it's the second-to-the-last sentence.  "One time while

8    her dad was hunting, Kathryn said her mom wanted her to

9    rub her titties and peepee."  And it goes on to have

10   some other statements, correct?

11       A   Correct.

12       Q   Okay.  And you -- so this information came to

13   Detective Flood per the report from Shirley Spencer?

14       A   Yes.

15       Q   And you indicated that Kathryn did call Shirley

16   "Mom"?

17       A   Yes.

18       Q   Okay.  Now, how old was Kathryn when you and her

19   father stopped living together?  Was she under the age

20   of one?

21       A   No.  She was -- it was December before her

22   second birthday.

23       Q   Second birthday.  Do you think it unlikely she

24   would have had any memory of an event that occurred

25   before you and Ray separated?

Continued objection

See next page

Deposition of Deanne Spencer                    SPENCER VS. PETERS

Objection to
carry over
question/
answer.
-Calls for
speculation
and lacks
foundation.

1        A    I -- I don't see how she could.

2        Q    Okay.  Now, there was also some mention in

3    Ms. Zellner's questions about statements that Karen

4    Stone made to Detective Krause that were reflected in a

5    report that the children were often dirty when they came

6    to see their father in the summers.

7            And you stated that wasn't the case; is that

8    correct?

9        A    That's correct.

10       Q    And there were also some similar statements

11   attributed to Shirley Spencer.

12       A    Correct.

13       Q    Do you recall that line of questioning?

14       A    Yes.

15       Q    Now, taking you back to August 29, 1984, when

16   Detective -- you came home from work and Detective Flood

17   from the Sacramento Sheriff's Office was standing in

18   your driveway.  You appeared to have a very clear

19   recollection of that day; is that correct?

20       A    I do.

21       Q    And why is that?

22       A    It was probably the most devastating day I've

23   ever experienced.

24       Q    I'm sorry to upset you -- and take a sip of

25   water or a break -- by bringing this up again.

· Objection
-FRE 402
-FRE 403

Deposition of Deanne Spencer                    SPENCER VS. PETERS

1        And I believe you testified that your first

2   thought was that your former husband had obtained

3   custody of your children and you thought that Detective

4   Flood was there to pick them up pursuant to some sort of

5   court order from Washington.  Is that what went through

6   your mind?

7        A   Yes.  My first thought was "Oh, my God.  He's

8   got custody."

9        Q   And why would you have a fear like that?  I

10  mean, your divorce has been over for a period of years.

11  It appears that you had a contested custody battle that

12  was resolved in your favor; is that right?

13       A   (Witness nods head.)

14       Q   Why did you have that fear?

15       A   Just some small incidences that kept occurring.

16  For example, every time the children came back from

17  their father's, my son would say, "Mommy, Daddy thinks

18  that I should live with him and Kathryn should live with

19  you."  And I just -- I just was afraid that's what he

20  was trying to do.

21       Q   Okay.  Do you think it's possible that those

22  statements -- that would reflect negatively on your

23  ability as a parent were made -- were motivated by this

24  possible desire by your former husband to obtain

25  custody?

*(margin annotation, lines 2–8):* Continued objection to line 20 based on lack of relevancy or probative value – FRE 402 and 403.

*(margin annotation, lines 21–22):* See next page

1      A   Yes.

2      Q   Okay.   So do you evaluate the veracity of such

3   statement meaning -- that the children were dirty when

4   they would come for visitation, that you were neglectful

5   as a mother, that your interests were primarily on a

6   social life -- do you attribute those -- those

7   statements to furthering -- possibly furthering that

8   goal?

9      A   I could see no other reason.

10     Q   Okay.   Because I take it they were not true?

11     A   They were not.

12     Q   In fact, they were completely false; is that

13  correct?

14     A   Absolutely.

15          MS. FETTERLY:   I have no further questions.

16          MR. FREIMUND:   I have no further questions.

17  Thank you again.

18          THE VIDEOGRAPHER:   This concludes the deposition

19  of DeAnne Spencer.   And the time is 1:32 p.m.

