# Exhibit A

# Phillip W. Esplin, Ed.D.
**Psychologist**

7131 E. Buena Terra Way
Scottsdale, Arizona 85253

Phone  (480) 421-6666    FAX  (480) 421-6360

STATE OF ARIZONA
          ) SS
County of Maricopa

I, PHILLIP W. ESPLIN, Ed.D., being duly sworn on oath depose and state the following.

I am a psychologist licensed to practice in the State of Arizona.  I am currently licensed by the Arizona Board of Psychologist Examiners, and have been so licensed since November, 1978.  I hold License #0769.

In addition to my private forensic psychological practice, I was a senior research consultant with the National Institute of Children Health and Development: Children Witness Research Project from 1988 through September 2006.    I have co-authored several scientific publications involving children witnesses (*see attached Vitae*).

I am co-author of a book, *Tell Me What Happened:  Structured Investigative Interviews of Children Victims and Witnesses.*  The text, released in 2008, by John Wiley & Sons, publishers, provides a comprehensive review of the scientific literature as well as an overview of factors affecting the capacities and limitations of young witnesses. Investigative procedures used during cases in which children are witnesses, either as the

1

result of being a participant in the event or a witness to the index event, are discussed. (Note: There are significant differences in the categories of details likely remembered when comparing a child who was an active participant in the event being remembered as opposed to a "bystander" witness to the events of interest.)

I am a contributing author of a text, edited by M.E. Pipe, M. Lamb, Y. Orbach and A.C. Cedarborg, titled *Children Sexual Abuse: Disclosure, Delay and Denial.* The chapter I co-authored with Karen Saywitz titled, "Forensic and Therapeutic Traditions; Convergence of Opposing Trends" explores some of the difficulties encountered when clinical and forensic objectives may be in conflict. The book, as well as Dr. Saywitz and my chapter, addresses the importance of lessening motivational barriers on the part of reluctant witnesses in order to obtain a clear and accurate understanding of what may or may not have happened to a children exposed to unwelcome sexual experiences. The book discusses both clinical and forensic implications when encountering youngsters who may be reluctant, for whatever motive, to provide an accurate, complete account of their experience or, in the alternative, may feel social pressure to provide information regardless of whether they have a clear recollection of the details at issue in order to appease or assist in the inquiry.

I am familiar with the scientific and clinical literature regarding "autobiographical memory" as well as the scientific literature on factors that can affect the accuracy of memories for personally experienced or witnessed events.

I am familiar with the scientific and clinical literature as it pertains to "post event circumstances that can influence the alteration and/or creation of "genuine but mistaken recollections."

2

I am also familiar with both laboratory and field studies addressing the issue of "witness confidence in the memory" versus the "accuracy of the recollection."

I am familiar with the complications that can occur to interviewers or evaluators when they make assumptions about the alleged events without obtaining high quality, accurate information directly from the participants or where they may have objectives that negatively affect the questions they pose, i.e., overly focused, direct questions which may be leading or suggestive as opposed to open ended, "invitational" questions.

I have qualified as an expert witness in the area of children psychology and autobiographical memory in multiple jurisdictions, including Federal Court (see attachment for a summary of cases in which depositions and/or court testimony has been offered).

I was requested by Daniel J. Judge, Patricia Campbell Fetterly, Bernard F. Veljacic, Gabriella Wagner, William Hudson Dunn, Gary A. Western, Guy Bogdanovich and Jeffrey Freimund, legal counsel for the named defendants, to review various documents in the matter of Spencer v. Clark County, Case #3:11-cv-05424 BHS, in preparation for case consultation and/or testimony. I was requested to review the relevant scientific literature relating to children witnesses. Included were publications relating to children's memory capacities and limitations. More specifically, I was requested to address the following issue: Was there a general consensus in the scientific, as well as investigative community, during the 1984 thru 1985 time period with regard to:

- Proper investigative and forensic interviewing procedures when conducting an investigation where a child may have been the victim of a sexual crime

- The use of interview aids, i.e., anatomically correct dolls, body diagrams, puppets and/or cartoon figures

- The use of "broad general guidelines" as opposed to structured interview protocols which provided specific instruction on question formats

- Procedures relating to pre-trial preparation of a child and/or refreshing a child's recollection of prior statements, i.e., how one should approach the preparation of a child witness while minimizing the risk of post-event contamination

- The rate of false allegation cases. Note: False allegation cases generally involve three varieties:

    1. Children who intentionally mislead an investigator, for whatever their motive, i.e., they are consciously aware that the information they are providing is incorrect.

    2. Children who have a "genuine belief" about a past experience, but that belief is incorrect.

    3. Children who have a "fuzzy" recollection, generally regarding a remote event, who utilize either internal or external processes to fill in the "gaps" of their memory, but remain somewhat uncertain about their independent recollections of the events of interest.

- The extent to which children who had been abused may be capable of either consciously or unconsciously "blocking" memories for those events.

- Were there methods and procedures established to address the issues surrounding "denials", i.e., true versus false, and "recantations", i.e., true versus false

- Were the methods and procedures employed in this particular case in compliance with the general acceptable standards of care that existed in the field during the 1984-1985 time period

*Note*: For the purposes of this analysis, competence/reliability refers to children below the age of 10 who may be incapable of receiving just impressions of the facts respecting which they are to testify, or of relating them truly. I've employed the definition of "just" from Webster's dictionary: of having a basis in or conforming to fact or reason; conforming to a standard of correctness; and I've accepted the definition of "truly" from Webster's dictionary: without feigning, falsity or inaccuracy in truth or fact. In order for a witness of any age, including a child, to recall an event, the facts under investigation need to be encoded into memory. If an event is not encoded due to inability, inattentiveness, or divided attention tasks, that memory is not preserved and is not subject to accurate recall. The critical dimension to examine is the age of the children as well as other factors at the time the event at issue was experienced, not just the age of the children at the time testimony is offered.

Scientific reliability refers to the trustworthiness of the evidence, not to the honesty or credibility of a witness. Statements can be unreliable due to various processes, including decay of memory, distortion, and external influences during the reconstruction process. Statements can also be unreliable if they are obtained utilizing procedures which are suggestive in nature. From a scientific prospective, reliability issues are a foundation to an examination of the validity of the information.

*Note:* This report was based solely on a document review as well as review of the scientific literature. I did not personally question any of the children, or relevant adults with regard to their current beliefs.

### ***Documents received***
*(via email (thru 7-31-2012)*

Email #1     Plaintiff's response to Defendant's summary judgment motions

Email #2     Detective Shannon Krause Summary Judgment Motion
             Clark County Summary Judgment Motion
             Shirley Spencer's 2nd Summary Judgment Motion
             Declaration of Redline

Email #3     Former Prosecutor Jim Peters Summary Judgment Motion
             Jim Peters Declaration  + Exhibits
                 Exhibits:
                 Fetterly Pt 1     Habaes Petition
                 Fetterly Pt 2     Direct Exam Mr. Dixon
                 Fetterly Pt 3     Court transcripts referencing Sodium Amytal
                 Hearing – Testimony of Kathryn Tetz
             Declaration of Fetterly

Email #4     Plaintiff's reply to Defendants Summary Judgment Motion
             Plaintiff's combined reply to Defendant's Summary Judgment Motion

Email #5     Defendant reply Brief in support of summary judgment
             Peters Join to Opposition
             Shirley Spence reply to
             Clark County Opposition to
             Spencer Reply
             Reply in support of summary judgment
             Second declaration of Freimund
             Second declaration of Freimund
             Krause reply to summary judgment

Email #6     Complaint

Email #7      Freimund declaration in support of Sgt Davidson summary judgment
              motion + Exhibits 21-26
                    exhibit 21     Order clarifying reference hearing order
                    exhibit 22     Finding of Fact on Reference hearing
                    exhibit 23     Order denying Motion for reconsideration
                    exhibit 24     Ruling denying reconsideration
                    exhibit 25     Order
                    exhibit 26     Motion and order for dismissal without prejudice


Email#8       Freimund declaration in support of Sgt Davidson summary judgment
              motion + Exhibits 6-20
                    exhibit 6      Information
                    exhibit 7      Statement of Defendant on Plea of guilty
                    exhibit 8      Report of Proceedings, dated 5-3, 5-16, 5-23, 1985
                    exhibit 9      Judgment and sentence
                    exhibit 10     Order dismissing petition
                    exhibit 11     Order dismissing petition
                    exhibit 12     Ruling denying motion for discretionary review
                    exhibit 13     Judgment in a civil case
                    exhibit 14     Appeal Doc – 9th Circuit
                    exhibit 15     Judgment in a civil case
                    exhibit 16     Appeal Doc – 9th Circuit
                    exhibit 17     Order denying petition
                    exhibit 18     Commutation of Mr. Spence
                    exhibit 19     Letter to Governor Locke from Matt Spencer (son)
                    exhibit 20     Order transferring petition for a reference hearing


Email #9      Declaration of Shirley Krause + 6 exhibits
                    exhibit 1 – 6  Clark County Sheriff's office Utility Reports


Email #10     Shirley Spence lst summary judgment motion
              Declaration of Shirley Spence
              Declaration of Matt Spence


Email #11     Defendant Davison summary judgment motion w/exhibits
                    exhibit 1      Statement (hand written)
                    exhibit 2      Information
                    exhibit 3      Vancouver Police Dept. correspondence
                    exhibit 4      Motion and affidavit for order for warrant of arrest
              Declaration of Friedman in support of summary judgment for defendants

Documents received 8-23-2012
- Statements from Sharon Krause; Michael Davidson; Shirley Spencer; Matthew Hansen, Phyllis Day and DeAnne Spencer
- Transcript – Deposition of Michael Davidson
- Transcript – Deposition of Sharon Krause
- Affidavit of Rebecca Wiester, MD
- Affidavit of James Matthew Peters
- Transcript – Deposition of James Rulli
- Evidentiary Hearing – Transcript of Trial

Document received 9-24-2012
- Training Records, approximately 1984 to early 1985, of Jim Peters, former Clark County Deputy Prosecutor; Sharon Krause, Sex Crimes Detective; Michael Davidson, Supervising Sgt.