20          MS. FETTERLY:   Ms. Spencer, I am going to order

21  a transcript of this.   I'm sure the other lawyers will

22  get it as well.   It will be typed up.   And you'll have

23  an opportunity to come here to the reporter's office and

24  review it for accuracy and then sign or make any

25  corrections on a correction sheet, or you can waive that

The handwritten margin note reads: Objection to carry over and through line 9. -Asking witness to speculate; lack of foundation

 1   right.

 2             What is your preference?

 3             THE WITNESS:  I will waive that right.

 4             MS. FETTERLY:  Okay.  You're waiving the

 5   right --

 6             MR. BOGDANOVICH:  This is Guy Bogdanovich.  I'm

 7   going to also state an objection for the record

 8   especially since I wasn't able to see the, apparently,

 9   large stack of exhibits that plaintiff's counsel

10   submitted for Ms. Spencer's deposition.  I'm going to

11   object to any exhibits that do have markings on them

12   that are not part of the original documents

13   unidentified.

14             MS. FETTERLY:  Correct.

15             MS. ZELLNER:  Fine.  We didn't get notice of the

16   deposition at all and found out about it when we were

17   out there.  So there was no notice sent to our office.

18   But we've continually maintained we're not going to be

19   using the writing on the exhibits.  And Ms. Fetterly

20   said she'd provide us with clean copies.  So I think

21   we've crossed that bridge.

22             MS. FETTERLY:  And, Counsel, do you want to

23   handle -- we're off the record now, I think.

24             THE REPORTER:  Ms. Zellner, would you like a

25   copy of the transcript?

```
 1              MS. ZELLNER:  I would.

 2              THE REPORTER:  Would you like copies of the

 3    exhibits, as well?

 4              MS. ZELLNER:  Yes.  I would like them attached.

 5              THE REPORTER:  Would you like a copy of the

 6    transcript?

 7              MR. FREIMUND:  I would like an E-tran, please,

 8    if that's possible.

 9              THE REPORTER:  Do you want the hard copy or just

10    E-tran?

11              MR. FREIMUND:  E-tran is sufficient for me.

12              THE REPORTER:  And just scan the exhibits as

13    well rather than a hard copy?

14              MR. FREIMUND:  That would be satisfactory, yes.

15              MR. BOGDANOVICH:  Same for me, please.  This is

16    Guy Bogdanovich.

17              MS. ZELLNER:  We would like the E-tran and the

18    hard copy.

19              MS. FETTERLY:  And I would as well.

20                   (Deposition concluded at 1:36 p.m.)

21

22

23

24

25
```

1  | CASE:  SPENCER, et al. vs. PETERS, et al.

2  | DATE:  November 16, 2012

3  |

4  | Please be advised I have read the foregoing deposition,

5  | and I hereby state there are:

6  | (Check one)

7  |                            _____ NO CORRECTIONS

8  |                            _____ CORRECTIONS ATTACHED

9  |

10 |

11 |                    _____

12 |                    DeANNE SPENCER

13 |

14 |                    _____

15 |                    Date Signed

16 |

17 |

18 |                    ---o0o---

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1    REPORTER'S CERTIFICATION OF PROCEEDINGS

2

3

4        I, Jennifer F. Milne, CSR #10894, a Certified

5    Shorthand Reporter in and for the State of California,

6    do hereby certify that, prior to being examined, the

7    witness named in the foregoing deposition was by me duly

8    sworn to testify the truth, the whole truth, and nothing

9    but the truth; that said deposition was taken down by me

10    in shorthand at the time and place named therein and was

11    thereafter transcribed under my supervision; that this

12    transcript contains a full, true and correct record of

13    the proceedings which took place at the time and place

14    set forth in the caption hereto.

15        I further certify that I have no interest in the

16    event of this action.

17

18

19    EXECUTED November 29, 2012

20

21

22    _____

23    JENNIFER MILNE

24

25