Documents received 9-27-2012 (via email)
- Transcript of Testimony of Matt Spencer
- Declaration of Kathryn E. Spencer
- Declaration of Matthew Ray Spencer
- Letter from Matt Spencer to Governor Gary Locke
- Transcript Testimony of Kathryn Tetz

Other:
Personal consultation with Dr. Maggie Bruck, re: *"Suggestibility of the Child Witness: A Historical Review and Synthesis"*, S.J. Ceci and M. Bruck, Psychological Bulletin (1993) Vol. 113, No 3, 403-439

**Case Synopsis:**

Ray Spencer is a former police officer of the Vancouver Police Department. In the summer of 1984, he and his now former wife, Shirley Spencer, and his step-son Matthew Hansen, were visited by his two biological children Kathryn and Matt, children from his prior marriage to DeAnne Spencer. Upon Mr. Spencer's return from a seminar, Shirley Spencer advised him that Kathryn made inconsistent allegations of sexual abuse, including ones against him. The allegations were reported to Child Protective Services in Vancouver, Washington and to CPS in Sacramento, California, where the children resided with their biological mother, DeAnne Spencer. (Order on Defendants' Motions for Summary Judgment and Plaintiffs' Motion to Continue dated 10/2/2012)

Kathryn Spencer and Matthew Spencer were questioned on multiple occasions over the course of several months, starting in 1984. The allegations were inconsistent across time with Kathryn. Matthew Spencer initially denied any sexual misconduct by his father, and later alleged that his father had sexually abused him. In February of 1985, Detective Krause met with Matt Hansen. Matt Hansen alleged that Mr. Spencer committed multiple acts of violent sex abuse against him at the hotel the night of February 16. Matt Hansen also implicated Mr. Spencer in previous acts of sexual misconduct and claimed that he had witnessed Mr. Spencer sexually abusing Matt and Kathryn Spencer.

7

The interviews with all the children were primarily conducted by Detective Sharon Krause, with the Clark County Sheriff's Department. At least one interview (video taped) of Kathryn Spencer was conducted by James Peters, a county prosecutor at the time in Clark County.

Ray Spencer entered an Alford plea of guilty and was convicted of multiple counts of sexually abusing Matthew Spencer, Kathryn Spencer, and his step-son Matthew Hansen, and was sentenced to life in prison. Subsequently, Ray Spencer filed numerous petitions with the state and federal courts challenging his arrest, conviction and incarceration. Matthew and Kathryn Spencer have since recanted their statements that their father sexually abused them and now maintain that no sexual misconduct ever took place between them and their father. Matt Hansen still maintains that Ray Spencer sexually abused him.

## TIMELINE

**08/24/1984**   Shirley Spencer reported that in the evening on this date, Kathryn disclosed that she had been sexually abused by multiple persons, including Ray Spencer, her father, and DeAnne Spencer, her mother. Shirley reported that Kathryn asked her if she could rub Shirley's tummy, which Shirley said was normal. Shirley reported that while Kathryn was rubbing her tummy Kathryn slid her hand up and tried to expose Shirley's top a few times, and tried to touch her breasts. Shirley reported that all of a sudden Kathryn slid her hand down to her front, and she said Kathryn, and then Kathryn jerked her hand away. Shirley reported that Kathryn then said to her, mommy can I rub your pee-pee, and Shirley told her no. Shirley reported Kathryn told her, "can I rub your peepee and when I'm down will you rub my peepee" (Written Statement of Shirley Spencer dated 8/30/84-Page 2). Shirley reported Kathryn said to her, "it feels good can I...Karen let me rub her peepee" (Written Statement of Shirley Spencer dated 8/30/84-Page 2). Shirley reported Kathryn continued to ask her to rub her peepee and would take Shirley's hand and try to push it to Kathryn's peepee, and Shirley again told her no. Shirley reports Kathryn then said, "Karen and my mommie DeAnne let me rub their tities and peepee" (Written Statement of Shirley Spencer dated 8/30/84-Page 2). Shirley reports at this point she began to question Kathryn about Karen and then her mom. Shirley reports that Kathryn then told her that her dad was away hunting and Karen was laying on the bed with Kathryn. Karen had Kathryn untie her robe and rub her tummy and then her breast, then she let Kathryn rub her peepee. Kathryn said that then Karen rubbed her peepee. When Shirley asked Kathryn how many times this happened, Kathryn told her it happened a few times. Shirley then asked her about her mother DeAnne. Kathryn told her pretty much the same thing, that they rubbed each other's tummys, tops and peepees. Shirley asked if this was only when mommie DeAnne put medicine on her peepee when it was sore and Kathryn told her no, she rubbed it other times when it didn't need medicine. Kathryn then told Shirley that he daddy lets her rub his peepee and he rubs her peepee. Shirley continues to question her about her father, and Kathryn told her that it had happened a whole bunch.

Kathryn said daddy told her not to tell. Shirley reports Ray came home from work and she didn't know what to do or say, until she spoke with Kathryn more about it. Shirley reports that she took the kids to the beach the next day, and while Kathryn was lying on the blanket they talked some more. Shirley reports that Kathryn said her same story about her mom and Karen and went into more detail about her dad and her and Big Matt. Shirley reports Kathryn told her that Big Matt sticks his finger in her sometimes, and every time he came around while they were talking at the beach, Kathryn would tell her shush, Matt's coming. Kathryn told Shirley that her dad would lay on his back and she would lay on his tummy and they started out with dad in his robe and shorts and her in her nighty and panties. Kathryn then told her that she took off her panties and slid daddys down and he put his peepee between her legs. Kathryn told Shirley that her daddy tried to put it in her little hole but it was too big. Shirley asked Kathryn if it hurt and Kathryn told her yes. Shirley asked Kathryn what happened after that and Kathryn stated that her daddy then kissed her peepee and then she kissed his peepee. Shirley asked Kathryn at the end of their conversation if Kathryn was making this up and Kathryn told her no.      (Written Statement of Shirley Spencer dated 8/30/84)

**08/26/1984**      Deanne Spencer picks up the children from Ray Spencer's house in WA on this date and takes them back to Sacramento, CA. She is not informed of the disclosure Kathryn made to Shirley. (Sacramento County Sheriff's Department, Detective Flood Crime Report/continuation report dated 8/29/84)

**08/29/1984**      Detective Flood of the Sacramento County Sheriff's Office received information from Child Protective Services that a local minor by the name of Kathryn Spencer had related that she had been molested.   This information was received through Child Protective Services in Yacolt, Washington.   The stepmother of the victim, Shirley Spencer, had made contact with CPS in that area.   Detective Flood called the Spencer residence in WA, and Ray Spencer answered the phone. Detective Flood spoke with Mr. Spencer. Mr. Spencer said he had left 8/25 for a seminar for work, and upon his return, his current wife Shirley Spencer told him that Kathryn had told her that she had been molested.   Kathryn had indicated that his ex-wife Deanne Spencer had fondled her and they play with each others pee pee. Shirley also had indicated to him that Kathryn had told her that Mr. Spencer had let her play with his pee pee and that he and played with hers and that Kathryn was very explicit. Mr. Spencer reported his wife picked up the kids on the morning of the 26th and went back to Sacramento. He reported his wife didn't tell him about this until he returned home from the seminar trip and when she did, he contacted the local authorities. (Sacramento County Sheriff's Department, Detective Flood Crime Report/continuation report dated 8/29/84)

Mr. Spencer then handed the phone over to his wife Shirley Spencer and Detective Flood spoke with Shirley Spencer: Shirley reported that Ray Spencer left Saturday, 8/25, for a seminar.

Saturday night, after Mr. Spencer had left already, Shirley and the kids were downstairs watching a movie. Shirley said that Kathryn wanted to rub her tummy and so she said that was okay. Shirley said that Kathryn kept moving her bathrobe off her top attempting to expose her breasts and one time she put her hand too far down toward the vaginal area. Shirley told Kathryn this was unacceptable. Kathryn asked Shirley, "want to rub my pee pee" and Kathryn wanted her to rub her pee pee because she said it felt good. Shirley reported this type of information got her interested and she asked her questions about certain things and Kathryn gave her some information. Kathryn told her one time her dad was hunting, Kathryn said that her mom wanted her to rub her titties and pee pee. Then another time while mom was at work, daddy wanted her to rub his pee pee and he rubbed hers. Kathryn also told her about a time that she sat on her father's lap with her father's penis between her legs. Kathryn put it in her mouth and he tried to put his penis into her pee pee but it hurt. Shirley reported Kathryn also told her about daddy kissing her on her pee pee. Shirley asked her how often this occurred and she said lots of times. Shirley said that Kathryn told her she watched her dad make love to mommy before he married her. Shirley reported that she questioned her story the next day (8/26) and it was the same. Kathryn told her that her daddy told her not to tell anyone or mommy Deanne. Shirley reported the next day Kathryn still wanted to have her pee pee rubbed because it felt good. (Sacramento County Sheriff's Department, Detective Flood Crime Report/continuation report dated 8/29/84) At this point Detective Flood told Shirley and Ray Spencer to go to their local authorities and get interviewed and to have the reports sent to him by their local authorities.

After speaking to Shirley Spencer, step-mother of the complainant, and Ray Spencer, father of the complainant, about the alleged outcry of the complainant, Detective Flood and Detective Madrigal went to the home of Deanne Spencer, the mother of the complainant who had custody of the children, to check on the welfare of the children. At this time, Detective Flood interviewed the complainant Kathryn in the kitchen.

**Detective Flood Interview of Kathryn Spencer:** (Sacramento County Sheriff's Department, Detective Flood Crime Report/continuation report dated 8/29/84) This interview was not recorded, this is a summary given by the detective of the interview.

- The child was directly asked if people had touched her "pee-pee", she nodded yes.
- She was directly asked if someone told her not to tell about it, she nodded her head yes
- She indicated that her mother did touch her potty but only when she was putting medicine on it.
- She indicated that she did tell Shirley everything that Shirley told him but then when asked to explain it or asked specific questions about it, she would say that she couldn't remember the words so she couldn't tell him.

10

- The detective asked if someone had told her not to tell about it and she indicated by shaking her head yes.
- When asked if someone had touched her pee pee she shook her head yes and when asked who, she would say daddy and then a few moments later she said not daddy, no one.
- When asked if someone had touched her pee pee, she would say yes, stop and think for a moment, and then indicate that it was her mother putting on the medicine.
- Kathryn indicated that her and her father played a game but she didn't want to talk about the game.

**Detective Flood Interview of Matt Spencer:** (Sacramento County Sheriff's Department, Detective Flood Crime Report/continuation report dated 8/29/84). This interview was not recorded, the following is a summary of the interview given by the detective who conducted the interview.

- Matt indicated that he knew nothing about what they were talking about.
- Matt indicated neither his mother nor his father had any inappropriate actions toward him.
- Matt reported he had not been touched in any way and nobody had made any advances toward him.
- Matt indicated that his sister had not told him anything about this in the past but indicated that she does tell stories and change her stories a lot, usually to get out of trouble.

**Detective Flood interviewed Deanne Spencer**, mother of the complainant: (Sacramento County Sheriff's Department, Detective Flood Crime Report/continuation report dated 8/29/84). This interview was not recorded, the following is a summary by the detective of the interview conducted by that detective.

- Reported this was the first she had heard of any of this.
- Reported that she left Ray Spencer some time ago because of some weird things he was doing.
- Reported that her sister told her that she was worried about Kathryn and Ray Spencer, that she thought something was not right but she couldn't elaborate what.
- She indicated that she had not touched her daughter nor allowed her daughter to touch her in any place that was inappropriate.
- The detective arranged for the mother to bring Kathryn to SSD for another interview, this time using anatomical dolls.

*After the interviews on this date, Detective flood apparently filed a report stating that Kathryn had denied being molested by anyone. He also reported that Matt had told him that Kathryn, "tells stories and changes her stories." Detective Flood apparently found no reason to proceed with an investigation.

Detective Flood suggested a medical examination be performed, because in the event that someone had done something to Kathryn, possible physical evidence may be found since the allegations included penetration. (Sacramento County Sheriff's Department, Detective Flood Crime Report/continuation report dated 8/29/84 & Complaint filed by Plaintiffs on 6/2/11)

08/30/1984    Ray Spencer and Shirley Spencer went to Clark County Sheriff's Office, in Washington State, to give written statements about the case. Shirley gave a 6 page written statement on what Kathryn had allegedly told her on the evening of August 24, 1984. Ray told the Detective Stephenson that he gets his children from California for 6 weeks visitation each summer. Ray mentioned that he had been gone the last week of the visitation while the children were there and that while he was gone, Kathryn had related a story of ongoing or past sexual abuse to Shirley. Ray stated that, among others, he was mentioned by Kathryn as one of the persons doing the molesting. (Clark County Sheriff's Office Utility Report by Officer Stephenson, dated 8-30-1984)

Kathryn underwent a medical examination by Dr. Magee at The University of California Davis Medical Center to determine if any evidence existed suggesting she had been molested. There was no physical evidence obtained from that medical exam. (Note: Apparently no oral or written information, or the actual medical report of Kathryn's exam on this date, was disclosed to Mr. Spencer prior to his trial and/or Alfred plea).    (University of California, Davis Medical Center, Sacramento, Therapeutic/Diagnostic Procedures Report, dated 8-30-1984.)

10/15/1984    Sharon Krause arrived in Sacramento on this evening and was briefly introduced to the two children but did not formally interview them. (Clark County Sheriff's Office-Utility Report by S.A. Krause dated 10-17-84)

10/16/1984    Deanne Spencer was given a polygraph exam on this date by the Sacramento Sheriff's office. Deanne Spencer passed the polygraph exam. (Clark County Sheriff's Office-Utility Report by S.A. Krause, not dated)

The first interview of Kathryn by Krause in Sacramento was on this date. No one observed this interview and the interview was not recorded. During this interview, Kathryn was advised that her father was "sick" and that she could help him by talking about the committed sexual acts against her. Detective Krause asked Kathryn during this interview about what Kathryn had told Shirley. Kathryn advised Detective Krause that she had lied to her stepmother about the other people with the exception of her father Ray Spencer. (Clark County Sheriff's Office Utility Report by Detective Krause, dated 10-16-1984)

During this trip Detective Krause also spoke with Matt Spencer for several hours. These interviews were not observed or recorded. Detective Krause's report indicated Matt Spencer denied having been either the victim of sex abuse or having witnessed any other children being abused. (Clark County Sheriff's Office-Utility Report by S.A. Krause,)

12

10/17/1984    Detective Krause interviewed Phyllis Day, maternal grandmother of
              Kathryn and Matt Spencer.    This interview was conducted during
              Detective Krause's trip to Sacramento to interview the children. Mrs. Day
              reported that Ray Spencer was extremely controlling over Deanne Spencer
              when they were married, even the way he had her dress was controlling.
              She reported she had never heard Kathryn Spencer make any allegations
              of sexual abuse while in her presence. She reported that Kathryn had not
              wanted to spend the summer with Ray Spencer, but that Mrs. Day thought
              that it was due to the fact that Kathryn was so young and it was a long
              period of time to be away from her mother. (Clark County Sheriff's
              Office- Utility Report by S.A. Krause dated 10/17/84)

              Detective Krause also interviewed Deanna Krause's younger sister,
              Kathryn Marie Roe. Kathryn mentioned that she had lived with Deanne
              and Ray Spencer one summer when she was 14, in Los Angeles after Ray
              and Deanna had been married. She said she recalled many times when
              Ray Spencer would say inappropriate things to her and make her feel
              uncomfortable, and that Ray would make Deanne dress like a "common
              whore". Kathryn made no allegations of sexual abuse or misconduct
              against Ray Spencer in this interview. (Clark County Sheriff's Office-
              Utility Report by S.A. Krause dated 10/17/84)

              On this afternoon, Detective Krause accompanied Deanne Spencer and
              Kathryn Spencer to a therapy session. Detective Krause was present with
              Kathryn during the therapy session. Kathryn made no disclosures of abuse
              during this session. (Clark County Sheriff's Office-Utility Report by S.A.
              Krause dated 10/18/84)

              During the early evening hours of this date, Detective Krause spent time
              alone with Matt Spencer, and interviewed Matt Spencer at her motel. Matt
              Spencer denied any sexual abuse by his father Ray Spencer.    When
              Detective Krause returned Matt home, she indicated to Kathryn that
              maybe they could meet again the next day and have another talk. Deanne
              Spencer was also present for this conversation with Kathryn, and Kathryn
              apparently stated several times prior to Detective Krause leaving the
              residence, "that she did not want to talk about it any more." However,
              prior to leaving, Detective Krause indicated to Kathryn that she would call
              her or stop by the following day to see if she changed her mind. (Clark
              County sheriff's Office-Utility Report by S.A. Krause dated 10/18/84)

10/18/1984    **Detective Krause Interviewed Kathryn Spencer for a 2nd time on her
              Sacramento trip**. This interview was not recorded, and no one observed
              the interview.
              -In the early afternoon of this date Detective Krause called the babysitter,
              Patty Owens, and made arrangements to go by at 1:45 to talk with Kathryn
              in an attempt to encourage Kathryn to accompany her so they could
              discuss the sexual issue again. Kathryn agreed to go with Detective
              Krause and speak with her again regarding the sexual issues. Detective
              Krause and Kathryn went to Dairy Queen and got sundaes.

While they were eating the sundaes they parked in the parking lot across the street from Dairy Queen near a baseball field and talked. This is where the interview took place. During the time in the car, Detective Krause notes that Kathryn mentioned several times that she "knew her step-mom, Shirley, was sure going to be proud of her for telling the truth." After they finished their Sundae, they proceeded to the Holiday Inn where Detective Krause was staying to finish their interview.

When they arrived at the Holiday Inn, Kathryn asked for the dolls they had used in the previous interview (the anatomically correct dolls). The dolls do not have clothes on, so Kathryn asked for clothes to dress them in. Kathryn then spent half an hour playing with these dolls and dressing them, at which time they did not discuss anything about the sexual issue or her father.

After this first half hour, Detective Krause asked Kathryn if she was ready to talk before they went back to Kathryn's house. Kathryn indicated that she was, but that she wanted to have the dolls while they talked. Detective Krause asked her which dolls they needed to use for their talk and Kathryn held up the adult male doll and the child female doll. Kathryn then stated "I'll take their clothes off because they have to be naked." Kathryn then stated, "I wish you had a bathrobe for him because that's what my daddy wears, but he doesn't have to have any underwear on. I would just need a bathrobe." Kathryn then told the detective, "Go ahead and ask the questions."

After being asked how old she was when this happened to her, Kathryn stated, "when my pee-pee got touched? That's when I was 5, remember?" Detective Krause then asked Kathryn what the first thing she can remember that happened. Kathryn then placed the male doll faced up and placed the female child doll on top of the male doll. Krause noted that at the time that she did this she was very careful to line the penis up with the vaginal opening on the female child doll. Krause asked Kathryn how many times that happened and Kathryn said "One time." When asked, Kathryn said Shirley was at work and they were all in the living room (Big Matt, Little Matt, her and her dad). She said that Big Matt and Little Matt were sleeping while this happened so they did not see anything. In talking more about the incident, Kathryn reports she had a night gown and her panties on, but that her dad makes her take off her clothes. When asked what happened after her clothes were off, Kathryn replied, "That's when my daddy's wiener sticks up."

When asked what happened then, Kathryn responded "Well, he hurt me then." Detective asked Kathryn if she could show her how her daddy hurt her with the dolls. Kathryn then picked up the female child doll and inserted the penis of the male doll into the vaginal opening of the child female doll that she had indicated was her. When asked if her daddy says anything when this happens, Kathryn reported she could not remember, so Detective Krause tells her, "sometimes it was hard to remember things that you don't like talking about but if you closed your eyes and were very quiet sometimes you would remember something."

14

Kathryn then covered her eyes with her hands and after only seconds, in a very sarcastic tone, Kathryn stated, "what do I say, baby girl?" When asked what that meant, Kathryn stated that's what he says to me. When asked if she could remember anything else, Kathryn stated she'd like to color for a while. After coloring for a little while, Krause asked Kathryn if her father ever kissed her, which Kathryn replied yes, on the mouth. When asked if he had ever kissed her anyplace else, she put her finger inside the vaginal opening of the female child doll and said that her daddy kissed her in there. When Krause asked is she could show her what she meant, Kathryn put the male dolls mouth on the vaginal area of the child female doll, and commented that "this is so gross." Kathryn stated, "He kisses inside that hole and it doesn't even hurt." When asked if she thought it would hurt, Kathryn stated, "Well, it hurts my mouth when I have to kiss his wiener inside." When then asked if anything else ever hurt her, she stated, "Just when he tried to stick his big wiener in my pee-pee, but he just did that once." When asked, she said she could only remember one time that she had to kiss his wiener and one time that he kissed her pee-pee inside the hole. When asked if she had ever taken a bath with anyone at her daddy's house, she reported that sometimes she took a shower with him but nothing ever happened when they were in the shower. Kathryn commented that she loved her daddy and he loved her too, and asked why he would do that to her if he loved her. Krause responded by telling her that when daddies do that it's because their thinking is sick and that he needs help. Kathryn was returned to her house shortly before 5:00 pm, making her time with Detective Krause roughly 3 hours. (Clark County Sheriff's Office- Utility Report by S.A. Krause dated 10/18/84)

Detective Krause interviewed Deanne Spencer with Deanne's sister Linda Lawrence present. Detective Krause spoke with Deanne Spencer several times over the course of her week in Sacramento, however did not talk with her in detail until the evening on this date. (Clark County Sheriff's Office- Utility Report by S.A. Krause dated 10/18/84)

Detective Krause interviewed Deanne Spencer's sister, Linda Lawrence, while she was in Sacramento, CA. During conversations between Deanne Spencer and Detective Krause, Deanne Spencer had indicated that her sister Linda had made comments that she felt uncomfortable about Ray Spencer and thought that possibly Ray may be having some type of sexual contact with Kathryn Spencer. Detective Krause then interviewed her on her trip. Deanne Spencer was present during this interview. Linda Lawrence related that she "never liked Ray Spencer and tried to avoid him." She also indicated that whenever she was around him he was always talking about women's bodies and referring to them as a "piece of ass". Linda described Ray Spencer as a very misogynistic man. Linda Lawrence also talked about the way "Ray would have Deanne dress." Linda reported that Deanne "looked just like a slut." Linda reported whenever they would speak to Deanne about the way she looked, Deanne would just say that that was how Ray liked her to dress.

When Detective Krause asked Linda about her concerns that something sexual was going on between Kathryn Spencer and her father Ray Spencer, Linda advised there was nothing specific, just a very uncomfortable feeling she had. (Clark County Sheriff's Office- Utility Report by S.A. Krause dated 10/18/84)

**11/15/1984**   Ray Spencer apparently contemplated suicide and was admitted at his own request to the Oregon Health Science Center on this date, and remained there until December 7, 1984 (3 week stay). His discharge diagnoses included major depression due to extreme psychological stressors, specifically his "pending felony charges". Mr. Spencer was placed on a regimen of antidepressants for 5 months. (Complaint)

**11/27/1984**   King County Prosecutor, Rebecca Roe, who had been asked to review the case, found that Kathryn's allegations provided insufficient evidence to obtain a conviction. However, per her letter to Clark County Prosecutors, she opined that she believed that the child had been sexually abused. (US District Court, Western District of Washington-Order on Defendants' Motions for Summary Judgment and Plaintiffs' Motion to Continue)

**12/11/1984**   Deputy Prosecuting Attorney for Clark County James Peters met with Kathryn (video taped). Mr. Peters utilized the dolls during the course of his interview and the mother was present with the child sitting on her lap. (DVD of Interview of Kathryn Spencer dated 12/11/1984)

**01/02/1985**   Mr. Spencer was charged with and arrested for two counts of sexually abusing Kathryn Spencer and released on personal recognizance. (US District Court, Western District of Washington-Order on Defendants' Motions for Summary Judgment and Plaintiffs' Motion to Continue)

**02/01/1985**   Ray Spencer was fired from his job at the Vancouver Police Department. (Clark County Sheriff's Office Incident Report by Officer Don Kerr dated 2/3/85)

**02/03/1985**   Clark County Sheriff's Officer Don Kerr responded to the home of Ray and Shirley Spencer for a domestic disturbance call. After interviewing the two, Officer Kerr wrote in his report that Shirley and Ray had been in bed and began arguing. Ray told Shirley that he wanted a divorce and began to gather some of his things to leave when Shirley jumped on him and grabbed his testicles to injure Ray. Shirley's son Robert heard the commotion and went upstairs to see what the problem was. Robert witnessed Shirley on Ray's back and separated the two. While Robert attempted to calm Ray down, Ray punched Robert in the face and then got on top of him and began hitting him. Shirley's other son Ralph then came up and got Ray off of Robert. The two sons then held Ray down until the officer Kerr arrived. Officer Kerr mentions in his report that Shirley kept saying over and over "I love that man to death, but I can't understand why he would go to bed with another woman and cheat on me, I know he was going to bed and fucking that woman" but never mentioned who the other woman was.

16

Officer Kerr was told by Shirley that Ray Spencer had recently undergone a 3-4 week stay at the mental ward at the University of Oregon Medical School, and so had Ray and one of Ray's friends agree to take Ray back to the mental ward to be checked out. Ray was transported to the hospital on this date after the incident. (Clark County Sheriff's Office Incident Report by Officer Don Kerr dated 2/3/85)

02/08/1985   Detective Krause was advised that Ray Spencer moved into an apartment at the Salmon Creek Motel. (Clark County Sheriff's Office Utility Report by S.A. Krause dated 2/22/85)

02/16/1985   Mr. Spencer was living at Salmon Creek Motel in Vancouver, WA at this point. Shirley Spencer dropped off her son, Matt Hansen, so that he could spend the night with Mr. Spencer in the motel. This is one of the locations that Matt Hansen alleges Ray Spencer sexually abused him. Matthew Hansen maintains that on this date, Ray Spencer "engaged in oral sex with him and penetrated his rectum with his penis, that is the defendant penetrated the boy's rectum with his penis" (Sworn Taped Statement of Matt Hansen dated 10/20/09). (Declaration of Matthew Hansen dated 3/6/12, Exhibits A & B)

02/20/1985   Ray Spencer was at the former home of himself and Shirley Spencer for a birthday party and noticed some of his guns were missing from his gun case. He asked Shirley to produce these guns to which Shirley refused, so Ray Spencer called Clark County requesting a civil standby. Officers were dispatched to the Spencer home and Officers contacted S.A. Krause about the situation. Krause informed the officers that part of Ray Spencer's original release agreement was that he was not to possess any weapons. (Clark County Sheriff's Office Utility Report by S.A. Krause dated 2/22/85)

02/22/1985   **Shirley Spencer met with Detective Krause** to speak with her about the investigation and its progress. During the course of this interview the investigation thus far was discussed. Amongst the things discussed, Shirley mentioned to Krause that she had learned that her husband has had a number of affairs during their relationship. In her report about this interview, Krause mentions that Shirley expressed concern several times throughout the conversation that she was concerned about her son, Matthew, and how all of this was affecting him. Shirley indicated that "little matt" was very confused about why his father could not live with them and also advised that Matt cared a lot about Ray. Shirley indicated there was a time, sometime around Christmas, on one occasion when Ray was going to take down the Christmas tree and he and Matt had words about something. Shirley advised that she was in another room and heard Matt say something to Ray similar to "you're not my daddy". She advised me that when she and Ray first started spending time together there were maybe 2 or 3 times when that came up, however, Matt "worshipped the ground Ray walked on"-Shirley. Detective Krause asked Shirley whether since they spoke at the beginning of the investigation, if Shirley had recalled anything that would make her wonder if her husband had been sexually involved with Kathryn.

Shirley then told her: "I don't know if I should be telling you this because you're not on Ray's side" and then proceeded to tell Detective Krause about a time when she came home late and Kathryn was still up and the other children were sleeping and that Shirley remembered feeling uncomfortable about that but didn't know why. Shirley said it was just one of those things that you cannot explain, and then she said she remembered the next day that Kathryn told her that she hurt down there and Shirley didn't check her. During the time Detective Krause spent with Shirley Spencer, Detective Krause expressed concerns about the possibility that Ray may have done something to her son, Matt. Shirley Spencer indicated to Detective Krause that she had talked with Matt and that Matt told her that Ray had never touched him in any inappropriate way. During their conversation, Detective Krause advised Shirley Spencer that she would be willing to talk with Shirley's son Matt, and felt it was important for her to do so because Matt apparently was not understanding what was going on regarding his father, and also that during that time Detective Krause would talk with Matt in an attempt to determine if there had been any type of sexual contact between Matt and his step-father, Ray Spencer, Krause indicated because she knew that children rarely report sexual abuse to their parent or parents.        (Clark County Sheriff's Office-Utility Report by S.A. Krause dated 2/22/85)

02/26/1985    Detective Krause made phone contact with Shirley Spencer about possibly interviewing Matt Hansen. While speaking on the phone with Shirley Spencer, Shirley indicated to Detective Krause that she thought Ray Spencer may have done something to "Little Matt" based on the fact that while Matt Hansen had been sick a few days prior, he became very upset when Shirley tried to take his temperature rectally, which she says she has always done, and he had never had a problem with. Shirley also reported to Krause that while speaking to Matt that day, he had told her that "daddy had done something but it was too gross and he didn't want to talk about it." Detective Krause set up a time to meet with Shirley Spencer the next day. (Clark County Sheriff's Office-Utility Report by S.A. Krause dated 2/28/85)

02/27/1985    Detective Krause interviewed Shirley Spencer in person to get more background on Ray Spencer. After this interview with Shirley Spencer, Detective Krause made arrangements for Shirley Spencer to bring her son Matt Hansen in the following day to be interviewed by Detective Krause. (Clark County Sheriff's Office-Utility Report by S.A. Krause dated 2/28/85)

02/28/1985    Detective Krause interviewed Matt Hansen in an interview room located in the Detective Unit of the Clark County Sheriff's Office, with permission from Shirley Spencer, with only Matt and Detective Krause present. After covering general topics, Detective Krause indicated to Matt that sometime she talks to children whose private parts had been touched by someone. Detective Krause asked Matt if he knew what private parts were and he shook his head, indicating yes. At this time, Detective Krause did a verbal body inventory with Matt, asking about different body parts and asking if that part was a private part.

When Detective Krause asked about the butt, Matt indicated that yes, that's private. After this, Detective Krause asked Matt if he knew why he was in her office to talk to her, and he told her that he did not. Detective Krause reports that she then stated to Matt, "Some of the things you said to your mom make me wonder if maybe your private parts were touched by someone". Detective Krause reports that at this time Matt shook his head and Krause asked him if anyone had ever touched him and Matt shook his head again and stated, "Yah." Detective Krause asked him who had touched him and Matt stated, "My dad." When asked what his daddy's name was, Matt responded, "Ray Spencer." Detective Krause then asked what part of Matt got touched, and Matt responded by pointing between his legs where his penis would be. When asked what he called that part of his body, Matt responded that he called it a "pee-pee".

A body inventory was then conducted with Matt using a cartoon drawing, where Matt identified the breasts as "titties", the buttocks as "bottom", and the penis on a male body a "pee-pee" or a "wiener". After this Detective Krause then asked Matt about what happened with his pee-pee and Matt stated, "My dad touched it." After being asked, Matt then went on to say that his dad had touched Matt's pee-pee with his hand, and that this occurred at his house. Matt was then asked if he could remember how old he was when this happened and Matt held up four fingers and stated, "four." When asked if it happened after he was four, Matt stated, "No, before my birthday." When asked how many times something happened like what he just told her, he stated, "a lots." Detective Krause then asked why he wasn't able to tell his mother before and Matt stated, "A dream, but it wasn't a dream." Detective Krause then asked if Matt ever had a dream about anyone else touching his pee-pee and Matt stated, "No, and it wasn't a dream, just my daddy touched my pee-pee before." Detective Krause asked if anything else happened and Matt stated, "He makes me touch his pee-pee with my hand." During this part of the interview, Detective Krause reports that Matt also mentions that it hurts when his dad touches his pee-pee, and that Matt stated at one point, "Well, my dad touches it too hard." At this time, Detective Krause stated to Matt, "Matt, does you daddy kiss you, like on the nose?" and Matt pointed between his legs to the area of his penis and stated, "He kisses my pee-pee." Detective Krause reports that after this, Matt stated to her, "Sharon, and he makes me kiss his pee-pee, you know that." After being asked, Matt stated that this happened at his house. When asked more specific questions about this incident, Matt indicated to Krause that it happened in the bath tub. Detective Krause asked Matt to tell her more about this tub incident and Matt stated, "He made me kiss his pee-pee under the water and it really scared me and it really hurt me." Detective Krause asked Matt if anything else on his body had been hurt, and Matt stated, "And he hurt my bottom, too." When asked who hurt his bottom Matt stated, "My dad, Ray Spencer. He puts his finger in my hole." Detective Krause asked him where he was when this happened and Matt stated, "We were in the living room and in the shower, and in my mom's room," and that this happens, "Mostly when he does things my mom is at work."

Detective Krause asked if there was anything else that happened to his body that he wanted to talk about and Matt stated, "He puts his pee-pee in my bottom and that really hurts and that makes me really cry," and that it happened, "In the shower." Detective Krause asked Matt if ever saw anything come out of his daddy's pee-pee and Matt stated, "Yes, pee." Krause then asked Matt if his daddy's pee looked like his pee and Matt told her no. Krause asked what color his daddy's pee was and Matt responded that it was white. When asked where it goes, Matt told her the toilet, sometimes the floor, sometimes his hand, and that he has to wipe it off his bottom when it gets on his bottom. Detective Krause asked Matt if anything ever happened with his body any place besides his house, and Matt stated, "At the motel." Matt stated that at the motel, "Well, he touched my pee-pee in the bathroom and then he put his pee-pee in my bottom." And that, "Well, I had to sleep with him and he kissed my bottom and he kissed my pee-pee, too." When asked more about what happened at the motel, the anatomically correct dolls were brought out. Krause reported that while using the dolls to demonstrate Matt stated, "That's when I had to put my mouth on this," while pointing to the penis on the doll, and continued, "But his pee-pee sticks up like this and that make it hurt my mouth." Later in the interview, Detective Krause reports that she asked Matt if he had ever seen his daddy touch any other children's body and Matt told her that his dad had touched Big Matt and Kathryn's body. Matt demonstrated with the dolls and put the penis of the male doll in the vagina of the female doll saying, "You have to put this all the way in and that's what he did to Kathryn." Matt also stated, "My dad puts his finger in Big Matt's bottom, just like he does to me." After further questioning, Matt also stated, "My daddy puts his pee-pee in Big Matt's bottom and that hurts Big Matt and he cried, too." (Clark County Sheriff's Office Utility Report by S.A. Krause dated 2/28/1985).

After the interview with Matthew Hansen on this date, Detective Krause contacted the Clark County Prosecutor's Office and obtained an arrest warrant for Ray Spencer, charging him with three counts of First Degree Statutory Rape based on the statements of Matthew Hansen on this date. Detective Krause and Detective Sgt. Davidson went to arrest Ray Spencer, and advised him of the new charges with the bail of $100,000. Ray Spencer asked who the victims were, to which Detective Sgt. Davidson replied that the warrant was issued based on statements made by "Little Matt". Ray Spencer was then arrested and taken to the Clark County Sheriff's Office to be interviewed. Ray Spencer was then interviewed on this date by Detective Sgt. Davidson and Detective Krause. (Clark County Sheriff's Office-Utility Report by S.A. Krause, dated 2/28/85)

03/06/1985   As a result of the recent allegations made that Matt Hansen was assaulted in the Salmon Creek Motel (on 2/16/1986), as well as other times, Matt Hansen was examined by Dr. Manuel Galaviz, of Kaiser Permanente in Vancouver, WA. The scope of the examination and the specific results were not available in the records. (Complaint-Pages 18-19)

**03/21/1985**     Detective Krause interviewed Matt Hansen.   See Detective Krause's Utility Report, dated 3-25-1985.

**03/25/1985**     Matthew Spencer was brought to Vancouver to meet with Detective Krause to be interviewed.  Defendant Krause repeated to Matthew that his father was a "sick" man who needed "help".  Matthew continued to deny that Mr. Spencer had done anything wrong to him or others.  Detective Krause then threatened Matthew that he would be forced to take a lie detector test, and that it would be a terrible ordeal for him.  Matthew did not know what a lie detector test involved, and was terrified of what he may have to undergo.   After these threats, Detective Krause claimed Matthew implicated his father in wrongdoing.   Detective Krause also spoke with Kathryn on this date and filed reports for things Kathryn had allegedly reported on this date. (Complaint-Pages 22-23)

**05/09/1985**     Mr. Peters traveled to Sacramento, CA to be present when Mr. Spencer's attorney interviewed the two children.  As a result of those meetings with the children, additional allegations surfaced.   Additional charges were filed against Mr. Spencer.  Matthew Spencer alleged that other men, as well as Mr. Spencer, were involved in sexual acts with the children and that several of those men were officers with the VPD.  He also claimed that photographs were taken of the sexual activities and taken to Portland, Oregon for processing. (Complaint-Pages 23-24)

**05/14/1985**     A psychiatrist from Portland, Oregon, Dr. Henry Dixon, put Mr. Spencer into deep hypnosis and then, in another test, administered sodium amytal, also known as "truth serum".  While in the hypnosis, Mr. Spencer made no admission of any sexual misconduct between himself and the children. (Complaint-Page 24)

**05/16/1985**     Mr. Spencer attended a hearing to change his plea from not guilty to an Alford Plea of guilty wherein Mr. Spencer did not admit guilt, but stipulated that a conviction would result.  Mr. Spencer's current attorney stipulates that, at the time of this plea, Mr. Spencer was incompetent and not of a rational mind.  (Complaint-Page 25)

**05/23/1985**     Judge Lodge sentenced Mr. Spencer to two life terms to run consecutively to each other, plus a consecutive term of 170 months in prison.   Mr. Spencer was sent to state prison.  Mr. Spencer was kept on 24 hour lock down and was kept isolated for close to a year, due to the probability he would otherwise be killed or sustain great bodily harm.  He was later moved to a prison in Idaho in an attempt to keep him alive.  Mr. spencer never saw or spoke to his children while incarcerated.  (Complaint-Pages 26-27)

**1986**          Mr. Spencer enrolled in California Coast University via correspondence course, to pursue his doctorate in clinical psychology.   In 1991, Mr. spencer finished all the course work necessary for the Masters and Doctorate Program at California Coast University. (Complaint-Pages 28)

**1991**      Mr. Spencer prepared his dissertation on mental health in prisons. The dissertation was accepted by the university. Due to his incarceration, he was unable to personally appear at the university to defend his research. After his release, Mr. Spencer ultimately presented his research and on January 21, 2008, was deemed to have properly presented it before California Coast University, a nationally accredited institution. (Complaint-Pages 28)

**12/23/1994**      The Court denied the Petitioner's motion (Ray Spencer) on the merits without an evidentiary hearing. Later, the 9th Circuit Court of Appeals reversed this in part and remanded for an evidentiary hearing, which was then held in September 2006. (Order Including Findings of Fact and Conclusions of Law dated 9/25/1996)

**03/02/2003**      **Matt Spencer writes letter to Governor Locke-** Matt Spencer wrote a letter to the governor on this date in regards to his father and not wanting his father to be granted clemency by the governor. "Perhaps if he admitted and began rehabilitation I would feel differently but he has not. I am afraid not only for myself, my sister and my mom but also for any children he may come in contact with. It is my hope you will deny his request." (Letter from Matt Spencer to Governor Locke dated 3/2/2003)

**2004**      Ray Spencer's prison sentence was commuted to community supervision by Governor Locke. Following his release from prison, Kathryn and Matthew recanted their prior allegations of sexual abuse. Matt Hansen did not recant his allegations. (Order on Defendants' Motions for Summary Judgment and Plaintiffs' Motion to Continue dated 10/2/2012)

**02/27/2006**      **Declaration of Matthew Spencer-**Matt Spencer made a written declaration to the court on this date declaring that, "I understand that my father was accused of sexually molesting me and my sister and my stepbrother. I also know that he pleaded guilty to those criminal charges and received a life sentence. I can state unequivocally that I was never molested in any manner at any tme by my father. I recall that in 1985 I was interviewed by a detective at my home. He asked me if my father had touched me improperly. I remember I told the detective that I had not been touched by my father in any inappropriate way. I know that I was interviewed by a female detective. I remember Detective Krause by name. She was investigating the allegations in 1984 or 1985 and came down to California to interview me and my sister. She drove me and my sister around and took us to her motel. She repeatedly asked me if my father had molested me. She told me that my sister and Little Matt had admitted that he had molested them. I kept telling her he didn't do anything. She wouldn't accept my denials and kept suggesting that he had molested me and that I wasn't being truthful. Finally I figured that if my father had molested my sister and Little Matt that maybe he had molested me as well so I told her that he had.

I made up specific details of what my father did based on what the detective asked me. None of this was true...I never observed my father have any sexual contact with my sister or stepbrother, Matt Hansen, nor did either one of them ever tell me that he did so. Over the years I have talked with my sister Kathryn. She has told me that she must have blocked out the abuse by my father because she has no memory of having been abused by him. Over the years I have always wanted to come forward and make clear that my father had not sexually abused me, but I have not known how to go about setting the record straight." (Declaration of Matthew Ray Spencer dated 2/27/2006)

**09/03/2006-**
**09/06/2006**    **Evidentiary Hearing** for Ray Spencer's Motion for Writ of Habeas Corpus by Person in State Custody (Trial Transcript included in our discovery)

**09/25/1996**    The court Ordered that Ray Spencer's Petition for Writ of Habeas Corpus by Person in State Custody is Denied. (Order Including Findings of Fact and Conclusions of Law dated 9/25/1996)

**09/14/2007**    **Declaration of Kathryn Spencer-** Kathryn Spencer made an official declaration to the court in writing, declaring that "I have no absolutely no memory of my father ever having sexually abused me or inappropriately touching me in anyway whatsoever. I believe that if my father had in fact engaged in the type of sexual abuse described in Detective's reports and in the charges brought against my father, I would remember such actions. I also have absolutely no memory of ever having observed my father engage in any sexual misconduct of any kind with either my brother, Matt Spencer, or my stepbrother, Matt Hansen, engaging in any sexual misconduct with me." (Declaration of Kathryn E. Spencer dated 9/14/2007)

**2009**    **Court of Appeals Testimony of Matt Spencer: (Age 33 now)**
**(Transcript of Matt Spencer Testimony)**
- Matt is a manual transmission mechanic.
- Completed 2 years in a community college and automotive experience.
- Reports there was never an occasion where his father Ray Spencer sexually molested him. (Page 9 of Transcript)
- Reports there was never a time where he observed his father engage in any sexual contact with his sister Kathryn. (Pages 9-10)
- Reports there was never a time where he observed his father engage in any sexual contact with his step-brother Matt Hansen. (Page 10)
- Reports that he has never seen his father abuse anybody. (Page 10)

- Reports he remembers a male officer coming to question him in Sacramento and questioning whether or not his father had abused him and his family. Reports that he recalls his answers when being questioned in Sacramento as always being "No," that his father did not molest him or his family. (Page 11)
- Reports that he remembers another police officer visiting him in Sacramento, a Sharon Krause. Recalls that this detective questioned him and his sister several times and that she questioned them in her hotel room for the latter questioning. (Page 11)
- Reports when Detective Krause questioned him and Kathryn on this trip, that they were always questioned individually. (Page 11)
- Reports that when he was with the detective he was questioned and bought gifts. (Page 12)
- Reports that during the questioning of himself done by Detective Krause on her visit to Sacramento, Detective Krause indicated to him that his sister Kathryn and step-brother Matt Hansen had been molested by his father and assured him that he had been molested as well. (Page 13)
- Reports that all his responses to the questioning of Detective Krause regarding his father molesting him or his family while Detective Krause was in Sacramento were continuously no. (Page 13)
- Reports that some time after being interviewed by Detective Krause in Sacramento, he and his sister were flown up to Vancouver and questioned separately for several hours. (Page 14)
- Reports that in Vancouver he was again questioned about whether or not his father molested him and was again told that his father molested his sister and step-brother, and that it was during this questioning that he "made a decision that was wrong." (Page 14)
- Reports that when he had been telling the detective Krause that he had not been molested, the detective never accepted a "no" answer. (Page 14)
- Reports that it wasn't until he finally said "yes" that the questioning stopped. (Page 14)
- Reports that when he finally told Detective Krause "yes", he told her that his father had molested him and his sister and step-brother and that there had been more than one individual involved. (Page 15)
- Indicates that he said yes and that his father did molest him and his sister and step-brother because he "wanted it to end," that he wanted the questioning to end. (Page 15)
- Reports "I wanted the questioning – I wasn't understanding. I came to a conclusion that my sister and my step-brother must have been molested and so I must have been as well." (Page 15)
- Reports he came to the conclusion that his sister and step-brother had been molested because he had heard it so many times from Detective Krause, he began to believe it. (Page 15)
- Reports that his sister and step-brother never told him that they were molested by his father. (Page 15)

24

- Indicates that his mother told him that his sister had been molested and that he must have been molested as well. (Page 16)
- Indicates after he told the detective that he had been molested, the questioning stopped. (Page 16)
- Reports there were several discussions over the years between him and his sister about whether or not they'd actually been molested. (Page 17)
- Reports that him and his sister were told they were blocking it out of their mind, but that he realized deep down every time, that nothing had happened, and after he turned 18 and was living on his own, was able to stand up for himself and make it right and make the steps. (Page 17)
- Indicates that his mother made him sign a paper declaring that what happened, happened, and that his father should not be up for parole. (Page 17)
- Reports that it took him many many years to get to where he's at, to the thoughts to making it right. (Page 18)
- Indicates that he initiated the contact with his father after his father was released from prison. (Page 19)
- Reports that he was counseled until he was 18 under Victim Witness. He indicates that while in counseling he did tell his counselor, Dr. Cooper, that the sexual abuse did not happen. He indicates that his mother and Dr. Cooper concluded that he was blocking the abuse out.

**2009**      **Court of Appeals Testimony of Kathryn (Spencer) Tetz: (Age 30 now)**
             **(Transcript of Kathryn Tetz Testimony)**

- Reports that her brother and her received gifts from their father while he was in prison but that they sent them to the Children's Receiving Home. (Page 62)
- Indicates that her mother tried to prevent contact between her and her father by not allowing her to respond to the presents that were sent or any of the letters. She was not permitted to respond to any correspondence at all. (Page 63)
- Reports that she has no recollection of her father having sexually abused her in any way. (Page 64)
- Reports that she has no recollection of observing her father have any sexual contact with either her brother Matt or her stepbrother Matt Hansen. (Page 64)
- Indicates that over the years as a child, she spoke with her brother Matt about whether or not her father had sexually molested her or her brother, or Matt Hansen, and that she told her brother "basically just telling him I'd never remembered anything like that happening." (Page 65)
- Indicates that her brother told her he hadn't been molested and didn't have any memory of being molested. (Page 65)

25

- Indicates that her and her brother had these conversations about whether or not they had been molested while they were still living at home with their mother. (Page 66)
- Reports that her mother had kept a journal of "the way she said we were acting or ways that she thought were out of character, and that she believed it had happened." (Page 66)

**2009**       The state court of appeals for Washington ruled Mr. Spencer could withdraw his Alford plea of guilty based, in part, on two of the three victims' recantations, and vacated his convictions. The Washington State Supreme Court denied the state's motion for discretionary review of the court of appeals 2009 decision.  (Order on Defendants' Motions for Summary Judgment and Plaintiffs' Motion to Continue dated 10/2/2012)

**10/20/2009**   **Matt Hansen Taped Statement-** Matt Hansen gave a six page statement to the Clark County Prosecuting Attorney's office on this date.  Matt Hansen swore that the descriptions of what Ray Spencer did to him as stated in this sworn statement are true and correct statements of what occurred when he was a little boy. (Sworn Taped Statement of Matthew Hansen dated 10/20/2009)

**09/2010**      The Superior court of Washington for Clark County granted the Clark County Prosecutor's motion to dismiss the charges against Ray Spencer without prejudice.    (Order on Defendants' Motions for Summary Judgment and Plaintiffs' Motion to Continue dated 10/2/2012)

**06/2011**      Ray Spencer, Matthew Spencer and Kathryn Tetz (Spencer) filed this lawsuit against the aforementioned defendants alleging state tort claims and violations of federal civil rights. (Order on Defendants' Motions for Summary Judgment and Plaintiffs' Motion to Continue dated 10/2/2012)

**03/06/2012**   **Declaration of Matt Hansen-** Matt Hansen reaffirmed that his sworn statement from October 20, 2009 was still true and accurate in his mind on this date, and signed a declaration to the court to that affect. (Declaration of Matthew Hansen dated 3/6/12)

Based upon the aforementioned documents reviewed, as well as a review of the scientific and professional literature, I would offer the following:

**Brief Historical Synopsis**

Clearly, by the mid to late 1970's, there was a growing recognition by various professional groups that the sexual victimization of children was a more serious societal problem than had been previously recognized.   There also was a growing awareness that many children who had been abused were reluctant to report that abuse to people in positions of authority, particularly if the abuser was a person in a position of trust and authority over the child, i.e., parents, caretakers, and teachers.

There was a growing awareness that in the majority of cases of child sex abuse, there would not be corroborating medical evidence or, for that matter, independent corroboration of the child's statement. Consequently, the child's statement became a critical "piece of evidence" with regard to case disposition, whether that be in criminal or civil proceedings.

Research psychologists have had a long term interest in the theoretical constructs and processes of various types of memory. The research community had not specifically focused their research efforts on studies that would have implications for issues relating to children's testimony in judicial proceedings.

Drs. Ceci and Bruck, in an article titled, "*Suggestibility of the Child Witness: A Historical Review and Synthesis*" define the late 1970's as involving "a resurgence of interest among developmental researchers in the reliability of children's reports". Their review of the literature suggested that the biggest stimulus contributing to the significant increase in research on children's suggestibility was the legal communities "heightened interest in behavioral science data related to specific innovations for dealing with child witnesses", as well as a heightened interest in social science expert testimony in judicial proceedings. For example, during the 1980's, all States dropped their corroboration requirement relating to child witnesses. See: "*The Suggestibility of the Children Witness:  A Historical Review and Synthesis*" (*1993*) S. Ceci and M. Bruck, published in the *Psychological Bulletin*.

Dr. Roland Summit, in a very influential article titled, "*The Child Sex Abuse Accommodation Syndrome*", stated that, "child sex abuse has exploded into public awareness during a span of less than five years" (1978-1983).   He also reported that more than 30 books had appeared during that time.  Dr Summit continues by stating that "hundreds of training symposia shared with specialists throughout the United States and Canada have reached thousands of individuals who have had personal and/or professional involvement in sex abuse."     Dr. Summit proposed a syndrome involving five components.  With regard to the component he labeled as "retraction", Dr. Summit stated "whatever a child says about sexual abuse, she is likely to reverse it".     Dr. Summit continues by stating, "unless there is special support for the child and immediate intervention to force responsibility on the father, the girl will follow the "normal" course and retract her complaint".    Dr. Summit continues by stating, "very few children, no more than 2-3 per thousand, have ever been found to exaggerate or to invent claims of sexual molestation".  He goes on to state, "it has become a maxim among child sex abuse intervention counselors and investigators that children never fabricate the kinds of explicit sexual manipulations they divulge in complaints and interrogations." See: *The Child Sexual Abuse Accommodation Syndrome*, Roland C. Summit, Child Abuse and Neglect, Vol. 7, pp 177-192 (1983) and, See: *Incest: Confronting the Silent Crime*, L. Muldoon, Minnesota Program for Victims of Sexual Assault, Saint Paul, Mn. (1979). Note: For a review of the empirical validation of the Child Abuse Accommodation Syndrome, See: "*Disclosure of Child Sexual Abuse:  A Review of the Contemporary Empirical Literature*, Kamala London, Maggie Bruck, Stephen J. Ceci, Daniel W. Shuman, Chapter 2 in "Child Sexual Abuse, Disclosure, Delay and Denial" Edited by Margaret Ellen Pipe, Michael E. Lamb, Yael Orbach, Ann Christin Cederborg, Lawrence Erlbaum Associates, (2007)

The use of the anatomical correct dolls had become very common, if not standard practice, in the evaluation of sexual victimization of children.   In a 1995 survey of nearly 300 professionals in North Carolina, Boat and Everson found usage of the dolls ranging from 40% among law enforcement agencies, 67% among mental health professionals, and 94% among child protection service agencies.  See: *"The Use of Anatomical Dolls among professionals in sexual abuse evaluations"*.  Child Abuse & Neglect, 12, 171-179 (1988a).   Conte, Sorenson, Fogarty and Rosa reported anatomical dolls were the most common tool used in child sex abuse evaluations with 92% of the respondents using the dolls.  See:  *"Evaluating children's reports of sex abuse: results from a survey of professionals"* Conte, J.R., Sorenson, E., Fogarty, L., Rosa, J., American Journal of Ortho Psychiatry, 61(3), 428-437 (1991).

The popularity of using the anatomically correct dolls has continued to be supported by present professionals, although more precise methods and procedures for their implementation has been published. See: *"Putting the anatomical doll controversy in perspective:  An examination of the major uses and criticisms of dolls in child sexual abuse evaluations"* Everson, M.D., Boat, B.W., Child Abuse & Neglect, Vol. 18, No2., pp113-129 (1994) and See:  *"Using anatomical dolls: guidelines for interviewing young children in sexual abuse investigations"*, Boat, B.W., Everson, M.D.,  Chapel Hill, North Carolina, University of North Carolina School of Medicine (1986) and, See: *"Anatomical dolls commentary"*, Berliner, L., Journal of Interpersonal Violence, 3, 468-470, (1988)

Controversy and heated debate intensified during the period from 1984 through the mid 1990's as the result of the legal system increasing their reliance on the behavioral and clinical sciences for guidance on issues relevant to child witnesses.  There was a lack of general consensus in both the research and professional communities.  There was heated debate between memory researchers as well as between applied professionals with regard to questions about how a child's recall of events could best be facilitated and least contaminated.  In fact, there were strong proponents of the notion that children were so infrequently involved in false alarm cases that there was "much ado about nothing".  This intense controversy led the American Psychological Association Science Directorate to fund the "Cornell Conference on the Suggestibility of Children's Recollections" in which recognized experts concerning the topics of interest were invited to Cornell.  See: "The *Suggestibility of Children's Recollections*", edited by John Doris, American Psychological Association, Washington, DC which was based in part on the Cornell conference.

The scientific and professional community was deeply engulfed in controversy by the early to mid 1980's.   There were suspicions and investigations of wide spread molestation of children in daycare programs and adults began "recovering" their memories of their own long forgotten abuse.  Up through the mid 1990's, scientific debates about trauma and memory were severely hampered by allegations emanating from both sides of the issue, i.e., those professionals that maintained that individuals could experience traumatic events but have periods of time in which they were unable to recall the events in question and, the opposing side that maintained that children and adults remember traumatic experiences all too well, as long as they had reached an age where they had sufficient language capacity.  It was only in the early 2000 time frame when the availability of research had clarified most of the most contentious issues.  See: *"Remembering Trauma"*, Richard J. McNally, The Belknap Press of Harvard University Press (2003) for a historical review.

The procedures relating to pre-trial preparation of a child and/or refreshing a child's recollection of prior statements remains unresolved. It was common practice during the time period in question that attorneys would meet with the child witness to develop rapport, desensitize the child to the courtroom customs, as well as try to obtain information, if necessary, relating to the child's testimonial capacities regarding the issues before the Court. Jurisdictions vary with regard to the procedures they employ and empirical research is lacking with regard to what procedures would best serve the child and the Court.

Research on both the strength and weaknesses of witnesses, including children, was well under way by the early 1990's. Decades of work exists on the complex issues related to children eyewitnesses (E.g. approaches to children interviewing; cognitive and linguistic factors related to eyewitness testimony; internal and external factors related to accurate and reliable reporting of event memory by children witnesses).

Some of the historical authoritative texts and seminal works include:

"The suggestibility of children's recollections: Implications for eyewitness testimony" (1991) edited by Dr. Doris, published by the American Psychological Association.

"Children as Witnesses" (1992) edited by Dr. Helen Dent, and Dr. Rona Flin, published by Chichester: Wiley.

"Sexually Victimized Children" David Finkelhor, The Free Press (1979)

"Father Daughter Incest", Judith Lewis Herman with Lisa Hirschman, Harvard University Press (1981)

"The Sexual Victimology of Youth", edited by LeRoy G. Schultz, Charles C. Thomas Publisher, (1980)

By the mid 1990's there was scientific consensus regarding general principles, which, when utilized in investigative interviews, would substantially reduce the risk of obtaining unreliable information from both adult and children witnesses. There was also a climate of awareness with regard to age related variables that pertained to children witnesses, both at a pre-trial and trial stages. These issues were outlined in scientific publications as well as discussed at professional conferences involving criminal justice personnel, forensic interviewers, memory researchers, and attorneys.

**Applying Science to Interviewing Children Witnesses who may have participated in or observed an event or series of events having potential legal implications, i.e., criminal or civil proceedings where the children may be a witness**

The manner in which a witness, including a child, is interviewed during an investigation has significant implications with regard to the accuracy and potential alteration of the children's beliefs. Research during the past several decades has focused on witness suggestibility, with some researchers placing an emphasis on children. (See reviews by Jones 2002; Pipe, Lamb, Orbach & Esplin 2004). However, children's capacities as witnesses are well recognized by both scientists and practitioners. Professional groups and experts, therefore, offer recommendations regarding the most effective ways of conducting investigative interviews with children witnesses (See "Do Best Practice Interviews with Children Abuse Victims Influence Case Processing?" Grant Final Report, U.S. Department of Justice; Document No. 224524; November 2008; Ceci, S., & Bruck, M. (1993) Suggestibility of the children witness: a historical review and synthesis. Psychological Bulletin, 113, 403-439; Poole, Debra A., Lamb, Michael E., Investigative Interviews of Children: A guide for helping professionals (1998) American Psychological Association.) See attachment for additional authoritative references.

Experimental, descriptive and empirical literature emphasizes careful investigative procedures with children witnesses, particularly with regard to investigative interview methods. In the past decade, several approaches to children interviews developed, however, there remained a consensus that the use of open-ended questions (E.g. *Tell me what happened*) versus direct questions was critical. Open-ended prompts during investigative interviews tap free recall versus recognition memory with free recall being typically more accurate regardless of the witness's age, but being particularly important with younger aged children.

<u>See</u> summary of science and its application to investigative interviews of children in Lamb, Hershkowitz, Orbach & Esplin, *"Tell me What Happened: Structured Interviews of Children Victims and Witnesses"*. Chichester: (2008) John Wiley & Sons

<u>See</u> *"Do Best Practice Interviews with Children Abuse Victims Influence Case Processing?"* Grant Final Report, U.S. Department of Justice; Document No. 224524; November 2008

**See also**

"The Science of False Memory", C.J. Brainerd, V.F. Reyna, Oxford Psychology Series, Oxford University Press (2005)

"Remembering Trauma" Richard J. McNally, The Belknap Press of Harvard University Press, (2003)

"Conviction of the Innocent, Lessons from Psychological Research", Edited by Brian L. Cutler, American Psychological Association (2012)

"The Evaluation of Child Sexual Abuse Allegations, A Comprehensive Guide to Assessment and Testimony," Edited by Kathryn Kuehnle and Mary Connell, John Wiley & Sons, Inc. (2009)

"False Sexual-Abuse Allegations by Children and Adolescents: Contextual Factors and Clinical Subtypes", Edwin J. Mikkelsen, M.D., Thomas G. Gutheil, M.D., Margaret Emens, B.A.., American Journal of Psychotherapy, Vol. XLVI, No 4, October (1992)

"False Statements and Differential Diagnosis of Abuse Allegations", William Bernet, M.D., Journal of American Academy of Child Adolescent Psychiatry, 32:5, September (1993)

"Unfounded allegations – a new child abuse problem", Douglas J. Besharov, The Public Interest, Spring (1986), #83

"Patients who make false allegations, the role of Forensic Psychiatrists", Richard C.W. Hall, M.D., University of Florida, Ryan C.W. Hall, Georgetown University School of Medicine, (2000-2002)

"Jeopardy in the Courtroom, A Scientific analysis of children's testimony", Stephen J. Ceci and Maggie Bruck, American Psychological Association (1995)

"Disclosure of Child Sexual Abuse:   A Review of the Contemporary Empirical Literature, Kamala London, Maggie Bruck, Stephen J. Ceci, Daniel W. Shuman, Chapter 2 in "Child Sexual Abuse, Disclosure, Delay and Denial" Edited by Margaret Ellen Pipe, Michael E. Lamb, Yael Orbach, Ann Christin Cederborg, Lawrence Erlbaum Associates, (2007)

Autobiographical (incidental) memories for personally experienced events is a "reconstructive" rather than a reproductive enterprise.  That is to mean that memories are not simply passively recorded, then stored in their natural form in a way that maintains their initial quality, nor are memories mechanically accessed in their original state at the time of recall.  Due to the reconstructive nature of memory, various factors can affect the accuracy of the recollections.  Included in these factors would be the nature of the event being remembered, salients (meaningfulness of the recollections), mental state at the time the events were experienced, whether the witness was a direct participant in the event or a "bystander," as well as post event circumstances.

"Suggestibility" as used in the scientific memory literature refers to the extent to which the encoding, storage, retrieval, and reporting of events can be influenced by a range of internal and external factors.   The more remote, vague, simplistic, or when an event occurs when the witness may not be directly focused on the event at issue, the greater the witness's susceptibility is to post event contamination and/or alteration of the recollection.  This is a characteristic of all witnesses, whether children or adult, although there are some factors that are "age related."  The less confidence the witness has in the reliability of the initial recollection, the greater the likelihood that the witness may rely on external factors to strengthen their confidence regarding the reality of the memory.

**IN SUMMARY**:

With regard to the referral questions, based upon the totality of information available to me, I would offer the following case specific opinions relative to the 1984-1985 time frame:

There were available and some training conducted that included very generic guidelines to employ when questioning a child who may have been a victim or witness to a crime. However, the guidelines were very skeletal in nature and lacked adequate validation, either in the scientific laboratory or in the field.    The guidelines for investigative interviews of children were of such a general nature as to be of limited utility to front line professionals.    The guidelines were based predominantly on intuition, not on methodologically adequate controlled studies. The use of "broad general guidelines" as opposed to more structured interview protocols, which provided specific instruction on question formats, was utilized in the majority of field investigations.

The use of investigative aids, including anatomically correct dolls, body diagrams, puppets, and/or cartoon figures was widely encouraged at that time.    Again, the suggestions for the use of props were predominantly generic in nature and did not provide adequate instructions for their use.    There was no general consensus in the scientific or professional communities as to the precise manner in which to employ interview props/demonstrative aids in order to increase the yield of information without increasing the risk of obtaining unreliable information.  Again, field professionals were pretty much left to their "own devices" as it related to their utilization of interview props/demonstrative aids in either the investigative process or in the trial preparation stage of the case.

The rate of false allegation cases, regardless of the variety, remains an unanswered question.  It is presently generally recognized that false allegation cases occur with sufficient frequency that alternative hypotheses should be systematically considered during the investigation of alleged sex crimes against children.  However, during the 1984-1985 time period, the training and education received by field professionals included information that suggested false allegation cases were extremely rare.  Training and educational materials during this period were woefully inadequate in providing field professionals the kind of information necessary to help them understand how genuine but false beliefs can occur.  This was particularly the case when investigations involved children in the 3-8 year old range.

The present general consensus in the relevant scientific community would be that the vast majority of children who have been maltreated, and who have interpreted that event as intrusive and salient, are capable of maintaining a continuous memory.  This would be particularly the case if the children were 6 years of age or older at the time they experienced the event(s).  It would be in a minority of cases in which children's memories for sexually abusive events would be inaccessible.  However, during the time period in question, there was a belief by a substantial number of professionals that memories of adverse events could be blocked from conscious awareness.

32

During the time period in question, the attitudes of field professionals could be characterized as considering denials as more likely false than true, and considering recantations as more likely false than true. Consequently, a child who denied or recanted sex abuse was still considered a likely victim which influenced the actions of the investigators. (Note: this issue still remains a difficult one to resolve, i.e., when is a denial true or false and when is a recantation true or false?)

Given the standard of care and the information available to field professionals during the 1984-1985 time frame, reasonable field professionals would not have known that the investigative techniques utilized in this case were so coercive and abusive that false information would result.

If additional information becomes available, I may be requested to supplement these opinions.

My fee in this matter is based on a charge of $400/hr and $4,000/day plus expenses for testimony out-of-state.

Phillip W. Esplin, Ed.D.
Psychologist

STATE OF ARIZONA
                    ss.
County of Maricopa

SUBSCRIBED AND SWORN to before me this _9th_ day of _October_, 2012 by
Phillip W. Esplin, Ed.D., Psychologist

Karen A. Harvey
Notary

My Commission Expires
January, 2015

OFFICIAL SEAL
KAREN A. HARVEY
Notary Public - State of Arizona
MARICOPA COUNTY
My Comm. Expires Jan. 11, 2015

33